1   **Ashley M. Gjovik, JD**
    *Pro Se Plaintiff*

2
    2108 N St. Ste. 4553
3   Sacramento, CA, 95816
    (408) 883-4428
4   legal@ashleygjovik.com



CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

5
## UNITED STATES DISTRICT COURT
6
## NORTHERN DISTRICT OF CALIFORNIA
7                                            CV23        4597
8                                       Case No.
                                                                 LB
9                                       **ORIGINAL COMPLAINT**

10

11  **ASHLEY GJOVIK**, *an individual,*      **PLAINTIFF'S CLAIMS**

12              Plaintiff,                   1. **Sarbanes-Oxley Act Whistleblower,**
                                                18 U.S.C. §1514A
13          v.
                                             2. **Dodd-Frank Act Whistleblower,**
14                                              15 U.S.C. §78u-6(h)(1)(A)(iii)

15  **APPLE INC**, *a corporation,*          1. **Bane Civil Rights Act,**
                                                Cal. Civ Code § 52.1
16              Defendant.
                                             2. **Ralph Civil Rights Act,**
17                                              Cal. Civ Code § 51.7

18                                           3. **Racketeer Influenced & Corrupt
                                                Organizations Act,**
19                                              18 U.S.C. §§ 1962(a), (c), (d)

20                                           3. **Whistleblower Protection Act,**
                                                Cal. Labor Code § 1102.5
21
                                             4. **Retaliation for Filing Complaints,**
22                                              Cal. Labor Code § 98.6

23                                           5. **Retaliation for Safety Activities,**
                                                Cal. Labor Code §§ 6310
24
                                             6. **Termination in Violation of Public Policy**
25
                                             7. **Intentional & Negligent Infliction of
26                                              Emotional Distress**

27
                                     **DEMAND FOR JURY TRIAL**
28

1

**COMPLAINT - TABLE OF CONTENTS**

**I.     SUMMARY**...................................................................................................... **4**

**II.    JURISDICTION**.............................................................................................. **5**

**III. VENUE**............................................................................................................. **6**

**IV. PARTIES**........................................................................................................... **7**

**V.     NOTICE OF PENDENCY & CONFLICT OF LAWS**................................. **7**

**VI. GENERAL ALLEGATIONS**........................................................................ **9**

**VII. LEGAL CLAIMS**.......................................................................................... **49**

   **A.   SOX WHISTLEBLOWER RETALIATION (15 U.S.C. § 1514A)** .......... **50**

     *i.     Evidence of Pretext (to be incorporated in all discharge claims):*............................. *52*

   **B.   DODD FRANK WHISTLEBLOWER RETALIATION (15 USC §78U-6(H)(1)(A)(III))** .......... **56**

   **C.   BANE CIVIL RIGHTS ACT: CAL. CIV. CODE § 52.1.**........................................ **57**

   **D.   RALPH CIVIL RIGHTS ACT: CAL. CIV. CODE §51.7**.......................................... **60**

   **E.   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)** .......... **61**

     *i.     Standing & Pleading* ............................................................................................ *62*

     *ii.    Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)*...................................... *64*

     *iii.   Creation, Nature, and Operation of the Enterprise*................................................ *65*

       a)   Apple as a Corporate Defendant ........................................................................66

       b)   The "Worldwide Loyalty Team" Enterprise ........................................................67

     *iv.    Pattern; Vertical and Horizontal Relatedness of Predicate Acts*............................. *69*

     *v.     The Schemes*........................................................................................................ *76*

     *vi.    Predicate Acts/Threats Involving Certain State Offenses* ....................................... *79*

       a)   Criminal Bribery of Executive Officer (Cal. Penal Code § 67) ............................79

       a)   Criminal Commercial Bribery (Cal. Penal Code § 641.3) ....................................81

       b)   Criminal Extortion (California Penal Code § 518) ...............................................84

     *vii.   Predicate Acts Indictable Under Title 18 US Code* ............................................... *88*

       a)   Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343) ......................................88

       b)   Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512) ......92

       c)   Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513) ...............102

viii.  *Predicate Acts Indictable Under Title 11 USC (Securities)* ................................. *106*

    a)  Securities Fraud (15 USC § 78) ......................................................... 106

i.  *Predicate Acts Indictable Under §2332(b)(g)(5)(B)* ............................................ *110*

    a)  Relating to Chemical Weapons (18 USC § 229) ................................... 110

ii.  *Injury in Fact to Plaintiff due to Racketeering Act* .............................................. *116*

iii.  *Continuity & Threat to Continue* ......................................................................... *120*

**F.  RETALIATION UNDER CALIFORNIA LABOR CODE** ....................................... **120**

i.  *California Whistleblower Protection Act: Cal. Labor Code §1102.5* ..................... *121*

    a)  Video Recording in Bathrooms: Cal. Labor Code § 435 ...................... 122

ii.  *Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6* ...................... *123*

    a)  Retaliation re: Work Conditions: Cal. Labor Code §232.5 (via § 98.6) ............. 123

    b)  Lawful Off-Duty Conduct: Cal. Labor Code § 96(k) (via 98.6) .......................... 124

iii.  *Retaliation for Safety Complaints: Cal. Labor Code § 6310* ................................ *125*

    a)  Right-to-Know Retaliation: Cal. Labor Code §6399.7 (via § 6310).................... 128

**G.  WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)** ....................... **130**

i.  *Invasion of Privacy (Cal. Const. art. 1, § 1)* ........................................................ *133*

ii.  *FTC Biometric Consent Rules* ............................................................................. *137*

iii.  *Breach Of Implied Contract: Good Cause Required (Foley/Banko)* ..................... *139*

**H.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** ................................... **140**

**VIII. DEMAND FOR RELIEF** ..................................................................................... **147**

**A.  SPECIAL REMEDIES** ........................................................................................ **150**

i.  *Exemplary and Punitive Damages* ....................................................................... *150*

ii.  *Medical Monitoring* ............................................................................................. *151*

iii.  *Special Damages* ................................................................................................. *152*

iv.  *Injunctive Relief* .................................................................................................. *152*

**IX.  PRAYER FOR RELIEF** ..................................................................................... **154**

**X.  CERTIFICATION AND CLOSING** ..................................................................... **155**

COMPLAINT                                                                                     SEPT. 7 2023

# I.   SUMMARY

1.      This complaint details a complex regulatory-compliance-avoidance scheme conducted by Apple through a criminal enterprise, which Gjovik became caught up in after she complained about toxic waste exposure at her office, and then she reported Apple to federal agencies and law enforcement, and Apple decided to physically remove her from the scene of their apparent environmental crimes in order to prevent Gjovik from gathering of evidence, and then Gjovik was terminated the day before a federal affidavit about Apple's unlawful acts, , shortly after complaining about 'witness intimidation' from a "Workplace Violence" interrogator. Gjovik realized it was all an effort to cover up regulatory failures under at least three federal environmental statutes which also implicated securities fraud concerns, and to cover up over five years of toxic exposure to a community by Apple who released metric tons of solvent vapors and lethal gases into home windows and made the residents severely ill, including Gjovik. Gjovik's termination was then followed with over two years of intimidation and attempts to coerce Gjovik to drop her charges.

2.      Ashley Gjovik ("Plaintiff") files this complaint against Apple Inc ("Defendant"), Gjovik's prior employer. Gjovik first attempted to pursue claims through agencies, but two years after those claims were filed, there still has not been any decisions on Gjovik's retaliation complaints. The US Department of Labor's statutory deadline to make a decision was February 10 2022. The NLRB's case metrics position Gjovik's NLRB charges against Apple in the top 1% of aged charges overdue for a decision on merit. Thus, due to uncertainty with the government charges, Gjovik files this civil complaint prior to her civil two-year statute of limitations on September 9 2023. Gjovik is "kicking-out" her California Department of Labor cases and US Department of Labor SOX whistleblower retaliation charge from the respective agencies, and consolidates those matters with her other civil claims here.

3.      A RICO case is appropriate and required here because Apple's threats and retaliation against Gjovik, and conspiracy to conceal its corrupt and unlawful acts, violated federal criminal statutes for which there is no other appropriate private civil action. Apple's

4

1  retaliation against Gjovik was partially due to Gjovik reporting Apple to the FBI and US

2  Department of Justice for multiple apparent criminal acts, and Gjovik's public accusations that

3  Apple is actively violating the RICO Act – all of which Apple knew prior to Apple's abrupt

4  termination of Gjovik by a Worldwide Loyalty "Workplace Violence" investigator and without

5  explanation.[1] This is quite literally a "RICO Act Whistleblower" case.

6      4.      In lieu of the US District Attorney's office deciding to pursue a criminal case

7  against Apple, (which hopefully still may occur at some point), Gjovik's only path to seek

8  holistic justice for the extensive harm she suffered due to Apple's egregious conduct is a RICO

9  lawsuit. RICO also enables Gjovik to admit evidence to show that Apple's actions towards

10  Gjovik were part of a larger criminal scheme, and to reflect the Russian-nesting-doll structure of

11  Apple's tortious conduct and violations of ordinances, as part of statutory civil violations, as part

12  of elaborate criminal schemes and enterprise.

## II.    JURISDICTION

15      5.      This court has both Subject Matter and Diversity jurisdiction over these claims.

16  The District Courts of the United States have original and exclusive jurisdiction over two of the

17  claims in this case, whistleblower retaliation under Sarbanes Oxley Act [18 U.S.C. §1514A] and

18  Dodd-Frank Act [15 USC §78u-6(h)(1)(A)(iii]. This US District Court has federal question

19  jurisdiction over "*all civil actions arising under the Constitution, laws, or treaties of the United*

20  *States,*" [28 U.S.C. § 1331], which provides original jurisdiction over many issues in this case

21  including claims of federal RICO with Predicate Acts under US Code Title 15 and Title 18;[2] and

22  interpretation of agency complaints under CERCLA [42 U.S.C. § 9601], RCRA [42 U.S.C.

23  §6901], the Clean Air Act [42 U.S.C. §7401],[3] complaints related to US CDC and FDA

---

[1] Gjovik complained to Apple about Apple violating RICO on August 21 2021, then posted a copy of that complaint on social media noting: "*One issue I'm raising to them is literally RICO,*" and then "@"ed the US Depart of Labor. https://twitter.com/ashleygjovik/status/1429174603713191936

[2] 18 U.S.C. § 1965; *Tafflin v. Levitt,* 493 U.S. 455 (1990); *Butchers' Union Local 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538-39 (9th Cir. 1986).

[3] Gjovik's U.S. EPA CERCLA Complaint: August 29, 2021; US EPA RCRA/CAA Complaint: June 12 2023, June 20 2023 Investigation, August ~17 2023 Inspection

1  programs;[4] legal questions related to US FTC rules;[5] and issues related to US government
2  sanctions on foreign countries.[6]

3      6.    The District Courts of the United States also have diversity jurisdiction over this
4  case because the amount in controversy exceeds $75,000 and the parties are of diverse state
5  citizenship. [28 U.S.C. § 1332]. Plaintiff is domiciled in New York. Defendant is a corporation
6  headquartered in California.

7      7.    Despite the inconvenience for the Plaintiff (who will request remote/video
8  hearings, please), this case is proper in California instead of New York because it requires
9  analysis of California Const. Art. 1, California Labor and Penal Codes, California common law
10  related to employee terminations in violation of public policy (*Tamney* claims), California
11  employee's constitutional right to privacy, and Santa Clara County "Toxic Gas" ordinances.

12      8.    The federal courts have an independent basis for federal jurisdiction on this case;
13  thus, they may also exercise supplemental jurisdiction because the claims arise from the same
14  case and controversy, share a common nucleus of operative fact, and would ordinarily be
15  expected to be tried all in one judicial proceeding.[7] The state claims here require analysis of
16  many of the same facts and legal questions as the federal claims, including: the retaliatory
17  termination, other whistleblower retaliation, filing of complaints with the employer and with the
18  government, environmental and health/safety concerns, threats and intimidation, and obstruction
19  of justice.[8] If the state causes of action in this complaint were tried separately, there would be
20  duplicative trials concurrently holding hearings on many of the same facts and legal questions.

## III.   VENUE

23      9.    Venue is proper in the District Court of Northern California because Apple is
24  headquartered and operates in this district and a substantial amount of Gjovik's claims arose
25  from acts, omissions, and injuries within the District of Northern California.

---

27  [4] Gjovik's U.S. DOJ National Center for Disease Fraud (NCDF) Complaint: Sept 3, 2021
    [5] Gjovik's FTC Report #154835129
28  [6] Gjovik's U.S. DOJ FBI Complaint: Sept 3, 2021
    [7] 28 U.S.C. § 1367; *Osborn v. Haley*, 549 U.S. 225, 245 (2007).
    [8] California Department of Labor: *Ashley Gjovik v. Apple Inc.*, (RCI-CM-842830)

6

10.     **Divisional Assignment**: Plaintiff files this complaint to the San Francisco Division, however either the San Jose or San Francisco Division are proper as a substantial part of the events and omissions giving rise to the claim both occurred in Santa Clara County (Santa Clara city, Cupertino, and Sunnyvale) and in San Francisco County (San Francisco city). Apple conducts day-to-day commercial activities within both counties. Apple has engaged in substantial, continuous, and systemic activities within both counties, providing for a fair and reasonable basis for the exercise of personal jurisdiction over Apple by this Court in either division. [Civil L.R. 3-5(b)].

## IV.     PARTIES

11.     Ashley Gjovik (pronounced "JOE-vik"), was an employee of Apple Inc and covered person under applicable statutes in this complaint. Gjovik is a natural person holding a Juris Doctor and appearing Pro Se. As of September 2022, Gjovik now resides and is domiciled in Albany New York. Gjovik lived in Santa Clara from February 2020 through October 2020, and then again August 2021 through August 2022. Gjovik lived and worked in San Francisco County from October 2020 through August 2021. Gjovik established a consulting LLC in California in 2022 which she continues to manage with a virtual office in Sacramento, and which is also registered in Albany New York.

12.     Apple Inc, is a business engaged in and affecting interstate commerce. Apple is a corporation headquartered in Cupertino California. Defendant has offices, retail stores, call centers, data centers, and other facilities in numerous US states and foreign countries.

## V.     NOTICE OF PENDENCY & CONFLICT OF LAWS

1.     Gjovik's SOX whistleblower retaliation claim was filed August 29 2021 and the case was docketed on December 12 2021.[9] SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. The case has been pending without resolution over

---

[9] *Ashley Gjovik v Apple Inc,* Apple Inc./Gjovik/9-3290-22-051; OSHA 11(c) Procedures: 29 CFR Part 1977, EPA Procedures: 29 CFR Part 24, SOX Procedures: 29 CFR Part 1980

7

180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims.

2.     Gjovik was forced to leave her CERCLA and OSHA whistleblower retaliation cases with US Department of Labor as their exclusive jurisdiction is with US Department of Labor and there is no way to remove the two charges to US district courts for a trial. The status of those charges is detailed in RICO Predicate Act "*Criminal Extortion.*"

3.     Gjovik filed retaliation and labor code violation charges to the California Department of Labor on August 29 2021 and the initial interview was conducted in October 2021. California Department of Labor has not started the investigation of Gjovik's California case and the statutes allow an option for the complainant to take the matter to a court instead waiting on an agency decision. This lawsuit will replace the California Department of Labor DIR case RCI-CM-842830.

4.     NLRB charges cannot be removed to court as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. Gjovik is a witness for the NLRB and some of the 1512 and 1513 Predicate Acts in this complaint were part of a scheme to keep Gjovik from testifying or providing evidence, and to coerce her to withdraw and drop her charges. This civil case will hopefully relieve the witness intimidation and retaliation Gjovik has suffered from Apple. The NLRA cannot preclude a federal RICO claim where a RICO Predicate Act arises from conduct that also violates another federal statute, as then that conduct is also a federal or state crime.[10]

5.     Similarly, the state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.[11]   The 9th Circuit found, *"there is no clear and manifest intent on the part of Congress to pre-empt all state tort laws that traditionally have been available to those persons who … allege outrageous conduct at the hands of an employer. That would require us to conclude that Congress has displaced not only*

---

[10] *Torres v. Vitale*, 954 F.3d 866, 874-75 (6th Cir. 2020)
[11] *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989)).

COMPLAINT                                                                 SEPT. 7 2023

*state tort law ... but also state criminal law, to the extent that such criminal law is applied to retaliatory conduct...*"[12]

## VI.   GENERAL ALLEGATIONS

1.      In 2014, Oaktree Capital and Hines purchased 825 Stewart Drive (Gjovik's future office and about which she would be terminated in 2021). In 2014, Ronald Sugar was an Apple Board member and chair of Apple's Finance and Audit committee, and also the lead independent director for the Chevron board. In 2014, Robert Denham was a Chevron Board Member, an Oaktree Capital Board member, and a Board member of the James Irvine Foundation. [13] Under information and belief, Ronald Sugar brokered the sale of 825 Stewart Drive to Oaktree Capital and the lease of 825 Stewart Drive to Apple, exploiting his position on the Chevron Broad.

2.      Ashley Gjovik (Plaintiff) worked for Apple Inc (Defendant) from February 23 2015 until Apple terminated Gjovik's employment on September 9 2021 effective September 10 2021. During her tenure with Apple, Gjovik led numerous high-profile projects. She participated in engineering project management of numerous high-profile products such as the iPhone, iPad, iPod, Apple Watch, MacBook MacBook Pro, MacBook Air, and Mac Pro and high-profile projects such as the launch of the Apple Music subscription service, Apple's transition of computers from Intel to Apple silicon, and work to establish the first company-wide Artificial Intelligence ethics policy.

3.      During Gjovik's nearly seven years with Apple, she was a significant contributor in developing and improving critical process and policies, mentoring employees, and managers, and providing strategic advice to executives. She has been praised for everything from "*saving Apple money*" to "*driving better testing and higher quality in Apple's software.*" Her direct supervisor at the time of her termination previously illustrated what he called Gjovik's' "*amazing work*" as: "*the combination of broad networking, collaboration, understanding of many technical and non-technical areas;*" "*providing deep and meaningful insights;*" and

---

[12] *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1154-55 (9th Cir. 2000); *Torres v. Vitale.* 954 F.3d 866, 871 (6th Cir. 2020).
[13] Chevron, https://chevroncorp.gcs-web.com/news-releases/news-release-details/former-salomon-inc-chairman-robert-e-denham-elected; https://chevroncorp.gcs-web.com/node/19621/html

COMPLAINT                                                          SEPT. 7 2023

1   "*connecting people for more collaboration*." He went on to say Gjovik had "*become a mentor to*

2   *people around the organization*" around "*relationship skills*," "*crafting presentations,*"

3   "*increasing visibility and network*," and "*coaching on tough conversations*."

4      4.     Gjovik's importance to Apple Inc was exemplified in her many outstanding

5   performance reviews. These included Apple's award to Gjovik of large bonuses and raises due

6   to her strong performance. Gjovik's performance never necessitated any performance

7   improvement plan, nor did Apple ever issue any negative written reviews. In fact, Apple told

8   Gjovik that she was an extremely valuable member of the company. At different times she was

9   told by her supervisors that she was both "*key talent*" (unreplaceable) and a "*high performer*."

10  Every annual performance review at Apple, Gjovik received at least one "Exceeds

11  Expectations."

12     5.     Gjovik started at Apple on February 23 2015. Gjovik experienced hostility from

13  the start of her employment. In her first year, her colleagues created one whiteboard of insulting

14  nicknames, another with tallies for points for "*making [her] want to quit,*" and filed a ticket in

15  the Radar work tracking tool entitled "*Make Ashley's Life a Living Hell.*"

16     6.     Despite knowing that she suffers from Post-Traumatic Stress Disorder (PTSD)

17  stemming from childhood trauma (which she shared why pleading for them to stop), Gjovik's

18  colleagues would try to startle her, make her scream, and attacked her with Nerf guns and

19  dodgeballs. Gjovik complained of these activities to Apple's Employee Relations team in July

20  and August 2021, noting in an email on July 21 2021 that her coworkers had created a

21  video/audio recording of her "*screaming bloody murder*" while they attacked her with dodge

22  balls, then created a 'remix' version of her screams and shared it with the team, while they were

23  "*laughing hysterically*."

24

25     7.     Gjovik was assigned to share an office with Rob Marini. Marini told her during

26  the first week that prior coworkers who had shared an office with him previously had either quit,

27  left the country, or committed suicide. Marini joked about which of those paths she would

28  follow. Marini often made cruel and awful 'jokes' like that, despite Gjovik's complaints. One

---

10

1  time, when she made a minor mistake drafting an XML document, Marini responded that

2  everyone would be better off if Gjovik 's "*mother had had an abortion.*"

3      8.      One of primary aggressors of the harassment at the time was a colleague named

4  Brad Reigel. Reigel often made comments about Gjovik, calling her fat, an idiot, or stupid. In

5  December 2015, Reigel made her stay in an office conference room against her will, where he

6  yelled at her while she cried. He would also often make somewhat violent jokes targeting her

7  including but not limited to that he was going to "smack" Gjovik. These remarks were all the

8  more concerning considering that he was known for bringing firearms into the office, and Gjovik

9  had seen ammunition at his desk.

10      9.      Reigel had also destroyed objects when upset at work, including infamously

11  striking a chocolate Easter bunny on a table to knock off its 'head' while screaming at a QA

12  Director. Marini also claimed Reigel has previously physically 'flipped a table' during a work

13  meeting while he was upset. Reigel was also an active police officer with a local Police

14  Department. Gjovik and her coworkers occasionally referred to him as "Officer Reigel."

15      10.     When Gjovik complained to Venkat about Reigel and Marini's behavior, Venkat

16  acknowledged it was inappropriate but his suggestions for Gjovik in response to the misconduct

17  included things like dumping the liquor bottles they had in their offices and replacing the liquor

18  with water and food coloring. Indeed, it was a regular occurrence for the team to drink at work

19  during work hours, and regularly coerced Gjovik to do the same, despite Gjovik's protests.

20

21      11.     In August 16 2021, when Gjovik's complained to Apple Employee Relations

22  about her team from 2015-2016, Gjovik also noted Memula's own work-time intoxication, with

23  Apple noting: "*You mentioned that Memula would snuggle up on you while drunk, whisper to*

24  *you, and say things that made no sense.*" Gjovik cited evidence including "*see photograph of*

25  *during one instance with documentation of his phases of drunkenness on whiteboard including*

26  *these behaviors, then following photo of him "crucifying" himself upon said whiteboard*

27  *writing.*"

28

11

12. One of Gjovik's coworkers on this team claimed to have familial connections to a major organized crime family. If this court finds direct ties to organized crime required for the RICO case, Gjovik will plead those details under seal.

13. A federal-court appointed monitor overseeing Apple following a 2013 judgement, issued his third report on Apple on April 16 2015.[14] The federal Monitor described Apple's behavior related to the monitor and monitoring program as "*inappropriate*" and "*adversarial*," and complained of Apple refusing to provide information on regulatory compliance as ordered by a federal judge. [15] He also complained that Apple had placed the new "Compliance Officer" in a position reporting to Tom Moyer (who leads *Worldwide Loyalty*) instead of directly reporting to the Apple Board, which the monitor called a "conflict of interest" that was "intentional" by Apple, and would compromise her ability, or even willingness, to challenge Apple's "*risky business decisions*." [16]

14. On October 15 2015, the federal monitor complained that the chair of Apple's Finance and Audit Committee admitted to not reading the monitors reports beyond reading the "executive summary", and upon feedback, Apple protested it was "*bizarre*" to expect the Chair, Ronald Sugar, to read the entire report from a federal-court-appointed monitor as the result of a lawsuit against Apple by the federal government, of which Apple lost and was found to have violated the Sherman Act, despite Sugar being the Chair of the Audit & Finance Committee which claims to oversee regulatory compliance, including antitrust. The monitor also complained the conflict of interest with the Compliance Officer still had not be resolved. Finally, the monitor also complained that Apple continued to refuse to provide information about their policies and procedures for investigating possible regulatory compliance issues. The monitor noted "*remarkable resistance*" from Apple on complying with the court order.[17]

---

[14] 3rd Report of the External Compliance Monitor United States v. Apple, Inc., et al., No. 1:12-CV-2826, and State of Texas v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394 (April 14, 2015).
[15] Id.
[16] Id.
[17] Fourth Report of the External Compliance Monitor United States v. Apple, Inc., et al., No. 1:12-CV-2826, and The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394 (October 15 2015).

12

15.     In 2015 Apple started stealth semiconductor manufacturing and silicon fabrication activities in a facility located at 3250 Scott Boulevard Santa Clara California. Apple was cited for building, environmental, health/safety, and fire code violations in at least 2015, 2016, 2017, and 2020. The factory vented its exhaust of solvents and toxic gases less than 300 feet from a large apartment complex. Under information and belief, Memula's team was involved in the decision to construct and use the plant for prototype silicon fabrication.

16.     In 2015, Apple started semiconductor manufacturing at 3250 Scott Blvd (next door to where Gjovik would get sick in 2020). While Irvine Company was finalizing the Environmental Impact Report (EIR) for the 3255 Scott Blvd property across the street (where Gjovik would live in 2020) and starting development of a large apartment complex. Somehow, Apple's factory was never mentioned in the EIR. Under information and belief, Apple and Irvine Company conspired to keep Apple's activities out of the EIR because if it was included, either Apple would have to comply with regulatory obligations and federal environmental statutes at the factory, and Irvine Company would have to rent their future apartments at a lower value due to the degraded air quality from Apple's emissions. In 2016, Oaktree Capital and Hines sold 825 Stewart Drive to CalSTRS via GI Partners while Apple was a tenant. Under information and belief, Apple's botched HVAC renovations were never disclosed to CalSTRS, a state government agency, thus defrauding the California government.

17.     In 2016, Marini began bragging about creating and being a member of "*secret cabals*" that consisted of certain Apple employees on an invite-only basis at Marini and Venkat's discretion. Several months later Marini told Gjovik there was a vote in one of the cabals and they agreed to she could be a member. Marini had Plaintiff added to an Apple AD group with this title and maybe ~20 other members. Marini repeatedly warned Gjovik, she must behave herself if she wanted Marini and the other members to allow her to remain in the cabal.

18.     Marini invited Gjovik to several social events in San Francisco, often with other coworkers and Memula. Marini told Gjovik that if she wanted to succeed at Apple, she must never decline an invite to spend personal time with engineering leadership. All social events Gjovik attended included excessive alcohol intake which Gjovik did not feel was optional.

13

COMPLAINT                                                          SEPT. 7 2023

1   19.    See "*Commercial Bribery*" section under RICO Predicate Acts for details of

2   Reigel becoming Gjovik's manager. Reigel promptly closed the "*Make Ashley's Life a Living*

3   *Hell*" task as "*complete*" after Gjovik was transferred under him.

4   20.    In 2016, Gjovik managed the Software Engineering failure analysis program for

5   products in the field and launch planning for New Product Introduction, still under Memula's

6   organization, now reporting to Shandra Rica. Gjovik drove field issue triage and root cause

7   analysis to resolution for customer software quality issues, and partnered with hardware teams

8   when software or firmware updates were needed to mitigate silicon or component issues.

9   21.    Rica reported to Memula and approached Gjovik to interact as personal friends.

10  In 2016, Rica invited Gjovik out to drink at bars, and to sleep over at Rica's home. Gjovik slept

11  over several times with both women sleeping in the same bed. They had become close friends,

12  Gjovik thought, so she was surprised when Rica severely retaliated against her months later.

13  22.    In 2016, there were reports of possible battery failures that were being escalated

14  across numerous teams. Gjovik felt like it was an emerging issue so began including it in her

15  status report and repeatedly urged her management to inform Software executives about the

16  matter so they were not caught off guard. Gjovik's management, Evan Buyze and Rica, refused

17  to notify management. Gjovik attempted to go around them and inform Rica's boss, Memula,

18  who was concerned and agreed, however Rica and Buyze quickly retaliated against Gjovik for

19  'going around them' and demanded she not inform any software executives of the issue without

20  their permission.

21

22  23.    Shortly after Gjovik received text messages from an Ops VP & Director asking if

23  she could come to an in-progress meeting about the battery issues. They said that Jeff Williams,

24  the COO, was asking where Software was. Gjovik quickly texted Buyze and Rica about the

25  matter asking for their input but it was late and both had stopped responding. Gjovik attended

26  the meeting and spoke for several minutes sharing an update and the data she had previously

27  vetted with functional teams. Williams seemed appeased and thanked her when she was done.

28  24.    Following these events Gjovik was informed that Craig Federighi (Senior VP)
    was upset that Kim Vorrath (Memula's manager) never told him about the emerging issues, and

14

Vorrath was upset that Memula had never told her about the emerging issue, and Memula told Gjovik he was going to try to '*take the fall*' because Gjovik had tried to escalate. However, Rica and Buyze quickly blamed Gjovik and said the only reason they were in trouble was that Gjovik went to the meeting and shared status. They said while the status was accurate and vetted, that Gjovik should have simply declined to attend and refuse to provide information because that is easier.

25.    Rica and Buyze then insisted the program's response to the battery issue should be 'ignoring it' and 'hoping it goes away.' When Gjovik continued to raise concerns about staffing for the overall program, Rica and Buyze said Gjovik should 'ignore' those issues too. They told Gjovik that if field issues are bad enough that Software executives will hear about them directly from other Executives so Gjovik should act in bad faith and stonewall at a program level. Gjovik pushed back on this and attempted to remind both how important customer product quality is.

26.    Shortly after, Rica constructively terminated Gjovik. Rica explained that she and Buyze 'got in trouble' while Gjovik was out for a week because Gjovik had set an 'unreasonable expectation' that Software would do work and so people expected them to do work, but they did not want to do work. They told Gjovik they now had to "reset expectations" for other organizations that Software will only provide minimum engagement on customer field issues. Rica told Gjovik that Gjovik's job was now "finding a new job." Rica also told Gjovik to not tell anyone what she just said and added she "*doesn't like people who talk [expletive].*"

27.    Out of concern for product quality, Gjovik brought the matter to the Human Resources business partner who agreed that Buyze and Rica "cannot do that" and said she would follow up. It is unclear what happened, but Gjovik had all of her job responsibilities removed for nearly three months until she was able to obtain and start in a new role at Apple. Human Resources told Gjovik they cannot take her job away and that Rica was in the wrong. Gjovik also complained about this matter to Apple Employee Relations in May, July, and August 2021.

28.    In August 2016, Employee Relations investigator Ekelemchi Okpo documented this situation in detail in his original version of the "Issue Confirmation":

15

COMPLAINT                                                                        SEPT. 7 2023

1
2
3
4
5
6
7

*"In 2016, Apple allegedly had products in the field (iPhones) with bad batteries. You shared that you gave Jeff Williams an update on field issues and the meeting went well. After your meeting with Williams, you felt that you were thrown under the bus by your skip level manager, Shandra Rica, and your manager, Evan Buyze, because they failed to update the leadership team on field issues. You told me that you did not have work assignments for 3 months after this incident, and your responsibilities were taken away. As a result, you believe that this was constructive discharge and you raised your concerns to Michallik on December 7, 2016."[18]*

8
9

Gjovik also provided her emails with Human Resources, Rica, and Buyze on the matter as evidence for the investigation.

10
11
12
13
14
15
16

29.     Gjovik joined Product Systems Quality in January 2017, reporting to David Powers and Dan West. Apple assigned Gjovik to work in the Apple office called "Stewart 1" (aka "SD01") at 825 Stewart Drive, Sunnyvale California from 2017-2021. Apple never informed Gjovik that the office was on a Superfund site or that it was a chemical release clean-up site generally. Gjovik would later be informed by a friend that her office was known by the U.S. EPA as the "TRW Superfund site" and one of the three sites constituting the "Triple [Superfund] Site."

17
18
19
20
21
22

30.     The U.S. EPA determined in 2015 that the conditions at the Triple Site may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility. The conditions of the Site constitute an actual or threatened "release" of a hazardous substance from the facility. The data demonstrated a pathway for vapor intrusion is occurring at the Site.[19]

23
24
25
26

31.     On December 28 2017, West tried to organize a sexual relationship between Gjovik and a sous chef at his favorite Michelin star restaurant. In 2018, West used his position of authority over Gjovik, put Gjovik under duress with fear of retribution and retaliation in her

27
28

[18] See: *"Issue Confirmation,"* original version, transmitted by Ekelemchi Okpo [Aug 16 2021]
[19] *In The Matter of: Offsite Operable Unit, Triple Site, Sunnyvale, California,* CERCLA Docket No 2019-05, Administrative Settlement Agreement & Order on Consent for removal Site Evaluation and Removal Action

16

employment, and paid money (estimated around $400) to persuade, encourage, and induct Gjovik to sleep with a business partner, although West's efforts need not and were not successful. West intended to influence Gjovik to engage in sexual intercourse or lewd act with another person, who was not West, in exchange for West to obtain receipt of the indirect benefits of positive influence in his business and personal dealings with the management of his favorite "Michelin Star" restaurant. West attempted to provide a defense of intoxication, though made no claim it was involuntary which is required for affirmative defense. *Pimping and Pandering with Indirect Benefits* is a felony.[20] Gjovik repeatedly protested West's inappropriate conduct.

32.    On the evening of Nov 30 2020, West messaged Gjovik and they discussed *the "pimping & pandering with indirect benefits"* incident. West told Gjovik; *of all the inappropriate things I've done. That might be top of the list, especially since I don't think you were comfortable telling me no."* West said he did not remember paying the hundreds of dollars for her dinner, saying *"I must have been drunk. That's over the top."* Gjovik described the night as an *"arranged marriag."* West told Gjovik he was *"awakening to all of [his] inappropriate behavior."* From 2017-2020, Dan West asked to visit Plaintiff at home several times. West also asked Gjovik out to dinner alone several times. Gjovik felt like she had to accept.

33.    Gjovik created a successful hardware re-use program in 2018 In order to fill test coverage gaps dependent on infrastructure while also dramatically reducing e-waste. West and Powers suddenly canceled her project without consulting or notifying Gjovik and the explanation provided one of West's reports requested the change in order to obtain personal benefit, and West approved. When Gjovik complained about the decision to cancel the project, resulting in a dramatic increase in e-waste and reduced test coverage for customer products which was known to increase risk and did result in customer field issues, Gjovik was repeatedly told by West and Powers that she was being *"emotional,"* *"aggressive,"* and *"irrational."*

34.    On April 13 2018, Tom Moyer (*Worldwide Loyalty*) was quoted in a Bloomberg article saying that Apple "leakers" *"not only lose their jobs, they can face extreme difficulty*

---

[20] California Penal Code §§ 266h, 266i

COMPLAINT                                                                    SEPT. 7 2023

*finding employment elsewhere. The potential criminal consequences of leaking are real and that can become part of your personal and professional identity forever.*" [21]

35.     On April 22 2018, Gjovik emailed Tom Moyer (*Worldwide Loyalty*) requesting "Business Conduct" approval to attend law school while she worked at Apple, a request suggested by a friend in Apple Legal. Gjovik also noted in her email that she hoped to get a job in Apple Legal after she graduated and if not, she planned to keep working at Apple, but do legal volunteer work on the side. On April 27 2018, Moyer replied and added a member from his team to review Gjovik's request. (Worldwide Loyalty knew Gjovik wanted to stay at Apple.) They approved shortly after.

36.     Gjovik was put on "document retention" for the Batterygate lawsuits March 15th 2018. The notice from Apple cited "*inquiries from the U.S. Department of Justice.*" In May 2018, Apple Legal reached out to perform Document Collection on Gjovik's devices, including her text messages. On May 8 2018 Gjovik replied saying she uses the same iMessage account for work and personal and said she strongly preferred to only share messages she had with the specific people involved in Batterygate, and alternatively is they have to take all messages, she asked if she could delete personal messages first. On May 10 2018 she added she is "*a private person.*"

37.     On May 10 an Apple lawyer replied telling her "Do not delete any messages." She said "we can certainly identify the relevant text messages with the list of individuals that [she] provides." Gjovik asked if she could "*export the message conversations from all relevant people instead of sharing the entire database?*" An Apple lawyer replied on May 14 2018 saying Gjovik should "*work with the team to do [her] best to avoid collection of entirely irrelevant information*" and that "*all documents are reviewed by attorneys, so if the document is not relevant to the issues, it will be categorized as such and not provided to requesting authorities.*"

38.     During the meeting, Apple's lawyers insisted Gjovik let them copy her entire iMessage database. Gjovik protested and explained further she was primarily concerned about

---

[21] Mark Gurman, *Apple Warns Employees to Stop Leaking Information to Media*, Bloomberg, April 13 2018, https://www.bloomberg.com/news/articles/2018-04-13/apple-warns-employees-to-stop-leaking-information- to-media

COMPLAINT                                                              SEPT. 7 2023

"nudes" and sexual messages with a man she was dating in Hawai'i who had no connection to Apple. Gjovik asked if she could show them the texts so they can confirm its irrelevant and then she can delete the thread before they copy it, but Apple said no. Apple told Gjovik they have ways to copy it unilaterally without Gjovik's cooperation but prefer not to do that. Once Gjovik handed them over, the Apple lawyers told her they would keep her texts (and nude pictures) in their "*permanent evidence locker*."

39.     Gjovik worried if she had an ethical duty to disclose to the man that Apple put his sexts in their 'permanent evidence locker' but because Apple says everything internal at Apple is confidential, she worried that saying anything to him would violate Apple policies. Further, she now realized Apple could be watching everything she does and if Apple did choose to take more personal data than they needed as a way to intimidate her to stay quiet about what happened in 2016, she worried Apple could be watching her to see what she does and possibly escalate their intimidation if it looks like she is not being a 'team player.'

40.     Gjovik complained about the incident to a few coworkers saying like it felt like they wanted "collateral" related to Gjovik's retaliatory discharge in 2016 because she refused to "ignore" Batterygate. Gjovik tweeted about the matter on August 19 2021 and it went viral. On September 7 2021, Gjovik also posted about it again, this time "quote-tweeting" a prior post where she complained about the Batterygate/nudes and also wrote "*the corruption at Apple may reach RICO levels*". Gjovik posted, "*I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the [battery] situation when I ran sw failure analysis.*" Gjovik was terminated two days later.

41.     Around 2019, US EPA and California EPA oversaw vapor intrusion testing of buildings on the Synertek Superfund plume originating from 3050 Coronado Blvd. Around this time, both EPA agencies were overseeing bio-remediation of the plume which resulted in a "bounce-back" of increasing TCE, vinyl chloride, and other chemicals. US EPA CERLCA project manager Fatima Ty and manager Edwin "Chip" Poalinelli oversaw and were aware. At this time there was also increasing chemical contaminants in groundwater wells near Apple's 3250 Scott Blvd factory and Irvine Company's 3255 Scott Blvd apartments. For some reason,

COMPLAINT                                                          SEPT. 7 2023

1    there was no vapor intrusion testing at either of the properties despite them being on the plume.

2    When Gjovik contacted US EPA in 2020 complaining about solvent exposure, US EPA via Ty

3    and Poalinelli claimed there were no issues or reason to think anything was wrong, and did not

4    disclose anything about the vapor intrusion testing or increasing contaminants at nearby wells.

5    Under information and belief, Apple, Irvine Company, and US EPA Region 9 were conspiring to

6    secretly avoid testing and disclosures to reduce the cost of regulatory compliance for Apple and

7    Irvine Company.

8        42.    In 2019, Apple's head of corporate legal compliance, Gene Levoff, was charged

9    by US DOJ with six counts of securities fraud and six counts of wire fraud. Levoff was

10   convicted in 2022 and faces potentially decades in federal prison (see "*Securities Fraud*" under

11   RICO Predicate Acts).[22]

12       43.    There was a leak of the deadly gases phosphine and silane in June 2019 at

13   Apple's 3250 Scott Blvd factory. Apple did not report the spill to CalOES and coerced the city

14   Fire Department to use a 'codename' for Apple in their incident report, and the agency

15   complying and calling Apple and their secret factory "*Project Aria*."

16       44.    In February 2020, the California Supreme Court described Defendant's legal

17   arguments attempting to defend their unlawful employee practices as *"farfetched,"* *inconsistent*,

18   and "*untenable*." [23]  The Court described Apple's work policies at issue as "*draconian*." The

19   Court ruled against Apple and Apple Inc. agreed to pay $29.9 million to a class of retail

20   employees.

21       45.    In February 2020, Gjovik moved into a large apartment complex at 3255 Scott

22   Boulevard Santa Clara California. Gjovik quickly feel ill and became disabled. Gjovik visited

23   the Emergency Room on February 13 2020 and Urgent Care (Apple's in-house clinic). Gjovik

24   went on short-term disability due to her severe, mysterious illness. Gjovik was screened for

25   multiple severe and fatal diseases and disorders. In 2020, John B. Frank was a Chevron Board

26

27   [22] DOJ, *Apple's Former Director of Corporate Law Admits Insider Trading*, June 2022,
28   https://www.justice.gov/usao-nj/pr/apple-s-former-director-corporate-law-admits-insider-trading
     [23] *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1055-56, 258 Cal. Rptr. 3d 392, 405-06, 457 P.3d 526, 537-38 (Feb. 2020)

COMPLAINT                                                                    SEPT. 7 2023

1  member and James Irvine Foundation Board member, and Frank was a Director at Oaktree
2  Capital.

3      46.      On September 3 2020 Gjovik discovered there were elevated and unexpectedly
4  'spiking' levels of volatile organic chemicals inside her apartment at 3255 Scott Blvd. Gjovik
5  gathered data on VOC air pollution patterns, documented medical symptoms at times the VOCs
6  'spiked,' and had an industrial hygienist test Gjovik's indoor air. Gjovik assumed the VOCs
7  were from the Superfund site next door and/or the Brownfield contamination on site. Gjovik
8  contacted Apple Real Estate & Development asking about pollution in the area and spoke with a
9  manager about it on September 9 and September 10.

10     47.      Gjovik noticed there was an Apple facility at 3250 Scott Boulevard across the
11  street and it was also on the Superfund groundwater plume. Gjovik mentioned the facility to
12  Apple on September 8, 9, and 10 2020 – inquiring if anyone was familiar with the area because
13  Apple had an office there. At no time in 2020 or later did Apple ever disclose their
14  manufacturing activities and chemical/gas emissions at 3250 Scott Boulevard to Gjovik. The
15  Apple Real Estate manager did suggest Gjovik use a special type of paid leave to move out of
16  the apartment called '*extreme condition leave*' which was designated for natural disasters.

17     48.      In November 2020, Apple's Chief Compliance Officer and head of the
18  *Worldwide Loyalty* team, Tom Moyer, was indicted for bribing a local sheriff. (See "*Criminal*
19  *Bribery of Public Official*" under RICO Predicate Acts). [24]
20

21     49.      In December 2020, Apple Senior Vice President Dan Riccio held an 'All Hands'
22  for his staff. During the All Hands, Dan Riccio made a comment that he had just left a meeting
23  with Apple CEO Tim Cook and that Apple entered a deal where they will obtain "early access"
24  to the COVID-19 vaccines. Riccio said Apple will only need to 'wait' for doctors and the
25  elderly, and then Apple will get 'a lot' for employees and their families, and even have 'extra
26  left over.' Gjovik was disturbed and upset by Riccio's comments. At that point in the pandemic,
27  there was a great need for vaccines for those with pre-existing conditions, front-line workers,

28  ―――――――――――――――――
[24] *Apple's head of global security indicted on bribery charges:* Washington Post, (Nov 2020),
https://www.washingtonpost.com/technology/2020/11/23/apple-sheriff-bribery/

21

1   and other high-risk populations. Riccio's comments inferred Apple arranged a back-room deal to
2   'skip the line' on the vaccine and intended to hoard the vaccines.

3       50.     Gjovik complained to West and Powers but they never responded in a meaningful
4   way. Gjovik then escalated her concerns to a Senior Director colleague in a different
5   organization, Joshua Cohen, who is seen as an ethics leader at the company. Gjovik told him
6   what she witnessed and expressed her concerns, and said if there was still time to stop Apple's
7   plan, she wanted to try to intervene for the sake of public health and the community. The
8   colleague jumped on the issue immediately and escalated the matter to at least Deirdre O'Brien
9   (Human Resources Vice President) and Lisa Jackson (VP of Apple Government Affairs &
10  Lobbying). Gjovik was told they were both concerned if it was true. The colleague called Gjovik
11  to confirm once more that Gjovik's recollection of events before the matter was escalated
12  further. Gjovik confirmed her prior statements and suggested they seek the recorded video of
13  Riccio's statements.

14      51.     Gjovik heard that the video was obtained and Gjovik's statements were
15  confirmed to be accurate, that Riccio did say those things. Gjovik was told it was escalated to the
16  "e-team" (executive team reporting to CEO Tim Cook) and they were "put on notice" about
17  "serious ethical issues" if what Riccio said was ever pursued. Gjovik was told the deal was either
18  not actually in place or would not occur now. However, she was told "*there are individual
19  stories about test machines and treatment that are troubling, but no such company wide access
20  is on the table, much less a done deal,*" on December 9 2020. Gjovik thanked Cohen for
21  believing her and Cohen replied: "*It has never occurred to me not to believe [Gjovik].*"
22
23      52.     Gjovik had asked to remain confidential, noting everyone was '*terrified*' of
24  Riccio. Gjovik was told her identity was kept confidential, though she worried that is not
25  possible at Apple due to the Worldwide Loyalty Team. Dan Riccio was demoted around one
26  month after Gjovik's concerns were raised, escalated, and confirmed. Gjovik made her identity
27  known related to the matter during the July 2021 investigation (since Apple would surely find it
28  going through her emails anyways) and labeled the evidence folder "*Corruption
    Whistleblowing*". Unsure whatever came of the situation, Gjovik filed complaints with the FDA

22

Office of Criminal Investigations and DOJ NCDF ("COVID-19 hoarding") about the matter on September 3 2021 and posted on social media that she did on September 6 2021. Gjovik was also still using her iCloud email so Apple would have surely seen the email receipts.

53.     Apple reported to the US EPA that in the year 2020 they released 7.8 tons (15,608 pounds) of volatile organic chemicals and 260 pounds of the now-banned combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air from the 3250 Scott Blvd factory.[25] Gjovik's apartment at 3255 Scott Blvd was only a few hundred feet from the exhaust vents.

54.     The US EPA TRI regulatory filing appears to be falsified claiming an additional 14,743 pounds of NMP was taken offsite to three waste processing facilities – however, review of the hazardous waste manifests from 2015-2022 show no NMP was ever removed the facility. Either Apple lied that the NMP was taken offsite and instead disposed of it onsite, or Apple did take the NMP offsite but used illegal hazardous waste transporters and disposal facilities without manifests, and lied about it. (See, "*Wire & Mail Fraud*" under RICO Predicate Acts).

55.     Gjovik met the Apple attorney responsible for EH&S & CERCLA due diligence back in November 2020, Debra J. Rubenstein. During those meetings with Rubenstein, Gjovik was discussing what happened at her apartment and Rubenstein confided she recently joined Apple's legal team and was concerned to find that Apple had not been doing vapor intrusion testing on their Superfund offices." Gjovik talked to Mike Ertell about his concerns about what Rubenstein had said and it making her concerned about Apple pretending the 2021 testing was routine. Gjovik shared the same concerns with Okpo, texting him a follow up of Rubenstein's LinkedIn on July 28, to which Okpo responded, "*Thank you*."

56.     On or around December 2020, Charlene Wall-Warren, director of Environmental Technologies, reporting to Yannick Bertolus, suggested Gjovik join her team in a position working on implementing circular economy legislation across the company, including projects

---

[25] US EPA, Federal Register, Document 2022-27438, Vol. 87, No. 242, December 19, 2022, ("EPA determined that NMP, as a whole chemical substance, presents an unreasonable risk of injury to health when evaluated under its conditions of use."); US EPA TRI report, 3250 Scott Blvd, 2020: https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310 885&fac_search =fac_beginning ; US EPA Air Pollutant Report, 3250 Scott Blvd, 2020, https://echo.epa.gov/air-pollutant-report?fid=110001168254

1  like "right to repair." Gjovik expressed she would love to transfer to the role. Around January

2  2021, West informed Gjovik that Wall-Warren requested to have Gjovik transferred to her team

3  and West declined to allow Gjovik to leave his team.

4      57.    AC Wellness Network LLC is a for-profit subsidiary of Apple Inc. In January

5  2021, Gjovik learned that the doctors and other medical professionals "report to" a Director in

6  Apple's Operations team under Jeff Williams (who also oversees manufacturing supply chains,

7  like what 3250 Scott Blvd is used for). Gjovik used AC Wellness for primary medical services

8  from 2015-2020. Gjovik left when her primary care provider at AC Wellness refused to help her

9  triage her medical issues (from Apple's solvent exposure) and instead suggested Gjovik could be

10  suffering from anxiety.

11      58.    On February 4 2021, a coworker who also worked in the TRW Microwave

12  building, texted Gjovik that Gjovik was the only Apple employee to inform her their office was

13  a Superfund site. She said after learning that it was a Superfund site, she stopped drinking the

14  water in the building. On March 16 2021, she informed Gjovik that she had fought cancer in

15  2018, requiring chemotherapy.

16      59.    On March 15 2021 Gjovik notified her managers, David Powers, and Dan West,

17  that she wrote an article about her previous apartment on a Superfund site groundwater plume

18  and it was being published in a newspaper. Gjovik notified them that Apple Business Conduct

19  approved her article being published but noted she felt pressured not to write about "*the toxic*

20  *nightmare that is Stewart 1*" (her Apple office)."[26]

21

22      60.    On March 17 2021, Apple sent an email to Gjovik and Powers' managers saying

23  it was going to test for "vapor intrusion" at Gjovik's office, 825 Stewart Dr, but did not mention

24  it was a Superfund or explain what vapor intrusion was. Gjovik replied informing her coworkers

25  it was a Superfund site with a link to the US EPA website for the office and two recent news

26

27

28

---

[26] See evidence files: Email to David Powers & Dan West on March 15 2021

24

1    articles about the site referring to the office as a *paved over environmental disaster zone*. [27]

2    Gjovik explained what vapor intrusion was and told them to take it seriously.

3    61.    Gjovik asked in her email reply for details of what type of testing was to be

4    performed and for what duration, if there would be a risk assessment, and if EH&S would share

5    the findings with the employees in the building. Gjovik expressed concerns that Apple

6    employees *"should be better informed about these types of environmental risks at our offices."*

7    Gjovik added, *"the chemicals under [the Stewart 1 office] if in high enough quantities, can*

8    *cause cancer, disruption of nervous and endocrine systems, and birth defects & miscarriages."*

9    62.    Gjovik quickly faced retaliation and hostility from her manager, David Powers,

10   quickly followed by retaliation and animus from employee relations, and her other manager Dan

11   West, related to her safety concerns and complaints. Less than a week after her response to the

12   email about vapor intrusion testing, on March 22, Powers gave Gjovik a "*warning*" for sharing

13   her safety concerns with his management team and he instructed her she was only to discuss

14   safety concerns or talk about the CERCLA status of their office with him, EH&S, and Apple

15   Employee Relations. Powers told Gjovik it was only a "*warning*" because he said, *"she was*

16   *having mention health issues."* Gjovik protested, explaining the Superfund status of their office

17   was public information. Powers persisted & then proceeded to give Gjovik feedback on an

18   Inclusion & Diversity presentation she gave to his management team and told her he received

19   feedback from his all-male management team that Gjovik was *"being too hard on the white*

20   *man."*

21

22   63.    On April 2, Gjovik met with Waibel and Steiger and asked them about the land

23   use covenant for the building, the history of vapor intrusion, and other CERCLA-related topics.

24   Gjovik expressed concerns that the 2014 Five-Year-Report for the site mentions the already very

25   restrictive land use covenant, is apparently out of compliance with California law and needs

26

27   [27] Alexis C. Madrigal, *Not Even Silicon Valley Escapes History*, The Atlantic (July 23 2013) ["The

28   empty octagonal glass building is a TRW Microwave Superfund site. I'd been walking on a paved-over environmental disaster zone, colonized by whoever wanted to benefit from lower leasing prices and a lack of NIMBY opponents."]

25

1  revised, [28] but Gjovik did not see any revisions. Gjovik asked, *"does California Civil Code §*

2  *1471 add any new requirements on the property not current reflected?"* Steiger told her simply

3  *"that's a question for legal"* and never followed up. Gjovik pressed Steiger and Waibel why

4  Apple does not inform its employees they are working on Superfund sites, repeatedly raising

5  concerns about California Proposition 65 and state/federal Right to Know compliance. Steiger

6  told Gjovik Apple *"decided"* employees did not have a right to know and did not plan on

7  informing them. Gjovik protested saying she though there were legal, ethical, and even practical

8  reasons employees should know – including so they knew to look for signs of vapor intrusion

9  and how to report it. Steiger and Waibel continued to ignore Gjovik's concerns.

10  64.  Gjovik raised her concerns about her office with West saying, *"Did you know that*

11  *[Stewart 1 office] has a history of TCE, vinyl chloride, & chloroform vapor intrusion as recent*

12  *as 2013? Beyond industrial limits, inside. And they haven't done any testing or monitoring since*

13  *2015."* She added she was asking Apple EH&S to *"reconsider the current policy of not*

14  *disclosing Superfund status to the employees that work in these sites."* West replied, *"Didn't*

15  *know that. I'm pretty sure that before we moved in there was some testing. Not sure what*

16  *though."* Gjovik responded, *"He said they did more remediation in 2014 and did some indoor*

17  *air testing in 2015 and it was fine now and they expect it to be fine. And I'm like what if the floor*

18  *cracks, it's literally hades down there, and he's like yeah that would be bad, let us know if you*

19  *smell anything weird. ER was there too. I expressed my understanding but general displeasure."*

20  West replied, *"It's all supposed to be sealed. Under the foundation."* Gjovik responded, *"Yes,*

21  *supposed to."* West replied, *"But I'm no expert."*

22

23  65.  Gjovik messaged with her Senior Director, Dan West, on April 5 2021 about the

24  vapor intrusion at her previous apartment, which sat on contamination from a Superfund site and

25  also an Apple R&D building. West asked Gjovik not to send him information about the situation

26

27  [28] U.S. EPA, 4th Five Year Review: AMD & TRW Microwave Superfund Sites, 2014,
https://semspub.epa.gov/work/09/1151964.pdf ["The existing restrictive covenant was recorded prior

28  to the passage of the California Civil Code section 1471, which establishes the framework for
environmental covenants in California. The legal owners of the former TRW Microwave property
should record a new restrictive covenant that is consistent with current California law."]

26

1  to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My*

2  *mail account is routinely scanned for lawsuits."*

3     66.    On April 5, 2021 Gjovik messaged with West about an article she wrote about the

4  apartment on hazardous waste she lived at that made her ill in 2020. Gjovik informed West five

5  other people contacted her who were also sick at the apartment and that she had been warned

6  about retaliation, possibly including physical violence, from the property owner, Irvine

7  Company. Gjovik told Mr. West she had sleeping with a knife under her pillow and West told

8  her not to sleep with the knife anymore, or a gun, so it will not be used against her and to instead

9  obtain pepper spray or a taser. West also warned Gjovik should worry about digital surveillance

10 as well and suggested Gjovik purchase a necklace that includes a panic button and calls ADT

11 agents. West told Gjovik *"if you don't have a therapist give EAP a call. You're in a stressful*

12 *situation (to say the least)."* Gjovik informed West she had a therapist but was still struggling

13 and had to increase her anxiety medication.

14    67.    Under California law, by April 2021, and as early as September 2020, Gjovik was

15 a crime victim because she was a *"victim of a crime that caused physical injury"* and suffered

16 *"physical, psychological, and financial harm due to the attempted commission of a crime or*

17 *delinquent act"* and thus was protected under Cal. Lab. Code § 230 against retaliation due to her

18 crime victim status and any of her actions in ensuring her health, safety, and welfare.[29]

19

20    68.    On April 5 Gjovik also notified Osman Akhtar, Director of Apple "AC Wellness"

21 employee medical Centers and Clinical Engineering, with whom she had been in previous

22 contact with, sharing that after her article was published, that more people came forward from

23 the 3255 Scott Blvd apartments reporting illness. Gjovik told Akhtar *"two are Apple employees.*

24 *At least one went through AC Wellness but no one could figure out what's wrong with them."*

25 Gjovik suggested the clinic should start *"screening local folks"* with unexplained medical

26 symptoms that match solvent exposure.

27

28 ───────────

[29] Cal. Lab. Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955. *"regardless whether anyone is arrested."*

27

69.     In April 2021, one of Gjovik's law professors suggested she contact the Santa Clara County District Attorney's office and document her findings and concerns. The professor was a prior criminal law attorney and warned Gjovik that her complaints about the pollution and chemical exposure she discovered could lead to retaliation and violence. Gjovik contacted the County DA's office on April 9 2021 and talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes. They scheduled a meeting and discussed Gjovik's concerns about 3255 Scott Blvd on April 16 2021. Apple would have seen these emails on Gjovik's work devices.

70.     On April 9, 2021, Waibel replied to Gjovik's email, stating that she would launch an investigation into Powers, but only into his statements about Gjovik's 'mental health' and complaints she was 'being too hard on the white man.' Gjovik immediately replied, indicating that she did not want an investigation (because she feared retaliation), and instead simply wanted her to explain "*labor laws*" to Powers. Waibel says she is going to do it anyway.

71.     On April 11 Gjovik wrote to Powers, forwarding the email she sent with questions and concerns to Steiger and Waibel including about "compromised" and "missing" sub-slat vents per the documentation, telling Powers, *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on."*

72.     In April 2021 and through August 2021, Gjovik complained to Apple about an apparently failure to properly report and track workplace injuries and unusual behavior related to worker's compensation requests. In April 2021, Gjovik was convinced a fainting spell at her office in September or December 2019 was due to vapor intrusion. Apple Human Resources Business Partner Helen Polkes insisted Gjovik file a worker's compensation claim for the fainting spell. Gjovik questioned Apple's justification and incentives in requesting Gjovik file the claim nearly two years after the fact. Gjovik documented her confusion in emails with

28

Polkes, Powers, and coworkers. Gjovik did follow Polkes instructions and filed a claim on April 26 2021.[30]

73.    Gjovik has a phone call with Waibel on April 27 where Gjovik requested again that there not be a sexism investigation. Waibel says there will be a sexism investigation. Waibel also gave Gjovik a five-point balancing test if Gjovik wants to talk about workplace safety.

74.    On April 29 Gjovik met with West and complained about the safety issues, retaliation, and harassment. She said she needed him to help and intervene or else she would have no other choice but to quit Apple. West told her she can just quit Apple. Gjovik documented his statement in meeting notes and forwarded it to Waibel.

75.    Gjovik saw an occupational exposure doctor on April 29 2021 about her exposure at 3255 Scott Blvd and at 825 Stewart Drive.

76.    On April 30 2021 there was another phosphine leak at the 3255 Scott Blvd facility. The HazMat agency said it required an evacuation and the phosphine was vented into the exterior air. Two weeks later in May 2021 Apple submitted manifests to transport x pounds of 'vacuum filters with glass shards' implying there was an explosion. Under information and belief there was a phosphine explosion on April 30 2021. Under information and belief, the residents in the apartments were never notified of the explosion or the venting of phosphine into their air.

77.    Another issue was Apple's concealment of the HVAC issues and avoidance of Gjovik's questions about the HVAC and air quality. By May 2021, Apple must have known that Northrop Grumman finalized their first sub-slat depressurization system report and transmitted it to the US EPA, per the US EPA's request May 12 2021, triggered by Gjovik's complaints. Northrop Grumman's report attempted to conceal the issues but issued a follow up report in March of 2022 which properly condemned Apple reckless conduct. Under Cal. Lab. Code § 6406, no person shall remove, displace, damage, or destroy any safety device or safe guard furnished for use in any place of employment (such as taking a hacksaw to the Superfund poison

---

[30] Workers Compensation Claim for Chemical Exposure (# 302174831070001) § Filed: 4/26/2021; Dated: 12/4/2019

29

1  vents on the roof and then installing the HVAC intake on top of them where the poison air

2  pools). [see also, Res Ipsa Loquitur]. Northrop Grumman emailed EPA the report on May 25

3  2021. Under information and belief, at some point between May 12 and May 25, Northrop

4  Grumman notified Apple that they were transmitting the report and data that would reveal

5  Apple's negligence, and that prior they had conspired to conceal the issue from regulators, while

6  knowing Apple's employees were likely being exposed to carcinogens.

7      78.    On May 17, 2021, in a sudden change of course, in a meeting with Gjovik and

8  Waibel, Steiger claimed the office was safe after all, and there would not be any testing in the

9  building for vapor intrusion. Steiger and Waibel also informed Gjovik they would not be

10  answering any of her questions about the safety of the office building. The meeting was

11  supposed to be to answer Gjovik's pending open questions from April, but instead Steiger only

12  read from a piece of paper like it was a script and told Gjovik that EH&S would no longer

13  answer any of her questions about her office, and that EH&S may no longer test the air for vapor

14  intrusion. Steiger went on medical leave less than thirty minutes after the meeting.

15      79.    When the worker's compensation administrator contacted Gjovik she expressed

16  surprise and concerns that Apple would intentionally ask, or even allow, employees to work on

17  Superfund sites. The Sedgwick investigator said she even called her contacts at Apple's HQ to

18  confirm if Apple actually had offices on Superfunds. She said the contact's initial response was

19  "of course not" but then upon searching Gjovik's office address online, the top result noted it

20  was a Superfund site. The investigator was further distressed to learn that additional offices

21  Gjovik had worked in and visited were also Superfund and Brownfield toxic waste clean-up

22  sites. The investigator said she was going to set Gjovik's claim as "continuous injury" and

23  Gjovik should expect the investigation to take at least two months.

24

25      80.    Waibel requests another phone call with Gjovik and they talk on May 20 2021.

26  Gjovik summarizes the call in the August 2021 Issue Confirmation as: "*Jenna tells me she will*

27  *talk to Rob Yepez about my sexual harassment claim and tell him I was the one who reported it.*

28  *I ask her not to and that I don't want him to know it was me and ask her not to look in to it and*

---

30

*she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation."*

81. Waibel implicitly threatening to deport and/or cancel the Permanent Resident Card sponsorship for one of Gjovik's best friends who was in the United States on a work visa, because Gjovik exercised her rights under Cal. Labor Code and was seeking information regarding whether Apple was in compliance with Cal. Labor Codes. [31] [Note, Gjovik's friend who had an in progress Green Card application sponsored by Apple, no longer resides in the United States].

82. In May 2021, Gjovik filed a worker's compensation claim for her 2019 fainting spell at the 825 Stewart Drive office, at the fraudulent and malicious urging of Apple. Apple then entered an office-space real estate "mega-deal" with Irvine Company (on toxic waste clean-up sites) and the weekend of the deal, Gjovik received a voicemail late on a Saturday night from the Sedgwick benefits administrator suddenly closing Gjovik's claim. [32] Under information and belief, Apple, Irvine Company, and Sedgwick conspired to close Gjovik's claim as part of their deal. At some point between May 25 and June 1 Apple conducted a "floor survey" looking for cracks in the slab of Gjovik's office at 825 Stewart Drive.

83. On June 14 Gjovik and another employee email Tim Cook (CEO) & Deirdre O'Brien (HR VP) expressing concerns about returning to work during the COVID-19 pandemic. Gjovik repeatedly expressed concerns about COVID safety. [33]

84. On July 2, Waibel emails Gjovik to notify her that there are cracks in the floor of Gjovik's office and Apple is going to repair the cracks, and following the repairs, then will test the air. On July 2, Gjovik replies to Waibel asking if Apple would test the air before they fix the

---

[31] Cal. Lab. Code § 1019(b)(C), (D)

[32] Silicon Valley, *Apple mega deal: Tech titan launches huge Sunnyvale expansion that could accommodate thousands*, https://www.siliconvalley.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/

[33] i.e., Cal. Lab. Code §§ 6325, 6409.6

---

31

1    floor to understand if there was vapor intrusion occurring through the cracks for "*cancer*

2    *monitoring*." Apple said no.

3    85.    On July 4, Gjovik expressed concerns to Lagares again about EH&S' suspicious

4    conduct and statements, including that now Apple said they had no plan to test the air in the near

5    future. Gjovik wrote to Lagares, "*The only reason I can think of that they're refusing to do this*

6    *testing after they previously planned on doing it, was that all the questions I was asking were*

7    *very good questions and revealed major gaps/issues — so they're going out of their way to not*

8    *have evidence of their negligence.*" Gjovik implored Lagares to look into EH&S's conduct,

9    saying "*I think everyone is forgetting I work in engineering & I'm in law school. I know how*

10   *toxic torts work.... right now, it feels like I'm not only being harassed by my manager and my*

11   *HR BP, but it appears there's a conspiracy to force me back into what appears to be a very*

12   *physically unsafe office building.*"

13   86.    Gjovik complained on July 4 2021 to Lagares that in 2017, West directly harmed

14   Gjovik and then failed to seek medical treatment despite potentially life-threatening injury due to

15   "being too drunk" and then days later Powers texted West complaining about "trying to kill" his

16   employee.

17   87.    On July 7, Gjovik met with EH&S (Steiger and Jain) and Waibel. Steiger says

18   Apple refuses to test the indoor air before they fix the cracks in the floor. Waibel claims that

19   because the 2015 test results came back acceptable that there is no reason to worry about vapor

20   intrusion. Gjovik reminded Waibel the cracks in the floor are new and cracks in the floor is the

21   primary vector for vapor intrusion at these sites. Gjovik explains that a cracked slab is a "change

22   of circumstances" and questions the need for air testing before and after the repairs, to confirm

23   the repairs were successful. Waibel said no. Waibel said Apple will not provide Gjovik any

24   details about what "fixing the cracks" entails and tells Gjovik they will not answer any more of

25   her questions about it. Gjovik reiterates she does not feel safe at the office and that she is

26   worried about vapor intrusion.

27   

28   88.    On July 8-9, Gjovik texted with her coworker Ertell complaining about Apple's

handling of the office. She wrote, "*I'm seriously considering doing one of these 2hr sorbent*

32

1  *tubes in the next few weeks before they seal the floor. Maybe ideally one early morning before*
2  *people come in and later evening after people already left.*" Ertell replied, "*Glad that you are all*
3  *over this!*"

4      89.    Gjovik also complains that she believes Apple is misrepresenting the conditions
5  at the office and Apple's response. Gjovik complained Apple claims the floor crack survey and
6  air testing is "*routine maintenance*," but that they also admitted it was the first time Apple had
7  ever done it. Gjovik questioned how it is "*routine*" if it has never been done before. Steiger then
8  claimed Apple had also performed floor-sealing activities at "two or three buildings." Gjovik
9  asked which buildings, so she can understand if Apple was being honest with her or if they were
10 indeed misrepresenting the situation. Waibel interjected and said "*they won't discuss buildings*
11 *[Gjovik's] not in,*" "*won't answer that question,*" and "*that level of detail is not appropriate for*
12 *this call.*"

13     90.    Steiger tells Gjovik that Apple no longer has any plan to test the indoor air at the
14 office, and that while it will occur at some point in the future, there is no estimated timeframe.
15 Steiger also says when they test it will only be with passive samplers (not SUMMA & TO-15),
16 with HVAC on (not worst-case scenario), and when employees are working in the office (and
17 could cause their own emissions). Gjovik expressed concerns that HVAC on brings in outdoor
18 air and would dilute indoor vapor intrusion. Gjovik also complained that testing with employees
19 working would give Apple an excuse to blame Gjovik's coworkers on causing their own
20 emissions as an excuse for any abnormal results (as Apple did when they vaguely blamed
21 "construction" for the high Toluene and Ethylbenzene in the 2015 test results).

23     91.    Steiger and Jain told Gjovik their test plan is "*protocol*" and "*over and beyond*"
24 what is expected. Gjovik asked them to share their protocols and documentation with her and
25 they said no because they don't exist and she can just "Google it." Waibel then said Apple will
26 not answer any of Gjovik's pending questions or any new questions and that Apple's position is
27 that "they feel it is safe." Gjovik emailed the three of them notes summarizing the meeting.
28 Gjovik then forwarded those notes to the US EPA. Gjovik complained about this meeting to
Okpo and Lagares and asked them to intervene. Gjovik included the meeting in her Issue

33

1  Confirmation document from mid-August 2021. Gjovik noted that witnesses included: "y'all
2  know what you did."

3      92.    Steiger, the Apple EH&S manager who had previously overseen Apple's due
4  diligence & environmental engineering related to offices on chemical clean-up sites, suddenly
5  resigned from Apple in the midst of these discussions. The last meeting Gjovik attended with
6  Steiger, he seemed upset with Apple and was forced to simply read a piece of paper that
7  appeared to have been written by Apple where he said essentially the office is safe because he is
8  an expert and he thinks it is safe. They told Gjovik that would be her final update. Steiger had
9  joined Apple in 2013 but now was gone within days.

10     93.    On July 15 2021, Mr. Powers suddenly and substantially increased Gjovik's
11  workload, all with unfavorable projects. The move made it apparent that he was trying to force
12  her to quit. Gjovik replied to him same day complaining that all the new assignments already
13  belonged to other people, and that the increase was quadrupling her workload. Gjovik promptly
14  informed Lagares and Polkes, that she was being "punished" by her supervisor.

15     94.    On July 16 Gjovik emailed Lagares: "*As previously discussed at length, I have
16  serious concerns about work place safety of my building, and Apple's other buildings on
17  chemical release sites. At least for my building, from what I've seen, Apple appears to have been
18  negligent with properly managing the vapor intrusion from the three toxic groundwater plumes
19  under the building. Also, as mentioned, I believe I have already been injured by the vapor
20  intrusion in 2019.*"

21     95.    Lagares told Gjovik that there were delays in his response to her because he had
22  to consult with a larger group of people and remarked to her there was a substantial number of
23  stakeholders interested in her complaints. Under information and belief, Lagares was referring to
24  members of the Enterprise in the scheme to hide Defendant's unlawful acts, including: the Real
25  Estate team, Steiger, Corporate Legal, Worldwide Loyalty, Ronald Sugar, Lisa Jackson, Margot
26  Perez Sullivan, and others.

27     96.    On July 16 2021, Okpo opens a new, second investigation. Gjovik said she
28  wanted them to investigate all the terrible things she went through at Apple since they ruined her

34

1    career already. On July 18 2021, Gjovik posts on Apple's Slack discussion tool that Apple was

2    negligent at her office and that Apple was misrepresenting their policies and protocols. Gjovik

3    also complained of "*intimidation and retaliation for raising concerns*." Gjovik shared she was

4    hoping that her talking publicly about the issues might "*make Apple & their goons act more like*

5    *humans*."

6        97.     Gjovik wrote to US EPA on July 19 asking for an update and complaining about

7    Ronald Sugar and conflicts of interest, and complaining Apple will not test the air before they

8    fix the cracked floor. The next day she replied and added that she was concerned Apple did not

9    notify US EPA about the cracks and claimed they do not have to.

10       98.     On July 20 2021, Gjovik complained about a manager in West's organization

11   making a written statement that sounded like he was bragging about smuggling and otherwise

12   violating US sanctions on Syria. Gjovik had raised the issue a year prior and there had been no

13   response. Gjovik contacted the Business Conduct tea, reporting to Tom Moyer, head of

14   Worldwide Loyalty. The team responded prompt and asked for a phone call. During the call

15   Gjovik was asked to preserve evidence while they investigate and the investigator told her it did

16   not sound like Apple violated sanctions because it was the employee's family handling the

17   smuggling, and because it was illegally importing the goods into Syria, it would likely break

18   Syrian laws but not US laws. Nothing was said about reporting the matter to the government

19   regardless. The investigator did comment he was concerned that Gjovik's felt coworker thought

20   it was normal to brag, at work no less, about illegal smuggling. Gjovik noted: "*I've been*

21   *complaining about, amongst other things, the culture of impunity and general lawlessness in my*

22   *org*." West then emailed Gjovik saying that because Apple did not break the law there is no

23   policy violation but they are going to remove the smuggling post anyways for no reason. Gjovik

24   complained he was minimizing the issue. West never responded to Gjovik ever again.

25

26       99.     Apple said they would consider offering a severance package with Gjovik if

27   Gjovik would sign a litigation waiver. Apple agreed Gjovik would not have to sign another

28   NDA but did make the severance negotiation contingent on Gjovik executing a waiver of claims

     while intentional concealing material facts about harm Apple caused to Gjovik through chemical

                                              35

COMPLAINT                                                              SEPT. 7 2023

1  exposure at her office at her apartment. Gjovik expressed concerns about the settlement amount

2  and her potential medical costs if she was to get cancer from the exposure. Apple denied the

3  severance on those conditions, in violation of California law, as Apple had previously denied

4  Gjovik's request for a different position not in a hostile work environment, knew she was in a

5  hostile work environment, and then effective suspended Gjovik before it then swiftly fired her. If

6  Gjovik accepted the claim waiver, Apple acted as if it would provide severance. Because Gjovik

7  denied the waiver, Apple discontinued Gjovik's employment and denied the raise and bonus due

8  to her at that time in violation of Cal. Gov't Code § 12964.5(a).

9      100.    On July 27 2021 the US EPA notified Northrop Grumman they wanted to inspect

10  Gjovik's office at 825 Stewart Drive due to Gjovik's disclosures and the HVAC issues. Under

11  information and belief, Northrop Grumman notified Apple that day, but no later than August 2

12  2021. US EPA and Apple conspired to hide the fact that there was even an inspection from

13  Gjovik indefinitely.

14      101.    On July 28 2021 Gjovik complained to a friend in Human Resources that she

15  already believed the second investigation was "a sham" and that Apple's Employee Relations

16  team was "supporting the culture of discrimination and impunity." On July 28 2021, Gjovik

17  emailed Okpo and Lagares about discussions with coworkers revealing frequent discrimination

18  and harassment issues across Apple, and what appeared to be systemic cover-ups of those issues

19  instead of actually resolving the problems, and that meanwhile Apple fraudulently holds itself

20  out publicly as caring about human rights and respect. On July 28 Gjovik texted Okpo asking if

21  he talked to Powers about keeping communications in writing and Okpo said he did not. Gjovik

22  told Okpo she was cancelling her 1:1 that day with Powers and asked him to expedite a

23  resolution. Gjovik texted Okpo a GIF of "Judge Judy" looking stem.

24

25      102.    Gjovik complained to the U.S. EPA about Ronald Sugar and what felt like a

26  Northrop Grumman/Apple cover-up (and forwarded the email to Apple on July 28-29). On July

27  30 2021, Gjovik complained to Lagares, Okpo, Polkes, and Waibel about her concerns about her

28  Superfund office and an apparent cover-up, and that she was "talking to NYT about [the] whole

debacle ongoing.

36

1      103.    At this point, the professional engineer who had previously worked at EKI before

2  joining Apple in 2013 to work on the hazardous waste clean-up at the Apple Park development

3  site, Michael Steiger, who then managed the EKI team as an Apple employee, went back to EKI

4  in August 2021 after suddenly leaving Apple in July 2021. Under information and belief, Apple

5  and EKI conspired to conduct indoor air testing on or around August 4 2021 but concealed the

6  testing and the results. Apple also made no reference to the August 19 2021 US EPA inspection

7  in any subsequent legal filings on Gjovik's retaliation lawsuits and the US EPA employees

8  (Poalinelli, Ty, Schulman, Perez-Sullivan) conspired with Apple to conceal the inspection from

9  Gjovik. Under information and belief, Apple, US EPA employees, and Lisa Jackson conspired to

10  hide this information from Gjovik in order to reduce Apple's liability to Gjovik in the lawsuits.

11      104.    On August 2 2021, Gjovik asked the US EPA what the status of her office was.

12  She said Apple refused to answer anymore of her questions. She also noted she was talking to

13  the New York Times. US EPA, Perez-Sullivan, responded August 3 2021 thanking Gjovik for

14  providing information but failing to mention the inspection or HVAC issues. Perez-Sullivan also

15  killed the New York Times story that day and reported her success in doing so to her manager.

16      105.    When Gjovik told Apple she planned to visit the office on August 5th to gather

17  evidence, Apple suddenly announced they were sending an EH&S team to her office all day on

18  August 4th. On Aug 3-4, Gjovik asked managers on her team who were onsite at the building,

19  Simon Moen & Eddie Borjas, to take photographs of the cracks in the floor as evidence, fearing

20  Apple was attempting to cover-up the safety issues and Gjovik and her colleagues would never

21  understand if they were exposed to chemicals in way that harmed their health. The managers

22  gathered the evidence for Gjovik & Gjovik involved employee relations of what they were doing

23  and showed them the photos. Gjovik notified Apple and told them could not hide or destroy

24  evidence.

25

26      106.    On the morning of August 4, Moen notified Gjovik he was at the office again. He

27  provided more data on the cracks and also noted "EH&S folks are here by the way. With so

28  many devices. Nice job." Gjovik asked him to take a photo of them too and say "*Ashley says hi.*"

COMPLAINT                                  SEPT. 7 2023

He responded, "*They are in the conf room next to Powers' office. Very difficult to take pic.*" Gjovik responded, "*they're legit hiding.*"

107.    A couple of hours later August 4, Apple suddenly put Gjovik on "indefinite administrative leave" and Gjovik said she did not want to be on leave, but Apple said she did not have a choice. Gjovik said she wanted to still be able to talk to coworkers and gather evidence, and Apple said she was removed her from the "workplace" and "all workplace interactions." Gjovik was then left unable to coordinate with her coworkers to gather evidence, or to visit her office as planned to gather evidence in person the next day. Gjovik realized that day Apple was preparing to fire her and quickly heard about conversations within her team that confirmed she was going to be fired. Starting around August 6, the managers in West's organization start raising the "Ashley Issue" as a discussion topic in staff meetings. The managers say if anyone has concerns about the "Ashley Issue" they should talk to Polkes. They and West mention West's plans to "discuss the Ashley Issue" at the upcoming October All Hands meeting. Gjovik complained to Apple about being on leave and called it a suspension but also prepared for imminent termination.

108.    Gjovik then saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S send notices they would be on site for long periods of time: Aug 4; Aug 6-Aug 8; Aug 11; Aug 13-15; Aug 18-19; Aug 20-22; Aug 27-29; and Sept 3-5. This was terribly unusual and highly suspicious. On August 12, Global Security (and/or Worldwide Loyalty) host the first ever "NPS Secrecy and Awareness Training" for all of West's organization.

109.    Gjovik was denied a request to attend a pre-registered training on August 20 with Apple justifying the denial "because she was on leave." On August 23 2021 Gjovik sent the revised Issue Confirmation to Okpo with her revisions and corrections, and it noted additional complaints she filed including a Business Conduct complaint about Ronald Sugar and her office, and she attached the Issue Confirmation with all of her other concerns. When Gjovik sent the "Issue Confirmation" back to Okpo in August 2021, she highlighted concerns about "Apple Real Estate Environment, Health, & Safety" which she detailed as "*RICO; Negligence,*

38

COMPLAINT                                                                                    SEPT. 7 2023

1  *Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right to Know;*

2  *Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness Tampering.*"

3  Gjovik asked Apple to investigate themselves.

4      110.    On August 28, 2021 Apple's Business Conduct team closed Gjovik's complaint.

5  On August 29 2021 Gjovik filed a formal complaint to the US EPA about Apple and her office

6  complaining of Apple's "lack of due diligence," about "negligence" and "recklessness," and

7  "violations of Right to Know & OSHA." Gjovik complained, "Apple's response has been to

8  misrepresent their activities and the site, intimidate me to not speak about workplace safety

9  concerns related to the site, and have refused to notify the Federal EPA of changed

10  circumstances at the site."

11      111.    On August 30 and 31 2021 Gjovik posted on social media sharing an article she

12  was interviewed for called "*Apple Cares about Privacy, Unless You Work at Apple.*" [34] In

13  Gjovik's posts she complained of Apple's surveillance of workers, its exploitation of workers at

14  the sake of their privacy, Apple's culture of intimidation and retaliation, and she compared

15  working at Apple to being in a panopticon. (Apple would later claim it was one of the reasons

16  Gjovik was fired and called it "*leaking.*")

17      112.    On September 1 2021, an Apple employee, Shantini Vyas wrote a long Twitter

18  thread accusing Gjovik of being a *liar, racist, and a predator.* Vyas claimed Gjovik made

19  "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies.*" Gjovik does not

20  know Vyas and under knowledge and belief Vyas made these posts under direction by Apple.

21
22      113.    On September 2, numerous papers wrote about Gjovik's charges against Apple.

23  Bloomberg wrote about Gjovik's NLRB, US Dept of Labor, California Dept of Labor, and

24  EEOC charges against Apple.[35] Bloomberg wrote, "*Gjovik's situation began with fears about*

25  *whether pollution had made her office a dangerous place to work.... Gjovik said her goal is to*

26  *bring light to systematic problems at Apple and try to improve policies. 'I want to pierce the veil*

27  _____

[34] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021,

28  https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

[35] Bloomberg, Sept 2 2021, https://www.bloombergquint.com/technology/national-labor-relations-board-fields-complaints-about-apple

*of intimidation and secrecy," she said in the interview. "The employees are terrified to speak up about their concerns'."*

114.    On September 3, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB charge against Apple, suggesting she was lying. The article includes quotes from Vyas and Ricky Mondello. Mondello also shared Vyas thread about Gjovik and stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple.

115.    On Sept 3 Gjovik filed a NCDF Disaster Complaint with the US Department of Justice and posted on Twitter about filing it. On Sept 6 Gjovik posted on Twitter as screenshot, captioned: "Aug 2 iMessage with Apple coworker: "*Seriously though, ER's face about the COVID vaccine & Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please talk to Deirdre O'Brien*." @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo of DOJ complaint & iMessage].[36]

116.    Gjovik filed a tip with the FBI on September 3rd about the sanctions. In the crime field she wrote: *"Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup."*  Gjovik posted on Twitter that she had reported the matter to the FBI. On September 6 Gjovik posted on social media about her cases with a status update of the report numbers. In addition to the prior charges, she now also referenced her SEC whistleblower tip.

117.    Around 1am on September 9 2021, the day Gjovik was fired, Gjovik was tipped off that Apple may be surveilling her through her work and personal devices. Gjovik posted publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my [personal] iCloud email and iMessages?"* To which members of the Info Sec community assured Gjovik Apple was doing that and more. Gjovik immediately began removing her data from Apple's servers. Realizing how terrified she had become of her employer, she began searching for legal resources. At 2:16am that morning Gjovik downloaded the US DOJ guide to litigating civil Rico cases, which Apple would have seen.

---

[36] https://twitter.com/ashleygjovik/status/1434830527140229124

40

1

2

3

4

« **Legal Reference** › **Law - CIVIL RICO**    ∨   C    Search Law - CIVIL RICO

Name    ∧    Date modified    Type    S

📄 **8. CIVIL RICO**    9/9/2021 2:16 AM    Adobe Acrobat D...

5

6

7

8

118.    On September 9, Gjovik published comments about Apple's felonious impersonation of law enforcement in 2010 in an effort to get into someone's house and unlawfully search their home. Ten minutes later, Gjovik was contacted by a "Workplace Violence" investigator demanding to speak with Gjovik on the phone and "within the hour."

9

10

11

12

13

14

15

16

119.    Gjovik promptly responded that she was willing to participate, but given the nature of her complaints, she wanted there to be a written record of their conversations. Gjøvik reiterated, *"As mentioned, I am definitely willing to participate in your investigation,"* adding: *"I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government."* Added Gjøvik: *"I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that."*

17

18

19

20

21

22

23

120.    Apple did not respond. Gjovik responds again complaining to the Workplace Violence interrogator of *"witness intimidation the day before her affidavit."* Apple's Workplace Violence interrogator never responds. Several hours later at Vice President emails Gjovik with subject line *"Your employment status"* and an attached letter saying she had been terminated for vague reasons. The termination letter illuminated nothing. It repeated an ambiguous charge and said she would *"failed to cooperate and to provide accurate and complete information during the Apple investigatory process."* [37]

24

25

26

121.    Up until a few hours before she was fired, Gjovik had access to future product roadmaps; unreleased hardware/product design and configuration; future operation system source code; access to all Research & Development finance ordering accounts at the company.

27

28

---

[37] Gizmodo, *Apple Fires Program Manager Who Accused Bosses of Harassment, Intimidation.* Sept 10 2021, https://gizmodo.com/apple-fires-program-manager-who-accused-bosses-of-haras-1847649269

41

1  including the executive office;[38] information on the manufacturing process and supply chain;
2  competitive analysis; product pricing information; product launch dates; marketing plans;
3  customer feedback and usage trends; access to future software features and projects; access to
4  submit code to the OS releases and view what others submitted.

5      122.    On September 9, Apple manager/supervisor Ricky Mondello, posted on Twitter
6  about Gjovik's termination, "*Sometimes you fuck around. Sometimes you find out.*" Gjovik
7  testified to NLRB for her affidavit on September 10 2021.  Gjovik received two calls from
8  Unknown number on Sept 12 with no voicemail. Gjovik did not pick up and complained on
9  Twitter that Apple needs to email her and keep it in writing if they want to talk. Gjovik watched
10  $591,612 in unvested AAPL RSUs disappear that weekend.

11      123.    The Press discussed Gjovik's retaliation and termination. A Public Radio
12  representative with over 87,000 Twitter followers publicly commented about "The Ashley
13  Gjovik Story," that "*the irony that Apple fired her during the week of Labor Day, allegedly as
14  retribution for filing a NLRB complaint, should be lost on no one.*" A Bloomberg reporter who
15  is covered Gjovik's labor struggle with Apple in depth posted after Gjovik's termination,
16  "*Ashley Gjovik, who was fired by Apple Thursday after filing NLRB, OSHA, and EEOC
17  complaints, has received right-to-sue notices allowing her to sue for discrimination in federal or
18  state court.*" In September, The New York Times described Gjovik's situation with Apple:
19  "*After taking her complaints about #Apple public this year, Ms. Gjovik was placed on leave and
20  later fired. She filed complaints with the NLRB, OSHA, the EEOC, & the Justice Department.*"
21  The close nexus between Gjovik's protected activities and Apple's negative actions towards her
22  was lost on no one.

24      124.    On September 15 2021, Employer's lawyers emailed Charging Party a letter
25  implying she was terminated due to several Twitter posts and the video content in a news article.
26  Employer pointed to the URLs and asked Charging Party to remove the content, which was
27  black and white photos of Charging Party secretly taken from her iPhone to gather her
28  biometrics without her consent; a video showing a number of these photos including in her

---

[38] See Evidence Files: Email from/to Jackie Franks and Tammy Davis on March 9 2017

1   living room, bedroom, bathroom, and in public spaces; and Twitter posts where Charging Party

2   complained about Employer's surveillance, intimidation tactics, overly restrictive confidentiality

3   policies, and ex-Intelligence/ex-military corporate paramilitary team known was the "Worldwide

4   Loyalty Team." This letter created the implication of surveillance and confirmed actual

5   surveillance. The message from Employer also expressly told Charging Party that Employer's

6   surveillance of its employees is 'confidential' and speaking of it publicly can result in immediate

7   termination.

8   125.   In addition to the bizarre and clearly pretextual timeline of events with

9   Kagramanov, Apple's lawyers' communications also show Apple's retaliatory animus by

10  timeline alone. Apple's lawyers contacted Gjovik on Sept 15, pointing to content posted 16-18

11  days prior. This is supposedly the same content that Kagramanov reached out to Gjovik about on

12  Sept 9, saying he had to talk to her "within the hour" about it and when she simply asked to keep

13  things in writing, Kagramanov suspended her account access.

14  126.   Gjovik's attorney for the retaliatory legal matter wrote to Apple's lawyers on

15  October 6 2021 saying, "*While I understand that Apple is not opposed to taking aggressive*

16  *litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as*

17  *an attorney regarding the assertion of claims that have no basis in fact or law.*" Gjovik's lawyer

18  told Apple, "*Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality*

19  *and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are*

20  *incorrect.*" He then went on to knock down Apple's arguments one by one until nothing was

21  left. Her lawyer closed, "*Given Ms. Gjøvik's removal of the content you referred to, coupled*

22  *with the infirmities of your intellectual property claims in the September 15, 2021 letter, we*

23  *consider this issue closed, and expect that Apple will immediately cease sending any further*

24  *inappropriate demands.*" Apple never responded.

25

26  127.   On October 12 2021, Gjovik filed two additional NLRB charges against her ex-

27  employer, Apple. The charges alleged Apple's NDAs and employment policies violate federal

28  labor laws in numerous ways outlined with footnotes in her brief. (The NLRB issued a decision

    of merit agreeing with Gjovik on January 29 2023).

128.    Apple's proffered reasons for Gjovik's termination were so farfetched and pretextual, a detailed article was written about exactly that, titled "*Apple Wanted Her Fired. It Settled on an Absurd Excuse.* "[39] The October 14 2021 article explained the background of Gjovik's whistleblowing about toxic waste as it was clearly the reason for Gjovik's termination.

129.    Gjovik emailed a federal investigator on October 26 2021 to complain that after the US NLRB had opened an investigation into Gjovik's charges that Apple's NDAs were unlawful (and the NLRB did find they were unlawful), Apple filed fraudulent statements to the US SEC about their NDAs denying any type of investigation. Gjovik complained to the investigator that Apple was "*literally lying to the SEC*" and the situation at Apple was like "***Waco meets Enron.***"

130.    On October 2 2021, an Apple account attempted to manipulate Gjovik to get access to Gjovik's computer. On November 5, the same Apple account attempted to direct Gjovik to a specific 3rd party iPhone repair shop, which after realizing the account was Apple, now Gjovik believes was another attempt to modify her devices for surveillance.

131.    On December 12 2021 the US Department of Labor docketed Gjovik's Whistleblower Protection Cases.

132.    A coworker called "Joanna Appleseed" (alias because this person tried to sue Gjovik last year for naming her in charges and legal filings alleging witness intimidation, and Gjovik fears she might try to do it again) who worked in Apple's *Worldwide Loyalty* team, posted on social media about Gjovik's government complaints and investigations claiming they were meritless and Gjovik was lying. Appleseed posted on September 9 2021 that Gjovik's NLRB charge may not have merit and she does not believe in Gjovik's charges; on September 13 2021 she posted that Gjovik's EEOC and DFEH charges were meritless, on September 26 posted that Gjovik was lying about being put on leave and that Gjovik "*leaked IP*," and again on November 1 2021 referencing "*evidence*" and jury "*verdicts*". On September 16 she posted that no one should donate to Gjovik's GoFundMe and called Gjovik a "*predator*," On October 25

---

[39] Dell Cameron, *Apple Wanted Her Fired. It Settled on an Absurd Excuse*, Gizmodo, Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

COMPLAINT                                                                          SEPT. 7 2023

1  2021 Appleseed posted that Gjovik's "complaints with federal and state agencies" do not have
2  merit and that Gjovik was not being "*honest or genuine*" in filing the charges, and that Gjovik
3  was "*harmful*" for doing so.

4    133.    On December 13 2021, Appleseed posted that Gjovik's claims were "*full-out*
5  *fabricated nonsense that borders conspiracy.*" On December 30 2021, Appleseed posted that
6  Gjovik has "*narcissistic personality disorder*" and urged people to ignore her. On October 25-29
7  2021, Appleseed messaged one of Gjovik's friends and told them Gjovik was "*lying about a*
8  *bunch of stuff,*" "*lied to the public, to the government, about what happened to her.*" On
9  December 29 2021, Appleseed messaged one of Gjovik's friends claiming Gjovik was
10 "*perjuring herself.*" On December 30 2021, Appleseed messaged once of Gjovik's friends
11 saying she was "*one of Apple's witnesses against [Gjovik]*". On February 5 2022, Appleseed
12 send Gjovik an email information Gjovik that Gjovik's SEC whistleblower tip "*contained*
13 *absolutely no material information.*"

14   134.    Gjovik filed complaints about witness intimidation and witness retaliation to
15 NLRB, US Dept of Labor, and California Department of Labor on or around January 10 2022.
16 Gjovik posted on social media it was filed and suggested Apple send cease & desist, and
17 document retention notices to a number of managers and employees including Vyas, Mondello,
18 and Appleseed. Around this time Appleseed filed a false report to the FBI accusing Gjovik of
19 "*criminal extortion and blackmail*" and apparently reported Gjovik to a police department.

20   135.    On January 30 2022, Appleseed sued Gjovik in a Washington state court
21 requesting an anti-harassment restraining order. Appleseed cited Apple's January 10 2022
22 NLRB charge on the legal petition writing under other pending litigation: "*NLRB Charge CA-*
23 *288816 – charge against Apple Inc which contains false/misleading information about me made*
24 *in bad faith by Ashley Gjovik.*"

25   136.    Appleseed sent Gjovik a lengthy email on February 5 2022 (over 3,000 words)
26 making false accusations against Gjovik, unlawful demands of Gjovik, threats against Gjovik
27 and demanded Gjovik withdraw allegations and evidence about Appleseed from Gjovik's'
28 federal charges (charges about obstruction of justice & witness tampering). Appleseed in great

45

1   hostility told Gjovik she believed one of Gjovik's SEC Whistleblower filings: *"contained*

2   *absolutely no material information for shareholders."* Gjovik refused to withdraw any federal

3   charge, allegations, or evidence -- and protested again that Appleseed was contacting her despite

4   Gjovik's request Appleseed cease all communication.

5   137.   On February 15 2022, Appleseed submitted a statement to the Washington state

6   courts saying she complained about Gjovik to the FBI and also to the Chief Security Officer of

7   the National Labor Relations Board, the previous Chief of Physical Security at The White House

8   and a Security Manager at the Department of Defense. In the February 15, 2022 testimony

9   Appleseed also claims, without any evidence to support prima facie elements of the charges, that

10  Gjovik committed *"criminal cyber-harassment, blackmail, and extortion."*

11  138.   Gjovik contacted Porter at the Santa Clara DA's office about the developments

12  with Apple, complaining about witness intimidation and witness retaliation on February 21 2022

13  and December 15 2022. Porter said it is generally up to the government agencies to refer cases to

14  the DA's office for prosecution, so Gjovik would need US NLRB, US EPA, or US Dept of

15  Labor to refer the case. Gjovik asked the agencies for DOJ referral repeatedly but they ignored

16  her and some of them kept intimidating her themselves (i.e., US Dept of Labor). Gjovik

17  complained to Porter that the agencies were *"complicit in the cover-up."*

18  139.   On March 1 2022, a Washington state district court Judge ruled and granted the

19  restraining order against Gjovik and demanded Gjovik not speak or write, publicly or privately,

20  about the ex-Global Security employee, Gjovik's Apple cases (which complain of threats &

21  harassment from the employee and many others), or anything else related to that employee for

22  five years (until 2027) with the single exception of *"testifying"* to the government. Gjovik would

23  eventually win the appeal but it took until September 2022 and was not fully dismissed until

24  January 2023. Gjovik's appellate win was even cited in a SCOTUS brief from the Electronic

25  Frontier Foundation in December 2022.[40]

---

28  [40] *Barton v State of Texas*, On Petition for Writ of Certiorari to the Supreme Court of the United
    States, Brief of Amicus Curiae Electronic Frontier Foundation, Eugene Volokh as Counsel of
    Record, pg10-12 *"Criticism of Political Activists"* (Dec 7 2022).

46

140.    On July 14 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with in accurate information, so the data about Gjovik's interview must have been destroyed or falsified. Gjovik won her appeal and a decision was issued stating:

> Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."

141.    There were three highly suspicious "call-drops" during phone calls over a period of ten days in 2022. The first drop occurred May 16 at 6:29pm PST while Gjovik was on the phone with an attorney in the state of Washington. The call dropped just as the lawyer was about to share information about the business associations of the state judge who had just ruled against her. The second drop occurred May 24 at 2:03pm during a call with a friend who lives and is located in Canada, and during this "drop" both experienced an outage of their entire internet connection and had to reboot routers in order restore the connection. The second drop occurred just as this friend was recommending an app that Gjovik could use to monitor her internet for hacking. [Gjovik got the name of the app from him after and the app did show Gjovik's internet was being hacked]. The third drop occurred May 26 at 1:59pm while Gjovik was on the phone with the Santa Clara District Attorney's office reporting unlawful conduct by Apple. The third drop occurred just as the Santa Clara DA's office attorney said something to Gjovik like "I will try to help you."

142.    Gjovik filed a complaint with the FBI on May 22 about the ongoing retaliation and harassment. Gjovik called the Santa Clara city police on May 31 2022 [re: report 2205310079] to report the listening device Apple planted in her chattel property and the call

https://www.supremecourt.gov/DocketPDF/22/22-430/249364/20221207141747388_22-430%20Amicus%20Electronic%20Frontier%20Foundation.pdf

1  drops and internet interference that led to her to search her items for bugs. Gjovik also reported
2  the matter to the FBI on May 29 2022 and the agent she talked to advised her to give the object
3  to the local police.[41]

4      143.    On July 20 2022, Gjovik filed a complaint with the US EPA OIG Hotline about
5  Jackson and others misconduct. Gjovik complained about "false representation[s] about a
6  material fact," "fraud," "knowingly falsifying or concealing a material fact," "abuse of power,"
7  and "improper use of government resources." Gjovik noted "discrepancies between reported
8  facts and supporting documentation," and "site inspection different status than what was
9  reported to EPA."

10      144.    Gjovik filed a complaint with the FBI on August 8 2022 to report break-in and
11  electronics in her attic. The FBI again advised her to call the police. Gjovik called the Santa
12  Clara city police on August 9 2022 [re: report 2208090087] to report Apple breaking into her
13  attic and installing some sort of electronic equipment. Gjovik also reported it to her landlord,
14  Prometheus, on August 9 2022.

15      145.    In January 29 2023, NLRB found merit in two of Gjovik's charges.[42]  NLRB that
16  "various work rules, handbook rules, and confidentiality rules at Apple" are unlawful because
17  they "reasonably tend to interfere with, restrain, or coerce employees" [43] In addition, the agency
18  "found merit to a charge alleging statements and conduct by Apple — including high-level
19  executives — also violated the National Labor Relations Act.". [44]

20      146.    In August 2023, CalSTRS suddenly sold 825 Stewart Drive to BentallGreenOak
21  at $6.5M above the prior sale price, despite all of the new issues introduced by Apple's botched
22  renovations, increased CERCLA obligations, and increasing contamination from the upgradient

---

[41] Bugged items in violations of Cal. Penal Code [§§ 631, 632, 632.5, 632.6, 632.7] and US Code
Title 18 [§§ 2511(1)(a), (c), (d); 2701-2712].
[42] *Apple Executives Violated Worker Rights, Labor Officials Say*, Bloomberg, Jan 30 2023,
https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-say
[43] CNN, *Apple has infringed on worker rights, NLRB investigators say*, Jan 31 2023,
https://www.cnn.com/2023/01/31/tech/apple-worker-rights-nlrb/index.html
[44] Bloomberg, supra.

1  plume.[45] Under information and belief, the sale price was inflated to pay off CalSTRS for the

2  harm Apple caused because CalSTRS is one of the largest Apple shareholders ($4B).

### VII.   LEGAL CLAIMS

5  147.    Gjovik incorporates by reference each and every allegation and fact before and

6  after this section, and within this section, with all sub-sections of this section.[46]  Where any

7  argument contradict with another argument, one or both of the conflicting arguments will be

8  pled in the alternative. Gjovik pleads all allegations independently of each other if no conflict of

9  law; but if conflict, then she pleads elements "in the alternative" to include the most coverage of

10  facts and legal remedy, while not duplicating remedies if prohibited, and not precluding or

11  preempting other claims in the complaint. Examples are pled to establish claims but are not the

12  exclusive facts for each claim. Where damages are quantified, they are done so to prove prima

13  facie elements but are not to be considered facts and instead will be fully pled, detailed, and

14  argued during the trial.

15  148.    Claims and allegations against "Apple" are made broadly to include corporate

16  liability for relevant actors as appropriate for each statute/law and circumstance, including:

17  Respondeat superior (managers, corporate officers, employees); labor law's "supervisor" theory;

18  agency theory for agents (law firms, contracted service firms, those asked to do favors, those

19  coerced to perform acts, employees, etc.).[47] Concurrently and in the alternative, Apple may be

20  responsible via aiding, conspiring, inciting, orchestrating, negligence, condoning, and other

21  methods of vicarious liability for unlawful conduct noted, which will be argued in detail where

22  appropriate during the trial.

23  149.    It's under information and belief, that the named parties are Apple Inc.'s agents

24  and employees, and that those named we reacting withing the scope of her/his/their agency

---

27  [45] Mercury News, *Apple-leased Silicon Valley office building is bought as value jumps*, Aug 29
2023, https://www.mercurynews.com/2023/08/29/apple-office-real-estate-sunnyvale-buy-build-tech-

28  economy-covid-iphone/
[46] Federal Rules of Civil Procedure, Rule 10 Form of Pleadings, (c) Adoption by Reference
[47] Cal. Lab. Code § 1104

49

1   and/or employment when he/she/they harmed Gjovik. [48]  Even if named parties conduct was

2   unauthorized by Apple Inc, it is still within the scope of employment and/or authorization

3   because the conduct was committed in the course of a series of acts authorized by the employer

4   and the conduct arose from a risk inherent in &/or created by Apple Inc [49] Further, actions

5   outside work hours and facially appearing recreational are still within the scope of employment

6   and/or agency because they were carried out with the employer's stated &/or implied

7   permission, they provided a benefit to the employer, and because they had become customary. [50]

8       150.    Where any statute of limitations is in question of possibly being expired for an

9   alleged claim, Gjovik, where reasonable, will argue the statute of limitations should be tolled

10  due to Apple's fraudulent concealment of numerous material facts in this case. Most

11  significantly, Gjovik not learning about the August 19 2021 inspection of her office until June

12  2022, and not learning about Apple's secret silicon fabrication plant outside her apartment in

13  2020 until February 21 2023, and only learning these facts after dogged, persistent research and

14  public records requests despite much push back and obstruction in an attempt to keep these facts

15  concealed. Gjovik may also argue, where applicable, the doctrine of continuing violations. [51]

16

17  **A.    SOX WHISTLEBLOWER RETALIATION (15 U.S.C. § 1514A)**

18      151.    The first claim against Apple is for retaliation under the SOX whistleblower

19  statute. SOX whistleblower retaliation charges begin with US Department of Labor but then

20  allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within

21  180 days. Gjovik's SOX whistleblower retaliation claim was filed with US Department of Labor

22

23  ---

[48] Judicial Council of California Civil Jury Instructions (2020 edition), *3701 Tort Liability Asserted
24  Against Principal,* https://www.justia.com/trials-litigation/docs/caci/3700/3701/
[49] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3722. Scope of
25  Employment - Unauthorized Acts*, https://www.justia.com/trials-litigation/docs/caci/3700/3722/
[50] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3724. Social or
26  Recreational Activities,* https://www.justia.com/trials-litigation/docs/caci/3700/3724/
[51] Gjovik's excited utterance upon discovery on February 21 2023, "APPLE IS DOING LITERAL
27  ACTUAL ******* SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I
GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT **** INTO THE AIR
28  FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY
3RD FLOOR APARTMENT" https://twitter.com/ashleygjovik/status/1628250591779516416

COMPLAINT                                                                        SEPT. 7 2023

on August 29 2021 and the case Docketed on December 10 2021. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims. If the Secretary fails to issue a timely final order, the complainant may seek de novo review in the appropriate district court of the United States having jurisdiction. [52] Jurisdiction vests with the district court when the case is filed.[53] There is a four-year statute of limitations to file a claim in court.[54]

152. Gjovik engaged in activity protected and the employer knew Gjovik engaged in this activity, then Gjovik suffered an unfavorable employment action, and Gjovik's protected activity was a cause of the action. The Sarbanes-Oxley Act, 15 U.S.C. § 1514A, seeks to combat what Congress identified as a corporate culture that discourages employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally." [55]

153. Gjovik filed complaints internally verbally and then formally, then complained to the government a filed a complaint with the US SEC. Gjovik had an objectively reasonable belief that Apple intentionally misrepresented and omitted certain facts to investors, which were material and which risked loss, and thus may constitute securities fraud. Gjovik had an objectively reasonable belief that Apple violated SEC rules.

154. Gjovik complained to Apple about conflicts of interest related to a board member and decision about her office, about apparent self-dealing by corporate insiders including an interested party transaction, Apple's false public statements about Apple's environmental and labor practices, including false statements by a prior government official and now Apple executive. Concerns that Apple's internal controls were inadequate as her complaints about the

---

[52] *Ashley Gjovik v Apple Inc* (Apple Inc/Gjovik/9-3290-22-051) U.S. Department of Labor; Gjovik's U.S. SEC Whistleblower Tip: Sept 1, 2021 (#16304-612-987-465); 28 U.S.C. § 1441(a); Sarbanes Oxley Act (SOX); Dodd Frank Act))
[53] *Stone v. Duke Energy Corp.*, 432 F.3d 320 (4th Cir.2005) (case below 2003-SOX-12).
[54] U.S. Department of Labor, *Whistleblower Investigations Manual,* https://www.osha.gov/sites/default/files/AnnotatedWIM.pdf
[55] S.Rep. No. 107-146, at 5 (2002).

51

1  safety of her office and about the complaint process generally, would be overseen by the Board

2  Committee chaired by an officer Gjovik was complaining about. [56]

3      155.    Gjovik's concerns were material as Apple makes statements about the conditions

4  of its properties, about its compliance with regulations, and its environmental practices in its

5  SEC filings and communications to shareholders. Gjovik's complaints were reasonable as they

6  included all the basic elements of fraud. Gjovik also filed a complaint with the SEC on August

7  31 2021 and made it public on September 1 2021 that she did so. Apple knew about Gjovik's

8  complaints and Gjovik's SEC charge when it fired her and Apple fired her because of her

9  complaints and SEC charge, along with other protected activity.

10  **i.    Evidence of Pretext (to be incorporated in all discharge claims):**

11      156.    Between at least September 3 2021 and March 2022, Apple's explanation for

12  terminating Gjovik changed multiple times; first presented as a neutral update on the

13  investigation into Gjovik's concerns timed with publication of a defamatory article about

14  Gjovik's NLRB charge (September 3), then shifting to a request to discuss "inconsistencies" in

15  Gjovik's complaints (September 7), then some urgent matter related to Workplace Violence, and

16  confidential information requiring a response within 'the hour' (September 9), then accusations

17  Gjovik vaguely violated Apple's employment policies and refused to get on the phone with the

18  interrogator (later on September 9), then implying she was fired due to some of her Twitter posts

19  on August 28 and August 30, including her open and public participation in an article about

20  work conditions at Apple (September 15), then claiming Gjovik was fired for secretly,

21  maliciously leaking confidential, product-related information and refusal to participate with an

22  alleged investigation (March 2022).[57] All of these share some facts, yet differ on Apple's

23  roaming pretextual, fragmented, and conflicting narratives.

24

25

26

27  [56] *Rocheleau v. Microsemi Corp Inc.*, 680 F. App'x 533, 535 (9th Cir.), cert. denied, U.S., 138 S. Ct. 166, 199 L.Ed.2d 40 (2017). *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 668
28  (4th Cir. 2015).
   [57] *Timmons v. Franklin Electric Coop.*, 1997-SWD-2 (ARB Dec. 1, 1998) (shifting explanations for termination point to pretext)

52

157.  Apple's animus against Gjovik continued to increase with the additional government charges and complaints she filed, and the continued requests from US EPA due to her disclosures, and any regulatory paperwork or communications required related to hazardous waste at 825 Stewart Dr and 3250 Scott Blvd. Actions related to the continued processing of a complaint may remind an employer of its pendency or stoke an employer's animus. [58] Apple's corrupt conduct towards Gjovik became increasingly deranged the more Gjovik spoke out about Apple's Worldwide Loyalty team and Apple's history of trouble with the California and US governments.

158.  Apple's later explanations for firing Gjovik contradict with the facts at the time of the termination. Apple claimed to not know about the article Gjovik participated in published August 30 2021, yet Apple was asked for comment on the article by the publisher several days prior to publication. Apple later claims Gjovik tried to conceal her involvement in the article, but the article includes quotes from Gjovik by name and an embedded video of images of Gjovik's face. Apple's later disclosed timeline of events around Gjovik's termination reveal Apple planned to terminate Gjovik by no later than August 29, yet Apple contacted Gjovik on September 3 under the premise of discussing the details of Gjovik's complaints about harassment and retaliation.[59] Simple inconsistencies between reasons and facts have been enough to prove pretext in the "context of a concerted effort to conceal major safety hazards."[60]

159.  Meanwhile, during those 10-12 days following her supposed "leaks," Gjovik said, *"the company made no attempt to keep her from viewing any sensitive data. 'I hadn't lost any of my account access. I still had access to the next four years of the Mac roadmap. I still had access to source code for future releases. I still had access to concept review documents.'"*[61] One would think if Apple actually thought Gjovik unlawfully leaked information, they would have

---

[58] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008); *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).
[59] *Overall v. Tennessee Valley Authority*, 97-ERA-53 (ALJ Apr. 1, 1998
[60] *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)
[61] Gizmodo, *"Apple Wanted Her Fired. It Settled on an Absurd Excuse"* https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

COMPLAINT                                                                                    SEPT. 7 2023

removed that access immediately. Or sent some sort of warning. Anything. But there was nothing until an email with no subject line from a Workplace Violence interrogator on Sept 9th., Gjovik agreed to participate in the investigation, however noted the prior retaliation and current government investigations and simply requested to keep discussion in writing, a far cry from "refusing to participate."

160.    Before Gjovik was fired, she had excellent performance ratings and an absence of prior complaints against her. Around the time of Gjovik's suspension and termination, Apple had indicated they were upset with Gjovik's protected activity, and continued to advise Gjovik to not report safety problems to her coworkers or the government. Apple was also grossly dishonest about Gjovik's protected activity – including a conspiracy to conceal from Gjovik that her disclosures led to an US EPA inspection of her Apple office, that the US EPA identified a number of issues including active vectors for exposure to TCE and other chemicals, and that Apple was operating a secret semiconductor manufacturing plant venting metric tons of solvent fumes directly into the apartment windows where Gjovik lived when she got severely ill from solvent fumes.

161.    Prior to her termination, and for some time, Apple had created and maintained an abuse and hostile work environment for Gjovik. The harassment Gjovik suffered would have detrimentally affected a reasonable person and did detrimentally affect Gjovik. The discriminatory conduct was frequent, pervasive, and severe; Gjovik suffered humiliation and harassment that unreasonably interfered with Gjovik's ability to do her job. The harassment included abuse and threats of abuse that seriously scared and harassed Gjovik for not legitimate or lawful reasons. [62] After Gjovik's protected activity reporting her illness next to Apple's facility at 3250 Scott, reporting concerns about Apple's dealings about the COVID vaccine, and complaining about safety concerns at her office – Apple additionally established a hostile work environment through retaliatory harassment. Where the harassment was previously not severe enough to alter the terms and conditions of her employment, once the retaliation began, all

---

[62] California's Courts, *Understanding Abuse & Harassment Laws*, https://www.courts.ca.gov/1258.htm

1   actions noted were sufficient to be "retaliatory harassing conduct." [63]   In addition, or in the

2   alternative, harassment & similar abuse occurred repeatedly over the course of Gjovik's

3   employment and thus constitutes a hostile work environment even if not severe.[64] In addition or

4   in the alternative, causation is seen from evidence that harassment by supervisors intensified

5   shortly after Gjovik filed complaints.[65]

6   162.   The actions taken against Gjovik were materially adverse enough to dissuade

7   reasonable workers from engaging in the protected activity. In fact, the chilling effect of Apple's

8   retaliation against Gjovik has been noted in articles, bog posts, social media, and even turned

9   into memes. Gjovik's ex-coworkers began using the phrase "get Gjoviked" as slang for getting

10   fired for speaking out about work conditions. Employees shared the term on message boards and

11   Twitter (*You are going to get "Gjoviked"*). Further, a submission from an employee to the

12   "AppleToo" employee group stated, "*even as we're writing this, we write it with fear, fear of

13   getting single out and retaliate against, even though HR policy stats that Apple do not tolerate

14   retaliation, after reading what Ashley Gjovik went through, we think the retaliation is real.*"

15   163.   Apple terminated Gjovik within weeks, days, and under some statutes – only a

16   matter of hours – after Gjovik engaged in protected activity. The temporal proximity here is

17   enough for sole substantiation, but there is much additional evidence of pretext. Apple did not

18   follow its own termination policies & process, and others were not terminated for the same

19   actions; others were not terminated for far worse actions. Apple's online harassment cited

20   Gjovik's protected activity as the reason for termination & retaliation. Before she was fired,

21   Apple repeatedly told Gjovik not to speak with coworkers about her concerns about safety,

22

23   ---

[63] *See, e.g., Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) (ruling that

24   after *Burlington Northern*, an employee claiming "retaliation by workplace harassment" is "no
   longer required to show that the harassment was severe or pervasive"); *EEOC v. Chrysler Grp., LLC*,

25   No. 08-C-1067, 2011 WL 693642, at *8-11 (E.D. Wis. Feb. 17, 2011) (holding that reasonable jury
   could conclude employees were subjected to unlawful retaliation under *Burlington*

26   *Northern* standard when human resources supervisor verbally harassed them by screaming and
   pounding his fists on the table while threatening termination if they filed grievances). *See* Federal

27   Sector Equal Employment Opportunity, 77 Fed. Reg. 43,498, 43,502 (July 25, 2012) (codified at 29

28   C.F.R. § 1614), https://federalregister.gov/a/2012-18134.
   [64] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)
   [65] *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8-9 (1st Cir. 2006)

1 labor, or retaliation. Apple's proffered reasons do not explain the other retaliation against Gjovik

2 from March 2021-August 2021 (hostile work environment, constructive termination, reassigning

3 of projects, increase in workload, assignment of unfavorable projects, etc.). Gjovik's Sept 9

4 termination freed Apple from having to respond to Gjovik's discrimination and retaliation

5 complaints, workplace safety complaints, vapor intrusion testing results, or provide her annual

6 performance review (the next week).

## B. DODD FRANK WHISTLEBLOWER RETALIATION (15 USC §78U-6(H)(1)(A)(III))

9 164. Apple discriminated against, took adverse employment actions, and discharged

10 Gjovik, in violation of the Dodd-Frank Act, due to Gjovik providing information related to a

11 violation of the securities laws to the Securities and Exchange Commission; initiating, testifying

12 in, or assisting in any investigation or administrative action of the SEC based upon or related to

13 such information; and making disclosures that are required by SOX, the Securities Exchange Act

14 of 1934, or other laws subject to the SEC's jurisdiction.

15 165. Apple discharged, suspended, threatened, harassed, and discriminated against,

16 directly and indirectly, Gjovik in the terms and conditions of employment because of lawful acts

17 done by the Gjovik in providing information to the Commission and making protected

18 disclosures, including but not limited to: about undisclosed conflicts of interest (Ronald Sugar,

19 Lisa Jackson), misrepresentations in securities (see RICO section on *Securities Fraud*), and filed

20 a whistleblower tip with the US SEC on August 31 2021.[66] A number of Apple's employment

21 policies also violate the Dodd-Frank Act and Apple cited these unlawful policies in its vague

22 justification of Gjovik's sudden termination.

23 166. Gjovik alleges violations of Dodd-Frank Act provisions and so brings an action in

24 an appropriate district court of the United States. Gjovik brings an action under this subsection

25 within ten years of the violation, six years of the retaliation, and within three years of knowledge

26 of the violation. [15 U.S.C.A. § 78u-6] he Dodd-Frank Act does not preempt state law claims ore

28 ---
[66] *Digital Realty Trust, Inc. v. Somers* (2018) US, 138 S.Ct. 767, 778. See *Banko v. Apple Inc*, 20
F.Supp.3d 749, 758 (ND CA 2013).

56

preclude federal laws. "*Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law.*" [15 USC § 78u-6(h)(3)]

## C. BANE CIVIL RIGHTS ACT: CAL. CIV. CODE § 52.1

167. Gjovik seeks relief under the Bane Civil Rights Act (§ 52.1) to deter discriminatory violence from Apple from occurring against Gjovik, stop Apple's threats of violence and intimidation, and to seek remedy for threats, coercion, intimidation, and property damage that has already occurred.[67]

168. In an attempt to prevent Gjovik from exercising her civil rights, and to retaliate against her for trying to do so, Apple has maliciously terrorized Gjovik with threats, intimidation, and coercion that interferes with her constitutional and statutory rights.[68] Apple tried and did prevent Gjovik from doing things she had a right to do under law and to force Gjovik to do things she was not required to do under law.[69]

169. Apple interfered and attempted to interfere by threat, intimidation, and/or coercion, or with reckless disregard for, Gjovik's exercise and/or enjoyment of a constitutional or other right under California or federal law. [70] Apple intimidated Gjovik with an intent to prevent her from giving testimony.[71] Apple threatened Gjovik after Gjovik's testimony. Threats, intimidation, and coercion included, but was not limited to, aggressive surveillance, bugging objects, whatever Apple installed in her attic, breaking into her apartment, breaking into adjacent apartments, lurking outside her home, blocked calls, retaliatory litigation, retaliatory reports of Gjovik to law enforcement, lurking sedans and SUVs with dark windows, social media accounts

---

[67] Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 63 (1987 Reg. Sess.) as am. Apr. 6, 1987, p. 2

[68] *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 787 (N.D. Cal. 2014); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1448 (Cal. Ct. App. 2006).

[69] *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 955-956 (2012).

[70] Intimidating a Witness - California Penal Code 136.1; Threatening a Witness Prior to Testimony - California Penal Code § 137(b); Threatening a Witness After Testimony - California Penal Code § 140(a)

[71] *People v. Serrano*, 77 Cal.App.5th 902, 912-913 [292 Cal.Rptr.3d 865] (2022); *People v. McDaniel*, 22 Cal.App.4th 278, 283 [27 Cal.Rptr.2d 306] (1994); *People v. McLaughlin*, 46 Cal.App.4th 836, 842 [54 Cal.Rptr.2d 4] (1996).

57

COMPLAINT                                                      SEPT. 7 2023

1   making threatening, harassing, and intimidating statements to Gjovik, and handling her dog
2   during one of the break-ins.

3       170.    Apple interfered and attempted to interfere with Gjovik's testimony to labor
4   agencies by threatening her with violence and intimidation, including termination her
5   employment, the day before she was to testify to the government about Apple, which is her right
6   to exercise her labor rights and engage with the government as a citizen of California (at that
7   time) and of the United States. Employment cases are included within the scope of §52.1 (Bane
8   Act) & § 51.7 (Ralph Act).[72] Apple's supposed justification for terminating Gjovik, and Apple's
9   conduct which Gjovik had complained about as Apple's justification, all violate the California
10  Constitution Article 1 right to privacy. Gjovik had the right and continues to have the right to
11  protest invasions into her privacy and Apple's pretextual termination for firing Gjovik and
12  harassing letter from their law firm threatens, coerces, and intimidates Gjovik to refrain from
13  exercising her Constitutional rights.

14      171.    Apple interfered and attempted to interfere with Gjovik's access to California's
15  unemployment insurance program and right to a fair hearing under California UIC Code § 1251
16  through obstruction with the agency including apparently falsified records and deleted records,
17  and/or false statements, and other irregularities marked with Apple's *modus operandi* in
18  obstruction.[73] Apple interfered and attempted to interfere with Gjovik's right to a safe workplace
19  [e.g., Cal. Labor Code §§ 6101, 6046, etc.] and warning workers about exposure to carcinogens
20  [Proposition 65].

21      172.    Apple interfered and attempted to interfere with Gjovik's civil rights under state
22  and federal law including her right to participate lawfully in speech and peaceful assembly
23  opposing any denial of the opportunity to participate in federal civil rights.[74] For example,
24  Apple's retaliatory litigation, retaliatory reports to law enforcement, and malicious gag order
25  prohibited Gjovik from doing so, including prohibiting her from sharing public records and her

26

27  [72] *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM
28  Indus. Inc.*, 212 Cal. App. 4th 258, 269, 150 Cal. Rptr. 3d 861, 870 (2012).
[73] "bad faith tactics" can be sanctioned and fined: Cal. Unemp. Ins. Code § 2122
[74] 18 U.S. Code § 245 - Federally protected activities; § 245(b)(5)

COMPLAINT                                                                                    SEPT. 7 2023

1  legal filings, to complain (even privately) about the retaliatory lawsuit and gag order, and

2  violating her right to free speech under the US Constitution, causing irreparable damage. [75]

3  173.  Apple's threats, intimidation, and coercion went beyond speech acts and

4  restricting Gjovik's speech, also extending to the physical world by breaking and bugging her

5  chattel property, breaking into her apartment, stalking her, and lurking outside her apartment.

6  intercepting her internet and phone lines, etc. [76]  Apple's actions threatened violence and created

7  a reasonable fear of imminent harm. Apple attempted to interfere with Gjovik's exercise of her

8  civil rights by way of threats, intimidation, and coercion. Apple made threats of violence against

9  Gjovik and her property (i.e., the box with her chattel property covered in glass chards and a

10 social media account threatening it could contain the severed head of one of her loved ones), that

11 she reasonably believed would be carried out if she exercised her civil rights. Apple acted

12 violently against Gjovik and her property to prevent her from exercising her rights and/or to

13 retaliate against her for doing so.

14 174.  The retaliatory litigation against Gjovik was filed, per the petitioner's own

15 testimony, because of Gjovik's NLRB charges against Apple, because Gjovik was complaining

16 about witness intimidation by Apple, because Gjovik claimed Apple terminated her in retaliation

17 for protected activity, and with the offer that the litigation and harassment would stop if Gjovik

18 (summarized) *admitted she leaked IP, admitted she deserved to be fired, removed her legal*

19 *filings against Apple from public view, and admitted was a selfish liar who committed perjury by*

20 *filing meritless charges against Apple.* The message was crystal clear to Gjovik: *the beatings*

21 *will continue* until she dropped any and all legal claims against Apple.

22
23 175.  Apple did, conspired, aided, and incited the filing and threatening to file of false

24 claims and reports about Gjovik to peace officers and law enforcement agencies that falsely

25 alleged Gjovik engaged in unlawful activity and/or in activity that requires law enforcement

26 ---
[75] 12 Cal. Jur. 3d Civil Rights § 105. Shoyoye v. Cnty. of Los Angeles, 203 Cal. App. 4th 947, 958–
27 59, 137 Cal. Rptr. 3d 839, 848 (2012).
[76] California Civil Code 52.1(j); Interference with Legal Rights., 8 Witkin, Summary 11th Const
28 Law § 990 (2023); *Bates v. San Francisco Sheriff's D. Chief Arata*, No. C 05-3383 SI (N.D. Cal.
Mar. 26, 2008); *Koerber v. Encyclopedia Britannica, Inc*., No. B312047, 18 (Cal. Ct. App. Jul. 13,
2022).

1 intervention, knowing the claim and reports are false, and/or with reckless disregard for the truth

2 or for falsity of the claim/report, and were filed after January 1 2021. [77] Apple filed false police

3 reports, filed false FBI reports (alleging criminal extortion and blackmail), filed meritless

4 litigation and obtained a gag-order in 2022 through fraud, filed false reports to social media

5 services alleging serious crimes (including that one of Gjovik's legal filings was 'child

6 pornography'), and other depraved actions intending to instigate investigations into Gjovik,

7 instigate searches of Gjovik's electronic devices and usage, instigate removal of Gjovik's

8 published documents and statements, and to incite others to threaten and attack Gjovik due to

9 these false allegations.

10     176. An action brought under section 52.1 is "independent of any other action,

11 remedy, or procedure that may be available to an aggrieved individual under any other provision

12 of law," including Civil Code section 51.7 (e.g., Ralph Act, below). [78]

13

14 ## D. RALPH CIVIL RIGHTS ACT: CAL. CIV. CODE §51.7

15     177. Apple violated The Ralph Act when it threatened violence and committed

16 violence against Gjovik and her property due to Gjovik's position in a labor dispute and

17 Gjovik's other protected characteristics, including her activism around environmental health and

18 chemical exposure, activism around privacy rights, and her membership in a protected class of

19 'victims of environmental crime'. [79] [80]

20

21

22 [77] Gov. Code § 51.7 (b)(2), Stats. 2020, c. 327 (AB 1775).

[78] *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 843, 87 P.3d 1, 14 (2004); *Jones v. Kmart Corp.*,
23 17 Cal. 4th 329, 334, 949 P.2d 941, 944 (1998).

[79] Civ. Code, § 51.7, subd. (b)(1). See *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at pp. 841-842;
24 *Jones v. Kmart Corp*., 17 Cal.4th at p. 332; *Bay Area Rapid Transit Dist. v. Superior Court,* supra,
38 Cal.App.4th at pp. 144; *Boccato*, supra, 29 Cal.App.4th 1797; *Winarto v. Toshiba America*
25 *Electronics Components, Inc*. (9th Cir. 2001) 274 F.3d 1276, 1288-1290, fn. 13.) *Stamps v. Superior*
*Court*, 136 Cal.App.4th 1441, 1457 (Cal. Ct. App. 2006)
26 [80] Civ. Code § 51.7(b)(1)), and codify identical language used in *In re Cox*, 3 Cal. 3d 205, 216, 90
Cal. Rptr. 24, 474 P.2d 992 (1970) to expand Unruh Act protected characteristics, not just the
27 enumerated bases. (*McCalden v. California Library Ass'n*, 955 F.2d 1214, 1221, 22 Fed. R. Serv. 3d
975 (9th Cir. 1990). Social justice organization protesting for racial equality constitutes a "political
28 affiliation," protected under the Ralph Act (*Black Lives Matter-Stockton Chapter v. San Joaquin*
*Sheriff's Office,* 398 F. Supp. 3d 660, 679 (E.D. Cal. 2019).) Animal rights activism and membership

COMPLAINT                                          SEPT. 7 2023

178.    While not required, Apple did express discriminatory animus and intent for their threats of violence because of Gjovik's membership in a protected class of persons. [81] Apple also aided, conspired, and incited these acts (i.e., incited and aided with the meritless litigation and police reports against Gjovik, and conspired to harass and threaten Gjovik about those reports and cases).[82] As detailed in the Bane Act section above, Apple committed violence and made threats of violence against Gjovik, including threatening messages and social media posts, threatening packages in the mail, home break-ins, and other misconduct.[83]

179.    A Ralph Act claim applies to employment and also does not displace another employment claim.[84] Ralph Act claims may be joined with an employment discrimination claim.[85] Apple intimidated Gjovik by threat of violence against Gjovik and/or her property and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and would have been intimidated by Apple's conduct. [86]

## E.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962

180.    RICO is appropriate and justified in this case due to the uniquely extreme and corrupt conduct perpetrated by Apple against Gjovik in furtherance of concealing their systemic pattern of criminal schemes and enterprise. RICO enables a more efficient analysis of the facts in this case by including evidence of wrongdoing that does not ordinarily fit into a civil lawsuit. Use of RICO enables Gjovik to seek remedy for witness intimidation and retaliation violations

in organization, constitutes a "political affiliation" under the Ralph Act. (*Campbell v. Feld Entertainment*, 75 F. Supp. 3d 1193 (N.D. Cal. 2014).)
[81] *Venegas v. County of Los Angeles,* 32 Cal.4th 820, 841 (2004). Oct 2020 – August 2021, Association with members of a protected class, S.F. Admin. Code § 12B.1(a) and 12B.2(a).)
[82] Civ. Code, § 52(b). Judicial Council of California Civil Jury Instruction 3064, Judicial Council of California Civil Jury Instruction 3064
[83] *Koerber v. Encyclopedia Britannica, Inc.,* No. B312047, 18 (Cal. Ct. App. Jul. 13, 2022)
[84] Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986 (1975-1976 Reg. Sess.) Apr. 6, 1976, p. 1.; Stamps v. Superior Court, 136 Cal.App.4th 1441, 1447 (Cal. Ct. App. 2006)
[85] *Stamps* at 1456-1457.
[86] Liability may also be found if a defendant "aids, incites, or conspires" in the denial of a right protected under Civil Code section 51.7. (Civ. Code, § 52(b).)

61

COMPLAINT                                                                                    SEPT. 7 2023

outside a criminal case initiated by US Department of Justice There is extensive evidence of fraud and regulatory violations occurring before and during Gjovik's disclosures, substantiating Gjovik's real-time complaints about a "cover-up" and "conspiracy." [87]

### i. Standing & Pleading

181. Any allegations of fraud and any actions under THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, CODIFIED AS TITLE IX OF THE ORGANIZED CRIME CONTROL ACT OF 1970, must comply with pleading requirements set forth by FRCP 8(a) and *Iqbal/Twombly*.[88] The heightened pleading standard requires establishing the circumstances constituting fraud, including: date, time, place, communications, and name of the person who made a fraudulent representation.[89] Both fraud and RICO must be plead with particularity and so are plead in detail in the "General Allegations" above and the sections below.[90]

182. The plaintiff needs to be injured by at least one RICO Predicate Act committed in furtherance of the scheme, and within four-years of when the injury occurred; however, plaintiff may also use other Predicate Acts targeting other victims, or past statute of limitations, to show evidence of a pattern of racketeering.[91]

183. Gjovik was directly injured, with harm occurring to her business, her tenancy rights, and to her personal chattel property, due to Apple's racketeering Predicate Acts of 1512 (Intimidating Witnesses) and 1513 (Retaliating Against Witnesses), occurring within the last

---

[87] Craig A Benedict (retired Assistant US Attorney, Northern District of New York), The Interplay of Worker Protection and Federal Criminal Statutes in Environmental Prosecutions

[88] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

[89] Schrieber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1400 (9th Cir. 1986); Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977); Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009); Cohen v. Trump, CASE NO. 13-cv-2519-GPC-WVG, 12 (S.D. Cal. Feb. 21, 2014)

[90] *Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N.D. Ill. 1996), aff'd, 185 F.3d 850, (7th Cir. 1999) (observing that, in RICO cases, Federal Rule of Civil Procedure 9(b) requires that "the complaint must, at a minimum, describe [fraud based] predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetuating the fraud'").

[91] *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004).

---

62

four years (2021-2023). Gjovik was directly injured with harm occurring to her personal chattel property due to Apple's racketeering Predicate Acts of 18 USC 229 (Relating to Chemical Weapons), occurring within the last four years (2020). Gjovik was directly injured with harm occurring to her business and to her chattel property, due to Apple's racketeering Predicate Acts of 1341 (Mail Fraud) and 1343 (Wire Fraud), occurring within the last four years (2020-2023). Some of Apple's Mail and Wire Fraud Acts also included Predicate Acts of 15 USC 78 (Securities Fraud) within the last four years (2020-2023), which also directly harmed Gjovik's business and personal chattel property. Gjovik was directly injured, with harm occurring to her business, due to Apple's racketeering Predicate Acts.

184.    Gjovik was directly injured by Apple's Predicate Acts of Commercial Bribery but is not claiming harm due to statute of limitations as the Acts occurred in 2015, over four years ago. Gjovik was only indirectly injured by Apple's Predicate Act of Criminal Bribery of Executive Officer and some of the 18 USC 78 (Securities Fraud) claims and is not claiming harm due to lack or direct injury and/or statute of limitations as some Securities Fraud claims occurred over four years ago. Gjovik also cites additional historic charges and claims against Apple, which are not Predicate Acts under RICO, but which support allegations of enterprise, scheme, and/or conspiracy. These claims include Sherman Act antitrust violations, impersonating law enforcement, and other felonious misadventures.

185.    Standard whistleblower retaliation lawsuits usually do not support concurrent RICO claims, as employees who suffer retaliatory terminations often do so in (comparatively) dull and predictable ways. However, whistleblower retaliation cases do support RICO when a discharge of employment is also a RICO Predicate Act (i.e., 18 USC 1512, 1513, etc.) that is part of a racketeering scheme and pattern. This is the situation with Gjovik's claims against Apple. Apple's termination of Gjovik consists of several RICO Predicate Acts. Gjovik complained of federal witness intimidation (§ 1512) the day before a federal affidavit and only hours before she was terminated in retaliation due to her cooperation with federal officers and federal investigations (§ 1513). Apple's termination of Gjovik was not simply because Gjovik refused to participate in Apple's pattern of racketeering activity, it was because Gjovik was a

63

federal witness, a victim of federal crimes perpetrated by Apple, and Gjovik was informing to the Feds about Apple's misconduct and criminal activities.[92]

186. In addition, and/or in the alternate, if Gjovik's termination is not found to be a Predicate Act or otherwise support RICO standing, then Gjovik argues her whistleblower retaliation claims are related to the RICO charges but are not "essential" to the alleged RICO scheme and conspiracy, and because the whistleblower case is peripheral to the RICO claims, then both claims can be pled concurrently.[93] In addition, and/or in the alternate, if Gjovik's employment-related injury claims are not found to be Predicate Acts or otherwise support RICO standing, Gjovik still has standing based on harm/injury beyond the employment matters (i.e., harm to personal chattel property due to 18 USC 229 Predicate Acts; harm to business and property due to witness intimidation and retaliation occurring well past Gjovik's termination, etc.).[94]

### ii. Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)

187. Apple engaged in RICO Predicate Acts with knowledge the conduct was illegal. The conduct affects interstate and/or foreign commerce under 18 U.S. Code § 1962 through interstate mail, interstate wires, and other instrumentalities of interstate commerce. Under 1962(a), the "person" and the "enterprise" are the same ("Apple") and Apple's racketeering benefited itself financially. Under sections 1962(c) and (d), the "person" and the "enterprise" are distinct, the "person" is Apple and the "enterprise" is Worldwide Loyalty.[95]

188. Apple, as an enterprise-as-person concept (only under 1962-a), benefitted by playing an active role in the pattern of racketeering which directly injured Gjovik's property and business. Legitimate hazardous waste disposal costs thousands of dollars, so it is hard to imagine any situation in which the illegal dumping of toxic wastes by corporate officers, employees, or agents will not directly or indirectly benefit the corporation enterprise.

---

[92] *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 294 (9th Cir. 1990).
[93] *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 295 (9th Cir. 1990).
[94] *Reddy* at 296.
[95] *RJR Nabisco, Inc. v. Eur. Cmty,* 136 S. Ct. 2090, 2104 (2016). Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).

1    189.    In violation of Section 1962(c), Apple conducted and participated in the conduct

2   of an associated enterprise ("Worldwide Loyalty") through a pattern of racketing activity, and

3   which is engaged in and/or the activities of which affect interstate commerce Apple.

4    190.    In Violation of Section 1962(d), Apple conspired "to conduct or participate,

5   directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering

6   activity." [96] Apple conspired to violate one or more of the substantive RICO provisions and

7   member of the conspiracy committed overt acts that constituted a predicate act of racketeering to

8   further the conspiracy. [97] Apple knowingly agreed to facilitate the commission of at least two

9   racketeering acts constituting a pattern and scheme to be committed by any member of the

10   conspiracy.[98]The statute of limitations for a RICO conspiracy runs until the scheme's objectives

11   are accomplished or abandoned, or until the defendant withdraws.[99]

12

### iii.    Creation, Nature, and Operation of the Enterprise

13    191.    Section 1962(c) requires the existence of two distinct entities: a "person" and an

14   "enterprise" that is not simply the same person referred to by a different name. Even under

15   subsection 1962(c), a corporate entity and its sole shareholder are sufficiently distinct to satisfy

16   the "enterprise" and "person" elements of a subsection (c) violation.[100] The RICO statute defines

17   "enterprise" to include "any individual, partnership, corporation, association, or other legal

18   entity, and any union or group of individuals associated in fact although not a legal entity." [101]

19   The enterprise is a group of persons associated together for a common purpose, there is a

20

21

22

23   _____

[96] *Salinas v. United States,* 522 U.S. 52, 63 (1997); *United States v. Wilkerson,* 966 F.3d 828, 841

24   (D. C. Cir. 2020); *United States v. Fernandez*, 388 F.3d 1119, 1228 (9th Cir. 2004).
[97] *Beck v. Prupis*, 529 U.S. 494, 503-07 (2000); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239

25   (5th Cir. 2010).
[98] See, e.g, *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Salinas v. United*

26   *States*, 522 U.S. 52 (1997).
[99] *United States v. Wilkerson*, 966 F.3d 828, 840 (D.C. Cir. 2020); *Allington v. Carpenter*, 619 F.

27   Supp. 474 (C.D. Cal. 1985).
[100] Cedric Kushner Promotions, Ltd., 533 U.S. at 161; Living Designs, Inc., 431 F.3d at 361; First

28   Capital Asset Management v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004).
[101] 18 U.S.C. § 1961(4); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).

COMPLAINT                                                          SEPT. 7 2023

relationship among those associated with the enterprise, and longevity is sufficient to permit those associated with the enterprise to pursue the enterprise's purpose.[102]

192.    The corrupt or corrupted enterprise must either engage in interstate or foreign commerce or engage in activities that affect interstate or foreign commerce. An enterprise that orders supplies and transports its employees and products in interstate commerce is "engaged in interstate commerce" for purposes of RICO, [103] as is an enterprise that uses telephones, the mail, or internet communications.[104] The interstate commerce requirement is satisfied if the activity of either the enterprise or the predicate acts of racketeering affects interstate commerce.[105]

### a)    Apple as a Corporate Defendant

193.    The defendant, Apple, is employed by the enterprise, associated with the enterprise, conducts in the enterprise's affairs, and participated in a pattern of racketeering with the enterprise.[106] A corporate entity can be held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself.

194.    An associated-in-fact RICO enterprise was found with DuPont and law firms employed by DuPont and expert witnesses retained by those law firms – and that enterprise was found to be distinct from DuPont.[107] Similarly, an association-in-fact RICO enterprise was found with Phillip Morris with groups of individuals, cigarette manufacturers, and trade organizations.[108] Apple had "some knowledge of the nature of the enterprise . . . to avoid an

---

[102] *Boyle v. United States*, 556 U.S. 938, 944-46 (2009); see *Conte v. Newsweek, Inc.*, 703 F. Supp. 2d 126, 133-34 (E.D.N.Y. 2010).
[103] *United States v. Robertson*, 514 U.S. 669, 671-72 (1995); see also *United States v. Velasquez*, 881 F.3d 314, 329 (5th Cir. 2018); *United States v. Keltner*, 147 F.3d 662, 669 (8th Cir. 1998).
[104] *Velasquez*, 881 F.3d at 329 ("Use of instrumentalities of interstate commerce such as telephones, the U.S. Postal Service, and pagers to communicate in furtherance of the enterprise's criminal purposes can also constitute the enterprise affecting interstate commerce.")
[105] See *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (quoting R.A.G.S. *Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1353 (5th Cir. 1985)); *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1289 (7th Cir. 1983).
[106] Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005); Churchill Village v. General Electric, 361 F.3d 566, 574-75 (9th Cir. 2004).
[107] *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005); See *United States v. Blinder*, 10 F.3d 1468, 1473–74 (9th Cir.1993).
[108] *Phillip Morris USA, Inc.*, 566 F.3d at 1111-12.

66

1  unjust association of the defendant[s] with the crimes of others," but the requirement of a

2  common purpose may be met so long as the defendants were "each aware of the essential nature

3  and scope of [the] enterprise and intended to participate in it." [109]

4      195.    In prosecution under Racketeer Influenced and Corrupt Organizations (RICO)

5  Statute, 18 U.S.C.A. §§ 1961 et seq., defendants' convictions would be affirmed where evidence

6  was sufficient to justify finding of common purpose, hence of identifiable "enterprise," centered

7  upon and given form by defendants' concerted activity in deliberately broadening scope, and

8  hence total weight, of corrupting influence upon police department that was primarily

9  responsible for ferreting out defendants' individual criminal acts.[110]

10      196.    The Supreme Court held that a defendant is not liable for a substantive RICO

11  violation under 18 U.S.C. § 1962(c) unless the defendant "participates in the operation or

12  management of the enterprise itself."[111]

13  ### b)  The "Worldwide Loyalty Team" Enterprise

14      197.    The criminal enterprise in this complaint will be named after a monster of

15  Apple's creation, the "Worldwide Loyalty Team." This group has been repeatedly identified,

16  over nearly two decades, as being involved the initiation, management, and/or cover-up of

17  criminal acts in furtherance of common schemes. Worldwide Loyalty is an enterprise separate

18  from the "person" (Apple) associated with the enterprise who engaged in unlawful RICO

19  conduct.[112] Worldwide Loyalty's own chosen name ("Worldwide") confirms they are an entity

20  which is engaged in and effects interstate and foreign commerce, further evidenced by interstate

21  wire and mail, interstate travel and shipping, and 'ops' in numerous states and countries.

22

23      198.    Apple is heavily involved in the operation and maintenance of the enterprise, and

24  most, if not all, of the schemes are for the ultimate benefit of Apple's short-term and long-term

25  unlawful goals and objectives. Similar enterprises have been recognized in situations with an

---

26  [109] *United States v. Christensen*, 828 F.3d 763, 780-81 (9th Cir. 2015), as amended on denial of reh'g

27  (9th Cir. 2016).
[110] *United States v Griffin* (1981, CA4 Md) 660 F2d 996, cert den (1982) 454 US 1156, 71 L Ed 2d

28  313, 102 S Ct 1029.
[111] *Reves*, 507 U.S. at 185.
[112] Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986).

association of individuals engaged in extorting money from companies in return for "labor peace,"[113] a group of individuals associated with various corporations unlawfully operating a pornography business,[114] a group of individuals involved in the commission of home robberies and transportation of stolen goods,[115] an association of policemen and state legislative aids stealing advance copies of civil service exams and selling them so policemen can cheat,[116] and an association of individuals committing arson for profit.[117]

199.    Allegations that employment agencies and other recruiters were separate and independent entities from employer that paid them to hire illegal workers were sufficient to show existence of an enterprise distinct from employer itself, for purposes of current and former employees' claim under the RICO Act, alleging that employer operated or participated in affairs of an enterprise through a pattern of racketeering activity.[118] Police departments and sheriff's offices can be RICO enterprises and part of RICO enterprises.[119]

200.    The gang-like[120] nature of Worldwide Loyalty has been found to satisfy association-in-fact when a gang "*exhibited group cohesion over time, its membership pooled and shared resources, the individuals involved had a sense of belonging and self-identified as gang members, and the group had a well-honed set of goals.*"[121] In fact, the day Appleseed sued Gjovik, because of Gjovik's NLRB charge against Apple and legal filings complaining of

[113] *United States v Provenzano* (1980, CA3 NJ) 620 F2d 985.
[114] *United States v Thevis* (1979, ND Ga) 474 F Supp 134.
[115] *United States v Aleman* (1979, CA7 Ill) 609 F2d 298, cert den 445 US 946.
[116] *United States v Doherty* (1989, CA1 Mass) 867 F2d 47, cert den (US) 106 L Ed 2d 590.
[117] *United States v Hansen* (1976, ED Wis) 422 F Supp 430, later proceeding (CA7 Wis) 583 F2d 325, cert den 439 US 912, 58 L Ed 2d 259, 99 S Ct 283.
[118] 18 U.S.C.A. §§ 1961(4), 1962(c). *Williams v. Mohawk Industries, Inc.,* 314 F. Supp. 2d 1333 (N.D. Ga. 2004); *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163 (9th Cir. 2002) (legally documented workers alleging that employers leveraged hiring of undocumented workers in order to depress wages).
[119] See, e.g., *United States v. DePeri,* 778 F.2d 963 (3d Cir. 1985) (Philadelphia Police Department), cert. denied, 475 U.S. 1109 (1986); *United States v. Ambrose,* 740 F.2d 505, 512 (7th Cir. 1984) (Chicago Police Department).
[120] California Penal Code Section 186.34, "criminal street gang" "means an ongoing organization ... or group .... having as one of its primary activities the commission of crimes .... who have a common identifying ... symbol or name, and whose members ... engage in or have engaged in a pattern of definable criminal activity."
[121] *United States v. Nascimento,* 491 F.3d 25 (1st Cir. 2007).

68

1   witness intimidation by Apple, Appleseed posted an image of her holding an Apple Global

2   Security branded "*challenge coin*", a symbolic item generally used by the military and law

3   enforcement to celebrate acts of achievement and for loyalty.

4       201.    For 1962(c),(d) – Apple and the enterprise are distinct and separate entities. Most

5   of the entities who are members of the enterprise are independent entities by definition – lawyers

6   and professional engineers are licensed professionals with ethical obligations to maintain

7   professional independence.[122] Similarly, law enforcement and regulatory agencies are supposed

8   to operate independent of private interests.

9       202.    Politicians and legislatures can be considered a RICO enterprise. [123] Fire

10  Departments can be considered RICO enterprises.[124] RICO enterprises have included a

11  California state senator and three Superior Court judges.[125] Executive departments and agencies

12  can be considered RICO enterprises. [126]

13          **iv.    Pattern; Vertical and Horizontal Relatedness of Predicate Acts**

14      203.    There may be some question whether the predicate offenses must relate to each

15  other as well as to the enterprise. Vertical relatedness requires that the defendant was enabled to

16  commit the offense solely because of his position in the enterprise or his involvement in or

17  control over the enterprise's affairs, or because the offense related to the activities of the

18  enterprise.[127] The requirements of horizontal relatedness can be established by linking each

19

20

21

22  ---

[122] *Gadda v. Ashcroft*, 377 F.3d 934, 942–43 (9th Cir.2004); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir.1992). Model Rules of Prof'l Conduct R. 5.4.

23  [123] *United States v. Freeman*, 6 F.3d 586, 596-97 (9th Cir. 1993) (Offices of the 49th Assembly District).

24  [124] See, e.g., *United States v. Balzano*, 916 F.2d 1273, 1290 (7th Cir. 1990) (Chicago Fire Department).

25  [125] *U.S. v. Jackson*, 72 F.3d 1370 (9th Cir. 1995) (California state senator); *U.S. v. Frega*, 179 F.3d 793 (9th Cir. 1999) (Superior court judges).

26  [126] See, e.g., *United States v. Hocking*, 860 F.2d 769, 778 (8th Cir. 1988) (Illinois Dept of Transportation); *United States v. Dozier*, 672 F.2d 531, 543 & n.8 (5th Cir. 1982) (Louisiana Dept of Agriculture).

27

28  [127] *United States v. Vernace*, 811 F.3d at 615-16. *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citing United *States v. Cain,* 671 F.3d 271, 284 (2d Cir. 2012)); see also *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020).

69

1   predicates act to enterprise.[128] To prove horizontal relatedness, a plaintiff need only show that

2   the predicate acts have similarities regarding the following characteristics: purposes, results,

3   participants, victims, methods of commission, or other distinguishing characteristics.[129]

4       204.    Apple is currently engaging in predicate acts of racketeering activity and Apple

5   has shown a long-running pattern and practice of regularly treating whistleblowers and those

6   who are cooperating with investigations into Apple in a way that constitutes criminal harassment

7   and intimidation. The goal of Apple's racketeering does not and cannot have an end date, as

8   much of Apple's racketeering conduct is performed in order to conceal its prior racketeering

9   activity. Apple dances madly on the lip of a volcano as it continues to engage in egregious

10  criminal conduct, while frantically working to cover-up its prior criminal conduct, by engaging

11  in even more criminal conduct. Cover-ups by their nature present a distinct threat of long-term

12  continuation.[130]

13      205.    In 2009, Gizmodo wrote about this group and explained that the group calls

14  themselves the "*Worldwide Loyalty Team*." The article added that some Apple employees chose

15  to refer to the group as the "Apple Gestapo."

16      *"[Apple employees] [knew] how it feels to be watched, to always be considered
17      guilty of crimes against another kind of state. He knew how it felt to have no
        privacy whatsoever when he was working right here, in a little Californian town
18      called Cupertino, in a legendary place located in One Infinite Loop. [He] knew
19      about all that pretty well, back when he was working at Apple Inc"*

20  The article describes that Apple employees "lack any privacy whatsoever," that Apple has

21  "moles working everywhere" that even "management is not aware of," and if Apple thinks an

22  employee shared sensitive information, the employee can except to "get fired and sued into

23  oblivion by Apple Legal." The article explains that when Worldwide Loyalty suspects a "leak"

24  of information from employees to the outside world, the team brings in the "special forces" to

25  ───────────────

26  [128] *United States v. Henley*, 766 F.3d at 907 with *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir.
    2008) ("It may be true that Fowler's predicate acts are not directly interrelated with each other, but
27  that is not required. Instead, the predicate acts must be connected to the affairs and operations of the
    criminal enterprise").

28  [129] H.*J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) (quoting former 18
    U.S.C. § 3575(e)); Reich, 858 F.3d 55 at 61.
    [130] *Mruz v. Caring*, Inc., 991 F. Supp. 701, 718 (D.N.J. 1998)

                                    70

"coordinate the operation" and "supervise the supervisors" as all cellphones are confiscated and data copied, then all data is reviewed including text messages and photos. "No privacy, no limits."[131]

206.    If employees do not want to participate, they are asked to leave and never come back. Apple's demands are supposedly "voluntary" but any employees who resist will then be investigated as to why they are resisting. If a "leaker" is identified, they are held by Apple all day while they are "interrogated" and "intimidat[ed] by [Apple] threatening to sue." The article concludes complaining that the "happy hippie company" that Apple used to be has now been transformed into a "company that does KGB-style lockdowns and Gestapo interrogations that end in suicides." [132]

**GIZMODO**   ☰

HOME   LATEST   REVIEWS   TECH   IO9   EARTHER   SCIENCE   FIELD GUIDE

———————————————— APPLE ————————————————

# Apple Gestapo: How Apple Hunts Down Leaks

**By Jesus Diaz**
12/15/09 5:38PM · Comments (440)



They call themselves the Worldwide Loyalty Team. Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to Jobs and Oppenheimer. Here's how they hunt people down.

---

[131] Id.
[132] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

COMPLAINT                                                          SEPT. 7 2023

207.    Worldwide Loyalty engages in other activities that include individuals and groups outside of Apple Inc. The group was "known for its network of informers and ruthless, systemic pursuit of leakers." [133] Worldwide Loyalty will "seed fake images to catch potential leaks and diffuse the hype about some product introductions." [134] The team has an "undisclosed number of investigators around the world" to control information and prevent "leaks" from reaching competitors and "the press," and to "hunt down" the source when leaks do occur."[135] The team also has a sub-team called "Secrecy Program Management" which members are 'embedded' within product teams.[136]

208.    The Worldwide Loyalty Team made headlines in April of 2010 when Apple orchestrated an illegal search warrant to raid the home of a tech reporter, seizing the reporter's computers and servers in violation of California's constitutional Reporter Shield law.[137] There was no legal basis for the search and the warrant was withdrawn. [138] It was also revealed that Apple sat on a steering committee that oversaw and directed the "police task force" (the "Rapid Enforcement Allied Computer Team") that raided the reporter's home on behalf of Apple.[139] By May 2010, the police "search" was now openly referred to as a home break-in, there was "outrage" from "media watchdogs", and press and public complained the task force was acting as "Apple's secret police" and as "Apple's private police force."[140]

---

[133] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[134] Id.
[135] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers
[136] Id.
[137] Matt Zimmerman, *OverREACTing: Dissecting the Gizmodo Warrant,* EFF, April 27 2010, https://www.eff.org/deeplinks/2010/04/gizmodo-search-warrant-illegal
[138] Matt Zimmerman, *Gizmodo iPhone Warrant Affidavit Released, Impropriety of Search Confirmed,* EFF, May 14 2010, https://www.eff.org/deeplinks/2010/05/iphone-warrant-affidavit-confirms-impropriety
[139] John Letzing, *Police task force oversight committee has included Apple,* MarketWatch, April 27 2010, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27
[140] Pete Carey, *Raid in iPhone case shines spotlight on REACT team, Mercury News*, May 4 2010, https://www.mercurynews.com/2010/05/04/raid-in-iphone-case-shines-spotlight-on-react-team/ "*The Rapid Enforcement Allied Computer Team operated out of publicity's glare until last month, when*

72

209. In 2011, Apple's Worldwide Loyalty team escalated further, this time arranging a raid of an innocent civilian's home without a warrant and with highly questionable support from local law enforcement.[141] Two Worldwide Loyalty employees obtained the presence of four plainclothes San Francisco police officers in order to search this man's home. The officers identified themselves as police while Worldwide Loyalty said nothing, letting the man assume they were also police officers. The man let the crew in thinking they were all police at which point one of the goons threatened the Latino man and his family with deportation.[142] The officers attempted to keep the search out of official records and off-books, leading the police spokesperson to initially assume it was a case of impersonation of officers by six individuals, not just two.[143]

210. "They threatened me," Calderón told The SF Weekly. "We don't know anything about it, still, to this day." If the people who stopped in at Calderon's home were not with the San Francisco police, that is a crime. And if they were with the SFPD, they had an obligation to report the information to the department, which did not happen. [144] "The Apple staff apparently threatened Calderon that they would expose the immigration status of his relatives if he did not agree to the search of his home. Legally that is considered extortion, and any police officers involved would be violating the searched party's constitutional rights." [145] Press coverage complained of "taxpayer paid enforcers for Jobs' mob."[146]

211. In 2011, CNN described working at Apple as "a brutal and unforgiving place" and even after employees leave, "the fear of retribution persists for years" resulting in silence

---

*armed with a search warrant, its investigators broke into the Fremont home of a blogger-editor for the website Gizmodo."*
[141] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[142] Id.
[143] Id.
[144] Mat Honan, *Apple Investigators Reportedly Impersonated SF Police*, Gizmodo, September 2011, https://gizmodo.com/apple-investigators-reportedly-impersonated-sf-police-i-5836990
[145] Fudzilla, Police investigate how they became Apple's secret police, https://www.fudzilla.com/news/24000-police-investigate-how-they-became-apples-secret-police
[146] Fudzilla, Police investigate how they became Apple's secret police, https://www.fudzilla.com/news/24000-police-investigate-how-they-became-apples-secret-police

73

about what occurred during their employment.[147] In 2011, a Gawker reporter described the culture of working at Apple as "bullying, manipulation and fear" and described Apple's leadership as "rude, dismissive, hostile, spiteful," and "deeply disturbing."[148] Ex-CEO Jobs 'berated' employees and told them they 'should hate each other'. [149]

212. Worldwide Loyalty was led by John Theriault (ex-Pfizer, ex-FBI) from 2007-2011.[150] Starting in September 2009, Tom Moyer became Apple's Chief Compliance Officer. [151] By 2014, Tom Moyer was Apple's "Head of Global Security."[152] Moyer reported to Apple's General Counsel and also to Apple's Audit and Finance Committee of the Board of Directors (led by Ronald Sugar).[153] In 2014, Moyer supposedly only had two employees reporting directly to him. One was the new court mandated Antitrust Compliance Officer and the other was Apple's Director of Business Conduct and Global Compliance.[154] It is unclear how Moyer is "Head of Global Security" if the team does not report to him. Apple's Global Security team was created after the 2010 incident where Apple unlawfully broke into a reporter's home.[155] It appears Moyer replaced the prior head of Worldwide Loyalty, John Theriault. [156]

213. A tech reporter wrote about how sources with ties to Apple often "suddenly register a look of disquiet when asked about Apple, then nervously close down the

---

[147] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011, https://web.archive.org/web/20111019220441/http://tech.fortune.cnn.com/2011/08/25/how-apple-works-inside-the-worlds-biggest-startup/
[148] Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011, https://www.gawker.com/5847344/what-everyone-is-too-polite-to-say-about-steve-jobs
[149] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011, https://web.archive.org/web/20111019220441/http://tech.fortune.cnn.com/2011/08/25/how-apple-works-inside-the-worlds-biggest-startup/
[150] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[151] Apple Inc, Report of The Special Litigation Committee of The Board Regarding Director Defendants and Settlement (May 26 2017).
[152] United States v. Apple, Inc., et al., No. 1:12-CV-2826, and The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394; Second Report of the External Compliance Monitor, Michael R. Bromwich, October 14 2014.
[153] Id.
[154] Id.
[155] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers
[156] Bloomberg via Yahoo, *Apple Security Head Charged with Bribery for Gun Licenses*, https://www.yahoo.com/now/apple-security-head-charged-offering-202206641.html

74

conversation." [157] The reporter notes that no one at Apple "wants to risk disfavor," that Apple has an "obsession with secrecy," says Apple has effectively established a "*culture of fear*."[158]

214.    These alleged schemes and patterns of conduct are not new or revolutionary allegations against Defendant. An op-ed in The Hill on August of 2023 accused Apple of being the "*world's most dishonest*" company and describes Apple's pattern of covering up unlawful conduct by bullying the victims of its unlawful acts with "*threats of legal and financial ruin*."[159] A March 2022 op-ed in Courthouse News accused Apple "*litigious bullying*" that was "*shameful*" and "*disgusting*."[160]

215.    In 2017, a Foundation for Economic Education article complained that Apple's messaging about its environmental practices is "*dishonest and misleads the public about broader policy issues*." [161] In 2017, VICE described Apple's Environmental Responsibility Reports as "*annual grandstanding effort that the company uses to position itself as a progressive, environmentally friendly company,*" but behind the scenes the company "*undermines*" environmental goals. [162] Frequent complaints include planned obsolescence, fighting right to repair, and insistence on disposal of e-waste instead of recycling. In 2021, a Tribune Magazine article complained "*Apple's environmental initiatives are designed to greenwash fundamentally unsustainable production and consumption patterns*." [163]

---

[157] Mark Sullivan, *Apple's Obsession With Secrecy May Be A Self-Fulfilling Prophecy*, Fast Company (June 2017), https://www.fastcompany.com/40433541/apples-obsession-with-secrecy-may-be-a-self-fulfilling-prophecy
[158] Id.
[159] Mark Cooper, "*Apple's anti-competitive tactics must be stopped*," The Hill, (Aug 19 2023), https://thehill.com/opinion/technology/4158989-apples-anti-competitive-tactics-must-be-stopped/
[160] Robert Kahn, "*Apple is Rotten*," Courthouse News, March 18 2022, https://www.courthousenews.com/apple-is-rotten/
[161] David L. Veksler, "Apple Is Not as Green as It Seems. Apple recently made some claims about its environmental impact that are, at best, questionable." FEE, Oct 15 2017, https://fee.org/articles/apples-environmental-claims-are-misleading/
[162] Jason Koebler, "*Apple Forces Recyclers to Shred All iPhones and MacBooks,*" VICE Motherboard, April 20 2017, https://www.vice.com/en/article/yp73jw/apple-recycling-iphones-macbooks
[163] Paris Marx, "*Apple Won't Save the World,*" Tribune, May 17 2021, https://tribunemag.co.uk/2021/05/apple-wont-save-the-world

SEPT. 7 2023

216. Apple's depraved retaliation against a whistleblower—a predicate act added by the Sarbanes-Oxley Act in 2002—is sufficiently related to allegations of witness intimidation and retaliation (§§ 1512, 1513). [164] Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower; therefore, in most cases retaliatory acts and the underlying scheme will satisfy the relatedness requirement. [165] Here, Gjovik was working to expose and report the Predicate Acts of wire fraud, mail fraud, securities violations, and violations of environmental laws with toxic chemical exposure. Gjovik was also reporting apparent violations of the RICO Act. Then Apple fired and terrorized her. It is all related.

**v.   The Schemes**

217. There is a lawful version of this enterprise. A corporation like Apple is able to lawfully report wrongdoing to law enforcement, able to request permits and to be regulated by agencies, able to rent buildings and operate facilities, able to hire professional engineers for construction and maintenance work, and able to employ law firms to represent them in litigation. None of these activities are activities RICO was designed to prohibit. [166] However, here, Apple chose violence. The "Worldwide Loyalty" enterprise with members from these supposedly independent entities is engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance, false statements about regulatory compliance in order to sell products and shares, and intimidation and obstruction to silence anyone who witnesses Apple's actual practices and who could report concerns to (non-captured) agencies and/or law enforcement. These activities occurred continuously over substantial period of time and poses a threat of continuing due to duration of activity and inherently unlawful acts in pursuit of

---

[164] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).
[165] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).
[166] Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005).

76

unlawful goals.[167] As of now, the threat of continuing criminal activity extends indefinitely into the future.[168]

218.    Apple's conduct is clearly not lawful or legitimate, nor is it simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws. This is similar to the scheme found in US v Philip Morris, where the enterprise joined together to "maximize their profits" through "false and fraudulent statements, representations, and promises" about "the devastating health effects of smoking."[169]

219.    Apple's scheme is three parts. First, Apple intends to avoid expending the resources that would be required for basic regulatory compliance in most of its basic dealings. Apple has centralized administration oversight for functions including Human Relations, Employee Relations, Environmental Health & Safety, and Human Rights. Apple has hundreds of facilities across the country and sends instructions and feedback to those offices and facilities from the headquarters in Cupertino via interstate emails, phone calls, video calls, and physical mailings. Apple transmits knowingly false information (or omits and fails to transmit legally required information) via communications with government agencies via email, paper mailings, electronic filing systems, phone calls, and other interstate communication methods. These false statements and omissions often lead to the complete lack of regulatory oversight and reporting despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities. The rampant retaliation and intimidation in response to employee labor complaints prevents charges from being filed with government which completely prevents government inspections and investigations that would have occurred because of those complaints. The

---

[167] *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991); *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *In re Managed Care Litigation*, 150 F. Supp. 2d 1330, 1351 (S.D. Fla. 2001); cf., *Churchill Village v. General Electric*, 361 F.3d 566, 574-75 (9th Cir. 2004).
[168] H.J. *Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 237-39 (1989), *SKS Constructors, Inc. v. Drinkwine,* 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006).
[169] *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 253 (D.C. Cir. 2015).

77

1  scheme is in place in order avoid compliance with basic legal requirements and to intentionally

2  hide known violations of the law.[170]

3         220.    Second, Apple intends to increase its stock price, sales, and other business

4  dealings through a knowingly false reputation of strong regulatory compliance in all of its

5  dealings (i.e., promoting itself as an industry leader in environmental responsibility, human

6  rights, etc.). Apple made these false statements via a variety of mediums. One example is

7  materials sent prior to annual shareholder meetings, including the main proxy report, statements

8  on voting items, references, and links to supplementary materials to the main proxy report

9  including company policies and annual updates on environmental compliance, supply chain-

10  related human rights updates, conflict mineral reports, and other documents. Starting in 2019,

11  Apple also uses these supplementary documents to 'grade itself' on ESG matters to determine

12  executive compensation. Apple transmits these false statements to shareholders and US SEC via

13  interstate, emails, paper mailings, faxes, and phone calls. Apple also invites shareholders to

14  travel (including interstate travel) to attend the shareholder meetings in person.

15         221.    Finally, Apple intents to bridge the gap between its actual practices and what it

16  reports to its shareholders and to the government about its practices through a scheme of witness

17  intimidation and tampering, systemic retaliation against employees and contractors, unlawful

18  NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering

19  evidence or reporting issues, and coercing government agencies to assist in these activities in

20  order to cover-up the Apple's unlawful activities and fraudulent misrepresentations. Apple often

21  sends its messages of retaliation, threats, intimidation, coercion, and harassment via interstate

22  emails, text messages, phone calls, video calls, physical mailings, and other mediums.

23

24         222.    The victims directly injured, with property and business harms, caused by

25  Apple's scheme, are those the operational regulations were put in place to protect. Apple's

26  violations of labor laws & systemic retaliation for raising concerns harms its employees. Apple's

27  violations of environmental and hazardous waste laws harms employees who are exposed,

28  people in the community who are exposed, and the general public where there is significant soil

---

[170] *Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 524 (5th Cir. 1996)

COMPLAINT                                                              SEPT. 7 2023

and groundwater contamination. Apple's violations of health/safety laws harm whoever is at the site where the laws are not being followed, so employees and vendors at offices and industrial facilities, customers, and workers at retail stores, and so on. The individuals noted above are also harmed due to the Apple's misleading and fraudulent statements about its actual practices, as it leads those people to expect a certain level of safety and lawfulness, when in reality conditions are likely to be unsafe and unlawful. This leads potential whistleblowers to fail to gather adequate evidence, organize with employees, or promptly report issues to a regulator because they relied on the false statements instead of acting with vigilance. This reliance makes the individuals 'fish in a barrel' for Apple to swiftly retaliate, discredit, confuse, censor, and incapacitate.

### vi.     Predicate Acts/Threats Involving Certain State Offenses [171]

223.    For all acts Gjovik argues Apple, or agents of Apple committed the acts, or in the alternative attempted to commit the acts, or in the alternative were accessories to the act,[172]or in the alterative and/or in addition conspired to commit the act.[173]

### a)     Criminal Bribery of Executive Officer (Cal. Penal Code § 67)

224.    Tom Moyer is Apple's "Chief Compliance Officer" and "head of Global Security." Moyer's responsibilities include overseeing regulatory compliance, including anti-bribery/FCPA, and Apple's Business Conduct program. Gjovik interacted with Moyer and his team on several occasions in her time at Apple. Shortly before she was suspended Gjovik reported smuggling/sanctions concerns to Moyer's team, and while suspended and before she was fired, Gjovik reported the "Issue Confirmation" including accusations of bribery and RICO to Moyer's team. Moyer was charged with criminal bribery in 2021 and then again in 2023. A chargeable instance of bribery under state penal code is a predicate act for RICO. [174]

---

[171] 18 U.S.C. § 1961(1)(a)
[172] 18 U.S.C. § 2(a) – Aider & Abettor
[173] 18 U.S.C.A. § 1964(d); 18 U.S. Code § 371 - Conspiracy to commit offense or to defraud United States
[174] Bribery: *United States v. Frega*, 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).

79

225. On November 19, 2020, a grand jury issued an indictment and charged Apple's Tom Moyer with bribing an executive officer in violation of section 67[175] by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.[176] A defendant is found guilty of violating California Penal Code § 67 when they give or offer a bribe to an executive officer in California, or someone acting on the officer's behalf, and the defendant acted with the corrupt intent to unlawfully influence that officer's official act or decision.[177] A person acts with corrupt intent when he or she acts to wrongfully gain financial or other advantage for himself, herself, or someone else.[178] The crime is punishable by imprisonment for 2-4 years.[179]

226. A trial judge unexpectedly dismissed the charge against Moyer sua sponte, and against the evidence and jury findings. The District Attorney appealed the dismissal and won on August 25 2023.[180] The charge of bribery against Moyer was reinstated and affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings, removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[181]

227. Tom Moyer was Apple's Director of Employment Law until September 2009 when he became Chief Compliance Officer. Moyer is responsible for Apple's compliance

[175] Penal Code Section 67 - "Bribery of an Executive Officer"
[176] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[177] California Criminal Jury Instructions (CALCRIM 2023), Crimes Against Government, Bribery of Official, https://www.justia.com/criminal/docs/calcrim/2600/2600/
[178] Id.
[179] Robert Salonga, "*Appeals court revives bribery charge for Apple security exec in Santa Clara County concealed-gun permit scandal,*" Mercury News, Aug 25 2023, https://www.mercurynews.com/2023/08/25/appeals-court-revives-bribery-charge-for-apple-security-exec-in-santa-clara-county-concealed-gun-permit-scandal/
[180] *People v Thomas Moyer,* Docket, https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=6&doc_id=2358260&doc_no=H049408&request_token=OCIwLSEmLkw3W1BZSCJNSEhIMFw7UCxbJyBOVzpRPDNOCg%3D%3D
[181] *Moyer* at 26, "While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See People v. Wong (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)"

COMPLAINT                                                    SEPT. 7 2023

1   policies.[182] Today, Tom Moyer is the Chief Compliance Officer and Head of Global Security at

2   Apple Inc. Apple told a federal monitor that Moyer "has overall responsibility for Apple's ethics

3   and compliance program including Apple's Business Conduct Policy, governing the ethical and

4   legal obligations of Apple's Board, executives and over 120,000 employees around the world.

5   Tom is also responsible for Apple's global security program including all physical security,

6   executive protection, loss prevention, technology, security related investigations, and the

7   security of new products and prototypes." [183] Moyer also leads *Worldwide Loyalty* and is now

8   the second senior officer/VP to be indicted for felonies in the last four years.

9            a)      **Criminal Commercial Bribery (Cal. Penal Code § 641.3)**

10   228.     Linda Keshishoglou was Gjovik's first direct manager at Apple. Venkat Memula

11   was the Director of Gjovik's first team and Keshishoglou reported to Venkat. Gjovik was hired

12   to Apple by Linda Keshishoglou in January 2015, with a first day of employment on February

13   23 2015. Gjovik's role was originally planned to report to a manager who would report to

14   Keshishoglou but Gjovik reported to Keshishoglou directly while the manager position was

15   vacant. Once the manager position was filled by Brad Reigel, Keshishoglou announced that she

16   was going to keep Gjovik as a direct report. Reigel repeatedly expressed frustration that

17   Keshishoglou 'stole his headcount'

18   229.     Keshishoglou praised Gjovik's work performance but also refused to allow

19   Gjovik to attend the same meetings or be included on the same emails or group text messages as

20   Gjovik's all-male coworker peers (Brad Reigel, Aron Talburt, and Rob Marini) were part of.

21   When Gjovik complained to Keshishoglou about the exclusion, Keshishoglou could not provide

22   a coherent explanation for why Gjovik was excluded.

23   230.     At or around six months into Gjovik's employment at Apple, Keshishoglou's

24   manager, Venkat Memula, questioned Gjovik about Keshishoglou's performance and Gjovik

25

26

27   [182] US DOJ, Second Report of the External Compliance Monitor United States v. Apple, Inc., et al.,
    No. 1:12-CV-2826, and The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-
28   3394 (October 15 2014).
    [183] Stanford, *Cybersecurity and the Legal Profession: Significant Challenges and Unique
    Opportunities*, 2015, https://law.stanford.edu/event/cybersecurity-and-the-legal-profession/

COMPLAINT                                                              SEPT. 7 2023

1      disclosed her concerns about the double-standard. Memula asked to receive updates on the

2      matter and expressed a desire to terminate or otherwise remove Keshishoglou from his team.

3      Memula must have informed Keshishoglou about Gjovik's complaints. In September, Linda

4      Keshishoglou met with Gjovik privately to deliver Gjovik's review and compensation.

5      Keshishoglou bragged she was able to provide Gjovik the unproportionally large compensation

6      because she had budget for open headcount and reallocated that money to Gjovik.

7      231.     It was Gjovik's understanding, based on conversations and company policies, that

8 the 2015 annual performance review cycle would 'skip' her because her employment at Apple

9 was six months or less by the July 2015 evaluation period. An employee like herself who had

10 only been employed at Apple for five months was supposed to be categorized as "too new to

11 rate." An employee that is "too new to rate" does not receive a bonus, additional RSU vesting, or

12 salary increase. Instead, Gjovik did receive an annual performance review in 2015 which

13 included a bonus, additional RSU vesting, and a salary increase. Further, the compensation

14 Gjovik received was above the ranges allocated for her role as an ICT3 Engineering Project

15 Manager.

16      232.     In September 2015, Keshishoglou provided Gjovik a $100,000 grant of RSUs

17 vesting over four years. Under information and belief, the maximum grant for an employee at

18 her level was $60,000 and as too new to rate there was to be no RSUs. Keshishoglou increased

19 Gjovik's salary and also provided Gjovik a bonus, which may or may not have not exceeded the

20 range allocated, but did exceed the $0 scoped for too new to rate. The document Keshishoglou

21 showed Gjovik in the meeting showed future compensation that was not effective immediately

22 and the RSUs additionally noted they would need Board approval. Gjovik viewed the

23 compensation as a "offer" contingent on her fulfillment of Keshishoglou's request.

24

25      233.     After detailing Gjovik's compensation, an explaining Keshishoglou provided a

26 favor for Gjovik, Keshishoglou then told Gjovik something akin to "*now go tell Venkat I'm a*

27 *good manager*." Gjovik interpreted Keshishoglou's statement as an offer of additional

28 compensation only if Gjovik were to drop her complaints about Keshishoglou and instead begin

---

82

praising Keshishoglou. Gjovik felt that if she were to refuse to drop her complaints, that Keshishoglou may retract the compensation she offered.

234.    In July 2021, Gjovik reported this incident to Apple Employee Relations, via Ekelemchi Okpo, including providing copies of emails exchanged between her and Memula and Michallik at the time, and a list of witnesses. Apple claimed they removed Gjovik from the workplace on August 4 2021 while they investigated, then first confirmed they started investigating on August 24 2021. Gjovik documented her interactions with Keshishoglou and the compensation incident in the "Issue Confirmation" for Apple's investigation as "hostile work env based on sex; quid pro quo; bribe; failure to resolve hostile work environment."[184]

235.    Gjovik was disturbed by the exchange and reported it to Memula. Memula expressed interest in exploiting the incident in order to initiate the removal of Keshishoglou and told Gjovik to report the incident to Human Resources to document it for him. Gjovik then reported it to the Human Resources business partner assigned to her organization, Kristen Michallik on September 25 2015. Gjovik then informed Memula of her conversation with Michallik.

236.    Keshishoglou suddenly transferred to a different organization shortly after. Memula began inviting Gjovik to personal social events and connecting Gjovik to leaders at Apple, which Gjovik interpreted as Memula allowing Gjovik to join the 'inner circle' as a reward for helping him remove Keshishoglou. Gjovik understood this as an offer of additional favors and favoritism if she was to continue to assist Memula in his schemes. At the same time, Keshishoglou's team was then moved under Officer Brad Reigel, despite Gjovik's repeated complaints about Reigel's misconduct and it being generally known that Reigel disliked Gjovik 'because Gjovik reminded him of an ex-wife he hates.' When Gjovik complained to Memula about being forced under Reigel, Memula acknowledged Reigel would not be a good manager but told Gjovik it was her job to help him become a good manager.

---

[184] See: "*Issue Confirmation v3*", document drafted by Ashley Gjovik and Apple to summarize Gjovik's concerns that Apple was supposedly investigating while Gjovik was forced on administrative leave. [Aug 23 2021]

COMPLAINT                                                                                      SEPT. 7 2023

237.    Keshishglou wanted to purchase a positive performance review and acted like it was a totally normal thing to do at Apple. However, it was also clear to Gjovik that Memula and Human Resources only acted on her complaint about Keshishglou because they already wanted to remove Keshishglou from the organization for reasons unrelated to misconduct like bribes. It was chilling to Gjovik that misconduct at Apple seemed normalized with the exception of exploiting instances for additional unlawful or retaliatory objectives. Gjovik was disturbed she was coerced to participate in their scheme and was so openly rewarded with cronyism for 'playing along', while concurrently actions were taken that showed Memula had no actual concern for her wellbeing or how her manager treated her.

238.    California Penal Code § 641.3(a) prohibits "Commercial Bribery" which includes any person offering or giving an employee money or anything of value, worth over $250, corruptly and without the consent of the employer, in return for using or agreeing to use the employee's position for the benefit of the other person. A chargeable instance of bribery under state penal code is a predicate act for RICO. [185]

### b)    Criminal Extortion (California Penal Code § 518)

239.    A chargeable instance of criminal extortion is a predicate act for RICO. In California, criminal extortion includes using threats to compel another person to hand over money or property or other consideration. It is a felony with up to four years of incarceration. [186] Threats may include wrongful use of force or fear, or threats under color of official right. Under federal law, it is a crime for United States officers or employees, under the color or pretense of office or employment commits or attempts an act of extortion. [187] Apple's and their enterprise members who are government agencies and/or employees of those agencies extorted Gjovik twice in only the last year in furtherance of the schemes at issue in this claim.

240.    Gjovik filed FOIA requests to the US EPA in January 2022 looking for records related to what occurred at her office in 2021. US EPA kept moving the request out and in May

---

[185] Bribery: United States v. Frega, 179 F.3d 793, 805-07 (9th Cir. 1999); United States v. Jackson, 72 F.3d 1370 (9th Cir. 1995); United States v. Freeman, 6 F.3d 586 (9th Cir. 1993).
[186] California Penal Code § 518
[187] 18 U.S. Code § 872 - Extortion by officers or employees of the United States

84

2022, Gjovik noticed at the end of a very long report recently uploaded about her office mentioned vaguely an inspection at her office on August 19 2021. Gjovik contacted Perez-Sullivan but got a bounce back saying Perez-Sullivan no longer worked at the EPA. Gjovik contacted the new contacts listed on the facility's webpage which would result in Poalinelli releasing the Oct 7 2022 report to Gjovik and for the first-time notifying Gjovik there was an inspection at her office, while she was suspended, looking into her concerns, and they found issues – most concerning, that the toxic gas from under the building was being sent into the HVAC intake.

241.     Gjovik asked follow up questions at which point US EPA lawyer Rebekah Reynolds told Gjovik that Gjovik is only allowed to talk to her going forward and also said she will not talk to Gjovik or answer any of her questions. Gjovik was told her only option was FOIA and the FOIA team kept pushing out their ETAs for documents. Over the next year, the EPA slowly released hundreds of damning documents that were no only critical for Gjovik's lawsuits as they proved Gjovik was right and Apple was upset about it, but it also showed a concerted effort by US EPA employees (Poalinelli, Perez-Sullivan, Ty, Schulman) to keep Gjovik from finding out about what happened and what they found, and to suppress at least two potential news stories about Gjovik and the office (New York Times in July 2021 and Independent UK in December 2021).

242.     The US EPA FOIA team had a manager, Andrew Helmlinger, assigned to Gjovik and Gjovik was told he was her only contact for her FOIA requests. Helmlinger was often adversarial, even claiming Gjovik's requests were "commercial" because, he claimed, she was looking to make money by suing Apple. As such, Helmlinger began attempting to charge Gjovik as a "commercial requester" in order for Gjovik to receive documents about her office and what happened to her and her coworkers. Gjovik appealed to US EPA General Counsel's office and won, but Helmlinger persisted. Gjovik complained repeatedly telling US EPA had an obligation to speak with her as a member of the community but instead they were forcing her to request documents through FOIA which EPA took over a year to release in some cases, and repeatedly

---

85

1  demanded she pay them for. Gjovik also complained that it appeared US EPA was saving the

2  most damning documents for the final releases, dragging it out as long as they could.

3  243.  On May 30 2022, Gjovik discovered and complained to US EPA that the FOIA

4  manager, Andrew Helmlinger, is married to a Partner at the law firm ("Orrick, Herrington &

5  Sutcliffe") that Apple hired to defend them from Gjovik's CERLCA (and SOX & OSH Act)

6  retaliation case with the US Department of Labor. Gjovik complained that he had a personal

7  interest in ensuring Gjovik did not receive the documents, and thus his repeated demands that

8  Gjovik pay for her requests, knowing Gjovik was broke was unlikely to be able to pay, in

9  furtherance of his wife, and Apple's interests in concealing Apple's misconduct, obstructing

10  Gjovik's charges and lawsuits, and demoralizing Gjovik in hope she gives up – and Helmlinger

11  did all of this under the color of official title – which is extortion.

12  244.  Similarly, the US Department of Labor Whistleblower Protection Program

13  escalated their obstruction of Gjovik's cases, including her NLRB charges and a number of

14  federal investigations including SEC and FTC, by demanding Gjovik provide them something

15  they had no right to demand and only planned to give it to Apple to help Apple defend itself

16  from Gjovik, under color of official title, and threatening to deprive Gjovik of her constitutional

17  and statutory rights if she did not comply.

18  245.  There was much misconduct from US Dept of Labor from the start of Gjovik's

19  cases with them and Gjovik complained of obstruction to their OIG and Solicitor starting in

20  November 2021. This included a phone call in September 2022 where Gjovik was told she

21  would receive an update on her cases from her investigator (Diangco) and her supervisor.

22  Instead, on the phone call was the Regional Asst. Administrator Matthew Parra, on a vacation

23  day (per his out of office), who spent most of the call trying to intimidate Gjovik into

24  withdrawing her charges. Gjovik complained on the phone and after of their conduct, including

25  filing more complaints.

26  

27  246.  When US Dept of Labor suddenly wanted another phone call with Gjovik in

28  January 2023, Gjovik demanded she be allowed to record it or otherwise wanted to keep

communications in writing due to their prior misconduct. US Dept. of Labor acquiesced. During

86

the phone call, Captain Parra showed up again as a surprise guest and again made many intimidating and obstructive comments, including repeatedly misstating facts and the law, mostly repeating Apple's position statement and eventually admitting they apparently didn't investigate the evidence or briefs Gjovik submitted. Gjovik repeatedly tried to "object" to Parra's statements but Parra told her to stop and that the call was "informal" and "not on the record," so Gjovik acquiesced and let him claim things that were not true and complied with bad legal analysis, with the hope they would simply agree to actually investigate by the end of it. On March 22 2023, Diangco suddenly reached out to Gjovik demanding a copy of the audio file of the meeting. US DOL had not previously asked for a copy and did not attempt to make their own copy at the time. Gjovik asked why they wanted it and they would not tell her.

247.    Gjovik told US Dept of Labor she would share a copy with OIG to investigate the team's misconduct but otherwise would not share it unless they could provide a rational justification why they need it – and they did not. Gjovik complained to them it sure seemed like Apple wanted it to transcribe and use Gjovik's acquiescence to Parra against her in their defense. Then, in March? 2023, Gjovik received a letter from Diangco demanding the audio file within ten days or else US Dept of Labor may dismiss Gjovik's entire whistleblower retaliation case, regardless of merit. Gjovik complained to US Dept of Labor that March 29 2023 and she would only share the file if they would draft an agreement "sealing" it so Apple could not get a copy. US Dept of Labor never responded. Gjovik complained what they were doing seemed illegal and if they persisted, she'd report their misconduct to …. Gjovik waited until the deadline at which point US Dept of Labor still had not responded, so on April 2nd 2023 Gjovik reported them to the FBI for "procedural extortion" and notified the US Dept of Labor of such. Gjovik has not heard back from them since their extortion letter.

248.    Both of these incidents were examples of Apple's Worldwide Loyalty enterprise using regional departments of government agencies and/or their employees to help Apple cover-up Apple's systemic non-compliance with regulatory obligations and use of criminal tactics to

intimidate and silence whistleblowers and witnesses. This is not a new allegation about the US

Dept of Labor agency that Gjovik interacted with.[188]

### vii.    Predicate Acts Indictable Under Title 18 US Code [189]

249.    Apple conducted and participated in the affairs of the Worldwide Loyalty Team

Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

and 1961(5), which includes: (i) multiple violations of 18 U.S.C. § 1951 by interfering with

commerce by threats or violence, (ii) Multiple violations of 18 U.S.C. § 1341 by engaging in

mail fraud, (iii) Multiple violations of 18 U.S.C. § 1343 by engaging in wire fraud, (iv) Multiple

violations of 18 U.S.C. § 1503 by obstructing justice, and (v) Multiple violations of 18 U.S.C. §

1512 by tampering with witnesses and victims.[190]

### a)    Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)

250.    Every time Apple transmits a document or communication to the government, to

shareholders, to the press, or to public interest groups – via the mail and/or over the wire – and

Apple makes material claims as to its regulatory compliance practices – each incident where

Apple's statement is materially false can be a charge of mail and/or wire fraud. Wire fraud is

intentionally devising or intending to devise a scheme to defraud by means of materially false or

fraudulent pretenses, representations, or promises over interstate wire communications.[191] The

false statement made "has a natural tendency to influence, or is capable of influencing, the

decision of the decision-making body to which it was addressed."[192]

251.    Mail fraud and wire fraud are both RICO and money laundering predicate

offenses. The legal precepts relating to principals, accessories after the fact, misprision, and

conspiracy apply to mail fraud and wire fraud as well. Under RICO, the injury caused by mail

---

[188] See, Bloomberg, *He Investigated Dubious Firings for U.S. Then He Was Fired* (2017),
https://www.bloomberg.com/politics/articles/2017-07-21/he-investigated-suspicious-firings-for-u-s-then-he-was-fired (same Regional Office as Gjovik's case)
[189] 18 U.S.C. § 1961(1)(b)
[190] *Steiner v eBay,* U.S. District Court of Massachusetts, 1:21-cv-11181, Complaint and Demand for Jury Trial, July 21 2021, https://www.scapicchiolaw.com/pdf/Steiner.pdf
[191] 18 U.S.C. § 1343. *United States v. Ransom,* 642 F.3d 1285, 1289-90 (10th Cir. 2011). *US v. Camick,* 796 F. 3d 1206 - Court of Appeals, 10th Circuit (2015).
[192] *United States v. Gordon,* 710 F.3d 1124, 1148 n. 26 (10th Cir.2013)

COMPLAINT                                                                    SEPT. 7 2023

and wire fraud must be business or property, but this also includes "intangible property rights."[193] The RICO predicate act of mail fraud in furtherance of criminal acts does not displace other charges nor is it pre-empted by the federal statutes the mail fraud was used to engage in.[194]

252.   Apple's actions are especially when there is a true and accurate report from another party (newspaper, NGO, etc.) about Apple's actual practices and Apple contacts the group demanding a "retraction" or "correction" of the true report, with changes requested to falsify the report, and Apple either citing prior falsified documents or requesting the falsification of the new report through threats, intimidation, and coercion. This happens often.[195]

253.   The Ninth Circuit has held that RICO fraud claims accrue when plaintiffs have "actual or constructive knowledge" of the fraud.[196] The Ninth Circuit has found that evidence of continuing participation in a fraudulent scheme despite knowledge of complaints regarding the scheme can support a conviction for mail fraud and the evidence to support that knowledge can include information like Better Business Bureau ratings.[197] Here, the press covered two major fines against Apple in 2016 and 2017 which should have put anyone on notice of Apple's actually environmental practices. In 2016, Apple agreed to a consent decree and was fined $450,000 by the California government over hazardous waste violations.[198] This was covered by major publishers and Lisa Jackon's ex-US EPA team gave comment.[199] In 2017, Apple was fined by the North Carolina government for violations of hazardous waste laws, which also

---

[193] *Carpenter v. US*, 484 U.S. 19, 26-27 (1987); *Pasquantino v. US*, 544 U.S. 349, 357 (2005).
[194] *United States v. Boffa*, 688 F.2d 919, 931-33 (3d Cir. 1982) (mail fraud statute not preempted by labor statutes, despite some overlap in statutes' coverage).
[195] FCPA Blog, *What does this Apple disclosure mean*? (2020), https://fcpablog.com/2020/02/10/what-does-this-apple-disclosure-mean/
[196] *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 9 (S.D. Cal. Feb. 21, 2014)
[197] See *U.S. v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 15 (S.D. Cal. Feb. 21, 2014).
[198] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
[199] Reuters, *California EPA says settled with Apple on hazardous waste claims* (Dec 6 2016), https://www.reuters.com/article/us-apple-waste-violations/california-epa-says-settled-with-apple-on-hazardous-waste-claims-idUSKBN13V2HS

89

1  revealed Apple was "lying" about the data center running on renewable energy. Again, Lisa

2  Jackson's team provided comment.

3      254.    In 2023, Apple's Supplier Responsibility report claimed: "*Apple is committed to*

4  *eliminating waste at every stage of our products' lifecycle — from the moment a product is*

5  *designed to when it is manufactured and, ultimately, recycled.*"[200] Apple lists "*illegal disposal of*

6  *hazardous waste*" as one of the most serious violations in its supply chain.[201] Apple's supply

7  chain reports also note additional violations the Apple claims are the 'most serious' violations

8  including: falsification, obstruction, unsafe work environments, lack of environmental controls

9  and controls, and retaliation.[202] In 2023, Apple admitted in their regulatory filings to multiple

10  instances of falsification, health & safety violations, environmental violations, and debt-bonded

11  labor in their supply chain.[203]

12      255.    It's clear these statements were made in furtherance of a "scheme or artifice to

13  defraud" and as such serve as the predicate offenses for a RICO violation.[204] Apple's scheme to

14  defraud under environmental laws was undertaken with a reckless disregard for the truth or

15  falsity of its hazardous waste representations. Apple employ's a prior Presidential appointed

16  administrator of the U.S. Environmental Protection Agency and much of her staff from the US

17  EPA. Apple's Supply Chain Responsibility policies describe in detail the regulatory obligations

18  for hazardous waste handling. Apple knew what was required of it and chose to break the law,

19  knowing its actions would create significant risk of harm to the public and often did actually

20  significantly harm the public.

21      256.    At 3250 Scott Blvd, from 2015-current, Apple manipulated hazardous waste

22  manifest documents and regulatory filings in a concerted effort to suppress and conceal the

23  Apple's actual hazardous waste practices. Apple used improper codes for hazardous waste

24

25  [200] Apple Inc, Supplier Responsibility Progress Report, page 81, 2023,
    https://www.apple.com/supplier-responsibility/pdf/Apple_SR_2023_Progress_Report.pdf
26  [201] Id at page 25.
    [202] Apple, Howe we Work with Suppliers, 2023, Page 10, https://www.apple.com/supplier-
27  responsibility/pdf/How-We-Work-With-Suppliers.pdf
    [203] Supplier Responsibility Progress Report at page 27.
28  [204] 18 U.S.C. §§ 1341, 1343. See *Philip Morris*, 449 F.Supp.2d at 852–54. *United States v. Philip
    Morris USA Inc.*, 566 F.3d 1095, 1116 (D.C. Cir. 2009)

COMPLAINT                                                    SEPT. 7 2023

disposal (i.e., coding solvent waste as non-RCRA, coding 'solvent mixtures' instead of notating each chemical, etc.). All of these efforts were in order to save money, downplay the environmental impact of the plant, and manipulate metrics on operations at the plant in order to mislead investors about Apple's environmental practices in annual SEC filings.

257.    On April 30 2021, Apple knowingly omitted information about another phosphine leak (and possible explosion) at its 3250 facilities by refusing to file a spill report with CalOES and demanding the city HazMat redact Apple's name from the incident report that was electronically filed for the incident.

258.    On June 30 2021, Apple knowingly omitted information about its treatment and disposal of the now-banned chemical NMP at its 3250 Scott Blvd facility. Apple submitted an electronic filing to the US EPA claiming x pounds were treated on site, but the treatment mechanism noted was scrubbers which would not reduce the chemical to the extent noted. Further, Apple made false statements in this filing claiming x pounds of NMP were transported offsite to three waste processing facilities, however no manifests were ever created for those supposed transfers. Apple either lied that it transported the NMP at all and instead unlawfully deployed x thousands of pounds of NMPs on site, or the Apple lied and transported the NMP without manifests to off the books disposal facilities.

259.    Apple's August 2021 ESG report, which they reference frequently in their SEC filings, states: *"Apple is committed to compliance with applicable export and sanctions laws. All employees are responsible for complying with these laws and reporting possible violations."*[205] Each time the report and any similar communications was emailed or shared digitally is wire fraud. Each time it was mailed, was mail fraud.

260.    Gjovik complained of fraud with the cracks in floor at her office because Apple was supposed to report that sort of thing to the US EPA and work with their oversight to evaluate and fix. Gjovik was primarily concerned that Apple's standard operating procedure seemed to be lawlessness, which is the opposite of how they claim they operate.

---

[205] Apple, 2021 ESG Report,
https://s2.q4cdn.com/470004039/files/doc_downloads/2021/08/2021_Apple_ESG_Report.pdf

COMPLAINT                                                                    SEPT. 7 2023

261.     In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about 3250 Scott and its air emissions. One of these schemes was an anonymous account (assumably Apple) sent her an email via the webform on her website claiming to be ex-US EPA enforcement and after commenting on a suspicious number of details about Gjovik's environmental complaints against Apple, then threatened her to stop talking about the NMP release. To support the threat, the person (Apple) claimed they had EPA insider information about an NMP air emission study that occurred on or after 2015. The email came from an IP flagged for spam and included certain details that seemed improbable for an actual US EPA employee to say. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[206] The email was sent as part of Apple's scheme to not comply with environmental laws, but claim it does, and use fraud, obstruction, and intimidation to silence anyone who could prove and report Apple's fraud – thus the email is another count of predicate act wire fraud.

262.     Apple knowingly omitted material information and/or made false statements and/or knowingly generated, stored, treated, transported, disposed of, exported, or otherwise handled hazardous waste without filing the appropriate documentation which is a felony offense under the Resource Conservation and Recovery Act and Clean Air Act.[207] Apple knowingly and intentionally manipulated and concealed scientific data in order to conceal its criminal conduct. Apple committed the above-mentioned violations while knowing it endangered others.

> **b)**     **Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512) [208]**

263.     Gjovik began meeting with the, U.S. NLRB and U.S. EEOC before she was fired, providing statements and evidence about her retaliation concerns. Gjovik has stated publicly in the press, in legal filings, and on social media, since August 2021 and ongoing, that she filed charges that would initiate communications with federal authorities and that she planned to

---

[206] False Impersonation of Federal Officer or Employee (18 U.S.C. § 912). *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).
[207] 42 U.S.C. § 6928(d)
[208] 18 U.S.C.A. § 1961 (B)

1  vigorously participate in any investigation into Apple for their conduct against her which she

2  reasonably believed was unlawful.[209] Many of the threats, intimidating and harassing messages,

3  and corrupt acts were done acknowledging Gjovik's federal charges, cases, and proceedings.

4  There is no question Apple understood the federal and criminal implications of their

5  intimidation.

6      264.    Section 1512 applies to the obstruction of federal proceedings: judicial,

7  congressional, or executive.[210] It consists of four somewhat overlapping crimes: use of force or

8  the threat of the use of force to prevent the production of evidence; use of deception or

9  corruption or intimidation to prevent the production of evidence; destruction or concealment of

10  evidence or attempts to do so; and witness harassment to prevent the production of evidence.[211]

11  Here, Apple obstructed justice through threats of violence against a witness, victim, and

12  informant (a), through intimidations, threats, persuasion, and decision of a witness, victim and

13  informant (b), and through harassment of a witness, victim and informant (d). Under information

14  and belief, it is likely that evidence has also been destroyed as Gjovik was prohibited and

15  prevented from gathering evidence through suspension and termination of her employment in

16  August and September 2021.

17      265.    Here, 18 U.S.C. 1512 (a) is implicated as assumed agents of Apple Inc referred to

18  Gjovik's protected activities as "*worthy of death*" (Sept 7 2021), and made references to Gjovik

19  dying from "*double tap*" gunshot wounds (Dec 20 2021), that in Russia Apple whistleblowers

20  would die from a "*car accident*" (Oct 15 2021). The day she was fired an Apple account posted

21  on an article about Gjovik that he wanted Apple to "*hunt [leakers] down like wild animals*" and

22  they "*want to see them destroyed*" (September 9 2021). One Twitter account posted on Sept 10

23  2021, the day after Gjovik was fired, that the world was "*reaming*" her and that Gjovik deserved

24

25

26  [209] *United States v. Guadalupe*, 402 F.3d 409, 412 (3d Cir. 2005).
   [210] 18 U.S.C. § 1515(a)(1) ("official proceeding" means "a proceeding before a judge or court of the
   United States," "a proceeding before the Congress," "a proceeding before a Federal Government
27  agency which is authorized by law," or "a proceeding involving the business of insurance whose
   activities affect interstate commerce . . .")
28  [211] Congressional Research Service, Obstruction of Justice: An Overview of Some of the Federal
   Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities, April 17 2014

COMPLAINT                                                SEPT. 7 2023

1   it. The account also paid to promote (advertise) the post. Another account posted a photo of a

2   ban holding a baseball bat and wrote that Tim Cook was "*gonna f@\*k some peeps up*" (Sept 22

3   2021). Another Apple account was repeatedly, directly harassing Gjovik on social media and at

4   one point referenced what was happening to Gjovik as "*the nail that sticks out, gets hammered*"

5   (Jan 30 2022).

6       266.    Gjovik's NLRB affidavit was to be taken the day after she was fired. When

7   Workplace Violence interrogator unexpectedly reached out to her on September 9 2021,

8   insisting he must talk to her within the hour, having never met the interrogator or heard of his

9   "Workplace Violence" team before, Gjovik wrote she was concerned he was intimidating her the

10  day before her affidavit as a federal witness against Apple Inc. Gjovik was fired a few hours

11  later without explanation.

12      267.    Upon reviewing Apple policies, the only mention of "Workplace Violence"

13  includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or*

14  *written threats, stalking, or destruction of property.*" It is entirely unclear why this team was

15  contacting Gjovik if not to intimidate and threaten her with at least an implied threat of violence.



**Ashley M. Gjovik**   ...
@ashleygjovik

Replying to @ashleygjovik

**Hey #Apple, "This feels a little like witness intimidation. I let @NLRB know." Love, Ashley**

**Clutches panic button & Mace while still laying on floor pondering the brutality of U.S. capitalism...**

**Ashley Marie Gjovik**   2:27 PM
Re:
To:            Cc: Ashley G (Work)   Details

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.

This feels a little like witness intimidation, etc...

---
Ashley M. Gjovik
 Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik

2:33 PM · Sep 9, 2021 · Twitter Web App

94

268.    Later, Apple would claim Gjovik's termination was due to statements Gjovik made on August 28 and August 30, a full 10-12 days prior, yet on Sept 9th 2021, Kagramanov insisted Gjovik get on the phone with him "*within the hour*." After her termination via email that day, Gjovik would not hear of the proffered reasons for her termination until September 15th, six days later. It is clear Kagramanov did not actually have a legitimate reason he planned to terminate Gjovik for on that day.

269.    An employer's termination, demotion, or harassment against an employee, caused by an employer's racketeering, under certain circumstances can constitute a RICO predicate act under § 1512.[212] There is no evidence any of Apple's agent's intimidating, harassing, and threatening conduct was actually good faith encouragements for Gjovik to testify truthfully.[213] Instead, Apple's agents even openly admitted they would continue terrorizing her until she dropped her charges and made specific false statements. They presented a false story to Gjovik of Gjovik's own experience and demanded Gjovik repeat that false story as if it were true.[214] (*She asked to be on leave. She leaked IP. She deserved to be fired*. Etc.) It was clear to Gjovik that the beatings would continue until Gjovik submitted to Apple, but Gjovik refused to surrender.

270.    Agents of Apple Inc wrote Gjovik was "*deserving of misery,*" that they looked forward to seeing Apple "*swallow her & spit her out,*" and that she is lucky Apple has not "*crushed her like a bug.*" They posted "*She's a senior manager at Apple and going on a tirade against them over the ground beneath the building. What did she expect to have happen to her?*" and "*Apple fired you because they already know how this ends… They waited and looked for a policy violation, found it, and booted you.*" Another wrote that as a "*seasoned employee, she more than others, was well aware of the consequences of airing dirty laundry,*" and Apple

---

[212] *Dooley v. United Techs. Corp.*, No. CIV. A. 91-2499, at *5 (D.D.C. June 17, 1992)
[213] *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013); *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005) ("Cruzado did ask that they tell the truth; however, his version of 'the truth' that he urged upon them was anything but the truth")
[214] *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005) ("corrupt persuasion occurs where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it")

95

should "*have fired her weeks ago.*" Another wrote "*there's no conspiracy [Gjovik] broke Apple's number one rule. She talked to the press while still employed. She is never going to work in tech again and since she is going to lose the lawsuit, she should just apply to fast foods right away.*"

271.    After Gjovik was fired, Apple Inc mailed her possessions from her office in a box full of broken glass shards. On September 28 2021, Apple commented to Gjovik via Twitter about the box before she opened it, saying "*Don't open it!*" and including an image from the movie SE7EN that implies it contained a severed head of one of her loved ones.[215]

272.    On October 1 2021, Apple commented on one of Gjovik's Twitter posts complaining she just "*spent 5min pulling a chunk of glass out of the sole of my foot & I'd like to remind everyone that #Apple sent me this box of spite after taking away my health insurance the day I was fired.*" An Apple account replied, "*I think it would also be really impactful to post a picture of your bleeding wounds w/ a tweet calling out their HR people by name. At this point why not shame the individuals there for their unambiguous, documented spitefulness with horrifying photographic evidence!*" Assumably Apple wanted Gjovik to call out "people by name" as a preemptive defense of individual liability for their actions and wanted a photo to assess liability for the physical harm.

273.    When Gjovik suffered harassment and intimidation that was openly said to be due to her federal cases, the focus was often Gjovik's NLRB charges. The interference extended to a lawsuit against Gjovik 'because of' Gjovik's NRLB charges, emails to Gjovik demanding she alter her testimony, emails demanding Gjovik omit certain evidence, and direct interference with the NLRB investigators overseeing Gjovik's charges and the resulting investigation. (NLRB investigators are considered Federal Officers under criminal statutes).[216]

274.    Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness: a violation of federal law. Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in

---

[215] 18 U.S.C. § 876(c) prohibits mailing "any threat to kidnap any person or any threat to injure the person of the addressee or of another."
[216] 9-139.800 Interference with National Labor Relations Board Agent (29 U.S.C. § 162).

96

COMPLAINT                                                                SEPT. 7 2023

misleading conduct toward Gjovik. [217]  Apple acted with intent to influence, delay, and/or prevent the testimony of Gjovik with NLRB, US SEC, US Department of Labor, California Department of Labor; or cause or induce Gjovik to withhold testimony and withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in the same. Several of these cases were federal proceedings and Apple intended to prevent Gjovik from cooperating with authorities.[218]

275.     Here, 18 U.S.C. 1512(b) is implicated as Apple employees & assumed agents of Apple Inc suggested Apple Inc should / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion,"* *"ending her,"* *"destroying her,"* *"ruining her,"* and bankrupting her. Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley,"* *"finding out"* for *"fucking around,"* a *"self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."*

276.     Joanna Appleseed, on behalf of Apple Inc tried numerous times (including January 7th - 8th 2022 and February 5th 2022) to coerce Gjovik to withdraw, retract, or otherwise stop a Wikipedia Arbitration Committee investigation into an account harassing Gjovik via Gjovik's Wikipedia article and which Gjovik alleged to be Appleseed or someone on Apple or Appleseed's behalf, but either way acting at the direction of Apple. Wikipedia banned Gjovik and refused to tell her why, but later admitting 'because she filed an NLRB charge against

---

[217] *United States v. Khatami*, 280 F.3d 907, 911-12 (9th Cir. 2002)("Synthesizing these various definitions of "corrupt" and "persuade," we note the statute strongly suggests that one who attempts to "corruptly persuade" another is, given the pejorative plain meaning of the root adjective "corrupt," motivated by an inappropriate or improper purpose to convince another to engage in a course of behavior-such as impeding an ongoing criminal investigation"); *United States v. Gotti*, 459 F.3d 296, 343 (2d Cir. 2006)("This Circuit has defined 'corrupt persuasion' as persuasion that is 'motivated by an improper purpose.' *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).
[218] 18 U.S. Code § 1512 (b) - Tampering with a witness, victim, or an informant

1   Apple.' Gjovik complained to Wikipedia legal as that seems unlawful. In November 2022, the

2   account harassing Gjovik was identified to be Appleseed.

3       277.    Apple Inc agents also threatened to denylist Gjovik from the technology,

4   engineering, and legal employment fields: including *"never working in the tech industry again,*

5   *never working for a large corporation again, never getting a job as a lawyer, failing the*

6   *California bar association's Moral Character investigation, and never getting a job anywhere*

7   *again other than working in fast food."*

8       278.    Here, 18 U.S.C. 1512(c) & (d) are implicated as Apple managers, employees, and

9   agents have referred to Gjovik's complaints to the federal and state government about Apple Inc

10  as *"unsubstantiated," "meritless," "baseless," "dead in the water,"* and that there's *"no case."*

11  Apple's agents referred to Gjovik as an *"ambulance chaser"* and her cases as *"shakedown*

12  *lawsuits."* Apple manager Ricky Mondello and ex-Apple employees Joanna Appleseed and

13  Shantini Vyas have publicly called Gjovik a *"liar," "predator," "racist," "inconsequential,"*

14  *"not a real whistleblower."* These parties have described Gjovik's protected activities as a

15  *"vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric,"* and

16  *"misinformation."* Among other things, Apple Inc & their agents have publicly called Gjovik a

17  *"liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility,*

18  *dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist,*

19  *'universally hated', a psychopath, paranoid, Bipolar, psychotic, schizophrenic, a grifter, a*

20  *Karen, a Super Karen, Karenx100, a 'typical feminist,'* and a *'classic cow'.*

21
22      279.    knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or

23  attempted to do so, or engaged in misleading conduct toward Gjovik. Apple acted with intent to

24  influence, delay, and/or prevent Gjovik from communicating to federal officers and law

25  enforcement authorities' information relating to the commission or possible commission of an

26  offense. There is a reasonable likelihood that at least one of the communications targeted by

27
28

98

COMPLAINT                                                          SEPT. 7 2023

1   Apple would have been made to a federal officer. The information that would have been

2   communicated related to the possible commission of a federal offense. [219]

3   280.   The U.S. Department of Justice describes examples of victim and witness

4   intimidation including explicit or implicit threats of physical violence, property damage,

5   courtroom intimidation, public humiliation of victims or witnesses (or their friends and

6   families), parking outside the victim's or witness's house, nuisance phone calls, vague verbal

7   warnings, threatening looks and gestures directed at the witness or victim in court, economic

8   threats, and threats of deportation. In situations where the Defendant aims for communitywide

9   noncooperation there may also be assault, public humiliation of suspected informants, and

10   random public acts of extreme brutality intended to terrify potential witnesses.[220] (i.e., "*don't get*

11   *Gjovik'ed*")

12   281.   Apple's presence in Silicon Valley is directly comparable to the community

13   where a gang operates as both are worlds unto themselves—"*places where people live, attend*

14   *school, and work, all within a radius of only a few blocks—from which they rarely venture out.*

15   *More importantly, victims and witnesses usually know the defendants against whom they are*

16   *asked to testify ... Furthermore, the community may regard many of the crimes for which*

17   *witnesses are sought as private business matters among [defendants], not crimes against the*

18   *community.*" [221]

19

20   282.   Apple's scheme with the enterprise to intimidate Gjovik to not participate in legal

21   activities related to Apple, and to retaliate against her for what she had already done, included

22   sending agents (employees, ex-employees, contractors, vendors, etc.) to her home to stand by

23   and walk around the courtyard of her Santa Clara apartment, to follow her when she ran errands,

24   to drive up to her New York apartment and capture videos/photos of her, and to send someone to

25

26

27   [219] 18 U.S. Code § 1512 (d) - Tampering with a witness, victim, or an informant

28   [220] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Research in Action: Victim and Witness Intimidation (October https://www.ojp.gov/pdffiles/witintim.pdf 1995).
[221] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Research in Action: Victim and Witness Intimidation* (October https://www.ojp.gov/pdffiles/witintim.pdf 1995).

99

COMPLAINT                                                                                    SEPT. 7 2023

1  stand on her New York sidewalk until she left the apartment and to send Gjovik notification she

2  was being watched by the person.

3      283.   In California, Apple delayed, lingered, prowled, and/or wandered on the private

4  property of Gjovik's apartments. Apple was on that property without a lawful purpose and

5  intended to commit a crime if the opportunity arose. Apple's purpose was to commit a crime if

6  the opportunity arose, which they did including by threatening Gjovik by taking unwanted

7  photos and videos and looking into the home windows, of a federal witness, with an intent to

8  intimidate;[222] by using social media accounts to harass Gjovik about the real-world events she

9  was experiencing in real time, and at least once fleeing the scene when caught by a neighbor

10  who said she would call police officers.[223]

11      284.   Apple maliciously and unlawfully damaged/obstructed/disconnected part of a

12  telephone/cable/electrical line, or equipment connected to the line – and Apple maliciously and

13  unlawfully made an unauthorized connection with part of a line used to conduct electricity or

14  equipment connected to the line – when Apple broke into Gjovik's Santa Clara apartment and

15  attic to install some sort of electronic equipment above her home office, assumably intercepting

16  the electrical and internet lines.[224]

17      285.   Apple entered a residential apartment/room within a locked residential building

18  and intended to commit felonious acts at least including installing surveillance equipment in

19  Gjovik's attic, bugging Gjovik's chattels, replacing the batteries in their prior bugs in Gjovik's

20  chattels, and obstructing/interfering with Gjovik's internet access.[225] Apple, and/or an agent of

21  Apple, willfully entered Gjovik's apartment without the consent of Gjovik and Apple had no

22  lawful reason to do so.[226]

23      286.   Apple intentionally listened to or recorded a conversation/communication using

24  an electronic amplifying/recording device without consent from all individuals who were party

25

26  _____

27  [222] California Penal Code § 647i "Peeking"
   [223] California Penal Code § 647(h) "Loitering"

28  [224] California Penal Code § 591 "Damaging Phone/Electrical Lines"
   [225] California Penal Code 459 "Burglary"
   [226] California Penal Code § 602.5 "Trespass into Dwelling"

to the conversation/communication, and at least one of the other individuals who were party to the conversation/communication intended that the conversation/communication be confidential and had objectively reasonable grounds to believe it would be confidential. Apple violated 632(a) at least when it intercepted or otherwise overheard Gjovik's phone calls with the Santa Clara District Attorney's office, and a separate call with a lawyer in Seattle Washington, and a friend in Canada – which were the three phone calls where Gjovik's internet/cell connection dropped at very suspicious times in the call, and in the matter with the Canadian, both of their Wi-Fi connections were taken down at the same time and had to be rebooted – and these three events led to Gjovik's investigation which found the bugged objects in her home.[227]

287.    In addition, several government employees who participated in the enterprise's scheme engaged in conduct with at least Gjovik that is likely criminal. The first NLRB investigator threatened Gjovik to obtain her signature on a document with her affidavit but which he also tampered with and threatened Gjovik not to correct or otherwise modify. In violation of California Penal Code § 141, the NLRB investigator willfully, intentionally, and wrongfully changed Gjovik's affidavit to plant new information in the document which came from Apple's lawyers, not Gjovik, but the investigator made the affidavit appear as if Gjovik testified to it under oath. The investigator intended that his action would result in Apple's proffered reason for firing Gjovik to be wrongfully produced as Gjovik's genuine and true belief that could be a reason Apple fired her before Apple contacted her about the matter.

288.    He violated § 522 when he threatened Gjovik that if she was to attempt to correct the document to only reflect what she actually said during her testimony, that her actions would expose by Apple and used by Apple to claim she is dishonest, lying about the retaliation, and felt it possible she was fired legitimately for cause. The investigator threatened Gjovik and a result of the threat, Gjovik signed the affidavit as prepared by the Investigator. The investigator also wrongly claimed Gjovik was not allowed to provided evidence in her charges and if she was to do so, the entire case may be thrown out. The investigator's actions also violate Penal Code 137(b) "Influencing a Witness by Fraud". Investigator used fraud against Gjovik with intent to

---

[227] California Penal Code § 632(a) "Eavesdropping and Recorded Communication

COMPLAINT                                                          SEPT. 7 2023

cause Gjovik to withhold true testimony/information and give false testimony/information. The investigator made false statements, misrepresents information, hid the truth with intent to deceive. Gjovik reported this to NLRB OIG in January 2022 who investigated and took actions.

c)   **Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513)** [228]

289.   Gjovik put her career and physical safety at grave risk in order to obtain evidence of what she believed to be criminal acts and violations of federal law.[229] Gjovik worked with state and federal agencies, and law enforcement, to report issues starting in September 2020 with the chemical exposure issues next to 3250 Scott Blvd. Gjovik spent much time gathering information and evidence for the government to support her claims that something was wrong. When the government asked her for more information or a new type of data, Gjovik always followed their instructions and was usually able to gather the data they wanted. These activities included Gjovik entering public, common, or general use areas but stealthily attempting to gather photos, videos, audio recordings, and scientific measurements like air quality readings.

290.   One infamous night at her apartment, Gjovik went up to the roof of her building through public, unlocked doors but around 11:30pm when she thought no one would be around. She brought with her tVOC monitors and other testing equipment. Once outside on the roof she set up the equipment and began taking photos of the utility lines and vents around her in attempt to figure out where the chemical fumes were coming from. Gjovik was confronted by a private security guard who questioned her about what she was doing. Gjovik became very nervous, but showed him the tools and said she was testing the air, showing him the readings, and then Gjovik quickly left the roof.

291.   At Gjovik's office in July and August, Gjovik concerted with coworkers about gathering at least photographic evidence of the cracked Superfund floor and they did gather photos of the cracks before Apple could repair them. Gjovik shared the information with the US

---

[228] 18 U.S.C.A. § 1961 (B)
[229] *United States v Joy Edwards,* United States Court of Appeals for the Sixth Circuit, No. 18-3541 (2019).

COMPLAINT                                                          SEPT. 7 2023

EPA and her disclosures about the cracks led to an onsite inspection of the office which found issues. Gjovik was swiftly 'removed from the workplace and all workplace interactions' following the photography and prior to the inspection.

292.   Even the evidence noted in this complaint post-termination was diligently gathered by Gjovik in preparation of filing additional complaints to the US government about Apple's ongoing misconduct. Gjovik diligently documented and preserved Apple's deranged harassment. Most people would have given up – or at least would not have the strength to create a memo of this type of harassment. Gjovik did and so Apple retaliated even more.

293.   Apple Retaliated against a Federal Witness & Informant in violation of § 1513(b). Apple knowingly engaged in conduct with intent to retaliate for testimony given and records/documents produced by Gjovik in an official proceeding, and for Gjovik providing information relating to the commission or possible commission of a federal offense. Apple's conduct threatened to and did cause bodily injury to Gjovik and damaged Gjovik's property. Apple also conspired to commit one or more § 1513(b) offenses. Apple Retaliated against a Federal Witness & Informant in violation of § 1513(e). Apple knowingly, with the intent to retaliate, took action harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for Gjovik providing to a law enforcement officer truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(e) offenses.

294.   Apple's harassment against Gjovik was serious acts and courses of conduct directed at Gjovik that caused substantial emotional distress to Gjovik and served no legitimate purpose. Apple's intimidation of Gjovik was serious acts and sources of conduct directed at Gjovik that caused fear or apprehension of Apple and served no legitimate purpose. The serious acts are threatening, retaliatory, harassing, and violent conduct that reasonably influences the willingness of a victim or witness to testify or participate in a federal criminal case or investigation.

295.   An individual who affirmatively conceals the commission of a §1513 by another is guilty of misprision. (18 U.S. Code 4).  The elements of misprision of felony under 18 U.S.C.

4 are (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) defendant took steps to conceal the crime.[230] Appleseed made numerous derogatory posts on social media about a federal informant and witness who testified against Appleseed's team at Apple, a team which leads the criminal enterprise at issue in the RICO claim. Appleseed's posts intended to retaliate and did cause Gjovik harm. There is no question that Appleseed's posts were in response to Gjovik's testimony.[231] Intent can be proven through circumstantial evidence, such as: (1) "the natural consequences likely to flow from the [retaliator's] actions," including fear on behalf of the witness.[232]

296.    In *U.S. v Camick*, the filing of a Civil Rights Lawsuit was found to violate 18 U.S.C. § 1513. As it was found to be filed with an intent to retaliate against a federal witness. Evidence supporting the conviction was circumstantial timing: the conduct that formed the basis of the allegations in the lawsuit took place in 2011, yet defendant waited until July 2013, after he had been charged with the federal crimes and after he became aware that the subject of the lawsuit would be a witness against him. [233] Like *Camick*, Apple and Appleseed waited a suspicious amount of time to approach Gjovik at all about the concerns they later hired very powerful attorneys to email her about on October 15 2021, implying they may sue me over those concerns, and threatening Gjovik on February 5 2022. This was only after Apple terminated Gjovik and needed to search for a pretextual explanation – and were also looking for ways to threaten & intimidate her from pursuing legal charges against them. [234]

---

[230] CRS Reports for Congress, Obstruction of Justice: An Abridged Overview of Related Federal Criminal Laws, RS22783 (2007)
[231] Intent may, and generally must, be proven with circumstantial evidence. United *States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007).
[232] *United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013)); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014).
[233] *U.S. v Camick*, 796 F.3d 1206 (2015).
[234] *EEOC v Outback Steakhouse*, 75 F. supp 2d 756 (ND Ohio 1999)

297. A defendant's liability can be based on its falsification, destruction, and misrepresentation of evidence during a judicial proceeding.[235] In fact, while common law often immunizes testimony from prior judicial proceedings, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity.[236] Appleseed's action were not protected.

298. The chilling effect of Apple's retaliation against Gjovik has been noted in articles, blog posts, social media, and even turned into memes. Gjovik's ex-coworkers began using the phrase "*get Gjoviked*" as slang for getting fired for speaking out about work conditions. Employees shared the term on message boards and Twitter (You are going to get "*Gjoviked*"). Further, a submission from an employee to the "AppleToo" employee group stated, "*even as we're writing this, we write it with fear, fear of getting single out and retaliate against, even though HR policy stats that Apple do not tolerate retaliation, after reading what Ashley Gjovik went through, we think the retaliation is real.*"

299. The Press often discussed Gjovik's retaliation and termination with similar candor. A Boston Public Radio representative with over 87,000 Twitter followers publicly commented about "The Ashley Gjovik Story," that "*the irony that Apple fired her during the week of Labor Day, allegedly as retribution for filing a NLRB complaint, should be lost on no one.*" A Bloomberg reporter who has covered Gjovik's labor struggle with Apple in depth posted after Gjovik's termination, "*Ashley Gjovik, who was fired by Apple Thursday after filing NLRB, OSHA, and EEOC complaints, has received right-to-sue notices allowing her to sue for discrimination in federal or state court.*" In September, The New York Times described Gjovik's situation with Apple: "*After taking her complaints about #Apple public this year, Ms. Gjovik was placed on leave and later fired. She filed complaints with the NLRB, OSHA, the EEOC, & the Justice Department.*" The close nexus between Gjovik's protected activities and Apple's negative actions towards her was lost on no one.

---

[235] See, Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co., 336 F.Supp.2d 1239, 1267 (S.D.Fla.2004)

[236] 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant).

105

300.    Here, it was clear the adverse actions Apple took and continues to take against Gjovik are in retaliation for her protected activities.  Timing and ongoing antagonism have often been the basis for the causal link. Where there is a lack of temporal proximity, circumstantial evidence of a `pattern of antagonism' following the protected conduct can also give rise to the inference.[237] The causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two. In *Robinson v. SEPTA*, the intervening pattern of antagonism was so strong that it overcame the lack of temporal proximity and, alone, proved the causal link. There was no need to look beyond this pattern for other, circumstantial, evidence.[238] Apple's retaliation against Gjovik has been swift, continuous, and merciless.

### viii.    Predicate Acts Indictable Under Title 11 USC (Securities) [239]

#### a)    Securities Fraud (15 USC § 78)

301.    Section 1961(1)(D) defines racketeering activity any offense, including attempts and conspiracies, involving fraud in the sale of securities punishable under any law of the United States.[240] The US government has repeatedly accused Apple of securities fraud in violation of federal securities laws.

302.    In 2007, the US SEC charged Apple executives with more than 13 counts of securities violations, including at least five fraud charges including false statements to auditors, false reports, falsifying records, circumventing internal accounting controls, and false proxy statements.[241] Apple's corporate secretary and general counsel Nancy R. Heinen created falsified 'Board Meeting' notes for a meeting that never happened in order to back date stock grants for Apple executives. Heinen also falsified Committee meeting notes as part of the scheme. The fraud caused Apple to underreport it expenses by nearly $40 Million.

---

[237] *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002).
[238] *Robinson v. SEPTA*, 982 F.2d 892 (3d Cir. 1993).
[239] 18 U.S.C. § 1961(1)(d)
[240] Securities Fraud United States v. Blinder, 10 F.3d 1468 (9th Cir. 1993); United States v. Bledsoe, 674 F.2d 647 (8th 1982); United States v. Pray, 452 F. Supp. 788 (M.D. Pa. 1978).
[241] US SEC Complaint against Apple Inc, 2007, https://www.sec.gov/files/litigation/complaints/2007/comp20086.pdf

COMPLAINT                                                                SEPT. 7 2023

303.    In 2019, Gene Levoff (Apple's head of Corporate Law and corporate secretary after Heinen) was indicted by the SEC for twelve felony counts of fraud based on insider trading: six counts of wire fraud and six counts of securities fraud. In 2022, Levoff pled guilty to six counts of securities fraud and agreed to a settlement agreement.[242] Levoff was the senior lawyer at Defendant who oversaw 'corporate law' and all SEC filings and compliance, including company-wide ensuring compliance with insider trading laws. Levoff's defense on the criminal charges was claiming that insider trading laws were a violation of the US Constitution.

304.    Gjovik accused Apple of fraud and violating securities law in July-August 2021 and filed an SEC charge about it on September 1 2021. Gjovik complained Apple had been making materially false statements about their actual environmental, labor, and regulatory compliance practices to shareholders and the SEC. Gjovik also accused Apple of a conflict of interest with Ronald Sugar and her Superfund office. She was concerned, due to the poor condition of her office, and Apple's fervent cover-up about it, that Sugar had used his position on Apple's Board of Directors to influence Apple in ways to benefit his prior company, Northrop Grumman (i.e., interested party transactions, RESPA, etc.). Gjovik was also concerned he had a personal interest in covering up Gjovik's concerns in order to protect Northrop Grumman. The owner of Gjovik's office was CalSTRS, one of Apple's largest shareholders. Fraudulent regulatory filings about her office, including omission of required information to the US EPA, would both constitute defrauding a key shareholder (with CalSTRS owning around $4 Billion of Apple stock in 2021).[243]

305.    Gjovik's specific concerns were public misstatements and fraudulent claims, about Apple's actual environmental practices compared to what Gjovik saw internally (reckless disregard for the law and public safety), Apple's actual labor practices (Apple's one step away

---

[242] The Private Securities Litigation Reform Act of 1995 ("Reform Act") amended RICO to eliminate securities fraud as a predicate act except where the defendant has been criminally convicted of the securities fraud. 18 U.S.C. § 1964(c); see also Powers v. Wells Fargo Bank, NA, 439 F.3d 1043, 1045-46 (9th Cir. 2006) (vacating dismissal of claim against defendant who had been convicted of securities fraud, but affirming dismissal of claims against co-defendants who had not been convicted).
[243] 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5

107

COMPLAINT                                                                                    SEPT. 7 2023

1 from installing the Foxconn "suicide nets" at Apple Park), and Apple's general regulatory
2 compliance and issue investigation practices (which is just mostly witness intimidation and
3 retaliation). Apple promotes these topics and the false claim they are ethical leaders in these
4 fields to attract customers to buy their products and to encourage investors to buy and hold
5 Apple stock.

6 306. As noted in the Wire & Mail Fraud sections, Gjovik also discovered concrete
7 evidence of Apple's fraudulent statements to shareholders and the SEC about their
8 environmental practices. Apple's SEC filings and proxy statements include 'Environment
9 Progress Reports' which include detailed reporting on Apple's air emissions and hazardous
10 waste generation. For instance, Apple reported that in 2021, they sent 1,599 tons of hazardous
11 waste to disposal facilities from corporate facilities globally. Based on manifests, 512 tons of
12 that global waste (32%) came from the facility at 3250 Scott Blvd. Apple also noted on the
13 amount of waste they "diverted from landfills" and highlighted this number in the report under
14 program they called "Zero Waste" saying they are moving towards "*waste-free operations*".
15 Apple claimed in 2021 they "diverted" 491,000 tons of waste. Apple said, "we maintain our
16 commitment to the safe and responsible management of hazardous waste, both onsite and
17 offsite." Meanwhile, at least at 3250 Scott Blvd, we have learned the way Apple was 'diverting'
18 waste was blasting solvent fumes and toxic gases out their exhaust vents and into apartment
19 windows. [244]

20
21 307. Worse, Apple knew exactly how dangerous those emissions were and still did it,
22 but also while they gassed a neighborhood, they also made public statements about the dangers
23 of the chemicals. For instance, Apple banned the use of NMP in their supply chain for years due
24 to safety concerns and even require vendors to certify that they are not using it. Meanwhile,
25 Apple blasted hundreds of pounds of NMP into Gjovik's windows in 2020. Apple's lies are
26 almost as sick as its toxic gases.

27
28
--------
[244] Apple, 2022 Environmental Progress Report,
https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2022.pdf

108

COMPLAINT                                                        SEPT. 7 2023

308. In 2021, Apple also instituted a "ESG modifier" for executive pay that can increase or decrease Executive Compensation 10% based on environmental (and other) practices. Apple's environmental violations were not just to save money on properly disposing of waste, it was also to inflate stock price with false and misleading claims about their actual practices, and to increase bonuses for the executives.[245]

309. This was not the first time Apple's lied about its environmental practices. For years, Apple's "environmental" ESG branding to shareholders has centered around a claim of running on "Green Energy." In 2015 it was exposed that Apple's claims about its data center in Maiden North Carolina running on 100% green energy were false. Apple had claimed they did not use fossil fuels at the facility and it was 100% "green" but records showed they did use fossil fuels and only <1% of the energy was "green". [246] Then in 2017, the North Carolina government discovered Apple was also violating environmental and health/safety laws with unauthorized generation, storage, and transport of hazardous waste. Apple was caught transporting waste without manifests, failing to keep records, and failing to report their activities to regulators. [247]

310. Gjovik also filed a SEC complaint in October 2021 alleging shareholder fraud when Apple had filed a no-action letter trying to block a shareholder vote about Apple's use of overly restrictive NDAs. Apple's response had completely omitted the NLRB was actively investigating Apple's policies based on a NRLB charge Gjovik had filed a week prior. Apple was actively trying to suppress shareholder voting about an issue it knew it was in trouble over and tried to mislead the SEC in order to prevent that vote. As noted, the NLRB confirmed in January 2023 the policies did violate US labor laws. Gjovik has discussed the matter with US SEC Enforcement investigators.

---

[245] Apple Inc, 2022 Proxy Statement,
https://www.sec.gov/Archives/edgar/data/320193/000119312522003583/d222670ddef14a.htm
[246] *Analysts Call Apple Renewable Energy Claims 'Lies,'* The Carolina Journal, 2015,
https://www.carolinajournal.com/analysts-call-apple-renewable-energy-claims-lies/
[247] *Apple clean energy project fined for environmental violations*, The Carolina Journal, 2017,
https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/

109

1

### i. Predicate Acts Indictable Under §2332(b)(g)(5)(B)

2
3
4
5

311. Subsection G was added to Section 1961(1) and made "any act that is indictable under any provision listed in section 2332b(g)(5)(B)" of Title 18 a RICO predicate offense. 18 U.S.C. § 2332b(g)(5)(B) lists approximately fifty offenses that may constitute RICO predicate offenses under 18 U.S.C. § 1961(1)(G).

6
7

### a) Relating to Chemical Weapons (18 USC § 229) [248]

8
9
10
11

312. The Weapons of Mass Destruction Prohibition Improvement Act of 2004 added 18 U.S.C. §§ 229-229F (relating to chemical weapons) as a RICO predicate offense in Section 1961(1)(B). 18 USC § 229 was created to implement the United States treaty obligations for the "Chemical Weapons Convention."[249]

12
13
14
15
16
17
18
19
20
21
22
23
24

313. This case ultimately revolves around facts related to hazardous waste and chemical exposure. Gjovik is unable to remove her CERCLA whistleblower retaliation case from the US Department of Labor because the agency has exclusive jurisdiction. Gjovik was not aware of the activities at 3250 Scott Blvd within the statute of limitations to file a whistleblower complaint with US Department of Labor under the Clean Air Act, Toxic Substances Control Act, or RCRA – and all three are exclusive to Department of Labor as is CERCLA.[250] To support judicial economy, in lieu of filing a separate toxic tort case here or in state court, Gjovik plans to seek remedy for her property damage due to the chemical exposure though the RICO 18 USC § 229 claim as it was the same chemicals Apple deployed onto Gjovik's home that are chemical weapons. Apple did in fact chemical weapon attacked Gjovik's apartment, and then terrorized Gjovik to cover up what they did, thus a RICO claim to seek remedy for the property damages seems appropriate.

25
26

314. Apple possessed chemicals not intended for peaceful purposes, protective purposes, unrelated military purposes, or law enforcement purposes, as described in 18 U.S.C. §

27
28

---

[248] 18 U.S.C.A. § 1961 (G); 18 U.S.C.A. § 2332 (B) (i)
[249] *Bond v US*, SCOTUS Amicus Brief from US DOJ,
https://www.justice.gov/sites/default/files/osg/briefs/2013/01/01/2012-0158.mer.aa.pdf
[250] US Department of Labor, Whistleblower Protection Program, Environmental Statutes,
https://www.whistleblowers.gov/sites/default/files/EPA_Desk_Aid.pdf

110

COMPLAINT                                                                SEPT. 7 2023

229F(7).[251] The US government defines "peaceful purposes" in *US v Bond*: "*As a matter of simple English, use of a highly toxic chemical to injure or kill another individual is not use of the chemical for a peaceful purpose. To the contrary, that is use of a chemical as a weapon.*"[252] Further, activities are only peaceful if they are non-malicious and socially beneficial.[253] The statute's mens rea is "*knowing*" which is the same standard for the Clean Air Act. CAA instructs that it is enough the perpetrator know that a release of hazardous air pollutants into the ambient air places another person in imminent danger of death or serious bodily injury, and knowledge of the emissions occurring is enough.[254] There is also a lesser violation for negligent emissions.

315. The OPCW and Section 299 define "Toxic Chemical" for the purposes of "chemical weapon" quite generally as: "*Any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.*" Similarly, the exception of "peaceful propose" is also quite broad and cases often find general intent to release dangerous chemicals in a way that could cause mass suffering to be sufficient mens rea. Many cases have referenced chlorine gas as a chemical weapon, even though it is not listed in the Treaty Annex II, and courts have decided "intending to release chlorine gas into an apartment building" was enough to convict.[255] While some toxic gases are commercially available, under *Bond*, they may serve as chemical weapons when used to make gas bombs, thus invoking 18 USC § 229. [256]

316. At 3250 Scott Blvd, Apple stored and used chemicals that are listed on the treaty including Phosphorus Trichloride. Apple also used chemicals listed on Department of Homeland

---

[251] *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at \*5 (D. Haw. Jan. 21, 2021). Mancuso, 718 F.3d at 790.
[252] *Bond v United States*, Brief for the United States, On Write of Certiorari to the US Court of Appeals for the 3rd Circuit, In the Supreme Court of the United States, No. 12-158
[253] Id.
[254] § 7413(c)(5)(A).
[255] See *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [Bond] suggested, it may serve as a chemical weapon when used to make a chlorine bomb."); *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at \*6-7 (D. Haw. Jan. 21, 2021) (defendant who released chlorine gas in a residential neighborhood); *United States v. Fries*, No. 13-10116 (9th Cir. 2015) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood).
[256] See *Kimber*, 777 F.3d at 561.

COMPLAINT                                                                    SEPT. 7 2023

Securities list of "Chemicals of Mass Effect" including: arsine, phosphine, and chlorine gases.[257] Apple repeatedly leaked phosphine gases from the factory at 3250 Scott Blvd, in at least 2019 and 2021. The incident report in 2021 notes they vented the gas into the exterior air (outside the apartments). While sick in 2020, Gjovik would wake up occasionally at 3am feeling like she was dying and with symptoms of heart failure (which Gjovik complained to her doctors about at the time). Heart monitoring showed arrythmias and blood pressure monitoring showed very slow heart rate and very low blood pressure. All of those symptoms match Phosphine gas exposure which can quickly become lethal. Gjovik felt like she was dying because Apple had some sort of auto-release of gases at 3am and chemical weapon attacked her in her bed and she probably could have died.

317.    Apple has a great quantity of Arsine gas on site and Gjovik's medical tests from September 2020 showed arsenic in her blood with no other explanation than Arsine gas exposure. Gjovik had one of those 3am spells before she had her blood and urine tested for chemicals and heavy metals early the next morning. Gjovik's blood showed arsenic at an elevated level but none in her urine. Arsenic in blood has a ~8hr half-life, and only shows in blood but not urine when exposed to Arsine gas (instead of ingesting arsenic). Apple chemical weapon attacked Gjovik with Arsine gas in her bedroom.



---

[257] DHS, Chemicals of Interest, https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

112

318.    Apple was cited in 2020 for failing to report its stockpile of Chlorine gas at 3250 Scott Blvd to regulators. Apple also has a history of gassing its employees with Chlorine. At least two chlorine gas leaks have been reported at Apple facilities. In 2012 there was a chlorine gas leak at an Apple factory in China which killed one worker and injured another four workers.[258] There was a chlorine gas leak at a North Carolina data center in 2015 resulting in an evacuation, HazMat response, and multiple employees taken to the hospital.[259]

319.    Apple's use, storage, and release (intentional and unintentional) of very toxic gases has the potential to produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emission, if it has not already occurred, could easily cause injuries and death. These use and release of these gases could injure first responders and should require the evacuation of an entire neighborhood and HAZMAT procedures if there were to be significant leak/spill. Apple is not only in "possession of extremely dangerous substances with the potential to cause severe harm to many people," but Apple has taken intention acts to ensure no one knows they have these chemicals or that they are releasing these chemicals into the neighborhood air.

320.    Apple attempted to and did acquire, transfer, receive, stockpile, retain, own, possess, use, and/or threaten to use chemical weapons. Apple assisted or induced another person to do the same, or attempted to conspire to do the same.[260] Apple is not an exempted agency or person. Apple has been on notice about the dangers of these toxic gases for decades. Apple was founded in the 1970s and would have witnessed the Bhopal incident in 1986.[261] Apple's local toxic Gas laws in Santa Clara County were designed to prevent a similar "catastrophic gas leak." *The law's goal is to prevent a disaster such as the 1984 gas leak in Bhopal, India that killed 2,800 people.*" Palo Alto City Manager Bill Zaner said "This is the single most important piece

---

[258] https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-china-flna714480
[259] https://www.theregister.com/2015/06/01/apple_data_center_chlorine_gas/ ;
https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre
[260] 18 U.S.C. § 229(a)(2)
[261] NYT, Gas Cylinders Removed from Blast Site in Jersey;
https://www.nytimes.com/1988/03/20/nyregion/gas-cylinders-removed-from-blast-site-in-jersey.html

113

1  of toxics legislation in the county in the last five years." Ted Smith noted the most common

2  gases used for semiconductor manufacturing are also "the most deadly" including arsine and

3  phosphine.[262]

4  321.  Apple knowingly released many other chemicals from their facility including

5  while Gjovik was there. Apple knowingly did so without proper abatement and apparently

6  without even changing their charcoal filters for over six years. Apple admitted to releasing NMP

7  into the outdoor air despite it being so hazardous it is now banned under TSCA. These chemicals

8  and gases not only harmed Gjovik physically, but they harmed an incredible amount of Gjovik's

9  property, of which Gjovik has photographs and other evidence documenting the stains and

10  degradation. It is clear that Apple's retaliation and intimidation against Gjovik was not just about

11  her office or her other complaints, it was also an attempt to coverup what Apple did to her at

12  3250 Scott Blvd. Apple's termination of Gjovik's employment was also an injury from this

13  Predicate Act.

14  322.  Apple's possession and use of these chemicals knowingly and intentionally

15  occurred without proper permits, in violation of reporting and risk management laws, with

16  repeated code violations and leaks/spills, and without proper abatement technology. Apple has

17  already harmed people, property, and the environment with its chemical weapons and the harm

18  occurred but for Apple's refusal to comply with basic health/safety, environmental, and HazMat

19  regulations in pursuit of the cheapest and quickest way to produce a result and to avoid reporting

20  the waste and harm associated with the unlawful approach in regulatory filings. The full extent

21  of Apple's misconduct will likely be revealed when US EPA releases the results of their August

22  17 2023 (per the EPA website) inspection of the factory, which was triggered by a complaint

23  filed by Gjovik in June 2023.

24

25  323.  Apple was not using those chemicals for peaceful purposes. While a theory as to

26  what Apple's non-peaceful purpose was is not required at this stage,[263] one possible theory is

27  Apple's non-peaceful purpose was to violate environmental and health/safety laws in order to

28  [262] Silicon Valley Toxics Coalition, Silicon Valley Toxics News, Volume 7, No. 1, Winter 1989; Santa Clara County Ordinance Code, Division B 11, Chapter XIV
[263] *US v. Sandomire,* CR 20-00085 JMS, at *5 (D. Haw. Jan. 21, 2021). *Mancuso,* 718 F.3d at 790.

114

1  produce off-books prototypes at the lowest cost and with the least amount of government

2  oversight, in knowing violation of federal, state, and local laws. Another non-peaceful purpose is

3  that Apple intended to store toxic gases and release them out of their exhaust, [264] in violation of

4  air quality and hazardous waste laws, knowing the chemicals would enter hundreds or thousands

5  of residential homes, but doing it anyways because it saved Apple money and cooked the books

6  on their environmental filings to the US SEC and shareholders.

7      324.    Here, like other 18 USC 229 cases, highly volatile and poisonous substances were

8  repeatedly released into highly trafficked areas, placing many people at risk of serious harm and

9  mass suffering.[265] Apple possessed an explosive and/or destructive device in a prohibited place

10  in violation of California Penal Code § 18715.[266] Apple recklessly possessed an explosive[267] or

11  destructive device (with its stockpile and mishandling of pyrophoric, combustible, and

12  flammable chemicals as detailed on its chemical inventory documents) on a public street; in/near

13  homes, a college, church, other public buildings; and in on or near another public place

14  ordinarily passed by human beings.[268] Apple was aware that its actions present a substantial and

15  unjustifiable risk, Apple ignored that risk, and Apple's behavior was grossly different from what

16  a reasonable person would have done in the same situation. There is no requirement to prove it

17  was set to explode or show that a person was actually holding or touching it.[269]

18      325.    The threshold is very low for establishing a violation of §229 in the pleading

19

20  stage. In 2017, the District Court of Eastern California found a pleading sufficient when a

21

22  [264] In *US v Sandomire*, a sufficient non-peaceful purpose to satisfy an indictment was an allegation of intent to create chlorine gas and release it into a large residential apartment building in downtown

23  Honolulu. *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021)

24  [265] *U.S. v. Kimber*, C.A.2 (N.Y.) 2015, 777 F.3d 553, certiorari denied 136 S.Ct. 170, 577 U.S. 869, 193 L.Ed.2d 123. *Bond v. United States*, 572 U.S. 844, 865, 134 S. Ct. 2077, 2093 (2014)

25  [266] "Destructive Devices" Under § 16460

[267] CALCRIM No. 2572 Weapons

26  [268] NOAA, Cameo Chemicals, *Phosphine*, https://cameochemicals.noaa.gov/chemical/1322 "*Burns

27  readily. Rapidly or completely vaporizes at atmospheric pressure and normal ambient temperature. Readily undergoes violent chemical changes at elevated temperatures and pressures. Phosphine can

28  explode with powerful oxidizers. The gas is heavier than air and may travel along the ground to an ignition source. Liquefied phosphine can be detonated.*"

[269] CALCRIM No. 2572. Possession of Explosive in Specified Place (Pen. Code, § 18715)

plaintiff alleged Defendants put chemical weapons in the air conditioning of a truck he was

driving and they produced an 'odd' or 'chemical' smell – despite a number of issues with the

pleading overall and repeated failure of the plaintiff to follow directions leading to a procedural

dismissal.[270]

### ii.    Injury in Fact to Plaintiff due to Racketeering Act

326.    Gjovik's injuries were "by reason of" a RICO violation.[271]  When a court

evaluates a RICO claim for proximate causation, the central question it must ask is whether the

alleged violation led directly to the plaintiff's injuries.[272] After Gjovik was suspended in August,

she filed charges with the U.S. NLRB, U.S. EEOC, U.S. SEC, U.S. DOJ, and other agencies,

capturing the diverse cornucopia Apple's unlawful conduct towards her and her colleagues.

Gjovik began providing evidence and witness statements to these federal agencies in late August

and early September.

327.    Gjovik was terminated the day she signed off on her statement to the U.S. EEOC

and the day before her U.S. NLRB affidavit was to be taken. When Gjovik was unexpectedly

contacted by a certified interrogator on Apple's "Workplace Violence" team, insisting she get on

the phone with him "within the hour," Gjovik agreed to engage but requested the communication

be in writing because, as she wrote Apple, it felt like "witness intimidation the day before her

NLRB affidavit." Gjovik also informed Apple that she notified the NLRB of their

communications from the "Workplace Violence" team. Gjovik was terminated within hours.

328.    Gjovik's injuries stem from Apple's retaliatory actions, RICO predicate acts, and

several actions which were both retaliatory and RICO predicate acts, including Gjovik's

---

[270] *Renfro v. J.G. Boswell Co. Inc.,* No. 117CV01069LJOSAB, 2017 WL 6611190, at *13 (E.D. Cal. Dec. 27, 2017), report and recommendation adopted, No. 117CV01069LJOSAB, 2018 WL 10322173 (E.D. Cal. Mar. 1, 2018)

[271] *Beck v. Prupis,* 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

[272] *Anza,* supra, at 461, 126 S.Ct. 1991; *Holmes,* 503 U.S., at 268, 112 S.Ct. 1311; *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 654–55, 128 S. Ct. 2131, 2141–42, 170 L. Ed. 2d 1012 (2008)

116

termination as a violation of 18 USC 1512 and1513. Apple's retaliation and termination of Gjovik are all part of the same RICO scheme to cover-up Apple's wrongdoing. [273]

329.    A person's loss of a job, such as a termination, is an injury to one's business or property.[274] While termination of employment is not an injury-in-fact for RICO if the termination itself was not a RICO violation, in situations where a termination itself is another RICO violation (i.e. §1512, §1513, etc.) in continuous racketeering and fitting the pattern of existing racketeering, or otherwise a result of a pattern of racketeering activity, then the termination is an injury-in-fact under RICO.[275] It would be contrary to public policy and the legislative intent of the RICO Act to immunize employers who are engaged in RICO acts, when one of their employee tries to blow the whistle to the feds on the employer's RICO activity (i.e. testifying to federal agencies, or informing to the FBI, etc.), and the employer responds to terminate the whistleblower with the intent and in a way which would violate additional RICO predicate act statutes. Racketeering is not "*transmogrif[ied]*" into something else simply because there is a termination of employment.[276]

330.    Apple injured Gjovik's business and property, and caused other injuries and loss, due to its Predicate Acts.[277] Apple injured Gjovik's business by terminating Gjovik' for a reason Apple knew would denylist Gjovik from working in law or for corporations, and knowing she would be forced to self-publish the reason and that it would be exposed in the already initiated legal proceedings. Apple's harassment of Gjovik ruined her reputation and ostracized her from the groups she hoped to work with and for with her legal degree. Gjovik had over $500,000 of unvested RSUs at the time of her termination which she would have been granted and vested if

---

[273] *DeGuelle v. Camilli*, No. 10-2172 (7th Cir. Dec. 15, 2011)
[274] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 711 (D.N.J. 1998); *Nodine v. Textron, Inc.*, 819 F.2d 347, 348 (1st Cir. 1987)
[275] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)
[276] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)
[277] *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975-76 (9th Cir. 2008) (citing *Sedima*, 473 U.S. at 496); see *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.,* 731 F.3d 556, 565-66 (6th Cir. 2013).

117

COMPLAINT                                                                                    SEPT. 7 2023

she was not fired. Apple's criminal termination of Gjovik resulted in business-related financial injury. [278]

331. Apple injured Gjovik's property with their chemical emissions, including 7.8 tons of VOCs omitted 300ft from her windows the year she lived next to Apple's factory.[279] Gjovik has documented destruction of clothing and jewelry from the chemicals, of which Apple engaged in falsification of records, obstruction, and witness tampering. Gjovik has photos and other evidence of the specific chattel property, with receipts of purchase, that was discolored or otherwise degraded by chemical exposure, as well as real time complaints in 2020 and 2021 about the discoloration and the state Department of Public health agreeing it looked like solvent exposure.

332. Apple injured Gjovik's property through 'bugging' an item at her desk when they mailed her back her possessions, causing Gjovik to have to transfer her property to police custody for investigation. Apple injured Gjovik's property when it broke into her home and 'bugged' one of her fake trees and upon discovering the RF and EMF signals emanating from the fake fig tree, Gjovik disposed of the tree into a dumpster and complained about it on social media. (Gjovik also has the receipt for original purchase of the tree). Due to Apple's surveillance and hacking, Gjovik's property was injured in that it was compromised by Apple and Gjovik had to disconnect and dispose of it to protest herself from Apple. Property included Apple products of which Apple could monitor her via server use and logging, 'smart home' accessories which were hacked and controlled by hackers at least once, her router which was assumed to have been compromised when the equipment in the attic was installed by Apple, and others instances of damage.

333. Apple injured Gjovik's property when they mailed her possessions back from her desk as a threat, posting online the box may contained a severed head of one of Gjovik's loved ones, and ensuring the box did contain a listening device in one of Gjovik's possessions, along with a very poorly packed box that ensured the salt lamps from Gjovik's desk (aka rocks) broke

[278] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985).
[279] See, US EPA EIS data for 2020

118

1  the glass on Gjovik's picture frames and glasses at her desk, resulting in a box full of rocks,

2  broken glass, and a listening device – if Apple didn't simply intentionally destroy Gjovik's

3  property before it was shipped.

4      334.    Apple injured Gjovik's business and property when it harassed her at and around

5  her home to the extent she was forced to leave the west coast to escape Apple, and moved to

6  New York next to a state executive building with state police stationed 24/7 outside her home.

7  By being forced to move, Gjovik lost the opportunity to obtain work in Silicon Valley, Gjovik

8  had to get rid of many of her belongings because she couldn't afford to move them, and several

9  items were destroyed in transit.

10     335.    Gjovik's injury occurred by reason of the Apple's violations.[280] If Apple had not

11  engaged in unlawful conduct, including unauthorized air pollution and chemical releases, then

12  Gjovik's property would not have been damaged. If Apple had not engaged in a cover-up, then

13  Gjovik would have known to protect her property from Apple. If Apple had not engaged in a

14  cover-up scheme, they would not have hacked into Gjovik's electronics, mailed her a bugged

15  object, or broke her chattel property. These are concrete examples of financial loss.[281] Apple

16  stained specific items of clothing, Apple caused reactions on the metal of specific items of

17  clothing and jewelry, Apple bugged a specific fake tree, Gjovik lost concrete salary and RSUs

18  when she was terminated, and so on. Civil RICO laws grant standing to any victim that sustained

19  real injuries to his or her business or property.[282]

20

21     336.    Under 18 U.S.C. § 1964(c), a plaintiff must show that the alleged RICO

22  violations proximately caused an injury to the plaintiff's business or property. Not every injury to

23

24

25

26

27  [280] *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-11 (2010); see also *Vanderbilt Mortg. & Fin., Inc. v. Flores,* 735 F. Supp. 2d 679, 698-99 (S.D. Tex. 2010).

28  [281] *International Raelian Movement*, 2:08-cv-0687 FCD DAD, 11-12 (E.D. Cal. Sep. 1, 2010)
[282] *Canyon County v. Syngenta Seeds*, Inc., 519 F.3d 969, 972 (9th Cir. 2008); *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).

119

1    business or property is compensable under RICO, and the Ninth Circuit "requires that a plaintiff
2    asserting injury to property allege `concrete financial loss.'"[283]

3       337.    Injury caused by an overt act that is not an act of racketeering or otherwise
4    wrongful under RICO does not give rise to a cause of action under § 1964(c) for a violation of §
5    1962(d). The plaintiff must instead allege injury from an act that is analogous to an "*ac[t] of a*
6    *tortious character.*"[284] The specific type of act that is analogous to an act of a tortious character
7    may depend on the underlying substantive violation the defendant is alleged to have committed.
8    Plaintiff must allege an act of racketeering and that is independently wrongful under any
9    substantive provision of the statute.[285]

10      **iii.**    **Continuity & Threat to Continue**

11       338.    Apple has engaged in a series of related predicate acts, extending over a
12    substantial period of time (decades). Further, Apple started a series of related predicate acts, and
13    it is clear will continue these acts into the future unless there is intervention. Apple's misconduct
14    is so persistent and egregious, and so dependent on continued intimidation of witnesses to keep
15    witnesses quiet about what they know, that its impracticable that Apple would ever voluntarily
16    stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the
17    inertia of organized crime.

18

19    **F.**    **RETALIATION UNDER CALIFORNIA LABOR CODE**

20       339.    Generally, Apple discriminated and retaliated against Gjovik in violation of
21    California Labor laws. For all claims, a complaint was filed with the California Department of
22    Labor Department of Industrial Relations Retaliation department on August 29 2021. The state
23    labor complaints statute of limitations were tolled while under consideration of the Labor
24    Commissioner but are now removed to this case, but are preserved by the Labor Commissioner

25

26    [283] *Canyon County*, 519 F.3d at 975 (quoting *Oscar v. Univ. Students Co-operative Ass'n*, 965 F.2d
27    783, 785 (9th Cir. 1992) (en banc)). See also *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d
     1303, 1310 (9th Cir. 1992) (citing *Oscar*, 965 F.2d at 785).
28    [284] Restatement (Second) of Torts § 876, Comment b, meaning an act that is independently wrongful
     under RICO.
     [285] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

120

for investigation if dismissed from this matter without a decision on the merits.[286] There is no requirement for an individual to exhaust administrative remedies before filing a lawsuit under most of these state Labor Codes, however administrative exhaustion was reached as a complaint was filed with the Retaliation Compliant Investigation Unit on time.[287]

### i. California Whistleblower Protection Act: Cal. Labor Code §1102.5

340. California Labor Code § 1102.5 "*reflects the broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation.*"[288] Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity.[289] This public policy is the modern-day equivalent of the long-established duty of the citizenry to bring to public attention the doings of a lawbreaker.[290]

341. Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations above and below this section, to government agencies. Gjovik had a reasonable cause to believe that the information she disclosed was a violation of statute and/or noncompliance with a rule or regulation. [291] Gjovik reported concerns to management, coworkers, the government, and the press.

342. Prior to her termination, Gjovik provided information to public bodies (US NLRB, US and California Department of Labor, US SEC, US DOJ, US EEOC, California DFEH, US EEOC, US and California EPA...) and several were already conducting an inquiry or which information initiated an inquiry. Gjovik testified before public bodies (US EEOC, US Department of Labor) and was scheduled to testify before public bodies (US NLRB) that were conducting investigations. Gjovik had reasonable cause to believe that the information provided

---

[286] Cal. Lab. Code § 98.7

[287] Cal. Lab. Code § 98.7 (a)(1), (f), (g); *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012).

[288] *Green v. Ralee Eng'g. Co.*, 19 Cal. 4th 66, 77 (1998).

[289] *Dowell v. Contra Costa Cnty.,* 928 F.Supp.2d 1137, 1154 (N.D. Cal. 2013); *Derby v. City of Pittsburg*, Case No. 16-cv-05469-SI, 20 (N.D. Cal. Feb. 23, 2017)

[290] *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1355, 181 Cal. Rptr. 3d 68, 85 (2014)

[291] Cal. Lab.C. § 1102.5(b); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924, 180 CR3d 359, 366-367.

1  to and testimony before the public body disclosed a violation of statute and/or noncompliance

2  with a rule or regulation.

3      343.    Gjovik refused to engage in unlawful acts including participating in Apple's

4  coverup, environmental crimes, and intimidation of witnesses. Gjovik had reasonable cause to

5  believe that her participation in the cover-up would result in a violation of statute and/or non-

6  compliance with rule or regulation. Apple discharged and discriminated against Gjovik, and

7  Gjovik's disclosures and her refusal to participate in the cover-up was a contributing factor in

8  Apple's decision to discharge and discriminate against Gjovik.[292] Further, Apple made, adopted,

9  and enforced rules, regulations and/or policies that prevents employees from providing

10  information or providing to a public body conducting an investigation, hearing or inquiry.

11      344.    Violations of California Labor Code § 1102.5 can be pursued alone or also

12  support a common law cause of action for wrongful termination in violation of public policy.[293]

13  No agency exhaustion is required prior to filing a civil complaint.

14      **a)    Video Recording in Bathrooms: Cal. Labor Code § 435**

15      345.    Video surveillance of private spaces in the workplace such as restrooms, locker

16  rooms, changing rooms and similar locations is strictly prohibited without a court order."[294]

17  Apple's supposed reason for termination Gjovik included Gjovik's protests of Apple's Face

18  "Gobbler" iPhone app which took videos of Gjovik 'whenever it thought it saw a face' including

19  in bathrooms, locker rooms, changing rooms, and similar locations. Among other legal

20  protections Gjovik had for protesting the application and Apple's practices, Apple's use of the

21  application violated this Labor Code. Gjovik has evidence of photos taken of her by the app in

23  her bathroom.

26

27  [292] *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012)
[293] *Scheu v. Charter Commc'ns, LLC*, Case No. 08–CV–02835–MMM, 2011 WL 3204672, at *20

28  (C.D.Cal. July 27, 2011) ("Violations of California Labor Code § 1102.5 ... constitute public policy within the meaning of Tameny and its progeny.").
[294] Cal. Labor Code § 435.

COMPLAINT                                                                SEPT. 7 2023

### ii. Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6

346. Apple violated Section 98.6 by retaliating against Gjovik due to Gjovik filing a claim with the California Labor Commissioner, instituting, and causing to be instituted proceedings related to the rights under the jurisdiction of the California Labor Commissioner, exercising rights provided under California Labor Code on behalf of herself and on behalf of other employees. Gjovik exercised labor rights provided under California Labor Code on behalf of herself and other employees when she complained about

347. Apple retaliated against Gjovik due to Gjovik's protected activity when she suffered materially adverse actions with causal connection to the protected activity and adverse actions which could dissuade a reasonable worker from making a charge of discrimination.[295] Gjovik's protected activities included filing complaints about work conditions which was protected under § 232.5.

348. Apple's supposed reason for termination Gjovik occurred while Gjovik was "*removed from the workplace and all workplace interactions*" and Gjovik was complaining on Twitter and to a reporter in an article exclusively about work conditions and the terms and conditions of employment at Apple, including unlawful and coercive surveillance.

### a) Retaliation re: Work Conditions: Cal. Labor Code §232.5 (via § 98.6)

349. Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik but also Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple's "legitimate" reason for discharging Gjovik's employment is unlawful under federal and state laws, and is also retaliation for protected "work conditions."

350. Under California Labor Code Section 232.5, employees have an enforceable right to disclose information about the employer's working conditions without restriction or fear of

---

[295] *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 57 (2006) (examining retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)); *see also Westendorf v. W. Coast Contractors of Nev.*, 712 F.3d 417, 422 (9th Cir. 2013) (examining Title VII retaliation claims).

123

COMPLAINT                                                                 SEPT. 7 2023

retaliation.[296] Under the statute and relevant case law, this right extends to disclosures to co-workers and to the general public, including media and press activity.[297] Employers cannot require an employee to refrain from disclosing or discussing information about the employer's working conditions. Remedies for harm from violations of § 232.5 are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. [298] No agency exhaustion is required prior to filing a civil complaint.

**b) Lawful Off-Duty Conduct: Cal. Labor Code § 96(k) (via 98.6)**

351. Under Labor Code Section 96(k), Apple may not demote, suspend, discharge from employment, threaten discharge, or otherwise discriminate against any employee for lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involves exercise of a "recognized constitutional right" and/or a right protected by the Labor Code.[299]

352. Gjovik engaged in lawful conduct asserting "recognized constitutional rights" (free speech, speaking about work conditions, protesting unlawful conduct, protesting unlawful surveillance and unfair business practices), occurring during nonworking hours (while she was on leave), and away from Apple's premises. Apple retaliated against Gjovik and supposedly discharged Gjovik because of this protected conduct. While the reason was pretext, Apple's admission further implicates its animus and lawlessness.

---

[296] Working conditions" is properly understood to include "conditions of employment"—such as "workload, office sizes, perquisites of employment, and 'work-life balance.'" *Glassdoor, Inc. v. Super,* Ct. 9 Cal. App.5th 623, 638 (2017); it encompasses matters such as hours, benefits, work rules and regulations, workplace safety, and the physical environment. See *Chan v. Canadian Standards Ass'n ,* No. SACV 19-2162, 2020 WL 2496174, at *3 (C.D. Cal. Mar. 16, 2020); *Massey v. Thrifty Payless, Inc.,* No. G047734, 2014 WL 2901377, at *5 (Cal. App. June 27, 2014).
[297] See § 232.5; *Glassdoor,* 9 Cal. App.5th at 638 ("employees are entitled by statute to publicize their complaints about such matters."); *Davis v. O'Melveny & Myers,* 485 F.3d 1066, 1078-79 (9th Cir. 2007) (employer's arbitration secrecy rule could prevent discussion between employees and chill public disclosure of the employer's working conditions in violation of § 232.5).
[298] *Turner v. Anheuser-Busch,* 7 Cal.4th 1238 (1994).
[299] Grinzi v. San Diego Hospice Corp., 120 Cal.App.4th 72 (2004); Barbee v. Household Automobile Fin. Corp., 113 Cal.App.4th 525 (2003)

124

1     353.     The fact Gjovik was posting about work conditions in her personal time does not

2 transform Gjovik's personal time into work time. Further, protected disclosures are protected by

3 their content, regardless of motive or if the content of information was related to job duties. [300]

4     354.     Remedies for harm from violations of § 96(k) are recoverable via private action

5 under § 98.6 claims. There is a three-year statute of limitations for actions creating liability

6 under statute. No agency exhaustion is required prior to filing a civil complaint.

7     **iii.**     **Retaliation for Safety Complaints: Cal. Labor Code § 6310**

8     355.     Gjovik filed a Retaliation claim with California Department of Labor DIR and

9 Apple was notified of such, prior to her termination. Apple retaliated against Gjovik

10 preemptively out of fear Gjovik would file additional complaints related to health and safety at

11 the workplace, and in hope the retaliation would cause Gjovik to drop her existing complaint out

12 of fear and intimidation.[301] Apple's retaliation violated § 6310 which protects an employee who:

13 (1) complains about safety or health conditions or practices, (2) institutes or causes to be

14 instituted any proceeding relating to the employee's rights to safe and healthful working

15 conditions, or testifies in any such proceeding, (3) exercises any rights under the California

16 Occupational Safety and Health Act.[302]

18     356.     Apple discriminated against Gjovik because Gjovik exercised her rights under the

19 federal and California law relating to occupational health and safety, and made written and

20 verbal complaints on behalf of herself and/or others, to government agencies about health &

21 safety issues at Apple facilities. [303]

22     357.     Apple discriminated against and discharged Gjovik because Gjovik complained

23 about safety and health conditions or practices at the workplace to Apple managers and her

24 coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-

---

26 [300] *Collier v. Superior Court*, 228 Cal. App. 3d 1117, 279 Cal. Rptr. 453 (1991)

27 [301] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1046, 21 CR3d 861, 866.
[302] Cal. Lab. Code § 6310(b)

28 [303] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44, 63 CR2d 727, 729; *Freund v. Nycomed Amersham* (9th Cir. 2003) 347 F3d 752; *Touchstone Television Productions v. Sup.Ct. (Sheridan)* (2012) 208 CA4th 676, 681-682, 145 CR3d 766, 770.

125

    

related injuries and illnesses, and requested information about work related injury and illness reports or records. [304]

358. Apple discriminated against and discharged Gjovik because Gjovik complained that Apple prohibited employees from observing and monitoring and measuring employee exposure to hazards pursuant to §142.3 (effectively determining "*whether the health of such employee is adversely affected by this exposure*") in violation of Cal. Labor Code §6408(c).

359. Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide access to employees to accurate records of employee exposures to potentially toxic materials or harmful physical agents in violation of Cal. Labor Code §6408(d). Occupational Safety and Health Standards 1910 Subpart Z "*Toxic and Hazardous Substances*," the "*Access to employee exposure and medical records*" section describes Gjovik's statutory right to request information about her chemical and biological exposure at work.

360. Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to notify employees who has been or who is being exposed to toxic materials or harmful physical agents and informing any employee so exposed of corrective action being taken in violation of Cal. Labor Code §6408(d). [305]

361. Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide Material Safety Data Sheets to employees on a timely and reasonable basis on substances in the workplace.[306] Failure to furnish employees who may be exposed to a hazardous substance with information on the contents of the MSDS for the

---

[304] "*Every employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct.*" Cal. Lab. Code § 6407

[305] "*Every employer shall furnish ... safeguards, and shall adopt and use practices ... which are reasonably adequate to render such employment and place of employment safe and healthful...*" Cal. Lab. Code § 6401 "*No employer shall fail or neglect to ... do every other thing reasonably necessary to protect the life, safety, and health of employees.*" Cal. Lab. Code § 6403

[306] California Labor Code §6398(a).

126

hazardous substances or equivalent information either in written form or through training programs.[307]

362.    Prior to her termination, from March 2021 through September 2021, Gjovik complained to Apple and to the government about safety concerns about Gjovik's office, concerns about Apple's safety policies and practices, and concerns about the safety of Gjovik's coworkers. Apple's discrimination against Gjovik included but was not limited to firing, reassignment, lost opportunity for promotion, suspension, threats, and denial of benefits. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

363.    In addition, Apple did all of the above while knowing it created an unsafe workplace, while attempting to conceal the safety issues at the workplace, and while also concurrently refusing to fix some of the major safety issues at that workplace (i.e., it took them two years to address the vapor intrusion/HVAC issues). [308] In violation of OSH Act 1910.1020(g), Apple never provided Gjovik information about the records noted or her rights under this section, either upon first entering into employment or least annually thereafter.

364.    In violation of 910.1020(e)(2)(i), Apple's response to Gjovik's request for exposure records for 825 Stewart Drive only resulted in Apple sharing the 2015 vapor intrusion testing result and no other data. When Gjovik requested information about her exposure to chemicals at her office, Apple should have provided a record measuring and monitoring the amount of toxic substances or harmful physical agents to which she had been exposed,[309] and in the absence of that data, then data about employees in work conditions similar to those of the

---

[307] California Labor Code §6398(b). "*All employers shall provide information to employees ... to observe monitoring or measuring of employee exposure to hazards ... accurate records of employee exposures to potentially toxic materials or harmful physical agents... Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents ... and informing any employee so exposed of corrective action being taken*." Cal. Lab. Code § 6408

[308] "*Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein*." Cal. Lab. Code § 6400(a); "*No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful*." Cal. Lab. Code § 6402. "*No employer, owner, or lessee of any real property shall construct or cause to be constructed any place of employment that is not safe and healthful*." Cal. Lab. Code § 6404, 6405.

[309] OSH Act 1910.1020(e)(2)(i)(A)(1)

127

employee to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected. [310] For instance, there are a number of EPA/OSHA studies about employee chemical exposure, and a number of EPA vapor intrusion studies in workplaces. Any of these could have been shared as a reference as to what Gjovik's exposure might be. When Gjovik started this type of inquiry, Waibel informed Gjovik that Apple would not discuss any of Gjovik's workplace safety concerns ever again.

365.    Apple discriminated against and discharged Gjovik because Gjovik complained about a violation of Cal. Labor Code §6399.7 (Right to Know).[311] Because Apple violated Section 6399, as with the other codes above, Apple also violated the provisions of Section 6310.

### a)    Right-to-Know Retaliation: Cal. Labor Code §6399.7 (via § 6310)

366.    Apple retaliated against Gjovik because Gjovik complained or testified regarding non-compliance with the Hazardous Substances Information and Training Act. Labor Code section 6399.7 prohibits an employer from retaliating against an employee who complains or testifies about non-compliance with the Hazardous Substances Information and Training Act. While Gjovik argued with Apple about this matter related to 825 Stewart Drive (as she did not yet know about 3250 Scott Blvd), however, Apple knew and was surely considering her arguments in the context of 3250 Scott Blvd as well under both California Labor Code but also the federal RIGHT TO KNOW statute and the CLEAN AIR ACT.[312]

367.    Apple failed to provide clear and reasonable warning to all individuals prior to exposure to chemicals listed on the Proposition 65 list of chemicals known to the State of California to cause cancer, birth defects, or reproductive harm. Apple did not disclose the recent history and thus imminent risk of exposure to certain dangerous chemicals (TCE, ethylbenzene,

---

[310] 1910.1020(e)(2)(i)(A)(2)

[311] Hazardous Substances Information and Training Act: "No person shall discharge or in any manner discriminate against, any employee because such employee .... because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310." Cal. Labor Code § 6399.7

[312] The Emergency Planning and Community Right-to-Know Act (EPCRA), aka Title III of the Superfund Amendments and Reauthorization Act (SARA). EPCRA §§ 302, 304, 311-3. Clean Air Act, 42 U.S.C., § 7622(a).

COMPLAINT                                                         SEPT. 7 2023

toluene, vinyl chloride, etc.) above EPA risk levels. Apple had one or more listed chemicals emitted into the environment where employees were and could be exposed. Apple did not and could not prove the exposure caused no significant risk.[313] Apple did not provide the required warning to employees or others who were exposed, before, after, or during exposure in violation of Cal. Code of Reg. §5194(b)(6).[314] [315]

368.    Known exposed parties at 825 Stewart Drive include employees, vendors, federal employees, and city employees resulting in occupational and environmental exposures. Known exposed parties at 3250 Scott Blvd include employees, vendors, city employees, and thousands of nearby residents resulting in occupational and environmental exposures. In neither location were warnings or signs posted conspicuously in the workplace, in violation of §5194(b)(6). Gjovik raised these concerns and Apple said they refused to do this because they decided there was no "legal obligation" and then fired Gjovik.

369.    At 825 Stewart Drive, Apple omitted at least 10 §339 hazardous chemicals including the contaminants of concern recorded in the federal Record of Decision for the CERLCA site: 1,1,1-TCA; Freon-113); 75343, 1,1-Dichloroethane; Ethylidene chloride; 1,1-Dichloroethene; 1,2-Dichlorobenzene; Vinyl chloride; 1,2-Dichloroethylene, 1,2,3,5-Perchloroethylene, 1,2-trans-Dichloroethylene, TCE.

370.    Prior indoor air testing also showed the presence of 2 additional §339 hazardous chemicals from §5194(b)(6), Toluene and Ethylbenzene, which were known to be in the CERCLA groundwater plume under the building, but Apple claimed without data the emissions were 'from construction,' yet did not provide conduct follow up air testing or provide warnings.

---

[313] "A warning … shall not apply to … An exposure for which the employer responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for the chemicals known to the State to cause cance… In any enforcement action the burden of showing that an exposure meets the criteria … shall be on the employer."

[314] "Before exposing any employee to any hazardous substance that otherwise falls within the scope of this section and which requires a warning under this Act (see 22 CCR Section 12000, Chemicals Known to the State to Cause Cancer or Reproductive Toxicity) … any employer subject to the Act shall comply with the requirements set forth in… the Act."

[315] §5194(b)(6), in violation Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194

129

Instead, Apple terminated and terrorized the whistleblower. Apple's conduct violated Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194, which is actionable under § 6310.

371.    For 3250 Scott Boulevard chemical emissions and exposure, see under "RICO Act," the Predicate Act of violating 18 USC § 229 "*Relating to Chemical Weapons*," and also sections on "*Mail and Wire Fraud.*"

## G.    WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)

372.    In California, an employer may be subject to tort liability if it terminates an employee in violation of a fundamental public policy. [316] Gjovik was retaliated against and discharged from employment for reasons that violate public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "strong public interest" reflected in California Labor Code § 1102.5, "in encouraging employee reports of illegal activity in the workplace." [317][318] For example, it is a termination in violation of publicly policy (*Tamney Claim*) to terminate an employee for complaining about unsafe work conditions or for asking to work in a safe and healthful workplace.[319]

373.    The true reasons for Gjovik's discharge are discussed as claims in this Complaint and in the government adjudications, however Apple's supposed, proffered (though pretextual), 'legitimate' reason for firing Gjovik also violates public policy. Apple claimed it fired Gjovik for exposing, protesting, and complaining about certain data collection practices by the employer and because Gjovik would not get on a phone call with a 'Workplace Violence' interrogator within 'the hour' to supposedly discuss Gjovik's complaints about these data collection practices.

---

[316] *Steffens v. Regus Grp., PLC*, 485 Fed.Appx. 187, 188 (9th Cir.2012) (citing *Gould v. Md. Sound Indus., Inc.,* 31 Cal.App. 4th 1137, 1147 (1995)).
[317] *Collier* at 1123; *Stoval* at *4; *Banko v. Apple, Inc.,* No. 13-02977 RS, 2013 WL 6623913, at *4 (N.D. Cal. Dec. 16, 2013)
[318] *Banko*; *Tameny v. Atlantic Richfield Co*. (1980) 27 Cal.3d 167 ; *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Haney v. Aramark Uniform Services, Inc*. (2004) 121 Cal.App.4th 623, 641; CACI No. 2430.
[319] Cal. Lab.C. § 6400; *Hentzel v. Singer Co*. (1982) 138 CA3d 290, 298, 188 CR 159, 164; *Cabesuela v. Browning-Ferris Indus. of Calif., Inc*. (1998) 68 CA4th 101, 109, 80 CR2d 60, 64; *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947, 88 CR3d 707, 716-717

130

374.    Apple's proffered reason for firing Gjovik which Apple claims is non-discriminatory, lawful, and was so important to Apple's business it justified immediate termination of an employee without warning – is literally illegal. Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of the California Constitution, California Labor Code 435, common law, and the US FTC Act. The unlawful data collection occurred with employees, but also with non-employees who were not given notice or asked for consent. Further, Apple claims if the employee were to warn the non-employee about the data collection, then the employee could be fired immediately as they did with Gjovik.

375.    The policy violated by Apple is supported by constitutional and statutory provisions, the policy is public in that it insures to benefit the public, the policy is fundamental and substantial, and the policy was referenced at the time of discharge.[320] Apple was put on notice that there were significant public policy concerns around the activities Gjovik complained of and was supposedly terminated over, when The US Congress sent Apple a letter in 2017 inquiring as to exactly the information Gjovik disclosed, how Apple obtained the training data for Face ID, at which time the Apple executives refused to answer Congress and instead provided misleading and inaccurate statements.[321] Apple refused to say where the images came from but did claim there was 'informed consent.' Apple knew their use of employees for this data could not be consensual so they did not provide that information to Congress.

376.    As for Apple's complaints about Gjovik complaining about Apple asking repeatedly to scan Gjovik's ear canals, despite what Apple said to threaten Gjovik with a meritless IP lawsuit, the information Gjovik shared was not secret. In fact, Apple's extensive ear scanning was made public years prior,[322] and Apple would go on to talk about it more a couple-

---

[320] *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890;

[321] Natasha Lomas, *Apple responds to Senator Franken's Face ID privacy concerns*, TechCrunch (October 17, 2017), https://techcrunch.com/2017/10/17/apple-responds-to-senator-frankens-face-id-privacy-concerns/

[322] Wired, "*The secrets behind the runaway success of Apple's AirPods*," Sept 5 2020, https://www.wired.co.uk/article/apple-airpods-success   "*We had done work with Stanford to 3D-*

131

1  months after Gjovik was fired, now claiming to have the largest library of ear (scans) in the

2  world.[323] In addition, contrary to what Apple claimed, Gjovik did not sign any NDA related to

3  the ears and in fact, on August 10 2018 Gjovik emailed Apple, in response to similar requests,

4  saying she didn't want her ears scanned "indefinitely."

5  377.  The text of the post Apple complained about was Gjovik saying: "*I'm still over*

6  *here in Apple's time-out chair & they keep telling me to respect my abuser's privacy & be silent.*

7  *Meanwhile I got 3x of these in the last month since being on leave. NO, APPLE, STOP IT. I*

8  *can't tell if they're harassing me or just being super intrusive or both.*" [324]Apple told Gjovik she

9  was fired for posting this and called it "leaking."

10  378.  Regardless of if Apple terminated Gjovik for the proffered reason, or the other

11  reasons alleged, all reasons violate fundamental public policy, including interest in a workplace

12  free from illegal practices.[325] It is a violation of public policy for an employer to discharge an

13  employee from employment due to the employee reporting crimes or due to the employee hiring

14  an attorney,[326] due to the employee refusing to sign a liability waiver,[327] or for the employee

15  refusing to engage in an unlawful act.[328] In *Collier*, the California Court of Appeal recognized

16  that there is a compelling and "fundamental public interest in a workplace free from crime."[329] In

17  *Banko v Apple*, the judge cited the *Collier* holding when striking down Apple's claim it could

18  fire employees for whatever reason it wanted, even for reporting crimes.[330] The court explained

19  that any laws captured in the penal code are assumed to reflect public policy.

20

---

21  *scan hundreds of different ears and ear styles and shapes... we took that research further – studied*
*more ears, more ear types."*

22  [323] Wallpaper, *Inside Apple Park: first look at the design team shaping the future of tech*, Dec 9

23  2021, https://www.wallpaper.com/design/apple-park-behind-the-scenes-design-team-interview
*"Thousands of ears were scanned.. I think we've assembled one of the largest ear libraries*

24  *anywhere."*
[324] Aug 28 Twitter Post:

25  https://web.archive.org/web/20210829034222/https://twitter.com/ashleygjovik/status/143182450145
7633283

26  [325] Banko; Collier; Ferrick.
[326] *Geliti v. Tishgart*, 77 Cal. App. 4th 219 (1999).

27  [327] *Baker Pac. Corp. v. Suttles*, 220 Cal. App. 3d 1148 (1990).

28  [328] Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167 (1980).
[329] *Banko* at 3.
[330] *Banko* at 5.

132

379.    In all claims noted, Gjovik took action to report the issue/concern internally where feasible, attempting to work with the Apple to address the issues, but when Apple made its position clear that it would not change and that Gjovik would face retaliation if she continued to raise the issues/concerns, then she reported it publicly to a government, the media, and/or disclosing the information to the public herself in hope public pressure could influence more lawful and ethical conduct from Apple. Gjovik discussed these intentions publicly in interviews before she was fired.

380.    Apple claims it retaliated against and terminated Gjovik for complaining about, protesting with her co-workers, and refusing to participate in activity that would have resulted in a violation of her rights and state and federal constitutions and statutes, including the California Constitution, Article I, Section 1, in violation of California Labor Code § 1102.5. Gjovik's termination was in violation of fundamental, basic, and substantial public policies of the State of California, including, but not limited to, section 1102.5 of the California Labor Code, section 17200 of the Business and Professions 2 Code, Article, I Section 1of the California Constitution, and Section 637.7 of the California Penal Code.

381.    There is a two-year statute of limitations following termination to bring a claim in court. [331] The cause of action accrues at the time of dismissal.[332]

### i.    Invasion of Privacy (Cal. Const. art. 1, § 1)

382.    Article 1 of the California Constitution expressly recognizes that all people have an inalienable right to privacy. (CAL. CONST. ART. 1, § 1). The California Supreme Court has said that an invasion of privacy claim under the California Constitution requires the "*serious invasion*" of a "*legally recognized privacy interest*" in circumstances where the plaintiff enjoyed a "*reasonable expectation of privacy*".[333] The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians.[334] Privacy is protected not merely against

---

[331] Cal. Code Civ. Proc. § 335.1; *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[332] See *Romano v. Rockwell Int'l, Inc.* (1996) 14 C4th 479, 501, 59 CR2d 20, 33; *Aviles-Rodriguez v. Los Angeles Comm. College Dist.* (2017) 14 CA5th 981, 991, 222 CR3d 444, 452.
[333] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal. 4th 1, 35-37 (1994).
[334] *White v. Davis*, 13 Cal.3d at p. 775.

1  state action; it is considered an inalienable right which may not be violated by anyone. [335] This

2  right to privacy impacts employment laws in many areas, from social media to surveillance to

3  protection of medical information.

4      383.    From 2015 through 2021, Gjovik complied with Apple's demands and used

5  almost exclusively "internal devices" and Apple software and services (apps, iCloud email,

6  iMessage texts, etc.) for everything she did at work and outside of work. During this time, Apple

7  was in a position to collect data (and store, analyze, and exploit that data) on Gjovik's real time

8  and historic GPS location,[336] what devices were around here and who they belong to (if also

9  "internal"), who Gjovik was talking to and about what (the corporate 'configuration profile'

10  allowed full disk access and allegedly included a keystroke recorder), what Gjovik's schedule

11  was and who she met with, the contents and metadata of all of Gjovik's documents and photos,

12  and other highly sensitive information. The full disk access meant Worldwide Loyalty had direct

13  access to any and all photos and biometrics captured by Gjovik's phone.

14      384.    While living on was often an actual responsibility of a role in Gjovik's Software

15  Engineering team, she continued to feel pressure in Hardware Engineering as well. One

16  example, in Gjovik's 2019 annual performance review, Powers wrote, "*She is an amazing bug*

17  *finder. Everything she touches seems to break.*" Said one person, "*I'm impressed on ability to*

18  *find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on*

19  *hardware that we say is solid. It helps that she's constantly living on as many unreleased*

20  *products as she can, and is diligent about filing bugs. Good stuff!* "There were many comments

21  like this.

22

23      385.    Gjovik was also coerced to 'file bugs' for any issues she found that could be

24  software 'bugs' and to do so 'especially' if she 'hit the bug' in a 'customer scenario' (i.e., a

25  situation that would be very unlikely to occur at work or during work hours) so Apple could

26

27  [335] See *Annenberg v. Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [ 113

28  Cal.Rptr. 519]; 26 Hastings L.J. 481, 504, fn. 138 (1974).) *Porten v. University of San Francisco*, 64
Cal.App.3d 825, 829-30 (Cal. Ct. App. 1976)
[336] Likely a violation of Cal. Penal Code § 637.7, prohibiting the use of GPS to track another person

1  obtain the invasive logging data from Gjovik, saying they cannot ask customers for that level of

2  information.

3      386.  As Gjovik spoke with her coworkers about her opposition to Apple's surveillance

4  practices, and many voiced the same concerns.[337] These conversations usually occurred outside

5  of work hours, far from campus, and in hushed voices acknowledging Apple could be listening

6  though their phones and other devices. Employers have no legal justification to monitor personal

7  communications of their employees.[338] Gjovik was also unable to turn the logging and apps off,

8  even if she felt brave enough to try worried Apple might notice and think she was disloyal.

9  Gjovik repeatedly tried to sign out of the Gobbler app but it always signed itself back in.

10      387.  Apple violated Gjovik's right to privacy established by the California

11  Constitution, by statutes, and by common law. Apple intruded into Gjovik's seclusion, Apple

12  physically and constructively invaded Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)],

13  and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video

14  camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor

15  Code § 435.[339] This statute prohibits the employer from videotaping these areas and strictly

16  prohibits the use of that recording for "*any purpose*." Here, Apple used those videos, which

17  included biometric data, to develop its commercial products to sell to customers without actual

18  consent or notice to the people whose data was gathered, including ***bathroom videos***.

19      388.  The Article 29 Working Party emphasized the imbalance of power in the

20  employment context: "*Given the dependency that results from the employer/employee*

21  *relationship, it is unlikely that the data subject is able to deny his/her employer consent to data*

22  *processing without experiencing the fear or real risk of detrimental effects as a result of a*

23  *refusal. It is unlikely that an employee would be able to respond freely to a request for consent*

24

25  [337] See, *Myrna Arias v Intermex Wire Transfer*, Superior Court of the State of California, Bakersfield County, <u>Complaint</u> (May 5 2015). (settled out of court)

26  [338] see: *Watkins v. L.M. Berry & Co*., 704 F.2d 577, 583 (11th Cir. 1983); *In re Google Inc*., 2013

27  WL 5423918 (N.D. Cal. Sept. 26, 2013).

[339] Cal. Lab. Code § 435 "(a) No employer may cause an audio or video recording to be made of an

28  employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order. (b) No recording made in violation of this section may be used by an employer for any purpose. This section applies to a private or public employer."

*from his/her employer to, for example, activate monitoring systems such as camera-observation in a workplace, or to fill out assessment forms, without feeling any pressure to consent."* The Working Party also advises that the imbalance of power in the employment relationship makes voluntary consent questionable and, for most work-related data processing, the GDPR lawful basis relied upon "*cannot and should not*" be the employee's consent. [340]

389. Gjovik had a legally protected privacy interest and a reasonable expectation of privacy under the circumstances (everyone should be able to demand privacy in the bathroom), and Apple's conduct amounts to a serious invasion of Gjovik's protected interests.[341] Gjovik has reasonable interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy') and interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')."[342]

390. Apple invaded Gjovik and other employee's privacy in many ways, but at issue here are Apple's requests to scan Gjovik's ears and Apple's use of the Face "Gobbler" application to gather videos and biometrics, and most importantly, Apple's declaration that those practices are 'secret' and any employee who 'leaks' those practices can be immediately terminated, even with open government investigations and charges against the employer.[343]

391. It seems absurd to have to put forth legal arguments why an employee should be able to publicly protest an employer pestering them to 3D scan their ears and ear canals or to install an app on their iPhone called "Gobbler" that cannot be turned off and captures videos of faces with biometrics constantly, and which data is made immediately accessible to Worldwide Loyalty. Apple's declaration that it can terminate employees for protesting these invasions is a

---

[340] Is Employee Consent under EU Data Protection Regulation Possible?, Joseph J. Lazzarotti and Maya Atrakchi, February 27, 2018
[341] *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1024 (N.D. Cal. 2012) (citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994)); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal. 2020)
[342] *Hill* at 35; *In re Google* at 829.
[343] Apple's Position Statement, Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022

COMPLAINT                                                          SEPT. 7 2023

"*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.*" [344]

392.    The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. When an employee successfully refuses to submit to an employer's wrongful intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests. [345]

### ii.    FTC Biometric Consent Rules

393.    In addition to the privacy concerns, Apple is also unlawfully coercing employees to provide personal data Apple can use for research and development, including training AI models, without real consent or compensation, in violation of federal competition laws and state and federal data protection laws. Apple's practices facially violate GDPR and Apple knows it, as it warned employees on August 3 2017 to never use these apps "*in France and Germany.*"

394.    Section 5 of the FTC Act prohibits, among other things: unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable; and misleading statements to consumers.[346] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

395.    Here, Apple is not only coercing its employees to let Apple harvest their personal data, in highly personal situations and with omnipresent surveillance, but Apple is using that data to build their software for consumer products. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per

---

[344] *Hill*. at 37. *In re Google* at 829.

[345] Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy § 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*

[346] FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices*, Consumer Compliance Handbook, https://www.federalreserve.gov/boarddocs/supmanual/cch/200806/ftca.pdf

Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development.

396.    The FTC issued a statement recently on biometric privacy rights, explaining there are certain business practices that are always unlawful and there is never consumer 'consent' for those practices. They noted the FTC Act may be violated by "surreptitious and unexpected collection of biometric information."[347] FTC added, "Injuries to consumers may also be compounded if there is no mechanism for accepting and addressing consumer complaints and disputes related to businesses' use of biometric information technologies."[348] Like terminating an employee because they complained about the practices or tried to warn consumers?

397.    The public policy on employee biometrics is clear with BIPA and GDPR; private entities are forbidden from selling or otherwise profiting from an employee's biometric identifier or biometric information under any circumstances.[349]

398.    Further, as to Apple's "confidentiality" argument, the Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[350] Information regarding an employer's illegal activities is not protectable by means of restrictive covenant. [351] Facts relating to actual, alleged, or potential violations of the law are generally not protectable trade secrets. An employee's agreement not to disclose such information may, in some situations, be unenforceable as against public policy.[352] This is true here. It's absurd Apple tried to claim Gjovik's speech and photos of herself secretly taken by AI in her home, violated a NDA.

---

[347] FTC, *FTC Warns About Misuses of Biometric Information and Harm to Consumers,* May 18 2023, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers
[348] FTC, *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act,* https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf
[349] 740 ILCS 14/15(c).
[350] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[351] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[352] *EEOC v. U.S. Steel Corp.,* 671 F. Supp. 351, 358 (W.D. Pa. 1987); *Chambers v. Capital,* 159 F.R.D. 441, 444 1995);
*EEOC v. Astra, Inc.,* 94 F.3d 738, 745 (1st Cir. 1996)

138

### iii.    Breach Of Implied Contract: Good Cause Required (*Foley/Banko*)

399.    Gjovik worked for Apple for nearly seven years. Gjovik received numerous raises, commendations, positive evaluations, and promotions. Apple took actions to assure Gjovik of continued employment. Under the *Foley* factors, and like in *Banko v Apple*, Apple's words and/or conduct made it reasonable for Gjovik to believe that the employer promised to only discharge or demote her for good cause. For instance, Apple's personnel policies and practices include development plans that are to be issued prior to termination. In her 2017 annual review West told Gjovik, he" appreciates *her willingness to speak truth to authority" and told her to "keep doing this and good things will continue to follow."* This was a promise to Gjovik that if she reported unethical and unlawful conduct, and held leaders to account, that she would have continued employment at Apple.

400.    Apple did not have good cause to discharge Gjovik for misconduct and did not conduct an appropriate investigation before terminating Gjovik. Apple claimed its investigation into Gjovik began on Aug 28-29 2021 and that it knew then it would fire Gjovik. Apple hid the investigation into Gjovik and attempted to coerce Gjovik into phone calls under the premise Apple was investigating her concerns (not her). Apple contacted Gjovik twice after it supposedly started the investigation into Gjovik, both times pretending it was still investigating Gjovik's concerns, not that it was investigating Gjovik. Gjovik was already worried about bad faith conduct by Apple and requested communications to be in writing and if not, that Business Conduct (Worldwide Loyalty) review her request and decide on the matter instead of the Employee Relations investigator.  Instead, Apple sent a "Workplace Violence and Threat Assessment" interrogator to terminate Gjovik knowing before he contacted her that he would fire her. Gjovik asked the interrogator to please explain what the accusations against her are but the interrogator refused to respond and instead Gjovik received a vague notice of termination from her VP a few hours later.

401.    Apple's termination of Gjovik was not honest, there was no appropriate investigation, and the termination was arbitrary and pretextual. Gjovik did not willfully breach a job duty, did not continually neglect her job duties, nor was she prevented from performing her

139

1  job duties due to continued incapacity.[353] Apple did not act in good faith, the investigation was

2  not reasonable, and Apple did not give Gjovik notice of the claimed misconduct or an

3  opportunity for Gjovik to answer the charge of misconduct before making the decision to

4  discharge Gjovik. Apple's practice were unlawful under California's Unfair Competition Law

5  because it violated a rule contained in other statutes and combined with Gjovik's good-cause

6  status, and the other issues noted above, Apple's termination of Gjovik was a violation of public

7  policy.[354]

8      402.    Apple also breached their Duty of Good Faith and Fair Dealing under the implied

9  contract and written contract, by terminating Gjovik only days before annual bonus and salary

10  increase, and only weeks before her next RSU vesting, in order to frustrated Gjovik's right to

11  receive benefit from her agreement with Apple through opportunistic use of its corporate power.

12  Further, Apple put Gjovik in a position where she was obligated by Apple policy to report issues

13  but was punished for doing so, similar to *Banko v Apple*. Finally, Apple also fabricated the

14  "evidence" it cited to justify terminating Gjovik, including inciting employees to file meritless

15  complaints against Gjovik. [355]

16      403.    There is at four-year statute of limitations for written contracts and a two-year

17  statute of limitations for oral contracts to file a claim in court.[356]

18

19  **H.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

20      404.    Apple inflicted IIED and/or NIED upon Gjovik in California from the start of the

21  limitations period until Gjovik left California on August 31 2021, at which point, Apple then

22  inflicted IIED and/or NIED upon Gjovik starting once she arrived in New York on September 1

23  2022. Apple's extreme and outrageous conduct with the intention of causing, or reckless

24  disregard of the probability of causing, or negligently causing, emotional distress – actually and

25

---

26  [353] *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 57 [100 Cal.Rptr.2d
27  627]. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 100 Cal. Rptr. 3d 296 (Cal. Ct. App. 2009);
    *Cotran v. Rollins Hudig Hall Internat., Inc.,* 17 Cal.4th 93, 107 (Cal. 1998).
28  [354] Soil Retention Products, Inc. v. Brentwood Industries, Inc., S.D.Cal.2021, WL 689914 (2021).
    [355] *Town of Cheswold v. Vann,* 9 A.3d 467, 473 (Del. 2010).
    [356] Cal. Code Civ. Proc. § 337, 339

140

1    proximately caused Gjovik to suffer severe or extreme emotional distress due to Apple's

2    conduct.[357]

3        405.    Apple began complaining to Apple that they were inflicting emotional distress

4    (IIED) upon her in a July 16 2021 email. Generally, wrongfully motivated personnel decisions

5    are not considered conduct "*beyond the bounds of human decency*" for the purposes of an IIED

6    claim.[358] However, an employer is liable for the willful and malicious torts of its employees

7    committed in the scope of employment.[359] Punitive damages have also been awarded for

8    employment retaliation in cases of "*systematic courses of retaliation*" by creating an

9    "*intimidating, hostile, and offensive working environment*." [360]

10       406.    Severe emotional distress means "emotional distress of such substantial quality or

11   enduring quality that no reasonable [person] in civilized society should be expected to endure

12   it."[361] Conduct is extreme and outrageous when it exceeds all bounds of decency usually

13   tolerated by a decent society, and is of a nature which is especially calculated to cause, and does

14   cause, mental distress.[362]

15       407.    Apple's conduct was not mere insults, indignities, threats, annoyances, petty

16   oppressions, or other trivialities.[363] Apple's misconduct towards Gjovik was/is extreme,

17   outrageous, persistent, and omnipresent. Apple's conduct left Gjovik in such fear for her safety,

18   the safety of her dog, the integrity of her electronics and utilities, and the safety of her chattels –

19   that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her

20

---

21   [357] *Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998). *Ferretti v. Pfizer Inc.,*
     855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012)

22   [358] *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80; *Koerber v. Encyclopedia*
     *Britannica*, Inc., No. B312047, 9 (Cal. Ct. App. Jul. 13, 2022)

23   [359] *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [ 256 Cal.Rptr. 766, 769 P.2d

24   948]. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 618 (Cal. Ct. App. 1989)
     [360] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 620 (Cal. Ct. App. 1989)

25   [361] *Hughes v. Pair*, 46 Cal.4th 1035, 1051 (Cal. 2009); *Potter v. Firestone Tire Rubber Co*, 6 Cal.4th
     at p. 1004.

26   [362] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 617 (Cal. Ct. App. 1989); Prosser,

27   Law of Torts (4th ed. 1971) p. 54; *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d
     222, 229-30 (Cal. Ct. App. 1983).

28   [363] Rest.2d Torts, § 46; *Molko v.Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1122 [ 252 Cal.Rptr. 122,
     762 P.2d 46], overruled on another ground in *Aguilar v. Atlantic Richfield Co.*, supra, 25 Cal.4th
     826, 853, fn. 19;

COMPLAINT                                                    SEPT. 7 2023

1    home, or even failing to properly secure entry to her home, would place her in danger and she

2    could be killed. Gjovik was and is under a justified belief that leaving her dog at home

3    unattended could result in harm to her dog and that he could be killed by Apple. Apple has

4    physically interacted with Gjovik's dog once, during at least one break-in to Gjovik's home,

5    leaving a scent of cigarettes on the dog's body along with other signs of break-in, trespass to

6    chattels, and additional modification of Apple's unlawful surveillance systems.

7         408.    What distinguishes this claim from the Bane Act or Ralph Act claims, is Apple's

8 deranged harassment, threats, and intimidation was intentional and malicious, following and

9 with full knowledge that in 2020, Apple's emissions of toxic chemicals and gases into Gjovik's

10 home (18 USC § 229) left Gjovik unable to function and disabled, even formally on state short-

11 term disability from May through September 2020. Gjovik did not know what was making her

12 ill at the time, and was told it could be fatal illness or injury. Gjovik did not understand what the

13 cause of her injury was and was warned by doctors that her fainting spells could lead to death if

14 she was to fall and whack her head, and that if she had a fatal arrythmia that exercise could

15 provoke a lethal heartbeat, and as such Gjovik was put on bed rest for months – concurrently

16 while being poisoned by Apple's manufacturing emissions while she was at home and in bed.

17 Apple's actions made Gjovik fear for her life, caused severe physical injuries, put Gjovik at high

18 risk for cancer and disease in her lifetime, put Gjovik's dog at risk for cancer and disease, made

19 Gjovik's hair fall out, caused growths and rashes that may permanently disfigure Gjovik, and

20 then proceeded to cover up what Apple did to Gjovik, while intentionally harassing,

21 intimidating, threatening, and terrorizing Gjovik – knowing that the increased stress they were

22 causing Gjovik was to make Gjovik even more likely to develop cancer and disease.

23

24         409.    Apple could have acted with some decency and reserve, but instead Apple

25 bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and

26 threatened it could contain a severed head, sued her, and reported her to law enforcement,

27 repeatedly threatened to harm and "*ruin*" and "*destroy*" her, and even sent her emails pretending

28 to be government employees threatening her to shut up about Apple's chemical leaks. Through

1   all of this, Apple went out of their way to act like deranged maniacs whose conduct clearly

2   exceeded all bounds of decency usually tolerated by society.

3       410.    Apple did follow through on many of its threats (like suing Gjovik), and

4   frequently combined online harassment with physical in-person harassment confirming to

5   Gjovik online what they were doing in person, all of which makes Apple's conduct menacing,

6   and not trivial.[364] Also, sufficient allegations for intention to cause or reckless disregard of the

7   probability of causing emotional distress may be satisfied by threats concerning Gjovik's health

8   and that of the Gjovik's family – like threatening to decapitate one of Gjovik's loved ones, or

9   that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap*."[365]

10      411.    When Gjovik explains to people what Apple has done to her, when she shows

11  them Apple's emails and posts, shows them the evidence she gathered of their physical

12  intrusions and harassment, the default response is not to simply shake their head with

13  disappointment. No, it is to exclaim something such as "*Outrageous!!*"[366] Further, these actions

14  have caused fear in those around Gjovik, as well as in Gjovik herself. Gjovik has lost many

15  friends through this – which she cannot blame them as Apple's menacing is likely smoke from

16  the fire of actionable threats of violence and mayhem.[367]

17      412.    Further, Apple's supposed (but pretextual) reason for firing Gjovik was two

18  topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct,

19  but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination,

20  despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans) being highly

21  unlawful, unethical, and in some cases illegal. In fact, A 2023 New York case awarded damages

22  for Negligent Infliction of Emotional Distress due to the use of cameras in bathrooms. Gjovik

23  protested "Gobbler," for among other reasons, it taking photos of her while naked and while in

24  the bathroom, and while naked in the bathroom. Gjovik complained of conduct found to be

[364] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[365] *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 230 (Cal. Ct. App. 1983)
[366] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[367] Rest.2d Torts, § 46, com. d. p. 73.

143

1  NIED and Apple then implicitly threatened to sue her if she was to protest it again, and blamed

2  their highly unlawful retaliation against Gjovik on Gjovik's outcry about unlawful conduct.[368]

3     413.   Similarly, Appleseed's retaliatory litigation filed against Gjovik in 2022 was

4  admittedly due to Gjovik's complaints about witness intimidation and harassment. The point of

5  the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the

6  trauma she was experiencing with threat of incarceration if she were to even complain privately

7  to a therapist. During that litigation, the petitioner from Apple's Worldwide Loyalty team, wrote

8  in email to Gjovik saying that Gjovik complaining about Apple's death threats and Gjovik

9  complaining about Apple trying to make her suicidal was "*harmful to Apple*" and Appleseed

10  said she "*reported*" Gjovik "to Apple" for making those statements, before proceeding to then

11  threaten Gjovik with litigation and unspecified reprisals if Gjovik didn't alter her federal

12  testimony (February 5 2022). After the gag order, Gjovik then could not complaint about what

13  occurred without risking years of incarceration.

14     414.   Apple's conduct of course left Gjovik with "*discomfort, worry, anxiety, upset

15  stomach, concern, and agitation*".[369] However, Gjovik also experienced overwhelming "*shock,

16  horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin,

17  disappointment [and] worry*."[370] Apple's actions were so extreme and caused such severe

18  disruption to Gjovik's life, Gjovik suffered panic attacks worrying about losing her home and

19  not having food or being able to care for her dog.[371] Gjovik cried every day. Gjovik kept a "go

20  bag" by her front door in case some Apple-captured police offer showed up to haul her away to

21  prison in Seattle. Gjovik had to arrange guardians for her dog and drafted a signed letter she

22  posted on the door and gave to the guardians that instructed the police to allow the guardians to

23  pick up Gjovik's eight-pound Chihuahua from the pound if Gjovik was arrested and

24  incarcerated. Gjovik was and is constantly on edge.

25

26  [368] *Brown v. New York Design Ctr., Inc.*, N.Y. App. Div. 1st Dep't (Mar. 9, 2023).

27  [369] *Koerber v. Encyclopaedia Britannica, Inc.,* No. B312047, 10-11 (Cal. Ct. App. Jul. 13, 2022)
    [370] *Crisci v. Security Ins. Co.*,66 Cal.2d 425, 433 [ 58 Cal.Rptr. 13, 426 P.2d 173]; Rest.2d Torts, §

28  46, com. j. *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397 (Cal. Ct. App. 1970).
    [371] *Alcorn v. Anbro Engineering*, Inc.,2 Cal.3d 493, 498; *Fletcher v. Western National Life Ins. Co.,*
    10 Cal.App.3d 376, 398 (Cal. Ct. App. 1970).

COMPLAINT                                                        SEPT. 7 2023

415.    As documented in legal filings, emails, doctor appointments, and in therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, severe depression requiring anti-depressants due to suicidal ideation and crying uncontrollable for hours every day. Gjovik suffers from paralyzing anxiety and it has been difficult to even get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between over eating and under eating, but overall gained over forty pounds starting in late 2021. Gjovik's body has been stuck in PTSD "hyperarousal" and she is constantly hyper-alert and vigilant, listening for sounds that there could be another break in, or anther stalker outside her home waiting to harass her. Gjovik has not been able to 'relax' for over three years.

416.    Apple had full knowledge of Gjovik's precarious financial and medical situations, and the prior impact to her mental health before Apple started retaliating about the office. Apple knew the retaliation about the office would further traumatize Gjovik after Apple had previously traumatized her due to the 3250 Scott Blvd emissions. Then, Apple intentionally terrorized Gjovik more in addition to the office retaliation – with holistic, expansive, passionate terrorism of Gjovik assumably in hope that Gjovik killed herself or died of cancer quicker than she would have otherwise. Gjovik has spoken and written about this extensively over the last six months after discovering what Apple did at 3250 Scott Blvd and realizing the incredibly depravity of Apple's conduct.

417.    Further, Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous (see "*Relating to Chemical Weapons*" section under RICO Act violation), Apple's intentional, reckless, and/or negligent conduct exposed Gjovik to carcinogens including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress, and acted with reckless disregard of the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer and Apple's conduct was a

COMPLAINT                                                                                          SEPT. 7 2023

1  substantial factor in causing Gjovik's severe emotional distress. [372] Apple's conduct was

2  despicable (base, vile, contemptible), and subjected Gjovik to cruel and unjust hardship, and was

3  carried out with a willful and/or conscious disregard of Gjovik's rights and safety. In addition, or

4  in the alternative, Apple intentionally misrepresented and/or concealed a material fact known to

5  Apple (that Apple was responsible for Gjovik's 2020 illness) wanting to cause Gjovik harm by

6  Gjovik not being able to litigate with all material facts and not able to take necessary

7  preventative measure for her health, with an apparent goal that Gjovik will soon die of cancer

8  and disease, homeless and bankrupt, as Apple's social media accounts threatened two years

9  ago.[373]

10  418.    Apple had a duty to follow environmental and health/safety laws, which it

11  breached repeatedly and egregiously, resulting in emissions of carcinogenic chemicals. Reliable

12  medical and scientific opinion will confirm that Gjovik's risk of developing cancer was

13  significantly increased by the exposure caused by Apple, and has resulted in actual risk that is

14  significant. It appears Apple may have already caused Gjovik to develop cancer on her thyroid

15  and she is waiting on a consultation with a specialist to learn more, but scheduling is severely

16  delayed as Gjovik is now on Medicaid.[374]

17  419.    In California, there is a two-year statute of limitations to file a complaint for IIED

18  or NIED.[375] New York as a one-year (from act) statute of limitations for IIED and three years

19  (from act) for NIED.[376] Gjovik argues Apple's conduct was IIED, but if not then, or concurrently

20  also NIED. NIED does not require 'extreme and outrageous conduct.'[377]

21

22

23

24

[372] Potter v. Firestone Tireand Rubber Co. (1993) 6 Cal.4th 965, 1001.

25  [373] CollegeHospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, 725.

[374] CACI No. 1601. Intentional Infliction of Emotional Distress - Fear of Cancer, HIV, or AIDS

26  [375] Cal. Code Civ. Proc. § 335.1; *Wassmann v. South Orange County Community College District*,
No. G053411, California Court of Appeal (June 12, 2018)

27  [376] CPLR 215(3); 14 N.Y.Prac., New York Law of Torts 1:40

[377] Brown v. New York Design Ctr., Inc., 2023 WL 2417772 (N.Y. App. Div. 1st Dep't Mar. 9,

28  2023). Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc. (1989) 48 Cal.3d 583; Burgess v.
Superior Court (1992) 2 Cal.4th 1064.

# VIII. DEMAND FOR RELIEF

**420. On the First Cause of Action: SOX Retaliation:** Apple violated SOX whistleblower retaliation prohibitions and thus owes Gjovik "make whole relief" with compensatory damages including lost wages (back pay, and front-pay or reinstatement), attorney's fees, and special damages for emotional distress and reputational harm.

**421. On the Second Cause of Action: Dodd-Frank Retaliation**: Due to of Apple's violation of the Dodd-Frank Act, Gjovik requests reinstatement, two times the amount of back pay owed to the individual, with interest, and compensation for litigation costs, expert witness fees, and reasonable expenses.

**422. On the Third Cause of Action: Bane Civil Rights Act (§52):** Gjovik was harmed and Apple's conduct was a substantial factor in causing Gjovik's harm. The Bane Act applies to private actors when they try to or do interfere with a victim's civil rights, as Apple did to Gjovik. Because Apple violated the Bane Act, Gjovik should be awarded compensatory damages, punitive/exemplary damages, attorney's fees with a fee multiplier, injunctive relief including a restraining order against Apple to protect Gjovik, treble damages, and a civil penalty of $25,000.[378] Damages should be up to a maximum of three times the amount of actual damages but in no case less than $4,000 and attorney's fees.[379]

423. Damages should include, but not be limited to: Gjovik's loss of employment, Gjovik's legal costs in fighting retaliatory litigation, costs to hire a 'reputation management firm' to remove or downrank defamatory articles about Gjovik based on Apple's actions and allegations against her, moving costs to flee California and hide in New York, expenses for personal and home security measures, and compensation for her mental anguish and emotional suffering from living in fear.[380] Gjovik also requests a restraining order prohibiting any physical or digital contact with Gjovik by Apple's corporate officers, security and 'loyalty' teams, and

---

[378] Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b)).
[379] § 52. Denial of civil rights or discrimination; damages; civil action by persons aggrieved; intervention; unlawful practice complaint; waiver of rights by contract
[380] Cal. Civ. Code §§ 52(c) and 52.1(i); *Rodriguez v. County of LA*, 891 F.3d 776, 808–809 (9th Cir. 2018); Cal. Civ. Code § 52(b); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1446-48 (2006).

1  any named employee who has previously threatened or intimidated Gjovik about her exercise of

2  civil rights.

3      424.   **On the Fourth Cause of Action: Ralph Civil Rights ACT (§51.7):** Gjovik was

4  harmed and Apple's conduct was a substantial factor in causing Gjovik's harm.[381] Because

5  Apple violated the Ralph Act, Gjovik should be awarded compensatory damages,

6  punitive/exemplary damages, attorney's fees, a restraining order against Apple to protect Gjovik

7  from Apple, and a civil penalty of $25,000.[382] Damages should include losses described under

8  The Bane Act above. Plaintiff must prove the amount of her actual damages. However, she does

9  not have to prove the exact amount of the harm or the exact number of damages that will provide

10  reasonable compensation for the harm.[383]

11      425.   **On the Fifth Cause of Action: RICO Act:** Between 2017 and 2021, Gjovik's

12  salary increased from $120,000 to $169,000 (an increase of 40%) and she went from $144,717 in

13  total compensation in 2015, to $386,382 in 2020 (an increase of 267%).[384] At the time of her

14  termination, Gjovik held $590,000 in unvested Apple Inc RSUs. Gjovik's next annual

15  performance review was the week after she was terminated, and she had been expecting

16  compensation to be at least what she received the year before (another 3-4% salary increase, a

17  $22,000 bonus, and another $130,000 four-year RSU grant). Gjovik lost tangible pay due to

18  Apple's felonious discharge of her employment.

19

20      426.   RICO injury claims require tangible harm and monetary loss. As described in the

21  RICO section, Gjovik suffered much damage to her chattel property due to Apple's

22  environmental mail and wire fraud, and nonpeaceful use of chemical weapons. Gjovik requests

23  all remedies available under each statute, including: back-pay (for lost wages, bonuses, &

24  benefits), compensatory damages (for pecuniary losses, emotional distress, mental anguish,

---

25  [381] Cal. Civ. Proc. Code § 338. § 14:2. Ralph Act, Calif. Fair Housing and Public Accommodations §

26  14:2; *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.,* 212 Cal. App. 4th 258, 269 (2012).

27  [382] 3068. Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b))

[383] Judicial Council Of California Civil Jury Instruction 3068 Ralph Act - Damages

28  [384] Note: these calculations are for purposes of proving tangible harm only and are not inclusive of all factors to determine damage amounts, do not contain all damage and remedy types, and are not meant to preclude or interfere with later remedy determinations.

1    reputational harm, personal humiliation), punitive and exemplary damages for Apple's reckless

2    and callous disregard for Gjovik's rights and health, injunctive and declaratory relief including

3    reinstatement (or front-pay) and purging of negative personnel records.

4    427. **On the Sixth Cause of Action: Cal. Labor Code § 1102.5:** Because Apple

5    retaliated against Gjovik due to Gjovik's whistleblowing in violation of Cal. Labor Code §

6    1102.5, Apple owes Gjovik a civil penalty of $10,000 for each violation and reasonable

7    attorney's fees.[385] Apple shall also indemnify Gjovik of all her necessary expenditures or losses

8    incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with

9    interest.[386] Violations are listed in the allegations.

10   428. **On the Seventh Cause of Action: Cal. Labor Code § 98.6:** Because Apple

11   violated Cal. Labor Code § 98.6 by discriminating, retaliating, and taking adverse against Gjovik

12   because Gjovik engaged in protected conduct, Gjovik is owed reinstatement (or front pay),

13   reimbursement for lost wages and work benefits, and civil penalties up to $10,000 for each

14   employee for each violation.[387] Apple shall also indemnify Gjovik of all her necessary

15   expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge

16   of her duties, with interest.[388]

17   429. **On the Eight Cause of Action: Cal. Labor Code § 6310:** Because Apple

18   violated the California Occupational Safety and Health Act by discharging, threatening to

19   discharge, demoting, suspending, and/or discriminating against Gjovik because Gjovik raised

20   workplace safety concerns, Apple must reinstate Gjovik (or pay front pay) and reimburse Gjovik

21   for lost wages and work benefits. [389] Apple shall also indemnify Gjovik of all her necessary

22   expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge

23   of her duties, with interest.[390]

---

[385] Cal. Lab. Code § 1102.5(f). *Sargent v. Board of Trustees of the California State University*, Sonoma County Super. Ct. No. SCV-255399 (2021)
[386] Cal. Lab. Code § 2802
[387] Cal. Lab. Code § 98.6(b).
[388] Cal. Lab. Code § 2802
[389] Cal. Lab. Code § 6310(b).
[390] Cal. Lab. Code § 2802

COMPLAINT                                                      SEPT. 7 2023

**430.** **On the Ninth Cause of Action: Wrongful Discharge in Violation of Public Policy**: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy; the discharged employee may maintain a tort action and recover damages traditionally available in such actions."[391] Gjovik requests compensatory damages, consequential damages, punitive damages, attorney's fees, and injunctive relief.

**431.** **On the Tenth Cause of Action: Intentional Inflict of Emotional Distress**: Because Apple inflicted severe emotional distress on Gjovik, Apple shall compensate Gjovik for emotional distress including but not limited to medical bills, lost wages, lost earning capacity, and other compensatory damages. Gjovik should be compensated for her anxiety, depression, insomnia, disordered eating, loss of consortium, loss of reputation, and loss of enjoyment of life activities. Apple also should pay Gjovik punitive/exemplary damages due to Apple's outrageous, repugnant, and deranged conduct. [392]

**A.** **SPECIAL REMEDIES**

432. Gjovik is informed and believes and, on that basis, alleges that Apple was at all relevant times aware of the conduct of all of their employees and agents, and approved and ratified that conduct.

**i.** **Exemplary and Punitive Damages**

433. Apple engaged in despicable conduct, exposing Gjovik to cruel and unjust hardship, with the intention to cause injury to Plaintiff, and with conscious disregard of her rights. Defendants occupied a position of trust which gave them power to damage Gjovik's ability to earn a livelihood. Defendants abused that position of trust by maliciously, fraudulently, and oppressively discharging Plaintiff and intentionally interfering with her business. Apple's conduct was carried out by and ratified by one or more of Apple's agents, and it was willful and

---

[391] *Tameny v. Atlantic RichfieldCo.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330]
[392] California Civil Jury Instructions (CACI) 1600. See, for example, *Christensen v. Superior Court* (1991) 54 Cal.3d 868; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995; *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590; *Hughes v. Pair* (2009) 46 Cal.4th 1035.

150

1  oppressive and done in conscious disregard of her rights. Gjovik is therefore entitled to punitive

2  damages in an amount to be proven at trial.

3      434.    Punitive (aka exemplary) damages are appropriate in this case. California law

4  permits awards of punitive damages "for the sake of example and by way of punishing the

5  defendant."[393] The most important factor in determining the amount of punitive damages to

6  award is "reprehensibility."[394] Factors to consider are if "the harm caused was physical as

7  opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of

8  the health or safety of others; the target of the conduct had financial vulnerability; the conduct

9  involved repeated actions or was an isolated incident; and the harm was the result of intentional

10  malice, trickery, or deceit, or mere accident."[395]

11     435.    Under California law, a plaintiff may recover punitive damages in connection

12  with a non-contractual claim if she establishes by clear and convincing evidence that the

13  defendant is guilty of fraud, oppression, or malice. [Cal. Civil Code § 3294(a)].[396] The California

14  Supreme Court has concluded that an appropriate maximum ratio between punitive and

15  compensatory damages is "10 times the compensatory award."[397] Malice, for purposes of

16  punitive damages, includes despicable conduct by the defendant with a willful and conscious

17  disregard of the rights or safety of others.[398] Despicable conduct is conduct that is so "base, vile

18  or contemptible" that it would be despised and looked down upon by ordinary people.[399]

19      **ii.    Medical Monitoring**

20

21     436.    Gjovik requests the remedy, for statutes where available, that Apple provide and

22  pay for medical monitoring for Gjovik, including any needed medical intervention on diseases

23  resulting from Gjovik's exposure to Apple's chemicals and gases. Medical monitoring costs are

24  [393] Civ. Code, § 3294(a); *Zirpel v. Alki David Prods.*, B317334, 20 (Cal. Ct. App. Jun. 20, 2023)
    [394] State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 419.

25  [395] Zirpel v. Alki David Prods., No. B317334, 21-22 (Cal. Ct. App. Jun. 20, 2023).

26  [396] *Lupo et all v Quality Assurance Services*, Case No. 16cv737 JM (JMA), U.S. District Court,
    Southern District of California (July 26 2017); See *Turman v. Turning Point of Cent. California*,

27  Inc., 191 Cal. App. 4th 53, 64 (2010).
    [397] *Zirpel v. Alki David Prods.*, No. B317334, 23 (Cal. Ct. App. Jun. 20, 2023).

28  [398] Civ. Code, § 3294, subd. (c)(1).
    [399] Angie M. v. Superior Court (1995) 37 Cal.App.4th 1217, 1228; Zirpel v. Alki David Prods., No.
    B317334, 22 (Cal. Ct. App. Jun. 20, 2023).

                                    151

1    a recoverable item of damages for plaintiffs who (1) prove exposure to toxic chemicals as a

2    result of a defendant's tortious conduct and (2) establish that the need for medical monitoring is a

3    reasonably certain consequence of the exposure. The cost of medical monitoring in the future is

4    awarded in California courts where the plaintiff shows the need for such monitoring is a

5    reasonably certain consequence of the toxic exposure, and the recommended monitoring is

6    reasonable.[400]

7         **iii.**     **Special Damages**

8         437.     Gjovik now suffers from permanent psychological trauma and damage because of

9    Gjovik's actions. Because of the threats and intimidation, she feared for her life and the

10    conspiracy hampered her ability to continue at the same level, causing her significant economic

11    damage. Gjovik has suffered tremendously because of Apple's efforts.

12         438.     Compensatory damages should include reimbursement for Gjovik's expenses in

13    undertaking her own version of the *Federal Witness Security Program*, in lieu of lack of

14    assistance from the government. Gjovik paid out of pocket for cross-country relocation,

15    purchasing a digital address for her LLC in order to hide her home address wherever possible,

16    efforts to remove damaging content from the internet, cleverly obtaining 24/7 law enforcement

17    outside her New York apartment at all times, and other tactics to stay safe.

18

19         **iv.**     **Injunctive Relief**

20         439.     Gjovik seeks injunctive relief against Apple, including, but not limited to an order

21    that prohibits Apple from coercing their employees to allow Apple to gather and use their

22    personal data in for-profit product development, including requests to participate in medical

23    experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of

24    the Face "Gobbler" application, and other conduct in violation of their rights of privacy. Gjovik

25    also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically

26

27

28    [400] Miranda v. Shell Oil Co., 7 Cal. Rptr. 2d 623, 74 Ed. Law Rep. 144, Prod. Liab. Rep. (CCH) P 13297 (App. 5th Dist. 1992), review granted and opinion superseded, 10 Cal. Rptr. 2d 182, 832 P.2d 898, 76 Ed. Law Rep. 175 (Cal. 1992).

1    obtained data, at the very least of Gjovik's data, including any products developed using

2    Gjovik's personal data, but especially Gobbler data.

3            440.    Apple coerces employees to participate in these activities to extract their data and

4    to exploit in research and development of commercial, for-profit products, in violation of the

5    FTC Act and Cal. Bus. & Prof. Code § 17200. As a result of Defendants' unfair business

6    practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik and her

7    former co-workers. Apple should be required to restore these monies to Gjovik and her former

8    co-workers. In the absence of injunctive equitable relief, Gjovik and her prior coworkers will

9    suffer irreparable injury, which cannot readily be remedied by damage remedies.

COMPLAINT                                                                         SEPT. 7 2023

## IX.   PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgement in her favor on each and every claim for relief set forth above and award its relief, including but not limited to an Order:

    a.    Entering judgement in her favor

    b.    Awarding her monetary relief, including damages sustained in an amount to be determined at trial

    c.    Awarding her compensatory damages

    d.    Awarding her consequential damages

    e.    Ordering her restatement at Apple, or else award her front pay and other applicable relevant consequential damages

    f.    Awarding her treble damages

    g.    Awarding her punitive and exemplary damages

    h.    Awarding her special damages

    i.    Awarding her attorney's fees with a fee multiplier

    j.    Awarding costs of suit incurred herein

    k.    Where applicable, the above with interest

    l.    Declaratory relief stating Gjovik is a Crime Victim under 18 U.S.C. § 3771 & 34 U.S.C. § 20141(e)(2)

    m.    Order her personnel file cleared of negative references

    n.    Order injunctive relief prohibiting invasions of employee privacy

    o.    Order injunctive relief forcing disgorgement of software and other products developed using Gjovik's unlawfully obtained personal data

    p.    Order prohibiting commercial profit by Apple from this 'story' and any revenue or profit to be held for benefit of Plaintiff and disgorged entirely to Plaintiff

    q.    Where there are no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00

    r.    For such other and further relief as the court deems just and proper.

**Plaintiff demands a Jury Trial.** [401]

Respectfully submitted,

By _____

Ashley M. Gjovik
*Pro Se* Complainant

---

[401] Fed. R. Civ. P. 38(b).

1  Dated: September 7 2023

## X.  CERTIFICATION AND CLOSING

448. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

449. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

450. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.[402]

Executed on:                    September 7 2023

Signature of Plaintiff

Printed Name of Plaintiff       Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816

Email: legal@ashleygjovik.com

Phone: (408) 883-4428

---

[402] 28 U.S.C.A. § 1746

COMPLAINT                                           SEPT. 7 2023