1 **Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2 2108 N St. Ste. 4553
Sacramento, CA, 95816
3 (408) 883-4428
legal@ashleygjovik.com

4

5 # UNITED STATES DISTRICT COURT
6 ## NORTHERN DISTRICT OF CALIFORNIA

7 **Case No. 3:23-cv-04597-EMC**

8 **Filed**: September 7 2023

9 **District Judge**: Honorable Edward Chen

10 **SECOND AMENDED COMPLAINT WITH EXHIBITS**

11 **ASHLEY GJOVIK**, *an individual*,

12 Plaintiff,

13 v.

14 **APPLE INC**, *a corporation*,

15 Defendant.

16 **PLAINTIFF'S CLAIMS**

1. **Sarbanes-Oxley Act Whistleblower**,
   18 U.S.C. §1514A
2. **Dodd-Frank Act Whistleblower**,
   15 U.S.C. §78u-6(h)(1)(A)(iii)
3. **Bane Civil Rights Act**,
   Cal. Civ Code § 52.1
4. **Ralph Civil Rights Act**,
   Cal. Civ Code § 51.7
5. **Racketeer Influenced & Corrupt Organizations Act**,
   18 U.S.C. §§ 1962(a), (c), (d)
6. **Ultrahazardous Activities**
7. **Whistleblower Protection Act**,
   Cal. Labor Code § 1102.5
8. **Retaliation for Filing Complaints**,
   Cal. Labor Code § 98.6
9. **Retaliation for Safety Activities**,
   Cal. Labor Code §§ 6310
10. **Termination in Violation of Public Policy**
11. **Private Nuisance; Per Se Nuisance**
    Cal. Civil Code § 3479
12. **Intentional & Negligent Infliction of Emotional Distress**

**DEMAND FOR JURY TRIAL**

1

Deleted: *<object>*

Deleted: CRB

Deleted: Charles R. Breyer

Deleted: FIRST

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

# I.  TABLE OF CONTENTS

I.   TABLE OF CONTENTS ............................................................................................. 2

II.   SUMMARY ............................................................................................................. 6

III.   JURISDICTION ...................................................................................................... 8

IV.   VENUE ................................................................................................................. 10

V.   PARTIES .............................................................................................................. 10

VI.   NOTICE OF PENDENCY & CONFLICT OF LAWS .......................................... 11

VII.   FACTS & GENERAL ALLEGATIONS ................................................................ 13

    A.   BACKGROUND ON KEY LOCATIONS AND PEOPLE .......................................... 13

        i.   Ronald Sugar, Apple Board Member; ex-TRW Executive; ex-Northrop Grumman CEO ...... 14

        ii.   The Triple Superfund Site & TRW Microwave Superfund sites at 825 Stewart Drive, Sunnyvale California .. 17

        iii.   Lisa Jackson, Apple Vice President of Government Affairs and Lobbying; ex-US EPA Administrator ... 32

        iv.   Apple's Secret Semiconductor Fabrication at 3250 Scott Blvd, Santa Clara California .... 34

        v.   Apple's Personal Data Collection and Surveillance of Employees (Panopticon) ........ 35

    B.   ASHLEY'S APPLE SAGA ................................................................................ 39

        i.   Gjovik Joins Apple; Team Bullies & Bribes Her; Gjovik is Retaliated Against for trying to Investigate Batterygate (2015-2016) ..... 39

        ii.   Gjovik is Assigned to Work at an Apple office on the "Triple Superfund Site"; Apple Invades Gjovik's Privacy & Fights to Increase e-Waste (2017) ..... 53

        iii.   Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior: Gjovik Faints (2019-2020) ..... 63

        iv.   Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020) ... 68

        v.   "Skipping the Line": The Vaccine Hoarding Incident (2020) .................................. 79

        vi.   The TRW Microwave Superfund Site Debacle (2021) ........................................ 82

        vii.   Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021) ...... 91

        viii.   Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive Intensify (April 2021-June 2021) ..... 102

        ix.   Apple's Retaliation Against Gjovik Intensifies (May-June 2021) ........................ 108

        x.   Trouble with the US Government Sanctions Against Syria (2020-21) ................. 130

        xi.   US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021) ..... 133

        xii.   Apple Torments Gjovik; US EPA Inspection! Apple Prepares to Fire Gjovik (August 2021) ..... 153

        xiii.   Apple Intimidates & Threatens Gjovik; Tries to Force Her onto a WebEx Meeting (September 3 2021) ..... 204

        xiv.   The Day Apple Fired Gjovik (September 9 2021) .......................................... 214

        xv.   Apple Increases Intimidation and Retaliation (September 2021) ...................... 227

        xvi.   Gjovik Files More Charges; EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021) ..... 249

        xvii.   Gag Orders & Missing "Documents" (February-March 2022) ........................ 274

        xviii.   Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be Sent to Jail if She Defends Herself (March 2022) ... 278

        xix.   Gjovik Discovers the August 19 2021 Inspection (May 2022) ......................... 293

        xx.   Gjovik Discovers the Secret Silicon Fabrication Plant; Apple Commits More Felonies (February 2023) ..... 316

        xxi.   After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023) ..... 330

VIII. LEGAL CLAIMS ................................................................................................. 334

    A.   SECURITIES FRAUD WHISTLEBLOWER RETALIATION ..................................... 337

        i.   Sarbanes-Oxley (SOX) Whistleblower Retaliation (18 U.S.C. § 1514A) ............ 338

        ii.   Dodd Frank Whistleblower Retaliation (15 USC §78u-6(h)(1)(A)(iii)) ............... 341

        iii.   Disclosure Controls and Procedures (SOX and Dodd Frank) .......................... 344

            1)   Employee Risk Disclosures ..................................................................... 347

2

Deleted: COMPLAINT -

Deleted: I. · SUMMARY · 6¶
II. · AMENDMENT · 7¶
III. · JURISDICTION · 8¶
IV. · VENUE · 10¶
V. · PARTIES · 11¶
VI. · NOTICE OF PENDENCY & CONFLICT OF LAWS · 11¶
VII. · FACTS & GENERAL ALLEGATIONS · 13¶
A. · CHRONOLOGICAL FACTS, BY TOPIC · 14¶
i. → Background on the Property and People Involved in This Case (2010-2015) · 14¶
ii. → Gjovik Joins Apple; Team Bullies & Bribes Her (2015-2016) · 27¶
iii. → The Batterygate Fiasco (2016) · 34¶
iv. → Gjovik is Assigned to the "TRW Microwave Superfund site" Apple Office on the Triple Superfund Site (2017) · 37¶
v. → Apple Forces Research & Development Employees to Use Work Devices for Personal Activities; Apple Forces Them to Participate in Medical Studies and Invasive Data Collection (2015-2021+) · 39¶
vi. → Apple Fighting To Increase Their E-Waste & Threatening Families about Superfund Offices (2018) · 43¶
vii. → The Batterygate Fiasco, Part II (2018) · 44¶
viii. → Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior (2019-2020) · 47¶
ix. → Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020) · 49¶
x. → The HVAC/Sub-Slat Vent Fiasco (2020) · 58¶
xi. → "Skipping the Line": The Vaccine Hoarding Incident (2020) · 60¶
xii. → The TRW Microwave Superfund Site Debacle (2021) · 62¶
xiii. → Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021) · 67¶
xiv. → The Non-Consensual Sexism Investigation, Doxing, Gag Orders, & Other Retaliation (April-June 2021) · 73¶
xv. → Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive Intensify (April 2021-June 2021) · 76¶
xvi. → Apple's Retaliation Against Gjovik Intensifies (May-June 2021) · 79¶
xvii. → US EPA and Apple Engage in a Cover-Up; Work Together to Intimidate and Mislead GJOVIK (June-July 2021) · 83¶
xviii. → Gjovik Fights Back (July-August 2021) · 88¶
xix. → Trouble with the US Government Sanctions Against Syria (2020-2021) · 96¶
xx. → US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021) · 98¶
xxi. → Apple Removes Gjovik from her Office and Coworkers in Preparation for the US EPA Inspection; Apple Prepares to Fire Gjovik (August 2021) · 11¶
xxii. → Apple Unleashes a Digital & Physical Harassment Campaign Against Gjovik to Demoralize and Intimidate Her (August 2021) · 119¶
xxiii. → Gjovik Pretends to Investigate Gjovik's Concerns; Gjovik Asks to Come Back & Apple Says No (August 2021) · 120¶
xxiv. → Gjovik Accuses Apple of Violating the RICO Act; Apple Increases the Digital Harassment (August 2021) · 122¶
xxv. → Apple Files Charges/Claims Against Apple with the State and Federal Government (August – September 2021) · 127¶
xxvi. → Apple Intimidates Gjovik and Tries to Force her Onto a WebEx Meeting (September 3 2021) · 132¶
xxvii. → Apple Files More Complaints Against Apple; Complaints of Apple Executives Criminal Conduct; Complaints about Batterygate Intimidation (September 3-9 2021) · 134¶ ... [1]

Deleted: FIRST

Deleted: –

Deleted: ev

Deleted: CRB

Deleted: OCTOBER 25

2)  Environmental & Safety Risk Disclosures .................................................................. 349
3)  Wire Fraud, Mail Fraud, Shareholder Fraud, Communications (SOX and Dodd Frank) ........ 357
iv.  *Conflicts of Interest (SOX & Dodd Frank)* ..................................................................... 359
1)  "Conflict of Interest" Generally .................................................................................. 365
2)  Interested Party Transactions (Cal. Corps. Code § 310) ............................................ 366
3)  Related Party Transaction ........................................................................................... 367
4)  Real Estate Settlement Procedures Act (RESPA) ....................................................... 369
v.  *OFAC Sanctions (Dodd-Frank; 22 US Code § 8792)* ...................................................... 370
vi.  *Skipping the Line & Vaccine Hoarding (Dodd-Frank; US DOJ NCDF)* ........................... 373
**B.  BANE AND RALPH CIVIL RIGHTS ACTS (CAL. CIV. CODE § 52.1, §52.7) ..................... 375**
i.  *Bane Civil Rights Act (Cal. Civ. Code § 52.1)* ................................................................ 376
ii.  *Ralph Civil Rights Act (Cal. Civ. Code §51.7)* ............................................................... 388
iii.  *Acts of Violence and Threats of Violence (Bane § 52.1 & Ralph § 52.7)* ........................ 392
iv.  *Intimidation & Coercion (Bane, § 52.1)* ......................................................................... 398
**C.  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962. ................. 399**
i.  *Standing & Pleading* ......................................................................................................... 400
ii.  *Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)* ............................................... 403
iii.  *Creation, Nature, and Operation of the Enterprise* ........................................................ 404
iv.  *Pattern; Vertical and Horizontal Relatedness of Predicate Acts* ................................... 409
v.  *The Schemes* ...................................................................................................................... 417
vi.  *Predicate Acts/Threats Involving Certain State Offenses* ............................................... 423
1)  Criminal Bribery of Executive Officer (Cal. Penal Code § 67) .................................. 423
1)  Criminal Commercial Bribery (Cal. Penal Code § 641.3) .......................................... 426
2)  Criminal Extortion (California Penal Code § 518) ..................................................... 427
vii.  *Predicate Acts Indictable Under Title 18 US Code* ......................................................... 431
viii.  *Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)* ............................................... 432
1)  Fraud: Environmental and Safety Practices .............................................................. 434
2)  Fraud: Privacy ............................................................................................................. 444
3)  Fraud: Compliance and Ethics .................................................................................... 449
i.  *Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)* .................. 454
1)  Use of Force or the Threat of the Use of Force to Prevent the Production of Evidence .......... 456
2)  Use of Deception or Corruption or Intimidation to Prevent the Production of Evidence ... 461
3)  Destruction or Concealment of Evidence or Attempts to Do So .................................. 467
4)  Witness Harassment to Prevent Production of Evidence ............................................ 469
ii.  *Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513)* .............. 476
1)  Retaliation and Conspiracy to Retaliate Against Witness for Providing Testimony and Evidence ... 480
2)  Retaliation & Conspiracy to Retaliate Against Witness for Reporting Federal Offenses ... 483
iii.  *Predicate Acts Indictable Under Title 11 USC (Securities)* ............................................ 484
1)  Securities Fraud (15 USC § 78) .................................................................................. 484
i.  *Predicate Acts Indictable Under §2332(b)(g)(5)(B)* ...................................................... 485
1)  Relating to Chemical Weapons (18 USC § 229) .......................................................... 486
ii.  *Injury in Fact to Plaintiff due to Racketeering Act* ........................................................ 496
iii.  *Continuity & Threat to Continue* .................................................................................... 500
**D.  TORT: ULTRAHAZARDOUS / ABNORMALLY DANGEROUS ACTIVITIES ....................... 500**
i.  *Silicon Fabrication Next to Homes* ................................................................................. 504
ii.  *Superfund Site Mega-Plumes with Complete Pathways for Vapor Intrusion* .................. 511
**E.  RETALIATION UNDER CALIFORNIA LABOR CODE ....................................................... 516**
i.  *California Whistleblower Protection Act: Cal. Labor Code §1102.5* ............................... 516
1)  §1102.5: Reporting Unlawful Labor/Employment Conduct ......................................... 518
2)  §1102.5: Reporting Environmental & Safety Violations ............................................. 519
3)  §1102.5: Refusal to Participate in Unlawful Conduct ................................................. 524
ii.  *Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6.* ............................. 529
1)  Filing a Labor Complaint: § 98.6 ................................................................................ 531
2)  §98.6: Retaliation re: Wages: Cal. Labor Code §232 ................................................. 531
3)  §98.6: Retaliation re: Work Conditions: Cal. Labor Code §232.5 .............................. 532
4)  §98.6: Lawful Off-Duty Conduct: Cal. Labor Code § 96(k) ....................................... 535
iii.  *Retaliation for Safety Complaints: Cal. Labor Code § 6310* .......................................... 537
1)  § 6310: Employee Exposure to Chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal.Code.Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020] ... 540

3

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

2)   §6310: COVID-19 Safety & Communication [Cal.Labor.C. §§ 6325; 6409.6, 6432] .................................545
3)   §6310: Wildfire Smoke [Cal.C.Reg. Title 8, § 5141.1].......................................546
4)   §6310: Injury Reporting [8 Cal.C.Reg. § 14300].....................................548
5)   §6310: Retaliation for Complaining about e-Waste Violations ................................549
6)   §6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7]..................................549
7)   §6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)].....................................550
8)   §6310:  Federal Environmental Statutes.......................................552
9)   §6310: Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9].....................................553
10)   6310: Unfair Business Practices & False Advertising [Cal. Bus. & Prof. Code §§ 17200, 17500]..............557

F.   WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)...............................**558**
     i.    *Tamney: Reporting Allegations of Criminal Conduct to Apple, Law Enforcement, and District Attorneys*............560
     ii.   *Tamney: Reporting Allegations of Unlawful Acts to State and Federal Agencies; Testifying About Employer*........561
     iii.  *Tamney: Testifying to Agency and/or Legislative Committee*.....................................563
     iv.   *Tamney: Discrimination, Harassment, and Retaliation due to Sex and Disability (Cal. FEHA; California*
     *Constitution, Article I, Section 8; Title VII/EEOC)*...........................................564
     v.    *Tamney: Victim of Crime: Apple's Concealment*.......................................567
     vi.   *Tamney: Invasion of Privacy (Cal. Const. art. 1, § 1)*.......................................568
     vii.  *Tamney: California Privacy Rights Act*.......................................573
     viii. *The International Covenant on Civil and Political Rights (OHCHR): Article VII, Free Consent*...............576
     ix.   *Tamney: FTC Act Biometric Consent Rules; Cal. Biz. & Pro. Code §§ 17200; Biometric Privacy Guide Posts* ...579
     x.    *Tamney: Protests about Misuse of ADA Procedures and Medical Clinics; Protest of Employee Health Data*
     *Collection*.......................................586
     xi.   *Foley/Banko: Breach of Implied Contract; Good Cause Required*.......................................587

G.   NUISANCE .......................................**590**
     i.    *Nuisance (Cal. Civil Code § 3479)*.......................................590
     ii.   *Factories, Hazardous Waste, & Air Pollution*.......................................592
     iii.  *Nuisance Per Se / Absolute Nuisance*.......................................595
     iv.   *Continuing Nuisance*.......................................596
     v.    *Enforcement*.......................................598

H.   INFLICTION OF EMOTIONAL DISTRESS .......................................**598**
     i.    *Retaliation & Interrogation*.......................................599
     ii.   *Burglary, Surveillance, Threats, and Stalking*.......................................603
     iii.  *False Police Reports*.......................................604
     iv.   *Surveillance / Gobbling*.......................................605
     v.    *Exposure & Concealment*.......................................606
     vi.   *Fear of Cancer*.......................................607
     vii.  *Deranged Gag-Order*.......................................608
     viii. *Gjovik's Injuries*.......................................610
     ix.   *Eggshell / Target*.......................................613

I.   ADVERSE/NEGATIVE EVENTS GENERALLY .......................................**614**
     i.    *2021-01 Hostile Work Environment*.......................................615
     ii.   *2021-4: Constructive Discharge*.......................................616
     iii.  *2021-07: Increase in Unfavorable Work / Reassignment / Fake Investigations / Misleading Statements*..........619
     iv.   *2021-08: "Removed from the Workplace and all Workplace Interactions"*.......................................620
     v.    *2021-09-09: Interrogation*.......................................625
     vi.   *2021-09-09 Termination*.......................................628
     vii.  *2021-2023: Digital Threats & Harassment*.......................................628
     viii. *2021-2023: Coworker Harassment; Retaliatory Lawsuits & Police Reports*.......................................629

J.   RETALIATION PRETEXT GENERALLY .......................................**632**
     i.    *Reasonableness & Credibility*.......................................633
     ii.   *Temporal Proximity*.......................................635
     iii.  *There is No Defense of Ignorance*.......................................636
     iv.   *Post Hoc Rationalizations*.......................................638
     v.    *Shifting Explanations*.......................................641
     vi.   *Evidence of Forbidden Animus*.......................................642
     vii.  *Unlawful Corporate Interrogation of Employee Whistleblower (Cotran)*.......................................643
     viii. *"Failure to Participate in Investigation"*.......................................645

4

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

iv.      *Arbitrary and Capricious; Apple's Actions with Gjovik were Contrary to Corporate Policies and Interests* ........ 646
v.       *Apple Stalks and Surveils any Public Commentary about the Company* ............................................. 649
xi.      *Great Performance & No Discipline Prior to Complaints* .................................................... 650
xii.     *Apple's Concealment of What they did to Gjovik.* ......................................................... 650
xiii.    *Farfetched and Illogical Narratives* ...................................................................... 652

IX.    **DEMAND FOR RELIEF** ................................................................................... **658**

   A.    **SPECIAL REMEDIES** .................................................................................... **663**

     i.      *Exemplary/Punitive Damages* ...................................................................... 663
     ii.     *Medical Monitoring* ............................................................................... 665
     iii.    *Special Damages* .................................................................................. 666
     iv.     *Injunctive Relief* .................................................................................. 667
     v.      *Physical Injuries and Sickness* ................................................................... 668
     vi.     *Declaratory Relief & Nominal Damages* ........................................................ 668

X.     **PRAYER FOR RELIEF** ................................................................................. **669**

XI.    **CERTIFICATION AND CLOSING** ....................................................................... **671**

XII.   **APPENDIX I: SUMMARY OF PARTIES /  PLACES** ..................................................... **672**

XIII.  **APPENDIX III: SUMMARY OF FALSE STATEMENTS** ................................................... **1**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

## II.   SUMMARY

1.      This complaint details a complex regulatory-compliance-avoidance scheme conducted by Apple Inc ("Defendant"), through a criminal enterprise, which prior-Apple-employee Ashley Gjovik ("Plaintiff") became caught up in after she complained about toxic waste exposure at her Triple Superfund site Apple office; and in response to her concerns, Apple threatened Gjovik not tell anyone about the pollution, dramatically increased her workload with unfavorable work, refused to let her transfer to a new team, agitated her management against her, demanded she work in an unsafe office, and told her she can 'just quit' if she doesn't like it. Then Gjovik reported Apple to federal agencies and law enforcement, leading to US EPA informing Apple they are investigating Gjovik's concerns and will come on site to inspect, so Apple decided to physically remove Gjovik from the scene of their apparent environmental crimes in order to prevent Gjovik from gathering of evidence. Gjovik was terminated the day before a federal affidavit about Apple's unlawful acts, shortly after complaining about "*witness intimidation*" from a "*Workplace Violence*" interrogator.

2.      Gjovik later realized it was all an effort to cover up intentional regulatory violations under at least three federal environmental statutes, which also implicated racketeering and securities fraud concerns, and to cover up over five years of Apple's poisoning of a large community by lawlessly releasing metric tons of solvent vapors and lethal gases into thousands of home windows and making some of the residents severely ill, including Gjovik.

3.      Gjovik's termination was proceeded by nearly seven years of a hostile work environment and then was followed with over two years of deranged intimidation, public corruption, and threats to coerce Gjovik to drop her charges. Gjovik files this complaint against Apple, Gjovik's prior employer. Gjovik first attempted to pursue claims through agencies, but two years after those claims were filed, there still has not been any final decisions on Gjovik's

Deleted: ,

Deleted: then she

Deleted: and

Deleted: her

Deleted: , and then

Deleted: Gjovik's termination was then followed with over two years of deranged intimidation and threats to coerce Gjovik to drop her charges. ¶
Ashley

Deleted: Ashley

Deleted: ("Plaintiff")

Deleted: Inc ("Defendant"),

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

retaliation complaints other than a finding in Gjovik's favor in her unemployment insurance appeal. The US Department of Labor's statutory deadline to make a decision was February 10 2022 and their case metrics are abysmal, providing Gjovik a 0.00048% chance of success for a decision in her favor for her charge under three statutes.[1] The NLRB's case metrics position Gjovik's NLRB charges against Apple in the top 1% of aged charges overdue for a decision on merit. Thus, due to uncertainty with the government charges, Gjovik files this civil complaint prior to her civil two-year statute of limitations on September 9 2023. Gjovik is "kicking out" her California Department of Labor cases and US Department of Labor SOX whistleblower retaliation charge from the respective agencies and consolidates those matters with her other civil claims here.

    4.    A Racketeer Influenced and Corrupt Organizations ("RICO") Act case is appropriate and required here because Apple's threats and retaliation against Gjovik, and conspiracy to conceal its corrupt and unlawful acts, violated federal criminal statutes for which there is no other appropriate private civil action. Apple's retaliation against Gjovik was partially due to Gjovik reporting Apple to the FBI, U.S. Department of Justice, and Santa Clara County District Attorney's office for multiple apparent criminal acts, and Gjovik's public accusations that Apple is actively violating the RICO Act – all of which Apple knew prior to Apple's abrupt termination of Gjovik by an Apple Global Security team/Worldwide Loyalty enterprise "Workplace Violence" investigator and without explanation.[2] This is quite literally a "*RICO Act Whistleblower*" case.

---

[1] US DOL Case Metrics, FY2017-FY2022: Decision of Merit found, OSH Act 0.8%, SOX 2% env 3%. https://web.archive.org/web/20230316203012/https://www.whistleblowers.org/factsheets_page/statistics/FY2022
[2] Gjovik complained to Apple about Apple violating RICO on August 21 2021, then posted that complaint on social media noting: "*One issue I'm raising to them is literally RICO,*" and then "@"ed the US Depart of Labor. https://twitter.com/ashleygjovik/status/1429174603713191936

Deleted: .

Deleted: -

Deleted: ,

Deleted: US

Deleted: a

Deleted: FIRST

Deleted: –

Deleted: ev

Deleted: CRB

Deleted: OCTOBER 25

5.     In lieu of the US District Attorney's office deciding to pursue a criminal case against Apple, (which hopefully still may occur at some point), Gjovik's only path to seek holistic justice for the extensive harm she suffered due to Apple's egregious conduct is a RICO lawsuit. RICO also enables Gjovik to admit evidence to show that Apple's actions towards Gjovik were part of a larger scheme, and to reflect the Russian-nesting-doll structure of Apple's tortious operations, as part of their systemic statutory civil violations, as part of their egregious ongoing criminal schemes.[3] It is all related.

### III.    JURISDICTION

6.     This court has both Subject Matter and Diversity jurisdiction over these claims. The District Courts of the United States have original and exclusive jurisdiction over two of the claims in this case: whistleblower retaliation under SARBANES OXLEY ACT [18 U.S.C. §1514A] and DODD-FRANK ACT [15 USC §78u-6(h)(1)(A)(iii). This US District Court has federal question jurisdiction over "*all civil actions arising under the Constitution, laws, or treaties of the United States,*" [28 U.S.C. § 1331], which provides original jurisdiction over many issues in this case including claims of federal RICO with Predicate Acts under US Code Title 15 and Title 18;[5] and interpretation of agency complaints under CERCLA [42 U.S.C. § 9601], the RESOURCE CONSERVATION AND RECOVERY ACT ("RCRA") [42 U.S.C. §6901], the CLEAN AIR ACT [42 U.S.C. §7401],[6] complaints related to US CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC") and FOOD AND DRUG ADMINISTRATION ("FDA") programs;[7] legal questions related to

---

[3] It is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants developed or to explain the mutual trust that existed between co-conspirators. See, *United States v Rosa*, 11 F.3d 315, 334 (2nd Cir. 1993); *United States v Williams*, 205 F.3d 33, 33-34 (2d Cir. 2000).

[5] 18 U.S.C. § 1965; *Tafflin v. Levitt*, 493 U.S. 455 (1990); *Butchers' Union Local 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir. 1986).

[6] Gjovik's U.S. EPA CERCLA Complaint: August 29, 2021; US EPA RCRA/CAA Complaint: June 12 2023, June 20 2023 Investigation, August ~17 2023 Inspection

[7] Gjovik's U.S. DOJ National Center for Disease Fraud (NCDF) Complaint: Sept 3, 2021

**Deleted:** <#>AMENDMENT¶
<#>Plaintiff filed the original complaint for this case on September 7 2023. ¶
<#>Defendant received direct notice of the filing on September 15 2021 and personal service on September 21 2023. Defendant did not respond to Plaintiff until October 5 2023, and at which time Defendant asked that Defendant be allowed to submit their answer later, after Plaintiff files her first Amended Complaint. ¶
<#>Plaintiff did not plan to file an Amended Complaint prior to the First Answer. After some negotiation, a stipulation was filed on October 9 2023 per Defendant's request, and approved by Judge Beeler on October 10 2023. Plaintiff then only had 16 days to draft and finalize her First Amended Complaint. This is the First Amended Complaint, filed October 25 2023, prior to the stipulated October 26 2023 deadline for the filing. ¶
<#>Defendant has been on notice about the majority of issues included in this complaint for over two years. The counsel for Defendant here ("Orrick") has been assigned to this case for nearly two years and has already viewed a significant amount of the evidence through the US Department of Labor process. In addition to Orrick, Apple has hired at least three additional law firms to work on this case, including at least fourteen external counsel lawyers, half of which are Partners.⁴ Plaintiff is and has been *pro se* for all government charges and civil litigation on this matter.¶
<#>Per stipulation, Defendant now has until November 16 2023 to file a response. Plaintiff will be reluctant to consent to further extensions, without compelling justification, considering the foregoing.¶

**Deleted:** FIRST

**Deleted:** .

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

US FEDERAL TRADE COMMISSION ("FTC") rules;[8] and issues related to US government sanctions on foreign countries.[9]

7.       The District Courts of the United States also have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. At the time the complaint was filed, Plaintiff was domiciled in New York, and is now domiciled in Massachusetts. Defendant is a corporation headquartered in California.

8.       Despite the inconvenience for the Plaintiff (who will request remote/video hearings, please), this case is proper in California instead of New York or Massachusetts because it requires analysis of California Labor and Penal Codes, California common law related to employee terminations in violation of public policy (*Tamney* claims), CALIFORNIA CONST. ART. 1 and California employee's constitutional right to privacy, the Santa Clara County "Toxic Gas" ordinances, and other state laws.

9.       The federal courts have an independent basis for federal jurisdiction on this case; thus, they may also exercise supplemental jurisdiction because the claims arise from the same case and controversy, share a common nucleus of operative fact, and would ordinarily be expected to be tried in one judicial proceeding.[10] The state claims here require analysis of many of the same facts and legal questions as the federal claims, including: the retaliatory termination, other whistleblower retaliation, filing of complaints with the employer and with the government, environmental and health/safety concerns, threats and intimidation, hazardous materials and hazardous waste practices, chemical exposure, and obstruction of justice.[11] If the state causes of

---

[8] Gjovik's FTC Report #154835129;
[9] Gjovik's U.S. DOJ FBI Complaint: Sept 3, 2021
[10] 28 U.S.C. § 1367; *Osborn v. Haley*, 549 U.S. 225, 245 (2007).
[11] California Department of Labor: *Ashley Gjovik v. Apple Inc.*, (RCI-CM-842830)

9

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1  action in this complaint were tried separately, there would be duplicative trials concurrently

2  holding hearings on many of the same facts and legal questions.

### IV. VENUE

10.     Venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district and a substantial amount of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California.

11.     **Divisional Assignment**: Plaintiff files this complaint to the San Francisco Division, however either the San Jose or San Francisco Division are proper as a substantial part of the events and omissions giving rise to the claim both occurred in Santa Clara County (Santa Clara city, Cupertino, and Sunnyvale) and in San Francisco County (San Francisco city). Apple conducts day-to-day commercial activities within both counties. Apple has engaged in substantial, continuous, and systemic activities within both counties, providing for a fair and reasonable basis for the exercise of personal jurisdiction over Apple by this Court in either division. [Civil L.R. 3-5(b)].

### V. PARTIES

12.     Ashley Gjovik (pronounced "JOE-vik"), Plaintiff, was an employee of Apple Inc and covered person under applicable statutes in this complaint. Gjovik is a natural person holding a Juris Doctor and appearing Pro Se. As of September 7 2022, Gjovik resided and was domiciled in Albany New York. Gjovik lived in Santa Clara from February 2020 through October 2020, and then again August 2021 through August 2022. Gjovik lived and worked in San Francisco County from October 2020 through August 2021. Gjovik established a consulting LLC in California in 2022 which she continues to manage with a virtual office in Sacramento. Gjovik has over twenty years of professional experience and has worked for universities/schools and in the private sector for well-known companies, including working nearly a decade at Nike

Deleted: Plaintiff

Deleted: resides

Deleted: ,.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

and Apple. Gjovik has a Project Management Professional certification, Certificate in Public International law with honors, and successfully passed the California Moral Character exam.

13. Apple Inc, Defendant, is a business engaged in and affecting interstate commerce, and a covered entity under the statutes at issue here. Apple is a corporation headquartered in Cupertino California. Apple is engaged in interstate and foreign commerce; and has offices, retail stores, call centers, data centers, and other facilities in numerous US states and foreign countries. Apple's business consists of "*design, manufacture, and marketing*" of products (phones, computers, wearables, home technology, accessories) and sales of "*a variety of related services*" (advertising, AppleCare, cloud services, digital content, payment services).[12] Apple says, it's "*customers are primarily in the consumer, small and mid-sized business, education, enterprise and government markets.*"[13] In 2023, Apple claimed net sales of $383.3 billion ($162.6 billion in the United States) and net income of $97.0 billion.[14]

14. At all pertinent times Apple was the operator in control of the facilities at 825 Stewart Drive in Sunnyvale California and 3250 Scott Boulevard in Santa Clara California.

## VI.   NOTICE OF PENDENCY & CONFLICT OF LAWS

15. Gjovik's SOX whistleblower retaliation claim was filed August 29 2021, and the case was docketed with US Department of Labor on December 12 2021.[15] SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. The case has been

---

[12] Apple Inc, 2023 10K, pg1-2, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[13] Id.
[14] Id.
[15] *Ashley Gjovik v Apple Inc*, Apple Inc./Gjovik/9-3290-22-051; OSHA 11(c) Procedures: 29 CFR Part 1977, EPA Procedures: 29 CFR Part 24, SOX Procedures: 29 CFR Part 1980

pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims.

16. Gjovik was forced to leave her CERCLA ("Superfund") and OSH Act whistleblower retaliation cases with US Department of Labor as the claim's exclusive jurisdiction is with US Department of Labor and there is no way to remove the two charges to US district courts for a de novo trial. The status of those charges was described in first amended complaint's RICO Predicate Act "*Criminal Extortion*," and the agencies additional misconduct since the prior filing is reflected in the facts and allegations in this complaint. A request for consideration of OSHA's OSH Act determination (a discretionary and non-binding agency determination) will be submitted shortly with US Department of Labor OSHA, and Gjovik plans to file her request for a de novo hearing within the US Department of Labor agency adjudication process on her CERCLA retaliation charge with the 30-day period provided by OSHA on December 8 2023.

17. Gjovik filed retaliation and labor code violation charges to the California Department of Labor on August 29 2021, and the initial interview was conducted in October 2021. California Department of Labor has not started the investigation of Gjovik's California case and the statutes allow an option for the complainant to take the matter to a court instead waiting on an agency decision. This lawsuit will replace the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830.

18. NLRB charges cannot be removed to court as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. Gjovik is a witness for the NLRB and some of the 18 US Code §§ 1512 and 1513 Predicate Acts in this complaint were part of a scheme to keep Gjovik from testifying or providing evidence, and to coerce her to withdraw and drop her

**Deleted:** OSHA

**Deleted:** is described in RICO Predicate Act "*Criminal Extortion*."

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

NLRB charges. This civil case will hopefully relieve the witness intimidation and retaliation Gjovik has suffered from Apple.

19.   None of the charges in this complaint are preempted by the NLRA. The NLRA cannot preclude a federal RICO claim where a RICO Predicate Act arises from conduct that also violates that federal statute, as then that conduct is also a federal and/or state crime.[16]

20.   Similarly, the state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.[17] The 9th Circuit found, *"there is no clear and manifest intent on the part of Congress to pre-empt all state tort laws that traditionally have been available to those persons who … allege outrageous conduct at the hands of an employer. That would require us to conclude that Congress has displaced not only state tort law … but also state criminal law, to the extent that such criminal law is applied to retaliatory conduct."*[18]

## VII.   FACTS & GENERAL ALLEGATIONS

A.   BACKGROUND ON KEY LOCATIONS AND PEOPLE.

21.   Prior to Gjovik being terminated by Apple – Gjovik alleged to Apple, the government, and the public/press – that she believed there was a large conspiracy underway (including Apple, certain people at Apple, and external parties) working together to cover-up violations of environmental, labor, securities, and anti-corruption laws – as well as violations of state and federal criminal laws, including fraud and various types of obstruction of justice. This was an extreme allegation, but at the time Gjovik felt confident there was enough circumstantial evidence to support the claim and she requested an investigation.

---

[16] *Torres v. Vitale*, 954 F.3d 866, 874-75 (6th Cir. 2020).
[17] *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).
[18] *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1154-55 (9th Cir. 2000); *Torres v. Vitale*, 954 F.3d 866, 871 (6th Cir. 2020).

**Deleted:** another

**Deleted:** <#>The claims and allegations against Apple in this case implicate several themes of issues for which there are relevant indirect facts required to provide proper framing related to retaliation pretext, RICO, and other contextual legal arguments. Most of these facts are already substantiated by public evidence, or evidence obtained through FOIA and Public Records Act Requests – however other indirect facts may require limited discovery. Certain facts not directly related to Gjovik are provided to show Apple's patterns of behavior on topics that are directly related to Gjovik's case, including:¶
   <#>Apple's offices on toxic waste clean-up sites (Superfunds, Brownfields, etc.); including government oversight and property owners¶
   <#>Apple's policies and practices related to hazardous material management; and hazardous waste management, storage, treatment, transport, and disposal¶
   <#>Apple's (including Apple executives and Board members) involvement in conduct which could be considered fraudulent, misleading, threatening, and obstructive; including "astroturfing," false public statements, and manipulation of the press and public discourse¶
   <#>Criminal investigations and charges against Apple and Apple executives¶
   <#>Apple's history of environmental, health/safety, and labor violations; evidence of Apple's patterns/practice of responding to environmental, health/safety, and labor concerns; evidence of Apple's responses to US government inquiries and investigations ¶
¶
<#>CHRONOLOGICAL FACTS; BY TOPIC¶

**Deleted:** THE PROPERTY

**Deleted:** INVOLVED IN THIS CASE (2010-2015)

**Deleted:** <#>In April of 2010, Apple obtained a search warrant to raid the home of a tech reporter, seizing the reporter's computers and servers. There was no legal basis for the search and the warrant was withdrawn.19 It was also revealed that Apple sat on a steering committee that oversaw and directed the "police task force" (the "Rapid Enforcement Allied Computer Team") that raided the reporter's home on behalf of Apple.20 ¶
   <#>By May 2010, the search was now openly referred to as a home break-in, there was "outrage" from "media watchdogs", and press and public complained that task force was acting as "Apple's secret police" and as "Apple's private police force."21 The search was believed by many to violate California's Constitutional Reporter Shield law.22 ¶
   <#>In 2011, Apple's Worldwide Loyalty team arranged a raid of a man's home without a warrant and based on their own corporate tracking of iPhone GPS data.23 Two Apple Global Security/Worldwide Loyalty employees obtained the presence of four plainclothes San Francisco police officers in order to search the man's home. The officers identified themselves as police while the Apple employees said nothing. The man assumed the Apple employees were also police officers and let them into his house. 24 The officers attempted to keep the search out of official records, leading the police spokesperson to initially assume it was a case of impersonation of officers by six individuals, not just two.25¶
   <#>If the Apple employees who searched the man's home were not with the San Francisco police, that is a crime. And if they were with the SFPD, they had an obligation to report the information to the department, which did not happen.26 ¶ … [2]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

22.     It took two years of Gjovik's FOIA / Public Records Requests Act requests and investigative research, but, as detailed through this complaint, Gjovik eventually obtained evidence to confirm her allegations were substantiated and that the actual conduct was far worse then she expected. Meanwhile, Apple has persistently insisted it did nothing wrong, belligerently claimed there were never any safety issues, and instead Gjovik's concerns were 'unreasonable'. Apple has also attempted to divert attention away from the larger issues and instead frame this dispute as a 'simple employment matter.' Because of this attempted misdirection, and because the credibility of the employee and employer are both often key factors in whistleblower retaliation and witness intimidation claims, the historical background to support Gjovik's allegations is detailed here, prior to reviewing the chronological timeline of events for the case.

i.       **Ronald Sugar, Apple Board Member; ex-TRW Executive; ex-Northrop Grumman CEO**

23.     Gjovik's SOX, Dodd-Frank Act, RICO, and other claims include allegations about Ronald Sugar and his relationship to Apple, Chevron, TRW Microwave, and Northrop Grumman.

24.     In 2010, Ronald Sugar joined the Apple Board of Directors as a Board member and chair of Apple's Audit and Finance committee, after retiring from his role as CEO of Northrop Grumman Corporation the same year. Sugar was also the lead independent director for the Chevron Board from 2005.[31] Apple's website says under the header of "*Who leads environmental efforts at Apple?"* that, "*Apple's Board of Directors oversees the CEO and other senior management in the competent and ethical operation of Apple on a day-to-day basis and ensures that the long-term interests of shareholders are being served. Our integrated approach*

---

[31] Apple, "*Ronald D. Sugar Joins Apple's Board of Directors"*. November 17, 2010, https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/

Deleted: was an

Deleted: and Audit

Deleted: joining in 2010

Deleted: .

Deleted: . In

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*means that decisions about environmental and social issues are reviewed at the highest levels of*

*the company.*"[32]

25.    By 2014, Robert Denham was also a Chevron Board Member, and an Oaktree

Capital Board member, (an investment fund who would buy and renovate Gjovik's Superfund

office), and a Board member of the James Irvine Foundation (and The Irvine Company would

rent to Gjovik when she was exposed to Apple's silicon fabrication exhaust, and also developed

homes on the groundwater plume flowing from Apple office on the TRW Microwave Superfund

site).[34] In 2015, a federated union, ITF, submitted a shareholder letter to Chevron, complaining

that Sugar and Denham, specifically, have problematic conflicts of interest, are not making

required disclosures, and are engaging in apparent self-dealing.[35]

26.    Prior to joining Northrop Grumman, Sugar was a long-time executive of TRW.

Ronald Sugar joined TRW in 1981 working on "microwave technology."[36] Sugar became President

and COO of "TRW Aerospace and Information Systems" in 1999 and CEO of Northrop Grumman

Corporation in 2003 after the company acquired TRW.[37] Sugar worked for twelve years at TRW

Microwave while the division had a headquarters at 825 Stewart Drive in Sunnyvale California (with

Sugar's work overlapping from 1981 through 1993). Microwave manufacturing and fabrication

activities had begun at the 825 Stewart Drive site in 1968 and continued until 1993; and hazardous

---

[32] Apple, *Environment – Answers*, (last accessed 12/17/23),
https://www.apple.com/environment/answers/
[34] Chevron Schedule 14A, Proxy, https://chevroncorp.gcs-web.com/node/19621/html
[35] ITF, Please WITHHOLD Support from Nominating Committee Chair Robert Denham and Audit
Committee Chair Ronald Sugar at Chevron's Annual Meeting on May 26 2015,
https://www.itfglobal.org/sites/default/files/resources-
files/15en0420smcsentchevronshareholderswithholdnominations.pdf
[36] Little Sis, *Robert Denham*, https://littlesis.org/person/1050-Robert_E_Denham
[37] *Industry Week Manufacturing Hall of Fame 2013 Inductee: Ronald D. Sugar*, Nov 5 2013,
https://www.industryweek.com/iw-manufacturing-hall-of-fame/article/21961725/iw-manufacturing-hall-
of-fame-2013-inductee-ronald-d-sugar

Deleted: ,

Deleted: .[33]

Deleted: <#>825 Stewart Drive is also known as the "TRW Microwave Superfund site" (EPA ID CAD009159088), which is one of the three sites making-up the "Triple Site" (EPA ID CAN000900265). The Responsible Party for the TRW Microwave site is Northrop Grumman Corporation, which acquired TRW decades ago. ¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

waste environmental remediation activities began at 825 Stewart Drive in 1985.[38] There were also radioactive substances onsite starting in at least 1983, with NRC records showing orders/deliveries of Promethium-147, Thallium-204, Cadmium-109, and Strontium-90.[39]

27.    It's improbable that Ronald Sugar was not personally involved in TRW Microwaves use and disposal of industrial hazardous materials at Gjovik's office, or not personally involved in the environmental clean-up of spills/dumping of those chemicals at Gjovik's office.

28.    While Sugar was still CEO of Northrop Grumman, in 2009 the company settled a whistleblower's fraud lawsuit over TRW dealings that resulted in a settlement of $325 million.[40] TRW and Northrop Grumman have faced, and settled/lost, many fraud lawsuits and government charges.[41] TRW sometimes responded in an adversarial manner, including filing a "meritless" countersuit against a whistleblower prior to eventually settling for $111 million in 2003,[42] – and settled another lawsuit for $80 million that same year.[43] (Ronald Sugar was the CEO of Northrop Grumman from 2003-2010).

29.    Ronald Sugar has also been the lead Board member for the Chevron Board of Directors for the entirety of Chevron's retaliation campaign against the human rights attorney Steven Donziger, after Donziger won a class-action lawsuit in 2011, against Chevron, over

---

[38] California Regional Water Quality Control Board San Francisco Bay Region, *Five-Year Review Former TRW Microwave Site 825 Stewart Drive*, https://semspub.epa.gov/work/HQ/178958.pdf
[39] State of California, Department of Health Services, Temporary Registration GL Devices, Letter from R. Kimball EH&S Coordinator at TRW Microwave to California DIR Radiation Health Unit (Aug 24 1983), https://adamswebsearch2.nrc.gov/webSearch2/main.jsp?AccessionNumber=ML20202A974
[40] New York Times, *Military Contractor Agrees to Pay $325 Million to Settle Whistle-Blower Lawsuit*, April 3 2009, https://www.nytimes.com/2009/04/03/business/03whistle.html
[41] New York Times, *TRW Lawsuit*, June 21 1986, https://www.nytimes.com/1986/06/21/business/trw-lawsuit.html -- ("*The military contractor TRW Inc., the subject of a $1.2 billion price-fixing lawsuit, improperly charged the Defense Department for work... company audits show.*")
[42] U.S. ex.rel. Richard D. Bagley v. TRW Inc., No. CV-95-4153-AHM (AKWx).
[43] US DOJ, Northrop Grumman To Pay $80 Million For Overcharging The U.S. And Selling Defective Military Equipment To The Navy, Aug 20 2003.

SECOND AMENDED COMPLAINT, 3:23-CV-04597-EMC                      DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Chevron/Texaco spilling over 16,000,000,000 gallons of crude oil in Ecuador.[44] Chevron recently admitted to having spent over $1 Billion on litigation against the human rights lawyer.[45] Chevron even orchestrated criminal charges against the human rights lawyer resulting in his incarceration, as Apple also attempted to do to Gjovik in 2022-2023, though Apple's attempts have failed thus far.

30.     In January 2017, Ronald Sugar, Apple Board Member was interviewed about what his biggest challenges were as CEO of Northrop Grumman Corporation. Sugar said he worried about: whistleblowers. Sugar said he worried about "*someone talking to the Wall Street Journal… Someone filing whistleblower suits about something they imagine might've happening in the organization. You worry about that.*"[46]

    **ii.     The Triple Superfund Site & TRW Microwave Superfund sites at 825 Stewart Drive, Sunnyvale California**

31.     Gjovik's Apple office from 2017 until her termination was located at 825 Stewart Drive in Sunnyvale California, also known as the "TRW Microwave" Superfund site, and part of the US EPA "Triple Site."

---

[44] Erin Brockovich, *This lawyer should be world-famous for his battle with Chevron – but he's in jail*, The Guardian, Feb. 8 2022, https://www.theguardian.com/commentisfree/2022/feb/08/chevron-amazon-ecuador-steven-donziger-erin-brockovich -- ("*a US attorney who agreed to represent thousands of Ecuadorian villagers in a [environmental] lawsuit against [Chevron/Texaco] has lost his law license, income, spent hundreds of days under house arrest in New York, and in 2021 was sentenced to six months in prison…[prior to the retaliation, a court found against Chevron/Texaco and] ordered it to pay $18bn in damages – the largest judgment ever awarded in an environmental lawsuit.*"); Donziger v US, 598 U. S. ____ (2023), (Justice Gorsuch and Justice Kavanaugh dissenting: "*Our Constitution does not tolerate what happened here.*")
[45] Sarah Randazzo, *Litigation Without End: Chevron Battles On in 28-Year-old Ecuador Lawsuit*, Wall Street Journal, https://www.wsj.com/articles/litigation-without-end-chevron-battles-on-in-28-year-old-ecuador-lawsuit-11619975500
[46] UCLA School of Engineering, via YouTube, The Ronald and Valerie Sugar Distinguished Speaker Series Featuring Ronald Sugar Live Stream, quote at 47:18-49:08

| | |
|---|---|
| **Deleted:** | FIRST |
| **Deleted:** | -- |
| **Deleted:** | cv |
| **Deleted:** | CRB |
| **Deleted:** | OCTOBER 25 |

32. The *"Triple Site"* is the collective name for three adjacent [Superfund] sites in Sunnyvale that have jointly contributed to a groundwater solvent plume.[47] The US EPA webpage for Triple Site states that, "*a groundwater plume composed of volatile organic compounds (VOCs), including TCE, extends from these [three Superfund] sites more than a mile.*[48] In addition, the *"Offsite Operable Unit,"* is roughly a one-hundred acre area where shallow groundwater contamination from TRW Microwave, and the other two sites, has migrated to, and which *includes four schools and over 1,000 residences.*"[49]

33. One of the three sites is the "TRW Microwave" Superfund site (EPA ID CAD009159088) which is a former industrial semiconductor fabrication and manufacturing facility at 825 Stewart Drive.[50] The primary contaminants in the TRW Microwave groundwater contamination plume are chlorinated volatile organic compounds including trichloroethene (TCE), and its daughter products cis-1,2-dichloroethene and vinyl chloride.[51] There are 10 Contaminants of Concern in total.

34. The first groundwater investigation at 825 Stewart Drive occurred in 1983 in response to state EPA inquiries and a state clean up order was issued in 1984 (Order No. 91-103).[52] The TRW Microwave site at 825 Stewart Drive was proposed for the National Priorities List on June 24 1988, officially included on February 21 1990, and a Record of Decision was

---

[47] US EPA, *Triple Site Site Profile - Background,* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0900265#bkground
[48] US EPA, Triple Site Site Profile – Background, supra.
[49] US EPA, Triple Site Site Profile – Background, supra; Offsite Operable Unit, Triple Site, Administrative Settlement Agreement and Order on Consent, CERCLA Docket Number 2019-05
[50] AECOM for Northrop Grumman, Development Of The Environmental Sequence Stratigraphy (ESS) Conceptual Site Model For Groundwater At The Former TRW Microwave Site, Sunnyvale, California, pg3, (Deeember 16 2020), https://semspub.epa.gov/work/09/100027767.pdf
[51] Id at 3.
[52] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf

issued in September 11 1991.[53] In 2002, TRW merged with Northrop Grumman and changed its name to Northrop Grumman Space & Mission Systems Corp.[54]  The building at 825 Stewart Drive was unoccupied from January 2001 through October 2015, when Apple moved Gjovik's team into the building.[55]

35.     The site has numerous hydro-stratigraphic units within four plume zones.[56] The shallowest zone (Zone A) is only 2.6 feet to 9.4 feet below the ground surface and as of 2021, TCE concentrations were up to 95 µg/L and vinyl chloride up to 27 µg/L.[57]  The second shallowed zone (Zone B1) is 22 feet to 46 feet below ground surface, and as of 2021, had concentrations of TCE up to 1,400 µg/L and vinyl chloride up to 51 µg/L.[58] Northrop Grumman conducted an initial vapor intrusion evaluation at the TRW Microwave site in 2004, which indicated that TCE concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels.[59]

36.     In 2014, the US EPA and US Army Corp of Engineers warned that "*the risk [at 825 Stewart Drive] due to vapor intrusion is controlled as long as the building remains unoccupied, and the exposure pathway remains incomplete. However, in order for the remedy to be protective in the long-term, the ROD will need to be amended to reflect a revised final soil and groundwater remedy for the Site since the remedy selected in the [Record of Decision] is no longer operating.*"[60] The US

---

[53] AECOM for Northrop Grumman, Conceptual Site Model Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, California, pg2, US EPA, (April 19 2016).
[54] Id at 3.
[55] Id at 3.
[56] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" slide 16, (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf
[57] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page 3-4, (September 18 2019).
[58] Id.
[59] Id at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA, March 17 2022, https://semspub.epa.gov/work/09/100027769.pdf
[60] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page15, (September 18 2019).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

EPA determined in 2015 that the conditions at the Triple Site may constitute an imminent and substantial endangerment to the public health or welfare.[61]

37.     In 2013 and 2014, the city of Sunnyvale received nuisance complaints about 825 Stewart Drive, including complaints about graffiti on the abandoned building (i.e., "PCP", "I LIKE TO F[***] THE HOMELESS", etc.) as well as people using the building's bike locker *"as an outhouse."* (#2013-0228).[62] The city then issued additional warnings in 2014 citing Nuisance under Sunnyvale Municipal Code 9.26.030 (#2014-1970) for overgrown foliage.[63]

38.     In May 2014, Oaktree Capital and Hines purchased 825 Stewart Drive (with the 14-year+ vacant, abandoned, TCE-filled office building), for $12 Million.[64] (At this time Oaktree Capital's Robert Denham was on the Chevron board with Ronald Sugar, who had left Northrup Grumman only four years prior but still remained an "Advisor" for the arms dealer).[65] Under information and belief, Ronald Sugar brokered the sale of 825 Stewart Drive to Oaktree Capital and the lease of 825 Stewart Drive to Apple, exploiting his position on the Chevron and Apple Boards, and in the interests of Northrup Grumman Corporation, and for his personal interest. Sugar has allegiance to Northrup Grumman through his longtime position as chief executive, and through large active stock holdings, but Sugar also has personal ties to the site to this location through TRW, and it's entirely possible Sugar was involved with matters related to the pollution, clean-up, and legal matters related to 825 Stewart Drive while he worked at TRW

---

[61] *In The Matter of: Offsite Operable Unit, Triple Site, Sunnyvale, California,* CERCLA Docket No 2019-05, Administrative Settlement Agreement & Order on Consent for removal Site Evaluation and Removal Action, Page 7 (2019).
[62] City of Sunnyvale, Public Record: Complaint 2013-0228 (four photos attached)
[63] Letter from Sunnyvale Department of Public Safety, Case #2014-1970
[64] Nathan Donato-Weinstein, *Hines, Oaktree scoop up Sunnyvale office building for $12M,* Silicon Valley Business Journal, May 19 20214, https://www.bizjournals.com/sanjose/news/2014/05/19/hines-oaktree-scoop-up-sunnyvale-office-building.html
[65] Felix Salmon, "Uber Is Not Serious About Changing Its Toxic Culture," Slate, August 2 2018 – ("Ronald Sugar, a 70-year-old white man who made his fortune as an arms dealer… the former CEO of Northrop Grumman.. a position that requires… the ability to be OK with making billions of dollars even as your products maim and kill hundreds of thousands of people around the world.")

Deleted: Board and in the interests of Northrop Grumman Corporationand Apple

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

1  Microwave. Sugar may want to limit Northrop Grumman's financial and public relations

2  exposure to the dangers at the site, and/or his own interests, by having "friendly" owners and

3  tenants.

4        39.    In May 2015, Northrop Grumman completed the installation of a "sub-slab"

5  ventilation system ("SSV") inside the building. (The "slab" refers to the concrete foundation,

6  and "sub-slab" is under the "slab.") Northrop Grumman installed a ventilation system

7  (horizontal "collection pipes") beneath the slab foundation, which allow vapors to move

8  laterally, and connected the collection pipes to vertical vent risers that vent to the roof, in order

9  to provide a preferred pathway for hazardous waste vapors "that allow sub-slab contaminant

10  vapors to discharge to the atmosphere."[67] The risers vent to the rooftop via wind-powered

11  turbines at the vent termination point.[68]  This type of mitigation system is referred to as

12  "passive" (compared to "active" and "depressurization") and is not as effective as other options

13  and not ideal when there's known vapor intrusion occurring.[69] Northrop Grumman left multiple

14  "sub-slab monitoring ports" inside, which allowed access to the "collection pipes" from above

15  ground for diagnostic testing and sample collection.[70] Northrop Grumman then hired a

16  professional engineer to inspect and certify the sealing of the floor cracks and conduits at 825

17  Stewart Drive. (the slab is the primary mitigation to prevent vapor intrusion in this building).

18        40.    In the second half of 2015, Apple also then renovated the building. Apple's

19  installation of the HVAC system for the building in late 2015 included Apple sawing the sub-

20  slab vent stacks, on the main building roof, down from three feet to one foot, and then installing

21  the HVAC intake in close proximity to the sub-slab vapor exhaust vents, and low to the ground

---

[67] San Francisco Bay Regional Water Board, Vapor Intrusion Mitigation Guidance, Pg 10 (June 2022).
[68] San Francisco Bay Regional Water Board, Vapor Intrusion Mitigation Guidance, Pg 21 (June 2022).
[69] ITRC, *Vapor Intrusion Pathway: A Practical Guideline*, Pg 48, (2007), https://semspub.epa.gov/work/01/533755.pdf
[70] San Francisco Bay Regional Water Board, Vapor Intrusion Mitigation Guidance, Pg 10 (June 2022).

**Deleted:** <#>The US EPA determined in 2015 that the conditions at the Triple Site may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility. The data demonstrated a pathway for vapor intrusion is occurring at the Site.⁶⁶¶

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

where the vapors would be pooling on the roof, nearly guaranteeing re-entrainment of the hazardous waste vapors into the HVAC system. Apple also installed tall 'fencing' around all of this, which prevented the wind from moving the pooling air away from the HVAC intake vents, and preventing the wind from spinning the vent turbines. Apple's activities introduced a significant risk for re-entrainment of the effluent vapors into the building.

41.     The industry standard for stack design is to ensure the stacks place the vent at least 10 feet above the rooftop.[71] The National Fire Protection Association specifies minimum stack height of 10 ft to protect rooftop workers. For laboratory exhaust, the American Industrial Hygiene Association recommends minimum stack height of 10 feet above adjacent roof line, and stack height extending one stack diameter above any screen.[72] (Compare to Apple's 1 foot).

---

[71] OSHA Technical Manual (OTM), Section III: Chapter 3, *Ventilation Investigation* ("Should be 10 ft higher than any roof line or air intake located within 50 ft of the stack (Figure III:3-8). For example, a stack placed 30 ft away from an air intake should be at least 10 ft higher than the center of the intake.") https://www.osha.gov/otm/section-3-health-hazards/chapter-3
[72] ANSI/AIHA Z9.5 ("Be in a vertical up direction at a minimum of 10 feet above the adjacent roof line as so located with respect to opening and air intakes of the laboratory or adjacent buildings to avoid re-entry.")

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



**Exhibit**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |



**Fig. 1   Flow Recirculation Regions and Exhaust Parameters**
(Wilson 1982)

*Exhibit: Exhaust Diagram from ASHRAE Handbook[73]*

42.    Apple penetrated the slab (concrete floor) of the building at 825 Stewart Drive in late 2015. US EPA records note that *"tenant improvements performed in late 2015 ... included... penetration and subsequent re-sealing of the concrete slab for installation of additional piping and utilities."*[74] Apple claims only AECOM inspected the floor prior to penetration and after sealing.[75] Under information and belief, Apple never engaged an independent professional engineer for inspection and certification as Northrop Grumman did in May 2015.

43.    In May 2015, vapor intrusion testing at 825 Stewart Drive showed indoor air pollution of Trichloroethylene (TCE), 1,2-Dichloroethene (1,2-DCE), Toluene, Chloroform, Methylene Chloride, and Ethylbenzene. The testing also showed outdoor air contamination on

---

[73] 2019 ASHRAE Handbook—HVAC Applications, BUILDING AIR INTAKE AND EXHAUST DESIGN, pg 46.2, https://www.ashrae.org/file%20library/technical%20resources/ashrae%20handbook/i-p_a19_ch46.pdf
[74] AECOM for Apple, *Vapor Intrusion Evaluation Report, Former TRW Microwave Site, 825 Stewart Drive Sunnyvale, California,* US EPA SEMS-RM DOCID # 1158560 (February 2016), https://semspub.epa.gov/work/09/1158560.pdf
[75] Id.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

the roof, possibly coming through the sub-slab vents. The rooftop air pollution included TCE, 1,2-DCE, Chloroform, and Xylenes.[76]

44.    Appl e (not Northrop Grumman) managed, signed off on, and submitted the report to the US EPA for the December 2015 vapor intrusion testing at 825 Stewart Drive. The vapor intrusion testing report cover page says "*prepared for Apple Inc.*" by AECOM.[77] Apple's December 2015 vapor intrusion testing results showed an increase in sub-slab and indoor air pollution compared to the May 2015 results.[78] For instance, while the highest indoor air TCE reading in May 2015 was 0.58 µg/m³, the highest indoor air TCE reading in December 2015 was 1.2 µg/m³ (double). Another example, in the May 2015 test results, no indoor air results exceeded US EPA or California DTSC HERO limits; the December 2015 results, however, included results for Ethylbenzene which exceeded both US EPA and DTSC HERO limits.[79] Even Apple's report noted a "noticeable increase" of TCE, PCE, and chloroform in the sub-slat venting system.[80]

45.    Apple submitted the test result report to US EPA in February 2016.  The report noted a number of issues that occurred during testing including inability to turn the HVAC off in one area of the building, unexpected construction work during the testing, moving an indoor air testing location to a different area not in a "secure" lockdown (implying Apple already had employees working in the building), and testing unplanned sub-slab monitoring ports (which are directly connected to the vapor intrusion ventilation system) because the two indoor planned that were planned to be tested were "compromised" (SS-7) and "could not be located" (SS-11).[81]

---

[76] US EPA, TRW Microwave, Site Documents, Vapor Intrusion,
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC
[77] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra.
[78] US EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[79] Id at pages 26-25.
[80] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg11.
[81] Id at pg4-5.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

46.     Both rounds of resting in 2015 were for only ten hours. Indoor air sampling for vapor intrusion contaminants is usually conducted for a duration of 24 hours, and eight hours is the bare minimum and requires proper justification.[82] On March 2 2016, the US EPA "approved" Apple's December 2015 test results, however, the US EPA actually re-approved the May 2015 results and did not respond to the December 2015 testing.  In 2016, US EPA (Melanie Morash) wrote about the December 2015 results in her approval letter: "*of the five indoor air samples collected, the highest level of trichloroethene (TCE) detected was 0.58 micrograms per cubic meter (ug/m³). "*[83] [However, this was the May 2015 data].

47.     Under information and belief, if the US EPA had reviewed the December 2015 test results, they may not have approved the results and/or may have said the building was not safe for occupation by workers. In the alternative, US EPA did review the December 2015 report but instead of denying it, they intentionally repeated the May 2015 results as a favor to Apple.

48.     Apple's February 2016 report stated that "*if building conditions change in the future where the sub-slab foundation is affected and/or other VI conduits are created, then an additional monitoring event will be performed utilizing the same sampling methodology*."[84] Apple's methodology for the 2015 testing included using 6-liter Summa canisters configured for a ten hour sample and TO-15 panel, and collecting multiple indoor air samples, multiple sub-slab port samples, and rooftop outdoor air samples.[85] [Gjovik and Apple would fight about this later, with Apple insisting on using inferior week-long passive sorbent-based testing in 2021, after notifying Gjovik that the slab was compromised, and Gjovik insisting Apple align with the

---

[82] US EPA, Engineering Issue Indoor Air Vapor Intrusion Mitigation Approaches, Pg38 (2008).
[83] US EPA, TRW Microwave, *EPA Approves Feb 2016 VI report,*
https://semspub.epa.gov/work/09/1158558.pdf
[84] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg14.
[85] Id at 8-9.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

prior workplan and also notify US EPA, but Apple refusing. Later, the US EPA would order Apple to essentially do what Gjovik said.]

49.    n 2016, Oaktree Capital and Hines sold 825 Stewart Drive to CalSTRS via GI Partners while Apple was a tenant. The US EPA transmitted a letter to CalSTRS/GI Partners instructing them about their obligations under CERCLA. The letter stated: "The new Prospective Purchaser and **any tenants** will cooperate with EPA and Northrop by providing reasonable access to the Property for operations maintenance and monitoring of the indoor air and vapor intrusion control systems, groundwater monitoring, as well as any other current and future remedial activities, monitoring and implementation of institutional controls."[86]

EPA understands that the new Prospective Purchaser intends to allow for the use of the Property as technology office space/research and development.  The new Prospective Purchaser and any tenants will cooperate with EPA and Northrop by providing reasonable access to the Property for operations maintenance and monitoring of the indoor air and vapor intrusion control systems, groundwater monitoring, as well as any other current and future remedial activities, monitoring and implementation of institutional controls.

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS about 825 Stewart Drive, 2016*

50.    The US EPA letter explained that in order for the new owner to qualify as a Bonafide Prospective Purchaser (BFPP) under CERCLA, they "must take reasonable steps" with respect to stopping continuing releases, preventing threatened future releases, and preventing or limiting human, environmental, or natural resources exposure to earlier releases."  Based on US EPA's analysis of TRW Microwave site data, the US EPA provided eight steps which *"should*

---

[86] US EPA to GI DC Sunnyvale LLC, "Status of Property and Prospective Purchaser's Reasonable Steps, 825 Stewart Drive, Sunnyvale, Santa Clara County, California, TRW Microwave Site Operable Unit of the "Triple Site", SEMS-RM DOCID #1160217 (May 18 2016), pg2, https://semspub.epa.gov/work/09/1160217.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*be taken by the Prospective Purchaser during its ownership with respect to the contamination at the Property;"*[87] These included,

- "2. Cooperation by providing reasonable access to the Property to EPA… for operation, maintenance and monitoring of the vapor intrusion mitigation system,"
- "5. A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, **without the prior approval of EPA,**"
- "6. Where prior approval is required in Step #5 above, **submit to EPA for review and approval a plan,** and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system,"
- "8. Cooperation with implementation of institutional controls at the Property to the extent required by EPA."[88]

The letter was signed by John Lyons, the Acting Assistant Director of Superfund Site Cleanups at the US EPA.

51.    When Gjovik requested FOIA documents from US EPA about their discussion with Apple about Gjovik's office following Gjovik's disclosures, an internal EPA email chain about Apple's activities at the building included a copy of this document with items #5 and #6 highlighted by US EPA – as well as several other emails/documents discussing Apple and CERCLA obligations.

---

[87] US EPA to GI DC Sunnyvale LLC, "Status of Property and Prospective Purchaser's Reasonable Steps," *supra,* pg3
[88] Id at pg3-4.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

5.   A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, without the prior approval of EPA;

6.   Where prior approval is required in Step #5 above, submit to EPA for review and approval a plan, and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system;

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS about 825 Stewart Drive, 2016, pt2*

subsurface activities, or installing injection wells on the Property, without EPA approval;

5.   A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, without the prior approval of EPA;

6.   Where prior approval is required in Step #5 above, submit to EPA for review and approval a plan, and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system;

7.   Inform EPA of plans to redevelop the Property for any purpose other than its current use, including light industrial purposes, so redeveloped plans

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS, US EPA Highlighted Version, FOIA,2022*

52.     Under information and belief, CalSTRS did share this letter and these requirements with Apple upon taking ownership of the property and the leasehold with Apple. Even if CalSTRS did not, Apple's head of Government Affairs, Lisa Jackson, was a prior US EPA administrator, who also spent years managing Superfund sites – and Apple's General Counsel, Katherine Adams, was a trial attorney for the United States Department of Justice's Environment and Natural Resources division prior to overseeing CERCLA and RCRA compliance for 14 years as Honeywell ("*a notorious polluter, and carried the largest Superfund liability of any corporation in the country*").[89] Apple fully understood its CERCLA obligations.

[89] ALI, *Kate Adams*, https://www.ali.org/members/member/440807/;Duke Law, *Convocation 2023: Kate Adams tells graduating students to savor the moment,* May 15 2023, https://magazine.law.duke.edu/convocation-fall-2023/

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

53.     Under information and belief, Apple's penetration of the slab and botched HVAC renovations in 2015 were never disclosed to CalSTRS, a state government agency, thus defrauding the California government.

54.     In 2019, the US EPA and US Army Corp of Engineers warned that TCE concentrations in the outdoor air of the Triple Site have been increasing and exceeding health and safety thresholds.[90]  In 2018 and 2019, TCE levels of up to 3.6 µg/m³ were identified in the outdoor air.[91] (Note: 3 µg/m of TCE in indoor air from vapor intrusion is unacceptable for commercial buildings).



**Figure 6. TCE Concentrations in Outdoor Air**
Fifth Five-Year Review – AMD 901/902 and TRW Superfund Sites and the Offsite OU

*Exhibit: TCE in the Outdoor Air of the Triple Site, 2019 [92]*

55.     In 2020, Northrop Grumman described the Triple Site and TRW Microwave site to the US EPA saying,

---

[90] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page27, (September 18 2019).
[91] Id.
[92] Id.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

"The Triple Site plume in the Santa Clara Valley represents a classic example of a '*complex contaminated groundwater*' site" …. Despite more than three decades of intense characterization and remediation efforts, including nearly four decades of groundwater pump and treat system operation from multiple locations across the plume since 1982, significant uncertainties remain regarding subsurface fluid flow, plume containment, and restoration timeframes. Remedy performance has lagged far behind expectations." [93]

**iii.    Lisa Jackson, Apple Vice President of Government Affairs and Lobbying; ex-US EPA Administrator**

56.    Gjovik's SOX, Dodd-Frank Act, RICO, and other claims include allegations about Lisa Jackson and her relationship to Apple and the US EPA.

57.    Apple's website says under the header of "*Who leads environmental efforts at Apple?*" that, "*Lisa P. Jackson is Apple's vice president of Environment, Policy and Social Initiatives, reporting to CEO Tim Cook. The Office of Environment, Policy and Social Initiatives works with teams across Apple to set strategy, engage stakeholders, and measure and communicate progress on Apple's commitments to address climate change, develop green materials for safer products, and use materials as efficiently as possible.*"[94]

58.    When Jackson was nominated for US EPA administrator in 2008, critics complained she was "*a pliant technocrat*" who's leadership included "*suppression of scientific information, issuance of gag order, and threats against professional staff members who dared to*

---

[93] US EPA, Development of The Environmental Sequence Stratigraphy, supra at pg16.
[94] Apple, *Environment – Answers*, (last accessed 12/17/23), https://www.apple.com/environment/answers/

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*voice concerns.*"[95]  Jackson has openly bragged to be "*a Shell Oil creation*", noting that Shell Oil paid for her undergraduate degree.[96]

59.     During Jackson's tenure as US EPA Administrator, a US EPA whistleblower was forced on leave and then terminated, faced false counter-allegations (baseless accusing her of workplace violence), and batted US EPA through US Department of Labor agency courts seeking relief, only to be met with egregious retaliation and obstruction of justice. The ALJ on the case complained that the US EPA, had among other misconduct:

"Failed, and failed miserably, over an extended course of time in complying with its discovery obligations and…Court discovery orders" Worked a "fraud on the Court" through numerous "false claims" and inaccurate claims of privilege which upon examination applied to "none of the documents provided"; Deliberately and illegally destroyed an unknown number of documents which should have been under a litigation hold."[97]

PEER commented that the "*EPA's obstruction of [the whistleblower's] attempts at discovery were further complicated by the agency's belated disclosure of "shadow email accounts" (such as a pseudonym account used by then-Administrator Lisa Jackson) maintained by agency employees subject to discovery.*"[98] Lisa Jackson was US EPA administrator from 2009-2013, which covered much of the time the US EPA was actively retaliating against the whistleblower.[99]

---

[95] Kate Sheppard, *Obama to pick NJ DEP commissioner Lisa Jackson to head EPA*, Grist, Dec. 11 2008, https://grist.org/article/transition-talk-jackson-action/
[96] Andrew Restuccia, *'I'm a Shell Oil creation,'* says EPA chief, The Hill, April 26 2011, https://thehill.com/policy/energy-environment/89549-im-a-shell-oil-creation-says-epa-chief/
[97] *Jenkins v US EPA*, Case No. 2011-CAA-3 (April 15 20215).
[98] Public Employees for Environmental Responsibility, *Egregious EPA Misconduct Delivers Whistleblower Win*, April 21 2015, https://peer.org/egregious-epa-misconduct-delivers-whistleblower-win/
[99] Public Employees for Environmental Responsibility, *EPA Un-Fires 9/11 Whistleblower but Vows to Try Again*, September 26 2013, https://peer.org/epa-un-fires-9-11-whistleblower-but-vows-to-try-again/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**iv.    Apple's Secret Semiconductor Fabrication at 3250 Scott Blvd, Santa Clara California**

60.    In late 2015, Apple started stealth semiconductor ("silicon") fabrication activities in a facility located at 3250 Scott Boulevard Santa Clara California.

61.    Apple was cited for building, environmental, health/safety, and fire code violations at 3250 Scott Blvd in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water, fire code and CalASPA violations, health & safety code violations), 2019 (phosphine/silane spill, wastewater testing violations), 2020 (fire code violations, using 2 EPA IDs, inaccurate hazmat inventory data, no spill plans or training, no business permit, no signature from supervisor on records), and 2021 (another phosphine leak).

62.    The factory at 3250 Scott Blvd vented its exhaust of solvents vapors and toxic gases less than 300 feet from a large apartment complex (1,800+ units) owned and managed by The Irvine Company.[100] The apartment complex ("Santa Clara Square Apartments") has multiple street addresses, as well as embedded commercial/retail units, so for simplicity it will be referred to in this complaint with the prior address for the parcel ("3255 Scott Blvd").

63.    In 2015, the Irvine Company was finalizing the Environmental Impact Report ("EIR") for the 3255 Scott Blvd property across the street from Apple's plant and starting development of a large apartment complex (where Gjovik would live in 2020). Apple's factory at 3250 Scott Blvd was never mentioned in the 3255 Scott Blvd EIR despite being located less than 300 feet away (making the apartments a "fence line community").

64.    Under information and belief, Apple and Irvine Company conspired to keep Apple's activities out of the EIR because if it was included, Apple would have to comply with

---

[100] The Irvine Company, *Santa Clara Square*, [last visited 12/12/23], https://www.irvinecompanyapartments.com/locations/northern-california/santa-clara/santa-clara-square.html

regulatory obligations and federal environmental statutes at the factory, and Irvine Company would have to rent their future apartments at a lower value due to the degraded air quality from Apple's emissions.

65.     On November 8 2016, Apple submitted a Tier 1 Application to DTSC for the 3250 Scott Blvd plant that included inaccurate and incomplete information. For example, the application denied that the site was on a chemical clean-up site despite being on a Superfund groundwater plume and other contamination. The application denied any chemical spills despite a citation that year for Apple spilling cooling water in a storm water drain.

**v.     Apple's Personal Data Collection and Surveillance of Employees (Panopticon)**

66.     Apple directly and indirectly requires (through deception, coercion, and manipulation) that their corporate Research & Development employees exclusively use internal devices (often "dev-fused hardware" and "internal" software) and Apple software/services for both work and personal use. From 2015 through 2021, Gjovik mostly complied with Apple's requests and coercion to do use Apple's internal devices for all of her personal activities, feeling that she would get in trouble if she did not (and employees would receive frequent nag emails if they were not on pre-release software builds), and that she would not be successful at Apple if she did not show her loyalty by engaging in this culture. Indeed, her performance reviews praised her for participation in these programs.

67.     While "living on" (aka "dogfood") and "user studies" were often an actual responsibility of a role in Gjovik's Software Engineering team, she continued to feel pressure in Hardware Engineering as well. One example, in Gjovik's 2019 annual performance review, Powers wrote, "*She is an amazing bug finder. Everything she touches seems to break.*" Said one person, "*I'm impressed on ability to find bugs. It's odd that she just goes about her work yet*



**Deleted:** <#>In 2015, Apple renovated the building at 825 Stewart Drive on the TRW Microwave Superfund site (that would become Gjovik's office). In May 2015, Northrop Grumman completed the installation of the sub-slab depressurization system and professional engineer certified sealing of the floor cracks and conduits, the primary mitigation measures to prevent vapor intrusion in the building. ¶
<#>Apple's installation of the HVAC system for the building in late 2015 included Apple sawing the sub-slab vents on the main building roof down from three feet to one foot, and then installing the HVAC intake in close proximity to the Superfund vapor vents, and low to the ground where the vapors would pool on the roof. ¶

**Exhibit A-i-a**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents* ¶
                                                                                                            ... 3

**Deleted:** The
**Deleted:** FIRST
**Deleted:** –
**Deleted:** ev
**Deleted:** CRB
**Deleted:** OCTOBER 25

*finds so many panics/hangs on hardware that we say is solid. It helps that she's constantly living on as many unreleased products as she can and is diligent about filing bugs. Good stuff*! "There were many comments like this.

68. Gjovik was also coerced to 'file bugs' for any issues she found that could be software 'bugs' and to do so 'especially' if she 'hit the bug' in a 'customer scenario' (i.e., a situation that would be very unlikely to occur at work or during work hours) so Apple could obtain the invasive logging data from Gjovik, saying they cannot ask customers for that level of information.

69. Apple employees are technically required to install an "MDM profile" (mobile device management) configuration profile on their personal devices if they want to check their work email from the device. The MDM profile then allowed extensive access to the employee's data by the employer. Corporate MDM profiles, even on "customer devices", are able to track the device in real time, read text messages, see photos and videos, check browsing history, monitor all internet traffic.[113] "Once an MDM profile is installed" the employer "can do whatever they want." However, employees like Gjovik were pressured to use "dev-fused" hardware with internal software builds that also allowed Apple "root access" to the device, and even some access to the Secure Enclave.[114]

---

[113] Christopher Demicoli, *never accept an MDM policy on your personal phone*, Jan 20 2020, https://blog.cdemi.io/never-accept-an-mdm-policy-on-your-personal-phone/
[114] David Shayer, "Understanding How Apple Security Research Devices Likely Work and Stay Secure," TidBITS, Aug. 4 2020 ("Apple engineers use iPhones with a development key (they're referred to as dev fused), and they run development builds of iOS. Dev builds of iOS include a shell, debugging and profiling code inside many apps, test hooks, and internal frameworks. Dev iOS builds are signed with a dev cert, so they boot on dev-fused iPhones.") https://tidbits.com/2020/08/04/understanding-how-apple-security-research-devices-likely-work-and-stay-secure/ *The Prototype iPhones That Hackers Use to Research Apple's Most Sensitive Code*, VICE, March 6 2019, ("I used one of these devices and obtained "root" access on it, giving me almost total control over the phone;"). https://www.vice.com/en/article/gyakgw/the-prototype-dev-fused-iphones-that-hackers-use-to-research-apple-zero-days

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

70.     Apple was in a position to collect data (and store, analyze, and exploit that data) on Gjovik's real time and historic GPS location,[115] what devices were around her and who they belong to who, who Gjovik was talking to, and about what, what Gjovik's schedule was, and who she met with, all of Gjovik's documents and photos, and other highly sensitive information. The full disk access meant Global Security had direct access to any and all photos and biometrics captured by Gjovik's phone.

71.     Apple also retaliated against Gjovik for complaining about an application (Gobbler) which was an electronic tracking device and Apple used it to determine Gjovik's movement and/or location and complaining about Apple's excessive surveillance of employees including using electronic tracking devices to determine employee movement and/or location, all in violation of law and public policy.[116]

72.     Even if Gjovik still used only Apple's consumer production projects and customer software builds, Apple could still monitor real-time device usage and also has access to flag, read, and even intercept user's private iCloud emails.[117] Even if employees used "personal" devices, Apple's "*Workplace Searches and Privacy*" policy said Apple would still spy on them. The policy says employees should have "*no expectation of privacy*" when using "*Apple systems*" (without qualifying "internal systems,") and even including "non-Apple property." Apple also says employees should "*have no expectation of privacy when on Apple premises*," which assumably includes anything devices they have with them even if they're "personal."

---

[115] Likely a violation of Cal. Penal Code § 637.7, prohibiting the use of GPS to track another person.
[116] Cal. Crim. Law 4th Crimes--Public § 519 (2023), "Use of Electronic Tracking Device."
[117] Thomas Brewster, *How Apple 'Intercepts' And Reads Emails …*, Feb 11 2020, https://www.forbes.com/sites/thomasbrewster/2020/02/11/how-apple-intercepts-and-reads-emails-when-it-finds-child-abuse/ Jeffrey Paul, *Your Computer Isn't Yours*, Dec. 12 2020 ("*This means that Apple knows when you're at home. When you're at work. What apps you open there, and how often… This data amounts to a tremendous trove of data about your life and habits and allows someone possessing all of it to identify your movement and activity patterns. For some people, this can even pose a physical danger to them.*") https://sneak.berlin/20201112/your-computer-isnt-yours/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Apple has openly admitted to reading, collecting, and publishing employee's private text messages and phone records, with one executive who was spied, upon calling it "*a stunning and disquieting invasion of privacy.*"[118]

---

## Workplace searches

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

---

*Exhibit: Excerpt from Apple's "Workplace Searches and Privacy" policy*

73.    Gjovik spoke with her coworkers (occurred outside of work hours, far from campus, and in hushed voices acknowledging Apple could be listening though their phones and other devices) about her opposition to Apple's surveillance practices, and many voiced the same concerns.[119]

---

[118] Annie Palmer, *Apple accused of monitoring employee text messages in lawsuit against ex-chip exec,* CNBC, Dec 10 2019, https://www.cnbc.com/2019/12/10/apple-accused-of-monitoring-employee-text-messages-in-lawsuit-against-ex-chip-exec.html

[119] See, *Myrna Arias v Intermex Wire Transfer,* Superior Court of the State of California, Bakersfield County, Complaint (May 5 2015). (settled out of court); see: *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 583 (11th Cir. 1983); *In re Google Inc.,* 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013).

38

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**B.    ASHLEY'S APPLE SAGA**

i.    **Gjovik Joins Apple; Team Bullies & Bribes Her; Gjovik is Retaliated Against for trying to Investigate Batterygate (2015-2016)**

74.    Note: While the events that occurred in Gjovik's first two roles at Apple (from 2015-2016) do not directly contribute to most of Gjovik's current legal claims, these events are still discussed as they constitute much of what Apple was supposedly investigating in 2021, at the time Apple told Gjovik she was "*removed from the workplace and all workplace interactions*" and then terminated with vague allegations that she violated company policies. Apple never provided an update to Gjovik on the outcome of this investigation, and most of the people named from these teams are still at Apple, and several have even been promoted.

75.    Ashley Gjovik became an employee of Apple in February 2015. Gjovik joined a team with many long-tenured Apple employees who had been in positions of leadership and influence at Apple for decades, and who had regularly interacted with top executives. Gjovik worked for Apple Inc from February 23 2015, until Apple terminated Gjovik's employment on September 9 2021 (effective September 10 2021).

76.    During her tenure with Apple, Gjovik led numerous high-profile projects. She participated in engineering project management of numerous high-profile products such as the iPhone, iPad, iPod, Apple Watch, MacBook Pro, MacBook Air, and Mac Pro and high-profile projects such as the launch of the Apple Music subscription service, Apple's transition of computers from Intel to Apple silicon, and strategic initiatives striving to establish Apple's first company-wide Artificial Intelligence ethics policy.

77.    During Gjovik's nearly seven years with Apple, she was a significant contributor in developing and improving critical process and policies, mentoring employees, and managers, and providing strategic advice to executives. She has been praised for everything from "*saving*

Deleted: Ashley

Deleted: work
Deleted: the

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*Apple money*" to "*driving better testing and higher quality in Apple's software.*" Her direct supervisor at the time of her termination previously illustrated what he called Gjovik's' "*amazing work*" as: "*the combination of broad networking, collaboration, understanding of many technical and non-technical areas;*" "*providing deep and meaningful insights;*" and "*connecting people for more collaboration.*"  He went on to say Gjovik had "*become a mentor to people around the organization*" around "*relationship skills,*" "*crafting presentations,*" "*increasing visibility and network,*" and "*coaching on tough conversations.*"

78.     Gjovik's importance to Apple Inc was exemplified in her many outstanding performance reviews. These included Apple's award to Gjovik of large bonuses and raises due to her strong performance. Gjovik's performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written reviews.

79.     In fact, Apple told Gjovik that she was an extremely valuable member of the company. At different times she was told by her supervisors that she was both "*key talent*" (unreplaceable) and a "*high performer.*" Apple tracks these employee categories in its personnel systems. Further, during every annual performance review at Apple, Gjovik received at least one "*Exceeds Expectations.*"

80.     Linda Keshishoglou was Gjovik's first direct supervisor at Apple. Keshishoglou reported to Venkat Memula, who was director of Software Engineering Build & Release Management, Hardware Systems Management, prototype hardware ordering and distribution, secrecy training and access management, Early Field Failure Analysis, software and diagnostics for Apple's global manufacturing facilities (Foxconn, etc.), AppleCare customer diagnostics

**Deleted:** Every

**Deleted:** <#>Gjovik started at Apple on February 23 2015. Linda Keshishoglou was Gjovik's first direct manager at Apple. Venkat Memula was the Director of Gjovik's first team and Keshishoglou reported to Venkat. ¶
Gjovik experienced

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

tools, software for Retail product demonstrations, and more. Memula reported to Kim Vorrath, head of Software Engineering Program Management.[120]

81.     Gjovik's direct co-workers, also reporting to Keshishoglou, were Rob Marni, Brad Riegel, and Aron Talburt. Gjovik experienced well-documented hostility from the start of her employment. In her first year, her colleagues created a whiteboard of insulting nicknames like "*Professor Fun Sucker*", and another with tallies for points for "*should they quit*" and "*making [Gjovik] want to quit,*" and filed a ticket in the Radar work tracking tool entitled "*Make Ashley's Life a Living Hell.*"

82.     Marini and Riegel told Gjovik that filing complaints to Human Resources at Apple is known as a "*CLM.*" They explained that stands for "*Career Limiting Move.*" Marini also openly bragged that a top software executive at Apple lovingly referred to Marini as his "*little Gestapo.*"

83.     Despite knowing that she suffers from Post-Traumatic Stress Disorder (PTSD) Gjovik's colleagues would try to startle her, and make her scream, by attacking her with Nerf guns and dodgeballs. (Gjovik complained of these activities to Apple's Employee Relations team in July and August 2021, noting in an email on July 21 2021, that her coworkers had created a video/audio recording of her "*screaming bloody murder*" while they attacked her with dodge balls, then created a 'remix' version of her screams and shared it with the team, while they were "*laughing hysterically.*")

84.     Gjovik was initially assigned to share an office with Rob Marini. Marini told her during her first week that prior coworkers who had shared an office with him previously had

---

[120] Vorrath notoriously became so enraged when an employee wanted to leave work early, that she slammed her office door shut with such might that the latch broke and she was locked inside, supposedly requiring a locksmith be brought on site to release her. "*This Story Perfectly Captures Why You Don't Miss Deadlines at Apple*, April 22 2014, https://www.businessinsider.com/why-you-dont-miss-deadlines-at-apple-2014-4

---

Deleted: ,

Deleted: her

Deleted: Rob
Deleted: Brad

Deleted: ,
Deleted: and attacked

Deleted: ."

Deleted: the

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

either quit, left the country, or committed suicide. Marini joked about which of those paths she

would follow. Marini often made cruel and awful 'jokes' like that, despite Gjovik's complaints

and requests for him to stop. One time, when she made a minor mistake drafting an XML

document, Marini responded that everyone would be better off if Gjovik 's *mother had had an*

*abortion." Gjovik complained to Memula about Marini, asking for help, and Memula told her he*

intentionally placed her in the same office as Marini in hope that Gjovik's positive attitude may

rub off on Marini despite knowing that Marini was likely to abuse her.

85.    Reigel often made comments about Gjovik, calling her fat, an idiot, or stupid.

Around December 2015, Reigel made her stay in an office conference room against her will,

where he yelled at her while she cried. Gjovik reported this to Memula, who did nothing. He

would also often make somewhat violent jokes targeting her including but not limited to that he

was going to "smack" Gjovik. These remarks were all the more concerning considering that he

was known for bringing firearms into the office, and Gjovik had seen ammunition at his desk.

Reigel had also destroyed objects when upset at work, including infamously striking a chocolate

Easter bunny on a table to knock off its 'head' while screaming at Software QA Director, Josh

Williams about a new software convergence model. Marini also claimed Reigel had previously

physically '*flipped a table'* during a work meeting while he was upset and brought it up

repeatedly.

86.    Reigel was also an active police officer with a local Police Department. Gjovik

and her coworkers occasionally referred to him as "*Officer Reigel*."

87.    When Gjovik complained to Memula about Reigel and Marini's behavior,

Memula acknowledged the men's conduct was inappropriate but his suggestions for Gjovik in

response to the misconduct included things like dumping the liquor bottles they had in their

Deleted: .

Deleted: One of primary aggressors of the harassment at the time was a colleague named Brad Reigel. Reigel often made comments
Deleted: ,

Deleted: .

Deleted: .

Deleted: Venkat
Deleted: Venkat
Deleted: it
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

offices and replacing the liquor with water and food coloring. (Gjovik shared this email chain with Employee Relations in 2021).

88. Indeed, it was a regular occurrence for the team to drink at work during work hours, and regularly coerced Gjovik to do the same, despite Gjovik's protests. This included and was often incited by Memula who hid bottles of liquor around the office after he said he got in trouble with Human Resources and his manager for drinking too much at work, even going so far as to buy a large storage cabinet for their office where he exclusively stored alcohol, kept the only key, and forbid the employees from telling Human Resources.

89. Marini and Reigel commonly referred to Venkat Memula's behavior when intoxicated at work as an alter ego called "*Drunkat.*" (On August 16 2021, when Gjovik complained to Apple Employee Relations about her team from 2015-2016, Gjovik also noted Memula's work-time intoxication, with Employee Relations noting: "*You mentioned that Memula would snuggle up on you while drunk, whisper to you, and say things that made no sense.*" Gjovik cited evidence including "*see photograph of during one instance with documentation of his phases of drunkenness on whiteboard including these behaviors, then following photo of him "crucifying" himself upon said whiteboard writing.*")

90. One of Gjovik's coworkers on this team claimed to have familial connections to a major organized crime family. If this court finds direct ties to organized crime required for the RICO case, Gjovik will plead those details under seal.

91. In 2016, Marini began bragging about creating and being a member of "*secret cabals*" that consisted of certain Apple employees, and possibly external parties, on an invite-only basis at Marini and Venkat's discretion. Several months later Marini told Gjovik there was a vote in one of the cabals and they agreed she could be a member. Marini added Gjovik to an Apple email group with around 20 other members. Marini repeatedly warned Gjovik that she

must behave herself if she wanted Marini and the other members to allow her to remain in the cabal.

92.     Under information and belief, based on timing and parties involved, the decision to engage in off books silicon fabrication at 3250 Scott Boulevard may have been the outcome of one of these 'cabals.' Regardless, Memula's team would have been aware, if not involved, in 3250 Scott Blvd, as Memula oversaw the Systems Engineering Project Managers for new devices, including silicon bring-up.

93.     Marini invited Gjovik to several social events in San Francisco, often with other coworkers and Memula. Marini told Gjovik that if she wanted to succeed at Apple, she must never decline an invite to spend personal time with engineering leadership. All social events Gjovik attended included excessive alcohol intake which Gjovik did not feel was optional. Gjovik recognized a deep culture of cronyism and nepotism,[121] and felt forced to acquiesce.

94.     Keshishoglou praised Gjovik's work performance but also refused to allow Gjovik to attend the same meetings or be included on the same emails or group text messages as Gjovik's all-male coworker peers (Brad Reigel, Aron Talburt, and Rob Marini) were part of. When Gjovik complained to Keshishoglou about the exclusion, Keshishoglou could not provide a coherent explanation for why Gjovik was not included.

95.     At or around six months into Gjovik's employment at Apple, Gjovik's manager, Venkat Memula, questioned Gjovik about Keshishoglou's performance and Gjovik disclosed her concerns about the double-standard. Memula asked to receive updates on the

---

[121] Nepotism: For instance, in Gjovik's final team at Apple, under Dan West, there were three members of the Basanese family. John Basanese was a Director reporting to West (mentioned later), and he also had two close family members working in West's organization, and a third family member in a different organization at Apple.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

matter and expressed a pre-existing desire to terminate or otherwise remove Keshishoglou from his team.

96.     Memula must have informed Keshishoglou about Gjovik's complaints.  In September 2015, Linda Keshishoglou met with Gjovik privately to deliver Gjovik's review and compensation. Keshishoglou bragged she was able to provide Gjovik the unproportionally large compensation.  After detailing Gjovik's compensation and explaining Keshishoglou provided a favor for Gjovik, Keshishoglou then told Gjovik something akin to "*now go tell Venkat I'm a good manager.*"

97.     It was Gjovik's understanding, based on conversations and company policies, that the 2015 annual performance review cycle would skip her because her employment at Apple was six months or less by the July 2015 evaluation period. An employee like herself who had only been employed at Apple for five months was supposed to be categorized as "*too new to rate.*" An employee that is "*too new to rate*" does not receive a bonus, additional RSU vesting, or salary increase.

98.     Instead, Gjovik did receive an annual performance review in 2015 which included a bonus, additional RSU vesting, and a salary increase. Further, the compensation Gjovik received was above the ranges allocated for her role as an ICT3 Engineering Project Manager.

99.     In September 2015, Keshishoglou provided Gjovik a $100,000 grant of RSUs vesting over four years. Under information and belief, the maximum grant for an employee in her role at her level was $60,000; and as too new to rate there was to be no RSUs. Keshishoglou also increased Gjovik's salary and also provided Gjovik a bonus, which may or may not have exceeded the range allocated but did exceed the $0 scoped for too new to rate. The document Keshishoglou showed Gjovik in the meeting showed this all as future compensation that was not effective immediately and the RSUs additionally noted they would need Board approval.

100.    Gjovik interpreted Keshishoglou's statement as an offer of additional compensation only if Gjovik were to drop her complaints about Keshishoglou and instead begin praising Keshishoglou. Gjovik felt that if she were to refuse to drop her complaints, that Keshishoglou may retract the compensation she offered.

101.    Because Memula was in a position of authority over Keshishoglou, and Gjovik feared disfavor from Memula more than Keshishoglou, Gjovik complained to Memula about Keshishoglou's comments. Memula then told Gjovik to complain to Human Resources.

> **Ashley Henderson:**
> In IL1. You around? Update from last weeks convo.
> **Venkat Memula:**
> 4
> **Ashley Henderson:**
> K! Just wanted to let you know I had my review today. It went well until Linda ended it saying "now go tell Venkat I'm a good manager. He told me you told him I was a bad manager." I'm sure that's not what you said. And it was really weird of her to tell me that. Sigh.
> **Venkat Memula:**
> Sigh
> You should talk to Kristen
> She was in the room when I mentioned our discussion
> **Ashley Henderson:**
> Okay - I will!
> Thanks
> **Venkat Memula:**
> Send Kristen an email today please
> **Ashley Henderson:**
> On it! I texted her already, but will email too
> I assume this email should contain all of my concerns, in addition to today's weirdness
> **Venkat Memula:**
> Yes please

*Exhibit: 9/29/15 Texts Between Gjovik & Memula*

102.    Shortly after Keshishoglou transferred to a different organization and her team was transferred under Officer Reigel. Gjovik protested before, during, and after the transfer – saying she refused to work for Reigel due to his abusive conduct towards her. After Gjovik was transferred to report to him as her manager, Officer Reigel promptly closed the *"Make Ashley's Life a Living Hell"* task as *"complete"*.

103.    In July 2021, Gjovik reported the bribery incident to Apple Employee Relations (Ekelemchi Okpo), including providing copies of emails exchanged between Gjovik, Memula, Human Resources at the time, and a list of witnesses. Gjovik documented her interactions with

Deleted: Venkat

Deleted: it, who

Deleted: this

Deleted: and

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Keshishoglou and the compensation incident in her August 2021 "*Issue Confirmation*" for Apple's investigation as "*hostile work env based on sex; quid pro quo; bribe; failure to resolve hostile work environment.*"

104.    While Reigel was Gjovik's manager, he continued with his inappropriate conduct towards Gjovik. Gjovik complained to Memula repeatedly about Reigel, but Memula refused to intervene.

105.    Gjovik started looking for a new job at Apple, interviewing with Haley Samale's team to manage new software features. Gjovik was assured she got the job, they began discussing her start date, but then was suddenly told she did not, due to Reigel providing negative feedback about her. Software Engineering Vice President, Kim Vorrath, then intervened and assigned Gjovik to run a program called Early Field Failure Analysis ("EFFA") reporting to a different manager, but still under Memula. Gjovik still wanted to leave Memula's organizing completely and tried to reject the position, but she was told it was her only option. Gjovik eventually accepted the role.

106.    In 2016, Gjovik managed Software Engineering "EFFA"; failure analysis program for products in the field and launch planning for New Product Introduction, still under Memula's organization, now reporting to Shandra Rica. Gjovik drove field issue triage and root cause analysis to resolution for customer software quality issues, and partnered with hardware teams when software or firmware updates were needed to mitigate silicon or component issues.

107.    Rica reported to Memula and she approached Gjovik to interact as personal friends. In 2016, Rica invited Gjovik out to drink at bars and to sleep over at Rica's home. Gjovik slept over several times with both women sleeping in the same bed. They had become close friends, Gjovik thought, so she was surprised when Rica severely retaliated against her months later.

**Deleted:** the

**Deleted:** <#>Officer Reigel promptly closed the "*Make Ashley's Life a Living Hell*" task as "*complete*" after Gjovik was transferred to report to him as her manager. ¶

**Deleted:** , including several of the issues listed above.

**Deleted:** manager

**Deleted:** told

**Deleted:** later

**Deleted:** VP

**Deleted:** . ¶

**Deleted:** ¶
<#>The Batterygate Fiasco (2016)¶

**Deleted:** the

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

108.     In late 2016, there were reports of possible battery failures and device stability issues in the field that were being escalated across numerous engineering teams at Apple.[122]

109.     Gjovik felt like it was an emerging issue so began including it in her status report and repeatedly urged her management to inform Software executives about the matter, so they were not caught off guard.

110.     Gjovik's management, Evan Buyze and Rica, refused to notify Software Engineering Program Office leadership.

111.     Gjovik attempted to go around them and inform Rica's boss, Memula, who was concerned and agreed with Gjovik; however Rica and Buyze quickly retaliated against Gjovik for 'going around them' and demanded she not inform any software executives of the issue without their permission.

112.     Shortly after, Gjovik received text messages from Operations Vice President Priya Balasubramanian asking if she could come to an in-progress meeting about the battery issues. They said that Jeff Williams, the COO, was asking where a representative from Software Engineering was and wanted someone there.

113.     Gjovik quickly texted Buyze and Rica about the matter asking for their input, but it was late and both had stopped responding.

114.     Gjovik decided to attend the meeting and spoke for several minutes sharing an update and the data she had previously vetted with functional teams. Jeff Williams seemed appeased and thanked her when she was done.

---

[122] California AG, "Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling" https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against, Investopedia, "Apple (AAPL) Reaches $500 Million Settlement Over iPhone 'Battergate'," https://www.investopedia.com/apple-aapl-reaches-settlement-over-iphone-batterygate-5088300

Deleted: attended

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

115.    Following these events Gjovik was informed that Craig Federighi (Senior Vice President of Software Engineering, reporting to Tim Cook) was upset that Kim Vorrath (Memula's manager) never told him about the emerging issues, and Vorrath was upset that Memula had never told her about the emerging issue, and Memula told Gjovik he was going to try to '*take the fall*' because Gjovik had tried to escalate.

116.    However, Rica and Buyze quickly blamed Gjovik and said the only reason they were in trouble was that Gjovik went to the meeting and shared status. They said while the status was accurate and vetted, that Gjovik should have simply declined to attend, and refuse to provide information, because that is 'easier.'

117.    Rica and Buyze then insisted the program's response to the battery issue should be 'ignoring it' and 'hoping it goes away.' When Gjovik continued to raise concerns about staffing for the overall program, Rica and Buyze said Gjovik should 'ignore' those issues too.

118.    They told Gjovik that if field issues are bad enough that Software executives will hear about them directly from other Executives so Gjovik should act in bad faith and stonewall at a program level. Gjovik pushed back on this and attempted to remind both how important customer product quality is.

119.    Shortly after, Rica constructively terminated Gjovik. Rica explained that she and Buyze 'got in trouble' over Batterygate, graphics corruption issues with the new MacBook Pro with TouchBar, and coverage while Gjovik was out for a week, because Gjovik had supposedly set an 'unreasonable expectation' that Software Engineering would do work and so people expected them to do work, but they did not want to do work. They told Gjovik they now had to "reset expectations" for other organizations that Software will only provide minimum engagement on customer field issues.

Deleted: MacBookPro

Deleted: Touchbar launch

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

From: **Ashley Henderson** a_henderson@apple.com 📎
Subject: 12/5 2:1 (Shandra, Evan, & Ashley) Meeting Summary
Date: December 7, 2016 at 10:02 PM
To: Kristen Michallik kmichallik@apple.com

Just FYI. Would like to have a paper trail of how this went down. Sorry lots of words.

— — —

Meeting starts. They ask me how my vacation was. **Then Shandra says before they start with "feedback", she wanted to ask me if I still wanted to be in this role. She says my answer will change the direction of the rest of the conversation.** I tell her I'm always considering other options and thinking about my long term goals, and have been wondering if it might be time to start exploring other options - but I haven't been actively looking. **She says something like "great, so you are ready to move on, this make the rest of this conversation easier".** Then she says "let's get into the feedback". She tells me "it's not working". She says while all the other orgs (AppleCare, Product Quality, etc) love me, the image of the EFFA program within SW is not good. She says our house is a mess, and we're in a lot of trouble.

She outlines the following pieces of feedback for me:

1. **"Over-communication internally":** the evidence she cites is that she receives 50+ emails a day about EFFA topics, and it's too much noise. She says she can't figure out what's important. She says she and Evan are in trouble for not knowing what's going on.
   * I try to clarify that now she's on the Mac EFFA lists for the last two weeks, she's getting a good chunk of the questions/asks that come to our team. The 50+ emails aren't actually from me. The # of emails sent directly to Shandra from me averages ~3-4/day the last few weeks, and ~1/day before that. She repeats over & over that I "send her 50+ emails a day" and "she doesn't know what's going on".
   * I also questioned her review of the daily status email I send her, Evan, Venkat, etc. (example in separate email). These include a list of top issues called out in bold w/ summaries and next steps. She previously said she didn't read those emails, but didn't offer a better way to get her info or explain why she didn't read them. I questioned why she didn't ask me to provide info to her in another way if she needed that info. She changed the subject.
2. **"Over-communication externally":** Shandra told me she's worried about my judgement of when to share information externally. She said most info shouldn't be shared - even if other teams request it. Her evidence were a few examples she and Evan didn't share updates with SWE leadership but other non-SWE teams had them, and it would have be better to not share with anyone than blindside SWE leadership. There was no other evidence provided for sharing info other than her getting in trouble.
   * I tried to point out times when I asked for them to share info with Venkat/Kim and it was declined, but they changed the subject.
   * I tried to explaining a lot of the benefits of sharing information with Ops/AppleCare etc in certain circumstances. Example was so AppleCare could build workaround customer support plans until a Software Update is released. Another example was so Ops & AppleCare could understand which customer symptoms might be attributed to a certain known issue - to know if there could be additional issues showing up in their field data. They changed the subject again.
3. **"Working too hard":** Shandra said that fixing issues very quickly and communicating details of root cause and resolution set an unrealistic expectation of what support SW can provide EFFA & QIF. She said the EFFA teams are mad at her now for not providing updates quickly/at all, or with details — but that she's okay with that and she will have the "tough conversations" to get them to understand what the "new expectations are". She also told me that even if she had 100 people in her org working on EFFA, they couldn't do everything that was asked of us.
   * I mentioned (again) that it sounds like we have different definitions of the goal of this program, and that I firmly believe if there are major sw issues in the field causing a bad experience for a customer on a certain device - it's the right thing to do to try to understand the issue quickly and drive a corrective action - in addition to providing any information that may be helpful to AppleCare in dealing with these issues until a fix is released.
   * I questioned her statement about 100 people, since I was able to support the majority of the P0s/P1s myself (1 person) - with only the P2s and lower getting neglected - and that she has been saying for the last few months we can't do everything..
   * I also pointed out that as we had previously discussed, I don't make commitments without looping to SWE teams first, and I push back when we don't have resources to support or don't think there's enough data to justify an investigation.
4. **"Priorities"** Evan also chimed in a couple times mentioning prioritization as a concern. While Shandra was talking about

*Exhibit: 12/7/16 Email from Gjovik to HR about Rica & Buyze, 1*

120.    Rica told Gjovik that Gjovik's job was now "*finding a new job.*" Rica also told

Gjovik to not tell anyone what she just said and added she "*doesn't like people who talk shit.*"

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

details of what they said were a few or up later this week pressing again fully, to discuss next steps.

I told them the feedback during the meeting seemed overwhelmingly negative and I wanted to gauge what kind of summary they planned to provide future managers about my time in the role. Evan exclaimed "you need to be able to take feedback." I told him, I am listening to the feedback - I'm just trying to understand what message they're planning to provide. Evan said "it will be fair and balanced". **Then Shandra suggested that it would be best if I volunteer this role "didn't work out for me" so we can all agree on that.** I told her I'd take that suggestion into consideration, but was hesitant to say that when I feel like I accomplished a lot of positive things in the last eight months. She told me she thought saying "it didn't work out" would be best. I said that again this feels like a very negative meeting, and I was wondering if there's a timeline on this transition because this feels like a development plan/HR type conversation. **Shandra told me there was no timeline and it's not an HR conversation yet, because I'm agreeing "to leave the role" they "won't have to start that conversation".**

The meeting ended with Shandra advising me not to complain to people about having to move on, because she doesn't like "shit talking".

— — —

*Exhibit: 12/7/16 Email from Gjovik to HR about Rica & Buyze,2*

121.    Out of concern for product quality, Gjovik brought the matter to the Human

Resources business partner who agreed that Buyze and Rica "*cannot do that*" and said she would

follow up. Gjovik had all of her job responsibilities removed for nearly three months until she

was able to obtain and start in a new role at Apple. Human Resources told Gjovik that Rica

cannot take her job away and that Rica was in the wrong.

122.    (Gjovik also complained about this matter to Apple Employee Relations in May,

July, and August 2021. In August 2021, Employee Relations investigator Ekelemchi Okpo

documented this situation in detail in his original version of the "Issue Confirmation":

> "In 2016, Apple allegedly had products in the field (iPhones) with
> bad batteries. You shared that you gave Jeff Williams an update on
> field issues and the meeting went well. After your meeting with
> Williams, you felt that you were thrown under the bus by your skip
> level manager, Shandra Rica, and your manager, Evan Buyze,
> because they failed to update the leadership team on field issues.
> You told me that you did not have work assignments for 3 months
> after this incident, and your responsibilities were taken away. As a
> result, you believe that this was constructive discharge, and you
> raised your concerns to Michallik on December 7, 2016."

124.    Gjovik also provided her emails with Human Resources, Rica, and Buyze on the

matter to Okpo as evidence for the investigation.)

Deleted: they

Deleted: ,

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

125.   In 2016, Buyze would unfairly lower Gjovik's performance rating due to Gjovik asking for Venkat to help fix product issues that Buyze wanted to ignore, which Gjovik was able to contest because there was a bug in the HR rating system that year that revealed peer feedback ratings and showed Buyze ratings were arbitrary. Buyze attempted to give Gjovik an Exceeds in result but just a Meets in Teamwork and Innovation. Gjovik had received constant praise that year for her teamwork, and the review system confirmed. In fact, she had a higher score in Teamwork than Results, but Buyze refused to give Gjovik an Exceeds in results citing two examples: that Brad Reigel was fighting with her (as if that was her fault), and that Buyze got annoyed when Gjovik wanted to investigate field issues quickly.



*Exhibit: Internal Review Ratings System View*

123. When Gjovik took a job with West and Powers, Buyze waited until 7pm on her last day to sent an email notifying Software Engineering partners she was leaving. Buyze concurrently told Gjovik not to tell anyone she had her job taken away or that she found a new one. Gjovik's new office was in the Sunnyvale, so she never had a chance to say good by to her friends at Infinite Loop. All of this to say, Gjovik knows certain Apple managers and administrators can be petty and spiteful, so she was not completely surprised with the conduct she faced in 2021.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: End of Day Notice*

**ii.**   **Gjovik is Assigned to Work at an** Apple **office on the "Triple**
**Superfund Site"; Apple Invades Gjovik's Privacy & Fights to**
**Increase e-Waste (2017)**

126.   Gjovik joined Product Systems Quality in January 2017, reporting to David Powers and Dan West. Apple assigned Gjovik to work in the Apple office called "Stewart 1" (aka "SD01") at 825 Stewart Drive, Sunnyvale California from 2017-2021.

127.   Apple never informed Gjovik that the office was on a Superfund site or that it was a chemical release clean-up site generally.

128.   Gjovik would later be informed by a friend that her office was known by the U.S. EPA as the "TRW Superfund site" and one of the three sites constituting the "Triple [Superfund] Site."[123]

---

[123] US EPA, *Superfund site: TRW Microwave (Building 825) Sunnyvale CA,* https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0901181

Deleted: the "TRW Microwave Superfund site"
Deleted: Office

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

129.    Under information and belief, in at least August 2017, Apple was flushing

Trichloroethylene ("TCE") in their wastewater at 3250 Scott Boulevard. Apple did not have

TCE listed in their CERS inventory, or their inventories for the city HazMat, or reported in any

of their other filings. Yet, their NPDES testing showed 24 ug/L of TCE exiting the factory and

entering the municipal sewer lines on August 23 2017.[124]

130.    On December 28, 2017, Gjovik's supervisor, Dan West, tried to organize a sexual

relationship between Gjovik and a sous chef at his favorite Michelin star restaurant ("Chez TJ"

in Mountain View). Gjovik arrived at the restaurant to eat dinner alone, but West texted her as

he conspired with the head chef to have the sous chef act as Gjovik's waiter, and both West and

Chef suggested to both parties they should become romantically involved.

131.    Gjovik objected but West persisted. West also paid Gjovik's bill for the dinner

and refused to refund Gjovik or even disclose to Gjovik how much the bill was, despite Gjovik's

protests.

132.    West used his position of authority over Gjovik, put Gjovik under duress with

fear of retribution and retaliation in her employment, and paid money (estimated around $400) to

persuade, encourage, and induce Gjovik to sleep with a business partner, although West's efforts

need not and were not successful. West intended to influence Gjovik to engage in sexual

intercourse or lewd act with another person, who was not West, in exchange for West to obtain

receipt of the indirect benefits of positive influence in his business and personal dealings with

the management of his favorite "Michelin Star" restaurant.

133.    *Pimping and Pandering with Indirect Benefits is a felony.*[125]

---

[124] Note: Apple banned use of TCE in their supply chain,
https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[125] California Penal Code §§ 266h, 266i

134.    On the evening of Nov 30, 2020, West messaged Gjovik and they discussed the incident. West told Gjovik; "*of all the inappropriate things I've done. That might be top of the list, especially since I don't think you were comfortable telling me no.*" West said he did not remember paying the hundreds of dollars for her dinner, saying "*I must have been drunk. That's over the top.*" Gjovik described the night as an "*arranged marriage.*" West told Gjovik he was "*awakening to all of [his] inappropriate behavior.*"



*Exhibit: 11/30/20 Texts between West & Gjovik*

*Exhibit: 11/30/20 Texts from West to Gjovik*

135.    From 2017-2020, Dan West asked to visit Gjovik at home several times. West also asked Gjovik out to dinner alone with him several times.

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

136.    On August 3 2017, an Apple engineering manager, Robert McKeon, emailed an unknown list of Apple employees, including Gjovik, about a "Gobbler" user study. The manager wrote the study used an iOS application called "Gobbler," and told employees "*As you continue to use your device, use the Gobbler application to periodically upload data that has been logged.*"  The manager then wrote, "*In terms of data collection, we want more. The algorithm uses deep learning and the more data the better.*" He wrote that the Gobbler algorithms are "*hungry for data*" and that "*for uploading data: all data that has your face in it is good data.*" Gjovik did not respond to or act on the email.

137.    On Aug 7 2021, Gjovik received a different email from a group account saying "*Come join us! We look forward to seeing you there!*"  The email appeared to be a social event. Gjovik accepted, assuming it was expected – and the message said nothing about Face ID.

**Deleted:** &lt;#&gt;**Apple Forces Research & Development Employees to Use Work Devices for Personal Activities; Apple Forces Them to Participate in Medical Studies and Invasive Data Collection (2015-2021+)**¶
&lt;#&gt;Apple's directly and indirectly requires that their corporate research & development employees exclusively use internal devices (ie, "dev-fused hardware" and internal software) and Apple software/services for both work and personal use. ¶
&lt;#&gt;From 2015 through 2021, Gjovik mostly complied with Apple's requests and coercion to do this.¶
&lt;#&gt;Even if employees used "personal" devices, Apple's "*Workplace Searches and Privacy"* policy said Apple would still spy on them. The policy says employees should have "no expectation of privacy" when using "Apple systems" without qualifying "internal systems," and even including "non-Apple property". Apple also says employees should "have no expectation of privacy when on Apple premises," which assumably includes anything devices they have with them even if they're "personal."¶

## Workplace searches

Only in cases where allowed unde

- Access, search, monitor, and
  all of its property, as well as
  business or if used for acces
  networks. This includes all c
  viewed, or stored (including
  other personal accounts) us
  systems.

- Conduct physical, video, or
  workspace such as file cabin
  locked), review phone recor
  (such as backpacks, purses

This means that you have no expe
someone else's personal devices
systems or networks, or when on

... [4]

**Deleted:** mandatory

**Deleted:** . (The

**Deleted:** .)

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25



*Exhibit: The email Gjovik received on Aug 7 2017 that led her to get Gobbled, 8/7/17*

138.    Gjovik received another response later that day saying, "*Hello there! Thank you very much for responding to our invite! ..... You will receive an iCal invite to the event shortly... Please arrive at [Apple's Mathilda 3B office building] Patio at your scheduled time. Do not hesitate to reach out if you have any questions or concerns regarding the study. See you soon!*"

Coercively, the email now turned formal (instead of fireworks GIFs) and requested she sign an ICF prior to learning anything about what she was signing, and further, she would be sent an

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

invite from the group (assumably in coordination with Global Security), so if she now wanted to decline participating, she would have to do so affirmatively – declining the invite, and emailing that she did not want to sign the ICF (without even being informed prior), or participate. Any loyal, terrified Apple employee knows better than to raise red flags like that.



*Exhibit: Email Gjovik received after 'registering for the social event, 8/7/17*

139.    Gjovik was tricked into attending a "social event" that was really a compound in a parking lot with an armed guard outside, where Gjovik was coerced to use the "Gobbler" application to provide her biometrics and videos of her before she left.

140.    Gjovik had received prior offers to participate in Gobbler, but denied those offers. However, now Gjovik felt she had no choice but to comply once she arrived at the compound.

Deleted:  prior and
Deleted: , but
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

141.    From that day forward Gobbler was always installed on Gjovik's iPhone and it was always capturing videos and biometrics from the front camera whenever "*it thought it saw a face.*" Even today Gjovik's iCloud is still connected to Gobbler with no way for Gjovik to disconnect it. Gjovik repeatedly tried to uninstall/deactivate it, but it always reinstalled/reactivated itself.



*Exhibit: Gjovik's iCloud Personal Account, Current Day*

142.    Apple would later rename the application from Gobbler to "Glimmer" after criticism about the face *"Gobbler"* name.

143.    On Apple's internal "Living On" help page, it explains that when you "live on" Apple devices, *"You are encouraged to make full use of your living on devices as you regularly would, and try to log as many bugs as possible. This will help us provide a better and bug free product to our customers.*

144.    Around this time Gjovik was contacted to participate in other user study programs including Apple wanting to study her ovulation cycles and menstruation, which she

59

Deleted: her

Deleted:

Deleted:

Deleted: facial

Deleted: ,

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

denied.  Apple asked to study Gjovik's vitals while she ran and swam, which she denied. Apple

asked to study Gjovik's vitals and sleep while she slept, which she accepted for a few months,

but then left the program due to how invasive it felt. Apple also asked to 3D scan Gjovik's ears

and ear canals, which Gjovik denied expressly in 2018 and stated her denial was 'indefinite.'

145.   Gjovik created a successful hardware re-use program in 2018, (which she called "Hand Me Down Hardware"), in order to fill test coverage gaps dependent on infrastructure, while also dramatically reducing e-waste.  West and Powers suddenly canceled her project without consulting or notifying Gjovik and the explanation provided to her was that one of West's reports, Reed Johnson, requested the change in order to obtain personal benefit, and West approved.

146.   When Gjovik complained about the decision to cancel the project, resulting in a dramatic increase in e-waste and reduced test coverage for customer products which was known to increase risk and did result in customer field issues, Gjovik was repeatedly told by West and Powers that she was simply being "*emotional,*" "*aggressive,*" and "*irrational.*" Powers suggested that when Gjovik is upset with Powers or West, that she should stay silent about it for at least one day, and then at that point, she will realize she is wrong and they are correct, and then she will not have concerns about them anymore. Powers then complained Gjovik was making facial expressions of displeasure that appeared directed towards him, and that she must always have a 'poker face' to be successful. In 2021, Gjovik complained about this matter to Jenna Waibel and Ekelemchi Okpo, and included it in the August 2021 "Issue Confirmation."

147.   On April 13, 2018, Tom Moyer, head of Apple Global Security, was quoted in a Bloomberg article saying that Apple "leakers" "*not only lose their jobs, they can face extreme*

**Deleted:** ¶
&lt;#&gt;Apple Fighting To Increase Their E-Waste & Threatening Families about Superfund Offices (2018)¶

**Deleted:** being "*emotional,*" "*aggressive,*" and "*irrational.*"¶

**Deleted:** (*Worldwide Loyalty*)

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

*difficulty finding employment elsewhere. The potential criminal consequences of leaking are real*

*and that can become part of your personal and professional identity forever.*" [127]

148.    On April 18 2018, Gjovik's Apple team emailed her and her coworkers about a

planned "Family Day" when they could bring their family members (spouses and children) to

their office at the TRW Microwave Superfund site in Sunnyvale, and Intersil/Siemens Superfund

site in Cupertino. The email stressed the need for "confidentiality" and instructed employees to

report any family members not complying with Apple's secrecy rules, at these Superfund sites to

Apple Global Security, (the same team Moyer represented when he threatened to have 'leakers'

arrested).

149.    Apple put Gjovik on "document retention" for the Batterygate lawsuits on March

15 2018. [128]  The notice from Apple cited "*inquiries from the U.S. Department of Justice.*"

150.    In May 2018, Apple Legal reached out to perform document collection on

Gjovik's devices, including her text messages.

151.    On May 8 2018, Gjovik replied saying she uses the same iMessage account for

work and personal and said she strongly preferred to only share messages she had with the

specific people involved in Batterygate. Or if they have to take all messages, she asked if she

could delete personal messages first. On May 10, 2018, she added she is "*a private person.*"

152.    On May 10 2018, an Apple lawyer replied telling her "*Do not delete any*

*messages.*" She said, "*we can certainly identify the relevant text messages with the list of*

*individuals that [she] provides.*" Gjovik asked if she could "*export the message conversations*

---

[127] Mark Gurman, *Apple Warns Employees to Stop Leaking Information to Media*, Bloomberg, April 13 2018, https://www.bloomberg.com/news/articles/2018-04-13/apple-warns-employees-to-stop-leaking-information- to-media

[128] Silicon Valley Business Journal, *"Federal investigators open new probe into Apple's intentional iPhone slowdowns,"* Jan 31 2018, https://www.bizjournals.com/sanjose/news/2018/01/31/apple-iphone-battery-slowdown-probe-doj-sec-aapl.html *"At the moment, investigators are reportedly looking at Apple's public statements, and whether the company violated securities laws by not disclosing material information to investors."*

Deleted: the
Deleted: the
Deleted: :
Deleted: <#>On or around December 2020, Charlene Wall-Warren, director of Environmental Technologies, reporting to Yannick Bertolus (Dan West's manager), suggested Gjovik join her team in a position working on implementing circular economy legislation across the company, including projects like "right to repair." ¶
<#>Gjovik expressed to West and Wall-Warren that she would love to transfer to the role. ¶
<#>Around January 2021, West informed Gjovik that Wall-Warren requested to have Gjovik transferred to her team and West declined to allow Gjovik to leave his team. ¶
<#>As of January 2021, Gjovik had attempted to find a role where she could stay working at Apple indefinitely. ¶
¶
**The Batterygate Fiasco, Part II (2018)**¶
Gjovik was put
Deleted: Document Collection
Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1   *from all relevant people instead of sharing the entire database?*" An Apple lawyer replied on

2   May 14, 2018, saying Gjovik should "*work with the team to do [her] best to avoid collection of*

3   *entirely irrelevant information.*"

4

5   153.    However, during the meeting, Apple's lawyers insisted Gjovik let them copy her

6   entire iMessage database. Gjovik protested and explained further she was primarily concerned

7   about "nudes" and sexual messages with a sushi chef she was dating in Hawai'i who had no

8   connection to Apple. Gjovik asked if she could show them the texts so they can confirm its

9   irrelevant and then she can delete the thread before they copy it, but Apple said no, despite

10  previously saying they would avoid collecting unnecessary and irrelevant information. Apple

11  told Gjovik they have ways to copy her data unilaterally without Gjovik's cooperation. Once

12  Gjovik handed her messages over, the Apple lawyers told her they would keep her texts (and

13  nude pictures) in their "*permanent evidence locker.*"

14

15  154.    Gjovik complained about the incident to a few coworkers saying like it felt like

16  Apple wanted "collateral" for Gjovik to stay quiet about her retaliatory constructive discharge in

17  2016, because she refused to ignore Batterygate. Gjovik complained about the matter in 2018 to

18  Dan West and John Basanese. Gjovik asked for their guidance on if she should directly consult

19  Apple's legal team about the constructive termination, and both executives told Gjovik they did

20  not want to talk about it and not to bring it up again.

21

22  155.    Gjovik also posted on Twitter about the matter on August 19 2021 and it gained

23  significant attention and engagement.  On September 7 2021, Gjovik also posted about it again

24  on Twitter, this time "quote-tweeting" a prior post where she complained about the

25  Batterygate/nudes and also wrote "*the corruption at Apple may reach RICO levels*". Gjovik

26  posted, "*I worry Apple wanted to intimidate me to never openly discuss how I was constructively*

27

28

**Deleted:** " and that "*all documents are reviewed by attorneys, so if the document is not relevant to the issues, it will be categorized as such and not provided to requesting authorities.*"...

**Deleted:** <#>Gjovik worried if she had an ethical duty to disclose to the man that Apple put his sexts in their 'permanent evidence locker' but because Apple says everything internal at Apple is confidential, she worried that saying anything to him would violate Apple policies. Further, she now realized Apple could be watching everything she does and if Apple did choose to take more personal data than they needed as a way to intimidate her to stay quiet about what happened in 2016, she worried Apple could be watching her to see what she does and possibly escalate their intimidation if it looks like she is not being a 'team player.' ¶

**Deleted:** they

**Deleted:** related

**Deleted:** Gjovik's

**Deleted:** Director

**Deleted:** went viral. ¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

*term'ed for speaking-up abt the [battery] situation when I ran sw failure analysis.*" Gjovik was

terminated two days later.

156.     On April 22 2018, Gjovik emailed Tom Moyer requesting "Business Conduct"

approval to attend law school while she worked at Apple, a request suggested by a friend in

Apple Legal.  Gjovik also noted in her email that she hoped to get a job in Apple Legal after she

graduated and if not, she planned to keep working at Apple, but do legal volunteer work on the

side. On April 27 2018, Moyer replied and added a member from his team to review Gjovik's

request. (Apple and Worldwide Loyalty knew Gjovik wanted to stay at Apple.) Moyer's team

approved Gjovik's request shortly after, providing requirements for when Gjovik needed to

request additional permissions from them for certain school activities.

### iii.     **Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior: Gjovik Faints (2019-2020)**

157.     The Santa Clara County District Attorney claims that on February 8 2019, Tom

Moyer participated in a "*clandestine*" meeting with the Santa Clara County Sheriff's Office in

order to arrange an exchange of iPads and political donations in exchange for concealed carry

handgun permits for Apple Global Security. [130]

158.     On February 13 2019, the US DOJ Civil Rights Division notified Apple that it

had opened an investigation into Apple's violations of the anti-discrimination provision of the

Immigration and Nationality Act (8 U.S.C. § 1324b).[131]

159.     On February 20 2019, Apple's Global Head of Corporate Law and Corporate

Secretary, Gene Levoff, was charged by the US DOJ and US SEC with twelve counts of felony

---

[130] *The People v Thomas Moyer*, California Sixth Appellate Circuit, H049408 (August 25 2023)

[131] US DOJ v Apple Inc, Investigation No. DJ# 197-11-963; US DOJ, Justice Department Secures $25 Million Landmark Agreement with Apple to Resolve Employment Discrimination Allegations Based on Citizenship Status, Nov 9 2023, https://www.justice.gov/opa/pr/justice-department-secures-25-million-landmark-agreement-apple-resolve-employment

---

**Deleted:** <#>In September 2019, Gjovik emailed Apple Business Conduct requesting permission to write for the law school's newspaper. Business Conduct approved as long as she did not use Apple devices. Gjovik wrote, *"I work in an engineering group and we 'live on' devices and file bugs when we find issues. My teammates were actually excited about me being in school, because I would hit some interesting use cases that employees normally do not. I also do not have a backup phone or cell service that is personal only — because we really want live on from the teams."* Business Conduct replied with advice from Global Security, that actually, Gjovik is correct, and just ensure any work for "clients" is not done on Apple devices. ¶

**Deleted:** <#>In January 2017, Ronald Sugar, Apple Board Member was interviewed about what his biggest challenges were as CEO of Northrop Grumman Corporation. Sugar said he worried about: whistleblowers. Sugar said he worried about *"someone talking to the Wall Street Journal… Someone filing whistleblower suits about something they imagine might've happening in the organization. You worry about that."*[129]¶

**Deleted:** for fraud.

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

fraud.[132] Later, in June 2022, Apple's head of corporate legal compliance, Gene Levoff, pled guilty to the US DOJ for the charges of six counts of securities fraud and six counts of wire fraud. Levoff faces potentially decades in federal prison (see "*Securities Fraud*" under RICO Predicate Acts).[133]

160.    On June 20 2019, Apple's ex-General Counsel and VP of Legal and Global Security, Bruce Sewell, was interviewed by Bloomberg Law about prior criminal investigations into Apple's business practices. Sewell discussed the successful 2013 US DOJ/FTC case against Apple for violating THE SHERMAN ACT. Sewell said that Apple knew there was a "*substantial chance [they would] lose but they were going to fight it*" and "*they would never settle that case, they would fight it as far as they could.*"[134]

161.    The same month, Sewell was interviewed by Columbia Law School and described Apple's corporate culture and legal team as "*kindergarten,*" "*very Laissez-faire,*" "*chaos,*" and "*a wild place.*"[135] Sewell said he tried to use risk to Apple's competitive advantage. He said Apple was able to get "*closer to risk*" then competitors, in-house lawyers understood which risk (and laws) they "*don't need to pay attention to,*" and that practice offered a competitive advantage to Apple.[136] He said that in order to do that, the company must permit the conduct, because sometimes the in-house lawyers will "*get it wrong.*" He then described Apple's

---

[132] *US SEC v Gene Levoff*, Civil No. 2:19-5536, Feb. 13 2019; *SEC Charges Former Senior Attorney at Apple with Insider Trading*, Feb. 13 2019, https://www.sec.gov/litigation/litreleases/lr-24399
[133] DOJ, *Apple's Former Director of Corporate Law Admits Insider Trading*, June 2022, https://www.justice.gov/usao-nj/pr/apple-s-former-director-corporate-law-admits-insider-trading
[134] Bloomberg Law via YouTube "*Bruce Sewell, Apple's Former General Counsel,*" quote at 16:51-20:10.
[135] Columbia Law School via YouTube, "Former General Counsel of Apple Interviewed by Columbia Law Student," quote at 18:19-20:33.
[136] See, Loren Fox: *Enron: The Rise and Fall*, pg96 quoting ex-Enron CEO and now convicted felon, Jeffrey Skilling, speaking about Enron's business model: ("*We like risk because you make money by taking risk.*")

**Deleted:** US SEC, SEC Charges Former Senior Attorney at Apple with Insider Trading, https://www.sec.gov/litigation/litreleases/lr-24399 DOJ,

**Deleted:** ,

**Deleted:** , https://youtu.be/KXIyqHZhJtU?si=KAAUaBiRQgdZ0rap&t=1010.

**Deleted:** , https://youtu.be/-wuf3Kl76Ds?si=Lk7Frl4ZebGL5h0c&t=965.

**Deleted:** FIRST

**Deleted:** --

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

conduct with the 2013 antitrust case as "*very ugly*", but Tim Cook told him "*Not to be scared,*" and not "*to stop pushing the envelope.*"[137]

162.   In June 2019, there was a leak of the deadly gasses' phosphine and silane at Apple's 3250 Scott Boulevard factory. Apple did not report the 2019 phosphine and silane leak to the California Office of Emergency Services (CalOES). Apple coerced the city Fire Department to use a codename for Apple in their incident report, and the agency complied and referred to Apple and their secret factory as "*Project Aria.*"

163.   In September 2019, Gjovik emailed Apple Business Conduct requesting permission to write for the law school's newspaper. Business Conduct approved as long as she did not use Apple devices. Gjovik wrote, *"I work in an engineering group and we 'live on' devices and file bugs when we find issues. My teammates were actually excited about me being in school, because I would hit some interesting use cases that employees normally do not. I also do not have a backup phone or cell service that is personal only — because we really want live on from the teams."* Business Conduct then replied with advice from Global Security, that actually, Gjovik's interpretation of Apple's "live on" request is correct, and just ensure any work for "clients" is not done on Apple devices.

164.   On September 4 2019, Gjovik experienced a severe fainting spell at her Apple office at 825 Stewart Drive that last for several hours, requiring her to sit down in a chair, sit down on the floor, and even lay down on the floor of her cubicle.  Gjovik's fainting spell started in Mike's office, she took an EKG with her Apple Watch, and she communicated her symptoms to Mike. The spell continued at Gjovik's desk. A coworker in the Apple Government Affairs team had asked Gjovik to quickly send the Apple VP of Public Policy and Government Affairs,

---

[137] Columbia Law School, "*Former General Counsel of Apple Interviewed by Columbia Law Student,*" quote at 36:55-39:55, https://youtu.be/-wuf3KI76Ds?si=wIPC3dIbsRX3588y&t=2126

**Deleted:** <#>Sewell said he tried to use risk to Apple's competitive advantage. He said Apple was able to get "*closer to risk*" then competitors, in-house lawyers understood which risk (and laws) they "*don't need to pay attention to,*" and that practice offered a competitive advantage to Apple. He said that in order to do that, the company must permit the conduct, because sometimes the in-house lawyers will "*get it wrong.*" He then described Apple's conduct with the 2013 antitrust case as "*very ugly*", but Tim Cook told him "*Not to be scared,*" and not "*to stop pushing the envelope.*"[138] ¶

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Cynthia Hogan,[139] a copy of Gjovik's white paper on Apple's AI ethics practices. Gjovik laid on the floor, dizzy, while drafting the email to the VP and sending the file. Later, Gjovik told David Powers about the fainting spell at some point the week after. Under information and belief, the fainting spell was due to vapor intrusion from the TRW Microwave Superfund site contamination.

165.    In September 2019, the US EPA emailed about high levels of TCE in the outdoor air at the TRW Microwave Superfund site (Gjovik's office) and across the Triple Site. The EPA said they were "concerned" and the TCE has been "*increasing over the past few years*." EPA noted the TCE concentrations are "*often exceeding … indoor air residential… concentrations*." EPA wrote that the levels of TCE in the outdoor air of Gjovik's office were "*close to exceeding*" the threshold for fetal heart defects in the first trimester of pregnancy.



---

[139] Axios, *Apple policy exec leaving company,* May 13 2020, https://www.axios.com/2020/05/13/apple-policy-exec-leaving-company "*Cynthia Hogan, Apple's vice president for public policy and government affairs, has resigned from the company, Apple said. Hogan was recently tapped by the Biden campaign as one of four leaders of its vice presidential selection committee.*"

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                          DECEMBER 21 2023

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**Exhibit**: *NOAA: TCE (Trichloroethylene) ["Poison"]*

166.    Around 2019, US EPA and California EPA oversaw vapor intrusion testing of buildings on the Synertek Superfund (EPA ID CAD990832735, Responsible Party is Honeywell) plume originating from 3050 Coronado Blvd in Santa Clara California. The Superfund property is owned by the same person, Kalil Jenab (a Cushman & Wakefield Vice Chairman) who also owns the 3250 Scott Blvd property and rented it to Apple for silicon fabrication activities.

167.    Around this time, both EPA agencies were overseeing bioremediation of the Synertek Superfund plume which resulted in a "bounce-back" of increasing TCE, vinyl chloride, and other chemicals. US EPA CERLCA project manager Fatima Ty and manager Edwin "Chip" Poalinelli managed the site and were aware, per US EPA FOIA documents.

168.    At this time there was also increasing chemical contaminants in groundwater wells near Apple's 3250 Scott Blvd factory and Irvine Company's 3255 Scott Blvd apartments. There was no state or federally overseen vapor intrusion testing at either of the properties despite them being on the plume.

169.    On November 25 2019, Gjovik received an email in her work email account inviting her to participate in DNA testing with a company called Color via the Apple AC Wellness Center. The invitation said: "*AC Wellness is generously offering the Tier 1 Hereditary Conditions Test for free. Get your Color test by clicking the button below.*"[140] Apple failed to mention that AC Wellness is a for-profit subsidiary of Apple Inc, that Apple Board member Susan Wagner is also a Board member at "Color," and that ex-CEO Steve Jobs' wife Laurene

---

[140] Email "*Claim your Color test*" from support@color.com to ashleygjovik@apple.com, November 25 2019.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Powell Jobs had also invested in the start-up "Color".[141] Gjovik requested a DNA kit and the confirmation email said *"Thank you for claiming your Color test. We'll email you when your test kit ships, along with tracking information. If you haven't already, we encourage you to add your health history, as it helps inform your results."*[142] Color emailed Gjovik no less than four times asking her to disclose her health history. Gjovik refused to provide her health history despite the constant nagging. Gjovik's results were released on January 21 2020.[143]

170.    In February 2020, the California Supreme Court described Apple's legal arguments defending their unlawful employment practices as *"farfetched," inconsistent*, and *"untenable."* [144] The Court described Apple's work policies at issue as *"draconian."* The Court ruled against Apple and Apple Inc agreed to pay $29.9 million to a class of retail employees.

### iv.    Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020)

171.    When Gjovik contacted US EPA in 2020 complaining about solvent exposure, US EPA (Ty and Poalinelli) claimed there were no issues or reason to think anything was wrong

---

[141] Matthew Lynley, *Color Genomics raises $45 million to provide cheaper genetic tests that detect cancer risk*, TechCrunch, Sept 27 2016, https://techcrunch.com/2016/09/27/color-genomics-raises-45-million-to-provide-cheaper-genetic-tests-that-detect-cancer-risk/; Sarah Buhr, *Confirmed: Color Genomics is in the final stages of an $80 million Series C financing round*, August 16 2017, https://techcrunch.com/2017/08/16/color-genomics-has-raised-52-million-in-equity-financing/; Michael Flynn, Informed Consent: Does "Ok" Really Mean "Ok?", 16 J. Health & Biomedical L. 29, 44–45 (2019) citing *Moore v. Regents of the University of California* – (The California court applied the patient-based standard, stating that the physician had a duty to disclose the financial interest he had in the procedure conducted *45 on the patient, even if it was unrelated to the medical treatment.142 The court came to this conclusion based on three principles: 1) every person has a right to control his or her body; 2) the patient is entitled to informed consent; and 3) the physician has a duty to disclose all information that is material to the patient making the decision.")

[142] Email: "Thank you for requesting your Color Kit" from support@color.com to ashleygjovik@apple.com Nov 25 20219, (Purchase #: 9177550947)

[143] Email "Your Color results are ready"" from support@color.com to ashleygjovik@apple.com Jan 21 2020.

[144] *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1055-56, 258 Cal. Rptr. 3d 392, 405-06, 457 P.3d 526, 537-38 (Feb. 2020)

---

Deleted: <#>In November 2020, Apple's Chief Compliance Officer and head of the *Worldwide Loyalty* team, Tom Moyer, was indicted for bribing the Santa Clara County Sheriff's office. (See *"Criminal Bribery of Public Official"* under RICO Predicate Acts).[145]¶

<#>Two Apple Global Security executives turned state's evidence on Moyer and Apple in exchange for immunity.[146]¶
<#>In December 2020, Apple submitted a request to revoke the DTSC consent decree in place since 2016. Under information and belief, the head of CalEPA at that time, Jared Blumenthal, orchestrated a revocation of the consent agreement despite Apple being in violation of the order, in exchange for a position as President of the Waverly Foundation working for Lisa Jackson and Laurene Powell Jobs, and/or other favors.¶
<#>In June 2022, Apple's head of corporate legal compliance, Gene Levoff, pled guilty to the US DOJ for six counts of securities fraud and six counts of wire fraud. Levoff faces potentially decades in federal prison (see *"Securities Fraud"* under RICO Predicate Acts).[147]¶

Deleted: <#>Around 2019, US EPA and California EPA oversaw vapor intrusion testing of buildings on the Synertek Superfund (EPA ID CAD990832735) plume originating from 3050 Coronado Blvd in Santa Clara California. The Superfund property is owned by the same person, Kalil Jenab (a Cushman & Wakefield Vice Chairman) who also owns the 3250 Scott Blvd property and rented to Apple for silicon fabrication activities.¶
<#>Around this time, both EPA agencies were overseeing bioremediation of the plume which resulted in a "bounce-back" of increasing TCE, vinyl chloride, and other chemicals. EPA CERLCA project manager Fatima Ty and Apple manager Edwin "Chip" Poalinelli oversaw and were aware.¶
<#>At this time there was also increasing chemical contaminants in groundwater wells near Apple's 3250 Scott Blvd factory and Irvine Company's 3255 Scott Blvd apartments. For some reason, there was no state or federally overseen vapor intrusion testing at either of the properties despite them being on the plume. ¶

Deleted: (US EPA

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

and did not disclose anything about the vapor intrusion testing or increasing contaminants at

nearby wells. Under information and belief, Apple, Irvine Company, Jenab, Honeywell, and US

EPA Region 9 employees Ty and Poalinelli, were conspiring to secretly avoid testing and

disclosures to reduce the cost of regulatory compliance for Apple and Irvine Company.

172.    In February 2020, Gjovik moved into an apartment complex at 3255 Scott

Boulevard Santa Clara California. Gjovik quickly fell ill and became disabled. Gjovik suffered

severe fainting spells, chest pains, palpitations, stomach aches, fatigue, and strange sensations in

her muscles and skin.

173.    In February 2020, TCE was identified in Apple's wastewater at 3250 Scott Blvd

again. Apple still had not reported any possession of TCE on site. Under information and belief,

Apple was using TCE at their semiconductor fabrication plant but never disclosed it to

regulators, and avoided disposing of it through hazardous waste disposal facilities which would

require manifests, and so instead flushed it into the sewers in order to avoid regulators finding

out about the TCE usage.

174.    Gjovik visited the Emergency Room on February 13 2020, and Urgent Care (at

AC Wellness, Apple's in-house clinic) on February 20 2020. AC Wellness Network LLC is a

for-profit subsidiary of Apple Inc. [In January 2021, Gjovik learned that the doctors and other

medical professionals at the AC Wellness clinics "report to" a Director (Osman Aktar) in

Apple's Operations team under Jeff Williams (who also oversees manufacturing supply chains,

like what 3250 Scott Blvd is used for). Gjovik used AC Wellness for primary medical services

from 2015-2020. ] Gjovik left for a different provider when her Apple primary care provider at

AC Wellness refused to help her triage her 2020 medical issues (from Apple's solvent exposure)

and instead suggested Gjovik could be suffering from anxiety.

**Deleted:** Cushman and Wakefield

**Deleted:** <#>In June 2019, there was a leak of the deadly gases phosphine and silane at Apple's 3250 Scott Boulevard factory. ¶
<#>Apple did not report the spill/leak to the California Office of Emergency Services (CalOES). ¶
<#>Apple coerced the city Fire Department to use a codename for Apple in their incident report, and the agency complied and referred to Apple and their secret factory as "*Project Aria*."¶

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

175.   Gjovik went on short-term disability due to her severe, mysterious illness. Gjovik was screened for multiple severe and fatal diseases and disorders including Multiple Sclerosis, brain tumors, fatal arrythmias, Neuromyelitis Optica, and more. Due to the solvent exposure, Gjovik suffered skin rashes, burns, hives, and her hair fell out to the extent she had a shaved head for most of 2022 as the bald patches still grew back. Gjovik saw dozens of doctors, who screened her for all sorts of diseases, subjecting Gjovik to extensive blood draws, urine samples, injections, and scans. Gjovik was too sick to work so she was forced to sue all her sick time and go on disability, which required an incredible amount of paperwork, meetings, and stress in dealing with the administrator Sedgwick.

176.   Gjovik attempted to come back to work around June 2020 even though she did not feel better or find out what was wrong, but she kept having fainting spells so she went back on full disability leave. Gjovik tried to come back again around August 2020 but started at two days a week. Gjovik still struggled (because she was still being exposed to Apple's factory exhaust) and she did not feel better until after she moved out.

177.   On August 27 2020, there was smoke in the air due to wildfires and the smoke entered the building at 825 Stewart Drive. Employees were complaining of burning eyes and sore throats. Apple EH&S investigated the employee complaints and informed Gjovik's team that no action is required by Apple unless the indoor air particulate matter exceeds 500 ug/m3. Gjovik complained to David Powers that 500 ug/m3 was literally "hazardous" and there were many stages of unsafe air prior to exceeding 500 ug/m3. Powers ignored Gjovik's complaints.

178.   On September 2 2020, Gjovik discovered there were elevated and unexpectedly 'spiking' levels of volatile organic chemicals inside her apartment at 3255 Scott Blvd. The timing of the spikes aligned with her most severe health issues.

**Deleted:** <#>Gjovik was screened for multiple severe and fatal diseases and disorders including: Multiple Sclerosis, brain tumors, fatal arrythmias, Neuromyelitis optica, and more.¶
<#>Gjovik suffered skin rashes, burns, hives, and her hair fell out to the extend she had a shaved head for most of 2022 as the bald patches still grew back.¶

**Deleted:** [Exhibit A-ix-A]

**Deleted:** [Exhibit A-ix-B]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

179.    Gjovik gathered data on VOC air pollution patterns, documented medical symptoms at times the VOCs 'spiked,' and had an industrial hygienist test Gjovik's indoor air. Because there was no public information disclosing what activities were occurring at 3250 Scott Blvd, Gjovik assumed the VOCs were solely from the Superfund site next door and/or the Brownfield contamination on site.

180.    Gjovik told Dan West and David Powers about what she discovered on September 2 2020, also asking their help to find someone to measure the chemicals in her apartment:

> "I need to find someone to measure tVOC (volatile organic compound) levels in my apartment & create an official record. This is generally a commercial/industrial thing apparently, I'm getting a bunch of very high tVOC (Total Volatile Organic Compounds) gas spikes. Always at night, around when weird stuff is happening, sometimes almost every night…. I woke up at 3am last night feeling terrible and having trouble breathing…and today I looked back & saw the air spike into the "can't even graph this poison" tVOC territory at 3am. I've had a lot of these middle of the night, wake up choking/sick incidents since I moved in. I wonder how many of them overlapped with these poison spikes…. Some of the spikes are so high, the monitor can't even report it (goes beyond "very polluted" which itself looks to be defined as toxic gas levels often found in laboratories with industrial chemicals). I don't know what you'd call it going beyond *that.*"

181.    On September 2 2020, Dan West responded to Gjovik,

> "Just got off the phone with a buddy…. the head of EHS at a medical devices company. His suggestions: If you suspect it's the air in your apartment. Get out of there right away - even if it means going to a hotel. Your health is more important and it's really hard to prove anything. He's spent hundreds of thousands of dollars doing stuff at company sites and he still isn't convinced it did much…. You can also hire someone called an industrial hygienist. I've never heard of this profession. Apparently, they can come to your location with all of the right equipment and do testing that is supposed to be best in class…He closed with pushing to have you move again. His position is that if you run the tests and it's bad, they probably won't be able to fix it. So you'd end up moving anyway."

Deleted: ocurring

Deleted: its

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

182.    David Powers then replied to Gjovik and West on September 3 2020 writing, *"I'm asking around. Your journey has just taken a pretty major twist! I'm glad you were able to figure this out. Are you going to warn others in your apartment?"*

183.    In September 2020, Gjovik set up additional air monitors to watch the levels of VOCs in her apartment next to the 3250 Scott Blvd factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Gjovik had noticed with her symptoms and ad hoc testing, that the VOCs mostly spiked early in the morning and late at night, like with an automated exhaust system.



Exhibit: 9/2/20 Text Messages          Exhibit: Data Showing tVOC Trends

184.    Gjovik noticed there was an Apple facility at 3250 Scott Boulevard across the street and it was also on the Superfund groundwater plume. Gjovik mentioned the facility to

Deleted: [Exhibit A-ix-B]
Deleted: A-ix-A
Deleted: A-ix-:
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Apple on at least September 8, 9, 10, and 13 2020 – inquiring if anyone was familiar with the area because Apple had an office there and Apple having at least one phone call with her – Elizabeth Schmidt, who was also actually in charge of the EH&S team overseeing Gjovik's Superfund office at 825 Stewart Drive.



*Exhibit: One of Gjovik's Emails to Apple about the Site*

**Deleted:** 10

**Deleted:** .

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

185.    At no time in 2020 or later did Apple ever disclose their fabrication activities and chemical/gas emissions at 3250 Scott Boulevard to Gjovik. The prior TRI registration was for a different company and Apple did not submit their first filing until mid-2021. For all Gjovik knew, 3250 Scott Blvd was currently a simple office building. The Apple Real Estate manager did suggest Gjovik use a special type of paid leave to move out of the apartment called '*extreme condition leave*' which was designated for natural disasters.

> On Sep 9, 2020, at 6:28 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>
> Hi!
>
> Hope you're both well and hanging in there.
>
> Could I talk to one of you about whether there are any Extreme Conditions Services that might be able to help me in a bit of horrific situation I'm in? Or anything else.
>
> I just talked to the Real Estate & Dev folks (I had emailed safety@apple with questions about hazardous waste, and it was escalated to Elizabeth to help) and she recommened I ask you about it. She wasn't sure that's exactly what it was called, something like Extreme Conditions, but the misc junk drawer of disaster/catastrophe support.
>
> Come to find out, my massive health issues this year are very likely caused by the fact my brand new apartment building was built on top of a mountain of unmonitored and mostly un-regulated hazardous waste. I have a lot of phone calls going on right now with doctors, lawyers, and government agencies about it.

*Exhibit: "Extreme Condition Leave" due to 3250 Scott Blvd*

186.    Apple reported to the US EPA that in the year 2020 they released 7.8 tons (15,608 pounds) of volatile organic chemicals and 260 pounds of the now-banned combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air from the 3250 Scott Blvd factory.[148]

---

[148] US EPA, Federal Register, Document 2022-27438, Vol. 87, No. 242, December 19, 2022, ("EPA determined that NMP, as a whole chemical substance, presents an unreasonable risk of injury to health when evaluated under its conditions of use."); US EPA TRI report, 3250 Scott Blvd, 2020: https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885&fac_search =fac_beginning ; US EPA Air Pollutant Report, 3250 Scott Blvd, 2020, https://echo.epa.gov/air-pollutant-report?fid=110001168254

**Deleted:** manufacturing

**Deleted:** A Hazardous Waste manager at 3250 Scott Blvd in 2020, Ryan Spartz, wrote in his LinkedIn profile for the time: "*Continued waste profile project ...working with account manager and adding additional TSDFs to find cost savings for client. Research and implement other cost-saving methods ... come up with innovate methods for disposal of unique wastes.*"…

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Gjovik's apartment at 3255 Scott Blvd was only a few hundred feet from the exhaust vents at 3250 Scott Blvd.



| | | | | | |
|---|---|---|---|---|---|
| 8.1a | Total on-site disposal to Class I Underground Injection Wells, RCRA Subtitle C landfills, and other landfills | NA | NA | NA | NA |
| 8.1b | Total other on-site disposal or other releases | Pounds | NA | 260.17 | 260.17 | 260.17 |
| 8.6 | Quantity Treated Onsite | Pounds | NA | 2341.51 | 2341.51 | 2341.51 |
| 8.7 | Quantity Treated Offsite | Pounds | NA | 14742.82 | 14742.82 | 14742.82 |

*Exhibit: Image from Apple's TRI filing for NMP*

187.    The US EPA TRI regulatory filing for 3250 Scott Blvd claims an additional 14,743 pounds of NMP was taken offsite to three waste processing facilities. However, there are zero DTSC hazardous waste transport manifests from 2015-2022 for NMP. Under information and belief, either Apple lied that the NMP was taken offsite and instead disposed of it onsite, or Apple did take the NMP offsite but used illegal hazardous waste transporters and disposal facilities without manifests and lied about it. (See, *"Wire & Mail Fraud"* under RICO Predicate Acts).

188.    In September 2020, Gjovik hired an industrial hygienist to test the indoor air at her apartment and it returned results showing a number of the chemicals in use by Apple at 3250 Scott Blvd including: Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, 1,2,4-TMB, Xylene. However, the TO-17 test only returned chemicals for ½ of the total VOCs it accounted for. The testing panel did not test for NMP, Arsine, Phosphine, Silane, or Chlorine – and these may have also been present.

**Deleted:** <#>In February 2020, TCE was identified in Apple's waste water at 3250 Scott Blvd again. Apple still had not reported any possession of TCE on site. ¶
<#>Under information and belief, Apple was using TCE at their silicon manufacturing plant but never disclosed it to regulators, and avoided disposing of it through hazardous waste disposal facilities which would require manifests, and so instead flushed it into the sewers. ¶
<#>On December 14 2020, Apple submitted their first hazardous waste manifests for activated charcoal at the 3250 Scott Boulevard facility. The manifests were for 630 pounds of activated charcoal. ¶
<#>Under information and belief, Apple did not change the charcoal/carbon filters for their solvent exhaust from 2015 until December 2020, despite maintenance protocols usually calling for replacements at least every six months. Under information and belief, if Apple did replace solvent-soaked charcoal prior to 2020, it did so without manifests, and illegally disposed of hazardous waste without proper transporters or disposal. ¶
¶
**Table A-2: Apple's Manifests at 3250 Scott Blvd for Carbon and Filters**¶

... [5]

**Deleted:** had

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

189.    In September 2020, Gjovik had her doctor order panels of blood and urine tests looking for chemical exposure. Gjovik went in first thing in the morning, after a bad night with multiple exposures, and when she had the blood draw, the nurse said it was the most blood they've ever drawn in one sitting – and in fact the tray holding all the blood vials became too heavy on one side and crashed onto the floor, spilling dozens of vials of Gjovik's blood everywhere. As the tray fell, it also pulled the needle out of Gjovik's arm, and leaving blood spitting out of her arm like a horror movie. There was evidence of at least Toluene and Arsine gas in her blood.

190.    On October 25 2020, Gjovik's Occupational Exposure doctor, Dr. Robert Harrison with UCSF and the California DPH wrote to Gjovik's iCloud email address: *"These multiple measurement [show] your improvement once you moved – sure do point to the effects of VOCs. So glad you feel better."*

191.    On November 12 2020, Northrop Grumman conducted the first sub-slab ventilation vent inspection on the roof of 825 Stewart Drive. Northrop Grumman would have seen that Apple sawed down the vents from 3 feet to 1 foot and installed the HVAC intake on top of the vents in the section of the building where Gjovik sat. Northrop Grumman did not submit a report of their findings until demanded by the EPA in May 2021, and even then, did not mention these issues.

192.    In November 2020, Apple's Chief Compliance Officer and head of Apple's Global Security team, Tom Moyer, was indicted for bribing the Santa Clara County Sheriff's office. (See *"Criminal Bribery of Public Official"* under RICO Predicate Acts).[150] Two Apple

---
[150] *Apple's head of global security indicted on bribery charges:* Washington Post, (Nov 2020), https://www.washingtonpost.com/technology/2020/11/23/apple-sheriff-bribery/

**Deleted:** <#>However, the TO-17 test only returned chemicals for ½ of the total VOCs it accounted for. The testing panel did not test for NMP, Arsine, Phosphine, Silane, or Chlorine – and these may have also been present.¶

**Deleted:** ot

**Deleted:** <#>Gjovik met the Apple attorney responsible for EH&S and CERCLA due diligence back in early November 2020, Debra J. Rubenstein. ¶
<#>During those meetings with Rubenstein, Gjovik was discussing what happened at her apartment and Rubenstein confided she recently joined Apple's legal team and was concerned to find that Apple had not been doing vapor intrusion testing on their Superfund offices."¶
<#>Gjovik talked to Mike Ertell and Ekelemchi Okpo about her concerns about what Rubenstein had said and that it was making her concerned about Apple pretending the 2021 testing was routine. ¶
<#>Gjovik texted Okpo a follow up of Rubenstein's LinkedIn on July 28 2021, to which Ekelemchi Okpo responded, *"Thank you."*¶
<#>On November 6 2020, Gjovik met with another Chemical Exposure doctor, Dr. Kari Nadeau, at Stanford. Dr. Nadeau wrote in Gjovik's visit notes, *"It sounds Ashley's symptoms were a response to chemical exposure, and the timing of her symptoms aligns with her living in the [3255 Scott Blvd] apartment. The severity and timing of the symptoms points to some type of industrial chemicals in her apartment and/or the property beneath it."* Dr. Nadeau added in the visit summary, *"I recommend the government agency in charge of the remediation site where she was living investigate the soil and groundwater as potential causes for her symptoms."*¶

<#>**The HVAC/Sub-Slat Vent Fiasco (2020)**¶
<#>On September 4 2019, Gjovik experienced a severe fainting spell at her Apple office at 825 Stewart Drive that last for several hours, requiring her to sit down in a chair, sit down on the floor, and even lay down on the floor of her cubicle. ¶
<#>Gjovik's fainting spell started in Mike Ertell's office, she took an EKG with her Apple Watch, and she communicated her symptoms to Ertell. ¶
<#>The spell continued at Gjovik's desk. A coworker in the Apple Government Affairs team had asked Gjovik to quickly send the Apple VP of Public Policy and Government Affairs, Cynthia Hogan,149 a copy of Gjovik's white paper on Apple's AI ethics practices. Gjovik laid on the floor, dizzy, while drafting the email to the VP and sending the file. ¶
<#>Later, Gjovik told David Powers about the fainting spell at some point the week after."¶
<#>Under information and belief, the fainting spell was due to vapor intrusion from the TRW Microwave Superfund site contamination. ¶
<#>In September 2019, the US EPA emailed about high levels of TCE in the outdoor air at the TRW Microwave Superfund site (Gjovik's office) and across the Triple Site. The EPA said they were "concerned" and the TCE has been "*increasing over the past few years*." EPA noted the TCE concentrations are "*often exceeding … indoor air residential… concentrations.*" EPA wrote that the levels of TCE in the outdoor air of Gjovik's office were "*close to exceeding*" the threshold for fetal heart defects in the first trimester of pregnancy. ¶
[... 6]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

1  Global Security executives turned state's evidence on Moyer and Apple in exchange for

2  immunity.[151]

3      193.    In 2020, John B. Frank was a Chevron Board member and James Irvine

4  Foundation Board member, and Frank was a Director at Oaktree Capital. In 2020, the 3250 Scott

5  Blvd factory was tied to Chevron through Ronald Sugar, and to Irvine Company through the

6  3255 Scott Blvd apartments next-door (where Gjovik lived). Gjovik's office at the 825 Stewart

7  Dr building on the TRW Microwave Superfund site was tied to Chevron through Ronald Sugar,

8  tied to Irvine Company through the new housing development next-door on the groundwater

9  plume, and tied to Oaktree Capital as Oaktree Capital owned the 825 Stewart Drive property

10  from 2014-2016. Under information and belief, these parties conspired about this real estate.

11      194.    Gjovik met the Apple attorney responsible for EH&S and CERCLA due diligence

12  back in early November 2020, Debra Rubenstein. During those meetings with Rubenstein,

13  Gjovik was discussing what happened at her apartment and Rubenstein confided she recently

14  joined Apple's legal team and was concerned to learn that Apple had not been doing vapor

15  intrusion testing on their Superfund offices. (In 2021, Gjovik talked to Mike and Ekelemchi

16  Okpo about her concerns about what Rubenstein had said and that it was making her concerned

17  about Apple pretending the 2021 testing was routine. Gjovik texted Okpo a follow up of

18  Rubenstein's LinkedIn on July 28 2021, to which Ekelemchi Okpo responded, "*Thank you.*")

19      195.    On November 6 2020, Gjovik met with another Chemical Exposure doctor, Dr.

20  Kari Nadeau, at Stanford. Dr. Nadeau wrote in Gjovik's visit notes,

21      "It sounds Ashley's symptoms were a response to chemical exposure, and the
timing of her symptoms aligns with her living in the [3255 Scott Blvd] apartment.
The severity and timing of the symptoms points to some type of industrial

---

[151] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty*, 2020, https://www.mercurynews.com/2020/10/19/main-witness-in-santa-clara-county-concealed-gun-bribery-case-pleads-guilty/

**Deleted:** <#>Under information and belief, these parties conspired about this real estate.¶
<#>On August 27 2020, there was smoke in the air due to wildfires and the smoke entered the building at 825 Stewart Drive. Employees were complaining of burning eyes and sore throats. Apple EH&S investigated the employee complaints and informed Gjovik's team that no action is required by Apple unless the indoor air particulate matter exceeds 500 ug/m3. Gjovik complained to David Powers that 500 ug/m3 was literally "hazardous" and there were many stages of unsafe air prior to exceeding 500 ug/m3. Powers ignored Gjovik's complaints.¶
<#>On November 12 2020, Northrop Grumman conducted the first "sub-slat depressurization vent" inspection on the roof of 825 Stewart Drive. Northrop Grumman would have seen that Apple sawed own the vents from 3 feet to 1 foot, and installed the HVAC intake on top of the vents in the section of the building where Gjovik sat. Northrop Grumman did not submit a report of their findings until demanded by the EPA in May 2021, and even then did not mention these issues.¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

chemicals in her apartment and/or the property beneath it." … "I recommend the government agency in charge of the remediation site where she was living investigate the soil and groundwater as potential causes for her symptoms."

196.    In December 2020, Apple submitted a request to revoke the DTSC consent decree in place since 2016. Under information and belief, the head of CalEPA at that time, Jared Blumenthal, orchestrated a revocation of the consent agreement despite Apple being in violation of the order, in exchange for a position as President of the Waverly Foundation working for Lisa Jackson and Laurene Powell Jobs, and/or other favors.

197.    On December 14 2020, Apple submitted their first hazardous waste manifests for activated charcoal at the 3250 Scott Boulevard facility. The manifests were for 630 pounds of activated charcoal.

198.    Under information and belief, Apple did not change the charcoal/carbon filters for their solvent exhaust from 2015 until December 14 2020, despite maintenance protocols usually calling for replacements at least every six months.[152] The carbon Apple removed was notated as non-RCRA waste, which is likely inaccurate and unlawful coding of solvent-soaked charcoal. Under information and belief, if Apple did replace solvent-soaked charcoal prior to 2020, it did so without manifests, and illegally disposed of hazardous waste without proper transporters or disposal.

**Table: Apple's Manifests at 3250 Scott Blvd for Carbon and Filters**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| Activated Charcoal | 0 | 0 | 0 | 0 | 0 | 630lbs | 980lbs | 1255lbs |

---

[152] Uniform Hazardous Waste Manifest, Apple Inc, Activated Carbon, Dec 14 2020, Tracking #014565900

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **(Carbon) Roof HVAC Filters** | 0 | 0 | 0 | 0 | 0 | 400lbs | 0 |
| **Vacuum Filters** | 0 | 0 | 0 | 0 | 0 | 60lbs (with glass) | 0 |

199.    On or around December 2020, Charlene Wall-Warren, director of Environmental Technologies, reporting to Yannick Bertolus (Dan West's manager), suggested Gjovik join her team in a position working on implementing circular economy legislation across the company, including projects like "right to repair." Gjovik expressed to West and Wall-Warren that she would love to transfer to the role. Around January 2021, West informed Gjovik that Wall-Warren requested to have Gjovik transferred to her team and West declined to allow Gjovik to leave his team.  As of January 2021, Gjovik had attempted, and continued to attempt, to find a role where she could stay working at Apple indefinitely.

v.    "Skipping the Line": The Vaccine Hoarding Incident (2020)

200.    In December 2020, Apple Senior Vice President Dan Riccio held an 'All Hands' for his staff, which included Gjovik. During the All Hands, Dan Riccio made a comment that he had just left a meeting with Apple CEO Tim Cook and that Apple entered a deal where they will obtain "early access" to the COVID-19 vaccines. Riccio said Apple will only need to 'wait' for doctors and the elderly, and then Apple will get 'a lot' for employees and their families, and even have 'extra left over.'

201.    Gjovik was disturbed and upset by Riccio's comments. At that point in the pandemic, there was a great need for vaccines for those with pre-existing conditions, front-line workers, and other high-risk populations. Riccio's comments inferred Apple arranged a backroom deal to 'skip the line' on the vaccine and intended to hoard the vaccines.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

202.    Indeed that same month, public articles were being published warning about how "*the rich and privileged*" will "*skip the line for Covid-19 vaccines*" and create a "*black market.*"[153] Attempts of the rich and powerful to "*jump the line*" ahead of the people who actually need the vaccines the most has been characterized as an "*antisocial behavior.*"[154] Companies caught trying to jump the line have been shamed, shunned, and forced to apologize.[155]

203.    At that time, "*With the first doses in short supply, California has laid out a strict order of vaccinations based on need and risk: Healthcare workers and nursing home residents, then essential workers and those with chronic health conditions, then, finally, everyone else.*"[156] Governor Newsom acknowledged Silicon Valley executives are accustomed to getting their way. In December 2020 he said, "*Those that think they can get ahead of the line and those that think because they have resources or they have relationships that will allow them to do it … we also will be monitoring that very, very closely.*"[157] Newsom also threatened to sanction and revoke professional licenses of those engaged in line jumping.[158]

---

[153] Olivia Goldhill and Nicholas St. Fleur, '*There absolutely will be a black market': How the rich and privileged can skip the line for Covid-19 vaccines, STAT* News, December 3 2020, https://www.statnews.com/2020/12/03/how-rich-and-privileged-can-skip-the-line-for-covid19-vaccines/
[154] Annike Beck, "*Inoculation Injustice: A Federal Response to Vaccine Line Jumping.*" Minnesota Law Review, February 15 2021, Volume 105, https://libpubsdss.lib.umn.edu/minnesotalawreviewprod/2021/02/15/inoculation-injustice-a-federal-response-to-vaccine-line-jumping/
[155] Bill Gardner, *Exclusive: Luxury firm offered GPs £100,000 for vaccines amid fears of jabs black market*, The Independent UK, January 8 2021, https://www.telegraph.co.uk/news/2021/01/08/exclusive-luxury-property-firm-offered-gps-100000-give-workers/
[156] Laura J. Nelson and Maya Lau, "*The wealthy scramble for COVID-19 vaccines: 'If I donate $25,000 … would that help me?*'" The LA Times, December 18 2020, https://www.latimes.com/california/story/2020-12-18/wealthy-patients-scramble-covid-19-vaccine
[157] Id.
[158] Molly Gamble, "Skip line for COVID-19 vaccine and lose your license, California governor warns healthcare providers," Beckers Hospital Review, December 29 2020, https://www.beckershospitalreview.com/legal-regulatory-issues/skip-line-for-covid-19-vaccine-and-lose-your-license-california-governor-warns-healthcare-providers.html

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

204. Gjovik complained to West and Powers, but they never responded in a meaningful way. Gjovik then escalated her concerns to a Senior Director colleague in a different organization, Dr. Cohen, who is seen as an ethics leader at the company. Gjovik told him what she witnessed and expressed her concerns and said if there was still time to stop Apple's plan, she wanted to try to intervene for the sake of public health and the community.

205. The colleague jumped on the issue and escalated the matter to at least Deirdre O'Brien (Human Resources Vice President) and Lisa Jackson (VP of Apple Government Affairs & Lobbying). Gjovik was told they were both concerned if it was true. The colleague called Gjovik to confirm that Gjovik's recollection of events before the matter was escalated further. Gjovik confirmed her prior statements and suggested they seek the recorded video of Riccio's statements.

206. Gjovik heard that the video was obtained, and Gjovik's statements were confirmed to be accurate, that Riccio did say those things. Gjovik was told it was escalated to the "e-team" (executive team reporting to CEO Tim Cook) and they were "put on notice" about "*serious ethical issues*" if what Riccio said was ever pursued.

207. Gjovik was told the deal was either not actually in place or would not occur now. However, on December 9 2020 she was told "*there are individual stories about test machines and treatment that are troubling, but no such company wide access is on the table, much less a done deal*." Gjovik thanked Cohen for believing her and Cohen replied: "*It has never occurred to me not to believe [Gjovik].*"

208. Gjovik had asked to remain confidential, noting everyone was '*terrified*' of Riccio. Gjovik was told her identity was kept confidential, though she worried that is not possible at Apple due to Apple's surveillance measures.

Deleted: Joshua

Deleted: , " on December 9, 2020.

Deleted: the Worldwide Loyalty Team

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

209.    In January 2021, Dan West texted Gjovik that employees who complain about him may "*feast on a banquet of consequences.*"



> Thu, Jan 7, 4:38 PM
>
> random thought —> should we allow for comments on confluence for "from the desk of…"
>
> I worry about snark. but that can't be done anonymously
>
> so if anyone does that, they may feast at a banquet of consequences

*Exhibit: Texts from Dan West 1/7/21 about "Consequences"*

210.    Dan Riccio was demoted and reassigned about one month after Gjovik's concerns were raised, escalated, and confirmed.[159] Gjovik now reported to David Powers and Dan West, who reported to Yannick Bertolus, who reported to John Ternus, who reported to Tim Cook.

211.    Gjovik made her identity known related to the matter during the July 2021 investigation (since Apple would find it going through her emails anyways) and labeled the evidence folder "*Corruption Whistleblowing*".

212.    Unsure whatever came of the situation, Gjovik also filed complaints with the FDA Office of Criminal Investigations and DOJ NCDF ("COVID-19 hoarding") about the matter on September 3, 2021, and posted on social media that she did on September 6 2021. Gjovik was also still using her iCloud email so Apple would have seen the email receipts.

**vi.    The TRW Microwave Superfund Site Debacle (2021)**

213.    On January 23 2021, Gjovik contacted US DOL OSHA, filing a FOIA request, and asking for "reports of chemical or heavy metal exposure, or suspected chemical or heavy

___

[159] Apple, *Dan Riccio begins a new chapter at Apple – Apple*, January 2021, https://www.apple.com/newsroom/2021/01/dan-riccio-begins-a-new-chapter-at-apple/ *("Apple today announced Dan Riccio will transition to a new role focusing on a new project and reporting to CEO Tim Cook, building on more than two decades of innovation, service, and leadership at Apple. John Ternus will now lead Apple's Hardware Engineering organization as a member of the executive team.")*

---

Deleted: around

Deleted: <#>In January 2021, Dan West texted Gjovik that employees who complain about him may "*feast on a banquet of consequences.*" ¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

metal exposure, during the construction and maintenance of the Santa Clara Square Apartments at 3255 Scott Blvd."[160]

214.    On February 4 2021, a coworker who also worked in the TRW Microwave building texted Gjovik that Gjovik was the only Apple employee to inform her their office was a Superfund site. She said after learning that it was a Superfund site, she stopped drinking the water in the building. On March 16, 2021, she informed Gjovik that she had fought cancer in 2018 requiring chemotherapy.

215.    On March 11 2021, Santa Clara County investigated a spill of cooling water at Apple Park and told Apple to report the spill to CalOES. Apple (Debra Rubenstein) refused to report the spill to CalOES. On March 15 2021, Apple received a Class II violation of hazardous waste laws for the spill. Apple never reported the spill to CalOES.

216.    On March 15 2021, Gjovik notified her managers, David Powers, and Dan West, that she wrote an article about her previous apartment on a Superfund site groundwater plume (next to 3250 Scott Blvd) and it was being published in a newspaper, SF Bay View. Gjovik notified them that Apple Business Conduct approved her article being published but noted she felt pressured not to write about "*the toxic nightmare that is Stewart 1*" (her Apple office).

217.    On March 17 2021, Apple sent an email to Gjovik and Powers' management team saying it was going to test for "vapor intrusion" at Gjovik's office, 825 Stewart Drive, but did not mention it was a Superfund or explain what vapor intrusion was. Gjovik replied informing her coworkers it was a Superfund site with a link to the US EPA website for the office

---

[160] US DOL OSHA FOIA 2021-F-04615, assigned tracking number February 9 2021.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1   and two recent news articles about the site referring to the office as a *paved over environmental*

2   *disaster zone*. [161] Gjovik explained what vapor intrusion was and told them to take it seriously.

3        218.   Gjovik expressed concerns that Apple employees *"should be better informed*

4   *about these types of environmental risks at our offices."* Gjovik added, *"the chemicals under*

5   *[the Stewart 1 office] if in high enough quantities, can cause cancer, disruption of nervous and*

6   *endocrine systems, and birth defects & miscarriages."* Gjovik asked in her email reply for

7   details of what type of testing was to be performed and for what duration, if there would be a

8   risk assessment, and if EH&S would share the findings with the employees in the building.

9   EH&S agreed to meet with Gjovik to discuss her concerns.

10

11        219.   Gjovik quickly faced retaliation and hostility from her manager, David Powers,

12   quickly followed by retaliation and animus from Employee Relations, and her other manager

13   Dan West, related to her safety concerns and complaints. Less than a week after her response to

14   the email about vapor intrusion testing, on March 22 2021, Powers gave Gjovik a *"warning"* for

15   sharing her safety concerns with his management team and he instructed her she was only to

16   discuss safety concerns or talk about the CERCLA status of their office with him, EH&S, and

17   Apple Employee Relations. Powers told Gjovik it was only a *"warning"* because he said, *"she*

18   *was having* mental *health issues."* Gjovik protested to Powers, explaining the Superfund status

19   of their office was public information. Powers persisted & then proceeded to give Gjovik

20   feedback on an Inclusion & Diversity presentation she gave to his management team and told

21   her he received feedback from his all-male management team that Gjovik was *"being too hard*

22   *on the white man."*

23

24

25

26   _____

27   [161] Alexis C. Madrigal, Not Even Silicon Valley Escapes History, The Atlantic (July 23 2013) ["The
     empty octagonal glass building is a TRW Microwave Superfund site. I'd been walking on a paved-over
     environmental disaster zone, colonized by whoever wanted to benefit from lower leasing prices and a
28   lack of NIMBY opponents."] https://www.theatlantic.com/technology/archive/2013/07/not-even-silicon-
     valley-escapes-history/277824/

**Deleted:** <#>Gjovik asked in her email reply for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. ¶

**Deleted:** mention

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

220.   On March 22 2021, Gjovik complained to a friend who was a coworker at Apple that she was getting 'yelled at' by Powers. The friend responded, "*Yelled at?! For bringing attention to a really important life-threatening situation? I mean ffs it was in pbs? KQED? Article years ago, remember?*" Gjovik added, in response to commented Powers told her not to 'freak people out,' that she told him "*How do you think I felt when my friend told me about the site when I moved in*"? The friend Gjovik was texting with about this was a Senior Manager at Apple.

221.   On March 25 2021, Gjovik emailed Powers and confirmed he told her not to tell anyone about her safety concerns, including findings from public records. She reported at least "three incidences of toxic levels of vapor intrusion" in the building, as recent as 2013. Gjovik noted the highest levels of TCE were found "*only about 10ft from [her] desk.*"



*From:* **Ashley Gjovik** ashleygjovik@apple.com 🔗
*Subject:* Quick SD01 Update - History of Vapor Intrusion
*Date:* March 25, 2021 at 8:11 PM
*To:* David Powers powers@apple.com

Hi! I'm meeting with EHS next Friday. I asked for some time so I can review the site documentation and ask informed questions.

I wanted to give you a heads up on what I've found so far. (Just you for now, as you requested).

There's been at least three incidences of toxic levels of vapor intrusion in the TRW Microwave building (SD01). Once in 2003, then 2004, then 2013. There were levels of TCE, Vinyl Chloride, & Chloroform found in the air above max industrial workplace thresholds.

I mapped out their findings below with the data published by the government. The very highest indoor air findings by far were found in 2013 & only about 10ft from my desk. They found 1,900ug/m3 of TCE in the air after drilling a hole in the floor, with a EPA Industrial Max threshold of only 3ug/m3, so 1897ug/m3 over. Right about where ▮▮▮▮ sits now.

*Exhibit: Gjovik's 3/25/21 email to Powers*

222.   On March 26 2021, Gjovik had published an article in SF Bay View about her chemical exposure experience with the apartment next to 3250 Scott Blvd, complaining of agency capture and government corruption.[162]

_____

[162] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste*, SF Bay View (March 26 2021), https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25





*Exhibit: Gjovik's 3/26/21 Article*

223.   On March 29 2021, Gjovik messaged a coworker, Mike, who also reported to Powers, and she said, *"As of last Monday Dave has forbidden me from talking about health concerns about [Stewart 1 office] to anyone other than him, HR, and EH&S. I actually found some stuff and I can tell you, but you have to promise to tell him I'm not telling you."* Mike confirmed he would not tell Powers Gjovik was discussing safety concerns, so Gjovik did not get in trouble with Powers.

224.   Mike responded to Gjovik's map of their office with vapor intrusion results saying, *"Holy hell. Where did that [Stewart 1 office] map come from? If the entire 1st floor is over the U.S. EPA max, why is the building still open?"* Mike worked only feet away from Gjovik in their office. Gjovik explained she *"made the map overlaying data from historical testing [Apple and Northrop Grumman] did with [Apple's] own maps so we can see that one place and bring it home [to Apple] that this is [Apple's] employees."* Then Mike responded, *"What's crazy is that on the Geotracker, they say no day care, no elder care, no residential, etc.*

Deleted: manager
Deleted: Ertell
Deleted: Ertell
Deleted: Ertell
Deleted: Ertell
Deleted: The Ertell
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*So, it's fine & dandy for everyone else to get slowly poisoned? Before COVID, I was at work for longer than I was at home on a daily basis. So glad you are digging into this stuff for all of us."*

225.    On March 29 2021, Gjovik noticed a person named Jenna Waibel, who worked in an organization called "Employee Relations," had been added to her meeting with EH&S. Gjovik emailed her that day: "*Hi Jenna! Not sure if it's a good or bad sign an ER HRBP got added to this*" and mentioned the article about her apartment where she got sick, and that she fainted at her office in 2019 and now thinks it was due to vapor intrusion.

226.    On April 2 2021, Gjovik met with Jenna Waibel and Michael Steiger and asked them about the land use covenant for the building, the history of vapor intrusion, and other CERCLA-related topics. Gjovik expressed concerns that the 2014 Five-Year-Report for the site mentions the already very restrictive land use covenant, is apparently out of compliance with California law and needs revised, [163] but Gjovik did not see any revisions. Gjovik asked, *"does California Civil Code § 1471 add any new requirements on the property not current reflected?"* Steiger told her simply "*that's a question for legal*" and never followed up.



8.  Pg 32 of the 2014 FYR mentions there's excess cancer risk for occupants due to vapor intrusion, and also plumbing/steam pathways (like the lockeroom showers). Shouldn't employees be notified about this? Prop 65 at least?

No Prop 65 requirements per internal review.

9.  Shouldn't employees be notified this is a remediation site? Ideally informed consent for working there. At the very least Right to Know should require some sort to disclosure?

Apple decided no legal requirement. Larger question for Apple on ethical/moral obligation.

10.  Pg 28 of the 2014 FYR mentions the current land use covenant is not in compliance with modern California legislation and needs to be revised. Was it revised? I don't see a new one still. Does CA Civil Code § 1471 add any new requirements on the property not current reflected?

Question for legal

*Exhibit: 4/2 Meeting Notes Excerpt*

---

[163] U.S. EPA, 4th Five Year Review: AMD & TRW Microwave Superfund Sites, 2014, https://semspub.epa.gov/work/09/1151964.pdf ["*The existing restrictive covenant was recorded prior to the passage of the California Civil Code section 1471, which establishes the framework for environmental covenants in California. The legal owners of the former TRW Microwave property should record a new restrictive covenant that is consistent with current California law.*"]

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

227.    Gjovik pressed Steiger and Waibel why Apple does not inform its employees they are working on Superfund sites, repeatedly raising concerns about California Proposition 65 and state/federal Right to Know compliance. Steiger told Gjovik Apple "*Decided*" employees did not have a right to know and did not plan to inform them. Gjovik protested saying she though there were legal, ethical, and even practical reasons employees should know – including so they knew to look for signs of vapor intrusion and how to report it. Steiger and Waibel continued to ignore Gjovik's concerns.

228.    On April 3 2021, Gjovik asked Jenna Waibel to explain to Powers that she is supposedly allowed to talk to coworkers about safety concerns and that he is not supposed to retaliate against her. Waibel would refuse to do this, despite repeated asks from Gjovik over the next few months.

On Apr 3, 2021, at 5:24 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Jenna,

Thanks again for your support. Favor to ask of you: that script that Michael read — about there being no prohibitions on Apple employees speaking out about concerns related to work place conditions, & no retaliation for speaking out either — was really great.

Any chance you could send me a written version I can forward to my manager?

My manager doesn't seem aligned on the messaging. Last Monday he told me directly I was not allowed to speak out about my concerns about the site to anyone in the organization — nor was I allowed to share any details from my meeting with EHS & you with our organization either. He said I was only allowed to talk to him and EHS about it going forward. He told me this under the premise of "employee feedback," and insinuated I was only being left off with a warning this time because of my "mental health issues" (verbatim) due to what happened to me last year at my apartment. I have told him previously I'm suffering from PTSD from what happened last year — but I didn't expect it to be linked into the current situation like he did.

Like most HWE managers, I don't think he had bad intent, just some people skill, diplomacy, & empathy deficits. Would be very helpful to me if I can have an email to forward to him clarifying what I'm allowed and not allowed to do — and that there should be no retaliation (like perf review) for speaking out. I suspect that should address the issue.

Thanks!

Ashley M. Gjovik

*Excerpt: Gjovik's Email to Waibel on 4/3*

229.    On April 4-5 2021, Gjovik raised her concerns about her office with West saying, "*Did you know that [Stewart 1 office] has a history of TCE, vinyl chloride, & chloroform vapor intrusion as recent as 2013? Beyond industrial limits, inside. And they haven't done any testing*

88

Deleted: decided

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*or monitoring since 2015."* She added she was asking Apple EH&S to *"reconsider the current policy of not disclosing Superfund status to the employees that work in these sites*."

230.    West replied, *"Didn't know that. I'm pretty sure that before we moved in there was some testing. Not sure what though."* Gjovik responded, *"He said they did more remediation in 2014 and did some indoor air testing in 2015 and it was fine now, and they expect it to be fine. And I'm like what if the floor cracks, it's literally hades down there, and he's like yeah that would be bad, let us know if you smell anything weird. ER was there too. I expressed my understanding but general displeasure."* West replied, *"It's all supposed to be sealed. Under the foundation…But I'm no expert."*

231.    Gjovik messaged with her West, on or around April 5 2021, about the chemical exposure at her previous apartment, which sat on contamination from a Brownfield and a Superfund site and was also next to 3250 Scott Blvd. West called her #ErinBrokovich, then warned her she is *"kicking a hornet's nest."* West asked Gjovik not to send him information about Gjovik's chemical exposure at 3255 Scott Blvd to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits*."

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: Gjovik's texts with West – 4/5/21*

232.    On April 5 2021, Gjovik messaged with West about an article she wrote about the apartment on hazardous waste she lived at that made her ill in 2020. Gjovik informed West five other people contacted her who were also sick at the apartment and that she had been warned about retaliation, possibly including physical violence, from the property owner, Irvine Company.

233.    Gjovik told West she had sleeping with a knife under her pillow and West told her not to sleep with the knife anymore, or a gun, so it will not be used against her and to instead obtain pepper spray or a taser.

234.    West also warned Gjovik should worry about digital surveillance as well and suggested Gjovik purchase a necklace that includes a panic button and calls ADT agents. West told Gjovik *"If you don't have a therapist give EAP a call. You're in a stressful situation (to say the least)."*

Deleted: *if*
Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

235.    Gjovik informed West she had a therapist but was still struggling and had to increase her anxiety medication.

236.    On April 11 2021, Gjovik wrote to Powers, forwarding the email she sent with questions and concerns to Steiger and Waibel including about "*compromised*" and "*missing*" sub-slat vents per the documentation, telling Powers, *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on."*

### vii.   Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021)

237.    On April 5 2021, Gjovik also notified Osman Akhtar, Director of Apple "AC Wellness" employee medical Centers and Clinical Engineering, with whom she had been in previous contact with, sharing that after her article was published more people came forward from the 3255 Scott Blvd apartments reporting illness.

238.    Gjovik told Akhtar "*Two are Apple employees. At least one went through AC Wellness but no one could figure out what's wrong with them.*" Gjovik suggested the clinic should start "*screening local folks*" with unexplained medical symptoms that match solvent exposure. Apple was on notice about the impact of its factory to the community and its own employees.

239.    On and around April 5 2021, additional victims came forward reporting solvent exposure medical systems while living next to Apple's 3250 Scott Boulevard factory. Some of them were current Apple employees. Two women contacted the government complaining of medical issues similar to Gjovik's.

240. Around April 2021, Gjovik told Mayor Gillmor, via Gjovik's iCloud email address, she was starting to investigate the industrial buildings uphill from 3255 Scott Blvd (which is where 3250 Scott Blvd was). Apple's retaliation against Gjovik quickly increased distracting Gjovik away from further investigation and instead redirecting Gjovik to what was happening in her office.

241. In April 2021, one of Gjovik's law professors suggested she contact the Santa Clara County District Attorney's office and document her findings and concerns. The professor was a prior criminal law attorney and warned Gjovik that her complaints about the pollution and chemical exposure she discovered could lead to retaliation and violence.

242. Gjovik contacted the County District Attorney's office on April 9 2021 and talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes. They scheduled a meeting and discussed Gjovik's concerns about 3255 Scott Blvd on April 16, 2021. Apple would have seen these emails on Gjovik's work devices.

243. On April 15 2021, Gjovik sent an email to Dr. Cohen, Apple Senior Director, complaining of Apple's conduct related to her office at 825 Stewart Drive and the mishandling of her complaints. Gjovik said she wanted to raise *ethical concerns* and complained that Apple's conduct was *morally wrong.*

244. On April 21 2021, Gjovik raised concerns to Apple's Inclusion & Diversity team, via John Brown, complaining of disparate impact of chemical exposure at Apple's offices toxic waste sites, disproportionally harming non-white people and women. The I&D manager asked Gjovik to draft a business justification for Apple to not expose Black and Brown people, and women, to industrial chemical vapors. Gjovik wrote to Brown:

> The majority of apple buildings are on really gross EPA Superfund and chemical
> release sites. For example, my building in Sunnyvale is on one of the worst
> superfunds in the country with decades of vapor intrusion at levels dangerous to

Deleted: her

Deleted: DA's

Deleted: Joshua
Deleted: mis-handling
Deleted: Gjovik wrote to Cohen:
Deleted: "Apparently most Apple buildings are on chemical release sites. … When I asked why they aren't telling employees — what EHS told me was that Apple did an internal review and decided it has no legal obligation to disclose anything about these release sites to employees… I was sharing all this with [an employee in Lisa Jackson's organization] and she's apparently preparing a presentation for Lisa right now about a new Env Justice type project Apple wants to lead and then when I told her what Apple's actually doing… she's like, uh oh. She's been doing more research and is preparing to raise the issue to Lisa in some way. But its even more complicated. I found an article from 2016 where apparently Apple was breaking hazardous waste laws and settled with the state gov for half a million. Alisha ([this persons'] manager) was quoted as saying that "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me."¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

human health. Apparently, Apple's official policy is that they have no obligation to disclose the status of these sites (even with dangerous chemicals on site) unless they believe, based on data, that human healthy is actively being harmed. At the same time, they appear to be doing very little or no testing or monitoring. I'm interrogating EHS right now — despite decades of vapor intrusion testing, after they did a really short and limited number of tests that for the first time ever were in range, they never tested or monitored again until later this year (not done yet).

Apparently, women get worse health issues from this type of chemical exposure. Because we have high body fat and sensitive hormones, etc. So if there are chemical vapor issues in buildings, women will get sicker. It also can mess with our reproductive health and pregnancies. But then EJ…. Which employees are going to spend the most time around vapor intrusion pathways (plumbing, vents, etc.) — probably our Black and Brown employees working in maintenance & cooking type roles. Who's going to spend the most time physically exerting themselves running things around at these buildings? Probably our technicians and admins, who are also predominately people of color and women, respectively. Our technicians are predominately Black & Brown. So are the maintenance staff.

245.    Brown responded: *"Have you done a well-crafted succinct email on the issue, the impact of the issue, and possible solution to consider that you could send to EHS?"* Gjovik replied, *"They're fully aware and don't care Or at least legal said they don't care and EHS is following that."*

246.    Brown replied: *"So what is your actual ask of Apple in three bullet points?"* Gjovik responded:

"1) inform apple employees of the presence of industrial chemicals in the soil & groundwater beneath their buildings, along with any anticipated health risks 2) empower apple employees to understand these sites and their rights around them (like who at the EPA to call if they have questions about their specific building and want a neutral 3rd party) 3) do ongoing vapor intrusion testing and

Deleted: )

Deleted: And

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

monitoring on buildings who have VI risk and train employees on site how to identify possible VI issues (medical symptoms, smells, etc.) In a perfect world 4) require informed consent for employees to actually be assigned to work in the worst of these buildings."

Brown never replied.

247.    In April 2021 and through August 2021, Gjovik complained to Apple about an apparent failure to properly report and track workplace injuries. In April 2021, Gjovik was convinced a fainting spell at her office in September or December 2019 was due to vapor intrusion. Apple Human Resources Business Partner Helen Polkes insisted Gjovik file a worker's compensation claim for the fainting spell. Gjovik questioned Apple's justification and incentives in requesting Gjovik file the claim nearly two years after the fact. Gjovik documented her confusion in emails with Polkes, Powers, and coworkers.

248.    Gjovik did follow Polkes instructions and filed a claim on April 21 2021, signed April 26 2021.[165] Gjovik texted a coworker about it and said the "Sedgwick lady told [her] to consider suing Apple."

249.    On April 21 2021, Gjovik contacted the US EPA about her Apple office on the TRW Microwave Superfund site.

---

[165] Workers Compensation Claim for Chemical Exposure (# 302174831070001) § Filed: 4/26/2021; Dated: 12/4/2019

> **From:** Ashley Gjovik <ashleygjovik@icloud.com>
> **Sent:** Wednesday, April 21, 2021 9:29 PM
> **To:** Schulman, Michael <Schulman.Michael@epa.gov>
> **Subject:** Questions about TRW Microwave (Building 825) in Sunnyvale CA - CAD009159088
>
> Hi Michael! I hope you're well.
>
> I work for Apple in the TRW Microwave (Building 825) site in Sunnyvale — part of the "Triple Site."
>
> I have some concerns about the current status of the building. I'm talking to our EH&S team at work about it and they said I'm allowed to reach out to you and talk to you directly as well.
>
> I've skimmed the majority of the site documentation on the EPA and Water Boards portals. (Thanks for adding the 2019 FYR!) Apple also shared the Dec 2015 indoor air testing summary.
>
> Would you be open to a phone call to discuss the site and some of my open technical questions? I can talk before 10:30a or between 2-4pm tomorrow, or anytime Friday before 11am, or between 12-2, or after 3pm.

*Excerpt: Gjovik Email to EPA 4/21*

250.    On April 23 2021, the US EPA told Apple that Gjovik contacted them about her Apple office. EPA's emails about Gjovik's questions and concerns advised, per Fatima Ty, that Apple should be included in any conversation that the US EPA had with Gjovik about the TRW Microwave Superfund site. Ty justified this requirement due to Ty's work "*in EHS at IBM.*" US EPA (Margot Perez-Sullivan, Fatima Ty, Edwin "Chip" Poalinelli, and Michael Schulman) drafted an email to Gjovik informing Gjovik they told Apple that Gjovik contacted them, but never sent it.

251.    On April 29 2021, Gjovik visited an occupational exposure doctor (Dr. Robert Harrison who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health[166]), about her exposure at

---

[166] UCSF, Dr. Robert Harrison MD MPH, https://profiles.ucsf.edu/robert.harrison

Deleted: 30

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

3255 Scott Blvd (the apartments next to Apple's 3250 Scott Blvd factory) and at 825 Stewart

Drive.

252.    The UCSF visit notes summarized Gjovik's 2020 medical symptoms as

"*Specifically, she was experiencing severe dizzy spells, a large decrease in resting heart rate,*

*palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath,*

*multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal*

*bleeding, and swollen glands"* The UCSF visit notes stated: *"there remains a concern about*

*potential pathways for residential exposures, and these should be addressed by the county and*

*State environmental agencies."*

253.    The April 29 2021 UCSF Occupational Exposure visit notes stated: "*She also*

*notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site*

*with a long history of vapor intrusion issues in the building. She states her apartment was built*

*in an industrial area next to a the Synertek Superfund and next to Apple Materials Superfund*

*and Intel Magnetics Superfund. She also notes her current office is in TRW Microwave building*

*on an EPA Superfund "Triple Site."*

254.    Under California law, by April 2021, and as early as February 2020, Gjovik was

an environmental crime victim because she was a "*victim of a crime that caused physical injury*"

and suffered "*physical, psychological, and financial harm due to the attempted commission of a*

*crime or delinquent act*" from Apple's criminal actions at 3250 Scott Boulevard[167] and 825

Stewart Drive[168] (even if she did not know it was Apple or understand the cause of her harm

---

[167] RCRA, CAA, Right to Know
[168] CERCLA, CWA

**Deleted:** 30

**Deleted:** ,

**Deleted:** possibly

**Deleted:** Stweart

**Deleted:** ,

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

until later), and thus Gjovik was protected under Cal. Lab. Code § 230 against retaliation due to

her crime victim status and any of her actions in ensuring her health, safety, and welfare.[169]

255.    Under federal law, by April 2021, and as early as February 2020, Gjovik was an

environmental crime victim suffered direct physical, emotional or financial harm as a result of

the commission of a federal crime.[170] As with BP Products, Gjovik was seriously injured by

Apple's unlawful release of hazardous air pollutants In cases where an environmental crime.[171]

either brings about obvious harm (deaths and injuries in the BP Products case) or where proven

exposure is a harm in itself (asbestos exposure in Keith Gordon-Smith), a court's identification

of victims can be relatively direct.[172] Harm caused by environmental crimes can include physical

and psychological injury, death, and pecuniary loss and property damage.[173]

256.    Gjovik has the right to receive protection from a suspected offender or persons

acting at their behest, the right to be reasonably protected from the accused, and the right to a

full and timely restitution with proceedings free from unreasonable delay.[174]

257.    On April 9, 2021, Waibel replied to Gjovik's email, stating that she would launch

an investigation into Powers, but only into his statements about Gjovik's '*mental health*' and

complaints Gjovik was '*being too hard on the white man.*' Gjovik quickly replied to Waibel,

---

[169] Cal. Lab. Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955. *"Regardless of* whether anyone is
*arrested.*"
[170]  US EPA, *Environmental Crime Victim Resources*, https://www.epa.gov/enforcement/environmental-
crime-victim-resources; US DOJ, *Environmental Crime Victim Assistance*,
https://www.justice.gov/enrd/environmental-crime-victim-assistance
[171] *United States v. BP Prods. N. Am., Inc.*, 610 F.Supp.2d 655, 672-73 (S.D. Tex. 2009). See also *United
States v. Keith Gordon-Smith*, No. 08-CR-6019 (W.D.N.Y. Sept. 20, 2010), available at
http://www.justice.gov/usao/nyw.gordon.html (victims of environmental crime that involved failure to
provide protective equipment to asbestos workers included the workers (and their families) who were
exposed to airborne asbestos fibers for several months during illegal asbestos removal and disposal).
[172] United States Department of Justice Executive Office for United States Attorneys, *Environmental
Crimes–2012*, Volume 60, Number 4, pg89 (July 2012
[173] United States Department of Justice Executive Office for United States Attorneys, *Environmental
Crimes–2012*, Volume 60, Number 4, pg96 (July 2012
[174] Victims' Rights and Restitution Act (34 U.S.C. § 20141); Crime Victims' Rights Act (18 U.S.C. §
3771).

Deleted: ¶
    <#>The Non-Consensual Sexism Investigation, Doxing,
    Gag Orders, & Other Retaliation (April-June 2021)¶

Deleted: "regardless

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

indicating that she did not want an investigation because she feared retaliation, and instead simply wanted Waibel to explain "*labor laws*" to Powers. Waibel says she was going to open the sexism investigation whether Gjovik wanted it or not.

258.    Gjovik had a phone call with Waibel on April 27 2021. Gjovik had requested again that Waibel talk to Powers about "labor laws" and clarify if she can talk about her safety concerns. Waibel suggested a 10-minute phone call to discuss Gjovik's right to discuss the "terms and conditions" of Gjovik's employment. During the call, Gjovik requested again that there not be a sexism investigation. Waibel said there will be a sexism investigation.

259.    On April 27 2021, Waibel also gave Gjovik a five-point balancing test if Gjovik wanted to talk about workplace safety including that information was complete, accurate, did not make an assessment about safety, does not cause a panic, and any follow up questions are redirected to EH&S to discuss privately with the other person.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

On Apr 27, 2021, at 10:27 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi,

Hi Michael and Jenna,

I'm looking for some clarity on what I'm officially allowed and not allowed to say about Apple's offices/buildings on chemical release sites.

I chatted with Jenna this morning and she said I'm allowed to speak about any concerns about the terms and conditions of my employment — but I can only share information that is "complete and accurate. Further, she said I should not cause "panic" if there's "no reason for panic." In addition, she said if there's any risk to employees safety, that communication would need to come directly from EHS. (Jenna, please confirm if this is a correct summary or not, and if not please clarify).

I mentioned to Jenna I'm still confused as to what that means. I had raised the issue weeks ago that my boss gave me "employee feedback" about my email with questions about the building and the VI testing, implied it was a "warning" because I was having "mental health issues," and forbid me from talking to anyone about the Superfund status of SD01 or any of my concerns about working in SD01 related to the building other than to him and EHS. Jenna said he denied he said this, but he hasn't followed up with me directly to clarify anything. (Jenna, please note if that is not correct per your convo with him).

Michael the script you read when we first met was great and that's why I called out what Dave told me to Jenna, because it seemed in direct contradiction to what you said. So I'd really appreciate clarity here.  When I talked to Jenna, I asked if I could even talk openly about the Superfund status of SD01 and she said only if EHS confirms that is complete and accurate information. I told her I think it would be best if I have you confirm some key points so I don't get in trouble later. So Michael, I have some questions for you below about what is "complete and accurate" — as well as some general questions, perhaps for both of you.

**Questions for Michael (to confirm if complete and accurate)**
- Y or N: The Stewart 1 is an EPA Superfund site called "TRW Microwave," part of the EPA "Triple Site"
- Y or N: TRW Microwave is an active Superfund site.
- Y or N: The EPA calls the area "Triple Site" because three groundwater aquifers were contaminated with industrial chemicals, and all three became active EPA Superfund sites, and at some point all three groundwater plumes merged and/or overlapped into a triple-groundwater plume (including TRW's original plume, as well as the other two plumes now impacting TRW Microwave)
- Y or N: Until 2021, the latest indoor air vapor intrusion testing inside SD01 was in Dec of 2015.
- Y or N: Do you consider the EPA, DTSC, and/or Water Boards documentation on the TRW Microwave site (SD01) to be complete and accurate?
- Y or N: Does my building assignment (aka "my official desk is in SD01") constitute part of the "terms & conditions" of my employment?
- Y or N: Do the other Apple buildings I visit for meetings also constitute part of the "terms & conditions" of my employment? (Aka the Siemens and Intersil Superfund sites)
- Y or N: Tantau 8 is on an active EPA Superfund site called "Intersil"
- Y or N: Homestead 1 is on an active EPA superfund site called "Siemens"
- Y or N: The Siemens groundwater plume is known to have contaminated the groundwater of the property that is now "Apple Park"
- Y or N: Apple Park is on several state water boards clean up sites (aka "HP")

**General Questions**
- If Michael says a building on a Superfund is "safe," (which I think is already implied because it sounds like EHS hasn't acted on SD01 recently), am I still allowed to express concerns about working on a Superfund or that specific Superfund? Or if Michael says the building is "safe," am I not allowed to raise any of my own concerns about the safety or Apple's oversight?
- Do the criteria of —  1) complete & 2) accurate & 3) do not cause panic — apply only to sharing information internally with other Apple employees — or does that also apply to me speaking externally?
- Do your speech restrictions apply to me talking to the government about my concerns?
- How do we measure "do not cause panic"? A lot of people seem very concerned about working or living on/near Superfunds generally. Arguably, as they should be. If there is a fact that is complete and accurate (such as if Michael confirms SD01 is on an Active Superfund), am I still not allowed to share it if "it could cause panic."? I'm confused how to navigate this one. The facts alone could cause panic, but that doesn't seem like it should be my fault. At the same time, I don't want to get in trouble.

Thanks,
-Ashley

—
Ashley M. Gjovik
 Engineering Program Manager
(408) 204-9976

*Exhibit: Gjovik's Meeting Notes from the call with Waibel on April 27 2021*

**Deleted:** *A-xiv-A*

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

260.    Waibel replied to Gjovik and wrote that Gjovik must ensure "*the information she shares,*" *... about "the terms and conditions of her employment," ... is accurate and complete as possible."* Waibel added that she believed Powers comments to Gjovik "align" with her statement. Waibel added, "*if others have concerns, they can connect with EHS directly.*" She said, "*we would like to speak individually with each employee who is interested to allow them to address their concerns more privately."*

---

**Jenna Waibel <jwaibel@apple.com>**                                Apr 27, 2021 at 4:38:13 PM
Re: Questions about speech related to Apple's buildings on chemical release sites
To: Ashley Gjovik <ashleygjovik@apple.com>
Cc: Michael Steiger <msteiger@apple.com>

Hi Ashley,

Michael and I will discuss your questions below and get back to you. I wanted to clarify a few things now from your email below, and the rest we will revisit in the near future:

1) I didn't say you aren't allowed to share concerns at any time during our conversation. I didn't comment on the difference in sharing concerns internally or externally. I said you have a right to discuss the terms and conditions of employment. We ask that you ensure the information you share is as accurate and complete as possible when doing so.
2) I wasn't present in your conversation with Dave, so I can't say what he did or didn't say. However, Dave seemed confident that he did not use the terms "warning" or "mental health issues" related to your right to speak about your concerns. He said that it wasn't a warning and he did not forbid you from speaking to others. He said that the intention of his message was aligned with my message above. He said he encouraged you to work with EHS to understand the data available fully.
3) I shared today that if others have concerns, they can connect with me or EHS directly- we are not asking you to broker those conversations. Rather, we would like to speak individually with each employee who is interested to allow them to address their concerns privately.

Thanks again for our call today.  We will be in touch soon on the other clarifications.

**Jenna Waibel**

 Corporate Employee Relations
510-396-7823 mobile
jwaibel@apple.com

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

---

*Exhibit: Waibel's Reply to Gjovik's 4/27 Notes*

261.    On April 29 2021, Gjovik met with West for their regular 1:1. Gjovik complained about the safety issues, retaliation, and harassment. She said she needed him to help and

intervene or else she would have no other choice but to quit Apple. West told her she can just

quit Apple. Gjovik documented his statement in meeting notes and forwarded it to Waibel.

---

**From: Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Notes from our Friday call
**Date:** April 29, 2021 at 5:24 PM
**To:** Jenna Waibel jwaibel@apple.com

Quick update -

Talked to Dan West today (my bosses boss). He will not move me out from Dave. He will not move me under him (Dan), or John, or anyone else. He says he doesn't want anymore re-orgs.

My choices are either I stay under Dave (I told him I cannot do this) or I leave the organization or Apple completely. He says he understood this likely means I will leave Apple.

Dan said when I leave, the role will likely be recycled into a standard Engineer or Manager role, and the PSQ EPM role will be dissolved.

No timeline was set.

—
Ashley M. Gjovik
 Engineering Program Manager

---

*Exhibit: Gjovik's Meeting Notes About West sent to Waibel, 4/29*

---

**From:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject: Ashley Gjovik/Dan - 4/29 Meeting Notes**
**Date:** April 29, 2021 at 6:01:18 PM PDT
**To:** Dan West <dan.west@apple.com>

**Discussion Notes**

- Ashley thinks All Hands went really well
- Ashley can't report to Dan. Dan does not want any re-orgs. EPM role will stay under Dave until Ashley leaves, then role will likely be dissolved and transformed into standard engineer or manager role. Ashley will need to find new role outside PSQ (or new job outside Apple) because she cannot work for Dave without further detriment to her mental health and there are no options in PSQ.
- Sedgwick expanded the Workers Comp claim as "continuous trauma," likely since when is started Apple in 2015. The trauma is the industrial chemical exposure at all of the chemical release & Superfund sites I've worked at (SD01, TA08, Homestead 1, IL1, Apple Park, etc.). Continuous trauma sounds like the best description I've heard so far summarizing my tenure at this company.

---

*Exhibit: Gjovik's Meeting Notes About West sent to West, 4/29*

---

101

### viii.     Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive

###           Intensify (April 2021-June 2021)

262.     On April 27 2021, Gjovik emailed once of her law school professors, Professor Dorothy Glancy, about what was happening with Apple. Gjovik wrote: "*I talked to a lawyer friend and they not only warned me to look out for retaliatory firing with this much whistle blowing — but that the HR BP may have pushed for workers comp because I guess it waives some litigation rights. I'm thinking I should probably talk to an employment attorney who specializes in OSHA type stuff.*"

263.     On April 28 2021, US EPA noted that the head of their regional office for Superfunds wanted a 'briefing' on Gjovik's concerns.

264.     On April 30 2021, Gjovik sent an email to the US EPA with three categories of questions: Testing, Communication, and Monitoring. She summarized a phone call they had a couple days prior. Gjovik asked about, among other things:

-    The expected frequency for indoor air testing, and the expected method/standard for that testing

-    Could the Ethylbenzene and Toluene indoor air pollution be from the groundwater plume?

-    What the Right to Know and OSHA rules are related to employee notification of Superfund exposure

-    Who she can speak to in order to understand her chemical exposure.

-    What Apple's responsibilities are for monitoring for vapor intrusion issues?

-    What Apple's responsibilities are to warn employees about sub-slab vent plugs?

-    What Apple's responsibilities are to ensure the integrity of the HVAC system in relation to the Superfund mitigation controls?

-    What the protocol is for employees to report issues at Superfund sites

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

265.     On April 30, 2021, there was another phosphine gas leak at the 3255 Scott Blvd facility. The city Fire Department/HazMat agency report said the leak required an evacuation and that phosphine gas was vented into the exterior air. Two weeks later, on May 13 2021, Apple submitted manifests to transport sixty pounds of '*vacuum filters with glass shards*' to a waste disposal facility. [175]



*Exhibit: 5/13/21 Manifest with "Glass Dust"*

---

[175] Uniform Hazardous Waste Manifest, Apple Inc, May 13 2021, Tracking # 015756482

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

### Phosphine Leak (2021)

*Exhibit: 4/30 CalOES entry filed by Santa Clara FD*

266.    The "*vacuum filters with glass shards*" and temporal proximity to the leak of a highly flammable and unstable gas,[176] suggests, there was an explosion during/related to the April 30 2021 leak. Under information and belief there was a phosphine explosion on April 30, 2021. Under information and belief, the residents in the apartments were never notified of the explosion or the venting of phosphine into their air.

267.    Phosphine gas is a reportable substance under 42 U.S. Code §§ 1712, 9602, and 9603. Phosphine is an "Extremely Hazardous Substance" under CERCLA Section 103 and EPCRA Section 304.

---

[176] NOAA, *Cameo Chemicals – Phosphine*, https://cameochemicals.noaa.gov/chemical/1322 "Very toxic by inhalation at extremely low concentrations. Prolonged heating may cause containers to rupture violently and rocket… Highly flammable. Usually ignites spontaneously in air. Burns with a luminous flame… Phosphine can explode with powerful oxidizers. The gas is heavier than air and may travel along the ground to an ignition source. Container may explode in heat of fire… Reacts violently with: air… Liquefied phosphine can be detonated… Forms explosive mixtures with even small amounts of oxygen. Autoignites at low pressure."

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

268. Apple concealed the HVAC issues (that they took a saw to the Superfund poison vents on the roof and then installed the HVAC intake on top of them where the poison air pools) at 825 Stewart Drive and avoided Gjovik's questions about the HVAC and air quality.

269. By May 2021, Apple must have known that Northrop Grumman finalized their first sub-slab ventilation system report for 825 Stewart Drive, and transmitted it to the US EPA, per the US EPA's request May 12 2021, triggered by Gjovik's complaints. Under information and belief, at some point between May 12 and May 25 2021, Northrop Grumman notified Apple that they were transmitting the report and data that would reveal Apple's negligence, and that prior they had conspired to conceal the issue from regulators, while knowing Apple's employees were likely being exposed to carcinogenic solvent vapors.[177]

270. On May 2 2021, Gjovik emailed Professor Glancy again, *"The work stuff is very very urgent now. They want me to sign a bunch of workers comp stuff. And it appears I'm being pushed out of my current role, maybe even apple."*

271. On May 5 2021, Gjovik emailed the Mayor of Santa Clara, Lisa Gillmor, sharing feedback on the Brownfield clean-up of her apartment at 3255 Scott Blvd from a community activist and the prior mayor of Mountain View, Lenny Siegel. Gjovik sent this email from her iCloud email account.

272. Among other things, Siegel wrote, *"TCE is found at or above 16 µg/m3 at three sampling points [at 3255 Scott Blvd], including one close to your former apartment, and it may be present at others but undetected because the detection limit for many of the samples was 100 µg/m3. So instead of dismissing vapor intrusion, the city and regulators should either have required additional investigation or required that vapor mitigation, such as sub-slab*

---

[177] Under Cal. Lab. Code § 6406, no person shall remove, displace, damage, or destroy any safety device or safe guard furnished for use in any place of employment. See also, Res Ipsa Loquitur.

*depressurization, be built into the apartment buildings. ... In my opinion, any building constructed where the TCE soil gas exceeds that level should be mitigated, but the worst-case exposure does not explain the acute health issues that you experienced."*

273.    Siegel's preliminary assessment inferred that the source of the solvent exposure that was harming residents at the apartment complex could not be explained by the known Superfund and Brownfield pollution on site. However, Siegel did raise concerns that there was not a proper evaluation of the pollution at the site nor was there proper solvent vapor mitigation installed during development.

274.    Gjovik had requested a letter of recommendation form Dr. Cohen in January 2021 for law school applications, but Dr. Cohen had not had time write one yet. On May 5 2021, Gjovik replied to the email thread with Dr. Cohen and asked if he could please write one soon and noted, *"Things are getting increasingly complicated at work & I'm not expecting an outcome in my favor."* Gjovik said she had started to apply for new jobs as she was expecting to get fired imminently.

275.    On May 6 2021, Gjovik submitted a Public Records Request to the city of Sunnyvale asking for records related to her office.

<div style="text-align:right"><small>Deleted: recommending</small><br><small>Deleted: 2022</small></div>

<div style="text-align:right"><small>Deleted: FIRST</small><br><small>Deleted: –</small><br><small>Deleted: cv</small><br><small>Deleted: CRB</small><br><small>Deleted: OCTOBER 25</small></div>

Submitted On: 5/3/2021 11:10 AM

Interaction Type: Public Records Request

Description: Hello, I am requesting copies of the environmental impact assessment and planning documents for the 2001-2003 exterior remodel of the building at 825 Stewart Drive Sunnyvale, CA 94085 (the TRW Microwave Superfund site). I'd also like to request copies of any environmental impact assessments (if there were any) for the site going back to 1960. From what I'm aware, owners were Aertech, then TRW, then FEI Microwave, then Tech Facility 1, then Stewart Associates, then Diablo Research Corporation, then Cadence Inc, then Pacific Landmark, then Hines/Oaktree Ventures, then GI Partners, then the current owner (and leased by Apple). Ideally would like to receive records digitally please. Please contact me if you need any clarifications or additional info. Thanks!

EPA page: https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm? fuseaction=second.cleanup&id=0901181

**Contact Info**

First Name: Ashley

Last Name: Gjovik

*Exhibit: Gjovik's Sunnyvale / TRW Site PRA Request*

276.    On May 12 2021, Gjovik signed the Worker's Comp claim. (Apple would suddenly close it without explanation 10 days later.)



*Exhibit: Gjovik's Signed Worker's Comp Claim*

277.    On May 16 2021, Gjovik complained that all of her iCloud@Work documents disappeared from her personal iCloud account. Gjovik asked Apple's IT department to recover

Deleted: Apple
Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

the files but they were unable. Under information and belief, the files were deleted as Apple

Global Security was copying all of Gjovik's personal iCloud information in order to start

investigating her as they planned a retaliatory response to her concerns.[178] (Another labor

whistleblower reporting something very similar happening right as Google forced her on

administrative leave, and then swiftly terminating her.)[179]

### ix.    Apple's Retaliation Against Gjovik Intensifies (May-June 2021)

278.    On May 17 2021, in a follow-up meeting with Gjovik and Waibel, Steiger

claimed the office was safe, and there would not be any testing in the building for vapor

intrusion in the foreseeable future. The meeting was supposed to be to answer Gjovik's pending

open questions from April 2021. Steiger and Waibel informed Gjovik they would not be

answering any of Gjovik's pending or new questions about the safety of Gjovik's office

building. They claimed the building was safe because it is and Gjovik could not ask any

questions about it ever again. Steiger went on leave less than thirty minutes after the meeting.

---

[178] A similar complaint was noted in The Guardian's '*They'll squash you like a bug': how Silicon Valley keeps a lid on leakers*, March 16 2018, https://www.theguardian.com/technology/2018/mar/16/silicon-valley-internal-work-spying-surveillance-leakers where a Google employee complained he ("*suspects he was being monitored by the company during his final days. He also described "weird things" happening to his work phone and laptop after the memo went viral. "All the internal apps updated at the same time, which had never happened before. I had to re-sign in to my Google account on both devices and my Google Drive – where the document was – stopped working.*")

[179] Sean Captain, *If you use your personal phone for work, say goodbye to your privacy*, Dec 9 2019, FastCompany, https://www.fastcompany.com/90440073/if-you-use-your-personal-phone-for-work-say-goodbye-to-your-privacy -- (the employee "*recounts how her personal Android phone went blank when she learned that she'd been placed on administrative leave ... "my personal phone was either corrupted or wiped"...*")

---

Deleted: response to her concerns.

Deleted: <#>On May 21 2021, Northrop Grumman prepared the report about their November 2020 inspection of Apple's 825 Stewart Blvd rooftop and the sub-slat depressurization system vents (that Apple sawed down to only one foot tall and installed the HVAC intake next to the vent exhaust). ¶
<#>The same day Gjovik had a mammogram at UCSF ordered by her doctor due to "*recent industrial chemical exposure.*" ¶
<#>On May 25 2021, Northrop Grumman submited their sub-slat vent report to the US EPA omiting what Apple had done. Under information and belief, Apple and Northrop Grumman conspired to hide the issues from the US EPA and Gjovik and her coworkers. ¶
¶

Deleted: sudden change of course, in a

Deleted:  after all

Deleted: her

Deleted: FIRST

Deleted: --

Deleted: ev

Deleted: CRB

Deleted: OCTOBER 25

On May 17, 2021, at 1:56 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Thanks for meeting today! Feel better Michael.

Here's my notes from our discussion. Let me know if I missed anything.

I have access to all publicly available information about the site per the gov websites. The report Michael previously shared should include all details for both May & Dec 2015 testing. Unless VI testing is done in the future, no additional data will be shared. If VI testing is done in SD01 in the future, the results will be shared with me. There is no timeframe for testing for vapor intrusion in Stewart 1. EHS might not test for vapor intrusion in Stewart 1 this year, or near future — they are looking over the building evaluation report and then will make a decision at an unspecified time whether they do VI testing or not.

Michael said that as an expert, he and EHS have reviewed the data for SD01 and feel there is no Vapor Intrusion occurring there and they've done what's necessary to ensure the safety of the building for the people working there. (He said this all really quickly, so trying my best to summarize.)

As for the EthylBenzene & Tolulene, Michael said those are not attributable to vapor intrusion in SD01 because they are not contaminants of concern. And that there was no evidence they exceeded OSHA PEL limits in the building. If I have any non-VI chemical questions, can arrange for a workplace evaluation by Austin.

Michael said would never turn HVAC off and if it someone said they did during wildfires, that must be a miscommunication.

Questions about land use restrictions are questions for the EPA.

Any additional questions I have about the specifics of soil/groundwater chemicals & vapor intrusion at the site, including my pending questions from April, will not be answered by EHS, since EHS has determined they feel confident there is no vapor intrusion in the building based on the historical tests and documents.

Jenna said I have a right to share concerns and talk to anyone about my concerns about the building. She said Apple would never restrict my right to speak about work place safety concerns. She said Apple would appreciate if I try to keep information accurate and also route people to EHS with questions, but not a requirement.

-Ashley

**EHS Follow up**
Scheduled: May 17, 2021 at 1:30 PM to 2:00 PM, PDT
Location: Virtual Conference One-Time Room
Invitees: Jenna Waibel, Ashley Gjovik, Michael Steiger

*Exhibit: Gjovik's 5/17 Meeting Notes*

279.    When the worker's compensation administrator contacted Gjovik, the

representative expressed surprise and concerns that Apple would intentionally ask, or even allow

employees to work on Superfund sites. The Sedgwick investigator said she even called her

contacts at Apple's HQ to confirm if Apple actually had offices on Superfunds. She said the

contact's initial response was "of course not" but then upon searching Gjovik's office address

online, the top result noted it was a Superfund site.

280.    The investigator was further distressed to learn that additional offices Gjovik had

worked in and visited were also Superfund and Brownfield toxic waste clean-up sites. The

Deleted: Steiger went on leave less than thirty minutes after the meeting.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

investigator said she was going to set Gjovik's claim as "continuous injury" and Gjovik should expect the investigation to take at least two months.

281.    Waibel requested another phone call with Gjovik, and they talked on May 20, 2021. Gjovik summarized the call in the August 2021 Issue Confirmation as: "*Jenna tells me she will talk to Rob Yepez [a Software Engineering Director] about my sexual harassment claim and tell him I was the one who reported it. I ask her not to and that I don't want him to know it was me and ask her not to look into it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being an H1B and worried about retaliation.*"

282.    An agent of Apple implicitly threatening to deport and/or cancel the Permanent Resident Card sponsorship for one of Gjovik's best friends who was in the United States on a work visa, because Gjovik exercised her rights under Cal. Labor Code and was seeking information regarding whether Apple was in compliance with Cal. Labor Codes—is a violation of California Labor Code § 1019(b).[180]

283.    Waibel said her focus continued to be on "sexism" and disability discrimination related to mental health. Gjovik told Waibel she was not including all of her complaints about issues at Apple, but only including the issues and related facts/issues to those that Waibel informed Gjovik she would be investigating, because Gjovik did not want the investigation at all an did not want to make things worse for herself.

284.    Gjovik was out of paid time off and needed to take law school exams. Waibel suddenly offered Gjovik that Gjovik can just take the time off to do her exams and did not need formal paid time off. Gjovik said that would be great. Waibel offered it and Gjovik accepted.

_____

[180] Cal. Lab. Code § 1019(b)(C), (D); [Note, Gjovik's friend, who had an in progress Permanent Resident application sponsored by Apple, no longer resides in the United States].

There were no restrictions on who Gjovik could talk to or what Gjovik could do. Later Waibel called it "Administrative Leave."

285.    In May 2021, Gjovik asked Waibel to include the 2018 e-waste/hardware-re-use incident in her investigation. Gjovik said the unilateral decision to cancel her projects without her input, and not even informing her directly, was an example of her managers treating her poorly because of her sex/gender. Gjovik also said that the manager who got her project cancelled, Reed Johnson, intentionally undermined her and acted in a way he knew she did not support, because he thought less of her because she was a woman.

286.    Waibel claimed to have investigated the e-waste problem, and other issues Gjovik raised, but said there were "no policy violations." Waibel told Gjovik she informed Gjovik's managers and team that Gjovik complained about sexism, and now it was up to Gjovik to figure out how to go forward following the closure of her investigation. It was clear to Gjovik that most of the issues were not investigated. Gjovik complained about a "*fake*" and "*sham*" investigation.

287.    On May 21 2021, Northrop Grumman prepared the report about their November 2020 inspection of Apple's 825 Stewart Blvd rooftop and the sub-slab ventilation system vents (that Apple sawed down to only one foot tall and installed the HVAC intake next to the vent exhaust). The same day, May 21 2021, Gjovik had a mammogram at UCSF ordered by her doctor due to "*recent industrial chemical exposure.*"

288.    On May 22 2021, Apple abruptly denied Gjovik's Worker's Comp that they just forced her to file. On April 21 2021, Gjovik filed a worker's compensation claim for her 2019 fainting spell at the 825 Stewart Drive office, at the urging of Apple. Apple then entered an office-space real estate "mega-deal" with Irvine Company (on toxic waste clean-up sites) and the weekend of the deal, Gjovik received a voicemail late on a Saturday night from the Sedgwick

111

Deleted: problem

Deleted: <#>It was clear to Gjovik that most of the issues were not investigated. Gjovik complained about a "fake" investigation. ¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

benefits administrator suddenly closing Gjovik's claim on May 22 2021.[181] Under information and belief, Apple, Irvine Company, and Sedgwick conspired to close Gjovik's claim as part of their deal.

289.    On May 25 2021, Northrop Grumman submitted their sub-slab ventilation report to the US EPA omitting what Apple had done. Under information and belief, Apple and Northrop Grumman conspired to hide the issues from the US EPA and Gjovik and her coworkers.

290.    At some point between May 25 and June 1 2021 Apple conducted a "floor survey" looking for cracks in the slab of Gjovik's office at 825 Stewart Drive. Under information and belief, Waibel had offered the leave to Gjovik to get Gjovik out of the office while they inspected the floor and prevent Gjovik from gathering evidence.

291.    Waibel held a "wrap up call" with Gjovik on June 3 2021. Waibel said her investigation found no policy violations and the only next step for Gjovik is for her to "process this" and work with Polkes on Gjovik's "path forward." Gjovik sent email notes after complaining that Waibel never reviewed several things Gjovik complained about.

292.    Waibel replied to Gjovik on June 3 2021 saying "*I could not confirm that violation of Apple policies occurred, Apple has taken appropriate action to address the findings of the investigation. If, in the future, you have any new concerns and/or experience behavior you feel is retaliatory, please contact your Helen or myself immediately.*" Gjovik responded on June 3, reiterating her concerns about workplace safety.

293.    On June 10 2021, Waibel told Gjovik she had to return to her Superfund office, even if she thought it was unsafe, unless Gjovik filed a request for ADA accommodations.

---

[181] Silicon Valley, *Apple mega deal: Tech titan launches huge Sunnyvale expansion that could accommodate thousands*, https://www.siliconvalley.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/

Deleted: , Irvine Company,

Deleted: Sedgwick

Deleted: close Gjovik's claim as part of their deal.

Deleted: files

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Gjovik told Waibel that does not make any sense. Waibel repeated it was the only option. Under Cal. Gov't Code § 12940, employers are prohibited from making medical or psychological inquiries unless the inquiry is job-related and consistent with business necessity.

294.    On June 7 2021, US EPA sent Gjovik their first response to her questions, which required review and comments from the Director of Public Relations for Region 9, discussion vapor intrusion, institutional controls, and community communications.

295.    On June 9 and June 10 2021, US EPA employees Edwin "Chip" Poalinelli and Michael Schulman conspired to arbitrarily update the public website information about the TRW Microwave site to say that "*Human Exposure*" was "*Under Control*" instead of "*Not Under Control*." On June 9 2021, one of Gjovik's coworkers emailed US EPA with concerns about their Superfund office. Schulman wrote a reply to the coworker saying Human Exposure is now Under Control. Schulman said he did not run his decision or email by Public Relations because "*he likes it.*"

296.    The main site document for TRW Microwave, dated April 2021, said exposure was *Not Under Control* and provided the earliest ETA for exposure to be under control was December 2021.

297.    On June 14 2021, Gjovik and another project manager employee emailed Tim Cook (CEO) & Deirdre O'Brien (HR Vice President) expressing concerns about returning to work during the COVID-19 pandemic**.** Gjovik repeatedly expressed concerns about COVID safety.[182] The email included and referenced a petition with over 2,000 employee signatures, dozens of testimonials from employees, and an eight-minute video of about a dozen employees reading the petition aloud, including Gjovik. Gjovik started being harassed by some of her coworkers about it, while many others thanked her.

---

[182] i.e., Cal. Lab. Code §§ 6325, 6409.6

298.    Gjovik met with Antonio Lagares, head of Apple Employee Relations, for the first time on June 17 2021. Gjovik complained about the 'sham' investigation by Waibel and the following retaliation. Gjovik said if Apple already ruined her career with the sham investigation, they should have to actually investigate all the things Apple did to her. Gjovik complained that Apple was just pretending to care about its workers but clearly did not, and that Apple should be more honest about its treatment of employee concerns. Lagares agreed saying it 'makes his job harder' that Apple's marketing did not match their operations, and he eventually agreed to open a 2nd investigation. Lagares also confirmed his prior role of 'Labor Relations with Beijing' for Apple, of procuring the vendors and materials for Apple's infamous "*suicide nets*" at its factories and Gjovik expressed her displeasure.

299.    On June 30 2021, Apple entered the US EPA TRI information for the 3250 Scott Blvd factory noting the NMP emissions, treatments, and supposed disposal. This was apparently the first and only entry for TRI that Apple ever submitted for the facility.  Under information and belief Apple was generating reportable emissions prior to the 2020 report, and after the 2020 report, but did not file reports with that information.

300.    On July 2 2021, Waibel emails Gjovik to notify her that there are cracks in the floor of Gjovik's office and Apple is going to repair the cracks, and following the repairs, then will test the air at some point in the future. Gjovik replied to Waibel asking if Apple would test the air before they fix the floor to understand if there was vapor intrusion occurring through the cracks for "*cancer monitoring*." Gjovik then texted her coworker Mike describing her email to Waibel as "*I'm kind of like 'don't startle them' but I'm also like 'did you give me cancer'*" and she asked "*too much?*" Mike replied "*I don't think that is too much. I think that is a totally fair request. Interest[ed] to hear what they say.*" (Waibel would tell Gjovik no, there will not be any air testing until after they fix the possible sources of air pollution).

---

114

**Deleted:** .

**Deleted:** Apple said no.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**From: Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Follow up call next week
**Date:** July 2, 2021 at 2:55 PM
**To:** Jenna Waibel jwaibel@apple.com
**Cc:** Michael Steiger msteiger@apple.com, Antone Jain antone@apple.com

Hi Jenna,

Thank you for the update! Glad you hear y'all decided to proceed with the testing, even if TBD timing.

Any chance EH&S would be willing to do a "before" air testing in SD01, at least my lockdown (Sim City), to determine if the floor cracks were/are allowing vapor intrusion into the office space? It seems like it would also be helpful data to have to compare to the testing "after" the floor is sealed — especially since the last testing was six years ago — and considering my 2019 fainting incident at my desk & in Mike Ertell's office. If I was exposed, I'd really like to know to what chemical & at what levels, for future cancer monitoring, etc.

Thanks!

--
Ashley M. Gjovik

*Exhibit: The Cancer Email*

301.    On July 4 2021, Gjovik expressed concerns to Lagares again about EH&S'
suspicious conduct and statements, including that now Apple said they had no plan to test the air
in the near future. Gjovik wrote to Lagares, "*The only reason I can think of that they're refusing
to do this testing after they previously planned on doing it, was that all the questions I was
asking were very good questions and revealed major gaps/issues — so they're going out of their
way to not have evidence of their negligence.*" Gjovik implored Lagares to look into EH&S's
conduct, saying "*I think everyone is forgetting I work in engineering & I'm in law school. I know
how toxic torts work…. right now, it feels like I'm not only being harassed by my manager and
my HR BP, but it appears there's a conspiracy to force me back into what appears to be a very
physically unsafe office building.*"

302.    On July 4 2021, Gjovik complained to Lagares, that in 2017, West directly
harmed Gjovik (by forcing her to eat peanut, which she is allergic to) and then failed to seek
medical treatment despite potentially life-threatening injury (she was in anaphylaxis) due to
West "*being too drunk*" and then days later Powers texted West complaining about why he is
"*trying to kill*" Gjovik.

Deleted: he
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

303.     On July 7 2021, Gjovik met with EH&S (Steiger and Jain) and Waibel. Steiger said Apple refused to test the indoor air before they fix the cracks in the floor.  Waibel claimed that because the 2015 test results came back acceptable that there is no reason to worry about vapor intrusion. Gjovik reminded Waibel the cracks in the floor are new, and cracks in the floor is the primary vector for vapor intrusion at these sites.

304.     Gjovik explained that a cracked slab is a "*change of circumstances*" and proposed the need for air testing before and after the repairs, to confirm the repairs were successful. Waibel said no.  Waibel said Apple will not provide Gjovik any details about what "*fixing the cracks*" entails and told Gjovik that Apple will not answer any more of her questions about it. Gjovik reiterated she does not feel safe at the office and that she is worried about vapor intrusion.

305.     Gjovik also complained to Waibel, Jain, and Steiger that she believed Apple was misrepresenting the conditions at the office and Apple's actions. Gjovik complained Apple claimed the floor crack survey and air testing is "*routine maintenance,*" but that they also admitted it was the first time Apple had ever done it. In the meeting, Gjovik questioned how it is "*routine*" if it has never been done before. Steiger then claimed Apple had also performed floor-sealing activities at "*two or three buildings.*" Gjovik asked which buildings, so she can understand if Apple was being honest with her or if they were indeed misrepresenting the situation. Waibel interjected and said, "*they won't discuss buildings [Gjovik's] not in,*" "*won't answer that question,*" and "*that level of detail is not appropriate for this call.*"

306.     Steiger told Gjovik that Apple no longer has any plan to test the indoor air at the office, and that while it will occur at some point in the future, there is no estimated timeframe. Steiger also said when they test it will only be with passive samplers (not TO-15 Summa canisters), with HVAC on (not standard). Summa canister sampling using TO-15 is considered

116

Deleted: refuses

Deleted: questions

Deleted: tells

Deleted: they

Deleted: the three of them

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

by many to be a "standard" for chlorinated solvents and volatile aromatics vapor intrusion studies.[183] The method involves collecting air samples in specially prepared canisters (e.g., Summa canisters) and analyzing aliquots of the samples by gas chromatography/mass spectrometry .[184] Among other issues, it is also particularly challenging to measure vinyl chloride and chloroform using passive samplers (which the US EPA would later inform Apple in 2022 when the US EPA demanded Apple use TO-15 Summa for the testing at Gjovik's office).[185]

307.   Steiger and Jain told Gjovik their test plan is "*protocol*" and "*over and beyond*" what is expected. Gjovik asked Apple to share their protocols and documentation with her and they said no because they do not exist, and she can just "*Google it.*" Waibel then said Apple will not answer any of Gjovik's pending questions or any new questions and that Apple's position is that "*they feel it is safe.*" Steiger and Waibel told Gjovik that would be her final update about her office building, ever.

308.   During the July 7 2021 meeting with Steiger and Waibel, Gjovik expressed concerns that HVAC on brings in outdoor air and would dilute indoor vapor intrusion. Gjovik also complained that testing with employees working would give Apple an excuse to blame Gjovik's coworkers on causing their own emissions as an excuse for any abnormal results (as Apple did when they blamed "construction" for the high Toluene and Ethylbenzene in the 2015 test results).

309.   Gjovik emailed the three (Jain, Steiger, Waibel) notes summarizing the July 7 2021 meeting. Gjovik then forwarded those notes to the US EPA. Gjovik complained about this

[183] NSCEP, Passive Samplers for Investigations of Air Quality: Method Description, Implementation, and Comparison to Alternative Sampling Methods, Pg 10, 2015.
[184] NSCEP, Passive Samplers for Investigations of Air Quality: Method Description, Implementation, and Comparison to Alternative Sampling Methods, Pg 9, 2015.
[185] US EPA, Passive Samplers for Investigations of Air Quality, pg19 (2015), https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=NRMRL&dirEntryId=308311

meeting to Okpo and Lagares and asked them to intervene. Gjovik included the meeting in her Issue Confirmation document from mid-August 2021. Gjovik noted that witnesses included: "*y'all know what you did.*"

310. Steiger suddenly left Apple in the midst of these discussions. Steiger returned to his prior employer, EKI, an environmental consulting group. Steiger had joined Apple in 2013 from EKI to work for Apple on hazardous waste issues, including the Apple Park clean-up for which EKI was a consultant. The last meeting Gjovik attended with Steiger, he seemed upset with Apple and was forced to simply read a piece of paper that appeared to have been written by Apple where he said essentially the office is safe because he is an expert, and he thinks it is safe.

311. Under information and belief, Apple and EKI conducted inspections and created reports of findings around August 4, 2021, and before August 19 2021, but concealed the testing and the results. Apple also made no reference to the August 19 2021, US EPA inspection in any subsequent legal filings on Gjovik's retaliation lawsuits and the US EPA employees (Poalinelli, Ty, Schulman, Perez-Sullivan) conspired with Apple to conceal the inspection from Gjovik. Under information and belief, Apple, US EPA employees, and Lisa Jackson conspired to hide this information from Gjovik in order to reduce Apple's liability to Gjovik in the lawsuits.

312. On July 7 2021, Gjovik emailed the US EPA complaining about Apple. Gjovik noted that the US EPA employee had told her "It is important for EPA to be aware if there's a significant change to the site conditions," and Gjovik said she hoped EPA had been informed about the cracked floor and floor sealing plan. Gjovik complained that after her questions on the matter, now Apple won't give her *"any details of what the floor sealing process entails,"* they refuse to *"test air before they seal the floor and won't give [her] any reasons why,"* Gjovik also noted Apple did not plan to look for cracks under the carpet, the manager previously in charge suddenly left Apple, and *"now [Apple] won't answer any more of my questions about the safety*

Deleted: from

Deleted: <#>Steiger and Waibel told Gjovik that would be her final update about her office building. ¶

Deleted: conspired to conduct indoor air testing on or

Deleted: .

Deleted: .

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*of the building." Gjovik added, "I told them I remain very concerned the building is not safe."*

*Gjovik told EPA she had "reminded Apple of labor laws & stuff," and also planned to speak*

*publicly about conditions at the site.*

313.    On July 8 2021, Gjovik learned through Yuan Tan that Dan West had been reassigning her work to other people in his organization following the April meeting when he told Gjovik to quit. Gjovik complained to David Powers, Human Resources, and Employee Relations about the work reassignments. One of the employees who received the new assignments apologized to Gjovik upon learning it was her work.

> On Jul 8, 2021, at 3:14 PM, Ashley Gjovik
> <ashleygjovik@apple.com> wrote:
>
> Hi,
>
> Unfortunately there's another new event— I just found out today.
>
> In May, apparently Dan and Dave decided to reduce my ownership and supervision of one of my main projects and appear to have handed it off to a male colleague in another organization (Daniel) — and didn't even tell me directly. Dan reduced my supervision & gave Daniel the project after I started raising formal concerns to him about Dave creating a hostile work env & be sexist, raising work place safety concerns, and filed a workers comp claim.

*Exhibit: Email from Gjovik to Lagares*

314.    On July 8-9 2021, Gjovik texted with her coworker Mike complaining about

Apple's handling of the office. She wrote, "*I'm seriously considering doing one of these 2hr*

*sorbent tubes in the next few weeks before they seal the floor. Maybe ideally one early morning*

*before people come in and later evening after people already left.*" Mike replied, "*Glad that you*

*are all over this!*" On July 9 2021, Gjovik complained to Mike she thought Apple was engaging

**Deleted:** Ertell

**Deleted:** Ertell

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

in a cover-up about the chemical exposure at the office, and noted several points where she

thought they were acting in bad faith.



**Ashley Gjovik** ashleygjovik@apple.com
ct: Re: EHS Follow up
te: July 9, 2021 at 12:31 PM
To: ▓▓▓▓▓▓▓▓▓

The problem is, the way they're testing the air now is bogus. Gold standard is HVAC off, no people around, at least 48hrs, summa & T015.

1 week would be great if the above was met — but HVAC on will be bringing in inside air, which would dilute whatever chemicals are in the air inside. Further people around mean they can be releasing their own chemicals (cleaning, etc) which might show up in the results — but also could neutralize other chemicals that might be in the air. I believe they're only testing for COCs still, not a full T015 panel — so it's more likely the COCs would be neutralized and you wouldn't even know it because without the panel, you don't even know what else is in the air.

I had a whole big discussion about this last year when my property manager decided to test the air in the apartment above mine when I was testing my own air. Even DTSC admitted if they did that — the air would be diluted because it's higher up (the refused to test the ground floor which prob would have showed the highest results, and also chemicals rising from below apartments could show up and/or mix/neutralize chemicals inside.

If I were Apple, and I wanted to save face after all the last discussions, and didn't care about employees health — this is what I'd do. They can't "not test" now that I threw such a fit about them threatening not to — but if they do test, they want to reduce the risk of them finding the COCs in the air as much as possible. Thus, they'd do exactly what they now say they're going to do.

During previous discussions they mentioned they'd do it on a weekend, etc. This is a change of plans. I'm not happy.

*Exhibit: Gjovik's 7/9/21 Email to Lagares*

315.   On July 12 2021, Gjovik texted Mike "If you end up in the office anytime soon

and feel comfortable doing so, please think about taking photos of the cracks in the floor,

especially our lockdown. I need to drop some stuff off end of July, but they may have sealed

them by the time I get there." Mike replied he would plan to do it next time he's in the office but

did not know when.

316.   On July 12 2021, Apple told Gjovik again that she has to come back to her office

on a Superfund site and with the COVID-19 Delta surge in September 2021 unless Gjovik files a

request for ADA accommodations.

317.   On July 13 2021, Gjovik sent an email complaining to Lagares that Sedgwick

was asking her for medical information for the ADA request and she only wanted to work in a

physically safe office. Gjovik complained that she had been worried Waibel was abusing the

**Deleted:** ¶
    <#>Gjovik Fights Back (July-August 2021)¶

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

ADA process to mess with Gjovik and said, "*looks like… my concerns about Jenna misrepresenting this process appear to now be confirmed.*"

318.   On July 14 2021, Gjovik met again with Mayor Gilmor about her concerns about chemical exposure at 3255 Scott Blvd (next to Apple's factory). Gjovik was communicating with the mayor and her staff through Gjovik's iCloud account. Apple surely knew.



| | | | |
|---|---|---|---|
| 4/8/2021 | 9:45 AM | Meeting regarding Former Resident's Health Concerns | Ashley Gjovik, Former Resident |
| 4/29/2021 | 4:30 PM | Meeting regarding Former Resident's Health Concerns | Ashley Gjovik, Former Resident |
| 7/14/2021 | 2:00 PM | Meeting regarding Santa Clara Square | Ashley Gjovic, Former Resident |

*Excerpt: Gjovik's Meeting with Mayor Gillmor in 2021: 4/8, 4/29, 7/14*

319.   On July 15 2021, Powers suddenly and substantially increased Gjovik's workload with unfavorable projects.  The move made it apparent that Powers was trying to force Gjovik to quit. Gjovik replied to Powers same day complaining that all the new assignments already belonged to other people, and that the increase was quadrupling her workload. Gjovik promptly informed Lagares and Polkes, that she was being "punished" by her supervisor. Gjovik also complained to Mike about their manager, Powers.

320.   On July 16 2021, Gjovik got a letter from Sedgwick about the ADA request Apple made Gjovik file and the letter was titled, "*Request to Correct Deficiency on ADA Information Request for Reasonable Accommodation.*" The form warned Gjovik she must have her doctor send responses to Sedgwick's questions by a deadline, but the form said "*You have until to return the requested information,*" (sic), failing to actually provide a deadline. Sedgwick's questions include, in response to Gjovik's documentation and complaints about known carcinogenic vapor intrusion in the indoor air, would she find it sufficient if Apple bought her an air purifier for her desk?

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**1. Understanding that the employer cannot reasonably guarantee an irritant free environment, is there alternative accommodations we can consider that would allow her to work onsite (ie PPE, air purifiers, filtering technology etc)? If not, why not?**

This would not be sufficient for the patient's condition. The patient provides evidence that there is enough risk to human health at the office building, due to the presence of chemicals, that day cares, elder cares, hospital use, and residential use on the property are prohibited by law. (See land use covenant: https://geotracker.waterboards.ca.gov/profile_report.asp?global_id=SL721101218

*7/16/21 Questions from Sedgwick, with Gjovik/doctor's 8/2/21 responses*

Sedgwick Claims Management Services, Inc.
PO BOX 144424
Lexington, KY 40512-4424

**sedgwick.**

Phone: (855) 702-7753
Fax: (866) 315-0607

07/16/2021

Ashley Gjovik

RE: Apple
   Request to Correct Deficiency on ADA Information Request for Reasonable
   Accommodation
   Event Number:

Dear Ashley,

We have received information from your provider in reference to your accommodation request. However, in order to evaluate your request, clarification and/or additional information is needed as noted below. You have until to return the requested information.

**Clarification Required** *(Reason(s) Provided Below)*

**Information Request for Reasonable Accommodation**

*Exhibit: 7/16/2021 ADA Request Response*

321.   On July 16 2021, Gjovik emailed Lagares: "*As previously discussed at length, I have serious concerns about workplace safety of my building, and Apple's other buildings on*

122

Deleted: *work place*

Deleted: FIRST

Deleted: --

Deleted: *cv*

Deleted: CRB

Deleted: OCTOBER 25

*chemical release sites. At least for my building, from what I've seen, Apple appears to have been*

*negligent with properly managing the vapor intrusion from the three toxic groundwater plumes*

*under the building. Also, as mentioned, I believe I have already been injured by the vapor*

*intrusion in 2019.*" Gjovik also complained that she felt misled about their ADA suggestion, and a nurse had reached out requesting a letter from her doctor, when Apple had expressly told her medical documentation would not be required.

322.    Lagares told Gjovik that there were delays in his response to her because he had to consult with a larger group of people and remarked to her there was a substantial number of stakeholders interested in her complaints. Under information and belief, Lagares was referring to members of the Enterprise in the scheme to hide Apple's unlawful acts, including: the Real Estate team, Steiger, EKI, AECOM, Northrop Grumman, Corporate Legal, Riccio, Worldwide Loyalty, Ronald Sugar, Lisa Jackson, Margot Perez Sullivan, Chip Poalinelli, Irvine Company, and others.

323.    On July 18, 2021, Gjovik posted on Apple's Slack discussion tool that Apple was negligent at her office and that Apple was misrepresenting their policies and protocols. Gjovik also complained of "*intimidation and retaliation for raising concerns.*" Gjovik shared she was hoping that her talking publicly about the issues might "*make Apple & their goons act more like humans.*" Gjovik posted on Apple Slack:

"…the remote work ADA process was actually suggested to me by Employee Relations as some sort of accommodation in response to me yelling for months about their negligence with my office/the property it is on, failure to address my workplace safety concerns, and misrepresentation of their policies/protocols. Also, yup I already reported her comments and my dissatisfaction with this whole mess of a process to Employee Relations. I have a big 90m meeting with two ER people this week to go over all this, in addition to my outstanding complaints about workplace safety, sexism, sexual harassment, failure to address hostile

**Deleted:** .

**Deleted:** work place

**Deleted:** work place

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

work env, failure to report workplace injuries, FMLA & ADA violations, intimidation and retaliation for raising concerns about all of the above, whistleblower retaliation, and a whole bunch more. To everyone suggesting I consider taking legal action, thank you and oh trust me, I am, but I think I will stress the judge out of I keep adding more & more cause of action after the initial complaint… so I'll let ER do their thing. Perhaps me talking publicly & semi-publicly about all this will make Apple & their goons act more like humans and less like a corporate machine, or at the very least act like a corporate machine with a PR crisis."

324.     Around July 2021, One of Gjovik's friends, an Apple Manager, warned her that if she kept posting about toxic waste and labor rights that *"Apple [was] going to take [her] Slack away."*

325.     Gjovik wrote to US EPA on July 19 2021 asking for an update and complaining about Ronald Sugar and conflicts of interest, and complaining Apple will not test the air before they fix the cracked floor. The next day Gjovik replied and added that she was concerned Apple did not notify US EPA about the cracks and claimed they do not have to. Gjovik asked EPA to find out *"what exactly this whole floor crack / floor sealing thing is about — in additional to the lack of air testing, and refusal to test the air before they seal the floor."* Gjovik also complained about the Ronald Sugar conflict of interest with Northrop Grumman, the Superfund site, and Apple – and complained Sugar's role at Apple appears to be overseeing that he himself would be in compliance with facilities and safety oversight at Apple. Gjovik suggested Apple could be engaged in unlawful conduct related to the cracks in the floor and asked US EPA to look into it.

326.     On July 20 2021, Gjovik wrote to US EPA from her iCloud email: *"Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."*

327.     On July 20 2021, US EPA emailed their Public Relations team informing them Gjovik had been complaining about her TRW Microwave Superfund office and about "*a connection between a member of Apple's BOD and his former post as CFO of TRW Microwave.*"

328.     Gjovik told Apple Employee Relations senior manager, Antonio Lagares, that because Waibel already ruined her career at Apple, Gjovik now wanted Apple to have to actually investigate what happened to her during her time at Apple. Gjovik told Lagares she was talking to reporters about Apple's work conditions and that she was considering suing Apple.

329.     On July 20 2021, Lagares agreed to open a new investigation into Gjovik's concerns. Lagares assigned investigator Ekelemchi Okpo to Gjovik's case. Gjovik started meeting with Okpo on July 21 2021 to discuss her concerns. Gjovik emailed Apple Employee Relations a list of evidence folders she shared with them, labeled by year and cause of action including: *"Failure to Report Workplace Injuries, Workplace Safety Concerns, Assault and Battery, Negligence."*

125



*Exhibit A-xvii-A: Gjovik's Box Evidence Folders*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Gjovik's Box Evidence Folders*

Deleted: *A-xvii-B*

330.   Apple said they would consider offering a severance package with Gjovik if Gjovik would sign a preemptive litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm Apple caused to Gjovik through chemical exposure at her office and her apartment.

Deleted: intentional concealing
Deleted: at
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

331.    Gjovik expressed concerns about the settlement amount and her potential medical costs if she was to get cancer from the exposure at her office, not even yet knowing about the factory at 3250 Scott Blvd or what Apple did to the HVAC at 825 Stewart Drive. Apple wanted all claims waived and Apple denied the severance on those conditions, in violation of California law. Apple had previously denied Gjovik's request for a different position at Apple, just not in a hostile work environment, knew she was in a hostile work environment, and then effectively suspended Gjovik before Apple then swiftly involuntarily terminate her employment. If Gjovik accepted the claim waiver, Apple acted as if it would provide severance at some point and not terminate her. If Gjovik has been able to continue her employment just five weeks more than when she was fired, then she would have received her annual performance bonus, additional RSU grants, a salary increases, and a large vesting of prior granted RSUs. It would be extremely unlikely Gjovik would voluntarily end her employment prior to these events.

332.    Because Gjovik denied the waiver, Apple discontinued Gjovik's employment and denied the raise and bonus due to her at that time in violation of Cal. Gov't Code § 12964.5(a). "When employers require employees to waive claims preemptively, it provides a mechanism for regularly wiping out claims that might otherwise lead to accountability and reform."[186] Apple also attempted to exploit information asymmetry to coerce Gjovik into a much smaller settlement than what would actually compensate her harm, by, among other tactics, persistently hiding and obstructing Gjovik from discovering the safety issues at Gjovik's office and what Apple did at the silicon fabrication plant. Apple's conduct with the settlement discussions was fraudulent and unlawful, and as such it is not protected under litigation immunity.[187]

---

[186] *Hamilton v. Juul Labs, Inc.*, No. 20-CV-03710-EMC, 2020 WL 5500377, at *9–10 (N.D. Cal. Sept. 11, 2020).
[187] *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 CA4th 847, 915, 93 CR2d 364, 411-412—settlement discussions may be admitted to prove insurer bad faith]; *Silberg v. Anderson* (1990) 50 C3d 205, 214-215, 266 CR 638, 643-644].

128

333.    On July 23 2021, Gjovik was quoted by New York Times where Gjovik criticized Apple's COVID-19 response in an article about return to work with the Delta surge. On July 23 2021, Apple emailed the city of Sunnyvale noting Apple's janitors had complained there had been "*an increase in the trash coming out of 825 Stewart,*" and asked to increase trash service. It's unclear what Apple was suddenly discarding en masse.

334.    On July 24 2021, New York Times make Gjovik's quote "Quotation of the Day" for the entire NYT.[188] Apple Employee Relations expressed they were upset Gjovik did this. Gjovik told Lagares that she was taking Labor Law and learned she is able to speak about her work conditions regardless of NDAs. Lagares told her it is annoying to Apple when employees "*figure that out*."

---

[188] New York Times, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans,*" July 24 2021, https://www.nytimes.com/2021/07/24/todayspaper/quotation-of-the-day-virus-surge-complicates-return-to-office-plans.html

129

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Gjovik's Quote in NYT, July 24 2021*

335.    On July 24 2021, Gjovik posted on Apple's Slack discussion tool complaining about secrecy at Apple after several of her coworkers suggested her quote in the NYT was "leaking" and Apple should/could fire her over it. Gjovik complained about Apple's "*over-generalized confidentiality scare tactics, culture of peer policing, and shaming.*"

**x.      Trouble with the US Government Sanctions Against Syria (2020-21)**

336.    Apple has a history of sanctions violations. In November 2019, the US Treasury found Apple liable for violations of Foreign Narcotics Kingpin Sanctions Regulations (31 C.F.R.

---

130

Part 598) and Apple settled for $466,912.[189] The amount Apple was fined was based on aggravating factors including the number of Apple's apparent violations; the length of time those violations occurred; the multiple points of failure within Apple's sanctions compliance program, policies, procedures; and that Apple's conduct "*demonstrated reckless disregard*" *of US sanctions requirements.*[190]

337.    On July 20 2021, Gjovik complained about a manager in West's organization making a written statement that sounded like he was bragging about smuggling and otherwise violating US sanctions on Syria. Gjovik had raised the issue a year prior, and John Basanese and Reed Johnson said they would look into, but there had been no response since. In the meantime, the male employee who was bragging about smuggling was promoted to manager of something called a "*Comfort Team*." Gjovik had inquired to the team as to what a "*Comfort Team*" is but no one ever responded to Gjovik.

338.    On July 20 2021, Gjovik contacted the Business Conduct team (reporting to Tom Moyer) about the smuggling and sanctions issues. The team responded promptly and asked for a phone call. Within two minutes Gjovik responded she was happy to help. During the call Gjovik was asked to preserve evidence while they investigate.

339.    The sanctions compliance investigator told her it did not sound like Apple violated sanctions because it was the employee's family handling the smuggling at his direction, and because it was illegally importing the goods into Syria, it would likely break Syrian laws but not US laws. Nothing was said about reporting the matter to the government regardless. The employee also bragged about running an IT consulting company, which is something Apple

---

[189] U.S. Treasury, OFAC, "*Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Apple, Inc.,*" Nov 25 2019, https://ofac.treasury.gov/recent-actions/20191125
[190] US Treasury, OFAC, "*ENFORCEMENT INFORMATION FOR NOVEMBER 25, 2019*" pg3, https://ofac.treasury.gov/media/25931/download?inline

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

employees are generally forbidden from doing. Upon investigation the employee claimed the business was based in California but it was apparently entirely operated in Syria and Lebanon and used an iOS application to facilitate border-crossings between the countries.

340.   The investigator commented he was concerned that Gjovik's coworker thought it was normal to brag about illegal smuggling at work. Gjovik noted: "*I've been complaining about, amongst other things, the culture of impunity and general lawlessness in my org.*" Even before an investigation concluded into the border crossing company, West then emailed Gjovik saying that because Apple did not break the law there is no policy violations so everything is fine. West added, however, they are going to remove the smuggling content from the article for undisclosed reasons that are not related to smuggling or other compliance concerns. Gjovik complained that West was minimizing the issue. Dan West never responded to Gjovik ever again.

341.   On July 22 2021, Gjovik contacted the US EPA and complained again about the current CERCLA-related activities at the office. Gjovik was becoming irritated with US EPA's indirect and passive responses, and Gjovik pointed out that there had never been a 24 hour indoor air test at the TRW Microwave Site that returned air pollution results within the acceptable limits – every time they had been run they failed, then Apple was only running inferior 10 hour tests, which did not fail but still showed pollution. Gjovik also asked if she talked to Apple and Northrop about "*the cracks in the floor and floor sealing plan", and mentioned Apple told her "they didn't notify the EPA about [it] and didn't plan to, despite [Gjovik] telling them they probably are required to."*

342.   On July 23 2021, the US EPA responded saying something about meeting with 'the site team' about Gjovik's office. Gjovik then texted Mike and told him "sounds like the EPA is finally yielding to my screams and is meeting with Apple to figure out what the f is

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

going on in our office building." Gjovik attached the email as a PDF for Mike. He responded, "*Oh, wow! That's awesome! It's happening!*"

**xi.    US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021)**

343.    On July 26 2021, the US EPA's CERCLA QA team reviewed Northrop Grumman's report about the sub-slab vents on the roof of 825 Stewart Drive. The vapor intrusion expert reviewed the report seeing the Main building (where Gjovik sat) SSD vents were sawed down to one foot and were exhausting the Superfund pollutants near the HVAC intake. The QA lead, Mathew Plate, wrote that it was "*not appropriate.*"

344.    On July 26 2021, the US EPA notified Northrop Grumman they wanted to inspect Gjovik's office at 825 Stewart Drive for vapor intrusion risk. US EPA told Northrop Grumman they wanted to inspect the sub-slab ventilation system, the building's concrete slab and cracks, any concrete slab penetrations, past indoor air sampling locations, and some additional topics.

345.    Under information and belief, Northrop Grumman notified Apple that day. Northrop Grumman's emails to US EPA on July 28 2021 noted they were "*still waiting*" on confirmation from Apple. Under information and belief, US EPA and Apple conspired to hide the fact that there was even an inspection from Gjovik indefinitely.

346.    In early August, Apple would also attempt to coerce the US EPA to sign a four-page, single-spaced Non-Disclosure Agreement that would prohibit the US EPA from making public statements about its compliance and enforcement activities against Apple, among other restrictions. The US EPA declined to sign Apple's NDA.[191]

---

[191] Apple NDA, Apple Number: NDA202104810699, Environmental Protection Agency (released per US EPA FOIA Request)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

347.     On July 27 2021, Gjovik forwarded her emails with the US EPA to Lagares and Okpo and encouraged them to do the right thing and adding the emails to a "*Work Place Safety*" folder with the other evidence folders.

348.     Around this time Gjovik had a meeting with Okpo where she pleaded with him to intervene or escalate the situation at her office, explaining why she was concerned about the cracked floor and the lack of testing, as well as why she was concerned about Apple's conduct including Apple counsel's prior admission of negligence. It seemed to Gjovik that Okpo did not care and she tried to appeal to him by telling him there was someone in the building who was at high risk for cancer (her coworker who disclosed the matter to Gjovik in March 2021) and told him she wanted to preserve their privacy but that there was an "*eggshell plaintiff*" in the building. He still did not react. Gjovik asked him if he understood and added it's a "*pussy shin*"[192] but with TCE vapor intrusion. Okpo said he did understand but said nothing more.

349.     On July 26 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns has just been to retaliate against her and intimidate her into silence – Gjovik asked if anyone else had been retaliated against for raising concerns. Many of Gjovik's coworkers responded that yes, they too had experienced retaliation from Apple for raising real and reasonable concerns. Okpo then swiftly interrogated Gjovik for over an hour about her posts and the responses, repeatedly asking her to stop posting about her concerns, and to stop encouraging other employees to post their concerns, and instead to send all employees to speak with him directly. Gjovik said no, and complained she would not send other employees to be retaliated against by Apple Employee Relations.

---

[192] *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (Wisc. 1891) (Twelve-year-old George Putney kicked fourteen-year-old Andrew Vosburg in the shin in a classroom…Unbeknownst to Putney, Vosburg had injured his leg the month before in a sledding accident. The court found Putney liable for all damages arising as a result of the kick, even though he did not intend the harm, nor was he aware of Vosburg's previous injury.)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

350.    On July 26 2021, US EPA discovered what Apple did to the HVAC at Gjovik's office at 825 Stewart Drive. The EPA QA employee wrote,

"In the mail building (where Gjovik sits) the [sub-slab depressurization] vents appear to be under components of the chiller. This is not appropriate and we should discuss. We should also get the distances between the vents and the HVAC outdoor air intakes. Have… air samples from the passive stacks been collected?"

---

**From:** Plate, Mathew <Plate.Mathew@epa.gov>
**Sent:** Monday, July 26, 2021 3:35 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>; Johnson, AudreyL <Johnson.AudreyL@epa.gov>
**Subject:** RE: TRW Microwave - 2020 SSD Inspection Memo

Michael,

In the main building the SSD vents appear to be under components of the chiller. This is not appropriate and we should discuss. We should also get the distances between the vents and the HVAC outdoor air intakes.

Have samples air samples from the passive stacks been collected?

Thanks
matt

---

*7/26/21 EPA email about SSD/HVAC (unknown if PST or EST)*

351.    On July 26 2021, US EPA then informed Northrop Grumman that EPA will be inspecting Gjovik's office. EPA noted a number of things they wanted to inspect including the sub-slab depressurization system, the concrete slab, any cracks/sealed cracks in the floor, and slab penetrations, locations of conduits and other vapor intrusion entry points, and locations for prior indoor air testing.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,

*Exhibit: 7/26/21 US EPA email to Northrop Grumman (unknown if PST or EST)*

352.     On July 27 2021, Gjovik emailed Okpo and Lagares a summary of their investigation, asking for a short-term solution to mitigate the retaliation she was facing from her supervisors, and also a long-term solution where she can either find a new job at Apple, or leave with a settlement but does not want to sign claim waivers or sign additional NDAs. Gjovik noted those were the "*two options we've discussed.*" Gjovik wrote: "*As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple [Employee Relations] to resolve, not for me to hide from.*" Gjovik told Lagares and Okpo, who kept repeatedly suggesting she take some sort of leave, that she did not want to go on leave. Gjovik complained that the leave Waibel put her on seemed to be an attempt to prevent Gjovik from monitoring the office and floor survey, and that Waibel never actually investigated.

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

353. On July 28, 2021, Gjovik emailed Okpo and Lagares about discussions with coworkers revealing frequent discrimination and harassment issues across Apple, and what appeared to be systemic cover-ups of those issues instead of actually resolving the problems, and that meanwhile Apple fraudulently holds itself out publicly as caring about human rights and respect. Okpo would then interrogate Gjovik about her posts, her organizing with other employees about concerns of cultures of retaliation and cover-up, and Gjovik encouraging employees to speak out. Okpo repeatedly he didn't want employees talking to each other or anyone else about their concerns and they should only talk to Apple Employee Relations 'privately.' Gjovik told him she would not help him retaliate against her coworkers.

From: **Ashley Gjovik** ashleygjovik@apple.com
Subject: Slack ER Chain
Date: July 28, 2021 at 2:46 PM
To: Ekelemchi Okpo eckpo@apple.com
Cc: Antonio Lagares (ER) alagares@apple.com

Hi,

The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400

Not even including DMs….

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.

-Ashley

**Thread** #women-in-swe⊚

🔖 Added to your saved items
Ashley Gjovik  Jul 26th at 12:41 PM
I just read this article and I have a lot of thoughts. I know this is a sensitive area, but I'm wondering if this is a topic that might be beneficial discuss, at least for those of us that have tried to go through the employee relations process here, or know folks who have.

https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-investigation/

Do we think Apple does a sufficient job at handling employees complaints about discrimination? Do we feel comfortable even reporting issues?

*Exhibit: The Slack/Retaliation Email*

Deleted: .
Deleted: *Slack/Retaliaton*
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

354.   On July 28 2021, Gjovik texted a friend summarizing a conversation with Okpo that day, where she said Okpo told Gjovik the only outcome from his investigation into her concerns would be "*a non-binding recommendation to the 'business' aka my dumb awful dude leadership and I told him they will just laugh, and I screamed at him for like 40min about the whole fucking thing being a sham.*"



Today he admitted that at the end of all this he's only going to provide a non-binding recommendation to the "business" aka my dumb awful dude leadership

And I told him they will just laugh

And I screamed at him for like 40min about the whole fucking thing being a sham

*Exhibit: Gjovik's text messages on July 28 2021 about Okpo*

355.   On July 28 2021, EPA emailed Gjovik saying: "*Thanks again for your continued interest in this site and providing your on-the-ground observations…. The agency takes these communications and on-the-ground observations seriously.*"

356.   On July 28 2021, Gjovik texted Okpo asking if he talked to Powers about keeping communications in writing, and Okpo said he did not.

357.   On July 28 2021 Gjovik complained to a friend in Human Resources that she believed the Employee Relations investigations were "*a sham*", writing to him in Apple Slack: "I've spent 20hrs in the last 2 weeks screaming at ER about Apple's ER being a sham & worthless & supporting the culture of discrimination and impunity – not to mention all of my workplace safety concerns being actively ignored."

358.   On July 29 2021, Gjovik complained to Okpo about her prior conversation with Apple EH&S Legal, Rubenstein, where the lawyer admitted Apple had not been testing the buildings for vapor intrusion and needs to be.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

359.    On July 30 2021, Gjovik complained to Lagares, Okpo, Polkes, and Waibel about her concerns about her Superfund office and an apparent cover-up, Waibel's sham investigation, and that she was "*talking to NYT about [the] whole debacle ongoing. NYT quoted [her] last week about [her] concerns about another workplace safety issue — what [she] feel[s] is inadequate safety protocols & policies around COVID exposure for employees being forced back into the office this fall in the midst of a global pandemic.*"

360.    Gjovik repeatedly said that she only wanted the situation with West and Powers controlled, and that worst case Okpo and Lagares could "pause" her job with West and Powers if they refuse to put things in writing and refuse to stop making changes to her workload. Gjovik told Okpo that she learned in law school that administrative can be an adverse employment action. Gjovik told Okpo that if he wanted to pursue the "pausing" her job option, that it must be a discussion and she must agree to the terms which must still allow her to organize with other employees, gather evidence, and participate in her other work activities (like trainings, her AI ethics project with Apple Legal, and her civic engagement project with Apple University). Gjovik said Okpo must offer the terms of the leave and she would either accept or reject it, otherwise she said, case law says if they force her on leave it's an unfavorable employment action.

361.    Around this time Okpo expressed disapproval that Gjovik was taking Employment Discrimination and Labor law school classes during the daytime. Gjovik told Okpo she was previously approved to take remote daytime classes in prior terms, as long as she was to multitask, which she continued to do. Gjovik told Okpo that if he wanted to forbid her from taking Employment Discrimination and Labor law that he must put it in writing. Gjovik said something like "*we'll see what the Judge thinks of that.*"

362.   Gjovik suggested several times that instead of working for West and Powers, that she could work in Employee Relations and try to fix their broken processes and culture of retaliation. At one-point Okpo offered that she could work in Employee Relations doing what she suggested, but that she would also have to continue to work for West and Powers. Gjovik expressed her frustration to Okpo that they still only seem to be trying to make her quit.

363.   On July 30 2021, Gjovik posted on Twitter complaining about Apple. "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions.*"



*Exhibit: Gjovik's 7/30/21 Twitter Post*

364.   After posting this, Gjovik had ex-Apple employees contact her to say they had similar experiences. Other Big Tech employees and ex-employees supported Gjovik for speaking out. Gjovik then decided to start sharing more of what was happening between her and Apple on social media in order to help others understand the issues so they could advocate for employees, and in hope it may pressure Apple to act more reasonably.

**Deleted:** <#>Gjovik wrote to Okpo and Lagares on July 27 2021 that she was also looking for a long-term solution to the issues that could either be a new role at Apple that is not a hostile work environment, or they should offer an exit package. She wrote *"I refuse to take medical leave as a response to the hostility. This is on Apple [Employee Relations] to resolve, not for me to hide from."*¶

**Deleted:** <#>On July 30 2021 Gjovik complained to a friend in Human Resources that she believed the Employee Relations investigations were *"a sham"*, writing to him in Apple Slack: ¶ "I've spent 20hrs in the last 2 weeks screaming at ER about Apple's ER being a sham & worthless & supporting the culture of discrimination and impunity – not to mention all of my work place safety concerns being actively ignored."¶
¶
<#>On July 28 2021, Gjovik texted Okpo asking if he talked to Powers about keeping communications in writing, and Okpo said he did not. ¶

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

365.    On July 30 2021, a Friday, Northrop Grumman wrote to US EPA that "*The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.*" [Monday of the next week was August 2 2021]. Under information and belief, Northrop Grumman were referring to Apple lawyer Debra Rubenstein.

366.    On July 30 2021, Apple Employee Relations emailed her to tell her Sedgwick is "*working with [her] provider to clarify and more fully understand [her] limitations.*" Gjovik responded to the person complaining that her office was unsafe and Apple was not taking it seriously, and that Apple was refusing to answer her safety questions and she blew the whistle on Apple the EPA. Gjovik complained about Apple forcing her to fill out "*invasive and intimidating paperwork to literally just not get poisoned.*"

367.    On July 30 2021, Gjovik posted on Apple Slack complaining about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups:

> I have been raising concerns about an unsafe work environment. I have very good reason to believe I've been exposed to uncontrolled industrial chemicals. I've been complaining for months. ER has partnered with EH&S to dodge my questions and arguably misrepresent what's happening. I had to resort to getting the U.S. EPA & California OSHA involved. Guess what Employee Relations recommended? Submit a medical accommodation request through Sedgwick to request remote work so I'm not exposed to the industrial chemicals. Guess what the request form asked for? Me to release a very large scope of medical records directly to Apple Inc and have my doctor fill out a detailed form explaining why exposure to uncontrolled industrial chemicals, possibly at toxic levels, is bad for my health and even referenced a worker's comp form I filled out for a fainting spell in my office in 2019, directly referencing vapor intrusion in my active Superfund office. Then what did Sedgwick do? Send me another detailed form for my doctor to fill out asking for more details about my health and also things like, what if we get you an air purifier by your desk? (Yes, an air filter, to mitigate the levels of TCE known to be in the air at my desk above max

Deleted: .

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

industrial levels even less than ten years ago). What happens when I complain to employee relations again that I have to fill out paperwork to not get poisoned? Literally Nothing."

368.    On August 2 2021, Gjovik asked the US EPA what the status of her office was. She said Apple refused to answer anymore of her questions. She also noted she was talking to the New York Times. US EPA, Perez-Sullivan, responded August 3, 2021, thanking Gjovik for providing information but failing to mention the inspection or HVAC issues). Perez-Sullivan also killed the New York Times story that day and reported her success in doing so to her manager.

369.    On August 2 2021, Gjovik and her coworker Mike, texted about their office. Mike asked, "*any updates on the testing in SD01?*" Gjovik replied: "*They told me they're not answering any more of my questions and they'll reach out to me when they feel like it.*"

370.    On August 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything Waibel had supposedly investigated and saying that if Waibel said it was fine then it was fine – Gjovik proceeded to start posting on Twitter about several of the smaller things she complained about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no issues, so then she is free to talk about it and she would do so. Gjovik posted on Twitter several examples of the evidence she provided related to West and Powers discriminating against her due to her sex/gender including a text message exchange with West where he was measuring the 'octaves' of her speaking voice, and another with Powers defending a political figure who was recently accused of sexually assaulting a woman. These posts quickly went viral.

**Deleted:** paper work

**Deleted:** )

**Deleted:** Ertell

**Deleted:** Ertell

**Deleted:** ,

**Deleted:** proceeding

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

371.    Gjovik complained repeatedly about the clear misuse of ADA and the offensive responses from Apple and Sedgwick related to her request. On August 2 2021, Gjovik emailed Okpo, Lagares, Waibel, and Polkes

"My doctor faxed his response to Sedgwick's follow up questions to them today. Attaching for you below since I assume you'll ask them for it anyway. Note: the questions about whether an air purifier could mitigate Superfund vapor intrusion (so severe that a land use covenant with the government prohibits elder care and day care on site) was particularly offensive, but so is the fact itself that you're forcing me to release medical info & fill out forms to not be poisoned."

372.    In response to Sedgwick's bizarre questions, Gjovik and her doctor repeatedly explained that industrial chemical air pollution is known to be on site, Gjovik should not be exposed to toxic air pollution, and Gjovik simply wants a location to work at Apple that is not a toxic waste dump. Gjovik's response suggested she either be allowed to work from home in the Bay Area, or be allowed to transfer to an Apple office in a different region with less pollution. Gjovik had also been discussing with Powers, Lagares, and Okpo that she would be open to working in an Apple building in Silicon Valley if it was not on a toxic waste dump, but they said there were no Apple offices she could transfer to in Santa Clara County that are not on toxic waste dumps.

---

**Deleted:** <#>Sedgwick provided Gjovik a medical release form to Sedgwick on behalf of Apple which Gjovik signed. Gjovik met with her doctor, and he prepared the documentation for the request despite also being confused by Apple's approach on the matter. ¶

**Deleted:** 2ⁿᵈ

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

> **1. What is the provider attempting to solve for in the current work environment with this accommodation?**
>
> I am attempting to allow the patient to continue to work her regular hours while at the same time protecting her from harm, due to industrial chemicals.  She has a medical history consistent with significant physical and cognitive impairment when she is exposed to industrial chemicals.
>
> The patient provides evidence that her current work environment is an active EPA Superfund site with a history of vapor intrusion above maximum industrial levels.  She has provided the following evidence: https://cumulis.epa.gov/supercpad/cursites/csitinfor.cfm?id=0901181
>
> The patient claims that may of Apple's other buildings are also on active Superfund sites or County/State-managed chemical clean-up sites.
>
> **1. Are there other accommodations that could be considered that would allow the patient to work in the office? If so, what are they?**
>
> Relocation to offices outside the San Francisco Bay Area to areas without systemic chemical pollution.
> The patient provides these sources:
> https://www.theatlantic.com/technology/archive/2019/09/silicon-valley-full-superfund-sites/598531/
> https://ehp.niehs.nih.gov/doi/10.1289/ehp.1205879

*Gjovik's 8/2/2021 Response to Sedgwick*

373.    Gjovik raised concerns to Apple in April through August of 2021, complaining of retaliation, discrimination, harassment, and intimidation. In response to Gjovik's detailed complaints with supporting evidence of misconduct by Apple managers and representatives, Apple (West, Powers, Polkes, Lagares, Okpo, Waibel) repeatedly suggested Gjovik's only path forward to resolve those issues was for Gjovik to request FMLA medical leave and/or utilize an Apple EAP ("Employee Assistance Program") mental health counselor.  Gjovik repeatedly complained that both of those suggestions implied Gjovik was imagining or overreacting to the issues, and that Gjovik's only option was to remove herself from Apple. Gjovik complained that she identified specific, tangible abuse and it was Apple's responsibility to investigate and remediate the misconduct. Gjovik also complained that Apple's inferences that the issue was Gjovik's mental health was undermined by Apple then suggesting an appropriate response to the abuse was to go on leave to remove herself from that abuse. Gjovik's logic and self-confidence did not deter Apple from continuing to pursue this line of intimidation for months and until Gjovik's inevitable termination.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

374.    Gjovik told Apple she was moving apartments to Santa Clara on August 6 2021 and driving from San Francisco to Santa Clara to pick up her key on August 5 2021. Gjovik said since she will be driving through Sunnyvale anyways, she planned to visit the office on August 5th to gather evidence. Gjovik specifically mentioned a work laptop that she believed had copies of the text exchange with West when he tried to pimp/pander her in 2018.

375.    Then, on August 2 2021, shortly after Gjovik said this, Apple suddenly announced it was sending an EH&S team to Gjovik's office on August 4 2021. The notice said there will "be testing" in three conference rooms. Gjovik quickly texted Mike to see if he would be at the office before August 4 2021, so he could help gather evidence, but he said he did not think he would be there before August 4 2021. Gjovik also wrote "*what does testing mean*"?

376.    Gjovik emailed US EPA on August 2 2021 and asked them what the status was of her complaints. Gjovik noted Appl was "*doing some kind of maintenance work in the office on Wednesday.*" EPA responded August 3 2021 saying again that EPA "*take[s Gjovik's] on-the-ground observations seriously.*"



Deleted: Ertell

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

377.    On August 3-4 2021, Gjovik asked other coworkers on her team who were onsite at the building, Simon and Eddie, to take photographs of the cracks in the floor as evidence, fearing Apple was attempting to cover-up the safety issues and Gjovik and her colleagues would never understand if they were exposed to chemicals in way that harmed their health. Gjovik messaged them: "*Weird ask but if either of you are in [Stewart 1 office] today can you please try to take detailed pics of any cracks you see in the floor – the cement – EH&S is supposed to fix it tomorrow-ish I want evidence of what they looked like before they do.*"

378.    Gjovik's coworkers responded they were in the office and asked her to point to "*where the cracks are*" so he "*can take a pic.*" They then sent a photo of a crack in the floor and asked, "*Do you consider this a crack?*" Gjovik responded, "*Thank you. Yes, can you get closer up to see the depth please and note where in the building it is. I love you both. The deeper the crack the more likely we're being slowly poisoned. I'll forward you an email after my meetings.* "



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

Deleted: *A-xx-A*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

Gjovik's coworker responded that he "*did a quick walk and it's all over the place.*" He

said he can "take pics" "but it is everywhere." Gjovik responded,

"If there's any way to show depth like sticking clay in a deep one and showing

how deep it is that would be amazing. It sounds like they're trying to cover all this

148

**Deleted:** *A-xx-B*

**Deleted:** *its*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

up as soon as tomorrow. This is me yelling about the cracks (email attachment). I think they're sealing them tomorrow but refusing to test or capture them otherwise until they fix them.

Gjovik's coworker responded with photos of cracks. Gjovik responded,

"Thank you. Would you mind looking in front of Mike's office and the concrete in front of the row where my desk is. I filed a worker's comp complaint for fainting in Mike's office and at my desk in 2019 now due to suspected chemical exposure.

Gjovik's coworker responded "*Well definitely some cracks in the floor. Also, a ton of floor (in all cubicle / office space) is all under carpet, so how do they know what is cracked under there?*" Gjovik replied: "*They said they weren't going to look under the carpet because they're smart and talented people and I should stop asking questions.*" Gjovik informed Employee Relations of what they were doing and showed Okpo the photos. Gjovik complained she would not let them hide or destroy evidence.

379.   On August 2 2021, Gjovik told EPA to expect to hear from a NYT reporter she was talking to about her office. On August 3 2021, EPA's notes show they misled the reporter by pointing him to old information and not disclosing to him, or Gjovik, the inspection that was about to occur.

Deleted: [Coworker 3]'s

Deleted: workers

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

---

**Message**

| | |
|---|---|
| **From:** | PerezSullivan, Margot [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6659D7F0435B465184ED9736F0FDBC7A-MPEREZSU] |
| **Sent:** | 8/3/2021 7:16:23 PM |
| **To:** | Barkett, Bonnie [Barkett.Bonnie@epa.gov] |
| **Subject:** | end of day |

**NY Times** (Jack Nicas) [Initial interaction 8/2] – CLOSED – Reporter emailed regarding concerned citizens claims about TRW Microwave superfund site. Reporter indicated he's checking to see if there's a possible story based on concerned citizen's claims. Explained to reporter that RPM is on vacation and that as of the last 5 year review, EPA determined the remedy is protective. Reporter indicated he would not wrote a story. SEMD, NorCal, Margot Perez-Sullivan

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 [Ex. 6 Personal Privacy (PP)]
E: perezsullivan.margot@epa.gov

380.    On August 3 2021, Alisha Johnson (prior US EPA Press Secretary under Lisa Jackson, now reporting to Lisa Jackson at Apple) emailed US EPA Public Relations to suddenly begin organizing an event where the current head of the US EPA, Michael Regan, would come to Apple Park and do a "fireside chat" with Lisa Jackson on August 17, two days before the US EPA's inspection of Gjovik's Superfund office. [196]

381.    The same day Apple announced a new "*joint commitment*" about "*protecting workers from chemical hazards.*"[197] The program claimed Apple committed to "*protect workers*" from chemical exposure, "*build safety systems and culture around process chemical management,*" and "*avoid harmful substances.*" The first round of

---

[196] Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*, https://www.axios.com/2021/08/18/epa-administrator-visits-apple-headquarters-climate
[197] Aug 3 2021, https://www.greenamerica.org/blog/groundbreaking-effort-protect-workers-chemicals-electronics; https://www.towardzeroexposure.org/about-the-program ; https://cleanelectronicsproduction.com/post/2021-08-03-electronics-industry-leaders-advance-toward-zero-exposure-to-workers-throughout-the-supply-chain

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

highly prioritized chemicals to ensure workers have "*zero exposure*" to included NMP, Toluene, and TCE.[198]

382.     On August 3 2021, Margot Perez-Sullivan (US EPA) sent status to US EPA Public Relations saying the NYT reached out to her about Gjovik and Gjovik's office asking if there is anything newsworthy happening at 825 Stewart Drive.[199] Perez-Sullivan said she told the reporter, Jack Nichols, that the 2019 report on the office said the current remedy "*is protective*" and claimed the current US EPA Project Manager was "*on vacation.*" Perez-Sullivan wrote "*Reporter indicated he would not write a story.*"

383.     On the night of August 3 2021, Gjovik posted on Apple's Slack discussion tool encouraging her coworkers to speak out about work conditions and the terms and conditions of their employment.

384.     On August 4 2021 at 7:23 AM the city of Sunnyvale asked to Apple to inspect Gjovik's office for hazardous waste regulatory compliance.

385.     On the morning of August 4, Simon notified Gjovik he was at the office again. He provided more data on the cracks and also noted "*EH&S folks are here by the way. With so many devices. Nice job.*" Gjovik asked him to take a photo of them too and say, "*Ashley says hi.*" He responded, "*They are in the conf room next to Powers' office. Very difficult to take pic.*" Gjovik responded, "*they're legit hiding.*"

---

[198] Toward Zero Exposure, 2023 Report, https://static1.squarespace.com/static/5fcaaeb867798450704de457/t/63ffcc83fe791111862f0a14/1677708419929/Toward+Zero+Exposure+Requirements+and+Verification+V1.1+February+2023.pdf
[199] Note: news coverage of Gjovik's claims against Apple, including about her office and the related cover-up were covered in depth by many newspapers including Financial Times, which featured the matter on their front page in December 2021. What was occurring was newsworthy.

Deleted: .

Deleted: Moen

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

**Deleted:** *A-xx-C*
**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**xii.**    **Apple Torments Gjovik: US EPA Inspection: Apple Prepares to Fire Gjovik (August 2021)**

386.    A couple of hours later on August 4 2021, Apple suddenly put Gjovik on "indefinite administrative leave". Gjovik was supposed to meet with Okpo to continue reviewing evidence files with him and discussing her concerns. Gjovik said she did not want to be on leave, but Apple said she did not have a choice. Gjovik said she wanted to still be able to talk to coworkers and gather evidence, and Apple said she was removed from the "*workplace*" and "*all workplace interactions.*" Gjovik was then left unable to coordinate with her coworkers to gather evidence, or to visit her office as planned to gather evidence in person the next day. Gjovik complained it was retaliation.

387.    Gjovik had been tracking the status of what they reviewed on the Box folders, and in addition to two pending folders, Gjovik had a new folder she wanted to review named "*New Evidence to Review 8-4*". Okpo said they were not going to review any more evidence and Gjovik is now on leave. Gjovik protested and Okpo persisted.



**Exhibit:** *Gjovik's Box folders on the morning of August 4 2021*

388.   Under information and belief, after receiving notice from US EPA that they were going to inspect 825 Stewart Drive, and after having reviewed the extensive and meticulous evidence Gjovik gathered at 3255 Scott Blvd, and knowing Gjovik was about to be at 825 Stewart Drive to do the same -- Apple conspired to get to the office before Gjovik could, and also concurrently "*remove Gjovik from the workplace*" so she did not make a surprise visit, and "*remove Gjovik from all workplace interactions*" so no coworkers tipped Gjovik off as to what Apple was doing.

389.   After her meeting with Okpo, Gjovik still had two other meetings scheduled that day. Gjovik asked Okpo if the leave could start in a day or two so she has time to wrap up meetings and ensure her projects are covered. Okpo said no, the leave starts immediately. Gjovik

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

complained to Okpo that the leave was retaliation. She complained he is setting her up for a bad review along with keeping her from organizing and gathering evidence.

390.    Gjovik went to both of her meetings that day. The first was with a coworker who wanted to talk about a bad experience they had with Employee Relations. She told the coworker what happened and said she was not sure if she would get in trouble for still attending their meeting. She also notified the coworker when her meeting with Okpo went late, describing Okpo's conduct during the meeting as "*spicy*" in her Slack messages with the coworker.

391.    Gjovik's last meeting of the day was with four senior managers in Dan West's organization. Gjovik knew Powers needed a specific outcome from that meeting and was expecting it that day, so Gjovik led the first half of the meeting like nothing was wrong. Once the project discussion completed, Gjovik then told them she was "*just put on leave*" and "*doesn't know if Apple will let her come back.*" Gjovik told them "*She did not understand what just happened*" and that Apple said it was voluntary but also said she had no choice.

392.    Gjovik told them solemnly that she expected it was probably the last meeting she'd ever lead as an engineering program manager at Apple. The senior managers advised her she should leave the call so she "*did not get in trouble with Employee Relations.*" Gjovik acquiesced.

393.    Gjovik complained a lot on Apple Slack about being put on leave and told her coworkers to follow her on Twitter, or text or email, if they wanted to keep organizing now that she has to stop using Slack. Gjovik also set up an out of office message that complained she was now on leave and Employee Relations doesn't want her on Slack. Gjovik shared her social media account so her coworkers could still watch what Apple was doing to her, and stay in touch, and she offered to connect workers to reporters to discuss things like Apple's "overly restrictive NDAs."

**Deleted:** The

**Deleted:** she

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**Ashley Gjøvik**  12:33 PM                    Today ⌄

I'm OoO now on administrative leave & ER wants me off of Slack. If anyone wants to keep in touch in the interim, etc. my Twitter is ashleygjovik and DMs are open, and I have Signal. If anyone is interested in talking to the press, I have a bunch of journalists interested in the remote work advocacy, overly restrictive NDAs, workplace safety issues, disability accommodations, and discrimination issues (especially Apple's systemic poor process & responses to all of the above). If anyone wants assistance in connecting to the 4th estate, happy to help.

394.    On August 4 2021, a reporter contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik posted. The reporter wanted to write an article about what Apple did to Gjovik. Gjovik agreed to let her write an article about Gjovik being put on leave, Gjovik also posted on Twitter about it herself first, and the story was picked up by other press.[200]

395.    Apple responded to the press only saying repeatedly: "*We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters.*"[201]

396.    Hours after Okpo put Gjovik on leave on August 4 2021, Okpo sent an email to Gjovik saying she was now on leave because she asked to be on leave. Gjovik never responded directly to Okpo because his email was inaccurate and combative, and she did not feel like arguing with Okpo more at that time.

---

[200] The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave,*" Aug 5 2021, https://www.telegraph.co.uk/technology/2021/08/05/apple-worker-complained-sexism-hostile-workplace-put-paid-leave/ ; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" Aug 5 2021, https://finance.yahoo.com/news/senior-apple-employee-alleges-sexism-at-work-is-put-on-indefinite-leave-235626960.html ; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues,*" https://www.foxnews.com/tech/apple-exec-placed-on-leave-sexism-concerns-workplace-issues
[201] Id.

---

156

Deleted: A

Deleted: .

Deleted: <#>Gjovik agreed to let her write an article about Gjovik being put on leave, and it was picked up by other press. ¶

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

On Aug 4, 2021, at 12:53 PM, Ekelemchi Okpo <eokpo@apple.com> wrote:

**Apple Confidential**

Hi Ashley,

I wanted to confirm our conversation a few minutes ago.  Per your request, you are now on paid administrative leave so as to not interact with your managers. You will receive your regular pay and benefits during this time. You are not expected to perform any work until the investigation is completed and closed. I will work with your manager to set your out of office message.

This administrative leave ensures that you are removed from the workplace, workplace interactions and contributions and your day to day roles and responsibilities while I conduct a thorough and complete investigation into your concerns. As discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.

I am reviewing the issues we discussed and will send you an email by early next week to confirm the scope of my investigation.  If you have any questions at any time, please feel free to email me.

*Exhibit: Okpo's 8/4/21 Email*

397.    Gjovik made three Twitter posts about the situation on August 4 2021. The first post was at 1:16pm PST. Gjovik wrote: "*So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack.*"[202]

---

[202] Twitter, Ashley Gjovik, August 4 2021, https://twitter.com/ashleygjovik/status/1423014977661591552

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Gjovik's 1:16pm PST Twitter Post*

*Exhibit: Post Analytics*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**THE VERGE**   TECH   SCIENCE   MORE

APPLE / POLICY / TECH

# Apple places female engineering program manager on administrative leave after tweeting about sexism in the office

*Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation*

By Zoe Schiffer | @ZoeSchiffer | Aug 4, 2021, 5:18pm EDT

*__Exhibit__: Verge Article about Gjovik from August 4 2021 at 2:18pm PST* [203]

---

[203] The Verge, *"Apple places female engineering program manager on administrative leave after tweeting about sexism in the office: Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation,"* Aug 4 2021, https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Apple has placed senior engineering program manager Ashley Gjøvik on indefinite administrative leave after she tweeted about sexism in the office. The company is currently investigating claims Gjøvik made about a hostile work environment.

"For months, I have been raising concerns with Apple employee relations about years of experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation," Gjøvik says in an interview with *The Verge.* "I asked them to mitigate the hostile work environment while they investigate, and they initially offered me EAP therapy and medical leave. I told them that made no sense, and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option they could give me paid administrative leave. They apparently made no effort to set boundaries and instead said they were placing me on administrative leave and implied they did not want me on Slack where I had been vocal about my concerns with certain policies at the company. They also implied they didn't want me to meet one-on-one with other women at the company about their concerns with Apple policies, which I had been doing."

This afternoon, Gjøvik set an out of office message informing colleagues that the employee relations team had placed her on indefinite paid leave.

So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack.

— Ashley M. Gjøvik (@ashleygjovik) August 4, 2021

*Exhibit: Excerpt from The Verge Article on Aug 4 2021*[204]

---

[204] The Verge, "*Apple places female engineering program manager on administrative leave after tweeting about sexism in the office: Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation,*" Aug 4 2021, https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

398.   The second post was at 2:12pm PST. Gjovik wrote, *"#Apple employee relation's 1st #sexism investigation only arose while I was complaining about unsafe work conditions and related #intimidation. They tried to quickly brush me off & prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review."*[205]



Ashley M. Gjøvik
@ashleygjovik                                    Promote   ...

#Apple employee relation's 1st #sexism investigation only arose while I was complaining about unsafe work conditions and related #intimidation. They tried to quickly brush me off & prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review.

6:12 PM · Aug 4, 2021, EST

View post engagements

💬 18      ↻ 75      ♡ 339      🔖 10      ⬆️

***Exhibit****: Gjovik's 2:12pm PST Twitter Post*

399.   Gjovik's third Twitter post was at 2:33pm and said, *"When I say "unsafe #workconditions," I mean physically unsafe; #dangerous chemicals; #OSHA. You'll hear much more about this in a bit."*[206]

400.   On the evening of August 4 2021, Dan West also suddenly scheduled two large meetings with the women's group Gjovik founded and co-chaired. He had never done this before and his assistant even had to send an email explaining what the meeting was because no one would expect such a thing. It was clearly pretextual and part of the cover-up.

_____

[205] Twitter, Ashley Gjovik, August 4 2021, https://twitter.com/ashleygjovik/status/1423044310451179523
[206] Twitter, Ashley Gjovik, August 4 2021, https://twitter.com/ashleygjovik/status/1423049593596481540

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Dan West meeting with Women's Group, 8/4*

*Exhibit: Gjovik's Twitter post on August 4 2021 3:33 PST*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

401.    On August 5 2021, Gjovik posted at 8:45am PST said, "*Lord have mercy. Here's my "#Apple ER said it's ok" for today. I sent them my annual reviews noting I shouldn't be "overbearing" or "#emotional," shouldn't express "#anger or frustration," and I "can cause #anxiety for herself." Formal review. ER said it's fine. Shut this down.*"[207] Gjovik was replying to an ex-Apple employee who had been engaging in the discussion about hostile work environments at Apple.

402.    On August 5 2021 at 9:38am PST, Okpo sent another email to Gjovik, replying to his prior email, complaining that Gjovik referred to the leave as "*indefinite*" even though there was no ETA for any type of update or outcome. Okpo also insisted, again, that Gjovik was supposedly the one who asked to be on leave and Apple was kind enough to put Gjovik on leave. Okpo called Gjovik's public statements a "*misrepresentation.*"

---

**From:** Ekelemchi Okpo <eokpo@apple.com>
**Date:** August 5, 2021 at 9:38:39 AM PDT
**To:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject: Re: Apple Confidential: Next Steps**

Ashley,

I'm disappointed about you misrepresenting our discussion.  As we discussed, and I confirmed in my follow up email, you requested and Apple agreed, to have you on paid administrative leave while I look into your concerns so that you can remain out of the workplace while the investigation continues.  We did not discuss you being on an indefinite leave.

To preserve the integrity of the investigation I requested, but did not require, that you refrain from sharing the content of our communications. As I shared, this is done in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses. I did not imply, nor did we ever discuss, the removal of your access to Slack.

If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements.  I'll be in touch with you soon about the investigation.

---

*Exhibit: Okpo's Email to Gjovik on 8/5/21*

403.    Apple's lawyers would later claim that on August 4 2022, Gjovik "*misrepresented [Okpo and her] meeting in a tweet, alleging that Apple had 'suspended' her by placing her on involuntary 'indefinite' leave.*" Counsel said Apple "*ER emailed Ms. Gjovik to correct her*

---

[207] Twitter, Ashley Gjovik, August 5 2021,
https://twitter.com/ashleygjovik/status/1423309111123349509

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*misrepresentation the following day.*" [208] Apple accessed, farcically "investigated", surveilled, documented, and reported Gjovik's social media activity in violation of Cal. Lab. Code § 980. Gjovik has a right to privacy in any personal social media including videos, photographs, blogs, text messages, and email. Apple's complaints about Gjovik's speech in Okpo's August 5 2021 email and in Apple's March 2022 position statement both confirmed Apple was reading Gjovik's Twitter posts. Apple's "comments" to press in the articles about Gjovik confirmed Apple was aware Gjovik was providing interviews to the press about what was happening with her employment at Apple.

404.    Gjovik realized Apple was preparing to fire her and quickly heard about conversations within her team that confirmed she was going to be fired. Starting around August 5 2021, the managers in West's organization start raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers say if anyone has concerns about the "*Ashley Issue*" they should talk to Helen Polkes. They and West mention West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands meeting.

405.    Gjovik realized they would not be discussing the "*Ashley Issue*" at a future all hands if she was there, and that West was already certain Gjovik was about to be fired. Gjovik also realized that Apple was sending her coworkers who were concerned that Gjovik had a point that Human Resources at Apple was severely corrupt, Apple was sending those coworkers to Human Resources. Gjovik realized Apple was not going to investigate or engage in good faith behavior.

406.    Starting on August 4-5, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. One on a forum discussion about

---

[208] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).

164

Deleted: 6

Deleted: about

Deleted: <#> Gjovik complained about being on leave a lot. As she heard and saw Apple's conduct become more retaliatory, and Apple refused to let her go to trainings, Gjovik then began referring to the leave as a "suspension". Gjovik began to prepare for imminent termination. ¶
<#>On the evening of August 4, Dan West also suddenly scheduled two large meetings with the women's group Gjovik founded and co-chaired.¶

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Gjovik, "*Doval*," wrote that Gjovik "*needs psychiatric help and confinement*" and that Gjovik

"*is a psychopath and frankly is a danger to other apple Employees*!" The account went on to call

Gjovik a "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and

make an example of people like this.*"[209]

407.    Gjovik moved apartments on August 6 2021. She picked up the key on August 5 2021 and her possessions were moved August 6 2021. Gjovik spent most of the time packing, moving, and unpacking on the phone with law firms frantically trying to find a lawyer to deal with Apple for her. All lawyers Gjovik talked to wanted Gjovik to be willing to agree to sign an NDA in exchange for a settlement, but Gjovik refused, so proceeded unrepresented.

408.    The press continued to cover what Apple was doing to Gjovik, as well as a growing movement across Apple employees who began speaking out and organizing with each other around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this too, and Gjovik posted on Twitter about it repeatedly. Gjovik was not only a catalyst for many employees to come forward themselves, but these employees catalyzed Gjovik's view and protest of Apple's misconduct.

409.    On August 9 2021, the US EPA sends travel approval requests to visit Gjovik's office and the justification for the visit cites Gjovik's disclosures.

---

[209] AppleInsider, 4 Aug 2021, https://forums.appleinsider.com/discussion/223222

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Destination: TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
Dates: 2021-08-19
Description of work: A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health. The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
Travel Method: Separate vehicles, one person per vehicle, local travel, no overnight stay.

*Exhibit: US EPA's 8/9/21 Travel Request for 8/19/21 Visit to Gjovik's Office*

410.    On August 9 2021, EPA emails complain Apple wants to know everywhere they want to go in Gjovik's building, and that Apple is trying to the EPA to sign an NDA.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*Apple Number: NDA202104810699*                    *Environmental Protection Agency*

## Apple Confidentiality Agreement

This Apple Confidentiality Agreement (the "**Agreement**") between Apple Inc., a California corporation located at One Apple Park Way, Cupertino, California 95014 United States ("**Apple**") and Environmental Protection Agency, located at Environmental Protection Agency  75 Hawthorne Street  San Francisco, CA 94105, United States, ("**Company**"), is effective as of August 9, 2021 ("**Effective Date**").

### 1. Scope

This Agreement governs any Confidential Information disclosed in connection with the Purpose.

In this Agreement: (i) "**Confidential Information**" means any nonpublic information, or material, which may include product plans, specifications, designs, photographs, costs, prices, project names, business plans, marketing plans, forecasts, orders, materials, components, prototypes, or pre-release products, disclosed by one party or any of its Affiliates (the "**Discloser**") to the other party or any of its Affiliates (the "**Recipient**") in connection with the Purpose, including information Recipient learns from Discloser's employees or Consultants or through inspection of Discloser's property; (ii) "**Purpose**" means Apple's evaluation, purchase or use of Company's, or its Affiliates', goods, services, technology, or other property (including intellectual property, real property, and personal property); (iii) "**Affiliate**" means any entity that Controls, is Controlled by, or is under common Control with a party; (iv) "**Control**" means the legal, beneficial, or equitable ownership, directly or indirectly, of more than 50% of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights; and (v) "**Consultants**" means a party's bankers, accountants, auditors, attorneys, financial advisers, and independent contractors.

Confidential Information also includes: the fact that the parties and their respective Affiliates and Consultants have discussed the Purpose; the substance of their discussions; and the terms, conditions, and existence of this Agreement.

### 2. Disclosure and Use Restrictions

Recipient may only disclose Confidential Information to its employees or Consultants who: (i) have a need to know in order to accomplish the Purpose; and (ii) are bound by a written agreement that prohibits any unauthorized disclosure or use of the Confidential Information that is at least as restrictive as the terms and conditions of this Agreement. Recipient shall not disclose, and shall cause its Consultants not to disclose, Confidential Information to any other person or entity without Discloser's prior written consent in each instance. Recipient and its Consultants may only use Confidential Information for the Purpose. Recipient and its Consultants must use a reasonable degree of care to protect Confidential Information it receives and to prevent any unauthorized use or disclosure of Confidential Information. Recipient shall be directly liable for any liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, as incurred by either party and their respective

Page 1 of 4

V. 03192021                                        Apple Confidential

ED_006475_00000040-00001

SECOND AMENDED COMPLAINT, 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

ED_006475_00000040-00

Apple Number: NDA202104810699

*Environmental Protection Agency*

Affiliates, related to any unauthorized disclosure or use of Discloser's Confidential Information by Recipient or any of its Consultants.

**3. Exclusions**

Confidential Information does not include information that: (i) was known by Recipient without restriction before receipt of the Confidential Information; (ii) is publicly available through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; or (iv) is independently developed by Recipient. Recipient may disclose Confidential Information to the extent it is required by law if it makes reasonable efforts to provide prior notice to Discloser and seeks protective treatment of the Confidential Information. The fact that a disclosure was legally required will not alter the nature of the Confidential Information.

**4. Intellectual Property**

Except as expressly set forth in this Agreement, nothing in this Agreement is intended to grant a license to or waive any rights in either party's patents, copyrights, trademarks, or mask works. Receipt of Confidential Information will not constitute or be used to show or support notice or knowledge of any patents.

**5. Feedback**

Any ideas, suggestions, or recommendations made by Recipient regarding Discloser's Confidential Information in connection with the Purpose, ("**Feedback**"), may be used and incorporated into Discloser's products, technologies, and services without paying royalties and without any other obligations or restrictions so long as Discloser does not infringe Recipient's patents, copyrights or trademark rights.

**6. Residuals**

In connection with the Purpose, Apple and its Affiliates shall be free to use any ideas, concepts, know-how and techniques retained in the unaided memory of the persons who had access to the Confidential Information ("**Residuals**") for any purpose (subject to any patents or copyrights of Company and its Affiliates), and Apple and its Affiliates have no obligation to limit or restrict the assignment of such persons. A person's memory is unaided if the person has not intentionally memorized the Confidential Information.

**7. Independent Development**

Each party acknowledges that the other party may, currently or in the future: (i) make or use goods, services, or technologies that compete with its own; (ii) develop information internally or receive information from other third parties that may be similar to its own Confidential Information; or (iii) evaluate, invest in, or do business with its competitors or potential competitors. Neither party's execution of this Agreement nor its receipt of any Confidential Information will restrict such activities.

**8. Warranty**

Page 2 of 4

V. 03192021                                    Apple Confidential

168

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Apple Number: NDA202104810699*                                            *Environmental Protection Agency*

Each party warrants that it has the right to disclose its Confidential Information. All Confidential Information is provided AS IS and without any warranty, express, implied, or otherwise, regarding its accuracy or performance.

**9. No Press Releases or Other Public Statements**

Neither party nor their respective Affiliates or Consultants shall issue press releases or other public statements regarding this Agreement or its subject matter without the other party's prior written approval; provided, however, Apple and its Affiliates may disclose the final results of any supplier responsibility assessments pursuant to its corporate compliance, corporate responsibility, and/or annual reporting programs.

**10. General Compliance with Laws**

The parties shall, and shall cause their respective Affiliates and Consultants to, comply with all applicable laws including export control and sanction controls.

**11. No Assignment**

This Agreement is not assignable or transferable by a party without the prior written consent of the other party. Any purported or attempted assignment, delegation, change of control, or other transfer without such consent will be null and void and will constitute a breach of this Agreement.

**12. Return of Confidential Information**

Upon written notice, Recipient shall return all tangible Confidential Information then in its, its Affiliates' and its Consultants', possession to Discloser and destroy all Confidential Information that cannot be returned, including any emails or other electronic documents containing Confidential Information (but excluding automatic electronic back-ups and archive systems) within 15 days after receipt of such notice.

**13. Protection Period**

Restrictions on use and disclosure of Confidential Information will remain in effect for 7 years from the date the Confidential Information was disclosed, however Confidential Information containing personally identifiable information will remain in effect perpetually.

**14. Term and Termination**

Either party may terminate this Agreement upon 15 days advance written notice to the other party. Upon termination of this Agreement Feedback, and Residual rights, and each party's disclosure and use obligations shall survive.

**15. Governing Law & Disputes**

This Agreement will be governed by the laws of the State of Delaware, without reference to conflict of laws principles. The confidentiality provisions of this Agreement will be enforceable under the Delaware Uniform Trade Secrets Act, Del. Code Ann. Title 6 Secs. 2001 et seq.

Page 3 of 4

V. 03192021                                                    Apple Confidential

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

ED_006475_00000040-C

*Apple Number: NDA202104810699*                                    *Environmental Protection Agency*

All disputes arising under or in connection with this Agreement will be finally settled under the then current Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such rules. The arbitration will be conducted in English in San Francisco, California. Judgment upon any award rendered by the arbitrator may be confirmed or enforced in any court having jurisdiction. The arbitrators shall award to the prevailing party, if any, its costs and expenses, including its attorneys' fees. The prevailing party shall also be entitled to its attorneys' fees and costs in any action to confirm and/or enforce any arbitration award in any judicial proceedings. All materials in the proceedings created for the purpose of the arbitration, all other documents produced by another party in the proceedings not otherwise in the public domain, and all awards in the arbitration will be deemed "Confidential Information", except to the extent disclosure may be required of a party by legal duty to protect or pursue a legal right or to enforce or challenge an award in legal proceedings before a court or other judicial authority.

Either party may bring court proceedings in any court having jurisdiction to seek an injunction, specific performance, or other equitable relief to enforce any right or obligation under this Agreement. The parties agree that no bond need be posted to obtain injunctive or equitable relief, but if required by law or the court, the parties consent to a bond in the lowest amount permitted by law.

**16. Entire Agreement**

This Agreement constitutes the entire agreement between the parties with respect to, and supersedes all prior or contemporaneous oral or written agreements or contractual provisions concerning any Confidential Information disclosed between the parties in connection with the same or similar purpose. Any amendments and waivers must be in writing and signed by both parties. Agreements, addenda, or supplements entered into between the parties prior to the Effective Date and that reference prior confidentiality provisions in connection with the same or similar purpose are amended to reference this Agreement in place of the prior provisions.

**17. Miscellaneous**

Company and Apple shall each ensure that its Affiliates comply with the terms and conditions of this agreement. A written notification addressed to the authorized representative(s) of a party will be deemed to be notice (i) when personally delivered; (ii) when sent by confirmed facsimile; (iii) one day after having been sent by commercial overnight carrier specifying next-day delivery with written verification of receipt; or (iv) three days after having been sent by first class or certified mail postage prepaid. A copy of any notice sent to Apple or its Affiliates must also be sent simultaneously to Apple's General Counsel at [disclosurenotices@apple.com]. The words "include" or "including" will be deemed followed by "without limitation."

Understood and agreed by the parties' authorized representatives:

Page 4 of 4

V. 03192021                                           Apple Confidential

170

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

August 11, 2021

**VIA Email** reynolds.rebekah@epa.gov
Rebekah Reynolds, Assistant Regional Counsel
US EPA Region 9
75 Hawthorne Street
*Mail Code:* ORC-3-2
San Francisco, CA 94105

**Re: 825 Stewart Drive, Sunnyvale, CA – TRW Microwave Superfund Site (the Site)**

Dear Ms. Reynolds,

Please accept this letter on behalf of Apple Inc. (Apple) in follow up to our discussion on August 10, 2021, and to formally request that any information relating to Apple operations at the Site (including but not limited to any hardware, process or other sensitive information) viewed or documented by EPA during its upcoming Site visit on August 19, 2021, be maintained as confidential business information (CBI) pursuant to *40 CFR Part 2, Subpart B, §2.203(b)*.

A CBI claim is defined as "a claim or allegation that business information is entitled to confidential treatment for reasons of business confidentiality, or a request for a determination that such information is entitled to such treatment."  *40 CFR §2.201(h)*

"The basis for claims of business confidentiality include the concept of trade secrecy and other related legal concepts which give (or may give) a business the right to preserve the confidentiality of business information and to limit its use or disclosure by others in order that the business may obtain or retain business advantages it derives from its rights in the information. The definition is meant to encompass any concept which authorizes a Federal agency to withhold business information under 5 U.S.C. 552(b)(4), as well as any concept which requires EPA to withhold information from the public for the benefit of a business under 18 U.S.C. 1905 or any of the various statutes cited in §§2.301 through 2.309." *40 CFR §2.201(e)*

We have been informed that EPA is interested in viewing the following areas at the Site:

- The sub-slab depressurization system.
- The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in

**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

ED_013963_00000007-00001

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The location of groundwater monitoring wells.
- The location of the previous bioremediation system and injection locations.

Some of these areas are located inside the Site building, which is made up of several highly confidential laboratories.  As such, EPA may see or be interested in documenting or photographing certain operations and areas, which contain trade secret, proprietary and/or company confidential information. These operations and areas are entitled to protection and should all be maintained as CBI.  Therefore, all information collected and documentation created during or relating to the Site visit (e.g. field notes and photographs) are being claimed by Apple as CBI and EPA should treat the information as such under the CBI regulations at 40 CFR Part 2.

If EPA would like to take a photograph during the visit to the Site, we request that EPA asks in advance of taking a photograph to limit, as much as possible, that any materials covered by CBI are being photographed.  We will also request that any photographs taken by EPA be shared with Apple at the conclusion of the Site visit and marked as CBI if appropriate.

Should you have any questions or require any additional information in relation to this CBI request, you can reach me at +1.415.893.9762 or at drubenstein@apple.com.

Very truly yours,

Apple Inc., a California corporation

By:     *Debra J Rubenstein*
        **Debra J Rubenstein**
        *Senior Counsel, Environment, Health & Safety*

CC:    Colin Scanlon

Apple
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

ED_013963_00000007-00002

172

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

411.    US EPA refused to sign Apple's NDA. Then, on August 11 2021, Apple EH&S emailed EPA claiming that "any information related to operations at the Site" from the August 19 2021 inspection, be considered Confidential Business Information.

412.    On August 12 2021, a fake Twitter account called "Beezie Wacks" was created to harass Gjovik and began harassing Gjovik for several days. In a reply to a post Gjovik made complaining about intimidation from Apple, Beezie told Gjovik that Gjovik was untrustworthy and unreliable.[210]

413.    On August 12 -13 2021 Gjovik filed complaints with US EEOC and California DFEH.

414.    When Gjovik complained the "Beezie" account was harassing her, Beezie replied with a link to the EEOC.gov website definition of harassment. Gjovik replied, "*I'm fairly sure EEOC only applies if you're my employer. Are you trying to tell me something, Beezie? Tim is that you?*" Gjovik added, "*You sure know a lot about employment law, Beezie.*"[211]

415.    On August 14 2021, Beezie was still harassing Gjovik and Gjovik had become certain the account was Apple. Gjovik responded to the account's posts: "*Beezie, would you plz let Tim know I'd like an update on the safety testing EH&S is doing in my office? They were supposed to send me an update by now. I haven't seen anything in my work email & ER wouldn't send to my personal email. Can you Tweet me when it's ready plz? Thx.*"

416.    Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices they would be on site for long periods of time: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5.

_____

[210] Twitter: Beezie Wacks, https://twitter.com/beezie_wacks/status/1425921919447040003
[211] Twitter: Beezie Wacks, https://web.archive.org/web/20210814052605/https://twitter.com/beezie_wacks/status/1426414739702259715

**Deleted:** her interview with EEOC on September 2 2021. Apple did not request an investigation but did request a Right to Sue letter which she received on 9 2021, prior to her termination. Apple was made aware of Gjovik's EEOC and DFEH complaints and that she was testifying to EEOC and DFEH about what Apple did to her...

**Deleted:** at least August 12 2021. Apple retaliated against Gjovik for filing a complaint and testifying with California FEHA. [Cal. Gov't Code § 12940(h); Cal. Code Regs. tit. 2, § 11021.]*now. I*

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

417.    This was unusual and highly suspicious. On August 12 2021, Global Security,

also hosted the first "*NPS Secrecy and Awareness Training*" for all of West's organization.

418.    Gjovik heard that around this time the managers in Dan West's organization were

being instructed to avoid putting employee/labor things in writing due to how much evidence

Gjovik was able to obtain.

*Table A-4: Apple's 825 Stewart Maintenance Work After 7/27 US EPA Inspection Notice*

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| August 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Sept 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

419.    On August 15 2021, Alisha Johnson (reporting to Lisa Jackson) sent US EPA

Apple's talking points about Apple's environmental practices. Including: *"We've achieved Zero*

*Waste to Landfill certifications at all supplier final assembly facilities for core product lines. In*

*fiscal year 2020, we diverted more than 70% of waste across Apple facilities including retail*

*stores. We have active Zero Waste to Landfill goals for retail, corporate facilities and our supply*

*chain.*"

420.    On August 16 2021, Apple emailed Gjovik and her coworkers about a "EH&S

Walkthrough 8/18 8/19" at her Superfund office. The email included a map of the office created

by EKI.

421.    On August 16 2021, Apple (Okpo) sent the "Issue Confirmation" of what they

were supposedly investigating. (It is unknown what Apple was doing for the twelve days

**Deleted:** (and/or *Worldwide Loyalty*)

**Deleted:** The email included a map of the office created by EKI. EKI was the consulting company Michael Steiger was at prior, and rejoined after leaving Apple in July 2021. Under information and belief, Steiger began supporting Apple's environmental work at the office from his new position at EKI. Under information and belief, Apple and EKI assessed the office during these 'walkthroughs' and there is documentation of the issues they found.On August 16 2021,

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

between then and when Apple forced her on leave). Among other things, Okpo documented in the issue confirmation:

- "[Gjovik] mentioned that after [she] joined Apple, [she] heard that during [her] on-site interview, Bodhi Gerfen saw [her] and said something about [her] ass, and things he wanted to do to [her] ass."
- [Gjovik] mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting. [Gjovik] told [Okpo] that when [she] addressed West about his comment, he said he didn't want to sleep with Powers so it wasn't a problem.
- "[Gjovik] stated that in 2017/2018, [John] Basanese told [her] that at [her] age, [she] needed to be married with children. [She] told [Okpo] that at holiday functions, Basanese made comments like "where is your partner? don't you have a boyfriend?, settle down and have kids."
- "[Gjovik] shared that during a meeting in 2017, West made a "spanking" gesture with his hand to describe how [Gjovik] "keeps him in line".

However, Okpo refused to document any of Gjovik's complaints about the safety of 825 Stewart Drive, including in the list of factors Gjovik believed caused retaliation.

422.   In Okpo's August 16 2021 letter he writes: "*To confirm, on Thursday July 29 2021 you told me that you had confidence in my ability to conduct an impartial and objective investigation into the concerns you raised.*" As mentioned and cited in texts and Slack posts, Gjovik repeatedly complained on July 28 2021 about Okpo's investigation being a sham and pointless. Gjovik also complained fervently to Okpo on August 4 2021 that he was acting in bad faith, when he put her on leave, despite them not completing a review of Gjovik's evidence yet, and him not letting Gjovik obtain additional evidence at her office, and his general demeanor and instructions during the meeting, including refusing Gjovik's negotiation attempts to not be on leave.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

APPLE CONFIDENTIAL

On Aug 16, 2021, at 5:38 PM ░░░░░@apple.com> wrote:

Apple confidential:

Hi Ashley:

Please see the attached.

<Apple Confidential_Issue Confirmation_8.16.21.pdf>

Hi Ashley,

As discussed, I'm providing a summary of my understanding of the concerns you shared with me via Box, Webex on July 20, 21, 27, 28, 29, August 2, 3, 2021, and by email. If there is anything I have missed, or if there are additional concerns you did not previously share with me, please let me know immediately by sending the details in writing to me via email. To confirm, on Thursday, July 29, 2021, you told me that you had confidence in my ability to conduct an impartial and objective investigation into the concerns you raised.

My investigation process includes speaking with the involved individuals, including you, and reviewing other relevant information and documentation. I may also consult with others whom I believe may assist in conducting a thorough investigation. As previously discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers whose names have been included here as part of the investigation document, and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.

Apple takes concerns such as yours seriously and has a No Retaliation policy that can be found here: https://businessconduct.apple.com/policies/speaking-up/no-retaliation/. If you have any concerns of retaliation, please do let me know.

*Exhibit: The first page of Okpo's 8/16/21 Issue Confirmation*

423.   Gjovik replied to Okpo on August 16 2021, complaining that she had been hearing that her coworkers were told to talk to HR Business Partner Helen Polkes if they have concerns about Apple's response to Gjovik, and told Okpo that implied to her that Polkes was not being investigated.  She reminded him that on August 4 2021 he had told her he was only investigating West and Powers, and if that was really his plan, she asked for him to confirm in writing. Gjovik also complained again about no timeline for being on leave or the investigation, or any next steps generally.

424.   Gjovik also asked Okpo about her office. *"Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via [Employee Relations]) was that they weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of activity by EH&S at*

176

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*my building — and I also noticed they appear to have hired an enormous amount of vendors*

*very recently. I'd love to learn more."*

---

**Ashley Gjovik** <ashleygjovik@apple.com>                    Aug 16, 2021 at 10:47:54 PM

Re: APPLE CONFIDENTIAL: Issue Confirmation

To: "Ekelemchi Okpo (ER)" <eokpo@apple.com>

Cc: ashleygjovik@icloud.com

Hi Ekelemchi,

I hope you're well. Good to hear from you… it's been a while.

Corrections will be needed to the document you sent. I will need to redline. If you'd prefer revisions to be inline, please send the document below in Word or Pages format so I can use the review feature (preferred). Otherwise, I'll resort to hand writing comments and scanning them to send back to you.

Can you please also specify which people will be investigated? On 8/4 you said only "Dan & Dave" because "it's simpler" that way, and that you won't be reaching out to me with any follow up questions because "you have everything you need." I protested that & that is when I told you I no longer trust you're going to actually do a good faith & thorough investigation.

The document you sent details many of things we discussed, but it is unclear if you plan to actually investigate anyone outside of Dan and Dave still. I was especially concerned when I heard that my teammates were being referred to Helen if they have questions about me & my situation, despite my request she herself be investigated…. So, I'd like the list of people being investigated to be made clear in the document, please & thank you.

Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via Jenna, aka ER) was that they weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of activity by EH&S at my building — and I also noticed they appear to have hired an enormous amount of vendors very recently. I'd love to learn more.

Thanks,
-Ashley

P.S. adding my personal email so it's easier for me to know when you reply, since on 8/4 you said I "don't need to check my work email or phone, since you have everything you need already" and when I kept asking for an ETA on when I'd hear fro you next, you said there is no ETA several times… aka indefinite (no defined start/end date, or checkpoint date). Would love a checkpoint! Thanks!

Ashley M. Gjovik

---

*Exhibit: Gjovik's Email to Okpo on 8/26/21*

---



**Ashley M. Gjøvik**
@ashleygjovik                                    **Promote**    · · ·

I spoke-up about workplace safety in Mar. #Apple ER forced a sexism investigation in April, but closed w/out trying in June. I demanded a full investigation in July. I shared 558x evidence, including all this. Now I'm on indefinite leave w/ no reason to think I'll be coming back.

4:33 PM · Aug 16, 2021
EST

---

*Exhibit: Gjovik's Aug 16 2021 1:33pm Twitter post*

---

177

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

 **Ashley M. Gjøvik**
@ashleygjovik                                    ...

I was told I was being "removed from the workplace & workplace interactions" and I didn't need to check my work email or phone indefinitely. I was told there is no ETA for updates or resolution. I heard my leadership plans to talk about "the Ashley Issue" at an Oct All Hands.

4:35 PM · Aug 16, 2021 EST

*Exhibit: Gjovik's Aug 16 2021 1:35pm Twitter post*

425.    On August 17 2021, Apple emailed Gjovik asking to take three-dimensional scans of her ears and ear canals. Gjovik did not respond.

426.    On August 17 and 18 2021, US EPA administrator Michael Regan was at Apple Park meeting with Lisa Jackson. They filmed a "*fireside chat*" and did interviews with press.

426.    CNBC published an article on August 18 2021 based on an interview with Apple's Lisa Jackson prior to the 'fireside chat' with Administrator Regan saying, "*Jackson told CNBC....Apple has made sustainability a big part of its corporate brand.... Jackson added she expects to discuss mandatory SEC disclosures of carbon emissions [with Regan on August 18 2023].*"[212]

427.    On August 17 2021, Okpo responded to Gjovik, claiming he never said he was not investigating the people that Gjovik's coworkers are being told to go talk to about Gjovik worrying those same people were retaliating against Gjovik; and Okpo also said Gjovik never told Okpo she thought he was not objective or impartial.[213] Okpo then told Gjovik Apple EH&S

---

[212] CNBC, *Apple backs Biden's proposal to eliminate greenhouse gases from power plants by 2035*, August 18 2021, https://www.cnbc.com/2021/08/18/apple-backs-biden-clean-energy-standard.html
[213] Garrick, Jacqueline, and Martina Buck. "Whistleblower Retaliation Checklist: A New Instrument For Identifying Retaliatory Tactics And Their Psychosocial Impacts After An Employee Discloses Workplace Wrongdoing." Crisis, Stress, and Human Resilience: An International Journal 2 (2): 76–93. (2020) – ("Gaslighting is defined as the manipulation by psychological means of an individual in order to cause

**Deleted:** ¶

Aug 18, 2021 - Energy & Environment

Exclusive: EPA administra
HQ to talk climate, enviro

Andrew Freedman, author of Axios Generate



EPA administrator Michael Regan (L) on a tour of Apple headquarter executive Lisa Jackson on Aug. 17, 2021. (Apple handout)

*Exhibit: Michael Regan, EPA Administrator, at Apple Park Aug 17-18 2021, before inspection*¶

**Deleted:** <#>On August 19th, the US EPA inspected Gjovik's Apple office for CERCLA compliance and found a number of issues, which were detailed in later reports. ¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

does not want to give her any updates yet and she is also supposed to be focusing on the investigation instead (of asking safety questions). Okpo refused to let Gjovik provide more evidence, or review evidence with him, or talk to her coworkers, so it's unclear what Okpo meant by 'focusing on the investigation' other than Gjovik having more panic attacks about Apple's retaliation.

On Aug 17, 2021, at 11:20 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

APPLE CONFIDENTIAL:

Ashley-

Please feel free to forward your revisions to the document to me in writing via email.

Based on what you've shared with me, I have identified a number of individuals who I believe have information about the concerns you raised. I am going to speak with these individuals and keep you updated on the progress of the investigation.

Your description of our August 4, 2021 call is not accurate. As outlined in the issue confirmation, I am looking into all of the concerns you raised, and I did not convey to you that I was limiting the scope of the investigation to Dan West and David Powers. You also did not express concerns about my ability to conduct an impartial and objective investigation during our 8/4/21 call, or at any other point during my conversations with you.

As previously mentioned, EHS is investigating your building and workplace safety concerns, and they will be in contact with you when they have an update to share. Additionally, as I mentioned during our call on 8/4/21, you are not expected to participate in any work related assignments, and your focus at this time should be on the investigation. I understand that as a result of this, you are not frequently checking your work email. Therefore, I will send you a message via text to your work device (+1-408-204-9976), and inform you of any communication to your work email address pertaining to the investigation.

Please let me know if you have any further questions.

Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

*Exhibit: Okpo email to Gjovik 8/17/23*

428.    Gjovik replied to Okpo on August 17 2021, complaining that he was misrepresenting her statements and she was glad their "communications will be in writing going forward so there will not be anymore he said/she said." Gjovik questioned what Okpo meant by

the subject(s) to question their own memory, perception, and sanity…to deflect their own wrongdoing and belittle or degrade the intelligence of their victims and undermine their credibility as witnesses.")

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

focusing on the investigation and asked if he meant she should stop asking questions about her

office. Gjovik added, "I remain concerned about the health and safety of my coworkers."

On Aug 17, 2021, at 11:32 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

Thanks for your reply. I will convert the PDF to a Word doc myself and send it to you with revisions after I've reviewed and feel it's accurate. I know you said to respond "immediately," but instead I will respond in a reasonable amount of time and not forsake accuracy for speed.

I'm glad our communications will be in writing going forward so there will not be any more he said/she said. As I mentioned many times, and in writing, this exact type of scenario is why I wanted my 1:1s with Dave, Dan, & Helen to be in writing during the investigation because verbal conversations were frequently being misrepresented and statements denied after the fact. I stand by my memory of the events on 8/4, and as you've seen/read (i.e. the vaccine corruption whiste-blowing), Apple senior leaders have trusted my recollection and interpretation of events/statements, even with major risk and consequences leading from that interpretation.

I will send you my updates in reasonable amount of time — and considering you took eight business days to send the issue confirmation, I assume you will be okay with waiting a few more days for corrections and clarifications.

Can you please elaborate what you mean by "your focus at this time should be on the investigation"? Are you implying that I not continue to raise work place safety concerns or monitor safety concerns I already raised? I remain concerned about the health and safety of my coworkers.

Best,
-Ashley

--
Ashley M. Gjovik

*Exhibit: Gjovik's email to Okpo on 8/17/21*

429.    Around August 2021, Gjovik was contacted by several women who had

organized labor concerns at another tech company. The women approached Gjovik supposedly

offering assistance and support. The women texted with Gjovik for a couple weeks. When

Gjovik mentioned she had hundreds of people reaching out to her with their own stories of

retaliation by Apple, the women suggested Gjovik create a platform for others to share their

stories, as it would also help bolster Gjovik's accusations against Apple. Gjovik went along

hesitantly but repeatedly raised concerns that she did not to use people's stories for her benefit,

nor did she want to provoke Apple to retaliate against her further, and that she wanted to focus

on her charges she filed against Apple with the government. However, Gjovik still took actions

to prepare including purchasing an internet domain and drafting the text for the announcement.

430.    On August 18 2021, Joanna Appleseed (alias because this person tried to sue

Gjovik in 2022 for naming her in charges and legal filings alleging witness intimidation, and

180

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Gjovik fears she might try to do it again) demanded to be added to the group chat Gjovik had with the other women. Gjovik acquiesced and by August 19 2021, Joanna Appleseed had incited the women to make personal attacks against Gjovik and demand Gjovik drop her government charges against Apple, and focus instead of social media activism. Gjovik resisted, and whatever Gjovik said, the women criticized Gjovik for it. Gjovik left the group chat and stopped associating with the women. Gjovik texted a journalist on August 19 2021 that the women's actions made her want to cry.

431.    Gjovik would have just a few more interactions with Appleseed, including Appleseed calling Gjovik a racist, selfish, a selfish racist, yelling at Gjovik while Gjovik cried because Gjovik was being called a racist but Appleseed was screaming at Gjovik that Gjovik's crying sounds too much like laughter, and also demanding Gjovik either apologize publicly for being a selfish racist or else Gjovik must delete her entire social media account. Gjovik completely blocked Appleseed from contacting her in September 2021 (while Appleseed still worked for Apple Global Security), made it clear she did not want to talk to her again, and hoped to never have to talk to her again.

432.    On August 19 2021, another fake Twitter account, Mel Nayer, began harassing Gjovik. Nayer posted in a reply to a thread with Gjovik, *"I can't help to think though, that if #AshleyGjovik were Black Apple would have fired her weeks ago. White women, even when they are victims of workplace abuse, are treated with a level of privilege."* [214]These fake accounts frequently harassed Gjovik about her gender, sex, race, disabilities, medical conditions, marital status, family/child status, and accused her of racism and classism.

433.    On August 19 2021, the US EPA conducted an onsite inspection of Gjovik's Apple office due to Gjovik's complaints to the US EPA about unsafe conditions at her office and

---

[214] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625

181

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                                      DECEMBER 21 2023

possible CERCLA non-compliance. Apple did not tell Gjovik about the inspection. The US

EPA's justification for inspecting the office was:

> "A site visit to an Apple office building is necessary to conduct a visual
> inspection of the building's vapor intrusion mitigation measures. An Apple
> employee recently contacted EPA and notified EPA that there were cracks in the
> building's foundation. If true and cracks are significant, this could impact the
> effectiveness of the VI mitigation system the protectiveness of human health."

<table>
<tr><td>

. Destination
**TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA**
. Proposed Travel Start
**2021-08-19**
. **Description of why this work is urgent and essential**
**A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.**

**The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).**

</td><td>

. Destination
**TRW Microwave Site (Triple Site), Sunnyvale, Santa Cl...**
. Proposed Travel Start
**2021-08-19**
. **Description of why this work is urgent an...**
**A site visit to an Apple office building is necessary to mitigation measures. An Apple employee recently co... building's foundation. If true and the cracks are signif... system the protectiveness of human health.**

**The onsite work will include visual inspections to the: system. (2) The building's concrete slab and past crac... to 2015 indoor air sampling locations. (4) The indoor... underneath the building. (5) The spaces between the... 2014-2015. (6) The groundwater in-situ bioremediatio...**

**Deleted:** See less

</td></tr>
</table>

*__Exhibit__: US EPA's Travel Justification Referencing Gjovik as a Whistleblower*

434.    Notes from the August 19 2021 site visit and inspection included the following

statements, as documented in records released via FOIA to Gjovik in 2022:

a.   *"Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for
      VOCs bc venting into hvac. Would be better / need to extend 10' high."*

b.   *"Roof, East [Main] Bldg stack issues. Vents too close to chiller Cut too low."*

c.   *"SS-05 under carpet… Seems mislabeled… seal sub slat ports. Not abandoned
      properly."*

d.   *"4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller
      stack, not even sure how to extend."*

e.   *"Crack inspection documentation"*

f.   *"Locate the indoor SS missing ports."*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

435.    On August 19 2021, Gjovik posted on Twitter complaining about Apple demanding all of her text messages, even those with nude photographs, back in 2018 for the Batterygate lawsuits and DOJ probe. Gjovik wrote: "*Sooo, #Apple has pics of my boobs. During a discovery thing 3yr ago, legal forced me to hand-over all my texts. They refused to let me delete anything, even "fully personal," even when I said, "by fully personal I mean nudes." They said they're in their "permanent evidence locker".*[215] The post went 'viral' with over one million views, over one thousand 'retweets', and 52,363 visits to Gjovik's profile.

436.    On August 19 2021, Apple emailed Gjovik for a second time to ask to capture three-dimensional imaging of Gjovik's ears and ear canals. Gjovik did not respond.

437.    On August 20 2021, Michael Schulman of the US EPA emailed his teammates saying he would avoid creating a paper trail of the inspection and interactions with Apple. He wrote, "*I will not prepare a formal memo of the site visit. Anything I share with management will be verbal or in an email, and at the "site management level" regarding human health protectiveness and site management action items.*"

438.    On August 20 2021, Gjovik asked Okpo for permission to attend a pre-registered training, even after the Professors approved, with Okpo justifying the denial "*because she was on leave.*" Gjovik complained that the leave felt like punishment. It was clear to Gjovik that Apple was hoping she would aggressively demand to come back at which point Apple would terminate her employment for some bogus reason like failure to cooperate with the investigation.

---

[215] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428495420917837826

**Deleted:** On August 23 2021, EPA CERCLA QA employee Mathew Platr submitted his own notes to Schulman, also released to Gjovik via FOIA, which included the following statements: ¶
"Subslab sampling ports, left in place, have been regularly smapled or maintained and several could not be located. It is recommended that these be located and maintained or decommissioned." ¶
"Significant, visible slab cracks, gaps and penetrations had been sealed… However large test equipment is bolted to the slab and it is unclear if any of these installations penetrate the slab." ¶
"SSD vents on the [West] roof are not significantly elevated above the roof (3 feet) and are sheltered from the wind…"SSD vents on the [Main] roof are under the building chiller plant piping and are within 12-feet of a ventilationa system intake. There is not significant air flow near the SSD vent stacks and it is likely that the SSD vents are not functioning as intended and vapors could be building up on the roof near the HVAC intake. "¶

**Apple Unleashes a Digital & Physical Harassment Campaign Against Gjovik to Demoralize and Intimidate Her (August 2021)**¶
On August 12 2021, a fake Twitter account called "Beezie Wacks" was created to harass Gjovik and began harassing Gjovik for several days. In a reply to a post Gjovik made complaining about intimidation from Apple, Beezie told Gjovik that Gjovik was untrustworthy and unreliable.[216] ¶
When Gjovik complained the account was harassing her, Beezie replied with a link to the EEOC.gov website definition of harassment. Gjovik replied, "I'm fairly sure EEOC only applies if you're my employer. Are you trying to tell me something, Beezie? Tim is that you?" Gjovik added, "You sure know a lot about employment law, Beezie."[217]¶
On August 14 2021, Beezie was still harassing Gjovik and Gjovik had become certain the account was Apple. Gjovik responded to the account's posts: "Beezie, would you plz let Tim know I'd like an update on the safety testing EH&S is doing in my office? They were supposed to send me an update by now. I haven't seen anything in my work email & ER wouldn't send to my personal email. Can you Tweet me when it's ready plz? Thx. "¶
These fake accounts frequently harassed Gjovik about her gender, sex, race, disabilities, medical conditions, marital status, child status, and accused her of racism and classism. ¶

**Apple Pretends to Investigate Gjovik's Concerns; Gjovik Asks to Come Back & Apple Says No (August 2021)**¶
On August 16 2021, Apple sent the "Issue Confirmation" of what they were supposedly investigating. (It is unknown what Apple was doing for the twelve days between then and when Apple forced her on leave). Among other things, Okpo documented in the issue confirmation: ¶
"[Gjovik] mentioned that after [she] joined Apple, [she] heard that during [her] on-site interview, Bodhi Gerfen saw [her] and said something about [her] ass, and things he wanted to do to [her] ass."¶

... [9]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Ashley Gjovik <ashleygjovik@apple.com>
Re: Welcome and Prep Work | AU Race & Justice
To: "Ekelemchi Okpo (ER)" <eokpo@apple.com>

Aug 20, 2021 at 3:05:06 PM

Hello,

I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.

P.S. I should get you the updated Issue Confirm before Monday. It's taken a lot of time to sort through and make sense of.

—
Ashley M. Gjovik
⬩ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 20, 2021, at 8:55 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

Hi Ashley-

Thank you for reaching out. Given that you are on leave, you will need to reschedule and attend a session in the future.

 Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Aug 19, 2021 at 1:12 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

I hope you're well.

Yesterday you wrote, *"As we previously discussed, you are not expected to participate in any work related assignments while I conduct a thorough and objective investigation into the concerns you've raised."*

I was previously invited & registered for this course with Apple University. I was & am very excited to attend. The coursework actually directly complements my current studies at Oxford. Becuase this course is voluntary and not a "work related assignment" — can you please reply and let me know if I'm allowed to attend? The first class is next Tuesday 8/24 and then continues weekly for a several weeks.

I checked with Professors [redacted] last night and they said they are still happy to have me in the course and can confirm that with you if needed. They asked me to confirm directly with you that I can attend though first, as they said they do not want my attendance to invite any sort of disciplinary action.

Thanks,
-Ashley

—
Ashley M. Gjovik

*Exhibit: 8/19 and 8/20/21 email where Gjovik asks to attend training; Okpo says no*

439.    On August 20 2021, Gjovik posted on Twitter complaining about Apple. She wrote in a thread of posts: "*I assume #Apple hoped I'd just quit the company by now. Nope. As I told Apple employee relations last month, I'm not quitting. They need to deal with the concerns I*

184

Deleted: ¶
    <#>Gjovik Accuses Apple of Violating the RICO Act;
    Apple Increases the Digital Harassment (August 2021)¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1  *raised, & even more: stop intimidating, retaliating, & bullying me for even raising them. I'm*

2  *here until they do... #Apple clearly couldn't find a solid reason to fire me with cause or I'm sure*

3  *they would have tried. So, now it's a game of who blinks first. I'm not backing down."*[220]

4      440.    On August 20 2021, news broke that Apple had threated and intimidated the

5  legislature of the state of Georgia.[221] Apple "exerts intense pressure on lawmakers with promises

6  of economic investment or threats to pull its money," "threatening jobs," and "the legislation

7  stalls." A state representative referred to Apple's conduct as "intimidation" and "strong-arming,"

8  noting legislatures will not challenge Apple out of fear of Apple harming their career and

9  livelihood. Lawmakers in one stated accused Apple of "unethical behavior and potentially

10  violating state ethics laws."[222] Gjovik posted about this on Twitter, criticizing Apple's corrupt

11  behavior.

12      441.    On August 21 2021, Gjovik complained about Okpo and the second "sham"

13  investigation again on Twitter, replying to someone's question if she was on paid leave but with

14  suspended system access. Gjovik replied it was paid leave with system access but she was

15  forbidden to access systems or talk to coworkers. Gjovik added she did not think she would be

16  allowed back.[223]

17      442.    On August 21 2021, Gjovik 'quote Tweeted' her August 19 2021 post about the

18  Batterygate discovery, and wrote: "*At the time, #Apple may have wanted leverage over me*

19  *related to that lawsuit. I don't know what their intent was, but due to the focus of the suit, my*

---

[220] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428846269619789824
[221] Emily Birnbaum, How the Apple lobbying machine took on Georgia, and won. Poorly resourced state governments are no match for the lobbying firepower of Apple, the most valuable company in the world, Politico, Aug 20 2021, https://www.politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299
[222] Id.
[223] Twitter, Ashley Gjovik, Aug 21 2021, https://twitter.com/ashleygjovik/status/1429157551287930885

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*whistleblowing, & the retaliation for it, it's in the realm of possibilities they took my nudes to*

*intimate me. Stay tuned..."*[224]

443.    On August 21 201, Gjovik submitted the first revised Issue Confirmation to Okpo

and also posted on Twitter about it. On Twitter, she provided screenshots of the document where

she suggested Apple needed to investigate itself for RICO Act violations *including "fraud" and*

*"organized witness tampering" among other concerns.*[225]



***Exhibit****: Gjovik's Issue Confirmation Concern List, 8/21*

---

[224] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429177842399469569

[225] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429174603713191936

186

444.    Shortly after Gjovik's post about Apple and RICO, a fake Twitter account called "Mel Nayer," began replying to Gjovik's posts making threats and wild allegations. Nayer said, "*This is an ACTIVE @Apple investigation and the managers accused are now receiving death threats. Stop sharing confidential info/screenshots that could reveal identity of those involved. #AshleyGjovik #apple.*"[226] Nayer added, "*Managers accused are receiving death threats. Take down the work screenshots because identifies are being outed and lives are at risk now.*"[227]

445.    Nayer added that "*people at Apple have been fired for sharing less.*" Gjovik replied to Nayer, writing "*If during the lawsuits we track down your account & see you work/consult for Apple, then your note just now: "people at Apple have been fired for sharing less" won't age well. Then you're not "just trying to help," you are actually threatening & intimidating a whistleblower." *"[228]

446.    After the outburst from Nayer, Gjovik posted on Twitter: "*Y'all, I really think it's because I finally said "RICO."*"[229] Gjovik then replied to her own post with a link to a music video for the song "R.I.C.O." by Meek Mill featuring Drake.[230] Gjovik also posted, "*Now that we're all fully distracted by whatever the f THAT was, plz keep in mind it happened just hours after I mentioned: 1) The corruption at #Apple may reach R.I.C.O. levels 2) Legal may have taken my nudes to intimidate me as a whistleblower re: that lawsuit." *"[231]

447.    On August 22 2021, Gjovik sent the second revised Issue Confirmation to Okpo with her revisions and corrections, and she posted about it on Twitter. She highlighted concerns

---

[226] Twitter, Mel Nayer, https://web.archive.org/web/20210822103330/https://twitter.com/mel_nayer/status/14292155549 13533 957
[227] Id.
[228] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625
[229] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429224817698304007
[230] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429233027683536897
[231] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429250234278825987

187

**Deleted:** 232q
On August 23 2021, Gjovik sent the third revised Issue Confirmation to Okpo adding she filed including a Business Conduct complaint about Ronald Sugar and her office, and she attached the Issue Confirmation with all of her other concerns.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

about "Apple Real Estate Environment, Health, & Safety" which she detailed as "*RICO;*

*Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right*

*to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness*

*Tampering.*" Gjovik asked Apple to investigate themselves.

448.    On August 23 2021, Gjovik filed a formal internal complaint to Apple's Business

Conduct reporting system about her concerns about Ronald Sugar. She received confirmation

her complaint was submitted and was provided a tracking number (*HRC000017207*)

449.    On August 23 2021, Gjovik sent the third revised Issue Confirmation to Okpo,

adding she filed including a Business Conduct complaint about Ronald Sugar and her office,

noting "conflict of interest and corruption." Gjovik said she added West's 'obstruction of justice'

comments (he conspired with Bertolus to conceal responsibility in preparation of expected

litigation) from a video she shared with Okpo earlier.

On Aug 23, 2021, at 7:33 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Actually please reference V3 below.

I added Dan West's obstructive of justice comments from the Fireside Chat video (that was missing too).

I also elaborated on my concerns around conflicts of interest & corruption related to Ronald Sugar. I filed a Business Conduct ticket with my concerns & also attached this document. It's ticket HRC000017207, as noted in the v3 document.

📄 Gjovik - Issue Confir...d .docx

📄 Gjovik - Issue Confir...ed .pdf

*Exhibit: Gjovik's Response to Okpo on 8/23/21*

450.    Gjovik noted her concerns about Apple's response to Gjovik's initial concerns

and the actions of the first Employee Relations investigator, Jenna Waibel, in the Issue

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Confirmation. Gjovik complained Waibel interjected herself in Gjovik's interactions with the EH&S without explanation, and when Gjovik asked Waibel on April 3 2021 to talk to her manager David Powers about comments he made about the EH&S concerns, Waibel refused but instead on April 9 insisted on opening an investigation into sexual discrimination. Gjovik told Waibel verbally and in writing, on at least April 9 and April 12 2021, that she did not want a sexism investigation and that it would only cause retaliation. Waibel requests a phone call with Gjovik. They talk on the phone on April 27, 2021. Gjovik summarizes the call in her Issue Confirmation with Apple in August 2021:

> "I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins."

451.    Gjovik listed her short-term disability claim from 2020 as due to "*chemical exposure*." At that point, Apple knew it was responsible for disabling Gjovik in 2020 and that the chemicals Gjovik was exposed to came from Apple's secret silicon fabrication plant next to Gjovik's apartment. Apple continued to conceal this fact from Gjovik.

452.    On August 23 2021, EPA CERCLA Quality Assurance employee Mathew Plate submitted his own notes to Schulman, also released to Gjovik via FOIA, which included the following statements:

> g.  *"Sub slab sampling ports, left in place, have not been regularly sampled or maintained and several could not be located. It is recommended that these be located and maintained or decommissioned."*

189

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

h.   *"Significant, visible slab cracks, gaps and penetrations had been sealed... However large test equipment is bolted to the slab and it is unclear if any of these installations penetrate the slab."*

i.   *"SSD vents on the [West] roof are not significantly elevated above the roof (3 feet) and are sheltered from the wind..." SSD vents on the [Main] roof are under the building chiller plant piping and are within 12-feet of a ventilation system intake. There is not significant air flow near the SSD vent stacks and it is likely that the SSD vents are not functioning as intended and vapors could be building up on the roof near the HVAC intake."*

Plate does not appear to be part of the Enterprise, with conduct in stark contrast to Poalinelli, Perez-Sullivan and others.

453.   On August 24 2021, Apple asked for a third time to conduct three-dimensional scanning of Gjovik's ears and ear canals. Gjovik did not respond.

454.   On August 24 2021, Okpo responded to Gjovik confirming receipt of her final Issue Confirmation, and again refusing to provide her any sort of ETA.

> **From:** Ekelemchi Okpo eokpo@apple.com 🖇
> **Subject:** Re: APPLE CONFIDENTIAL: Issue Confirmation
> **Date:** August 24, 2021 at 2:53 PM
> **To:** Ashley Gjovik ashleygjovik@apple.com
>
> Ashley-
>
> I've received your revised issue confirmation.
>
> The investigation is ongoing and I've started conducting witness interviews.  I am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you with additional updates.
>
>  Best,
>
> Ekelemchi Okpo
> Corporate Employee Relations
> eokpo@apple.com
>
> This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

455.   Around August 23 2021, Joanna Appleseed, an active Apple Global Security employee then publicly announced Gjovik's initiative as if it were own, also now claiming that "15 Apple employees" were involved while it was only her and also a known IP leaker named "Stella Fudge" who managed a Discord server the leaker and Global Security employee then directed would-be whistleblowers and union organizers to and encouraged them to share

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

sensitive and confidential information on a platform supposedly secure from Apple. Gjovik, already attacked repeatedly by Appleseed, said nothing about the group other than she supported employees speaking out, reserving her concerns and injury out of fear.

456.    Starting in August 2021 and continuing to this day, hundreds of 'throwaway' and fake social media accounts posted about and to Gjovik making statements that were harassing, threatening, intimidating, defamatory, insulting, and harassing. These accounts were usually created the day of and only used to make these posts, or sometimes created prior but only used to make posts that were pro-Apple, including posting insults against other parties Apple was in litigation with including Corellium and Epic Games.

457.    Fake or suspicious accounts were also used to post similarly unsettling posts about Gjovik on forums. When articles were shared that mentioned Gjovik, many of these accounts posted inflammatory, offensive posts about Gjovik and those posts were very quickly 'liked' and 'upvoted' and any comments that were supportive of Gjovik were very quickly 'down voted' and even flagged and removed by moderators.

458.    Under information and belief, Apple created and managed these accounts to harass and defame those who challenged them, and also unnaturally influenced online discussion through flagging, reporting, and other artificial engagements, and also through their position at an 'administrator' in a number of forums including Reddit and HackerNews.

459.    On August 26 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so.  On August 26 2021, a news article discussed Apple's employment practices and wrote: *"One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave."*

**Deleted:** ¶
<#>**Gjovik Files Charges/Claims Against Apple with the State and Federal Government (August – September 2021)**¶

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

460.    On August 27 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. The message posted said: "*Hi Ashley, Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and investigation,*" with the ticket updated to say, "*Request is closed. This request is closed and can't be reopened. If you need more help with this issue, create a new request.*" Which seemed odd.



*Exhibit: Apple closing the Business Conduct complaint*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

461.    On August 28 2021, Gjovik complained on Twitter that she wanted Apple to stop asking to capture three-dimensional scans of her ears and ear canals. Gjovik said she could not tell if Apple was harassing her or being intrusive, or both.

462.    On August 28 2021, at 8:22pm, Gjovik posted on Twitter about Tom Moyer's criminal charges for bribery. "*Moyer served as #Apple's chief compliance officer from 2009-13 & one responsibility was to ensure Apple follows anti-bribery laws. The indictment comes 1yr after an Apple attorney in charge of enforcing the co's insider-trading policies was indicted on insider-trading charges.*"[233] [See RICO Predicate Act: Criminal Bribery]

463.    On August 28 2021, at 8:40pm, 18 minutes later, Gjovik posted on Twitter the link to the Meek Mill R.I.C.O. music video again. Gjovik wrote: "R.I.C.O. 👀" [234]

464.    On August 28 2021, Gjovik posted on Twitter about her manager, Dan West, attempting to pimp/pander her in 2017.[235] On August 29 2021, Gjovik added, "*If anyone's wondering, yes, indeed, I did call out this incident with my manager as a potential legal claim. For now, I referred it to    #AppleEmployeeRetaliations as "pimping & pandering with receipt of indirect benefits.*"[236]

465.    On August 29 2021, Gjovik filed a formal complaint to the US EPA about Apple and her office complaining of Apple's "*lack of due diligence,*" about "*negligence*" and "*recklessness,*" and "*violations of Right to Know & OSHA.*" Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me not to speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site.*"

---

[233] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431774126272696328
[234] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431778838858518528
[235] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431680707433140226
[236] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432092351485210627

Deleted: <#>On August 28 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. ¶

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

466.   On Sunday August 29 2021 at 11:32am PST, Gjovik filed a Whistleblower Protection Program complaint with the US Department of Labor, reference number ECN76833, which sent a receipt to her iCloud email.

467.   Gjovik messaged Joshua Banko (from *Banko v Apple*) on August 30 2021 writing, *"it's only because of reading your suit that I realized I needed to file a whistleblower retaliation complaint with the Dept of Labor/OSHA -- and I did, just 2 days under the 30-day deadline. Thank you!!"* Banko never responded. Gjovik had discovered a lawsuit from 2013, where ex-Apple Manager Joshua Banko sued Apple for retaliation and a termination in violation of public policy. Apple fired Banko for reporting embezzlement but Apple said they can fire employees for any reason they want, even reporting crimes. The Judge disagreed with Apple. The lawsuit filings and decisions taught Gjovik about certain government charges she needed to file in order to sue Apple. The lawsuit also helped Gjovik realize Apple was acting in bad faith. Banko had reported to the same Hardware Engineering leadership team that Gjovik currently reported under, and Gjovik had interacted several times with his direct manager Kate Bergeron (who told him to ignore criminal embezzlement by high performers).[239]

468.   On August 30 and 31 2021 Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy, Unless You Work at Apple.*" [240]  In Gjovik's posts she complained of Apple's surveillance of workers, its exploitation of workers for the sake of their privacy, Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon. (Apple would later claim it was one of the reasons Gjovik was fired).[241]

---

[239] Banko v Apple, Case 3:13-cv-02977-VC, Complaint, Doc #1 (2013)
[240] The Verge, *Apple Cares about Privacy, Unless You Work at Apple*, Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[241] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432381235926499332; https://twitter.com/ashleygjovik/status/1432416891201490946

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**ASHLEY M. GJØVIK**
@ashleygjovik

I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

Working at Apple in "normal" times, I walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other "powers that be." I realize now that during those times, I didn't question a lot of things that I should have. Not just the abuse I suffered, but also the constant invasion of privacy — and perhaps those two things are linked.

There seems to be limitless ways Apple can access employee data and monitor us. I recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but I never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and I felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021 · Twitter Web App

*Exhibit: One of Gjovik's Aug 30 2021 Twitter Posts About Apple's Surveillance*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: Gjovik 8/30/21 Twitter Post about Apple's Invasions of Employee Privacy*

469.    On August 31 2021, Gjovik posted on Twitter about the 2007 US SEC/DOJ

charge against Apple's General Counsel and CFO for fraud.[242] Gjovik wrote, "2007: *"#Apple's*

*General Counsel was charged with, among other things, committing fraud, lying to Apple's*

*auditors, & violating prohibitions on circumventing internal controls."* [See RICO Predicate

Act: Securities Fraud]. She then posted about the 2010 US DOJ/FTC case against Apple for a

salary-fixing conspiracy with other tech companies.[243]

470.    On September 1 2021, Gjovik created and published a website she called

"*iWhistleblower*" with resources for Apple employees on the different government agencies they

_____

[242] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432803511431950339
[243] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432808176026472448

Deleted: [See RICO Predicate Act: Securities Fraud]

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

could file charges to about Apple's misconduct, including US DOL, US DOJ, US SEC, and others. Gjovik posted on Twitter about it and it was referenced in some news articles.[244]

471.    Gjovik was interviewed by a reporter who said she was interested in the digital harassment Gjovik was facing. Gjovik was quoted discussing "some suspiciously over-invested trolls," (Beezie Wacks, Mel Mayer, etc), however Gjovik said overall she was "*met overwhelmingly with support from current & past colleagues, the press, and the public. [She also] also have many friends who are senior leaders at Apple who continue to support her through all of this.*"[245]

472.    On August 31 2021, at 11:15pm PST, Gjovik posted that she had filed a whistleblower tip to the US SEC about Apple 13 minutes prior.[246]

---

[244] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433140768638574599
[245] *[] organizer faces online harassment—some of it from coworkers,* Mashable, Sept. 2 2021, https://mashable.com/article/apple-too-organizer-harassment
[246] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432950336973533189

Deleted: .

Deleted: On September 1 2021,

Deleted: 2:15am

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



*Exhibit: Gjovik's Twitter post about SEC tip on 8/31/21*

473.    On August 31 2021, Gjovik filed a charge with the California Department of Labor alleging retaliation. On September 1 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor and included a screenshot of the complaint.

**Deleted:** added in addition to

**Deleted:** submitted tip, "Y'all, the process is so broken. The only way I'm figuring out what paperwork I need to submit complaint. One question

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

One question asked: How did your employer know about the protected right you exercised?

Gjovik had written, *"I kept saying, 'Stop it you guys. There's Labor laws about this.'"*[247]



*Exhibit: Gjovik posting about her CalDOL complaint*

474.   On September 1 2021, Gjovik got notice her NLRB charge was assigned to a field examiner, and Gjovik posted about it on Twitter.

_____
[247] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433303578802749442

SECOND AMENDED COMPLAINT, 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Gjovik posting about her NLRB charge on 9/1/21*

475.    On September 1 2021, an Apple employee, Shantini Vyas wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator.* Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies.*"

476.    Vyas' posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts, as well as named Apple employees and managers. Gjovik does not know Vyas and under knowledge and belief Vyas made these posts under direction by Apple.

Deleted: Shantini's

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

477. On September 2-3 2021, numerous papers wrote about Gjovik's charges against Apple. Bloomberg wrote about Gjovik's NLRB, US Dept of Labor, California Dept of Labor, and EEOC charges against Apple.[248] Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing the concerns. "I should be able to raise concerns about safety and public policy," she said in an interview Thursday. Gjovik also has filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. "I want to pierce the veil of intimidation and secrecy," she said in the interview. "The employees are terrified to speak up about their concerns."[249]

On September 2 2021, Financial Times wrote about Gjovik:

> "Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "chemical exposure" at her Apple office in Sunnyvale, California, where more than 100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "TRW Microwave Superfund site", a location requiring special oversight owing to previous contamination by hazardous waste materials in the soil and groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at facilities at their Cupertino headquarters and Sunnyvale. Gjovik said her concerns were brushed aside and

---

[248] Nick Turner, *Apple Worker Complaints Reviewed by Labor Relations Board,* Bloomberg, Sept 2 2021, https://www.bloomberg.com/news/articles/2021-09-03/national-labor-relations-board-fields-complaints-about-apple

[249] Id.

Deleted: Bloomberg

Deleted: https://www.bloombergquint.com/technology/national-labor-relations-board-fields-complaints-about-apple …

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

she was warned against speaking up about them. In her letter to the NLRB, she said Apple's employee relations department "intimidated me not to speak about my safety concerns", that a manager advised she quit Apple and that she was subject to sexism and a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave."[250]

478.    On September 2 2021, Gjovik complained on Twitter that Apple had already assigned external counsel to her NLRB charge (McDermott Will & Emery), including two partners and one associate. She complained the Partners (per their website) specialized in "*defending leading companies against whistleblowers,*" and the associate had previously clerked with EEOC and the NLRB.[251]

[250] Patrick McGee, *US labour board examines retaliation claims against Apple*, Financial Times, Sept. 2 2021, https://www.ft.com/content/484fa8be-925e-495e-91ff-54950b112754
[251] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433539314963869696

SECOND AMENDED COMPLAINT↓ 3:23-CV-04597-EMC                    ↓DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



Deleted: On September 2 2021, Gjovik was interviewed by US Equal Employment Opportunity Commission (…

*Exhibit: Gjovik's post complaining about MWE on 9/2/21*

479.    Gjovik had her interview with EEOC on September 2 2021. Gjovik did not request an investigation but did request a Right to Sue letter which she received on 9 2021, prior to her termination. Apple was made aware of Gjovik's EEOC and DFEH complaints and that she was testifying to EEOC and DFEH about what Apple did to her by at least August 12 2021. Gjovik Tweeted about her appointment with US EEOC.[252] Apple retaliated against Gjovik for filing a complaint and testifying with California FEHA. [Cal. Gov't Code § 12940(h); Cal. Code Regs. tit. 2, § 11021.].

Deleted: ).

Deleted: said she

Deleted: want

Deleted: and just wanted

Deleted: Gjovik had been threatening to sue Apple for over two months now and she wanted to ensure she had all of the paperwork to do so. which she received on 9 2021, prior to her termination.

Deleted: ¶
On September 2 2021, Gjovik posted on Twitter that she had filed

Deleted: with the California Department of Labor DIR Retaliation team alleging retaliation by Apple. Gjovik included a screenshot of the complaint. One question asked: How did your employer know about the protected right you exercised? Gjovik had written, *"I kept saying, 'Stop it you guys. There's Labor laws about this.'"*[253]

Deleted: https://twitter.com/ashleygjovik/status/143329290749090 6113

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

---

[252] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433292907490906113



*Exhibit: Gjovik's Twitter Post on 9/1 (PST) about her NLRB and EEOC cases*

480.    On September 1 2021,

*Exhibit: Gjovik's 9/2/21 post about her EEOC interview*

xiii.    **Apple Intimidates & Threatens Gjovik; Tries to Force Her onto a WebEx Meeting (September 3 2021)**

481.    On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB charge against Apple, suggesting she was lying. The article includes quotes from Vyas and Ricky Mondello. Mondello also shared Vyas' thread about Gjovik and Mondello stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple.

204

| Deleted: and |
| Deleted: Onto |

| Deleted: Vyas |
| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |



*Exhibit: 9to5Mac Article Harassing Gjovik*

482.     On September 3 2021, at 8:36am Okpo texted Gjovik asking for her to join a WebEx meeting with him in less than two hours. Okpo said, "*Hi Ashley Good Morning, I would like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time work for you? Thank you."* He then emailed her at 10:07am asking for the 10:30am meeting.

483.     Per Apple's March 2022 Position Statement, Apple had already started investigating Gjovik prior to September 3 2021, however at no time prior to September 9 2021 did Apple tell Gjovik she was under investigation. Under information and belief, Okpo contacted Gjovik on September 3 2021 claiming he wanted to talk to Gjovik about the investigation into Gjovik's concerns, but Okpo planned to surprise-attack Gjovik with the investigation into Gjovik. Okpo assumably did not warn Gjovik so she did not try to record or get a witness for whatever it was Okpo planned to do to Gjovik. Under information and belief, Apple and MWE arranged the smear article to occur shortly before an attempted interrogation and forced settlement.

Deleted: contacted

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

484.  Gjovik had become very irritated with Apple's misrepresentations and manipulations by this point. On September 3 2021, Gjovik replied to Okpo complaining about being on leave and Apple's misconduct. Gjovik said she wanted to keep communication in writing.

> I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.
>
> As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.
>
> I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) — I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.
>
> On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you on 8/3 that I was concerting with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.
>
> Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.
>
> Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

*Exhibit: Gjovik's email to Okpo on 9/3/21, pt1*

485.  Gjovik asked Okpo for some sort of assurance what he was doing to her wasn't going to impact her annual performance review, and Gjovik asked Okpo for a written update about the status of her office and complained that she has received no updates but saw lots of notifications that EH&S was doing work at the building.

> Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.
>
> Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.
>
> -Ashley

*Exhibit: Gjovik's email to Okpo, pt2*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

486.    Gjovik then posted on Twitter about Okpo reaching out, providing a screenshot of her email response to Okpo. In the post Gjovik wrote, *"The    #Apple Employee Retaliations team reached out today to "request a meeting." I replied that I am req we keep everything in writing due to their freq misrep of verbal comms. I also req an explanation of how my perf review will not be neg impacted by being forced on leave."[254]*

487.    At some point around September 2021, Gjovik heard two men in the attic directly above the office in her apartment. The men spent over an hour in the attic directly above the room she used as an office. It made Gjovik feel uneasy at the time but she did not know what to do. In 2022, Gjovik raised the attic event to her landlord. The landlord said the only entrance to the attic is through her bedroom closet. Gjovik said no one was in the apartment with her. The landlord had no other explanation. Gjovik looked in the attic and found cables/cords that did not look like they belonged – and the landlord told her they did not know where they came from. Gjovik saw the attic units were divided by thin plywood and told her landlord she suspected someone must have broken into an adjacent unit (there were a couple) and went into the attic of that unit and then broke into Gjovik's attic from there. Under information and belief. Apple broke into Gjovik's attic in the fall of 2021. Under information and belief, Apple installed electronic equipment in Gjovik's attic to surveil her.

488.    On September 3 2021, Gjovik filed a NCDF Disaster Complaint with the US Department of Justice and posted on Twitter about filing it.

489.    On September 3 2021, Gjovik filed a tip with the FBI about the possible sanctions' violations. In the crime field she wrote: *"Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup."* Gjovik posted on Twitter that she had reported the matter to the FBI.

---

[254] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433902544695095298

**Deleted:** in to

**Deleted:** ¶
<#>Gjovik Files More Complaints Against Apple; Complaints of Apple Executives Criminal Conduct; Complaints about Batterygate Intimidation (September 3-9 2021)¶

**Deleted:** <#>On September 6 2021, Gjovik posted on Twitter as screenshot, captioned: "Aug 2 iMessage with Apple coworker: "Seriously though, ER's face about the COVID vaccine & Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please talk to Deirdre O'Brien." @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo of DOJ complaint & iMessage].[255] ¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

490.    On September 5 2021, Gjovik posted on Twitter about the US DOJ case against Apple lawyer Gene Levoff. Gjovik said she found a denied motion in the case where Levoff's defense was arguing "*insider trading laws don't exist*" and/or do exist "*but are unconstitutional.*"[256]  [See RICO Predicate Acts: Securities Fraud and Wire Fraud]

491.    On September 6 2021, Gjovik posted on Twitter as screenshot, captioned: "Aug 2 iMessage with Apple coworker: "*Seriously though, ER's face about the COVID vaccine & Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please talk to Deirdre O'Brien.*" @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo of DOJ complaint & iMessage].[257]

492.    On September 6 2021, Gjovik posted on social media about her cases with a status update and the report numbers. In addition to the prior charges, she now also referenced her SEC whistleblower tip, FBI tip, and DOJ complaint.[258]



*Exhibit: Gjovik's Sept. 6 2021 Post about Cases*

---

[256] *US v. Gene Levoff,* USDC of NJ (Aug 12, 2020), Docket No. 19-cr-780, Motion to dismiss: Denied; Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434406050275287043
[257] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434830527140229124
[258] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434836915086188544



*Exhibit: Gjovik's 9/6/21 Twitter post about FBI complaint about Smuggling*

493.   On September 6 2021, Gjovik replied to the US EEOC confirming she was working on a draft of her complaint and was targeting to submit it to them by September 8 2201, responding to US EEOC sending her a 'courtesy reminder' on September 3 2021, to complete the draft.

494.   On September 6 2021, Gjovik posted on Twitter about the Slack discussion from July 27 2021 where she and her coworkers discussed Apple systemically retaliating against them for raising valid concerns.

495.   On September 7 2021, Gjovik posted on Twitter about the Batterygate/nude photographs matter. Gjovik finally disclosed the construction termination that occurred leading

209

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

up to Apple's intimidating conduct. Gjovik posted, "*I spent much time pondering why my nudes were so critical to #Apple's doc collection for the Batterygate lawsuits...I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the 🟩 situation when I ran sw failure analysis.*" [259] Gjovik then added, *"#Apple Batterygate/Nudegate/Constructiveterminationgate.*"[260]







At

_____

[259] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1435444339019182083
[260] Twitter, Ashely Gjovik, https://twitter.com/ashleygjovik/status/1435444945117073414

Deleted:
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*Exhibit: Gjovik's Sept. 7 2021 Post about Batterygate & RICO*

Deleted: A-xxvii-B:



*Exhibit: Gjovik's Sept 7 2021 Post about "ConstructiveTerminationGate"*

Deleted:
Deleted: A-xxvii-C:

496.    On September 7 2021, Gjovik discovered a Santa Clara County Superior Court

lawsuit against Apple filed by one of her ex-coworkers. The ex-coworker, Crystal Brown, sued

Apple due to harassment and retaliation from her manager, who was also Gjovik's manager, Dan

West. The lawsuit was filed in 2018 and settled in 2019. Gjovik posted on Twitter about it

tagging Tim Cook and Apple's Twitter accounts and complained that Apple had tried to claim

they investigated West but found no 'policy violations' when he was sued by another employee

only a couple of years prior and Apple had quickly settled the case.

497.    On September 7 2021 at 8:42pm, Okpo contacted Gjovik again asking to speak

with Gjovik by September 10 2021. (Gjovik's NLRB affidavit was due September 13 2021).

Now Okpo said there were some "*inconsistencies*" he wanted to discuss. Okpo had never

responded to Gjovik's concerns on September 3 2021 and this was the last email Gjovik would

receive from Okpo.

Deleted: Okpo is an attorney
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

---

**Ekelemchi Okpo <eokpo@apple.com>**                    Sep 7, 2021 at 8:42:11 PM

Re: Meeting Request

To: Ashley Gjøvik <ashleygjovik@apple.com>

Ashley-

Thank you for your email.

Based on interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information.

Please let me know when you have availability to connect tomorrow or later this week.

 Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

---

*Exhibit: Okpo's email to Gjovik on 9/7/21*

498.    Okpo is an attorney. Gjovik again asked to keep communications in writing. Gjovik asked for Business Conduct review (by Tom Moyer's team) of Okpo's repeated denial to keep communications in writing. Okpo never said, at any time, that Gjovik was under investigation, but instead maintained he was investigating Gjovik's concerns about others.

499.    On September 7 2021, Gjovik responded to Okpo. Gjovik reiterated she wanted to keep communications in writing, and asked Okpo to have Business Conduct review her request and his denial of her request. She then repeated her two questions form five days prior about the leave negatively impacting her review and what the status of her office was. She added that she had just discovered the lawsuit filed against apple by her ex-coworker Crystal Brown alleging retaliation, failure to investigate, IIED, and other charges – while naming Dan West, John Basanese, and Employee Relations – which Apple settled in 2019. To Gjovik, that lawsuit removed any doubt that these investigation were completely farcical and Employee Relations will blatantly lie to employees about their "findings." Waibel surely knew about the prior lawsuit against West, yet acted as if West as blameless and Gjovik was insane.

---

212

---

Deleted: <#>Okpo never said, at any time, that Gjovik was under investigation, but instead maintained he was investigating Gjovik's concerns about others. ¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Ashley Gjovik <ashleygjovik@apple.com>                                    Sep 7, 2021 at 9:45:45 PM
Re: Meeting Request
To: "Ekelemchi Okpo (ER)" <eokpo@apple.com>

Hi Ekelemchi!

Happy belated Labor Day! I hope you're well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I'd like to request that we please keep our exchanges in writing.")Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you're implicitly denying my request otherwise — and because you're an attorney and you're in an adversarial position to me, if you are denying my request, I'd also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?

**II. I'm also awaiting my reply about my review**

> I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4 and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

**III. I'm also waiting your reply about the safety of my workplace**

> Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will not answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

Thanks!
-Ashley

P.S. Not sure if you've heard yet, maybe they didn't tell you - but I found Superior Court for the State of California for the County of Santa Clara Case 18CV330796 (2018) & 18CV330922 (2019) with for the NOTICE OF SETTLEMENT OF ENTIRE CASE for Retaliation, Failure to take Reasonable Steps to Investigate, Failure to take Reasonable Steps to Prevent Retaliation, Constructive Termination in Violation of Public Policy, & Intentional Infliction of Emotional Distress against Apple Inc, Dan West, and Employee Relations. Please feel free to respond now....otherwise we'll def address this later.

—
Ashley M. Gjovik

*Exhibit: Gjovik's email to Okpo on 9/7/21*

500.    On September 8 2021, Gjovik emailed the US EEOC her draft of the language for her US EEOC charge.

501.    On September 8 2021, and article was published discussing Gjovik's complaints about Apple being a physical and psychological toxic workplace. The same day Gjovik posted on Twitter complaining that it seemed like Apple reached out the day prior in order to intimidate her about her NLRB charge, because NLRB said her affidavit was due by 9/13, and Apple

213

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

insisted they talk to Gjovik prior to 9/13 (which would give them time to get Gjovik to recant even if she already testified).

### xiv.    The Day Apple Fired Gjovik (September 9 2021)

502.    On September 9 2021, around 1 AM the day Gjovik was fired, Gjovik was tipped off that Apple may be surveilling her through her work and personal devices. Gjovik posted publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my [personal] iCloud email and iMessages?"* [261] To which members of the Info Sec community assured Gjovik Apple was likely doing that and more.

503.    Gjovik immediately began removing her data from Apple's servers. Realizing how terrified she had become of her employer; she began searching for legal resources. At 2:16am that morning Gjovik downloaded the US DOJ guide to litigating civil RICO cases, which Apple would have seen.





*Exhibit: 9/9 RICO Download*

504.    Minutes later at 2:27 AM September 9 2021, a self-declared "burner" Twitter account, with zero posts or "likes" ever, @Guybrus55626232, sent Gjovik a direct message accusing her of making a claim that was *"verifiably incorrect and complete misrepresentation of facts."* The user claimed that when Gjovik posted she found the *Crystal Brown v Apple* lawsuit, and said Apple settled (which Apple did), she was *"unequivocally misrepresenting facts, most*

---

[261] Note: California employers cannot eavesdrop on or record employees' private telephone, email, or in-person conversations without prior consent by all participants. See, Cal. Penal Code §§ 631(a), 632(a).

Deleted: 

Deleted: Sept

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*likely with malicious intent."* The account said, *"as someone attending law school, you should have known better."*

505.     This user would later contact Gjovik again on January 9 2022, accusing Gjovik of committing a federal crime. Gjovik asked the user to identify themself. The user refused and instead urged her to talk to her lawyer about 18 U.S. Code § 1512, a law Gjovik previously posted publicly she plans to pursue a charge against Apple for violating, and the user now accused Gjovik of violating.

506.     It is under information and belief this user was an agent of Apple or acting on Apple's direction attempting to intimidate Gjovik to stop posting about her surveillance and privacy concerns and attempting to 'DARVO' Gjovik. Gjovik even responded, saying hi to *"Apple Legal"* and asking them to leave her alone. The user then deleted its account.

507.     On the day Gjovik was fired, her Box evidence folders still sat with several folders marked as pending as they had not been reviewed yet after Okpo stopped the process on August 4 2021 when he put Gjovik on leave.

508.     On September 9 2021, at 11:49am, the city of Sunnyvale inspected Gjovik's Superfund Apple office for hazardous waste and fire code compliance and wrote up Apple for violating at least one law.

509.     On September 9 2021, at 12:39pm PST, Gjovik emailed the US EEOC and asked the investigator if she needed anything else from Gjovik in order to move forward. Then again at 1:02pm asking US EEOC how she can sign the charge in order to meet the deadline (that day).

510.     On September 9 2021, at 1:58pm PST, Gjovik published comments about Apple's felonious impersonation of law enforcement in 2011.



*Exhibit: A-xxviii-A: Gjovik's Box Folders, Still Pending*

215

Deleted: .

Deleted: on January 9, 2022

Deleted: ¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



*Exhibit: The Post About Apple Breaking into People's Homes*

**Deleted:** A-xxviii-B: ...he Post About Apple Breaking Into ... [11]

**Deleted:** FIRSTSECOND AMENDED COMPLAINT –... [10]

**Deleted:** OCTOBER 25

511.    Ten minutes later, at 2:08pm PST, Gjovik was contacted by Aleks Kagramanov, a *"Workplace Violence and Threat Assessment"* investigator demanding to speak with Gjovik on the phone *"within the hour."* The email had no subject line and Gjovik had never heard of the team or person who reached out. The person claimed to be Employee Relations but said he was *"looking into a sensitive Intellectual Property matter"* and he wanted to speak with Gjovik about it. He said he wanted to talk as soon as possible, within this hour (so less than 52 minutes). He said he was sending her an iCal for a call but could reschedule as long as they meet that day. He said they *"sincerely appreciate [her] prioritizing this call and being flexible."* He said Gjovik's *"cooperation and participation [are] imperative,"* however he never said Gjovik was under investigation.

On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

Hi Ashley,

This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.

As part of Apple's policy, your cooperation and participation is imperative.

Thank you in advance, and talk soon.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com

*Exhibit: Email from Workplace Violence on 9/9/2021 2:08pm*

Deleted: ¶

Ashley M. Gjøvik
@ashleygjovik

Any bets if I get a literal knock o
#Apple today?

(No Subject)
To:   Ashley G (Work),   Ashley Marie G

Hi Ashley,

This is [            ] from Employee Relation
Intellectual Property matter that we would like to sp
connect with you at as soon as possible today; with
come through shortly. We sincerely appreciate you
you absolutely cannot make this time, please prop

Deleted: A-xxviii-C

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit*: Gjovik's Posts on 9/9/2021 – Knock on Door

512.     Gjovik promptly responded at 2:10 PM PST, two minutes later, saying that she

was willing to participate, she wanted there to be a written record of their conversations. She

said she will respond as quickly as she can. Kagramanov did not respond, so Gjovik replied

again.

---

On Sep 9, 2021, at 2:27 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.

This feels a little like witness intimidation, etc...

—
Ashley M. Gjovik
 Senior Engineering Program Manager, Apple

On Sep 9, 2021, at 2:10 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Aleks! Happy to help! Please send any questions / updates via email so we keep everything written please.

I will respond via email as quickly as I can. Thanks!

—
Ashley M. Gjovik

---

*Exhibit: Gjovik's email to Workplace Violence on 9/9/21 2:20 and 2:27 PM*

513.     Gjovik responded again at 2:27 PM PST complaining to the Workplace Violence

interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded

his emails to her NLRB investigator.

Deleted: but given the nature of her complaints,

Deleted: .

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

514.    Gjovik was posting screenshots of the conversation on Twitter in real time, along with her commentary and research discoveries about the team who contacted her. Gjovik posted on Twitter complaining of witness intimidation at 2:33 PM PST.



*Exhibit: Gjovik's Posts on 9/9/2021 2:33pm*

*Exhibit: Gjovik's Posts on 9/9/2021 2:34pm*

219

515.    Gjovik forwarded Kagramanov's emails to her NLRB investigator Alex Hadjuk at 2:26pm and 2:30pm PST, via her iCloud email address which Apple would have seen. Gjovik also notified Kagramanov directly she did so.

516.    A fake Twitter account called "EarlyRiser," then replied to one of Gjovik's posts saying, "*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" Under information and belief, "EarlyRiser" is Apple.

517.    Kagramanov then responded at 2:50 PM, and said "*we are investigating allegations that you improperly disclosed Apple confidential information*" and claimed she refused to 'participate' in his farcical investigation. He did not explain what "participate in the discussion" meant. (Assumably he, and a bunch of lawyers and security goons, would meet her on the call, threaten to sue her, or threat to get charges filed against her for whoknowswhat, unless she signs some illegal waiver of claims and disappears). Kagramanov then said he was suspending all of Gjovik's account access. Notably, he never gave Gjovik a warning that she had to talk on the phone as the only option, nor did he tell Gjovik she was under investigation until after he suspended her accounts.

On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com

*Exhibit: Workplace Violence email on 9/9/21 2:50pm*

518.    Gjovik responded to Kagramanov at 3:07 PM re-iterating she wanted to participate. "*As mentioned, I'm definitely willing to participate in your investigation. I only*

Deleted: <#>Under information and belief, "EarlyRiser" is Apple.

Deleted:  and said he was suspending all of Gjovik's account access. Aleks…

Deleted: (Apple, via Jessica Perry of Orrick) later admitted Apple already planned to fire Gjovik over a week earlier, with the decision made on or around August 29 2021). …

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*asked that the discussion be kept to email — I said nothing about not participating in the*

*discussion at all."* Gjovik added: *"I offered to help via email to ensure we have a documented*

*[record] of our conversations considering everything that's currently going on with my*

*investigation and my complaints to the government." "I would really like the opportunity to*

*remedy any actual issues. Please let me know what the issues are so I can make a good faith*

*attempt at that."*

> **From:** Ashley Gjovik <ashleygjovik@icloud.com>
> **Subject:** Re:
> **Date:** September 9, 2021 at 3:07:37 PM PDT
> **To:** Aleks Kagramanov <akagramanov@apple.com>
> **Cc:** "Ashley G (Work)" <ashleygjovik@apple.com>
>
> Hi Aleks,
>
> As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.
>
> I offered to help via email to ensure we have a documented recored of our conversations considering everything that's currently going on with my investigation and my complaints to the government.
>
> I have been speaking out about work conditions, about workplace safety, concerns about discrimination & retaliation, and about concerns about intimidation and corruption (as reported to the government in public record).
>
> I'm very concerned about what you are calling "serious allegations." Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting my access to Apple system? Or are you doing something more — and if so what?
>
> Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.
>
> In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.
>
> Best,
> -Ashley
>
> --
> **Ashley M. Gjovik**

*Exhibit: Gjovik's email to Workplace Violence on 9/9/21 3:07pm*

519.    Gjovik added in her 3:07 PM email reply to Kagramanov: *"In the meantime,*

*without any additional context or effort to communicate with me in email, this really does feel*

*like intimidation and additional retaliation and I will consider it as such."* Gjovik still did not

know what she was supposedly accused of.

520.    Gjovik search online for *"Apple"* and *"threat assessment and workplace violence"*

to see if there were any articles about Kagramanov's team. LinkedIn returned three results,

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

including Kagramanov, and the Apple employee who broke into the Latino man's house in 2011. Gjovik posted about it at 4:20 PM.



*Exhibit: Gjovik's Posts on 9/9/2021*

521.    On September 9 2021, at 4:24pm PST, the US EEOC investigator emailed Gjovik saying she posted the final version of the charge and asked Gjovik to sign the charge. Gjovik only had less than 40 minutes to meet the deadline until her charge could be closed.[262]

522.    On September 9 2021, at 4:27pm PST, Gjovik digitally signed her EEOC charge against Apple, which she had already filed on August 12 2021, and with the notifications of these events still occurring through her iCloud email account. Gjovik's charge included a brief summary of retaliation up to when she filed it:

> "After engaging in protected activity, around May 6, 2021, West reassigned my work to others without explanation and ostracized me. Around July 15, 2021, Powers dramatically increased my workload with unfavorable projects. Around July 2, 2021, Employee Relations forced me to submit a reasonable accommodation request to not be exposed to the hazardous chemicals, instead of addressing my concerns for the health/safety of all employees. Waibel asked I not share my concerns with other employees, refused to take/answer my safety questions, or allow the EH&S team to take/answer my safety questions. In retaliation, on August 4, 2021, Apple placed me on an indefinite paid administrative leave even though I objected."[263]

The charge Gjovik filed only went through August, so after she was fired she had to file a second charge to add the additional retaliation.

---

[262] US EEOC on 9/3/21: "Please understand that if you fail to sign and return the drafted charge within seven (7) days, I have the authority to assume that you no longer are interested in filing a charge, will close the inquiry, and no further action will be taken by the EEOC."

[263] US EEOC, Charge of Discrimination # 556-2021-00608, Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*Exhibit: EEOC Charge, Signed 9/9/21 7:27EST/4:27PST*

523.    At 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, emailed Gjovik

with subject line "*Your employment status*" and an attached letter saying she had been

terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking

and said she "*failed to cooperate and to provide accurate and complete information during the*

*Apple investigatory process.*"[264]

---

[264] Gizmodo, *Apple Fires Program Manager Who Accused Bosses of Harassment, Intimidation,* Sept 10
2021, https://gizmodo.com/apple-fires-program-manager-who-accused-bosses-of-haras-1847649269

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Bertolus' email on 9/9/21 at 6:54pm PST*

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Date:   September 9, 2021

To:     Ashley Gjovik                              Employee ID: ▓▓▓▓
From:   Yannick Bertolus
cc:     Personnel file

via Email
ashleygjovik@icloud.com

via FedEx
▓▓▓▓▓▓▓▓▓▓

Re:   Termination of employment

Apple has determined that you have engaged in conduct that warrants termination of
employment, including, but not limited to, violations of Apple policies.  You disclosed
confidential product-related information in violation of Apple policies and your
obligations under the Intellectual Property Agreement (IPA). We also found that you
failed to cooperate and to provide accurate and complete information during the Apple
investigatory process.

Your access to Apple systems has been suspended as of today and your employment
will terminate on September 10, 2021. You will receive your final pay which will include
regular pay through your termination date, all accrued unused vacation pay and any
ESPP contributions made in the current period.

*Exhibit: The Letter Attached to Bertolus' 9/9/21 Email*

524.    No explanation was ever provided as to why Bertolus was the one who

terminated Gjovik, and not Gjovik's managers Powers or West, or Employee Relations

employees Okpo or Lagares. Gjovik had only a handful of interactions with Bertolus during her

time working in his organization. Still, Bertolus surely knew about everything going on with

Gjovik if his report, West, has been talking about "*The Ashley Issue*" at every staff meeting,

Apple public relations was fielding questions about Gjovik daily, the US EPA raided Gjovik's

office, and Apple legal was organizing defenses to Gjovik's government complaints. Everyone

knew about Gjovik's protected activity.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

525.   Up until a few hours before she was fired, Gjovik had access to future product roadmaps; unreleased hardware/product design and configuration; future operation system source code; access to all Research & Development finance ordering accounts at the company, including the executive office, information on the manufacturing process and supply chain; competitive analysis; product pricing information; product launch dates; marketing plans; customer feedback and usage trends; access to future software features and projects; access to submit code to the OS releases and view what others submitted.

526.   There was a news cycle covering Gjovik's termination which was humiliating and will forever mark her career and reputation as being fired for "leaking." In interviews Gjovik explained she already knew she would be fired, based on Apple's corrupt conduct, but she wasn't "going to be quiet or slink away," and she said she "was going to stand up for [herself] and [her] fellow employees – [she] was going to expose the systemic problems [she] identified."

527.   On September 9 2021, an Apple Security manager Ricky Mondello, who was friends with a member of Gjovik's Software Engineering team (Faye Garfinkle, close friend of Rob Marini), posted on Twitter about Gjovik's termination, "*Sometimes you fuck around. Sometimes you find out.*"

**xv.   Apple Increases Intimidation and Retaliation (September 2021)**

528.   Gjovik testified to NLRB for her affidavit on September 10 2021.

529.   Joanna Appleseed, who worked in Apple's Global Security team, posted on social media about Gjovik's government complaints and investigations claiming they were meritless, and Gjovik was lying, including on September 9-10 2021.

530.   Appleseed posted on September 9 2021, that Gjovik's NLRB charge may not have merit and she does not believe in Gjovik's charges; on September 13 2021 she posted that Gjovik's EEOC and DFEH charges were meritless, on September 26 posted that Gjovik was

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

lying about being put on leave and claiming that Gjovik "*leaked IP*," and again on November 1 2021 referencing "*evidence*" and jury "*verdicts*". On September 16 she posted that no one should donate to Gjovik's GoFundMe and called Gjovik a "*predator*," On October 25, 2021, Appleseed posted that Gjovik's "*complaints with federal and state agencies*" do not have merit and that Gjovik was not being "*honest or genuine*" in filing the charges, and that Gjovik was "*harmful*" for filing charges against Apple.

531.   On September 10 2021, a fake Twitter account, "Beezie Wacks" began posting about Gjovik and in Gjovik's replies. Beezie shared, liked, and commented on other fake account and employee harassment of Gjovik. Beezie posted "*#ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit #coward,*" and then paid to 'promote' her Twitter post. Under information and belief Beezie was Apple, and possibly Gjovik's first Employee Relations investigator, Jenna Waibel.

532.   On September 8-10 2021, an account on Reddit began posting about Gjovik. The account "crissnovak" posted on September 8 2021 sharing a link to the Vyas Twitter posts about Gjovik and Gjovik's US DOJ complaints, "*Shantini is my hero, best take on "A" with over 200+ ❤️s. ALOT seem to agree: entitled, obnoxious, toxic, vindictive employee. To me, zero credibility. I would not even want to be on the same sidewalk with that.*" The same account posted on September 9 2021, "*Good riddance. They should have fired her weeks ago.*," "*Santa Clara University Law must be cringing.*" On September 10 2021, the account posted in a thread about Gjovik: "*The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help.*" The same day the account posted about Gjovik: "*I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies*

Deleted: On September 9-10 2021, a fake account on Reddit began posting about Gjovik. The account "crissnovak" postedOn

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity.*"[265]

533.    On September 11 2021 the crissnovak account posted, "*I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!*" [266] Crissnovak then began threatening other Apple employees they may "*get Gjoviked*!" if Apple does not like them.[267] On September 13 2021, the crissnovak account posted on a thread about Gjovik: "*.... Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood...*" then added about Gjovik's appearance that Gjovik was on the "*chubby side*" and had "*baby teeth lol.*"[268]

534.    Prior to harassing Gjovik, the account posted specific demographic information which Gjovik was able to match to several Apple employees who may be behind the account, including a manager and analyst in Apple Human Resources, two project managers in Apple's Developer Tools (a team that is close with Marini and Riegel), and a senior manager for the team that appears to be in charge of the Face Gobbler application and data. Under information and belief crissnovak was Apple.

---

[265] Reddit, u/crissnovak, https://www.reddit.com/user/crissnovak/comments/
[266] Reddit, Apple fires Senior Engineering Program manager Ashley Gjovik, https://www.reddit.com/r/apple/comments/plcc8i/apple_fires_senior_engineering_program_manager/hcxlth/?context=3
[267] Id.
[268] Reddit, https://www.reddit.com/r/apple/comments/pm7lio/comment/hcnwjqz/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    | DECEMBER 21 2023

**Deleted:** <#>Under information and belief crissnovak was Apple, possibly Waibel. ¶

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

535.   Starting in at least September 2021 and assumed to continue through current day, Joanna Appleseed and other Apple employees undertook a 'whisper campaign' to smear Gjovik's character and creating fear, uncertainty, and doubt about Gjovik's allegations against Apple.

536.   On September 10 2021, one of Gjovik's coworkers began posting about Gjovik under the screenname "Neoform." Neoform was Gjovik's coworker Ian O'Shaughnessy who sat a few desks from Gjovik at 825 Stewart Drive.[269]  For around a week when Gjovik was fired, Neoform/Shaughnessy began posting extensively about Gjovik on Twitter, Reddit, and other forums and social media sites. In September 2021, in threads about Gjovik getting fired on Twitter and Reddit, Shaughnessy posted under the name "Neoform":

a.   *Vexatious litigant incoming!*

b.   *The way she's been attacking her employer on every possible front (including taking digs at the CEO and board of directors, repeatedly), this was basically a self-fulfilling prophecy.*

c.   *Based on her writings and twitter feed, I would not be surprised in the least to learn she has some kind of psychosis.*

d.   *She's entirely to blame for her firing.*

e.   *She clearly doesn't have a lawyer, so I'd guess all of her claims are entirely baseless. The irony is: she's a law student graduating next year...How terrifying*

f.   *Silicon Valley has a number of Superfund sites, she says both her apartment AND her workplace office are located above a superfund site... That said, she's claiming she was hallucinating and getting sick from the tVOCs – meanwhile no one else around her was suffering the same.*

g.   *[directly to Gjovik about Gjovik's SEC charge] Why would the Finance & Audit committee oversee the renting/purchasing of property?*

h.   *[directly to Gjovik about Gjovik's lost RSUs] But you said were only planning on staying at Apple until Dec 2022 though, which means you wouldn't be getting all that money anyways*

i.   *You think there are law firms that will want to hire her? She's toxic.*

---

[269] Newsique, About, DJ Neoform/Ian O'Shaughnessy
https://web.archive.org/web/20070109074012/http://www.newsique.com/about/ ; Wikipedia Neoform link to Newisque https://en.wikipedia.org/w/index.php?title=User:Neoform&oldid=92521016

Deleted: <#>On threads about Gjovik getting fired, Shaughnessy posted:¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25