*j.   I was giving her the benefit of the doubt until I saw her claim that turning on her webcam during meetings was sexist.*

*k.   Right to Sue notices are the default position of the NLRB – ergo, they decided \*not\* to take action of their own, hence, you can go ahead and sue to resolve it yourself.*

*l.   Why are you certain the investigation had not been closed? She posted that ER had reached out to her, she effectively refused to talk to them, they replied saying "ok, we're going to proceed without you then." Sounds like they were wrapping things up…*

*m.   She accused her boss of pimping because he recommended a Michelin star resto to her, she went, then the sous-chef who knew her boss talked to her and paid for her meal.*

*n.   You think there are law firms that will want to hire her? She's toxic.*

*o.   "Now Apple has fired her for supposedly 'leaking' insider information." A brief glance at her twitter feed can resolve the "supposedly" part*

Shaughnessy also "liked" Vyas' posts attacking Gjovik from early September 2021.

> **Deleted:** 2

537.   On September 22 2021, Gjovik finally blocked Shaughnessy ("Neoform") and upon which he replied: "*Lol, you blocked me for giving you the most mild criticism? How thin-skinned are you?*"

538.   On September 12 2021, Gjovik received two calls from an Unknown number on with no voicemail.[270] Gjovik did not pick up and complained on Twitter that Apple needs to email her and keep it in writing if they want to talk. "*if that was #Apple... As I've requested for months now, If @Apple would like to intimidate me, they need to do it in writing only please. Thanks. Appreciate your understanding.*"[271]

539.   Gjovik watched $591,612 in unvested AAPL RSUs disappear that weekend. [272] Gjovik was also due for her annual performance review, which Apple never gave, and would have had her annual bonus awarded with a week or so.

540.   The Press discussed Gjovik's termination and Apple's retaliation against her. A Public Radio representative with over 87,000 Twitter followers publicly commented about "The

> **Deleted:** and termination

---

[270] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437228327555710977
[271] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437179879250960397
[272] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437248801006358532

> **Deleted:** FIRST
> **Deleted:** –
> **Deleted:** ev
> **Deleted:** CRB
> **Deleted:** OCTOBER 25

Ashley Gjovik Story," that "*the irony that Apple fired her during the week of Labor Day, allegedly as retribution for filing a NLRB complaint, should be lost on no one.*"



Andy Ihnatko ✔
@Ihnatko

Finally: yes indeed, the @ashleygjovik story is now on the docket for Friday's tech news roundup on @BosPublicRadio at 1:15-ish. The irony that Apple fired her during the week of Labor Day, allegedly as retribution for filing a NLRB complaint, should be lost on no one.

12:21 AM · Sep 10, 2021 · Twitter Web App

*Exhibit: Boston Public Radio Twitter Post*

541.    A Bloomberg reporter who is covered Gjovik's labor struggle with Apple in depth posted after Gjovik's termination, "*Ashley Gjovik, who was fired by Apple Thursday after filing NLRB, OSHA, and EEOC complaints, has received right-to-sue notices allowing her to sue for discrimination in federal or state court.*" In September, The New York Times described Gjovik's situation with Apple: "*After taking her complaints about #Apple public this year, Ms. Gjovik was placed on leave and later fired. She filed complaints with the NLRB, OSHA, the EEOC, & the Justice Department.*" The close nexus between Gjovik's protected activities and Apple's negative actions towards her was lost on no one.

542.    On September 14 2021, after a fake account on Reddit began posting that Apple employees will get "*Gjovik'd*" if they do not fall in line, Apple employees then began sharing the post and term "*Get Gjovik'd.*" Under information and belief this account was Apple and the term Gjovik'd was a riff off the term "*Steve'd*" which referred to Steve Jobs laying people off.

232

Deleted: :

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

543.   On September 14 2021, Gjovik had the second part of her NLRB affidavit. She posted about it on Twitter.



**Ashley M. Gjøvik**
@ashleygjovik

This morning I have part two of my @NLRB affidavit for my charge against #Apple, alleging Apple violated national labor laws in their conduct towards me.

9:57 AM · Sep 14, 2021 · Twitter Web App

*Exhibit: Gjovik's Twitter Post on 9/14/21*

544.   On September 20 2021, Bertolus' administrative assistant contacted Gjovik notifying Gjovik that Apple would be mailing her the things from her desk back. The assistant sent Gjovik a tracking label on September 29 2021.

545.   On September 15 2021 at 7:40pm PST, Apple's lawyers at O'Melveny & Myers emailed Gjovik a letter implying she was terminated due to several Twitter posts and the video content in a news article.

233

Deleted: .

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

On Sep 15, 2021, at 7:40 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Please see the attached correspondence.

Sincerely,

David

**O'Melveny**

**David R. Eberhart**
deberhart@omm.com
O: +1-415-984-8808

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Website | LinkedIn

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

<Gjovik, Ashley M. IPA.pdf><Sep_15_Gjovik_Letter_FINAL.pdf>

*Exhibit: 9/15/21 email from Eberhart*

234

| Deleted: | FIRST |
| Deleted: | -- |
| Deleted: | cv |
| Deleted: | CRB |
| Deleted: | OCTOBER 25 |

**O'Melveny**

O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823

T: +1 415 984 8700
F: +1 415 984 8701
omm.com

File Number:
600,000-3 (Apple Inc.)

September 15, 2021

**David R. Eberhart**
D: +1 415 984 8808
deberhart@omm.com

**VIA E-MAIL**

Ms. Ashley Gjovik
1050 Benton Street, Apt 2310
Santa Clara, CA 95050
ashleygjovik@icloud.com

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:

https://twitter.com/ashleygjovik/status/1431824501457633283

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-internal user study project. Please remove those images from any public location and refrain from further public disclosures about that project.

The second is the image contained in the following tweet:

https://twitter.com/ashleygjovik/status/1432400136471072769

The related video is located here:

https://volume-assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application during confidential Apple-internal user studies. Please remove that image and video from any public location and refrain from further public disclosures about that application or related user studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you are represented by counsel in this matter, please identify your counsel.

/ / /

Century City • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo

235

| | |
|---|---|
| **Deleted:** FIRST | |
| **Deleted:** -- | |
| **Deleted:** cv | |
| **Deleted:** CRB | |
| **Deleted:** OCTOBER 25 | |

O'Melveny

Sincerely,

/s/ David Eberhart

David R. Eberhart
of O'MELVENY & MYERS LLP

*Exhibit: The O'Melveny & Myers Letter*

546.    The Partner, David Eberhard, pointed to the URLs and asked Gjovik to remove the content, which was black and white photos of Gjovik secretly taken from her iPhone to gather her biometrics without her consent; a video of these images including in her living room, bedroom, bathroom, and in public spaces; and Twitter posts where Gjovik complained about Apple's surveillance, intimidation tactics, overly restrictive confidentiality policies, and ex-Intelligence/ex-military corporate paramilitary team, the *Worldwide Loyalty Team.*"

Sincerely,

/s/ David Eberhart

David R. Eberhart
of O'MELVENY & MYERS LLP

**Deleted:**

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



^ *The Twitter Posts Apple's Lawyer's Demanded that I Delete on Sept 15 2021* ^

*Exhibit: The Posts in Question*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

237



*Exhibit: The Posts in Question*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Exhibit: The Video in Question*

547.   This letter created the implication of surveillance and confirmed actual surveillance of Gjovik by Apple. The message from Apple also expressly told Gjovik that Apple's surveillance of its employees is 'confidential' and speaking of it publicly can result in immediate termination.

548.   In addition to the bizarre and clearly pretextual timeline of events with Kagramanov, Apple's lawyers' communications also show Apple's retaliatory animus by timeline alone. Apple's lawyers contacted Gjovik on September 15 2021, pointing to content posted 16-18 days prior. This is supposedly the same content that Kagramanov reached out to Gjovik about on September 9 2021, saying he had to talk to her "*within the hour*" about. It's also unclear why it took an additional six days after Gjovik's termination for Apple to email Gjovik the URLs of the Twitter posts it supposedly fired Gjovik over. If Apple's post-hoc rationalization was true, then with the posts already identified, it probably only took five minutes to draft the email – something they could have sent on September 9 2021.

549.   Further evidence of Apple's pretext is that after the initial email, Eberhardt then replied with essentially, "*oh hey here's another one or two I just found.*" Its unclear how Apple could be so certain it would fire Gjovik, and have over two weeks to prepare its position and communications with Gjovik, yet Apple forgot about two of the posts it fired her over, but remember them the next day. It's also absurd for a law firm such as OMM to act like they don't know how to file a take-down request for actual Intellectual Property – but they know the content is not Apple's property and their requests would be denied.

---

239

**Deleted:** it and when she simply asked to keep things in writing, Kagramanov suspended her account access. . It's also unclear why it

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Wednesday, September 15, 2021 8:58 PM
**To:** Eberhart, David R. <deberhart@omm.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]

Hello David,

I hope you're well.  Thank you for your email.

I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1431824501457633283
https://twitter.com/ashleygjovik/status/1432400136471072769

As for the video hosted by Vox, I do not have the power to delete it as Vox is in control of their own servers, not me. I am talking others about your request and someone will get back to you related to the Vox hosted video.

—

Ashley M. Gjovik

*Exhibit: OMM Email 9/15*

On Sep 16, 2021, at 8:49 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Dear Ms. Gjovik –
Thank you for your email.

I look forward to further information about Apple's request to remove the video. In the meantime, I note that there are additional tweets that also contain the same or similar images from confidential Apple-internal user studies:

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Please remove those images from any public location, remove any similar images, and refrain from further public disclosures of the same or similar information.
Sincerely,
David

*Exhibit: OMM Email 9/16*

240

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

1

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Friday, September 17, 2021 11:48 AM
**To:** Eberhart, David R. <deberhart@omm.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]

Hi David,

Again, I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Would you please let me know — have you already sent a request to Vox for them to remove the video? Have you received a response from them separately?

--
Ashley M. Gjøvik

On Sep 17, 2021, at 12:40 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Dear Ms. Gjovik --

Thank you for your email.

Based on your September 15 email, we understood that you were in communication with others about removal of the video hosted by Vox. Consequently, we have not separately communicated with Vox. Please let us know the status of the communications you referenced.

Sincerely,

David

*Exhibit: OMM Email 9/17*

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.
**Date:** September 20, 2021 at 11:37:24 AM PDT
**To:** "Eberhart, David R." <deberhart@omm.com>

Hi David,

I hope you're well. I chatted with a journalist over at Vox and they mentioned you'd need to reach out formally with any requests like this. Let me know if you need help getting contact information for their legal team. They thought you might already have it, but if not, I can try to get you a contact over there.

--
Ashley M. Gjøvik

*Exhibit: OMM Email 9/20*

550.    Gjovik obtained a lawyer to respond to Apple's lawyers about Apple's

threatening letter. Gjovik's lawyer, David Hecht, sent Apple a letter on October 6 2021, saying,

"*While I understand that Apple is not opposed to taking aggressive litigation postures (and*

241

Deleted: the Twitter posts. ¶

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law."*

551.    Gjovik's lawyer told Apple, "*Your September 15, 2021, letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect.*"

552.    He then went on to knock down Apple's arguments one by one until nothing was left. Her lawyer closed, "*Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021, letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.*"   Apple never responded.

242

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



David L. Hecht
Partner
P: (212) 851-6821
E: dhecht@hechtpartners.com

October 6, 2021

**VIA E-MAIL**

David R. Eberhart
O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
deberhart@omm.com

<u>**Re: Ashley Gjovik**</u>

Dear Mr. Eberhart,

    I represent Ms. Gjovik.  I am in receipt of your letter dated September 15, 2021 and subsequent email communication with my client.  Going forward, please direct all such correspondence to me.

    As you are aware, Ms. Gjovik has already complied with your September 15, 2021 demand to remove certain images from some of her Twitter posts.  However, I write regarding the inappropriateness of your requests, which may comprise copyright misuse.  While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.

    Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").  You are incorrect.  The IPA does not cover the images/video that Ms. Gjovik posted.  For example, you take issue with Ms. Gjovik's post of screenshots of an automated email sent to Ms. Gjovik from "Ask," "an internal survey solution."  The email itself was not marked as confidential.  Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential.  The content of the automated email also contained nothing that could be considered secret or otherwise proprietary: there was no disclosure of the content, methodology, identity of any participants in the survey (other than Ms. Gjovik), or any of the survey's findings.  The posted image of the email merely noted what was already known

125 Park Avenue, 25th Floor, New York, NY 10017

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

to the public: Apple was conducting 3D scans of human ears to "collect representative ear geometry data across age, gender, and ethnic groups" and to benefit "audio research efforts and better our understanding of ear geometry variance." It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPods products. In fact, Apple's Vice President of Product Marketing, Greg Joswiak, spoke publicly about the 3D ear scans over a year ago:

> "We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Joswiak says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."

*See* Jeremy White, *The secrets behind the runaway success of Apple's AirPods*, Wired (September 5, 2020), *available at* https://www.wired.co.uk/article/apple-airpods-success.

Accordingly, Ms. Gjovik cannot face restriction in disclosing a non-confidential email about the mere existence of a survey concerning 3D ear scanning (scanning that Apple had already publicly disclosed much earlier) sent to her during the period in which Apple put her on administrative leave. Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual.

Your September 15, 2021 letter and subsequent email communication also takes issue with image/video that you contend "were generated by a confidential internal Apple application during confidential Apple-internal user studies." Apple holds no copyright to these images, which were not authored by a human. As you are aware, United States copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *Trade-Mark Cases*, 100 U.S. 82, 94 (1879). Because copyright law is limited to "original intellectual conceptions of the author," Apple would be unable to register any of the images or video generated by the "Glimmer" app since a human being did not create the work. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884). Apple therefore cannot allege infringement of any copyright by Ms. Gjøvik.

To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such. You also have not alleged how mere images of Ms. Gjøvik, in her home, taken by the Glimmer app, on Ms. Gjøvik's own phone, could quality as confidential and/or

244

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

proprietary information under the IPA. For example, your letter fails to acknowledge that the images posted were (a) taken by an automated process running on Ms. Gjøvik's own iPhone and (b) captured her own likeness and portions of her living space. There can be no doubt that Ms. Ms. Gjøvik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the non-proprietary images Ms. Gjøvik posted, she intentionally rendered unreadable any conceivably non-public information when posting these otherwise non-proprietary images. Your claims of any violation of the IPA based on the posting of these images appear, therefore, to have no basis in fact or law.

Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021 letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.

Sincerely,

David L. Hecht
Hecht Partners LLP

cc: Erika Heath, Esq.
Ashley M. Gjøvik

*Exhibit: David Hecht's Letter to Apple's Lawyers re: Gobbler & Ear Canals*

553.    On September 15, 2021, Tim Cook announced an unexpected all hands meeting scheduled for September 17, 2021 with all Apple employees. This was unusual. He also provided a way for staff to submit questions beforehand. Numerous people told Gjøvik they submitted questions about why Apple was mistreating Gjøvik, what Apple was going to do to fix its culture of retaliation, and why Apple had offices on Superfund sites.

554.    On September 21, 2021, Tim Cook sent an email to his staff complaining someone spoke publicly about discussion from the all hands (about pay equity, COVID response, benefits, and other work conditions). Cook said Apple was "doing *everything in our*

245

Deleted: .

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*power to identify those who leaked.*" Cook said, "*people who leak confidential information do not belong here.*"

555.    On September 22 2021, Apple suddenly joined the advisory board of ChemFORWARD, a chemical safety NGO.[273] [Apple had suddenly joined this group on May 7 2021.][274] On October 26 2021, Apple's lobbyists (reporting to Lisa Jackson) suddenly approached the US EPA Chemical Safety & Pollution Prevention program asking for a meeting. On October 27 2021, Apple's ChemFORWARD suddenly partnered with CEPN.[275] On November 2 2021, Apple suddenly got "Electronics Watch" to join their CEPN 'worker safety' group.[276] Electronics Watch includes Gjovik's Occupational Exposure medical doctor, Dr. Robert Harrison, who is in their OHS Advisory Panel.[277] On November 3 2021, Apple co-hosted a chemical safety webinar with its new friends at ChemFORWARD.[278] On November 3 2021, Apple's lobbyists reporting to Lisa Jackson submitted an agenda request to the US EPA Chemical Safety team, requesting a meeting.

556.    Apple notified Gjovik it was mailing her the possessions from her desk and sent a tracking number. Gjovik posted on Twitter the tracking number said the package was about to arrive. On September 29, 2021, another fake Twitter account, "BabyHummingbird," commented to Gjovik via Twitter about the box before she opened it, saying "*Don't open it*!" and included

---

[273] https://twitter.com/ChemForward/status/1308483392170844162; https://www.chemforward.org/news/apples-art-fong-to-lead-chemforward-technical-advisory-group
[274] https://twitter.com/ChemForward/status/1390773254680350722; https://www.chemforward.org/news/apple-and-chemforward-collaboration-offers-affordable-verified-data-on-safer-cleaners-to-protect-worker-health
[275] Oct 27 2021, https://www.chemforward.org/news/chemforward-invited-to-become-a-membernbspof-the-clean-electronics-production-network-org
[276] Nov 2 2021, https://electronicswatch.org/en/electronics-watch-joins-the-clean-electronics-production-network_2597317
[277] Electronics Watch, OHS Advisory Panel, https://electronicswatch.org/ohs-advisory-panel_2581888
[278] https://www.chemforward.org/news/november-3rd-webinar-recap; https://twitter.com/ChemForward/status/1466170142589657092

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

an image from the movie SE7EN that implies it contained a severed head of one of her loved ones.[279]



*Exhibit: The "Severed Head" Post*

557.   BabyHummingbird's Twitter account had just a small number of posts, almost entirely directed at Gjovik. BabyHummingbird also liked posts about Gjovik, including the "don't get Gjovik'd" posts. BabyHummingbird's first "like" was a post from 2014 that said, "Apple's Back, Better than Ever." Under information and belief, "BabyHummingbird" was Apple.



*Exhibit: First "Like" from BabyHummingbird*

_____

[279] 18 U.S.C. § 876(c) prohibits mailing "any threat to kidnap any person or any threat to injure the person of the addressee or of another."



Deleted:
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

558.   On September 30 2021, Gjovik received a box of her personal items, full of broken glass.




Deleted:

559.   On October 1 2021, another fake Twitter account, "FemaleInTech," commented on one of Gjovik's Twitter posts where Gjovik complained she just "*spent 5min pulling a chunk of glass out of the sole of my foot & I'd like to remind everyone that #Apple sent me this box of spite after taking away my health insurance the day I was fired.*" The Apple account replied, "*I think it would also be really impactful to post a picture of your bleeding wounds w/ a tweet calling out their HR people by name. At this point why not shame the individuals there for their unambiguous, documented spitefulness with horrifying photographic evidence!*"  Assumably Apple wanted Gjovik to call out "people by name" as a preemptive defense of individual liability for their actions and wanted a photo to assess liability for the physical harm. Under information and belief, FemaleInTech, is Apple because the account was primarily used to post about and to Gjovik, did not seem authentic, and made several highly suspicious posts/comments.

Deleted: complaining

Deleted: An

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

248

560.   On October 2 2021, the "FemaleinTech" Apple account attempted to manipulate Gjovik to get access to Gjovik's computer randomly offering to edit XMLs on Gjovik's system. On November 5 2021, the same account attempted to direct Gjovik to a specific 3rd party iPhone repair shop, which after realizing the account was Apple, now Gjovik believes was another attempt to modify her devices for surveillance. [California's Consumer Protection Against Computer Spyware makes it illegal for anyone to install software on someone else's computer and willfully or in a deliberately deceptive way to use it for wrongful purposes.][280]

### xvi.   Gjovik Files More Charges: EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021)

561.   On October 7 2021, the US EPA sent a letter to Northrop Grumman with a report of the August 29 2021 inspection. The letter notes "the purpose of the [August 19 2021] site visit was for EPA to inspect the following … to assess the potential for vapor intrusion into the building," including:

- "The sub-slab depressurization (SSD) system that was installed underneath the three connected site buildings that passively vents soil gas vapors to the atmosphere.
- The building's concrete slab and the April 2015 cracks that where sealed to prevent potential vapor intrusion. The building's concrete slab and penetrations from pipes or seams.
- The previously installed soil gas sampling vapor ports.
- …The operation of the HVAC system and the HVAC air venting and intakes on the roof…
- A review of any post-2015 building modifications or changes to the buildings…"[281]

---

[280] Cal. Bus. & Prof. Code §§ 22947.2 to 22947.4.
[281] US EPA, Re: EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue [sic], Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088), October 7 2021, https://semspub.epa.gov/work/09/100025885.pdf

249

562.   US EPA also requested a number of corrective actions from Northrop Grumman and Apple, including fixing the HVAC/vent situation (see exhibit), and locating/fixing several sub-slab vent ports inside the building (the same ones Gjovik had complained about).[282]

over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

*Exhibit: October 7 2021 Letter re: SSD System Vent Pipes*

563.   On October 9 2021, Gjovik posted a Twitter thread about Apple and the Worldwide Loyalty enterprise firing her after she had posted on Twitter about Apple breaking into someone's home in 2011. Someone posted it on the "HackerNews" forum and quickly a number of very suspicious account began posting horrible things about Gjovik including a self-identified current Apple employee (azinman2) calling her "*a nutcase,*" and saying she has "*negative credibility.*" Another suspicious account (0des) also defended Apple, condemned Gjovik, and bolstered the posts of azinman2. Both began accusing anyone who supported Gjovik as being Gjovik herself and a "*sockpuppet.*" Another suspect account joined (n0000d3js) which

---

[282] Id.

Deleted: Apple's

Deleted: team

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

not only harassed Gjovik but also defended Apple's break-in of the person's apartment in 2011 and said Apple's actions "*didn't break the law*."[283] Under information and belief all of these accounts were Apple.

564.    Posts in support of Gjovik were quickly flagged and removed, while posts Gjovik reported as harassment were ignored and left up, and when Gjovik tried to defend herself in the thread her posts were quickly flagged and removed by moderators. Under information and belief Apple has moderator/admin control over HackerNews threads. In that HackerNews thread, people then complained about the suspect accounts writing "*Are you Global Security or something? What makes you so invested in defending the wealthiest company on earth*?" Another posted, "*It's actually quite concerning and even a little suspicious that so many defamatory comments are linking criticism of the workplace with mental illness.*" Another added, '*If Apple is actually sending people to employee's homes, what's to stop them from manipulating discourse on forums such as this? They certainly have the money and the expertise to do it. If this is at all a concern, what is this forum doing to prevent that from happening*?" Another added, "*They definitely do this on MacRumors just look at any comment section there.*" Another added, "*This thread looks very sus. The way few accounts are defending apple and accusing the employee raises more eyebrows on apple.*[284]

565.    Gjovik saw all of this playout in real time as she was tagged by HackerNews and read the comments as they came in. Gjovik posted on Twitter complaining it was clear Apple Global Security was behind many of the comments and they were further retaliating against her for the thread she posted about Apple's misconduct.

---

[283] HackerNews, https://news.ycombinator.com/item?id=28811746
[284] HackerNews, https://news.ycombinator.com/item?id=28811746

251

**Deleted:** *macrumors*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

566.    On October 12 2021, Gjovik filed two additional NLRB charges Apple, alleging Cook's email, and Apple's NDAs and employment policies (including surveillance) violate federal labor laws in numerous ways outlined with footnotes in her brief, Gjovik's charges were covered in the Press with quotes from prior NLRB leadership commenting on the strength of Gjovik's case. (The NLRB issued a decision of merit agreeing with Gjovik on January 29, 2023).

567.    Implied by the OMM letter, Apple's proffered reasons for Gjovik's termination were so farfetched and pretextual, a detailed article was written about exactly that, titled "*Apple Wanted Her Fired. It Settled on an Absurd Excuse.*"[285] The October 14, 2021 articles explained the background of Gjovik's whistleblowing about toxic waste, harassment, and cover-ups as it was clearly the reasons for Gjovik's termination.

---

[285] Dell Cameron, *Apple Wanted Her Fired. It Settled on an Absurd Excuse*, Gizmodo, Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789



*Exhibit: The Oct 15 2021 Article*

568.    On October 14, 2021 a discussion board account, "SlushierCupid", apparently created to celebrate Apple's legal win over Epic Games before transitioning to harassing Gjovik, posted in the comments for the "*Absurd Excuse*" article: "*This woman's tweets show she is both unhinged and a narcissist. I don't buy her story. What I do buy is that she is probably difficult to get along with and doing what many culturally brainwashed individuals do these days and play the victim card, hoping for attention and a payout.*" Commentors replied saying "*you're definitely not an Apple employee or contractor trying to smear her,*" and "*Apple's crisis team is on the move, I see*!" "SlushierCupid" added "*She attends law school, she knew she was going to be fired for whatever ridiculous reason Apple gave. I knew my brother would punch me when I*

253

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*irritated him non stop.*" Other accounts responded calling "SlushierCupid" an "*apple shill*" and noted all their pasts posts were "*in defense of [their] corporate master.*"

569.     On October 15 2021, "SlushierCupid" continued to post replies harassing and defaming Gjovik, now increasingly referencing Gjovik's apartment next to the 3250 Scott Blvd factory and Gjovik's Apple office on a Superfund site. They posed, "*I can not find a piece of evidence from any environmental agency or environmental non-profit who said her claims were valid either for the "poisoning" at work or the "poisoning" at home. If I am wrong, please point it out.*"

570.     Under information and belief SlushierCupid was a member of Apple Global Security team and Worldwide Loyalty enterprise posting on behalf of Apple. Under information and belief SlushierCupid was involved in or aware of Apple's activities starting around August 2021 with joining chemical safety and environmental health NGOs in order to prevent them from supporting Gjovik. Under information and belief SlushierCupid was involved in or aware of Apple's conspiracy with the US EPA to cover-up what happened at Gjovik's office.

571.     On October 16 2021, Apple requested a "no-action" letter from the US SEC related to a shareholder proposal requesting a vote on a request for Apple to conduct a risk assessment on its use of NDAs to cover-up unlawful conduct. Apple's letter to SEC failed to mention they were actively under investigation by the NLRB over their NDAs, based on Gjovik's charges. Apple instead claimed its NDAs and use of NDAs was legal and ethical, so there was no reason to think there was any issue and thus there was no need to have a vote. Gjovik alleged this was fraud.[286]

_____

[286] *Hawran v. Hixson* (2012) 209 CA4th 256, 280-281, 147 CR3d 88, 109 (collecting cases) – (Corporation's press release was not a "fair report" of an SEC investigation where it did not report on, summarize or describe the SEC proceeding or investigation, the history of that proceeding, or any communications made in the course of the investigation and where nothing in the release provided the "gist" or "sting" of the SEC's charges or proceedings.)

Deleted: team

Deleted: need

Deleted: have a vote.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

572.    Around October 26 2021, Appleseed messaged one of Gjovik's friends and told them Gjovik was "*lying about a bunch of stuff,*" "*lied to the public, to the government, about what happened to her.*"

573.    On October 26 2021, Gjovik filed an SEC whistleblower tip alleging shareholder fraud when Apple had filed a no-action letter trying to block a shareholder vote about Apple's use of overly restrictive NDAs. Apple's response had completely omitted the NLRB was actively investigating Apple's policies based on a NRLB charge Gjovik had filed a week prior. Apple was actively trying to suppress shareholder voting about an issue it knew it was in trouble over and tried to mislead the SEC in order to prevent that vote. As noted, the NLRB confirmed in January 2023 the policies did violate US labor laws. On October 26 2021, Gjovik then emailed her NLRB investigator to complain that Apple was "*literally lying to the SEC*". Gjovik wrote that the situation at Apple was like "*Waco meets Enron.*"

574.    On November 16 2021, Gjovik asked US Department of Labor to confirm if they included CERCLA, SOX, and other relevant statutes in her case, in addition to OSHA Act. US Department of Labor (Andrea Diangco) then suddenly tried to dismiss her entire case and claimed it was never opened, despite FOIA documents revealing it was open and the investigator, Andrea Diangco, was making false and misleading statements.

575.    On November 23 2021, US EPA Chemical Safety replied to Apple's lobbyists and confirmed the agenda which included: the Chemical Safer Choice Partner of the Year Award. On November 29 2021, Lisa Jackson, prior head of the US EPA and current Apple VP of Lobbying, emailed the current head of the US EPA a letter of recommendation for the person she wanted to run US EPA's Region 9 office, which oversees the majority of Apple's federally regulated offices and facilities. Jackson sent the letter from her Apple work email account.

255

---

**Deleted:** fraudulent statements to the US

**Deleted:** .

**Deleted:** ¶
    **<#>Apple Works to Capture and Influence Government Agencies to Ignore Gjovik and Ignore Apple's Environmental/Safety Violations (October-December 2021)¶**
<#>On September 22 2021, Apple suddenly joined the advisory board of ChemFORWARD, a chemical safety NGO.²⁸⁷ [Apple had suddenly joined this group in on May 7 2021.]²⁸⁸¶
<#>On October 26 2021, Apple's lobbyists (reporting to Lisa Jackson) suddenly approached the US EPA Chemical Safety & Pollution Prevention program asking for a meeting.¶
<#>On October 27 2021, Apple's ChemFORWARD suddenly partnered with CEPN.²⁸⁹¶
<#>On November 2 2021, Apple suddenly gets "Electronics Watch" to join their CEPN 'worker safety' group.²⁹⁰ Electronics Watch includes Gjovik's Occupational Exposure medical doctor, Dr. Robert Harrison, who is in their OHS Advisory Panel.²⁹¹¶
<#>On November 3 2021, Apple co-hosts a chemical safety webinar with its new friends at ChemFORWARD.²⁹²¶
<#>On November 3 2021, Apple's lobbyists reporting to Lisa Jackson submit an agenda request to the US EPA Chemical Safety team, requesting a meeting.¶

**Deleted:** replies

**Deleted:** confirms

**Deleted:** includes

**Deleted:** chemical

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Message

**From:** Lisa Jackson [lisa_jackson@apple.com]
**Sent:** 11/29/2021 9:52:56 PM
**To:** Regan, Michael [Regan.Michael@epa.gov]
**CC:** Utech, Dan [Utech.Dan@epa.gov]
**Subject:** Recommendation for Ex. 6 Personal Privacy Region 9
**Attachments:** Ex. 6 Personal Privacy

*Exhibit: Lisa Jackson's Letter of Rec Email – 11/29/21*

256

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

# Lisa P. Jackson

Ex. 6 Personal Privacy

November 29, 2021

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC  20004

Dear Administrator Regan:

I am writing to express my strong support for the nomination of [Ex. 6 Personal Privacy] to the position of Region 9 Administrator at the U.S. Environmental Protection Agency.

[_____] is a collaborative leader who has dedicated [Ex. 6] career to protecting human health and the environment. [Ex. 6] has demonstrated a sustained ability to tackle complex challenges and has strong relationships, respect and trust across a number of stakeholders in Region 9 and nationally.

If selected as Region 9 Administrator, [Ex. 6] is committed to centering environmental justice communities in the Region's work, and clearly understands the need and opportunities for partnership between states and the federal government in implementing goals around climate, equity, justice, and jobs. I am confident that [Ex. 6] will work to ensure stakeholders across all states in the region have an equal voice and seat at the table.

I believe that [_____] experience, expertise, relationships, and values will position [Ex. 6 PP] to be a great fit to lead EPA's Region 9. I fully support [Ex. 6] nomination and look forward to working with [Ex. 6] to advance environmental justice and increase access to reliable, clean energy in this critical region.

Sincerely yours,

Lisa P. Jackson

Cc: Dan Utech, EPA Chief of Staff

ED_013249C_00000003-00001

*Exhibit: Lisa Jackson's Letter of Rec– 11/29/21*

257

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

576. On December 1 2021, Diangco finally contacted US EPA about Gjovik's case and asked, "*did Gjovik report any CERCLA violations to you*?" US EPA (Chip) then met with US DOL (Diangco) to discuss Gjovik's complaints and the office. On December 12, 2021, the US Department of Labor docketed Gjovik's Whistleblower Protection Cases.

577. On December 8 2021, Gjovik received an email from her website webform from a "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from "The Messenger," said, "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple.*" The email then quoted Matthew 5:38-42 from the Christian Bible. Under information and belief, the email came from Apple at or around Apple's first manufacturing facility in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data center.[293]

578. On December 13, 2021, Appleseed posted that Gjovik's claims were "*full-out fabricated nonsense that borders conspiracy.*" On December 30, 2021, Appleseed posted that Gjovik has "*narcissistic personality disorder*" and urged people to ignore her.

579. A December 13 2021, Financial Times article was published on December 13, 2021, which said:

"The labour department will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defense company responsible for the dump — and maintenance — of waste

[293] NY Times, "Apple *Computers Used to Be Built in the U.S. It Was a Mess.*," Dec 2018, https://www.nytimes.com/2018/12/15/business/apple-california-manufacturing-history.html; CultureofMac, *A brief history of Apple's misadventures in manufacturing: Part 1*, https://www.cultofmac.com/616044/a-brief-history-of-apples-misadventures-in-manufacturing-part-1-cook-book-leftovers/

Deleted: defence

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

materials beneath the Sunnyvale office. Sugar could not be immediately reached for comment. "Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board. "Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."[294]

580.    On December 13 2021, US EPA (Chip) sent US DOL (Diangco) a copy of the October 7 2021 report about the August 19 2021 inspection of Gjovik's office. At this time Gjovik still did not know there was an inspection by US EPA due to her complaints. Diangco would never tell Gjovik about it or disclose that she knew about it. Chip would finally tell Gjovik in May of 2022.

581.    On December 14 2021, the US DOJ contacted Gjovik confirming receipt of a complaint she sent to their antitrust division in November of 2021.

582.    On December 15, 2021, Apple (represented by Art Fong) was part of a chemical safety webinar which discussed the dangers of certain 'restricted substances' including Benzene, Toluene, Methanol, TCE, and NMP (N-Methyl-Pyrrolidone).[295] The presentation discussed Apple's new program "Towards Zero Exposure" where it claimed to protect workers from chemical exposure. Apple noted "Participating Organizations" in the project which included "Electronics Watch" (Gjovik's chemical exposure doctor, Dr. Harrison); "ICRT" (the Silicon Valley chemical/labor activist Ted Smith), and Santa Cara University (Gjovik's law school).

---

[294] Financial Times, *"Apple faces probe over whether it retaliated against whistleblower,"* Dec 13 2021, https://www.ft.com/content/973aae8d-21d9-4e84-8912-ead071c7935d
[295] https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

583.   Under information and belief, Apple's decision to join these groups and participate in chemical safety/labor projects was part of a formal public relations/legal strategy devised by Apple to capture the NGOs and activists that would hold them accountable if it came out what Apple was doing, to continue making false statements about their practices but now for a larger audience, and to create 'talking points' for their defense, and for applications to additional programs with the same goals noted above. When Apple applied for the 2023 US EPA chemical safety Safer Choice Partner of the Year award, Apple cited evidence of why it deserves the award as its partnerships with ChemFORWARD, CEPN, and other groups it joined in 2021.[296]

584.   On December 20 2021, the US EPA responded to an IndependentUK reporter who had reached out asking about Gjovik and her office. US EPA said exposure was under control at the site and failed to mention the inspection or ongoing corrective actions.

585.   On December 26 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank and witness retaliation claim against Apple, citing 18 USC § 1513.[298]

586.   On December 29, 2021, Appleseed messaged one of Gjovik's friends claiming Gjovik was *"perjuring herself."* On December 30, 2021, Appleseed messaged once of Gjovik's friends saying Appleseed was *"one of Apple's witnesses against [Gjovik]"*.

587.   On December 31 2021, someone began making problematic edits to Gjovik's Wikipedia article that had been created only the day prior. The edits included specific harassment Gjovik had received from Appleseed and Gjovik quickly realized the account was

---

[296] Note: In September 2022, Apple was caught funding an "astroturf lobbying group" that acted as if it was independent but was influenced by Apple and made statements in support of Apple's interests, even including amicus briefs. https://gizmodo.com/apple-lobby-app-developers-1849554671
https://twitter.com/ashleygjovik/status/1696344092265845100
[298] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434820337166786563

260

**Deleted:** they were

**Deleted:** --

**Deleted:** ¶
    <#>**Apple's Harassment of Gjovik Becomes Increasingly Deranged (September-December 2021)**¶
<#>On October 2, 2021, an Apple account attempted to manipulate Gjovik to get access to Gjovik's computer. On November 5 2021, the same Apple account attempted to direct Gjovik to a specific 3rd party iPhone repair shop, which after realizing the account was Apple, now Gjovik believes was another attempt to modify her devices for surveillance.¶
<#>A coworker called "Joanna Appleseed" (alias because this person tried to sue Gjovik last year for naming her in charges and legal filings alleging witness intimidation, and Gjovik fears she might try to do it again) who worked in Apple's *Worldwide Loyalty* team, posted on social media about Gjovik's government complaints and investigations claiming they were meritless, and Gjovik was lying. ¶
<#>Appleseed posted on September 9, 2021, that Gjovik's NLRB charge may not have merit and she does not believe in Gjovik's charges; on September 13 2021 she posted that Gjovik's EEOC and DFEH charges were meritless, on September 26 posted that Gjovik was lying about being put on leave and that Gjovik *"leaked IP,"* and again on November 1 2021 referencing *"evidence"* and jury *"verdicts"*. On September 16 she posted that no one should donate to Gjovik's GoFundMe and called Gjovik a *"predator,"* On October 25, 2021, Appleseed posted that Gjovik's *"complaints with federal and state agencies"* do not have merit and that Gjovik was not being *"honest or genuine"* in filing the charges, and that Gjovik was *"harmful"* for doing so. ¶
<#>On December 8 2021, Gjovik received an email from her website webform from a "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from "The Messenger," said, *"Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple."* The email then quoted Matthew 5:38-42 from the Christian Bible. ¶
<#>Under information and belief, the email came from Apple at or around Apple's first manufacturing facility in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data center.[29]¶
<#>On December 13, 2021, Appleseed posted that Gjovik's claims were *"full-out fabricated nonsense that borders conspiracy."* On December 30, 2021, Appleseed posted that Gjovik has *"narcissistic personality disorder"* and urged people to ignore her. On December 25-29, 2021, Appleseed messaged one of Gjovik's friends and told them Gjovik was *"lying about a bunch of stuff," "lied to the public, to the government, about what happened to her."* …

**Deleted:** ¶
    <#>**The Government Responds to Gjovik; Some Agencies Complicit in the Cover-Up; Gjovik Escalates Further; Apple Bites Back (December 2021-January 2021)**¶
<#>On December 13 2021, US EPA (Chip) sent US DOL (Diangco) a copy of the Ocotber 7 2021 report about the August 19 2021 inspection of Gjovik's office. At this time Gjovik still did not know there was an inspection by US EPA due to her complaints. Diangco would never tell Gjovik about it or disclose that she knew about it. Chip would finally tell Gjovik in May of 2022.¶   … [13]

**Deleted:** funding

**Deleted:** intersts

**Deleted:** FIRST

**Deleted:** --

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

Appleseed operating under an alias of "SquareInARoundHole" which is a reference to a famous Apple commercial. Appleseed would deny it was her and even claim Gjovik's complaints about Appleseed's harassment were harassing Appleseed. In November 2022, Wikipedia administrators confirmed SquareInARoundHole was indeed Appleseed and she was banned.

588.    On January 9 2022, Gjovik posted a Twitter thread summarizing what happened with Apple. Gjovik reflected: "*In July [2021], I was like, you know, it seems weird that you're doing RICO shit to me like witness intimidation about this office… Is this your normal MO or is it because apparently the CEO of the corp that dumped those chemicals is now on the Apple board of directors? Maybe also because the person who ran the US EPA reports to Tim cook now? They didn't like any of that. I filed some SEC charges about it. I filed a lot of charges. Then one eventful day, a Russian interrogator from Apple's workplace violence team said hello*"

589.    On or around January 10 2022, Gjovik filed complaints about witness intimidation and witness retaliation to NLRB, US Department of Labor, and California Department of Labor. Gjovik posted on social media it was filed and suggested Apple send cease & desist, and document retention notices to a number of managers and employees including Vyas, Mondello, and Appleseed.[300] Gjovik drafted several legal documents on the matter including a legal brief, image exhibits, and a detailed dossier with the text of all of the accounts and posts Gjovik believed to be Apple, not only quoting the posts in question, but positioning the posts in larger threads/conversations, and preparing summaries of red flags for the accounts (like created only to harass Gjovik). Gjovik also organized the most problematic posts/comments by type of propaganda.

---

[300] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1481760216978837505; https://twitter.com/ashleygjovik/status/1481026531438706689

Deleted: .

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

590.   On or around January 10 2022, Appleseed filed an FBI report against Gjovik charging Gjovik with "criminal extortion and blackmail."[301]

591.   Around this time Appleseed filed a false report to the FBI accusing Gjovik of "*criminal extortion and blackmail*" and apparently reported Gjovik to a police department. [302]

592.   On January 11 2022, Gjovik was notified by Twitter that someone reported Gjovik's Twitter posts (complaining of harassment) to German law enforcement.

593.   On January 11 2022, Gjovik posted about her latest NLRB charge:

-   Ashley Gjovik: *Hi @Apple, #Apple, @tim_cook Just to be clear, my Jan 11 #NLRB filing will name the following Apple managers (& ICs as their/your agents), as known participants in this 5 month harassment & defamation campaign against me, in retaliation for PA & filing NLRB charge on Aug 26*

-   Ashley Gjovik: *I recommend you this send the Document Retention notices + some sort of C&D missive to them now. Known Managers: Ricky Mondello, Faye Garfinkle Suspected Mgs: Rob Marini, Brad Reigel Known ICs: [Appleseed], Shantini Vyas, Kev Kitchens, Amanda Harrison Sus ICs: TBD*

-   Ashley Gjovik: *First order of business for the C&D is to tell them to stop reporting me to local and federal law enforcement, and domestic and foreign governments in bad faith, for meritless, retaliatory accusations. (Otherwise this is def how i'm getting the RICO charge, y'all)"*

594.   In January-February of 2022, Apple (including Appleseed) reported a number of Gjovik's social media posts and had the content removed. This included a Scribd document consisting of Apple's workplace surveillance policies, a legal memo Gjovik wrote documenting Apple's witness intimidation and retaliation,[303] and photos of Brad Reigel and Rob Marini. The

---

[301] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik,* 22CIV01704KCX, King County District Court, Court of Limited Jurisdiction, State of Washington (2022).
[302]
[303] DELETED: Ashley Gjovik v Apple Inc; Evidence Report, Link: https://www.scribd.com/document/555822358/Ashley-Gjovik-v-Apple-Inc-Propaganda-

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

latter two removals were confirmed by Appleseed to be a joint effort between Apple and Appleseed.[304] Gjovik did not know it was Appleseed orchestrating the deletions of her legal filings posted on Scribd until later, but at that time, Gjovik already knew to blame Apple: "*So if a federal witness is complaining to fed law enforcement about witness intimidation & threats by Apple Inc in violation of numerous laws & she's sending gov agencies Scribd links of her filings & evidence & Apple appears to be deleting her evidence OBSTRUCTION OF JUSTICE?*"

595.    In January 2022, Gjovik contacted a VICE reporter Lorenzo Franceschi-Biccierai. Gjovik told him that she just discovered an article he wrote about Apple in July 2021 about "Apple IP leakers" spying on Apple employees for Apple,[305] and that she thought Apple was doing something similar with current labor organizing. Gjovik complained to Lorenzo that Appleseed worked for Global Security and one of the few other named persons involved in Appleseed's supposed employee union organizing was a known "IP leaker" named "StellaFudge."

596.    Appleseed apparently asked StellaFudge to set up a Discord chat service where Apple employees could go to strategize organizing and unions at Apple. StellaFudge had previously "leaked" prototypes and other information that the VICE articles had said would be forgiven by Apple if the person then becomes a spy for Apple against Apple's employees. While hosting this labor organizing Discord server, StellaFudge continued to "leak" new IP, including prototype hardware.

---

Campaign-Final-v1; Ashley Gjovik v Apple Inc; Evidence Report, Link: https://www.scribd.com/document/557503681/Gjovik-v-Apple-Intimidation-Campaign-Evidence-Report
[304] See, email from Appleseed to Gjovik on February 5 2022.
[305] VICE, *Apple Tells Leaker to Snitch on Sources or It Will Report Them to the Police*, July 2021, https://www.vice.com/en/article/dyv5bm/apple-tells-leaker-to-snitch-on-sources-or-it-will-report-them-to-the-police

Deleted: And

Deleted: the

Deleted: .

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

597.     Under information and belief Apple has been spying on the labor and union

organizing of its employees in the Discord server via access granted by StellaFudge.  Under

information Gjovik's messages to Lorenzo about this were seen or known about by Apple, and

Gjovik's discovery about this was one of the reasons Apple swiftly obtained a gag order against

Gjovik.

598.     On January 25 2022, Gjovik emailed the NLRB about her January 10 2022

witness intimidation charge and attached a 77-page rough draft of the Evidence Report.

| From | 🔒 Ashley Gjovik <ashleymgjovik@protonm... | ☆ 🔖 📎 | Jan 25, 2022 |
| To | Sollett, Mathew <Mathew.Sollett@nlrb.gov> | | ∧ |

Tuesday, January 25th, 2022 at 4:14 AM

Hi Mathew,

That sounds great! Looking forward to talking tomorrow.

Btw, I'm still finalizing it, but the working draft of my memo for the latest charge is attached if you want to skim it before we chat. I'm targeting to have a final version by Friday.

*Exhibit: Gjovik Notifies NLRB of Incoming Witness Intimidation Allegations & Report*

264

Deleted: Gjoviks'

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

---

**U.S. NATIONAL LABOR REVIEW BOARD**
COMPLAINT AGAINST APPLE INC. | HARASSMENT DRAFT V1
CHARGE: CA-288816

**Sept 1 8:27pm - Public Twitter.com Post[46]**

- **Shantini Vyas**: Okay at the risk of *gestures wildly at Twitter*. Apple is a big company. It's got some problems. But it's a great place to work for a lot of people. A certain employee has made it their mission to bring down Apple through whatever means necessary. Including straight LIES.
  - **Shantini Vyas**: This is about a person whose name starts with "A."
  - **Shantini Vyas**: Did they suffer abuse? Not my place to speculate. However, they have lied about actions Apple has taken. They have misled people by leaving out key details. They find new angles to make all of the Apple out to be the Big Bad Guy. The goalposts move hourly.
  - **Shantini Vyas**: They say things like: Apple violated my private by accessing my data. Full picture: Apple accessed data from an Apple-owned prototype device that comes with no expectation of privacy.
  - **Shantini Vyas**: This person has taken the spotlight for themselves and deliberately undermined others' concerted efforts to improve and challenge the company. Through their actions this person contributes to an insidious narrative: that women make things up and are trying to get attention.
  - **Shantini Vyas**: This is so damaging to other women. To those afraid to speak up. By creating bogus, unsubstantiated filings with the DOJ and other regulatory bodies, this person has just endangered the future cases of people with legitimate claims.
  - **Shantini Vyas**: This person has a lot of support. They've gained it by taking advantage of the anger and frustration of other people. It's predatory. They weaponize their

*Exhibit: Example Page from 1/25/22 Draft of Report*

599.   On January 31 2022, Gjovik posted on Twitter that she planned to submit her legal filings about the witness intimidation to the US Department of Justice, in addition to the whistleblower and labor agencies. Gjovik commented that Apple's actions were "criminal."[306]

600.   On January 31, 2022, Appleseed sued Gjovik in a Washington state court requesting an anti-harassment restraining order.[307] Appleseed cited Gjovik's Evidence Report and January 10 2022, NLRB charge against Apple on her petition, writing under other pending litigation: "*NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik.*" Appleseed repeatedly mentioned Gjovik's federal legal filing about the witness intimidation.

---

[306] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1488305820496322560
[307] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

265

**Deleted:** ,
**Deleted:** ,
**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

601.   After filing the retaliatory lawsuit against Gjovik on January 31 2021, Appleseed then posted on her Twitter account several hours later, a photo of an Apple Global Security 'challenge coin.'



*Exhibit: Posted by Appleseed on Jan 31 2022*

602.   Between February 3 - February 9 2022, Gjovik submitted the final draft (ending at version 9) of her legal memo and evidence report (the "Evidence Report") to the government agencies looking into her complaints.

**Deleted:** In

**Deleted:** 2022,

**Deleted:** reported a number

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25



From 🔄 🔒 Ashley Gjovik <ashleymgjovik@protonmai... ⭐ 📕 Feb 3, 2022
To   Kilpatrick, Elizabeth <Elizabeth.Kilpatrick@nlrb.gov>

Thursday, February 3rd, 2022 at 4:36 AM

Hi Elizabeth! Sorry for the delay; I finally wrapped up my evidence report for my most recent NLRB charge, the harassment & propaganda campaign. Attached! I sent it over to Mathew just now too.

This campaign definitely made me want to give up on just about everything (which I assume was the intent), and I didn't even notice at the time how often they were hinting at assassination or other physical violence. Realizing it was Apple making that severed head reference definitely will be a topic for therapy this week.

I talked to Mathew about precedent last week, but I assume the 2020 Barstool Sports and 2021 Tesla & The Federalist cases will probably be strong precedent for unfair labor practices via Twitter.

*Exhibit: Gjovik Submits Final Evidence Report to NLRB*

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25



Case 2:22-cv-00807-RAJ-BAT   Document 15-9   Filed 06/23/22   Page 1 of 327

**Ashley M. Gjovik**
Juris Doctor Candidate & Public International Law Certificate Candidate
Santa Clara University, Class of 2022

For Submission To:
- U.S. NLRB: Region 32 & Office of General Counsel
- U.S. Department of Labor: Whistleblower Protection Program
- U.S. Attorney's Office: Northern District of California
- California DOJ: Office of the Attorney General
- California Department of Labor: DIR Labor Commissioners

MS. ASHLEY GJOVIK

    Complainant,

    v.

APPLE INC., *et al.,*

    Respondent.

**Case No.:**
U.S. Dept of Labor: 9-3290-22-051
U.S. NLRB: 32-CA- 282142, 283161, 284428 & 284441, & 288816
U.S. EEOC 556-2021-00608
U.S. SEC: 16304-612-987-465 & 16353-506-600-213
CA Dept of Labor: RCI-CM-842830

**LEGAL MEMO**
**Date Action filed:** February 7, 2022

**Charges:**
National Labor Relations Act §8(a)(1)
National Labor Relations Act §8(a)(4)
CERCLA, 42 U.S.C. §9610
SOX 18 U.S.C.A. §1514A
OSHA §11(c) 29 U.S.C. §660
18 U.S.C. §1512(a),(b),(c),(d)
18 U.S.C. §1505
18 U.S.C. 1513
18 U.S.C. §371
18 U.S.C. §876
Dodd-Frank 15 U.S.C. §78u-6(h)(1)(A)(iii)
Racketeer Influenced & Corrupt Organizations Act
Civil Rights Act Title VII, 42 U.S.C. §2000e
CA Labor Code §232.5, §6310, §1102.5, §6399, & §132(a)

*Exhibit: Gjovik's Final "Evidence Report" Cover Page*

603.    The document included hundreds of pages of direct quotes of public statements and direct messages sent by named people, and anonymous accounts Gjovik was nearly certain were Apple, organized by type of propaganda, and then by date. Appleseed (who's harassment was captured in the report, linked to her official Twitter account) would soon sue Gjovik alleging the Evidence Report was criminal harassment, among other crimes supposedly committed against her by Gjovik.

268

Deleted: social media posts and had the content removed. This included a Scribd *Final "Evidence Report" Cover Page*

Deleted: consisting

Deleted: Apple's workplace surveillance policies, a legal memo

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

## ASHLEY GJOVIK V APPLE INC

### INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

**TABLE OF CONTENTS**

HARASSMENT CAMPAIGN EVIDENCE REPORT ........................................................................ 1

CHARGES ........................................................................................................................ 5
    ASSOCIATED CHARGES & CASES ................................................................................ 5

SUMMARY ...................................................................................................................... 5

REVIEW METHODOLOGY .................................................................................................. 9

UNLAWFUL THREATS MADE BY APPLE INC ....................................................................... 10
    THREATS OF VIOLENCE .............................................................................................. 10
    THREATS OF TERMINATION & RETALIATION .............................................................. 12
    THREATS OF BLACKLISTING; RUINING LEGAL CAREER ................................................ 14
    THREATS AGAINST FRIENDS & COLLOGUES ............................................................... 17

APPLE INC'S RETALIATORY ANIMUS .................................................................................. 18
    FORBIDDEN ANIMUS ................................................................................................ 18

APPLE INC'S LAWFARE ..................................................................................................... 20
    LAWFARE: THREATS OF LITIGATION; PROSECUTION; BANKRUPTCY; "RUIN" ................ 20
    LAWFARE: COERCION TO WITHDRAW
    CHARGES & COMPLAINTS .......................................................................................... 23
    LAWFARE: DOUBT; DISINFORMATION; FALSE ACCUSATIONS ....................................... 27

ANTI-UNION & ANTI-LABOR THREATS & COERCION ............................................................. 32

DISCRIMINATION DUE TO SEX &/OR DISABILITY ................................................................. 33

EVIDENCE OF PROPAGANDA BY TYPE ................................................................................. 37
    THE BIG LIE (*GROSE LÜGE*) = AD NAUSEAM & RATIONALIZATION ............................... 37
    DIVIDE & RULE; BLACK/WHITE FALLACY; FACTIONS ................................................... 42
    VIRTUE WORDS; APPEAL TO PREJUDICE; TRANSFER; MORAL PANIC; FEAR-MONGERING ... 44
    CULT OF PERSONALITY; DEMAGOGUE; APPEAL TO AUTHORITY ..................................... 47
    BANDWAGON & INEVITABLE VICTORY ....................................................................... 48
    SPIN; AGENDA SETTING; BURY BAD NEWS .................................................................. 49
    FALSE FLAG OPERATION & REVERSE FALSE-FLAG ....................................................... 52
    AD HOMINEM ATTACKS; SMEARS; CHARACTER ASSASSINATION; FALSE ACCUSATIONS ... 55
    RED HERRING; WHATABOUTISM; STRAWMAN; MINIMIZATION; CHERRY-PICKING ........... 59
    DEMORALIZATION; GASLIGHTING; PROPAGANDA OF DESPAIR ....................................... 62

EVIDENCE (CHRONOLOGICAL) ........................................................................................... 63
    LEGEND .................................................................................................................. 63
    AUGUST 2021 ........................................................................................................... 64

**ASHLEY M. GJOVIK**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University

*Exhibit: Gjovik's Final Evidence Report – Table of Contents 1*

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

**ASHLEY GJOVIK V APPLE INC**
INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

SEPTEMBER 2021 .................................................................................... 98
OCTOBER 2021 ...................................................................................... 174
NOVEMBER 2021 ................................................................................... 196
DECEMBER 2021 ................................................................................... 208
JANUARY 2021 ...................................................................................... 235
FEBRUARY 2021 .................................................................................... 271

APPENDIX I: CAST OF CHARACTERS (PARTIES) ........................................ **298**
EMPLOYERS (MANAGERS/SUPERVISORS) ....................................................... 298
EMPLOYEES ACTING AT DIRECTION OF APPLE INC .......................................... 300
AGENTS ACTING AT DIRECTION OF APPLE INC ............................................... 306
APPLE INC: AGENTS FOR PROPAGANDA ........................................................ 307

APPENDIX II: RETALIATORY MEMES ....................................................... **323**
APPENDIX III: BABY HUMMINGBIRD ......................................................... **326**

*Exhibit: Gjovik's Final Evidence Report – Table of Contents 2*

604.   Gjovik's Evidence Report includes an introduction to the "Evidence of Propaganda by Type" section where she discussed Tom Moyer. Gjovik wrote, *"Apple's Head of Global Security & Crisis Management, Thomas Moyer, spent four years as an U.S. Navy Intelligence Specialist from 1988 to 1992, including the Cold War & Operation Desert Strom...Moyer then obtained a Bachelor degree in "Rhetoric."*

**ASHLEY GJOVIK V APPLE INC**
INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

**EVIDENCE OF PROPAGANDA BY TYPE**

Apple's Head of Global Security & Crisis Management, Thomas Moyer, spent four years as an U.S. Navy Intelligence Specialist from 1988 to 1992, including the Cold War & Operation Desert Strom.[232] The U.S. Navy describes the role of "Intelligence Specialist" as collecting intel on everything from data on foreign cultures to enemy movements to current weather forecasts; then, using it to create cohesive intelligence briefings for high-ranking Navy officials. [233]

Moyer then obtained a Bachelor degree in "Rhetoric," followed by a Juris Doctorate. Berkley describes their Rhetoric program as *"Through its emphasis on the history and theory of rhetoric, the department provides an understanding of the format of contemporary theories of argument and interpretation as well as an opportunity, within this framework, to explore the role of persuasion in pragmatic and aesthetic contexts."*[234]

**THE BIG LIE (GROẞE LÜGE)** + AD NAUSEAM & RATIONALIZATION

*The Big Lie: a gross distortion or misrepresentation of the truth. The repeated articulation of a complex of events that justify subsequent action. The descriptions of these events have elements of truth, and the "big lie" generalizations merge and eventually supplant the public's accurate perception of the underlying events. The German expression was coined by Adolf Hitler, when he dictated his 1925 book*

Deleted: documenting

Deleted: FIRST

Deleted: –

Deleted: ev

Deleted: CRB

Deleted: OCTOBER 25

*Exhibit: Evidence Report – Propaganda Introduction*

605.    February 2 2022, Appleseed posted on Twitter that *"[She has] never sued anyone, nor been part of a lawsuit."* Appleseed had just sued Gjovik three days prior. Assumably Appleseed viewed her lawsuit against Gjovik as being filed by Apple against Gjovik, and she simply initiated the proceedings for Apple / at Apple's request.

606.    Gjovik had informed the California EDD of the circumstances she was terminated under, and that Apple never provided her the exact reasons for her termination. Gjovik informed the EDD of her government cases against Apple and of the general public opinion that her termination was retaliatory. However, on February 4, 2022, Gjovik received a Notice of Determination from California EDD denying her Unemployment Insurance, citing disqualification under § 1256, explaining that she will not receive benefits because Apple alleges, they terminated her due to misconduct as she *"broke a reasonable employer rule."* Gjovik appealed. Upon receipt of the case history, Gjovik saw her interview with the EDD agency was never recorded, and EDD instead falsely claimed Gjovik never responded.

607.    Under information and belief, EDD deleted the record of the call, or never made a record in the first place, conspiring with Apple against Gjovik.

608.    Appleseed sent Gjovik a lengthy email on February 5, 2022 (over 3,000 words) making false accusations against Gjovik, unlawful demands of Gjovik, threats against Gjovik and demanded Gjovik withdraw allegations and evidence about Appleseed from Gjovik's federal charges against Apple (charges about obstruction of justice & witness tampering). Appleseed in great hostility told Gjovik she believed one of Gjovik's SEC Whistleblower filings: *"contained absolutely no material information for shareholders."* Appleseed informed Gjovik she reported Gjovik to the FBI, and also told Gjovik that she reported Gjovik to Apple for Gjovik

**Deleted:** witness intimidation and retaliation, and photos of Brad Reigel and Rob Marini. The later two removals were confirmed by Appleseed to be a joint-effort between Apple and Appleseedrequest

**Deleted:** Inc

**Deleted:** 4th

**Deleted:** Gjovik's'

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

complaining that Apple was trying to make her kill herself, and that Apple could have Gjovik assassinated, which Appleseed complained was "*extremely harmful*" to her and Apple.



*Exhibit: Appleseed's 2/5/2022 Email*

609.    On February 5 2022, Appleseed posted on Twitter claiming the NLRB accused Gjovik of extortion and told Appleseed to report Gjovik to the FBI (which she also testified at the ex parte hearing on January 31 2022, and which the NLRB fervently denied) and Appleseed later blamed on an illegal drug relapse. In Appleseed's posts she mentions Gjovik is a federal witness. Appleseed then claimed "*multiple people*" were reporting Gjovik to Gjovik's law school at Santa Clara University and claimed "*the authorities had to get involved*" with Gjovik.

> In my conversation with the federal agency about what occurred, and to avoid disparagement and defamation, I told them matter-of-factly what happened and they recommended I report this person to the FBI for extortion.
>
> Being a witness does not give you a license to abuse.
>
> 11:57 AM · Feb 5, 2022 · Twitter Web App

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                              DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Appleseed's February 5 2022 Twitter Post about NLRB*

Multiple people reported this person for their behavior to their University as far as I know, and the agencies currently involved do not know what to do as they've never had this happen in nearly 100 years. It's disturbing that the authorities have to get involved.

12:01 PM · Feb 5, 2022 · Twitter Web App

*Appleseed's February 5 2022 Post about SCU*

610.    Gjovik refused to withdraw any federal charge, allegations, or evidence, and protested on Twitter that Appleseed was contacting her again despite Gjovik's repeated request Appleseed cease all communication with her.

611.    On February 7 2022, Appleseed posted on Twitter that she understood her lawsuit was meritless, saying "*the current procedure for getting aid in this requires that the abuser has published 'non-protected' information, such as medical or other private information, and ignores the intent and impact of repeated malicious harassment.*" On February 11 2022, she added the lower court judge explained to her the supposed "*harassment was protected speech.*" On February 12 2022, she added "*I was denied a Temp anti-harassment order (which I expected due to the physical distance).*"

612.    Joanna Appleseed, on behalf of Apple Inc tried numerous times (including January 7th - 8th 2022 and February 5th, 2022) to coerce Gjovik to withdraw, retract, or otherwise stop a Wikipedia Arbitration Committee investigation into an account harassing Gjovik via Gjovik's Wikipedia article and which Gjovik alleged to be Appleseed or someone on Apple or Appleseed's behalf, but either way acting at the direction of Apple to smear and intimidate Gjovik. Wikipedia banned Gjovik and refused to tell her why, but later admitted 'because she filed an NLRB charge against Apple.'

Deleted: --

Deleted: again

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

**xvii.**   **Gag Orders & Missing" Documents" (February-March 2022)**

613.   On February 8 2022, Gjovik asked the US EPA FOIA team assigned to her Apple/825 Stewart Drive FOIA requests, if anyone was investigating her 2021 complaints about 825 Stewart Drive. The lawyers who report under Andrew Helmlinger claimed that California EPA was investigating the federal Superfund site. Gjovik complained that made no sense but the lawyers would not clarify further.

614.   It was the US EPA who was investigating. These lawyers who directly misled Gjovik reported to Helmlinger, who is married to an Orrick, Herrington, & Sutcliffe Partner, Robyn Helmlinger. (by now Orrick, via Jessica Perry, was already retained by Apple to defend Apple on Gjovik's US Department of Labor case).

615.   On February 9 2022, Gjovik sent slightly revised versions of her witness intimidation reports to the NLRB, noting the differences. For Example:

> Legal memo (mostly the same, I think the biggest change was adding Apple's comments about violent anal sex)
> https://www.scribd.com/document/557375216/Gjovik-v-Apple-Intimidation-Campaign-Legal-Memo
>
> -Ashley

*Exhibit: February 9 2022 Updates for NLRB*

Gjovik also testified to the NLRB on February 10 2022.

616.   On February 11 2022, another fake Twitter account, FirstnameBunchofnumbers (@FirstNa47437596) began harassing Gjovik about Gjovik's charges against Apple and Appleseed's lawsuit against Gjovik. The account posted a variety of attacks over a week or so, including:

> p.   Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.  [Photo of young girl at computer

Deleted: about

Deleted: ..

Deleted: FIRST

Deleted: ..

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*drinking soda and smiling mischievously] link:*
*https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines*

q. *If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law.*

r. *Cyberbullying is NOT Whistleblowing. In fact, neither is reporting the company to itself. That's called internal complaining, and you don't get accolades for it.*

s. *honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*

t. *You should probably get a clue that if Twitter doesn't even care about the alleged "wrongs" perpetrated against you that a court of law probably isn't going to either.*

617.    Gjovik was served for Appleseed's lawsuit around noon on February 14 2022, for a February 15 2022 court date. On February 15 2022, Appleseed submitted a statement to the Washington state courts saying she complained about Gjovik to the FBI and also to the Chief Security Officer of the National Labor Relations Board, the previous Chief of Physical Security at The White House and a Security Manager at the Department of Defense.[308]

618.    In the February 15, 2022, testimony Appleseed also claimed, without any evidence to support prima facie elements of the charges, that Gjovik committed "*criminal cyber-harassment, blackmail, and extortion.*"

619.    Gjovik contacted Bud Porter at the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on February 21 2022, and December 15 2022.

620.    Porter said it is generally up to the government agencies to refer cases to the District Attorney's office for prosecution, so Gjovik would need US NLRB, US EPA, or US Department of Labor to refer the case. Gjovik asked the agencies for DOJ referral repeatedly,

---

[308] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

but they ignored her and some of them kept intimidating her themselves (i.e., US Department of
Labor). Gjovik complained to Porter that the agencies were "*complicit in the cover-up.*"

621.    On February 22 2022, Appleseed posted on Twitter that Apple employees *"in
[Apple] Global Security inform [her] when they see anything in reference to [her], or what
reasonable seems like it is referencing [her]."*

> How do I know? Well, for one thing, some of them are cited in various
> documents they've collected, and some quiet whistleblowers in Global
> Security inform me when they see anything in reference to me, or what
> reasonably seems like it is referencing me.
>
> 3:27 PM · Feb 22, 2022

*Exhibit: Global Security 'whistleblowers'*

622.    Appleseed admitted she was in friendly contact with Apple Global Security at
least through February 2022, even after quitting in November 2021. Appleseed is clearly part of
the Worldwide Loyalty enterprise, even after she left employment at Apple.

623.    Under information and belief, Apple Global Security was surveilling Gjovik's
public comments and attempting to incite Appleseed to threaten, intimidate, and coerce Gjovik
by using Gjovik's comments to provoke or frighten Appleseed, and conspiring with Appleseed
about how Appleseed would then threaten, intimidate, and coerce Gjovik and directing or
guiding her actions towards Apple's interests.

624.    On March 1 2022, a Washington state Judge in a court of Limited Jurisdiction
ruled and granted the restraining order against Gjovik and demanded Gjovik not speak or write,
publicly or privately, about the ex-Global Security employee, Gjovik's Apple cases (where they
complain of threats and harassment from Appleseed or Appleseed's associates), or anything else

276

Deleted: which

Deleted: &
Deleted: the employee and many others

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1   related to that employee for five years (until 2027) with the single exception of "*testifying*" to the

2   government.[309]

3       625.    Gjovik would eventually win the appeal, but it took until September 2022 and

4   was not fully dismissed until January 2023.[310]

5

6       626.    During the March 1 2022 hearing Gjovik complained repeatedly about witness

7   intimidation and witness retaliation in her legal filings and her testimony.

8       627.    On March 3 2022, some law firm requested a copy of the Appleseed lawsuit

9   decision against Gjovik. Under information and belief, this was Apple's lawyers requesting a

10  copy, and Apple's lawyers were aware of the lawsuit, if they did not orchestrate it themselves.

11

12      628.    Under information and belief, Apple did orchestrate this lawsuit against Gjovik.

13      629.    On March 4 2022, Apple's Position Statement claims Gjovik never admitted she

14  spoke publicly about the Gobbler app and that Apple received a complaint from an Apple

15  employee (Appleseed) on September 15 2021 where Appleseed gave Apple her private texts

16  with Gjovik and filed a Business Conduct complaint against Gjovik. Apple's Position Statement

17  failed to mention Gjovik spoke publicly about Gobbler starting in August 2021 and the images

18  shared were of Gjovik's recognizable face, so there was no 'gotcha.'

19      630.    The March 4 2022 Position Statement did make clear that Apple was

20  manipulating Appleseed to attack Gjovik, and Appleseed (who was making a large amount of

21  money off of the image of being a 'labor leader') absolutely did not want it to ever come out that

22  she filed a complaint against Gjovik to help Apple fabricate a paper-trail to justify Gjovik's

23

24

25  _____

26  [309] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated),
    King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated)
27  King County District Court, Court of Limited Jurisdiction, State of Washington (2022).
    [310] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated),
28  King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated)
    King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

**Deleted:** <#>Gjovik's appellate win was even cited in a SCOTUS brief from the Electronic Frontier Foundation in December 2022.[311]¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1  retaliatory termination. However, it was now literally illegal for Gjovik to tell anyone about what

2  she discovered.

3

4       **xviii.**   **Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be**

5                **Sent to Jail if She Defends Herself (March 2022)**

6

7       631.    On March 3 2022, Jessica Perry for Orrick representing Apple, submitted Apple's

8  position statement to US Department of Labor in response to Gjovik's claims of whistleblower

9  retaliation under SOX, CERCLA, and the OSH Act. Apple's response was misleading,

10  fraudulent, harassing, and attempted to obstruct justice. Apple not only failed to mention

11  anything about the August 2021 US EPA inspection of Gjovik's office, but Apple claimed that

12  the last that was heard from EPA was in July 2021 and that Gjovik was being 'unreasonable'

13  about her concerns. Orrick's letter also falsely claimed Gjovik 'wanted to be on leave' and

14  referenced a non-existent email they claim documented Gjovik asking for leave, or referenced an

15  email where Gjovik said she did not want to be on leave but Orrick claimed the opposite. On

16  March 4 2022, Gjovik was provided a copy of Apple's position statement.

17

18

19

20

21

22

23

24

25

26

27

28

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

March 4, 2022

**VIA ELECTRONIC MAIL**

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015
+1 650 614 7400
orrick.com

Jessica R. Perry

E    jperry@orrick.com
D    +1 650 614 7350
F    +1 650 614 7401

Re:    *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

I.    **INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

4161-3255-5828

279

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by *intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press*, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

II.     **FACTUAL BACKGROUND**

    A.     **Apple Prohibits Discrimination, Harassment, and Retaliation.**

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

    B.     **Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.**

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was

280

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 3

promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the termination of her employment on September 10, 2021.[2]

Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties as an Apple employee." "Proprietary Information" includes, inter alia, non-public "materials or information relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of Apple's rules and policies regarding proprietary information" and understood that breach of the agreement could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings." To safeguard information about Apple's products, employees are prohibited from disclosing confidential information without prior approval of management.

As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. On each occasion, Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple required all participants—as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed the Alpha Study Consent Form and expressly acknowledged that any information about the study, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.").

_____

[2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

[3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from further unauthorized disclosure.

4161-3255-5828

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 4

**C.**   **Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

_____

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

282

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 5

**D.    Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.    Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, ***Ms. Gjovik admitted to disclosing confidential information*** about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.    Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.    Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.

4161-3255-5828

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Andrea Diangco
March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- March 22, 2021: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- April 2, 2021: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- April 9, 2021: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."

4161-3255-5828

284

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



Andrea Diangco
March 4, 2022
Page 7

- April 11, 2021: Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- April 27, 2021: Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- May 17, 2021: Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- May 18, 2021: Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- June 10, 2021: Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- July 2, 2021: ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- July 7, 2021: Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.

285

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 8

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

### 2. Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

### 3. Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).

4161-3255-5828

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 9

I want to confirm our conversation a few minutes ago. **Per your request, you are now on paid administrative leave so as to not interact with your managers.**

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

### III.    ARGUMENT

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complains about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.

---

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 10

**A.**     **Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.**

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The *only* reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.

4161-3255-5828

| Deleted: FIRST |
|---|
| Deleted: – |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

288

orrick

Andrea Diangco
March 4, 2022
Page 11

**B.    Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.**

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.

289

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

orrick

Andrea Diangco
March 4, 2022
Page 12

**C.** **Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.**

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.,* 171 F. Supp. 2d 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant,* 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l,* 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.,* ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.,* 402 F. App'x 936 (5th Cir. 2010); *Williams,* 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

**D.** **Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.**

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that *"[p]er your request, you are now on paid administrative leave"*—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced,* 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



Andrea Diangco
March 4, 2022
Page 13

**IV.    CONCLUSION**

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By: _____

Jessica R. Perry

*Exhibit: Apple's US DOL Position Statement, March 2022*

632.    On March 18 and 24 2022, Appleseed edited Gjovik's Wikipedia article to say there were no vapor intrusion issues at Gjovik's office and added a quote from Apple defending Apple's employment practices.

633.    On April 5 2022, the law firm MWE requested copies of the transcripts of Appleseed's lawsuit against Gjovik.

291

Deleted: their

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Same Law Firm (MWE) Hired for Gjovik's NLRB Case, Requests Litigation Transcripts*

634.   On April 7 2022, Gjovik asked US EPA for an update on the 825 Stewart Drive site.

635.   In April 2022, New York Post suddenly published a defamatory, harassing, traumatizing article about Appleseed suing Gjovik. AppleInsider then wrote an equally inflammatory and traumatizing article about the New York Post article. An Apple marketing executive with a large following then shared the article ridiculing Gjovik. Both New York Post and Apple Insider refused to correct or retract, or even update, the articles after Gjovik won the appeal of Appleseed's gag order. Under information and belief Apple was behind these articles & their stickiness on the top of Gjovik's internet search results.

636.   On April 15 2022, Northrop Grumman submitted a report about the sub-slab ventilation vents on the roof saying Apple installed their HVAC *"without consideration of the*

292

Deleted: suddently

Deleted: NYP claimed both women were accusing each other of harassment, despite supposedly fighting harassment, and that Appleseed won a gag order over Gjovik. AppleInsider then wrote an

Deleted: on Google

Deleted: submited

Deleted: slat depressurization

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

*vents or their function.*" Northrop Grumman wrote that the vents were in an "*assumed sphere of influence of the HVAC intakes.*"

637.   On April 17, 2022, a Telegraph profile was published about Gjovik titled "*Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now*", and the reporter posted the article on Twitter. Appleseed and her friends then quickly replied to the post and 'quote-tweeted' the post making allegations against Gjovik, and making derogatory statements about Gjovik, and harassing the reporter for writing about Gjovik.[312]After Appleseed's protest, The Telegraph changed the subtitle of the article about Gjovik from something positive to saying that what happened to Gjovik was the "*consequences of her actions."* If Gjovik complained, Appleseed could try to have Gjovik incarcerated.

638.   In May 2022, Gjovik managed to still graduate law school. She graduated in the top 20% of her class and received her certificate in Public International Law with honors. In order to complete law school at Santa Clara Law, Gjovik had to remain in Santa Clara County (in order to attend in person) even after she was terminated and until graduation. The cost of living in the area is extremely expensive and with no income, she was unable to find a new job, and Gjovik quickly lost most of her life savings through rent and cost of living expenses.

xix.   **Gjovik Discovers the August 19 2021 Inspection (May 2022)**

639.   On May 12 2022, Gjovik noticed a new document on the TRW Microwave EPA webpage. It was the annual groundwater monitoring report, but deep in the middle of the long report, there was an appendix related to the roof that mentioned an US EPA inspection of the site on August 19 2021. Gjovik them emailed the EPA site team asking about it.

640.   On May 12 2022, Gjovik complained to the EPA FOIA lawyers, who still had not released a single document, that they were hiding the inspection from her.

---

[312] Twitter, Lucy Burton, https://twitter.com/Lucymburton/status/1515641563350712323

Deleted: about

Deleted: notices

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

I assume in the five months you've been working on this, you already knew all this and you've kept this information away from me. For instance, the Aug 19 site visit emails with the EPA informing Apple & Northrop they were going to do a site inspection (assumably based on my whistleblower disclosures). I wonder if there's any coincidence that I'm a CERCLA whistleblower with a case against Apple, & reporting to the CEO of Apple is your old boss Lisa Jackson, meanwhile the US EPA appears to be hiding critical information from me in an apparent attempt to run out the clock the my cases against Apple. Please let me know if y'all are ready to do your jobs or if I should pursue and Inspector General complaint against y'all over this. Please send me the August 19 2021 site visit emails ASAP. I'm sure you're well aware those documents could make or break my CERCLA case."

641.   There were three highly suspicious "call-drops" during phone calls over a period of ten days in 2022. The first drop occurred May 16 at 6:29pm PST while Gjovik was on the phone with an attorney in the state of Washington. The call dropped just as the lawyer was about to share information about the business associations of the local judge who had just ruled against Gjovik.

642.   On May 20 2022, the US EPA sent a letter to Northrop Grumman about 825 Stewart Drive, instruction that: "EPA requires that one round of indoor air samples be collected... under current conditions."[313] The letter included an attached memo from the US EPA's Quality Assurance branch instruction Northrop Grumman (and Apple) that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has been*

_____
[313] US EPA, Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation, *825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site* (CERCLIS ID# CAD009159088) (May 20 2022), https://semspub.epa.gov/work/09/100029487.pdf

*modified in a manner that could compromise the system; evaluation of changes to building use,"* in addition to also inspection roof components.[314]

643.    The May 20 2022 letter also included a second attachment written by a third-party expert hired by US EPA to consult on the vapor intrusion control systems at 825 Stewart Drive. The memo warned that Apple's tampering with the sub-slab vent system on the roof and placement of the HVAC intake next to the shortened vents "*may result in concentrated effluents ...to re-entrain into the building through intakes on the roof.*"[315]

644.    The second drop occurred May 24 at 2:03pm during a call with a friend who lives and is located in Canada, and during this "drop" both experienced an outage of their entire internet connection and had to reboot routers in order restore the connection. The second drop occurred just as this friend was recommending an app that Gjovik could use to monitor her internet for hacking. [Gjovik got the name of the app from him after, and the app did show Gjovik's internet was being hacked]. The third drop occurred May 26 at 1:59pm while Gjovik was on the phone with the Santa Clara District Attorney's office reporting unlawful conduct by Apple. The third drop occurred just as an intake attorney at the Santa Clara District Attorney's office said something to Gjovik like "I see if I can help you."

645.    On May 27 2022, the US EPA sent Gjovik a copy of the October 7 2021 report of the August 19 2021 inspection.

646.    On May 28 2022, Gjovik discovered hacking on her network.

---

[314] US EPA, Passive Sub Slab Depressurization (SSD) System Operation and Maintenance Plan (Document Control Number [DCN] FY22SEMD _ 161) and Evaluation of Passive SSD System, Former TRW Microwave Site, Sunnyvale, California (April 25 2022), https://semspub.epa.gov/work/09/100029487.pdf
[315] APTIM, Technical Review of Proposed Modification to a Passive Vapor Intrusion Mitigation System Installed at the Former TRW Site, Sunnyvale, CA (May 20 2022)

Deleted: will try to

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

647.   On May 29 2022, Gjovik discovered one of the items Apple mailed her from desk was emitting RF and EMF signals. Gjovik posted about it on Twitter.[316]



*Exhibits: The Bugged Statue*

648.   On May 30 2022, Gjovik contacted the FBI to report hacking and the bugged object. The FBI agent she talked to advised Gjovik to give the object to the local police.[317]

649.   Several hours later Gjovik heard someone trying to break into her apartment through the front door. Gjovik posted on Twitter about it, blaming Apple.[318]

---

[316] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1530764537611288576 ; https://twitter.com/ashleygjovik/status/1530775382626025474

[317] Bugged items in violations of Cal. Penal Code [§§ 631, 632, 632.5, 632.6, 632.7] and US Code Title 18 [§§ 2511(1)(a), (c), (d); 2701-2712].

[318] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1531176997803679744 ; https://twitter.com/ashleygjovik/status/1531177000831959042

296

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: May 30 2022 Break In Attempt*

650.   Gjovik called the Santa Clara city police on May 31, 2022 [re: report 2205310079] to report the listening device Apple planted in her chattel property and the call drops and internet interference that led to her to search her items for bugs. The police took possession of the statue. Gjovik later found her fake fig tree was also producing RF and EMF signals and threw it in the trash and complained on Twitter about it.

651.   On May 31 2022, Lisa Jackson has a private meeting with US EPA administrator Michael Regan.

652.   On June 1 2022, Gjovik asked questions about the HVAC, sub-slab ventilation and ports, and cracked floor at her office. The same day, the US EPA lawyer for the site, Rebecca Reynolds, removed the site team from the email chain with Gjovik and told Gjovik she is only allowed to talk to the lawyer now and cannot talk to the site team.

297

Deleted: ¶
  <#>Gjovik Attempts to Investigate What Happened in 2021; Apple Increases the Cover-Up; Gjovik Still Gagged (May-August 2022)¶

Deleted: slat vents

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

653.    On June 7 2022, Gjovik had her first meeting with SEC's Enforcement team about her Apple charges.

654.    On June 8 2022, Appleseed edited Gjovik's Wikipedia article deleting over 8,000 characters and accusing Gjovik of "libel" based on Gjovik's accusations against Lisa Jackson and Ronald Sugar.

655.    On June 9 2022, Gjovik sued the state of Washington in facial and as-applied constitution challenge over the order against her due to Appleseed's lawsuit and the statute it was issued under. Gjovik said the statutes were unlawfully vague and broad to ever allow a decision like that, and that the entire matter was more witness intimidation. [319]

656.    On June 27 2022 Gjovik received her first FOIA documents from US EPA, over five months after she requested them.

657.    On June 28 2022, the US District Court suddenly dismissed Gjovik's case against the state of Washington. Gjovik filed a motion for reconsideration, and the judge filed a second decision against Gjovik within hours.[320]

658.    On July 12 2022, US EPA complained that Apple was not addressing most of their concerns about Gjovik's office. US EPA also emailed about the high levels of TCE in the outdoor air at Gjovik's office.

659.    On July 14, 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with inaccurate information, so the data about Gjovik's interview must have been destroyed or falsified. Gjovik won her unemployment insurance appeal, and a decision was issued by an Administrative Law Judge stating:

_____

[319]

[320] _Gjovik v. State_, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022); _Gjovik v. State_, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022).

Deleted: <#>On June 4 2022, MWE requested copies of the transcripts of Appleseed's lawsuit against Gjovik.¶

Deleted: in accurate

Deleted: ALJ

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[321]

660.    On July 20, 2022, Gjovik filed a complaint with the US EPA OIG Hotline about Jackson and others misconduct. Gjovik complained about "*false representation[s] about a material fact,*" "*fraud,*" "*knowingly falsifying or concealing a material fact,*" "*abuse of power,*" and "*improper use of government resources.*" Gjovik noted "*discrepancies between reported facts and supporting documentation,*" and "*site inspection different status than what was reported to EPA.*"

661.    On July 21 2022, Lisa Jackson visited the US EPA HQ to have a private meeting with US EPA administer Michael Regan.

662.    On July 27 2022, Gjovik cancelled her California Bar Exam appointment due to the smears and restraining order.

663.    On July 28 2022, Northrop Grumman told the US EPA they are late in responding to US EPA's questions because Apple and CalSTRS stopped responding to them for weeks.

_____

[321] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022

299

Deleted: visits

Deleted: ..

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

664.    On August 12 2022, Lisa Jackson made Jared Blumenthal (prior head of CalEPA, and head of US EPA Region 9 before that) President of the Waverly Foundation. Was Blumenthal who Jackson tried to nominate for the Region 9 role in November 2021?

665.    In August 2022, Gjovik discovered Apple had broken into her attic in the fall of 2021 and installed some sort of surveillance equipment. Gjovik complained about this to her landlord, a large real estate company, and she reported it to the FBI and the local police. Gjovik filed a complaint with the FBI on August 8 2022, to report another break-in and about the electronics in her attic. The FBI again advised her to call the police.

666.    Gjovik called the Santa Clara city police on August 9, 2022 [re: report 2208090087] to report Apple breaking into her attic and installing some sort of electronic equipment. After Gjovik reported the attic situation to law enforcement the police said they would come by the next day to create the report. Gjovik left her home to run an errand. When Gjovik returned, the day before the police were to arrive and search her attic, she found two signs that someone had broken into her apartment and entered the attic. First, her dog's belly smelled strongly of cigarettes despite him not leaving the apartment while she was gone and Gjovik not smoking cigarettes. After noticing the odor, Gjovik quickly inspected her closet where the entrance to the attic is and found attic insulation stuff on the floor despite having just vacuumed before she left. Under information and belief, Apple broke into Gjovik's apartment again, this time to retrieve whatever they installed in her attic, before law enforcement arrived.

667.    Gjovik also reported it to her landlord, Prometheus, on August 9 2022. Under information and belief, Apple broke into Gjovik's attic at some point in the fall of 2021 and installed some sort of surveillance equipment and likely intercepted Gjovik's internet.

668.    Around August 2022 Gjovik was finally offered a well paying consulting job, as an expert witness for a law firm. However, when Apple's lawyers found out, they apparently did

---

**Deleted:** ,

**Deleted:** Gjovik also reported it to her landlord, Prometheus, on August 9, 2022.¶
<#>Under information and belief, Apple broke into Gjovik's attic at some point in the fall of 2021 and installed some sort of surveillance equipment and likely intercepted Gjovik's internet.¶
<#>On August 12 2022, Lisa Jackson made Jared Blumenthal (prior head of CalEPA, and head of US EPA Region 9 before that) President of the Waverly Foundation.¶
¶
    <#>**Gjovik Starts to Recover; Gjovik Discovers More of Apple's Misconduct; Gjovik Fights Back (August 2022 – February 2023)**¶
<#>In August 2022, Gjovik discovered Apple had broken into her attic in the fall of 2021 and installed some sort of surveillance equipment. Gjovik complained about this to her landlord, a large real estate company, and she reported it to the FBI and the local police.¶

**Deleted:** apartment again, this time to retrieve whatever they

**Deleted:** in her attic, before

**Deleted:** enforcement arrived

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

a number of things that resulted in having Gjovik removed from the matter to respond to Apple threatening to disqualify her. The law firm was going to pay Gjovik close to what Gjovik's Apple salary was, but then after Apple had Gjovik removed ,Gjovik could not find any job for nearly a year, and now even though she finally found a job, she makes around 41% less than what she made at Apple.

669.    Gjovik moved to New York on August 31 2022. Gjovik chose the East Coast primarily to get far away from Apple. Gjovik chose Albany in hope of finding a government job. Despite hundreds of applications and dozens of interviews, Gjovik was never able to find a job in Albany New York. Gjovik had at least two visits from Private Investigators harassing her at her new apartment in New York. One of them showed up as her property was being delivered by the moving company, and the PIs filmed her while peeking into her windows and walking around to see her backyard. The second one showed up after Gjovik had been there for several months, and verbally acknowledged her when she opened her front door to get her mail ("there she is.") All of them saw Gjovik notice them and then exaggerated their lurking as a confirmation. Assumably, ratio wise, there were many other PIs who also visited, but did not want Gjovik to notice them.

670.    Gjovik won her appeal of the gag order against her in November 2022, which was then followed by even more harassment and defamation by Joanna Appleseed. [322]

671.    On September 12 2022, Gjovik asked US DOL for status on her charges. On September 16 2022, US DOL had a call with Gjovik where a department executive, Captain Parra, showed up and intimidated Gjovik to withdraw her charges. Gjovik complained of intimidation and obstruction.

---

[322] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

Deleted: <#>Gjovik moved to New York on Aug 31 2022. Gjovik chose the East Coast primarily to get far away from Apple.¶

Deleted: shows

Deleted: intimidates

Deleted: complains

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

672.    On October 28 22022, the Santa Clara County Department of Environmental

Health (SCC DEH), related to an Apple office on a toxic-waste clean-up site, instructed Apple to

label its sub-slat vent risers with labels saying "CAUTION VENT RISER DO NOT TAMPER"

every five feet throughout the building and on the roof. Santa Clara Couty ("SCC") Department

of Environmental Health ("DEH") also insisted Apple notify the department if there are any

cracks in the floor. SCC DEH also insisted that vent rises be at least 10 feet away from any

window/opening/intake and at least 3 feet high on the roof. Gjovik had been giving DEH

updates on Apple's sub-slat vent/HVAC and cracked floor situation at 825 Stewart Drive prior.

Under information and belief, all of SCC DEH's explicit instructions on this matter were due to

Gjovik telling them what happened at 825 Stewart Drive. This building was part of the 'real

estate mega deal' that occurred the weekend in May 2021 when Sedgwick suddenly closed

Gjovik's' chemical exposure claim.

Deleted: SCC DEH

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



*From SCC DEH's documents for Apple's Office at Pathline Park*

303

Deleted: <object>

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

673.    On November 2022 an expert consultant for the US EPA submitted a letter saying Apple should have been testing for indoor air vapor intrusion at Gjovik's office at a minimum of every five years. (The most recent testing was December 2015, so it was due again December 2020 – and the testing wasn't 'voluntary').

674.    On December 6 2022, US EPA sent a letter to Northrop Grumman (and Apple) with feedback on their proposed vapor intrusion testing plan, with 12 requests, including that they notify US EPA "immediately" if test results show the presence of TCE in the indoor air above 7 μg/m3.[323] The document also included an image of testing locations, including air sampling where Gjovik's desk was.

---

[323] US EPA, Re: Northrop Grumman Vapor Intrusion Work Plan Addendum #3. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088), https://semspub.epa.gov/work/09/100031563.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

SEMS-RM DOCID # 100031563



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
75 Hawthorne Street
San Francisco, CA 94105-3901

December 6, 2022

Mr. Joshua Nandi                                        SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Vapor Intrusion Work Plan Addendum #3. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Nandi,

Thank you for submitting the Northrop Grumman Systems Corporation (Northrop Grumman) Vapor Intrusion Work Plan Addendum #3.  EPA requests the Addendum be revised to improve its readability and to address the following technical comments below:

1.  Edit the Addendum's main text to include a summary description of the standard operation procedures (SOP) for the activities to be performed (e.g., soil gas installation and sampling, indoor/outdoor air sampling, differential pressure monitoring) and include the SOPs as attachments (or clearly reference the SOP location in the document).

2.  Include an SOP for differential pressure monitoring and describe the associated QA/QC criteria. The monitoring should be performed over a period of one week and measurements recorded every five minutes.

3.  Add laboratory reporting limits to Table 1.

4.  Include a footnote in Table 1 to indicate that EPA will be notified immediately if indoor air results for TCE are above the accelerated response value of 7 µg/m$^3$ for commercial/industrial exposure and appropriate actions will be taken to confirm the results and implement mitigation measures.

5.  Include a table (Table 2) for soil gas screening levels and laboratory reporting limits.  Define the soil gas screening levels by using the indoor air levels for long-term exposure in Table 1 divided by the attenuation factor of 0.03.

6.  Include a summary of the QA/QC metrics (e.g., QA/QC criteria for duplicated samples).

*Exhibit: EPA Letter from Dec 6 2022, pt1*

305

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

7. Include additional long-term (seven days) indoor air sampling using passive samplers in four locations (IA-2, IA-3, IA4, IA-7). Include one long-term outdoor air sampling. Include a summary and SOP for the long-term passive sampling.

8. Include one additional sub-slab sampling location (SS-12) for spatial coverage as indicated in the figure attached.

9. Move sampling location IA-2 to the cubicles next to SS-7 (pending building walk through).

10. Provide the sequence of activities.  EPA recommends the following sequence:
    1. Day Zero: Building walk through, check sub-slab ports and install SS-12
    2. Day 1: Start sampling
        a. Begin differential pressure monitoring at tree sub-slab ports SS-2, SS-7 and SS-10
        b. Start long-term passive indoor air sampling at four locations IA-2, IA-3, IA-4, and IA-7; and one outdoor location at HVAC intake.
    3. Day 2: One week after start of sampling on Day 1
        a. Start the 10-hour indoor air sampling with SUMMA™ canisters in all indoor air locations (IA-1 to IA-9), and one outdoor location at HVAC intake
        b. Stop and remove the differential pressure monitoring from sub-slab ports
        c. Perform the sub-slab sampling in all sub-slab locations

11. Include a statement that after data collection and evaluation is completed, reviewed, and approved by EPA, the sub-slab ports will be decommissioned, upon consultation and approval by EPA.

12. Include a statement that a report will be submitted to EPA within 30 days of receipt of the results from the laboratory.

EPA requests that Northrop Grumman provide a Revised Work Plan Addendum within 30-days from the receipt of this letter. Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

LILIAN ABREU
Digitally signed by LILIAN ABREU
Date: 2022.12.06 14:01:30 -08'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division

cc:   Holly Holbrook, AECOM
      Cynthia Woo, Aptim Federal Services, LLC

2

*Exhibit: EPA Letter from Dec 6 2022, pt2*

306

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

675.    On December 7 2022, Gjovik's appellate win against Appleseed was cited in a SCOTUS brief filed by EFF in *Barton v Texas*.[324] On December 12 2022, the Washington state court ordered the prior decision and order against Gjovik to be vacated and the case against Gjovik dismissed. Even with the legal wins, it was still mortifying the press coverage and Appleseed's comments continued to give basis to Gjovik being some sort of bad actor. Appleseed also harassed Gjovik even more.

676.    On December 30 2022, US FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans and provided Gjovik a report tracking number.

677.    On January 11 2023, Gjovik reviewed the most recent Five-Year Report for the Synertek Superfund site next to 3250 Scott Blvd and emailed some questions and concerns to the US EPA contacts for the site (Edwin Poalinelli and Fatmina Ty). Gjovik asked why 3250 Scott Blvd was skipped when EPA ordered vapor intrusion testing in all other buildings on the plume. US EPA never responded. Gjovik started investigating 3250 Scott Blvd through public records requests. Gjovik also discovered that US EPA, Honeywell, and Irvine Company had "lost" a Superfund groundwater monitoring well somewhere under the apartment complex when it was built around 2018.

678.    On January 20 2023, US EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over 7 years.

679.    On January 23 2023, US DOL suddenly wanted to meet with Gjovik to discuss her case. Gjovik asked to record the call due to her concerns about their prior misconduct. US DOL agreed. On January 26 2023, Gjovik met with US DOL and Captain Parra, was a surprise

---

[324] *Barton v State of Texas*, On Petition for Writ of Certiorari to the Supreme Court of the United States, Brief of Amicus Curiae Electronic Frontier Foundation, Eugene Volokh as Counsel of Record, pg10-12 "*Criticism of Political Activists*" (Dec 7 2022). https://www.supremecourt.gov/DocketPDF/22/22-430/249364/20221207141747388_22-430%20Amicus%20Electronic%20Frontier%20Foundation.pdf

307

Deleted: Appleseed harassment

Deleted: ,

Deleted: now

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

participant again. The call lasted around three hours and Parra tried to intimidate Gjovik again and refused to allow her to 'object' to inaccurate statements. Parra claimed the call was completely off the record. Parra eventually acknowledged that US DOL did not actually investigate Gjovik's claims or evidence, and agreed to go back and do it now

680.    On January 23 2023, after the retaliatory lawsuit against Gjovik was already dismissed and vacated, Appleseed then filed another document in which she accused Gjovik of a variety of torts (defamation, harassment) and criminal acts (criminal wiretapping, perjury), threatened to report Gjovik to the Bar Association, and threatened to sue Gjovik again.[325] The next day Appleseed posted on Twitter about Gjovik, with some of the language as her legal filing: *"If you lack the moral fortitude to admit that you misrepresented, omitted, misquoted, or otherwise altered facts to exaggerate and fit a narrative... sincerely, don't bother engaging in the public space. You will eventually be hit with a boomerang of your own making."*

---

[325]

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25



If you lack the moral fortitude to admit that you misrepresented, omitted, misquoted, or otherwise altered facts to exaggerate and fit a narrative... sincerely, don't bother engaging in the public space.

You will eventually be hit with a boomerang of your own making.

2:44 AM · Jan 24, 2023 · 2,356 Views

*Exhibit: Boomerang Post*

681.    On January 24 2023, Appleseed replied to the post above and added "*A YEAR OF THIS [EXPLETIVE] A YEARRRRRRRRRR*". (sic) Appleseed filed the lawsuit against Gjovik on January 31 2022 (a year prior) and was clearly referring to Gjovik and threatening her with being "*hit*" if she did not leave "*the public space.*"

682.    On Thursday January 26 2023, NLRB held a video conference with Gjovik to inform her they found merit in her charges against Apple about Apple's NDAs and Tim Cook's email. NLRB asked Gjovik not to tell anyone until they could also inform Apple and then send a formal email. Gjovik did not post anything about it but assumably Apple was also informed on January 26, or else on Friday January 27 2023.

309

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

683.    On January 27 2023, Appleseed posted on Twitter about Gjovik's government cases and complaints again saying her posts were initiated due to "*just [finding] out [Gjovik's] OSHA case tries to use [her] as the Apple scapegoat with a mountain of deceit and good god [she is] sick of this [expletive]."* She claimed Gjovik was "*try[ing] to use other victims as leverage*" and "*center[ing her] conspiracy theory around them.*" She said it was "*indefensible*" and "*unconscionable,*" and said she has "*never been so disappointed in another human in [her] entire life.*" A blogger commented on her thread about Gjovik asking her if she watched a recent interview a YouTuber did with Gjovik, and Appleseed said no, that it was "*nothing substantive*", and "*hopefully Apple doesn't go after the host for whatever [Gjovik] said.*"

684.    In January 29 2023, the NLRB sent Gjovik an email stating they found merit in two of Gjovik's charges against Apple's employment policies, including their NDAs and surveillance practices.[326] NLRB that "*various work rules, handbook rules, and confidentiality rules at Apple*" are unlawful because they "*reasonably tend to interfere with, restrain, or coerce employees*"[327] In addition, the agency "*found merit to a charge alleging statements and conduct by Apple — including high-level executives — also violated the National Labor Relations Act.*"[328] The press covered the decision of merit.

685.    On January 31 2023 until February 10 2023, Appleseed edited the Wikipedia article about Gjovik and other articles referencing Gjovik, including adding Gjovik to the "TRW Microwave" company page in a new Superfund site section. Wikipedia caught her and banned her again on February 11 2023. Prior to the latest ban, Appleseed made edits about Gjovik's Superfund office and workplace safety concerns, removed mention of Gjovik fainting at her

---

[326] *Apple Executives Violated Worker Rights, Labor Officials Say*, Bloomberg, Jan 30 2023, https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-say
[327] CNN, *Apple has infringed on worker rights, NLRB investigators say*, Jan 31 2023, https://www.cnn.com/2023/01/31/tech/apple-worker-rights-nlrb/index.html
[328] Bloomberg, supra.

Deleted: NLRB

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

office, changed the grammar of a line about Gjovik's NLRB case to infer the NLRB will decide

against Gjovik, and added that Gjovik *"was fired for leaking confidential information."*

```
infringed on workers' rights |work=TechCrunch
|url=https://techcrunch.com/2023/01/30/labor-officials-found-that-
apple-execs-infringed-on-workers-rights/ |access-date=31 January 2023
|quote=Gjovik was fired by Apple in September 2021 for leaking
confidential information; she told TechCrunch that she thinks she was
fired in retaliation after reporting to the EPA that her office was
built on the triple site of toxic waste in Silicon Valley, where
cracks in the floor exposed employees to carcinogenic fumes.}}</ref>
```

*Exhibit: You Make Me Fade Post about Leak*

686.    On February 7 2023, Macworld published an article about Gjovik's NLRB win.

The article 'translated' Cook's email to Cook's actual meaning including Cook complaining

about workers talking to reporters about work conditions, *"How can we put the screws to you if

it's in the news? Duh. C'mon, people. Think*!" and *"Tattooed on Tim Cook's right bicep: "Loose

lips…" And on his left: "…pink slips*." The article suggests after an *"old-fashioned intervention*"

the public would learn that Apple acts the way it did to Gjovik and her coworkers in 2021

because *"Steve Jobs was... never hugged or whatever.*"[329]

687.    On February 11 2023, Appleseed was caught editing Gjovik's Wikipedia article

again, as discussed, and was banned again.

---

[329] Macworld, *Apple's war against leakers is really a battle against the people that matter most,*
Feb 7 2023, https://www.macworld.com/article/1504665/macalope-apple-tim-cook-leakers-
nlrb.html

311

Deleted: <#>Apple and Orrick Try to Squash and Demoralize
Gjovik Again (January-April 2023).¶
<#>On January 23 2023, US DOL suddenly wanted to meet with
Gjovik to discuss her case. Gjovik asked to record the call due to her
concerns about their prior misconduct. US DOL agreed. ¶
<#>On January 26 2023, Gjovik met with US DOL and Captain
Parra, was a surprise participant again. The call lasted around three
hours and Parra tried to intimidate Gjovik again and refused to allow
her to 'object' to inaccurate statements. Parra claimed the call was
completely off the record. Parra eventually acknowledged that US
DOL did not actually investigate Gjovik's claims or evidence, and
agreed to go back and do it now.¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

# User contributions for You Make Me Fade  Help

For You Make Me Fade (talk | block log | uploads | logs | filter log)

This account is currently blocked. *(Show block details)* The latest block log entry is provided below for reference:

- 03:47, 11 February 2023 GeneralNotability (talk | contribs) blocked You Make Me Fade (talk | contribs) with an expiration time of indefinite (account creation blocked) *(Sock puppetry User:CodeHitchhiker)* *(Tag: Twinkle)*

*Exhibit: CH /YMMF 1*

## ⌄ Search for contributions

(newest | oldest) View (newer 50 | older 50) (20 | 50 | 100 | 250 | 500)

- 07:44, 11 February 2023 (diff | hist) . . (+227) . . User talk:You Make Me Fade  *(→February 2023: Reply)* **(current)** *(Tag: Reply)*
- 07:34, 11 February 2023 (diff | hist) . . (+169) . . User talk:You Make Me Fade  *(→February 2023: Reply)* **(current)** *(Tag: Reply)*
- 21:26, 10 February 2023 (diff | hist) . . **(+1,186)** . . List of whistleblowers  *(→2010s: Added Tesla 2)* **(current)**
- 21:11, 10 February 2023 (diff | hist) . . (+11) . . **m** TRW Inc.  *(→Superfund site: Fixed typo)*
- 19:51, 10 February 2023 (diff | hist) . . (+15) . . List of Superfund sites in California  *(→Superfund sites: Changed wikilink)* **(current)**
- 19:50, 10 February 2023 (diff | hist) . . (+25) . . Ashley Gjøvik  *(→Environmental health and safety concerns: Added wikilink)* *(Tag: Visual edit: Switched)*
- 19:49, 10 February 2023 (diff | hist) . . (+37) . . **N** TRW Microwave Superfund  *(←Redirected page to TRW Inc.#Superfund site)* **(current)** *(Tag: New redirect)*
- 19:48, 10 February 2023 (diff | hist) . . (+22) . . **N** TRW Microwave  *(←Redirected page to TRW Inc.)* **(current)** *(Tag: New redirect)*
- 19:45, 10 February 2023 (diff | hist) . . **(+33,359)** . . TRW Inc.  *(→Superfund site: New section)* *(Tag: nowiki added)*
- 16:57, 10 February 2023 (diff | hist) . . (+52) . . List of whistleblowers  *(→2020s: Added picture)* *(Tag: Visual edit)*

*Exhibit: YMMF 2*

312

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25



*Exhibit: CH / SIARH 1*

688.    In February 2023, Appleseed began publishing a five-part manifesto about *"her spiritual cultivation at Apple",* including writing about *"the Church of Apple and the living word of Steve Jobs."* She wrote about Gjovik in several of the posts, directly naming Gjovik, and Gjovik was notified via news alerts linked to her name. Appleseed also directly embedded several of Gjovik's Twitter posts. (All of this was creepy, invasive, and harassing).

689.    In Appleseed's manifesto she talked about one of Gjovik's complaints and shared what appeared to be an outcome of Okpo's supposed investigation into Gjovik's concerns. Okpo never shared any type of outcome or findings with Gjovik from his supposed investigation into her concerns and that investigation was supposedly still open when Gjovik was fired. It's unclear when, how, or why Apple Employee Relations and/or Workplace Violence met with Apple Global Security employee Joanna Appleseed to discuss Apple's personnel decisions about Gjovik.

313

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

> The comment about Radar, an issue tracking tool that is available for public access so external parties can file bug reports, is about a heinous radar from a team Ashley Gjøvik was on, in which they all filed Radars about ruining each other's lives.
>
> 
>
> **Ashley M. Gjøvik, JD**
> @ashleygjovik · Follow
>
> #Apple makes great products, & some workers have a great experience, but some don't. Everyone who knows me at work knows I've dealt with more abuse than anyone should have. (See: "Make Ashley's Life a Living Hell" &
>
> ♥ 464    💬 Reply    🔗 Copy link
>                  Read 28 replies
>
> Investigation into this found no policy violations, of course, because Ashley was not the only one that was subjected to a "living hell" radar and participated with the others. However, at Apple, unless you work in retail or AppleCare, you are lucky if there's more than one woman on your team. I

*Exhibit: Radar Investigation*

690.   Appleseed also admitted in the manifesto, that Apple employees *"told [her] that Ashley planned to hand over all of her messages to management."* Gjovik had no plans to hand over her text messages to Apple, and would not have told anyone that, so it was a lie from Apple. Further, Gjovik and Appleseed had and have no mutual friends and only knew each other briefly at work, so these 'mutual friends' are Apple employees – possibly Global Security, but also possibly Gjovik's ex-coworkers including Marini and Garfinkle, and that "Neoform" from Gjovik's last team. Appleseed reported facts establishing that someone, assumably Apple, threatened her in order to coerce her to file a bogus report against Gjovik, and even admitted the report *"served no legal purpose."* She admitted she filed a Business Conduct complaint about Gjovik, and Apple's lawyers later cited Appleseed's complaint, claiming it was filed September 15 2021, the same day Apple's OM&M lawyers sent Gjovik a harassing email about Gjovik's

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

314

Twitter posts about work conditions. Apple coerced or directed Appleseed to assist them in fabricating a paper trail, only hours prior to Apple sending an email to Gjovik about the same topic as Appleseed's complaint.

> When the article came out, I removed my iCloud from my work device and deleted the aforementioned conversation. A week after Ashley was terminated mutual friends told me that Ashley planned to hand over all of her messages to management. They had already investigated me and found nothing, this would give them a reason to fire me. I panicked and filed a report. Apple made that post-termination report a part of their justification against Ashley's retaliatory firing claims, despite that it serves no legal purpose.

*Exhibit: False Complaint – Appleseed Quote*

691.    Under information and belief, Apple has been coercing and inciting Appleseed, directly or indirectly, to help them cover-up what they did to Gjovik. Under information and belief, Apple then used Appleseed's actions to further coerce her into furthering their scheme because otherwise, if Gjovik were to win her cases against Apple, it would be revealed what Appleseed did in partnership with Apple to harm Gjovik. Thus, Gjovik must not win her lawsuits.

692.    (At some point in late 2023, Appleseed deleted her entire Medium account that hosted the manifesto posts. This was around the time she changed her Twitter account name to a new phrase and then deleted her prior account name, attempting to obstruct URLs to her prior posts from attaching to her account.)

693.    In February 19 2023, Joanna Appleseed contacted Gjovik with an email saying she knows Gjovik does not "*wish to hear from [her]*" and then proceeded to make more accusations against Gjovik. Appleseed added, *"I realize I'm not likely ever going to convince*

315

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*you .... that I'm not working for or with Apple."[330]* She then compared Apple to "Area X" from

"Annihilation." Gjovik did not respond. Gjovik still had not, and has not, initiated any contact

with Appleseed since September 2021.

**xx.     Gjovik Discovers the Secret Silicon Fabrication Plant; Apple**

**Commits More Felonies (February 2023)**

694.    On February 21 2023, Gjovik discovered the semiconductor fabrication activities

at 3250 Scott Blvd in Santa Clara, next to the apartment where she got sick. Gjovik posted on

Twitter in real time as she learned about it. Gjovik added that day, "*I've been making muffled*

*screaming noises for about twenty-five minutes now. WTAF IS WRONG WITH THEM. THEY*

*MUST HAVE KNOWN THEY DID THAT SHIT TO ME!!!  No wonder they gave me that*

*"extreme condition leave" to move out. Apple is the extreme condition.*"

695.    Under information and belief, Apple saw these posts and discussed what their

response should be to Gjovik now having this knowledge.

---

[330] Joanna Appleseed to Ashley Gjovik (business email at ashley@gjovik.co), February 19 2023 10:45am

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

 **Ashley M. Gjøvik**
@ashleygjovik

···

APPLE IS DOING LITERAL ACTUAL GODDAMN SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT SHIT INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT



11:29 PM · Feb 21, 2023 · **7,123** Views

331

*Exhibit: The Discovery of the Secret Silicon Fabrication*

---

331 Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1628250591779516416

317

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

696.    On February 21 2023, US DOL suddenly demanded Gjovik provide a copy of the audio recording from the prior meeting. Under information and belief, it was Orrick on behalf of Apple, and/or Morgan Lewis on behalf of Apple, requesting this audio transcript to use for their defense in Gjovik's cases.

697.    On February 27 2023, five Morgan Lewis attorneys filed a notice of appearance on Gjovik's NLRB charges, along with the three MWE lawyers. One of the Morgan Lewis attorneys was an ex-NLRB Board Member (Harry Johnson).

698.    On February 27 2023, US DOL suddenly demanded Gjovik index all of the documents and emails she previously sent US DOL Under information and belief, this was on request of Orrick and/or Morgan Lewis.

699.    On March 1 2023, Gjovik asked if any chemists followed her Twitter account and could weigh in on if NMP could cause the reaction she saw on her jeans. On March 2 2023 and for several days following, a Twitter account created specifically to interact with Gjovik about her claims about N-Methyl-2-pyrrolidone (NMP), "Sybil", replied repeatedly to her posts. Sybil repeatedly claimed NMP is completely safe, not banned, and that Gjovik was lying about the yellow clothes and rusty jeans and it was occurring simply because Gjovik did not know how to do laundry properly.



*Exhibit: Example Sybil Post*

318

**Deleted:** ¶
     <#>**Gjovik Discovers the Secret Silicon Fabrication Plant; Apple commits more Felonies (February 2023)**¶
<#>On February 21 2023, Gjovik discovered the silicon fabrication and manufacturing activities at 3250 Scott Blvd in Santa Clara, next to the apartment where she got sick. Gjovik posted on Twitter in real time as she learned about it. Gjovik added that day, *"I've been making muffled screaming noises for about twenty-five minutes now. WTAF IS WRONG WITH THEM. THEY MUST HAVE KNOWN THEY DID THAT SHIT TO ME!!!  No wonder they gave me that "extreme condition leave" to move out. Apple is the extreme condition."* ¶
<#>Under information and belief, Apple saw these posts and discussed what their response should be to Gjovik now having this knowledge.¶
     … [14]

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

700. Even after blocking the NMP account, it continued to stalk Gjovik's posts and continue posting, next calling for Gjovik's account to be suspended due to supposedly spreading misinformation about NMP. Under information and belief, Sybil was Apple.

701. On March 11 2023, a fake account ("Comrade Jones", sorry@butno.com) sent Gjovik an email claiming to be an ex-EPA compliance/enforcement employee. The account attempted to get Gjovik to stop talking about the vapor intrusion documentation for 825 Stewart Drive and tried to get Gjovik to stop talking about the NMP. The account made threats to intimidate Gjovik. The IP came from a location known for spam accounts.

> The reason I suggest you talk to an expert in the law here is because you have several misconceptions that are leaving you open to severe ridicule on a public stage. I don't know much about corporate law, but I can't imagine they won't attack your credibility and integrity.

*Threats from "Comrade Jones"*

702. Under information and belief, "Comrade Jones" was Apple.[333]

703. On March 22 2023, US DOL said they may dismiss Gjovik's entire case now if Gjovik does not send the audio file. Gjovik explained to them why that was unlawful and told them she would only send it if they agreed to 'seal' it so Apple could not get a copy. US DOL refused, essentially acknowledging they wanted to send Apple a copy due to something that occurred after the meeting.

704. Around March 2023 a new anonymous Twitter account ("Praveen") began harassing Gjovik. The account knew way too much about Gjovik and her claims against Apple, and the account almost exclusively trolled whistleblowers and unions. Gjovik and others researched the account and found it was affiliated with the MWE law firm, and was

---

[333] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1634647629421223936

predominantly harassing plaintiff's in cases where MWE represented the defendant. Gjovik called the account out and it not deny the affiliation, but still proceeded to harass Gjovik more including attacking her mental health, physical appearance and moral character .

705.    Gjovik continued to protest US DOL's corrupt behavior to US DOL, on Twitter, to US DOL OIG, and in a petition she created on Change.org asking US DOL to stop doing corruption to whistleblowers.

706.    On March 28 2023, US EPA FOIA manager Andrew Helmlinger (married to a partner at Orrick) claimed there were no documents related to Apple's TRI filing about NMP waste and emissions in 2020. (EPA functional teams would later tell Gjovik that was not a true statement). Gjovik complained to US EPA OIG about the matter.

707.    On April 3 2023, CalSTRS closed Gjovik's PRA request about her Apple Superfund office owned by CalSTRS. CalSTRS suddenly claimed there are no PRA documents other than a press release.

708.    Gjovik found note in a note in an US EPA document that CalSTRS conducted a 2016 Environmental Site Assessment for 825 Stewart Drive. Gjovik asked CalSTRS for a copy. CalSTRS denied any knowledge of it. US EPA and CalSTRS denied any records for the Site Assessment.

709.    On April 10 2023, Gjovik was notified that Apple's Morgan Lewis attorneys had requested a 'reconsideration' of merit of Gjovik's NLRB charge that Tim Cook's email violated federal labor laws. The NLRB refused to answer her questions as to how such a thing was arranged or to respond to her complaints that it was not allowed. Gjovik complained she suspected Apple was engaged in unlawful ex parte communications.

---

320

Deleted: incorrect).

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

710. On April 27 2023, Gjovik submitted two filings to NLRB. One objecting to the reconsideration process as a violation of the NLRA, APA, and US Constitution. The second arguing the charge should still be found to have merit.

711. On May 5 2023, CalSTRS put 825 Stewart Drive up for sale. All public listings failed to disclose its a Superfund site.

712. On May 13 – 15 2023, Appleseed suddenly published around or over forty posts on Twitter that made negative remarks and allegations against Gjovik. Appleseed included Gjovik's name and other personally identifiable information in several of the posts and tagged Gjovik's acquaintances, and even included images of the documents in Appleseed's lawsuit against Gjovik – so it was clear Appleseed was posting about Gjovik. Appleseed uploaded a video attached to one of these posts that showed an open web browser window on the computer she was using and the browser had multiple open tabs for Gjovik's whistleblower website (3x windows), Gjovik's air quality website, a US EPA page about air quality, and the SCOTUS brief in question. Appleseed was cyberstalking Gjovik as she posted these things about Gjovik.



*Exhibit: Image posted by Appleseed during May 13-14 2023 Posts about Gjovik*

713. Appleseed also posted claims that Gjovik violated the Constitution and claimed Gjovik wanted to "*deny civil liberty to an entire state,*" claimed Gjovik was trying to "*egregiously violate other people's constitutional rights and indiscriminately verbally and psychologically abuse those people for exercising them and then use [Gjovik's] rights as a [Gjovik's] own friend from accountability,*" claimed Gjovik filed a "*frivolous*" lawsuit which was "*self-serving nonsense that would catastrophically deny civil liberties,*", claimed Gjovik had

321

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

a "*wanton disregard for the truth in pursuit of [Gjovik's] own goals,*" and claimed Gjovik was "*admonished by the Assistant Attorney General of Washington for [Gjovik's] behavior toward [Appleseed].*" Appleseed tagged the Washington state AG's office's Twitter account in her post (which would notify that office of her post).

714.   Appleseed also make public posts about the state lower court and appellate judges assigned to Appleseed's retaliatory lawsuit against Gjovik. Appleseed claimed the appellate judge who found against her and in favor of Gjovik made an "*error*" and the lower court judge wrote an "*unsophisticated order.*" Appleseed also posted she "*already ordered the frame for*" a quote from the legal filing from Washington state arguing Gjovik's Constitutional challenge lawsuit should be dismissed under the state's 11th amendment rights. Appleseed implied she planned to hang a portion of that federal legal filing (for a lawsuit caused by her meritless retaliatory lawsuit against Gjovik) in her home. Appleseed then replied to her prior post ridiculing Gjovik with a new post that said "*I'm a lawyer*" with an image of a boy sticking a flute up his nose, implying that is Gjovik.



*Exhibit: Appleseed's 5/14/23 Flute Post*

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

715.    Appleseed admitted in her flurry of posts that she knew when she lost Gjovik's appeal in November of 2022 that it was "*best for [Appleseed] and all to let it go*" but that she decided to start attacking Gjovik again due to Gjovik's appellate win of Appleseed's meritless retaliatory lawsuit against Gjovik being cited in an amicus brief for a SCOTUS case written by a well-known human rights and civil liberties non-profit organization, and because, Appleseed said, members of "*Operational Intelligence*" groups contacted her and convinced her that Gjovik "*misled*" and "*deceived*" her in some way (assumably she was referring to Apple Global Security again).

716.    Appleseed once again claimed Gjovik's pleas for Appleseed to stop harassing her was some sort of criminal act by Gjovik. Appleseed complained that Gjovik "*cr[ied stalker [and] harassment*" about Appleseed, that Gjovik "*rationalized [Gjovik's] behavior with free speech,*" and Gjovik's actions "*justify more abuse*" by Appleseed. She then wrote "*ableism, racism, privacy invasion, fraud, it's the wild wild west so long as they've been criticized.*"

> Really sick of people who dox based off non-information (can't dignify with "conjecture") who defame, and are verbally and psychologically abusive.
>
> They rationalize their behavior with free speech and disinformation. They cry stalker, harassment, and justify more abuse.
>
> 11:44 PM · May 16, 2023 · **2,176** Views

> Weird how their values depend entirely on whether or not you agree with their abusive and nonsensical bullshit.
>
> Ableism, racism, privacy invasion, fraud, it's the wild wild west so long as they've been criticized, no matter how mildly and if they've done serious wrongs!

*Exhibits: Appleseed May 16 2023 Posts*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

717. Throughout the posts, Appleseed repeatedly referred to Gjovik as a "*harasser*", called Gjovik a "*liar*," she accused Gjovik of defamation and harassment, she accused Gjovik of doxing and called Gjovik a hypocrite. Appleseed posted that Gjovik *was "DESTROYING [HER] LIFE"* (sic). Appleseed posted that Gjovik lied to "*a friend*", lied "*on social media*," lied "*to a biased tabloid,*" lied "*to a respected news outlet,*" and lied "*to the government under oath.*" Appleseed added that now "*the lie is in case law, Academica, and books.*"

> Everyone really needs to recognize how terrifying this kind of thing truly is.
>
> The escalation of disinformation.
>
> Lie:
> to a friend,
> on social media,
> to a biased tabloid,
> to a respected news outlet,
> to the government under oath.
>
> Now the lie is in case law, academia, and books.
>
> 12:26 AM · May 14, 2023 · **4,208** Views
>
> **6** Retweets   **22** Likes   **2** Bookmarks

*Exhibit: Appleseed's "Case Law" Post*

718. Appleseed confessed again to proactively contacting people quietly and without Gjovik's knowledge, to claim Gjovik was lying and to allege Apple's version of facts about Gjovik's allegations against Apple. Appleseed referred to Gjovik's allegations against Apple as "*disinformation*" and "*fraud,*" quoted the book 1984, and then said that Gjovik wanted "*power*" and to "*deny liberty by corruption reality and agency of reason.*" Appleseed then implied Gjovik is at the "*root of all evil*" and compared Gjovik's lawsuit against Apple to Nazis and genocide.

719. Appleseed claimed in this frenzy of Twitter posts that she reported Gjovik to EFF and the ACLU and invited any "*civil liberties group or attorneys*" to contact her to review her "*thorough accounting documenting the issues in the orders, the events, and all the documentation of events that spurred it.*"

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

720.     On May 15 2023, Appleseed (an agent of Apple), then posted that she reported Gjovik to "the proper authorities" (assumably another FBI and/or local law enforcement report). Appleseed wrote she reported Gjovik to law enforcement alleging Gjovik committed perjury, fabricated evidence, made false statements to federal agencies, committed fraud, and engaged in harassment, doxing, and stalking.

I reported this to the proper authorities.

The perjury of everyone involved. The fabricated evidence. Using agencies and people in the government.

The false statements to federal agencies.

The fraud. The harassment. The doxing. The stalking.

ALL of it. I'm done.

1:49 PM · May 15, 2023 · **2,570** Views

*Exhibit: May 2023 False Reports*

721.     Appleseed, in this same eruption of posts over a few days, then also accused one of Gjovik's acquaintances of perjury, lying, lying under oath, harassment, being a sociopath, falsifying and fabricating evidence, and amplifying disinformation – all connected to Gjovik. Appleseed posted that she is "*hopeful*" that Gjovik's acquaintance was "*genuinely misled*" by Gjovik. She tagged the Twitter account for the President of the United States and claimed Gjovik won the appeal with "*fabricated evidence.*" She also made a vague statement about "*untrue hearsay from an authoritative source*" about Gjovik.

722.     In several posts Appleseed even directly addressed Gjovik saying: "*To be very [expletive] clear: No amount of intimidation, threat, or coercion can stop it. That ship has sailed. You can discredit me into oblivion at this point, it won't make a difference. Whatever lies you want to tell, it won't change the outcome. The fraud is undone.*" Appleseed added *"[she]*

325

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*believe['s] in civil disobedience"* and referred to Gjovik as *"white wealthy people co-opting that with fraud."*

723.     Gjovik still had not, and has not, initiated any contact with Appleseed since September 2021. Even after the gag-order was removed in January 2023, Gjovik still refused to speak about Appleseed publicly, out of fear of another lawsuit or more false reports or worse.

724.     On May 21 2023, Appleseed began posting about Gjovik again. Appleseed complained that Gjovik was *"psychologically torturing"* her and Gjovik was being *"maliciously abusive"* and Appleseed wanted to *"talk about it"* with Gjovik or else wanted Gjovik to *"move on in peace"* (which implied her desire for Gjovik to withdraw Gjovik's charges and lawsuits against Apple). Appleseed posted about how Gjovik lied, and someone unnamed misunderstood, and she criticized Gjovik with a *"quote tweet"*, and Gjovik was a *"vindictive [expletive]"* and Gjovik would destroy her, and *"ruin other lives,"* and that Gjovik *"love[s] it."* She claimed Gjovik is *"evil,"* and has a *"vendetta"* and *"disregard for life."*

725.     On May 26 2023, Appleseed attempted to contact Gjovik through a third-party (a current Apple employee domiciled in another country) and conspired with him and attempted to get Gjovik on the phone with her without Gjovik knowing it would be Appleseed on the other line. When Gjovik saw through the plan and complained to the third-party, that person explained Appleseed wanted to talk to Gjovik about Gjovik's evidence against Apple in her federal charges that implicated Appleseed and encourage Gjovik to withdraw that evidence.

**Apple employee, 5/26/23, 12:01am:** *"I want to ask if you wanted to talk sometime soon. Someone reached out to me with concern that some of the bot network and false identifies attacking you might be more dangerous than you have already uncovered, and perhaps much more widespread than you have initial found. They reached out to me because they worked at Apple and I'm a [employee] at Apple. They asked if I would mind facilitating a conversation, because they are genuinely afraid and they will only talk about this to you and I over voice. I spoke with them already and they showed me some of what they have uncovered and it seems very credible to me. I can talk to you first if you would like, and then I can invite the other party in if you agree to it. This is a*

*conversation that needs to be kept in confidence of course, as we are dealing with a huge disinformation campaign, that may have multiple origins, targeting Apple opposition (public worker organizations and whistleblower)."*

**Gjovik, 5/26, 12:44pm:** Responds mentioning she already has federal charges about Apple's digital harassment and surveillance. Mentions she created a 400-page filing with evidence of the accounts and she complains Appleseed sued her over it and reported the legal filing as 'child porn.' Gjovik commented her NLRB case seemed to be progressing and she is expecting a finding in her favor about the digital harassment and Appleseed's lawsuit against her. Gjovik then sent him a copy of the federal filing titled *"Gjovik v Apple – Intimidation and Threats Evidence Report".* Gjovik also commented she is concerned who ever reached out to him could be "*sent by Apple to get [her] to comment on things which they'd record and some[how] try to use against [her]"* in the federal cases.

**Apple employee, 5/26, 10:38pm:** *"The person believes they have been manipulated, and they just figured it out a week ago… They are terrified because they are being stalked. Someone named "[name]" physically came to an old address. I have offered to be on a group call with them and you as a witness and to try to facilitate trust. It seems too important for the conversation to not happen."*

**Gjovik, 5/26/23, 10:39pm:** Gjovik complains about Apple's spies again, and complains about Apple breaking into her attic and installing "surveillance crap" in her home. Gjovik says she will not consider talking to the person unless their identity is disclosed prior.

**Apple employee: 5/26/23, 11:43pm:** *"I think they reached out to me first because they described the exact same scenario, with people sending them repeated messaging that they didn't recognize was just baiting them until now. They also 100% do not trust anyone at this point except very specific people that are actually confirmed to be real and not a part of the government or big business, especially tech. I'm not home at the moment … Would you have time to talk tomorrow? I'm guessing it is late for you now."*

**Gjovik, 5/26/23, 11:55pm:** Gjovik complains his request "*feels like an op"* and "*worried it's an op to mess with [her federal] testimony."* Gjovik complains it is suspicious and "*odd"* that "*someone urgently must talk to [her], but only without any paper trail, about a topic that is a matter of [her] federal charges and will be discussed in federal courts in the near future."*

**Apple employee: 5/27/23, 1:10am:** [not directly related comments] … *"I definitely don't want anything to hinder your case. That's why I wanted to get this person as well."*

**Gjovik, 5/27/23, 1:15am:** *"The case about Tim Cook's email means Tim Cook has to be in the court room & has to testify in my case… because he sent that email. They're for sure going to murder me, but it will be worth it. Maybe they'll stop sending shitty emails!!!"*

**Apple employee, 5/27/23, 2:57am:** *"Hopefully they realize that losing money isn't worth physically silencing someone…. The reason that the person that reached out to me couldn't approach you alone is because they are afraid of the orchestrators being told, and it's important that the orchestrators think it's business as usual while the puzzle is*

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

1   *fully assembled. The purpose is to have all the facts and undo successful false divisions*
2   *and false associations… it's about safety and ensuring it is not disclosed to the wrong*
    *people."*
3   **Gjovik, 5/27/23, 2:12pm:** *"…. The repeated requests for confidentiality are also*
4   *concerning. I'm very public with everything that's done, it's one of the ways I try to stay*
5   *alive. … and what I said about court means that I can't hide anything in court,*
    *regardless of whatever it is they're talking about 'undoing.' I don't want to be part of*
6   *anything directly related to my own lawsuits that someone is demanding I keep quiet for*
    *their own benefit. That sounds crazy…. This whole matter is seriously stressing me out a*
7   *lot, so I'd prefer not to talk about it anymore…"*
8   **Apple employee, 5/27/23, pm:** *"…. This person contacted me through established*
9   channels… and I talked to them in depth as well so I am as certain as I can be that I don't
    think there is any trickery. If you would like we can chat briefly over voice and I can tell
10  you who it is and explain the baseline of why they want to talk….the fact that they were
    recently being stalked stoked the urgency… so it is up to you, either we leave it here as
11  you asked, or I can have a voice/video (me only on video and you voice even) chat to
12  explain the who and why and you can decide after that. …I have had to worry about the
    local… mafia coming after me … so I understand the stress you are into some degree…
13  Let me know."
14  **Gjovik, 5/27/23, pm:** *"I don't want to talk about this anymore & I have a feeling I may*
15  *know who the person is now and if its the person I think it is, they're involving you in*
    *their own illegal and sociopathic conduct. If it is that person, I have no desire to talk to*
16  *them whatsoever for the rest of my life, as I made clear to them nearly two years ago.*
    *There is no situation imaginable that could ever change my position on that after*
17  *everything the person has to me over the last two years. And that's all I have to say about*
18  *any of this."*
19  **Apple employee, 5/27/23, pm:** *"…. The only advice I will give is that you might want to*
    *reach out to [newspaper editor] via Email or DM and ask for his Signal. Then ask if he*
20  *told you that [reporter] said that to him and if he even spoke to you on Signal at all, let*
21  *alone from that account on September 16 2021. It looks like that account might have*
    *been an impersonation. Take care."*
22  [Note: This is a reference to some of Appleseed's evidence of Apple's stalking and
23  harassment against Gjovik and was submitted as part of Gjovik's federal charges and was
    included in the document Appleseed sued Gjovik over. The editor contacted Gjovik in
24  September 2021 and asked Gjovik because Appleseed was reaching out to a reporter at
    their publication and advising him not to talk to Gjovik. The account Gjovik
25  communicated with was authentic as the editor used it to coordinate the publication of
26  articles with Gjovik, including Gjovik publishing an op-ed with that publisher.]
27  **Gjovik: 5/27/23, pm:** *"omfg…. She is doing this because she's afraid its about to come*
28  *out she assisted Apple in violating federal law. Please do not ever contact me on her*
    *behalf ever again…. I'm blocking you here because of what you've done for her. Its*
    *offensive and dangerous."*

328

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**Apple employee, 5/27/23, pm:** *"I don't think that is her intention but I understand."*
**Gjovik, 5/27/23, pm:** *"She's a sociopath and you helped her mislead me, deceive me, and basically lie to me to compromise me and get me on the phone with someone who has tried repeatedly to tamper with my federal testimony about her actions. You are blocked now & I wish it did not have to be that way."*
[Note: Account was blocked].

726.   On May 31 2023 at 4:35pm, Appleseed contacted one of Gjovik's friends via LinkedIn, identifying herself as "*Apple Global Security*," and trying to learn about Gjovik's "*friends or family*," claiming she wants to "*help*" Gjovik, and admitting she has been extensively cyberstalking Gjovik.

> I am so sorry to bother you, but you are the only person I can find who might have known Ashley before she worked at Apple. I worked in Global Security and have fraud and information security research expertise and found Ashley's old website was cloned, which is an indication someone has been hacked.
>
> Something happened at the end of 2021 that was quite odd, and since then, seems to have gotten worse. During my investigation, I found her old twitter handle on her original website, which led me to a tweet in which you asked her if she was hacked.

*Exhibit: 5/31/23 Messages 1*

> I know this sounds super weird, believe me, but Ashley has never had any friends or family she's ever spoken about since I've known her, and others before her. Her entire online life was scrubbed from the internet between 2012-2015, and while I have no idea what any of this means, the situation around your 2012 message to her might help me help her.
>
> Thank you!

*Exhibit: 5/31/23 Messages 2*

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**xxi.   After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023).**

727.   On May 30 2023, Gjovik complained to US EPA OIG and General Counsel's office about Helmlinger's conflict of interest with Apple's counsel at Orrick, and his misconduct with her US EPA FOIA requests.

728.   On June 23 2023, Gjovik filed complaints about Apple's facility at 3250 Scott Blvd to US EPA, CalEPA, city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with three exhibits attachments: the factory operations, the apartment next door, and the history of the site. Gjovik also posted on Twitter that she did so and provided a link to a Google Drive folder with what she submitted – which is still accessible today.[334]

729.   On July 9 2023, NLRB affirmed the prior decision of merit on Gjovik's charge about Tim Cook's 2021 email.

730.   On August 7 2023, "*Praveen*", posted on Twitter harassing Gjovik again. One of the only income opportunities Gjovik had in 2023 was writing an article in a magazine for which she was compensated for that article. Gjovik wrote an article about adult women with autism and her experience realizing she was autistic. Gjovik hoped the publication of her work could lead to more opportunities for contracted work or employment. On August 7 2023, the magazine posted from their official account, an account with 78,200 other accounts 'following' it, a link to Gjovik's article and tagged Gjovik's Twitter account in the post.  The same day, Praveen replied to the magazine's post commenting publicly: "*Ahh autism is why Ashley lies to creates*

---

[334] GoogleDrive, Ashley Gjovik – 3250 Scott Blvd Complaint, https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK

Deleted: ¶
<#>After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023).¶

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1  *spectacles for social credit.*"³³⁵ Now if anyone searched Twitter for Gjovik's article, they would

2  find that comment accusing Gjovik of being a liar.

3      731.    On August 17 2023, US EPA inspected Apple's factory at 3250 Scott Blvd due to

4  Gjovik's complaints.³³⁶



*Exhibit: US EPA ECHO for 3250 Scott Blvd*

17      732.    In mid to late 2023, ex-Apple Global Security employee, Joanna Appleseed,

18  began deleting evidence of her unlawful conduct towards Gjovik, including deleting her prior

19  Twitter account which account name mapped to Appleseed's Twitter posts that Gjovik cited in

20  her legal filings. Appleseed also deleted her Medium blog account where Appleseed had posted

21  blog posts where she made allegations against Gjovik and provided admissions about her

22  collusion with Apple about Gjovik.

---

27  ³³⁵ Twitter, Index on Censorship, August 7 2023,
    https://twitter.com/IndexCensorship/status/1688495940590583808
28  ³³⁶ US EPA, ECHO, 3250 SCOTT BOULEVARD, SANTA CLARA, CA 95054,
    https://echo.epa.gov/detailed-facility-report?fid=110001168254

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

733.    On August 25 2023, Apple Head of Global Security, Tom Moyer, was recharged

with criminal bribery following the District Attorney's successful appeal on the prior

inexplicable dismissal.[337]

734.    In August 2023, CalSTRS suddenly sold 825 Stewart Drive to BentallGreenOak

at $6.5M above the prior sale price, despite all of the new issues introduced by Apple's botched

renovations, increased CERCLA obligations, and increasing contamination from the upgradient

plume.[338] Under information and belief, the sale price was inflated to pay off CalSTRS for the

harm Apple caused because CalSTRS is one of the largest Apple shareholders ($4B).

735.    On August 31, 2023, the US EPA published a brief letter responding to Apple's

May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since

December of 2015, calling Apple's testing report and strategy "*fundamentally incorrect,*" having

"*no fundamental basis,*" "*not accurate,*" "*confusing,*" and "*misleading.*" Among other issues the

EPA complained that Apple still had not found the missing sub-slab vent port, something Gjovik

also complained about in 2021.[339]

736.    On September 2023 a Reddit thread was started about this lawsuit and where

harassing and defamatory comments were posted about Gjovik in an attempt to further

intimidate and smear her. Gjovik reported many of the comments but the moderators refused to

take down the comments other than one that was explicitly sexual. Gjovik discovered that at

least one of the moderator's was an active Apple Security employee and someone who had

---

[337] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth
Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[338] Mercury News, *Apple-leased Silicon Valley office building is bought as value jumps*, Aug 29 2023,
https://www.mercurynews.com/2023/08/29/apple-office-real-estate-sunnyvale-buy-build-tech-economy-
covid-iphone/
[339] US EPA, TRW Microwave Site, Re: Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31
2023, https://semspub.epa.gov/work/09/100034523.pdf

**Deleted:** ¶
    <#>**Apple Respond with More Cover-Ups & Harassment
    (July-September 2023)**¶
<#>In July 2023, Kate Adams Wikipedia article was suddenly
removed. Weeks later her father, a famous environmentalism
responsible helping get the Clean Water Act passed, had his
Wikipedia page edited to remove details of his work with US
environmental legislation and to remove Kate Adam's ties to Apple.¶

**Deleted:** slat

**Deleted:** FIRST

**Deleted:** –

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

harassed her while she was still an employee (Dakota). Gjovik complained to the moderators that Apple was protecting Apple harassing her, but they never responded.

737.    Through all of this, Gjovik applied for jobs and participated in interviews, however no one would offer her a job, and some even admitted it was due to her open litigation with Apple. After being terminated in September of 2021, Gjovik would not find a job until September of 2023, when she was offered a role as a program manager at a university for an urban air pollution program in their college of engineering. Gjovik accepted and started September 28 2023. Gjovik's new job offers her a $100,000 salary, no performance bonus, no stock options other than a 401k, and the position is for a five-year temporary program. In this first job after Apple, Gjovik's salary was lowered 41% and total compensation was lowered 74%.[340]

738.    Without a job for two years, Gjovik lost all of her savings including her money in her savings accounts, all of her 401-Ks, and also accrued tens of thousands of dollars of credit card debt with interest. Gjovik graduated law school with $80,000 of student loan debt which began accruing interest in October of 2023.

739.    In October 2023, Yannick Bertolus, the person who sent the termination letter to Gjovik, suddenly left Apple.[341]

740.    On November 9 2023, the US DOJ Civil Rights Division settled with Apple that over Apple's violations of the anti-discrimination provision of the Immigration and Nationality Act (8 U.S.C. § 1324b), with Apple owing $25M.[342]

---

[340] Note: whistleblowers who report illegal/immoral practices by their employer to an outside party who could act on the employee's complaint see average earnings drop of around 67% following disclosure. See, Kate Kenny and Marianna Fotaki, "*The Costs and Labour of Whistleblowing: Bodily Vulnerability and Post-disclosure Survival,*" Journal of Business Ethics, 182, pp. 341-64 (2023).
[341] Bloomberg, *Apple Renews Top Ranks With Wave of Executive Promotions,* Oct 15 2023, https://www.bloomberg.com/news/newsletters/2023-10-15/apple-october-2023-executive-promotions-new-vps-of-retail-software-operations-lnrh4t94

741.   After two years of threatening to dismiss Gjovik's claims without justification, on December 8 2023, the US Department of Labor suddenly dismissed Gjovik's OSH Act and CERCLA whistleblower retaliation claims with demonstrably false, incoherent and inflammatory statements. Gjovik notified US DOL she planned to appeal, moments after receiving the decision. The dismissal came only 48 hours of Gjovik was notified her a U.S. Senator had just contacted a number of US government agencies on Gjovik's behalf asking for updates on Gjovik's complaints, including to the US Department of Labor.

742.   In December 2023, Dan West was "promoted" to a "non-product role" reporting to John Ternus.[343] (At the time Gjovik left Apple, the only "non-product role" reporting to executives was their administrative assistant teams – it's unclear what West is now doing).

## VIII.   LEGAL CLAIMS

743.   Gjovik hereby incorporates by reference each and every allegation and fact.[344] Where any argument contradicts with another argument, one or both of the conflicting arguments will be pled in the alternative.

744.   Claims and allegations against "Apple" are made broadly to include corporate liability for relevant actors as appropriate for each statute/law and circumstance, including: Respondeat superior (managers, corporate officers, employees); labor law's "supervisor" theory; agency theory for agents (law firms, contracted service firms, those asked to do favors, those

---

[342] US DOJ v Apple Inc, Investigation No. DJ#197-11-963; US DOJ, Justice Department Secures $25 Million Landmark Agreement with Apple to Resolve Employment Discrimination Allegations Based on Citizenship Status, Nov 9 2023, https://www.justice.gov/opa/pr/justice-department-secures-25-million-landmark-agreement-apple-resolve-employment

[343] Bloomberg, *Apple's iPhone and Watch Product Design Chief to Leave in Shake-Up,* December 8 2023, https://www.bloomberg.com/news/articles/2023-12-08/apple-s-iphone-and-watch-product-design-chief-to-leave-in-shake-up

[344] Federal Rules of Civil Procedure, Rule 10 Form of Pleadings, (e) Adoption by Reference

334

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

coerced to perform acts, employees, etc.).[345] Concurrently and in the alternative, Apple may be responsible via aiding, conspiring, inciting, orchestrating, negligence, condoning, ratifying, and other methods of vicarious liability for unlawful conduct noted, which will be argued in detail where appropriate during the trial. An admission by an agent within the scope of his employment is admissible.[346]

745.    Apple is liable for harassment (threats, intimidation, defamation, humiliation, etc.) against Gjovik by Gjovik's coworkers, and even by anonymous actions, because Apple ratified the tortious acts, and/or Apple subsequently ratified the originally unauthorized tortious acts.[347] Apple was aware of the harassment and failed to take steps to investigate or address it.[348] The press even published articles describing Gjovik's coworkers harassing Gjovik about her whistleblowing, articles which Apple was asked to comment on by the reporters.[349] While knowing of systemic issues, Apple failed to respond to complaints about harassment of Gjovik, affirmatively refused to address Gjovik's complaints about harassment, failed to discipline or terminate those who were harassing Gjovik, concealed and covered-up the source of harassment, failed to provide a system for registering complaints of harassment of Gjovik, and even discouraged complaints of harassment of Gjovik from being filed.[350]

---

[345] Cal. Lab. Code § 1104; *Persson v. Smart Inventions, Inc.*, 125 Cal.App.4th 1141, 1167 (2005); 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 32, p. 94.
[346] See *Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir.1986); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), as amended (Aug. 11, 1998).
[347] C.R. v. Tenet Healthcare Corp., 169 Cal.App.4th 1094, 1110 (2009), Ventura v. ABM Indus. Inc., B231817 (Cal. App. Dec 20, 2012); Murillo v. Rite Stuff Foods, Inc., 65 Cal.App.4th 833, 852 (1998); Shultz Steel Co. v. Hartford Accident & Indemnity Co., 187 Cal.App.3d 513 (1986).
[348] Id; 29 C.F.R. § 1604.11(d); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 1001 (9th Cir. 2010); *Pryor v. United Air Lines, Inc.*, 791 F.3d 488 (4th Cir. 2015).
[349] The Verge, Apple's fortress of secrecy is crumbling from the inside, September 30 2021 ("After Gjovik started to gain momentum on Twitter, multiple current and former Apple employees tweeted about how they were suspicious of her claims and felt like she was merely trying to get attention.")
[350] *Vance v. Ball State University*, 133 S. Ct. 2434 (2013); US EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC-CVG-1999-2 (1999); *City of Los Angeles v.*

**Deleted:** It's under information and belief, that

**Deleted:** Cal. Lab. Code § 1104

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1    746.   The named parties were Apple's agents and employees, and those named were

2    acting withing the scope of her/his/their agency and/or employment when he/she/they harmed

3    Gjovik.[352]  The named parties conspired with Apple, and were aided and incited by Apple, and

4    Apple condoned and ratified their conduct against Gjovik.[353] Even if named parties conduct was

5    unauthorized by Apple Inc, it is still within the scope of employment and/or authorization

6    because the conduct was committed in the course of a series of acts authorized by the employer

7    and the conduct arose from a risk inherent in and/or created by Apple Inc.[354]

8    

9    747.   Actions taken by agents and servants of Apple, against Gjovik, outside work

10   hours and facially appearing recreational, are still within the scope of employment and/or agency

11   because they were carried out with the employer's stated and/or implied permission, they

12   provided a benefit to the employer, they were ratified or condoned, and/or because they had

13   become customary.[355]

14   

15   748.   Where any statute of limitations is in question of possibly being expired for an

16   alleged claim, Gjovik, where reasonable, will argue the statute of limitations should be tolled

17   due to Apple's fraudulent concealment of numerous material facts in this case. A significant

18   amount of new evidence and facts came to light after initial charges were filed and initial

19   investigations conducted (the Aug 19 2021, EPA inspection, the May 2021 report on the SSD

20   system, the EPA investigation into SSV/HVAC issues starting July 2021, the EPA ordering VI

21   

22   

23   *Superior Court*, 33 Cal.App.3d 778, 782-783 (1973); *Coats v. Construction & Gen. Laborers Local No.*
      *185*, 15 Cal.App.3d 908, 914 (1971); *C.R. v. Tenet Healthcare Corp.*, 169 Cal.App.4th 1094, (Cal. App.
      2009).
24   [352] Judicial Council of California Civil Jury Instructions (2020 edition), *3701 Tort Liability Asserted*
      *Against Principal,* https://www.justia.com/trials-litigation/docs/caci/3700/3701/
25   [353] *Rood v. County of Santa Clara*, 113 Cal.App.4th 549, 571 (2003); *Golceff v. Sugarman*, 36 Cal.2d
      152, 154 (1950); *Alvarez v. Felker Mfg. Co.*, 230 Cal.App.2d 987, 997 (1964).
26   [354] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3722. Scope of*
      *Employment - Unauthorized Acts*, https://www.justia.com/trials-litigation/docs/caci/3700/3722/
27   [355] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3724. Social or*
      *Recreational Activities*, https://www.justia.com/trials-litigation/docs/caci/3700/3724/

28   

Deleted: some of Apple Inc.'s
Deleted: that
Deleted: [351] ¶
Deleted: &/
Deleted: Further, actions
Deleted: &/
Deleted: Most significantly, Gjovik not learning about the August
Deleted: , inspection of her office until June 2022, and not learning about Apple's  EPA inspection, the May 2021 report on the
Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

testing and fixes to HVAC/SSV system, EPA telling US DOL about the inspection in Dec 2021, the secret silicon fabrication, the Chevron/Apple/Oaktree Capital/Irvine Company Board conflicts of interest, Lisa Jackson's active interference with US EPA investigations, etc.).

749.   This information was obtained through numerous FOIA and PRA requests submitted by Gjovik, information obtained by Gjovik through investigative research of other public records, meetings and inquiries to government agencies; and detailed analysis and investigation of continuing, prolonged digital activity directed towards Gjovik. Gjovik only obtained this evidence and facts after dogged, persistent research and public records requests despite much push back and obstruction by Apple in an attempt to keep these facts concealed.

750.   Gjovik will also argue, where applicable, the doctrine of continuing violations.[356]

A.   SECURITIES FRAUD WHISTLEBLOWER RETALIATION

751.   Apple is a California corporation and one of the largest companies in the world. Apple's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, required to publicly file periodic reports containing financial results and other material information, and is listed on the NASDAQ Stock Market under the ticker symbol "AAPL."

752.   Apple discriminated and retaliated against Gjovik in violation of Sarbanes-Oxley Act and Dodd-Frank Act statutes. Anti-retaliation claims under Dodd-Frank and Sarbanes-Oxley "have legally independent origins and are equally available to the employee."[357] Examples of protected complaints under SEC rules (and thus Dodd-Frank and SOX whistleblower protection)

---

[356] Gjovik's excited utterance upon discovery on February 21 2023, "APPLE IS DOING LITERAL ACTUAL ******* SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT **** INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT" https://twitter.com/ashleygjovik/status/1628250591779516416
[357] *Artim Transportation Systems*, 826 F.2d at 550 (quoting *Alexander*, 415 U.S. at 52, 94 S.Ct. 1011); *Xanthopoulos v. United States Dep't of Lab.*, 991 F.3d 823, 834 (7th Cir. 2021).

Deleted: plant outside her apartment in 2020 until February 21 2023; and only learning these…

Deleted: may

Deleted: SOX

Deleted: (15

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

are captured in the Federal Register and include but are not limited to: "misrepresentations / omissions in marketing and press releases, corporate governance concerns, conflicts of interest by management, advisory conflicts of interest, failure to notify shareholders of corporate events, false/misleading financial statements and proxy materials, and corporate disclosure matters."[358]

753.    In applying § 10(b)'s reach to specific conduct, the Supreme Court explains that the securities laws should be construed "*not technically and restrictively, but flexibly to effectuate its remedial purposes.*"[359] To that point, the Supreme Court has observed that the executive branch generally adopts "*a broad reading*" of the phrase "*in connection with the purchase or sale of any security*" and, given the SEC's role in enforcing the Act, its view is "*entitled to deference if it is reasonable*" within the particular dispute faced by a court.[360]

754.    In addition to the legal precedent discussed later, Apple's own Whistleblowing Policy acknowledges that reports of "*financial… misrepresentations, impropriety, or fraud*", "*failure to comply with a legal or regulatory obligation*", "*disclosure concerns,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[361]

i.    **Sarbanes-Oxley (SOX) Whistleblower Retaliation (18** U.S.C. § 1514A)

755.    The first claim against Apple is for retaliation under the SOX whistleblower statute, 18 U.S.C. § 1514A.  "A publicly traded company may not retaliate against an employee who provides information that employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating

---

[358] US SEC, *Securities Whistleblower Incentives and Protections*, 76 FR 34300 (June 13 2011), https://www.federalregister.gov/documents/2011/06/13/2011-13382/securities-whistleblower-incentives-and-protections

[359] *S.E.C. v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)

[360] Id. at 819–20, 122 S.Ct. 1899; *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1115 (N.D. Ill. 2016).

[361] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

Deleted: .

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

to fraud against shareholders."[362]  Apple is a publicly traded company whose securities must be registered under federal securities laws.

756.    SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. Gjovik's SOX whistleblower retaliation claim was filed with US Department of Labor on August 29, 2021, and the case Docketed on December 10 2021. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims. If the Secretary fails to issue a timely final order, the complainant may seek de novo review in the appropriate district court of the United States having jurisdiction.[363] Jurisdiction vests with the district court when the case is filed.[364] There is a four-year statute of limitations to file a claim in court.[365]

757.    Gjovik engaged in protected activity (complaints of fraud, complaints of violations of SEC rules, and reports to the US SEC); the employer knew, actually and constructively, that Gjovik engaged in this activity; then Gjovik suffered an unfavorable employment action, and Gjovik's protected activity was a cause of the action. The Sarbanes-Oxley Act, 15 U.S.C. § 1514A, seeks to combat what Congress identified as a corporate culture that discourages employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally."[366]

758.    Gjovik filed complaints internally verbally and then formally (August 23 2021), complained to supervisors, then complained to the federal government (July 2021), complained

---

[362] 18 U.S.C. § 1514A(a)(1).
[363] *Ashley Gjovik v Apple Inc* (Apple Inc/Gjovik/9-3290-22-051) U.S. Department of Labor; Gjovik's U.S. SEC Whistleblower Tip: Sept 1, 2021 (#16304-612-987-465); 28 U.S.C. § 1441(a); Sarbanes Oxley Act (SOX); Dodd Frank Act))
[364] *Stone v. Duke Energy Corp.*, 432 F.3d 320 (4th Cir.2005) (case below 2003-SOX-12).
[365] U.S. Department of Labor, *Whistleblower Investigations Manual*, https://www.osha.gov/sites/default/files/AnnotatedWIM.pdf
[366] 29 C.F.R. § 1980.104(b)(1); S.Rep. No. 107-146, at 5 (2002).

Deleted: activity

Deleted: ,

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

to the press, and filed a complaint with the US SEC (August 31 2021).[367] Gjovik's complaints to Apple definitively and specifically relate to one of the listed categories of fraud or securities violations under 18 U.S.C. § 1514A(a).[368] Gjovik had an objectively reasonable belief that Apple intentionally misrepresented and omitted certain facts to investors, which were material, and which risked loss, and thus may constitute securities fraud. Gjovik had an objectively reasonable belief that Apple violated SEC rules, and had insufficient internal controls, and engaged in fraud related to securities.

759. Gjovik complained to Apple about conflicts of interest related to a board member and decision about her office, about apparent self-dealing by corporate insiders including an interested party transaction, Apple's false public statements about Apple's environmental and labor practices, including false statements by a prior government official and now Apple executive; concerns that Apple's internal controls were inadequate; Apple appeared to be silencing and retaliating against whistleblowers and people raising concerns, in order to cover up the issues instead of investigate or resolve problems; and Gjovik's complaints about the safety of her office and about the complaint process generally would be overseen by the Board Committee chaired by an officer Gjovik was complaining about, Ron Sugar.[369]

760. Gjovik's concerns were material as Apple makes statements about the conditions of its properties, about its compliance with regulations, and its environmental practices in its SEC filings and communications to shareholders. Gjovik's complaints were reasonable as the allegations included all the basic elements of fraud. A claimant who reports a violation of the

---

[367] See OSHA Release No. 22-1763-DAL, SOX Case, Oct. 7, 2022 (ordering a company to pay more than $800,000 in damages and reinstate two scientists whose employment was terminated in retaliation for leaking information to media).
[368] *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir.2008); *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir.2009).
[369] *Rocheleau v. Microsemi Corp Inc.*, 680 F. App'x 533, 535 (9th Cir.), cert. denied, U.S., 138 S. Ct. 166, 199 L.Ed.2d 40 (2017). *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 668 (4th Cir. 2015).

340

mail fraud or wire fraud statutes need not also establish that such violations relate to fraud against shareholders and does not have to use the word "fraud" to qualify as a SOX whistleblower under the Act.[370]

761.    Gjovik also filed a complaint with the SEC on August 31 2021, and made it public on September 1 2021, that she did so. Apple knew about Gjovik's complaints due to its surveillance of Gjovik's private and public activities, due to press coverage of the complaint, and due to coworkers talking about the complaint. Apple knew about Gjovik's SEC charge when it fired her and Apple fired her because of her complaints and SEC charge, along with other protected activity. Gjovik's SOX activities were at least a contributing factor in Gjovik's subsequent termination.

**ii.    Dodd Frank Whistleblower Retaliation (15 USC §78u-6(h)(1)(A)(iii))**

762.    Apple discriminated against, took adverse employment actions, and discharged Gjovik, in violation of the Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), due to Gjovik providing information related to a violation of the securities laws to the Securities and Exchange Commission; initiating, testifying in, or assisting in any investigation or administrative action of the SEC based upon or related to such information; and making disclosures that are required by SOX, the Securities Exchange Act of 1934, or other laws subject to the SEC's jurisdiction. The scope of Dodd Frank whistleblower retaliation protections is broader than SOX. The Dodd-Frank Act protects whistleblowers from retaliation for making disclosures that are required or protected under any law, rule, or regulation subject to the jurisdiction of the SEC, which includes more than securities laws.[371]

---

[370] *Lockheed Martin Corp. v. Administrative Review Bd.*, U.S. Dept. of Labor (10th Cir. 2013) 717 F3d 1121, 1130.
[371] *Asadi v. G.E. Energy (USA)*, L.L.C., 720 F.3d 620, 625–26 (5th Cir. 2013); § 78u–6(h)(1)(A)(iii).

341

**Deleted:** ,

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

763.     Much of the public policy behind Dodd-Frank whistleblower retaliation protections runs parallel to prohibitions on employers terminating employees for reasons that violate public policy. For example, it is a termination in violation of public policy if an employer terminates an employee for disclosing company-related information to law enforcement.[372] It's also a termination in violation of public policy if an employer terminates an employee because they reported corporate fraud,[373] or because the employee reported to the company's board chairman that he thought that certain business actions were illegal and fraudulent.[374] In addition, an employer cannot retaliate against an employee who disclosed and complained to the employer's shareholders about certain business and medical practices that he thought were unethical and illegal.[375]

764.     As discussed in the RICO section, 18 U.S.C. 1513(e) prohibits "*knowingly, with the intent to retaliate, tak[ing] any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense…*"[376] Section 1107 makes criminal any adverse employment related action, including termination, taken by an employer against an employee for reporting to appropriate law enforcement authority what the employee in good faith reasonably believes to be a violation of any federal law, and not just securities fraud. It applies to all companies, including nonprofits,

---

[372] *Palmateer* v *IHO*, 85 Ill. 2d at 132, 52 Ill.Dec. at 16, 421 N.E.2d at 879 (1981); *Cardenas v. M. Fanaian, D.D.S., Inc.* (App. 5 Dist. 2015) 194 Cal.Rptr.3d 1, 240 Cal.App.4th 1167, review filed, review granted and opinion superseded 195 Cal.Rptr.3d 789, 362 P.3d 431, review dismissed 198 Cal.Rptr.3d 821, 365 P.3d 789
[373] *Smith v. Mitre Corp.*, 949 F. Supp. 943, 69 Empl. Prac. Dec. (CCH) ¶ 44506, 37 Fed. R. Serv. 3d 54 (D. Mass. 1997) (applying Massachusetts law).
[374] *Nappi v. Meridian Leasing Corp.*, 859 F. Supp. 1177, 131 Lab. Cas. (CCH) ¶ 58021 (N.D. Ill. 1994) (applying Illinois law). 105 A.L.R.5th 351 (Originally published in 2003)
[375] *Brewer v. Fortunato*, 1993 WL 818649 (Mass. Super. Ct. 1993).
[376] 18 U.S.C. 1513(e)

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

and not just to public companies, and to all individuals involved in retaliatory termination decisions related to any federal offense.[377]

765.    Apple discharged, suspended, threatened, harassed, and discriminated against, directly and indirectly, Gjovik in the terms and conditions of employment because of lawful acts done by the Gjovik in providing information to the Commission and law enforcement, and making protected disclosures, including but not limited to: about undisclosed conflicts of interests and self-dealing (Ronald Sugar, Lisa Jackson), misrepresentations in securities (see RICO section on *Securities Fraud*), false statements to government and shareholders, material fraudulent conduct, inadequate internal controls, sanctions violations, witness intimidation, and obstruction of justice.

766.    Apple General Counsel Kate Adams' previously stated her approach to Dodd-Frank compliance is "*wait and see.*"[378]

767.    Gjovik filed a whistleblower complaint with the US SEC on August 31 2021.[379] Gjovik posted about her SEC complaint publicly, sharing screenshots of her complaint on Twitter, and speaking to the press about the matter prior to her termination. Apple knew Gjovik filed an SEC complaint. An employee who files an SEC complaint is a "whistleblower" under Dodd-Frank.[380]

768.    In addition, number of Apple's employment policies also violate the Dodd-Frank Act and Apple cited these unlawful policies in its vague justification of Gjovik's sudden

---

[377] John A. Gray, Employers Beware: The Tort of Abusive Discharge and Sarbanes-Oxley, Section 1107, 10 Atlantic L.J. 47, 55–59 (2007).
[378] Roger Adler, *Katherine Adams*, The Recorder, May 24 2012, https://www.law.com/therecorder/almID/1202555942226/ -- ("*Regarding the Dodd-Frank Act, Adams is taking a wait-and-see approach. Since Honeywell isn't a financial company, it isn't one of that law's main targets, she said.*")
[379] *Digital Realty Trust, Inc. v. Somers* (2018) US, 138 S.Ct. 767, 778. See *Banko v. Apple Inc*, 20 F.Supp.3d 749, 758 (ND CA 2013).
[380] *Digital Realty Trust, Inc. v. Somers* (2018) US, 138 S.Ct. 767, 778

343

---

**Deleted:** were inadequate

**Deleted:** also

**Deleted:** tip

**Deleted:** A

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

termination, following Gjovik's SEC charge. Sections about Apple's unlawfully overbroad and overly restrictive policies are incorporated here, especially where the policies discourage or forbit external reporting in violation of Exchange Act Rule 21F-17(a).

769.   US SEC began investigating Gjovik's August 31 2021 complaint against Apple and Apple's NDAs in 2022 due to Gjovik's complaints. Gjovik has met with US SEC Enforcement three times now since 2022 to discuss her Apple whistleblower tips to the agency.

770.   Gjovik alleges violations of Dodd-Frank Act provisions and so brings an action in an appropriate district court of the United States. Gjovik brings an action under this subsection within ten years of the violation, six years of the retaliation, and within three years of knowledge of the violation. [15 U.S.C.A. § 78u-6]. The Dodd-Frank Act does not preempt state law claims or preclude federal laws. "*Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law.*"[381]

**iii.    Disclosure Controls and Procedures (SOX and Dodd Frank)**

771.   Gjovik accused Apple of fraud and violating securities law in July-August 2021 and filed her first SEC whistleblower tip about it on September 1 2021. Gjovik complained Apple had been making materially false statements about their actual environmental, labor, and regulatory compliance practices to shareholders, the public, and the SEC.

772.   Apple disclosed a number of risk factors in its 10-K and 10-Q filings to the Commission, however Gjovik believed that Apple lacked controls and procedures designed to ensure that it captured and assessed certain information related to these risks. Apple's Audit and Finance Committee, chaired by Ronald Sugar, oversees Apple's "s internal control over financial

---

[381] 15 USC § 78u-6(h)(3): An individual who does not file an SEC complaint may nonetheless state a claim for wrongful termination in violation of public policy if his or her termination violates the public policy underlying Dodd-Frank. [See *Banko v. Apple Inc.* (ND CA 2013) 20 F.Supp.3d 749, 758—termination in retaliation for reporting embezzlement violated public policy behind Dodd-Frank and Sarbanes-Oxley Act, including policies against embezzlement and illegitimate corporate tax deductions, and encouragement of whistleblowing]

Deleted: .

Deleted: ] he

Deleted: ore

Deleted: [15 USC § 78u-6(h)(3)]

Deleted: FIRST

Deleted: –

Deleted: ev

Deleted: CRB

Deleted: OCTOBER 25

reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations."[382]

773.    Exchange Act Rule 13a-15(a) requires issuers that have a class of securities registered pursuant to Section 12 of the Exchange Act to maintain disclosure controls and procedures.[383] Disclosure controls and procedures include those "*designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management . . . to allow timely decisions regarding required disclosure.*"[384] Disclosure controls and procedures "*are intended to cover a broader range of information than is covered by an issuer's internal controls related to financial reporting*" and "*should capture information that is relevant to an assessment of the need to disclose developments and risks that pertain to the issuer's businesses.*"[385]

774.    If an Exchange Act Registrant fails to implement and maintain disclosure controls and procedures as required, its management may not have adequate information to assess whether the disclosures it makes to investors are fulsome, accurate, and not misleading by omission.[386] The Internal Controls Rule falls under § 1514A because it is a "rule or regulation of the [SEC]."[387]

---

[382] Apple, Audit and Finance Committee Charter (as of August 19, 2020), pg4, https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
[383] Defined in Rule 13a-15(e), disclosure controls and procedures are "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms." Exchange Act Rule 13a-15(e).
[384] Id.
[385] Certification of Disclosure in Companies' Quarterly & Annual Reports Final Rule Adopting Release, Release No. 33-8124 (Aug. 29, 2002).
[386] US SEC, In the Matter of Activision Blizzard Inc, Respondent; Order Instituting Cease-And desist Proceedings Pursuant to Section 21c Of the Securities Exchange Act Of 1934, Making Findings, And Imposing A Cease and-Desist Order, File No. 3-21294, Release No. 96796, February 3, 2023.
[387] *Erhart v. BofI Holding, Inc.,* 612 F. Supp. 3d 1062, 1091–93 (S.D. Cal. 2020)

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

775.    Risk disclosures can be misleading if they warn about risks that "could" or "may" occur when the corporation knows that the risks have already materialized.[388] Corporations have a duty to update (correct) disclosures that were misleading when made, but corporations are also bound to correct any voluntary disclosures that, although correct when made, become materially misleading in light of subsequent events.[389] The disclosure requirement generally applies to information uniquely within the corporation's knowledge. There is no duty to disclose matters that are generally known or "knowable" by the investing public.[390]

776.    Gjovik's statements to Cohen, and the Issue Confirmation, included allegations that Apple provided false or fraudulent information to shareholders or the public, with an intent to deceive in order to obtain profit and other benefits from that deception.[391]

777.    Apple's website explains that they "*conduct internal and third-party independent assessments of [Apple's] programs to ensure they are effective. [Apple] make[s] changes to [their] policies and [their] training to reflect emerging trends. Apple's Chief Compliance Officer provides regular updates to the Audit and Finance Committee of the Board of Directors.*"[392] Apple's public statement about internal controls admits that Apple's Chief Compliance Officer (Thomas Moyer, currently facing criminal bribery charges), is the Apple executive responsible for reporting on the effectiveness of Apple's controls. Further, he reports his Findings to Ronald Sugar, Chair of the Audit and Finance Committee.

---

[388] *In re Alphabet, Inc. Secur. Litig.* (9th Cir. 2021) 1 F4th 687, 703-704—risk disclosures warning about security vulnerabilities were misleading because corporation failed to disclose that it already detected cybersecurity issues; see *Siracusano v. Matrixx Initiatives, Inc.* (9th Cir. 2009) 585 F3d 1167, 1181— company warned about "risks of product liability claims in the abstract" when high-level executives knew that company's product was linked to medical condition and that company was going to be sued.]
[389] See *In re Time Warner Inc. Secur. Litig.* (2nd Cir. 1993) 9 F3d 259, 267-268; Backman v. Polaroid Corp. (1st Cir. 1990) 910 F2d 10, 16-17; compare San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc. (2nd Cir. 1996) 75 F3d 801, 808-81.
[390] *Hanon v. Dataproducts Corp.* (9th Cir. 1992) 976 F2d 497, 505.
[391] See *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).
[392] Apple, Compliance and Ethics, "Being Accountable," (last accessed 12/2/2023), https://www.apple.com/compliance/

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

### 1) Employee Risk Disclosures

778.    Apple made risk factor disclosures pertaining to its workforce in its annual reports on Form 10-Ks. Apple's 10-K statements about its workforce changed dramatically from 2019-2022. A table is provided below for comparisons. Following Gjovik's SEC whistleblower tip about Apple's deficient internal controls and inadequate disclosures related to employment practices, Apple dramatically modified it's 10-K filings related to employees and employment practices for the first time in over a decade. However, under "*Controls and Procedures*", Apple has claimed with the same statement (sans current date), from at least 2020 through 2023, that Apple "*concluded that the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act were effective…*" and "*there were no changes in [Apple's] internal control over financial reporting.*"[393]

779.    When Gjovik made complaints to SEC, other government agencies, and to Apple in 2021, Gjovik believed that Apple lacked the controls and procedures required to properly document, collect, or analyze employee complaints of workplace misconduct; and as a result, complaints related to workplace misconduct were not documented, collected, or analyzed for disclosure purposes. Gjovik believed this led to Apple making false public statements about their employment practices.

780.    Gjovik's posts on Apple's Slack discussion tool about her concerns about Apple's fraud and controls issues were even covered by the press. In a September 30 2021 article, a publisher wrote about Gjovik's escalation to other employees and to managers:

On July 26th, 2021, Ashley Gjøvik, a senior engineering program manager, posed a question in the #women-in-swe Slack channel. "*Do we think Apple does a sufficient job at handling employee complaints about discrimination?*" she

---

[393] Apple, 2023 10-K, https://s2.q4cdn.com/470004039/files/doc_earnings/2023/q4/filing/_10-K-Q4-2023-As-Filed.pdf

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

asked. *"Do we feel comfortable even reporting issues?"* The note sparked a long discussion from women who also felt misled by the tech giant's HR team. Gjøvik herself shared that employee relations had investigated some of her complaints and told her *"actions were taken."* "But when I pried further, there was no actual resolution or actions because no Apple 'policies' were violated,'" she wrote. Her sentiment was echoed by other women who said they'd experienced similar frustrations.[394]

781.    Gjovik was interrogated about her Slack posts by Apple, so Apple knew about her statements. Complaints about discrimination can be protected SOX activity.[395] Gjovik complained to Okpo and Lagares that Apple was only pretending to care about human rights.

---

**From:** **Ashley Gjovik** ashleygjovik@apple.com 
**Subject:** Slack ER Chain
**Date:** July 28, 2021 at 2:46 PM
**To:** Exelemchi Okpo eokpo@apple.com
**Cc:** Antonio Lagares (ER) alagares@apple.com

Hi,

The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400

Not even including DMs….

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that pretend it cares about human rights, inclusion, diversity, and respect. Pretends to be the important word there.

-Ashley

---

*Exhibit: Slack ER Chain Email*

---

[394] The Verge, Apple's fortress of secrecy is crumbling from the inside, September 30 2021.
[395] "Conceivably, fraudulent disclosures to shareholders concerning racial discrimination within a company covered by SOX may violate the law and reporting such fraud may be protected." See, *In the Matter of Smith v. Hewlett Packard*, 2006 WL 3246894 (U.S. Dept. of Labor SAROX 2006); *In the Matter of Harvey v. The Home Depot, Inc.*, 2004 WL 5840283 (U.S. Dept. of Labor SAROX 2004). § 12:34. Sarbanes-Oxley Act of 2002, 2 Investig. Employee Conduct § 12:34

348

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

782.    Gjovik's *Issue Confirmation v3,* submitted August 23 2021 to Okpo and Business Conduct, also complained about inadequate disclosures. Gjovik summarized her overarching concerns about the Employee Relations team as "*RICO; Organized Intimidation; Organized Witness Tampering; Retaliation.*" (pg24). Gjovik also complains expressly about Apple's "*Misuse of ADA Policies*" as a tool for Intimidation and Retaliation. (pg26). Gjovik summarized her concerns about Apple's corporate conduct by year for each cause of actions she complained to Okpo and Lagares about with the exception of the "RICO" bullet which stated: "*RICO (Unknown-current) Misrepresentation & fraud; Racketeering; Organized witness tampering; Organized intimidation; Corporate corruption; Cronyism & nepotism."*

**2)  Environmental & Safety Risk Disclosures**

783.    Gjovik expressed concerns to Apple that Jackson must have known about Apple's offices on Superfund sites, but Jackson was making public statements about Apple's commitment to "*healthy communities*" and environmental justice. Gjovik also raised concerns that Jackson's team publicly stated in 2016 that Apple goes "*well beyond legal requirements*" but that EH&S told Gjovik Apple only does what is absolutely legally required related to Superfund sites. Apple never responded to Gjovik's concerns.

784.    Gjovik complained in the Issue Confirmation v3, under "*Apple Real Estate Environment, Health, & Safety"* of concerns about "*RICO; Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness Tampering."*

785.    At this point, August 23 2021, Apple was trying to gaslight Gjovik into insanity, however she was right on point. Her disclosures about Apple concealing matters of CERCLA concern, if not actual violations, had triggered an onsite inspection of her office just four days

349

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

prior (August 19 2021). The US EPA had identified a number of safety and regulatory

compliance issues, and would then spend the next two years+ fighting with Apple to get Apple

to comply with US EPA protocols and requirements for vapor intrusion mitigation. Apple

responded with obstructive activities with the agency executive and blasting the press with a

narrative opposite of what was actually happening. Further, Gjovik would not figure this out

until nearly two years later, but Apple had nearly killed her in 2020 with the illegal factory

exhaust from dangerous silicon fabrication spewing into her windows, which Apple was surely

hoping Gjovik would not connect to Apple.

786.     On April 15 2021, Gjovik sent an email to Dr. Cohen, Apple Senior Director,

complaining of Apple's conduct related to her office at 825 Stewart Drive and the mishandling

of her complaints. Gjovik said she wanted to raise "*ethical concerns*" and complained that

Apple's conduct was "*morally wrong.*" Gjovik wrote to Cohen:

> "Apparently most Apple buildings are on chemical release sites. … When I
> asked why they aren't telling employees — what EHS told me was that Apple
> did an internal review and decided it has no legal obligation to disclose anything
> about these release sites to employees… I was sharing all this with [an
> employee in Lisa Jackson's organization] and she's apparently preparing a
> presentation for Lisa right now about a new Env Justice type project Apple
> wants to lead and then when I told her what Apple's actually doing… she's like,
> uh oh. She's been doing more research and is preparing to raise the issue to Lisa
> in some way. But it's even more complicated. I found an article from 2016
> where apparently Apple was breaking hazardous waste laws and settled with the
> state gov for half a million. Alisha ([this persons'] manager) was quoted as
> saying that "We've worked closely with [the Department of Toxic Substance
> Control] to ensure that going forward we have the proper permits for our current
> site. As we do with all our facilities, we followed our stringent set of health and
> safety standards, which go well beyond legal requirements." But when it comes
> to working on contaminated chemical release sites, apparently Apple's stance is

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

to only do what is absolutely legally required. At least that's what they told me."

The same day Gjovik replied that she "may be too late." (which was cute that back in April 2021 Gjovik thought this could have just been an accidental oversight).

| | |
|---|---|
| **From** 🔗 agjovik@icloud.com | ⭐ 🟥 Apr 15, 2021 |
| **To** Josh Cohen, Ashley Gjovik | ⌄ |

✉ 🗑 📥 🏷 ▽ …     ↩ ↪ ➦

Actually, maybe it's too late to get ahead of this. Just saw Lisa just announced some big community environmental health event on 4/21.

—
Ashley M. Gjovik

*Exhibit: Gjovik email to Cohen 4/15/21*

787.    Gjovik complained to Dr. Cohen that she thought Apple was making fraudulent public statements about its actual practices and positions. Gjovik had become irritated listening to Apple EH&S and Employee Relations blow her off while Apple had just issued a press release for Earth Day. The press release included:

"As government and business leaders gather to fight climate change and build a better future for our planet, we're reminded that each of us — in communities around the world — is a part of this work," said Lisa Jackson, Apple's vice president of Environment, Policy and Social Initiatives. "The resources and community initiatives we're sharing today are all about amplifying voices too often unheard, and giving people the tools to learn, engage, and be part of the solution… As people around the world celebrate Earth Day, Apple's focus remains on supporting those

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

communities most impacted by climate change and environmental challenges."[396]

Gjovik was inflamed that Apple was telling her to keep her safety and environmental concerns secret, to not talk to her coworkers, and that she should just assume Apple was following environmental and safety laws because Apple said it was. And while Gjovik did not yet know Apple was behind the toxic exposures at 3250 Scott Blvd, Gjovik was irritated at Apple's apparent indifference towards the community living and working atop the Triple Site.

788.    Apple's announcement also included a new project Apple released that was: "*collaborating with Dolores Huerta, social justice advocate and founder of the Dolores Huerta Foundation, to encourage learners of all ages to "Create a Better World Through Environmental Justice.*"[397] Gjovik was similarly irritated at Apple's supposedly earnest claim to partner with labor leader Dolores Huerta on Environmental Justice maters, while Apple had just showed Gjovik an aggressive disregard for labor rights and workplace safety rules.

789.    Gjovik replied to Dr. Cohen with an update on April 21 2021, saying:

I'm trying to run this up the chain with I&D too, but they think it will just end up back with EHS.  Which employees are going to spend the most time around vapor intrusion pathways (plumbing, vents, etc) — probably our Black and Brown employees working in maintenance & cooking type roles. Who's going to spend the most time physically exerting themselves running things around at these buildings? Probably our technicians and admins, who are also predominately people of color and women, respectively. Apparently women get worse health issues from this type of chemical exposure. Because we have high body fat and sensitive hormones, etc. So if there are chemical vapor issues in buildings, women will get sicker. It also can mess with our reproductive health and pregnancies. So Black & Brown women get the worst of it. ;; We're clearly not the only ones doing this…. That Google/TCE exposure news coverage was horrifying. Figured I'd at least try though. You know me.

---

[396] Apple, *Apple Celebrates Earth Day 2021*, April 21 2021, https://www.apple.com/newsroom/2021/04/apple-celebrates-earth-day-2021/
[397] Id.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

790.   On April 21 2021, Gjovik had not yet faced all the retaliation from Waibel, West had not told her to quit, she did not know about the cracks in the floor – the world was a different place and she considered letting it go for the moment, however noted it was clearly a systemic issue, which implicates the need for controls and disclosures.

791.   Apple's environmental disclosures dramatically changed after Ronald Sugar joined Apple's Board of Director's in 2010 and became Chair of the Audit and Finance Committee. Prior to Sugar, Apple had repeatedly reported "environmental laws" as a potential risk factor to Apple's business model. The final 10-K prior to Sugar's tenure repeated the statement: "*Environmental Laws: Compliance with federal, state, local and foreign laws enacted for the protection of the environment has to date had no significant effect on the Company's capital expenditures, earnings, or competitive position. **In the future, compliance with environmental laws could materially adversely affect the Company***."[398] At this point, supposed environmentalist, Al Gore, was on the Board of Directors. Starting in 2011, after Sugar joined, that section 'environmental laws are bad' section was removed from Apple's 10-Ks after being there since the last 1990s. The same years Apple's Environmental Report claims "*Apple is committed to protecting the environment, health, and safety of its employees, customers, and the global communities in which it operates.*"[399]

792.   In Apple's 2023 10-K, Apple included under "General Risks", "Item 2. Properties" which said: "*The Company's headquarters is located in Cupertino, California. As of September 30, 2023, the Company owned or leased facilities and land for corporate functions, R&D, data centers, retail and other purposes at locations throughout the U.S. and in various*

---

[398] Apple, 2010 10-K, https://d1lge852tjjqow.cloudfront.net/CIK-0000320193/afa23a45-2381-49cc-9933-750c74d3f0a8.pdf
[399] Apple, Environmental Report, 2010, https://www.apple.com/environment/pdf/Apple_Facilities_Report_2010.pdf

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1  *places outside the U.S. The Company believes its existing facilities and equipment, which are*

2  *used by all reportable segments, are in good operating condition and are suitable for the*

3  *conduct of its business.*" This is roughly the same statement used in 10-Ks for years.[400]

4      793.    Apple's 10-Ks reference "*environmental, health, and safety*" as a risk factor

5  under *"The Company is subject to complex and changing laws and regulations worldwide,*

6  *which exposes the Company to potential liabilities, increased costs and other adverse effects on*

7  *the Company's business,*" from at least 2020-2023.[401] In 2021, after Gjovik's SEC whistleblower

8  complaint, Apple added examples of "*environmental, health, and safety*" risks as "*including*

9  *electronic waste, recycling, and climate change.*"[402] In 2023, after Gjovik discovered Apple's

10  secret silicon fabrication at 3250 Scott Blvd, Apple revised it to: "*including electronic waste,*

11  *recycling,* **product design** *and climate change.*"[403]

12      794.    Environmental liability disclosures (or lack thereof) may constitute material

13  securities fraud.[404] When Lisa Jackson suddenly brought the head of the US EPA to Apple Park

14  the day before the US EPA inspected Gjovik's Superfund office (due to Gjovik's disclosures to

15  the US EPA), Jackson told CNBC that when she meets with Regan, she "*expects to discuss*

16  *mandatory SEC disclosures of carbon emissions. 'We'll probably talk about SEC disclosure.'*"

17  she said.[405]

---

[400] Id.

[401] Apple, 2023 10-K page 13, 2022 10-K page 13, 2021 10-K page 14, 2020 10-K page 11.

[402] Apple 2021 10-K

[403] Apple 2023 10-K

[404] *Chem-Nuclear Systems, Inc. v. Waste Management, Inc.*, Case No. C82-812C (W.D. Wa., July 16, 1982), 1982 CCH Federal Securities Law Reports, ¶. 98, 759 pp. 93.846-93.849 (an analysis of materiality of contingent environmental liabilities in a Rule 10b-5 action*); Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86 (E.D.N.Y. 1981) aff'd., 665 F.2d 10 (2d Cir. 1981) (preliminary injunction granted in favor of Grumman to prevent its acquisition by subsidiary of LTV where the involved offer to purchase failed to disclose contingent environmental liabilities).

[405] Kif Leswing, *Apple backs Biden's proposal to eliminate greenhouse gases from power plants by 2035*, CNBC, Aug 18 2021, https://www.cnbc.com/2021/08/18/apple-backs-biden-clean-energy-standard.html

---

354

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

795.    Apple's 10-Ks also include in this section, from at least 2020-2023, a warning that Apple believes "*compliance with these laws and regulations may be onerous and expensive,*" "*there can be no assurance the Company's employees, contractors or agents will not violate such laws and regulations.*"[406] It then states, ""*if [Apple] is found to have violated laws and regulations, it could materially adversely affect [Apple's] business, reputation, results of operations and financial condition.*"[407]

796.    Following Gjovik's public disclosures, government charges and investigations, and extensive press coverage of her complaints about Apple's in summer/fall of 2021 – Apple then updated its 10-K risk disclosures in October 2021 to create a new section called: "*The technology industry, including, in some instances, [Apple], is subject to intense media, political and regulatory scrutiny, which exposes [Apple] to increasing regulation, government investigations, legal actions and penalties.*"[408] Under this new header, Apple added a completely new disclosure that says: "*Changes to the Company's business practices to comply with new laws and regulations or in connection with other legal proceedings could negatively impact the reputation of the Company's products for privacy …and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, and lost sales.*"[409] This wording has remained through 2023.

797.    Similarly, in 2021 Apple suddenly expanded the "*Employee*" section to "*Human Capital*" with a "*Health and Safety*" sub-section – the first major change to the "*Employee*" section in over a decade. Under health and safety, Apple wrote in 2021 that Apple "*supports employees with general safety training and puts specific programs in place for those working in*

---

[406] Apple, 2020-2023 10-Ks
[407] Id.
[408] Apple, 2021 10-K, page 14
[409] Id.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*potentially high-hazard environments, including chemical management… hazardous materials management.*"[410] In 2022, after it appeared Gjovik may never discover what happened at 3250 Scott Blvd, and Gjovik was under a five-year gag-order, Apple them removed "*including chemical management… hazardous materials management*" from the disclosure.[411] In fact there is now no mention of chemicals or hazardous waste/materials at all in the eighty page reports.

798.    Gjovik's concerns included public misstatements and fraudulent claims about Apple's actual environmental practices compared to what Gjovik saw internally (reckless disregard for the law and public safety), Apple's actual labor practices (Apple is actually one step away from installing the Foxconn "suicide nets" at Apple Park[412]), and Apple's general regulatory compliance and issue investigation practices (which is just mostly witness intimidation and retaliation). Apple promotes these topics and the false claim they are ethical leaders in these fields to attract customers to buy their products and to encourage investors to buy and hold Apple stock. In one SOX whistleblower case, an employee raised concerns about a misstatement in one of the company's filings with the SEC and the court found her actions were protected conduct.[413]

799.    While Ronald Sugar was Northrop Grumman CEO, the company included Superfund site expenses in their SEC disclosures, however only after Sugar left did Northrop Grumman start including individual Superfund site litigation disclosures.[414] While Kate Adams

---

[410] Apple, 2021 10-K, page 4
[411] Apple, 2022 & 2023 10-K
[412] CNN, *Apple employee found dead at HQ shot himself*, 2016, https://money.cnn.com/2016/04/28/technology/apple-employee-death-gun-suicide/index.html ; The Verge, *APPLE'S FRONTLINE EMPLOYEES ARE STRUGGLING TO SURVIVE*, 2021, https://www.theverge.com/c/22807871/apple-frontline-employees-retail-customer-service-pandemic
[413] Jones v. Southpeak Interactive Corporation of Delaware, 777 F.3d, 658 (4th Cir. 2015).
[414] Northrop Grumman 10-K, 2011, Section 15, pg88, ("The company is one of several defendants in litigation …. for alleged contribution to volatile organic chemical contamination of the County's shallow groundwater. The lawsuit includes counts against the defendants for violation of the Orange County

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

was General Counsel of Honeywell, Honeywell included hazardous waste related disclosures in

their SEC filings, but she has not included them in Apple's filings.[415]

### 3) Wire Fraud, Mail Fraud, Shareholder Fraud, Communications (SOX and Dodd Frank)

800.    An employee, like Gjovik, making complaints and inquires can engage in activity

protected by SOX and Dodd-Frank, when the complaints and inquires definitely and specifically

relate to wire or mail fraud, and when the employee files a complaint about the matter to the US

SEC.[416] "The statute clearly protects an employee against retaliation based upon that employee's

reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of

the company."[417] Many of Gjovik's complaints alleged fraud that would constitute one or more

of mail, wire, and/or securities fraud – especially Gjovik's complaints about misleading

statements by Lisa Jackson, of which there were two she cited directly.

801.    A securities fraud claim's elements "*include a material misrepresentation or*

*omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss,*

*and loss causation.*"[418] To show securities fraud under SEC Rule 10b–5, "a plaintiff must

demonstrate (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection

with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic

---

Water District Act, the California Super Fund Act, negligence, nuisance, trespass and declaratory relief….") https://investor.northropgrumman.com/static-files/2f043e4b-b825-4345-9814-c52f12a66656
[415] See for example, US SEC, Honeywell 10-K, 2015, pg12 https://honeywell.gcs-web.com/static-files/622b6f6c-65ca-445e-9d11-015cc64c3e5a-- ("*We are and have been engaged in the handling, manufacture, use and disposal of many substances classified as hazardous by one or more regulatory agencies …. future knowledge or other developments, such as improved capability to detect substances in the environment or increasingly strict environmental laws and standards and enforcement policies, could bring into question our current or past handling, manufacture, use or disposal of these substances.*")
[416] *Neely v. Boeing Co.*, 823 F. App'x 494, 496 (9th Cir. 2020) – (dismissing SOX and Dodd Frank claims based on safety complaints that do not allege fraud and where there is no complaint to the US SEC)
[417] *Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789 (7th Cir. 2018); *Reyna v. ConAgra Foods, Inc.*, 506 F. Supp. 2d 1363, 1382 (M.D. Ga. 2007).
[418] Van Asdale v. International Game Technology, 577 F.3d 989 (9th Cir. 2009)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

loss."[419] A conceivable shareholder fraud theory requires at least (1) a material misrepresentation or omission of fact and (2) an indication of an intent to defraud.[420]

802.   Fraud and Rule 10b-5 related claims can occur in "commercial sales of businesses where contingent environmental liabilities for both cleanup and toxic tort damages have not been fully disclosed. Where, for instance, a corporation owns commercial or industrial property which it knows or should know is contaminated with hazardous substances and that corporation is issuing or selling securities or is itself being sold as a business entity, it may well incur liability under Rule 10b-5 and similar state securities laws and regulations should the contingent environmental liability prove to be material and should the corporation fail to fully disclose those liabilities in the transaction."[421]

803.   Under 15 U.S.C.A. § 77l, "*Any person who… offers or sells a security ….by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements…not misleading (the purchaser not knowing of such untruth or omission),… and in the exercise of reasonable care could not have known, of such untruth or omission… shall be liable… to the person purchasing such security from him.*"[422]

---

[419] Id (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)).
[420] See *Van Asdale*, 577 F.3d at 1001; see also *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 472, 474 (9th Cir. 2015) (noting "scienter or intent to defraud" is "a bedrock requirement of Rule 10b–5"); *ESG Capital Partners, LP v. Stratos* (9th Cir. 2016) 828 F.3d 1023, 1032.
[421] Evolving Issues In Toxic Tort Law: What Happens When Clean-Up Is Not Enough?, 22B RMMLF-INST 9 (1988); See, Chem-Nuclear Systems, Inc. v. Waste Management, Inc., Case No. C82-812C (W.D. Wa., July 16, 1982), 1982 CCH Federal Securities Law Reports, ¶. 98, 759 pp. 93.846-93.849 (an analysis of materiality of contingent environmental liabilities in a Rule 10b-5 action).
[422] 15 U.S.C.A. § 77l

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

### iv.    Conflicts of Interest (SOX & Dodd Frank)

804.    Gjovik accused Ronald Sugar of not disclosing a conflict of interest and/or letting a conflict of interest interfere with his duties as the Chair of Apple's Audit and Finance committee, related to her Superfund office. She was concerned, due to the poor condition of her office, and Apple's fervent cover-up about it, that Sugar had used his position on Apple's Board of Directors to influence Apple in ways to benefit his prior company, Northrop Grumman, and to protect his own personal interests (i.e., interested party transactions, RESPA, etc.). Gjovik was also concerned Sugar had a personal interest in covering up Gjovik's concerns in order to protect Northrop Grumman and himself.

805.    After discovering many issues at her Superfund site office (which ended up being the tip of the iceberg), Gjovik began wondering why Apple decided it was a good idea to rent a property on a massive toxic waste dump. Gjovik began questioning if the prior CEO of the responsible party who was now on the Apple Board in charge of real estate oversight, Ron Sugar, may have influenced Apple's decision to rent the property. After hearing Apple's position about the toxic waste dump (its great and she should shut her mouth), Gjovik also began questioning why Apple was making grand public statements about environmental compliance and safety when their internal practices were deranged and reckless. Further, Gjovik questioned why one of the key people making these public statements for Apple, Lisa Jackson, would do such a thing considering her background in environmental protection. Finally, Gjovik also began worrying Apple executives persisted on their terrible plan of record and retaliation against Gjovik because it would be embarrassing to Jackson for it to come out what Apple had done.

806.    On August 23 2021, Gjovik filed a formal internal complaint to Apple's Business Conduct reporting system about her concerns about Ronald Sugar. She received confirmation her complaint was submitted and was provided a tracking number (*HRC000017207*)

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Request submitted - Business Conduct                                    8/23/21, 4:30 PM

You can change your language preferences.
Update here.

# Your request has been sent.

Support Request HRC000017207 has been created.

Thank you for contacting Business Conduct. We make every effort to respond as soon as possible. If your question is urgent, you can call us at the numbers listed on this page.

*Exhibit: Internal Complaint, 8/23/21, # HRC000017207, Submitted*

807.    Gjovik's Business Conduct complaint included the Issue Confirmation v3 as an attachment, and the text in the form read:

"Ronald Sugar used to be CEO/President of TRW Microwave & Northrup Grumman. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee, which appears to oversee the due diligence programs for offices on chemical clean-up sites, including the TRW Microwave Superfund. His previous companies caused the contamination that is now being cleaned up under my office. See page 33 of attached PDF."

For location, Gjovik put "TRW Microwave Superfund Site.

808.    Gjovik directed Business Conduct to her detailed complaints on Page 33 of the 34 page "Issue Confirmation" which has a section titled "5. Board of Directors", "I. Finance & Audit Committee," "xxii. Ronald Sugar." Gjovik noted overall concerns were: Conflcit of Interest, Corruption, and Fraud.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

## Tell us about your concern.

Text fields must be completed in English.
Fields marked with an * are required

Name
Ashley Gjovik

Apple email address
ashleygjovik@apple.com

https://hcl.apple.com/businessconduct?id=sc_cat_item&sys_id=7eb6...37150106c27313e0fb23235&cat_id=ab886f7ba3c720109e883f0807ef642e          Page 1 of 3

Request - Business Conduct                                                    8/23/21, 4:29 PM

Preferred phone number
4082049976

Explain what happened *
Ronald Sugar used to be CEO/President of TRW Microwave & Northrup Grumman. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee, which appears to oversee the due diligence programs for offices on chemical clean-up sites, including the TRW Microwave Superfund. His previous companies caused the contamination that is now being cleaned up under my office. See page 33 of attached PDF.

Date
8/23/2021

Time
4:30pm

Location *
825 Stewart Ave Sunnyvale CA (TRW Microwave Superfund site)

List employees and/or people involved *
Ronald Sugar

Have you reported this to anyone else? If so, who? *
Yes, Employee Relations in July 2021

*Exhibit: Internal Complaint, 8/23/21, # HRC000017207, Form*

361

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

809.     Gjovik's formal Business Conduct Complaint, which referenced her "Issue Confirmation" drafted with Employee Relations, first provided a recitation of facts about Sugar, Northrop Grumman, and TRW. Gjovik also complained about Apple EH&S and Employee Relations conduct related to the environmental issues at her office, referring to their activities as "negligent, reckless," that they "misrepresented their activities," and that they "intimidated [her] not to speak out about [her] safety concerns." Gjovik then asked three questions.

-   1) Is Sugar overseeing the due diligence program for clean-up, testing, employee
    complaints, finance for this office that his previous company caused the pollution
    for & is still responsible to clean up?

-   2) Did he notify the General Counsel of this conflict of interest?

-   3) Has he taken any actions that are favorable to NG/TRW and forsake proper safety
    & protection for Apple employees?

Finally, Gjovik links to evidence to support her claims (US EPA websites), the policies she is asking if Apple is in compliance with (Apple's Audit and Finance Committee Charter, Corporate Governance Guidelines), and an Apple Press Release about Sugar joining the Board of Directors in 2010.

810.     Gjovik notes both policies reference the *"Guidelines Regarding Director of Conflicts of Interest,"* which orders that "Directors should take all reasonable steps to avoid conflicts of interest with the corporation. Any director who becomes aware of an actual or potential conflict of interest with the Corporation at any time shall notify the Corp GC promptly in writing of the material facts of the actual or potential conflict of interest."

811.     Gjovik disclosed what she viewed as witness intimidation and fraud that may be caused in some way by Sugar due to this clear conflict of interest. Gjovik's inquiry about Ronald

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Sugar was fact finding. This was not a "gotcha!" complaint. Gjovik was actually about corporate governance regulatory compliance concerns.

## 5. Board of Directors

### I. Finance & Audit Committee

#### xxii.    Ronald Sugar

- **Concerns:** Conflict of Interest, Corruption; Fraud
- **Issues:**
  - Ronald Sugar used to be CEO/President of TRW Microwave then Northrup Grumman.
  - Mr. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee. The committee appears to oversee the finance and oversight of the due diligence programs for chemical clean-up site offices, including the TRW Microwave Superfund, which is the office I work in.
  - His previous companies (TRW & NG) caused the contamination that is now being cleaned up under my office. My office is designated as the EPA's "TRW Microwave" Superfund site. (Part of the "Triple Site" of 3x Superfund groundwater plumes in Sunnyvale, CA).
  - Is Sugar overseeing the due diligence program for clean-up, testing, employee complaints, finance for this office that his previous company caused the pollution for & is still responsible to clean up?
  - Did he notify the General Counsel of this conflict of interest?
  - Has he taken any actions that are favorable to NG/TRW and forsake proper safety & protection for Apple employees?
  - I have been reporting safety concerns in that office since March 2021 and have escalated further concerns that EH&S has been negligent, reckless, misrepresented their activities, and have intimidated me to not speak out about the safety concerns.
  - The Federal EPA was notified. of my concerns & notified Apple ER & EHS of my contact with the gov at that time..
- **Evidence:** Box folder including emails & photos; emails:
  - The Finance & Audit committee 2020 charter includes responsibilities such as:
    - The purpose of the Committee is to:  1. Assist the Board in oversight and monitoring of: compliance with legal, regulatory and public disclosure requirements; the independent auditors, including their qualifications and independence; enterprise risk management

Page 33 of 34

*Exhibit: Issue Confirmation, Version 3, pg 33*

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- ▪ Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints regarding the Corporation's financial statements or accounting policies.
- ▪ https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
- ▪ Guidelines Regarding Director of Conflicts of Interest says
    - ▪ Directors should take all reasonable steps to avoid conflicts of interest with the corporation.
    - ▪ Any director who becomes aware of an actual or potential conflict of interest with the Corporation at any time shall notify the Corp GC promptly in writing of the material facts of the actual or potential conflict of interest.
- ▪ Corporate Governance Guideline say:
    - ▪ The Board expects its directors, as well as officers and employees, to act ethically. Directors are expected to adhere to the Corporation's Business Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.
    - ▪ https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Corporate-Governance-Guidelines.pdf
- ▪ https://semspub.epa.gov/work/09/1158562.pdf
- ▪ https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/
- ▪ https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901181#bkground
- ▪ https://www.microwaves101.com/encyclopedias/where-are-they-now#trw
- **Witnesses:** Business Conduct? Gov Affairs? *You know what y'all did*
- **Business Conduct Report:** Support Request HRC000017207
-

---

*Exhibit: Issue Confirmation, Version 3, pg 34*
*(Note header was not updated with latest version, it was on file name)*

812.    Gjovik complained to Apple, the press, and to the SEC that Lisa Jackson and Alisa Johnson 's conflict- of-interest and yet "*seem to be heavily involved in Apple's … public relations about Apple's hazardous waste crimes/infractions*" and "*Lisa Jackson used to run the U.S. EPA & Alisha was her press secretary, including commenting on the 2016 DTSC settlement.*" (see US EPA and US SEC complaints).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**1) "Conflict of Interest" Generally**

813.   There are a number of different types of conflicts of interest government by the US SEC.[423] Directors, officers and controlling shareholders are required to act with "inherent fairness" to the corporation and those interested therein.[424] This "fairness" requirement underlies various statutory and common law limits on conflict-of-interest transactions: i.e., transactions in which the personal interests of such directors, officers or controlling shareholders may conflict with those of the corporation.

814.   For example, in *Thomas v. Tyco International Management Co.* a reasonable, valid SOX whistleblower claim was found with a complaint about the "*proper segregation of duties in the financial reporting team*" due to conflicts of interest, and the district court found "*that a genuine issue of material fact exist[ed] as to whether [the plaintiff] reasonably believed that she was engaging in protected conduct each time she raised issues regarding [the defendant's] lack of internal controls regarding financial management.*" [425]

815.   For example, in *Wadler v Bio-Rad Labs*, there was a sufficient claim for SOX/Dodd-Frank whistleblower retaliation when an employee suspected the company was engaged in FCPA violations and started investigation, only to meet a variety of types of retaliation and obstruction.[426] The employee asked for documents and the company refused to provide them; the employee claimed he was being "stonewalled"; and the conduct made employee "*become suspicious that [the] corruption issues …. were known to senior management, and that management was intentionally blocking his efforts to uncover evidence of*

---

[423] 15 U.S.C.A. § 77z-2a "§ 77z-2a. "Conflicts of interest relating to certain securitizations"; *Thomas v. Tyco International Management Co.,* 416 F. Supp. 3d 1340 (S.D. Fla. 2019).
[424] *Jones v. H.F. Ahmanson & Co.* (1969) 1 C3d 93, 110, 81 CR 592, 600; *see Steinberg v. Amplica, Inc.* (1986) 42 C3d 1198, 1210, 233 CR 249, 256; see also *Meister v. Mensinger* (2014) 230 CA4th 381, 395, 178 CR3d 604, 615.
[425] *Thomas v. Tyco International Management Co.,* 416 F. Supp. 3d 1340 (S.D. Fla. 2019).
[426] *Wadler v. Bio-Rad Labs., Inc.,* 141 F. Supp. 3d 1005, 1008-9 (N.D. Cal. 2015)

365

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*bribery and related misconduct.*"[427] The employee he then took his concerns to the Audit Committee of the Board of Directors, but complained that the people who would investigate his claim "*had a clear conflict of interest,*" and the employee was then terminated.[428]

816.    Apple's Business Conduct Policy states: "*A conflict of interest is any activity that may damage Apple's reputation or financial interests or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.*" [429] Apple's policy lists examples of common conflicts of interest including business relationships. The policy instructs: "*Do not... use your position at Apple to solicit resources or any other benefit for your outside activity, obtain favored treatment, or pressure others to assist you.*"[430] The policy discusses personal investments saying "*when determining whether a personal investment creates a conflict of interest, consider if you are in a position to influence transactions between Apple and a business in which you have invested.*"[431]

817.    The policy adds, "*Members of Apple's Board of Directors should follow the requirements and procedures described in the Guidelines Regarding Director Conflicts of Interest.*" Under "*Board Positions,*" it states: "*A board position that presents a potential or actual conflict of interest is unlikely to be approved.*"[432]

### 2)  Interested Party Transactions (Cal. Corps. Code § 310)

818.    A contract or other transaction with another firm (corporation, partnership or other business entity) is also subject to the requirements if a director has "a material financial

---

[427] Id at 1009.
[428] Id at 1009.
[429] Apple, Business Conduct Policy, August 2022, page 10, https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf
[430] Id at page 11.
[431] Id at page 11.
[432] Id at pages 10-11.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

interest" in such firm.[433] All material facts, both as to the director's interest in the transaction, and as to the contract itself, must be disclosed to (or already known by) the shareholders.[434]

819.    Ronald Sugar has commercial, reputational, and relationship interests in Northrop Grumman generally – Sugar may also have a personal tie to this Superfund site, as he apparently used to work there, maybe for over a decade. It seems peculiar that Apple would suddenly want to lease such a property, after the building had sat vacant and gutted for over a decade. It was a reasonable inquiry if Sugar influenced Apple's decision to become a long-term tenant, and if so, what kind of arrangement Apple has with Northrop Grumman related to the CERCLA obligations.

820.    The impact of these real estate deals is significant – not just with the environmental concerns, but the owner of Gjovik's office was CalSTRS, one of Apple's largest shareholders. Fraudulent regulatory filings about her office, including omission of required information to the US EPA, would defraud a key shareholder (with CalSTRS owning around $4 Billion of Apple stock in 2021.[435]

### 3)  Related Party Transaction

821.    Gjovik raised concerns about issues that constitute a Related Party Transaction and related disclosure: "*a deal or arrangement made between two parties who are joined by a preexisting business relationship or common interest*" and can include "*leases*."[436] The Securities and Exchange Commission (SEC) requires that all publicly-traded companies disclose

---

[433] Cal. Corps. Code § 310(a); Conflict of Interest Limitations, Cal. Prac. Guide Corps. Ch. 6-E
[434] Cal. Corps. Code § 310(a)(1).
[435] 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5
[436] Investopedia, Related Party Transactions (last visited 12/3/2023), https://www.investopedia.com/terms/r/related-partytransaction.asp

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

all transactions with related parties—such as executives, associates, and family members—in their quarterly 10-Q reports and their annual 10-K reports.[437]

822.   Enron used related-party transactions to cover up billions of dollars in debt. These fraudulent related-party transactions led to Enron's bankruptcy, prison sentences for its executives, lost pensions and savings of employees and shareholders, and the ruin and closure of Arthur Andersen – all of which led to the development of the Sarbanes-Oxley Act of 2002, which established new and expanded existing requirements for U.S. public company boards, management, and public accounting firms, including specific rules that limit conflicts of interest arising from related-party transactions.[438]

823.   Here, this real estate deal would have likely counted as a Related Party Transaction. In addition to the $12M sale Apple's rent for a long-term lease, the building was dramatically renovated for Apple with significant Capital improvements. Further, at the time of the sale to Oaktree Capital and lease to Apple, it had not been five years since Sugar 'retired' from Northrop Grumman, and he apparently still stayed on as an "Advisor."

824.   Curiously, Apple used to report Related Party Transactions in its 10-Ks through 2010, but stopped in 2011 after Ronald Sugar joined the Apple Board of Directors and became Chair of the Audit and Finance Committee.[439] Apple had included Related Party Transactions in its 10-Ks from 1999-2010.[440] (See section on *Background: Ronald Sugar* noting that Northrop Grumman did not start making detailed Superfund disclosures until the year after Sugar retired).

825.   Apple's Audit and Finance Committee, chaired by Ronald Sugar, oversees Apple's responsibility to: "*Review and approve related-party transactions consistent with the*

[437] Id.
[438] Id.
[439] Apple, 2010 10-K, page 81, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=7519151
[440] Apple, 1999 10-K, page 101, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=124179

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Related Party Transactions Policy and report to the full Board on any approved*

*transactions.*"[441]

### 4)  Real Estate Settlement Procedures Act (RESPA)

826.    At 825 Stewart Drive, Oaktree Capital/Hines owned the property from 2014-2016, at which point it sold the property to CalSTRS/GI Partners (the California government) who then owned the property from 2016-2023, before selling it.  Apple leased the building from 2015-current. During this time, both the owners and Northrop Grumman were in contract with the U.S. government under CERCLA, and that contract provided direct obligations for the owner related to tenants (Apple). During this time, Ronald Sugar was on the Board of Apple and Chair of Apple's Audit and Finance Committee, owned millions of dollars of Northrop Grumman stock (the company where he used to be CEO), and also sat on a Board (Chevron) with an executive at the property owner Oaktree Capital.[442]

827.    Section 8(a) of RESPA prohibits any person from giving or receiving "*any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.*[443] "Regulation X" clarifies that such an agreement or understanding may be inferred from a course of conduct.[444] It's possible Sugar's conduct related to the sale and leasing of the office, a property with a federal loan (through CERCLA) may have violated RESPA. In fact, in December 2021, a law firm requested public records about specific information related to the property sale from Oaktree Capital to CalSTRS.

---

[441] Apple, Audit and Finance Committee Charter (as of August 19, 2020), pg4, https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
[442]
[443] 12 U.S.C. § 2607(a).
[444] 24 C.F.R. §1024.14(e).

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Upon investigation, it appears the law firm was looking into RESPA related to the property, but

it is unknown who they represented (probably CalSTRS/GI Partners).

**v.     OFAC Sanctions (Dodd-Frank; 22 U.S. Code § 8792)**

828.     Shortly before Gjovik was "removed from the workplace and all workplace

interactions" indefinitely, she was complaining about one of her coworkers bragging in a career

growth article about what sounded like illegal smuggling and violation sanctions against Syria.

Gjovik's management (Powers, West, also Basanese) had all ignored it for months so Gjovik

reported it to Business Conduct. West told her after that the employee did nothing wrote but that

he wanted to delete the portion of the article Gjovik alleged referenced smuggling.

---

On Jul 20, 2021, at 7:54 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi John,

I wanted to check in on these outstanding questions — especially and specifically my question about the illegality of Amr exporting
to & re-selling Apple products in Syria. I did some research today and it appears that what he did was VERY illegal. Not just a violation
of Apple policies, but a violation of U.S. federal law, and perhaps a violation of international law as well, if I'm reading all this right.

We need to notify the appropriate Apple legal teams of this information.

— — —

**Apple Trade Compliance**
PROHIBITED DESTINATIONS
*"The U.S. holds complete embargoes against North Korea and Syria.*
*The exportation, reexportation, sale or supply, directly or indirectly, from the United States, or by a U.S. person wherever located, of*
*any Apple goods, software, technology (including technical data), or services to any of these countries is strictly prohibited without*
*prior authorization by the U.S. Government. "*
https://www.apple.com/legal/more-resources/gtc.html

**Legal Framework of U.S. sanctions on Syria:**
*"The Syria Sanctions program represents the implementation of multiple legal authorities.  Some of these authorities are in the form*
*of an executive order issued by the President. Other authorities are public laws (statutes) passed by The Congress. These*
*authorities are further codified by OFAC in its regulations which are published in the Code of Federal Regulations (CFR).*
*Modifications to these regulations are posted in the Federal Register.  In addition to all of these authorities, OFAC may also*
*implement United Nations Security Council Resolutions (UNSCRs) with regard to Syria."*
https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/syria-sanctions

— — —

**Quote from Amr's article:**
*"Syria is not a country where Apple is allowed to sell products or have authorized resellers. But luckily, my grandma was visiting the*
*U.S. and returning in a few weeks so I had to act fast. I decided to buy 10 iPods, sell 9 to my friends in school at a markup (because*
*I had no competition), and finance my own from the profits. I convinced my dad to lend me the money, my grandma to buy and carry*
*10 black boxes the size of a mac mini, and managed to secure 5 pre-orders. A few weeks later, the magical devices arrived and I*
*sold all 9. That was probably my first real-life lesson about Business and Entrepreneurship."*
https://confluence.sd.apple.com/display/PSQ/How+I+Got+Here+-+Amr

<How I Got Here - Amr - Product Systems Quality - SEO Confluence.pdf>

---

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Exhibit: Gjovik's email to West, Powers, Johnson, and Basanese on 7/20/21*

829.    The IRAN THREAT REDUCTION AND SYRIA HUMAN RIGHTS ACT OF 2012 requires disclosures under Section 13(a) of THE SECURITIES EXCHANGE ACT OF 1934 via 10-Ks and or 10-Qs.[445] Companies have been fined by the Federal Reserve and OFAC for "unsafe or unsound practices relating to … inadequate oversight of sanctions compliance risks."[446]

830.    Federal statutes also govern smuggling. (see, 18 U.S. Code § 554 - Smuggling goods from the United States; 18 U.S. Code § 546 - Smuggling goods into foreign).

831.    Apple was recently fined by OFAC for violations of sanctions laws, noting that "*based on the number of Apparent Violations, the length of time over which the Apparent Violations occurred, and the multiple points of failure within the company's sanctions compliance program, policies, and procedures, [Apple's [ conduct demonstrated reckless disregard for U.S. sanctions requirements*." The settlement included a requirement that Apple "*Implemented mandatory training for all employees on export and sanctions regulations.*"[447]

832.    Apple's Business Conduct team said they did not care of the employee had been involved with illegal smuggling in his personal time, but only cared if he did it in a way that implicated Apple. Gjovik asked if they would still report it if it was illegal, and they said no. West also echoed this sentiment saying it was fine because there "*are no compliance issues for Apple*", but for vague reasons they will remove the references to smuggling, and also, they still want to publish the article. Gjovik's supervisor, Dan West, never talked to Gjovik again after this response.

---

[445] 22 U.S. Code Subchapter VII - Sanctions with Respect to Human Rights Abuses in Syria, §§ 8791 - 8795
[446] US Federal Reserve, *Federal Reserve Board Fines Wells Fargo $67.8 million for inadequate oversight of sanctions risk at its subsidiary bank,* March 30 2023, https://www.federalreserve.gov/newsevents/pressreleases/enforcement20230330a.htm
[447] OFAC, Apple, Inc. Settles Potential Civil Liability for Apparent Violations of the Foreign Narcotics Kingpin Sanctions Regulations, 31 C.F.R. part 598:, Nov. 25 2019, https://ofac.treasury.gov/media/25931/download?inline

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

On Jul 21, 2021, at 1:53 PM, Dan West <dan.west@apple.com> wrote:

Hi Ashley,

Thanks for bringing this back up as we get ready to publish "How I Got Here" for Amr.

John looked into bullets 3-4 at the time you flagged these in August 2020 and we did not have any concerns. Since you raised these again to us, we reached out to our global compliance team (and understand you spoke with them too) and confirmed there are no compliance issues for Apple. With regards to any outside consulting activities, we're confirming these are still in line with Apple policy and will address it as appropriate.

Given how long it's been since this article was initially drafted, we're going to be making a few edits to reflect Amr's role change. Also, even though there's no compliance issue, we are removing the story about the iPods. John met with Amr this morning and Amr will be updating the article in the near future. It will then be passed on to you for publication.

Thanks again for taking the time to review.

Dan

*Exhibit: Dan West's Final Email to Gjovik*

**From:** **Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: My "How I Got Here" is ready
**Date:** July 21, 2021 at 2:32 PM
**To:** Daniel L. West dan.west@apple.com
**Cc:** John Basanese jbasanese@apple.com, Helen Polkes (HR BP) polkes@apple.com, David Powers powers@apple.com, Reed Johnson reedjohnson@apple.com



Hi Dan,

Thanks for the update. When I talked to the compliance team yesterday I agreed to lock down Amr's page so no one else can edit it until they confirm no crime & sanctions violations were committed, so we don't mess with potential evidence (obstruction of justice). That included both Amr's grandmother's apparent U.S. customs situations as well as the Syrian based "services" Amr is providing.

*Exhibit: Excerpt of Gjovik's reply to West, complaining of "Obstruction of Justice"*

833.    Apple's August 2021 ESG report, which Apple references frequently in their SEC filings, states: *"Apple is committed to compliance with applicable export and sanctions laws. All employees are responsible for complying with these laws and reporting possible violations."*[448] Apple clearly does not follow this policy and each time the report and any similar communications was emailed or shared digitally is wire fraud. Each time it was mailed, was mail fraud.

834.    Apple's "Trade Compliance" policy and public website states: *"Apple is committed to complying with all applicable trade regulations in all countries in which we*

---
[448] Apple, 2021 ESG Report,
https://s2.q4cdn.com/470004039/files/doc_downloads/2021/08/2021_Apple_ESG_Report.pdf

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*operate, including, but not limited to, all export and sanctions regulations.*"[449] Apple further states:

The U.S. holds complete embargoes against North Korea and Syria. The exportation, reexportation, sale or supply, directly or indirectly, from the United States, or by a U.S. person wherever located, of any Apple goods, software, technology (including technical data), or services to any of these countries is strictly prohibited without prior authorization by the U.S. Government.[450]

835.    Before Gjovik was terminated, she reported the apparent sanctions and smuggling violations to US DOJ and posted on social media that she did so, fresh on the heels of Apple getting fined by OFAC for a 'reckless disregard' for sanctions laws.

**vi.    Skipping the Line & Vaccine Hoarding (Dodd-Frank; US DOJ NCDF)**

836.    In December 2020, Gjovik complained to Dr. Cohen (who then complained to Lisa Jackson and Dierdre O'Brien on Gjovik's behalf) about Apple's apparent attempt to "skip the line" on COVID-19 vaccines – and Gjovik raised the matter again in August 2021 to Okpo under a title of "*Corruption Whistleblowing*".

837.    On September 3 2021, after it was clear Apple was acting in bad faith, Gjovik filed complaints with the FDA Office of Criminal Investigations and DOJ National Center for Disaster Fraud about Apple's apparent attempt to "skip the line" on COVID-19 vaccines, as well as hoard the vaccines. US DOJ NCDF had created a "Hoarding & Price Gouging Task Force," and had a webform for claims like Gjovik's.[451]

---

[449] Apple, Apple Trade Compliance, (last visited 12/2/2023), https://www.apple.com/legal/more-resources/gtc.html
[450] Id.
[451] US DOJ, NCDF, COVID-19 Hoarding and Price Gouging Task Force, https://web.archive.org/web/20220331164405/https://www.justice.gov/coronavirus/combatingpricegouginghoarding

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

838.    On September 6 2021 Gjovik posted on social media that she filed those complaints. Gjovik was also still using her iCloud email so Apple would have seen the email receipts.

839.    The United Nations Office on Drug and Crime warned of corruption risks related to the initial COVID-19 vaccine distribution including "*conflicts of interest," "nepotism, favouritism, and corrupted procurement system*s."[452] The United Nations added that "*during the pandemic, whistle-blowers are critical given the ample opportunities for corruption in times of crisis.*"[453] In December 2020, "*a health sector anti-corruption expert who teaches at the University of San Francisco*" predicted that "*powerful people could gain early access to the vaccine not by using bribery or coercion, but through more subtle means, like making requests to similarly powerful friends.*" [454] She suggested an executive may contact "*friend of the leader of a pharmaceutical company.*"

840.    On March 23 2020, the President issued an Executive Order pursuant to section 102 of the Defense Production Act prohibiting the hoarding of designated items. Thus, 50 U.S.C. §§ 4512, 4513 made it a crime for any person to accumulate that item "in excess of his or her reasonable needs." [455]  A list of items included PPE, medical supplies, and disinfectant.[456]

---

[452] United Nations Office on Drug and Crime (UNODC), *Covid-19 Vaccines and Corruption Risks: Preventing Corruption in The Manufacture, Allocation and Distribution Of Vaccines*, https://www.unodc.org/documents/corruption/COVID-19/Policy_paper_on_COVID-19_vaccines_and_corruption_risks.pdf
[453] Id.
[454] Laura J. Nelson and Maya Lau, *"The wealthy scramble for COVID-19 vaccines: 'If I donate $25,000 ... would that help me?' "* The LA Times, December 18 2020, https://www.latimes.com/california/story/2020-12-18/wealthy-patients-scramble-covid-19-vaccine
[455] Office of Attorney General, *Memorandum For All Heads Of Department Components And Law Enforcement Agencies*, March 24 2020, https://www.justice.gov/file/1262776/download
[456] US DHHS, Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950, https://www.justice.gov/file/1264276/download

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

841.    The Johnson & Johnson 'Janssen Biotech' vaccine became available in February of 2021.[457] That was the timeframe Riccio had suggested Apple would get "lots" of early vaccines. In November of 2021, Alex Gorsky, the prior CEO and Chair of Johnson & Johnson, suddenly joined the Board of Directors of Apple.[458] Under information and belief, in December 2020, Ricco was referencing a conversation between him, Tim Cook, and Alex Gorsky.

842.    Apple knew Gjovik reporting the vaccine issues internally, and to the FDA and DOJ, and terminated Gjovik because she did so. It's a termination in violation of public policy when an employer retaliates against an employee for threatening to report issues with the employer's operations to the Food and Drug Administration.[459] It's also a termination in violation of public policy for an employer to terminate an employee for reporting the employer's financial "*irregularities and illegalities*" or suspected fraud to the FBI or other authorities. [460]

**B.      BANE AND RALPH CIVIL RIGHTS ACTS (CAL. CIV. CODE § 52.1, §52.7)**

843.    Employment cases are included within the scope of §52.1 (Bane Act) & § 51.7 (Ralph Act).[461] A Ralph or Bane Act claim does not displace another employment claim.  Ralph Act and Bane Act claims may be joined with an employment discrimination claim.

844.    Liability includes any "*person [or corporation] who denies the right*" as well as anyone who "*aids, incites, or conspires in that denial.*"[462] Liability does not require actual

---

[457] Federal Register, Authorizations of Emergency Use of Certain Biological Products During the COVID-19 Pandemic; Availability, Docket No. FDA-2021-N-0335
[458] Apple, *Alex Gorsky joins Apple's board of directors – Apple*, November 9 2021, https://www.apple.com/newsroom/2021/11/alex-gorsky-joins-apples-board-of-directors/
[459] *Liberatore v. Melville Corp.*, 168 F.3d 1326, 14 I.E.R. Cas. (BNA) 1545, 137 Lab. Cas. (CCH) ¶ 58596 (D.C. Cir. 1999) (applying District of Columbia law); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 2 I.E.R. Cas. (BNA) 768, 122 L.R.R.M. (BNA) 2327, 106 Lab. Cas. (CCH) ¶ 55731 (Mo. Ct. App. W.D. 1985).
[460] *Moskal v. First Tennessee Bank*, 815 S.W.2d 509, 6 I.E.R. Cas. (BNA) 1080, 6 I.E.R. Cas. (BNA) 1082, 122 Lab. Cas. (CCH) ¶ 56914 (Tenn. Ct. App. 1991); *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 3 I.E.R. Cas. (BNA) 177, 109 Lab. Cas. (CCH) ¶ 55904 (1988).
[461] *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.*, 212 Cal. App. 4th 258, 269, 150 Cal. Rptr. 3d 861, 870 (2012).

**Deleted:** ACT:

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

interference with a plaintiff's legal rights – even an attempted interference is enough to give rise to a claim.[463] Where Apple is not liable for directly denying or interfering with Gjovik's rights, Apple did aid, incite, and/or conspire in those denials. For example, actions taken by Appleseed against Gjovik while Appleseed was still formally employed at Apple in their Global Security team clearly implicate Apple through respondeat superior, negligence, and other employment theories.

### i.    Bane Civil Rights Act (Cal. Civ. Code § 52.1)

845.    The Bane Act, Cal. Civ. Code § 52.1, authorizes a claim for relief "*against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law.*"[464]

846.    The Bane Act prohibits "*an attempted or completed act of interference with a legal right, accompanied by a form of coercion*" with specific intent to violate the rights of the person or a reckless disregard for the rights of the person.[465] "*Coercion*" is a "*compulsion of a free agent by physical, moral, or economic force or threat of physical force*" and does not have to include an act of violence or threat of violence to satisfy Bane Act requirements.[466]

847.    Gjovik seeks relief under the Bane Civil Rights Act (§ 52.1) to deter discriminatory violence from Apple from occurring against Gjovik, stop Apple's threats of

---

[462] Cal. Civ. Code. § 52(b)
[463] Cal. Civ. Code, § 52.1, subds. (a), (b); *Ramirez v. County of Los Angeles* (C.D. Cal. 2005) 397 F. Supp. 2d 1208.
[464] *Sahyous v. Tulare Cty.*, No. 1:14-cv-01633-MCE (GSA) at *6 (E.D. Cal. June 1, 2015) (quoting *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 331, 70 Cal. Rptr. 2d 844, 949 P.2d 941 (1998)).
[465] *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338; *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015); *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 519-20 (9th Cir. 2018); *Reese v. Cty. Of Sacramento*, 888 F.3d 1030, 1043-1045 (9th Cir. 2018).
[466] COERCION, Black's Law Dictionary (11th ed. 2019); *Williams v. Kohl's Dep't Stores, Inc.*, United States District Court for the Central District of California, Case No. EDCV 19-397 JGB (SHKx), (September 13 2019).

376

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

violence and intimidation, and to seek remedy for acts, threats, coercion, intimidation, – leading to injury and property damage that has already occurred.[467]

848.    In an attempt to prevent Gjovik from exercising her civil rights, and to retaliate against her for trying to exercising her civil rights, in violation of Gjovik's civil rights, Apple has maliciously terrorized Gjovik with threats, intimidation, and coercion that interferes with her constitutional and statutory rights.[468] Apple tried and did prevent Gjovik from doing things she had a right to do under law and to force Gjovik to do things she was not required to do under law.[469] Apple interfered and attempted to interfere by threat, intimidation, and/or coercion, or with reckless disregard for, Gjovik's exercise and/or enjoyment of a constitutional or other right under California or federal law.[472] These rights included:

-   Filing charges with the government (agencies/police)
-   Testifying and providing evidence to the government (agencies/police)
-   Ability to become a licensed attorney.
-   Ability to exercise California Right to Privacy (including protest of invasion)
-   Right to a safe workplace
-   Right to access the courts
-   Ability to testify at legislative committees and meet with legislatures.
-   Right to be free from nuisance & bodily harm
-   Right to free speech about Constitutionally and statutorily protected topics

---

[467] Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 63 (1987 Reg. Sess.) as am. Apr. 6, 1987, p. 2
[468] *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 787 (N.D. Cal. 2014); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1448 (Cal. Ct. App. 2006).
[469] *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 955-956 (2012).
[472] Intimidating a Witness - California Penal Code 136.1; Threatening a Witness Prior to Testimony - California Penal Code § 137(b); Threatening a Witness After Testimony – Cal. Penal Code § 140(a)

377

**Deleted:** [470] Apple intimidated Gjovik with an intent to prevent her from giving testimony.[471] Apple threatened Gjovik after Gjovik's testimony.[472]

**Deleted:** <#>Threats, intimidation, and coercion included, but was not limited to, aggressive surveillance, bugging objects, whatever Apple installed in her attic, breaking into her apartment, breaking into adjacent apartments, lurking outside her home, blocked calls, retaliatory litigation, retaliatory reports of Gjovik to law enforcement, lurking sedans and SUVs with dark windows, social media accounts making threatening, harassing, and intimidating statements to Gjovik, and someone handling her dog during one of the break-ins.¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

849.   Apple intimidated Gjovik with an intent to prevent her from giving testimony.[473] Apple threatened Gjovik after Gjovik's testimony. Apple interfered and attempted to interfere with Gjovik's testimony to labor agencies by threatening her with violence and intimidation, including termination her employment, the day before she was to testify to the government about Apple, which is her right to exercise her labor rights and engage with the government as a citizen of California (at that time) and of the United States.

850.   Apple's supposed justification for terminating Gjovik, and Apple's conduct which Gjovik had complained about as Apple's justification, all violate the California Constitution Article 1 right to privacy. Gjovik had the right and continues to have the right to protest invasions into her privacy and Apple's pretextual termination for firing Gjovik and harassing letter from their law firm threatens, coerces, and intimidates Gjovik to refrain from exercising her Constitutional rights.

851.   Apple interfered and attempted to interfere with Gjovik's access to California's unemployment insurance program and right to a fair hearing under California UIC Code § 1251 through obstruction with the agency including apparently falsified records and deleted records, and/or false statements, and other irregularities marked with Apple's *modus operandi* in obstruction.[475]

852.   Apple interfered and attempted to interfere with Gjovik's right to access the courts. The morning she was fired, one of the anonymous accounts that is probably Apple posted to Gjovik, ""*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" (EarlyRiser, Twitter).

_____

[473] *People v. Serrano*, 77 Cal.App.5th 902, 912-913 [292 Cal.Rptr.3d 865] (2022); *People v. McDaniel*, 22 Cal.App.4th 278, 283 [27 Cal.Rptr.2d 306] (1994); *People v. McLaughlin*, 46 Cal.App.4th 836, 842 [54 Cal.Rptr.2d 4] (1996).
[475] Note: "bad faith tactics" can be sanctioned and fined: Cal. Unemp. Ins. Code § 2122

378

**Deleted:** Employment cases are included within the scope of §52.1 (Bane Act) & § 51.7 (Ralph Act).[474]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

853.    Apple interfered and attempted to interfere with Gjovik's right to a safe workplace [e.g., Cal. Labor Code §§ 6101, 6046, etc.] and warning workers about exposure to carcinogens [Proposition 65]. Apple also interfered and attempted to interfere with Gjovik's right to work in a work environment free of discrimination based on sex, disability, status is a labor dispute, and crime victim status.[476]



*Exhibit: Gjovik's Texts with West on 4/7/21 about the CalEPA DTSC and Senator Weickowski*

854.    Starting in early 2021, Gjovik began contacting and meeting with local, state, and federal politicians about what occurred to her next to 3250 Scott Blvd – and Apple was aware of this. For example, Gjovik met with Senator Bob Weickowski and his staff on April 7 2021. On April 7 2021, Gjovik told West about the meetings.

---

[476] *Zamora v. Sacramento Rendering Co.*, United States District Court for the Eastern District of California, Case No. No. Civ. S-05-00789 DFL KJM (January 16 2007).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**RE: Delayed Response**

From    Clemons, Chris <Chris.Clemons@sen.ca.gov>

To    Ashley Gjovik<agjovik@scu.edu>

Date    Friday, July 16th, 2021 at 3:45 PM

I conveyed them myself on the Senator's behalf with the Governor's staff and leadership of both houses.

**From:** Ashley Gjovik <agjovik@scu.edu>
**Sent:** Friday, July 16, 2021 12:39 PM
**To:** Clemons, Chris <Chris.Clemons@sen.ca.gov>
**Subject:** Re: Delayed Response

Hey Chris,

Was the Senator able to talk to DTSC about my specific issue like he said he would?

*Exhibit: Gjovik's Messages with Senator Weickowski's Legislative Director*

855.    On July 27 2021, Gjovik was asked by a NGO to testify as a witness to Senator Cortese and Gjovik accepted. Gjovik was to speak about the chemical exposure she experienced at her apartment at 3255 Scott Blvd (that was actually Apple's silicon fabrication fumes).

380

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



**Request for Meeting 8/3 or 8/4 re: SB 37**

From  🔒 Chelsea Tu &lt;ctu@crpe-ej.org&gt;   ☆ Jul 27, 2021

To   Mickle, Ryan,  Melissa Romero,  Tiffany Eng, California Environmental Justice Alliance,  Ashley Gjov... ⌄

**Important**

Hello Ryan,

Thank you for helping us schedule a second meeting with Senator Cortese on SB 37. Folks in this email chain, including Ashley Gjovik, would like to participate. Are there any good times for the Senator to meet with us next week, either on **8/3** (Tuesday) or **8/4** (Wednesday)?

We think it would be important for the Senator to meet with Ashley, who recently experienced severe health impacts from living on a toxic site in Santa Clara. Ashley has written an article about her experience here, and could also share her story during the meeting.

We'd also like to take the opportunity to discuss how to tweak the existing and forthcoming amendments to ensure that projects involving residences and other sensitive receptors go through environmental review, among other things as time permits. As I mentioned in my other email, I hope to share our recommendations in writing by Thursday AM, so that you and the Senator will have them in advance of the meeting.

Please let me know if you have any questions at all, and thank you again for working with us so diligently on this bill.

Best,
Chelsea

*Chelsea Tu*
Senior Attorney
**Center on Race, Poverty & the Environment**

*Exhibit: Request from NGO for Gjovik to testify to Senator Cortese*

856.    Gjovik also posted on Twitter about it on August 15 2021, while she was on leave but before she was fired. Gjovik had meetings with US Representatives, state Senators, Assembly-members, and Mayors. In 2022, there was discussion of bringing Gjovik's situation with Apple related to the environmental violations to a US House Sub-Committee.

381

SECOND AMENDED COMPLAINT  3:23-CV-04597-EMC                            DECEMBER 21 2023

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*Exhibit: Gjovik's August 15 2021 Twitter Post about Meeting with Politicians*

857.    Starting in late 2021, Gjovik began contacting and meeting with state and federal politicians about all of Apple's unlawful conduct, including to get help with her cases.

858.    Apple's threats and intimidation interfered and attempted to interfere with Gjovik's right to appear as a witness before a legislative committee in violation of Govt.C. § 9414(a)(1). Apple's harassment of Gjovik was motivated by the fact that Gjovik was or may be a witness before a legislative committee in violation of Govt.C. § 9414(b). Apple's threats and intimidation prior to Gjovik's termination and Apple's termination of Gjovik was motivated by Gjovik being and possibly becoming a witness before a legislative committee in violation of Govt.C. § 91414(a)(2). Apple knowingly and maliciously prevented, dissuaded, and attempted to prevent and dissuade, Gjovik, a witness and victim, from attending or giving testimony at legal proceedings and inquires in violation of California Penal Code § 136.1(a).

382

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

859.    Apple attempted to prevent and dissuaded Gjovik, who was a victim of a crime and a witness to a crime, from making reports of that victimization to peace officers and law enforcement and prosecuting agencies, from causing a complaint to be sought and prosecuted, and seeking the arrest of persons in connection with her victimization.in violation of California Penal Code § 136.1(b). Gjovik was a victim of crime under a number of civil and criminal statutes including RCRA, CERCLA, CAA, 18 USC 1502, 18 USC 1503, and more.

860.    Apple caused bodily harm to Gjovik through the variety of chemical exposures also violating Gjovik's right to be free from bodily harm under California Civil Code § 43 and free from Nuisance under California Civil Code § 3479.[477]

861.    Apple interfered and attempted to interfere with Gjovik's civil rights under state and federal law including her right to participate lawfully in speech and peaceful assembly opposing any denial of the opportunity to participate in federal civil rights.[478] For example, Apple's retaliatory litigation, retaliatory reports to law enforcement, and malicious gag order prohibited Gjovik from doing so, including prohibiting her from sharing public records and her legal filings, to complain (even privately) about the retaliatory lawsuit and gag order, and violating her right to free speech under the US Constitution, causing irreparable damage to Gjovik. [479]

---

[477] *Cambell v Feld Entertainment*, United States District Court, Northern District, Case Nos. 12-CV-04233-LHK; 13-CV-00233-LHK, (December 15 2014); *Medrano v. Kern Cnty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1015 n.2 (E.D. Cal. 2013); see also *Bolbol v. City of Daly City*, No. C-09-1944 EMC, 2011 U.S. Dist. LEXIS 81228, 2011 WL 3156866, at *7 (N.D. Cal. July 26, 2011).

[478] 18 U.S. Code § 245 - Federally protected activities; § 245(b)(5)

[479] 12 Cal. Jur. 3d Civil Rights § 105. *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 958–59, 137 Cal. Rptr. 3d 839, 848 (2012).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Ms. Gjovik's cyberharassment of me appears to be in part for exercising my own first amendment rights in expressing my opinion that her retaliatory discharge case would be hard to prove because of the bonafide fact that she had leaked private documents about unreleased intellectual property owned by Apple to the press, and additionally because I was cited in Apple's defense case in her charges against the company. I took the time to apologize for exercising those first amendment rights, because it clearly hurt her feelings, despite my right to say such things. and her public assertions that she supported such rights.

*Exhibit: Appleseed's 2/15/22 lawsuit testimony claiming she has a Constitutional right to threaten Gjovik & calling Gjovik's complaints of threats/intimidation, "cyberharassment"*

862.    This retaliatory lawsuit also was filed with the intention of preventing Gjovik from becoming a licensed attorney. Gjovik had a right to become an attorney and Apple egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Apple) harassed Gjovik about exactly this.

384

Deleted: Apple's

Deleted: ,

Deleted: and coercion went beyond speech acts and restricting Gjovik's speech,"*cyberharassment*"

Deleted: extending to

Deleted: physical world by breaking and bugging her chattel property, breaking into her apartment, stalking her, and lurking outside her apartment, intercepting her internet and phone lines, etc. 480

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



*Exhibit: FirstnameBunchofnumbers & California Moral Character*

*Exhibit: FirstnameBunchofnumbers Account Dedicated to Suing Gjovik*

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

863.    Apple's actions threatened violence and created a reasonable fear of imminent harm. Apple attempted to interfere with Gjovik's exercise of her civil rights by way of threats, intimidation, and coercion. Apple made threats of violence against Gjovik and her property (i.e., the box with her chattel property – broken, covered in glass shards and a social media account threatening it could contain the severed head of one of her loved ones, etc.), she reasonably believed would be carried out if she exercised her civil rights. Apple acted violently against Gjovik and her property to prevent her from exercising her rights and/or to retaliate against her for doing so.

864.    The Washington state retaliatory litigation against Gjovik was filed, per Appleseed's own testimony, because of Gjovik's NLRB charges against Apple, because Gjovik was complaining about witness intimidation by Apple, because Gjovik claimed Apple terminated her in retaliation for protected activity. [see RICO Predicate Act § 1512]. Appleseed's complaints in the retaliatory, meritless lawsuit included quotes from, and photos of, Gjovik's federal and state legal filings, addressed to regulatory agencies and the respective District Attorney's offices.

865.    Gjovik statements about lawsuits, government charges, reports of suspected criminal conduct, criminal proceedings, and criminal records – were protected with absolute privilege under California Civil Code § 47(b) and under Fair Report Privilege.[481]  Gjovik's

---

[481] *Kenne v. Stennis* (2014) 230 CA4th 953, 963-965, 179 CR3d 198, 206-208; 5 Witkin, Summary of California Law, Torts §§ 660-662, 666-689;. [Civ.C. § 47(d)(1); see generally, *J-M Mfg. Co., Inc. v. Phillips & Cohen LLP* (2016) 247 CA4th 87, 98-105, 201 CR3d 782, 792-798 (collecting cases); *McClatchy Newspapers, Inc. v. Sup.Ct.* (Mosesian) (1987) 189 CA3d 961, 974-975, 234 CR 702, 710-711].

Deleted: ), that

Deleted: the Applegate's

Deleted: the offer

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1  public and private statements about legal and regulatory matters, while sometimes hyperbolic,[482]

2  were never materially false or misleading.[483]

3      866.    Appleseed's lawsuit was a SLAPP suit and Gjovik even filed an anti-SLAPP

4  motion in response.[484] Appleseed's legal filings about Gjovik are also unprotected due to

5  extrinsic fraud.[485] Appleseed's conduct was criminal witness intimidation and witness retaliation

6  and is not protected by litigation immunity because it is a crime.[486]

7

8      867.    Appleseed offered to Gjovik that the litigation and harassment would stop if

9  Gjovik (summarized) *admitted she leaked IP, admitted she deserved to be fired, wanted to be on*

10  *leave, removed her legal filings against Apple from public view, and admitted was a selfish liar*

11  *who committed perjury by filing meritless charges against Apple.* The message was crystal clear

12  to Gjovik: *the beatings will continue* until she dropped any and all legal claims against Apple.

13

14      868.    Apple intended to cause harm, Gjovik was harmed, and Apple's actions were a

15  substantial factor in causing Gjovik's harm. An action brought under section 52.1 is

16  "independent of any other action, remedy, or procedure that may be available to an aggrieved

17  _____

18  [482] *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 ["rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action"].

19  [483] The report need not be 100 percent accurate; the statement just must capture the "gist" or "sting" of the proceedings. [*Carver v. Bonds* (2005) 135 CA4th 328, 351-352, 37 CR3d 480, 499—privilege covered statement that 22 complaints were filed against podiatrist, even if only six filed; *Colt v. Freedom Communications, Inc.* (2003) 109 CA4th 1551, 1558-1560, 1 CR3d 245, 250-252—neither subtle differences between plaintiff's actual conduct and that reported by defendant nor true errors void privilege.

20  [484] *C.S. v Gjovik*, 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

21  [485] *Silberg v. Anderson* (1990) 50 C3d 205, 214-215, 266 CR 638, 643-644. ("Fraud is extrinsic where the defrauded party was deprived of the opportunity to present [their] claim or defense to the court, that is, where [they were] kept in ignorance or in some other manner … fraudulently prevented from fully participating in the proceeding.") *Marriage of Stevenot* (1984) 154 CA3d 1051, 1068, 202 CR 116, 128]

22  [486] *Scalzo v. Baker* (2010) 185 CA4th 91, 100, 109 CR3d 638, 645; *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 C3d 1157, 1168, 232 CR 567, 574—("when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent").

23

24

25

26

27

28

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

individual under any other provision of law," including Civil Code section 51.7 (e.g., Ralph Act, below).[487]

**ii.    Ralph Civil Rights Act (Cal. Civ. Code §51.7)**

869.    To show a violation of the Ralph Act, a plaintiff must establish (1) the defendant threatened or committed violent acts against the plaintiff, (2) the defendant was motivated by his perception of plaintiff's protected characteristic, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm.[488]

870.    Apple intimidated Gjovik by threat of violence against Gjovik and/or her property and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and would have been intimidated by Apple's conduct.[489]

871.    The test for determining whether facts constitute a "*threat of violence*" looks to whether "*a reasonable person* [reasonable woman for sex discrimination, person in labor dispute for labor discrimination, etc.], *standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendant and perceived a threat of violence.*"[490] The violence or threat of violence can be against the person or their property.[491]

---

[487] *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 843, 87 P.3d 1, 14 (2004); *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334, 949 P.2d 941, 944 (1998).
[488] I.H. by & through Hunter v. Oakland School for Arts, 234 F. Supp. 3d 987, 995 (N.D. Cal. 2017).
[489] Liability may also be found if a defendant "aids, incites, or conspires" in the denial of a right protected under Civil Code section 51.7. (Civ. Code, § 52(b).)
[490] Winarto v. Toshiba America Elecs. Components, Inc., 274 F.3d 1276, 1289 (9th Cir. 2001).
[491] *Campbell v. Feld Entm't, Inc.*, United States District Court for the Northern District of California, San Jose Division, Case No. 12-CV-04233-LHK; 13-CV-00233-LHK (December 15 2014).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

872.    Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property motivated by Apple's perception of: [492] [493]

- Gjovik's position in a labor dispute with Apple
- Gjovik's sex and gender (female, woman)
- Gjovik's disabilities and medical conditions (PTSD, ADHD, autism spectrum, anxiety, depression, multiple chemical sensitivity syndrome/recovery from solvent exposure)
- Gjovik's color/race (white) [these threats were not made with actual discrimination, but instead with an intent to cause division among social groups, which Gjovik argues is still animus]
- Gjovik's activism around environmental health and chemical exposure
- Gjovik's activism around privacy rights
- Gjovik's membership in a protected class of 'victims of environmental crime'

Apple's acts of violence and threats of violence were substantial factor in causing Gjovik harm and did cause Gjovik harm to her property and person.

873.    Gjovik never 'consented' to or waived her rights related to any of Apple's conduct under this Act. An employer may not require an employee to waive any right under Civ.C. § 51.7 as a condition of entering into a contract, including the right to pursue a civil

---

[492] Civ. Code § 51.7(b)(1)), and codify identical language used in *in re Cox*, 3 Cal. 3d 205, 216, 90 Cal. Rptr. 24, 474 P.2d 992 (1970) to expand Unruh Act protected characteristics, not just the enumerated bases. (*McCalden v. California Library Ass'n*, 955 F.2d 1214, 1221, 22 Fed. R. Serv. 3d 975 (9th Cir. 1990). Social justice organization protesting for racial equality constitutes a "political affiliation," protected under the Ralph Act (*Black Lives Matter-Stockton Chapter v. San Joaquin Sheriff's Office*, 398 F. Supp. 3d 660, 679 (E.D. Cal. 2019).) Animal rights activism and membership in organization, constitutes a "political affiliation" under the Ralph Act. (*Campbell v. Feld Entertainment*, 75 F. Supp. 3d 1193 (N.D. Cal. 2014).)

[493] Civ. Code, § 51.7, subd. (b)(1). See *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at pp. 841-842; *Jones v. Kmart Corp.*, 17 Cal.4th at p. 332; *Bay Area Rapid Transit Dist. v. Superior Court*, supra, 38 Cal.App.4th at pp. 144; *Boccato*, supra, 29 Cal.App.4th 1797; *Winarto v. Toshiba America Electronics Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1288-1290, fn. 13.) *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1457 (Cal. Ct. App. 2006)

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

action with any public prosecutor or law enforcement agency. Any such waiver shall be deemed involuntary, unconscionable, against public policy, and unenforceable.[494]

874.    While not required, Apple did express discriminatory animus and intent for their threats of violence because of Gjovik's membership in a protected class of persons.[495] Many of the social media posts and harassing messages Gjovik received from known Apple employees, and from anonymous accounts assumed to be Apple agents/employees, on posts and articles about Gjovik, included discriminatory comments including:

a)  *"Wow... This person is literally mentally sick and needs help. It's actually quite sad."* (Aug 20 2021, now deleted account "JohnTarion"); *"It seems like Ashley is a sick individual with some serious mental issues."* (Aug 22 2021, Twitter, John Tarion).

b)  *"This woman has serious mental issues because she's mostly lying and trying to make Apple the bad guy (in her case)."* (Sept. 3 2021, Twitter, "Antrunt" – account mostly tweets positively about Apple products)

c)  *"I like to call it passive stimulant psychosis. She's probably on a low dose Adderall or Vyvanse and it's slowly turning her crazy."* (Sept. 9 2021, Reddit, "DetectiveBirbe")

d)  *"I don't feel bad for her and society and media gives far too much exposure to the mentally ill today, even enabling them and supporting them, as they partake in their fraudulent, slanderous and lying crusades. This crazy lady is not the only mentally ill person infecting media today... I miss the old days when we didn't let the mentally ill freely roam about the streets. We locked them up and put them in facilities for their own good and for the good of everybody else."* (Sept. 9 2021, Reddit, "pacmandaddy")

e)  *"Glad they fired her and any other know it all activist employee should be terminated too. She had so many complaints and not just about her job but having PTSD and many other complaints outside of work that I would classify her as having Borderline Personality disorder. Don't let the door hit you on your way out!!"* (Sept. 9 2021, "")

f)  *"Is she mentally unwell? Clearly. From the bananas OpEd she wrote, to her borderline paranoid schizophrenic website, to the very bizarre and suspect things she's posted to her Twitter, this is not a woman of sound character and mind." ."* (Sept. 22 2021, Reddit, "Fred257")

a)  *"This chick is a hypochondriac ... she's borderline insane... seriously check out her writing - she's convinced her apartment was killing her but don't have the good*

---

[494] Civ.C. § 51.7(c) (applicable to any agreement entered into or modified on or after 1/1/15).
[495] *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 841 (2004). Oct 2020 – August 2021, Association with members of a protected class, S.F. Admin. Code § 12B.1(a) and 12B.2(a).)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*sense to move and apparently her sickness only happened to her and not anyone else..... if her claims were true. Why is she the only person sick ? Anyways like I said chick is nuts AF."* (Sept 11 2021, Reddit, "LVNcalifornia")

b) *"I'm concerned for her, but she made a lot of money and has no dependents."* (Sept. 26 2021, Team Blind, Appleseed).

c) *"It is exactly the kind of thing a person who in paranoid would believe. What is more likely, a big company is breaking into employees home and impersonating the police, or Apple has employed somebody with an undiscovered mental illness."* (Oct. 9 2021, Reddit, TomJen3)

d) *"Most people like me don't relate to those who take their emotional support animals jet setting while funding their law school degree while at the same time asking for $100,000 in profitable donations, while turning down a $600,000 settlement."* (Dec. 29 2021, LinkedIn, Apple Security employee Amanda Harrison)

e) *"As she [Gjovik] is a woman, and one who seems particularly subject to harassment, it would be nice to clarify how much higher education she's accomplished."* (Jan 1 2022, Wikipedia Talk, Appleseed).

f) *"She clearly doesn't have a lawyer, so I'd guess all of her claims are entirely baseless. She is a classic cow and belongs on kiwifarms."* (Sept 10 2021, HackerNews, "iD0it4thedrUgz")

g) *"Anyone can file complaints with federal and state agencies. It doesn't mean there is merit, and it doesn't mean the person doing the reporting is being honest or genuine in doing so."* (Oct 25 2021, Twitter, Appleseed)

h) *"A wanna be Erin-Brockavich-hero loony SF liberal who probably sues everyone she works for or interacts with... She comes off as a super karen. She's reported alleged unsafe work conditions, toxic environmental issues, retaliation, curtailment of speech and surveillance. She's reported to OSHA, the Securities Exchange Commission, EPA, Dept. Of labor, labor relations board, etc... type of people who thrive on victimology need to be called out at the very least."* (Dec 20 2021, Reddit, StopTop).

i) *"I am not going to diagnose anyone, but this behavior maps to narcissistic personality disorder, and if it's narcissistic supply driving them, giving it ANY attention only FUELS it further."* (Dec 30 2021, Twitter, Appleseed)

j) *"NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik"* (Dec 31 2021, Lawsuit, Appleseed)

k) *"Implying that people are trying to have you assassinated or cause you to kill yourself, me included, is extremely harmful, and I alerted APPLE about the chain of tweets involved in doing so."* (Feb 5 2022, Email, Appleseed)

875.    Apple sent a "Workplace Violence" interrogator to intimidate Gjovik due to Gjovik's position in a labor dispute with an affidavit the next day, implicitly, if not expressly,

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

threatening some sort of violence against Gjovik due to her NLRB case (a labor dispute), with Gjovik even complaining it felt like witness intimidation and was fired hours later. Gjovik even posted on Twitter questioning why a Workplace Violence interrogator was reaching out and if he investigated Workplace Violence of if Workplace Violence was "*a service he delivered*" for Apple. [see sections on threats and intimidation, incorporated here].

### iii.    Acts of Violence and Threats of Violence (Bane § 52.1 & Ralph § 52.7)

876.    Both Bane and Ralph Civil Rights Acts prohibit acts of violence, and/or threats of acts of violence, against persons and/or property. These actions included 18 USC § 1512, 18 USC § 1513, California Penal Code §§ 148.3 and 148.5, California Penal Code § 136.1.

877.    Apple committed violence and made threats of violence against Gjovik and her property, including threatening messages and social media posts, threatening packages in the mail, tampering with Gjovik's chattels to the extent of conversion, destroying Gjovik's chattels, home break-ins (burglary, trespassing), and other violent misconduct.

878.    The filing, or threat of filing, of false police reports is "intimidation by threat of violence" when the defendant files or threatens to file, a false report of criminal activity to law enforcement about the victim, when the defendant knew the report was false, or filed the report with "*reckless disregard of its truth or falsity*."[496] (see FBI reports, police reports, reports to NLRB security, and others made by Appleseed and others, against Gjovik). This is expressly stated in the Ralph Act statute, and is implied to be mirrored for the Bane Act.

879.    Apple repeatedly filed knowingly and intentionally false reports about Gjovik to state and federal law enforcement, foreign law enforcement, and other peace officers – intending to cause Gjovik to fear for her safety; and to initiate bogus investigations into Gjovik in order to

---

[496] Cal.Civ.C. § 51.7(b)(2).

392

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

demoralize, discredit, terrify, and intimidate Gjovik as retaliation and as an effort to stop Gjovik from pursuing her complaints against Apple. Appleseed, as an agent of Apple, filed an FBI complaint against Gjovik which she later apologized for and blamed on an illegal drug relapse. Appleseed, as an agent of Apple, filed retaliatory litigation against Gjovik in a Washington state court (including evidence and testimony of the bogus FBI complaint, and testimony she also reported Gjovik to local law enforcement) – all of which was eventually dismissed as having no merit (finding Gjovik did nothing unlawful), and the prior order against Gjovik was found by an appellate Judge to violate Gjovik's Constitutional rights. Thus, Apple's false reports are not protected and have no litigation immunity (however Gjovik's forced responses to the matters do have litigation immunity).[497]

880.   Apple did, conspired, aided, ratified, condoned, and incited the filing and threatening to file of false claims and reports about Gjovik to peace officers and law enforcement agencies that falsely alleged Gjovik engaged in unlawful activity and/or in activity that requires law enforcement intervention, knowing the claim and reports are false, and/or with reckless disregard for the truth or for falsity of the claim/report, and were filed after January 1 2021.[498]

881.   Under California Penal Code § 148.5, it is a misdemeanor to making knowingly or negligently false reports to a peace officer. Under California Penal Code § 148.3, it is a misdemeanor to knowingly file a false report to a government agency, board, or law enforcement that there is some type of emergency ("swatting").[499] California A.B. 1775, effective January 1

---

[497] Cal.Civ.C. § 47(b)(1)-(5).

[498] California Gov. Code § 51.7 (b)(2), Stats. 2020, c. 327 (AB 1775).

[499] California Penal Code § 148.5(b) "Every person who reports to any other peace officer… that a felony or misdemeanor has been committed, knowing the report to be false, is guilty of a misdemeanor if (1) the false information is given while the peace officer is engaged in the performance of his or her duties as a peace officer and (2) the person providing the false information knows or should have known that the person receiving the information is a peace officer."

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

2021, created a new statute and private right of action for discriminatory, false calls to 911 stating: "*that intimidation by threat of violence includes knowingly or recklessly making or threatening to make a false claim or report to a peace officer . . . alleging that another person has engaged in unlawful activity.*"[500]

882.    Apple made threats to Gjovik over emails, messages via her website webform, messages on social media, tagged Gjovik on social media, made posts on forum then told Gjovik to look at those posts via social media, and via other mediums. Some of these threats came from named people (i.e., Appleseed, Neoform, the Workplace Violence interrogator, etc.) and some came from anonymous accounts that were clearly Apple (the fake EPA enforcement employee 'comrade jones'). Further, the threats were related, interlinked, and amplified by the members of the campaign against Gjovik.[501]

883.    An example of these digital threats includes, but is not at all limited to this post from Sept. 22 2021, on a discussion thread linked to an article about Apple's CEO Tim Cook sending a threatening email to staff claiming any internal information is confidential (an email which the NLRB found in January 2023, based on Gjovik's charge, violated federal law) and commenters discussing Gjovik's termination:

"I said it in the last thread about bad, criminal employees, and I'll say it again. It's time for Apple to take out the trash. Do whatever it takes to identify and catch the leakers and then ruin their lives. Fire them, prosecute and go after them. Do whatever it takes. Hunt them down like wild animals. Leakers and other activist employees who believe that they can do as they please have no business being at Apple. I want to see them gone and I want to see them destroyed. Trashy employees do not belong at Apple. And who is surprised that the leakers go running to the garbage site called the Verge? They already had

---

[500] State Assemb. 1775 § 2, 2019-2020 Leg., Reg. Sess. (Cal. 2020); Cal. Civ. Code § 51.7(b)(2); *Williams v Alameda Cnty.*, US District Court, Northern District of California, Case No. 21-cv-00523-CRB (July 14 2023).
[501] *People v. Mendoza* (1997) 59 C.A.4th 1333, 1339, 69 C.R.2d 728 [use of surrounding circumstances to change seemingly innocuous words into threat].

394

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

one campaign that backfired on them when the lunatic woman leaker was fired, now it's time to get rid of any remaining leakers and criminals. Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death and all Apple would need to do is to make it apply to corporations and not just nations… People just need to be optimistic and patient." (pacmandaddy, Sept 22 2021)[502]

884.    Another example, of many, was from September 12 2021, with the account commenting to Gjovik, *"You're beyond pathetic. It will be fun watch you disappear after you lose everything."*[503] (AllonsyAlonso85, Sept. 13 2021).

885.    Another example, of many, was from Dec. 21 2021, a now deleted account posted on a thread about Gjovik titled "*Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions.*" The account, "RomanAthens" said: "*Tomorrow's headline: Apple Whistleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here).*"[504]

---

[502] Reddit, Sept 22 2021, *Tim Cook says employees who leak memos do not belong at Apple, according to leaked memo*, https://www.reddit.com/r/apple/comments/pt91m5/comment/hdv5qbj/, https://www.reddit.com/r/apple/comments/pt91m5/comment/hdvtqqn/?rdt=62895
[503] Twitter, AllonsyAlonso85, https://twitter.com/AllonsyAlonso85/status/1437323131258015745
[504] Reddit, Dec 21 2021, *Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions*, https://www.reddit.com/r/technews/comments/rkyslb/comment/hpg6bzu/

395

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

r/technews · 2 yr. ago
magenta_placenta

## Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions

truthout.org                                    Open

⬆ 6.9K ⬇        💬 240        ⬆ Share

Single comment thread                    See full discussion

[deleted] · 2 yr. ago

Tomorrow's headline: Apple Whisleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here).

⬆ 1 ⬇    💬 Reply   ⬆ Share   ...

*Exhibit: "Never mind the double tap"*

886.    Under California Penal Code § 136.1(c), Apple's acts of witness intimidation (§ 136.1a-b) would be felonies when they were accompanied by an express or implied threat of force or violence against Gjovik or her property, where Apple's acts were in furtherance of a larger conspiracy, and where the acts were committed for pecuniary gain.[505] Apple attempted to influence Gjovik's legal filings and contracts through threats and menace in violation of state and federal witness tampering statutes.[506]

887.    Apple engaged in threats and actual acts of violence against Gjovik and her property, including physical violence, psychological violence, emotional violence, and moral harassment. Numerous California cases (criminal threats, domestic violence, custody battles, and

---

[505] California Penal Code, "CHAPTER 6. Falsifying Evidence, and Bribing, Influencing, Intimidating or Threatening Witnesses," § 136.1(a),(b),(c).
[506] Civ. Code § 1570; *Odorizzi v. Bloomfield Sch. Dist.* (1996) 246 Cal. App. 2d 123, 128.

396

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

so on) have recognized "*emotional violence*" and "*psychological violence*" in the same vein as "*physical violence*".[507] Several 9th Circuit and District Court cases recognize "*emotional violence.*"[508]

888.    A recent California Court of Appeals decision referred to the criminal threats at issue in that case as "*gratuitous psychological violence*."[509] Another case described a combination of psychological violence and physical violence as "*abhorrent*."[510] Another case recognized a defendant's use of "*physical, psychological, and emotional violence*" to control, exploit, deflect, and counter-accuse.[511] Making a threat can reasonably be viewed as an act of psychological violence because "*making a threat of violence is itself an act of psychological force and coercion akin to an act of violence against another in that it can cause the listener to feel terror and suffer sustained anxiety and fear of injury or death at the hands of the*

---

[507] *In re Marriage of McLoren*, 202 Cal. App. 3d 108, 115, 247 Cal. Rptr. 897, 901 (Ct. App. 1988), as modified (July 7, 1988) [joint-custody order]; 117 People v. Richard, No. A158285, 2020 WL 7395407 (Cal. Ct. App. Dec. 17, 2020) [criminal battery and threats; unpublished]; *People v. Claster*, No. B227830, 2011 WL 3190420, at *4 (Cal. Ct. App. July 27, 2011) [mentally disordered offender order; unpublished]; *People v. Lowder*, No. 2D CRIM. B243669, 2013 WL 1247709, at *3 (Cal. Ct. App. Mar. 28, 2013) [mentally disordered offender order; unpublished]; *People v. Ruiz*, No. D052347, 2008 WL 3856681, at *3 (Cal. Ct. App. Aug. 20, 2008) [sentencing mitigation for robbery, third-strike; unpublished].
[508] *Swan v. Pfeiffer*, No. 522CV00193SVWAFM, 2022 WL 17858152, at *11 (C.D. Cal. Oct. 24, 2022), report and recommendation adopted, No. 522CV00193SVWAFM, 2022 WL 17853198 (C.D. Cal. Dec. 22, 2022) [lewd acts and rape]; *Rhoades v. Henry*, 638 F.3d 1027, 1049 (9th Cir. 2011) [emotional violence in defendant's history]; Toussaint v. Rushen, 553 F. Supp. 1365, 1377 (N.D. Cal. 1983), aff'd in part sub nom. *Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) [emotional violence by prison guards and prison conditions leading to suicides and self-mutilation].
[509] *People v. Henderson*, No. 2D CRIM. B275751, 2017 WL 4416319, at *4 (Cal. Ct. App. Oct. 5, 2017) [criminal threats; unpublished].
[510] *People v. Gomez-Garcia*, No. C084227, 2021 WL 1186392, at *11 (Cal. Ct. App. Mar. 30, 2021) [felony enhancement for sexual assault; unpublished]
[511] *Boyd v. Geddes*, No. G040585, 2009 WL 990761, at *2 (Cal. Ct. App. Apr. 14, 2009).

397

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*declarant.* "[512]  Several states, including California, also recognize forms of "*emotional terrorism.*" [513]

### iv.     Intimidation & Coercion (Bane, § 52.1)

889.    Intimidation and coercion went beyond speech acts (and speech restrictions), and included, but was not limited to, aggressive surveillance (including lurking Private Investigators in Santa Clara, San Francisco, and Albany NY), bugging her chattel property [the statue Apple mailed Gjovik from her desk; Gjovik's fig tree, etc), whatever Apple installed in her attic (photos show cables/cords laid in away landlord denied was them), breaking into her apartment (at least once in 2021 and in 2022), breaking into adjacent apartments (at least once in 2021), lurking outside her home, stalking her, blocked calls (September 2021), retaliatory litigation (January 31 2022), retaliatory reports of Gjovik to law enforcement (January 2022, May 2023, etc., lurking sedans and SUVs with dark windows, social media accounts making threatening, harassing, and intimidating statements to Gjovik, and someone handling her dog during one of the break-ins (August 2022). [514]

890.    Apple filed false police reports, filed false FBI reports (alleging criminal extortion and blackmail), filed meritless litigation and obtained a gag-order in 2022 through fraud, filed false reports to social media services alleging serious crimes (including that one of

---

[512] See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1024, 109 Cal.Rptr.2d 464; *People v. Senior* (1992) 3 Cal.App.4th 765, 775, 5 Cal.Rptr.2d 14; *People v. Preciado*, No. H024362, 2004 WL 1045965, at *15 (Cal. Ct. App. May 10, 2004) [first-degree murder with enhanced sentencing; unpublished].
[513] *People v. Mendoza*, 59 Cal. App. 4th 1333, 1344, 69 Cal. Rptr. 2d 728, 735 (1997) ["Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat"]; Claire Wright, *Torture at Home: Borrowing from the Torture Convention to Define Domestic Violence,* 24 Hastings Women's L.J. 457, 524 (2013).
[514] California Civil Code 52.1(j); Interference with Legal Rights., 8 Witkin, Summary 11th Const Law § 990 (2023); *Bates v. San Francisco Sheriff's D. Chief Arata*, No. C 05-3383 SI (N.D. Cal. Mar. 26, 2008); *Koerber v. Encyclopedia Britannica, Inc.*, No. B312047, 18 (Cal. Ct. App. Jul. 13, 2022). *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006, 314 Ill. Dec. 162, 874 N.E.2d 72 (4th Dist. 2007), appeal pending, (May 1, 2007).

398

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Gjovik's legal filings was 'child pornography'), and other depraved actions intending to instigate investigations into Gjovik, instigate searches of Gjovik's electronic devices and usage, instigate removal of Gjovik's published documents and statements, and to incite others to threaten and attack Gjovik due to these false allegations.

891.    Undue Influence was present as Apple threatened to seek criminal prosecution of Gjovik for an alleged crime and when Gjovik was entirely innocent of that or any other crime, causing the Gjovik to fear arrest and imprisonment and the damage that would result to Gjovik's

891.    business and reputation,[518] Apple also aided, conspired, and incited these acts (i.e., incited and aided with the meritless litigation and police reports against Gjovik and conspired to harass and threaten Gjovik about those reports and cases).[519]

892.    See also *RICO Predicate Acts: Witness Intimidation and Witness Retaliation* sections which are incorporated here.

## C.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962.

893.    Creating enhanced criminal and civil remedies, Congress drafted the Racketeer Influenced and Corrupt Organizations (RICO) Act to address "enterprise criminality," that is, patterns of unlawful conduct including: (1) acts of violence and terrorism; (2) the provision of illegal goods and services; (3) corruption in labor or management relations; (4) corruption in government; and (5) criminal fraud by, through, or against various types of licit or illicit enterprises.[524]

---

[518] 8C Am. Jur. Pl. & Pr. Forms *Duress and Undue Influence* § 29
[519] Civ. Code, § 52(b). Judicial Council of California Civil Jury Instruction 3064, Judicial Council of California Civil Jury Instruction 3064
[524] 18 U.S.C.A. §§ 1961-68; *St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir.2000).

---

**Deleted:** engaged in threats and actual acts of violence against

**Deleted:** and her property, including: physical violence, psychological violence, and moral harassment.¶
An action brought under section 52.1 is "independent

**Deleted:** action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law," including Civil Code section 51.7 (e.g., Ralph Act, below).[515]¶
<#>RALPH CIVIL RIGHTS ACT: CAL. CIV. CODE §51.7¶
Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property due

**Deleted:** position in a labor dispute and Gjovik's other protected characteristics (sex/gender, disability, color/race, medical condition, etc), including her activism around environmental health and chemical exposure, activism around privacy rights, and her membership in a protected class of 'victims of environmental crime.'[516][517]¶
While not required, Apple did express discriminatory animus and intent for their threats of violence because of Gjovik's membership in a protected class of persons.business and reputation,

**Deleted:** As detailed in the Bane Act section above, Apple committed violence and made threats of violence against Gjovik and her property, including threatening messages and social media posts, threatening packages in the mail, tampering with Gjovik's chattels, destroying Gjovik's chattels, home break-ins, and other violence misconduct.[520]

**Deleted:** <#>Apple engaged in threats and actual acts of violence against Gjovik and her property, including: physical violence, psychological violence, and moral harassment.¶
<#>A Ralph Act claim applies to employment and also does not displace another employment claim.[521] Ralph Act claims may be joined with an employment discrimination claim.[522] Apple intimidated Gjovik by threat of violence against Gjovik and her property and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and would have been intimidated by Apple's conduct.[523]¶
¶

**Deleted:** *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 841 (2004). Oct 2020 – August 2021, Association with members of a protected class, S.F. Admin. Code § 12B.1(a) and 12B.2(a)....

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

894.     RICO is appropriate and justified in this case due to the uniquely extreme and corrupt conduct perpetrated by Apple against Gjovik in furtherance of concealing their systemic pattern of criminal schemes and enterprise. RICO enables a more efficient analysis of the facts in this case by including evidence of wrongdoing that does not ordinarily fit into a civil lawsuit.

895.     Use of RICO enables Gjovik to seek remedy for witness intimidation and retaliation violations outside a criminal case initiated by US Department of Justice.

896.     There is extensive evidence of fraud and regulatory violations occurring before and during Gjovik's disclosures, substantiating Gjovik's real-time complaints about a "cover-up" and "conspiracy."[525]

### i.     Standing & Pleading

897.     Any allegations of fraud and any actions under THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, codified as TITLE IX OF THE ORGANIZED CRIME CONTROL ACT OF 1970, must comply with pleading requirements set forth by FRCP 8(a) and *Iqbal/Twombly*.[526] The heightened pleading standard requires establishing the circumstances constituting fraud, including: date, time, place, communications, and name of the person who made a fraudulent representation.[527] Both fraud and RICO must be plead with particularity and so are plead in detail in the "General Allegations" above, here, and the sections below, unfortunately making this pleading quite long.[528]

898.     Gjovik was directly injured, with harm occurring to her business, her tenancy rights, and to her personal chattel property, due to Apple's racketeering Predicate Acts of § 1512

---

[525] Craig A Benedict (retired Assistant US Attorney, Northern District of New York), The Interplay of Worker Protection and Federal Criminal Statutes in Environmental Prosecutions
[526] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)
[527] Schrieber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1400 (9th Cir. 1986); Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977); Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009); Cohen v. Trump, Case No. 13-cv-2519-GPC-WVG, 12 (S.D. Cal. Feb. 21, 2014)
[528] *Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N.D. Ill. 1996), aff'd, 185 F.3d 850, (7th Cir. 1999),

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

(Intimidating Witnesses) and § 1513 (Retaliating Against Witnesses) occurring within the last

four years (2021-2023). Gjovik was directly injured with harm occurring to her personal chattel

property due to Apple's racketeering Predicate Acts of 18 USC 229 (Relating to Chemical

Weapons), occurring within the last four years (2020). Gjovik was directly injured with harm

occurring to her business and to her chattel property due to Apple's racketeering Predicate Acts

of 1341 (Mail Fraud) and 1343 (Wire Fraud), occurring within the last four years (2020-2023).

Some of Apple's Mail and Wire Fraud Acts also included Predicate Acts of 15 USC 78

(Securities Fraud) within the last four years (2020-2023), which also directly harmed Gjovik's

business and personal chattel property. Gjovik was directly injured, with harm occurring to her

business, due to Apple's racketeering Predicate Acts. [529]

899.    Gjovik was directly injured by Apple's Predicate Acts of Commercial Bribery but

is not claiming harm due to statute of limitations as the Acts occurred in 2015, over four years

ago. Gjovik was only indirectly injured by Apple's Predicate Act of Criminal Bribery of

Executive Officer and some of the 18 USC 78 (Securities Fraud) claims, and thus is not claiming

redressable harm due to lack or direct injury and/or statute of limitations as some Securities

Fraud claims occurred over four years ago. Gjovik also cites additional historic charges and

claims against Apple, which are not Predicate Acts under RICO, but are evidence to support

allegations of enterprise, scheme, and/or conspiracy. These claims include Sherman Act antitrust

violations, impersonating law enforcement, and other felonious affairs.

900.    Standard whistleblower retaliation lawsuits usually do not support concurrent

RICO claims, as employees who suffer retaliatory terminations often do so in (comparatively)

dull and predictable ways. However, whistleblower retaliation cases do support RICO when a

---

[529] *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004).

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

discharge of employment is also a RICO Predicate Act (i.e., 18 USC §§ 1512, 1513, etc.) that is part of a racketeering scheme and pattern. This is the situation with Gjovik's claims against Apple.

901.    Apple's termination of Gjovik consists of several RICO Predicate Acts. Gjovik complained of federal witness intimidation (§ 1512) the day before a federal affidavit and only hours before she was terminated in retaliation due to her cooperation with federal officers and federal investigations (§ 1513). Apple's termination of Gjovik was not simply because Gjovik refused to participate in Apple's pattern of racketeering activity, it was because Gjovik was a federal witness, a victim of federal crimes perpetrated by Apple, and Gjovik was informing to the Feds about Apple's misconduct and criminal activities.[530]

902.    In addition, and/or in the alternate, if Gjovik's termination is not found to be a Predicate Act or otherwise support RICO standing, then Gjovik argues her whistleblower retaliation claims are related to the RICO charges but are not "essential" to the alleged RICO scheme and conspiracy, and because the whistleblower case is related but peripheral to the RICO claims, then both claims can be pled concurrently.[531]  In addition, and/or in the alternate, if Gjovik's employment-related injury claims are not found to be Predicate Acts or otherwise support RICO standing, Gjovik still has standing based on harm/injury beyond the employment matters (i.e., harm to personal chattel property due to 18 USC 229 Predicate Acts; harm to business and property due to witness intimidation and retaliation occurring well past Gjovik's termination, etc.).[532]

---

[530] *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 294 (9th Cir. 1990).
[531] *Reddy* at 295/
[532] *Reddy* at 296.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

ii.      **Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)**

903.     Apple engaged in RICO Predicate Acts with knowledge the conduct was illegal. The conduct affects interstate and/or foreign commerce under 18 U.S. Code § 1962 through interstate mail, interstate wires, and other instrumentalities of interstate commerce.

904.     Under 1962(a), the "person" and the "enterprise" are the same ("Apple") and Apple's racketeering benefited itself financially. Under sections 1962(c) and (d), the "person" and the "enterprise" are distinct, the "person" is Apple, and the "enterprise" is Worldwide Loyalty.[533]

905.     In violation of Section 1962(c), Apple conducted and participated in the conduct of an associated enterprise ("Worldwide Loyalty") through a pattern of racketeering activity and engaged in and/or the activities of which affect interstate commerce Apple.

906.     In Violation of Section 1962(d), Apple conspired "*to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.*"[534] During the time Gjovik worked at Apple, Apple undertook criminal acts with the "*intent to commit, and to aid and abet, and in connection with another federal crime.*"[535] Apple conspired to violate one or more of the substantive RICO provisions and member of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy. [536] Apple and The Worldwide Loyalty Team are mutually dependent on each other, assist each other on the acts of racketeering, and their actions are intertwined with each other as

---

[533] RJR Nabisco, Inc. v. Eur. Cmty, 136 S. Ct. 2090, 2104 (2016); Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).
[534] *Salinas v. United States*, 522 U.S. 52, 63 (1997); *United States v. Wilkerson*, 966 F.3d 828, 841 (D. C. Cir. 2020); *United States v. Fernandez*, 388 F.3d 1119, 1228 (9th Cir. 2004).
[535] *United States v. Raniere*, 384 F. Supp. 3d 282, 306 (E.D.N.Y. 2019).
[536] *Beck v. Prupis*, 529 U.S. 494, 503-07 (2000); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).

403

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Apple would not be able to engage in the racketeering acts it does without the Worldwide Loyalty Team Enterprise.[537]

907.    Apple knowingly agreed to facilitate the commission of at least two racketeering acts constituting a pattern and scheme to be committed by any member of the conspiracy.[538]

### iii.    Creation, Nature, and Operation of the Enterprise

908.    Apple, as an enterprise-as-person concept (only under 1962-a), benefitted by playing an active role in the pattern of racketeering which directly injured Gjovik's property and business. Legitimate hazardous waste disposal costs thousands of dollars, so it is hard to imagine any situation in which the illegal dumping of toxic wastes by corporate officers, employees, or agents will not directly or indirectly benefit the corporation enterprise. Indeed, "intentional polluters are doing so because it is less costly and more profitable than complying with the environmental laws."[539]

909.    Even more egregious, in 2021, Apple also instituted a "ESG modifier" for executive pay that can increase or decrease Executive Compensation 10% based on environmental (and other) practices. Apple's environmental violations were not just to save money on properly disposing of waste, it was also to inflate stock price with false and misleading claims about their actual practices, and to increase bonuses for the executives. Apple is literally giving executives bigger bonuses for illegally disposing of hazardous waste. As Apple makes more money from its criminal conduct, it allows it to reinvest that money in its Global Security team that it can use for more criminal conduct, or bribing sheriff's offices, etc.

---

[537] _United States v. Raniere_, 384 F. Supp. 3d 282, 305 (E.D.N.Y. 2019).
[538] See, e.g. _United States v. Fernandez_, 388 F.3d 1199, 1230 (9th Cir. 2004); _Salinas v. United States_, 522 U.S. 52 (1997).
[539] Brendan Rielly, Using RICO to Fight Environmental Crime: The Case for Listing Violations of Rcra As Predicate Offenses for RICO, 70 Notre Dame L. Rev. 651, 679–81 (1995).

404

**Deleted:** <#>In violation of Section 1962(c), Apple conducted and participated in the conduct of an associated enterprise ("Worldwide Loyalty") through a pattern of racketeering activity, and engaged in and/or the activities of which affect interstate commerce Apple. ¶
<#>In Violation of Section 1962(d), Apple conspired "to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity." [540]  Apple conspired to violate one or more of the substantive RICO provisions and member of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy. [541] ¶
<#>Apple knowingly agreed to facilitate the commission of at least two racketeering acts constituting a pattern and scheme to be committed by any member of the conspiracy.[542] ¶
**<#>Creation, Nature, and Operation of the Enterprise** ¶

**Deleted:** FIRST

**Deleted:** ·

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

910.    In addition, RICO Section 1962(c) requires the existence of two distinct entities:

a "person" and an "enterprise" that is not simply the same person referred to by a different name.

Even under subsection 1962(c), a corporate entity and its sole shareholder are sufficiently

distinct to satisfy the "enterprise" and "person" elements of a subsection (c) violation.[543] The

RICO statute defines "enterprise" to include "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."[544]

911.    Apple and the Worldwide Loyalty Team enterprises engage in interstate and

foreign commerce and activities that affect interstate or foreign commerce. An enterprise that

orders supplies and transports its employees and products in interstate commerce, is "engaged in

interstate commerce" for purposes of RICO, [545] as is an enterprise that uses telephones, the mail,

or internet communications.[546] The enterprises activities and the predicate acts of racketeering

all affect interstate commerce.[547]

912.    The defendant, Apple, is employed by the enterprise, associated with the

enterprise, conducts in the enterprise's affairs, lead the enterprise, and participated in a pattern of

racketeering with the enterprise.[548] Apple is heavily involved in the operation and maintenance

of the enterprise, and most of the schemes are for the ultimate benefit of Apple's short-term and

---

[543] Cedric Kushner Promotions, Ltd., 533 U.S. at 161; Living Designs, Inc., 431 F.3d at 361; First Capital Asset Management v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004).
[544] 18 U.S.C. § 1961(4); Cisneros v. Petland, Inc., 972 F.3d 1204, 1211 (11th Cir. 2020).
[545] United States v. Robertson, 514 U.S. 669, 671-72 (1995); see also United States v. Velasquez, 881 F.3d 314, 329 (5th Cir. 2018); United States v. Keltner, 147 F.3d 662, 669 (8th Cir. 1998).
[546] Velasquez, 881 F.3d at 329 ("Use of instrumentalities of interstate commerce such as telephones, the U.S. Postal Service, and pagers to communicate in furtherance of the enterprise's criminal purposes can also constitute the enterprise affecting interstate commerce.")
[547] See DeFalco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001); United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005) (quoting R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1353 (5th Cir. 1985)); Bunker Ramo Corp. v. United Bus. Forms, Inc., 713 F.2d 1272, 1289 (7th Cir. 1983).
[548] Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005); Churchill Village v. General Electric, 361 F.3d 566, 574-75 (9th Cir. 2004).

405

long-term unlawful goals and objectives.  Apple can be held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself.

913.   The criminal enterprise in this complaint, where not Apple itself, will be named after a monster of Apple's creation, the "*Worldwide Loyalty Team*." This group has been repeatedly identified, over nearly two decades, as being involved the initiation, management, and/or cover-up of criminal acts in furtherance of common schemes. The "Worldwide Loyalty" Enterprise here references and includes, but is not limited to, Apple's actual "Worldwide Loyalty Team" organization. Worldwide Loyalty is an enterprise separate from the "person" (Apple) associated with the enterprise who engaged in unlawful RICO conduct.[550]

914.   The Worldwide Loyalty Team's own chosen name ("Worldwide") affirms they are an entity which is engaged in and effects interstate and foreign commerce, further evidenced by interstate wire and mail, interstate travel and shipping, and 'ops' in numerous states and countries. (Predicate Act of Criminal Bribery occurred in California, Predicate Act of Securities Fraud occurred in California and New Jersey, Predicate Acts of Witness Intimidation/Witness Relation occurred in California, Washington, New York, etc.).

915.   For 1962(c),(d) – Apple and the enterprise are distinct and separate entities. This enterprise includes Apple the corporation, along with: lawyers, law firms, expert witnesses, trade organizations, non-profit organization, media companies, tech reporters, third-party administrators, employees and officials in government agencies, doctors, and environmental consultants.[552]  Most of the entities who are members of the enterprise are independent entities

---

[550] Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986).
[552] Phillip Morris USA, Inc., 566 F.3d at 1111-12; Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005); United States v. Blinder, 10 F.3d 1468, 1473–74 (9th Cir.1993). Jackson v. Sedgwick Claims Management Services, Inc., 699 F.3d 466 (6th Cir. 2012).

**Deleted:** – including with law firms, expert witnesses, trade organizations, third-party administrators, doctors, and/or environmental consultants..[549]

**Deleted:** <#>The "Worldwide Loyalty Team" Enterprise¶

**Deleted:** Loyalty's

**Deleted:** confirms

**Deleted:** <#>Apple is heavily involved in the operation and maintenance of the enterprise, and most, if not all, of the schemes are for the ultimate benefit of Apple's short-term and long-term unlawful goals and objectives.[551]¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

by definition – lawyers and professional engineers are licensed professionals with ethical obligations to maintain professional independence.[553] Similarly, law enforcement and regulatory agencies are supposed to operate independent of private interests.[554]

916.    Many of the individuals and groups named in this complaint for their activities as part of Apple's racketeering have had other similar allegations made about them or related to them prior. Many of these individuals and groups likely are not only engaged in Apple's racketeering, but also the racketeering and unlawful conduct undertaken for the benefit of other big businesses. For example, as mentioned, there is extensive press coverage of corruption concerns at the US Department of Labor OSHA Whistleblower Protection Program west-coast offices.

917.    The local police have also faced a number of investigations, charges, and convictions over the last couple decades, some of which were already noted (Predicate Act Criminal Bribery, etc.). Other known felonious conduct by and related to the local police include the recent infamous eBay cyberstalking and obstruction of justice scandal. Two former Santa Clara police captains, Philip Cooke and Brian Gilbert, pled guilty to conspiracy to commit cyberstalking and conspiracy to tamper with witnesses.[555] Cooke admitted to participation in an *"elaborate cyberstalking scheme to intimidate … and then interfered with the investigation into tactics that included sending the victims live spiders, cockroaches, and a fetal pig."*[556] Cooke and Gilbert were involved in every part of the eBay cyberstalking conspiracy, including a digital

---

[553] *Gadda v. Ashcroft*, 377 F.3d 934, 942–43 (9th Cir.2004); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir.1992). Model Rules of Prof'l Conduct R. 5.4.
[554] *United States v Griffin* (1981, CA4 Md) 660 F2d 996, cert den (1982) 454 US 1156, 71 L Ed 2d 313, 102 S Ct 1029.
[555] US DOJ, *Former eBay Employee Pleads Guilty in Aggressive Cyberstalking Campaign*, District of Massachusetts (October 27 2020), https://www.justice.gov/usao-ma/pr/former-ebay-employee-pleads-guilty-aggressive-cyberstalking-campaign
[556] Robert Salonga, *Ex-Santa Clara police captain pleads guilty in bizarre cyberstalking of eBay critics*, The Mercury News (October 27 2020), https://www.mercurynews.com/2020/10/27/ex-santa-clara-police-captain-pleads-guilty-in-bizarre-cyberstalking-of-ebay-critics/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

harassment campaign, installing surveillance equipment on the victim's property, and conspiracy to obstruct an FBI investigation from discovering the financial paper trail connecting them to the threatening deliveries of live insects and death-themed items.[557] Gilbert and Cooke also conspired to use a "*friendly*" police officer at the Santa Clara Police Department, who they "*can control*" to assist in the coverup for eBay.[558] Gilbert was a captain with the Santa Clara police until 2018, and Cooke was a captain with the Santa Clara police, including managing 29 employees and SWAT, until 2017. In 2016, Cooke was awarded the "*California Commendation Medal,*" and a "*Lifetime Achievement Award.*"[559] Following the eBay stalking/harassment fiasco, and Moyer's criminal charge of bribery, an allegation that Apple is using "friendly" employees in local law enforcement and agencies to assist them in criminal schemes is undeniably plausible.

918.    Criminal RICO Enterprises have been found with members of an "*Inner Circle*" that demands member's "*absolute commitment*" to leadership, will "*not tolerat[e] dissent,*" "*isolating associates and others from friends and family,*" "*gaining political influence and evading regulatory agencies,*" "*using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics,*" and by "*obtaining sensitive information about members and associates of the Enterprise to control them.*"[560]

---

[557] Id.
[558] *USA v. Baugh et al*, US District Court, Massachusetts District, Case 1:20-MJ-02398 (2021), Docket #3-2 "Affidavit of Mark Wilson" FBI Special Agent pg42-44
[559] Jason Green, *Santa Clara to investigate ex-police captain charged in eBay cyberstalking case*, Mercury News, June 18 2022, https://www.mercurynews.com/2020/06/18/santa-clara-to-investigate-ex-police-captain-charged-in-ebay-cyberstalking-case/; *US v Cooke*, US District Court, District of Mass, Case 1:20-cr-10126-ADB (2021), Doc #20, Defendant Philip Cooke's Sentencing Memorandum
[560] *United States v. Raniere*, 384 F. Supp. 3d 282, 294 (E.D.N.Y. 2019).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

919.     The entities comprising a RICO enterprise can also play different roles in the case, including the roles of victim, prize, instrument or perpetrator of the violation.[561]

**iv.     Pattern; Vertical and Horizontal Relatedness of Predicate Acts**

920.     The predicate offenses relate to each other and the enterprise. Relatedness enabled Apple to commit the offense solely because of its position in the enterprise and/or his involvement in or control over the enterprise's affairs, and/or because the offense related to the activities of the enterprise.[562] Relatedness links each of Apple's predicates act to the enterprise.[563] Apple's predicate acts have similarities related to: purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (i.e., agency capture, intimidation and censorship, lying about environmental practices, whistleblower retaliation, etc.).[565] Through all the stories here, there are several repeated patterns, including:

- Apple's (including Apple executives and Board members) involvement in conduct which could be considered fraudulent, misleading, threatening, and obstructive; including "astroturfing," false public statements, and manipulation of the press and public discourse. Apple's engagement of outside parties (Enterprise) in support of the misconduct.

- Apple's misconduct related to offices on toxic waste clean-up sites (Superfunds, Brownfields, etc.); including government oversight and property owners. Apple's policies and practices related to hazardous material management; and hazardous waste management, storage, treatment, transport, and disposal. Apple's history of

---

[561] *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 n. 5, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); see Prof. G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 307-25 (1982).
[562] *United States v. Vernace*, 811 F.3d at 615-16. *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citing United *States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)); see also *Rajaratnam v. Motley Rice*, LLC, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020).
[563] *United States v. Henley*, 766 F.3d at 907 with *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008) ("It may be true that Fowler's predicate acts are not directly interrelated with each other, but that is not required. Instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise").
[565] *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) (quoting former 18 U.S.C. § 3575(e)); *Reich*, 858 F.3d 55 at 61.

409

Deleted: ).[564]

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

environmental, health/safety, and labor violations; Apple's patterns/practice of responding to environmental, health/safety, and labor concerns.

• Apple's history of being subject to criminal investigations and charges; Apple's responses to US government inquiries and investigations

921.    Apple is engaged in predicate acts of racketeering activity and Apple has shown a long-running pattern and practice of regularly treating whistleblowers and those who are cooperating with investigations into Apple in a way that constitutes criminal harassment and intimidation. The goal of Apple's racketeering does not and cannot have an end date, as much of Apple's racketeering conduct is performed in order to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct, while frantically working to cover-up its prior criminal conduct, by engaging in even more criminal conduct. Cover-ups by their nature present a distinct threat of long-term continuation.[566]

922.    In 2009, Gizmodo wrote about Apple and this Enterprise and explained that the group calls themselves the "*Worldwide Loyalty Team*." The article added that some Apple employees chose to refer to the group as the "Apple Gestapo."

> "[Apple employees] [knew] how it feels to be watched, to always be considered guilty of crimes against another kind of state. He knew how it felt to have no privacy whatsoever when he was working right here, in a little Californian town called Cupertino, in a legendary place located in One Infinite Loop. [He] knew about all that pretty well, back when he was working at Apple Inc"

The article details that Apple employees "*lack any privacy whatsoever*," that Apple has "*moles working everywhere*" that even "*management is not aware of*," and if Apple thinks an employee shared sensitive information, the employee can expect to "*get fired and sued into oblivion by Apple Legal*." The article explains that when Worldwide Loyalty suspects a "*leak*" of

---

[566] *Mruz v. Caring*, Inc., 991 F. Supp. 701, 718 (D.N.J. 1998)

410

---

Deleted: currently engaging

Deleted: except

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

information from employees to the outside world, the team brings in the "*special forces*" to "*coordinate the operation*" and "*supervise the supervisors*" as all cellphones are confiscated and data copied, then all data is reviewed including text messages and photos. "*No privacy, no limits.*"[567]

923.   Apple's Business Conduct policy in 2010 described Apple's search/privacy policies for employees simply as: "*Subject to rules or regulations affecting an employee's rights, Apple may monitor or search its work environments, including equipment, networks, mail, and electronic systems, without notice. Apple monitors facilities and equipment to promote safety, prevent unlawful activity, investigate misconduct, manage information systems, comply with legal guidelines, and for other business purposes.*"[568]

924.   However, the 2009 article said that if employees do not want to participate, the employees are asked to leave Apple and never come back. The article says that while Apple's demands are supposedly "*voluntary*", in reality any employees who resist will then be investigated as to why they are resisting. If a "*leaker*" is identified, they are held by Apple all day while they are "*interrogated*" and "*intimidat[ed] by [Apple] threatening to sue.*" The article concludes complaining that the "*happy hippie company*" that Apple used to be has now been transformed into a "*company that does KGB-style lockdowns and Gestapo interrogations that end in suicides.*" [569]

---

[567] Id.

[568] Apple, 2010 10-K, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=7519151

[569] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

411

Deleted: If

Deleted: they

Deleted: " but

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25



## Apple Gestapo: How Apple Hunts Down Leaks

Jesus Diaz
12/15/09 5:38PM

💬 440    🔖 2    [f] [🐦] [✉] [🔗]

They call themselves the Worldwide Loyalty Team. Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to Jobs and Oppenheimer.

*Exhibit: Apple Gestapo Article* [570]

925.    Worldwide Loyalty engages in other activities that include individuals and groups outside of Apple Inc. The group was "*known for its network of informers and ruthless, systemic pursuit of leakers.*" [571] The team has an "*undisclosed number of investigators around the world*" (foreign commerce) to control information and prevent "*leaks*" from reaching "*the press,*" and to "*hunt down*" the source when leaks occur." [572] The team also has a sub-team called "Secrecy

---

[570] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058
[571] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader*, Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[572] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

412



Deleted:

Deleted: competitors and

Deleted:  do

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Program Management" which members are 'embedded' within product teams.[573] *"Inner Circles"* *of organization have been found to be criminal RICO Enterprises when "[p]romoting, enhancing and protecting the Enterprise by committing, attempting and conspiring to commit crimes."*[574]

926.    Worldwide Loyalty was led by John Theriault (ex-Pfizer, ex-FBI) from 2007-2011.[577] *Theriault, known as Apple's "Gestapo Chief", oversaw all of Apple's security, including "not-so-secret internal police force that controls Apple's own employees, the infamous World Wide Loyalty Team."*[578] *One publication noted, "we're not 100% certain what he does, but we wouldn't want to have him knocking on our front door."*[579] Starting in September 2009, Tom Moyer became Apple's Chief Compliance Officer.[580] By 2014, Tom Moyer was Apple's "Head of Global Security."[581] Moyer reported to Apple's General Counsel and also to Apple's Audit and Finance Committee within the Board of Directors (led by Ronald Sugar).[582] In 2014, Moyer supposedly only had two employees reporting directly to him. One was the new court mandated Antitrust Compliance Officer and the other was Apple's Director of Business Conduct and Global Compliance.[583]

927.    It is unclear how Moyer is "Head of Global Security" if the team does not report to him. Under information and belief, Apple's Global Security team was created after the 2011

---

[573] Id.
[574] *United States v. Raniere*, 384 F. Supp. 3d 282, 294 (E.D.N.Y. 2019)
[577] Tate, Supra
[578] Jesus Diaz, *Apple's Gestapo Chief "Steps Down"*, Gizmodo, (November 4 2011), https://gizmodo.com/apples-gestapo-chief-steps-down-5856443
[579] Jay Yarow, *Secret Apple Execs You've Never Heard Of*, Business Insider, (July 26 2011), https://www.businessinsider.com/apple-execs-2011-6
[580] Apple Inc, Report of The Special Litigation Committee of The Board Regarding Director Defendants and Settlement (May 26 2017).
[581] *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, No. 1:12-CV-3394; Second Report of the External Compliance Monitor, Michael R. Bromwich, October 14 2014.
[582] Id.
[583] Id.

**Deleted:** <#>In 2011, CNN described working at Apple as "*a brutal and unforgiving place*" and even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment.[575] In 2011, a Gawker reporter described the culture of working at Apple as "*bullying, manipulation and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful,*" and "*deeply disturbing.*"[576] ¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

incident where Apple unlawfully broke into the Latino man's home.[584] Under information and belief, Tom Moyer replaced the prior head of Worldwide Loyalty, John Theriault.[585]

928.    In 2011, CNN described working at Apple as "*a brutal and unforgiving place*" and even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment.[586] In 2011, a Gawker reporter described the culture of working at Apple as "*bullying, manipulation and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful,*" and "*deeply disturbing.*"[587] In 2018, The Register complained Apple had "*gone full swivel-eyed, control-freak crazy on its own employees,*" and that Apple's paranoid led it to direct substantial amounts of "*spittle-flecked invectives*" at its own workers.[588]

929.    These alleged schemes and patterns of conduct are not new or revolutionary allegations against Defendant. A tech reporter wrote about how sources with ties to Apple often "*suddenly register a look of disquiet when asked about Apple, then nervously close down the conversation.*" [589] The reporter noted that no one at Apple "*wants to risk disfavor,*" that Apple has an "*obsession with secrecy,*" says Apple has effectively established a "*culture of fear.*"[590]

---

[584] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers
[585] Bloomberg via Yahoo, *Apple Security Head Charged with Bribery for Gun Licenses*, https://www.yahoo.com/now/apple-security-head-charged-offering-202206641.html
[586] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011, https://web.archive.org/web/20111019220441/http://tech.fortune.cnn.com/2011/08/25/how-apple-works-inside-the-worlds-biggest-startup/
[587] Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011, https://www.gawker.com/5847344/what-everyone-is-too-polite-to-say-about-steve-jobs
[588] Kieren McCarthy, *Apple leak: If you leak from Apple, we'll have you arrested, says Apple*, The Register, April 13 2018, https://www.theregister.com/2018/04/13/apple_leak_threats/
[589] Mark Sullivan, *Apple's Obsession With Secrecy May Be A Self-Fulfilling Prophecy*, Fast Company (June 2017), https://www.fastcompany.com/40433541/apples-obsession-with-secrecy-may-be-a-self-fulfilling-prophecy
[590] Id.

414

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

930.     Apple is also well known for influencing politicians and agencies,[591] as well as the press and public opinion.[592] In fact there is a term to describe Apple's ability to influence public opinion that is so famous it has its own acronym and Wikipedia page: the "*Reality Distortion Field*" or "RDF."[593] The phrase was established in 1981 by Bud Tribble. Tribble said, longtime Apple CEO "*Steve [Jobs]*[594] *has a reality distortion field...In his presence, reality is malleable. He can convince anyone of practically anything... It wears off when he's not around.*"[595] Other Apple executives were more critical calling the RDF a way to "*con people*" and that Jobs would "*assert something...without even considering the truth*" and that it "*came from willfully denying reality.*"[596] Fraud is still fraud even if you give it an acronym. The egregious deception also arose from Jobs's "*belief that the rules didn't apply to him*" – including parking in handicapped spaces, driving without a license place, making false accusations in lawsuits, and denying the paternity of his daughter despite DNA proof.[597] Some of Apple's Board members and top executives are also known for fraud and misrepresentation. Longtime Apple Board member Al Gore has a notorious "*penchant for embellishing the facts*" and his "*Pinocchio problem.*"[598]

---

[591] Cecilia Kang, David McCabe and Kenneth P. Vogel, "Tech Giants, Fearful of Proposals to Curb Them, Blitz Washington With Lobbying," New York Times, June 22 2021, ("In the days after lawmakers introduced legislation that could break the dominance of tech companies, Apple's chief executive, Tim Cook, called Speaker Nancy Pelosi and other members of Congress to deliver a warning… Mr. Cook asked for a delay in the Judiciary Committee's process of considering the bills…"), https://www.nytimes.com/2021/06/22/technology/amazon-apple-google-facebook-antitrust-bills.html
[592]
[593] Wikipedia, "*Reality Distortion Field*," https://en.wikipedia.org/wiki/Reality_distortion_field
[594] Note: Steve Jobs was CEO of Apple from 1976-1985 and 1997-2011 (23 years)
[595] Chris Foresman, "Reality Distortion Field (RDF)," ArsTechnica, (2008), https://arstechnica.com/technopaedia/2008/03/reality-distortion-field-rdf/
[596] Michael Shermer, "*The reality distortion field: Steve Jobs's modus operandi of ignoring reality is a double-edged sword,*" Skeptic, Volume 17 Issue 4, (Summer 2012), link.gale.com/apps/doc/A313159919/AONE?u=mlin_oweb&sid=googleScholar&xid=297074b3
[597] Id.
[598] Kennedy School of Government Case Program, Al Gore and the "Embellishment Issue: Press Coverage of the Gore Presidential Campaign," C15-02.1679.0 (2002).

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

931.    An op-ed in The Hill on August of 2023 accused Apple of being the "*world's most dishonest*" company and detailed Apple's pattern of covering up unlawful conduct by bullying the victims of its unlawful acts with "*threats of legal and financial ruin.*"[599] A March 2022 op-ed in Courthouse News accused Apple "*litigious bullying*" that was "*shameful*" and "*disgusting.*"[600]

932.    The criticism wasn't just about labor or litigation, it was also about environmental practices. In 2017, a Foundation for Economic Education article complained that Apple's messaging about its environmental practices is "*dishonest and misleads the public about broader policy issues.*"[601] In 2017, VICE described Apple's Environmental Responsibility Reports as "*annual grandstanding effort that the company uses to position itself as a progressive, environmentally friendly company,*" but behind the scenes the company "*undermines*" environmental goals.[602]

933.    Frequent complaints include planned obsolescence, fighting right to repair, and insistence on disposal of e-waste instead of recycling. In 2020, Ethical Consumer gave Apple their "*worst rating for environmental reporting*".[603] In 2021, a Tribune Magazine article complained "*Apple's environmental initiatives are designed to greenwash fundamentally unsustainable production and consumption patterns.*"[604] Back in 2011, the Institute of Public & Environmental Affairs said Apple's "*stubbornly evasive*" posture toward accusations of

---

[599] Mark Cooper, "*Apple's anti-competitive tactics must be stopped,*" The Hill, (Aug 19 2023), https://thehill.com/opinion/technology/4158989-apples-anti-competitive-tactics-must-be-stopped/
[600] Robert Kahn, "*Apple is Rotten,*" Courthouse News, March 18 2022, https://www.courthousenews.com/apple-is-rotten/
[601] David L. Veksler, "Apple Is Not as Green as It Seems. Apple recently made some claims about its environmental impact that are, at best, questionable." FEE, Oct 15 2017, https://fee.org/articles/apples-environmental-claims-are-misleading/
[602] Jason Koebler, "*Apple Forces Recyclers to Shred All iPhones and MacBooks,*" VICE Motherboard, April 20 2017, https://www.vice.com/en/article/yp73jw/apple-recycling-iphones-macbooks
[603] Ethical Consumer, Apple Inc, https://www.ethicalconsumer.org/company-profile/apple-inc
[604] Paris Marx, "*Apple Won't Save the World,*" Tribune, May 17 2021, https://tribunemag.co.uk/2021/05/apple-wont-save-the-world

Deleted: describes

Deleted: ti

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

pollution (polluted water and hazardous-gas emissions) *"can only be seen as a deliberate refusal of responsibility"* for environmental issues.[605]

934.    Apple's also well known for threatening, capturing, and coercing the press in order to ensure there is only positive press coverage of the company.[606]

935.    In addition to the well-established pattern of Apple's racketeering, Apple's depraved retaliation against a whistleblower (Gjovik) —a predicate act added by the Sarbanes-Oxley Act in 2002—is sufficiently related to allegations of witness intimidation and retaliation (§§ 1512, 1513). [607] Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower; therefore, in most cases retaliatory acts and the underlying scheme will satisfy the relatedness requirement.[608] Here, Gjovik was working to expose and report the Predicate Acts of conspiracy, wire fraud, mail fraud, (convicted) securities violations, and violations of environmental laws with toxic chemical exposure. Gjovik was also reporting apparent violations of the RICO Act. Then Apple fired and terrorized her. It is all related.

**v.    The Schemes**

936.    There is a lawful version of this enterprise. A corporation like Apple is able to lawfully report wrongdoing to law enforcement, able to request permits and to be regulated by agencies, able to rent buildings and operate facilities, able to hire professional engineers for

---

[605] Evan Osnos, *Is Apple's Tim Cook Listening?,* The New Yorker, September 1 2011, https://www.newyorker.com/news/evan-osnos/is-apples-tim-cook-listening; Michael Martina, *Apple criticized for China supply chain pollution,* Reuters, August 31 2011, https://www.reuters.com/article/2011/08/31/us-apple-china-idUSTRE77U4M620110831/
[606] Kieren McCarthy, *Inside our three-month effort to attend Apple's iPhone 7 launch party,* The Register, September 7 2016, ("*The truth though is that large tech companies, especially in Silicon Valley, often use access to their events and their executives as a way to force positive coverage of themselves. If you write one bad thing about them, they threaten to stop talking to you. If you ignore the warnings, they blacklist you.*") https://www.theregister.com/2016/09/07/reg_effort_to_attend_iphone_7_launch
[607] *DeGuelle v. Camilli,* 664 F.3d 192, 204 (7th Cir. 2011).
[608] *DeGuelle v. Camilli,* 664 F.3d 192, 204 (7th Cir. 2011).

Deleted: Paris Marx, *"Apple Won't Save the World,"* Tribune, May 17 2021, https://tribunemag.co.uk/2021/05/apple-wont-save-the-world …

Deleted: FIRST
Deleted: –
Deleted: ev
Deleted: CRB
Deleted: OCTOBER 25

construction and maintenance work, and able to employ law firms to represent them in litigation.

None of these activities are activities RICO was designed to prohibit.[609]

937.    However, here, Apple chose violence. The "Worldwide Loyalty" Enterprise (with Apple and external members from these supposedly independent entities) is engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance, false statements about regulatory compliance in order to increase profits and create positive reputation. The Enterprise also uses intimidation and obstruction to silence anyone who witnesses Apple's actual practices and who could report concerns to the press and/or public, and (non-captured) agencies and/or law enforcement. Apple's own public statements reflect this scheme.

938.    Apple's self-proclaimed competitive edge in the markets it operates in includes "*aggressive price competition and resulting downward pressure on gross margins.*"[610] Apple says many of its competitors "*seek to complete primarily through aggressive pricing and very low-cost structures.*" Apple also adds that its principle competitive factors "*important to [Apple]*" include "*price,*" "*marketing... capability,*" and "*corporate reputation.*"[611] Apple adds that some of its competitors compete by "*us[ing] illegitimate means*" to develop products.[612]

939.    Apple has also stated that its "*global operations are subject to complex and changing laws and regulations on subjects, including privacy; consumer protection; advertising; ... artificial intelligence;  labor and employment; anticorruption; ... and environmental, health and safety...*"[613] Apple adds that "*compliance with these laws and regulations is onerous and*

---

[609] Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005).
[610] Apple Inc, 2023 10k, page 2, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[611] Id at page 3.
[612] Id.
[613] Id at page 13.

*expensive… laws and regulations can adversely affect [Apple's] business by increasing … costs, … and requiring changes to the Company's supply chain and its business.*"[614]

940.    Apple admits that in order to succeed it must cut costs wherever possible, that it competes with business that engage in illegal activities, and that laws and regulations are threat to Apple's business model.

941.    Apple also speaks to the reason it uses intimidation, threats, and coercion to cover-up its violations of laws and regulations. Apple said if it "*is found to have violated laws and regulations, it could materially adversely affect [Apple's] business, reputation, results of operations and financial condition.*"[615] Apple says it uses its "*Global Security team*" to respond to environmental health and safety issues.[616] (As it did with Gjovik?) Further, Apple stated that in order to respond to employee health and safety concerns, Apple has developed "*measures to mitigate possible hazards*", which includes "*supporting employees with… crisis management training.*"[617]  Crisis Management is primarily a key aspect of Public Relations, and is not a safety program.[618]

942.    Apple explained why it works diligently to ensure its false public statements are not corrected with evidence or testimony, or that witnesses even attempt to complain about the false statements. Apple says that:

> …Any failure, or perceived failure, by [Apple] to achieve its goals, further its
> initiatives, adhere to its public statements, comply with federal, state or
> international environmental, social and governance laws and regulations, or

---

[614] Id.
[615] Id.
[616] Id.
[617] Id at page 4.
[618] "Crisis management is a process designed to prevent or lessen the damage a crisis can inflict on an organization and its stakeholders…  common members of the crisis team as public relations, legal, security, operations, finance, and human resources…  Public relations plays a critical role in the crisis response by helping to develop the messages that are sent to various publics," Institute for Public Relations, https://instituteforpr.org/crisis-management-and-communications/

419

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

meet evolving and varied stakeholder expectations and standards could result in legal and regulatory proceedings against [Apple] and materially adversely affect [Apple's] business, reputation, results of operations, financial condition and stock price… [619]

943.    Apple and the Enterprise's activities occurred continuously over substantial period of time (decades) and poses a threat of continuing due to duration of activity and inherently unlawful acts in pursuit of unlawful goals.[620] Apple admits to its scheme in its regulatory filings and even suggests its business model and financial condition require continuance of the scheme. As of now, the threat of continuing criminal activity extends indefinitely into the future.[621]

944.    Apple's conduct is not lawful or legitimate, nor is it simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws. This is similar to the scheme found in *US v Philip Morris*, where the enterprise joined together to "*maximize their profits*" through "*false and fraudulent statements, representations, and promises*" about "*the devastating health effects of smoking.*"[622]

945.    Apple's scheme is three parts. First, Apple intends to avoid expending the resources that would be required for basic regulatory compliance in most of its basic dealings. Apple has centralized administration oversight for functions including Human Relations, Employee Relations, Environmental Health & Safety, and Human Rights. Apple has hundreds of

---

[619] Apple Inc, 2023 10k, page 13, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[620] *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991); *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *In re Managed Care Litigation*, 150 F. Supp. 2d 1330, 1351 (S.D. Fla. 2001); cf., *Churchill Village v. General Electric*, 361 F.3d 566, 574-75 (9th Cir. 2004).
[621] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989), *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006).
[622] *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 253 (D.C. Cir. 2015).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

facilities across the country and sends instructions and feedback to those offices and facilities from the headquarters in Cupertino via interstate emails, phone calls, video calls, and physical mailings. Apple transmits knowingly false information (or omits and fails to transmit legally required information) via communications with government agencies and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to the complete lack of environmental sustainability, regulatory oversight and reporting, despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities. The rampant retaliation and intimidation in response to employee labor complaints prevents charges from being filed with government which completely prevents government inspections and investigations that would have occurred because of those complaints. The scheme is in place in order avoid compliance with basic legal requirements and to intentionally hide known violations of the law.[623]

946.    Second, Apple intends to increase profits and obtain other financial benefits, through a knowingly false reputation of strong regulatory compliance in all of its dealings (i.e., promoting itself as an industry leader in environmental responsibility, human rights, etc.). Apple made these false statements via a variety of medium , including: press releases, quotes to the press, advertisements, materials published and filed to SEC prior to annual shareholder meetings (including the main proxy report, statements on voting items, references, and links to supplementary materials), documents filed and letters sent to other government agencies, website pages, company policies, updates on environmental compliance, supply chain-related human rights updates, and other documents.

_____

[623] Heller Fin., Inc. v. Grammco Computer Sales, Inc., 71 F.3d 518, 524 (5th Cir. 1996)

947.   Apple transmits these false statements to the government, shareholders, customers, the press, and the public via interstate, emails, paper mailings, faxes, and phone calls. Apple also invites interested parties to travel (including foreign and interstate travel) to attend the shareholder meetings in person where Apple makes false statements, and Apple also invites members of the press and public to travel (including foreign and interstate travel) to attend product launches and other public relations events in person where Apple makes more false statements.

948.   Finally, Apple intents to bridge the gap between its actual practices and what it reports to its shareholders and to the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing government agencies to assist in these activities in order to cover-up the Apple's unlawful activities and fraudulent misrepresentations. Apple often sends its messages of retaliation, threats, intimidation, coercion, and harassment via interstate emails, text messages, phone calls, video calls, physical mailings, and other mediums.

949.   The victims directly injured, with property and business harms, caused by Apple's scheme, are those the operational regulations were put in place to protect. Apple's violations of labor laws and systemic retaliation for raising concerns harms its employees. Apple's violations of environmental and hazardous waste laws harms employees who are exposed, people in the community who are exposed, the general public where there is significant soil and groundwater contamination or air pollution.

950.   Apple's violations of health/safety laws harm whoever is at the site where the laws are not being followed, so employees and vendors at offices and industrial facilities, customers, and workers at retail stores, and so on. These individuals are also harmed due to the

---

**Deleted:** US SEC

**Deleted:** shareholders

**Deleted:** . Apple invites reporters to the campus for product announces where they also make

**Deleted:** they also make

**Deleted:** the

**Deleted:** occur across state lines.

**Deleted:** &

**Deleted:** .

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Apple's misleading and fraudulent statements about its actual practices, as it leads those people to expect a certain level of safety and lawfulness, when in reality conditions are likely to be unsafe and unlawful. This leads potential whistleblowers to fail to gather adequate evidence, organize with employees, or promptly report issues to a regulator because they relied on the false statements instead of acting with vigilance. This reliance makes the individuals 'fish in a barrel' for Apple to swiftly retaliate, discredit, confuse, censor, and incapacitate.

### vi.   Predicate Acts/Threats Involving Certain State Offenses [624]

951.    For all acts Gjovik argues Apple, or agents of Apple committed the acts, or in the alternative attempted to commit the acts, or in the alternative were accessories to the act,[625] or in the alterative and/or in addition conspired to commit the act.[626]

### 1)  Criminal Bribery of Executive Officer (Cal. Penal Code § 67)

952.    Tom Moyer is Apple's "Chief Compliance Officer" and "head of Global Security." Moyer's responsibilities include overseeing regulatory compliance, including anti-bribery/FCPA, export and sanctions compliance, health compliance, political compliance, and Apple's Business Conduct program.[627] Gjovik interacted with Moyer and his team on several occasions in her time at Apple. Shortly before she was suspended Gjovik reported smuggling/sanctions concerns to Moyer's team, and while suspended and before she was fired, Gjovik reported the "Issue Confirmation" including accusations of bribery and RICO to Moyer's

---

[624] 18 U.S.C. § 1961(1)(a)
[625] 18 U.S.C. § 2(a) – Aider & Abettor
[626] 18 U.S.C.A. § 1964(d); 18 U.S. Code § 371 - Conspiracy to commit offense or to defraud United States
[627] Apple, Compliance and Ethics, "Compliance at Apple," (last accessed 12/2/2023), https://www.apple.com/compliance/

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

team. Moyer was charged with criminal bribery in 2021 and then again in 2023. A chargeable instance of bribery under state penal code is a predicate act for RICO. [628]

953.    On November 19 2020, a grand jury issued an indictment and charged Apple's Tom Moyer with bribing an executive officer in violation of section 67[629] by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.[630]

954.    A defendant is found guilty of violating California Penal Code § 67 when they give or offer a bribe to an executive officer in California, or someone acting on the officer's behalf, and the defendant acted with the corrupt intent to unlawfully influence that officer's official act or decision.[631] A person acts with corrupt intent when he or she acts to wrongfully gain financial or other advantage for himself, herself, or someone else.[632] The crime is punishable by imprisonment for 2-4 years.[633]

955.    A trial judge unexpectedly dismissed the charge against Moyer sua sponte, and against the evidence and jury findings. The District Attorney appealed the dismissal and won on August 25, 2023.[634] The charge of bribery against Moyer was reinstated and affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings,

---

[628] Bribery: *United States v. Frega*, 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).
[629] Penal Code Section 67 - "Bribery of an Executive Officer"
[630] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[631] California Criminal Jury Instructions (CALCRIM 2023), Crimes Against Government, Bribery of Official, https://www.justia.com/criminal/docs/calcrim/2600/2600/
[632] Id.
[633] Robert Salonga, "*Appeals court revives bribery charge for Apple security exec in Santa Clara County concealed-gun permit scandal,*" Mercury News, Aug 25 2023, https://www.mercurynews.com/2023/08/25/appeals-court-revives-bribery-charge-for-apple-security-exec-in-santa-clara-county-concealed-gun-permit-scandal/
[634] *People v Thomas Moyer,* California Appellate Courts, Docket, https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=6&doc_id=2358260&doc_no=H049408&request_token=OCIwLSEmLkw3W1BZSCJNSEhIMFw7UCxbJyBOVzpRPDNOCg%3D%3D

424

Deleted: ,

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[635]

956.    Tom Moyer was Apple's Director of Employment Law until September 2009 when he became Chief Compliance Officer. Moyer is responsible for Apple's compliance policies.[636] Today, Tom Moyer is the Chief Compliance Officer and Head of Global Security at Apple Inc. Apple told a federal monitor that Moyer "*has overall responsibility for Apple's ethics and compliance program including Apple's Business Conduct Policy, governing the ethical and legal obligations of Apple's Board, executives and over 120,000 employees around the world. Tom is also responsible for Apple's global security program including all physical security, executive protection, loss prevention, technology, security related investigations, and the security of new products and prototypes.*" [637] Moyer also leads Global Security and is now the second senior Apple officer/VP to be indicted for felonies in the last four years.

957.    Apple published an anti-corruption policy, probably written by Tom Moyer's team, that says "*you cannot offer or receive bribes...*"[638] It adds, "*At Apple, we do not tolerate any form of corruption in connection with our business dealings.*"[639] Apple admits it knows what the law is, and claims it follows the law, when in reality the top executive in charge of this policy has been charged with criminal bribery. Further, the policy notes: "*All questions about*

---

[635] State v Moyer at 26, "While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See People v. Wong (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)"
[636] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc.*, et al., No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, No. 1:12-CV-3394 (October 15 2014).
[637] Stanford, *Cybersecurity and the Legal Profession: Significant Challenges and Unique Opportunities*, 2015, https://law.stanford.edu/event/cybersecurity-and-the-legal-profession/
[638] Apple, Anti-Corruption Policy, June 2018, https://s2.q4cdn.com/470004039/files/doc_downloads/gov_docs/Anti-Corruption_Policy.pdf
[639] Id.

Deleted: *Worldwide Loyalty*

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*information contained in this Policy should be directed to Business Conduct."*[640] This last statement infers that any/all question about anti-corruption at Apple should be only directed to Business Conduct (Tom Moyer) and no one else. This shows relatedness to the scheme with unlawful conduct, but claiming no unlawful conduct, and processes put in place to silence any whistleblowers and witnesses.

### 1) Criminal Commercial Bribery (Cal. Penal Code § 641.3)

958.   As discussed, Gjovik's first manager attempted to bribe Gjovik. Gjovik was disturbed by the exchange and reported it to her manager's manager, Venkat Memula. Memula expressed interest in exploiting the incident in order to initiate the removal of Keshishoglou and told Gjovik to report the incident to Human Resources to document it for him. Gjovik then reported it to the Human Resources business partner assigned to her organization, Kristen Michallik on September 25, 2015. Gjovik then informed Memula of her conversation with Michallik.

959.   Keshishoglou suddenly transferred to a different organization shortly after. Memula began inviting Gjovik to personal social events and connecting Gjovik to leaders at Apple, which Gjovik interpreted as Memula allowing Gjovik to join the 'inner circle' as a reward for helping him remove Keshishoglou. Gjovik understood this as an offer of additional favors and favoritism if she was to continue to assist Memula in his schemes. At the same time, Keshishoglou's team, including Gjovik, was then moved under Officer Brad Reigel, despite Gjovik's repeated complaints about Reigel's misconduct and it being generally known that Reigel disliked Gjovik '*because Gjovik reminded him of an ex-wife he hates.*' When Gjovik complained to Memula about being forced under Reigel, Memula acknowledged Reigel would not be a good manager but told Gjovik it was her job to help him become a good manager.

---

[640] Id.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

960.     It was chilling to Gjovik that misconduct at Apple seemed normalized with the exception of exploiting instances for additional unlawful or retaliatory objectives. Gjovik was disturbed she was coerced to participate in their scheme and was so openly rewarded with cronyism for 'playing along,' while concurrently actions were taken that showed Memula had no actual concern for her wellbeing or how her manager treated her.

961.     California Penal Code § 641.3(a) prohibits "Commercial Bribery" which includes any person offering or giving an employee money or anything of value, worth over $250, corruptly and without the consent of the employer, in return for using or agreeing to use the employee's position for the benefit of the other person. A chargeable instance of bribery under state penal code is a predicate act for RICO. [641]

### 2)   Criminal Extortion (California Penal Code § 518)

962.     A chargeable instance of criminal extortion is a predicate act for RICO. In California, criminal extortion includes using threats to compel another person to hand over money or property or other consideration. It is a felony with up to four years of incarceration.[642] Threats may include wrongful use of force or fear, or threats under color of official right. Under federal law, it is a crime for United States officers or employees, under the color or pretense of office or employment commits or attempts an act of extortion.[643] Apple's and their enterprise members who are government agencies and/or employees of those agencies extorted Gjovik twice in only the last year in furtherance of the schemes at issue in this claim.

963.     Gjovik filed FOIA requests to the US EPA in January 2022 looking for records related to what occurred at her office in 2021. US EPA kept moving the request out and in May

---

[641] Bribery: *United States v. Frega*, 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).
[642] California Penal Code § 518
[643] 18 U.S. Code § 872 - Extortion by officers or employees of the United States

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

2022, Gjovik noticed at the end of a very long report recently uploaded about her office

mentioned vaguely an inspection at her office on August 19, 2021. Gjovik contacted Perez-

Sullivan but got a bounce back saying Perez-Sullivan no longer worked at the EPA. Gjovik

contacted the new contacts listed on the facility's webpage which would result in Poalinelli

releasing the October 7 2022, report to Gjovik and for the first-time notifying Gjovik there was

an inspection at her office, while she was suspended, and they found issues. The most

concerning, was that the toxic gas from under the building, including TCE, was being sent into

the HVAC intake since 2015.

964.     Gjovik asked to follow up questions at which point US EPA lawyer Rebekah

Reynolds told Gjovik that Gjovik is only allowed to talk to her going forward and also said she

will not talk to Gjovik or answer any of her questions. Gjovik was told her only option was

FOIA and the FOIA team kept pushing out their ETAs for documents. Over the next year, the

EPA slowly released hundreds of damning documents that were not only critical for Gjovik's

lawsuits as they proved Gjovik was right and Apple was upset about it, but it also showed a

concerted effort by US EPA employees (Poalinelli, Perez-Sullivan, Ty, Schulman) to keep

Gjovik from finding out about what happened and what they found, and to suppress at least two

potential news stories about Gjovik and the office (New York Times in July 2021 and

Independent UK in December 2021).

965.     The US EPA FOIA team had a manager, Andrew Helmlinger, assigned to Gjovik

and Gjovik was told he was her only contact for her FOIA requests. Helmlinger was often

adversarial, even claiming Gjovik's requests were "commercial" because, he claimed, she was

looking to make money by suing Apple. As such, Helmlinger began attempting to charge Gjovik

as a "commercial requester" in order for Gjovik to receive documents about her office and what

happened to her and her coworkers. Gjovik appealed to US EPA General Counsel's office and

<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** Oct</div>

<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** no</div>

<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** FIRST</div>
<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** --</div>
<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** cv</div>
<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** CRB</div>
<div style="margin-left: 60%; border: 1px solid #7ba7d0; padding: 2px;">**Deleted:** OCTOBER 25</div>

won, but Helmlinger persisted. Gjovik complained repeatedly, arguing that US EPA had an obligation to speak with her as a member of the community but instead they were forcing her to request documents through FOIA which EPA took over a year to release in some cases, and repeatedly demanded she pay them for. Gjovik also complained that it appeared US EPA was saving the most damning documents for the final releases, dragging it out as long as they could.

966.    On May 30 2022, Gjovik discovered and complained to US EPA that the FOIA manager, Andrew Helmlinger, is married to a Partner at the law firm ("Orrick, Herrington & Sutcliffe") that Apple hired to defend them from Gjovik's CERLCA (and SOX & OSH Act) retaliation case with the US Department of Labor. Gjovik complained that he had a personal interest in ensuring Gjovik did not receive the documents, and thus his repeated demands that Gjovik pay for her requests, knowing Gjovik did not have money and was unlikely to be able to pay, in furtherance of his wife, and Apple's, interests in concealing Apple's misconduct, obstructing Gjovik's charges and lawsuits, and demoralizing Gjovik in hope she gives up – and Helmlinger did all of this under the color of official title – which is extortion, among other things.

967.    Similarly, the US Department of Labor Whistleblower Protection Program's obstruction of Gjovik's cases, including obstructing her NLRB charges and a number of federal investigations including SEC and FTC, by demanding Gjovik provide them something they had no right to demand and only planned to give it to Apple to help Apple defend itself from Gjovik, under color of official title, and threatening to deprive Gjovik of her constitutional and statutory rights if she did not comply.

968.    There was much misconduct from US Department of Labor from the start of Gjovik's cases with them and Gjovik complained of obstruction to their OIG and Solicitor starting in November 2021. This included a phone call in September 2022 where Gjovik was

told she would receive an update on her cases from her investigator (Diangco) and her supervisor. Instead, on the phone call was the Regional Assistant Administrator Matthew Parra, on a vacation day (per his out of office), who spent most of the call trying to intimidate Gjovik into withdrawing her charges. Gjovik complained on the phone and after of their conduct, including filing an OIG complaint about it.

969.     When US Department of Labor suddenly wanted another phone call with Gjovik in January 2023, Gjovik demanded she be allowed to record it or otherwise wanted to keep communications in writing due to their prior misconduct. US Department of Labor acquiesced. During the phone call, Captain Parra showed up again as a surprise guest and again made many intimidating and obstructive comments, including repeatedly misstating facts and the law, mostly repeating Apple's position statement and eventually admitting they apparently did not investigate the evidence or briefs Gjovik submitted. Gjovik repeatedly tried to "object" to Parra's statements, but Parra told her to stop and that the call was "informal" and "not on the record," so Gjovik acquiesced and let him claim things that were not true and complied with bad legal analysis, with the hope they would simply agree to actually investigate by the end of it.

970.     On March 22, 2023, Diangco suddenly reached out to Gjovik demanding a copy of the audio file of the meeting. US DOL had not previously asked for a copy and did not attempt to make their own copy at the time. Gjovik asked why they wanted it, and they would not tell her.

971.     Gjovik told US Department of Labor she would share a copy with OIG to investigate the team's misconduct but otherwise would not share it unless they could provide a rational justification why they need it – and they did not. Gjovik complained to them it sure seemed like Apple wanted it to transcribe and use Gjovik's acquiescence to Parra against her in their defense.

Deleted: Asst.

Deleted: Dept

Deleted: .

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

972.     Then, in March 2023, Gjovik received a letter from Diangco demanding the audio file within ten days or else US Department of Labor may dismiss Gjovik's entire whistleblower retaliation case, regardless of merit.

973.     Gjovik complained to US Department of Labor that she would only share the file if they would draft an agreement "sealing" it so Apple could not get a copy. US Department of Labor never responded. Gjovik complained what they were doing seemed illegal and if they persisted, she would report their misconduct.

974.     Gjovik waited until the deadline at which point US Department of Labor still had not responded, so on April 2nd, 2023, Gjovik reported US DOL and Apple to the FBI for "procedural extortion" and notified the US Department of Labor of such. Gjovik has not heard back from US DOL since their extortion letter. [Update: US DOL's Parra attempted to dismiss Gjovik's charges in December 2023 citing harassing and demonstrably false justifications. Gjovik is appealing both.]

975.     Both of these incidents were examples of Apple and the Worldwide Loyalty enterprise using regional departments of government agencies and/or their employees to help Apple cover-up Apple's systemic non-compliance with regulatory obligations and use of criminal tactics to intimidate and silence whistleblowers and witnesses. These were not a new allegation about the US Department of Labor agency that Gjovik interacted with.[644]

**vii.     Predicate Acts Indictable Under Title 18 US Code [645]**

976.     Apple conducted and participated in the affairs of the Worldwide Loyalty Team Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

---

[644] See, Bloomberg, *He Investigated Dubious Firings for U.S. Then He Was Fired* (2017), https://www.bloomberg.com/politics/articles/2017-07-21/he-investigated-suspicious-firings-for-u-s-then-he-was-fired (same Regional Office as Gjovik's case)
[645] 18 U.S.C. § 1961(1)(b)

**Deleted:** Apple's

**Deleted:** allegations

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

and 1961(5), which includes: multiple violations of 18 U.S.C. § 1341 by engaging in mail fraud; multiple violations of 18 U.S.C. § 1343 by engaging in wire fraud; multiple violations of 18 U.S.C. § 1512 by tampering with witnesses and victims.[646]

### viii.   Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)

977.    Mail fraud and wire fraud are both RICO predicate offenses. Apple knew it was making false representations and/or acted with reckless indifference to their truth or falsity.[647]

978.    The legal precepts relating to principals, accessories after the fact, misprision, and conspiracy apply to mail fraud and wire fraud as well. Gjovik's injury caused by Apple's mail and wire fraud is of her business and property, including "intangible property rights."[648] The RICO predicate act of mail fraud in furtherance of criminal acts does not displace other charges nor is it pre-empted by the federal statutes the mail fraud was used to engage in.[649]

979.    A corporation making public statements about working conditions and other business operations, does so as commercial speech with intent to maintain or increase sales and profit. [650] When a corporation, to maintain and increase its sales and profits, makes public statements defending [its] labor practices and working conditions … those public statements are commercial speech that may be regulated to prevent consumer deception. [651]

---

[646] *Steiner v eBay*, U.S. District Court of Massachusetts, 1:21-cv-11181, Complaint and Demand for Jury Trial, July 21 2021, https://www.scapicchiolaw.com/pdf/Steiner.pdf
[647] *United States v. Cusino*, 694 F.2d 185, 187 (9th Cir. 1982); *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000).
[648] *Carpenter v. US*, 484 U.S. 19, 26-27 (1987); *Pasquantino v. US*, 544 U.S. 349, 357 (2005).
[649] *United States v. Boffa*, 688 F.2d 919, 931-33 (3d Cir. 1982) (mail fraud statute not preempted by labor statutes, despite some overlap in statutes' coverage).
[650] *Kasky v. Nike, Inc.*, 45 P. 3d 243, Cal. Supreme Court, 119 Cal.Rptr.2d 296, 314 (2002).
[651] *Kasky v. Nike, Inc.*, 45 P. 3d 243, Cal. Supreme Court, 119 Cal.Rptr.2d 296, 319 (2002) – ("To the extent Nike's speech represents expression of opinion or points of view on general policy questions such as the value of economic "globalization," it is noncommercial speech subject to full First Amendment protection. Nike's speech loses that full measure of protection only when it concerns facts material to commercial transactions.").

---

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

980.    Every time Apple transmitted a document or communication to the government, to customers, to the press, to the public, or to public interest groups – via the mail and/or over the wire – and Apple makes claims as to its regulatory compliance practices – each incident where Apple's statement is materially false can be a charge of mail and/or wire fraud. Wire fraud is intentionally devising or intending to devise a scheme to defraud by means of materially false or fraudulent pretenses, representations, or promises over interstate wire communications.[652] Apple's false statements made "*has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed.*"[653]

981.    Inaccurate reports by the press may be attributable to misleading information deliberately supplied by company officials. In such circumstances, a company "cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties."[656]

982.    Apple's actions are especially egregious when there is a true and accurate report from another party (newspaper, nonprofit, etc.) about Apple's actual practices and Apple contacts the group demanding a "retraction" or "correction" of the true report, with changes requested to falsify the report, and Apple either citing prior falsified documents or requesting the falsification of the new report through threats, intimidation, and coercion. This happens often.[657]

---

[652] 18 U.S.C. § 1343. *United States v. Ransom*, 642 F.3d 1285, 1289-90 (10th Cir. 2011). *US v. Camick*, 796 F. 3d 1206 - Court of Appeals, 10th Circuit (2015).
[653] *United States v. Gordon*, 710 F.3d 1124, 1148 n. 26 (10th Cir.2013)
[656] *Warshaw v. Xoma Corp.* (9th Cir. 1996) 74 F3d 955, 959; *Cooper v. Pickett* (9th Cir. 1997) 137 F3d 616, 624; see *Southland Secur. Corp. v. INSpire Ins. Solutions Inc.* (5th Cir. 2004) 365 F3d 353, 373-383.
[657] FCPA Blog, *What does this Apple disclosure mean*? (2020), https://fcpablog.com/2020/02/10/what-does-this-apple-disclosure-mean/ ; See *U.S. v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 15 (S.D. Cal. Feb. 21, 2014).; *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 9 (S.D. Cal. Feb. 21, 2014)

433

**Deleted:** transmits

**Deleted:** shareholders

**Deleted:** <#>Mail fraud and wire fraud are both RICO predicate offenses. The legal precepts relating to principals, accessories after the fact, misprision, and conspiracy apply to mail fraud and wire fraud as well. Gjovik's injury caused by Apple's mail and wire fraud is of her business and property, including "intangible property rights."[654] The RICO predicate act of mail fraud in furtherance of criminal acts does not displace other charges nor is it pre-empted by the federal statutes the mail fraud was used to engage in.[655]¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

### 1)  Fraud: Environmental and Safety Practices

983.    Apple's statements were made in furtherance of a "*scheme or artifice to defraud*" and as such serve as the predicate offenses for a RICO violation.[663] Apple's scheme to defraud under environmental laws was undertaken with a reckless disregard for the truth or falsity of its hazardous waste representations. Apple employs a prior Presidential appointed administrator of the U.S. Environmental Protection Agency and much of her prior staff from the US EPA.

984.    Apple's Supply Chain Responsibility policies describe in detail the regulatory obligations for hazardous waste handling. Apple knew what was required of it and chose to break the law, knowing its actions would create significant risk of harm to the public and often did actually significantly harm the public.

### *Emissions & Releases*

985.    On June 30 2021, Apple knowingly omitted information about its treatment and disposal of the now-banned chemical NMP at its 3250 Scott Blvd facility. Apple submitted an electronic filing to the US EPA claiming thousands of pounds were treated on site, but the treatment mechanism noted was scrubbers which would not reduce the chemical to the extent noted.

986.    Further, Apple made false statements in this filing claiming 14,743 pounds of NMP were transported offsite to three waste processing facilities, however no manifests were ever created for those supposed transfers. Apple either lied that it transported the NMP at all and instead unlawfully deployed thousands of pounds of NMPs on site, or the Apple lied and transported the NMP without manifests to off book disposal facilities. It is a criminal violation of the Clean Air Act to make false statements and representations, and/or omit material

---

[663] 18 U.S.C. §§ 1341, 1343. See *Philip Morris*, 449 F.Supp.2d at 852–54. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1116 (D.C. Cir. 2009)

---

**Deleted:** <#>In 2016, Apple agreed to a consent decree and was fined $450,000 by the California government over hazardous waste violations with CalEPA.658 This was covered by major publishers and Lisa Jackson's ex-US EPA team gave false comment.659 ¶
<#>In 2017, Apple was fined by the North Carolina government for violations of hazardous waste laws, which also revealed Apple was "lying" about the data center running on renewable energy. Again, Lisa Jackson's team provided comment. ¶
<#>Gjovik complained to Apple, the press, and to the SEC that Lisa Jackson and Alisa Johnson 's conflict- of-interest and yet "*seem to be heavily involved in Apple's … public relations about Apple's hazardous waste crimes/infractions*" and "*Lisa Jackson used to run the U.S. EPA & Alisha was her press secretary, including commenting on the 2016 DTSC settlement.*" Gjovik expressed concerns to Apple that Jackson must have known about Apple's offices on Superfund sites, but Jackson was making public statements about Apple's commitment to "*healthy communities*" and environmental justice. Gjovik also raised concerns that Jackson's team publicly stated in 2016 that Apple "*well beyond legal requirements*" but that EH&S told Gjovik Apple only does what is absolutely legally required related to Superfund sites. Apple never responded to Gjovik's concerns. ¶
<#>In 2008, Gene Levoff (now awaiting prison sentencing) was Apple's Corporate Secretary and head of Corporate Law. He filed a no-action letter to the SEC on November 20 2008, fighting a shareholder proposal requesting a sustainability report that addressed, among other environmental topics, Apple's "*toxics*" and "*employee and product safety.*"660 ¶
<#>In November 2016, Levoff fought another shareholder proposal about the environment, complaining that shareholders were trying to micromanage Apple's environmental practices and argued Apple's environmental statements are not false, citing NGOs and other groups praising Apple but failing to mention Apple's capture of these groups as part of its enterprise and schemes.661 ¶
<#>Levoff fought another shareholder proposal about Apple's environmental practices in November of 2017, complaining again of micromanaging and claiming Apple's actually doing a great job.662 This was false.¶
<#>The US SEC began investigating Levoff for fraud in 2018, and then charged Levoff with twelve counts of criminal fraud in February 2019.¶

**Deleted:** <#>At 3250 Scott Blvd, from 2015-current, Apple manipulated hazardous waste manifest documents and regulatory filings in a concerted effort to suppress and conceal the Apple's actual hazardous waste practices. Apple used improper codes for hazardous waste disposal (i.e., coding solvent waste as non-RCRA, coding 'solvent mixtures' instead of notating each chemical, etc.). All of these efforts were in order to save money, downplay the environmental impact of the plant, and manipulate metrics on operations at the plant in order to mislead investors about Apple's environmental practices in annual SEC filings.¶
<#>On April 30 2021, Apple knowingly omitted information about another phosphine leak (and possible explosion) at its 3250 facilities by refusing to file a spill report with CalOES and demanding the city HazMat redact Apple's name from the incident report that was electronically filed for the incident. It is a crime under 42 US Code 11045(b)(4) and 42 USC 7413(c)(2)(B) to knowingly and willingly fail to provide required notice after releasing extremely hazardous substances.¶

**Deleted:** FIRST
**Deleted:** ,
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

information, and/or alter or conceal a document required under the Clean Air Act. (42 US Code 7413(c)(2)(A).

987.   Apple's Clean Air Act and TRI reports for the 3250 Scott Blvd factory only included emissions for 2020. For all other years Apple was operating, Apple's failure to file reports inferred zero emissions, which is clearly false. Apple lied about its practices and Apple's lies show intentional harm.

988.   Apple knew exactly how dangerous those emissions were and still did it, and while they gassed a neighborhood, they also made public statements about the dangers of the same chemicals. For instance, Apple banned the use of NMP in their supply chain for years due to safety concerns and Apple even requires vendors to certify that they are not using it. Meanwhile, Apple blasted hundreds of pounds of NMP into Gjovik's windows in 2020.

989.   In *United States v. Pollution Control Industry of America*, a hazardous waste treatment company was fined $200,000 for telling a government agency that it would dispose of benzene at a Texas facility, but instead treated and disposed of it at its own facilities.[664] In *United States v. Case*, a district court convicted a person of "conspiracy to commit mail fraud and of mail fraud stemming from his illegal dumping of hazardous waste – where he told hazardous waste generators that he would dispose of the waste legally, then dumped it into Hudson Bay and into an unauthorized landfill. To conceal this scheme, he submitted false reports and manifests to the [state] Department of Environmental Protection."[665]

---

[664] United States v. Pollution Control Industry of America, 20 Env't Rep. (BNA) 579 (N.D. Ind. June 19, 1989); Brendan Rielly, Using RICO to Fight Environmental Crime: The Case for Listing Violations of Rcra As Predicate Offenses for RICO, 70 Notre Dame L. Rev. 651, 666–67 (1995)
[665] *United States v Case*, 684 F. Supp. 109 (D.NJ. 1988), aftld, 866 F.2d 1413 (3d Cir. 1988).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

990.    Here, further, Apple had repeatedly spoken publicly about the dangers of NMP

(N-Methyl-2-pyrrolidone).[666] Apple placed NMP on its regulated chemicals list and required

vendors prove they are not using NMP in their work on Apple's products.[667] Apple added these

restrictions on NMP back in March of 2016.[668] Apple (Art Fong) spoke at a December 2021

webinar about Chemical Safety where it discussed the "priority chemicals" to eliminate from

manufacturing supply chains, including NMP, Toluene, and TCE – among others.[669] Apple

spoke of its new program "*Toward Zero Exposure*" where it committed to protect workers from

exposure to chemical hazards.

991.    On April 30 2021, Apple knowingly omitted information about another

phosphine leak (and possible explosion) at its 3250 Scott Blvd facilities by refusing to file a spill

report with CalOES and demanding the city HazMat redact Apple's name from the incident

report that was electronically filed for the incident. It is a crime under 42 US Code 11045(b)(4)

and 42 USC 7413(c)(2)(B) to knowingly and willingly fail to provide required notice after

releasing extremely hazardous substances.

992.    Apple knowingly omitted material information and/or made false statements

and/or knowingly generated, stored, treated, transported, disposed of, exported, or otherwise

handled hazardous waste without filing the appropriate documentation which is a felony offense

under the Resource Conservation and Recovery Act and Clean Air Act.[670] Apple knowingly and

---

[666] GreenScreenChemicals, https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf; https://www.apple.com/environment/pdf/Apple_Prioritizing_Chemicals_2018.pdf;
[667] Apple, Regulated Substances, pages 12 and 15. https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[668] Id at page 18.
[669] GreenScreenChemicals, *supra*, at page 46.
[670] 42 U.S.C. § 6928(d); (RCRA sets criminal penalties for persons who knowingly commit any of the following acts: (a) transport hazardous waste to a facility that does not have a permit for hazardous waste; (b) treat, store, or dispose of hazardous waste without or in violation of a permit; (c) make fraudulent

Deleted: <#>Apple's Clean Air Act and TRI reports for the 3250 Scott Blvd factory only included emissions for 2020. For all other years Apple was operating, Apple's failure to file reports inferred zero emissions, which is clearly false. Apple lied about its practices and Apple's lies show intentional harm.¶

Deleted: ;
Deleted: Apple, Regulated Substances, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf ...
Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

intentionally manipulated and concealed scientific data in order to conceal its criminal conduct.
Apple committed the above-mentioned violations while knowing it endangered others by
engaging in this fraud. Where Apple's regulatory filings were correct individually, Apple's
overall conduct was still unlawful, and thus Apple's positive marketing statements (via email,
web, television, video, social media, etc.) about its environmental practices were fraud.[671]

993.     Apple said, "*In everything we do, people come first,*" said Jeff Williams, Apple's
chief operating officer. *"We are constantly raising the bar for ourselves and our suppliers*
*because we are committed to the people who make our products possible as well as the planet,*
*we all share. Apple has also strengthened its efforts to help its supply chain conserve resources,*
*expand the adoption of safer chemicals and reduce pollution. In prioritizing Zero Waste to*
*Landfill, Apple suppliers have diverted 1 million tons of garbage in three years.*"[672] This is false
and misleading. The statement is false that Apple puts people first (it does not); false that Apple
is always trying to act more lawfully (they are not); it is false that they are reducing pollution
(see 3250 Scott Blvd); and it is materially misleading to say they are 'diverting' waste from
landfills when they are simply incinerating it and letting the fumes blow into home windows.

994.     In Apple's "*Spill Response and Employee Hazardous Waste Training*" guide,
Apple prohibits employees from being trained on how to deal with chemical spills or hazardous
waste. The guide requires that in case of a chemical spill the employee call Apple Global

---

statements, omit information, or destroy or alter compliance documentation; (d) transport hazardous
waste without documentation, export hazardous waste.)

[671] *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 344, 292 Cal. Rptr. 3d 424, 462–63 (2022), as
modified on denial of reh'g (Apr. 27, 2022), review denied (July 13, 2022), cert. denied sub nom.
*Johnson & Johnson v. California*, 143 S. Ct. 847, 215 L. Ed. 2d 87 (2023) – ("Because doctors
themselves were likely to be deceived by [the]  marketing communications, the trial court reasonably
found [the] marketing communications were likely to deceive patients notwithstanding the legal duties
doctors owe to their patients.")
[672] Apple, *Apple releases 13th annual Supplier Responsibility Progress Report*, March 6 2019,
https://www.apple.com/newsroom/2019/03/apple-releases-13th-annual-supplier-responsibility-progress-report/

---

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Security and they will decide if anyone tells the government (they do not) and they will send a third-party vendor to deal with the spill. This is a facially unlawful training policy but it is honest. It is an example of Apple's actual policies and conduct, to contrast with how Apple says it acts.

### *False Statements about E-Waste (Universal Waste)*

995.    In 2013, the California EPA DTSC started investigating Apple for violating e-waste regulations.[673]

996.    In 2015, Apple's Environmental Report claimed: "*If not recycled properly, electronic waste can be a serious health and environmental issue. To make a quick profit, unethical recyclers sometimes dump e-waste or use dangerous techniques that can leak toxins and harm the environment. That's why we're committed to helping people recycle responsibly.*"[674]

997.    Apple's 2016 Environmental Responsibility said, "*Apple disposes of hazardous waste responsibly. We complete regular audits of the Transportation, Disposal, and Storage Facilities (TSDF), where the hazardous waste is ultimately sent to be treated, incinerated, or recycled. Only facilities we audit and approve are allowed to accept and treat the hazardous waste we generate, which was 1 million pounds in fiscal year 2015.*"[675]

998.    In 2016, Apple agreed to a five-year consent decree and was fined by CalEPA DTSC for $450,000 over hazardous/universal waste violations.[676] "In order to settle the

---

[673] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
[674] Apple, *Environmental Responsibility Report*, 2015, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf
[675] Apple, *Environmental Responsibility Report*, 2016, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2016.pdf
[676] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/

438

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

allegations, Apple has agreed to increase inspections at its facilities in Cupertino and Sunnyvale, according to CEPA's Department of Toxic Substances Control (DTSC)."

999.   This was covered by major publishers and Lisa Jackson's ex-US EPA team gave false comment.[677]

"An Apple spokesperson, Alisha Johnson, said: 'This matter involves an oversight in filing paperwork to close one of our recycling facilities as part of our expansion to a larger site…. We've worked closely with the DTSC to ensure that going forward we have the proper permits for our current site…As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond the legal requirements." Yet, Apple told Gjovik they only do the bare minimum of what's required (and Gjovik discovered they don't even do that.)

1000.   In the 2015 Environment Report, Apple said "*Since 1994, we have diverted more than 508 million pounds of equipment from landfills.*" In the 2016 complaint and settlement, DTSC complained that Apple used unlicensed waste disposers.

1001.   In the 2015 and 2016 Environmental Responsibility Reports, Apple said: "*All electronic waste we collect worldwide is processed in the region where it's collected— nothing is shipped overseas for disposal. The vast majority of our recycling is handled in-region, so we can make sure our recycled materials are not being dumped unsafely.*"[678] In the 2016 DTSC complaint and settlement, DTSC noted Apple was illegally shipping e-waste to Canada.

### *Apple's Statements about Solid Hazardous Waste*

---

[677] Reuters, *California EPA says settled with Apple on hazardous waste claims* (Dec 6 2016), https://www.reuters.com/article/us-apple-waste-violations/california-epa-says-settled-with-apple-on-hazardous-waste-claims-idUSKBN13V2HS
[678] Apple, Environmental Responsibility Report, 2015, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf; 2016, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2016.pdf

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1002.   Apple reported that in 2021, they sent 1,599 tons of hazardous waste to disposal facilities from corporate facilities globally. Based on manifests, 512 tons of that global waste (32%) came from the facility at 3250 Scott Blvd.

1003.   Apple noted on the amount of waste they "diverted from landfills" and highlighted this number in the report under program they called "Zero Waste" saying they are moving towards "*waste-free operations*". Apple claimed in 2021 they "diverted" 491,000 tons of waste. Apple said, "*we maintain our commitment to the safe and responsible management of hazardous waste, both onsite and offsite.*"

1004.   Meanwhile, at least at 3250 Scott Blvd, the way Apple was 'diverting' waste was blasting solvent fumes and toxic gases out their exhaust vents and into apartment windows.[679] Apple told the public and government that it is engaging in environmentally friendly practices in order to reduce waste, however Apple is only reducing the paper trail and cost of its waste by illegally disposing of dangerous chemicals into residential neighborhoods.

1005.   In *Commonwealth v. Lavelle,* a corporation was charged with violating a state penal code related to corrupt organizations. Employees told generators of solid and liquid waste that the company would dispose of the waste legally, then systematically dumped the waste by pouring it "*down a mine borehole located at [their] office.*"[680]

1006.   In Apple's 2015 Environmental Responsibility Report section on "Toxins", Apple says:" *We continue to lead the industry in reducing or eliminating harmful toxic substances to keep both people and the environment healthy,*" and "*Apple is committed to providing safe working conditions for the people who make our products. Many toxins are*

---

[679] Apple, 2022 Environmental Progress Report, https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2022.pdf
[680] *Commonwealth v. Lavelle,* 16 Envtl. L. Rep. 20497 (Pa. Ct. C.P. Lackawanna Cty. 1985), aff'd 555 A.2d 218 (Pa. Super. Ct. 1989), appeal denied, 568 A.2d 1246 (Pa. 1989) (no written opinion) (discussing 18 PA. CONS. STAT. ANN. § 911 (Supp. 1994)).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*restricted not only in the products themselves but also in the manufacturing processes .*"[681] At this point Apple had started silicon fabrication at 3250 Scott Blvd and had already been cited for a number of health and safety violations. Apple is also using a number of substances at the location that it says it has prohibited from its supply chain, like NMP and TCE.

1007.   On May 28 2021, Apple submitted an application to the US EPA for "EPA Safer Choice Partner of the Year Award." Apple wrote, "*Volatile organic compounds (VOCs) are commonly found in consumer products and related manufacturing processes. VOCs are also major contributor to smog and overall poor air quality, which can adversely affect human health in local communities, making it not just an environmental issue, but an issue of environmental justice. While proper ventilation and engineering controls can protect the health and safety of those working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities."* The first half of the statement true, but the second part where Apple says it prioritizes proper ventilation and engineering controls is false (see 3250 Scott Blvd; 825 Stewart Dr), as is Apple's claim they aim higher than those basic functions which they fail splendidly to do.

**1008.   *Applications/Permits***

1009.   Apple began leasing the 3250 Scott Blvd facility in 2014. They started renovations and operations (including hazardous waste generation and hazardous material storage) in 2015 but only contacted DTSC in November 2016 to begin the permitting process. On November 8, 2016, Apple submitted a Phase 1 tiered permit application. The 2016 DTSC application asked if there was knowledge of disposing of hazardous wastes in or under the property, and the applicant said "no." However, Apple admits in the application to a prior

---

[681] Apple, Environmental Responsibility Report, 2015,
https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf

**Deleted:** This is clearly false. Apple knows what the right thing should beThe first half of the statement is true

**Deleted:** intentionally chose not to do it (ie, 3250 Scott Blvd).

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

environmental assessment for the property, and Apple submitted a planning package to the city, which shows the applicant knew the property contained at least an "*acid neutralization plant*," "*acid waste tank*," and "*acid neutralization pit*." All of these are for waste treatment and disposal. A quick public records search, and the review of the environmental report would both note that the site is directly next to an active US EPA Superfund site (Synertek, CAD990832735) with a groundwater plume of solvents that extends under the property caused by spills and leaks. The same person, Jenab, owns both properties.

1010.   At 3250 Scott Blvd, from 2015-current, Apple manipulated hazardous waste manifest documents and regulatory filings in a concerted effort to suppress and conceal the Apple's actual hazardous waste practices. Apple used improper codes for hazardous waste disposal (i.e., coding RCRA solvent waste as non-RCRA, coding 'solvent mixtures' instead of notating each chemical, etc.). All of these efforts were in order to save money, downplay the environmental impact of the plant, and manipulate metrics on operations at the plant in order to mislead the public, institutions, and customers about Apple's environmental practices.

1011.   In December 2016, Apple was fined $450,000 by the California EPA for violating a number of Hazardous Waste laws, including operating off books waste processing plants, transporting waste without manifests, and failing to take proper employee safety precautions.[685]   These violations surely included wire fraud and mail fraud to pull off such an operation for so long.

### *Carbon Neutrality*

1012.   Apple's website includes a section of "Environmental, Social, Governance" matters. On this page under "Environmental", Apple states: "*since 2020, we have been carbon*

---

[685] CalEPA DTSC, "*Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*," Dec 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/

**Deleted:** <#>Apple's August 2021 ESG report, which Apple references frequently in their SEC filings, states: "*Apple is committed to compliance with applicable export and sanctions laws. All employees are responsible for complying with these laws and reporting possible violations.*"[662] Each time the report and any similar communications was emailed or shared digitally is wire fraud. Each time it was mailed, was mail fraud. Apple intentionally violates these laws as its standard practice. The statements are false.¶
<#>An example of evidence supporting Apple's practices not matching their statements is Apple's "*Spill Response and Employee Hazardous Waste Training*" guide. Apple's guide prohibits employees from being trained on how to deal with chemical spills or hazardous waste. The guide requires that in case of a chemical spill the employee call Apple Global Security and they will decide if anyone tells the government (they do not) and they will send a third-party vendor to deal with the spill. This is a facially unlawful training policy.¶
<#>Gjovik complained of fraud with the cracks in floor at her Superfund office because Apple was supposed to report a "change of circumstance" to the US EPA and work with US EPA oversight to evaluate and fix a compromised mitigation system. Gjovik was concerned that Apple's standard operating procedure seemed to be lawlessness, which is the opposite of how they claim they operate.¶
<#>Apple's actions related to the HVAC and Sub-Slab Depressurization systems at 825 Stewart, and failure to install exhaust monitoring and abatement systems at 3250 Scott Blvd, likely violated 42 US Code 7413(c)(1) by constructing new sources and modifying existing sources, failing to comply with design and work practices, and emitting hazardous pollutants in violation of NESHAP. It is a criminal violation of 42 US Code 7413(c)(2)(C) to fail to install monitoring devices required by the Clean Air Act.¶
<#>In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about 3250 Scott and its air emissions. One of these schemes was an anonymous account (assumably Apple) sent her an email via the webform on her website claiming to be ex-US EPA enforcement and after commenting on a suspicious number of details about Gjovik's environmental complaints against Apple, then threatened her to stop talking about the NMP release. To support the threat, the person (Apple) claimed they had EPA insider information about an NMP air emission study that occurred on or after 2015. The email came from an IP flagged for spam and included certain details that seemed improbable for an actual US EPA employee to say. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[663] The email was sent as part of Apple's scheme to not comply with environmental laws, but claim it does, and use fraud, obstruction, and intimidation to silence anyone who could prove and report Apple's fraud – thus the email is another count of predicate act wire fraud.¶
<#>Apple knowingly omitted material information and/or made false statements and/or knowingly generated, stored, treated, transported, disposed of, exported, or otherwise handled hazardous waste without filing the appropriate documentation which is a felony offense under the Resource Conservation and Recovery Act and Clean Air Act.[664] Apple knowingly and intentionally manipulated and concealed scientific data in order to conceal its criminal conduct. Apple committed the above-mentioned violations while knowing it endangered others by engaging in this fraud.¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

*neutral for our corporate operations,*" and "*we're partnering with communities and local leaders to make sure our environmental efforts are also a force for equity and justice.*"[686]

1013.   On Apple's "Environment FAQ" webpage, Apple said "*We've committed to achieving carbon neutrality across our entire value chain, including all our products, by 2030 — reducing emissions by 75 percent compared with 2015. We're cutting the majority of emissions through innovations in materials, clean energy, and low-carbon shipping. And we're investing in nature-based projects to offset the small amount that remains.*"[687]

1014.   It seems impossible that 3250 Scott Blvd is operating 'carbon neutral.' Apple has conclusively said that 3250 Scott Blvd, a silicon fabrication plant, has been 'carbon neutral' since 2020. Apple should provide evidence to substantiate that, otherwise the only way to reconcile the books is Apple's intentionally failure to get Air Resource Board permits and install monitoring technology, so they do not even track all of their emissions – however that still doesn't explain the millions of gallons of water and all of the electricity from the municipal grid for semiconductor fabrication which likely runs 24/7.

### *Green Energy*

1015.   In 2018, Apple wrote to the EPA saying that "*Apple generates 100% of our operational load through clean energy.*"[688] For years, Apple's "environmental" branding has centered around a claim of running on "Green Energy." In 2015 it was exposed that Apple's claims about its data center in Maiden North Carolina running on 100% green energy were false. Apple had claimed they did not use fossil fuels at the facility, and it was 100% "green" but

---

[686] Apple, Investor Relations: ESG, (last visited 12/3/2023), https://investor.apple.com/esg/default.aspx
[687] Apple, Environment – FAQs, (last visited 12/3/2023), https://www.apple.com/environment/answers/
[688] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions …* (at 83 FR 45588, September 18, 2018).

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

records showed they did use fossil fuels and only <1% of the energy was "green". [689] Then in 2017, the North Carolina government discovered Apple was also violating environmental and health/safety laws with unauthorized generation, storage, and transport of hazardous waste. Apple was caught transporting waste without manifests, failing to keep records, and failing to report their activities to regulators. Michael Steiger was also heavily involved in the North Carolina data center code violations.[690]

### 2) Fraud: Privacy

1016.   Apple frequently claims, over a variety of mediums, that "privacy" is one of its core values and that privacy is a human right. Apple also frequently claims that it protects consumer's privacy and does not invade their privacy.

1017.   At a commencement speech at Stanford University, Apple CEO Tim Cook discussed the societal and psychological impact of surveillance and data collection, saying:

"Even if you have done nothing wrong other than think differently, you begin to censor yourself. Not entirely at first. Just a little, bit by bit. To risk less, to hope less, to imagine less, to dare less, to create less, to try less, to talk less, to think less. The chilling effect of digital surveillance is profound, and it touches everything." – Tim Cook [691]

1018.   Apple's website claims: "*Privacy is a fundamental human right. It's also one of our core values.*"[692] In 2019, Apple spokesman Fred Sainz commented to the Washington Post

---

[689] *Analysts Call Apple Renewable Energy Claims 'Lies,'* The Carolina Journal, 2015, https://www.carolinajournal.com/analysts-call-apple-renewable-energy-claims-lies/
[690] *Apple clean energy project fined for environmental violations,* The Carolina Journal, 2017, https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/
[691] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action,* July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/
[692] Apple, Privacy, (last accessed 12/17/2023), https://www.apple.com/privacy/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

claiming:" We *believe privacy is a fundamental human right and is at the core of what it means to be an American.*"[693]

1019.   Washington Post described Apple's public statements on privacy saying:

On the issue of privacy, Apple itself has helped create sky-high expectations with its public pronouncements. For months, it has been running advertisements touting its privacy bona fides, including one plastered to the side of a hotel during a major tech conference that promised, "What happens on your iPhone, stays on your iPhone."

– Washington Post about Apple [694]

1020.   Notably, the oversight and monitoring of privacy at Apple is led by the Audit and Finance Committee, chaired by no other than Ronald Sugar.[695]

### *Tracking & Data Collection*

1021.   It was discovered in late 2022, that despite Apple's public statements to the contrary, Apple was actually gathering a lot of user information directly connected to the user's Apple accounts, which led to an onslaught of lawsuits,[696] and fines.[697]

1022.   The internal policy says outright that Apple will access, copy, store, and monitor consumer's messages and emails, and other activities, if Apple supposedly thinks that an Apple employee is talking to that consumer about Apple's 'business.' Other tech companies have been

---

[693] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action,* July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/; *Apple's statement on privacy lobbying,* https://www.washingtonpost.com/technology/2019/07/15/apples-statement-privacy-lobbying/
[694] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action,* July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/
[695] Apple, Privacy Governance, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/en-ww/governance/ ("*the Audit and Finance Committee of the Board of Directors assists the Board of Directors with the oversight and monitoring of privacy and data security*").
[696] Thomas Germain, *After a Dozen Lawsuits, Apple Breaks Its Silence on Privacy Problems,* Gizmodo, Feb. 6 2023, https://gizmodo.com/apple-iphone-privacy-analytics-12-lawsuits-statement-1850077715
[697] CNIL, *Advertising ID: APPLE DISTRIBUTION INTERNATIONAL fined 8 million euros,* Dec. 29 2022, https://www.cnil.fr/en/advertising-id-apple-distribution-international-fined-8-million-euros

445

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

caught red-handed spying on non-employees without notice or consent, which led to public backlash.[698] Apple's policies are vague enough for Apple to justify a mass-surveillance drag-net on all of its product user's. Apple's internal admission is in direct contraction to the absolute promises Apple makes publicly.

1023.   Further, Apple's actual practices violate GDPR and other international laws as it essentially amounts to a form of wiretapping.

1024.   Apple's website claims: "*Apple does not create or store faceprints of our customers.*"[699] This statement was made absolutely with no qualifiers or caveats.

1025.   Apple's use of the Gobbler application on employee phones leads to the capture of thousands, if not millions, of images/videos of consumers without their knowledge or consent, and worse, capture of their biometrics as well. Apple also now claims that it was a terminable offense for an employee to tell the public that Apple was using this application, which was a formal statement that Apple had no intention to ever notify consumers of the practice or seek their consent.

---

[698] Mohit Kumar, *Microsoft Admits Spying on Hotmail Account to track Source of Windows 8 leak*, The Hacker News, March 22 2014, https://thehackernews.com/2014/03/microsoft-admits-spying-on-hotmail.html ("*Microsoft admitted that they have accessed a French Blogger's private Hotmail account to identify a former Microsoft employee who had leaked the company's trade secrets in 2012.*")
[699] Apple, California Privacy Disclosures, "Biometric Information," (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/ca-privacy-disclosures.html

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25





*Figure 1: Photos captured by "Gobbler" in Gjovik's home bathroom, including Gjovik washing her face without clothing*

*Exhibit: Collection of Photos/Biometrics Taken by Gobbler*

1026.  Additionally problematic is that Apple knew back in 2017 that the use of the Gobbler application in France or Germany is illegal, however Apple also know that employees traveling for work or even going on vacation, may end up in these countries, or in other EU countries.[700]

1027.  This section is incorporated in the Cal. Labor Code § 1102.5 claim for § 435, and the Tamney claims under the same, the California Constitution Right to Privacy, and the FTC Act – and those sections are also incorporated here.

1028.  Apple's statements about privacy related to tracking and data collection are false.

***Wiretapping***

---

[700] Apple, Privacy Governance, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/en-ww/governance/

447

SECOND AMENDED COMPLAINT   3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1029.   In 2018-2019, it was revealed by a number of Apple whistleblowers that Apple was actually secretly recording customers using Siri, storing the recordings, and asking employees to listen to them and review them.[701] A whistleblower said: *"There have been countless instances of recordings featuring private discussions between doctors and patients, business deals, seemingly criminal dealings, sexual encounters and so on. These recordings are accompanied by user data showing location, contact details, and app data."*[702]

1030.   The whistleblower argued "Apple should reveal to users this human oversight exists – and, specifically, stop publishing some of its jokier responses to Siri queries. Ask the personal assistant 'are you always listening', for instance, and it will respond with: 'I only listen when you're talking to me.' That is patently false, the [whistleblower] said."[703] One of these whistleblowers, Thomas le Bonniec, noted the expansive sweep of the recordings he heard, saying: *"The recordings were not limited to the users of Apple devices, but also involved relatives, children, friends, colleagues, and whoever could be recorded by the device. The system recorded everything."*[704]

---

[701] Alex Hern, *Apple contractors 'regularly hear confidential details' on Siri recordings, Workers hear drug deals, medical details and people having sex, says whistleblower*, The Guardian, July 26 2019, https://www.theguardian.com/technology/2019/jul/26/apple-contractors-regularly-hear-confidential-details-on-siri-recordings
[702] Id.
[703] Id.
[704] Alex Hern, *Apple whistleblower goes public over 'lack of action'*, May 20 2020, https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*Exhibit: One of the Millions of Secret Siri Recordings, via Telerama* [705]

### 3) Fraud: Compliance and Ethics

1031.   Apple's Global Whistleblowing Policy starts with the statement: "*Apple conducts business ethically, honestly, and in compliance with applicable laws and regulations.*"[706] Apple does not say that 'Apple tries to conduct…' or 'believes that it is important to conduct'– no, Apple says it does conduct. Apple states a conclusive, definite fact that the company is ethical, honest, and never violates laws or regulations. Apple's statement is false, as well as preemptive threatening against whistleblowers speaking out, as if Apple is doing nothing wrong, there is nothing to blow the whistle about.

1032.   Apple's website has a homepage for "Ethics and Compliance" that leads with a prominent statement, similarly saying: *"Apple conducts business ethically, honestly, and in full compliance with the law. We believe that how we conduct ourselves is as critical to Apple's*

---

[705] Olivier Tesquest, *Siri, l'assistant vocal d'Apple ? C'est une taupe !*, February 24 2021, https://www.telerama.fr/debats-reportages/siri-lassistant-vocal-dapple-cest-une-taupe-6822626.php
[706] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

449

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*success as making the best products in the world.*" It also includes a quote from CEO Tim Cook saying: "*We do the right thing, even when it's not easy.*"[707] Again, these are false and misleading statements.

1033.   Apple "Business Conduct Policy", produced by Tom Moyer's team starts with: "*Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations. This applies to every business decision in every area of the company worldwide.*"[708]

1034.   Reviewing the long list of criminal and civil charges, decisions, and settlements against Apple – it's clear that not "*every business decision in every area of the company worldwide*" is ethical, honest, or in full compliance with the law. These are all false statements and they are wire fraud when posted on a website or emailed, and mail fraud when sent via postal mail.

1035.   Apple's "Ethics and Compliance" website claims that "*Apple does not tolerate retaliation,*" and "*Apple will not retaliate — and will not tolerate retaliation — against any individual for reporting a good-faith concern or complaint, or for participating in the investigation of any complaint.*"[709] But there are constant complaints about Apple retaliating against its workers.[710]

1036.   Apple's Supply Chain policy and Apple website say: "*we hold ourselves… to the highest standards of labor and human rights, health and safety in the workplace, environmental practices…*"[711]

---

[707] Apple, Ethics and Compliance, (last accessed 12/2/2023), https://www.apple.com/compliance/
[708] Apple, Business Conduct Policy, August 2022, https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf
[709] Apple, Ethics and Compliance, "Speak Up," (last visited 12/2/2023), https://www.apple.com/compliance/speak-up/
[710] NY Times, Another Apple Worker Says the Company Retaliated Against Her, Nov 2 2021, https://www.nytimes.com/2021/11/02/technology/apple-worker-retaliation.html
[711] Apple, *People and Environment*, 2023, https://www.apple.com/supplier-responsibility/pdf/Apple_SR_2023_Progress_Report.pdf

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**People and Environment in Our Supply Chain**

We hold ourselves and our suppliers to the highest standards of labor and human rights, health and safety in the workplace, environmental practices, and the responsible sourcing of materials.

Visit the Supplier Responsibility site ›

*Exhibit: Apple Website Statement on Supply Chain*

1037.   Apple's Anti-Corruption Policy says: "*Apple will not retaliate – and will not tolerate retaliation – against any individual for filing a good-faith complaint with management, HR, Legal, Internal Audit, Finance, or Business Conduct, or for participating in the investigation of any such complaint.*"[712] Notably this specific anti-retaliation policy does not attempt to claim Apple will not retaliate against employees for reporting unlawful acts to government agencies or law enforcement.

**Retaliation Is Not Tolerated**
Apple will not retaliate – and will not tolerate retaliation – against any individual for filing a good-faith complaint with management, HR, Legal, Internal Audit, Finance, or Business Conduct, or for participating in the investigation of any such complaint.

*Exhibit: Apple Retaliation Policy Excerpt*

---

[712] Apple, Anti-Corruption Policy, June 2018, https://s2.q4cdn.com/470004039/files/doc_downloads/gov_docs/Anti-Corruption_Policy.pdf

451

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1038.   Both of the prior policies reference that reports must be made in "*good-faith*" and must be "*reasonable.*" Both of these subjective, vague requirements written in a formal policy, have a tendency to chill reporting.

1039.   The Anti-Corruption policy also instructs employees to handle anti-corruption compliance concerns in house:

"You should consult with Business Conduct if there is a question as to the appropriateness of a particular business decision or course of action… Any employee who learns of any misconduct or suspicious activities, including potential violations of this Policy and the law, must immediately report such misconduct either to Business Conduct or Legal... All questions about information contained in this Policy should be directed to Business Conduct."[713]

This statement captures Part III of Apple and the Worldwide Loyalty Enterprise's scheme, the silencing of witnesses and obstruction of justice. By limiting any reports/questions to only Business Conduct, the policy implies that employees are not allowed to report issues to government agencies or law enforcement. By requiring employees to immediately report any issues to only Business Conduct and/or Legal (which are the same organization – Moyer reports to General Counsel), it ensures that if Apple needs to cover-up the issue and silence witnesses, it starts on that right away. Requiring employees to report also ensures that Apple and Worldwide Loyalty can keep a database of witnesses and whistleblowers and surveil them to ensure they don't get any wild ideas like talk to the press or reporting crimes to the government.

1040.   Apple's new "Global Whistleblowing Policy" (published around January 2023) says: "*Reporting of certain types of actual or suspected wrongdoing that are in the public interest and affect others is often described as whistleblowing. Depending on applicable law, whistleblowing reports may include, but are not limited to, suspicions of wrongdoing regarding:*

---

[713] Id.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

- *Financial malpractice, misrepresentations, impropriety, or fraud, including accounting and auditing or disclosure concerns.*
- *Failure to comply with a legal or regulatory obligation.*
- *Public health and product safety*
- *Risk or damage to the environment*
- *Criminal activity*
- *Bribery, facilitation of tax evasion or money laundering*
- *Privacy and data protection breaches*
- *Anti-competitive conduct*
- *Breaches of sanctions*
- *Violations of human rights…*
- *Attempts to cover up any of these behaviors."*[714]

Notably, Apple's policy highlights several examples of whistleblowing which were exactly what Gjovik did prior to Apple's abrupt and violent termination of her employment, including disclosures about: misrepresentations, impropriety, fraud, disclosure concerns, failure to comply with laws, violation of criminal laws, public health issues, environmental risks, privacy issues, sanctions violations, human rights violations, and Apple's attempts to "*cover up [all] of these behaviors.*"

1041.   Apple's new Whistleblowing Policy also includes a "No Retaliation" section which says:

"Apple will not retaliate — and will not tolerate any retaliation — against any individual for raising a good-faith and genuine concern within Apple or to the appropriate body under local law, or for participating in the investigation of any complaint. Any person who retaliates against a whistleblower, threatens any such retaliation, or is involved in any such conduct may be subject to

---

[714] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

disciplinary action, up to and including termination of employment or contractual relationship with Apple."[715] This statement, while problematic for issues discussed in the next section, does assure employees that they will not face retaliation if they blow the whistle, which is a false statement.

1042.   Apple has a long history of retaliating against employees for raising concerns and reporting issues to regulators, and for enlisting law enforcement and regulators to help Apple cover-up the issues.

i.    **Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)** [716]

1043.   Gjovik began meeting with, the U.S. NLRB and U.S. EEOC before she was fired, providing statements and evidence about her retaliation concerns. Gjovik has stated publicly in the press, in legal filings, and on social media, since August 2021 and ongoing, that she filed charges that would initiate communications with federal authorities and that she planned to vigorously participate in any investigation into Apple for their conduct related to 825 Stewart Drive against her which she reasonably believed was unlawful.[717] Apple also knew if Gjovik ever learned of what they did to her at 3250 Scott Blvd, that Gjovik would also cooperate with authorities against Apple on that matter as well.

1044.   Many of the threats, intimidating and harassing messages, and corrupt acts were performed expressly acknowledging Gjovik's federal charges, cases, and proceedings. There is no question Apple understood the federal and criminal implications of their intimidation. Apple is liable and culpable for the acts of individuals through a variety of liability theories including conspiracy, aiding and abetting, Respondeat superior, negligence, and others. Indeed, even under

---

[715] Id.
[716] 18 U.S.C.A. § 1961 (B)
[717] *United States v. Guadalupe*, 402 F.3d 409, 412 (3d Cir. 2005).

Deleted: done

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

the doctrine of respondeat superior, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents.[718]

1045.   Section 1512 applies to the obstruction of federal proceedings: judicial, congressional, or executive.[719] It consists of four somewhat overlapping crimes: use of force or the threat of the use of force to prevent the production of evidence; use of deception or corruption or intimidation to prevent the production of evidence; destruction or concealment of evidence or attempts to do so; and witness harassment to prevent the production of evidence.[720]

1046.   Threats of harm may be express or implied, and may include physical, emotional, psychological, economic, and legal tactics. Intimidation may also include stalking, vandalism, symbolic acts, cultural pressure, and emotional manipulation.[721] The intimidators may include the offenders, their allies and family, institutional and cultural authority figures, and the community. The targets may include the witness, and the witness's family, friends, and pets.[722] Digital intimidation may include posts identifying the witness with an implicit or explicit call to action, targeted threats and harassment, and shunning where mutual friends or followers are

---

[718] US DOJ, 9-28.000 - Principles of Federal Prosecution of Business Organizations

[719] 18 U.S.C. § 1515(a)(1) ("official proceeding" means "a proceeding before a judge or court of the United States," "a proceeding before the Congress," "a proceeding before a Federal Government agency which is authorized by law," or "a proceeding involving the business of insurance whose activities affect interstate commerce . . .")

[720] Congressional Research Service, Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities, April 17 2014

[721] Aequitas, *Field Guide to Witness Intimidation: A Reference for Identification* (Jan 2018), https://aequitasresource.org/wp-content/uploads/2018/09/Field_Guide_to_Witness_Intimidation_3.19.18.pdf

[722] Id.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

encouraged to un-friend/unfollow the witness.[723] A Judge referred to extreme digital intimidation as the "*electronic version of a lynch mob.*"[724]

1047.   The US Department of Justice describes examples of victim and witness intimidation including explicit or implicit threats of physical violence, property damage, courtroom intimidation, public humiliation of victims or witnesses (or their friends and families), parking outside the victim's or witness's house, nuisance phone calls, vague verbal warnings, threatening looks and gestures directed at the witness or victim in court, economic threats, and threats of deportation (all of which Apple has done to Gjovik).

**1)   Use of Force or the Threat of the Use of Force to Prevent the Production of Evidence**

1048.   Here, 18 U.S.C. 1512(a)(2)-(3) is implicated as Apple used the threat of physical force against Gjovik, or attempted to do so, with intent to influence, delay, or prevent the testimony of Gjovik in an official proceeding (US NLRB, US DOL); or cause or induce Gjovik to withhold testimony, or withhold a record, document, or other object, from an official proceeding (US NLRB, US DOL); or alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding (US NLRB, US DOL); and hinder, delay, or prevent Gjovik's communication to a law enforcement officer (FBI, state police, local police) of information relating to the commission or possible commission of a Federal offense.

*Workplace Violence*

---

[723] International Association of Chiefs of Police, Project Safe Neighborhoods: Witness Intimidation in the Era of Social Media (Sept 2016), https://www.theiacp.org/sites/default/files/all/p-r/PSNPolicyBrief_WitnessIntimidation.pdf
[724] John Browning, #Snitches Get Stitches: Witness Intimidation in the Age of Facebook and Twitter, 35 Pace L. Rev. 192 (2014).

1049.   Gjovik's NLRB affidavit was to be taken the day after she was fired. When Workplace Violence interrogator unexpectedly reached out to her on September 9 2021, insisting he must talk to her within the hour, having never met the interrogator or heard of his "Workplace Violence" team before, Gjovik wrote she was concerned he was intimidating her the day before her affidavit as a federal witness against Apple (See Twitter post about laying on the floor, holding a can of Mace, and 'pondering the brutality of US capitalism'). Gjovik was fired a few hours later without explanation.  Upon reviewing Apple policies, the only mention of "Workplace Violence" includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or written threats, stalking, or destruction of property."* It is entirely unclear why this team was contacting Gjovik if not to intimidate and threaten her with at least an implied threat of violence.

1050.   Later, Apple would claim Gjovik's termination was due to statements Gjovik made on August 28 and August 30, a full 10-12 days prior, yet on September 9, 2021, Kagramanov insisted Gjovik get on the phone with him "*within the hour.*" After her termination via email that day, Gjovik would not hear of the likely proffered reasons for her termination until September 15th, six days later. It is clear Kagramanov did not actually have a legitimate reason he planned to terminate Gjovik.

**1051.  *Digital Threats***

1052.   Assumed agents of Apple Inc referred to Gjovik's protected activities as "*worthy of death*" (Sept 7, 2021) and made references to Gjovik dying from "*double tap*" gunshot wounds (Dec 20 2021[725]), that in Russia Apple whistleblowers would die from a "*car accident*" (Oct 15 2021). The day she was fired an Apple account posted on an article about Gjovik that he

---

[725] Reddit, now deleted user,
https://www.reddit.com/r/technews/comments/rkyslb/apple_employee_blows_whistle_on_illegal_spying/hpg6bzu/?utm_source=share&utm_medium=web2x&context=3

Deleted: ).

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

wanted Apple to "*hunt [leakers] down like wild animals*" and they "*want to see them destroyed*" (September 9, 2021[726]). One Twitter account, Beezie Wacks, posted on Sept 10, 2021, the day after Gjovik was fired, that the world was "*reaming*" her and that Gjovik deserved it. The account also paid to promote (advertise) the post. Another account posted a photo of a ban holding a baseball bat and wrote that Tim Cook was "*gonna f@/\*k some peeps up*" (September 22, 2021[727]). Another Apple account was repeatedly, directly harassing Gjovik on social media and at one point referenced what was happening to Gjovik as "*the nail that sticks out, gets hammered*" (Jan 29, 2022[728]). [all of these posts have been collected, archived, and documented]

      1053.  An employer's termination, demotion, or harassment against an employee, caused by an employer's racketeering, under certain circumstances can constitute a RICO predicate act under § 1512.[729] There is no evidence any of Apple's agent's intimidating, harassing, and threatening conduct was actually good faith encouragements for Gjovik to testify truthfully.[730] Instead, Apple's agents even openly admitted they would continue terrorizing her until she dropped her charges and made specific false statements. They presented a false story to Gjovik of Gjovik's own experience and demanded Gjovik repeat that false story as if it were true.[731] (*She asked to be on leave. She leaked IP. She deserved to be fired*. etc.)

---

[726] Reddit: 22 Sept 2021, @pacmandaddy, https://www.reddit.com/r/apple/comments/pt91m5/tim_cook_says_employees_who_leak_memos_do_not/hdv5qbj/
[727] MacRumors, 22 Sept 2021, https://forums.macrumors.com/threads/apple-ceo-tim-cook-in-leaked-memo-we-are-doing-everything-in-our-power-to-identify-leakers.2312633/page-2
[728] Twitter, I'mPinkThereforeI'mSpam (@I_mspam), https://web.archive.org/web/20220130031154/https://twitter.com/i_mspam/status/1487549097070379008
[729] *Dooley v. United Techs. Corp.*, No. CIV. A. 91-2499, at *5 (D.D.C. June 17, 1992)
[730] *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013); *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005) ("Cruzado did ask that they tell the truth; however, his version of 'the truth' that he urged upon them was anything but the truth")
[731] *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005) ("corrupt persuasion occurs where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it")

**Deleted:** <#>Gjovik's NLRB affidavit was to be taken the day after she was fired. When Workplace Violence interrogator unexpectedly reached out to her on September 9, 2021, insisting he must talk to her within the hour, having never met the interrogator or heard of his "Workplace Violence" team before, Gjovik wrote she was concerned he was intimidating her the day before her affidavit as a federal witness against Apple Inc. Gjovik was fired a few hours later without explanation. ¶
<#>Upon reviewing Apple policies, the only mention of "Workplace Violence" includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or written threats, stalking, or destruction of property.*" It is entirely unclear why this team was contacting Gjovik if not to intimidate and threaten her with at least an implied threat of violence. ¶
<#>Later, Apple would claim Gjovik's termination was due to statements Gjovik made on August 28 and August 30, a full 10-12 days prior, yet on Sept 9th, 2021, Kagramanov insisted Gjovik get on the phone with him "*within the hour.*" After her termination via email that day, Gjovik would not hear of the proffered reasons for her termination until September 15th, six days later. It is clear Kagramanov did not actually have a legitimate reason he planned to terminate Gjovik for on that day.¶

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1054.   Agents of Apple Inc wrote Gjovik was "*deserving of misery*," that they looked forward to seeing Apple "*swallow her & spit her out*," and that she is lucky Apple has not "*crushed her like a bug.*" They posted "*She's a senior manager at Apple and going on a tirade against them over the ground beneath the building. What did she expect to have happen to her?*" and "*Apple fired you because they already know how this ends… They waited and looked for a policy violation, found it, and booted you."* Another wrote that as a *"seasoned employee, she more than others, was well aware of the consequences of airing dirty laundry,*" and Apple should "*have fired her weeks ago.*" [all of these posts have been collected, archived, and documented]

1055.   On September 16 2021, Gjovik posted on Twitter alleging Apple's Employee Relations team may be engaged in RICO: "*In 2017 a lawsuit against alleged a RICO violation (enterprise engaging in pattern of illegal racketeering activity over a substantial period). Plaintiffs argued covering up systemic harassment involved obstruction of justice & mail/wire fraud. #Apple [Employee Relations]?*" One of the anonymous Twitter accounts Gjovik is nearly certain is Apple ("i_mspam") responded, "*You'll never work as an attorney,*" (post then liked by other anonymous account "BeezieWacks"), and added "*The nail that sticks out, gets hammered.*"

### Appleseed & the NLRB Charges

1056.   When Gjovik suffered harassment and intimidation that was openly said to be due to her federal cases, the focus was often Gjovik's NLRB charges. The interference extended to a lawsuit against Gjovik 'because of' Gjovik's NRLB charges, emails to Gjovik demanding she alter her testimony, emails demanding Gjovik omit certain evidence, and direct interference with

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

the NLRB investigators overseeing Gjovik's charges and the resulting investigation. (NLRB investigators are considered Federal Officers under criminal statutes).[732]

1057.   Appleseed contacted Gjovik directly on February 5 2022, demanding Gjovik modify her charges, writing to Gjovik:

- *Implying that people are trying to have you assassinated or cause you to kill yourself, me included, is extremely harmful, and I alerted APPLE about the chain of tweets involved in doing so.*
- *Please remove my tweets that cannot be reasonably justified to be connected to you from your January NLRB memo*
- *You need to delete my tweets from your memo that contain personal information about me…*
- *You need to remove all assertions that I am accounts trolling you*

**Stalking & Prowling**

1058.   In California, Apple delayed, lingered, prowled, and/or wandered on the private property of Gjovik's apartments. Apple was on that property without a lawful purpose and intended to commit a crime if the opportunity arose. Apple's purpose was to commit a crime if the opportunity arose, which they did including by threatening Gjovik by taking unwanted photos and videos and looking into the home windows, of a federal witness, with an intent to intimidate;[737] by using social media accounts to harass Gjovik about the real-world events she was experiencing in real time, and at least once fleeing the scene when caught by a neighbor who said she would call police officers.[738]

---

[732] 9-139.800 Interference with National Labor Relations Board Agent (29 U.S.C. § 162).

[737] California Penal Code § 647i "Peeking"/Prowling ("who, while loitering, prowling, or wandering upon the private property of another, at any time, peeks in the door or window of any inhabited building or structure, without visible or lawful business with the owner or occupant."

[738] California Penal Code § 647(h) "Loitering to Commit a Crime" (""who loiters, prowls, or wanders upon the private property of another, at any time, without visible or lawful business with the owner or occupant… delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered.")

---

**Deleted:** <#>Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness: a violation of federal law. Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik.[733] Apple acted with intent to influence, delay, and/or prevent the testimony of Gjovik with NLRB, US SEC, US Department of Labor, California Department of Labor; or cause or induce Gjovik to withhold testimony and/withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in the same. Several of these cases were federal proceedings and Apple intended to prevent Gjovik from cooperating with authorities.[734]

<#>Here, 18 U.S.C. 1512(b) is implicated as Apple employees & assumed agents of Apple Inc suggested Gjovik sue Gjovik / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion," "ending her," "destroying her," "ruining her,"* and bankrupting her. Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley," "finding out"* for *"fucking around,"* a *"self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."* ¶

<#>Joanna Appleseed, on behalf of Apple Inc tried numerous times (including January 7th - 8th 2022 and February 5th, 2022) to coerce Gjovik to withdraw, retract, or otherwise stop a Wikipedia Arbitration Committee investigation into an account harassing Gjovik via Gjovik's Wikipedia article and which Gjovik alleged to be Appleseed or someone on Apple or Appleseed's behalf, but either way acting at the direction of Apple to smear and intimidate Gjovik. Wikipedia banned Gjovik and refused to tell her why, but later admitted 'because she filed an NLRB charge against Apple.' Gjovik complained to Wikipedia legal as that seems unlawful. In November 2022, the account harassing Gjovik was identified to be Appleseed and was banned herself.[1]

<#>Apple Inc agents also threatened to denylist Gjovik from the technology, engineering, and legal employment fields: including *"never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the California bar association's Moral Character investigation, and never getting a job anywhere again other than working in fast food."*

<#>Here, 18 U.S.C. 1512(c) & (d) are implicated as Apple managers, employees, and agents have referred to Gjovik's complaints to the federal and state government about Apple Inc as *"unsubstantiated," "meritless," "baseless," "dead in the water,"* and that there's *"no case."* Apple's agents referred to Gjovik as an *"ambulance chaser"* and her cases as *"shakedown lawsuits."* Apple manager Ricky Mondello and ex-Apple employees Joanna Appleseed and Shantini Vyas have publicly called Gjovik a *"liar," "predator," "racist," "inconsequential," "not a real whistleblower."* These parties have described Gjovik's protected activities as a *"vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric,"* and *"misinformation."* Among other things, Apple Inc & their agents have publicly called Gjovik a *"liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility, dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist, 'ugl... [15]*

**Deleted:** California Penal Code § 647i "Peeking"

**Deleted:** California Penal Code § 647(h) "Loitering"

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1059.   Apple's scheme with the enterprise to intimidate Gjovik to not participate in legal activities related to Apple, and to retaliate against her for what she had already done, included sending agents (employees, ex-employees, contractors, vendors, etc.) to her home to stand by and walk around the courtyard of her Santa Clara apartment, to follow her when she ran errands, to drive up to her New York apartment and capture videos/photos of her, and to send someone to stand on her New York sidewalk until she left the apartment and to send Gjovik notification she was being watched by the person.

**2)   Use of Deception or Corruption or Intimidation to Prevent the Production of Evidence**

1060.   Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness: a violation of federal law. Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik. [739]

1061.   Here, 18 U.S.C. 1512(b) is implicated as Apple acted with intent to influence, delay, and/or prevent the testimony of Gjovik with NLRB, US SEC, US DOJ, US Department of Labor, California Department of Labor; or cause or induce Gjovik to withhold testimony and withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in the same.

---

[739] *United States v. Khatami,* 280 F.3d 907, 911-12 (9th Cir. 2002)("Synthesizing these various definitions of "corrupt" and "persuade," we note the statute strongly suggests that one who attempts to "corruptly persuade" another is, given the pejorative plain meaning of the root adjective "corrupt," motivated by an inappropriate or improper purpose to convince another to engage in a course of behavior-such as impeding an ongoing criminal investigation"); *United States v. Gotti,* 459 F.3d 296, 343 (2d Cir. 2006)("This Circuit has defined 'corrupt persuasion' as persuasion that is 'motivated by an improper purpose.' *United States v. Thompson,* 76 F.3d 442, 452 (2d Cir. 1996).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Several of these cases were federal proceedings and Apple intended to prevent Gjovik from cooperating with authorities.[740]

1062.   Apple employees & assumed agents of Apple Inc suggested Apple Inc should / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion," "ending her," "destroying her," "ruining her,"* and bankrupting her. [all of these posts have been collected, archived, and documented]

1063.   Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley," "finding out"* for *"fucking around," a "self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."*  [all of these posts have been collected, archived, and documented]

1064.   Apple Inc agents threatened to denylist Gjovik from the technology, engineering, and legal employment fields: including *"never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the California bar association's Moral Character investigation, and never getting a job anywhere again other than working in fast food."* (September 2021). [all of these posts have been captured and documented]

### *Direct Coercion*

1065.   Apple, via their agents/employees, repeatedly harassed and intimidated Gjovik specifically about Gjovik's federal and state charges and cases. Examples include but are not limited to:

---

[740] 18 U.S. Code § 1512 (b) - Tampering with a witness, victim, or an informant

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

- *"Important! The NLRB investigates ALL charges brought to its office. It isn't indicative of prosecution of cases or merit in charges.* (Sept 9 2021, Appleseed, Twitter, upon Gjovik being fired with an open NLRB charge)
- *"NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik"* (Jan 31 2022, Appleseed, lawsuit)
- "The EEOC and DFEH have already declined to pursue and given her the right-to-sue" (Sept 13 2021, Appleseed, Twitter)
- "I want to see her get justice, but perjuring herself and doing all of this is harmful," (Dec 29 2021, Appleseed, text)
- *"Do you know whose AppleInsider piece on a [SEC] whistleblower tip which contained absolutely no material information shareholders could use caused that? Yours."* (Feb 5 2022, Appleseed, email)

These posts also specifically instructed Gjovik to drop her cases/charges or modify her testimony/evidence. Examples include but are not limited to:

- *"Remove my tweets that cannot be reasonably justified to be connected to you from your January NLRB memo"* (Feb 5 2022, Appleseed, email)
- "You *need to delete my tweets from your memo that contain personal information… You need to remove all assertions that I am accounts trolling you.*" (Feb 5 2022, Appleseed, email)

Appleseed's lawsuit repeatedly noted Gjovik's NLRB, DOL, and SEC charges/cases.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

> I also reported her behavior to her University, and to Twitter. Neither of these seems to have deterred her from continuing to engage in the harassment.
>
> On January 11, 2022, she filed an NLRB charge against Apple, Inc, claiming that I was harassing her on Apple's behalf. I have not harassed her. On January 31, 2022, she published a "memo" for that charge containing defamatory and private information about me (and others) on a platform called Scribd. Ordinarily, this information would be redacted and confidential by the NLRB. She has shopped this information around to the press in an attempt to make it public record, for malicious purposes. Much of the information she has reposted is my personal medical information, which I have not given her consent to share.
>
> https://www.scribd.com/document/555822358/US-NLRB-Ashley-Gjovik-Apple-Inc-Jan-10-2022-Charge-Draft-1

*Exhibit: From Appleseed's 1/31/2022 Petition for a Restraining Order against Gjovik [741]*

1066.   A defendant's liability can be based on its falsification, destruction, and misrepresentation of evidence during a judicial proceeding.[742] In fact, while common law often immunizes testimony from prior judicial proceedings, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity.[743] Apple's lawfare was not protected, including their letter about face Gobbler and Appleseed's lawsuit against Gjovik.

### *Threatening Emails and Social Media Posts*

1067.   In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about 3250 Scott and its air emissions. One of these schemes was an anonymous account (assumably Apple) sent her an email via the webform on her website claiming to be ex-US EPA enforcement (see Comrade

---

[741] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik,* 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).
[742] See, Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co., 336 F.Supp.2d 1239, 1267 (S.D.Fla.2004).
[743] 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant).

| | |
|---|---|
| **Deleted:** | FIRST |
| **Deleted:** | -- |
| **Deleted:** | cv |
| **Deleted:** | CRB |
| **Deleted:** | OCTOBER 25 |

Jones) and after commenting on a suspicious number of details about Gjovik's environmental complaints against Apple, then threatened her to stop talking about the NMP release.

1068.   To support the threat, the person (Apple) claimed they had EPA insider information about an NMP air emission study that occurred on or after 2015. The email came from an IP flagged for spam and included certain details that seemed improbable for an actual US EPA employee to say. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[744] The email was sent as part of Apple's scheme to not comply with environmental laws, but claim it does, and use fraud, obstruction, and intimidation to silence anyone who could prove and report Apple's fraud.

### *Surveillance & Burglary*

1069.   Apple maliciously and unlawfully damaged/obstructed/disconnected part of a telephone/cable/electrical line, or equipment connected to the line – and Apple maliciously and unlawfully made an unauthorized connection with part of a line used to conduct electricity or equipment connected to the line – when Apple broke into Gjovik's Santa Clara apartment and attic to install some sort of electronic equipment above her home office, assumably intercepting the electrical and internet lines.[745]

1070.   Apple entered a residential apartment/room within a locked residential building and intended to commit felonious acts at least including installing surveillance equipment in Gjovik's attic, bugging Gjovik's chattels, replacing the batteries in their prior bugs in Gjovik's chattels, and obstructing/interfering with Gjovik's internet access.[746] Apple, and/or an agent of

---

[744] False Impersonation of Federal Officer or Employee (18 U.S.C. § 912). *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).
[745] California Penal Code § 591 "Damaging Phone/Electrical Lines"
[746] California Penal Code § 459 "Burglary"

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Apple, willfully entered Gjovik's apartment without the consent of Gjovik and Apple had no lawful reason to do so.[747]

1071.   Apple intentionally listened to or recorded a conversation/communication using an electronic amplifying/recording device without consent from all individuals who were party to the conversation/communication, and at least one of the other individuals who were party to the conversation/communication intended that the conversation/communication be confidential and had objectively reasonable grounds to believe it would be confidential. Apple violated 632(a) at least when it intercepted or otherwise overheard Gjovik's phone calls with the Santa Clara District Attorney's office, and a separate call with a lawyer in Seattle Washington, and a friend in Canada – which were the three phone calls where Gjovik's internet/cell connection dropped at very suspicious times in the call, and in the matter with the Canadian, both of their Wi-Fi connections were taken down at the same time and had to be rebooted – and these three events led to Gjovik's investigation which found the bugged objects in her home.[748]

***Example: Captured Government Employees as part of the Enterprise***

1072.   Apple's capture of local government and law enforcement agencies is also implicated here, as evidenced by the US NLRB (Hadjuk), US DOL (Parra, Diangco) US EPA (Helminger, Poalinelli) and other representatives and officials openly threatening and intimidation Gjovik to drop her charges. The connection to Apple was direct and clear, revealed by facts like the NLRB agent corruptly intimidating Gjovik while his coworker was actively applying for a job in Apple Employee Relations; or the Regional Supervisor of the US EEOC offices overseeing US EEOC complaints in the SF Bay Area (including Apple, and assumably Gjovik's if she had requested an investigation) joining Apple Employee Relations only two

---

[747] California Penal Code § 602.5 "Trespass into Dwelling"
[748] California Penal Code § 632(a) "Eavesdropping and Recorded Communication

466

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

months after Gjovik's US EEOC charge was filed and Apple celebrating his announcement on LinkedIn with an Apple Employee Relations employee it was great he was "finally" able to join Apple. How long was he applying to join Apple? How many Apple cases did he process while he was waiting? US EEOC denied to respond to Gjovik's inquiries into the matter.

**3)  Destruction or Concealment of Evidence or Attempts to Do So**

1073.  Here, 18 U.S.C. 1512(c) is implicated as Apple corruptly altered, destroyed, and concealed a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructed, influenced, or impeded any official proceeding, or attempted to do so.

*NLRB employee as part of the Enterprise*

1074.   In addition, several government employees who participated in the enterprise's scheme engaged in conduct with at least Gjovik that is likely criminal. The first NLRB investigator, Alex Hajduk threatened Gjovik to obtain her signature on a document with her affidavit but which he also tampered with and threatened Gjovik not to correct or otherwise modify. In violation of California Penal Code § 141,[749] the NLRB investigator willfully, intentionally, and wrongfully changed Gjovik's affidavit to plant new information in the document which came from Apple's lawyers, not Gjovik, but the investigator made the affidavit appear as if Gjovik testified to it under oath. The investigator intended that his action would result in Apple's proffered reason for firing Gjovik to be wrongfully produced as Gjovik's genuine and true belief that could be a reason Apple fired her before Apple contacted her about the matter.

---

[749] Cal Penal Code 141 PC – crime to tamper with evidence or to plant evidence in any legal matter

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1075.   Hadjuk violated Cal. Penal Code § 522[750] when he threatened Gjovik that if she was to attempt to correct the document to only reflect what she actually said during her testimony, that her actions would be exposed by Apple and used by Apple to claim she is dishonest, lying about the retaliation, and felt it possible she was fired legitimately for cause. Hadjuk threatened Gjovik and a result of the threat, Gjovik signed the affidavit as prepared by the Investigator. The investigator also wrongly claimed Gjovik was not allowed to provided evidence in her charges and if she was to do so, the entire case may be thrown out.

1076.   Hadjuk's actions also violate Penal Code 137(b) "Influencing a Witness by Fraud". Hadjuk used fraud against Gjovik with intent to cause Gjovik to withhold true testimony/information and give false testimony/information. The investigator made false statements, misrepresented information, and hid the truth with intent to deceive. Gjovik reported this to NLRB OIG in January 2022, who confirmed an investigation. Gjovik's case was transferred to a different region several weeks later.

### *Appleseed as part of the Worldwide Enterprise*

1077.   Appleseed repeatedly tried to delete, and did get deleted, Gjovik's posts and filings, including a copy of a federal legal filing. This occurred when Appleseed was an active Apple employee, and also after she supposedly quit Apple in late 2021.

- Appleseed admitted to reporting Gjovik's "Evidence Report" about harassment and intimidation, on Scribd, on February 7 and 8 Feb 2022, and it was deleted by Scribd.
- Appleseed reported the same legal filing as "children pornography" to Gjovik's web host.
- Appleseed admitted to reporting social media posts Gjovik made complaining about Reigel and Marini (and then confirmed Apple corporate told her they reported them as well)

---

[750] Cal Penal Code § 522 PC -- crime to obtain another person's signature to a legal document by means of extortion

***The Cracks in the Floor***

1078.   Many environmental crimes involve deception, both before the offense is committed and then later, when the defendant tries to cover his tracks.[751] Here, Apple attempted and did prevent Gjovik from gathering evidence of the cracks in the floor of her office prior to them re-sealing the cracks, by "removing her from the workplace and all workplace interactions." Apple tried to intimidate Gjovik not to report Apple's apparent CERCLA non-compliance. Apple tried to interrogate Gjovik the day before a federal affidavit and fired her hours after she reported "witness intimidation."

**4)   Witness Harassment to Prevent the Production of Evidence**

***Gjovik's 2021 Charges***

1079.   Here, 18 U.S.C. 1512(d) is implicated as Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik. Apple acted with intent to influence, delay, and/or prevent Gjovik from communicating to federal officers and law enforcement authorities' information relating to the commission or possible commission of an offense. There is a reasonable likelihood that at least one of Gjovik's communications targeted by Apple would have been made to a federal officer. The information that would have been communicated by Gjovik related to the possible commission of a federal offense.[752]

1080.   Apple managers, employees, and agents have referred to Gjovik's complaints to the federal and state government about Apple Inc as "*unsubstantiated*," "*meritless*," "*baseless*," "*dead in the water*," and that there's "*no case*." Apple's agents referred to Gjovik as an "*ambulance chaser*" and her cases as "*shakedown lawsuits*." Apple manager Ricky Mondello

---

[751] United States Department of Justice Executive Office for United States Attorneys, *Environmental Crimes–2012*, Volume 60, Number 4, pg89 (July 2012).
[752] 18 U.S. Code § 1512 (d) - Tampering with a witness, victim, or an informant

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

and ex-Apple employees Joanna Appleseed and Shantini Vyas have publicly called Gjovik a *"liar," "predator," "racist," "inconsequential," "not a real whistleblower."* These parties have described Gjovik's protected activities as a *"vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric,"* and *"misinformation."* [all of these posts have been collected, archived, and documented]

1081.   Among other things, Apple Inc & their agents have publicly called Gjovik a *"liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility, dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist, 'universally hated,' a psychopath, paranoid, Bipolar, psychotic, schizophrenic, a grifter, a Karen, a Super Karen, Karenx100, a 'typical feminist,'* and a *'classic cow'.* [all of these posts have been collected, archived, and documented]

1082.   Apple, through named and anonymous accounts (as described throughout the complaint) incessantly harassed Gjovik with public posts attacking Gjovik's ethics, mental health, competence, physical appearance, and moral character. "Incessantly" included flooding the comments sections of article as soon as an article was published about Gjovik, repeatedly creating fake accounts to insert negative content into the Wikipedia article about Gjovik, quickly commenting on social media posts about Gjovik to call her names and make accusations against her, starting threats on social media about Gjovik where they accused her of lying and engaging in criminal conduct, and even messaging Gjovik in real-time to privately harass her about their concurrent public harassment.

1083.   Even before the August 2021+ corrupt harassment started, Gjovik's July 2021 Slack thread about retaliation showed how many people Apple had hurt and how silent they had been about it, and that Apple was silencing complaints at a mass scale. In situations where the Defendant aims for communitywide noncooperation there may also be assault, public

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

humiliation of suspected informants, and random public acts of extreme brutality intended to terrify potential witnesses.[753] (i.e., "*don't get Gjovik'd*").

1084.   Apple's presence in Silicon Valley is directly comparable to the community where a gang operates as both are worlds unto themselves—"*places where people live, attend school, and work, all within a radius of only a few blocks—from which they rarely venture out.*" Hearing about what Apple did to Gjovik is likely to silence anyone else in Cupertino, and it was very effective. Meanwhile, anyone still willing to speak out was directed to Appleseed (an Apple Global Security employee).

### *Gjovik & Batterygate*

1085.   California's constitution provides that privacy is an inalienable right and "*protects against disclosure of, among other things, sexual and non-party contact information.*"[754] Even in litigation, a party's sexual practices are protected by the California Constitution's right of privacy.[755] Any compelled disclosure, "*must be narrowly drawn to assure maximum protection of the constitutional interests at stake.*"[756] During the document "*collection and processing phases, privacy concerns are truly amplified… Those charged with identifying and collecting relevant data may therefore appropriately determine what data sources are likely to contain sensitive information prior to collection.*"[757]

---

[753] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Research in Action: Victim and Witness Intimidation* (October https://www.ojp.gov/pdffiles/witintim.pdf 1995).
[754] Allyson Haynes Stuart, A Right to Privacy for Modern Discovery, 29 GEO. MASON L. REV., Volume 29, Issue 3 (September 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3930199; *Tien v. Superior Court*, 139 Cal.App.4th 528, 539 (Cal. Ct. App. 2006) ("*It protects against the unwarranted, compelled disclosure of various private or sensitive information regarding one's personal life, including his or her …. sexual relationships.*")
[755] Cal. Const. Art. I, § 1; *Vinson v. Sup.Ct.* (Peralta Comm. College Dist.) (1987).
[756] *John B. v. Sup.Ct.* (Bridget B.), supra, 38 Cal.4th at 1200.
[757] Robert D. Keeling and Ray Mangum, *The Burden of Privacy In Discovery*, Judicature (Duke), Vol. 105 No. 2 (September 2021), https://judicature.duke.edu/articles/the-burden-of-privacy-in-discovery///

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1086.   Gjovik worried if she had an ethical duty to disclose to the man that Apple put his sexts in their 'permanent evidence locker' but because Apple says everything internal at Apple is confidential, she worried that saying anything to him would violate Apple policies. Further, she now realized Apple could be watching everything she does and if Apple did choose to take more personal data than they needed as a way to intimidate her to stay quiet about what happened in 2016, she worried Apple could be watching her to see what she does and possibly escalate their intimidation if it looks like she is not being a 'team player.' It's entirely possible this was Apple's objective.

### *The Federal Monitor*

1087.   Enforcement monitorships use independent compliance consultants to review, evaluate, remediate and oversee the specific controls in place to prevent a recurrence of the subject misconduct.[758] Monitors are essentially paid fact witnesses, thus it flow that the party the monitor is assigned to would violate witness intimidation laws if it was to attempt to threaten/intimidate/coerce a monitor to change its reports about what it has witnesses with the party. There is a splendid example of Monitor Intimidation with Apple's court appointed anti-trust monitor from 2013-2015.

1088.   Gjovik was surely not the only federal witness Apple has intimidated. Apple was sued by US FTC and US DOJ in 2013-2014 for violating THE SHERMAN ACT. In court decisions in the US District Court and the 2nd Circuit of Appeals, the Judges complained that Apple was not taking the law seriously, showed no contrition, was only providing cryptic responses, showed '*strained and unreasonable*' readings of the law, took a '*confrontational and obstructionist approach*' to the lawsuit, dragged their feet and sat on their hands, and was not

---

[758] GIR, *When do Enforcement Agencies Decide to Appoint a Monitor?* , https://globalinvestigationsreview.com/guide/the-guide-monitorships/third-edition/article/when-do-enforcement-agencies-decide-appoint-monitor

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

complying in good faith.[759] The District Court went so far as to say there was a "*blatant and aggressive disregard at Apple for the requirements of the law.*"[760]

1089.   Following the decision against Apple, the court appointed a monitor to oversee Apple's response to the decision and ensure Apple began to comply with antitrust laws. Michael Bromwich was appointed as the monitor. Bromwich had previously worked as a federal prosecutor, as associate counsel in the Office of Independent Counsel for Iran-Contra and was Inspector General for the US DOJ from 1994-1999. The monitor, Bromwich, issued his third report about his experience with Apple on April 16 2015.[761] He described Apple's behavior as "*inappropriate*" and "*adversarial,*" and complained Apple refused to provide evidence of regulatory compliance.[762]

1090.   He complained that Apple had placed the new Compliance Officer in a position reporting to Tom Moyer (head of Global Security) instead of directly reporting to the Apple Board under Ronald Sugar. He called the reporting structure an "*intentional*" "*conflict of interest*", and warned it would compromise the Officer's ability, or even willingness, to challenge Apple's "*risky business decisions.*"[763]

1091.   On October 15 2015, the federal monitor, Bromwich, complained that the chair of Apple's Finance and Audit Committee, Ronald Sugar, admitted to not reading Bromwich's reports beyond the executive summary. Upon hearing Bromwich's feedback, Apple protested it was "*bizarre*" to expect the Chair, Ronald Sugar, to read the entire report from a federal-court-appointed monitor as the result of a lawsuit against Apple by the federal government, of which

---

[759] *U.S. v Apple Inc,* F.Supp.2nd 263 (S. Dist. of NY 2014). *U.S. v Apple Inc,* 787 F.3d 131 (2nd Circuit 2015).
[760] *U.S. v Apple Inc,* F.Supp.2nd 263, supra.
[761] 3rd Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, and *State of Texas v. Penguin Group (USA) Inc., et al.*, No. 1:12-CV-3394 (April 14, 2015).
[762] Id.
[763] Id.

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

Apple lost and was found to have violated THE SHERMAN ACT, despite Sugar being the Chair of the Audit & Finance Committee which claims to oversee regulatory compliance, including antitrust.  Finally, Bromwich, also complained that Apple continued to refuse to provide information about their policies and procedures for investigating possible regulatory compliance issues. The monitor noted "*remarkable resistance*" from Apple on complying with the court order and his monitorship.[764]

1092.   Apple engaged in deranged conduct towards Bromwich, quite similar to some of the actions Apple has taken against Gjovik. Apple had articles written about Bromwich to smear and try to intimidate him. Apple baselessly accused Bromwich of extortion. Bromwich quickly found himself receiving obscene, harassing emails from anonymous accounts. Bromwich even attached some of these emails in his monitorship filings.

---

[764] Fourth Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, No. 1:12-CV-3394 (October 15 2015).

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

Case 1:12-cv-02826-DLC   Document 424-2   Filed 12/30/13

Sunday, December 1, 2013 5:27:1

**Subject:** Piece of Shit

**Date:**   Saturday, November 30, 2013 12:17:54 PM Eastern Standard Time

**From:**   My Site

**To:**    info@bromwichgroup.com

Name: Steve

Email: Blowme@gmail.com

Subject: Piece of Shit

Comments:
You are a thieving schiester piece of shit. There enough misery that beset
you for the rest of your life.

Steve Jobs

765

**Exhibit** *Exhibit in Bromwich's Statement Filed in Response to Apple Attempting to Remove Him*

1093.   Apple is also very likely behind at least some of the deranged press coverage that
came out attacking Bromwich, and the framing of the Monitorship like it was a boxing match.
Some of those articles include:

- Verdict: *I Don't Want Michael Bromwich Messing With My Next iPhone*, John Dean
  (2013)
- Fortune, *Behind Apple's mutiny against its court-ordered e-books monitor: Apple is
  taking aim not just at the court-ordered monitor in the e-books antitrust case, but
  also at U.S. District Judge Denise Cote herself.* (2013)
- The Verge, *Apple granted temporary removal of its hated ebooks monitor,* (2014)
- CPI, *US: Apple looks to put monitor Bromwich out of a job* (2014)
- The Verge, *How Apple's court-appointed monitor became Cupertino's most wanted:
  After losing an antitrust trial, Apple has been facing off with Michael Bromwich.
  Could the fight change how we keep tech giants under control?* (2015)

---

765 US DOJ, Federal Monitor Report Filing, Declaration of Michael Bromwich,
https://www.justice.gov/d9/atr/case-documents/attachments/2013/12/30/302674.pdf

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

- WSJ: *Court Rejects Apple's Bid to Shake Off Corporate Monitor, Michael Bromwich's role as Apple monitor is 'appropriately constrained,' court says* (2015)

1094.   Bromwich and his firm also frequently met aggressions from Apple where they tried to treat the federal Monitorship as if Bromwich worked for Apple, including trying to adjust Bromwich fees. Apple also complained Bromwich was being too invasive.. When Bromwich tried to set boundaries, Apple inciting a social media movement to accuse Bromwich of extortion, whilst concurrently demanding Bromwich be removed from the Monitorship, attempting to humiliate Bromwich in front of the court. Bromwich gathered a dossier of communications with Apple to show his side of the story and filed it to the court in response to Apple's motion, at which point Apple essentially accused him of leaking.

**ii.      Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513)** [766]

1095.   In violation of § 1513(b)(1), Apple engaged in conduct and thereby caused bodily injury to Gjovik and damages the tangible property of Gjovik, and threatened to do so, with intent to retaliate against Gjovik for the attendance as a witness or party at an official proceeding, and any testimony given or any record, document, or other object produced by a witness in an official proceeding. In violation of § 1513(e), Apple, with the intent to retaliate, took any action harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.

1096.   Gjovik put her career and physical safety at risk in order to obtain evidence of what she believed to be criminal acts and violations of federal law.[767] Gjovik worked with state

---

[766] 18 U.S.C.A. § 1961 (B)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

and federal agencies, and law enforcement, to report issues starting in September 2020 with the chemical exposure issues next to 3250 Scott Blvd. Gjovik spent much time gathering information and evidence for the government to support her claims that something was wrong. When the government asked her for more information or a new type of data, Gjovik always followed their instructions and was usually able to gather the data they wanted. These activities included Gjovik entering public, common, or general use areas but stealthily attempting to gather photos, videos, audio recordings, and scientific measurements like air quality readings.

1097.   For example, one night at her apartment, Gjovik went up to the roof of her building through public, unlocked doors but around 11:30pm when she thought no one would be around. She brought with her tVOC monitors and other testing equipment. Once outside on the roof she set up the equipment and began taking photos of the utility lines and vents around her in attempt to figure out where the chemical fumes were coming from. Gjovik was confronted by a private security guard who questioned her about what she was doing. Gjovik became very nervous but showed him the tools and said she was testing the air, showing him the readings, and then Gjovik quickly left the roof. Gjovik's actions were not trivial.

1098.   At Gjovik's office in July and August 2021, Gjovik organized with coworkers about gathering at least photographic evidence of the cracked Superfund floor and they did gather photos of the cracks before Apple could repair them. Gjovik talked with coworkers about doing their own indoor air testing. Gjovik shared information with the US EPA, planned to conduct her own sorbent tube testing, and Gjovik's disclosures about the cracks led to an onsite inspection of the office which found issues. Gjovik was swiftly 'removed from the workplace

---

[767] *United States v Joy Edwards,* United States Court of Appeals for the Sixth Circuit, No. 18-3541 (2019).

**Deleted:** concerted

**Deleted:** her

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

and all workplace interactions' following the photography, talk of her own testing, and prior to the inspection.

1099.   Apple even openly admitted to retaliating against Gjovik for her complaints about the Gobbler application, a clear violation of California state law and federal NLRB and FTC laws. While Gjovik initially brought her complaints about Apple's Gobbler practices to the press and public, and Apple said that is why they fired her, Gjovik continued to raise the issue filing additional charges to the federal government and law enforcement about Gobbler and also Apple's position on it. Apple continued to retaliate against Gjovik for doing so.

1100.   Even the evidence noted in this complaint post-termination was diligently gathered by Gjovik in preparation of filing additional complaints to the US government about Apple's ongoing misconduct. Gjovik diligently documented and preserved Apple's deranged harassment. Most people would have given up – or at least would not have the strength to create a memo of this type of harassment. Gjovik did, and so Apple retaliated even more.

1101.   Even Apple's formal Business Conduct Policy states: "*Apple will not retaliate— and will not tolerate retaliation—against any individual for reporting a good-faith concern or complaint to a manager, People, Legal, Business Assurance and Audit, Finance, or Business Conduct, or for participating in the investigation of a concern or complaint.*"[768] Apple only promises there will be no retaliation if a report is made internally (but not externally).

1102.   The chilling effect of Apple's retaliation against Gjovik has been noted in articles, blog posts, social media, and even turned into memes. Gjovik's ex-coworkers began using the phrase "*get Gjoviked*" as slang for getting fired for speaking out about work conditions. Employees shared the term on message boards and Twitter (You are going to get

---

[768] Apple, Business Conduct Policy, August 2022, https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

"*Gjoviked*"). Further, a submission from an employee to the "AppleToo" employee group stated, "*even as we're writing this, we write it with fear, fear of getting single out and retaliate against, even though HR policy stats that Apple do not tolerate retaliation, after reading what Ashley Gjovik went through, we think the retaliation is real.*"

1103.   Here, it was clear the adverse actions Apple took and continues to take against Gjovik are in retaliation for her protected activities. Timing and ongoing antagonism have often been the basis for the causal link. Where there is a lack of temporal proximity, circumstantial evidence of a `pattern of antagonism' following the protected conduct can also give rise to the inference.[769] The causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two. In *Robinson v. SEPTA*, the intervening pattern of antagonism was so strong that it overcame the lack of temporal proximity and, alone, proved the causal link. There was no need to look beyond this pattern for other circumstantial evidence.[770] Apple's retaliation against Gjovik has been swift, continuous, and merciless. Apple's threats and intimidation did not have to succeed in order to find Apple liable and culpable for the harm and injury that Apple has caused to Gjovik and to others through its conduct directed towards Gjovik. Gjovik persists in fighting Apple and seeking justice for her harm, continuing to speak publicly encouraging reform and anti-corruption efforts, while Gjovik treads water personally. Gjovik's determination, despite her severe and extensive injuries, to keep her head up for the sake of others, does not excuse Apple's egregious misconduct. As Industrial Workers of the World member and labor activist Joe Hill said at his execution: "*Don't waste any time in mourning. Organize.*"[771]

---

[769] *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir.2002).
[770] *Robinson v. SEPTA*, 982 F.2d 892 (3d Cir. 1993).
[771] Howard Zinn, A People's History of the United States, p. 335

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**1) Retaliation and Conspiracy to Retaliate Against Witness for Providing Testimony and Evidence**

1104.   Apple retaliated against a Federal Witness & Informant in violation of § 1513(b). Apple knowingly engaged in conduct with intent to retaliate for testimony given and records/documents produced by Gjovik in an official proceeding, and for Gjovik providing information relating to the commission or possible commission of a federal offense. Apple's conduct threatened to and did cause bodily injury to Gjovik and damaged Gjovik's property. Apple also conspired to commit one or more § 1513(b) offenses.

1105.   Appleseed made numerous derogatory posts on social media about a federal informant and witness, Gjovik, who testified against Appleseed's team at Apple, a team which leads the criminal enterprise at issue in the RICO claim. Appleseed's posts intended to retaliate and did cause Gjovik harm. There is no question that Appleseed's posts were in response to Gjovik's testimony.[772] Intent can be proven through circumstantial evidence, such as: (1) "the natural consequences likely to flow from the [retaliator's] actions," including fear on behalf of the witness.[773] This is also like the case with Apple's many fake social media accounts and Apple's harassing emails.

1106.   In *U.S. v Camick*, the filing of a Civil Rights Lawsuit was found to violate 18 U.S.C. § 1513. It was found to be filed with an intent to retaliate against a federal witness.[774] Like *Camick*, Apple waited a suspicious amount of time to approach Gjovik at all about the concerns they later hired very powerful attorneys to email her about on October 15, 2021, implying they may sue Gjovik over those concerns. This was only after Apple terminated Gjovik

---

[772] Intent may, and generally must, be proven with circumstantial evidence. *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007).
[773] *United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013)); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014).
[774] *U.S. v Camick*, 796 F.3d 1206 (2015).

480

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

and needed to search for a pretextual explanation – and were also looking for ways to threaten and intimidate her from pursuing legal charges against them.[775]

1107. Similarly, Appleseed only sued Gjovik after Gjovik reported Appleseed to agencies and law enforcement, then citing Gjovik's claims as justification for the lawsuit. During the hearing, Appleseed directly interrogating Gjovik demanding to know why Gjovik reported her conduct to government agencies and law enforcement. "*Why have you made statements like that I am… coercing you, harassing you, intimidating you, threatening you… why were you saying that I was… swatting, threatening, illegally coercing you modify federal charges…Why did you say I'm in active communication with Apple, helping Apple in their campaign of harassment, threats, and horror against the safety whistle blower…*" (Appleseed, 3/1/22)

---

[775] *EEOC v Outback Steakhouse*, 75 F. supp 2d 756 (ND Ohio 1999)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Case 2:22-cv-00807-RAJ-BAT   Document 11-1   Filed 06/21/22   Page 11 of 47

**GJOVIK LEGAL FILING IN US DC CHALLENGE**

```
 1        MR. BLAIR:  That sounds like an argument, Your Honor.
 2        THE COURT:  Just tell us the question.
 3   Q.   (By Ms. Scarlett)  Why do you think -- why have you made
 4        statements like that that I am stalking anybody who --
 5        stalking you, coercing you, harassing you, intimidating you,
 6        threatening you, and telling people that bad things will
 7        happen to them if they support you?
 8        Why were you saying that I was harassing, defaming,
 9        swatting, threatening, illegally coercing you to modify
10        federal charges.  Why we were saying -- it should be
11        mentioned that I am currently under investigation by
12        numerous federal agencies and law enforcement for federal
13        witness intimidation and obstruction of justice.
14        Why have you said that I'm in active communication with
15        Apple helping Apple in their campaign of harassment, threats
16        and horror against the safety whistle blower.  Why did you
17        say I'll report you to Apple if I leak Apple's crimes?  Why
18        did you say --
```

*Exhibit: 3/1/22 testimony during Appleseed's retaliatory lawsuit*

1108.   Civil lawsuits "*that are aimed at preventing citizens from exercising their political rights or punishing those who have done so*" are often known as SLAPP suits.[776] These lawsuits "*are brought, not to vindicate a legal right, but rather to interfere with the defendant's*

---

[776] *Church of Scientology v. Wollersheim*, 42 Cal.App.4th 628, 645 (Cal. Ct. App. 1996); California Code Section 425.16.

482

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*ability to pursue his or her interests.*" [777] Characteristically, the SLAPP suit lacks merit and the "*aim is not to win the lawsuit but to detract the defendant from his or her objective, which is adverse to the plaintiff.*" [778]

### 2) Retaliation & Conspiracy to Retaliate Against Witness for Reporting Federal Offenses

1109.   Apple retaliated against a Federal Witness & Informant in violation of § 1513(e). Apple knowingly, with the intent to retaliate, took actions harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for Gjovik providing to a law enforcement officer truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(e) offenses.

1110.   Apple's harassment against Gjovik was serious acts and courses of conduct directed at Gjovik that caused substantial emotional distress to Gjovik and served no legitimate purpose. Apple's intimidation of Gjovik was serious acts and sources of conduct directed at Gjovik that caused fear or apprehension of Apple by Gjovik and served no legitimate purpose. The serious acts are threatening, retaliatory, harassing, and violent conduct that reasonably influences the willingness of a victim or witness to testify or participate in a federal criminal case or investigation. An individual who affirmatively conceals the commission of a §1513 by another is guilty of misprision. [779]

---

[777] Id.
[778] Id.
[779] CRS Reports for Congress, Obstruction of Justice: An Abridged Overview of Related Federal Criminal Laws, RS22783 (2007); 18 U.S. Code 4, *The elements of misprision of felony under 18 U.S.C. 4 are (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) defendant took steps to conceal the crime.*

### iii.  Predicate Acts Indictable Under Title 11 USC (Securities) [788]

#### 1)  Securities Fraud (15 USC § 78)

1111.   Section 1961(1)(D) defines racketeering activity any offense, including attempts and conspiracies, involving fraud in the sale of securities punishable under any law of the United States.[789] The US government has repeatedly accused Apple of securities fraud in violation of federal law.

1112.   In 2007, the US SEC charged Apple executives with more than 13 counts of securities violations, including at least five fraud charges including false statements to auditors, false reports, falsifying records, circumventing internal accounting controls, and false proxy statements.[790] Apple's corporate secretary and general counsel Nancy R. Heinen created falsified 'Board Meeting' notes for a meeting that never happened in order to back date stock grants for Apple executives. Heinen also falsified Committee meeting notes as part of the scheme. The fraud caused Apple to underreport it expenses by nearly $40 Million.

1113.   In 2019, Gene Levoff (Apple's head of Corporate Law and corporate secretary after Heinen) was indicted by the SEC for twelve felony counts of fraud based on insider trading: six counts of wire fraud and six counts of securities fraud. In 2022, Levoff pled guilty to six counts of securities fraud and agreed to a settlement agreement.[791] Levoff was the senior lawyer at Defendant who oversaw 'corporate law' and all SEC filings and compliance, including

---

[788] 18 U.S.C. § 1961(1)(d)

[789] *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993); *United States v. Bledsoe*, 674 F.2d 647 (8th 1982); *United States v. Pray*, 452 F. Supp. 788 (M.D. Pa. 1978).

[790] US SEC Complaint against Apple Inc, 2007, https://www.sec.gov/files/litigation/complaints/2007/comp20086.pdf

[791] The Private Securities Litigation Reform Act of 1995 ("Reform Act") amended RICO to eliminate securities fraud as a predicate act except where the defendant has been criminally convicted of the securities fraud. 18 U.S.C. § 1964(c); see also Powers v. Wells Fargo Bank, NA, 439 F.3d 1043, 1045-46 (9th Cir. 2006) (vacating dismissal of claim against defendant who had been convicted of securities fraud, but affirming dismissal of claims against co-defendants who had not been convicted).

company-wide ensuring compliance with insider trading laws. Levoff's defense on the criminal charges was claiming that insider trading laws were a violation of the US Constitution.

1114.   From 2013 until his termination in September of 2018, Levoff was Senior Director of Corporate Law at Apple, reporting directly to the General Counsel. Levoff also served on Apple's Disclosure Committee from September 2008 to July 2018, including as chair of the committee from December 2012 to July 2018. [798]

1115.   While not part of the predicate act, but to show pattern, it's worth noting that in November 2016, Apple Corporate Secretary Gene Levoff fought a shareholder proposal about the environment, complaining that shareholders were trying to micromanage Apple's environmental practices and argued Apple's environmental statements are not false, citing NGOs and other groups praising Apple but failing to mention Apple's capture of these groups as part of its enterprise and schemes.[799] Levoff fought another shareholder proposal about Apple's environmental practices in November of 2017, complaining again of micromanaging and claiming Apple's actually doing a great job.[800]

### i.   Predicate Acts Indictable Under §2332(b)(g)(5)(B)

1116.   Subsection G was added to Section 1961(1) and made "any act that is indictable under any provision listed in section 2332b(g)(5)(B)" of Title 18 a RICO predicate offense. 18 U.S.C. § 2332b(g)(5)(B) lists approximately fifty offenses that may constitute RICO predicate offenses under 18 U.S.C. § 1961(1)(G).

---

[798] *US SEC v Gene Levoff*, Civil No. 2:19-5536, Feb. 13 2019; *SEC Charges Former Senior Attorney at Apple with Insider Trading*, Feb. 13 2019, https://www.sec.gov/litigation/litreleases/lr-24399
[799] US SEC, Apple, 2016, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2016/christinejantzapple120516-14a8.pdf
[800] US SEC, 2017, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2017/sustainvestasset121217-14a8.pdf

**Deleted:** <#>Gjovik accused Apple of fraud and violating securities law in July-August 2021 and filed her first SEC whistleblower tip about it on September 1, 2021. Gjovik complained Apple had been making materially false statements about their actual environmental, labor, and regulatory compliance practices to shareholders and the SEC. Gjovik also accused Apple of a conflict of interest with Ronald Sugar and her Superfund office. She was concerned, due to the poor condition of her office, and Apple's fervent cover-up about it, that Sugar had used his position on Apple's Board of Directors to influence Apple in ways to benefit his prior company, Northrop Grumman (i.e., interested party transactions, RESPA, etc.). Gjovik was also concerned he had a personal interest in covering up Gjovik's concerns in order to protect Northrop Grumman. The owner of Gjovik's office was CalSTRS, one of Apple's largest shareholders. Fraudulent regulatory filings about her office, including omission of required information to the US EPA, would defraud a key shareholder (with CalSTRS owning around $4 Billion of Apple stock in 2021.[792]¶
<#>Gjovik's concerns included public misstatements and fraudulent claims about Apple's actual environmental practices compared to what Gjovik saw internally (reckless disregard for the law and safety), Apple's actual labor practices (Apple is actually one step away from installing the Foxconn "suicide nets" at Apple Park[793]), and Apple's general regulatory compliance and issue investigation practices (which is just mostly witness intimidation and retaliation). Apple promotes these topics and the false claim they are ethical leaders in these fields to attract customers to buy their products and to encourage investors to buy and hold Apple stock.¶
<#>As noted in the Wire & Mail Fraud sections, Gjovik also discovered concrete evidence of Apple's fraudulent statements to shareholders and the SEC about their environmental practices. Apple's SEC filings and proxy statements include 'Environment Progress Reports' which include detailed reporting on Apple's air emissions and hazardous waste generation. The items below are also included in mail/wire fraud. ¶
<#>For instance, Apple reported that in 2021, they sent 1,599 tons of hazardous waste to disposal facilities from corporate facilities globally. Based on manifests, 512 tons of that global waste (32%) came from the facility at 3250 Scott Blvd. ¶
<#>Apple also noted on the amount of waste they "diverted from landfills" and highlighted this number in the report under program they called "Zero Waste" saying they are moving towards "*waste-free operations*". Apple claimed in 2021 they "diverted" 491,000 tons of waste. Apple said, "*we maintain our commitment to the safe and responsible management of hazardous waste, both onsite and offsite.*" ¶
<#>Meanwhile, at least at 3250 Scott Blvd, we have learned the way Apple was 'diverting' waste was blasting solvent fumes and toxic gases out their exhaust vents and into apartment windows.[794] Apple tells its shareholders it is engaging in environmentally friendly practices in order to reduce waste, however Apple is only reducing the paper trail and cost of its waste by illegally disposing of dangerous chemicals into residential neighborhoods.¶
<#>Apple knew exactly how dangerous those emissions were and still did it, and while they gassed a neighborhood, they also made public statements about the dangers of the same chemicals. For instance, Apple banned the use of NMP in their supply chain for years due to safety concerns and Apple even requires vendors to certify that they are not using it. Meanwhile, Apple blasted hundreds of pounds of NMP into Gjovik's windows in 2020. ¶
<#>In 2021, Apple also instituted a "ESG tool" for executive pay that can increase or decrease Executive Compensation 10% based on environmental (and other) practices. Apple's environmental violations were not just to save money on pr... [16]

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

### 1) Relating to Chemical Weapons (18 USC § 229) [801]

1117.   In 1987, a U.S. Representative spoke to Congress about RICO's coverage of illegal hazardous waste disposal – explaining that the mob, with its traditional involvement in garbage disposal and operating landfills, was particularly well-suited to move into hazardous waste disposal due to its history of controlling major portions of the garbage industry in some areas and through labor racketeering. [802] The U.S. Representative argued that the congress must "begin to view the illegal dumping of hazardous waste, not only as an economic crime, but as a crime of violence."

1118.   The Weapons of Mass Destruction Prohibition Improvement Act of 2004 added 18 U.S.C. §§ 229-229F (relating to chemical weapons) as a RICO predicate offense in Section 1961(1)(B). 18 USC § 229 was created to implement the United States treaty obligations for the "Chemical Weapons Convention."[803]

1119.   This case ultimately revolves around facts related to hazardous waste and chemical exposure. Apple did in fact chemical weapon attack Gjovik's apartment, and then terrorized Gjovik to cover up their chemical weapon attack, thus a RICO claim to seek remedy for the property damages seems appropriate.

1120.   Apple possessed chemicals not intended for peaceful purposes, protective purposes, unrelated military purposes, or law enforcement purposes, as described in 18 U.S.C. § 229F(7).[804] The US government defines "peaceful purposes" in *US v Bond*: "*As a matter of simple English, use of a highly toxic chemical to injure or kill another individual is not use of the*

---

[801] 18 U.S.C.A. § 1961 (G); 18 U.S.C.A. § 2332 (B) (i)
[802] "*Mob Involvement in Hazardous Waste Disposal: Why We Need a Strong RICO*," Aug. 7, 1987. 134 Cong. Rec. H6788 (daily ed. Aug. 10 1988). [U.S. Representative John Conyers, Michigan, 1965-2017].
[803] *Bond v US*, SCOTUS Amicus Brief from US DOJ, https://www.justice.gov/sites/default/files/osg/briefs/2013/01/01/2012-0158.mer.aa.pdf
[804] *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).

486

Deleted: attacked

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*chemical for a peaceful purpose. To the contrary, that is use of a chemical as a weapon.*"[805] Further, activities are only peaceful if they are non-malicious and socially beneficial.[806]

1121.   The statute's mens rea is "*knowing*" which is the same standard for the Clean Air Act. CAA instructs that it is enough the perpetrator know that a release of hazardous air pollutants into the ambient air places another person in imminent danger of death or serious bodily injury, and knowledge of the emissions occurring is enough.[807] The CAA also has a lesser violation for negligent emissions.

1122.   The OPCW and Section 299 define "Toxic Chemical" for the purposes of "chemical weapon" quite generally as: "*Any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.*" Similarly, the exception of "peaceful propose" is also quite broad and cases often find general intent to release dangerous chemicals in a way that could cause mass suffering to be sufficient mens rea.

1123.   Many cases have referenced chlorine gas as a chemical weapon, even though it is not listed in the Treaty Annex II, and courts have decided "*intending to release chlorine gas into an apartment building*" was enough to convict.[808] While some toxic gases are commercially available, under *Bond*, they may serve as chemical weapons when used to make gas bombs, thus invoking 18 USC § 229.[809]

---

[805] *Bond v United States*, Brief for the United States, On Write of Certiorari to the US Court of Appeals for the 3rd Circuit, In the Supreme Court of the United States, No. 12-158
[806] Id.
[807] § 7413(c)(5)(A).
[808] See *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [Bond] suggested, it may serve as a chemical weapon when used to make a chlorine bomb."); *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *6–7 (D. Haw. Jan. 21, 2021) (defendant who released chlorine gas in a residential neighborhood); *United States v. Fries*, No. 13-10116 (9th Cir. 2015) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood).
[809] See *Kimber*, 777 F.3d at 561.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1124.   At 3250 Scott Blvd, Apple even stored and used chemicals that are listed on the Chemical Weapons Treaty Annex including Phosphorus Trichloride.

1125.   Apple also used chemicals listed on Department of Homeland Securities list of "Chemicals of Mass Effect" including arsine, phosphine, and chlorine gases.[810]

1126.   Apple repeatedly leaked phosphine gases from the factory at 3250 Scott Blvd, in at least 2019 and 2021. The incident report in 2021 notes Apple vented the phosphine gas into the exterior air (and into the apartments).

1127.   While sick in 2020, Gjovik would wake up occasionally at 3am feeling like she was dying and with symptoms of heart failure (which Gjovik complained to her doctors about at the time). Heart monitoring showed arrythmias and blood pressure monitoring showed very slow heart rate and very low blood pressure. All of those symptoms match Phosphine and Arsine gas exposure which can quickly become lethal. Gjovik felt like she was dying because Apple had some sort of auto-release of gases at 3 AM and chemical weapon attacked her in her bed, and she probably could have died.

1128.   Apple has a great quantity of Arsine gas on site and Gjovik's medical tests from September 2020 showed arsenic in her blood with no other explanation than Arsine gas exposure. Gjovik had one of those 3am spells before she had her blood and urine tested for chemicals and heavy metals early the next morning. Gjovik's blood showed arsenic at an elevated level but none in her urine. Arsenic in blood has a ~8hr half-life, and only shows in blood but not urine when exposed to Arsine gas (instead of ingesting arsenic). Apple chemical

---

[810] DHS, Chemicals of Interest, https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

weapon attacked Gjovik with Arsine gas in her bedroom. Arsine gas becomes life threatening at

only 0.91 parts per million over 10 minutes. There is no antidote for arsine gas poisoning.[811]

1129.   Multiple occupational and environmental exposure doctors told Gjovik all of her

symptoms were consistent with solvent exposure and other chemical exposures. The most

noteworthy correlation was that exposure to solvent vapor and other gases can cause decreased

heart rate (see below), volatile blood pressure (which Gjovik had confirmed via 24-hour blood

pressure monitor), the rashes and burns on Gjovik's body, and Gjovik's symptoms of dizzy

spells, fainting, numbness, and muscle spasms.



*Exhibit: Gjovik's Heart Rate (Dipping in 2020)*

1130.   Apple was cited in 2020 for failing to report its stockpile of Chlorine gas at 3250

Scott Blvd to regulators. Apple also has a history of gassing its employees with Chlorine. At

least two chlorine gas leaks have been reported at Apple facilities. In 2012 there was a chlorine

gas leak at an Apple factory which killed one worker and injured another four workers.[812] There

---

[811] US CDC, *Arsine Emergency Response,*
https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750014.html
[812] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China,* July 2012,
https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-china-flna714480

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

was a chlorine gas leak at an Apple data center in 2015 resulting in an evacuation, HazMat response, and multiple employees taken to the hospital.[813]

1131.   Gjovik's blood and urine medical tests also revealed the presence of several other industrial chemicals including Toluene (Hippuric Acid) and Xylene (2-3-4 Methylhippuric Acid (2,-3-,4-MHA) in her urine.



*NOAA: Phosphine*                     *NOAA: Arsine*

---

[813] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015, https://www.theregister.com/2015/06/01/apple_data_center_chlorine_gas/ ; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015, https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25



*NOAA: Chlorine*

*NOAA: Silane*

*NOAA: Toluene*

*NOAA: NMP*

491

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1132.   At 3250 Scott Blvd, Apple's use, storage, and release (intentional and unintentional) of very toxic gases has the potential to produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emission, if it has not already occurred, could easily cause injuries and death. These use and release of these gases could injure first responders and should require the evacuation of an entire neighborhood and HAZMAT procedures if there were to be significant leak/spill. Apple is not only in "*possession of extremely dangerous substances with the potential to cause severe harm to many people,*" but Apple has taken intentional acts to ensure no one knows they have these chemicals or that they are releasing these chemicals into the neighborhood air.

1133.   Apple attempted to and did acquire, transfer, receive, stockpile, retain, own, possess, use, and/or threaten to use chemical weapons. Apple assisted or induced another person to do the same or attempted to conspire to do the same.[814] Apple is not an exempted agency or person.

1134.   Apple has been on notice about the dangers of these toxic gases for decades. Apple was founded in the 1970s and would have witnessed the Union Carbide/Bhopal incident in 1984.[815] Apple's local toxic Gas laws in Santa Clara County were designed to prevent a similar "*catastrophic gas leak.*" These laws apply to Apple's facility in Santa Clara County. "*The law's goal is to prevent a disaster such as the 1986 gas leak in Bhopal, India that killed 2,800 people.*" Palo Alto City Manager Bill Zaner said, "*This is the single most important piece of toxics legislation in the county in the last five years.*" Ted Smith noted the most common

---

[814] 18 U.S.C. § 229(a)(2)
[815] NYT, *Gas Cylinders Removed from Blast Site in Jersey*; https://www.nytimes.com/1988/03/20/nyregion/gas-cylinders-removed-from-blast-site-in-jersey.html

Deleted: intention

Deleted: 1986

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

gases used for semiconductor fabrication are also "*the most deadly*" including arsine and phosphine.[816]

1135.   Many of the chemicals Apple had on site, sometimes in bulks, were characterized as "extremely hazardous" or "acutely hazardous" materials.[817]

1136.   Apple knowingly released many other chemicals from their facility including while Gjovik was there. Apple knowingly did so without proper abatement and apparently without even changing their charcoal filters for over six years. Apple admitted to releasing NMP into the outdoor air despite it being so hazardous it is now banned under TSCA.

1137.   These chemicals and gases not only harmed Gjovik physically, but they harmed an incredible amount of Gjovik's property, of which Gjovik has photographs and other evidence documenting the stains and degradation.

1138.   It is clear that Apple's retaliation and intimidation against Gjovik was not just about her office or her other complaints, it was also an attempt to coverup what Apple did to her at 3250 Scott Blvd. Apple's termination of Gjovik's employment was also an injury from this Predicate Act.

---

[816] Silicon Valley Toxics Coalition, *Silicon Valley Toxics News*, Volume 7, No. 1, Winter 1989; Santa Clara County Ordinance Code, Division B 11, Chapter XIV

[817] 8 CCR § 5189(b)(1), (c) … "acutely hazardous materials" (generally, bulk quantities of specifically designated explosives, flammable gases and liquids, and other highly toxic or reactive substances)." (includes phosphine, arsine, and chlorine, https://www.dir.ca.gov/title8/5189a.html)

**Deleted:** manufacturing

**Deleted:** It is clear that Apple's retaliation and intimidation against Gjovik was not just about her office or her other complaints, it was also an attempt to coverup what Apple did to her at 3250 Scott Blvd. Apple's termination of Gjovik's employment was also an injury from this Predicate Act. ¶

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

**Table 5: 3250 Scott Blvd: Rogue Chemicals; Risk Categories**

| | Release / Leak / Spill / Violation | California "Proposition 65" [818] | US EPA "Extremely Hazardous Substances"[819] | TSCA Review: "Unreasonable Risks to Public Health"[820] | DHS Chemicals of Interest[821] |
|---|---|---|---|---|---|
| **Phosphine Gas** | Multiple Leaks | | x | | x (flammable; weapon of mass effect) |
| **Silane Gas** | Multiple Leaks | | x | | x (flammable) |
| **Arsine Gas** | Blood test | x (cancer) | x | | x (toxic; weapon of mass effect) |
| **Chlorine Gas** | Code violation for not reporting | | x | | x (toxic; weapon of mass effect) |
| **Benzene** | Indoor Air | x (cancer) | | | |
| **Ethylbenzene** | Indoor Air | x (cancer) | | | |
| **Toluene** | Indoor Air | x (cancer) | | | |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | x (cancer) | | x (January 2023) | |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | x (development) | | x (December 2022) | |

1139.   Apple's possession and use of these chemicals knowingly and intentionally occurred without proper permits, in violation of reporting and risk management laws, with repeated code violations and leaks/spills, and without proper abatement technology. Apple has already harmed people, property, and the environment with its chemical weapons and the harm occurred but for Apple's refusal to comply with basic health/safety, environmental, and HazMat regulations in pursuit of the cheapest and quickest way to produce a result and to avoid reporting

[818] Proposition 65, https://oehha.ca.gov/media/downloads/proposition-65/p65chemicalslistsinglelisttable2021p.pdf
[819] Appendix A to Part 355—The List of Extremely Hazardous Substances and Their Threshold Planning Quantities, https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-355
[820] TSCA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca
[821] DHS CISA: https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

the waste and harm associated with the unlawful approach in regulatory filings. The full extent

of Apple's misconduct will likely be revealed when US EPA releases the results of their August

17 2023 (per the EPA website) inspection of the factory, which was triggered by a complaint

filed by Gjovik in June 2023.

1140.   Apple was not using those chemicals for peaceful purposes. While a theory as to

what Apple's non-peaceful purpose was is not required at this stage,[822] one possible theory is

Apple's non-peaceful purpose was to violate environmental and health/safety laws in order to

produce off-books prototypes at the lowest cost and with the least amount of government

oversight, in knowing violation of federal, state, and local laws. Another non-peaceful purpose is

that Apple intended to store toxic gases and release them out of their exhaust,[823] in violation of

air quality and hazardous waste laws, knowing the chemicals would enter hundreds or thousands

of residential homes, but doing it anyways because it cooked the books on their environmental

regulatory filings and statements to the public and the press.

1141.   The threshold is very low for establishing a violation of §229 in the pleading

stage.[824] Here, like other 18 USC 229 cases, highly volatile and poisonous substances were

repeatedly released into highly trafficked areas, placing many people at risk of serious harm and

mass suffering.[825]

---

[822] *US v. Sandomire*, CR 20-00085 JMS, at *5 (D. Haw. Jan. 21, 2021). *US v Mancuso*, 718 F.3d 780 (9th Cir. 2013)., quoting *United States v. Cochrane*, 985 F.2d 1027, 1035 (9th Cir. 1993).
[823] In *US v Sandomire*, a sufficient non-peaceful purpose to satisfy an indictment was an allegation of intent to create chlorine gas and release it into a large residential apartment building in downtown Honolulu. *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).
[824] *Renfro v. J.G. Boswell Co. Inc.*, No. 117CV01069LJOSAB, 2017 WL 6611190, at *13 (E.D. Cal. Dec. 27, 2017), report and recommendation adopted, No. 117CV01069LJOSAB, 2018 WL 10322173 (E.D. Cal. Mar. 1, 2018)
[825] *U.S. v. Kimber*, C.A.2 (N.Y.) 2015, 777 F.3d 553, certiorari denied 136 S.Ct. 170, 577 U.S. 869, 193 L.Ed.2d 123. *Bond v. United States*, 572 U.S. 844, 865, 134 S. Ct. 2077, 2093 (2014)

---

Deleted: US SEC

Deleted: shareholders

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

### ii.   Injury in Fact to Plaintiff due to Racketeering Act

1142.   Gjovik's injuries from all Predicate Acts and racketeering were "by reason of" a RICO violation.[826]  Apple's racketeering led directly to the plaintiff's injuries.[827] Gjovik's injuries stem from Apple's retaliatory actions, RICO predicate acts, and several actions which were both retaliatory and RICO predicate acts, including Gjovik's termination as a violation of 18 USC §§ 1512 and 1513. Apple's retaliation and termination of Gjovik are all part of the same RICO scheme to cover-up Apple's wrongdoing.[828]

1143.   A person's loss of a job, such as a termination, is an injury to one's business or property.[829] In situations where a termination itself is another RICO violation (i.e. §1512, §1513, etc.) in continuous racketeering and fitting the pattern of existing racketeering, or otherwise a result of a pattern of racketeering activity, then the termination is an injury-in-fact under RICO.[830] It would be contrary to public policy and the legislative intent of the RICO Act to immunize employers who are engaged in RICO acts, when one of their employee tries to blow the whistle to the feds on the employer's RICO activity (i.e. testifying to federal agencies, or informing to the FBI, etc.), and the employer responds to terminate the whistleblower with the intent and in a way which would violate additional RICO predicate act statutes. Racketeering is not "*transmogriff[ied]*" into something else simply because there is a termination of employment.[831]

---

[826] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)
[827] *Anza*, supra, at 461, 126 S.Ct. 1991; *Holmes*, 503 U.S., at 268, 112 S.Ct. 1311; *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55, 128 S. Ct. 2131, 2141–42, 170 L. Ed. 2d 1012 (2008)
[828] *DeGuelle v. Camilli*, No. 10-2172 (7th Cir. Dec. 15, 2011)
[829] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 711 (D.N.J. 1998); *Nodine v. Textron, Inc.*, 819 F.2d 347, 348 (1st Cir. 1987)
[830] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)
[831] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)

Deleted: and1513

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1144.   Apple injured Gjovik's business and property, and caused other injuries and loss, due to its Predicate Acts.[832] Apple injured Gjovik's business by terminating Gjovik' for a reason Apple knew would denylist Gjovik from working in law or for corporations, and knowing she would be forced to self-publish the reason and that it would be exposed in the already initiated legal proceedings. Apple's harassment of Gjovik ruined her reputation and ostracized her from the groups she hoped to work with and for with her legal degree. Gjovik had over $500,000 in unvested RSUs and a pending annual bonus at the time of her termination which she would have been granted and vested if she was not fired. Apple's criminal termination of Gjovik resulted in business-related financial injury.[833]

1145.   Apple interfered with Gjovik's leasehold (forcing her to move), employment (requiring her to take months of disability leave), and injured Gjovik's property (through destruction, conversion, and diminution in value) with their illegal chemical emissions, including 7.8 tons of VOCs omitted 300 feet from her windows the year she lived next to Apple's factory.[834] Gjovik has documented destruction of clothing and jewelry from the chemicals, of which Apple engaged in falsification of records, obstruction, and witness tampering. Gjovik has photos and other evidence of the specific chattel property, with receipts of purchase, that was discolored or otherwise degraded by chemical exposure, as well as real time complaints in 2020 and 2021 about the discoloration and the state Department of Public health agreeing it looked like solvent exposure. "Harms associated with hazardous substances …. are clearly within the ambit of [RICO's] protection."[835]

---

[832] *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975-76 (9th Cir. 2008) (citing *Sedima*, 473 U.S. at 496); see *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013).
[833] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985).
[834] See, US EPA EIS data for 2020; *Ayers v. Jackson Twp.*, 106 N.J. 557, 608–12, 525 A.2d 287, 314–16 (1987).
[835] Ian Lyngklip, *RICO and Environmental Harms from Hazardous Substances*, 69 U. Det. Mercy L. Rev. 255, 282–83 (1992).

Deleted: bonsu

Deleted: 300ft

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25






*Exhibit: Gjovik's clothing, metals, and plastics turned yellow and/or reacted with oxidation*

1146.   Apple injured Gjovik's property through 'bugging' an item at her desk when they mailed her back her possessions, causing Gjovik to have to transfer her property to police custody for investigation. Apple injured Gjovik's property when it broke into her home and 'bugged' one of her fake trees and upon discovering the RF and EMF signals emanating from the fake fig tree, Gjovik disposed of the tree into a dumpster and complained about it on social media. (Gjovik also has the receipt for original purchase of the tree). Due to Apple's surveillance and hacking, Gjovik's property was injured in that it was compromised by Apple and Gjovik had to disconnect and dispose of it to protect herself from Apple. Property included Apple products of which Apple could monitor her via server use and logging, 'smart home' accessories which were hacked and controlled by hackers at least once, her router which was assumed to have been compromised when the equipment in the attic was installed by Apple, and other instances of damage.

498

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1147.   Apple injured Gjovik's property when they mailed her possessions back from her desk as a threat, posting online the box may contained a severed head of one of Gjovik's loved ones, and ensuring the box did contain a listening device in one of Gjovik's possessions, along with a very poorly packed box that ensured the salt lamps from Gjovik's desk (aka rocks) broke the glass on Gjovik's picture frames and glasses at her desk, resulting in a box full of rocks, broken glass, and a listening device – if Apple didn't intentionally destroy Gjovik's property before it was shipped.

1148.   Apple injured Gjovik's business and property when it harassed her at and around her home to the extent she was forced to leave the west coast to escape Apple, and moved to New York next to a state executive building with state police stationed 24/7 outside her home. By being forced to move, Gjovik lost the opportunity to obtain work in Silicon Valley, Gjovik had to get rid of many of her belongings because she could not afford to move them, and several items were destroyed in transit.

1149.   Gjovik's injury occurred by reason of the Apple's violations.[836] If Apple had not engaged in unlawful conduct, including unauthorized air pollution and chemical releases, then Gjovik's property would not have been damaged. If Apple had not engaged in a cover-up, then Gjovik would have known to protect her property from Apple. If Apple had not engaged in a cover-up scheme, they would not have hacked into Gjovik's electronics, mailed her a bugged object, or broke her chattel property. These are concrete examples of financial loss. [837]

1150.   Apple stained specific items of clothing, Apple caused reactions on the metal of specific items of clothing and jewelry, Apple bugged a specific fake tree, Gjovik lost concrete

---

[836] *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-11 (2010); see also *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 698-99 (S.D. Tex. 2010).
[837] *International Raelian Movement*, 2:08-cv-0687 FCD DAD, 11-12 (E.D. Cal. Sep. 1, 2010)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

salary and RSUs when she was terminated, and so on. Civil RICO laws grant standing to any

victim that sustained real injuries to his or her business or property. [838]

1151.   The plaintiff must instead allege injury from an act that is analogous to an "*ac[t]*

*of a tortious character*.", The specific type of act that is analogous to an act of a tortious

character may depend on the underlying substantive violation the defendant is alleged to have

committed. Plaintiff must allege an act of racketeering and that is independently wrongful under

any substantive provision of the statute.[840] Gjovik details the many torts and statutes violated by

Apple inline and in the footnotes of this complaint.

### iii.      Continuity & Threat to Continue

1152.   Apple has engaged in a series of related predicate acts, extending over a

substantial period of time (decades). Further, Apple started a series of related predicate acts, and

it is clear will continue these acts into the future unless there is intervention. Apple's misconduct

is so persistent and egregious, and so dependent on continued intimidation of witnesses to keep

witnesses quiet about what they know, that its impracticable that Apple would ever voluntarily

stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the

inertia of organized crime.

### D.      TORT: ULTRAHAZARDOUS / ABNORMALLY DANGEROUS ACTIVITIES

1153.   Apple's activities at 3250 Scott Blvd and 825 Stewart Drive provided a high

degree of risk of great harm to people and property, and the risk could not be eliminated by the

exercise of reasonable care, the activities benefit does not outweigh the risk, and these activities

are inappropriate for the location, and are not common. "Where one, in the conduct and

maintenance of an enterprise lawful and proper in itself, deliberately does an act under known

---

[838] *Canyon County v. Syngenta Seeds*, Inc., 519 F.3d 969, 972 (9th Cir. 2008); *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).

[840] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

conditions, and, with knowledge that injury may result to another, proceeds, and injury is done to the other as the direct and proximate consequence of the act, however carefully done, the one who does the act and causes the injury should, in all fairness, be required to compensate the other for the damage done."[841]

1154.   One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels or another resulting from the activity, although he has exercised the utmost care to prevent the harm.[842] Put another way, *"We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to mischieve if it escapes, must keep it at his peril, and if he does not do so, is prime facie answerable for all the damage, which is the natural consequence of its escape."*[843]

1155.   Ultrahazardous activities often "involve damage caused through fault or damage caused by constructions, by escaping dangerous substances, such as dammed water or sewerage, and by ultrahazardous activities such as dynamite blasting, spraying noxious chemicals, and pile driving operations by heavy equipment."[844] The use of a property for production, storage or disposal of hazardous substances may constitute an "abnormally dangerous" ("ultrahazardous") activity subject to strict liability in tort.[845]

---

[841] CA Civ Code § 3514 (2022), "3514. One must so use his own rights as not to infringe upon the rights of another." *Green v. General Petroleum Corp.*, 205 Cal. 328, 333-34 (Cal. 1928).  (sic utere tuo ut alienum nonlaedas).
[842] Restatement (Second) of Torts, § 519.
[843] *Rylands v. Fletcher*, (1868) 3 L.R.E. & I. App. 330 (H.L.).
[844] A. Yiannopoulos, *Predial Servitudes* 4 La.Civil Law Treatise, § 50 at 139-40 (1983); *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 543 (W.D. La. 1992).
[845] Rest.2d Torts § 520; D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D; *Ashland Oil, Inc. v. Miller Oil Purchasing Co.* (5th Cir. 1982) 678 F2d 1293, 1307-1308 —chemical waste disposal company and person with whom it arranged to dispose of hazardous substances pursuant to plan to introduce them into crude oil pipeline were strictly liable for engaging in ultrahazardous activity; see also *Ahrens v. Sup.Ct. (Pacific Gas & Elec. Co.)* (1988) 197 CA3d 1134, 1149, 243 CR 420, 428-429—triable issue of fact whether using, maintaining and operating electrical transformers containing PCBs at high-rise office building is "ultrahazardous"]; Tom Kuhnle, *The Rebirth*

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1156.   State law claims of liability for ultrahazardous activities are judged by state precedents and by state laws that control site pollution; a site dealing with hazardous substances that could potentially be destructive can be ultrahazardous. [846] California recognizes a hazardous waste ultrahazardous tort claim,[847] along with Maine,[848] Colorado,[849] Louisiana,[850] New York,[851] Tennessee,[852] Oregon,[853] Montana,[854] and of course New Jersey.[855] The Restatement of Torts also recognizes the claim.[856]

1157.   New Jersey courts, a leading advocate for the use of ultrahazardous tort claims for hazardous waste issues, explained, "*an actor who chooses to store dangerous chemicals should be responsible for the release of those chemicals into the air.*"[857] They added, "*an*

---

*of Common Law Actions for Addressing Hazardous Waste Contamination*, 15 Stan. Envtl. L.J. 187, 217–18 (1996).

[846] *Buggsi, Inc. v. Chevron U.S.A., Inc.*, 857 F. Supp. 1427, 39 Env't. Rep. Cas. (BNA) 1526, 25 Envtl. L. Rep. 20147 (D. Or. 1994); § 6:9. How is a cause of action established for unreasonably dangerous or ultrahazardous strict liability?, 1 Toxic Torts Prac. Guide § 6:9 (2023-2)

[847] *Ahrens v. Sup.Ct. (Pacific Gas & Elec. Co.)* (1988) 197 CA3d 1134, 1149, 243 CR 420, 428-429; *Potter v. Firestone Tire and Rubber Company*, 2 Tx.L.R. 662 (Cal. Super. Ct., Monterey Co. No. 81723, 1987) (court held that disposal of large quantities of toxic waste into a sanitary landfill "is an ultra-hazardous activity that will subject the defendant to strict liability for all damages that result")

[848] *Lefebvre v. Central Maine Power Co.*, 7 F. Supp. 2d 64, 47 Env't. Rep. Cas. (BNA) 1143 (D. Me. 1998), relying on Jacques v. Pioneer Plastics, Inc., 676 A.2d 504, 506–07, 43 Env't. Rep. Cas. (BNA) 1348 (Me. 1996).

[849] *Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir. 1992) [creation of a "ninety-three acre toxic lake" surface impound for hazardous waste was a ultrahazardous activity]

[850] *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 543 (W.D. La. 1992) (The court concluded by holding that the disposal of hazardous waste was ultrahazardous under Louisiana law based on precedent as well as the findings by Louisiana's legislature).

[851] *United States v. Hooker Chemicals & Plastics Corp.*, 722 F. Supp. 960, 966–67 (W.D.N.Y. 1989) [Love Canal].

[852] *Sterling v. Velsicol Chemical Corp.*, 647 F. Supp. 303, 308 (W.D. Tenn. 1986). (federal court found an abnormally dangerous activity under Tennessee law in the 'selection, implementation, operation and burial of more than 300,000 fifty-five gallon drums filled with ultrahazardous chemical waste, and hundreds of boxes of ultrahazardous dry chemical waste).

[853] *Buggsi, Inc. v. Chevron U.S.A.*, Inc., 857 F. Supp. 1427, 1432 (D. Or. 1994).

[854] *Matkovic v. Shell Oil Company*, 707 P.2d (Mont. 1985) (disposal of oil well production water containing hydrogen sulfide is abnormally dangerous).

[855] *State, Dep't of Env't Prot. v. Ventron Corp.*, 94 N.J. 473, 488–93, 468 A.2d 150, 157–60 (1983).

[856] Rest.2d Torts § 520; Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D

[857] *New Jersey Dep't of Env't Prot. v. Alden Leeds, Inc.*, 153 N.J. 272, 287, 708 A.2d 1161, 1168 (1998). See *DeEugenio & Sons v. Division of Envtl. Quality*, 92 N.J.A.R.2d (Vol.5) (EPE) 47, 1992 WL 257715,

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*ultrahazardous [now abnormally dangerous] activity which introduces an unusual danger into the community … should pay its own way in the event it actually causes damage to others.*" [858]

1158.   Oregon courts have explained that "the abnormally dangerous nature of an activity need not be proved by evidence if this danger is recognized by stringent legislative or administrative safety regulations …Whether the danger is so great as to give rise to strict liability depends both on the probability and on the magnitude of the threatened harm. If the consequences of a mishap are potentially lethal or highly destructive of health or property, a slight likelihood that they will occur suffices…."[859]

1159.   In 1980, Apple Board member Al Gore (2003-current), then as a U.S. Representative, made "the most extensive arguments in support of a strict liability standard for activities that resulted in hazardous substance releases" and predicted that "*it was only a matter of time before courts began applying the common law doctrine of strict liability for abnormally dangerous activities to the nation's growing hazardous waste problem.*"[860] Gore said, "*there can be little doubt that actions involving hazardous waste would be considered by the courts as abnormally dangerous or ultrahazardous activity sufficient to subject a responsible party to strict liability.*"[861]

1160.   Apple was engaged in an ultrahazardous activity that caused Gjovik to be harmed. Apple's activities were the proximate cause of that harm, and Apple is responsible for

---

aff'd, No. A-4055-91T2, (App. Div. April 2, 1993), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993) (holding that despite lawfulness of open burning in question, consequent deposit of smoke particulate on neighboring property violated N.J.A.C. 7:27-5.2(a)).
[858] *T & E Indus., Inc. v. Safety Light Corp.*, 227 N.J. Super. 228, 239–41, 546 A.2d 570, 575–76 (App. Div. 1988), aff'd as modified, 123 N.J. 371, 587 A.2d 1249 (1991); *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 410, 181 A.2d 487 (1962), quoted in *Ventron*, 94 N.J. at 487, 468 A.2d 150.
[859] *Buggsi, Inc. v. Chevron U.S.A., Inc.*, 857 F. Supp. 1427, 1432 (D. Or. 1994).
[860] Alexandra B. Klass, *From Reservoirs to Remediation: The Impact of CERCLA on Common Law Strict Liability Environmental Claims*, 39 Wake Forest L. Rev. 903, 961–62 (2004); See 126 Cong. Rec. H9462 (1980), reprinted in Needham & Menefee, supra note 90, Vol. II, at 136.
[861] Id.

that harm. People who engage in ultrahazardous activities are responsible for the harm these

activities cause others, regardless of how carefully (or recklessly) they carry out these activities.

Apple damaged Gjovik's chattel property (discoloring, weakening, dissolving glues, causing

reactions), degraded the conditions of her leasehold (which was a $3,800 month lease), harmed

Gjovik's body (as noted in facts), and distressed Gjovik's mind (as noted in Nuisance and IIED).

1161.   Gjovik did not become aware of the cause of her injuries, or sufficient facts to put

her on notice the injuries were caused by the wrongful acts of Apple, until 2022 (for activities at

825 Stewart Drive), and 2023 (for activities at 3250 Scott Blvd). These activities were/are

continuing violations with the harmful conduct occurring through at least 2023. Further, Apple

worked to conceal their role in these activities and the harm to Gjovik until Gjovik discovered

Apple's role and activities in 2022-2023. The statute of limitations is three years, so even

without tolling, it is September 7 2020-September 7 2023, covering periods Gjovik was at her

office and living in her apartment next to 3250 Scott Blvd.[862]

### i.      Silicon Fabrication Next to Homes

1162.   Conducting an activity in the wrong place can render such activity abnormally

dangerous.[863] Operating a silicon fabrication factory can be a ultrahazardous activity. The

activity has a high degree of risk of some harm to people, land, and chattels; a likelihood that the

harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care;

---

[862] Cal. Code of Civ. P. § 338(b); *McCoy v. Gustafson*, 180 Cal. App. 4th 56, 66 (2009); *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583, 595 (2007); *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1149 (1991); *Verse Two Properties, LLC v. MedPlast Fremont, Inc.*, No. 5:14-CV-03765-EJD, 2015 WL 6955133, at *6 (N.D. Cal. Nov. 10, 2015).

[863] Gerald W. Boston, Strict Liability for Abnormally Dangerous Activity: The Negligence Barrier, 36 SAN DIEGO L. REV. 597, 615 (1999); Valerio Spinaci, Lessons From BP: Deepwater Oil Drilling is an Abnormally Dangerous Activity, Nova Law Review, Volume 35, Issue 3 (2011).

504

---

**Deleted:** semiconductor manufacturing

**Deleted:** and operating

**Deleted:** facility on an active Superfund site are both

**Deleted:** activities. Both activities have

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on.[864]

1163.   Semiconductor fabrication adjacent to a residential area is an ultrahazardous activity. For decades, its known to require use of pyrophoric gases which have a "serious fire hazard," combustible and flammable chemicals which must be "carefully monitored and handled by experienced personnel," heating devices and ignition sources, and complex fire suppressant systems. Air handling systems at these plants must control "the spread of contaminants."[865] There is an entire section of the US OSHA website dedicated to semiconductor fabrication.[866]

1164.   Gjovik's home was 300 feet from Apple's fabrication plant. Like in the classic California ultrahazardous activity case, *Alonso v Hills*, an ultrahazardous activity like use of poisons or blasting, only 200 yards (or here, 300 feet) from hundreds of homes in a residential district, will be found to be an ultrahazardous activity with strict liability even without proof of negligence.[867] Gjovik's case is similarly comparable to *Green v General Petroleum*, where oil drilling itself is not an ultrahazardous activity, but the California Supreme Court found that drilling for oil directly next to someone's home (the property line roughly 200 feet away), is indeed a strict liability ultrahazardous activity.[868]

---

[864] Restatement of Torts Second, section 519-520
[865] IMUA's Manufacturer's and Dealer's Committee, "*Underwriting Semiconductor Manufacturing Exposures,*" 2000, https://www.imua.org/Files/reports/Underwriting%20Semiconductor%20Manufacturing%20Exposures.html
[866] US OSHA, Silicon Device Fabrication, https://www.osha.gov/semiconductors/silicon-device-fabrication; Silicon Manufacturing, https://www.osha.gov/semiconductors/silicon ; GA Device Manufacturing, https://www.osha.gov/semiconductors/gallium-arsenide ; GA Device Fabrication, https://www.osha.gov/semiconductors/gallium-arsenide/device-fabrication
[867] *Alonso v. Hills* (1950) 95 C.A.2d 778, 214 P.2d 50; *McKenna v. Pacific Elec. Ry. Co.* (1930) 104 C.A. 538, 540, 286 P. 445.
[868] *Green v. General Petroleum Corp.*, 205 Cal. 328, 333-34 (Cal. 1928)

Deleted: manufacturing

Deleted: The storage of dangerous, highly poisonous gas

Deleted:  IMUA's Manufacturer's and Dealer's Committee, "*Underwriting Semiconductor Manufacturing Exposures,*" 2000, https://www.imua.org/Files/reports/Underwriting%20Semiconductor%20Manufacturing%20Exposures.html US OSHA, Silicon Device

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

1   1165.   Further, "the storage of toxic gases is, without doubt, an ultrahazardous activity."

2   [869] The "manufacture, storage, transportation and use of high explosives" and welding a gas tank

3   are ultrahazardous activities.[870]   The OSHA website notes, "Unexpected releases of toxic,

4   reactive, or flammable liquids and gases in processes involving highly hazardous chemicals have

5   been reported for many years."[871]

6

7   1166.   Chlorine gas is a deadly choking agent which can severely stress the respiratory

8   system tissue, causing profuse edema resembling drowning, and which can result in death by

9   asphyxiation. [872] In case of an arsine or chlorine spill, "isolate spill or leak area for at least 100

10   meters (330 feet) in all directions."[873] Apple had this gas and was cited for failing to properly

11   report it; Gjovik had these symptoms.

12

13   1167.   Arsine gas is heavier than air and hazardous concentrations may develop quickly,

14   and the odor threshold is 10x greater than the OSHA permissible exposure limit.[874] Arsine is

15   heavier than air and hazardous concentrations may develop quickly in enclosed, poorly

16   ventilated, or low-lying areas. Initial symptoms (malaise, dizziness, nausea, abdominal pain, and

17   dyspnea)."[875]   "Arsine is a highly toxic gas and may be fatal if inhaled in sufficient quantities."

18   The CDC warns "there is no specific antidote for arsine" and that "Arsine is a highly toxic

19

20

21

22

---

23   [869] *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 543 (W.D. La. 1992).
      [870] *Garcia v. Est. of Norton*, 183 Cal. App. 3d 413, 418–20, 228 Cal. Rptr. 108, 111–12 (Ct. App. 1986).
24   [871] US OSHA, Process Safety Management, https://www.osha.gov/process-safety-management
      [872] NIEHS Chemical Incidents Response Training Tool, Worker Education and Training Program,
25   *Protecting Yourself While Responding to Chemical Incidents*,
      https://tools.niehs.nih.gov/wetp/public/hasl_get_blob.cfm?ID=8109
26   [873] US NOAA, *Cameo Chemicals: Arsine*, https://cameochemicals.noaa.gov/chemical/178; *Cameo
      Chemicals: Chlorine*, https://cameochemicals.noaa.gov/chemical/2862
27   [874] CDC, ASTDR, *Arsine MMG*, https://www.atsdr.cdc.gov/MHMI/mmg169.pdf
      [875] CDC, ASTDR, *Arsine Medical Management Guidelines*,
28   https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=1199&toxid=278

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

systemic poison."[876]  Apple had this gas; Gjovik had these symptoms; tests showed Gjovik had arsine in her blood.

1168.   Phosphine is used in the semiconductor industry to introduce phosphorus into silicon crystals as an intentional impurity. Phosphine exposure symptoms include "restlessness, irritability, drowsiness, tremors, vertigo, diplopia, ataxia, cough, dyspnea, retrosternal discomfort, abdominal pain, and vomiting." "Cardiovascular manifestations include hypotension, reduction in cardiac output, tachycardia, irregular heartbeat, or cardiac arrest. Laboratory tests may reveal abnormal myocardial enzymes." There is no antidote for phosphine poisoning.[877] In case of a phosphine spill, "isolate spill or leak area for at least 100 meters (330 feet) in all directions."[878] Apple had this gas and leaked this gas; Gjovik had these symptoms.

1169.   Silane (silicon tetrahydride) vapors may cause dizziness or asphyxiation without warning. Some may be toxic if inhaled at high concentrations. Contact with gas or liquefied gas may cause burns, severe injury and/or frostbite.[879] It is easily ignited in air, reacts with oxidizing agents, is very toxic by inhalation, and is a strong irritant to skin, eyes and mucous membranes.[880]  In case of a silane spill, "isolate spill or leak area for at least 100 meters (330 feet) in all directions."[881] Apple had this gas and leaked this gas; Gjovik had these symptoms.

1170.   Here, these chemicals are so dangerous and so corrosive, their use posed an unreasonable danger to human beings, but also to property, including the exterior and interiors of the apartment complex, including the tenant's chattel property.[882] In *Luthringer v Moore*, California courts found the use of "hydrocyanic acid gas" an ultrahazardous activity even though

---

[876] CDC, ASTDR, Phosphine MMG, https://www.atsdr.cdc.gov/MHMI/mmg177.pdf
[877] Id.
[878] US NOAA, *Cameo Chemicals: Phosphine,* https://cameochemicals.noaa.gov/chemical/1322
[879] US NOAA, *Cameo Chemicals: Silane,* https://cameochemicals.noaa.gov/chemical/4434
[880] Id.
[881] Id.
[882] County of Santa Clara v. Atlantic Richfield Co. 137 Cal. App. 4th 292, 324-25 (2006).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

its used by fumigators, because it is classified as a "dangerous or lethal chemical" and there were only three fumigators in the city.[883]

1171.   California courts have found the "use of sulfuric acid" not a matter of common usage and comparable to dynamite (blasting) in that sense, nor does the value of use of sulfuric acid outweigh the risks of its use.[884] The court also based the finding of ultrahazardous activity noting the chemical was categorized as a "hazardous material", is "highly toxic, very reactive," and a "highly dangerous chemical." The court found "the use of sulfuric acid involves a high degree of risk and … that if it comes in contact with humans the resulting harm is likely to be great."[885] A nuclear industry facility releasing radioactive emissions and another working on nuclear fabrication have been found to be ultrahazardous activities.[886]

1172.   Here, the use of these chemicals was only a few hundred feet from homes and the chemicals in question were being emitted from vents.[887] The storage, use, and release of dangerous, highly poisonous gas in a residential area, is an activity which, even when conducted with the greatest of care and prudence, could cause damage to others in the neighborhood and thus is an ultrahazardous activity.[888] The possible consequences of the gas escaping and causing harm were known or should have been known.

1173.   Even where the manufacture or sale of a hazardous material does not constitute an abnormally dangerous activity, the manner in which it is transported, stored, used, or

---

[883] *Luthringer v. Moore (*1948) 31 C2d 489, 497-500, 190 P2d 1, 7-8—statute classified gas as "dangerous or lethal chemical," and, although used by licensed pest control fumigators, there were only three such operators in Sacramento]
[884] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991)
[885] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991)
[886] *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 856 (Mo. Ct. App. 1985); *Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 606 (W.D. Okla. 1979)
[887] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991);. *Blackwell v. Phelps Dodge Corp.*, 157 Cal.App.3d 372, 203 Cal. Rptr. 706 (Cal. Ct. App. 1984).
[888] *Langlois v. Allied Chem. Corp.*, 258 La. 1067, 1083, 249 So. 2d 133, 139 (1971)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1   disposed of may meet the standard.[889] Here, it is the close proximity to residential areas that
2   makes this ultrahazardous. Neighbors to the factory may not know about the emissions and thus
3   cannot mitigate or monitor them. Neighbors exposed to emissions at home may not know it and
4   will not be able to "decontaminate" like in an industrial chemical spill/leak."[890] Courts have
5   found that the storage of explosives and large quantities of flammable liquids in densely
6   populated areas is an ultrahazardous activity (but not in isolated areas).[891] Similarly, oil and gas
7   wells are ultrahazardous when in thickly settled communities (but not rural areas).[892] Apple was
8   engaged in use of poisons and flammable gas in a crowded area and Gjovik and her property
9   were damaged as a result of those activities.[893]

11      1174.   There are reports dangerous chemicals and gases escaped from 3250 Scott Blvd
12   in at least three documented leaks. Apple also received a number of citations for failure to
13   comply with basic regulations and several root-caused formally as 'negligence.' However, a
14   business engaged in an ultrahazardous activity with strict liability can still be negligent: a
15   business blasting dynamite next to a school does not somehow escape strict liability for damage
16   by blasting recklessly instead of as carefully as possible.

18      1175.   In fact, Apple's gross negligence, recklessness, and even knowing violation of
19   health, safety, and environmental laws at this site is one of the reasons Gjovik has stated a claim

---

[889] *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 532–33 (S.D.N.Y. 2007); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir.1985) (holding that "allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste constitutes abnormally dangerous activity").
[890] NIEHS Chemical Incidents Response Training Tool, Worker Education and Training Program, *Protecting Yourself While Responding to Chemical Incidents*, https://tools.niehs.nih.gov/wetp/public/hasl_get_blob.cfm?ID=8109
[891] Exner v. Sherman Power Constr. Co., 54 F.2d 510 (2 Cir.1931); French v. Center Creek Powder Mfg. Co., 173 Mo.App. 220, 158 S.W. 723 (1913); State ex rel. Stewart v. Cozad, 113 Kan. 200, 213 P. 654 (1923); Buchholz v. Standard Oil Co. of Indiana, 211 Mo.App. 397, 244 S.W. 973 (1922); Shell Petroleum Corp. v. Wilson, 178 Okl. 355, 65 P.2d 173 (1936).
[892] *Green v. General Petroleum Corp.*, 205 Cal. 328, 270 P. 952 (1928); *Tyner v. People's Gas Co.*, 131 Ind. 408, 31 N.E. 61 (1892).
[893] [§ 628] Ultrahazardous Activity., 4 Witkin, Cal. Proc. 6th Pleag § 628 (2023)

509

---

**Deleted:** is proof the
**Deleted:** with
**Deleted:** document
**Deleted:** There is
**Deleted:** proof of a history of negligence at the site with

**Deleted:** There

**Deleted:** also proof
**Deleted:** Plaintiff's home was 300 feet from the plant. Like in the classic Californiareasons Gjovik has stated a claim for

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

for ultrahazardous activities. Combined with Apple's insistence on keeping the existence of the factory secret, Apple failed to put anyone around the facility on notice that they could be harmed by Apple's ultrahazardous activities. Apple's secrecy increases the danger of its activities (as reflected in state and federal "Right to Know" laws), as well as conceal from victims the cause of their injuries.

1176.   The manufacture of a hazardous material, with no warning as to the dangers associated with it, can constitute an abnormally dangerous activity.[894] The release of hazardous chemicals into the an employee's workplace, with no warning as to their toxic properties, may be an abnormally dangerous activity" [895] If the defendant attempted to conceal its liability and culpability in the harm caused, through omissions and/or false statements, then that fraud then tolls the statute of limitations. Apple had a duty of care to notify residents and employees of its ultrahazardous activities, under community safety laws like the EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT (EPCRA), hazardous waste laws like CERCLA and RCRA, pollution laws like the CLEAN AIR ACT, and labor and health/safety laws requiring notification of chemical exposure (see § 6310).

1177.   See also *RICO Predicate Act 'Relating to Chemical Weapons,'* which is incorporated here, and this is incorporated there.

---

[894] *Abbatiello v. Monsanto Co.,* 522 F. Supp. 2d 524, 532 (S.D.N.Y. 2007); *Cf. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 175 F. Supp. 2d 593, 629 (S.D.N.Y. 2001) ("MTBE I") (denying motion to dismiss nuisance claim against petroleum companies for contamination of wells, where plaintiffs alleged that defendants had "knowledge of the dangers MTBE poses to groundwater" and "failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners").
[895] *Abbatiello v. Monsanto Co.,* 522 F. Supp. 2d 524, 533 (S.D.N.Y. 2007).

510

**Deleted:** activity case, *Alonso v Hills,* an

**Deleted:** use of poisons or blasting, only 200 yards (or

**Deleted:** 300 feet) from hundreds of homes in a residential district, will be found to be an and this is incorporated there.

**Deleted:** FIRST

**Deleted:** --

**Deleted:** ev

**Deleted:** CRB

**Deleted:** OCTOBER 25

**ii.    Superfund Site Mega-Plumes with Complete Pathways for Vapor**
**Intrusion**

1178.   Operating a business on a Superfund mega-site with a pathway for vapor intrusion, and vapor intrusion contaminants of concern including TCE and/or Vinyl Chloride, is an ultrahazardous activity. The activity has a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on. [896] Recovery for unexposed exposure to toxic fumes in an office building or other building has been recognized as a legitimate legal claim, even where the effects upon the building occupants are not permanent. [897]

1179.   Solvent vapors from groundwater plumes or soil contamination can make their way through soil and enter homes through cracks in the foundation, utility lines, and drains. This process is termed vapor intrusion. [898] Residents can be exposed to solvents by breathing indoor air contaminated with vapors. CERCLA sites already have strict liability for the hazardous waste contamination. [899] CERCLA imposes strict liability for environmental contamination upon, among others, the owner and operator of a facility – which in this case is Northrop Grumman and Apple, respectively. [900]

---

[896] Restatement of Torts Second, section 519-520.
[897] *Butler v. Helmsley-Spear Inc.*, 198 A.D.2d 131, 131–32, 604 N.Y.S.2d 51, 52 (1993); 91 Am. Jur. Trials 1 (Originally published in 2004).
[898] CDC, Agency for Toxic Substances and Disease Registry, *Land Reuse and Redevelopment: Creating Healthy Communities* (Oct 2020), https://www.atsdr.cdc.gov/sites/brownfields/classroom_training/Creating_Healthy_Communities-508.pdf
[899] Burlington Northern & Santa Fe Railway Co. Et Al. V. United States Et Al., 556 U.S. 599 (2009).
[900] 42 U. S. C. §9607(a).

1180.   The status of a property as a Superfund site has been a factor in deciding if an activity is ultrahazardous.[901] The 'storage' of hazardous waste in open pits is a ultrahazardous activity.[902] Courts have found that "*mercury and other toxic wastes are `abnormally dangerous,' and the disposal of them past or present, is an abnormally dangerous activity.*"[903] There have been similar findings for processing and disposal of radium, especially when processed and disposed of in an urban area, which was described as "*particularly inappropriate.*"[904]

1181.   The analysis of nuclear site risk in *Bennett v. Mallinckrodt*, [905] seems comparable to Superfund sites, (or at least Superfund mega-sites) because both types of sites are unique in the:

> "inherent and… unrectifiable danger. [They're] regulated by the federal government. Numerous safety standards have been set to ensure the public welfare, but even with these precautions taken, the potential danger is still enormous… the safety standards are not guarantees of absolute safety. Federal emission standards are only guidelines which are based upon an inherently inexact balancing of human and environmental risks against social benefits."[906]

---

[901] *T E Industries v. Safety Light Corp.*, 123 N.J. 371, 394 (N.J. 1991)  ("Plaintiff's property is befouled with radium because of defendant's abnormally-dangerous activity. Radiation levels at the site exceed those permitted under governmental health regulations. Moreover, the property has been earmarked as a Superfund site.")
[902] *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 544 (W.D. La. 1992)
[903] State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (N.J. 1983);  T E Industries v. Safety Light Corp., 123 N.J. 371, 391 (N.J. 1991).
[904] T E Industries v. Safety Light Corp., 123 N.J. 371, 394 (N.J. 1991)
[905] *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1005 (9th Cir. 2008) ("Regardless of Defendants' efforts to exercise reasonable care, some I–131 would be released, and developing plutonium is hardly an activity of common usage. While the value to the community at large, i.e., the nation, of developing an atomic bomb was perceived as high and there is pragmatically no very appropriate place to carry on such an activity, the § 520 factors on balance support holding that Defendants' activities were abnormally dangerous.")
[906] *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 868 (Mo. Ct. App. 1985); see also *Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 581-82 (W.D. Okla. 1979); *Keyes v. Howarth*, at 541, 568. See also 10 C.F.R. § 20.1(c).

512

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Further, similar to nuclear sites, Superfund sites are relatively uncommon.  As of September 2023, there are only 1,336 active Superfund National Priority List sites in the United States.[907] According to a Law Review article penned by Apple General Counsel Kate Adams in 2008, she expects that as time goes on, the number of Superfund sites will decrease, but the average complexity and risk of Superfund sites will increase, with a focus on complex megasites.[908] Adams notes that the "*EPA estimates that there are approximately 189 megasites or potential megasites across the country.*"[909] Either count is sufficiently uncommon for an ultrahazardous designation.

1182.   As of 2019, despite decades of clean-up efforts, the TCE concentrations in the shallow A-Zone of the TRW Microwave plume were "*either stable or show no trend*" and pollution levels "*remain elevated above the [Record of Decision] cleanup levels.*"[910] Northrop Grumman's qualification of the site continued to explain: "*The Triple Site Plume is a commingled plume, and multiple source areas have been identified. The former TRW Site is one.*"[911] Northrop Grumman warned that "*due to inherent geologic complexities, restoration [of the Triple Site/TRW Microwave plume] within the next 50-100 years is likely not achievable.*"[912]

1183.   The TRW Microwave site at 825 Stewart Drive is part of a mega-plume, merging with other megaplumes, and impacting a large community with emissions. The 2021 Site management Plan for the Triple Site and TRW Microwave site noted that developers were

---

[907] US EPA, Superfund: National Priorities List (NPL), [last visited 12/20/23], https://www.epa.gov/superfund/superfund-national-priorities-list-npl (noting data is current as of September 7 2023).
[908] Kate Adams and Brian Israel, *Waste In The 21st Century: A Framework For Wiser Management*, N.Y.U. Environmental Law Journal, Volume 17, Pg 710, (Nov. 2008).
[909] Id.
[910] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page67, (September 18 2019).
[911] Id.
[912] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" slide 24, (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf

513

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

selling people homes on the plume without disclosing the pollution and vapor intrusion issues. (Two of the primary developers/investors are Irvine Company and Oaktree Capital. Apple also entered a business deal for many of these homes where HomeKit accessories were installed by default in the condos.).



Draft Deliberative Document – Triple Site
Site Management Plan
Enforcement Confidential

a)  **Municipal/Community/State Issues** (e.g., legal, policy, jurisdictional, position):
Residences are being sold in the OOU and building permits for construction are being issued by the City without notification of site conditions and transmittal of mitigation system O&M plans and EPA requirements to existing owners, prospective purchasers, and new buyers. An Institutional Controls (ICs) plan needs to be prepared to address this gap, the development of which will be coordinated with the City of Sunnyvale to integrate into their existing permitting process and municipal record-keeping system.

b)  **Groundwater Issues / Change Site Conditions**
Vapor intrusion in the OOU was not addressed in the ROD. The ROD Remedial Investigation (RI) for groundwater is outdated and the surficial aquifer exposure pathway for VI is poorly delineated in the Offsite OOU. To address this a FFS and likely RODA is needed.

*Exhibit: Site Management Plan – Community Issues*

1184.   Speaking of her time working on Superfund sites in upstate New York, Lisa Jackson empathized with residents impacted by Superfund pollution. *"These people were saying, 'This is where you've given me to live, and yet [pollution] accumulate in fish here so my diet is impacted; I live off of fish that I can no longer eat without getting carcinogens in my body, and I have to live with emissions.'* Jackson added that she felt, "There was so much injustice in that."[914]

---

[914] Harpers Bazaar, *Apple's Vice President of Environment, Policy, and Social Initiatives Has Hope for the Planet*, April 28 2023, https://www.harpersbazaar.com/culture/features/a43739956/apples-vice-president-of-environment-policy-and-social-initiatives-has-hope-for-the-planet/

**Deleted:** proof of finding of negligence.[913]

**Deleted:** FIRST
**Deleted:** –
**Deleted:** ev
**Deleted:** CRB
**Deleted:** OCTOBER 25

1185.   The contaminant of concern at the Triple Site as a problem. Trichloroethylene is heavier than air and may cause asphyxiation in poorly ventilated or enclosed spaces.[915] Trichloroethylene can produce CNS effects including headache, dizziness, lack of coordination, stupor, and coma. Respiratory depression or cardiac dysrhythmia from high-level exposures can result in death. Other effects of acute exposure include hypotension, nausea, vomiting, and diarrhea.[916] There is no antidote for trichloroethylene poisoning.[917] There is strong evidence that trichloroethylene can cause kidney cancer in people and some evidence for trichloroethylene-induced liver cancer and malignant lymphoma.[918] The Department of Health and Human Services (DHHS) considers trichloroethylene to be a known human carcinogen.[919] The International Agency for Research on Cancer (IARC) classified trichloroethylene as carcinogenic to humans. The EPA has characterized trichloroethylene as carcinogenic to humans by all routes of exposure.[920]

1186.   While the responsible party for the Superfund site is Northrop Grumman, there are obligations for Apple as the tenant and operator with sole control of the facility since 2015. (After Apple moved in, the City of Sunnyvale Fire Department emailed amongst themselves that the building was now part of the '*Apple machine'* and they cannot drop by unexpected.) As the tenant/operator of a facility on a Superfund site, Apple was required to, among other things: provide legally required notices; the tenant takes reasonable steps with respect to hazardous substance releases; provide cooperation, assistance, and access; comply with land use

---

[915] CDC, Medical Management Guidelines for Trichloroethylene, https://www.atsdr.cdc.gov/MHMI/mmg19.pdf
[916] Id.
[917] Id.
[918] CDC, Trichloroethylene ToxFAQs 2020, https://www.atsdr.cdc.gov/toxfaqs/tfacts19.pdf
[919] Id.
[920] Id.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

restrictions and institutional controls; comply with information requests; and not impede any response action.[921]

1187.   Apple's ultrahazardous activity was a substantial factor in causing Gjovik's harm to her property and herself.

### E.   RETALIATION UNDER CALIFORNIA LABOR CODE

1188.   Generally, Apple discriminated and retaliated against Gjovik in violation of California Labor laws. For all claims, a complaint was filed with the California Department of Labor Department of Industrial Relations Retaliation department on August 29, 2021. The state labor complaints statute of limitations were tolled while under consideration of the Labor Commissioner but are now removed to this case, but are preserved by the Labor Commissioner for investigation if dismissed from this matter without a decision on the merits.[922] There is no requirement for an individual to exhaust administrative remedies before filing a lawsuit under most of these state Labor Codes, however administrative exhaustion was reached as a complaint was filed with the Retaliation Compliant Investigation Unit on time.[923]

### i.   California Whistleblower Protection Act: Cal. Labor Code §1102.5

1189.   California Labor Code § 1102.5 "*reflects the broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation.*"[924] Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity in disclosing information to a governmental or law enforcement agency, to a

---

[921] US EPA, Revised Enforcement Guidance Regarding the Treatment of Tenants Under the CERCLA Bona Fide Prospective Purchaser Provision, (Dec 5 2012), https://www.epa.gov/sites/default/files/documents/tenants-bfpp-2012_0.pdf
[922] Cal. Lab. Code § 98.7
[923] Cal. Lab. Code § 98.7 (a)(1), (f), (g); *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012).
[924] *Green v. Ralee Eng'g. Co.*, 19 Cal. 4th 66, 77 (1998).

516

person with authority over the employee, or to another employee who has authority to investigate, discover or correct the violation; or providing information to, or testifying before, any public body conducting an investigation, hearing or inquiry.[925]

1190.   Here, Section 1102.5 also covers public disclosures as due to Apple's extreme power and control over the government agencies who are supposed to be able to regulate it, often the only party in a position to actually force Apple to correct the issue, is the public. In fact, many of Gjovik's public statements in August and September 2021, and statements to coworkers in June and July 2021, all prior to her termination, noted that was why Gjovik was bringing her complaints forward to her coworkers and the public – so the public pressure may force Apple to do the right thing for once.

1191.   Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations, above and below this section, to government agencies (US and California Department of Labor, US SEC, US DOJ, US EEOC, US NLRB, California DFEH, US EEOC, US and California EPA, etc.), and to Apple management. Gjovik had a reasonable cause to believe that the information she disclosed was a violation of statute and/or noncompliance with a rule or regulation.[927]

1192.   As a statutory cause of action, a claim for retaliation in violation of section 1102.5(b) is treated by the courts as a stand-alone theory of recovery distinct from a common law *Tameny* claim.[928] Violations of California Labor Code § 1102.5 can be pursued alone or also

---

[925] Cal. Lab.C. § 1102.5(b); *Dowell v. Contra Costa Cnty.*, 928 F.Supp.2d 1137, 1154 (N.D. Cal. 2013); *Derby v. City of Pittsburg*, Case No. 16-cv-05469-SI, 20 (N.D. Cal. Feb. 23, 2017), *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1355, 181 Cal. Rptr. 3d 68, 85 (2014)

[927] Cal. Lab.C. § 1102.5(b); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924, 180 CR3d 359, 366-367.

[928] *Cardenas v. M. Fanaian, D.D.S., Inc.*, 194 Cal. Rptr. 3d 1, 7–15 (Ct. App.), review granted and opinion superseded sub nom. *Cardenas v. Fanaian*, 362 P.3d 431 (Cal. 2015).

---

517

**Deleted:** [926] Gjovik reported concerns to management, coworkers, the government, and the press.¨

**Deleted:** FIRST
**Deleted:** ¬
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

support a common law cause of action for wrongful termination in violation of public policy.[929] Under the Labor Code, employers are responsible for the acts of their managers, officers, agents, and employees for alleged violations of § 1102.5.[930] No agency exhaustion is required prior to filing a civil complaint. Safety and worker's rights complaints under California Labor Code Section 1102.5 are matters of traditional local concern and are not preempted by the NLRA.[931]

1193.   See also the *Tamney* section on Reporting Criminal and Unlawful conduct, and those sections are incorporated here and this section incorporated there.

**1)  §1102.5: Reporting Unlawful Labor/Employment Conduct**

1194.   Prior to her termination, Gjovik provided information to public bodies (including US and California Department of Labor, US NLRB, California DFEH, US EEOC, etc.) about Apple's violations of labor and employment laws, and several agencies were already conducting an inquiry based on Gjovik's information.[932]

1195.   Gjovik testified before public bodies (US EEOC, US Department of Labor) and was scheduled to testify before public bodies (US NLRB) that were conducting investigations. Gjovik had reasonable cause to believe that the information provided to and testimony before the public body disclosed a violation of statute and/or noncompliance with a rule or regulation.

1196.   Gjovik also reported Apple's unlawful conduct to Apple (Jenna Waibel, Ekelemchi Okpo, Antiono Lagares, Helen Polkes, Business Conduct hotline), which were also protected disclosures under this statute. While a complaint about illegal conduct made to the

---

[929] Scheu v. Charter Comme'ns, LLC, Case No. 08–CV–02835–MMM, 2011 WL 3204672, at *20 (C.D.Cal. July 27, 2011) ("Violations of California Labor Code § 1102.5 ... constitute public policy within the meaning of Tameny and its progeny.").
[930] Cal. Lab. Code § 1104 ("*In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees.*").
[931] *Doe v. Google, Inc.*, 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).
[932] *Carmichael v. Alfano Temporary Personnel* (1991) 233 CA3d 1126, 1132, 285 CR 143, 147 (employee allegedly discharged for filing charges with EEOC that employer discriminated against women and minorities)

Deleted: US NLRB,

Deleted: SEC, US DOJ, US EEOC

Deleted: US and California EPA.

Deleted: or which

Deleted:  initiated an inquiry.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

individual who is engaging in the conduct is a protected disclosure, Gjovik's reports of individuals misconduct to those above that person (such as Gjovik complaining of Jenna Waibel's conduct to Antio Lagares, or Gjovik complaining of her manager's conduct to Business Conduct, etc.) is a protected activity.[933]

1197.   Apple knew Gjovik was engaged in this protected activity and Apple retaliated against Gjovik because of her protected activity. Apple's activity that Gjovik reported did violate the law and/or Gjovik had a reasonable belief that it violates the law.[934]

1198.   Employee complaints may be of illegal conduct by supervisors, co-workers, and/or by contractors.[935]  It is not the motive of the asserted whistleblower, but the content of the communication, that determines whether it is covered.[936]

1199.   See section titled "*Retaliation for Filing a Labor Complaint*" under California Labor Code Section 98.6. It is incorporated here.

### 2)  §1102.5: Reporting Environmental & Safety Violations

1200.   Prior to her termination, Gjovik reported violations of environmental and safety laws (CERCLA, OSH Act, etc) at 825 Stewart Drive to the US EPA from April through August 2021, to the California EPA in August 2021, and to US Department of Labor OSHA in August through September 2021. Gjovik also reported violations of environmental laws (RCRA, CAA) to the US EPA and California EPA, and to legislatures (city mayor, county commissioner, state

---

[933] *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 C5th 719, 729-730, 308 CR3d 388, 397 – (plaintiff bartender complained to nightclub Owner that she had not been paid for three previous work shifts. Owner threatened to terminate her employment, report her to immigration authorities and told her never to return to the club. Bartender's complaint to the Owner was a Lab.C. § 1102.5 protected disclosure.)
[934] *Mueller v. County of Los Angeles* (2009) 176 CA4th 809 821-822, 98 CR3d 281, 291; *Manavian v. Department of Justice* (2018) 28 CA5th 1127, 1141-1142, 239 CR3d 710, 723; *Love v. Motion Indus., Inc.* (ND CA 2004) 309 F.Supp.2d 1128, 1134].
[935] *McVeigh v. Recology San Francisco* (2013) 213 CA4th 443, 448, 471, 152 CR3d 595, 600, 618-619.
[936] *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 CA4th 832, 853, 136 CR3d 259, 277 (disapproved on other grounds by People ex rel. *Garcia-Brower v. Kolla's, Inc.* (2023) 14 C5th 719, 733-734, 308 CR3d 388, 400).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

senator, state assemblyman) about 3250 Scott Blvd in September 2020 through July 2021, although during that time Gjovik thought she was reporting California DTSC Brownfield and/or US EPA CERCLA issues originating at 3255 Scott Blvd, and did not know she was actually reporting Apple's factory emissions. Gjovik also reported suspected environmental violations at 825 Stewart Drive and 3250 Scott Blvd to her coworkers, the press, and the public.

1201.   Gjovik refused to help Apple cover-up their CERCLA non-compliance. Apple repeatedly asked Gjovik to not talk to anyone else about her concerns about her Superfund office and workplace safety, and instead keep her concerns 'private' with her managers, EH&S, and Employee Relations. Gjovik's manager even gave her a "warning" because she expressed concerns that Apple had not be testing the air inside her office, and because she told her coworkers the office was a Superfund site.

1202.   The US EPA explains that institutional controls for toxic waste remediation sites with "*vapor intrusion mitigation systems*" will "*require more frequent inspection or maintenance.*" [937] Gjovik complained Apple had not been inspecting or testing her office for the last six years. Apple told Gjovik it was fine because they said so, and she should not tell anyone else about her concerns, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

1203.   The US EPA notes that the "*rupture [of] an engineering cap*" is a "*compromise [to] the integrity of a response action for that site.*" [938] US EPA explains that vapor intrusion "*primarily enter[s] through openings in the building foundation*" through "*cracks in the*

---

[937] US EPA, Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA-540-R-09-001, (December 2012), pg29, https://www.epa.gov/sites/default/files/documents/final_pime_guidance_december_2012.pdf
[938] US EPA, *Institutional Controls, supra* at page 29 ("8.3 Periodic Reviews").

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

concrete slab."[939] The US EPA explains that when there are cracks in the slab, "vapors resulting from the volatilization of contaminants in soil may be transported into indoor spaces," and "*inhalation of these vapors by indoor workers may be an important exposure pathway.*"[940] When Apple told Gjovik there were cracks in the concrete floor (the "slab") at her office, Gjovik told Apple they needed to report the issues to the US EPA, but Apple told her they do not need to tell the US EPA. Gjovik asked Apple to test the air before they fix the cracks, but Apple said they intentionally will not test the air until after they fix the cracks. Gjovik told Apple the cracks were "changed circumstances" at the federally overseen CERCLA site, and that Apple must consult with the US EPA about the cracks and Apple's plan to fix the cracks, including their air testing work plan. Apple once again told Gjovik that they were right, she was wrong, and she should not talk to anyone else about her concerns. Apple told Gjovik it was fine because they said so, and she should not tell anyone else about her concerns, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

1204. Like in *Parada v City of Colton*,[941] where a city building department employee refused to allow residential construction by certain city officials without building permits as required by law, Gjovik refused to allow Apple to cover-up the cracks in the floor without reporting them to the US EPA under CERCLA, or to have the US EPA oversee testing and repair under CERCLA. Gjovik and Apple argued about this repeatedly with Apple insisting they refused to tell the US EPA about the work because it did not have to.

---

[939] US EPA, *A Citizen's Guide to Vapor Intrusion Mitigation*, EPA 542-F-12-021 (September 2012), https://www.epa.gov/sites/default/files/2015-04/documents/a_citizens_guide_to_vapor_intrusion_mitigation_.pdf
[940] US EPA, Supplemental Guidance For Developing Soil Screening Levels For Superfund Sites, OSWER 9355.4-24 (December 2002).
[941] 24 CA4th 356 (1994).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1205.   The US EPA explains that "*community members who live or work near [Superfund] sites*" "*generally are the first to recognize changes at the site,*" and should be encouraged to help monitor the site.[942] The US EPA suggests outreach activities to inform community members about institutional controls (like sealed floors and sub-slab vapor monitoring), "*what types of activities may adversely affect the integrity of the response action,*" and points of contact for "*reporting a breach.*"[943] Gjovik asked Apple to tell her coworkers their office was a Superfund site, to explain the site's institutional controls to them (sub-slab vent ports, etc), and provide them a process for reporting concerns at the site (like if they smell chemicals). Apple told Gjovik they will not tell her coworkers about the site or the controls, but told her not to interact with the sub-slab vent ports and to call them right away if she smells something weird, but then said once more they will not tell anyone else and she should not tell anyone else, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

1206.   Apple also retaliated against Gjovik for Gjovik's refusal (and protest due to actual opportunity to refuse) with Apple's unlawful medical studies and data collection of employee personal data for commercial research and development purposes.[944] As in *Ferretti v. Pfizer,* employees can refuse to participate in unlawful studies.[945] Gjovik's posts on Twitter and quotes in the article make it crystal clear Gjovik thought Apple's conduct with the application was egregious. Gjovik also expressly noted that she chose to expose the application because

---

[942] US EPA, *Institutional Controls, supra* at page 31 ("8.6 Community IC Monitoring").
[943] US EPA, *Institutional Controls, supra* at page 31 ("8.6 Community IC Monitoring")
[944] Lab.C. § 1102.5(c); *Ferretti v. Pfizer, Inc.* (ND CA 2012) 855 F.Supp.2d 1017, 1025-1027—doctor stated § 1102.5 claim by alleging she refused to participate in drug testing program that violated federal regulations; *Barela v. C.R. England & Sons, Inc.,* 197 F.3d 1313, 15 I.E.R. Cas. (BNA) 1481, 139 Lab. Cas. (CCH) ¶ 58801 (10th Cir. 1999), appeal after remand, 203 F.3d 834 (10th Cir. 1999) – (internally reported the employer's practice of requiring employees to violate state and federal trucking laws)
[945] *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*"Apple's policy of secrecy should not shield it from public scrutiny about human rights & dignity."*[946]

1207.   Gjovik complained about 825 Stewart Drive's deed being out of compliance and deeds are part of the institutional controls for Superfund sites. Apple brushed her off, but then later the US EPA had the same inquiry to Northrop Grumman and amongst themselves. Deed restrictions are restrictive covenants used as institutional controls to protect the public's health and safety, and compliance is important. To quote Lisa Jackson when she was the head of the New Jersey EPA, her agency launched "*enforcement actions against approximately 950 responsible parties who have failed to monitor and report on the … status of deed notices …We realize that the state's system that allows self-reporting for monitoring of these contaminated properties is broken, and we are taking the first steps toward fixing this, Commissioner Jackson said.… this situation seriously undermines the department's ability to ensure protection of public health and the environment.*"[947] Apple also fired Gjovik for complaining about and inquiring about the Superfund deed.

1208.   An employer cannot retaliate against an employee who reported violations of regulations related to employee chemical/radiation exposure, reported excess toxic substances at a work site, or reported possible illegalities related to an environmental assessment.[948]  In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges that reports of "*public health,*" "*product safety,*" "*risk or damage to the environment,*" "*failure to comply*

---

[946] Twitter, Ashley Gjovik, August 30 2021, https://twitter.com/ashleygjovik/status/1432416891201490946
[947] New Jersey Department of Environmental Health, DEP TAKES ENFORCEMENT ACTIONS AGAINST RESPONSIBLE PARTIES FOR FAILURE TO MEET CONTAMINATED SITE MONITORING REQUIREMENTS, Sept. 24 2007, https://www.nj.gov/dep/newsrel/2007/07_0041.htm
[948] *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, 117 Lab. Cas. (CCH) ¶ 56469 (1989) (exposure); *Devlyn v. Lassen Mun. Utility Dist.*, E.D.Cal.2010, 737 F.Supp.2d 1116 (toxins); *Killgore v. SpecPro Professional Services*, LLC, C.A.9 (Cal.)2022, 51 F.4th 973 (environmental assessment).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*with a legal or regulatory obligation*", "*criminal activity,*" "*violations of human rights,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[949]

1209.   See section titled "*Retaliation for Safety Complaints*" California Labor Code Section 6310. It is incorporated here.

**3)  §1102.5: Refusal to Participate in Unlawful Conduct**

1210.   California Labor Code 1102.5 prohibits employers from terminating employees due to the employee refusing to participate in an activity that would result in a violation of state or federal statute, rule, or regulation.[950] Gjovik refused to engage in unlawful acts including participating in Apple's obstruction of justice, violations of environmental law, and Apple's unlawful surveillance and AI data collection. All of these reference constitutional or statutory rights that benefits the public, substantial and fundamental rights, firmly established at the time of Gjovik's discharge.[951]

1211.   It is a violation of public policy for an employer to discharge an employee from employment due to the employee refusing to engage in an unlawful act.[952] This includes an employer pressuring an employee to not report a crime or other serious violation of the law. In *Wadler v. Bio-Rad Laboratories*, the Court explained that activity protected by § 1102.5 can include refusal to participate in an employer's cover-up after receiving either direct or indirect requests to do so from the employer – explaining that Apple's direct instructions to an employee to ignore criminal conduct in *Banko v Apple Inc* were an extreme version of the conduct the

---

[949] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf
[950] *Wadler v. Bio-Rad Laboratories, Inc.*, N.D.Cal.2015, 141 F.Supp.3d 1005, motion to certify appeal denied.
[951] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.
[952] Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167 (1980).

Deleted: coverup, environmental crimes, and intimidation of witnesses....

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

statute intended to cover, and that indirect or implied suggestions to ignore unlawful conduct are also protected.[953]

    1212.   Gjovik refused to help Apple in their efforts to conceal and obstruct investigations and reporting of employee complaints, including of apparently civil and criminal legal violations. Around July 28 2021, Okpo interrogated Gjovik for hours about Gjovik's posts on Apple's Slack tool complaining about a culture of cover-ups at Apple, and dozens of other employees starting to share their own stories of Apple burying their real concerns and issues, and Apple retaliating against them for raising the concern in the first place. Okpo repeatedly told Gjovik to stop posting about it and to send everyone who comments on her prior post or contacts her about it, to send them directly to Okpo so he can talk to them in a 'private' conversation. Gjovik had reasonable cause to believe that her participation in the cover-up would result in a violation of statute and/or non-compliance with rule or regulation. Apple discharged and discriminated against Gjovik, and Gjovik's disclosures and her refusal to participate in Apple's cover-up was a contributing factor in Apple's decision to discharge and discriminate against Gjovik.[954]

    1213.   Similarly, Gjovik refused to abide by Apple's illegally overbroad NDAs and be silent about business practices she believed violated the law, and to not share those concerns with her coworkers and the public, when her coworkers and the public were being harmed. Apple's practices with Gobbler were unlawful and Apple fired Gjovik for exposing and protesting them.

    1214.   Apple's supposedly legitimate reason for terminating Gjovik (which was pretext and false) included Gjovik's protests of Apple's Face "Gobbler" iPhone app which took videos

---

[953] *Wadler v. Bio-Rad Labs.*, Inc., 141 F. Supp. 3d 1005, 1027 (N.D. Cal. 2015) citing *Banko v Apple*, 20 F.Supp.3d 749, 759–60.
[954] *Ferretti v. Pfizer Inc*., 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012)

---

**Deleted:** the

**Deleted:** Further, Apple made, adopted, and enforced rules, regulations and/or policies that prevents employees from providing information or providing to a public body conducting an investigation, hearing, or inquiry. …Violations of California Labor Code <#>Violations of California Labor Code § 1102.5 can be pursued alone or also support a common law cause of action for wrongful termination in violation of public policy."[956] No agency exhaustion is required prior to filing a civil complaint.¶
    <#>**Video Recording in Bathrooms: Cal. Labor Code § 435**¶
Video surveillance of private spaces in the workplace such as restrooms, locker rooms, changing rooms and similar locations is strictly prohibited without a court order."[956] Apple's supposed reason for termination GjovikSimilarly, Gjovik refused to abide by

**Deleted:** <#>Violations of California Labor Code § 1102.5 can be pursued alone or also support a common law cause of action for wrongful termination in violation of public policy.[955] No agency exhaustion is required prior to filing a civil complaint.¶
    <#>**Video Recording in Bathrooms: Cal. Labor Code § 435**¶
Video surveillance of private spaces in the workplace such as restrooms, locker rooms, changing rooms and similar locations is strictly prohibited without a court order."[956] Apple's supposed reason for termination GjovikSimilarly, Gjovik refused to abide by

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

of Gjovik 'whenever it thought it saw a face' including in bathrooms, locker rooms, changing rooms, and similar locations. The application took and collected photos videos, captured biometric information (face prints), and also gathered other information such the location via the iPhone GPS. Apple also claims it terminated Gjovik for Gjovik protesting that Apple asked her three times to capture 3D scans of Gjovik's ears and ear canals, after Gjovik had already declined the same request "indefinitely" back in 2018.

1215.   Gjovik had a legal right to protest the Gobbler application, Apple wanting to scan her ear canals, and Apple's unlawful and unethical data collection practices. Gjovik had protested internally, to the public, to and through the press, prior to her termination. Cal. Labor Code § 1102.5 applies to disclosures made to the press and public as long as it is exposing previously unknown information about a suspected violation of the law. Apple's conduct with Face Gobbler violating numerous laws, including the California Constitution Article 1 Right to Privacy (discussed in the *Tamney* section and incorporated here), the prohibition on video recording in bathrooms in Cal. Labor Code § 435, and the prohibition on retaliation for Political Activity found in Cal. Labor Code §§ 1101-1102. (Gjovik also discusses Apple's violation of the CPRA, ICCPR, and FTC Act in the *Tamney* section, which is also incorporated here).

1216.   First, Apple's use of the application violated the Labor Code § 435, which is an infraction. Gjovik has direct evidence of photos taken of her by the app in her bathroom (see below). In August 2021, prior to Gjovik's termination, Gjovik contemplated revealing Apple's practice of Face Gobbling, and opened the application to review the photos and videos currently stored within, finding among other disturbing things, photos of her taken naked in her bathroom. Because Gobbler data is time stamped and has GPS data, Gjovik was able to see these photos were taken the day of her first meeting with Apple EH&S about her office on April 2 2021. This shows how easy it would be for Apple Global Security to access employee Gobbler data and find

Deleted: Among other legal protections Gjovik had for protesting the application and Apple's practices, Apple's use of the application violated Labor Code § 435. Gjovik has evidence of photos taken of her by the app in her bathroomThe application took and collected





*Figure 1: Photos captured by "Gobbler" in Gj bathroom, including Gjovik washing her face w*

Deleted:

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

24/7 surveillance videos of those employees on dates or at locations of interest to them, even for nefarious purposes.




*Figure 1: Photos captured by "Gobbler" in Gjovik's home bathroom, including Gjovik washing her face without clothing*

*Photos taken of Gjovik by Gobbler on the day of her first meeting with EH&S (April 2 2021)*

1217.   Cal. Lab. Code § 435 prohibits employers from "*causing to be made*," or "*using for any purpose*" a video recording of an employee in a restroom, locker room, or changing room.[957] All California private employees are protected by this law. This is a strict liability statute (with the exception of an employer having court order to engage in the conduct) and no specific intent is required. An employer's notice cannot alter the employer's legal obligations under Cal. Labor Code Section 435.[958]  Further there is much common law establishing that surveillance in bathrooms is a violation of privacy.[959]

[957] Cal. Labor Code § 435;  see *Trujillo v. City of Ontario* (CD CA 2006) 428 F.Supp.2d 1094, 1106—Lab.C. § 435 among statutes that "represent society's understanding that a locker room is a private place requiring special protection".
[958] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal.4th 1, 67 (Cal. 1994) [Judge George concurrence] – ("Even if an employer discloses before hiring an employee that it intends to engage in visual surveillance of the employee restrooms and requires all employees to consent to such surveillance as a condition of employment, a state constitutional privacy challenge to such conduct would not necessarily founder on the ground that, in view of the explicit warnings and consent, the employees had no reasonable expectation of privacy."); Lothar Determann & Robert Sprague, Intrusive Monitoring: Employee Privacy

527

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1218.   California has a "*legislative policy against clandestine observation of public restrooms,' rendering it `reasonable for users thereof to expect that their privacy will not be surreptitiously violated.*"[960] The "*illegal, clandestine surveillance of restrooms*" is a "*blatant invasion of privacy.*"[961] "These are attributes that people view as deeply primordial, and their exposure often creates embarrassment and humiliation. Grief, suffering, trauma, injury, nudity, sex, urination, and defecation all involve primal aspects of our lives--ones that are physical, instinctual, and necessary."[962]

1219.   Judge Raymond C. Fisher of the 9th Circuit wrote in 2000 of an employer surveilling employees in the bathroom: "*There was . . . no way of knowing whether you were being watched at any given moment… It was even conceivable that they watched everybody all the time. . . . You had to live -did live, from habit that became instinct -in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized. George Orwell, 1984.*"[963]

---

Expectations Are Reasonable in Europe, Destroyed in the United States, 26 Berkeley Tech. L.J. 979, 1009–11 (2011).

[959] *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 167 L.R.R.M. (BNA) 2353, 143 Lab. Cas. (CCH) ¶ 11025, 145 Lab. Cas. (CCH) ¶ 59475 (9th Cir. 2001), as amended, (Aug. 27, 2001) (applying California law) (surreptitious surveillance of employees' restrooms with video and audio devices as well as two-way mirrors gave rise to actionable claims); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094 (C.D. Cal. 2006) (applying California law) (California Constitution's privacy provision violated by installation of secret video camera in police locker room); *Benitez v. KFC Nat. Management Co.*, 305 Ill. App. 3d 1027, 239 Ill. Dec. 705, 714 N.E.2d 1002 (2d Dist. 1999) (awarding damages for invasion of privacy arising out of peepholes placed by coemployees in ceiling of women's bathroom so as to view women employees disrobing and using facilities); *Harkey v. Abate*, 131 Mich. App. 177, 346 N.W.2d 74 (1983) (secret camera in employees' restroom constituted actionable invasion of privacy).
[960] *In re Deborah C.*, 177 Cal. Rptr. 852, 858 n.9 (Cal. 1981) (quoting People v. Metcalf, 98 Cal. Rptr. 925, 927 (Cal. Ct. App. 1971))
[961] *Cramer v. Consolidated Freightways, Inc.*, 209 F.3d 1122 (9th Cir. 2000) [Fisher, Circuit Judge, dissenting in part]
[962] Jane R. Bambauer, *Glass Half Empty*, 64 UCLA L. Rev. Discourse 434, 457 (2016), citing Daniel J. Solove, *A Taxonomy of Privacy*, 154 U. PA. L. REV. 477, 516 (2006) (describing harms from distortion).
[963] *Cramer v. Consolidated Freightways, Inc.*, 209 F.3d 1122 (9th Cir. 2000) [Fisher, 9th Circuit Judge, dissenting in part]

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1220.   A California Supreme Court Judge argued in concurrence in 1994, that *"applicable social norms are those of society overall, not "social norms" created by an association or an industry practice.*[964]  *No association, industry, or other group or entity may establish the parameters of the reasonable expectation of privacy at the expense of society. For instance, an employer may not, simply by announcing in advance that all employees will be subject to periodic strip searches, thereby defeat the employees' otherwise reasonable expectation that such searches will not occur."*[965]

1221.   Next, Apple violated the § 1102.5 prohibition on wrongful discharge in violation of public policy when it claims it terminated Gjovik due to Gjovik's political activities, which is protected under California Labor Code §§ 1101 and 1102.[966] These laws protects an employee making public statements about political topics, such as overly-broad NDAs, unlawful data collection for AI models, or an employee's right to privacy in California.

1222.   This section also incorporates and is incorporated in the Tamney claims for Constitutional Right to Privacy, CPRA, ICCPR, and FTC Act.

    **ii.**      **Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6.**

1223.   Gjovik exercised labor rights provided under California Labor Code on behalf of herself and other employees. Apple retaliated against Gjovik due to Gjovik's protected activity and she suffered materially adverse actions with causal connection to the protected activity,

---

[964] *Hill v. Nat'l Collegiate Athletic Ass'n,* 7 Cal.4th 1, 60 (Cal. 1994). See also, e.g., *Smith v. Maryland* (1979) 442 U.S. 735, 740-741, fn. 5 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577]; Rest.2d Torts, § 295A, com. c, p. 63; Prosser Keaton on Torts (5th ed. 1984) § 33, pp. 194-195.
[965] *Hill v. Nat'l Collegiate Athletic Ass'n,* 7 Cal.4th 1, 60 (Cal. 1994) [California Supreme Court Judge Kennard Concurrence].
[966] Wrongful termination in violation of public policy, Cal. Bus. Law Deskbook § 17:7; *Ali v. L.A. Focus Publication,* 112 Cal. App. 4th 1477, 1487–88, 5 Cal. Rptr. 3d 791, 798–99, 20 I.E.R. Cas. (BNA) 892 (2d Dist. 2003).

529

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

Apple had forbidden animus, and the adverse actions taken could dissuade a reasonable worker from filing a charge of discrimination.[967]

1224.   Under California Labor Code § 98.6, employers may not discharge or discriminate against an employee for engaging in certain activities, including *"filing a complaint with the Labor Commissioner or testifying in such proceedings."* [968]

1225.   If an employer engages in any action prohibited by this section within 90 days of the protected activity specified in this section, as Apple did here, there shall be a rebuttable presumption in favor of the employee's claim.[969]

1226.   Some of the factors behind why the 90 day presumption rule was put in place include that: *"In today's workplace, the fear of retaliation is still one of the main reasons workers are afraid to report labor violations" and the prior "burden of proof is extremely challenging for a worker who does not have the same level of access to information as the employer."*[970] Further, when the California Senate Committee on Labor explained the need for the law, the Committee noted a recent study reporting that of the California workers who reported a labor concern to the government, half of the workers reported subsequent retaliation from their employer.[971] Additionally, the Senate Judiciary Committee noted that 47% of California workers will not report violations of labor laws to the government or anyone at all,

---

[967] *See Burlington N. & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405, 57 (2006) (examining retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)); *see also Westendorf v. W. Coast Contractors of Nev.,* 712 F.3d 417, 422 (9th Cir. 2013) (examining Title VII retaliation claims).
[968] *Hollie v. Concentra Health Servs., Inc.,* C 10–5197 PJH, 2012 WL 993522, at *6 (N.D. Cal. Mar. 23, 2012) (citing Cal. Lab. Code § 98.6(a)).
[969] Cal. SB-497: Protected employee conduct. Section 1, Section 98.6(b)(1) [Signed October 8 2023; Effective January 1 2024].
[970] Cal. SB-497 Legislative History – Senate, Third Reading, April 27 2023.
[971] Cal. SB-497 Legislative History – Senate Committee On Labor, Public Employment And Retirement, April 12 2023

530

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1    due to fear of retaliation.[972] The SJC explained, "*The purpose behind the rebuttable presumption*

2    *is to make it more difficult to invent a pretext to fire a worker who has just filed a complaint.*"[973]

3         **1)  Filing a Labor Complaint: § 98.6**

4    

5    1227.   Apple violated Section 98.6 by retaliating against Gjovik due to Gjovik filing a

6    claim with the California Labor Commissioner instituting, and causing to be instituted

7    proceedings related to the rights under the jurisdiction of the California Labor Commissioner,

8    exercising rights provided under California Labor Code on behalf of herself and on behalf of

9    other employees. Like in *Ayala v Frito Lay*, Gjovik filed a complaint with the Labor

10   Commissioner, and in under three months, Apple then terminated Gjovik's employment.[974]

11   

12   1228.   See section titled "*Retaliation for Safety Complaints*" under California Labor

13   Code 6310. It is incorporated here.

14       **2)  §98.6: Retaliation re: Wages: Cal. Labor Code §232**

15   1229.   Labor Code section 232 provides: "*No employer shall do any of the following:*

16   *…Discharge, formally discipline, or otherwise discriminate* against, *for job advancement, an*

17   *employee who discloses the amount of his or her wages.*" [975]

18   

19   1230.   Gjovik participated in a pay survey with her coworkers in late July 2021, and also

20   shared her wages on social media and discussed with her coworkers in August 2021.

21   1231.   Apple fired Gjovik due to Gjovik discussing her wages.

22   

23   _____
     [972] Cal. SB-497 Legislative History – Senate Judiciary Committee, April 25 2023.
24   [973] Id.
     [974] *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 914–19 (E.D. Cal. 2017) – (claim surviving motion to
25   dismiss when employee asserts that she reported defendant to the Labor Commissioner in May 2015, and
     that as a result of these complaints, defendant subjected her to increased job responsibilities, denial of a
26   request to transfer work shifts, denial of long-term disability, and, finally, in July 2015 termination); See
     *Hennighan v. Insphere Ins. Sols., Inc.*, No. 13-cv-00638-JST, 2013 WL 1758934, at *1 (N.D. Cal. Apr.
27   24, 2013) (finding that the plaintiff had adequately alleged a § 98.6 claim when defendant terminated his
     employment five months after he reported to the Labor Commissioner defendant's allegedly unlawful
28   employment policies including failure to provide rest breaks).
     [975] Cal. Lab.Code, § 232, subd. (c), italics added (hereafter section 232).

                                    531

---

**Deleted:** .

**Deleted:** Gjovik exercised labor rights provided under California Labor Code on behalf of herself and other employees when she complained about….

**Deleted:** Apple retaliated

**Deleted:** Gjovik's protected activity when she suffered materially adverse actions with causal connection to the protected activity and adverse actionsGjovik discussing her wages.

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

### 3)   §98.6: Retaliation re: Work Conditions: Cal. Labor Code §232.5

1232.   California Labor Code § 232.5 prohibits disciplining or discharging an employee for disclosing information about the employer's working conditions. It has been conceded that this statute states a sufficient public policy on which to base a wrongful termination claim and as such this is also incorporated with the *Tamney* claim.[976]

1233.   "It is necessary that the individual workman have full freedom of association ... to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in ... concerted activities for the purpose of ... mutual aid or protection."[978] "The Legislature has expressly declared [in Labor Code section 923] that the public policy of California favors concerted activities of employees for the purpose of ... mutual aid or protection."[979]

1234.   Gjovik's protected activities included filing complaints about work conditions, and discussing work conditions with coworkers and the public, all of which was protected under § 232.5. "*It is a simple - and perhaps profound - political truth: when individuals tell their stories, they can bring about change…it is the personal narrative that has the power to reshape social discourse and provide an impetus for change.*"[980]

1235.   Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik, but also Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple's "legitimate" reason for discharging Gjovik's employment is unlawful under

---

[976] *Luke v. Collotype Labels USA, Inc.* (2008) 159 CA4th 1463, 1468-1469 (discussing work conditions not preempted by NLRA; however concerted activity would be)
[978] *Grant-Burton v. Covenant Care, Inc.*, 99 Cal. App. 4th 1361, 1378–80, 122 Cal. Rptr. 2d 204, 218–20 (2002), as modified on denial of reh'g (July 30, 2002); California Stats.1937, ch. 90, § 923, pp. 208–209, italics added.
[979] *Schwartz–Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 769, 40 Cal.Rptr. 233, 394 P.2d 921.
[980] Ellen J. Zucker, *NDAs: Is There Anything Worth Keeping?*, 66-SUM B. B.J. 22 (Summer 2022)

---

**Deleted:** could dissuade a reasonable worker

**Deleted:** making a charge of discrimination.[977]

**Deleted:** <#>Apple's supposed reason for termination Gjovik occurred while Gjovik was "*removed from the workplace and all workplace interactions*" and Gjovik was complaining on Twitter and to a reporter in an article exclusively about work conditions and the terms and conditions of employment at Apple, including unlawful and coercive surveillance.¶
    <#>**Retaliation re: Work Conditions: Cal. Labor Code §232.5 (via § 98.6)**¶

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

federal and state laws and is also retaliation for protected activity. Apple claims its NDAs prohibit Gjovik from speaking about work conditions, and that if Gjovik does speak about work conditions, it violates her NDA and that violation is grounds for immediate termination.

1236.   Apple's supposed reason for termination Gjovik occurred while Gjovik was *"removed from the workplace and all workplace interactions"* and Gjovik was complaining on Twitter and to a reporter in an article exclusively about work conditions and the terms and conditions of employment at Apple, including complaining about unlawful and coercive surveillance.

1237.   The policy violated by Apple is supported by constitutional and statutory provisions, the policy is public in that it insures to benefit the public, the policy is fundamental and substantial, and the policy was referenced at the time of discharge.[981] "Termination of an employee most clearly violates public policy when it contravenes the provision of a statute forbidding termination for a specified reason."[982] As the United States Supreme Court has noted:

> "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.... It is recognized now that satisfactory hours and wages and working conditions in industry ... have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing."[983]

1238.   Under California Labor Code Section 232.5, employees have an enforceable right to disclose information about the employer's working conditions without restriction or fear of

---

[981] *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890;
[982] 4 Wilcox, Cal. Employment Law (2002) § 60.04[2][c], p. 60–68.
[983] *Thornhill v. Alabama* (1940) 310 U.S. 88, 102–103, 60 S.Ct. 736, 84 L.Ed. 1093.

retaliation.[984] Under the statute and relevant case law, this right extends to disclosures to co-workers and to the general public, including media and press activity.[985] Apple cannot require Gjovik to refrain from disclosing or discussing information about the employer's working conditions.

1239.   "Examples of working conditions provided in the legislative history material include attire, proper behavior, break room condition, elevator maintenance, seat comfort, temperature, lighting, uniforms, hair requirements, breaks, restroom facilities, and 'even one's required attitude.' In an enrolled bill report, contained within the legislative history material, working conditions are described as '(e.g., hours, workplace safety, benefits).' In an analysis from the Senate Rules Committee, the reference to working conditions is followed by '(e.g., hours, uniforms, occupation, safety)'."[986] "Working conditions are those conditions determined by the employer as a condition of employment."[987]

1240.   Remedies for harm from violations of § 232.5 are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. [988] There is no agency exhaustion is required prior to filing a civil complaint.

---

[984] Working conditions" is properly understood to include "conditions of employment"—such as "workload, office sizes, perquisites of employment, and 'work-life balance.'" *Glassdoor, Inc. v. Super,* Ct. 9 Cal. App.5th 623, 638 (2017); it encompasses matters such as hours, benefits, work rules and regulations, workplace safety, and the physical environment. See *Chan v. Canadian Standards Ass'n,* No. SACV 19-2162, 2020 WL 2496174, at *3 (C.D. Cal. Mar. 16, 2020); *Massey v. Thrifty Payless, Inc.,* No. G047734, 2014 WL 2901377, at *5 (Cal. App. June 27, 2014).
[985] See § 232.5; *Glassdoor,* 9 Cal. App.5th at 638 ("employees are entitled by statute to publicize their complaints about such matters."); *Davis v. O'Melveny & Myers,* 485 F.3d 1066, 1078-79 (9th Cir. 2007) (employer's arbitration secrecy rule could prevent discussion between employees and chill public disclosure of the employer's working conditions in violation of § 232.5).
[986] *Tam v. Qualcomm,* Inc., 300 F. Supp. 3d 1130, 1148–50 (S.D. Cal. 2018); *United States ex rel. Lupo v. Quality Assurance Servs., Inc.,* 242 F.Supp.3d 1020, 1030–31 (S.D. Cal. 2017).
[987] Id.
[988] *Turner v. Anheuser-Busch,* 7 Cal.4th 1238 (1994).

534

Deleted: No

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Complaints under California Labor Code Section 232.5 are matters of traditional local concern and are not preempted by the NLRA.[989]

### 4) §98.6: Lawful Off-Duty Conduct: Cal. Labor Code § 96(k)

1241.   Under Labor Code Section 96(k), Apple may not demote, suspend, discharge from employment, threaten discharge, or otherwise discriminate against any employee for lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involves exercise of a right protected by the Labor Code or Constitution.[990] The ACLU was quoted in the legislative history saying, "We think it is crucial to preserve the distinction between company time and the sanctity of our private lives.  An individual engaging in lawful conduct during non-working hours away from the workplace should not be subject to discrimination by his or her employer."[991]

1242.   Gjovik engaged in lawful conduct asserting "recognized constitutional rights" (political activism, speaking about work conditions, protesting unlawful conduct, protesting unlawful surveillance and unfair business practices, etc.), occurring during nonworking hours -- while she was on leave, away from Apple's premises. Apple retaliated against Gjovik and supposedly discharged Gjovik because some of this protected conduct. While the reason was pretext, Apple's admission further implicates its animus and lawlessness.

1243.   Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back and Apple said no. Apple cannot then turn around and claim the "leave" was worktime or the workplace. Apple told Gjovik she had been "*removed from the workplace.*" Until Apple let Gjovik return to work, Gjovik was off duty.

---

[989] *Doe v. Google, Inc.*, 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).
[990] *Grinzi v. San Diego Hospice Corp.*, 120 Cal.App.4th 72 (2004); Barbee v. Household Automobile Fin. Corp., 113 Cal.App.4th 525 (2003)
[991] "AB-1015 Employment: retaliation," An act to amend Section 98.6 of the Labor Code, relating to employment (2001-2002), ASSEMBLY COMMITTEE ON JUDICIARY on April 24, 2001.

1244.   The fact Gjovik was posting about work conditions in her personal time does not transform Gjovik's personal time into work time. Further, protected disclosures are protected by their content, regardless of motive or if the content of information was related to job duties.[992]

1245.   Remedies for harm from violations of § 96(k) are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. No agency exhaustion is required prior to filing a civil complaint. Complaints under California Labor Code Section 98(k) are matters of traditional local concern and are not preempted by the NLRA.[993]

1246.   In addition, "the city and county of San Francisco recognize the right of privacy in the workplace and protect employees against unreasonable inquiry and investigation into off-the-job conduct, associations and activities not directly related to the actual performance of job responsibilities."[994] Gjovik rented an apartment in San Francisco until September 2021.

1247.   On August 25 2021, the "Pussy Riot" Twitter account (the Russian feminist punk protest group) posted "*we're in SF, wondered if anyone here knows ppl in apple and twitter offices? wanted to come by and chat about activism.*" Someone tagged Gjovik and Gjovik replied to Pussy Riot: *"#Apple would probably just offer @pussyrrriot EAP or medical leave.*" Gjovik exchanged contact information with Nadya privately and the two texted and planned to meet in person the next day, however they were not able to meet up. Apple would have seen Gjovik's communications with Nadya on her iPhone. Gjovik's Twitter posts and texting with Pussy Riot, in response to Pussy Riot asking to talk to people at Apple about "activism" was a de facto protected political activity.

---

[992] *Collier v. Superior Court*, 228 Cal. App. 3d 1117, 279 Cal. Rptr. 453 (1991)
[993] *Doe v. Google, Inc.*, 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).
[994] San Francisco Code, Part II, Chapter VIII, Article 33A.

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25



*Exhibit: The Pussy Rrriot Tweet*

Apple was surely not pleased.

### iii.    Retaliation for Safety Complaints: Cal. Labor Code § 6310

1248.   California Labor Code § 6310(b) prohibits discrimination, suspension, discharge, or threat of discharge for complaining about unsafe work conditions or practices.[995]  Firing an

---

[995] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44; Freund v. Nycomed Amersham (9th Cir. 2003) 347 F3d 752, 759 (applying Calif. law—"The public policy behind § 6310 is not merely to aid the reporting of actual safety violations … it is also to prevent retaliation against those who in good faith report working conditions they believe to be unsafe"); Lujan v. Minagar (2004) 124 CA4th 1040, 1046

537

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

employee whom the employer fears will complain of safety violations is also actionable as retaliation under Lab.C. § 6310(b).[996] Protected complaints may be made, orally or written, to the California Department of Labor, or anything other government agencies responsible for employee safety or health, or to the employer, or to a representative of the employer.[997]

1249.   Gjovik filed a Retaliation claim with California Department of Labor DIR and Apple was notified of such, prior to her termination. Gjovik complained of unsafe work conditions, and violations of safety laws/rules/standards internally to Apple, to the US EPA, to CalEPA, and to OSHA.[998] Apple retaliated against Gjovik preemptively out of fear Gjovik would file additional complaints related to health and safety at the workplace, and in hope the retaliation would cause Gjovik to drop her existing complaint out of fear and intimidation, and not file additional complaints.[999] Apple swiftly retaliated against Gjovik due to Gjovik's complaints about an unsafe workplace.[1000]

1250.   Apple's retaliation violated § 6310 which protects an employee who: (1) complains about safety or health conditions or practices, (2) institutes or causes to be instituted any proceeding relating to the employee's rights to safe and healthful working conditions, or

(includes preemptive retaliation against employees whom employer fears will file workplace safety complaints).
[996] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1045-1046, 21 CR3d 861, 865-866—employer feared employee, who was friend of coemployee who had filed workplace safety complaint, would file similar complaint.
[997] Cal. Lab. Code § 6310(a)(1).
[998] *Jenkins v. Family Health Program*, 214 Cal. App. 3d 440, 262 Cal. Rptr. 798, (2d Dist. 1989) – (complained to employers about the substandard employment conditions in their facility.); *Freidrichs v. Western Nat. Mut. Ins. Co.*, 410 N.W.2d 62, 2 (Minn. Ct. App. 1987) – (reported violations of American Society of Manufacturing Engineers standards at manufacturing facilities insured by the employer); *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, (1989) – (reported a power company's violations of regulations to the Nuclear Regulatory Commission resulting from employees' exposure to excessive levels of radiation.).
[999] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1046, 21 CR3d 861, 866; *Diego v. Pilgrim United Church of Christ (*2014) 231 CA4th 913, 921-923, 180 CR3d 359, 365-367.
[1000] *Oyarzo v. Tuolumne Fire Dist.*, supra, 955 F.Supp.2d at 1099, (The district court in the Oyarzo case appears to have determined that causation was shown by mere "temporal proximity between [plaintiff's] protected activity and an adverse action.)

**Deleted:** *Lujan v. Minagar* (2004) 124 CA4th 1040, 1046, 21 CR3d 861, 866….

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

testifies in any such proceeding, (3) exercises any rights under the California Occupational

Safety and Health Act.[1001]

1251.   Apple discriminated against Gjovik because Gjovik exercised her rights under the federal and California law relating to occupational health and safety, and made written and verbal complaints on behalf of herself and/or others, to government agencies about health & safety issues at Apple facilities.[1002] Apple knew Gjovik did this by at least Gjovik's direct communications to Apple about it, and Apple also had reason to believe Gjovik did this.

1252.   Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses, and requested information about work related injury and illness reports or records.[1003] Apple knew about Gjovik's complaints through oral conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts.[1004]

1253.   Prior to her termination, from March 2021 through September 2021, Gjovik complained to Apple and to the government about safety concerns about Gjovik's office, concerns about Apple's safety policies and practices, and concerns about the safety of Gjovik's coworkers. Apple's discrimination against Gjovik included but was not limited to firing,

---

[1001] Cal. Lab. Code § 6310(b).

[1002] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44, 63 CR2d 727, 729; *Freund v. Nycomed Amersham* (9th Cir. 2003) 347 F3d 752; *Touchstone Television Productions v. Sup.Ct. (Sheridan)* (2012) 208 CA4th 676, 681-682, 145 CR3d 766, 770.

[1003] Cal. Lab. Code § 6407 – ("*Every Employer and Every Employee Shall Comply with Occupational Safety and Health Standards, With Section 25910 Of the Health and Safety Code, And with All Rules, Regulations, And Orders Pursuant to This Division Which Are Applicable to His Own Actions and Conduct.*").

[1004] *Cuevas v. SkyWest Airlines,* 17 F. Supp. 3d 956, 965 (N.D. Cal. 2014), aff'd sub nom. *Cuevas v. SkyWest Airlines, Inc.,* 644 F. App'x 791 (9th Cir. 2016) – (meeting notes from employer summarizing employee's safety complaints is evidence employer knew about protected activity).

reassignment, lost opportunity for promotion, suspension, threats, and denial of benefits. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

1254.   Employees may pursue a claim under §6310 and for the tort of wrongful termination simultaneously.[1005]

1)  **§ 6310: Employee Exposure to Chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal.Code.Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]**

1255.   Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide access to employees to accurate records of employee exposures to potentially toxic materials or harmful physical agents in violation of Cal. Labor Code §6408(d).

---

**From: Ashley Gjovik** ashleygjovik@apple.com  📎
**Subject:** Fwd: SD01 EHS Request - 4/2 Notes
**Date:** April 11, 2021 at 11:33 AM
**To:** David Powers powers@apple.com

None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in [ ]s office in Sept 2019 was very likely related to the chemicals on this Superfund site.

If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on.

---

*Exhibit: Gjovik Email to Powers on 4/11/21*

---

– – –

9) I've recently begun learning a lot more about how these types of chemicals tend to have a far worse impact on women then men (due to our increased body fat, lower weight, and also how sensitive our hormones are). Do you happen to know if the OSHA and EPA industrial max levels have started to consider female subjects? Or are these numbers mostly expected male bodies?

– – –

---

*Exhibit: Gjovik Email to EH&S and Employee Relations on 4/11/21*

1256.   Occupational Safety and Health Standards 1910 Subpart Z "*Toxic and Hazardous Substances,*" the "*Access to employee exposure and medical records*" section describes Gjovik's

---
[1005] Boston v. Penny Lane Centers, Inc.(2009) 170 Cal App 4th 936

540

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

statutory right to request information about her chemical and biological exposure at work.[1006] Based on facts pled, Apple violated Gjovik's Rights under Part Z, and Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to notify employees who has been or who is being exposed to toxic materials or harmful physical agents and informing any employee so exposed of corrective action being taken in violation of Cal. Labor Code §6408(d) and 8 CCR § 340.2.[1007] Gjovik asked repeatedly about exposure, and notifying employees, and was told to not tell her coworkers, and that Apple won't answer anymore of her questions.

    1257.  Based on facts pled, Apple discriminated against and discharged Gjovik because Gjovik complained that Apple prohibited employees from observing and monitoring and measuring employee exposure to hazards pursuant to Cal. Labor Code §142.3 (effectively determining "*whether the health of such employee is adversely affected by this exposure*") in violation of Cal. Labor Code §6408(c).[1008] Apple went so far as to "remove" Gjovik from the "workplace and all workplace interactions" in order to ensure she could not monitor the crack assessment.

---

[1006] US CFR, Title 29, Subpart Z – Toxic and Hazardous Substances.
[1007] Cal. Lab. Code § 6401 – ("*Every employer shall furnish ... safeguards, and shall adopt and use practices ... which are reasonably adequate to render such employment and place of employment safe and healthful...*"). Cal. Lab. Code § 6403 – ("*No employer shall fail or neglect to ... do every other thing reasonably necessary to protect the life, safety, and health of employees.*" Cal. Code Regs Title 8 § 340.2 – ("*Whenever any employee has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels exceeding those prescribed by applicable standard, order, or special order, the employer of the affected employee must promptly notify any employee so affected in writing of the fact that the employee has been exposed, and of the corrective action being taken by the employer.*").
[1008] Cal. Lab. Code §142.3(c) – ("...the use of labels or other appropriate forms of warning as are necessary to ensure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions for safe use or exposure. Where appropriate, these standards or orders shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with these hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals and in a manner as may be necessary for the protection of employees.")

13)

I made a map of where I had the really bad fainting spell in September of 2019. I brought this up again with our Sr Director, who remembered me telling him about it when it happened. This screwed up my diagnosis of what happened last year because the only time I have ever had severe fainting spells like I did in my hazardous waste apartment (with suspected VI) — was that time in September at SD01. It first started in Mike Ertell's office (marked) and then continued for a couple hours at my desk (marked).

You can see these are almost the exact locations of SS-7, SS-2, IA-7, AI-12, and IA-2

These slub slats have up to 2100 ug/m3 of TCE, 290ug/m3 of PCE, & 6.6-26 of Chloroform.

The indoor air there has had up to 7.3 ug/me TCE, 12ug/m3 of ethylbezene, 1100 of toluene, and 0.53 of vinyl chloride.

Not sure if anyone else has ever had incidents like that but probably worth noting our organization is only 10% women — so if women are the canaries in the coal mine due to our hormones & fat....

For the 2021 testing would you be willing to please test IA-7, IA2,  &/or AI-12 again please? (Essentially my does and Mike Ertell's office) And SS-2 & SS-7 if you're doing sub slats again too.



*Exhibit: Gjovik Email to EH&S and Employee Relations on 4/11/21*

1258.   In addition, Apple did all of the above while knowing it created an unsafe workplace, while attempting to conceal the safety issues at the workplace, and while also concurrently refusing to fix some of the major safety issues at that workplace (i.e., it took them two years to address the vapor intrusion/HVAC issues) in violation of Cal. Lab. Code §§ 6400(a), 6402, 6405.[1010]

1259.   In violation of OSH Act § 1910.1020(g), Apple never provided Gjovik information about the records noted or her rights under this section, either upon first entering

---

[1010] Cal. Lab. Code § 6402 – "*Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein.*"). Cal. Lab. Code § 6400(a) – ("*No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful.*"). Cal. Lab. Code § 6405. – ("*No employer, owner, or lessee of any real property shall construct or cause to be constructed any place of employment that is not safe and healthful.*").

**Deleted:** <#>Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide access to employees to accurate records of employee exposures to potentially toxic materials or harmful physical agents in violation of Cal. Labor Code §6408(d). Occupational Safety and Health Standards 1910 Subpart Z "*Toxic and Hazardous Substances*," the "*Access to employee exposure and medical records*" section describes Gjovik's statutory right to request information about her chemical and biological exposure at work. ¶
<#>Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to notify employees who has been or who is being exposed to toxic materials or harmful physical agents and informing any employee so exposed of corrective action being taken in violation of Cal. Labor Code §6408(d).[1009]¶

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

into employment or least annually thereafter.[1011] In violation of OSH Act § 1910.1020(e)(2)(i)(A)(3), when Gjovik took a job under David Powers and Dan West in January 2017, and thus was assigned to work in the office building at 825 Stewart Drive (TRW Microwave Superfund site), and required to attend and hold meetings in Dan West's building (the Intersil/Siemens Superfund site).[1012] Apple failed to provide Gjovik "*records to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents at workplaces... to which the employee is being assigned or transferred.*"[1013]

1260.   In violation of OSH Act § 1910.1020(e)(2)(i), Apple's response to Gjovik's request for exposure records for 825 Stewart Drive only resulted in Apple sharing the 2015 vapor intrusion testing result and no other data. When Gjovik requested information about her exposure to chemicals at her office, Apple should have provided a record measuring and monitoring the amount of toxic substances or harmful physical agents to which she had been exposed,[1014] and in the absence of that data, then data about employees in work conditions similar to those of the employee to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected.[1015]

---

[1011] OSH Act § 1910.1020(g)(1) – ("*Upon an employee's first entering into employment, and at least annually thereafter, each employer shall inform current employees covered by this section of the following: The existence, location, and availability of any records covered by this section…*").

[1012] Intersil Inc./Siemens Components Superfund Site, 10900 N Tantau Ave Cupertino California, EPA ID CAD041472341, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0901325

[1013] OSH Act § 1910.1020(e)(2)(i)(A)(3) – ("Exposure records to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents at workplaces or under working conditions to which the employee is being assigned or transferred").

[1014] OSH Act §1910.1020(e)(2)(i)(A)(1) – ("*each employer shall, upon request, assure the access to each employee and designated representative to employee exposure records relevant to the employee… consist[ing] of… A record which measures or monitors the amount of a toxic substance or harmful physical agent to which the employee is or has been exposed…*")

[1015] OSH Act §1910.1020(e)(2)(i)(A)(2) – ("*In the absence of such directly relevant records, such records of other employees with past or present job duties or working conditions related to or similar to those of the employee to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected…*").

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1261.   For instance, there are a number of EPA/OSHA studies about employee chemical exposure, and a number of EPA vapor intrusion studies in workplaces. Any of these could have been shared as a reference as to what Gjovik's exposure might be. When Gjovik started this type of inquiry, Waibel informed Gjovik that Apple would not discuss any of Gjovik's workplace safety concerns ever again. Apple discriminated against and discharged Gjovik, because Gjovik complained  to Apple and to government agencies, that Apple failed to provide Material Safety Data Sheets/Safety Data Sheets, related to known indoor air pollution consisting of hazardous chemicals, and risk of indoor air pollution consisting of hazardous chemicals, to employees on a timely and reasonable basis on substances in the workplace, under California Labor Code § 6398.[1016] Gjovik complained that Apple failed to furnish employees who may be exposed to a hazardous substance (the known indoor air pollution and risk of pollution) with information on the contents of the MSDS for the hazardous substances, or equivalent information either in written form or through training programs in violation of CLC §§ 6398 and § 6408.[1017]

1262.   At Gjovik's Superfund office, Apple concealed and excused away the known presence of Toluene and Ethylbenzene in the indoor air. It was a topic Gjovik argued with Apple about repeatedly, with Apple claiming it was safe and fine. In Apple's "Regulated Substances"

---

[1016] California Labor Code § 6398(a) – ("In MSDS shall be available to an employee, collective bargaining representative, or the employee's physician, on a timely and reasonable basis, on substances in the workplace.")

[1017] California Labor Code § 6398(b). "*All employers shall provide information to employees … to observe monitoring or measuring of employee exposure to hazards … accurate records of employee exposures to potentially toxic materials or harmful physical agents…  Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents … and informing any employee so exposed of corrective action being taken.*" Cal. Lab. Code § 6408(c),(d),(e) – ("*All employers shall provide information to employees in the following ways, as prescribed by authorized regulations…The opportunity for employees or their representatives to observe monitoring or measuring of employee exposure to hazards conducted pursuant to standards promulgated under Section 142.3…Allow access by employees or their representatives to accurate records of employee exposures to potentially toxic materials or harmful physical agents…Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels exceeding those prescribed by an applicable standard, order, or special order, and informing any employee so exposed of corrective action being taken.*")

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

policy, Apple requires the reporting of any use or Toluene or Ethylbenzene and prove non-use of the chemicals.[1018] Apple added these chemicals to its Regulated List in 2016, the same year the vapor intrusion testing report was approved for Gjovik's office, despite the presence of both chemicals, and Ethylbenzene results exceeding max limits.

1263.   Despite Apple's feigned ignorance during conversations with Gjovik on this topic, Apple is fully aware of the legal requirements around MSDS/SDS. Apple's public website clearly states: "*MSDS/SDS are required for Chemicals and Substances.*"[1019]

1264.   Apple also discharged Gjovik due to her refusal to work in hazardous conditions. An employee may refuse to perform work that would result a real and apparent hazard to the employee or their coworkers. Under California Labor Code § 6311, an employee who is discharged for refusing to perform work under such circumstances may bring an action for lost wages.

**2)   §6310: COVID-19 Safety & Communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]**

1265.   Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure from the COVID-19 virus.  Gjovik complained of the return to work plans during the Delta surge, for people who could work from home without issue, and that she felt it was reckless. Gjovik gave interview to NYT about her criticism of Apple's return to work plans which was published July 23 2021, and Gjovik was made NYT Quote of the Day on July 24 2021, and Apple retaliated against her because of it, in violation of California Labor Codes.

---

[1018] Apple, Regulated Substances, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[1019] Apple, Trade Compliance, "Apple and Beats Product Information Sheets," (last visited 12/2/2023), https://www.apple.com/legal/more-resources/gtc.html

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

**3) §6310: Wildfire Smoke [Cal.C.Reg. Title 8, § 5141.1]**

1266.   Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure to particulate matter in the indoor air of her office caused by wildfire smoke and concerns that Apple was in violation of California Code of Regulations, Title 8, § 5141.1 "Protection from Wildfire Smoke").[1020]

1267.   Under California code, Apple had to demonstrate that the "concentration of PM2.5 in the air does not exceed a concentration that corresponds to a current AQI of 151 or greater by measuring PM2.5 levels at the worksite."[1023] An AQI of 151 is equivalent to 55.5 µg/m3 of PM2.5.[1024]

1268.   Apple was required by law to "establish and implement a system for communicating wildfire smoke hazards in a language and manner readily understandable by employees, including provisions designed to encourage employees to inform the employer of wildfire smoke hazards at the worksite without fear of reprisal, including "informing employees of adverse symptoms that may be the result of wildfire smoke exposure such as asthma attacks, difficulty breathing, and chest pain."[1025]

1269.   "If engineering controls are not sufficient to reduce exposure to PM2.5 to less than a current AQI of 151, then the employer shall reduce employee exposures to the extent feasible."[1026] "Whenever engineering controls are not feasible or do not reduce employee exposures to PM2.5 to less than a current AQI of 151, the employer shall implement

---

[1020] California Code of Regulations, Title 8, § 5141.1 – ("This section applies to workplaces where: (A) The current Air Quality Index (current AQI) for PM2.5 is 151 or greater, regardless of the AQI for other pollutants; and (B) The employer should reasonably anticipate that employees may be exposed to wildfire smoke. "). Law effective July 29 2019.
[1023] Id at (a)(C).
[1024] California Department of Labor, Dept. of Industrial Relations, *Worker Protection from Wildfire Smoke*, https://www.dir.ca.gov/dosh/doshreg/Protection-from-Wildfire-Smoke/Wildfire-smoke-emergency-standard.html
[1025] Id at (d).
[1026] Id at (f)(1).

546

administrative controls, if practicable, such as relocating work to a location where the current

AQI for PM2.5 is lower, changing work schedules, reducing work intensity, or providing

additional rest periods."[1027]

1270.   "Where the current AQI for PM2.5 is equal to or greater than 151, but does not

exceed 500, the employer shall provide a sufficient number of respirators to all employees for

voluntary use in accordance with section 5144 and encourage employees to use respirators."[1028]

1271.   Section 5141 requires employer provide information included in Appendix B,

which includes that: "Particulate matter can irritate the lungs and cause persistent coughing,

phlegm, wheezing, or difficulty breathing. Particulate matter can also cause more serious

problems, such as reduced lung function, bronchitis, worsening of asthma, heart failure, and

early death."[1029]  Gjovik complained of these health risks to her manager David Powers and the

EH&S team but was ignored.

1272.   Appendix B also includes a required statement to be shared with workers that:

"An AQI over 100 is unhealthy for sensitive people and an AQI over 150 is unhealthy for

everyone."[1030] Again, Gjovik reported this to her manager and EH&S, and complained they were

not aligning with this rule, and instead claimed they only cared if AQI exceeded 500. Gjovik

complained that 500 is "hazardous."

1273.   Gjovik complained to Apple about their wildfire smoke response, including

employee PM2.5 exposure, in at least 2019, 2020, and 2021. Gjovik complained to US EPA

about Apple's response to wildfire smoke and how it intersected with her concerns about

Apple's response to their CERCLA allegations in 2021.

---

[1027] Id at (f)(2).
[1028] Id at (f)(3)(A).
[1029] California Code of Regulations, Title 8, § 5141.1 – Appendix B "Protection from Wildfire Smoke Information to Be Provided to Employees (Mandatory)" [Effective July 29 2019].
[1030] Id at (c)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

**4)  §6310: Injury Reporting [8 Cal.C.Reg. § 14300]**

1274.  Apple discriminated against and discharged Gjovik because Gjovik complained that Apple is hiding its employee injury rates. Apple keeps internal registries of employee injuries that are not made public or shared with OSHA, however one was 'leaked' and described by reporters in 2017. Among other injuries, the report documented a female employee in Apple's Arques offices in Sunnyvale on an adjacent Superfund mega-plume as Gjovik's office, noting she complained of "*feeling lightheaded, had difficulty seeing clearly, could not stand.*"[1031] Employees from Apple's factories have been reporting poisonings from chemical emissions, including fainting at work, since at least 2009.[1032]

1275.  Apple told Gjovik they did not even record her fainting spell at the Triple Site. Apple likely has internal documents revealing vapor intrusion exposure to their employees yet denied any such knowledge or records. Under 8 CCR § 14300 et seq. Apple was supposed to record all injuries that are work-related, appear to create a new case, and that result in a loss of consciousness on a Form 301. Powers never filed a Form 301 or otherwise reported Gjovik's fainting spell.

1276.  Gjovik also complained Apple never recorded or reported to OSHA her fainting spell in 2019, the peanut anaphylaxis in 2017, the contraction of whooping cough at a work conference in 2017 (along with West's failure to provide first aid), or a burn to her eyes from

---

[1031] William Turton, Leaked Document Details Apple Employee Injuries, Hints at Secretive New Products. Gizmodo, April 20 2017, https://gizmodo.com/leaked-document-details-apple-employee-injuries-hints-1794482497

[1032] Friends of Nature, IPE, Green Beagle, The Otherside of Apple, Jan 20 2011, pg7, ("When local authorities inspected the production site, they discovered a buildup of volatile n-hexane in the air that greatly exceeded national safety limits. As the workers were not effectively protected, over time many in the production area were gradually poisoned. Since late 2009, many of the employees at Lian Jian Technology have been falling sick. Lacking physical strength, they would suddenly drop what they were holding or even faint and collapse in the production area..") https://media.business-humanrights.org/media/documents/files/media/documents/it_report_phase_iv-the_other_side_of_apple-final.pdf

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

iPhone prototype lasers in 2018. The whooping cough would have required both a Form 301 and Form 5020 due to lost work time beyond the date of injury (Gjovik took time off due to the severe illness).

### 5) §6310: Retaliation for Complaining about e-Waste Violations

1277.   Apple retaliated against Gjovik because Gjovik complained to the government

1277.   and to Apple about Apple's history of negligence related to hazardous waste due diligence, employee safety precautions, and lack of disclosure to employees about hazardous waste exposure and its health impacts, citing the *People of the State of California v. Apple Inc* lawsuit (filed against Apple over violations of California Health and Safety Code §25100 and implementing regulations).[1036] The California government settlement with Apple required injunctive relief to cease unlawful actions, require training at California Compliance School, conduct inspections and maintain documentation, and to pay the Department of Toxic Substances control $450,000.

1278.   Apple retaliated against Gjovik because she raised her cancelled "Hand Me Down Hardware" recycling program as part of her investigations with Employee Relations in 2021. Gjovik complained about how she was treated, but also about the unnecessary waste.

### 6) §6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7]

1279.   Apple discriminated against and discharged Gjovik because Gjovik complained about a violation of Cal. Labor Code §6399.7 (Right to Know).[1037] Because Apple violated Section 6399, as with the other codes above, Apple also violated the provisions of Section 6310.

---

[1036] People of the State of California v Apple Inc., Case No. 16CV303579, Final Judgement Pursuant to Stipulation (Dec 2016)

[1037] Cal. Labor Code § 6399.7 Hazardous Substances Information and Training Act – ("No person shall discharge or in any manner discriminate against, any employee because such employee …. because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310.")

**Deleted:** about Apple's NDAs restricting discussion of workplace injuries. For example, Apple had provided an NDA for Gjovik to sign when a customer Apple Watch band gave her a severe rub-burn on her wrist. The NDA claimed to be a "Deed Poll" and said Apple considers it Confidential information that they are *"conducting the study, the types and methods of data collection, and any other detail about the study, and the types and methods of data collection, and any other detail about the study."* The NDA said not to tell anyone about the study, even other employees, friends, family members, and *"especially, the press."*¶

Prior to her termination, from March 2021 through September 2021, Gjovik complained to Apple and to the government about safety

**Deleted:** about safety concerns about Gjovik's office, concerns about Apple's safety policies and practices, and concerns about the safety of Gjovik's coworkers. Apple's discrimination against Gjovik included but was not limited to firing, reassignment, lost opportunity for promotion, suspension, threats, and denial of benefits. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.¶
<#>In addition, Apple did all of the above while knowing it created an unsafe workplace, while attempting to conceal the safety issues at the workplace, and while also concurrently refusing to fix some of the major safety issues at that workplace (i.e., it took them two years to address the vapor intrusion/HVAC issues).¹⁰³³ In violation of OSH Act 1910.1020(g), Apple never provided Gjovik information about the records noted or her rights under this section, either upon first entering into employment or least annually thereafter.¶
<#>In violation of 910.1020(e)(2)(i), Apple's response to Gjovik's request for exposure records for 825 Stewart Drive only resulted in Apple sharing the 2015 vapor intrusion testing result and no other data. When Gjovik requested information about her exposure to chemicals at her office, Apple should have provided a record measuring and monitoring the amount of toxic substances or harmful physical agents to which she had been exposed,¹⁰³⁴ and in the absence of that data, then data about employees in work conditions similar to those of the employee to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected. ¹⁰³⁵ For instance, there are a number of EPA/OSHA studies about employee chemical exposure, and a number of EPA vapor intrusion studies in workplaces. Any of these could have been shared as a reference as to what Gjovik's exposure might be. When Gjovik started this type of inquiry, Waibel informed Gjovik that Apple would not discuss any of Gjovik's workplace safety concerns ever again.¶
Gjovik also raised concerns

**Deleted:** with

**Deleted:** around

**Deleted:** ,§§

**Deleted:** .

**Deleted:** : "

**Deleted:** , Cal. Labor Code § 6399.7

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1280.   Apple retaliated against Gjovik because Gjovik complained or testified regarding non-compliance with the Hazardous Substances Information and Training Act (Section 6399.7) which prohibits an employer from retaliating against an employee who complains or testifies about non-compliance with the Hazardous Substances Information and Training Act.

1281.   While Gjovik argued with Apple about this matter related to 825 Stewart Drive (as she did not yet know about 3250 Scott Blvd), however, Apple knew and was considering her arguments in the context of 3250 Scott Blvd as well under both California Code, but also the federal RIGHT TO KNOW statute and the CLEAN AIR ACT.[1038]

**7)   §6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)]**

1282.   Apple retaliated against Gjovik because Gjovik complained that Apple failed to provide clear and reasonable warning to all individuals prior to exposure to chemicals listed on the Proposition 65 (Cal. Code of Reg. §5194(b)(6)) list of chemicals known to the State of California to cause cancer, birth defects, or reproductive harm. Prop 65 applies to both occupational and environmental exposures. [1039]

1283.   Apple at 825 Stewart Drive did not disclose the recent history and thus imminent risk of exposure to certain dangerous chemicals (TCE, ethylbenzene, toluene, vinyl chloride, etc.) above EPA risk levels. Apple had one or more listed chemicals emitted into the environment where employees were and could be exposed. Apple did not and could not prove the exposure caused no significant risk.[1040] Apple did not provide the required warning to

---

[1038] The Emergency Planning and Community Right-to-Know Act (EPCRA), aka Title III of the Superfund Amendments and Reauthorization Act (SARA). EPCRA §§ 302, 304, 311-3. Clean Air Act, 42 U.S.C., § 7622(a).

[1039]

[1040] "A warning … shall not apply to … An exposure for which the employer responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for the chemicals known to the State to cause cancer… In any enforcement action the burden of showing that an exposure meets the criteria … shall be on the employer."

Deleted: <#>Right-to-Know Retaliation: Cal. Labor Code §6399.7 (via § 6310)¶

Deleted: . Labor Code section

Deleted: Labor

Deleted: ,

Deleted: ,

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

employees or others who were exposed, before, after, or during exposure in violation of Cal. Code of Reg. §5194(b)(6).[1041]

1284. Known exposed parties at 825 Stewart Drive include employees, vendors, federal employees, and city employees resulting in occupational and environmental exposures. Known exposed parties at 3250 Scott Blvd include employees, vendors, city employees, and thousands of nearby residents resulting in occupational and environmental exposures. In neither location were warnings or signs posted conspicuously in the workplace, in violation of §5194(b)(6). Gjovik raised these concerns and Apple said they refused to do this because they decided there was no "legal obligation" and then fired Gjovik.

1285. At 825 Stewart Drive, Apple omitted disclosure of at least 10 §339 hazardous chemicals including the contaminants of concern recorded in the federal Record of Decision for the CERLCA site: 1,1,1-TCA; Freon-113); 75343, 1,1-Dichloroethane; Ethylidene chloride; 1,1-Dichloroethene; 1,2-Dichlorobenzene; Vinyl chloride; 1,2-Dichloroethylene, 1,2,3,5-Perchloroethylene, 1,2-trans-Dichloroethylene, TCE.

1286. Prior indoor air testing at 825 Stewart Drive, also showed the presence of 2 additional §339 hazardous chemicals from §5194(b)(6), Toluene and Ethylbenzene, which were known to be in the CERCLA groundwater plume under the building, but Apple claimed without data the emissions were 'from construction,' yet did not provide conduct follow up air testing or provide warnings. Instead, Apple terminated and terrorized the whistleblower. Apple's conduct violated Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194, which is actionable under § 6310.

---

[1041] Cal.Code.Reg. §5194(b)(6) "Proposition 65 Warnings" – ("Before exposing any employee to any hazardous substance that otherwise falls within the scope of this section and which requires a warning under this Act,… any employer subject to the Act shall comply with the requirements set forth in… the Act,") – in violation Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194

551

Deleted: [1042]

Deleted: [1041] ..

Deleted: (see 22 CCR Section 12000, Chemicals Known to the State to Cause Cancer or Reproductive Toxicity) …

Deleted: ."

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

### 8)  §6310:  Federal Environmental Statutes

1287.   Apple retaliated against Gjovik and terminated Gjovik's employment because of Gjovik's safety complaints related to a number of federal environmental statutes including, but not limited to: RCRA, EPCRA, SARA, NESHAP, the Clean Air Act ("CAA"), and the Clean Water Act ("CWA").[1043] Gjovik also made many complaints under CERCLA, and those complaints are detailed in this complaint to provide adequate factual background and context, and also argues Apple retaliation against her and termination of her employment was in retaliation for her CERCLA-related complaints to the extent they are not pre-empted by Gjovik's CERCLA whistleblower case.

1288.   Gjovik complained of fraud with the cracks in floor at her Superfund office because Apple was supposed to report a "change of circumstance" to the US EPA and work with US EPA oversight to evaluate and fix a compromised mitigation system. Gjovik was concerned that Apple's standard operating procedure seemed to be lawless, which is the opposite of how they claim they operate.

1289.   A Plaintiff who photographs a machine that caused injuries or talks to the press about safety issues, which leads to an OSHA investigation, engages in protected activity. Retaliation can be proven with the employee then suddenly terminated and the employer knew about the Plaintiff taking the photos and talking to coworkers about it, especially when *"the first thing [OSHA] wanted to look at was that machine [the Plaintiff photographed] when they arrived for the inspection."*[1044] Here, Apple knew Gjovik was organizing with coworkers to take photos of the cracks in the floor, knew Gjovik was talking to US EPA about the cracks in the

---

[1043]

[1044] *Perez v. Lloyd Indus., Inc.,* 399 F. Supp. 3d 308, 318–19 (E.D. Pa. 2019), noting *Donovan v. R. D. Andersen Constr. Co.,* 552 F. Supp. 249 (D. Kan. 1982).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

floor which led to US EPA inspecting Gjovik's office, and US EPA's notice of the inspection and inspection notes both mentioned cracks in the floor.

1290.   Apple's actions related to the HVAC and sub-slab ventilation systems at 825 Stewart, and failure to install exhaust monitoring and abatement systems at 3250 Scott Blvd, likely violated 42 US Code 7413(c)(1) by constructing new sources and modifying existing sources, failing to comply with design and work practices, and emitting hazardous pollutants in violation of NESHAP. It is a criminal violation of 42 US Code 7413(c)(2)(C) to fail to install monitoring devices required by the Clean Air Act.

1291.   For 3250 Scott Boulevard chemical emissions and exposure, see under "RICO Act," the Predicate Act of violating 18 USC § 229 *Relating to Chemical Weapons*," and also RCRA, CERCLA, CAA, and other environmental violations explained in the sections on "*Mail and Wire Fraud."* Those facts and allegations are incorporated here.

**9)   §6310: Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]**

1292.   Apple retaliated against Gjovik due to Gjovik complaining about Apple's compliance with Workplace Violence laws and policy in violation of California Labor Code § 6401.[1045]

1293.   California law prohibits retaliation for reporting Workplace Violence concerns.[1046] Apple retaliated against Gjovik for Gjovik's complaints about Apple's Workplace Violence personnel, policies, and practices – as well as Gjovik's complaints about Apple Global Security misrepresenting their Workplace Violence functional team's purpose and activities, and those activities violating numerous laws.

---

[1045] California Labor Code § 6401.7, 6401.9
[1046] California Labor Code § 6401.9(c) (1)(A), (2)(D) – ("An employer shall establish, implement, and maintain an effective workplace violence prevention plan… (2) The plan shall include all of the following… (D) Effective procedures for the employer to accept and respond to reports of workplace violence, and to prohibit retaliation against an employee who makes such a report.")

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1294.   Apple also sent a fake social media account after Gjovik and the account, (Mel Nayer) claimed that that Gjovik speaking publicly about her concerns about th terms and conditions of her employment at Apple was 'causing death threats' and so she had to delete her screenshots and posts immediately .

1295.   In April of 2010, Apple obtained a search warrant to raid the home of a tech reporter, seizing the reporter's computers and servers. There was no legal basis for the search and the warrant was withdrawn.[1047] It was also revealed that Apple sat on a steering committee that oversaw and directed the "*police task force*" (the "Rapid Enforcement Allied Computer Team") that raided the reporter's home on behalf of Apple.[1048]

located at 585 Whipple Avenue in Redwood City. I conducted a search of the premises and located the missing Apple prototype sticker in the parking lot near the entrance to the convenience store.

On 4/22/2010 at approximately 1245 hours, Apple employee Venkat Memula delivered the prototype iPhone to me at the REACT San Mateo Office to be retained as evidence in this case.

Continuing on 4/23/2010, I conducted a query on the address 40726 Greystone Terrace in

*Exhibit: Affidavit of Detective Matthew Broad, April 23 2010* [1049]

1296.   Gjovik's prior director, **Venkat Memula**, was included in the police officer's affidavit that was used as justification for the search warrant to raid the reporter's home. Memula was noted as the Apple employee who transported the iPhone to the REACT office. The affidavit also notes involvement by O'Melveny and Myers (the same law firm who sent the harassing Gobbler/ear canal email to Gjovik in September 2021).

---

[1047] Matt Zimmerman, *Gizmodo iPhone Warrant Affidavit Released, Impropriety of Search Confirmed,* EFF, May 14 2010, https://www.eff.org/deeplinks/2010/05/iphone-warrant-affidavit-confirms-impropriety
[1048] John Letzing, *Police task force oversight committee has included Apple,* MarketWatch, April 27 2010, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27
[1049]  Superior Court of the County of San Mateo, Affidavit for Search Warrant, SBSW 6643, Filed April 29 2010, pg9

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1297.   By May 2010, the search was now openly referred to as a home break-in, there was "*outrage*" from "*media watchdogs*", and press and public complained the task force was acting as "*Apple's secret police*" and as "*Apple's private police force*."[1050] The search was believed by many to violate California's Constitutional Reporter Shield law.[1051]

1298.   In 2011, Apple's Global Security and the Worldwide Loyalty team arranged a raid of a man's home without a warrant and based on their own corporate tracking of iPhone GPS data.[1052] Two Apple Global Security employees/Worldwide Loyalty members obtained the presence of four plainclothes San Francisco police officers in order to search the man's home. The officers identified themselves as police while the Apple employees said nothing. The man assumed the Apple employees were also police officers and let them into his house. [1053] The officers attempted to keep the search out of official records, leading the police spokesperson to initially assume it was a case of impersonation of officers by six individuals, not just two.[1054]

1299.   If the Apple employees who searched the man's home were not with the San Francisco police, that is a crime. And if they were with the SF Police Department, they had an obligation to report the information to the department, which did not happen.[1055]

---

[1050] Pete Carey, *Raid in iPhone case shines spotlight on REACT team, Mercury News*, May 4 2010, https://www.mercurynews.com/2010/05/04/raid-in-iphone-case-shines-spotlight-on-react-team/ "*The Rapid Enforcement Allied Computer Team operated out of publicity's glare until last month, when armed with a search warrant, its investigators broke into the Fremont home of a blogger-editor for the website Gizmodo."*
[1051] Matt Zimmerman, *OverREACTing: Dissecting the Gizmodo Warrant*, EFF, April 27 2010, https://www.eff.org/deeplinks/2010/04/gizmodo-search-warrant-illegal
[1052] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader*, Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader; SF Weekly, Lost iPhone 5: Bernal Heights Man Says Visitors Impersonating Police Searched His Home, https://web.archive.org/web/20211009190421/https://archives.sfweekly.com/thesnitch/2011/09/02/lost-iphone-5-bernal-heights-man-says-visitors-impersonating-police-searched-his-home-exclusive
[1053] Id.
[1054] Id.
[1055] Mat Honan, *Apple Investigators Reportedly Impersonated SF Police*, Gizmodo, September 2011, https://gizmodo.com/apple-investigators-reportedly-impersonated-sf-police-i-5836990

---

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1300.   One of the Apple employees threatened the Latino man and his family with deportation if he did not cooperate with Apple's search of his home.

1301.   Legally that is considered extortion, and any police officers involved would be violating the searched party's Constitutional rights.[1056] Press coverage complained of "*taxpayer paid enforcers for Jobs' mob.*"[1057]

1302.   Apple would later terminate Gjovik's employment only hours after Gjovik posted on Twitter linking to a 2011 article titled *"Lost iPhone 5: Bernal Heights Man Says Visitors Impersonating Police Searched His Home."*[1058] The article discussed both 2010 and 2011 "break in" matters discussed above.

1303.   California law requires that employers have an "effective" procedure for communication about workplace violence matters which ensures employees do not fear reprisal.[1059] Apple sent a "Workplace Violence and Threat Assessment" investigator to contact Gjovik in a haphazard, intimidating, and suspicious way. The person sent Gjovik an email without a subject line, with no context of why he was reaching out, made a vague threat against Gjovik, and demanded Gjovik get on the phone with him within an hour. Even if there was a real Workplace Violence concern about Gjovik, this is not normal or acceptable communication.

---

[1056] Fudzilla, Police investigate how they became Apple's secret police, https://www.fudzilla.com/news/24000-police-investigate-how-they-became-apples-secret-police
[1057] Id.
[1058] SFWeekly, Lost iPhone 5, *supra*; Twitter, https://twitter.com/ashleygjovik/status/1436071412624609287
[1059] California Labor Code § 6401.9(c) (1)(A), (2)(F) – ("An employer shall establish, implement, and maintain an effective workplace violence prevention plan……(2) The plan shall include all of the following... (F) Effective procedures to communicate with employees regarding workplace violence matters, including, but not limited to, both of the following…(i) How an employee can report a violent incident, threat, or other workplace violence concern to the employer or law enforcement without fear of reprisal. (ii) How employee concerns will be investigated as part of the employer's responsibility in complying with… [the code]… and how employees will be informed of the results of the investigation and any corrective actions to be taken.")

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1304.   Apple's termination of Gjovik was suspiciously timed with Gjovik's comments about Apple's apparent violation of California state criminal laws, and possibly also federal laws. Gjovik's comments about the article, and then also about the "Workplace Violence" interrogator who reached out to her ten minutes after she shared the article, was Gjovik raising concerns about (among other things) workplace safety at Apple, including Apple's Workplace Violence (law) policies and practices.[1060]

**10) 6310: Unfair Business Practices & False Advertising [Cal. Bus. & Prof. Code §§ 17200, 17500]**

1305.   Apple's violations of Cal.Lab.C. § 6310 also violate California Business & Professional Code §§ 17200 and 17500.[1061] The California Unfair Business Practices and False Advertising laws are not considered to be a means of enforcing the law claimed to have been violated; rather, they provide a remedy for economic damage suffered as a result of violations of a wide array of other laws.[1062] The California Supreme Court ruled that the federal OSH Act does not preempt either Cal.Bus. & Prof.C. § 17200 or § 17500 under the similar legal theory as why Proposition 65 was found to not be preempted by federal law.[1063]

1306.   Apple's failure to comply with workplace safety standards represented an unlawful, unfair, and fraudulent business practice; and Apple's representations concerning its commitment to workplace safety and its compliance with all applicable workplace safety standards were false and misleading in violation of California's fair advertising law. [See also,

---

[1060]

[1061] *Solus Industrial Innovations, LLC v. Superior Court,* 4 Cal. 5th 316, 345-52 (2018) – On February 8, 2018, the California Supreme Court unanimously ruled that local prosecutors could pursue civil penalties against employers for violating workplace safety standards under California's unfair competition law and fair advertising law.

[1062] Solus Indus. Innovations, LLC v. Superior Court of Orange Cnty., 4 Cal.5th 316, 340 (Cal. 2018)

[1063] Id at 342 – ("Our conclusion is consistent with the decision of the federal Department of Labor approving California's Hazard Communication Standard (Standard), which incorporated provisions from Proposition 65, the Safe Drinking Water and Toxic Enforcement Act. (Health & Saf. Code, §§ 25249.5 et seq. ; 62 F.R. § 31159-01.)")

---

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1  SOX and Dodd-Frank Whistleblower sections, and RICO Predicate Acts Wire Fraud and Mail

2  Fraud].[1064]

3  **F.   WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)**

4      1307.   In California, an employer may be subject to tort liability if it terminates an

5  employee in violation of a fundamental public policy.[1065]

6      1308.   Gjovik was retaliated against and discharged from employment for a variety of

7  reasons that violate public policy. Among other unlawful reasons, Gjovik was terminated in

8  violation of the "*strong public interest*" reflected in California Labor Code § 1102.5, "*in*

9  *encouraging employee reports of illegal activity in the workplace.*" [1066] [1067] For example, it is a

10  termination in violation of publicly policy (*Tamney Claim*) to terminate an employee for

11  complaining about unsafe work conditions or for asking to work in a safe and healthful

12  workplace.[1068] An example of this would be complaining about violations of California Labor

13  Code § 6403 (see § 6310 claim).[1069]

14     1309.   Apple's coercive and unlawful data collection of biometric, genetic, anatomical,

15  and surveillance data is a gross and egregious violation of the California Constitution, California

---

[1064] California Business and Professions Code sections 17200 and 17500.

[1065] *Steffens v. Regus Grp., PLC*, 485 Fed.Appx. 187, 188 (9th Cir.2012) (citing *Gould v. Md. Sound Indus., Inc.*, 31 Cal.App. 4th 1137, 1147 (1995)).

[1066] *Collier* at 1123; *Stoval* at *4; *Banko v. Apple, Inc.*, No. 13-02977 RS, 2013 WL 6623913, at *4 (N.D. Cal. Dec. 16, 2013).

[1067] *See Banko v. Apple Inc. (ND CA 2013) 20 F.Supp.3d 749, 758*—(termination in retaliation for reporting embezzlement violated public policy behind Dodd-Frank and Sarbanes-Oxley Act, including policies against embezzlement and illegitimate corporate tax deductions, and encouragement of whistleblowing); *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167; *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; CACI No. 2430.

[1068] Cal. Lab.C. § 6400; *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298, 188 CR 159, 164; *Cabesuela v. Browning-Ferris Indus. of Calif., Inc.* (1998) 68 CA4th 101, 109, 80 CR2d 60, 64; *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947, 88 CR3d 707, 716-717

[1069] *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1191–92 (C.D. Cal. 2013) – (The termination of an employee for complaining about a violation of § 6403 will support a cause of action for wrongful termination in violation of public policy.) See also *Khachatrian v. Stanford University*, No. C 97–20833 PVT, 1998 WL 856084, *3 (N.D.Cal. Dec. 4, 1998) – (same).

---

558

---

**Deleted:** <#>The true reasons for Gjovik's discharge are discussed as claims in this Complaint and in the government adjudications (all of Gjovik's pre-termination charges and complaints to the government are filed are incorporated here), and Apple's other violations of the law are incorporated here accordingly, including but not limited to retaliation for disclosures about Battergygate, reporting sanctions violations and vaccine hoarding to the DOJ, all of Gjovik's other legal claims, and posting about Apple's 2011 home invasion), however Apple's proffered though pretextual reason for firing Gjovik also violates public policy. Apple claimed it fired Gjovik for exposing, protesting, and complaining about certain data collection practices by Apple and because Gjovik would not get on a phone call with a 'Workplace Violence' interrogator within 'the hour' to supposedly discuss Gjovik's complaints about these data collection practices, though Apple later admitted it already planned to fire Gjovik.*¶
Apple's proffered reason for firing Gjovik which Apple claims is non-discriminatory, lawful, and was so important to Apple's business it justified immediate termination of an employee without warning – is literally illegal. Apple's coercive and unlawful data

**Deleted:** )

**Deleted:** *Banko; Tameny v.*

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

Labor Code 435, Cal. Penal Code 637.7, the California Privacy Rights Act, and the US FTC Act. Further, while the OCCPR is not self-executing, Apple's conduct violates the spirit of the ratified treaty. This unlawful data collection occurred with employees, but also with non-employees who were not given notice or asked for consent, and as such implicates the public and public policy. Further, Apple claims if the employee were to warn the non-employee about the data collection, then the employee could be fired immediately as they did with Gjovik – thus there was no way this practice would have been revealed without a whistleblower.

    1310.   Gjovik reported and testified about topics including employment discrimination, an unsafe workplace, refusing to sign a waiver of liability, improper business practices, discussing wages and equal pay with coworkers, and making political statements – all of which implicate public policy for the purpose of a *Tamney* claim.[1075]

    1311.   Facts, allegations, and legal authority related to California Lab.C. § 6310(b) and Lab.C. § 1102.5 are also incorporated here.[1076] There is a two-year statute of limitations following termination to bring a claim in court. [1077] The cause of action accrues at the time of dismissal.[1078]

---

[1075] *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 C4th 1143, 1160 (employment discrimination); *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947 (unsafe workplace), Civ.C. § 1668 and *Baker Pacific Corp. v. Suttles* (1990) 220 CA3d 1148, 1156-1157 (refusal to release employer from liability); *Green v. Ralee Eng. Co.* (1998) 19 C4th 66, 85 (improper practices); *Green v. Par Pools Inc.* (2003) 111 CA4th 620, 633 (wages; equal pay); *Ali v. L.A. Focus Publication* (2003) 112 CA4th 1477, 1487-1488 (political speech); *White v. Ultramar, Inc.* (1999) 21 C4th 563, 568 (testifying at a hearing).
[1076] *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298 and *Cabesuela v. Browning-Ferris Indus. of Calif., Inc.* (1998) 68 CA4th 101, 109 (employee fired for complaining about unsafe working conditions)
[1077] Cal. Code Civ. Proc. § 335.1; *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[1078] *See Romano v. Rockwell Int'l, Inc.* (1996) 14 C4th 479, 501, 59 CR2d 20, 33; *Aviles-Rodriguez v. Los Angeles Comm. College Dist.* (2017) 14 CA5th 981, 991, 222 CR3d 444, 452.

---

Deleted: common law

Deleted: The

Deleted: .

Deleted: .

Deleted: <#>The policy violated by Apple is supported by constitutional and statutory provisions, the policy is public in that it insures to benefit the public, the policy is fundamental and substantial, and the policy was referenced at the time of discharge.[1076] ¶
<#>Apple was put on notice that there were significant public policy concerns around the activities Gjovik complained of and was supposedly terminated over, when The Congress sent Apple a letter in 2017 inquiring as to exactly the information Gjovik disclosed, how Apple obtained the training data for Face ID. At which time the Apple executives refused to answer Congress and instead provided misleading and inaccurate statements.[1071] Apple refused to say where the images came from but did falsely claim there was 'informed consent.' Apple knew their use of employees for this data could not be consensual, so they did not provide that information to Congress.¶
<#>As for Apple's complaints about Gjovik complaining about Apple asking repeatedly to scan Gjovik's car canals, despite what Apple said to threaten Gjovik with a meritless IP lawsuit, the information Gjovik shared was not secret. In fact, Apple's extensive ear scanning was made public years prior,[1072] and Apple would go on to talk about it more a couple months after Gjovik was fired, now claiming to have the largest library of ear (scans) in the world.[1073] ¶
<#>In addition, contrary to what Apple claimed, Gjovik did not sign any NDA related to the ears. In fact, on August 10 2018 Gjovik emailed Apple, in response to similar requests, saying she didn't want her ears scanned "indefinitely." ¶
<#>The text of the post Apple complained about was Gjovik saying: "*I'm still over here in Apple's time-out chair & they keep telling me to respect my abuser's privacy & be silent. Meanwhile I got 3x of these in the last month since being on leave. NO, APPLE, STOP IT. I can't tell if they're harassing me or just being super intrusive or both."[1074]* Apple told Gjovik she was fired for posting this and called it "leaking." ¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

**i.    Tamney: Reporting Allegations of Criminal Conduct to Apple, Law Enforcement, and District Attorneys**

1312.   Regardless of if Apple terminated Gjovik for the proffered reason, or the other reasons alleged, all reasons violate fundamental public policy, including interest in a workplace free from illegal practices.[1079] Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to her constitutional or statutory rights to report suspected crimes to law enforcement and to district attorneys, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[1080]

1313.   Apple retaliated against Gjovik because Apple knew, and/or Apple suspected, that Gjovik reported suspected criminal activity by Apple to law enforcement, to district attorneys, and to Apple.[1081] Witness Retaliation statutes forbid retaliation (including termination) against witnesses for providing testimony and cooperating in investigations, and it is captured in state and federal statutes which include criminal penalties, thus this Tamney claim for retaliation due to reporting criminal conduct clearly implicates public policy.[1085]

1314.   In *Collier*, the California Court of Appeal recognized that there is a compelling and "*fundamental public interest in a workplace free from crime.*"[1086] In *Banko v Apple*, the judge cited the *Collier* holding when striking down Apple's claim it could fire employees for

---

[1079] *Banko v. Apple, Inc; Tamney v. Atlantic Richfield Co; Collier v. Sup.Ct. (MCA, Inc.)* (1991) 228 CA3d 1117, 1123-1124, 279 CR 453, 456; *Ferrick v. Santa Clara Univ.* (2014) 231 CA4th 1337, 1346-1347, 181 CR3d 68, 78.
[1080] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 CA4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.
[1081] *Jie v. Liang Tai Knitwear Co., Ltd.* (2001) 89 CA4th 654, 660-661, (plaintiffs were allegedly fired for complaining to authorities that defendants were employing undocumented workers in violation of federal immigration laws)
[1085] *Grant-Burton v. Covenant Care, Inc.* (2002) 99 CA4th 1361, 1372; *Sullivan v. Delta Air Lines, Inc.* (1997) 58 CA4th 938, 946.
[1086] Banko v. Apple, Inc at 3.

560

Deleted: It is a violation of public policy for Apple to discharge an employee from employment due to the employee Apple

Deleted: crimes or due to the employee hiring an attorney,[1082] due to the employee refusing to sign a liability waiver,[1083] or for the employee refusing to engage in an unlawful act.[1084]

Deleted: Banko; Collier; Ferrick.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

whatever reason it wanted, even for reporting crimes.[1087] The court explained that any laws

captured in the penal code are always assumed to reflect public policy. It is a violation of public

policy for Apple to discharge an employee from employment due to the employee reporting

crimes.[1088] In *Bartley*, an employer's termination of an employee who was cooperating with the

FBI's investigation into her employer constituted a Tamny claim.[1089]

1315.   In addition to the legal precedent, Apple's own Whistleblowing Policy

acknowledges that reports of "*criminal activity*", "*breaches of sanctions*", and "*attempts to cover

up any of these behaviors*" are whistleblower disclosures.[1090] cooperated with an FBI bribery

investigation of his employer and its union.

1316.   See also the § 1102.5 section and it is incorporated here and this is incorporated

there.

### ii.    Tamney: Reporting Allegations of Unlawful Acts to State and Federal Agencies; Testifying About Employer

1317.   Gjovik reported and testified about topics including sex and disability

discrimination, worker's health and safety laws, public health and safety laws, anti-corruption

laws, and laws prohibiting fraud and misrepresentations – all of which are "fundamental" rights

for the purpose of a *Tamney* claim.[1091]

---

[1087] Banko v. Apple, Inc at 5.
[1088] Banko v. Apple, Inc at 5.
[1089] *Bartley v. University Asphalt Co., Inc.*, 129 Ill. App. 3d 231, 84 Ill. Dec. 539, 472 N.E.2d 499 (4th Dist. 1984), appeal allowed, (May 1, 1985) and judgment rev'd on other grounds, 111 Ill. 2d 318, 95 Ill. Dec. 503, 489 N.E.2d 1367, 121 L.R.R.M. (BNA) 2928, 103 Lab. Cas. (CCH) ¶ 55545, 106 Lab. Cas. (CCH) ¶ 55697 (1986).
[1090] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf
[1091] *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298 (worker health and safety); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924 (public health and safety); *Collier v. Sup.Ct. (MCA, Inc.)* (1991) 228 CA3d 1117, 1123-1124 (antitrust and bribery laws); *Ferrick v. Santa Clara Univ.* (2014) 231 CA4th 1337, 1346-1347 (illegal and unethical business practices); *Stevenson v. Sup.Ct. (Huntington*

1318.   Gjovik reported CERCLA violations to Apple, to the US EPA, and to other agencies where Apple's misconduct resulted in several vectors of hazardous waste vapor exposure at 825 Stewart Drive. The US EPA has explained that, "*CERCLA sites are potential sources of air pollutant emissions that can affect public health or welfare.*"[1092] Further, CERCLA retaliation claims are not precluded by US Department of Labor Jurisdiction.[1093] Thus, this is another *Tamney* claim.

1319.   Gjovik reported to US EEOC and California DFEH (see below). Gjovik reported to NLRB. Gjovik reported to the US Department of Justice. All of these are protected.

1320.   Gjovik was discriminated against and terminated because she provided truthful testimony to government agencies that was adverse to Apple. In fact, Apple attempted to interrogate her and then terminated her the day before a federal affidavit. There is a Tamney claim for wrongful discharge when an employee is fired for providing truthful testimony.[1094] *Deschene v. Pinole Point Steel Co* explains that "*since 1959, California has recognized that it is 'obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee" because the employee gives truthful testimony.'*[1095]

---

*Mem. Hosp.),* 16 C4th at 896 (sex discrimination); *City of Moorpark v. Sup.Ct. (Dillon),* 18 C4th at 1160-1161 (disability discrimination); Bus. & Prof.C. § 17200, Civ.C. § 1709; and Pen.C. § 484 (fraud).
[1092] US EPA, *ARARs Fact Sheet: Compliance with the Clean Air Act and Associated Air Quality Requirements,* September 1992, OSWER 9234.2-22FS, pg2,
https://www.epa.gov/superfund/contaminant-media-and-site-type-specific-remedy-guidance#air
[1093] Devlyn v. Lassen Municipal Utility District, 737 F. Supp. 2d 1116, 1122 (E.D. Cal. 2010) – (nothing in the statute or in Ninth Circuit precedent requires that a plaintiff first apply to the Secretary of Labor for review in order to assert a claim under CERCLA...")
[1094] *Deschene v. Pinole Point Steel Co.,* 76 Cal. App. 4th 33, 41, 90 Cal. Rptr. 2d 15, 21 (1999), as modified (Nov. 29, 1999); *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1086–1087, 4 Cal.Rptr.2d 874, 824 P.2d 680 [claim for wrongful discharge may arise for employee who gives truthful testimony].
[1095] Id at 43; *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188, 344 P.2d 25.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1321.   It is also a violation of public policy for Apple to discharge an employee from employment due to the employee refusing to sign a liability waiver, as Apple did to Gjovik.[1096]

**iii.      Tamney: Testifying to Agency and/or Legislative Committee**

1322.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional or statutory right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[1097] Termination of an employee most clearly violates public policy when it contravenes a statute forbidding termination for a specified reason.[1098]

1323.   Cal. Gov. Code § 9414 protects employees from employer retaliation for the employee being a witness for a committee, or givin testimony to a committee as a witness or victim. The code says, any employer or person acting on behalf of an employer who, directly or indirectly, harasses any person employed by that employer, when the harassment is motivated by the fact that the employee is, was, or may be a witness before a committee, is guilty of a misdemeanor.[1099]  It is also a misdemeanor to deprive, threaten, attempt to deprive, or request that a person not be employed, because the person was or might become a witness before a committee.[1100] Any person who knowingly and maliciously prevents or dissuades (or attempts to prevent or dissuade) any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law – is guilty of a public offense and shall be punished by imprisonment.[1101]

---

[1096] *Baker Pac. Corp. v. Suttles*, 220 Cal. App. 3d 1148 (1990).
[1097] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.
[1098] *Grant-Burton v. Covenant Care, Inc.* (2002) 99 CA4th 1361, 1372, 122 CR2d 204, 214.
[1099] Cal. Gov. Code § 9414(b)
[1100] Cal. Gov. Code § 9414(a)(2)
[1101] Cal. Penal Code § 136.1

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1324.   Apple knew Gjovik was talking to law makers about what occurred to her next to 3250 Scott Blvd, and secretly knew that it was Apple who was responsible for Gjovik's harm, despite Gjovik not knowing that fact yet, and Apple encouraging her to instead pursue Irvine Company. Apple knew Gjovik may testify at legislative committees about the air pollution (caused by Apple), and Apple undertook an effort to ensure Gjovik did not testify, and to also harass Gjovik because Gjovik may testify to a committee.

1325.   Apple also knew Gjovik was talking to politicians about its retaliation against Gjovik after her termination, including a State Senator, a US Representative, and a US Senator. If an employer has reason to think the employee plans to be a witness for an agency or committee, that is enough to make the employee's related conduct protected from retaliation.[1102]

### iv.    Tamney: Discrimination, Harassment, and Retaliation due to Sex and Disability (Cal. FEHA; California Constitution, Article I, Section 8; Title VII/EEOC)

1326.   The California Fair Employment and Housing Act ("FEHA") makes it an unlawful employment practice to harass an employee based on the full range of protected characteristics.[1103] Harassment involves various forms of verbal and physical conduct, sexual or nonsexual, that create a hostile or offensive working environment and is something that communicates an offensive message to the harassed employee.[1104] Employers are automatically liable for harassment committed by a manager or supervisor.[1105] Employers may be responsible

---

[1102] Floyd v. Arizona Public Service Co., 90-ERA-39 (Sec'y Sept. 23, 1994).
[1103] Gov.C. § 12940(j)(1); Gov.C. § 12940(j)(1); see *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 C4th 121, 129, 87 CR2d 132, 137-138.
[1104] 2 CCR § 11019(b); *Roby v. McKesson Corp.* (2009) 47 C4th 686, 706, 101 CR3d 773, 788.
[1105] 2 CCR § 11019(b)(3).

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

through negligence for harassment of the plaintiff by non-supervisor employees.[1106] Employers may also be responsible via negligence for harassment of the plaintiff by non-employees.[1107]

1327.   FEHA prohibits retaliation against persons who file a charge with the Civil Rights Department DFEH; testify, assist or participate in charge proceedings; request an accommodation under FEHA; oppose acts prohibited by FEHA ("opposition").[1108] Submitting a charge to the agency is protected activity.[1109]   The scope of the anti-retaliation provision under Title VII "extends beyond workplace-related or employment-related retaliatory acts and harm."[1110] Retaliation can occur even after the employment relationship has ended, such as by refusing to give a job reference or giving an unjustified negative one.[1111] Plaintiff need only prove that retaliatory animus was a substantial or motivating factor.[1112]

1328.   FEHA creates a statutory duty for employers to accommodate protected characteristics including physical disability.[1113] "Physical disability" includes a physiological condition that affects a body system and limits a major life activity or requires special education.[1114] "Mental disability" includes any mental or psychological condition that limits a

---

[1106] 2 CCR § 11019(b)(4).
[1107] Gov.C. § 12940(j)(1); *Carter v. California Dept. of Veterans Affairs* (2006) 38 C4th 914, 930, 44 CR3d 223, 235-236; *M.F. v. Pacific Pearl Hotel Mgmt. LLC* (2017) 16 CA5th 693, 696-697, 701, 224 CR3d 542, 545, 549—(employer's duty triggered after drunk, nonemployee trespasser loitered on the premises, confronted and aggressively propositioned other employees for sexual favors and then sexually assaulted plaintiff)
[1108] See Chin, Wiseman, Callahan & Lowe, Cal. Prac. Guide: Employment Litigation (TRG), Ch. 5 Part II.
[1109] *George v. California Unemployment Ins. Appeals Bd.* (2009) 179 CA4th 1475, 1490, 102 CR3d 431, 444.
[1110] *Burlington Northern & Santa Fe Ry. Co. v. White*, supra, 548 US at 67, 126 S.Ct. at 2414; see *Arias v. Raimondo* (9th Cir. 2017) 860 F3d 1185, 1191-1192—retaliation claim under Fair Labor Standards Act (29 USC § 201 et seq.) stated where attorney tried to deport employee who sued his client.
[1111] 2 CCR § 11021(a)—employer must act impartially in recommending former employee for subsequent jobs; *Robinson v. Shell Oil Co.* (1997) 519 US 337, 345-346, 117 S.Ct. 843, 848-849
[1112] George v. California Unemployment Ins. Appeals Bd., supra, 179 CA4th at 1492, 102 CR3d at 446.
[1113] See Gov.C. §§ 12940(m), (n); *A.M. v. Albertsons, LLC* (2009) 178 CA4th 455, 463, 100 CR3d 449, 455.
[1114] Gov.C. § 12926(m); *County of Fresno v. Fair Employment & Housing Comm'n* (1991) 226 CA3d 1541, 1549, 277 CR 557, 562-563

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

major life activity or requires special education.[1115] when an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require the employee take a leave.[1116]

1329.   Antidiscrimination laws such as FEHA "*unquestionably satisfy [the] requirement*" of a discharge being a violation of a "*firmly established, fundamental, and substantial*" public policy.[1117] Cal. Gov. Code § 12920 explains: "*It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination on account of … sex.").* Discharging an employee in retaliation for reporting discrimination based on sex and sexual harassment violates California public policy.[1118] Termination in violation of public policy claims are not preempted or blocked by FEHA claims, as they can exist concurrently in the same lawsuit as a derivative claim.[1119]

1330.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[1120]

1331.   Gjovik filed DFEH and EEOC claims on August 12 2021 and proceeded to testify and provide evidence, requesting a Right to Sue letter, which she was granted on September 9

---

[1115] Gov.C. § 12926(j).
[1116] 2 CCR § 11068(c).
[1117] *Foley v. Interactive Data Cor*p., 47 Cal. 3d 654, 671 n.11 (1988)
[1118] *Barton v. New United Motor Mfg., Inc.,* 43 Cal. App. 4th 1200, 1208-09 (1996); *Zamora v. Sacramento Rendering Co.,* United States District Court for the Eastern District of California, No. Civ. S-05-00789 DFL KJM (January 17 2007).
[1119] *Ayala v. Frito Lay, Inc.,* 263 F. Supp. 3d 891, 913 (E.D. Cal. 2017).
[1120] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

2021, just hours before Apple fired her.[1121] Apple retaliated against Gjovik for opposing Apple's discriminatory practices.[1122]

### v.   Tamney: Victim of Crime; Apple's Concealment

1332.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[1123]

1333.   Under Cal. Lab. Code § 230(e), "*An employer shall not discharge or in any manner discriminate or retaliate against an employee because of the employee's status as a victim of crime or abuse, if the employee provides notice to the employer of the status or the employer has actual knowledge of the status.*" An employee who is *"discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated or retaliated against in the terms and conditions of employment by their employer for reasons prohibited in subdivision …(e)… shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer, as well as appropriate equitable relief."* Termination of an employee most clearly violates public policy when it contravenes a statute forbidding termination for a specified reason.[1124]

---

[1121]

[1122] *Rojo v. Kliger* (1990) 52 C3d 65, 89 (Tameny claim based on gender discrimination and sexual harassment); *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)*, supra, 16 C4th at 885, (Because the FEHA expressly does not preempt common law tort claims, the FEHA's remedies are not exclusive and do not bar a tort claim for wrongful discharge in violation of public policy); *Phillips v. St. Mary Regional Med. Ctr.*, supra, 96 CA4th at 238 (Plaintiffs may rely on Title VII as a source of public policy for their state common law wrongful termination cause of action); *Carmichael v. Alfano Temporary Personnel* (1991) 233 CA3d 1126, 1132 (employee allegedly discharged for filing charges with EEOC that employer discriminated against women and minorities).
[1123] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.
[1124] *Grant-Burton v. Covenant Care, Inc.* (2002) 99 CA4th 1361, 1372, 122 CR2d 204, 214.

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1334. Apple also terminated Gjovik due to Gjovik's complaints and protest about, and injuries due to Apple's fraudulent business practices.[1125] Apple also attempted to obtain a waiver of future claims from Gjovik through fraud, and which could be used by Apple to waive that fraud.[1126] "*One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.*"[1127]

**vi.    Tamney; Invasion of Privacy (Cal. Const. art. 1, § 1)**

1335. Apple's supposedly legitimate reason for terminating Gjovik, while false and pretextual, is an illegality itself. Apple claims it fired Gjovik for complaining about Apple surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording.[1128] Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to constitutional and statutory right to privacy, which are rights that benefits the public, are substantial and fundamental rights, and which were firmly established at the time of discharge.[1129] While this reason is pretextual and false, Apple's decision to use this reason as their excuse for terminating Gjovik, reveals Apple's animus against California employee privacy rights.

---

[1125] *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 CA4th 338, 367, 112 CR3d 455, 481-482; California Bus. & Prof.C. § 17200; *Collier v. Sup.Ct. (MCA, Inc.)* (1991) 228 CA3d 1117, 1123-1124, 279 CR 453, 456.

[1126] Cal. Government Code § 12964.5; Emily Otte, Toxic Secrecy: Non-Disclosure Agreements and #metoo, 69 U. Kan. L. Rev. 545, 571 (2021) – ("Contract law provides limitations on the freedom to contract and refuses to enforce contracts that include duress, undue influence, unconscionability, mistake, and public policy.")

[1127] California Code, Civil Code - CIV § 1709.

[1128] This was Apple's written justification on March 3 2022 in the US Department of Labor *Gjovik v Apple* CERCLA, SOX, & OSH Act case, and was also implied by the threatening letter the O'Melveny & Myers law firm sent Gjovik on September 15 2021.

[1129] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1336.  Gjovik has a legally protected privacy interest and a reasonable expectation of privacy, and the conduct by Apple was a serious invasion of privacy.[1130] Apple did discriminate against Gjovik for Gjovik's statements about privacy rights and protests about privacy invasions. Gjovik's termination was in violation of fundamental, basic, and substantial public policies of the State of California, including, but not limited to, section 1102.5 of the California Labor Code, section 17200 of the Business and Professions 2 Code, Article I Section 1 of the California Constitution, and Section 637.7 of the California Penal Code.

1337.  Article I, section 1 of the California Constitution declares: "*All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.*" Proposition 11 stated:

The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.[1133]

1338.  Article 1 of the California Constitution expressly recognizes that all people have an inalienable right to privacy. (CAL. CONST. ART. 1, § 1). The California Supreme Court has said that an invasion of privacy claim under the California Constitution requires the "*serious invasion*" of a "*legally recognized privacy interest*" in circumstances where the plaintiff enjoyed

---

[1130] *Trujillo v. City of Ontario,* 428 F. Supp. 2d 1094, 1119–20 (C.D. Cal. 2006), aff'd sub nom. *Bernhard v. City of Ontario,* 270 F. App'x 518 (9th Cir. 2008).
[1133] RIGHT OF PRIVACY, California Prop. 11 (1972). https://repository.uclawsf.edu/ca_ballot_props/762

a "*reasonable expectation of privacy*".[1134] The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians.[1135]  Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.[1136] This right to privacy impacts employment laws in many areas, from social media to surveillance to protection of medical information. All California employees are covered by California's constitutional right to privacy. [1137] California's constitutional right to privacy is "self-executing" and confers a judicial right of action on all Californians.[1138]

1339.  The definition of the right of privacy is simply the "right to be left alone." [1141] It is also the value that is threatened by "snooping," the "monitoring" of personal conduct, and the "collecting" and "gather[ing]" of personal information.[1142] "It is clear that a right of action is implicit in the right of privacy." [1143] One's role in society as a student or employee does not diminish one's right to privacy.[1144] An employer's use of cameras to monitor employee behavior at home can be particularly troublesome for employers. The Supreme Court clearly identifies the home as a bastion of intimacy and privacy.[1145] While most courts have ruled against an invasion of privacy based on video recording in the workplace, courts often draw the line in areas society

---

[1134] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal. 4th 1, 35-37 (1994).

[1135] *White v. Davis*, 13 Cal. 3d 757 (1975).

[1136] See *Annenberg v. Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [ 113 Cal.Rptr. 519]; 26 Hastings L.J. 481, 504, fn. 138 (1974).) *Porten v. University of San Francisco*, 64 Cal.App.3d 825, 829-30 (Cal. Ct. App. 1976)

[1137] *Employee Privacy Laws: California*, Practical Law State Q&A w-000-1572

[1138] *White v. Davis*, 13 Cal. 3d 757, 773 (1975).

[1141] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 81 (Cal. 1994) [Judge Mosk Dissent], citing: Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; cf. *Olmstead v. United States*, supra,277 U.S. at p. 478 [72 L.Ed. at p. 956] (dis. opn. of Brandeis, J.) [calling the right of privacy the "right to be let alone"]; Warren Brandeis, The Right to Privacy (1890) 4 Harv. L.Rev. 193, 193 [to similar effect].)

[1142] Id.

[1143] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 85 (Cal. 1994) [Judge Mosk Dissent].

[1144] *Hill v. Nat'l Collegiate Athletic* Ass'n, 7 Cal.4th 1, 93 (Cal. 1994) [Judge Mosk Dissent] ("The fact that student athletes are regulated and supervised and function in a communal environment does not prepare them to be watched by a stranger as they urinate.")

[1145]

---

Deleted: <#>While "living on" (aka "dogfood") and "user studies" were often an actual responsibility of a role in Gjovik's Software Engineering team, she continued to feel pressure in Hardware Engineering as well. One example, in Gjovik's 2019 annual performance review, Powers wrote, "*She is an amazing bug finder. Everything she touches seems to break.*" Said one person, "*I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid. It helps that she's constantly living on as many unreleased products as she can and is diligent about filing bugs. Good stuff!*" "There were many comments like this. ¶
<#>Gjovik was also coerced to 'file bugs' for any issues she found that could be software 'bugs' and to do so 'especially' if she 'hit the bug' in a 'customer scenario' (i.e., a situation that would be very unlikely to occur at work or during work hours) so Apple could obtain the invasive logging data from Gjovik, saying they cannot ask customers for that level of information. ¶
<#>Apple intended to invade it's employee's privacy. Whether it was to spy on them, to collect and hoard their data, or to exploit unpaid labor from them – Apple possessed intention and purpose in invading employee privacy, including Gjovik's privacy.¶
<#>As Gjovik spoke with her coworkers about her opposition to Apple's surveillance practices, and many voiced the same concerns.[1139] These conversations usually occurred outside of work hours, far from campus, and in hushed voices acknowledging Apple could be listening though their phones and other devices. Employers have no legal justification to monitor personal communications of their employees.[1140] Gjovik was also coerced to turn the logging and apps off, even if she felt brave enough to try worried Apple might notice and think she was disloyal. Gjovik repeatedly tried to sign out of the Gobbler app, but it always signed itself back in.¶

Deleted: at p. 775.

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

perceives to be intimate – it is within these areas of intimacy that individuals have a reasonable expectation of privacy, an invasion of which could easily be perceived as highly offensive.[1146]

1340.   Apple exploited Gjovik's identity without Gjovik's consent and for commercial purposes, in violation of the California's common law Right of Publicity.[1147] Apple's unauthorized use and appropriation of the Gjovik's identity and likeness was for Apple's commercial advantage and Gjovik suffered injury because of it.[1148] Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained about it, claiming they can fire any employees without notice for protesting these specific unfair business practices. An employee should be able to publicly protest an employer pestering them to 3D scan their ears and ear canals or to install an app on their iPhone called "Gobbler" that cannot be turned off and captures videos of faces with biometrics constantly, and which data is made immediately accessible to Apple Global Security and the Worldwide Loyalty enterprise. Apple's declaration that it can terminate employees for protesting these invasions is a "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.*" [1149]

1341.   The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. People have a right to conducting certain personal activities without observation, intrusion or interference, including human bodily functions normally performed in private.[1150] When an employee successfully refuses to submit to an employer's wrongful

---

[1146] See, *Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("In the home, our cases show, all details are show, all details are intimate details, because the entire area is held safe from prying government eyes.")
[1147] *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017).
[1148] *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001); *Ross v. Roberts*, 166 Cal.Rptr.3d 359, 365, 222 Cal.App.4th 677, 684 (Cal. 2013)
[1149] *Hill.* at 37. *In re Google* at 829.
[1150] [*Hill v. National Collegiate Athletic Ass'n* (1994) 7 C4th 1, 40-41, 26 CR2d 834, 859; *Hansen v. California Dept. of Corrections* (ND CA 1996) 920 F.Supp. 1480, 1505 (applying Calif. law)—though

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests.[1151]

1342.   Apple's use of Gobbler on Gjovik's phone also forced Gjovik to participate in Apple's unlawful acts, by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometric information of the public without their knowledge or consent. Apple's termination of Gjovik also stated if Apple was to warn people what was occurring on her phone, she would be fired, so consent from the public was made impossible by Apple's unfair business practices. The public had a reasonable expectation of privacy to their highly sensitive biometrics.[1152]

1343.   Apple violated Gjovik's right to privacy established by the California Constitution, by statutes, and by common law. Apple intruded into Gjovik's seclusion, Apple physically and constructively invaded Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor Code § 435.[1153] This statute prohibits the employer from videotaping these areas and strictly

---

prison guard agreed to drug test as condition of employment, guard did not agree to another employee's "deeply invasive" observation of her urination]

[1151] Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy § 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*

[1152] *In re Clearview AI, Inc. Consumer Privacy Litigation*, Memorandum Opinion and Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg20, (Feb. 14 2022).

[1153] Cal. Lab. Code § 435 "(a) No employer may cause an audio or video recording to be made of an employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order. (b) No recording made in violation of this section may be used by an employer for any purpose. This section applies to a private or public employer."

Deleted: FIRST
Deleted: -
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

prohibits the use of that recording for "*any purpose.*" Here, Apple used those videos, which included biometric data, to develop its commercial products to sell to customers without actual consent or notice to the people whose data was gathered, including *bathroom videos.* Notably, even Google Glass refused to capture biometrics, and yet people were still "freaking out."[1154]

1344.   Apple intended to invade its employee's privacy. Whether it was to spy on them, to collect and hoard their data, or to exploit unpaid labor from them – Apple possessed intention and purpose in invading employee privacy, including Gjovik's privacy. Apple claims that employees 'consented' to even its most invasive violations of privacy, such as scanning ear canals, 24/7 biometrics gathering, sleep monitoring, or monitoring employee's ovulation and menstruation.

1345.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for FTC Act, and *Tamney* for ICCPR which are incorporated here.

**vii.    Tamney: California Privacy Rights Act**

1346.   The California Privacy Rights Act ("CPRA"), states that "*It is the intent of the Legislature to ensure that personal information about California residents is protected*" and that "personal information" includes "*unique biometric data generated from measurements or technical analysis of human body characteristics… used to authenticate a specific individual… [including] a physical or digital photograph… used or stored for facial recognition purposes.*"[1155]

---

[1154] Bridget A. Sarpu, *Google: The Endemic Threat to Privacy*, 15 J. High Tech. L. 97, 99–100 (2014); See Letter from Rep. Joe Barton, Co-Chairman, Bi-Partisan Privacy Caucus, to Larry Page, CEO, Google (May 2013), (providing an example of the attention Google Glass had been getting with a letter that was written by members of Congress to Google concerning Google Glass and possible constitutional violations). See also Richard Gray, *The Places Where Google Glass is Banned*, THE TELEGRAPH (Dec. 4, 2013), (listing the numerous places where Google Glass is already banned including in the car, cinemas, strip clubs, casinos, restaurants, hospitals, sports grounds, concerts, banks, and ATMs).
[1155] Cal. Civ. Code § 1798.81.5(a)(1) and (d)(1)(a)(vi).

**Deleted:** The GDPR Article 29 Working Party emphasized the imbalance of power in the employment context: "*Given the dependency that results from the employer/employee relationship, it is unlikely that the data subject is able to deny his/her employer consent to data processing without experiencing the fear or real risk of detrimental effects as a result of a refusal. It is unlikely that an employee would be able to respond freely to a request for consent from his/her employer to, for example, activate monitoring systems such as camera-observation in a workplace, or to fill out assessment forms, without feeling any pressure to consent.*" The Working Party also advisesApple intended to invade its employee's privacy.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1347.   The CPRA defines biometric information as "an individual's physiological, biological, or behavioral characteristics, including information pertaining to an individual's deoxyribonucleic acid (DNA), that is used or is intended to be used singly or in combination with each other or with other identifying data, to establish individual identity. Biometric information includes, but is not limited to, imagery of the iris, retina, fingerprint, face, hand, palm, vein patterns, and voice recordings, from which an identifier template, such as a faceprint, a minutiae template, or a voiceprint, can be extracted, and keystroke patterns or rhythms, gait patterns or rhythms, and sleep, health, or exercise data that contain identifying information."[1156]

1348.   The CPRA also grants employees the right to limit the use and disclosure of "sensitive personal information" by their employers, which includes ""precise geolocation data" and "biometric information."[1157] Labor Code § 1051 has made it a crime for employers to share employee biometric information with a third-party.[1158] Further, "the right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution." [1159]

1349.   The CPRA warns that "*A business shall not discriminate against a consumer because the consumer exercised any of the consumer's rights under this title, including … retaliating against an employee… for exercising their rights under this title.*"

---

[1156] CPRA 1798.140(c)
[1157] Proposition 24, 1798.125(A)(1),(E)
[1158] California Labor Code § 1051, (Amended by Stats. 1987, Ch. 77, Sec. 1.). ["… any person or agent or officer thereof, who requires, as a condition precedent to .. retaining employment, that an employee … be photographed … by any person who desires his or her photograph …for the purpose of furnishing the same or information concerning the same or concerning the employee … to any other employer or third person, and these photographs … could be used to the detriment of the employee …is guilty of a misdemeanor."]
[1159] *Hill v. Nat'l Collegiate Athletic Ass'n,* 7 Cal.4th 1, 75-76 (Cal. 1994) [Judge Mosk Dissent], citing Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26-27, italics added in place of underscoring in original; *Olmstead v. United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.) [stating that the right of privacy is "the most comprehensive of rights and the right most valued by civilized men"].)

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1350.   In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges that reports of "*privacy,*" "*data protection breaches*", "*failure to comply with a legal or regulatory obligation*", "*violations of human rights,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[1160]

1351.   The GDPR Article 29 Working Party advised that the imbalance of power in the employment relationship makes voluntary consent questionable and, for most work-related data processing, the GDPR lawful basis relied upon "*cannot and should not*" be the employee's consent. [1161]

1352.   Apple's own website says: "*California consumers … have a right to opt out of the sale or sharing of their personal information by a business, and a right not to be discriminated against for exercising their California privacy rights.*"[1162] Apple adds that it "*does not discriminate in response to privacy rights requests.*"[1163]

1353.   Apple also explains that "*under California law, biometric information includes any physiological or behavioral characteristics that can be used to establish your identity, such as a fingerprint or an image of your face from which a faceprint can be created.*"[1164]

1354.   Also see § 1102.5 for § 435, *Tamney* for California Constitution Art. 1, *Tamney* for FTC Act, and *Tamney* for ICCPR which are incorporated here.

---

[1160] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf
[1161] Joseph J. Lazzarotti and Maya Atrakchi, *Is Employee Consent under EU Data Protection Regulation Possible?*, National Law Review, February 27 2018, https://natlawreview.com/article/employee-consent-under-gdpr-possible
[1162] Apple Inc, *California Privacy Rights*, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/
[1163] Id.
[1164] Apple Inc, California Privacy Disclosures (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/ca-privacy-disclosures.html

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

### viii.   The International Covenant on Civil and Political Rights (OHCHR):

### Article VII, Free Consent

1355.   Apple frequently invaded its employee's privacy in numerous ways. The issue raised by Apple here are Apple's repeated requests to 3D scan Gjovik's ears, conduct medical studies and research on Gjovik's mind and body, and Apple's use of the Face "Gobbler" application to gather 24/7 videos and biometrics of anyone around Gjovik's iPhone. Further, and most importantly, also at issue is Apple's declaration that its studies and experiments are 'secret' and any employee who 'leaks' those practices can be immediately terminated, even with open government investigations and whistleblower charges against the employer.[1165]

1356.   Apple asked Gjovik to participate in invasive, oppressive, and humiliating medical studies, anatomical studies, DNA tests, biometrics data collection, and other highly personal studies. Apple's requests to scan Gjovik's ears in 2021 may have also included intentionally gathering Gjovik's ear biometrics, but otherwise the data of Gjovik's ear anatomy is also a biometric.[1166]

1357.   The INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS states: "*No one shall be subjected to torture or to cruel, inhuman or degrading treatment … no one shall be subjected without his free consent to medical or scientific experimentation.*"[1167]

---

[1165] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).

[1166] Bhanu, B. (2011). *Ear Shape for Biometric Identification*. In: van Tilborg, H.C.A., Jajodia, S. (eds) Encyclopedia of Cryptography and Security. Springer, Boston, MA. https://doi.org/10.1007/978-1-4419-5906-5_738 ["Ear shape has played a significant role in forensic science and its use by law enforcement agencies for many years. After decades of research of anthropometric measurements of ear photographs of thousands of people, it has been found that no two ears are alike, even in the cases of identical and fraternal twins, triplets, and quadruplets. It is also found that the structure of the ear does not change radically over time."]

[1167] THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, 16 December 1966, General Assembly resolution 2200A (XXI); Ratified by the United States in 1992.

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1358.   Gjovik did not provide 'informed consent' to Apple monitoring her body while she slept, or capturing her biometrics 24/7, when Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to share Apple's secrets, even to a doctor or attorney (as was expressly written in the noted Deed Poll). The Wilson Directive explains why Apple's posture is unlawful and unethical:

"The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experiment subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment."[1168]

Apple's use of Gobbler on employees was not the same as performing experiments with chemical weapons on human subjects (though Apple essentially did that to Gjovik in her bedroom next to 3250 Scott Blvd), Apple's coercion of employees to use prototype hardware was not without physical risks.

1359.   In *Vietnam Veterans of Am. v. C.I.A.* this district found lack of informed consent, despite much paperwork proffered as such:

---

[1168] *Vietnam Veterans of Am. v. Cent. Intel. Agency,* No. C 09-0037 CW, 2013 WL 6092031, at *2 (N.D. Cal. Nov. 19, 2013), aff'd in part, rev'd in part sub nom. *Vietnam Veterans of Am. v. C.I.A.,* 791 F.3d 1122 (9th Cir. 2015), and aff'd in part, rev'd in part, 811 F.3d 1068 (9th Cir. 2016)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

"Volunteers participated without giving informed consent… because the risks of the experiments were not fully disclosed…test participants were required to sign a secrecy oath, which required their agreement that they would not divulge or make available any information related to …participation in the volunteer program…. [and] based on the form's language, participants erroneously believed that punishment … could occur even after their discharge…."[1169] While the nature of the C.I.A.'s study of use of biological and chemical weapons on human subjects was far more extreme than Apple's conduct, the policy rationale on informed consent is similar.

1360.   Knowledge of the capability of monitoring alone cannot be considered implied consent. [1170] Gjovik had a legally protected privacy interest and a reasonable expectation of privacy under the circumstances (everyone should be able to demand privacy in the bathroom), and Apple's conduct amounts to a serious invasion of Gjovik's protected interests.[1171] Gjovik has reasonable interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy') and interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')."[1172]

1361.   In fact, Gjovik was injured several times. One February 12 2019, the Face ID system blasted a bright light into her eyes, leaving her eyes sore and feeling like they had been

---

[1169] *Vietnam Veterans of Am. v. C.I.A.*, No. C 09-0037 CW, 2010 WL 291840, at *2 (N.D. Cal. Jan. 19, 2010).
[1170] *Watkins v. L.M. Berry Co.*, 704 F.2d 577 (11th Cir. 1983); see also *Sheinbrot v. Pfeffer*, 1995 WL 432608, at *4 (E.D.N.Y. 1995) -- (the plaintiff's consent could not be implied from the fact that the defendant's multi-line phone system permitted the defendant to eavesdrop unless the privacy option was activated). *Hay v. Burns Cascade Co., Inc.*, 5:06-CV-0137 (NAM/DEP), 16 (N.D.N.Y. Feb. 18, 2009); *Ali v. Douglas Cable Communications*, 929 F. Supp. 1362, 1371 (D. Kan. 1996).
[1171] *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1024 (N.D. Cal. 2012) (citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994)); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal. 2020)
[1172] Hill v Nat'l at 35; In re Google at 829.

578

Deleted: <#>Apple invaded Gjovik and other employee's privacy in many ways, but at issue here are Apple's requests to scan Gjovik's ears and Apple's use of the Face "Gobbler" application to gather videos and biometrics, and most importantly, Apple's declaration that those practices are 'secret' and any employee who 'leaks' those practices can be immediately terminated, even with open government investigations and charges against the employer.[1174¶]
<#>An  employee should be able to publicly protest an employer pestering them to 3D scan their ears and ear canals or to install an app on their iPhone called "Gobbler" that cannot be turned off and captures videos of faces with biometrics constantly, and which can be immediately accessible to Worldwide Loyalty. Apple's declaration that it can terminate employees for protesting these invasions is a "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.*"[1174¶]
<#>The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. When an employee successfully refuses to submit to an employer's wrongful intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests.[1175¶]

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

burned. She had to notify an internal laser safety team who quickly contained her prototype iPhone in a special Pelican case with IRPF stickers.

1362.   Further, it should not be ignored that Apple's main "Live On" and "User Study" program was managed by a team reporting to Gjovik's Supervisor Dan West – the Senior Director who tried to pimp and pander Gjovik with indirect benefits and told her to quit Apple (with the role under John Basanese – the Director reporting to Dan West, who repeatedly complained to Gjovik that she was not married and did not have children).

1363.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for California Constitution Art. 1, and *Tamney* for FTC Act which are incorporated here.

### ix.   **Tamney: FTC Act Biometric Consent Rules; Cal. Biz. & Pro. Code §§ 17200; Biometric Privacy Guide Posts**

1364.   In addition to the privacy concerns, Apple is also unlawfully coercing employees to provide personal data, including biometrics, which Apple can use for research and development, including training machine learning models, without real consent or compensation, and in violation of federal competition laws and state and federal data protection laws.

1365.   Apple is not only coercing its employees to let Apple harvest their personal data, in highly personal situations and with omnipresent surveillance, but Apple is using that data to build their software for consumer products. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development.

1366.   If a phone with Gobbler installed automatically captures video / photo / biometric / location data whenever it "thinks it sees a face" and Apple instructs employees to use only one

**Deleted:** :

**Deleted:** Apple's practices facially violate GDPR

**Deleted:** knows it, as it warned employees on August 3, 2017, to never use instructs employees to use only one device for work and

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

device for work and personal, and most people carry their phones with them everywhere they go, and very few people cover the cameras of their phones – then these Apple employees were capturing this highly sensitive data of non-employees in locations such as stores, banks, mass transit, doctor's offices, gyms, schools, colleges, parks, and other frequently visited locations. They would also be gathering these photos/videos/biometrics in their own homes and in other people's homes, including wherever their phone is including bedrooms, bathrooms, and nursery's. Data would still be gathered even if the employee left their phone sitting on a table and left the room, and non-employees engaged in private conduct in that room without the employee present.

1367.   One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, use of toilets, use of showers, minors, and even naked minors – along with their biometric information.

### *FTC Act*

1368.   Section 5 of the FTC Act prohibits, among other things: unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable; and misleading statements to consumers.[1176] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

1369.   The FTC issued a statement recently on biometric privacy rights, explaining there are certain business practices that are always unlawful and there is never consumer 'consent' for

---

[1176] US FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices*, Consumer Compliance Handbook, https://www.federalreserve.gov/boarddocs/supmanual/cch/200806/ftca.pdf

580

Deleted: apps "

Deleted: *France and Germany.*"

Deleted: <#>Here, Apple is not only coercing its employees to let Apple harvest their personal data, in highly personal situations and with omnipresent surveillance, but Apple is using that data to build their software for consumer products. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. One must assume Apple has hundreds of thousands of biometrics of non-employees – including children -- that are used to train Apple's machine learning models.¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

those practices. They noted the FTC Act may be violated by "*surreptitious and unexpected collection of biometric information.*"[1177] FTC added, "*Injuries to consumers may also be compounded if there is no mechanism for accepting and addressing consumer complaints and disputes related to businesses' use of biometric information technologies.*"[1178] Like terminating an employee because they complained about the practices and tried to warn consumers?

1370.   Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the ICFs and NDAs for the program, and then told employees they cannot tell anyone what the program would now be doing on their iPhones. Like in *In re Arizona Theranos, Inc., Litig*, Apple was aware Gobbler is not a market-ready product (nor was it intended to be), and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyways while continuing to promise customers that Apple would never collect their biometrics.[1180] Apple's website states: "*Face ID data doesn't leave your device and is never backed up to iCloud or anywhere else. If you choose to enroll in Face ID, you can control how it's used or disable it at any time.*"[1181]

1371.   In December 2023, the US FTC settled with Rite Aid over unlawful uses of biometrics collection and surveillance. US FTC complained, "The company did not inform

---

[1177] FTC, *FTC Warns About Misuses of Biometric Information and Harm to Consumers,* May 18 2023, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers

[1178] FTC, *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act,* https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf

[1180] *In re Arizona Theranos, Inc., Litig.,* 308 F. Supp. 3d 1026, 1050–53 (D. Ariz. 2018) – ("If, as plausibly alleged, Walgreens knew that the Edison device was not market-ready, then Walgreens at least had constructive knowledge that the essential nature of the tiny blood draws was not legitimate testing. That Walgreens knew that Edison device was not market-ready supports the further allegation that Walgreens understood that research and development was the true purpose of the tiny blood draws. The Edison plaintiffs have stated plausible battery and medical battery claims against Walgreens.")

[1181] Apple, *About Face ID advanced technology,* (last accessed 12/16/2023), https://support.apple.com/en-us/102381

Deleted: or

Deleted: <#>The public policy on employee biometrics is clear with BIPA and GDPR; private entities are forbidden from selling or otherwise profiting from an employee's biometric identifier or biometric information under any circumstances.[1179] ¶

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

consumers that it was using the technology in its stores and employees were discouraged from revealing such information."[1182] Rite Aid's unlawful conducted included employees using an app on their mobile phones to capture photos of customers that gathered the person's biometrics without notifying the person, let alone asking for consent.[1183] Rite Aid is now prohibited from using facial recognition technology for surveillance purposes for five years.

1372.  Further, as to Apple's "confidentiality" argument, the Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[1184] Information regarding an employer's illegal activities is not protectable by means of restrictive covenant. [1185] Facts relating to actual, alleged, or potential violations of the law are generally not protectable trade secrets. An employee's agreement not to disclose such information may, in some situations, be unenforceable as against public policy.[1186] This is applicable here. [1187]

### *Business and Professions Code §§ 17200*

1373.  California's Unfair Competition Law (Business and Professions Code §§ 17200) borrows heavily from section 5 of the Federal Trade Commission Act but has developed its own body of case law.[1188] Gjovik suffered an economic injury (not being compensated for labor, not being compensated for seizure of personal data, being terminated from her job, being false

[1182] US FTC, Rite Aid Banned from Using AI Facial Recognition After FTC Says Retailer Deployed Technology without Reasonable Safeguards, Dec 19 2023, https://www.ftc.gov/news-events/news/press-releases/2023/12/rite-aid-banned-using-ai-facial-recognition-after-ftc-says-retailer-deployed-technology-without

[1183] US FTC v Rite Aid, Case No. , pg 6 ("Rite Aid obtained enrollment images by, among other methods, excerpting images captured via Rite Aid's closed-circuit television ("CCTV") cameras, saving photographs taken by the facial recognition cameras, and by taking photographs of individuals using mobile phone cameras.")

[1184] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[1185] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[1186] *EEOC v. U.S. Steel Corp.,* 671 F. Supp. 351, 358 (W.D. Pa. 1987); *Chambers v. Capital,* 159 F.R.D. 441, 444 1995); *EEOC v. Astra, Inc.,* 94 F.3d 738, 745 (1st Cir. 1996)
[1187] *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 923, 180 CR3d 359, 366-367—(perception of whistleblowing is sufficient given the public policy behind then-existing Lab.C. § 1102.5(b), which is to encourage employees to report suspected violations of law.)
[1188] California Antitrust & Unfair Competition Law (Third), Volume 2: Unfair Competition (State Bar of California, 2003 Daniel Mogin & Danielle S. Fitzpatrick, eds.) at pg. 9.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

imprisoned with debilitating injuries caused by dangerous air pollution) and this was the result of Apple's Unfair Business Practices.[1189]  An employee fired even partly in retaliation for reporting her employer's piracy of computer software to her supervisor is a termination in violation of public policy.[1190]

1374.    Disgorgement is appropriate here and there is precedent of FTC using disgorgement as a remedy with at least five cases since 2019, including against Amazon and Cambridge Analytica.[1191] The court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200,[1192] including the power to order restitution and/or disgorgement.[1193]

### *Biometric Guideposts*

1375.   The United States government considers biometric data to be "sensitive personal information" and believes that standards and regulations should be followed in any implementation of technology that uses biometric data.[1194] 18 U.S.C. § 1028 weighs biometric data as equal to private information like one's name or Social Security number.[1195]

1376.   A recent Illinois BIPA case warned about the extreme risk of biometrics collection, explaining that "*social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the*

---

[1189] *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322, (Cal. 2011); *Diaz v. Gates* (9th Cir. 2005) 420 F3d 897, 899 (en banc).
[1190] *Langford v. County of Cook*, 965 F. Supp. 1091 (N.D. Ill. 1997) – (Termination in violation of public policy found when employee harassed and fired after raising questions about the legality of employer's use of bootlegged and pirated software, even though also filed worker's comp claim prior to termination and WC claim was also a cause of the retaliatory termination.)
[1191] IAPP, *Algorithm disgorgement 'significant part' of FTC's AI enforcement strategy*, https://iapp.org/news/a/algorithm-disgorgement-significant-part-of-ftcs-ai-enforcement-strategy/
[1192] *Cortez v. Purolator Air Filtration Product Co.*, 23 Cal.4th 163, 179 (2000).
[1193] California Antitrust & Unfair Competition Law, supra note 2, at 32-33; *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1276-1277 fn.9 (1992).
[1194] Bridget A. Sarpu, *Google: The Endemic Threat to Privacy*, 15 J. High Tech. L. 97, 118–20 (2014)
[1195] Id.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*individual has no recourse.*"[1196] Like in the recent *in re Clearview AI Consumer Privacy Litigation* case, Apple is also "*capturing of faceprints*" and "*extracting private biometric identifiers from the faceprints.*"[1197] *Biometric identifiers "are immutable, and once compromised, are compromised forever.*"[1198]

1377.   The 2022 California bill "*SB-1189 - Biometric information*" captured similar prohibitions on selling or profiting from biometrics data as Illinois' BIPA, and was an expansion of the California Consumer Privacy Act to include protections based on BIPA.[1199] This bill was introduced to by the California Senator Gjovik had been working with since 2021.[1200] The legislative intent of the bill was noted as:

> This bill is motivated by concerns that without bolstered privacy protections, the widespread collection, disclosure, use, and retention of biometric information risks empowering discriminative business practices, degrading privacy, and imposing heightened security risks on consumers."[1201]

1378.   The definition of "Surveillance Technology" in San Francisco Admin. Code Chapter 19B includes "*any software, electronic device, system utilizing an electronic device… designed …to collect, retain, process, or share … electronic, visual,… biometric… or similar … capable of being associated with… any individual or group.*"[1202] While the statute was directed

---

[1196] *In re Clearview AI, Inc. Consumer Privacy Litigation*, Memorandum Opinion And Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg8, (Feb. 14 2022).
[1197] Id.
[1198] Id; *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020) (quoting 740 ILCS 14/5).
[1199] California SB-1189 *Biometric information*. (2021-2022), Report of the Senate Judiciary Committee, Page 9-10
[1200] California SB-1189 *Biometric information*. (2021-2022), introduced by Senator Wieckowski.
[1201] California SB-1189 *Biometric information*. (2021-2022), Report of the Senate Judiciary Committee, Page 8
[1202] San Francisco Administrative Code Chapter 19B

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

at the local government's activities, this definition would easily encompass Apple's use of Gobbler on Gjovik's devices while Gjovik resided in and/or visited San Francisco.

1379.   Apple's Gobbler biometric practices facially violate GDPR and Apple knows it, as it warned employees on August 3, 2017, to never use these apps "*in France and Germany.*"

1380.   The public policy on employee biometrics is clear with BIPA and GDPR; private entities are forbidden from selling or otherwise profiting from an employee's biometric identifier or biometric information under any circumstances.[1203]  Apple's use of Gobbler and related practices was unlawful and unethical, and Apple profited from its unjust conduct at Gjovik's expense (economic and personal).[1204] *Tamney* claims have been found based on employee complaints about invasions of employee privacy, complaints of violations of privacy of non-employees, and complaints of violations of consumer protection laws.[1205]

1381.   Gjovik's opposition and complaints about Apple's coercive use of Gobbler to secretly gather biometrics, coercion of employees into unpaid labor through aggressive dogfooding (testing internal software/products as if it as a normal personal device), and Apple's weird anatomical and medical experiments on employees, were protected conduct and Apple knew it. In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges that reports of "*failure to comply with a legal or regulatory obligation*", "*anti-competitive conduct,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[1206]

---

[1203] 740 ILCS 14/15(c); [1203] *In re Clearview AI, Inc. Consumer Privacy Litigation,* Memorandum Opinion And Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg13, (Feb. 14 2022).
[1204] *ESG Capital Partners, LP v. Stratos,* 828 F.3d 1023, 1038 (9th Cir. 2016); see also *Hart v. TWC Product & Tech. LLC,* 526 F.Supp.3d 592, 604 (N.D. Cal. 2021)
[1205] *Hejmadi v. Amfac, Inc.* (1988) 202 CA3d 525, 540 (Tamney claim established by reporting to management that company's practice of strip-searching suspected shoplifters violated state law); *Tamney v. Atlantic Richfield Co.* (1980) 27 C3d 167, 172 (Tamney claim established by reporting violations of consumer protection laws).
[1206] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1382.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for California Constitution Art. 1, and *Tamney* for ICCPR – which are incorporated here.

**x.      Tamney: Protests about Misuse of ADA Procedures and Medical Clinics; Protest of Employee Health Data Collection**

1383.   At some point prior to 2018, Apple is launched primary care clinics called AC Wellness for employees and planned to "leverage its medical clinics as a way to test its growing range of health services and products, which it is starting to roll out to consumers at large."[1207] Apple now runs its own primary-care medical service with Apple-employed doctors at its own clinics.[1208]

1384.   In 2020, Gjovik's Apple "AC Wellness" doctor was dismissive of Gjovik's medical issues due to the solvent exposure, and even tried to blame Gjovik's injuries as "anxiety." Employees may recover in tort for negligent aggravation of an initial industrial injury against an employer who assumes the capacity of medical care provider by undertaking to treat the employee's injury itself.[1209]

1385.   Gjovik had to pay a 'co-pay' when she visited "AC Wellness", which she did several times in 2020. It is illegal for a physician or medical facility to bill a worker if they know the injury is or may be work related.[1210]

1386.   In 2020, Apple also coerced Gjovik to participate in a blood pressure program in response to the blood pressure issues they were causing with their solvent and toxic gas fumes

---

[1207] Christina Farr, *Apple is launching medical clinics to deliver the 'world's best health care experience' to its employees*, CNBC, Feb. 27 2018, https://www.cnbc.com/2018/02/27/apple-launching-medical-clinics-for-employees.html
[1208] Rolfe Winkler, *Apple Struggles in Push to Make Healthcare Its Greatest Legacy*, Wallstreet Journal, June 16 2021, https://www.wsj.com/articles/apple-struggles-in-push-to-make-healthcare-greatest-legacy-11623832200
[1209] *Duprey v. Shane*, 39 Cal.2d 781, 249 P.2d 8 (Cal. 1952); *Alander v. Vacavalley Hospital*, 49 Cal.App.4th 1298, 1305 (Cal. Ct. App. 1996) (see, the dual capacity exception to the exclusive remedy provision set forth in section 3602.)
[1210] California Labor Code section 3751(b)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

where they accessed her personal medical information and met with her repeatedly to suggest she made changes to her food and meditation to stabilize her solvent-driven blood pressure issues.

1387.   Gjovik had notified the head of Apple's medical clinics in early 2021 that other employees were injured by Apple's factory as well. On or around August 23 2021, Apple suddenly decided to cancel the blood pressure program it made Gjovik participate in, called "HealthHabit".[1211]

1388.   Requiring an employee "to disclose medications that he or she is currently taking" or to authorize the employer "to acquire information concerning the internal state of the tested individual's body" intrudes upon privacy interests protected by the state Constitution.[1212]

**xi.   Foley/Banko: Breach of Implied Contract: Good Cause Required**

1389.   Gjovik worked for Apple for six years and five months. (In Foley, 6 years and 9 months was sufficient time for conduct to occur on which to base findings of implied-in-fact contract not to terminate arbitrarily.[1213]

1390.   Gjovik received numerous raises, commendations, positive evaluations, and promotions. Apple took actions to assure Gjovik of continued employment. Under the *Foley* factors, and like in *Banko v Apple*, Apple's words and/or conduct made it reasonable for Gjovik to believe that the employer promised to only discharge or demote her for good cause.

1391.   For instance, Apple's personnel policies and practices include development plans that are to be issued prior to termination. In her 2017 annual review West told Gjovik, he" appreciates *her willingness to speak truth to authority" and told her to "keep doing this and*

---

[1211] Kat Jerich, *Apple scaling back employees-only virtual care app, says Insider.* Healthcare IT News, August 23 2021, https://www.healthcareitnews.com/news/apple-scaling-back-employees-only-virtual-care-app-says-insider
[1212] *Loder v. City of Glendale* (1997) 14 C4th 846, 896, 59 CR2d 696, 728; see *Norman-Bloodsaw v. Lawrence Berkeley Laboratory* (9th Cir. 1998) 135 F3d 1260, 1271 (applying Calif. law).
[1213] *Foley v. Interactive Data Corp.*, supra, 47 C3d at 681, 254 CR at 226.

587

**Deleted:** Of

**Deleted:** *(Foley/Banko)*

**Deleted:** nearly seven

**Deleted:** .

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

*good things will continue to follow."* This was a promise to Gjovik that if she reported unethical and unlawful conduct, and held leaders to account, that she would have continued employment at Apple. The employer's words or conduct, on which an employee reasonably relied, gave rise to that specific understanding.[1214] The independent consideration given by the employee (e.g., a covenant to "keep…speaking[ing] truth to authority") proves the existence of an implied contract not to terminate without cause:

1392.   Apple's policies further supported West's promise. Apple's website says: "*Our employees understand they have a responsibility to speak up when they see or hear of a violation of our policies or the law.*"[1215] Gjovik was told that not only is she required to report policy and legal violations, but she was also promised if she did so, she would be rewarded.

1393.   Apple did not have good cause to discharge Gjovik for misconduct and did not conduct an appropriate investigation before terminating Gjovik. Apple claimed its investigation into Gjovik began on Aug 28-29, 2021, and implied that it knew then it would fire Gjovik. Apple hid the investigation into Gjovik and attempted to coerce Gjovik into phone calls under the premise Apple was investigating her concerns (not her). Apple contacted Gjovik twice after it supposedly started the investigation into Gjovik, both times pretending it was still investigating Gjovik's concerns, not that it was investigating Gjovik. Gjovik was already worried about bad faith conduct by Apple and requested communications to be in writing and if not, that Business Conduct review her request and decide on the matter instead of the Employee Relations investigator.

---

[1214] *Guz v. Bechtel Nat'l, Inc.*, supra, 24 C4th at 342, 100 CR2d at 369 (emphasis in original); *Faigin v. Signature Group Holdings, Inc.* (2012) 211 CA4th 726, 749, 150 CR3d 123, 142—employee need only prove implied promise was made, not that employer intended to fulfill promise; see also *Foley v. Interactive Data Corp.*, supra, 47 C3d at 681, 254 CR at 226; *Stillwell v. Salvation Army* (2008) 167 CA4th 360, 380-382, 84 CR3d 111, 127-128.

[1215] Apple Inc, Compliance and Ethics, "Speak Up", (last visited 12/2/2023), https://www.apple.com/compliance/speak-up/

---

**Deleted:** ,

**Deleted:** (Worldwide Loyalty)

**Deleted:** FIRST
**Deleted:** -
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1394.   Instead, Apple sent a "Workplace Violence and Threat Assessment" interrogator to terminate Gjovik knowing before he contacted her that he would fire her. Gjovik asked the interrogator to please explain what the accusations against her are, but the interrogator refused to respond and instead Gjovik received a vague notice of termination from her VP a few hours later.

1395.   Apple's termination of Gjovik was not honest, there was no appropriate investigation, and the termination was arbitrary and pretextual. Gjovik did not willfully breach a job duty, did not continually neglect her job duties, nor was she prevented from performing her job duties due to continued incapacity.[1216] Apple did not act in good faith, the investigation was not reasonable, and Apple did not give Gjovik notice of the claimed misconduct or an opportunity for Gjovik to answer the charge of misconduct before making the decision to discharge Gjovik. Apple's practices were unlawful under California's Unfair Competition Law because it violated a rule contained in other statutes and combined with Gjovik's good-cause status, and the other issues noted above, Apple's termination of Gjovik was a violation of public policy.[1217]

1396.   Apple also breached their Duty of Good Faith and Fair Dealing under the implied contract and written contract, by terminating Gjovik only days before annual bonus and salary increase, and only weeks before her next RSU vesting, in order to frustrate Gjovik's right to receive benefit from her agreement with Apple through opportunistic use of its corporate power. The implied covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which he or she was clearly entitled, such

---

[1216] *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 57 [100 Cal.Rptr.2d 627]. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 100 Cal. Rptr. 3d 296 (Cal. Ct. App. 2009); *Cotran v. Rollins Hudig Hall Internat., Inc.*, 17 Cal.4th 93, 107 (Cal. 1998).
[1217] Soil Retention Products, Inc. v. Brentwood Industries, Inc., S.D.Cal.2021, WL 689914 (2021).

589

Deleted: frustrated

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

as compensation already earned. [1218] The review year ended on June 30 2021, thus Gjovik's bonus was already earned.

1397.   Further, Apple put Gjovik in a position where she was obligated by Apple policy to report issues but was punished for doing so, similar to *Banko v Apple*. Finally, Apple also fabricated the "evidence" it cited to justify terminating Gjovik, including inciting employees to file meritless complaints against Gjovik after the fact.[1219]

1398.   There is at four-year statute of limitations for written contracts and a two-year statute of limitations for oral contracts to file a claim in court.[1220]

**G.    NUISANCE.**

> Deleted: (CAL. CIVIL CODE § 3479)

1399.   Gjovik claims harm caused by Apple due to Apple's creation of a private nuisance, continuing nuisance, and absolute nuisance / nuisance per se.  A "nuisance" is

> Deleted: .

"*[a]nything which is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property …*"[1221]

**i.    Nuisance (Cal. Civil Code § 3479)**

1400.   Apple created and maintained a nuisance that was demonstrably injurious to health, that was indecent and offensive to the senses, and which obstructed the free use of property.[1222] In addition to being a ultrahazardous activity, Apple's actions were intentional,

---

[1218] *Guz v. Bechtel Nat'l, Inc.,* supra, 24 C4th at 353, 100 CR2d at 377, fn. 18 (dictum); see McCollum v. XCare.net, Inc. (ND CA 2002) 212 F.Supp.2d 1142, 1153, 1155—summary judgment denied due to factual issues whether purpose of termination was to "frustrate" employee's "legitimate expectations" of receiving disputed commissions.
[1219] *Town of Cheswold v. Vann,* 9 A.3d 467, 473 (Del. 2010).
[1220] Cal. Code Civ. Proc. § 337, 339
[1221] Cal.Civ.C. § 3479
[1222] Id.

> Deleted: FIRST
> Deleted: --
> Deleted: cv
> Deleted: CRB
> Deleted: OCTOBER 25

reckless, and negligent.[1223] Apple's interference would (and did) substantially annoy or disturb persons of normal health and sensibilities in the same community.[1224]

1401.   On or about 2015, Apple (a.k.a. alias: "Aria") constructed, or caused to be constructed, exhaust vents and open tank near the common border line of defendant's and Gjovik's property. The exhaust vents were maintained in a negligent and unskillful manner. Apple exhausted through the vents and emptied into the open tank various materials or substances that cause a foul, obnoxious, and disagreeable odor and pollute the atmosphere of Gjovik's property.

1402.   Apple has conducted their business in such a manner as to constitute a nuisance in that their silicon fabrication plant emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property, and collect Gjovik's chattel property, and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property. Apple created the nuisance as the result of unnecessary, unreasonable, and injurious methods of operation of their business.

1403.   Gjovik controlled her apartment at 3390 Octavius Drive (the apartments at 3255 Scott Boulevard). Apple created a condition to exist that was harmful to health, offensive to the sense, and/or obstructed the free use of property as to interfere with the comfortable enjoyment of that property. Apple's conduct was intentional, reckless, and/or negligent. The condition Apple created substantially interfered with Gjovik's use and/or enjoyment of land, and an ordinary person would be reasonably annoyed by the condition. Gjovik did not consent to a

---

[1223] *Tint v. Sanborn* (1989) 211 CA3d 1225, 1228, 259 CR 902, 903; *Sturges v. Charles L. Harney, Inc.;* (1958) 165 CA2d 306, 318, 331 P2d 1072, 1079.
[1224] *San Diego Gas & Elec. Co. v. Sup.Ct. (Covalt),* supra, 13 C4th at 938, 55 CR2d at 752; see also Civ.C. §§ 3479-3481; Rest.2d Torts § 821F.

Deleted: .

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1 defendant's conduct and Gjovik was harmed. Apple's conduct was a substantial factor in causing

2 Gjovik's harm and the seriousness of the harm outweighs the social utility of the Apple's

3 conduct.[1226] Apple damaged Gjovik's property and injured Gjovik's person. Due to Apple's

4 actions, Gjovik lost use of much of her property.[1227]

6     1404.   The condition created by Apple interfered with Gjovik's use and/or enjoyment of

7 her apartment. An ordinary person would reasonably be annoyed or disturbed by Apple's

8 conduct and Gjovik did not consent to Apple's conduct. Gjovik was harmed and Apple's actions

9 and omissions was a substantial factor in causing Gjovik's harm and the seriousness of the harm

10 outweighs any public benefit of Apple's conduct.

12     1405.   Gjovik suffered harm because Apple created a nuisance. Gjovik leased an

13 apartment at 3390 Octavius Drive (aka 3255 Scott Blvd). Apple by acting and failing to act,

14 created a condition or permitted a condition to exist that was harmful to health, offensive to the

15 senses, was an obstruction to the free use of property, and was a fire, explosion, and poisoning

16 hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, and/or reckless.

17 The condition Apple created and permitted to exist was the result of abnormally dangerous

18 activity for which there should also be strict liability. [1228]

20 **ii.   Factories, Hazardous Waste, & Air Pollution**

21     1406.   Chemical waste disposal sites and sewerage treatments plants are often found

22 to be nuisances.[1229] There are many nuisances cases related to hazardous waste and chemical

25 [1226] Lussier v. San Lorenzo Valley Water Dist. (1988) 206 Cal.App.3d 92, 100.
26 [1227] Mangini v. Aerojet-General Corp. (Mangini II), 12 C4th at 1103, 51 CR2d at 282; Shamsian v. Atlantic Richfield Co., 107 CA4th at 982, 132 CR2d at 647.
27 [1228] Lussier, supra, 206 Cal.App.3d at p. 100; see Rest.2d Torts, § 822.
28 [1229] Village of Wilsonville v. SCA Services, Inc. 86 Ill.2d 1 (1981); Varjabedian v. City of Madera (1977) 20 C3d 285, 293-294, 142 CR 429, 435; (Against a sewage treatment plant for interference caused by noxious odors.)

pollution.[1230]  Further, California Health & Safety Code § 5411 expressly prohibits the discharge of waste in a way "which will result in contamination, pollution, or nuisance."[1231]

1407.   An actionable nuisance may include air or water pollution, excessive noise or foul smell, hazardous waste disposal or any other form of environmental pollution or degradation which interferes with the reasonable use and enjoyment of a person's property-related rights.[1232] If one has created an actionable nuisance, it is no defense that he acted in compliance with a permit or an applicable regulation, since neither a permit nor a regulation can confer a license to cause injury to the person or property rights of another.[1233]

1408.   Like in *King v Columbian Carbon*, Apple is continuously casting pollution upon the property of the owner and tenants of the Santa Clara Square Apartments, as it knew it would do when it constructed its plant. It knew then, as it knows now, that so long as it would continue its operation the pollution would continue to fall, not by accident or mishap, but in conformity with knowledge that it had before the erection of the plant. Apple should be presumed to have intended the natural known, and reasonable consequences of its act.[1234] As ex-Commissioner of the New Jersey DEP, Lisa Jackson has said, "*Pollution prevention encourages the reduction or*

---

[1230] See, e.g., *Shamsian v. Atlantic Richfield Co.* (2003) 107 CA4th 967, 979, 132 CR2d 635, 644 (leaking underground petroleum tanks); *KFC Western, Inc. v. Meghrig* (1994) 23 CA4th 1167, 1182, 28 CR2d 676, 685 (same); *Newhall Land & Farming Co. v. Sup.Ct. (Mobil Oil Corp.)* (1993) 19 CA4th 334, 341-345, 23 CR2d 377, 381-383 (soil contamination resulting from former landowners' operation of natural gas processing plant); *Team Enterprises, LLC v. Western Investment Real Estate Trust* (9ᵗʰ Cir. 2011) 647 F3d 901, 912; *Branch v. Western Petroleum*, 657 P.2d 267 (Utah 1982) (nuisance per se for violation state statute in hazardous waste case).
[1231] California Code, Health and Safety Code - HSC § 5411 ("No person shall discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance.")
[1232] *Village of Wilsonville v. S.C.A. Services*, 77 Ill.App.3d 618, 396 N.E. 2d 552 (1979), aff'd 82 Ill. 2d 1, 426 N.E. 2d 824 (1981) (operation of a hazardous waste); *Branch v. Western Petroleum*, 657 P.2d 267 (Utah 1982) (nuisance per se for violation state statute in hazardous waste case).
[1233] See, *Brown v. Petrolane, Inc.*, 102 Cal.App.3d 720, 162 Cal. Rptr., 551 (1980).
[1234] *King v. Columbian Carbon Co.*, 152 F.2d 636, 640 (5th Cir. 1945)

593

SECOND AMENDED COMPLAINT 3:23-CV-04597-EMC                    DECEMBER 21 2023

Deleted: FIRST
Deleted: -
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*elimination of industrial waste at the source through the use of better management practices...*

*pollution prevention protects the environment and public health."[1235]*

1409.   Semiconductor fabrication plants are long known to be dangerous for workers and those exposed to the chemicals used. Defendants knew or should have known that the chemicals released can cause reproductive hazards, including spontaneous abortions, stillbirths, malformations, birth defects, early childhood cancers, and other neurological, developmental, and degenerative conditions.[1236]

1410.   Apple released chemicals categorized by Cal. Code Regs. Tit. 17, § 93000 as "Substances Identified as Toxic Air Contaminants" of which there is no safe level of exposure without "significant adverse health effects." These chemicals included: Benzene, Methylene Chloride, Chloroform, Vinyl Chloride, Formaldehyde, 1,3-Butadiene.[1239] Apple released into the air chemicals categorized under 42 U.S.C. Section 7412(b) as "Hazardous Air Pollutants" and Cal. Code Regs. Tit. 17, § 93001 as "Hazardous Air Pollutants Identified as Toxic Air Contaminants" including: Benzene, Chlorine, Chloroform, Cresol, Ethylbenzene, Formaldehyde, Hexane, Phenol, Phosphine, Phosphorus, Toluene, Vinyl Chloride, Arsine. [1240]

*1411.   Under RCRA, corporations engage in "knowing endangerment" when they violate RCRA requirements concerning the transport, treatment, storage, disposal, or export of hazardous wastes; and they knowingly place someone in imminent danger of death or serious bodily injury.[1241]*

---

[1235] New Jersey DEP, *DEP ANALYSIS DEMONSTRATES BENEFITS OF POLLUTION PREVENTION*, March 21 2007, https://www.nj.gov/dep/newsrel/2007/07_0014.htm
[1236] *Molina v. on Semiconductor Corp.*, C.A. No. N10C-12-267 JRJ (Del. Super. Ct. Mar. 27, 2013)
[1239] Cal. Code Regs. Tit. 17, § 93000 - Substances Identified as Toxic Air Contaminants
[1240] Cal. Code Regs. Tit. 17, § 93001 - Hazardous Air Pollutants Identified as Toxic Air Contaminants
[1241] *Ashley Crooks et. al.,* Environmental Crimes, 51 Am. Crim. L. Rev. 1051, 1125–30 (2014)

594

---

**Deleted:** <#>The condition created by Apple interfered with Gjovik's use and/or enjoyment of her apartment. An ordinary person would reasonably be annoyed or disturbed by Apple's conduct and Gjovik did not consent to Apple's conduct. Gjovik was harmed and Apple's actions and omissions was a substantial factor in causing Gjovik's harm and the seriousness of the harm outweighs any public benefit of Apple's conduct.¶

**Deleted:** manufacturing

**Deleted:** <#>Damages may be recovered for "annoyance and distress, including mental anguish." Nominal damages are often awarded as well. [1237] Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom.[1238]¶

**Deleted:** ¶
Intentional

**Deleted:** As

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1412.   Apple not only knew what it was doing, but the emissions were a business decision in order to be able to report reduced waste sent to landfills. Apple could emit chemicals without auditing but could not sent waste out as easily. So, as Apple's hazardous waste output peaked in 2018, Apple began finding ways to dispose of that waste extralegally including through air emissions and flushing it into the sewers. Apple's 2020 Environmental Responsibility Report says: "*In 2018, we launched our commitment to send zero waste to landfill for our offices, retail stores, and data centers. That commitment aims to eliminate waste sent to landfills from these sites.*"[1242] Apple added, "*Hazardous waste generated at Apple facilities is another challenge we're actively addressing*" without further elaboration.[1243]

### iii.      Nuisance Per Se / Absolute Nuisance

1413.   Further, Apple's knowing and intentional releases of hazardous waste into the air and water trigger strict liability under the nuisance claim, or "nuisance per se".[1244]

1414.   Now and since 2015, defendant's officers, agents, and employees knew or should have known that the factory emitted and is emitting the gases and particulates referred to and knew or should have known that those emissions would injure the health of persons living near the factory and cause such conditions as plaintiff's. In September 2020, Gjovik informed one of defendant's employees overseeing the silicon fabrication factory, of Gjovik's injuries caused by emissions. Nevertheless, defendant's officers, agents, and employees did nothing to reduce or eliminate the emissions. On the contrary, such persons authorized production of the objectionable emissions.

---

[1242] Apple, Environmental Responsibility Report, 2020, https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2020.pdf
[1243] Id.
[1244] *Copart, Monarch Chemicals, and Amax, Inc. v. Sohio Prods. Co.*, 121 Misc.2d 814, 469 N.Y.S.2d 282 (1983) (sustaining nuisance cause of action on theory of strict liability for abnormally dangerous activity, and that it "may reasonably be deemed the case [that the activity is inherently dangerous] where the disposal of hazardous wastes are involved...." 479 N.Y.S.2d at 1014.)

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1415.   A Hazardous Waste manager at 3250 Scott Blvd in 2020, Ryan Spartz, wrote in his LinkedIn profile for the time: "*Continued waste profile project …working with account manager and adding additional TSDFs to find cost savings for client. Research and implement other cost-saving methods … come up with innovate methods for disposal of unique wastes.*" Spartz did not elaborate on his hazardous waste disposal "innovations."

1416.   As with the Love Canal (*US v Hooker Chemicals*) case where 21,800 tons of toxic waste was released into the waters, and here where at least 7.8 tons of toxic waste was released into the air, the activities are a nuisance per se.[1245] "If the abnormally dangerous activity involves a risk of harm to others that substantially impairs the use and enjoyment of neighboring lands or interferes with rights common to all members of the public the impairment or interference may be actionable on the basis of a public or a private nuisance. The rule of strict liability stated in § 519 frequently is applied by many courts in these cases under the name of "absolute nuisance," even when the harm that results is physical harm to person, land or chattels."[1246]

### iv.      Continuing Nuisance

1417.   The statute of limitations for an ordinary nuisance claim is three years.[1247] Where a nuisance is continuing, plaintiffs may file an action for continuing nuisance at any time before the nuisance is abated.[1248]

---

[1245] United States v. Hooker Chemicals & Plastics Corp., 722 F. Supp. 960, 966–67 (W.D.N.Y. 1989)
[1246] Restatement (Second) of Torts § 520 (1977)
[1247] Cal. Code Civ. P § 338(b); *California Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners*, NO. CIV. S-02-2389 LKK/DAD, 16 (E.D. Cal. Aug. 16, 2007)
[1248] *Jordan v. City of Santa Barbara*, 46 Cal. App. 4th 1245, 1256 (1996) ("[P]ersons harmed by [continuing nuisance] may bring successive actions for damages until the nuisance is abated"); See *Chevron U.S.A. v. Superior Court*, 44 Cal. App. 4th 1009, 1017 (1994) (finding that where a three year statute of limitations applies, an action for continuing nuisance is timely if it "has been filed before abatement of the nuisance . . . or within three years after abatement").

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1418.   The classic example of a continuing nuisance is an ongoing disturbance caused by noise, vibration, or foul odor.[1249] With a continuing nuisance, every continuation of the nuisance (or trespass) gives rise to a separate damages claim and an action alleging a continuing nuisance may be maintained at any time before the nuisance is abated or within three years thereafter.[1250] With respect to a permanent nuisance, the statute of limitations commences to run on the date plaintiff discovered, or should have discovered, the contamination.[1251]

1419.   The Superfund Amendments and Reauthorization Act of 1986 ("SARA") which entitled "State Procedural Reform" and which purports to preempt state statutes of limitation by establishing a "federally required commencement date" of the date of discovery, i.e., when "the plaintiff knew (or reasonably should have known) that the personal injury or property damage is referred to ... or caused or contributed to by the hazardous substance or pollutant or contaminant concerned."[1252]

1420.   An action alleging a continuing nuisance may be maintained at any time before the nuisance is abated or within three years thereafter.[1253] The nuisance was continuing through at least 2023, and Gjovik was actively exposed and harmed by the nuisance within three years prior to filing the complaint.

---

[1249] Mangini v. Aerojet-Gen. Corp., 230 Cal. App. 3d 1125, 1146, 281 Cal. Rptr. 827, 840 (Ct. App. 1991)
[1250] Mangini v. Aerojet-General Corp. (Mangini II), supra, 12 C4th at 1093, 51 CR2d at 275; Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 C3d 862, 869.
[1251] Hicks v. Hines Inc., 826 F.2d 1543 (6th Cir. 1987); Gehr v. Baker Hughes Oil Field Operations, Inc, 165 CA4th at 667, 81 CR3d at 224.
[1252] Superfund Amendments and Reauthorization Act of 1986 ("SARA") Section 203; CERCLA Section 309
[1253] Mangini v. Aerojet-General Corp. (Mangini II), supra, 12 C4th at 1093, 51 CR2d at 275; Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 C3d 862, 869, 218 CR 293, 297; and see Gehr v. Baker Hughes Oil Field Operations, Inc., supra, 165 CA4th at 667, 81 CR3d at 224.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

###### v.    Enforcement

1421.   The violation of a statute may raise a presumption that the violator was negligent. The presumption arises if (1) defendant violated a statute; (2) the violation proximately caused plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute was designed to prevent; and (4) plaintiff was among the class of persons the statute was intended to protect.[1254]

### H.    INFLICTION OF EMOTIONAL DISTRESS

1422.   Apple inflicted IIED and/or NIED upon Gjovik in California from the start of the limitations period until Gjovik left California on August 31, 2021, at which point, Apple then inflicted IIED and/or NIED upon Gjovik starting once she arrived in New York on September 1 2022. Apple's extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, or negligently causing, emotional distress – actually and proximately caused Gjovik to suffer severe or extreme emotional distress due to Apple's conduct.[1255] Apple's conduct had no legitimate purpose.

1423.   Apple caused Gjovik to suffer "*emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.*"[1256] Apple's conduct was extreme and outrageous, and it exceeds all bounds of decency usually tolerated by a decent society – and is of a nature which is especially calculated to cause, and does cause, mental distress.[1257]

---

[1254] Cal.Ev.C. § 669; *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 CA4th 1502, 1526-1527, 119 CR3d 529, 546-547.
[1255] *Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998). *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012)
[1256] *Hughes v. Pair*, 46 Cal.4th 1035, 1051 (Cal. 2009); *Potter v. Firestone Tire Rubber Co*, 6 Cal.4th at p. 1004.
[1257] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 617 (Ct. Ct. App. 1989); Prosser, Law of Torts (4th ed. 1971) p. 54; *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 229-30 (Cal. Ct. App. 1983).

**Deleted:** Gjovik began complaining to Apple in July 2021 that they were inflicting emotional distress (IIED) upon her. Apple

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1424.   An employer is liable for the willful and malicious torts of its employees committed in the scope of employment.[1258]

### i.   Retaliation & Interrogation

1425.   Generally, wrongfully motivated personnel decisions are not considered conduct "*beyond the bounds of human decency*" for the purposes of an IIED claim.[1259] However, Punitive damages are still often awarded for employment retaliation in cases of "*systematic courses of retaliation*" by creating an "*intimidating, hostile, and offensive working environment*."[1260] In addition, certain fact patterns of employer retaliation and coworker harassment have been found sufficient for a claim of IIED.[1261]

1426.   Apple abused its position of power over Gjovik and exploited that power differential in its campaign of terror against Gjovik. Apple has an extreme amount of power and control over Gjovik and its other employees, as one of the largest and most powerful companies in the history of the world, and as such their deranged conduct should be deemed to be outrageous and the Gjovik's emotional reaction to be deemed severe.[1263]

1427.   Gjovik began complaining to Apple around July 2021 that they were inflicting emotional distress (IIED) upon her. Starting in April 2021, Apple pressured Gjovik to file complaints and request that Gjovik did not feel comfortable filing including a worker's compensation claim for a fainting spell three years prior, an ADA accommodation request for

---

[1258] *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [ 256 Cal.Rptr. 766, 769 P.2d 948]. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 618 (Cal. Ct. App. 1989)
[1259] *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80; *Koerber v. Encyclopedia Britannica*, Inc., No. B312047, 9 (Cal. Ct. App. Jul. 13, 2022)
[1260] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 620 (Cal. Ct. App. 1989)
[1261] *Schoen v. Freightliner LLC*, 224 Or. App. 613, 199 P.3d 332 (2008); *Robel v. Roundup Corp.*, 148 Wash. 2d 35, 59 P.3d 611, 13 A.D. Cas. (BNA) 1557 (2002); *Hall v. May Dep't Stores Co.*, 292 Or. 131, 138, 637 P.2d 126, 131 (1981); *Harris v. Procter & Gamble Cellulose Co.*, 73 F.3d 321, 11 I.E.R. Cas. (BNA) 605 (11th Cir. 1996) (IIED allegation sufficient when employee suffered continuous harassment, threats of termination, humiliation, supervisory indifference, and false accusations after plaintiff reported allegedly dangerous workplace conditions to defendant).
[1263] *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866-68 (Ill. App. Ct. 2000).

vapor intrusion exposure, and FMLA leave in response to her manager's retaliation against her. Gjovik had nonconsensual investigations opened on her behalf with the purpose of agitating her management and coworkers, and thus pressuring her to quit. The farcical investigations found no issues (despite no investigation) and thus positioned Gjovik as being unreasonable despite never wanting the investigations.

1428.   Further, Okpo pressured Gjovik to meet with him on a video chat without witnesses on September 3 and September 7, supposedly to discuss a second investigation into Gjovik's concerns, despite Gjovik's continued protests to keep things in writing, and ultimately Okpo's requests were fraudulent as he apparently wanted to interrogate Gjovik but intended to deceive her in order to get her to join a video call. Employer conduct that is deceitful and certain to cause harm, or deceitful with intent to cause harm, can support an IIED claim.[1264]

1429.   Finally, on September 9 2021, Gjovik was contacted by a "Workplace Violence and Threat Assessment" investigator demanding to get on the phone with Gjovik 'within the hour.' Gjovik asked to keep communication in writing as she felt it was witness intimidation the day before her affidavit and the investigator responded by suspending all of Gjovik's account access, and she was fired a few hours later.[1265]

---

[1264] See, *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 4 Media L. Rep. (BNA) 2537 (3d Cir. 1979) (applying Pennsylvania law); *Corkery v. SuperX Drugs Corp.*, 602 F. Supp. 42, 36 Fair Empl. Prac. Cas. (BNA) 1815, 37 Empl. Prac. Dec. (CCH) P 35408 (M.D. Fla. 1985) (applying Florida law); *M. B. M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681, 118 L.R.R.M. (BNA) 2925 (1980); *Rulon-Miller v. International Business Machines Corp.*, 162 Cal. App. 3d 241, 208 Cal. Rptr. 524, 1 I.E.R. Cas. (BNA) 405, 117 L.R.R.M. (BNA) 3309 (1st Dist. 1984); *Toney v. State of California*, 54 Cal. App. 3d 779, 126 Cal. Rptr. 869 (5th Dist. 1976).
[1265] *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 501 N.Y.S.2d 871 (1st Dep't 1986) ("Employer investigative conduct may become extreme and outrageous under certain circumstances, such as, for example, when interrogation continues for a long time, accusations of guilt are made but the evidence on which the accusations are based is not disclosed, and threats to seek prosecution are made unless a confession is given."); see *Hall v. May Dept. Stores Co.*, 292 Or. 131, 637 P.2d 126 (1981); *Smithson v. Nordstrom, Inc.*, 63 Or. App. 423, 664 P.2d 1119 (1983).

Deleted: , and does

Deleted: ,

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

1430.   Like Apple attempted to do with Gjovik, when an employee is forced into a meeting by her employer's security team where the interrogator accused her of crimes and threatened prosecution, without evidence of misconduct by her, for the purpose of scaring her and scaring other employees – including making vague allegations against her without providing specifics or evidence – and was plausibly a deliberate and systematic tactic to threaten and frighten the employee into a confession – and the 9th Circuit and Oregon Supreme Court have found sufficient for a claim of IIED.[1266]

1431.   Like Apple did to Gjovik, an employer retaliating against an employee for reporting safety concerns by opening a sham investigation and coercing coworkers to falsely accuse the whistleblower of unlawful conduct including harassment and falsifying documents, all for the sole purpose of retaliating against the employee, is sufficient to constitute extreme and outrageous behavior.[1267]  It is unlawful for an employer to "*deliberately, and in furtherance of his employer's objectives, used psychic distress as a tool to coerce an employe into admitting a crime when defendant knew that there was no proof of the employe's guilt.*"[1268]

1432.   When an employer's conduct is both coercive and retaliatory, courts have generally found the conduct to be extreme and outrageous, constituting a claim for intentional infliction of emotional distress.[1269]

---

[1266] *Hall v. May Dep't Stores Co.*, 292 Or. 131, 132-133, 637 P.2d 126, 131 (1981), cited in *McGanty v. Staudenraus*, Supreme Court of Oregon, En Banc. September 08, 1995 321 Or. 532 901 P.2d 841. [Ninth Circuit cases citing and approving of *Hall v May*'s analysis of employer caused IIED through malicious interrogations: *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1374 (9th Cir. 1990); *Miller v. AT&T Network Systems*, 850 F.2d 543 (9th Cir. 1988); *Dutson v. Farmers Ins. Exchange*, 35 F.3d 570 (9th Cir. 1994)]
[1267] Graham v. Commonwealth Edison Co., 742 Illinois (2000).
[1268] *Lewis v. Oregon Beauty Supply Co.* 302 Or. 616, 627 (Or. 1987), citing Hall v May, supra; see also: *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 410–12, 501 N.Y.S.2d 871, 872–73 (1st Dep't 1986) (holding that a three-hour interrogation about an alleged theft, accompanied by threats, loud and profane language, and intimation of possible criminal prosecution, sufficiently stated a cause of action for infliction of emotional distress).
[1269] *Rudis v. National College of Education*, 191 Ill.App.3d 1009, 1014 (1989); *Milton v. Illinois Bell Telephone Co.*, 101 Ill.App.3d 75, 77, 56 Ill.Dec. 497, 427 N.E.2d 829, 831 (1981) (The court found the

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1433.   Apple's behavior was outrageous for reasons including: abuse a relation or position which gives him power to damage Gjovik's interest; knowledge that Gjovik is susceptible to injuries through mental distress; and acting intentionally or unreasonably with the recognition that the acts are likely to result in Gjovik becoming ill through mental distress.[1271] Apple knew Gjovik was especially susceptible to emotional distress when it intentionally inflicted emotional distress upon her.[1272] An employer was found liable for IIED against employee after retaliating against employee who asked for payment for work by threatening employee with deportation, lawsuits, false criminal charges, and sabotage of his professional career.[1273]

1434.   Much of Apple's retaliation against Gjovik was punishment for her protected activity and also a chilling warning to Gjovik's coworkers about what would happen to them if they were to speak out. Gjovik had been organizing her coworkers around complaints of discrimination, retaliation, and cover-ups prior to be forced on leave and then fired. Adverse employment actions in itself can be a sufficient allegation of IIED against an employer if the employee was organizing their coworker sand representing the concerns of their colleagues about discrimination in the workplace, and the adverse actions were "*a tactic designed to stifle opposition to sexual harassment.* "[1274] In *Dias v Sky Chefs* (where a sufficient allegation of IIED

---

employer's conduct in coercing plaintiff to do something illegal and then retaliating against him when he refused to do so constituted extreme and outrageous behavior.)
[1271] *Agarwal v. Johnson*, 25 Cal.3d 932, 946 (Cal. 1979); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 881 (Cal. Ct. App. 1989).
[1272] *Alcorn v. Anbro Eng., Inc.*, supra, 2 C3d at 498, 86 CR at 90, fn. 3 - If defendant proceeds in face of knowledge that plaintiff is peculiarly susceptible to emotional distress, defendant's conduct may become "extreme and outrageous" although it would not be so if defendant had been unaware of plaintiff's condition.
[1273] *Tekstrom, Inc. v. Savla*, 2006 WL 2338050 (Del. Super. Ct. 2006), judgment aff'd, 2007 WL 328836 (Del. 2007).
[1274] *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1374 (9th Cir. 1990) quoting Hall, 637 P.2d at 133 n. 3 ("permissible" acts may become impermissible if done with illicit intent and knowledge of predictable illicit result).

was found), like with Gjovik, following speaking up for herself and her coworkers – the employee faced harassment and criticisms, her benefits were interfered with, she was told to stop talking to her coworkers, she was followed, her work location was changed, and then she was fired.[1275]

### ii.  Burglary, Surveillance, Threats, and Stalking

1435.  Apple's conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[1276] Apple's misconduct towards Gjovik was/is extreme, outrageous, persistent, and omnipresent. Apple's conduct left Gjovik in such fear for her safety, the safety of her dog, the integrity of her electronics and utilities, and the safety of her chattels – that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her home, or even failing to properly secure entry to her home, would place her in danger and she could be killed. Gjovik was and is under a justified belief that leaving her dog at home unattended could result in harm to her dog and that he could be killed by Apple.[1277] Apple has physically interacted with Gjovik's dog once, during at least one break-in to Gjovik's home, leaving a scent of cigarettes on the dog's body along with other signs of break-in, trespass to chattels, and additional modification of Apple's unlawful surveillance systems.

1436.  Apple did follow through on many of its threats (like suing Gjovik), and frequently combined online harassment with physical in-person harassment confirming to

---

[1275] *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1373 (9th Cir. 1990).
[1276] Rest.2d Torts, § 46; *Molko v.Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1122 [ 252 Cal.Rptr. 122, 762 P.2d 46], overruled on another ground in *Aguilar v. Atlantic Richfield Co.*, supra, 25 Cal.4th 826, 853, fn. 19;
[1277] ICAN Foundation, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

Deleted: What

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Gjovik online what they were doing in person, all of which makes Apple's conduct menacing, and not trivial.[1278]

1437.   Also, sufficient allegations for intention to cause or reckless disregard of the probability of causing emotional distress may be satisfied by threats concerning Gjovik's health and that of the Gjovik's family – like threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap.*"[1279]

### iii.     False Police Reports

1438.   Apple and their agents filed numerous false reports against Gjovik with federal, state/local, and foreign (international) law enforcement. Appleseed testified that she filed reports to the FBI and local/state police about Gjovik, which were false. Appleseed made allegations of criminal conduct against Gjovik publicly and to Gjovik's coworkers. Someone (assumably Apple) also reported Gjovik's social media posts to German law enforcement.

1439.   An employer filing false police reports against an employee, and telling coworkers about it, is a sufficient claim for IIED.[1280] Knowingly false accusations of crimes made by employer against employee sufficient for IIED claim.[1281] Allegations that an institution

---

[1278] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[1279] *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 230 (Cal. Ct. App. 1983)
[1280] *Free v. Kramer*, 2022 WL 3920863 (D. Colo. 2022).
[1281] Fahmy v. Duane reade, Inc., 2005 WL 2338711 (S.D. N.Y. 2005) (applying New York law; noting that false accusations of criminal conduct can meet the extreme and outrageous standard in some situations); Fahmy v. Duane reade, Inc., 2005 WL 2338711 (S.D. N.Y. 2005) (applying New York law; noting that false accusations of criminal conduct can meet the extreme and outrageous standard in some situations); Contreras v. Crown Zellerbach Corp., 88 Wash. 2d 735, 565 P.2d 1173, 36 Fair Empl. Prac. Cas. (BNA) 571, 15 Empl. Prac. Dec. (CCH) P 7853 (1977) (attempting to implicate the plaintiff in criminal activity, when there is no basis for the implication, may be considered extreme and outrageous conduct).

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

harassed and denylisted a victim of potentially false allegations and pressured the victim to drop criminal charges against members of the institution, was sufficient for claim of IIED.[1282]

### iv.    Surveillance / Gobbling

1440.   Further, Apple's supposed (but pretextual) reason for firing Gjovik was two topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct, but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination, despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans) being highly unlawful, unethical, and in some cases illegal. Apple's use of Gobbler and requests to scan Gjovik's ear canals, and retaliation for complaining about it, did cause Gjovik harm. Even if the harm caused to Gjovik by Apple's threats against Gjovik related to Gjovik's complaints about the Face Gobbler and complaints about ear canal scanning requests, was completely unintentional and merely negligent acts/omissions, Apple is still liable for the negligent infliction of emotional distress they caused Gjovik.[1283]

1441.   Apple intentional and malicious coercion of Gjovik to use the Face Gobbler application did cause injury to Gjovik. However, even if the harm caused to Gjovik by Apple's use of the Gobbler application was completely unintentional and merely negligent acts/omissions, Apple is still liable for the negligent infliction of emotional distress they caused Gjovik.

1442.   In fact, New York courts have repeatedly awarded damages for Infliction of Emotional Distress due to the use of cameras in bathrooms with the act itself finding NIED,[1284] and the act by an employer in a work restroom finding IIED.[1285]

---

[1282] *Gibson Bros., Inc. v. Oberlin College*, 2022-Ohio-1079, 187 N.E.3d 629 (Ohio Ct. App. 9th Dist. Lorain County 2022).
[1283] *Slaughter v. Legal Process Courier Service* (1984) 162 Cal.App.3d 1236, 1249); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 900 (Cal. Ct. App. 1989).
[1284] *Brown v. New York Design Ctr., Inc.*, N.Y. App. Div. 1st Dep't (Mar. 9, 2023).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1443.   Gjovik protested "Gobbler," for among other reasons, it is taking photos of her while naked and while in the bathroom, and while naked in the bathroom. Here, Gjovik complained of conduct found to be NIED and Apple then implicitly threatened to sue Gjovik if she was to protest it again, and Apple blamed their highly unlawful retaliation against Gjovik on Gjovik's outcry about unlawful conduct.[1286]

1444.   However, Apple's use of Gobbler was likely criminal and as such is "outrageous per se" in California under Cal. Penal Code § 653(n).[1287] Apple's many other criminal acts were also "outrageous per se" including witness intimidation, witness retaliation, burglary, extortion, threats, and surveillance. Allegations of surveillance have been a factor in finding sufficiency of allegations of IIED.[1288]

**v.    Exposure & Concealment**

1445.   The *Abbatiello v. Monsanto* Court explained "that an allegation of knowingly subjecting individuals to exposure to a highly toxic substance, while purposefully concealing from those so exposed the serious injuries that might result from such exposure, and in reckless disregard of these risks, may constitute extreme and outrageous conduct." [1289]

---

[1285] *Sawicka v. Catena*, 79 A.D.3d 848, 912 N.Y.S.2d 666 (2d Dep't 2010) – (Male employer's conduct in installing video camera in workplace restroom in order to surreptitiously view and record female employees while they used restroom was conduct which was unquestionably outrageous and extreme, and caused employees' emotional distress, as required for employees to sustain claim for intentional infliction of emotional distress.)

[1286]

[1287] *Cramer v. Consolidated Freightways, Inc.* (9th Cir. 2001) 255 F3d 683, 697 (en banc)—employer concealed video cameras and audio listening devices behind two-way mirrors in employee restrooms in violation of Pen.C. § 653n.

[1288] *Hooper v. North Carolina*, 379 F. Supp. 2d 804, 201 Ed. Law Rep. 137 (M.D. N.C. 2005) – (police chief and university chancellor engaged in unlawful wiretapping and surveillance of her); *Williams v. Agency, Inc.*, 2014 WL 496656 (E.D. Va. 2014) – (secret videotaping of woman having sexual encounter inside her house).

[1289] *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 536 (S.D.N.Y. 2007); see *also German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 571 (S.D.N.Y. 1995) (denying motion to dismiss where landlords knowingly exposed tenants to lead paint, "a highly toxic substance to children," thereby putting them at risk for physical and mental injuries.)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

### vi.    Fear of Cancer

1446.   Further, Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and/or negligent conduct exposed Gjovik to carcinogens including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress, and acted with reckless disregard of the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer and Apple's conduct was a substantial factor in causing Gjovik's severe emotional distress. [1290]

1447.   Apple's conduct was despicable (base, vile, contemptible), and subjected Gjovik to cruel and unjust hardship, and was carried out with a willful and/or conscious disregard of Gjovik's rights and safety. Like in *Field v Philadelphia*, Apple deliberately vented deadly substances on Gjovik and then deliberately made false statements to conceal their actions, all of which could be considered criminal actions.[1291]

1448.   Apple intentionally misrepresented and/or concealed a material fact known to Apple (that Apple was responsible for Gjovik's 2020 illness) wanting to cause Gjovik harm by Gjovik not being able to litigate with all material facts and not able to take necessary preventative measure for her health, with an apparent goal that Gjovik will soon die of cancer

---

[1290] *Potter v. Firestone Tire and Rubber Co.* (1993) 6 Cal.4th 965, 1001 [recognizing potential cause of action for emotional distress damages from fear of cancer resulting from exposure to toxins, as well as damages liability for medical monitoring costs]

[1291] *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 428 (Pa. Super. Ct. 1989) , ("They told Field that his badge readings indicated that he had not been exposed to radiation, and they told him that his survey meter had malfunctioned when it indicated that he had been exposed to radiation…We can visualize no conduct more outrageous in character, so extreme in degree, that went beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community, than to vent highly radioactive steam upon another. ")

607

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

and disease, homeless and bankrupt – as Apple's social media accounts threatened two years ago.[1292]

1449.   Apple had a duty to follow environmental and health/safety laws, which it breached repeatedly and egregiously, resulting in emissions of carcinogenic chemicals. Reliable medical and scientific opinion will confirm that Gjovik's risk of developing cancer was significantly increased by the exposure caused by Apple and has resulted in actual risk that is significant.[1293] It appears Apple may have already caused Gjovik to develop cancer on her thyroid and struggled to obtain timely diagnostics and medical advice as Gjovik found herself on Medicaid.[1294] The latest ultrasounds in 2023 showed additional morphology of the growth.

1450.   As a proximate result of the acts of defendant, Gjovik suffered severe emotional distress including the fear of developing cancer and an increased risk of developing cancer. Gjovik also suffered a wide array of physical symptoms attributed to the toxic chemicals at 825 Stewart Drive and 3250 Scott Blvd including spasms, nausea, hair loss, rashes, hives, burns, dizziness, headache, hallucination, arrythmia, etc. Gjovik required and will continue to require frequent medical monitoring and psychiatric treatment.

### vii.   Deranged Gag-Order

1451.   Appleseed's retaliatory litigation filed against Gjovik in 2022 was admittedly due to Gjovik's complaints about witness intimidation and harassment by Apple, including by Appleseed. The point of the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the trauma she was experiencing with threat of incarceration if she were to even complain privately. Appleseed emailed Gjovik demanding Gjovik alter her federal

---

[1292] CollegeHospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, 725.
[1293] D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D; *Potter v. Firestone Tire & Rubber Co.*, 2 Tx.L.R. 862 (Cal. Super. Ct., Monterey County, Case No. 81723, 1987). (In addition to its cancerphobia award, the court also awarded 2.6 million in punitive damages.)
[1294] CACI No. 1601. Intentional Infliction of Emotional Distress - Fear of Cancer, HIV, or AIDS

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

testimony and Appleseed said because Gjovik refused, she sued Gjovik. Allegation of witness intimidation and/or pressure to suborn perjury are sufficient for a claim of IIED.[1295] Anonymous emails with false allegations of criminal and vile acts may be sufficient for a claim of IIED.[1296]

1452.   During that litigation, the petitioner from Apple's Global Security team, wrote in email to Gjovik saying that Gjovik complaining about Apple's death threats and Gjovik complaining about Apple trying to make her suicidal was "*harmful to Apple*" and Appleseed said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony (February 5 2022).

1453.   After the gag order, Gjovik then could not complain about what occurred without risking years of incarceration. However, Appleseed then proceeding to continue to stalk, harass, defame, disquiet, disturb, and intimidate Gjovik knowing she could get Gjovik incarcerated for multiple years if Gjovik responded in anyway.

1454.   They day after the lawsuit, Appleseed also reported one of Gjovik's legal filings to Gjovik's webserver alleging it was "child pornography" (the filing alleged witness intimidation by Apple and was addressed (and previously submitted to) to US government agencies investigating Gjovik's charges, as well as to District Attorney's offices. A sufficient allegation of IIED was found when coworkers retaliated against a financial whistleblower by filing false reports accusing him of sexually abusing children.[1297]

1455.   A district court found that lawsuits against employees, along with public allegations of criminal misconduct and lack of professionalism made by employer against those

---

[1295] *Alexander v. U.S.*, 721 F.3d 418 (7th Cir. 2013); *Shmueli v. Corcoran Group*, 9 Misc. 3d 589, 802 N.Y.S.2d 871 (Sup 2005).
[1296] *Juzwiak v. Doe*, 415 N.J. Super. 442, 2 A.3d 428, 259 Ed. Law Rep. 724 (App. Div. 2010).
[1297] *Cimmino v. Marcoccia*, 2009 WL 2961461 (Conn. Super. Ct. 2009).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

employees, in retaliation for the employees speaking to the media about the employer's operations is a sufficient allegation of IIED.[1298]

### viii.    Gjovik's Injuries

1456.   When Gjovik explains to people what Apple has done to her, when she shows them Apple's emails and posts, shows them the evidence she gathered of their physical intrusions and harassment, the default response is not to simply shake their head with disappointment. No, it is to exclaim something such as "*Outrageous!!*"[1299]  Further, these actions have caused fear in those around Gjovik, as well as in Gjovik herself. Gjovik has lost many friends through this – which she cannot blame them as Apple's menacing is likely smoke from the fire of actionable threats of violence and mayhem.[1300]

1457.   Apple's conduct of course left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation*".[1301] However, as a direct and proximate result of Apple's conduct, Gjovik also experienced overwhelming anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment [and] worry.*"[1302] Apple's conduct resulted in Post-Traumatic Stress Disorder and anxiety symptoms. Gjovik grappled with depersonalization and derealization.

1458.   Apple's actions were so extreme and caused such severe disruption to Gjovik's life, Gjovik suffered panic attacks worrying about losing her home and not having food or being able to care for her dog.[1303] Gjovik cried every day. Gjovik kept a "go bag" by her front door in case some Apple-captured police offer showed up to haul her away to prison in Seattle. Gjovik

---

[1298] *Pete v. Tacoma School District No. 10*, 198 F. Supp. 3d 1206 (W.D. Wash. 2016).
[1299] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[1300] Rest.2d Torts, § 46, com. d. p. 73.
[1301] *Koerber v. Encyclopaedia Britannica, Inc.*, No. B312047, 10-11 (Cal. Ct. App. Jul. 13, 2022)
[1302] *Crisci v. Security Ins. Co.*,66 Cal.2d 425, 433 [ 58 Cal.Rptr. 13, 426 P.2d 173]; Rest.2d Torts, § 46, com. j. *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397 (Cal. Ct. App. 1970).
[1303] *Alcorn v. Anbro Engineering*, Inc.,2 Cal.3d 493, 498; *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 398 (Cal. Ct. App. 1970).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

had to arrange guardians for her dog and drafted a signed letter she posted on the door and gave

to the guardians that instructed the police to allow the guardians to pick up Gjovik's eight-pound

Chihuahua from the pound if Gjovik was arrested and incarcerated. Gjovik was and is constantly

on edge.

　　　1459.  Apple's intentional and malicious surveillance of Gjovik during the retaliation

period and also prior when she was an employee using one device for personal and work, as

requested by Apple, empowered Apple with massive amounts of data to know Gjovik's "*work,*

*home, personal lifestyle, patterns of living, and daily comings and goings.*"[1304] Gjovik was

harmed by Apple's extensive and oppressive surveillance, and threats of surveillance. Even if

the harm caused to Gjovik by Apple's surveillance policies and practices was completely

unintentional and merely negligent acts/omissions, Apple is still liable for the negligent

infliction of emotional distress they caused Gjovik. [1305]

　　　1460.  Apple also has access to weapons, having weapons is part of Apple Global

Security's self-image and the self-image of their ex-law enforcement and ex-military staff,

Apple's threats have extended to Gjovik's friends and been made directly to Gjovik's friends,

Apple has a history of abuse and violence, Apple has destroyed Gjovik's property, Apple has

enlisted others to monitor and harass Gjovik, Apple has made unwanted attempts to

communicate with Gjovik directly and through third-parties.

　　　1461.  Apple is notoriously obsessed with power and revenge, and Apple (one of the

most wealthy and powerful companies in the history of the modern world) surely has the means

to carry out any of their threats or any act of violence it desires against Gjovik.[1306]

---

[1304] US DOJ, *Model Protocol for Community Oriented Police Response to Stalking,*
https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-w0045-pub.pdf
[1305] *Slaughter v. Legal Process Courier Service* (1984) 162 Cal.App.3d 1236, 1249); *Wollersheim v.*
*Church of Scientology*, 212 Cal.App.3d 872, 900 (Cal. Ct. App. 1989).
[1306] US DOJ, Model Protocol for Community Oriented Police Response to Stalking.

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

1462.   Apple smeared Gjovik's image and credibility beyond repair

1463.   As documented in legal filings, emails, doctor appointments, and in therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, severe depression requiring anti-depressants due to suicidal ideation and crying uncontrollably for hours every day. Gjovik suffers from paralyzing anxiety, and it has been difficult to even get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between overeating and under eating, but overall gained over forty pounds starting in late 2021. Gjovik's body has been stuck in PTSD "hyperarousal" and she is constantly hyper-alert and vigilant, listening for sounds that there could be another break in, or anther stalker outside her home waiting to harass her. Gjovik has not been able to 'relax' for over three years.

1464.   Gjovik seriously considered suicide several times in 2021 – 2023.

1465.   Apple had full knowledge of Gjovik's precarious situation, and the prior impact to her mental health before Apple started retaliating about Gjovik's office. Apple knew the retaliation about the office would further traumatize Gjovik after Apple had previously traumatized her due to the 3250 Scott Blvd emissions. Then, Apple intentionally terrorized Gjovik more in addition to the office retaliation – with holistic, expansive, passionate terrorism of Gjovik assumably in hope that Gjovik killed herself or died of cancer quicker than she would have otherwise. Gjovik has spoken and written about this extensively over the last six months after discovering what Apple did at 3250 Scott Blvd and realizing the incredibly depravity of Apple's conduct.

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1466.   In California, there is a two-year statute of limitations to file a complaint for IIED or NIED.[1307] New York as a one-year (from act) statute of limitations for IIED and three years (from act) for NIED.[1308] Gjovik argues Apple's conduct was IIED, but if not then, or concurrently also NIED. NIED does not require 'extreme and outrageous conduct.'[1309]

1467.   In a civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than the later of two years from the date of injury or two years after plaintiff "*becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another …*"[1310] Gjovik did not discover Apple's HVAC/TCE mess until June 2022 and did not discovery Apple's secret silicon fabrication until February 2023. Knowing injuries exist and knowing the general actions that may cause such injuries is not enough, instead the victim must become aware of the actual, specific cause of the injuries.[1311]

### ix.      Eggshell / Target

1468.   Beyond the broader scope of the claim, what distinguishes this claim from the Bane Act or Ralph Act claims, is Apple's deranged harassment, threats, and intimidation was intentional and malicious, following and with full knowledge that in 2020, Apple's emissions of

---

[1307] Cal. Code Civ. Proc. § 335.1; *Wassman v. South Orange County Community College District*, No. G053411, California Court of Appeal (June 12, 2018)
[1308] CPLR 215(3); 14 N.Y.Prac., New York Law of Torts 1:40
[1309] *Brown v. New York Design Ctr., Inc.*, 2023 WL 2417772 (N.Y. App. Div. 1st Dep't Mar. 9, 2023). *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583; Burgess v. Superior Court (1992) 2 Cal.4th 1064.
[1310] CCP § 340.8(a); D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D
[1311] *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986); *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 886–89 (9th Cir. 2017).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

toxic chemicals and gases into Gjovik's home left Gjovik unable to function and disabled, even

formally on state short-term disability from May through September 2020.

1469.   Gjovik did not know what was making her ill at the time and was told it could be

fatal illness or injury. Gjovik did not understand what the cause of her injury was and was

warned by doctors that her fainting spells could lead to death if she was to fall and whack her

head, and that if she had a fatal arrythmia that exercise could provoke a lethal heartbeat, and as

such Gjovik was put on bed rest for months – concurrently while being poisoned by Apple's

fabrication emissions while she was at home and in bed. Apple's actions made Gjovik fear for

her life, caused severe physical injuries, put Gjovik at high risk for cancer and disease in her

lifetime, put Gjovik's dog at risk for cancer and disease, made Gjovik's hair fall out, caused

growths and rashes that may permanently disfigure Gjovik, and then proceeded to cover up what

Apple did to Gjovik, while intentionally harassing, intimidating, threatening, and terrorizing

Gjovik – knowing that the increased stress they were causing Gjovik was to make Gjovik even

more likely to develop cancer and disease.

1470.   Apple could have acted with some decency and reserve, but instead Apple

bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and

threatened it could contain a severed head, sued her, and reported her to law enforcement,

repeatedly threatened to harm and "*ruin*" and "*destroy*" her, and even sent her emails pretending

to be government employees threatening her to shut up about Apple's chemical leaks. Through

all of this, Apple went out of their way to act like deranged maniacs whose conduct clearly

exceeded all bounds of decency usually tolerated by society.

## I.   ADVERSE/NEGATIVE EVENTS GENERALLY

1471.   There are an incredible number of ways employers retaliate against their

employees. Employees injured by retaliation may describe it using legal or functional terms, or

614

**Deleted:** manufacturing

**Deleted:** <#>Apple did follow through on many of its threats (like suing Gjovik), and frequently combined online harassment with physical in-person harassment confirming to Gjovik online what they were doing in person, all of which makes Apple's conduct menacing, and not trivial.¹³¹² Also, sufficient allegations for intention to cause or reckless disregard of the probability of causing emotional distress may be satisfied by threats concerning Gjovik's health and that of the Gjovik's family – like threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap.*"¹³¹³¶

<#>When Gjovik explains to people what Apple has done to her, when she shows them Apple's emails and posts, shows them the evidence she gathered of their physical intrusions and harassment, the default response is not to simply shake their head with disappointment. No, it is to exclaim something such as "*Outrageous!?*"¹³¹⁴  Further, these actions have caused fear in those around Gjovik, as well as in Gjovik herself. Gjovik has lost many friends through this – which she cannot blame them as Apple's menacing is likely smoke from the fire of actionable threats of violence and mayhem.¹³¹⁵¶

<#>Further, Apple's supposed (but pretextual) reason for firing Gjovik was two topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct, but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination, despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans) being highly unlawful, unethical, and in some cases illegal. ¶

<#>In fact, A 2023 New York case awarded damages for Negligent Infliction of Emotional Distress due to the use of cameras in bathrooms. Gjovik protested "Gobbler," for among other reasons, it is taking photos of her while naked and while in the bathroom, and while naked in the bathroom. Gjovik complained of conduct found to be NIED and Apple then implicitly threatened to sue her if she was to protest it again and blamed their highly unlawful retaliation against Gjovik on Gjovik's outcry about unlawful conduct.¹³¹⁶¶

<#>Similarly, Applesced's retaliatory litigation filed against Gjovik in 2022 was admittedly due to Gjovik's complaints about witness intimidation and harassment. The point of the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the trauma she was experiencing with threat of incarceration if she were to even complain privately. During that litigation, the petitioner from Apple's Worldwide Loyalty team, wrote in email to Gjovik saying that Gjovik complaining about Apple's death threats and Gjovik complaining about Apple trying to make her suicidal was "*harmful to Apple*" and Applesced said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony (February 5 2022). After the gag order, Gjovik then could not complaint about what occurred without risking years of incarceration.¶

<#>Applesced then proceeding to continue to stalk, harass, defame, and intimidate Gjovik knowing she could get Gjovik incarcerated for multiple years if Gjovik responded in anyway.¶

<#>Apple's conduct of course left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation*".¹³¹⁷ However, Gjovik also experienced overwhelming "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment [and] worry.*"¹³¹⁸ ¶

<#>Apple's actions were so extreme and caused such severe disruption to Gjovik's life, Gjovik suffered panic attacks worrying about losing her home and not having food or being able to care for her dog.¹³¹⁹ Gjovik cried every day. Gjovik kept a "go bag" by her front door in case some Apple-captured police offer showed ... [17]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

even vague artful declarations [complaint of "*some kind of weird retaliation*"[1328] ], but the language used to summarize the retaliation does not change the facts. This section applies to all claims that include employment retaliation as an element.

### i.      2021-01 Hostile Work Environment

1472.   To establish a hostile environment, harassment must be "so severe or pervasive as to "alter the conditions of the victim's employment and create an abusive working environment."[1329] Prior to her termination, and for some time, Apple had created and maintained an abuse and hostile work environment for Gjovik. Gjovik has been actively looking for a new role at Apple, interviewing with several teams, and telling West and Powers that she was doing so.[1330] While some roles feel through (headcount canceled, etc.), other roles were expressly blocked by West.

1473.   The harassment Gjovik suffered would have detrimentally affected a reasonable person and did detrimentally affect Gjovik.[1331] The discriminatory conduct was frequent, pervasive, and severe; Gjovik suffered humiliation and harassment that unreasonably interfered with Gjovik's ability to do her job. The harassment included abuse and threats of abuse that seriously scared and harassed Gjovik for not legitimate or lawful reasons.[1332]

1474.   Where the harassment was previously not severe enough to alter the terms and conditions of her employment, once the retaliation began, all actions noted were sufficient to be

---

[1328] *Redacted v. Art Institute Of California,* 173 Cal.App.4th 986, 1020 (Cal. Ct. App. 2009).
[1329] *Fisher v. San Pedro Peninsula Hosp.* (1989) 214 CA3d 590, 608, 262 CR 842, 851 (adopting federal case law for hostile environment sexual harassment claims under California law); *Alexander v. Community Hosp. of Long Beach* (2020) 46 CA5th 238, 262, 259 CR3d 340, 364
[1330] Gjovik's 2020 annual performance review self-assessment noted under goals that she would "Continue to look for opps @ Apple with a legal/policy focus. In the meantime, appreciate any projects that focus on strategy, comms, research, or implementing new policy (transferable to next phase of career)."
[1331]
[1332] California Courts, *Understanding Harassment Laws,* https://www.courts.ca.gov/1258.htm

615

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

"*retaliatory harassing conduct*."[1333]  In addition, or in the alternative, harassment and similar abuse occurred repeatedly over the course of Gjovik's employment and thus constitutes a hostile work environment even if not severe.[1334] In addition or in the alternative, causation is seen from evidence that harassment by supervisors and coworkers intensified shortly after Gjovik filed complaints.[1335]

1475.   After Gjovik's protected activity reporting her illness next to Apple's facility at 3250 Scott Blvd, reporting concerns about Apple's dealings related to the COVID-19 vaccine, and complaining about safety issues at her office. Apple increased the severity of her hostile work environment through retaliatory harassment. Apple also refused to remedy the issues it created, even blatantly and unreasonable denying transfers.

**ii.      2021-4: Constructive Discharge**

1476.   Constructive discharge occurs when the employer's conduct effectively forces an employee to resign because "under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position would have felt compelled to resign."[1336] The requisite knowledge or intent must be on the part of the employer or those who

---

[1333] *See, e.g.*, *Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*, an employee claiming "retaliation by workplace harassment" is "no longer required to show that the harassment was severe or pervasive"); *EEOC v. Chrysler Grp., LLC*, No. 08-C-1067, 2011 WL 693642, at *8-11 (E.D. Wis. Feb. 17, 2011) (holding that reasonable jury could conclude employees were subjected to unlawful retaliation under *Burlington Northern* standard when human resources supervisor verbally harassed them by screaming and pounding his fists on the table while threatening termination if they filed grievances). *See* Federal Sector Equal Employment Opportunity, 77 Fed. Reg. 43,498, 43,502 (July 25, 2012) (codified at 29 C.F.R. § 1614), https://federalregister.gov/a/2012-18134.
[1334] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)
[1335] *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8-9 (1st Cir. 2006)
[1336] *Turner v. Anheuser-Busch, Inc.*, 7 Cal 4th 1238, 1256, 32 Cal. Rptr. 2d 223, 876 P.2d 1022 (1994).

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

"effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." [1337]

1477.  Gjovik's role under David Powers and Dan West had been a hostile work environment for some time, with repeated escalations to Dan West about it and requesting him to help, as well as numerous attempts to transfer to other teams at Apple. During this time, Dan West repeatedly blocked Gjovik's ability to transfer to a different team without coherent explanation, while also refusing to resolve Gjovik's complaints about a hostile work environment.

1478.  The escalation of harassment and retaliation in March and April 2021, due to Gjovik's protected activity, relocated Gjovik's position from the frying pan and instead straight into the fire, with Apple's Employee Relations and Human Resources teams gleefully adding kindling as they further provoked her managers, coworkers, and leadership at the company about her. On April 29 2021, when Gjovik complained again of the ongoing hostile work environment, and now the new harassment and retaliation, and the unsafe work conditions, Dan West refused to do anything to help. Gjovik said if he did nothing and continued to block her transfers she would have to quit, and West agreed then she should just quit Apple. Although the employee may say, *"I quit,"* the employment relationship is actually severed by the employer's acts against the employee's will. As a result, a constructive discharge is legally regarded as a firing by the employer rather than a voluntary resignation or retirement by the employee.[1338]

1479.  In determining whether a reasonable employee would feel compelled to resign, courts consider such factors as: reassignment to menial or degrading work; badgering,

_____

[1337] *Turner v. Anheuser-Busch, Inc.,* supra, 7 C4th at 1251, 32 CR2d at 230 (emphasis added); *Ortiz v. Dameron Hosp. Ass'n* (2019) 37 CA5th 568, 579, 250 CR3d 1, 10—evidence that supervisory employee intentionally created working conditions leading to plaintiff's resignation sufficient to impute knowledge to employer.

[1338] *Turner v. Anheuser-Busch, Inc.,* supra, 7 C4th at 1244-1245, 32 CR2d at 226; *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 CA4th 1156, 1166, 104 CR2d 95, 102.

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

harassment or humiliation by the employer calculated to encourage the employee to resign; offers of continued employment on terms less favorable than the employee's former status.[1339] Intolerable working conditions are those which either are unusually aggravated, or amount to a continuous pattern of objectionable conduct.[1340]

1480.   Apple (via Jenna Waibel) used a sham and nonconsensual sexism investigation to create an extremely hostile work environment for Gjovik with her two managers, and with some of the other leaders she had to work with, and with Human Resources. In response to this and to Gjovik's continued protected activity, Gjovik's managers then began reassigning her work to other people, dramatically increasing her workload with unfavorable projects, harassing her and threatening discipline through "warnings" (David Powers, March 2021) about her exercising her rights, while also denying requests for transfers and instead telling her she "can just quit" (Dan West, April 29 2021).

1481.   Gjovik notified numerous people in positions of authority of the intolerable conditions, so Apple was aware of what happened and did nothing, or intentionally made it worse. Gjovik notified Apple of constructive discharge starting in April of 2021, again in May, June, July, August, and September 2021.[1341]

1482.   As in *Zilmer*, when Apple 'quadrupled' Gjovik's workload, Apple knew Gjovik could not take on the workload and the increase was false and pretextual, creating a wrongful constructive discharge.[1342] Similarly, as in *Colores*, frequent reorganization of Gjovik's duties along with frequent attempts to invent pretextual documents and unlawful demands is a

---

[1339] See *Brown v. Kinney Shoe Corp.* (5th Cir. 2001) 237 F3d 556, 566; Constructive Discharge, Cal. Prac. Guide Employment Litigation Ch. 4-G.
[1340] *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1246-1247, 32 CR2d at 227-228; *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 CA4th 1156, 1171-1172, 104 CR2d 95, 106—continuous course of harassment, uncorrected by management, can constitute objectively intolerable working conditions.
[1341] *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1250, 32 CR2d at 230.
[1342] *Zilmer v. Carnation Co.* (1989) 215 CA3d 29, 38-39, 263 CR 422, 426-427 (disapproved on other grounds by *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1251, 32 CR2d at 230).

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

wrongful constructive discharge especially as Apple knew its actions would create stress that would exacerbate Gjovik's medical conditions (PTSD, anxiety, etc.).[1343]

1483.   Further, Apple constructively discharged Gjovik in violation of a public policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision.[1344] Gjovik's constructive discharge was in violation of a "firmly established, fundamental, and substantial" public policy as described with the same factors in the *Tameny* claims section.[1345] Apple's construction discharge of Gjovik occurred alongside related breach of contract, torts, and criminal conduct by Apple, which injured Gjovik.[1346]

### iii.      2021-07: Increase in Unfavorable Work / Reassignment / Fake Investigations / Misleading Statements

1484.   Apple reassigned Gjovik's projects, gave her unfavorable work, gave her increased workload, and opened fake investigations on her behalf solely to incite retaliation.[1347] Apple used Employee Relation investigators to open fake investigations intended to upset Gjovik's management and coworkers in hope that Gjovik quits. The same team also abused ADA and FMLA processes as vehicles for innovation retaliation tactics, which is deeply disrespectful to the Congressional intent for those statutes.

1485.   Okpo repeatedly told Gjovik that everything they discussed was 'confidential.' Gjovik, annoyed with Okpo's misleading posture, eventually complained to Okpo that he was attempting to mislead her that he would not share what she said with Apple management or

---

[1343] Colores v. Board of Trustees of Calif. State Univ., supra, 105 CA4th at 1310, 130 CR2d at 360.
[1344] *Turner v. Anheuser-Busch, Inc.*, 7 Cal 4th 1238, 1256, 32 Cal. Rptr. 2d 223, 876 P.2d 1022 (1994).
[1345] Foley v. Interactive Data Corp., 47 Cal. 3d 654, 671 n.11, 254 Cal. Rptr. 211, 765 P.2d 373 (1988); Zamora v. Sacramento Rendering Co., United States District Court for the Eastern District of California, No. Civ. S-05-00789 DFL KJM (January 17 2007).
[1346] *Zamora*, supra.
[1347] *Simers v. Los Angeles Times Communications*, LLC (2018) 18 Cal.App.5th 1248, 1279 [227 Cal.Rptr.3d 695; *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003).

619

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

legal, at which point Okpo then looked shocked and forlorn that Gjovik actually knew her legal

rights, and at which point then confirm the conversation was not confidential between the two of

them. Gjovik also complained to Okpo that he was a lawyer and was acting like he was her

lawyer, but he represents the corporation, at which point Okpo finally provided a long overdue

Upjohn warning.[1348]

### iv.    2021-08: "Removed from the Workplace and all Workplace Interactions"

1486.   Gjovik requested that Apple modify her reporting relationship with her

supervisors while they investigated and as a temporary resolution to the hostile work

environment. Gjovik asked, at the very least, that her prior workload be restored, and that

interactions with her supervisors be kept to writing. This was not an unreasonable request.

"Where the conduct being investigated involves a supervisor and the supervisor's direct or

indirect report, an employer should strongly consider modifying the relevant reporting

relationship pending completion of the investigation to avoid further harassment or intimidation

of the accused or disruption to the work environment."[1349]

1487.   Instead of accepting Gjovik's request, Apple suddenly placed Gjovik "on leave,"

despite her protests, and refusing her attempts to negotiate the terms of the leave. The act of

placing an employee on administrative leave can be an adverse employment action.[1350]   An

employee that complained of discrimination or retaliation leading to an investigation by their

---

[1348] *Upjohn Co. v. United States*, 449 U.S. 383 (1981) – (If an attorney is conducting the investigation, the attorney should provide the employees with an Upjohn warning explaining that the attorney represents the company, not the employee)

[1349] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452

[1350] *Whitehall v. Cnty. of San Bernardino*, 17 Cal. App. 5th 352, 367, 225 Cal. Rptr. 3d 321, 332 (2017); See *Lakeside–Scott v. Multnomah*, 556 F.3d 797, 803 n. 7 (9th Cir.2009); See *Dahlia v. Rodriguez* (9th Cir. 2013) 735 F.3d 1060, 1078, citing Coszalter v. City of Salem (9th Cir. 2003) 320 F.3d 968, 975.) *Whitehall v. Cnty. of San Bernardino*, 17 Cal. App. 5th 352, 367, 225 Cal. Rptr. 3d 321, 332 (2017)

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

employer into their concerns, "*may be so distressed by the events that led to the investigation, or by the reactions of the accused to the investigation, that an employer deems it appropriate to offer the complainant paid leave or another accommodation pending completion of the investigation. Whatever the accommodation, the employer should ensure it only offers and does not force it on the complainant to avoid a potential retaliation claim.*"[1351] "Walking off" employees from the work site (like "removing them from the workplace") may constitute an adverse action.[1352]

1488.    Courts have found conduct by employers to be probative evidence of retaliatory discrimination when the employee is excellent and had no warnings, but the employer suddenly makes a decision to terminate or discipline the employee, but the employer orchestrates the action in some suspicious way, such as failing to provide any warnings, or choosing to 'walk off' and suspend the employee prior to discipline yet still failing to provide any warning.[1353] This is what Apple did to Gjovik. Apple provided Gjovik no warnings for whatever reason they fired her for, and instead of a warning, they suspended her always, then terminated her – and prior she was an excellent employee with no disciplinary issues.

1489.   The Ninth Circuit held over a decade ago that "placement on administrative leave can constitute an adverse employment action."[1354] The proper inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity."[1355] However, it may

---

[1351] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452; see, for example, Id, *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012).
[1352] *Lawson v. United Airlines, Inc.*, 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg33 -- (Respondent's "walk off" of Complainant on April 2, 2001 was also an adverse employment action. The equivalent of a suspension.")
[1353] Lawson v. United Airlines, Inc., 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg33. -- (see also, "The record demonstrates that Complainant's protected activity was a contributing factor to the adverse employment action he suffered. Furthermore, Respondent has not proven a legitimate, nondiscriminatory reason for Complainant's suspension or subsequent discharge." Id pg 42).
[1354] *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013).
[1355] Id.

621

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

also qualify as an adverse employment action if there are associated injuries due to the leave, like not being able to take exams required for career advancement, loss of extra pay, and loss of opportunities for work experience. Courts have also found paid administrative leave can be an adverse employment action if the leave is 'stigmatizing.'[1356]

1490.   The Courts have found a preponderance of evidence that protected activity was a contributing factor in the adverse employment action an employee suffered when the employer failed to seriously respond to the employee's concerns, or did not respond at all, became frustrated with employee's persistence, and pretended to corporate onlookers like they were actually earnestly trying to the help the employee when they were not. [1357]  Once again, this is what Apple did to Gjovik.

1491.   Gjovik and Apple discussed the potential for administrative leave as an oral contract matter prior to Apple putting her on leave. Gjovik explained the terms she would require if she was to "accept" administrative leave and the terms which would cause her to "reject" an offer of administrative leave, and this was a negotiation to negotiate.  Gjovik made it clear she would "accept" administrative leave as a mitigation to address the retaliation and harassment occurring from her managers as long as the leave was constrained to only that dynamic – and would not impact her ability to visit the office, to organize with coworkers, to use Slack, or any other modifications of the terms and conditions of her employment.

1492.   When Okpo told her it was "putting her on leave" on August 4th, Gjovik said she did not want to go on leave. Apple told Gjovik that they were putting her on leave because she "offered" to go on leave and they "accepted" her offer. Okpo's terms for leave included the

---

[1356] *Retaliation*, Practical Law Practice Note 5-501-1430
[1357] Lawson v. United Airlines, Inc., 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg36 -- (see also, "The record demonstrates that Complainant's protected activity was a contributing factor to the adverse employment action he suffered. Furthermore, Respondent has not proven a legitimate, nondiscriminatory reason for Complainant's suspension or subsequent discharge." Id pg 42).

| Deleted: FIRST |
| Deleted: -- |
| Deleted: cv |
| Deleted: CRB |
| Deleted: OCTOBER 25 |

terms Gjovik previously mentioned were unacceptable to her. Gjovik told Okpo his statement of putting her on leave had different terms than their prior discussion, and even if she had offered prior, his statement would be a counteroffer, not an acceptance. Okpo said Gjovik had no choice. Gjovik summarized this dynamic in the Issue Confirmation v3, saying that Okpo says the leave *"is voluntary but I also don't have a choice."* (pg29).

1493.   Under a contracts view, Apple had put Gjovik under economic duress, and used undue influence, in order to attempt to make her accept Apple's oppressive and unfavorable terms.[1358] Apple also concealed material information (the HVAC mess and US EPA inspection at 825 Stewart Drive and what happened at 3250 Scott Blvd), while making fraudulent and misrepresented statements  (that it was investigating Gjovik's complaints, that the leave was not indefinite, etc.) that Apple intended to induce Gjovik to rely on those statements to Gjovik's detriment.[1359] In addition, even if the leave was offered in way that Gjovik accepted (which she did not), Apple's fraud and misconduct frustrated the purpose of the agreement.[1360]

1494.   Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, mutual assent or consent being necessary to the formation of a contract. Consent is not mutual unless all the parties agree to the same thing in the same sense.

---

[1358] Economic duress occurs when one party commits wrongful acts that are coercive enough to cause a reasonably prudent person, lacking suitable alternatives, to agree to an unfavorable contract. [ *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 CA3d 1058, 1077-1081, 267 CR 457, 466-468 (collecting cases and extensively discussing economic duress); *Perez v. Uline, Inc.* (2007) 157 CA4th 953, 959-960, 68 CR3d 872, 876-877 (stating criteria for invalidating employment settlement agreement due to economic duress); *Hester v. Public Storage* (2020) 49 CA5th 668, 679, 263 CR3d 299, 308]
[1359] Civ.C. §§ 1566-1567; Rest.2d Contracts §§ 7, 161-162, 164 ("Fraud renders apparent consent not given of one's own free will and volition, making the contract voidable."); Civ.C. § 1572(3); Rest.2d Contracts §§ 160-161 (Concealment: When the party suppresses the truth); Civ.C. § 1573(1) (Breach of duty: Conduct by which the actor gains an advantage or misleads another to his or her prejudice.)
[1360] *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 C2d 666, 676-677, 75 CR 889, 896, fn. 13 (collecting cases); ( Frustration of Purpose: This defense applies when performance is not impossible or impracticable, but has become pointless—i.e., the main purpose of a contract has become frustrated.)

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Thus, there is no meeting of the minds of the parties to the contract while they are still negotiating terms.[1361]

1495.   Gjovik complained to Okpo when he put her on leave, that he refused to provide her any ETA for updates, or visibility to any next steps. Okpo told her he would get back to her when he felt like it. Gjovik asked if it could be multiple months before she heard back and Okpo said he did not know and would not tell her. Gjovik said if she was not supposed to work for months, that she was not going to check her work email regularly, and when Okpo was ready to talk to her, he should contact her via her personal email. Gjovik also complained that even Waibel gave her an ETA and idea of next steps. Okpo told Gjovik she should not check her work email anyways but that also he refused to contact her via her personal email. Gjovik complained to Okpo and later to the press and on social media, of "indefinite administrative leave."

1496.   When Gjovik asked to attend a training she previously registered for, and even got approval from the professors to do so, Okpo told Gjovik no "because she is on leave." The denial of previously promised training and the failure to promote may constitute adverse employment actions.[1362]

1497.   This was not an unreasonable statement by Gjovik. Corporate employers are advised to "Decide in advance on a target date for completion of the investigation. Setting and meeting a target completion date ensures that the investigation concludes promptly, allowing for swift corrective action as necessary and minimizing any costly paid administrative leave time for

---

[1361] California Civil Code § 1580; 14 Cal. Jur. 3d Contracts § 64; *Cheema v. L.S. Trucking, Inc.*, 252 Cal. Rptr. 3d 606 (Cal. App. 1st Dist. 2019), as modified on reh'g, (Oct. 7, 2019) – (Failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms or have taken some action related to the contract.)
[1362] Light v Department of Parks & Recreation, 14 Cal.App.5th at p. 93.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

affected employees. It also signals to the affected employees that the employer is taking their concerns seriously."[1363]

### v.   2021-09-09: Interrogation

1498.   In determining whether company's interrogation of employee tends to be coercive or threatening in light of total circumstances, court considers: the history of employer's attitude toward its employees; the nature of information sought; rank of questioner in employer's hierarchy; the place and manner of conversation; the truthfulness of employee's reply; whether employer had valid purpose in obtaining information sought about protected activities;  whether valid purpose for interrogation, if existent, was communicated to employee; and whether employer assured employee that there would be no reprisals. [1364]

1499.   Here, Gjovik had no warnings, Gjovik was not assured of no reprisals, the interrogator was part of the "Workplace Violence" Team, Apple had been acting adversarial to Gjovik, and its entirely unclear what Apple wanted  to question Gjovik about. The record seems to show Apple simply wanted to fire Gjovik, and they wanted to do it over the phone or a video call in order to obtain something they wanted from Gjovik.

1500.   "The question under California law is not: 'Did the employee in fact commit the act leading to dismissal?' but rather: 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?'"[1365]  There is no evidence Apple ever investigated Gjovik's concerns earnestly.

---

[1363] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452
[1364] *Tellepsen Pipeline Services Co. v. N.L.R.B.*, 320 F.3d 554, 171 L.R.R.M. (BNA) 3065, 147 Lab. Cas. (CCH) ¶ 10177 (5th Cir. 2003); West's Key Number Digest, Labor Relations 382.1; 3 Am. Jur. Proof of Facts 2d 699 (Originally published in 1985).
[1365] *Jones v. Costco Wholesale Corp.*, 34 F. App'x 320, 323 (9th Cir. 2002), citing *Cotran,*69 Cal.Rptr.2d 900, 948 P.2d at 422

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1501.   Investigative fairness "contemplates listening to both sides and providing employees a fair opportunity to present their position and to correct or contradict relevant statements prejudicial to their case, without the procedural formalities of a trial."[1366] Good cause, in the context of implied employment contracts, means 'fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual.'"[1367]

1502.   Investigative interviews may rise to an actionable level where they lead to an adverse consequence or where the attending circumstances show that a reasonable person subjected to them would be dissuaded from complaining about discrimination.[1368] In *Perez v USPS*, a series of four investigative interviews over seven weeks were found to be an adverse action when the interviews were never "preceded by an explication of its purpose," nor was the employee warned "that the interviews could lead to disciplinary actions," and "each was carried out in an offensive and antagonistic manner" including questioning the employee's "loyalty" while "berating" him.[1369] The Workplace Violence interrogator approached Gjovik first politely like a friend but with an implied threat of general reprisals, and ended the exchange as quickly as it started like they were enemies. The interrogator changed his story twice about what his intent in approaching her was.

1503.   Coercive speech is not protected as free speech either by the First Amendment or by labor laws. Interrogation is afforded protection by the Constitution and by labor laws only to

---

[1366] *Silva v. Lucky Stores, Inc.*, 65 Cal. App. 4th 256, 264, (5th Dist. 1998) (citing *Cotran v. Rollins Hudig Hall Intern., Inc.*, 17 Cal. 4th 93, 108, 69 Cal. Rptr. 2d 900, 910; see *Serri v. Santa Clara University*, 226 Cal. App. 4th 830, 873, 172 Cal. Rptr. 3d 732, 769, 304 Ed. Law Rep. 1128 (6th Dist. 2014);
[1367] *King v. United Parcel Service, Inc.*, 152 Cal. App. 4th 426, 438, 60 Cal. Rptr. 3d 359, 370 (3d Dist. 2007); *Ayala v. Costco Wholesale Corporation*, 2018 WL 6307891, *3 (C.D. Cal. 2018); *Lewis v. Dow Chemical Corporation*, 2018 Fair Empl. Prac. Cas. (BNA) 177566, 2018 I.E.R. Cas. (N.D. Cal. 2018).
[1368] *Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168, 1185 (W.D. Wash. 2015). See *Ballard v. Donahoe*, 2014 WL 1286193, *12 (E.D.Cal.2014) – (recognizing that "an investigative interview can be deemed adverse if it leads to an adverse consequence"); *Lee v. Hawaii*, 2010 WL 235009, at *7 (D.Haw.2010).
[1369] *Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168, 1185 (W.D. Wash. 2015)

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

the point that it is free from coercion; and if the questioning is such that the employer may be said to have engaged in conduct reasonably tending to interfere with the free exercise of employee labor rights, then it has passed that limit and violates the law.[1370] Threatening and intimidating federal witnesses and whistleblowers is not a right for corporations protected by the first amendment .

     1504.   An employer's decision to arrange a "*cold-blooded tactic of interrogation*" of an employee based on "*scanty evidence*" as an "*intentionally oppressive method of browbeating an employee into a confession*" is plausibly a method "*beyond the outer bounds of socially tolerable employer practices*" for an IIED claim. [1371] The tactic combines the intimidation of unlawful debt collection tactics with the coercive dependency of the employee in the employment relationship.[1372]  Employers deliberating inflicting distress upon their employees in this way waives their "*privilege of insisting on the employer's legal rights in a permissible way*", even if that way may also cause emotional distress – as it is distinguished from simply trying to cause distress for the sake of causing distress or other unlawful objectives."[1373]

     1505.   In an attempt to strike a balance between the employer's interests in preparing its case for trial, and the employee's interest in being free from unwarranted interrogation, agencies and the courts have established specific safeguards designed to minimize the coercive impact of such employer interrogation.[1374]  The employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis, and the questioning must occur in a context free from employer hostility to

---

[1370] 43 Am. Jur. Proof of Facts 2d 699 (Originally published in 1985).
[1371] *Hall v. May Dep't Stores Co.*, 292 Or. 131, 133, 637 P.2d 126, 131 (1981).
[1372] Id.
[1373] Id; Restatement (Second) Torts § 46, comment g.
[1374] 4 A.L.R. Fed. 280 (Originally published in 1970).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

protected rights and must not be itself coercive in nature. None of this happened with Gjovik; Apple did the opposite.

1506.    If an employer wants to interrogate an employee who has engaged in protected activity and who is about to provide testimony to the government – the employer is required to communicate to the employee the purpose of the questioning, assure the employee that no reprisal will take place, and obtain employee participation on a voluntary basis.[1375] If the employer interrogates an employee, and the employee requests accommodation for the stress (such as an anxiety medication), but the employer denies the request and agitates the employee, the employer may be liable for IIED.[1376]

1507.   Finally, OSHA's description of the "workplace violence" function at the workplace discusses threats, physical assaults, and aggravated assaults.[1377] It's entirely unclear why this interrogator was reaching out to Gjovik except to intimidate her.

**vi.      2021-09-09 Termination**

1508.   Apple's termination of Gjovik on September 9 2021 is facially retaliatory and does not require additional analysis.

**vii.      2021-2023: Digital Threats & Harassment**

1509.   Apple's technical sophistication enabled it to retaliate against Gjovik in complex and innovative ways. Apple's novel method for a comprehensive, all accompanying harassment campaign against Gjovik included several tactics which make Apple's formal involvement less

---

[1375] *NLRB v Neuhoff Bros., Packers, Inc.* (1967, CA5) 375 F2d 372 -- (Violation of labor laws when employees were ordered to come to company offices for an unannounced purpose, and management representatives were present, including on at least one occasion a supervisor alleged to have made certain coercive threats, and in the general atmosphere of strong intense feelings.); *Re Johnnie's Poultry Co.* (1964) 146 NLRB 770; 4 A.L.R. Fed. 280; *Louton, Inc.* (1984) 270 NLRB No. 9, 116 BNA LRRM 1084, 1983-84 CCH NLRB ¶ 16266.
[1376] *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312, 52 A.L.R.4th 839 (1984)
[1377] Workplace Violence, Practical Law Practice Note 7-505-7511

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

directly visible. Despite this, Gjovik, her coworkers, and the public all quickly saw these actions were orchestrated and ordered by Apple.

1510.   The success of Apple's short-sighted strategies (such as using fake social media accounts to harass Gjovik) was contingent on a successful outcome that left Gjovik incapable of defending herself, because otherwise, Apple's retaliatory conduct and animosity towards Gjovik was despicable, reprehensible, and attributable to Apple with much effort.[1378]

1511.   Today, what Apple did is not entirely novel. Other large companies have tried to do it and gotten caught, including: eBay, Tesla, Walmart, Google, and others.

### viii.   2021-2023: Coworker Harassment; Retaliatory Lawsuits & Police Reports

1512.   Employers can be liable for co-workers' harassing behavior under negligence principles; when the employer must have known or had reason to know of the harassment and failed to take adequate steps to address it.[1379] An employer may even be held liable for a hostile work environment created by third parties, or an anonymous harasser, if the employer is aware of the harassment and fails to take steps to address it.[1380]  Anonymous conduct that creates a hostile work environment does not mean that an employer is held to a lesser standard of liability.[1381] The anonymous nature of severe threats or acts of harassment may, in fact, heighten

---

[1378] See: Zirpel v. Alki David Prods., Inc., 93 Cal. App. 5th 563, 579–81, 310 Cal. Rptr. 3d 730, 743–45 (2023), reh'g denied (July 10, 2023) – ("When Zirpel voiced his concerns regarding workplace safety, David yelled and screamed obscenities at Zirpel in front of his coworkers, called him a "faggot" and told him to "suck my dick." While screaming at Zirpel, David stood so close to him that spittle flew into Zirpel's face. After telling Zirpel he was fired, David followed Zirpel out of the theater building and continued to scream at him. The totality of the circumstances here supports a finding of reprehensible conduct.")
[1379] 29 C.F.R. § 1604.11(d); see also Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 636 (7th Cir. 2009), EEOC v. Prospect Airport Servs., Inc., 621 F.3d 991, 1001 (9th Cir. 2010).
[1380] See Pryor v. United Air Lines, Inc., 791 F.3d 488 (4th Cir. 2015); Legal Update, Employer May Be Held Liable for Hostile Work Environment Created by Anonymous Racist Note: Fourth Circuit.
[1381] *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011).

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

what is required of an employer.[1382] There is an adverse action against an employee when an employee's "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[1383]

1513.   If the employer refuses to act after there is a complaint of coworker adverse employment action, the employer may still be found responsible. [1384] Where nonsupervisory coworkers harass an employee to punish the employee for complaining, the employer may be liable if it knew or should have known of the retaliation, and either participated in it, encouraged it or failed to stop it.[1385]

1514.   In *Centeno-Bernuy v. Perry*, here an employee filed reasonable, good faith labor complaints against an employer and as soon as the learned of the complaints, the employer (themselves or via agent as here with Applesced) responded by reporting the employee to law enforcement and accusing the employee of extremely serious federal crimes.[1386] In *Centeno-Bernuy,* the employer repeatedly, without merit and in retaliation for the labor activity, reported the workers as "*terrorists*" to INS, claimed they were part of a "*sleeper cell,*" claimed they were involved in trafficking and smuggling, and attempted to have them deported. During litigation of the employee's lawsuit against the employer, the employer also alleged the employees and lawyers were involved in "*the biggest operation of trafficking in and smuggling of illegal aliens*

---

[1382] *Pryor v. United Air Lines, Inc.,* 791 F.3d 488 (4th Cir. 2015).
[1383] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
[1384] *Pellier v. British Airways, Plc,* No. 02-CV-4195, 2006 WL 132073 (E.D.N.Y. Jan. 17, 2006).
[1385] *Kelley v. Conco Cos.* (2011) 196 CA4th 191, 213-214, 126 CR3d 651, 670-671; *Bohnert v. Roman Catholic Archbishop of San Francisco* (ND CA 2015) 136 F.Supp.3d 1094, 1120; *Yanowitz v. L'Oreal USA, Inc.,* supra, 36 C4th at 1060-1061, 32 CR3d at 460.
[1386] *Centeno-Bernuy v. Perry,* 302 F. Supp. 2d 128 (W.D.N.Y. 2003).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*in the 21st Century.*"[1387] The employer was able to get INS to open an investigation into the employees and repeatedly claimed to be working with the agency against the employees. A federal court issues a restraining order against the employer from any further harassment and reports to government or law enforcement about the employees.[1388]

1515.   Here, in 2022, Apple learned Gjovik was working on a federal legal filing documenting Apple's criminal threats and intimidation, and promptly sent Joanna Appleseed after Gjovik, with Appleseed then without merit (and later confirmed by Appleseed to be without merit) reporting Gjovik to the FBI and law enforcement for "criminal blackmail and extortion," among other felonies, Then, days after viewing the legal filing Gjovik planned to submit addressed to the US District Attorney's office as well as several federal and state agencies,  and part of new charges Gjovik filed that month for the witness intimidation, Appleseed then filed a lawsuit against Gjovik again accusing Gjovik of "criminal blackmail and extortion," claiming Gjovik's NLRB charge against Apple was filed in bad faith, and claiming she feared for her safety from Gjovik, was not sure if Gjovik had a gun, and moved homes because of Gjovik. Appleseed also reported Gjovik's federal legal filing to Gjovik's webserver as "child pornography." Similarly, upon learning of Gjovik's appellate win of Appleseed's retaliatory lawsuit being cited in a SCOTUS brief, Appleseed then again reported (or claimed to have reported) Gjovik to law enforcement and accused Gjovik of more felonies.

---

[1387] Centeno-Bernuy, supra – ("Despite Perry's insistence to government authorities that plaintiffs are terrorists, he admitted at the hearing that he has no evidence that the plaintiffs are terrorists or members of a sleeper cell; it is simply his belief or opinion that they are.")
[1388] Centeno-Bernuy, supra – ("Ordered that defendant …. is restrained and enjoined from contacting or communicating with, in any way, any local, state or federal government official or agency, including but not limited to the United States Attorney General, the United States Attorney, the New York State Attorney General, the United States Department of Labor, the New York State Police, the INS, the United States Department of Homeland Security, and the United States State Department, with regard to the …. and their attorneys; and it is further; Ordered that defendant … is restrained and enjoined from any further retaliation, in any form, against the plaintiffs…")

631

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

The Director of Security of the NLRB, Raymond Hankins, and the supervisory Field Attorney for Region 32, Catherine Ventola, which is handling Ms. Gjovik's NLRB charge which names me, both recommended over the phone that I report Ms. Gjovik's conduct to federal and local authorities, on or around January 25, 2022, and on or around February 4, 2022, respectively. They further advised that they had had numerous operations meetings to discuss how to handle Ms. Gjovik's conduct and my personal and private information being published without my or my family's consent. They advised they would redact information per Exemption 6 of FOIA, and linked me to the relevant guide from the DOJ, but said they did not have jurisdiction over her

*Exhibit: Appleseed's 2/15/22 retaliatory lawsuit testimony claiming NLRB told her to report Gjovik to the police and FBI (which NLRB denied in writing)*

1516.  Just as with *Centeno-Bernuy*, prior to Gjovik's labor complaints, Appleseed nor any other agents of Apple, to Gjovik's knowledge, had reported Gjovik to law enforcement or sued Gjovik alleging Gjovik committed felonies.[1389]

**J.   RETALIATION PRETEXT GENERALLY**

1517.  This section applies to all legal claims that involve adverse and unfavorable employment actions, including but not limited to: Apple's termination of Gjovik on September 9 2021, Apple refusing to provide Gjovik her annual performance review around August-September 2021, co-worker retaliation in July-September 2021, Apple denying Gjovik's requests to attend training during the administrative leave around August 20 2021, forcing Gjovik on indefinite administrative leave on August 4 2021 and "removing her from the workplace and all workplace interactions", increasing Gjovik's workload with unfavorable projects in July 2021, pressuring Gjovik to go on FMLA leave from May-August 2021, pressuring Gjovik to file ADA accommodation requests for workplace safety issues from June-August 2021, refusing to provide Gjovik her mid-year review around April-May 2021, removing

---

[1389] Centeno-Bernuy, supra – ("The Court finds that [employer's] claims that plaintiffs are terrorists are baseless and that he has known from the outset that they were baseless. He has asserted these sensational yet unfounded claims to government authorities for the sole purpose of preventing or dissuading plaintiffs from pursuing the [labor] litigation.")

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

Gjovik from previously assigned projects around May-July 2021, opening a bogus, non-consensual investigation simply to make Gjovik a target for her management around April-June 2021, suggesting Gjovik quit around April 2021, denying Gjovik's requests to transfer to other management/teams or mitigate a hostile work environment in January-September 2021.

1518.   A plaintiff can show pretext "either (1) directly by persuading the court that a discriminatory reason more likely motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence."[1390] Circumstantial evidence tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable.[1391]

1519.   A plaintiff does not meet this burden simply by showing that "the employer's decision was wrong, mistaken, or unwise. Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[1392] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons.[1393]

**i.        Reasonableness & Credibility**

1520.   Gjovik is highly credible. Gjovik was correct in her concerns, validated by experts, encouraged by leaders in environmental health, and repeatedly thanked by

---

[1390] Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).
[1391] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir.1998); *Adetuyi v. City & Cnty. of San Francisco*, 63 F. Supp. 3d 1073, 1087 (N.D. Cal. 2014).
[1392] *Horn v. Cushman & Wakefield W., Inc.*, 72 Cal.App.4th 798, 806–07, 85 Cal.Rptr.2d 459 (1999); *Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 966 (N.D. Cal. 2014), aff'd sub nom. *Cuevas v. SkyWest Airlines, Inc.*, 644 F. App'x 791 (9th Cir. 2016).
[1393] *Guz v Bechtel*, 24 Cal.4th at 361, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000); *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1174–75 (C.D. Cal. 2013).

633

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

coworkers.[1394]  Further, Gjovik was actually about to expose far more safety issues and misconduct then she was aware of at the time. (See, generally, Karen Silkwood).

1521.   On March 10 2021, Dr. Janice Prudhomme, the Asst. Deputy Director for Environmental and Occupational Health for the California Center for Public Health wrote to Gjovik's iCloud email address. The two had been corresponding about Gjovik's medical issues in 2020 and what she discovered about chemicals at her apartment. Gjovik shared a draft of the article she would publish in SF Bay View about her experience. Dr. Prudhomme wrote:

> "Your story is so compelling and you hit on so many important aspects of the many facets of these hazardous waste sites and what appears to be failures from all sides and yes, money seemingly at the root of it all…. I love what you are trying to do and it takes tenacity to fight the big guys. Continuing to bring awareness to impacted communities is noble and will hopefully improve the lives of many. Thank you for sharing this story and all your hard work."

1522.   In the May 30 2021 letter of recommendation that Dr. Cohen wrote for Gjovik because Gjovik was worried, she was about to get fired by Apple and was looking for a different job elsewhere, Dr. Cohen described Gjovik as:

> Gjovik is very much a self-starter, with a sharp analytical mind, a passionate commitment to doing the right thing, a capacity to work with great energy and to great effect, and a deep sense of personal responsibility. She is also a wonderful collaborator: she listens attentively, respects the insights and expertise of the people she is working with, and expresses, clearly and forthrightly, her own insights and ideas.[1395]

Dr. Cohen is one of the most senior and well-respected executives at Apple.

---

[1394] *Seater v. Southern California Edison Co.*, Decision & Order of Remand (ARB Sept. 27, 1996) ARB No. 96-013; ARB Nos. 96-013 and 97-072, ALJ No. 1995-ERA-13 (A whistleblowers concerns being factually correct is not determinative but can be evidence of pretext)
[1395] Letter of Recommendation for Ashley Gjovik, Dated May 30 2021, signed J. Cohen.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1523.   In 2017, one of Gjovik's other mentors and another senior executive at Apple, Vice President Tara Bunch, wrote Gjovik a letter of recommendation for law school. Bunch noted that Gjovik is "a *great communicator and collaborator," "a good listener who seeks out the opinions and viewpoints of others*," and "*has the personal courage to contribute her thoughts and speak out on important issues*."[1396]

1524.   Meanwhile, from Gjovik's first meeting with Apple's teams in April 2021 about her office, Apple repeatedly made incorrect and dishonest statements about Gjovik's office and their operations. Further, ongoing Apple has repeatedly made false statements about its actions, about Gjovik's actions, and about the merit of Gjovik's complaints and charges.[1397]

**ii.     Temporal Proximity**

1525.   Apple terminated Gjovik's employment less than two months after Gjovik filed internal and external complaints, participated an internal investigation, participated in an external investigation with a government agency, filed a lawsuit (charge/claim), and otherwise opposed Apple's conduct. At the time of termination, Apple refused to provide a coherent explanation as to why Gjovik was being terminated other than she refused to get on a phone call with a "Workplace Violence" interrogator and instead asked for the exchange to be in writing as she felt his contact was "witness intimidation" the day before a federal affidavit.

1526.   Apple terminated Gjovik within weeks, days, and under some statutes – only a matter of hours – after Gjovik engaged in protected activity. The temporal proximity here is

---

[1396] Letter of Recommendation, Dated August 23 2017, signed Tara Bunch
[1397] Clemmons v. Ameristar Airways, Inc. , ARB No. 08-067, ALJ No. 2004-AIR-11 (ARB May 26, 2010) (Final Decision and Order) – ("the ALJ found Wachendorfer's statements concerning the reasons Ameristar fired Clemmons to be "incredible." Wachendorfer testified that Clemmons was fired because he had to instruct him how to load the aircraft on January 16, 2003. Substantial evidence supports the ALJ's finding that this reason was pretext because: (1) Wachendorfer did not talk to Clemmons on that day but to his co-pilot; (2) Clemmons was able to load 20 of the 24 pallets on the plane, not 30 percent as Wachendorfer claimed; (3) the problem was not Clemmons's supposed inability but the customer's misrepresentation of the size of the pallets; and (4) Wachendorfer admitted that no other pilot was fired for such a reason.")

---

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

enough for sole substantiation, but there is much additional evidence of pretext. Apple did not follow its own termination policies and process, and others were not terminated for the same actions; others were not terminated for far worse actions. [1398]

1527.   Apple's later disclosed timeline of events around Gjovik's termination reveal, if true (which they are not), that Apple likely planned to terminate Gjovik by no later than August 29 2021. However, Apple contacted Gjovik on September 3 under the premise of discussing the details of Gjovik's complaints about harassment and retaliation.[1399]

### iii.       There is No Defense of Ignorance

1528.   An employer may be liable for wrongful termination when the supervisor who starts the disciplinary process acts with retaliatory animus, but a different supervisor who ultimately fires the employee does not know that the employee has engaged in protected activities so long as the initial supervisor's retaliatory motive was a but-for cause of the dismissal, the employer may be liable for retaliatory discharge.[1400] If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker.[1401]

1529.   At the time Gjovik was terminated, Gjovik reported to David Powers and Dan West. Dan West reported to Yannick Bertolus, and Yannick Bertolus reported to Dan Riccio, then John Ternus. Yannick Bertolus sent Gjovik her notice of termination, however Bertolus is very close personal friends with West, working together for twenty years – meeting at Palm, and

---

[1398] *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that causation could be inferred where the first adverse employment action occurred less than three months after the plaintiff's protected activity); *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1076 (S.D. Cal. 2017) (citing *Yartzoff's* temporal standard in a SOX retaliation case)

[1399] Overall v. Tennessee Valley Authority, 97-ERA-53 (ALJ Apr. 1, 1998).

[1400] *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 113 (Cal. Ct. App. 2004).

[1401] *Russell v. McKinney Hosp. Venture* (5th Cir. 2000) 235 F.3d 219, 226; *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

both moving to Apple together, and continuing to work closely as well as spend personal time together. In fact, the Michelin Star restaurant where Gjovik was 'pimped and pandered' by West, was actually also one of Bertolus' favorite restaurants, and the chef came out to talk to Gjovik while she was there, talking about West and him texting about Gjovik that night, but also spending much time telling her very personal stories about Bertolus (which she protested and said was inappropriate for her to hear). It is unfathomable that Bertolus would have terminated Gjovik without knowledge of all of Gjovik's protected activity, including complaints about and to West, one of his close personal friends.

1530.   Here, Apple supposedly started investigating Gjovik on or around August 29 2021, and started interrogating other employees about it as early as September 3 2021, yet Apple repeatedly misled Gjovik about the investigation, instead twice lying to her and attempting to get her on a WebEx call under false pretenses on September 3 and 7 2021. Further, even in the extremely unlikely situation where the "Workplace Violence" interrogator who confronted Gjovik did not know about Gjovik's prior protected action, Gjovik complained about "witness intimidation" the day before her "NLRB affidavit" and the interrogator responded by suspending Gjovik's accounts within minutes. In addition, Apple used Gjovik's Vice President, Bertolus, to terminate her, and again, even in the extremely unlikely (and implausible) circumstance that Bertolus was not aware of Gjovik's prior protected activity, Bertolus cited the Workplace Violence interrogator in the termination letter, thus confirming Bertolus at least knew about Gjovik's NLRB charges and imminent testimony against Apple, prior to terminating her.

1531.   In *Reeves*, there was ample evidence that a manager acted with retaliatory motive when he opposed the employee's efforts to exercise labor rights and protected activity, made accusations against the employee who did these things, suddenly made accusations against the employee over a minor thing, did not properly investigate the employee's alleged misconduct,

637

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

and instead labeled the misconduct as "*workplace violence*," and referred the matter to a security officer, knowing it could lead to the employee's discharge.[1402] *It was clear "the goal [was] getting rid of a worker who created trouble by complaining about matters that the supervisors preferred to ignore*."[1403] An improper investigation like this can indicate that the investigator was a cat's paw, a conduit for imputation of discriminatory animus.

1532.   Finally, Gjovik's complaints were not simply to her direct supervisor and not known by the larger company. By July 2021, Gjovik's complaints were known by her leadership and coworkers, by Apple Human Resources and Employee Relations (including senior leadership), Apple Legal leadership, Business Conduct and Global Security, and the tens of thousands of coworkers and managers who saw her posts on Apple's Slack tool. By August 2021, all of these people knew about Gjovik's complaints, including millions of people who saw the news articles about Gjovik's internal complaints and complaints filed to the government. It is impossible that Gjovik's entire leadership chain and all of Apple's human resources and global security teams were not aware of Gjovik's protected conduct.

### iv.   Post Hoc Rationalizations

1533.   The credibility of an employer's after-the-fact reasons for firing an employee is diminished if these reasons were not given at the time of the initial discharge decision.[1404] Simple inconsistencies between reasons and facts have been enough to prove pretext in the "context of a concerted effort to conceal major safety hazards."[1405] "*Poorly veiled threats and an attempt to*

---

[1402] *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).
[1403] *Reves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).
[1404] Negron v. Vieques Air Link, Inc., ARB No. 04-021, ALJ No. 2003-AIR-010, slip op. at 8 (ARB Dec. 30, 2004), aff'd Vieques Air Link, Inc. v. U.S. Dept. of Labor, 437 F.3d 102, 109 (1st Cir. 2006).
[1405] St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*abruptly terminate*" an employee quickly following protected activity was enough to "*raise an inference that the protected activity was a contributing factor in the unfavorable action.*"[1406]

1534.   Apple's proffered explanation for terminating Gjovik does not attempt to explain all of the retaliation Gjovik complained of prior to suspension and termination. Apple positions itself as if Gjovik's Twitter posts about employee privacy occurred in a vacuum and denies that Apple had been mercilessly tormenting Gjovik for months prior. While it is now clear that Apple suddenly forced Gjovik on indefinite administrative leave to remove her prior to the US EPA inspection due to her disclosures, at the time Apple claimed it was some favor to Gjovik as they investigated Gjovik's complaints of discrimination, and retaliation for raising complaints of discrimination, and retaliation for raising complaints of retaliation. Prior to the indefinite administrative leave, Gjovik had already documented and complained of tangible adverse employment actions including: dramatically increasing her workload, assigning her unfavorable work, removing her from favorable work, repeatedly denying transfers, constructive termination, repeatedly suggesting Gjovik take some sort of mental health leave and to see a psychologist for mental issues, opening two sham investigations only attempting to force Gjovik to quit, and refusing to remedy harassment and retaliation against Gjovik (while instead taking steps to ensure the harassment and retaliation against Gjovik increased in severity).

1535.   Apple attempts to claim that shortly prior to Gjovik being put on leave on August 4 2021, Gjovik had simply asked to be put on leave. Around this time Gjovik was not only complaining about the retaliation against her, but also a culture of retaliation and cover-ups at Apple. Gjovik was complaining about Apple's abusive use of NDAs and misuse of ADA/FMLA processes to initiate terminations of employees for non-ADA/FMLA reasons. Gjovik had been

---

[1406] *Erhart v. Bofl Holding, Inc.*, 269 F. Supp. 3d 1059, 1076 (S.D. Cal. 2017); *Tides v Boeing Co*, 644 F.3d at 814 (9th Circuit 2011); see also 29 C.F.R. § 1980.104(e)(2)(iv).

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

complaining about the April-June 2021 sham investigation by Jenna Waibel and now also the July-August 2021 sham investigation by Ekelemchi Okpo. Gjovik was complaining about a cover-up at her office including Apple trying to obstruct justice and destroy/hide evidence. Gjovik repeatedly said she planned to sue Apple, that she knew Apple was trying to get her to quit but she refused to quit and they had to address her concerns, and that she believed they were all acting in bad faith. Gjovik also repeatedly asked Apple to intervene to limit the retaliation she was facing by her manager, either by limiting interactions to writing and reverting their changes to her workload, or 'pausing' her work with West and Powers during the investigation. Gjovik asked for a ceasefire of the retaliation, while also saying she refused to remove herself from the workplace (like taking medical leave), and that she was focused on ensuring Apple investigated and documented their findings for the lawsuit she planned to file against them. Apple then claimed Gjovik asked to be removed from the workplace and all workplace interactions, with no updates about her office, and no communicating with her coworkers, and with no ETA whatsoever for any updates or resolution of root cause of the issues.

1536.   Finally, Apple's repeated attempts at concocting a post-hoc defense and personally attacking Gjovik consistently rely on the same narrative – the same narrative Appleseed and others said Gjovik must 'admit to' if they were to ever stop tormenting Gjovik: that Gjovik wanted to be on leave, that Gjovik leaked IP, that Gjovik deserved to be fired, that Gjovik just wanted attention, and that Gjovik is lying and acting in bad faith. Regardless of the facts (which do not support this narrative other than documentation Apple created itself solely to attempt to support its own false narrative), there is no logical explanation for Gjovik's actions if Apple's narrative was true.

---

640

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

### v.      Shifting Explanations

1537.   Apple's defense consists of roaming, pretextual, fragmented, ever changing, and conflicting narratives. Between at least September 3 2021 and March 2022, Apple's explanation for terminating Gjovik changed multiple times; first presented as a neutral update on the investigation into Gjovik's concerns timed with publication of a defamatory article about Gjovik's NLRB charge (September 3 2021), then shifting to a request to discuss "*inconsistencies*" in Gjovik's complaints (September 7 2021), then some urgent matter related to Workplace Violence and confidential information requiring a response within 'the hour' (September 9 2021), then accusations Gjovik vaguely violated Apple's employment policies and refused to get on the phone with the interrogator (later on September 9 2021), then implying Gjovik was fired due to some of her Twitter posts on August 28 and August 30, including her open and public participation in an article about work conditions at Apple (September 15 2021), then claiming Gjovik was fired for secretly, maliciously leaking confidential, product-related information and refusal to participate with an alleged investigation (March 2022).[1407]

1538.   Concurrently, Apple now claims that it never knew about Gjovik's August 31 2021 SEC whistleblower tip until after it fired Gjovik.  In Apple's March 2022 position statement, Apple's lawyers claimed Apple did investigate Gjovik's complaints about Apple Board Member Ronald Sugar however Apple claimed they "*investigated [Gjovik's concerns] and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated…*" [1408] In Apple's November 2023 Motion

---

[1407] *Timmons v. Franklin Electric Coop.*, 1997-SWD-2 (ARB Dec. 1, 1998) (shifting explanations for termination point to pretext).

[1408] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).

Deleted: ,

Deleted: she

Deleted: All of these share some facts, yet differ on Apple's roaming pretextual, fragmented, and conflicting narratives.

Deleted: )

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

to Dismiss, Apple (via the exact same lawyer) would then claim that actually Gjovik never made any internal complaints about the topic.

1539.   Apple's later explanations for firing Gjovik contradict with the facts at the time of the termination.

1540.   Apple claimed to not know about the article Gjovik participated in published August 30 2021, yet Apple was asked for comment on the article by the publisher several days prior to publication.

1541.   Apple later claims Gjovik tried to conceal her involvement in the article, but the article includes quotes from Gjovik by name and an embedded video of images of Gjovik's face.

### vi.   Evidence of Forbidden Animus

1542.   Apple's animus against Gjovik continued to increase with the additional government charges and complaints she filed, and the continued requests from US EPA due to her disclosures, and any regulatory paperwork or communications required related to hazardous waste at 825 Stewart Drive and 3250 Scott Blvd. Actions related to the continued processing of a complaint may also remind an employer of its pendency or stoke an employer's animus.[1410] Apple retaliation against Gjovik increased as US EPA's interest in Gjovik's office increased, and as Gjovik filed additional government complaints against Apple. Apple's corrupt conduct towards Gjovik became increasingly deranged the more Gjovik spoke out about Apple's Global Security team and membership in the Worldwide Loyalty enterprise, and Apple's history of trouble with the California and US governments.

1543.   Apple's defense for a retaliation claim simply needed to be legitimate and non-retaliatory. However, here, Apple's proffered defense is not legitimate and is retaliatory. Apple

---

[1410] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008); *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).

**Deleted:** Dr

**Deleted:** employer's

**Deleted:** 1409

**Deleted:** team

**Deleted:** <#>Apple's later explanations for firing Gjovik contradict with the facts at the time of the termination. Apple claimed to not know about the article Gjovik participated in published August 30 2021, yet Apple was asked for comment on the article by the publisher several days prior to publication. Apple later claims Gjovik tried to conceal her involvement in the article, but the article includes quotes from Gjovik by name and an embedded video of images of Gjovik's face. Apple's later disclosed timeline of events around Gjovik's termination reveal Apple planned to terminate Gjovik by no later than August 29 2021, yet Apple contacted Gjovik on September 3 under the premise of discussing the details of Gjovik's complaints about harassment and retaliation.[1411] Simple inconsistencies between reasons and facts have been enough to prove pretext in the "context of a concerted effort to conceal major safety hazards."[1412] ¶
<#>Before Gjovik was fired, she had excellent performance ratings and an absence of prior complaints against her. Around the time of Gjovik's suspension and termination, Apple had indicated they were upset with Gjovik's protected activity and continued to advise Gjovik to not report safety concerns to her coworkers or the government. ¶
<#>Apple was also grossly dishonest about Gjovik's protected activity – including a conspiracy to conceal from Gjovik that her disclosures led to an US EPA inspection of her Apple office, that the US EPA identified a number of issues including active vectors for exposure to TCE and other chemicals, and that Apple was operating a secret semiconductor manufacturing plant venting metric tons of solvent fumes directly into the apartment windows where Gjovik lived when she got severely ill from solvent fumes.¶
<#>Prior to her termination, and for some time, Apple had created and maintained an abuse and hostile work environment for Gjovik. The harassment Gjovik suffered would have detrimentally affected a reasonable person and did detrimentally affect Gjovik. The discriminatory conduct was frequent, pervasive, and severe; Gjovik suffered humiliation and harassment that unreasonably interfered with Gjovik's ability to do her job. The harassment included abuse and threats of abuse that seriously scared and harassed Gjovik for not legitimate or lawful reasons.[1413] After Gjovik's protected activity reporting her illness next to Apple's facility at 3250 Scott, reporting concerns about Apple's dealings about the COVID vaccine, and complaining about safety concerns at her office – Apple additionally established a hostile work environment through retaliatory harassment. Apple also refused to remedy the issues, even denying transfers.¶
<#>Where the harassment was previously not severe enough to alter the terms and conditions of her employment, once the retaliation began, all actions noted were sufficient to be "retaliatory harassing conduct." [1414] In addition, or in the alternative, harassment & similar abuse occurred repeatedly over the course of Gjovik's employment and thus constitutes a hostile work environment even if not severe.[1415] In addition or in the alternative, causation is seen from evidence that harassment by supervisors intensified shortly after Gjovik filed complaints.[1416]¶
Apple terminated Gjovik within weeks, days, and under some statutes – only a matter of hours – after Gjovik engaged in protected activity. The temporal proximity is enough for sole substantiation, but there is much additional evidence of pretext. Apple did not follow its own termination policies & process.... [18]

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

cannot defeat a claim of retaliation for protected activity but claiming it did retaliate, but about different protected activity, just not that protected activity. The question is of retaliatory animus and Apple admits its animus openly. Evidence of a stark pattern of retaliatory conduct is "very persuasive" evidence of retaliatory motive.[1417]

1544.  Apple's online harassment cited Gjovik's protected activity as the reason for termination & retaliation. Before she was fired, Apple repeatedly told Gjovik not to speak with coworkers about her concerns about safety, labor, or retaliation. Apple's proffered reasons do not explain the other retaliation against Gjovik from March 2021-August 2021 (hostile work environment, constructive termination, reassigning of projects, increase in workload, assignment of unfavorable projects, etc.). Gjovik's September 9 2021 termination freed Apple from having to respond to Gjovik's discrimination and retaliation complaints, workplace safety complaints, vapor intrusion testing results, or provide her annual performance review the next week.

### vii.  Unlawful Corporate Interrogation of Employee Whistleblower (*Cotran*)

1545.  The California Supreme Court held that the proper inquiry in adjudicating a breach of contract claim is not whether "the employee in fact commit[ted] the act leading to dismissal." [1418] Rather, it is whether "the factual basis on which the employer concluded a dischargeable act had been committed [was] reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual."[1419] An "adequate investigation," the Court held, "includes notice of the claimed misconduct and a chance for the employee to respond." [1420]

---

[1417] *Hammrich v. Potlatch Corp.*, 937 F.2d 612, 1991 WL 126366, *2 (9th Cir. June 28, 1991); *Coleman v. Quaker Oats Co*, 232 F.3d at 1283, (9th Cir. 2000).
[1418] Cotran v. Rollins Hudig Hall Int'l., Inc., 17 Cal. 4th 93, 107 (1998).
[1419] Id at 107.
[1420] Id at 108; Conducting an Effective Workplace Investigation, VLR994 ALI-ABA 459, 465.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1546.   Apple claims it began investigating Gjovik promptly following a Business Conduct complaint filed on August 28 2021? about one of Gjovik's Twitter posts made on August 29 2021?. The post in question was Gjovik complaining about Apple asking repeatedly to scan her ear canals. There was nothing to investigate about this – Gjovik made the post from her own account. If Apple felt what Gjovik said was some sort of policy violation, they would have known that immediately. Apple then claims they began investigating Gjovik's comments about Face Gobbler at some unknown point, but no later than September 15 2021. Again, there was nothing to investigate about this – Gjovik made these comments under her own name. If Apple believed Gjovik's statements were some facial policy violations worthy of immediate termination, Apple would have known that immediately.

1547.   Meanwhile, Apple repeatedly contacted Gjovik on September 3 and 7 2021, with Okpo asking to talk to Gjovik about Gjovik's concerns, while secretly planning on interrogating Gjovik. This is a known tactic of these big tech companies, with Facebook recently doing something similar where it already planned to fire an employee for 'leaking' yet told the employee the employee was going to be promoted, in order to coerce the employee to enter an interrogation room with security personnel.[1421]

1548.   Gjovik, as documented by her contemporaneous social media posts, was scared Apple was not only about to threaten and punish her, but could also attempt to physical harm her. Further, Gjovik, as documented by her social media posts about the topic, expected Apple to contact her to threaten her to withdraw/drop her government charges against them. Based on information and belief, including stories of other big tech companies engaging in this type of conduct, Gjovik expected the meeting Apple wanted with her to involve unlawful conduct, and

---

[1421] The Guardian, *'They'll squash you like a bug': how Silicon Valley keeps a lid on leakers*, March 16 2018, https://www.theguardian.com/technology/2018/mar/16/silicon-valley-internal-work-spying-surveillance-leakers

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

that Apple would threaten her to help them with their cover-up of their prior felonious activity. Gjovik requested the communications in writing because she wanted dissuade Apple from violating the law and she wanted to be able to document her refusal to violate the law or enable/aid Apple in violating the law. Gjovik's refusal to join the illegal interrogation was protected.[1422]

1549.   Following Apple's own post-hoc, meandering explanation for Gjovik's termination, Apple would have seen public posts by Gjovik on/around August 28 and August 30 2021 that Apple thought was facially worthy of immediate termination, yet Apple would not suspend Gjovik's accounts or terminate Gjovik until September 9 2021.[1423]

1550.   Gjovik never concealed or misrepresented her activities. Gjovik made disclosures under her own name and never denied she made the disclosures she did. Further, Apple's security training warned employees that even if employees 'leak', that they are unlikely to face discipline unless they lie about it.[1424]

1551.   Apple's termination – failed to follow disciplinary procedures, disregarded termination procedures in manual, and deviated from policy/practice.

**viii.   "Failure to Participate in Investigation"**

1552.   Apple claims that Gjovik's public statements about ear canal scans and Face Gobbling were enough to justify Gjovik's immediate termination without warning, and also that Gjovik was terminated for "*failure to participate in the investigatory process*" for the investigation into Gjovik's public statements twelve days earlier. Gjovik said she was happy to

---

[1422] 2003-SOX-32 *Jayaraj v. Pro-Pharmaceuticals, Inc.*, Recommended Decision & Order (ALJ Feb. 11, 2005) (Colleen A. Geraghty) Pg 24
[1423] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorney's for Apple Inc).
[1424] The Outline, Leaked recording: Inside Apple's global war on leakers, June 20 2017, ("Nine times out of 10, when people get in trouble at Apple, [the Global Security executive] says, it's because they tried to cover up a mistake".) https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

help but asked that the communication stay in writing due to her government charges. Apple then proclaimed she refused to respond without giving her a warning or trying to negotiate.

1553.   Further, Gjovik responded 2 minutes after the first email saying she was happy to help, which is just how she responded to the Business Conduct investigator about the sanctions issues in July 2021 (2 minutes after the email is sent she says happy to help).

1554.   Quite similar to Lawson v U, both there and here, the employer suddenly requested the employee (Gjovik) speak with an investigator (Workplace Violence) about some investigation and the employee inquired what the investigation was about and worried (with contemporaneous statements) that she was about to be terminated or harmed, and then the employer informed the employee that the employee had not participated in the investigation. In addition, again in parallel with Lawson, the employer never informed the employee that refusing to meet with interrogators would be insubordination or noncooperation, or explain the ramifications of a refusal, the employee never explicitly refused to participate in the investigation, the employer never explained why their demanded format for the conversation was the only option, and the employee was never given an opportunity to reconsider the supposed alleged refusal.[1425]

### ix.    Arbitrary and Capricious; Apple's Actions with Gjovik were Contrary to Corporate Policies and Interests

1555.   Apple's proffered explanation for suspending and terminating Gjovik is far-fetched, inconsistent, illogical, and even puts Apple's claims of trade secret protection (for real trade secrets) at risk.

1556.   Even if we believe Apple's statements about Gjovik's termination, that would mean Apple thought Gjovik was 'leaking' "confidential information" as early as August 29

---
[1425]

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

2021, yet took no actions what so ever to warn Gjovik she was under investigation or that she violated a policy, took no actions to restrict Gjovik's access to actual confidential and proprietary information, including trade secrets and patent ideas, even though Apple thought Gjovik was 'leaking.'

1557.   Assuming Apple was made aware of Gjovik's comments and posts about Face Gobbler same day on August 30 2021, Apple would have then seen Gjovik continuing to 'leak' information Apple would later claim was confidential, yet Apple said nothing. On top of all of this, Apple's new claim that it never knew Gjovik filed an SEC tip prior to Gjovik's termination would require that Apple was not monitoring any of Gjovik's Twitter posts between August 31 2021 and September 9 2021 (because Gjovik posted on Twitter repeatedly about her SEC tip, including screenshots of the filing).

1558.   Viewing Apple's 'facts' as true, it would mean Apple thought it had a senior employee with access to highly sensitive, highly confidential information who was actively 'tweeting' statements and screenshots that included supposedly 'confidential, proprietary information', and Apple was supposedly actively investigating Gjovik's Twitter posts, and yet, in this scenario, Apple did not read any of Gjovik's Twitter posts after the start of its investigation and up to Gjovik's termination.

1559.   Apple publicly states that it "*devotes significant resources to network and data security,*" "*takes steps to secure confidential information,*" and "*has implemented systems and processes intended to secure its information technology systems and prevent unauthorized access to or loss of sensitive data and mitigate the impact of unauthorized access.*"[1426]

---

[1426] Apple Inc, 2023 10k, page 11, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1560.   Multiple federal criminal lawsuits against ex-Apple employees note Apple's strict security procedures as well as the extensive harm caused by these ex-employees' misuse of Apple's confidential information. In 2014, an Apple Global Supply Manager was sentenced to prison and ordered to pay over $4.4 Million in restitution for trading "confidential internal Apple information" to external parties in exchange for kickbacks.[1427] In 2022, an ex-Apple firmware engineer pled guilty to theft of Apple's trade secrets.[1428] In 2023, a buyer in Apple's Global Service Supply Chain organization was sentenced to three years in prison and ordered to pay over $19 Million in restitution for wire and mail fraud and financial crimes, all of which were facilitated by his access to "insider information" at Apple.[1429] In 2023, a software engineer was charged with theft of Apple trade secrets.[1430]

1561.   On Jan 9 2019, the Apple manager running Gobbler, posted an article to LinkedIn called "Data Collection" where he wrote, "*During the lead up to Face ID being launched, my team went out and collected a large set of potential aggressors to see if we were missing anything in our larger data collections, things would be normal to a regular user.*" Later that year, he posted again about the work Apple did on Face ID, saying that *"tons of data was being*

[1427] United States v. Devine, Case No., 5:10-cr-00603-JW, USDC, Northern District of California (2010-2015) – ("in his role as Apple GSM, Devine had access to confidential company information, including Apple product forecasts and product development plans, known as "roadmaps", pricing targets, and product specifications." Doc #1, pg3, para 5); US DOJ, Former Apple Executive Sentenced to One Year in Prison for Defrauding Apple in Kickback Scheme and Laundering the Proceeds of The Fraud, press release, December 5 2014.

[1428] United States v. Zhang, Case No. 5:18-cr-00312 EJD, USDC, Northern District of California (2018-2023) – ("Zhang used his employment as an Apple employee, working on a secretive program, to obtain intellectual property and trade secrets from Apple", Doc 1, pg12, para38); US DOJ, Former Apple Employee Indicted on Theft of Trade Secrets, July 16 2018.

[1429] United States v. Prasad, Case No. 5:22-cr-00123-BLF, USDC, Northern District of California (2022-2023) – ("by virtue of his position at Apple Defendant had inside information regarding the company's fraud-detection techniques, and he designed his criminal schemes to avoid those techniques," Doc #39, pg4); US DOJ, Former Apple Employee Admits Defrauding Apple of More Than $17 Million, press release, November 1 2022.

[1430] United States v. Wang, Case No. 3:23-cr-00104, USDC, Northern District of California (2023-) – ("Due to Wang's role on the Project, he was granted broad access to the Databases, which contained trade secrets and intellectual property for the Project." Doc #1, pg3, para 9); US DOJ, Former Apple Employee Charged with Theft of Trade Secrets, press release, May 16 2023.

**Deleted:** FIRST

**Deleted:** –

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

*collected at the time to cover all the bases."[1431]* Here the head of Gobbler posted publicly about Gobbler, discussing the strategy and performance of the program, which was far more than Gjovik shared. McKeon was not fired. Further, Reigel, Marini, and Memula were held responsible for the inadvertent leak of actual Face ID in 2018 – yet none of them were fired.

1562.   Yet, here, Apple's best proffered explanation for what it did to Gjovik, claims that Apple was put on notice of a supposed active risk to its confidential information, with Gjovik leaking, yet for twelve days, took no steps whatsoever to prevent access by Gjovik to Apple's sensitive data. Gjovik even posted on Twitter on September 7 2021, noting she still had access to highly confidential information and Apple had not removed her access. In *Mattel, Inc. v. MGA Ent., Inc.*, the court found a genuine issue of fact if the company failed to take reasonable efforts to maintain the secrecy of its documents when it did not restrict access to sensitive company files despite the employee interviewing at a competitor and creating a "To Take" folder on his work computer.[1432] This is yet another signal that Apple's post hoc rationalization for terminating Gjovik is false and merely pretext.

**x.      Apple Stalks and Surveils any Public Commentary about the Company**

1563.   It is public information that Apple employees have reported when they post on social media about Apple, they quickly hear from Apple about it and a request to stop.[1433] The contents of a 2018 leaked Apple memo threatening to file criminal charges against employee who "leak" was described by press as Apple's "*aggressive surveillance of its own employees and*

---

[1431] Robert McKeon, https://www.linkedin.com/pulse/design-experiment-data-collection-robert-mckeon-aloe/; https://www.linkedin.com/pulse/ml-examining-test-set-robert-mckeon-aloe/
[1432] Mattel, Inc. v. MGA Ent., Inc., 782 F. Supp. 2d 911, 971 (C.D. Cal. 2011).
[1433] The Verge, *Apple's fortress of secrecy is crumbling from the inside*, September 30 2021, ("multiple employees tell The Verge that those who tweet about Apple quickly receive a note from the business communications team asking to chat. They don't always get in trouble, but the message is clear: Apple executives are watching.")  https://www.theverge.com/22700898/apple-company-culture-change-secrecy-employee-unrest

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

*intensive investigative efforts to catch and punish leakers"* and added that *"Apple is notorious for its culture of secrecy."*[1434] Apple pretending to be ignorant of Gjovik's social media activity and press interviews is absurd.

### xi.    Great Performance & No Discipline Prior to Complaints

1564.   Before Gjovik was fired, she had excellent performance ratings and an absence of prior complaints against her. Once Apple had indicated they were upset with Gjovik's protected activity and continued to advise Gjovik to not report safety concerns to her coworkers or to the government, nor to discuss concerns about work conditions with her coworkers, Apple then never gave Gjovik another performance review.

1565.   Not only did Apple refuse to give Gjovik any warnings prior to termination, a clear sign of pretext,[1435] Apple also somehow drug out Gjovik's mid-year and annual review without ever providing them to her. In 2020, Gjovik's annual performance review was dated June 2020. However, by the time Gjovik was terminated in September 2021, she had not received her mid-year or annual performance review for 2021 – which was highly unusual and against Apple policies.

### xii.    Apple's Concealment of What they did to Gjovik.

1566.   Apple was also grossly dishonest about Gjovik's protected activity – including a conspiracy to conceal from Gjovik that her disclosures led to an US EPA inspection of her Apple office, that the US EPA identified a number of issues including active vectors for exposure to TCE and other chemicals, and that Apple was operating a secret semiconductor

---

[1434] The Guardian, *Apple threatens leakers with criminal action in leaked memo – report*, April 13 2018, https://www.theguardian.com/technology/2018/apr/13/apple-memo-leaked-arrests-criminal-threat
[1435] *Clean Harbors v Herman*, 146 f3d 12 (1st cir 1998) – (evidence that the termination justification was pretext for retaliation included that the employer provided no warnings to the employee prior to termination).

650

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

fabrication plant venting metric tons of solvent fumes directly into the apartment windows where Gjovik lived when she got severely ill from solvent fumes.

1567.   Apple concealed a material fact it is was under a duty to disclose to the Gjovik; Apple intended to defraud Gjovik; and Gjovik sustained damage as a result of the concealment or suppression of the fact.[1436] Apple misrepresented facts, knowing that the facts were false, and that Gjovik reasonably relied on these facts to her detriment.[1437]

1568.   Apple (Waibel, Okpo, Steiger, Jain) told Gjovik her office was safe when they knew about the HVAC/TCE issues, and while Gjovik suspected Apple was misleading her about the air testing and cracked floor, she would have never thought to look into the HVAC if it were not for Apple's statements. Apple (West, Powers) told Gjovik to pursue her claims against Irvine Company for her chemical exposure in 2020, when Apple (Real Estate, Legal, others) knew it was Apple who exposed Gjovik to chemicals, in additional to or instead of Irvine Company. Apple's encouragement of Gjovik to pursue the real estate company misdirected Gjovik and she relied to her detriment on Apple's statements. Apple (Okpo, Lagares, Steiger, Rubenstein, Powers, West) knew the US EPA was going to inspect Gjovik's office due to Gjovik's complaints about unsafe work conditions and CERCLA non-compliance, yet Apple concealed the inspection from Gjovik, and Apple (Lisa Jackson) misled Gjovik by engaging in a public relations blitz with the current head of the US EPA (Michael Reagan) at Apple Park the day before the inspection, causing Gjovik to believe the US EPA had ignored her complaints and causing Gjovik to not follow up with the US EPA until months after she was fired.

---

[1436] *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606, 172 Cal.Rptr.3d 218 (2014*); Mewawalla v. Middleman,* 601 F. Supp. 3d 574, 602 (N.D. Cal. 2022).
[1437] *Molko v. Holy Spirit Assn.*, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122, 762 P.2d 46 (1988) (superseded on other grounds by Cal. C. Civ. P. § 437c(o)(2)); *Mewawalla v. Middleman*, 601 F. Supp. 3d 574, 599–601 (N.D. Cal. 2022).

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1569.   Cal. Pen.C. § 387(a), (b)(4) prohibits the knowing concealment of occupational hazards. "*A corporation… who has actual knowledge of a serious concealed danger (i.e., one that is not readily apparent and that could foreseeably cause death, great bodily injury or serious exposure) must notify both the [Labor] Division and affected employees. Failure to do so is punishable by up to three years' imprisonment and/or a $25,000 fine (increasing to as much as $1,000,000 for a corporate … defendant).*"[1438]

1570.   Apple was notified of a serious concealed danger (the HVAC/TCE mess at 825 Stewart Dr) by Northrop Grumman likely at some point between November 2020 and May 2021, and then by US EPA on July 27 2021. Apple's response to learning to that notification was to not tell employees, and to remove Gjovik from the workplace and all workplace interactions and conspire and attempt to conceal the issue from Gjovik for nearly a year.

1571.   Apple was notified of a serious concealed danger (that their factory at 3250 Scott Blvd was sickening a community with its silicon fabrication exhaust air pollution) by Gjovik in September 2020. Apple's response to that notification was to not tell Gjovik, to distract Gjovik in order to prevent Gjovik from looking into the matter further, and to continue with their dangerous operations.

1572.   Apple's summary of Gjovik's termination is full of misdirection, inconsistencies, and misrepresentations.

### xiii.   Farfetched and Illogical Narratives

1573.   Under Apple's narrative, they were a safe and supportive workplace that respected Gjovik and took her concerns seriously. In that case, Gjovik would have every incentive to continue her employment with Apple in good standing, and to not cause trouble, as she was currently making great money working at Apple (more money than she'd ever make in

[1438] Cal. Pen.C. § 387(a), (b)(4)

---

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

another field) and had access to many benefits through her employment. So, then supposedly despite this, Gjovik suddenly began filing supposedly false claims and making supposedly false allegations "for attention." Apple repeatedly claims that it was not investigating Gjovik until late August 2021, which means Gjovik should have had no reason to think her job was in jeopardy and as such had no reason to take risky actions such as going public about her concerns.

1574.   Further, Apple's favorite inflammatory allegation is that Gjovik 'asked to be on leave' and then lied about it. Apple first claimed Gjovik was lying when she complained the leave was "indefinite" even though Apple admittedly refused to provide any ETA whatsoever for next steps. Gjovik also requested to 'come back' from leave to attend a training she was already registered for, and Apple told her 'no' 'because she was on leave.' Apple also then offered that Gjovik could ask to come back even though she had just asked to come back and in the same email Apple told her she cannot come back. If Gjovik was simply 'looking for attention' she would have taken every opportunity to loudly fight Apple on these clearly abusive tactics, but instead Gjovik was mostly quiet with Apple, as she knew they wanted to fire her and she did not want to be fired, and avoided initiating a conflict that Apple could use as an excuse to initiate a termination.

1575.   Evidence makes clear that in late July and early August, prior to the leave, Gjovik was extremely interested in what was going on with the cracks in the floor of her office and Apple's sudden EH&S activities, and Gjovik was heavily involved in organizing with employees about her concerns on work discussion tools. Gjovik asked for Apple to intervene with her managers who were actively retaliating against her, but there was no incentive whatsoever for Gjovik to ask to be removed / blocked from gathering evidence that supported her cases, or organizing with employees who could help her drive reform at the company.

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

1576.   Further, Gjovik has repeatedly said she would accept a formal written public apology from Apple for what they did to her, instead of damages. In addition, Gjovik denied Apple's original ~$600k settlement offer because she was afraid Apple was trying to abuse the claim waiver they requested, worrying they were hiding things. If Gjovik just wanted money, she should have taken that amount – which is larger than many jury verdict awards in employment cases – instead of denying the offer. Apple did not want an additional NDA so Gjovik could have gone and written a book about it if she also wanted "attention." Gjovik did none of these things. Instead, Gjovik has sacrificed everything in her life, and exposed some of the most painful and humiliating moments of her life to the public, in hope that everything Gjovik has gone through and fights for can help others and drive change to reform Apple's business practices.

1577.   Then, Apple claims Gjovik 'leaked' confidential information about two topics that it claims was previously known quote, despite one of the topics (ear scans) being well known for years due to disclosures made by Apple itself, and the second topic (Face ID biometric data collection) already being disclosed by Apple and other employees. The only thing previously unknown was that Apple was coercing its employees to allow Apple to collect this sensitive anatomical information from its own employees (and in the case of Gobbler, anyone around their phones), which is a protected disclosure. Finally, Apple claims that Gjovik signed some 'informed consent form' about the Gobbler app yet fails to mention it would have occurred prior to Gjovik even knowing what the app was.[1439] agreements were signed in a military-like

---

[1439] A common coercive and predatory tactic by Apple: "You signed an NDA that let you see the NDA that had the code name on it. You couldn't see the code name, until you agreed not to discuss the code name.") Terry Lambert, Apple Makes You Sign an NDA Before You Can Even See a Secret Project's Codename, December 2016, https://www.forbes.com/sites/quora/2016/12/08/apple-makes-you-sign-an-nda-before-you-can-even-see-a-secret-projects-codename/?sh=49debf0a4b19

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

locked compound with armed guards, and that Apple also refuses to provide Gjovik a copy of this alleged document.

1578.   Next, Apple repeatedly claims repeatedly, vaguely and with much inflammation, that Gjovik 'asked to be on leave" / "wanted to be on leave'"– and even suggests that Apple offered for Gjovik to come back at any time. As discussed in depth in the facts and administrative leave sections, the situation in this case, even facially, was not as simple as "asking for leave" or "not asking for leave" yet Apple constantly leans into this binary dynamic for its key defense, forsaking any of the legal analysis to argue why the administrative leave Gjovik was placed on by Okpo on August 4 2021 aligned with the short-term mitigation or long-term resolutions Gjovik actually asked for, or why it was acceptable for Apple's version of this leave to include terms Gjovik has expressly said she would reject.

1579.   Next, Apple also repeatedly argues Gjovik could come back to work at any time, citing two pieces of evidence – two emails that Apple (Okpo) sent Gjovik, and Gjovik disputed in writing prior to her termination, yet Apple claims Apple's own statements are conclusive. First, Okpo unilaterally sent an email to Gjovik on August 4 2021 claiming he put Gjovik on leave because she asked for it. (See the facts section, Administrative Leave under "Adverse/Negative Actions Generally section, and the May/August Leave comparison section under "Retaliation Pretext Generally" for analysis on this.)

1580.   The second email exchange that Apple cites is around August 20 2021 when Gjovik asked to attend a training she was previously registered for, and noted she was granted permission by the professors (forwarding an email with their permission), however noting the professors asked her to ask Okpo for permission to attend so she didn't 'face disciplinary action.' Okpo responded to Gjovik's email denying Gjovik's request to attend the training and said nothing to reassure Gjovik she would not be disciplined if she wanted to return to work.

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

1581.   Gjovik then replied to Okpo and complained to him she felt the leave was retaliatory and punitive. After Gjovik's response, Okpo then replied saying Gjovik could request to come back to work at any time (note, Okpo did not say Gjovik could come back to work at any time – but that she could request to come back). Apple's framing of this supposed 'offer' and combined with its simultaneous rejection of her request to come back for a training – made it clear Apple had no intention to let Gjovik come back, and if Gjovik asked, Apple would use her request as an excuse to force her to resign or otherwise create pretext for removing her from the company.

1582.   Finally, it was clear to Gjovik Apple had initiated her termination as soon as it "removed her from the workplace and all workplace interactions." As discussed in prior sections, parties that Apple told her were supposedly under investigation were put in charge of handling any concerns from Gjovik's coworkers about how that exact person had been treating Gjovik – Gjovik's leadership told her organization they would discuss "the Ashley Issue" at an All Hands meeting two months later – and other signs of animus and plans to terminate Gjovik. Gjovik extended the fantastical world Apple was creating to the extent of querying one of Apple's fake social media accounts, used to harass Gjovik, as to what West was up to with the "Apple Issue" conversations.



> **Ashley M. Gjøvik**
> @ashleygjovik      •••
>
> AND I've heard from coworkers that he plans to address the 'Ashley issue' in his Oct All Hands. Sounds like he's not even being investigated.
>
> I'm not going to be allowed back? Or he'll talk abt me w/ me there?
>
> Beezie, plz explain.
>
> 2:18 PM · Aug 15, 2021

**Deleted:** FIRST
**Deleted:** –
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

*Exhibit: Gjovik's 8/15/21 Twitter Post about "Ashley issue"*

1583.   Further, Apple had done nothing to mitigate Gjovik's concerns about her managers (reassigning her projects, increasing her workload with unfavorable projects, denying her request to work in a different building that wasn't a Superfund site, etc.) and then acted as if Gjovik would want to return to work with all those same issues, but instead of Apple trying to resolve the issues, Apple had now made the issues worse then they were before.

1584.   Gjovik's actions and statements align with what one would expect from a worker worried about safety issues and misconduct at her workplace, and a cover-up of complaints, who then faces multiple waves of retaliation on top of her existing and well-established hostile work environment, and under the increasing pressure created by the employer, the worker scrambles to both protect herself from the employer as well as investigate/document the employers misconduct, while balancing the employees personal injuries from the ongoing harm from the employer, with a good faith attempt to do the right thing for her coworkers and society.

1585.   Apple's false narrative makes no sense. Apple positions Gjovik as some sort of litigation-happy, attention-hungry loon who just wants attention and to create conflict. Apple's position is that Gjovik was a successful, long-time senior employee at the company who was trusted with some of Apple's most important and high-risk projects and decision making processes, who excelled in law school, successfully completed a high-visibility internship in Apple legal working on company-wide ethics policies, and was a trusted advisor and confident with some of Apple's most senior executives – yet Gjovik woke up one morning and decided to become irrationally obsessed with toxic waste and wanted to be a famous whistleblower so started making frivolous complaints about safety issues and filing bad faith reports of non-existent retaliation. In reality, there is no reason any person would subject themselves to these

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

legal processes, on their own and with no support, driving themselves into debt, and losing any personal time or enjoyment during key years of their life.

1586.  Finally, Apple's narrative fails to mention it constructed a gas chamber in Gjovik's office in 2015 and was caught by the US EPA about it in 2021 due to Gjovik's complaints, which led to a mandatory US EPA inspection of Gjovik's office due to Gjovik's reports and where US EPA identified a number of safety issues (all of which were the same issues Gjovik was raising), and also, Apple nearly killed Gjovik in 2020 with their illegal hazardous waste air emissions next only a few hundred feet from her apartment and was hoping Gjovik never learned about any of it.

## IX.    DEMAND FOR RELIEF

**1587.  On the First Cause of Action: SOX Retaliation:** Apple violated SOX whistleblower retaliation prohibitions and thus owes Gjovik "make whole relief" with compensatory damages including lost wages (back pay, and front-pay or reinstatement), attorney's fees, and special damages for emotional distress, mental anguish, humiliation, and reputational harm.[1440]

**1588.  On the Second Cause of Action: Dodd-Frank Retaliation**: Due to of Apple's violation of the Dodd-Frank Act, Gjovik requests reinstatement (or front pay), two times the amount of back pay owed to the individual, with interest, and compensation for litigation costs, expert witness fees, and reasonable expenses.

**1589.  On the Third Cause of Action: Bane Civil Rights Act (§52):** Gjovik was harmed, and Apple's conduct was a substantial factor in causing Gjovik's harm. The Bane Act

---

[1440] *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1138 (10th Cir. 2013) (upholding an award of "noneconomic compensatory damages" for "emotional pain and suffering, mental anguish, and humiliation").

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

applies to private actors when they try to or do interfere with a victim's civil rights, as Apple did

to Gjovik. Because Apple violated the Bane Act, Gjovik should be awarded compensatory

damages, punitive/exemplary damages, attorney's fees with a fee multiplier, injunctive relief

including a restraining order against Apple to protect Gjovik, treble damages, and a civil penalty

of $25,000.[1441] Damages should be up to a maximum of three times the amount of actual

damages but in no case less than $4,000 and attorney's fees.[1442]

1590.    Damages should include, but not be limited to: Gjovik's loss of employment,

Gjovik's legal costs in fighting retaliatory litigation, costs to hire a 'reputation management

firm' to remove or downrank defamatory articles about Gjovik based on Apple's actions and

allegations against her, moving costs to flee California and hide in New York, expenses for

personal and home security measures, and compensation for her mental anguish and emotional

suffering from living in fear.[1443]

1591.   **On the Fourth Cause of Action: Ralph Civil Rights ACT (§51.7):** Gjovik was

harmed and Apple's conduct was a substantial factor in causing Gjovik's harm.[1444] Because

Apple violated the Ralph Act, Gjovik should be awarded compensatory damages,

punitive/exemplary damages, attorney's fees, a restraining order against Apple to protect Gjovik

from Apple, and a civil penalty of $25,000.[1445] Damages should include, but not limited to,

losses described under The Bane Act above.[1446]

---

[1441] Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b).
[1442] § 52. Denial of civil rights or discrimination; damages; civil action by persons aggrieved; intervention; unlawful practice complaint; waiver of rights by contract
[1443] Cal. Civ. Code §§ 52(c) and 52.1(i); *Rodriguez v. County of LA*, 891 F.3d 776, 808–809 (9th Cir. 2018); Cal. Civ. Code § 52(b); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1446-48 (2006).
[1444] Cal. Civ. Proc. Code § 338. § 14:2. Ralph Act, Calif. Fair Housing and Public Accommodations § 14:2; *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.*, 212 Cal. App. 4th 258, 269 (2012).
[1445] 3068. Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b))
[1446] Judicial Council of California Civil Jury Instruction 3068 Ralph Act - Damages

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

1592.   **On the Fifth Cause of Action: RICO Act:** Between 2017 and 2021, Gjovik's salary increased from $120,000 to $169,000 (an increase of 40%) and she went from $144,717 in total compensation in 2015, to $386,382 in 2020 (an increase of 267%).[1447]  At the time of her termination, Gjovik held $590,000 in unvested Apple Inc RSUs. Gjovik's next annual performance review was the week after she was terminated, and she had been expecting compensation to be at least what she received the year before (another 3-4% salary increase, a $22,000 bonus, and another $130,000 four-year RSU grant). Gjovik lost tangible pay due to Apple's felonious discharge of her employment.

1593.   RICO injury claims require tangible harm and monetary loss. As described in the RICO section, Gjovik suffered much damage to her chattel property due to Apple's environmental mail and wire fraud, and nonpeaceful use of chemical weapons.

1594.   **On the Sixth Cause of Action: Ultrahazardous Activities**: Because Apple engaged in ultrahazardous activities and caused injury to Gjovik through those activities, Gjovik requests compensatory damages, including for distress and mental anguish.

1595.   **On the Seventh Cause of Action: Cal. Labor Code § 1102.5:** Because Apple retaliated against Gjovik due to Gjovik's whistleblowing in violation of Cal. Labor Code § 1102.5, Apple must pay backpay and benefits, reinstate Gjovik (or pay front pay), pay the employee's actual damages, pay punitive damages, and pay reasonable attorney's fees.[1448] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in

---

[1447] Note: these calculations are for purposes of proving tangible harm only and are not inclusive of all factors to determine damage amounts, do not contain all damage and remedy types, and are not meant to preclude or interfere with later remedy determinations.
[1448] Cal. Lab. Code § 1102.5(f). *Sargent v. Board of Trustees of the California State University*, Sonoma County Super. Ct. No. SCV-255399 (2021)

Deleted: owes
Deleted: a civil penalty of $10,000 for each violation and

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

direct consequence of Apple's unlawful discharge of her duties, with interest.[1449] Examples of violations are listed in the allegations.

1596. **On the Eight Cause of Action: Cal. Labor Code § 98.6:** Because Apple violated Cal. Labor Code § 98.6 by discriminating, retaliating, and taking adverse against Gjovik because Gjovik engaged in protected conduct, Gjovik is owed reinstatement (or front pay), reimbursement for lost wages and work benefits, and civil penalties up to $10,000 for each employee for each violation.[1450] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[1451]

1597. **On the Ninth Cause of Action: Cal. Labor Code § 6310:** Because Apple violated the California Occupational Safety and Health Act by discharging, threatening to discharge, demoting, suspending, and/or discriminating against Gjovik because Gjovik raised workplace safety concerns, Apple must reinstate Gjovik (or pay front pay) and reimburse Gjovik for back pay, and lost wages and work benefits. [1452] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[1453]

1598. **On the Tenth Cause of Action: Wrongful Discharge in Violation of Public Policy**: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy; the discharged employee may maintain a tort action and recover damages

---

[1449] Cal. Lab. Code § 2802
[1450] Cal. Lab. Code § 98.6(b).
[1451] Cal. Lab. Code § 2802
[1452] Cal. Lab. Code § 6310(b).
[1453] Cal. Lab. Code § 2802

traditionally available in such actions."[1454] Gjovik requests compensatory damages, consequential damages, punitive damages, attorney's fees, and injunctive relief.

1599.   Gjovik requests all remedies available, including back-pay (for lost wages, bonuses, and benefits), compensatory damages (for pecuniary losses, emotional distress, mental anguish, reputational harm, personal humiliation), punitive and exemplary damages for Apple's reckless and callous disregard for Gjovik's rights and health, injunctive and declaratory relief including reinstatement (or front-pay), and purging of negative personnel records.

1600.   **On the Eleventh Cause of Action: Nuisance**: Cal. Civ. Code § 3501 provides remedies against a private nuisance in a civil action. Gjovik requests damages for annoyance, distress, mental anguish, and nominal damages.[1455] Gjovik seeks compensatory damages for the injury caused by the nuisance, including personal injury.

1601.   Damages may be recovered for "annoyance and distress, including mental anguish." Nominal damages are often awarded as well. [1456] Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom.[1457]

1602.   **On the Twelfth Cause of Action: Intentional Inflict of Emotional Distress**: Because Apple inflicted severe emotional distress on Gjovik, Apple shall compensate Gjovik for emotional distress including but not limited to medical bills, lost wages, lost earning capacity, and other compensatory damages. Gjovik should be compensated for her anxiety, depression, insomnia, disordered eating, loss of consortium, PTSD, loss of reputation, and loss of enjoyment of life activities. Apple also should pay Gjovik the maximum number of punitive/exemplary

---

[1454] *Tameny v. Atlantic RichfieldCo.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330]
[1455] Kornoff v Kingsburg Cotton Oil Co (1955) 45 Cal.2d 265, 272.
[1456] *Kornoff v Kingsburg Cotton Oil Co (1955) 45 Cal.2d 265, 272. Kelly v CB&I Construction, Inc (2009) 179 Cal.App.4th 442, 456.*
[1457] *Kornoff v. Kingsburg Cotton Oil Co. (1955) 45 Cal.2d 265, 272 [288 P.2d 507]*

damages due to Apple's outrageous, repugnant, and deranged conduct.[1458] Apple is liable for a variety of special remedies.

A.   **SPECIAL REMEDIES**

    **i.        Exemplary/Punitive Damages**

    1603.   Gjovik is informed and believes and, on that basis, alleges that Apple was at all relevant times aware of the conduct of all of their employees and agents, and directed, approved, and ratified that conduct.[1459] In addition or in the alternative, Gjovik is informed and believes and, on that basis, alleges that agents of Apple were at all relevant times unfit and Apple was reckless in employing them, and/or they were employed in a managerial capacity and acting in the scope of their employment.[1460]

    1604.   Apple engaged in despicable conduct, exposing Gjovik to cruel and unjust hardship, with the intention to cause injury to Gjovik, and with conscious disregard of her rights. Defendants occupied a position of trust which gave them power to damage Gjovik's ability to earn a livelihood. Apple abused that position of trust by maliciously, fraudulently, and oppressively discharging Gjovik and intentionally interfering with her business. Apple's conduct was carried out by and ratified by one or more of Apple's agents, and it was willful and oppressive and done in conscious disregard of her rights. Gjovik is therefore entitled to punitive damages in an amount to be proven at trial.

---

[1458] California Civil Jury Instructions (CACI) 1600. See, for example, *Christensen v. Superior Court* (1991) 54 Cal.3d 868; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995; *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590; *Hughes v. Pair* (2009) 46 Cal.4th 1035.
[1459] *Merlo v. Standard Life Acc. Ins. Co.*, 59 Cal.App.3d 5, 18; *Agarwal v. Johnson*, 25 Cal.3d 932, 950 (Cal. 1979).
[1460] *Hale v. Farmers Ins. Exch.*, 42 Cal.App.3d 681, 690-691; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822, *Agarwal v. Johnson*, 25 Cal.3d 932, 950 (Cal. 1979)

663

1   1605.   Apple's harm against Gjovik was physical as well as economic; Apple's tortious

2   conduct evinced an indifference to or a reckless disregard of the health and safety of others;

3   Gjovik had financial vulnerability; the conduct involved repeated actions (was not an isolated

4   incident); and the harm to Gjovik was the result of Apple's intentional malice, trickery, and

5   deceit.[1461]

6

7   1606.   Punitive (aka exemplary) damages are appropriate in this case. California law

8   permits awards of punitive damages "for the sake of example and by way of punishing the

9   defendant."[1462] The most important factor in determining the amount of punitive damages to

10  award is "reprehensibility."[1463] The harm Apple caused was physical, not just  economic; the

11  tortious conduct evinced an indifference to or a reckless disregard of the health or safety of

12  others; the target of the conduct had financial vulnerability; the conduct involved repeated

13  actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or

14

15  deceit, or mere accident."[1464]  These all apply here.

16  1607.   Under California law, a plaintiff may recover punitive damages in connection

17  with a non-contractual claim if she establishes by clear and convincing evidence that the

18  defendant is guilty of fraud, oppression, or malice. [Cal. Civil Code § 3294(a)].[1465] The

19  California Supreme Court has concluded that an appropriate maximum ratio between punitive

20  and compensatory damages is "10 times the compensatory award."[1466] Malice, for purposes of

21

22  punitive damages, includes despicable conduct by the defendant with a willful and conscious

23

24  ────────────────

25  [1461] *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419–29, 123 S. Ct. 1513, 1521–26, 155 L. Ed. 2d 585 (2003).
[1462] Civ. Code, § 3294(a); *Zirpel v. Alki David Prods.*, B317334, 20 (Cal. Ct. App. Jun. 20, 2023)
26  [1463] State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 419.
[1464] *Zirpel v. Alki David Prods.*, No. B317334, 21-22 (Cal. Ct. App. Jun. 20, 2023).
27  [1465] *Lupo et all v Quality Assurance Services*, Case No. 16cv737 JM (JMA), U.S. District Court, Southern District of California (July 26 2017); See *Turman v. Turning Point of Cent. California*, Inc., 191 Cal.
28  App. 4th 53, 64 (2010).
[1466] *Zirpel v. Alki David Prods.*, No. B317334, 23 (Cal. Ct. App. Jun. 20, 2023).

Deleted: "

Deleted: ."

Deleted: ."

Deleted: "

Deleted: "

Deleted: FIRST

Deleted: –

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

disregard of the rights or safety of others.[1467] Apple's conduct was despicable, and so "base, vile or contemptible" that it would be despised and looked down upon by ordinary people.[1468]

1608.   As of December 2023, Apple Inc has a market cap of $3.021 trillion, $61.55 billion in cash, annual revenue of $383.29 billion, and annual gross profit of $170.78 billion.[1470]

### ii.   Medical Monitoring

1609.   Gjovik requests remedy under statutes where available, that Apple provide and pay for medical monitoring for Gjovik, including any needed medical intervention on diseases resulting from Gjovik's exposure to Apple's chemicals and gases. Apple's misconduct puts Gjovik at "increased risk" for disease. An application of tort law that allows post-injury, pre-symptom recovery in toxic tort litigation for reasonable medical surveillance costs is manifestly consistent with the public interest in early detection and treatment of disease.

1610.   Medical monitoring costs are a recoverable item of damages for plaintiffs who (1) prove exposure to toxic chemicals as a result of a defendant's tortious conduct and (2) establish that the need for medical monitoring is a reasonably certain consequence of the exposure.[1471] The cost of medical monitoring in the future is awarded in California courts where the plaintiff shows the need for such monitoring is a reasonably certain consequence of the toxic exposure, and the recommended monitoring is reasonable.[1472] Gjovik will prove this related to both 825 Stewart Drive and 3250 Scott Blvd.

---

[1467] Civ. Code, § 3294, subd. (c)(1).
[1468] *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228; *Zirpel v. Alki David Prods.*, No. B317334, 22 (Cal. Ct. App. Jun. 20, 2023).
[1470] Yahoo Finance, AAPL, [last visited 12/7/2023], https://finance.yahoo.com/quote/AAPL?p=AAPL; *Adams v. Murakami* (1991) 54 C3d 105, 110, 284 CR 318, 321; see *Barnes v. Logan* (9th Cir. 1997) 122 F3d 820, 821-822.
[1471] *Potter v. Firestone Tire & Rubber Co., 2 Tx. L.R. 862 (Cal. Super. Ct., Monterey County, Case No. 81723, 1987).* (Court finds increased risk of disease and awards damages for, inter alia, medical monitoring as a result of TCE generated by defendant and disposed of in city owned landfill.)
[1472] *Miranda v. Shell Oil Co.*, 7 Cal. Rptr. 2d 623, 74 Ed. Law Rep. 144, Prod. Liab. Rep. (CCH) P 13297 (App. 5th Dist. 1992), review granted and opinion superseded, 10 Cal. Rptr. 2d 182, 832 P.2d 898, 76 Ed. Law Rep. 175 (Cal. 1992).

**Deleted:** <#>Apple's conduct was despicable, and so "base, vile or contemptible" that it would be despised and looked down upon by ordinary people.[1469] ¶

**Deleted:** defendant's

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

### iii.    Special Damages

1611.   Gjovik is entitled to compensation for any special damages suffered by her resulting from Apple's outrageous and defamatory acts.[1473]

1612.   Gjovik now suffers from permanent psychological trauma and damage because of Gjovik's actions. Because of the threats and intimidation, she feared for her life and the conspiracy hampered her ability to continue at the same level, causing her significant economic damage. Gjovik has suffered tremendously because of Apple's efforts.

1613.   Compensatory and consequential damages should include reimbursement for Gjovik's expenses in undertaking her own version of the *Federal Witness Security Program* and *Crime Victims Assistance Program*,[1474] in lieu of lack of assistance from the government. Expenses include "*medical costs, mental health counseling … and lost wages.*"[1475] Expenses may also include "*home security installation or improvement, relocation, crime scene clean-up.*"[1476] Injunctive relief includes the right to refuse to be interviewed (interview, deposition, or discovery request) by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant – and to set reasonable conditions on the conduct of any such interview to which the victim consents."[1477] Crime victim assistance costs also cover "*counseling… criminal justice advocacy, and emergency transportation.*"

1614.   Gjovik paid out of pocket for cross-country relocation, warned landlords and neighbors about the stalking and harassment, bought self-defense weapons, purchasing a digital address for her LLC in order to hide her home address wherever possible, installed home

---

[1473] *Agarwal v. Johnson*, 25 Cal.3d 932, 952 (Cal. 1979).
[1474] US DOJ, *Assistance and Resources for Victims,* https://www.justice.gov/enrd/environmental-crime-victim-assistance/assistance-and-resources-victims; CalVCB, *What is Covered*, https://victims.ca.gov/for-victims/what-is-covered/
[1475] US DOJ, *supra*
[1476] CalVCB, *supra*
[1477] California Office of the Inspector General, *Marsy's Law,* https://oag.ca.gov/victimservices/marsys_law

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

security equipment, attempted to remove damaging content from the internet through timely and costly SEO activities, and cleverly obtained 24/7 law enforcement outside her New York apartment at all times through proximity to a state executive building, and other tactics to stay safe.

### iv.   Injunctive Relief

1615.   Gjovik seeks injunctive relief against Apple, including, but not limited to an order that prohibits Apple from coercing their employees to allow Apple to gather and use their personal data in for-profit product development, including requests to participate in medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct in violation of their rights of privacy. Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, but especially Gobbler data from 2017-2021, and the naked/undressed photos Apple obtained from Gjovik during the Batterygate fiasco in 2018.

1616.   Apple coerces employees to participate in these activities to extract their data and to exploit in research and development of commercial, for-profit products, in violation of the FTC Act and Cal. Bus. & Prof. Code § 17200. As a result of Defendants' unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik and her former co-workers. Apple should be required to restore these monies to Gjovik and her former co-workers however Apple's extensive use of these illegal practices will make calculating damages a challenge. In the absence of injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which cannot readily be remedied by damage remedies.

1617.   Apple should be ordered to disgorge unlawful data, and the fruit of the toxic data, models built off the unlawful data.

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

### v.     Physical Injuries and Sickness

1618.   Gjovik is owned damages on account of personal physical injuries or physical sickness. These damages are exempt income and not taxable to the recipient.[1478]  Any amount paid by an employer to a former employee "on account of personal physical injuries or sickness," including any amount paid for emotional distress caused by such injuries/sickness, is not income to the employee.[1479] Gjovik's injuries include, but are not limited, to the physical harm to her body caused by the chemical exposure at her office and from the factory outside her home; the emotional distress suffered by Gjovik due to those physical injuries; and attorney's fees for these claims. Gjovik should also be refunded for all vacation time used to respond to these injuries, and all vacation time lost while on disability due to these injuries, and she should not be taxed for it.

### vi.    Declaratory Relief & Nominal Damages

1619.   Gjovik requests declaratory relief that Apple's NDAs and secrecy oaths related to its experiments on employees, and surveillance of employees, is unlawful. This would allow Gjovik and her coworkers to "to speak freely about their experiences," and seek "treatment and counseling for the harm inflicted by the experiments."[1480]

1620.   Further, where there is no other remedy, provide declaratory relief and nominal damages of $1.00 (or $3.00 where treble damages apply).

---

[1478] 26 USC § 104(a)(2); *Commissioner of Internal Revenue v. Schleier* (1995) 515 US 323, 337, 115 S.Ct. 2159, 2167 (decided under prior version of statute).
[1479] 26 USC § 104(a)(2); 26 CFR § 1.104-1(c)(1).
[1480] *Vietnam Veterans of Am. v. C.I.A.*, No. C 09-0037 CW, 2010 WL 291840, at *6 (N.D. Cal. Jan. 19, 2010)

Deleted: Where

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

## X.    PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgement in her favor on each and every

claim for relief set forth above and award its relief, including but not limited to an Order:

    a.    Entering judgement in her favor

    b.    Awarding her monetary relief, including damages sustained in an amount to be

        determined at trial.

    c.    Awarding her compensatory damages

    d.    Awarding her consequential damages

    e.    Ordering her restatement at Apple, or else award her front pay and other

        applicable relevant consequential damages

    f.    Awarding her treble damages

    g.    Awarding her punitive and exemplary damages

    h.    Awarding her special damages

    i.    Awarding her attorney's fees with a fee multiplier

    j.    Awarding costs of suit incurred herein.

    k.    Where applicable, all the above with interest

    l.    Declaratory relief stating Gjovik is a Crime Victim under 18 U.S.C. § 3771 & 34

        U.S.C. § 20141(e)(2)

    m.    Declaratory relief stating Gjovik is a Crime Victim under California Labor Code

        §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955

    n.    Order her personnel file cleared of negative references.

    o.    Order injunctive relief prohibiting invasions of employee privacy.

    p.    Order injunctive relief forcing disgorgement of software and other products

        developed using Gjovik's unlawfully obtained personal data.

    q.    Order injunctive relief forcing deletion of unlawfully obtained data of and related

        to Gjovik.

    r.    Order prohibiting commercial profit by Apple from this 'story' and any revenue

        or profit to be held for benefit of Plaintiff and disgorged entirely to Plaintiff.

    s.    Where there are no damages or other relief are available, entry of declaratory

        relief and nominal damages of $1.00.

| | |
|---|---|
| **Deleted:** | FIRST |
| **Deleted:** | -- |
| **Deleted:** | cv |
| **Deleted:** | CRB |
| **Deleted:** | OCTOBER 25 |

1      t.      For such other and further relief as the court deems just and proper.

2

3   **Plaintiff demands a Jury Trial.** [1481]

4

5                              Respectfully submitted,

6

7                              By_____

8                                 Ashley M. Gjovik
                                  *Pro Se* Complainant
9                                 12/21/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1481] Fed. R. Civ. P. 38(b).

670

Deleted: <object>

Deleted: FIRST

Deleted: --

Deleted: cv

Deleted: CRB

Deleted: OCTOBER 25

DATED: December 21 2023

Deleted: OCTOBER 25

## XI. CERTIFICATION AND CLOSING

448. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

449. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

450. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.[1482]

Executed on:                              DECEMBER 21 2023

Deleted: OCTOBER 25

Deleted: <object>

Signature of Plaintiff         _____

Printed Name of Plaintiff         Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816

Email: legal@ashleygjovik.com

Phone: (408) 883-4428

_____
[1482] 28 U.S.C.A. § 1746

Deleted:
Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

### XII.    APPENDIX I: SUMMARY OF PARTIES / PLACES

**Key People at Apple**

*(witnesses listed elsewhere)*

| Person | Title, Department | Role | Connections to Others |
|---|---|---|---|
| **Yannick Bertolus** | Vice President, Product Integrity | Prior executive of team Gjovik worked in; Sent termination letter; boss' boss | Friends with West, worked together at Palm |
| **Dan West** | Senior Director, Product Systems Quality | Co-manager at time of termination | Reports to Bertolus; Friends with Bertolus, worked together at Palm |
| **David Powers** | Director, Mac Systems Quality | Co-manager at time of termination | Reports to West |
| **Dan Riccio** | Senior Vice President, Hardware Engineering | Prior executive of team Gjovik worked in; Gjovik made complaints about Riccio's statements that implicated corruption | Bertolus used to report to Riccio |
| **Ekelemchi Okpo** | Investigator, Employee Relations | Led July-September 2021 Investigation | Reports to Lagares |
| **Jenna Waibel** | Investigator, Employee Relations | Led April-June 2021 Investigation | Reports to Lagares |
| **Tony Lagares** | Senior Manager, Corporate Employee Relations | Received Gjovik's complaints about a culture of cover-up, corruption, and retaliation at Apple. | Manager of both investigators (Okpo and Waibel) |
| **Helen Polkes** | Human Resources Business Partner, Hardware Engineering | Threatened, intimidated, harassed, and coerced Gjovik in 2021 – including forcing Gjovik to file worker's comp claim. | "HR BP" for Dan West and his organization |
| **Michael Steiger** | Project Manager, EH&S | Oversaw CERCLA at 825 Stewart Drive | Rotating door from EKI and back to EKI, working on Apple projects at EKI and Apple |
| **Debra Rubenstein** | Environmental/EH&S Lawyer, Apple Legal | Met with Gjovik in November 2020 for personal conversation; Oversaw legal matters related to Gjovik's office in 2021 | Involved in several of Apple's other environmental blunders, including the chemical spill at Apple Park in March 2021 |
| **Lisa Jackson** | Vice President, Government Affairs and Lobbying | False public statements; corrupt meddling | Prior US EPA admin including TRW Site; Synertek; Triple Site |
| **Ronald Sugar** | Board Member; Chair of Audit & Finance | (open question) | Per legal/regulatory filings, works very closely with Ronald |

**Deleted:** FIRST

**Deleted:** --

**Deleted:** cv

**Deleted:** CRB

**Deleted:** OCTOBER 25

| | | | |
|---|---|---|---|
| **Tom Moyer** | Head of Global Security and Chief Compliance Officer | Oversaw Business Compliance hotline where Gjovik submitted internal complaint on August 23 2021 | Sugar<br><br>Per legal/regulatory filings, works very closely with Ronald Sugar; currently facing criminal charges for bribing Sheriff's Office |
| **Gene Levoff** | Vice President of Corporate Legal; Corporate Secretary | Was in charge of Apple's SEC filings through 2018, including one's Gjovik complains about here; Was in charge of all Apple subsidiaries which would include AC Wellness | Charged with 12 counts of criminal fraud; convicted and sentenced. |
| **Aleks Kagramanov** | Workplace Violence and Threat Assessment | Tried (unsuccessfully) to interrogate Gjovik on Sept. 9 202, 10min after Gjovik posted on Twitter about his team breaking into people's houses. | Also named as agent of employer in famous Google NLRB retaliation case (he is ex-Google) |
| **Evan Buyze** | Manager, Software Engineering | Prior direct supervisor | Conspired with Rica to constructively terminate and retaliate against Gjovik over Batterygate. |
| **Shandra Rica** | Senior Manager, Software Engineering | Prior "skip level" supervisor | Conspired with Rica to constructively terminate and retaliate against Gjovik over Batterygate. |
| **Brad Reigel** | Manager, Software Engineering | Prior direct supervisor; Prior co-worker | Also police officer at local police department |
| **Robert Marini** | Manager, Software Engineering | Prior co-worker | Close personal friends with Garfinkle; friends with Memula and Reigel |
| **Faye Garfinkle** | Manager, Software Engineering | Prior co-worker | Close personal friends with Marini; friends with Mondello and Vyas (who harassed Gjovik in 2021-2022) |
| **Venkat Memula** | Director, Software Engineering | Prior "skip level" supervisor | Assisted Worldwide Loyalty team and Global Security to obtain illegal search warrant for reporter's home in 2010. |
| **Linda Keshishoglou** | Manager, Software Engineering | Prior Direct Supervisor | Reported to Memula |
| **Kristen M** | Human Resources Business Partner, Software Engineering | "HR BP" for Kim Vorrath | Received complaints from Gjovik about Gjovik's managers in Software Engineering, and about Marini. |

Deleted: FIRST<br>
Deleted: –<br>
Deleted: cv<br>
Deleted: CRB<br>
Deleted: OCTOBER 25

673

| Kim Vorrath | Vice President, Software Engineering | Prior executive of team Gjovik worked in | Assigned Gjovik to EFFA role under Rica where Gjovik was constructively terminated |
|---|---|---|---|

**Key Companies**

| Agency / Company | Names | Notes |
|---|---|---|
| Apple Inc | | |
| Northrop Grumman (& TRW) | Prior CEO: Ronald Sugar | Responsible Party for Triple Site & TRW Site Superfunds |
| Honeywell | Prior GC: Kate Adams CEO David Cote is ex TRW CEO | Responsible Party for Synertek Superfund |
| Oaktree Capital | Execs: Robert Denham (Chevron Board); John Frank (Chevron Board) | TRW/825 Stewart owner 2014-2016 |
| Chevron | Lead Board Director: Ronald Sugar; Robert Denham; John Frank | See also, Steven Donziger retaliation |
| Irvine Company | Board: Robert Denham (Chevron Board); John Frank (Chevron Board) | Property manager of Santa Clara Square (3255 Scott Blvd) |

**Key Places**

| Location Name | Address | Companies / People |
|---|---|---|
| TRW Microwave Superfund site; "Stewart 1" | 825 Stewart Dr Sunnyvale | Apple as Tenant; Northrop Grumman as Responsible Party; Oaktree Capital, Hines, GI Partners, CalSTRS as Owners; AECOM & EKI as Consultants |
| "Scott 1" (aka "Project Aria") | 3250 Scott Blvd Santa Clara | Apple as Tenant; Honeywell as Responsible Party |
| Santa Clara Square Apartments | 3255 Scott Blvd Santa Clara | Irvine Company as Owner; Honeywell as Responsible Party |
| Synertek Superfund site | 3050 Coronado Dr Santa Clara | Honeywell as Responsible Party |
| Triple Site in Sunnyvale | Over 100 acres | Apple as Tenant in Multiple Buildings; Irvine Company and Oaktree Capital as Developers / Owners. |
| Apple Park | 1 Apple Park Way, Cupertino | Apple as Owner; HP as Responsible Party; EKI as Consultant |
| "Tantau 9" / "Intersil/Siemens Superfund Site" | 10900 Tantau Ave, Cupertino | Apple as Tenant; Siemens and GE as Responsible Parties |

674

Deleted: FIRST
Deleted: --
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

# XIII.   APPENDIX III: SUMMARY OF FALSE STATEMENTS

**Senior District Judge Chen's Standing Order Rule #10** [1483]
*Complaints in Federal Securities Fraud Cases*

"Where a plaintiff files a federal securities fraud case, the plaintiff shall attach to its complaint a chart regarding any allegedly fraudulent/misleading statement(s) or omission(s)."

**SOX Act & Dodd Frank Act Whistleblower Retaliation**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 786, 999 | Alysha Johnson. Reuters, December 6, 2016, California EPA says settled with Apple on hazardous waste claims | "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." [1484] | Apple does the bare minimum required and tells employees that | Gjovik to Cohen: "But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me." |
| 2 | 787 | Lisa Jackson, Apple Press Release, 4/21/21 | The resources and community initiatives we're sharing today are all about amplifying voices too often | Apple showed complete indifference to the health impact of communities around its toxic | Gjovik tired to escalate Env Justice concerns & the Inclusion & Diversity |

[1483] US Courts, CAND, *Judge Chen's Standing Orders*, https://www.cand.uscourts.gov/wp-content/uploads/judges/chen-emc/Standing-Order-Civil-General-REVISED-12-1-2022.pdf
[1484] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/; Reuters, https://www.reuters.com/article/idUSKBN13V2HS/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

| | | | unheard, and giving people the tools to learn, engage, and be part of the solution… As people around the world celebrate Earth Day, Apple's focus remains on supporting those communities most impacted by climate change and environmental challenges."[1485] | waste sites; Apple has poor management of its hazardous waste sites | team told her to pitch why Apple shouldn't poison Black people |
| 3 | 781 | Abstract, attributed to many statements by Apple | "Cares about Human Rights" | AG: "A company that likes to pretend it cares about human rights… pretends seems to be the important words there…" | |
| | | | | | |

**RICO Predicate Act: Wire Fraud and/or Mail Fraud**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 986 | Apple, 2021, NMP Manifests in TRI filing | Apple claimed it shipped NMP to waste facilities but there were no manifests so it didn't | Cover-up how many chemicals it vented on Gjovik | It's literally a crime under RCRA |
| 2 | 990 | Apple, 2021, Art Fong | Claimed NMP is priority chemical and eliminated since 2016 | Have tons at 3250 Scott Blvd & launch it into the air | CAA violation |
| 3 | 1007 | Apple to EPA, May 28 2021 | "While proper ventilation and engineering controls | See, 3250 Scott Blvd emissions | CAA/RCRA violations |

[1485] Apple, *Apple Celebrates Earth Day 2021*, April 21 2021, https://www.apple.com/newsroom/2021/04/apple-celebrates-earth-day-2021/

2

**Deleted:** FIRST
**Deleted:** --
**Deleted:** cv
**Deleted:** CRB
**Deleted:** OCTOBER 25

| | | | | can protect the health and safety of those working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities" | | |
|---|---|---|---|---|---|---|
| 4 | 1015 | Apple, 2018, to EPA | Apple generates 100% of our operational load through clean energy."[1486] | Proven they do not | |
| 5 | 1018 | Tim Cook, Apple Website, 12/21/21 | "Privacy is a fundamental human right. It's also one of our core values."[1487] | They claim employees have no right to privacy, which either means they're lying or they don' think their employees are humans | See to the left |
| 6 | 1031, 1032 | Apple, Ethics & Compliance Website, Current | "Apple conducts business ethically, honestly, and in full compliance with the law. | See all of Apple's fines, violations, sanctions, investigations | Corruption |
| | 1033 | Business Conduct Policy, Current, Apple | "Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations | See all of Apple's fines, violations, sanctions, investigations | Corruption |

[1486] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions …* (at 83 FR 45588, September 18, 2018).
[1487] Apple, Privacy, (last accessed 12/17/2023), https://www.apple.com/privacy/

Deleted: FIRST
Deleted: –
Deleted: cv
Deleted: CRB
Deleted: OCTOBER 25

| | | |
|---|---|---|
| **Page 2: [1] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 13: [2] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 35: [3] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 56: [4] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 75: [5] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 76: [6] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 139: [7] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 153: [8] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 183: [9] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |
| **Page 1: [10] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [10] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [10] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [10] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 216: [11] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 216: [11] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [12] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [12] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [12] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| | | |
|---|---|---|
| **Page 1: [12] Deleted** | **Diff** | **12/21/23 11:35:00 PM** |

| Page 260: [13] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|

| Page 318: [14] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|

| Page 460: [15] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|

| Page 485: [16] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|

| Page 614: [17] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|

| Page 642: [18] Deleted | Diff | 12/21/23 11:35:00 PM |
|---|---|---|