**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| | **Case No. 3:23-cv-04597-EMC** |
| | **Filed**: September 7 2023 |
| | **District Judge**: Honorable Edward M. Chen |
| **ASHLEY GJOVIK**, *an individual*, | **MOTION FOR JUDICIAL NOTICE** |
| Plaintiff, | |
| v. | **Hearing** |
| | Dept: Courtroom 5, 17th Floor (Virtual) |
| **APPLE INC**, *a corporation*, | Date: February 8, 2024 1:30 p.m. |
| Defendant. | *Plaintiff Does Not Require Oral Arguments* |
| | *Concurrent with:* |
| | *Defendant's Motion to Dismiss (Doc #30)* |
| | *P's Opposition to Motion to Dismiss (Doc #33)* |

**Motion for Judicial Notice Cover Page: Exhibit  1**

### 825 Stewart Drive, Sunnyvale, California

**Declaration**: *I verified the authenticity of each of these documents. A true and correction version of each document is attached in each exhibit. I declare under penalty of perjury this is true and correction. /s/ Ashley M. Gjovik (December 25 2023).*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

Gjovik's 2021 Complaint

ECHO Gov Login     Contact Us

Your report has been successfully sent. Your confirmation is below.

# Report Environmental Violations - Submitted

Thank you for submitting information on a possible environmental violation. The information will be reviewed by EPA enforcement personnel.

This notice will be the only response you will receive regarding your submission. Due to the sensitive manner in which enforcement information must be managed by EPA, we cannot provide status reports or updates regarding any submission we receive through the Report Environmental Violations form.

Back to Report Environmental Violations page

# Report Confirmation

| | |
|---|---|
| **Received** | Aug 29, 2021 at 4:44pm EDT |
| | |
| **Your Name** | Ashley Gjovik |
| **Your Email** | ashleymgjovik@protonmail.com |
| **Your Phone Number** | 4159646272 |
| | |
| **Suspected Violator's Name \*** | Apple Inc |
| **Suspected Violation Location \*** | 825 Stewart Drive |

| | |
|---|---|
| **Suspected Violation City \*** | Sunnyvale |
| **Suspected Violation State \*** | California |
| **Suspected Violation ZIP Code \*** | 94086 |
| **Responsible Party** | Company |
| | |
| **Is the suspected violation still occurring?** | Yes |
| **Date of Incident** | |
| **Characterized incident as:** | |
| **Intention \*** | Intentional |
| **Violation Method \*** | Falsified |
| **Affected Subject(s)** | Air, Worker, Documents |
| | |

| | |
|---|---|
| **Violation Description \*** | As reported to the EPA Superfund site community contact (Margot PerezSullivan), I've had concerns since March 2021 about Apple's oversight & lack of due diligence for the safety of their employees in the TRW Microwave Superfund site (825 Stewart). I've expressed concerns about negligence and even recklessness, possible violations of Right to Know & OSHA. Worse, Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site (e.g. cracks in the cement floor requiring repair). Apple has frequently told me they refuse to answer any of my questions about safety or the site, and even pressured me into requesting an ADA accommodation request to work remotely to not be exposed to the chemicals at the site, after pressuring me to file a worker's comp claim for a fainting spell I had in 2019, which I believe to be caused by vapor intrusion. Apple has refused to test the indoor air for vapor intrusion until after they seal the cracks, despite the last testing being done in 2015 and was limited (10hrs) and the only time the results ever came back without vapor intrusion above max EPA industrial limits (there was a long history of toxic indoor air vapor intrusion in the building). Further, Northrup Grumman is the responsible party and their ex-CEO/President, Ronald Sugar, is now on the Board of Directors of Apple & the Chair of the Finance & Audit committee. I can provide documentation for all of the above. I reported my concerns about conflicts of interest to Apple. I've also filed DOL OSHA Whistleblower retaliation complaints, and claims with the EEOC, NLRB, & CA DEFH. |
| **File(s) Uploaded** | No files uploaded. |
| | |

LAST UPDATED ON AUGUST 19, 2021

DATA REFRESH INFORMATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

October 7 2021
Letter



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
**75 Hawthorne Street**
**San Francisco, CA  94105**

October 7, 2021

Mr. Kurt Batsel                                                                    SENT VIA EMAIL
The Dextra Group, Inc.
On behalf of Northrup Grumman Corp
batsel@dextra-group.com

**Re:   EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue**
**Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Batsel:

Thank you for organizing for me and Matt Plate to conduct the August 19, 2021 site visit of
the 825 Stewart Drive building, which is currently leased by Apple, Inc. (Apple). The site visit
was attended by Michael Shannon with Northrup Grumman Corp (NGC), you, and NGC's
consultant Holly Holbrook with AECOM. During the site visit an Apple leasing manager
provided access throughout the building. The purpose of the site visit was for EPA to inspect
the following items to assess the potential for vapor intrusion into the building:

- The sub-slab depressurization (SSD) system that was installed underneath the three
  connected site buildings that passively vents soil gas vapors to the atmosphere.
- The building's concrete slab and the April 2015 cracks that where sealed to
  prevent potential vapor intrusion.
- The building's concrete slab and penetrations from pipes or seams.
- The previously installed soil gas sampling vapor ports.
- The locations where past indoor air sampling has been conducted.
- The operation of the HVAC system and the HVAC air venting and intakes on the roof.
- The location where contaminated soil was excavated in 2014 from underneath the
  building.
- The location where the spaces between the walls of the three buildings' sections
  were sealed in 2015.
- A review of any post-2015 building modifications or changes to the buildings.
- The groundwater emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

Based on EPA's inspection of the building and real-time indoor pressure readings, the building
HVAC system is well balanced to maintain a positive pressure within the occupied building
areas, and the likelihood for vapor intrusion is low and not expected. EPA understands that

Apple intentionally operates the HVAC system to balance room pressures, heating, and air turn-over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

- **HVAC Operation:** EPA's observations of the HVAC system and pressures within the building were limited to the day of the site visit and the operation of the building at the time. While a balanced HVAC system was observed maintaining a positive pressure, EPA requests that HVAC and building test and balance information for the HVAC systems be provided to EPA to confirm this.

- **Sub-slab Sampling Ports:** The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located (SS-10 and SS-11). These ports need to be located and maintained where future sub-slab sampling will be conducted, or decommissioned if a justification is provided that the ports are no longer needed. EPA also requests an updated figure for the building showing all sub-slab vapor sampling port locations including measurements from exterior and interior walls, their ID names, and callouts presenting historical VOC detections. The figure used to locate the sub-slab ports in the field only showed approximate locations.

- **SSD System Maintenance and Inspections:** In May 2021 GES, on behalf of NGC, prepared the first Annual Maintenance Inspection memorandum for the 825 Steward Ave SSD System. The memorandum documented a November 2020 inspection and NGC prepared the memorandum to address the 2019 EPA Five Year Review Report recommendation to incorporate "long-term stewardship measures for the current vapor mitigation measures in place." EPA asks that NGC document in a work plan or technical memorandum the scope of the annual SSD system maintenance inspections, including how and when the inspections will be reported to EPA.

EPA requests that NGC provide a written response in the next 30-days addressing EPA's comments above. Please feel free to contact me anytime at schulman.michael@epa.gov or

https://semspub.epa.gov/work/09/100025885.pdf

415-972-3064 if you have any questions or comments. Thank you again for your cooperation and participation in the site visit and these follow-up items.

Sincerely,

Digitally signed by MICHAEL SCHULMAN
Date: 2021.10.07 18:38:47 -07'00'

Michael Schulman
Remedial Project Manager
Superfund & Emergency Response Division

cc:   Joshua Nandi, Northrop Grumman Corp.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

## SECTION:

US EPA Letter
May 2022



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

May 20, 2022

Mr. Joshua Nandi                                                                SENT VIA EMAIL
Northrop Grumman
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation,**
**825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site**
**(CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman documents for EPA's review.

The attached technical memoranda present EPA's technical comments for the following documents prepared by Northrop Grumman / AECOM for the Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA:

- Passive Sub Slab Depressurization System, Operation and Maintenance (O&M) Plan - dated March 31, 2022
- Evaluation of Passive Sub Slab Depressurization System (SSDS) - dated April 15, 2022

Based on EPA's technical review the O&M Plan and SSDS Evaluation, these reports are not approved by EPA at this time. Please refer to the attached technical memoranda for specific comments.

Based on the EPA visit that occurred on August 19, 2021, to inspect the 825 Stewart Drive building, which is currently leased by Apple, Inc. (Apple), EPA concluded that the building's HVAC system was well balanced to maintain a positive pressure within the occupied building areas. The likelihood for vapor intrusion is low under normal building operations. EPA understands that Apple intentionally operates the HVAC system to balance room pressures, heating, and air turn-over to support their operations. HVAC is one of the engineering controls used to mitigate the potential for vapor intrusion but, as specified in the review comments attached, improvements to the O&M are required. While modifications to the building passive subslab ventilation system are being addressed, EPA requires that one round of indoor air samples be collected to document protectiveness under current conditions.

In the attached technical memoranda, there are recommendations to change the discharge points elevations and to potentially transform the passive sub slab ventilation system into an active one. For a final determination whether the passive system coupled with the HVAC operation are still protective, EPA recommends an evaluation of the current subslab soil gas concentration conditions be conducted.

EPA also recommends a building-wide slab pressure differential evaluation to identify areas of the building where positive pressure at the slab is not obtained. This information will further assist in the decision to convert the existing system to an active one.

One of the technical comments attached refers to defining the system as a passive ventilation system, instead of a passive depressurization system. EPA recognizes that when the system was installed back in 2014, it was called as passive sub-slab vapor collection (SVC) system and over the years this term was used interchangeable with "passive depressurization system." It is EPA's understanding that the system's design and intended use have not changed.

EPA requests that NGC provide a written response within 30-days to address EPA's comments above and provided in the attached technical memoranda. Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

LILIAN ABREU
Digitally signed by LILIAN ABREU
Date: 2022.05.20 13:03:53 -07'00'

Lilian Abreu, MS, PhD
Remedial Project Manager
Superfund and Emergency Management Division

Enclosures

cc:    Holly Holbrook, AECOM
       Mark Riley, AECOM



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**REGION 9**

**75 Hawthorne Street**
**San Francisco, CA  94105-3901**

April 25, 2022

<u>MEMORANDUM (sent via email only)</u>

SUBJECT:     Passive Sub Slab Depressurization (SSD) System Operation and
                      Maintenance Plan (Document Control Number [DCN] FY22SEMD_161)
                      and Evaluation of Passive SSD System, Former TRW Microwave Site,
                      Sunnyvale, California

FROM:          Mathew Plate, Environmental Scientist
                      Quality Assurance Branch

THROUGH:   Audrey L Johnson, Manager
                      Quality Assurance Branch

TO:                Lilian Abreu, Remedial Project Manager
                      Superfund Division California Sites

                      Michael Schulman, Remedial Project Manager
                      Superfund Division California Sites

These documents provided by Northrop Grumman for the Former TRW Microwave Site,
dated March 31 and April 15, 2022, were reviewed based on guidance provided in the
following documents:

- *OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion
  Pathway from Subsurface Vapor Sources to Indoor Air* (USEPA OSWER, June
  2015)
- *Guidance for the Evaluation and Mitigation of Subsurface Vapor Intrusion to
  Indoor Air, Final*, (California Department of Toxic Substances Control, October
  2011)
- *Vapor Intrusion Mitigation Advisory, Final*, (California Department of Toxic
  Substances Control, October 2011)

The O&M Plan and SSD Evaluation would benefit from a more thoughtful evaluation of
SSD system engineering.

Questions or comments regarding this review should be referred to me at (415) 972-3799.

Lilian Abreu, Michael Schulman
April 25, 2022

**Concerns**

1. [O&M Plan; Annual Inspection Protocol] This section notes that inspections are limited to the roof components. Elements of inspection should also include:
   - Verification that the floor slab and barrier system have not been breached or otherwise compromised.
   - Evaluation to confirm that the building has not been modified in a manner that could compromise the system.
   - Evaluation of changes to building use. (this could be changes in mechanical operations or changes in exposure scenarios that we not envisioned when the system was designed).

2. [O&M Plan; General] A building-specific inspection checklist should be developed and included with this plan.

3. [O&M Plan; Appendix A, Passive SSD System Design Drawings] The design drawing should be updated to reflect the current building configuration.

4. [SSD Evaluation; Duct] The design selected introduces long horizonal duct runs and several duct bends on the roof. These features will reduce the effectiveness of the system by causing resistance to air flow.

5. [SSD Evaluation; Vent height] The current height proposed does not appear to be sufficient to clear obstructions. Clearing obstructions is important for dispersion of pollutants and to provide sufficient exposure to wind (which provides part of the driving force for proper passive SSD operation).

6. [SSD Evaluation; Location of HVAC intakes] The HVAC intake location is mislabeled. Please correct this and verify that the other HVAC intakes were properly located.





# Technical Memorandum

## Technical Review of Proposed Modification to a Passive Vapor Intrusion Mitigation System Installed at the Former TRW Site, Sunnyvale, CA

Date: May 20, 2022

To: Dr. Lilian Abreu
U.S. Environmental Protection Agency
Task Order Project Officer

From: Mr. Bill Morris
Vapor Mitigation Sciences LLC on behalf of Aptim Federal Services LLC

Task Order: TO 0025

Project No.: 500291-01410003

Vapor Mitigation Sciences' (VMS) task was to review several documents regarding the passive system and proposed modifications to the passive system installed previously at the former TRW building at 825 Stewart Avenue, Sunnyvale, CA.

Documents reviewed are as follows:

- Memorandum from Mathew Plate, regarding the "Passive Sub Slab Depressurization (SSD) System Operation and Maintenance Plan (Document Control Number [DCN] FY22SEMD_161) and Evaluation of Passive SSD System, Former TRW Microwave Site, Sunnyvale, California"

- A letter to Mr. Kurt Batsel, dated October 7, 2021, regarding the "EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue, Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)"

- A Northrop Grumman / AECOM Document dated March 31, 2022, regarding the "Passive Sub Slab Depressurization System, Operation and Maintenance Plan, Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA" • A Northrop Grumman / AECOM

Document dated April 15, 2022, regarding the "Evaluation of Passive Sub Slab
Depressurization System, Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA"

**General Comments**

1. Based on professional judgement, VMS identifies the current mitigation system as a sub-slab
   venting system instead of a sub-slab depressurization (SSD) system. It would be challenging
   with significant uncertainty to determine if depressurization is occurring under the slab even
   with the roof turbines rotating. These turbines may provide upwards of 0.2 inches of water
   column vacuum at the riser, and it would be difficult to measure sustained negative pressure
   differentials under the slab caused by the system configuration.

2. VMS recommends that the requested HVAC building test and balance information be
   collected during varying weather conditions. It is important to understand what the building
   pressures are during various weather conditions (i.e., windy vs. no wind days, high pressure
   vs. low pressure days, etc.). Temperature inversions are common occurrences in the Bay
   Area. When the inversion occurs atop a building it may result in concentrated effluents to get
   pushed back down to the roof and have a potential to re-entrain into the building through
   intakes on the roof. VMS has experienced this phenomenon on several sites along the West
   Coast in California with active systems and exhaust flow around 15-20 cubic feet per minute
   (cfm) and a passive system would generally have less flow than this.

3. The discharge of the pipes should be above the screen walls to be exposed to the wind as
   much as possible and ensure there is no chance of re-entrainment into the building. VMS
   recommends the exhaust points are located above the screen wall, whether the system is
   passive or active.

4. If sub slab soil gas concentrations are known to be elevated and indoor air sampling indicates
   unacceptable indoor air concentrations, while pressure differential data indicate the system is
   being protective, then re-entrainment at the building's rooftop is a possibility (and this may
   explain the unacceptable indoor air concentrations). A second booster fan can be used to
   increase the velocity at the exhaust point and dilute the concentrations making re-entrainment
   less likely.

5. Based on VMS professional judgement, additional building flow and balance data and indoor
   air results should be collected to assist with the evaluation of the design modifications to the
   passive sub slab ventilation system that will be implemented. If the additional data indicates
   an issue, then possibly upgrading to an active system may be prudent and more cost-effective
   than identifying where the issue is across the entire building footprint. An evaluation of the

HVAC systems' flow and balances will help with determining the efficacy of the HVAC in augmenting the passive sub slab ventilation system.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

US EPA Letter
July 2022



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

July 21, 2022

Mr. Joshua Nandi                                                SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Response to EPA Technical Comments on the Passive SSDS O&M Plan
and SSDS Evaluation, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site
(CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman Systems Corporation (Northrop Grumman) written
response to EPA's technical comments and agreeing to collect indoor air samples at the subject building.
As stated in the EPA's letter, the objective of collecting the indoor air is to document protectiveness,
under a normal building HVAC operation, while the modifications to the building passive sub-slab
ventilation (SSV) system are being addressed.

Based on the uncontrolled and unpredictable nature of many weather variables that could potentially
affect the vapor intrusion into a building, an approach to evaluate vapor intrusion in any site, is to collect
multiple lines of evidence.  Based on that, EPA requires Northrop Grumman to evaluate the current
sub-slab soil gas concentrations as well as the building-slab pressure differentials at the time of the
indoor air sampling, and regardless of the indoor air results. The sampling plan should include outdoor
air measurements at the intakes of the HVAC systems. The data from the sub-slab soil gas samples and
the pressure differentials will assist in determining whether the passive SSV should be converted to an
active system.  Additionally, this data will provide information on the current conceptual site model.
Please submit a sampling plan that includes indoor air sampling with building-slab pressure differential
monitoring, sub-slab soil gas sampling and outdoor air sampling at the HVAC intakes.

Regarding the limitations to change vents height due to the building codes, EPA cannot evaluate the
impact on air dispersion and re-entry through the HVAC intakes without sub-slab soi gas, indoor and
outdoor air data; nevertheless, the results of the future sampling plan to be collected, will assist in this
evaluation. Northrop Grumman states on Response #3 to EPA's comment that the design drawings are
correct in relation to the overall exterior building layout. In this case, EPA requests that Northrop
Grumman perform the modifications to the SSV as proposed.

Regarding Response #2 to the Vapor Mitigation Sciences comment, the results of the sub-slab soil gas
sampling will inform the potential concern for weather inversions based on potential emissions through
the roof.

EPA requests that Northrop Grumman provide a sampling and analysis plan for the collection of indoor air and sub-slab soil gas samples and monitoring of the building-slab pressure differentials within 30-days from the receipt of this letter. Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

LILIAN ABREU
Digitally signed by LILIAN ABREU
Date: 2022.07.21 14:54:22 -07'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division

cc:   Holly Holbrook, AECOM
      Mark Riley, AECOM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

US EPA Letter
Feb 2023



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

December 6, 2022

Mr. Joshua Nandi                                                SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Vapor Intrusion Work Plan Addendum #3. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman Systems Corporation (Northrop Grumman) Vapor Intrusion Work Plan Addendum #3.  EPA requests the Addendum be revised to improve its readability and to address the following technical comments below:

1.  Edit the Addendum's main text to include a summary description of the standard operation procedures (SOP) for the activities to be performed (e.g., soil gas installation and sampling, indoor/outdoor air sampling, differential pressure monitoring) and include the SOPs as attachments (or clearly reference the SOP location in the document).

2.  Include an SOP for differential pressure monitoring and describe the associated QA/QC criteria. The monitoring should be performed over a period of one week and measurements recorded every five minutes.

3.  Add laboratory reporting limits to Table 1.

4.  Include a footnote in Table 1 to indicate that EPA will be notified immediately if indoor air results for TCE are above the accelerated response value of 7 $\mu g/m^3$ for commercial/industrial exposure and appropriate actions will be taken to confirm the results and implement mitigation measures.

5.  Include a table (Table 2) for soil gas screening levels and laboratory reporting limits.  Define the soil gas screening levels by using the indoor air levels for long-term exposure in Table 1 divided by the attenuation factor of 0.03.

6.  Include a summary of the QA/QC metrics (e.g., QA/QC criteria for duplicated samples).

7. Include additional long-term (seven days) indoor air sampling using passive samplers in four locations (IA-2, IA-3, IA-4, IA-7). Include one long-term outdoor air sampling. Include a summary and SOP for the long-term passive sampling.

8. Include one additional sub-slab sampling location (SS-12) for spatial coverage as indicated in the figure attached.

9. Move sampling location IA-2 to the cubicles next to SS-7 (pending building walk through).

10. Provide the sequence of activities.  EPA recommends the following sequence:
    1. Day Zero: Building walk through, check sub-slab ports and install SS-12
    2. Day 1: Start sampling
       a. Begin differential pressure monitoring at tree sub-slab ports SS-2, SS-7 and SS-10
       b. Start long-term passive indoor air sampling at four locations IA-2, IA-3, IA-4, and IA-7; and one outdoor location at HVAC intake.
    3. Day 2: One week after start of sampling on Day 1
       a. Start the 10-hour indoor air sampling with SUMMA™ canisters in all indoor air locations (IA-1 to IA-9), and one outdoor location at HVAC intake
       b. Stop and remove the differential pressure monitoring from sub-slab ports
       c. Perform the sub-slab sampling in all sub-slab locations

11. Include a statement that after data collection and evaluation is completed, reviewed, and approved by EPA, the sub-slab ports will be decommissioned, upon consultation and approval by EPA.

12. Include a statement that a report will be submitted to EPA within 30 days of receipt of the results from the laboratory.


EPA requests that Northrop Grumman provide a Revised Work Plan Addendum within 30-days from the receipt of this letter. Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

LILIAN ABREU
Digitally signed by LILIAN ABREU
Date: 2022.12.06 14:01:30 -08'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division


cc:   Holly Holbrook, AECOM
      Cynthia Woo, Aptim Federal Services, LLC



Include another SS around here for spatial coverage

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

## SECTION:

US EPA Letter
Feb 2023



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

February 7, 2023

Mr. Joshua Nandi                                             SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Revised Vapor Intrusion Work Plan Addendum #3. Former TRW**
**Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site**
**(CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman Systems Corporation (NGSC) Revised Vapor
Intrusion Work Plan Addendum #3, dated of February 2, 2023; and prepared by AECOM on behalf of
NGSC. The revised plan satisfactorily addressed EPA's comments provided in the letter dated of
December 6, 2022; and provided in the emails dated of January 20 and 23, 2023.

The revised plan is approved.  Please proceed with scheduling the field sampling event and coordinating
with EPA for oversight.

Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any
questions or comments.

Sincerely,     LILIAN     Digitally signed by
               ABREU      LILIAN ABREU
                          Date: 2023.02.07
                          19:10:30 -08'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division

cc:     Holly Holbrook, AECOM

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

August 31, 2023

Mr. Joshua Nandi                                    SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Vapor Intrusion Evaluation Report. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman Systems Corporation (NGSC) Vapor Intrusion Evaluation Report, dated of June 23, 2023; and prepared by AECOM on behalf of NGSC. The Report presents and evaluates the results of the field data collected during the investigation conducted at the Site between April 24, 2023, and May 5, 2023.

EPA agrees that, based on the results of the field data collected in this investigation, subsurface vapors of volatile organic compounds (VOCs) are not migrating into indoor air at levels above detection limits and there are no unacceptable human health risks for inhalation of indoor air from subsurface vapors at the Site under current building conditions.

Based on the data from this investigation, EPA further concludes that the building HVAC/ventilation system operations (resulting in positive building pressure) and the building slab are the major conditions preventing and mitigating vapor intrusion under the building's current conditions.

Although the field data results are usable and accepted by EPA, this Vapor Intrusion Evaluation Report (Report) is not acceptable as written and needs to be revised and resubmitted to EPA. The vapor intrusion evaluation in this report based on the Acetone concentration and calculated attenuation factor is fundamentally incorrect. Therefore, all the related discussion and evaluation should be deleted, and another evaluation presented that considers building pressure and slab condition.

EPA requests repeating this sampling event during the upcoming winter season to record the effects of the HVAC operating conditions and pressure cycling during a different season (targeting the late fall to early winter as the seasonal weather changes) to record information for a long-term stewardship planning.  This additional data can assist in the planning of institutional controls (e.g., inspect building slab, building use changes, HVAC/ventilation modification (e.g., addition of HVAC units or exhaust, rebalancing of the HVAC)) in the long-term stewardship.

From the report it appears that port SS7 was not found and therefore was not decommissioned.  For the long-term stewardship, this port shall be found and decommissioned.

A. <u>General Comments</u>

This Report neglected to discuss the pressure differential data in the context of the results, incorrectly indicated that the SVC system was effective in mitigating vapor intrusion, and erroneously presented a discussion on attenuation factor for Acetone, which is commonly found as background in indoor air of residences, industrial buildings, and laboratories. Each of these issues is discussed in more detail below.

    1. Pressure Differential Data

The Executive Summary and the report did not discuss the indoor air results in the context of the pressure differential data. In Section 2.4 the pressure differential is presented as average values. EPA recommends presenting the range of the diurnal variation of the actual readings of pressure differential, instead of average values. EPA checked the pressure differential data, and it shows the building indoor air is consistently under positive pressure in relation to the subslab soil gas, thereby inhibiting subsurface vapor migration into the building.

EPA concludes that the building HVAC/ventilation system operations (resulting in positive building pressure) and the building slab, are the major conditions preventing and mitigating vapor intrusion under the building current conditions.

    2. Effectiveness of Passive SVC System

The Report   states that the passive SVC system installed in 2015 is effective in mitigating vapor intrusion. Nevertheless, there is no data to support that this passive SVC system, as built, can sustain any measurable depressurization under this building slab. The data collected in 2015 for the VI pathway, demonstrated that there was no unacceptable risk from vapor intrusion after tenant improvements were completed and all penetrations of the slab were re-sealed. Therefore, a reasonable conclusion is that the tenant improvements and sealing of penetrations were effective in mitigating vapor intrusion. Please remove all statements from this report about the effectiveness/protectiveness of the passive SVC system.

EPA considers the primary benefit of the installed SVC system as being that it can be made active if needed. The data also helps to provide evidence that exhaust from the SVC is not impacting the building's ventilation system / roof intakes. The current field data results indicated that activation of the SVC system into an active SSD (subslab depressurization) system is not required at this time, because the building slab and building HVAC/ventilation system are effectively preventing and mitigating vapor intrusion.

Accordingly, please delete from this report the following statement:
- "Note that the installation of the passive SVC system effectively increases the attenuation of sub-slab vapors between the building foundation and indoor air by perhaps one to two orders of magnitude".

There is no data collected associated with this passive SVC system (e.g., capacity of promoting subslab depressurization, air velocity, air flow and air concentration through vent riser) to support this statement and, as stated above, there were other lines of evidence that prevented/mitigated the vapor intrusion into this building.

2

3.   Acetone Analysis

The Pathway Analysis presented in Section 3.1 focused on Acetone, and it was fundamentally incorrect as described below.

Acetone is a common background chemical in indoor air, outdoor and lab environments. This Report focused on discussing Acetone when TCE/PCE already indicated no vapor intrusion is occuring.  The Report focused on a compound (Acetone) that is not a chemical of concern, is commonly found as background, has no vapor intrusion screening levels nor a project action level, and was detected in very low concentration (25 ug/m3).  As a reference, below are the available exposure limits for Acetone:

- OSHA: The legal airborne permissible exposure limit (PEL) is 2,400,000 ug/m3 averaged over an 8-hour work shift.
- NIOSH: The recommended airborne exposure limit (REL) is 590,000 ug/m3 averaged over a 10-hour work shift.

The vapor intrusion evaluation should be focused on the detected compounds in the subsurface with the highest concentrations and highest frequency of detection, and the COC for the site, particularly TCE, PCE. Once a determination is made if vapor intrusion (VI) is occuring or is not occurring, based on the detected compounds with highest concentrations in the subsurface, any of the other detected compounds may be evaluated accordingly.

The soil gas is a mixture of chemical compounds. If VI is not occuring for one compound with the highest concentration in the mixture (e.g., TCE), then VI is not occuring for any of the other compounds of the mixture. On the other hand, if VI is occuring, then the compound concentration ratios in the soil gas mixture should be similar to the concentration ratios of those compounds in the indoor air.

Please remove the following statement on page 10. It is fundamentally incorrect and is not how VI is evaluated:

- Acetone was the only chemical detected in all media. Acetone was not detected in sub-slab soil vapor at SS-7R indicating the concentration in indoor air at IA-2 was not likely due to VI. Co-located samples SS-10/IA-3 reported detections of acetone; thus, a location-specific attenuation factor was calculated (7.1 microgram per cubic meter [$\mu$g/m3] in indoor air / 25 $\mu$g/m3 in sub-slab soil vapor = 0.28). This attenuation factor (0.28) is approximately nine times greater than the USEPA default value (0.03), indicating that the source of acetone in indoor air is unlikely the result of VI.

Acetone is a common indoor air contaminant, and this type of evaluation is misleading and unnecessary. If this was a site COC, that is not a common indoor air contaminant, it would be fundamentally incorrect to conclude that if the location specific attenuation factor is greater than the EPA default value this would be an indication of indoor air sources. If a site-specific (location specific) attenuation factor is greater than the EPA default value, all it indicates is that the EPA default value was not conservative enough to predict the site-specific attenuation.
An attenuation factor can be as high as 1, and the value of 1 indicates that there is no attenuation.  If a location specific attenuation factor is greater than 1, that may indicate an indoor air source or the existence of another subsurface source or preferential pathway that were not identified.

B. <u>Specific Comments</u>

Revise Executive summary to:

- Delete the sentence: "The passive Sub-Slab Vapor Collection (SVC) system below the existing site building is effectively mitigating the VI pathway."
- Include "at this time" after "no further sampling is warranted."
- Discuss the indoor air results under the context of the pressure differential data.
- Include discussion on long-term stewardship.
- Clarify what institutional controls are in place to assure that sampling is performed if changes in building conditions occurs in the future that could affect the vapor intrusion pathway.

Page 1, Delete the following sentences:
- As noted in Section 1.1, previous VI sampling events in May and December of 2015 have established that the passive Sub-Slab Vapor Collection (SVC) system is protective of human health.
- Evaluations have determined that the SVC system is effectively mitigating the VI pathway.

Page 3, Activity 3 is missing the following:
- deployed outdoor air sampling equipment (Radiello samplers) near the HVAC intake on the roof top for 7-day sampling duration.

Page 3, Activity 3 and 4, correct the subslab ID, replace SS-7 by SS-7R, in the following sentences:
- Deployed differential pressure recorders at SS-2, SS-7, and SS-10 for continuous monitoring…
- Stopped and removed differential pressure monitoring equipment from SS-2, SS-7, and SS-10.
Note that subslab ID SS-7 was not located and another port was installed with ID SS-7R.

Page 4, Port ID SS-7 was not located and therefore was not demolished. Please remove it from the list in following sentence:
- Demolished new and existing sub-slab sample probes (SS-2, SS-3, SS-4, SS-5, SS-7, SS-7R, SS-10, and SS-12).
If port ID SS-7 was later located and demolished, further discussion of SS-7 should be added to the report, including photo.

Revise Figure 4 to indicate SS-7 was not located therefore it was not demolished.

Page 4, Delete or edit the following sentence:
- Temperature readings were not used for any type of evaluation or data interpretation.
As noted above, temperature was used by the laboratory for the Radiello sampling results.

Page 4.  Indicate in section 2.1 and Figure 4, that location IA-7 was moved closer to the SS-2 location.

Pg. 4. This report stated that:
- "temperature readings were not collected" and "Temperature readings were not used for any typc of cvaluation or data intcrprctation."
This statement shall be deleted or edited to discuss the missing temperature readings, or the temperature information can still be gathered from the building HVAC set point for indoor air temperature.

Temperature is used by the laboratory to quantify sample results from Radiello samplers.  The laboratory report and chain of custody (COCs) for the Radiello samples were missing from this report. It was provided later upon EPA request.  The laboratory assumed a standard temperature (25 degrees Celsius, 77 degrees Fahrenheit) to determine the Radiello sample results. As building temperatures are normally set in the range of 68 – 78 degrees Fahrenheit, and the conditions of the building during sampling were consistent with this temperature range, EPA accepted the data results from the Radiello samples as usable but recommends that the HVAC temperature set for the indoor air be recorded in any future sampling.

Page 6, Section 2.4.2.1, the text is confusing and not accurate and needs editorial revision. Shut-in test is performed first, then a leak test is performed during purging and during sampling. For the leak test during purging a purged volume of 300 ml was adopted to have enough air (soil gas) for a helium detector reading.

Page 7. Section 2.4.2.2, text is not accurate, needs editorial revision. A fixed volume of 300 ml was adopted for purging to get enough volume for the helium detector reading.

Page 8. Section 5. Following sentence shall state Modified Method TO-17
- samples collected via Radiello® sampler were analyzed for VOCs using USEPA Method TO-17.

Page 9. Section 3.1 It is stated:
- Co-located sub-slab soil vapor and indoor air samples were collected at locations SS-7R/IA-2 and SS-10/IA-3.
There are other collocated sample locations not referenced: SS-2/IA-7 and SS-5/IA-6

Page 9. Section 3.1. The following sentence is fundamentally incorrect and should be deleted:
- An attenuation factor greater than the default is indicative of an indoor source of chemicals.
If a site-specific (location specific) attenuation factor is greater than the EPA default value, all it indicates is that the EPA default value was not conservative enough to predict the site-specific attenuation.

Page 10. There is no fundamental basis for the following statement, which should be deleted:
- Note that the installation of the passive SVC system effectively increases the attenuation of sub-slab vapors between the building foundation and indoor air by perhaps one to two orders of magnitude,

Page 11. Section 3.2.5. There is no evidence to fundamentally support the following statement:
- The passive SVC system is designed to collect vapors below the building slab and vent to the atmosphere as a protective measure against any current or future vapor intrusion…health risk should the SVC system be removed from service.
As stated above, there is no evidence that support the passive SVC as the major factor mitigating VI. The slab condition and the building positive pressure are the major mitigation factors.

Page 12, second paragraph, replace "should the SVC system be non-operational" by "should building be underpressurized relative to soil gas".

Page 12. Section 4.1.  Replace the text "presence of the passive SVC system" by "building pressurization and slab condition".

Page 12 Section 4.2.1 edit the following sentence to indicate "represents a different operating condition scenario":

- The HVAC system was running throughout sample collection. Previous sampling events were conducted with the HVAC system off which represents a worst-case scenario for VI.

There is no evidence that HVAC system off is always the worst-case scenario for VI. HVAC system off represent just a different operating condition.  If a building occupancy under normal operating conditions is with HVAC system on, that is the condition representing the exposure scenario. Revise the above statement accordingly.

Page 13 section 4.3, Include "at this time" after "no further sampling is warranted".

Table 2. Define what negative pressure means.

Table 3. Include the historical TCE/PCE results for comparison.

Based on the comments above, please revise and resubmit the Report within 30 days from the date of this letter.  While this Report is being revised, please proceed with scheduling the requested second sampling event to capture seasonal changes and coordinate with EPA for oversight.

Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

LILIAN ABREU

Digitally signed by LILIAN ABREU
Date: 2023.08.31 16:24:50 -07'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division

cc:     Holly Holbrook, AECOM

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

US EPA Page for Site as of March 2021

The EPA web page you have selected may be temporarily unavailable on Monday March 22, 2021 starting at 9pm Eastern Time (ET). We apologize for any inconvenience this may cause.



# TRW MICROWAVE, INC (BUILDING 825) SUNNYVALE, CA

# Health & Environment

<u>Sign up</u> for this Superfund site's mailing list

**On this page:**

- <u>What Are the Risks at the Site?</u>
- <u>Contaminant Information</u>
- <u>Performance Measures</u>

## What Are the Risks at the Site?

A vapor intrusion investigation conducted at the building at the TRW Site in 2013 (which was unfinished and unoccupied at the time), indicated that vapor intrusion into the building was occurring. Vapor intrusion is a process whereby vapors from contaminated groundwater move upward through the soil and enter the indoor air of nearby buildings. Additional investigation and mitigation work were completed in 2014 to address the vapor intrusion risks, and included the removal of impacted soil and groundwater beneath the building, installation of a building subslab vapor system as a precautionary measure, and sealing of the floor slab during the building remodel that was conducted prior to occupancy by the new/current tenants. A subsequent vapor intrusion investigation conducted in the building in 2015 indicated that vapor intrusion has been successfully mitigated and indoor air concentrations have been reduced to levels that EPA considers protective of human health.

EPA began indoor air sampling in the residential neighborhood adjacent to the Site, which overlies the TCE groundwater plume, in late 2015. More than 250 buildings have been sampled to date, and twenty mitigation systems have been installed in residences and classrooms to prevent unacceptable levels of TCE vapors from accumulating indoors.

Groundwater beneath the site has been contaminated by various Volatile Organic Compounds (VOCs), primarily trichloroethene (TCE). However, institutional controls are in place to ensure that no one can ingest or come in direct contact with contaminated groundwater. Drinking water is not affected by the contamination. Drinking water in this area comes from the Hetch Hetchy Reservoir in the Sierra Nevada Mountains, and is regularly tested to ensure that it meets all applicable state and federal requirements. Municipal wells for the cities of Santa Clara and Mountain View tap a deep aquifer as a drinking water source that has not been affected by the contamination.

## Contaminant Information

The main contaminant of concern at the TRW Site is trichloroethene (TCE). More information about TCE can be found at this website: http://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=172&tid=30

View a full list of contaminants of concern for this site.

## Performance Measures

EPA uses performance measures to track environmental results at Superfund sites. If you have any questions or concerns about the measures at this site, please contact the site team members listed under Site Contacts.

Read more about Superfund Remedial Performance Measures.

| Performance Measure | Status at this Superfund Site | What does this mean? |
|---|---|---|
| Human | | **Yes** means assessments indicate that across the entire site:<br><br>1. There are currently no unacceptable human exposure pathways; and<br>2. EPA has determined the site is under control for human exposure.<br><br>**No** means an unsafe level of contamination has been detected at the site and a reasonable expectation exists that people could be exposed. |

| Exposure Under Control | <u>No</u> | **Insufficient data** means that, due to uncertainty regarding exposures, one cannot draw conclusions as to whether human exposures are controlled, typically because:<br><br>1. Response to the contamination has not begun; or<br>2. The response has begun, but it has not yet generated information sufficiently reliable to evaluate whether there are currently any unacceptable human exposure pathways at the site. |
|---|---|---|
| Groundwater Migration Under Control | Yes | **Yes** means EPA reviewed all information on known and reasonably expected groundwater contamination. EPA concluded the migration of contaminated groundwater is stabilized and there is no unacceptable discharge to surface water. EPA will conduct monitoring to confirm that affected groundwater remains in the original area of contamination.<br><br>**No** means EPA has reviewed all information on known and reasonably expected groundwater contamination, and the migration of contaminated groundwater is not stabilized.<br><br>**Insufficient data** means that due to uncertainty regarding contaminated groundwater migration, EPA cannot draw conclusions as to whether the migration of contaminated groundwater is stabilized. |
| Construction Complete | Yes | **Yes** means the physical construction of the cleanup is complete for the **entire site**.<br><br>**No** means either physical construction is not complete or actions are still needed to address contamination. |
| Sitewide Ready for Anticipated Use | No | **Yes** means:<br><br>1. All cleanup goals affecting current and reasonably anticipated future land uses of the entire site have been achieved, so there are no unacceptable risks;<br>2. All required land-use restrictions or other controls have been put in place; and<br>3. The site has achieved Construction Complete status.<br><br>**No** means that one or more of these three criteria have **not** been met. However, a site listed as **no** may still have redevelopment occurring on portions of the site and may be eligible for additional redevelopment. |

Case 3:23-cv-04597-EMC   Document 35-2   Filed 12/25/23   Page 38 of 97

3/22/21, 3:57 PM

MARCH 22, 2021

Case 3:23-cv-04597-EMC   Document 35-2   Filed 12/25/23   Page 39 of 97
3/22/21, 3:57 PM

The EPA web page you have selected may be temporarily unavailable on Monday March 22, 2021 starting at 9pm Eastern Time (ET). We apologize for any inconvenience this may cause.

 United States Environmental Protection Agency

# TRW MICROWAVE, INC (BUILDING 825) SUNNYVALE, CA

# Contaminant List

Sign up for this Superfund site's mailing list

EPA has identified the chemical substances (i.e., hazardous substances, pollutants or contaminants) listed below as contaminants of concern (COCs) for the site. COCs are the chemical substances found at the site that EPA has determined pose an unacceptable risk to human health or the environment. These are the substances evaluated by EPA to be addressed by cleanup actions at the site.

To identify COCs, EPA:

- Identifies people and ecological resources that could be exposed to contamination found at the site;
- Determines the amount and type of contaminants present; and
- Determines the human health or ecological effects that could result from contact with the contaminants.

The list of COCs provided below come from EPA's remedy decisions for this site. This list may not reflect a modification to these decisions that removes a contaminant from the COC list. Also, after the decision, a COC may have been cleaned up. The COCs are displayed for the OU numbers indicated in the original decision document. OU numbers may change over time.

EPA is working to improve data quality. The information presented on this page is undergoing review for accuracy and completeness, and may be subject to change.

The following ATSDR Profile links exit the site    EXIT

| Contaminant Name | Contaminated Media | Area of Site Found (Operable Unit) | More Information | CAS # |
|---|---|---|---|---|
| 1,1,1-TRICHLOROETHANE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 71-55-6 |
| 1,1,2-TRICHLORO-1,2,2-TRIFLUOROETHANE | Groundwater | OVERALL SITE (01) | | 76-13-1 |
| 1,1-DICHLOROETHANE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 75-34-3 |
| 1,1-DICHLOROETHENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 75-35-4 |
| 1,2-DICHLOROBENZENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 95-50-1 |
| CHLOROETHENE (VINYL CHLORIDE) | Groundwater | OVERALL SITE (01) | ATSDR Profile | 75-01-4 |
| CIS-1,2-DICHLOROETHENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 156-59-2 |
| TETRACHLOROETHENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 127-18-4 |
| TRANS-1,2-DICHLOROETHENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 156-60-5 |
| TRICHLOROETHENE | Groundwater | OVERALL SITE (01) | ATSDR Profile | 79-01-6 |

## About CAS #

Chemical Abstracts Service (CAS) is a division of the American Chemical Society. CAS builds and maintains the largest and most current database of chemical substance information in the world. These chemical substances are labeled with CAS Registry Numbers® (CASRNs or CAS Numbers) and are used internationally as unique numeric identifiers for a single substance. They have no chemical significance and, because they are widely used, are a link to a wealth of information about a specific chemical substance. They are provided here for reference purposes to hopefully aide you in researching the respective chemical. For more information, visit the CAS Web site.  EXIT

## About ATSDR

The Agency for Toxic Substances and Disease Registry (ATSDR) is an agency of the U.S. Department of

3/22/21, 3:57 PM

Health and Human Services. ATSDR is charged under the Superfund law (CERCLA) to assess the presence and nature of health hazards at specific Superfund sites, to help prevent or reduce further exposure and the illnesses that result from such exposures, and to expand the knowledge base about health effects from exposure to hazardous substances. ATSDR maintains a series of fact sheets and profiles about contaminants of concern commonly found at Superfund sites. Links to these resources are provided above when available. For more information, visit the ATSDR Web site.   EXIT

## About EPA's IRIS

The Integrated Risk Information System (IRIS), prepared and maintained by the U.S. Environmental Protection Agency (U.S. EPA), is an electronic database containing information on human health effects that may result from exposure to various chemicals in the environment. IRIS was initially developed for EPA staff in response to a growing demand for consistent information on chemical substances for use in risk assessments, decision-making and regulatory activities. The information in IRIS is intended for those without extensive training in toxicology, but with some knowledge of health sciences. For more information, visit the EPA IRIS Web site.

## About EPA's SRS

The Substance Registry System (SRS) is the Environmental Protection Agency's (EPA) central system for information about regulated and monitored substances. The system provides a common basis for identification of chemicals, biological organisms, and other substances listed in EPA regulations and data systems, as well as substances of interest from other sources, such as publications. The system does not provide health hazard information at this time. For more information, visit the EPA SRS Web site.

MARCH 22, 2021

The EPA web page you have selected may be temporarily unavailable on Monday March 22, 2021 starting at 9pm Eastern Time (ET). We apologize for any inconvenience this may cause.



# TRW MICROWAVE, INC (BUILDING 825) SUNNYVALE, CA

## Cleanup Activities

Sign up for this Superfund site's mailing list

**On this page:**

- Background
- What Has Been Done to Clean Up the Site?
- What Is the Current Site Status?
- Emergency Response and Removal

**On related pages:**

- Operable Units
- Cleanup Progress

## Background

The TRW Microwave, Inc. (Building 825) site is one of three sites contributing contamination to a groundwater plume in Sunnyvale, California. Former microwave manufacturing and semiconductor processing activities contaminated groundwater and soil with volatile organic compounds (VOCs).

The former TRW Microwave Superfund Site (TRW Site), part of the "Triple Site" in Sunnyvale, California, is located at 825 Stewart Drive and neighbors multiple other sites, including: the Advanced Micro Devices (AMD) Buildings 901/902 Thompson Place Superfund Site (AMD 901/902 Site), the AMD 915 De Guigne Drive Superfund Site (AMD 915 Site), the Philips Semiconductors Site (Philips Site; formerly Signetics Inc.), which includes the properties at 811 Arques Avenue, 440 North Wolfe Road, and facilities along Stewart Drive, and the Mohawk Laboratories Site. A groundwater plume composed of volatile organic compounds (VOCs), including trichloroethene (TCE), extends from these sites more than a mile north in Sunnyvale to beyond Highway 101.

The TRW Site, together with three other operable units (OUs), was covered by a 1991 Record of Decision for the Triple Site, all located in Sunnyvale. The four OUs for the Triple Site are as follows:

(1) The AMD 901/902 Site OU;
(2) The Philips Site OU;
(3) The TRW Site OU; and
(4) The Companies Offsite Operable Unit (OOU), a commingled plume of contaminants which originated from the other three operable units (and has contributions from other sites in the area).

At the time of adoption of the 1991 Record of Decision, the OOU was defined as a 100-acre area, downgradient and north of the Triple Site in an area bounded by the Sunnyvale East Drainage Channel on the west and Santa Paula Ave. on the east, and as the area inside a 5 micrograms per liter ($\mu$g/L) contour for trichloroethene (TCE) in groundwater. Over 400 residences and at least 4 schools are present within the OOU.

The TRW Site was occupied by Aertech Industries from 1968 until it was sold to TRW Inc (TRW) in 1974. In 1987, TRW sold the facility to FEI Microwave, Inc. In 1993, FEI Microwave stopped production and in 1995 the site was acquired by Stewart Associates and leased to research and development companies until 2001. The exterior of the building was remodeled between 2001 and 2003, including demolition of part of the existing structure and construction of a new two-story building. In December 2002, TRW merged with Northrop Grumman. In 2004, the property was purchased by Pacific Landmark, and then by Hines in 2014 and then GI Partners, the current owner, in 2016. During these changes in site ownership, TRW and then Northrop Grumman retained responsibility for site cleanup.

The primary activity at the TRW Site was assembling and testing microwave components until semiconductor processing began in 1970. Primarily solvents and small quantities of acids were used in the assembly areas for semiconductors. Solvents, acids, and heavy metals were used in the fabrication areas and plating shop. The paint shop used paints and solvents.

Acid rinse water generated by the assembly processes was neutralized on-site and discharged to the City of Sunnyvale sewer system. An underground ammonia gas acid neutralization system was installed when the facility first opened. Floor drains and acid sinks in the plating shop were connected to buried plumbing that carried acid waste to the neutralization system. This system was closed in 1986, and the underground piping was sealed. The system was replaced with three aboveground tanks. Spent solvents were stored in one of four on-site underground tanks. After 1982, solvents were stored in drums and transported off-site.

Case 3:23-cv-04597-EMC   Document 35-2   Filed 12/25/23   Page 44 of 97

## What Has Been Done to Clean Up the Site?

Initial Actions

Four spent solvent underground tanks, along with some soil, were removed in 1973, 1976, 1980, and 1983. In 1984, 120 cubic yards of contaminated soil were excavated and transported to an EPA-approved hazardous waste facility. The site was backfilled to the surface with gravel and concrete was poured over the gravel to prevent rainwater from seeping into the pit. TRW installed and operated a soil vapor extraction (SVE) system in the vicinity of the former source area excavation from 1993 to 1998. Testing indicated that no further soil remediation was necessary and the SVE system was removed in 1998.

The gravel pit created during the initial source area excavations became part of a groundwater extraction system operated by TRW between 1985 and 2001 to clean up the on-site groundwater and prevent VOCs from migrating off-site. Extracted groundwater was treated by an air stripper and then discharged to Calabasas Creek. In 2000 and 2001, pumps in the groundwater extraction wells were turned off to allow for initiation of enhanced anaerobic bioremediation (EAB) in the former site source area. Based on groundwater testing that showed improved groundwater conditions, the groundwater extraction system was shut down.

Cleanup Ongoing

EAB was initially implemented in 2000 and has been ongoing in an effort to reduce contaminant concentrations at the TRW Site. Multiple injections of different EAB substrates have been performed in and immediately downgradient of the former site source area since 2000.

In 1984, the State issued an order requiring AMD, Philips, and TRW to develop a joint plan to prevent further migration of contaminants. New orders in 1989 required TRW to submit an investigation and proposed cleanup plan with AMD and Philips. In 1991, the State and EPA issued a combined Record of Decision for TRW and the surrounding AMD and Philips sites. The companies installed off-site extraction wells to prevent migration of the VOC-impacted groundwater north of Highway 101. The extracted groundwater is treated at the Philips on-site treatment system.

The TRW Site, together with the AMD 901/902 Thompson Place Site and the Philips (formerly Signetics) Site, were transferred back to EPA from the State of California in August 2014. Since that time EPA has been overseeing the ongoing environmental investigation and cleanup activities at the Site.

## What Is the Current Site Status?

Cleanup Results to Date

The removal of tanks and contaminated soil have reduced the potential for exposure to contaminated materials at the TRW Site. Groundwater extraction and subsequent bioremediation activities have significantly reduced and/or eliminated pollutants in groundwater at the site, and ongoing groundwater

sampling indicates that bioremediation processes are continuing to have a beneficial effect.

EPA's fourth Five-Year Review was completed in 2014, reviewing the protectiveness of the remedy at the TRW Site and the adjacent residential neighborhood – the "Offsite Operable Unit" or "OOU." The OOU extends north from the TRW Site (and adjacent AMD and Philips sites) and encompasses an area of about 100 acres. The area includes four schools and over 400 residential properties.

The fourth Five-Year Review concluded that the remedy at the TRW Site currently protects human health and the environment because exposure pathways for soil and groundwater are being controlled. Exposure pathways to contaminated groundwater that could result in unacceptable risks are prevented through an environmental covenant. The risk due to vapor intrusion at the TRW Site is also being controlled by successful mitigation efforts that have eliminated exposure pathways to contaminated subsurface vapors.

However, in order for the remedy to be protective in the long-term, EPA's Record of Decision will need to be amended to reflect a revised final soil and groundwater remedy for the site, since the remedy selected in the Record of Decision (groundwater extraction) is no longer operating. EPA also recommended the following: (1) adding source area and down-gradient B3 zone wells to the suite of annual monitoring wells, to more fully characterize groundwater contamination in the source area and down-gradient B3 zone; and (2) investigating and implementing optimization options for the in-situ bioremediation work, to better capture contaminants that are migrating offsite.

The first recommendation was addressed on March 1, 2016, when EPA approved a Technical Memorandum prepared by Northrop Grumman Systems Corporation, which recommended re-designating a previously mischaracterized B2 zone monitoring well (well T-9C) to a B3 zone well to be monitored annually moving forward. EPA also approved a recommendation in the Technical Memorandum to not require adding source area wells, which would create potential vapor intrusion pathways into the on-site building.

Additionally, the Five-Year Review concluded that a protectiveness determination of the remedy at the OOU cannot be made until further information is obtained from the OOU area. Vapor intrusion assessments must be conducted to determine if indoor air pathways are complete. If unacceptable levels are encountered in a particular building, mitigation plans will be implemented to ensure that levels of VOCs in indoor air are protective of human health.

EPA began indoor air sampling in the adjacent neighborhood in late 2015 and has sampled over 250 homes and classrooms, certain of which have showed unacceptable levels of TCE vapor intrusion. Twenty mitigation systems in residences and school buildings have been installed, and outreach and sampling continues.

## Emergency Response and Removal

Removal actions, or short-term cleanups, included the removal of four spent solvent underground tanks, excavation and transport of contaminated soils, backfilling of excavated areas and pouring of concrete over the backfilled area for waterproofing. Since 1985, seven on-site extraction wells have prevented VOCs from

Case 3:23-cv-04597-EMC   Document 35-2   Filed 12/25/23   Page 46 of 97

migrating off site. An air stripper treats groundwater before treated water is discharged to Calabasas Creek.

MARCH 22, 2021

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

## SECTION:

CalEPA Page for Site as of
March 2021



STATE WATER RESOURCES CONTROL BOARD
# GeoTracker

|  | Tools | Reports | UST Case Closures | Information |  |

---

**TRW MICROWAVE (SL721251223)** - **(MAP)**                          SIGN UP FOR EMAIL ALERTS

825 STEWART DRIVE
SUNNYVALE, CA  94086
SANTA CLARA COUNTY
*CLEANUP PROGRAM SITE* (INFO)
*OPEN - REMEDIATION AS OF 7/2/1985* - *DEFINITION*
PRINTABLE CASE SUMMARY / CSM REPORT

**CLEANUP OVERSIGHT AGENCIES**
US ENVIRONMENTAL PROTECTION AGENCY *(LEAD)* - *CASE #: 2020398*
    *CASEWORKER:* MELANIE MORASH
SAN FRANCISCO BAY RWQCB (REGION 2) - *CASE #: 43S1005, 43S0125*

Summary    Cleanup Action Report    Regulatory Activities    Environmental Data (ESI)    Site Maps / Documents    Community Involvement

### Regulatory Profile                                        **PRINTABLE CASE SUMMARY**

**CLEANUP STATUS** - DEFINITIONS
**OPEN - REMEDIATION AS OF 7/2/1985** -  CLEANUP STATUS HISTORY

**POTENTIAL CONTAMINANTS OF CONCERN**           **POTENTIAL MEDIA OF CONCERN**
PCE, TCE                                        OTHER GROUNDWATER (USES OTHER THAN DRINKING WATER)

**FILE LOCATION**                               **DESIGNATED GROUNDWATER BENEFICIAL USE(S)** - DEFINITIONS
REGIONAL BOARD                                  MUN, AGR, IND, PROC

**DWR GROUNDWATER SUB-BASIN NAME**              **CALWATER WATERSHED NAME**
Santa Clara Valley - Santa Clara (2-009.02)     Santa Clara - Palo Alto (205.50)

---

### Deed Restrictions / Land Use Restrictions / Covenants

| | DATE RECORDED | SITE MANAGEMENT REQUIREMENTS |
|---|---|---|
| [VIEW COVENANT] | 8/10/1992 | ACTIVITIES PROHIBITED WHICH DISTURB THE REMEDY AND MONITORING SYSTEMS WITHOUT APPROVAL, DAY CARE CENTER PROHIBITED, ELDER CARE CENTER PROHIBITED, HOSPITAL USE PROHIBITED, LAND USE COVENANT, MAINTAIN MONITORING OF GROUNDWATER, NO GROUNDWATER EXTRACTION AT ANY DEPTH WITHOUT APPROVAL, NOTIFY DAMAGES TO REMEDY AND MONITORING SYSTEMS UPON DISCOVERY, NOTIFY PRIOR TO SUBSURFACE WORK, ONLY EXTRACTION OF GROUNDWATER FOR SITE REMEDIATION PERMITTED, RAISING OF FOOD PROHIBITED, RESIDENCE USE PROHIBITED |

---

### Post Closure Site Management Requirements

ACTIVITIES PROHIBITED WHICH DISTURB THE REMEDY AND MONITORING SYSTEMS WITHOUT APPROVAL

DAY CARE CENTER PROHIBITED

ELDER CARE CENTER PROHIBITED

HOSPITAL USE PROHIBITED

LAND USE COVENANT

MAINTAIN MONITORING OF GROUNDWATER

NO GROUNDWATER EXTRACTION AT ANY DEPTH WITHOUT APPROVAL

NOTIFY DAMAGES TO REMEDY AND MONITORING SYSTEMS UPON DISCOVERY

NOTIFY PRIOR TO SUBSURFACE WORK

ONLY EXTRACTION OF GROUNDWATER FOR SITE REMEDIATION PERMITTED

RAISING OF FOOD PROHIBITED

RESIDENCE USE PROHIBITED

---

### Site History

The oversight of this case was transferred from the Regional Water Board to the US EPA Region 9 on August 7, 2014. The US EPA Remediation project Manager is Ms. Melanie Morash. Her telephone number is (415) 972-3050, and her e-mail address is morash.melanie@epa.gov.


Background

The site is located at 825 Stewart Drive near the intersection of Wolfe Road and Arques Avenue in Sunnyvale. Land use in the area is mixed, predominantly consisting of industrial/commercial properties, as well as an adjacent private school, and homes farther to the north. From 1968 to 1974, Aertech Industries (Aertech) assembled and tested microwave and semiconductor components at the site. In 1974, TRW Inc. (TRW) acquired the site from Aertech and in 1987 FEI Microwave bought the site from TRW.

In December 2002, TRW merged with Northrop Grumman Corporation and changed its name to Northrop Grumman Space & Mission Systems Corp. (Northrop Grumman). In 2004, the property was purchased by Pacific Landmark. Northrop Grumman remains responsible for site investigation and cleanup.

During operations at the site between 1968 and 1993, trichloroethene (TCE) and several other industrial solvents, composed mainly of TCE, was stored in an underground storage tank (UST) on the site from 1970 until 1982. The Water Board is the lead regulatory agency overseeing soil and groundwater investigation and cleanup activities at this Site.

Site Investigation
In 1983, TRW initiated an investigation of potential soil and groundwater contamination at the site. Also that year, the UST was removed and soil in the immediate area was excavated and hauled off site. Between 1983 and 1986, several subsurface investigations conducted in the vicinity of the former UST location and associated piping revealed elevated levels of solvents, including TCE, in the groundwater and identified the former UST location as the only site source of those solvents. A comprehensive soil investigation was conducted in 1988 to delineate the extent of soil contamination in the area of the former UST.

Contamination from two other nearby VOC release sites (the former AMD site at 901/902 Thompson Place and the Philips site at 811East Arques Avenue) have commingled with the TRW plume. The commingled plume extends north to U.S. Highway 101, west to San Juan Drive and east to San Miguel Avenue. The commingled plume is managed as �The Companies Offsite Operable Unit.�

Shallow groundwater beneath the site is not currently used for drinking. The City of Sunnyvale supplies drinking water to the site and its vicinity.

Site Cleanup Activity
In 1984, TRW excavated approximately 120 additional cubic yards of soil that had not been removed when the UST was removed in 1983. In 1985, TRW implemented a groundwater extraction and treatment system to reduce groundwater solvent concentrations and maintain hydraulic control of the groundwater plume to prevent it from migrating to other parts of the site or off site.

Extracted groundwater was treated on site via an air stripper to remove solvents. Treated groundwater was discharged to the storm drain under a Water Board discharge permit. The system operated through 2001. About 92.5 million gallons of groundwater was extracted and about 3,100 pounds of TCE was removed.

In 1993, TRW installed a soil vapor extraction (SVE) system to remove solvents from the onsite soil. Following Water Board approval, the SVE system was shut down in 1996, as the cleanup goal for soil had been met.

In 1999, TRW determined that the groundwater extraction and treatment system was no longer effectively removing solvent mass from the subsurface. TRW implemented an enhanced anaerobic biodegradation (EAB) treatment at the site in October 2000 into the affected groundwater at the former UST location.

The intent of the EAB treatment was to increase the natural biodegradation rate of TCE to harmless byproducts. EAB treatment involves injection of nutrients for the naturally occurring microbes in subsurface soil and groundwater to produce hydrogen which breaks down TCE into non-toxic or harmless byproducts.

Since the EAB treatment began, the rate of TCE degradation has dramatically increased in all wells within the application area. TCE has been reduced by 99% within the source area, such that TCE levels within the source area are now lower than in up-gradient site boundary wells. Based on the success of the EAB treatment and the high rate of natural attenuation occurring at the site, the Water Board approved complete shut down of the groundwater extraction and treatment system in late 2001. Based on the initial EAB success, the EAB treatment area was expanded in 2005 to include additional site groundwater down-gradient of the former source area.

Next Steps
Northrop Grumman will continue monitoring the effectiveness of the EAB treatment, as measured by the ongoing increased biodegradation rate of TCE and its degradation products, and will also continue monitoring overall site groundwater quality into foreseeable future until Water Board-established cleanup standards for this site are met.

Water Board Oversight Process
The Water Board oversees more than 3,000 site cleanup cases in the Bay Area, including more than 2,000 leaking fuel tank cases. Water Board staff direct investigation or cleanup work and set cleanup standards under Water Code authority. Responsible parties (e.g., past operators) propose specific measures, perform the actual work, and submit technical reports documenting task completion.

As part of this process, we circulate key documents, such as draft cleanup plans, to interested persons and provide an opportunity for comment on these documents. Interested persons include other agencies, local officials, non-profit organizations, and interested landowners and residents/occupants in the site vicinity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

## SECTION:

2014 PPPR Letter





EDMUND G. BROWN JR.
GOVERNOR

MATTHEW RODRIGUEZ
SECRETARY FOR
ENVIRONMENTAL PROTECTION

**San Francisco Bay Regional Water Quality Control Board**

April 29, 2014
File No. 43S1005 (MS)

825 Stewart Acquisitions Partners LLC
c/o Hines
Attention: Thomas Kruggel (Thomas.Kruggel@Hines.com)
101 California Street, Suite 1000
San Francisco, CA 94111

c/o Hines
Attention: Shawn Hardy (Shawn.Hardy@Hines.com)
2479 East Bayshore Road, Suite 265
Palo Alto, CA  94303

SUBJECT:     Status of Property at 825 Stewart Drive, Sunnyvale, Santa Clara County

Dear Mr. Kruggel and Mr. Hardy:

825 Stewart Acquisitions Partners, LLC (Prospective Purchaser) has informed the Regional
Water Board that it intends to purchase the property located at 825 Stewart Drive in Sunnyvale
(Site). Since 1983, the Regional Water Board has been the lead agency in connection with the
investigation and remediation of soil and groundwater contamination at the Site. From 1970 to
1974, Aertech Industries (Aertech) assembled and tested microwave and semiconductor
components at the Site. In 1974, TRW Inc. (TRW) acquired the Site from Aertech and in 1987
FEI Microwave bought the Site from TRW. During operations at the Site between 1970 and
1993, trichloroethene (TCE) and several other industrial solvents, composed mainly of TCE were
used at the Site. TCE was stored in an underground storage tank (UST) on the Site from 1970
until 1982. In December 2002, TRW merged with Northrop Grumman Corporation (Northrop
Grumman). In 2004, the Site was purchased by Pacific Landmark, LLC, which is now under
contract to sell the Site to the Prospective Purchaser. Northrop Grumman remains responsible for
site investigation and cleanup activities at the Site. Over the past 31 years, Northrop Grumman
(and its predecessor TRW) have cooperated fully with the Regional Water Board, and Northrop
Grumman has committed to do so in the future.

In 1983, TRW initiated an investigation of potential soil and groundwater contamination at the
Site. Also that year, the UST was removed and soil in the immediate area was excavated and
hauled offsite. Between 1983 and 1986, several subsurface investigations conducted in the
vicinity of the former UST location and associated piping revealed elevated levels of solvents,
including TCE, in the groundwater and identified the former UST location as the only Site
source of those solvents. The area of the former UST is also sometimes referred to in reports as

the "eductor pit." A comprehensive soil investigation was conducted in 1988 to delineate the extent of soil contamination in the area of the former UST. Contamination from two other nearby volatile organic compound release sites (the former Advanced Micro Devices site at 901/902 Thompson Place and the Philips Electronics site at 811 East Arques Avenue) have commingled with the TRW plume. The commingled plume extends north to U.S. Highway 101, west to San Juan Drive and east to San Miguel Avenue. The commingled plume is managed as "The Companies Offsite Operable Unit."

In 1984, TRW excavated approximately 120 additional cubic yards of soil that had not been removed when the UST was removed in 1983. In 1985, TRW implemented a groundwater extraction and treatment system to reduce groundwater solvent concentrations and maintain hydraulic control of the groundwater plume to prevent it from migrating to other parts of the Site or offsite. Extracted groundwater was treated onsite via an air stripper to remove solvents. Treated groundwater was discharged to the storm drain under a Regional Water Board discharge permit. The system operated through 2001. About 93 million gallons of groundwater were extracted and about 3,100 pounds of TCE were removed. In June 1991, the Regional Water Board adopted Site Cleanup Requirement Order No. 91-103 for the Site and the Offsite Operable Unit. The Site is a federal Superfund Site and in September 1991, the US EPA issued a Record of Decision for the Site. In 1993, TRW installed a soil vapor extraction (SVE) system to remove solvents from the onsite soil. Following Regional Water Board approval, the SVE system was shut down in 1996, as the cleanup level for soil had been met. In 1999, TRW determined that the groundwater extraction and treatment system was no longer effectively removing solvent mass from the subsurface. In approximately 2002, the Site was redeveloped to expand the footprint of the building to cover the former UST/eductor pit area.

TRW implemented enhanced anaerobic biodegradation (EAB) treatment at the Site in 2000 for the affected groundwater at the former UST location. The intent of the EAB treatment was to increase the natural biodegradation rate of TCE to harmless byproducts. EAB treatment involves injection of organic substrate and nutrients for the naturally occurring microbes in subsurface soil and groundwater to consume so that the can break down TCE into non-toxic or harmless byproducts. Since the EAB treatment began, the rate of TCE degradation has dramatically increased in all wells within the application area. TCE has been reduced by 99% within the source area, such that TCE levels within the source area are now lower than in up-gradient Site boundary wells. Based on the success of the EAB treatment and the high rate of natural attenuation occurring at the Site, the Regional Water Board approved complete shutdown of the groundwater extraction and treatment system in 2001. Based on the initial EAB success, the EAB treatment area was expanded in 2005 to include additional Site groundwater down-gradient of the former source area. Northrop Grumman will continue monitoring the effectiveness of the EAB treatment, as measured by the ongoing increased biodegradation of TCE and its degradation products, and will also continue monitoring overall Site groundwater quality until the cleanup levels for the Site are met.

In December 2013, Northrop Grumman conducted sub-slab and indoor air sampling, which revealed TCE that could contribute to vapor intrusion. Based on these findings, Northrop Grumman submitted an e-mail with a conceptual outline of next steps for the Site that includes: (1) further excavation of soil in the source area/eductor pit, (2) preparation and implementation of a Vapor Intrusion Mitigation Plan, including additional indoor sampling in accordance with

Regional Water Board requirements following source removal and vapor mitigation, and (3) updating the 2011 Draft Focused Feasibility Study for a revised path forward to achieve Site closure. The vapor mitigation measures may include the destruction of the existing sub-slab monitoring wells and installation of a passive sub-slab vapor mitigation system.

The Regional Water Board considers Northrop Grumman to be the primarily responsible party in connection with the remediation of contamination at the Site, and the Regional Water Board expects that Northrop Grumman will continue to implement the current remedial action plan until closure is obtained. In this case, the Regional Water Board will not pursue the Prospective Purchaser (once they take title to the property) where the primarily responsible party has the financial resources necessary to conduct the remediation, where that responsible party is satisfactorily engaged in active remediation, and where the Prospective Purchaser provides reasonable access for necessary remedial activities.

If you have any additional questions, please contact Max Shahbazian of my staff at (510) 622-4824, or by email at [MShahbazian@waterboards.ca.gov].

Sincerely,

Bruce H. Wolfe
Executive Officer

cc:  Mailing List (via e-mail)

Mailing List
Former TRW Microwave Site
825 Stewart Drive, Sunnyvale, California

Amy Sullivan (amy.sullivan@ngc.com)
Brett Stringer (brett.stringer@amd.com)
Brian Aubry (baubry@geologica.net)
Daniel Esdorn (Daniel.Esdorn@hines.com)
Elizabeth C. Brown (Elizabeth.C.Brown@ngc.com)
George Clever (George.Clever@hines.com)
George Cook (gcook@valleywater.org)
John Wesley Hawthorne (hawthornej@locustec.com)
Karen Bradley (Karen.Bradley@Hines.com)
Klaus Rowher (Klaus.Rohwer@EquipoiseCorp.com)
Lynne Kilpatrick (lkilpatrick@ci.sunnyvale.ca.us)
Melanie Morash (morash.melanie@epa.gov)
Misty Sanford (Misty.Sanford@mto.com)
Peter Bennett (pbennett@haleyaldrich.com)
Rebecca Mora (rebecca.mora@aecom.com)
Ron Mavaddat (Ron@EliteProperty.com)
Shau-Luen Barker (ShauLuen.Barker@philips.com)
Thelma Estrada (Estrada.Thelma@epa.gov)
Tom Graf (tom@grafcon.us)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

2016 Deed




## San Francisco Bay Regional Water Quality Control Board

May 25, 2016
File No. 43S1005 (MS)

825 Stewart Acquisitions, LLC
c/o Hines Interest Limited Partnership
Attn: Shawn Hardy (Shawn.Hardy@Hines.com)
101 California Street #1000
San Francisco, CA 94111

Subject:     Status of Deed Restriction, Former TRW Microwave, 825 Stewart Drive,
             Sunnyvale, Santa Clara County

Dear Mr. Hardy:

This is to notify 825 Stewart Acquisitions, LLC (Owner) in response to its request dated April 25, 2016 – made pursuant to Section 5.06 of that certain Covenant and Agreement to Restrict Use of Property dated August 10, 1992 (Covenant) and recorded as Instrument Number 11507222 in the official Records of Santa Clara County at Page 613 of Book M338 for the subject property – that the Regional Water Board has no knowledge of any failure of Owner to comply with the provisions of the Covenant. In providing this statement, the Regional Water Board has relied solely upon review of its official records and has made no other inquiries and has made no inspection of the Property owned by Owner. The Owner does not send regular updates on compliance with the Covenant. Should the Regional Water Board determine that any violation of the Covenant has occurred, this letter does not waive the Regional Water Board's right to enforce the Covenant. The Regional Water Board recommends that a prospective purchaser obtain independent legal counsel and appropriate technical advice to make an independent determination of whether the Owner has complied with the Covenant.

If you have any questions, please contact Max Shahbazian of my staff at (510) 622-4824 or by email: max.shahbazian@waterboards.ca.gov.

Sincerely,

Bruce H. Wolfe
Executive Officer

Digitally signed by Stephen Hill
DN: cn=Stephen Hill, o, ou=RWQCB,
email=SHill@waterboards.ca.gov, c=US
Date: 2016.05.25 14:03:47 -07'00'

cc: Mailing List

https://semspub.epa.gov/work/09/100023779.pdf

Mailing List
Former TRW Microwave Site
825 Stewart Drive, Sunnyvale, California

Amy Sullivan (amy.sullivan@ngc.com)
Brett Stringer (brett.stringer@amd.com)
Daniel Esdorn (Daniel.Esdorn@hines.com)
Elizabeth C. Brown (Elizabeth.C.Brown@ngc.com)
George Cook (gcook@valleywater.org)
John Wesley Hawthorne (hawthornej@locustec.com)
Lynne Kilpatrick (lkilpatrick@sunnyvale.ca.us)
Melanie Morash (morash.melanie@epa.gov)
Peter Bennett (pbennett@haleyaldrich.com)
Rebecca Mora (rebecca.mora@aecom.com)
Shau-Luen Barker (ShauLuen.Barker@philips.com)
Thelma Estrada (Estrada.Thelma@epa.gov)
Tom Graf (tom@grafcon.us)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

## 2016 PPPR Letter



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
75 Hawthorne Street
San Francisco, CA 94105

**MAY 1 8 2016**

Michael L. Armstrong, Real Estate
David A. Smolen, General Counsel
GI DC Sunnyvale LLC
188 The Embarcadero, Suite 700
San Francisco, CA 94105

SUBJECT:   Status of Property and Prospective Purchaser's Reasonable Steps
           825 Stewart Drive, Sunnyvale, Santa Clara County, California
           TRW Microwave Site Operable Unit of the "Triple Site"

Dear Messrs. Armstrong and Smolen:

The United States Environmental Protection Agency Region 9 ("EPA") understands that GI DC Sunnyvale LLC, a Delaware limited liability company ("Prospective Purchaser"), is in the process of acquiring the real property located at 825 Stewart Drive in Sunnyvale, California ("the Property') to be used for commercial purposes. Because the Property is located within the TRW Microwave Site Operable Unit of the AMD 901/902 Thompson Place Site Operable Unit/TRW Microwave Site Operable Unit/Philips Site Operable Unit/Offsite Operable Unit Combined Sites, of which the AMD 901/902 Thompson Place Site, TRW Microwave Site, and Offsite Operable Units are listed in the National Priorities List (the four Operable Units collectively, referred to by the informal term "Triple Site"), Prospective Purchaser has requested a letter regarding its status as a potential property owner at the Triple Site.

The Property is the subject of a previous Prospective Purchaser "Comfort Letter" issued on May 1, 2014 to 825 Stewart Acquisition Partners, LLC (the current owner, and "Seller" of the Property to the new Prospective Purchaser). That May 2014 Prospective Purchaser Comfort Letter provided that "Consistent with EPA policy, EPA does not anticipate taking enforcement action against future owners of the Property." The conclusion by EPA was based upon information at that time with respect to the remediation activities by Northrop Grumman Corporation ("Northrop"), the Responsible Party for the TRW Microwave Site Operable Unit and a joint Responsible Party for the Triple Site with two other Responsible Parties – Philips Semiconductors, Inc. and Advanced Micro Devices, Inc., conducted with oversight at the time by the Regional Water Quality Control Board, San Francisco Bay Region ("State") and EPA. Since that time, oversight for the Triple Site was transferred from the State to EPA and is currently being performed solely by EPA.

Based on information provided by the new Prospective Purchaser in the Phase I Environmental Site Assessment dated April 1, 2016, since the time of the May 1, 2014 letter, Northrop has undertaken additional actions at the Property, including, but not limited to:

1.   Performing building improvements;

2.   Decommissioning of the former on-Property groundwater extraction and treatment ("GWET") system;

3.   Source area soil removal near the former waste solvent underground storage tank ("UST") inside the building;

4.   Implementation of vapor mitigation measures, including installation of a passive Sub-Slab Vapor Collection System, interior monitoring and Eductor Pipe well destructions, concrete slab and penetrations sealing; and additional indoor air and sub-slab vapor sampling to determine the effectiveness of the vapor mitigation measures; and

5.   Continued on-Property groundwater monitoring.

EPA understands that the new Prospective Purchaser intends to allow for the use of the Property as technology office space/research and development. The new Prospective Purchaser and any tenants will cooperate with EPA and Northrop by providing reasonable access to the Property for operations maintenance and monitoring of the indoor air and vapor intrusion control systems, groundwater monitoring, as well as any other current and future remedial activities, monitoring and implementation of institutional controls.

New property owners may be protected from CERCLA liabilities as Bonafide Prospective Purchaser ("BFPPs") pursuant to CERCLA. CERCLA's BFPP provisions, enacted in 2002 as part of the Brownfield's Amendments, state that new property owners meeting certain criteria are protected from CERCLA liability as long as they meet the requirements of a BFPP. Specifically, such property owners must conduct "all appropriate inquiry" prior to acquiring the property, take "reasonable steps" to control existing contamination after acquiring the property, and otherwise meet the requirements of Sections 101(40) and 107(r) of CERCLA.

Prospective Purchaser has provided to EPA a Phase I of the Property. As noted above, to qualify as a BFPP, a new landowner must take "reasonable steps" with respect to stopping continuing releases, preventing threatened future releases, and preventing or limiting human, environmental, or natural resources exposure to earlier releases. Based on information evaluated to date, EPA believes the following appropriate reasonable steps should be taken by the Prospective Purchaser during its ownership with respect to the contamination at the Property:

1.   Accommodation of the existing groundwater monitoring wells outside the footprint of the building and in any future construction of the Property;

2.   Cooperation by providing reasonable access to the Property to EPA and EPA's designated representatives, as well as the Responsible Parties for the Triple Site, including, but not limited to, Northrop, and their designated representatives, acting under the direction and oversight of EPA, for investigation and remedial activities and monitoring as described above, as well as access for operation, maintenance and monitoring of the vapor intrusion mitigation system currently on the Property as well as any future remedial activities (including, but not limited

to, vapor intrusion control system operation and maintenance) that may be required by EPA;

3.   Appropriate handling and monitoring of potentially contaminated soil or groundwater encountered at the Property;

4.   Prohibition on conducting any groundwater extraction, monitoring, or other subsurface activities, or installing injection wells on the Property, without prior EPA approval;

5.   A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, without the prior approval of EPA;

6.   Where prior approval is required in Step #5 above, submit to EPA for review and approval a plan, and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system;

7.   Inform EPA of plans to redevelop the Property for any purpose other than its current use, including light industrial or residential occupancy, and if such redevelopment takes place take measures to mitigate any potential preferential pathways for subsurface vapors to enter into any structures; and

8.   Cooperation with implementation of institutional controls at the Property to the extent required by EPA.

Please note this letter is provided solely for informational purposes and is based on the nature and extent of the contamination at the Triple Site and at the Property known to EPA at this time.  If additional information regarding the nature and extent of hazardous substances contamination at the Property becomes available, additional or different actions may be necessary to satisfy the reasonable steps criteria.

The BFPP exemption has a number of continuing conditions beyond requiring the Property owner to take reasonable steps.  This letter does not provide a release to the Property owner from CERCLA liability, but only provides information with respect to reasonable steps based on information EPA has available at this time.

In light of the foregoing, and consistent with EPA policy, EPA does not anticipate taking enforcement action against future owners of the Property.  Please see EPA's guidance titled "Policy Towards Owners of Property Containing Contaminated Aquifers," at 60 Fed. Reg. 34790 (July 3, 1995).

Should you have any legal questions regarding this matter, please contact Thelma Estrada of our Office of Regional Counsel at (415) 972-3866, or by email to estrada.thelma@epa.gov. If you have technical questions, contact Melanie Morash of our Superfund Division at (415) 972-3050, or by email to morash.melanie@epa.gov.

Sincerely,

John Lyons
Acting Assistant Director
Site Cleanup Branch, Superfund Division

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

2021 Inspection - Day of Termination



CONSOLIDATED INSPECTION REPORT
**DEPARTMENT OF PUBLIC SAFETY**
**FIRE PREVENTION & HAZARDOUS MATERIALS**
**CERTIFIED UNIFIED PROGRAM AGENCY**
505 W. Olive Ave, Suite 150
Sunnyvale, CA 84086
(408) 730-7212 | Fax: (408) 328-0726
FirePrevention@Sunnyvale.ca.gov

CONSOLIDATED INSPECTION REPORT

**Facility Name:** Apple Inc. - Stewart Drive 1                **CERS ID:** 10687162 **Purpose:** Routine        **Date:** 09/09/2021

**Address:** 825 Stewart Dr Sunnyvale CA 94085            **Consent to Inspect Granted:** ☑ **By:** Tom Huynh

| **OBSERVATIONS AND CORRECTIVE ACTIONS** |
|---|
| **Fire Prevention  -  HazMat** |

36 -   **Observation:** PCI Cart with misc. storage is present in the facility's exterior electrical room.
    **Code Section:** CFC 315.3.3
    **Violation Type:** Repeat
    **Correct By:** 10/09/2021

**Additional Comments:**   Fire extinguishers are current.

5-year riser certification was performed April 2017. Annual riser certification was performed Oct. 2020.

Flammable storage cabinets are utilized and are self closing.

Secondary containment is provided - clean and dry.

No signature obtained due to COVID-19 protocols. Verbal consent to inspect granted.

This report shall serve as a "NOTICE TO COMPLY" for Minor Violations, and a "NOTICE OF VIOLATION" for Class I or II violations. You are, hereby, ordered to correct the above noted violations within 30 days, or as otherwise specified. Formal enforcement and/or penalty assessment may be initiated at any time without further notice for Class I or II violations noted, and for Minor violations not corrected within 30 days.

| **OBSERVATIONS AND CORRECTIVE ACTIONS** |
|---|
| **Hazardous Waste Generator - Small Quantity Generator  -  Routine** |

**Additional Comments:**   Hazardous waste is properly labeled.

Solder waste is collected at the point of generation. Discussed housekeeping of solder areas.

Accumulation times - OK.

Manifests - OK. Log documenting when manifests are sent to DTSC are maintained.

No signature obtained due to COVID-19 protocols. Verbal consent to inspect granted.

There were no violations observed during this inspection.

All violations must be corrected within 30 days of the date of this notice unless otherwise noted. H&SC 25187.8 requires that you write a brief description of the corrective action taken to bring this facility into compliance and submit that information to this office by email or fax within 5 days of achieving compliance.

Corrective Action Taken:     PCI cart was removed from the facilities exterior electrical room following the HazMat inspection.

Certification: I certify under penalty of perjury that this facility has corrected all items identified in this Notice of Violation.

Name of Owner/Operator:        Austin J DeBaene          Signature: *Austin J DeBaene*  Date:    11/17/21

**Inspected By:** _____       **Facility Representative:** _____

Morgan Kaman                                       Tom Huynh

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

## Deed

SFUND RECORDS CTR
**2119219**

M338PAGE0513

11507222

Recording Requested By:

    Tech Facility 1, Inc.

    55 Charles Lindbergh Blvd.

    Uniondale, New York 11553

When Recorded, Certified Copies of the Recorded Instrument
Should be Mailed To:

    Regional Board Executive Officer

    California Regional Water Quality Control Board

    San Francisco Bay Region

    2101 Webster St, Suite 500

    Oakland, CA 94612

11507222

Vincenti & Schickler

3 New York Plaza

New York, New York 10004

| REC FEE | 32 |
| RMF | 28 |
| MICRO | 2 |
| RTCF | 2C |
| LIEN | |
| SMPF | |
| 8 | PCOR |

COVENANT AND AGREEMENT

TO RESTRICT USE OF PROPERTY

This Covenant and Agreement ("Covenant") is made as

of the ___10th___ day of _____August_____, 1992 by, Tech

Facility 1, Inc. ("Covenantor"), which is the owner of record

M338PAGE0614

of certain property situated in the city of Santa Clara, County of Santa Clara, State of California, described in Exhibit "A" attached hereto and incorporated herein by this reference ("the Property") for the benefit of the Property and the California Regional Water Quality Control Board, San Francisco Bay Region (the "Regional Board"), with reference to the following facts:

A.      The Property is located at:  825 Stewart Drive, Sunnyvale, CA 94088, and is commonly referred to as the Former TRW Site.

B.      The site is on the National Priorities List (NPL) and is regulated by Regional Board Orders, as indicated herein:

| | | |
|---|---|---|
| a. | June, 1984 | Cleanup and Abatement Order issued. |
| b. | October, 1985 | Waste Discharge Requirements Adopted, Order No. 85-107. |
| c. | January, 1988 | Site Cleanup Requirements Adopted, Order No. 88-015. |
| d. | June 1988 | Site proposed for inclusion on the National Priorities List (NPL). |

2

M338PAGE0615

| | | |
|---|---|---|
| e. | April 1989 | Regional Board Adopted Revised Site Cleanup Requirements, Order No. 89-057. |
| f. | September 1989 | Waste Discharge Requirements Revised and Re-Issued, Order No. 89-146. |
| g. | February 1990 | Site formally added to the NPL. |
| h. | June 1991 | Final Site Cleanup Requirements Adopted, Order No. 91-103. |

C.      Pursuant to the South Bay Multi-Site Cooperative Agreement and the South Bay Ground Water Contamination Enforcement Agreement, entered into on May 2, 1985 (as subsequently amended) by the Regional Board, the U.S. Environmental Protection Agency and the California Department of Health Services, the Regional Board has been acting as the lead regulatory agency.  The Regional Board will continue to regulate the discharger's remediation and administer enforcement actions under the federal Comprehensive Environmental Response, Compensation and Liability Act as amended, and the California Water Code, Health and Safety Code, and regulations adopted there under.

D.      Most of the ground water underlying the site is impacted by Volatile Organic Compounds (VOCs) originating from sources off-site and on-site. Monitoring wells were installed

3

M338PAGE0616

to define the vertical extent of the plume. There are six local ground water aquifers at the TRW facility and they are defined as the upper aquifer which includes the A, B1, B2, B3, B4 and B5 zones. Beneath this upper aquifer is the lower regional aquifer referred to as the C aquifer. As of October 1991, the vertical extent of ground water pollution extends into the B2 zone at a depth of approximately 65 feet from ground surface. The VOCs found in the ground water are TCE ranging from 7.8 to 15,000 ppb, 1,2-DCE ranging from 0.6 to 38,000 ppb, vinyl chloride ranging up to 3300 ppb, PCE ranging up to 700 ppb and Freon-113 ranging up to 1900 ppb. The other compounds detected on site are 1,1-DCE, 1,1-DCA, 1,1,1-TCA and 1,2-DCB but their concentrations are below the maximum contaminant level drinking water standards determined by California Department of Health Services (DHS) now known as California Department of Toxic Substances Control (DTSC). No ground water pollution has been detected directly beneath the site in the B3 zone which extends to a depth of approximately 80 feet. However, ground water pollution, underlying sites in the vicinity of 825 Stewart Drive, has been detected in the B3 zone and in the B4 zone, which extends to a depth of approximately 115 feet.

E.      The sources of ground water pollution have been identified as off-site and on-site sources. The off-site sources are upgradient to the west and south and originate

4

M338PAGE0617

from leaks in underground storage tanks.  The on-site source
originated from a leak in an underground storage tank.  The
tank and the surrounding contaminated soil were removed in
1983.

F.      Regional Board Order 91-103 requires Covenantor to
implement a deed restriction prohibiting the use of the upper
aquifer as a source of drinking water, and for controlling on-
site activities that could endanger the public health or the
environment due to exposure to VOCs (91-103, Section C.4.a.).
However, the water can be used for purposes other than
drinking water after the VOCs have been removed by proper
treatment.

G.      Covenantor desires and intends that use of the
Property shall be subject to observance of the requirements
stated herein.

        Now, therefore, Covenantor and the Regional Board
declare and agree as follows:

5

M338PAGE0618

ARTICLE I

DEFINITIONS

1.01 Areas of Investigation. "Areas of Investigation" shall mean those areas on the Property investigated for the presence of chemicals and which will be remediated until ground water cleanup standards have been achieved and pollutant levels have been stabilized in onsite aquifers in accordance with Regional Board Order 91-103, and/or subsequent orders and/or any amendments to these orders. These are depicted on the map attached as Exhibit B.

1.02 Regional Board. "Regional Board" shall mean the California Regional Water Quality Control Board, San Francisco Bay Region and shall include its successor agencies, if any.

1.03 Ground Water. "Ground Water" shall mean, pursuant to Title 22, California code of Regulations, Section 66079, Water below the land surface in a zone of saturation.

1.04 Upper and Lower Aquifer. The upper aquifer at the TRW facility as defined by the Regional Board includes A, B1, B2, B3, B4 and B5 zones. This upper aquifer extends from approximately 6 to 123 ft below ground surface (bgs). The lower aquifer in the TRW facility vicinity as defined by the

6

H338PAGE0619

Regional Board is the C aquifer which occurs approximately 150
ft bgs.

1.05  **Production Well**.  "Production Well(s)" shall mean any
well, boring or excavation that allows extraction of ground
water from the upper aquifer which includes A, B1, B2, B3, B4
and B5 zones which exist above a depth of approximately 123
feet (approximately 83 feet below mean sea level) below ground
surface.

1.06  **Improvements**.  "Improvements" shall mean all buildings,
roads, driveways, and paved parking areas, constructed or
placed upon the Property.

1.07  **Occupants**.  "Occupants" shall mean those persons
entitled by ownership, leasehold, or other legal relationship
to the exclusive right to occupy any portion of the property.

1.08  **Owner**.  "Owner" shall mean the Covenantor or its
successors in interest, including heirs and assigns, who hold
fee simple title to all or any portion of the Property.

1.09  **Property**.  The "Property" consists of the land described
in Exhibit A.

7

M 338 PAGE 0620

## ARTICLE II

### ESTABLISHMENT OF RESTRICTIONS

2.01  <u>Provisions to Run with the Land</u>.  This covenant sets
forth and establishes a common scheme and plan for the use,
enjoyment, conveyance, development, repair, maintenance and
improvement of the Property, and establishes certain
protective provisions, covenants, restrictions, and conditions
(collectively referred to as "Restrictions"), upon and subject
to which the Property and every portion thereof shall be
improved, held, used, occupied, ground leased, sold,
hypothecated, encumbered, and conveyed.  Each and all of the
Restrictions are declared to be in furtherance of a plan
established for the purpose of enhancing and protecting the
value, desirability and enjoyment of the Property.  Each and
all of the Restrictions shall run with the land, including any
interest in the Property conveyed or reserved, and be for the
benefit of and be binding on any interest conveyed or
reserved, and all parties having or acquiring any right,
title, interest or estate in the Property and any successors
in interest thereto.  Each and all of the Restrictions are
imposed as equitable servitude upon the Property and on any
portion thereof, for the benefit of the Property and the
Regional Board and shall be enforceable solely by the Regional
Board and any successor agency thereto.

8

M338PAGE0621

2.02   Concurrence of Owners Presumed.  All purchasers and
ground lessees of the Property or any portion thereof shall be
deemed by their purchase, leasing, or possession of all or any
portion of the Property, to be in accord with the Restrictions
and to agree for and among themselves, their heirs,
successors, and assigns, and the agents, employees, and ground
lessees of such owners, heirs, successors, and assigns that
the Restrictions shall be adhered to for the benefit of the
Regional Board and the future owners and occupants of the
Property and that their interest in the Property shall be
subject to the Restrictions contained herein.

2.03   Incorporation Into Deeds and Leases.  Covenantor
covenants that the Restrictions shall be contained in each and
all deeds and leases of any portion of the Property in
accordance with Sections 1468, 1469, and 1470 of the
California Civil Code, provided, however, that the right to
enforce the Restrictions shall exist only in the Regional
Board.  In addition to any express provision required to
comply with California Civil Code Section 1468, 1469 and 1470,
the following statement shall appear:

>    This grant of interest in real property is
>    expressly made subject to the certain Covenant and
>    Agreement dated as of August 10, 1992   , and recorded
>    on _____, in the Official Records

9

M338PAGE0622

of the county of Santa Clara, State of California, as document No. _____, which Covenant and Agreement imposes certain covenants, conditions, and restriction on usage of ground water underlying the real property described herein. The provisions of the Covenant and Agreement are incorporated herein and made a part hereof as if set forth in full. The only persons who have the right to enforce the Covenant and Agreement are the California Regional Water Quality Control Board, San Francisco Bay Region.

2.04. **Statement Regarding Hazard.** Nothing in this Covenant shall be construed as a statement, admission or declaration that any existing or potential health, environmental, or other hazard exists or will exist on the Property or on any portion of it.

## ARTICLE III

### DEVELOPMENT, USE, AND CONVEYANCE OF THE PROPERTY

3.01 **Restrictions on Use.** Covenantor promises to restrict the use of the Property as follows:

10

https://semspub.epa.gov/work/09/2119219.pdf

M338PAGE0623

(1)     No water production wells may be drilled in the
upper or lower aquifer as defined in Section 1.04
on the Property without the express prior written
approval of the Regional Board and any other agency
with jurisdiction.  In addition, notification and
review of well installation by the Regional Board
is required before monitoring or other test wells
are installed.   The following are not subject to
this provision: borings for the purpose of testing
soils; excavation for foundations, utilities or
similar purposes; or, borings to define geology.

3.02  **Conveyance of Property.**  Any person acquiring ownership
of the Property, or any portion thereof, or entering into a
ground lease as lessee of the Property, or any portion
thereof, shall provide, within 30 days of any such purchase or
ground lease, written notice of the purchase or ground lease
to the Regional Board and to Covenantor at the addresses
specified in paragraph 5.02.  The Regional Board shall not by
reason of the Covenant have authority to approve, disapprove,
or otherwise affect any sale, lease, or other conveyance of
the Property or of any portion of the Property.  Notice is
required hereunder only for the purpose of maintaining a
current record of the Owners and ground lessees of the
Property.

11

https://semspub.epa.gov/work/09/2119219.pdf

M338PAGE0624

3.03   <u>Enforcement</u>.   Failure of the Owner or Occupants to
comply with any of the requirements, as set forth in paragraph
3.01 shall be grounds for the Regional Board, by reason of the
Covenant, to require that the Owner or Occupant modify or
remove any Improvements constructed in violation of that
paragraph.  Violation of the Covenant shall be grounds for the
Regional Board to file civil and criminal actions against the
Owner as provided by law.  This Covenant shall not create any
private right of action against Covenantor or any Owner or
Occupant of the Property or any portion thereof.

3.04  Extent of Covenantor's Obligations.  Upon conveyance of
all or any portion of the Property by deed, ground lease or
other appropriate instrument, which conveyance instrument
contains  the  provisions  set  forth  in  Paragraph  2.03,
Covenantor shall be released from any and all obligations
under this Covenant as to that portion of the Property which
has been conveyed.   At no time shall Covenantor have an
obligation of any kind whatsoever to police or to enforce the
observance of the covenants and restrictions contained herein
by other Owners or Occupants of the Property or any portion
thereof.

12

https://seapub.epa.gov/work/09/2119219.pdf

M 338 PAGE 0625

ARTICLE IV

VARIANCE AND TERMINATION

4.01  Variance.  Any Owner or Occupant of the Property or any
portion thereof, may apply to the Regional Board for a written
variance from the provisions of this Covenant.

4.02  Termination.  The Restrictions shall remain in full
force and effect until ground water cleanup standards have
been achieved and pollutant levels have been stabilized in
onsite aquifers in accordance with Regional Board Order 91-
103, and/or subsequent orders and/or amendments to these
orders.  Any Owner or Occupant of the Property or a portion
thereof, may apply to the Regional Board for an amendment or
termination of the Restrictions as applied to that portion of
the Property which is owned or ground leased by the Owner or
Occupant.  The Restrictions shall remain in full force and
effect with respect to the Property and shall run with the
land until such time as the Owner of the Property, or any
portion thereof, records a release of the Property or a
portion thereof from the provisions of the Restrictions.  Any
such release shall contain a sworn statement that the Owner of
the Property to be released has demonstrated, to the written
satisfaction of the Regional Board, that the Restrictions are
no longer reasonably necessary to protect the public health or

13

H 338 PAGE 0626

safety from any chemicals which may be located on the Property or that portion of the Property to be released from the Restrictions.   In addition, any such release shall have attached an acknowledgement by the Regional Board that the statements contained in the release are correct.   Any such release shall be effective without the concurrence of any other Owner of any portion of the Property, or any adjacent property.

4.03   **Term**.   Unless terminated in accordance with paragraph 4.02 above, by law or otherwise, this Covenant shall continue in effect in perpetuity.

## ARTICLE V

### MISCELLANEOUS

5.01   **No Dedication Intended**.   Nothing set forth herein shall be construed to be a gift or dedication, or offer of a gift or dedication, of the Property or any portion thereof to the general public or for any purposes whatsoever.

5.02   **Notices**.   Whenever any person shall desire to give or serve any notice, demand, or other communication with respect

14

https://semspub.epa.gov/work/09/2119219.pdf

ᴹ338 PAGE 0627

to this Covenant, each such notice, demand, or other communication shall be in writing and shall be deemed effective (i) when delivered, if personally delivered to the person being served or to an officer of a corporate party being served or official of a government agency being served, or (ii) five (5) days after deposit in the mail if mailed by United States mail, postage paid certified, return receipt requested, to Covenantor and the Regional Board at the following addresses or at such other addresses as Covenantor or the Regional Board may designate in a written notice which shall be addressed and delivered personally or by certified mail to each of the then Owners and Occupants of the Property.

To: Tech Facility 1, Inc.

   55 Charles Lindbergh Blvd

   Uniondale, New York  11553

   ATTENTION: PRESIDENT

COPY To: California Regional Water Quality Control

   Board

   San Francisco Bay Region

   2101 Webster St, Suite 500

   Oakland, CA  94612

15

https://semspub.epa.gov/work/09/2119219.pdf

M338PAGE0628

FEI Microwave, Inc.

825 Stewart Drive

Sunnyvale, CA  94088

ATTENTION: PRESIDENT


5.03  Partial Invalidity.  If any portion of this Covenant is determined to be invalid for any reason, the remaining portion shall remain in full force and effect as if such portion has not been included herein.


5.04  Article Headings.  Headings at the beginning of each numbered article of this Covenant are solely for the convenience of the parties and are not intended to aid in the meaning or interpretation of any part of the Covenant.


5.05  Recordation.  This instrument shall be executed by Covenantor and by the Executive Officer, Regional Water Quality Control Board, San Francisco Bay Region.  This instrument shall be recorded by Covenantor in the County of Santa Clara within ten (10) days of the date of full execution.


5.06  Statement of Compliance.  Within a reasonable time of receipt of a written request from any Owner or Occupant of a Property or any portion thereof, the Regional Board shall provide to such Owner or Occupant a written statement,

16

M338 PAGE 0629

substantially in the form attached hereto as Exhibit C,
indicating whether to the Regional Board's knowledge such
Owner or Occupant is operating in compliance with the
provisions of this Covenant, and such confirmation shall be
conclusive as of the date prepared.

17

https://semspub.epa.gov/work/09/2119219.pdf

M 338 PAGE 0630

IN WITNESS WHEREOF, the parties execute this Covenant as of
the date set forth above.

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD,
SAN FRANCISCO BAY REGION

By: _____

Title: EXECUTIVE OFFICER _____

18

https://semspub.epa.gov/work/09/2119219.pdf

M338PAGE0631

IN WITNESS WHEREOF, the parties execute this Covenant as of
the date set forth above.


TECH FACILITY 1, Inc.


By: _____

Title: __Vice President__


19

https://semspub.epa.gov/work/09/2119219.pdf

M338 PAGE 0632

EXHIBIT A

825 STEWART DRIVE, SUNNYVALE, CA PROPERTY DESCRIPTION

338 PAGE 0633

EXHIBIT "A"

LEGAL DESCRIPTION

Portion of Lot 14, as shown upon that certain Map entitled,
"Tract No. 2421 International Science Center", which Map was
filed for record in the Office of the Recorder of the County
of Santa Clara, State of California, on July 15, 1959 in Book
108 of Maps, at pages 53, 54, 55 and 56, and more particularly
described as follows:

Beginning at the Southwesterly corner of Lot 14, as said Lot
is shown upon the Map above referred to; thence from said
point of beginning South 89° 34' 05" East along the Southerly
boundary of said Lot 14 for a distance of 436.446 feet; thence
North 0° 25' 55" East and parallel with the Westerly line of
De Guigne Drive, as said drive is shown upon the Map above
referred to for a distance of 504.45 feet; thence North 89°
34' 05" West and parallel with the Southerly line of said Lot
14 for a distance of 302.00 feet, more or less, to a point in
the Westerly line of said Lot 14; thence South 14° 54' 25"
West along the most Westerly line of said Lot 14 for a
distance of 520 feet, more or less, to the point of beginning.

https://semspub.epa.gov/work/09/2119219.pdf

M338 PAGE 0634

EXHIBIT B

825 STEWART DRIVE, SUNNYVALE, CA SITE MAP

22



Monitoring and Extraction Well Locations - 825 Stewart Drive, Sunnyvale, California

EXHIBIT "B"

M338PAGE0636

EXHIBIT C

Date _____

_____

_____

_____

Dear _____:

      This is to notify [Owner] in response to a request dated _____ made pursuant to that certain Covenant and Agreement to Restrict Use of Property dated ____ _____ (the "Covenant") and recorded in the official Records of Santa Clara County at Page _____ of Book _____ that the California Regional Water Quality Control Board, San Francisco Bay Region (the "Regional Board") has no knowledge of any failure of [Owner] to comply with the provisions of the Covenant.  [or Regional Board has knowledge of the following facts: _____.]  In providing this statement, the Regional Board has relied upon review of its official records and has made no other inquiries and has made no inspection of the Property owned by [Owner].

          CALIFORNIA REGIONAL WATER QUALITY CONTROL

          BOARD, SAN FRANCISCO BAY REGION

By: _____

24

M338PAGE0637

STATE OF CALIFORNIA          )
                             )
COUNTY OF _____   )


On _____, 1992, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as _____ _____ _____ of _____ _____ _____, a _____ _____ corporation, on behalf of the corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same.


WITNESS my hand and official seal.


_____

Notary Public in and for said County and State


25

https://semspub.epa.gov/work/09/2119219.pdf

M338 PAGE 0638

STATE OF NEW YORK          )

                          )

COUNTY OF NASSAU          )

    On _7 August_____, 1992, before me, the undersigned, a Notary Public in and for said state, personally appeared _Joseph Kastenholz_____, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as _____ _Vice President_____ of TECH FACILITY 1, Inc. , a      DELAWARE corporation, on behalf of the corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same.

    WITNESS my hand and official seal.

_____

**Notary Public in and for said County and State**

CAROL LIEBERMAN
NOTARY PUBLIC, State of New York
No. 30-4684665
Qualified in Nassau County
Commission Expires October 31, 199__

26

M338PAGE0639

STATE OF CALIFORNIA      )
                               )
COUNTY OF  ALAMEDA        )

        On  August 11 , 1992, before me, the
undersigned, a Notary Public in and for said state, personally
appeared  STEVEN R. RITCHIE , personally known to me
or proved to me on the basis of satisfactory evidence to be
the person who executed the within instrument as _____
EXECUTIVE OFFICER _____ of the California
Regional Water Quality Control Board, San Francisco Bay
Region, the agency that executed the within instrument, and
acknowledged to me that such corporation executed the same.

        WITNESS my hand and official seal.


_Remedios T. Deocampo_

Notary Public in and for said County and State

OFFICIAL SEAL
REMEDIOS T. DEOCAMPO
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires May, 16, 1994

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR JUDICIAL NOTICE
# EXHIBIT

# SECTION:

Gjovik's FOIA Appeal
for US EPA fees on 825 Stewart Dr records



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

OFFICE OF
GENERAL COUNSEL

January 12, 2023

Ms. Ashley M. Gjovik, J.D.
141 Eagle St. #1
Albany, NY 12202

       Re: Freedom of Information Act Appeal No. EPA-2023-001386 (Request No. EPA-R9-2023-000314)

Dear Ms. Gjovik:

       I am responding to your December 19, 2022 appeal under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. You appealed the decision of the U.S. Environmental Protection Agency ("EPA") to place you in the "commercial" fee category. You seek a change in your fee category placement from "commercial" to "other" for FOIA request EPA-R9-2023-000314, for "any notes, documents, records, drawings, photos, presentations, or other records in the possession of, sent from, sent to, or otherwise developed by Mathew Plate (Plate.Mathew@epa.gov) about my Apple office (825 Stewart Drive / TRW Microwave Superfund)," as more fully described in your request. You ask the Agency to remove any fees pending for your FOIA request consistent with a change to the "other" fee category.

       I have carefully considered your request, EPA's search, and your appeal. For the reasons described below, I have determined that your appeal should be, and is, granted.

       Criteria have been established for reducing or waiving fees for processing and copying requested documents under the FOIA at 5 U.S.C. § 552(a)(4)(A); the Office of Management and Budget's Uniform FOIA Fee Schedule and Guidelines ("OMB Guidelines"), 52 Fed. Reg. 10012 (March 27, 1987)[2]; and EPA regulations at 40 C.F.R. § 2.107. Under 40 C.F.R. § 2.107(c)(1)(iv), a requester who falls into the "other" fee category is entitled to two free hours of search time and 100 pages of free copying. 40 C.F.R. § 2.107(c)(1)(iv). Commercial use requesters are charged for all search and review time and for all copying. 40 C.F.R. § 2.107(c)(1)(i). See also 5 U.S.C. § 552(a)(4)(A)(ii) and (iv); OMB Guidelines, 52 Fed. Reg. 10012 at 10017-19.

       Requesters cannot be placed in the "other" fee category if the FOIA request is filed for commercial use. 40 C.F.R. § 2.107(c)(1)(iv); OMB Guidelines, 52 Fed. Reg. 10012, 10019. Commercial use requests are requests from or on behalf of a person who seeks information for a use or purpose that furthers his/her commercial, trade, or profit interests, through litigation or otherwise. 40 C.F.R. § 2.107(b)(1); OMB Guidelines, 52 Fed. Reg. 10012, 10017-18. The use to which the requester will put

Ms. Ashley M. Gjovik, J.D.
Appeal No. EPA-2023-001386 (Request No. EPA-R9-2023-000314)
Page **2** of **2**

the information obtained by the request determines whether the request is included in this category rather than the identity of the requester. 40 C.F.R. § 2.107(b)(1); OMB Guidelines, 52 Fed. Reg. 10012, 10013, 10018.

In your appeal, you argue that the reason you seek the requested documents is "to help me understand why I was fired & my personal chemical exposure, as well as the chemical exposure of my colleagues." In conversations with personnel from EPA Region 9, you indicated that documents would be used for litigation against your former employer. EPA's FOIA regulations state that a "Commercial use request means a request from or on behalf of a person who seeks information for a use or purpose that furthers the requester's commercial, trade, or profit interests, which can include furthering those interests through litigation." However, the 9th Circuit held in *McClellan Ecological Seepage Situation v. Carlucci* that "[i]nformation helpful to a tort claim furthers a requester's interest in compensation or retribution, but not an interest in commerce, trade, or profit" and, therefore that tort claims for damages "do not constitute a commercial interest." 835 F.2d 1282, 1285 (9th Cir. 1987). Because your apparent purpose for requesting the documents does not constitute a "commercial use" your appeal is granted. Pursuant to 40 C.F.R. § 2.104(k), I am remanding your request to EPA Region 9 to change your fee category for FOIA request EPA-R9-2023-000314 from "commercial" to "other," and make corresponding adjustments to any billing associated with this request.

This letter constitutes EPA's final determination on this matter. Pursuant to 5 U.S.C. § 552(a)(4)(B), you may obtain judicial review of this determination by filing a complaint in the United States District Court for the district in which you reside or have your principal place of business, or the district in which the records are situated, or in the District of Columbia. Additionally, as part of the 2007 FOIA amendments, the Office of Government Information Services (OGIS) within the National Archives and Records Administration was created to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. You may contact OGIS in any of the following ways: by mail, Office of Government Information Services, National Archives and Records Administration, Room 2510, 8610 Adelphi Road, College Park, MD, 20740-6001; e-mail, ogis@nara.gov; telephone, 202-741-5770 or 1-877-684-6448; and fax, 202-741-5769.

Should you have any questions concerning this matter, please contact Matt Schwarz at schwarz.matthew@epa.gov or at 202-564-5654.

Sincerely,


Lynn Kelly
Assistant General Counsel
General Law Office


cc:      EPA Region 9