**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**Case No. 3:23-cv-04597-EMC**

**Filed**: September 7 2023

**District Judge**: Honorable Edward M. Chen

**ASHLEY GJOVIK**, *an individual*,

Plaintiff,

v.

**APPLE INC**, *a corporation*,

Defendant.

**MOTION FOR JUDICIAL NOTICE**

**Hearing**
Dept: Courtroom 5, 17th Floor (Virtual)
Date: February 8, 2024 1:30 p.m.
*Plaintiff Does Not Require Oral Arguments*

*Concurrent with:*
*Defendant's Motion to Dismiss (Doc #30)*
*P's Opposition to Motion to Dismiss (Doc #33)*

## Court Cases

### Motion for Judicial Notice Cover Page: Exhibit 7

## Criminal Cases (US/People v): Levoff; Moyer
## Coworker Cases (v Apple): Banko, Brown

***Declaration***: *I verified the authenticity of each of these documents. A true and correction version of each document is attached in each exhibit. I declare under penalty of perjury this is true and correction. /s/ Ashley M. Gjovik (December 25 2023).*

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

USAO2017R00679/CAH/DVS

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

OCT 2 4 2019

AT 8:30 _____ 4:05 PM
WILLIAM T. WALSH
CLERK    JB

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| | : |
| | : Criminal No. 19-*Cr 780 (WJM)* |
| v. | : |
| | : 15 U.S.C. §§ 78j(b) and 78ff |
| | : 17 C.F.R. §§ 240.10b-5 and 240.10b5-2 |
| GENE LEVOFF | : 18 U.S.C. §§ 1343 and 2 |

**INDICTMENT**

The Grand Jury in and for the District of New Jersey, sitting at

Newark, charges:

**COUNTS ONE THROUGH SIX**
(Securities Fraud)

**Relevant Individuals and Entities**

1.      At all times relevant to this Indictment:

a.      Company-1 was a global technology company

headquartered in Cupertino, California that designed, developed, and sold

consumer electronics, computer software, and online services.  Company-1 was

a publicly traded company whose securities were listed on the NASDAQ Stock

Market.

b.      Defendant GENE LEVOFF ("LEVOFF") was employed

by Company-1 at its headquarters in Cupertino.  From in or around 2008

through in or around 2013, LEVOFF, an attorney, was the Director of

Corporate Law at Company-1.  From in or around 2013 through September

2018, LEVOFF was the Senior Director of Corporate Law at Company-1.  In

that role, LEVOFF functioned as the top corporate attorney at Company-1,

reporting directly to Company-1's General Counsel.  Among other things,

LEVOFF was responsible for overseeing Company-1's compliance with

securities laws, which included advising others regarding U.S. Securities and

Exchange Commission (the "SEC") filings and financial reporting.  In or around

February 2018, Company-1 named LEVOFF its Corporate Secretary, a title he

maintained until September 2018.  Before that, LEVOFF held the role of

Assistant Secretary.

           c.      LEVOFF's responsibilities included ensuring

compliance with Company-1's Insider Trading Policy.  Company-1's Insider

Trading Policy prohibited the unauthorized disclosure of any nonpublic

information acquired in the work place and the misuse of material nonpublic

information in securities trading ("Company-1's Insider Trading Policy").

           d.      From in or around September 2008 through in or

around July 2018, LEVOFF served on Company-1's Disclosure Committee,

and, as a result, had access to and obtained Company-1's draft SEC filings and

earnings materials before Company-1 disclosed its quarterly and yearly

financial results to the public.  LEVOFF served as one of the Disclosure

Committee's co-chairpersons from in or around December 2012 through in or

around July 2018.  As a Disclosure Committee member and high-ranking

Company-1 employee, LEVOFF owed a fiduciary duty to Company-1 and its

shareholders to protect the material nonpublic information regarding

Company-1 to which he had access.  LEVOFF further owed Company-1 and its

shareholders a duty not to use such material nonpublic information for his own personal benefit.  Additionally, LEVOFF was subject to certain company-imposed "blackout periods" that prohibited him and others like him with access to material nonpublic information regarding Company-1 from engaging in trades involving Company-1 stock.

e.     First Republic Securities Company, LLC ("First Republic") was a brokerage firm based in San Francisco, California that provided various investment services, including online investing.  LEVOFF maintained an account with First Republic (the "First Republic Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

f.     TD Ameritrade was a brokerage firm based in Omaha, Nebraska that provided online investing services for institutions and individuals.  LEVOFF maintained a brokerage account with TD Ameritrade (the "TD Ameritrade Brokerage Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

g.     Virtu Americas, LLC, f/k/a KCG Americas LLC, f/k/a Knight Capital Markets ("Virtu") was a market maker – i.e., a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price, thus providing liquidity to the market.  The servers that housed Virtu's electronic trading systems and executed trades involving those systems were located in New Jersey.

h.      Susquehanna International Group, f/k/a G1 Execution Services, LLC ("G1") was a market maker.  The servers that housed G1's electronic trading systems and executed trades involving those systems were located in New Jersey.

i.      BNY Mellon Capital Markets, LLC ("BNY Mellon") was a market maker.  The third-party affiliate servers that housed BNY Mellon's electronic trading systems were located in New Jersey.

j.      Two Sigma Securities, LLC ("Two Sigma") was a market maker.  The servers that housed Two Sigma's electronic trading systems and executed trades involving those systems were located in New Jersey.

## The Insider Trading Scheme

2.      From in or around February 2011 through in or around April 2016, LEVOFF orchestrated a scheme to defraud Company-1 and its shareholders by misappropriating material nonpublic information regarding Company-1's financial results in order to execute favorable trades involving the securities of Company-1.

## Goal of the Scheme

3.      The goal of the insider trading scheme was for LEVOFF to enrich himself by obtaining money and avoiding losses by purchasing and selling Company-1 securities on the basis of material nonpublic information regarding Company-1 gained by LEVOFF through his position at Company-1.

## **Manner and Means of the Insider Trading Scheme**

4.      The manner and means by which LEVOFF accomplished the goal of the insider trading scheme included:

a.      LEVOFF used his position on Company-1's Disclosure Committee to obtain material nonpublic information regarding Company-1's financial results before Company-1 disclosed that information to the public.

b.      LEVOFF converted the material nonpublic information to his own use by executing trades involving Company-1 stock in the TD Ameritrade Brokerage Account and the First Republic Account before Company-1 disclosed its financial results to the public.  When LEVOFF discovered that Company-1 had strong revenue and net profit for a given financial quarter, he purchased large quantities of Company-1 stock, which he later sold for a profit after Company-1 disclosed the positive earnings information to the public and the market reacted to the news.  Conversely, when LEVOFF learned that Company-1 had lower-than-anticipated revenue and net profit, he sold large quantities of Company-1 stock, thus avoiding the significant losses that would occur after Company-1 disclosed the information to the public and the market reacted to the negative news regarding Company-1's earnings.

c.      LEVOFF executed, and caused to be executed, a number of trades, referenced herein, with market maker counterparties whose electronic trading systems or servers were located in the District of New Jersey, namely, Virtu, G1, BNY Mellon, and Two Sigma.

        d.      LEVOFF executed the favorable trades involving Company-1 stock in violation of Company-1's Insider Trading Policy and during Company-1 black out periods.

        e.      LEVOFF executed trades in furtherance of the scheme from at least as early as April of 2011 through at least as late as April of 2016, realizing profits of approximately $227,000 and avoiding losses of approximately $377,000.

        5.      On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant,

**GENE LEVOFF**,

did willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: by executing and causing others to execute securities transactions in the securities of Company-1 on the basis of material nonpublic information concerning Company-1 in breach of a duty of

trust and confidence that was owed directly, indirectly, and derivatively to the issuers of those securities, the shareholders of the issuers, and to other persons who were the source of the material nonpublic information, each such transaction constituting a separate count of this Indictment.

| COUNT | APPROXIMATE DATE | SECURITIES TRANSACTION |
|-------|------------------|------------------------|
| One | July 17, 2015 | Sale of approximately 43,750 shares of Company-1 stock by LEVOFF.  Virtu acted as counterparty to some of these trades. |
| Two | July 17, 2015 | Sale of approximately 8,700 shares of Company-1 stock by LEVOFF.  BNY Mellon acted as counterparty to some of these trades. |
| Three | July 20, 2015 | Sale of approximately 7,000 shares of Company-1 stock by LEVOFF.  G1 and Virtu acted as counterparties to some of these trades. |
| Four | July 21, 2015 | Sale of approximately 17,678 shares of Company-1 stock by LEVOFF.  Virtu and Two Sigma acted as counterparties to some of these trades. |
| Five | October 26, 2015 | Purchase of approximately 10,000 shares of Company-1 stock by LEVOFF.  Two Sigma acted as a counterparty for some of these trades. |
| Six | April 21, 2016 | Sale of approximately 4,009 shares of Company-1 stock by LEVOFF.  G1 acted as a counterparty for some of these trades. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## COUNTS SEVEN THROUGH TWELVE
(Wire Fraud)

1.      The allegations contained in paragraphs 1, 2, and 4 of Count One are incorporated as if fully set forth herein.

2.      On or about the dates set forth below, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, the defendant,

**GENE LEVOFF**,

did, for the purpose of executing and attempting to execute the scheme and artifice, knowingly and intentionally cause to be transmitted by means of wire, radio, or television communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, to wit, LEVOFF schemed to defraud Company-1 of confidential information related to Company-1's financial results through deceptive means and then converted that information to his own use, through wire transmissions, for the purpose of executing securities transactions in Company-1 stock.

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION |
|-------|------------------|--------------------|
| Seven | July 17, 2015 | Sale of approximately 5,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |

| Eight | July 20, 2015 | Sale of approximately 2,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with G1. |
|---|---|---|
| Nine | July 20, 2015 | Sale of approximately 5,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |
| Ten | July 21, 2015 | Sale of approximately 2,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |
| Eleven | October 26, 2015 | Purchase of approximately 10,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Two Sigma. |
| Twelve | April 21, 2016 | Sale of approximately 4,009 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with G1. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATIONS

1.      As the result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One through Seven, inclusive, of this Indictment, defendant GENE LEVOFF shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the conspiracy and securities fraud offenses, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

  a.      Cannot be located upon the exercise of due diligence;

  b.      Has been transferred or sold to, or deposited with, a third person;

  c.      Has been place beyond the jurisdiction of the Court;

  d.      Has been substantially diminished in value; or

  e.      Has been commingled with other property which cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.


A TRUE BILL


Grand Jury Foreperson


CRAIG CARPENITO
UNITED STATES ATTORNEY

CASE NUMBER: _19 cr 780 (WJM)_

## United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

GENE LEVOFF

# INDICTMENT FOR

15 U.S.C. §§ 78j(b) and 78ff
17 C.F.R. §§ 240.10b-5 and 240.10b5-2
18 U.S.C. §§ 1343 and 2

A True Bill

_____
Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

COURTNEY A. HOWARD
DANIEL V. SHAPIRO
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Mark Falk |
| | : | |
| v. | : | Mag. No. 19-3507 |
| | : | |
| GENE LEVOFF | : | **CRIMINAL COMPLAINT** |

I, Robert M. Napolitano, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Special Agent Robert M. Napolitano
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
February 13, 2019 at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

## Count One
## (Securities Fraud)

From in or around February 2011 through in or around April 2016, in Hudson County, in the District of New Jersey, and elsewhere, defendant

### GENE LEVOFF

did unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: by executing and causing others to execute securities transactions in the securities of Company-1 on the basis of material nonpublic information concerning Company-1 in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively to the issuers of those securities, the shareholders of the issuers, and to other persons who were the source of the material nonpublic information.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Robert M. Napolitano, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with law enforcement officers, witnesses, and others, and my review of reports, documents, and items of evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. All times are approximate and, unless otherwise noted, are in the Pacific Time Zone.

### Background Information

1.    At all times relevant to this Complaint:

a.    Company-1 was a global technology company headquartered in Cupertino, California that designed, developed, and sold consumer electronics, computer software, and online services. Company-1 was a publicly traded company whose securities were listed on the NASDAQ Stock Market. In terms of market capitalization, Company-1 was consistently among the most valuable companies in the world.

b.    Defendant GENE LEVOFF ("LEVOFF") was employed by Company-1 at its headquarters in Cupertino. From in or around 2008 through in or around 2013, LEVOFF, an attorney, was the Director of Corporate Law at Company-1. From in or around 2013 through his termination in or around September 2018, LEVOFF was the Senior Director of Corporate Law at Company-1. In that role, LEVOFF functioned as the top corporate attorney at Company-1, reporting directly to Company-1's General Counsel. Among other things, LEVOFF was responsible for overseeing Company-1's compliance with securities laws, which included advising others regarding U.S. Securities and Exchange Commission (the "SEC") filings and financial reporting. In or around February 2018, Company-1 named LEVOFF its Corporate Secretary, a title he maintained until his termination. Before that, LEVOFF held the role of Assistant Secretary. From in or around September 2008 through in or around July 2018, LEVOFF served on Company-1's Disclosure Committee, and, as a result, had access to and obtained Company-1's draft SEC filings and earnings materials before Company-1 disclosed its quarterly and yearly financial results to the public. LEVOFF served as one of the Disclosure Committee's co-chairpersons from in or around December 2012 through in or around July 2018.

c.      First Republic Securities Company, LLC ("First Republic") was a brokerage firm based in San Francisco, California that provided various investment services, including online investing.  LEVOFF maintained an account with First Republic (the "First Republic Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

d.      TD Ameritrade was a brokerage firm based in Omaha, Nebraska that provided online investing services for institutions and individuals.  LEVOFF maintained a brokerage account with TD Ameritrade (the "TD Ameritrade Brokerage Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

e.      Virtu Americas, LLC, f/k/a KCG Americas LLC, f/k/a Knight Capital Markets ("Virtu") was a market maker – i.e., a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price, thus providing liquidity to the market.  The servers that housed Virtu's electronic trading systems and executed trades involving those systems were located in Jersey City, New Jersey.

f.      Susquehanna International Group, f/k/a G1 Execution Services, LLC ("G1") was a market maker.  The servers that housed G1's electronic trading systems and executed trades involving those systems were located in Secaucus, New Jersey.

g.      BNY Mellon Capital Markets, LLC ("BNY Mellon") was a market maker.  The third-party affiliate servers that housed BNY Mellon's electronic trading systems were located in Carteret, New Jersey.

h.      Two Sigma Securities, LLC ("Two Sigma") was a market maker.  The servers that housed Two Sigma's electronic trading systems and executed trades involving those systems were located in Secaucus, New Jersey.

### The Insider Trading Scheme

2.      From in or around February 2011 through in or around April 2016, LEVOFF orchestrated a scheme to defraud Company-1 and its shareholders by misappropriating material nonpublic information regarding Company-1's financial results in order to execute favorable trades involving the securities of Company-1.  These trades caused LEVOFF to realize profits of approximately $227,000 and to avoid losses of approximately $377,000.

3.      In particular, LEVOFF used his position as a member and/or an invitee of Company-1's Disclosure Committee to obtain material nonpublic information regarding Company-1's financial results before Company-1 disclosed that information to the public.

2

4.     LEVOFF converted the material nonpublic information to his own use by executing trades involving Company-1 stock in the TD Ameritrade Brokerage Account and/or the First Republic Account before Company-1 disclosed its financial results to the public.  When LEVOFF discovered that Company-1 had posted strong revenue and net profit for a given financial quarter, he purchased large quantities of Company-1 stock, which he later sold for a profit once Company-1 disclosed the positive earnings information to the public and the market reacted to the news.  Conversely, when LEVOFF learned that Company-1 had posted lower-than-anticipated revenue and net profit, he sold large quantities of Company-1 stock, thus avoiding the significant losses that would occur once Company-1 disclosed the information to the public and the market reacted to the negative news regarding Company-1's earnings.

5.     A number of the trades referenced in this Complaint were executed with market maker counterparties whose electronic trading systems and/or servers were located in the District of New Jersey, namely, Virtu, G1, BNY Mellon, and Two Sigma.

6.     When LEVOFF executed each of the trades described in this Complaint, he was subject to a regular company-imposed "blackout period" that prohibited him and others like him with access to material nonpublic information regarding Company-1 from engaging in trades involving Company-1 stock.  LEVOFF ignored this restriction, as well as Company-1's Insider Trading Policy, and instead repeatedly executed trades based on material nonpublic information without Company-1's knowledge or authorization.

## Company-1's Periodic SEC Filings, Public Disclosures of Financial Results, and the Disclosure Committee

7.     At all times relevant to this Complaint, Company-1 divided its financial year into four quarters that each consisted of three calendar months: "Q1" or first quarter (October, November, December); "Q2" or second quarter (January, February, March); "Q3" or third quarter (April, May, June); and "Q4" or fourth quarter (July, August, September).  As with other publicly traded companies, Company-1 was required to file quarterly Form 10-Q reports and annual Form 10-K reports with the SEC.  Among other things, Company-1's periodic SEC filings contained information regarding Company-1's quarterly and yearly financial results.  Once filed, Company-1's SEC filings were available online to the public.

8.     Company-1 typically disclosed its quarterly and yearly financial results to the public shortly before its SEC filings.  Company-1 announced its earnings via press releases and executive remarks, which occurred in or around the following dates each financial year: late-January or early-February (Q1 financial results); late-April or early-May (Q2 financial results); late-July or

early-August (Q3 financial results); and late-October or early-November (Q4 and yearly financial results).

9.    At all times relevant to this Complaint, Company-1 had a Disclosure Committee that reviewed and discussed Company-1's draft SEC filings and its draft public disclosures of financial results before they were filed with the SEC and/or disclosed to the public. The composition of the Disclosure Committee changed over time, but its members typically consisted of high-level executives within Company-1, including Vice Presidents and Directors of various groups. The Disclosure Committee also included various "invitees," who were typically high-ranking employees within those groups. At any given point, the Disclosure Committee's members and invitees generally totaled approximately fourteen to approximately eighteen individuals.

10.    At all times relevant to this Complaint, LEVOFF was a member and/or an invitee of the Disclosure Committee. Beginning in or around December 2012 and continuing through in or around July 2018, LEVOFF led the Disclosure Committee, serving as one of its co-chairpersons.

11.    The Disclosure Committee typically met one or two weeks before Company-1 filed its Form 10-Q/Form 10-K reports with the SEC and/or disclosed its financial results to the public. The Disclosure Committee meetings took place at Company-1's headquarters in Cupertino, although some Disclosure Committee members and/or invitees participated in meetings by telephone. During the meetings, Disclosure Committee members and invitees reviewed and discussed Company-1's draft SEC filings and/or draft earnings materials that would later be disclosed to the public.

12.    A few days before each Disclosure Committee meeting, Disclosure Committee members and invitees received an email or series of emails attaching Company-1's draft SEC filings and/or draft earnings materials, which included information regarding Company-1's financial results.

13.    The information regarding Company-1's financial results that Disclosure Committee members and invitees received by email, and later reviewed and discussed during Disclosure Committee meetings, was material nonpublic information. The information ceased being material nonpublic information only after Company-1 disclosed the information to the public in SEC filings and/or through press releases.

14.    As a Disclosure Committee member and high-ranking Company-1 employee, LEVOFF owed a fiduciary duty to Company-1 and its shareholders to protect material nonpublic information regarding Company-1 to which he had access. LEVOFF further owed Company-1 and its shareholders a duty not to use such material nonpublic information for his own personal benefit.

## **Company-1's Insider Trading Policy and Regular Blackout Periods**

15.     At all times relevant to this Complaint, Company-1 prohibited its officers, directors, employees, consultants, independent contractors, and their immediate families from engaging in insider trading.  Company-1 memorialized this prohibition against insider trading in its "Insider Trading Policy," which Company-1 periodically amended.  Two Insider Trading Policies were in effect during the time period covered by this Complaint: an Insider Trading Policy dated August 21, 2003 (the "August 2003 Insider Trading Policy") and, later, an Insider Trading Policy dated September 2015 (the "September 2015 Insider Trading Policy").

16.     Company-1's August 2003 Insider Trading Policy prohibited any officer, director, employee, consultant, independent contractor, or immediate family member who received or had access to material nonpublic information regarding Company-1 from engaging "in any transaction involving a purchase or sale of [Company-1's] securities" from the date he or she possessed material nonpublic information until either sixty hours after public disclosure of the information or at such time as the nonpublic information was no longer material.  Similarly, the September 2015 Insider Trading Policy prohibited individuals from "buy[ing] or sell[ing] [Company-1] stock when aware of information that ha[d] not been publicly announced and that could have a material effect on the value of the stock" until either twenty-four hours after public disclosure or when the information was no longer material.

17.     The August 2003 and September 2015 Insider Trading Policies each identified Company-1's "financial results" among the various categories of sensitive material information that could form the basis of insider trading.  The August 2003 and September 2015 Insider Trading Policies also warned employees that engaging in transactions involving Company-1's stock while in possession of material nonpublic information regarding Company-1 violated federal securities laws.

18.     Since at least in or around 2010, LEVOFF had responsibility for ensuring compliance with Company-1's Insider Trading Policy.  In or around 2015, LEVOFF initiated and oversaw an update of the policy that resulted in the revised September 2015 Insider Trading Policy.

19.     At all times relevant to this Complaint, Company-1 instituted a regular "blackout period" ahead of its public disclosure of Company-1's periodic financial results.  During these blackout periods, individuals likely to possess material nonpublic information regarding Company-1 – sometimes referred to as "insiders" – were prohibited from buying or selling Company-1 securities.  Company-1's blackout periods generally began on the first day of the last month of a fiscal quarter – i.e., December/Q1, March/Q2, June/Q3, and September/Q4 – and ended either sixty or twenty-four hours (depending

on the Insider Trading Policy in effect at the time) after Company-1 publicly disclosed its periodic financial results in a press release.

20.     Prior to each blackout period, Company-1 sent an email to individuals subject to the blackout period notifying them (i) that they were subject to the blackout period and therefore prohibited from buying or selling Company-1 stock during that period, and (ii) of the dates the blackout period began and ended.  The blackout period emails also reiterated and summarized Company-1's prohibition against insider trading.

21.     At certain times relevant to this Complaint, LEVOFF's compliance responsibilities in connection with insider trading included notifying individuals subject to the blackout period or supervising individuals who made the notifications.  On several occasions, LEVOFF authored and disseminated the blackout period notification emails himself.  LEVOFF also played a role in determining who should be placed on the blackout list.

22.     At all times relevant to this Complaint, LEVOFF – a member and/or an invitee of the Disclosure Committee with access to material nonpublic information regarding Company-1 – was subject to Company-1's blackout periods.  As with other insiders, Company-1 notified LEVOFF by email that he was subject to the blackout periods and of the specific dates of the blackout periods.

23.     At no time relevant to this Complaint was LEVOFF authorized by Company-1 or by any other entity to buy or sell Company-1 stock while in possession of material nonpublic information regarding Company-1, nor was he authorized to buy or sell Company-1 stock during any applicable blackout period.

### LEVOFF Trades Ahead of Company-1's
### Q2 2011 Earnings Announcement

24.     The blackout period for Q2 2011 began on or about March 1, 2011 and ended on or about April 25, 2011 (the "Q2 2011 Blackout Period").

25.     On or about February 24, 2011, LEVOFF sent an email to individuals subject to the Q2 2011 Blackout Period bearing the subject line, "Commencement of Trading Blackout – March 1, 2011."  In the email, LEVOFF – who was himself subject to the Q2 2011 Blackout Period – notified the recipients that, starting on or about March 1, 2011, they and their immediate family members were prohibited from engaging in "any transactions in [Company-1] securities" until sixty hours after Company-1 announced its quarterly earnings in or around April 2011.  LEVOFF stated in the email that Company-1's Insider Trading Policy prohibited individuals from buying or selling Company-1 stock if they possessed material nonpublic information

6

regarding Company-1. Specifically, LEVOFF wrote: "Pursuant to [Company-1's] Insider Trading Policy, you are prohibited from any transactions in [Company-1] securities if you possess or have access to material nonpublic information regarding [Company-1]." To emphasize that Company-1's prohibition against insider trading applied regardless of whether a blackout period was in place, LEVOFF wrote at the top of the email, in capitalized letters: "*** REMEMBER, TRADING IS NOT PERMITTED, WHETHER OR NOT IN AN OPEN TRADING WINDOW, IF YOU POSSESS OR HAVE ACCESS TO MATERIAL INFORMATION THAT HAS NOT BEEN DISCLOSED PUBLICLY ***." LEVOFF concluded the email by reiterating that trading on material nonpublic information was impermissible and encouraged the recipients to contact a Company-1 employee to discuss any questions they had regarding the policy.

26.    On or about April 8, 2011, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q2 2011. The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for Q2 2011.

27.    Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q2 2011, including a draft press release, financials, and prepared executive remarks.

28.    On or about April 11, 2011, the Disclosure Committee met at Company-1's headquarters in Cupertino. LEVOFF attended the meeting in person as a Disclosure Committee invitee. During the meeting, Disclosure Committee members and invitees reviewed and discussed Company-1's proposed Q2 2011 disclosures, including its draft Form 10-Q report and its draft press release regarding earnings.

29.    On or about April 13, 2011, LEVOFF purchased approximately 3,140 shares of Company-1 stock in the TD Ameritrade Brokerage Account. LEVOFF purchased the Company-1 stock at an average price of approximately $334.47 per share, for a total cost of more than approximately $1 million. At the time he purchased the Company-1 stock, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q2 2011 Blackout Period.

30.    On or about April 20, 2011, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q2 2011 financial results to the public. In the April 20, 2011 press release, Company-1 announced that it had posted record revenue and net profit for Q2 2011. Company-1's CEO remarked in the posting that Company-1 was "firing on all cylinders."

31.    Later the same day, LEVOFF sold approximately 3,500 shares of Company-1 stock in the TD Ameritrade Brokerage Account while he was still subject to the Q2 2011 Blackout Period.  LEVOFF sold the Company-1 shares at an average price of approximately $353.85 per share.  By virtue of his sales of Company-1 stock on or about April 20, 2011, LEVOFF realized a profit of approximately $60,000.

32.    On or about April 22, 2011, LEVOFF sent an email to individuals subject to the Q2 2011 Blackout Period notifying them that the blackout period would end on or about April 25, 2011.  LEVOFF told the email recipients they could resume trading Company-1 securities on the specified date and reiterated Company-1's prohibition against insider trading.  LEVOFF wrote in the email: "This information is provided to you in an effort to protect you and [Company-1] from any violations of federal . . . securities laws that may result from a failure to comply with those laws."

### LEVOFF Trades Ahead of Company-1's Q3 2011 Earnings Announcement

33.    The blackout period for Q3 2011 began on or about June 1, 2011 and ended on or about July 22, 2011 (the "Q3 2011 Blackout Period").

34.    On or about May 27, 2011, LEVOFF sent an email to individuals subject to the Q3 2011 Blackout Period with the subject line, "Commencement of Trading Blackout – June 1, 2011."  LEVOFF was again among the individuals subject to the Q3 2011 Blackout Period.  In the email – which, except for the dates of the applicable blackout period, was virtually identical to his February 24, 2011 email – LEVOFF notified the recipients that they and their immediate family members were prohibited from trading in Company-1 securities starting on or about June 1, 2011 until sixty hours after Company-1 announced its quarterly earnings in or around July 2011.  LEVOFF stated in the email – as he had in his February 24, 2011 email – that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place.

35.    On or about July 8, 2011, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q3 2011, including a draft press release, financials, and prepared executive remarks.

36.    Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q3 2011.  The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for

8

Q3 2011.  Soon after receiving this material nonpublic information, LEVOFF began purchasing Company-1 stock.

37.     On or about July 11, 2011, at approximately 6:40 a.m., LEVOFF purchased approximately 850 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $357.76 per share.  At the time he made the purchases, LEVOFF possessed material nonpublic information regarding Company-1 and was also subject to the Q3 2011 Blackout Period.

38.     At approximately 8:00 a.m. the same day, LEVOFF attended a Disclosure Committee meeting at Company-1's Cupertino headquarters as an invitee.  During the meeting, the Disclosure Committee members and invitees reviewed and discussed Company-1's draft Form 10-Q report and draft earnings materials for Q3 2011.

39.     The following day, on or about July 12, 2011, LEVOFF purchased approximately 860 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

40.     On or about July 14, 2011, LEVOFF purchased approximately 600 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

41.     On or about July 15, 2011, LEVOFF purchased approximately 600 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

42.     On or about July 18, 2011, LEVOFF purchased approximately 700 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

43.     On or about July 19, 2011, LEVOFF purchased approximately 326 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

44.     Between on or about July 11, 2011 and on or about July 19, 2011, LEVOFF purchased approximately 3,936 shares of Company-1 stock at average prices ranging from approximately $354.58 to approximately $374.80 per share.  LEVOFF paid nearly $1.4 million for the Company-1 stock.  At the time he purchased the shares, LEVOFF was in possession of material nonpublic information regarding Company-1 and was subject to the Q3 2011 Blackout Period.

45.     On or about July 19, 2011, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q3 2011 financial results to the public. The public disclosure announced that Company-1 had again posted record revenue and net profit for Q3 2011.  Company-1's CEO remarked in the July 19, 2011 press release that Company-1 was "thrilled to deliver [its] best quarter ever."

46.     Later the same day, LEVOFF began selling Company-1 securities. By the time he was finished, LEVOFF had liquidated approximately 3,936 shares of Company-1 stock – the same number of shares LEVOFF had purchased in the days leading up to Company-1's July 19, 2011 press release. LEVOFF sold the 3,936 shares at an average price of approximately $397.88 per share, well above the prices he had paid for an equal number of Company-1 shares days earlier. As a result of his sales of Company-1 stock on or about July 19, 2011 – when he was still subject to the Q3 2011 Blackout Period – LEVOFF realized a profit of approximately $144,000.

47.     On or about July 21, 2011, LEVOFF sent an email notifying individuals subject to the Q3 2011 Blackout Period that the trading restriction would end on or about July 22, 2011.  LEVOFF reminded the recipients that they were prohibited from trading Company-1 stock if they had access to material nonpublic information regarding Company-1 and that such conduct violated federal securities laws.

### LEVOFF Trades Ahead of Company-1's
### Q1 2012 Earnings Announcement

48.     The blackout period for Q1 2012 began on or about December 1, 2011 and ended on or about January 27, 2012 (the "Q1 2012 Blackout Period").

49.     On or about November 28, 2011, a Company-1 employee sent an email to individuals subject to the Q1 2012 Blackout Period, including LEVOFF.  The email – which had the subject line, "Commencement of Trading Blackout – December 1, 2011" – notified the recipients that they and their immediate family members were prohibited from engaging in any transactions involving Company-1 stock beginning on or about December 1, 2011 and ending sixty hours after Company-1 announced its earnings in or around January 2012.  The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place.

50.     On or about January 13, 2012, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q1 2012, including a draft press release, financials, and prepared executive remarks.

51.     Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q1 2012.  The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for Q1 2012.

52.   On or about January 16, 2012, the Disclosure Committee met at Company-1's headquarters in Cupertino.  LEVOFF attended the meeting in person as a Disclosure Committee invitee.  During the meeting, members and invitees of the Disclosure Committee discussed Company-1's draft Form 10-Q report and draft earnings materials for Q1 2012.  After the Disclosure Committee meeting, LEVOFF began purchasing Company-1 securities, all in the TD Ameritrade Brokerage Account.

53.   On or about January 20, 2012, LEVOFF purchased approximately 800 shares of Company-1 stock at an average price of approximately $423.36 per share.

54.   On or about January 23, 2012, LEVOFF purchased approximately 250 additional shares of Company-1 stock at an average price of approximately $427.50 per share.

55.   On or about the morning of January 24, 2012, LEVOFF purchased another approximately 528 shares of Company-1 stock at an average price of approximately $423.98 per share.

56.   Together, LEVOFF paid a total of approximately $669,000 to acquire approximately 1,578 shares of Company-1 stock.  At the time of the purchases, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q1 2012 Blackout Period.

57.   On or about January 24, 2012, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q1 2012 financial results to the public.  The January 24, 2012 press release heralded Company-1's record revenue and net profit for the quarter, which Company-1's CEO credited to Company-1's "record-breaking sales" of Company-1 products.

58.   Later the same day, LEVOFF began selling shares of Company-1 stock.  LEVOFF sold approximately 666 shares of Company-1 stock at an average price of approximately $454.11 per share, well above the prices LEVOFF had paid days before.  By virtue of LEVOFF's sales on or about January 24, 2012 – which occurred when he was still subject to the Q1 2012 Blackout Period – LEVOFF realized a profit of approximately $19,000.

59.   On or about January 26, 2012, a Company-1 employee sent an email to individuals subject to the Q1 2012 Blackout Period, including LEVOFF, advising them that the trading restriction would end on or about January 27, 2012.  The email went on to reiterate Company-1's prohibition against insider trading, regardless of whether a blackout period was in place.

## LEVOFF Trades Ahead of Company-1's
## Q3 2015 Earnings Announcement

60.    The blackout period for Q3 2015 began on or about June 1, 2015 and ended on or about July 24, 2015 (the "Q3 2015 Blackout Period").

61.    On or about May 26, 2015, Company-1 sent an email to individuals subject to the Q3 2015 Blackout Period, including LEVOFF.  The email notified the recipients that they and their immediate family members were prohibited from buying or selling Company-1 stock beginning on or about June 1, 2015 until sixty hours after Company-1 released its earnings to the public in or around July 2015.  The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

62.    On or about July 10, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q3 2015, including a draft press release, financials, and prepared executive remarks.

63.    Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q3 2015.  The email read: "Each Disclosure Committee member is required to review the entire Form 10-Q to ensure the Company's disclosures are complete and accurate."  Among other things, the attached draft Form 10-Q contained information about Company-1's earnings, including Company-1's revenue and net profit for Q3 2015.

64.    On or about July 13, 2015, the Disclosure Committee met at Company-1's headquarters in Cupertino.  LEVOFF was one of the two co-chairpersons of the Disclosure Committee and participated in the meeting by telephone.  During the meeting, Disclosure Committee members and invitees reviewed and discussed Company-1's draft earnings materials and draft Form 10-Q report for Q3 2015.  After the Disclosure Committee meeting, LEVOFF began selling Company-1 securities.

65.    On or about July 17, 2015, LEVOFF sold approximately 43,750 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $129 per share.  Virtu acted as a counterparty for some of these trades.

66.    That same day, LEVOFF sold approximately 8,700 shares of Company-1 stock in the First Republic Account at an average price of

approximately $128.94 per share.  BNY Mellon acted as a counterparty for some of these trades.

67.     On or about July 20, 2015, LEVOFF sold approximately 7,000 more shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $131.54 per share.  G1 and Virtu each acted as counterparties for some of these trades.

68.     On or about July 21, 2015, LEVOFF sold approximately 17,678 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $131.07 per share.  Virtu and Two Sigma each acted as counterparties for some of these trades.

69.     From on or about July 17, 2015 through on or about July 21, 2015, LEVOFF sold approximately 77,128 shares of Company-1 stock for approximately $10 million.  At the time of the sales, LEVOFF was in possession of material nonpublic information regarding Company-1 and was subject to Q3 2015 Blackout Period.

70.     On or about July 21, 2015, at approximately 1:30 p.m. – after LEVOFF had sold his final shares of Company-1 stock that day – Company-1 issued a press release disclosing its Q3 2015 financial results to the public. The July 21, 2015 press release disclosed revenue and profit below what many analysts had predicted, causing Company-1's stock price to decline by nearly 4.2 percent by the close of trading the following day.

71.     As a result of LEVOFF's sale of approximately 77,128 shares of Company-1 stock ahead of Company-1's July 21, 2015 press release – when he was still subject to the Q3 2015 Blackout Period – LEVOFF avoided a loss of approximately $345,000.

72.     On or about July 23, 2015, Company-1 sent an email to individuals subject to the Q3 2015 Blackout Period, including LEVOFF, stating that the trading restriction would end the following day, on or about July 24, 2015.

### LEVOFF Trades Ahead of Company-1's
### Q4 2015 Earnings Announcement

73.     The blackout period for Q4 2015 began on or about September 1, 2015 and ended on or about October 29, 2015 (the "Q4 2015 Blackout Period").

74.     On or about August 27, 2015, Company-1 sent an email to individuals subject to the Q4 2015 Blackout Period, including LEVOFF, with the subject line, "Commencement of Trading Blackout – Tuesday, September 1, 2015."  The email notified the recipients that they and their immediate family

13

members were prohibited from buying or selling Company-1 stock beginning on or about September 1, 2015 until sixty hours after Company-1 released its earnings to the public in or around October 2015.  The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

75.    On or about October 12, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-K report for financial year 2015.  The email stated that Disclosure Committee members were required to review "the entire Form 10-K" to ensure the disclosures it contained were complete and accurate. Among other things, the draft Form 10-K contained information about Company-1's earnings, including revenue and net profit for financial year 2015.

76.    On or about October 13, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q4 2015, including a draft press release, financials, and prepared executive remarks.

77.    On or about October 15, 2015, Disclosure Committee members and invitees met at Company-1's headquarters in Cupertino to discuss the draft Form 10-K report.  LEVOFF did not attend the meeting or participate by telephone.

78.    On or about October 26, 2015, LEVOFF purchased approximately 10,000 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $115.70 per share for a cost of approximately $1.15 million.  At the time he purchased the Company-1 securities, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q4 2015 Blackout Period.  Two Sigma acted as a counterparty for some of these trades.

79.    On or about the morning of October 27, 2015, Company-1 sent an email to individuals subject to the Q4 2015 Blackout Period, including LEVOFF, informing them that they could resume trading Company-1 securities on or about October 29, 2015.  (Company-1's September 2015 Insider Trading Policy reduced the waiting period from sixty hours after Company-1 disclosed earnings to twenty-four hours.)  The email also reiterated Company-1's standard prohibition against trading on material nonpublic information.

80.    At approximately 1:30 p.m. that afternoon, Company-1 issued a press release disclosing its Q4 2015 financial results to the public.  In the

October 27, 2015 press release, Company-1 announced that Company-1 had posted record fourth quarter results, and Company-1's CEO remarked in the disclosure that "Fiscal 2015 was [Company-1's] most successful year ever."

81.     On or about October 28, 2015 – before the Q4 2015 Blackout Period had terminated – LEVOFF sold approximately 12,174 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $116.20 per share, for a profit of approximately $4,700.

### LEVOFF Trades Ahead of Company-1's Q2 2016 Earnings Announcement

82.     The blackout period for Q2 2016 began on or about March 1, 2016 and ended on or about April 28, 2016 (the "Q2 2016 Blackout Period").

83.     On or about February 25, 2016, Company-1 sent an email to individuals subject to the Q2 2016 Blackout Period, including LEVOFF.  The email – which had the subject line, "Commencement of Trading Blackout – Tuesday, March 1, 2016" – notified the recipients that they and their immediate family members were prohibited from engaging in any transactions involving Company-1 stock beginning on that date until twenty-four hours after Company released its earnings in or around April 2016.  The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

84.     On or about April 8, 2016, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q2 2016.  The draft Form 10-Q contained information about Company-1's earnings, including revenue and net profit for Q2 2016.

85.     On or about April 15, 2016, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q2 2016, including a draft press release, financials, and prepared executive remarks.

86.     Later the same day, the Disclosure Committee met at Company-1's headquarters in Cupertino.  LEVOFF, as one of the Disclosure Committee's co-chairpersons, attended the meeting in person.  During the meeting, the Disclosure Committee reviewed and discussed Company-1's draft earnings materials for Q2 2016.

87.     On or about April 21, 2016, LEVOFF sold approximately 4,009 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an

average price of approximately $105.87 per share.  At the time, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q2 2016 Blackout Period.  G1 acted as a counterparty for some of these trades.

88.    On or about April 26, 2016, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q2 2016 financial results to the public. Company-1 announced in the April 26, 2016 press release that its revenue and net profit were each down compared to Q2 2015.  Company-1's CEO remarked in the press release that Company-1's team had "executed extremely well in the face of strong macroeconomic headwinds."  By the close of trading the following day, Company-1's stock price had fallen approximately 6.2 percent.

89.    By virtue of his sales of Company-1 stock on or about April 21, 2016 – while he possessed material nonpublic information regarding Company-1's earnings – LEVOFF avoided a loss of approximately $32,000.

90.    On or about April 27, 2016, Company-1 sent an email to individuals subject to the Q2 2016 Blackout Period, including LEVOFF.  The email announced that the recipients could resume trading Company-1 securities on or about April 28, 2016.

16

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant Gene D. Levoff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : No. 2:19-cv-05536 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : **ANSWER, AFFIRMATIVE** |
| | : **DEFENSES, AND DEMAND** |
| | : <u>**FOR TRIAL BY JURY**</u> |
| GENE DANIEL LEVOFF, | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendant, Gene D. Levoff ("Levoff"), by his undersigned attorneys, answers and responds to the Complaint of Plaintiff, the Securities and Exchange Commission (the "SEC"), as follows.  By submitting this Answer, Levoff does not waive, and expressly preserves, all of his rights under the Fifth Amendment to the U.S. Constitution in light of the parallel criminal proceeding pending against him.[1]   Unless specifically admitted, Levoff asserts his Fifth Amendment privilege against self-incrimination in response to each substantive allegation in the Complaint, and denies them on that basis.[2]

---

[1] *United States v. Levoff*, No. 2:19-mj-3507-MF.

[2] *Nat'l Acceptance Co. v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983) ("Because a plaintiff may not rest a judgment on a defendant's constitutionally protected silence alone, a valid claim of privilege in response to the allegations of a complaint must not be treated as an admission of those allegations."); *see also SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) (relying on *Bathalter* for the proposition that "dismissal of an action or entry of judgment as a

## SUMMARY

1.      Levoff admits that he was employed by Apple Inc. ("Apple") and that he was Apple's Senior Director of Corporate Law, Corporate Secretary, and a member of its Disclosure Committee.  Levoff further admits that the Complaint alleges that he engaged in insider trading. Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the remaining allegations contained in paragraph 1 of the Complaint, and denies them on that basis.

2.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 2 of the Complaint, and denies them on that basis.

3.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 3 of the Complaint, and denies them on that basis.

4.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 4 of the Complaint, and denies them on that basis.

5.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 5 of the Complaint, and denies them on that basis.

---

sanction for a valid invocation of the privilege during discovery is improper."); *United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267, 292 n.32 (3d Cir. 1985) (relying on *Bathalter* to find that the mere invocation of the privilege against self-incrimination was not a sufficient basis to draw a negative inference).

6.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 6 of the Complaint, and denies them on that basis.

### NATURE OF PROCEEDING AND RELIEF SOUGHT

7.      Levoff admits that the SEC purports to bring this action pursuant to Section 21A [15 U.S.C. § 78u-1] of the Exchange Act and Section 20(b) [15 U.S.C. § 77t(b)] of the Securities Act.  Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the remaining allegations contained in paragraph 7 of the Complaint, and denies them on that basis.

### JURISDICTION AND VENUE

8.      Levoff admits the allegations contained in paragraph 8 of the Complaint.

9.      Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 9 of the Complaint, and denies them on that basis.

10.     Levoff lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the location of any trading activity alleged in paragraph 10 of the Complaint, and denies them on that basis.  Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the remaining allegations contained in paragraph 10 of the Complaint, and denies them on that basis.

### DEFENDANT

11.     Levoff denies that he is 44 years old, but admits the remaining allegations contained in paragraph 11 of the Complaint.

## OTHER RELEVANT ENTITY

12.     Levoff admits the allegations contained in paragraph 12 of the Complaint.

## FACTS

### A.     Levoff Was an Insider Who Had a Duty to Apple and Its Shareholders Not to Trade on Apple's Nonpublic Information

Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in heading A of the Facts section of the Complaint, and denies them on that basis.

*1.   As a Senior Attorney and Member of Apple's Disclosure Committee, Levoff Was Entrusted with Material Nonpublic Information*

Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in subheading A.1 of the Facts section of the Complaint, and denies them on that basis.

13.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 13 of the Complaint, and denies them on that basis.

14.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 14 of the Complaint, and denies them on that basis.

15.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 15 of the Complaint, and denies them on that basis.

16.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 16 of the Complaint, and denies them on that basis.

17.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 17 of the Complaint, and denies them on that basis.

>    2.   *At the Time of His Trading, Apple Had Taken Steps to Prevent Employees, Such as Levoff, from Trading on Material Nonpublic Information*
>
>    Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in subheading A.2 of the Facts section of the Complaint, and denies them on that basis.

18.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 18 of the Complaint, and denies them on that basis.

19.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 19 of the Complaint, and denies them on that basis.

20.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 20 of the Complaint, and denies them on that basis.

21.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 21 of the Complaint, and denies them on that basis.

22.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 22 of the Complaint, and denies them on that basis.

23.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 23 of the Complaint, and denies them on that basis.

**B.     Levoff Learned Material, Nonpublic Information as a Member of Apple's Disclosure Committee and Traded on That Information in Breach of His Duty to Apple**

Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in heading B of the Facts section of the Complaint, and denies them on that basis.

24.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 24 of the Complaint, and denies them on that basis.

25.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 25 of the Complaint, and denies them on that basis.

*The July 21, 2015 Earnings Announcement*

26.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 26 of the Complaint, and denies them on that basis.

27.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 27 of the Complaint, and denies them on that basis.

28.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 28 of the Complaint, and denies them on that basis.

29.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 29 of the Complaint, and denies them on that basis.

30.     Levoff lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 30 of the Complaint, and denies them on that basis.

31.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 31 of the Complaint, and denies them on that basis.

32.     Levoff lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 32 of the Complaint, and denies them on that basis.

33.     Levoff lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 33 of the Complaint, and denies them on that basis.

34.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 34 of the Complaint, and denies them on that basis.

### *The October 27, 2015 Earnings Announcement*

35.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 35 of the Complaint, and denies them on that basis.

36.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 36 of the Complaint, and denies them on that basis.

37.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 37 of the Complaint, and denies them on that basis.

38.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 38 of the Complaint, and denies them on that basis.

39.     Levoff lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 39 of the Complaint, and denies them on that basis.

40.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 40 of the Complaint, and denies them on that basis.

41.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 41 of the Complaint, and denies them on that basis.

*The April 26, 2016 Earnings Announcement*

42.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 42 of the Complaint, and denies them on that basis.

43.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 43 of the Complaint, and denies them on that basis.

44.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 44 of the Complaint, and denies them on that basis.

45.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 45 of the Complaint, and denies them on that basis.

46.     Levoff lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 46 of the Complaint, and denies them on that basis.

47.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 47 of the Complaint, and denies them on that basis.

<u>*The 2011 and 2012 Earnings Reports*</u>

48.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 48 of the Complaint, and denies them on that basis.

49.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 49 of the Complaint, and denies them on that basis.

50.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 50 of the Complaint, and denies them on that basis.

C.     **Levoff Knew, or Was Reckless in Not Knowing, That He Traded on Material Nonpublic Information in Violation of His Duty to Apple and Its Shareholders**

Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in heading C of the Facts section of the Complaint, and denies them on that basis.

51.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 51 of the Complaint, and denies them on that basis.

52.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 52 of the Complaint, and denies them on that basis.

53.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 53 of the Complaint, and denies them on that basis.

54.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 54 of the Complaint, and denies them on that basis.

55.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 55 of the Complaint, and denies them on that basis.

56.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 56 of the Complaint, and denies them on that basis.

57.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 57 of the Complaint, and denies them on that basis.

## **FIRST CLAIM FOR RELIEF**

### **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

58.     Levoff repeats and realleges his responses to paragraphs 1 through 57 as if set forth fully herein.

59.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 59 of the Complaint, and denies them on that basis.

60.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 60 of the Complaint, and denies them on that basis.

## **SECOND CLAIM FOR RELIEF**

### **Section 17(a)(1) of the Securities Act**

61.     Levoff repeats and realleges his responses to paragraphs 1 through 60 as if set forth fully herein.

62.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 62 of the Complaint, and denies them on that basis.

63.     Levoff asserts his Fifth Amendment privilege against compelled self-incrimination in response to the allegations contained in paragraph 63 of the Complaint, and denies them on that basis.

**PRAYER FOR RELIEF**

WHEREFORE, Levoff respectfully demands judgment in his favor and against the Plaintiff dismissing the Complaint in its entirety with prejudice and awarding such other relief as the Court may deem just and proper.

**AFFIRMATIVE DEFENSES**

1. The Complaint fails to state a claim against Levoff upon which relief can be granted.

2. The Complaint is barred, in whole or in part, by the applicable statute of limitations.

3. Levoff reserves the right to assert such additional defenses as may become applicable during the course of this litigation.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Levoff hereby demands a trial by jury on all issues properly so triable.

Respectfully submitted,

**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Phone: (973) 824-9300
Fax:    (973) 824-8425

Dated: March 26, 2019
       Chatham, New Jersey          By: _____
                                         Kevin H. Marino
                                         kmarino@khmarino.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES,** | |
| **v.** | 19-cr-780 |
| **GENE LEVOFF.** | **OPINION** |

## WILLIAM J. MARTINI, U.S.D.J.:

This matter arises out of Defendant Gene Levoff's alleged insider trading scheme. The matter comes before the Court on Defendant's Motion to Dismiss the Indictment. ECF No. 32. As discussed in more detail below, the motion is **DENIED**.

## I.    BACKGROUND

According to the Criminal Complaint, from 2008-2018, Defendant Gene Levoff ("Levoff") was an attorney at a large technology company ("Employer") listed on the NASDAQ Stock Exchange. From 2008-2013, Levoff was director of Corporate Law, before being promoted to Senior Director. Levoff also served as Corporate Secretary and was a member (and co-chairperson) of the Disclosure Committee. As a member of the Disclosure Committee, Levoff had early access to Employer's draft U.S. Securities Commission ("SEC") filings. Compl., ECF No. 1.

The Government alleges that from 2011-2016, Levoff orchestrated an insider trading scheme to defraud Employer and its shareholders. Purportedly based on non-public information he received as a member of the Disclosure Committee, Levoff traded Employer's securities shortly before its results became public. The trades allegedly allowed Levoff to realize profits of $227,000 and to avoid losses of $377,000. Indictment, ECF No. 16.

On October 24, 2019, a federal grand jury returned a twelve-count indictment (the "Indictment") against Levoff, charging him with securities fraud for violations of 15 U.S.C. § 78j & 78ff; 17 C.F.R. §§ 240.10b-5 & 240.10b5-2; and 18 U.S.C. § 2 (Counts 1-6) and wire fraud for violations of 18 U.S.C. §§ 1343 & 2 (Counts 7-12). On April 27, 2020, Levoff moved to dismiss all counts of the Indictment, arguing that criminal insider trading laws are unconstitutional. Mot. at 3.

## II.    STANDARD OF REVIEW

When evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in an indictment. *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Thus, a district court's review is limited to determining whether, assuming all of the facts as true, a jury could find that the defendant committed the offense for which he was charged. *Id.* at 596. Further, "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).

## III.      DISCUSSION

Levoff argues that because there is no statute that explicitly criminalizes insider trading, the Indictment must be dismissed.  The Government responds that Levoff's alleged conduct violates the Securities and Exchange Act of 1934 ("the Act") and SEC regulations as a "classical" case of insider trading.  The Government is correct.

### A.      The Allegations Constitute a "Classical" Insider Trading Violation

15 U.S.C. § 78j prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Under the "classical theory," insider trading constitutes a deceptive trade practice prohibited by Section 78j.  Courts have interpreted "manipulative or deceptive device" to include trading by a corporate insider based on material, nonpublic information.  *United States v. O'Hagan,* 521 U.S. 642, 651-52 (1997).  Given the fiduciary relationship between corporate insiders—including corporate officers and attorneys—and shareholders, insiders have a duty to either disclose material information, or abstain from trading the corporation's securities.  *Chiarella v. United States*, 445 U.S. 222, 228-29 (1980).  Furthermore, contrary to Levoff's assertions, the SEC *did* promulgate a rule barring classical insider trading.  Under 17 C.F.R. § 240.10b5–1(a):

> The manipulative and deceptive devices prohibited by . . . 15 U.S.C. § 78j[] and § 240.10b-5 thereunder include . . . the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly . . . to the issuer of that security or the shareholders of that issuer . . . .

Levoff's alleged conduct fits squarely within the SEC's promulgated definition of "manipulative and deceptive devices."  *See id.*  As a member of Employer's Disclosure Committee and an attorney for Employer, Levoff had access to material, nonpublic information, and a duty not to misuse it.  *See Chiarella*, 445 U.S. at 228-29.  He allegedly used that material, nonpublic information to make trades that allowed him to realize profits and avoid losses.  *See* 17 C.F.R. § 240.10b5–1(b) (defining "trading on the basis of" as awareness of material, non-public information when trading).  Furthermore, he allegedly traded while specifically subject to Employer's blackout periods.  *See United States v. Heron*, 323 F. App'x 150, 156 (3d Cir. 2009) (finding trading pattern during blackout period "might be sufficient for a jury to infer guilt" even without evidence of insider knowledge).  In doing so, he breached his "duty of trust or confidence" to Employer.  17 C.F.R. § 240.10b5–1(a).  Accordingly, Levoff's alleged conduct is within "the scope of the relevant criminal statute, as a matter of statutory interpretation."  *Panarella*, 277 F.3d at 685.

### B.      Insider Trading Is Not a Common-Law Crime

Levoff characterizes insider trading law as "federal common-law crimes," and thus unconstitutional.  Levoff is incorrect.  Congress passed the Act "in order to protect interstate commerce. . . and to insure the maintenance of fair and honest markets in such transactions." 15 U.S.C. § 78b.  The Act established the SEC as the rulemaking body for securities

regulation and gave it the authority to promulgate rules related to securities fraud and transactions. 15 U.S.C. § 78d. Thereafter, the SEC promulgated rules directly applicable to Levoff's alleged conduct. *Compare* 17 C.F.R. § 240.10b5–1 (defining terms in 15 U.S.C. § 78j and 15 C.F.R. § 240.10b-5), *with* Mot. at 1-2 ("Had the SEC performed that legislative function . . . to promulgate regulations that targeted insider trading as a specific manipulative practice or deceptive device—those regulations would have the force of criminal law.").

Furthermore, since its passage, Congress has repeatedly ratified interpretations of Section 10(b) to include Supreme Court precedent on insider trading. In 2000, Congress modified Section 10(b) to extend "rules promulgated and judicial precedents decided" under Section 10(b) "that prohibit fraud, manipulation, or insider trading" to security-based agreements "to the same extent as they apply to securities." 15 U.S.C. § 78j. Congress has also codified the penalties for violation of SEC regulations, including monetary fines and/or imprisonment. *See* 15 U.S.C. § 78ff. And as discussed above, the SEC promulgated specific rules further clarifying the statutes. The fact that judicial precedents help define the contours of what does, and does not, fall within the statutory and regulatory terms is not unique to insider trading. Instead, it is completely typical. *See Carter v. United States*, 530 U.S. 255, 266-270 (2000) (discussing "extortion," "robbery," and "larceny" with reference to common law meanings and outcomes of various interpretations).

### C.     Insider Trading Laws Do Not Violate the Non-Delegation Doctrine

The non-delegation doctrine, based in Constitutional principle of separation of powers, prohibits Congress from delegating its legislative power to a different branch. *See Mistretta v. United* States, 488 U.S. 361, 371-72 (1989). However, the non-delegation doctrine does not completely preclude Congress from delegating rulemaking powers to administrative agencies. *See id.* at 372. Assistance of such agencies requires Congress to "lay down by legislative act an intelligible principle to which the person or body authorize[d] to [exercise the delegated authority] is directed to conform." *Id.* (citation omitted). The Supreme Court has repeatedly found that the direction supplied by Congress can be broad or general. *See Gundy v. United* States, 139 S. Ct. 2116, 2129 (2019); *Mistretta*, 488 U.S. at 372. Directives for agencies to regulate in the "public interest"; "fair and equitable" prices; "just and reasonable" rates, and "requisite to protect the public health" have passed constitutional muster. *See, e.g.*, Gundy, 139 S. Ct. at 2129.

Here, Levoff argues the charges are beyond the scope of criminal law because the SEC's promulgation of rules outlawing insider trading is outside Congress's delegation to the SEC. He is incorrect. As stated above, the Act was passed by Congress to "insure the maintenance of fair and honest markets in [securities] transactions." 15 U.S.C. § 78b. And Congress delegated power to the SEC to enact securities regulations under the Act toward that goal. 15 U.S.C. § 78b; *United States v. McGee*, 763 F.3d 304, 315 (3d Cir. 2014). The SEC promulgated rule 10b-5, which makes it unlawful "to employ any device, scheme, or artifice to defraud. . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Further, the SEC promulgated 10b5-1, which defines "manipulative and deceptive devices" to include "the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach

3

of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security." Though the term "insider trading" is not included, the regulations outline the nature of the illegal behavior; trading based on material, nonpublic information. Levoff is accused of participating in this exact behavior.

### D.   **Chevron Deference**

Levoff argues that because the Supreme Court has recently rejected *Chevron* deference for criminal statutes, "only judicial opinions focused on the text of the statute itself should govern Levoff's case." Mot. at 22 (citing *United States v. Apel*, 571 U.S. 359, 369 (2014)). And, Levoff continues, without agency deference, the rule of lenity requires the Court to interpret Section 78j in Levoff's favor. *Id.* at 23.

Accepting Levoff's premise *arguendo*, the result remains the same. Levoff quotes Justice Scalia's denial of *certiorari* in *Whitman v. United States* in support of his argument. But as Justice Scalia noted, "[u]ndoubtedly Congress may make it a crime to violate a regulation." *Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J.). Thus, Congress "can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend." *United States v. Grimaud*, 220 U.S. 506, 520 (1911) (cited by *Whitman*, 574 U.S. 1003). Congress did so in enacting 15 U.S.C. § 78j (prohibiting use of "any manipulative or deceptive device or contrivance in contravention *of such rules and regulations as the Commission may prescribe*" (emphasis added)). Thereafter, the SEC enacted several regulations which prohibit Levoff's alleged conduct. *See* 17 C.F.R. §§ 240.10b-5-1; 240.10b-5-1; 240.10b-5-2.

As to lenity, post-*Apel*, the Supreme Court rejected a rule of lenity argument in a case involving "tipper" securities fraud liability. *See Salman v. United States*, 137 S. Ct. 420, 429 (2016). The Court found the rule of lenity inapplicable because the tipper-defendant failed to show a "grievous ambiguity or uncertainty that would trigger the rule's application." *Id.* (citation omitted). Here, Levoff similarly fails to raise a sufficient ambiguity or uncertainty. His alleged conduct is "classical" insider trading. *See supra* Part III.A. As the gift-giving tipper's conviction in *Salman* passed rule-of-lenity muster, so does Levoff's alleged conduct.

### E.   **Wire Fraud Charges Against Levoff Remain**

Levoff argues that the wire fraud charges (Counts 7-12) are derivative of the securities fraud charges (Counts 1-6), and thus should thus be dismissed for the same reasons. As the Court will not dismiss the securities fraud charges, it will not derivatively dismiss the wire fraud charges.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss the Indictment, ECF No. 32, is **DENIED**. An appropriate order follows.


_____
*/s/ William J. Martini*
**Date: August 12, 2020**          **WILLIAM J. MARTINI, U.S.D.J.**

4

## MARINO, TORTORELLA & BOYLE, P.C.

ATTORNEYS AT LAW

KEVIN H. MARINO
JOHN D. TORTORELLA
JOHN A. BOYLE

———

ROSEANN BASSLER DAL PRA*
EREZ J. DAVY*
WAN CHA

437 SOUTHERN BOULEVARD
CHATHAM, NEW JERSEY 07928-1488
TELEPHONE (973) 824-9300
FAX (973) 824-8425
www.khmarino.com

888 SEVENTH AVENUE, 9TH FLOOR
NEW YORK, NEW YORK 10019
TELEPHONE (212) 307-3700
FAX (212) 262-0050
e-mail:kmarino@khmarino.com
*OF COUNSEL

June 3, 2020

**VIA ECF**

Honorable William J. Martini, U.S.D.J.
United States District Court
Martin Luther King, Jr., Federal Building
    & Courthouse
50 Walnut Street
Newark, NJ  07102

      Re:    *United States v. Gene Levoff*, No. 2:19-cr-00780-WJM

Dear Judge Martini:

      Defendant, Gene Levoff ("Levoff"), respectfully submits this reply to the Government's May 22, 2020 response to his motion to dismiss the Indictment.

      The Government doesn't want to respond to Levoff's motion, and doesn't think it has to. Rather than grapple with the serious constitutional issue the motion presents—whether Congress ever properly declared insider trading a federal crime—it simply wishes the issue away, filing a studiously offhand four-page letter more memorable for what it fails to say than for what it does. The Government leads with the conclusory and flatly erroneous declaration that the Supreme Court has already resolved the question presented—apparently sub silentio—in a series of cases decided over the past forty years.  Building on that demonstrably false premise, the Government devotes much of its letter to reminding the Court that a district judge cannot overrule the Supreme Court, augments that truism with the unsupportable claim that its wire-fraud charges will carry the day even if its insider-trading counts fail, and closes by hedging its bet in a last-minute footnote. Revealing a gnawing concern that its strategic devil-may-care approach may not sit well with the federal judge responsible for actually deciding the motion, the Government promises to address Levoff's arguments on the merits "should the Court so desire."

      The Court should "so desire."  As the Government's cases do not resolve—or even allude to—the issues at the heart of Levoff's motion, it should be required to meet them head on. Specifically, the Government must explain how the SEC fulfilled the obligation delegated it by Congress, why that agency's re-delegation of that obligation was constitutional, where the framers entrusted the courts to create federal crimes, and when the Supreme Court reversed its holding that <u>Chevron</u> deference does not apply to criminal statutes.  Levoff made his arguments, and the Government must meet them.  That's how it works.  And after the Government submits its belated response to the motion, Levoff should have leave to reply.  In that way, he will have the last word on his motion and the Court will have the benefit of full briefing, as the rules require.

Honorable William J. Martini, U.S.D.J.
June 3, 2020—Page 2

Contrary to the Government's conclusory assertion, the United States Supreme Court has never considered the constitutionality of the federal common-law crime of insider trading, which developed in the wake of the SEC's unauthorized redelegation of its rulemaking authority to the federal judiciary. The Government's strategic refusal to provide a meaningful response to Levoff's motion leaves the Court in the untenable position of having to address an important issue of first impression without the substantive input of the Department of Justice. See NASA v. Nelson, 562 U.S. 134, 147 n.10 (2011) ("It is undesirable for [the court] to decide a matter of this importance in a case in which [the court does] not have the benefit of briefing by the parties."). Although the Government casts Levoff's motion as too outlandish to warrant its attention or that of the Court, the infirmities in insider-trading law that Levoff highlights have been the subject of serious scholarly criticism for years. In addition to the Gouraige article discussed at length in Levoff's opening brief,[1] a substantial body of scholarship discussing the constitutional problems inherent in insider-trading law belies the Government's characterization of Levoff's challenge, and underscores its gravity. See Stephen M. Bainbridge, Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition, 52 Wash. & Lee L. Rev. 1189, 1201 n.48, 1202 (1995) ("Even a former SEC solicitor admits that 'modern development of the law of insider trading is a classic example of common law in the federal courts. No statute defines insider trading; no statute expressly makes it unlawful.'"); Roberta S. Karmel, The Law on Insider Trading Lacks Needed Definition, 68 SMU L. Rev. 757, 757 (2015) ("Insider trading is not defined in the federal securities laws. It is, essentially, a common law crime . . . ."); A.C. Pritchard, Justice Lewis F. Powell, Jr., and the Counterrevolution in the Federal Securities Laws, 52 Duke L.J. 841, 930 (2003) ("Justice Powell saw Rule 10b-5's jurisprudence as a species of 'federal common law.'"); Jeanne L. Schroeder, Taking Stock: Insider and Outsider Trading By Congress, 5 Wm. & Mary Bus. L. Rev. 159, 163 (2014) ("[W]e are left with a jurisprudential scandal that insider trading is largely a federal common-law offense."); Jeanne L. Schroeder, Envy and Outsider Trading: The Case of Martha Stewart, 26 Cardozo L. Rev. 2023, 2043 (2005) ("This is the single most disturbing aspect of insider trading law—it is essentially a common law federal crime.").

Ignoring the ongoing scholarly debate on the subject, the Government contents itself with the bold declaration that the Supreme Court resolved Levoff's constitutional challenge to insider-trading law in Chiarella v. United States, 445 U.S. 222 (1980); Dirks v. SEC, 463 U.S. 646 (1983); United States v. O'Hagan, 521 U.S. 642 (1997); and Salman v. United States, 137 S. Ct. 420 (2016), and that granting Levoff's motion would therefore require this Court to overrule the Supreme Court. Not so. None of those cases—not Chiarella, Dirks or O'Hagan, addressed in Levoff's moving brief, nor Salman, discussed below—involved a challenge to insider trading as a federal common-law crime, or considered the SEC's unlawful redelegation of its rulemaking authority to the judiciary. It is well settled that decisions that assume but do not decide the validity of underlying principles of law are not binding in cases that actually raise such issues. See United States v. Verdugo-Urquidez, 494 U.S. 259, 272 (1990) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, . . . and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions."); Hagans v. Lavine, 415 U.S. 528, 533 n.5 (1974) ("[T]his Court has never

---

[1] Hervé Gouraige, Do Federal Courts Have Constitutional Authority to Adjudicate Criminal Insider-Trading Cases?, 69 Rutgers L. Rev. 47 (2016).

Honorable William J. Martini, U.S.D.J.
June 3, 2020—Page 3

considered itself bound when a subsequent case finally brings the jurisdictional issue before us."); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952) (Where an argument was not "raised in briefs . . . nor discussed in the opinion of the Court[,] . . . the case is not binding precedent on this point"). Moreover, no court anticipates constitutional issues that are not raised in the case before it. Communist Party of United States v. Subversive Activities Control Bd., 367 U.S. 1, 71–72 (1961) ("No rule of practice . . . is more well settled than 'never to anticipate a question of constitutional law in advance of the necessity of deciding it'" (citation omitted)). Finally, while the Government warns that granting Levoff's motion would overrule Supreme Court precedent, it fails to address the Supreme Court's foundational ruling in United States v. Hudson & Goodwin, 11 U.S. (7 Cranch) 32, 33–34 (1812), whose holding—that courts lack jurisdiction under Rule 12(b)(2) to adjudicate federal common-law crimes—it would have this Court ignore.

Consistent with its 30,000-foot approach to Levoff's motion, the Government labels his conduct "insider trading at its most basic," but fails to supply the statutory definition of the crime—a curious tactic if its proposition is indeed so obvious. Rather than citing Section 10(b) or Rule 10b-5 for this assertion, the Government cites Salman—but selectively fails to note that it invoked judge-made decisions for the definition of insider trading, not the statutory or regulatory text.[2] The Government goes on to accuse Levoff of "incorrectly characteriz[ing] insider trading as judge-made law" because Congress passed Section 10(b) and the SEC passed Rules 10b-5, 10b5-1, and 10b5-2. But as Levoff explained in his moving brief,[3] neither that statute nor those regulations, or any combination of them, defines insider trading. The Government also argues that Congress "ratified" the Supreme Court's interpretation of insider trading through various amendments and the STOCK Act, all of which reference the common law of insider trading in the abstract, but none of which textually defines insider trading nor even commits to a particular judge-made definition.[4]

---

[2] The Government's parenthetical explanation of Salman reads "'[defendant's] conduct is in the heartland' of prohibited behavior and 'precisely' what was 'envisioned.'" (Gov't Letter, at 2 (quoting Salman).) Unaltered, the Salman Court stated, "Salman's conduct is in the heartland of Dirks's rule concerning gifts. . . . this case involves 'precisely the gift of confidential information to a trading relative that Dirks envisioned.'" 137 S. Ct. at 429 (emphasis added). By omitting that the conduct was in the heartland of "Dirks"—a judicial decision and not the statute or regulation—the Supreme Court held that the law of criminal insider trading is not unconstitutionally vague or ambiguous such that the Rule of Lenity would apply because insider trading is clearly defined in judicial opinions. See id. at 428–29. In other words, Salman relied on judicial precedent without questioning its statutory or regulatory underpinnings, which were not then at issue.

[3] Levoff's moving brief also anticipated the Government's reliance on United States v. McGee, 763 F.3d 304 (3d Cir. 2014), and addresses McGee throughout.

[4] The Government concedes that Section 10(b) does not contain any definition by resorting to Congress's supposed "ratification" of the common-law definition of insider trading. But Congress did no such thing—it merely extended the scope of insider-trading law in its common-law form to security-based swap agreements "to the same extent as they apply to securities." Moreover, Section 10(b) fails to identify a specific definition (or a specific court decision), and instead acknowledges the judiciary's continued ability to change that definition as common law. The

Honorable William J. Martini, U.S.D.J.
June 3, 2020—Page 4

Beyond its cursory opposition to Levoff's core insider-trading argument, the Government cites <u>Carpenter v. United States</u>, 484 U.S. 19 (1987), for the proposition that its wire fraud charges would survive regardless of the dismissal of its insider-trading counts because "the concept of 'fraud' includes the act of embezzlement." (Gov't Letter, at 4 (quoting <u>Carpenter</u>).)  According to the Government, because <u>Carpenter</u> unanimously upheld a wire-fraud conviction while splitting the vote on the misappropriation theory of insider trading, Levoff's wire fraud charges should similarly survive the invalidation of the Indictment's insider trading charges. (Gov't Letter, at 4.) The Government is mistaken.  <u>Carpenter</u> does not stand for the proposition that a wire-fraud charge premised entirely on an insider-trading charge—as Levoff's is in this case—could survive the invalidation of the predicate insider-trading allegation.[5]  It could not.  <u>See United States v. Chestman</u>, 947 F.2d 551, 571 (2d Cir. 1991) (en banc) (reversing 10b-5 and mail fraud convictions because "[t]he fortunes of <u>Chestman</u>'s mail fraud convictions are tied closely to his securities fraud conviction"); <u>United States v. Joon Kim</u>, 184 F. Supp. 2d 1006, 1015 (N.D. Cal. 2002) (dismissing wire fraud indictment because "[t]he alleged fraud underlying the securities fraud charges [which were dismissed] also serves as the basis for the wire fraud charge").  Indeed, a court in this District previously adopted the Government's view that violation of the mail and wire fraud statutes depends on the 10b-5 charge when premised on the same conduct.  <u>See United States v. Eisenberg</u>, 773 F. Supp. 662, 720–21 (D.N.J. 1991) (agreeing with "[t]he Government['s] [position] . . . that 'because these [wire fraud and mail fraud] schemes are basically securities fraud schemes, . . . the critical inquiry . . . is to determine whether they violate Section 10(b) and Rule 10b-5.'").

In sum, the Government has failed to meaningfully engage with Levoff's insider-trading argument, on which the validity of its Indictment turns.  Accordingly, Levoff respectfully requests that the Court take the Government up on its offer to make a supplemental submission actually addressing Levoff's motion, and grant Levoff leave to reply to that submission before ruling on it. The Government's strategic insouciance notwithstanding, the issue this motion raises is simply too important to be decided on less than comprehensive briefing.

Thank you for your consideration of this submission.

Respectfully,

Kevin H. Marino

cc:   Courtney A. Howard, AUSA
      Daniel V. Shapiro, AUSA
      Heather Suchorsky, AUSA

---

STOCK Act does not define insider trading and merely states that government employees are not exempt from insider trading law.  Pub. L. No. 112-105 § 9(b), 126 Stat. 291 (2012).

[5] The Government fails to acknowledge that ten years later, the Court in <u>United States v. O'Hagan</u> used <u>Carpenter</u>'s mail-and-wire-fraud definition of "embezzlement" to bring misappropriation within the definition of insider trading, linking the two definitions whose prior differences accounted for the disparate ruling in <u>Carpenter</u>.  <u>See O'Hagan</u>, 521 U.S. 642, 654 (1997).



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

May 22, 2020

**BY ECF & EMAIL**

The Honorable William J. Martini
United States District Court
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

   Re: *United States v. Gene Levoff*, Crim. No. 19-780 (WJM)

Dear Judge Martini:

  The United States opposes defendant Gene Levoff's motion to dismiss the indictment in this case, which charges him with six counts of securities fraud and six counts of wire fraud. Dkt. #32. That indictment addresses Levoff's flagrant use of inside information to trade for his own financial benefit while he was a senior corporate lawyer responsible for overseeing compliance with securities laws. *See* Dkt. #16. In response, Levoff launches a Hail Mary pass, arguing that this Court should dismiss the indictment because, according to him, the criminalization of insider trading is unconstitutional. He is wrong, and his motion should be denied.

  Insider trading violates the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"). The Supreme Court has held so for decades. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 228 (1980) (reversing conviction due to lack of fiduciary duty but recognizing that a corporate insider who trades using material nonpublic information violates Section 10(b) and Rule 10b-5 because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation"); *Dirks v. SEC*, 463 U.S. 646, 662 (1983) (reversing censure while holding that a tippee violates Section 10(b) and Rule 10b-5 where disclosure breaches a fiduciary duty and "the insider personally will benefit, directly or indirectly, from his disclosure"); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (upholding insider trading conviction because "a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10b and Rule

10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information"); *Salman v. United States*, 137 S. Ct. 420, 423 (2016) (affirming insider trading conviction consistent with *Dirks* and *O'Hagan* and reiterating that "Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage").[1]

This Court, like all District and Circuit Courts, cannot overrule Supreme Court precedent. The Supreme Court reserves to itself "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express Inc.*, 490 U.S. 477, 484 (1989). This is true regardless of defendant's assertions that "the precedential weight of many historical insider-trading cases is diminished and a much stricter construction is necessary." Dkt. #32 at 20. Indeed, lower courts may not assume Supreme Court precedent has been overruled unless the Supreme Court says so itself. *See United States v. Extreme Associates*, 431 F.3d 150, 155 (3d Cir. 2005) (citing *Rodriguez de Quijas*, 490 U.S. at 484); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").[1] The Third Circuit faithfully follows this rule. *See, e.g.*, *United States v. Johnson*, 899 F.3d 191, 201 (3d Cir. 2018); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017). So must this District Court.

To be clear, the allegations in the indictment depict insider trading at its most basic. *See Salman*, 137 S. Ct. at 429 (affirming insider trading conviction where "[defendant's] conduct is in the heartland" of prohibited behavior and "precisely" what was "envisioned") (quoting *Dirks*, 463 U.S. at 664) (some quotation marks omitted). Levoff was a senior employee who had access to material nonpublic information in order to fulfill his job responsibilities. *See* Dkt. #16. In violation of his fiduciary duties to his employer and its shareholders, Levoff used that material nonpublic information to trade for his own financial benefit. *Id.* Such conduct is paradigmatic insider trading in violation of Section 10(b) and Rule 10b-5, as recognized by the Supreme Court. *See O'Hagan*, 521 U.S. at 651-52 (under "classical" or "traditional theory" of insider trading "a corporate insider trades in the securities of his corporation on the basis of material nonpublic information," and under "misappropriation theory" a person

---

[1] Similarly, cherry-picked dicta does not accurately reflect the state of Supreme Court precedent. *See Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").

"misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information").

While the Supreme Court's precedents interpreting Section 10(b) and Rule 10b-5 by themselves resolve Levoff's motion, he also incorrectly characterizes insider trading as judge-made law. Congress—not the judiciary—passed the Securities Exchange Act of 1934 to "insure honest securities markets and thereby promote investor confidence." *O'Hagan*, 521 U.S. at 658. Congress included Section 10(b), making it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Thereafter, the SEC—not the judiciary— promulgated Rule 10b-5, forbidding the use "in connection with the purchase or sale of any security" of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 C.F.R. § 240.10b-5; *see United States v. McGee*, 763 F.3d 304, 310 (3d Cir. 2014) ("The SEC acted on this broad delegation of rulemaking authority [from Congress] by promulgating Rule 10b-5 . . ."). And the SEC—not the judiciary— also promulgated Rules 10b5-1, the so-called "disclose or abstain" rule, and 10b5-2, providing a non-exclusive definition of circumstances in which a person has a duty of trust or confidence for purposes of the misappropriation theory of insider trading. *See* 17 C.F.R. §§ 240.10b5-1 & 240.10b5-2.

Moreover, Congress has repeatedly ratified the Supreme Court's interpretation of insider trading law in modifying Section 10(b) and passing new insider trading legislation consistent with Supreme Court precedent. For example, in 2000, Congress amended Section 10(b) to extend "rules promulgated" and "judicial precedents decided" under Section 10(b) "that prohibit fraud, manipulation, or insider trading" to security-based swap agreements "to the same extent as they apply to securities." Pub. L. 106-554, 114 Stat. 2763A-454 (2000). In 2010, Congress again modified the language of Section 10(b) while maintaining the state of insider trading law.[2] *See* Pub. L. 111-203, 124 Stat. 1761 (2010). And in 2012, Congress enacted the Stop Trading on Congressional Knowledge or "Stock Act," stating that members of Congress "are not exempt from the insider trading prohibitions arising under the securities laws, including section 10(b) . . . and Rule 10b-5" and are prohibited from "using

---

[2] Specifically, Congress removed the words "registered on a national securities exchange" and inserted "other than a government security," struck the words "(as defined in section 206B of the Gramm-Leach-Bliley Act)," and added subsection (c), relating to "effect[ing], accept[ing], or facilitat[ing] a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe." Pub. L. 111-203, 124 Stat. 1761 (2010).

nonpublic information derived from their official positions for personal benefit." Pub. L. No. 112-105, 126 Stat. 291 (2012).

Further, Levoff's motion ignores half of the charges against him—namely, the six counts of wire fraud in the indictment. He devotes a single footnote to the conclusory demand for dismissal of those charges. *See* Dkt. #32 at 3 n.1. Wire fraud, like securities fraud, is a federal crime. *See* 18 U.S.C. § 1343 (prohibiting the use of a wire transmission for executing "any scheme or artifice to defraud" a victim of its property, or to obtain property by false pretenses). Even worse for Levoff, the Supreme Court *unanimously* had "little trouble" holding that trading on "confidential information is not outside the reach of the mail and wire fraud statutes." *Carpenter v. United States,* 484 U.S. 19, 28 (1987) (upholding insider trading wire fraud convictions). After all, "[c]onfidential information has long been recognized as property." *Id.* at 26. And the "concept of 'fraud' includes the act of embezzlement, which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." *Id.* at 27 (some quotation marks omitted). Accordingly, the wire fraud charges against Levoff, like the securities fraud charges, should proceed.

In sum, because Levoff's arguments fly in the face of binding Supreme Court precedent, this Court should deny his motion without a hearing, argument, or further briefing.[3]

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

/s/ *Heather Suchorsky*
By:   Heather Suchorsky
Courtney A. Howard
Daniel V. Shapiro
Assistant United States Attorneys

cc:   Kevin H. Marino, Esq.
John D. Tortorella, Esq.
Wan Cha, Esq.
*Attorneys for Gene Levoff*

---

[3] Of course, should the Court desire it, the Government can provide supplemental briefing explaining the many other ways in which Levoff's arguments fail.

**2:19-cr-00780-WJM All Defendants** USA v. LEVOFF
**Date filed:** 10/24/2019
**Date of last filing:** 05/30/2023

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| [1](#) | Filed: | 02/13/2019 | Complaint |
| | Entered: | 02/20/2019 | |
| [3](#) | Filed & Entered: | 02/20/2019 | Notice of Attorney Appearance - Defendant |
| [4](#) | Filed: | 02/20/2019 | Bond Hearing |
| | Entered: | 02/26/2019 | |
| [5](#) | Filed: | 02/20/2019 | Waiver of Preliminary Hearing |
| | Entered: | 02/26/2019 | |
| [6](#) | Filed: | 02/20/2019 | Order Setting Conditions of Release |
| | Entered: | 02/26/2019 | |
| [7](#) | Filed: | 02/20/2019 | Bond |
| | Entered: | 02/26/2019 | |
| [9](#) | Filed: | 02/20/2019 | Order to Continue - Ends of Justice |
| | Entered: | 02/28/2019 | |
| [8](#) | Filed: | 02/22/2019 | Transcript |
| | Entered: | 02/26/2019 | |
| [10](#) | Filed: | 04/11/2019 | Order to Continue - Ends of Justice |
| | Entered: | 04/14/2019 | |
| [11](#) | Filed: | 06/25/2019 | Order to Continue - Ends of Justice |
| | Entered: | 06/28/2019 | |
| [12](#) | Filed & Entered: | 07/17/2019 | Notice of Attorney Appearance - USA |
| [13](#) | Filed: | 08/08/2019 | Order to Continue - Ends of Justice |
| | Entered: | 08/20/2019 | |
| [14](#) | Filed & Entered: | 09/09/2019 | Order to Continue - Ends of Justice |
| [15](#) | Filed: | 09/29/2019 | Order to Continue - Ends of Justice |
| | Entered: | 09/30/2019 | |
| | Filed: | 10/24/2019 | Notice of Allocation and Assignment |
| | Entered: | 10/25/2019 | |
| [16](#) | Filed: | 10/24/2019 | Indictment |
| | Entered: | 10/25/2019 | |
| | Filed & Entered: | 10/30/2019 | Notice of Hearing |
| [17](#) | Filed & Entered: | 10/30/2019 | Order to Continue - Ends of Justice |
| | Filed & Entered: | 11/07/2019 | Set/Reset Motion and R&R Deadlines/Hearings |
| [18](#) | Filed & Entered: | 11/07/2019 | Arraignment |
| [19](#) | Filed & Entered: | 11/07/2019 | Order for Discovery and Inspection |
| [20](#) | Filed & Entered: | 12/04/2019 | Transcript |
| [21](#) | Filed & Entered: | 12/18/2019 | Order |
| [22](#) | Filed & Entered: | 12/18/2019 | Order to Continue - Ends of Justice |
| [23](#) | Filed & Entered: | 12/18/2019 | Notice (Other) |
| [24](#) | Filed & Entered: | 01/13/2020 | Notice of Attorney Appearance - USA |

| 25 | *Filed & Entered:* 01/13/2020 | Notice of Attorney Appearance - Defendant |
|----|-------------------------------|-------------------------------------------|
| 26 | *Filed & Entered:* 01/13/2020 | Notice of Attorney Appearance - Defendant |
|    | *Filed & Entered:* 01/17/2020 | Set/Reset Motion and R&R Deadlines/Hearings |
| 27 | *Filed & Entered:* 01/17/2020 | Order |
| 28 | *Filed & Entered:* 03/13/2020 | Order to Continue - Ends of Justice |
| 29 | *Filed:* 03/16/2020 *Entered:* 03/17/2020 | Order to Continue - Ends of Justice |
| 30 | *Filed & Entered:* 03/27/2020 | Letter |
| 31 | *Filed & Entered:* 04/20/2020 | Order to Continue - Ends of Justice |
| 32 | *Filed & Entered:* 04/27/2020 *Terminated:* 08/12/2020 | Motion to Dismiss |
| 33 | *Filed & Entered:* 05/22/2020 | Brief in Opposition |
| 34 | *Filed & Entered:* 05/28/2020 | Order to Continue - Ends of Justice |
| 35 | *Filed & Entered:* 06/03/2020 | Reply to Response |
| 36 | *Filed & Entered:* 06/23/2020 | Order to Continue - Ends of Justice |
| 37 | *Filed & Entered:* 08/12/2020 | Memorandum Opinion |
| 38 | *Filed & Entered:* 08/12/2020 | Order on Motion to Dismiss |
| 39 | *Filed & Entered:* 08/20/2020 | Order to Continue - Ends of Justice |
| 40 | *Filed & Entered:* 08/26/2020 | Order to Continue - Ends of Justice |
| 41 | *Filed & Entered:* 09/23/2020 | Order to Continue - Ends of Justice |
| 42 | *Filed & Entered:* 11/09/2020 | Order to Continue - Ends of Justice |
| 43 | *Filed & Entered:* 12/20/2020 | Order to Continue - Ends of Justice |
| 44 | *Filed:* 02/04/2021 *Entered:* 02/11/2021 | Order to Continue - Ends of Justice |
| 45 | *Filed & Entered:* 03/15/2021 | Order to Continue - Ends of Justice |
| 46 | *Filed & Entered:* 04/27/2021 | Order to Continue - Ends of Justice |
| 47 | *Filed & Entered:* 06/22/2021 | Order to Continue - Ends of Justice |
| 48 | *Filed & Entered:* 09/30/2021 | Order to Continue - Ends of Justice |
| 49 | *Filed & Entered:* 12/30/2021 | Order to Continue - Ends of Justice |
| 50 | *Filed:* 01/31/2022 *Entered:* 02/01/2022 | Order to Continue - Ends of Justice |
| 51 | *Filed & Entered:* 04/28/2022 | Order to Continue - Ends of Justice |
| 52 | *Filed:* 06/30/2022 *Entered:* 07/05/2022 | Change of Plea Hearing |
| 53 | *Filed:* 06/30/2022 *Entered:* 07/05/2022 | Plea Application of Guilty |
| 54 | *Filed:* 06/30/2022 *Entered:* 07/05/2022 | Plea Agreement |
| 55 | *Filed:* 06/30/2022 *Entered:* 07/05/2022 | Order |
| 56 | *Filed:* 07/05/2022 *Entered:* 07/07/2022 | Transcript |
|    | *Filed & Entered:* 11/02/2022 | Set/Reset Deadlines/Hearings |
| 57 | *Filed & Entered:* 11/02/2022 | Notice of Attorney Appearance - USA |
|    | *Filed & Entered:* 02/27/2023 | Set/Reset Deadlines/Hearings |
|    | *Filed & Entered:* 05/30/2023 | Set/Reset Deadlines/Hearings |

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049408 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. C2015936) |
| v. | |
| THOMAS MOYER, | |
| Defendant and Respondent. | |

This appeal raises a question not yet addressed by any California court: whether a public official may be bribed with a promise to donate to the official's office. According to the People, the Santa Clara County undersheriff requested—and defendant Thomas Moyer made—a promise to donate iPads to the Santa Clara County Sheriff's Office in exchange for releasing concealed carry weapon (CCW) licenses that the sheriff had signed. Consistent with the Ninth Circuit's interpretation of California law, federal law and the law in many states, we conclude that such a promise may constitute a bribe. We also conclude that the evidence presented to the grand jury was sufficient to raise a reasonable suspicion of such bribery. Accordingly, we reverse the trial court's order dismissing the bribery count against Moyer, reinstate that count, and remand for further proceedings.

# I. Background

Because defendant challenges the sufficiency of the evidence presented to the grand jury, we recount that evidence below. As required on appeal, we consider that evidence in the light most favorable to the indictment, drawing all legitimate inferences in favor of it. (See, e.g., *Stark v. Superior Court* (2011) 52 Cal.4th 368, 406-407 (*Stark*); *People v. Guzman* (2011) 201 Cal.App.4th 1090, 1096.)

## A. *CCW Licenses in Santa Clara County*

The Penal Code authorizes, but does not require, county sheriffs to issue licenses to carry concealed weapons to applicants who are of good moral character, have good cause for a license, reside or work in the county, and have completed a specified course of training. (Pen. Code, § 26150, subd. (a)[1]; but see *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S.__, __ [142 S.Ct. 2111, 2123-2124, 2156] [noting that California's good cause requirement is similar to the New York "proper-cause" requirement held unconstitutional under the Second Amendment].) In the Santa Clara County Sheriff's Office, CCW applications are processed by the public information officer, who is responsible for conducting background checks, arranging fingerprinting, and ensuring that applicants complete the required trainings.

During the relevant time frame, the Santa Clara County Sheriff's Office rarely issued CCW licenses. Indeed, the office's practice was to not even process an application for a CCW license absent a special instruction to do so. Only Sheriff Laurie Smith and a small number of others in the Sheriff's Office had the authority to give such instructions. One of those individuals was Rick Sung, who appears to have run Sheriff Smith's 2018 re-election campaign and after the election became the undersheriff, second in command to the sheriff. Undersheriff Sung also had authority to place license applications on hold even after licenses were signed by the sheriff.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Undersheriff Sung abused his authority over CCW applications to extract favors. In 2016 or 2017, Harpreet Chadha, a business owner, applied to renew a CCW license. After the license was signed, Sung placed the license on hold and met with Chadha. Afterwards, Chadha attempted to schedule an event for the sheriff in his company's luxury suite in the San Jose sports arena. The event did not take place then, and Chadha's CCW license remained on hold for more than a year until Sung spoke with Chadha in December 2018 and a new permit was prepared. On February 14, 2019, Chadha hosted an event for Sheriff Smith in his company's luxury suite. That same day, Chadha received his CCW license.

### B. *Apple's CCW Applications*

Thomas Moyer is Apple, Inc.'s head of global security. The company's executive protection team is under his supervision. In 2016 and early 2017 the team began receiving more serious threats against Tim Cook, Apple's CEO, and became concerned about its ability to respond to these threats. As a consequence, in early 2017, Apple decided its executive protection team should be armed and began taking steps to obtain CCW licenses for team members, many of them based in Santa Clara County.

### 1. The 2017 Meeting with Undersheriff Sung

In August 2017, after several initial approaches were rebuffed, two Apple officials—David Gullo, senior director of global security, and Eric Mueller, senior director of operations for the security team—met with Undersheriff Sung to discuss CCW licenses. In the meeting Sung said he would help Apple obtain licenses.

At the end of the meeting, Undersheriff Sung brought up the upcoming election for sheriff and asked Gullo and Mueller if they would support Sheriff Smith's re-election. The request raised "a red flag" for Gullo because Sung appeared to be linking CCW licenses to his request for political support. Consequently, Gullo reported to Moyer that "we were approached by the Sheriff's Office, and they wanted us to support the Sheriff for re-election." Moyer responded with a "[c]ouple of rules": "You are free to support

whomever you like," but "[y]ou should not feel like you need to support her because you work for Apple." Moyer also added pointedly, "We will not give money or anything of value in exchange for CCW[s]."

2. The 2018 CCW Applications

For nearly a year, Apple's CCW applications made little progress. In June 2018, Moyer got involved personally and secured a meeting with Sheriff Smith. After the meeting, Moyer told the leader of the executive protection team that the sheriff would approve the CCW licenses, and he should "start preparing the Santa Clara CCW paperwork for the team."

The next month, members of the executive protection team submitted CCW applications to the Santa Clara County Sheriff's Office. The public information officer, however, did nothing because he received no instruction to process the applications even when he specifically asked Sheriff Smith about them.

3. Moyer's Donation to Sheriff Smith's Campaign

Although Moyer had said in August 2017 that Apple would not give anything of value in exchange for CCW licenses, in October 2018 Mueller donated $1,000, the maximum allowable amount, to Sheriff Smith's re-election campaign based on Undersheriff Sung's "ask" a year earlier. After Mueller informed Moyer of the donation, Moyer likewise donated the maximum amount to Sheriff Smith's campaign, and Mueller informed the sheriff's campaign of both donations.

4. Processing of the CCW Applications and Signing of the Licenses

Several days after donating to Sheriff Smith's campaign, Moyer emailed the sheriff to check on the status of Apple's CCW applications. Moyer followed up the next week, and at the end of the month Apple put together a report on the increasing number of threats against its CEO in hopes of speeding up issuance of the CCW licenses.

After the November 2018 election, the public information officer asked Undersheriff Sung about Apple's CCW applications. Sung responded that one of

Apple's security officers had actively supported Sheriff Smith's opponent in the election and that he would not allow the licenses to be granted if that officer was the one requesting them.

Later in November, Undersheriff Sung called Mueller. Sung expressed anger that some Apple security officials had endorsed Sheriff Smith's opponent. After this "venting," Sung turned to the CCW applications and asked to meet about them in person. Later that day Mueller again talked with Sung, who told him that the licenses had been "signed off on" and asked to meet with Moyer. The following day, Mueller sent an email to Sung's personal email address "[r]eintroducing" him to Moyer.

That same day, Undersheriff Sung directed the public information officer to process Apple's CCW applications. In January 2019, after the applicants were fingerprinted and had completed their firearm range qualification tests, Sheriff Smith signed the CCW licenses, which were sent to an administrative assistant. However, before the assistant could tell the applicants to pick them up, the licenses were removed from her desk.

5. The February 8, 2019 Meeting

On January 23, 2019, Undersheriff Sung sent an email from his personal email account to Moyer, asking to set up a meeting with Moyer, Sheriff's Office Captain James Jensen, and himself. This meeting took place on February 8 in the visitor's center at Apple Park.

Although Apple had no established program for donating products to law enforcement agencies, and the Sheriff's Office had no immediate need for iPads, during the meeting Moyer sent himself a blank email with the subject line: "IPad Donation."

Immediately after the meeting, Moyer emailed the leader of Apple's executive protection team that "[y]ou will have your permits shortly."

6.  The Promised iPad Donation and Release of the CCW Licenses

On February 10, 2019, two days after meeting with Undersheriff Sung and Captain Jensen, Moyer emailed a senior finance manager at Apple asking about the rules for donating iPads or computers to the local sheriff's office for its "new training facility." The following day an Apple compliance attorney replied that California public agencies may accept donations but asked Moyer to "make sure that there are no significant matters or purchases pending with the agency." In response Moyer made no mention of Apple's pending CCW license applications. Instead, he told the compliance attorney that "we are not doing this because we are receiving anything in exchange." Moyer informed the attorney of the applications only after the licenses were issued and does not appear to have disclosed that the applications were pending when the iPad donations were first proposed.

About a month later, Moyer emailed Captain Jensen. Although in fact the Sheriff's Office was not setting up a new training center, Moyer said that "[y]ou mentioned previously that you folks were setting up a new training center." Then, Moyer said he was "[c]urious if you have a need for iPads or potentially computers for that facility."

Captain Jensen forwarded Moyer's email to Undersheriff Sung and Assistant Sheriff Michael Doty. Later that day, Sung asked Doty to "start thinking of ideas on how we could utilize either computers or iPads from Apple in the training division." When Doty suggested asking for 50 iPads, Sung told Doty to think bigger, and ultimately they asked for 200 iPads, which were worth $50,000 to $80,000.

On March 26, 2019, members of Apple's executive protection team were told to pick up their CCW licenses, which they did at the Sheriff's Office. Although by that point he had no regular involvement in processing CCW applications, Captain Jensen personally handed out the licenses.

7.  Termination of the Promised iPad Donation

In the months following the release of Apple's CCW licenses, Moyer took several steps to complete the promised iPad donation to the Sheriff's Office, such as meeting with Assistant Sheriff Doty in late April to agree on the number of iPads and making an internal proposal for the donation.  Moyer also asked Captain Jensen if the Sheriff's Office had any color preference and apologized for "the wheels moving very slowly."  Notably, however, Moyer did not inform Gullo, the head of Apple's executive protection team, of the donation, and Jensen likewise did not inform the law enforcement personnel primarily responsible for Apple's headquarters.

In August 2019, Moyer terminated the promised donation.  On August 7, he informed Apple's chief litigation attorney that the treatment of CCW applications by the Santa Clara County Sheriff's Office was being investigated.  Although Moyer had failed to mention Apple's CCW applications to the compliance attorney in February, he then disclosed the approved applications as well as his $1,000 donation to the sheriff's re-election campaign that had been made while the applications were still pending.  Moyer also said that Apple had approved a donation of $50,000 worth of iPads to the Sheriff's Office, adding later that day that "we should table Apple's iPad donation."  The attorney agreed, and less than three minutes later Moyer instructed the personnel handling the promised donation to stop it.

C.  *Procedural Background*

In November 2020, prosecutors presented evidence concerning Apple's CCW applications and the promised iPad donation to a grand jury, which indicted Undersheriff Sung and Captain Jensen for soliciting bribes and Moyer for making one.

1.  The Instructions

After the People finished presenting evidence to the grand jury, the prosecutor instructed the jury on the law, including the elements of bribery.  In particular, the prosecutor instructed the jury that a "bribe" is the payment of "something of present or

7

future value or advantage, or a promise to give such a thing," made "with the corrupt intent to unlawfully influence" official action by the person bribed.

In subsequently urging the grand jury to indict Undersheriff Sung, Captain Jensen, and Moyer, the prosecutor elaborated on what may constitute a bribe. Many people, the prosecutor observed, think of a bribe as "money . . . sort of slid across the bench in a brown paper bag to a person." In fact, the prosecutor continued, "the thing of value does not have to go to the person that is being influenced" because a bribe "can either be something of value or a promise to give something of value. So it could be that the promise is given to the person that you are trying to influence and the thing of value could go to someone else."

The prosecutor offered an example: "if the police officer stops you on the side of the road and they're going to ticket you, and you say hey, if you don't ticket me I will give your niece $5,000, of course that's a bribe. Obviously, the officer is not getting the money, but the promise is going to the officer."

### 2. The Indictment

On November 19, 2020, the grand jury issued an indictment. The first count charged Undersheriff Sung and Captain Jensen with asking, receiving and agreeing to receive a bribe in violation of section 68, subdivision (a). The second count charged Moyer with bribing an executive officer in violation of section 67 by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.

### 3. Dismissal of the Charge against Moyer

Moyer moved under section 995 to dismiss count 2 of the indictment. He argued that the prosecutor erroneously instructed the grand jury that it could charge him with bribery based on a promise to give a thing of value to a third party rather than to the target of the bribe. On June 1, 2021, the trial court granted the motion and dismissed count 2 of the indictment.

The trial court found no error in the instructions given to the grand jury.  Noting that no case holds that a payment must go to the target of the bribe and that a target may benefit indirectly from things of value going to third parties, the trial court saw no reason why an official could not be bribed by promising to give a thing of value to a third party designated by the official.

However, the trial court concluded *sua sponte* that the evidence presented to the grand jury was insufficient to establish that Moyer had a corrupt intent in promising the iPad donation.  In reaching this conclusion, the court noted that, by the time of the February 8, 2019, meeting in which Moyer allegedly promised the iPad donation, Moyer already had been repeatedly informed that Apple's CCW licenses would be issued.  The court also observed that Moyer submitted the request to make the iPad donation through proper channels at Apple.  It dismissed as unreasonable the inference that Moyer offered the donation to persuade Sung and Jensen to release Apple's CCW licenses.

The People timely filed a notice of appeal.

## II.  Discussion

The People argue that the trial court erred in ruling the evidence of corrupt intent presented to the grand jury insufficient to support the indictment.  Moyer defends this ruling and argues as well that a promise to make a payment to a third party or entity cannot constitute a bribe, even where, as here, the target of the bribe directed payment to that party or entity.  We disagree and conclude that under the Penal Code's definition of "bribe" a promise to make a payment to a third party or entity may constitute a bribe.  We also conclude that the evidence of corrupt intent presented to the grand jury was sufficient to support Moyer's indictment.

### A.  *The Bribery Instruction*

Moyer challenges the gloss that the prosecutor placed on the definition of bribe.  As the trial court recognized, the prosecutor largely followed the Judicial Council's pattern instructions in defining bribery and describing the elements of the charged

offense.  (See CALCRIM Nos. 2600 & 2603.)  Later, however, the prosecutor informed the grand jury that a promise to give a thing of value to a third party may constitute a bribe, as when a motorist promises to give money to a police officer's niece if the officer does not write a ticket.  Moyer argues that this gloss is erroneous, and his indictment must be dismissed because the grand jury may have been misled into indicting him on an impermissible theory.  (See, e.g., *Stark*, *supra*, 52 Cal.4th at p. 407; *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1022, fn. 1).

This argument raises a question of statutory interpretation, which we review de novo.  (See, e.g., *People v. Posey* (2004) 32 Cal.4th 193, 218.)  In interpreting statutes, our primary objective is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' "  (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 849 (*Carmack*), quoting *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)  "We look first to ' "the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context." ' "  (*People v. Jimenez* (2020) 9 Cal.5th 53, 61.)  We also " 'keep[] in mind the statutory purpose' " and seek to harmonize statutory provisions concerning the same subject " 'to the extent possible.' "  (*Carmack*, *supra*, 2 Cal.5th at p. 850.)  If the meaning of the statute nonetheless remains uncertain, we turn to other indicia of the Legislature's intent such as " 'the consequences that will flow from a particular interpretation.' "  (*People v. Valencia* (2017) 3 Cal.5th 347, 354, 358.)

As the trial court correctly recognized, the Penal Code defines the term "bribe" more broadly than Moyer contends.  That definition does not limit bribes to promises to convey a thing of value to the target of the bribe, and we see no reason to imply such a limitation into the definition.  Instead, consistent with the Ninth Circuit's interpretation of California law, federal law and the law of many states, we interpret the Penal Code's definition of "bribe" as it is written to include promises to give a thing of value to a third party or entity.

1. <u>The Penal Code's Definition of "Bribe"</u>

Moyer argues that the target of a bribe must either receive payment or be promised personal receipt of payment, and therefore a promise to make a payment to a third party cannot constitute a bribe. The Penal Code, however, defines the term "bribe," and while that definition is not a model of clarity, nothing in it limits bribes to promises to make payments to the target of the bribe as opposed to a third party selected by the target. Moreover, implying such a restriction into the definition would exclude corrupt conduct such as Undersheriff Sung's alleged actions in this case from the scope of California's bribery statutes.

The Penal Code defines "bribe" as follows: "[t]he word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." (§ 7, subd. (6).) This language divides bribes into two general categories or prongs. The first prong concerns direct payments: "anything of value or advantage" that is requested, given, or accepted with the intent to corruptly influence its target. The second prong concerns promises: "any promise or undertaking to give any[thing of value or advantage]" that is requested, given or accepted to corruptly influence its target.

While the payment prong requires that the target of the bribe receive a "[]thing of value or advantage"—typically, a payment—the promise prong requires only that the target receive a promise to make a payment, not a promise that the target, rather than some other party, will receive a payment. As Moyer points out, the Penal Code's definition of bribe requires a corrupt intent to influence "the person to whom *it* is given." (§ 7, subd. (6), italics added.) In the payment prong, "it" refers to the payment made (*ibid*.), and therefore the payment must be made to the target of the bribe. In the promise prong, however, "it" refers to a "promise or undertaking to give any[thing of value or advantage]." (*Ibid*.) Thus, under the promise prong, the target must receive a promise

that a payment will be made. There is, however, no additional requirement that the payment be promised to the target of the bribe. To the contrary, under the plain language of the definition, the promise may be to make a future payment to anyone, whether a third party or the target.

This conclusion is supported by the specific language of the promise prong. The Penal Code defines "bribe" to include "*any* promise or undertaking" to give a thing of value. (§ 7, subd. (6), italics added.) As the Supreme Court has recognized, "[u]se of the term 'any' " in a law "demonstrates the Legislature intended the law to have a broad sweep." (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 714.) Indeed, "any" is defined to mean, among other things, "one or some indiscriminately of whatever kind" (Webster's 3d New Internat. Dict. (1993) p. 97), and therefore a reference to "any" item or object in a statute is "most naturally read to mean [items or objects] of whatever kind." (*Ali v. Federal Bureau of Prisons* (2008) 552 U.S. 214, 218-219.) As a consequence, the Penal Code's reference to "any promise or undertaking to give any[thing of value or advantage]" is naturally read to mean promises to make payments of any kind, not just promises that the target of the bribe will receive payment in the future.

This interpretation makes sense. The Penal Code's definition of bribe applies not only when a bribe is "given" to a public official, but also when a public official has "asked" for a bribe. (§ 7, subd. (6); see § 68, subd. (a).) If a personal receipt requirement were implied into the promise prong, and that prong were limited to promises of future payment to the target of the bribe, executive officials would be free to demand payments to their relatives or friends in exchange for official actions without fear of prosecution for bribery (at least as long as such payments are not an indirect conduit to the officials). Indeed, were Moyer's interpretation adopted, Undersheriff Sung's indictment for bribery might have to be dismissed because he demanded that iPads be donated to the Sheriff's Office rather than to himself. We see no reason why the Legislature would have defined bribe to allow such alleged corrupt conduct, and certainly no reason to force into the

definition of bribe an implied restriction allowing it.  (See, e.g., *People v. Bullard* (2020) 9 Cal.5th 94, 106 [statutes should not be interpreted to create " 'obvious injustice' "].)

Moyer contends that a personal receipt requirement must be implied into the promise prong to avoid an untenable difference with the payment prong.  According to Moyer, "[b]ecause the statute does not apply when a would-be briber *delivers* a thing of value to a third party, it cannot possibly apply when the briber *promises* to give a thing of value to a third party in the future."  In fact, there is good reason to punish promises to pay third parties but not unsolicited payments to such parties.  When a public official extracts a promise to give something of value to a third party selected by the official, there is a clear danger that the official's action will be improperly influenced.  The danger of improper influence is much lower where, without any solicitation or promise, a party gives money to a third party.  In that situation, the deed has been done, and the official presumably has little, if any, incentive to take improper action as a result of the payment. It is true that an unsolicited gift to a relative, once known by an official, might generate a sense of gratitude that in turn might influence the official.  The Legislature, however, reasonably may have deemed this threat minimal.  Indeed, the federal government has done just that: while the federal bribery statute covers both payments and promises to make payments to public officials, it covers only promises to make payments to "any other person or entity."  (28 U.S.C. § 201(b)(1).)

Moyer tries to find support for his personal receipt requirement in an 1895 Supreme Court decision, *People v. Ward* (1895) 110 Cal. 369 (*Ward*).  While this decision was issued after the current definition of "bribe" was adopted (Amends. to the Codes 1873-1874, ch. 614, § 1), nothing in the decision suggests that the Supreme Court even considered that definition.  In *Ward*, the Supreme Court observed that there was no "promise to do something, or an undertaking of some kind which was, or would be, beneficial to the supervisor" targeted by the bribe in that case.  (*Ward*, *supra*, at p. 373.) The issue before the Supreme Court in *Ward*, however, was whether the indictment

complied with the then-applicable pleading requirement that an indictment describe the acts constituting the offense. (*Id*. at p. 371.) In the passage quoted, the Supreme Court simply concluded that the indictment did not comply with this requirement. (*Id*. at p. 373.) There is no indication that the Supreme Court considered the definition of bribe in reaching this conclusion, and therefore the decision has no bearing here. (See, e.g., *Santa Clara Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 243 ["It is axiomatic that an opinion is not authority for an issue not considered therein."].) The Court of Appeal's decision in *People v. Gaio* (2000) 81 Cal.App.4th 919 is similarly inapposite because it involved payments made to the target of the bribe and does not even mention promises of future payment. (*Id*. at p. 928.)

Thus, nothing in the Penal Code's definition of bribe supports the personal receipt requirement that Moyer seeks to imply into the promise prong of the definition.

### 2. The Political Reform Act

Moyer also argues that a personal receipt requirement should be implied into the promise prong of the bribe definition to avoid a conflict with the behested payment provision of the Political Reform Act of 1974, Government Code section 81000 et seq. That provision requires elected officials to report payments made at the official's request for, among others, charitable or governmental purposes. (Gov. Code, § 84224, subd. (a); see also *id*. § 82004.5 [defining behested payment].) Moyer asserts that, unless the promise prong is construed to include a personal receipt requirement, it will permit prosecution of behested payments and "chill the willingness of elected officials and donors to engage in these charitable/governmental practices."

Moyer fails to substantiate this assertion. The promise prong of the Penal Code's definition of "bribe" does not subject most promises to make a donation at the behest of a public official to prosecution. A promise to make a payment to a third party satisfies only one element of bribery. To constitute bribery, such a promise must be made "with a corrupt intent to influence, unlawfully, the person to whom it is given" in an official

activity.  (§ 7, subd. (6).)  Moyer fails to identify any situation in which a promise made in good faith to contribute to a charity, or a government entity could satisfy the corrupt intent requirement.  As a consequence, Moyer fails to show any conflict between the promise prong, as written, and the behested payment provision of the Political Reform Act.

In any event, the Legislature has instructed how to harmonize the Political Reform Act with other statutes.  The Act states that "[n]othing in this chapter shall exempt any person from the applicable provisions of any other laws of this state."  (Gov. Code, § 91014.)  Thus, if there were any conflict between the Political Reform Act's behested payment provision and the promise prong of the definition of bribe, the Political Reform Act would have to yield.

### 3. The Rule of Lenity

Moyer argues as well that, "to the extent there is any ambiguity," the rule of lenity requires that a personal receipt requirement be implied into the promise prong.  In fact, the rule of lenity is inapplicable.  When a statute defining a crime or punishment is susceptible of two interpretations of roughly equal plausibility, the rule of lenity requires adoption of the interpretation more favorable to the defendant.  (*People v. Avery* (2002) 27 Cal.4th 49, 57 (*Avery*).)  In other words, "the rule of lenity is a tie-breaking principle" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30 (*Lexin*)), which applies if there is "an *egregious* ambiguity" and " 'two reasonable interpretations of the same provision stand in relative equipoise' " (*People v. Manzo* (2012) 53 Cal.4th 880, 889, quoting *Lexin*, *supra*, 47 Cal.4th at p. 1102, fn. 30; see also *Avery*, *supra*, 27 Cal.4th at p. 58).  The rule has no application where a court can "fairly discern" legislative intent.  (*People v. Soto* (2018) 4 Cal.5th 968, 980, quoting *People ex Rel Green v. Grewal* (2015) 61 Cal.4th 544, 565; *People v. Cornett* (2012) 53 Cal.4th 1261, 1277; *Avery*, *supra*, 27 Cal.4th at p. 58.)  As shown above, that is the case here.

### 4.  Constitutional Considerations

Finally, Moyer argues that a personal receipt requirement must be implied into the promise prong because otherwise California's bribery statutes would be expanded in an unforeseeable fashion in violation of due process.  (See *People v. Heitzmann* (1994) 9 Cal.4th 189, 199 [statutes "must be definite enough to provide a standard of conduct for those whose activities are proscribed" and "must provide definite guidelines . . . to prevent arbitrary and discriminate enforcement"] (*Heitzmann*)); see also *Walker v. Superior Court* (1988) 47 Cal.3d 112, 141-142 (*Walker*).)  In fact, it was foreseeable that California's bribery statutes would be construed to cover promises to make payments to third parties because Ninth Circuit precedent construing California law, federal law, and the law of many states, all allow bribery prosecutions for payments, or promises to give things of value, to third parties.

The Ninth Circuit interpreted California's bribery statutes to apply to payments to third parties more than thirty years ago.  In *United States v Frega* (9th Cir. 1999) 179 F.3d 793 (*Frega*), an attorney and several Superior Court judges were charged with violating the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 et seq.  The indictment alleged multiple acts of bribery in violation of sections 92 and 93 (*Frega*, *supra*, at p. 799), including several payments to family members of the judges (*id*. at p. 807).  The Ninth Circuit rejected the defendants' assertion that "payments to family members [are] beyond the reach of the bribery statute."[2]  (*Ibid*.)  As a consequence, for at least three decades, there has been precedent for applying California's bribery statutes to payments to third parties.

---

[2] In *Frega*, the Ninth Circuit also rejected the defendants' contention that the jury should have been instructed that a payment to a family member cannot be a bribe if the judge is not made aware of the payment.  (*Frega*, *supra*, 179 F.3d at p. 807.)  We express no opinion on the correctness of that ruling.

In addition, in other jurisdictions it is well established that promises to make payments to third parties may constitute a bribe. Federal law makes it a crime to make "promises" to a federal official "to give anything of value *to any other person or entity*[] with intent[] [¶] to influence any official act." (18 U.S.C. § 201, subd. (b)(1)(A), italics added.) Similarly, the Model Penal Code defines bribery to include any offer to confer a "pecuniary benefit" in consideration for official action (Model Pen. Code, §240.1, subd. (1)), and "benefit" is defined in turn to include "benefit to any other person or entity in whose welfare [the beneficiary of a bribe] is interested." (*Id*., § 240.0, subd. (1).) Moreover, at least ten states have adopted in whole or in large part this definition of bribe. (See Del. Code Ann., tit. 11, § 1209(3); Haw. Rev. Stat. § 710-1000; Ida. Code § 18-1351(1); Neb. Rev. Stat. § 28-916.01(2); N.J. Stat. Ann. § 2C:27-1(a); 18 Pa. Stat. and Const. Stat. Ann. § 4501; Tenn. Code Ann. § 39-11-106(2); Tex. Pen. Code § 36.01(3); Va. St. Ann. § 18.2-446; W Va. Code Ann. § 61-5A-2(8).) Thus, federal law and the law of at least ten other states recognize that a promise to a public official to make a payment to, or confer a benefit upon, a third party may constitute a bribe. (See, e.g., *United States v. Menendez* (D.N.J. 2015) 132 F.Supp.3d 635, 639-640; *United States v. Siegelman* (11th Cir. 2011) 640 F.3d 1159, 1165-1166; *Commonwealth v. Moran* (Pa. 2014) 104 A.3d 1136, 1146.)

As a consequence, based on longstanding judicial construction of California's bribery statutes, federal law and the laws of many other states, Moyer had fair warning that a bribery charge might be based on a promise to make payments to a third party.

Moyer also argues that, without a requirement that promised payments be made to the target of a bribe, bribery statutes might be enforced in an arbitrary manner and become a convenient tool for discriminatory enforcement. As noted above, however, more than thirty years ago the Ninth Circuit interpreted California's bribery statute to cover payments to third parties, and federal law as well as the law of other states have long recognized that promises to make payments to third parties may constitute bribery.

17

Nevertheless, Moyer fails to cite a single instance in which those laws have been applied in an arbitrary or discriminatory fashion, and he does not identify a scenario in which this might happen.

We therefore find Moyer's constitutional objections unpersuasive and hold that the Penal Code's definition of "bribe" should be interpreted as it is written, without implying any personal receipt requirement into its promise prong.

### B. *Sufficiency of the Evidence Supporting the Indictment*

The People challenge the trial court's determination that the evidence of corrupt intent before the grand jury was insufficient to support an indictment. The People argue that the circumstantial evidence presented to the grand jury was sufficient to create a strong suspicion that Moyer bribed Undersheriff Sung and Captain Jensen when he promised to donate over $50,000 worth of iPads to the Santa Clara County Sheriff's Office in exchange for release of Apple's CCW licenses. We agree. While the evidence presented to the grand jury might be interpreted innocently and by itself may not be sufficient to support a conviction, it is sufficient to satisfy the much less stringent requirements for an indictment.

### 1. Standard of Review

Under section 995, an indictment must be dismissed if the grand jury indicted the defendant "without reasonable or probable cause." (§ 995, subd. (a)(1)(B).) "Reasonable or probable cause" means a state of facts leading a person of ordinary caution or prudence "[to] conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Mower* (2002) 28 Cal.4th 457, 473.)

The evidentiary showing needed to satisfy this standard is "exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846 (*Salazar*).) " 'Evidence that will justify a prosecution need not be sufficient to support a conviction' " (*People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*), quoting *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474), and "[a]n indictment may be justified even if the evidence leaves some

room for doubt" (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 698 (*Costa*)).  Reasonable or probable cause to indict exists " 'if there is some rational ground for assuming the possibility that an offense has been committed and the defendant is guilty of it.' " (*Scully*, *supra*, 11 Cal.5th at p. 582; see also *People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226 ["Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged."].)

   With respect to an indictment, the grand jury sits as the finder of fact (*People v. Pic'l* (1982) 31 Cal.3d 731, 737 (*Pic'l*)), and we review *de novo* the sufficiency of the evidence supporting the grand jury's determination.  (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.)  In doing so, a reviewing court may not substitute its judgment on the weight of the evidence for the fact finder's (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1147-1148 (*Williams*)), and " '[e]very legitimate inference that may be drawn from the evidence must be drawn in favor of the [indictment]' " (*Pic'l*, *supra*, 31 Cal.3d at p. 737). In addition, while there must be some showing concerning each element of the charged crime, "such a showing may be made by means of circumstantial evidence supportive of reasonable inferences."  (*Williams*, *supra*, 71 Cal.2d at p. 1148.)

   2.  The Evidence Presented to the Grand Jury

   Drawing all legitimate inferences in favor of the indictment, we conclude that there was sufficient circumstantial evidence to create a strong suspicion that Moyer promised to donate iPads to the Sheriff's Office with a corrupt intent to influence Undersheriff Sung to release Apple's CCW licenses.  This evidence showed that Sung used CCW licenses to extract favors, that he released Apple's CCW licenses only after Moyer promised to make the donation of iPads in their February 8, 2019 meeting, and that Moyer's subsequent actions displayed a consciousness of guilt.

a.  Undersheriff Sung's Misuse of Authority over CCW Licenses

The People presented evidence to the grand jury showing that Undersheriff Sung had broad authority over CCW licenses and that he used this authority to extract favors.

Under California law, sheriffs have authority to issue licenses to carry concealed weapons.  (§ 26150.)  Although the Penal Code sets forth requirements that applicants must satisfy, the Code does not grant an entitlement to a license: it merely states that a sheriff "may" issue a license when the statutory requirements are satisfied.  (*Ibid*.)  In fact, during the relevant time period, the Santa Clara County Sheriff's Office generally did *not* process applications for CCW licenses.  The Sheriff's Office, however, would process applications on instructions from several high-ranking officials, including Undersheriff Sung, and Sung had authority to hold licenses even after they were signed by the sheriff.  This authority gave Sung the power to extract favors from applicants, and he exercised that power.

For example, Undersheriff Sung forced one applicant to allow the sheriff to use a luxury suite.  Harpreet Chadha, the owner of a business with a suite at San Jose's sports arena, applied to renew his CCW license in 2016.  Although Sheriff Smith signed the license in October 2017, Sung put the license on hold so that he could meet with Chadha, and when he did, he attempted to schedule an event for the sheriff in Chadha's suite.  The event, however, did not take place until February 14, 2019, and it was only on that date— roughly sixteen months after Sheriff Smith signed Chadha's license—that Chadha picked up his license.

Undersheriff Sung also used his authority over CCW licenses to pressure Moyer and Eric Mueller, the senior director of Apple's security team, into contributing to Sheriff Smith's re-election campaign.  In August 2017, Mueller and another Apple official met with Sung to discuss the CCW licenses that Apple was trying to obtain for its executive protection team.  During the meeting, Sung brought up the sheriff's upcoming re-election and asked whether Mueller and another Apple official would support the sheriff.  The

suggestion raised a "red flag" because it appeared to connect the CCW licenses to political support for the sheriff, and when Moyer was told of it he responded that "[w]e will not give money or anything of value in exchange for CCW[s]."

Over the next year, however, Apple's CCW applications languished, and in October Moyer and Mueller donated money to Sheriff Smith's campaign—as Undersheriff Sung had requested the year before. Moreover, it was only after the election that the final steps for processing the applications took place and the sheriff signed the licenses.

Thus, the grand jury had more than enough evidence to create a reasonable suspicion that Undersheriff Sung was abusing his authority over CCW licenses to extract favors from, among others, Moyer.

b. The iPad Donation Promise

The grand jury also had enough evidence to create a reasonable suspicion that Moyer promised a sizable donation of iPads to the Sheriff's Office to persuade Undersheriff Sung to release Apple's CCW licenses.

Apple's CCW licenses were not released immediately after they were signed and ready for use. Sheriff Smith signed Apple's CCW licenses sometime in mid-January 2020, and normally the licenses would have been released immediately afterwards. They were not. Instead, shortly after Apple's CCW licenses were signed, they were removed from the desk of the administrative assistant who normally would have notified the applicants to pick them up.

Indeed, release of Apple's CCW licenses was delayed for two months, until after Undersheriff Sung had met with Moyer, the possibility of an iPad donation had been raised, and Moyer had returned with a concrete proposal. In late January 2019, around the time that release of Apple's licenses was held up, Sung—who, as mentioned above, had authority to hold up licenses signed by the sheriff—requested that Moyer meet with him and Captain Jensen. During this meeting, which occurred on February 8, 2019,

Moyer sent a blank email to himself with the subject line "IPad Donation."  Two days later, Moyer began inquiring how to arrange such a donation, and in early March, Moyer emailed Jensen to propose donating iPads for a new training center.  Three weeks later— and nearly two months after they were signed—Apple's CCW licenses were released.

This sequence of events creates a suspicion that Apple's CCW licenses were released in exchange for the promised iPad donation.  This suspicion is heightened by evidence that both the licenses and the donation were discussed at the February 8 meeting between Moyer, Undersheriff Sung, and Captain Jensen.  As noted above, during his February 8 meeting with Sung and Jensen, Moyer sent himself a blank email with the subject line "IPad Donation," which suggests that the donation was discussed during the meeting.  In addition, shortly after the meeting, Moyer emailed the leader of Apple's executive protection team that "[y]ou will have your permits shortly," which suggests that the CCW licenses also were discussed.  Furthermore, Jensen played an active role in both handling the iPad donation and handing out the CCW licenses, even though the donation was not for a program under his direct supervision, and he had no direct responsibility for CCW licenses.

Other evidence raises further suspicion.  First, the promised iPad donation was both unusual and large.  Apple had never before donated any products to law enforcement agencies.  In addition, at Undersheriff Sung's suggestion, the Sheriff's Office requested 200 iPads—worth $50,000 to $80,000—even though previously the office had no need for iPads.  Second, Moyer did not appear to have been much concerned about how the iPads would be used.  He offered them for a new training center, even though the Sheriff's Office was not setting up such a center.  Third, the donation was made secretively.  Neither Mueller nor Gullo, the head of Apple's executive protection team, were informed of the planned donation, and the officers primarily responsible for law enforcement in and around Apple Park were likewise kept in the dark.

In light of the delay in releasing Apple's CCW licenses until the iPad donation promise had taken shape, the discussion of both the licenses and the donation at the February 8 meeting, Captain Jensen's subsequent involvement with both the licenses and the donation, and other evidence of unusual activity, the grand jury had adequate grounds for entertaining a reasonable suspicion that Undersheriff Sung demanded, and Moyer gave, a promise to make the iPad donation in exchange for release of Apple's CCW licenses.

c. Moyer's Intent

The grand jury also had evidence sufficient to create a strong suspicion that Moyer had a corrupt intent in promising the iPad donation. The trial court found insufficient evidence of corrupt intent because, by the time of his February 8, 2019 meeting with Undersheriff Sung and Captain Jensen, Moyer had been repeatedly informed that Apple's CCW licenses would be issued. As noted above, however, despite receiving assurances from the sheriff in June 2018, Apple's CCW applications had been languishing for months. In addition, Moyer had a "red flag" warning that Sung was using his authority over CCW licenses for improper purposes. As a consequence, the grand jury had ample ground for inferring that Moyer understood that he had to promise Sung something to obtain the release of Apple's CCW licenses.

This inference is supported by evidence showing Moyer's consciousness of guilt. Although, as the trial court pointed out, Moyer went through proper channels at Apple in requesting the iPad donation, Moyer was less than candid in doing so. For example, when a compliance attorney asked whether Apple had any significant matters pending with the Sheriff's Office, Moyer initially failed to disclose the CCW licenses that he had spent so much time trying to obtain, saying instead that "we are not doing this because we are receiving anything in exchange." He only revealed the licenses after they had been issued and does not appear to have disclosed that applications for them were still pending when he first proposed the iPad donation. Especially as Apple's CCW licenses

were discussed in the same meeting in which the grand jury reasonably could have inferred that the iPad donation was mentioned, the grand jury could have found this omission surprising and suspicious. As a consequence, the grand jury reasonably could have inferred that Moyer was trying to hide the connection between the donation and the licenses.

The grand jury also had grounds for suspecting that Moyer tried to create a false paper trail. As noted above, during his February 8 meeting with Undersheriff Sung and Captain Jensen, Moyer sent himself an email about the iPad donation, which suggests that the donation was discussed during the meeting. A month later, however, Moyer sent an email to Jensen saying he was "[c]urious if you have a need for iPads or potentially computers for that new facility[.]" Moyer also stated that Jensen had mentioned that the sheriff was "setting up a new training center," even though there was no new center. The grand jury could have inferred that these statements were intended to conceal that Moyer had discussed the promised donation the month before in the same meeting where Apple's CCW licenses were discussed.

Finally, the grand jury could have found further evidence of consciousness of guilt in the speed with which Moyer reacted upon learning that the Santa Clara County Sheriff's Office was under investigation for its treatment of CCW licenses. On August 7, 2019, the press reported that the Sheriff's Office had received a subpoena concerning CCW licenses. There was no mention in the article about Apple or the promised iPad donation, and in February, when asked by the compliance attorney about matters pending before the Sheriff's Office, Moyer had not disclosed Apple's CCW applications. In August, however, Moyer not only made a connection between the licenses and the promised donation; he also immediately emailed Apple's head litigator to disclose that the CCW applications had been pending when the iPad donation was promised and to recommend tabling the donation. And within three minutes after the litigator agreed, Moyer instructed those working on the donation to cease work. The grand jury could

have inferred from the speed with which Moyer made the connection between the CCW licenses and the iPad donation, disclosed it, and tabled the promised donation that he was gravely worried.

Moyer argues that the inferences urged by the People are speculative and unsupported. He contends that there are innocent explanations for many of the actions that the People contend are suspicious, such as Moyer's email to himself during the February 8 meeting and his reaction to news of the investigation of the Sheriff's Office. He also downplays his failure to disclose Apple's CCW licenses to the compliance attorneys, objects that he had no knowledge that Undersheriff Sung was holding up the licenses, and contends that the People are "piling inference upon inference."

These are substantial points, which, absent additional evidence, may be challenging to overcome at trial. At the indictment stage, however, proof beyond a reasonable doubt is not required. To the contrary, at that stage the standard is "exceedingly low." (*Salazar*, *supra*, 83 Cal.App.4th at p. 846.) To overcome a challenge to the sufficiency of the evidence presented to the grand jury, the People need show "reasonable or probable cause" (§ 995, subd. (a)(1)(B)), which requires only "some rational ground for assuming that an offense has been committed and the defendant is guilty of it." (*Scully*, *supra*, 11 Cal.5th at p. 582, quotation omitted.) We conclude that the evidence presented to the grand jury provided such a ground. (*Ibid.*)

3. Corrupt Use of Donations

Moyer argues that, even if his promise to donate iPads to the Sheriff's Office was intended to persuade Undersheriff Sung to release Apple's CCW licenses, he cannot have had a corrupt intent because the Political Reform Act allows behested payments. This argument is unpersuasive for three reasons.

*First*, Moyer has not shown that the proposed iPad donation would have been a behested payment. Donations "made principally" for "charitable" and "governmental purposes" may qualify as behested payments. (Gov. Code, § 82004.5, subd. (c)(4), (5).)

The evidence presented to the grand jury, however, created a reasonable suspicion (and therefore permitted the grand jury to find) that Moyer proposed the iPad donation principally for another purpose: to secure release of Apple's CCW licenses.

*Second*, while Moyer notes that behested payments are allowed by the Political Reform Act, he has not pointed to anything in the Act authorizing public officials such as Undersheriff Sung and Captain Jensen to demand (or receive) donations in exchange for performing their official duties. Indeed, it would be surprising if the Act authorized such demands. It has long been recognized that "[p]ublic policy and sound morals alike forbid that a public officer should demand or receive for services performed by him or her in the discharge of official duty other or further remuneration than that described by law." (52 Cal. Jur. (2023) Public Officers & Employees, § 357; see also *Noble v. City of Palo Alto* (1928) 89 Cal.App. 47, 51.)

*Third*, the People presented to the grand jury evidence that Moyer was less than candid about the iPad donation. As the trial court recognized, there is no corrupt intent when a corporation publicly offers to fund a public works project in exchange for a city council tabling a tax proposal, because in such a case the deal is made openly and lawfully. The situation here is different. Far from making a public deal, Moyer allegedly struck a private bargain with Undersheriff Sung and Captain Jensen to donate iPads in exchange for release of Apple's CCW licenses. In addition, far from disclosing this bargain, Moyer failed to mention the applications when compliance personnel asked about matters pending before the Sheriff's Office, and he took steps to actively conceal the connection between the applications and the promised donation until the investigation into the Sheriff's Office created too great a danger. While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See *People v. Wong* (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)

### III. Disposition

The order dismissing count 2 of the indictment is reversed, count 2 is reinstated, and this case is remanded for further proceedings.

_____
BROMBERG, J.


WE CONCUR:



_____
GROVER, ACTING P.J.



_____
LIE, J.



*People v. Moyer*
H049408

Trial Court:                              Santa Clara County
                                          Superior Court No.:  C2015936

Trial Judge:                              The Honorable Eric S. Geffon

Attorneys for Plaintiff and Appellant     Jeffrey F. Rosen, District Attorney
The People of the State of California:
                                          John Chase, Deputy District Attorney

Attorneys for Defendant and Respondent    Edward W. Swanson
Thomas Moyer:
                                          Mary McNamara

                                          Britt H. Evangelist

The People v. Moyer
H049408

# MOTION FOR JUDICIAL NOTICE
## EXHIBIT

# SECTION:





1  DAVID J. MICLEAN (SB# 115098)
   dmiclean@micleangleason.com
2  GARY R. GLEASON (SB# 136167)
   ggleason@micleangleason.com
3  ANNE-MARIE D. DAO (SB# 282632)
   adao@micleangleason.com
4  MICLEAN GLEASON LLP
   100 MARINE PARKWAY, SUITE 310
5  REDWOOD SHORES, CA 94065
   TEL: (650) 684-1181
6  FAX: (650) 684-1182

7  Attorneys for Plaintiff
   JOSHUA BANKO
8

ORIGINAL FILED

JUN 27 2013

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

9
10      UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA
11

12  JOSHUA BANKO                     CASE NO. CV 13 - 02977 DMR

13                Plaintiff,         COMPLAINT FOR DAMAGES FOR:

14          vs.                      1. **VIOLATION OF DODD-FRANK ACT**

15  APPLE, INC., DOES 1-50           2. **WRONGFUL TERMINATION IN**
                                        **VIOLATION OF PUBLIC POLICY**
16                Defendants.

17                                   3. **RETALIATION**

18                                   4. **BREACH OF EMPLOYMENT**
19                                      **CONTRACT**
20
                                     5. **BREACH OF IMPLIED COVENANT**
21                                      **OF GOOD FAITH AND FAIR**
22                                      **DEALING**
23
                                     **JURY TRIAL REQUESTED**
24
25
26
27
28
─────────────────────────────────────
              COMPLAINT FOR DAMAGES

**I.      PARTIES**

1.      Plaintiff JOSHUA BANKO ("Mr. Banko") is an individual and at all times relevant to this action was a resident of Palo Alto located in Santa Clara County.

2.      Defendant APPLE, INC. ("Apple") is a corporation incorporated in the State of California whose principal place of business is within Santa Clara County. Defendant's entity address is 1 Infinite Loop, Cupertino, CA 95014.

3.      DOES 1-50 are unknown at this time but are believed to have contributed to the injury sustained by Mr. Banko. DOES 1-50 were at all times relevant to this action employees, agents, and/or members of the Board of Directors of Apple.  Mr. Banko is unaware of the true names and capacities of Defendants sued herein as DOES 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Mr. Banko will pray leave of this court to amend this complaint to allege the true names and capacities when ascertained.

4.      Mr. Banko is informed and believes, and thereon alleges, that each of the Defendants herein was, at all times relevant to this action, the agent, employee, representing partner, or joint venturer of the remaining Defendants and was acting within the course and scope of that relationship.  Mr. Banko is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

**II.     JURISDICTION & VENUE**

5.      Jurisdiction is proper in the U.S. District Court, Northern District of California pursuant to 28 U.S.C. §1331, because the claims asserted herein arise under 15 U.S.C. §78u-6 and 18 U.S.C. §1514A.

6.      Venue is proper in the Northern District Court of California pursuant to 28 U.S.C. §1391 because both Apple's location and the location of the wrongful termination are in Santa Clara County, which is located within the geographic region

presided over by the Northern District of California.

III.   **GENERAL ALLEGATIONS**

7.     This whistleblower action, which arises pursuant to, among other statutes, the Dodd-Frank act (15 U.S.C. §78u-6) and Title VIII of the Sarbanes-Oaxley Act of 2002 (18 U.S.C. §1514A), is brought to recover damages sustained by Mr. Banko when Apple, retaliated against him because of his complaints about, and objection to, Employee Roe's embezzlement of publicly traded corporation's funds which Mr. Banko reasonably believed to be unlawful and against public policy.

A.     **MR. BANKO'S HIGHLY SUCCESSFUL CAREER AT APPLE.**

8.     Defendant Apple, a publicly traded corporation, first hired Mr. Banko on or about September 18, 2000.

9.     Mr. Banko worked exclusively for Apple from September, 2000 until his termination over 12 years later.  During his tenure with Apple, Mr. Banko received multiple promotions, led numerous projects and even finished a graduate degree during his employment.  Mr. Banko participated in the development and/or engineering management of numerous high profile products such as the iPad, iBook, MacBook, MacBook Pro, and MacBook Air.  Moreover, in Mr. Banko's over 12 years with the company, he was a significant contributor in developing more than 22 important Apple patents.

10.    Mr. Banko's importance to the company was exemplified by many outstanding performance reviews.  These include Apple's award to Mr. Banko of large discretionary bonuses and raises, all related to his strong performance as an Apple employee.

11.    During his tenure at Apple, Mr. Banko's performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written

1   reviews.

2   12.   Mr. Banko was also assigned the lead on numerous projects and told that he

3   was an extremely valuable member of the company by his supervisor, Ms. Bergeron.

4   13.   Among other projects, Mr. Banko led, designed and managed the engineering

5   development of the iPad.  Largely because of Mr. Banko's efforts, the iPad became

6   one of Apple's most successful product launches.

7   14.   Following the launch of the iPad, Mr. Banko received a significant bonus, and

8   an e-mail accompanying the bonus that acknowledged his work on the project.  It

9   was communicated to Mr. Banko that he was being awarded a $12,000 bonus for

10  January 02, 2010 because of his persistence and drive to finish his project on the

11  iPad.  It was also communicated that Apple was looking forward to Mr. Banko

12  accomplishing great things that year.

13  15.   During his tenure at Apple, Mr. Banko's supervisor, Ms. Bergeron specifically

14  stated that she would "back-up" and "support" Mr. Banko with respect to his

15  employment at Apple because he was such a valuable employee to Apple.

16

17        **B.     MR. BANKO'S ASSIGNMENT TO, AND SUCCESSFUL LEADERSHIP
              OF, ANOTHER HIGH LEVEL APPLE PROJECT.**

18

19  16.   In March of 2012 Apple promoted Mr. Banko to the position of "Engineering

20  Manager II", and assigned him to oversee the engineering of one of the most

21  important and politically sensitive Apple development projects taking place at that

22  time (the "Project").  The assignment to Mr. Banko of such a crucial project was yet

23  another acknowledgement by Apple of the high regard it had for Mr. Banko's

24  abilities and for his outstanding performance with respect to the previous

25  responsibilities assigned to him over the years.

26  17.   As the Engineering Manager in charge of the Project, Mr. Banko continued to

27  meet design and project deadlines.

28

18.     In or about November, 2012 Mr. Banko's efforts led to the completion of a successful build of a prototype for the Project within the Project deadline for the build.

19.     On December 18, 2012 a meeting was held regarding the Project and its status. No complaints were lodged with respect to any aspect on the Project.  In fact, the Project was going so well that on December 21, 2012 Apple congratulated the Project team on completing a prototype system build before the holidays.  (Mr. Banko's superiors did not think it would be possible to complete the system build prototype that soon.)  Apple communicated to Mr. Banko that the team had done excellent work and pulled off a successful Pre-Proto system build in time for the holidays which many thought would not be possible before the holiday.

20.     On that same day, a physical prototype arrived at Apple.  It was enthusiastically received by key personnel at Apple in the Industrial Design Department.

21.     Apple subsequently shut down for its customary holiday break from December 22, 2012 to January 2, 2013.

22.     Within a day after returning to work after the holidays, Mr. Banko learned he had been given a significant discretionary bonus in relation to his work on the Project.

**C.     BACKGROUND OF EMPLOYEE ROE, A DIRECT REPORT TO MR. BANKO.**

23.     One of the Apple employees that reported directly to Mr. Banko during his tenure at Apple was Employee Roe[1], another engineer.  In or about August, 2011, Mr. Banko promoted Employee Roe, and provided her with a pay raise and a stock grant. The raise and grant were of the level commensurate with Employee Roe's

---

[1] The term Employee Roe is used to protect the individual's privacy.

1    performance and promotion.

2    24.     Two months later, in or about October, 2011, Stacey Smith, the senior human

3    resources director at Apple Inc., unilaterally altered the raise recommended by Mr.

4    Banko, and increased Employee Roe's bonus by 30% (from $13,500 to $17,500) and

5    her stock grant by 66% (from 300 to 500 shares).  He did this without prior notice to

6    either Mr. Banko or Mr. Banko's supervisor, Kate Bergeron.  Moreover, there was

7    no explanation provided to justify this action.

8    25.     Ms. Bergeron made no effort to correct or protest this unilateral action of Mr.

9    Smith.

10   26.     In or about March of 2012, Mr. Smith again provided Employee Roe with

11   favored treatment by unilaterally awarding her a pay increase of $40,000 and a grant

12   of 1500 Restricted Stock Units (over seven times the size of the additional amount he

13   had unilaterally given her in August of 2011).  These substantial increases in

14   Employee Roe's compensation took place without the knowledge of either Mr.

15   Banko or his supervisor Ms. Bergeron.

16   27.     Once again, Ms. Bergeron made no effort to correct or protest this unilateral

17   action of Mr. Smith.

18   28.     Mr. Banko was later told that the justification for the March, 2012 increase

19   was Employee Roe's claim that she was leaving Apple for a job at Facebook, and

20   receiving a substantial increase in compensation in connection with her new position.

21   The increased compensation Mr. Smith gave to Employee Roe was supposedly to

22   entice Employee Roe to stay at Apple.  However, to Mr. Banko's knowledge,

23   Employee Roe never provided anyone at Apple with any proof that she had ever

24   received an actual offer from Facebook, including Mr. Smith.

25   ///

26   ///

27

28

**D.    MR. BANKO'S DISCOVERY AND REPORTING OF EMBEZZLEMENT BY EMPLOYEE ROE.**

29.    Unbeknownst to Mr. Banko, Employee Roe had been submitting expense reports which included charges that consisted of either personal expenses, and/or expenses that could not be documented.

30.    In early 2012, Mr. Banko began to notice the irregularities on Employee Roe's expense reports.  In or about January, 2012, Mr. Banko met with and directed Employee Roe to remove fraudulent charges off her expense report.  Yet, even though Employee Roe inflated her expenses, she was awarded a bonus in or around February 2012.

31.    In or about December, 2012, Mr. Banko again discovered inconsistencies in another of Employee Roe's expense reports in which she inflated her expenses. When Mr. Banko highlighted these issues and asked Employee Roe to remedy them, Employee Roe failed to fix them.

32.    Upon Employee Roe's refusal to remedy her expense reports, Mr. Banko had a reasonable belief that Employee Roe was violating both Apple policy and the law and that he was required to report her.

33.    Mr. Banko's supervisors instructed Mr. Banko not to report Employee Roe, in essence asking him to cover up and be complicit in the embezzlement of Employee Roe.

34.    Notwithstanding his superiors' instructions to ignore the situation, Mr. Banko reported the embezzlement.

35.    As a result of Mr. Banko's reporting of Employee Roe, Apple conducted an internal audit in order to determine if Employee Roe had misrepresented expenses on her expense reports and, if so, the extent of Employee Roe's falsified expense reports.

36.    Apple's internal audit resulted in the discovery of over 40 instances of fraudulent expense reports in which Employee Roe either inflated or falsified

expenses for which she obtained reimbursement from Apple.

37.     Based on Apple's policies, and Mr. Banko's reasonable belief that Employee Roe's actions represented embezzlement from Apple, Mr. Banko recommended Employee Roe's immediate termination for fraud and embezzlement of company funds.

38.     To Mr. Banko's surprise both his supervisor (Ms. Bergeron) and Ms. Bergeron's supervisor (Doug Field) informed Mr. Banko that he should not pursue the termination of Employee Roe, stating she was a valuable employee (apparently even with her lack of loyalty to Apple and her embezzlement).

39.     Because of the legal implications of Employee Roe's actions, and the fact he reasonably believed he was obligated by law and Apple policy to terminate Employee Roe, Mr. Banko approached Mr. Victor Cousins of Apple's Human Resources department.

40.     Following his review of the facts, Mr. Cousins wrote a report recommending termination of Employee Roe on or around December 21, 2012.

41.     Thereafter a meeting was held that involved, at a minimum, Ms. Bergeron and Mr. Field regarding Employee Roe.  Mr. Banko was not invited to participate in the meeting, even though Employee Roe was his direct report and he was typically included in such meetings.

42.     On December 21, 2012, Ms. Bergeron informed Employee Roe that Apple was terminating her employment, effective December 31, 2012.

43.     Ms. Bergeron and Mr. Field, as well as Mr. Smith and others were upset that Mr. Banko had reported Employee Roe and had recommended her termination against their wishes.

44.     Notwithstanding the turmoil Mr. Banko had to navigate during late 2012 regarding Employee Roe, he successfully continued to complete his duties overseeing the engineering of the Project.

### E.   MR. BANKO'S TERMINATION FOLLOWING THE TERMINATION OF EMPLOYEE ROE.

45.   Apple was shut down for the holidays from December 22, 2012 through January 2, 2013.  Mr. Banko received no indication that there were any complaints or concerns regarding the Project during that time.  In fact, he had received praise and congratulations for successfully completing a prototype on schedule before the holiday break.

46.   Immediately after his return from the holidays, Mr. Banko received a significant discretionary bonus in relation to his work on the Project.  Thus, by all indications everything in relation to the Project was not only going well, but Mr. Banko was being rewarded for how well he was doing with respect to leading the Project.

47.   Suddenly and without warning, on or around January 9, 2013, nine days after Employee Roe's termination date, Mr. Banko was called into a meeting with Ms. Bergeron and Mike Ignaffo, a member of Apple's human resources department. During this meeting, Mr. Banko was pulled off the Project and told to stay home the rest of the week and return on Monday, January 14, 2013. Mr. Banko was shocked as he recognized such action as that typical of terminations.

48.   During the meeting Mr. Banko asked the reason for the action.  Neither Ms. Bergeron nor Mr. Ignaffo was able to provide a justification for the action.  Although asked directly, there was no mention of poor performance on the part of Mr. Banko. Upon his return on January 14, 2013, Mr. Banko was terminated from his position at Apple after over 12 years with the company.

### FIRST CAUSE OF ACTION
### VIOLATION OF DODD-FRANK ACT

49.   Paragraphs 1-48 are incorporated herein by reference.

50.   15 U.S.C. §78u-6 states no employer may discharge or in any other manner discriminate against, a whistleblower in the terms and conditions of employment

because of any lawful act done by the whistleblower in providing information that is required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934, and any other law, rule, or regulation subject to the jurisdiction of the Commission. (15 U.S.C. §78u-6 (h) (1) (A) (iii) ).

51.     Apple has violated 15 U.S.C. §78u-6(h)(1) because the decision to terminate Mr. Banko's employment was motivated by Mr. Banko's disclosures which are protected by Section 806 of the Sarbanes-Oxley Act (18 U.S.C. §1514A).

52.     Apple is governed by the Sarbanes-Oxley Act because, upon information and belief, it (a) has a "class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. §78l), and (b) it is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78o (d) ). (18 U.S.C. §1514A (a)).

53.     Mr. Banko engaged in activity that is protected by Section 806 of the Sarbanes Oxley Act (18 U.S.C. §1514A) when he informed Apple's officers and/or management of conduct which he reasonably believed to be in violation of federal law relating to fraud against shareholders.

54.     In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to report the embezzlement of Employee Roe.  Having a reasonable belief that the theft had occurred and that he was obligated to report it, Mr. Banko did so.

55.     In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to pursue the termination of Employee Roe after she had been found to have embezzled funds on 40 separate occasions in violation of Apple policy and the law.

56.     Mr. Banko recommended her termination to his supervisors, and then terminated her, against the wishes of his supervisors.

57.     As a proximate result of Mr. Banko's conduct as described in Paragraph 29-48 above, Apple terminated him within 14 days of Employee Roe's termination.

58.    As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and other special and general damages, all to his damage in an amount to be established at trial.

59.    Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

60.    In committing the acts set forth above, Apple and the other Defendants knew that the conduct that they would have required of Mr. Banko was unlawful, and required Mr. Banko to choose between violating the law and/or Apple policy and losing his job.  Notwithstanding this knowledge, Apple subjected Mr. Banko to cruel and unjust hardship in conscious disregard of Mr. Banko's rights by resisting Mr. Banko's efforts to report and subsequently terminate the embezzling Employee Roe and then terminating Mr. Banko's employment when he acted in accordance with Apple policy and the law.  Apple's conduct warrants the assessment of punitive damages.

61.    WHEREFORE, Mr. Banko requests relief as hereinafter provided.

## SECOND CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

62.    Paragraphs 1-61 are incorporated herein by reference.

63.    In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to pursue the investigation and/or termination of Employee Roe who had been found to embezzle funds on 40 separate occasions in violation of Apple policy and the law.  Having a reasonable belief that the theft had occurred and that he was obligated to report it, Mr. Banko did so.

64.    Employee Roe's embezzlement of a publicly traded corporation's funds harms the general public by impacting the millions of Apple shareholders, and by creating

tax irregularities (deduction of illegitimate expenses as business expenses) which in turn could harm Apple and its millions of shareholders. Enforcing laws and policies with respect to illegal acts by employees increases the value of the company and thereby benefits the public who owns Apple and increases taxable revenue of the company.

65.     As a proximate result of Mr. Banko's conduct as described in Paragraph 63, above, and in violation of public policy as set forth in Paragraph 64 above, Apple terminated Mr. Banko's employment.

66.     As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and other special and general damages, all to his damage in an amount to be established at trial.

67.     Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

68.     In committing the acts set forth above, Apple and the other Defendants knew that the conduct that they would have required of Mr. Banko was unlawful, and required Mr. Banko to choose between violating the law and/or Apple policy and losing his job. Notwithstanding this knowledge, Apple subjected Mr. Banko to cruel and unjust hardship in conscious disregard of Mr. Banko's rights by resisting Mr. Banko's efforts to report and subsequently terminate the embezzling Employee Roe and then terminating Mr. Banko's employment when he acted in accordance with Apple policy and the law. Apple's conduct warrants the assessment of punitive damages.

69.     WHEREFORE, Mr. Banko requests relief as hereinafter provided.

///

///

**THIRD CAUSE OF ACTION**
**RETALIATION**
**(15 USC §78u-6, 18 USC §1514A and California Labor Code §1102.5)**

70.     Paragraphs 1-69 are incorporated herein by reference.

71.     This cause of action is brought pursuant to 15 USC §78u-6, 18 USC §1514A and California Labor Code §1102.5

72.      Because Mr. Banko engaged in protected activities, such as not covering up embezzlement, not becoming complicit in the embezzlement, and reporting the embezzlement within a publicly traded company, as alleged above, Mr. Banko was subjected to adverse actions.

73.     Apple and/or the other Defendants and each of them acting in the course and scope of their employment and as representatives of Apple retaliated against Mr. Banko by the acts and conduct described above, which materially affected Mr. Banko's terms of employment.

74.     15 USC §78u-618 and USC §1514A makes it illegal for an employer to retaliate against an employee who reports embezzlement.

75.     California Labor Code makes it illegal for an employer to retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

76.     As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and other special and general damages, all to his damage in an amount to be established at trial.

77.     Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

78.     In doing the things herein alleged, the conduct of Apple and each of the other

1   Defendants was despicable and each Defendant acted towards Mr. Banko with

2   malice, oppression, fraud, and with a willful and conscious disregard of Mr. Banko's

3   rights.  Each of the Defendants ratified, authorized and condoned the conduct of each

4   and every other Defendant and managing agent, entitling Mr. Banko to an award of

5   punitive and exemplary damages.

6   79.    WHEREFORE, Mr. Banko requests relief as hereinafter provided.

7

8                          **FOURTH CAUSE OF ACTION**

9                  **BREACH OF EMPLOYMENT CONTRACT**

10  80.    Paragraphs 1-79 are incorporated herein by reference.

11  81.    Mr. Banko was employed by Apple for 12 years.  During the entirety of his

12  employment with Apple, he consistently received either good or excellent

13  performance evaluations and merit raises, was assured on numerous occasions that

14  he would not be terminated arbitrarily, and was told by his supervisor that she would

15  support him and back him up with respect to continued employment.

16  82.    Apple normally has a course of conduct and a policy of putting employees on

17  performance improvement plans prior to terminating them.

18  83.    Based on the oral representations, promises, and/or conduct of Apple and/or

19  the other Defendants, Mr. Banko had an employment contract with Apple stating that

20  he would be employed by Apple so long as his performance was satisfactory, and

21  that Apple and/or the other Defendants would not discharge him without good and

22  just cause.

23  84.    The terms of the employment contract included, but were not limited to, the

24  following: Apple and/or the other Defendants would not demote or discharge Mr.

25  Banko without good cause and fair warning, based on objective, reasonable job

26  evaluations of Mr. Banko, and following an opportunity to participate in a

27  performance improvement plan.

28

85.    Mr. Banko at all times fulfilled his duties and conditions under the contract and has been ready, willing, and able to continue performing them in a competent and satisfactory manner.

86.    Notwithstanding the implied promise to terminate the employment contract only for good cause, on or about January 16, 2013, Apple and the other Defendants terminated Mr. Banko's employment and later alleged grounds of poor performance, even though Mr. Banko had received consistently good performance evaluations, had received merit raises and bonuses, including a substantial discretionary merit bonus less than 2 weeks before his termination.

87.    Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

88.    As a proximate result of Apple and the other Defendants' breach of the employment contract, Mr. Banko has suffered and continues to suffer losses in earnings and other employment benefits, to his damage in an amount to be established at trial.

89.    WHEREFORE, Mr. Banko requests relief as hereinafter provided.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

90.    Paragraphs 1-889 are incorporated herein by reference.

91.    The employment agreement referred to above contained an implied covenant of good faith and fair dealing, which obligated Apple and/or the other Defendants to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act that would prevent or impede Mr. Banko from performing any or all of the conditions of the contract that he agreed to perform, or any act that would deprive Mr. Banko of the benefits of the contract.

92.    Mr. Banko was employed by Apple for 12 years, and reasonably relied on the

provisions of the implied agreement regarding the causes for which employees could be discharged or demoted and the procedures set forth for such discharges for the expectation that Apple and/or the other Defendants would apply its policies even-handedly to afford Mr. Banko the protections of those procedures if Apple and/or the other Defendants believed there was cause to discharge Mr. Banko.

93.    Mr. Banko performed all the duties and conditions of the employment agreement.

94.    Apple and/or the other Defendants knew that Mr. Banko had fulfilled all his duties and conditions under the contract.

95.    Apple and/or the other Defendants breached the implied covenant of good faith and fair dealing under the employment agreement by discharging Mr. Banko intentionally, maliciously, and without probable cause, in bad faith and for reasons extraneous to the contract.  In fact, Apple and/or the other Defendants discharged Mr. Banko, not because of alleged poor performance, but because Mr. Banko, in good faith and in a reasonable, appropriate, and businesslike manner, refused to cover up the embezzlement of Employee Roe and because he reported the embezzlement of Employee Roe.  Such motives were retaliatory in nature and extraneous to the employment relationship and were intended to deprive Mr. Banko of the benefits thereof.

96.    Apple and/or the other Defendants further breached the implied covenant of good faith and fair dealing by violating and failing to follow its own personnel policies by not providing Mr. Banko with the written warning of performance deficiency, by refusing to offer a performance improvement plan, and by failing to "support" him as promised by Ms. Bergeron.

97.    Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

15

98.     As a proximate result of Apple and/or the other Defendants' breach of the implied covenant of good faith and fair dealing, Mr. Banko has suffered, and continues to suffer, losses in earning and other employment benefits, to his damage in an amount to be established at trial.

99.     As a further proximate result of Apple and/or the other Defendants' breach of the implied covenant of good faith and fair dealing, Mr. Banko has incurred reasonable attorney's fees in attempting to secure the benefits owed him under the employment contract.

100.   WHEREFORE, Mr. Banko requests relief as hereinafter provided.

## IV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

1.     For a money judgment representing compensatory damages including lost wages, earnings, retirement benefits and other employee benefits, and all other sums of money, together with interest on these amounts, according to proof;

2.     For a money judgment for mental pain and anguish and emotional distress, according to proof;

3.     For an award of exemplary and punitive damages, according to proof;

4.     For costs of suit and attorney's fees;

5.     For pre-judgment and post-judgment interest; and

6.     For such other and further relief as the court deems just and proper.

\\\

\\\

\\\

\\\

\\\

**V.     REQUEST FOR JURY TRIAL**

        Plaintiff Joshua Banko hereby requests trial by Jury.


DATED: June 27, 2013                    MICLEAN GLEASON LLP


                                        By _____
                                            David P. Miclean
                                            Gary R. Gleason
                                            Attorneys for Plaintiff Joshua Banko

1    TODD K. BOYER, Bar No. 203132
     tboyer@littler.com
2    BENJAMIN A. EMMERT, Bar No. 212157
     bemmert@littler.com
3    LITTLER MENDELSON, P.C.
     50 W. San Fernando, 15th Floor
4    San Jose, California  95113.2303
     Telephone:    408.998.4150
5    Facsimile:    408.288.5686

6    Attorneys for Defendant
     APPLE INC.

7

8                        UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12   JOSHUA BANKO,                          Case No.  CV13-02977 RS

13                    Plaintiff,            **DEFENDANT APPLE INC.'S ANSWER TO**
                                            **PLAINTIFF'S FIRST AMENDED**
14          v.                              **COMPLAINT**

15   APPLE INC., and DOES 1-50,

16                    Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S  ANSWER  TO  FIRST  AMENDED
COMPLAINT                                          Case No. CV13-02977 (RS)

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Defendant Apple Inc. ("Apple"), hereby answers the First Amended Complaint filed by Plaintiff, Joshua Banko, as follows:

## I.      PARTIES

1.      Answering Paragraph 1 of the First Amended Complaint, Apple admits that Plaintiff is an individual.  Apple is without sufficient knowledge or information to form a belief as to the truth or falsity of Plaintiff's allegations regarding Plaintiff's residence, and on that basis, Apple denies the allegations.  Except as so specifically admitted, Apple denies the remaining allegations contained in Paragraph 1.

2.      Answering Paragraph 2 of the First Amended Complaint, Apple admits that it is a California Corporation and that its corporate headquarters are located at 1 Infinite Loop, Cupertino, CA 95014.  Except as so specifically admitted, Apple denies the remaining allegations contained in Paragraph 2.

3.      Answering Paragraph 3 of the First Amended Complaint, Plaintiff's statement is a legal conclusion that does not require a response.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 3.

4.      Answering Paragraph 4 of the First Amended Complaint, Plaintiff's statement is a legal conclusion that does not require a response.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 4.

## II.      JURISDICTION AND VENUE

5.      Answering Paragraph 5 of the First Amended Complaint, Apple admits the Court had subject matter jurisdiction over Plaintiff's claims brought under 15 U.S.C. §78u and 18 U.S.C. §1514 which have since been dismissed with prejudice.  To the extent Paragraph 5 contains factual allegations, Apple denies each and every allegation contained therein.

6.      Answering Paragraph 6 of the First Amended Complaint, Plaintiff's statement that venue is proper is a legal conclusion that does not require a response.  Apple admits that its headquarters is in the Northern District of California.  Except as expressly admitted, Apple denies each and every allegation contained in Paragraph 6.

1

### III.   GENERAL ALLEGATIONS

2       7.      Answering Paragraph 7 of the First Amended Complaint, this paragraph

3   contains a description of Plaintiff's lawsuit as alleged in Plaintiff's First Amended Complaint, as

4   well as legal conclusions, and does not contain factual allegations that require a response.  To the

5   extent Paragraph 7 contains factual allegations, Apple denies each and every allegation contained

6   therein and also denies that Plaintiff is entitled to any relief or recovery whatsoever.

7       8.      Answering Paragraph 8 of the First Amended Complaint, Apple admits that it

8   is a publically traded corporation and that Plaintiff first started working for Apple in September

9   2000.   Except as so expressly admitted, Apple denies each and every allegation contained in

10  Paragraph 8.

11      9.      Answering Paragraph 9 of the First Amended Complaint, Apple admits that

12  Plaintiff worked for Apple from September 2000 until his employment was terminated.  Apple also

13  admits that Plaintiff worked on certain Apple products during his employment.   Except as so

14  expressly admitted, Apple denies each and every allegation contained in Paragraph 9.

15      10.     Answering Paragraph 10 of the First Amended Complaint, Apple admits that

16  Plaintiff received performance reviews, discretionary bonuses and pay raises at certain times during

17  his employment at Apple.  Except as so expressly admitted, Apple denies each and every allegation

18  contained in Paragraph 10.

19      11.     Answering Paragraph 11 of the First Amended Complaint, Apple admits that

20  Plaintiff was never placed on any formal performance improvement plan during his employment at

21  Apple.   Except as so expressly admitted, Apple denies each and every allegation contained in

22  Paragraph 11.

23      12.     Answering Paragraph 12 of the First Amended Complaint, Apple admits that

24  Plaintiff worked on certain of Apple products during his employment.   Except as so expressly

25  admitted, Apple denies each and every allegation contained in Paragraph 12.

26      13.     Answering Paragraph 13 of the First Amended Complaint, Apple admits that

27  Plaintiff was one of the team members that worked on the development of Apple's iPad.  Except as

28  so expressly admitted, Apple denies each and every allegation contained in Paragraph 13.

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                          3.                    Case No. CV13-02977 (RS)

14.     Answering Paragraph 14 of the First Amended Complaint, Apple admits that Plaintiff was awarded discretionary bonuses at certain times during his employment at Apple. Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 13.

15.     Answering Paragraph 15 of the First Amended Complaint, Apple denies each and every allegation contained therein.

16.     Answering Paragraph 16 of the First Amended Complaint, Apple denies each and every allegation contained therein.

17.     Answering Paragraph 17 of the First Amended Complaint, Apple denies each and every allegation contained therein.

18.     Answering Paragraph 18 of the First Amended Complaint, Apple denies each and every allegation contained therein.

19.     Answering Paragraph 19 of the First Amended Complaint, Apple denies each and every allegation contained therein.

20.     Answering Paragraph 20 of the First Amended Complaint, Apple denies each and every allegation contained therein.

21.     Answering Paragraph 21 of the First Amended Complaint, Apple admits that it conducts a shutdown during the winter holiday.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 21.

22.     Answering Paragraph 22 of the First Amended Complaint, Apple admits that Plaintiff was awarded discretionary bonuses at certain times during his employment at Apple and was given a bonus in or around December 2012/January 2013.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 22.

23.     Answering Paragraph 23 of the First Amended Complaint, Apple admits that Plaintiff was Employee Roe's direct manager.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 23.

24.     Answering Paragraph 24 of the First Amended Complaint, Apple admits that it gave Employee Roe a pay raise and granted her certain stock options during her employment. Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 24.

25.     Answering Paragraph 25 of the First Amended Complaint, Plaintiff's statement is a legal conclusion that does not require a response.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 25.

26.     Answering Paragraph 26 of the First Amended Complaint, Apple admits that it gave Employee Roe a pay raise and granted her certain stock options during her employment. Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 26.

27.     Answering Paragraph 27 of the First Amended Complaint, Apple denies that Mr. Smith did anything "unilaterally," that needed "correction" such that it would require the intervention of Ms. Bergeron.  Expect as so expressly admitted, Apple denies each and every allegation contained therein.

28.     Answering Paragraph 28 of the First Amended Complaint, Apple admits that it gave Employee Roe a pay raise and granted her certain stock options during her employment. Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 28.

29.     Answering Paragraph 29 of the First Amended Complaint, Apple admits that it discovered Employee Roe submitted expense reports that did not comply with Apple's policies at certain times during her employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 29.

30.     Answering Paragraph 30 of the First Amended Complaint, Apple admits Employee Roe was given certain bonuses during her employment and further admits that Employee Roe submitted expense reports that did not comply with Apple's policies at certain times during her employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 30.

31.     Answering Paragraph 31 of the First Amended Complaint, Apple admits that Employee Roe submitted expense reports that did not comply with Apple's policies at certain times during her employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 31.

32.     Answering Paragraph 32 of the First Amended Complaint, Plaintiff's statement is a legal conclusion that does not require a response.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 32.

33.     Answering Paragraph 33 of the First Amended Complaint, Apple denies each and every allegation contained therein.

34.     Answering Paragraph 34 of the First Amended Complaint, Apple admits that Plaintiff reported to Apple that he believed that Employee Roe had submitted expense reports that did not comply with Apple's policies at certain times during her employment.   Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 34.

35.     Answering Paragraph 35 of the First Amended Complaint, Apple admits that it audited Employee Roe's expense reports during her employment.   Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 35.

36.     Answering Paragraph 36 of the First Amended Complaint, Apple admits that Employee Roe submitted expense reports that did not comply with Apple's policies at certain times during her employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 36.

37.     Answering Paragraph 37 of the First Amended Complaint, Plaintiff's statement is a legal conclusion that does not require a response.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 37.

38.     Answering Paragraph 38 of the First Amended Complaint, Apple denies each and every allegation contained therein.

39.     Answering Paragraph 39 of the First Amended Complaint, Apple admits that Plaintiff reported to Apple that he believed that Employee Roe had submitted expense reports that did not comply with Apple's policies at certain times during her employment.   Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 39.

40.     Answering Paragraph 40 of the First Amended Complaint, Apple admits that it terminated Employee Roe's employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 40.

41.     Answering Paragraph 41 of the First Amended Complaint, Apple admits that it held meeting regarding Employee Roe and that Plaintiff was Employee Roe's manager during her employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 41.

42.     Answering Paragraph 42 of the First Amended Complaint, Apple admits that it terminated Employee Roe's employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 42.

43.     Answering Paragraph 43 of the First Amended Complaint, Apple denies each and every allegation contained therein.

44.     Answering Paragraph 44 of the First Amended Complaint, Apple denies each and every allegation contained therein.

45.     Answering Paragraph 45 of the First Amended Complaint, Apple admits that it was shut down for the winter holidays in 2012.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 45.

46.     Answering Paragraph 46 of the First Amended Complaint, Apple admits that Plaintiff was given a bonus around December 2012/January 2013.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 46.

47.     Answering Paragraph 47 of the First Amended Complaint, Apple admits that Plaintiff told to stay home between about January 9, 2013, and to return to work on about January 14, 2013.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 47.

48.     Answering Paragraph 48 of the First Amended Complaint, Apple admits that it terminated Plaintiff's employment.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 48.

**FIRST CAUSE OF ACTION**

**VIOLATION OF DODD-FRANK ACT.**

49.     Answering Paragraph 49 of the Complaint, Apple incorporates all of the preceding paragraphs of this Answer as though fully set forth herein.

50.     Answering Paragraph 50 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 50.

51.     Answering Paragraph 51 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 51.

52.     Answering Paragraph 52 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 52.

53.     Answering Paragraph 53 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 53.

54.     Answering Paragraph 54 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 54.

55.     Answering Paragraph 55 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 55.

56.     Answering Paragraph 56 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 56.

57.     Answering Paragraph 57 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 57.

58.     Answering Paragraph 58 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 58.

59.     Answering Paragraph 59 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 59.

60.     Answering Paragraph 60 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 60.

61.     Answering Paragraph 61 of the First Amended Complaint, pursuant to the Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in Paragraph 61.

## SECOND CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

62.     Answering Paragraph 62 of the Complaint, Apple incorporates all of the preceding paragraphs of this Answer as though fully set forth herein.

63.     Answering Paragraph 63 of the Complaint, this paragraph contains legal conclusions that do not require a response.  To the extent Paragraph 63 contains factual allegations, Apple denies each and every allegation therein.

1    64.    Answering Paragraph 64 of the Complaint, this paragraph contains legal

2    conclusions that do not require a response. To the extent Paragraph 64 contains factual allegations,

3    Apple denies each and every allegation therein.

4    65.    Answering Paragraph 65 of the Complaint, this paragraph contains legal

5    conclusions that do not require a response. To the extent Paragraph 65 contains factual allegations,

6    Apple denies each and every allegation therein.

7    66.    Answering Paragraph 66 of the Complaint, this paragraph contains legal

8    conclusions that do not require a response. To the extent Paragraph 66 contains factual allegations,

9    Apple denies each and every allegation therein.

10   67.    Answering Paragraph 67 of the Complaint, this paragraph contains legal

11   conclusions that do not require a response. To the extent Paragraph 67 contains factual allegations,

12   Apple denies each and every allegation therein.

13   68.    Answering Paragraph 68 of the Complaint, this paragraph contains legal

14   conclusions that do not require a response. To the extent Paragraph 68 contains factual allegations,

15   Apple denies each and every allegation therein.

16   69.    Answering Paragraph 69 of the Complaint, this paragraph contains legal

17   conclusions that do not require a response. To the extent Paragraph 69 contains factual allegations,

18   Apple denies each and every allegation therein.

19                              **THIRD CAUSE OF ACTION**

20                                    **RETALIATION**

21   70.    Answering Paragraph 70 of the Complaint, Apple incorporates all of the

22   preceding paragraphs of this Answer as though fully set forth herein.

23   71.    Answering Paragraph 71 of the First Amended Complaint, pursuant to the

24   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

25   necessary. Except as so expressly admitted, Apple denies each and every allegation contained in

26   Paragraph 71.

27   72.    Answering Paragraph 72 of the First Amended Complaint, pursuant to the

28   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                    10.                    Case No. CV13-02977 (RS)

1    necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

2    Paragraph 72.

3            73.     Answering Paragraph 73 of the First Amended Complaint, pursuant to the

4    Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

5    necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

6    Paragraph 73.

7            74.     Answering Paragraph 74 of the First Amended Complaint, pursuant to the

8    Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

9    necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

10   Paragraph 74.

11           75.     Answering Paragraph 75 of the First Amended Complaint, pursuant to the

12   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

13   necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

14   Paragraph 75.

15           76.     Answering Paragraph 76 of the First Amended Complaint, pursuant to the

16   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

17   necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

18   Paragraph 76.

19           77.     Answering Paragraph 77 of the First Amended Complaint, pursuant to the

20   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

21   necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

22   Paragraph 77.

23           78.     Answering Paragraph 78 of the First Amended Complaint, pursuant to the

24   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

25   necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

26   Paragraph 78.

27           79.     Answering Paragraph 79 of the First Amended Complaint, pursuant to the

28   Court's Order dated December 16, 2013, dismissing this claim with prejudice, no response is

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                    11.                    Case No. CV13-02977 (RS)

1    necessary.  Except as so expressly admitted, Apple denies each and every allegation contained in

2    Paragraph 79.

3                              **FOURTH CAUSE OF ACTION**

4                       **BREACH OF EMPLOYMENT CONTRACT**

5                 80.    Answering Paragraph 80 of the Complaint, Apple incorporates all of the

6    preceding paragraphs of this Answer as though fully set forth herein.

7                 81.    Answering Paragraph 81 of the First Amended Complaint, Apple admits that

8    Plaintiff was employed by Apple and that he received written performance reviews during his

9    employment.  Except as so expressly admitted, Apple denies each and every allegation contained in

10   Paragraph 81.

11                82.    Answering Paragraph 82 of the First Amended Complaint, Apple denies each

12   and every allegation contained therein.  To the extent Paragraph 82 contains factual allegations,

13   Apple denies each and every allegation therein.

14                83.    Answering Paragraph 83 of the First Amended Complaint, Apple denies each

15   and every allegation contained therein.  To the extent Paragraph 83 contains factual allegations,

16   Apple denies each and every allegation therein.

17                84.    Answering Paragraph 84 of the First Amended Complaint, Apple denies each

18   and every allegation contained therein.  To the extent Paragraph 84 contains factual allegations,

19   Apple denies each and every allegation therein.

20                85.    Answering Paragraph 85 of the First Amended Complaint, Apple denies each

21   and every allegation contained therein.  To the extent Paragraph 85 contains factual allegations,

22   Apple denies each and every allegation therein.

23                86.    Answering Paragraph 86 of the First Amended Complaint, Apple denies each

24   and every allegation contained therein.  To the extent Paragraph 86 contains factual allegations,

25   Apple denies each and every allegation therein.

26                87.    Answering Paragraph 87 of the Complaint, this paragraph contains legal

27   conclusions that do not require a response.  To the extent Paragraph 87 contains factual allegations,

28   Apple denies each and every allegation therein.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                          12.                      Case No. CV13-02977 (RS)

1    88.    Answering Paragraph 88 of the Complaint, this paragraph contains legal

2    conclusions that do not require a response.  To the extent Paragraph 88 contains factual allegations,

3    Apple denies each and every allegation therein.

4    89.    Answering Paragraph 89 of the Complaint, this paragraph contains legal

5    conclusions that do not require a response.  To the extent Paragraph 89 contains factual allegations,

6    Apple denies each and every allegation therein.

7                              **FIFTH CAUSE OF ACTION**

8    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

9    90.    Answering Paragraph 90 of the Complaint, Apple incorporates all of the

10   preceding paragraphs of this Answer as though fully set forth herein.

11   91.    Answering Paragraph 91 of the Complaint, this paragraph contains legal

12   conclusions that do not require a response.  To the extent Paragraph 91 contains factual allegations,

13   Apple denies each and every allegation therein.

14   92.    Answering Paragraph 92 of the Complaint, this paragraph contains legal

15   conclusions that do not require a response.  To the extent Paragraph 92 contains factual allegations,

16   Apple denies each and every allegation therein.

17   93.    Answering Paragraph 93 of the Complaint, this paragraph contains legal

18   conclusions that do not require a response.  To the extent Paragraph 93 contains factual allegations,

19   Apple denies each and every allegation therein.

20   94.    Answering Paragraph 94 of the Complaint, this paragraph contains legal

21   conclusions that do not require a response.  To the extent Paragraph 94 contains factual allegations,

22   Apple denies each and every allegation therein.

23   95.    Answering Paragraph 95 of the Complaint, this paragraph contains legal

24   conclusions that do not require a response.  To the extent Paragraph 95 contains factual allegations,

25   Apple denies each and every allegation therein.

26   96.    Answering Paragraph 96 of the Complaint, this paragraph contains legal

27   conclusions that do not require a response.  To the extent Paragraph 96 contains factual allegations,

28   Apple denies each and every allegation therein.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                    13.                          Case No. CV13-02977 (RS)

1        97.     Answering Paragraph 97 of the Complaint, this paragraph contains legal

2    conclusions that do not require a response.  To the extent Paragraph 97 contains factual allegations,

3    Apple denies each and every allegation therein.

4        98.     Answering Paragraph 98 of the Complaint, this paragraph contains legal

5    conclusions that do not require a response.  To the extent Paragraph 98 contains factual allegations,

6    Apple denies each and every allegation therein.

7                        **PLAINTIFFS' PRAYER FOR RELIEF**

8        Plaintiff's Prayer for Relief does not contain factual allegations to which Apple is

9    required to respond.  To the extent the Prayer for Relief may be deemed to require a response, Apple

10   denies each and every allegation contained therein.

11                       **REQUEST FOR JURY TRIAL**

12       Plaintiff's Demand for Jury Trial does not contain factual allegations to which Apple

13   is required to respond.  To the extent the Prayer for Relief may be deemed to require a response,

14   Apple denies each and every allegation contained therein.

15                       **AFFIRMATIVE DEFENSES**

16       Apple asserts the following affirmative and other defenses, which it has designated,

17   collectively, as "affirmative defenses."  Apple's designation of its defenses as "affirmative" is not

18   intended in any way to alter Plaintiff's burden of proof with regard to any element of his claims for

19   relief.

20       AS A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

21   EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT,

22   DEFENDANT, Defendant Apple alleges:

23       That Plaintiff's First Amended Complaint fails to allege facts sufficient to constitute

24   any cause of action or to set forth a claim upon which relief can be granted.

25       AS A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

26   EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

27   Apple alleges:

28

1    Defendant is informed and believes that Plaintiff's claims are barred by the applicable

2    statutes of limitations, including but not limited to, the limitations period contained in California

3    Code of Civil Procedure Sections 339, 340, 18 U.S.C. § 1514A(b)(2)(D), 29 C.F.R. § 1980.103(d)

4    and 12 U.S.C. § 5567(c)(4)(D).

5    AS A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

6    EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

7    Apple alleges:

8    That Plaintiff is barred in equity from recovering on his First Amended Complaint, or

9    on any claim contained therein, under the doctrine of unclean hands.

10    AS A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

11    EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

12    Apple alleges:

13    That Plaintiff is estopped to assert his claims due to his own conduct, acts, or

14    omissions and is precluded from recovering against Defendant on any purported claims for relief

15    contained in the First Amended Complaint.

16    AS A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

17    EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

18    Apple alleges:

19    That Plaintiff was an at-will employee within the meaning of California Labor Code

20    section 2922, whereby the terms and conditions of his employment could be changed without cause.

21    AS A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

22    EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

23    Apple alleges:

24    That all actions with regard to Plaintiff (1) were made for legitimate, non-

25    discriminatory business reasons, (2) were based on reasonable factors, and (3) were a just and proper

26    exercise of management discretion undertaken for a fair and honest reason, not prohibited by law.

27

28

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                                    15.                    Case No. CV13-02977 (RS)

1        AS A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

2 EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

3 Apple alleges:

4        That Plaintiff failed to adequately exhaust all of the internal remedies available to

5 him, and that such failure bars this suit in whole or in part.

6        AS AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

7 EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

8 Apple alleges:

9        That to the extent that Plaintiff claims that he has suffered emotional distress damages

10 due to Defendant's alleged conduct, Defendant alleges that the court lacks jurisdiction of this matter,

11 as Plaintiff's claims are barred by the exclusive remedy provision of the California Workers'

12 Compensation Act, California Labor Code sections 3200, *et. seq*.

13        AS A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

14 EVERY CAUSE OF ACTION SET FORTH IN THE FIRST AMENDED COMPLAINT, Defendant

15 Apple alleges:

16        That Plaintiff's damages, if any, are barred to the extent that Plaintiff has failed to

17 mitigate damages, and any recovery of damages, if any there be, should be reduced in the amount by

18 which Plaintiff should have mitigated those alleged damages.

19        AS A TENTH, SEPARATE AND AFFIRMATIVE DEFENSE TO EACH AND

20 EVERY CAUSE OF ACTION SET FORTH IN THE COMPLAINT, Defendant Apple alleges:

21        Plaintiff's causes of action and claims for relief are barred by the Doctrine of Laches.

22        AS AN ELEVENTH , SEPARATE AND AFFIRMATIVE DEFENSE TO EACH

23 AND EVERY CAUSE OF ACTION SET FORTH IN THE COMPLAINT, Defendant Apple

24 alleges:

25        Plaintiff has waived and is estopped and barred from alleging the matters set forth in

26 the Complaint.

27

28

1    WHEREFORE, Defendant prays judgment against Plaintiff as follows:

2        1.    For an order dismissing Plaintiff's claims with prejudice, and entering

3    judgment in favor of Defendant and against Plaintiff;

4        2.    For all reasonable costs and attorneys' fees incurred by Defendant in

5    connection with the defense of this matter; and

6        3.    For such other and further relief as the Court in the exercise of its discretion

7    deems just and proper.

8

9    Dated: December 30, 2013

10

11                                        //s// Todd K. Boyer
                                          TODD K. BOYER
12                                        LITTLER MENDELSON, P.C.
                                          Attorneys for Defendant
13                                        APPLE INC.

14
     Firmwide:124779567.1 043907.1171
15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S ANSWER TO FIRST AMENDED
COMPLAINT                              17.                Case No. CV13-02977 (RS)

1  DAVID J. MICLEAN (SB# 115098)
   Email: dmiclean@micleangleason.com
2  GARY R. GLEASON   (SB# 136167)
   Email: ggleason@micleangleason.com
3  MICLEAN GLEASON LLP
   100 Marine Parkway Suite 310
4  Redwood Shores, CA 94065
   Office: 650-684-1181
5  Fax: 650-681-1182
6
7  Attorneys for Plaintiff
   JOSHUA BANKO
8
9                    UNITED STATES DISTRICT COURT
10                   NORTHERN DISTRICT OF CALIFORNIA
11
   JOSHUA BANKO,                        Case No. CV 13-02977 RS
12
             Plaintiff(s),
13                                      FIRST AMENDED COMPLAINT FOR
      v.                                DAMAGES FOR:
14
   APPLE, INC., DOES 1-50               1.  VIOLATION OF DODD-FRANK
15                                          ACT
             Defendant(s).
16                                      2.  WRONGFUL TERMINATION IN
                                            VIOLATION OF PUBLIC
17                                          POLICY
18                                      3.  RETALIATION
19                                      4.  BREACH OF EMPLOYMENT
                                            CONTRACT
20
                                        5.  BREACH OF IMPLIED
21                                          COVENANT OF GOOD FAITH
                                            AND FAIR DEALING
22
23                                      JURY TRIAL REQUESTED
24
25
26
27
28

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

## I.      PARTIES

1.      Plaintiff JOSHUA BANKO ("Mr. Banko") is an individual and at all times relevant to this action was a resident of Palo Alto located in Santa Clara County.

2.      Defendant APPLE, INC. ("Apple") is a corporation incorporated in the State of California whose principal place of business is within Santa Clara County. Defendant's entity address is 1 Infinite Loop, Cupertino, CA 95014.

3.      DOES 1-50 are unknown at this time but are believed to have contributed to the injury sustained by Mr. Banko.  DOES 1-50 were at all times relevant to this action employees, agents, and/or members of the Board of Directors of Apple.  Mr. Banko is unaware of the true names and capacities of Defendants sued herein as DOES 1-50, inclusive, and therefore sues these Defendants by such fictitious names.  Mr. Banko will pray leave of this court to amend this complaint to allege the true names and capacities when ascertained.

4.      Mr. Banko is informed and believes, and thereon alleges, that each of the Defendants herein was, at all times relevant to this action, the agent, employee, representing partner, or joint venturer of the remaining Defendants and was acting within the course and scope of that relationship.  Mr. Banko is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.


## II.     JURISDICTION & VENUE

5.      Jurisdiction is proper in the U.S. District Court, Northern District of California pursuant to 28 U.S.C. §1331, because the claims asserted herein arise under 15 U.S.C. §78u-6 and 18 U.S.C. §1514A.

6.      Venue is proper in the Northern District Court of California pursuant to 28 U.S.C. §1391 because both Apple's location and the location of the wrongful termination are in Santa Clara County, which is located within the geographic region presided over by the Northern District of California.

III.    **GENERAL ALLEGATIONS**

7.      This whistleblower action, which arises pursuant to, among other statutes, the Dodd-Frank act (15 U.S.C. §78u-6) and Title VIII of the Sarbanes-Oaxley Act of 2002 (18 U.S.C. §1514A), is brought to recover damages sustained by Mr. Banko when Apple, retaliated against him because of his complaints about, and objection to, Employee Roe's embezzlement of publicly traded corporation's funds which Mr. Banko reasonably believed to be unlawful and against public policy.

        A.      **MR. BANKO'S HIGHLY SUCCESSFUL CAREER AT APPLE.**

8.      Defendant Apple, a publicly traded corporation, first hired Mr. Banko on or about September 18, 2000.

9.      Mr. Banko worked exclusively for Apple from September, 2000 until his termination over 12 years later.  During his tenure with Apple, Mr. Banko received multiple promotions, led numerous projects and even finished a graduate degree during his employment.  Mr. Banko participated in the development and/or engineering management of numerous high profile products such as the iPad, iBook, MacBook, MacBook Pro, and MacBook Air.  Moreover, in Mr. Banko's over 12 years with the company, he was a significant contributor in developing more than 22 important Apple patents.

10.     Mr. Banko's importance to the company was exemplified by many outstanding performance reviews.  These include Apple's award to Mr. Banko of large discretionary bonuses and raises, all related to his strong performance as an Apple employee.

11.     During his tenure at Apple, Mr. Banko's performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written reviews.

12.     Mr. Banko was also assigned the lead on numerous projects and told that he was an extremely valuable member of the company by his supervisor, Ms. Bergeron.

13.     Among other projects, Mr. Banko led, designed and managed the engineering development of the iPad.  Largely because of Mr. Banko's efforts, the iPad became one of Apple's most successful product launches.

14.     Following the launch of the iPad, Mr. Banko received a significant bonus, and an e-mail

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

1    accompanying the bonus that acknowledged his work on the project.  It was communicated to Mr.

2    Banko that he was being awarded a $12,000 bonus for January 02, 2010 because of his persistence

3    and drive to finish his project on the iPad.  It was also communicated that Apple was looking

4    forward to Mr. Banko accomplishing great things that year.

5    15.    During his tenure at Apple, Mr. Banko's supervisor, Ms. Bergeron specifically stated that

6    she would "back-up" and "support" Mr. Banko with respect to his employment at Apple because

7    he was such a valuable employee to Apple.

8

9    **B.    MR. BANKO'S ASSIGNMENT TO, AND SUCCESSFUL LEADERSHIP OF,**
     **ANOTHER HIGH LEVEL APPLE PROJECT.**
10

11   16.    In March of 2012 Apple promoted Mr. Banko to the position of "Engineering Manager II",

12   and assigned him to oversee the engineering of one of the most important and politically sensitive

13   Apple development projects taking place at that time (the "Project").  The assignment to Mr.

14   Banko of such a crucial project was yet another acknowledgement by Apple of the high regard it

15   had for Mr. Banko's abilities and for his outstanding performance with respect to the previous

16   responsibilities assigned to him over the years.

17   17.    As the Engineering Manager in charge of the Project, Mr. Banko continued to meet design

18   and project deadlines.

19   18.    In or about November, 2012 Mr. Banko's efforts led to the completion of a successful build

20   of a prototype for the Project within the Project deadline for the build.

21   19.    On December 18, 2012 a meeting was held regarding the Project and its status.  No

22   complaints were lodged with respect to any aspect on the Project.  In fact, the Project was going so

23   well that on December 21, 2012 Apple congratulated the Project team on completing a prototype

24   system build before the holidays.  (Mr. Banko's superiors did not think it would be possible to

25   complete the system build prototype that soon.)  Apple communicated to Mr. Banko that the team

26   had done excellent work and pulled off a successful Pre-Proto system build in time for the holidays

27   which many thought would not be possible before the holiday.

28   20.    On that same day, a physical prototype arrived at Apple.  It was enthusiastically received by

4

1   key personnel at Apple in the Industrial Design Department.

2   21.     Apple subsequently shut down for its customary holiday break from December 22, 2012 to

3   January 2, 2013.

4   22.     Within a day after returning to work after the holidays, Mr. Banko learned he had been

5   given a significant discretionary bonus in relation to his work on the Project.

6
7       C.     BACKGROUND OF EMPLOYEE ROE, A DIRECT REPORT TO MR.
               BANKO.

8   23.     One of the Apple employees that reported directly to Mr. Banko during his tenure at Apple

9   was Employee Roe[1], another engineer.  In or about August, 2011, Mr. Banko promoted Employee

10  Roe, and provided her with a pay raise and a stock grant. The raise and grant were of the level

11  commensurate with Employee Roe's performance and promotion.

12  24.     Two months later, in or about October, 2011, Stacey Smith, the senior human resources

13  director at Apple Inc., unilaterally altered the raise recommended by Mr. Banko, and increased

14  Employee Roe's bonus by 30% (from $13,500 to $17,500) and her stock grant by 66% (from 300

15  to 500 shares).  He did this without prior notice to either Mr. Banko or Mr. Banko's supervisor,

16  Kate Bergeron.  Moreover, there was no explanation provided to justify this action.

17  25.     Ms. Bergeron made no effort to correct or protest this unilateral action of Mr. Smith.

18  26.     In or about March of 2012, Mr. Smith again provided Employee Roe with favored

19  treatment by unilaterally awarding her a pay increase of $40,000 and a grant of 1500 Restricted

20  Stock Units (over seven times the size of the additional amount he had unilaterally given her in

21  August of 2011).  These substantial increases in Employee Roe's compensation took place without

22  the knowledge of either Mr. Banko or his supervisor Ms. Bergeron.

23  27.     Once again, Ms. Bergeron made no effort to correct or protest this unilateral action of Mr.

24  Smith.

25  28.     Mr. Banko was later told that the justification for the March, 2012 increase was Employee

26  Roe's claim that she was leaving Apple for a job at Facebook, and receiving a substantial increase

27

28      [1] The term Employee Roe is used to protect the individual's privacy.

Miclean Gleason LLP
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

Miclean Gleason LLP
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

in compensation in connection with her new position.  The increased compensation Mr. Smith gave to Employee Roe was supposedly to entice Employee Roe to stay at Apple.  However, to Mr. Banko's knowledge, Employee Roe never provided anyone at Apple with any proof that she had ever received an actual offer from Facebook, including Mr. Smith.

### D.   MR. BANKO'S DISCOVERY AND REPORTING OF EMBEZZLEMENT BY EMPLOYEE ROE.

29.   Unbeknownst to Mr. Banko, Employee Roe had been submitting expense reports which included charges that consisted of either personal expenses, and/or expenses that could not be documented.

30.   In early 2012, Mr. Banko began to notice the irregularities on Employee Roe's expense reports.  In or about January, 2012, Mr. Banko met with and directed Employee Roe to remove fraudulent charges off her expense report.  Yet, even though Employee Roe inflated her expenses, she was awarded a bonus in or around February 2012.

31.   In or about December, 2012, Mr. Banko again discovered inconsistencies in another of Employee Roe's expense reports in which she inflated her expenses. When Mr. Banko highlighted these issues and asked Employee Roe to remedy them, Employee Roe failed to fix them.

32.   Upon Employee Roe's refusal to remedy her expense reports, Mr. Banko had a reasonable belief that Employee Roe was violating both Apple policy and the law and that he was required to report her.

33.   Mr. Banko's supervisors instructed Mr. Banko not to report Employee Roe, in essence asking him to cover up and be complicit in the embezzlement of Employee Roe.

34.   Notwithstanding his superiors' instructions to ignore the situation, Mr. Banko reported the embezzlement.

35.   As a result of Mr. Banko's reporting of Employee Roe, Apple conducted an internal audit in order to determine if Employee Roe had misrepresented expenses on her expense reports and, if so, the extent of Employee Roe's falsified expense reports.

36.   Apple's internal audit resulted in the discovery of over 40 instances of fraudulent expense reports in which Employee Roe either inflated or falsified expenses for which she obtained

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

1    reimbursement from Apple.

2    37.    Based on Apple's policies, and Mr. Banko's reasonable belief that Employee Roe's actions

3    represented embezzlement from Apple, Mr. Banko recommended Employee Roe's immediate

4    termination for fraud and embezzlement of company funds.

5    38.    To Mr. Banko's surprise both his supervisor (Ms. Bergeron) and Ms. Bergeron's supervisor

6    (Doug Field) informed Mr. Banko that he should not pursue the termination of Employee Roe,

7    stating she was a valuable employee (apparently even with her lack of loyalty to Apple and her

8    embezzlement).

9    39.    Because of the legal implications of Employee Roe's actions, and the fact he reasonably

10    believed he was obligated by law and Apple policy to terminate Employee Roe, Mr. Banko

11    approached Mr. Victor Cousins of Apple's Human Resources department.

12    40.    Following his review of the facts, Mr. Cousins wrote a report recommending termination of

13    Employee Roe on or around December 21, 2012.

14    41.    Thereafter a meeting was held that involved, at a minimum, Ms. Bergeron and Mr. Field

15    regarding Employee Roe.  Mr. Banko was not invited to participate in the meeting, even though

16    Employee Roe was his direct report and he was typically included in such meetings.

17    42.    On December 21, 2012, Ms. Bergeron informed Employee Roe that Apple was terminating

18    her employment, effective December 31, 2012.

19    43.    Ms. Bergeron and Mr. Field, as well as Mr. Smith and others were upset that Mr. Banko

20    had reported Employee Roe and had recommended her termination against their wishes.

21    44.    Notwithstanding the turmoil Mr. Banko had to navigate during late 2012 regarding

22    Employee Roe, he successfully continued to complete his duties overseeing the engineering of the

23    Project.

24

25    **E.    MR. BANKO'S TERMINATION FOLLOWING THE TERMINATION OF
        EMPLOYEE ROE.**

26

27    45.    Apple was shut down for the holidays from December 22, 2012 through January 2, 2013.

28    Mr. Banko received no indication that there were any complaints or concerns regarding the Project

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

1  during that time.  In fact, he had received praise and congratulations for successfully completing a

2  prototype on schedule before the holiday break.

3  46.      Immediately after his return from the holidays, Mr. Banko received a significant

4  discretionary bonus in relation to his work on the Project.  Thus, by all indications everything in

5  relation to the Project was not only going well, but Mr. Banko was being rewarded for how well he

6  was doing with respect to leading the Project.

7  47.      Suddenly and without warning, on or around January 9, 2013, nine days after Employee

8  Roe's termination date, Mr. Banko was called into a meeting with Ms. Bergeron and Mike Ignaffo,

9  a member of Apple's human resources department.  During this meeting, Mr. Banko was pulled off

10  the Project and told to stay home the rest of the week and return on Monday, January 14, 2013. Mr.

11  Banko was shocked as he recognized such action as that typical of terminations.

12  48.      During the meeting Mr. Banko asked the reason for the action.  Neither Ms. Bergeron nor

13  Mr. Ignaffo was able to provide a justification for the action.  Although asked directly, there was

14  no mention of poor performance on the part of Mr. Banko.

15  Upon his return on January 14, 2013, Mr. Banko was terminated from his position at Apple after

16  over 12 years with the company.

17

18  <u>**FIRST CAUSE OF ACTION**</u>
   <u>**VIOLATION OF DODD-FRANK ACT**</u>

19  49.      Paragraphs 1-48 are incorporated herein by reference.

20  50.      15 U.S.C. §78u-6 states no employer may discharge or in any other manner discriminate

21  against, a whistleblower in the terms and conditions of employment because of any lawful act done

22  by the whistleblower in providing information that is required or protected under the Sarbanes-

23  Oxley Act, the Securities Exchange Act of 1934, and any other law, rule, or regulation subject to

24  the jurisdiction of the Commission. (15 U.S.C. §78u-6 (h) (1) (A) (iii)).

25  51.      Apple has violated 15 U.S.C. §78u-6(h)(1) because the decision to terminate Mr. Banko's

26  employment was motivated by Mr. Banko's disclosures which are protected by Section 806 of the

27  Sarbanes-Oxley Act (18 U.S.C. §1514A).

28  52.      Apple is governed by the Sarbanes-Oxley Act because, upon information and belief, it (a)

8

has a "class of securities registered under section 12 of the Securities Exchange Act of 1934 (15

U.S.C. §78l), and (b) it is required to file reports under section 15(d) of the Securities Exchange

Act of 1934 (15 U.S.C. §78o (d)).  (18 U.S.C. §1514A (a)).

53.    Mr. Banko engaged in activity that is protected by Section 806 of the Sarbanes Oxley Act

(18 U.S.C. §1514A) when he informed Apple's officers and/or management of conduct which he

reasonably believed to be in violation of federal law relating to fraud against shareholders.

54.    In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to

report the embezzlement of Employee Roe.  Having a reasonable belief that the theft had occurred

and that he was obligated to report it, Mr. Banko did so.

55.    In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to

pursue the termination of Employee Roe after she had been found to have embezzled funds on 40

separate occasions in violation of Apple policy and the law.

56.    Mr. Banko recommended her termination to his supervisors, and then terminated her,

against the wishes of his supervisors.

57.    As a proximate result of Mr. Banko's conduct as described in Paragraph 29-48 above,

Apple terminated him within 14 days of Employee Roe's termination.

58.     As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost

earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and

other special and general damages, all to his damage in an amount to be established at trial.

59.    Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants

named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired

to commit one or more of the acts alleged herein.

60.    In committing the acts set forth above, Apple and the other Defendants knew that the

conduct that they would have required of Mr. Banko was unlawful, and required Mr. Banko to

choose between violating the law and/or Apple policy and losing his job.  Notwithstanding this

knowledge, Apple subjected Mr. Banko to cruel and unjust hardship in conscious disregard of Mr.

Banko's rights by resisting Mr. Banko's efforts to report and subsequently terminate the

embezzling Employee Roe and then terminating Mr. Banko's employment when he acted in

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

accordance with Apple policy and the law.  Apple's conduct warrants the assessment of punitive damages.

61.     WHEREFORE, Mr. Banko requests relief as hereinafter provided.

**SECOND CAUSE OF ACTION**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

62.     Paragraphs 1-61 are incorporated herein by reference.

63.     In or about December, 2012, Apple's officers and/or management advised Mr. Banko not to pursue the investigation and/or termination of Employee Roe who had been found to embezzle funds on 40 separate occasions in violation of Apple policy and the law.  Having a reasonable belief that the theft had occurred and that he was obligated to report it, Mr. Banko did so.

64.     Employee Roe's embezzlement of a publicly traded corporation's funds harms the general public by impacting the millions of Apple shareholders, and by creating tax irregularities (deduction of illegitimate expenses as business expenses) which in turn could harm Apple and its millions of shareholders.  Enforcing laws and policies with respect to illegal acts by employees increases the value of the company and thereby benefits the public who owns Apple and increases taxable revenue of the company.

65.     As a proximate result of Mr. Banko's conduct as described in Paragraph 63, above, and in violation of public policy as set forth in Paragraph 64 above, Apple terminated Mr. Banko's employment.

66.     As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and other special and general damages, all to his damage in an amount to be established at trial.

67.     Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

68.     In committing the acts set forth above, Apple and the other Defendants knew that the conduct that they would have required of Mr. Banko was unlawful, and required Mr. Banko to choose between violating the law and/or Apple policy and losing his job.  Notwithstanding this

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

1   knowledge, Apple subjected Mr. Banko to cruel and unjust hardship in conscious disregard of Mr.

2   Banko's rights by resisting Mr. Banko's efforts to report and subsequently terminate the

3   embezzling Employee Roe and then terminating Mr. Banko's employment when he acted in

4   accordance with Apple policy and the law.  Apple's conduct warrants the assessment of punitive

5   damages.

6   69.      WHEREFORE, Mr. Banko requests relief as hereinafter provided.

7                    **THIRD CAUSE OF ACTION**
                          **RETALIATION**
8      **(15 USC §78u-6, 18 USC §1514A and California Labor Code §1102.5)**

9   70.      Paragraphs 1-69 are incorporated herein by reference.

10  71.      This cause of action is brought pursuant to 15 USC §78u-6, 18 USC §1514A and California

11  Labor Code §1102.5

12  72.      Because Mr. Banko engaged in protected activities, such as not covering up embezzlement,

13  not becoming complicit in the embezzlement, and reporting the embezzlement within a publicly

14  traded company, as alleged above, Mr. Banko was subjected to adverse actions.

15  73.      Apple and/or the other Defendants and each of them acting in the course and scope of their

16  employment and as representatives of Apple retaliated against Mr. Banko by the acts and conduct

17  described above, which materially affected Mr. Banko's terms of employment.

18  74.      15 USC §78u-6 and 18 USC §1514A makes it illegal for an employer to retaliate against an

19  employee who reports embezzlement.

20  75.      California Labor Code makes it illegal for an employer to retaliate against an employee for

21  refusing to participate in an activity that would result in a violation of state or federal statute, or a

22  violation or noncompliance with a state or federal rule or regulation.

23  76.      As a proximate result of Apple's conduct, Mr. Banko has suffered harm, including lost

24  earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and

25  other special and general damages, all to his damage in an amount to be established at trial.

26  77.      Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants

27  named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired

28  to commit one or more of the acts alleged herein.

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

78.     In doing the things herein alleged, the conduct of Apple and each of the other Defendants was despicable and each Defendant acted towards Mr. Banko with malice, oppression, fraud, and with a willful and conscious disregard of Mr. Banko's rights.  Each of the Defendants ratified, authorized and condoned the conduct of each and every other Defendant and managing agent, entitling Mr. Banko to an award of punitive and exemplary damages.

79.     WHEREFORE, Mr. Banko requests relief as hereinafter provided.

## FOURTH CAUSE OF ACTION
## BREACH OF EMPLOYMENT CONTRACT

80.     Paragraphs 1-79 are incorporated herein by reference.

81.     Mr. Banko was employed by Apple for 12 years.  During the entirety of his employment with Apple, he consistently received either good or excellent performance evaluations and merit raises, was assured on numerous occasions that he would not be terminated arbitrarily, and was told by his supervisor that she would support him and back him up with respect to continued employment.

82.     Apple normally has a course of conduct and a policy of putting employees on performance improvement plans prior to terminating them.

83.     Based on the oral representations, promises, and/or conduct of Apple and/or the other Defendants, Mr. Banko had an employment contract with Apple stating that he would be employed by Apple so long as his performance was satisfactory, and that Apple and/or the other Defendants would not discharge him without good and just cause.

84.     The terms of the employment contract included, but were not limited to, the following: Apple and/or the other Defendants would not demote or discharge Mr. Banko without good cause and fair warning, based on objective, reasonable job evaluations of Mr. Banko, and following an opportunity to participate in a performance improvement plan.

85.     Mr. Banko at all times fulfilled his duties and conditions under the contract and has been ready, willing, and able to continue performing them in a competent and satisfactory manner.

86.      Notwithstanding the implied promise to terminate the employment contract only for good cause, on or about January 16, 2013, Apple and the other Defendants terminated Mr. Banko's

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

Miclean Gleason LLP
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

employment and later alleged grounds of poor performance, even though Mr. Banko had received consistently good performance evaluations, had received merit raises and bonuses, including a substantial discretionary merit bonus less than 2 weeks before his termination.

87.    Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

88.    As a proximate result of Apple and the other Defendants' breach of the employment contract, Mr. Banko has suffered and continues to suffer losses in earnings and other employment benefits, to his damage in an amount to be established at trial.

89.    WHEREFORE, Mr. Banko requests relief as hereinafter provided.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

90.    Paragraphs 1-89 are incorporated herein by reference.

91.    The employment agreement referred to above contained an implied covenant of good faith and fair dealing, which obligated Apple and/or the other Defendants to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act that would prevent or impede Mr. Banko from performing any or all of the conditions of the contract that he agreed to perform, or any act that would deprive Mr. Banko of the benefits of the contract.

92.    Mr. Banko was employed by Apple for 12 years, and reasonably relied on the provisions of the implied agreement regarding the causes for which employees could be discharged or demoted and the procedures set forth for such discharges for the expectation that Apple and/or the other Defendants would apply its policies even-handedly to afford Mr. Banko the protections of those procedures if Apple and/or the other Defendants believed there was cause to discharge Mr. Banko.

93.    Apple and/or the other Defendants breached the implied covenant of good faith and fair dealing under the employment agreement by, among other actions, taking steps to undermine Mr. Banko's performance of his employment obligations, and, in fact, making it impossible for Mr. Banko to perform his job.  To this end, Apple's actions, through Mr. Banko's direct supervisors', show that Apple ultimately required that Mr. Banko violate company policies and the law.  The

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

actions of Apple frustrated and undermined Mr. Banko's ability to perform his job by creating a situation whereby to properly perform in the view of his supervisors required him to choose to directly violate company policy and the law, thus causing disruption with his duties as Engineering Manager.

94.     In addition to the above, Mr. Banko was one of the inventors of certain Apple Technology. As an inventor, Mr. Banko was entitled to, and had earned a bonus prior to his termination.  Apple further breached the implied covenant of good faith and fair dealing by terminating Mr. Banko in order to justify not paying Mr. Banko the bonus he had already earned in relation to his work on the Apple invention.

95.     Mr. Banko is informed and believes and thereupon alleges that the fictitious Defendants named as DOES 1 through 50, inclusive, aided, abetted, incited, compelled, coerced or conspired to commit one or more of the acts alleged herein.

96.      As a proximate result of Apple and/or the other Defendants' breach of the implied covenant of good faith and fair dealing, Mr. Banko has suffered, and continues to suffer, losses in earning and other employment benefits, to his damage in an amount to be established at trial.

97.     As a further proximate result of Apple and/or the other Defendants' breach of the implied covenant of good faith and fair dealing, Mr. Banko has incurred reasonable attorney's fees in attempting to secure the benefits owed him under the employment contract.

98.     WHEREFORE, Mr. Banko requests relief as hereinafter provided.


## IV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

1.     For a money judgment representing compensatory damages including lost wages, earnings, retirement benefits and other employee benefits, and all other sums of money, together with interest on these amounts, according to proof;

2.     For a money judgment for mental pain and anguish and emotional distress, according to proof;

3.     For an award of exemplary and punitive damages, according to proof;

4.      For costs of suit and attorney's fees;

5.      For pre-judgment and post-judgment interest; and

6.      For such other and further relief as the court deems just and proper.


**V.      REQUEST FOR JURY TRIAL**

Plaintiff Joshua Banko hereby requests trial by Jury.


DATED: October 25, 2013                    MICLEAN GLEASON LLP


By  _____
                                                    David J. Miclean
                                                    Gary R. Gleason
                                                    Attorneys for Plaintiff Joshua Banko

**Miclean Gleason LLP**
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
650-684-1181 Main   650-684-1182 Fax

1   TODD K. BOYER, Bar No. 203132
    tboyer@littler.com
2   BENJAMIN A. EMMERT, Bar No. 212157
    bemmert@littler.com
3   LITTLER MENDELSON, P.C.
    50 W. San Fernando, 15th Floor
4   San Jose, California  95113.2303
    Telephone:     408.998.4150
5   Facsimile:     408.288.5686

6   Attorneys for Defendant
    APPLE INC.

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      OAKLAND DIVISION

11

12   JOSHUA BANKO,                        Case No.  CV13-02977

13              Plaintiff,                **DEFENDANT APPLE INC.'S NOTICE OF
                                          MOTION; MOTION TO DISMISS
14        v.                              PLAINTIFF'S COMPLAINT PURSUANT
                                          TO FED. R. CIV. P. 12(b)(1) and 12(b)(6);
15   APPLE INC., and DOES 1-50,           MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF
16              Defendants.               DEFENDANT'S MOTION TO DISMISS
                                          PLAINTIFF'S COMPLAINT PURSUANT
17                                        TO FED.R.CIV.P. 12(b)(1) AND 12(b)(6)**

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

**TABLE OF CONTENTS**

**PAGE**

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................ 2

II.   INTRODUCTION ........................................................................................ 3

III.  STATEMENT OF ALLEGATIONS ............................................................ 4

IV.   LEGAL ARGUMENT .................................................................................. 5

      A.    Standard On A Rule 12(b)(6) Motion ............................................. 5

      B.    Plaintiff Has Not Alleged Facts Establishing His First Claim For Relief For
            An Alleged Violation Of The Dodd-Frank Act (15 U.S.C. § 78u-6) ......... 7

            1.    Plaintiff Is Not A Whistleblower Under Dodd-Frank ................ 7

            2.    The Court Lacks Jurisdiction Over Plaintiff's SOX Allegations Which
                  Are Barred By The Statute Of Limitations And SOX's Administrative
                  Procedure Requirements ................................................ 10

            3.    Plaintiff's Communications Were Not Required or Protected Under
                  SOX .......................................................................... 11

      C.    Plaintiff's Second Claim For Relief For Wrongful Termination Should Be
            Dismissed As He Has Failed To Allege A Violation Of Public Policy ............ 13

      D.    Plaintiff Has Not Alleged Facts Establishing The Essential Elements Of His
            Third Claim For Relief For Retaliation ...................................... 15

      E.    Plaintiff Has Not Alleged Facts Establishing The Essential Elements Of His
            Fourth Claim For Relief For Breach Of Contract ........................ 17

      F.    Plaintiff's Fifth Claim For Relief Breach Of The Covenant Of Good Faith
            And Fair Dealing Fails As A Matter Of Law .............................. 21

V.    CONCLUSION ............................................................................................ 22

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

i.

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aguilar v. Atlantic Richfield Co.*,
    25 Cal. 4th 826 (2001) ........................................................................................................20

*Allen v. Beverly Hills*,
    911 F.2d 367 (9th Cir. 1990) ...........................................................................................19

*Allen v. Dep't. of Labor*,
    514 F.3d 468 (5th Cir. 2008) ...........................................................................................12

*Asadi v. G.E. Energy*,
    No. 12-20522, 2013 U.S. App. LEXIS 14470 (5th Cir. July 17, 2013).........................passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................5, 6, 7

*Balistreri v. Pacifica Police Dept.*,
    901 F.2d 696 (9th Cir. 1990) ...........................................................................................5

*Bedroc Ltd. v. United States*,
    541 U.S. 176 (2004)..........................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................5, 6, 7

*Bionghi v. Metro Water Dist.*,
    70 Cal.App.4th 1358 (1999) ...........................................................................................22

*Bishop v. PCS Admin., Inc.*,
    2006 U.S. Dist. LEXIS 37230 .......................................................................................12

*Burt v. Irvine Co.*,
    237 Cal. App. 2d 828 (1965) ..........................................................................................19

*Carter v. Escondido Union High School District*,
    148 Cal.App.4th 922 (2007) ...........................................................................................13

*Coppinger-Martin v. Nordstrom, Inc.*,
    627 F.3d 745 (9th Cir. 2010) .....................................................................................10, 11

*Day v. Staples Inc.*,
    555 F.3d 42 (1st Cir. 2009)..............................................................................................11

*Edgerly v. City of Oakland*,
    211 Cal.App.4th 1191 (2012) ....................................................................................16, 17

*Foley v. Interactive Data Corp.,*
    47 Cal.3d 654 (1988) .................................................................................................14, 21

*Fraser v. Fiduciary Trust Co. Int'l,*
    417 F.Supp.2d 310 (S.D.N.Y. Aug. 25, 2006) aff'd, 396 Fed. Appx. 734 (2d Cir. 2010) ......12

*Gale v. World Fin. Group,*
    2006-SOX-43 (Dep't. of Labor June 9, 2006) .......................................................................12

*Gant v. Sentry Insurance,*
    1 Cal.4th 1083 (1992) ............................................................................................................14

*Godfrey v. Union Pac. R.R. Co.,*
    ARB Case No. 08-088, *4 (July 30, 2009) ............................................................................12

*Green v. Ralee Engineering Co.,*
    19 Cal. 4th 66 (1988) .......................................................................................................15, 16

*Guz v. Bechtel National, Inc.,*
    24 Cal.4th 317 (2000) ..................................................................................................... passim

*Horn v. Cushman & Wakefield Western, Inc.,*
    72 Cal.App.4th 798 (1999) ...............................................................................................19, 20

*In re Gilead Sciences Securities Litigation,*
    536 F.3d 1049 (9th Cir. 2008) ..................................................................................................5

*In Riddle v. First Tenn. Bank Nat'l Assoc.,*
    2012 U.S. App. LEXIS 18684 .................................................................................................12

*INS v. Cardozo Fonesca,*
    480 U.S. 421 (1987)...................................................................................................................9

*Kovatch v. Cal. Casualty Management Co.,*
    65 Cal. App. 4th 1256 (1998) .................................................................................................20

*Livingston v. Wyeth, Inc.,*
    2006 U.S. Dist. LEXIS 52978 (M.D.N.C. July 28, 2006) aff'd 520 F.3d 344 (4th Cir.
    2008) .................................................................................................................................12, 13

*Love v. Motion Industries, Inc.,*
    309 F.Supp.2d 1128 (N.D. Cal. 2004) ....................................................................................15

*Meese v. Keene,*
    481 U.S. 465 (1987)...................................................................................................................9

*Mueller v. County of Los Angeles,*
    176 Cal.App.4th 809 (2009) ....................................................................................................17

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
    212 F.3d 493 (9th Cir. 2000) ..................................................................................15

*Robinson v. Morgan Stanley*,
    No. 07-070, 2010 .....................................................................................................12

*Sequoia Ins. Co. v. Superior Court*
    13 Cal.App.4th 1472 (1993) .....................................................................................14

*Silvas v. E\*Trade Mortg. Corp.*,
    421 F.Supp.2d 1315 (S.D. Cal. 2006)........................................................................5

*Stevenson v. Superior Court*,
    16 Cal.4th 880 (1997) ...............................................................................................13

*Strigliabotti v. Franklin Resources, Inc.*,
    398 F.Supp.2d 1094 (N.D. Cal. 2005) ........................................................................5

*Strother v. S. Cal. Permanente Med. Group*,
    79 F.3d 859 (9th Cir. 1996) ......................................................................................15

*Tameny v. Atlantic Richfield Co.*,
    27 Cal.3d 167 (1980) ................................................................................................13

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)....................................................................................................10

*Turner v. Anheuser-Busch, Inc.*,
    7 Cal.4th 1238 (1994) ...............................................................................................14

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989 (9th Cir. 2009) ....................................................................................11

**STATUTES**

12 U.S.C. § 5567(c)(4)(D) ..............................................................................................10

15 U.S.C. § 78u-6 ......................................................................................3, 7, 8, 9, 10, 15

18 U.S.C. 1514A .............................................................................................................15

18 U.S.C. § 1514A(a)(1) ............................................................................................11, 12

18 U.S.C. § 1514A(b)(2)(D) ...........................................................................................10

Cal. Civ. Code § 1636......................................................................................................19

Cal. Labor Code § 2922 ...................................................................................................18

Cal. Labor Code § 1102.5 ...........................................................................................3, 15

Dodd-Frank Wall Street Reform Consumer Protection Act of 2010, Pub. L. No. 111-203 § 922, 124 Stat. 1376, 1841-49 (2010) ....................................................................................11

Labor Code section 1102.5(b).............................................................................................16

Labor Code sections 1102.5(b) and (c)....................................................................15, 16, 17

Sarbanes-Oxley Act ("SOX") ....................................................................................3, 8, 12

**OTHER AUTHORITIES**

29 C.F.R. § 1980.103(d) ......................................................................................................10

7, *21 (ARB Jan. 10, 2010) .................................................................................................12

Restoring American Financial Stability Act of 2010, H.R. 4173, 111th .............................9

Rule 12(b)(6)..........................................................................................................................5

Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173, 111th.....................9

1                  **NOTICE OF MOTION AND MOTION TO DISMISS**

2   **TO PLAINTIFF JOSHUA BANKO AND TO HIS ATTORNEYS OF RECORD:**

3         **PLEASE TAKE NOTICE** that on Thursday, September 26, 2013, at 1:30 p.m., or as

4   soon thereafter as the matter may be heard in Courtroom 3 (17th Floor) of the above-entitled Court,

5   located at 450 Golden Gate Avenue, San Francisco, California, 94102, Apple Inc., ("Defendant" or

6   "Apple") will and hereby moves the Court for an order dismissing Plaintiff's first, second, third,

7   fourth and fifth claims for relief under FCRP 12(b)(1) and 12(b)(6) with prejudice on the grounds

8   that Plaintiff Joshua Banko ("Plaintiff") fails to state facts sufficient to establish a claim upon which

9   relief can be granted and on the grounds the Court lacks jurisdiction due to Plaintiff's failure to

10  exhaust his administrative remedies.

11         Apple's motion is based on this Notice, the Memorandum of Points and Authorities

12  set forth below, the files and records in this action, and any further evidence and argument that the

13  Court may receive at or before the hearing.

14  **I.     STATEMENT OF ISSUES TO BE DECIDED**

15         Apple's motion seeks dismissal of Plaintiff's complaint in its entirety with prejudice

16  presents the Court with the following issues for decision:

17         1.     Does Plaintiff's first claim for relief state facts sufficient to establish a claim

18  for violation of Dodd-Frank and/or SOX?

19         2.     Does Plaintiff's second claim for relief state facts sufficient to establish that

20  Apple wrongfully terminated his employment in violation of some unidentified fundamental public

21  policy?

22         3.     Does Plaintiff's third claim for relief state facts sufficient to establish that

23  Apple terminated his employment in retaliation for his engaging in a protected activity?

24         4.     Does Plaintiff's fourth claim for relief state facts sufficient to establish that

25  Apple breached some agreement to terminate his "at-will" employment under only certain

26  unidentified circumstances?

27         5.     Does Plaintiff's fifth claim for relief state facts sufficient to establish Apple

28  violated the implied covenant of good faith and fair dealing in terminating his employment?

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

2.                       Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

## II.    INTRODUCTION

Plaintiff is a former "at-will" Apple employee who brings this meritless lawsuit based on his contention that Apple unlawfully terminated his employment on January 14, 2013, because he reported that one of his subordinates had allegedly padded her expense reports she submitted to Apple in violation of Apple's internal policies and procedures.  Even assuming this was true, which it is not, Plaintiff's allegations do not amount to a violation of the law.

As discussed below, Plaintiff has not and cannot establish the essential elements of his five claims for relief for: (1) violation of the Dodd-Frank Act ("Dodd-Frank") (15 U.S.C. § 78u-6) and the Sarbanes-Oxley Act ("SOX") (18 U.S.C. § 1514A); (2) wrongful termination in violation of public policy; (3) retaliation in violation of Dodd-Frank, SOX, and/or California Labor Code Section 1102.5; (4) breach of employment contract; and (5) breach of the implied covenant of good faith and fair dealing.

Plaintiff's first and third claims under Dodd-Frank and SOX fail because he has not alleged he engaged in any protected activity, and on the grounds that his Dodd-Frank and SOX claims are barred by his failure to exhaust his necessary and jurisdictional pre-filing administrative remedies.  His second claim for wrongful termination in violation of public policy fails because he has identified no State or federal constitutional, statutory, or regulatory provision that Apple allegedly violated in terminating his employment.  His fourth and fifth claims for breach of implied contract and of the implied covenant of good faith and fair dealing fail because he has not and cannot establish Apple breached any agreement it had to terminate his "at-will" employment under only specified circumstances.

While Plaintiff may be unhappy with Apple's decision to terminate his employment, he has not and cannot allege any facts establishing Apple violated any federal or State statute in doing so.  Apple's motion should therefore be granted.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

3.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

## III.  STATEMENT OF ALLEGATIONS

Plaintiff alleges he worked as an engineer for Apple from September 2000 until his employment was terminated on January 14, 2013.  (Plaintiff's Complaint "Compl.," ¶¶9, 48.)  He claims to have received multiple promotions, led numerous high profile projects, received numerous outstanding performance reviews, received several merit based salary increases and discretionary bonuses and was otherwise routinely complemented on his job performance during his employment.  (*Id*. at ¶¶ 9-22.)  He also claims his "performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written reviews."  (*Id*. at ¶11.)

He further alleges that in early 2012, he noticed that one of his direct reports, another engineer called "Employee Roe," was allegedly submitting fraudulent charges on her expense reports.  (*Id*. at ¶30.)  Plaintiff claims to have instructed Employee Roe to remove the charges from her expense reports but she failed to do so.  (*Id*. at ¶31.)  Believing her alleged fraudulent charges constituted a violation of Apple's policies and some unidentified "law," he believed he was required to report her to his supervisor.  (*Id*. at ¶32.)  When his supervisor allegedly told him not to report Employee Roe, Plaintiff proceeded in reporting the alleged conduct to Apple's management.  (Compl., ¶34.)  Plaintiff claims Apple conducted an investigation of his report and discovered she had submitted over 40 fraudulent expense reports.  (*Id*. at ¶36.)

Because of Apple's investigation, Plaintiff claims he recommended Employee Roe be fired.  (*Id*. at ¶37.)  Plaintiff claims his supervisors rebuffed his suggestion, and he thus made his termination recommendation directly to Apple's Human Resources Department.  (*Id*. at ¶¶39-40.)  He claims Apple Human Resources' Business Partner held a meeting with his supervisors regarding whether to fire Employee Roe.  (*Id*. at ¶42.)  Plaintiff alleges Apple terminated Employee Roe's employment on about December 31, 2012.  (*Id*.)  Plaintiff claims his supervisors and others were upset that he had reported Employee Roe's falsification of her expense reports and recommended her termination.  (Compl., ¶43.)

Plaintiff alleges that on January 9, 2013, he was called into a meeting with his supervisor and one of Apple Human Resources Department's Business Partners.  (*Id*. at ¶47.)  He claims they pulled him off the project he was working on and told him to stay home the rest of the

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

4.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

1   week and return to work on January 14, 2013.  (*Id.*)  He claims that when he returned to work on

2   January 14, 2013, Apple terminated his employment.  (*Id.*)

3   **IV.   LEGAL ARGUMENT**

4       **A.   Standard On A Rule 12(b)(6) Motion.**

5           In ruling on a motion to dismiss under Rule 12(b)(6), the court must determine

6   whether the plaintiff has stated a claim upon which relief may be granted.  *See* Fed. R. Civ. P.

7   12(b)(6); *Strigliabotti v. Franklin Resources, Inc.*, 398 F.Supp.2d 1094, 1097 (N.D. Cal. 2005)

8   (discussing the standards under Rule 12(b)(6)).  The Court should grant a motion to dismiss when a

9   set of facts pled, even if true, would not entitle the plaintiff to relief.  *Balistreri v. Pacifica Police*

10  *Dept.,* 901 F.2d 696, 699 (9th Cir. 1990) (as amended) (motion to dismiss warranted when there is

11  an "absence of sufficient facts alleged under a cognizable legal theory") (disapproved on other

12  grounds in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007)).

13          To survive a motion to dismiss, a Complaint must offer "more than labels and

14  conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.*

15  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  And, although the court must assume the Complaint's

16  factual allegations are true, "legal conclusions need not be taken as true merely because they are cast

17  in the form of factual allegations."  *Silvas v. E\*Trade Mortg. Corp.*, 421 F.Supp.2d 1315, 1317 (S.D.

18  Cal. 2006).  "Nor is the court required to accept as true allegations that are  . . . unreasonable

19  inferences."  *In re Gilead Sciences Securities Litigation,* 536 F.3d 1049, 1055 (9th Cir. 2008)

20  (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)).

21          Further, while the pleading standard under the Federal Rules of Civil Procedure "does

22  not require 'detailed factual allegations,' . . . it [certainly] demands more than an unadorned, the-

23  defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

24  *Twombly, supra*, 550 U.S. at 555).  A complaint that offers "'naked assertion[s]' devoid of 'further

25  factual enhancement'" is insufficient.  *Ashcroft,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

26  557).  Rather, factual allegations must "possess enough heft to show that the pleader is entitled to

27  relief."  *Twombly,* 550 U.S. at 557 (citations omitted).  A plaintiff must plead a "statement of

28

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

5.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

circumstances, occurrences, and events in support of the claim presented." *Id.* at 556 n.3, citation omitted.  As the Supreme Court stated in *Twombly,* 550 U.S. at 555:

> While a complaint attacked by Rule 12 (b)(6) motion to dismiss does not need detailed factual allegations [citation], a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do [citation]. Factual allegations must be enough to raise a right to relief above the speculative level . . . . [T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action . . . . [citations].

Likewise, the court further noted in *Ashcroft v. Iqbal,* 556 U.S. at 678-79 that:

> A court considering a motion to dismiss can choose to begin by identifying allegations that, **because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.** When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. . . .
>
> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [Citation.]  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." [Citation.]
>
> To survive a motion to dismiss, **a complaint must contain sufficient factual matter**, accepted as true, to "state a claim to relief that is plausible on its face." [Citation.]  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [Citation.]  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  [Citation.]  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" [Citation.]
>
> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. [Citation.]  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context specific task that requires the reviewing court to draw on its judicial experience and common sense. [Citation.]  But where the well-pleaded facts do not **permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "show[n]"— "that the pleader is entitled to relief."** Fed. Rule Civ. Proc. 8(a)(2).

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

6.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

*Ashcroft* 556 U.S. at 678-679 (emphasis added).  A court should not assume that a plaintiff can prove facts not alleged.  *Twombly,* 550 U.S. at 563 n.8 (quoting *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983)).  If a plaintiff's allegations do not bring his "claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* at 570.  As discussed below, Plaintiff's Complaint fails to allege facts establishing his five claims for relief under this pleading standard.

> **B.  Plaintiff Has Not Alleged Facts Establishing His First Claim For Relief For An Alleged Violation Of The Dodd-Frank Act (15 U.S.C. § 78u-6).**

Plaintiff's first claim for relief fails as a matter of law because he has alleged no facts establishing he engaged in any protected activity and his claims are barred by the statute of limitations.

> **1.  Plaintiff Is Not A Whistleblower Under Dodd-Frank.**

Plaintiff cannot state a claim for relief under Dodd-Frank because he did not make a report to the Securities and Exchange Commission ("SEC") and therefore does not meet the statutory definition of a "whistleblower."  Congress could not have been more clear: the anti-retaliation provision of Dodd-Frank prohibits actions taken against "whistleblowers."  15 U.S.C. § 78u-6(h)(1)(A). A "whistleblower" is defined as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities law ***to the [Securities and Exchange] Commission*** . . . ." *Id.* § 78u-6(a)(6) (emphasis added).  Congress mandated this definition "shall apply" to the entire statute, including the anti-retaliation subsection.  *Id.* at §78u-6(a).  "[T]he whistleblower-protection provision [of Dodd-Frank] unambiguously requires individuals to provide information relating to a violation of the securities laws *to the SEC* to qualify for protection from retaliation . . . ." *Asadi v. G.E. Energy, No.* 12-20522, 2013 U.S. App. LEXIS 14470, *27 (5th Cir. July 17, 2013) (emphasis in original).  Plaintiff has not claimed – and cannot claim – that he reported any information to the SEC.  (See Compl., *passim*.)  He is not a "whistleblower" as defined by Dodd-Frank and the Court should dismiss his first claim for relief in its entirety with prejudice.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

7.                                             Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

To avoid this fatal defect, Plaintiff asserts he is protected under Dodd-Frank because his internal complaints were "required or protected under the Sarbanes-Oxley Act ("SOX")." (Compl., ¶50.)  The only appellate court to consider this argument, however, has explicitly rejected this misinterpretation of the statute.   In *Asadi*, the Fifth Circuit held that Dodd-Frank's anti-retaliation protections apply only to individuals who have provided information to the SEC.  *Asadi, supra,* 2013 U.S. App. LEXIS 14470, at *13.  Like Plaintiff here, the plaintiff in *Asadi* argued his claim fell within Dodd-Frank's purview because his internal complaints were still "required or protected" under SOX.  The Fifth Circuit concluded this was a clear misreading of the statute.  *Id*. As the court explained, subsection (a) of Dodd-Frank provides definitions for certain terms used throughout the statue.  Included in this list is the term "whistleblower," which is defined as "any individual who provides or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws ***to the Commission*** . . . ."  15 U.S.C. § § 78u-6(a)(6) (emphasis added).  Subsection (h) of Dodd-Frank then accords these whistleblowers a private right of action against employers who take retaliatory actions against them for engaging in certain enumerated protected activities:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, ***a whistleblower*** in the terms and conditions of employment because of any lawful act done by ***the whistleblower***—
>
> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

§ 78u-6(h)(1)(A) [emphasis added].

The statutory language conditions that the protections in subsection (h) ***only apply to an individual who has already qualified as a "whistleblower" under the statute***.  *Asadi, supra,*

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

8.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

2013 U.S. App. LEXIS 14470, at **16-17 ("Importantly, the placement of the three categories of protected activity in subsection (h) follows the phrase '[n]o employer may discharge . . . or in any other matter discriminate against, *a whistleblower* . . . because of any lawful act done by *the whistleblower* . . . .'" § 78u-6(h)(1)(A)) (emphasis in original).

Plaintiff's expansion of the term "whistleblower" contradicts the unambiguous language of the statute. "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *Bedroc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The fact that Congress used "the term 'whistleblower,' [in subsection (h)] as compared with terms such as 'individual' or 'employee,' is significant." *Asadi*, 2013 U.S. App. LEXIS 14470, at **17-18. Congress deliberately selected the word "whistleblower" rather than the word "employee" or "person" and this Court must enforce the plain language of the statute. *Id.* "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene*, 481 U.S. 465, 484 (1987).

The legislative history of Dodd-Frank confirms that Congress intentionally chose the more restrictive term "whistleblower" when drafting the law's anti-retaliation provision. The anti-retaliation provision in the bill originally passed by the House of Representatives did not use the term "whistleblower" but instead prohibited adverse employment actions against "***an employee, contractor, or agent*** in the terms and conditions of employment . . . ." Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173, 111th Cong. § 7203(g)(1)(A) (p. 1114) (1st Sess. 2009) (emphasis added). The Senate's version, which provided the basis for the enacted text, restructured the provision and replaced the phrase "employee, contractor, or agent" with the term "whistleblower" defined as "any individual who provides, or 2 or more individuals acting jointly, who provides information relating to a violation of the securities laws ***to the Commission*** . . . ." Restoring American Financial Stability Act of 2010, H.R. 4173, 111th Cong. §§ 922(a)(6) (p. 976), (h)(1)(A) (pp. 983-984) (2d Sess. 2010) (emphasis added). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardozo Fonesca*,

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113-2303
408.998.4150

9.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

480 U.S. 421, 442-43 (1987).  Congress clearly intended Dodd-Frank's anti-retaliation provisions to only apply to a "whistleblower," defined as an individual who reports information to the SEC.

Plaintiff's attempt to expand Dodd-Frank's definition of a "whistleblower" would impermissibly render statutory text superfluous.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citations omitted).  Section 78u-6(h)(1)(A) defines a "whistleblower" as any individual who reports information regarding securities violations to the SEC.  Plaintiff seeks to impermissibly broaden this definition to include employees who make only internal complaints.

As explained by the Fifth Circuit, "[Plaintiff's] suggested statutory construction would read the words 'to the Commission' out of the definition of 'whistleblower' for purposes of the whistle-blower protection provision.  Construing the statute in this manner would violate the surplusage canon, that every word is to be given effect."  *Asadi, supra*, 2013 U.S. App. LEXIS 14470, at **23-24.  Accordingly, Plaintiff's Dodd-Frank claim is based on an erroneous reading of the statute and must be dismissed with prejudice.  Without allegations that he reported a securities law violation to the SEC, Plaintiff cannot state a claim for relief under Dodd-Frank.

### 2. The Court Lacks Jurisdiction Over Plaintiff's SOX Allegations Which Are Barred By The Statute Of Limitations And SOX's Administrative Procedure Requirements.

Plaintiff's claims for relief under SOX likewise founders because he failed to file a charge with the United States Secretary of Labor within 180 days of his termination.  Individuals who bring a SOX anti-retaliation claim must first file a complaint with the Secretary of Labor within 180 days of the alleged violation, and are only permitted to sue in federal court if the Secretary has not issued a final order within 210 days.  18 U.S.C. § 1514A(b)(2)(D); 29 C.F.R. § 1980.103(d); 12 U.S.C. § 5567(c)(4)(D).  Plaintiff alleges that Apple terminated his employment on January 14, 2013.  (Compl., ¶48.)  Plaintiff had to file his complaint with the Secretary of Labor by July 15, 2013.  Plaintiff has not done so and his SOX claims are now time-barred.  See *Coppinger-Martin v. Nordstrom, Inc.*, 627 F.3d 745, 749 (9th Cir. 2010) (holding plaintiff's SOX was untimely because

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

10.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

statute of limitations ran from date she learned of her actual injury).  Plaintiff's failure to file with the Secretary of Labor prior to filing his claim with this Court likewise precludes his recovery as a matter of law.  Further, Plaintiff's failure to file with the Secretary of Labor within the statutorily-prescribed timeframe cannot be excused because he had sufficient information to know of his claim at the time of his termination and he had secured counsel and filed this lawsuit before the statute of limitations expired.  *Id.* at 750.

Plaintiff cannot recast his SOX allegations as a Dodd-Frank claim to circumvent SOX's statute of limitations and administrative procedure requirements.  Once again, *Asadi* rejected this argument, reasoning that, if it held otherwise, "the SOX anti-retaliation provision, and most importantly, its administrative scheme, for practical purposes, would be rendered moot."  *Asadi*, 2013 U.S. App. LEXIS 14470, at **26-27.   Unlike SOX, Dodd-Frank does not have an administrative procedure requirement and affords a six to ten-year statute of limitations period.  15 U.S.C. § 78u-6(h).  If, as Plaintiff contends, a SOX violation can serve as a predicate basis for a Dodd-Frank claim, then SOX's carefully-crafted administrative scheme would become a nullity.  This is particularly troublesome because Congress amended SOX's statute of limitations from 90 to 180 days in another section of Dodd-Frank.   See, Dodd-Frank Wall Street Reform Consumer Protection Act of 2010, Pub. L. No. 111-203 § 922, 124 Stat. 1376, 1841-49 (2010).  It would defy logic for Congress to tweak SOX's administrative scheme in one section of Dodd-Frank, while at the same time intending for Dodd-Frank's anti-retaliation provision to render the SOX limitation period moot.  *Asadi*, 2013 U.S. App. LEXIS 14470, at **26-27.

**3.      Plaintiff's Communications Were Not Required or Protected Under SOX.**

Even if Plaintiff can establish that a SOX claim can be the basis for a Dodd-Frank claim, he cannot as a matter of law establish his reports regarding another employee's expense reports sufficiently involved shareholder fraud to constitute protected activity under SOX.  "[T]o constitute 'protected activity' under SOX, the allegation must 'definitively and specifically' relate to one of the list categories of fraud or securities violations under 18 U.S.C. § 1514A(a)(1)."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996-97 (9th Cir. 2009); *Day v. Staples Inc.*, 555 F.3d 42, 55 (1st Cir. 2009).  This means that, "to be protected under [SOX], an employee's disclosure must

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

11.                                          Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

1    be related to illegal activity that, at its core, involves shareholder fraud." *Livingston v. Wyeth, Inc.*,

2    2006 U.S. Dist. LEXIS 52978, at *30 (M.D.N.C. July 28, 2006) aff'd 520 F.3d 344 (4th Cir. 2008).

3    See, e.g., *Allen v. Dep't. of Labor*, 514 F.3d 468, 479-480 (5th Cir. 2008) (there must be an intent to

4    defraud shareholders); *Fraser v. Fiduciary Trust Co. Int'l*, 417 F.Supp.2d 310, 323-34 (S.D.N.Y.

5    Aug. 25, 2006) aff'd, 396 Fed. Appx. 734 (2d Cir. 2010) (dismissing claimant's complaint for failure

6    to demonstrate that claimant actually complained of illegal activity, as opposed to violating internal

7    policy); *Bishop v. PCS Admin., Inc.*, 2006 U.S. Dist. LEXIS 37230, **30-32 (N.D. Ill. May 23,

8    2006) (concluding the phrase "relating to fraud against shareholder" must be read as applying to all

9    violations enumerated under § 1514A(a)(1)); *Gale v. World Fin. Group*, 2006-SOX-43 (Dep't. of

10   Labor June 9, 2006) ("The phrase 'relating to fraud against shareholders' in [§ 1514A] must be read

11   as modifying each item in the series, including 'rule or regulations of the [SEC]'") (quoting *Bishop*

12   *v. PCS Admin., Inc.*, 2006 U.S. Dist. LEXIS 37230 (N.D. Ill. May 23, 2006)).

13            The alleged shareholder fraud must be "material" and "a mere possibility that a

14   challenged practice could adversely affect the financial condition of a corporation, and that the effect

15   on the financial condition could in turn be intentionally withheld from investors, is not enough" to

16   constitute protected activity. *Robinson v. Morgan Stanley*, No. 07-070, 2010 DOLSOX LEXIS 7,

17   *21 (ARB Jan. 10, 2010); see also *Livingston, supra*, 2006 U.S. Dist. LEXIS 52978, at *33 (holding

18   that "under Supreme Court authority, for information to be material, there must be a substantial

19   likelihood that a reasonable shareholder would consider [the matter] important to his decision to

20   invest"); *Godfrey v. Union Pac. R.R. Co.*, ARB Case No. 08-088, *4 (July 30, 2009) ("employee

21   must ordinarily complain about a material misstatement of fact (or omission) concerning a

22   corporation's financial condition on which an investor would reasonably rely").

23            Even taking Plaintiff's allegations at face value, his reports regarding an employee's

24   inaccurate expense reports do not constitute a complaint regarding shareholder fraud to constitute

25   protected activity under SOX. *In Riddle v. First Tenn. Bank Nat'l Assoc.*, 2012 U.S. App. LEXIS

26   18684, at **19-21 (6th Cir. Aug. 31, 2012), the plaintiff reported to his superiors that a fellow

27   employee made improper cash advances on a corporate credit card and submitted inaccurate expense

28   reports. The Sixth Circuit Court of Appeals dismissed plaintiff's SOX claim, reasoning he "failed to

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

12.                                    Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

1    show how [the accused employee's] behavior constituted a misrepresentation to shareholders that

2    resulted in a loss.  [Plaintiff's] belief that [the employee's] gift card practices violated SOX is not

3    itself an objectively reasonable belief that shareholders have been or were likely to be defrauded."

4    *Id.* at 21.  Similarly, Plaintiff's complaints about an employee's failure to follow Apple's internal

5    expense report procedures did not involve shareholder fraud and are thus not protected under SOX.

6    Moreover, the total dollar amount in "Employee Roe's" allegedly fraudulent expenses would have

7    been entirely immaterial to investors.  *Livingston, supra*, 2006 U.S. Dist. LEXIS 52978, at *33.  It is

8    preposterous for Plaintiff to assert that discrepancies in a single employee's expense reports could be

9    material to Apple's overall disclosed financial records.  There are no allegations, that Employee

10   Roe's allegedly inaccurate expense reports would have any material effect on Apple.  Plaintiff's

11   alleged complaints were neither "required [nor] protected" under SOX as a matter of law, and the

12   Court should dismiss Plaintiff's first and third claims for relief under SOX in their entirety with

13   prejudice.

14       C.       **Plaintiff's Second Claim For Relief For Wrongful Termination Should Be
                  Dismissed As He Has Failed To Allege A Violation Of Public Policy**
15

16            In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980), the California Supreme

17   Court recognized a narrow exception to California's "at-will" employment doctrine and held that

18   "[a]n employer's traditional broad authority to discharge an at-will employee 'may be limited by

19   statute . . . or by considerations of public policy.'"  *Id.* at 172, citations omitted.  Thus, the Court

20   recognized the existence of a tort claim arising from a public policy violation.

21            Wrongful termination claims based on violating a fundamental public policy must be

22   tethered to some recognized statutory or regulatory provision.  *Stevenson v. Superior Court,* 16

23   Cal.4th 880, 887-894 (1997).  A discharge is actionable as against public policy only if it violates a

24   policy that is: "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense

25   that it 'inures to the benefit of the public' rather than serving merely the interests of the individual;

26   (3) well established at the time of the discharge; and (4) 'substantial' and 'fundamental.'"  *Carter v.*

27   *Escondido Union High School District,* 148 Cal.App.4th 922, 929 (2007) (quoting *Stevenson v.*

28   *Superior Court* 16 Cal.4th 880, 901–902 (1997)).

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

13.                                Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

To bring a cognizable public policy claim, Plaintiff must show: (1) that Defendant violated some statute or regulation (or that Plaintiff had a reasonable belief that Defendant did so); and (2) that the violation was tethered to an important and fundamental public policy articulated in the statute or regulation.  See *Gant v. Sentry Insurance*, 1 Cal.4th 1083, 1095 (1992); *Sequoia Ins. Co. v. Superior Court* 13 Cal.App.4th 1472, 1475 (1993) (a showing the employer's conduct was "specifically prohibited" by statute is a "foundational requirement" for wrongful termination claims). In *Foley v. Interactive Data Corp.,* 47 Cal.3d 654 (1988), the California Supreme Court recognized that no tort claim can typically exist for employment related conduct, such as termination of employment, absent some violation of public policy.  *Foley,* 47 Cal.3d. at 671.

Here, Plaintiff cites no actual public policy or statute to support his wrongful termination claim.  Rather he only makes vague reference to "the law." (Compl., ¶63.)  He claims "Apple's officers and/or management advised [him] not to pursue the investigation and/or termination of Employee Rose who had been found to embezzle funds on 40 separate occasions in violation of Apple policy and the law." (*Id*.)  In Paragraph 65 of the Complaint, Plaintiff states: "[a]s a proximate result of [Plaintiff's] conduct as described in Paragraph 63, above, and in violation of public policy as set forth in Paragraph 64 above, Apple terminated [Plaintiff's] employment." Nowhere in his wrongful termination claim, however, does Plaintiff cite any statute which stands for the proposition that advising an individual not to pursue an investigation or terminating an employee for allegedly padding expense reports violates any statute or law.  Plaintiff cites nothing at all which even remotely constitutes a "public policy" supporting a wrongful termination claim.  *Gant, supra*, 1 Cal. 4th at 1095.

Moreover, Plaintiff's reliance on Employee Roe's alleged violation of Apple's internal policies is completely insufficient as a matter of law.  The law is clear that alleged violations of internal practices that affect only the employer's or employee's interest, and not the general public's interest, cannot support a public policy claim.  *Foley, supra*, 47 Cal.3d at 669-671; see also *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1257 (1994) ("[t]he tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others").

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

14.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

There is not a single statute referenced, nor does Plaintiff explain the "law" and Courts have routinely rejected public policy claims "unaccompanied by citations to specific statutory or constitutional provisions.'" *Green v. Ralee Engineering Co.,* 19 Cal. 4th 66, 83 (1988) (citing *Turner, supra*, 7 Cal. 4th at 1257.) "The omission 'puts [the defendant] and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing plainly cannot create an issue of material fact justifying a trial on the merits of [the plaintiff's] claims.'" *Ibid*. Without citation to a statute which establishes Plaintiff's wrongful termination claim, Plaintiff's wrongful termination claim must be dismissed.

### D.     Plaintiff Has Not Alleged Facts Establishing The Essential Elements Of His Third Claim For Relief For Retaliation.

In his third claim for relief, Plaintiff alleges that Apple retaliated against him in violation of Dodd Frank, 15 U.S.C. § 78u-6, SOX, 18 U.S.C. 1514A, and California Labor Code Section 1102.5. To establish a *prima facie* claim of retaliation, Plaintiff must plead facts establishing: (1) he engaged in a protected activity; (2) that Apple subjected him to an adverse employment action; and (3) there was a causal link between his protected activity and the adverse action. See *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 868 (9th Cir. 1996); *Love v. Motion Industries, Inc.*, 309 F.Supp.2d 1128, 1134 (N.D. Cal. 2004). Plaintiff cannot do so.

As established above, Plaintiff has not and cannot establish he engaged in any protected activity under Dodd Frank and/or SOX and that his claims under SOX are time barred for his failure to exhaust his administrative remedies. He therefore cannot establish that Apple unlawfully retaliated against him under these statutes as a matter of law.

Plaintiff also cannot establish he engaged in any activity protected by California Labor Code section 1102.5. Labor Code sections 1102.5(b) and (c) make it an unlawful employment practice for an employer to:

> [b] retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation, [or;]

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

15.                                          Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

[c] retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

As an initial matter, Plaintiff has alleged no facts establishing he ever complained of any alleged violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation to a government or law enforcement agency.  At most, he claims he reported Employee Roe's alleged improper actions to Apple.  These complaints cannot establish a violation of Section 1102.5(b) as a matter of law.  *Green, supra,* 19 Cal.4th at 77 (stating Labor Code section 1102.5(b) "does not protect plaintiff, who reported his suspicions [of illegal activity] directly to his employer").  Moreover, Plaintiff has not alleged what statute he believes Employee Roe's alleged conduct violated.  Plaintiff alleges Apple's management told him not to investigate or fire Employee Roe and he was terminated shortly thereafter.  (Compl., ¶37-38.)  Plaintiff claims this "violated the law" but cites no statute which requires an employer to investigate or fire an employee for inflating an expense report – as of course there is no such law.  *Edgerly v. City of Oakland*, 211 Cal.App.4th 1191 (2012).  He therefore also cannot establish the essential element for this cause of action that he actually reported a violation of a state or federal statute or noncompliance with a rule or regulation.  Cal. Labor Code § 1102.5(b).

Plaintiff also cannot establish he was terminated for refusing to participate in an activity that would result in violating a State or federal statute, or a violation or noncompliance with a state or federal rule or regulation for the purposes of Labor Code section 1102.5(c).  While Plaintiff claims he was fired for "refusing to participate in an activity that would result in a violation of a State of federal statute, or a violation or noncompliance with a state of federal rule or regulation," his Complaint is devoid of any factual allegations supporting this conclusion.  (Compl., ¶75.)  Plaintiff's alleged refusal to not pursue Employee Roe's alleged improper expense reports does not constitute refusing to participate in an activity that would cause a violation of state or federal statute for the purposes of Section 1102.5(c) as a matter of law.

The recent case of *Edgerly v. City of Oakland* is completely analogous to Plaintiff's Section 1102.5(c) claims and shows this claim fails as a matter of law.  *Edgerly, supra,* 211 Cal.App.4th at 1191.  The plaintiff in *Edgerly* was Oakland's City Administrator who alleged the

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

1    City of Oakland terminated her employment in retaliation for her refusal to approve expense
2    reimbursement requests submitted by the Mayor she believed violated the City's rules and
3    regulations. *Id*. at 1194-1196. She sued the City alleging among other causes of action, unlawful
4    retaliation in violation of Section 1102.5(c) which was dismissed by the trial court on demurrer. *Id*.

5            The Appellate Court affirmed the dismissal because Plaintiff had identified no State
6    or federal statute, rule or regulation violated by the Mayor's alleged conduct. *Id*. at 1200-1201. At
7    most, the conduct violated the City's charter. *Id*. The Court held the City's charter, much like an
8    employer's own internal policies and procedures, is not a State or federal statute, rule or regulation.
9    *Id*. Plaintiff's alleged termination for refusing to approve the expenses could not establish a
10   violation of Labor Code section 1102.5(c) as a matter of law. See also, *Mueller v. County of Los*
11   *Angeles,* 176 Cal.App.4th 809, 822 (2009) (holding that complaints regarding internal procedures
12   "such as transferring employees, writing up employees, and counseling employees are personnel
13   matters" and do "not rise to the level of whistleblower retaliation" as a matter of law).

14           Here, Plaintiff, like the plaintiff in *Edgerly,* alleges throughout his Complaint that he
15   complained that Employee Roe had padded her expense reports in violation of Apple's internal
16   policies. (Compl., ¶32.) There are no allegations that he was asked to do anything which would
17   violate any law, statute, or regulation. Moreover, Plaintiff has not alleged that an employee's
18   alleged padding her expense report in violation of an employer's internal policies or procedures
19   violates any State or federal statute, rule or regulation. As the *Edgerly* Court held, it does not.
20   *Edgerly, supra,* 211 Cal.App.4th at 1204. Accordingly, as with Plaintiff's Dodd-Frank and SOX
21   retaliation claims, Plaintiff's Section 1102.5(c) claim fails and must be dismissed with prejudice.

22       **E.    Plaintiff Has Not Alleged Facts Establishing The Essential Elements Of His**
             **Fourth Claim For Relief For Breach Of Contract.**
23

24           Plaintiff's fourth claim for relief is premised on his contention that he had an implied
25   agreement with Apple that Apple would not "arbitrarily" terminate his employment. (Compl., ¶83.)
26   Plaintiff, however, has failed to allege any facts establishing Apple agreed to any such term or
27   agreed to employ him on any basis other than "at-will." Even if Plaintiff could establish Apple

28

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

17.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

agreed to alter the "at-will" nature of his employment in some fashion, he has alleged no facts establishing under what circumstances he contends that Apple could terminate his employment.

It is well-established in California at an employment having no specified term is presumed to be on an "at-will" basis.  Cal. Labor Code § 2922; *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 335 (2000).  This means that either the employer or the employee can terminate the employment relationship "'at any time without cause,' for any or no reason" at all.  *Guz,* 24 Cal.4th at 335.  While the presumption of "at-will" employment can be altered by a written or oral agreement between the employer and the employee, it is also well established by California's Legislature and its Supreme Court that an employee must present substantial evidence of an employer's actual intent to employ the employee on a basis other than "at-will" to establish a departure from the "at-will" presumption.  *Guz,* 24 Cal.4th at 335-336.

As the *Guz* Court held:

> [a]bsent other evidence of the employer's intent, longevity, raises and promotions are their own reward for the employee's continuing valued service; they do not, *in and of themselves*, additionally constitute a contractual guarantee of future employment security.  A rule granting such contractual rights on the basis of successful longevity alone would discourage the retention and promotion of employees.

*Guz*, 24 Cal.4th at 342 (emphasis in original).  The *Guz* Court also held that a statement by a representative of the employer that "his understanding [was] that [the employer] terminated workers only with 'good cause' or for 'lack of [available] work'" was "insufficient as a matter of law to permit a finding that the company, by an unwritten practice or policy on which employees reasonably relied, had contracted away its right to discharge [its employees] at will."  *Id.* at 345.  Plaintiff's allegation regarding some unidentified alleged agreement by Apple to limit its statutory right to terminate its employees "at will" fails for the same reasons as the plaintiff's in *Guz.*

Here, Plaintiff does not allege his employment with Apple was for any specified term.  He is therefore presumed to be employed on an "at-will" basis.  Cal. Labor Code § 2922; *Guz, supra*, 24 Cal.4th at 335.  Plaintiff has not alleged anyone at Apple ever told him that he would be terminated only for good cause, or upon some other specified circumstances.  *Guz,* 24 Cal.4th at 341.  Rather, Plaintiff's contention that Apple contractually agreed to alter the "at-will" nature of his

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

18.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

1   employment is based on his claim that: (1) he had been "employed by Apple for 12 years" and

2   "consistently received either good or excellent performance evaluations and merit raises" and

3   discretionary bonuses; (2) he was "assured on numerous occasions that he would not be terminated

4   arbitrarily;" (3) his supervisor told him that she "would support him and back him up with respect to

5   continued employment"; and (4) that "Apple normally has a course of conduct and a policy of

6   putting employees on performance improvement plans prior to terminating them." (Compl., ¶¶ 9-22,

7   81, 82.)

8            First, Plaintiff's longevity of service, performance evaluation, merit raises, bonuses,

9   and promotions do not evidence any intent by Apple to alter the "at-will" nature of his employment

10  as a matter of law. *Guz, supra,* 24 Cal.4th at 342 ("longevity, raises, and promotions . . . do not . . .

11  constitute a contractual guarantee of future employment security"); *Horn v. Cushman & Wakefield*

12  *Western, Inc.,* 72 Cal.App.4th 798, 818-19 (1999) (same).

13           Second, his claims that he "was assured on numerous occasions that he would not be

14  terminated arbitrarily" and that his supervisor would "back-up" and "support" him regarding his

15  employment at Apple" are also completely insufficient to alter the "at-will" nature of his

16  employment. As an initial matter, such allegations are nothing more than an impermissible legal

17  conclusion not considered on a motion to dismiss. *Burt v. Irvine Co*., 237 Cal. App. 2d 828, 849

18  (1965) ("[a]llegations that the acts of [the defendants] were 'arbitrary, capricious, fraudulent,

19  wrongful and unlawful,' like other adjectival descriptions of such proceedings, constitute mere

20  conclusions of law which are not to be deemed admitted by a demurrer") (quoting *Faulkner v.*

21  *California Toll Bridge Authority*, 40 Cal.2d 317, 329 (1953)). Such allegations do not evidence a

22  protectable right to continued employment. *Allen v. Beverly Hills*, 911 F.2d 367, 371 (9th Cir. 1990)

23  ("[w]here the only substantive restriction placed on [an employer] is that its decision to terminate

24  employment must be 'reasonable,' or in 'good faith,' any claim to a protected property interest . . . is

25  negated.")

26           Even if these allegations are not impermissible conclusions, they are far too vague to

27  constitute an enforceable contractual provision as a matter of law. Courts seek to enforce the

28  contracting parties' actual agreement. Cal. Civ. Code § 1636. To do this, Plaintiff must establish

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

19.                                                Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

what circumstances constitute an "arbitrary" termination decision from those that do not.  Absent defining the term, the Court and the trier of fact cannot determine if the termination decision violated the parties' alleged agreement.

Finally, Plaintiff's contention that "Apple normally has a course of conduct and a policy of putting employees on performance improvement plans prior to terminating them" does not support his breach of contract claim.  (Compl., ¶82.)  Even if true, this allegation means, at most, that Apple would first give a poor performing employee the opportunity to improve his/her performance if it would terminate their employment for job performance reasons.  It would not alter Apple's ability to terminate an "at-will" employee for reasons other than for performance.  Even if true, this allegation is no help to Plaintiff.  Plaintiff does not allege that Apple terminated his employment for poor performance.  In fact, Plaintiff unambiguously claims his job performance was never anything less than completely spectacular.  (Compl., ¶¶8-14, 16-22, 45-46.)  In addition, during the meeting in which his employment was terminated, Plaintiff states "there was no mention of poor performance on the part of [Plaintiff]."  (Compl., ¶48.)

Plaintiff's allegations on which this claim for relief is based are no more than those California's Courts have consistently found insufficient to rebut the presumption of "at-will" employment as a matter of law.  *Guz, supra,* 24 Cal.4th at 342, 345; *Horn, supra,* 72 Cal.App.4th at 819 ("[i]n our view, [the plaintiff's] evidence of positive performance reviews, commendations, salary increases, and vague assurances that [the plaintiff] would become a sales manager was not sufficient to create a triable issue of fact as to whether the parties had implicitly agreed [the company's] right to terminate [the plaintiff] would be limited.  Most of those factors are 'natural occurrences of an employee who remains with an employer for a substantial length of time.'"); *Kovatch v. Cal. Casualty Management Co*., 65 Cal. App. 4th 1256, 1275-1277 (1998) (same) (overruled on other grounds in *Aguilar v. Atlantic Richfield Co*., 25 Cal. 4th 826 (2001)).  Plaintiff's fourth claim for relief should therefore be dismissed.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

20.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

**F.     Plaintiff's Fifth Claim For Relief Breach Of The Covenant Of Good Faith And Fair Dealing Fails As A Matter Of Law.**

There is no tort remedy available for breach of the implied covenant in the employment context when, as here, the cause of action is based on facts identical to a breach of an implied contract claim.  *Foley, supra,* 47 Cal.3d at 700 (abolishing tort remedies for breach of the implied covenant in wrongful termination of employment cases).   This reasoning has been repeatedly recognized by the Appellate Courts and affirmed by the California Supreme Court in *Guz, supra,* 24 Cal.4th at 352-353.  The *Guz* Court expressly limited the ability of a plaintiff to assert a claim for breach of the implied covenant of good faith and fair dealing in the employment context. The Court held that a plaintiff may not recover on such a claim for the alleged breach of obligations not contained in the underlying contract because "the covenant of good faith and fair dealing . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*"  *Id.* at 349 (emphasis in original).  As further stated by the Court, "insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is superfluous."  *Id*. at 352.  Rather, "the remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is *solely contractual.*"  *Ibid*. (emphasis in original) (finding that "allegations that a breach was wrongful, in bad faith, arbitrary, and unfair are unavailing").

In his fifth claim for relief, Plaintiff alleges that Apple breached the implied covenant of good faith and fair dealing contained in the alleged employment contract by, among other things, terminating Plaintiff's employment. (Compl., ¶95).  His breach of contract and breach of the implied covenant claims are both based upon the premise that Apple breached both the alleged employment agreement and the implied covenant by wrongfully terminating Plaintiff's employment. (*Id*. at ¶¶92-96.)  Plaintiff pleads no unique facts to support his breach of the covenant of good faith and fair dealing.  Moreover, Plaintiff is seeking the same damages on both claims – an alleged "losses in earning and other employment benefits, to his damage" because of Defendants' alleged breach. (*Id*. at ¶¶88, 98.)

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

21.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

Plaintiff's implied covenant claim is superfluous, does not constitute a valid cause of action as a matter of law and should be dismissed.  See *Guz, supra,* 24 Cal.4th at 352; *Bionghi v. Metro Water Dist.*, 70 Cal.App.4th 1358, 1370 (1999).  Accordingly, Defendant's motion to dismiss Plaintiff's fifth claim for relief should be granted.

**V.     CONCLUSION**

Apple respectfully requests the Court issue and order dismissing Plaintiff's Complaint in its entirety without leave to amend.

Dated: August 5, 2013

//s// Todd K. Boyer
_____
TODD K. BOYER
LITTLER MENDELSON, P.C.
Attorneys for Defendant
APPLE INC.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

22.

Case No. CV13-02977

DEFT APPLE'S NOTICE OF MOTION, MOTION TO DISMISS AND MPA'S ISO THEREOF

DAVID J. MICLEAN (SB# 115098)
Email: dmiclean@micleangleason.com
GARY R. GLEASON   (SB# 136167)
Email: ggleason@micleangleason.com
CARMEN M. AVILES (SB# 251993)
Email: caviles@micleangleason.com
MICLEAN GLEASON LLP
100 Marine Parkway Suite 310
Redwood Shores, CA 94065
Office: 650-684-1181
Fax: 650-681-1182

Attorneys for Plaintiff
JOSHUA BANKO

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA BANKO, | Case No. 3:13-cv-02977 RS |
| Plaintiff(s), | |
| v. | **STIPULATED DISMISSAL WITH PREJUDICE** |
| APPLE, INC., DOES 1-50 | **[FRCP 41(A)(ii)]** |
| Defendant(s). | |

1
Plaintiff Joshua Banko and Apple, Inc. by and through their counsel of record hereby file

2
their Joint Stipulation of Dismissal pursuant to Rule 41(A)(ii) of the Federal Rules of Civil

3
Procedure and state:

4
    1.  The above entitled action is dismissed with prejudice.

5
    2.  Each party will bear its own costs, expenses and attorneys' fees.

6

7
MICLEAN GLEASON LLP

8
Dated: July 08, 2014               By:    /s/

9
                                    David J. Miclean

10
                                    Gary R. Gleason
Carmen M. Aviles
Attorneys for Plaintiff, Joshua Banko

11

12

13
LITTLER MENDELSON, P.C.

14
Dated: July 08, 2014               By:    /s/

15
                                    Todd K. Boyer
Benjamin A. Emmert
Attorneys for Defendant, APPLE, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

# MOTION FOR JUDICIAL NOTICE EXHIBIT

# SECTION:

E-FILED
6/28/2018 10:24 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV330796
Reviewed By: R. Tien

1  Angela M. Alioto (SBN 130328)
2  Angela Mia Veronese (SBN 269942)
   H. Larry Elam III (SBN 178836)
3  LAW OFFICES OF JOSHEPH L. ALIOTO
   AND ANGELA ALIOTO
4  700 Montgomery Street
5  San Francisco, CA 94111-2104
   Telephone: (415) 434-8700
6  Facsimile: (415) 438-4638

7  Attorneys for Plaintiff CRYSTAL BROWN

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **FOR THE COUNTY OF SANTA CLARA**

10

11  CRYSTAL BROWN, an individual,          CASE NO.:  18CV330796

12                                          **COMPLAINT FOR DAMAGES:**
                    Plaintiff,
13                                          1.  **RETALIATION IN VIOLATION
                                                OF FEHA;**
14         v.                               2.  **FAILURE TO TAKE
                                                REASONABLE STEPS TO
15  APPLE INC., and Does 1 through 100, inclusive,   **INVESTIGATE AND PREVENT
                                                RETALIATION IN VIOLATION
16                  Defendants.                  OF FEHA;**
                                            3.  **CONSTRUCTIVE TERMINATION
17                                              IN VIOLATION OF PUBLIC
                                                POLICY; AND**
18                                          4.  **INTENTIONAL INFLICTION OF
19                                              EMOTIONAL DISTRESS.**

20                                          **DEMAND FOR JURY TRIAL**
21

22

23

24

25

26

27

28

---

                            - 1 -
                  **COMPLAINT FOR DAMAGES**

## **INTRODUCTION**

1.      Plaintiff CRYSTAL BROWN ("Ms. Brown" or "Plaintiff") is an individual.

2.      Defendant APPLE INC. is a California corporation with its principal place of business in Santa Clara County, California.

3.      Jurisdiction and venue are proper in this Court because some or all of the claims alleged herein arose in Santa Clara County and some or all of the parties were and/or are residents of Santa Clara County or are doing or did business in Santa Clara County at all times relevant herein.

4.      The amount in controversy in this matter exceeds the sum of $25,000.00, exclusive of interest and costs.

5.      DOE Defendants 1 through 100 are sued under fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff is informed and believes, and on that basis alleges, that each defendant sued under such fictitious names is in some manner responsible for the wrongs and damages as alleged below, and in so acting was functioning as the agent, servant, manager, supervisor, and/or employee of the Employer Defendants, and in doing the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant.

6.      Plaintiff is informed that all named Defendants and DOES 1-100 were at all times the alter egos of each other, so that as to maintain the fiction of a separate existence would work an injustice on Plaintiff, among others. Plaintiff is informed and believes that there is such a unity of interest between the said Defendants that to uphold the fiction of corporate separateness between the said Defendants would be to sanction an injustice against the Plaintiff and others. Said Defendants acted in all respects pertinent to this action as the agent of each other, and carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each are legally attributable to the other.

7.      All named Defendants and DOES 1-100 will hereinafter be collectively referred to as the "Employer Defendants" or "Defendants."

8.     Plaintiff was at all times relevant to this action was employed by the Employer Defendants. Plaintiff was an employee of APPLE up until approximately February 19, 2018.

9.     The Employer Defendants are California employers who employ more than five people and are accordingly subject to the provisions of FEHA.

## II.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.    Plaintiff has fully exhausted her statutory administrative remedies required by FEHA as a prerequisite to bringing this action. On April 24, 2018, Plaintiff filed a Complaint of Discrimination with the DFEH against Defendant Apple, Inc., DFEH Matter No. 201804-02019024. On April 24, 2018, the DFEH issued a Notice of Case Closure and Right to Sue authorizing Plaintiff to file a private lawsuit against APPLE to enforce her rights to full and equal employment opportunities free from unlawful discrimination and retaliation.

## III.

## FACTS COMMON TO ALL CAUSES OF ACTION

11.    Plaintiff Crystal Brown began working for APPLE on June 15, 2015, as an administrative assistant. Plaintiff provided administrative assistance and support to an Apple executive named Dan West and his team.

12.    In late September or early October 2015, Plaintiff brought to Mr. West's attention that her workload was too heavy providing support for him and his direct reports. Plaintiff was averaging Twelve to Fifteen (12-15) hours per day, which included an average of over Thirty (30) over-time hours per week.

13.    The issue of her workload and work hours became a larger issue when in November 2015, the group in which Plaintiff was assigned was reorganized and Plaintiff was required to provide administrative support to a second executive, John Basanese, and his team in addition to her prior responsibilities to Mr. West and his direct reports.

14.    In early 2016, Plaintiff met with Mr. West to discuss her workload and find solutions to address her complaints. At this meeting Mr. West and Plaintiff agreed that Plaintiff should work no more than 10 hours per day, in other words a full eight-hour day and no more than

two hours of overtime. Mr. West encouraged her to draw boundaries with his managers so that Plaintiff would not be overextended. Mr. West agreed that he would communicate these new guidelines to his direct reports, and they in turn were to communicate this agreement with their reporting managers. Despite their agreement, Mr. West failed to communicate these new guidelines to his direct reports and as a result Plaintiff was required to continue to work 12-15 hours.

15. By July 2016, Plaintiff was physically and emotional exhausted by her heavy workload and on doctor's orders took FMLA leave to try and recover physically and emotionally.

16. Plaintiff returned from FMLA leave on September 5, 2016 and was permitted to work from home one day per week. At this time Plaintiff was also given her 2016 performance evaluation from Mr. West, where he rated her performance as "performed at the high level expected of the role". Plaintiff believed that this represented an honest assessment of her performance.

17. However, on November 28, 2016, despite being off work on leave the months of July and August 2016, Plaintiff was asked to submit to a mid-cycle review. Plaintiff then met with Mr. West to discuss her mid-cycle performance and Plaintiff reiterated the concerns previously discussed in early 2016 regarding her workload and the lack of communication from him to his direct reports with respect to lessening her workload, and the lack of boundaries exhibited by his team that pulled her away from his administrative needs. Mr. West and Plaintiff discussed re-training the team to make the managers more self-sufficient, as well as guidelines to assist with workflow. However, the guidelines were never followed and her complaint of being overburdened continued to be an issue adding to her level of stress.

18. In early January 2017, Plaintiff brought to Mr. West's attention a growing concern over some areas within the organization that she believed were in violation of APPLE'S anti-discrimination policies. Plaintiff brought to Mr. West's attention two specific examples involving two women working under two of his direct reports. These two women believed that they were being treated differently by their respective managers solely because of their gender. Plaintiff further informed Mr. West that these women were reluctant to make a formal complaint because

they feared backlash and retaliation from their respective managers and Mr. West, which would effectively end their careers at APPLE, and thereby making a difficult situation worse for them. As these two women brought specific examples of disparate treatment to Plaintiff, she would relate them to Mr. West. Examples of the disparate treatment that these two women shared with Plaintiff and that Plaintiff shared with Mr. West are as follows:

        a.    Bullying, sexist statements, unequal treatment in terms and conditions of employment based on gender,

        b.    Job assignments were based on gender, women were given the least valuable job assignments, whereas the best job assignments were reserved for men.

        c.    Both women expressed fear that complaining in their respective job environments would be career suicide, as they would be subjected to retaliation by their male supervisors, and thus they were reluctant to go directly to Human Resources with their complaints.

    19.    Plaintiff took these complaints to Mr. West, but he failed to do anything effective to intervene or stop the disparate treatment. Ultimately, these two women were forced to quit, just like Plaintiff was later forced to do. In fact, one of the women told Plaintiff that she "would rather be hit by a bus than stay in this organization" because of the stress and emotional trauma she experienced most days.

    20.    Mr. West was notified that these two women had resigned and he sought to talk with one of them who had expressed the belief that "she could be more forthcoming now that she no longer had to fear she would jeopardize her job by speaking truthfully." Mr. West knew that the culture at APPLE included the view that complaints by employees would be reciprocated with retaliatory actions by the employee's supervisor. In fact, Mr. West commented to this former Apple employee via e-mail requesting the meeting that he was "not so naïve to think that we [APPLE] get the entire story from employees when they are here [APPLE]. There are too many concerns about ticking off the boss, retaliation, etc."

    21.    In March 2017, Mr. West "blind carbon copied" Plaintiff on an e-mail that an APPLE engineer named David Girard had written to Tim Cook, CEO at APPLE. In APPLE parlance this email is known as a "Dear Tim" email. Mr. West asked Plaintiff to schedule a one-

on-one meeting between himself and Mr. Girard, because Mr. West was unhappy with Mr. Girard for sending the "Dear Tim" e-mail to Mr. Cook, despite the fact that APPLE policy encouraged employees to do so.

22.    At a point in time after the one-on-one meeting between Mr. West and Mr. Girard, Plaintiff noticed that Mr. Girard was now being treated less favorably by Mr. West and his leadership team when Plaintiff saw Mr. Girard's name come up for special projects his name [Mr. Girard's] would be removed by Mr. West and his leadership team and replaced with another. Plaintiff believes Mr. West was upset with Mr. Girard for sending the "Dear Tim" e-mail and resorted to punishing Mr. Girard.

23.    By late May 2017, Plaintiff was exhausted and disappointed in Mr. West's lack of response and interest in resolving the complaints of these two women while they were employed by APPLE and his retaliatory treatment of Mr. Girard. It also became clear that Mr. West was not happy that Plaintiff was supporting Mr. Girard and the two women and he began to subject her to heightened scrutiny because of her actions.

24.    In or about August 2017, Mr. West began creating a work environment where Plaintiff felt she could not openly communicate concerns and issues involving APPLE policy dealing with discrimination, harassment and retaliation. Mr. West became overly aggressive towards Plaintiff in the way he spoke to her and was often times rude and dismissive. Mr. West started to find fault in her work, which he used as a platform for his criticisms and rudeness. Plaintiff determined that her working relationship with Mr. West was irreconcilably broken and that she could no longer thrive in that environment, so she decided she should start looking for another job within APPLE.

25.    Plaintiff followed APPLE policy by communicating her intentions to Mr. West and began utilizing APPLE resources to locate another role within the company. Thereafter, Mr. West's treatment and conduct towards her worsened exponentially.

26.    By August 2017, Plaintiff had identified four roles within one APPLE organization that interested her and Plaintiff took September/October getting to know the team in one-on-one meetings. Before applying for these positions Plaintiff approached Mr. Basanese, the second

executive she was supporting along with Mr. West, and ask Mr. Basanese if he would be willing to provide her with a letter of recommendation. Mr. Basanese happily agreed, but Plaintiff was informed later that he had his mind changed by Mr. West, and that he would no longer be willing to write the letter of recommendation that Plaintiff would need to successfully transition to another organization within APPLE. Despite this setback, Plaintiff continued her efforts to find other positions within APPLE.

27.     Prior to applying for a position, Plaintiff reached out to the managers and confirmed that the position remained opened. However, when Plaintiff applied for the positions, she was told that they were all closed. Plaintiff later received confirmation from management that the positions she had applied for were not closed at the time she attempted to apply. Plaintiff believe that Mr. West made sure that she would not be able to continue working at APPLE, even in a new role by intentionally sabotaging a transfer to another team.

28.     In late August 2017, Plaintiff received her performance review from Mr. West, which was based on false and erroneous facts. After receiving her 2017 performance evaluation and convinced that Mr. West was actively preventing her from leaving his organization to join another within APPLE, Plaintiff took her complaints to APPLE Employee Relations.

29.     In late August 2017, Plaintiff made a formal complaint to APPLE Corporate Employee Relations where she detailed of the negative interactions she was having with Mr. West, believing that they stemmed directly from her notifying him that two APPLE employees had been made to suffer discrimination and harassment simply because they were women and for sticking up for Mr. Girard.

30.     After taking her complaints about Mr. West's conduct toward her to Employee Relations, Plaintiff received no relief. Mr. West continued to micromanage her, criticize her work, find fault with her decisions, and threaten to place her on an Apple documented coaching plan. Plaintiff interpreted the coaching plan as an affirmative plan to end her employment at APPLE.

31.     Whenever Plaintiff pressed Employee Relations to step in and stop Mr. West from his retaliatory treatment, Employee Relations would only pass her complaints on to "someone more senior" in Employee Relations. In all, Plaintiff's complaints were passed on to two additional

**COMPLAINT FOR DAMAGES**

Employee Relations representatives, not counting the original representative.

32. By November 2017, Plaintiff was terrified of Mr. West. Plaintiff became emotionally unable to return to work and suffered panic attacks if she had to interact with him.

33. Plaintiff took additional FMLA leave from November 28, 2017 to January 3, 2018. Plaintiff returned to APPLE on Thursday, January 4 and was contacted by the third Employee Relations representative who was investigating her complaints. Plaintiff shared her frustration that she was now dealing with the third Employee Relations representative, which made her feel like APPLE was not taking her complaints about Mr. West seriously. The new representative suggested that Plaintiff work from home on Monday, January 8 so that they could talk about Plaintiff's complaints. After their talk, the representative placed Plaintiff on administrative leave from January 9 through January 26, 2018.

34. On January 26, 2018, Plaintiff was informed that Employee Relations had completed its investigation and determined that her claims of retaliation could not be substantiated. At this time, Plaintiff was offered two options by Human Resources: (1) accept two months of severance and sign a release of her rights to pursue legal action against APPLE for things that had happened during her employment; or (2) return to work on January 29, 2018 and continue reporting to Mr. West. The Employee Relations representative also mentioned a possible third option, which would have Plaintiff providing administrative support to Mr. Basanese, the other executive, and not Mr. West, but Plaintiff found out soon thereafter that Mr. West would not permit it. Ultimately Plaintiff's administrative leave was extended to February 1, 2018.

35. On February 19, 2018, after speaking with her doctor and family, Plaintiff determined that neither option was in her best interest and that she was therefore forced to resign her position with APPLE effective this date.

36. Plaintiff believed that her work environment providing administrative support to Mr. West had become so intolerable and aggravated that a reasonable person in her position would be compelled to resign.

37. Plaintiff believes that she had done everything within her power to bring to light the intolerable actions and aggravated conditions and of their impact upon her to APPLE management,

- 8 -

who could have and should have remedied her situation, but chose a different course.

38.     Plaintiff was employed by APPLE and APPLE through Mr. West, intentionally created or knowingly permitted intolerable working conditions. These working conditions were so intolerable that a reasonable person in Plaintiff's position would have had no reasonable alternative except to resign. Plaintiff was forced to resign because of these working conditions.

39.     Plaintiff was harmed and the working conditions were a substantial factor in causing Plaintiff's harm.

## FIRST CAUSE OF ACTION

## RETALIATION IN VIOLATION OF CAL. GOV'T CODE § 12940(h)

## AGAINST ALL DEFENDANTS

Plaintiff incorporates by reference Paragraphs 1 through 39 of this Complaint as if fully set forth herein and for a cause of action alleges as follows:

40.     This is an action for damages arising from retaliation against the Plaintiff for having opposed unlawful employment practices. This action is brought pursuant to the California Fair Employment And Housing Act ["FEHA"], i.e., **Cal. Gov. Code § § 12900, 12921, 12926, 129240 and 12965**.

41.     At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), **Cal. Government Code § 12900 et seq.**, was in full force and effect and was fully binding upon the Employer Defendants. Specifically, **section 12940(h)** makes it an unlawful employment practice for an employer to discriminate against any person because the person has opposed any practices forbidden under FEHA.

42.     Towards the end of her employment with APPLE, Plaintiff repeatedly and persistently objected to the practices of her employer, as described above that she justifiably believed evidenced discrimination on the basis of gender. Observing that such objections had no apparent positive effect on the working conditions of these two women, in August, 2017, Plaintiff placed her objections in a written communication to APPLE'S Employee Relations consultant.

43.     As a direct and proximate result of said complaints, managing agents of APPLE took adverse action against Plaintiff by creating working conditions so abusive and intolerable that

1    a reasonable employee in the Plaintiff's position would have had no alternative but to resign.  In

2    other words, Plaintiff was subjected to constructive discharge in retaliation for her protected

3    activity.

4        44.    Plaintiff is informed and believes, and thereon alleges that this cause of action is not

5    preempted by the California Workers' Compensation Act on the grounds that retaliation for

6    opposing unlawful discrimination is not a risk of employment.

7        45.    As a result of the aforesaid acts of retaliation, Plaintiff has suffered and is

8    continuing to suffer a loss of wages/salary, benefits and other employee compensation in an

9    amount which is currently unascertained.  Plaintiff faces substantial diminution of her future

10   earning capacity in an amount which is also currently unascertained.  Plaintiff will request leave of

11   the court to amend this complaint to state the amount of all such damages when they have been

12   ascertained or upon proof at the time of trial.

13       46.    As a result of the aforesaid retaliation, Plaintiff has been held up to great derision

14   and embarrassment with fellow workers, colleagues in the industry, friends, members of the

15   community and family, and continues to suffer emotional distress because Defendants, and each of

16   them, demonstrated to Plaintiff that it would not recognize nor accept the fact that she objected to

17   the discriminatory practices she encountered in the workplace.  Defendants, and each of them,

18   acted unreasonably because it knew and/or should have known that its conduct was likely

19   to result in additional, mental distress.  Plaintiff therefore seeks damages for such emotional

20   distress in an amount to be proven at time of trial.

21       47.    Because of the wrongful acts of Defendants, and each of them, as herein above

22   alleged, Plaintiff has been and will in the future be required to employ physicians to examine, treat

23   and care for her and will incur additional medical expenses in an amount to be proven at the time

24   of trial.

25       48.    In doing the acts set forth above, Defendants, and each of them, acted as herein

26   alleged with a conscious disregard of its obligation under California law to take appropriate action

27   to prevent and/or remedy unlawful employment practices.  Defendants, and each of them, in utter

28   disregard of its obligation under the law, acted with the malicious intention of punishing Plaintiff

**COMPLAINT FOR DAMAGES**

for opposing unlawful discrimination in the work place. In addition, APPLE, its officers and managing agents have knowingly retained, promoted, coddled and protected vicious employees known to disregard the laws prohibiting discrimination in employment. Officers and managing agents of Defendants, and each of them, made a conscious decision that they would punish Plaintiff for daring to object to their discriminatory practices. This conduct by APPLE was, and is, despicable, cruel and oppressive. Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

49. In bringing this action, Plaintiff has been required to retain the services of counsel. Pursuant to **California Government Code § 12965(b),** she is entitled to and hereby requests an award of attorney and expert witness fees and costs of suit.

<u>**SECOND CAUSE OF ACTION**</u>

**FAILURE TO INVESTIGATE AND TAKE REASONABLE STEPS TO PREVENT**

**RETALIATION IN VIOLATION OF CAL. GOV'T CODE § 12940(k)**

**AGAINST ALL DEFENDANTS**

Plaintiff incorporates by reference Paragraphs 1 through 39 of this Complaint as if fully set forth herein and for a cause of action alleges as follows:

50. At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), **Cal. Government Code § 12900** *et seq.*, was in full force and effect and was fully binding upon the Employer Defendants. Specifically, **section 12940(k)** makes it an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination, harassment, or retaliation from occurring.

51. As described above, Defendants, and each of them, received multiple complaints about the harassing, and retaliatory behavior of Mr. West and some of his managers, but did nothing about their behavior. Plaintiff contacted APPLE'S Employee Relations to inform APPLE of the harassing and retaliatory treatment of her and others, yet APPLE declined to take action. Defendants, and each of them, failed to adequately investigate Plaintiff's complaints, failed to take all reasonable steps to prevent Mr. West from retaliating against Plaintiff and did not investigate or discipline Mr. West in response to Plaintiff's multiple complaints. The Employer Defendants

failed to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring in violation of **Cal. Gov. Code § 12950(k)**.

52. As a direct, foreseeable and proximate result of APPLE'S unlawful actions, Plaintiff has suffered economic damages, including back pay, front pay, equity, benefits, and other compensation.

53. As a further direct, foreseeable and proximate result of APPLE'S unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, mental anguish and embarrassment all to the Plaintiff's damage in an amount in excess of the minimum jurisdiction of this Court and according to proof.

54. As a further direct and proximate result of the APPLE'S unlawful actions, Plaintiff was required to and did seek medical attention, and will need medical attention in the future, all to Plaintiff's damages in a sum according to proof.

55. As a further direct and proximate result of APPLES'S unlawful actions, Plaintiff was forced to and did retain attorneys, and is accordingly entitled to an award of attorneys' fees and costs according to proof at the time of trial.

56. Defendants, and each of them, committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights or safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from the Employer Defendants in an amount according to proof. Plaintiff is informed and believes and thereon alleges that such conduct was taken by an officer, owner or managing agent of APPLE, or alternatively, authorized, ratified or approved by an officer, owner or managing agent of the Defendants.

### THIRD CAUSE OF ACTION

### CONSTRUCTIVE TERMINATION IN VIOLATION OF PUBLIC POLICY

### AGAINST ALL DEFENDANTS

Plaintiff incorporates by reference Paragraphs 1 through 39 of this Complaint as if fully set forth herein and for a cause of action alleges as follows:

57.     Jurisdiction is invoked in this court pursuant to the California Supreme Court case of **Tameny v. Atlantic Richfield Company (1980) 27 Cal. 3d 167** and **Rojo v. Kliger (1990) 52 Cal. 3d 65**.

58.     There is a fundamental and well-established public policy in this state against retaliating against an employee for engaging in protective activity, including but not limited to complaining about discrimination based on gender.

59.     APPLE and its managing agents treated female employees differently than they treated male employees in their work place.

60.     APPLE forced Plaintiff to resign for reasons that violate public policy.  It is a violation of public policy for an employer to subject an employee to heightened scrutiny because the employee supported and reported instances of gender discrimination experienced by female employees; to provide unwarranted performance evaluations simply designed to thwart the employee's efforts to find alternative positions with in the employer; to dissuade other employees from supporting employee in her efforts to find other employment.

61.     In furtherance of said objections, APPLE, its managing agents and its managers created and/or allowed the creation of a work environment for Plaintiff that was so abusive and intolerable that a reasonable employee in the position of Plaintiff would have had no alternative but to resign.  In other words, Plaintiff was subjected to constructive discharge.

62.     Plaintiff is informed and believes and thereon alleges that this cause of action is not preempted by the California Workers' Compensation Act on the grounds that employment discrimination on the basis of gender is not a risk of employment.  See, **Tameny v. Atlantic Richfield Company (1980) 27 Cal. 3d 167** and **Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083**.

63.     Because of the aforesaid constructive discharge, Plaintiff has suffered, and is continuing to suffer, losses of wages/salary, benefits and other employee compensation in an amount which is currently unascertained.  Plaintiff will therefore request leave of the court to amend this complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

**COMPLAINT FOR DAMAGES**

64. Plaintiff has been held up to great derision and embarrassment with fellow workers, colleagues in the industry, friends, members of the community and family, and continues to suffer emotional distress because Defendants, and each of them, demonstrated to Plaintiff that it would not accept or recognize her right to equal employment opportunities regardless of her gender. Defendants, and each of them, acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, emotional distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

65. Because of the wrongful acts of Defendants, and each of them, as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for her and will incur additional medical expenses in an amount to be proven at the time of trial.

66. Defendants, and each of them, acted or failed to act as herein alleged with a conscious disregard of its obligation not to discriminate against its female employees. APPLE, its officers and managing agents have knowingly retained, promoted, coddled and protected vicious employees known by its managing agents to be misogynist. The officers and managing agents of Defendants, and each of them, made a conscious decision that they would not comply with the public policy of this state prohibiting employment discrimination based on gender. This conduct by Defendants was, and is, despicable, cruel and oppressive. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### [AGAINST ALL DEFENDANTS]

Plaintiff incorporates by reference Paragraphs 1 through 39 of this Complaint as if fully set forth herein and for a cause of action alleges as follows:

67. By this cause of action Plaintiff seeks to recover damages to compensate her for the emotional distress caused by the Defendants' wrongful and unlawful conduct. Jurisdiction is invoked pursuant to **Rojo v. Klinger (1990) 52 Cal.3d 63**.

**COMPLAINT FOR DAMAGES**

1    68.    Defendants, and each of them, willfully and wantonly, and with full knowledge and

2    intent, harmed Plaintiff by its extreme and outrageous conduct as more fully set forth in the

3    preceding paragraphs of this Complaint. The extreme and outrageous conduct by the Defendants,

4    and each of them, included, but was not limited to:

5              a.    Using rude and aggressive language and tone to criticize her work;

6              b.    Micromanaging her;

7              c.    Unfair and unwarranted criticism of her work;

8              d.    Unfair and unwarranted fault-finding with her decisions;

9              e.    Threaten to place her on an Apple documented coaching plan.

10    69.    Defendants' actions were so extreme and outrageous that it exceeded the boundaries

11    of human decency and was beyond the pale of conduct tolerated in a civilized society. Plaintiff's

12    efforts to find another position within APPLE were thwarted, subverted, and eliminated by Mr.

13    West, when he exerted his considerable influence to dissuade Mr. Basanese from providing

14    Plaintiff a letter of recommendation.   Mr. West's conduct was intended to cause severe emotional

15    distress, or was done in reckless disregard of the probability of causing severe emotional distress.

16    70.    As a direct, actual and proximate result of the Defendants' wrongful conduct,

17    Plaintiff has suffered and continues to suffer loses in earnings, future earnings, bonuses, deferred

18    compensation, and other employment benefits, and has suffered and continues to suffer the

19    indignation of unlawful discrimination, deprivation of her right to full and equal employment

20    opportunities, as well as severe and continuous humiliation, emotional distress, and physical and

21    mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

22    71.    The Defendants committed the acts alleged herein maliciously, fraudulently, and

23    oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil

24    motive amounting to malice and in conscious disregard of Plaintiff's rights. Because the acts taken

25    toward Plaintiff were carried out by the Employer Defendants acting in deliberate, cold, callous,

26    and intentional manner in order to injure and damage Plaintiff, she is entitled to punitive damages

27    from the Employer Defendants, in an amount appropriate to punish and make an example of them.

28

**COMPLAINT FOR DAMAGES**

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CRYSTAL BROWN prays for judgment against Defendants, and each of them, as follows:

1. For damages for lost employment income and benefits, past and future, according to proof;

2. For general damages including for pain and suffering past and future according to proof;

3. For attorney's fees according to proof;

4. For costs of suit incurred herein;

5. For punitive damages;

6. For prejudgment interest as provided by law; and

7. For such other and further relief as the court deems just and proper.

Dated: June 19th, 2018

LAW OFFICES OF MAYOR JOSEPH L. ALIOTO & ANGELA ALIOTO

By: _____
ANGELA ALIOTO
Attorneys for Plaintiff, CRYSTAL BROWN

- 16 -

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury of all issues, except the issue of attorneys' fees and costs.

Dated:  June _19_, 2018

LAW OFFICES OF MAYOR JOSEPH L. ALIOTO
& ANGELA ALIOTO

By: _____
H. LARRY ELAM III
Attorneys for Plaintiff, CRYSTAL BROWN

1  JESSICA R. PERRY (STATE BAR NO. 209321)
   ANJALI PRASAD (STATE BAR NO. 318440)
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
3  Menlo Park, CA  94025-1015
   Telephone:    (650) 614-7400
4  Facsimile:    (650) 614-7401
   jperry@orrick.com
5  aprasad@orrick.com

6  Attorneys for Defendant
   APPLE INC.
7

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 8/15/2018 9:41 AM
Reviewed By: E. Fang
Case #18CV330796
Envelope: 1836668**

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF SANTA CLARA

10

11  CRYSTAL BROWN, an individual,          Case No. 18CV330796

12            Plaintiff,                   **DEFENDANT APPLE INC.'S ANSWER
                                           TO PLAINTIFF CRYSTAL BROWN'S
13       v.                                COMPLAINT**

14  APPLE INC., and Does 1 through 100,    Date Action Filed: June 28, 2018
    inclusive,
15
              Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to California Code of Civil Procedure Code Section 431.30, Defendant Apple Inc. hereby answers Plaintiff Crystal Brown's unverified Complaint as follows:

### GENERAL DENIAL

Pursuant to California Code of Civil Procedure section 431.30(d), Defendant generally denies each and every material allegation of the Complaint, including all causes of action therein. Defendant further denies that Plaintiff has suffered any injury or has been damaged in the manner and amount alleged, or in any manner or amount.

### AFFIRMATIVE DEFENSES

Without conceding that Defendant bears the burden of proof or persuasion as to any of them and reserving its rights to assert additional defenses if appropriate as more information is discovered, Defendant asserts the following separate defenses to the allegations set forth in the Complaint:

### FIRST AFFIRMATIVE DEFENSE

1.    As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that the Complaint, and each purported cause of action therein, fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

2.    As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that no conduct by or attributable to Defendant was either the cause in fact or the proximate cause of any injury or damages allegedly suffered by Plaintiff.

### THIRD AFFIRMATIVE DEFENSE

3.    As a separate defense to the Complaint to each cause of action therein, Defendant alleges that Plaintiff relinquished and waived any right to any of the claims upon which Plaintiff now seeks relief, and by her acts or omissions, is estopped from asserting any claims upon which Plaintiff now seeks relief.

### FOURTH AFFIRMATIVE DEFENSE

4.    As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that the claims of Plaintiff are barred by the applicable statute of limitations.

**FIFTH AFFIRMATIVE DEFENSE**

5.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that, should it be determined that Plaintiff has been damaged, then said damages were proximately caused by Plaintiff's own conduct.

**SIXTH AFFIRMATIVE DEFENSE**

6.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that any relief Plaintiff may be entitled to under that cause of action should be barred and/or limited by subsequently discovered evidence of misconduct by Plaintiff.

**SEVENTH AFFIRMATIVE DEFENSE**

7.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff has failed to comply with California Labor Code sections 2854, 2856, 2858 and 2859, respectively, to the extent that Plaintiff failed to use ordinary care and diligence in the performance of Plaintiff's duties, failed to substantially comply with the reasonable directions of Plaintiff's alleged employer, and failed to exercise a reasonable degree of skill in performing Plaintiff's job duties.

**EIGHTH AFFIRMATIVE DEFENSE**

8.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff's recovery in this action is barred by Plaintiff's failure to exercise reasonable care and diligence to mitigate Plaintiff's alleged damages.  Alternatively, Defendants allege that any recovery by Plaintiff should be reduced by those damages that Plaintiff failed to mitigate.

**NINTH AFFIRMATIVE DEFENSE**

9.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that any alleged action which Defendant took with respect to Plaintiff was privileged and justified and protected by the doctrine of business necessity.

**TENTH AFFIRMATIVE DEFENSE**

10.     As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff has failed to state facts sufficient to support an award of

compensatory, punitive, general, and/or other damages against Defendant

## ELEVENTH AFFIRMATIVE DEFENSE

11. As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that the Complaint fails to state facts sufficient to form a basis for Plaintiff's request for punitive damages, and any award of punitive damages in this case would violate the due process, equal protection and excessive fines provisions of the California and United States Constitutions.

## TWELFTH AFFIRMATIVE DEFENSE

12. As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff unreasonably delayed bringing this action to the prejudice of Defendant, and therefore the Complaint and each cause of action therein is barred by the doctrine of laches.

## THIRTEENTH AFFIRMATIVE DEFENSE

13. As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff, by Plaintiff's acts and omissions, may be barred by the doctrine of *in pari delicto* and unclean hands from asserting any of the claims upon which Plaintiff seeks relief, or in the alternative, these doctrines may cut off or reduce her alleged damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

14. As a separate defense to the Complaint and to each cause of action therein, Defendant alleges that Plaintiff is barred from any recovery because Defendant had in place and implemented, in good faith, policies, procedures and other measures that reasonably should have prevented the retaliation Plaintiff alleges and Plaintiff unreasonably failed to invoke those measures or take other corrective actions to stop the alleged retaliation.

## FIFTEENTH AFFIRMATIVE DEFENSE

15. As a separate defense to the Complaint and to each cause of action therein, Defendant alleges it cannot be liable for punitive damages because, at the time of the alleged acts or omissions giving rise to Plaintiff's claims for punitive damages, Defendant had implemented in good faith one or more policies prohibiting the alleged acts or omissions and/or had otherwise

- 3 -

made good faith efforts to comply with the applicable law.

### SIXTEENTH AFFIRMATIVE DEFENSE

16. As a separate defense to the Complaint, Plaintiff's claims are barred to the extent Plaintiff failed to exhaust her administrative remedies, to the extent Plaintiff failed to bring a timely claim, and to the extent Plaintiff failed to comply with prerequisites to suit.

### SEVENTEENTH AFFIRMATIVE DEFENSE

17. As a separate defense to the Complaint, Defendant alleges that the actions complained of were not based upon a retaliatory reason, but were based upon legitimate, non-retaliatory, job-related reasons.

### EIGHTEENTH AFFIRMATIVE DEFENSE

18. As a separate defense to the Complaint, Defendant alleges that, even if it is determined that a retaliatory reason motivated the adverse employment actions as alleged by Plaintiff, which Defendant denies, Defendant would have, in any event, taken the same actions based upon other legitimate, non-retaliatory reasons standing alone and in the absence of the alleged retaliatory reason.

### NINETEENTH AFFIRMATIVE DEFENSE

19. As a separate defense to the Complaint, Defendant alleges that Plaintiff was an at-will employee with no entitlement to continued employment pursuant to Cal. Labor Code § 2922.

### TWENTIETH AFFIRMATIVE DEFENSE

20. As a separate defense to the Complaint and as to each cause of action therein, Defendant alleges that to the extent Plaintiff seeks damages under California law for emotional and physical distress or injury, Plaintiff's exclusive remedy is provided by the Workers' Compensation Act, California Labor Code section 3600 *et seq*. Alternatively, Defendant alleges that it may be entitled to a set-off for any amounts paid to Plaintiff pursuant to the California Workers' Compensation Act.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

21. As a separate defense to the Complaint and to the fourth cause of action

- 4 -

therein, Defendant alleges that its conduct was not unreasonable, extreme or outrageous.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

22.   Defendant acted without malice, and in good faith and had reasonable grounds for believing its actions did not violate employment laws.

Defendant has insufficient knowledge or information on which to form a belief as to whether it has any additional, as yet unstated, defenses available. Defendant reserves the right to assert additional defenses in the event discovery indicates it would be appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Defendant prays that the Court grant the following relief:

1.   That the Complaint be dismissed with prejudice and that Plaintiff take nothing thereby;

2.   That judgment be entered in favor of Defendant as to all of the causes of action;

3.   That Defendant be awarded its attorneys' fees and costs of suit; and

4.   For such other and further relief as this Court may deem proper.

Dated: August 15, 2018                  ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
        JESSICA R. PERRY
        Attorneys for Defendant
        APPLE INC.

## PROOF OF SERVICE

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. On August 15, 2018, I served the following document(s):

- **DEFENDANT APPLE INC'S ANSWER TO PLAINTIFF CRYSTAL BROWN'S COMPLAINT**

on the interested parties in this action by placing true and correct copies thereof in sealed envelope(s) addressed as follows:

> Angela M. Alioto, Esq.
> Angela Mia Veronese, Esq.
> H. Larry Elam III, Esq.
> Law Offices of Joseph L. Alioto
> & Angela Alioto
> 700 Montgomery Street
> San Francisco, CA 94111

I am employed in the county from which the mailing occurred. On the date indicated above, I placed the sealed envelope(s) for collection and mailing at this firm's office business address indicated above. I am readily familiar with this firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the firm's correspondence would be deposited with the United States Postal Service on this same date with postage thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 15, 2018 at Menlo Park, California.

_____
Josette Romero

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
LAW OFFICES OF MAYOR JOSEPH L. ALIOTO & ANGELA ALIOTO
H. Larry Elam III (SBN 178836)
700 Montgomery Street, San Francisco, CA 94111
TELEPHONE NO.: (415) 434-8700    FAX NO. *(Optional)*: (415) 438-4638
E-MAIL ADDRESS *(Optional)*: lelam@aliotolawoffice.com
ATTORNEY FOR *(Name)*: Plaintiff CRYSTAL BROWN

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

PLAINTIFF/PETITIONER:   CRYSTAL BROWN

DEFENDANT/RESPONDENT:   APPLE, INC.

**FOR COURT USE ONLY**

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 3/5/2019 9:43 AM
Reviewed By: System System
Case #18CV330922
Envelope: 2586030**

| NOTICE OF SETTLEMENT OF ENTIRE CASE | CASE NUMBER: 18CV330796 |
| | JUDGE: Hon. Peter Kirwan |
| | DEPT.: 19 |

## NOTICE TO PLAINTIFF OR OTHER PARTY SEEKING RELIEF

You must file a request for dismissal of the entire case within 45 days after the date of the settlement if the settlement is **unconditional.** You must file a dismissal of the entire case within 45 days after the date specified in item 1b below if the settlement is **conditional.** Unless you file a dismissal within the required time or have shown good cause before the time for dismissal has expired why the case should not be dismissed, the court will dismiss the entire case.

**To the court, all parties, and any arbitrator or other court-connected ADR neutral involved in this case:**

1. This entire case has been settled.  The settlement is:
   a. ☐ **Unconditional.** A request for dismissal of the entire case will be filed within 45 days after the date of the settlement.
      Date of settlement:
   b. ☑ **Conditional.** The settlement agreement conditions dismissal of this matter on the satisfactory completion of specified terms that are not to be performed within 45 days of the date of the settlement.  A request for dismissal will be filed no later than *(date)*: 04/30/19

2. Date initial pleading filed: 06/28/18

3. Next scheduled hearing or conference:
   a. Purpose: Further Case Management Conference
   b. ☑ (1) Date: 03/12/19
      (2) Time: 10:00 a.m.
      (3) Department: 19

4. Trial date:
   a. ☑ No trial date set.
   b. ☐ (1) Date:
      (2) Time:
      (3) Department:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: 03/04/2019

H. LARRY ELAM III
_____
(TYPE OR PRINT NAME OF  ☑ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

▶ _____
(SIGNATURE)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-200 [Rev. January 1, 2007]

**NOTICE OF SETTLEMENT OF ENTIRE CASE**

Cal. Rules of Court, rule 3.1385
*www.courtinfo.ca.gov*

| | CASE NUMBER: |
|---|---|
| PLAINTIFF/PETITIONER: CRYSTAL BROWN | |
| DEFENDANT/RESPONDENT: APPLE, INC. | 18CV330796 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF SETTLEMENT OF ENTIRE CASE

*(NOTE: You cannot serve the Notice of Settlement of Entire Case if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

   700 Montgomery Street, San Francisco, CA 94111

2. I served a copy of the *Notice of Settlement of Entire Case* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☑ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Settlement of Entire Case* was mailed:

   a. on *(date):* 03/05/19

   b. from *(city and state):* San Francisco, California

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   Jessica Perry, Esq./Orrick Herrington
   Street address: 1000 Marsh Road
   City: Menlo Park
   State and zip code: CA 94025

   c. Name of person served:
   Street address:
   City:
   State and zip code:

   b. Name of person served:
   Street address:
   City:
   State and zip code:

   d. Name of person served:
   Street address:
   City:
   State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached _____.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 03/05/19

DEBORAH JAMES
(TYPE OR PRINT NAME OF DECLARANT)

*Deborah James*
(SIGNATURE OF DECLARANT)

System System
**CM-200**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
LAW OFFICES OF MAYOR JOSEPH L. ALIOTO & ANGELA ALIOTO
H. Larry Elam III (SBN 178836)
700 Montgomery Street, San Francisco, CA 94111
TELEPHONE NO.: (415) 434-8700  FAX NO. *(Optional):* (415) 438-4638
E-MAIL ADDRESS *(Optional):* lelam@aliotolawoffice.com
ATTORNEY FOR *(Name):* Plaintiff CRYSTAL BROWN

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

PLAINTIFF/PETITIONER:  CRYSTAL BROWN

DEFENDANT/RESPONDENT:  APPLE, INC.

**NOTICE OF SETTLEMENT OF ENTIRE CASE**

FOR COURT USE ONLY
**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 3/5/2019 9:43 AM
Reviewed By: System System
Case #18CV330922
Envelope: 2586030**

CASE NUMBER:
18CV330796
JUDGE: Hon. Peter Kirwan
DEPT.: 19

---

**NOTICE TO PLAINTIFF OR OTHER PARTY SEEKING RELIEF**
You must file a request for dismissal of the entire case within 45 days after the date of the settlement if the settlement is **unconditional.** You must file a dismissal of the entire case within 45 days after the date specified in item 1b below if the settlement is **conditional.** Unless you file a dismissal within the required time or have shown good cause before the time for dismissal has expired why the case should not be dismissed, the court will dismiss the entire case.

**To the court, all parties, and any arbitrator or other court-connected ADR neutral involved in this case:**

1. This entire case has been settled.  The settlement is:
   a. ☐ **Unconditional.** A request for dismissal of the entire case will be filed within 45 days after the date of the settlement.
      Date of settlement:
   b. ☑ **Conditional.** The settlement agreement conditions dismissal of this matter on the satisfactory completion of specified terms that are not to be performed within 45 days of the date of the settlement.  A request for dismissal will be filed no later than *(date):* 04/30/19

2. Date initial pleading filed:  06/28/18

3. Next scheduled hearing or conference:
   a. Purpose:  Further Case Management Conference
   b. ☑ (1) Date: 03/12/19
      (2) Time: 10:00 a.m.
      (3) Department: 19

4. Trial date:
   a. ☑ No trial date set.
   b. ☐ (1) Date:
      (2) Time:
      (3) Department:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: 03/04/2019

H. LARRY ELAM III
(TYPE OR PRINT NAME OF  ☑ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

► _____
(SIGNATURE)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-200 [Rev. January 1, 2007]

**NOTICE OF SETTLEMENT OF ENTIRE CASE**

Cal. Rules of Court, rule 3.1385
*www.courtinfo.ca.gov*

| PLAINTIFF/PETITIONER: CRYSTAL BROWN | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: APPLE, INC. | 18CV330796 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF SETTLEMENT OF ENTIRE CASE

*(NOTE: You cannot serve the Notice of Settlement of Entire Case if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

    700 Montgomery Street, San Francisco, CA 94111

2. I served a copy of the *Notice of Settlement of Entire Case* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

    a. ☐ deposited the sealed envelope with the United States Postal Service.

    b. ☑ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Settlement of Entire Case* was mailed:

    a. on *(date):* 03/05/19

    b. from *(city and state):* San Francisco, California

4. The envelope was addressed and mailed as follows:

    a. Name of person served:
    Jessica Perry, Esq./Orrick Herrington
    Street address: 1000 Marsh Road
    City: Menlo Park
    State and zip code: CA 94025

    c. Name of person served:
    Street address:
    City:
    State and zip code:

    b. Name of person served:
    Street address:
    City:
    State and zip code:

    d. Name of person served:
    Street address:
    City:
    State and zip code:

    ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached _____.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 03/05/19

DEBORAH JAMES
(TYPE OR PRINT NAME OF DECLARANT)

*Deborah James*
(SIGNATURE OF DECLARANT)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jessica Perry (SBN: 209321); Anjali Prasad Vadillo (SBN: 318440) <br> ORRICK HERRINGTON & SUTCLIFFE LLP-1000 Marsh Rd, Menlo Park, CA 94025 <br> TELEPHONE NO.: (650) 614-7400    FAX NO.: (650) 614-7401 <br> E-MAIL ADDRESS: jperry@orrick.com; avadillo@orrick.com <br> ATTORNEY FOR *(Name):* Defendant Apple Inc. | System System <br><br> **Electronically Filed <br> by Superior Court of CA, <br> County of Santa Clara, <br> on 4/24/2019 3:57 PM <br> Reviewed By: System System <br> Case #18CV330796 <br> Envelope: 2800374** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS: same as above
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

PLAINTIFF/PETITIONER: Crystal Brown

DEFENDANT/RESPONDENT: Apple Inc., et al.

| NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE <br> ☐ **Personal Injury, Property Damage, or Wrongful Death** <br> ☐ **Motor Vehicle**  ☐ **Other** <br> ☐ **Family Law** <br> ☐ **Eminent Domain** <br> ☑ **Other** *(specify):* Employment | CASE NUMBER: <br><br> 18CV330796 |

**TO ATTORNEYS AND PARTIES WITHOUT ATTORNEYS:** A dismissal was entered in this action by the clerk as shown on the *Request for Dismissal. (Attach a copy completed by the clerk.)*

Date: 4/24/2019

Anjali Prasad Vadillo

| (TYPE OR PRINT NAME OF  ☑ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY) | ▶ (SIGNATURE) |
|---|---|

## PROOF OF SERVICE

1. I am over the age of 18 and not a party to this cause. My residence or business address is:
   1000 Marsh Road, Menlo Park, CA 94025

2. ☑ I am a resident of or employed in the county where the mailing occurred. I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by mailing them, in a sealed envelope with postage fully prepaid, as follows:
   a. ☐ I deposited the envelope with the United States Postal Service.
   b. ☑ I placed the envelope for collection and processing for mailing following this business's ordinary practice with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.
   c. Date of deposit: 4/24/2019      d. Place of deposit *(city and state):* Menlo Park, CA
   e. Addressed as follows *(name and address):*
      H. Larry Elam III - 700 Montgomery Street, San Francisco, CA 94111

3. ☐ I served a copy of the *Notice of Entry of Dismissal and Request for Dismissal* by personally delivering copies as shown below:
   a. Name of person served:
   b. Address at which person served:
   c. On *(date):*      d. At *(time):*

4. ☐ I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by electronically serving copies as shown below *(complete if electronic service is used based on a court order or agreement of the parties):*
   a. Name of person served:
   b. Electronic service address of person served:
   c. On *(date):*      d. At *(time):*
   e. Electronic service address from which I served the documents:
      ☐ Proof of electronic service is attached.

5. ☐ Proof of service on additional parties is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 4/24/2019

Josette Romero

| (TYPE OR PRINT NAME) | ▶ (SIGNATURE OF DECLARANT) | Page 1 of 1 |
|---|---|---|

Form Adopted for Mandatory Use
Judicial Council of California
CIV-120 [Rev. January 1, 2012]

**NOTICE OF ENTRY OF DISMISSAL
AND PROOF OF SERVICE**

Code of Civil Procedure, § 581 et seq.;
Cal. Rules of Court, rule 3.1390
www.courts.ca.gov

A. Floresca

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO. 178836 | FOR COURT USE ONLY |
|---|---|---|

NAME: H. Larry Elam III
FIRM NAME: LAW OFFICES OF MAYOR JOSEPH L. ALIOTO & ANGELA ALIOTO
STREET ADDRESS: 700 Montgomery Street
CITY: San Francisco    STATE: CA    ZIP CODE: 94111
TELEPHONE NO.: (415) 434-8700    FAX NO.: (415) 438-4638
E-MAIL ADDRESS: lelam@aliotolawoffice.com
ATTORNEY FOR (Name): Plaintiff CRYSTAL BROWN

**FOR COURT USE ONLY**

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/12/2019 9:02 AM
Reviewed By: A. Floresca
Case #18CV330796
Envelope: 2750609**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

Plaintiff/Petitioner: CRYSTAL BROWN
Defendant/Respondent: APPLE, INC.

/s/ A. Floresca

| REQUEST FOR DISMISSAL | CASE NUMBER: 18CV330796 |
|---|---|

A conformed copy will not be returned by the clerk unless a method of return is provided with the document.

This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [X] With prejudice    (2) [ ] Without prejudice
   b. (1) [X] Complaint    (2) [ ] Petition
      (3) [ ] Cross-complaint filed by (name):    on (date):
      (4) [ ] Cross-complaint filed by (name):    on (date):
      (5) [X] Entire action of all parties and all causes of action
      (6) [X] Other (specify):* mutual waiver of attorneys' fees and costs.

2. (Complete in all cases except family law cases.)
   The court [ ] did [X] did not waive court fees and costs for a party in this case. (This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed.)

Date: March    , 2019
H. LARRY ELAM III
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

(SIGNATURE)
Attorney or party without attorney for:
[X] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
Date:

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

(SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross Complainant

(To be completed by clerk)

4. [X] Dismissal entered as requested on (date): 4/12/2019 9:02 AM
5. [ ] Dismissal entered on (date):    as to only (name):
6. [ ] Dismissal **not entered** as requested for the following reasons (specify):

4/12/2019 9:02 AM

7. a. [ ] Attorney or party without attorney notified on (date):
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
      [ ] a copy to be conformed    [ ] means to return conformed copy

/s/ A. Floresca
**Clerk of Court**

Date: 4/12/2019 9:02 AM    Clerk, by _____, Deputy    Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.; Gov. Code,
§ 68637(c); Cal. Rules of Court, rule 3.1350
www.courts.ca.gov

| Plaintiff/Petitioner: CRYSTAL BROWN | CASE NUMBER: |
|---|---|
| Defendant/Respondent: APPLE, INC. | 18CV330796 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is *(check one below):*

   a. ☐ not recovering anything of value by this action.

   b. ☐ recovering less than $10,000 in value by this action.

   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one):*   Yes   No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date:

_____

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)

▶ _____

(SIGNATURE)