**EXHIBIT A**

**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ASHLEY GJOVIK, *an individual*, <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC, *a corporation*, <br><br> Defendant. | **Case No. 3:23-cv-04597-EMC** <br><br> **Filed**: September 7 2023 <br><br> **District Judge**: Honorable Edward Chen <br><br> **SECOND AMENDED COMPLAINT WITH EXHIBITS** <br><br> **PLAINTIFF'S CLAIMS** |

**PLAINTIFF'S CLAIMS**

1. **Sarbanes-Oxley Act Whistleblower,** 18 U.S.C. §1514A
2. **Dodd-Frank Act Whistleblower,** 15 U.S.C. §78u-6(h)(1)(A)(iii)
3. **Bane Civil Rights Act,** Cal. Civ Code § 52.1
4. **Ralph Civil Rights Act,** Cal. Civ Code § 51.7
5. **Racketeer Influenced & Corrupt Organizations Act,** 18 U.S.C. §§ 1962(a), (c), (d)
6. **Ultrahazardous Activities**
7. **Whistleblower Protection Act,** Cal. Labor Code § 1102.5
8. **Retaliation for Filing Complaints,** Cal. Labor Code § 98.6
9. **Retaliation for Safety Activities,** Cal. Labor Code §§ 6310
10. **Termination in Violation of Public Policy**
11. **Private Nuisance; Per Se Nuisance** Cal. Civil Code § 3479
12. **Intentional & Negligent Infliction of Emotional Distress**

## DEMAND FOR JURY TRIAL

1

# I.   TABLE OF CONTENTS

I.     TABLE OF CONTENTS ................................................................................................2

II.    SUMMARY .................................................................................................................6

III.   JURISDICTION ..........................................................................................................8

IV.    VENUE .....................................................................................................................10

V.     PARTIES ..................................................................................................................10

VI.    NOTICE OF PENDENCY & CONFLICT OF LAWS ...............................................11

VII.   FACTS & GENERAL ALLEGATIONS ....................................................................13

    A.   BACKGROUND ON KEY LOCATIONS AND PEOPLE ..........................................................13

        i.     Ronald Sugar, Apple Board Member; ex-TRW Executive; ex-Northrop Grumman CEO .........................14

        ii.    The Triple Superfund Site & TRW Microwave Superfund sites at 825 Stewart Drive, Sunnyvale California ...........17

        iii.   Lisa Jackson, Apple Vice President of Government Affairs and Lobbying; ex-US EPA Administrator ..................31

        iv.    Apple's Secret Semiconductor Fabrication at 3250 Scott Blvd, Santa Clara California ...............................32

        v.     Apple's Personal Data Collection and Surveillance of Employees (Panopticon) .....................................34

    B.   ASHLEY'S APPLE SAGA ......................................................................................................37

        i.     Gjovik Joins Apple; Team Bullies & Bribes Her; Gjovik is Retaliated Against for trying to Investigate Batterygate (2015-2016) ............................37

        ii.    Gjovik is Assigned to Work at an Apple office on the "Triple Superfund Site"; Apple Invades Gjovik's Privacy & Fights to Increase e-Waste (2017) ..................52

        iii.   Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior; Gjovik Faints (2019-2020) .....62

        iv.    Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020)......67

        v.     "Skipping the Line": The Vaccine Hoarding Incident (2020)........................................................78

        vi.    The TRW Microwave Superfund Site Debacle (2021) ..............................................................81

        vii.   Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021)..................................90

        viii.  Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive Intensify (April 2021-June 2021) ..........................101

        ix.    Apple's Retaliation Against Gjovik Intensifies (May-June 2021)...................................................107

        x.     Trouble with the US Government Sanctions Against Syria (2020-21) ...............................................129

        xi.    US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021) ............................131

        xii.   Apple Torments Gjovik; US EPA Inspection! Apple Prepares to Fire Gjovik (August 2021) .............................151

        xiii.  Apple Intimidates & Threatens Gjovik; Tries to Force Her onto a WebEx Meeting (September 3 2021)...............202

        xiv.   The Day Apple Fired Gjovik (September 9 2021) ..................................................................212

        xv.    Apple Increases Intimidation and Retaliation (September 2021) ...................................................224

        xvi.   Gjovik Files More Charges; EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021) ..................246

        xvii.  Gag Orders & Missing" Documents" (February-March 2022) ......................................................270

        xviii. Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be Sent to Jail if She Defends Herself (March 2022) 274

        xix.   Gjovik Discovers the August 19 2021 Inspection (May 2022) .....................................................289

        xx.    Gjovik Discovers the Secret Silicon Fabrication Plant; Apple Commits More Felonies (February 2023)............311

        xxi.   After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023). ..................325

VIII. LEGAL CLAIMS ....................................................................................................329

    A.   SECURITIES FRAUD WHISTLEBLOWER RETALIATION .......................................................332

        i.     Sarbanes-Oxley (SOX) Whistleblower Retaliation (18 U.S.C. § 1514A) ...........................................333

        ii.    Dodd Frank Whistleblower Retaliation (15 USC §78u-6(h)(1)(A)(iii)) ...........................................336

        iii.   Disclosure Controls and Procedures (SOX and Dodd Frank) ....................................................339

            1)     Employee Risk Disclosures ...............................................................................342

2) Environmental & Safety Risk Disclosures ........................................................ 344
3) Wire Fraud, Mail Fraud, Shareholder Fraud, Communications (SOX and Dodd Frank) .................... 352
 iv. *Conflicts of Interest (SOX & Dodd Frank)* ............................................................. 353
  1) "Conflict of Interest" Generally ................................................................ 360
  2) Interested Party Transactions (Cal. Corps. Code § 310) ................................ 361
  3) Related Party Transaction............................................................................ 362
  4) Real Estate Settlement Procedures Act (RESPA) ....................................... 364
 v. *OFAC Sanctions (Dodd-Frank; 22 U.S. Code § 8792)* .............................................. 365
 vi. *Skipping the Line & Vaccine Hoarding (Dodd-Frank; US DOJ NCDF)* ........................... 368
**B.** **BANE AND RALPH CIVIL RIGHTS ACTS (CAL. CIV. CODE § 52.1, §52.7) ..........................370**
 i. *Bane Civil Rights Act (Cal. Civ. Code § 52.1)*.......................................................... 371
 ii. *Ralph Civil Rights Act (Cal. Civ. Code §51.7)* .......................................................... 383
 iii. *Acts of Violence and Threats of Violence (Bane § 52.1 & Ralph § 52.7)*............................ 387
 iv. *Intimidation & Coercion (Bane, § 52.1)* ............................................................... 393
**C.** **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962. ..........394**
 i. *Standing & Pleading* ................................................................................. 395
 ii. *Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)*............................................ 397
 iii. *Creation, Nature, and Operation of the Enterprise*...................................................... 399
 iv. *Pattern; Vertical and Horizontal Relatedness of Predicate Acts* .................................... 403
 v. *The Schemes*........................................................................................... 412
 vi. *Predicate Acts/Threats Involving Certain State Offenses* ............................................ 418
  1) Criminal Bribery of Executive Officer (Cal. Penal Code § 67) ...................... 418
  1) Criminal Commercial Bribery (Cal. Penal Code § 641.3) ............................ 421
  2) Criminal Extortion (California Penal Code § 518)......................................... 422
 vii. *Predicate Acts Indictable Under Title 18 US Code* ................................................... 426
 viii. *Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)* ............................................ 427
  1) Fraud: Environmental and Safety Practices............................................... 428
  2) Fraud: Privacy............................................................................... 438
  3) Fraud: Compliance and Ethics ............................................................ 443
 i. *Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)* ....................... 448
  1) Use of Force or the Threat of the Use of Force to Prevent the Production of Evidence ........... 450
  2) Use of Deception or Corruption or Intimidation to Prevent the Production of Evidence .......... 454
  3) Destruction or Concealment of Evidence or Attempts to Do So............................ 460
  4) Witness Harassment to Prevent the Production of Evidence ........................ 462
 ii. *Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513)* .................... 469
  1) Retaliation and Conspiracy to Retaliate Against Witness for Providing Testimony and Evidence ......... 472
  2) Retaliation & Conspiracy to Retaliate Against Witness for Reporting Federal Offenses.................... 475
 iii. *Predicate Acts Indictable Under Title 11 USC (Securities)* ........................................ 475
  1) Securities Fraud (15 USC § 78)............................................................ 475
 i. *Predicate Acts Indictable Under §2332(b)(g)(5)(B)*.................................................. 477
  1) Relating to Chemical Weapons (18 USC § 229) ....................................... 477
 ii. *Injury in Fact to Plaintiff due to Racketeering Act* .................................................... 488
 iii. *Continuity & Threat to Continue* ....................................................................... 492
**D.** **TORT: ULTRAHAZARDOUS / ABNORMALLY DANGEROUS ACTIVITIES......................................492**
 i. *Silicon Fabrication Next to Homes*..................................................................... 496
 ii. *Superfund Site Mega-Plumes with Complete Pathways for Vapor Intrusion*.......................... 502
**E.** **RETALIATION UNDER CALIFORNIA LABOR CODE ..................................................507**
 i. *California Whistleblower Protection Act: Cal. Labor Code §1102.5* .................................. 508
  1) §1102.5: Reporting Unlawful Labor/Employment Conduct ........................ 509
  2) §1102.5: Reporting Environmental & Safety Violations ............................ 511
  3) §1102.5: Refusal to Participate in Unlawful Conduct ................................ 515
 ii. *Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6.* ................................. 521
  1) Filing a Labor Complaint: § 98.6 ......................................................... 522
  2) §98.6: Retaliation re: Wages: Cal. Labor Code §232................................ 523
  3) §98.6: Retaliation re: Work Conditions: Cal. Labor Code §232.5................ 523
  4) §98.6: Lawful Off-Duty Conduct: Cal. Labor Code § 96(k).......................... 526
 iii. *Retaliation for Safety Complaints: Cal. Labor Code § 6310*.......................................... 529
  1) § 6310: Employee Exposure to Chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal.Code.Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]................................ 531

2)   §6310: COVID-19 Safety & Communication [Cal.Labor.C. §§ 6325; 6409.6, 6432] ...................................... 537
3)   §6310: Wildfire Smoke [Cal.C.Reg. Title 8, § 5141.1].......................................................................................... 537
4)   §6310: Injury Reporting [8 Cal.C.Reg. § 14300] .................................................................................................. 539
5)   §6310: Retaliation for Complaining about e-Waste Violations ............................................................................ 540
6)   §6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7] ........................................................................... 541
7)   §6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)] ....................................................................................... 541
8)   §6310:  Federal Environmental Statutes. ................................................................................................................ 543
9)   §6310: Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9] ............................................................................... 545
10)  6310: Unfair Business Practices & False Advertising [Cal. Bus. & Prof. Code §§ 17200, 17500]................... 548

**F.   WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)................................................549**

i.    *Tamney: Reporting Allegations of Criminal Conduct to Apple, Law Enforcement, and District Attorneys*........... 551
ii.   *Tamney: Reporting Allegations of Unlawful Acts to State and Federal Agencies; Testifying About Employer*...... 553
iii.  *Tamney: Testifying to Agency and/or Legislative Committee* ............................................................................ 554
iv.   *Tamney: Discrimination, Harassment, and Retaliation due to Sex and Disability (Cal. FEHA; California Constitution, Article I, Section 8; Title VII/EEOC)*.............................................................................................. 555
v.    *Tamney: Victim of Crime; Apple's Concealment* ............................................................................................. 558
vi.   *Tamney: Invasion of Privacy (Cal. Const. art. 1, § 1)*...................................................................................... 559
vii.  *Tamney: California Privacy Rights Act* ........................................................................................................... 564
viii. *The International Covenant on Civil and Political Rights (OHCHR): Article VII, Free Consent*........................ 566
ix.   *Tamney: FTC Act Biometric Consent Rules; Cal. Biz. & Pro. Code §§ 17200; Biometric Privacy Guide Posts* ... 570
x.    *Tamney: Protests about Misuse of ADA Procedures and Medical Clinics; Protest of Employee Health Data Collection.* ............................................................................................................................................................. 576
xi.   *Foley/Banko: Breach of Implied Contract: Good Cause Required* ...................................................................... 578

**G.   NUISANCE ...............................................................................................................................................................581**

i.    *Nuisance (Cal. Civil Code § 3479)* ................................................................................................................... 581
ii.   *Factories, Hazardous Waste, & Air Pollution* ................................................................................................. 583
iii.  *Nuisance Per Se / Absolute Nuisance* ............................................................................................................... 586
iv.   *Continuing Nuisance* ......................................................................................................................................... 587
v.    *Enforcement* ....................................................................................................................................................... 588

**H.   INFLICTION OF EMOTIONAL DISTRESS .........................................................................................................588**

i.    *Retaliation & Interrogation* .............................................................................................................................. 589
ii.   *Burglary, Surveillance, Threats, and Stalking* ................................................................................................. 593
iii.  *False Police Reports* .......................................................................................................................................... 594
iv.   *Surveillance / Gobbling* .................................................................................................................................... 595
v.    *Exposure & Concealment* ................................................................................................................................. 596
vi.   *Fear of Cancer.* .................................................................................................................................................. 597
vii.  *Deranged Gag-Order.* ....................................................................................................................................... 598
viii. *Gjovik's Injuries.* ............................................................................................................................................... 600
ix.   *Eggshell / Target.* .............................................................................................................................................. 603

**I.   ADVERSE/NEGATIVE EVENTS GENERALLY .....................................................................................................604**

i.    *2021-01 Hostile Work Environment* .................................................................................................................. 605
ii.   *2021-4: Constructive Discharge* ....................................................................................................................... 606
iii.  *2021-07: Increase in Unfavorable Work / Reassignment / Fake Investigations / Misleading Statements*............... 609
iv.   *2021-08: "Removed from the Workplace and all Workplace Interactions"*..................................................... 610
v.    *2021-09-09: Interrogation* ................................................................................................................................ 614
vi.   *2021-09-09 Termination* .................................................................................................................................... 618
vii.  *2021-2023: Digital Threats & Harassment* ....................................................................................................... 618
viii. *2021-2023: Coworker Harassment; Retaliatory Lawsuits & Police Reports* ..................................................... 619

**J.   RETALIATION PRETEXT GENERALLY .............................................................................................................622**

i.    *Reasonableness & Credibility*............................................................................................................................ 623
ii.   *Temporal Proximity* ........................................................................................................................................... 625
iii.  *There is No Defense of Ignorance* ..................................................................................................................... 625
iv.   *Post Hoc Rationalizations.* ................................................................................................................................ 628
v.    *Shifting Explanations* ........................................................................................................................................ 630
vi.   *Evidence of Forbidden Animus* ......................................................................................................................... 631
vii.  *Unlawful Corporate Interrogation of Employee Whistleblower (Cotran)* ......................................................... 632
viii. *"Failure to Participate in Investigation"* .......................................................................................................... 634

4

ix.     Arbitrary and Capricious; Apple's Actions with Gjovik were Contrary to Corporate Policies and Interests......... 635
x.      Apple Stalks and Surveils any Public Commentary about the Company........................... 638
xi.     Great Performance & No Discipline Prior to Complaints ................................. 639
xii.    Apple's Concealment of What they did to Gjovik. ..................................... 639
xiii.   Farfetched and Illogical Narratives ............................................... 641

IX.    DEMAND FOR RELIEF ....................................................... 647

   A.    SPECIAL REMEDIES ........................................................ 651
      i.      Exemplary/Punitive Damages ............................................. 651
      ii.     Medical Monitoring ................................................... 653
      iii.    Special Damages .................................................... 654
      iv.     Injunctive Relief .................................................. 655
      v.      Physical Injuries and Sickness .......................................... 656
      vi.     Declaratory Relief & Nominal Damages .................................... 657

X.     PRAYER FOR RELIEF ...................................................... 658

XI.    CERTIFICATION AND CLOSING .............................................. 660

XII.   APPENDIX I: SUMMARY OF PARTIES /  PLACES ............................... 661

XIII.  APPENDIX III: SUMMARY OF FALSE STATEMENTS ............................. 1

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

## II.   SUMMARY

1.     This complaint details a complex regulatory-compliance-avoidance scheme conducted by Apple Inc ("Defendant"), ==through a criminal enterprise,== which prior-Apple-employee Ashley Gjovik ("Plaintiff") became caught up in after she complained about toxic waste exposure at her Triple Superfund site Apple office; and in response to her concerns, Apple threatened Gjovik not tell anyone about the pollution, dramatically increased her workload with unfavorable work, refused to let her transfer to a new team, agitated her management against her, demanded she work in an unsafe office, and told her she can 'just quit' if she doesn't like it. Then Gjovik reported Apple to federal agencies and law enforcement, leading to US EPA informing Apple they are investigating Gjovik's concerns and will come on site to inspect, so Apple decided to physically remove Gjovik from the scene of their apparent environmental crimes in order to prevent Gjovik from gathering of evidence. ==Gjovik was terminated the day before a federal affidavit about Apple's unlawful acts, shortly after complaining about "*witness intimidation*" from a "*Workplace Violence*" interrogator.==

2.     Gjovik later realized it was all an effort to cover up intentional regulatory violations under at least three federal environmental statutes, w==hich also implicated racketeering and securities fraud concerns,== and to cover up over five years of Apple's poisoning of a large community by lawlessly releasing metric tons of solvent vapors and lethal gases into thousands of home windows and making some of the residents severely ill, including Gjovik.

3.     Gjovik's termination was proceeded by nearly seven years of a hostile work environment and then was followed with over two years of deranged intimidation, public corruption, and threats to coerce Gjovik to drop her charges. Gjovik files this complaint against Apple, Gjovik's prior employer. ==Gjovik first attempted to pursue claims through agencies, but two years after those claims were filed, there still has not been any final decisions on Gjovik's==

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

retaliation complaints other than a finding in Gjovik's favor in her unemployment insurance appeal. The US Department of Labor's statutory deadline to make a decision was February 10 2022 and their case metrics are abysmal, providing Gjovik a 0.00048% chance of success for a decision in her favor for her charge under three statutes.[1] The NLRB's case metrics position Gjovik's NLRB charges against Apple in the top 1% of aged charges overdue for a decision on merit. Thus, due to uncertainty with the government charges, Gjovik files this civil complaint prior to her civil two-year statute of limitations on September 9 2023. Gjovik is "kicking out" her California Department of Labor cases and US Department of Labor SOX whistleblower retaliation charge from the respective agencies and consolidates those matters with her other civil claims here.

4.     A Racketeer Influenced and Corrupt Organizations ("RICO") Act case is appropriate and required here because Apple's threats and retaliation against Gjovik, and conspiracy to conceal its corrupt and unlawful acts, violated federal criminal statutes for which there is no other appropriate private civil action. Apple's retaliation against Gjovik was partially due to Gjovik reporting Apple to the FBI, U.S. Department of Justice, and Santa Clara County District Attorney's office for multiple apparent criminal acts, and Gjovik's public accusations that Apple is actively violating the RICO Act – all of which Apple knew prior to Apple's abrupt termination of Gjovik by an Apple Global Security team/Worldwide Loyalty enterprise "Workplace Violence" investigator and without explanation.[2] This is quite literally a *RICO Act Whistleblower*" case.

---

[1] US DOL Case Metrics, FY2017-FY2022: Decision of Merit found, OSH Act 0.8%, SOX 2% env 3%. https://web.archive.org/web/20230316203012/https://www.whistleblowers.gov/factsheets_page/statistics/FY2022
[2] Gjovik complained to Apple about Apple violating RICO on August 21 2021, then posted that complaint on social media noting: "*One issue I'm raising to them is literally RICO,*" and then "@"ed the US Depart of Labor. https://twitter.com/ashleygjovik/status/1429174603713191936

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

5.      In lieu of the US District Attorney's office deciding to pursue a criminal case against Apple, (which hopefully USC still may occur at some point), Gjovik's only path to seek holistic justice for the extensive harm she suffered due to Apple's egregious conduct is a RICO lawsuit. RICO also enables Gjovik to admit evidence to show that Apple's actions towards Gjovik were part of a larger scheme, and to reflect the Russian-nesting-doll structure of Apple's tortious operations, as part of their systemic statutory civil violations, as part of their egregious ongoing criminal schemes.[3] It is all related.

## III.   JURISDICTION

6.      This court has both Subject Matter and Diversity jurisdiction over these claims. The District Courts of the United States have original and exclusive jurisdiction over two of the claims in this case: whistleblower retaliation under SARBANES OXLEY ACT [18 U.S.C. §1514A] and DODD-FRANK ACT [15 USC §78u-6(h)(1)(A)(iii). This US District Court has federal question jurisdiction over "*all civil actions arising under the Constitution, laws, or treaties of the United States,*" [28 U.S.C. § 1331], which provides original jurisdiction over many issues in this case including claims of federal RICO with Predicate Acts under US Code Title 15 and Title 18;[4] and interpretation of agency complaints under CERCLA [42 U.S.C. § 9601], the RESOURCE CONSERVATION AND RECOVERY ACT  ("RCRA") [42 U.S.C. §6901], the CLEAN AIR ACT [42 U.S.C. §7401],[5] complaints related to US CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC") and FOOD AND DRUG ADMINISTRATION ("FDA") programs;[6] legal questions related to

---

[3] It is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants developed or to explain the mutual trust that existed between co-conspirators. See, *United States v Rosa,* 11 F.3d 315, 334 (2nd Cir. 1993); *United States v Williams,* 205 F.3d 23, 33-34 (2d Cir. 2000).
[4] 18 U.S.C. § 1965; *Tafflin v. Levitt,* 493 U.S. 455 (1990); *Butchers' Union Local 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538-39 (9th Cir. 1986).
[5] Gjovik's U.S. EPA CERCLA Complaint: August 29, 2021; US EPA RCRA/CAA Complaint: June 12 2023, June 20 2023 Investigation, August ~17 2023 Inspection
[6] Gjovik's U.S. DOJ National Center for Disease Fraud (NCDF) Complaint: Sept 3, 2021

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

US FEDERAL TRADE COMMISSION ("FTC") rules;[7] and issues related to US government sanctions on foreign countries.[8]

7.    The District Courts of the United States also have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. At the time the complaint was filed, Plaintiff was domiciled in New York, and is now domiciled in Massachusetts. Defendant is a corporation headquartered in California.

8.    Despite the inconvenience for the Plaintiff (who will request remote/video hearings, please), this case is proper in California instead of New York or Massachusetts because it requires analysis of California Labor and Penal Codes, California common law related to employee terminations in violation of public policy (*Tamney* claims), CALIFORNIA CONST. ART. 1 and California employee's constitutional right to privacy, the Santa Clara County "Toxic Gas" ordinances, and other state laws.

9.    The federal courts have an independent basis for federal jurisdiction on this case; thus, they may also exercise supplemental jurisdiction because the claims arise from the same case and controversy, share a common nucleus of operative fact, and would ordinarily be expected to be tried in one judicial proceeding.[9] The state claims here require analysis of many of the same facts and legal questions as the federal claims, including: the retaliatory termination, other whistleblower retaliation, filing of complaints with the employer and with the government, environmental and health/safety concerns, threats and intimidation, hazardous materials and hazardous waste practices, chemical exposure, and obstruction of justice.[10] If the state causes of

---

[7] Gjovik's FTC Report #154835129;
[8] Gjovik's U.S. DOJ FBI Complaint: Sept 3, 2021
[9] 28 U.S.C. § 1367; *Osborn v. Haley*, 549 U.S. 225, 245 (2007).
[10] California Department of Labor: *Ashley Gjovik v. Apple Inc.*, (RCI-CM-842830)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

action in this complaint were tried separately, there would be duplicative trials concurrently holding hearings on many of the same facts and legal questions.

## IV.  VENUE

10.     Venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district and a substantial amount of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California.

11.     **Divisional Assignment**: Plaintiff files this complaint to the San Francisco Division, however either the San Jose or San Francisco Division are proper as a substantial part of the events and omissions giving rise to the claim both occurred in Santa Clara County (Santa Clara city, Cupertino, and Sunnyvale) and in San Francisco County (San Francisco city). Apple conducts day-to-day commercial activities within both counties. Apple has engaged in substantial, continuous, and systemic activities within both counties, providing for a fair and reasonable basis for the exercise of personal jurisdiction over Apple by this Court in either division. [Civil L.R. 3-5(b)].

## V.  PARTIES

12.     Ashley Gjovik (pronounced "JOE-vik"), Plaintiff, was an employee of Apple Inc and covered person under applicable statutes in this complaint. Gjovik is a natural person holding a Juris Doctor and appearing Pro Se. As of September 7 2022, Gjovik resided and was domiciled in Albany New York. Gjovik lived in Santa Clara from February 2020 through October 2020, and then again August 2021 through August 2022. Gjovik lived and worked in San Francisco County from October 2020 through August 2021. Gjovik established a consulting LLC in California in 2022 which she continues to manage with a virtual office in Sacramento. Gjovik has over twenty years of professional experience and has worked for universities/schools and in the private sector for well-known companies, including working nearly a decade at Nike

10

and Apple. Gjovik has a Project Management Professional certification, Certificate in Public International law with honors, and successfully passed the California Moral Character exam.

13. Apple Inc, Defendant, is a business engaged in and affecting interstate commerce, and a covered entity under the statutes at issue here. Apple is a corporation headquartered in Cupertino California. Apple is engaged in interstate and foreign commerce; and has offices, retail stores, call centers, data centers, and other facilities in numerous US states and foreign countries. Apple's business consists of "*design, manufacture, and marketing*" of products (phones, computers, wearables, home technology, accessories) and sales of "*a variety of related services*" (advertising, AppleCare, cloud services, digital content, payment services).[11] Apple says, it's "*customers are primarily in the consumer, small and mid-sized business, education, enterprise and government markets.*"[12] In 2023, Apple claimed net sales of $383.3 billion ($162.6 billion in the United States) and net income of $97.0 billion.[13]

14. At all pertinent times Apple was the operator in control of the facilities at 825 Stewart Drive in Sunnyvale California and 3250 Scott Boulevard in Santa Clara California.

## VI.  NOTICE OF PENDENCY & CONFLICT OF LAWS

15. Gjovik's SOX whistleblower retaliation claim was filed August 29 2021, and the case was docketed with US Department of Labor on December 12 2021.[14] SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims.

---

[11] Apple Inc, 2023 10K, pg1-2, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[12] Id.
[13] Id.
[14] *Ashley Gjovik v Apple Inc,* Apple Inc./Gjovik/9-3290-22-051; OSHA 11(c) Procedures: 29 CFR Part 1977, EPA Procedures: 29 CFR Part 24, SOX Procedures: 29 CFR Part 1980

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

16.     Gjovik was forced to leave her CERCLA ("Superfund") and OSH Act whistleblower retaliation cases with US Department of Labor as the claim's exclusive jurisdiction is with US Department of Labor and there is no way to remove the two charges to US district courts for a de novo trial. The status of those charges was described in first amended complaint's RICO Predicate Act "*Criminal Extortion*," and the agencies additional misconduct since the prior filing is reflected in the facts and allegations in this complaint. A request for consideration of OSHA's OSH Act determination (a discretionary and non-binding agency determination) will be submitted shortly with US Department of Labor OSHA, and Gjovik plans to file her request for a de novo hearing within the US Department of Labor agency adjudication process on her CERCLA retaliation charge with the 30-day period provided by OSHA on December 8 2023.

17.     Gjovik filed retaliation and labor code violation charges to the California Department of Labor on August 29 2021, and the initial interview was conducted in October 2021. California Department of Labor has not started the investigation of Gjovik's California case and the statutes allow an option for the complainant to take the matter to a court instead waiting on an agency decision. This lawsuit will replace the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830.

18.     NLRB charges cannot be removed to court as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. Gjovik is a witness for the NLRB and some of the 18 US Code §§ 1512 and 1513 Predicate Acts in this complaint were part of a scheme to keep Gjovik from testifying or providing evidence, and to coerce her to withdraw and drop her NLRB charges. This civil case will hopefully relieve the witness intimidation and retaliation Gjovik has suffered from Apple.

19.      None of the charges in this complaint are preempted by the NLRA. The NLRA cannot preclude a federal RICO claim where a RICO Predicate Act arises from conduct that also violates that federal statute, as then that conduct is also a federal and/or state crime.[15]

20.      Similarly, the state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.[16]  The 9th Circuit found, *"there is no clear and manifest intent on the part of Congress to pre-empt all state tort laws that traditionally have been available to those persons who … allege outrageous conduct at the hands of an employer. That would require us to conclude that Congress has displaced not only state tort law … but also state criminal law, to the extent that such criminal law is applied to retaliatory conduct."*[17]

## VII.   FACTS & GENERAL ALLEGATIONS

### A.   BACKGROUND ON KEY LOCATIONS AND PEOPLE

21.      Prior to Gjovik being terminated by Apple – Gjovik alleged to Apple, the government, and the public/press – that she believed there was a large conspiracy underway (including Apple, certain people at Apple, and external parties) working together to cover-up violations of environmental, labor, securities, and anti-corruption laws – as well as violations of state and federal criminal laws, including fraud and various types of obstruction of justice. This was an extreme allegation, but at the time Gjovik felt confident there was enough circumstantial evidence to support the claim and she requested an investigation.

22.      It took two years of Gjovik's FOIA / Public Records Requests Act requests and investigative research, but, as detailed through this complaint, Gjovik eventually obtained evidence to confirm her allegations were substantiated and that the actual conduct was far worse

---

[15] *Torres v. Vitale*, 954 F.3d 866, 874-75 (6th Cir. 2020).
[16] *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).
[17] *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1154-55 (9th Cir. 2000); *Torres v. Vitale,* 954 F.3d 866, 871 (6th Cir. 2020).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                     DECEMBER 21 2023

then she expected. Meanwhile, Apple has persistently insisted it did nothing wrong, belligerently claimed there were never any safety issues, and instead Gjovik's concerns were 'unreasonable'. Apple has also attempted to divert attention away from the larger issues and instead frame this dispute as a 'simple employment matter.' Because of this attempted misdirection, and because the credibility of the employee and employer are both often key factors in whistleblower retaliation and witness intimidation claims, the historical background to support Gjovik's allegations is detailed here, prior to reviewing the chronological timeline of events for the case.

        i.       **Ronald Sugar, Apple Board Member; ex-TRW Executive; ex-Northrop Grumman CEO**

23.     Gjovik's SOX, Dodd-Frank Act, RICO, and other claims include allegations about Ronald Sugar and his relationship to Apple, Chevron, TRW Microwave, and Northrop Grumman.

24.     In 2010, Ronald Sugar joined the Apple Board of Directors as a Board member and chair of Apple's Audit and Finance committee, after retiring from his role as CEO of Northrop Grumman Corporation the same year. Sugar was also the lead independent director for the Chevron Board from 2005.[18] Apple's website says under the header of "*Who leads environmental efforts at Apple?*" that, "*Apple's Board of Directors oversees the CEO and other senior management in the competent and ethical operation of Apple on a day-to-day basis and ensures that the long-term interests of shareholders are being served. Our integrated approach means that decisions about environmental and social issues are reviewed at the highest levels of the company.*"[19]

---

[18] Apple, "*Ronald D. Sugar Joins Apple's Board of Directors*". November 17, 2010, https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/
[19] Apple, *Environment – Answers*, (last accessed 12/17/23), https://www.apple.com/environment/answers/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC          DECEMBER 21 2023

25.     By 2014, Robert Denham was also a Chevron Board Member, and an Oaktree Capital Board member (an investment fund who would buy and renovate Gjovik's Superfund office), and a Board member of the James Irvine Foundation (and The Irvine Company would rent to Gjovik when she was exposed to Apple's silicon fabrication exhaust, and also developed homes on the groundwater plume flowing from Apple office on the TRW Microwave Superfund site).[20] In 2015, a federated union, ITF, submitted a shareholder letter to Chevron, complaining that Sugar and Denham, specifically, have problematic conflicts of interest, are not making required disclosures, and are engaging in apparent self-dealing.[21]

26.     Prior to joining Northrop Grumman, Sugar was a long-time executive of TRW. Ronald Sugar joined TRW in 1981 working on "microwave technology."[22] Sugar became President and COO of "TRW Aerospace and Information Systems" in 1999 and CEO of Northrop Grumman Corporation in 2003 after the company acquired TRW.[23] Sugar worked for twelve years at TRW Microwave while the division had a headquarters at 825 Stewart Drive in Sunnyvale California (with Sugar's work overlapping from 1981 through 1993). Microwave manufacturing and fabrication activities had begun at the 825 Stewart Drive site in 1968 and continued until 1993; and hazardous waste environmental remediation activities began at 825 Stewart Drive in 1985.[24] There were also

---

[20] Chevron Schedule 14A, Proxy, https://chevroncorp.gcs-web.com/node/19621/html
[21] ITF, Please WITHHOLD Support from Nominating Committee Chair Robert Denham and Audit Committee Chair Ronald Sugar at Chevron's Annual Meeting on May 26 2015, https://www.itfglobal.org/sites/default/files/resources-files/15en0420smcsentchevronshareholderswithholdnominations.pdf
[22] Little Sis, *Robert Denham*, https://littlesis.org/person/1050-Robert_E_Denham
[23] *Industry Week Manufacturing Hall of Fame 2013 Inductee: Ronald D. Sugar*, Nov 5 2013, https://www.industryweek.com/iw-manufacturing-hall-of-fame/article/21961725/iw-manufacturing-hall-of-fame-2013-inductee-ronald-d-sugar
[24] California Regional Water Quality Control Board San Francisco Bay Region, *Five-Year Review Former TRW Microwave Site 825 Stewart Drive*, https://semspub.epa.gov/work/HQ/178958.pdf

15

radioactive substances onsite starting in at least 1983, with NRC records showing orders/deliveries of Promethium-147, Thallium-204, Cadmium-109, and Strontium-90.[25]

27.     It's improbable that Ronald Sugar was not personally involved in TRW Microwaves use and disposal of industrial hazardous materials at Gjovik's office, or not personally involved in the environmental clean-up of spills/dumping of those chemicals at Gjovik's office.

28.     While Sugar was still CEO of Northrop Grumman, in 2009 the company settled a whistleblower's fraud lawsuit over TRW dealings that resulted in a settlement of $325 million.[26] TRW and Northrop Grumman have faced, and settled/lost, many fraud lawsuits and government charges.[27] TRW sometimes responded in an adversarial manner, including filing a "meritless" countersuit against a whistleblower prior to eventually settling for $111 million in 2003,[28] – and settled another lawsuit for $80 million that same year.[29] (Ronald Sugar was the CEO of Northrop Grumman from 2003-2010).

29.     Ronald Sugar has also been the lead Board member for the Chevron Board of Directors for the entirety of Chevron's retaliation campaign against the human rights attorney Steven Donziger, after Donziger won a class-action lawsuit in 2011, against Chevron, over Chevron/Texaco spilling over 16,000,000,000 gallons of crude oil in Ecuador.[30] Chevron

---

[25] State of California, Department of Health Services, Temporary Registration GL Devices, Letter from R. Kimball EH&S Coordinator at TRW Microwave to California DIR Radiation Health Unit (Aug 24 1983), https://adamswebsearch2.nrc.gov/webSearch2/main.jsp?AccessionNumber=ML20202A974
[26] New York Times, *Military Contractor Agrees to Pay $325 Million to Settle Whistle-Blower Lawsuit*, April 3 2009, https://www.nytimes.com/2009/04/03/business/03whistle.html
[27] New York Times, *TRW Lawsuit*, June 21 1986, https://www.nytimes.com/1986/06/21/business/trw-lawsuit.html -- ("*The military contractor TRW Inc., the subject of a $1.2 billion price-fixing lawsuit, improperly charged the Defense Department for work… company audits show.*")
[28] U.S. ex.rel. Richard D. Bagley v. TRW Inc., No. CV-95-4153-AHM (AKWx).
[29] US DOJ, Northrop Grumman To Pay $80 Million For Overcharging The U.S. And Selling Defective Military Equipment To The Navy, Aug 20 2003.
[30] Erin Brockovich, *This lawyer should be world-famous for his battle with Chevron – but he's in jail*, The Guardian, Feb. 8 2022, https://www.theguardian.com/commentisfree/2022/feb/08/chevron-amazon-ecuador-steven-donziger-erin-brockovich -- ("*a US attorney who agreed to represent thousands of Ecuadorian villagers in a [environmental] lawsuit against [Chevron/Texaco] has lost his law license, income, spent hundreds of days under house arrest in New York, and in 2021 was sentenced to six months in prison…Texaco/Chevron did not dispute that pollution occurred, and  freely admits that large sludge*

1    recently admitted to having spent over $1 Billion on litigation against the human rights lawyer.[31]

2    Chevron even orchestrated criminal charges against the human rights lawyer resulting in his

3    incarceration, as Apple also attempted to do to Gjovik in 2022-2023, though Apple's attempts

4    have failed thus far.

5        30.    In January 2017, Ronald Sugar, Apple Board Member was interviewed about

6    what his biggest challenges were as CEO of Northrop Grumman Corporation. Sugar said he

7    worried about: whistleblowers. Sugar said he worried about "*someone talking to the Wall Street

8    Journal… Someone filing whistleblower suits about something they imagine might've happening

9    in the organization. You worry about that.*"[32]

10

11        ii.    **The Triple Superfund Site & TRW Microwave Superfund sites at 825**

12               **Stewart Drive, Sunnyvale California**

13        31.    Gjovik's Apple office from 2017 until her termination was located at 825 Stewart

14   Drive in Sunnyvale California, also known as the "TRW Microwave" Superfund site, and part of the

15   US EPA "Triple Site."

16        32.    The *"Triple Site"* is the collective name for three adjacent [Superfund] sites in

17   Sunnyvale that have jointly contributed to a groundwater solvent plume.[33]  The US EPA

18   webpage for Triple Site states that, "*a groundwater plume composed of volatile organic

19   compounds (VOCs), including TCE, extends from these [three Superfund] sites more than a*

---

*pits still dot the Amazon'…*[prior to the retaliation, a court found against Chevron/Texaco and] *ordered it to pay $18bn in damages – the largest judgment ever awarded in an environmental lawsuit.' ); Donziger v US,* 598 U. S. _____ (2023), (Justice Gorsuch and Justice Kavanaugh dissenting: "*Our Constitution does not tolerate what happened here.*")
[31] Sarah Randazzo, *Litigation Without End: Chevron Battles On in 28-Year-old Ecuador Lawsuit*, Wall Street Journal, https://www.wsj.com/articles/litigation-without-end-chevron-battles-on-in-28-year-old-ecuador-lawsuit-11619975500
[32] UCLA School of Engineering, via YouTube, The Ronald and Valerie Sugar Distinguished Speaker Series Featuring Ronald Sugar Live Stream, quote at 47:18-49:08
[33] US EPA, *Triple Site Site Profile - Background,* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0900265#bkground

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*mile.*[34] In addition, the *"Offsite Operable Unit"* is roughly a one-hundred acre area where shallow groundwater contamination from TRW Microwave, and the other two sites, has migrated to, and which "*includes four schools and over 1,000 residences.*"[35]

33.     One of the three sites is the "TRW Microwave" Superfund site (EPA ID CAD009159088) which is a former industrial semiconductor fabrication and manufacturing facility at 825 Stewart Drive.[36] The primary contaminants in the TRW Microwave groundwater contamination plume are chlorinated volatile organic compounds including trichloroethene (TCE), and its daughter products cis-1,2-dichloroethene and vinyl chloride.[37] There are 10 Contaminants of Concern in total.

34.     The first groundwater investigation at 825 Stewart Drive occurred in 1983 in response to state EPA inquiries and a state clean up order was issued in 1984 (Order No. 91-103).[38] The TRW Microwave site at 825 Stewart Drive was proposed for the National Priorities List on June 24 1988, officially included on February 21 1990, and a Record of Decision was issued in September 11 1991.[39] In 2002, TRW merged with Northrop Grumman and changed its name to Northrop Grumman Space & Mission Systems Corp.[40] The building at 825 Stewart Drive was unoccupied from January 2001 through October 2015, when Apple moved Gjovik's team into the building.[41]

---

[34] US EPA, Triple Site Site Profile – Background, supra.
[35] US EPA, Triple Site Site Profile – Background, supra; Offsite Operable Unit, Triple Site, Administrative Settlement Agreement and Order on Consent, CERCLA Docket Number 2019-05
[36] AECOM for Northrop Grumman, Development Of The Environmental Sequence Stratigraphy (ESS) Conceptual Site Model For Groundwater At The Former TRW Microwave Site, Sunnyvale, California, pg3, (December 16 2020), https://semspub.epa.gov/work/09/100027767.pdf
[37] Id at 3.
[38] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf
[39] AECOM for Northrop Grumman, Conceptual Site Model Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, California, pg2, US EPA, (April 19 2016).
[40] Id at 3.
[41] Id at 3.

18

35. The site has numerous hydro-stratigraphic units within four plume zones.[42] The shallowest zone (Zone A) is only 2.6 feet to 9.4 feet below the ground surface and as of 2021, TCE concentrations were up to 95 μg/L and vinyl chloride up to 27 μg/L.[43] The second shallowed zone (Zone B1) is 22 feet to 46 feet below ground surface, and as of 2021, had concentrations of TCE up to 1,400 μg/L and vinyl chloride up to 51 μg/L.[44] Northrop Grumman conducted an initial vapor intrusion evaluation at the TRW Microwave site in 2004, which indicated that TCE concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels.[45]

36. In 2014, the US EPA and US Army Corp of Engineers warned that "*the risk [at 825 Stewart Drive] due to vapor intrusion is controlled as long as the building remains underlined{unoccupied, and the exposure pathway remains incomplete. However, in order for the remedy to be protective in the long-term, the ROD will need to be amended to reflect a revised final soil and groundwater remedy for the Site since the remedy selected in the [Record of Decision] is no longer operating.*"[46] The US EPA determined in 2015 that the conditions at the Triple Site may constitute an imminent and substantial endangerment to the public health or welfare.[47]

37. In 2013 and 2014, the city of Sunnyvale received nuisance complaints about 825 Stewart Drive, including complaints about graffiti on the abandoned building (i.e., "PCP", "I LIKE TO F[***] THE HOMELESS", etc.) as well as people using the building's bike locker

---

[42] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" slide 16, (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf
[43] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page 3-4, (September 18 2019).
[44] Id.
[45] Id at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA, March 17 2022, https://semspub.epa.gov/work/09/100027769.pdf
[46] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page15, (September 18 2019).
[47] *In The Matter of: Offsite Operable Unit, Triple Site, Sunnyvale, California,* CERCLA Docket No 2019-05, Administrative Settlement Agreement & Order on Consent for removal Site Evaluation and Removal Action, Page 7 (2019).

19

1    *as an outhouse."* (#2013-0228).[48] The city then issued additional warnings in 2014 citing

2    Nuisance under Sunnyvale Municipal Code 9.26.030 (#2014-1970) for overgrown foliage.[49]

3         38.    In May 2014, Oaktree Capital and Hines purchased 825 Stewart Drive (with the

4    14-year+ vacant, abandoned, TCE-filled office building), for $12 Million.[50] (At this time

5    Oaktree Capital's Robert Denham was on the Chevron board with Ronald Sugar, who had left

6    Northrop Grumman only four years prior but still remained an "Advisor" for the arms dealer).[51]

7    Under information and belief, Ronald Sugar brokered the sale of 825 Stewart Drive to Oaktree

8    Capital and the lease of 825 Stewart Drive to Apple, exploiting his position on the Chevron and

9    Apple Boards, and in the interests of Northrop Grumman Corporation, and for his personal

10   interest. Sugar has allegiance to Northrop Grumman through his longtime position as chief

11   executive, and through large active stock holdings, but Sugar also has personal ties to the site to

12   this location through TRW, and it's entirely possible Sugar was involved with matters related to

13   the pollution, clean-up, and legal matters related to 825 Stewart Drive while he worked at TRW

14   Microwave. Sugar may want to limit Northrop Grumman's financial and public relations

15   exposure to the dangers at the site, and/or his own interests, by having "friendly" owners and

16   tenants.

17        39.    In May 2015, Northrop Grumman completed the installation of a "sub-slab"

18   ventilation system ("SSV") inside the building. (The "slab" refers to the concrete foundation,

19   and "sub-slab" is under the "slab.") Northrop Grumman installed a ventilation system

20   (horizontal "collection pipes") beneath the slab foundation, which allow vapors to move

---

[48] City of Sunnyvale, Public Record: Complaint 2013-0228 (four photos attached)
[49] Letter from Sunnyvale Department of Public Safety, Case #2014-1970
[50] Nathan Donato-Weinstein, *Hines, Oaktree scoop up Sunnyvale office building for $12M*, Silicon Valley Business Journal, May 19 20214, https://www.bizjournals.com/sanjose/news/2014/05/19/hines-oaktree-scoop-up-sunnyvale-office-building.html
[51] Felix Salmon, "Uber Is Not Serious About Changing Its Toxic Culture," Slate, August 2 2018 – ("Ronald Sugar, a 70-year-old white man who made his fortune as an arms dealer… the former CEO of Northrop Grumman.. a position that requires… the ability to be OK with making billions of dollars even as your products maim and kill hundreds of thousands of people around the world.")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

laterally, and connected the collection pipes to vertical vent risers that vent to the roof, in order to provide a preferred pathway for hazardous waste vapors "that allow sub-slab contaminant vapors to discharge to the atmosphere."[52] The risers vent to the rooftop via wind-powered turbines at the vent termination point.[53]  This type of mitigation system is referred to as "passive" (compared to "active" and "depressurization") and is not as effective as other options and not ideal when there's known vapor intrusion occurring.[54] Northrop Grumman left multiple "sub-slab monitoring ports" inside, which allowed access to the "collection pipes" from above ground for diagnostic testing and sample collection.[55] Northrop Grumman then hired a professional engineer to inspect and certify the sealing of the floor cracks and conduits at 825 Stewart Drive. (the slab is the primary mitigation to prevent vapor intrusion in this building).

      40.    In the second half of 2015, Apple also then renovated the building. Apple's installation of the HVAC system for the building in late 2015 included Apple sawing the sub-slab vent stacks, on the main building roof, down from three feet to one foot, and then installing the HVAC intake in close proximity to the sub-slab vapor exhaust vents, and low to the ground where the vapors would be pooling on the roof, nearly guaranteeing re-entrainment of the hazardous waste vapors into the HVAC system. Apple also installed tall 'fencing' around all of this, which prevented the wind from moving the pooling air away from the HVAC intake vents, and preventing the wind from spinning the vent turbines. Apple's activities introduced a significant risk for re-entrainment of the effluent vapors into the building.

---

[52] San Francisco Bay Regional Water Board, *Vapor Intrusion Mitigation Guidance*, Pg 10 (June 2022).
[53] San Francisco Bay Regional Water Board, *Vapor Intrusion Mitigation Guidance*, Pg 21 (June 2022).
[54] ITRC, *Vapor Intrusion Pathway: A Practical Guideline*, Pg 48, (2007), https://semspub.epa.gov/work/01/533755.pdf
[55] San Francisco Bay Regional Water Board, *Vapor Intrusion Mitigation Guidance*, Pg 10 (June 2022).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC          DECEMBER 21 2023

41.    The industry standard for stack design is to ensure the stacks place the vent at least 10 feet above the rooftop.[56] The National Fire Protection Association specifies minimum stack height of 10 ft to protect rooftop workers. For laboratory exhaust, the American Industrial Hygiene Association recommends minimum stack height of 10 feet above adjacent roof line, and stack height extending one stack diameter above any screen.[57] (Compare to Apple's 1 foot).



*Exhibit: Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

---

[56] OSHA Technical Manual (OTM), Section III: Chapter 3, *Ventilation Investigation* ("Should be 10 ft higher than any roof line or air intake located within 50 ft of the stack (Figure III:3-8). For example, a stack placed 30 ft away from an air intake should be at least 10 ft higher than the center of the intake.") https://www.osha.gov/otm/section-3-health-hazards/chapter-3

[57] ANSI/AIHA Z9.5 ("Be in a vertical up direction at a minimum of 10 feet above the adjacent roof line as so located with respect to opening and air intakes of the laboratory or adjacent buildings to avoid re-entry.")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



**Exhibit**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Exhaust Diagram from ASHRAE Handbook[58]*

42.     Apple penetrated the slab (concrete floor) of the building at 825 Stewart Drive in late 2015. US EPA records note that *"tenant improvements performed in late 2015… included… penetration and subsequent re-sealing of the concrete slab for installation of additional piping and utilities."*[59] Apple claims only AECOM inspected the floor prior to penetration and after sealing.[60] Under information and belief, Apple never engaged an independent professional engineer for inspection and certification as Northrop Grumman did in May 2015.

43.     In May 2015, vapor intrusion testing at 825 Stewart Drive showed indoor air pollution of Trichloroethylene (TCE), 1,2-Dichloroethene (1,2-DCE), Toluene, Chloroform, Methylene Chloride, and Ethylbenzene. The testing also showed outdoor air contamination on

---

[58] 2019 ASHRAE Handbook—HVAC Applications, BUILDING AIR INTAKE AND EXHAUST DESIGN, pg 46.2, https://www.ashrae.org/file%20library/technical%20resources/ashrae%20handbook/i-p_a19_ch46.pdf

[59] AECOM for Apple, *Vapor Intrusion Evaluation Report, Former TRW Microwave Site, 825 Stewart Drive Sunnyvale, California,* US EPA SEMS-RM DOCID # 1158560 (February 2016), https://semspub.epa.gov/work/09/1158560.pdf

[60] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

the roof, possibly coming through the sub-slab vents. The rooftop air pollution included TCE, 1,2-DCE, Chloroform, and Xylenes.[61]

44.     Appl e (not Northrop Grumman) managed, signed off on, and submitted the report to the US EPA for the December 2015 vapor intrusion testing at 825 Stewart Drive. The vapor intrusion testing report cover page says "*prepared for Apple Inc.*" by AECOM.[62] Apple's December 2015 vapor intrusion testing results showed an increase in sub-slab and indoor air pollution compared to the May 2015 results.[63] For instance, while the highest indoor air TCE reading in May 2015 was 0.58 µg/m³, the highest indoor air TCE reading in December 2015 was 1.2 µg/m³ (double). Another example, in the May 2015 test results, no indoor air results exceeded US EPA or California DTSC HERO limits; the December 2015 results, however, included results for Ethylbenzene which exceeded both US EPA and DTSC HERO limits.[64] Even Apple's report noted a "noticeable increase" of TCE, PCE, and chloroform in the sub-slat venting system.[65]

45.     Apple submitted the test result report to US EPA in February 2016.  The report noted a number of issues that occurred during testing including inability to turn the HVAC off in one area of the building, unexpected construction work during the testing, moving an indoor air testing location to a different area not in a "secure" lockdown (implying Apple already had employees working in the building), and testing unplanned sub-slab monitoring ports (which are directly connected to the vapor intrusion ventilation system) because the two indoor planned that were planned to be tested were "compromised" (SS-7) and "could not be located" (SS-11).[66]

---

[61] US EPA, TRW Microwave, Site Documents, Vapor Intrusion, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC
[62] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra.
[63] US EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[64] Id at pages 26-25.
[65] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg11.
[66] Id at pg4-5.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

46.     Both rounds of resting in 2015 were for only ten hours. Indoor air sampling for vapor intrusion contaminants is usually conducted for a duration of 24 hours, and eight hours is the bare minimum and requires proper justification.[67] On March 2 2016, the US EPA "approved" Apple's December 2015 test results, however, the US EPA actually re-approved the May 2015 results and did not respond to the December 2015 testing.  In 2016, US EPA (Melanie Morash) wrote about the December 2015 results in her approval letter: "*cf the five indoor air samples collected, the highest level of trichloroethene (TCE) detected was 0.58 micrograms per cubic meter (ug/m³).*"[68] [However, this was the May 2015 data].

47.     Under information and belief, if the US EPA had reviewed the December 2015 test results, they may not have approved the results and/or may have said the building was not safe for occupation by workers. In the alternative, US EPA did review the December 2015 report but instead of denying it, they intentionally repeated the May 2015 results as a favor to Apple.

48.     Apple's February 2016 report stated that "*if building conditions change in the future where the sub-slab foundation is affected and/or other VI conduits are created, then an additional monitoring event will be performed utilizing the same sampling methodology*."[69] Apple's methodology for the 2015 testing included using 6-liter Summa canisters configured for a ten hour sample and TO-15 panel, and collecting multiple indoor air samples, multiple sub-slab port samples, and rooftop outdoor air samples.[70] [Gjovik and Apple would fight about this later, with Apple insisting on using inferior week-long passive sorbent-based testing in 2021, after notifying Gjovik that the slab was compromised, and Gjovik insisting Apple align with the prior workplan and also notify US EPA, but Apple refusing. Later, the US EPA would order Apple to essentially do what Gjovik said.]

---

[67] US EPA, Engineering Issue Indoor Air Vapor Intrusion Mitigation Approaches, Pg38 (2008),
[68] US EPA, TRW Microwave, *EPA Approves Feb 2016 VI report,*
https://semspub.epa.gov/work/09/1158558.pdf
[69] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg14.
[70] Id at 8-9.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

49. n 2016, Oaktree Capital and Hines sold 825 Stewart Drive to CalSTRS via GI Partners while Apple was a tenant. The US EPA transmitted a letter to CalSTRS/GI Partners instructing them about their obligations under CERCLA. The letter stated: "The new Prospective Purchaser and **any tenants** will cooperate with EPA and Northrop by providing reasonable access to the Property for operations maintenance and monitoring of the indoor air and vapor intrusion control systems, groundwater monitoring, as well as any other current and future remedial activities, monitoring and implementation of institutional controls."[71]

> EPA understands that the new Prospective Purchaser intends to allow for the use of the Property as technology office space/research and development.  The new Prospective Purchaser and any tenants will cooperate with EPA and Northrop by providing reasonable access to the Property for operations maintenance and monitoring of the indoor air and vapor intrusion control systems, groundwater monitoring, as well as any other current and future remedial activities, monitoring and implementation of institutional controls.

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS about 825 Stewart Drive, 2016*

50. The US EPA letter explained that in order for the new owner to qualify as a Bonafide Prospective Purchaser (BFPP) under CERCLA, they "must take reasonable steps" with respect to stopping continuing releases, preventing threatened future releases, and preventing or limiting human, environmental, or natural resources exposure to earlier releases."  Based on US EPA's analysis of TRW Microwave site data, the US EPA provided eight steps which *"should be taken by the Prospective Purchaser during its ownership with respect to the contamination at the Property*."[72] These included,

- "2. Cooperation by providing reasonable access to the Property to EPA… for operation, maintenance and monitoring of the vapor intrusion mitigation system,"

---

[71] US EPA to GI DC Sunnyvale LLC, "Status of Property and Prospective Purchaser's Reasonable Steps, 825 Stewart Drive, Sunnyvale, Santa Clara County, California, TRW Microwave Site Operable Unit of the "Triple Site", SEMS-RM DOCID #1160217 (May 18 2016), pg2, https://semspub.epa.gov/work/09/1160217.pdf
[72] US EPA to GI DC Sunnyvale LLC, "Status of Property and Prospective Purchaser's Reasonable Steps," supra, pg3

27

- "5. A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, **without the prior approval of EPA**,"

- "6. Where prior approval is required in Step #5 above, **submit to EPA for review and approval a plan,** and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system,"

- "8. Cooperation with implementation of institutional controls at the Property to the extent required by EPA."[73]

The letter was signed by John Lyons, the Acting Assistant Director of Superfund Site Cleanups at the US EPA.

51.    When Gjovik requested FOIA documents from US EPA about their discussion with Apple about Gjovik's office following Gjovik's disclosures, an internal EPA email chain about Apple's activities at the building included a copy of this document with items #5 and #6 highlighted by US EPA – as well several other emails/documents discussing Apple and CERCLA obligations.

> 5.    A prohibition on building construction, renovation or other modification activities that may affect the integrity of the concrete slab or affect the integrity of the sub-slab vapor mitigation system, without the prior approval of EPA;
>
> 6.    Where prior approval is required in Step #5 above, submit to EPA for review and approval a plan, and then implement such plan, to mitigate any potential preferential pathways for subsurface vapors to enter into the building as a result of such afore-referenced activities, and make any repairs necessary to ensure continued effective operation of the sub-slab vapor mitigation system;

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS about 825 Stewart Drive, 2016, pt2*

---

[73] Id at pg3-4.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

*Exhibit: Excerpt of Letter from EPA to GI Partners/CalSTRS, US EPA Highlighted Version, FOIA,2022*

52.    Under information and belief, CalSTRS did share this letter and these requirements with Apple upon taking ownership of the property and the leasehold with Apple. Even if CalSTRS did not, Apple's head of Government Affairs, Lisa Jackson, was a prior US EPA administrator, who also spent years managing Superfund sites – and Apple's General Counsel, Katherine Adams, was a trial attorney for the United States Department of Justice's Environment and Natural Resources division prior to overseeing CERCLA and RCRA compliance for 14 years as Honeywell ("*a notorious polluter, and carried the largest Superfund liability of any corporation in the country*").[74] Apple fully understood its CERCLA obligations.

53.    Under information and belief, Apple's penetration of the slab and botched HVAC renovations in 2015 were never disclosed to CalSTRS, a state government agency, thus defrauding the California government.

54.    In 2019, the US EPA and US Army Corp of Engineers warned that TCE concentrations in the outdoor air of the Triple Site have been increasing and exceeding health and safety thresholds.[75]  In 2018 and 2019, TCE levels of up to 3.6 $\mu$g/m³ were identified in the

[74] ALI, *Kate Adams*, https://www.ali.org/members/member/440807/;Duke Law, *Convocation 2023: Kate Adams tells graduating students to savor the moment*, May 15 2023, https://magazine.law.duke.edu/convocation-fall-2023/

[75] US Army Corps of Engineers for the US EPA, Fifth Five-Year Review Report for Advanced Micro Devices 901/902 And TRW Microwave Superfund Sites, page27, (September 18 2019).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

outdoor air.[76] (Note: 3 µg/m of TCE in indoor air from vapor intrusion is unacceptable for commercial buildings).



*Exhibit: TCE in the Outdoor Air of the Triple Site, 2019* [77]

55.   In 2020, Northrop Grumman described the Triple Site and TRW Microwave site to the US EPA saying,

"The Triple Site plume in the Santa Clara Valley represents a classic example of a '*complex contaminated groundwater*' site" …. Despite more than three decades of intense characterization and remediation efforts, including nearly four decades of groundwater pump and treat system operation from multiple locations across the plume since 1982, significant uncertainties remain regarding subsurface fluid flow, plume containment, and restoration timeframes. Remedy performance has lagged far behind expectations." [78]

---

[76] Id.
[77] Id.
[78] US EPA, Development of The Environmental Sequence Stratigraphy, supra at pg16.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### iii. Lisa Jackson, Apple Vice President of Government Affairs and Lobbying; ex-US EPA Administrator

56.     Gjovik's SOX, Dodd-Frank Act, RICO, and other claims include allegations about Lisa Jackson and her relationship to Apple and the US EPA.

57.     Apple's website says under the header of "*Who leads environmental efforts at Apple?*" that, "*Lisa P. Jackson is Apple's vice president of Environment, Policy and Social Initiatives, reporting to CEO Tim Cook. The Office of Environment, Policy and Social Initiatives works with teams across Apple to set strategy, engage stakeholders, and measure and communicate progress on Apple's commitments to address climate change, develop green materials for safer products, and use materials as efficiently as possible.*"[79]

58.     When Jackson was nominated for US EPA administrator in 2008, critics complained she was "*a pliant technocrat*" who's leadership included "*suppression of scientific information, issuance of gag order, and threats against professional staff members who dared to voice concerns.*"[80]  Jackson has openly bragged to be "*a Shell Oil creation*", noting that Shell Oil paid for her undergraduate degree.[81]

59.     During Jackson's tenure as US EPA Administrator, a US EPA whistleblower was forced on leave and then terminated, faced false counter-allegations (baseless accusing her of workplace violence), and batted US EPA through US Department of Labor agency courts seeking relief, only to be met with egregious retaliation and obstruction of justice. The ALJ on the case complained that the US EPA, had among other misconduct:

---

[79] Apple, *Environment – Answers*, (last accessed 12/17/23),
https://www.apple.com/environment/answers/
[80] Kate Sheppard, *Obama to pick NJ DEP commissioner Lisa Jackson to head EPA*, Grist, Dec. 11 2008,
https://grist.org/article/transition-talk-jackson-action/
[81] Andrew Restuccia, *'I'm a Shell Oil creation,'* says EPA chief, The Hill, April 26 2011,
https://thehill.com/policy/energy-environment/89549-im-a-shell-oil-creation-says-epa-chief/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

"Failed, and failed miserably, over an extended course of time in complying with its discovery obligations and…Court discovery orders" Worked a "fraud on the Court" through numerous "false claims" and inaccurate claims of privilege which upon examination applied to "none of the documents provided"; Deliberately and illegally destroyed an unknown number of documents which should have been under a litigation hold."[82]

PEER commented that the "*EPA's obstruction of [the whistleblower's] attempts at discovery were further complicated by the agency's belated disclosure of "shadow email accounts" (such as a pseudonym account used by then-Administrator Lisa Jackson) maintained by agency employees subject to discovery*."[83] Lisa Jackson was US EPA administrator from 2009-2013, which covered much of the time the US EPA was actively retaliating against the whistleblower.[84]

### iv. Apple's Secret Semiconductor Fabrication at 3250 Scott Blvd, Santa Clara California

60.     In late 2015, Apple started stealth semiconductor ("silicon") fabrication activities in a facility located at 3250 Scott Boulevard Santa Clara California.

61.     Apple was cited for building, environmental, health/safety, and fire code violations at 3250 Scott Blvd in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water, fire code and CalASPA violations, health & safety code violations), 2019 (phosphine/silane spill, wastewater testing violations), 2020 (fire code violations, using 2 EPA IDs, inaccurate hazmat inventory data, no spill plans or training, no business permit, no signature from supervisor on records), and 2021 (another phosphine leak).

---

[82] *Jenkins v US EPA*, Case No. 2011-CAA-3 (April 15 20215).
[83] Public Employees for Environmental Responsibility, *Egregious EPA Misconduct Delivers Whistleblower Win*, April 21 2015, https://peer.org/egregious-epa-misconduct-delivers-whistleblower-win/
[84] Public Employees for Environmental Responsibility, *EPA Un-Fires 9/11 Whistleblower but Vows to Try Again*, September 26 2013, https://peer.org/epa-un-fires-9-11-whistleblower-but-vows-to-try-again/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

62.     The factory at 3250 Scott Blvd vented its exhaust of solvents vapors and toxic gases less than 300 feet from a large apartment complex (1,800+ units) owned and managed by The Irvine Company.[85] The apartment complex ("Santa Clara Square Apartments") has multiple street addresses, as well as embedded commercial/retail units, so for simplicity it will be referred to in this complaint with the prior address for the parcel ("3255 Scott Blvd").

63.     In 2015, the Irvine Company was finalizing the Environmental Impact Report ("EIR") for the 3255 Scott Blvd property across the street from Apple's plant and starting development of a large apartment complex (where Gjovik would live in 2020). Apple's factory at 3250 Scott Blvd was never mentioned in the 3255 Scott Blvd EIR despite being located less than 300 feet away (making the apartments a "*fence line community*")

64.     Under information and belief, Apple and Irvine Company conspired to keep Apple's activities out of the EIR because if it was included, Apple would have to comply with regulatory obligations and federal environmental statutes at the factory, and Irvine Company would have to rent their future apartments at a lower value due to the degraded air quality from Apple's emissions.

65.     On November 8 2016, Apple submitted a Tier 1 Application to DTSC for the 3250 Scott Blvd plant that included inaccurate and incomplete information. For example, the application denied that the site was on a chemical clean-up site despite being on a Superfund groundwater plume and other contamination. The application denied any chemical spills despite a citation that year for Apple spilling cooling water in a storm water drain.

---

[85] The Irvine Company, *Santa Clara Square*, [last visited 12/12/23], https://www.irvinecompanyapartments.com/locations/northern-california/santa-clara/santa-clara-square.html

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                         DECEMBER 21 2023

### v.    Apple's Personal Data Collection and Surveillance of Employees (Panopticon)

66.    Apple directly and indirectly requires (through deception, coercion, and manipulation) that their corporate Research & Development employees exclusively use internal devices (often "dev-fused hardware" and "internal" software) and Apple software/services for both work and personal use. From 2015 through 2021, Gjovik mostly complied with Apple's requests and coercion to do use Apple's internal devices for all of her personal activities, feeling that she would get in trouble if she did not (and employees would receive frequent nag emails if they were not on pre-release software builds), and that she would not be successful at Apple if she did not show her loyalty by engaging in this culture. Indeed, her performance reviews praised her for participation in these programs.

67.    While "living on" (aka "dogfood") and "user studies" were often an actual responsibility of a role in Gjovik's Software Engineering team, she continued to feel pressure in Hardware Engineering as well. One example, in Gjovik's 2019 annual performance review, Powers wrote, "*She is an amazing bug finder. Everything she touches seems to break.*" Said one person, "*I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid. It helps that she's constantly living on as many unreleased products as she can and is diligent about filing bugs. Good stuff*! "There were many comments like this.

68.    Gjovik was also coerced to 'file bugs' for any issues she found that could be software 'bugs' and to do so 'especially' if she 'hit the bug' in a 'customer scenario' (i.e., a situation that would be very unlikely to occur at work or during work hours) so Apple could obtain the invasive logging data from Gjovik, saying they cannot ask customers for that level of information.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                         DECEMBER 21 2023

69.     Apple employees are technically required to install an "MDM profile" (mobile device management) configuration profile on their personal devices if they want to check their work email from the device. The MDM profile then allowed extensive access to the employee's data by the employer. Corporate MDM profiles, even on "customer devices", are able to track the device in real time, read text messages, see photos and videos, check browsing history, monitor all internet traffic.[86]  "Once an MDM profile is installed" the employer "can do whatever they want."  However, employees like Gjovik were pressured to use "dev-fused" hardware with internal software builds that also allowed Apple "root access" to the device, and even some access to the Secure Enclave.[87]

70.     Apple was in a position to collect data (and store, analyze, and exploit that data) on Gjovik's real time and historic GPS location,[88] what devices were around her and who they belong to who, who Gjovik was talking to, and about what, what Gjovik's schedule was, and who she met with, all of Gjovik's documents and photos, and other highly sensitive information. The full disk access meant Global Security had direct access to any and all photos and biometrics captured by Gjovik's phone.

71.     Apple also retaliated against Gjovik for complaining about an application (Gobbler) which was an electronic tracking device and Apple used it to determine Gjovik's movement and/or location and complaining about Apple's excessive surveillance of employees

---

[86] Christopher Demicoli, *never accept an MDM policy on your personal phone*, Jan 20 2020, https://blog.cdemi.io/never-accept-an-mdm-policy-on-your-personal-phone/
[87] David Shayer, "Understanding How Apple Security Research Devices Likely Work and Stay Secure," TidBITS, Aug. 4 2020 ("Apple engineers use iPhones with a development key (they're referred to as dev fused), and they run development builds of iOS. Dev builds of iOS include a shell, debugging and profiling code inside many apps, test hooks, and internal frameworks. Dev iOS builds are signed with a dev cert, so they boot on dev-fused iPhones.") https://tidbits.com/2020/08/04/understanding-how-apple-security-research-devices-likely-work-and-stay-secure/ *The Prototype iPhones That Hackers Use to Research Apple's Most Sensitive Code*, VICE, March 6 2019, ("I used one of these devices and obtained "root" access on it, giving me almost total control over the phone;"), https://www.vice.com/en/article/gyakgw/the-prototype-dev-fused-iphones-that-hackers-use-to-research-apple-zero-days
[88] Likely a violation of Cal. Penal Code § 637.7, prohibiting the use of GPS to track another person.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

including using electronic tracking devices to determine employee movement and/or location, all in violation of law and public policy.[89]

72. Even if Gjovik still used only Apple's consumer production projects and customer software builds, Apple could still monitor real-time device usage and also has access to flag, read, and even intercept user's private iCloud emails.[90] Even if employees used "personal" devices, Apple's "*Workplace Searches and Privacy*" policy said Apple would still spy on them. The policy says employees should have *"no expectation of privacy"* when using "*Apple systems*" (without qualifying "internal systems,") and even including "non-Apple property." Apple also says employees should "*have no expectation of privacy when on Apple premises*," which assumably includes anything devices they have with them even if they're "personal." Apple has openly admitted to reading, collecting, and publishing employee's private text messages and phone records, with one executive who was spied, upon calling it "*a stunning and disquieting invasion of privacy.*"[91]

---

[89] Cal. Crim. Law 4th Crimes--Public § 519 (2023), "Use of Electronic Tracking Device."

[90] Thomas Brewster, *How Apple 'Intercepts' And Reads Emails …*, Feb 11 2020, https://www.forbes.com/sites/thomasbrewster/2020/02/11/how-apple-intercepts-and-reads-emails-when-it-finds-child-abuse/ Jeffrey Paul, *Your Computer Isn't Yours,* Dec. 12 2020 ("*This means that Apple knows when you're at home. When you're at work. What apps you open there, and how often… This data amounts to a tremendous trove of data about your life and habits and allows someone possessing all of it to identify your movement and activity patterns. For some people, this can even pose a physical danger to them.*") https://sneak.berlin/20201112/your-computer-isnt-yours/

[91] Annie Palmer, *Apple accused of monitoring employee text messages in lawsuit against ex-chip exec,* CNBC, Dec 10 2019, https://www.cnbc.com/2019/12/10/apple-accused-of-monitoring-employee-text-messages-in-lawsuit-against-ex-chip-exec.html

36

**Workplace searches**

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

*Exhibit: Excerpt from Apple's "Workplace Searches and Privacy" policy*

73.     Gjovik spoke with her coworkers (occurred outside of work hours, far from campus, and in hushed voices acknowledging Apple could be listening though their phones and other devices) about her opposition to Apple's surveillance practices, and many voiced the same concerns.[92]

**B.     ASHLEY'S APPLE SAGA**

**i.     Gjovik Joins Apple; Team Bullies & Bribes Her; Gjovik is Retaliated Against for trying to Investigate Batterygate (2015-2016)**

74.     Note: While the events that occurred in Gjovik's first two roles at Apple (from 2015-2016) do not directly contribute to most of Gjovik's current legal claims, these events are still discussed as they constitute much of what Apple was supposedly investigating in 2021, at

---

[92] See, *Myrna Arias v Intermex Wire Transfer*, Superior Court of the State of California, Bakersfield County, Complaint (May 5 2015). (settled out of court); see: *Watkins v. L.M. Berry & Co*., 704 F.2d 577, 583 (11th Cir. 1983); *In re Google Inc*., 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

the time Apple told Gjovik she was "*removed from the workplace and all workplace interactions*" and then terminated with vague allegations that she violated company policies. Apple never provided an update to Gjovik on the outcome of this investigation, and most of the people named from these teams are still at Apple, and several have even been promoted.

75.     Ashley Gjovik became an employee of Apple in February 2015. Gjovik joined a team with many long-tenured Apple employees who had been in positions of leadership and influence at Apple for decades, and who had regularly interacted with top executives. Gjovik worked for Apple Inc from February 23 2015, until Apple terminated Gjovik's employment on September 9 2021 (effective September 10 2021).

76.     During her tenure with Apple, Gjovik led numerous high-profile projects. She participated in engineering project management of numerous high-profile products such as the iPhone, iPad, iPod, Apple Watch, MacBook Pro, MacBook Air, and Mac Pro and high-profile projects such as the launch of the Apple Music subscription service, Apple's transition of computers from Intel to Apple silicon, and strategic initiatives striving to establish Apple's first company-wide Artificial Intelligence ethics policy.

77.     During Gjovik's nearly seven years with Apple, she was a significant contributor in developing and improving critical process and policies, mentoring employees, and managers, and providing strategic advice to executives. She has been praised for everything from "*saving Apple money*" to "*driving better testing and higher quality in Apple's software*." Her direct supervisor at the time of her termination previously illustrated what he called Gjovik's' "*amazing work*" as: "*the combination of broad networking, collaboration, understanding of many technical and non-technical areas;*" "*providing deep and meaningful insights;*" and "*connecting people for more collaboration.*"  He went on to say Gjovik had "*become a mentor to*

*people around the organization"* around *"relationship skills," "crafting presentations,"* *"increasing visibility and network,"* and *"coaching on tough conversations."*

78.   Gjovik's importance to Apple Inc was exemplified in her many outstanding performance reviews. These included Apple's award to Gjovik of large bonuses and raises due to her strong performance. Gjovik's performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written reviews.

79.   In fact, Apple told Gjovik that she was an extremely valuable member of the company. At different times she was told by her supervisors that she was both *"key talent"* (unreplaceable) and a *"high performer."* Apple tracks these employee categories in its personnel systems. Further, during every annual performance review at Apple, Gjovik received at least one *"Exceeds Expectations."*

80.   Linda Keshishoglou was Gjovik's first direct supervisor at Apple. Keshishoglou reported to Venkat Memula, who was director of Software Engineering Build & Release Management, Hardware Systems Management, prototype hardware ordering and distribution, secrecy training and access management, Early Field Failure Analysis, software and diagnostics for Apple's global manufacturing facilities (Foxconn, etc.), AppleCare customer diagnostics tools, software for Retail product demonstrations, and more. Memula reported to Kim Vorrath, head of Software Engineering Program Management.[93]

81.   Gjovik's direct co-workers, also reporting to Keshishoglou, were Rob Marni, Brad Riegel, and Aron Talburt. Gjovik experienced well-documented hostility from the start of her employment. In her first year, her colleagues created a whiteboard of insulting nicknames like *"Professor Fun Sucker"*, and another with tallies for points for *"should they quit"* and

---

[93] Vorrath notoriously became so enraged when an employee wanted to leave work early, that she slammed her office door shut with such might that the latch broke and she was locked inside, supposedly requiring a locksmith be brought on site to release her. *"This Story Perfectly Captures Why You Don't Miss Deadlines at Apple*, April 22 2014, https://www.businessinsider.com/why-you-dont-miss-deadlines-at-apple-2014-4

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

"*making [Gjovik] want to quit,*" and filed a ticket in the Radar work tracking tool entitled "*Make Ashley's Life a Living Hell.*"

82.  Marini and Riegel told Gjovik that filing complaints to Human Resources at Apple is known as a "*CLM.*" They explained that stands for "*Career Limiting Move.*" Marini also openly bragged that a top software executive at Apple lovingly referred to Marini as his "*little Gestapo.*"

83.  Despite knowing that she suffers from Post-Traumatic Stress Disorder (PTSD) Gjovik's colleagues would try to startle her and make her scream, by attacking her with Nerf guns and dodgeballs. (Gjovik complained of these activities to Apple's Employee Relations team in July and August 2021, noting in an email on July 21 2021, that her coworkers had created a video/audio recording of her "*screaming bloody murder*" while they attacked her with dodge balls, then created a 'remix' version of her screams and shared it with the team, while they were "*laughing hysterically.*")

84.  Gjovik was initially assigned to share an office with Rob Marini. Marini told her during her first week that prior coworkers who had shared an office with him previously had either quit, left the country, or committed suicide. Marini joked about which of those paths she would follow. Marini often made cruel and awful 'jokes' like that, despite Gjovik's complaints and requests for him to stop. One time, when she made a minor mistake drafting an XML document, Marini responded that everyone would be better off if Gjovik 's "*mother had had an abortion.*" Gjovik complained to Memula about Marini, asking for help, and Memula told her he intentionally placed her in the same office as Marini in hope that Gjovik's positive attitude may rub off on Marini despite knowing that Marini was likely to abuse her.

85.  Reigel often made comments about Gjovik: calling her fat, an idiot, or stupid. Around December 2015, Reigel made her stay in an office conference room against her will,

where he yelled at her while she cried. Gjovik reported this to Memula, who did nothing. He would also often make somewhat violent jokes targeting her including but not limited to that he was going to "smack" Gjovik. These remarks were all the more concerning considering that he was known for bringing firearms into the office, and Gjovik had seen ammunition at his desk. Reigel had also destroyed objects when upset at work, including infamously striking a chocolate Easter bunny on a table to knock off its 'head' while screaming at Software QA Director, Josh Williams about a new software convergence model. Marini also claimed Reigel had previously physically '*flipped a table*' during a work meeting while he was upset and brought it up repeatedly.

86.     Reigel was also an active police officer with a local Police Department. Gjovik and her coworkers occasionally referred to him as "*Officer Reigel*."

87.     When Gjovik complained to Memula about Reigel and Marini's behavior, Memula acknowledged the men's conduct was inappropriate but his suggestions for Gjovik in response to the misconduct included things like dumping the liquor bottles they had in their offices and replacing the liquor with water and food coloring. (Gjovik shared this email chain with Employee Relations in 2021).

88.     Indeed, it was a regular occurrence for the team to drink at work during work hours, and regularly coerced Gjovik to do the same, despite Gjovik's protests. This included and was often incited by Memula who hid bottles of liquor around the office after he said he got in trouble with Human Resources and his manager for drinking too much at work, even going so far as to buy a large storage cabinet for their office where he exclusively stored alcohol, kept the only key, and forbid the employees from telling Human Resources.

89.     Marini and Reigel commonly referred to Venkat Memula's behavior when intoxicated at work as an alter ego called "*Drunkat*." (On August 16 2021, when Gjovik

41

complained to Apple Employee Relations about her team from 2015-2016, Gjovik also noted

Memula's work-time intoxication, with Employee Relations noting: "*You mentioned that*

*Memula would snuggle up on you while drunk, whisper to you, and say things that made no*

*sense*." Gjovik cited evidence including "*see photograph of during one instance with*

*documentation of his phases of drunkenness on whiteboard including these behaviors, then*

*following photo of him "crucifying" himself upon said whiteboard writing*.")

90.    One of Gjovik's coworkers on this team claimed to have familial connections to a major organized crime family. If this court finds direct ties to organized crime required for the RICO case, Gjovik will plead those details under seal.

91.    In 2016, Marini began bragging about creating and being a member of "*secret cabals*" that consisted of certain Apple employees, and possibly external parties, on an invite-only basis at Marini and Venkat's discretion. Several months later Marini told Gjovik there was a vote in one of the cabals and they agreed she could be a member. Marini added Gjovik to an Apple email group with around 20 other members. Marini repeatedly warned Gjovik that she must behave herself if she wanted Marini and the other members to allow her to remain in the cabal.

92.    Under information and belief, based on timing and parties involved, the decision to engage in off books silicon fabrication at 3250 Scott Boulevard may have been the outcome of one of these '*cabals*.' Regardless, Memula's team would have been aware, if not involved, in 3250 Scott Blvd, as Memula oversaw the Systems Engineering Project Managers for new devices, including silicon bring-up.

93.    Marini invited Gjovik to several social events in San Francisco, often with other coworkers and Memula. Marini told Gjovik that if she wanted to succeed at Apple, she must never decline an invite to spend personal time with engineering leadership. All social events

Gjovik attended included excessive alcohol intake which Gjovik did not feel was optional.

Gjovik recognized a deep culture of cronyism and nepotism,[94] and felt forced to acquiesce.

94.     Keshishoglou praised Gjovik's work performance but also refused to allow

Gjovik to attend the same meetings or be included on the same emails or group text messages as

Gjovik's all-male coworker peers (Brad Reigel, Aron Talburt, and Rob Marini) were part of.

When Gjovik complained to Keshishoglou about the exclusion, Keshishoglou could not provide

a coherent explanation for why Gjovik was not included.

95.     At or around six months into Gjovik's employment at Apple, Keshishoglou's

manager, Venkat Memula, questioned Gjovik about Keshishoglou's performance and Gjovik

disclosed her concerns about the double-standard. Memula asked to receive updates on the

matter and expressed a pre-existing desire to terminate or otherwise remove Keshishoglou from

his team.

96.     Memula must have informed Keshishoglou about Gjovik's complaints.  In

September 2015, Linda Keshishoglou met with Gjovik privately to deliver Gjovik's review and

compensation. Keshishoglou bragged she was able to provide Gjovik the unproportionally large

compensation.  After detailing Gjovik's compensation and explaining Keshishoglou provided a

favor for Gjovik, Keshishoglou then told Gjovik something akin to "*now go tell Venkat I'm a

good manager.*"

97.     It was Gjovik's understanding, based on conversations and company policies, that

the 2015 annual performance review cycle would skip her because her employment at Apple was

six months or less by the July 2015 evaluation period. An employee like herself who had only

been employed at Apple for five months was supposed to be categorized as "*too new to rate.*"

---

[94] Nepotism: For instance, in Gjovik's final team at Apple, under Dan West, there were three members of the Basanese family. John Basanese was a Director reporting to West (mentioned later), and he also had two close family members working in West's organization, and a third family member in a different organization at Apple.

An employee that is "*too new to rate*" does not receive a bonus, additional RSU vesting, or salary increase.

98.    Instead, Gjovik did receive an annual performance review in 2015 which included a bonus, additional RSU vesting, and a salary increase. Further, the compensation Gjovik received was above the ranges allocated for her role as an ICT3 Engineering Project Manager.

99.    In September 2015, Keshishoglou provided Gjovik a $100,000 grant of RSUs vesting over four years. Under information and belief, the maximum grant for an employee in her role at her level was $60,000; and as too new to rate there was to be no RSUs. Keshishoglou also increased Gjovik's salary and also provided Gjovik a bonus, which may or may not have exceeded the range allocated but did exceed the $0 scoped for too new to rate. The document Keshishoglou showed Gjovik in the meeting showed this all as future compensation that was not effective immediately and the RSUs additionally noted they would need Board approval.

100.    Gjovik interpreted Keshishoglou's statement as an offer of additional compensation only if Gjovik were to drop her complaints about Keshishoglou and instead begin praising Keshishoglou. Gjovik felt that if she were to refuse to drop her complaints, that Keshishoglou may retract the compensation she offered.

101.    Because Memula was in a position of authority over Keshishoglou, and Gjovik feared disfavor from Memula more than Keshishoglou, Gjovik complained to Memula about Keshishoglou's comments. Memula then told Gjovik to complain to Human Resources.

Ashley Henderson:
  In IL1. You around? Update from last weeks convo.
Venkat Memula:
  4
Ashley Henderson:
  K! Just wanted to let you know I had my review today. It went well until Linda ended it saying "now go tell Venkat I'm a good manager. He told me you told him I was a bad manager." I'm sure that's not what you said. And it was really weird of her to tell me that. Sigh.
Venkat Memula:
  Sigh
  You should talk to Kristen
  She was in the room when I mentioned our discussion
Ashley Henderson:
  Okay – I will!
  Thanks
Venkat Memula:
  Send Kristen an email today please
Ashley Henderson:
  On it! I texted her already, but will email too
  I assume this email should contain all of my concerns, in addition to today's weirdness
Venkat Memula:
  Yes please

*Exhibit: 9/29/15 Texts Between Gjovik & Memula*

102.     Shortly after Keshishoglou transferred to a different organization and her team was transferred under Officer Reigel. Gjovik protested before, during, and after the transfer – saying she refused to work for Reigel due to his abusive conduct towards her. After Gjovik was transferred to report to him as her manager, Officer Reigel promptly closed the *"Make Ashley's Life a Living Hell"* task as "*complete*".

103.     In July 2021, Gjovik reported the bribery incident to Apple Employee Relations (Ekelemchi Okpo), including providing copies of emails exchanged between Gjovik, Memula, Human Resources at the time, and a list of witnesses. Gjovik documented her interactions with Keshishoglou and the compensation incident in her August 2021 "*Issue Confirmation*" for Apple's investigation as "*hostile work env based on sex; quid pro quo; bribe; failure to resolve hostile work environment.*"

104.     While Reigel was Gjovik's manager, he continued with his inappropriate conduct towards Gjovik. Gjovik complained to Memula repeatedly about Reigel, but Memula refused to intervene.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

105.    Gjovik started looking for a new job at Apple, interviewing with Haley Samale's team to manage new software features. Gjovik was assured she got the job, they began discussing her start date, but then was suddenly told she did not, due to Reigel providing negative feedback about her. Software Engineering Vice President, Kim Vorrath, then intervened and assigned Gjovik to run a program called Early Field Failure Analysis ("EFFA") reporting to a different manager, but still under Memula. Gjovik still wanted to leave Memula's organizing completely and tried to reject the position, but she was told it was her only option. Gjovik eventually accepted the role.

106.    In 2016, Gjovik managed Software Engineering "EFFA"; failure analysis program for products in the field and launch planning for New Product Introduction, still under Memula's organization, now reporting to Shandra Rica. Gjovik drove field issue triage and root cause analysis to resolution for customer software quality issues, and partnered with hardware teams when software or firmware updates were needed to mitigate silicon or component issues.

107.    Rica reported to Memula and she approached Gjovik to interact as personal friends. In 2016, Rica invited Gjovik out to drink at bars and to sleep over at Rica's home. Gjovik slept over several times with both women sleeping in the same bed. They had become close friends, Gjovik thought, so she was surprised when Rica severely retaliated against her months later.

108.    In late 2016, there were reports of possible battery failures and device stability issues in the field that were being escalated across numerous engineering teams at Apple.[95]

---

[95] California AG, "Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling" https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against, Investopedia, "Apple (AAPL) Reaches $500 Million Settlement Over iPhone 'Batterygate'," https://www.investopedia.com/apple-aapl-reaches-settlement-over-iphone-batterygate-5088300

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

109.     Gjovik felt like it was an emerging issue so began including it in her status report and repeatedly urged her management to inform Software executives about the matter, so they were not caught off guard.

110.     Gjovik's management, Evan Buyze and Rica, refused to notify Software Engineering Program Office leadership.

111.     Gjovik attempted to go around them and inform Rica's boss, Memula, who was concerned and agreed with Gjovik; however Rica and Buyze quickly retaliated against Gjovik for 'going around them' and demanded she not inform any software executives of the issue without their permission.

112.     Shortly after, Gjovik received text messages from Operations Vice President Priya Balasubramanian asking if she could come to an in-progress meeting about the battery issues. They said that Jeff Williams, the COO, was asking where a representative from Software Engineering was and wanted someone there.

113.     Gjovik quickly texted Buyze and Rica about the matter asking for their input, but it was late and both had stopped responding.

114.     Gjovik decided to attend the meeting and spoke for several minutes sharing an update and the data she had previously vetted with functional teams. Jeff Williams seemed appeased and thanked her when she was done.

115.     Following these events Gjovik was informed that Craig Federighi (Senior Vice President of Software Engineering, reporting to Tim Cook) was upset that Kim Vorrath (Memula's manager) never told him about the emerging issues, and Vorrath was upset that Memula had never told her about the emerging issue, and Memula told Gjovik he was going to try to '*take the fall*' because Gjovik had tried to escalate.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

116.     However, Rica and Buyze quickly blamed Gjovik and said the only reason they were in trouble was that Gjovik went to the meeting and shared status. They said while the status was accurate and vetted, that Gjovik should have simply declined to attend, and refuse to provide information, because that is 'easier.'

117.     Rica and Buyze then insisted the program's response to the battery issue should be 'ignoring it' and 'hoping it goes away.' When Gjovik continued to raise concerns about staffing for the overall program, Rica and Buyze said Gjovik should 'ignore' those issues too.

118.     They told Gjovik that if field issues are bad enough that Software executives will hear about them directly from other Executives so Gjovik should act in bad faith and stonewall at a program level. Gjovik pushed back on this and attempted to remind both how important customer product quality is.

119.     Shortly after, Rica constructively terminated Gjovik. Rica explained that she and Buyze 'got in trouble' over Batterygate, graphics corruption issues with the new MacBook Pro with TouchBar, and coverage while Gjovik was out for a week, because Gjovik had supposedly set an 'unreasonable expectation' that Software Engineering would do work and so people expected them to do work, but they did not want to do work. They told Gjovik they now had to "reset expectations" for other organizations that Software will only provide minimum engagement on customer field issues.

*Exhibit: 12/7/16 Email from Gjovik to HR about Rica & Buyze, 1*

120. Rica told Gjovik that Gjovik's job was now '*finding a new job*." Rica also told Gjovik to not tell anyone what she just said and added she "*doesn't like people who talk shit.*"

49

I told them the feedback during the meeting seemed overwhelmingly negative and I wanted to gauge what kind of summary they planned to provide hiring managers about my time in the role. Evan exclaimed "you seem to be able to take feedback." I told him, I am listening to the feedback – I'm just trying to understand what message they're planning to provide. Evan said "it will be fair and balanced". Then Shandra suggested that it would be best if I volunteer this role "didn't work out for me" so we can all agree on that. I told her I'd take that suggestion into consideration, but was hesitant to say that when I feel like I accomplished a lot of positive things in the last eight months. She told me she thought saying "it didn't work out" would be best. I said that again this feels like a very negative meeting, and I was wondering if there's a timeline on this transition because this feels like a development plan/HR type conversation. Shandra told me there was no timeline and it's not an HR conversation yet, because I'm agreeing "to leave the role" they "won't have to start that conversation".

The meeting ended with Shandra advising me not to complain to people about having to move on, because she doesn't like "shit talking".

*Exhibit: 12/7/16 Email from Gjovik to HR about Rica & Buyze,2*

121.    Out of concern for product quality, Gjovik brought the matter to the Human Resources business partner who agreed that Buyze and Rica "*cannot do that*" and said she would follow up. Gjovik had all of her job responsibilities removed for nearly three months until she was able to obtain and start in a new role at Apple. Human Resources told Gjovik that Rica cannot take her job away and that Rica was in the wrong.

122.    (Gjovik also complained about this matter to Apple Employee Relations in May, July, and August 2021. In August 2021, Employee Relations investigator Ekelemchi Okpo documented this situation in detail in his original version of the "Issue Confirmation":

> "In 2016, Apple allegedly had products in the field (iPhones) with bad batteries. You shared that you gave Jeff Williams an update on field issues and the meeting went well. After your meeting with Williams, you felt that you were thrown under the bus by your skip level manager, Shandra Rica, and your manager, Evan Buyze, because they failed to update the leadership team on field issues. You told me that you did not have work assignments for 3 months after this incident, and your responsibilities were taken away. As a result, you believe that this was constructive discharge, and you raised your concerns to Michallik on December 7, 2016."

124.    Gjovik also provided her emails with Human Resources, Rica, and Buyze on the matter to Okpo as evidence for the investigation.)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

125.    In 2016, Buyze would unfairly lower Gjovik's performance rating due to Gjovik asking for Venkat to help fix product issues that Buyze wanted to ignore, which Gjovik was able to contest because there was a bug in the HR rating system that year that revealed peer feedback ratings and showed Buyze ratings were arbitrary. Buyze attempted to give Gjovik an Exceeds in result but just a Meets in Teamwork and Innovation. Gjovik had received constant praise that year for her teamwork, and the review system confirmed. In fact, she had a higher score in Teamwork than Results, but Buyze refused to give Gjovik an Exceeds in results citing two examples: that Brad Reigel was fighting with her (as if that was her fault), and that Buyze got annoyed when Gjovik wanted to investigate field issues quickly.



*Exhibit: Internal Review Ratings System View*

123. When Gjovik took a job with West and Powers, Buyze waited until 7pm on her last day to sent an email notifying Software Engineering partners she was leaving. Buyze concurrently told Gjovik not to tell anyone she had her job taken away or that she found a new one. Gjovik's new office was in the Sunnyvale, so she never had a chance to say good by to her friends at Infinite Loop. All of this to say, Gjovik knows certain Apple managers and administrators can be petty and spiteful, so she was not completely surprised with the conduct she faced in 2021.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: End of Day Notice*

### ii.     Gjovik is Assigned to Work at an Apple office on the "Triple Superfund Site"; Apple Invades Gjovik's Privacy & Fights to Increase e-Waste (2017)

126.     Gjovik joined Product Systems Quality in January 2017, reporting to David Powers and Dan West. Apple assigned Gjovik to work in the Apple office called "Stewart 1" (aka "SD01") at 825 Stewart Drive, Sunnyvale California from 2017-2021.

127.     Apple never informed Gjovik that the office was on a Superfund site or that it was a chemical release clean-up site generally.

128.     Gjovik would later be informed by a friend that her office was known by the U.S. EPA as the "TRW Superfund site" and one of the three sites constituting the "Triple [Superfund] Site."[96]

---

[96] US EPA, *Superfund site: TRW Microwave (Building 825) Sunnyvale CA,* https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0901181

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                     DECEMBER 21 2023

129.   Under information and belief, in at least August 2017, Apple was flushing Trichloroethylene ("TCE") in their wastewater at 3250 Scott Boulevard. Apple did not have TCE listed in their CERS inventory, or their inventories for the city HazMat, or reported in any of their other filings. Yet, their NPDES testing showed 24 ug/L of TCE exiting the factory and entering the municipal sewer lines on August 23 2017.[97]

130.   On December 28, 2017, Gjovik's supervisor, Dan West, tried to organize a sexual relationship between Gjovik and a sous chef at his favorite Michelin star restaurant ("Chez TJ" in Mountain View). Gjovik arrived at the restaurant to eat dinner alone, but West texted her as he conspired with the head chef to have the sous chef act as Gjovik's waiter, and both West and Chef suggested to both parties they should become romantically involved.

131.   Gjovik objected but West persisted. West also paid Gjovik's bill for the dinner and refused to refund Gjovik or even disclose to Gjovik how much the bill was, despite Gjovik's protests.

132.   West used his position of authority over Gjovik, put Gjovik under duress with fear of retribution and retaliation in her employment, and paid money (estimated around $400) to persuade, encourage, and induce Gjovik to sleep with a business partner, although West's efforts need not and were not successful. West intended to influence Gjovik to engage in sexual intercourse or lewd act with another person, who was not West, in exchange for West to obtain receipt of the indirect benefits of positive influence in his business and personal dealings with the management of his favorite "Michelin Star" restaurant.

133.   *Pimping and Pandering with Indirect Benefits* is a felony.[98]

134.   On the evening of Nov 30, 2020, West messaged Gjovik and they discussed the incident. West told Gjovik; "*of all the inappropriate things I've done. That might be top of the*

---

[97] Note: Apple banned use of TCE in their supply chain, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[98] California Penal Code §§ 266h, 266i

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*list, especially since I don't think you were comfortable telling me no."* West said he did not remember paying the hundreds of dollars for her dinner, saying *"I must have been drunk. That's over the top."* Gjovik described the night as an "*arranged marriage*." West told Gjovik he was "*awakening to all of [his] inappropriate behavior.*"



*Exhibit: 11/30/20 Texts between West & Gjovik*

*Exhibit: 11/30/20 Texts from West to Gjovik*

135.    From 2017-2020, Dan West asked to visit Gjovik at home several times. West also asked Gjovik out to dinner alone with him several times.

136.    On August 3 2017, an Apple engineering manager, Robert McKeon, emailed an unknown list of Apple employees, including Gjovik, about a "Gobbler" user study. The manager wrote the study used an iOS application called "Gobbler," and told employees *"As you continue*

*to use your device, use the Gobbler application to periodically upload data that has been*

*logged.*"  The manager then wrote, "*In terms of data collection, we want more. The algorithm*

*uses deep learning and the more data the better.*" He wrote that the Gobbler algorithms are

"*hungry for data*" and that "*for uploading data: all data that has your face in it is good data.*"

Gjovik did not respond to or act on the email.

137.     On Aug 7 2021, Gjovik received a different email from a group account saying

"*Come join us! We look forward to seeing you there!*"  The email appeared to be a social event.

Gjovik accepted, assuming it was expected – and the message said nothing about Face ID.



SSP User Studies Group <ssp_usg@apple.com>          Aug 7, 2017, 3:00:38 PM
Social Hour Study: You're Invited!
To: recipients not specified: ;

 SSP USG 
Come join us!

Greetings!

Join the SSP User Studies Group for a **Data Collection Social Hour**! We'll have food, drinks and music waiting for you!

*Exhibit: The email Gjovik received on Aug 7 2017 that led her to get Gobbled, 8/7/17*

138.    Gjovik received another response later that day saying, "*Hello there! Thank you very much for responding to our invite! ..... You will receive an iCal invite to the event shortly... Please arrive at [Apple's Mathilda 3B office building] Patio at your scheduled time. Do not hesitate to reach out if you have any questions or concerns regarding the study. See you soon!*" Coercively, the email now turned formal (instead of fireworks GIFs) and requested she sign an ICF prior to learning anything about what she was signing, and further, she would be sent an invite from the group (assumably in coordination with Global Security), so if she now wanted to decline participating, she would have to do so affirmatively – declining the invite, and emailing that she did not want to sign the ICF (without even being informed prior), or participate. Any loyal, terrified Apple employee knows better than to raise red flags like that.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Email Gjovik received after 'registering for the social event, 8/7/17*

139.    Gjovik was tricked into attending a "social event" that was really a compound in a parking lot with an armed guard outside, where Gjovik was coerced to use the "Gobbler" application to provide her biometrics and videos of her before she left.

140.    Gjovik had received prior offers to participate in Gobbler, but denied those offers. However, now Gjovik felt she had no choice but to comply once she arrived at the compound.

141.    From that day forward Gobbler was always installed on Gjovik's iPhone and it was always capturing videos and biometrics from the front camera whenever "*it thought it saw a face.*" Even today Gjovik's iCloud is still connected to Gobbler with no way for Gjovik to

disconnect it. Gjovik repeatedly tried to uninstall/deactivate it, but it always

reinstalled/reactivated itself.



*Exhibit: Gjovik's iCloud Personal Account, Current Day*

142.   Apple would later rename the application from Gobbler to "Glimmer" after

criticism about the face *"Gobbler"* name.

143.   On Apple's internal "Living On" help page, it explains that when you "live on"

Apple devices, *"You are encouraged to make full use of your living on devices as you regularly*

*would and try to log as many bugs as possible. This will help us provide a better and bug free*

*product to our customers.*

144.   Around this time Gjovik was contacted to participate in other user study

programs including Apple wanting to study her ovulation cycles and menstruation, which she

denied.  Apple asked to study Gjovik's vitals while she ran and swam, which she denied. Apple

asked to study Gjovik's vitals and sleep while she slept, which she accepted for a few months,

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

but then left the program due to how invasive it felt. Apple also asked to 3D scan Gjovik's ears and ear canals, which Gjovik denied expressly in 2018 and stated her denial was 'indefinite.'

145.    Gjovik created a successful hardware re-use program in 2018, (which she called "Hand Me Down Hardware"), in order to fill test coverage gaps dependent on infrastructure, while also dramatically reducing e-waste.  West and Powers suddenly canceled her project without consulting or notifying Gjovik and the explanation provided to her was that one of West's reports, Reed Johnson, requested the change in order to obtain personal benefit, and West approved.

146.    When Gjovik complained about the decision to cancel the project, resulting in a dramatic increase in e-waste and reduced test coverage for customer products which was known to increase risk and did result in customer field issues, Gjovik was repeatedly told by West and Powers that she was simply being "*emotional*," "*aggressive*," and "*irrational*." Powers suggested that when Gjovik is upset with Powers or West, that she should stay silent about it for at least one day, and then at that point, she will realize she is wrong and they are correct, and then she will not have concerns about them anymore. Powers then complained Gjovik was making facial expressions of displeasure that appeared directed towards him, and that she must always have a 'poker face' to be successful. In 2021, Gjovik complained about this matter to Jenna Waibel and Ekelemchi Okpo, and included it in the August 2021 "Issue Confirmation."

147.    On April 13, 2018, Tom Moyer, head of Apple Global Security, was quoted in a Bloomberg article saying that Apple "leakers" "*not only lose their jobs, they can face extreme difficulty finding employment elsewhere. The potential criminal consequences of leaking are real and that can become part of your personal and professional identity forever.*" [99]

---

[99] Mark Gurman, *Apple Warns Employees to Stop Leaking Information to Media*, Bloomberg, April 13 2018, https://www.bloomberg.com/news/articles/2018-04-13/apple-warns-employees-to-stop-leaking-information- to-media

148.     On April 18 2018, Gjovik's Apple team emailed her and her coworkers about a planned "Family Day" when they could bring their family members (spouses and children) to their office at the TRW Microwave Superfund site in Sunnyvale, and Intersil/Siemens Superfund site in Cupertino. The email stressed the need for "confidentiality" and instructed employees to report any family members not complying with Apple's secrecy rules, at these Superfund sites to Apple Global Security (the same team Moyer represented when he threatened to have 'leakers' arrested).

149.     Apple put Gjovik on "document retention" for the Batterygate lawsuits on March 15 2018.[100]  The notice from Apple cited "*inquiries from the U.S. Department of Justice.*"

150.     In May 2018, Apple Legal reached out to perform document collection on Gjovik's devices, including her text messages.

151.     On May 8 2018, Gjovik replied saying she uses the same iMessage account for work and personal and said she strongly preferred to only share messages she had with the specific people involved in Batterygate. Or if they have to take all messages, she asked if she could delete personal messages first. On May 10, 2018, she added she is "*a private person.*"

152.     On May 10 2018, an Apple lawyer replied telling her "*Do not delete any messages.*" She said, "*we can certainly identify the relevant text messages with the list of individuals that [she] provides.*" Gjovik asked if she could "*export the message conversations from all relevant people instead of sharing the entire database?*" An Apple lawyer replied on May 14, 2018, saying Gjovik should "*work with the team to do [her] best to avoid collection of entirely irrelevant information.*"

---

[100] Silicon Valley Business Journal, *"Federal investigators open new probe into Apple's intentional iPhone slowdowns,"* Jan 31 2018, https://www.bizjournals.com/sanjose/news/2018/01/31/apple-iphone-battery-slowdown-probe-doj-sec-aapl.html  "*At the moment, investigators are reportedly looking at Apple's public statements, and whether the company violated securities laws by not disclosing material information to investors.*"

153. However, during the meeting, Apple's lawyers insisted Gjovik let them copy her entire iMessage database. Gjovik protested and explained further she was primarily concerned about "nudes" and sexual messages with a sushi chef she was dating in Hawai'i who had no connection to Apple. Gjovik asked if she could show them the texts so they can confirm its irrelevant and then she can delete the thread before they copy it, but Apple said no, despite previously saying they would avoid collecting unnecessary and irrelevant information. Apple told Gjovik they have ways to copy her data unilaterally without Gjovik's cooperation. Once Gjovik handed her messages over, the Apple lawyers told her they would keep her texts (and nude pictures) in their "*permanent evidence locker.*"

154. Gjovik complained about the incident to a few coworkers saying like it felt like Apple wanted "collateral" for Gjovik to stay quiet about her retaliatory constructive discharge in 2016, because she refused to ignore Batterygate. Gjovik complained about the matter in 2018 to Dan West and John Basanese. Gjovik asked for their guidance on if she should directly consult Apple's legal team about the constructive termination, and both executives told Gjovik they did not want to talk about it and not to bring it up again.

155. Gjovik also posted on Twitter about the matter on August 19 2021 and it gained significant attention and engagement. On September 7 2021, Gjovik also posted about it again on Twitter, this time "quote-tweeting" a prior post where she complained about the Batterygate/nudes and also wrote "*the corruption at Apple may reach RICO levels*". Gjovik posted, "*I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the [battery] situation when I ran sw failure analysis.*" Gjovik was terminated two days later.

156. On April 22 2018, Gjovik emailed Tom Moyer requesting "Business Conduct" approval to attend law school while she worked at Apple, a request suggested by a friend in

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Apple Legal. Gjovik also noted in her email that she hoped to get a job in Apple Legal after she graduated and if not, she planned to keep working at Apple, but do legal volunteer work on the side. On April 27 2018, Moyer replied and added a member from his team to review Gjovik's request. (Apple and Worldwide Loyalty knew Gjovik wanted to stay at Apple.) Moyer's team approved Gjovik's request shortly after, providing requirements for when Gjovik needed to request additional permissions from them for certain school activities.

### iii. Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior; Gjovik Faints (2019-2020)

157. The Santa Clara County District Attorney claims that on February 8 2019, Tom Moyer participated in a "*clandestine*" meeting with the Santa Clara County Sheriff's Office in order to arrange an exchange of iPads and political donations in exchange for concealed carry handgun permits for Apple Global Security. [101]

158. On February 13 2019, the US DOJ Civil Rights Division notified Apple that it had opened an investigation into Apple's violations of the anti-discrimination provision of the Immigration and Nationality Act (8 U.S.C. § 1324b). [102]

159. On February 20 2019, Apple's Global Head of Corporate Law and Corporate Secretary, Gene Levoff, was charged by the US DOJ and US SEC with twelve counts of felony fraud. [103] Later, in June 2022, Apple's head of corporate legal compliance, Gene Levoff, pled guilty to the US DOJ for the charges of six counts of securities fraud and six counts of wire

---

[101] *The People v Thomas Moyer*, California Sixth Appellate Circuit, H049408 (August 25 2023)
[102] US DOJ v Apple Inc, Investigation No. DJ# 197-11-963; US DOJ, Justice Department Secures $25 Million Landmark Agreement with Apple to Resolve Employment Discrimination Allegations Based on Citizenship Status, Nov 9 2023, https://www.justice.gov/opa/pr/justice-department-secures-25-million-landmark-agreement-apple-resolve-employment
[103] *US SEC v Gene Levoff*, Civil No. 2:19-5536, Feb. 13 2019; *SEC Charges Former Senior Attorney at Apple with Insider Trading,* Feb. 13 2019, https://www.sec.gov/litigation/litreleases/lr-24399

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

fraud. Levoff faces potentially decades in federal prison (see "*Securities Fraud*" under RICO Predicate Acts).[104]

160.    On June 20 2019, Apple's ex-General Counsel and VP of Legal and Global Security, Bruce Sewell, was interviewed by Bloomberg Law about prior criminal investigations into Apple's business practices. Sewell discussed the successful 2013 US DOJ/FTC case against Apple for violating THE SHERMAN ACT. Sewell said that Apple knew there was a "*substantial chance [they would] lose but they were going to fight it*" and "*they would never settle that case, they would fight it as far as they could.*"[105]

161.    The same month, Sewell was interviewed by Columbia Law School and described Apple's corporate culture and legal team as "*kindergarten,*" "*very Laissez-faire,*" "*chaos,*" and "*a wild place.*"[106] Sewell said he tried to use risk to Apple's competitive advantage. He said Apple was able to get "*closer to risk*" then competitors, in-house lawyers understood which risk (and laws) they "*don't need to pay attention to,*" and that practice offered a competitive advantage to Apple.[107] He said that in order to do that, the company must permit the conduct, because sometimes the in-house lawyers will "*get it wrong.*" He then described Apple's conduct with the 2013 antitrust case as "*very ugly*", but Tim Cook told him "*Not to be scared,*" and not "*to stop pushing the envelope.*"[108]

162.    In June 2019, there was a leak of the deadly gasses' phosphine and silane at Apple's 3250 Scott Boulevard factory. Apple did not report the 2019 phosphine and silane leak

---

[104] DOJ, *Apple's Former Director of Corporate Law Admits Insider Trading*, June 2022, https://www.justice.gov/usao-nj/pr/apple-s-former-director-corporate-law-admits-insider-trading
[105] Bloomberg Law via YouTube "*Bruce Sewell, Apple's Former General Counsel,*" quote at 16:51-20:10.
[106] Columbia Law School via YouTube, "Former General Counsel of Apple Interviewed by Columbia Law Student," quote at 18:19-20:33.
[107] See, Loren Fox: *Enron: The Rise and Fall*, pg96 quoting ex-Enron CEO and now convicted felon, Jeffrey Skilling, speaking about Enron's business model: ("*We like risk because you make money by taking risk.*")
[108] Columbia Law School, "*Former General Counsel of Apple Interviewed by Columbia Law Student*," quote at 36:55-39:55, https://youtu.be/-wuf3KI76Ds?si=wIPC3dIbsRX3588y&t=2126

to the California Office of Emergency Services (CalOES). Apple coerced the city Fire Department to use a codename for Apple in their incident report, and the agency complied and referred to Apple and their secret factory as "*Project Aria*."

163.    In September 2019, Gjovik emailed Apple Business Conduct requesting permission to write for the law school's newspaper. Business Conduct approved as long as she did not use Apple devices. Gjovik wrote, *"I work in an engineering group and we 'live on' devices and file bugs when we find issues. My teammates were actually excited about me being in school, because I would hit some interesting use cases that employees normally do not. I also do not have a backup phone or cell service that is personal only — because we really want live on from the teams.*" Business Conduct then replied with advice from Global Security, that actually, Gjovik's interpretation of Apple's "live on" request is correct, and just ensure any work for "clients" is not done on Apple devices.

164.    On September 4 2019, Gjovik experienced a severe fainting spell at her Apple office at 825 Stewart Drive that last for several hours, requiring her to sit down in a chair, sit down on the floor, and even lay down on the floor of her cubicle.  Gjovik's fainting spell started in Mike's office, she took an EKG with her Apple Watch, and she communicated her symptoms to Mike. The spell continued at Gjovik's desk. A coworker in the Apple Government Affairs team had asked Gjovik to quickly send the Apple VP of Public Policy and Government Affairs, Cynthia Hogan,[109] a copy of Gjovik's white paper on Apple's AI ethics practices. Gjovik laid on the floor, dizzy, while drafting the email to the VP and sending the file.  Later, Gjovik told David Powers about the fainting spell at some point the week after. Under information and

---

[109] Axios, *Apple policy exec leaving company*, May 13 2020, https://www.axios.com/2020/05/13/apple-policy-exec-leaving-company "*Cynthia Hogan, Apple's vice president for public policy and government affairs, has resigned from the company, Apple said. Hogan was recently tapped by the Biden campaign as one of four leaders of its vice presidential selection committee.*"

belief, the fainting spell was due to vapor intrusion from the TRW Microwave Superfund site contamination.

165.    In September 2019, the US EPA emailed about high levels of TCE in the outdoor air at the TRW Microwave Superfund site (Gjovik's office) and across the Triple Site. The EPA said they were "concerned" and the TCE has been "in*creasing over the past few years*." EPA noted the TCE concentrations are "*often exceeding … indoor air residential… concentrations*." EPA wrote that the levels of TCE in the outdoor air of Gjovik's office were "*close to exceeding*" the threshold for fetal heart defects in the first trimester of pregnancy.



**Exhibit**: *NOAA: TCE (Trichloroethylene) ["Poison"]*

166.    Around 2019, US EPA and California EPA oversaw vapor intrusion testing of buildings on the Synertek Superfund (EPA ID CAD990832735, Responsible Party is Honeywell) plume originating from 3050 Coronado Blvd in Santa Clara California. The Superfund property is owned by the same person, Kalil Jenab (a Cushman & Wakefield Vice

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Chairman) who also owns the 3250 Scott Blvd property and rented it to Apple for silicon fabrication activities.

167.    Around this time, both EPA agencies were overseeing bioremediation of the Synertek Superfund plume which resulted in a "bounce-back" of increasing TCE, vinyl chloride, and other chemicals. US EPA CERLCA project manager Fatima Ty and manager Edwin "Chip" Poalinelli managed the site and were aware, per US EPA FOIA documents.

168.    At this time there was also increasing chemical contaminants in groundwater wells near Apple's 3250 Scott Blvd factory and Irvine Company's 3255 Scott Blvd apartments. There was no state or federally overseen vapor intrusion testing at either of the properties despite them being on the plume.

169.    On November 25 2019, Gjovik received an email in her work email account inviting her to participate in DNA testing with a company called Color via the Apple AC Wellness Center. The invitation said: "*AC Wellness is generously offering the Tier 1 Hereditary Conditions Test for free. Get your Color test by clicking the button below.*"[110] Apple failed to mention that AC Wellness is a for-profit subsidiary of Apple Inc, that Apple Board member Susan Wagner is also a Board member at "Color," and that ex-CEO Steve Jobs' wife Laurene Powell Jobs had also invested in the start-up "Color".[111] Gjovik requested a DNA kit and the

---

[110] Email "*Claim your Color test*" from support@color.com to ashleygjovik@apple.com, November 25 2019.

[111] Matthew Lynley, *Color Genomics raises $45 million to provide cheaper genetic tests that detect cancer risk,* TechCrunch, Sept 27 2016, https://techcrunch.com/2016/09/27/color-genomics-raises-45-million-to-provide-cheaper-genetic-tests-that-detect-cancer-risk/; Sarah Buhr*, Confirmed: Color Genomics is in the final stages of an $80 million Series C financing ro*und, August 16 2017, https://techcrunch.com/2017/08/16/color-genomics-has-raised-52-million-in-equity-financing/ Michael Flynn, Informed Consent: Does "Ok" Really Mean "Ok?", 16 J. Health & Biomedical L. 29, 44–45 (2019) citing *Moore v. Regents of the University of California* – (The California court applied the patient-based standard, stating that the physician had a duty to disclose the financial interest he had in the procedure conducted *45 on the patient, even if it was unrelated to the medical treatment.142 The court came to this conclusion based on three principles: 1) every person has a right to control his or her body; 2) the patient is entitled to informed consent; and 3) the physician has a duty to disclose all information that is material to the patient making the decision.")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

confirmation email said "*Thank you for claiming your Color test. We'll email you when your test kit ships, along with tracking information. If you haven't already, we encourage you to add your health history, as it helps inform your results.*"[112] Color emailed Gjovik no less than four times asking her to disclose her health history. Gjovik refused to provide her health history despite the constant nagging. Gjovik's results were released on January 21 2020.[113]

170.   In February 2020, the California Supreme Court described Apple's legal arguments defending their unlawful employment practices as *"farfetched," inconsistent*, and "*untenable.*" [114] The Court described Apple's work policies at issue as "*draconian.*" The Court ruled against Apple and Apple Inc agreed to pay $29.9 million to a class of retail employees.

### iv.   Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020)

171.   When Gjovik contacted US EPA in 2020 complaining about solvent exposure, US EPA (Ty and Poalinelli) claimed there were no issues or reason to think anything was wrong and did not disclose anything about the vapor intrusion testing or increasing contaminants at nearby wells. Under information and belief, Apple, Irvine Company, Jenab, Honeywell, and US EPA Region 9 employees Ty and Poalinelli, were conspiring to secretly avoid testing and disclosures to reduce the cost of regulatory compliance for Apple and Irvine Company.

172.   In February 2020, Gjovik moved into an apartment complex at 3255 Scott Boulevard Santa Clara California. Gjovik quickly fell ill and became disabled. Gjovik suffered

---

[112] Email: "Thank you for requesting your Color Kit" from support@color.com to ashleygjovik@apple.com Nov 25 20219, (Purchase #: 9177550947)
[113] Email "Your Color results are ready"" from support@color.com to ashleygjovik@apple.com Jan 21 2020.
[114] *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1055-56, 258 Cal. Rptr. 3d 392, 405-06, 457 P.3d 526, 537-38 (Feb. 2020)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

severe fainting spells, chest pains, palpitations, stomach aches, fatigue, and strange sensations in her muscles and skin.

173.     In February 2020, TCE was identified in Apple's wastewater at 3250 Scott Blvd again. Apple still had not reported any possession of TCE on site. Under information and belief, Apple was using TCE at their semiconductor fabrication plant but never disclosed it to regulators, and avoided disposing of it through hazardous waste disposal facilities which would require manifests, and so instead flushed it into the sewers in order to avoid regulators finding out about the TCE usage.

174.     Gjovik visited the Emergency Room on February 13 2020, and Urgent Care (at AC Wellness, Apple's in-house clinic) on February 20 2020. AC Wellness Network LLC is a for-profit subsidiary of Apple Inc. [In January 2021, Gjovik learned that the doctors and other medical professionals at the AC Wellness clinics "report to" a Director (Osman Aktar) in Apple's Operations team under Jeff Williams (who also oversees manufacturing supply chains, like what 3250 Scott Blvd is used for). Gjovik used AC Wellness for primary medical services from 2015-2020. ] Gjovik left for a different provider when her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (from Apple's solvent exposure) and instead suggested Gjovik could be suffering from anxiety.

175.     Gjovik went on short-term disability due to her severe, mysterious illness. Gjovik was screened for multiple severe and fatal diseases and disorders including Multiple Sclerosis, brain tumors, fatal arrythmias, Neuromyelitis Optica, and more. Due to the solvent exposure, Gjovik suffered skin rashes, burns, hives, and her hair fell out to the extent she had a shaved head for most of 2022 as the bald patches still grew back. Gjovik saw dozens of doctors, who screened her for all sorts of diseases, subjecting Gjovik to extensive blood draws, urine samples, injections, and scans. Gjovik was too sick to work so she was forced to sue all her sick time and

go on disability, which required an incredible amount of paperwork, meetings, and stress in dealing with the administrator Sedgwick.

176.    Gjovik attempted to come back to work around June 2020 even though she did not feel better or find out what was wrong, but she kept having fainting spells so she went back on full disability leave. Gjovik tried to come back again around August 2020 but started at two days a week. Gjovik still struggled (because she was still being exposed to Apple's factory exhaust) and she did not feel better until after she moved out.

177.    On August 27 2020, there was smoke in the air due to wildfires and the smoke entered the building at 825 Stewart Drive. Employees were complaining of burning eyes and sore throats. Apple EH&S investigated the employee complaints and informed Gjovik's team that no action is required by Apple unless the indoor air particulate matter exceeds 500 ug/m3. Gjovik complained to David Powers that 500 ug/m3 was literally "hazardous" and there were many stages of unsafe air prior to exceeding 500 ug/m3. Powers ignored Gjovik's complaints.

178.    On September 2 2020, Gjovik discovered there were elevated and unexpectedly 'spiking' levels of volatile organic chemicals inside her apartment at 3255 Scott Blvd. The timing of the spikes aligned with her most severe health issues.

179.    Gjovik gathered data on VOC air pollution patterns, documented medical symptoms at times the VOCs 'spiked,' and had an industrial hygienist test Gjovik's indoor air. Because there was no public information disclosing what activities were occurring at 3250 Scott Blvd, Gjovik assumed the VOCs were solely from the Superfund site next door and/or the Brownfield contamination on site.

180.    Gjovik told Dan West and David Powers about what she discovered on September 2 2020, also asking their help to find someone to measure the chemicals in her apartment:

"I need to find someone to measure tVOC (volatile organic compound) levels in my apartment & create an official record. This is generally a commercial/industrial thing apparently, I'm getting a bunch of very high tVOC (Total Volatile Organic Compounds) gas spikes. Always at night, around when weird stuff is happening, sometimes almost every night…. I woke up at 3am last night feeling terrible and having trouble breathing…and today I looked back & saw the air spike into the "can't even graph this poison" tVOC territory at 3am. I've had a lot of these middle of the night, wake up choking/sick incidents since I moved in. I wonder how many of them overlapped with these poison spikes…. Some of the spikes are so high, the monitor can't even report it (goes beyond "very polluted" which itself looks to be defined as toxic gas levels often found in laboratories with industrial chemicals). I don't know what you'd call it going beyond *that.*""

181. On September 2 2020, Dan West responded to Gjovik,

"Just got off the phone with a buddy…. the head of EHS at a medical devices company. His suggestions: If you suspect it's the air in your apartment. Get out of there right away - even if it means going to a hotel. Your health is more important and it's really hard to prove anything. He's spent hundreds of thousands of dollars doing stuff at company sites and he still isn't convinced it did much…. You can also hire someone called an industrial hygienist. I've never heard of this profession. Apparently, they can come to your location with all of the right equipment and do testing that is supposed to be best in class…He closed with pushing to have you move again. His position is that if you run the tests and it's bad, they probably won't be able to fix it. So you'd end up moving anyway."

182. David Powers then replied to Gjovik and West on September 3 2020 writing,

*"I'm asking around. Your journey has just taken a pretty major twist! I'm glad you were able to figure this out. Are you going to warn others in your apartment?"*

183. In September 2020, Gjovik set up additional air monitors to watch the levels of VOCs in her apartment next to the 3250 Scott Blvd factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Gjovik had noticed with her symptoms and ad hoc testing, that the VOCs mostly spiked early in the morning and late at night, like with an automated exhaust system.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



Exhibit: 9/2/20 Text Messages          Exhibit: Data Showing tVOC Trends

184.    Gjovik noticed there was an Apple facility at 3250 Scott Boulevard across the street and it was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on at least September 8, 9, 10, and 13 2020 – inquiring if anyone was familiar with the area because Apple had an office there and Apple having at least one phone call with her – Elizabeth Schmidt, who was also actually in charge of the EH&S team overseeing Gjovik's Superfund office at 825 Stewart Drive.



*Exhibit: One of Gjovik's Emails to Apple about the Site*

185.    At no time in 2020 or later did Apple ever disclose their fabrication activities and chemical/gas emissions at 3250 Scott Boulevard to Gjovik. The prior TRI registration was for a different company and Apple did not submit their first filing until mid-2021. For all Gjovik knew, 3250 Scott Blvd was currently a simple office building. The Apple Real Estate manager

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

did suggest Gjovik use a special type of paid leave to move out of the apartment called '*extreme condition leave'* which was designated for natural disasters.



> On Sep 9, 2020, at 6:28 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>
> Hi!
>
> Hope you're both well and hanging in there.
>
> Could I talk to one of you about whether there are any Extreme Conditions Services that might be able to help me in a bit of horrific situation I'm in? Or anything else.
>
> I just talked to the Real Estate & Dev folks (I had emailed safety@apple with questions about hazardous waste, and it was escalated to Elizabeth to help) and she recommenced I ask you about it. She wasn't sure that's exactly what it was called, something like Extreme Conditions, but the misc junk drawer of disaster/catastrophe support.
>
> Come to find out, my massive health issues this year are very likely caused by the fact my brand new apartment building was built on top of a mountain of unmonitored and mostly un-regulated hazardous waste. I have a lot of phone calls going on right now with doctors, lawyers, and government agencies about it.

*Exhibit: "Extreme Condition Leave" due to 3250 Scott Blvd*

186.    Apple reported to the US EPA that in the year 2020 they released 7.8 tons (15,608 pounds) of volatile organic chemicals and 260 pounds of the now-banned combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air from the 3250 Scott Blvd factory.[115] Gjovik's apartment at 3255 Scott Blvd was only a few hundred feet from the exhaust vents at 3250 Scott Blvd.

---

[115] US EPA, Federal Register, Document 2022-27438, Vol. 87, No. 242, December 19, 2022, ("EPA determined that NMP, as a whole chemical substance, presents an unreasonable risk of injury to health when evaluated under its conditions of use."); US EPA TRI report, 3250 Scott Blvd, 2020: https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885 &fac_search =fac_beginning ; US EPA Air Pollutant Report, 3250 Scott Blvd, 2020, https://echo.epa.gov/air-pollutant-report?fid=110001168254

| | | | | | | |
|---|---|---|---|---|---|---|
| 8.1a | Total on-site disposal to Class I Underground Injection Wells, RCRA Subtitle C landfills, and other landfills | | NA | NA | NA | NA |
| 8.1b | Total other on-site disposal or other releases | Pounds | NA | 260.17 | 260.17 | 260.17 |
| 8.6 | Quantity Treated Onsite | Pounds | NA | 2341.51 | 2341.51 | 2341.51 |
| 8.7 | Quantity Treated Offsite | Pounds | NA | 14742.82 | 14742.82 | 14742.82 |

*Exhibit: Image from Apple's TRI filing for NMP*

187.     The US EPA TRI regulatory filing for 3250 Scott Blvd claims an additional 14,743 pounds of NMP was taken offsite to three waste processing facilities. However, there are zero DTSC hazardous waste transport manifests from 2015-2022 for NMP. Under information and belief, either Apple lied that the NMP was taken offsite and instead disposed of it onsite, or Apple did take the NMP offsite but used illegal hazardous waste transporters and disposal facilities without manifests and lied about it. (See, "*Wire & Mail Fraud*" under RICO Predicate Acts).

188.     In September 2020, Gjovik hired an industrial hygienist to test the indoor air at her apartment and it returned results showing a number of the chemicals in use by Apple at 3250 Scott Blvd including: Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, 1,2,4-TMB, Xylene. However, the TO-17 test only returned chemicals for ½ of the total VOCs it accounted for. The testing panel did not test for NMP, Arsine, Phosphine, Silane, or Chlorine – and these may have also been present.

189.     In September 2020, Gjovik had her doctor order panels of blood and urine tests looking for chemical exposure. Gjovik went in first thing in the morning, after a bad night with multiple exposures, and when she had the blood draw, the nurse said it was the most blood

they've ever drawn in one sitting – and in fact the tray holding all the blood vials became too heavy on one side and crashed onto the floor, spilling dozens of vials of Gjovik's blood everywhere. As the tray fell, it also pulled the needle out of Gjovik's arm, and leaving blood spitting out of her arm like a horror movie. There was evidence of at least Toluene and Arsine gas in her blood.

190.    On October 25 2020, Gjovik's Occupational Exposure doctor, Dr. Robert Harrison with UCSF and the California DPH wrote to Gjovik's iCloud email address: *"These multiple measurement [show] your improvement once you moved – sure do point to the effects of VOCs. So glad you feel better."*

191.    On November 12 2020, Northrop Grumman conducted the first sub-slab ventilation vent inspection on the roof of 825 Stewart Drive. Northrop Grumman would have seen that Apple sawed down the vents from 3 feet to 1 foot and installed the HVAC intake on top of the vents in the section of the building where Gjovik sat. Northrop Grumman did not submit a report of their findings until demanded by the EPA in May 2021, and even then, did not mention these issues.

192.    In November 2020, Apple's Chief Compliance Officer and head of Apple's Global Security team, Tom Moyer, was indicted for bribing the Santa Clara County Sheriff's office. (See "*Criminal Bribery of Public Official*" under RICO Predicate Acts). [116] Two Apple Global Security executives turned state's evidence on Moyer and Apple in exchange for immunity.[117]

193.    In 2020, John B. Frank was a Chevron Board member and James Irvine Foundation Board member, and Frank was a Director at Oaktree Capital. In 2020, the 3250 Scott

---

[116] *Apple's head of global security indicted on bribery charges:* Washington Post, (Nov 2020), https://www.washingtonpost.com/technology/2020/11/23/apple-sheriff-bribery/
[117] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty,* 2020, https://www.mercurynews.com/2020/10/19/main-witness-in-santa-clara-county-concealed-gun-bribery-case-pleads-guilty/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Blvd factory was tied to Chevron through Ronald Sugar, and to Irvine Company through the 3255 Scott Blvd apartments next-door (where Gjovik lived). Gjovik's office at the 825 Stewart Dr building on the TRW Microwave Superfund site was tied to Chevron through Ronald Sugar, tied to Irvine Company through the new housing development next-door on the groundwater plume, and tied to Oaktree Capital as Oaktree Capital owned the 825 Stewart Drive property from 2014-2016. Under information and belief, these parties conspired about this real estate.

194. Gjovik met the Apple attorney responsible for EH&S and CERCLA due diligence back in early November 2020, Debra Rubenstein. During those meetings with Rubenstein, Gjovik was discussing what happened at her apartment and Rubenstein confided she recently joined Apple's legal team and was concerned to learn that Apple had not been doing vapor intrusion testing on their Superfund offices. (In 2021, Gjovik talked to Mike and Ekelemchi Okpo about her concerns about what Rubenstein had said and that it was making her concerned about Apple pretending the 2021 testing was routine. Gjovik texted Okpo a follow up of Rubenstein's LinkedIn on July 28 2021, to which Ekelemchi Okpo responded, "*Thank you.*")

195. On November 6 2020, Gjovik met with another Chemical Exposure doctor, Dr. Kari Nadeau, at Stanford. Dr. Nadeau wrote in Gjovik's visit notes,

> "It sounds Ashley's symptoms were a response to chemical exposure, and the timing of her symptoms aligns with her living in the [3255 Scott Blvd] apartment. The severity and timing of the symptoms points to some type of industrial chemicals in her apartment and/or the property beneath it." … "I recommend the government agency in charge of the remediation site where she was living investigate the soil and groundwater as potential causes for her symptoms."

196. In December 2020, Apple submitted a request to revoke the DTSC consent decree in place since 2016. Under information and belief, the head of CalEPA at that time, Jared Blumenthal, orchestrated a revocation of the consent agreement despite Apple being in violation

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

of the order, in exchange for a position as President of the Waverly Foundation working for Lisa Jackson and Laurene Powell Jobs, and/or other favors.

197.   On December 14 2020, Apple submitted their first hazardous waste manifests for activated charcoal at the 3250 Scott Boulevard facility. The manifests were for 630 pounds of activated charcoal.

198.   Under information and belief, Apple did not change the charcoal/carbon filters for their solvent exhaust from 2015 until December 14 2020, despite maintenance protocols usually calling for replacements at least every six months.[118] The carbon Apple removed was notated as non-RCRA waste, which is likely inaccurate and unlawful coding of solvent-soaked charcoal. Under information and belief, if Apple did replace solvent-soaked charcoal prior to 2020, it did so without manifests, and illegally disposed of hazardous waste without proper transporters or disposal.

| Table: Apple's Manifests at 3250 Scott Blvd for Carbon and Filters | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Activated Charcoal (Carbon) | 0 | 0 | 0 | 0 | 0 | 630lbs | 980lbs | 1255lbs |
| Roof HVAC Filters | 0 | 0 | 0 | 0 | 0 | 0 | 400lbs | 0 |
| Vacuum Filters | 0 | 0 | 0 | 0 | 0 | 0 | 60lbs (with glass) | 0 |

199.   On or around December 2020, Charlene Wall-Warren, director of Environmental Technologies, reporting to Yannick Bertolus (Dan West's manager), suggested Gjovik join her

---

[118] Uniform Hazardous Waste Manifest, Apple Inc, Activated Carbon, Dec 14 2020, Tracking #014565900

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

team in a position working on implementing circular economy legislation across the company, including projects like "right to repair." Gjovik expressed to West and Wall-Warren that she would love to transfer to the role. Around January 2021, West informed Gjovik that Wall-Warren requested to have Gjovik transferred to her team and West declined to allow Gjovik to leave his team.  As of January 2021, Gjovik had attempted, and continued to attempt, to find a role where she could stay working at Apple indefinitely.

v. **"Skipping the Line": The Vaccine Hoarding Incident (2020)**

200.    In December 2020, Apple Senior Vice President Dan Riccio held an 'All Hands' for his staff, which included Gjovik. During the All Hands, Dan Riccio made a comment that he had just left a meeting with Apple CEO Tim Cook and that Apple entered a deal where they will obtain "early access" to the COVID-19 vaccines. Riccio said Apple will only need to 'wait' for doctors and the elderly, and then Apple will get 'a lot' for employees and their families, and even have 'extra left over.'

201.    Gjovik was disturbed and upset by Riccio's comments. At that point in the pandemic, there was a great need for vaccines for those with pre-existing conditions, front-line workers, and other high-risk populations. Riccio's comments inferred Apple arranged a backroom deal to 'skip the line' on the vaccine and intended to hoard the vaccines.

202.    Indeed that same month, public articles were being published warning about how "*the rich and privileged*" will "*skip the line for Covid-19 vaccines*" and create a "*black market*."[119] Attempts of the rich and powerful to '*jump the line*" ahead of the people who

---

[119] Olivia Goldhill and Nicholas St. Fleur, '*There absolutely will be a black market': How the rich and privileged can skip the line for Covid-19 vaccines, STAT* News, December 3 2020, https://www.statnews.com/2020/12/03/how-rich-and-privileged-can-skip-the-line-for-covid19-vaccines/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

actually need the vaccines the most has been characterized as an "*antisocial behavior.*"[120] Companies caught trying to jump the line have been shamed, shunned, and forced to apologize.[121]

203.    At that time, "*With the first doses in short supply, California has laid out a strict order of vaccinations based on need and risk: Healthcare workers and nursing home residents, then essential workers and those with chronic health conditions, then, finally, everyone else.*"[122] Governor Newsom acknowledged Silicon Valley executives are accustomed to getting their way. In December 2020 he said, "*Those that think they can get ahead of the line and those that think because they have resources or they have relationships that will allow them to do it ... we also will be monitoring that very, very closely.*"[123] Newsom also threatened to sanction and revoke professional licenses of those engaged in line jumping.[124]

204.    Gjovik complained to West and Powers, but they never responded in a meaningful way. Gjovik then escalated her concerns to a Senior Director colleague in a different organization, Dr. Cohen, who is seen as an ethics leader at the company. Gjovik told him what she witnessed and expressed her concerns and said if there was still time to stop Apple's plan, she wanted to try to intervene for the sake of public health and the community.

---

[120] Annike Beck, "*Inoculation Injustice: A Federal Response to Vaccine Line Jumping,*" Minnesota Law Review, February 15 2021, Volume 105, https://libpubsdss.lib.umn.edu/minnesotalawreviewprod/2021/02/15/inoculation-injustice-a-federal-response-to-vaccine-line-jumping/
[121] Bill Gardner, *Exclusive: Luxury firm offered GPs £100,000 for vaccines amid fears of jabs black market,* The Independent UK, January 8 2021, https://www.telegraph.co.uk/news/2021/01/08/exclusive-luxury-property-firm-offered-gps-100000-give-workers/
[122] Laura J. Nelson and Maya Lau, *"The wealthy scramble for COVID-19 vaccines: 'If I donate $25,000 ... would that help me?'"* The LA Times, December 18 2020, https://www.latimes.com/california/story/2020-12-18/wealthy-patients-scramble-covid-19-vaccine
[123] Id.
[124] Molly Gamble, "Skip line for COVID-19 vaccine and lose your license, California governor warns healthcare providers," Beckers Hospital Review, December 29 2020, https://www.beckershospitalreview.com/legal-regulatory-issues/skip-line-for-covid-19-vaccine-and-lose-your-license-california-governor-warns-healthcare-providers.html

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

205.     The colleague jumped on the issue and escalated the matter to at least Deirdre O'Brien (Human Resources Vice President) and Lisa Jackson (VP of Apple Government Affairs & Lobbying). Gjovik was told they were both concerned if it was true. The colleague called Gjovik to confirm that Gjovik's recollection of events before the matter was escalated further. Gjovik confirmed her prior statements and suggested they seek the recorded video of Riccio's statements.

206.     Gjovik heard that the video was obtained, and Gjovik's statements were confirmed to be accurate, that Riccio did say those things. Gjovik was told it was escalated to the "e-team" (executive team reporting to CEO Tim Cook) and they were "put on notice" about "*serious ethical issues*" if what Riccio said was ever pursued.

207.     Gjovik was told the deal was either not actually in place or would not occur now. However, on December 9 2020 she was told "*there are individual stories about test machines and treatment that are troubling, but no such company wide access is on the table, much less a done deal".*  Gjovik thanked Cohen for believing her and Cohen replied: "*It has never occurred to me not to believe [Gjovik].*"

208.     Gjovik had asked to remain confidential, noting everyone was '*terrified'* of Riccio. Gjovik was told her identity was kept confidential, though she worried that is not possible at Apple due to Apple's surveillance measures.

209.     In January 2021, Dan West texted Gjovik that employees who complain about him may '*feast on a banquet of consequences*.'

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Thu, Jan 7, 4:38 PM

random thought —> should we allow for comments on confluence for "from the desk of…"

I worry about snark. but that can't be done anonymously

so if anyone does that, they may feast at a banquet of consequences

*Exhibit: Texts from Dan West 1/7/21 about "Consequences"*

210.    Dan Riccio was demoted and reassigned about one month after Gjovik's concerns were raised, escalated, and confirmed.[125]  Gjovik now reported to David Powers and Dan West, who reported to Yannick Bertolus, who reported to John Ternus, who reported to Tim Cook.

211.    Gjovik made her identity known related to the matter during the July 2021 investigation (since Apple would find it going through her emails anyways) and labeled the evidence folder "*Corruption Whistleblowing*".

212.    Unsure whatever came of the situation, Gjovik also filed complaints with the FDA Office of Criminal Investigations and DOJ NCDF ("COVID-19 hoarding") about the matter on September 3, 2021, and posted on social media that she did on September 6 2021. Gjovik was also still using her iCloud email so Apple would have seen the email receipts.

vi.    **The TRW Microwave Superfund Site Debacle (2021)**

213.    On January 23 2021, Gjovik contacted US DOL OSHA, filing a FOIA request, and asking for "reports of chemical or heavy metal exposure, or suspected chemical or heavy

---

[125] Apple, *Dan Riccio begins a new chapter at Apple – Apple*, January 2021, https://www.apple.com/newsroom/2021/01/dan-riccio-begins-a-new-chapter-at-apple/ *("Apple today announced Dan Riccio will transition to a new role focusing on a new project and reporting to CEO Tim Cook, building on more than two decades of innovation, service, and leadership at Apple. John Ternus will now lead Apple's Hardware Engineering organization as a member of the executive team.")*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

metal exposure, during the construction and maintenance of the Santa Clara Square Apartments at 3255 Scott Blvd."[126]

214.    On February 4 2021, a coworker who also worked in the TRW Microwave building texted Gjovik that Gjovik was the only Apple employee to inform her their office was a Superfund site. She said after learning that it was a Superfund site, she stopped drinking the water in the building. On March 16, 2021, she informed Gjovik that she had fought cancer in 2018 requiring chemotherapy.

215.    On March 11 2021, Santa Clara County investigated a spill of cooling water at Apple Park and told Apple to report the spill to CalOES. Apple (Debra Rubenstein) refused to report the spill to CalOES. On March 15 2021, Apple received a Class II violation of hazardous waste laws for the spill. Apple never reported the spill to CalOES.

216.    On March 15 2021, Gjovik notified her managers, David Powers, and Dan West, that she wrote an article about her previous apartment on a Superfund site groundwater plume (next to 3250 Scott Blvd) and it was being published in a newspaper, SF Bay View. Gjovik notified them that Apple Business Conduct approved her article being published but noted she felt pressured not to write about "*the toxic nightmare that is Stewart 1*" (her Apple office)."

217.    On March 17 2021, Apple sent an email to Gjovik and Powers' management team saying it was going to test for "vapor intrusion" at Gjovik's office, 825 Stewart Drive, but did not mention it was a Superfund or explain what vapor intrusion was. Gjovik replied informing her coworkers it was a Superfund site with a link to the US EPA website for the office and two recent news articles about the site referring to the office as a *paved over environmental disaster zone*. [127] Gjovik explained what vapor intrusion was and told them to take it seriously.

---

[126] US DOL OSHA FOIA 2021-F-04615, assigned tracking number February 9 2021.
[127] Alexis C. Madrigal, Not Even Silicon Valley Escapes History, The Atlantic (July 23 2013) ["The empty octagonal glass building is a TRW Microwave Superfund site. I'd been walking on a paved-over

218.     Gjovik expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Gjovik added, *"the chemicals under [the Stewart 1 office] if in high enough quantities, can cause cancer, disruption of nervous and endocrine systems, and birth defects & miscarriages."* Gjovik asked in her email reply for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S agreed to meet with Gjovik to discuss her concerns.

219.     Gjovik quickly faced retaliation and hostility from her manager, David Powers, quickly followed by retaliation and animus from Employee Relations, and her other manager Dan West, related to her safety concerns and complaints. Less than a week after her response to the email about vapor intrusion testing, on March 22 2021, Powers gave Gjovik a "*warning*" for sharing her safety concerns with his management team and he instructed her she was only to discuss safety concerns or talk about the CERCLA status of their office with him, EH&S, and Apple Employee Relations. Powers told Gjovik it was only a "*warning*" because he said, *"she was having mental health issues."* Gjovik protested to Powers, explaining the Superfund status of their office was public information. Powers persisted & then proceeded to give Gjovik feedback on an Inclusion & Diversity presentation she gave to his management team and told her he received feedback from his all-male management team that Gjovik was *"being too hard on the white man."*

220.     On March 22 2021, Gjovik complained to a friend who was a coworker at Apple that she was getting 'yelled at' by Powers. The friend responded, "*Yelled at?! For bringing attention to a really important life-threatening situation? I mean ffs it was in pbs? KQED?*

environmental disaster zone, colonized by whoever wanted to benefit from lower leasing prices and a lack of NIMBY opponents."] https://www.theatlantic.com/technology/archive/2013/07/not-even-silicon-valley-escapes-history/277824/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Article years ago, remember?*" Gjovik added, in response to commented Powers told her not to 'freak people out,' that she told him "*How do you think I felt when my friend told me about the site when I moved in*"? The friend Gjovik was texting with about this was a Senior Manager at Apple.

221.    On March 25 2021, Gjovik emailed Powers and confirmed he told her not to tell anyone about her safety concerns, including findings from public records. She reported at least "three incidences of toxic levels of vapor intrusion" in the building, as recent as 2013. Gjovik noted the highest levels of TCE were found "*only about 10ft from [her] desk*."



*Exhibit: Gjovik's 3/25/21 email to Powers*

222.    On March 26 2021, Gjovik had published an article in SF Bay View about her chemical exposure experience with the apartment next to 3250 Scott Blvd, complaining of agency capture and government corruption.[128]

---

[128] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste*, SF Bay View (March 26 2021), https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023



*Exhibit: Gjovik's 3/26/21 Article*

223.     On March 29 2021, Gjovik messaged a coworker, Mike, who also reported to Powers, and she said, *"As of last Monday Dave has forbidden me from talking about health concerns about [Stewart 1 office] to anyone other than him, HR, and EH&S. I actually found some stuff and I can tell you, but you have to promise to tell him I'm not telling you."* Mike confirmed he would not tell Powers Gjovik was discussing safety concerns, so Gjovik did not get in trouble with Powers.

224.     Mike responded to Gjovik's map of their office with vapor intrusion results saying, *"Holy hell. Where did that [Stewart 1 office] map come from? If the entire 1st floor is over the U.S. EPA max, why is the building still open?"* Mike worked only feet away from Gjovik in their office. Gjovik explained she *made the map overlaying data from historical testing [Apple and Northrop Grumman] did with [Apple's] own maps so we can see that one place and bring it home [to Apple] that this is [Apple's] employees."* Then Mike responded, *"What's crazy is that on the Geotracker, they say no day care, no elder care, no residential, etc.*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*So, it's fine & dandy for everyone else to get slowly poisoned? Before COVID, I was at work for longer than I was at home on a daily basis. So glad you are digging into this stuff for all of us."*

225.    On March 29 2021, Gjovik noticed a person named Jenna Waibel, who worked in an organization called "Employee Relations," had been added to her meeting with EH&S. Gjovik emailed her that day: "*Hi Jenna! Not sure if it's a good or bad sign an ER HRBP got added to this*" and mentioned the article about her apartment where she got sick, and that she fainted at her office in 2019 and now thinks it was due to vapor intrusion.

226.    On April 2 2021, Gjovik met with Jenna Waibel and Michael Steiger and asked them about the land use covenant for the building, the history of vapor intrusion, and other CERCLA-related topics. Gjovik expressed concerns that the 2014 Five-Year-Report for the site mentions the already very restrictive land use covenant, is apparently out of compliance with California law and needs revised, [129] but Gjovik did not see any revisions. Gjovik asked, *"does California Civil Code § 1471 add any new requirements on the property not current reflected?"* Steiger told her simply "*that's a question for legal*" and never followed up.



*Exhibit: 4/2 Meeting Notes Excerpt*

---

[129] U.S. EPA, 4th Five Year Review: AMD & TRW Microwave Superfund Sites, 2014, https://semspub.epa.gov/work/09/1151964.pdf ["*The existing restrictive covenant was recorded prior to the passage of the California Civil Code section 1471, which establishes the framework for environmental covenants in California. The legal owners of the former TRW Microwave property should record a new restrictive covenant that is consistent with current California la*w."]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

227.    Gjovik pressed Steiger and Waibel why Apple does not inform its employees they are working on Superfund sites, repeatedly raising concerns about California Proposition 65 and state/federal Right to Know compliance. Steiger told Gjovik Apple "*Decided*" employees did not have a right to know and did not plan to inform them. Gjovik protested saying she though there were legal, ethical, and even practical reasons employees should know – including so they knew to look for signs of vapor intrusion and how to report it. Steiger and Waibel continued to ignore Gjovik's concerns.

228.    On April 3 2021, Gjovik asked Jenna Waibel to explain to Powers that she is supposedly allowed to talk to coworkers about safety concerns and that he is not supposed to retaliate against her. Waibel would refuse to do this, despite repeated asks from Gjovik over the next few months.

On Apr 3, 2021, at 5:24 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Jenna,

Thanks again for your support. Favor to ask of you: that script that Michael read — about there being no prohibitions on Apple employees speaking out about concerns related to work place conditions, & no retaliation for speaking out either — was really great.

Any chance you could send me a written version I can forward to my manager?

My manager doesn't seem aligned on the messaging. Last Monday he told me directly I was not allowed to speak out about my concerns about the site to anyone in the organization — nor was I allowed to share any details from my meeting with EHS & you with our organization either. He said I was only allowed to talk to him and EHS about it going forward. He told me this under the premise of "employee feedback," and insinuated I was only being let off with a warning this time because of my "mental health issues" (verbatim) due to what happened to me last year at my apartment. I have told him previously I'm suffering from PTSD from what happened last year — but I didn't expect it to be linked into the current situation like he did.

Like most HWE managers, I don't think he had bad intent, just some people skill, diplomacy, & empathy deficits. Would be very helpful to me if I can have an email to forward to him clarifying what I'm allowed and not allowed to do — and that there should be no retaliation (like perf review) for speaking out. I suspect that should address the issue.

Thanks!

*Excerpt: Gjovik's Email to Waibel on 4/3*

229.    On April 4-5 2021, Gjovik raised her concerns about her office with West saying, "*Did you know that [Stewart 1 office] has a history of TCE, vinyl chloride, & chloroform vapor intrusion as recent as 2013? Beyond industrial limits, inside. And they haven't done any testing*

*or monitoring since 2015."* She added she was asking Apple EH&S to *"reconsider the current policy of not disclosing Superfund status to the employees that work in these sites."*

230. West replied, *"Didn't know that. I'm pretty sure that before we moved in there was some testing. Not sure what though."* Gjovik responded, *"He said they did more remediation in 2014 and did some indoor air testing in 2015 and it was fine now, and they expect it to be fine. And I'm like what if the floor cracks, it's literally hades down there, and he's like yeah that would be bad, let us know if you smell anything weird. ER was there too. I expressed my understanding but general displeasure."* West replied, *"It's all supposed to be sealed. Under the foundation…But I'm no expert."*

231. Gjovik messaged with her West, on or around April 5 2021, about the chemical exposure at her previous apartment, which sat on contamination from a Brownfield and a Superfund site and was also next to 3250 Scott Blvd. West called her #ErinBrokovich, then warned her she is "*kicking a hornet's nest.*" West asked Gjovik not to send him information about Gjovik's chemical exposure at 3255 Scott Blvd to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits."*



*Exhibit: Gjovik's texts with West – 4/5/21*

232.     On April 5 2021, Gjovik messaged with West about an article she wrote about the apartment on hazardous waste she lived at that made her ill in 2020. Gjovik informed West five other people contacted her who were also sick at the apartment and that she had been warned about retaliation, possibly including physical violence, from the property owner, Irvine Company.

233.     Gjovik told West she had sleeping with a knife under her pillow and West told her not to sleep with the knife anymore, or a gun, so it will not be used against her and to instead obtain pepper spray or a taser.

234.     West also warned Gjovik should worry about digital surveillance as well and suggested Gjovik purchase a necklace that includes a panic button and calls ADT agents. West told Gjovik *"If you don't have a therapist give EAP a call. You're in a stressful situation (to say the least)."*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

235.    Gjovik informed West she had a therapist but was still struggling and had to increase her anxiety medication.

236.    On April 11 2021, Gjovik wrote to Powers, forwarding the email she sent with questions and concerns to Steiger and Waibel including about "*compromised*" and "*missing*" sub-slat vents per the documentation, telling Powers, *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on."*

### vii.    Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021)

237.    On April 5 2021, Gjovik also notified Osman Akhtar, Director of Apple "AC Wellness" employee medical Centers and Clinical Engineering, with whom she had been in previous contact with, sharing that after her article was published more people came forward from the 3255 Scott Blvd apartments reporting illness.

238.    Gjovik told Akhtar "*Two are Apple employees. At least one went through AC Wellness but no one could figure out what's wrong with them*." Gjovik suggested the clinic should start "*screening local folks*" with unexplained medical symptoms that match solvent exposure. Apple was on notice about the impact of its factory to the community and its own employees.

239.    On and around April 5 2021, additional victims came forward reporting solvent exposure medical systems while living next to Apple's 3250 Scott Boulevard factory. Some of them were current Apple employees. Two women contacted the government complaining of medical issues similar to Gjovik's.

240.     Around April 2021, Gjovik told Mayor Gillmor, via Gjovik's iCloud email address, she was starting to investigate the industrial buildings uphill from 3255 Scott Blvd (which is where 3250 Scott Blvd was). Apple's retaliation against Gjovik quickly increased distracting Gjovik away from further investigation and instead redirecting Gjovik to what was happening in her office.

241.     In April 2021, one of Gjovik's law professors suggested she contact the Santa Clara County District Attorney's office and document her findings and concerns. The professor was a prior criminal law attorney and warned Gjovik that her complaints about the pollution and chemical exposure she discovered could lead to retaliation and violence.

242.     Gjovik contacted the County District Attorney's office on April 9 2021 and talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes. They scheduled a meeting and discussed Gjovik's concerns about 3255 Scott Blvd on April 16, 2021. Apple would have seen these emails on Gjovik's work devices.

243.     On April 15 2021, Gjovik sent an email to Dr. Cohen, Apple Senior Director, complaining of Apple's conduct related to her office at 825 Stewart Drive and the mishandling of her complaints. Gjovik said she wanted to raise "*ethical concerns*" and complained that Apple's conduct was "*morally wrong*."

244.     On April 21 2021, Gjovik raised concerns to Apple's Inclusion & Diversity team, via John Brown, complaining of disparate impact of chemical exposure at Apple's offices toxic waste sites, disproportionally harming non-white people and women. The I&D manager asked Gjovik to draft a business justification for Apple to not expose Black and Brown people, and women, to industrial chemical vapors. Gjovik wrote to Brown:

> The majority of apple buildings are on really gross EPA Superfund and chemical
> release sites. For example, my building in Sunnyvale is on one of the worst
> superfunds in the country with decades of vapor intrusion at levels dangerous to

91

human health. Apparently, Apple's official policy is that they have no obligation to disclose the status of these sites (even with dangerous chemicals on site) unless they believe, based on data, that human healthy is actively being harmed. At the same time, they appear to be doing very little or no testing or monitoring. I'm interrogating EHS right now — despite decades of vapor intrusion testing, after they did a really short and limited number of tests that for the first time ever were in range, they never tested or monitored again until later this year (not done yet).

Apparently, women get worse health issues from this type of chemical exposure. Because we have high body fat and sensitive hormones, etc. So if there are chemical vapor issues in buildings, women will get sicker. It also can mess with our reproductive health and pregnancies. But then EJ…. Which employees are going to spend the most time around vapor intrusion pathways (plumbing, vents, etc.) — probably our Black and Brown employees working in maintenance & cooking type roles. Who's going to spend the most time physically exerting themselves running things around at these buildings? Probably our technicians and admins, who are also predominately people of color and women, respectively. Our technicians are predominately Black & Brown. So are the maintenance staff.

245.    Brown responded: *"Have you done a well-crafted succinct email on the issue, the impact of the issue, and possible solution to consider that you could send to EHS?"* Gjovik replied, *"They're fully aware and don't care Or at least legal said they don't care and EHS is following that."*

246.    Brown replied: *"So what is your actual ask of Apple in three bullet points?"* Gjovik responded:

"1) inform apple employees of the presence of industrial chemicals in the soil & groundwater beneath their buildings, along with any anticipated health risks 2) empower apple employees to understand these sites and their rights around them (like who at the EPA to call if they have questions about their specific building and want a neutral 3rd party) 3) do ongoing vapor intrusion testing and

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

monitoring on buildings who have VI risk and train employees on site how to identify possible VI issues (medical symptoms, smells, etc.) In a perfect world 4) require informed consent for employees to actually be assigned to work in the worst of these buildings."

Brown never replied.

247.    In April 2021 and through August 2021, Gjovik complained to Apple about an apparent failure to properly report and track workplace injuries. In April 2021, Gjovik was convinced a fainting spell at her office in September or December 2019 was due to vapor intrusion. Apple Human Resources Business Partner Helen Polkes insisted Gjovik file a worker's compensation claim for the fainting spell. Gjovik questioned Apple's justification and incentives in requesting Gjovik file the claim nearly two years after the fact. Gjovik documented her confusion in emails with Polkes, Powers, and coworkers.

248.    Gjovik did follow Polkes instructions and filed a claim on April 21 2021, signed April 26 2021.[130] Gjovik texted a coworker about it and said the "Sedgwick lady told [her] to consider suing Apple."

249.    On April 21 2021, Gjovik contacted the US EPA about her Apple office on the TRW Microwave Superfund site.

---

[130] Workers Compensation Claim for Chemical Exposure (# 302174831070001) § Filed: 4/26/2021; Dated: 12/4/2019

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

From: Ashley Gjovik <ashleygjovik@icloud.com>
Sent: Wednesday, April 21, 2021 9:29 PM
To: Schulman, Michael <Schulman.Michael@epa.gov>
Subject: Questions about TRW Microwave (Building 825) in Sunnyvale CA -
CAD009159088

Hi Michael! I hope you're well.

I work for Apple in the TRW Microwave (Building 825) site in Sunnyvale — part of the
"Triple Site."

I have some concerns about the current status of the building. I'm talking to our EH&S
team at work about it and they said I'm allowed to reach out to you and talk to you
directly as well.

I've skimmed the majority of the site documentation on the EPA and Water Boards
portals. (Thanks for adding the 2019 FYR!) Apple also shared the Dec 2015 indoor air
testing summary.

Would you be open to a phone call to discuss the site and some of my open technical
questions? I can talk before 10:30a or between 2-4pm tomorrow, or anytime Friday
before 11am, or between 12-2, or after 3pm.

*Excerpt: Gjovik Email to EPA 4/21*

250.    On April 23 2021, the US EPA told Apple that Gjovik contacted them about her

Apple office. EPA's emails about Gjovik's questions and concerns advised, per Fatima Ty, that

Apple should be included in any conversation that the US EPA had with Gjovik about the TRW

Microwave Superfund site. Ty justified this requirement due to Ty's work "*in EHS at IBM.*" US

EPA (Margot Perez-Sullivan, Fatima Ty, Edwin "Chip" Poalinelli, and Michael Schulman)

drafted an email to Gjovik informing Gjovik they told Apple that Gjovik contacted them, but

never sent it.

251.    On April 29 2021, Gjovik visited an occupational exposure doctor (Dr. Robert

Harrison who directs the UCSF Occupational Health Services department and the Worker

Investigation Program for California Department of Public Health[131]), about her exposure at

---

[131] UCSF, Dr. Robert Harrison MD MPH, https://profiles.ucsf.edu/robert.harrison

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

3255 Scott Blvd (the apartments next to Apple's 3250 Scott Blvd factory) and at 825 Stewart Drive.

252.    The UCSF visit notes summarized Gjovik's 2020 medical symptoms as "*Specifically, she was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal bleeding, and swollen glands*" The UCSF visit notes stated: "*there remains a concern about potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies.*"

253.    The April 29 2021 UCSF Occupational Exposure visit notes stated: "*She also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues in the building. She states her apartment was built in an industrial area next to a the Synertek Superfund and next to Apple Materials Superfund and Intel Magnetics Superfund. She also notes her current office is in TRW Microwave building on an EPA Superfund "Triple Site."*

254.    Under California law, by April 2021, and as early as February 2020, Gjovik was an environmental crime victim because she was a "*victim of a crime that caused physical injury*" and suffered "*physical, psychological, and financial harm due to the attempted commission of a crime or delinquent act*" from Apple's criminal actions at 3250 Scott Boulevard[132] and 825 Stewart Drive[133] (even if she did not know it was Apple or understand the cause of her harm

---

[132] RCRA, CAA, Right to Know
[133] CERCLA, CWA

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

until later), and thus Gjovik was protected under Cal. Lab. Code § 230 against retaliation due to her crime victim status and any of her actions in ensuring her health, safety, and welfare.[134]

255.    Under federal law, by April 2021, and as early as February 2020, Gjovik was an environmental crime victim suffered direct physical, emotional or financial harm as a result of the commission of a federal crime.[135] As with *BP Products*, Gjovik was seriously injured by Apple's unlawful release of hazardous air pollutants In cases where an environmental crime.[136] either brings about obvious harm (deaths and injuries in the BP Products case) or where proven exposure is a harm in itself (asbestos exposure in Keith Gordon-Smith), a court's identification of victims can be relatively direct.[137] Harm caused by environmental crimes can include physical and psychological injury, death, and pecuniary loss and property damage.[138]

256.    Gjovik has the right to receive protection from a suspected offender or persons acting at their behest, the right to be reasonably protected from the accused, and the right to a full and timely restitution with proceedings free from unreasonable delay.[139]

257.    On April 9, 2021, Waibel replied to Gjovik's email, stating that she would launch an investigation into Powers, but only into his statements about Gjovik's '*mental health*' and complaints Gjovik was '*being too hard on the white man.*' Gjovik quickly replied to Waibel,

---

[134] Cal. Lab. Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955. "*Regardless of whether anyone is arrested.*"

[135] US EPA, *Environmental Crime Victim Resources*, https://www.epa.gov/enforcement/environmental-crime-victim-resources; US DOJ, *Environmental Crime Victim Assistance*, https://www.justice.gov/enrd/environmental-crime-victim-assistance

[136] *United States v. BP Prods. N. Am., Inc.*, 610 F.Supp.2d 655, 672-73 (S.D. Tex. 2009). See also *United States v. Keith Gordon-Smith*, No. 08-CR-6019 (W.D.N.Y. Sept. 20, 2010), available at http://www.justice.gov/usao/nyw.gordon.html (victims of environmental crime that involved failure to provide protective equipment to asbestos workers included the workers (and their families) who were exposed to airborne asbestos fibers for several months during illegal asbestos removal and disposal).

[137] United States Department of Justice Executive Office for United States Attorneys, *Environmental Crimes–2012,* Volume 60, Number 4, pg89 (July 2012

[138] United States Department of Justice Executive Office for United States Attorneys, *Environmental Crimes–2012,* Volume 60, Number 4, pg96 (July 2012

[139] Victims' Rights and Restitution Act (34 U.S.C. § 20141); Crime Victims' Rights Act (18 U.S.C. § 3771).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

indicating that she did not want an investigation because she feared retaliation, and instead simply wanted Waibel to explain "*labor laws*" to Powers. Waibel says she was going to open the sexism investigation whether Gjovik wanted it or not.

258. Gjovik had a phone call with Waibel on April 27 2021. Gjovik had requested again that Waibel talk to Powers about "labor laws" and clarify if she can talk about her safety concerns. Waibel suggested a 10-minute phone call to discuss Gjovik's right to discuss the "terms and conditions" of Gjovik's employment. During the call, Gjovik requested again that there not be a sexism investigation. Waibel said there will be a sexism investigation.

259. On April 27 2021, Waibel also gave Gjovik a five-point balancing test if Gjovik wanted to talk about workplace safety including that information was complete, accurate, did not make an assessment about safety, does not cause a panic, and any follow up questions are redirected to EH&S to discuss privately with the other person.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

On Apr 27, 2021, at 10:27 AM, Ashley Gjovik <ashleyjgjovik@apple.com> wrote:

Hi,

Hi Michael and Jenna,

I'm looking for some clarity on what I'm officially allowed and not allowed to say about Apple's offices/buildings on chemical release sites.

I chatted with Jenna this morning and she said I'm allowed to speak about any concerns about the terms and conditions of my employment — but I can only share information that is "complete and accurate." Further, she said I should not cause "panic" if there's "no reason for panic." In addition, she said if there's any risk to employees safety, that communication would need to come directly from EHS. (Jenna, please confirm if this is a correct summary or not, and if not please clarify).

I mentioned to Jenna I'm still confused as to what that means. I had raised the issue weeks ago that my boss gave me "employee feedback" about my email with questions about the building and the VI testing, implied it was a "warning" because I was having "mental health issues," and forbid me from talking to anyone about the Superfund status of SD01 or any of my concerns about working in SD01 related to the building other than to him and EHS. Jenna said he denied he said this, but he hasn't followed up with me directly to clarify anything. (Jenna, please note if that is not correct per your convo with him).

Michael the script you read when we first met was great and that's why I called out what Dave told me to Jenna, because it seemed in direct contradiction to what you said. So I'd really appreciate clarity here. When I talked to Jenna, I asked if I could even talk openly about the Superfund status of SD01 and she said only if EHS confirms that is complete and accurate information. I told her I think it would be best if I have you confirm some key points so I don't get in trouble later. So Michael, I have some questions for you below about what is "complete and accurate" — as well as some general questions, perhaps for both of you.

**Questions for Michael (to confirm if complete and accurate)**
- Y or N: The Stewart 1 is an EPA Superfund site called "TRW Microwave," part of the EPA "Triple Site"
- Y or N: TRW Microwave is an active Superfund site.
- Y or N: The EPA calls the area "Triple Site" because three groundwater aquifers were contaminated with industrial chemicals, and all three became active EPA Superfund sites, and at some point all three groundwater plumes merged and/or overlapped into a triple-groundwater plume (including TRW's original plume, as well as the other two plumes now impacting TRW Microwave)
- Y or N: Until 2021, the latest indoor air vapor intrusion testing inside SD01 was in Dec of 2015
- Y or N: Do you consider the EPA, DTSC, and/or Water Boards documentation on the TRW Microwave site (SD01) to be complete and accurate?
- Y or N: Does my building assignment (aka "my official desk is in SD01") constitute part of the "terms & conditions" of my employment?
- Y or N: Do the other Apple buildings I visit for meetings also constitute part of the "terms & conditions" of my employment? (Aka the Siemens and Intersil Superfund sites)
- Y or N: Tantau 8 is on an active EPA Superfund site called "Intersil"
- Y or N: Homestead 1 is on an active EPA superfund site called "Siemens"
- Y or N: The Siemens groundwater plume is known to have contaminated the groundwater of the property that is now "Apple Park"
- Y or N: Apple Park is on several state water boards clean up sites (aka "HP")

**General Questions**
- If Michael says a building on a Superfund is "safe," (which I think is already implied because it sounds like EHS hasn't acted on SD01 recently), am I still allowed to express concerns about working on a Superfund or that specific Superfund? Or if Michael says the building is "safe," then I am not allowed to raise any of my own concerns about the safety or Apple's oversight?
- Do the criteria of — 1) complete & 2) accurate & 3) do not cause panic — apply only to sharing information internally with other Apple employees — or does that also apply to me speaking externally?
- Do your speech restrictions apply to me talking to the government about my concerns?
- How do we measure "do not cause panic"? A lot of people seem very concerned about working or living on/near Superfunds generally. Arguably, as they should be. If there is a fact that is complete and accurate (such as if Michael confirms SD01 is on an Active Superfund), am I still not allowed to share it if "it could cause panic."? I'm confused how to navigate this one. The facts alone could cause panic, but that doesn't seem like it should be my fault. At the same time, I don't want to get in trouble.

Thanks,
-Ashley

—

Ashley M. Gjovik
🍎 Engineering Program Manager
(408) 204-9976

*Exhibit: Gjovik's Meeting Notes from the call with Waibel on April 27 2021*

98

1    260.    Waibel replied to Gjovik and wrote that Gjovik must ensure "*the information she*

2  *shares*" … about "*the terms and conditions of her employment*" …" *is accurate and complete as*

3  *possible.*" Waibel added that she believed Powers comments to Gjovik "align" with her

4  statement. Waibel added, "*if others have concerns, they can connect with EHS directly*." She

5  said, "*we would like to speak individually with each employee who is interested to allow them to*

6  *address their concerns more privately.*"

7

8

9

| Jenna Waibel <jwaibel@apple.com> | Apr 27, 2021 at 4:38:13 PM |

Re: Questions about speech related to Apple's buildings on chemical release sites

To: Ashley Gjovik <ashleygjovik@apple.com>

Cc: Michael Steiger <msteiger@apple.com>

Hi Ashley,

Michael and I will discuss your questions below and get back to you. I wanted to clarify a few things now from your email below, and the rest we will revisit in the near future:

1) I didn't say you aren't allowed to share concerns at any time during our conversation. I didn't comment on the difference in sharing concerns internally or externally. I said you have a right to discuss the terms and conditions of employment. We ask that you ensure the information you share is as accurate and complete as possible when doing so.

2) I wasn't present in your conversation with Dave, so I can't say what he did or didn't say. However, Dave seemed confident that he did not use the terms "warning" or "mental health issues" related to your right to speak about your concerns. He said that it wasn't a warning and he did not forbid you from speaking to others. He said that the intention of his message was aligned with my message above. He said he encouraged you to work with EHS to understand the data available fully.

3) I shared today that if others have concerns, they can connect with me or EHS directly- we are not asking you to broker those conversations. Rather, we would like to speak individually with each employee who is interested to allow them to address their concerns privately.

Thanks again for our call today.  We will be in touch soon on the other clarifications.

**Jenna Waibel**

 Corporate Employee Relations
510-396-7823 mobile
jwaibel@apple.com

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

*Exhibit: Waibel's Reply to Gjovik's 4/27 Notes*

261.    On April 29 2021, Gjovik met with West for their regular 1:1. Gjovik complained

about the safety issues, retaliation, and harassment. She said she needed him to help and

99

intervene or else she would have no other choice but to quit Apple. West told her she can just

quit Apple. Gjovik documented his statement in meeting notes and forwarded it to Waibel.

**From:** Ashley Gjovik ashleygjovik@apple.com
**Subject:** Re: Notes from our Friday call
**Date:** April 29, 2021 at 5:24 PM
**To:** Jenna Waibel jwaibel@apple.com

Quick update -

Talked to Dan West today (my bosses boss). He will not move me out from under Dave. He will not move me under him (Dan), or John, or anyone else. He says he doesn't want anymore re-orgs.

My choices are either I stay under Dave (I told him I cannot do this) or I leave the organization or Apple completely. He says he understood this likely means I will leave Apple.

Dan said when I leave, the role will likely be recycled into a standard Engineer or Manager role, and the PSQ EPM role will be dissolved.

No timeline was set.

Ashley M. Gjovik
Engineering Program Manager

*Exhibit: Gjovik's Meeting Notes About West sent to Waibel, 4/29*

**From:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject:** Ashley Gjovik/Dan - 4/29 Meeting Notes
**Date:** April 29, 2021 at 6:01:18 PM PDT
**To:** Dan West <dan.west@apple.com>

**Discussion Notes**

- Ashley thinks All Hands went really well
- Ashley can't report to Dan. Dan does not want any re-orgs. EPM role will stay under Dave until Ashley leaves, then role will likely be dissolved and transformed into standard engineer or manager role. Ashley will need to find new role outside PSQ (or new job outside Apple) because she cannot work for Dave without further detriment to her mental health and there are no options in PSQ.
- Sedgwick expanded the Workers Comp claim as "continuous trauma," likely since when is started Apple in 2015. The trauma is the industrial chemical exposure at all of the chemical release & Superfund sites I've worked at (SD01, TA08, Homestead 1, IL1, Apple Park, etc.). Continuous trauma sounds like the best description I've heard so far summarizing my tenure at this company.

*Exhibit: Gjovik's Meeting Notes About West sent to West, 4/29*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                     DECEMBER 21 2023

**viii.**   **Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive**
**Intensify (April 2021-June 2021)**

262.   On April 27 2021, Gjovik emailed once of her law school professors, Professor
Dorothy Glancy, about what was happening with Apple. Gjovik wrote: "*I talked to a lawyer
friend and they not only warned me to look out for retaliatory firing with this much whistle
blowing — but that the HR BP may have pushed for workers comp because I guess it waives
some litigation rights. I'm thinking I should probably talk to an employment attorney who
specializes in OSHA type stuff.*"

263.   On April 28 2021, US EPA noted that the head of their regional office for
Superfunds wanted a 'briefing' on Gjovik's concerns.

264.   On April 30 2021, Gjovik sent an email to the US EPA with three categories of
questions: Testing, Communication, and Monitoring. She summarized a phone call they had a
couple days prior. Gjovik asked about, among other things:

- The expected frequency for indoor air testing, and the expected method/standard for that
  testing
- Could the Ethylbenzene and Toluene indoor air pollution be from the groundwater
  plume?
- What the Right to Know and OSHA rules are related to employee notification of
  Superfund exposure
- Who she can speak to in order to understand her chemical exposure.
- What Apple's responsibilities are for monitoring for vapor intrusion issues?
- What Apple's responsibilities are to warn employees about sub-slab vent plugs?
- What Apple's responsibilities are to ensure the integrity of the HVAC system in relation
  to the Superfund mitigation controls?
- What the protocol is for employees to report issues at Superfund sites

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

265. On April 30, 2021, there was another phosphine gas leak at the 3255 Scott Blvd facility. The city Fire Department/HazMat agency report said the leak required an evacuation and that phosphine gas was vented into the exterior air. Two weeks later, on May 13 2021, Apple submitted manifests to transport sixty pounds of '*vacuum filters with glass shards*' to a waste disposal facility. [140]



*Exhibit: 5/13/21 Manifest with "Glass Dust"*

---

[140] Uniform Hazardous Waste Manifest, Apple Inc, May 13 2021, Tracking # 015756482

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit:4/30 CalOES entry filed by Santa Clara FD*

266.    The "*vacuum filters with glass shards*" and temporal proximity to the leak of a highly flammable and unstable gas,[141] suggests, there was an explosion during/related to the April 30 2021 leak. Under information and belief there was a phosphine explosion on April 30, 2021. Under information and belief, the residents in the apartments were never notified of the explosion or the venting of phosphine into their air.

267.    Phosphine gas is a reportable substance under 42 U.S. Code §§ 1712, 9602, and 9603. Phosphine is an "Extremely Hazardous Substance" under CERCLA Section 103 and EPCRA Section 304.

---

[141] NOAA, *Cameo Chemicals – Phosphine*, https://cameochemicals.noaa.gov/chemical/1322 "Very toxic by inhalation at extremely low concentrations. Prolonged heating may cause containers to rupture violently and rocket… Highly flammable. Usually ignites spontaneously in air. Burns with a luminous flame… Phosphine can explode with powerful oxidizers. The gas is heavier than air and may travel along the ground to an ignition source. Container may explode in heat of fire… Reacts violently with: air… Liquefied phosphine can be detonated… Forms explosive mixtures with even small amounts of oxygen. Autoignites at low pressure."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

268.   Apple concealed the HVAC issues (that they took a saw to the Superfund poison

vents on the roof and then installed the HVAC intake on top of them where the poison air pools)

at 825 Stewart Drive and avoided Gjovik's questions about the HVAC and air quality.

269.   By May 2021, Apple must have known that Northrop Grumman finalized their

first sub-slab ventilation system report for 825 Stewart Drive, and transmitted it to the US EPA,

per the US EPA's request May 12 2021 triggered by Gjovik's complaints. Under information

and belief, at some point between May 12 and May 25 2021, Northrop Grumman notified Apple

that they were transmitting the report and data that would reveal Apple's negligence, and that

prior they had conspired to conceal the issue from regulators, while knowing Apple's employees

were likely being exposed to carcinogenic solvent vapors.[142]

270.   On May 2 2021, Gjovik emailed Professor Glancy again, *"The work stuff is very

very urgent now. They want me to sign a bunch of workers comp stuff. And it appears I'm being

pushed out of my current role, maybe even apple."*

271.   On May 5 2021, Gjovik emailed the Mayor of Santa Clara, Lisa Gillmor, sharing

feedback on the Brownfield clean-up of her apartment at 3255 Scott Blvd from a community

activist and the prior mayor of Mountain View, Lenny Siegel. Gjovik sent this email from her

iCloud email account.

272.   Among other things, Siegel wrote, *"TCE is found at or above 16 μg/m3 at three

sampling points [at 3255 Scott Blvd], including one close to your former apartment, and it may

be present at others but undetected because the detection limit for many of the samples was 100

μg/m3. So instead of dismissing vapor intrusion, the city and regulators should either have

required additional investigation or required that vapor mitigation, such as sub-slab

depressurization, be built into the apartment buildings. … In my opinion, any building*

---

[142] Under Cal. Lab. Code § 6406, no person shall remove, displace, damage, or destroy any safety device or safe guard furnished for use in any place of employment. See also, Res Ipsa Loquitur.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                           DECEMBER 21 2023

*constructed where the TCE soil gas exceeds that level should be mitigated, but the worst-case*

*exposure does not explain the acute health issues that you experienced."*

273.    Siegel's preliminary assessment inferred that the source of the solvent exposure

that was harming residents at the apartment complex could not be explained by the known

Superfund and Brownfield pollution on site. However, Siegel did raise concerns that there was

not a proper evaluation of the pollution at the site nor was there proper solvent vapor mitigation

installed during development.

274.    Gjovik had requested a letter of recommendation form Dr. Cohen in January 2021

for law school applications, but Dr. Cohen had not had time write one yet. On May 5 2021,

Gjovik replied to the email thread with Dr. Cohen and asked if he could please write one soon

and noted, "*Things are getting increasingly complicated at work & I'm not expecting an*

*outcome in my favor."* Gjovik said she had started to apply for new jobs as she was expecting to

get fired imminently.

275.    On May 6 2021, Gjovik submitted a Public Records Request to the city of

Sunnyvale asking for records related to her office.

*Exhibit: Gjovik's Sunnyvale / TRW Site PRA Request*

276. On May 12 2021, Gjovik signed the Worker's Comp claim. (Apple would suddenly close it without explanation 10 days later.)



*Exhibit: Gjovik's Signed Worker's Comp Claim*

277. On May 16 2021, Gjovik complained that all of her iCloud@Work documents disappeared from her personal iCloud account. Gjovik asked Apple's IT department to recover the files but they were unable. Under information and belief, the files were deleted as Apple

106

Global Security was copying all of Gjovik's personal iCloud information in order to start investigating her as they planned a retaliatory response to her concerns.[143] (Another labor whistleblower reporting something very similar happening right as Google forced her on administrative leave, and then swiftly terminating her.)[144]

### ix. Apple's Retaliation Against Gjovik Intensifies (May-June 2021)

278.    On May 17 2021, in a follow-up meeting with Gjovik and Waibel, Steiger claimed the office was safe, and there would not be any testing in the building for vapor intrusion in the foreseeable future. The meeting was supposed to be to answer Gjovik's pending open questions from April 2021. Steiger and Waibel informed Gjovik they would not be answering any of Gjovik's pending or new questions about the safety of Gjovik's office building. They claimed the building was safe because it is and Gjovik could not ask any questions about it ever again. Steiger went on leave less than thirty minutes after the meeting.

---

[143] A similar complaint was noted in The Guardian's '*They'll squash you like a bug': how Silicon Valley keeps a lid on leakers,* March 16 2018, https://www.theguardian.com/technology/2018/mar/16/silicon-valley-internal-work-spying-surveillance-leakers where a Google employee complained he ("*suspects he was being monitored by the company during his final days. He also described "weird things" happening to his work phone and laptop after the memo went viral. "All the internal apps updated at the same time, which had never happened before. I had to re-sign in to my Google account on both devices and my Google Drive – where the document was – stopped working.*")

[144] Sean Captain, *If you use your personal phone for work, say goodbye to your privacy*, Dec 9 2019, FastCompany, https://www.fastcompany.com/90440073/if-you-use-your-personal-phone-for-work-say-goodbye-to-your-privacy -- (the employee "*recounts how her personal Android phone went blank when she learned that she'd been placed on administrative leave ... 'my personal phone was either corrupted or wiped'...*")

> On May 17, 2021, at 1:56 PM, Ashley Gjovik <~~~~~~~~~~~~~~~~~~> wrote:
>
> Thanks for meeting today! Feel better Michael.
>
> Here's my notes from our discussion. Let me know if I missed anything.
>
> I have access to all publicly available information about the site per the gov websites. The report Michael previously shared should include all details for both May & Dec 2015 testing. Unless VI testing is done in the future, no additional data will be shared. If VI testing is done in SD01 in the future, the results will be shared with me. There is no timeframe for testing for vapor intrusion in Stewart 1. EHS might not test for vapor intrusion in Stewart 1 this year, or near future — they are looking over the building evaluation report and then will make a decision at an unspecified time whether they do VI testing or not.
>
> Michael said that as an expert, he and EHS have reviewed the data for SD01 and feel there is no Vapor Intrusion occurring there and they've done what's necessary to ensure the safety of the building for the people working there. (He said this all really quickly, so trying my best to summarize).
>
> As for the EthylBenzene & Toluene, Michael said those are not attributable to vapor intrusion in SD01 because they are not contaminants of concern. And that there was no evidence they exceeded OSHA PEL limits in the building. If I have any non-VI chemical questions, can arrange for a workplace evaluation by Austin.
>
> Michael said would never turn HVAC off and if it someone said they did during wildfires, that must be a miscommunication.
>
> Questions about land use restrictions are questions for the EPA.
>
> Any additional questions I have about the specifics of soil/groundwater chemicals & vapor intrusion at the site, including my pending questions from April, will not be answered by EHS, since EHS has determined they feel confident there is no vapor intrusion in the building based on the historical tests and documents.
>
> Jenna said I have a right to share concerns and talk to anyone about my concerns about the building. She said Apple would never restrict my right to speak about work place safety concerns. She said Apple would appreciate if I try to keep information accurate and also route people to EHS with questions, but not a requirement.
>
> -Ashley
>
> **EHS Follow up**
> Scheduled: May 17, 2021 at 1:30 PM to 2:00 PM, PDT
> Location: Virtual Conference One-Time Room
> Invitees: Jenna Waibel, Ashley Gjovik, Michael Steiger

*Exhibit: Gjovik's 5/17 Meeting Notes*

279.    When the worker's compensation administrator contacted Gjovik, the representative expressed surprise and concerns that Apple would intentionally ask, or even allow employees to work on Superfund sites. The Sedgwick investigator said she even called her contacts at Apple's HQ to confirm if Apple actually had offices on Superfunds. She said the contact's initial response was "of course not" but then upon searching Gjovik's office address online, the top result noted it was a Superfund site.

280.    The investigator was further distressed to learn that additional offices Gjovik had worked in and visited were also Superfund and Brownfield toxic waste clean-up sites. The

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

investigator said she was going to set Gjovik's claim as "continuous injury" and Gjovik should expect the investigation to take at least two months.

281.    Waibel requested another phone call with Gjovik, and they talked on May 20, 2021. Gjovik summarized the call in the August 2021 Issue Confirmation as: "*Jenna tells me she will talk to Rob Yepez [a Software Engineering Director] about my sexual harassment claim and tell him I was the one who reported it. I ask her not to and that I don't want him to know it was me and ask her not to look into it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation.*"

282.    An agent of Apple implicitly threatening to deport and/or cancel the Permanent Resident Card sponsorship for one of Gjovik's best friends who was in the United States on a work visa, because Gjovik exercised her rights under Cal. Labor Code and was seeking information regarding whether Apple was in compliance with Cal. Labor Codes—is a violation of California Labor Code § 1019(b).[145]

283.    Waibel said her focus continued to be on "sexism" and disability discrimination related to mental health. Gjovik told Waibel she was not including all of her complaints about issues at Apple, but only including the issues and related facts/issues to those that Waibel informed Gjovik she would be investigating, because Gjovik did not want the investigation at all an did not want to make things worse for herself.

284.    Gjovik was out of paid time off and needed to take law school exams. Waibel suddenly offered Gjovik that Gjovik can just take the time off to do her exams and did not need formal paid time off. Gjovik said that would be great. Waibel offered it and Gjovik accepted.

---

[145] Cal. Lab. Code § 1019(b)(C), (D); [Note, Gjovik's friend, who had an in progress Permanent Resident application sponsored by Apple, no longer resides in the United States].

There were no restrictions on who Gjovik could talk to or what Gjovik could do. Later Waibel

called it "Administrative Leave."

285.    In May 2021, Gjovik asked Waibel to include the 2018 e-waste/hardware-re-use

incident in her investigation. Gjovik said the unilateral decision to cancel her projects without

her input, and not even informing her directly, was an example of her managers treating her

poorly because of her sex/gender. Gjovik also said that the manager who got her project

cancelled, Reed Johnson, intentionally undermined her and acted in a way he knew she did not

support, because he thought less of her because she was a woman.

286.    Waibel claimed to have investigated the e-waste problem, and other issues Gjovik

raised, but said there were "no policy violations." Waibel told Gjovik she informed Gjovik's

managers and team that Gjovik complained about sexism, and now it was up to Gjovik to figure

out how to go forward following the closure of her investigation. It was clear to Gjovik that most

of the issues were not investigated. Gjovik complained about a "*fake*" and "*sham*" investigation.

287.    On May 21 2021, Northrop Grumman prepared the report about their November

2020 inspection of Apple's 825 Stewart Blvd rooftop and the sub-slab ventilation system vents

(that Apple sawed down to only one foot tall and installed the HVAC intake next to the vent

exhaust).  The same day, May 21 2021, Gjovik had a mammogram at UCSF ordered by her

doctor due to "*recent industrial chemical exposure*."

288.    On May 22 2021, Apple abruptly denied Gjovik's Worker's Comp that they had

just forced her to file. On April 21 2021, Gjovik filed a worker's compensation claim for her

2019 fainting spell at the 825 Stewart Drive office, at the urging of Apple. Apple then entered an

office-space real estate "mega-deal" with Irvine Company (on toxic waste clean-up sites) and the

weekend of the deal, Gjovik received a voicemail late on a Saturday night from the Sedgwick

benefits administrator suddenly closing Gjovik's claim on May 22 2021.[146] Under information and belief, Apple, Irvine Company, and Sedgwick conspired to close Gjovik's claim as part of their deal.

289.    On May 25 2021, Northrop Grumman submitted their sub-slab ventilation report to the US EPA omitting what Apple had done. Under information and belief, Apple and Northrop Grumman conspired to hide the issues from the US EPA and Gjovik and her coworkers.

290.    At some point between May 25 and June 1 2021 Apple conducted a "floor survey" looking for cracks in the slab of Gjovik's office at 825 Stewart Drive. Under information and belief, Waibel had offered the leave to Gjovik to get Gjovik out of the office while they inspected the floor and prevent Gjovik from gathering evidence.

291.    Waibel held a "wrap up call" with Gjovik on June 3 2021. Waibel said her investigation found no policy violations and the only next step for Gjovik is for her to "process this" and work with Polkes on Gjovik's "path forward." Gjovik sent email notes after complaining that Waibel never reviewed several things Gjovik complained about.

292.    Waibel replied to Gjovik on June 3 2021 saying "*I could not confirm that violation of Apple policies occurred, Apple has taken appropriate action to address the findings of the investigation. If, in the future, you have any new concerns and/or experience behavior you feel is retaliatory, please contact your Helen or myself immediately.*" Gjovik responded on June 3, reiterating her concerns about workplace safety.

293.    On June 10 2021, Waibel told Gjovik she had to return to her Superfund office, even if she thought it was unsafe, unless Gjovik filed a request for ADA accommodations.

---

[146] Silicon Valley, *Apple mega deal: Tech titan launches huge Sunnyvale expansion that could accommodate thousands*,  https://www.siliconvalley.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik told Waibel that does not make any sense. Waibel repeated it was the only option. Under Cal. Gov't Code § 12940, employers are prohibited from making medical or psychological inquiries unless the inquiry is job-related and consistent with business necessity.

294.    On June 7 2021, US EPA sent Gjovik their first response to her questions, which required review and comments from the Director of Public Relations for Region 9, discussion vapor intrusion, institutional controls, and community communications.

295.    On June 9 and June 10 2021, US EPA employees Edwin "Chip" Poalinelli and Michael Schulman conspired to arbitrarily update the public website information about the TRW Microwave site to say that "*Human Exposure*" was "*Under Control*" instead of "*Not Under Control*." On June 9 2021, one of Gjovik's coworkers emailed US EPA with concerns about their Superfund office. Schulman wrote a reply to the coworker saying Human Exposure is now Under Control. Schulman said he did not run his decision or email by Public Relations because "*he likes it*."

296.    The main site document for TRW Microwave, dated April 2021, said exposure was *Not Under Control* and provided the earliest ETA for exposure to be under control was December 2021.

297.    On June 14 2021, Gjovik and another project manager employee emailed Tim Cook (CEO) & Deirdre O'Brien (HR Vice President) expressing concerns about returning to work during the COVID-19 pandemic**.** Gjovik repeatedly expressed concerns about COVID safety.[147] The email included and referenced a petition with over 2,000 employee signatures, dozens of testimonials from employees, and an eight-minute video of about a dozen employees reading the petition aloud, including Gjovik. Gjovik started being harassed by some of her coworkers about it, while many others thanked her.

---

[147] i.e., Cal. Lab. Code §§ 6325, 6409.6

298. Gjovik met with Antonio Lagares, head of Apple Employee Relations, for the first time on June 17 2021. Gjovik complained about the 'sham' investigation by Waibel and the following retaliation. Gjovik said if Apple already ruined her career with the sham investigation, they should have to actually investigate all the things Apple did to her. Gjovik complained that Apple was just pretending to care about its workers but clearly did not, and that Apple should be more honest about its treatment of employee concerns. Lagares agreed saying it 'makes his job harder' that Apple's marketing did not match their operations, and he eventually agreed to open a 2nd investigation. Lagares also confirmed his prior role of 'Labor Relations with Beijing' for Apple, of procuring the vendors and materials for Apple's infamous "*suicide nets*" at its factories and Gjovik expressed her displeasure.

299. On June 30 2021, Apple entered the US EPA TRI information for the 3250 Scott Blvd factory noting the NMP emissions, treatments, and supposed disposal. This was apparently the first and only entry for TRI that Apple ever submitted for the facility.  Under information and belief Apple was generating reportable emissions prior to the 2020 report, and after the 2020 report, but did not file reports with that information.

300. On July 2 2021, Waibel emails Gjovik to notify her that there are cracks in the floor of Gjovik's office and Apple is going to repair the cracks, and following the repairs, then will test the air at some point in the future. Gjovik replied to Waibel asking if Apple would test the air before they fix the floor to understand if there was vapor intrusion occurring through the cracks for "*cancer monitoring.*" Gjovik then texted her coworker Mike describing her email to Waibel as "*I'm kind of like 'don't startle them' but I'm also like 'did you give me cancer'*" and she asked "*too much*?" Mike replied "*I don't think that is too much. I think that is a totally fair request. Interest[ed] to hear what they say.*" (Waibel would tell Gjovik no, there will not be any air testing until after they fix the possible sources of air pollution).

From: **Ashley Gjovik** ashleygjovik@apple.com
Subject: Re: Follow up call next week
Date: July 2, 2021 at 2:55 PM
To: Jenna Waibel jwaibel@apple.com
Cc: Michael Steiger msteiger@apple.com, Antone Jain antone@apple.com

Hi Jenna,

Thank you for the update! Glad you hear y'all decided to proceed with the testing, even if TBD timing.

Any chance EH&S would be willing to do a "before" air testing in SD01, at least my lockdown (Sim City), to determine if the floor cracks were/are allowing vapor intrusion into the office space? It seems like it would also be helpful data to have to compare to the testing "after" the floor is sealed — especially since the last testing was six years ago — and considering my 2019 fainting incident at my desk & in Mike Ertell's office. If I was exposed, I'd really like to know to what chemical & at what levels, for future cancer monitoring, etc.

Thanks!

*Exhibit: The Cancer Email*

301.     On July 4 2021, Gjovik expressed concerns to Lagares again about EH&S'

suspicious conduct and statements, including that now Apple said they had no plan to test the air

in the near future. Gjovik wrote to Lagares, "*The only reason I can think of that they're refusing*

*to do this testing after they previously planned on doing it, was that all the questions I was*

*asking were very good questions and revealed major gaps/issues — so they're going out of their*

*way to not have evidence of their negligence.*" Gjovik implored Lagares to look into EH&S's

conduct, saying "*I think everyone is forgetting I work in engineering & I'm in law school. I know*

*how toxic torts work…. right now, it feels like I'm not only being harassed by my manager and*

*my HR BP, but it appears there's a conspiracy to force me back into what appears to be a very*

*physically unsafe office building.*"

302.     On July 4 2021, Gjovik complained to Lagares, that in 2017, West directly

harmed Gjovik (by forcing her to eat peanut, which she is allergic to) and then failed to seek

medical treatment despite potentially life-threatening injury (she was in anaphylaxis) due to

West "*being too drunk*" and then days later Powers texted West complaining about why he is

"*trying to kill*" Gjovik.

114

303.    On July 7 2021, Gjovik met with EH&S (Steiger and Jain) and Waibel. Steiger said Apple refused to test the indoor air before they fix the cracks in the floor.  Waibel claimed that because the 2015 test results came back acceptable that there is no reason to worry about vapor intrusion. Gjovik reminded Waibel the cracks in the floor are new, and cracks in the floor is the primary vector for vapor intrusion at these sites.

304.    Gjovik explained that a cracked slab is a "*change of circumstances*" and proposed the need for air testing before and after the repairs, to confirm the repairs were successful. Waibel said no.  Waibel said Apple will not provide Gjovik any details about what "*fixing the cracks*" entails and told Gjovik that Apple will not answer any more of her questions about it. Gjovik reiterated she does not feel safe at the office and that she is worried about vapor intrusion.

305.    Gjovik also complained to Waibel, Jain, and Steiger that she believed Apple was misrepresenting the conditions at the office and Apple's actions. Gjovik complained Apple claimed the floor crack survey and air testing is "*routine maintenance*," but that they also admitted it was the first time Apple had ever done it. In the meeting, Gjovik questioned how it is "*routine*" if it has never been done before. Steiger then claimed Apple had also performed floor-sealing activities at "*two or three buildings*." Gjovik asked which buildings, so she can understand if Apple was being honest with her or if they were indeed misrepresenting the situation. Waibel interjected and said, "*they won't discuss buildings [Gjovik's] not in,*" "*won't answer that question*," and "*that level of detail is not appropriate for this call.*"

306.    Steiger told Gjovik that Apple no longer has any plan to test the indoor air at the office, and that while it will occur at some point in the future, there is no estimated timeframe. Steiger also said when they test it will only be with passive samplers (not TO-15 Summa canisters), with HVAC on (not standard). Summa canister sampling using TO-15 is considered

by many to be a "standard" for chlorinated solvents and volatile aromatics vapor intrusion studies.[148] The method involves collecting air samples in specially prepared canisters (e.g., Summa canisters) and analyzing aliquots of the samples by gas chromatography/mass spectrometry .[149] Among other issues, it is also particularly challenging to measure vinyl chloride and chloroform using passive samplers (which the US EPA would later inform Apple in 2022 when the US EPA demanded Apple use TO-15 Summa for the testing at Gjovik's office).[150]

307.    Steiger and Jain told Gjovik their test plan is "*protocol*" and "*over and beyond*" what is expected. Gjovik asked Apple to share their protocols and documentation with her and they said no because they do not exist, and she can just "*Google it.*" Waibel then said Apple will not answer any of Gjovik's pending questions or any new questions and that Apple's position is that "*they feel it is safe*." Steiger and Waibel told Gjovik that would be her final update about her office building, ever.

308.    During the July 7 2021 meeting with Steiger and Waibel, Gjovik expressed concerns that HVAC on brings in outdoor air and would dilute indoor vapor intrusion. Gjovik also complained that testing with employees working would give Apple an excuse to blame Gjovik's coworkers on causing their own emissions as an excuse for any abnormal results (as Apple did when they blamed "construction" for the high Toluene and Ethylbenzene in the 2015 test results).

309.    Gjovik emailed the three (Jain, Steiger, Waibel) notes summarizing the July 7 2021 meeting. Gjovik then forwarded those notes to the US EPA. Gjovik complained about this

---

[148] NSCEP, Passive Samplers for Investigations of Air Quality: Method Description, Implementation, and Comparison to Alternative Sampling Methods, Pg 10, 2015.
[149] NSCEP, Passive Samplers for Investigations of Air Quality: Method Description, Implementation, and Comparison to Alternative Sampling Methods, Pg 9, 2015.
[150] US EPA, Passive Samplers for Investigations of Air Quality, pg19 (2015), https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=NRMRL&dirEntryId=308311

meeting to Okpo and Lagares and asked them to intervene. Gjovik included the meeting in her Issue Confirmation document from mid-August 2021. Gjovik noted that witnesses included: "*y'all know what you did*."

310.    Steiger suddenly left Apple in the midst of these discussions. Steiger returned to his prior employer, EKI, an environmental consulting group. Steiger had joined Apple in 2013 from EKI to work for Apple on hazardous waste issues, including the Apple Park clean-up for which EKI was a consultant. The last meeting Gjovik attended with Steiger, he seemed upset with Apple and was forced to simply read a piece of paper that appeared to have been written by Apple where he said essentially the office is safe because he is an expert, and he thinks it is safe.

311.    Under information and belief, Apple and EKI conducted inspections and created reports of findings around August 4 2021, and before August 19 2021, but concealed the testing and the results. Apple also made no reference to the August 19 2021, US EPA inspection in any subsequent legal filings on Gjovik's retaliation lawsuits and the US EPA employees (Poalinelli, Ty, Schulman, Perez-Sullivan) conspired with Apple to conceal the inspection from Gjovik. Under information and belief, Apple, US EPA employees, and Lisa Jackson conspired to hide this information from Gjovik in order to reduce Apple's liability to Gjovik in the lawsuits.

312.    On July 7 2021, Gjovik emailed the US EPA complaining about Apple. Gjovik noted that the US EPA employee had told her "It is important for EPA to be aware if there's a significant change to the site conditions," and Gjovik said she hoped EPA had been informed about the cracked floor and floor sealing plan. Gjovik complained that after her questions on the matter, now Apple won't give her "*any details of what the floor sealing process entails,*" they refuse to "*test air before they seal the floor and won't give [her] any reasons why,*" Gjovik also noted Apple did not plan to look for cracks under the carpet, the manager previously in charge suddenly left Apple, and *"now [Apple] won't answer any more of my questions about the safety*

*of the building*." Gjovik added, *"I told them I remain very concerned the building is not safe."* Gjovik told EPA she had "*reminded Apple of labor laws & stuff*," and also planned to speak publicly about conditions at the site.

313.    On July 8 2021, Gjovik learned through Yuan Tan that Dan West had been reassigning her work to other people in his organization following the April meeting when he told Gjovik to quit. Gjovik complained to David Powers, Human Resources, and Employee Relations about the work reassignments. One of the employees who received the new assignments apologized to Gjovik upon learning it was her work.

On Jul 8, 2021, at 3:14 PM, Ashley Gjovik
<ashleygjovik@apple.com> wrote:

Hi,

Unfortunately there's another new event— I just found out today.

In May, apparently Dan and Dave decided to reduce my ownership and supervision of one of my main projects and appear to have handed it off to a male colleague in another organization (Daniel) — and didn't even tell me directly. Dan reduced my supervision & gave Daniel the project <u>after</u> I started raising formal concerns to him about Dave creating a hostile work env & be sexist, raising work place safety concerns, and filed a workers comp claim.

*Exhibit: Email from Gjovik to Lagares*

314.    On July 8-9 2021, Gjovik texted with her coworker Mike complaining about Apple's handling of the office. She wrote, "*I'm seriously considering doing one of these 2hr sorbent tubes in the next few weeks before they seal the floor. Maybe ideally one early morning before people come in and later evening after people already left.*" Mike replied, "*Glad that you are all over this!*" On July 9 2021, Gjovik complained to Mike she thought Apple was engaging

in a cover-up about the chemical exposure at the office, and noted several points where she

thought they were acting in bad faith.



**From: Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: EHS Follow up
**Date:** July 9, 2021 at 12:31 PM
**To:**

The problem is, the way they're testing the air now is bogus. Gold standard is HVAC off, no people around, at least 48hrs, summa & T015.

1 week would be great if the above was met — but HVAC on will be bringing in inside air, which would dilute whatever chemicals are in the air inside. Further people around mean they can be releasing their own chemicals (cleaning, etc) which might show up in the results — but also could neutralize other chemicals that might be in the air. I believe they're only testing for COCs still, not a full T015 panel — so it's more likely the COCs would be neutralized and you wouldn't even know it because without the panel, you don't even know what else is in the air.

I had a whole big discussion about this last year when my property manager decided to test the air in the apartment above mine when I was testing my own air. Even DTSC admitted if they did that — the air would be diluted because it's higher up (the refused to test the ground floor which prob would have showed the highest results, and also chemicals rising from below apartments could show up and/or mix/neutralize chemicals inside.

If I were Apple, and I wanted to save face after all the last discussions, and didn't care about employees health — this is what I'd do. They can't "not test" now that I threw such a fit about them threatening not to — but if they do test, they want to reduce the risk of them finding the COCs in the air as much as possible. Thus, they'd do exactly what they now say they're going to do.

During previous discussions they mentioned they'd do it on a weekend, etc. This is a change of plans. I'm not happy.

*Exhibit: Gjovik's 7/9/21 Email to Lagares*

315.    On July 12 2021, Gjovik texted Mike "If you end up in the office anytime soon

and feel comfortable doing so, please think about taking photos of the cracks in the floor,

especially our lockdown. I need to drop some stuff off end of July, but they may have sealed

them by the time I get there." Mike replied he would plan to do it next time he's in the office but

did not know when.

316.    On July 12 2021, Apple told Gjovik again that she has to come back to her office

on a Superfund site and with the COVID-19 Delta surge in September 2021 unless Gjovik files a

request for ADA accommodations.

317.    On July 13 2021, Gjovik sent an email complaining to Lagares that Sedgwick

was asking her for medical information for the ADA request and she only wanted to work in a

physically safe office. Gjovik complained that she had been worried Waibel was abusing the

ADA process to mess with Gjovik and said, "*looks like… my concerns about Jenna misrepresenting this process appear to now be confirmed."*

318.  On July 14 2021, Gjovik met again with Mayor Gilmor about her concerns about chemical exposure at 3255 Scott Blvd (next to Apple's factory). Gjovik was communicating with the mayor and her staff through Gjovik's iCloud account. Apple surely knew.



| | | | |
|---|---|---|---|
| 4/8/2021 | 9:45 AM | Meeting regarding Former Resident's Health Concerns | Ashley Gjovik, Former Resident |
| 4/29/2021 | 4:30 PM | Meeting regarding Former Resident's Health Concerns | Ashley Gjovik, Former Resident |
| 7/14/2021 | 2:00 PM | Meeting regarding Santa Clara Square | Ashley Gjovic, Former Resident |

*Excerpt: Gjovik's Meeting with Mayor Gillmor in 2021: 4/8, 4/29, 7/14*

319.  On July 15 2021, Powers suddenly and substantially increased Gjovik's workload with unfavorable projects.  The move made it apparent that Powers was trying to force Gjovik to quit. Gjovik replied to Powers same day complaining that all the new assignments already belonged to other people, and that the increase was quadrupling her workload. Gjovik promptly informed Lagares and Polkes, that she was being "punished" by her supervisor. Gjovik also complained to Mike about their manager, Powers.

320.  On July 16 2021, Gjovik got a letter from Sedgwick about the ADA request Apple made Gjovik file and the letter was titled, "*Request to Correct Deficiency on ADA Information Request for Reasonable Accommodation*." The form warned Gjovik she must have her doctor send responses to Sedgwick's questions by a deadline, but the form said "*You have until to return the requested information*," (sic), failing to actually provide a deadline. Sedgwick's questions include, in response to Gjovik's documentation and complaints about known carcinogenic vapor intrusion in the indoor air, would she find it sufficient if Apple bought her an air purifier for her desk?

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1. **Understanding that the employer cannot reasonably guarantee an irritant free environment, is there alternative accommodations we can consider that would allow her to work onsite (ie PPE, air purifiers, filtering technology etc)? If not, why not?**

This would not be sufficient for the patient's condition. The patient provides evidence that there is enough risk to human health at the office building, due to the presence of chemicals, that day cares, elder cares, hospital use, and residential use on the property are prohibited by law. (See land use covenant: https://geotracker.waterboards.ca.gov/profile_report.asp?global_id=SL721101218)

*7/16/21 Questions from Sedgwick, with Gjovik/doctor's 8/2/21 responses*



Sedgwick Claims Management Services, Inc.
PO BOX 144424
Lexington, KY 40512-4424

**sedgwick**

Phone: (855) 702-7753
Fax: (866) 315-0607

07/16/2021

Ashley Gjovik

RE: Apple
Request to Correct Deficiency on ADA Information Request for Reasonable Accommodation
Event Number:

Dear Ashley,

We have received information from your provider in reference to your accommodation request. However, in order to evaluate your request, clarification and/or additional information is needed as noted below. You have until to return the requested information.

**Clarification Required** *(Reason(s) Provided Below)*

**Information Request for Reasonable Accommodation**

*Exhibit: 7/16/2021 ADA Request Response*

321.    On July 16 2021, Gjovik emailed Lagares: "*As previously discussed at length, I have serious concerns about workplace safety of my building, and Apple's other buildings on*

121

*chemical release sites. At least for my building, from what I've seen, Apple appears to have been negligent with properly managing the vapor intrusion from the three toxic groundwater plumes under the building. Also, as mentioned, I believe I have already been injured by the vapor intrusion in 2019."* Gjovik also complained that she felt misled about their ADA suggestion, and a nurse had reached out requesting a letter from her doctor, when Apple had expressly told her medical documentation would not be required.

322.    Lagares told Gjovik that there were delays in his response to her because he had to consult with a larger group of people and remarked to her there was a substantial number of stakeholders interested in her complaints. Under information and belief, Lagares was referring to members of the Enterprise in the scheme to hide Apple's unlawful acts, including: the Real Estate team, Steiger, EKI, AECOM, Northrop Grumman, Corporate Legal, Riccio, Worldwide Loyalty, Ronald Sugar, Lisa Jackson, Margot Perez Sullivan, Chip Poalinelli, Irvine Company, and others.

323.    On July 18 2021, Gjovik posted on Apple's Slack discussion tool that Apple was negligent at her office and that Apple was misrepresenting their policies and protocols. Gjovik also complained of "*intimidation and retaliation for raising concerns*." Gjovik shared she was hoping that her talking publicly about the issues might "*make Apple & their goons act more like humans*." Gjovik posted on Apple Slack:

> "…the remote work ADA process was actually suggested to me by Employee Relations as some sort of accommodation in response to me yelling for months about their negligence with my office/the property it is on, failure to address my workplace safety concerns, and misrepresentation of their policies/protocols. Also, yup I already reported her comments and my dissatisfaction with this whole mess of a process to Employee Relations. I have a big 90m meeting with two ER people this week to go over all this, in addition to my outstanding complaints about workplace safety, sexism, sexual harassment, failure to address hostile

work env, failure to report workplace injuries, FMLA & ADA violations, intimidation and retaliation for raising concerns about all of the above, whistleblower retaliation, and a whole bunch more. To everyone suggesting I consider taking legal action, thank you and oh trust me, I am, but I think I will stress the judge out of I keep adding more & more cause of action after the initial complaint… so I'll let ER do their thing. Perhaps me talking publicly & semi-publicly about all this will make Apple & their goons act more like humans and less like a corporate machine, or at the very least act like a corporate machine with a PR crisis."

324. Around July 2021, One of Gjovik's friends, an Apple Manager, warned her that if she kept posting about toxic waste and labor rights that *"Apple [was] going to take [her] Slack away."*

325. Gjovik wrote to US EPA on July 19 2021 asking for an update and complaining about Ronald Sugar and conflicts of interest, and complaining Apple will not test the air before they fix the cracked floor. The next day Gjovik replied and added that she was concerned Apple did not notify US EPA about the cracks and claimed they do not have to. Gjovik asked EPA to find out *"what exactly this whole floor crack / floor sealing thing is about — in additional to the lack of air testing, and refusal to test the air before they seal the floor."* Gjovik also complained about the Ronald Sugar conflict of interest with Northrop Grumman, the Superfund site, and Apple – and complained Sugar's role at Apple appears to be overseeing that he himself would be in compliance with facilities and safety oversight at Apple. Gjovik suggested Apple could be engaged in unlawful conduct related to the cracks in the floor and asked US EPA to look into it.

326. On July 20 2021, Gjovik wrote to US EPA from her iCloud email: *"Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."*

327.     On July 20 2021, US EPA emailed their Public Relations team informing them Gjovik had been complaining about her TRW Microwave Superfund office and about "*a connection between a member of Apple's BOD and his former post as CFO of TRW Microwave.*"

328.     Gjovik told Apple Employee Relations senior manager, Antonio Lagares, that because Waibel already ruined her career at Apple, Gjovik now wanted Apple to have to actually investigate what happened to her during her time at Apple. Gjovik told Lagares she was talking to reporters about Apple's work conditions and that she was considering suing Apple.

329.     On July 20 2021, Lagares agreed to open a new investigation into Gjovik's concerns. Lagares assigned investigator Ekelemchi Okpo to Gjovik's case. Gjovik started meeting with Okpo on July 21 2021 to discuss her concerns. Gjovik emailed Apple Employee Relations a list of evidence folders she shared with them, labeled by year and cause of action including: *"Failure to Report Workplace Injuries, Workplace Safety Concerns, Assault and Battery, Negligence."*



*Exhibit A-xvii-A: Gjovik's Box Evidence Folders*

*Exhibit: Gjovik's Box Evidence Folders*

330.    Apple said they would consider offering a severance package with Gjovik if Gjovik would sign a preemptive litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm Apple caused to Gjovik through chemical exposure at her office and her apartment.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

331.    Gjovik expressed concerns about the settlement amount and her potential medical costs if she was to get cancer from the exposure at her office, not even yet knowing about the factory at 3250 Scott Blvd or what Apple did to the HVAC at 825 Stewart Drive. Apple wanted all claims waived and Apple denied the severance on those conditions, in violation of California law. Apple had previously denied Gjovik's request for a different position at Apple, just not in a hostile work environment, knew she was in a hostile work environment, and then effectively suspended Gjovik before Apple then swiftly involuntarily terminate her employment. If Gjovik accepted the claim waiver, Apple acted as if it would provide severance at some point and not terminate her. If Gjovik has been able to continue her employment just five weeks more than when she was fired, then she would have received her annual performance bonus, additional RSU grants, a salary increases, and a large vesting of prior granted RSUs. It would be extremely unlikely Gjovik would voluntarily end her employment prior to these events.

332.    Because Gjovik denied the waiver, Apple discontinued Gjovik's employment and denied the raise and bonus due to her at that time in violation of Cal. Gov't Code § 12964.5(a). "When employers require employees to waive claims preemptively, it provides a mechanism for regularly wiping out claims that might otherwise lead to accountability and reform."[151] Apple also attempted to exploit information asymmetry to coerce Gjovik into a much smaller settlement than what would actually compensate her harm, by, among other tactics, persistently hiding and obstructing Gjovik from discovering the safety issues at Gjovik's office and what Apple did at the silicon fabrication plant. Apple's conduct with the settlement discussions was fraudulent and unlawful, and as such it is not protected under litigation immunity.[152]

---

[151] *Hamilton v. Juul Labs, Inc.*, No. 20-CV-03710-EMC, 2020 WL 5500377, at *9–10 (N.D. Cal. Sept. 11, 2020).

[152] *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 CA4th 847, 915, 93 CR2d 364, 411-412—settlement discussions may be admitted to prove insurer bad faith]; *Silberg v. Anderson* (1990) 50 C3d 205, 214-215, 266 CR 638, 643-644].

333.     On July 23 2021, Gjovik was quoted by New York Times where Gjovik criticized Apple's COVID-19 response in an article about return to work with the Delta surge. On July 23 2021, Apple emailed the city of Sunnyvale noting Apple's janitors had complained there had been "*an increase in the trash coming out of 825 Stewart*," and asked to increase trash service. It's unclear what Apple was suddenly discarding en masse.

334.     On July 24 2021, New York Times make Gjovik's quote "Quotation of the Day" for the entire NYT.[153] Apple Employee Relations expressed they were upset Gjovik did this. Gjovik told Lagares that she was taking Labor Law and learned she is able to speak about her work conditions regardless of NDAs. Lagares told her it is annoying to Apple when employees "*figure that out*."



### The New York Times

## Quotation of the Day: Virus Surge Complicates Return-to-Office Plans

🎁 Share full article    ↗    🔖

July 24, 2021

"OK, you want me to put my life on the line to come back to the office, which will also decrease my productivity, and you're not giving me any logic on why I actually need to do that?"

ASHLEY GJOVIK, a senior engineering program manager at Apple, who was one of many employees to push back against an earlier plan to return to the office in September. Many companies are reconsidering their return dates after objections from employees and concerns about the surging Delta variant.

A version of this article appears in print on July 24, 2021, Section A, Page 3 of the New York edition with the headline: Quote of the Day. Order Reprints | Today's Paper | Subscribe.

---

[153] New York Times, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*," July 24 2021, https://www.nytimes.com/2021/07/24/todayspaper/quotation-of-the-day-virus-surge-complicates-return-to-office-plans.html

*Exhibit: Gjovik's Quote in NYT, July 24 2021*

335.    On July 24 2021, Gjovik posted on Apple's Slack discussion tool complaining about secrecy at Apple after several of her coworkers suggested her quote in the NYT was "leaking" and Apple should/could fire her over it. Gjovik complained about Apple's "*over-generalized confidentiality scare tactics, culture of peer policing, and shaming*."

**x.    Trouble with the US Government Sanctions Against Syria (2020-21)**

336.    Apple has a history of sanctions violations. In November 2019, the US Treasury found Apple liable for violations of Foreign Narcotics Kingpin Sanctions Regulations (31 C.F.R. Part 598) and Apple settled for $466,912.[154] The amount Apple was fined was based on aggravating factors including the number of Apple's apparent violations; the length of time those violations occurred; the multiple points of failure within Apple's sanctions compliance program, policies, procedures; and that Apple's conduct "*demonstrated reckless disregard" of US sanctions requirements*. [155]

337.    On July 20 2021, Gjovik complained about a manager in West's organization making a written statement that sounded like he was bragging about smuggling and otherwise violating US sanctions on Syria. Gjovik had raised the issue a year prior, and John Basanese and Reed Johnson said they would look into, but there had been no response since. In the meantime, the male employee who was bragging about smuggling was promoted to manager of something called a "*Comfort Team*." Gjovik had inquired to the team as to what a "*Comfort Team*" is but no one ever responded to Gjovik.

---

[154] U.S. Treasury, OFAC, "*Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Apple, Inc.,"* Nov 25 2019, https://ofac.treasury.gov/recent-actions/20191125
[155] US Treasury, OFAC, "*ENFORCEMENT INFORMATION FOR NOVEMBER 25, 2019*" pg3, https://ofac.treasury.gov/media/25931/download?inline

129

338. On July 20 2021, Gjovik contacted the Business Conduct team (reporting to Tom Moyer) about the smuggling and sanctions issues. The team responded promptly and asked for a phone call. Within two minutes Gjovik responded she was happy to help. During the call Gjovik was asked to preserve evidence while they investigate.

339. The sanctions compliance investigator told her it did not sound like Apple violated sanctions because it was the employee's family handling the smuggling at his direction, and because it was illegally importing the goods into Syria, it would likely break Syrian laws but not US laws. Nothing was said about reporting the matter to the government regardless. The employee also bragged about running an IT consulting company, which is something Apple employees are generally forbidden from doing. Upon investigation the employee claimed the business was based in California but it was apparently entirely operated in Syria and Lebanon and used an iOS application to facilitate border-crossings between the countries.

340. The investigator commented he was concerned that Gjovik's coworker thought it was normal to brag about illegal smuggling at work. Gjovik noted: "*I've been complaining about, amongst other things, the culture of impunity and general lawlessness in my org.*" Even before an investigation concluded into the border crossing company, West then emailed Gjovik saying that because Apple did not break the law there is no policy violations so everything is fine. West added, however, they are going to remove the smuggling content from the article for undisclosed reasons that are not related to smuggling or other compliance concerns. Gjovik complained that West was minimizing the issue. Dan West never responded to Gjovik ever again.

341. On July 22 2021, Gjovik contacted the US EPA and complained again about the current CERCLA-related activities at the office. Gjovik was becoming irritated with US EPA's indirect and passive responses, and Gjovik pointed out that there had never been a 24 hour

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

indoor air test at the TRW Microwave Site that returned air pollution results within the acceptable limits – every time they had been run they failed, then Apple was only running inferior 10 hour tests, which did not fail but still showed pollution. Gjovik also asked if she talked to Apple and Northrop about "*the cracks in the floor and floor sealing plan", and mentioned Apple told her "they didn't notify the EPA about [it] and didn't plan to, despite [Gjovik] telling them they probably are required to.*"

342.    On July 23 2021, the US EPA responded saying something about meeting with 'the site team' about Gjovik's office. Gjovik then texted Mike and told him "sounds like the EPA is finally yielding to my screams and is meeting with Apple to figure out what the f is going on in our office building." Gjovik attached the email as a PDF for Mike. He responded, "*Oh, wow! That's awesome! It's happening!*"

### xi.    US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021)

343.    On July 26 2021, the US EPA's CERCLA QA team reviewed Northrop Grumman's report about the sub-slab vents on the roof of 825 Stewart Drive. The vapor intrusion expert reviewed the report seeing the Main building (where Gjovik sat) SSD vents were sawed down to one foot and were exhausting the Superfund pollutants near the HVAC intake. The QA lead, Mathew Plate, wrote that it was "*not appropriate.*"

344.    On July 26 2021, the US EPA notified Northrop Grumman they wanted to inspect Gjovik's office at 825 Stewart Drive for vapor intrusion risk. US EPA told Northrop Grumman they wanted to inspect the sub-slab ventilation system, the building's concrete slab and cracks, any concrete slab penetrations, past indoor air sampling locations, and some additional topics.

345.    Under information and belief, Northrop Grumman notified Apple that day. Northrop Grumman's emails to US EPA on July 28 2021 noted they were "*still waiting*" on

confirmation from Apple. Under information and belief, US EPA and Apple conspired to hide the fact that there was even an inspection from Gjovik indefinitely.

346.    In early August, Apple would also attempt to coerce the US EPA to sign a four-page, single-spaced Non-Disclosure Agreement that would prohibit the US EPA from making public statements about its compliance and enforcement activities against Apple, among other restrictions. The US EPA declined to sign Apple's NDA.[156]

347.    On July 27 2021, Gjovik forwarded her emails with the US EPA to Lagares and Okpo and encouraged them to do the right thing and adding the emails to a "*Work Place Safety*" folder with the other evidence folders.

348.    Around this time Gjovik had a meeting with Okpo where she pleaded with him to intervene or escalate the situation at her office, explaining why she was concerned about the cracked floor and the lack of testing, as well as why she was concerned about Apple's conduct including Apple counsel's prior admission of negligence. It seemed to Gjovik that Okpo did not care and she tried to appeal to him by telling him there was someone in the building who was at high risk for cancer (her coworker who disclosed the matter to Gjovik in March 2021) and told him she wanted to preserve their privacy but that there was an "*eggshell plaintiff*" in the building. He still did not react. Gjovik asked him if he understood and added it's a "*pussy shin*"[157] but with TCE vapor intrusion. Okpo said he did understand but said nothing more.

349.    On July 26 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns has just been to retaliate against her and intimidate her into silence – Gjovik asked if anyone else had been retaliated against for raising concerns. Many of

---

[156] Apple NDA, Apple Number: NDA202104810699, Environmental Protection Agency (released per US EPA FOIA Request)
[157] *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (Wisc. 1891) (Twelve-year-old George Putney kicked fourteen-year-old Andrew Vosburg in the shin in a classroom…Unbeknownst to Putney, Vosburg had injured his leg the month before in a sledding accident. The court found Putney liable for all damages arising as a result of the kick, even though he did not intend the harm, nor was he aware of Vosburg's previous injury.)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

Gjovik's coworkers responded that yes, they too had experienced retaliation from Apple for raising real and reasonable concerns. Okpo then swiftly interrogated Gjovik for over an hour about her posts and the responses, repeatedly asking her to stop posting about her concerns, and to stop encouraging other employees to post their concerns, and instead to send all employees to speak with him directly. Gjovik said no, and complained she would not send other employees to be retaliated against by Apple Employee Relations.

350.   On July 26 2021, US EPA discovered what Apple did to the HVAC at Gjovik's office at 825 Stewart Drive. The EPA QA employee wrote,

> "In the mail building (where Gjovik sits) the [sub-slab depressurization] vents appear to be under components of the chiller. This is not appropriate and we should discuss. We should also get the distances between the vents and the HVAC outdoor air intakes. Have… air samples from the passive stacks been collected?"

From: Plate, Mathew <Plate.Mathew@epa.gov>
Sent: Monday, July 26, 2021 3:35 PM
To: Schulman, Michael <Schulman.Michael@epa.gov>; Johnson, AudreyL <Johnson.AudreyL@epa.gov>
Subject: RE: TRW Microwave - 2020 SSD Inspection Memo

Michael,

In the main building the SSD vents appear to be under components of the chiller. This is not appropriate and we should discuss. We should also get the distances between the vents and the HVAC outdoor air intakes.

Have samples air samples from the passive stacks been collected?

Thanks
matt

*7/26/21 EPA email about SSD/HVAC (unknown if PST or EST)*

351.   On July 26 2021, US EPA then informed Northrop Grumman that EPA will be inspecting Gjovik's office. EPA noted a number of things they wanted to inspect including the sub-slab depressurization system, the concrete slab, any cracks/sealed cracks in the floor, and slab penetrations, locations of conduits and other vapor intrusion entry points, and locations for prior indoor air testing.

133

From: Schulman, Michael <Schulman.Michael@epa.gov>
Sent: Monday, July 26, 2021 2:47 PM
To: Kurt Batsel <batsel@dextra-group.com>
Subject: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,

*Exhibit: 7/26/21 US EPA email to Northrop Grumman (unknown if PST or EST)*

352.    On July 27 2021, Gjovik emailed Okpo and Lagares a summary of their investigation, asking for a short-term solution to mitigate the retaliation she was facing from her supervisors, and also a long-term solution where she can either find a new job at Apple, or leave with a settlement but does not want to sign claim waivers or sign additional NDAs. Gjovik noted those were the "*two options we've discussed*." Gjovik wrote: "*As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple [Employee Relations] to resolve, not for me to hide from*." Gjovik told Lagares and Okpo, who kept repeatedly suggesting she take some sort of leave, that she did not want to go on leave. Gjovik complained that the leave Waibel put her on seemed to be an attempt to prevent Gjovik from monitoring the office and floor survey, and that Waibel never actually investigated.

353.     On July 28 2021, Gjovik emailed Okpo and Lagares about discussions with coworkers revealing frequent discrimination and harassment issues across Apple, and what appeared to be systemic cover-ups of those issues instead of actually resolving the problems, and that meanwhile Apple fraudulently holds itself out publicly as caring about human rights and respect. Okpo would then interrogate Gjovik about her posts, her organizing with other employees about concerns of cultures of retaliation and cover-up, and Gjovik encouraging employees to speak out. Okpo repeatedly he didn't want employees talking to each other or anyone else about their concerns and they should only talk to Apple Employee Relations 'privately.' Gjovik told him she would not help him retaliate against her coworkers.



**From:** Ashley Gjovik ashleygjovik@apple.com
**Subject:** Slack ER Chain
**Date:** July 28, 2021 at 2:46 PM
**To:** Ekelemchi Okpo eokpo@apple.com
**Cc:** Antonio Lagares (ER) alagares@apple.com

Hi,

The Slack chain we talked about yesterday & today: https://a13911114.slack.com/archives/CK1KDPQCF/p1627328464228400

Not even including DMs....

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing.)

There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.

-Ashley

**Thread** #women-in-swe

⚑ Added to your saved items

Ashley Gjovik Jul 26th at 12:45 PM
I just read this article and I have a lot of thoughts. I know this is a sensitive area, but I'm wondering if this is a topic that might be benefici discuss, at least for those of us that have tried to go through the employee relations process here, or know folks who have.

https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-investigation/

Do we think Apple does a sufficient job at handling employees complaints about discrimination? Do we feel comfortable even reporting issues?

*Exhibit: The Slack/Retaliation Email*

135

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

354. On July 28 2021, Gjovik texted a friend summarizing a conversation with Okpo that day, where she said Okpo told Gjovik the only outcome from his investigation into her concerns would be "*a non-binding recommendation to the 'business' aka my dumb awful dude leadership and I told him they will just laugh, and I screamed at him for like 40min about the whole fucking thing being a sham.*"



*Exhibit: Gjovik's text messages on July 28 2021 about Okpo*

355. On July 28 2021, EPA emailed Gjovik saying: "*Thanks again for your continued interest in this site and providing your on-the-ground observations…. The agency takes these communications and on-the-ground observations seriousl*y."

356. On July 28 2021, Gjovik texted Okpo asking if he talked to Powers about keeping communications in writing, and Okpo said he did not.

357. On July 28 2021 Gjovik complained to a friend in Human Resources that she believed the Employee Relations investigations were "*a sham*", writing to him in Apple Slack:

"I've spent 20hrs in the last 2 weeks screaming at ER about Apple's ER being

a sham & worthless & supporting the culture of discrimination and impunity –

not to mention all of my workplace safety concerns being actively ignored."

358. On July 29 2021, Gjovik complained to Okpo about her prior conversation with Apple EH&S Legal, Rubenstein, where the lawyer admitted Apple had not been testing the buildings for vapor intrusion and needs to be.

359.     On July 30 2021, Gjovik complained to Lagares, Okpo, Polkes, and Waibel about her concerns about her Superfund office and an apparent cover-up, Waibel's sham investigation, and that she was "*talking to NYT about [the] whole debacle ongoing. NYT quoted [her] last week about [her] concerns about another workplace safety issue — what [she] feel[s] is inadequate safety protocols & policies around COVID exposure for employees being forced back into the office this fall in the midst of a global pandemic.*"

360.     Gjovik repeatedly said that she only wanted the situation with West and Powers controlled, and that worst case Okpo and Lagares could "pause" her job with West and Powers if they refuse to put things in writing and refuse to stop making changes to her workload. Gjovik told Okpo that she learned in law school that administrative can be an adverse employment action. Gjovik told Okpo that if he wanted to pursue the "pausing" her job option, that it must be a discussion and she must agree to the terms which must still allow her to organize with other employees, gather evidence, and participate in her other work activities (like trainings, her AI ethics project with Apple Legal, and her civic engagement project with Apple University). Gjovik said Okpo must offer the terms of the leave and she would either accept or reject it, otherwise she said, case law says if they force her on leave it's an unfavorable employment action.

361.     Around this time Okpo expressed disapproval that Gjovik was taking Employment Discrimination and Labor law school classes during the daytime. Gjovik told Okpo she was previously approved to take remote daytime classes in prior terms, as long as she was to multitask, which she continued to do. Gjovik told Okpo that if he wanted to forbid her from taking Employment Discrimination and Labor law that he must put it in writing. Gjovik said something like "*we'll see what the Judge thinks of that.*"

362.     Gjovik suggested several times that instead of working for West and Powers, that she could work in Employee Relations and try to fix their broken processes and culture of retaliation. At one-point Okpo offered that she could work in Employee Relations doing what she suggested, but that she would also have to continue to work for West and Powers. Gjovik expressed her frustration to Okpo that they still only seem to be trying to make her quit.

363.     On July 30 2021, Gjovik posted on Twitter complaining about Apple. "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions.*"



*Exhibit: Gjovik's 7/30/21 Twitter Post*

364.     After posting this, Gjovik had ex-Apple employees contact her to say they had similar experiences. Other Big Tech employees and ex-employees supported Gjovik for speaking out. Gjovik then decided to start sharing more of what was happening between her and Apple on social media in order to help others understand the issues so they could advocate for employees, and in hope it may pressure Apple to act more reasonably.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

365. On July 30 2021, a Friday, Northrop Grumman wrote to US EPA that "*The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.*" [Monday of the next week was August 2 2021]. Under information and belief, Northrop Grumman were referring to Apple lawyer Debra Rubenstein.

366. On July 30 2021, Apple Employee Relations emailed her to tell her Sedgwick is "*working with [her] provider to clarify and more fully understand [her] limitations.*" Gjovik responded to the person complaining that her office was unsafe and Apple was not taking it seriously, and that Apple was refusing to answer her safety questions and she blew the whistle on Apple the EPA. Gjovik complained about Apple forcing her to fill out "*invasive and intimidating paperwork to literally just not get poisoned.*"

367. On July 30 2021, Gjovik posted on Apple Slack complaining about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups:

> I have been raising concerns about an unsafe work environment. I have very good reason to believe I've been exposed to uncontrolled industrial chemicals. I've been complaining for months. ER has partnered with EH&S to dodge my questions and arguably misrepresent what's happening. I had to resort to getting the U.S. EPA & California OSHA involved. Guess what Employee Relations recommended? Submit a medical accommodation request through Sedgwick to request remote work so I'm not exposed to the industrial chemicals. Guess what the request form asked for? Me to release a very large scope of medical records directly to Apple Inc and have my doctor fill out a detailed form explaining why exposure to uncontrolled industrial chemicals, possibly at toxic levels, is bad for my health and even referenced a worker's comp form I filled out for a fainting spell in my office in 2019, directly referencing vapor intrusion in my active Superfund office. Then what did Sedgwick do? Send me another detailed form for my doctor to fill out asking for more details about my health and also things like, what if we get you an air purifier by your desk? (Yes, an air filter, to mitigate the levels of TCE known to be in the air at my desk above max

industrial levels even less than ten years ago). What happens when I complain to employee relations again that I have to fill out paperwork to not get poisoned? Literally Nothing."

368.   On August 2 2021, Gjovik asked the US EPA what the status of her office was. She said Apple refused to answer anymore of her questions. She also noted she was talking to the New York Times. US EPA, Perez-Sullivan, responded August 3, 2021, thanking Gjovik for providing information) but failing to mention the inspection or HVAC issues). Perez-Sullivan also killed the New York Times story that day and reported her success in doing so to her manager.

369.   On August 2 2021, Gjovik and her coworker Mike, texted about their office. Mike asked, "*any updates on the testing in SD01?*" Gjovik replied: "*They told me they're not answering any more of my questions and they'll reach out to me when they feel like it.*"

370.   On August 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything Waibel had supposedly investigated and saying that if Waibel said it was fine then it was fine – Gjovik proceeded to start posting on Twitter about several of the smaller things she complained about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no issues, so then she is free to talk about it and she would do so. Gjovik posted on Twitter several examples of the evidence she provided related to West and Powers discriminating against her due to her sex/gender including a text message exchange with West where he was measuring the 'octaves' of her speaking voice, and another with Powers defending a political figure who was recently accused of sexually assaulting a woman. These posts quickly went viral.

371.    Gjovik complained repeatedly about the clear misuse of ADA and the offensive responses from Apple and Sedgwick related to her request. On August 2 2021, Gjovik emailed Okpo, Lagares, Waibel, and Polkes

"My doctor faxed his response to Sedgwick's follow up questions to them today. Attaching for you below since I assume you'll ask them for it anyway. Note: the questions about whether an air purifier could mitigate Superfund vapor intrusion (so severe that a land use covenant with the government prohibits elder care and day care on site) was particularly offensive, but so is the fact itself that you're forcing me to release medical info & fill out forms to not be poisoned."

372.    In response to Sedgwick's bizarre questions, Gjovik and her doctor repeatedly explained that industrial chemical air pollution is known to be on site, Gjovik should not be exposed to toxic air pollution, and Gjovik simply wants a location to work at Apple that is not a toxic waste dump. Gjovik's response suggested she either be allowed to work from home in the Bay Area, or be allowed to transfer to an Apple office in a different region with less pollution. Gjovik had also been discussing with Powers, Lagares, and Okpo that she would be open to working in an Apple building in Silicon Valley if it was not on a toxic waste dump, but they said there were no Apple offices she could transfer to in Santa Clara County that are not on toxic waste dumps.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                         DECEMBER 21 2023

> 1. **What is the provider attempting to solve for in the current work environment with this accommodation?**
>
> I am attempting to allow the patient to continue to work her regular hours while at the same time protecting her from harm, due to industrial chemicals. She has a medical history consistent with significant physical and cognitive impairment when she is exposed to industrial chemicals.
>
> The patient provides evidence that her current work environment is an active EPA Superfund site with a history of vapor intrusion above maximum industrial levels. She has provided the following evidence: https://cumulis.epa.gov/supercpad/cursites/csitinfor.cfm?id=0901181
>
> The patient claims that may of Apple's other buildings are also on active Superfund sites or County/State-managed chemical clean-up sites.
>
> 1. **Are there other accommodations that could be considered that would allow the patient to work in the office? If so, what are they?**
>
> Relocation to offices outside the San Francisco Bay Area to areas without systemic chemical pollution. The patient provides these sources:
> https://www.theatlantic.com/technology/archive/2019/09/silicon-valley-full-superfund-sites/598531/
> https://ehp.niehs.nih.gov/doi/10.1289/ehp.1205879

*Gjovik's 8/2/2021 Response to Sedgwick*

373.    Gjovik raised concerns to Apple in April through August of 2021, complaining of retaliation, discrimination, harassment, and intimidation. In response to Gjovik's detailed complaints with supporting evidence of misconduct by Apple managers and representatives, Apple (West, Powers, Polkes, Lagares, Okpo, Waibel) repeatedly suggested Gjovik's only path forward to resolve those issues was for Gjovik to request FMLA medical leave and/or utilize an Apple EAP ("Employee Assistance Program") mental health counselor. Gjovik repeatedly complained that both of those suggestions implied Gjovik was imagining or overreacting to the issues, and that Gjovik's only option was to remove herself from Apple. Gjovik complained that she identified specific, tangible abuse and it was Apple's responsibility to investigate and remediate the misconduct. Gjovik also complained that Apple's inferences that the issue was Gjovik's mental health was undermined by Apple then suggesting an appropriate response to the abuse was to go on leave to remove herself from that abuse. Gjovik's logic and self-confidence did not deter Apple from continuing to pursue this line of intimidation for months and until Gjovik's inevitable termination.

374.     Gjovik told Apple she was moving apartments to Santa Clara on August 6 2021 and driving from San Francisco to Santa Clara to pick up her key on August 5 2021. Gjovik said since she will be driving through Sunnyvale anyways, she planned to visit the office on August 5th to gather evidence. Gjovik specifically mentioned a work laptop that she believed had copies of the text exchange with West when he tried to pimp/pander her in 2018.

375.     Then, on August 2 2021, shortly after Gjovik said this, Apple suddenly announced it was sending an EH&S team to Gjovik's office on August 4 2021. The notice said there will "be testing" in three conference rooms. Gjovik quickly texted Mike to see if he would be at the office before August 4 2021, so he could help gather evidence, but he said he did not think he would be there before August 4 2021. Gjovik also wrote "*what does testing mean*"?

376.     Gjovik emailed US EPA on August 2 2021 and asked them what the status was of her complaints. Gjovik noted Appl was "*doing some kind of maintenance work in the office on Wednesday.*" EPA responded August 3 2021 saying again that EPA *"take[s Gjovik's] on-the-ground observations seriously."*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

377.    On August 3-4 2021, Gjovik asked other coworkers on her team who were onsite at the building, Simon and Eddie, to take photographs of the cracks in the floor as evidence, fearing Apple was attempting to cover-up the safety issues and Gjovik and her colleagues would never understand if they were exposed to chemicals in way that harmed their health. Gjovik messaged them: "*Weird ask but if either of you are in [Stewart 1 office] today can you please try to take detailed pics of any cracks you see in the floor – the cement – EH&S is supposed to fix it tomorrow-ish I want evidence of what they looked like before they do.*"

378.    Gjovik's coworkers responded they were in the office and asked her to point to "*where the cracks are*" so he "*can take a pic.*" They then sent a photo of a crack in the floor and asked, "*Do you consider this a crack?*" Gjovik responded, "*Thank you. Yes, can you get closer up to see the depth please and note where in the building it is. I love you both. The deeper the crack the more likely we're being slowly poisoned. I'll forward you an email after my meetings.* "

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

145

*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

Gjovik's coworker responded that he "*did a quick walk and it's all over the place.*" He

said he can "take pics" "but it is everywhere." Gjovik responded,

> "If there's any way to show depth like sticking clay in a deep one and showing
> how deep it is that would be amazing. It sounds like they're trying to cover all this

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

up as soon as tomorrow. This is me yelling about the cracks (email attachment). I think they're sealing them tomorrow but refusing to test or capture them otherwise until they fix them.

Gjovik's coworker responded with photos of cracks. Gjovik responded,

"Thank you. Would you mind looking in front of Mike's office and the concrete in front of the row where my desk is. I filed a worker's comp complaint for fainting in Mike's office and at my desk in 2019 now due to suspected chemical exposure.

Gjovik's coworker responded "*Well definitely some cracks in the floor. Also, a ton of floor (in all cubicle / office space) is all under carpet, so how do they know what is cracked under there*?" Gjovik replied: "*They said they weren't going to look under the carpet because they're smart and talented people and I should stop asking questions.*" Gjovik informed Employee Relations of what they were doing and showed Okpo the photos. Gjovik complained she would not let them hide or destroy evidence.

379.    On August 2 2021, Gjovik told EPA to expect to hear from a NYT reporter she was talking to about her office. On August 3 2021, EPA's notes show they misled the reporter by pointing him to old information and not disclosing to him, or Gjovik, the inspection that was about to occur.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

---

**Message**

| | |
|---|---|
| **From:** | PerezSullivan, Margot [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6659D7F0435B465184ED9736F0FDBC7A-MPEREZSU] |
| **Sent:** | 8/3/2021 7:16:23 PM |
| **To:** | Barkett, Bonnie [Barkett.Bonnie@epa.gov] |
| **Subject:** | end of day |

**NY Times** (Jack Nicas) [Initial interaction 8/2] – CLOSED – Reporter emailed regarding concerned citizens claims about TRW Microwave superfund site. Reporter indicated he's checking to see if there's a possible story based on concerned citizen's claims. Explained to reporter that RPM is on vacation and that as of the last 5 year review, EPA determined the remedy is protective. Reporter indicated he would not wrote a story. SEMD, NorCal, Margot Perez-Sullivan

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C [Ex. 6 Personal Privacy (PP)]
E: perezsullivan.margot@epa.gov

---

380.    On August 3 2021, Alisha Johnson (prior US EPA Press Secretary under Lisa Jackson, now reporting to Lisa Jackson at Apple) emailed US EPA Public Relations to suddenly begin organizing an event where the current head of the US EPA, Michael Regan, would come to Apple Park and do a "fireside chat" with Lisa Jackson on August 17, two days before the US EPA's inspection of Gjovik's Superfund office. [158]

381.    The same day Apple announced a new "*joint commitment*" about "*protecting workers from chemical hazards.*"[159] The program claimed Apple committed to "*protect workers*" from chemical exposure, "*build safety systems and culture around process chemical management,*" and "*avoid harmful substances.*" The first round of

---

[158] Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*, https://www.axios.com/2021/08/18/epa-administrator-visits-apple-headquarters-climate
[159] Aug 3 2021, https://www.greenamerica.org/blog/groundbreaking-effort-protect-workers-chemicals-electronics; https://www.towardzeroexposure.org/about-the-program ; https://cleanelectronicsproduction.org/post/2021-08-03-electronics-industry-leaders-advance-toward-zero-exposure-to-workers-throughout-the-supply-chain

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

highly prioritized chemicals to ensure workers have "*zero exposure*" to included NMP, Toluene, and TCE.[160]

382.    On August 3 2021, Margot Perez-Sullivan (US EPA) sent status to US EPA Public Relations saying the NYT reached out to her about Gjovik and Gjovik's office asking if there is anything newsworthy happening at 825 Stewart Drive.[161] Perez-Sullivan said she told the reporter, Jack Nichols, that the 2019 report on the office said the current remedy "*is protective*" and claimed the current US EPA Project Manager was "*on vacation.*" Perez-Sullivan wrote "*Reporter indicated he would not write a story.*"

383.    On the night of August 3 2021, Gjovik posted on Apple's Slack discussion tool encouraging her coworkers to speak out about work conditions and the terms and conditions of their employment.

384.    On August 4 2021 at 7:23 AM the city of Sunnyvale asked to Apple to inspect Gjovik's office for hazardous waste regulatory compliance.

385.    On the morning of August 4, Simon notified Gjovik he was at the office again. He provided more data on the cracks and also noted "*EH&S folks are here by the way. With so many devices. Nice job.*" Gjovik asked him to take a photo of them too and say, "*Ashley says hi.*" He responded, "*They are in the conf room next to Powers' office. Very difficult to take pic.*" Gjovik responded, "*they're legit hiding.*"

---

[160] Toward Zero Exposure, 2023 Report,
https://static1.squarespace.com/static/5fcaaeb867798450704de457/t/63ffcc83fe791111862f0a14/1677708
419929/Toward+Zero+Exposure+Requirements+and+Verification+V1.1+February+2023.pdf
[161] Note: news coverage of Gjovik's claims against Apple, including about her office and the related cover-up were covered in depth by many newspapers including Financial Times, which featured the matter on their front page in December 2021. What was occurring was newsworthy.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

xii.    **Apple Torments Gjovik; US EPA Inspection! Apple Prepares to Fire Gjovik (August 2021)**

386.    A couple of hours later on August 4 2021, Apple suddenly put Gjovik on "indefinite administrative leave". Gjovik was supposed to meet with Okpo to continue reviewing evidence files with him and discussing her concerns. Gjovik said she did not want to be on leave, but Apple said she did not have a choice. Gjovik said she wanted to still be able to talk to coworkers and gather evidence, and Apple said she was removed from the "*workplace*" and "*all workplace interactions*." Gjovik was then left unable to coordinate with her coworkers to gather evidence, or to visit her office as planned to gather evidence in person the next day. Gjovik complained it was retaliation.

387.    Gjovik had been tracking the status of what they reviewed on the Box folders, and in addition to two pending folders, Gjovik had a new folder she wanted to review named "*New Evidence to Review 8-4".* Okpo said they were not going to review any more evidence and Gjovik is now on leave. Gjovik protested and Okpo persisted.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Exhibit:** *Gjovik's Box folders on the morning of August 4 2021*

388.    Under information and belief, after receiving notice from US EPA that they were going to inspect 825 Stewart Drive, and after having reviewed the extensive and meticulous evidence Gjovik gathered at 3255 Scott Blvd, and knowing Gjovik was about to be at 825 Stewart Drive to do the same -- Apple conspired to get to the office before Gjovik could, and also concurrently "*remove Gjovik from the workplace*" so she did not make a surprise visit, and "*remove Gjovik from all workplace interactions*" so no coworkers tipped Gjovik off as to what Apple was doing.

389.    After her meeting with Okpo, Gjovik still had two other meetings scheduled that day. Gjovik asked Okpo if the leave could start in a day or two so she has time to wrap up meetings and ensure her projects are covered. Okpo said no, the leave starts immediately. Gjovik

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

complained to Okpo that the leave was retaliation. She complained he is setting her up for a bad review along with keeping her from organizing and gathering evidence.

390. Gjovik went to both of her meetings that day. The first was with a coworker who wanted to talk about a bad experience they had with Employee Relations. She told the coworker what happened and said she was not sure if she would get in trouble for still attending their meeting. She also notified the coworker when her meeting with Okpo went late, describing Okpo's conduct during the meeting as "*spicy*" in her Slack messages with the coworker.

391. Gjovik's last meeting of the day was with four senior managers in Dan West's organization. Gjovik knew Powers needed a specific outcome from that meeting and was expecting it that day, so Gjovik led the first half of the meeting like nothing was wrong. Once the project discussion completed, Gjovik then told them she was "*just put on leave*" and "*doesn't know if Apple will let her come back.*" Gjovik told them "*She did not understand what just happened*" and that Apple said it was voluntary but also said she had no choice.

392. Gjovik told them solemnly that she expected it was probably the last meeting she'd ever lead as an engineering program manager at Apple. The senior managers advised her she should leave the call so she "*did not get in trouble with Employee Relations.*" Gjovik acquiesced.

393. Gjovik complained a lot on Apple Slack about being put on leave and told her coworkers to follow her on Twitter, or text or email, if they wanted to keep organizing now that she has to stop using Slack. Gjovik also set up an out of office message that complained she was now on leave and Employee Relations doesn't want her on Slack. Gjovik shared her social media account so her coworkers could still watch what Apple was doing to her, and stay in touch, and she offered to connect workers to reporters to discuss things like Apple's "overly restrictive NDAs."

153

**Ashley Gjøvik** 12:31 PM    Today ⌄

I'm OoO now on administrative leave & ER wants me off of Slack. If anyone wants to keep in touch in the interim, etc. my Twitter is ashleygjovik and DMs are open, and I have Signal. If anyone is interested in talking to the press, I have a bunch of journalists interested in the remote work advocacy, overly restrictive NDAs, workplace safety issues, disability accommodations, and discrimination issues (especially Apple's systemic poor process & responses to all of the above). If anyone wants assistance in connecting to the 4th estate, happy to help.

394.    On August 4 2021, a reporter contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik posted. The reporter wanted to write an article about what Apple did to Gjovik. Gjovik agreed to let her write an article about Gjovik being put on leave, Gjovik also posted on Twitter about it herself first, and the story was picked up by other press.[162]

395.    Apple responded to the press only saying repeatedly: "*We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters.*"[163]

396.    Hours after Okpo put Gjovik on leave on August 4 2021, Okpo sent an email to Gjovik saying she was now on leave because she asked to be on leave. Gjovik never responded directly to Okpo because his email was inaccurate and combative, and she did not feel like arguing with Okpo more at that time.

---

[162] The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave,*" Aug 5 2021, https://www.telegraph.co.uk/technology/2021/08/05/apple-worker-complained-sexism-hostile-workplace-put-paid-leave/ ; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" Aug 5 2021, https://finance.yahoo.com/news/senior-apple-employee-alleges-sexism-at-work-is-put-on-indefinite-leave-235626960.html ; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues,*" https://www.foxnews.com/tech/apple-exec-placed-on-leave-sexism-concerns-workplace-issues

[163] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

On Aug 4, 2021, at 12:53 PM, Ekelemchi Okpo <~~~~~~~~~~~> wrote:

**Apple Confidential**

Hi Ashley,

I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as to not interact with your managers. You will receive your regular pay and benefits during this time. You are not expected to perform any work until the investigation is completed and closed. I will work with your manager to set your out of office message.

This administrative leave ensures that you are removed from the workplace, workplace interactions and contributions and your day to day roles and responsibilities while I conduct a thorough and complete investigation into your concerns. As discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.

I am reviewing the issues we discussed and will send you an email by early next week to confirm the scope of my investigation. If you have any questions at any time, please feel free to email me.

*Exhibit: Okpo's 8/4/21 Email*

397. Gjovik made three Twitter posts about the situation on August 4 2021. The first post was at 1:16pm PST. Gjovik wrote: "*So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack.*" [164]

---

[164] Twitter, Ashley Gjovik, August 4 2021,
https://twitter.com/ashleygjovik/status/1423014977661591552

155



*Exhibit*: *Gjovik's 1:16pm PST Twitter Post*



*Exhibit*: *Post Analytics*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Exhibit**: *Verge Article about Gjovik from August 4 2021 at 2:18pm PST* [165]

---

[165] The Verge, "*Apple places female engineering program manager on administrative leave after tweeting about sexism in the office: Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation,*" Aug 4 2021, https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Apple has placed senior engineering program manager Ashley Gjøvik on indefinite administrative leave after she tweeted about sexism in the office. The company is currently investigating claims Gjøvik made about a hostile work environment.

"For months, I have been raising concerns with Apple employee relations about years of experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation," Gjøvik says in an interview with *The Verge*. "I asked them to mitigate the hostile work environment while they investigate, and they initially offered me EAP therapy and medical leave. I told them that made no sense, and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option they could give me paid administrative leave. They apparently made no effort to set boundaries and instead said they were placing me on administrative leave and implied they did not want me on Slack where I had been vocal about my concerns with certain policies at the company. They also implied they didn't want me to meet one-on-one with other women at the company about their concerns with Apple policies, which I had been doing."

This afternoon, Gjøvik set an out of office message informing colleagues that the employee relations team had placed her on indefinite paid leave.

So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I'm now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack.

— Ashley M. Gjøvik (@ashleygjovik) August 4, 2021

*Exhibit: Excerpt from The Verge Article on Aug 4 2021[166]*

398.    The second post was at 2:12pm PST. Gjovik wrote, *"#Apple employee relation's 1st #sexism investigation only arose while I was complaining about unsafe work conditions and*

---

[166] The Verge, "*Apple places female engineering program manager on administrative leave after tweeting about sexism in the office: Ashley Gjøvik says the employee relations team implied she should stay off Slack pending an ongoing investigation,*" Aug 4 2021, https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

*related #intimidation. They tried to quickly brush me off & prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review."*[167]



**Exhibit**: Gjovik's 2:12pm PST Twitter Post

399.     Gjovik's third Twitter post was at 2:33pm and said, "*When I say "unsafe #workconditions," I mean physically unsafe; #dangerous chemicals; #OSHA. You'll hear much more about this in a bit.*"[168]

400.     On the evening of August 4 2021, Dan West also suddenly scheduled two large meetings with the women's group Gjovik founded and co-chaired. He had never done this before and his assistant even had to send an email explaining what the meeting was because no one would expect such a thing. It was clearly pretextual and part of the cover-up.

---

[167] Twitter, Ashley Gjovik, August 4 2021,
https://twitter.com/ashleygjovik/status/1423044310451179523
[168] Twitter, Ashley Gjovik, August 4 2021,
https://twitter.com/ashleygjovik/status/1423049593596481540

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Dan West meeting with Women's Group, 8/4*



EST

***Exhibit***: *Gjovik's Twitter post on August 4 2021 3:33 PST*

401.    On August 5 2021, Gjovik posted at 8:45am PST said, "*Lord have mercy. Here's my "#Apple ER said it's ok" for today. I sent them my annual reviews noting I shouldn't be*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

"overbearing" or "#emotional," shouldn't express "#anger or frustration," and I "can cause #anxiety for herself." Formal review. ER said it's fine. Shut this down."[169] Gjovik was replying to an ex-Apple employee who had been engaging in the discussion about hostile work environments at Apple.

402.   On August 5 2021 at 9:38am PST, Okpo sent another email to Gjovik, replying to his prior email, complaining that Gjovik referred to the leave as "*indefinite*" even though there was no ETA for any type of update or outcome. Okpo also insisted, again, that Gjovik was supposedly the one who asked to be on leave and Apple was kind enough to put Gjovik on leave. Okpo called Gjovik's public statements a "*misrepresentation*."



**From:** Ekelemchi Okpo <eokpo@apple.com>
**Date:** August 5, 2021 at 9:38:39 AM PDT
**To:** Ashley Gjovik <ashleygjovik@apple.com>
**Subject:** Re: Apple Confidential: Next Steps

Ashley,

I'm disappointed about you misrepresentating our discussion.  As we discussed, and I confirmed in my follow up email, you requested and Apple agreed  to have you on paid administrative leave while I look into your concerns so that you can remain out of the workplace while the investigation continues.  We did not discuss you being on an indefinite leave.

To preserve the integrity of the investigation I requested, but did not require, that you refrain from sharing the content of our communications. As I shared, this is done in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses. I did not imply, nor did I ever discuss, the removal of your access to Slack.

If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements.  I'll be in touch with you soon about the investigation.

*Exhibit: Okpo's Email to Gjovik on 8/5/21*

403.   Apple's lawyers would later claim that on August 4 2022, Gjovik "*misrepresented [Okpo and her] meeting in a tweet, alleging that Apple had 'suspended' her by placing her on involuntary 'indefinite' leave.*" Counsel said Apple *"ER emailed Ms. Gjovik to correct her misrepresentation the following day.*" [170] Apple accessed, farcically "investigated", surveilled, documented, and reported Gjovik's social media activity in violation of Cal. Lab. Code § 980.

---

[169] Twitter, Ashley Gjovik, August 5 2021,
https://twitter.com/ashleygjovik/status/1423309111123349509
[170] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                     DECEMBER 21 2023

Gjovik has a right to privacy in any personal social media including videos, photographs, blogs, text messages, and email. Apple's complaints about Gjovik's speech in Okpo's August 5 2021 email and in Apple's March 2022 position statement both confirmed Apple was reading Gjovik's Twitter posts. Apple's "comments" to press in the articles about Gjovik confirmed Apple was aware Gjovik was providing interviews to the press about what was happening with her employment at Apple.

404.    Gjovik realized Apple was preparing to fire her and quickly heard about conversations within her team that confirmed she was going to be fired. Starting around August 5 2021, the managers in West's organization start raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers say if anyone has concerns about the "*Ashley Issue*" they should talk to Helen Polkes. They and West mention West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands meeting.

405.    Gjovik realized they would not be discussing the "*Ashley Issue*" at a future all hands if she was there, and that West was already certain Gjovik was about to be fired. Gjovik also realized that Apple was sending her coworkers who were concerned that Gjovik had a point that Human Resources at Apple was severely corrupt, Apple was sending those coworkers to Human Resources. Gjovik realized Apple was not going to investigate or engage in good faith behavior.

406.    Starting on August 4-5, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. One on a forum discussion about Gjovik, "*Doval*," wrote that Gjovik "*needs psychiatric help and confinement*" and that Gjovik "*is a psychopath and frankly is a danger to other apple Employees*!" The account went on to call

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik a "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this.*"[171]

407.    Gjovik moved apartments on August 6 2021. She picked up the key on August 5 2021 and her possessions were moved August 6 2021. Gjovik spent most of the time packing, moving, and unpacking on the phone with law firms frantically trying to find a lawyer to deal with Apple for her. All lawyers Gjovik talked to wanted Gjovik to be willing to agree to sign an NDA in exchange for a settlement, but Gjovik refused, so proceeded unrepresented.

408.    The press continued to cover what Apple was doing to Gjovik, as well as a growing movement across Apple employees who began speaking out and organizing with each other around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this too, and Gjovik posted on Twitter about it repeatedly. Gjovik was not only a catalyst for many employees to come forward themselves, but these employees catalyzed Gjovik's view and protest of Apple's misconduct.

409.    On August 9 2021, the US EPA sends travel approval requests to visit Gjovik's office and the justification for the visit cites Gjovik's disclosures.

Destination: TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
Dates: 2021-08-19
Description of work: A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health. The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
Travel Method: Separate vehicles, one person per vehicle, local travel, no overnight stay.

*Exhibit: US EPA's 8/9/21 Travel Request for 8/19/21 Visit to Gjovik's Office*

---

[171] AppleInsider, 4 Aug 2021, https://forums.appleinsider.com/discussion/223222

163

410. On August 9 2021, EPA emails complain Apple wants to know everywhere they want to go in Gjovik's building, and that Apple is trying to the EPA to sign an NDA.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Apple Number: NDA202104810699                    Environmental Protection Agency

## Apple Confidentiality Agreement

This Apple Confidentiality Agreement (the "**Agreement**") between Apple Inc., a California corporation located at One Apple Park Way, Cupertino, California 95014 United States ("**Apple**") and Environmental Protection Agency, located at Environmental Protection Agency  75 Hawthorne Street  San Francisco, CA 94105, United States, ("**Company**"), is effective as of August 9, 2021 ("**Effective Date**").

### 1. Scope

This Agreement governs any Confidential Information disclosed in connection with the Purpose.

In this Agreement: (i) "**Confidential Information**" means any nonpublic information, or material, which may include product plans, specifications, designs, photographs, costs, prices, project names, business plans, marketing plans, forecasts, orders, materials, components, prototypes, or pre-release products, disclosed by one party or any of its Affiliates (the "**Discloser**") to the other party or any of its Affiliates (the "**Recipient**") in connection with the Purpose, including information Recipient learns from Discloser's employees or Consultants or through inspection of Discloser's property; (ii) "**Purpose**" means Apple's evaluation, purchase or use of Company's, or its Affiliates', goods, services, technology, or other property (including intellectual property, real property, and personal property); (iii) "**Affiliate**" means any entity that Controls, is Controlled by, or is under common Control with a party; (iv) "**Control**" means the legal, beneficial, or equitable ownership, directly or indirectly, of more than 50% of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights; and (v) "**Consultants**" means a party's bankers, accountants, auditors, attorneys, financial advisers, and independent contractors.

Confidential Information also includes: the fact that the parties and their respective Affiliates and Consultants have discussed the Purpose; the substance of their discussions; and the terms, conditions, and existence of this Agreement.

### 2. Disclosure and Use Restrictions

Recipient may only disclose Confidential Information to its employees or Consultants who: (i) have a need to know in order to accomplish the Purpose; and (ii) are bound by a written agreement that prohibits any unauthorized disclosure or use of the Confidential Information that is at least as restrictive as the terms and conditions of this Agreement. Recipient shall not disclose, and shall cause its Consultants not to disclose, Confidential Information to any other person or entity without Discloser's prior written consent in each instance. Recipient and its Consultants may only use Confidential Information for the Purpose. Recipient and its Consultants must use a reasonable degree of care to protect Confidential Information it receives and to prevent any unauthorized use or disclosure of Confidential Information. Recipient shall be directly liable for any liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, as incurred by either party and their respective

Page 1 of 4

V. 03192021                                    Apple Confidential

ED_006475_00000040-00001

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

ED_006475_00000040-00

*Apple Number: NDA202104810699*                                    *Environmental Protection Agency*

Affiliates, related to any unauthorized disclosure or use of Discloser's Confidential Information by Recipient or any of its Consultants.

**3. Exclusions**

Confidential Information does not include information that: (i) was known by Recipient without restriction before receipt of the Confidential Information; (ii) is publicly available through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; or (iv) is independently developed by Recipient. Recipient may disclose Confidential Information to the extent it is required by law if it makes reasonable efforts to provide prior notice to Discloser and seeks protective treatment of the Confidential Information. The fact that a disclosure was legally required will not alter the nature of the Confidential Information.

**4. Intellectual Property**

Except as expressly set forth in this Agreement, nothing in this Agreement is intended to grant a license to or waive any rights in either party's patents, copyrights, trademarks, or mask works. Receipt of Confidential Information will not constitute or be used to show or support notice or knowledge of any patents.

**5. Feedback**

Any ideas, suggestions, or recommendations made by Recipient regarding Discloser's Confidential Information in connection with the Purpose, ("**Feedback**"), may be used and incorporated into Discloser's products, technologies, and services without paying royalties and without any other obligations or restrictions so long as Discloser does not infringe Recipient's patents, copyrights or trademark rights.

**6. Residuals**

In connection with the Purpose, Apple and its Affiliates shall be free to use any ideas, concepts, know-how and techniques retained in the unaided memory of the persons who had access to the Confidential Information ("**Residuals**") for any purpose (subject to any patents or copyrights of Company and its Affiliates), and Apple and its Affiliates have no obligation to limit or restrict the assignment of such persons. A person's memory is unaided if the person has not intentionally memorized the Confidential Information.

**7. Independent Development**

Each party acknowledges that the other party may, currently or in the future: (i) make or use goods, services, or technologies that compete with its own; (ii) develop information internally or receive information from other third parties that may be similar to its own Confidential Information; or (iii) evaluate, invest in, or do business with its competitors or potential competitors. Neither party's execution of this Agreement nor its receipt of any Confidential Information will restrict such activities.

**8. Warranty**

Page 2 of 4

V. 03192021                                                    Apple Confidential

Apple Number: NDA202104810699

Environmental Protection Agency

Each party warrants that it has the right to disclose its Confidential Information. All Confidential Information is provided AS IS and without any warranty, express, implied, or otherwise, regarding its accuracy or performance.

## 9. No Press Releases or Other Public Statements

Neither party nor their respective Affiliates or Consultants shall issue press releases or other public statements regarding this Agreement or its subject matter without the other party's prior written approval; provided, however, Apple and its Affiliates may disclose the final results of any supplier responsibility assessments pursuant to its corporate compliance, corporate responsibility, and/or annual reporting programs.

## 10. General Compliance with Laws

The parties shall, and shall cause their respective Affiliates and Consultants to, comply with all applicable laws including export control and sanction controls.

## 11. No Assignment

This Agreement is not assignable or transferable by a party without the prior written consent of the other party. Any purported or attempted assignment, delegation, change of control, or other transfer without such consent will be null and void and will constitute a breach of this Agreement.

## 12. Return of Confidential Information

Upon written notice, Recipient shall return all tangible Confidential Information then in its, its Affiliates' and its Consultants', possession to Discloser and destroy all Confidential Information that cannot be returned, including any emails or other electronic documents containing Confidential Information (but excluding automatic electronic back-ups and archive systems) within 15 days after receipt of such notice.

## 13. Protection Period

Restrictions on use and disclosure of Confidential Information will remain in effect for 7 years from the date the Confidential Information was disclosed, however Confidential Information containing personally identifiable information will remain in effect perpetually.

## 14. Term and Termination

Either party may terminate this Agreement upon 15 days advance written notice to the other party. Upon termination of this Agreement Feedback, and Residual rights, and each party's disclosure and use obligations shall survive.

## 15. Governing Law & Disputes

This Agreement will be governed by the laws of the State of Delaware, without reference to conflict of laws principles. The confidentiality provisions of this Agreement will be enforceable under the Delaware Uniform Trade Secrets Act, Del. Code Ann. Title 6 Secs. 2001 et seq.

Page 3 of 4

V. 03192021

Apple Confidential

ED_006475_00000040-C

Apple Number: NDA202104810699                                    *Environmental Protection Agency*

All disputes arising under or in connection with this Agreement will be finally settled under the then current Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such rules. The arbitration will be conducted in English in San Francisco, California. Judgment upon any award rendered by the arbitrator may be confirmed or enforced in any court having jurisdiction. The arbitrators shall award to the prevailing party, if any, its costs and expenses, including its attorneys' fees. The prevailing party shall also be entitled to its attorneys' fees and costs in any action to confirm and/or enforce any arbitration award in any judicial proceedings. All materials in the proceedings created for the purpose of the arbitration, all other documents produced by another party in the proceedings not otherwise in the public domain, and all awards in the arbitration will be deemed "Confidential Information", except to the extent disclosure may be required of a party by legal duty to protect or pursue a legal right or to enforce or challenge an award in legal proceedings before a court or other judicial authority.

Either party may bring court proceedings in any court having jurisdiction to seek an injunction, specific performance, or other equitable relief to enforce any right or obligation under this Agreement. The parties agree that no bond need be posted to obtain injunctive or equitable relief, but if required by law or the court, the parties consent to a bond in the lowest amount permitted by law.

### 16. Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to, and supersedes all prior or contemporaneous oral or written agreements or contractual provisions concerning any Confidential Information disclosed between the parties in connection with the same or similar purpose. Any amendments and waivers must be in writing and signed by both parties. Agreements, addenda, or supplements entered into between the parties prior to the Effective Date and that reference prior confidentiality provisions in connection with the same or similar purpose are amended to reference this Agreement in place of the prior provisions.

### 17. Miscellaneous

Company and Apple shall each ensure that its Affiliates comply with the terms and conditions of this agreement. A written notification addressed to the authorized representative(s) of a party will be deemed to be notice (i) when personally delivered; (ii) when sent by confirmed facsimile; (iii) one day after having been sent by commercial overnight carrier specifying next-day delivery with written verification of receipt; or (iv) three days after having been sent by first class or certified mail postage prepaid. A copy of any notice sent to Apple or its Affiliates must also be sent simultaneously to Apple's General Counsel at [disclosurenotices@apple.com]. The words "include" or "including" will be deemed followed by "without limitation."

Understood and agreed by the parties' authorized representatives:

Page 4 of 4

V. 03192021                                              Apple Confidential

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1
2
3
4
5
6

August 11, 2021

**VIA Email** reynolds.rebekah@epa.gov
Rebekah Reynolds, Assistant Regional Counsel
US EPA Region 9
75 Hawthorne Street
**Mail Code:** ORC-3-2
San Francisco, CA 94105

**Re: 825 Stewart Drive, Sunnyvale, CA – TRW Microwave Superfund Site (the Site)**

Dear Ms. Reynolds,

Please accept this letter on behalf of Apple Inc. (Apple) in follow up to our discussion on August 10, 2021, and to formally request that any information relating to Apple operations at the Site (including but not limited to any hardware, process or other sensitive information) viewed or documented by EPA during its upcoming Site visit on August 19, 2021, be maintained as confidential business information (CBI) pursuant to *40 CFR Part 2, Subpart B, §2.203(b).*

A CBI claim is defined as "a claim or allegation that business information is entitled to confidential treatment for reasons of business confidentiality, or a request for a determination that such information is entitled to such treatment." *40 CFR §2.201(h)*

"The basis for claims of business confidentiality include the concept of trade secrecy and other related legal concepts which give (or may give) a business the right to preserve the confidentiality of business information and to limit its use or disclosure by others in order that the business may obtain or retain business advantages it derives from its rights in the information. The definition is meant to encompass any concept which authorizes a Federal agency to withhold business information under 5 U.S.C. 552(b)(4), as well as any concept which requires EPA to withhold information from the public for the benefit of a business under 18 U.S.C. 1905 or any of the various statutes cited in §§2.301 through 2.309." *40 CFR §2.201(e)*

We have been informed that EPA is interested in viewing the following areas at the Site:

- The sub-slab depressurization system.
- The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in

**Apple**
One Apple Park Way
Cupertino, CA 95014
T 408 996-1010
www.apple.com

ED_013963_00000007-00001

the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The location of groundwater monitoring wells.
- The location of the previous bioremediation system and injection locations.

Some of these areas are located inside the Site building, which is made up of several highly confidential laboratories.  As such, EPA may see or be interested in documenting or photographing certain operations and areas, which contain trade secret, proprietary and/or company confidential information. These operations and areas are entitled to protection and should all be maintained as CBI.  Therefore, all information collected and documentation created during or relating to the Site visit (e.g. field notes and photographs) are being claimed by Apple as CBI and EPA should treat the information as such under the CBI regulations at 40 CFR Part 2.

If EPA would like to take a photograph during the visit to the Site, we request that EPA asks in advance of taking a photograph to limit, as much as possible, that any materials covered by CBI are being photographed.  We will also request that any photographs taken by EPA be shared with Apple at the conclusion of the Site visit and marked as CBI if appropriate.

Should you have any questions or require any additional information in relation to this CBI request, you can reach me at +1.415.893.9762 or at drubenstein@apple.com.


Very truly yours,

Apple Inc., a California corporation

By:    *Debra J Rubenstein*

       **Debra J Rubenstein**
       *Senior Counsel, Environment, Health & Safety*


CC:    Colin Scanlon

**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

ED_013963_00000007-00002

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

411.    US EPA refused to sign Apple's NDA. Then, on August 11 2021, Apple EH&S emailed EPA claiming that "any information related to operations at the Site" from the August 19 2021 inspection, be considered Confidential Business Information.

412.    On August 12 2021, a fake Twitter account called "Beezie Wacks" was created to harass Gjovik and began harassing Gjovik for several days. In a reply to a post Gjovik made complaining about intimidation from Apple, Beezie told Gjovik that Gjovik was untrustworthy and unreliable.[172]

413.    On August 12 -13 2021 Gjovik filed complaints with US EEOC and California DFEH.

414.    When Gjovik complained the "Beezie" account was harassing her, Beezie replied with a link to the EEOC.gov website definition of harassment. Gjovik replied, "*I'm fairly sure EEOC only applies if you're my employer. Are you trying to tell me something, Beezie? Tim is that you?*" Gjovik added, "*You sure know a lot about employment law, Beezie.*"[173]

415.    On August 14 2021, Beezie was still harassing Gjovik and Gjovik had become certain the account was Apple. Gjovik responded to the account's posts: "*Beezie, would you plz let Tim know I'd like an update on the safety testing EH&S is doing in my office? They were supposed to send me an update by now. I haven't seen anything in my work email & ER wouldn't send to my personal email. Can you Tweet me when it's ready plz? Thx.*"

416.    Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices they would be on site for long periods of time: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5.

---

[172] Twitter: Beezie Wacks, https://twitter.com/beezie_wacks/status/1425921919447040003
[173] Twitter: Beezie Wacks, https://web.archive.org/web/20210814052605/https://twitter.com/beezie_wacks/status/1426414739702259715

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

417.     This was unusual and highly suspicious. On August 12 2021, Global Security

also hosted the first "*NPS Secrecy and Awareness Training*" for all of West's organization.

418.     Gjovik heard that around this time the managers in Dan West's organization were

being instructed to avoid putting employee/labor things in writing due to how much evidence

Gjovik was able to obtain.

**Table A-4: Apple's 825 Stewart Maintenance Work After 7/27 US EPA Inspection Notice**

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| August 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Sept 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

419.     On August 15 2021, Alisha Johnson (reporting to Lisa Jackson) sent US EPA

Apple's talking points about Apple's environmental practices. Including: *"We've achieved Zero*

*Waste to Landfill certifications at all supplier final assembly facilities for core product lines. In*

*fiscal year 2020, we diverted more than 70% of waste across Apple facilities including retail*

*stores. We have active Zero Waste to Landfill goals for retail, corporate facilities and our supply*

*chain."*

420.     On August 16 2021, Apple emailed Gjovik and her coworkers about a "EH&S

Walkthrough 8/18 8/19" at her Superfund office. The email included a map of the office created

by EKI.

421.     On August 16 2021, Apple (Okpo) sent the "Issue Confirmation" of what they

were supposedly investigating. (It is unknown what Apple was doing for the twelve days

172

between then and when Apple forced her on leave). Among other things, Okpo documented in the issue confirmation:

- "[Gjovik] mentioned that after [she] joined Apple, [she] heard that during [her] on-site interview, Bodhi Gerfen saw [her] and said something about [her] ass, and things he wanted to do to [her] ass."
- [Gjovik] mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting. [Gjovik] told [Okpo] that when [she] addressed West about his comment, he said he didn't want to sleep with Powers so it wasn't a problem.
- "[Gjovik] stated that in 2017/2018, [John] Basanese told [her] that at [her] age, [she] needed to be married with children. [She] told [Okpo] that at holiday functions, Basanese made comments like "where is your partner? don't you have a boyfriend?, settle down and have kids.""
- "[Gjovik] shared that during a meeting in 2017, West made a "spanking" gesture with his hand to describe how [Gjovik] "keeps him in line"."

However, Okpo refused to document any of Gjovik's complaints about the safety of 825 Stewart Drive, including in the list of factors Gjovik believed caused retaliation.

422.    In Okpo's August 16 2021 letter he writes: "*To confirm, on Thursday July 29 2021 you told me that you had confidence in my ability to conduct an impartial and objective investigation into the concerns you raised.*" As mentioned and cited in texts and Slack posts, Gjovik repeatedly complained on July 28 2021 about Okpo's investigation being a sham and pointless. Gjovik also complained fervently to Okpo on August 4 2021 that he was acting in bad faith, when he put her on leave, despite them not completing a review of Gjovik's evidence yet, and him not letting Gjovik obtain additional evidence at her office, and his general demeanor and instructions during the meeting, including refusing Gjovik's negotiation attempts to not be on leave.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



> APPLE CONFIDENTIAL
>
> Hi Ashley,
>
> As discussed, I'm providing a summary of my understanding of the concerns you shared with me via Box, Webex on July 20, 21, 27, 28, 29, August 2, 3, 2021, and by email. If there is anything I have missed, or if there are additional concerns you did not previously share with me, please let me know immediately by sending the details in writing to me via email. To confirm, on Thursday, July 29, 2021, you told me that you had confidence in my ability to conduct an impartial and objective investigation into the concerns you raised.
>
> My investigation process includes speaking with the involved individuals, including you, and reviewing other relevant information and documentation. I may also consult with others whom I believe may assist in conducting a thorough investigation. As previously discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers whose names have been included here as part of the investigation document, and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.
>
> Apple takes concerns such as yours seriously and has a No Retaliation policy that can be found here: https://businessconduct.apple.com/policies/speaking-up/no-retaliation/. If you have any concerns of retaliation, please do let me know.

*Exhibit: The first page of Okpo's 8/16/21 Issue Confirmation*

423.    Gjovik replied to Okpo on August 16 2021, complaining that she had been hearing that her coworkers were told to talk to HR Business Partner Helen Polkes if they have concerns about Apple's response to Gjovik, and told Okpo that implied to her that Polkes was not being investigated.  She reminded him that on August 4 2021 he had told her he was only investigating West and Powers, and if that was really his plan, she asked for him to confirm in writing. Gjovik also complained again about no timeline for being on leave or the investigation, or any next steps generally.

424.    Gjovik also asked Okpo about her office. "*Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via [Employee Relations]) was that they weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of activity by EH&S at*

174

*my building — and I also noticed they appear to have hired an enormous amount of vendors*

*very recently. I'd love to learn more*."

---

Ashley Gjovik <ashleygjovik@apple.com>                                          Aug 16, 2021 at 10:47:54 PM
Re: APPLE CONFIDENTIAL: Issue Confirmation
To: "Ekelemchi Okpo (ER)" <eokpo@apple.com>
Cc: ashleygjovik@icloud.com

Hi Ekelemchi,

I hope you're well. Good to hear from you… it's been a while.

Corrections will be needed to the document you sent. I will need to redline. If you'd prefer revisions to be inline, please send the document below in
Word or Pages format so I can use the review feature (preferred). Otherwise, I'll resort to hand writing comments and scanning them to send back
to you.

Can you please also specify which people will be investigated? On 8/4 you said only "Dan & Dave" because "it's simpler" that way, and that you
won't be reaching out to me with any follow up questions because "you have everything you need." I protested that & that is when I told you I no
longer trust you're going to actually do a good faith & thorough investigation.

The document you sent details many of things we discussed, but it is unclear if you plan to actually investigate anyone outside of Dan and Dave
still. I was especially concerned when I heard that my teammates were being referred to Helen if they have questions about me & my situation,
despite my request she herself be investigated…. So, I'd like the list of people being investigated to be made clear in the document, please & thank
you.

Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via Jenna, aka ER) was that they
weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of
activity by EH&S at my building — and I also noticed they appear to have hired an enormous amount of vendors very recently. I'd love to learn
more.

Thanks,
-Ashley

P.S. adding my personal email so it's easier for me to know when you reply, since on 8/4 you said I "don't need to check my work email or phone,
since you have everything you need already" and when I kept asking for an ETA on when I'd hear fro you next, you said there is no ETA several
times… aka indefinite (no defined start/end date, or checkpoint date). Would love a checkpoint! Thanks!

—
Ashley M. Gjøvik

---

*Exhibit: Gjovik's Email to Okpo on 8/26/21*



**Ashley M. Gjøvik**
@ashleygjovik

Promote  ...

I spoke-up about workplace safety in Mar. #Apple ER forced a sexism
investigation in April, but closed w/out trying in June. I demanded a full
investigation in July. I shared 558x evidence, including all this. Now I'm on
indefinite leave w/ no reason to think I'll be coming back.

4:33 PM · Aug 16, 2021
EST

***Exhibit****: Gjovik's Aug 16 2021 1:33pm Twitter post*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023



> I was told I was being "removed from the workplace & workplace interactions" and I didn't need to check my work email or phone indefinitely. I was told there is no ETA for updates or resolution. I heard my leadership plans to talk about "the Ashley Issue" at an Oct All Hands.
>
> 4:35 PM · Aug 16, 2021
> — EST

***Exhibit***: *Gjovik's Aug 16 2021 1:35pm Twitter post*

425.    On August 17 2021, Apple emailed Gjovik asking to take three-dimensional scans of her ears and ear canals. Gjovik did not respond.

426.    On August 17 and 18 2021, US EPA administrator Michael Regan was at Apple Park meeting with Lisa Jackson. They filmed a "*fireside chat*" and did interviews with press. CNBC published an article on August 18 2021 based on an interview with Apple's Lisa Jackson prior to the 'fireside chat' with Administrator Regan saying, "*Jackson told CNBC…Apple has made sustainability a big part of its corporate brand…. Jackson added she expects to discuss mandatory SEC disclosures of carbon emissions [with Regan on August 18 2023].*"[174]

427.    On August 17 2021, Okpo responded to Gjovik, claiming he never said he was not investigating the people that Gjovik's coworkers are being told to go talk to about Gjovik worrying those same people were retaliating against Gjovik; and Okpo also said Gjovik never told Okpo she thought he was not objective or impartial.[175] Okpo then told Gjovik Apple EH&S

---

[174] CNBC, *Apple backs Biden's proposal to eliminate greenhouse gases from power plants by 2035*, August 18 2021, https://www.cnbc.com/2021/08/18/apple-backs-biden-clean-energy-standard.html
[175] Garrick, Jacqueline, and Martina Buck. "Whistleblower Retaliation Checklist: A New Instrument For Identifying Retaliatory Tactics And Their Psychosocial Impacts After An Employee Discloses Workplace Wrongdoing." Crisis, Stress, and Human Resilience: An International Journal 2 (2): 76–93. (2020) – ("Gaslighting is defined as the manipulation by psychological means of an individual in order to cause

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

does not want to give her any updates yet and she is also supposed to be focusing on the

investigation instead (of asking safety questions). Okpo refused to let Gjovik provide more

evidence, or review evidence with him, or talk to her coworkers, so it's unclear what Okpo

meant by 'focusing on the investigation' other than Gjovik having more panic attacks about

Apple's retaliation.

On Aug 17, 2021, at 11:20 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

APPLE CONFIDENTIAL:

Ashley-

Please feel free to forward your revisions to the document to me in writing via email.

Based on what you've shared with me, I have identified a number of individuals who I believe have information about the concerns you raised. I am going to speak with these individuals and keep you updated on the progress of the investigation.

Your description of our August 4, 2021 call is not accurate. As outlined in the issue confirmation, I am looking into all of the concerns you raised, and I did not convey to you that I was limiting the scope of the investigation to Dan West and David Powers. You also did not express concerns about my ability to conduct an impartial and objective investigation during our 8/4/21 call, or at any other point during my conversations with you.

As previously mentioned, EHS is investigating your building and workplace safety concerns, and they will be in contact with you when they have an update to share. Additionally, as I mentioned during our call on 8/4/21, you are not expected to participate in any work related assignments, and your focus at this time should be on the investigation. I understand that as a result of this, you are not frequently checking your work email. Therefore, I will send you a message via text to your work device (+1-408-204-9976), and inform you of any communication to your work email address pertaining to the investigation.

Please let me know if you have any further questions.

 Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

*Exhibit: Okpo email to Gjovik 8/17/23*

428.    Gjovik replied to Okpo on August 17 2021, complaining that he was

misrepresenting her statements and she was glad their "communications will be in writing going

forward so there will not be anymore he said/she said." Gjovik questioned what Okpo meant by

the subject(s) to question their own memory, perception, and sanity...to deflect their own wrongdoing and belittle or degrade the intelligence of their victims and undermine their credibility as witnesses.")

focusing on the investigation and asked if he meant she should stop asking questions about her

office. Gjovik added, "I remain concerned about the health and safety of my coworkers."



On Aug 17, 2021, at 11:32 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

Thanks for your reply. I will convert the PDF to a Word doc myself and send it to you with revisions after I've reviewed and feel it's accurate. I know you said to respond "immediately," but instead I will respond in a reasonable amount of time and not forsake accuracy for speed.

I'm glad our communications will be in writing going forward so there will not be any more he said/she said. As I mentioned many times, and in writing, this exact type of scenario is why I wanted my 1:1s with Dave, Dan, & Helen to be in writing during the investigation because verbal conversations were frequently being misrepresented and statements denied after the fact. I stand by my memory of the events on 8/4, and as you've seen/read (i.e. the vaccine corruption whistle-blowing), Apple senior leaders have trusted my recollection and interpretation of events/statements, even with major risk and consequences leading from that interpretation.

I will send you my updates in reasonable amount of time -- and considering you took eight business days to send the issue confirmation, I assume you will be okay with waiting a few more days for corrections and clarifications.

Can you please elaborate what you mean by "your focus at this time should be on the investigation"? Are you implying that I not continue to raise work place safety concerns or monitor safety concerns I already raised? I remain concerned about the health and safety of my coworkers.

Best,
-Ashley

*Exhibit: Gjovik's email to Okpo on 8/17/21*

429.    Around August 2021, Gjovik was contacted by several women who had

organized labor concerns at another tech company. The women approached Gjovik supposedly

offering assistance and support. The women texted with Gjovik for a couple weeks. When

Gjovik mentioned she had hundreds of people reaching out to her with their own stories of

retaliation by Apple, the women suggested Gjovik create a platform for others to share their

stories, as it would also help bolster Gjovik's accusations against Apple. Gjovik went along

hesitantly but repeatedly raised concerns that she did not to use people's stories for her benefit,

nor did she want to provoke Apple to retaliate against her further, and that she wanted to focus

on her charges she filed against Apple with the government. However, Gjovik still took actions

to prepare including purchasing an internet domain and drafting the text for the announcement.

430.    On August 18 2021, Joanna Appleseed (alias because this person tried to sue

Gjovik in 2022 for naming her in charges and legal filings alleging witness intimidation, and

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik fears she might try to do it again) demanded to be added to the group chat Gjovik had

with the other women. Gjovik acquiesced and by August 19 2021, Joanna Appleseed had incited

the women to make personal attacks against Gjovik and demand Gjovik drop her government

charges against Apple, and focus instead of social media activism. Gjovik resisted, and whatever

Gjovik said, the women criticized Gjovik for it. Gjovik left the group chat and stopped

associating with the women. Gjovik texted a journalist on August 19 2021 that the women's

actions made her want to cry.

431.    Gjovik would have just a few more interactions with Appleseed, including

Appleseed calling Gjovik a racist, selfish, a selfish racist, yelling at Gjovik while Gjovik cried

because Gjovik was being called a racist but Appleseed was screaming at Gjovik that Gjovik's

crying sounds too much like laughter, and also demanding Gjovik either apologize publicly for

being a selfish racist or else Gjovik must delete her entire social media account. Gjovik

completely blocked Appleseed from contacting her in September 2021 (while Appleseed still

worked for Apple Global Security), made it clear she did not want to talk to her again, and hoped

to never have to talk to her again.

432.    On August 19 2021, another fake Twitter account, Mel Nayer, began harassing

Gjovik. Nayer posted in a reply to a thread with Gjovik, *I can't help to think though, that if

#AshleyGjovik were Black Apple would have fired her weeks ago. White women, even when they

are victims of workplace abuse, are treated with a level of privilege."* [176] These fake accounts

frequently harassed Gjovik about her gender, sex, race, disabilities, medical conditions, marital

status, family/child status, and accused her of racism and classism.

433.    On August 19 2021, the US EPA conducted an onsite inspection of Gjovik's

Apple office due to Gjovik's complaints to the US EPA about unsafe conditions at her office and

---

[176] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

possible CERCLA non-compliance. Apple did not tell Gjovik about the inspection. The US

EPA's justification for inspecting the office was:

> "A site visit to an Apple office building is necessary to conduct a visual
> inspection of the building's vapor intrusion mitigation measures. An Apple
> employee recently contacted EPA and notified EPA that there were cracks in the
> building's foundation. If true and cracks are significant, this could impact the
> effectiveness of the VI mitigation system the protectiveness of human health."

**Destination**
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
**Proposed Travel Start**
2021-08-19
**Description of why this work is urgent and essential**
A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.

The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
See less

*Exhibit*: US EPA's Travel Justification Referencing Gjovik as a Whistleblower

434.    Notes from the August 19 2021 site visit and inspection included the following

statements, as documented in records released via FOIA to Gjovik in 2022:

a.   *"Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for*
     *VOCs bc venting into hvac. Would be better / need to extend 10' high."*

b.   *"Roof, East [Main] Bldg stack issues. Vents too close to chiller Cut too low.*

c.   *"SS-05 under carpet… Seems mislabeled… seal sub slat ports. Not abandoned*
     *properly."*

d.   *"4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller*
     *stack, not even sure how to extend."*

e.   *"Crack inspection documentation"*

f.   *"Locate the indoor SS missing ports."*

435. On August 19 2021, Gjovik posted on Twitter complaining about Apple demanding all of her text messages, even those with nude photographs, back in 2018 for the Batterygate lawsuits and DOJ probe. Gjovik wrote: "*Sooo, #Apple has pics of my boobs. During a discovery thing 3yr ago, legal forced me to hand-over all my texts. They refused to let me delete anything, even "fully personal," even when I said, "by fully personal I mean nudes." They said they're in their "permanent evidence locker".*[177] The post went 'viral' with over one million views, over one thousand 'retweets', and 52,363 visits to Gjovik's profile.

436. On August 19 2021, Apple emailed Gjovik for a second time to ask to capture three-dimensional imaging of Gjovik's ears and ear canals. Gjovik did not respond.

437. On August 20 2021, Michael Schulman of the US EPA emailed his teammates saying he would avoid creating a paper trail of the inspection and interactions with Apple. He wrote, "*I will not prepare a formal memo of the site visit. Anything I share with management will be verbal or in an email, and at the "site management level" regarding human health protectiveness and site management action items.*"

438. On August 20 2021, Gjovik asked Okpo for permission to attend a pre-registered training, even after the Professors approved, with Okpo justifying the denial "*because she was on leave.*" Gjovik complained that the leave felt like punishment. It was clear to Gjovik that Apple was hoping she would aggressively demand to come back at which point Apple would terminate her employment for some bogus reason like failure to cooperate with the investigation.

---

[177] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428495420917837826

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC   DECEMBER 21 2023

Ashley Gjovik <ashleygjovik@apple.com>                    Aug 20, 2021 at 3:05:06 PM

Re: Welcome and Prep Work | AU Race & Justice

To: "Ekelemchi Okpo (ER)" <eokpo@apple.com>

Hello,

I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.

P.S. I should get you the updated Issue Confirm before Monday. It's taken a lot of time to sort through and make sense of.

—

Ashley M. Gjovik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

On Aug 20, 2021, at 8:55 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:

Hi Ashley-

Thank you for reaching out. Given that you are on leave, you will need to reschedule and attend a session in the future.

Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Aug 19, 2021, at 1:12 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi,

I hope you're well.

Yesterday you wrote, "As we previously discussed, you are not expected to participate in any work related assignments while I conduct a thorough and objective investigation into the concerns you've raised."

I was previously invited & registered for this course with Apple University. I was & am very excited to attend. The coursework actually directly complements my current studies at Oxford. Because this course is voluntary and not a "work related assignment" — can you please reply and let me know if I'm allowed to attend? The first class is next Tuesday 8/24 and then continues weekly for a several weeks.

I checked with Professors ▓▓▓▓▓▓▓▓ last night and they said they are still happy to have me in the course and can confirm that with you if needed. They asked me to confirm directly with you that I can attend though first, as they said they do not want my attendance to invite any sort of disciplinary action.

Thanks,
-Ashley

—

Ashley M. Gjøvik

*Exhibit: 8/19 and 8/20/21 email where Gjovik asks to attend training; Okpo says no*

439.    On August 20 2021, Gjovik posted on Twitter complaining about Apple. She

wrote in a thread of posts: "*I assume #Apple hoped I'd just quit the company by now. Nope. As I*

*told Apple employee relations last month, I'm not quitting. They need to deal with the concerns I*

*raised, & even more: stop intimidating, retaliating, & bullying me for even raising them. I'm*

182

*here until they do... #Apple clearly couldn't find a solid reason to fire me with cause or I'm sure they would have tried. So, now it's a game of who blinks first. I'm not backing down."[178]*

440.    On August 20 2021, news broke that Apple had threated and intimidated the legislature of the state of Georgia.[179] Apple "exerts intense pressure on lawmakers with promises of economic investment or threats to pull its money," "threatening jobs," and "the legislation stalls." A state representative referred to Apple's conduct as "intimidation" and "strong-arming," noting legislatures will not challenge Apple out of fear of Apple harming their career and livelihood. Lawmakers in one stated accused Apple of "unethical behavior and potentially violating state ethics laws."[180] Gjovik posted about this on Twitter, criticizing Apple's corrupt behavior.

441.    On August 21 2021, Gjovik complained about Okpo and the second "sham" investigation again on Twitter, replying to someone's question if she was on paid leave but with suspended system access. Gjovik replied it was paid leave with system access but she was forbidden to access systems or talk to coworkers. Gjovik added she did not think she would be allowed back.[181]

442.    On August 21 2021, Gjovik 'quote Tweeted' her August 19 2021 post about the Batterygate discovery, and wrote: "*At the time, #Apple may have wanted leverage over me related to that lawsuit. I don't know what their intent was, but due to the focus of the suit, my whistleblowing, & the retaliation for it, it's in the realm of possibilities they took my nudes to intimidate me. Stay tuned..."[182]*

---

[178] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428846269619789824
[179] Emily Birnbaum, How the Apple lobbying machine took on Georgia, and won. Poorly resourced state governments are no match for the lobbying firepower of Apple, the most valuable company in the world, Politico, Aug 20 2021, https://www.politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299
[180] Id.
[181] Twitter, Ashley Gjovik, Aug 21 2021, https://twitter.com/ashleygjovik/status/1429157551287930885
[182] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429177842399469569

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

443.    On August 21 201, Gjovik submitted the first revised Issue Confirmation to Okpo and also posted on Twitter about it. On Twitter, she provided screenshots of the document where she suggested Apple needed to investigate itself for RICO Act violations including "*fraud*" and "*organized witness tampering*" among other concerns.[183]



**Exhibit**: *Gjovik's Issue Confirmation Concern List, 8/21*

444.    Shortly after Gjovik's post about Apple and RICO, a fake Twitter account called "Mel Nayer," began replying to Gjovik's posts making threats and wild allegations. Nayer said, "*This is an ACTIVE @Apple investigation and the managers accused are now receiving death*

---

[183] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429174603713191936

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1    *threats. Stop sharing confidential info/screenshots that could reveal identity of those involved.*

2    *#AshleyGjovik #apple.*"[184]  Nayer added, "*Managers accused are receiving death threats. Take*

3    *down the work screenshots because identifies are being outed and lives are at risk now.*"[185]

4        445.    Nayer added that "*people at Apple have been fired for sharing less.*" Gjovik

5

6    replied to Nayer, writing "*If during the lawsuits we track down your account & see you*

7    *work/consult for Apple, then your note just now: "people at Apple have been fired for sharing*

8    *less" won't age well. Then you're not "just trying to help," you are actually threatening &*

9    *intimidating a whistleblower.*" [186]

10        446.    After the outburst from Nayer, Gjovik posted on Twitter: *"Y'all, I really think it's*

11    *because I finally said "RICO."*"[187] Gjovik then replied to her own post with a link to a music

12

13    video for the song "R.I.C.O." by Meek Mill featuring Drake.[188] Gjovik also posted, "*Now that*

14    *we're all fully distracted by whatever the f THAT was, plz keep in mind it happened just hours*

15    *after I mentioned: 1) The corruption at #Apple may reach R.I.C.O. levels 2) Legal may have*

16    *taken my nudes to intimidate me as a whistleblower re: that lawsuit."* [189]

17        447.    On August 22 2021, Gjovik sent the second revised Issue Confirmation to Okpo

18

19    with her revisions and corrections, and she posted about it on Twitter. She highlighted concerns

20    about "Apple Real Estate Environment, Health, & Safety" which she detailed as "*RICO;*

21    *Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right*

22    *to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness*

23    *Tampering.*" Gjovik asked Apple to investigate themselves.

24

---

25  [184] Twitter, Mel Nayer,

26  https://web.archive.org/web/20210822103330/https:/twitter.com/mel_nayer/status/14292155549 13533 957

27  [185] Id.

28  [186] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625
 [187] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429224817698304007
 [188] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429233027683536897
 [189] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429250234278825987

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC          DECEMBER 21 2023

448.     On August 23 2021, Gjovik filed a formal internal complaint to Apple's Business Conduct reporting system about her concerns about Ronald Sugar. She received confirmation her complaint was submitted and was provided a tracking number (*HRC000017207*)

449.     On August 23 2021, Gjovik sent the third revised Issue Confirmation to Okpo, adding she filed including a Business Conduct complaint about Ronald Sugar and her office, noting "conflict of interest and corruption." Gjovik said she added West's 'obstruction of justice' comments (he conspired with Bertolus to conceal responsibility in preparation of expected litigation) from a video she shared with Okpo earlier.



On Aug 23, 2021, at 7:33 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Actually please reference V3 below.

I added Dan West's obstructive of justice comments from the Fireside Chat video (that was missing too).

I also elaborated on my concerns around conflicts of interest & corruption related to Ronald Sugar. I filed a Business Conduct ticket with my concerns & also attached this document. It's ticket HRC000017207, as noted in the v3 document.

Gjovik - Issue Confir...d .docx

Gjovik - Issue Confir...ed .pdf

*Exhibit: Gjovik's Response to Okpo on 8/23/21*

450.     Gjovik noted her concerns about Apple's response to Gjovik's initial concerns and the actions of the first Employee Relations investigator, Jenna Waibel, in the Issue Confirmation. Gjovik complained Waibel interjected herself in Gjovik's interactions with the EH&S without explanation, and when Gjovik asked Waibel on April 3 2021 to talk to her manager David Powers about comments he made about the EH&S concerns, Waibel refused but instead on April 9 insisted on opening an investigation into sexual discrimination. Gjovik told

Waibel verbally and in writing, on at least April 9 and April 12 2021, that she did not want a sexism investigation and that it would only cause retaliation. Waibel requests a phone call with Gjovik. They talk on the phone on April 27, 2021. Gjovik summarizes the call in her Issue Confirmation with Apple in August 2021:

> "I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins."

451.    Gjovik listed her short-term disability claim from 2020 as due to "*chemical exposure*." At that point, Apple knew it was responsible for disabling Gjovik in 2020 and that the chemicals Gjovik was exposed to came from Apple's secret silicon fabrication plant next to Gjovik's apartment. Apple continued to conceal this fact from Gjovik.

452.    On August 23 2021, EPA CERCLA Quality Assurance employee Mathew Plate submitted his own notes to Schulman, also released to Gjovik via FOIA, which included the following statements:

> g.  "*Sub slab sampling ports, left in place, have not been regularly sampled or maintained and several could not be located. It is recommended that these be located and maintained or decommissioned.*"
> h.  "*Significant, visible slab cracks, gaps and penetrations had been sealed… However large test equipment is bolted to the slab and it is unclear if any of these installations penetrate the slab.*"
> i.  "*SSD vents on the [West] roof are not significantly elevated above the roof (3 feet) and are sheltered from the wind…*" SSD vents on the [Main] roof are under the building chiller plant piping and are within 12-feet of a ventilation system intake. There is not significant air flow near the SSD vent stacks and it is likely that the SSD

*vents are not functioning as intended and vapors could be building up on the roof near the HVAC intake."*

Plate does not appear to be part of the Enterprise, with conduct in stark contrast to Poalinelli, Perez-Sullivan and others.

453.    On August 24 2021, Apple asked for a third time to conduct three-dimensional scanning of Gjovik's ears and ear canals. Gjovik did not respond.

454.    On August 24 2021, Okpo responded to Gjovik confirming receipt of her final Issue Confirmation, and again refusing to provide her any sort of ETA.

---

From: **Ekelemchi Okpo** eokpo@apple.com  🔗
Subject: Re: APPLE CONFIDENTIAL: Issue Confirmation
Date: August 24, 2021 at 2:53 PM
To: Ashley Gjovik ashleygjovik@apple.com

    EO

Ashley-

I've received your revised issue confirmation.

The investigation is ongoing and I've started conducting witness interviews. I am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you with additional updates.

 Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

---

455.    Around August 23 2021, Joanna Appleseed, an active Apple Global Security employee then publicly announced Gjovik's initiative as if it were own, also now claiming that "15 Apple employees" were involved while it was only her and also a known IP leaker named "Stella Fudge" who managed a Discord server the leaker and Global Security employee then directed would-be whistleblowers and union organizers to and encouraged them to share sensitive and confidential information on a platform supposedly secure from Apple. Gjovik, already attacked repeatedly by Appleseed, said nothing about the group other than she supported employees speaking out, reserving her concerns and injury out of fear.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

456.     Starting in August 2021 and continuing to this day, hundreds of 'throwaway' and fake social media accounts posted about and to Gjovik making statements that were harassing, threatening, intimidating, defamatory, insulting, and harassing. These accounts were usually created the day of and only used to make these posts, or sometimes created prior but only used to make posts that were pro-Apple, including posting insults against other parties Apple was in litigation with including Corellium and Epic Games.

457.     Fake or suspicious accounts were also used to post similarly unsettling posts about Gjovik on forums. When articles were shared that mentioned Gjovik, many of these accounts posted inflammatory, offensive posts about Gjovik and those posts were very quickly 'liked' and 'upvoted' and any comments that were supportive of Gjovik were very quickly 'down voted' and even flagged and removed by moderators.

458.     Under information and belief, Apple created and managed these accounts to harass and defame those who challenged them, and also unnaturally influenced online discussion through flagging, reporting, and other artificial engagements, and also through their position at an 'administrator' in a number of forums including Reddit and HackerNews.

459.     On August 26 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so.  On August 26 2021, a news article discussed Apple's employment practices and wrote: *"One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave."*

460.     On August 27 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. The message posted said: "*Hi Ashley, Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and*

*investigation,*" with the ticket updated to say, "*Request is closed. This request is closed and can't be reopened. If you need more help with this issue, create a new request.*" Which seemed odd.



*Exhibit: Apple closing the Business Conduct complaint*

461.    On August 28 2021, Gjovik complained on Twitter that she wanted Apple to stop asking to capture three-dimensional scans of her ears and ear canals. Gjovik said she could not tell if Apple was harassing her or being intrusive, or both.

462.    On August 28 2021, at 8:22pm, Gjovik posted on Twitter about Tom Moyer's criminal charges for bribery. "*Moyer served as #Apple's chief compliance officer from 2009-13*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

1  & one responsibility was to ensure Apple follows anti-bribery laws. The indictment comes 1yr

2  after an Apple attorney in charge of enforcing the co's insider-trading policies was indicted on

3  insider-trading charges."[190] [See RICO Predicate Act: Criminal Bribery]

4       463.   On August 28 2021, at 8:40pm, 18 minutes later, Gjovik posted on Twitter the

5  link to the Meek Mill R.I.C.O. music video again. Gjovik wrote: "R.I.C.O. 👀 "[191]

7       464.   On August 28 2021, Gjovik posted on Twitter about her manager, Dan West,

8  attempting to pimp/pander her in 2017.[192] On August 29 2021, Gjovik added, "If anyone's

9  wondering, yes, indeed, I did call out this incident with my manager as a potential legal claim.

10  For now, I referred it to ☐ #AppleEmployeeRetaliations as "pimping & pandering with receipt

11  of indirect benefits."[193]

13       465.   On August 29 2021, Gjovik filed a formal complaint to the US EPA about Apple

14  and her office complaining of Apple's "lack of due diligence," about "negligence" and

15  "recklessness," and "violations of Right to Know & OSHA." Gjovik complained, "Apple's

16  response has been to misrepresent their activities and the site, intimidate me to not speak about

17  workplace safety concerns related to the site, and have refused to notify the Federal EPA of

18  changed circumstances at the site."

20       466.   On Sunday August 29 2021 at 11:32am PST, Gjovik filed a Whistleblower

21  Protection Program complaint with the US Department of Labor, reference number ECN76833,

22  which sent a receipt to her iCloud email.

23       467.   Gjovik messaged Joshua Banko (from Banko v Apple) on August 30 2021

24  writing, "it's only because of reading your suit that I realized I needed to file a whistleblower

25  retaliation complaint with the Dept of Labor/OSHA -- and I did, just 2 days under the 30-day

---

[190] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431774126272696328
[191] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431778838858518528
[192] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431680707433140226
[193] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432092351485210627

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*deadline. Thank you!!"* Banko never responded. Gjovik had discovered a lawsuit from 2013, where ex-Apple Manager Joshua Banko sued Apple for retaliation and a termination in violation of public policy. Apple fired Banko for reporting embezzlement but Apple said they can fire employees for any reason they want, even reporting crimes. The Judge disagreed with Apple. The lawsuit filings and decisions taught Gjovik about certain government charges she needed to file in order to sue Apple. The lawsuit also helped Gjovik realize Apple was acting in bad faith. Banko had reported to the same Hardware Engineering leadership team that Gjovik currently reported under, and Gjovik had interacted several times with his direct manager Kate Bergeron (who told him to ignore criminal embezzlement by high performers).[194]

468.    On August 30 and 31 2021 Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy, Unless You Work at Apple*." [195]  In Gjovik's posts she complained of Apple's surveillance of workers, its exploitation of workers at the sake of their privacy, Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon. (Apple would later claim it was one of the reasons Gjovik was fired).[196]

---

[194] Banko v Apple, Case 3:13-cv-02977-VC, Complaint, Doc #1 (2013)
[195] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[196] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432381235926499332; https://twitter.com/ashleygjovik/status/1432416891201490946

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**ASHLEY M. GJØVIK**
@ashleygjovik

I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

Working at Apple in "normal" times, I walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other "powers that be." I realize now that during those times, I didn't question a lot of things that I should have. Not just the abuse I suffered, but also the constant invasion of privacy — and perhaps those two things are linked.

There seems to be limitless ways Apple can access employee data and monitor us. I recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but I never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and I felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021 · Twitter Web App

*Exhibit: One of Gjovik's Aug 30 2021 Twitter Posts About Apple's Surveillance*



*Exhibit: Gjovik 8/30/21 Twitter Post about Apple's Invasions of Employee Privacy*

469.    On August 31 2021, Gjovik posted on Twitter about the 2007 US SEC/DOJ charge against Apple's General Counsel and CFO for fraud.[197] Gjovik wrote, "2007: *"#Apple's General Counsel was charged with, among other things, committing fraud, lying to Apple's auditors, & violating prohibitions on circumventing internal controls."* [See RICO Predicate Act: Securities Fraud]. She then posted about the 2010 US DOJ/FTC case against Apple for a salary-fixing conspiracy with other tech companies.[198]

470.    On September 1 2021, Gjovik created and published a website she called "*iWhistleblower*" with resources for Apple employees on the different government agencies they

---

[197] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432803511431950339
[198] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432808176026472448

could file charges to about Apple's misconduct, including US DOL, US DOJ, US SEC, and others. Gjovik posted on Twitter about it and it was referenced in some news articles.[199]

471.    Gjovik was interviewed by a reporter who said she was interested in the digital harassment Gjovik was facing. Gjovik was quoted discussing "some suspiciously over-invested trolls," (Beezie Wacks, Mel Mayer, etc), however Gjovik said overall she was "*met overwhelmingly with support from current & past colleagues, the press, and the public. [She also] also have many friends who are senior leaders at Apple who continue to support her through all of this.*"[200]

472.    On August 31 2021, at 11:15pm PST, Gjovik posted that she had filed a whistleblower tip to the US SEC about Apple 13 minutes prior.[201]

---

[199] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433140768638574599
[200] *[] organizer faces online harassment—some of it from coworkers,* Mashable, Sept. 2 2021, https://mashable.com/article/apple-too-organizer-harassment
[201] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432950336973533189

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's Twitter post about SEC tip on 8/31/21*

473.    On August 31 2021, Gjovik filed a charge with the California Department of Labor alleging retaliation. On September 1 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor and included a screenshot of the complaint.

One question asked: How did your employer know about the protected right you exercised?

Gjovik had written, *"I kept saying, 'Stop it you guys. There's Labor laws about this.'"*[202]



*Exhibit: Gjovik posting about her CalDOL complaint*

474.   On September 1 2021, Gjovik got notice her NLRB charge was assigned to a field examiner, and Gjovik posted about it on Twitter.

---

[202] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433303578802749442

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Gjovik posting about her NLRB charge on 9/1/21*

475. On September 1 2021, an Apple employee, Shantini Vyas wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator.* Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies.*"

476. Vyas' posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts, as well as named Apple employees and managers. Gjovik does not know Vyas and under knowledge and belief Vyas made these posts under direction by Apple.

477.   On September 2-3 2021, numerous papers wrote about Gjovik's charges against Apple. Bloomberg wrote about Gjovik's NLRB, US Dept of Labor, California Dept of Labor, and EEOC charges against Apple.[203] Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing the concerns. "I should be able to raise concerns about safety and public policy," she said in an interview Thursday. Gjovik also has filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. "I want to pierce the veil of intimidation and secrecy," she said in the interview. "The employees are terrified to speak up about their concerns."[204]

On September 2 2021, Financial Times wrote about Gjovik:

> "Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "chemical exposure" at her Apple office in Sunnyvale, California, where more than 100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "TRW Microwave Superfund site", a location requiring special oversight owing to previous contamination by hazardous waste materials in the soil and groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at facilities at their Cupertino headquarters and Sunnyvale. Gjovik said her concerns were brushed aside and she was warned against speaking up about them. In her letter to the NLRB, she

---

[203] Nick Turner, *Apple Worker Complaints Reviewed by Labor Relations Board*, Bloomberg, Sept 2 2021, https://www.bloomberg.com/news/articles/2021-09-03/national-labor-relations-board-fields-complaints-about-apple
[204] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

said Apple's employee relations department "intimidated me not to speak about my safety concerns", that a manager advised she quit Apple and that she was subject to sexism and a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave."[205]

478.   On September 2 2021, Gjovik complained on Twitter that Apple had already assigned external counsel to her NLRB charge (McDermott Will & Emery), including two partners and one associate. She complained the Partners (per their website) specialized in "*defending leading companies against whistleblowers,*" and the associate had previously clerked with EEOC and the NLRB.[206]

---

[205] Patrick McGee, *US labour board examines retaliation claims against Apple*, Financial Times, Sept. 2 2021, https://www.ft.com/content/484fa8be-925e-495c-91ff-54950b112754
[206] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433593914963869696

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's post complaining about MWE on 9/2/21*

479.    Gjovik had her interview with EEOC on September 2 2021. Gjovik did not request an investigation but did request a Right to Sue letter which she received on 9 2021, prior to her termination. Apple was made aware of Gjovik's EEOC and DFEH complaints and that she was testifying to EEOC and DFEH about what Apple did to her by at least August 12 2021. Gjovik Tweeted about her appointment with US EEOC.[207] Apple retaliated against Gjovik for filing a complaint and testifying with California FEHA. [Cal. Gov't Code § 12940(h); Cal. Code Regs. tit. 2, § 11021.].

---

[207] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433292907490906113

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Gjovik's Twitter Post on 9/1 (PST) about her NLRB and EEOC cases*

480.  On September 1 2021,



*Exhibit: Gjovik's 9/2/21 post about her EEOC interview*

**xiii.    Apple Intimidates & Threatens Gjovik; Tries to Force Her onto a WebEx Meeting (September 3 2021)**

481.  On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB charge against Apple, suggesting she was lying. The article includes quotes from Vyas and Ricky Mondello. Mondello also shared Vyas' thread about Gjovik and Mondello stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: 9to5Mac Article Harassing Gjovik*

482.     On September 3 2021, at 8:36am Okpo texted Gjovik asking for her to join a WebEx meeting with him in less than two hours. Okpo said, "*Hi Ashley Good Morning, I would like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time work for you? Thank you.*" He then emailed her at 10:07am asking for the 10:30am meeting.

483.     Per Apple's March 2022 Position Statement, Apple had already started investigating Gjovik prior to September 3 2021, however at no time prior to September 9 2021 did Apple tell Gjovik she was under investigation. Under information and belief, Okpo contacted Gjovik on September 3 2021 claiming he wanted to talk to Gjovik about the investigation into Gjovik's concerns, but Okpo planned to surprise-attack Gjovik with the investigation into Gjovik. Okpo assumably did not warn Gjovik so she did not try to record or get a witness for whatever it was Okpo planned to do to Gjovik. Under information and belief, Apple and MWE arranged the smear article to occur shortly before an attempted interrogation and forced settlement.

484.     Gjovik had become very irritated with Apple's misrepresentations and manipulations by this point. On September 3 2021, Gjovik replied to Okpo complaining about being on leave and Apple's misconduct. Gjovik said she wanted to keep communication in writing.

I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.

As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.

I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) — I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.

On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you that on 8/3 that I was conferring with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.

Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.

Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

*Exhibit: Gjovik's email to Okpo on 9/3/21, pt1*

485.     Gjovik asked Okpo for some sort of assurance what he was doing to her wasn't going to impact her annual performance review, and Gjovik asked Okpo for a written update about the status of her office and complained that she has received no updates but saw lots of notifications that EH&S was doing work at the building.

Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance review this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

-Ashley

*Exhibit: Gjovik's email to Okpo, pt2*

486.     Gjovik then posted on Twitter about Okpo reaching out, providing a screenshot of her email response to Okpo. In the post Gjovik wrote, *"The ☐ #Apple Employee Retaliations team reached out today to "request a meeting." I replied that I am req we keep everything in writing due to their freq misrep of verbal comms. I also req an explanation of how my perf review will not be neg impacted by being forced on leave."[208]*

487.     At some point around September 2021, Gjovik heard two men in the attic directly above the office in her apartment. The men spent over an hour in the attic directly above the room she used as an office. It made Gjovik feel uneasy at the time but she did not know what to do. In 2022, Gjovik raised the attic event to her landlord. The landlord said the only entrance to the attic is through her bedroom closet. Gjovik said no one was in the apartment with her. The landlord had no other explanation. Gjovik looked in the attic and found cables/cords that did not look like they belonged – and the landlord told her they did not know where they came from. Gjovik saw the attic units were divided by thin plywood and told her landlord she suspected someone must have broken into an adjacent unit (there were a couple) and went into the attic of that unit and then broke into Gjovik's attic from there. Under information and belief, Apple broke into Gjovik's attic in the fall of 2021. Under information and belief, Apple installed electronic equipment in Gjovik's attic to surveil her.

488.     On September 3 2021, Gjovik filed a NCDF Disaster Complaint with the US Department of Justice and posted on Twitter about filing it.

489.     On September 3 2021, Gjovik filed a tip with the FBI about the possible sanctions' violations. In the crime field she wrote: *"Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup."* Gjovik posted on Twitter that she had reported the matter to the FBI.

---

[208] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433902544695095298

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

490.　On September 5 2021, Gjovik posted on Twitter about the US DOJ case against Apple lawyer Gene Levoff. Gjovik said she found a denied motion in the case where Levoff's defense was arguing "*insider trading laws don't exist*" and/or do exist "*but are unconstitutional.*"[209]  [See RICO Predicate Acts: Securities Fraud and Wire Fraud]

491.　On September 6 2021, Gjovik posted on Twitter as screenshot, captioned: "Aug 2 iMessage with Apple coworker: "*Seriously though, ER's face about the COVID vaccine & Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please talk to Deirdre O'Brien.*" @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo of DOJ complaint & iMessage].[210]

492.　On September 6 2021, Gjovik posted on social media about her cases with a status update and the report numbers. In addition to the prior charges, she now also referenced her SEC whistleblower tip, FBI tip, and DOJ complaint.[211]



*Exhibit: Gjovik's Sept. 6 2021 Post about Cases*

---

[209] *US v. Gene Levoff,* USDC of NJ (Aug 12, 2020), Docket No. 19-cr-780, Motion to dismiss: Denied; Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434406050275287043
[210] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434830527140229124
[211] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434836915086188544

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    *Exhibit: Gjovik's 9/6/21 Twitter post about FBI complaint about Smuggling*
18

19    493.    On September 6 2021, Gjovik replied to the US EEOC confirming she was
20    working on a draft of her complaint and was targeting to submit it to them by September 8 2201,
21    responding to US EEOC sending her a 'courtesy reminder' on September 3 2021, to complete
22    the draft.
23

24    494.    On September 6 2021, Gjovik posted on Twitter about the Slack discussion from
25    July 27 2021 where she and her coworkers discussed Apple systemically retaliating against them
26    for raising valid concerns.

27    495.    On September 7 2021, Gjovik posted on Twitter about the Batterygate/nude
28    photographs matter. Gjovik finally disclosed the construction termination that occurred leading

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

up to Apple's intimidating conduct. Gjovik posted, "*I spent much time pondering why my nudes were so critical to #Apple's doc collection for the Batterygate lawsuits...I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the ▮ situation when I ran sw failure analysis.*" [212] Gjovik then added, *"#Apple Batterygate/Nudegate/Constructiveterminationgate.*"[213]



*Exhibit: Gjovik's Sept. 7 2021 Post about Batterygate & RICO*

[212] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1435444339019182083
[213] Twitter, Ashely Gjovik, https://twitter.com/ashleygjovik/status/1435444945117073414

208



*Exhibit: Gjovik's Sept 7 2021 Post about "ConstructiveTerminationGate"*

496. On September 7 2021, Gjovik discovered a Santa Clara County Superior Court lawsuit against Apple filed by one of her ex-coworkers. The ex-coworker, Crystal Brown, sued Apple due to harassment and retaliation from her manager, who was also Gjovik's manager, Dan West. The lawsuit was filed in 2018 and settled in 2019. Gjovik posted on Twitter about it tagging Tim Cook and Apple's Twitter accounts and complained that Apple had tried to claim they investigated West but found no 'policy violations' when he was sued by another employee only a couple of years prior and Apple had quickly settled the case.

497. On September 7 2021 at 8:42pm, Okpo contacted Gjovik again asking to speak with Gjovik by September 10 2021. (Gjovik's NLRB affidavit was due September 13 2021). Now Okpo said there were some "*inconsistencies*" he wanted to discuss. Okpo had never responded to Gjovik's concerns on September 3 2021 and this was the last email Gjovik would receive from Okpo.

Ekelemchi Okpo <eokpo@apple.com>                    Sep 7, 2021 at 8:42:11 PM

Re: Meeting Request

To: Ashley Gjøvik <ashleygjovik@apple.com>

Ashley-

Thank you for your email.

Based on interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information.

Please let me know when you have availability to connect tomorrow or later this week.

Best,

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

*Exhibit: Okpo's email to Gjovik on 9/7/21*

498.    Okpo is an attorney. Gjovik again asked to keep communications in writing. Gjovik asked for Business Conduct review (by Tom Moyer's team) of Okpo's repeated denial to keep communications in writing. Okpo never said, at any time, that Gjovik was under investigation, but instead maintained he was investigating Gjovik's concerns about others.

499.    On September 7 2021, Gjovik responded to Okpo. Gjovik reiterated she wanted to keep communications in writing, and asked Okpo to have Business Conduct review her request and his denial of her request. She then repeated her two questions form five days prior about the leave negatively impacting her review and what the status of her office was. She added that she had just discovered the lawsuit filed against apple by her ex-coworker Crystal Brown alleging retaliation, failure to investigate, IIED, and other charges – while naming Dan West, John Basanese, and Employee Relations – which Apple settled in 2019. To Gjovik, that lawsuit removed any doubt that these investigation were completely farcical and Employee Relations will blatantly lie to employees about their "findings." Waibel surely knew about the prior lawsuit against West, yet acted as if West as blameless and Gjovik was insane.

Ashley Gjovik <ashleygjovik@apple.com>
Re: Meeting Request
To: "Ekelemchi Okpo (HR)" <ekopo@apple.com>

Hi Ekelemchi!

Happy belated Labor Day! I hope you're well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I'd like to request that we please keep our exchanges in writing.") Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you're implicitly denying my request otherwise — and because you're an attorney and you're in an adversarial position to me, if you are denying my request, I'd also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?

**II. I'm also awaiting your reply about my review**

I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4 and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

**III. I'm also waiting your reply about the safety of my workplace**

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will not answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

Thanks!
-Ashley

P.S. Not sure if you've heard yet, maybe they didn't tell you - but I found Superior Court for the State of California for the County of Santa Clara Case 18CV330796 (2018) & 18CV330922 (2019) with for the NOTICE OF SETTLEMENT OF ENTIRE CASE for Retaliation, Failure to take Reasonable Steps to Investigate, Failure to take Reasonable Steps to Prevent Retaliation, Constructive Termination in Violation of Public Policy, & Intentional Infliction of Emotional Distress against Apple Inc, Dan West, and Employee Relations. Please feel free to respond now,...otherwise we'll def address this later.

Ashley M. Gjovik

*Exhibit: Gjovik's email to Okpo on 9/7/21*

500.    On September 8 2021, Gjovik emailed the US EEOC her draft of the language for her US EEOC charge.

501.    On September 8 2021, and article was published discussing Gjovik's complaints about Apple being a physical and psychological toxic workplace. The same day Gjovik posted on Twitter complaining that it seemed like Apple reached out the day prior in order to intimidate her about her NLRB charge, because NLRB said her affidavit was due by 9/13, and Apple

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

insisted they talk to Gjovik prior to 9/13 (which would give them time to get Gjovik to recant

even if she already testified).

### xiv. The Day Apple Fired Gjovik (September 9 2021)

502.    On September 9 2021, around 1 AM the day Gjovik was fired, Gjovik was tipped

off that Apple may be surveilling her through her work and personal devices. Gjovik posted

publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my*

*[personal] iCloud email and iMessages?"* [214] To which members of the Info Sec community

assured Gjovik Apple was likely doing that and more.

503.    Gjovik immediately began removing her data from Apple's servers. Realizing

how terrified she had become of her employer; she began searching for legal resources. At

2:16am that morning Gjovik downloaded the US DOJ guide to litigating civil RICO cases,

which Apple would have seen.



*Exhibit: 9/9 RICO Download*

504.    Minutes later at 2:27 AM September 9 2021, a self-declared "burner" Twitter

account, with zero posts or "likes" ever, @Guybrus55626232, sent Gjovik a direct message

accusing her of making a claim that was *"verifiably incorrect and complete misrepresentation of*

*facts."* The user claimed that when Gjovik posted she found the *Crystal Brown v Apple* lawsuit,

and said Apple settled (which Apple did), she was "*unequivocally misrepresenting facts, most*

---

[214] Note: California employers cannot eavesdrop on or record employees' private telephone, email, or in-person conversations without prior consent by all participants. See, Cal. Penal Code §§ 631(a), 632(a).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*likely with malicious intent."* The account said, *"as someone attending law school, you should have known better."*

505.    This user would later contact Gjovik again on January 9 2022, accusing Gjovik of committing a federal crime. Gjovik asked the user to identify themself. The user refused and instead urged her to talk to her lawyer about 18 U.S. Code § 1512, a law Gjovik previously posted publicly she plans to pursue a charge against Apple for violating, and the user now accused Gjovik of violating.

506.    It is under information and belief this user was an agent of Apple or acting on Apple's direction attempting to intimidate Gjovik to stop posting about her surveillance and privacy concerns and attempting to 'DARVO' Gjovik. Gjovik even responded, saying hi to "*Apple Legal"* and asking them to leave her alone. The user then deleted its account.

507.    On the day Gjovik was fired, her Box evidence folders still sat with several folders marked as pending as they had not been reviewed yet after Okpo stopped the process on August 4 2021 when he put Gjovik on leave.

508.    On September 9 2021, at 11:49am, the city of Sunnyvale inspected Gjovik's Superfund Apple office for hazardous waste and fire code compliance and wrote up Apple for violating at least one law.

509.    On September 9 2021, at 12:39pm PST, Gjovik emailed the US EEOC and asked the investigator if she needed anything else from Gjovik in order to move forward. Then again at 1:02pm asking US EEOC how she can sign the charge in order to meet the deadline (that day).

510.    On September 9 2021, at 1:58pm PST, Gjovik published comments about Apple's felonious impersonation of law enforcement in 2011.



*Exhibit: The Post About Apple Breaking into People's Homes*

511.    Ten minutes later, at 2:08pm PST, Gjovik was contacted by Aleks Kagramanov, a "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour.*" The email had no subject line and Gjovik had never heard of the team or person who reached out. The person claimed to be Employee Relations but said he was "*looking into a sensitive Intellectual Property matter*" and he wanted to speak with Gjovik about it. He said he wanted to talk as soon as possible, within this hour (so less than 52 minutes). He said he was sending her an iCal for a call but could reschedule as long as they meet that day. He said they "*sincerely appreciate [her] prioritizing this call and being flexible.*" He said Gjovik's "*cooperation and participation [are] imperative,*" however he never said Gjovik was under investigation.

On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

Hi Ashley,

This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.

As part of Apple's policy, your cooperation and participation is imperative.

Thank you in advance, and talk soon.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com

*Exhibit: Email from Workplace Violence on 9/9/2021 2:08pm*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Gjovik's Posts on 9/9/2021 – Knock on Door*

512.     Gjovik promptly responded at 2:10 PM PST, two minutes later, saying that she was willing to participate, she wanted there to be a written record of their conversations. She said she will respond as quickly as she can. Kagramanov did not respond so Gjovik replied again.

> On Sep 9, 2021, at 2:27 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>
> FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.
>
> This feels a little like witness intimidation, etc...
>
> —
> Ashley M. Gjøvik
>  Senior Engineering Program Manager, Apple
>
> > On Sep 9, 2021, at 2:10 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
> >
> > Hi Aleks! Happy to help! Please send any questions / updates via email so we keep everything written please.
> >
> > I will respond via email as quickly as I can. Thanks!
> >
> > —
> > Ashley M. Gjovik

*Exhibit: Gjovik's email to Workplace Violence on 9/9/21 2:20 and 2:27 PM*

513.     Gjovik responded again at 2:27 PM PST complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator.

514. Gjovik was posting screenshots of the conversation on Twitter in real time, along with her commentary and research discoveries about the team who contacted her. Gjovik posted on Twitter complaining of witness intimidation at 2:33 PM PST.



*Exhibit:: Gjovik's Posts on 9/9/2021 2:33pm*



*Exhibit: Gjovik's Posts on 9/9/2021 2:34pm*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

515. Gjovik forwarded Kagramanov's emails to her NLRB investigator Alex Hadjuk at 2:26pm and 2:30pm PST, via her iCloud email address which Apple would have seen. Gjovik also notified Kagramanov directly she did so.

516. A fake Twitter account called "EarlyRiser," then replied to one of Gjovik's posts saying, "*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" Under information and belief, "EarlyRiser" is Apple.

517. Kagramanov then responded at 2:50 PM, and said "*we are investigating allegations that you improperly disclosed Apple confidential information*" and claimed she refused to 'participate' in his farcical investigation. He did not explain what "participate in the discussion" meant. (Assumably he, and a bunch of lawyers and security goons, would meet her on the call, threaten to sue her, or threat to get charges filed against her for whoknowswhat, unless she signs some illegal waiver of claims and disappears). Kagramanov then said he was suspending all of Gjovik's account access. Notably, he never gave Gjovik a warning that she had to talk on the phone as the only option, nor did he tell Gjovik she was under investigation until after he suspended her accounts.

On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com

*Exhibit: Workplace Violence email on 9/9/21 2:50pm*

518. Gjovik responded to Kagramanov at 3:07 PM re-iterating she wanted to participate. "*As mentioned, I'm definitely willing to participate in your investigation. I only*

*asked that the discussion be kept to email — I said nothing about not participating in the discussion at all."* Gjovik added: *"I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government." "I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that."*

From: Ashley Gjovik <ashleygjovik@icloud.com>
Subject: Re:
Date: September 9, 2021 at 3:07:37 PM PDT
To: Aleks Kagramanov <akagramanov@apple.com>
Cc: "Ashley G (Work)" <ashleygjovik@apple.com>

Hi Aleks,

As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.

I offered to help via email to ensure we have a documented record of our conversations considering everything that's currently going on with my investigation and my complaints to the government.

I have been speaking out about work conditions, about workplace safety, concerns about discrimination & retaliation, and about concerns about intimidation and corruption (as reported to the government in public record).

I'm very concerned about what you are calling "serious allegations." Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting my access to Apple system? Or are you doing something more — and if so what?

Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.

In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.

Best,
-Ashley

—
Ashley M. Gjøvik

*Exhibit: Gjovik's email to Workplace Violence on 9/9/21 3:07pm*

519.    Gjovik added in her 3:07 PM email reply to Kagramanov: *"In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such."* Gjovik still did not know what she was supposedly accused of.

520.    Gjovik search online for *"Apple"* and *"threat assessment and workplace violence"* to see if there were any articles about Kagramanov's team. LinkedIn returned three results,

219

including Kagramanov, and the Apple employee who broke into the Latino man's house in

2011. Gjovik posted about it at 4:20 PM.



*Exhibit: Gjovik's Posts on 9/9/2021*

521.    On September 9 2021, at 4:24pm PST, the US EEOC investigator emailed Gjovik

saying she posted the final version of the charge and asked Gjovik to sign the charge. Gjovik

only had less than 40 minutes to meet the deadline until her charge could be closed.[215]

---

[215] US EEOC on 9/3/21: "Please understand that if you fail to sign and return the drafted charge within seven (7) days, I have the authority to assume that you no longer are interested in filing a charge, will close the inquiry, and no further action will be taken by the EEOC."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

522.    On September 9 2021, at 4:27pm PST, Gjovik digitally signed her EEOC charge against Apple, which she had already filed on August 12 2021, and with the notifications of these events still occurring through her iCloud email account. Gjovik's charge included a brief summary of retaliation up to when she filed it:

> "After engaging in protected activity, around May 6, 2021, West reassigned my work to others without explanation and ostracized me. Around July 15, 2021, Powers dramatically increased my workload with unfavorable projects. Around July 2, 2021, Employee Relations forced me to submit a reasonable accommodation request to not be exposed to the hazardous chemicals, instead of addressing my concerns for the health/safety of all employees. Waibel asked I not share my concerns with other employees, refused to take/answer my safety questions, or allow the EH&S team to take/answer my safety questions. In retaliation, on August 4, 2021, Apple placed me on an indefinite paid administrative leave even though I objected."[216]

The charge Gjovik filed only went through August, so after she was fired she had to file a second charge to add the additional retaliation.



---

[216] US EEOC, Charge of Discrimination # 556-2021-00608, Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT

221

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: EEOC Charge, Signed 9/9/21 7:27EST/4:27PST*

523.  At 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, emailed Gjovik with subject line "*Your employment status*" and an attached letter saying she had been terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking and said she "*failed to cooperate and to provide accurate and complete information during the Apple investigatory process.*"[217]



*Exhibit: Bertolus' email on 9/9/21 at 6:54pm PST*

---

[217] Gizmodo, *Apple Fires Program Manager Who Accused Bosses of Harassment, Intimidation,* Sept 10 2021, https://gizmodo.com/apple-fires-program-manager-who-accused-bosses-of-haras-1847649269

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Date:  September 9, 2021

To:    Ashley Gjovik                                    Employee ID: ▓▓▓▓▓▓
From: Yannick Bertolus
cc:    Personnel file

via Email
ashleygjovik@icloud.com

via FedEx
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Re:    Termination of employment

Apple has determined that you have engaged in conduct that warrants termination of
employment, including, but not limited to, violations of Apple policies.  You disclosed
confidential product-related information in violation of Apple policies and your
obligations under the Intellectual Property Agreement (IPA). We also found that you
failed to cooperate and to provide accurate and complete information during the Apple
investigatory process.

Your access to Apple systems has been suspended as of today and your employment
will terminate on September 10, 2021. You will receive your final pay which will include
regular pay through your termination date, all accrued unused vacation pay and any
ESPP contributions made in the current period.

*Exhibit: The Letter Attached to Bertolus' 9/9/21 Email*

524.    No explanation was ever provided as to why Bertolus was the one who

terminated Gjovik, and not Gjovik's managers Powers or West, or Employee Relations

employees Okpo or Lagares. Gjovik had only a handful of interactions with Bertolus during her

time working in his organization. Still, Bertolus surely knew about everything going on with

Gjovik if his report, West, has been talking about "*The Ashley Issue*" at every staff meeting,

Apple public relations was fielding questions about Gjovik daily, the US EPA raided Gjovik's

office, and Apple legal was organizing defenses to Gjovik's government complaints. Everyone

knew about Gjovik's protected activity.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

525.    Up until a few hours before she was fired, Gjovik had access to future product roadmaps; unreleased hardware/product design and configuration; future operation system source code; access to all Research & Development finance ordering accounts at the company, including the executive office, information on the manufacturing process and supply chain; competitive analysis; product pricing information; product launch dates; marketing plans; customer feedback and usage trends; access to future software features and projects; access to submit code to the OS releases and view what others submitted.

526.    There was a news cycle covering Gjovik's termination which was humiliating and will forever mark her career and reputation as being fired for "leaking." In interviews Gjovik explained she already knew she would be fired, based on Apple's corrupt conduct, but she wasn't "going to be quiet or slink away," and she said she "was going to stand up for [herself] and [her] fellow employees – [she] was going to expose the systemic problems [she] identified."

527.    On September 9 2021, an Apple Security manager Ricky Mondello, who was friends with a member of Gjovik's Software Engineering team (Faye Garfinkle, close friend of Rob Marini), posted on Twitter about Gjovik's termination, "*Sometimes you fuck around. Sometimes you find out.*"

**xv.    Apple Increases Intimidation and Retaliation (September 2021)**

528.    Gjovik testified to NLRB for her affidavit on September 10 2021.

529.    Joanna Appleseed, who worked in Apple's Global Security team, posted on social media about Gjovik's government complaints and investigations claiming they were meritless, and Gjovik was lying, including on September 9-10 2021.

530.    Appleseed posted on September 9 2021, that Gjovik's NLRB charge may not have merit and she does not believe in Gjovik's charges; on September 13 2021 she posted that Gjovik's EEOC and DFEH charges were meritless, on September 26 posted that Gjovik was

lying about being put on leave and claiming that Gjovik "*leaked IP*," and again on November 1 2021 referencing "*evidence*" and jury "*verdicts*". On September 16 she posted that no one should donate to Gjovik's GoFundMe and called Gjovik a "*predator*," On October 25, 2021, Appleseed posted that Gjovik's "*complaints with federal and state agencies*" do not have merit and that Gjovik was not being "*honest or genuine*" in filing the charges, and that Gjovik was "*harmful*" for filing charges against Apple.

531.　On September 10 2021, a fake Twitter account, "Beezie Wacks" began posting about Gjovik and in Gjovik's replies. Beezie shared, liked, and commented on other fake account and employee harassment of Gjovik. Beezie posted "#*ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit #coward,"* and then paid to 'promote' her Twitter post. Under information and belief Beezie was Apple, and possibly Gjovik's first Employee Relations investigator, Jenna Waibel.

532.　On September 8-10 2021, an account on Reddit began posting about Gjovik. The account "crissnovak" posted on September 8 2021 sharing a link to the Vyas Twitter posts about Gjovik and Gjovik's US DOJ complaints, "*Shantini is my hero, best take on "A" with over 200+ s. ALOT seem to agree: entitled, obnoxious, toxic, vindictive employee. To me, zero credibility. I would not even want to be on the same sidewalk with that."* The same account posted on September 9 2021, "*Good riddance. They should have fired her weeks ago.*," "*Santa Clara University Law must be cringing.*"On September 10 2021, the account posted in a thread about Gjovik: "*The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help.*" The same day the account posted about Gjovik: "*I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC　　　　　　　　　DECEMBER 21 2023

*are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity.*"[218]

533.    On September 11 2021 the crissnovak account posted, "*I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!*" [219] Crissnovak then began threatening other Apple employees they may "*get Gjoviked*!" if Apple does not like them.[220] On September 13 2021, the crissnovak account posted on a thread about Gjovik: "*.... Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood…*" then added about Gjovik's appearance that Gjovik was on the "*chubby side*" and had "*baby teeth lol*."[221]

534.    Prior to harassing Gjovik, the account posted specific demographic information which Gjovik was able to match to several Apple employees who may be behind the account, including a manager and analyst in Apple Human Resources, two project managers in Apple's Developer Tools (a team that is close with Marini and Riegel), and a senior manager for the team that appears to be in charge of the Face Gobbler application and data. Under information and belief crissnovak was Apple.

---

[218] Reddit, u/crissnovak, https://www.reddit.com/user/crissnovak/comments/
[219] Reddit, Apple fires Senior Engineering Program manager Ashley Gjovik, https://www.reddit.com/r/apple/comments/plcc8i/apple_fires_senior_engineering_program_manager/hccxlth/?context=3
[220] Id.
[221221] Reddit, https://www.reddit.com/r/apple/comments/pm7lio/comment/hcnwjqz/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                        DECEMBER 21 2023

535.     Starting in at least September 2021 and assumed to continue through current day, Joanna Appleseed and other Apple employees undertook a 'whisper campaign' to smear Gjovik's character and creating fear, uncertainty, and doubt about Gjovik's allegations against Apple.

536.     On September 10 2021, one of Gjovik's coworkers began posting about Gjovik under the screenname "Neoform." Neoform was Gjovik's coworker Ian O'Shaughnessy who sat a few desks from Gjovik at 825 Stewart Drive.[222]   For around a week when Gjovik was fired, Neoform/Shaughnessy began posting extensively about Gjovik on Twitter, Reddit, and other forums and social media sites. In September 2021, in threads about Gjovik getting fired on Twitter and Reddit, Shaughnessy posted under the name "Neoform":

a.   *Vexatious litigant incoming!*
b.   *The way she's been attacking her employer on every possible front (including taking digs at the CEO and board of directors, repeatedly), this was basically a self-fulfilling prophecy.*
c.   *Based on her writings and twitter feed, I would not be surprised in the least to learn she has some kind of psychosis.*
d.   *She's entirely to blame for her firing.*
e.   *She clearly doesn't have a lawyer, so I'd guess all of her claims are entirely baseless. The irony is: she's a law student graduating next year...How terrifying*
f.   *Silicon Valley has a number of Superfund sites, she says both her apartment AND her workplace office are located above a superfund site... That said, she's claiming she was hallucinating and getting sick from the tVOCs – meanwhile no one else around her was suffering the same.*
g.   *[directly to Gjovik about Gjovik's SEC charge] Why would the Finance & Audit committee oversee the renting/purchasing of property?*
h.   *[directly to Gjovik about Gjovik's lost RSUs] But you said were only planning on staying at Apple until Dec 2022 though, which means you wouldn't be getting all that money anyways*
i.   *You think there are law firms that will want to hire her? She's toxic.*
j.   *I was giving her the benefit of the doubt until I saw her claim that turning on her webcam during meetings was sexist.*

---

[222] Newsique, About, DJ Neoform/Ian O'Shaughnessy https://web.archive.org/web/20070109074012/http://www.newsique.com/about/ ; Wikipedia Neoform link to Newisque https://en.wikipedia.org/w/index.php?title=User:Neoform&oldid=92521016

k.  *Right to Sue notices are the default position of the NLRB – ergo, they decided \*not\* to take action of their own, hence, you can go ahead and sue to resolve it yourself.*

l.  *Why are you certain the investigation had not been closed? She posted that ER had reached out to her, she effectively refused to talk to them, they replied saying "ok, we're going to proceed without you then." Sounds like they were wrapping things up…*

m.  *She accused her boss of pimping because he recommended a Michelin star resto to her, she went, then the sous-chef who knew her boss talked to her and paid for her meal.*

n.  *You think there are law firms that will want to hire her? She's toxic.*

o.  *"Now Apple has fired her for supposedly 'leaking' insider information." A brief glance at her twitter feed can resolve the "supposedly" part*

Shaughnessy also "liked" Vyas' posts attacking Gjovik from early September 2021.

537.    On September 22 2021, Gjovik finally blocked Shaughnessy ("Neoform") and upon which he replied: "*Lol, you blocked me for giving you the most mild criticism? How thin-skinned are you?*"

538.    On September 12 2021, Gjovik received two calls from an Unknown number on with no voicemail.[223] Gjovik did not pick up and complained on Twitter that Apple needs to email her and keep it in writing if they want to talk. "*¡f that was #Apple… As I've requested for months now, If @Apple would like to intimidate me, they need to do it in writing only please. Thanks. Appreciate your understanding.*"[224]

539.    Gjovik watched $591,612 in unvested AAPL RSUs disappear that weekend. [225] Gjovik was also due for her annual performance review, which Apple never gave, and would have had her annual bonus awarded with a week or so.

540.    The Press discussed Gjovik's termination and Apple's retaliation against her. A Public Radio representative with over 87,000 Twitter followers publicly commented about "The Ashley Gjovik Story," that "*the irony that Apple fired her during the week of Labor Day, allegedly as retribution for filing a NLRB complaint, should be lost on no one.*"

---

[223] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437228327555710977
[224] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437179879250960397
[225] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437248801006358532

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Boston Public Radio Twitter Post*

541.    A Bloomberg reporter who is covered Gjovik's labor struggle with Apple in depth posted after Gjovik's termination, "*Ashley Gjovik, who was fired by Apple Thursday after filing NLRB, OSHA, and EEOC complaints, has received right-to-sue notices allowing her to sue for discrimination in federal or state court.*" In September, The New York Times described Gjovik's situation with Apple: *"After taking her complaints about #Apple public this year, Ms. Gjovik was placed on leave and later fired. She filed complaints with the NLRB, OSHA, the EEOC, & the Justice Department."* The close nexus between Gjovik's protected activities and Apple's negative actions towards her was lost on no one.

542.    On September 14 2021, after a fake account on Reddit began posting that Apple employees will get "*Gjovik'd*" if they do not fall in line, Apple employees then began sharing the post and term "*Get Gjovik'd.*" Under information and belief this account was Apple and the term Gjovik'd was a riff off the term "*Steve'd*" which referred to Steve Jobs laying people off.

543.    On September 14 2021, Gjovik had the second part of her NLRB affidavit. She posted about it on Twitter.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's Twitter Post on 9/14/21*

544.   On September 20 2021, Bertolus' administrative assistant contacted Gjovik notifying Gjovik that Apple would be mailing her the things from her desk back. The assistant sent Gjovik a tracking label on September 29 2021.

545.   On September 15 2021 at 7:40pm PST, Apple's lawyers at O'Melveny & Myers emailed Gjovik a letter implying she was terminated due to several Twitter posts and the video content in a news article.

On Sep 15, 2021, at 7:40 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Please see the attached correspondence.

Sincerely,

David

**O'Melveny**

**David R. Eberhart**
deberhart@omm.com
O: +1-415-984-8808

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Website | LinkedIn

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

<Gjovik, Ashley M. IPA.pdf><Sep_15_Gjovik_Letter_FINAL.pdf>

*Exhibit: 9/15/21 email from Eberhart*

231

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

## O'Melveny

O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823

T: +1 415 984 8700
F: +1 415 984 8701
omm.com

File Number:
600,000-3 (Apple Inc.)

September 15, 2021

**David R. Eberhart**
D: +1 415 984 8808
deberhart@omm.com

**VIA E-MAIL**

Ms. Ashley Gjovik
1050 Benton Street, Apt 2310
Santa Clara, CA 95050
ashleygjovik@icloud.com

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:

https://twitter.com/ashleygjovik/status/1431824501457633283

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-internal user study project. Please remove those images from any public location and refrain from further public disclosures about that project.

The second is the image contained in the following tweet:

https://twitter.com/ashleygjovik/status/1432400136471072769

The related video is located here:

https://volume-assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application during confidential Apple-internal user studies. Please remove that image and video from any public location and refrain from further public disclosures about that application or related user studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you are represented by counsel in this matter, please identify your counsel.

/ / /

Century City • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo

232

O'Melveny

Sincerely,

/s/ David Eberhart

David R. Eberhart
of O'MELVENY & MYERS LLP

*Exhibit: The O'Melveny & Myers Letter*

546.    The Partner, David Eberhard, pointed to the URLs and asked Gjovik to remove the content, which was black and white photos of Gjovik secretly taken from her iPhone to gather her biometrics without her consent; a video of these images including in her living room, bedroom, bathroom, and in public spaces; and Twitter posts where Gjovik complained about Apple's surveillance, intimidation tactics, overly restrictive confidentiality policies, and ex-Intelligence/ex-military corporate paramilitary team, the "*Worldwide Loyalty Team*."



^ *The Twitter Posts Apple's Lawyer's Demanded that I Delete on Sept 15 2021* ^

*Exhibit: The Posts in Question*



*Exhibit: The Posts in Question*



data that has your face in it is good data," said an internal email about the project. After rumors of criticism, Apple eventually changed the codename to "Glimmer."

*Exhibit: The Video in Question*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

547.   This letter created the implication of surveillance and confirmed actual surveillance of Gjovik by Apple. The message from Apple also expressly told Gjovik that Apple's surveillance of its employees is 'confidential' and speaking of it publicly can result in immediate termination.

548.   In addition to the bizarre and clearly pretextual timeline of events with Kagramanov, Apple's lawyers' communications also show Apple's retaliatory animus by timeline alone. Apple's lawyers contacted Gjovik on September 15 2021, pointing to content posted 16-18 days prior. This is supposedly the same content that Kagramanov reached out to Gjovik about on September 9 2021, saying he had to talk to her "*within the hour*" about. It's also unclear why it took an additional six days after Gjovik's termination for Apple to email Gjovik the URLs of the Twitter posts it supposedly fired Gjovik over. If Apple's post-hoc rationalization was true, then with the posts already identified, it probably only took five minutes to draft the email – something they could have sent on September 9 2021.

549.   Further evidence of Apple's pretext is that after the initial email, Eberhardt then replied with essentially, "*oh hey here's another one or two I just found*." Its unclear how Apple could be so certain it would fire Gjovik, and have over two weeks to prepare its position and communications with Gjovik, yet Apple forgot about two of the posts it fired her over, but then remember them the next day. It's also absurd for a law firm such as OMM to act like they don't know how to file a take-down request for actual Intellectual Property – but they know the content is not Apple's property and their requests would be denied.

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Wednesday, September 15, 2021 8:58 PM
**To:** Eberhart, David R. <deberhart@omm.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]
Hello David,

I hope you're well.  Thank you for your email.

I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1431824501457633283
https://twitter.com/ashleygjovik/status/143240013647072769

As for the video hosted by Vox, I do not have the power to delete it as Vox is in control of their own servers, not me. I am talking others about your request and someone will get back to you related to the Vox hosted video.

—
Ashley M. Gjovik

*Exhibit: OMM Email 9/15*

On Sep 16, 2021, at 8:49 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Dear Ms. Gjovik –
Thank you for your email.

I look forward to further information about Apple's request to remove the video. In the meantime, I note that there are additional tweets that also contain the same or similar images from confidential Apple-internal user studies:

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Please remove those images from any public location, remove any similar images, and refrain from further public disclosures of the same or similar information.
Sincerely,
David

*Exhibit: OMM Email 9/16*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Friday, September 17, 2021 11:48 AM
**To:** Eberhart, David R. <deberhart@omm.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]

Hi David,

Again, I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Would you please let me know — have you already sent a request to Vox for them to remove the video? Have you received a response from them separately?

Ashley M. Gjovik

---

On Sep 17, 2021, at 12:40 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Dear Ms. Gjovik --

Thank you for your email.

Based on your September 15 email, we understood that you were in communication with others about removal of the video hosted by Vox. Consequently, we have not separately communicated with Vox. Please let us know the status of the communications you referenced.

Sincerely,

David

*Exhibit: OMM Email 9/17*

---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.
**Date:** September 20, 2021 at 11:37:24 AM PDT
**To:** "Eberhart, David R." <deberhart@omm.com>

Hi David,

I hope you're well. I chatted with a journalist over at Vox and they mentioned you'd need to reach out formally with any requests like this. Let me know if you need help getting contact information for their legal team. They thought you might already have it, but if not, I can try to get you a contact over there.

Ashley M. Gjovik

*Exhibit: OMM Email 9/20*

550.     Gjovik obtained a lawyer to respond to Apple's lawyers about Apple's threatening letter. Gjovik's lawyer, David Hecht, sent Apple a letter on October 6 2021, saying, "*While I understand that Apple is not opposed to taking aggressive litigation postures (and*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law."*

551.    Gjovik's lawyer told Apple, "*Your September 15, 2021, letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect.*"

552.    He then went on to knock down Apple's arguments one by one until nothing was left. Her lawyer closed, "*Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021, letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.*"  Apple never responded.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



David L. Hecht
Partner
P: (212) 851-6821
E: dhecht@hechtpartners.com

October 6, 2021

**VIA E-MAIL**

David R. Eberhart
O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
deberhart@omm.com

**Re: Ashley Gjøvik**

Dear Mr. Eberhart,

I represent Ms. Gjovik. I am in receipt of your letter dated September 15, 2021 and subsequent email communication with my client. Going forward, please direct all such correspondence to me.

As you are aware, Ms. Gjovik has already complied with your September 15, 2021 demand to remove certain images from some of her Twitter posts. However, I write regarding the inappropriateness of your requests, which may comprise copyright misuse. While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.

Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect. The IPA does not cover the images/video that Ms. Gjovik posted. For example, you take issue with Ms. Gjovik's post of screenshots of an automated email sent to Ms. Gjovik from "Ask," "an internal survey solution." The email itself was not marked as confidential. Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential. The content of the automated email also contained nothing that could be considered secret or otherwise proprietary; there was no disclosure of the content, methodology, identity of any participants in the survey (other than Ms. Gjovik), or any of the survey's findings. The posted image of the email merely noted what was already known

125 Park Avenue, 25th Floor, New York, NY 10017

240

to the public: Apple was conducting 3D scans of human ears to "collect representative ear geometry data across age, gender, and ethnic groups" and to benefit "audio research efforts and better our understanding of ear geometry variance." It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPods products. In fact, Apple's Vice President of Product Marketing, Greg Joswiak, spoke publicly about the 3D ear scans over a year ago:

> "We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Joswiak says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."

*See* Jeremy White, *The secrets behind the runaway success of Apple's AirPods*, Wired (September 5, 2020), *available at* https://www.wired.co.uk/article/apple-airpods-success.

Accordingly, Ms. Gjovik cannot face restriction in disclosing a non-confidential email about the mere existence of a survey concerning 3D ear scanning (scanning that Apple had already publicly disclosed much earlier) sent to her during the period in which Apple put her on administrative leave. Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual.

Your September 15, 2021 letter and subsequent email communication also takes issue with image/video that you contend "were generated by a confidential internal Apple application during confidential Apple-internal user studies." Apple holds no copyright to these images, which were not authored by a human. As you are aware, United States copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *Trade-Mark Cases*, 100 U.S. 82, 94 (1879). Because copyright law is limited to "original intellectual conceptions of the author," Apple would be unable to register any of the images or video generated by the "Glimmer" app since a human being did not create the work. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884). Apple therefore cannot allege infringement of any copyright by Ms. Gjøvik.

To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such. You also have not alleged how mere images of Ms. Gjøvik, in her home, taken by the Glimmer app, on Ms. Gjøvik's own phone, could quality as confidential and/or

proprietary information under the IPA. For example, your letter fails to acknowledge that the images posted were (a) taken by an automated process running on Ms. Gjøvik's own iPhone and (b) captured her own likeness and portions of her living space. There can be no doubt that Ms. Ms. Gjøvik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the non-proprietary images Ms. Gjøvik posted, she intentionally rendered unreadable any conceivably non-public information when posting these otherwise non-proprietary images. Your claims of any violation of the IPA based on the posting of these images appear, therefore, to have no basis in fact or law.

Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021 letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.

Sincerely,

David L. Hecht
Hecht Partners LLP

cc: Erika Heath, Esq.
Ashley M. Gjøvik

*Exhibit: David Hecht's Letter to Apple's Lawyers re: Gobbler & Ear Canals*

553.    On September 15, 2021, Tim Cook announced an unexpected all hands meeting scheduled for September 17, 2021 with all Apple employees. This was unusual. He also provided a way for staff to submit questions beforehand. Numerous people told Gjovik they submitted questions about why Apple was mistreating Gjovik, what Apple was going to do to fix its culture of retaliation, and why Apple had offices on Superfund sites.

554.    On September 21, 2021, Tim Cook sent an email to his staff complaining someone spoke publicly about discussion from the all hands (about pay equity, COVID response, benefits, and other work conditions). Cook said Apple was "doing *everything* in our

242

power to identify those who leaked." Cook said, "*people who leak confidential information do not belong here*."

555. On September 22 2021, Apple suddenly joined the advisory board of ChemFORWARD, a chemical safety NGO.[226] [Apple had suddenly joined this group on May 7 2021.][227] On October 26 2021, Apple's lobbyists (reporting to Lisa Jackson) suddenly approached the US EPA Chemical Safety & Pollution Prevention program asking for a meeting. On October 27 2021, Apple's ChemFORWARD suddenly partnered with CEPN.[228] On November 2 2021, Apple suddenly got "Electronics Watch" to join their CEPN 'worker safety' group.[229] Electronics Watch includes Gjovik's Occupational Exposure medical doctor, Dr. Robert Harrison, who is in their OHS Advisory Panel.[230] On November 3 2021, Apple co-hosted a chemical safety webinar with its new friends at ChemFORWARD.[231] On November 3 2021, Apple's lobbyists reporting to Lisa Jackson submitted an agenda request to the US EPA Chemical Safety team, requesting a meeting.

556. Apple notified Gjovik it was mailing her the possessions from her desk and sent a tracking number. Gjovik posted on Twitter the tracking number said the package was about to arrive. On September 29, 2021, another fake Twitter account, "BabyHummingbird," commented to Gjovik via Twitter about the box before she opened it, saying "*Don't open it*!" and included

---

[226] https://twitter.com/ChemForward/status/1308483392170844162; https://www.chemforward.org/news/apples-art-fong-to-lead-chemforward-technical-advisory-group
[227] https://twitter.com/ChemForward/status/1390773254680350722; https://www.chemforward.org/news/apple-and-chemforward-collaboration-offers-affordable-verified-data-on-safer-cleaners-to-protect-worker-health
[228] Oct 27 2021, https://www.chemforward.org/news/chemforward-invited-to-become-a-membernbspof-the-clean-electronics-production-network-cepn
[229] Nov 2 2021, https://electronicswatch.org/en/electronics-watch-joins-the-clean-electronics-production-network_2597317
[230] Electronics Watch, OHS Advisory Panel, https://electronicswatch.org/ohs-advisory-panel_2581888
[231] https://www.chemforward.org/news/november-3rd-webinar-recap; https://twitter.com/ChemForward/status/1466170142589657092

---

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

an image from the movie SE7EN that implies it contained a severed head of one of her loved ones.[232]



*Exhibit: The "Severed Head" Post*

557.   BabyHummingbird's Twitter account had just a small number of posts, almost entirely directed at Gjovik. BabyHummingbird also liked posts about Gjovik, including the "don't get Gjovik'd" posts. BabyHummingbird's first "like" was a post from 2014 that said, "Apple's Back, Better than Ever." Under information and belief, "BabyHummingbird" was Apple.



*Exhibit: First "Like" from BabyHummingbird*

---

[232] 18 U.S.C. § 876(c) prohibits mailing "any threat to kidnap any person or any threat to injure the person of the addressee or of another."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

558.     On September 30 2021, Gjovik received a box of her personal items, full of broken glass.



559.     On October 1 2021, another fake Twitter account, "FemaleInTech," commented on one of Gjovik's Twitter posts where Gjovik complained she just "*spent 5min pulling a chunk of glass out of the sole of my foot & I'd like to remind everyone that #Apple sent me this box of spite after taking away my health insurance the day I was fired.*" The Apple account replied, "*I think it would also be really impactful to post a picture of your bleeding wounds w/ a tweet calling out their HR people by name. At this point why not shame the individuals there for their unambiguous, documented spitefulness with horrifying photographic evidence!*"  Assumably Apple wanted Gjovik to call out "people by name" as a preemptive defense of individual liability for their actions and wanted a photo to assess liability for the physical harm. Under information and belief, FemaleInTech, is Apple because the account was primarily used to post about and to Gjovik, did not seem authentic, and made several highly suspicious posts/comments.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

560.     On October 2 2021, the "FemaleinTech" Apple account attempted to manipulate Gjovik to get access to Gjovik's computer randomly offering to edit XMLs on Gjovik's system. On November 5 2021, the same account attempted to direct Gjovik to a specific 3rd party iPhone repair shop, which after realizing the account was Apple, now Gjovik believes was another attempt to modify her devices for surveillance. [California's Consumer Protection Against Computer Spyware makes it illegal for anyone to install software on someone else's computer and willfully or in a deliberately deceptive way to use it for wrongful purposes.][233]

xvi.    **Gjovik Files More Charges: EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021)**

561.     On October 7 2021, the US EPA sent a letter to Northrop Grumman with a report of the August 29 2021 inspection. The letter notes "the purpose of the [August 19 2021] site visit was for EPA to inspect the following … to assess the potential for vapor intrusion into the building," including:

-    "The sub-slab depressurization (SSD) system that was installed underneath the three connected site buildings that passively vents soil gas vapors to the atmosphere.
-    The building's concrete slab and the April 2015 cracks that where sealed to prevent potential vapor intrusion. The building's concrete slab and penetrations from pipes or seams.
-    The previously installed soil gas sampling vapor ports.
-    …The operation of the HVAC system and the HVAC air venting and intakes on the roof…
-    A review of any post-2015 building modifications or changes to the buildings…"[234]

---

[233] Cal. Bus. & Prof. Code §§ 22947.2 to 22947.4.
[234] US EPA, Re: EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue [sic], Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088), October 7 2021, https://semspub.epa.gov/work/09/100025885.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

562.   US EPA also requested a number of corrective actions from Northrop Grumman and Apple, including fixing the HVAC/vent situation (see exhibit), and locating/fixing several sub-slab vent ports inside the building (the same ones Gjovik had complained about).[235]

over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

*Exhibit: October 7 2021 Letter re: SSD System Vent Pipes*

563.   On October 9 2021, Gjovik posted a Twitter thread about Apple and the Worldwide Loyalty enterprise firing her after she had posted on Twitter about Apple breaking into someone's home in 2011. Someone posted it on the "HackerNews" forum and quickly a number of very suspicious account began posting horrible things about Gjovik including a self-identified current Apple employee (azinman2) calling her "*a nutcase,*" and saying she has "*negative credibility.*" Another suspicious account (0des) also defended Apple, condemned Gjovik, and bolstered the posts of azinman2. Both began accusing anyone who supported Gjovik as being Gjovik herself and a "*sockpuppet.*" Another suspect account joined (n0000d3js) which not only harassed Gjovik but also defended Apple's break-in of the person's apartment in 2011

---

[235] Id.

and said Apple's actions "*didn't break the law*."[236] Under information and belief all of these accounts were Apple.

564.    Posts in support of Gjovik were quickly flagged and removed, while posts Gjovik reported as harassment were ignored and left up, and when Gjovik tried to defend herself in the thread her posts were quickly flagged and removed by moderators. Under information and belief Apple has moderator/admin control over HackerNews threads. In that HackerNews thread, people then complained about the suspect accounts writing "*Are you Global Security or something? What makes you so invested in defending the wealthiest company on earth*?" Another posted, "*It's actually quite concerning and even a little suspicious that so many defamatory comments are linking criticism of the workplace with mental illness.*" Another added, '*If Apple is actually sending people to employee's homes, what's to stop them from manipulating discourse on forums such as this? They certainly have the money and the expertise to do it. If this is at all a concern, what is this forum doing to prevent that from happening*?" Another added, "*They definitely do this on MacRumors just look at any comment section there.*" Another added, "*This thread looks very sus. The way few accounts are defending apple and accusing the employee raises more eyebrows on apple.*[237]

565.    Gjovik saw all of this playout in real time as she was tagged by HackerNews and read the comments as they came in. Gjovik posted on Twitter complaining it was clear Apple Global Security was behind many of the comments and they were further retaliating against her for the thread she posted about Apple's misconduct.

566.    On October 12 2021, Gjovik filed two additional NLRB charges Apple, alleging Cook's email, and Apple's NDAs and employment policies (including surveillance) violate federal labor laws in numerous ways outlined with footnotes in her brief, Gjovik's charges were

---

[236] HackerNews, https://news.ycombinator.com/item?id=28811746
[237] HackerNews, https://news.ycombinator.com/item?id=28811746

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

covered in the Press with quotes from prior NLRB leadership commenting on the strength of Gjovik's case. (The NLRB issued a decision of merit agreeing with Gjovik on January 29, 2023).

567.    Implied by the OMM letter, Apple's proffered reasons for Gjovik's termination were so farfetched and pretextual, a detailed article was written about exactly that, titled "*Apple Wanted Her Fired. It Settled on an Absurd Excuse.*"[238] The October 14 2021 articles explained the background of Gjovik's whistleblowing about toxic waste, harassment, and cover-ups as it was clearly the reasons for Gjovik's termination.



*Exhibit: The Oct 15 2021 Article*

---

[238] Dell Cameron, *Apple Wanted Her Fired. It Settled on an Absurd Excuse*, Gizmodo, Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

568. On October 14, 2021 a discussion board account, "SlushierCupid", apparently created to celebrate Apple's legal win over Epic Games before transitioning to harassing Gjovik, posted in the comments for the "*Absurd Excuse*" article: "*This woman's tweets show she is both unhinged and a narcissist. I don't buy her story. What I do buy is that she is probably difficult to get along with and doing what many culturally brainwashed individuals do these days and play the victim card, hoping for attention and a payout.*" Commentors replied saying "*you're definitely not an Apple employee or contractor trying to smear her*," and "*Apple's crisis team is on the move, I see*!" "SlushierCupid" added "*She attends law school, she knew she was going to be fired for whatever ridiculous reason Apple gave. I knew my brother would punch me when I irritated him non stop.*" Other accounts responded calling "SlushierCupid" an "*apple shill*" and noted all their pasts posts were "*in defense of [their] corporate master.*"

569. On October 15 2021, "SlushierCupid" continued to post replies harassing and defaming Gjovik, now increasingly referencing Gjovik's apartment next to the 3250 Scott Blvd factory and Gjovik's Apple office on a Superfund site. They posed, "*I can not find a piece of evidence from any environmental agency or environmental non-profit who said her claims were valid either for the "poisoning" at work or the "poisoning" at home. If I am wrong, please point it out.*"

570. Under information and belief SlushierCupid was a member of Apple Global Security team and Worldwide Loyalty enterprise posting on behalf of Apple. Under information and belief SlushierCupid was involved in or aware of Apple's activities starting around August 2021 with joining chemical safety and environmental health NGOs in order to prevent them from supporting Gjovik. Under information and belief SlushierCupid was involved in or aware of Apple's conspiracy with the US EPA to cover-up what happened at Gjovik's office.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

571.    On October 16 2021, Apple requested a "no-action" letter from the US SEC related to a shareholder proposal requesting a vote on a request for Apple to conduct a risk assessment on its use of NDAs to cover-up unlawful conduct. Apple's letter to SEC failed to mention they were actively under investigation by the NLRB over their NDAs, based on Gjovik's charges. Apple instead claimed its NDAs and use of NDAs was legal and ethical, so there was no reason to think there was any issue and thus there was no need to have a vote. Gjovik alleged this was fraud.[239]

572.    Around October 26 2021, Appleseed messaged one of Gjovik's friends and told them Gjovik was "*lying about a bunch of stuff,*" "*lied to the public, to the government, about what happened to her.*"

573.    On October 26 2021, Gjovik filed an SEC whistleblower tip alleging shareholder fraud when Apple had filed a no-action letter trying to block a shareholder vote about Apple's use of overly restrictive NDAs. Apple's response had completely omitted the NLRB was actively investigating Apple's policies based on a NRLB charge Gjovik had filed a week prior. Apple was actively trying to suppress shareholder voting about an issue it knew it was in trouble over and tried to mislead the SEC in order to prevent that vote. As noted, the NLRB confirmed in January 2023 the policies did violate US labor laws. On October 26 2021, Gjovik then emailed her NLRB investigator to complain that Apple was "*literally lying to the SEC*". Gjovik wrote that the situation at Apple was like *"Waco meets Enron."*

574.    On November 16 2021, Gjovik asked US Department of Labor to confirm if they included CERCLA, SOX, and other relevant statutes in her case, in addition to OSHA Act. US Department of Labor (Andrea Diangco) then suddenly tried to dismiss her entire case and

---

[239] *Hawran v. Hixson* (2012) 209 CA4th 256, 280-281, 147 CR3d 88, 109 (collecting cases) – (Corporation's press release was not a "fair report" of an SEC investigation where it did not report on, summarize or describe the SEC proceeding or investigation, the history of that proceeding, or any communications made in the course of the investigation and where nothing in the release provided the "gist" or "sting" of the SEC's charges or proceedings.)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                              DECEMBER 21 2023

claimed it was never opened, despite FOIA documents revealing it was open and the investigator, Andrea Diangco, was making false and misleading statements.

575.    On November 23 2021, US EPA Chemical Safety replied to Apple's lobbyists and confirmed the agenda which included: the Chemical Safer Choice Partner of the Year Award. On November 29 2021, Lisa Jackson, prior head of the US EPA and current Apple VP of Lobbying, emailed the current head of the US EPA a letter of recommendation for the person she wanted to run US EPA's Region 9 office, which oversees the majority of Apple's federally regulated offices and facilities. Jackson sent the letter from her Apple work email account.

| Message | |
|---------|--|
| From: | Lisa Jackson [lisa_jackson@apple.com] |
| Sent: | 11/29/2021 9:52:56 PM |
| To: | Regan, Michael [Regan.Michael@epa.gov] |
| CC: | Utech, Dan [Utech.Dan@epa.gov] |
| Subject: | Recommendation for Ex. 6 Personal Privacy Region 9 |
| Attachments: | Ex. 6 Personal Privacy |

*Exhibit: Lisa Jackson's Letter of Rec Email – 11/29/21*

# Lisa P. Jackson

Ex. 6 Personal Privacy

November 29, 2021

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC  20004

Dear Administrator Regan:

I am writing to express my strong support for the nomination of [Ex. 6 Personal Privacy] to the position of Region 9 Administrator at the U.S. Environmental Protection Agency.

[  ] is a collaborative leader who has dedicated [  ] career to protecting human health and the environment. [  ] has demonstrated a sustained ability to tackle complex challenges and has strong relationships, respect and trust across a number of stakeholders in Region 9 and nationally.

If selected as Region 9 Administrator, [  ] is committed to centering environmental justice communities in the Region's work, and clearly understands the need and opportunities for partnership between states and the federal government in implementing goals around climate, equity, justice, and jobs. I am confident that [  ] will work to ensure stakeholders across all states in the region have an equal voice and seat at the table.

I believe that [  ] experience, expertise, relationships, and values will position [Ex. 6 PP] to be a great fit to lead EPA's Region 9. I fully support [  ] nomination and look forward to working with [  ] to advance environmental justice and increase access to reliable, clean energy in this critical region.

Sincerely yours,

*Lisa P. Jackson*

Lisa P. Jackson

Cc: Dan Utech, EPA Chief of Staff

ED_013249C_00000003-00001

*Exhibit: Lisa Jackson's Letter of Rec– 11/29/21*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

576.     On December 1 2021, Diangco finally contacted US EPA about Gjovik's case and asked, "*did Gjovik report any CERCLA violations to you*?" US EPA (Chip) then met with US DOL (Diangco) to discuss Gjovik's complaints and the office. On December 12, 2021, the US Department of Labor docketed Gjovik's Whistleblower Protection Cases.

577.     On December 8 2021, Gjovik received an email from her website webform from a "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from "The Messenger," said, "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple*." The email then quoted Matthew 5:38-42 from the Christian Bible. Under information and belief, the email came from Apple at or around Apple's first manufacturing facility in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data center.[240]

578.     On December 13, 2021, Appleseed posted that Gjovik's claims were '*full-out fabricated nonsense that borders conspiracy*." On December 30, 2021, Appleseed posted that Gjovik has "*narcissistic personality disorder*" and urged people to ignore her.

579.     A December 13 2021, Financial Times article was published on December 13, 2021, which said:

> "The labour department will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defense company responsible for the dump — and maintenance — of waste

---

[240] NY Times, "Apple *Computers Used to Be Built in the U.S. It Was a Mess*.," Dec 2018, https://www.nytimes.com/2018/12/15/business/apple-california-manufacturing-history.html; CultureofMac, *A brief history of Apple's misadventures in manufacturing: Part 1*, https://www.cultofmac.com/616044/a-brief-history-of-apples-misadventures-in-manufacturing-part-1-cook-book-leftovers/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

materials beneath the Sunnyvale office. Sugar could not be immediately reached for comment. "Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board. "Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."[241]

580.     On December 13 2021, US EPA (Chip) sent US DOL (Diangco) a copy of the October 7 2021 report about the August 19 2021 inspection of Gjovik's office. At this time Gjovik still did not know there was an inspection by US EPA due to her complaints. Diangco would never tell Gjovik about it or disclose that she knew about it. Chip would finally tell Gjovik in May of 2022.

581.     On December 14 2021, the US DOJ contacted Gjovik confirming receipt of a complaint she sent to their antitrust division in November of 2021.

582.     On December 15 2021, Apple (represented by Art Fong) was part of a chemical safety webinar which discussed the dangers of certain 'restricted substances' including Benzene, Toluene, Methanol, TCE, and NMP (N-Methyl-Pyrrolidone).[242] The presentation discussed Apple's new program "Towards Zero Exposure" where it claimed to protect workers from chemical exposure. Apple noted "Participating Organizations" in the project which included "Electronics Watch" (Gjovik's chemical exposure doctor, Dr. Harrison); "ICRT" (the Silicon Valley chemical/labor activist Ted Smith), and Santa Cara University (Gjovik's law school).

---

[241] Financial Times, "*Apple faces probe over whether it retaliated against whistleblower*," Dec 13 2021, https://www.ft.com/content/973aae8d-21d9-4e84-8912-ead071c7935d
[242] https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf

583.     Under information and belief, Apple's decision to join these groups and participate in chemical safety/labor projects was part of a formal public relations/legal strategy devised by Apple to capture the NGOs and activists that would hold them accountable if it came out what Apple was doing, to continue making false statements about their practices but now for a larger audience, and to create 'talking points' for their defense – and for applications to additional programs with the same goals noted above. When Apple applied for the 2023 US EPA chemical safety Safer Choice Partner of the Year award, Apple cited evidence of why it deserves the award as its partnerships with ChemFORWARD, CEPN, and other groups it joined in 2021.[243]

584.     On December 20 2021, the US EPA responded to an IndependentUK reporter who had reached out asking about Gjovik and her office. US EPA said exposure was under control at the site and failed to mention the inspection or ongoing corrective actions.

585.     On December 26 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank and witness retaliation claim against Apple, citing 18 USC § 1513.[244]

586.     On December 29, 2021, Appleseed messaged one of Gjovik's friends claiming Gjovik was "*perjuring herself.*" On December 30, 2021, Appleseed messaged once of Gjovik's friends saying Appleseed was "*one of Apple's witnesses against [Gjovik]*".

587.     On December 31 2021, someone began making problematic edits to Gjovik's Wikipedia article that had been created only the day prior. The edits included specific harassment Gjovik had received from Appleseed and Gjovik quickly realized the account was

---

[243] Note: In September 2022, Apple was caught funding an "astroturf lobbying group" that acted as if it was independent but was influenced by Apple and made statements in support of Apple's interests, even including amicus briefs. https://gizmodo.com/apple-lobby-app-developers-1849554671 https://twitter.com/ashleygjovik/status/1696344092265845100
[244] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434820337166786563

Appleseed operating under an alias of "SquareInARoundHole" which is a reference to a famous Apple commercial. Appleseed would deny it was her and even claim Gjovik's complaints about Appleseed's harassment were harassing Appleseed. In November 2022, Wikipedia administrators confirmed SquareInARoundHole was indeed Appleseed and she was banned.

588.    On January 9 2022, Gjovik posted a Twitter thread summarizing what happened with Apple. Gjovik reflected: "*In July [2021], I was like, you know, it seems weird that you're doing RICO shit to me like witness intimidation about this office… Is this your normal MO or is it because apparently the CEO of the corp that dumped those chemicals is now on the Apple board of directors? Maybe also because the person who ran the US EPA reports to Tim cook now? They didn't like any of that. I filed some SEC charges about it. I filed a lot of charges. Then one eventful day, a Russian interrogator from Apple's workplace violence team said hello*"

589.    On or around January 10 2022, Gjovik filed complaints about witness intimidation and witness retaliation to NLRB, US Department of Labor, and California Department of Labor. Gjovik posted on social media it was filed and suggested Apple send cease & desist, and document retention notices to a number of managers and employees including Vyas, Mondello, and Appleseed.[245] Gjovik drafted several legal documents on the matter including a legal brief, image exhibits, and a detailed dossier with the text of all of the accounts and posts Gjovik believed to be Apple, not only quoting the posts in question, but positioning the posts in larger threads/conversations, and preparing summaries of red flags for the accounts (like created only to harass Gjovik). Gjovik also organized the most problematic posts/comments by type of propaganda.

---

[245] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1481760216978837505; https://twitter.com/ashleygjovik/status/1481026531438706689

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

590.    On or around January 10 2022, Appleseed filed an FBI report against Gjovik charging Gjovik with "criminal extortion and blackmail."[246]

591.    Around this time Appleseed filed a false report to the FBI accusing Gjovik of "*criminal extortion and blackmail*" and apparently reported Gjovik to a police department. [247]

592.    On January 11 2022, Gjovik was notified by Twitter that someone reported Gjovik's Twitter posts (complaining of harassment) to German law enforcement.

593.    On January 11 2022, Gjovik posted about her latest NLRB charge:

-    Ashley Gjovik: *Hi @Apple, #Apple, @tim_cook Just to be clear, my Jan 11 #NLRB filing will name the following Apple managers (& ICs as their/your agents), as known participants in this 5 month harassment & defamation campaign against me, in retaliation for PA & filing NLRB charge on Aug 26*

-    Ashley Gjovik: *I recommend you this send the Document Retention notices + some sort of C&D missive to them now. Known Managers: Ricky Mondello, Faye Garfinkle Suspected Mgs: Rob Marini, Brad Reigel Known ICs: [Appleseed], Shantini Vyas, Kev Kitchens, Amanda Harrison Sus ICs: TBD*

-    Ashley Gjovik: *First order of business for the C&D is to tell them to stop reporting me to local and federal law enforcement, and domestic and foreign governments in bad faith, for meritless, retaliatory accusations. (Otherwise this is def how i'm getting the RICO charge, y'all)"*

594.    In January-February of 2022, Apple (including Appleseed) reported a number of Gjovik's social media posts and had the content removed. This included a Scribd document consisting of Apple's workplace surveillance policies, a legal memo Gjovik wrote documenting Apple's witness intimidation and retaliation,[248] and photos of Brad Reigel and Rob Marini. The

---

[246] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik,* 22CIV01704KCX, King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

[247]

[248] DELETED: Ashley Gjovik v Apple Inc; Evidence Report, Link: https://www.scribd.com/document/555822358/Ashley-Gjovik-v-Apple-Inc-Propaganda-

latter two removals were confirmed by Appleseed to be a joint effort between Apple and Appleseed.[249] Gjovik did not know it was Appleseed orchestrating the deletions of her legal filings posted on Scribd until later, but at that time, Gjovik already knew to blame Apple: "*So if a federal witness is complaining to fed law enforcement about witness intimidation & threats by Apple Inc in violation of numerous laws & she's sending gov agencies Scribd links of her filings & evidence & Apple appears to be deleting her evidence OBSTRUCTION OF JUSTICE?*"

595.    In January 2022, Gjovik contacted a VICE reporter Lorenzo Franceschi-Biccierai. Gjovik told him that she just discovered an article he wrote about Apple in July 2021 about "Apple IP leakers" spying on Apple employees for Apple,[250] and that she thought Apple was doing something similar with current labor organizing. Gjovik complained to Lorenzo that Appleseed worked for Global Security and one of the few other named persons involved in Appleseed's supposed employee union organizing was a known "IP leaker" named "StellaFudge."

596.    Appleseed apparently asked StellaFudge to set up a Discord chat service where Apple employees could go to strategize organizing and unions at Apple. StellaFudge had previously "leaked" prototypes and other information that the VICE articles had said would be forgiven by Apple if the person then becomes a spy for Apple against Apple's employees. While hosting this labor organizing Discord server, StellaFudge continued to "leak" new IP, including prototype hardware.

597.    Under information and belief Apple has been spying on the labor and union organizing of its employees in the Discord server via access granted by StellaFudge.  Under

Campaign-Final-v1; Ashley Gjovik v Apple Inc; Evidence Report, Link: https://www.scribd.com/document/557503681/Gjovik-v-Apple-Intimidation-Campaign-Evidence-Report
[249] See, email from Appleseed to Gjovik on February 5 2022.
[250] VICE, *Apple Tells Leaker to Snitch on Sources or It Will Report Them to the Police*, July 2021, https://www.vice.com/en/article/dyv5bm/apple-tells-leaker-to-snitch-on-sources-or-it-will-report-them-to-the-police

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

information Gjovik's messages to Lorenzo about this were seen or known about by Apple, and Gjovik's discovery about this was one of the reasons Apple swiftly obtained a gag order against Gjovik.

598.    On January 25 2022, Gjovik emailed the NLRB about her January 10 2022 witness intimidation charge and attached a 77-page rough draft of the Evidence Report.



but the working draft of my memo for the latest charge
to skim it before we chat. I'm targeting to have a final

*Exhibit: Gjovik Notifies NLRB of Incoming Witness Intimidation Allegations & Report*

U.S. NATIONAL LABOR REVIEW BOARD
COMPLAINT AGAINST APPLE INC. | HARASSMENT DRAFT V1
CHARGE CA-288816

**Sept 1 8:27pm – Public Twitter.com Post**[46]

- **Shantini Vyas**: Okay at the risk of *gestures wildly at Twitter*. Apple is a big company. It's got some problems. But it's a great place to work for a lot of people. A certain employee has made it their mission to bring down Apple through whatever means necessary. Including straight LIES.
  - **Shantini Vyas**: This is about a person whose name starts with "A."
  - **Shantini Vyas**: Did they suffer abuse? Not my place to speculate. However, they have lied about actions Apple has taken. They have misled people by leaving out key details. They find new angles to make all of the Apple out to be the Big Bad Guy. The goalposts move hourly.
  - **Shantini Vyas**: They say things like: Apple violated my private by accessing my data. Full picture: Apple accessed data from an Apple-owned prototype device that comes with no expectation of privacy.
  - **Shantini Vyas**: This person has taken the spotlight for themselves and deliberately undermined others' concerted efforts to improve and challenge the company. Through their actions this person contributes to an insidious narrative: that women make things up and are trying to get attention.
  - **Shantini Vyas**: This is so damaging to other women. To those afraid to speak up. By creating bogus, unsubstantiated filings with the DOJ and other regulatory bodies, this person has just endangered the future cases of people with legitimate claims.
  - **Shantini Vyas**: This person has a lot of support. They've gained it by taking advantage of the anger and frustration of other people. It's predatory. They weaponize their

*Exhibit: Example Page from 1/25/22 Draft of Report*

599.    On January 31 2022, Gjovik posted on Twitter that she planned to submit her legal filings about the witness intimidation to the US Department of Justice, in addition to the whistleblower and labor agencies. Gjovik commented that Apple's actions were "criminal."[251]

600.    On January 31 2022, Appleseed sued Gjovik in a Washington state court requesting an anti-harassment restraining order.[252] Appleseed cited Gjovik's Evidence Report and January 10 2022, NLRB charge against Apple on her petition, writing under other pending litigation: "*NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik.*" Appleseed repeatedly mentioned Gjovik's federal legal filing about the witness intimidation.

---

[251] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1488305820496322560
[252] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

601.    After filing the retaliatory lawsuit against Gjovik on January 31 2021, Appleseed then posted on her Twitter account several hours later, a photo of an Apple Global Security 'challenge coin.'



*Exhibit: Posted by Appleseed on Jan 31 2022*

602.    Between February 3 - February 9 2022, Gjovik submitted the final draft (ending at version 9) of her legal memo and evidence report (the "Evidence Report") to the government agencies looking into her complaints.

From    🔒 Ashley Gjovik <ashleymgjovik@protonmai... ☆ 🟥 📎 Feb 3, 2022

To    Kilpatrick, Elizabeth <Elizabeth.Kilpatrick@nlrb.gov>    ⌃

Thursday, February 3rd, 2022 at 4:36 AM

✉   🗑   ⤵   🏷   🔻   ⋯      ↰   ↰   ↱

Hi Elizabeth! Sorry for the delay; I finally wrapped up my evidence report for my most recent NLRB charge, the harassment & propaganda campaign. Attached! I sent it over to Mathew just now too.

This campaign definitely made me want to give up on just about everything (which I assume was the intent), and I didn't even notice at the time how often they were hinting at assassination or other physical violence. Realizing it was Apple making that severed head reference definitely will be a topic for therapy this week.

I talked to Mathew about precedent last week, but I assume the 2020 Barstool Sports and 2021 Tesla & The Federalist cases will probably be strong precedent for unfair labor practices via Twitter.

*Exhibit: Gjovik Submits Final Evidence Report to NLRB*

263

> Case 2:22-cv-00807-RAJ-BAT Document 15-9 Filed 06/23/22 Page 1 of 327
>
> Ashley M. Gjovik
> Juris Doctor Candidate & Public International Law Certificate Candidate
> Santa Clara University, Class of 2022
>
> For Submission To:
> • U.S. NLRB: Region 32 & Office of General Counsel
> • U.S. Department of Labor: Whistleblower Protection Program
> • U.S. Attorney's Office: Northern District of California
> • California DOJ: Office of the Attorney General
> • California Department of Labor: DIR Labor Commissioner
>
> Case No.:
> U.S. Dept of Labor: 9-3290-22-051
> U.S. NLRB: 32-CA- 282142, 283161,
> 284428 & 284441, & 288816
> U.S. EEOC 556-2021-00608
> U.S. SEC: 16304-612-987-465 & 16353-
> 506-600-213
> CA Dept of Labor: RCI-CM-842830
>
> MS. ASHLEY GJOVIK
>
> Complainant,
>
> v.
>
> APPLE INC., et al.,
>
> Respondent.
>
> LEGAL MEMO
> Date Action filed: February 7, 2022
>
> Charges:
> National Labor Relations Act §8(a)(1)
> National Labor Relations Act §8(a)(4)
> CERCLA, 42 U.S.C. §9610
> SOX 18 U.S.C.A. §1514A
> OSHA §11(c) 29 U.S.C. §660
> 18 U.S.C. §1512(a),(b),(c),(d)
> 18 U.S.C. §1505
> 18 U.S.C. 1513
> 18 U.S.C. §371
> 18 U.S.C. §876
> Dodd-Frank 15 U.S.C. §78u-6(h)(1)(A)(iii)
> Racketeer Influenced & Corrupt
> Organizations Act
> Civil Rights Act Title VII, 42 U.S.C. §2000e
> CA Labor Code §232.5, §6310, §1102.5,
> §6399, & §132(a)

*Exhibit: Gjovik's Final "Evidence Report" Cover Page*

603.　The document included hundreds of pages of direct quotes of public statements and direct messages sent by named people, and anonymous accounts Gjovik was nearly certain were Apple, organized by type of propaganda, and then by date. Appleseed (who's harassment was captured in the report, linked to her official Twitter account) would soon sue Gjovik alleging the Evidence Report was criminal harassment, among other crimes supposedly committed against her by Gjovik.

# ASHLEY GJOVIK V APPLE INC
### INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

## TABLE OF CONTENTS

HARASSMENT CAMPAIGN EVIDENCE REPORT.................................................................................1

CHARGES..........................................................................................................................................5

   ASSOCIATED CHARGES & CASES:............................................................................................5

SUMMARY........................................................................................................................................5

REVIEW METHODOLOGY.................................................................................................................9

UNLAWFUL THREATS MADE BY APPLE INC...................................................................................10

   THREATS OF VIOLENCE.............................................................................................................10
   THREATS OF TERMINATION & RETALIATION...........................................................................12
   THREATS OF BLACKLISTING; RUINING LEGAL CAREER.............................................................14
   THREATS AGAINST FRIENDS & COLLEAGUES............................................................................17

APPLE INC'S RETALIATORY ANIMUS...............................................................................................18

   FORBIDDEN ANIMUS................................................................................................................18

APPLE INC'S LAWFARE...................................................................................................................20

   LAWFARE: THREATS OF LITIGATION; PROSECUTION; BANKRUPTCY; "RUIN"...........................20
   LAWFARE: COERCION TO WITHDRAW
   CHARGES & COMPLAINTS.........................................................................................................23
   LAWFARE: DOUBT; DISINFORMATION; FALSE ACCUSATIONS....................................................27

ANTI-UNION & ANTI-LABOR THREATS & COERCION......................................................................32

DISCRIMINATION DUE TO SEX &/OR DISABILITY..........................................................................33

EVIDENCE OF PROPAGANDA BY TYPE............................................................................................37

   THE BIG LIE (GROSSE LÜGE) + AD NAUSEAM & RATIONALIZATION............................................37
   DIVIDE & RULE; BLACK/WHITE FALLACY; FACTIONS.................................................................42
   VIRTUE WORDS; APPEAL TO PREJUDICE; TRANSFER; MORAL PANIC; FEAR-MONGERING..........44
   CULT OF PERSONALITY; DEMAGOGUE; APPEAL TO AUTHORITY................................................47
   BANDWAGON & INEVITABLE VICTORY.....................................................................................48
   SPIN; AGENDA SETTING; BURY BAD NEWS..............................................................................49
   FALSE FLAG OPERATION & REVERSE FALSE-FLAG....................................................................52
   AD HOMINEM ATTACKS; SMEARS; CHARACTER ASSASSINATION, FALSE ACCUSATIONS.............55
   RED HERRING; WHATABOUTISM; STRAWMAN; MINIMIZATION; CHERRY-PICKING.....................59
   DEMORALIZATION; GASLIGHTING; PROPAGANDA OF DESPAIR...................................................62

EVIDENCE (CHRONOLOGICAL)........................................................................................................63

   LEGEND...................................................................................................................................63
   AUGUST 2021...........................................................................................................................64

### ASHLEY M. GJOVIK
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University

*Exhibit: Gjovik's Final Evidence Report – Table of Contents 1*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Case 2:22-cv-00807-RAJ-BAT   Document 15-9   Filed 06/23/22   Page 4 of 327

## ASHLEY GJOVIK V APPLE INC
### INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

SEPTEMBER 2021 ............................................................................. 98
OCTOBER 2021 ................................................................................. 174
NOVEMBER 2021 .............................................................................. 196
DECEMBER 2021 .............................................................................. 208
JANUARY 2021 ................................................................................. 235
FEBRUARY 2021 ............................................................................... 271

APPENDIX I: CAST OF CHARACTERS (PARTIES) ................................. 298

EMPLOYER (MANAGERS/SUPERVISORS) ............................................ 298
EMPLOYEES ACTING AT DIRECTION OF APPLE INC ............................ 300
AGENTS ACTING AT DIRECTION OF APPLE INC ................................. 306
APPLE INC AGENTS FOR PROPAGANDA ............................................ 307

APPENDIX II: RETALIATORY MEMES .................................................. 323

APPENDIX III: BABY HUMMINGBIRD ................................................. 326

*Exhibit: Gjovik's Final Evidence Report – Table of Contents 2*

604.    Gjovik's Evidence Report includes an introduction to the "Evidence of Propaganda by Type" section where she discussed Tom Moyer. Gjovik wrote, *"Apple's Head of Global Security & Crisis Management, Thomas Moyer, spent four years as an U.S. Navy Intelligence Specialist from 1988 to 1992, including the Cold War & Operation Desert Strom…Moyer then obtained a Bachelor degree in "Rhetoric."*

Case 2:22-cv-00807-RAJ-BAT   Document 15-9   Filed 06/23/22   Page 37 of 327

## ASHLEY GJOVIK V APPLE INC
### INTIMIDATION, THREATS, & OBSTRUCTION | EVIDENCE REPORT

## EVIDENCE OF PROPAGANDA BY TYPE

Apple's Head of Global Security & Crisis Management, Thomas Moyer, spent four years as an U.S. Navy Intelligence Specialist from 1988 to 1992, including the Cold War & Operation Desert Strom.[232] The U.S. Navy describes the role of "Intelligence Specialist" as collecting intel on everything from data on foreign cultures to enemy movements to current weather forecasts; then, using it to create cohesive intelligence briefings for high-ranking Navy officials.[233]

Moyer then obtained a Bachelor degree in "Rhetoric," followed by a Juris Doctorate. Berkley describes their Rhetoric program as *"Through its emphasis on the history and theory of rhetoric, the department provides an understanding of the format of contemporary theories of argument and interpretation as well as an opportunity, within this framework, to explore the role of persuasion in pragmatic and aesthetic contexts."*[234]

### THE BIG LIE (*GROßE LÜGE*) + AD NAUSEAM & RATIONALIZATION

*The Big Lie: a gross distortion or misrepresentation of the truth. The repeated articulation of a complex of events that justify subsequent action. The descriptions of these events have elements of truth, and the "big lie" generalizations merge and eventually supplant the public's accurate perception of the underlying events. The German expression was coined by Adolf Hitler, when he dictated his 1925 book*

*Exhibit: Evidence Report – Propaganda Introduction*

605.   February 2 2022, Appleseed posted on Twitter that *"[She has] never sued anyone, nor been part of a lawsuit."* Appleseed had just sued Gjovik three days prior. Assumably Appleseed viewed her lawsuit against Gjovik as being filed by Apple against Gjovik, and she simply initiated the proceedings for Apple / at Apple's request.

606.   Gjovik had informed the California EDD of the circumstances she was terminated under, and that Apple never provided her the exact reasons for her termination. Gjovik informed the EDD of her government cases against Apple and of the general public opinion that her termination was retaliatory. However, on February 4, 2022, Gjovik received a Notice of Determination from California EDD denying her Unemployment Insurance, citing disqualification under § 1256, explaining that she will not receive benefits because Apple alleges, they terminated her due to misconduct as she *"broke a reasonable employer rule."* Gjovik appealed. Upon receipt of the case history, Gjovik saw her interview with the EDD agency was never recorded, and EDD instead falsely claimed Gjovik never responded.

607.   Under information and belief, EDD deleted the record of the call, or never made a record in the first place, conspiring with Apple against Gjovik.

608.   Appleseed sent Gjovik a lengthy email on February 5, 2022 (over 3,000 words) making false accusations against Gjovik, unlawful demands of Gjovik, threats against Gjovik and demanded Gjovik withdraw allegations and evidence about Appleseed from Gjovik's federal charges against Apple (charges about obstruction of justice & witness tampering). Appleseed in great hostility told Gjovik she believed one of Gjovik's SEC Whistleblower filings: *"contained absolutely no material information for shareholders."* Appleseed informed Gjovik she reported Gjovik to the FBI, and also told Gjovik that she reported Gjovik to Apple for Gjovik

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

complaining that Apple was trying to make her kill herself, and that Apple could have Gjovik

assassinated, which Appleseed complained was "*extremely harmful*" to her and Apple.



*Exhibit: Appleseed's 2/5/2022 Email*

609.     On February 5 2022, Appleseed posted on Twitter claiming the NLRB accused

Gjovik of extortion and told Appleseed to report Gjovik to the FBI (which she also testified at

the ex parte hearing on January 31 2022, and which the NLRB fervently denied) and Appleseed

later blamed on an illegal drug relapse. In Appleseed's posts she mentions Gjovik is a federal

witness. Appleseed then claimed "*multiple people*" were reporting Gjovik to Gjovik's law

school at Santa Clara University and claimed "*the authorities had to get involved*" with Gjovik.

> In my conversation with the federal agency about what occurred, and to avoid disparagement and defamation, I told them matter-of-factly what happened and they recommended I report this person to the FBI for extortion.
>
> Being a witness does not give you a license to abuse.
>
> 11:57 AM · Feb 5, 2022 · Twitter Web App

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Appleseed's February 5 2022 Twitter Post about NLRB*

Multiple people reported this person for their behavior to their University as far as I know, and the agencies currently involved do not know what to do as they've never had this happen in nearly 100 years. It's disturbing that the authorities have to get involved.

12:01 PM · Feb 5, 2022 · Twitter Web App

*Appleseed's February 5 2022 Post about SCU*

610.    Gjovik refused to withdraw any federal charge, allegations, or evidence – and protested on Twitter that Appleseed was contacting her again despite Gjovik's repeated request Appleseed cease all communication with her.

611.    On February 7 2022, Appleseed posted on Twitter that she understood her lawsuit was meritless, saying "*the current procedure for getting aid in this requires that the abuser has published 'non-protected' information, such as medical or other private information, and ignores the intent and impact of repeated malicious harassment.*" On February 11 2022, she added the lower court judge explained to her the supposed "*harassment was protected speech.*" On February 12 2022, she added "*I was denied a Temp anti-harassment order (which I expected due to the physical distance).*"

612.    Joanna Appleseed, on behalf of Apple Inc tried numerous times (including January 7th - 8th 2022 and February 5th, 2022) to coerce Gjovik to withdraw, retract, or otherwise stop a Wikipedia Arbitration Committee investigation into an account harassing Gjovik via Gjovik's Wikipedia article and which Gjovik alleged to be Appleseed or someone on Apple or Appleseed's behalf, but either way acting at the direction of Apple to smear and intimidate Gjovik. Wikipedia banned Gjovik and refused to tell her why, but later admitted 'because she filed an NLRB charge against Apple.'

269

### xvii.   Gag Orders & Missing" Documents" (February-March 2022)

613.   On February 8 2022, Gjovik asked the US EPA FOIA team assigned to her Apple/825 Stewart Drive FOIA requests, if anyone was investigating her 2021 complaints about 825 Stewart Drive. The lawyers who report under Andrew Helmlinger claimed that California EPA was investigating the federal Superfund site. Gjovik complained that made no sense but the lawyers would not clarify further.

614.   It was the US EPA who was investigating. These lawyers who directly misled Gjovik reported to Helmlinger, who is married to an Orrick, Herrington, & Sutcliffe Partner, Robyn Helmlinger. (by now Orrick, via Jessica Perry, was already retained by Apple to defend Apple on Gjovik's US Department of Labor case).

615.   On February 9 2022, Gjovik sent slightly revised versions of her witness intimidation reports to the NLRB, noting the differences. For Example:

Legal memo (mostly the same, I think the biggest change was adding Apple's comments about violent anal sex)
https://www.scribd.com/document/557375216/Gjovik-v-Apple-intimidation-Campaign-Legal-Memo

-Ashley

*Exhibit: February 9 2022 Updates for NLRB*

Gjovik also testified to the NLRB on February 10 2022.

616.   On February 11 2022, another fake Twitter account, FirstnameBunchofnumbers (@FirstNa47437596) began harassing Gjovik about Gjovik's charges against Apple and Appleseed's lawsuit against Gjovik. The account posted a variety of attacks over a week or so, including:

> p.   *Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.  [Photo of young girl at computer*

*drinking soda and smiling mischievously] link:*
*https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines*

q. *If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law.*

r. *Cyberbullying is NOT Whistleblowing. In fact, neither is reporting the company to itself. That's called internal complaining, and you don't get accolades for it.*

s. *honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*

t. *You should probably get a clue that if Twitter doesn't even care about the alleged "wrongs" perpetrated against you that a court of law probably isn't going to either.*

617. Gjovik was served for Appleseed's lawsuit around noon on February 14 2022, for a February 15 2022 court date. On February 15, 2022, Appleseed submitted a statement to the Washington state courts saying she complained about Gjovik to the FBI and also to the Chief Security Officer of the National Labor Relations Board, the previous Chief of Physical Security at The White House and a Security Manager at the Department of Defense.[253]

618. In the February 15, 2022, testimony Appleseed also claimed, without any evidence to support prima facie elements of the charges, that Gjovik committed "*criminal cyber-harassment, blackmail, and extortion.*"

619. Gjovik contacted Bud Porter at the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on February 21 2022, and December 15 2022.

620. Porter said it is generally up to the government agencies to refer cases to the District Attorney's office for prosecution, so Gjovik would need US NLRB, US EPA, or US Department of Labor to refer the case. Gjovik asked the agencies for DOJ referral repeatedly,

---

[253] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

but they ignored her and some of them kept intimidating her themselves (i.e., US Department of Labor). Gjovik complained to Porter that the agencies were "*complicit in the cover-up.*"

621.    On February 22 2022, Appleseed posted on Twitter that Apple employees *"in [Apple] Global Security inform [her] when they see anything in reference to [her], or what reasonable seems like it is referencing [her]."*

> How do I know? Well, for one thing, some of them are cited in various documents they've collected, and some quiet whistleblowers in Global Security inform me when they see anything in reference to me, or what reasonably seems like it is referencing me.
>
> 3:27 PM · Feb 22, 2022

*Exhibit: Global Security 'whistleblowers'*

622.    Appleseed admitted she was in friendly contact with Apple Global Security at least through February 2022, even after quitting in November 2021. Appleseed is clearly part of the Worldwide Loyalty enterprise, even after she left employment at Apple.

623.    Under information and belief, Apple Global Security was surveilling Gjovik's public comments and attempting to incite Appleseed to threaten, intimidate, and coerce Gjovik by using Gjovik's comments to provoke or frighten Appleseed, and conspiring with Appleseed about how Appleseed would then threaten, intimidate, and coerce Gjovik and directing or guiding her actions towards Apple's interests.

624.    On March 1 2022, a Washington state Judge in a court of Limited Jurisdiction ruled and granted the restraining order against Gjovik and demanded Gjovik not speak or write, publicly or privately, about the ex-Global Security employee, Gjovik's Apple cases (where they complain of threats and harassment from Appleseed or Appleseed's associates), or anything else

related to that employee for five years (until 2027) with the single exception of "*testifying*" to the government.[254]

625.    Gjovik would eventually win the appeal, but it took until September 2022 and was not fully dismissed until January 2023.[255]

626.    During the March 1 2022 hearing Gjovik complained repeatedly about witness intimidation and witness retaliation in her legal filings and her testimony.

627.    On March 3 2022, some law firm requested a copy of the Appleseed lawsuit decision against Gjovik. Under information and belief, this was Apple's lawyers requesting a copy, and Apple's lawyers were aware of the lawsuit, if they did not orchestrate it themselves.

628.    Under information and belief, Apple did orchestrate this lawsuit against Gjovik.

629.    On March 4 2022, Apple's Position Statement claims Gjovik never admitted she spoke publicly about the Gobbler app and that Apple received a complaint from an Apple employee (Appleseed) on September 15 2021 where Appleseed gave Apple her private texts with Gjovik and filed a Business Conduct complaint against Gjovik. Apple's Position Statement failed to mention Gjovik spoke publicly about Gobbler starting in August 2021 and the images shared were of Gjovik's recognizable face, so there was no 'gotcha.'

630.    The March 4 2022 Position Statement did make clear that Apple was manipulating Appleseed to attack Gjovik, and Appleseed (who was making a large amount of money off of the image of being a 'labor leader') absolutely did not want it to ever come out that she filed a complaint against Gjovik to help Apple fabricate a paper-trail to justify Gjovik's

---

[254] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

[255] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

273

retaliatory termination. However, it was now literally illegal for Gjovik to tell anyone about what she discovered.

### xviii.   Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be Sent to Jail if She Defends Herself (March 2022)

631.   On March 3 2022, Jessica Perry for Orrick representing Apple, submitted Apple's position statement to US Department of Labor in response to Gjovik's claims of whistleblower retaliation under SOX, CERCLA, and the OSH Act. Apple's response was misleading, fraudulent, harassing, and attempted to obstruct justice. Apple not only failed to mention anything about the August 2021 US EPA inspection of Gjovik's office, but Apple claimed that the last that was heard from EPA was in July 2021 and that Gjovik was being 'unreasonable' about her concerns. Orrick's letter also falsely claimed Gjovik 'wanted to be on leave' and referenced a non-existent email they claim documented Gjovik asking for leave, or referenced an email where Gjovik said she did not want to be on leave but Orrick claimed the opposite. On March 4 2022, Gjovik was provided a copy of Apple's position statement.



**orrick**

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

**orrick.com**

March 4, 2022

<u>**VIA ELECTRONIC MAIL**</u>

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

**Jessica R. Perry**

E   jperry@orrick.com
D   +1 650 614 7350
F   +1 650 614 7401

Re:   <u>*Ashley Gjovik v. Apple Inc.*</u>, Case No. 9-3290-22-051

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

**I.    INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

4161-3255-5828

275

orrick

Andrea Diangco
March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by ***intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press***, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## II.   FACTUAL BACKGROUND

### A.   Apple Prohibits Discrimination, Harassment, and Retaliation.

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

### B.   Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was

1
2
3

orrick

4    Andrea Diangco
5    March 4, 2022
     Page 3
6
7    promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the
     termination of her employment on September 10, 2021.[2]

8    Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's
9    confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property
     Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or
10   after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any
     Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties
11   as an Apple employee." "Proprietary Information" includes, inter alia, non-public "materials or information
     relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of
12   Apple's rules and policies regarding proprietary information" and understood that breach of the agreement
     could result in termination of her employment. Additionally, the importance of protecting Apple's confidential
13   pre-release product information is clearly set out in the company's Business Conduct Policy: "One of
     [Apple's] greatest assets is information about [its] products and services, including future product offerings."
14   To safeguard information about Apple's products, employees are prohibited from disclosing confidential
     information without prior approval of management.

15   As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret
16   information about unreleased products and features under development, which was shared internally only
     with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to
17   participate in new product or feature user studies and to test unreleased prototypes. On each occasion,
     Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional
18   confidentiality obligations that prohibited her from disclosing any information about the existence of the
     study or her participation in it.
19
20   In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called
     "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple
21   required all participants— as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed
     the Alpha Study Consent Form and expressly acknowledged that any information about the study, including
22   her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to
     third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the
23   Study, including any Study details or the fact of your participation, are considered Apple Confidential
     Information, and are covered by the obligations under your agreements with Apple.").
24

25   [2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time
26   while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

     [3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from
27   further unauthorized disclosure.

28

     4161-3255-5828

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

orrick

Andrea Diangco
March 4, 2022
Page 4

**C.**  **Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

orrick

Andrea Diangco
March 4, 2022
Page 5

**D.** **Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.** **Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, **Ms. Gjovik admitted to disclosing confidential information** about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.** **Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.** **Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.

4161-3255-5828

orrick

Andrea Diangco
March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- **March 22, 2021**: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- **April 2, 2021**: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- **April 9, 2021**: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."

4161-3255-5828

orrick

Andrea Diangco
March 4, 2022
Page 7

- **April 11, 2021**: Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- **April 27, 2021**: Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- **May 17, 2021**: Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- **May 18, 2021**: Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- **June 10, 2021**: Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- **July 2, 2021**: ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- **July 7, 2021**: Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

orrick

Andrea Diangco
March 4, 2022
Page 8

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

> 2. **Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.**

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

> 3. **Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.**

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).

4161-3255-5828

Andrea Diangco
March 4, 2022
Page 9

I want to confirm our conversation a few minutes ago. **Per your request, you are now on paid administrative leave so as to not interact with your managers**.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

**III.    ARGUMENT**

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.

orrick

Andrea Diangco
March 4, 2022
Page 10

### A. Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The **only** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.

4161-3255-5828

---

284

orrick

Andrea Diangco
March 4, 2022
Page 11

### B. Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

orrick

Andrea Diangco
March 4, 2022
Page 12

### C. Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant*, 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.*, 402 F. App'x 936 (5th Cir. 2010); *Williams*, 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

### D. Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that **"[p]er your request, you are now on paid administrative leave"**—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced*, 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.

286

orrick

Andrea Diangco
March 4, 2022
Page 13

IV.   **CONCLUSION**

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By: _____
Jessica R. Perry

*Exhibit: Apple's US DOL Position Statement, March 2022*

632.   On March 18 and 24 2022, Appleseed edited Gjovik's Wikipedia article to say there were no vapor intrusion issues at Gjovik's office and added a quote from Apple defending Apple's employment practices.

633.   On April 5 2022, the law firm MWE requested copies of the transcripts of Appleseed's lawsuit against Gjovik.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: Same Law Firm (MWE) Hired for Gjovik's NLRB Case, Requests Litigation Transcripts*

634. On April 7 2022, Gjovik asked US EPA for an update on the 825 Stewart Drive site.

635. In April 2022, New York Post suddenly published a defamatory, harassing, traumatizing article about Appleseed suing Gjovik. AppleInsider then wrote an equally inflammatory and traumatizing article about the New York Post article. An Apple marketing executive with a large following then shared the article ridiculing Gjovik. Both New York Post and Apple Insider refused to correct or retract, or even update, the articles after Gjovik won the appeal of Appleseed's gag order. Under information and belief Apple was behind these articles & their stickiness on the top of Gjovik's internet search results.

636. On April 15 2022, Northrop Grumman submitted a report about the sub-slab ventilation vents on the roof saying Apple installed their HVAC "*without consideration of the*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*vents or their function.*" Northrop Grumman wrote that the vents were in an "*assumed sphere of influence of the HVAC intakes.*"

637.    On April 17, 2022, a Telegraph profile was published about Gjovik titled "*Apple whistleblower Ashley Gjøvik:* '*My life is a goddamn nightmare now*", and the reporter posted the article on Twitter. Appleseed and her friends then quickly replied to the post and 'quote-tweeted' the post making allegations against Gjovik, and making derogatory statements about Gjovik, and harassing the reporter for writing about Gjovik.[256] After Appleseed's protest, The Telegraph changed the subtitle of the article about Gjovik from something positive to saying that what happened to Gjovik was the "*consequences of her actions.*" If Gjovik complained, Appleseed could try to have Gjovik incarcerated.

638.    In May 2022, Gjovik managed to still graduate law school. She graduated in the top 20% of her class and received her certificate in Public International Law with honors. In order to complete law school at Santa Clara Law, Gjovik had to remain in Santa Clara County (in order to attend in person) even after she was terminated and until graduation. The cost of living in the area is extremely expensive and with no income, she was unable to find a new job, and Gjovik quickly lost most of her life savings through rent and cost of living expenses.

### xix.    Gjovik Discovers the August 19 2021 Inspection (May 2022)

639.    On May 12 2022, Gjovik noticed a new document on the TRW Microwave EPA webpage. It was the annual groundwater monitoring report, but deep in the middle of the long report, there was an appendix related to the roof that mentioned an US EPA inspection of the site on August 19 2021. Gjovik them emailed the EPA site team asking about it.

640.    On May 12 2022, Gjovik complained to the EPA FOIA lawyers, who still had not released a single document, that they were hiding the inspection from her.

---

[256] Twitter, Lucy Burton, https://twitter.com/Lucymburton/status/1515641563350712323

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

I assume in the five months you've been working on this, you already knew all this and you've kept this information away from me. For instance, the Aug 19 site visit emails with the EPA informing Apple & Northrop they were going to do a site inspection (assumably based on my whistleblower disclosures). I wonder if there's any coincidence that I'm a CERCLA whistleblower with a case against Apple, & reporting to the CEO of Apple is your old boss Lisa Jackson, meanwhile the US EPA appears to be hiding critical information from me in an apparent attempt to run out the clock the my cases against Apple. Please let me know if y'all are ready to do your jobs or if I should pursue and Inspector General complaint against y'all over this. Please send me the August 19 2021 site visit emails ASAP. I'm sure you're well aware those documents could make or break my CERCLA case."

641.    There were three highly suspicious "call-drops" during phone calls over a period of ten days in 2022. The first drop occurred May 16 at 6:29pm PST while Gjovik was on the phone with an attorney in the state of Washington. The call dropped just as the lawyer was about to share information about the business associations of the local judge who had just ruled against Gjovik.

642.    On May 20 2022, the US EPA sent a letter to Northrop Grumman about 825 Stewart Drive, instruction that: "EPA requires that one round of indoor air samples be collected... under current conditions."[257] The letter included an attached memo from the US EPA's Quality Assurance branch instruction Northrop Grumman (and Apple) that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been*

---

[257] US EPA, Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation, *825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site* (CERCLIS ID# CAD009159088) (May 20 2022), https://semspub.epa.gov/work/09/100029487.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*modified in a manner that could compromise the system; evaluation of changes to building use,*" in addition to also inspection roof components.[258]

643.     The May 20 2022 letter also included a second attachment written by a third-party expert hired by US EPA to consult on the vapor intrusion control systems at 825 Stewart Drive. The memo warned that Apple's tampering with the sub-slab vent system on the roof and placement of the HVAC intake next to the shortened vents "*may result in concentrated effluents …to re-entrain into the building through intakes on the roof.*"[259]

644.     The second drop occurred May 24 at 2:03pm during a call with a friend who lives and is located in Canada, and during this "drop" both experienced an outage of their entire internet connection and had to reboot routers in order restore the connection. The second drop occurred just as this friend was recommending an app that Gjovik could use to monitor her internet for hacking. [Gjovik got the name of the app from him after, and the app did show Gjovik's internet was being hacked]. The third drop occurred May 26 at 1:59pm while Gjovik was on the phone with the Santa Clara District Attorney's office reporting unlawful conduct by Apple. The third drop occurred just as an intake attorney at the Santa Clara District Attorney's office said something to Gjovik like "I see if I can help you."

645.     On May 27 2022, the US EPA sent Gjovik a copy of the October 7 2021 report of the August 19 2021 inspection.

646.     On May 28 2022, Gjovik discovered hacking on her network.

---

[258] US EPA, Passive Sub Slab Depressurization (SSD) System Operation and Maintenance Plan (Document Control Number [DCN] FY22SEMD _ 161) and Evaluation of Passive SSD System, Former TRW Microwave Site, Sunnyvale, California (April 25 2022), https://semspub.epa.gov/work/09/100029487.pdf
[259] APTIM, Technical Review of Proposed Modification to a Passive Vapor Intrusion Mitigation System Installed at the Former TRW Site, Sunnyvale, CA (May 20 2022)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

647.     On May 29 2022, Gjovik discovered one of the items Apple mailed her from desk was emitting RF and EMF signals. Gjovik posted about it on Twitter.[260]



*Exhibits: The Bugged Statue*

648.     On May 30 2022, Gjovik contacted the FBI to report hacking and the bugged object. The FBI agent she talked to advised Gjovik to give the object to the local police.[261]

649.     Several hours later Gjovik heard someone trying to break into her apartment through the front door. Gjovik posted on Twitter about it, blaming Apple.[262]

---

[260] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1530764537611288576 ; https://twitter.com/ashleygjovik/status/1530775382626025474

[261] Bugged items in violations of Cal. Penal Code [§§ 631, 632, 632.5, 632.6, 632.7] and US Code Title 18 [§§ 2511(1)(a), (c), (d); 2701-2712].

[262] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1531176997803679744 ; https://twitter.com/ashleygjovik/status/1531177000831959042

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Ashley M. Gjøvik, J.D.
@ashleygjovik

📱 Contacted @FBI at 8:35pm (20:35) tonight about the statue/EMF, call drops, network attacks

Asked the FBI to take & analyze the statue for spycraft

Abt 20min ago I heard noises in my living room, like someone messing with the locks on my front door. Dog went nuts (good dog)

Ashley M. Gjøvik, J.D. @ashleygjovik · May 29
Thank you to everyone who reached out last night with advice on how to deal with this. I captured photos & videos of the readings, & backed it up

I sequestered the statue for the weekend

I'm contacting the feds on my Apple cases about it & will insist they ask the DOJ to engage twitter.com/ashleygjovik/s...

Show this thread

3:33 AM · May 30, 2022 · Twitter Web App

*Exhibit: May 30 2022 Break In Attempt*

650.    Gjovik called the Santa Clara city police on May 31, 2022 [re: report 2205310079] to report the listening device Apple planted in her chattel property and the call drops and internet interference that led to her to search her items for bugs. The police took possession of the statue. Gjovik later found her fake fig tree was also producing RF and EMF signals and threw it in the trash and complained on Twitter about it.

651.    On May 31 2022, Lisa Jackson has a private meeting with US EPA administrator Michael Regan.

652.    On June 1 2022, Gjovik asked questions about the HVAC, sub-slab ventilation and ports, and cracked floor at her office. The same day, the US EPA lawyer for the site, Rebecca Reynolds, removed the site team from the email chain with Gjovik and told Gjovik she is only allowed to talk to the lawyer now and cannot talk to the site team.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                           DECEMBER 21 2023

653.    On June 7 2022, Gjovik had her first meeting with SEC's Enforcement team about her Apple charges.

654.    On June 8 2022, Appleseed edited Gjovik's Wikipedia article deleting over 8,000 characters and accusing Gjovik of "libel" based on Gjovik's accusations against Lisa Jackson and Ronald Sugar.

655.    On June 9 2022, Gjovik sued the state of Washington in facial and as-applied constitution challenge over the order against her due to Appleseed's lawsuit and the statute it was issued under. Gjovik said the statutes were unlawfully vague and broad to ever allow a decision like that, and that the entire matter was more witness intimidation. [263]

656.    On June 27 2022 Gjovik received her first FOIA documents from US EPA, over five months after she requested them.

657.    On June 28 2022, the US District Court suddenly dismissed Gjovik's case against the state of Washington. Gjovik filed a motion for reconsideration, and the judge filed a second decision against Gjovik within hours.[264]

658.    On July 12 2022, US EPA complained that Apple was not addressing most of their concerns about Gjovik's office. US EPA also emailed about the high levels of TCE in the outdoor air at Gjovik's office.

659.    On July 14, 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with inaccurate information, so the data about Gjovik's interview must have been destroyed or falsified. Gjovik won her unemployment insurance appeal, and a decision was issued by an Administrative Law Judge stating:

> Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the

---

[263]

[264] *Gjovik v. State*, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022); *Gjovik v. State*, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[265]

660.    On July 20, 2022, Gjovik filed a complaint with the US EPA OIG Hotline about Jackson and others misconduct. Gjovik complained about '*false representation[s] about a material fact," "fraud," "knowingly falsifying or concealing a material fact," "abuse of power,"* and "*improper use of government resources.*" Gjovik noted "*discrepancies between reported facts and supporting documentation*," and "*site inspection different status than what was reported to EPA.*"

661.    On July 21 2022, Lisa Jackson visited the US EPA HQ to have a private meeting with US EPA administer Michael Regan.

662.    On July 27 2022, Gjovik cancelled her California Bar Exam appointment due to the smears and restraining order.

663.    On July 28 2022, Northrop Grumman told the US EPA they are late in responding to US EPA's questions because Apple and CalSTRS stopped responding to them for weeks.

664.    On August 12 2022, Lisa Jackson made Jared Blumenthal (prior head of CalEPA, and head of US EPA Region 9 before that) President of the Waverly Foundation. Was Blumenthal who Jackson tried to nominate for the Region 9 role in November 2021?

---

[265] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

665.    In August 2022, Gjovik discovered Apple had broken into her attic in the fall of 2021 and installed some sort of surveillance equipment. Gjovik complained about this to her landlord, a large real estate company, and she reported it to the FBI and the local police. Gjovik filed a complaint with the FBI on August 8 2022, to report another break-in and about the electronics in her attic. The FBI again advised her to call the police.

666.    Gjovik called the Santa Clara city police on August 9, 2022 [re: report 2208090087] to report Apple breaking into her attic and installing some sort of electronic equipment. After Gjovik reported the attic situation to law enforcement the police said they would come by the next day to create the report. Gjovik left her home to run an errand. When Gjovik returned, the day before the police were to arrive and search her attic, she found two signs that someone had broken into her apartment and entered the attic. First, her dog's belly smelled strongly of cigarettes despite him not leaving the apartment while she was gone and Gjovik not smoking cigarettes. After noticing the odor, Gjovik quickly inspected her closet where the entrance to the attic is and found attic insulation stuff on the floor despite having just vacuumed before she left. Under information and belief, Apple broke into Gjovik's apartment again, this time to retrieve whatever they installed in her attic, before law enforcement arrived.

667.    Gjovik also reported it to her landlord, Prometheus, on August 9 2022. Under information and belief, Apple broke into Gjovik's attic at some point in the fall of 2021 and installed some sort of surveillance equipment and likely intercepted Gjovik's internet.

668.    Around August 2022 Gjovik was finally offered a well paying consulting job, as an expert witness for a law firm. However, when Apple's lawyers found out, they apparently did a number of things that resulted in having Gjovik removed from the matter to respond to Apple threatening to disqualify her. The law firm was going to pay Gjovik close to what Gjovik's Apple salary was, but then after Apple had Gjovik removed ,Gjovik could not find any job for

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

nearly a year, and now even though she finally found a job, she makes around 41% less than what she made at Apple.

669.    Gjovik moved to New York on August 31 2022. Gjovik chose the East Coast primarily to get far away from Apple. Gjovik chose Albany in hope of finding a government job. Despite hundreds of applications and dozens of interviews, Gjovik was never able to find a job in Albany New York. Gjovik had at least two visits from Private Investigators harassing her at her new apartment in New York. One of them showed up as her property was being delivered by the moving company, and the PIs filmed her while peeking into her windows and walking around to see her backyard. The second one showed up after Gjovik had been there for several months, and verbally acknowledged her when she opened her front door to get her mail ("there she is.") All of them saw Gjovik notice them and then exaggerated their lurking as a confirmation. Assumably, ratio wise, there were many other PIs who also visited, but did not want Gjovik to notice them.

670.    Gjovik won her appeal of the gag order against her in November 2022, which was then followed by even more harassment and defamation by Joanna Appleseed. [266]

671.    On September 12 2022, Gjovik asked US DOL for status on her charges. On September 16 2022, US DOL had a call with Gjovik where a department executive, Captain Parra, showed up and intimidated Gjovik to withdraw her charges. Gjovik complained of intimidation and obstruction.

672.    On October 28 22022, the Santa Clara County Department of Environmental Health (SCC DEH), related to an Apple office on a toxic-waste clean-up site, instructed Apple to label its sub-slat vent risers with labels saying "CAUTION VENT RISER DO NOT TAMPER"

---

[266] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

every five feet throughout the building and on the roof. Santa Clara Couty ("SCC") Department of Environmental Health ("DEH") also insisted Apple notify the department if there are any cracks in the floor. SCC DEH also insisted that vent rises be at least 10 feet away from any window/opening/intake and at least 3 feet high on the roof. Gjovik had been giving DEH updates on Apple's sub-slat vent/HVAC and cracked floor situation at 825 Stewart Drive prior. Under information and belief, all of SCC DEH's explicit instructions on this matter were due to Gjovik telling them what happened at 825 Stewart Drive. This building was part of the 'real estate mega deal' that occurred the weekend in May 2021 when Sedgwick suddenly closed Gjovik's' chemical exposure claim.

10' AWAY FROM, OR AT LEAST 3' ABOVE ANY
OPERABLE WINDOW, DOOR, OPENING, OR AIR
INTAKE INTO BUILDING, OR VENT SHAFT. 3' MIN. IN
EVERY DIRECTION FROM ANY LOT LINE, ALLEY AND
STREET.  MIN 3' AT PARAPET WALL.

PLACARDS SPACED
AT 5 FT INTERVALS

CAUTION

VENT RISER DO
NOT TAMPER

10' LOUVERED
MECHANICAL SCREEN -
AS SPECIFIED BY
OTHERS

RAIN CAP

3 FT. MAX

INLINE FAN:
RADON AWAY RP145 OR
EQUIVALENT (TYPICAL)
- APPROX 60 WATT

PRESSURE
MEASUREMENT TUBING

7 FT.
MIN

FAN FAILURE ALARM -
TJERLUND RA1 OR
EQUIVALENT

POWER SUPPLY AND
ELECTRICAL
ENCLOSURE (TBD
BASED ON ELECTRICAL
SPECS)

VENT SUPPORT AS
NEEDED

PIPE FLASHING (TYP)

INTERIOR WALL PER
PLAN (TYP)

PLACARDS SPACED
AT 5 FT INTERVALS

CAUTION

VENT RISER DO
NOT TAMPER

TERIOR ROUTING PLAN
O BE DETERMINED. 90-
EGREE ELBOWS AND
ATERAL LENGTHS TO BE
INIMIZED.

4-IN DIA CAST IRON NO
HUB COUPLING VENT
RISER

*From SCC DEH's documents for Apple's Office at Pathline Park*

299

673.    On November 2022 an expert consultant for the US EPA submitted a letter saying Apple should have been testing for indoor air vapor intrusion at Gjovik's office at a minimum of every five years. (The most recent testing was December 2015, so it was due again December 2020 – and the testing wasn't 'voluntary').

674.    On December 6 2022, US EPA sent a letter to Northrop Grumman (and Apple) with feedback on their proposed vapor intrusion testing plan, with 12 requests, including that they notify US EPA "immediately" if test results show the presence of TCE in the indoor air above 7 µg/m3.[267] The document also included an image of testing locations, including air sampling where Gjovik's desk was.

---

[267] US EPA, Re: Northrop Grumman Vapor Intrusion Work Plan Addendum #3. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088), https://semspub.epa.gov/work/09/100031563.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023



SEMS-RM DOCID # 100031563

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
75 Hawthorne Street
San Francisco, CA 94105-3901

December 6, 2022

Mr. Joshua Nandi                                    SENT VIA EMAIL
Northrop Grumman Systems Corporation
One Space Park Mail Stop: NGC CER-XE6D21
Redondo Beach, CA 90278

**Re: Northrop Grumman Vapor Intrusion Work Plan Addendum #3. Former TRW Microwave Site, 825 Stewart Dr., Sunnyvale, California, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Nandi:

Thank you for submitting the Northrop Grumman Systems Corporation (Northrop Grumman) Vapor Intrusion Work Plan Addendum #3. EPA requests the Addendum be revised to improve its readability and to address the following technical comments below:

1. Edit the Addendum's main text to include a summary description of the standard operation procedures (SOP) for the activities to be performed (e.g., soil gas installation and sampling, indoor/outdoor air sampling, differential pressure monitoring) and include the SOPs as attachments (or clearly reference the SOP location in the document).

2. Include an SOP for differential pressure monitoring and describe the associated QA/QC criteria. The monitoring should be performed over a period of one week and measurements recorded every five minutes.

3. Add laboratory reporting limits to Table 1.

4. Include a footnote in Table 1 to indicate that EPA will be notified immediately if indoor air results for TCE are above the accelerated response value of 7 $\mu g/m^3$ for commercial/industrial exposure and appropriate actions will be taken to confirm the results and implement mitigation measures.

5. Include a table (Table 2) for soil gas screening levels and laboratory reporting limits. Define the soil gas screening levels by using the indoor air levels for long-term exposure in Table 1 divided by the attenuation factor of 0.03.

6. Include a summary of the QA/QC metrics (e.g., QA/QC criteria for duplicated samples).

*Exhibit: EPA Letter from Dec 6 2022, pt1*

301

7. Include additional long-term (seven days) indoor air sampling using passive samplers in four locations (IA-2, IA-3, IA-4, IA-7). Include one long-term outdoor air sampling. Include a summary and SOP for the long-term passive sampling.

8. Include one additional sub-slab sampling location (SS-12) for spatial coverage as indicated in the figure attached.

9. Move sampling location IA-2 to the cubicles next to SS-7 (pending building walk through).

10. Provide the sequence of activities. EPA recommends the following sequence:
    1. Day Zero: Building walk through, check sub-slab ports and install SS-12
    2. Day 1: Start sampling
        a. Begin differential pressure monitoring at tree sub-slab ports SS-2, SS-7 and SS-10
        b. Start long-term passive indoor air sampling at four locations IA-2, IA-3, IA-4, and IA-7; and one outdoor location at HVAC intake.
    3. Day 2: One week after start of sampling on Day 1
        a. Start the 10-hour indoor air sampling with SUMMA™ canisters in all indoor air locations (IA-1 to IA-9), and one outdoor location at HVAC intake
        b. Stop and remove the differential pressure monitoring from sub-slab ports
        c. Perform the sub-slab sampling in all sub-slab locations

11. Include a statement that after data collection and evaluation is completed, reviewed, and approved by EPA, the sub-slab ports will be decommissioned, upon consultation and approval by EPA.

12. Include a statement that a report will be submitted to EPA within 30 days of receipt of the results from the laboratory.

EPA requests that Northrop Grumman provide a Revised Work Plan Addendum within 30-days from the receipt of this letter. Please feel free to contact me anytime at abreu.lilian@epa.gov or 415-972-3010 if you have any questions or comments.

Sincerely,

**LILIAN ABREU**
Digitally signed by LILIAN ABREU
Date: 2022.12.06 14:01:30 -08'00'

Lilian Abreu, PhD
Remedial Project Manager
Superfund and Emergency Management Division

cc:   Holly Holbrook, AECOM
      Cynthia Woo, Aptim Federal Services, LLC

2

*Exhibit: EPA Letter from Dec 6 2022, pt2*

675.     On December 7 2022, Gjovik's appellate win against Appleseed was cited in a SCOTUS brief filed by EFF in *Barton v Texas*.[268] On December 12 2022, the Washington state court ordered the prior decision and order against Gjovik to be vacated and the case against Gjovik dismissed. Even with the legal wins, it was still mortifying the press coverage and Appleseed's comments continued to give basis to Gjovik being some sort of bad actor. Appleseed also harassed Gjovik even more.

676.     On December 30 2022, US FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans and provided Gjovik a report tracking number.

677.     On January 11 2023, Gjovik reviewed the most recent Five-Year Report for the Synertek Superfund site next to 3250 Scott Blvd and emailed some questions and concerns to the US EPA contacts for the site (Edwin Poalinelli and Fatmina Ty). Gjovik asked why 3250 Scott Blvd was skipped when EPA ordered vapor intrusion testing in all other buildings on the plume. US EPA never responded. Gjovik started investigating 3250 Scott Blvd through public records requests. Gjovik also discovered that US EPA, Honeywell, and Irvine Company had "lost" a Superfund groundwater monitoring well somewhere under the apartment complex when it was built around 2018.

678.     On January 20 2023, US EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over 7 years.

679.     On January 23 2023, US DOL suddenly wanted to meet with Gjovik to discuss her case. Gjovik asked to record the call due to her concerns about their prior misconduct. US DOL agreed. On January 26 2023, Gjovik met with US DOL and Captain Parra, was a surprise participant again. The call lasted around three hours and Parra tried to intimidate Gjovik again

---

[268] *Barton v State of Texas*, On Petition for Writ of Certiorari to the Supreme Court of the United States, Brief of Amicus Curiae Electronic Frontier Foundation, Eugene Volokh as Counsel of Record, pg10-12 "*Criticism of Political Activists*" (Dec 7 2022). https://www.supremecourt.gov/DocketPDF/22/22-430/249364/20221207141747388_22-430%20Amicus%20Electronic%20Frontier%20Foundation.pdf

and refused to allow her to 'object' to inaccurate statements. Parra claimed the call was completely off the record. Parra eventually acknowledged that US DOL did not actually investigate Gjovik's claims or evidence, and agreed to go back and do it now

680.    On January 23 2023, after the retaliatory lawsuit against Gjovik was already dismissed and vacated, Appleseed then filed another document in which she accused Gjovik of a variety of torts (defamation, harassment) and criminal acts (criminal wiretapping, perjury), threatened to report Gjovik to the Bar Association, and threatened to sue Gjovik again.[269] The next day Appleseed posted on Twitter about Gjovik, with some of the language as her legal filing: *"If you lack the moral fortitude to admit that you misrepresented, omitted, misquoted, or otherwise altered facts to exaggerate and fit a narrative… sincerely, don't bother engaging in the public space. You will eventually be hit with a boomerang of your own making."*

---

[269]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Boomerang Post*

681. On January 24 2023, Appleseed replied to the post above and added "*A YEAR OF THIS [EXPLETIVE] A YEARRRRRRRRRR*". (sic) Appleseed filed the lawsuit against Gjovik on January 31 2022 (a year prior) and was clearly referring to Gjovik and threatening her with being "*hit*" if she did not leave "*the public space.*"

682. On Thursday January 26 2023, NLRB held a video conference with Gjovik to inform her they found merit in her charges against Apple about Apple's NDAs and Tim Cook's email. NLRB asked Gjovik not to tell anyone until they could also inform Apple and then send a formal email. Gjovik did not post anything about it but assumably Apple was also informed on January 26, or else on Friday January 27 2023.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

683.     On January 27 2023, Appleseed posted on Twitter about Gjovik's government cases and complaints again saying her posts were initiated due to '*just [finding] out [Gjovik's] OSHA case tries to use [her] as the Apple scapegoat with a mountain of deceit and good god [she is] sick of this [expletive]."* She claimed Gjovik was "*try[ing] to use other victims as leverage*" and "*center[ing her] conspiracy theory around them.*" She said it was "*indefensible*" and "*unconscionable*," and said she has "*never been so disappointed in another human in [her] entire life.*" A blogger commented on her thread about Gjovik asking her if she watched a recent interview a YouTuber did with Gjovik, and Appleseed said no, that it was "*nothing substantive*", and "*hopefully Apple doesn't go after the host for whatever [Gjovik] said.*"

684.     In January 29 2023, the NLRB sent Gjovik an email stating they found merit in two of Gjovik's charges against Apple's employment policies, including their NDAs and surveillance practices.[270]  NLRB that "*various work rules, handbook rules, and confidentiality rules at Apple*" are unlawful because they "*reasonably tend to interfere with, restrain, or coerce employees*" [271] In addition, the agency '*found merit to a charge alleging statements and conduct by Apple — including high-level executives — also violated the National Labor Relations Act.*"[272] The press covered the decision of merit.

685.     On January 31 2023 until February 10 2023, Appleseed edited the Wikipedia article about Gjovik and other articles referencing Gjovik, including adding Gjovik to the "TRW Microwave" company page in a new Superfund site section. Wikipedia caught her and banned her again on February 11 2023. Prior to the latest ban, Appleseed made edits about Gjovik's Superfund office and workplace safety concerns, removed mention of Gjovik fainting at her

---

[270] *Apple Executives Violated Worker Rights, Labor Officials Say*, Bloomberg, Jan 30 2023, https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-say
[271] CNN, *Apple has infringed on worker rights, NLRB investigators say,* Jan 31 2023, https://www.cnn.com/2023/01/31/tech/apple-worker-rights-nlrb/index.html
[272] Bloomberg, supra.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

office, changed the grammar of a line about Gjovik's NLRB case to infer the NLRB will decide against Gjovik, and added that Gjovik "*was fired for leaking confidential information.*"

```
infringed on workers' rights |work=TechCrunch
|url=https://techcrunch.com/2023/01/30/labor-officials-found-that-
apple-execs-infringed-on-workers-rights/ |access-date=31 January 2023
|quote=Gjovik was fired by Apple in September 2021 for leaking
confidential information; she told TechCrunch that she thinks she was
fired in retaliation after reporting to the EPA that her office was
built on the triple site of toxic waste in Silicon Valley, where
cracks in the floor exposed employees to carcinogenic fumes.}}</ref>
```

*Exhibit: You Make Me Fade Post about Leak*

686.    On February 7 2023, Macworld published an article about Gjovik's NLRB win. The article 'translated' Cook's email to Cook's actual meaning including Cook complaining about workers talking to reporters about work conditions, "*How can we put the screws to you if it's in the news? Duh. C'mon, people. Think!*" and "*Tattooed on Tim Cook's right bicep: "Loose lips..." And on his left: "...pink slips.*" The article suggests after an "*old-fashioned intervention*" the public would learn that Apple acts the way it did to Gjovik and her coworkers in 2021 because "*Steve Jobs was... never hugged or whatever.*"[273]

687.    On February 11 2023, Appleseed was caught editing Gjovik's Wikipedia article again, as discussed, and was banned again.

## User contributions for You Make Me Fade  Help

For You Make Me Fade (talk | block log | uploads | logs | filter log)

This account is currently blocked. *(Show block details)* The latest block log entry is provided below for reference:

* 03:47, 11 February 2023 General/Notability (talk | contribs) blocked You Make Me Fade (talk | contribs) with an expiration time of indefinite (account creation blocked) *(Sock puppetry User:CodaHitchhiker)* (Tag: Twinkle)

---

[273] Macworld, *Apple's war against leakers is really a battle against the people that matter most,* Feb 7 2023, https://www.macworld.com/article/1504665/macalope-apple-tim-cook-leakers-nlrb.html

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: CH /YMMF 1*

> ∨ **Search for contributions**
>
> (newest | oldest) View (newer 50 | older 50) (20 | 50 | 100 | 250 | 500)
>
> - 07:44, 11 February 2023 (diff | hist) . . (+227) . . User talk:You Make Me Fade  (→February 2023: Reply) **(current)** *(Tag: Reply)*
> - 07:34, 11 February 2023 (diff | hist) . . (+169) . . User talk:You Make Me Fade  (→February 2023: Reply) *(Tag: Reply)*
> - 21:26, 10 February 2023 (diff | hist) . . **(+1,186)** . . List of whistleblowers  (→2010s: Added Tesla 2) **(current)**
> - 21:11, 10 February 2023 (diff | hist) . . (+11) . . **m** TRW Inc.  (→Superfund site: Fixed typo)
> - 19:51, 10 February 2023 (diff | hist) . . (+15) . . List of Superfund sites in California  (→Superfund sites: Changed wikilink) **(current)**
> - 19:50, 10 February 2023 (diff | hist) . . (+25) . . Ashley Gjøvik  (→Environmental health and safety concerns: Added wikilink) *(Tag: Visual edit: Switched)*
> - 19:49, 10 February 2023 (diff | hist) . . (+37) . . **N** TRW Microwave Superfund  (←Redirected page to TRW Inc.#Superfund site) **(current)** *(Tag: New redirect)*
> - 19:48, 10 February 2023 (diff | hist) . . (+22) . . **N** TRW Microwave  (←Redirected page to TRW Inc.) **(current)** *(Tag: New redirect)*
> - 19:45, 10 February 2023 (diff | hist) . . **(+33,359)** . . TRW Inc.  (→Superfund site: New section) *(Tag: nowiki added)*
> - 16:57, 10 February 2023 (diff | hist) . . (+52) . . List of whistleblowers  (→2020s: Added picture) *(Tag: Visual edit)*

*Exhibit: YMMF 2*

> # User talk:CodeHitchhiker                                                          文A ∨
>
> User page  Talk                                          Read  Edit  Add topic  View history
>
> From Wikipedia, the free encyclopedia
>
> ## Blocked as a sockpuppet  [edit]
>
> ⊗  You have been **blocked indefinitely** from editing for abusing multiple accounts as a sockpuppet of User:SquareInARoundHole per the evidence presented at Wikipedia:Sockpuppet investigations/SquareInARoundHole. Note that multiple accounts are allowed, but **not for illegitimate reasons**, and any contributions made while evading blocks or bans may be reverted or deleted. If you think there are good reasons for being unblocked, please read the guide to appealing blocks, then add the following text below the block notice on your talk page: {{unblock|reason=Your reason here ----}}. -- Tamzin[cetacean needed] (she|they|xe) 13:26, 21 November 2022 (UTC)
>
>   [reply]

*Exhibit: CH / SIARH 1*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

688.    In February 2023, Appleseed began publishing a five-part manifesto about *"her spiritual cultivation at Apple",* including writing about "*the Church of Apple and the living word of Steve Jobs."* She wrote about Gjovik in several of the posts, directly naming Gjovik, and Gjovik was notified via news alerts linked to her name. Appleseed also directly embedded several of Gjovik's Twitter posts. (All of this was creepy, invasive, and harassing).

689.    In Appleseed's manifesto she talked about one of Gjovik's complaints and shared what appeared to be an outcome of Okpo's supposed investigation into Gjovik's concerns. Okpo never shared any type of outcome or findings with Gjovik from his supposed investigation into her concerns and that investigation was supposedly still open when Gjovik was fired. It's unclear when, how, or why Apple Employee Relations and/or Workplace Violence met with Apple Global Security employee Joanna Appleseed to discuss Apple's personnel decisions about Gjovik.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Radar Investigation*

690.   Appleseed also admitted in the manifesto, that Apple employees *"told [her] that Ashley planned to hand over all of her messages to management."* Gjovik had no plans to hand over her text messages to Apple, and would not have told anyone that, so it was a lie from Apple. Further, Gjovik and Appleseed had and have no mutual friends and only knew each other briefly at work, so these 'mutual friends' are Apple employees – possibly Global Security, but also possibly Gjovik's ex-coworkers including Marini and Garfinkle, and that "Neoform" from Gjovik's last team. Appleseed reported facts establishing that someone, assumably Apple, threatened her in order to coerce her to file a bogus report against Gjovik, and even admitted the report "*served no legal purpose.*" She admitted she filed a Business Conduct complaint about Gjovik, and Apple's lawyers later cited Appleseed's complaint, claiming it was filed September 15 2021, the same day Apple's OM&M lawyers sent Gjovik a harassing email about Gjovik's Twitter posts about work conditions. Apple coerced or directed Appleseed to assist them in fabricating a paper trail, only hours prior to Apple sending an email to Gjovik about the same topic as Appleseed's complaint.

> When the article came out, I removed my iCloud from my work device and deleted the aforementioned conversation. A week after Ashley was terminated mutual friends told me that Ashley planned to hand over all of her messages to management. They had already investigated me and found nothing, this would give them a reason to fire me. I panicked and filed a report. Apple made that post-termination report a part of their justification against Ashley's retaliatory firing claims, despite that it serves no legal purpose.

*Exhibit: False Complaint – Appleseed Quote*

691.   Under information and belief, Apple has been coercing and inciting Appleseed, directly or indirectly, to help them cover-up what they did to Gjovik. Under information and

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

belief, Apple then used Appleseed's actions to further coerce her into furthering their scheme because otherwise, if Gjovik were to win her cases against Apple, it would be revealed what Appleseed did in partnership with Apple to harm Gjovik. Thus, Gjovik must not win her lawsuits.

692.    (At some point in late 2023, Appleseed deleted her entire Medium account that hosted the manifesto posts. This was around the time she changed her Twitter account name to a new phrase and then deleted her prior account name, attempting to obstruct URLs to her prior posts from attaching to her account.)

693.    In February 19 2023, Joanna Appleseed contacted Gjovik with an email saying she knows Gjovik does not "*wish to hear from [her]*" and then proceeded to make more accusations against Gjovik. Appleseed added, *"I realize I'm not likely ever going to convince you …. that I'm not working for or with Apple."[274]* She then compared Apple to "Area X" from "Annihilation." Gjovik did not respond. Gjovik still had not, and has not, initiated any contact with Appleseed since September 2021.

xx.    **Gjovik Discovers the Secret Silicon Fabrication Plant; Apple Commits More Felonies (February 2023)**

694.    On February 21 2023, Gjovik discovered the semiconductor fabrication activities at 3250 Scott Blvd in Santa Clara, next to the apartment where she got sick. Gjovik posted on Twitter in real time as she learned about it. Gjovik added that day, "*I've been making muffled screaming noises for about twenty-five minutes now. WTAF IS WRONG WITH THEM. THEY MUST HAVE KNOWN THEY DID THAT SHIT TO ME!!!  No wonder they gave me that "extreme condition leave" to move out. Apple is the extreme condition.*"

---

[274] Joanna Appleseed to Ashley Gjovik (business email at ashley@gjovik.co), February 19 2023 10:45am

695. Under information and belief, Apple saw these posts and discussed what their response should be to Gjovik now having this knowledge.



*Exhibit: The Discovery of the Secret Silicon Fabrication*

---

[275] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1628250591779516416

312

696. On February 21 2023, US DOL suddenly demanded Gjovik provide a copy of the audio recording from the prior meeting. Under information and belief, it was Orrick on behalf of Apple, and/or Morgan Lewis on behalf of Apple, requesting this audio transcript to use for their defense in Gjovik's cases.

697. On February 27 2023, five Morgan Lewis attorneys filed a notice of appearance on Gjovik's NLRB charges, along with the three MWE lawyers. One of the Morgan Lewis attorneys was an ex-NLRB Board Member (Harry Johnson).

698. On February 27 2023, US DOL suddenly demanded Gjovik index all of the documents and emails she previously sent US DOL Under information and belief, this was on request of Orrick and/or Morgan Lewis.

699. On March 1 2023, Gjovik asked if any chemists followed her Twitter account and could weigh in on if NMP could cause the reaction she saw on her jeans. On March 2 2023 and for several days following, a Twitter account created specifically to interact with Gjovik about her claims about N-Methyl-2-pyrrolidone (NMP), "Sybil", replied repeatedly to her posts. Sybil repeatedly claimed NMP is completely safe, not banned, and that Gjovik was lying about the yellow clothes and rusty jeans and it was occurring simply because Gjovik did not know how to do laundry properly.



*Exhibit: Example Sybil Post*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

700.   Even after blocking the NMP account, it continued to stalk Gjovik's posts and continue posting, next calling for Gjovik's account to be suspended due to supposedly spreading misinformation about NMP. Under information and belief, Sybil was Apple.

701.   On March 11 2023, a fake account ("Comrade Jones", sorry@butno.com) sent Gjovik an email claiming to be an ex-EPA compliance/enforcement employee. The account attempted to get Gjovik to stop talking about the vapor intrusion documentation for 825 Stewart Drive and tried to get Gjovik to stop talking about the NMP. The account made threats to intimidate Gjovik. The IP came from a location known for spam accounts.

> The reason I suggest you talk to an expert in the law here is because you have several misconceptions that are leaving you open to severe ridicule on a public stage. I don't know much about corporate law, but I can't imagine they won't attack your credibility and integrity.

*Threats from "Comrade Jones"*

702.   Under information and belief, "Comrade Jones" was Apple.[276]

703.   On March 22 2023, US DOL said they may dismiss Gjovik's entire case now if Gjovik does not send the audio file. Gjovik explained to them why that was unlawful and told them she would only send it if they agreed to 'seal' it so Apple could not get a copy. US DOL refused, essentially acknowledging they wanted to send Apple a copy due to something that occurred after the meeting.

704.   Around March 2023 a new anonymous Twitter account ("Praveen") began harassing Gjovik. The account knew way too much about Gjovik and her claims against Apple, and the account almost exclusively trolled whistleblowers and unions. Gjovik and others researched the account and found it was affiliated with the MWE law firm, and was predominantly harassing plaintiff's in cases where MWE represented the defendant. Gjovik

---

[276] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1634647629421223936

called the account out and it not deny the affiliation, but still proceeded to harass Gjovik more including attacking her mental health, physical appearance and moral character .

705.    Gjovik continued to protest US DOL's corrupt behavior to US DOL, on Twitter, to US DOL OIG, and in a petition she created on Change.org asking US DOL to stop doing corruption to whistleblowers.

706.    On March 28 2023, US EPA FOIA manager Andrew Helmlinger (married to a partner at Orrick) claimed there were no documents related to Apple's TRI filing about NMP waste and emissions in 2020. (EPA functional teams would later tell Gjovik that was not a true statement). Gjovik complained to US EPA OIG about the matter.

707.    On April 3 2023, CalSTRS closed Gjovik's PRA request about her Apple Superfund office owned by CalSTRS. CalSTRS suddenly claimed there are no PRA documents other than a press release.

708.    Gjovik found note in a note in an US EPA document that CalSTRS conducted a 2016 Environmental Site Assessment for 825 Stewart Drive. Gjovik asked CalSTRS for a copy. CalSTRS denied any knowledge of it. US EPA and CalSTRS denied any records for the Site Assessment.

709.    On April 10 2023, Gjovik was notified that Apple's Morgan Lewis attorneys had requested a 'reconsideration' of merit of Gjovik's NLRB charge that Tim Cook's email violated federal labor laws. The NLRB refused to answer Gjovik's questions as to how such a thing was arranged or to respond to her complaints that it was not allowed. Gjovik complained she suspected Apple was engaged in unlawful ex parte communications.

710.    On April 27 2023, Gjovik submitted two filings to NLRB. One objecting to the reconsideration process as a violation of the NLRA, APA, and US Constitution. The second arguing the charge should still be found to have merit.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

711.     On May 5 2023, CalSTRS put 825 Stewart Drive up for sale. All public listings failed to disclose its a Superfund site.

712.     On May 13 – 15 2023, Appleseed suddenly published around or over forty posts on Twitter that made negative remarks and allegations against Gjovik. Appleseed included Gjovik's name and other personally identifiable information in several of the posts and tagged Gjovik's acquaintances, and even included images of the documents in Appleseed's lawsuit against Gjovik – so it was clear Appleseed was posting about Gjovik. Appleseed uploaded a video attached to one of these posts that showed an open web browser window on the computer she was using and the browser had multiple open tabs for Gjovik's whistleblower website (3x windows), Gjovik's air quality website, a US EPA page about air quality, and the SCOTUS brief in question. Appleseed was cyberstalking Gjovik as she posted these things about Gjovik.



*Exhibit: Image posted by Appleseed during May 13-14 2023 Posts about Gjovik*

713.     Appleseed also posted claims that Gjovik violated the Constitution and claimed Gjovik wanted to "*deny civil liberty to an entire state*," claimed Gjovik was trying to "*egregiously violate other people's constitutional rights and indiscriminately verbally and psychologically abuse those people for exercising them and then use [Gjovik's] rights as a [Gjovik's] own friend from accountability*," claimed Gjovik filed a '*frivolous*" lawsuit which was "*self-serving nonsense that would catastrophically deny civil liberties*,", claimed Gjovik had a "*wanton disregard for the truth in pursuit of [Gjovik's] own goals*," and claimed Gjovik was "*admonished by the Assistant Attorney General of Washington for [Gjovik's] behavior toward*

*[Appleseea].*" Appleseed tagged the Washington state AG's office's Twitter account in her post (which would notify that office of her post).

714. Appleseed also make public posts about the state lower court and appellate judges assigned to Appleseed's retaliatory lawsuit against Gjovik. Appleseed claimed the appellate judge who found against her and in favor of Gjovik made an "*error*" and the lower court judge wrote an "*unsophisticated order.*" Appleseed also posted she "*already ordered the frame for*" a quote from the legal filing from Washington state arguing Gjovik's Constitutional challenge lawsuit should be dismissed under the state's 11th amendment rights. Appleseed implied she planned to hang a portion of that federal legal filing (for a lawsuit caused by her meritless retaliatory lawsuit against Gjovik) in her home. Appleseed then replied to her prior post ridiculing Gjovik with a new post that said "*I'm a lawyer*" with an image of a boy sticking a flute up his nose, implying that is Gjovik.



*Exhibit: Appleseed's 5/14/23 Flute Post*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

715.     Appleseed admitted in her flurry of posts that she knew when she lost Gjovik's appeal in November of 2022 that it was "*best for [Appleseed] and all to let it go*" but that she decided to start attacking Gjovik again due to Gjovik's appellate win of Appleseed's meritless retaliatory lawsuit against Gjovik being cited in an amicus brief for a SCOTUS case written by a well-known human rights and civil liberties non-profit organization, and because, Appleseed said, members of "*Operational Intelligence*" groups contacted her and convinced her that Gjovik "*misled*" and "*deceived*" her in some way (assumably she was referring to Apple Global Security again).

716.     Appleseed once again claimed Gjovik's pleas for Appleseed to stop harassing her was some sort of criminal act by Gjovik. Appleseed complained that Gjovik "*cr[ied stalker [and] harassment*" about Appleseed, that Gjovik "*rationalized [Gjovik's] behavior with free speech,*" and Gjovik's actions '*justify more abuse*" by Appleseed. She then wrote "*ableism, racism, privacy invasion, fraud, it's the wild wild west so long as they've been criticized.*"



Really sick of people who dox based off non-information (can't dignify with "conjecture") who defame, and are verbally and psychologically abusive.

They rationalize their behavior with free speech and disinformation. They cry stalker, harassment, and justify more abuse.

11:44 PM · May 16, 2023 · 2,176 Views

Weird how their values depend entirely on whether or not you agree with their abusive and nonsensical bullshit.

Ableism, racism, privacy invasion, fraud, it's the wild wild west so long as they've been criticized, no matter how mildly and if they've done serious wrongs!

*Exhibits: Appleseed May 16 2023 Posts*

717.     Throughout the posts, Appleseed repeatedly referred to Gjovik as a "*harasser*", called Gjovik a "*liar*," she accused Gjovik of defamation and harassment, she accused Gjovik of

318

doxing and called Gjovik a hypocrite. Appleseed posted that Gjovik *was "DESTROYING [HER] LIFE"* (sic). Appleseed posted that Gjovik lied to "*a friend*", lied "*on social media*," lied *"to a biased tabloid,*" lied "*to a respected news outlet,*" and lied "*to the government under oath*." Appleseed added that now "*the lie is in case law, Academica, and books*."



> Everyone really needs to recognize how terrifying this kind of thing truly is.
>
> The escalation of disinformation.
>
> Lie:
> to a friend,
> on social media,
> to a biased tabloid,
> to a respected news outlet,
> to the government under oath.
>
> Now the lie is in case law, academia, and books.
>
> 12:26 AM · May 14, 2023 · 4,208 Views
>
> 6 Retweets   22 Likes   2 Bookmarks

*Exhibit: Appleseed's "Case Law" Post*

718.     Appleseed confessed again to proactively contacting people quietly and without Gjovik's knowledge, to claim Gjovik was lying and to allege Apple's version of facts about Gjovik's allegations against Apple. Appleseed referred to Gjovik's allegations against Apple as "*disinformation*" and '*fraud*," quoted the book 1984, and then said that Gjovik wanted "*power*" and to "*deny liberty by corruption reality and agency of reason*." Appleseed then implied Gjovik is at the "*root of all evil*" and compared Gjovik's lawsuit against Apple to Nazis and genocide.

719.     Appleseed claimed in this frenzy of Twitter posts that she reported Gjovik to EFF and the ACLU and invited any "*civil liberties group or attorneys*" to contact her to review her "*thorough accounting documenting the issues in the orders, the events, and all the documentation of events that spurred it*."

720.     On May 15 2023, Appleseed (an agent of Apple), then posted that she reported Gjovik to "the proper authorities" (assumably another FBI and/or local law enforcement report).

Appleseed wrote she reported Gjovik to law enforcement alleging Gjovik committed perjury, fabricated evidence, made false statements to federal agencies, committed fraud, and engaged in harassment, doxing, and stalking.

> I reported this to the proper authorities.
>
> The perjury of everyone involved. The fabricated evidence. Using agencies and people in the government.
>
> The false statements to federal agencies.
>
> The fraud. The harassment. The doxing. The stalking.
>
> ALL of it. I'm done.
>
> 1:49 PM · May 15, 2023 · 2,570 Views

*Exhibit: May 2023 False Reports*

721.    Appleseed, in this same eruption of posts over a few days, then also accused one of Gjovik's acquaintances of perjury, lying, lying under oath, harassment, being a sociopath, falsifying and fabricating evidence, and amplifying disinformation – all connected to Gjovik. Appleseed posted that she is "*hopeful*" that Gjovik's acquaintance was "*genuinely misled*" by Gjovik. She tagged the Twitter account for the President of the United States and claimed Gjovik won the appeal with '*fabricated evidence*." She also made a vague statement about "*untrue hearsay from an authoritative source*" about Gjovik.

722.    In several posts Appleseed even directly addressed Gjovik saying: *"To be very [expletive] clear: No amount of intimidation, threat, or coercion can stop it. That ship has sailed. You can discredit me into oblivion at this point, it won't make a difference. Whatever lies you want to tell, it won't change the outcome. The fraud is undone*." Appleseed added "*[she] believe['s] in civil disobedience"* and referred to Gjovik as "*white wealthy people co-opting that with fraud*."

723.    Gjovik still had not, and has not, initiated any contact with Appleseed since September 2021. Even after the gag-order was removed in January 2023, Gjovik still refused to speak about Appleseed publicly, out of fear of another lawsuit or more false reports or worse.

724.    On May 21 2023, Appleseed began posting about Gjovik again. Appleseed complained that Gjovik was "*psychologically torturing*" her and Gjovik was being "*maliciously abusive*" and Appleseed wanted to "*talk about it*" with Gjovik or else wanted Gjovik to "*move on in peace*" (which implied her desire for Gjovik to withdraw Gjovik's charges and lawsuits against Apple). Appleseed posted about how Gjovik lied, and someone unnamed misunderstood, and she criticized Gjovik with a "*quote tweet*", and Gjovik was a "*vindictive [expletive]"* and Gjovik would destroy her, and "*ruin other lives,*" and that Gjovik "*love[s] it.*" She claimed Gjovik is "*evil,*" and has a "*vendetta*" and "*disregard for life."*

725.    On May 26 2023, Appleseed attempted to contact Gjovik through a third-party (a current Apple employee domiciled in another country) and conspired with him and attempted to get Gjovik on the phone with her without Gjovik knowing it would be Appleseed on the other line. When Gjovik saw through the plan and complained to the third-party, that person explained Appleseed wanted to talk to Gjovik about Gjovik's evidence against Apple in her federal charges that implicated Appleseed and encourage Gjovik to withdraw that evidence.

**Apple employee, 5/26/23, 12:01am:** "*I want to ask if you wanted to talk sometime soon. Someone reached out to me with concern that some of the bot network and false identifies attacking you might be more dangerous than you have already uncovered, and perhaps much more widespread than you have initial found. They reached out to me because they worked at Apple and I'm a [employee] at Apple. They asked if I would mind facilitating a conversation, because they are genuinely afraid and they will only talk about this to you and I over voice. I spoke with them already and they showed me some of what they have uncovered and it seems very credible to me. I can talk to you first if you would like, and then I can invite the other party in if you agree to it. This is a conversation that needs to be kept in confidence of course, as we are dealing with a huge disinformation campaign, that may have multiple origins, targeting Apple opposition (public worker organizations and whistleblower)."*

**Gjovik, 5/26, 12:44pm:** Responds mentioning she already has federal charges about Apple's digital harassment and surveillance. Mentions she created a 400-page filing with evidence of the accounts and she complains Appleseed sued her over it and reported the legal filing as 'child porn.' Gjovik commented her NLRB case seemed to be progressing and she is expecting a finding in her favor about the digital harassment and Appleseed's lawsuit against her. Gjovik then sent him a copy of the federal filing titled *"Gjovik v Apple – Intimidation and Threats Evidence Report".* Gjovik also commented she is concerned who ever reached out to him could be "*sent by Apple to get [her] to comment on things which they'd record and some[how] try to use against [her]"* in the federal cases.

**Apple employee, 5/26, 10:38pm:** *"The person believes they have been manipulated, and they just figured it out a week ago... They are terrified because they are being stalked. Someone named "[name]" physically came to an old address. I have offered to be on a group call with them and you as a witness and to try to facilitate trust. It seems too important for the conversation to not happen."*

**Gjovik, 5/26/23, 10:39pm:** Gjovik complains about Apple's spies again, and complains about Apple breaking into her attic and installing "surveillance crap" in her home. Gjovik says she will not consider talking to the person unless their identity is disclosed prior.

**Apple employee: 5/26/23, 11:43pm "***I think they reached out to me first because they described the exact same scenario, with people sending them repeated messaging that they didn't recognize was just baiting them until now. They also 100% do not trust anyone at this point except very specific people that are actually confirmed to be real and not a part of the government or big business, especially tech. I'm not home at the moment ... Would you have time to talk tomorrow? I'm guessing it is late for you now."*

**Gjovik, 5/26/23, 11:55pm:** Gjovik complains his request '*feels like an op*" and "*worried it's an op to mess with [her federal] testimony."* Gjovik complains it is suspicious and "*odd*" that "*someone urgently must talk to [her], but only without any paper trail, about a topic that is a matter of [her] federal charges and will be discussed in federal courts in the near future*."

**Apple employee: 5/27/23, 1:10am:** [not directly related comments] ... *"I definitely don't want anything to hinder your case. That's why I wanted to get this person as well."*

**Gjovik, 5/27/23, 1:15am:** *"The case about Tim Cook's email means Tim Cook has to be in the court room & has to testify in my case... because he sent that email. They're for sure going to murder me, but it will be worth it. Maybe they'll stop sending shitty emails!!!"*

**Apple employee, 5/27/23, 2:57am:** "*Hopefully they realize that losing money isn't worth physically silencing someone.... The reason that the person that reached out to me couldn't approach you alone is because they are afraid of the orchestrators being told, and it's important that the orchestrators think it's business as usual while the puzzle is fully assembled. The purpose is to have all the facts and undo successful false divisions and false associations... it's about safety and ensuring it is not disclosed to the wrong people."*

**Gjovik, 5/27/23, 2:12pm:** "…. *The repeated requests for confidentiality are also concerning. I'm very public with everything that's done, it's one of the ways I try to stay alive. … and what I said about court means that I can't hide anything in court, regardless of whatever it is they're talking about 'undoing.' I don't want to be part of anything directly related to my own lawsuits that someone is demanding I keep quiet for their own benefit. That sounds crazy…. This whole matter is seriously stressing me out a lot, so I'd prefer not to talk about it anymore…"*

**Apple employee, 5/27/23, pm:** "…. This person contacted me through established channels… and I talked to them in depth as well so I am as certain as I can be that I don't think there is any trickery. If you would like we can chat briefly over voice and I can tell you who it is and explain the baseline of why they want to talk….the fact that they were recently being stalked stoked the urgency… so it is up to you, either we leave it here as you asked, or I can have a voice/video (me only on video and you voice even) chat to explain the who and why and you can decide after that. …I have had to worry about the local… mafia coming after me … so I understand the stress you are into some degree… Let me know."

**Gjovik, 5/27/23, pm:** "*I don't want to talk about this anymore & I have a feeling I may know who the person is now and if its the person I think it is, they're involving you in their own illegal and sociopathic conduct. If it is that person, I have no desire to talk to them whatsoever for the rest of my life, as I made clear to them nearly two years ago. There is no situation imaginable that could ever change my position on that after everything the person has to me over the last two years. And that's all I have to say about any of this.*"

**Apple employee, 5/27/23, pm:** *"…. The only advice I will give is that you might want to reach out to [newspaper editor] via Email or DM and ask for his Signal. Then ask if he told you that [reporter] said that to him and if he even spoke to you on Signal at all, let alone from that account on September 16 2021. It looks like that account might have been an impersonation. Take care."*

[Note: This is a reference to some of Gjovik's evidence of Appleseed's stalking and harassment against Gjovik and was submitted as part of Gjovik's federal charges and was included in the document Appleseed sued Gjovik over. The editor contacted Gjovik in September 2021 and asked Gjovik because Appleseed was reaching out to a reporter at their publication and advising him not to talk to Gjovik. The account Gjovik communicated with was authentic as the editor used it to coordinate the publication of articles with Gjovik, including Gjovik publishing an op-ed with that publisher.]

**Gjovik: 5/27/23, pm:** "*omfg…. She is doing this because she's afraid its about to come out she assisted Apple in violating federal law. Please do not ever contact me on her behalf ever again…. I'm blocking you here because of what you've done for her. Its offensive and dangerous.*"

**Apple employee, 5/27/23, pm:** *"I don't think that is her intention but I understand."*

**Gjovik, 5/27/23, pm:** "*She's a sociopath and you helped her mislead me, deceive me, and basically lie to me to compromise me and get me on the phone with someone who*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*has tried repeatedly to tamper with my federal testimony about her actions. You are blocked now & I wish it did not have to be that way."*
[Note: Account was blocked].

726.    On May 31 2023 at 4:35pm, Appleseed contacted one of Gjovik's friends via LinkedIn, identifying herself as "*Apple Global Security*," and trying to learn about Gjovik's ' *friends or family*," claiming she wants to "*help*" Gjovik, and admitting she has been extensively cyberstalking Gjovik.

I am so sorry to bother you, but you are the only person I can find who might have known Ashley before she worked at Apple. I worked in Global Security and have fraud and information security research expertise and found Ashley's old website was cloned, which is an indication someone has been hacked.

Something happened at the end of 2021 that was quite odd, and since then, seems to have gotten worse. During my investigation, I found her old twitter handle on her original website, which led me to a tweet in which you asked her if she was hacked.

*Exhibit: 5/31/23 Messages 1*

I know this sounds super weird, believe me, but Ashley has never had any friends or family she's ever spoken about since I've known her, and others before her. Her entire online life was scrubbed from the internet between 2012-2015, and while I have no idea what any of this means, the situation around your 2012 message to her might help me help her.

Thank you!

*Exhibit: 5/31/23 Messages 2*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

xxi.     **After Learning about the Factory and its Leaks/Spills, Gjovik is**
         **Certain Apple Made her Sick in 2020; Gjovik Goes After Apple**
         **(June-August 2023).**

727.     On May 30 2023, Gjovik complained to US EPA OIG and General Counsel's office about Helmlinger's conflict of interest with Apple's counsel at Orrick, and his misconduct with her US EPA FOIA requests.

728.     On June 23 2023, Gjovik filed complaints about Apple's facility at 3250 Scott Blvd to US EPA, CalEPA, city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with three exhibits attachments: the factory operations, the apartment next door, and the history of the site. Gjovik also posted on Twitter that she did so and provided a link to a Google Drive folder with what she submitted – which is still accessible today.[277]

729.     On July 9 2023, NLRB affirmed the prior decision of merit on Gjovik's charge about Tim Cook's 2021 email.

730.     On August 7 2023, "*Praveen*", posted on Twitter harassing Gjovik again. One of the only income opportunities Gjovik had in 2023 was writing an article in a magazine for which she was compensated for that article. Gjovik wrote an article about adult women with autism and her experience realizing she was autistic. Gjovik hoped the publication of her work could lead to more opportunities for contracted work or employment. On August 7 2023, the magazine posted from their official account, an account with 78,200 other accounts 'following' it, a link to Gjovik's article and tagged Gjovik's Twitter account in the post.  The same day, Praveen replied to the magazine's post commenting publicly: "*Ahh autism is why Ashley lies to creates*

---

[277] GoogleDrive, Ashley Gjovik – **3250 Scott Blvd** Complaint, https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK

*spectacles for social credit."*[278] Now if anyone searched Twitter for Gjovik's article, they would find that comment accusing Gjovik of being a liar.

731. On August 17 2023, US EPA inspected Apple's factory at 3250 Scott Blvd due to Gjovik's complaints.[279]



*Exhibit: US EPA ECHO for 3250 Scott Blvd*

732. In mid to late 2023, ex-Apple Global Security employee, Joanna Appleseed, began deleting evidence of her unlawful conduct towards Gjovik, including deleting her prior Twitter account which account name mapped to Appleseed's Twitter posts that Gjovik cited in her legal filings. Appleseed also deleted her Medium blog account where Appleseed had posted blog posts where she made allegations against Gjovik and provided admissions about her collusion with Apple about Gjovik.

---

[278] Twitter, Index on Censorship, August 7 2023,
https://twitter.com/IndexCensorship/status/1688495940590583808
[279] US EPA, ECHO, 3250 SCOTT BOULEVARD, SANTA CLARA, CA 95054,
https://echo.epa.gov/detailed-facility-report?fid=110001168254

733.   On August 25 2023, Apple Head of Global Security, Tom Moyer, was recharged with criminal bribery following the District Attorney's successful appeal on the prior inexplicable dismissal.[280]

734.   In August 2023, CalSTRS suddenly sold 825 Stewart Drive to BentallGreenOak at $6.5M above the prior sale price, despite all of the new issues introduced by Apple's botched renovations, increased CERCLA obligations, and increasing contamination from the upgradient plume.[281] Under information and belief, the sale price was inflated to pay off CalSTRS for the harm Apple caused because CalSTRS is one of the largest Apple shareholders ($4B).

735.   On August 31, 2023, the US EPA published a brief letter responding to Apple's May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since December of 2015, calling Apple's testing report and strategy '*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," and "*misleading*." Among other issues the EPA complained that Apple still had not found the missing sub-slab vent port, something Gjovik also complained about in 2021.[282]

736.   On September 2023 a Reddit thread was started about this lawsuit and where harassing and defamatory comments were posted about Gjovik in an attempt to further intimidate and smear her. Gjovik reported many of the comments but the moderators refused to take down the comments other than one that was explicitly sexual. Gjovik discovered that at least one of the moderator's was an active Apple Security employee and someone who had harassed her while she was still an employee (Dakota). Gjovik complained to the moderators that Apple was protecting Apple harassing her, but they never responded.

---

[280] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[281] Mercury News, *Apple-leased Silicon Valley office building is bought as value jumps*, Aug 29 2023, https://www.mercurynews.com/2023/08/29/apple-office-real-estate-sunnyvale-buy-build-tech-economy-covid-iphone/
[282] US EPA, TRW Microwave Site, Re: Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023, https://semspub.epa.gov/work/09/100034523.pdf

737.     Through all of this, Gjovik applied for jobs and participated in interviews, however no one would offer her a job, and some even admitted it was due to her open litigation with Apple. After being terminated in September of 2021, Gjovik would not find a job until September of 2023, when she was offered a role as a program manager at a university for an urban air pollution program in their college of engineering. Gjovik accepted and started September 28 2023. Gjovik's new job offers her a $100,000 salary, no performance bonus, no stock options other than a 401k, and the position is for a five-year temporary program. In this first job after Apple, Gjovik's salary was lowered 41% and total compensation was lowered 74%.[283]

738.     Without a job for two years, Gjovik lost all of her savings including her money in her savings accounts, all of her 401-Ks, and also accrued tens of thousands of dollars of credit card debt with interest. Gjovik graduated law school with $80,000 of student loan debt which began accruing interest in October of 2023.

739.     In October 2023, Yannick Bertolus, the person who sent the termination letter to Gjovik, suddenly left Apple.[284]

740.     On November 9 2023, the US DOJ Civil Rights Division settled with Apple that over Apple's violations of the anti-discrimination provision of the Immigration and Nationality Act (8 U.S.C. § 1324b), with Apple owing $25M.[285]

---

[283] Note: whistleblowers who report illegal/immoral practices by their employer to an outside party who could act on the employee's complaint see average earnings drop of around 67% following disclosure. See, Kate Kenny and Marianna Fotaki, "*The Costs and Labour of Whistleblowing: Bodily Vulnerability and Post-disclosure Survival*," Journal of Business Ethics, 182, pp. 341-64 (2023).

[284] Bloomberg, *Apple Renews Top Ranks With Wave of Executive Promotions*, Oct 15 2023, https://www.bloomberg.com/news/newsletters/2023-10-15/apple-october-2023-executive-promotions-new-vps-of-retail-software-operations-lnrh4t94

[285] US DOJ v Apple Inc, Investigation No. DJ#197-11-963; US DOJ, Justice Department Secures $25 Million Landmark Agreement with Apple to Resolve Employment Discrimination Allegations Based on Citizenship Status, Nov 9 2023, https://www.justice.gov/opa/pr/justice-department-secures-25-million-landmark-agreement-apple-resolve-employment

741.    After two years of threatening to dismiss Gjovik's claims without justification, on December 8 2023, the US Department of Labor suddenly dismissed Gjovik's OSH Act and CERCLA whistleblower retaliation claims with demonstrably false, incoherent and inflammatory statements. Gjovik notified US DOL she planned to appeal, moments after receiving the decision. The dismissal came only 48 hours of Gjovik was notified her a U.S. Senator had just contacted a number of US government agencies on Gjovik's behalf asking for updates on Gjovik's complaints, including to the US Department of Labor.

742.    In December 2023, Dan West was "promoted" to a "non-product role" reporting to John Ternus.[286] (At the time Gjovik left Apple, the only "non-product role" reporting to executives was their administrative assistant teams – it's unclear what West is now doing).

# VIII.   LEGAL CLAIMS

743.    Gjovik hereby incorporates by reference each and every allegation and fact.[287] Where any argument contradicts with another argument, one or both of the conflicting arguments will be pled in the alternative.

744.    Claims and allegations against "Apple" are made broadly to include corporate liability for relevant actors as appropriate for each statute/law and circumstance, including: Respondeat superior (managers, corporate officers, employees); labor law's "supervisor" theory; agency theory for agents (law firms, contracted service firms, those asked to do favors, those coerced to perform acts, employees, etc.).[288] Concurrently and in the alternative, Apple may be responsible via aiding, conspiring, inciting, orchestrating, negligence, condoning, ratifying, and

---

[286] Bloomberg, *Apple's iPhone and Watch Product Design Chief to Leave in Shake-Up,* December 8 2023, https://www.bloomberg.com/news/articles/2023-12-08/apple-s-iphone-and-watch-product-design-chief-to-leave-in-shake-up
[287] Federal Rules of Civil Procedure, Rule 10 Form of Pleadings, (c) Adoption by Reference
[288] Cal. Lab. Code § 1104; *Persson v. Smart Inventions, Inc.*, 125 Cal.App.4th 1141, 1167 (2005); 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 32, p. 94.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

other methods of vicarious liability for unlawful conduct noted, which will be argued in detail where appropriate during the trial. An admission by an agent within the scope of his employment is admissible.[289]

745.   Apple is liable for harassment (threats, intimidation, defamation, humiliation, etc.) against Gjovik by Gjovik's coworkers, and even by anonymous actions, because Apple ratified the tortious acts, and/or Apple subsequently ratified the originally unauthorized tortious acts.[290] Apple was aware of the harassment and failed to take steps to investigate or address it.[291] The press even published articles describing Gjovik's coworkers harassing Gjovik about her whistleblowing, articles which Apple was asked to comment on by the reporters.[292] While knowing of systemic issues, Apple failed to respond to complaints about harassment of Gjovik, affirmatively refused to address Gjovik's complaints about harassment, failed to discipline or terminate those who were harassing Gjovik, concealed and covered-up the source of harassment, failed to provide a system for registering complaints of harassment of Gjovik, and even discouraged complaints of harassment of Gjovik from being filed.[293]

746.   The named parties were Apple's agents and employees, and those named were acting withing the scope of her/his/their agency and/or employment when he/she/they harmed

---

[289] See *Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir.1986); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), as amended (Aug. 11, 1998).
[290] C.R. v. Tenet Healthcare Corp., 169 Cal.App.4th 1094, 1110 (2009), Ventura v. ABM Indus. Inc., B231817 (Cal. App. Dec 20, 2012); Murillo v. Rite Stuff Foods, Inc., 65 Cal.App.4th 833, 852 (1998); Shultz Steel Co. v. Hartford Accident & Indemnity Co,. 187 Cal.App.3d 513 (1986).
[291] Id; 29 C.F.R. § 1604.11(d); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 1001 (9th Cir. 2010); *Pryor v. United Air Lines, Inc.*, 791 F.3d 488 (4th Cir. 2015).
[292] The Verge, Apple's fortress of secrecy is crumbling from the inside, September 30 2021 ("After Gjøvik started to gain momentum on Twitter, multiple current and former Apple employees tweeted about how they were suspicious of her claims and felt like she was merely trying to get attention.")
[293] *Vance v. Ball State University*, 133 S. Ct. 2434 (2013); US EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC-CVG-1999-2 (1999); *City of Los Angeles v. Superior Court*, 33 Cal.App.3d 778, 782-783 (1973); *Coats v. Construction & Gen. Laborers Local No. 185*, 15 Cal.App.3d 908, 914 (1971); *C.R. v. Tenet Healthcare Corp.,* 169 Cal.App.4th 1094, (Cal. App. 2009).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik.[294]  The named parties conspired with Apple, and were aided and incited by Apple, and Apple condoned and ratified their conduct against Gjovik.[295]Even if named parties conduct was unauthorized by Apple Inc, it is still within the scope of employment and/or authorization because the conduct was committed in the course of a series of acts authorized by the employer and the conduct arose from a risk inherent in and/or created by Apple Inc.[296]

747.    Actions taken by agents and servants of Apple, against Gjovik, outside work hours and facially appearing recreational, are still within the scope of employment and/or agency because they were carried out with the employer's stated and/or implied permission, they provided a benefit to the employer, they were ratified or condoned, and/or because they had become customary.[297]

748.    Where any statute of limitations is in question of possibly being expired for an alleged claim, Gjovik, where reasonable, will argue the statute of limitations should be tolled due to Apple's fraudulent concealment of numerous material facts in this case. A significant amount of new evidence and facts came to light after initial charges were filed and initial investigations conducted (the Aug 19 2021 EPA inspection, the May 2021 report on the SSD system, the EPA investigation into SSV/HVAC issues starting July 2021, the EPA ordering VI testing and fixes to HVAC/SSV system, EPA telling US DOL about the inspection in Dec 2021, the secret silicon fabrication, the Chevron/Apple/Oaktree Capital/Irvine Company Board conflicts of interest, Lisa Jackson's active interference with US EPA investigations, etc.).

[294] Judicial Council of California Civil Jury Instructions (2020 edition), *3701 Tort Liability Asserted Against Principal,* https://www.justia.com/trials-litigation/docs/caci/3700/3701/
[295] *Rood v. County of Santa Clara*, 113 Cal.App.4th 549, 571 (2003); *Golceff v. Sugarman*, 36 Cal.2d 152, 154 (1950); *Alvarez v. Felker Mfg. Co.,* 230 Cal.App.2d 987, 997 **(1964).**
[296] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3722. Scope of Employment - Unauthorized Acts,* https://www.justia.com/trials-litigation/docs/caci/3700/3722/
[297] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3724. Social or Recreational Activities,* https://www.justia.com/trials-litigation/docs/caci/3700/3724/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

749.    This information was obtained through numerous FOIA and PRA requests submitted by Gjovik, information obtained by Gjovik through investigative research of other public records, meetings and inquiries to government agencies; and detailed analysis and investigation of continuing, prolonged digital activity directed towards Gjovik. Gjovik only obtained this evidence and facts after dogged, persistent research and public records requests despite much push back and obstruction by Apple in an attempt to keep these facts concealed.

750.    Gjovik will also argue, where applicable, the doctrine of continuing violations.[298]

**A.    SECURITIES FRAUD WHISTLEBLOWER RETALIATION**

751.    Apple is a California corporation and one of the largest companies in the world. Apple's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, required to publicly file periodic reports containing financial results and other material information, and is listed on the NASDAQ Stock Market under the ticker symbol "AAPL."

752.    Apple discriminated and retaliated against Gjovik in violation of Sarbanes-Oxley Act and Dodd-Frank Act statutes. Anti-retaliation claims under Dodd-Frank and Sarbanes-Oxley "*have legally independent origins and are equally available to the employee*."[299] Examples of protected complaints under SEC rules (and thus Dodd-Frank and SOX whistleblower protection) are captured in the Federal Register and include but are not limited to: "misrepresentations / omissions in marketing and press releases, corporate governance concerns, conflicts of interest

---

[298] Gjovik's excited utterance upon discovery on February 21 2023, "APPLE IS DOING LITERAL ACTUAL ******* SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT **** INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT" https://twitter.com/ashleygjovik/status/1628250591779516416
[299] *Artim Transportation Systems*, 826 F.2d at 550 (quoting *Alexander*, 415 U.S. at 52, 94 S.Ct. 1011); *Xanthopoulos v. United States Dep't of Lab.*, 991 F.3d 823, 834 (7th Cir. 2021).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

by management, advisory conflicts of interest, failure to notify shareholders of corporate events, false/misleading financial statements and proxy materials, and corporate disclosure matters."[300]

753.    In applying § 10(b)'s reach to specific conduct, the Supreme Court explains that the securities laws should be construed "*not technically and restrictively, but flexibly to effectuate its remedial purposes.*"[301] To that point, the Supreme Court has observed that the executive branch generally adopts "*a broad reading*" of the phrase "*in connection with the purchase or sale of any security*" and, given the SEC's role in enforcing the Act, its view is "*entitled to deference if it is reasonable*" within the particular dispute faced by a court.[302]

754.    In addition to the legal precedent discussed later, Apple's own Whistleblowing Policy acknowledges that reports of '*financial… misrepresentations, impropriety, or fraud*", '*failure to comply with a legal or regulatory obligation*", "*disclosure concerns,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[303]

### i.    Sarbanes-Oxley (SOX) Whistleblower Retaliation (18 U.S.C. § 1514A)

755.    The first claim against Apple is for retaliation under the SOX whistleblower statute 18 U.S.C. § 1514A.  "A publicly traded company may not retaliate against an employee who provides information that employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating

---

[300] US SEC, *Securities Whistleblower Incentives and Protections*, 76 FR 34300 (June 13 2011), https://www.federalregister.gov/documents/2011/06/13/2011-13382/securities-whistleblower-incentives-and-protections
[301] *S.E.C. v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)
[302] Id. at 819–20, 122 S.Ct. 1899; *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1115 (N.D. Ill. 2016).
[303] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

to fraud against shareholders."[304]  Apple is a publicly traded company whose securities must be registered under federal securities laws.

756.    SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. Gjovik's SOX whistleblower retaliation claim was filed with US Department of Labor on August 29, 2021, and the case Docketed on December 10 2021. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims. If the Secretary fails to issue a timely final order, the complainant may seek de novo review in the appropriate district court of the United States having jurisdiction.[305] Jurisdiction vests with the district court when the case is filed.[306] There is a four-year statute of limitations to file a claim in court.[307]

757.    Gjovik engaged in protected activity (complaints of fraud, complaints of violations of SEC rules, and reports to the US SEC); the employer knew, actually and constructively, that Gjovik engaged in this activity; then Gjovik suffered an unfavorable employment action, and Gjovik's protected activity was a cause of the action. The Sarbanes-Oxley Act, 15 U.S.C. § 1514A, seeks to combat what Congress identified as a corporate culture that discourages employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally."[308]

758.    Gjovik filed complaints internally verbally and then formally (August 23 2021), complained to supervisors, then complained to the federal government (July 2021), complained

---

[304] 18 U.S.C. § 1514A(a)(1).
[305] *Ashley Gjovik v Apple Inc* (Apple Inc/Gjovik/9-3290-22-051) U.S. Department of Labor; Gjovik's U.S. SEC Whistleblower Tip: Sept 1, 2021 (#16304-612-987-465); 28 U.S.C. § 1441(a); Sarbanes Oxley Act (SOX); Dodd Frank Act))
[306] *Stone v. Duke Energy Corp.*, 432 F.3d 320 (4th Cir.2005) (case below 2003-SOX-12).
[307] U.S. Department of Labor, *Whistleblower Investigations Manual,* https://www.osha.gov/sites/default/files/AnnotatedWIM.pdf
[308] 29 C.F.R. § 1980.104(b)(1); S.Rep. No. 107-146, at 5 (2002).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

to the press, and filed a complaint with the US SEC (August 31 2021).[309] Gjovik's complaints to Apple definitively and specifically relate to one of the listed categories of fraud or securities violations under 18 U.S.C. § 1514A(a).[310] Gjovik had an objectively reasonable belief that Apple intentionally misrepresented and omitted certain facts to investors, which were material, and which risked loss, and thus may constitute securities fraud. Gjovik had an objectively reasonable belief that Apple violated SEC rules, and had insufficient internal controls, and engaged in fraud related to securities.

759.    Gjovik complained to Apple about conflicts of interest related to a board member and decision about her office, about apparent self-dealing by corporate insiders including an interested party transaction, Apple's false public statements about Apple's environmental and labor practices, including false statements by a prior government official and now Apple executive; concerns that Apple's internal controls were inadequate; Apple appeared to be silencing and retaliating against whistleblowers and people raising concerns, in order to cover up the issues instead of investigate or resolve problems; and Gjovik's complaints about the safety of her office and about the complaint process generally would be overseen by the Board Committee chaired by an officer Gjovik was complaining about, Ron Sugar.[311]

760.    Gjovik's concerns were material as Apple makes statements about the conditions of its properties, about its compliance with regulations, and its environmental practices in its SEC filings and communications to shareholders. Gjovik's complaints were reasonable as the allegations included all the basic elements of fraud. A claimant who reports a violation of the mail fraud or wire fraud statutes need not also establish that such violations relate to fraud

[309] See OSHA Release No. 22-1763-DAL, SOX Case, Oct. 7, 2022 (ordering a company to pay more than $800,000 in damages and reinstate two scientists whose employment was terminated in retaliation for leaking information to media).
[310] *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir.2008); *Day v. Staples, Inc.,* 555 F.3d 42, 55 (1st Cir.2009).
[311] *Rocheleau v. Microsemi Corp Inc.*, 680 F. App'x 533, 535 (9th Cir.), cert. denied, U.S., 138 S. Ct. 166, 199 L.Ed.2d 40 (2017). *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 668 (4th Cir. 2015).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

against shareholders and does not have to use the word "fraud" to qualify as a SOX whistleblower under the Act.[312]

761.    Gjovik also filed a complaint with the SEC on August 31 2021, and made it public on September 1 2021, that she did so. Apple knew about Gjovik's complaints due to its surveillance of Gjovik's private and public activities, due to press coverage of the complaint, and due to coworkers talking about the complaint. Apple knew about Gjovik's SEC charge when it fired her and Apple fired her because of her complaints and SEC charge, along with other protected activity. Gjovik's SOX activities were at least a contributing factor in Gjovik's subsequent termination.

### ii.    Dodd Frank Whistleblower Retaliation (15 USC §78u-6(h)(1)(A)(iii))

762.    Apple discriminated against, took adverse employment actions, and discharged Gjovik, in violation of the Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), due to Gjovik providing information related to a violation of the securities laws to the Securities and Exchange Commission; initiating, testifying in, or assisting in any investigation or administrative action of the SEC based upon or related to such information; and making disclosures that are required by SOX, the Securities Exchange Act of 1934, or other laws subject to the SEC's jurisdiction. The scope of Dodd Frank whistleblower retaliation protections is broader than SOX. The Dodd-Frank Act protects whistleblowers from retaliation for making disclosures that are required or protected under any law, rule, or regulation subject to the jurisdiction of the SEC, which includes more than securities laws.[313]

763.    Much of the public policy behind Dodd-Frank whistleblower retaliation protections runs parallel to prohibitions on employers terminating employees for reasons that

---

[312] *Lockheed Martin Corp. v. Administrative Review Bd.*, U.S. Dept. of Labor (10th Cir. 2013) 717 F3d 1121, 1130.
[313] *Asadi v. G.E. Energy (USA),* L.L.C., 720 F.3d 620, 625–26 (5th Cir. 2013); § 78u–6(h)(1)(A)(iii).

violate public policy. For example, it is a termination in violation of public policy if an employer terminates an employee for disclosing company-related information to law enforcement.[314] It's also a termination in violation of public policy if an employer terminates an employee because they reported corporate fraud,[315] or because the employee reported to the company's board chairman that he thought that certain business actions were illegal and fraudulent.[316] In addition, an employer cannot retaliate against an employee who disclosed and complained to the employer's shareholders about certain business and medical practices that he thought were unethical and illegal.[317]

764.     As discussed in the RICO section, 18 U.S.C. 1513(e) prohibits "*knowingly, with the intent to retaliate, tak[ing] any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense…*"[318] Section 1107 makes criminal any adverse employment related action, including termination, taken by an employer against an employee for reporting to appropriate law enforcement authority what the employee in good faith reasonably believes to be a violation of any federal law, and not just securities fraud. It applies to all companies, including nonprofits, and not just to public companies, and to all individuals involved in retaliatory termination decisions related to any federal offense.[319]

---

[314] *Palmateer* v *IHO*, 85 Ill. 2d at 132, 52 Ill.Dec. at 16, 421 N.E.2d at 879 (1981); *Cardenas v. M. Fanaian, D.D.S., Inc.* (App. 5 Dist. 2015) 194 Cal.Rptr.3d 1, 240 Cal.App.4th 1167, review filed, review granted and opinion superseded 195 Cal.Rptr.3d 789, 362 P.3d 431, review dismissed 198 Cal.Rptr.3d 821, 365 P.3d 789
[315] *Smith v. Mitre Corp.*, 949 F. Supp. 943, 69 Empl. Prac. Dec. (CCH) ¶ 44506, 37 Fed. R. Serv. 3d 54 (D. Mass. 1997) (applying Massachusetts law).
[316] *Nappi v. Meridian Leasing Corp.*, 859 F. Supp. 1177, 131 Lab. Cas. (CCH) ¶ 58021 (N.D. Ill. 1994) (applying Illinois law). 105 A.L.R.5th 351 (Originally published in 2003)
[317] *Brewer v. Fortunato*, 1993 WL 818649 (Mass. Super. Ct. 1993).
[318] 18 U.S.C. 1513(e)
[319] John A. Gray, Employers Beware: The Tort of Abusive Discharge and Sarbanes-Oxley, Section 1107, 10 Atlantic L.J. 47, 55–59 (2007).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

765.    Apple discharged, suspended, threatened, harassed, and discriminated against, directly and indirectly, Gjovik in the terms and conditions of employment because of lawful acts done by the Gjovik in providing information to the Commission and law enforcement, and making protected disclosures, including but not limited to: about undisclosed conflicts of interests and self-dealing (Ronald Sugar, Lisa Jackson), misrepresentations in securities (see RICO section on *Securities Fraud*), false statements to government and shareholders, material fraudulent conduct, inadequate internal controls , sanctions violations, witness intimidation, and obstruction of justice.

766.    Apple General Counsel Kate Adams' previously stated her approach to Dodd-Frank compliance is "*wait and see.*"[320]

767.    Gjovik filed a whistleblower complaint with the US SEC on August 31 2021.[321] Gjovik posted about her SEC complaint publicly, sharing screenshots of her complaint on Twitter, and speaking to the press about the matter prior to her termination. Apple knew Gjovik filed an SEC complaint. An employee who files an SEC complaint is a "whistleblower' under Dodd-Frank.[322]

768.    In addition, number of Apple's employment policies also violate the Dodd-Frank Act and Apple cited these unlawful policies in its vague justification of Gjovik's sudden termination following Gjovik's SEC charge. Sections about Apple's unlawfully overbroad and overly restrictive policies are incorporated here, especially where the policies discourage or forbid external reporting in violation of Exchange Act Rule 21F-17(a).

---

[320] Roger Adler, *Katherine Adams*, The Recorder, May 24 2012, https://www.law.com/therecorder/almID/1202555942226/ -- ("*Regarding the Dodd-Frank Act, Adams is taking a wait-and-see approach. Since Honeywell isn't a financial company, it isn't one of that law's main targets, she said.*")
[321] *Digital Realty Trust, Inc. v. Somers* (2018) US, 138 S.Ct. 767, 778. See *Banko v. Apple Inc*, 20 F.Supp.3d 749, 758 (ND CA 2013).
[322] Digital Realty Trust, Inc. v. Somers (2018) US, 138 S.Ct. 767, 778

769.     US SEC began investigating Gjovik's August 31 2021 complaint against Apple and Apple's NDAs in 2022 due to Gjovik's complaints. Gjovik has met with US SEC Enforcement three times now since 2022 to discuss her Apple whistleblower tips to the agency.

770.     Gjovik alleges violations of Dodd-Frank Act provisions and so brings an action in an appropriate district court of the United States. Gjovik brings an action under this subsection within ten years of the violation, six years of the retaliation, and within three years of knowledge of the violation. [15 U.S.C.A. § 78u-6]. The Dodd-Frank Act does not preempt state law claims or preclude federal laws. "*Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law.*"[323]

### iii.     Disclosure Controls and Procedures (SOX and Dodd Frank)

771.     Gjovik accused Apple of fraud and violating securities law in July-August 2021 and filed her first SEC whistleblower tip about it on September 1 2021. Gjovik complained Apple had been making materially false statements about their actual environmental, labor, and regulatory compliance practices to shareholders, the public, and the SEC.

772.     Apple disclosed a number of risk factors in its 10-K and 10-Q filings to the Commission, however Gjovik believed that Apple lacked controls and procedures designed to ensure that it captured and assessed certain information related to these risks. Apple's Audit and Finance Committee, chaired by Ronald Sugar, oversees Apple's "s internal control over financial

---

[323] 15 USC § 78u-6(h)(3); An individual who does not file an SEC complaint may nonetheless state a claim for wrongful termination in violation of public policy if his or her termination violates the public policy underlying Dodd-Frank. [See *Banko v. Apple Inc.* (ND CA 2013) 20 F.Supp.3d 749, 758—termination in retaliation for reporting embezzlement violated public policy behind Dodd-Frank and Sarbanes-Oxley Act, including policies against embezzlement and illegitimate corporate tax deductions, and encouragement of whistleblowing]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations."[324]

773.    Exchange Act Rule 13a-15(a) requires issuers that have a class of securities registered pursuant to Section 12 of the Exchange Act to maintain disclosure controls and procedures.[325] Disclosure controls and procedures include those "*designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management . . . to allow timely decisions regarding required disclosure*."[326] Disclosure controls and procedures "*are intended to cover a broader range of information than is covered by an issuer's internal controls related to financial reporting*" and "*should capture information that is relevant to an assessment of the need to disclose developments and risks that pertain to the issuer's businesses*."[327]

774.    If an Exchange Act Registrant fails to implement and maintain disclosure controls and procedures as required, its management may not have adequate information to assess whether the disclosures it makes to investors are fulsome, accurate, and not misleading by omission.[328] The Internal Controls Rule falls under § 1514A because it is a "rule or regulation of the [SEC]."[329]

---

[324] **Apple, Audit and Finance** Committee Charter (as of August 19, 2020), pg4, https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
[325] Defined in Rule 13a-15(e), disclosure controls and procedures are "controls and other procedures of an issuer that are designed to ensure that information required to
be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms." Exchange Act Rule 13a-15(e).
[326] Id.
[327] Certification of Disclosure in Companies' Quarterly & Annual Reports Final Rule Adopting Release, Release No. 33-8124 (Aug. 29, 2002).
[328] US SEC, In the Matter of Activision Blizzard Inc, Respondent; Order Instituting Cease-And desist Proceedings Pursuant to Section 21c Of the Securities Exchange Act Of 1934, Making Findings, And Imposing A Cease and-Desist Order, File No. 3-21294, Release No. 96796, **February** 3, 2023.
[329] *Erhart v. BofI Holding, Inc.,* 612 F. Supp. 3d 1062, 1091–93 (S.D. Cal. 2020)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

775.     Risk disclosures can be misleading if they warn about risks that "could" or "may" occur when the corporation knows that the risks have already materialized.[330] Corporations have a duty to update (correct) disclosures that were misleading when made, but corporations are also bound to correct any voluntary disclosures that, although correct when made, become materially misleading in light of subsequent events.[331] The disclosure requirement generally applies to information uniquely within the corporation's knowledge. There is no duty to disclose matters that are generally known or "knowable" by the investing public.[332]

776.     Gjovik's statements to Cohen, and the Issue Confirmation, included allegations that Apple provided false or fraudulent information to shareholders or the public, with an intent to deceive in order to obtain profit and other benefits from that deception.[333]

777.     Apple's website explains that they "*conduct internal and third-party independent assessments of [Apple's] programs to ensure they are effective. [Apple] make[s] changes to [their] policies and [their] training to reflect emerging trends. Apple's Chief Compliance Officer provides regular updates to the Audit and Finance Committee of the Board of Directors.*"[334] Apple's public statement about internal controls admits that Apple's Chief Compliance Officer (Thomas Moyer, currently facing criminal bribery charges), is the Apple executive responsible for reporting on the effectiveness of Apple's controls. Further, he reports his Findings to Ronald Sugar, Chair of the Audit and Finance Committee.

---

[330] *In re Alphabet, Inc. Secur. Litig.* (9th Cir. 2021) 1 F4th 687, 703-704—risk disclosures warning about security vulnerabilities were misleading because corporation failed to disclose that it already detected cybersecurity issues; see *Siracusano v. Matrixx Initiatives, Inc.* (9th Cir. 2009) 585 F3d 1167, 1181— company warned about "risks of product liability claims in the abstract" when high-level executives knew that company's product was linked to medical condition and that company was going to be sued.]

[331] See *In re Time Warner Inc. Secur. Litig.* (2nd Cir. 1993) 9 F3d 259, 267-268; Backman v. Polaroid Corp. (1st Cir. 1990) 910 F2d 10, 16-17; compare San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc. (2nd Cir. 1996) 75 F3d 801, 808-81.

[332] *Hanon v. Dataproducts Corp.* (9th Cir. 1992) 976 F2d 497, 505.

[333] See *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

[334] Apple, Compliance and Ethics, "Being Accountable," (last accessed 12/2/2023), https://www.apple.com/compliance/

341

### 1) Employee Risk Disclosures

778.     Apple made risk factor disclosures pertaining to its workforce in its annual reports on Form 10-Ks. Apple's 10-K statements about its workforce changed dramatically from 2019-2022. A table is provided below for comparisons. Following Gjovik's SEC whistleblower tip about Apple's deficient internal controls and inadequate disclosures related to employment practices, Apple dramatically modified it's 10-K filings related to employees and employment practices for the first time in over a decade. However, under "*Controls and Procedures*", Apple has claimed with the same statement (sans current date), from at least 2020 through 2023, that Apple "*concluded that the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act were effective…*" and *"there were no changes in [Apple's] internal control over financial reporting.*"[335]

779.     When Gjovik made complaints to SEC, other government agencies, and to Apple in 2021, Gjovik believed that Apple lacked the controls and procedures required to properly document, collect, or analyze employee complaints of workplace misconduct; and as a result, complaints related to workplace misconduct were not documented, collected, or analyzed for disclosure purposes. Gjovik believed this led to Apple making false public statements about their employment practices.

780.     Gjovik's posts on Apple's Slack discussion tool about her concerns about Apple's fraud and controls issues were even covered by the press. In a September 30 2021 article, a publisher wrote about Gjovik's escalation to other employees and to managers:

> On July 26th, 2021, Ashley Gjøvik, a senior engineering program manager, posed a question in the #women-in-swe Slack channel. "*Do we think Apple does a sufficient job at handling employee complaints about discrimination?*" she asked. "*Do we feel comfortable even reporting issues?*" The note sparked a long

---

[335] Apple, 2023 10-K, https://s2.q4cdn.com/470004039/files/doc_earnings/2023/q4/filing/_10-K-Q4-2023-As-Filed.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

discussion from women who also felt misled by the tech giant's HR team. Gjøvik herself shared that employee relations had investigated some of her complaints and told her "*actions were taken*." "But when I pried further, there was no actual resolution or actions because no Apple 'policies' were violated,'" she wrote. Her sentiment was echoed by other women who said they'd experienced similar frustrations.[336]

781. Gjovik was interrogated about her Slack posts by Apple, so Apple knew about her statements. Complaints about discrimination can be protected SOX activity.[337] Gjovik complained to Okpo and Lagares that Apple was only pretending to care about human rights.



From: Ashley Gjovik ashleygjovik@apple.com
Subject: Slack ER Chain
Date: July 28, 2021 at 2:46 PM
To: Ekelemchi Okpo eokpo@apple.com
Cc: Antonio Lagares (ER) alagares@apple.com

Hi,

The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p162732840228400

Not even including DMs...

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

There seems to be a growing group of us with very horrific stories to tell, who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.

Ashley

*Exhibit: Slack ER Chain Email*

782. Gjovik's *Issue Confirmation v3,* submitted August 23 2021 to Okpo and Business Conduct, also complained about inadequate disclosures. Gjovik summarized her overarching concerns about the Employee Relations team as "*RICO; Organized*

---

[336] The Verge, Apple's fortress of secrecy is crumbling from the inside, September 30 2021.

[337] "Conceivably, fraudulent disclosures to shareholders concerning racial discrimination within a company covered by SOX may violate the law and reporting such fraud may be protected." See, *In the Matter of Smith v. Hewlett Packard*, 2006 WL 3246894 (U.S. Dept. of Labor SAROX 2006); *In the Matter of Harvey v. The Home Depot, Inc*., 2004 WL 5840283 (U.S. Dept. of Labor SAROX 2004). § 12:34. Sarbanes-Oxley Act of 2002, 2 Investig. Employee Conduct § 12:34

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Intimidation; Organized Witness Tampering; Retaliation.*" (pg24). Gjovik also complains expressly about Apple's "*Misuse of ADA Policies*" as a tool for Intimidation and Retaliation. (pg26). Gjovik summarized her concerns about Apple's corporate conduct by year for each cause of actions she complained to Okpo and Lagares about with the exception of the "RICO" bullet which stated: "*RICO (Unknown-current) Misrepresentation & fraud; Racketeering; Organized witness tampering; Organized intimidation; Corporate corruption; Cronyism & nepotism.*"

### 2) Environmental & Safety Risk Disclosures

783.    Gjovik expressed concerns to Apple that Jackson must have known about Apple's offices on Superfund sites, but Jackson was making public statements about Apple's commitment to "*healthy communities*" and environmental justice. Gjovik also raised concerns that Jackson's team publicly stated in 2016 that Apple goes "*well beyond legal requirements*" but that EH&S told Gjovik Apple only does what is absolutely legally required related to Superfund sites. Apple never responded to Gjovik's concerns.

784.    Gjovik complained in the Issue Confirmation v3, under "*Apple Real Estate Environment, Health, & Safety*" of concerns about "*RICO; Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness Tampering.*"

785.    At this point, August 23 2021, Apple was trying to gaslight Gjovik into insanity, however she was right on point. Her disclosures about Apple concealing matters of CERCLA concern, if not actual violations, had triggered an onsite inspection of her office just four days prior (August 19 2021). The US EPA had identified a number of safety and regulatory compliance issues, and would then spend the next two years+ fighting with Apple to get Apple to comply with US EPA protocols and requirements for vapor intrusion mitigation. Apple

responded with obstructive activities with the agency executive and blasting the press with a narrative opposite of what was actually happening. Further, Gjovik would not figure this out until nearly two years later, but Apple had nearly killed her in 2020 with the illegal factory exhaust from dangerous silicon fabrication spewing into her windows, which Apple was surely hoping Gjovik would not connect to Apple.

786.    On April 15 2021, Gjovik sent an email to Dr. Cohen, Apple Senior Director, complaining of Apple's conduct related to her office at 825 Stewart Drive and the mishandling of her complaints. Gjovik said she wanted to raise "*ethical concerns*" and complained that Apple's conduct was "*morally wrong*." Gjovik wrote to Cohen:

> "Apparently most Apple buildings are on chemical release sites. … When I asked why they aren't telling employees — what EHS told me was that Apple did an internal review and decided it has no legal obligation to disclose anything about these release sites to employees… I was sharing all this with [an employee in Lisa Jackson's organization] and she's apparently preparing a presentation for Lisa right now about a new Env Justice type project Apple wants to lead and then when I told her what Apple's actually doing… she's like, uh oh. She's been doing more research and is preparing to raise the issue to Lisa in some way. But it's even more complicated. I found an article from 2016 where apparently Apple was breaking hazardous waste laws and settled with the state gov for half a million. Alisha ([this persons'] manager) was quoted as saying that "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me."

The same day Gjovik replied that she "may be too late." (which was cute that back in April 2021 Gjovik thought this could have just been an accidental oversight).

From  🔒 agjovik@icloud.com                    ☆ 🔴 Apr 15, 2021
To      Josh Cohen,  Ashley Gjovik                              ⌄

✉   🗑   ⬇   🏷   ▽   …                    ↩   ↩   ↪

Actually, maybe it's too late to get ahead of this. Just saw Lisa just announced some big community environmental health event on 4/21.
—
Ashley M. Gjovik

*Exhibit: Gjovik email to Cohen 4/15/21*

787.   Gjovik complained to Dr. Cohen that she thought Apple was making fraudulent public statements about its actual practices and positions. Gjovik had become irritated listening to Apple EH&S and Employee Relations blow her off while Apple had just issued a press release for Earth Day. The press release included:

> "As government and business leaders gather to fight climate change and build a better future for our planet, we're reminded that each of us — in communities around the world — is a part of this work," said Lisa Jackson, Apple's vice president of Environment, Policy and Social Initiatives. "The resources and community initiatives we're sharing today are all about amplifying voices too often unheard, and giving people the tools to learn, engage, and be part of the solution… As people around the world celebrate Earth Day, Apple's focus remains on supporting those communities most impacted by climate change and environmental challenges."[338]

Gjovik was inflamed that Apple was telling her to keep her safety and environmental concerns secret, to not talk to her coworkers, and that she should just assume Apple was following environmental and safety laws because Apple said it was. And while Gjovik did not yet know

---

[338] Apple, *Apple Celebrates Earth Day 2021*, April 21 2021, https://www.apple.com/newsroom/2021/04/apple-celebrates-earth-day-2021/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Apple was behind the toxic exposures at 3250 Scott Blvd, Gjovik was irritated at Apple's apparent indifference towards the community living and working atop the Triple Site.

788. Apple's announcement also included a new project Apple released that was: "*collaborating with Dolores Huerta, social justice advocate and founder of the Dolores Huerta Foundation, to encourage learners of all ages to "Create a Better World Through Environmental Justice.*"[339] Gjovik was similarly irritated at Apple's supposedly earnest claim to partner with labor leader Dolores Huerta on Environmental Justice maters, while Apple had just showed Gjovik an aggressive disregard for labor rights and workplace safety rules.

789. Gjovik replied to Dr. Cohen with an update on April 21 2021, saying:

> I'm trying to run this up the chain with I&D too, but they think it will just end up back with EHS. Which employees are going to spend the most time around vapor intrusion pathways (plumbing, vents, etc) — probably our Black and Brown employees working in maintenance & cooking type roles. Who's going to spend the most time physically exerting themselves running things around at these buildings? Probably our technicians and admins, who are also predominately people of color and women, respectively. Apparently women get worse health issues from this type of chemical exposure. Because we have high body fat and sensitive hormones, etc. So if there are chemical vapor issues in buildings, women will get sicker. It also can mess with our reproductive health and pregnancies. So Black & Brown women get the worst of it. ;; We're clearly not the only ones doing this…. That Google/TCE exposure news coverage was horrifying. Figured I'd at least try though. You know me.

790. On April 21 2021, Gjovik had not yet faced all the retaliation from Waibel, West had not told her to quit, she did not know about the cracks in the floor – the world was a different place and she considered letting it go for the moment, however noted it was clearly a systemic issue, which implicates the need for controls and disclosures.

791. Apple's environmental disclosures dramatically changed after Ronald Sugar joined Apple's Board of Director's in 2010 and became Chair of the Audit and Finance

---

[339] Id.

Committee. Prior to Sugar, Apple had repeatedly reported "environmental laws" as a potential risk factor to Apple's business model. The final 10-K prior to Sugar's tenure repeated the statement: "*Environmental Laws: Compliance with federal, state, local and foreign laws enacted for the protection of the environment has to date had no significant effect on the Company's capital expenditures, earnings, or competitive position. **In the future, compliance with environmental laws could materially adversely affect the Company*****.**"[340] At this point, supposed environmentalist, Al Gore, was on the Board of Directors. Starting in 2011, after Sugar joined, that section 'environmental laws are bad' section was removed from Apple's 10-Ks after being there since the last 1990s. The same years Apple's Environmental Report claims "*Apple is committed to protecting the environment, health, and safety of its employees, customers, and the global communities in which it operates.*"[341]

792.    In Apple's 2023 10-K, Apple included under "General Risks", "Item 2. Properties" which said: "*The Company's headquarters is located in Cupertino, California. As of September 30, 2023, the Company owned or leased facilities and land for corporate functions, R&D, data centers, retail and other purposes at locations throughout the U.S. and in various places outside the U.S. The Company believes its existing facilities and equipment, which are used by all reportable segments, are in good operating condition and are suitable for the conduct of its business.*" This is roughly the same statement used in 10-Ks for years.[342]

793.    Apple's 10-Ks reference "*environmental, health, and safety*" as a risk factor under *"The Company is subject to complex and changing laws and regulations worldwide, which exposes the Company to potential liabilities, increased costs and other adverse effects on*

---

[340] Apple, 2010 10-K, https://d1lge852tjjqow.cloudfront.net/CIK-0000320193/afa23a45-2381-49cc-9933-750c74d3f0a8.pdf
[341] Apple, Environmental Report, 2010, https://www.apple.com/environment/pdf/Apple_Facilities_Report_2010.pdf
[342] Id.

*the Company's business,*" from at least 2020-2023.[343] In 2021, after Gjovik's SEC whistleblower complaint, Apple added examples of "*environmental, health, and safety*" risks as "*including electronic waste, recycling, and climate change.*"[344] In 2023, after Gjovik discovered Apple's secret silicon fabrication at 3250 Scott Blvd, Apple revised it to: "*including electronic waste, recycling, __product design__ and climate change.*"[345]

794.    Environmental liability disclosures (or lack thereof) may constitute material securities fraud.[346] When Lisa Jackson suddenly brought the head of the US EPA to Apple Park the day before the US EPA inspected Gjovik's Superfund office (due to Gjovik's disclosures to the US EPA), Jackson told CNBC that when she meets with Regan, she "*expects to discuss mandatory SEC disclosures of carbon emissions. 'We'll probably talk about SEC disclosure,'*" she said.[347]

795.    Apple's 10-Ks also include in this section, from at least 2020-2023, a warning that Apple believes "*compliance with these laws and regulations may be onerous and expensive,*" "*there can be no assurance the Company's employees, contractors or agents will not violate such laws and regulations.*"[348] It then states, "'*if [Apple] is found to have violated laws and regulations, it could materially adversely affect [Apple's] business, reputation, results of operations and financial condition.*"[349]

---

[343] Apple, 2023 10-K page 13, 2022 10-K page 13, 2021 10-K page 14, 2020 10-K page 11.

[344] Apple 2021 10-K

[345][345] Apple 2023 10-K

[346] *Chem-Nuclear Systems, Inc. v. Waste Management, Inc.,* Case No. C82-812C (W.D. Wa., July 16, 1982), 1982 CCH Federal Securities Law Reports, ¶. 98, 759 pp. 93.846-93.849 (an analysis of materiality of contingent environmental liabilities in a Rule 10b-5 action*); Grumman Corp. v. LTV Corp.,* 527 F.Supp. 86 (E.D.N.Y. 1981) aff'd., 665 F.2d 10 (2d Cir. 1981) (preliminary injunction granted in favor of Grumman to prevent its acquisition by subsidiary of LTV where the involved offer to purchase failed to disclose contingent environmental liabilities).

[347] Kif Leswing, *Apple backs Biden's proposal to eliminate greenhouse gases from power plants by 2035*, CNBC, Aug 18 2021, https://www.cnbc.com/2021/08/18/apple-backs-biden-clean-energy-standard.html

[348] Apple, 2020-2023 10-Ks

[349] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

796.     Following Gjovik's public disclosures, government charges and investigations, and extensive press coverage of her complaints about Apple's in summer/fall of 2021 – Apple then updated its 10-K risk disclosures in October 2021 to create a new section called: "*The technology industry, including, in some instances, [Apple], is subject to intense media, political and regulatory scrutiny, which exposes [Apple] to increasing regulation, government investigations, legal actions and penalties.*"[350] Under this new header, Apple added a completely new disclosure that says: "*Changes to the Company's business practices to comply with new laws and regulations or in connection with other legal proceedings could negatively impact the reputation of the Company's products for privacy …and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, and lost sales.*"[351] This wording has remained through 2023.

797.     Similarly, in 2021 Apple suddenly expanded the "*Employee*" section to "*Human Capital*" with a "*Health and Safety*" sub-section – the first major change to the "*Employee*" section in over a decade. Under health and safety, Apple wrote in 2021 that Apple "*supports employees with general safety training and puts specific programs in place for those working in potentially high-hazard environments, including chemical management… hazardous materials management.*"[352] In 2022, after it appeared Gjovik may never discover what happened at 3250 Scott Blvd, and Gjovik was under a five-year gag-order, Apple them removed "*including chemical management… hazardous materials management*" from the disclosure.[353] In fact there is now no mention of chemicals or hazardous waste/materials at all in the eighty page reports.

798.     Gjovik's concerns included public misstatements and fraudulent claims about Apple's actual environmental practices compared to what Gjovik saw internally (reckless

---

[350] Apple, 2021 10-K, page 14
[351] Id.
[352] Apple, 2021 10-K, page 4
[353] Apple, 2022 & 2023 10-K

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

disregard for the law and public safety), Apple's actual labor practices (Apple is actually one step away from installing the Foxconn "suicide nets" at Apple Park[354]), and Apple's general regulatory compliance and issue investigation practices (which is just mostly witness intimidation and retaliation). Apple promotes these topics and the false claim they are ethical leaders in these fields to attract customers to buy their products and to encourage investors to buy and hold Apple stock. In one SOX whistleblower case, an employee raised concerns about a misstatement in one of the company's filings with the SEC and the court found her actions were protected conduct.[355]

799.    While Ronald Sugar was Northrop Grumman CEO, the company included Superfund site expenses in their SEC disclosures, however only after Sugar left did Northrop Grumman start including individual Superfund site litigation disclosures.[356] While Kate Adams was General Counsel of Honeywell, Honeywell included hazardous waste related disclosures in their SEC filings, but she has not included them in Apple's filings.[357]

---

[354] CNN, *Apple employee found dead at HQ shot himself*, 2016, https://money.cnn.com/2016/04/28/technology/apple-employee-death-gun-suicide/index.html ; The Verge, *APPLE'S FRONTLINE EMPLOYEES ARE STRUGGLING TO SURVIVE*, 2021, https://www.theverge.com/c/22807871/apple-frontline-employees-retail-customer-service-pandemic
[355] Jones v. Southpeak Interactive Corporation of Delaware, 777 F.3d, 658 (4th Cir. 2015).
[356] Northrop Grumman 10-K, 2011, Section 15, pg88, ("The company is one of several defendants in litigation …. for alleged contribution to volatile organic chemical contamination of the County's shallow groundwater. The lawsuit includes counts against the defendants for violation of the Orange County Water District Act, the California Super Fund Act, negligence, nuisance, trespass and declaratory relief….") https://investor.northropgrumman.com/static-files/2f043e4b-b825-4345-9814-c52f12a66656
[357] See for example, US SEC, Honeywell 10-K, 2015, pg12 https://honeywell.gcs-web.com/static-files/622b6f6c-65ca-445e-9d11-015cc64c3e5a-- ("*We are and have been engaged in the handling, manufacture, use and disposal of many substances classified as hazardous by one or more regulatory agencies ... future knowledge or other developments, such as improved capability to detect substances in the environment or increasingly strict environmental laws and standards and enforcement policies, could bring into question our current or past handling, manufacture, use or disposal of these substances.*")

### 3) Wire Fraud, Mail Fraud, Shareholder Fraud, Communications (SOX and Dodd Frank)

800. An employee, like Gjovik, making complaints and inquires can engage in activity protected by SOX and Dodd-Frank, when the complaints and inquires definitely and specifically relate to wire or mail fraud, and when the employee files a complaint about the matter to the US SEC.[358] "The statute clearly protects an employee against retaliation based upon that employee's reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of the company."[359] Many of Gjovik's complaints alleged fraud that would constitute one or more of mail, wire, and/or securities fraud – especially Gjovik's complaints about misleading statements by Lisa Jackson, of which there were two she cited directly.

801. A securities fraud claim's elements "*include a material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation*."[360] To show securities fraud under SEC Rule 10b–5, "a plaintiff must demonstrate (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."[361] A conceivable shareholder fraud theory requires at least (1) a material misrepresentation or omission of fact and (2) an indication of an intent to defraud.[362]

802. Fraud and Rule 10b-5 related claims can occur in "commercial sales of businesses where contingent environmental liabilities for both cleanup and toxic tort damages have not been fully disclosed. Where, for instance, a corporation owns commercial or industrial property which

---

[358] *Neely v. Boeing Co*., 823 F. App'x 494, 496 (9th Cir. 2020) – (dismissing SOX and Dodd Frank claims based on safety complaints that do not allege fraud and where there is no complaint to the US SEC)
[359] *Verfuerth v. Orion Energy Sys., Inc*., 879 F.3d 789 (7th Cir. 2018); *Reyna v. ConAgra Foods, Inc*., 506 F. Supp. 2d 1363, 1382 (M.D. Ga. 2007).
[360] Van Asdale v. International Game Technology, 577 F.3d 989 (9th Cir. 2009)
[361] Id (quoting *In re Daou Sys., Inc*., 411 F.3d 1006, 1014 (9th Cir. 2005)).
[362] See *Van Asdale*, 577 F.3d at 1001; see also *In re ChinaCast Educ. Corp. Sec. Litig*., 809 F.3d 471, 472, 474 (9th Cir. 2015) (noting "scienter or intent to defraud" is "a bedrock requirement of Rule 10b–5"); *ESG Capital Partners, LP v. Stratos* (9th Cir. 2016) 828 F3d 1023, 1032.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

it knows or should know is contaminated with hazardous substances and that corporation is issuing or selling securities or is itself being sold as a business entity, it may well incur liability under Rule 10b-5 and similar state securities laws and regulations should the contingent environmental liability prove to be material and should the corporation fail to fully disclose those liabilities in the transaction."[363]

803.    Under 15 U.S.C.A. § 77l, "*Any person who… offers or sells a security ….by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements…not misleading (the purchaser not knowing of such untruth or omission),… and in the exercise of reasonable care could not have known, of such untruth or omission… shall be liable… to the person purchasing such security from him.*"[364]

### iv.    Conflicts of Interest (SOX & Dodd Frank)

804.    Gjovik accused Ronald Sugar of not disclosing a conflict of interest and/or letting a conflict of interest interfere with his duties as the Chair of Apple's Audit and Finance committee, related to her Superfund office. She was concerned, due to the poor condition of her office, and Apple's fervent cover-up about it, that Sugar had used his position on Apple's Board of Directors to influence Apple in ways to benefit his prior company, Northrop Grumman, and to protect his own personal interests (i.e., interested party transactions, RESPA, etc.). Gjovik was also concerned Sugar had a personal interest in covering up Gjovik's concerns in order to protect Northrop Grumman and himself.

---

[363] Evolving Issues In Toxic Tort Law: What Happens When Clean-Up Is Not Enough?, 22B RMMLF-INST 9 (1988); See, Chem-Nuclear Systems, Inc. v. Waste Management, Inc., Case No. C82-812C (W.D. Wa., July 16, 1982), 1982 CCH Federal Securities Law Reports, ¶. 98, 759 pp. 93.846-93.849 (an analysis of materiality of contingent environmental liabilities in a Rule 10b-5 action).
[364] 15 U.S.C.A. § 77l

805.     After discovering many issues at her Superfund site office (which ended up being the tip of the iceberg), Gjovik began wondering why Apple decided it was a good idea to rent a property on a massive toxic waste dump. Gjovik began questioning if the prior CEO of the responsible party who was now on the Apple Board in charge of real estate oversight, Ron Sugar, may have influenced Apple's decision to rent the property. After hearing Apple's position about the toxic waste dump (its great and she should shut her mouth), Gjovik also began questioning why Apple was making grand public statements about environmental compliance and safety when their internal practices were deranged and reckless. Further, Gjovik questioned why one of the key people making these public statements for Apple, Lisa Jackson, would do such a thing considering her background in environmental protection. Finally, Gjovik also began worrying Apple executives persisted on their terrible plan of record and retaliation against Gjovik because it would be embarrassing to Jackson for it to come out what Apple had done.

806.     On August 23 2021, Gjovik filed a formal internal complaint to Apple's Business Conduct reporting system about her concerns about Ronald Sugar. She received confirmation her complaint was submitted and was provided a tracking number (*HRC000017207*)

Request submitted - Business Conduct                                    8/23/21, 4:30 PM

You can change your language preferences.
Update here.

## Your request has been sent.

Support Request HRC000017207 has been created.

Thank you for contacting Business Conduct. We make every effort to respond as soon as possible. If your question is urgent, you can call us at the numbers listed on this page.

*Exhibit: Internal Complaint, 8/23/21, #HRC000017207, Submitted*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

807.    Gjovik's Business Conduct complaint included the Issue Confirmation v3 as an attachment, and the text in the form read:

> "Ronald Sugar used to be CEO/President of TRW Microwave & Northrup Grumman. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee, which appears to oversee the due diligence programs for offices on chemical clean-up sites, including the TRW Microwave Superfund. His previous companies caused the contamination that is now being cleaned up under my office. See page 33 of attached PDF."

For location, Gjovik put "TRW Microwave Superfund Site.

808.    Gjovik directed Business Conduct to her detailed complaints on Page 33 of the 34 page "Issue Confirmation" which has a section titled "5. Board of Directors", "I. Finance & Audit Committee," "xxii. Ronald Sugar." Gjovik noted overall concerns were: Conflcit of Interest, Corruption, and Fraud.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

## Tell us about your concern.

Text fields must be completed in English.
Fields marked with an * are required

Name
Ashley Gjovik

Apple email address
ashleygjovik@apple.com

https://hcl.apple.com/businessconduct?id=sc_cat_item&sys_id=7eb6...37150106c27313e0fb23235&cat_id=ab886f7ba3c720109e883f0807ef642e          Page 1 of 3

Request – Business Conduct                                                                                                  8/23/21, 4:29 PM

Preferred phone number
4082049976

Explain what happened *                                                                                                      *
Ronald Sugar used to be CEO/President of TRW Microwave & Northrup Grumman. Sugar is now on the Board of Directors for Apple as
chair of the finance & audit committee, which appears to oversee the due diligence programs for offices on chemical clean-up sites,
including the TRW Microwave Superfund. His previous companies caused the contamination that is now being cleaned up under my
office. See page 33 of attached PDF.

Date
8/23/2021

Time
4:30pm

Location *                                                                                                                  *
825 Stewart Ave Sunnyvale CA (TRW Microwave Superfund site)

List employees and/or people involved *                                                                                    *
Ronald Sugar

Have you reported this to anyone else? If so, who? *                                                                        *
Yes, Employee Relations in July 2021

*Exhibit: Internal Complaint, 8/23/21, #HRC000017207, Form*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                          DECEMBER 21 2023

809.    Gjovik's formal Business Conduct Complaint, which referenced her "Issue Confirmation" drafted with Employee Relations, first provided a recitation of facts about Sugar, Northrop Grumman, and TRW. Gjovik also complained about Apple EH&S and Employee Relations conduct related to the environmental issues at her office, referring to their activities as "negligent, reckless," that they "misrepresented their activities," and that they "intimidated [her] not to speak out about [her] safety concerns." Gjovik then asked three questions.

-    1) Is Sugar overseeing the due diligence program for clean-up, testing, employee complaints, finance for this office that his previous company caused the pollution for & is still responsible to clean up?

-    2) Did he notify the General Counsel of this conflict of interest?

-    3) Has he taken any actions that are favorable to NG/TRW and forsake proper safety & protection for Apple employees?

Finally, Gjovik links to evidence to support her claims (US EPA websites), the policies she is asking if Apple is in compliance with (Apple's Audit and Finance Committee Charter, Corporate Governance Guidelines), and an Apple Press Release about Sugar joining the Board of Directors in 2010.

810.    Gjovik notes both policies reference the *"Guidelines Regarding Director of Conflicts of Interest,"* which orders that "Directors should take all reasonable steps to avoid conflicts of interest with the corporation. Any director who becomes aware of an actual or potential conflict of interest with the Corporation at any time shall notify the Corp GC promptly in writing of the material facts of the actual or potential conflict of interest."

811.    Gjovik disclosed what she viewed as witness intimidation and fraud that may be caused in some way by Sugar due to this clear conflict of interest. Gjovik's inquiry about Ronald

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1  Sugar was fact finding. This was not a "gotcha!" complaint. Gjovik was actually about corporate

2  governance regulatory compliance concerns.

## 5. Board of Directors

### I. Finance & Audit Committee

xxii.  **Ronald Sugar**

- **Concerns:** Conflict of Interest, Corruption; Fraud
- **Issues:**
  - Ronald Sugar used to be CEO/President of TRW Microwave then Northrup Grumman.
  - Mr. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee. The committee appears to oversee the finance and oversight of the due diligence programs for chemical clean-up site offices, including the TRW Microwave Superfund, which is the office I work in.
  - His previous companies (TRW & NG) caused the contamination that is now being cleaned up under my office. My office is designated as the EPA's "TRW Microwave" Superfund site. (Part of the "Triple Site" of 3x Superfund groundwater plumes in Sunnyvale, CA).
  - Is Sugar overseeing the due diligence program for clean-up, testing, employee complaints, finance for this office that his previous company caused the pollution for & is still responsible to clean up?
  - Did he notify the General Counsel of this conflict of interest?
  - Has he taken any actions that are favorable to NG/TRW and forsake proper safety & protection for Apple employees?
  - I have been reporting safety concerns in that office since March 2021 and have escalated further concerns that EH&S has been negligent, reckless, misrepresented their activities, and have intimidated me to not speak out about the safety concerns.
  - The Federal EPA was notified, of my concerns & notified Apple ER & EHS of my contact with the gov at that time
- **Evidence:** Box folder including emails & photos; emails:
  - The Finance & Audit committee 2020 charter includes responsibilities such as:
    - The purpose of the Committee is to:  1. Assist the Board in oversight and monitoring of: compliance with legal, regulatory and public disclosure requirements; the independent auditors, including their qualifications and independence; enterprise risk management

Page 33 of 34

*Exhibit: Issue Confirmation, Version 3, pg 33*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1; with AG rev v2 | 22 Aug 2021

- Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints regarding the Corporation's financial statements or accounting policies.
- https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
  - Guidelines Regarding Director of Conflicts of Interest says
    - Directors should take all reasonable steps to avoid conflicts of interest with the corporation.
    - Any director who becomes aware of an actual or potential conflict of interest with the Corporation at any time shall notify the Corp GC promptly in writing of the material facts of the actual or potential conflict of interest.
  - Corporate Governance Guideline say:
    - The Board expects its directors, as well as officers and employees, to act ethically. Directors are expected to adhere to the Corporation's Business Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.
      - https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Corporate-Governance-Guidelines.pdf
- https://semspub.epa.gov/work/09/1158562.pdf
- https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/
- https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901481/bkground
- https://www.microwaves101.com/encyclopedias/where-are-they-now//trw
- **Witnesses:** Business Conduct? Gov Affairs? *You know what y'all did*
- **Business Conduct Report:** Support Request HRC000017207
- 

*Exhibit: Issue Confirmation, Version 3, pg 34*
*(Note header was not updated with latest version, it was on file name)*

812.    Gjovik complained to Apple, the press, and to the SEC that Lisa Jackson and Alisa Johnson 's conflict- of-interest and yet "*seem to be heavily involved in Apple's … public relations about Apple's hazardous waste crimes/infractions*" and "*Lisa Jackson used to run the U.S. EPA & Alisha was her press secretary, including commenting on the 2016 DTSC settlemen*t." (see US EPA and US SEC complaints).

359

### 1) "Conflict of Interest" Generally

813.    There are a number of different types of conflicts of interest government by the US SEC.[365] Directors, officers and controlling shareholders are required to act with "inherent fairness" to the corporation and those interested therein.[366] This "fairness" requirement underlies various statutory and common law limits on conflict-of-interest transactions: i.e., transactions in which the personal interests of such directors, officers or controlling shareholders may conflict with those of the corporation.

814.    For example, in *Thomas v. Tyco International Management Co*. a reasonable, valid SOX whistleblower claim was found with a complaint about the "*proper segregation of duties in the financial reporting team*" due to conflicts of interest, and the district court found "*that a genuine issue of material fact exist[ed] as to whether [the plaintiff] reasonably believed that she was engaging in protected conduct each time she raised issues regarding [the defendant's] lack of internal controls regarding financial management.*" [367]

815.    For example, in *Wadler v Bio-Rad Labs*, there was a sufficient claim for SOX/Dodd-Frank whistleblower retaliation when an employee suspected the company was engaged in FCPA violations and started investigation, only to meet a variety of types of retaliation and obstruction.[368] The employee asked for documents and the company refused to provide them; the employee claimed he was being "stonewalled"; and the conduct made the employee "*become suspicious that [the] corruption issues …. were known to senior management, and that management was intentionally blocking his efforts to uncover evidence of*

---

[365] 15 U.S.C.A. § 77z-2a "§ 77z-2a. "Conflicts of interest relating to certain securitizations"; *Thomas v. Tyco International Management Co*., 416 F. Supp. 3d 1340 (S.D. Fla. 2019).
[366] *Jones v. H.F. Ahmanson & Co*. (1969) 1 C3d 93, 110, 81 CR 592, 600; *see Steinberg v. Amplica, Inc.* (1986) 42 C3d 1198, 1210, 233 CR 249, 256; see also *Meister v. Mensinger* (2014) 230 CA4th 381, 395, 178 CR3d 604, 615.
[367] *Thomas v. Tyco International Management Co*., 416 F. Supp. 3d 1340 (S.D. Fla. 2019).
[368] *Wadler v. Bio-Rad Labs., Inc.,* 141 F. Supp. 3d 1005, 1008-9 (N.D. Cal. 2015)

360

*bribery and related misconduct."*[369] The employee he then took his concerns to the Audit Committee of the Board of Directors, but complained that the people who would investigate his claim "*had a clear conflict of interest,*" and the employee was then terminated.[370]

816.    Apple's Business Conduct Policy states: "*A conflict of interest is any activity that may damage Apple's reputation or financial interests or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.*" [371] Apple's policy lists examples of common conflicts of interest including business relationships. The policy instructs: "*Do not… use your position at Apple to solicit resources or any other benefit for your outside activity, obtain favored treatment, or pressure others to assist you*."[372] The policy discusses personal investments saying "*when determining whether a personal investment creates a conflict of interest, consider if you are in a position to influence transactions between Apple and a business in which you have invested.*"[373]

817.    The policy adds, "*Members of Apple's Board of Directors should follow the requirements and procedures described in the Guidelines Regarding Director Conflicts of Interest.*" Under "*Board Positions,*" it states: "*A board position that presents a potential or actual conflict of interest is unlikely to be approved."*[374]

### 2)  Interested Party Transactions (Cal. Corps. Code § 310)

818.    A contract or other transaction with another firm (corporation, partnership or other business entity) is also subject to the requirements if a director has "a material financial

---

[369] Id at 1009.
[370] Id at 1009.
[371] Apple, Business Conduct Policy, August 2022, page 10,
https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf
[372] Id at page 11.
[373] Id at page 11.
[374] Id at pages 10-11.

361

interest" in such firm.[375]  All material facts, both as to the director's interest in the transaction, and as to the contract itself, must be disclosed to (or already known by) the shareholders.[376]

819.    Ronald Sugar has commercial, reputational, and relationship interests in Northrop Grumman generally – Sugar may also have a personal tie to this Superfund site, as he apparently used to work there, maybe for over a decade. It seems peculiar that Apple would suddenly want to lease such a property, after the building had sat vacant and gutted for over a decade. It was a reasonable inquiry if Sugar influenced Apple's decision to become a long-term tenant, and if so, what kind of arrangement Apple has with Northrop Grumman related to the CERCLA obligations.

820.    The impact of these real estate deals is significant – not just with the environmental concerns, but the owner of Gjovik's office was CalSTRS, one of Apple's largest shareholders. Fraudulent regulatory filings about her office, including omission of required information to the US EPA, would defraud a key shareholder (with CalSTRS owning around $4 Billion of Apple stock in 2021.[377]

### 3) Related Party Transaction

821.    Gjovik raised concerns about issues that constitute a Related Party Transaction and related disclosure: "*a deal or arrangement made between two parties who are joined by a preexisting business relationship or common interest*" and can include "*leases*."[378] The Securities and Exchange Commission (SEC) requires that all publicly-traded companies disclose all transactions with related parties—such as executives, associates, and family members—in their quarterly 10-Q reports and their annual 10-K reports.[379]

---

[375] Cal. Corps. Code § 310(a); Conflict of Interest Limitations, Cal. Prac. Guide Corps. Ch. 6-E
[376] Cal. Corps. Code § 310(a)(1).
[377] 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5
[378] Investopedia, Related Party Transactions (last visited 12/3/2023), ttps://www.investopedia.com/terms/r/related-partytransaction.asp
[379] Id.

822.    Enron used related-party transactions to cover up billions of dollars in debt. These fraudulent related-party transactions led to Enron's bankruptcy, prison sentences for its executives, lost pensions and savings of employees and shareholders, and the ruin and closure of Arthur Andersen – all of which led to the development of the Sarbanes-Oxley Act of 2002, which established new and expanded existing requirements for U.S. public company boards, management, and public accounting firms, including specific rules that limit conflicts of interest arising from related-party transactions.[380]

823.    Here, this real estate deal would have likely counted as a Related Party Transaction. In addition to the $12M sale Apple's rent for a long-term lease, the building was dramatically renovated for Apple with significant Capital improvements. Further, at the time of the sale to Oaktree Capital and lease to Apple, it had not been five years since Sugar 'retired' from Northrop Grumman, and he apparently still stayed on as an "Advisor."

824.    Curiously, Apple used to report Related Party Transactions in its 10-Ks through 2010, but stopped in 2011 after Ronald Sugar joined the Apple Board of Directors and became Chair of the Audit and Finance Committee.[381] Apple had included Related Party Transactions in its 10-Ks from 1999-2010.[382] (See section on *Background: Ronald Sugar* noting that Northrop Grumman did not start making detailed Superfund disclosures until the year after Sugar retired).

825.    Apple's Audit and Finance Committee, chaired by Ronald Sugar, oversees Apple's responsibility to: "*Review and approve related-party transactions consistent with the*

---

[380] Id.
[381] Apple, 2010 10-K, page 81, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=7519151
[382] Apple, 1999 10-K, page 101, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=124179

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Related Party Transactions Policy and report to the full Board on any approved transactions.*"[383]

#### 4) Real Estate Settlement Procedures Act (RESPA)

826.    At 825 Stewart Drive, Oaktree Capital/Hines owned the property from 2014-2016, at which point it sold the property to CalSTRS/GI Partners (the California government) who then owned the property from 2016-2023, before selling it.  Apple leased the building from 2015-current. During this time, both the owners and Northrop Grumman were in contract with the U.S. government under CERCLA, and that contract provided direct obligations for the owner related to tenants (Apple). During this time, Ronald Sugar was on the Board of Apple and Chair of Apple's Audit and Finance Committee, owned millions of dollars of Northrop Grumman stock (the company where he used to be CEO), and also sat on a Board (Chevron) with an executive at the property owner Oaktree Capital.[384]

827.    Section 8(a) of RESPA prohibits any person from giving or receiving "*any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.*"[385] "Regulation X" clarifies that such an agreement or understanding may be inferred from a course of conduct.[386] It's possible Sugar's conduct related to the sale and leasing of the office, a property with a federal loan (through CERCLA) may have violated RESPA. In fact, in December 2021, a law firm requested public records about specific information related to the property sale from Oaktree Capital to CalSTRS.

---

[383] Apple, Audit and Finance Committee Charter (as of August 19, 2020), pg4, https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
[384]
[385] 12 U.S.C. § 2607(a).
[386] 24 C.F.R. §1024.14(e).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Upon investigation, it appears the law firm was looking into RESPA related to the property, but it is unknown who they represented (probably CalSTRS/GI Partners).

### v.     OFAC Sanctions (Dodd-Frank; 22 U.S. Code § 8792)

828.     Shortly before Gjovik was "removed from the workplace and all workplace interactions" indefinitely, she was complaining about one of her coworkers bragging in a career growth article about what sounded like illegal smuggling and violation sanctions against Syria. Gjovik's management (Powers, West, also Basanese) had all ignored it for months so Gjovik reported it to Business Conduct. West told her after that the employee did nothing wrote but that he wanted to delete the portion of the article Gjovik alleged referenced smuggling.

On Jul 20, 2021, at 7:54 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi John,

I wanted to check in on these outstanding questions — especially and specifically my question about the illegality of Amr exporting to & re-selling Apple products in Syria. I did some research today and it appears what he did was VERY illegal. Not just a violation of Apple policies, but a violation of U.S. federal law, and perhaps a violation of international law as well, if I'm reading all this right.

We need to notify the appropriate Apple legal teams of this information.

— — —

Apple Trade Compliance
PROHIBITED DESTINATIONS
"The U.S. holds complete embargos against North Korea and Syria.
The exportation, reexportation, sale or supply, directly or indirectly, from the United States, or by a U.S. person wherever located, of any Apple goods, software, technology (including technical data), or services to any of these countries is strictly prohibited without prior authorization by the U.S. Government."
https://www.apple.com/legal/more-resources/export.html

Legal Framework of U.S. sanctions on Syria:
"The Syria Sanctions program represents the implementation of multiple legal authorities. Some of these authorities are in the form of an executive order issued by the President. Other authorities are public laws (statutes) passed by The Congress. These authorities are further codified by OFAC in its regulations which are published in the Code of Federal Regulations (CFR). Modifications to these regulations are posted in the Federal Register. In addition to all of these authorities, OFAC may also implement United Nations Security Council Resolutions (UNSCRs) with regard to Syria."
https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/syria-sanctions

— — —

Quote from Amr's article:
"Syria is not a country where Apple is allowed to sell products or have authorized resellers. But luckily, my grandma was visiting the U.S. and returning in a few weeks so I had to act fast. I decided to buy 10 iPods, sell 5 to my friends in school at a markup (because I had no competition), and finance my own from the profits. I convinced my dad to lend me the money, my grandma to buy and carry 10 black boxes the size of a mac mini, and managed to secure 5 pre-orders. A few weeks later, the magical devices arrived and I sold all 9. That was probably my first real-life lesson about Business and Entrepreneurship."
https://confluence.sd.apple.com/display/PSQ/How+I+Got+Here+-+Amr

<How I Got Here - Amr - Product Systems Quality - SEO Confluence.pdf>

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's email to West, Powers, Johnson, and Basanese on 7/20/21*

829.    The I<small>RAN</small> T<small>HREAT</small> R<small>EDUCTION AND</small> S<small>YRIA</small> H<small>UMAN</small> R<small>IGHTS</small> A<small>CT OF</small> 2012 requires disclosures under Section 13(a) of <small>THE</small> S<small>ECURITIES</small> E<small>XCHANGE</small> A<small>CT OF</small> 1934 via 10-Ks and or 10-Qs.[387] Companies have been fined by the Federal Reserve and OFAC for "unsafe or unsound practices relating to … inadequate oversight of sanctions compliance risks."[388]

830.    Federal statutes also govern smuggling. (see, 18 U.S. Code § 554 - Smuggling goods from the United States; 18 U.S. Code § 546 - Smuggling goods into foreign).

831.    Apple was recently fined by OFAC for violations of sanctions laws, noting that *"based on the number of Apparent Violations, the length of time over which the Apparent Violations occurred, and the multiple points of failure within the company's sanctions compliance program, policies, and procedures, [Apple's [ conduct demonstrated reckless disregard for U.S. sanctions requirements."* The settlement included a requirement that Apple *"Implemented mandatory training for all employees on export and sanctions regulations."*[389]

832.    Apple's Business Conduct team said they did not care of the employee had been involved with illegal smuggling in his personal time, but only cared if he did it in a way that implicated Apple. Gjovik asked if they would still report it if it was illegal, and they said no. West also echoed this sentiment saying it was fine because there *"are no compliance issues for Apple",* but for vague reasons they will remove the references to smuggling, and also, they still want to publish the article. Gjovik's supervisor, Dan West, never talked to Gjovik again after this response.

---

[387] 22 U.S. Code Subchapter VII - Sanctions with Respect to Human Rights Abuses in Syria, §§ 8791 - 8795
[388] US Federal Reserve, *Federal Reserve Board Fines Wells Fargo $67.8 million for inadequate oversight of sanctions risk at its subsidiary bank*, March 30 2023, https://www.federalreserve.gov/newsevents/pressreleases/enforcement20230330a.htm
[389] OFAC, Apple, Inc. Settles Potential Civil Liability for Apparent Violations of the Foreign Narcotics Kingpin Sanctions Regulations, 31 C.F.R. part 598:, Nov. 25 2019, https://ofac.treasury.gov/media/25931/download?inline

366

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

On Jul 21, 2021, at 1:53 PM, Dan West <dan.west@apple.com> wrote:

Hi Ashley,

Thanks for bringing this back up as we get ready to publish "How I Got Here" for Amr.

John looked into bullets 3–4 at the time you flagged these in August 2020 and we did not have any concerns. Since you raised these again to us, we reached out to our global compliance team (and understand you spoke with them too) and confirmed there are no compliance issues for Apple. With regards to any outside consulting activities, we're confirming these are still in line with Apple policy and will address it as appropriate.

Given how long it's been since this article was initially drafted, we're going to be making a few edits to reflect Amr's role change. Also, even though there's no compliance issue, we are removing the story about the iPods. John met with Amr this morning and Amr will be updating the article in the near future. It will then be passed on to you for publication.

Thanks again for taking the time to review.

Dan

*Exhibit: Dan West's Final Email to Gjovik*

From: Ashley Gjovik ashleygjovik@apple.com
Subject: Re: My "How I Got Here" is ready
Date: July 21, 2021 at 2:32 PM
To: Daniel L. West dan.west@apple.com
Cc: John Basanese jbasanese@apple.com, Helen Polkes (HR BP) polkes@apple.com, David Powers powers@apple.com, Reed Johnson reedjohnson@apple.com

Hi Dan,

Thanks for the update. When I talked to the compliance team yesterday I agreed to lock down Amr's page so no one else can edit it until they confirm no crime & sanctions violations were committed, so we don't mess with potential evidence (obstruction of justice). That included both Amr's grandmother's apparent U.S. customs situations as well as the Syrian based "services" Amr is providing.

*Exhibit: Excerpt of Gjovik's reply to West, complaining of "Obstruction of Justice"*

833.    Apple's August 2021 ESG report, which Apple references frequently in their SEC filings, states: *"Apple is committed to compliance with applicable export and sanctions laws. All employees are responsible for complying with these laws and reporting possible violations."*[390] Apple clearly does not follow this policy and each time the report and any similar communications was emailed or shared digitally is wire fraud. Each time it was mailed, was mail fraud.

834.    Apple's "Trade Compliance" policy and public website states: "*Apple is committed to complying with all applicable trade regulations in all countries in which we*

---

[390] Apple, 2021 ESG Report,
https://s2.q4cdn.com/470004039/files/doc_downloads/2021/08/2021_Apple_ESG_Report.pdf

*operate, including, but not limited to, all export and sanctions regulations.*"[391] Apple further states:

> The U.S. holds complete embargoes against North Korea and Syria. The exportation, reexportation, sale or supply, directly or indirectly, from the United States, or by a U.S. person wherever located, of any Apple goods, software, technology (including technical data), or services to any of these countries is strictly prohibited without prior authorization by the U.S. Government.[392]

835. Before Gjovik was terminated, she reported the apparent sanctions and smuggling violations to US DOJ and posted on social media that she did so, fresh on the heels of Apple getting fined by OFAC for a 'reckless disregard' for sanctions laws.

### vi. Skipping the Line & Vaccine Hoarding (Dodd-Frank; US DOJ NCDF)

836. In December 2020, Gjovik complained to Dr. Cohen (who then complained to Lisa Jackson and Dierdre O'Brien on Gjovik's behalf) about Apple's apparent attempt to "skip the line" on COVID-19 vaccines – and Gjovik raised the matter again in August 2021 to Okpo under a title of "*Corruption Whistleblowing*".

837. On September 3 2021, after it was clear Apple was acting in bad faith, Gjovik filed complaints with the FDA Office of Criminal Investigations and DOJ National Center for Disaster Fraud about Apple's apparent attempt to "skip the line" on COVID-19 vaccines, as well as hoard the vaccines. US DOJ NCDF had created a "Hoarding & Price Gouging Task Force," and had a webform for claims like Gjovik's.[393]

---

[391] Apple, Apple Trade Compliance, (last visited 12/2/2023), https://www.apple.com/legal/more-resources/gtc.html
[392] Id.
[393] US DOJ, NCDF, COVID-19 Hoarding and Price Gouging Task Force, https://web.archive.org/web/20220331164405/https://www.justice.gov/coronavirus/combatingpricegouginghoarding

838.    On September 6 2021 Gjovik posted on social media that she filed those complaints. Gjovik was also still using her iCloud email so Apple would have seen the email receipts.

839.    The United Nations Office on Drug and Crime warned of corruption risks related to the initial COVID-19 vaccine distribution including "*conflicts of interest," "nepotism, favouritism, and corrupted procurement system*s."[394] The United Nations added that "*during the pandemic, whistle-blowers are critical given the ample opportunities for corruption in times of crisis.*"[395] In December 2020, "*a health sector anti-corruption expert who teaches at the University of San Francisco*" predicted that "*powerful people could gain early access to the vaccine not by using bribery or coercion, but through more subtle means, like making requests to similarly powerful friends."* [396] She suggested an executive may contact '*friend of the leader of a pharmaceutical company.*"

840.    On March 23 2020, the President issued an Executive Order pursuant to section 102 of the Defense Production Act prohibiting the hoarding of designated items. Thus, 50 U.S.C. §§ 4512, 4513 made it a crime for any person to accumulate that item "in excess of his or her reasonable needs." [397] A list of items included PPE, medical supplies, and disinfectant.[398]

---

[394] United Nations Office on Drug and Crime (UNODC), *Covid-19 Vaccines and Corruption Risks: Preventing Corruption in The Manufacture, Allocation and Distribution Of Vaccines,* https://www.unodc.org/documents/corruption/COVID-19/Policy_paper_on_COVID-19_vaccines_and_corruption_risks.pdf
[395] Id.
[396] Laura J. Nelson and Maya Lau, *"The wealthy scramble for COVID-19 vaccines: 'If I donate $25,000 ... would that help me?'"* The LA Times, December 18 2020, https://www.latimes.com/california/story/2020-12-18/wealthy-patients-scramble-covid-19-vaccine
[397] Office of Attorney General, *Memorandum For All Heads Of Department Components And Law Enforcement Agencies,* March 24 2020, https://www.justice.gov/file/1262776/download
[398] US DHHS, Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950, https://www.justice.gov/file/1264276/download

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

841.     The Johnson & Johnson 'Janssen Biotech' vaccine became available in February of 2021.[399] That was the timeframe Riccio had suggested Apple would get "lots" of early vaccines. In November of 2021, Alex Gorsky, the prior CEO and Chair of Johnson & Johnson, suddenly joined the Board of Directors of Apple.[400] Under information and belief, in December 2020, Ricco was referencing a conversation between him, Tim Cook, and Alex Gorsky.

842.     Apple knew Gjovik reporting the vaccine issues internally, and to the FDA and DOJ, and terminated Gjovik because she did so. It's a termination in violation of public policy when an employer retaliates against an employee for threatening to report issues with the employer's operations to the Food and Drug Administration.[401] It's also a termination in violation of public policy for an employer to terminate an employee for reporting the employer's financial "*irregularities and illegalities*" or suspected fraud to the FBI or other authorities. [402]

**B.     BANE AND RALPH CIVIL RIGHTS ACTS (CAL. CIV. CODE § 52.1, §52.7)**

843.     Employment cases are included within the scope of §52.1 (Bane Act) & § 51.7 (Ralph Act).[403] A Ralph or Bane Act claim does not displace another employment claim.  Ralph Act and Bane Act claims may be joined with an employment discrimination claim.

844.     Liability includes any "*person [or corporation] who denies the right*" as well as anyone who "*aids, incites, or conspires in that denial.*"[404] Liability does not require actual

---

[399] Federal Register, Authorizations of Emergency Use of Certain Biological Products During the COVID-19 Pandemic; Availability, Docket No. FDA-2021-N-0335

[400] Apple, *Alex Gorsky joins Apple's board of directors – Apple*, November 9 2021, https://www.apple.com/newsroom/2021/11/alex-gorsky-joins-apples-board-of-directors/

[401] *Liberatore v. Melville Corp.*, 168 F.3d 1326, 14 I.E.R. Cas. (BNA) 1545, 137 Lab. Cas. (CCH) ¶ 58596 (D.C. Cir. 1999) (applying District of Columbia law); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 2 I.E.R. Cas. (BNA) 768, 122 L.R.R.M. (BNA) 2327, 106 Lab. Cas. (CCH) ¶ 55731 (Mo. Ct. App. W.D. 1985).

[402] *Moskal v. First Tennessee Bank*, 815 S.W.2d 509, 6 I.E.R. Cas. (BNA) 1080, 6 I.E.R. Cas. (BNA) 1082, 122 Lab. Cas. (CCH) ¶ 56914 (Tenn. Ct. App. 1991); *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 3 I.E.R. Cas. (BNA) 177, 109 Lab. Cas. (CCH) ¶ 55904 (1988).

[403] *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.*, 212 Cal. App. 4th 258, 269, 150 Cal. Rptr. 3d 861, 870 (2012).

[404] Cal. Civ. Code. § 52(b)

370

interference with a plaintiff's legal rights – even an attempted interference is enough to give rise to a claim.[405] Where Apple is not liable for directly denying or interfering with Gjovik's rights, Apple did aid, incite, and/or conspire in those denials. For example, actions taken by Appleseed against Gjovik while Appleseed was still formally employed at Apple in their Global Security team clearly implicate Apple through respondeat superior, negligence, and other employment theories.

### i. Bane Civil Rights Act (Cal. Civ. Code § 52.1)

845. The Bane Act, Cal. Civ. Code § 52.1, authorizes a claim for relief "*against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law.*"[406]

846. The Bane Act prohibits "*an attempted or completed act of interference with a legal right, accompanied by a form of coercion*" with specific intent to violate the rights of the person or a reckless disregard for the rights of the person.[407] "*Coercion*" is a "*compulsion of a free agent by physical, moral, or economic force or threat of physical force*" and does not have to include an act of violence or threat of violence to satisfy Bane Act requirements.[408]

847. Gjovik seeks relief under the Bane Civil Rights Act (§ 52.1) to deter discriminatory violence from Apple from occurring against Gjovik, stop Apple's threats of

---

[405] Cal. Civ. Code, § 52.1, subds. (a), (b); *Ramirez v. County of Los Angeles* (C.D. Cal. 2005) 397 F. Supp. 2d 1208.
[406] *Sahymus v. Tulare Cty*., No. 1:14-cv-01633-MCE (GSA) at *6 (E.D. Cal. June 1, 2015) (quoting *Jones v. Kmart Corp*., 17 Cal. 4th 329, 331, 70 Cal. Rptr. 2d 844, 949 P.2d 941 (1998)).
[407] *Jones v. Kmart Corp*. (1998) 17 Cal.4th 329, 338; *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015); *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 519-20 (9th Cir. 2018); *Reese v. Cty. Of Sacramento,* 888 F.3d 1030, 1043-1045 (9th Cir. 2018).
[408] COERCION, Black's Law Dictionary (11th ed. 2019); *Williams v. Kohl's Dep't Stores, Inc.,* United States District Court for the Central District of California, Case No. EDCV 19-397 JGB (SHKx), (September 13 2019).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

violence and intimidation, and to seek remedy for acts, threats, coercion, intimidation, – leading to injury and property damage that has already occurred.[409]

848.   In an attempt to prevent Gjovik from exercising her civil rights, and to retaliate against her for trying to exercising her civil rights, in violation of Gjovik's civil rights, Apple has maliciously terrorized Gjovik with threats, intimidation, and coercion that interferes with her constitutional and statutory rights.[410] Apple tried and did prevent Gjovik from doing things she had a right to do under law and to force Gjovik to do things she was not required to do under law.[411] Apple interfered and attempted to interfere by threat, intimidation, and/or coercion, or with reckless disregard for, Gjovik's exercise and/or enjoyment of a constitutional or other right under California or federal law.[412] These rights included:

- Filing charges with the government (agencies/police)
- Testifying and providing evidence to the government (agencies/police)
- Ability to become a licensed attorney.
- Ability to exercise California Right to Privacy (including protest of invasion)
- Right to a safe workplace
- Right to access the courts
- Ability to testify at legislative committees and meet with legislatures.
- Right to be free from nuisance & bodily harm
- Right to free speech about Constitutionally and statutorily protected topics

---

[409] Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 63 (1987 Reg. Sess.) as am. Apr. 6, 1987, p. 2
[410] *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 787 (N.D. Cal. 2014); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1448 (Cal. Ct. App. 2006).
[411] *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 955-956 (2012).
[412] Intimidating a Witness - California Penal Code 136.1; Threatening a Witness Prior to Testimony - California Penal Code § 137(b); Threatening a Witness After Testimony – Cal. Penal Code § 140(a)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                        DECEMBER 21 2023

849.    Apple intimidated Gjovik with an intent to prevent her from giving testimony.[413] Apple threatened Gjovik after Gjovik's testimony. Apple interfered and attempted to interfere with Gjovik's testimony to labor agencies by threatening her with violence and intimidation, including termination her employment, the day before she was to testify to the government about Apple, which is her right to exercise her labor rights and engage with the government as a citizen of California (at that time) and of the United States.

850.    Apple's supposed justification for terminating Gjovik, and Apple's conduct which Gjovik had complained about as Apple's justification, all violate the California Constitution Article 1 right to privacy. Gjovik had the right and continues to have the right to protest invasions into her privacy and Apple's pretextual termination for firing Gjovik and harassing letter from their law firm threatens, coerces, and intimidates Gjovik to refrain from exercising her Constitutional rights.

851.    Apple interfered and attempted to interfere with Gjovik's access to California's unemployment insurance program and right to a fair hearing under California UIC Code § 1251 through obstruction with the agency including apparently falsified records and deleted records, and/or false statements, and other irregularities marked with Apple's *modus operandi* in obstruction.[414]

852.    Apple interfered and attempted to interfere with Gjovik's right to access the courts. The morning she was fired, one of the anonymous accounts that is probably Apple posted to Gjovik, ""*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" (EarlyRiser, Twitter).

---

[413] *People v. Serrano*, 77 Cal.App.5th 902, 912-913 [292 Cal.Rptr.3d 865] (2022); *People v. McDaniel*, 22 Cal.App.4th 278, 283 [27 Cal.Rptr.2d 306] (1994); *People v. McLaughlin*, 46 Cal.App.4th 836, 842 [54 Cal.Rptr.2d 4] (1996).
[414] Note: "bad faith tactics" can be sanctioned and fined: Cal. Unemp. Ins. Code § 2122

373

853.     Apple interfered and attempted to interfere with Gjovik's right to a safe workplace [e.g., Cal. Labor Code §§ 6101, 6046, etc.] and warning workers about exposure to carcinogens [Proposition 65]. Apple also interfered and attempted to interfere with Gjovik's right to work in a work environment free of discrimination based on sex, disability, status is a labor dispute, and crime victim status.[415]



*Exhibit: Gjovik's Texts with West on 4/7/21 about the CalEPA DTSC and Senator Weickowski*

854.     Starting in early 2021, Gjovik began contacting and meeting with local, state, and federal politicians about what occurred to her next to 3250 Scott Blvd – and Apple was aware of this. For example, Gjovik met with Senator Bob Weickowski and his staff on April 7 2021. On April 7 2021, Gjovik told West about the meetings.

---

[415] *Zamora v. Sacramento Rendering Co*., United States District Court for the Eastern District of California, Case No. No. Civ. S-05-00789 DFL KJM (January 16 2007).

374

**RE: Delayed Response**

From   Clemons, Chris <Chris.Clemons@sen.ca.gov>

To     Ashley Gjovik<agjovik@scu.edu>

Date   Friday, July 16th, 2021 at 3:45 PM


I conveyed them myself on the Senator's behalf with the Governor's staff and leadership of both houses.


**From:** Ashley Gjovik <agjovik@scu.edu>
**Sent:** Friday, July 16, 2021 12:39 PM
**To:** Clemons, Chris <Chris.Clemons@sen.ca.gov>
**Subject:** Re: Delayed Response


Hey Chris,


Was the Senator able to talk to DTSC about my specific issue like he said he would?

*Exhibit: Gjovik's Messages with Senator Weickowski's Legislative Director*

855.    On July 27 2021, Gjovik was asked by a NGO to testify as a witness to Senator Cortese and Gjovik accepted. Gjovik was to speak about the chemical exposure she experienced at her apartment at 3255 Scott Blvd (that was actually Apple's silicon fabrication fumes).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



### Request for Meeting 8/3 or 8/4 re: SB 37

From  Chelsea Tu <ctu@crpe-ej.org>                                    ☆ Jul 27, 2021

To    Mickle, Ryan, Melissa Romero, Tiffany Eng, California Environmental Justice Alliance, Ashley Gjov... ∨

Important

Hello Ryan:

Thank you for helping us schedule a second meeting with Senator Cortese on SB 37. Folks in this email chain, including Ashley Gjovik, would like to participate. Are there any good times for the Senator to meet with us next week, either on **8/3** (Tuesday) or **8/4** (Wednesday)?

We think it would be important for the Senator to meet with Ashley, who recently experienced severe health impacts from living on a toxic site in Santa Clara. Ashley has written an article about her experience here, and could also share her story during the meeting.

We'd also like to take the opportunity to discuss how to tweak the existing and forthcoming amendments to ensure that projects involving residences and other sensitive receptors go through environmental review, among other things as time permits. As I mentioned in my other email, I hope to share our recommendations in writing by Thursday AM, so that you and the Senator will have them in advance of the meeting.

Please let me know if you have any questions at all, and thank you again for working with us so diligently on this bill.

Best,
Chelsea

*Chelsea Tu*
Senior Attorney
Center on Race, Poverty & the Environment

*Exhibit: Request from NGO for Gjovik to testify to Senator Cortese*

856.    Gjovik also posted on Twitter about it on August 15 2021, while she was on leave but before she was fired. Gjovik had meetings with US Representatives, state Senators, Assembly-members, and Mayors. In 2022, there was discussion of bringing Gjovik's situation with Apple related to the environmental violations to a US House Sub-Committee.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

Twitter post from Ashley M. Gjovik (@ashleygjovik):

"While all this was going down with #Apple this year, I was mtg with politicians: advocating for gov reform & public health in Santa Clara, & representing the other victims who came forward from the #SantaClaraSquare apts. Apple knew all about this and still treated me this way.

9:51 AM · Aug 15, 2021 · Twitter Web App"

*Exhibit: Gjovik's August 15 2021 Twitter Post about Meeting with Politicians*

857. Starting in late 2021, Gjovik began contacting and meeting with state and federal politicians about all of Apple's unlawful conduct, including to get help with her cases.

858. Apple's threats and intimidation interfered and attempted to interfere with Gjovik's right to appear as a witness before a legislative committee in violation of Govt.C. § 9414(a)(1). Apple's harassment of Gjovik was motivated by the fact that Gjovik was or may be a witness before a legislative committee in violation of Govt.C. § 9414(b). Apple's threats and intimidation prior to Gjovik's termination and Apple's termination of Gjovik was motivated by Gjovik being and possibly becoming a witness before a legislative committee in violation of Govt.C. § 91414(a)(2). Apple knowingly and maliciously prevented, dissuaded, and attempted to prevent and dissuade, Gjovik, a witness and victim, from attending or giving testimony at legal proceedings and inquires in violation of California Penal Code § 136.1(a).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

859.     Apple attempted to prevent and dissuaded Gjovik, who was a victim of a crime and a witness to a crime, from making reports of that victimization to peace officers and law enforcement and prosecuting agencies, from causing a complaint to be sought and prosecuted, and seeking the arrest of persons in connection with her victimization.in violation of California Penal Code § 136.1(b). Gjovik was a victim of crime under a number of civil and criminal statutes including RCRA, CERCLA, CAA, 18 USC 1502, 18 USC 1503, and more.

860.     Apple caused bodily harm to Gjovik through the variety of chemical exposures also violating Gjovik's right to be free from bodily harm under California Civil Code § 43 and free from Nuisance under California Civil Code § 3479.[416]

861.     Apple interfered and attempted to interfere with Gjovik's civil rights under state and federal law including her right to participate lawfully in speech and peaceful assembly opposing any denial of the opportunity to participate in federal civil rights.[417] For example, Apple's retaliatory litigation, retaliatory reports to law enforcement, and malicious gag order prohibited Gjovik from doing so, including prohibiting her from sharing public records and her legal filings, to complain (even privately) about the retaliatory lawsuit and gag order, and violating her right to free speech under the US Constitution, causing irreparable damage to Gjovik.[418]

---

[416] *Cambell v Feld Entertainment*, United States District Court, Northern District, Case Nos. 12-CV-04233-LHK; 13-CV-00233-LHK, (December 15 2014); *Medrano v. Kern Cnty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1015 n.2 (E.D. Cal. 2013); see also *Bolbol v. City of Daly City,* No. C-09-1944 EMC, 2011 U.S. Dist. LEXIS 81228, 2011 WL 3156866, at *7 (N.D. Cal. July 26, 2011).
[417] 18 U.S. Code § 245 - Federally protected activities; § 245(b)(5)
[418] 12 Cal. Jur. 3d Civil Rights § 105. *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 958–59, 137 Cal. Rptr. 3d 839, 848 (2012).

> Ms. Gjovik's cyberharassment of me appears to be in part for exercising my own first amendment rights in expressing my opinion that her retaliatory discharge case would be hard to prove because of the bonafide fact that she had leaked private documents about unreleased intellectual property owned by Apple to the press, and additionally because I was cited in Apple's defense case in her charges against the company. I took the time to apologize for exercising those first amendment rights, because it clearly hurt her feelings, despite my right to say such things, and her public assertions that she supported such rights.

*Exhibit: Appleseed's 2/15/22 lawsuit testimony claiming she has a Constitutional right to threaten Gjovik & calling Gjovik's complaints of threats/intimidation, "cyberharassment"*

862.    This retaliatory lawsuit also was filed with the intention of preventing Gjovik from becoming a licensed attorney. Gjovik had a right to become an attorney and Apple egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Apple) harassed Gjovik about exactly this.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023



*Exhibit: FirstnameBunchofnumbers & California Moral Character*

*Exhibit: FirstnameBunchofnumbers Account Dedicated to Suing Gjovik*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

863.    Apple's actions threatened violence and created a reasonable fear of imminent harm. Apple attempted to interfere with Gjovik's exercise of her civil rights by way of threats, intimidation, and coercion. Apple made threats of violence against Gjovik and her property (i.e., the box with her chattel property – broken, covered in glass shards and a social media account threatening it could contain the severed head of one of her loved ones, etc.), she reasonably believed would be carried out if she exercised her civil rights. Apple acted violently against Gjovik and her property to prevent her from exercising her rights and/or to retaliate against her for doing so.

864.    The Washington state retaliatory litigation against Gjovik was filed, per Appleseed's own testimony, because of Gjovik's NLRB charges against Apple, because Gjovik was complaining about witness intimidation by Apple, because Gjovik claimed Apple terminated her in retaliation for protected activity. [see RICO Predicate Act § 1512]. Appleseed's complaints in the retaliatory, meritless lawsuit included quotes from, and photos of, Gjovik's federal and state legal filings, addressed to regulatory agencies and the respective District Attorney's offices.

865.    Gjovik statements about lawsuits, government charges, reports of suspected criminal conduct, criminal proceedings, and criminal records – were protected with absolute privilege under California Civil Code § 47(b) and under Fair Report Privilege.[419]   Gjovik's

---

[419] *Kenne v. Stennis* (2014) 230 CA4th 953, 963-965, 179 CR3d 198, 206-208; 5 Witkin, Summary of California Law, Torts §§ 660-662, 666-689;. [Civ.C. § 47(d)(1); see generally, *J-M Mfg. Co., Inc. v. Phillips & Cohen LLP* (2016) 247 CA4th 87, 98-105, 201 CR3d 782, 792-798 (collecting cases); *McClatchy Newspapers, Inc. v. Sup.Ct.* (Mosesian) (1987) 189 CA3d 961, 974-975, 234 CR 702, 710-711].

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

public and private statements about legal and regulatory matters, while sometimes hyperbolic,[420] were never materially false or misleading.[421]

866.    Appleseed's lawsuit was a SLAPP suit and Gjovik even filed an anti-SLAPP motion in response.[422] Appleseed's legal filings about Gjovik are also unprotected due to extrinsic fraud.[423] Appleseed's conduct was criminal witness intimidation and witness retaliation and is not protected by litigation immunity because it is a crime.[424]

867.    Appleseed offered to Gjovik that the litigation and harassment would stop if Gjovik (summarized) *admitted she leaked IP, admitted she deserved to be fired, wanted to be on leave, removed her legal filings against Apple from public view, and admitted was a selfish liar who committed perjury by filing meritless charges against Apple.* The message was crystal clear to Gjovik: *the beatings will continue* until she dropped any and all legal claims against Apple.

868.    Apple intended to cause harm, Gjovik was harmed, and Apple's actions were a substantial factor in causing Gjovik's harm. An action brought under section 52.1 is "independent of any other action, remedy, or procedure that may be available to an aggrieved

---

[420] *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 ["rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action"].

[421] The report need not be 100 percent accurate; the statement just must capture the "gist" or "sting" of the proceedings. [*Carver v. Bonds* (2005) 135 CA4th 328, 351-352, 37 CR3d 480, 499—privilege covered statement that 22 complaints were filed against podiatrist, even if only six filed; *Colt v. Freedom Communications, Inc.* (2003) 109 CA4th 1551, 1558-1560, 1 CR3d 245, 250-252—neither subtle differences between plaintiff's actual conduct and that reported by defendant nor true errors void privilege.

[422] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik,* 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

[423] *Silberg v. Anderson* (1990) 50 C3d 205, 214-215, 266 CR 638, 643-644. ("Fraud is extrinsic where the defrauded party was deprived of the opportunity to present [their] claim or defense to the court, that is, where [they were] kept in ignorance or in some other manner … fraudulently prevented from fully participating in the proceeding.") *Marriage of Stevenot* (1984) 154 CA3d 1051, 1068, 202 CR 116, 128]

[424] *Scalzo v. Baker* (2010) 185 CA4th 91, 100, 109 CR3d 638, 645; *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 C3d 1157, 1168, 232 CR 567, 574—("when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

individual under any other provision of law," including Civil Code section 51.7 (e.g., Ralph Act, below).[425]

### ii.     Ralph Civil Rights Act (Cal. Civ. Code §51.7)

869.     To show a violation of the Ralph Act, a plaintiff must establish (1) the defendant threatened or committed violent acts against the plaintiff, (2) the defendant was motivated by his perception of plaintiff's protected characteristic, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm.[426]

870.     Apple intimidated Gjovik by threat of violence against Gjovik and/or her property and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and would have been intimidated by Apple's conduct.[427]

871.     The test for determining whether facts constitute a "*threat of violence*" looks to whether "*a reasonable person* [reasonable woman for sex discrimination, person in labor dispute for labor discrimination, etc.], *standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendant and perceived a threat of violence.*"[428] The violence or threat of violence can be against the person or their property.[429]

---

[425] *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 843, 87 P.3d 1, 14 (2004); *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334, 949 P.2d 941, 944 (1998).
[426] I.H. by & through Hunter v. Oakland School for Arts, 234 F. Supp. 3d 987, 995 (N.D. Cal. 2017).
[427] Liability may also be found if a defendant "aids, incites, or conspires" in the denial of a right protected under Civil Code section 51.7. (Civ. Code, § 52(b).)
[428] Winarto v. Toshiba America Elecs. Components, Inc., 274 F.3d 1276, 1289 (9th Cir. 2001).
[429] *Campbell v. Feld Entm't, Inc.*, United States District Court for the Northern District of California, San Jose Division, Case No. 12-CV-04233-LHK; 13-CV-00233-LHK (December 15 2014).

872.     Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property motivated by Apple's perception of: [430] [431]

- Gjovik's position in a labor dispute with Apple
- Gjovik's sex and gender (female, woman)
- Gjovik's disabilities and medical conditions (PTSD, ADHD, autism spectrum, anxiety, depression, multiple chemical sensitivity syndrome/recovery from solvent exposure)
- Gjovik's color/race (white) [these threats were not made with actual discrimination, but instead with an intent to cause division among social groups, which Gjovik argues is still animus]
- Gjovik's activism around environmental health and chemical exposure
- Gjovik's activism around privacy rights
- Gjovik's membership in a protected class of 'victims of environmental crime'

Apple's acts of violence and threats of violence were substantial factor in causing Gjovik harm and did cause Gjovik harm to her property and person.

873.     Gjovik never 'consented' to or waived her rights related to any of Apple's conduct under this Act. An employer may not require an employee to waive any right under Civ.C. § 51.7 as a condition of entering into a contract, including the right to pursue a civil action with any public prosecutor or law enforcement agency. Any such waiver shall be deemed involuntary, unconscionable, against public policy, and unenforceable.[432]

---

[430] Civ. Code § 51.7(b)(1)), and codify identical language used in *in re Cox*, 3 Cal. 3d 205, 216, 90 Cal. Rptr. 24, 474 P.2d 992 (1970) to expand Unruh Act protected characteristics, not just the enumerated bases. (*McCalden v. California Library Ass'n*, 955 F.2d 1214, 1221, 22 Fed. R. Serv. 3d 975 (9th Cir. 1990). Social justice organization protesting for racial equality constitutes a "political affiliation," protected under the Ralph Act (*Black Lives Matter-Stockton Chapter v. San Joaquin Sheriff's Office,* 398 F. Supp. 3d 660, 679 (E.D. Cal. 2019).) Animal rights activism and membership in organization, constitutes a "political affiliation" under the Ralph Act. (*Campbell v. Feld Entertainment*, 75 F. Supp. 3d 1193 (N.D. Cal. 2014).)

[431] Civ. Code, § 51.7, subd. (b)(1). See *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at pp. 841-842; *Jones v. Kmart Corp*., 17 Cal.4th at p. 332; *Bay Area Rapid Transit Dist. v. Superior Court,* supra, 38 Cal.App.4th at pp. 144; *Boccato*, supra, 29 Cal.App.4th 1797; *Winarto v. Toshiba America Electronics Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1288-1290, fn. 13.) *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1457 (Cal. Ct. App. 2006)

[432] Civ.C. § 51.7(c) (applicable to any agreement entered into or modified on or after 1/1/15).

384

874.    While not required, Apple did express discriminatory animus and intent for their threats of violence because of Gjovik's membership in a protected class of persons.[433] Many of the social media posts and harassing messages Gjovik received from known Apple employees, and from anonymous accounts assumed to be Apple agents/employees, on posts and articles about Gjovik, included discriminatory comments including:

a) "*Wow... This person is literally mentally sick and needs help. It's actually quite sad.*" (Aug 20 2021, now deleted account "JohnTarion"); "*It seems like Ashley is a sick individual with some serious mental issues.*" (Aug 22 2021, Twitter, John Tarion).

b) "*This woman has serious mental issues because she's mostly lying and trying to make Apple the bad guy (in her case).*" (Sept. 3 2021, Twitter, "Antrunt" – account mostly tweets positively about Apple products)

c) "*I like to call it passive stimulant psychosis. She's probably on a low dose Adderall or Vyvanse and it's slowly turning her crazy.*" (Sept. 9 2021, Reddit, "DetectiveBirbe")

d) "*I don't feel bad for her and society and media gives far too much exposure to the mentally ill today, even enabling them and supporting them, as they partake in their fraudulent, slanderous and lying crusades. This crazy lady is not the only mentally ill person infecting media today… I miss the old days when we didn't let the mentally ill freely roam about the streets. We locked them up and put them in facilities for their own good and for the good of everybody else.*" (Sept. 9 2021, Reddit, "pacmandaddy")

e) "*Glad they fired her and any other know it all activist employee should be terminated too. She had so many complaints and not just about her job but having PTSD and many other complaints outside of work that I would classify her as having Borderline Personality disorder. Don't let the door hit you on your way out*!!" (Sept. 9 2021, "")

f) "*Is she mentally unwell? Clearly. From the bananas OpEd she wrote, to her borderline paranoid schizophrenic website, to the very bizarre and suspect things she's posted to her Twitter, this is not a woman of sound character and mind.*"." (Sept. 22 2021, Reddit, "Fred257")

a) "*This chick is a hypochondriac … she's borderline insane… seriously check out her writing - she's convinced her apartment was killing her but don't have the good sense to move and apparently her sickness only happened to her and not anyone else….. if her claims were true. Why is she the only person sick ? Anyways like I said chick is nuts AF.*" (Sept 11 2021, Reddit, "LVNcalifornia")

b) "*I'm concerned for her, but she made a lot of money and has no dependents.*" (Sept. 26 2021, Team Blind, Appleseed).

---

[433] *Venegas v. County of Los Angeles,* 32 Cal.4th 820, 841 (2004). Oct 2020 – August 2021, Association with members of a protected class, S.F. Admin. Code § 12B.1(a) and 12B.2(a).)

385

c) *"It is exactly the kind of thing a person who in paranoid would believe. What is more likely, a big company is breaking into employees home and impersonating the police, or Apple has employed somebody with an undiscovered mental illness."* (Oct. 9 2021, Reddit, TomJen3)

d) *"Most people like me don't relate to those who take their emotional support animals jet setting while funding their law school degree while at the same time asking for $100,000 in profitable donations, while turning down a $600,000 settlement."* (Dec. 29 2021, LinkedIn, Apple Security employee Amanda Harrison)

e) *"As she [Gjovik] is a woman, and one who seems particularly subject to harassment, it would be nice to clarify how much higher education she's accomplished."* (Jan 1 2022, Wikipedia Talk, Appleseed).

f) *"She clearly doesn't have a lawyer, so I'd guess all of her claims are entirely baseless. She is a classic cow and belongs on kiwifarms."* (Sept 10 2021, HackerNews, "iD0it4thedrUgz")

g) *"Anyone can file complaints with federal and state agencies. It doesn't mean there is merit, and it doesn't mean the person doing the reporting is being honest or genuine in doing so."* (Oct 25 2021, Twitter, Appleseed)

h) *"A wanna be Erin-Brockavich-hero loony SF liberal who probably sues everyone she works for or interacts with... She comes off as a super karen. She's reported alleged unsafe work conditions, toxic environmental issues, retaliation, curtailment of speech and surveillance. She's reported to OSHA, the Securities Exchange Commission, EPA, Dept. Of labor, labor relations board, etc... type of people who thrive on victimology need to be called out at the very least."* (Dec 20 2021, Reddit, StopTop).

i) *"I am not going to diagnose anyone, but this behavior maps to narcissistic personality disorder, and if it's narcissistic supply driving them, giving it ANY attention only FUELS it further."* (Dec 30 2021, Twitter, Appleseed)

j) *"NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik"* (Dec 31 2021, Lawsuit, Appleseed)

k) *"Implying that people are trying to have you assassinated or cause you to kill yourself, me included, is extremely harmful, and I alerted APPLE about the chain of tweets involved in doing so."* (Feb 5 2022, Email, Appleseed)

875.    Apple sent a "Workplace Violence" interrogator to intimidate Gjovik due to Gjovik's position in a labor dispute with an affidavit the next day, implicitly, if not expressly, threatening some sort of violence against Gjovik due to her NLRB case (a labor dispute), with Gjovik even complaining it felt like witness intimidation and was fired hours later. Gjovik even posted on Twitter questioning why a Workplace Violence interrogator was reaching out and if he

investigated Workplace Violence of if Workplace Violence was "*a service he delivered*" for Apple. [see sections on threats and intimidation, incorporated here].

### iii.    Acts of Violence and Threats of Violence (Bane § 52.1 & Ralph § 52.7)

876.    Both Bane and Ralph Civil Rights Acts prohibit acts of violence, and/or threats of acts of violence, against persons and/or property. These actions included 18 USC § 1512, 18 USC § 1513, California Penal Code §§ 148.3 and 148.5, California Penal Code § 136.1.

877.    Apple committed violence and made threats of violence against Gjovik and her property, including threatening messages and social media posts, threatening packages in the mail, tampering with Gjovik's chattels to the extent of conversion, destroying Gjovik's chattels, home break-ins (burglary, trespassing), and other violent misconduct.

878.    The filing, or threat of filing, of false police reports is "intimidation by threat of violence" when the defendant files or threatens to file, a false report of criminal activity to law enforcement about the victim, when the defendant knew the report was false, or filed the report with "*reckless disregard of its truth or falsity.*"[434] (see FBI reports, police reports, reports to NLRB security, and others made by Appleseed and others, against Gjovik). This is expressly stated in the Ralph Act statute, and is implied to be mirrored for the Bane Act.

879.    Apple repeatedly filed knowingly and intentionally false reports about Gjovik to state and federal law enforcement, foreign law enforcement, and other peace officers – intending to cause Gjovik to fear for her safety; and to initiate bogus investigations into Gjovik in order to demoralize, discredit, terrify, and intimidate Gjovik as retaliation and as an effort to stop Gjovik from pursuing her complaints against Apple. Appleseed, as an agent of Apple, filed an FBI complaint against Gjovik which she later apologized for and blamed on an illegal drug relapse. Appleseed, as an agent of Apple, filed retaliatory litigation against Gjovik in a Washington state

---

[434] Cal.Civ.C. § 51.7(b)(2).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

court (including evidence and testimony of the bogus FBI complaint, and testimony she also reported Gjovik to local law enforcement) – all of which was eventually dismissed as having no merit (finding Gjovik did nothing unlawful), and the prior order against Gjovik was found by an appellate Judge to violate Gjovik's Constitutional rights. Thus, Apple's false reports are not protected and have no litigation immunity (however Gjovik's forced responses to the matters do have litigation immunity).[435]

880.    Apple did, conspired, aided, ratified, condoned, and incited the filing and threatening to file of false claims and reports about Gjovik to peace officers and law enforcement agencies that falsely alleged Gjovik engaged in unlawful activity and/or in activity that requires law enforcement intervention, knowing the claim and reports are false, and/or with reckless disregard for the truth or for falsity of the claim/report, and were filed after January 1 2021.[436]

881.    Under California Penal Code § 148.5, it is a misdemeanor to making knowingly or negligently false reports to a peace officer. Under California Penal Code § 148.3, it is a misdemeanor to knowingly file a false report to a government agency, board, or law enforcement that there is some type of emergency ("swatting").[437] California A.B. 1775, effective January 1 2021, created a new statute and private right of action for discriminatory, false calls to 911 stating: "*that intimidation by threat of violence includes knowingly or recklessly making or*

---

[435] Cal.Civ.C. § 47(b)(1)-(5).
[436] California Gov. Code § 51.7 (b)(2), Stats. 2020, c. 327 (AB 1775).
[437] California Penal Code § 148.5(b) "Every person who reports to any other peace officer… that a felony or misdemeanor has been committed, knowing the report to be false, is guilty of a misdemeanor if (1) the false information is given while the peace officer is engaged in the performance of his or her duties as a peace officer and (2) the person providing the false information knows or should have known that the person receiving the information is a peace officer."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*threatening to make a false claim or report to a peace officer . . . alleging that another person has engaged in unlawful activity.*"[438]

882.    Apple made threats to Gjovik over emails, messages via her website webform, messages on social media, tagged Gjovik on social media, made posts on forum and then told Gjovik to look at those posts via social media, and via other mediums. Some of these threats came from named people (i.e., Appleseed, Neoform, the Workplace Violence interrogator, etc.) and some came from anonymous accounts that were clearly Apple (the fake EPA enforcement employee 'comrade jones'). Further, the threats were related, interlinked, and amplified by the members of the campaign against Gjovik.[439]

883.    An example of these digital threats includes, but is not at all limited to this post from Sept. 22 2021, on a discussion thread linked to an article about Apple's CEO Tim Cook sending a threatening email to staff claiming any internal information is confidential (an email which the NLRB found in January 2023, based on Gjovik's charge, violated federal law) and commenters discussing Gjovik's termination:

> "I said it in the last thread about bad, criminal employees, and I'll say it again. It's time for Apple to take out the trash. Do whatever it takes to identify and catch the leakers and then ruin their lives. Fire them, prosecute and go after them. Do whatever it takes. Hunt them down like wild animals. Leakers and other activist employees who believe that they can do as they please have no business being at Apple. I want to see them gone and I want to see them destroyed. Trashy employees do not belong at Apple. And who is surprised that the leakers go running to the garbage site called the Verge? They already had one campaign that backfired on them when the lunatic woman leaker was fired, now it's time to get rid of any remaining leakers and criminals. Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death and all Apple

---

[438] State Assemb. 1775 § 2, 2019-2020 Leg., Reg. Sess. (Cal. 2020); Cal. Civ. Code § 51.7(b)(2); *Williams v Alameda Cnty.*, US District Court, Northern District of California, Case No. 21-cv-00523-CRB (July 14 2023).
[439] *People v. Mendoza* (1997) 59 C.A.4th 1333, 1339, 69 C.R.2d 728 [use of surrounding circumstances to change seemingly innocuous words into threat].

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

would need to do is to make it apply to corporations and not just nations... People just need to be optimistic and patient." (pacmandaddy, Sept 22 2021)[440]

884.    Another example, of many, was from September 12 2021, with the account commenting to Gjovik, "*You're beyond pathetic. It will be fun watch you disappear after you lose everything.*"[441] (AllonsyAlonso85, Sept. 13 2021).

885.    Another example, of many, was from Dec. 21 2021, a now deleted account posted on a thread about Gjovik titled "*Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions.*" The account, "RomanAthens" said: "*Tomorrow's headline: Apple Whistleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here*)."[442]

---

[440] Reddit, Sept 22 2021, *Tim Cook says employees who leak memos do not belong at Apple, according to leaked memo*, https://www.reddit.com/r/apple/comments/pt91m5/comment/hdv5qbj/, https://www.reddit.com/r/apple/comments/pt91m5/comment/hdvtqqn/?rdt=62895

[441] Twitter, AllonsyAlonso85, https://twitter.com/AllonsyAlonso85/status/1437323131258015745

[442] Reddit, Dec 21 2021, *Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions*, https://www.reddit.com/r/technews/comments/rkyslb/comment/hpg6bzu/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: "Never mind the double tap"*

886.     Under California Penal Code § 136.1(c), Apple's acts of witness intimidation (§ 136.1a-b) would be felonies when they were accompanied by an express or implied threat of force or violence against Gjovik or her property, where Apple's acts were in furtherance of a larger conspiracy, and where the acts were committed for pecuniary gain.[443] Apple attempted to influence Gjovik's legal filings and contracts through threats and menace in violation of state and federal witness tampering statutes.[444]

887.     Apple engaged in threats and actual acts of violence against Gjovik and her property, including physical violence, psychological violence, emotional violence, and moral harassment. Numerous California cases (criminal threats, domestic violence, custody battles, and

---

[443] California Penal Code, "CHAPTER 6. Falsifying Evidence, and Bribing, Influencing, Intimidating or Threatening Witnesses," § 136.1(a),(b),(c).
[444] Civ. Code § 1570; *Odorizzi v. Bloomfield Sch. Dist.* (1996) 246 Cal. App. 2d 123, 128.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

so on) have recognized "*emotional violence*" and "*psychological violence*" in the same vein as "*physical violence*".[445] Several 9th Circuit and District Court cases recognize "*emotional violence.*"[446]

888.    A recent California Court of Appeals decision referred to the criminal threats at issue in that case as "*gratuitous psychological violence.*"[447] Another case described a combination of psychological violence and physical violence as "*abhorrent.*"[448] Another case recognized a defendant's use of "*physical, psychological, and emotional violence*" to control, exploit, deflect, and counter-accuse.[449] Making a threat can reasonably be viewed as an act of psychological violence because "*making a threat of violence is itself an act of psychological force and coercion akin to an act of violence against another in that it can cause the listener to feel terror and suffer sustained anxiety and fear of injury or death at the hands of the*

---

[445] *In re Marriage of McLoren*, 202 Cal. App. 3d 108, 115, 247 Cal. Rptr. 897, 901 (Ct. App. 1988), as modified (July 7, 1988) [joint-custody order]; 117 People v. Richard, No. A158285, 2020 WL 7395407 (Cal. Ct. App. Dec. 17, 2020) [criminal battery and threats; unpublished]; *People v. Claster,* No. B227830, 2011 WL 3190420, at *4 (Cal. Ct. App. July 27, 2011) [mentally disordered offender order; unpublished]; *People v. Lowder*, No. 2D CRIM. B243669, 2013 WL 1247709, at *3 (Cal. Ct. App. Mar. 28, 2013) [mentally disordered offender order; unpublished]; *People v. Ruiz*, No. D052347, 2008 WL 3856681, at *3 (Cal. Ct. App. Aug. 20, 2008) [sentencing mitigation for robbery, third-strike; unpublished].
[446] *Swan v. Pfeiffer*, No. 522CV00193SVWAFM, 2022 WL 17858152, at *11 (C.D. Cal. Oct. 24, 2022), report and recommendation adopted, No. 522CV00193SVWAFM, 2022 WL 17853198 (C.D. Cal. Dec. 22, 2022) [lewd acts and rape]; *Rhoades v. Henry*, 638 F.3d 1027, 1049 (9th Cir. 2011) [emotional violence in defendant's history]; Toussaint v. Rushen, 553 F. Supp. 1365, 1377 (N.D. Cal. 1983), aff'd in part sub nom. *Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) [emotional violence by prison guards and prison conditions leading to suicides and self-mutilation].
[447] *People v. Henderson*, No. 2D CRIM. B275751, 2017 WL 4416319, at *4 (Cal. Ct. App. Oct. 5, 2017) [criminal threats; unpublished].
[448] *People v. Gomez-Garcia*, No. C084227, 2021 WL 1186392, at *11 (Cal. Ct. App. Mar. 30, 2021) [felony enhancement for sexual assault; unpublished]
[449] *Boyd v. Geddes*, No. G040585, 2009 WL 990761, at *2 (Cal. Ct. App. Apr. 14, 2009).

*declarant."*[450]  Several states, including California, also recognize forms of "*emotional terrorism.*"[451]

### iv.    Intimidation & Coercion (Bane, § 52.1)

889.    Intimidation and coercion went beyond speech acts (and speech restrictions), and included, but was not limited to, aggressive surveillance (including lurking Private Investigators in Santa Clara, San Francisco, and Albany NY), bugging her chattel property [the statue Apple mailed Gjovik from her desk; Gjovik's fig tree, etc), whatever Apple installed in her attic (photos show cables/cords laid in away landlord denied was them), breaking into her apartment (at least once in 2021 and in 2022), breaking into adjacent apartments (at least once in 2021), lurking outside her home, stalking her, blocked calls (September 2021), retaliatory litigation (January 31 2022), retaliatory reports of Gjovik to law enforcement (January 2022, May 2023, etc., lurking sedans and SUVs with dark windows, social media accounts making threatening, harassing, and intimidating statements to Gjovik, and someone handling her dog during one of the break-ins (August 2022).[452]

890.    Apple filed false police reports, filed false FBI reports (alleging criminal extortion and blackmail), filed meritless litigation and obtained a gag-order in 2022 through fraud, filed false reports to social media services alleging serious crimes (including that one of Gjovik's legal filings was 'child pornography'), and other depraved actions intending to instigate

---

[450] See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1024, 109 Cal.Rptr.2d 464; *People v. Senior* (1992) 3 Cal.App.4th 765, 775, 5 Cal.Rptr.2d 14; *People v. Preciado*, No. H024362, 2004 WL 1045965, at *15 (Cal. Ct. App. May 10, 2004) [first-degree murder with enhanced sentencing; unpublished].

[451] *People v. Mendoza*, 59 Cal. App. 4th 1333, 1344, 69 Cal. Rptr. 2d 728, 735 (1997) ["Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat"]; Claire Wright, *Torture at Home: Borrowing from the Torture Convention to Define Domestic Violence,* 24 Hastings Women's L.J. 457, 524 (2013).

[452] California Civil Code 52.1(j); Interference with Legal Rights., 8 Witkin, Summary 11th Const Law § 990 (2023); *Bates v. San Francisco Sheriff's D. Chief Arata*, No. C 05-3383 SI (N.D. Cal. Mar. 26, 2008); *Koerber v. Encyclopedia Britannica, Inc.*, No. B312047, 18 (Cal. Ct. App. Jul. 13, 2022). *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006, 314 Ill. Dec. 162, 874 N.E.2d 72 (4th Dist. 2007), appeal pending, (May 1, 2007).

investigations into Gjovik, instigate searches of Gjovik's electronic devices and usage, instigate removal of Gjovik's published documents and statements, and to incite others to threaten and attack Gjovik due to these false allegations.

891.    Undue Influence was present as Apple threatened to seek criminal prosecution of Gjovik for an alleged crime and when Gjovik was entirely innocent of that or any other crime, causing the Gjovik to fear arrest and imprisonment and the damage that would result to Gjovik's business and reputation,[453] Apple also aided, conspired, and incited these acts (i.e., incited and aided with the meritless litigation and police reports against Gjovik and conspired to harass and threaten Gjovik about those reports and cases).[454]

892.    See also *RICO Predicate Acts: Witness Intimidation and Witness Retaliation* sections which are incorporated here.

**C.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962.**

893.    Creating enhanced criminal and civil remedies, Congress drafted the Racketeer Influenced and Corrupt Organizations (RICO) Act to address "enterprise criminality," that is, patterns of unlawful conduct including: (1) acts of violence and terrorism; (2) the provision of illegal goods and services; (3) corruption in labor or management relations; (4) corruption in government; and (5) criminal fraud by, through, or against various types of licit or illicit enterprises.[455]

894.    RICO is appropriate and justified in this case due to the uniquely extreme and corrupt conduct perpetrated by Apple against Gjovik in furtherance of concealing their systemic

---

[453] 8C Am. Jur. Pl. & Pr. Forms *Duress and Undue Influence* § 29
[454] Civ. Code, § 52(b). Judicial Council of California Civil Jury Instruction 3064, Judicial Council of California Civil Jury Instruction 3064
[455] 18 U.S.C.A. §§ 1961-68; *St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir.2000).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

pattern of criminal schemes and enterprise. RICO enables a more efficient analysis of the facts in this case by including evidence of wrongdoing that does not ordinarily fit into a civil lawsuit.

895.    Use of RICO enables Gjovik to seek remedy for witness intimidation and retaliation violations outside a criminal case initiated by US Department of Justice.

896.    There is extensive evidence of fraud and regulatory violations occurring before and during Gjovik's disclosures, substantiating Gjovik's real-time complaints about a "cover-up" and "conspiracy."[456]

### i.    Standing & Pleading

897.    Any allegations of fraud and any actions under THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, CODIFIED AS TITLE IX OF THE ORGANIZED CRIME CONTROL ACT OF 1970, must comply with pleading requirements set forth by FRCP 8(a) and *Iqbal/Twombly*.[457] The heightened pleading standard requires establishing the circumstances constituting fraud, including: date, time, place, communications, and name of the person who made a fraudulent representation.[458] Both fraud and RICO must be plead with particularity and so are plead in detail in the "General Allegations" above, here, and the sections below, unfortunately making this pleading quite long.[459]

898.    Gjovik was directly injured, with harm occurring to her business, her tenancy rights, and to her personal chattel property, due to Apple's racketeering Predicate Acts of § 1512 (Intimidating Witnesses) and § 1513 (Retaliating Against Witnesses) occurring within the last four years (2021-2023). Gjovik was directly injured with harm occurring to her personal chattel

---

[456] Craig A Benedict (retired Assistant US Attorney, Northern District of New York), The Interplay of Worker Protection and Federal Criminal Statutes in Environmental Prosecutions
[457] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)
[458] Schrieber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1400 (9th Cir. 1986); Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977); Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009); Cohen v. Trump, Case No. 13-cv-2519-GPC-WVG, 12 (S.D. Cal. Feb. 21, 2014)
[459] *Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N.D. Ill. 1996), aff'd, 185 F.3d 850, (7th Cir. 1999),

property due to Apple's racketeering Predicate Acts of 18 USC 229 (Relating to Chemical Weapons), occurring within the last four years (2020). Gjovik was directly injured with harm occurring to her business and to her chattel property due to Apple's racketeering Predicate Acts of 1341 (Mail Fraud) and 1343 (Wire Fraud), occurring within the last four years (2020-2023). Some of Apple's Mail and Wire Fraud Acts also included Predicate Acts of 15 USC 78 (Securities Fraud) within the last four years (2020-2023), which also directly harmed Gjovik's business and personal chattel property. Gjovik was directly injured, with harm occurring to her business, due to Apple's racketeering Predicate Acts. [460]

899.    Gjovik was directly injured by Apple's Predicate Acts of Commercial Bribery but is not claiming harm due to statute of limitations as the Acts occurred in 2015, over four years ago. Gjovik was only indirectly injured by Apple's Predicate Act of Criminal Bribery of Executive Officer and some of the 18 USC 78 (Securities Fraud) claims, and thus is not claiming redressable harm due to lack or direct injury and/or statute of limitations as some Securities Fraud claims occurred over four years ago. Gjovik also cites additional historic charges and claims against Apple, which are not Predicate Acts under RICO, but are evidence to support allegations of enterprise, scheme, and/or conspiracy. These claims include Sherman Act antitrust violations, impersonating law enforcement, and other felonious affairs.

900.    Standard whistleblower retaliation lawsuits usually do not support concurrent RICO claims, as employees who suffer retaliatory terminations often do so in (comparatively) dull and predictable ways. However, whistleblower retaliation cases do support RICO when a discharge of employment is also a RICO Predicate Act (i.e., 18 USC §§ 1512, 1513, etc.) that is part of a racketeering scheme and pattern. This is the situation with Gjovik's claims against Apple.

---

[460] *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004).

901.    Apple's termination of Gjovik consists of several RICO Predicate Acts. Gjovik complained of federal witness intimidation (§ 1512) the day before a federal affidavit and only hours before she was terminated in retaliation due to her cooperation with federal officers and federal investigations (§ 1513). Apple's termination of Gjovik was not simply because Gjovik refused to participate in Apple's pattern of racketeering activity, it was because Gjovik was a federal witness, a victim of federal crimes perpetrated by Apple, and Gjovik was informing to the Feds about Apple's misconduct and criminal activities.[461]

902.    In addition, and/or in the alternate, if Gjovik's termination is not found to be a Predicate Act or otherwise support RICO standing, then Gjovik argues her whistleblower retaliation claims are related to the RICO charges but are not "essential" to the alleged RICO scheme and conspiracy, and because the whistleblower case is related but peripheral to the RICO claims, then both claims can be pled concurrently.[462]  In addition, and/or in the alternate, if Gjovik's employment-related injury claims are not found to be Predicate Acts or otherwise support RICO standing, Gjovik still has standing based on harm/injury beyond the employment matters (i.e., harm to personal chattel property due to 18 USC 229 Predicate Acts; harm to business and property due to witness intimidation and retaliation occurring well past Gjovik's termination, etc.).[463]

**ii.    Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)**

903.    Apple engaged in RICO Predicate Acts with knowledge the conduct was illegal. The conduct affects interstate and/or foreign commerce under 18 U.S. Code § 1962 through interstate mail, interstate wires, and other instrumentalities of interstate commerce.

---

[461] *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 294 (9th Cir. 1990).
[462] *Reddy* at 295/
[463] *Reddy* at 296.

397

904.    Under 1962(a), the "person" and the "enterprise" are the same ("Apple") and Apple's racketeering benefited itself financially. Under sections 1962(c) and (d), the "person" and the "enterprise" are distinct, the "person" is Apple, and the "enterprise" is Worldwide Loyalty.[464]

905.    In violation of Section 1962(c), Apple conducted and participated in the conduct of an associated enterprise ("Worldwide Loyalty") through a pattern of racketeering activity and engaged in and/or the activities of which affect interstate commerce Apple.

906.    In Violation of Section 1962(d), Apple conspired "*to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.*"[465] During the time Gjovik worked at Apple, Apple undertook criminal acts with the "*intent to commit, and to aid and abet, and in connection with another federal crime.*"[466] Apple conspired to violate one or more of the substantive RICO provisions and member of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy. [467] Apple and The Worldwide Loyalty Team are mutually dependent on each other, assist each other on the acts of racketeering, and their actions are intertwined with each other as Apple would not be able to engage in the racketeering acts it does without the Worldwide Loyalty Team Enterprise.[468]

907.    Apple knowingly agreed to facilitate the commission of at least two racketeering acts constituting a pattern and scheme to be committed by any member of the conspiracy.[469]

---

[464] RJR Nabisco, Inc. v. Eur. Cmty, 136 S. Ct. 2090, 2104 (2016); Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).
[465] *Salinas v. United States,* 522 U.S. 52, 63 (1997); *United States v. Wilkerson,* 966 F.3d 828, 841 (D. C. Cir. 2020); *United States v. Fernandez*, 388 F.3d 1119, 1228 (9th Cir. 2004).
[466] *United States v. Raniere*, 384 F. Supp. 3d 282, 306 (E.D.N.Y. 2019).
[467] *Beck v. Prupis*, 529 U.S. 494, 503-07 (2000); *Chaney v. Dreyfus Serv. Corp*., 595 F.3d 219, 239 (5th Cir. 2010).
[468] *United States v. Raniere*, 384 F. Supp. 3d 282, 305 (E.D.N.Y. 2019).
[469] See, e.g, *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Salinas v. United States*, 522 U.S. 52 (1997).

398

### iii.     Creation, Nature, and Operation of the Enterprise

908.     Apple, as an enterprise-as-person concept (only under 1962-a), benefitted by playing an active role in the pattern of racketeering which directly injured Gjovik's property and business. Legitimate hazardous waste disposal costs thousands of dollars, so it is hard to imagine any situation in which the illegal dumping of toxic wastes by corporate officers, employees, or agents will not directly or indirectly benefit the corporation enterprise. Indeed, "intentional polluters are doing so because it is less costly and more profitable than complying with the environmental laws."[470]

909.     Even more egregious, in 2021, Apple also instituted a "ESG modifier" for executive pay that can increase or decrease Executive Compensation 10% based on environmental (and other) practices. Apple's environmental violations were not just to save money on properly disposing of waste, it was also to inflate stock price with false and misleading claims about their actual practices, and to increase bonuses for the executives. Apple is literally giving executives bigger bonuses for illegally disposing of hazardous waste. As Apple makes more money from its criminal conduct, it allows it to reinvest that money in its Global Security team that it can use for more criminal conduct, or bribing sheriff's offices, etc.

910.     In addition, RICO Section 1962(c) requires the existence of two distinct entities: a "person" and an "enterprise" that is not simply the same person referred to by a different name. Even under subsection 1962(c), a corporate entity and its sole shareholder are sufficiently distinct to satisfy the "enterprise" and "person" elements of a subsection (c) violation.[471] The RICO statute defines "enterprise" to include "any individual, partnership, corporation,

---

[470] Brendan Rielly, Using RICO to Fight Environmental Crime: The Case for Listing Violations of Rcra As Predicate Offenses for RICO, 70 Notre Dame L. Rev. 651, 679–81 (1995).
[471] Cedric Kushner Promotions, Ltd., 533 U.S. at 161; Living Designs, Inc., 431 F.3d at 361; First Capital Asset Management v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004).

399

association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[472]

911.     Apple and the Worldwide Loyalty Team enterprises engage in interstate and foreign commerce and activities that affect interstate or foreign commerce. An enterprise that orders supplies and transports its employees and products in interstate commerce, is "engaged in interstate commerce" for purposes of RICO, [473] as is an enterprise that uses telephones, the mail, or internet communications.[474] The enterprises activities and the predicate acts of racketeering all affect interstate commerce.[475]

912.     The defendant, Apple, is employed by the enterprise, associated with the enterprise, conducts in the enterprise's affairs, lead the enterprise, and participated in a pattern of racketeering with the enterprise.[476] Apple is heavily involved in the operation and maintenance of the enterprise, and most of the schemes are for the ultimate benefit of Apple's short-term and long-term unlawful goals and objectives.  Apple can be held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself.

913.     The criminal enterprise in this complaint, where not Apple itself, will be named after a monster of Apple's creation, the "*Worldwide Loyalty Team*." This group has been repeatedly identified, over nearly two decades, as being involved the initiation, management,

---

[472] 18 U.S.C. § 1961(4); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).
[473] *United States v. Robertson*, 514 U.S. 669, 671-72 (1995); see also *United States v. Velasquez*, 881 F.3d 314, 329 (5th Cir. 2018); *United States v. Keltner*, 147 F.3d 662, 669 (8th Cir. 1998).
[474] *Velasquez*, 881 F.3d at 329 ("Use of instrumentalities of interstate commerce such as telephones, the U.S. Postal Service, and pagers to communicate in furtherance of the enterprise's criminal purposes can also constitute the enterprise affecting interstate commerce.")
[475] See *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (quoting R.*A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1353 (5th Cir. 1985)); *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1289 (7th Cir. 1983).
[476] Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005); Churchill Village v. General Electric, 361 F.3d 566, 574-75 (9th Cir. 2004).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

and/or cover-up of criminal acts in furtherance of common schemes. The "Worldwide Loyalty" Enterprise here references and includes, but is not limited to, Apple's actual "Worldwide Loyalty Team" organization. Worldwide Loyalty is an enterprise separate from the "person" (Apple) associated with the enterprise who engaged in unlawful RICO conduct.[477]

914.    The Worldwide Loyalty Team's own chosen name ("Worldwide") affirms they are an entity which is engaged in and effects interstate and foreign commerce, further evidenced by interstate wire and mail, interstate travel and shipping, and 'ops' in numerous states and countries. (Predicate Act of Criminal Bribery occurred in California, Predicate Act of Securities Fraud occurred in California and New Jersey, Predicate Acts of Witness Intimidation/Witness Relation occurred in California, Washington, New York, etc.).

915.    For 1962(c),(d) – Apple and the enterprise are distinct and separate entities. This enterprise includes Apple the corporation, along with: lawyers, law firms, expert witnesses, trade organizations, non-profit organization, media companies, tech reporters, third-party administrators, employees and officials in government agencies, doctors, and environmental consultants.[478]  Most of the entities who are members of the enterprise are independent entities by definition – lawyers and professional engineers are licensed professionals with ethical obligations to maintain professional independence.[479] Similarly, law enforcement and regulatory agencies are supposed to operate independent of private interests.[480]

916.    Many of the individuals and groups named in this complaint for their activities as part of Apple's racketeering have had other similar allegations made about them or related to

---

[477] Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986).
[478] Phillip Morris USA, Inc., 566 F.3d at 1111-12; Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005); United States v. Blinder, 10 F.3d 1468, 1473–74 (9th Cir.1993). Jackson v. Sedgwick Claims Management Services, Inc., 699 F.3d 466 (6th Cir. 2012).
[479] *Gadda v. Ashcroft*, 377 F.3d 934, 942–43 (9th Cir.2004); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir.1992). Model Rules of Prof'l Conduct R. 5.4.
[480] *United States v Griffin* (1981, CA4 Md) 660 F2d 996, cert den (1982) 454 US 1156, 71 L Ed 2d 313, 102 S Ct 1029.

401

them prior. Many of these individuals and groups likely are not only engaged in Apple's racketeering, but also the racketeering and unlawful conduct undertaken for the benefit of other big businesses. For example, as mentioned, there is extensive press coverage of corruption concerns at the US Department of Labor OSHA Whistleblower Protection Program west-coast offices.

917.    The local police have also faced a number of investigations, charges, and convictions over the last couple decades, some of which were already noted (Predicate Act Criminal Bribery, etc.). Other known felonious conduct by and related to the local police include the recent infamous eBay cyberstalking and obstruction of justice scandal. Two former Santa Clara police captains, Philip Cooke and Brian Gilbert, pled guilty to conspiracy to commit cyberstalking and conspiracy to tamper with witnesses.[481] Cooke admitted to participation in an "*elaborate cyberstalking scheme to intimidate … and then interfered with the investigation into tactics that included sending the victims live spiders, cockroaches, and a fetal pig.*"[482] Cooke and Gilbert were involved in every part of the eBay cyberstalking conspiracy, including a digital harassment campaign, installing surveillance equipment on the victim's property, and conspiracy to obstruct an FBI investigation from discovering the financial paper trail connecting them to the threatening deliveries of live insects and death-themed items.[483] Gilbert and Cooke also conspired to use a '*friendly*" police officer at the Santa Clara Police Department, who they "*can control*" to assist in the coverup for eBay.[484] Gilbert was a captain with the Santa Clara police until 2018, and Cooke was a captain with the Santa Clara police, including managing 29

---

[481] US DOJ, *Former eBay Employee Pleads Guilty in Aggressive Cyberstalking Campaign*, District of Massachusetts (October 27 2020), https://www.justice.gov/usao-ma/pr/former-ebay-employee-pleads-guilty-aggressive-cyberstalking-campaign

[482] Robert Salonga, *Ex-Santa Clara police captain pleads guilty in bizarre cyberstalking of eBay critics*, The Mercury News (October 27 2020), https://www.mercurynews.com/2020/10/27/ex-santa-clara-police-captain-pleads-guilty-in-bizarre-cyberstalking-of-ebay-critics/

[483] Id.

[484] *USA v. Baugh et al*, US District Court, Massachusetts District, Case 1:20-MJ-02398 (2021), Docket #3-2 "Affidavit of Mark Wilson" FBI Special Agent pg42-44

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

employees and SWAT, until 2017. In 2016, Cooke was awarded the "*California Commendation Medal*," and a "*Lifetime Achievement Award*."[485] Following the eBay stalking/harassment fiasco, and Moyer's criminal charge of bribery, an allegation that Apple is using "friendly" employees in local law enforcement and agencies to assist them in criminal schemes is undeniably plausible.

918.    Criminal RICO Enterprises have been found with members of an "*Inner Circle*" that demands member's "*absolute commitment*" to leadership, will "*not tolerat[e] dissent*," "*isolating associates and others from friends and family*," "*gaining political influence and evading regulatory agencies*," "*using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics*," and by "*obtaining sensitive information about members and associates of the Enterprise to control them*."[486]

919.    The entities comprising a RICO enterprise can also play different roles in the case, including the roles of victim, prize, instrument or perpetrator of the violation.[487]

**iv.    Pattern; Vertical and Horizontal Relatedness of Predicate Acts**

920.    The predicate offenses relate to each other and the enterprise. Relatedness enabled Apple to commit the offense solely because of its position in the enterprise and/or his involvement in or control over the enterprise's affairs, and/or because the offense related to the activities of the enterprise.[488] Relatedness links each of Apple's predicates act to the

---

[485] Jason Green, *Santa Clara to investigate ex-police captain charged in eBay cyberstalking case*, Mercury News, June 18 2022, https://www.mercurynews.com/2020/06/18/santa-clara-to-investigate-ex-police-captain-charged-in-ebay-cyberstalking-case/; *US v Cooke*, US District Court, District of Mass, Case 1:20-cr-10126-ADB (2021), Doc #20, Defendant Philip Cooke's Sentencing Memorandum

[486] *United States v. Raniere*, 384 F. Supp. 3d 282, 294 (E.D.N.Y. 2019).

[487] *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 n. 5, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); see Prof. G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,* 58 Notre Dame L. Rev. 237, 307-25 (1982).

[488] *United States v. Vernace*, 811 F.3d at 615-16. *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citing United *States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)); see also *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

enterprise.[489] Apple's predicate acts have similarities related to: purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (i.e., agency capture, intimidation and censorship, lying about environmental practices, whistleblower retaliation, etc.).[490] Through all the stories here, there are several repeated patterns, including:

- Apple's (including Apple executives and Board members) involvement in conduct which could be considered fraudulent, misleading, threatening, and obstructive; including "astroturfing," false public statements, and manipulation of the press and public discourse. Apple's engagement of outside parties (Enterprise) in support of the misconduct.

- Apple's misconduct related to offices on toxic waste clean-up sites (Superfunds, Brownfields, etc.); including government oversight and property owners. Apple's policies and practices related to hazardous material management; and hazardous waste management, storage, treatment, transport, and disposal. Apple's history of environmental, health/safety, and labor violations; Apple's patterns/practice of responding to environmental, health/safety, and labor concerns.

- Apple's history of being subject to criminal investigations and charges; Apple's responses to US government inquiries and investigations

921.    Apple is engaged in predicate acts of racketeering activity and Apple has shown a long-running pattern and practice of regularly treating whistleblowers and those who are cooperating with investigations into Apple in a way that constitutes criminal harassment and intimidation. The goal of Apple's racketeering does not and cannot have an end date, as much of Apple's racketeering conduct is performed in order to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct, while frantically working to cover-up

---

[489] *United States v. Henley*, 766 F.3d at 907 with *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008) ("It may be true that Fowler's predicate acts are not directly interrelated with each other, but that is not required. Instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise").
[490] *H.J. Inc. v. Northwestern Bell Telephone Co*., 492 U.S. 229, 240 (1989) (quoting former 18 U.S.C. § 3575(e)); *Reich*, 858 F.3d 55 at 61.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

its prior criminal conduct, by engaging in even more criminal conduct. Cover-ups by their nature present a distinct threat of long-term continuation.[491]

922.    In 2009, Gizmodo wrote about Apple and this Enterprise and explained that the group calls themselves the "*Worldwide Loyalty Team*." The article added that some Apple employees chose to refer to the group as the "Apple Gestapo."

"[Apple employees] [knew] how it feels to be watched, to always be considered guilty of crimes against another kind of state. He knew how it felt to have no privacy whatsoever when he was working right here, in a little Californian town called Cupertino, in a legendary place located in One Infinite Loop. [He] knew about all that pretty well, back when he was working at Apple Inc"

The article details that Apple employees "*lack any privacy whatsoever*," that Apple has "*moles working everywhere*" that even "*management is not aware of*," and if Apple thinks an employee shared sensitive information, the employee can expect to "*get fired and sued into oblivion by Apple Legal*." The article explains that when Worldwide Loyalty suspects a "*leak*" of information from employees to the outside world, the team brings in the "*special forces*" to "*coordinate the operation*" and "*supervise the supervisors*" as all cellphones are confiscated and data copied, then all data is reviewed including text messages and photos. "*No privacy, no limits.*"[492]

923.    Apple's Business Conduct policy in 2010 described Apple's search/privacy policies for employees simply as: "*Subject to rules or regulations affecting an employee's rights, Apple may monitor or search its work environments, including equipment, networks, mail, and electronic systems, without notice. Apple monitors facilities and equipment to promote safety,*

---

[491] *Mruz v. Caring*, Inc., 991 F. Supp. 701, 718 (D.N.J. 1998)
[492] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*prevent unlawful activity, investigate misconduct, manage information systems, comply with legal guidelines, and for other business purposes."*[493]

924.    However, the 2009 article said that if employees do not want to participate, the employees are asked to leave Apple and never come back. The article says that while Apple's demands are supposedly "*voluntary*", in reality any employees who resist will then be investigated as to why they are resisting. If a "*leaker*" is identified, they are held by Apple all day while they are "*interrogated*" and *"intimidat[ed] by [Apple] threatening to sue."* The article concludes complaining that the "*happy hippie company*" that Apple used to be has now been transformed into a "*company that does KGB-style lockdowns and Gestapo interrogations that end in suicides.*" [494]

---

[493] Apple, 2010 10-K, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=7519151
[494] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

# Apple Gestapo: How Apple Hunts Down Leaks

Jesus Diaz
12/15/09 5:38PM

440   2

They call themselves the Worldwide Loyalty Team. Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to Jobs and Oppenheimer.

*Exhibit: Apple Gestapo Article [495]*

925. Worldwide Loyalty engages in other activities that include individuals and groups outside of Apple Inc. The group was "*known for its network of informers and ruthless, systemic pursuit of leakers*." [496] The team has an "*undisclosed number of investigators around the world*" (foreign commerce) to control information and prevent "*leaks*" from reaching "*the press*," and to "*hunt down*" the source when leaks occur."[497] The team also has a sub-team called "Secrecy

[495] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058
[496] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[497] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

407

Program Management" which members are 'embedded' within product teams.[498] "*Inner Circles*" of organization have been found to be criminal RICO Enterprises when *"[p]romoting, enhancing and protecting the Enterprise by committing, attempting and conspiring to commit crimes."*[499]

926.    Worldwide Loyalty was led by John Theriault (ex-Pfizer, ex-FBI) from 2007-2011.[500] Theriault, known as Apple's "*Gestapo Chief*", oversaw all of Apple's security, including "*not-so-secret internal police force that controls Apple's own employees, the infamous World Wide Loyalty Team.*"[501] One publication noted, "*we're not 100% certain what he does, but we wouldn't want to have him knocking on our front door.*"[502] Starting in September 2009, Tom Moyer became Apple's Chief Compliance Officer. [503] By 2014, Tom Moyer was Apple's "Head of Global Security."[504] Moyer reported to Apple's General Counsel and also to Apple's Audit and Finance Committee within the Board of Directors (led by Ronald Sugar).[505] In 2014, Moyer supposedly only had two employees reporting directly to him. One was the new court mandated Antitrust Compliance Officer and the other was Apple's Director of Business Conduct and Global Compliance.[506]

927.    It is unclear how Moyer is "Head of Global Security" if the team does not report to him. Under information and belief, Apple's Global Security team was created after the 2011

---

[498] Id.
[499] *United States v. Raniere*, 384 F. Supp. 3d 282, 294 (E.D.N.Y. 2019)
[500] Tate, Supra
[501] Jesus Diaz, *Apple's Gestapo Chief "Steps Down"*, Gizmodo, (November 4 2011), https://gizmodo.com/apples-gestapo-chief-steps-down-5856443
[502] Jay Yarow, *Secret Apple Execs You've Never Heard Of*, Business Insider, (July 26 2011), https://www.businessinsider.com/apple-execs-2011-6
[503] Apple Inc, Report of The Special Litigation Committee of The Board Regarding Director Defendants and Settlement (May 26 2017).
[504] *United States v. Apple, Inc., et al*., No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394; Second Report of the External Compliance Monitor, Michael R. Bromwich, October 14 2014.
[505] Id.
[506] Id.

408

incident where Apple unlawfully broke into the Latino man's home.[507] Under information and belief, Tom Moyer replaced the prior head of Worldwide Loyalty, John Theriault.[508]

928.    In 2011, CNN described working at Apple as "*a brutal and unforgiving place*" and even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment.[509] In 2011, a Gawker reporter described the culture of working at Apple as "*bullying, manipulation and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful,*" and "*deeply disturbing.*"[510] In 2018, The Register complained Apple had "*gone full swivel-eyed, control-freak crazy on its own employees,*" and that Apple's paranoid led it to direct substantial amounts of "*spittle-flecked invectives*" at its own workers.[511]

929.    These alleged schemes and patterns of conduct are not new or revolutionary allegations against Defendant. A tech reporter wrote about how sources with ties to Apple often "*suddenly register a look of disquiet when asked about Apple, then nervously close down the conversation.*" [512] The reporter noted that no one at Apple "*wants to risk disfavor,*" that Apple has an "*obsession with secrecy,*" says Apple has effectively established a "*culture of fea*r."[513]

---

[507] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers
[508] Bloomberg via Yahoo, *Apple Security Head Charged with Bribery for Gun Licenses*, https://www.yahoo.com/now/apple-security-head-charged-offering-202206641.html
[509] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011, https://web.archive.org/web/20111019220441/http://tech.fortune.cnn.com/2011/08/25/how-apple-works-inside-the-worlds-biggest-startup/
[510] Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011, https://www.gawker.com/5847344/what-everyone-is-too-polite-to-say-about-steve-jobs
[511] Kieren McCarthy, *Apple leak: If you leak from Apple, we'll have you arrested, says Apple*, The Register, April 13 2018, https://www.theregister.com/2018/04/13/apple_leak_threats/
[512] Mark Sullivan, *Apple's Obsession With Secrecy May Be A Self-Fulfilling Prophecy*, Fast Company (June 2017), https://www.fastcompany.com/40433541/apples-obsession-with-secrecy-may-be-a-self-fulfilling-prophecy
[513] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

930.   Apple is also well known for influencing politicians and agencies,[514] as well as the press and public opinion.[515] In fact there is a term to describe Apple's ability to influence public opinion that is so famous it has its own acronym and Wikipedia page: the "*Reality Distortion Field*" or "RDF."[516] The phrase was established in 1981 by Bud Tribble. Tribble said, longtime Apple CEO "*Steve [Jobs][517] has a reality distortion field...In his presence, reality is malleable. He can convince anyone of practically anything... It wears off when he's not around.*"[518] Other Apple executives were more critical calling the RDF a way to "*con people*" and that Jobs would "*assert something...without even considering the truth*" and that it "*came from willfully denying reality.*"[519] Fraud is still fraud even if you give it an acronym. The egregious deception also arose from Jobs's "*belief that the rules didn't apply to him*" – including parking in handicapped spaces, driving without a license place, making false accusations in lawsuits, and denying the paternity of his daughter despite DNA proof.[520] Some of Apple's Board members and top executives are also known for fraud and misrepresentation. Longtime Apple Board member Al Gore has a notorious "*penchant for embellishing the facts*" and his "*Pinocchio problem.*"[521]

---

[514] Cecilia Kang, David McCabe and Kenneth P. Vogel, "Tech Giants, Fearful of Proposals to Curb Them, Blitz Washington With Lobbying," New York Times, June 22 2021, ("In the days after lawmakers introduced legislation that could break the dominance of tech companies, Apple's chief executive, Tim Cook, called Speaker Nancy Pelosi and other members of Congress to deliver a warning… Mr. Cook asked for a delay in the Judiciary Committee's process of considering the bills…"), https://www.nytimes.com/2021/06/22/technology/amazon-apple-google-facebook-antitrust-bills.html
[515]
[516] Wikipedia, "*Reality Distortion Field*," https://en.wikipedia.org/wiki/Reality_distortion_field
[517] Note: Steve Jobs was CEO of Apple from 1976-1985 and 1997-2011 (23 years)
[518] Chris Foresman, "Reality Distortion Field (RDF)", ArsTechnica, (2008), https://arstechnica.com/technopaedia/2008/03/reality-distortion-field-rdf/
[519] Michael Shermer, "*The reality distortion field: Steve Jobs's modus operandi of ignoring reality is a double-edged sword,*" Skeptic, Volume 17 Issue 4, (Summer 2012), link.gale.com/apps/doc/A313159919/AONE?u=mlin_oweb&sid=googleScholar&xid=297074b3
[520] Id.
[521] Kennedy School of Government Case Program, Al Gore and the "Embellishment Issue: Press Coverage of the Gore Presidential Campaign," C15-02.1679.0 (2002).

931.     An op-ed in The Hill on August of 2023 accused Apple of being the "*world's most dishonest*" company and detailed Apple's pattern of covering up unlawful conduct by bullying the victims of its unlawful acts with "*threats of legal and financial ruin*."[522] A March 2022 op-ed in Courthouse News accused Apple "*litigious bullying*" that was "*shameful*" and "*disgusting*."[523]

932.     The criticism wasn't just about labor or litigation, it was also about environmental practices. In 2017, a Foundation for Economic Education article complained that Apple's messaging about its environmental practices is "*dishonest and misleads the public about broader policy issues*." [524] In 2017, VICE described Apple's Environmental Responsibility Reports as "*annual grandstanding effort that the company uses to position itself as a progressive, environmentally friendly company,*" but behind the scenes the company "*undermines*" environmental goals. [525]

933.     Frequent complaints include planned obsolescence, fighting right to repair, and insistence on disposal of e-waste instead of recycling. In 2020, Ethical Consumer gave Apple their "*worst rating for environmental reporting*".[526] In 2021, a Tribune Magazine article complained "*Apple's environmental initiatives are designed to greenwash fundamentally unsustainable production and consumption patterns*." [527] Back in 2011, the Institute of Public & Environmental Affairs said Apple's "*stubbornly evasive*" posture toward accusations of

---

[522] Mark Cooper, "*Apple's anti-competitive tactics must be stopped*," The Hill, (Aug 19 2023), https://thehill.com/opinion/technology/4158948-apples-anti-competitive-tactics-must-be-stopped/
[523] Robert Kahn, "*Apple is Rotten*," Courthouse News, March 18 2022, https://www.courthousenews.com/apple-is-rotten/
[524] David L. Veksler, "Apple Is Not as Green as It Seems. Apple recently made some claims about its environmental impact that are, at best, questionable." FEE, Oct 15 2017, https://fee.org/articles/apples-environmental-claims-are-misleading/
[525] Jason Koebler, "*Apple Forces Recyclers to Shred All iPhones and MacBooks,*" VICE Motherboard, April 20 2017, https://www.vice.com/en/article/yp73jw/apple-recycling-iphones-macbooks
[526] Ethical Consumer, Apple Inc, https://www.ethicalconsumer.org/company-profile/apple-inc
[527] Paris Marx, *"Apple Won't Save the World,"* Tribune, May 17 2021, https://tribunemag.co.uk/2021/05/apple-wont-save-the-world

pollution (polluted water and hazardous-gas emissions) "*can only be seen as a deliberate refusal of responsibility*" for environmental issues.[528]

934.    Apple's also well known for threatening, capturing, and coercing the press in order to ensure there is only positive press coverage of the company.[529]

935.    In addition to the well-established pattern of Apple's racketeering, Apple's depraved retaliation against a whistleblower (Gjovik) —a predicate act added by the Sarbanes-Oxley Act in 2002—is sufficiently related to allegations of witness intimidation and retaliation (§§ 1512, 1513). [530] Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower; therefore, in most cases retaliatory acts and the underlying scheme will satisfy the relatedness requirement.[531] Here, Gjovik was working to expose and report the Predicate Acts of conspiracy, wire fraud, mail fraud, (convicted) securities violations, and violations of environmental laws with toxic chemical exposure. Gjovik was also reporting apparent violations of the RICO Act. Then Apple fired and terrorized her. It is all related.

### v.    The Schemes

936.    There is a lawful version of this enterprise. A corporation like Apple is able to lawfully report wrongdoing to law enforcement, able to request permits and to be regulated by agencies, able to rent buildings and operate facilities, able to hire professional engineers for

---

[528] Evan Osnos, *Is Apple's Tim Cook Listening?,* The New Yorker, September 1 2011, https://www.newyorker.com/news/evan-osnos/is-apples-tim-cook-listening; Michael Martina, *Apple criticized for China supply chain pollution*, Reuters, August 31 2011, https://www.reuters.com/article/2011/08/31/us-apple-china-idUSTRE77U4M620110831/

[529] Kieren McCarthy, *Inside our three-month effort to attend Apple's iPhone 7 launch party*, The Register, September 7 2016, ("*The truth though is that large tech companies, especially in Silicon Valley, often use access to their events and their executives as a way to force positive coverage of themselves. If you write one bad thing about them, they threaten to stop talking to you. If you ignore the warnings, they blacklist you.*") https://www.theregister.com/2016/09/07/reg_effort_to_attend_iphone_7_launch

[530] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).

[531] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                           DECEMBER 21 2023

construction and maintenance work, and able to employ law firms to represent them in litigation. None of these activities are activities RICO was designed to prohibit.[532]

937.    However, here, Apple chose violence. The "Worldwide Loyalty" Enterprise (with Apple and external members from these supposedly independent entities) is engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance, false statements about regulatory compliance in order to increase profits and create positive reputation. The Enterprise also uses intimidation and obstruction to silence anyone who witnesses Apple's actual practices and who could report concerns to the press and/or public, and (non-captured) agencies and/or law enforcement. Apple's own public statements reflect this scheme.

938.    Apple's self-proclaimed competitive edge in the markets it operates in includes "*aggressive price competition and resulting downward pressure on gross margins.*"[533] Apple says many of its competitors "*seek to complete primarily through aggressive pricing and very low-cost structures.*" Apple also adds that its principle competitive factors "*important to [Apple]*" include "*price,*" "*marketing… capability,*" and "*corporate reputation.*"[534] Apple adds that some of its competitors compete by "*us[ing] illegitimate means*" to develop products.[535]

939.    Apple has also stated that its "*global operations are subject to complex and changing laws and regulations on subjects, including privacy; consumer protection; advertising; … artificial intelligence;  labor and employment; anticorruption; … and environmental, health and safety…*"[536] Apple adds that "*compliance with these laws and regulations is onerous and*

---

[532] *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005).
[533] Apple Inc, 2023 10k, page 2, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[534] Id at page 3.
[535] Id.
[536] Id at page 13.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*expensive… laws and regulations can adversely affect [Apple's] business by increasing … costs, … and requiring changes to the Company's supply chain and its business."*[537]

940.    Apple admits that in order to succeed it must cut costs wherever possible, that it competes with business that engage in illegal activities, and that laws and regulations are threat to Apple's business model.

941.    Apple also speaks to the reason it uses intimidation, threats, and coercion to cover-up its violations of laws and regulations. Apple said if it "*is found to have violated laws and regulations, it could materially adversely affect [Apple's] business, reputation, results of operations and financial condition.*"[538] Apple says it uses its "*Global Security team*" to respond to environmental health and safety issues.[539] (As it did with Gjovik?) Further, Apple stated that in order to respond to employee health and safety concerns, Apple has developed "*measures to mitigate possible hazards*", which includes "*supporting employees with… crisis management training.*"[540] Crisis Management is primarily a key aspect of Public Relations, and is not a safety program.[541]

942.    Apple explained why it works diligently to ensure its false public statements are not corrected with evidence or testimony, or that witnesses even attempt to complain about the false statements. Apple says that:

> …Any failure, or perceived failure, by [Apple] to achieve its goals, further its initiatives, adhere to its public statements, comply with federal, state or international environmental, social and governance laws and regulations, or

---

[537] Id.
[538] Id.
[539] Id.
[540] Id at page 4.
[541] "Crisis management is a process designed to prevent or lessen the damage a crisis can inflict on an organization and its stakeholders… common members of the crisis team as public relations, legal, security, operations, finance, and human resources… Public relations plays a critical role in the crisis response by helping to develop the messages that are sent to various publics," Institute for Public Relations, https://instituteforpr.org/crisis-management-and-communications/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

meet evolving and varied stakeholder expectations and standards could result in legal and regulatory proceedings against [Apple] and materially adversely affect [Apple's] business, reputation, results of operations, financial condition and stock price…[542]

943. Apple and the Enterprise's activities occurred continuously over substantial period of time (decades) and poses a threat of continuing due to duration of activity and inherently unlawful acts in pursuit of unlawful goals.[543] Apple admits to its scheme in its regulatory filings and even suggests its business model and financial condition require continuance of the scheme. As of now, the threat of continuing criminal activity extends indefinitely into the future.[544]

944. Apple's conduct is not lawful or legitimate, nor is it simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws. This is similar to the scheme found in *US v Philip Morris*, where the enterprise joined together to "*maximize their profits*" through '*false and fraudulent statements, representations, and promises*" about "*the devastating health effects of smoking*."[545]

945. Apple's scheme is three parts. First, Apple intends to avoid expending the resources that would be required for basic regulatory compliance in most of its basic dealings. Apple has centralized administration oversight for functions including Human Relations, Employee Relations, Environmental Health & Safety, and Human Rights. Apple has hundreds of

---

[542] Apple Inc, 2023 10k, page 13, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298
[543] *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991); *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *In re Managed Care Litigation*, 150 F. Supp. 2d 1330, 1351 (S.D. Fla. 2001); cf., *Churchill Village v. General Electric*, 361 F.3d 566, 574-75 (9th Cir. 2004).
[544] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989), *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006).
[545] *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 253 (D.C. Cir. 2015).

415

facilities across the country and sends instructions and feedback to those offices and facilities from the headquarters in Cupertino via interstate emails, phone calls, video calls, and physical mailings. Apple transmits knowingly false information (or omits and fails to transmit legally required information) via communications with government agencies and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to the complete lack of environmental sustainability, regulatory oversight and reporting, despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities. The rampant retaliation and intimidation in response to employee labor complaints prevents charges from being filed with government which completely prevents government inspections and investigations that would have occurred because of those complaints. The scheme is in place in order avoid compliance with basic legal requirements and to intentionally hide known violations of the law.[546]

946.    Second, Apple intends to increase profits and obtain other financial benefits, through a knowingly false reputation of strong regulatory compliance in all of its dealings (i.e., promoting itself as an industry leader in environmental responsibility, human rights, etc.). Apple made these false statements via a variety of medium , including: press releases, quotes to the press, advertisements, materials published and filed to SEC prior to annual shareholder meetings (including the main proxy report, statements on voting items, references, and links to supplementary materials), documents filed and letters sent to other government agencies, website pages, company policies, updates on environmental compliance, supply chain-related human rights updates, and other documents.

---

[546] Heller Fin., Inc. v. Grammco Computer Sales, Inc., 71 F.3d 518, 524 (5th Cir. 1996)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

947.    Apple transmits these false statements to the government, shareholders, customers, the press, and the public via interstate, emails, paper mailings, faxes, and phone calls. Apple also invites interested parties to travel (including foreign and interstate travel) to attend the shareholder meetings in person where Apple makes false statements, and Apple also invites members of the press and public to travel (including foreign and interstate travel) to attend product launches and other public relations events in person where Apple makes more false statements.

948.    Finally, Apple intents to bridge the gap between its actual practices and what it reports to its shareholders and to the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing government agencies to assist in these activities in order to cover-up the Apple's unlawful activities and fraudulent misrepresentations. Apple often sends its messages of retaliation, threats, intimidation, coercion, and harassment via interstate emails, text messages, phone calls, video calls, physical mailings, and other mediums.

949.    The victims directly injured, with property and business harms, caused by Apple's scheme, are those the operational regulations were put in place to protect. Apple's violations of labor laws and systemic retaliation for raising concerns harms its employees. Apple's violations of environmental and hazardous waste laws harms employees who are exposed, people in the community who are exposed, the general public where there is significant soil and groundwater contamination or air pollution.

950.    Apple's violations of health/safety laws harm whoever is at the site where the laws are not being followed, so employees and vendors at offices and industrial facilities, customers, and workers at retail stores, and so on. These individuals are also harmed due to the

Apple's misleading and fraudulent statements about its actual practices, as it leads those people to expect a certain level of safety and lawfulness, when in reality conditions are likely to be unsafe and unlawful. This leads potential whistleblowers to fail to gather adequate evidence, organize with employees, or promptly report issues to a regulator because they relied on the false statements instead of acting with vigilance. This reliance makes the individuals 'fish in a barrel' for Apple to swiftly retaliate, discredit, confuse, censor, and incapacitate.

### vi.    Predicate Acts/Threats Involving Certain State Offenses [547]

951.    For all acts Gjovik argues Apple, or agents of Apple committed the acts, or in the alternative attempted to commit the acts, or in the alternative were accessories to the act,[548] or in the alterative and/or in addition conspired to commit the act.[549]

### 1)  Criminal Bribery of Executive Officer (Cal. Penal Code § 67)

952.    Tom Moyer is Apple's "Chief Compliance Officer" and "head of Global Security." Moyer's responsibilities include overseeing regulatory compliance, including anti-bribery/FCPA, export and sanctions compliance, health compliance, political compliance, and Apple's Business Conduct program.[550] Gjovik interacted with Moyer and his team on several occasions in her time at Apple. Shortly before she was suspended Gjovik reported smuggling/sanctions concerns to Moyer's team, and while suspended and before she was fired, Gjovik reported the "Issue Confirmation" including accusations of bribery and RICO to Moyer's team. Moyer was charged with criminal bribery in 2021 and then again in 2023. A chargeable instance of bribery under state penal code is a predicate act for RICO. [551]

---

[547] 18 U.S.C. § 1961(1)(a)
[548] 18 U.S.C. § 2(a) – Aider & Abettor
[549] 18 U.S.C.A. § 1964(d); 18 U.S. Code § 371 - Conspiracy to commit offense or to defraud United States
[550] Apple, Compliance and Ethics, "Compliance at Apple," (last accessed 12/2/2023), https://www.apple.com/compliance/
[551] Bribery: *United States v. Frega*, 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

953.     On November 19 2020, a grand jury issued an indictment and charged Apple's Tom Moyer with bribing an executive officer in violation of section 67[552] by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.[553]

954.     A defendant is found guilty of violating California Penal Code § 67 when they give or offer a bribe to an executive officer in California, or someone acting on the officer's behalf, and the defendant acted with the corrupt intent to unlawfully influence that officer's official act or decision.[554] A person acts with corrupt intent when he or she acts to wrongfully gain financial or other advantage for himself, herself, or someone else.[555] The crime is punishable by imprisonment for 2-4 years.[556]

955.     A trial judge unexpectedly dismissed the charge against Moyer sua sponte, and against the evidence and jury findings. The District Attorney appealed the dismissal and won on August 25 2023.[557] The charge of bribery against Moyer was reinstated and affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings, removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[558]

---

[552] Penal Code Section 67 - "Bribery of an Executive Officer"
[553] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[554] California Criminal Jury Instructions (CALCRIM 2023), Crimes Against Government, Bribery of Official, https://www.justia.com/criminal/docs/calcrim/2600/2600/
[555] Id.
[556] Robert Salonga, "*Appeals court revives bribery charge for Apple security exec in Santa Clara County concealed-gun permit scandal,*" Mercury News, Aug 25 2023, https://www.mercurynews.com/2023/08/25/appeals-court-revives-bribery-charge-for-apple-security-exec-in-santa-clara-county-concealed-gun-permit-scandal/
[557] *People v Thomas Moyer*, California Appellate Courts, Docket, https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=6&doc_id=2358260&doc_no=H049408&request_token=OCIwLSEmLkw3W1BZSCJNSEhIMFw7UCxbJyBOVzpRPDNOCg%3D%3D
[558] State v Moyer at 26, "While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See People v. Wong (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)"

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

956.     Tom Moyer was Apple's Director of Employment Law until September 2009 when he became Chief Compliance Officer. Moyer is responsible for Apple's compliance policies.[559] Today, Tom Moyer is the Chief Compliance Officer and Head of Global Security at Apple Inc. Apple told a federal monitor that Moyer "*has overall responsibility for Apple's ethics and compliance program including Apple's Business Conduct Policy, governing the ethical and legal obligations of Apple's Board, executives and over 120,000 employees around the world. Tom is also responsible for Apple's global security program including all physical security, executive protection, loss prevention, technology, security related investigations, and the security of new products and prototypes.*" [560] Moyer also leads Global Security and is now the second senior Apple officer/VP to be indicted for felonies in the last four years.

957.     Apple published an anti-corruption policy, probably written by Tom Moyer's team, that says "*you cannot offer or receive bribes...*"[561] It adds, "*At Apple, we do not tolerate any form of corruption in connection with our business dealings.*"[562] Apple admits it knows what the law is, and claims it follows the law, when in reality the top executive in charge of this policy has been charged with criminal bribery. Further, the policy notes: *"All questions about information contained in this Policy should be directed to Business Conduct.*"[563] This last statement infers that any/all question about anti-corruption at Apple should be only directed to Business Conduct (Tom Moyer) and no one else. This shows relatedness to the scheme with unlawful conduct, but claiming no unlawful conduct, and processes put in place to silence any whistleblowers and witnesses.

---

[559] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc.*, et al., No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al*., No. 1:12-CV-3394 (October 15 2014).
[560] Stanford, *Cybersecurity and the Legal Profession: Significant Challenges and Unique Opportunities*, 2015, https://law.stanford.edu/event/cybersecurity-and-the-legal-profession/
[561] Apple, Anti-Corruption Policy, June 2018, https://s2.q4cdn.com/470004039/files/doc_downloads/gov_docs/Anti-Corruption_Policy.pdf
[562] Id.
[563] Id.

### 1) Criminal Commercial Bribery (Cal. Penal Code § 641.3)

958.    As discussed, Gjovik's first manager attempted to bribe Gjovik. Gjovik was disturbed by the exchange and reported it to her manager's manager, Venkat Memula. Memula expressed interest in exploiting the incident in order to initiate the removal of Keshishoglou and told Gjovik to report the incident to Human Resources to document it for him. Gjovik then reported it to the Human Resources business partner assigned to her organization, Kristen Michallik on September 25, 2015. Gjovik then informed Memula of her conversation with Michallik.

959.    Keshishoglou suddenly transferred to a different organization shortly after. Memula began inviting Gjovik to personal social events and connecting Gjovik to leaders at Apple, which Gjovik interpreted as Memula allowing Gjovik to join the 'inner circle' as a reward for helping him remove Keshishoglou. Gjovik understood this as an offer of additional favors and favoritism if she was to continue to assist Memula in his schemes. At the same time, Keshishoglou's team, including Gjovik, was then moved under Officer Brad Reigel, despite Gjovik's repeated complaints about Reigel's misconduct and it being generally known that Reigel disliked Gjovik '*because Gjovik reminded him of an ex-wife he hates*.' When Gjovik complained to Memula about being forced under Reigel, Memula acknowledged Reigel would not be a good manager but told Gjovik it was her job to help him become a good manager.

960.    It was chilling to Gjovik that misconduct at Apple seemed normalized with the exception of exploiting instances for additional unlawful or retaliatory objectives. Gjovik was disturbed she was coerced to participate in their scheme and was so openly rewarded with cronyism for 'playing along,' while concurrently actions were taken that showed Memula had no actual concern for her wellbeing or how her manager treated her.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

961.    California Penal Code § 641.3(a) prohibits "Commercial Bribery" which includes any person offering or giving an employee money or anything of value, worth over $250, corruptly and without the consent of the employer, in return for using or agreeing to use the employee's position for the benefit of the other person. A chargeable instance of bribery under state penal code is a predicate act for RICO. [564]

### 2) Criminal Extortion (California Penal Code § 518)

962.    A chargeable instance of criminal extortion is a predicate act for RICO. In California, criminal extortion includes using threats to compel another person to hand over money or property or other consideration. It is a felony with up to four years of incarceration.[565] Threats may include wrongful use of force or fear, or threats under color of official right. Under federal law, it is a crime for United States officers or employees, under the color or pretense of office or employment commits or attempts an act of extortion.[566] Apple's and their enterprise members who are government agencies and/or employees of those agencies extorted Gjovik twice in only the last year in furtherance of the schemes at issue in this claim.

963.    Gjovik filed FOIA requests to the US EPA in January 2022 looking for records related to what occurred at her office in 2021. US EPA kept moving the request out and in May 2022, Gjovik noticed at the end of a very long report recently uploaded about her office mentioned vaguely an inspection at her office on August 19, 2021. Gjovik contacted Perez-Sullivan but got a bounce back saying Perez-Sullivan no longer worked at the EPA. Gjovik contacted the new contacts listed on the facility's webpage which would result in Poalinelli releasing the October 7 2022, report to Gjovik and for the first-time notifying Gjovik there was an inspection at her office, while she was suspended, and they found issues. The most

---

[564] Bribery: *United States v. Frega,* 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).
[565] California Penal Code § 518
[566] 18 U.S. Code § 872 - Extortion by officers or employees of the United States

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

concerning, was that the toxic gas from under the building, including TCE, was being sent into the HVAC intake since 2015.

964.    Gjovik asked to follow up questions at which point US EPA lawyer Rebekah Reynolds told Gjovik that Gjovik is only allowed to talk to her going forward and also said she will not talk to Gjovik or answer any of her questions. Gjovik was told her only option was FOIA and the FOIA team kept pushing out their ETAs for documents. Over the next year, the EPA slowly released hundreds of damning documents that were not only critical for Gjovik's lawsuits as they proved Gjovik was right and Apple was upset about it, but it also showed a concerted effort by US EPA employees (Poalinelli, Perez-Sullivan, Ty, Schulman) to keep Gjovik from finding out about what happened and what they found, and to suppress at least two potential news stories about Gjovik and the office (New York Times in July 2021 and Independent UK in December 2021).

965.    The US EPA FOIA team had a manager, Andrew Helmlinger, assigned to Gjovik and Gjovik was told he was her only contact for her FOIA requests. Helmlinger was often adversarial, even claiming Gjovik's requests were "commercial" because, he claimed, she was looking to make money by suing Apple. As such, Helmlinger began attempting to charge Gjovik as a "commercial requester" in order for Gjovik to receive documents about her office and what happened to her and her coworkers. Gjovik appealed to US EPA General Counsel's office and won, but Helmlinger persisted. Gjovik complained repeatedly arguing that US EPA had an obligation to speak with her as a member of the community but instead they were forcing her to request documents through FOIA which EPA took over a year to release in some cases, and repeatedly demanded she pay them for. Gjovik also complained that it appeared US EPA was saving the most damning documents for the final releases, dragging it out as long as they could.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

966.     On May 30 2022, Gjovik discovered and complained to US EPA that the FOIA manager, Andrew Helmlinger, is married to a Partner at the law firm ("Orrick, Herrington & Sutcliffe") that Apple hired to defend them from Gjovik's CERLCA (and SOX & OSH Act) retaliation case with the US Department of Labor. Gjovik complained that he had a personal interest in ensuring Gjovik did not receive the documents, and thus his repeated demands that Gjovik pay for her requests, knowing Gjovik did not have money and was unlikely to be able to pay, in furtherance of his wife, and Apple's, interests in concealing Apple's misconduct, obstructing Gjovik's charges and lawsuits, and demoralizing Gjovik in hope she gives up – and Helmlinger did all of this under the color of official title – which is extortion, among other things.

967.     Similarly, the US Department of Labor Whistleblower Protection Program's obstruction of Gjovik's cases, including obstructing her NLRB charges and a number of federal investigations including SEC and FTC, by demanding Gjovik provide them something they had no right to demand and only planned to give it to Apple to help Apple defend itself from Gjovik, under color of official title, and threatening to deprive Gjovik of her constitutional and statutory rights if she did not comply.

968.     There was much misconduct from US Department of Labor from the start of Gjovik's cases with them and Gjovik complained of obstruction to their OIG and Solicitor starting in November 2021. This included a phone call in September 2022 where Gjovik was told she would receive an update on her cases from her investigator (Diangco) and her supervisor. Instead, on the phone call was the Regional Assistant Administrator Matthew Parra, on a vacation day (per his out of office), who spent most of the call trying to intimidate Gjovik into withdrawing her charges. Gjovik complained on the phone and after of their conduct, including filing an OIG complaint about it.

969.    When US Department of Labor suddenly wanted another phone call with Gjovik in January 2023, Gjovik demanded she be allowed to record it or otherwise wanted to keep communications in writing due to their prior misconduct. US Department of Labor acquiesced. During the phone call, Captain Parra showed up again as a surprise guest and again made many intimidating and obstructive comments, including repeatedly misstating facts and the law, mostly repeating Apple's position statement and eventually admitting they apparently did not investigate the evidence or briefs Gjovik submitted. Gjovik repeatedly tried to "object" to Parra's statements, but Parra told her to stop and that the call was "informal" and "not on the record," so Gjovik acquiesced and let him claim things that were not true and complied with bad legal analysis, with the hope they would simply agree to actually investigate by the end of it.

970.    On March 22 2023, Diangco suddenly reached out to Gjovik demanding a copy of the audio file of the meeting. US DOL had not previously asked for a copy and did not attempt to make their own copy at the time. Gjovik asked why they wanted it, and they would not tell her.

971.    Gjovik told US Department of Labor she would share a copy with OIG to investigate the team's misconduct but otherwise would not share it unless they could provide a rational justification why they need it – and they did not. Gjovik complained to them it sure seemed like Apple wanted it to transcribe and use Gjovik's acquiescence to Parra against her in their defense.

972.    Then, in March 2023, Gjovik received a letter from Diangco demanding the audio file within ten days or else US Department of Labor may dismiss Gjovik's entire whistleblower retaliation case, regardless of merit.

973.    Gjovik complained to US Department of Labor that she would only share the file if they would draft an agreement "sealing" it so Apple could not get a copy. US Department of

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Labor never responded. Gjovik complained what they were doing seemed illegal and if they persisted, she would report their misconduct.

974.    Gjovik waited until the deadline at which point US Department of Labor still had not responded, so on April 2nd, 2023, Gjovik reported US DOL and Apple to the FBI for "procedural extortion" and notified the US Department of Labor of such. Gjovik has not heard back from US DOL since their extortion letter. [Update: US DOL's Parra attempted to dismiss Gjovik's charges in December 2023 citing harassing and demonstrably false justifications. Gjovik is appealing both.]

975.    Both of these incidents were examples of Apple and the Worldwide Loyalty enterprise using regional departments of government agencies and/or their employees to help Apple cover-up Apple's systemic non-compliance with regulatory obligations and use of criminal tactics to intimidate and silence whistleblowers and witnesses. These were not a new allegation about the US Department of Labor agency that Gjovik interacted with.[567]

### vii.    Predicate Acts Indictable Under Title 18 US Code [568]

976.    Apple conducted and participated in the affairs of the Worldwide Loyalty Team Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes: multiple violations of 18 U.S.C. § 1341 by engaging in mail fraud; multiple violations of 18 U.S.C. § 1343 by engaging in wire fraud; multiple violations of 18 U.S.C. § 1512 by tampering with witnesses and victims.[569]

---

[567] See, Bloomberg, *He Investigated Dubious Firings for U.S. Then He Was Fired* (2017), https://www.bloomberg.com/politics/articles/2017-07-21/he-investigated-suspicious-firings-for-u-s-then-he-was-fired (same Regional Office as Gjovik's case)
[568] 18 U.S.C. § 1961(1)(b)
[569] *Steiner v eBay,* U.S. District Court of Massachusetts, 1:21-cv-11181, Complaint and Demand for Jury Trial, July 21 2021, https://www.scapicchiolaw.com/pdf/Steiner.pdf

### viii.     Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)

977.     Mail fraud and wire fraud are both RICO predicate offenses. Apple knew it was making false representations and/or acted with reckless indifference to their truth or falsity.[570]

978.     The legal precepts relating to principals, accessories after the fact, misprision, and conspiracy apply to mail fraud and wire fraud as well. Gjovik's injury caused by Apple's mail and wire fraud is of her business and property, including "intangible property rights."[571] The RICO predicate act of mail fraud in furtherance of criminal acts does not displace other charges nor is it pre-empted by the federal statutes the mail fraud was used to engage in.[572]

979.     A corporation making public statements about working conditions and other business operations, does so as commercial speech with intent to maintain or increase sales and profit.[573] When a corporation, to maintain and increase its sales and profits, makes public statements defending [its] labor practices and working conditions … those public statements are commercial speech that may be regulated to prevent consumer deception.[574]

980.     Every time Apple transmitted a document or communication to the government, to customers, to the press, to the public, or to public interest groups – via the mail and/or over the wire – and Apple makes claims as to its regulatory compliance practices – each incident where Apple's statement is materially false can be a charge of mail and/or wire fraud. Wire fraud is intentionally devising or intending to devise a scheme to defraud by means of materially false or fraudulent pretenses, representations, or promises over interstate wire

---

[570] *United States v. Cusino*, 694 F.2d 185, 187 (9th Cir. 1982); *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000).

[571] *Carpenter v. US*, 484 U.S. 19, 26-27 (1987); *Pasquantino v. US,* 544 U.S. 349, 357 (2005).

[572] *United States v. Boffa*, 688 F.2d 919, 931-33 (3d Cir. 1982) (mail fraud statute not preempted by labor statutes, despite some overlap in statutes' coverage).

[573] *Kasky v. Nike., Inc*., 45 P. 3d 243, Cal. Supreme Court, 119 Cal.Rptr.2d 296, 314 (2002).

[574] *Kasky v. Nike., Inc*., 45 P. 3d 243, Cal. Supreme Court, 119 Cal.Rptr.2d 296, 319 (2002) – ("To the extent Nike's speech represents expression of opinion or points of view on general policy questions such as the value of economic "globalization," it is noncommercial speech subject to full First Amendment protection. Nike's speech loses that full measure of protection only when it concerns facts material to commercial transactions.").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

communications.[575] Apple's false statements made "*has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed*."[576]

981.    Inaccurate reports by the press may be attributable to misleading information deliberately supplied by company officials. In such circumstances, a company "cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties."[577]

982.    Apple's actions are especially egregious when there is a true and accurate report from another party (newspaper, nonprofit, etc.) about Apple's actual practices and Apple contacts the group demanding a "retraction" or "correction" of the true report, with changes requested to falsify the report, and Apple either citing prior falsified documents or requesting the falsification of the new report through threats, intimidation, and coercion. This happens often.[578]

### 1)  Fraud: Environmental and Safety Practices

983.    Apple's statements were made in furtherance of a "*scheme or artifice to defraud*" and as such serve as the predicate offenses for a RICO violation.[579] Apple's scheme to defraud under environmental laws was undertaken with a reckless disregard for the truth or falsity of its hazardous waste representations. Apple employs a prior Presidential appointed administrator of the U.S. Environmental Protection Agency and much of her prior staff from the US EPA.

---

[575] 18 U.S.C. § 1343. *United States v. Ransom*, 642 F.3d 1285, 1289-90 (10th Cir. 2011). *US v. Camick*, 796 F. 3d 1206 - Court of Appeals, 10th Circuit (2015).

[576] *United States v. Gordon*, 710 F.3d 1124, 1148 n. 26 (10th Cir.2013)

[577] *Warshaw v. Xoma Corp.* (9th Cir. 1996) 74 F3d 955, 959; *Cooper v. Pickett* (9th Cir. 1997) 137 F3d 616, 624; see *Southland Secur. Corp. v. INSpire Ins. Solutions Inc*. (5th Cir. 2004) 365 F3d 353, 373-383.

[578] FCPA Blog, *What does this Apple disclosure mean*? (2020), https://fcpablog.com/2020/02/10/what-does-this-apple-disclosure-mean/ ; See *U.S. v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 15 (S.D. Cal. Feb. 21, 2014).; *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 9 (S.D. Cal. Feb. 21, 2014)

[579] 18 U.S.C. §§ 1341, 1343. See *Philip Morris*, 449 F.Supp.2d at 852–54. *United States v. Philip Morris USA Inc*., 566 F.3d 1095, 1116 (D.C. Cir. 2009)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

984.     Apple's Supply Chain Responsibility policies describe in detail the regulatory obligations for hazardous waste handling. Apple knew what was required of it and chose to break the law, knowing its actions would create significant risk of harm to the public and often did actually significantly harm the public.

*Emissions & Releases*

985.     On June 30 2021, Apple knowingly omitted information about its treatment and disposal of the now-banned chemical NMP at its 3250 Scott Blvd facility. Apple submitted an electronic filing to the US EPA claiming thousands of pounds were treated on site, but the treatment mechanism noted was scrubbers which would not reduce the chemical to the extent noted.

986.     Further, Apple made false statements in this filing claiming 14,743 pounds of NMP were transported offsite to three waste processing facilities, however no manifests were ever created for those supposed transfers. Apple either lied that it transported the NMP at all and instead unlawfully deployed thousands of pounds of NMPs on site, or the Apple lied and transported the NMP without manifests to off book disposal facilities. It is a criminal violation of the Clean Air Act to make false statements and representations, and/or omit material information, and/or alter or conceal a document required under the Clean Air Act. (42 US Code 7413(c)(2)(A).

987.     Apple's Clean Air Act and TRI reports for the 3250 Scott Blvd factory only included emissions for 2020. For all other years Apple was operating, Apple's failure to file reports inferred zero emissions, which is clearly false. Apple lied about its practices and Apple's lies show intentional harm.

988.     Apple knew exactly how dangerous those emissions were and still did it, and while they gassed a neighborhood, they also made public statements about the dangers of the

same chemicals. For instance, Apple banned the use of NMP in their supply chain for years due to safety concerns and Apple even requires vendors to certify that they are not using it. Meanwhile, Apple blasted hundreds of pounds of NMP into Gjovik's windows in 2020.

989.    In *United States v. Pollution Control Industry of America*, a hazardous waste treatment company was fined $200,000 for telling a government agency that it would dispose of benzene at a Texas facility, but instead treated and disposed of it at its own facilities.[580] In *United States v. Case,* a district court convicted a person of "conspiracy to commit mail fraud and of mail fraud stemming from his illegal dumping of hazardous waste – where he told hazardous waste generators that he would dispose of the waste legally, then dumped it into Hudson Bay  and into an unauthorized landfill. To conceal this scheme, he submitted false reports and manifests to the [state] Department of Environmental Protection."[581]

990.    Here, further, Apple had repeatedly spoken publicly about the dangers of NMP (N-Methyl-2-pyrrolidone).[582] Apple placed NMP on its regulated chemicals list and required vendors prove they are not using NMP in their work on Apple's products.[583] Apple added these restrictions on NMP back in March of 2016.[584] Apple (Art Fong) spoke at a December 2021 webinar about Chemical Safety where it discussed the "priority chemicals" to eliminate from manufacturing supply chains, including NMP, Toluene, and TCE – among others.[585] Apple spoke of its new program "*Toward Zero Exposure*" where it committed to protect workers from exposure to chemical hazards.

---

[580] United States v. Pollution Control Industry of America, 20 Env't Rep. (BNA) 579 (N.D. Ind. June 19, 1989); Brendan Rielly, Using RICO to Fight Environmental Crime: The Case for Listing Violations of Rcra As Predicate Offenses for RICO, 70 Notre Dame L. Rev. 651, 666–67 (1995)
[581] *United States v Case*, 684 F. Supp. 109 (D.NJ. 1988), aftld, 866 F.2d 1413 (3d Cir. 1988).
[582] GreenScreenChemicals, https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf; https://www.apple.com/environment/pdf/Apple_Prioritizing_Chemicals_2018.pdf;
[583] Apple, Regulated Substances, pages 12 and 15, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[584] Id at page 18.
[585] GreenScreenChemicals, *supra*, at page 46.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

991.     On April 30 2021, Apple knowingly omitted information about another phosphine leak (and possible explosion) at its 3250 Scott Blvd facilities by refusing to file a spill report with CalOES and demanding the city HazMat redact Apple's name from the incident report that was electronically filed for the incident. It is a crime under 42 US Code 11045(b)(4) and 42 USC 7413(c)(2)(B) to knowingly and willingly fail to provide required notice after releasing extremely hazardous substances.

992.     Apple knowingly omitted material information and/or made false statements and/or knowingly generated, stored, treated, transported, disposed of, exported, or otherwise handled hazardous waste without filing the appropriate documentation which is a felony offense under the Resource Conservation and Recovery Act and Clean Air Act.[586] Apple knowingly and intentionally manipulated and concealed scientific data in order to conceal its criminal conduct. Apple committed the above-mentioned violations while knowing it endangered others by engaging in this fraud. Where Apple's regulatory filings were correct individually, Apple's overall conduct was still unlawful, and thus Apple's positive marketing statements (via email, web, television, video, social media, etc.) about its environmental practices were fraud.[587]

993.     *Apple said, "In everything we do, people come first," said Jeff Williams, Apple's chief operating officer. "We are constantly raising the bar for ourselves and our suppliers because we are committed to the people who make our products possible as well as the planet, we all share. Apple has also strengthened its efforts to help its supply chain conserve resources,*

---

[586] 42 U.S.C. § 6928(d); (RCRA sets criminal penalties for persons who knowingly commit any of the following acts: (a) transport hazardous waste to a facility that does not have a permit for hazardous waste; (b) treat, store, or dispose of hazardous waste without or in violation of a permit; (c) make fraudulent statements, omit information, or destroy or alter compliance documentation; (d) transport hazardous waste without documentation, export hazardous waste.)

[587] *People v. Johnson & Johnson,* 77 Cal. App. 5th 295, 344, 292 Cal. Rptr. 3d 424, 462–63 (2022), as modified on denial of reh'g (Apr. 27, 2022), review denied (July 13, 2022), cert. denied sub nom. *Johnson & Johnson v. California,* 143 S. Ct. 847, 215 L. Ed. 2d 87 (2023) – ("Because doctors themselves were likely to be deceived by [the] marketing communications, the trial court reasonably found [the] marketing communications were likely to deceive patients notwithstanding the legal duties doctors owe to their patients.")

*expand the adoption of safer chemicals and reduce pollution. In prioritizing Zero Waste to Landfill, Apple suppliers have diverted 1 million tons of garbage in three years.*"[588] This is false and misleading. The statement is false that Apple puts people first (it does not); false that Apple is always trying to act more lawfully (they are not); it is false that they are reducing pollution (see 3250 Scott Blvd); and it is materially misleading to say they are 'diverting' waste from landfills when they are simply incinerating it and letting the fumes blow into home windows.

994.    In Apple's "*Spill Response and Employee Hazardous Waste Training*" guide, Apple prohibits employees from being trained on how to deal with chemical spills or hazardous waste. The guide requires that in case of a chemical spill the employee call Apple Global Security and they will decide if anyone tells the government (they do not) and they will send a third-party vendor to deal with the spill. This is a facially unlawful training policy but it is honest. It is an example of Apple's actual policies and conduct, to contrast with how Apple says it acts.

### False Statements about E-Waste (Universal Waste)

995.    In 2013, the California EPA DTSC started investigating Apple for violating e-waste regulations.[589]

996.    In 2015, Apple's Environmental Report claimed: "*If not recycled properly, electronic waste can be a serious health and environmental issue. To make a quick profit, unethical recyclers sometimes dump e-waste or use dangerous techniques that can leak toxins*

---

[588] Apple, *Apple releases 13th annual Supplier Responsibility Progress Report*, March 6 2019, https://www.apple.com/newsroom/2019/03/apple-releases-13th-annual-supplier-responsibility-progress-report/
[589] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*and harm the environment. That's why we're committed to helping people recycle responsibly."*[590]

997.    Apple's 2016 Environmental Responsibility said, "*Apple disposes of hazardous waste responsibly. We complete regular audits of the Transportation, Disposal, and Storage Facilities (TSDF), where the hazardous waste is ultimately sent to be treated, incinerated, or recycled. Only facilities we audit and approve are allowed to accept and treat the hazardous waste we generate, which was 1 million pounds in fiscal year 2015.*"[591]

998.    In 2016, Apple agreed to a five-year consent decree and was fined by CalEPA DTSC for $450,000 over hazardous/universal waste violations.[592] "In order to settle the allegations, Apple has agreed to increase inspections at its facilities in Cupertino and Sunnyvale, according to CEPA's Department of Toxic Substances Control (DTSC)."

999.    This was covered by major publishers and Lisa Jackson's ex-US EPA team gave false comment.[593]

"An Apple spokesperson, Alisha Johnson, said: 'This matter involves an oversight in filing paperwork to close one of our recycling facilities as part of our expansion to a larger site…. We've worked closely with the DTSC to ensure that going forward we have the proper permits for our current site…As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond the legal requirements."

Yet, Apple told Gjovik they only do the bare minimum of what's required (and Gjovik discovered they don't even do that.)

---

[590] Apple, *Environmental Responsibility Report*, 2015, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf
[591] Apple, Environmental Responsibility Report, 2016, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2016.pdf
[592] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
[593] Reuters, *California EPA says settled with Apple on hazardous waste claims* (Dec 6 2016), https://www.reuters.com/article/us-apple-waste-violations/california-epa-says-settled-with-apple-on-hazardous-waste-claims-idUSKBN13V2HS

1000.   In the 2015 Environment Report, Apple said "*Since 1994, we have diverted more than 508 million pounds of equipment from landfills.*" In the 2016 complaint and settlement, DTSC complained that Apple used unlicensed waste disposers.

1001.   In the 2015 and 2016 Environmental Responsibility Reports, Apple said: "*All electronic waste we collect worldwide is processed in the region where it's collected— nothing is shipped overseas for disposal. The vast majority of our recycling is handled in-region, so we can make sure our recycled materials are not being dumped unsafely.*"[594] In the 2016 DTSC complaint and settlement, DTSC noted Apple was illegally shipping e-waste to Canada.

### Apple's Statements about Solid Hazardous Waste

1002.   Apple reported that in 2021, they sent 1,599 tons of hazardous waste to disposal facilities from corporate facilities globally. Based on manifests, 512 tons of that global waste (32%) came from the facility at 3250 Scott Blvd.

1003.   Apple noted on the amount of waste they "diverted from landfills" and highlighted this number in the report under program they called "Zero Waste" saying they are moving towards "*waste-free operations*". Apple claimed in 2021 they "diverted" 491,000 tons of waste. Apple said, "*we maintain our commitment to the safe and responsible management of hazardous waste, both onsite and offsite.*"

1004.   Meanwhile, at least at 3250 Scott Blvd, the way Apple was 'diverting' waste was blasting solvent fumes and toxic gases out their exhaust vents and into apartment windows.[595] Apple told the public and government that it is engaging in environmentally friendly practices in order to reduce waste, however Apple is only reducing the paper trail and cost of its waste by illegally disposing of dangerous chemicals into residential neighborhoods.

[594] Apple, Environmental Responsibility Report, 2015, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf; 2016, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2016.pdf
[595] Apple, 2022 Environmental Progress Report, https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2022.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1005.   In *Commonwealth v. Lavelle*, a corporation was charged with violating a state penal code related to corrupt organizations. Employees told generators of solid and liquid waste that the company would dispose of the waste legally, then systematically dumped the waste by pouring it "*down a mine borehole located at [their] office*."[596]

1006.   In Apple's 2015 Environmental Responsibility Report section on "Toxins", Apple says:" *We continue to lead the industry in reducing or eliminating harmful toxic substances to keep both people and the environment healthy*," and "*Apple is committed to providing safe working conditions for the people who make our products. Many toxins are restricted not only in the products themselves but also in the manufacturing processes*."[597] At this point Apple had started silicon fabrication at 3250 Scott Blvd and had already been cited for a number of health and safety violations. Apple is also using a number of substances at the location that it says it has prohibited from its supply chain, like NMP and TCE.

1007.   On May 28 2021, Apple submitted an application to the US EPA for "EPA Safer Choice Partner of the Year Award." Apple wrote, "*Volatile organic compounds (VOCs) are commonly found in consumer products and related manufacturing processes. VOCs are also major contributor to smog and overall poor air quality, which can adversely affect human health in local communities, making it not just an environmental issue, but an issue of environmental justice. While proper ventilation and engineering controls can protect the health and safety of those working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities.*" The first half of the statement is true, but the second part where Apple says it prioritizes proper ventilation and engineering controls is false (see 3250

---

[596] *Commonwealth v. Lavelle*, 16 Envtl. L. Rep. 20497 (Pa. Ct. C.P. Lackawanna Cty. 1985), aff'd 555 A.2d 218 (Pa. Super. Ct. 1989), appeal denied, 568 A.2d 1246 (Pa. 1989) (no written opinion) (discussing 18 PA. CONS. STAT. ANN. § 911 (Supp. 1994)).
[597] Apple, Environmental Responsibility Report, 2015, https://www.apple.com/environment/pdf/Apple_Environmental_Responsibility_Report_2015.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Scott Blvd; 825 Stewart Dr), as is Apple's claim they aim higher than those basic functions which they fail splendidly to do.

### 1008.   *Applications/Permits*

1009.   Apple began leasing the 3250 Scott Blvd facility in 2014. They started renovations and operations (including hazardous waste generation and hazardous material storage) in 2015 but only contacted DTSC in November 2016 to begin the permitting process. On November 8, 2016, Apple submitted a Phase 1 tiered permit application. The 2016 DTSC application asked if there was knowledge of disposing of hazardous wastes in or under the property, and the applicant said "no." However, Apple admits in the application to a prior environmental assessment for the property, and Apple submitted a planning package to the city, which shows the applicant knew the property contained at least an "*acid neutralization plant*," "*acid waste tank*," and "*acid neutralization pit*." All of these are for waste treatment and disposal. A quick public records search, and the review of the environmental report would both note that the site is directly next to an active US EPA Superfund site (Synertek, CAD990832735) with a groundwater plume of solvents that extends under the property caused by spills and leaks. The same person, Jenab, owns both properties.

1010.   At 3250 Scott Blvd, from 2015-current, Apple manipulated hazardous waste manifest documents and regulatory filings in a concerted effort to suppress and conceal the Apple's actual hazardous waste practices. Apple used improper codes for hazardous waste disposal (i.e., coding RCRA solvent waste as non-RCRA, coding 'solvent mixtures' instead of notating each chemical, etc.). All of these efforts were in order to save money, downplay the environmental impact of the plant, and manipulate metrics on operations at the plant in order to mislead the public, institutions, and customers about Apple's environmental practices.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1011.   In December 2016, Apple was fined $450,000 by the California EPA for violating a number of Hazardous Waste laws, including operating off books waste processing plants, transporting waste without manifests, and failing to take proper employee safety precautions.[598]   These violations surely included wire fraud and mail fraud to pull off such an operation for so long.

### *Carbon Neutrality*

1012.   Apple's website includes a section of "Environmental, Social, Governance" matters. On this page under "Environmental", Apple states: "*since 2020, we have been carbon neutral for our corporate operations*," and "*we're partnering with communities and local leaders to make sure our environmental efforts are also a force for equity and* justice."[599]

1013.   On Apple's "Environment FAQ" webpage, Apple said "*We've committed to achieving carbon neutrality across our entire value chain, including all our products, by 2030 — reducing emissions by 75 percent compared with 2015. We're cutting the majority of emissions through innovations in materials, clean energy, and low-carbon shipping. And we're investing in nature-based projects to offset the small amount that remains.*"[600]

1014.   It seems impossible that 3250 Scott Blvd is operating 'carbon neutral.' Apple has conclusively said that 3250 Scott Blvd, a silicon fabrication plant, has been 'carbon neutral' since 2020. Apple should provide evidence to substantiate that, otherwise the only way to reconcile the books is Apple's intentionally failure to get Air Resource Board permits and install monitoring technology, so they do not even track all of their emissions – however that still doesn't explain the millions of gallons of water and all of the electricity from the municipal grid for semiconductor fabrication which likely runs 24/7.

---

[598] CalEPA DTSC, "*Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*," Dec 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
[599] Apple, Investor Relations: ESG, (last visited 12/3/2023), https://investor.apple.com/esg/default.aspx
[600] Apple, Environment – FAQs, (last visited 12/3/2023), https://www.apple.com/environment/answers/

### *Green Energy*

1015.   In 2018, Apple wrote to the EPA saying that "*Apple generates 100% of our operational load through clean energy*."[601] For years, Apple's "environmental" branding has centered around a claim of running on "Green Energy." In 2015 it was exposed that Apple's claims about its data center in Maiden North Carolina running on 100% green energy were false. Apple had claimed they did not use fossil fuels at the facility, and it was 100% "green" but records showed they did use fossil fuels and only <1% of the energy was "green". [602] Then in 2017, the North Carolina government discovered Apple was also violating environmental and health/safety laws with unauthorized generation, storage, and transport of hazardous waste. Apple was caught transporting waste without manifests, failing to keep records, and failing to report their activities to regulators. Michael Steiger was also heavily involved in the North Carolina data center code violations.[603]

### 2)  Fraud: Privacy

1016.   Apple frequently claims, over a variety of mediums, that "privacy" is one of its core values and that privacy is a human right. Apple also frequently claims that it protects consumer's privacy and does not invade their privacy.

1017.   At a commencement speech at Stanford University, Apple CEO Tim Cook discussed the societal and psychological impact of surveillance and data collection, saying:

> "Even if you have done nothing wrong other than think differently, you begin to censor yourself. Not entirely at first. Just a little, bit by bit. To risk less, to hope less, to imagine less, to dare less, to create less, to try less, to

---

[601] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions* … (at 83 FR 45588, September 18, 2018).
[602] *Analysts Call Apple Renewable Energy Claims 'Lies,'* The Carolina Journal, 2015, https://www.carolinajournal.com/analysts-call-apple-renewable-energy-claims-lies/
[603] *Apple clean energy project fined for environmental violations*, The Carolina Journal, 2017, https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

talk less, to think less. The chilling effect of digital surveillance is profound, and it touches everything." – Tim Cook [604]

1018.   Apple's website claims: "*Privacy is a fundamental human right. It's also one of our core values*."[605] In 2019, Apple spokesman Fred Sainz commented to the Washington Post claiming:" We *believe privacy is a fundamental human right and is at the core of what it means to be an American*."[606]

1019.   Washington Post described Apple's public statements on privacy saying:

On the issue of privacy, Apple itself has helped create sky-high expectations with its public pronouncements. For months, it has been running advertisements touting its privacy bona fides, including one plastered to the side of a hotel during a major tech conference that promised, "What happens on your iPhone, stays on your iPhone." – Washington Post about Apple [607]

1020.   Notably, the oversight and monitoring of privacy at Apple is led by the Audit and Finance Committee, chaired by no other than Ronald Sugar.[608]

*Tracking & Data Collection*

---

[604] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action*, July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/
[605] Apple, Privacy, (last accessed 12/17/2023), https://www.apple.com/privacy/
[606] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action*, July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/; *Apple's statement on privacy lobbying*, https://www.washingtonpost.com/technology/2019/07/15/apples-statement-privacy-lobbying/
[607] Reed Albergotti, *Apple preaches privacy. Lawmakers want the talk to turn to action*, July 15 2019, https://www.washingtonpost.com/technology/2019/07/15/apple-preaches-privacy-lawmakers-want-talk-turn-action/
[608] Apple, Privacy Governance, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/en-ww/governance/ ("*the Audit and Finance Committee of the Board of Directors assists the Board of Directors with the oversight and monitoring of privacy and data security*").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1021.   It was discovered in late 2022, that despite Apple's public statements to the contrary, Apple was actually gathering a lot of user information directly connected to the user's Apple accounts, which led to an onslaught of lawsuits,[609] and fines.[610]

1022.   The internal policy says outright that Apple will access, copy, store, and monitor consumer's messages and emails, and other activities, if Apple supposedly thinks that an Apple employee is talking to that consumer about Apple's 'business.' Other tech companies have been caught red-handed spying on non-employees without notice or consent, which led to public backlash.[611] Apple's policies are vague enough for Apple to justify a mass-surveillance drag-net on all of its product user's. Apple's internal admission is in direct contraction to the absolute promises Apple makes publicly.

1023.   Further, Apple's actual practices violate GDPR and other international laws as it essentially amounts to a form of wiretapping.

1024.   Apple's website claims: "*Apple does not create or store faceprints of our customers.*"[612] This statement was made absolutely with no qualifiers or caveats.

1025.   Apple's use of the Gobbler application on employee phones leads to the capture of thousands, if not millions, of images/videos of consumers without their knowledge or consent, and worse, capture of their biometrics as well. Apple also now claims that it was a terminatable offense for an employee to tell the public that Apple was using this application, which was a

---

[609] Thomas Germain, *After a Dozen Lawsuits, Apple Breaks Its Silence on Privacy Problems,* Gizmodo, Feb. 6 2023, https://gizmodo.com/apple-iphone-privacy-analytics-12-lawsuits-statement-1850077715
[610] CNIL, *Advertising ID: APPLE DISTRIBUTION INTERNATIONAL fined 8 million euros*, Dec. 29 2022, https://www.cnil.fr/en/advertising-id-apple-distribution-international-fined-8-million-euros
[611] Mohit Kumar, *Microsoft Admits Spying on Hotmail Account to track Source of Windows 8 leak*, The Hacker News, March 22 2014, https://thehackernews.com/2014/03/microsoft-admits-spying-on-hotmail.html ("*Microsoft admitted that they have accessed a French Blogger's private Hotmail account to identify a former Microsoft employee who had leaked the company's trade secrets in 2012.*")
[612] Apple, California Privacy Disclosures, "Biometric Information," (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/ca-privacy-disclosures.html

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

formal statement that Apple had no intention to ever notify consumers of the practice or seek their consent.



*Exhibit: Collection of Photos/Biometrics Taken by Gobbler*

1026.   Additionally problematic is that Apple knew back in 2017 that the use of the Gobbler application in France or Germany is illegal, however Apple also know that employees traveling for work or even going on vacation, may end up in these countries, or in other EU countries.[613]

1027.   This section is incorporated in the Cal. Labor Code § 1102.5 claim for § 435, and the Tamney claims under the same, the California Constitution Right to Privacy, and the FTC Act – and those sections are also incorporated here.

1028.   Apple's statements about privacy related to tracking and data collection are false.

*Wiretapping*

---

[613] Apple, Privacy Governance, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/en-ww/governance/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1029.   In 2018-2019, it was revealed by a number of Apple whistleblowers that Apple was actually secretly recording customers using Siri, storing the recordings, and asking employees to listen to them and review them.[614] A whistleblower said: *"There have been countless instances of recordings featuring private discussions between doctors and patients, business deals, seemingly criminal dealings, sexual encounters and so on. These recordings are accompanied by user data showing location, contact details, and app data."*[615]

1030.   The whistleblower argued "Apple should reveal to users this human oversight exists – and, specifically, stop publishing some of its jokier responses to Siri queries. Ask the personal assistant 'are you always listening', for instance, and it will respond with: 'I only listen when you're talking to me.' That is patently false, the [whistleblower] said."[616] One of these whistleblowers, Thomas le Bonniec, noted the expansive sweep of the recordings he heard, saying: *"The recordings were not limited to the users of Apple devices, but also involved relatives, children, friends, colleagues, and whoever could be recorded by the device. The system recorded everything.*"[617]

---

[614] Alex Hern, *Apple contractors 'regularly hear confidential details' on Siri recordings, Workers hear drug deals, medical details and people having sex, says whistleblower*, The Guardian, July 26 2019, https://www.theguardian.com/technology/2019/jul/26/apple-contractors-regularly-hear-confidential-details-on-siri-recordings
[615] Id.
[616] Id.
[617] Alex Hern, *Apple whistleblower goes public over 'lack of action'*, May 20 2020, https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: One of the Millions of Secret Siri Recordings, via Telerama* [618]

### 3)  Fraud: Compliance and Ethics

1031.   Apple's Global Whistleblowing Policy starts with the statement: "*Apple conducts business ethically, honestly, and in compliance with applicable laws and regulations.*"[619] Apple does not say that 'Apple tries to conduct…' or 'believes that it is important to conduct'– no, Apple says it <u>does conduct</u>. Apple states a conclusive, definite fact that the company is ethical, honest, and never violates laws or regulations. Apple's statement is false, as well as preemptive threatening against whistleblowers speaking out, as if Apple is doing nothing wrong, there is nothing to blow the whistle about.

1032.   Apple's website has a homepage for "Ethics and Compliance" that leads with a prominent statement, similarly saying: *"Apple conducts business ethically, honestly, and in full compliance with the law. We believe that how we conduct ourselves is as critical to Apple's*

[618] Olivier Tesquest, *Siri, l'assistant vocal d'Apple ? C'est une taupe !*, February 24 2021, https://www.telerama.fr/debats-reportages/siri-lassistant-vocal-dapple-cest-une-taupe-6822626.php
[619] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

*success as making the best products in the world.*" It also includes a quote from CEO Tim Cook saying: "*We do the right thing, even when it's not easy.*"[620] Again, these are false and misleading statements.

1033.   Apple "Business Conduct Policy", produced by Tom Moyer's team starts with: "*Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations. This applies to every business decision in every area of the company worldwide.*"[621]

1034.   Reviewing the long list of criminal and civil charges, decisions, and settlements against Apple – it's clear that not "*every business decision in every area of the company worldwide*" is ethical, honest, or in full compliance with the law. These are all false statements and they are wire fraud when posted on a website or emailed, and mail fraud when sent via postal mail.

1035.   Apple's "Ethics and Compliance" website claims that "*Apple does not tolerate retaliation,*" and "*Apple will not retaliate — and will not tolerate retaliation — against any individual for reporting a good-faith concern or complaint, or for participating in the investigation of any complaint.*"[622] But there are constant complaints about Apple retaliating against its workers.[623]

1036.   Apple's Supply Chain policy and Apple website say: "*we hold ourselves… to the highest standards of labor and human rights, health and safety in the workplace, environmental practices…*"[624]

---

[620] Apple, Ethics and Compliance, (last accessed 12/2/2023), https://www.apple.com/compliance/
[621] Apple, Business Conduct Policy, August 2022, https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf
[622] Apple, Ethics and Compliance, "Speak Up," (last visited 12/2/2023), https://www.apple.com/compliance/speak-up/
[623] NY Times, Another Apple Worker Says the Company Retaliated Against Her, Nov 2 2021, https://www.nytimes.com/2021/11/02/technology/apple-worker-retaliation.html
[624] Apple, *People and Environment*, 2023, https://www.apple.com/supplier-responsibility/pdf/Apple_SR_2023_Progress_Report.pdf

*Exhibit: Apple Website Statement on Supply Chain*

1037.   Apple's Anti-Corruption Policy says: "*Apple will not retaliate – and will not tolerate retaliation – against any individual for filing a good-faith complaint with management, HR, Legal, Internal Audit, Finance, or Business Conduct, or for participating in the investigation of any such complaint.*"[625] Notably this specific anti-retaliation policy does not attempt to claim Apple will not retaliate against employees for reporting unlawful acts to government agencies or law enforcement.



*Exhibit: Apple Retaliation Policy Excerpt*

1038.   Both of the prior policies reference that reports must be made in "*good-faith*" and must be "*reasonable.*" Both of these subjective, vague requirements written in a formal policy, have a tendency to chill reporting.

---

[625] Apple, Anti-Corruption Policy, June 2018,
https://s2.q4cdn.com/470004039/files/doc_downloads/gov_docs/Anti-Corruption_Policy.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1039.   The Anti-Corruption policy also instructs employees to handle anti-corruption compliance concerns in house:

> "You should consult with Business Conduct if there is a question as to the appropriateness of a particular business decision or course of action… Any employee who learns of any misconduct or suspicious activities, including potential violations of this Policy and the law, must immediately report such misconduct either to Business Conduct or Legal... All questions about information contained in this Policy should be directed to Business Conduct."[626]

This statement captures Part III of Apple and the Worldwide Loyalty Enterprise's scheme, the silencing of witnesses and obstruction of justice. By limiting any reports/questions to only Business Conduct, the policy implies that employees are not allowed to report issues to government agencies or law enforcement. By requiring employees to immediately report any issues to only Business Conduct and/or Legal (which are the same organization – Moyer reports to General Counsel), it ensures that if Apple needs to cover-up the issue and silence witnesses, it starts on that right away. Requiring employees to report also ensures that Apple and Worldwide Loyalty can keep a database of witnesses and whistleblowers and surveil them to ensure they don't get any wild ideas like talk to the press or reporting crimes to the government.

1040.   Apple's new "Global Whistleblowing Policy" (published around January 2023) says: "*Reporting of certain types of actual or suspected wrongdoing that are in the public interest and affect others is often described as whistleblowing. Depending on applicable law, whistleblowing reports may include, but are not limited to, suspicions of wrongdoing regarding*:

- *Financial malpractice, misrepresentations, impropriety, or fraud, including accounting and auditing or disclosure concerns.*
- *Failure to comply with a legal or regulatory obligation.*
- *Public health and product safety*
- *Risk or damage to the environment*

---

[626] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

- *Criminal activity*
- *Bribery, facilitation of tax evasion or money laundering*
- *Privacy and data protection breaches*
- *Anti-competitive conduct*
- *Breaches of sanctions*
- *Violations of human rights…*
- *Attempts to cover up any of these behaviors."*[627]

Notably, Apple's policy highlights several examples of whistleblowing which were exactly what Gjovik did prior to Apple's abrupt and violent termination of her employment, including disclosures about: misrepresentations, impropriety, fraud, disclosure concerns, failure to comply with laws, violation of criminal laws, public health issues, environmental risks, privacy issues, sanctions violations, human rights violations, and Apple's attempts to "*cover up [all] of these behaviors.*"

1041.   Apple's new Whistleblowing Policy also includes a "No Retaliation" section which says:

"Apple will not retaliate — and will not tolerate any retaliation — against any individual for raising a good-faith and genuine concern within Apple or to the appropriate body under local law, or for participating in the investigation of any complaint. Any person who retaliates against a whistleblower, threatens any such retaliation, or is involved in any such conduct may be subject to disciplinary action, up to and including termination of employment or contractual relationship with Apple."[628]

This statement, while problematic for issues discussed in the next section, does assure employees that they will not face retaliation if they blow the whistle, which is a false statement.

---

[627] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf
[628] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1042.   Apple has a long history of retaliating against employees for raising concerns and reporting issues to regulators, and for enlisting law enforcement and regulators to help Apple cover-up the issues.

### i.   Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512) [629]

1043.   Gjovik began meeting with the, U.S. NLRB and U.S. EEOC before she was fired, providing statements and evidence about her retaliation concerns. Gjovik has stated publicly in the press, in legal filings, and on social media, since August 2021 and ongoing, that she filed charges that would initiate communications with federal authorities and that she planned to vigorously participate in any investigation into Apple for their conduct related to 825 Stewart Drive against her which she reasonably believed was unlawful.[630] Apple also knew if Gjovik ever learned of what they did to her at 3250 Scott Blvd, that Gjovik would also cooperate with authorities against Apple on that matter as well.

1044.   Many of the threats, intimidating and harassing messages, and corrupt acts were performed expressly acknowledging Gjovik's federal charges, cases, and proceedings. There is no question Apple understood the federal and criminal implications of their intimidation. Apple is liable and culpable for the acts of individuals through a variety of liability theories including conspiracy, aiding and abetting, Respondeat superior, negligence, and others. Indeed, even under the doctrine of respondeat superior, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents.[631]

---

[629] 18 U.S.C.A. § 1961 (B)
[630] *United States v. Guadalupe*, 402 F.3d 409, 412 (3d Cir. 2005).
[631] US DOJ, 9-28.000 - Principles of Federal Prosecution of Business Organizations

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1045.   Section 1512 applies to the obstruction of federal proceedings: judicial, congressional, or executive.[632] It consists of four somewhat overlapping crimes: use of force or the threat of the use of force to prevent the production of evidence; use of deception or corruption or intimidation to prevent the production of evidence; destruction or concealment of evidence or attempts to do so; and witness harassment to prevent the production of evidence.[633]

1046.   Threats of harm may be express or implied, and may include physical, emotional, psychological, economic, and legal tactics. Intimidation may also include stalking, vandalism, symbolic acts, cultural pressure, and emotional manipulation.[634] The intimidators may include the offenders, their allies and family, institutional and cultural authority figures, and the community. The targets may include the witness, and the witness's family, friends, and pets.[635] Digital intimidation may include posts identifying the witness with an implicit or explicit call to action, targeted threats and harassment, and shunning where mutual friends or followers are encouraged to un-friend/unfollow the witness.[636] A Judge referred to extreme digital intimidation as the "*electronic version of a lynch mob*."[637]

1047.   The US Department of Justice describes examples of victim and witness intimidation including explicit or implicit threats of physical violence, property damage, courtroom intimidation, public humiliation of victims or witnesses (or their friends and

---

[632] 18 U.S.C. § 1515(a)(1) ("official proceeding" means "a proceeding before a judge or court of the United States," "a proceeding before the Congress," "a proceeding before a Federal Government agency which is authorized by law," or "a proceeding involving the business of insurance whose activities affect interstate commerce . . .")

[633] Congressional Research Service, Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities, April 17 2014

[634] Aequitas, *Field Guide to Witness Intimidation: A Reference for Identification* (Jan 2018), https://aequitasresource.org/wp-content/uploads/2018/09/Field_Guide_to_Witness_Intimidation_3.19.18.pdf

[635] Id.

[636] International Association of Chiefs of Police, Project Safe Neighborhoods: Witness Intimidation in the Era of Social Media (Sept 2016), https://www.theiacp.org/sites/default/files/all/p-r/PSNPolicyBrief_WitnessIntimidation.pdf

[637] John Browning, #Snitches Get Stitches: Witness Intimidation in the Age of Facebook and Twitter, 35 Pace L. Rev. 192 (2014).

families), parking outside the victim's or witness's house, nuisance phone calls, vague verbal warnings, threatening looks and gestures directed at the witness or victim in court, economic threats, and threats of deportation (all of which Apple has done to Gjovik).

**1) Use of Force or the Threat of the Use of Force to Prevent the Production of Evidence**

1048.   Here, 18 U.S.C. 1512(a)(2)-(3) is implicated as Apple used the threat of physical force against Gjovik, or attempted to do so, with intent to influence, delay, or prevent the testimony of Gjovik in an official proceeding (US NLRB, US DOL); or cause or induce Gjovik to withhold testimony, or withhold a record, document, or other object, from an official proceeding (US NLRB, US DOL); or alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding (US NLRB, US DOL); and hinder, delay, or prevent Gjovik's communication to a law enforcement officer (FBI, state police, local police) of information relating to the commission or possible commission of a Federal offense.

*Workplace Violence*

1049.   Gjovik's NLRB affidavit was to be taken the day after she was fired. When Workplace Violence interrogator unexpectedly reached out to her on September 9 2021, insisting he must talk to her within the hour, having never met the interrogator or heard of his "Workplace Violence" team before, Gjovik wrote she was concerned he was intimidating her the day before her affidavit as a federal witness against Apple (See Twitter post about laying on the floor, holding a can of Mace, and 'pondering the brutality of US capitalism'). Gjovik was fired a few hours later without explanation.  Upon reviewing Apple policies, the only mention of "Workplace Violence" includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or written threats, stalking, or destruction of property.*" It is entirely unclear

why this team was contacting Gjovik if not to intimidate and threaten her with at least an implied threat of violence.

1050.   Later, Apple would claim Gjovik's termination was due to statements Gjovik made on August 28 and August 30, a full 10-12 days prior, yet on September 9, 2021, Kagramanov insisted Gjovik get on the phone with him "*within the hour*." After her termination via email that day, Gjovik would not hear of the likely proffered reasons for her termination until September 15th, six days later. It is clear Kagramanov did not actually have a legitimate reason he planned to terminate Gjovik.

1051.   *Digital Threats*

1052.   Assumed agents of Apple Inc referred to Gjovik's protected activities as "*worthy of death*" (Sept 7, 2021) and made references to Gjovik dying from "*double tap*" gunshot wounds (Dec 20 2021[638]), that in Russia Apple whistleblowers would die from a "*car accident*" (Oct 15 2021). The day she was fired an Apple account posted on an article about Gjovik that he wanted Apple to "*hunt [leakers] down like wild animals*" and they "*want to see them destroyed*" (September 9, 2021[639]). One Twitter account, Beezie Wacks, posted on Sept 10, 2021, the day after Gjovik was fired, that the world was "*reaming*" her and that Gjovik deserved it. The account also paid to promote (advertise) the post. Another account posted a photo of a ban holding a baseball bat and wrote that Tim Cook was "*gonna f@\*k some peeps up*" (September 22, 2021[640]). Another Apple account was repeatedly, directly harassing Gjovik on social media

---

[638] Reddit, now deleted user, https://www.reddit.com/r/technews/comments/rkyslb/apple_employee_blows_whistle_on_illegal_spying/hpg6bzu/?utm_source=share&utm_medium=web2x&context=3
[639] Reddit: 22 Sept 2021, @pacmandaddy, https://www.reddit.com/r/apple/comments/pt91m5/tim_cook_says_employees_who_leak_memos_do_not/hdv5qbj/
[640] MacRumors, 22 Sept 2021, https://forums.macrumors.com/threads/apple-ceo-tim-cook-in-leaked-memo-we-are-doing-everything-in-our-power-to-identify-leakers.2312633/page-2

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

and at one point referenced what was happening to Gjovik as "*the nail that sticks out, gets hammered*" (Jan 29, 2022[641]). [all of these posts have been collected, archived, and documented]

1053.   An employer's termination, demotion, or harassment against an employee, caused by an employer's racketeering, under certain circumstances can constitute a RICO predicate act under § 1512.[642] There is no evidence any of Apple's agent's intimidating, harassing, and threatening conduct was actually good faith encouragements for Gjovik to testify truthfully.[643] Instead, Apple's agents even openly admitted they would continue terrorizing her until she dropped her charges and made specific false statements. They presented a false story to Gjovik of Gjovik's own experience and demanded Gjovik repeat that false story as if it were true.[644] (*She asked to be on leave. She leaked IP. She deserved to be fired*. etc.)

1054.   Agents of Apple Inc wrote Gjovik was "*deserving of misery*," that they looked forward to seeing Apple "*swallow her & spit her out*," and that she is lucky Apple has not "*crushed her like a bug*." They posted "*She's a senior manager at Apple and going on a tirade against them over the ground beneath the building. What did she expect to have happen to her*?" and *"Apple fired you because they already know how this ends… They waited and looked for a policy violation, found it, and booted you."* Another wrote that as a *"seasoned employee, she more than others, was well aware of the consequences of airing dirty laundry*," and Apple should "*have fired her weeks ago*." [all of these posts have been collected, archived, and documented]

---

[641] Twitter, I'mPinkThereforeI'mSpam (@I_mspam), https://web.archive.org/web/20220130031154/https://twitter.com/i_mspam/status/1487549097070379008

[642] *Dooley v. United Techs. Corp.*, No. CIV. A. 91-2499, at *5 (D.D.C. June 17, 1992)

[643] *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013); *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005) ("Cruzado did ask that they tell the truth; however, his version of 'the truth' that he urged upon them was anything but the truth")

[644] *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005) ("corrupt persuasion occurs where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1055.   On September 16 2021, Gjovik posted on Twitter alleging Apple's Employee Relations team may be engaged in RICO: "*In 2017 a lawsuit against alleged a RICO violation (enterprise engaging in pattern of illegal racketeering activity over a substantial period). Plaintiffs argued covering up systemic harassment involved obstruction of justice & mail/wire fraud. #Apple [Employee Relations]*?" One of the anonymous Twitter accounts Gjovik is nearly certain is Apple ("i_mspam") responded, "*You'll never work as an attorney,*" (post then liked by other anonymous account "BeezieWacks"), and added "*The nail that sticks out, gets hammered.*"

### *Appleseed & the NLRB Charges*

1056.   When Gjovik suffered harassment and intimidation that was openly said to be due to her federal cases, the focus was often Gjovik's NLRB charges. The interference extended to a lawsuit against Gjovik 'because of' Gjovik's NRLB charges, emails to Gjovik demanding she alter her testimony, emails demanding Gjovik omit certain evidence, and direct interference with the NLRB investigators overseeing Gjovik's charges and the resulting investigation. (NLRB investigators are considered Federal Officers under criminal statutes).[645]

1057.   Appleseed contacted Gjovik directly on February 5 2022, demanding Gjovik modify her charges, writing to Gjovik:

- *Implying that people are trying to have you assassinated or cause you to kill yourself, me included, is extremely harmful, and I alerted APPLE about the chain of tweets involved in doing so.*
- *Please remove my tweets that cannot be reasonably justified to be connected to you*
- *from your January NLRB memo*
- *You need to delete my tweets from your memo that contain personal information about me…*
- *You need to remove all assertions that I am accounts trolling you*

### *Stalking & Prowling*

---

[645] 9-139.800 Interference with National Labor Relations Board Agent (29 U.S.C. § 162).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1058.   In California, Apple delayed, lingered, prowled, and/or wandered on the private property of Gjovik's apartments. Apple was on that property without a lawful purpose and intended to commit a crime if the opportunity arose. Apple's purpose was to commit a crime if the opportunity arose, which they did including by threatening Gjovik by taking unwanted photos and videos and looking into the home windows, of a federal witness, with an intent to intimidate;[646] by using social media accounts to harass Gjovik about the real-world events she was experiencing in real time, and at least once fleeing the scene when caught by a neighbor who said she would call police officers.[647]

1059.   Apple's scheme with the enterprise to intimidate Gjovik to not participate in legal activities related to Apple, and to retaliate against her for what she had already done, included sending agents (employees, ex-employees, contractors, vendors, etc.) to her home to stand by and walk around the courtyard of her Santa Clara apartment, to follow her when she ran errands, to drive up to her New York apartment and capture videos/photos of her, and to send someone to stand on her New York sidewalk until she left the apartment and to send Gjovik notification she was being watched by the person.

**2)  Use of Deception or Corruption or Intimidation to Prevent the Production of Evidence**

1060.   Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness: a violation of federal law. Apple knowingly used

---

[646] California Penal Code § 647i "Peeking"/Prowling ("who, while loitering, prowling, or wandering upon the private property of another, at any time, peeks in the door or window of any inhabited building or structure, without visible or lawful business with the owner or occupant.")
[647] California Penal Code § 647(h) "Loitering to Commit a Crime" (""who loiters, prowls, or wanders upon the private property of another, at any time, without visible or lawful business with the owner or occupant… delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered.")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik. [648]

1061.   Here, 18 U.S.C. 1512(b) is implicated as Apple acted with intent to influence, delay, and/or prevent the testimony of Gjovik with NLRB, US SEC, US DOJ, US Department of Labor, California Department of Labor; or cause or induce Gjovik to withhold testimony and withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in the same. Several of these cases were federal proceedings and Apple intended to prevent Gjovik from cooperating with authorities.[649]

1062.   Apple employees & assumed agents of Apple Inc suggested Apple Inc should / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion," "ending her," "destroying her," "ruining her,"* and bankrupting her. [all of these posts have been collected, archived, and documented]

1063.   Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley," "finding out"* for *"fucking around," a "self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."* [all of these posts have been collected, archived, and documented]

---

[648] *United States v. Khatami*, 280 F.3d 907, 911-12 (9th Cir. 2002)("Synthesizing these various definitions of "corrupt" and "persuade," we note the statute strongly suggests that one who attempts to "corruptly persuade" another is, given the pejorative plain meaning of the root adjective "corrupt," motivated by an inappropriate or improper purpose to convince another to engage in a course of behavior-such as impeding an ongoing criminal investigation"); *United States v. Gotti*, 459 F.3d 296, 343 (2d Cir. 2006)("This Circuit has defined 'corrupt persuasion' as persuasion that is 'motivated by an improper purpose.' *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).
[649] 18 U.S. Code § 1512 (b) - Tampering with a witness, victim, or an informant

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                     DECEMBER 21 2023

1064.   Apple Inc agents threatened to denylist Gjovik from the technology, engineering, and legal employment fields: including *"never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the California bar association's Moral Character investigation, and never getting a job anywhere again other than working in fast food."* (September 2021). [all of these posts have been captured and documented]

### *Direct Coercion*

1065.   Apple, via their agents/employees, repeatedly harassed and intimidated Gjovik specifically about Gjovik's federal and state charges and cases. Examples include but are not limited to:

- *"Important! The NLRB investigates ALL charges brought to its office. It isn't indicative of prosecution of cases or merit in charges.* (Sept 9 2021, Appleseed, Twitter, upon Gjovik being fired with an open NLRB charge)
- *"NLRB Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik"* (Jan 31 2022, Appleseed, lawsuit)
- "The EEOC and DFEH have already declined to pursue and given her the right-to-sue" (Sept 13 2021, Appleseed, Twitter)
- "I want to see her get justice, but perjuring herself and doing all of this is harmful," (Dec 29 2021, Appleseed, text)
- *"Do you know whose AppleInsider piece on a [SEC] whistleblower tip which contained absolutely no material information shareholders could use caused that? Yours.*" (Feb 5 2022, Appleseed, email)

These posts also specifically instructed Gjovik to drop her cases/charges or modify her testimony/evidence. Examples include but are not limited to:

- *"Remove my tweets that cannot be reasonably justified to be connected to you from your January NLRB memo"* (Feb 5 2022, Appleseed, email)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

- "You *need to delete my tweets from your memo that contain personal information… You need to remove all assertions that I am accounts trolling you.*" (Feb 5 2022, Appleseed, email)

Appleseed's lawsuit repeatedly noted Gjovik's NLRB, DOL, and SEC charges/cases.

I also reported her behavior to her University, and to Twitter. Neither of these seems to have deterred her from continuing to engage in the harassment.

On January 11, 2022, she filed an NLRB charge against Apple, Inc, claiming that I was harassing her on Apple's behalf. I have not harassed her. On January 31, 2022, she published a "memo" for that charge containing defamatory and private information about me (and others) on a platform called Scribd. Ordinarily, this information would be redacted and confidential by the NLRB. She has shopped this information around to the press in an attempt to make it public record, for malicious purposes. Much of the information she has reposted is my personal medical information, which I have not given her consent to share.

https://www.scribd.com/document/555822358/US-NLRB-Ashley-Gjovik-Apple-Inc-Jan-10-2022-Charge-Draft-1

*Exhibit: From Appleseed's 1/31/2022 Petition for a Restraining Order against Gjovik* [650]

1066.   A defendant's liability can be based on its falsification, destruction, and misrepresentation of evidence during a judicial proceeding.[651] In fact, while common law often immunizes testimony from prior judicial proceedings, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity.[652] Apple's lawfare was not protected, including their letter about face Gobbler and Appleseed's lawsuit against Gjovik.

***Threatening Emails and Social Media Posts***

---

[650] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).
[651] See, Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co., 336 F.Supp.2d 1239, 1267 (S.D.Fla.2004).
[652] 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant).

457

1067.   In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about 3250 Scott and its air emissions. One of these schemes was an anonymous account (assumably Apple) sent her an email via the webform on her website claiming to be ex-US EPA enforcement (see Comrade Jones) and after commenting on a suspicious number of details about Gjovik's environmental complaints against Apple, then threatened her to stop talking about the NMP release.

1068.   To support the threat, the person (Apple) claimed they had EPA insider information about an NMP air emission study that occurred on or after 2015. The email came from an IP flagged for spam and included certain details that seemed improbable for an actual US EPA employee to say. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[653] The email was sent as part of Apple's scheme to not comply with environmental laws, but claim it does, and use fraud, obstruction, and intimidation to silence anyone who could prove and report Apple's fraud.

### *Surveillance & Burglary*

1069.   Apple maliciously and unlawfully damaged/obstructed/disconnected part of a telephone/cable/electrical line, or equipment connected to the line – and Apple maliciously and unlawfully made an unauthorized connection with part of a line used to conduct electricity or equipment connected to the line – when Apple broke into Gjovik's Santa Clara apartment and attic to install some sort of electronic equipment above her home office, assumably intercepting the electrical and internet lines.[654]

1070.   Apple entered a residential apartment/room within a locked residential building and intended to commit felonious acts at least including installing surveillance equipment in

---

[653] False Impersonation of Federal Officer or Employee (18 U.S.C. § 912). *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).
[654] California Penal Code § 591 "Damaging Phone/Electrical Lines"

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik's attic, bugging Gjovik's chattels, replacing the batteries in their prior bugs in Gjovik's chattels, and obstructing/interfering with Gjovik's internet access.[655] Apple, and/or an agent of Apple, willfully entered Gjovik's apartment without the consent of Gjovik and Apple had no lawful reason to do so.[656]

1071.   Apple intentionally listened to or recorded a conversation/communication using an electronic amplifying/recording device without consent from all individuals who were party to the conversation/communication, and at least one of the other individuals who were party to the conversation/communication intended that the conversation/communication be confidential and had objectively reasonable grounds to believe it would be confidential. Apple violated 632(a) at least when it intercepted or otherwise overheard Gjovik's phone calls with the Santa Clara District Attorney's office, and a separate call with a lawyer in Seattle Washington, and a friend in Canada – which were the three phone calls where Gjovik's internet/cell connection dropped at very suspicious times in the call, and in the matter with the Canadian, both of their Wi-Fi connections were taken down at the same time and had to be rebooted – and these three events led to Gjovik's investigation which found the bugged objects in her home.[657]

***Example: Captured Government Employees as part of the Enterprise***

1072.   Apple's capture of local government and law enforcement agencies is also implicated here, as evidenced by the US NLRB (Hadjuk), US DOL (Parra, Diangco) US EPA (Helminger, Poalinelli) and other representatives and officials openly threatening and intimidation Gjovik to drop her charges. The connection to Apple was direct and clear, revealed by facts like the NLRB agent corruptly intimidating Gjovik while his coworker was actively applying for a job in Apple Employee Relations; or the Regional Supervisor of the US EEOC

---

[655] California Penal Code § 459 "Burglary"
[656] California Penal Code § 602.5 "Trespass into Dwelling"
[657] California Penal Code § 632(a) "Eavesdropping and Recorded Communication

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

offices overseeing US EEOC complaints in the SF Bay Area (including Apple, and assumably Gjovik's if she had requested an investigation) joining Apple Employee Relations only two months after Gjovik's US EEOC charge was filed and Apple celebrating his announcement on LinkedIn with an Apple Employee Relations employee it was great he was "finally" able to join Apple. How long was he applying to join Apple? How many Apple cases did he process while he was waiting? US EEOC denied to respond to Gjovik's inquiries into the matter.

### 3)  Destruction or Concealment of Evidence or Attempts to Do So

1073.   Here, 18 U.S.C. 1512(c) is implicated as Apple corruptly altered, destroyed, and concealed a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructed, influenced, or impeded any official proceeding, or attempted to do so.

### *NLRB employee as part of the Enterprise*

1074.   In addition, several government employees who participated in the enterprise's scheme engaged in conduct with at least Gjovik that is likely criminal. The first NLRB investigator, Alex Hajduk threatened Gjovik to obtain her signature on a document with her affidavit but which he also tampered with and threatened Gjovik not to correct or otherwise modify. In violation of California Penal Code § 141,[658] the NLRB investigator willfully, intentionally, and wrongfully changed Gjovik's affidavit to plant new information in the document which came from Apple's lawyers, not Gjovik, but the investigator made the affidavit appear as if Gjovik testified to it under oath. The investigator intended that his action would result in Apple's proffered reason for firing Gjovik to be wrongfully produced as Gjovik's genuine and true belief that could be a reason Apple fired her before Apple contacted her about the matter.

---

[658] Cal Penal Code 141 PC – crime to tamper with evidence or to plant evidence in any legal matter

1075.   Hadjuk violated Cal. Penal Code § 522[659] when he threatened Gjovik that if she was to attempt to correct the document to only reflect what she actually said during her testimony, that her actions would be exposed by Apple and used by Apple to claim she is dishonest, lying about the retaliation, and felt it possible she was fired legitimately for cause. Hadjuk threatened Gjovik and a result of the threat, Gjovik signed the affidavit as prepared by the Investigator. The investigator also wrongly claimed Gjovik was not allowed to provided evidence in her charges and if she was to do so, the entire case may be thrown out.

1076.   Hadjuk's actions also violate Penal Code 137(b) "Influencing a Witness by Fraud". Hadjuk used fraud against Gjovik with intent to cause Gjovik to withhold true testimony/information and give false testimony/information. The investigator made false statements, misrepresented information, and hid the truth with intent to deceive. Gjovik reported this to NLRB OIG in January 2022, who confirmed an investigation. Gjovik's case was transferred to a different region several weeks later.

### *Appleseed as part of the Worldwide Enterprise*

1077.   Appleseed repeatedly tried to delete, and did get deleted, Gjovik's posts and filings, including a copy of a federal legal filing. This occurred when Appleseed was an active Apple employee, and also after she supposedly quit Apple in late 2021.

- Appleseed admitted to reporting Gjovik's "Evidence Report" about harassment and intimidation, on Scribd, on February 7 and 8 Feb 2022, and it was deleted by Scribd.
- Appleseed reported the same legal filing as "children pornography" to Gjovik's web host.
- Appleseed admitted to reporting social media posts Gjovik made complaining about Reigel and Marini (and then confirmed Apple corporate told her they reported them as well)

### *The Cracks in the Floor*

---

[659] Cal Penal Code § 522 PC -- crime to obtain another person's signature to a legal document by means of extortion

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1078.   Many environmental crimes involve deception, both before the offense is committed and then later, when the defendant tries to cover his tracks.[660] Here, Apple attempted and did prevent Gjovik from gathering evidence of the cracks in the floor of her office prior to them re-sealing the cracks, by "removing her from the workplace and all workplace interactions." Apple tried to intimidate Gjovik not to report Apple's apparent CERCLA non-compliance. Apple tried to interrogate Gjovik the day before a federal affidavit and fired her hours after she reported "witness intimidation."

### 4)  Witness Harassment to Prevent the Production of Evidence

### *Gjovik's 2021 Charges*

1079.   Here, 18 U.S.C. 1512(d) is implicated as Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik. Apple acted with intent to influence, delay, and/or prevent Gjovik from communicating to federal officers and law enforcement authorities' information relating to the commission or possible commission of an offense. There is a reasonable likelihood that at least one of Gjovik's communications targeted by Apple would have been made to a federal officer. The information that would have been communicated by Gjovik related to the possible commission of a federal offense.[661]

1080.   Apple managers, employees, and agents have referred to Gjovik's complaints to the federal and state government about Apple Inc as "*unsubstantiated*," "*meritless*," "*baseless*," "*dead in the water*," and that there's "*no case*." Apple's agents referred to Gjovik as an "*ambulance chaser*" and her cases as "*shakedown lawsuits*."  Apple manager Ricky Mondello and ex-Apple employees Joanna Appleseed and Shantini Vyas have publicly called Gjovik a

---

[660] United States Department of Justice Executive Office for United States Attorneys, *Environmental Crimes–2012,* Volume 60, Number 4, pg89 (July 2012).
[661] 18 U.S. Code § 1512 (d) - Tampering with a witness, victim, or an informant

"*liar,*" "*predator,*" "*racist,*" "*inconsequential,*" "*not a real whistleblower.*" These parties have described Gjovik's protected activities as a "*vendetta,*" "*warpath,*" "*perjury,*" "*fabricated nonsense,*" "*misleading rhetoric,*" and "*misinformation.*" [all of these posts have been collected, archived, and documented]

1081.   Among other things, Apple Inc & their agents have publicly called Gjovik a "*liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility, dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist, 'universally hated,' a psychopath, paranoid, Bipolar, psychotic, schizophrenic, a grifter, a Karen, a Super Karen, Karenx100, a 'typical feminist,'* and a *'classic cow'.* [all of these posts have been collected, archived, and documented]

1082.   Apple, through named and anonymous accounts (as described throughout the complaint) incessantly harassed Gjovik with public posts attacking Gjovik's ethics, mental health, competence, physical appearance, and moral character. "Incessantly" included flooding the comments sections of article as soon as an article was published about Gjovik, repeatedly creating fake accounts to insert negative content into the Wikipedia article about Gjovik, quickly commenting on social media posts about Gjovik to call her names and make accusations against her, starting threats on social media about Gjovik where they accused her of lying and engaging in criminal conduct, and even messaging Gjovik in real-time to privately harass her about their concurrent public harassment.

1083.   Even before the August 2021+ corrupt harassment started, Gjovik's July 2021 Slack thread about retaliation showed how many people Apple had hurt and how silent they had been about it, and that Apple was silencing complaints at a mass scale. In situations where the Defendant aims for communitywide noncooperation there may also be assault, public

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

humiliation of suspected informants, and random public acts of extreme brutality intended to terrify potential witnesses.[662] (i.e., "*don't get Gjovik'd*").

1084.   Apple's presence in Silicon Valley is directly comparable to the community where a gang operates as both are worlds unto themselves—"*places where people live, attend school, and work, all within a radius of only a few blocks—from which they rarely venture out.*" Hearing about what Apple did to Gjovik is likely to silence anyone else in Cupertino, and it was very effective. Meanwhile, anyone still willing to speak out was directed to Appleseed (an Apple Global Security employee).

### *Gjovik & Batterygate*

1085.   California's constitution provides that privacy is an inalienable right and "*protects against disclosure of, among other things, sexual and non-party contact information.*"[663] Even in litigation, a party's sexual practices are protected by the California Constitution's right of privacy.[664] Any compelled disclosure, "*must be narrowly drawn to assure maximum protection of the constitutional interests at stake.*"[665] During the document "*collection and processing phases, privacy concerns are truly amplified… Those charged with identifying and collecting relevant data may therefore appropriately determine what data sources are likely to contain sensitive information prior to collection.*"[666]

1086.   Gjovik worried if she had an ethical duty to disclose to the man that Apple put his sexts in their 'permanent evidence locker' but because Apple says everything internal at Apple is

---

[662] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Research in Action: Victim and Witness Intimidation* (October https://www.ojp.gov/pdffiles/witintim.pdf 1995).
[663] Allyson Haynes Stuart, A Right to Privacy for Modern Discovery, 29 GEO. MASON L. REV., Volume 29, Issue 3 (September 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3930199; *Tien v. Superior Court,* 139 Cal.App.4th 528, 539 (Cal. Ct. App. 2006) ("*It protects against the unwarranted, compelled disclosure of various private or sensitive information regarding one's personal life, including his or her …. sexual relationships.*")
[664] Cal. Const. Art. I, § 1; *Vinson v. Sup.Ct.* (Peralta Comm. College Dist.) (1987).
[665] *John B. v. Sup.Ct.* (Bridget B.), supra, 38 Cal.4th at 1200.
[666] Robert D. Keeling and Ray Mangum, *The Burden of Privacy In Discovery*, Judicature (Duke), Vol. 105 No. 2 (September 2021), https://judicature.duke.edu/articles/the-burden-of-privacy-in-discovery//

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

confidential, she worried that saying anything to him would violate Apple policies. Further, she now realized Apple could be watching everything she does and if Apple did choose to take more personal data than they needed as a way to intimidate her to stay quiet about what happened in 2016, she worried Apple could be watching her to see what she does and possibly escalate their intimidation if it looks like she is not being a 'team player.' It's entirely possible this was Apple's objective.

### *The Federal Monitor*

1087.   Enforcement monitorships use independent compliance consultants to review, evaluate, remediate and oversee the specific controls in place to prevent a recurrence of the subject misconduct.[667] Monitors are essentially paid fact witnesses, thus it flow that the party the monitor is assigned to would violate witness intimidation laws if it was to attempt to threaten/intimidate/coerce a monitor to change its reports about what it has witnesses with the party. There is a splendid example of Monitor Intimidation with Apple's court appointed anti-trust monitor from 2013-2015.

1088.   Gjovik was surely not the only federal witness Apple has intimidated. Apple was sued by US FTC and US DOJ in 2013-2014 for violating THE SHERMAN ACT. In court decisions in the US District Court and the 2nd Circuit of Appeals, the Judges complained that Apple was not taking the law seriously, showed no contrition, was only providing cryptic responses, showed '*strained and unreasonable*' readings of the law, took a '*confrontational and obstructionist approach*' to the lawsuit, dragged their feet and sat on their hands, and was not

---

[667] GIR, *When do Enforcement Agencies Decide to Appoint a Monitor?* , https://globalinvestigationsreview.com/guide/the-guide-monitorships/third-edition/article/when-do-enforcement-agencies-decide-appoint-monitor

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

complying in good faith.[668] The District Court went so far as to say there was a "*blatant and aggressive disregard at Apple for the requirements of the law.*"[669]

1089.   Following the decision against Apple, the court appointed a monitor to oversee Apple's response to the decision and ensure Apple began to comply with antitrust laws. Michael Bromwich was appointed as the monitor. Bromwich had previously worked as a federal prosecutor, as associate counsel in the Office of Independent Counsel for Iran-Contra and was Inspector General for the US DOJ from 1994-1999. The monitor, Bromwich, issued his third report about his experience with Apple on April 16 2015.[670] He described Apple's behavior as "*inappropriate*" and "*adversarial,*" and complained Apple refused to provide evidence of regulatory compliance.[671]

1090.   He complained that Apple had placed the new Compliance Officer in a position reporting to Tom Moyer (head of Global Security) instead of directly reporting to the Apple Board under Ronald Sugar. He called the reporting structure an "*intentional*" "*conflict of interest*", and warned it would compromise the Officer's ability, or even willingness, to challenge Apple's "*risky business decisions.*"[672]

1091.   On October 15 2015, the federal monitor, Bromwich, complained that the chair of Apple's Finance and Audit Committee, Ronald Sugar, admitted to not reading Bromwich's reports beyond the executive summary. Upon hearing Bromwich's feedback, Apple protested it was "*bizarre*" to expect the Chair, Ronald Sugar, to read the entire report from a federal-court-appointed monitor as the result of a lawsuit against Apple by the federal government, of which Apple lost and was found to have violated THE SHERMAN ACT, despite Sugar being the Chair of

---

[668] *U.S. v Apple Inc,* F.Supp.2nd 263 (S. Dist. of NY 2014). *U.S. v Apple Inc,* 787 F.3d 131 (2nd Circuit 2015).
[669] *U.S. v Apple Inc,* F.Supp.2nd 263, supra.
[670] 3rd Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, and *State of Texas v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394 (April 14, 2015).
[671] Id.
[672] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

the Audit & Finance Committee which claims to oversee regulatory compliance, including antitrust.  Finally, Bromwich, also complained that Apple continued to refuse to provide information about their policies and procedures for investigating possible regulatory compliance issues. The monitor noted "*remarkable resistance*" from Apple on complying with the court order and his monitorship.[673]

1092.   Apple engaged in deranged conduct towards Bromwich, quite similar to some of the actions Apple has taken against Gjovik. Apple had articles written about Bromwich to smear and try to intimidate him. Apple baselessly accused Bromwich of extortion. Bromwich quickly found himself receiving obscene, harassing emails from anonymous accounts. Bromwich even attached some of these emails in his monitorship filings.

Case 1:12-cv-02826-DLC   Document 424-2   Filed 12/30/13
Sunday, December 1, 2013 5:27:1

Subject: Piece of Shit
Date:      Saturday, November 30, 2013 12:17:54 PM Eastern Standard Time
From:    My Site
To:        info@bromwichgroup.com

Name: Steve

Email: Blowme@gmail.com

Subject: Piece of Shit

Comments:
You are a thieving schiester piece of shit. There enough misery that beset
you for the rest of your life.

Steve Jobs
[674]

---

[673] Fourth Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.,* No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394 (October 15 2015).
[674] US DOJ, Federal Monitor Report Filing, Declaration of Michael Bromwich, https://www.justice.gov/d9/atr/case-documents/attachments/2013/12/30/302674.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                          DECEMBER 21 2023

**Exhibit** *Exhibit in Bromwich's Statement Filed in Response to Apple Attempting to Remove Him*

1093.   Apple is also very likely behind at least some of the deranged press coverage that came out attacking Bromwich, and the framing of the Monitorship like it was a boxing match. Some of those articles include:

- Verdict: *I Don't Want Michael Bromwich Messing With My Next iPhone*, John Dean (2013)
- Fortune, *Behind Apple's mutiny against its court-ordered e-books monitor: Apple is taking aim not just at the court-ordered monitor in the e-books antitrust case, but also at U.S. District Judge Denise Cote herself.* (2013)
- The Verge, Apple granted temporary removal of its hated ebooks monitor, (2014)
- CPI, *US: Apple looks to put monitor Bromwich out of a job* (2014)
- The Verge, *How Apple's court-appointed monitor became Cupertino's most wanted: After losing an antitrust trial, Apple has been facing off with Michael Bromwich. Could the fight change how we keep tech giants under control*? (2015)
- WSJ: *Court Rejects Apple's Bid to Shake Off Corporate Monitor, Michael Bromwich's role as Apple monitor is 'appropriately constrained,' court says* (2015)

1094.   Bromwich and his firm also frequently met aggressions from Apple where they tried to treat the federal Monitorship as if Bromwich worked for Apple, including trying to adjust Bromwich fees. Apple also complained Bromwich was being too invasive.. When Bromwich tried to set boundaries, Apple inciting a social medial movement to accuse Bromwich of extortion, whilst concurrently demanding Bromwich be removed from the Monitorship, attempting to humiliate Bromwich in front of the court. Bromwich gathered a dossier of communications with Apple to show his side of the story and filed it to the court in response to Apple's motion, at which point Apple essentially accused him of leaking.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

### ii.      Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513) [675]

1095.   In violation of § 1513(b)(1), Apple engaged in conduct and thereby caused bodily injury to Gjovik and damages the tangible property of Gjovik, and threatened to do so, with intent to retaliate against Gjovik for the attendance as a witness or party at an official proceeding, and any testimony given or any record, document, or other object produced by a witness in an official proceeding. In violation of § 1513(e), Apple, with the intent to retaliate, took any action harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.

1096.   Gjovik put her career and physical safety at risk in order to obtain evidence of what she believed to be criminal acts and violations of federal law.[676] Gjovik worked with state and federal agencies, and law enforcement, to report issues starting in September 2020 with the chemical exposure issues next to 3250 Scott Blvd. Gjovik spent much time gathering information and evidence for the government to support her claims that something was wrong. When the government asked her for more information or a new type of data, Gjovik always followed their instructions and was usually able to gather the data they wanted. These activities included Gjovik entering public, common, or general use areas but stealthily attempting to gather photos, videos, audio recordings, and scientific measurements like air quality readings.

1097.   For example, one night at her apartment, Gjovik went up to the roof of her building through public, unlocked doors but around 11:30pm when she thought no one would be around. She brought with her tVOC monitors and other testing equipment. Once outside on the

---

[675] 18 U.S.C.A. § 1961 (B)
[676] *United States v Joy Edwards,* United States Court of Appeals for the Sixth Circuit, No. 18-3541 (2019).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                DECEMBER 21 2023

roof she set up the equipment and began taking photos of the utility lines and vents around her in attempt to figure out where the chemical fumes were coming from. Gjovik was confronted by a private security guard who questioned her about what she was doing. Gjovik became very nervous but showed him the tools and said she was testing the air, showing him the readings, and then Gjovik quickly left the roof. Gjovik's actions were not trivial.

1098.   At Gjovik's office in July and August 2021, Gjovik organized with coworkers about gathering at least photographic evidence of the cracked Superfund floor and they did gather photos of the cracks before Apple could repair them. Gjovik talked with coworkers about doing their own indoor air testing. Gjovik shared information with the US EPA, planned to conduct her own sorbent tube testing, and Gjovik's disclosures about the cracks led to an onsite inspection of the office which found issues. Gjovik was swiftly 'removed from the workplace and all workplace interactions' following the photography, talk of her own testing, and prior to the inspection.

1099.   Apple even openly admitted to retaliating against Gjovik for her complaints about the Gobbler application, a clear violation of California state law and federal NLRB and FTC laws. While Gjovik initially brought her complaints about Apple's Gobbler practices to the press and public, and Apple said that is why they fired her, Gjovik continued to raise the issue filing additional charges to the federal government and law enforcement about Gobbler and also Apple's position on it. Apple continued to retaliate against Gjovik for doing so.

1100.   Even the evidence noted in this complaint post-termination was diligently gathered by Gjovik in preparation of filing additional complaints to the US government about Apple's ongoing misconduct. Gjovik diligently documented and preserved Apple's deranged harassment. Most people would have given up – or at least would not have the strength to create a memo of this type of harassment. Gjovik did, and so Apple retaliated even more.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

1101.   Even Apple's formal Business Conduct Policy states: "*Apple will not retaliate—and will not tolerate retaliation—against any individual for reporting a good-faith concern or complaint to a manager, People, Legal, Business Assurance and Audit, Finance, or Business Conduct, or for participating in the investigation of a concern or complaint.*"[677] Apple only promises there will be no retaliation if a report is made internally (but not externally).

1102.   The chilling effect of Apple's retaliation against Gjovik has been noted in articles, blog posts, social media, and even turned into memes. Gjovik's ex-coworkers began using the phrase "*get Gjoviked*" as slang for getting fired for speaking out about work conditions. Employees shared the term on message boards and Twitter (You are going to get "*Gjoviked*"). Further, a submission from an employee to the "AppleToo" employee group stated, "*even as we're writing this, we write it with fear, fear of getting single out and retaliate against, even though HR policy stats that Apple do not tolerate retaliation, after reading what Ashley Gjovik went through, we think the retaliation is real*."

1103.   Here, it was clear the adverse actions Apple took and continues to take against Gjovik are in retaliation for her protected activities. Timing and ongoing antagonism have often been the basis for the causal link. Where there is a lack of temporal proximity, circumstantial evidence of a `pattern of antagonism' following the protected conduct can also give rise to the inference.[678] The causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two. In *Robinson v. SEPTA*, the intervening pattern of antagonism was so strong that it overcame the lack of temporal proximity and, alone, proved the causal link. There was no need to look beyond this

---

[677] Apple, Business Conduct Policy, August 2022, https://www.apple.com/compliance/pdfs/Business-Conduct-Policy.pdf
[678] *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

pattern for other circumstantial evidence.[679] Apple's retaliation against Gjovik has been swift, continuous, and merciless. Apple's threats and intimidation did not have to succeed in order to find Apple liable and culpable for the harm and injury that Apple has caused to Gjovik and to others through its conduct directed towards Gjovik. Gjovik persists in fighting Apple and seeking justice for her harm, continuing to speak publicly encouraging reform and anti-corruption efforts, while Gjovik treads water personally. Gjovik's determination, despite her severe and extensive injuries, to keep her head up for the sake of others, does not excuse Apple's egregious misconduct. As Industrial Workers of the World member and labor activist Joe Hill said at his execution: "*Don't waste any time in mourning. Organize.*"[680]

### 1) Retaliation and Conspiracy to Retaliate Against Witness for Providing Testimony and Evidence

1104.   Apple retaliated against a Federal Witness & Informant in violation of § 1513(b). Apple knowingly engaged in conduct with intent to retaliate for testimony given and records/documents produced by Gjovik in an official proceeding, and for Gjovik providing information relating to the commission or possible commission of a federal offense. Apple's conduct threatened to and did cause bodily injury to Gjovik and damaged Gjovik's property. Apple also conspired to commit one or more § 1513(b) offenses.

1105.   Appleseed made numerous derogatory posts on social media about a federal informant and witness, Gjovik, who testified against Appleseed's team at Apple, a team which leads the criminal enterprise at issue in the RICO claim. Appleseed's posts intended to retaliate and did cause Gjovik harm. There is no question that Appleseed's posts were in response to

---

[679] *Robinson v. SEPTA*, 982 F.2d 892 (3d Cir. 1993).
[680] Howard Zinn, A People's History of the United States, p. 335

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik's testimony.[681] Intent can be proven through circumstantial evidence, such as: (1) "the natural consequences likely to flow from the [retaliator's] actions," including fear on behalf of the witness.[682] This is also like the case with Apple's many fake social media accounts and Apple's harassing emails.

1106.   In *U.S. v Camick*, the filing of a Civil Rights Lawsuit was found to violate 18 U.S.C. § 1513. It was found to be filed with an intent to retaliate against a federal witness.[683] Like *Camick*, Apple waited a suspicious amount of time to approach Gjovik at all about the concerns they later hired very powerful attorneys to email her about on October 15, 2021, implying they may sue Gjovik over those concerns. This was only after Apple terminated Gjovik and needed to search for a pretextual explanation – and were also looking for ways to threaten and intimidate her from pursuing legal charges against them.[684]

1107.   Similarly, Appleseed only sued Gjovik after Gjovik reported Appleseed to agencies and law enforcement, then citing Gjovik's claims as justification for the lawsuit. During the hearing, Appleseed directly interrogating Gjovik demanding to know why Gjovik reported her conduct to government agencies and law enforcement. "*Why have you made statements like that I am… coercing you, harassing you, intimidating you, threatening you… why were you saying that I was… swatting, threatening, illegally coercing you modify federal charges…Why did you say I'm in active communication with Apple, helping Apple in their campaign of harassment, threats, and horror against the safety whistle blower…*" (Appleseed, 3/1/22)

---

[681] Intent may, and generally must, be proven with circumstantial evidence. *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007).
[682] *United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013)); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014).
[683] *U.S. v Camick,* 796 F.3d 1206 (2015).
[684] *EEOC v Outback Steakhouse*, 75 F. supp 2d 756 (ND Ohio 1999)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**GJOVIK LEGAL FILING IN US DC CHALLENGE**

> 1    MR. BLAIR:  That sounds like an argument, Your Honor.
>
> 2    THE COURT:  Just tell us the question.
>
> 3  Q.  (By Ms. Scarlett)  Why do you think -- why have you made
>
> 4    statements like that that I am stalking anybody who --
>
> 5    stalking you, coercing you, harassing you, intimidating you,
>
> 6    threatening you, and telling people that bad things will
>
> 7    happen to them if they support you?
>
> 8    Why were you saying that I was harassing, defaming,
>
> 9    swatting, threatening, illegally coercing you to modify
>
> 10    federal charges.  Why we were saying -- it should be
>
> 11    mentioned that I am currently under investigation by
>
> 12    numerous federal agencies and law enforcement for federal
>
> 13    witness intimidation and obstruction of justice.
>
> 14    Why have you said that I'm in active communication with
>
> 15    Apple helping Apple in their campaign of harassment, threats
>
> 16    and horror against the safety whistle blower.  Why did you
>
> 17    say I'll report you to Apple if I leak Apple's crimes?  Why
>
> 18    did you say --

*Exhibit: 3/1/22 testimony during Appleseed's retaliatory lawsuit*

1108.   Civil lawsuits "*that are aimed at preventing citizens from exercising their political rights or punishing those who have done so*" are often known as SLAPP suits.[685] These lawsuits "*are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests.*"[686] Characteristically, the SLAPP suit lacks merit and the

---

[685] *Church of Scientology v. Wollersheim*, 42 Cal.App.4th 628, 645 (Cal. Ct. App. 1996); California Code Section 425.16.

[686] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC         DECEMBER 21 2023

*"aim is not to win the lawsuit but to detract the defendant from his or her objective, which is adverse to the plaintiff."*[687]

### 2) Retaliation & Conspiracy to Retaliate Against Witness for Reporting Federal Offenses

1109.   Apple retaliated against a Federal Witness & Informant in violation of § 1513(e). Apple knowingly, with the intent to retaliate, took actions harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for Gjovik providing to a law enforcement officer truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(e) offenses.

1110.   Apple's harassment against Gjovik was serious acts and courses of conduct directed at Gjovik that caused substantial emotional distress to Gjovik and served no legitimate purpose. Apple's intimidation of Gjovik was serious acts and sources of conduct directed at Gjovik that caused fear or apprehension of Apple by Gjovik and served no legitimate purpose. The serious acts are threatening, retaliatory, harassing, and violent conduct that reasonably influences the willingness of a victim or witness to testify or participate in a federal criminal case or investigation. An individual who affirmatively conceals the commission of a §1513 by another is guilty of misprision.[688]

### iii.    Predicate Acts Indictable Under Title 11 USC (Securities) [689]

### 1) Securities Fraud (15 USC § 78)

1111.   Section 1961(1)(D) defines racketeering activity any offense, including attempts and conspiracies, involving fraud in the sale of securities punishable under any law of the United

---

[687] Id.

[688] CRS Reports for Congress, Obstruction of Justice: An Abridged Overview of Related Federal Criminal Laws, RS22783 (2007); 18 U.S. Code 4, *The elements of misprision of felony under 18 U.S.C. 4 are (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) defendant took steps to conceal the crime.*

[689] 18 U.S.C. § 1961(1)(d)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

States.[690] The US government has repeatedly accused Apple of securities fraud in violation of federal law.

1112.   In 2007, the US SEC charged Apple executives with more than 13 counts of securities violations, including at least five fraud charges including false statements to auditors, false reports, falsifying records, circumventing internal accounting controls, and false proxy statements.[691] Apple's corporate secretary and general counsel Nancy R. Heinen created falsified 'Board Meeting' notes for a meeting that never happened in order to back date stock grants for Apple executives. Heinen also falsified Committee meeting notes as part of the scheme. The fraud caused Apple to underreport it expenses by nearly $40 Million.

1113.   In 2019, Gene Levoff (Apple's head of Corporate Law and corporate secretary after Heinen) was indicted by the SEC for twelve felony counts of fraud based on insider trading: six counts of wire fraud and six counts of securities fraud. In 2022, Levoff pled guilty to six counts of securities fraud and agreed to a settlement agreement.[692] Levoff was the senior lawyer at Defendant who oversaw 'corporate law' and all SEC filings and compliance, including company-wide ensuring compliance with insider trading laws. Levoff's defense on the criminal charges was claiming that insider trading laws were a violation of the US Constitution.

1114.   From 2013 until his termination in September of 2018, Levoff was Senior Director of Corporate Law at Apple, reporting directly to the General Counsel. Levoff also

---

[690] *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993); *United States v. Bledsoe*, 674 F.2d 647 (8th 1982); *United States v. Pray*, 452 F. Supp. 788 (M.D. Pa. 1978).
[691] US SEC Complaint against Apple Inc, 2007, https://www.sec.gov/files/litigation/complaints/2007/comp20086.pdf
[692] The Private Securities Litigation Reform Act of 1995 ("Reform Act") amended RICO to eliminate securities fraud as a predicate act except where the defendant has been criminally convicted of the securities fraud. 18 U.S.C. § 1964(c); see also Powers v. Wells Fargo Bank, NA, 439 F.3d 1043, 1045-46 (9th Cir. 2006) (vacating dismissal of claim against defendant who had been convicted of securities fraud, but affirming dismissal of claims against co-defendants who had not been convicted).

served on Apple's Disclosure Committee from September 2008 to July 2018, including as chair of the committee from December 2012 to July 2018. [693]

1115.   While not part of the predicate act, but to show pattern, it's worth noting that in November 2016, Apple Corporate Secretary Gene Levoff fought a shareholder proposal about the environment, complaining that shareholders were trying to micromanage Apple's environmental practices and argued Apple's environmental statements are not false, citing NGOs and other groups praising Apple but failing to mention Apple's capture of these groups as part of its enterprise and schemes.[694] Levoff fought another shareholder proposal about Apple's environmental practices in November of 2017, complaining again of micromanaging and claiming Apple's actually doing a great job.[695]

### i.   Predicate Acts Indictable Under §2332(b)(g)(5)(B)

1116.   Subsection G was added to Section 1961(1) and made "any act that is indictable under any provision listed in section 2332b(g)(5)(B)" of Title 18 a RICO predicate offense. 18 U.S.C. § 2332b(g)(5)(B) lists approximately fifty offenses that may constitute RICO predicate offenses under 18 U.S.C. § 1961(1)(G).

### 1)  Relating to Chemical Weapons (18 USC § 229) [696]

1117.   In 1987, a U.S. Representative spoke to Congress about RICO's coverage of illegal hazardous waste disposal – explaining that the mob, with its traditional involvement in garbage disposal and operating landfills, was particularly well-suited to move into hazardous waste disposal due to its history of controlling major portions of the garbage industry in some

---

[693] *US SEC v Gene Levoff*, Civil No. 2:19-5536, Feb. 13 2019; *SEC Charges Former Senior Attorney at Apple with Insider Trading,* Feb. 13 2019, https://www.sec.gov/litigation/litreleases/lr-24399
[694] US SEC, Apple, 2016, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2016/christinejantzapple120516-14a8.pdf
[695] US SEC, 2017, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2017/sustainvestasset121217-14a8.pdf
[696] 18 U.S.C.A. § 1961 (G); 18 U.S.C.A. § 2332 (B) (i)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

areas and through labor racketeering.[697] The U.S. Representative argued that the congress must "begin to view the illegal dumping of hazardous waste, not only as an economic crime, but as a crime of violence."

1118.   The Weapons of Mass Destruction Prohibition Improvement Act of 2004 added 18 U.S.C. §§ 229-229F (relating to chemical weapons) as a RICO predicate offense in Section 1961(1)(B). 18 USC § 229 was created to implement the United States treaty obligations for the "Chemical Weapons Convention."[698]

1119.   This case ultimately revolves around facts related to hazardous waste and chemical exposure. Apple did in fact chemical weapon attack Gjovik's apartment, and then terrorized Gjovik to cover up their chemical weapon attack, thus a RICO claim to seek remedy for the property damages seems appropriate.

1120.   Apple possessed chemicals not intended for peaceful purposes, protective purposes, unrelated military purposes, or law enforcement purposes, as described in 18 U.S.C. § 229F(7).[699] The US government defines "peaceful purposes" in *US v Bond*: "*As a matter of simple English, use of a highly toxic chemical to injure or kill another individual is not use of the chemical for a peaceful purpose. To the contrary, that is use of a chemical as a weapon.*"[700] Further, activities are only peaceful if they are non-malicious and socially beneficial.[701]

1121.   The statute's mens rea is "*knowing*" which is the same standard for the Clean Air Act. CAA instructs that it is enough the perpetrator know that a release of hazardous air pollutants into the ambient air places another person in imminent danger of death or serious

---

[697] "*Mob Involvement in Hazardous Waste Disposal: Why We Need a Strong RICO*," Aug. 7, 1987. 134 Cong. Rec. H6788 (daily ed. Aug. 10 1988). [U.S. Representative John Conyers, Michigan, 1965-2017].
[698] *Bond v US,* SCOTUS Amicus Brief from US DOJ, https://www.justice.gov/sites/default/files/osg/briefs/2013/01/01/2012-0158.mer.aa.pdf
[699] *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).
[700] *Bond v United States*, Brief for the United States, On Write of Certiorari to the US Court of Appeals for the 3rd Circuit, In the Supreme Court of the United States, No. 12-158
[701] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

bodily injury, and knowledge of the emissions occurring is enough.[702] The CAA also has a lesser violation for negligent emissions.

1122.   The OPCW and Section 299 define "Toxic Chemical" for the purposes of "chemical weapon" quite generally as: "*Any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.*" Similarly, the exception of "peaceful propose" is also quite broad and cases often find general intent to release dangerous chemicals in a way that could cause mass suffering to be sufficient mens rea.

1123.   Many cases have referenced chlorine gas as a chemical weapon, even though it is not listed in the Treaty Annex II, and courts have decided "*intending to release chlorine gas into an apartment building"* was enough to convict.[703] While some toxic gases are commercially available, under *Bond*, they may serve as chemical weapons when used to make gas bombs, thus invoking 18 USC § 229. [704]

1124.   At 3250 Scott Blvd, Apple even stored and used chemicals that are listed on the Chemical Weapons Treaty Annex including Phosphorus Trichloride.

1125.   Apple also used chemicals listed on Department of Homeland Securities list of "Chemicals of Mass Effect" including arsine, phosphine, and chlorine gases.[705]

---

[702] § 7413(c)(5)(A).
[703] See *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [Bond] suggested, it may serve as a chemical weapon when used to make a chlorine bomb."); *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *6–7 (D. Haw. Jan. 21, 2021) (defendant who released chlorine gas in a residential neighborhood); *United States v. Fries*, No. 13-10116 (9th Cir. 2015) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood).
[704] See *Kimber*, 777 F.3d at 561.
[705] DHS, Chemicals of Interest, https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1126.   Apple repeatedly leaked phosphine gases from the factory at 3250 Scott Blvd, in at least 2019 and 2021. The incident report in 2021 notes Apple vented the phosphine gas into the exterior air (and into the apartments).

1127.   While sick in 2020, Gjovik would wake up occasionally at 3am feeling like she was dying and with symptoms of heart failure (which Gjovik complained to her doctors about at the time). Heart monitoring showed arrythmias and blood pressure monitoring showed very slow heart rate and very low blood pressure. All of those symptoms match Phosphine and Arsine gas exposure which can quickly become lethal. Gjovik felt like she was dying because Apple had some sort of auto-release of gases at 3 AM and chemical weapon attacked her in her bed, and she probably could have died.

1128.   Apple has a great quantity of Arsine gas on site and Gjovik's medical tests from September 2020 showed arsenic in her blood with no other explanation than Arsine gas exposure. Gjovik had one of those 3am spells before she had her blood and urine tested for chemicals and heavy metals early the next morning. Gjovik's blood showed arsenic at an elevated level but none in her urine. Arsenic in blood has a ~8hr half-life, and only shows in blood but not urine when exposed to Arsine gas (instead of ingesting arsenic). Apple chemical weapon attacked Gjovik with Arsine gas in her bedroom. Arsine gas becomes life threatening at only 0.91 parts per million over 10 minutes. There is no antidote for arsine gas poisoning.[706]

1129.   Multiple occupational and environmental exposure doctors told Gjovik all of her symptoms were consistent with solvent exposure and other chemical exposures. The most noteworthy correlation was that exposure to solvent vapor and other gases can cause decreased heart rate (see below), volatile blood pressure (which Gjovik had confirmed via 24-hour blood

[706] US CDC, *Arsine Emergency Response,* https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750014.html

pressure monitor), the rashes and burns on Gjovik's body, and Gjovik's symptoms of dizzy spells, fainting, numbness, and muscle spasms.



*Exhibit: Gjovik's Heart Rate (Dipping in 2020)*

1130.   Apple was cited in 2020 for failing to report its stockpile of Chlorine gas at 3250 Scott Blvd to regulators. Apple also has a history of gassing its employees with Chlorine. At least two chlorine gas leaks have been reported at Apple facilities. In 2012 there was a chlorine gas leak at an Apple factory which killed one worker and injured another four workers.[707] There was a chlorine gas leak at an Apple data center in 2015 resulting in an evacuation, HazMat response, and multiple employees taken to the hospital.[708]

1131.   Gjovik's blood and urine medical tests also revealed the presence of several other industrial chemicals including Toluene (Hippuric Acid) and Xylene (2-3-4 Methylhippuric Acid (2,-3-,4-MHA) in her urine.

---

[707] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 2012, https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-china-flna714480
[708] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015, https://www.theregister.com/2015/06/01/apple_data_center_chlorine_gas/ ; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015, https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



NOAA: Phosphine

NOAA: Arsine

NOAA: Chlorine

NOAA: Silane

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*NOAA: Toluene*                                          *NOAA: NMP*

1132.   At 3250 Scott Blvd, Apple's use, storage, and release (intentional and unintentional) of very toxic gases has the potential to produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emission, if it has not already occurred, could easily cause injuries and death. These use and release of these gases could injure first responders and should require the evacuation of an entire neighborhood and HAZMAT procedures if there were to be significant leak/spill. Apple is not only in "*possession of extremely dangerous substances with the potential to cause severe harm to many people,*" but Apple has taken intentional acts to ensure no one knows they have these chemicals or that they are releasing these chemicals into the neighborhood air.

1133.   Apple attempted to and did acquire, transfer, receive, stockpile, retain, own, possess, use, and/or threaten to use chemical weapons. Apple assisted or induced another person

to do the same or attempted to conspire to do the same.[709] Apple is not an exempted agency or person.

1134.    Apple has been on notice about the dangers of these toxic gases for decades. Apple was founded in the 1970s and would have witnessed the Union Carbide/Bhopal incident in 1984.[710] Apple's local toxic Gas laws in Santa Clara County were designed to prevent a similar "*catastrophic gas leak*." These laws apply to Apple's facility in Santa Clara County. *"The law's goal is to prevent a disaster such as the 1986 gas leak in Bhopal, India that killed 2,800 people*." Palo Alto City Manager Bill Zaner said, "*This is the single most important piece of toxics legislation in the county in the last five years*."  Ted Smith noted the most common gases used for semiconductor fabrication are also "*the most deadly*" including arsine and phosphine.[711]

1135.   Many of the chemicals Apple had on site, sometimes in bulks, were characterized as "extremely hazardous" or "acutely hazardous" materials.[712]

1136.    Apple knowingly released many other chemicals from their facility including while Gjovik was there. Apple knowingly did so without proper abatement and apparently without even changing their charcoal filters for over six years. Apple admitted to releasing NMP into the outdoor air despite it being so hazardous it is now banned under TSCA.

1137.   These chemicals and gases not only harmed Gjovik physically, but they harmed an incredible amount of Gjovik's property, of which Gjovik has photographs and other evidence documenting the stains and degradation.

---

[709] 18 U.S.C. § 229(a)(2)
[710] NYT, *Gas Cylinders Removed from Blast Site in Jersey*; https://www.nytimes.com/1988/03/20/nyregion/gas-cylinders-removed-from-blast-site-in-jersey.html
[711] Silicon Valley Toxics Coalition, *Silicon Valley Toxics News*, Volume 7, No. 1, Winter 1989; Santa Clara County Ordinance Code, Division B 11, Chapter XIV
[712] 8 CCR § 5189(b)(1), (c) … "acutely hazardous materials" (generally, bulk quantities of specifically designated explosives, flammable gases and liquids, and other highly toxic or reactive substances)." (includes phosphine, arsine, and chlorine, https://www.dir.ca.gov/title8/5189a.html)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1138.   It is clear that Apple's retaliation and intimidation against Gjovik was not just about her office or her other complaints, it was also an attempt to coverup what Apple did to her at 3250 Scott Blvd. Apple's termination of Gjovik's employment was also an injury from this Predicate Act.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

| Table 5: 3250 Scott Blvd: Rogue Chemicals; Risk Categories | | | | | |
|---|---|---|---|---|---|
| | Release / Leak / Spill / Violation | California "Proposition 65" [713] | US EPA "Extremely Hazardous Substances" [714] | TSCA Review: "Unreasonable Risks to Public Health" [715] | DHS Chemicals of Interest [716] |
| Phosphine Gas | Multiple Leaks | | X | | X (flammable; weapon of mass effect) |
| Silane Gas | Multiple Leaks | | X | | X (flammable) |
| Arsine Gas | Blood test | x (cancer) | X | | X (toxic; weapon of mass effect) |
| Chlorine Gas | Code violation for not reporting | | X | | X (toxic; weapon of mass effect) |
| Benzene | Indoor Air | x (cancer) | | | |
| Ethylbenzene | Indoor Air | x (cancer) | | | |
| Toluene | Indoor Air | x (cancer) | | | |
| Trichloroethylene (TCE) | Groundwater; Wastewater | x (cancer) | | x (January 2023) | |
| 2-Methyl-1-propanol (NMP) | Intentional Release | x (development) | | x (December 2022) | |

1139.  Apple's possession and use of these chemicals knowingly and intentionally occurred without proper permits, in violation of reporting and risk management laws, with repeated code violations and leaks/spills, and without proper abatement technology. Apple has already harmed people, property, and the environment with its chemical weapons and the harm occurred but for Apple's refusal to comply with basic health/safety, environmental, and HazMat regulations in pursuit of the cheapest and quickest way to produce a result and to avoid reporting the waste and harm associated with the unlawful approach in regulatory filings. The full extent

[713] Proposition 65, https://oehha.ca.gov/media/downloads/proposition-65/p65chemicalslistsinglelisttable2021p.pdf
[714] Appendix A to Part 355—The List of Extremely Hazardous Substances and Their Threshold Planning Quantities, https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-355
[715] TSCA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca
[716] DHS CISA: https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

of Apple's misconduct will likely be revealed when US EPA releases the results of their August 17 2023 (per the EPA website) inspection of the factory, which was triggered by a complaint filed by Gjovik in June 2023.

1140.   Apple was not using those chemicals for peaceful purposes. While a theory as to what Apple's non-peaceful purpose was is not required at this stage,[717] one possible theory is Apple's non-peaceful purpose was to violate environmental and health/safety laws in order to produce off-books prototypes at the lowest cost and with the least amount of government oversight, in knowing violation of federal, state, and local laws. Another non-peaceful purpose is that Apple intended to store toxic gases and release them out of their exhaust,[718] in violation of air quality and hazardous waste laws, knowing the chemicals would enter hundreds or thousands of residential homes, but doing it anyways because it cooked the books on their environmental regulatory filings and statements to the public and the press.

1141.   The threshold is very low for establishing a violation of §229 in the pleading stage.[719] Here, like other 18 USC 229 cases, highly volatile and poisonous substances were repeatedly released into highly trafficked areas, placing many people at risk of serious harm and mass suffering.[720]

---

[717] *US v. Sandomire,* CR 20-00085 JMS, at *5 (D. Haw. Jan. 21, 2021). *US v Mancuso*, 718 F.3d 780 (9th Cir. 2013)., quoting *United States v. Cochrane*, 985 F.2d 1027, 1035 (9th Cir. 1993).
[718] In *US v Sandomire*, a sufficient non-peaceful purpose to satisfy an indictment was an allegation of intent to create chlorine gas and release it into a large residential apartment building in downtown Honolulu. *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).
[719] *Renfro v. J.G. Boswell Co. Inc.,* No. 117CV01069LJOSAB, 2017 WL 6611190, at *13 (E.D. Cal. Dec. 27, 2017), report and recommendation adopted, No. 117CV01069LJOSAB, 2018 WL 10322173 (E.D. Cal. Mar. 1, 2018)
[720] *U.S. v. Kimber*, C.A.2 (N.Y.) 2015, 777 F.3d 553, certiorari denied 136 S.Ct. 170, 577 U.S. 869, 193 L.Ed.2d 123. *Bond v. United States*, 572 U.S. 844, 865, 134 S. Ct. 2077, 2093 (2014)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### ii.       Injury in Fact to Plaintiff due to Racketeering Act

1142.   Gjovik's injuries from all Predicate Acts and racketeering were "by reason of" a RICO violation.[721]  Apple's racketeering led directly to the plaintiff's injuries.[722] Gjovik's injuries stem from Apple's retaliatory actions, RICO predicate acts, and several actions which were both retaliatory and RICO predicate acts, including Gjovik's termination as a violation of 18 USC §§ 1512 and 1513. Apple's retaliation and termination of Gjovik are all part of the same RICO scheme to cover-up Apple's wrongdoing.[723]

1143.   A person's loss of a job, such as a termination, is an injury to one's business or property.[724] In situations where a termination itself is another RICO violation (i.e. §1512, §1513, etc.) in continuous racketeering and fitting the pattern of existing racketeering, or otherwise a result of a pattern of racketeering activity, then the termination is an injury-in-fact under RICO.[725] It would be contrary to public policy and the legislative intent of the RICO Act to immunize employers who are engaged in RICO acts, when one of their employee tries to blow the whistle to the feds on the employer's RICO activity (i.e. testifying to federal agencies, or informing to the FBI, etc.), and the employer responds to terminate the whistleblower with the intent and in a way which would violate additional RICO predicate act statutes. Racketeering is not "*transmogrif[ied]"* into something else simply because there is a termination of employment.[726]

---

[721] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)
[722] *Anza*, supra, at 461, 126 S.Ct. 1991; *Holmes*, 503 U.S., at 268, 112 S.Ct. 1311; *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 654–55, 128 S. Ct. 2131, 2141–42, 170 L. Ed. 2d 1012 (2008)
[723] *DeGuelle v. Camilli*, No. 10-2172 (7th Cir. Dec. 15, 2011)
[724] *Mruz v. Caring, Inc*., 991 F. Supp. 701, 711 (D.N.J. 1998); *Nodine v. Textron, Inc*., 819 F.2d 347, 348 (1st Cir. 1987)
[725] *Mruz v. Caring, Inc*., 991 F. Supp. 701, 713 (D.N.J. 1998)
[726] *Mruz v. Caring, Inc*., 991 F. Supp. 701, 713 (D.N.J. 1998)

1144.   Apple injured Gjovik's business and property, and caused other injuries and loss, due to its Predicate Acts.[727] Apple injured Gjovik's business by terminating Gjovik' for a reason Apple knew would denylist Gjovik from working in law or for corporations, and knowing she would be forced to self-publish the reason and that it would be exposed in the already initiated legal proceedings. Apple's harassment of Gjovik ruined her reputation and ostracized her from the groups she hoped to work with and for with her legal degree. Gjovik had over $500,000 of unvested RSUs and a pending annual bonus at the time of her termination which she would have been granted and vested if she was not fired. Apple's criminal termination of Gjovik resulted in business-related financial injury.[728]

1145.   Apple interfered with Gjovik's leasehold (forcing her to move), employment (requiring her to take months of disability leave), and injured Gjovik's property (through destruction, conversion, and diminution in value) with their illegal chemical emissions, including 7.8 tons of VOCs omitted 300 feet from her windows the year she lived next to Apple's factory.[729] Gjovik has documented destruction of clothing and jewelry from the chemicals, of which Apple engaged in falsification of records, obstruction, and witness tampering. Gjovik has photos and other evidence of the specific chattel property, with receipts of purchase, that was discolored or otherwise degraded by chemical exposure, as well as real time complaints in 2020 and 2021 about the discoloration and the state Department of Public health agreeing it looked like solvent exposure. "Harms associated with hazardous substances …. are clearly within the ambit of [RICO's] protection."[730]

---

[727] *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975-76 (9th Cir. 2008) (citing *Sedima*, 473 U.S. at 496); see *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013).
[728] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985).
[729] See, US EPA EIS data for 2020;
*Ayers v. Jackson Twp.,* 106 N.J. 557, 608–12, 525 A.2d 287, 314–16 (1987).
[730] Ian Lyngklip, *RICO and Environmental Harms from Hazardous Substances*, 69 U. Det. Mercy L. Rev. 255, 282–83 (1992).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's clothing, metals, and plastics turned yellow and/or reacted with oxidation*

1146.   Apple injured Gjovik's property through 'bugging' an item at her desk when they mailed her back her possessions, causing Gjovik to have to transfer her property to police custody for investigation. Apple injured Gjovik's property when it broke into her home and 'bugged' one of her fake trees and upon discovering the RF and EMF signals emanating from the fake fig tree, Gjovik disposed of the tree into a dumpster and complained about it on social media. (Gjovik also has the receipt for original purchase of the tree). Due to Apple's surveillance and hacking, Gjovik's property was injured in that it was compromised by Apple and Gjovik had to disconnect and dispose of it to protest herself from Apple. Property included Apple products of which Apple could monitor her via server use and logging, 'smart home' accessories which were hacked and controlled by hackers at least once, her router which was assumed to have been compromised when the equipment in the attic was installed by Apple, and other instances of damage.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1147.   Apple injured Gjovik's property when they mailed her possessions back from her desk as a threat, posting online the box may contained a severed head of one of Gjovik's loved ones, and ensuring the box did contain a listening device in one of Gjovik's possessions, along with a very poorly packed box that ensured the salt lamps from Gjovik's desk (aka rocks) broke the glass on Gjovik's picture frames and glasses at her desk, resulting in a box full of rocks, broken glass, and a listening device – if Apple didn't intentionally destroy Gjovik's property before it was shipped.

1148.   Apple injured Gjovik's business and property when it harassed her at and around her home to the extent she was forced to leave the west coast to escape Apple, and moved to New York next to a state executive building with state police stationed 24/7 outside her home. By being forced to move, Gjovik lost the opportunity to obtain work in Silicon Valley, Gjovik had to get rid of many of her belongings because she could not afford to move them, and several items were destroyed in transit.

1149.   Gjovik's injury occurred by reason of the Apple's violations.[731] If Apple had not engaged in unlawful conduct, including unauthorized air pollution and chemical releases, then Gjovik's property would not have been damaged. If Apple had not engaged in a cover-up, then Gjovik would have known to protect her property from Apple. If Apple had not engaged in a cover-up scheme, they would not have hacked into Gjovik's electronics, mailed her a bugged object, or broke her chattel property. These are concrete examples of financial loss.[732]

1150.   Apple stained specific items of clothing, Apple caused reactions on the metal of specific items of clothing and jewelry, Apple bugged a specific fake tree, Gjovik lost concrete

---

[731] *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-11 (2010); see also *Vanderbilt Mortg. & Fin., Inc. v. Flores,* 735 F. Supp. 2d 679, 698-99 (S.D. Tex. 2010).
[732] *International Raelian Movement*, 2:08-cv-0687 FCD DAD, 11-12 (E.D. Cal. Sep. 1, 2010)

salary and RSUs when she was terminated, and so on. Civil RICO laws grant standing to any victim that sustained real injuries to his or her business or property.[733]

1151.   The plaintiff must instead allege injury from an act that is analogous to an "*ac[t] of a tortious character.*" The specific type of act that is analogous to an act of a tortious character may depend on the underlying substantive violation the defendant is alleged to have committed. Plaintiff must allege an act of racketeering and that is independently wrongful under any substantive provision of the statute.[734] Gjovik details the many torts and statutes violated by Apple inline and in the footnotes of this complaint.

### iii.   Continuity & Threat to Continue

1152.   Apple has engaged in a series of related predicate acts, extending over a substantial period of time (decades). Further, Apple started a series of related predicate acts, and it is clear will continue these acts into the future unless there is intervention. Apple's misconduct is so persistent and egregious, and so dependent on continued intimidation of witnesses to keep witnesses quiet about what they know, that its impracticable that Apple would ever voluntarily stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the inertia of organized crime.

### D.   TORT: ULTRAHAZARDOUS / ABNORMALLY DANGEROUS ACTIVITIES

1153.   Apple's activities at 3250 Scott Blvd and 825 Stewart Drive provided a high degree of risk of great harm to people and property, and the risk could not be eliminated by the exercise of reasonable care, the activities benefit does not outweigh the risk, and these activities are inappropriate for the location, and are not common. "Where one, in the conduct and maintenance of an enterprise lawful and proper in itself, deliberately does an act under known

---

[733] *Canyon County v. Syngenta Seeds*, Inc., 519 F.3d 969, 972 (9th Cir. 2008); *Berg v. First State Ins. Co*., 915 F.2d 460, 464 (9th Cir. 1990).
[734] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

conditions, and, with knowledge that injury may result to another, proceeds, and injury is done to the other as the direct and proximate consequence of the act, however carefully done, the one who does the act and causes the injury should, in all fairness, be required to compensate the other for the damage done."[735]

1154.   One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels or another resulting from the activity, although he has exercised the utmost care to prevent the harm.[736] Put another way, "*We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to mischieve if it escapes, must keep it at his peril, and if he does not do so, is prime facie answerable for all the damage, which is the natural consequence of its escape.*"[737]

1155.   Ultrahazardous activities often "involve damage caused through fault or damage caused by constructions, by escaping dangerous substances, such as dammed water or sewerage, and by ultrahazardous activities such as dynamite blasting, spraying noxious chemicals, and pile driving operations by heavy equipment."[738] The use of a property for production, storage or disposal of hazardous substances may constitute an "abnormally dangerous" ("ultrahazardous") activity subject to strict liability in tort.[739]

---

[735] CA Civ Code § 3514 (2022), "3514. One must so use his own rights as not to infringe upon the rights of another." *Green v. General Petroleum Corp*., 205 Cal. 328, 333-34 (Cal. 1928).  (sic utere tuo ut alienum nonlaedas).

[736] Restatement (Second) of Torts, § 519.

[737] *Rylands v. Fletcher*, (1868) 3 L.R.E. & I. App. 330 (H.L.).

[738] A. Yiannopoulos, *Predial Servitudes* 4 La.Civil Law Treatise, § 50 at 139-40 (1983); *Updike v. Browning-Ferris, Inc*., 808 F. Supp. 538, 543 (W.D. La. 1992).

[739] Rest.2d Torts § 520; D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D; *Ashland Oil, Inc. v. Miller Oil Purchasing Co*. (5th Cir. 1982) 678 F2d 1293, 1307-1308 —chemical waste disposal company and person with whom it arranged to dispose of hazardous substances pursuant to plan to introduce them into crude oil pipeline were strictly liable for engaging in ultrahazardous activity; see also *Ahrens v. Sup.Ct. (Pacific Gas & Elec. Co.)* (1988) 197 CA3d 1134, 1149, 243 CR 420, 428-429—triable issue of fact whether using, maintaining and operating electrical transformers containing PCBs at high-rise office building is "ultrahazardous"]; Tom Kuhnle, *The Rebirth of Common Law Actions for Addressing Hazardous Waste Contamination*, 15 Stan. Envtl. L.J. 187, 217–18 (1996).

1156.   State law claims of liability for ultrahazardous activities are judged by state precedents and by state laws that control site pollution; a site dealing with hazardous substances that could potentially be destructive can be ultrahazardous. [740] California recognizes a hazardous waste ultrahazardous tort claim,[741] along with Maine,[742] Colorado,[743] Louisiana,[744] New York,[745] Tennessee,[746] Oregon,[747] Montana,[748] and of course New Jersey.[749] The Restatement of Torts also recognizes the claim.[750]

1157.   New Jersey courts, a leading advocate for the use of ultrahazardous tort claims for hazardous waste issues, explained, "*an actor who chooses to store dangerous chemicals should be responsible for the release of those chemicals into the air.*"[751] They added, "*an*

---

[740] *Buggsi, Inc. v. Chevron U.S.A., Inc.*, 857 F. Supp. 1427, 39 Env't. Rep. Cas. (BNA) 1526, 25 Envtl. L. Rep. 20147 (D. Or. 1994); § 6:9. How is a cause of action established for unreasonably dangerous or ultrahazardous strict liability?, 1 Toxic Torts Prac. Guide § 6:9 (2023-2)

[741] *Ahrens v. Sup.Ct. (Pacific Gas & Elec. Co.)* (1988) 197 CA3d 1134, 1149, 243 CR 420, 428-429; *Potter v. Firestone Tire and Rubber Company*, 2 Tx.L.R. 662 (Cal. Super. Ct., Monterey Co. No. 81723, 1987) (court held that disposal of large quantities of toxic waste into a sanitary landfill "is an ultra-hazardous activity that will subject the defendant to strict liability for all damages that result")

[742] *Lefebvre v. Central Maine Power Co.*, 7 F. Supp. 2d 64, 47 Env't. Rep. Cas. (BNA) 1143 (D. Me. 1998), relying on Jacques v. Pioneer Plastics, Inc., 676 A.2d 504, 506–07, 43 Env't. Rep. Cas. (BNA) 1348 (Me. 1996).

[743] *Daigle v. Shell Oil Co.,* 972 F.2d 1527 (10th Cir. 1992) [creation of a "ninety-three acre toxic lake" surface impound for hazardous waste was a ultrahazardous activity]

[744] *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 543 (W.D. La. 1992) (The court concluded by holding that the disposal of hazardous waste was ultrahazardous under Louisiana law based on precedent as well as the findings by Louisiana's legislature).

[745] *United States v. Hooker Chemicals & Plastics Corp.*, 722 F. Supp. 960, 966–67 (W.D.N.Y. 1989) [Love Canal].

[746] *Sterling v. Velsicol Chemical Corp.*, 647 F. Supp. 303, 308 (W.D. Tenn. 1986). (federal court found an abnormally dangerous activity under Tennessee law in the 'selection, implementation, operation and burial of more than 300,000 fifty-five gallon drums filled with ultrahazardous chemical waste, and hundreds of boxes of ultrahazardous dry chemical waste).

[747] *Buggsi, Inc. v. Chevron U.S.A.*, Inc., 857 F. Supp. 1427, 1432 (D. Or. 1994).

[748] *Matkovic v. Shell Oil Company*, 707 P.2d (Mont. 1985) (disposal of oil well production water containing hydrogen sulfide is abnormally dangerous).

[749] *State, Dep't of Env't Prot. v. Ventron Corp*., 94 N.J. 473, 488–93, 468 A.2d 150, 157–60 (1983).

[750] Rest.2d Torts § 520; Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D

[751] *New Jersey Dep't of Env't Prot. v. Alden Leeds, Inc.*, 153 N.J. 272, 287, 708 A.2d 1161, 1168 (1998). See *DeEugenio & Sons v. Division of Envtl. Quality*, 92 N.J.A.R.2d (Vol.5) (EPE) 47, 1992 WL 257715, aff'd, No. A-4055-91T2, (App. Div. April 2, 1993), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993) (holding that despite lawfulness of open burning in question, consequent deposit of smoke particulate on neighboring property violated N.J.A.C. 7:27-5.2(a)).

---

494

*ultrahazardous [now abnormally dangerous] activity which introduces an unusual danger into the community … should pay its own way in the event it actually causes damage to others.*"[752]

1158.   Oregon courts have explained that "the abnormally dangerous nature of an activity need not be proved by evidence if this danger is recognized by stringent legislative or administrative safety regulations …Whether the danger is so great as to give rise to strict liability depends both on the probability and on the magnitude of the threatened harm. If the consequences of a mishap are potentially lethal or highly destructive of health or property, a slight likelihood that they will occur suffices…."[753]

1159.   In 1980, Apple Board member Al Gore (2003-current), then as a U.S. Representative, made "the most extensive arguments in support of a strict liability standard for activities that resulted in hazardous substance releases" and predicted that "*it was only a matter of time before courts began applying the common law doctrine of strict liability for abnormally dangerous activities to the nation's growing hazardous waste problem.*"[754] Gore said, "*there can be little doubt that actions involving hazardous waste would be considered by the courts as abnormally dangerous or ultrahazardous activity sufficient to subject a responsible party to strict liability.*"[755]

1160.   Apple was engaged in an ultrahazardous activity that caused Gjovik to be harmed, Apple's activities were the proximate cause of that harm, and Apple is responsible for that harm. People who engage in ultrahazardous activities are responsible for the harm these activities cause others, regardless of how carefully (or recklessly) they carry out these activities.

---

[752] *T & E Indus., Inc. v. Safety Light Corp.*, 227 N.J. Super. 228, 239–41, 546 A.2d 570, 575–76 (App. Div. 1988), aff'd as modified, 123 N.J. 371, 587 A.2d 1249 (1991); *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 410, 181 A.2d 487 (1962), quoted in *Ventron*, 94 N.J. at 487, 468 A.2d 150.
[753] *Buggsi, Inc. v. Chevron U.S.A., Inc.*, 857 F. Supp. 1427, 1432 (D. Or. 1994).
[754] Alexandra B. Klass, *From Reservoirs to Remediation: The Impact of CERCLA on Common Law Strict Liability Environmental Claims*, 39 Wake Forest L. Rev. 903, 961–62 (2004); See 126 Cong. Rec. H9462 (1980), reprinted in Needham & Menefee, supra note 90, Vol. II, at 136.
[755] Id.

Apple damaged Gjovik's chattel property (discoloring, weakening, dissolving glues, causing reactions), degraded the conditions of her leasehold (which was a $3,800 month lease), harmed Gjovik's body (as noted in facts), and distressed Gjovik's mind (as noted in Nuisance and IIED).

1161.   Gjovik did not become aware of the cause of her injuries, or sufficient facts to put her on notice the injuries were caused by the wrongful acts of Apple, until 2022 (for activities at 825 Stewart Drive), and 2023 (for activities at 3250 Scott Blvd). These activities were/are continuing violations with the harmful conduct occurring through at least 2023. Further, Apple worked to conceal their role in these activities and the harm to Gjovik until Gjovik discovered Apple's role and activities in 2022-2023. The statute of limitations is three years, so even without tolling, it is September 7 2020-September 7 2023, covering periods Gjovik was at her office and living in her apartment next to 3250 Scott Blvd.[756]

### i.   Silicon Fabrication Next to Homes

1162.   Conducting an activity in the wrong place can render such activity abnormally dangerous.[757] Operating a silicon fabrication factory can be a ultrahazardous activity. The activity has a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on.[758]

1163.   Semiconductor fabrication adjacent to a residential area is an ultrahazardous activity. For decades, its known to require use of pyrophoric gases which have a "serious fire

---

[756] Cal. Code of Civ. P. § 338(b); *McCoy v. Gustafson*, 180 Cal. App. 4th 56, 66 (2009); *Starrh & Starrh Cotton Growers v. Aera Energy LLC,* 153 Cal. App. 4th 583, 595 (2007); *Mangini v. Aerojet-Gen. Corp*., 230 Cal. App. 3d 1125, 1149 (1991); *Verse Two Properties, LLC v. MedPlast Fremont, Inc*., No. 5:14-CV-03765-EJD, 2015 WL 6955133, at *6 (N.D. Cal. Nov. 10, 2015).

[757] Gerald W. Boston, Strict Liability for Abnormally Dangerous Activity: The Negligence Barrier, 36 SAN DIEGO L. REV. 597, 615 (1999); Valerio Spinaci, Lessons From BP: Deepwater Oil Drilling is an Abnormally Dangerous Activity, Nova Law Review, Volume 35, Issue 3 (2011).

[758] Restatement of Torts Second, section 519-520

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

hazard," combustible and flammable chemicals which must be "carefully monitored and handled by experienced personnel," heating devices and ignition sources, and complex fire suppressant systems. Air handling systems at these plants must control "the spread of contaminants."[759] There is an entire section of the US OSHA website dedicated to semiconductor fabrication.[760]

1164.   Gjovik's home was 300 feet from Apple's fabrication plant. Like in the classic California ultrahazardous activity case, *Alonso v Hills*, an ultrahazardous activity like use of poisons or blasting, only 200 yards (or here, 300 feet) from hundreds of homes in a residential district, will be found to be an ultrahazardous activity with strict liability even without proof of negligence.[761] Gjovik's case is similarly comparable to *Green v General Petroleum,* where oil drilling itself is not an ultrahazardous activity, but the California Supreme Court found that drilling for oil directly next to someone's home (the property line roughly 200 feet away), is indeed a strict liability ultrahazardous activity.[762]

1165.   Further, "the storage of toxic gases is, without doubt, an ultrahazardous activity."[763] The "manufacture, storage, transportation and use of high explosives" and welding a gas tank are ultrahazardous activities.[764]   The OSHA website notes, "Unexpected releases of toxic, reactive, or flammable liquids and gases in processes involving highly hazardous chemicals have been reported for many years."[765]

---

[759] IMUA's Manufacturer's and Dealer's Committee, "*Underwriting Semiconductor Manufacturing Exposures,*" 2000, https://www.imua.org/Files/reports/Underwriting%20Semiconductor%20Manufacturing%20Exposures.html

[760] US OSHA, Silicon Device Fabrication, https://www.osha.gov/semiconductors/silicon/device-fabrication; Silicon Manufacturing, https://www.osha.gov/semiconductors/silicon  ; GA Device Manufacturing, https://www.osha.gov/semiconductors/gallium-arsenide ; GA Device Fabrication, https://www.osha.gov/semiconductors/gallium-arsenide/device-fabrication

[761] *Alonso v. Hills* (1950) 95 C.A.2d 778, 214 P.2d 50; *McKenna v. Pacific Elec. Ry. Co*. (1930) 104 C.A. 538, 540, 286 P. 445.

[762] *Green v. General Petroleum Corp*., 205 Cal. 328, 333-34 (Cal. 1928)

[763] *Updike v. Browning-Ferris, Inc*., 808 F. Supp. 538, 543 (W.D. La. 1992).

[764] *Garcia v. Est. of Norton*, 183 Cal. App. 3d 413, 418–20, 228 Cal. Rptr. 108, 111–12 (Ct. App. 1986).

[765] US OSHA, Process Safety Management, https://www.osha.gov/process-safety-management

1166.   Chlorine gas is a deadly choking agent which can severely stress the respiratory system tissue, causing profuse edema resembling drowning, and which can result in death by asphyxiation. [766] In case of an arsine or chlorine spill, "isolate spill or leak area for at least 100 meters (330 feet) in all directions." [767] Apple had this gas and was cited for failing to properly report it; Gjovik had these symptoms.

1167.   Arsine gas is heavier than air and hazardous concentrations may develop quickly, and the odor threshold is 10x greater than the OSHA permissible exposure limit. [768] Arsine is heavier than air and hazardous concentrations may develop quickly in enclosed, poorly ventilated, or low-lying areas. Initial symptoms (malaise, dizziness, nausea, abdominal pain, and dyspnea)." [769] "Arsine is a highly toxic gas and may be fatal if inhaled in sufficient quantities." The CDC warns "there is no specific antidote for arsine" and that "Arsine is a highly toxic systemic poison." [770] Apple had this gas; Gjovik had these symptoms; tests showed Gjovik had arsine in her blood.

1168.   Phosphine is used in the semiconductor industry to introduce phosphorus into silicon crystals as an intentional impurity. Phosphine exposure symptoms include "restlessness, irritability, drowsiness, tremors, vertigo, diplopia, ataxia, cough, dyspnea, retrosternal discomfort, abdominal pain, and vomiting." "Cardiovascular manifestations include hypotension, reduction in cardiac output, tachycardia, irregular heartbeat, or cardiac arrest. Laboratory tests may reveal abnormal myocardial enzymes." There is no antidote for phosphine

---

[766] NIEHS Chemical Incidents Response Training Tool, Worker Education and Training Program, *Protecting Yourself While Responding to Chemical Incidents,* https://tools.niehs.nih.gov/wetp/public/hasl_get_blob.cfm?ID=8109
[767] US NOAA, *Cameo Chemicals: Arsine,* https://cameochemicals.noaa.gov/chemical/178; *Cameo Chemicals: Chlorine*, https://cameochemicals.noaa.gov/chemical/2862
[768] CDC, ASTDR, *Arsine MMG*, https://www.atsdr.cdc.gov/MHMI/mmg169.pdf
[769] CDC, ASTDR, *Arsine Medical Management Guidelines*, https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=1199&toxid=278
[770] CDC, ASTDR, Phosphine MMG, https://www.atsdr.cdc.gov/MHMI/mmg177.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

poisoning.[771] In case of a phosphine spill, "isolate spill or leak area for at least 100 meters (330 feet) in all directions."[772] Apple had this gas and leaked this gas; Gjovik had these symptoms.

1169.   Silane (silicon tetrahydride) vapors may cause dizziness or asphyxiation without warning. Some may be toxic if inhaled at high concentrations. Contact with gas or liquefied gas may cause burns, severe injury and/or frostbite.[773] It is easily ignited in air, reacts with oxidizing agents, is very toxic by inhalation, and is a strong irritant to skin, eyes and mucous membranes.[774] In case of a silane spill, "isolate spill or leak area for at least 100 meters (330 feet) in all directions."[775] Apple had this gas and leaked this gas; Gjovik had these symptoms.

1170.   Here, these chemicals are so dangerous and so corrosive, their use posed an unreasonable danger to human beings, but also to property, including the exterior and interiors of the apartment complex, including the tenant's chattel property.[776] In *Luthringer v Moore*, California courts found the use of "hydrocyanic acid gas" an ultrahazardous activity even though its used by fumigators, because it is classified as a "dangerous or lethal chemical" and there were only three fumigators in the city.[777]

1171.   California courts have found the "use of sulfuric acid" not a matter of common usage and comparable to dynamite (blasting) in that sense, nor does the value of use of sulfuric acid outweigh the risks of its use.[778] The court also based the finding of ultrahazardous activity noting the chemical was categorized as a "hazardous material", is "highly toxic, very reactive," and a "highly dangerous chemical." The court found "the use of sulfuric acid involves a high

---

[771] Id.
[772] US NOAA, *Cameo Chemicals: Phosphine,* https://cameochemicals.noaa.gov/chemical/1322
[773] US NOAA, *Cameo Chemicals: Silane*, https://cameochemicals.noaa.gov/chemical/4434
[774] Id.
[775] Id.
[776] County of Santa Clara v. Atlantic Richfield Co. 137 Cal. App. 4th 292, 324-25 (2006).
[777] *Luthringer v. Moore (*1948) 31 C2d 489, 497-500, 190 P2d 1, 7–8—statute classified gas as "dangerous or lethal chemical," and, although used by licensed pest control fumigators, there were only three such operators in Sacramento]
[778] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

degree of risk and … that if it comes in contact with humans the resulting harm is likely to be great."[779] A nuclear industry facility releasing radioactive emissions and another working on nuclear fabrication have been found to be ultrahazardous activities.[780]

1172.   Here, the use of these chemicals was only a few hundred feet from homes and the chemicals in question were being emitted from vents.[781] The storage, use, and release of dangerous, highly poisonous gas in a residential area, is an activity which, even when conducted with the greatest of care and prudence, could cause damage to others in the neighborhood and thus is an ultrahazardous activity.[782] The possible consequences of the gas escaping and causing harm were known or should have been known.

1173.   Even where the manufacture or sale of a hazardous material does not constitute an abnormally dangerous activity, the manner in which it is transported, stored, used, or disposed of may meet the standard.[783] Here, it is the close proximity to residential areas that makes this ultrahazardous. Neighbors to the factory may not know about the emissions and thus cannot mitigate or monitor them. Neighbors exposed to emissions at home may not know it and will not be able to "decontaminate" like in an industrial chemical spill/leak." [784] Courts have found that the storage of explosives and large quantities of flammable liquids in densely populated areas is an ultrahazardous activity (but not in isolated areas).[785] Similarly, oil and gas

---

[779] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991)
[780] *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 856 (Mo. Ct. App. 1985); *Silkwood v. Kerr-McGee Corp.,* 485 F. Supp. 566, 606 (W.D. Okla. 1979)
[781] *Edwards v. Post Transportation Co.*, 228 Cal.App.3d 980, 279 Cal. Rptr. 231 (Cal. Ct. App. 1991);. *Blackwell v. Phelps Dodge Corp.*, 157 Cal.App.3d 372, 203 Cal. Rptr. 706 (Cal. Ct. App. 1984).
[782] *Langlois v. Allied Chem. Corp.*, 258 La. 1067, 1083, 249 So. 2d 133, 139 (1971)
[783] *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 532–33 (S.D.N.Y. 2007); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir.1985) (holding that "allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste constitutes abnormally dangerous activity").
[784] NIEHS Chemical Incidents Response Training Tool, Worker Education and Training Program, *Protecting Yourself While Responding to Chemical Incidents,* https://tools.niehs.nih.gov/wetp/public/hasl_get_blob.cfm?ID=8109
[785] Exner v. Sherman Power Constr. Co., 54 F.2d 510 (2 Cir.1931); French v. Center Creek Powder Mfg. Co., 173 Mo.App. 220, 158 S.W. 723 (1913); State ex rel. Stewart v. Cozad, 113 Kan. 200, 213 P. 654

wells are ultrahazardous when in thickly settled communities (but not rural areas).[786] Apple was engaged in use of poisons and flammable gas in a crowded area and Gjovik and her property were damaged as a result of those activities.[787]

1174.   There are reports dangerous chemicals and gases escaped from 3250 Scott Blvd in at least three documented leaks. Apple also received a number of citations for failure to comply with basic regulations and several root-caused formally as 'negligence.' However, a business engaged in an ultrahazardous activity with strict liability can still be negligent: a business blasting dynamite next to a school does not somehow escape strict liability for damage by blasting recklessly instead of as carefully as possible.

1175.   In fact, Apple's gross negligence, recklessness, and even knowing violation of health, safety, and environmental laws at this site is one of the reasons Gjovik has stated a claim for ultrahazardous activities. Combined with Apple's insistence on keeping the existence of the factory secret, Apple failed to put anyone around the facility on notice that they could be harmed by Apple's ultrahazardous activities. Apple's secrecy increases the danger of its activities (as reflected in state and federal "Right to Know" laws), as well as conceal from victims the cause of their injuries.

1176.   The manufacture of a hazardous material, with no warning as to the dangers associated with it, can constitute an abnormally dangerous activity.[788] The release of hazardous chemicals into the an employee's workplace, with no warning as to their toxic properties, may

---

(1923); Buchholz v. Standard Oil Co. of Indiana, 211 Mo.App. 397, 244 S.W. 973 (1922); Shell Petroleum Corp. v. Wilson, 178 Okl. 355, 65 P.2d 173 (1936).
[786] *Green v. General Petroleum Corp.*, 205 Cal. 328, 270 P. 952 (1928); *Tyner v. People's Gas Co.,* 131 Ind. 408, 31 N.E. 61 (1892).
[787] [§ 628] Ultrahazardous Activity., 4 Witkin, Cal. Proc. 6th Plead § 628 (2023)
[788] *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 532 (S.D.N.Y. 2007); *Cf. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 175 F. Supp. 2d 593, 629 (S.D.N.Y. 2001) ("MTBE I") (denying motion to dismiss nuisance claim against petroleum companies for contamination of wells, where plaintiffs alleged that defendants had "knowledge of the dangers MTBE poses to groundwater" and "failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

be an abnormally dangerous activity"[789] If the defendant attempted to conceal its liability and culpability in the harm caused, through omissions and/or false statements, then that fraud then tolls the statute of limitations. Apple had a duty of care to notify residents and employees of its ultrahazardous activities, under community safety laws like the EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT (EPCRA), hazardous waste laws like CERCLA and RCRA, pollution laws like the CLEAN AIR ACT, and labor and health/safety laws requiring notification of chemical exposure (see § 6310),

1177.   See also *RICO Predicate Act 'Relating to Chemical Weapons*,' which is incorporated here, and this is incorporated there.

### ii.   Superfund Site Mega-Plumes with Complete Pathways for Vapor Intrusion

1178.   Operating a business on a Superfund mega-site with a pathway for vapor intrusion, and vapor intrusion contaminants of concern including TCE and/or Vinyl Chloride, is an ultrahazardous activity. The activity has a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on.[790] Recovery for unexpected exposure to toxic fumes in an office building or other building has been recognized as a legitimate legal claim, even where the effects upon the building occupants are not permanent.[791]

1179.   Solvent vapors from groundwater plumes or soil contamination can make their way through soil and enter homes through cracks in the foundation, utility lines, and drains. This

---

[789] *Abbatiello v. Monsanto Co*., 522 F. Supp. 2d 524, 533 (S.D.N.Y. 2007).
[790] Restatement of Torts Second, section 519-520.
[791] *Butler v. Helmsley-Spear Inc*., 198 A.D.2d 131, 131–32, 604 N.Y.S.2d 51, 52 (1993); 91 Am. Jur. Trials 1 (Originally published in 2004).

process is termed vapor intrusion.[792] Residents can be exposed to solvents by breathing indoor air contaminated with vapors. CERCLA sites already have strict liability for the hazardous waste contamination.[793] CERCLA imposes strict liability for environmental contamination upon, among others, the owner and operator of a facility – which in this case is Northrop Grumman and Apple, respectively.[794]

1180.   The status of a property as a Superfund site has been a factor in deciding if an activity is ultrahazardous.[795] The 'storage' of hazardous waste in open pits is a ultrahazardous activity.[796] Courts have found that "*mercury and other toxic wastes are `abnormally dangerous,' and the disposal of them past or present, is an abnormally dangerous activity.*"[797] There have been similar findings for processing and disposal of radium, especially when processed and disposed of in an urban area, which was described as "*particularly inappropriate.*"[798]

1181.   The analysis of nuclear site risk in *Bennett v. Mallinckrodt*,[799] seems comparable to Superfund sites, (or at least Superfund mega-sites) because both types of sites are unique in the:

---

[792] CDC, Agency for Toxic Substances and Disease Registry, *Land Reuse and Redevelopment: Creating Healthy Communities* (Oct 2020), https://www.atsdr.cdc.gov/sites/brownfields/classroom_training/Creating_Healthy_Communities-508.pdf
[793] Burlington Northern & Santa Fe Railway Co. Et Al. V. United States Et Al., 556 U.S. 599 (2009).
[794] 42 U. S. C. §9607(a).
[795] *T E Industries v. Safety Light Corp.*, 123 N.J. 371, 394 (N.J. 1991)  ("Plaintiff's property is befouled with radium because of defendant's abnormally-dangerous activity. Radiation levels at the site exceed those permitted under governmental health regulations. Moreover, the property has been earmarked as a Superfund site.")
[796] *Updike v. Browning-Ferris, Inc.*, 808 F. Supp. 538, 544 (W.D. La. 1992)
[797] State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (N.J. 1983);  T E Industries v. Safety Light Corp., 123 N.J. 371, 391 (N.J. 1991).
[798] T E Industries v. Safety Light Corp., 123 N.J. 371, 394 (N.J. 1991)
[799] *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1005 (9th Cir. 2008) ("Regardless of Defendants' efforts to exercise reasonable care, some I–131 would be released, and developing plutonium is hardly an activity of common usage. While the value to the community at large, i.e., the nation, of developing an atomic bomb was perceived as high and there is pragmatically no very appropriate place to carry on such an activity, the § 520 factors on balance support holding that Defendants' activities were abnormally dangerous.")

"inherent and… unrectifiable danger. [They're] regulated by the federal government. Numerous safety standards have been set to ensure the public welfare, but even with these precautions taken, the potential danger is still enormous… the safety standards are not guarantees of absolute safety. Federal emission standards are only guidelines which are based upon an inherently inexact balancing of human and environmental risks against social benefits."[800]

Further, similar to nuclear sites, Superfund sites are relatively uncommon.  As of September 2023, there are only 1,336 active Superfund National Priority List sites in the United States.[801] According to a Law Review article penned by Apple General Counsel Kate Adams in 2008, she expects that as time goes on, the number of Superfund sites will decrease, but the average complexity and risk of Superfund sites will increase, with a focus on complex megasites.[802] Adams notes that the "*EPA estimates that there are approximately 189 megasites or potential megasites across the country*."[803] Either count is sufficiently uncommon for an ultrahazardous designation.

1182.   As of 2019, despite decades of clean-up efforts, the TCE concentrations in the shallow A-Zone of the TRW Microwave plume were "*either stable or show no trend*" and pollution levels "*remain elevated above the [Record of Decision] cleanup levels*."[804] Northrop Grumman's qualification of the site continued to explain: "*The Triple Site Plume is a commingled plume, and multiple source areas have been identified. The former TRW Site is*

---

[800] *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 868 (Mo. Ct. App. 1985); see also *Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 581-82 (W.D. Okla. 1979); *Keyes v. Howarth*, at 541, 568. See also 10 C.F.R. § 20.1(c).
[801] US EPA, Superfund: National Priorities List (NPL), [last visited 12/20/23], https://www.epa.gov/superfund/superfund-national-priorities-list-npl (noting data is current as of September 7 2023).
[802] Kate Adams and Brian Israel, *Waste In The 21st Century: A Framework For Wiser Management*, N.Y.U. Environmental Law Journal, Volume 17, Pg 710, (Nov. 2008).
[803] Id.
[804] US Army Corps of Engineers for the US EPA, Fifth Five-**Year Review Report for Adv**anced Micro Devices 901/902 And TRW Microwave Superfund Sites, page67, (September 18 2019**).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

one."[805] Northrop Grumman warned that "*due to inherent geologic complexities, restoration [of the Triple Site/TRW Microwave plume] within the next 50-100 years is likely not achievable.*"[806]

1183.   The TRW Microwave site at 825 Stewart Drive is part of a mega-plume, merging with other megaplumes, and impacting a large community with emissions. The 2021 Site management Plan for the Triple Site and TRW Microwave site noted that developers were selling people homes on the plume without disclosing the pollution and vapor intrusion issues. (Two of the primary developers/investors are Irvine Company and Oaktree Capital. Apple also entered a business deal for many of these homes where HomeKit accessories were installed by default in the condos.).

*Exhibit: Site Management Plan – Community Issues*

1184.   Speaking of her time working on Superfund sites in upstate New York, Lisa Jackson empathized with residents impacted by Superfund pollution. *"These people were saying, 'This is where you've given me to live, and yet [pollution] accumulate in fish here so my*

---

[805] Id.
[806] AECOM for Northrop Grumman, "*Former TRW Microwave Site Current Site Status and Path Forward,*" slide 24, (July 9 2020), https://semspub.epa.gov/work/09/100023781.pdf

*diet is impacted; I live off of fish that I can no longer eat without getting carcinogens in my body, and I have to live with emissions.*' Jackson added that she felt, "*There was so much injustice in that.*"[807]

1185.   The contaminant of concern at the Triple Site as a problem. Trichloroethylene is heavier than air and may cause asphyxiation in poorly ventilated or enclosed spaces.[808] Trichloroethylene can produce CNS effects including headache, dizziness, lack of coordination, stupor, and coma. Respiratory depression or cardiac dysrhythmia from high-level exposures can result in death. Other effects of acute exposure include hypotension, nausea, vomiting, and diarrhea.[809] There is no antidote for trichloroethylene poisoning.[810] There is strong evidence that trichloroethylene can cause kidney cancer in people and some evidence for trichloroethylene-induced liver cancer and malignant lymphoma.[811] The Department of Health and Human Services (DHHS) considers trichloroethylene to be a known human carcinogen.[812] The International Agency for Research on Cancer (IARC) classified trichloroethylene as carcinogenic to humans. The EPA has characterized trichloroethylene as carcinogenic to humans by all routes of exposure.[813]

1186.   While the responsible party for the Superfund site is Northrop Grumman, there are obligations for Apple as the tenant and operator with sole control of the facility since 2015. (After Apple moved in, the City of Sunnyvale Fire Department emailed amongst themselves that the building was now part of the '*Apple machine*' and they cannot drop by unexpected.) As the

---

[807] Harpers Bazaar, *Apple's Vice President of Environment, Policy, and Social Initiatives Has Hope for the Planet,* April 28 2023, https://www.harpersbazaar.com/culture/features/a43739956/apples-vice-president-of-environment-policy-and-social-initiatives-has-hope-for-the-planet/
[808] CDC, Medical Management Guidelines for Trichloroethylene, https://www.atsdr.cdc.gov/MHMI/mmg19.pdf
[809] Id.
[810] Id.
[811] CDC, Trichloroethylene ToxFAQs 2020, https://www.atsdr.cdc.gov/toxfaqs/tfacts19.pdf
[812] Id.
[813] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

tenant/operator of a facility on a Superfund site, Apple was required to, among other things: provide legally required notices; the tenant takes reasonable steps with respect to hazardous substance releases; provide cooperation, assistance, and access; comply with land use restrictions and institutional controls; comply with information requests; and not impede any response action.[814]

1187.   Apple's ultrahazardous activity was a substantial factor in causing Gjovik's harm to her property and herself.

## E.   RETALIATION UNDER CALIFORNIA LABOR CODE

1188.   Generally, Apple discriminated and retaliated against Gjovik in violation of California Labor laws. For all claims, a complaint was filed with the California Department of Labor Department of Industrial Relations Retaliation department on August 29, 2021. The state labor complaints statute of limitations were tolled while under consideration of the Labor Commissioner but are now removed to this case, but are preserved by the Labor Commissioner for investigation if dismissed from this matter without a decision on the merits.[815] There is no requirement for an individual to exhaust administrative remedies before filing a lawsuit under most of these state Labor Codes, however administrative exhaustion was reached as a complaint was filed with the Retaliation Compliant Investigation Unit on time.[816]

---

[814] US EPA, Revised Enforcement Guidance Regarding the Treatment of Tenants Under the CERCLA Bona Fide Prospective Purchaser Provision, (Dec 5 2012), https://www.epa.gov/sites/default/files/documents/tenants-bfpp-2012_0.pdf
[815] Cal. Lab. Code § 98.7
[816] Cal. Lab. Code § 98.7 (a)(1), (f), (g); *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012).

i.       **California Whistleblower Protection Act: Cal. Labor Code §1102.5**

1189.   California Labor Code § 1102.5 "*reflects the broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation.*"[817] Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity in disclosing information to a governmental or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover or correct the violation; or providing information to, or testifying before, any public body conducting an investigation, hearing or inquiry.[818]

1190.   Here, Section 1102.5 also covers public disclosures as due to Apple's extreme power and control over the government agencies who are supposed to be able to regulate it, often the only party in a position to actually force Apple to correct the issue, is the public. In fact, many of Gjovik's public statements in August and September 2021, and statements to coworkers in June and July 2021, all prior to her termination, noted that was why Gjovik was bringing her complaints forward to her coworkers and the public – so the public pressure may force Apple to do the right thing for once.

1191.   Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations, above and below this section, to government agencies (US and California Department of Labor, US SEC, US DOJ, US EEOC, US NLRB, California DFEH, US EEOC, US and California EPA, etc.), and to Apple

---

[817] *Green v. Ralee Eng'g. Co.*, 19 Cal. 4th 66, 77 (1998).

[818] Cal. Lab.C. § 1102.5(b); *Dowell v. Contra Costa Cnty.*, 928 F.Supp.2d 1137, 1154 (N.D. Cal. 2013); *Derby v. City of Pittsburg*, Case No. 16-cv-05469-SI, 20 (N.D. Cal. Feb. 23, 2017), *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1355, 181 Cal. Rptr. 3d 68, 85 (2014)

management. Gjovik had a reasonable cause to believe that the information she disclosed was a violation of statute and/or noncompliance with a rule or regulation.[819]

1192.   As a statutory cause of action, a claim for retaliation in violation of section 1102.5(b) is treated by the courts as a stand-alone theory of recovery distinct from a common law *Tameny* claim.[820] Violations of California Labor Code § 1102.5 can be pursued alone or also support a common law cause of action for wrongful termination in violation of public policy.[821] Under the Labor Code, employers are responsible for the acts of their managers, officers, agents, and employees for alleged violations of § 1102.5.[822] No agency exhaustion is required prior to filing a civil complaint. Safety and worker's rights complaints under California Labor Code Section 1102.5 are matters of traditional local concern and are not preempted by the NLRA.[823]

1193.   See also the *Tamney* section on Reporting Criminal and Unlawful conduct, and those sections are incorporated here and this section incorporated there.

### 1) §1102.5: Reporting Unlawful Labor/Employment Conduct

1194.   Prior to her termination, Gjovik provided information to public bodies (including US and California Department of Labor, US NLRB, California DFEH, US EEOC, etc.) about Apple's violations of labor and employment laws, and several agencies were already conducting an inquiry based on Gjovik's information.[824]

---

[819] Cal. Lab.C. § 1102.5(b); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924, 180 CR3d 359, 366-367.

[820] *Cardenas v. M. Fanaian, D.D.S., Inc.*, 194 Cal. Rptr. 3d 1, 7–15 (Ct. App.), review granted and opinion superseded sub nom. *Cardenas v. Fanaian*, 362 P.3d 431 (Cal. 2015).

[821] Scheu v. Charter Commc'ns, LLC, Case No. 08–CV–02835–MMM, 2011 WL 3204672, at *20 (C.D.Cal. July 27, 2011) ("Violations of California Labor Code § 1102.5 ... constitute public policy within the meaning of Tameny and its progeny.").

[822] Cal. Lab. Code § 1104 ("*In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees.*").

[823] *Doe v. Google, Inc.*, 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).

[824] *Carmichael v. Alfano Temporary Personnel* (1991) 233 CA3d 1126, 1132, 285 CR 143, 147 (employee allegedly discharged for filing charges with EEOC that employer discriminated against women and minorities)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1195.   Gjovik testified before public bodies (US EEOC, US Department of Labor) and was scheduled to testify before public bodies (US NLRB) that were conducting investigations. Gjovik had reasonable cause to believe that the information provided to and testimony before the public body disclosed a violation of statute and/or noncompliance with a rule or regulation.

1196.   Gjovik also reported Apple's unlawful conduct to Apple (Jenna Waibel, Ekelemchi Okpo, Antiono Lagares, Helen Polkes, Business Conduct hotline), which were also protected disclosures under this statute. While a complaint about illegal conduct made to the individual who is engaging in the conduct is a protected disclosure, Gjovik's reports of individuals misconduct to those above that person (such as Gjovik complaining of Jenna Waibel's conduct to Antio Lagares, or Gjovik complaining of her manager's conduct to Business Conduct, etc.) is a protected activity.[825]

1197.   Apple knew Gjovik was engaged in this protected activity and Apple retaliated against Gjovik because of her protected activity. Apple's activity that Gjovik reported did violate the law and/or Gjovik had a reasonable belief that it violates the law.[826]

1198.   Employee complaints may be of illegal conduct by supervisors, co-workers, and/or by contractors.[827]  It is not the motive of the asserted whistleblower, but the content of the communication, that determines whether it is covered.[828]

---

[825] *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 C5th 719, 729-730, 308 CR3d 388, 397 – (plaintiff bartender complained to nightclub Owner that she had not been paid for three previous work shifts. Owner threatened to terminate her employment, report her to immigration authorities and told her never to return to the club. Bartender's complaint to the Owner was a Lab.C. § 1102.5 protected disclosure.)

[826] *Mueller v. County of Los Angeles* (2009) 176 CA4th 809 821-822, 98 CR3d 281, 291; *Manavian v. Department of Justice* (2018) 28 CA5th 1127, 1141-1142, 239 CR3d 710, 723; *Love v. Motion Indus., Inc.* (ND CA 2004) 309 F.Supp.2d 1128, 1134].

[827] *McVeigh v. Recology San Francisco* (2013) 213 CA4th 443, 448, 471, 152 CR3d 595, 600, 618-619.

[828] *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 CA4th 832, 853, 136 CR3d 259, 277 (disapproved on other grounds by People ex rel. *Garcia-Brower v. Kolla's, Inc.* (2023) 14 C5th 719, 733-734, 308 CR3d 388, 400).

510

1199.   See section titled "*Retaliation for Filing a Labor Complaint*" under California Labor Code Section 98.6. It is incorporated here.

### 2)  §1102.5: Reporting Environmental & Safety Violations

1200.   Prior to her termination, Gjovik reported violations of environmental and safety laws (CERCLA, OSH Act, etc) at 825 Stewart Drive to the US EPA from April through August 2021, to the California EPA in August 2021, and to US Department of Labor OSHA in August through September 2021. Gjovik also reported violations of environmental laws (RCRA, CAA) to the US EPA and California EPA, and to legislatures (city mayor, county commissioner, state senator, state assemblyman) about 3250 Scott Blvd in September 2020 through July 2021, although during that time Gjovik thought she was reporting California DTSC Brownfield and/or US EPA CERCLA issues originating at 3255 Scott Blvd, and did not know she was actually reporting Apple's factory emissions. Gjovik also reported suspected environmental violations at 825 Stewart Drive and 3250 Scott Blvd to her coworkers, the press, and the public.

1201.   Gjovik refused to help Apple cover-up their CERCLA non-compliance. Apple repeatedly asked Gjovik to not talk to anyone else about her concerns about her Superfund office and workplace safety, and instead keep her concerns 'private' with her managers, EH&S, and Employee Relations. Gjovik's manager even gave her a "warning" because she expressed concerns that Apple had not be testing the air inside her office, and because she told her coworkers the office was a Superfund site.

1202.   The US EPA explains that institutional controls for toxic waste remediation sites with "*vapor intrusion mitigation systems*" will "*require more frequent inspection or maintenance.*"[829] Gjovik complained Apple had not been inspecting or testing her office for the

---

[829] US EPA, Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA-540-R-09-001, (December 2012), pg29, https://www.epa.gov/sites/default/files/documents/final_pime_guidance_december_2012.pdf

last six years. Apple told Gjovik it was fine because they said so, and she should not tell anyone else about her concerns, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

1203.   The US EPA notes that the "*rupture [of] an engineering cap*" is a "*compromise [to] the integrity of a response action for that site.*"[830] US EPA explains that vapor intrusion "*primarily enter[s] through openings in the building foundation*" through "*cracks in the concrete slab.*"[831] The US EPA explains that when there are cracks in the slab, "vapors resulting from the volatilization of contaminants in soil may be transported into indoor spaces," and "*inhalation of these vapors by indoor workers may be an important exposure pathway*."[832] When Apple told Gjovik there were cracks in the concrete floor (the "slab") at her office, Gjovik told Apple they needed to report the issues to the US EPA, but Apple told her they do not need to tell the US EPA. Gjovik asked Apple to test the air before they fix the cracks, but Apple said they intentionally will not test the air until after they fix the cracks. Gjovik told Apple the cracks were "changed circumstances" at the federally overseen CERCLA site, and that Apple must consult with the US EPA about the cracks and Apple's plan to fix the cracks, including their air testing work plan. Apple once again told Gjovik that they were right, she was wrong, and she should not talk to anyone else about her concerns. Apple told Gjovik it was fine because they said so, and she should not tell anyone else about her concerns, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

---

[830] US EPA, *Institutional Controls, supra* at page 29 ("8.3 Periodic Reviews").
[831] US EPA, *A Citizen's Guide to Vapor Intrusion Mitigation*, EPA 542-F-12-021 (September 2012), https://www.epa.gov/sites/default/files/2015-04/documents/a_citizens_guide_to_vapor_intrusion_mitigation_.pdf
[832] US EPA, Supplemental Guidance For Developing Soil Screening Levels For Superfund Sites, OSWER 9355.4-24 (December 2002).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1204.   Like in *Parada v City of Colton*,[833] where a city building department employee refused to allow residential construction by certain city officials without building permits as required by law, Gjovik refused to allow Apple to cover-up the cracks in the floor without reporting them to the US EPA under CERCLA, or to have the US EPA oversee testing and repair under CERCLA. Gjovik and Apple argued about this repeatedly with Apple insisting they refused to tell the US EPA about the work because it they did not have to.

1205.   The US EPA explains that "co*mmunity members who live or work near [Superfund] sites*" "*generally are the first to recognize changes at the site*," and should be encouraged to help monitor the site.[834] The US EPA suggests outreach activities to inform community members about institutional controls (like sealed floors and sub-slab vapor monitoring), "*what types of activities may adversely affect the integrity of the response action*," and points of contact for "*reporting a breach*."[835] Gjovik asked Apple to tell her coworkers their office was a Superfund site, to explain the site's institutional controls to them (sub-slab vent ports, etc), and provide them a process for reporting concerns at the site (like if they smell chemicals). Apple told Gjovik they will not tell her coworkers about the site or the controls, but told her not to interact with the sub-slab vent ports and to call them right away if she smells something weird, but then said once more they will not tell anyone else and she should not tell anyone else, but Gjovik refused and instead reported Apple's violations to her coworkers, the government, and the press. Apple fired Gjovik because she did so.

1206.   Apple also retaliated against Gjovik for Gjovik's refusal (and protest due to actual opportunity to refuse) with Apple's unlawful medical studies and data collection of

---

[833] 24 CA4th 356 (1994).
[834] US EPA, *Institutional Controls, supra* at page 31 ("8.6 Community IC Monitoring").
[835] US EPA, *Institutional Controls, supra* at page 31 ("8.6 Community IC Monitoring")

employee personal data for commercial research and development purposes.[836] As in *Ferretti v. Pfizer,* employees can refuse to participate in unlawful studies.[837] Gjovik's posts on Twitter and quotes in the article make it crystal clear Gjovik thought Apple's conduct with the application was egregious. Gjovik also expressly noted that she chose to expose the application because *"Apple's policy of secrecy should not shield it from public scrutiny about human rights & dignity."*[838]

1207.   Gjovik complained about 825 Stewart Drive's deed being out of compliance and deeds are part of the institutional controls for Superfund sites. Apple brushed her off, but then later the US EPA had the same inquiry to Northrop Grumman and amongst themselves. Deed restrictions are restrictive covenants used as institutional controls to protect the public's health and safety, and compliance is important. To quote Lisa Jackson when she was the head of the New Jersey EPA, her agency launched "*enforcement actions against approximately 950 responsible parties who have failed to monitor and report on the … status of deed notices …We realize that the state's system that allows self-reporting for monitoring of these contaminated properties is broken, and we are taking the first steps toward fixing this, Commissioner Jackson said.… this situation seriously undermines the department's ability to ensure protection of public health and the environment*."[839] Apple also fired Gjovik for complaining about and inquiring about the Superfund deed.

---

[836] Lab.C. § 1102.5(c); *Ferretti v. Pfizer, Inc.* (ND CA 2012) 855 F.Supp.2d 1017, 1025-1027—doctor stated § 1102.5 claim by alleging she refused to participate in drug testing program that violated federal regulations; *Barela v. C.R. England & Sons, Inc.*, 197 F.3d 1313, 15 I.E.R. Cas. (BNA) 1481, 139 Lab. Cas. (CCH) ¶ 58801 (10th Cir. 1999), appeal after remand, 203 F.3d 834 (10th Cir. 1999) – (internally reported the employer's practice of requiring employees to violate state and federal trucking laws)
[837] *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012).
[838] Twitter, Ashley Gjovik, August 30 2021, https://twitter.com/ashleygjovik/status/1432416891201490946
[839] New Jersey Department of Environmental Health, DEP TAKES ENFORCEMENT ACTIONS AGAINST RESPONSIBLE PARTIES FOR FAILURE TO MEET CONTAMINATED SITE MONITORING REQUIREMENTS, Sept. 24 2007, https://www.nj.gov/dep/newsrel/2007/07_0041.htm

1208.   An employer cannot retaliate against an employee who reported violations of regulations related to employee chemical/radiation exposure, reported excess toxic substances at a work site, or reported possible illegalities related to an environmental assessment.[840]  In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges that reports of "*public health,*" "*product safety,*" "*risk or damage to the environment,*" "*failure to comply with a legal or regulatory obligation*", "*criminal activity,*" "*violations of human rights,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[841]

1209.   See section titled "*Retaliation for Safety Complaints*" California Labor Code Section 6310. It is incorporated here.

### 3)  §1102.5: Refusal to Participate in Unlawful Conduct

1210.   California Labor Code 1102.5 prohibits employers from terminating employees due to the employee refusing to participate in an activity that would result in a violation of state or federal statute, rule, or regulation.[842] Gjovik refused to engage in unlawful acts including participating in Apple's obstruction of justice, violations of environmental law, and Apple's unlawful surveillance and AI data collection. All of these reference constitutional or statutory rights that benefits the public, substantial and fundamental rights, firmly established at the time of Gjovik's discharge.[843]

---

[840] *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, 117 Lab. Cas. (CCH) ¶ 56469 (1989) (exposure); *Devlyn v. Lassen Mun. Utility Dist.*, E.D.Cal.2010, 737 F.Supp.2d 1116 (toxins); *Killgore v. SpecPro Professional Services*, LLC, C.A.9 (Cal.)2022, 51 F.4th 973 (environmental assessment).

[841] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

[842] *Wadler v. Bio-Rad Laboratories, Inc.*, N.D.Cal.2015, 141 F.Supp.3d 1005, motion to certify appeal denied.

[843] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found*. (2002) 27 C4th 1097, 1104.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1211.   It is a violation of public policy for an employer to discharge an employee from employment due to the employee refusing to engage in an unlawful act.[844] This includes an employer pressuring an employee to not report a crime or other serious violation of the law. In *Wadler v. Bio-Rad Laboratories*, the Court explained that activity protected by § 1102.5 can include refusal to participate in an employer's cover-up after receiving either direct or indirect requests to do so from the employer – explaining that Apple's direct instructions to an employee to ignore criminal conduct in *Banko v Apple Inc* were an extreme version of the conduct the statute intended to cover, and that indirect or implied suggestions to ignore unlawful conduct are also protected.[845]

1212.   Gjovik refused to help Apple in their efforts to conceal and obstruct investigations and reporting of employee complaints, including of apparently civil and criminal legal violations. Around July 28 2021, Okpo interrogated Gjovik for hours about Gjovik's posts on Apple's Slack tool complaining about a culture of cover-ups at Apple, and dozens of other employees starting to share their own stories of Apple burying their real concerns and issues, and Apple retaliating against them for raising the concern in the first place. Okpo repeatedly told Gjovik to stop posting about it and to send everyone who comments on her prior post or contacts her about it, to send them directly to Okpo so he can talk to them in a 'private' conversation. Gjovik had reasonable cause to believe that her participation in the cover-up would result in a violation of statute and/or non-compliance with rule or regulation. Apple discharged and discriminated against Gjovik, and Gjovik's disclosures and her refusal to participate in Apple's

---

[844] Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167 (1980).
[845] *Wadler v. Bio-Rad Labs.*, Inc., 141 F. Supp. 3d 1005, 1027 (N.D. Cal. 2015) citing *Banko v Apple*, 20 F.Supp.3d 749, 759–60.

cover-up was a contributing factor in Apple's decision to discharge and discriminate against Gjovik.[846]

1213.   Similarly, Gjovik refused to abide by Apple's illegally overbroad NDAs and be silent about business practices she believed violated the law, and to not share those concerns with her coworkers and the public, when her coworkers and the public were being harmed. Apple's practices with Gobbler were unlawful and Apple fired Gjovik for exposing and protesting them.

1214.   Apple's supposedly legitimate reason for terminating Gjovik (which was pretext and false) included Gjovik's protests of Apple's Face "Gobbler" iPhone app which took videos of Gjovik 'whenever it thought it saw a face' including in bathrooms, locker rooms, changing rooms, and similar locations. The application took and collected photos videos, captured biometric information (face prints), and also gathered other information such the location via the iPhone GPS. Apple also claims it terminated Gjovik for Gjovik protesting that Apple asked her three times to capture 3D scans of Gjovik's ears and ear canals, after Gjovik had already declined the same request "indefinitely" back in 2018.

1215.   Gjovik had a legal right to protest the Gobbler application, Apple wanting to scan her ear canals, and Apple's unlawful and unethical data collection practices. Gjovik had protested internally, to the public, to and through the press, prior to her termination. Cal. Labor Code § 1102.5 applies to disclosures made to the press and public as long as it is exposing previously unknown information about a suspected violation of the law. Apple's conduct with Face Gobbler violating numerous laws, including the California Constitution Article 1 Right to Privacy (discussed in the *Tamney* section and incorporated here), the prohibition on video recording in bathrooms in Cal. Labor Code § 435, and the prohibition on retaliation for Political

---

[846] *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012)

517

Activity found in Cal. Labor Code §§ 1101-1102. (Gjovik also discusses Apple's violation of the CPRA, ICCPR, and FTC Act in the *Tamney* section, which is also incorporated here).

1216.   First, Apple's use of the application violated the Labor Code § 435, which is an infraction. Gjovik has direct evidence of photos taken of her by the app in her bathroom (see below). In August 2021, prior to Gjovik's termination, Gjovik contemplated revealing Apple's practice of Face Gobbling, and opened the application to review the photos and videos currently stored within, finding among other disturbing things, photos of her taken naked in her bathroom. Because Gobbler data is time stamped and has GPS data, Gjovik was able to see these photos were taken the day of her first meeting with Apple EH&S about her office on April 2 2021. This shows how easy it would be for Apple Global Security to access employee Gobbler data and find 24/7 surveillance videos of those employees on dates or at locations of interest to them, even for nefarious purposes.



*Figure 1: Photos captured by "Gobbler" in Gjovik's home bathroom, including Gjovik washing her face without clothing*

*Photos taken of Gjovik by Gobbler on the day of her first meeting with EH&S (April 2 2021)*

1217.   Cal. Lab. Code § 435 prohibits employers from "*causing to be made,*" or "*using for any purpose*" a video recording of an employee in a restroom, locker room, or changing

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

room.[847] All California private employees are protected by this law. This is a strict liability statute (with the exception of an employer having court order to engage in the conduct) and no specific intent is required. An employer's notice cannot alter the employer's legal obligations under Cal. Labor Code Section 435.[848]  Further there is much common law establishing that surveillance in bathrooms is a violation of privacy.[849]

1218.   California has a "*legislative policy against clandestine observation of public restrooms,' rendering it `reasonable for users thereof to expect that their privacy will not be surreptitiously violated.*"[850] The "*illegal, clandestine surveillance of restrooms*" is a "*blatant invasion of privacy.*"[851] "These are attributes that people view as deeply primordial, and their exposure often creates embarrassment and humiliation. Grief, suffering, trauma, injury, nudity,

---

[847] Cal. Labor Code § 435;  see *Trujillo v. City of Ontario* (CD CA 2006) 428 F.Supp.2d 1094, 1106— Lab.C. § 435 among statutes that "represent society's understanding that a locker room is a private place requiring special protection".

[848] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal.4th 1, 67 (Cal. 1994) [Judge George concurrence] – ("Even if an employer discloses before hiring an employee that it intends to engage in visual surveillance of the employee restrooms and requires all employees to consent to such surveillance as a condition of employment, a state constitutional privacy challenge to such conduct would not necessarily founder on the ground that, in view of the explicit warnings and consent, the employees had no reasonable expectation of privacy."); Lothar Determann & Robert Sprague, Intrusive Monitoring: Employee Privacy Expectations Are Reasonable in Europe, Destroyed in the United States, 26 Berkeley Tech. L.J. 979, 1009–11 (2011).

[849] *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 167 L.R.R.M. (BNA) 2353, 143 Lab. Cas. (CCH) ¶ 11025, 145 Lab. Cas. (CCH) ¶ 59475 (9th Cir. 2001), as amended, (Aug. 27, 2001) (applying California law) (surreptitious surveillance of employees' restrooms with video and audio devices as well as two-way mirrors gave rise to actionable claims); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094 (C.D. Cal. 2006) (applying California law) (California Constitution's privacy provision violated by installation of secret video camera in police locker room); *Benitez v. KFC Nat. Management Co.,* 305 Ill. App. 3d 1027, 239 Ill. Dec. 705, 714 N.E.2d 1002 (2d Dist. 1999) (awarding damages for invasion of privacy arising out of peepholes placed by coemployees in ceiling of women's bathroom so as to view women employees disrobing and using facilities); *Harkey v. Abate*, 131 Mich. App. 177, 346 N.W.2d 74 (1983) (secret camera in employees' restroom constituted actionable invasion of privacy).

[850] *In re Deborah C.,* 177 Cal. Rptr. 852, 858 n.9 (Cal. 1981) (quoting People v. Metcalf, 98 Cal. Rptr. 925, 927 (Cal. Ct. App. 1971))

[851] *Cramer v. Consolidated Freightways, Inc*., 209 F.3d 1122 (9th Cir. 2000) [Fisher, Circuit Judge, dissenting in part]

519

sex, urination, and defecation all involve primal aspects of our lives--ones that are physical, instinctual, and necessary."[852]

1219.   Judge Raymond C. Fisher of the 9th Circuit wrote in 2000 of an employer surveilling employees in the bathroom: "*There was . . . no way of knowing whether you were being watched at any given moment… It was even conceivable that they watched everybody all the time. . .. You had to live -did live, from habit that became instinct -in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized. George Orwell, 1984.*"[853]

1220.   A California Supreme Court Judge argued in concurrence in 1994, that "*applicable social norms are those of society overall, not "social norms" created by an association or an industry practice.*[854]  *No association, industry, or other group or entity may establish the parameters of the reasonable expectation of privacy at the expense of society. For instance, an employer may not, simply by announcing in advance that all employees will be subject to periodic strip searches, thereby defeat the employees' otherwise reasonable expectation that such searches will not occur.*"[855]

1221.   Next, Apple violated the § 1102.5 prohibition on wrongful discharge in violation of public policy when it claims it terminated Gjovik due to Gjovik's political activities, which is protected under California Labor Code §§ 1101 and 1102.[856] These laws protects an employee

---

[852] Jane R. Bambauer, *Glass Half Empty*, 64 UCLA L. Rev. Discourse 434, 457 (2016), citing Daniel J. Solove, *A Taxonomy of Privacy*, 154 U. PA. L. REV. 477, 516 (2006) (describing harms from distortion).
[853] *Cramer v. Consolidated Freightways, Inc.*, 209 F.3d 1122 (9th Cir. 2000) [Fisher, 9th Circuit Judge, dissenting in part]
[854] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 60 (Cal. 1994). See also, e.g., *Smith v. Maryland* (1979) 442 U.S. 735, 740-741, fn. 5 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577]; Rest.2d Torts, § 295A, com. c, p. 63; Prosser Keaton on Torts (5th ed. 1984) § 33, pp. 194-195.
[855] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 60 (Cal. 1994) [California Supreme Court Judge Kennard Concurrence].
[856] Wrongful termination in violation of public policy, Cal. Bus. Law Deskbook § 17:7; *Ali v. L.A. Focus Publication,* 112 Cal. App. 4th 1477, 1487–88, 5 Cal. Rptr. 3d 791, 798–99, 20 I.E.R. Cas. (BNA) 892 (2d Dist. 2003).

making public statements about political topics, such as overly-broad NDAs, unlawful data collection for AI models, or an employee's right to privacy in California.

1222.   This section also incorporates and is incorporated in the Tamney claims for Constitutional Right to Privacy, CPRA, ICCPR, and FTC Act.

**ii.    Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6.**

1223.   Gjovik exercised labor rights provided under California Labor Code on behalf of herself and other employees. Apple retaliated against Gjovik due to Gjovik's protected activity and she suffered materially adverse actions with causal connection to the protected activity, Apple had forbidden animus, and the adverse actions taken could dissuade a reasonable worker from filing a charge of discrimination.[857]

1224.   Under California Labor Code § 98.6, employers may not discharge or discriminate against an employee for engaging in certain activities, including *"filing a complaint with the Labor Commissioner or testifying in such proceedings."* [858]

1225.   If an employer engages in any action prohibited by this section within 90 days of the protected activity specified in this section, as Apple did here, there shall be a rebuttable presumption in favor of the employee's claim.[859]

1226.   Some of the factors behind why the 90 day presumption rule was put in place include that: "*In today's workplace, the fear of retaliation is still one of the main reasons workers are afraid to report labor violations"* and the prior *"burden of proof is extremely challenging for a worker who does not have the same level of access to information as the*

---

[857] *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 57 (2006) (examining retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)); *see also Westendorf v. W. Coast Contractors of Nev.*, 712 F.3d 417, 422 (9th Cir. 2013) (examining Title VII retaliation claims).
[858] *Hollie v. Concentra Health Servs., Inc.*, C 10–5197 PJH, 2012 WL 993522, at *6 (N.D. Cal. Mar. 23, 2012) (citing Cal. Lab. Code § 98.6(a)).
[859] Cal. SB-497: Protected employee conduct. Section 1, Section 98.6(b)(1) [Signed October 8 2023; Effective January 1 2024].

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                              DECEMBER 21 2023

*employer.*"[860] Further, when the California Senate Committee on Labor explained the need for

the law, the Committee noted a recent study reporting that of the California workers who

reported a labor concern to the government, half of the workers reported subsequent retaliation

from their employer.[861] Additionally, the Senate Judiciary Committee noted that 47% of

California workers will not report violations of labor laws to the government or anyone at all,

due to fear of retaliation.[862] The SJC explained, "*The purpose behind the rebuttable presumption*

*is to make it more difficult to invent a pretext to fire a worker who has just filed a complaint.*"[863]

### 1) Filing a Labor Complaint: § 98.6

1227.   Apple violated Section 98.6 by retaliating against Gjovik due to Gjovik filing a

claim with the California Labor Commissioner instituting and causing to be instituted

proceedings related to the rights under the jurisdiction of the California Labor Commissioner,

exercising rights provided under California Labor Code on behalf of herself and on behalf of

other employees. Like in *Ayala* v *Frito Lay*, Gjovik filed a complaint with the Labor

Commissioner, and in under three months, Apple then terminated Gjovik's employment.[864]

1228.   See section titled "*Retaliation for Safety Complaints*" under California Labor

Code 6310. It is incorporated here.

---

[860] Cal. SB-497 Legislative History – Senate, Third Reading, April 27 2023.
[861] Cal. SB-497 Legislative History – Senate Committee On Labor, Public Employment And Retirement, April 12 2023
[862] Cal. SB-497 Legislative History – Senate Judiciary Committee, April 25 2023.
[863] Id.
[864] *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 914–19 (E.D. Cal. 2017) – (claim surviving motion to dismiss when employee asserts that she reported defendant to the Labor Commissioner in May 2015, and that as a result of these complaints, defendant subjected her to increased job responsibilities, denial of a request to transfer work shifts, denial of long-term disability, and, finally, in July 2015 termination); See *Hennighan v. Insphere Ins. Sols., Inc.*, No. 13-cv-00638-JST, 2013 WL 1758934, at *1 (N.D. Cal. Apr. 24, 2013) (finding that the plaintiff had adequately alleged a § 98.6 claim when defendant terminated his employment five months after he reported to the Labor Commissioner defendant's allegedly unlawful employment policies including failure to provide rest breaks).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### 2) §98.6: Retaliation re: Wages: Cal. Labor Code §232

1229.   Labor Code section 232 provides: "*No employer shall do any of the following: …Discharge, formally discipline, or otherwise discriminate against, for job advancement, an employee who discloses the amount of his or her wages.*" [865]

1230.   Gjovik participated in a pay survey with her coworkers in late July 2021, and also shared her wages on social media and discussed with her coworkers in August 2021.

1231.   Apple fired Gjovik due to Gjovik discussing her wages.

### 3) §98.6: Retaliation re: Work Conditions: Cal. Labor Code §232.5

1232.   California Labor Code § 232.5 prohibits disciplining or discharging an employee for disclosing information about the employer's working conditions. It has been conceded that this statute states a sufficient public policy on which to base a wrongful termination claim and as such this is also incorporated with the *Tamney* claim.[866]

1233.   "It is necessary that the individual workman have full freedom of association ... to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in ... concerted activities for the purpose of ... mutual aid or protection."[867] "The Legislature has expressly declared [in Labor Code section 923] that the public policy of California favors concerted activities of employees for the purpose of ... mutual aid or protection."[868]

1234.   Gjovik's protected activities included filing complaints about work conditions, and discussing work conditions with coworkers and the public, all of which was protected under

---

[865] Cal. Lab.Code, § 232, subd. (c), italics added (hereafter section 232).

[866] *Luke v. Collotype Labels USA, Inc.* (2008) 159 CA4th 1463, 1468-1469 (discussing work conditions not preempted by NLRA; however concerted activity would be)

[867] *Grant-Burton v. Covenant Care, Inc.*, 99 Cal. App. 4th 1361, 1378–80, 122 Cal. Rptr. 2d 204, 218–20 (2002), as modified on denial of reh'g (July 30, 2002); California Stats.1937, ch. 90, § 923, pp. 208–209, italics added.

[868] Schwartz–Torrance Investment Corp. v. Bakery & Confectionery Workers' Union (1964) 61 Cal.2d 766, 769, 40 Cal.Rptr. 233, 394 P.2d 921.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

§ 232.5. "*It is a simple - and perhaps profound - political truth: when individuals tell their stories, they can bring about change…it is the personal narrative that has the power to reshape social discourse and provide an impetus for change.*"[869]

1235.  Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik, but also Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple's "legitimate" reason for discharging Gjovik's employment is unlawful under federal and state laws and is also retaliation for protected activity. Apple claims its NDAs prohibit Gjovik from speaking about work conditions, and that if Gjovik does speak about work conditions, it violates her NDA and that violation is grounds for immediate termination.

1236.  Apple's supposed reason for termination Gjovik occurred while Gjovik was "*removed from the workplace and all workplace interactions*" and Gjovik was complaining on Twitter and to a reporter in an article exclusively about work conditions and the terms and conditions of employment at Apple, including complaining about unlawful and coercive surveillance.

1237.  The policy violated by Apple is supported by constitutional and statutory provisions, the policy is public in that it insures to benefit the public, the policy is fundamental and substantial, and the policy was referenced at the time of discharge.[870] "Termination of an employee most clearly violates public policy when it contravenes the provision of a statute forbidding termination for a specified reason."[871] As the United States Supreme Court has noted:

> "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.... It is recognized now that satisfactory

---

[869] Ellen J. Zucker, *NDAs: Is There Anything Worth Keeping?,* 66-SUM B. B.J. 22 (Summer 2022)
[870] *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890;
[871]  4 Wilcox, Cal. Employment Law (2002) § 60.04[2][e], p. 60–68.

hours and wages and working conditions in industry ... have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing."[872]

1238.   Under California Labor Code Section 232.5, employees have an enforceable right to disclose information about the employer's working conditions without restriction or fear of retaliation.[873] Under the statute and relevant case law, this right extends to disclosures to co-workers and to the general public, including media and press activity.[874] Apple cannot require Gjovik to refrain from disclosing or discussing information about the employer's working conditions.

1239.   "Examples of working conditions provided in the legislative history material include attire, proper behavior, break room condition, elevator maintenance, seat comfort, temperature, lighting, uniforms, hair requirements, breaks, restroom facilities, and 'even one's required attitude.' In an enrolled bill report, contained within the legislative history material, working conditions are described as '(e.g., hours, workplace safety, benefits).' In an analysis from the Senate Rules Committee, the reference to working conditions is followed by '(e.g.,

---

[872] *Thornhill v. Alabama* (1940) 310 U.S. 88, 102–103, 60 S.Ct. 736, 84 L.Ed. 1093.

[873] Working conditions" is properly understood to include "conditions of employment"—such as "workload, office sizes, perquisites of employment, and 'work-life balance.'" *Glassdoor, Inc. v. Super,* Ct. 9 Cal. App.5th 623, 638 (2017); it encompasses matters such as hours, benefits, work rules and regulations, workplace safety, and the physical environment. See *Chan v. Canadian Standards Ass'n ,* No. SACV 19-2162, 2020 WL 2496174, at *3 (C.D. Cal. Mar. 16, 2020); *Massey v. Thrifty Payless, Inc.*, No. G047734, 2014 WL 2901377, at *5 (Cal. App. June 27, 2014).

[874] See § 232.5; *Glassdoor*, 9 Cal. App.5th at 638 ("employees are entitled by statute to publicize their complaints about such matters."); *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1078-79 (9th Cir. 2007) (employer's arbitration secrecy rule could prevent discussion between employees and chill public disclosure of the employer's working conditions in violation of § 232.5).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

hours, uniforms, occupation, safety)'."[875] "Working conditions are those conditions determined by the employer as a condition of employment."[876]

1240.   Remedies for harm from violations of § 232.5 are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. [877] There is no agency exhaustion is required prior to filing a civil complaint. Complaints under California Labor Code Section 232.5 are matters of traditional local concern and are not preempted by the NLRA.[878]

### 4)  §98.6: Lawful Off-Duty Conduct: Cal. Labor Code § 96(k)

1241.   Under Labor Code Section 96(k), Apple may not demote, suspend, discharge from employment, threaten discharge, or otherwise discriminate against any employee for lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involves exercise of a right protected by the Labor Code or Constitution.[879] The ACLU was quoted in the legislative history saying, "We think it is crucial to preserve the distinction between company time and the sanctity of our private lives.  An individual engaging in lawful conduct during non-working hours away from the workplace should not be subject to discrimination by his or her employer."[880]

1242.   Gjovik engaged in lawful conduct asserting "recognized constitutional rights" (political activism, speaking about work conditions, protesting unlawful conduct, protesting unlawful surveillance and unfair business practices, etc.), occurring during nonworking hours -- while she was on leave, away from Apple's premises. Apple retaliated against Gjovik and

---

[875] *Tam v. Qualcomm*, Inc., 300 F. Supp. 3d 1130, 1148–50 (S.D. Cal. 2018); *United States ex rel. Lupo v. Quality Assurance Servs., Inc.*, 242 F.Supp.3d 1020, 1030–31 (S.D. Cal. 2017).
[876] Id.
[877] *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[878] *Doe v. Google, Inc.*, 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).
[879] *Grinzi v. San Diego Hospice Corp.*, 120 Cal.App.4th 72 (2004); Barbee v. Household Automobile Fin. Corp., 113 Cal.App.4th 525 (2003)
[880] "AB-1015 Employment: retaliation," An act to amend Section 98.6 of the Labor Code, relating to employment (2001-2002), ASSEMBLY COMMITTEE ON JUDICIARY on April 24, 2001.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

supposedly discharged Gjovik because some of this protected conduct. While the reason was pretext, Apple's admission further implicates its animus and lawlessness.

1243.   Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back and Apple said no. Apple cannot then turn around and claim the "leave" was worktime or the workplace. Apple told Gjovik she had been "*removed from the workplace*." Until Apple let Gjovik return to work, Gjovik was off duty.

1244.   The fact Gjovik was posting about work conditions in her personal time does not transform Gjovik's personal time into work time. Further, protected disclosures are protected by their content, regardless of motive or if the content of information was related to job duties.[881]

1245.   Remedies for harm from violations of § 96(k) are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. No agency exhaustion is required prior to filing a civil complaint. Complaints under California Labor Code Section 98(k) are matters of traditional local concern and are not preempted by the NLRA.[882]

1246.   In addition, "the city and county of San Francisco recognize the right of privacy in the workplace and protect employees against unreasonable inquiry and investigation into off-the-job conduct, associations and activities not directly related to the actual performance of job responsibilities."[883] Gjovik rented an apartment in San Francisco until September 2021.

1247.   On August 25 2021, the "Pussy Riot" Twitter account (the Russian feminist punk protest group) posted "*we're in SF, wondered if anyone here knows ppl in apple and twitter offices? wanted to come by and chat about activism.*" Someone tagged Gjovik and Gjovik replied to Pussy Riot: "*#Apple would probably just offer @pussyrriot EAP or medical leave.*"

---

[881] *Collier v. Superior Court*, 228 Cal. App. 3d 1117, 279 Cal. Rptr. 453 (1991)
[882] *Doe v. Google, Inc*., 54 Cal.App.5th 948, 961 (Cal. Ct. App. 2020).
[883] San Francisco Code, Part II, Chapter VIII, Article 33A.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

Gjovik exchanged contact information with Nadya privately and the two texted and planned to meet in person the next day, however they were not able to meet up. Apple would have seen Gjovik's communications with Nadya on her iPhone. Gjovik's Twitter posts and texting with Pussy Riot, in response to Pussy Riot asking to talk to people at Apple about "activism" was a de facto protected political activity.



*Exhibit: The Pussy Rrriot Tweet*

Apple was surely not pleased.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### iii.     Retaliation for Safety Complaints: Cal. Labor Code § 6310

1248.    California Labor Code § 6310(b) prohibits discrimination, suspension, discharge, or threat of discharge for complaining about unsafe work conditions or practices.[884]  Firing an employee whom the employer fears will complain of safety violations is also actionable as retaliation under Lab.C. § 6310(b).[885] Protected complaints may be made, orally or written, to the California Department of Labor, or anything other government agencies responsible for employee safety or health, or to the employer, or to a representative of the employer.[886]

1249.    Gjovik filed a Retaliation claim with California Department of Labor DIR and Apple was notified of such, prior to her termination. Gjovik complained of unsafe work conditions, and violations of safety laws/rules/standards internally to Apple, to the US EPA, to CalEPA, and to OSHA.[887] Apple retaliated against Gjovik preemptively out of fear Gjovik would file additional complaints related to health and safety at the workplace, and in hope the retaliation would cause Gjovik to drop her existing complaint out of fear and intimidation, and

---

[884] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44; Freund v. Nycomed Amersham (9th Cir. 2003) 347 F3d 752, 759 (applying Calif. law—"The public policy behind § 6310 is not merely to aid the reporting of actual safety violations … it is also to prevent retaliation against those who in good faith report working conditions they believe to be unsafe"); Lujan v. Minagar (2004) 124 CA4th 1040, 1046 (includes preemptive retaliation against employees whom employer fears will file workplace safety complaints).

[885] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1045-1046, 21 CR3d 861, 865-866—employer feared employee, who was friend of coemployee who had filed workplace safety complaint, would file similar complaint.

[886] Cal. Lab. Code § 6310(a)(1).

[887] *Jenkins v. Family Health Program*, 214 Cal. App. 3d 440, 262 Cal. Rptr. 798, (2d Dist. 1989) – (complained to employers about the substandard employment conditions in their facility.); *Freidrichs v. Western Nat. Mut. Ins. Co.*, 410 N.W.2d 62, 2  (Minn. Ct. App. 1987) – (reported violations of American Society of Manufacturing Engineers standards at manufacturing facilities insured by the employer); *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, (1989) – (reported a power company's violations of regulations to the Nuclear Regulatory Commission resulting from employees' exposure to excessive levels of radiation.).

not file additional complaints.[888] Apple swiftly retaliated against Gjovik due to Gjovik's complaints about an unsafe workplace.[889]

1250.   Apple's retaliation violated § 6310 which protects an employee who: (1) complains about safety or health conditions or practices, (2) institutes or causes to be instituted any proceeding relating to the employee's rights to safe and healthful working conditions, or testifies in any such proceeding, (3) exercises any rights under the California Occupational Safety and Health Act.[890]

1251.   Apple discriminated against Gjovik because Gjovik exercised her rights under the federal and California law relating to occupational health and safety and made written and verbal complaints on behalf of herself and/or others, to government agencies about health & safety issues at Apple facilities.[891] Apple knew Gjovik did this by at least Gjovik's direct communications to Apple about it, and Apple also had reason to believe Gjovik did this.

1252.   Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses, and requested information about work related injury and illness reports or records.[892] Apple knew about Gjovik's complaints through oral conversations, emails,

---

[888] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1046, 21 CR3d 861, 866; *Diego v. Pilgrim United Church of Christ (*2014) 231 CA4th 913, 921-923, 180 CR3d 359, 365-367.

[889] *Oyarzo v. Tuolumne Fire Dist.*, supra, 955 F.Supp.2d at 1099, (The district court in the Oyarzo case appears to have determined that causation was shown by mere "temporal proximity between [plaintiff's] protected activity and an adverse action.)

[890] Cal. Lab. Code § 6310(b).

[891] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44, 63 CR2d 727, 729; *Freund v. Nycomed Amersham* (9th Cir. 2003) 347 F3d 752; *Touchstone Television Productions v. Sup.Ct. (Sheridan)* (2012) 208 CA4th 676, 681-682, 145 CR3d 766, 770.

[892] Cal. Lab. Code § 6407 – ("*Every Employer and Every Employee Shall Comply with Occupational Safety and Health Standards, With Section 25910 Of the Health and Safety Code, And with All Rules, Regulations, And Orders Pursuant to This Division Which Are Applicable to His Own Actions and Conduct.*").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

meeting notes, internal complaints, external complaints, public interviews, and social media posts.[893]

1253.   Prior to her termination, from March 2021 through September 2021, Gjovik complained to Apple and to the government about safety concerns about Gjovik's office, concerns about Apple's safety policies and practices, and concerns about the safety of Gjovik's coworkers. Apple's discrimination against Gjovik included but was not limited to firing, reassignment, lost opportunity for promotion, suspension, threats, and denial of benefits. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

1254.   Employees may pursue a claim under §6310 and for the tort of wrongful termination simultaneously.[894]

### 1)  § 6310: Employee Exposure to Chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal.Code.Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]

1255.   Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide access to employees to accurate records of employee exposures to potentially toxic materials or harmful physical agents in violation of Cal. Labor Code §6408(d).



From: **Ashley Gjovik** ashleygjovik@apple.com
Subject: Fwd: SD01 EHS Request - 4/2 Notes
Date: April 11, 2021 at 11:33 AM
To: David Powers powers@apple.com

None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in [    ]s office in Sept 2019 was very likely related to the chemicals on this Superfund site.

If not the TCE, PCE, or Chloroform — then the levels of Ethylebenzene and Tolulene exceeding max industrial limits in 2015 that no one seems to have ever followed up on.

*Exhibit: Gjovik Email to Powers on 4/11/21*

---

[893] *Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 965 (N.D. Cal. 2014), aff'd sub nom. *Cuevas v. SkyWest Airlines, Inc.*, 644 F. App'x 791 (9th Cir. 2016) – (meeting notes from employer summarizing employee's safety complaints is evidence employer knew about protected activity).
[894] Boston v. Penny Lane Centers, Inc.(2009) 170 Cal App 4th 936

9) I've recently begun learning a lot more about how these types of chemicals tend to have a far worse impact on women then men (due to our increased body fat, lower weight, and also how sensitive our hormones are). Do you happen to know if the OSHA and EPA industrial max levels have started to consider female subjects? Or are these numbers mostly expected male bodies?

*Exhibit: Gjovik Email to EH&S and Employee Relations on 4/11/21*

1256.   Occupational Safety and Health Standards 1910 Subpart Z "*Toxic and Hazardous Substances*," the "*Access to employee exposure and medical records*" section describes Gjovik's statutory right to request information about her chemical and biological exposure at work.[895] Based on facts pled, Apple violated Gjovik's Rights under Part Z, and Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to notify employees who has been or who is being exposed to toxic materials or harmful physical agents and informing any employee so exposed of corrective action being taken in violation of Cal. Labor Code §6408(d) and 8 CCR § 340.2.[896] Gjovik asked repeatedly about exposure, and notifying employees, and was told to not tell her coworkers, and that Apple won't answer anymore of her questions.

1257.   Based on facts pled, Apple discriminated against and discharged Gjovik because Gjovik complained that Apple prohibited employees from observing and monitoring and measuring employee exposure to hazards pursuant to Cal. Labor Code §142.3 (effectively determining "*whether the health of such employee is adversely affected by this exposure*") in

---

[895] US CFR, Title 29, Subpart Z – Toxic and Hazardous Substances.
[896] Cal. Lab. Code § 6401 – ("*Every employer shall furnish ... safeguards, and shall adopt and use practices ... which are reasonably adequate to render such employment and place of employment safe and healthful...*"). Cal. Lab. Code § 6403 – ("*No employer shall fail or neglect to ... do every other thing reasonably necessary to protect the life, safety, and health of employees.*" Cal. Code Regs Title 8 § 340.2 – ("*Whenever any employee has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels exceeding those prescribed by applicable standard, order, or special order, the employer of the affected employee must promptly notify any employee so affected in writing of the fact that the employee has been exposed, and of the corrective action being taken by the employer.*").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

violation of Cal. Labor Code §6408(c).[897] Apple went so far as to "remove" Gjovik from the "workplace and all workplace interactions" in order to ensure she could not monitor the crack assessment.



*Exhibit: Gjovik Email to EH&S and Employee Relations on 4/11/21*

1258.   In addition, Apple did all of the above while knowing it created an unsafe workplace, while attempting to conceal the safety issues at the workplace, and while also concurrently refusing to fix some of the major safety issues at that workplace (i.e., it took them

---

[897] Cal. Lab. Code §142.3(c) – ("…the use of labels or other appropriate forms of warning as are necessary to ensure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions for safe use or exposure. Where appropriate, these standards or orders shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with these hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals and in a manner as may be necessary for the protection of employees.")

two years to address the vapor intrusion/HVAC issues) in violation of Cal. Lab. Code §§ 6400(a), 6402, 6405.[898]

1259.  In violation of OSH Act § 1910.1020(g), Apple never provided Gjovik information about the records noted or her rights under this section, either upon first entering into employment or least annually thereafter.[899] In violation of OSH Act § 1910.1020(e)(2)(i)(A)(3), when Gjovik took a job under David Powers and Dan West in January 2017, and thus was assigned to work in the office building at 825 Stewart Drive (TRW Microwave Superfund site), and required to attend and hold meetings in Dan West's building (the Intersil/Siemens Superfund site),[900] Apple failed to provide Gjovik "*records to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents at workplaces… to which the employee is being assigned or transferred*."[901]

1260.  In violation of OSH Act § 1910.1020(e)(2)(i), Apple's response to Gjovik's request for exposure records for 825 Stewart Drive only resulted in Apple sharing the 2015 vapor intrusion testing result and no other data. When Gjovik requested information about her exposure to chemicals at her office, Apple should have provided a record measuring and monitoring the amount of toxic substances or harmful physical agents to which she had been

---

[898] Cal. Lab. Code § 6402 – ("*Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein.*"). Cal. Lab. Code § 6400(a) – ("*No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful.*"). Cal. Lab. Code § 6405. – ("*No employer, owner, or lessee of any real property shall construct or cause to be constructed any place of employment that is not safe and healthful.*").
[899] OSH Act § 1910.1020(g)(1) – ("*Upon an employee's first entering into employment, and at least annually thereafter, each employer shall inform current employees covered by this section of the following: The existence, location, and availability of any records covered by this section…*").
[900] Intersil Inc./Siemens Components Superfund Site, 10900 N Tantau Ave Cupertino California, EPA ID CAD041472341, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0901325
[901] OSH Act § 1910.1020(e)(2)(i)(A)(3) – ("*Exposure records to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents at workplaces or under working conditions to which the employee is being assigned or transferred*").

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

exposed,[902] and in the absence of that data, then data about employees in work conditions similar to those of the employee to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected.[903]

1261.   For instance, there are a number of EPA/OSHA studies about employee chemical exposure, and a number of EPA vapor intrusion studies in workplaces. Any of these could have been shared as a reference as to what Gjovik's exposure might be. When Gjovik started this type of inquiry, Waibel informed Gjovik that Apple would not discuss any of Gjovik's workplace safety concerns ever again. Apple discriminated against and discharged Gjovik, because Gjovik complained  to Apple and to government agencies, that Apple failed to provide Material Safety Data Sheets/Safety Data Sheets, related to known indoor air pollution consisting of hazardous chemicals, and risk of indoor air pollution consisting of hazardous chemicals, to employees on a timely and reasonable basis on substances in the workplace, under California Labor Code § 6398.[904] Gjovik complained that Apple failed to furnish employees who may be exposed to a hazardous substance (the known indoor air pollution and risk of pollution) with information on the contents of the MSDS for the hazardous substances, or equivalent information either in written form or through training programs in violation of CLC §§ 6398 and § 6408.[905]

---

[902] OSH Act §1910.1020(e)(2)(i)(A)(1) – *("each employer shall, upon request, assure the access to each employee and designated representative to employee exposure records relevant to the employee… consist[ing] of… A record which measures or monitors the amount of a toxic substance or harmful physical agent to which the employee is or has been exposed…")*

[903] OSH Act §1910.1020(e)(2)(i)(A)(2) – *("In the absence of such directly relevant records, such records of other employees with past or present job duties or working conditions related to or similar to those of the employee to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected…")*

[904] California Labor Code § 6398(a) – ("In MSDS shall be available to an employee, collective bargaining representative, or the employee's physician, on a timely and reasonable basis, on substances in the workplace.")

[905] California Labor Code § 6398(b). "*All employers shall provide information to employees … to observe monitoring or measuring of employee exposure to hazards … accurate records of employee exposures to potentially toxic materials or harmful physical agents… Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents … and informing any employee so exposed of corrective action being taken.*" Cal. Lab. Code § 6408(c),(d),(e) – ("*All*

1262.   At Gjovik's Superfund office, Apple concealed and excused away the known presence of Toluene and Ethylbenzene in the indoor air. It was a topic Gjovik argued with Apple about repeatedly, with Apple claiming it was safe and fine. In Apple's "Regulated Substances" policy, Apple requires the reporting of any use or Toluene or Ethylbenzene and prove non-use of the chemicals.[906] Apple added these chemicals to its Regulated List in 2016, the same year the vapor intrusion testing report was approved for Gjovik's office, despite the presence of both chemicals, and Ethylbenzene results exceeding max limits.

1263.   Despite Apple's feigned ignorance during conversations with Gjovik on this topic, Apple is fully aware of the legal requirements around MSDS/SDS. Apple's public website clearly states: "*MSDS/SDS are required for Chemicals and Substances.*"[907]

1264.   Apple also discharged Gjovik due to her refusal to work in hazardous conditions. An employee may refuse to perform work that would result a real and apparent hazard to the employee or their coworkers. Under California Labor Code § 6311, an employee who is discharged for refusing to perform work under such circumstances may bring an action for lost wages.

---

*employers shall provide information to employees in the following ways, as prescribed by authorized regulations…The opportunity for employees or their representatives to observe monitoring or measuring of employee exposure to hazards conducted pursuant to standards promulgated under Section 142.3…Allow access by employees or their representatives to accurate records of employee exposures to potentially toxic materials or harmful physical agents…Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels exceeding those prescribed by an applicable standard, order, or special order, and informing any employee so exposed of corrective action being taken."*)*

[906] Apple, Regulated Substances, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[907] Apple, Trade Compliance, "Apple and Beats Product Information Sheets," (last visited 12/2/2023), https://www.apple.com/legal/more-resources/gtc.html

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### 2)   §6310: COVID-19 Safety & Communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]

1265.   Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure from the COVID-19 virus.  Gjovik complained of the return to work plans during the Delta surge, for people who could work from home without issue, and that she felt it was reckless. Gjovik gave interview to NYT about her criticism of Apple's return to work plans which was published July 23 2021, and Gjovik was made NYT Quote of the Day on July 24 2021, and Apple retaliated against her because of it, in violation of California Labor Codes.

### 3)   §6310: Wildfire Smoke [Cal.C.Reg. Title 8, § 5141.1]

1266.   Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure to particulate matter in the indoor air of her office caused by wildfire smoke and concerns that Apple was in violation of California Code of Regulations, Title 8, § 5141.1 "Protection from Wildfire Smoke").[908]

1267.   Under California code, Apple had to demonstrate that the "concentration of PM2.5 in the air does not exceed a concentration that corresponds to a current AQI of 151 or greater by measuring PM2.5 levels at the worksite."[909] An AQI of 151 is equivalent to 55.5 µg/m3 of PM2.5.[910]

1268.   Apple was required by law to "establish and implement a system for communicating wildfire smoke hazards in a language and manner readily understandable by

---

[908] California Code of Regulations, Title 8, § 5141.1 – ("This section applies to workplaces where: (A) The current Air Quality Index (current AQI) for PM2.5 is 151 or greater, regardless of the AQI for other pollutants; and (B) The employer should reasonably anticipate that employees may be exposed to wildfire smoke. "). Law effective July 29 2019.
[909] Id at (a)(C).
[910] California Department of Labor, Dept. of Industrial Relations, *Worker Protection from Wildfire Smoke*, https://www.dir.ca.gov/dosh/doshreg/Protection-from-Wildfire-Smoke/Wildfire-smoke-emergency-standard.html

537

employees, including provisions designed to encourage employees to inform the employer of wildfire smoke hazards at the worksite without fear of reprisal, including "informing employees of adverse symptoms that may be the result of wildfire smoke exposure such as asthma attacks, difficulty breathing, and chest pain."[911]

1269.  "If engineering controls are not sufficient to reduce exposure to PM2.5 to less than a current AQI of 151, then the employer shall reduce employee exposures to the extent feasible."[912]  "Whenever engineering controls are not feasible or do not reduce employee exposures to PM2.5 to less than a current AQI of 151, the employer shall implement administrative controls, if practicable, such as relocating work to a location where the current AQI for PM2.5 is lower, changing work schedules, reducing work intensity, or providing additional rest periods."[913]

1270.  "Where the current AQI for PM2.5 is equal to or greater than 151, but does not exceed 500, the employer shall provide a sufficient number of respirators to all employees for voluntary use in accordance with section 5144 and encourage employees to use respirators."[914]

1271.  Section 5141 requires employer provide information included in Appendix B, which includes that: "Particulate matter can irritate the lungs and cause persistent coughing, phlegm, wheezing, or difficulty breathing. Particulate matter can also cause more serious problems, such as reduced lung function, bronchitis, worsening of asthma, heart failure, and early death."[915]  Gjovik complained of these health risks to her manager David Powers and the EH&S team but was ignored.

---

[911] Id at (d).
[912] Id at (f)(1).
[913] Id at (f)(2).
[914] Id at (f)(3)(A).
[915] California Code of Regulations, Title 8, § 5141.1 – Appendix B "Protection from Wildfire Smoke Information to Be Provided to Employees (Mandatory)" [Effective July 29 2019].

1272.   Appendix B also includes a required statement to be shared with workers that: "An AQI over 100 is unhealthy for sensitive people and an AQI over 150 is unhealthy for everyone."[916] Again, Gjovik reported this to her manager and EH&S, and complained they were not aligning with this rule, and instead claimed they only cared if AQI exceeded 500. Gjovik complained that 500 is "hazardous."

1273.   Gjovik complained to Apple about their wildfire smoke response, including employee PM2.5 exposure, in at least 2019, 2020, and 2021. Gjovik complained to US EPA about Apple's response to wildfire smoke and how it intersected with her concerns about Apple's response to their CERCLA allegations in 2021.

### 4)   §6310: Injury Reporting [8 Cal.C.Reg. § 14300]

1274.   Apple discriminated against and discharged Gjovik because Gjovik complained that Apple is hiding its employee injury rates. Apple keeps internal registries of employee injuries that are not made public or shared with OSHA, however one was 'leaked' and described by reporters in 2017. Among other injuries, the report documented a female employee in Apple's Arques offices in Sunnyvale on an adjacent Superfund mega-plume as Gjovik's office, noting she complained of "*feeling lightheaded, had difficulty seeing clearly, could not stand.*"[917] Employees from Apple's factories have been reporting poisonings from chemical emissions, including fainting at work, since at least 2009.[918]

---

[916] Id at (c)

[917] William Turton, Leaked Document Details Apple Employee Injuries, Hints at Secretive New Products. Gizmodo, April 20 2017, https://gizmodo.com/leaked-document-details-apple-employee-injuries-hints-1794482497

[918] Friends of Nature, IPE, Green Beagle, The Otherside of Apple, Jan 20 2011, pg7, ("When local authorities inspected the production site, they discovered a buildup of volatile n-hexane in the air that greatly exceeded national safety limits. As the workers were not effectively protected, over time many in the production area were gradually poisoned. Since late 2009, many of the employees at Lian Jian Technology have been falling sick. Lacking physical strength, they would suddenly drop what they were holding or even faint and collapse in the production area..") https://media.business-humanrights.org/media/documents/files/media/documents/it_report_phase_iv-the_other_side_of_apple-final.pdf

1275.   Apple told Gjovik they did not even record her fainting spell at the Triple Site. Apple likely has internal documents revealing vapor intrusion exposure to their employees yet denied any such knowledge or records. Under 8 CCR § 14300 et seq. Apple was supposed to record all injuries that are work-related, appear to create a new case, and that result in a loss of consciousness on a Form 301. Powers never filed a Form 301 or otherwise reported Gjovik's fainting spell.

1276.   Gjovik also complained Apple never recorded or reported to OSHA her fainting spell in 2019, the peanut anaphylaxis in 2017, the contraction of whooping cough at a work conference in 2017 (along with West's failure to provide first aid), or a burn to her eyes from iPhone prototype lasers in 2018. The whooping cough would have required both a Form 301 and Form 5020 due to lost work time beyond the date of injury (Gjovik took time off due to the severe illness).

### 5)  §6310: Retaliation for Complaining about e-Waste Violations

1277.   Apple retaliated against Gjovik because Gjovik complained to the government and to Apple about Apple's history of negligence related to hazardous waste due diligence, employee safety precautions, and lack of disclosure to employees about hazardous waste exposure and its health impacts, citing the *People of the State of California v. Apple Inc* lawsuit (filed against Apple over violations of California Health and Safety Code §25100 and implementing regulations).[919] The California government settlement with Apple required injunctive relief to cease unlawful actions, require training at California Compliance School, conduct inspections and maintain documentation, and to pay the Department of Toxic Substances control $450,000.

---

[919] People of the State of California v Apple Inc., Case No. 16CV303579, Final Judgement Pursuant to Stipulation (Dec 2016)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                              DECEMBER 21 2023

1278.   Apple retaliated against Gjovik because she raised her cancelled "Hand Me Down Hardware" recycling program as part of her investigations with Employee Relations in 2021. Gjovik complained about how she was treated, but also about the unnecessary waste.

### 6)   §6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7]

1279.   Apple discriminated against and discharged Gjovik because Gjovik complained about a violation of Cal. Labor Code §6399.7 (Right to Know).[920] Because Apple violated Section 6399, as with the other codes above, Apple also violated the provisions of Section 6310.

1280.   Apple retaliated against Gjovik because Gjovik complained or testified regarding non-compliance with the Hazardous Substances Information and Training Act (Section 6399.7) which prohibits an employer from retaliating against an employee who complains or testifies about non-compliance with the Hazardous Substances Information and Training Act.

1281.   While Gjovik argued with Apple about this matter related to 825 Stewart Drive (as she did not yet know about 3250 Scott Blvd), however, Apple knew and was considering her arguments in the context of 3250 Scott Blvd as well under both California Code, but also the federal RIGHT TO KNOW statute and the CLEAN AIR ACT.[921]

### 7)   §6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)]

1282.   Apple retaliated against Gjovik because Gjovik complained that Apple failed to provide clear and reasonable warning to all individuals prior to exposure to chemicals listed on the Proposition 65 (Cal. Code of Reg. §5194(b)(6)) list of chemicals known to the State of

---

[920] Cal. Labor Code § 6399.7 Hazardous Substances Information and Training Act – ("No person shall discharge or in any manner discriminate against, any employee because such employee …. because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310.")

[921] The Emergency Planning and Community Right-to-Know Act (EPCRA), aka Title III of the Superfund Amendments and Reauthorization Act (SARA). EPCRA §§ 302, 304, 311-3. Clean Air Act, 42 U.S.C., § 7622(a).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

California to cause cancer, birth defects, or reproductive harm. Prop 65 applies to both occupational and environmental exposures. [922]

1283.   Apple at 825 Stewart Drive did not disclose the recent history and thus imminent risk of exposure to certain dangerous chemicals (TCE, ethylbenzene, toluene, vinyl chloride, etc.) above EPA risk levels. Apple had one or more listed chemicals emitted into the environment where employees were and could be exposed. Apple did not and could not prove the exposure caused no significant risk.[923] Apple did not provide the required warning to employees or others who were exposed, before, after, or during exposure in violation of Cal. Code of Reg. §5194(b)(6).[924]

1284.   Known exposed parties at 825 Stewart Drive include employees, vendors, federal employees, and city employees resulting in occupational and environmental exposures. Known exposed parties at 3250 Scott Blvd include employees, vendors, city employees, and thousands of nearby residents resulting in occupational and environmental exposures. In neither location were warnings or signs posted conspicuously in the workplace, in violation of §5194(b)(6). Gjovik raised these concerns and Apple said they refused to do this because they decided there was no "legal obligation" and then fired Gjovik.

1285.   At 825 Stewart Drive, Apple omitted disclosure of at least 10 §339 hazardous chemicals including the contaminants of concern recorded in the federal Record of Decision for the CERLCA site: 1,1,1-TCA; Freon-113); 75343, 1,1-Dichloroethane; Ethylidene chloride; 1,1-

---

[922]

[923] "A warning … shall not apply to … An exposure for which the employer responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for the chemicals known to the State to cause cancer… In any enforcement action the burden of showing that an exposure meets the criteria … shall be on the employer."

[924] Cal.Code.Reg. §5194(b)(6) "Proposition 65 Warnings" – ("Before exposing any employee to any hazardous substance that otherwise falls within the scope of this section and which requires a warning under this Act … any employer subject to the Act shall comply with the requirements set forth in… the Act.") – in violation Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194

Dichloroethene; 1,2-Dichlorobenzene; Vinyl chloride; 1,2-Dichloroethylene, 1,2,3,5-

Perchloroethylene, 1,2-trans-Dichloroethylene, TCE.

1286.   Prior indoor air testing at 825 Stewart Drive, also showed the presence of 2

additional §339 hazardous chemicals from §5194(b)(6), Toluene and Ethylbenzene, which were

known to be in the CERCLA groundwater plume under the building, but Apple claimed without

data the emissions were 'from construction,' yet did not provide conduct follow up air testing or

provide warnings. Instead, Apple terminated and terrorized the whistleblower. Apple's conduct

violated Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194, which is actionable

under § 6310.

### 8)   §6310:  Federal Environmental Statutes

1287.   Apple retaliated against Gjovik and terminated Gjovik's employment because of

Gjovik's safety complaints related to a number of federal environmental statutes including, but

not limited to: RCRA, EPCRA, SARA, NESHAP, the Clean Air Act ("CAA"), and the Clean

Water Act ("CWA").[925] Gjovik also made many complaints under CERCLA, and those

complaints are detailed in this complaint to provide adequate factual background and context,

and also argues Apple retaliation against her and termination of her employment was in

retaliation for her CERCLA-related complaints to the extent they are not pre-empted by Gjovik's

CERCLA whistleblower case.

1288.   Gjovik complained of fraud with the cracks in floor at her Superfund office

because Apple was supposed to report a "change of circumstance" to the US EPA and work with

US EPA oversight to evaluate and fix a compromised mitigation system. Gjovik was concerned

that Apple's standard operating procedure seemed to be lawlessness, which is the opposite of

how they claim they operate.

---

[925]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1289.   A Plaintiff who photographs a machine that caused injuries or talks to the press about safety issues, which leads to an OSHA investigation, engages in protected activity. Retaliation can be proven with the employee then suddenly terminated and the employer knew about the Plaintiff taking the photos and talking to coworkers about it, especially when  "*the first thing [OSHA] wanted to look at was that machine [the Plaintiff photographed] when they arrived for the inspection*."[926] Here, Apple knew Gjovik was organizing with coworkers to take photos of the cracks in the floor, knew Gjovik was talking to US EPA about the cracks in the floor which led to US EPA inspecting Gjovik's office, and US EPA's notice of the inspection and inspection notes both mentioned cracks in the floor.

1290.   Apple's actions related to the HVAC and sub-slab ventilation systems at 825 Stewart, and failure to install exhaust monitoring and abatement systems at 3250 Scott Blvd, likely violated 42 US Code 7413(c)(1) by constructing new sources and modifying existing sources, failing to comply with design and work practices, and emitting hazardous pollutants in violation of NESHAP. It is a criminal violation of 42 US Code 7413(c)(2)(C) to fail to install monitoring devices required by the Clean Air Act.

1291.   For 3250 Scott Boulevard chemical emissions and exposure, see under "RICO Act," the Predicate Act of violating 18 USC § 229 "*Relating to Chemical Weapons*," and also RCRA, CERCLA, CAA, and other environmental violations explained in the sections on "*Mail and Wire Fraud.*" Those facts and allegations are incorporated here.

---

[926] *Perez v. Lloyd Indus., Inc.,* 399 F. Supp. 3d 308, 318–19 (E.D. Pa. 2019), noting *Donovan v. R. D. Andersen Constr. Co.,* 552 F. Supp. 249 (D. Kan. 1982).

### 9)  §6310: Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]

1292.   Apple retaliated against Gjovik due to Gjovik complaining about Apple's compliance with Workplace Violence laws and policy in violation of California Labor Code § 6401.[927]

1293.   California law prohibits retaliation for reporting Workplace Violence concerns.[928] Apple retaliated against Gjovik for Gjovik's complaints about Apple's Workplace Violence personnel, policies, and practices – as well as Gjovik's complaints about Apple Global Security mispresenting their Workplace Violence functional team's purpose and activities, and those activities violating numerous laws.

1294.   Apple also sent a fake social media account after Gjovik and the account, (Mel Nayer) claimed that that Gjovik speaking publicly about her concerns about th terms and conditions of her employment at Apple was 'causing death threats' and so she had to delete her screenshots and posts immediately .

1295.   In April of 2010, Apple obtained a search warrant to raid the home of a tech reporter, seizing the reporter's computers and servers. There was no legal basis for the search and the warrant was withdrawn.[929] It was also revealed that Apple sat on a steering committee that oversaw and directed the "*police task force*" (the "Rapid Enforcement Allied Computer Team") that raided the reporter's home on behalf of Apple.[930]

---

[927] California Labor Code § 6401.7. 6401.9

[928] California Labor Code § 6401.9(c) (1)(A), (2)(D) – ("An employer shall establish, implement, and maintain an effective workplace violence prevention plan… (2) The plan shall include all of the following... (D) Effective procedures for the employer to accept and respond to reports of workplace violence, and to prohibit retaliation against an employee who makes such a report.")

[929] Matt Zimmerman, *Gizmodo iPhone Warrant Affidavit Released, Impropriety of Search Confirmed,* EFF, May 14 2010, https://www.eff.org/deeplinks/2010/05/iphone-warrant-affidavit-confirms-impropriety

[930] John Letzing, *Police task force oversight committee has included Apple,* MarketWatch, April 27 2010, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27

located at 565 Whipple Avenue in Redwood City. I conducted a search of the premises and located the missing Apple prototype sticker in the parking lot near the entrance to the convenience store.

On 4/22/2010 at approximately 1245 hours, Apple employee Venkat Memula delivered the prototype iPhone to me at the REACT San Mateo Office to be retained as evidence in this case.

Continuing on 4/23/2010, I conducted a query on the address 40726 Greystone Terrace in Fremont. The address was the where Brian Sewell of Apple reportedly retrieved the stolen

*Exhibit: Affidavit of Detective Matthew Broad, April 23 2010* [931]

1296.   Gjovik's prior director, **Venkat Memula**, was included in the police officer's affidavit that was used as justification for the search warrant to raid the reporter's home. Memula was noted as the Apple employee who transported the iPhone to the REACT office. The affidavit also notes involvement by O'Melveny and Myers (the same law firm who sent the harassing Gobbler/ear canal email to Gjovik in September 2021).

1297.   By May 2010, the search was now openly referred to as a home break-in, there was "*outrage*" from "*media watchdogs*", and press and public complained the task force was acting as "*Apple's secret police*" and as "*Apple's private police force*."[932] The search was believed by many to violate California's Constitutional Reporter Shield law.[933]

1298.   In 2011, Apple's Global Security and the Worldwide Loyalty team arranged a raid of a man's home without a warrant and based on their own corporate tracking of iPhone GPS data.[934] Two Apple Global Security employees/Worldwide Loyalty members obtained the

---

[931] Superior Court of the County of San Mateo, Affidavit for Search Warrant, SBSW 6643, Filed April 29 2010, pg9

[932] Pete Carey, *Raid in iPhone case shines spotlight on REACT team, Mercury News*, May 4 2010, https://www.mercurynews.com/2010/05/04/raid-in-iphone-case-shines-spotlight-on-react-team/ "*The Rapid Enforcement Allied Computer Team operated out of publicity's glare until last month, when armed with a search warrant, its investigators broke into the Fremont home of a blogger-editor for the website Gizmodo.*"

[933] Matt Zimmerman, *OverREACTing: Dissecting the Gizmodo Warrant,* EFF, April 27 2010, https://www.eff.org/deeplinks/2010/04/gizmodo-search-warrant-illegal

[934] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader; SF Weekly, Lost iPhone 5: Bernal Heights Man Says Visitors Impersonating Police Searched His Home, https://web.archive.org/web/20211009190421/https://archives.sfweekly.com/thesnitch/2011/09/02/lost-iphone-5-bernal-heights-man-says-visitors-impersonating-police-searched-his-home-exclusive

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

presence of four plainclothes San Francisco police officers in order to search the man's home.
The officers identified themselves as police while the Apple employees said nothing. The man
assumed the Apple employees were also police officers and let them into his house. [935] The
officers attempted to keep the search out of official records, leading the police spokesperson to
initially assume it was a case of impersonation of officers by six individuals, not just two.[936]

1299.   If the Apple employees who searched the man's home were not with the San
Francisco police, that is a crime. And if they were with the SF Police Department, they had an
obligation to report the information to the department, which did not happen.[937]

1300.   One of the Apple employees threatened the Latino man and his family with
deportation if he did not cooperate with Apple's search of his home.

1301.   Legally that is considered extortion, and any police officers involved would be
violating the searched party's Constitutional rights. [938] Press coverage complained of "*taxpayer
paid enforcers for Jobs' mob*."[939]

1302.   Apple would later terminate Gjovik's employment only hours after Gjovik posted
on Twitter linking to a 2011 article titled *"Lost iPhone 5: Bernal Heights Man Says Visitors
Impersonating Police Searched His Home."*[940] The article discussed both 2010 and 2011 "break
in" matters discussed above.

1303.   California law requires that employers have an "effective" procedure for
communication about workplace violence matters which ensures employees do not fear

---

[935] Id.
[936] Id.
[937] Mat Honan, *Apple Investigators Reportedly Impersonated SF Police*, Gizmodo, September 2011,
https://gizmodo.com/apple-investigators-reportedly-impersonated-sf-police-i-5836990
[938] Fudzilla, Police investigate how they became Apple's secret police,
https://www.fudzilla.com/news/24000-police-investigate-how-they-became-apples-secret-police
[939] Id.
[940] SFWeekly, Lost iPhone 5, *supra*; Twitter,
https://twitter.com/ashleygjovik/status/1436071412624609287

reprisal.[941] Apple sent a "Workplace Violence and Threat Assessment" investigator to contact

Gjovik in a haphazard, intimidating, and suspicious way. The person sent Gjovik an email

without a subject line, with no context of why he was reaching out, made a vague threat against

Gjovik, and demanded Gjovik get on the phone with him within an hour. Even if there was a real

Workplace Violence concern about Gjovik, this is not normal or acceptable communication.

1304.   Apple's termination of Gjovik was suspiciously timed with Gjovik's comments

about Apple's apparent violation of California state criminal laws, and possibly also federal

laws. Gjovik's comments about the article, and then also about the "Workplace Violence"

interrogator who reached out to her ten minutes after she shared the article, was Gjovik raising

concerns about (among other things) workplace safety at Apple, including Apple's Workplace

Violence (law) policies and practices.[942]

### 10)  6310: Unfair Business Practices & False Advertising [Cal. Bus. & Prof. Code §§ 17200, 17500]

1305.   Apple's violations of Cal.Lab.C. § 6310 also violate California Business &

Professional Code §§ 17200 and 17500.[943] The California Unfair Business Practices and False

Advertising laws are not considered to be a means of enforcing the law claimed to have been

violated; rather, they provide a remedy for economic damage suffered as a result of violations of

---

[941] California Labor Code § 6401.9(c) (1)(A), (2)(F) – ("An employer shall establish, implement, and maintain an effective workplace violence prevention plan……(2) The plan shall include all of the following... (F) Effective procedures to communicate with employees regarding workplace violence matters, including, but not limited to, both of the following…(i) How an employee can report a violent incident, threat, or other workplace violence concern to the employer or law enforcement without fear of reprisal. (ii) How employee concerns will be investigated as part of the employer's responsibility in complying with… [the code]… and how employees will be informed of the results of the investigation and any corrective actions to be taken.")

[942]

[943] *Solus Industrial Innovations, LLC v. Superior Court*, 4 Cal. 5th 316, 345-52 (2018) – On February 8, 2018, the California Supreme Court unanimously ruled that local prosecutors could pursue civil penalties against employers for violating workplace safety standards under California's unfair competition law and fair advertising law.

548

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                          DECEMBER 21 2023

a wide array of other laws.[944] The California Supreme Court ruled that the federal OSH Act does not preempt either Cal.Bus. & Prof.C. § 17200 or § 17500 under the similar legal theory as why Proposition 65 was found to not be preempted by federal law.[945]

1306.   Apple's failure to comply with workplace safety standards represented an unlawful, unfair, and fraudulent business practice; and Apple's representations concerning its commitment to workplace safety and its compliance with all applicable workplace safety standards were false and misleading in violation of California's fair advertising law. [See also, SOX and Dodd-Frank Whistleblower sections, and RICO Predicate Acts Wire Fraud and Mail Fraud].[946]

## F.   WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)

1307.   In California, an employer may be subject to tort liability if it terminates an employee in violation of a fundamental public policy.[947]

1308.   Gjovik was retaliated against and discharged from employment for a variety of reasons that violate public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "*strong public interest*" reflected in California Labor Code § 1102.5, "*in encouraging employee reports of illegal activity in the workplace*." [948] [949] For example, it is a

---

[944] Solus Indus. Innovations, LLC v. Superior Court of Orange Cnty., 4 Cal.5th 316, 340 (Cal. 2018)
[945] Id at 342 – ("Our conclusion is consistent with the decision of the federal Department of Labor approving California's Hazard Communication Standard (Standard), which incorporated provisions from Proposition 65, the Safe Drinking Water and Toxic Enforcement Act. (Health & Saf. Code, §§ 25249.5 et seq. ; 62 F.R. § 31159-01.)")
[946] California Business and Professions Code sections 17200 and 17500.
[947] *Steffens v. Regus Grp., PLC*, 485 Fed.Appx. 187, 188 (9th Cir.2012) (citing *Gould v. Md. Sound Indus., Inc.,* 31 Cal.App. 4th 1137, 1147 (1995)).
[948] *Collier* at 1123; *Stoval* at *4; *Banko v. Apple, Inc.,* No. 13-02977 RS, 2013 WL 6623913, at *4 (N.D. Cal. Dec. 16, 2013).
[949] *See Banko v. Apple Inc. (ND CA 2013) 20 F.Supp.3d 749, 758*—(termination in retaliation for reporting embezzlement violated public policy behind Dodd-Frank and Sarbanes-Oxley Act, including policies against embezzlement and illegitimate corporate tax deductions, and encouragement of whistleblowing); *Tameny v. Atlantic Richfield Co*. (1980) 27 Cal.3d 167; *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; CACI No. 2430.

549

termination in violation of publicly policy (*Tamney Claim*) to terminate an employee for complaining about unsafe work conditions or for asking to work in a safe and healthful workplace.[950] An example of this would be complaining about violations of California Labor Code § 6403 (see § 6310 claim).[951]

1309.   Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of the California Constitution, California Labor Code 435, Cal. Penal Code 637.7, the California Privacy Rights Act, and the US FTC Act. Further, while the OCCPR is not self-executing, Apple's conduct violates the spirit of the ratified treaty. This unlawful data collection occurred with employees, but also with non-employees who were not given notice or asked for consent, and as such implicates the public and public policy. Further, Apple claims if the employee were to warn the non-employee about the data collection, then the employee could be fired immediately as they did with Gjovik – thus there was no way this practice would have been revealed without a whistleblower.

1310.   Gjovik reported and testified about topics including employment discrimination, an unsafe workplace, refusing to sign a waiver of liability, improper business practices, discussing wages and equal pay with coworkers, and making political statements – all of which implicate public policy for the purpose of a *Tamney* claim.[952]

---

[950] Cal. Lab.C. § 6400; *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298, 188 CR 159, 164; *Cabesuela v. Browning-Ferris Indus. of Calif., Inc.* (1998) 68 CA4th 101, 109, 80 CR2d 60, 64; *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947, 88 CR3d 707, 716-717

[951] *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1191–92 (C.D. Cal. 2013) – (The termination of an employee for complaining about a violation of § 6403 will support a cause of action for wrongful termination in violation of public policy.) See also *Khachatrian v. Stanford University*, No. C 97–20833 PVT, 1998 WL 856084, *3 (N.D.Cal. Dec. 4, 1998) – (same).

[952] *City of Moorpark v. Sup.Ct.* (*Dillon*) (1998) 18 C4th 1143, 1160 (employment discrimination); *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947 (unsafe workplace), Civ.C. § 1668 and *Baker Pacific Corp. v. Suttles* (1990) 220 CA3d 1148, 1156-1157 (refusal to release employer from liability); *Green v. Ralee Eng. Co.* (1998) 19 C4th 66, 85 (improper practices); *Green v. Par Pools Inc.* (2003) 111 CA4th 620, 633 (wages; equal pay); *Ali v. L.A. Focus Publication* (2003) 112 CA4th 1477, 1487-1488 (political speech); *White v. Ultramar, Inc.* (1999) 21 C4th 563, 568 (testifying at a hearing).

1311.   Facts, allegations, and legal authority related to California Lab.C. § 6310(b) and Lab.C. § 1102.5 are also incorporated here.[953] There is a two-year statute of limitations following termination to bring a claim in court. [954] The cause of action accrues at the time of dismissal.[955]

### i.   Tamney: Reporting Allegations of Criminal Conduct to Apple, Law Enforcement, and District Attorneys

1312.   Regardless of if Apple terminated Gjovik for the proffered reason, or the other reasons alleged, all reasons violate fundamental public policy, including interest in a workplace free from illegal practices.[956] Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to her constitutional or statutory rights to report suspected crimes to law enforcement and to district attorneys, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[957]

1313.   Apple retaliated against Gjovik because Apple knew, and/or Apple suspected, that Gjovik reported suspected criminal activity by Apple to law enforcement, to district attorneys, and to Apple.[958] Witness Retaliation statutes forbid retaliation (including termination) against witnesses for providing testimony and cooperating in investigations, and it is captured in

---

[953] *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298 and *Cabesuela v. Browning-Ferris Indus. of Calif., Inc.* (1998) 68 CA4th 101, 109 (employee fired for complaining about unsafe working conditions)
[954] Cal. Code Civ. Proc. § 335.1; *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[955] See *Romano v. Rockwell Int'l, Inc.* (1996) 14 C4th 479, 501, 59 CR2d 20, 33; *Aviles-Rodriguez v. Los Angeles Comm. College Dist.* (2017) 14 CA5th 981, 991, 222 CR3d 444, 452.
[956] *Banko v. Apple, Inc*; *Tameny v. Atlantic Richfield Co*; *Collier v. Sup.Ct. (MCA, Inc.*) (1991) 228 CA3d 1117, 1123-1124, 279 CR 453, 456; *Ferrick v. Santa Clara Univ.* (2014) 231 CA4th 1337, 1346-1347, 181 CR3d 68, 78.
[957] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.
[958] *Jie v. Liang Tai Knitwear Co., Ltd.* (2001) 89 CA4th 654, 660-661, (plaintiffs were allegedly fired for complaining to authorities that defendants were employing undocumented workers in violation of federal immigration laws)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

state and federal statutes which include criminal penalties, thus this Tamney claim for retaliation

due to reporting criminal conduct clearly implicates public policy.[959]

1314.   In *Collier*, the California Court of Appeal recognized that there is a compelling

and "*fundamental public interest in a workplace free from crime.*"[960] In *Banko v Apple*, the judge

cited the *Collier* holding when striking down Apple's claim it could fire employees for whatever

reason it wanted, even for reporting crimes.[961] The court explained that any laws captured in the

penal code are always assumed to reflect public policy. It is a violation of public policy for

Apple to discharge an employee from employment due to the employee reporting crimes.[962] In

*Bartley*, an employer's termination of an employee who was cooperating with the FBI's

investigation into her employer constituted a Tamny claim.[963]

1315.   In addition to the legal precedent, Apple's own Whistleblowing Policy

acknowledges that reports of "*criminal activity*", "*breaches of sanctions*", and "*attempts to cover

up any of these behaviors*" are whistleblower disclosures.[964] cooperated with an FBI bribery

investigation of his employer and its union.

1316.   See also the § 1102.5 section and it is incorporated here and this is incorporated

there.

---

[959] *Grant-Burton v. Covenant Care, Inc.* (2002) 99 CA4th 1361, 1372; *Sullivan v. Delta Air Lines, Inc.* (1997) 58 CA4th 938, 946.
[960] Banko v. Apple, Inc at 3.
[961] Banko v. Apple, Inc at 5.
[962] Banko v. Apple, Inc at 5.
[963] *Bartley v. University Asphalt Co., Inc.*, 129 Ill. App. 3d 231, 84 Ill. Dec. 539, 472 N.E.2d 499 (4th Dist. 1984), appeal allowed, (May 1, 1985) and judgment rev'd on other grounds, 111 Ill. 2d 318, 95 Ill. Dec. 503, 489 N.E.2d 1367, 121 L.R.R.M. (BNA) 2928, 103 Lab. Cas. (CCH) ¶ 55545, 106 Lab. Cas. (CCH) ¶ 55697 (1986).
[964] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

ii.     **Tamney: Reporting Allegations of Unlawful Acts to State and Federal Agencies; Testifying About Employer**

1317.   Gjovik reported and testified about topics including sex and disability discrimination, worker's health and safety laws, public health and safety laws, anti-corruption laws, and laws prohibiting fraud and misrepresentations – all of which are "fundamental" rights for the purpose of a *Tamney* claim.[965]

1318.   Gjovik reported CERCLA violations to Apple, to the US EPA, and to other agencies where Apple's misconduct resulted in several vectors of hazardous waste vapor exposure at 825 Stewart Drive. The US EPA has explained that, "*CERCLA sites are potential sources of air pollutant emissions that can affect public health or welfare.*"[966] Further, CERCLA retaliation claims are not precluded by US Department of Labor Jurisdiction.[967] Thus, this is another *Tamney* claim.

1319.   Gjovik reported to US EEOC and California DFEH (see below). Gjovik reported to NLRB. Gjovik reported to the US Department of Justice. All of these are protected.

1320.   Gjovik was discriminated against and terminated because she provided truthful testimony to government agencies that was adverse to Apple. In fact, Apple attempted to interrogate her and then terminated her the day before a federal affidavit. There is a Tamney

---

[965] *Hentzel v. Singer Co*. (1982) 138 CA3d 290, 298 (worker health and safety); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924 (public health and safety); *Collier v. Sup.Ct. (MCA, Inc.)* (1991) 228 CA3d 1117, 1123-1124 (antitrust and bribery laws); *Ferrick v. Santa Clara Univ.* (2014) 231 CA4th 1337, 1346-1347 (illegal and unethical business practices); *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.),* 16 C4th at 896 (sex discrimination); *City of Moorpark v. Sup.Ct. (Dillon),* 18 C4th at 1160-1161 (disability discrimination); Bus. & Prof.C. § 17200, Civ.C. § 1709; and Pen.C. § 484 (fraud).
[966] US EPA, *ARARs Fact Sheet: Compliance with the Clean Air Act and Associated Air Quality Requirements,* September 1992, OSWER 9234.2-22FS, pg2, https://www.epa.gov/superfund/contaminant-media-and-site-type-specific-remedy-guidance#air
[967] Devlyn v. Lassen Municipal Utility District, 737 F. Supp. 2d 1116, 1122 (E.D. Cal. 2010) – (nothing in the statute or in Ninth Circuit precedent requires that a plaintiff first apply to the Secretary of Labor for review in order to assert a claim under CERCLA...")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

claim for wrongful discharge when an employee is fired for providing truthful testimony.[968] *Deschene v. Pinole Point Steel Co* explains that "*since 1959, California has recognized that it is 'obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee" because the employee gives truthful testimony.*'[969]

1321.   It is also a violation of public policy for Apple to discharge an employee from employment due to the employee refusing to sign a liability waiver, as Apple did to Gjovik.[970]

### iii.   Tamney: Testifying to Agency and/or Legislative Committee

1322.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional or statutory right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[971] Termination of an employee most clearly violates public policy when it contravenes a statute forbidding termination for a specified reason.[972]

1323.   Cal. Gov. Code § 9414 protects employees from employer retaliation for the employee being a witness for a committee, or givin testimony to a committee as a witness or victim. The code says, any employer or person acting on behalf of an employer who, directly or indirectly, harasses any person employed by that employer, when the harassment is motivated by the fact that the employee is, was, or may be a witness before a committee, is guilty of a misdemeanor.[973]  It is also a misdemeanor to deprive, threaten, attempt to deprive, or request that a person not be employed, because the person was or might become a witness before a

---

[968] *Deschene v. Pinole Point Steel Co*., 76 Cal. App. 4th 33, 41, 90 Cal. Rptr. 2d 15, 21 (1999), as modified (Nov. 29, 1999); *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1086–1087, 4 Cal.Rptr.2d 874, 824 P.2d 680 [claim for wrongful discharge may arise for employee who gives truthful testimony].
[969] Id at 43; *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188, 344 P.2d 25.
[970] *Baker Pac. Corp. v. Suttles*, 220 Cal. App. 3d 1148 (1990).
[971] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found*. (2002) 27 C4th 1097, 1104.
[972] *Grant-Burton v. Covenant Care, Inc*. (2002) 99 CA4th 1361, 1372, 122 CR2d 204, 214.
[973] Cal. Gov. Code § 9414(b)

554

committee.[974] Any person who knowingly and maliciously prevents or dissuades (or attempts to prevent or dissuade) any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law – is guilty of a public offense and shall be punished by imprisonment.[975]

1324.   Apple knew Gjovik was talking to law makers about what occurred to her next to 3250 Scott Blvd, and secretly knew that it was Apple who was responsible for Gjovik's harm, despite Gjovik not knowing that fact yet, and Apple encouraging her to instead pursue Irvine Company. Apple knew Gjovik may testify at legislative committees about the air pollution (caused by Apple), and Apple undertook an effort to ensure Gjovik did not testify, and to also harass Gjovik because Gjovik may testify to a committee.

1325.   Apple also knew Gjovik was talking to politicians about its retaliation against Gjovik after her termination, including a State Senator, a US Representative, and a US Senator. If an employer has reason to think the employee plans to be a witness for an agency or committee, that is enough to make the employee's related conduct protected from retaliation.[976]

### iv.   Tamney: Discrimination, Harassment, and Retaliation due to Sex and Disability (Cal. FEHA; California Constitution, Article I, Section 8; Title VII/EEOC)

1326.   The California Fair Employment and Housing Act ("FEHA") makes it an unlawful employment practice to harass an employee based on the full range of protected characteristics.[977] Harassment involves various forms of verbal and physical conduct, sexual or nonsexual, that create a hostile or offensive working environment and is something that

---

[974] Cal. Gov. Code § 9414(a)(2)
[975] Cal. Penal Code § 136.1
[976] Floyd v. Arizona Public Service Co., 90-ERA-39 (Sec'y Sept. 23, 1994),
[977] Gov.C. § 12940(j)(1); Gov.C. § 12940(j)(1); see *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 C4th 121, 129, 87 CR2d 132, 137-138.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

communicates an offensive message to the harassed employee.[978] Employers are automatically liable for harassment committed by a manager or supervisor.[979] Employers may be responsible through negligence for harassment of the plaintiff by non-supervisor employees.[980] Employers may also be responsible via negligence for harassment of the plaintiff by non-employees.[981]

1327.   FEHA prohibits retaliation against persons who file a charge with the Civil Rights Department DFEH; testify, assist or participate in charge proceedings; request an accommodation under FEHA; oppose acts prohibited by FEHA ("opposition").[982] Submitting a charge to the agency is protected activity.[983]  The scope of the anti-retaliation provision under Title VII "extends beyond workplace-related or employment-related retaliatory acts and harm."[984] Retaliation can occur even after the employment relationship has ended, such as by refusing to give a job reference or giving an unjustified negative one.[985] Plaintiff need only prove that retaliatory animus was a substantial or motivating factor.[986]

1328.   FEHA creates a statutory duty for employers to accommodate protected characteristics including physical disability.[987] "Physical disability" includes a physiological condition that affects a body system and limits a major life activity or requires special

[978] 2 CCR § 11019(b); *Roby v. McKesson Corp.* (2009) 47 C4th 686, 706, 101 CR3d 773, 788.

[979] 2 CCR § 11019(b)(3).

[980] 2 CCR § 11019(b)(4).

[981] Gov.C. § 12940(j)(1); *Carter v. California Dept. of Veterans Affairs* (2006) 38 C4th 914, 930, 44 CR3d 223, 235-236; *M.F. v. Pacific Pearl Hotel Mgmt. LLC* (2017) 16 CA5th 693, 696-697, 701, 224 CR3d 542, 545, 549—(employer's duty triggered after drunk, nonemployee trespasser loitered on the premises, confronted and aggressively propositioned other employees for sexual favors and then sexually assaulted plaintiff)

[982] See Chin, Wiseman, Callahan & Lowe, Cal. Prac. Guide: Employment Litigation (TRG), Ch. 5 Part II.

[983] *George v. California Unemployment Ins. Appeals Bd.* (2009) 179 CA4th 1475, 1490, 102 CR3d 431, 444.

[984] *Burlington Northern & Santa Fe Ry. Co. v. White,* supra, 548 US at 67, 126 S.Ct. at 2414; see *Arias v. Raimondo* (9th Cir. 2017) 860 F3d 1185, 1191-1192—retaliation claim under Fair Labor Standards Act (29 USC § 201 et seq.) stated where attorney tried to deport employee who sued his client.

[985] 2 CCR § 11021(a)—employer must act impartially in recommending former employee for subsequent jobs; *Robinson v. Shell Oil Co.* (1997) 519 US 337, 345-346, 117 S.Ct. 843, 848-849

[986] George v. California Unemployment Ins. Appeals Bd., supra, 179 CA4th at 1492, 102 CR3d at 446.

[987] See Gov.C. §§ 12940(m), (n); A.*M. v. Albertsons, LLC* (2009) 178 CA4th 455, 463, 100 CR3d 449, 455.

education.[988] "Mental disability" includes any mental or psychological condition that limits a major life activity or requires special education.[989] when an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require the employee take a leave.[990]

1329.   Antidiscrimination laws such as FEHA "*unquestionably satisfy [the] requirement*" of a discharge being a violation of a ' *firmly established, fundamental, and substantial*" public policy.[991] Cal. Gov. Code § 12920 explains: "*It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination on account of … sex.").* Discharging an employee in retaliation for reporting discrimination based on sex and sexual harassment violates California public policy.[992] Termination in violation of public policy claims are not preempted or blocked by FEHA claims, as they can exist concurrently in the same lawsuit as a derivative claim.[993]

1330.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[994]

---

[988] Gov.C. § 12926(m); *County of Fresno v. Fair Employment & Housing Comm'n* (1991) 226 CA3d 1541, 1549, 277 CR 557, 562-563
[989] Gov.C. § 12926(j).
[990] 2 CCR § 11068(c).
[991] *Foley v. Interactive Data Co*rp., 47 Cal. 3d 654, 671 n.11 (1988)
[992] *Barton v. New United Motor Mfg., Inc*., 43 Cal. App. 4th 1200, 1208-09 (1996); *Zamora v. Sacramento Rendering Co*., United States District Court for the Eastern District of California, No. Civ. S-05-00789 DFL KJM (January 17 2007).
[993] *Ayala v. Frito Lay, Inc.,* 263 F. Supp. 3d 891, 913 (E.D. Cal. 2017).
[994] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found*. (2002) 27 C4th 1097, 1104.

557

1331.   Gjovik filed DFEH and EEOC claims on August 12 2021 and proceeded to testify and provide evidence, requesting a Right to Sue letter, which she was granted on September 9 2021, just hours before Apple fired her.[995] Apple retaliated against Gjovik for opposing Apple's discriminatory practices.[996]

### v.   Tamney: Victim of Crime; Apple's Concealment

1332.   Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.[997]

1333.   Under Cal. Lab. Code § 230(e), "*An employer shall not discharge or in any manner discriminate or retaliate against an employee because of the employee's status as a victim of crime or abuse, if the employee provides notice to the employer of the status or the employer has actual knowledge of the status*." An employee who is *"discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated or retaliated against in the terms and conditions of employment by their employer for reasons prohibited in subdivision …(e)… shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer, as well as appropriate equitable relief."*

---

[995]

[996] *Rojo v. Kliger* (1990) 52 C3d 65, 89 (Tameny claim based on gender discrimination and sexual harassment); *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)*, supra, 16 C4th at 885, (Because the FEHA expressly does not preempt common law tort claims, the FEHA's remedies are not exclusive and do not bar a tort claim for wrongful discharge in violation of public policy); *Phillips v. St. Mary Regional Med. Ctr.*, supra, 96 CA4th at 238 (Plaintiffs may rely on Title VII as a source of public policy for their state common law wrongful termination cause of action); *Carmichael v. Alfano Temporary Personnel* (1991) 233 CA3d 1126, 1132 (employee allegedly discharged for filing charges with EEOC that employer discriminated against women and minorities).

[997] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct. (Dillon)* (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.

Termination of an employee most clearly violates public policy when it contravenes a statute forbidding termination for a specified reason.[998]

1334.   Apple also terminated Gjovik due to Gjovik's complaints and protest about, and injuries due to Apple's fraudulent business practices.[999]  Apple also attempted to obtain a waiver of future claims from Gjovik through fraud, and which could be used by Apple to waive that fraud.[1000] "*One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.*"[1001]

### vi.      Tamney: Invasion of Privacy (Cal. Const. art. 1, § 1)

1335.   Apple's supposedly legitimate reason for terminating Gjovik, while false and pretextual, is an illegality itself. Apple claims it fired Gjovik for complaining about Apple surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording.[1002] Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to constitutional and statutory right to privacy, which are rights that benefits the public, are substantial and fundamental rights, and which were firmly established at the time of discharge.[1003] While this reason is pretextual and false, Apple's decision to use this reason as their excuse for terminating Gjovik, reveals Apple's animus against California employee privacy rights.

---

[998] *Grant-Burton v. Covenant Care, Inc.* (2002) 99 CA4th 1361, 1372, 122 CR2d 204, 214.

[999] *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 CA4th 338, 367, 112 CR3d 455, 481-482; California Bus. & Prof.C. § 17200; *Collier v. Sup.Ct. (MCA, Inc.)* (1991) 228 CA3d 1117, 1123-1124, 279 CR 453, 456.

[1000] Cal. Government Code § 12964.5; Emily Otte, Toxic Secrecy: Non-Disclosure Agreements and #metoo, 69 U. Kan. L. Rev. 545, 571 (2021) – ("Contract law provides limitations on the freedom to contract and refuses to enforce contracts that include duress, undue influence, unconscionability, mistake, and public policy.")

[1001] California Code, Civil Code - CIV § 1709.

[1002] This was Apple's written justification on March 3 2022 in the US Department of Labor *Gjovik v Apple* CERCLA, SOX, & OSH Act case, and was also implied by the threatening letter the O'Melveny & Myers law firm sent Gjovik on September 15 2021.

[1003] *Stevenson v. Sup.Ct. (Huntington Mem. Hosp.)* (1997) 16 C4th 880, 894; *City of Moorpark v. Sup.Ct.* (Dillon) (1998) 18 C4th 1143, 1159; *Silo v. CHW Med. Found.* (2002) 27 C4th 1097, 1104.

1336.   Gjovik has a legally protected privacy interest and a reasonable expectation of privacy, and the conduct by Apple was a serious invasion of privacy.[1004] Apple did discriminate against Gjovik for Gjovik's statements about privacy rights and protests about privacy invasions. Gjovik's termination was in violation of fundamental, basic, and substantial public policies of the State of California, including, but not limited to, section 1102.5 of the California Labor Code, section 17200 of the Business and Professions 2 Code, Article I Section 1 of the California Constitution, and Section 637.7 of the California Penal Code.

1337.   Article I, section 1 of the California Constitution declares: "*All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.*" Proposition 11 stated:

> The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.[1005]

1338.   Article 1 of the California Constitution expressly recognizes that all people have an inalienable right to privacy. (CAL. CONST. ART. 1, § 1). The California Supreme Court has said that an invasion of privacy claim under the California Constitution requires the "*serious invasion*" of a "*legally recognized privacy interest*" in circumstances where the plaintiff enjoyed

---

[1004] *Trujillo v. City of Ontario,* 428 F. Supp. 2d 1094, 1119–20 (C.D. Cal. 2006), aff'd sub nom. *Bernhard v. City of Ontario,* 270 F. App'x 518 (9th Cir. 2008).
[1005] RIGHT OF PRIVACY, California Prop. 11 (1972). https://repository.uclawsf.edu/ca_ballot_props/762

560

a "*reasonable expectation of privacy*".[1006] The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians.[1007] Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.[1008] This right to privacy impacts employment laws in many areas, from social media to surveillance to protection of medical information. All California employees are covered by California's constitutional right to privacy.[1009] California's constitutional right to privacy is "self-executing" and confers a judicial right of action on all Californians.[1010]

    1339.   The definition of the right of privacy is simply the "right to be left alone."[1011] It is also the value that is threatened by "snooping," the "monitoring" of personal conduct, and the "collecting" and "gather[ing]" of personal information.[1012] "It is clear that a right of action is implicit in the right of privacy."[1013] One's role in society as a student or employee does not dimmish one's right to privacy.[1014] An employer's use of cameras to monitor employee behavior at home can be particularly troublesome for employers. The Supreme Court clearly identifies the home as a bastion of intimacy and privacy.[1015] While most courts have ruled against an invasion of privacy based on video recording in the workplace, courts often draw the line in areas society

---

[1006] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal. 4th 1, 35-37 (1994).
[1007] *White v. Davis*, 13 Cal. 3d 757 (1975).
[1008] See *Annenberg v. Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [ 113 Cal.Rptr. 519]; 26 Hastings L.J. 481, 504, fn. 138 (1974).) *Porten v. University of San Francisco*, 64 Cal.App.3d 825, 829-30 (Cal. Ct. App. 1976)
[1009] *Employee Privacy Laws: California,* Practical Law State Q&A w-000-1572
[1010] *White v. Davis*, 13 Cal. 3d 757, 773 (1975).
[1011] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 81 (Cal. 1994) [Judge Mosk Dissent], citing: Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; cf. *Olmstead v. United States*, supra,277 U.S. at p. 478 [72 L.Ed. at p. 956] (dis. opn. of Brandeis, J.) [calling the right of privacy the "right to be let alone"]; Warren Brandeis, The Right to Privacy (1890) 4 Harv. L.Rev. 193, 193 [to similar effect].)
[1012] Id.
[1013] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 85 (Cal. 1994) [Judge Mosk Dissent].
[1014] *Hill v. Nat'l Collegiate Athletic* Ass'n, 7 Cal.4th 1, 93 (Cal. 1994) [Judge Mosk Dissent] ("The fact that student athletes are regulated and supervised and function in a communal environment does not prepare them to be watched by a stranger as they urinate.")
[1015]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

perceives to be intimate – it is within these areas of intimacy that individuals have a reasonable expectation of privacy, an invasion of which could easily be perceived as highly offensive.[1016]

1340.   Apple exploited Gjovik's identity without Gjovik's consent and for commercial purposes, in violation of the California's common law Right of Publicity.[1017] Apple's unauthorized use and appropriation of the Gjovik's identity and likeness was for Apple's commercial advantage and Gjovik suffered injury because of it.[1018] Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained about it, claiming they can fire any employees without notice for protesting these specific unfair business practices. An employee should be able to publicly protest an employer pestering them to 3D scan their ears and ear canals or to install an app on their iPhone called "Gobbler" that cannot be turned off and captures videos of faces with biometrics constantly, and which data is made immediately accessible to Apple Global Security and the Worldwide Loyalty enterprise. Apple's declaration that it can terminate employees for protesting these invasions is a "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right*." [1019]

1341.   The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. People have a right to conducting certain personal activities without observation, intrusion or interference, including human bodily functions normally performed in private.[1020] When an employee successfully refuses to submit to an employer's wrongful

---

[1016] See, *Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("In the home, our cases show, all details are show, all details are intimate details, because the entire area is held safe from prying government eyes.")
[1017] *Maloney v. T3Media, Inc*., 853 F.3d 1004, 1010 (9th Cir. 2017).
[1018] *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001); *Ross v. Roberts*, 166 Cal.Rptr.3d 359, 365, 222 Cal.App.4th 677, 684 (Cal. 2013)
[1019] *Hill*. at 37. *In re Google* at 829.
[1020] [*Hill v. National Collegiate Athletic Ass'n* (1994) 7 C4th 1, 40-41, 26 CR2d 834, 859; *Hansen v. California Dept. of Corrections* (ND CA 1996) 920 F.Supp. 1480, 1505 (applying Calif. law)—though prison guard agreed to drug test as condition of employment, guard did not agree to another employee's "deeply invasive" observation of her urination]

intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests.[1021]

1342.   Apple's use of Gobbler on Gjovik's phone also forced Gjovik to participate in Apple's unlawful acts, by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometric information of the public without their knowledge or consent. Apple's termination of Gjovik also stated if Apple was to warn people what was occurring on her phone, she would be fired, so consent from the public was made impossible by Apple's unfair business practices. The public had a reasonable expectation of privacy to their highly sensitive biometrics.[1022]

1343.   Apple violated Gjovik's right to privacy established by the California Constitution, by statutes, and by common law. Apple intruded into Gjovik's seclusion, Apple physically and constructively invaded Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor Code § 435.[1023] This statute prohibits the employer from videotaping these areas and strictly prohibits the use of that recording for "*any purpose.*" Here, Apple used those videos, which included biometric data, to develop its commercial products to sell to customers without actual

---

[1021] Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy § 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*

[1022] *In re Clearview AI, Inc. Consumer Privacy Litigation*, Memorandum Opinion and Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg20, (Feb. 14 2022).

[1023] Cal. Lab. Code § 435 "(a) No employer may cause an audio or video recording to be made of an employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order. (b) No recording made in violation of this section may be used by an employer for any purpose. This section applies to a private or public employer."

consent or notice to the people whose data was gathered, including *__bathroom videos__*.  Notably, even Google Glass refused to capture biometrics, and yet people were still "freaking out."[1024]

1344.   Apple intended to invade its employee's privacy. Whether it was to spy on them, to collect and hoard their data, or to exploit unpaid labor from them – Apple possessed intention and purpose in invading employee privacy, including Gjovik's privacy. Apple claims that employees 'consented' to even its most invasive violations of privacy, such as scanning ear canals, 24/7 biometrics gathering, sleep monitoring, or monitoring employee's ovulation and menstruation.

1345.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for FTC Act, and *Tamney* for ICCPR which are incorporated here.

### vii.   Tamney: California Privacy Rights Act

1346.   The California Privacy Rights Act ("CPRA"), states that "*It is the intent of the Legislature to ensure that personal information about California residents is protected*" and that "personal information" includes "*unique biometric data generated from measurements or technical analysis of human body characteristics… used to authenticate a specific individual… [including] a physical or digital photograph… used or stored for facial recognition purposes*."[1025]

1347.   The CPRA defines biometric information as "an individual's physiological, biological, or behavioral characteristics, including information pertaining to an individual's deoxyribonucleic acid (DNA), that is used or is intended to be used singly or in combination

---

[1024] Bridget A. Sarpu, *Google: The Endemic Threat to Privacy*, 15 J. High Tech. L. 97, 99–100 (2014); See Letter from Rep. Joe Barton, Co-Chairman, Bi-Partisan Privacy Caucus, to Larry Page, CEO, Google (May 2013), (providing an example of the attention Google Glass had been getting with a letter that was written by members of Congress to Google concerning Google Glass and possible constitutional violations). See also Richard Gray, *The Places Where Google Glass is Banned*, THE TELEGRAPH (Dec. 4, 2013), (listing the numerous places where Google Glass is already banned including in the car, cinemas, strip clubs, casinos, restaurants, hospitals, sports grounds, concerts, banks, and ATMs).
[1025] Cal. Civ. Code § 1798.81.5(a)(1) and (d)(1)(a)(vi).

with each other or with other identifying data, to establish individual identity. Biometric information includes, but is not limited to, imagery of the iris, retina, fingerprint, face, hand, palm, vein patterns, and voice recordings, from which an identifier template, such as a faceprint, a minutiae template, or a voiceprint, can be extracted. and keystroke patterns or rhythms, gait patterns or rhythms, and sleep, health, or exercise data that contain identifying information."[1026]

1348.   The CPRA also grants employees the right to limit the use and disclosure of "sensitive personal information" by their employers, which includes ""precise geolocation data" and "biometric information."[1027] Labor Code § 1051 has made it a crime for employers to share employee biometric information with a third-party.[1028] Further, "the right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution." [1029]

1349.   The CPRA warns that "*A business shall not discriminate against a consumer because the consumer exercised any of the consumer's rights under this title, including … retaliating against an employee… for exercising their rights under this title.*"

1350.   In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges that reports of "*privacy," "data protection breaches*", "*failure to comply with a*

---

[1026] CPRA 1798.140(c)

[1027] Proposition 24, 1798.125(A)(1),(E)

[1028] California Labor Code § 1051, (Amended by Stats. 1987, Ch. 77, Sec. 1.). ["… any person or agent or officer thereof, who requires, as a condition precedent to .. retaining employment, that an employee … be photographed … by any person who desires his or her photograph …for the purpose of furnishing the same or information concerning the same or concerning the employee … to any other employer or third person, and these photographs … could be used to the detriment of the employee …is guilty of a misdemeanor."]

[1029] *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 75-76 (Cal. 1994) [Judge Mosk Dissent], citing Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26-27, italics added in place of underscoring in original; *Olmstead v. United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.) [stating that the right of privacy is "the most comprehensive of rights and the right most valued by civilized men"].)

565

*legal or regulatory obligation*", "*violations of human rights*," and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[1030]

1351.   The GDPR Article 29 Working Party advised that the imbalance of power in the employment relationship makes voluntary consent questionable and, for most work-related data processing, the GDPR lawful basis relied upon "*cannot and should not*" be the employee's consent. [1031]

1352.   Apple's own website says: "*California consumers … have a right to opt out of the sale or sharing of their personal information by a business, and a right not to be discriminated against for exercising their California privacy rights*."[1032] Apple adds that it "*does not discriminate in response to privacy rights requests.*"[1033]

1353.   Apple also explains that "*under California law, biometric information includes any physiological or behavioral characteristics that can be used to establish your identity, such as a fingerprint or an image of your face from which a faceprint can be created*."[1034]

1354.   Also see § 1102.5 for § 435, *Tamney* for California Constitution Art. 1, *Tamney* for FTC Act, and *Tamney* for ICCPR which are incorporated here.

### viii.   The International Covenant on Civil and Political Rights (OHCHR): Article VII, Free Consent

1355.   Apple frequently invaded its employee's privacy in numerous ways. The issue raised by Apple here are Apple's repeated requests to 3D scan Gjovik's ears, conduct medical

---

[1030] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf
[1031] Joseph J. Lazzarotti and Maya Atrakchi, *Is Employee Consent under EU Data Protection Regulation Possible*?, National Law Review, February 27 2018, https://natlawreview.com/article/employee-consent-under-gdpr-possible
[1032] Apple Inc, *California Privacy Rights*, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/
[1033] Id.
[1034] Apple Inc, California Privacy Disclosures (last accessed 12/2/2023), https://www.apple.com/legal/privacy/california/ca-privacy-disclosures.html

studies and research on Gjovik's mind and body, and Apple's use of the Face "Gobbler"

application to gather 24/7 videos and biometrics of anyone around Gjovik's iPhone. Further, and

most importantly, also at issue is Apple's declaration that its studies and experiments are 'secret'

and any employee who 'leaks' those practices can be immediately terminated, even with open

government investigations and whistleblower charges against the employer.[1035]

1356.   Apple asked Gjovik to participate in invasive, oppressive, and humiliating

medical studies, anatomical studies, DNA tests, biometrics data collection, and other highly

personal studies. Apple's requests to scan Gjovik's ears in 2021 may have also included

intentionally gathering Gjovik's ear biometrics, but otherwise the data of Gjovik's ear anatomy

is also a biometric.[1036]

1357.   The INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS states: "*No one

shall be subjected to torture or to cruel, inhuman or degrading treatment … no one shall be

subjected without his free consent to medical or scientific experimentation.*"[1037]

1358.   Gjovik did not provide 'informed consent' to Apple monitoring her body while

she slept, or capturing her biometrics 24/7, when Apple did not disclose the details of the

experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then

repeatedly threatened Gjovik with termination if she was to share Apple's secrets, even to a

doctor or attorney (as was expressly written in the noted Deed Poll). The Wilson Directive

explains why Apple's posture is unlawful and unethical:

---

[1035] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).

[1036] Bhanu, B. (2011). *Ear Shape for Biometric Identification*. In: van Tilborg, H.C.A., Jajodia, S. (eds) Encyclopedia of Cryptography and Security. Springer, Boston, MA. https://doi.org/10.1007/978-1-4419-5906-5_738 ["Ear shape has played a significant role in forensic science and its use by law enforcement agencies for many years. After decades of research of anthropometric measurements of ear photographs of thousands of people, it has been found that no two ears are alike, even in the cases of identical and fraternal twins, triplets, and quadruplets. It is also found that the structure of the ear does not change radically over time."]

[1037] THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, 16 December 1966, General Assembly resolution 2200A (XXI); Ratified by the United States in 1992.

> "The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experiment subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment."[1038]

Apple's use of Gobbler on employees was not the same as performing experiments with chemical weapons on human subjects (though Apple essentially did that to Gjovik in her bedroom next to 3250 Scott Blvd), Apple's coercion of employees to use prototype hardware was not without physical risks.

1359.   In *Vietnam Veterans of Am. v. C.I.A.* this district found lack of informed consent, despite much paperwork proffered as such:

> "Volunteers participated without giving informed consent… because the risks of the experiments were not fully disclosed…test participants were required to sign a secrecy oath, which required their agreement that they would not divulge or make available any information related to …participation in the volunteer program…. [and] based on the form's language, participants erroneously believed that punishment … could occur even after their discharge…."[1039]

---

[1038] *Vietnam Veterans of Am. v. Cent. Intel. Agency,* No. C 09-0037 CW, 2013 WL 6092031, at *2 (N.D. Cal. Nov. 19, 2013), aff'd in part, rev'd in part sub nom. *Vietnam Veterans of Am. v. C.I.A.*, 791 F.3d 1122 (9th Cir. 2015), and aff'd in part, rev'd in part, 811 F.3d 1068 (9th Cir. 2016)

[1039] *Vietnam Veterans of Am. v. C.I.A.*, No. C 09-0037 CW, 2010 WL 291840, at *2 (N.D. Cal. Jan. 19, 2010).

While the nature of the C.I.A.'s study of use of biological and chemical weapons on human subjects was far more extreme than Apple's conduct, the policy rationale on informed consent is similar.

1360.   Knowledge of the capability of monitoring alone cannot be considered implied consent. [1040] Gjovik had a legally protected privacy interest and a reasonable expectation of privacy under the circumstances (everyone should be able to demand privacy in the bathroom), and Apple's conduct amounts to a serious invasion of Gjovik's protected interests.[1041] Gjovik has reasonable interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy') and interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')."[1042]

1361.   In fact, Gjovik was injured several times. One February 12 2019, the Face ID system blasted a bright light into her eyes, leaving her eyes sore and feeling like they had been burned. She had to notify an internal laser safety team who quickly contained her prototype iPhone in a special Pelican case with IRPF stickers.

1362.   Further, it should not be ignored that Apple's main "Live On" and "User Study" program was managed by a team reporting to Gjovik's Supervisor Dan West – the Senior Director who tried to pimp and pander Gjovik with indirect benefits and told her to quit Apple (with the role under John Basanese – the Director reporting to Dan West, who repeatedly complained to Gjovik that she was not married and did not have children).

[1040] *Watkins v. L.M. Berry Co.*, 704 F.2d 577 (11th Cir. 1983); see also *Sheinbrot v. Pfeffer,* 1995 WL 432608, at \*4 (E.D.N.Y. 1995) -- (the plaintiff's consent could not be implied from the fact that the defendant's multi-line phone system permitted the defendant to eavesdrop unless the privacy option was activated). *Hay v. Burns Cascade Co., Inc.*, 5:06-CV-0137 (NAM/DEP), 16 (N.D.N.Y. Feb. 18, 2009); *Ali v. Douglas Cable Communications,* 929 F. Supp. 1362, 1371 (D. Kan. 1996).

[1041] *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1024 (N.D. Cal. 2012) (citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994)); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal. 2020)

[1042] Hill v Nat'l at 35; In re Google at 829.

569

1363.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for California

Constitution Art. 1, and *Tamney* for FTC Act which are incorporated here.

### ix.      Tamney: FTC Act Biometric Consent Rules; Cal. Biz. & Pro. Code §§ 17200; Biometric Privacy Guide Posts

1364.   In addition to the privacy concerns, Apple is also unlawfully coercing employees

to provide personal data, including biometrics, which Apple can use for research and

development, including training machine learning models, without real consent or compensation,

and in violation of federal competition laws and state and federal data protection laws.

1365.   Apple is not only coercing its employees to let Apple harvest their personal data,

in highly personal situations and with omnipresent surveillance, but Apple is using that data to

build their software for consumer products. Further, the way Gobbler works, employees are then

also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's

termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn

consumers and others around them that Apple was capturing videos of them and their biometrics

for product development.

1366.   If a phone with Gobbler installed automatically captures video / photo / biometric

/ location data whenever it "thinks it sees a face" and Apple instructs employees to use only one

device for work and personal, and most people carry their phones with them everywhere they go,

and very few people cover the cameras of their phones – then these Apple employees were

capturing this highly sensitive data of non-employees in locations such as stores, banks, mass

transit, doctor's offices, gyms, schools, colleges, parks, and other frequently visited locations.

They would also be gathering these photos/videos/biometrics in their own homes and in other

people's homes, including wherever their phone is including bedrooms, bathrooms, and

nursery's. Data would still be gathered even if the employee left their phone sitting on a table

and left the room, and non-employees engaged in private conduct in that room without the employee present.

1367.   One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, use of toilets, use of showers, minors, and even naked minors – along with their biometric information.

### *FTC Act*

1368.   Section 5 of the FTC Act prohibits, among other things: unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable; and misleading statements to consumers.[1043] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

1369.   The FTC issued a statement recently on biometric privacy rights, explaining there are certain business practices that are always unlawful and there is never consumer 'consent' for those practices. They noted the FTC Act may be violated by "*surreptitious and unexpected collection of biometric information.*"[1044] FTC added, "*Injuries to consumers may also be compounded if there is no mechanism for accepting and addressing consumer complaints and disputes related to businesses' use of biometric information technologies.*"[1045] Like terminating an employee because they complained about the practices and tried to warn consumers?

---

[1043] US FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices*, Consumer Compliance Handbook, https://www.federalreserve.gov/boarddocs/supmanual/cch/200806/ftca.pdf
[1044] FTC, *FTC Warns About Misuses of Biometric Information and Harm to Consumers,* May 18 2023, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers
[1045] FTC, *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act,* https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf

1370.   Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the ICFs and NDAs for the program, and then told employees they cannot tell anyone what the program would now be doing on their iPhones. Like in *In re Arizona Theranos, Inc., Litig*, Apple was aware Gobbler is not a market-ready product (nor was it intended to be), and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyways while continuing to promise customers that Apple would never collect their biometrics.[1046] Apple's website states: "*Face ID data doesn't leave your device and is never backed up to iCloud or anywhere else. If you choose to enroll in Face ID, you can control how it's used or disable it at any time*."[1047]

1371.   In December 2023, the US FTC settled with Rite Aid over unlawful uses of biometrics collection and surveillance. US FTC complained, "The company did not inform consumers that it was using the technology in its stores and employees were discouraged from revealing such information."[1048] Rite Aid's unlawful conducted included employees using an app on their mobile phones to capture photos of customers that gathered the person's biometrics without notifying the person, let alone asking for consent.[1049] Rite Aid is now prohibited from using facial recognition technology for surveillance purposes for five years.

---

[1046] *In re Arizona Theranos, Inc., Litig.,* 308 F. Supp. 3d 1026, 1050–53 (D. Ariz. 2018) – ("If, as plausibly alleged, Walgreens knew that the Edison device was not market-ready, then Walgreens at least had constructive knowledge that the essential nature of the tiny blood draws was not legitimate testing. That Walgreens knew that Edison device was not market-ready supports the further allegation that Walgreens understood that research and development was the true purpose of the tiny blood draws. The Edison plaintiffs have stated plausible battery and medical battery claims against Walgreens.")
[1047] Apple, *About Face ID advanced technology*, (last accessed 12/16/2023), https://support.apple.com/en-us/102381
[1048] US FTC, Rite Aid Banned from Using AI Facial Recognition After FTC Says Retailer Deployed Technology without Reasonable Safeguards, Dec 19 2023, https://www.ftc.gov/news-events/news/press-releases/2023/12/rite-aid-banned-using-ai-facial-recognition-after-ftc-says-retailer-deployed-technology-without
[1049] US FTC v Rite Aid, Case No. , pg 6 ("Rite Aid obtained enrollment images by, among other methods, excerpting images captured via Rite Aid's closed-circuit television ("CCTV") cameras, saving

1372.   Further, as to Apple's "confidentiality" argument, the Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[1050] Information regarding an employer's illegal activities is not protectable by means of restrictive covenant.[1051] Facts relating to actual, alleged, or potential violations of the law are generally not protectable trade secrets. An employee's agreement not to disclose such information may, in some situations, be unenforceable as against public policy.[1052] This is applicable here.[1053]

### *Business and Professions Code §§ 17200*

1373.   California's Unfair Competition Law (Business and Professions Code §§ 17200) borrows heavily from section 5 of the Federal Trade Commission Act but has developed its own body of case law.[1054] Gjovik suffered an economic injury (not being compensated for labor, not being compensated for seizure of personal data, being terminated from her job, being false imprisoned with debilitating injuries caused by dangerous air pollution) and this was the result of Apple's Unfair Business Practices.[1055]  An employee fired even partly in retaliation for reporting her employer's piracy of computer software to her supervisor is a termination in violation of public policy.[1056]

---

[1050] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[1051] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret
[1052] *EEOC v. U.S. Steel Corp.,* 671 F. Supp. 351, 358 (W.D. Pa. 1987); *Chambers v. Capital,* 159 F.R.D. 441, 444 1995); *EEOC v. Astra, Inc.,* 94 F.3d 738, 745 (1st Cir. 1996)
[1053] *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 923, 180 CR3d 359, 366-367— (perception of whistleblowing is sufficient given the public policy behind then-existing Lab.C. § 1102.5(b), which is to encourage employees to report suspected violations of law.)
[1054] California Antitrust & Unfair Competition Law (Third), Volume 2: Unfair Competition (State Bar of California, 2003 Daniel Mogin & Danielle S. Fitzpatrick, eds.) at pg. 9.
[1055] *Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 322, (Cal. 2011); *Diaz v. Gates* (9th Cir. 2005) 420 F3d 897, 899 (en banc).
[1056] *Langford v. County of Cook,* 965 F. Supp. 1091 (N.D. Ill. 1997) – (Termination in violation of public policy found when employee harassed and fired after raising questions about the legality of employer's use of bootlegged and pirated software, even though also filed worker's comp claim prior to termination and WC claim was also a cause of the retaliatory termination.)

1374.   Disgorgement is appropriate here and there is precedent of FTC using disgorgement as a remedy with at least five cases since 2019, including against Amazon and Cambridge Analytica.[1057] The court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200,[1058] including the power to order restitution and/or disgorgement.[1059]

### Biometric Guideposts

1375.   The United States government considers biometric data to be "sensitive personal information" and believes that standards and regulations should be followed in any implementation of technology that uses biometric data.[1060] 18 U.S.C. § 1028 weighs biometric data as equal to private information like one's name or Social Security number.[1061]

1376.   A recent Illinois BIPA case warned about the extreme risk of biometrics collection, explaining that "*social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse.*"[1062] Like in the recent *in re Clearview AI Consumer Privacy Litigation* case, Apple is also "*capturing of faceprints" and "extracting private biometric identifiers from the faceprints*."[1063] *Biometric identifiers "are immutable, and once compromised, are compromised forever.*"[1064]

---

[1057] IAPP, *Algorithm disgorgement 'significant part' of FTC's AI enforcement strategy,* https://iapp.org/news/a/algorithm-disgorgement-significant-part-of-ftcs-ai-enforcement-strategy/
[1058] Cortez v. Purolator Air Filtration Product Co., 23 Cal.4th 163, 179 (2000).
[1059] California Antitrust & Unfair Competition Law, supra note 2, at 32-33; *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1276-1277 fn.9 (1992).
[1060] Bridget A. Sarpu, *Google: The Endemic Threat to Privacy*, 15 J. High Tech. L. 97, 118–20 (2014)
[1061] Id.
[1062] *In re Clearview AI, Inc. Consumer Privacy Litigation*, Memorandum Opinion And Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg8, (Feb. 14 2022).
[1063] Id.
[1064] Id; *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020) (quoting 740 ILCS 14/5).

1377.   The 2022 California bill "*SB-1189 - Biometric information*" captured similar prohibitions on selling or profiting from biometrics data as Illinois' BIPA, and was an expansion of the California Consumer Privacy Act to include protections based on BIPA.[1065] This bill was introduced to by the California Senator Gjovik had been working with since 2021.[1066] The legislative intent of the bill was noted as:

> This bill is motivated by concerns that without bolstered privacy protections, the widespread collection, disclosure, use, and retention of biometric information risks empowering discriminative business practices, degrading privacy, and imposing heightened security risks on consumers."[1067]

1378.   The definition of "Surveillance Technology" in San Francisco Admin. Code Chapter 19B includes "*any software, electronic device, system utilizing an electronic device… designed …to collect, retain, process, or share … electronic, visual,… biometric… or similar … capable of being associated with… any individual or group*."[1068] While the statute was directed at the local government's activities, this definition would easily encompass Apple's use of Gobbler on Gjovik's devices while Gjovik resided in and/or visited San Francisco.

1379.   Apple's Gobbler biometric practices facially violate GDPR and Apple knows it, as it warned employees on August 3, 2017, to <u>never</u> use these apps "*in France and Germany*."

1380.   The public policy on employee biometrics is clear with BIPA and GDPR; private entities are forbidden from selling or otherwise profiting from an employee's biometric identifier

---

[1065] California SB-1189 *Biometric information*. (2021-2022), Report of the Senate Judiciary Committee, Page 9-10
[1066] California SB-1189 *Biometric information*. (2021-2022), introduced by Senator Wieckowski.
[1067] California SB-1189 *Biometric information*. (2021-2022), Report of the Senate Judiciary Committee, Page 8
[1068] San Francisco Administrative Code Chapter 19B

or biometric information under any circumstances.[1069]  Apple's use of Gobbler and related

practices was unlawful and unethical, and Apple profited from its unjust conduct at Gjovik's

expense (economic and personal).[1070] *Tamney* claims have been found based on employee

complaints about invasions of employee privacy, complaints of violations of privacy of non-

employees, and complaints of violations of consumer protection laws.[1071]

1381.   Gjovik's opposition and complaints about Apple's coercive use of Gobbler to

secretly gather biometrics, coercion of employees into unpaid labor through aggressive

dogfooding (testing internal software/products as if it as a normal personal device), and Apple's

weird anatomical and medical experiments on employees, were protected conduct and Apple

knew it. In addition to the legal precedent, Apple's own Whistleblowing Policy acknowledges

that reports of "*failure to comply with a legal or regulatory obligation*", "*anti-competitive*

*conduct,*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures.[1072]

1382.   Also see § 1102.5 for § 435, *Tamney* for CPRA, *Tamney* for California

Constitution Art. 1, and *Tamney* for ICCPR – which are incorporated here.

### x.   Tamney: Protests about Misuse of ADA Procedures and Medical Clinics; Protest of Employee Health Data Collection

1383.   At some point prior to 2018, Apple is launched primary care clinics called AC

Wellness for employees and planned to "leverage its medical clinics as a way to test its growing

---

[1069] 740 ILCS 14/15(c); [1069] *In re Clearview AI, Inc. Consumer Privacy Litigation*, Memorandum Opinion And Order, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 21-cv-0135, pg13, (Feb. 14 2022).
[1070] *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); see also *Hart v. TWC Product & Tech. LLC*, 526 F.Supp.3d 592, 604 (N.D. Cal. 2021)
[1071] *Hejmadi v. Amfac, Inc.* (1988) 202 CA3d 525, 540 (Tamney claim established by reporting to management that company's practice of strip-searching suspected shoplifters violated state law); *Tameny v. Atlantic Richfield Co.* (1980) 27 C3d 167, 172 (Tamney claim established by reporting violations of consumer protection laws).
[1072] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

range of health services and products, which it is starting to roll out to consumers at large."[1073] Apple now runs its own primary-care medical service with Apple-employed doctors at its own clinics.[1074]

1384.   In 2020, Gjovik's Apple "AC Wellness" doctor was dismissive of Gjovik's medical issues due to the solvent exposure, and even tried to blame Gjovik's injuries as "anxiety." Employees may recover in tort for negligent aggravation of an initial industrial injury against an employer who assumes the capacity of medical care provider by undertaking to treat the employee's injury itself.[1075]

1385.   Gjovik had to pay a 'co-pay' when she visited "AC Wellness", which she did several times in 2020. It is illegal for a physician or medical facility to bill a worker if they know the injury is or may be work related.[1076]

1386.   In 2020, Apple also coerced Gjovik to participate in a blood pressure program in response to the blood pressure issues they were causing with their solvent and toxic gas fumes where they accessed her personal medical information and met with her repeatedly to suggest she made changes to her food and meditation to stabilize her solvent-driven blood pressure issues.

1387.   Gjovik had notified the head of Apple's medical clinics in early 2021 that other employees were injured by Apple's factory as well. On or around August 23 2021, Apple

---

[1073] Christina Farr, *Apple is launching medical clinics to deliver the 'world's best health care experience' to its employees*, CNBC, Feb. 27 2018, https://www.cnbc.com/2018/02/27/apple-launching-medical-clinics-for-employees.html

[1074] Rolfe Winkler, *Apple Struggles in Push to Make Healthcare Its Greatest Legacy*, Wallstreet Journal, June 16 2021, https://www.wsj.com/articles/apple-struggles-in-push-to-make-healthcare-greatest-legacy-11623832200

[1075] *Duprey v. Shane*, 39 Cal.2d 781, 249 P.2d 8 (Cal. 1952); *Alander v. Vacavalley Hospital,* 49 Cal.App.4th 1298, 1305 (Cal. Ct. App. 1996) (see, the dual capacity exception to the exclusive remedy provision set forth in section 3602.)

[1076] California Labor Code section 3751(b)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

suddenly decided to cancel the blood pressure program it made Gjovik participate in, called "HealthHabit".[1077]

1388.   Requiring an employee "to disclose medications that he or she is currently taking" or to authorize the employer "to acquire information concerning the internal state of the tested individual's body" intrudes upon privacy interests protected by the state Constitution.[1078]

### xi.   Foley/Banko: Breach of Implied Contract: Good Cause Required

1389.   Gjovik worked for Apple for six years and five months. (In Foley, 6 years and 9 months was sufficient time for conduct to occur on which to base findings of implied-in-fact contract not to terminate arbitrarily.[1079]

1390.   Gjovik received numerous raises, commendations, positive evaluations, and promotions. Apple took actions to assure Gjovik of continued employment. Under the *Foley* factors, and like in *Banko v Apple*, Apple's words and/or conduct made it reasonable for Gjovik to believe that the employer promised to only discharge or demote her for good cause.

1391.   For instance, Apple's personnel policies and practices include development plans that are to be issued prior to termination. In her 2017 annual review West told Gjovik, he" appreciates *her willingness to speak truth to authority" and told her to "keep doing this and good things will continue to follow."* This was a promise to Gjovik that if she reported unethical and unlawful conduct, and held leaders to account, that she would have continued employment at Apple. The employer's words or conduct, on which an employee reasonably relied, gave rise to that specific understanding.[1080] The independent consideration given by the employee (e.g., a

---

[1077] Kat Jerich, *Apple scaling back employees-only virtual care app, says Insider,* Healthcare IT News, August 23 2021, https://www.healthcareitnews.com/news/apple-scaling-back-employees-only-virtual-care-app-says-insider

[1078] *Loder v. City of Glendale* (1997) 14 C4th 846, 896, 59 CR2d 696, 728; see *Norman-Bloodsaw v. Lawrence Berkeley Laboratory* (9th Cir. 1998) 135 F3d 1260, 1271 (applying Calif. law).

[1079] *Foley v. Interactive Data Corp.,* supra, 47 C3d at 681, 254 CR at 226.

[1080] *Guz v. Bechtel Nat'l, Inc.,* supra, 24 C4th at 342, 100 CR2d at 369 (emphasis in original); *Faigin v. Signature Group Holdings, Inc.* (2012) 211 CA4th 726, 749, 150 CR3d 123, 142—employee need only

covenant to "keep…speaking[ing] truth to authority") proves the existence of an implied contract not to terminate without cause:

1392.   Apple's policies further supported West's promise. Apple's website says: "*Our employees understand they have a responsibility to speak up when they see or hear of a violation of our policies or the law.*"[1081] Gjovik was told that not only is she required to report policy and legal violations, but she was also promised if she did so, she would be rewarded.

1393.   Apple did not have good cause to discharge Gjovik for misconduct and did not conduct an appropriate investigation before terminating Gjovik. Apple claimed its investigation into Gjovik began on Aug 28-29 2021, and implied that it knew then it would fire Gjovik. Apple hid the investigation into Gjovik and attempted to coerce Gjovik into phone calls under the premise Apple was investigating her concerns (not her). Apple contacted Gjovik twice after it supposedly started the investigation into Gjovik, both times pretending it was still investigating Gjovik's concerns, not that it was investigating Gjovik. Gjovik was already worried about bad faith conduct by Apple and requested communications to be in writing and if not, that Business Conduct review her request and decide on the matter instead of the Employee Relations investigator.

1394.   Instead, Apple sent a "Workplace Violence and Threat Assessment" interrogator to terminate Gjovik knowing before he contacted her that he would fire her. Gjovik asked the interrogator to please explain what the accusations against her are, but the interrogator refused to respond and instead Gjovik received a vague notice of termination from her VP a few hours later.

---

prove implied promise was made, not that employer intended to fulfill promise; see also *Foley v. Interactive Data Corp.*, supra, 47 C3d at 681, 254 CR at 226; *Stillwell v. Salvation Army* (2008) 167 CA4th 360, 380-382, 84 CR3d 111, 127-128.

[1081] Apple Inc, Compliance and Ethics, "Speak Up", (last visited 12/2/2023), https://www.apple.com/compliance/speak-up/

1395.   Apple's termination of Gjovik was not honest, there was no appropriate investigation, and the termination was arbitrary and pretextual. Gjovik did not willfully breach a job duty, did not continually neglect her job duties, nor was she prevented from performing her job duties due to continued incapacity.[1082] Apple did not act in good faith, the investigation was not reasonable, and Apple did not give Gjovik notice of the claimed misconduct or an opportunity for Gjovik to answer the charge of misconduct before making the decision to discharge Gjovik. Apple's practices were unlawful under California's Unfair Competition Law because it violated a rule contained in other statutes and combined with Gjovik's good-cause status, and the other issues noted above, Apple's termination of Gjovik was a violation of public policy.[1083]

1396.   Apple also breached their Duty of Good Faith and Fair Dealing under the implied contract and written contract, by terminating Gjovik only days before annual bonus and salary increase, and only weeks before her next RSU vesting, in order to frustrate Gjovik's right to receive benefit from her agreement with Apple through opportunistic use of its corporate power. The implied covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which he or she was clearly entitled, such as compensation already earned. [1084] The review year ended on June 30 2021, thus Gjovik's bonus was already earned.

1397.   Further, Apple put Gjovik in a position where she was obligated by Apple policy to report issues but was punished for doing so, similar to *Banko v Apple*. Finally, Apple also

---

[1082] *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 57 [100 Cal.Rptr.2d 627]. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 100 Cal. Rptr. 3d 296 (Cal. Ct. App. 2009); *Cotran v. Rollins Hudig Hall Internat., Inc.,* 17 Cal.4th 93, 107 (Cal. 1998).

[1083] Soil Retention Products, Inc. v. Brentwood Industries, Inc., S.D.Cal.2021, WL 689914 (2021).

[1084] *Guz v. Bechtel Nat'l, Inc.,* supra, 24 C4th at 353, 100 CR2d at 377, fn. 18 (dictum); see McCollum v. XCare.net, Inc. (ND CA 2002) 212 F.Supp.2d 1142, 1153, 1155—summary judgment denied due to factual issues whether purpose of termination was to "frustrate" employee's "legitimate expectations" of receiving disputed commissions.

fabricated the "evidence" it cited to justify terminating Gjovik, including inciting employees to file meritless complaints against Gjovik after the fact.[1085]

1398.   There is at four-year statute of limitations for written contracts and a two-year statute of limitations for oral contracts to file a claim in court.[1086]

**G.   NUISANCE**

1399.   Gjovik claims harm caused by Apple due to Apple's creation of a private nuisance, continuing nuisance, and absolute nuisance / nuisance per se.  A "nuisance" is *"[a]nything which is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property …"*[1087]

### i.   Nuisance (Cal. Civil Code § 3479)

1400.   Apple created and maintained a nuisance that was demonstrably injurious to health, that was indecent and offensive to the senses, and which obstructed the free use of property.[1088] In addition to being a ultrahazardous activity, Apple's actions were intentional, reckless, and negligent.[1089] Apple's interference would (and did) substantially annoy or disturb persons of normal health and sensibilities in the same community.[1090]

1401.   On or about 2015, Apple (a.k.a. alias: "Aria") constructed, or caused to be constructed, exhaust vents and open tank near the common border line of defendant's and Gjovik's property. The exhaust vents were maintained in a negligent and unskillful manner. Apple exhausted through the vents and emptied into the open tank various materials or

---

[1085] *Town of Cheswold v. Vann,* 9 A.3d 467, 473 (Del. 2010).
[1086] Cal. Code Civ. Proc. § 337, 339
[1087] Cal.Civ.C. § 3479
[1088] Id.
[1089] *Tint v. Sanborn* (1989) 211 CA3d 1225, 1228, 259 CR 902, 903; *Sturges v. Charles L. Harney, Inc.;* (1958) 165 CA2d 306, 318, 331 P2d 1072, 1079.
[1090] *San Diego Gas & Elec. Co. v. Sup.Ct. (Covalt),* supra, 13 C4th at 938, 55 CR2d at 752; see also Civ.C. §§ 3479-3481; Rest.2d Torts § 821F.

substances that cause a foul, obnoxious, and disagreeable odor and pollute the atmosphere of Gjovik's property.

1402.   Apple has conducted their business in such a manner as to constitute a nuisance in that their silicon fabrication plant emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property, and collect Gjovik's chattel property, and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property. Apple created the nuisance as the result of unnecessary, unreasonable, and injurious methods of operation of their business.

1403.   Gjovik controlled her apartment at 3390 Octavius Drive (the apartments at 3255 Scott Boulevard). Apple created a condition to exist that was harmful to health, offensive to the sense, and/or obstructed the free use of property as to interfere with the comfortable enjoyment of that property. Apple's conduct was intentional, reckless, and/or negligent. The condition Apple created substantially interfered with Gjovik's use and/or enjoyment of land, and an ordinary person would be reasonably annoyed by the condition. Gjovik did not consent to a defendant's conduct and Gjovik was harmed. Apple's conduct was a substantial factor in causing Gjovik's harm and the seriousness of the harm outweighs the social utility of the Apple's conduct.[1091] Apple damaged Gjovik's property and injured Gjovik's person. Due to Apple's actions, Gjovik lost use of much of her property.[1092]

1404.   The condition created by Apple interfered with Gjovik's use and/or enjoyment of her apartment. An ordinary person would reasonably be annoyed or disturbed by Apple's conduct and Gjovik did not consent to Apple's conduct. Gjovik was harmed and Apple's actions

---

[1091] Lussier v. San Lorenzo Valley Water Dist. (1988) 206 Cal.App.3d 92, 100.
[1092] Mangini v. Aerojet-General Corp. (Mangini II), 12 C4th at 1103, 51 CR2d at 282; Shamsian v. Atlantic Richfield Co., 107 CA4th at 982, 132 CR2d at 647.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

and omissions was a substantial factor in causing Gjovik's harm and the seriousness of the harm outweighs any public benefit of Apple's conduct.

1405.   Gjovik suffered harm because Apple created a nuisance. Gjovik leased an apartment at 3390 Octavius Drive (aka 3255 Scott Blvd). Apple by acting and failing to act, created a condition or permitted a condition to exist that was harmful to health, offensive to the senses, was an obstruction to the free use of property, and was a fire, explosion, and poisoning hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, and/or reckless. The condition Apple created and permitted to exist was the result of abnormally dangerous activity for which there should also be strict liability. [1093]

### ii.      Factories, Hazardous Waste, & Air Pollution

1406.   Chemical waste disposal sites and sewerage treatments plants are often found to be nuisances.[1094] There are many nuisances cases related to hazardous waste and chemical pollution.[1095]  Further, California Health & Safety Code § 5411 expressly prohibits the discharge of waste in a way "which will result in contamination, pollution, or nuisance."[1096]

1407.   An actionable nuisance may include air or water pollution, excessive noise or foul smell, hazardous waste disposal or any other form of environmental pollution or degradation

---

[1093] *Lussier*, supra, 206 Cal.App.3d at p. 100; see Rest.2d Torts, § 822).
[1094] Village of Wilsonville v. SCA Services, Inc. 86 Ill.2d 1 (1981); Varjabedian v. City of Madera (1977) 20 C3d 285, 293-294, 142 CR 429, 435; (Against a sewage treatment plant for interference caused by noxious odors.)
[1095] See, e.g., *Shamsian v. Atlantic Richfield Co.* (2003) 107 CA4th 967, 979, 132 CR2d 635, 644 (leaking underground petroleum tanks); *KFC Western, Inc. v. Meghrig* (1994) 23 CA4th 1167, 1182, 28 CR2d 676, 685 (same); *Newhall Land & Farming Co. v. Sup.Ct. (Mobil Oil Corp.)* (1993) 19 CA4th 334, 341-345, 23 CR2d 377, 381-383 (soil contamination resulting from former landowners' operation of natural gas processing plant); *Team Enterprises, LLC v. Western Investment Real Estate Trust* (9th Cir. 2011) 647 F3d 901, 912; *Branch v. Western Petroleum*, 657 P.2d 267 (Utah 1982) (nuisance per se for violation state statute in hazardous waste case).
[1096] California Code, Health and Safety Code - HSC § 5411 ("No person shall discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance.")

which interferes with the reasonable use and enjoyment of a person's property-related rights.[1097] If one has created an actionable nuisance, it is no defense that he acted in compliance with a permit or an applicable regulation, since neither a permit nor a regulation can confer a license to cause injury to the person or property rights of another.[1098]

1408.   Like in *King v Columbian Carbon*, Apple is continuously casting pollution upon the property of the owner and tenants of the Santa Clara Square Apartments, as it knew it would do when it constructed its plant. It knew then, as it knows now, that so long as it would continue its operation the pollution would continue to fall, not by accident or mishap, but in conformity with knowledge that it had before the erection of the plant. Apple should be presumed to have intended the natural known, and reasonable consequences of its act.[1099] As ex-Commissioner of the New Jersey DEP, Lisa Jackson has said, "*Pollution prevention encourages the reduction or elimination of industrial waste at the source through the use of better management practices... pollution prevention protects the environment and public health*."[1100]

1409.   Semiconductor fabrication plants are long known to be dangerous for workers and those exposed to the chemicals used. Defendants knew or should have known that the chemicals released can cause reproductive hazards, including spontaneous abortions, stillbirths, malformations, birth defects, early childhood cancers, and other neurological, developmental, and degenerative conditions.[1101]

1410.   Apple released chemicals categorized by Cal. Code Regs. Tit. 17, § 93000 as "Substances Identified as Toxic Air Contaminants" of which there is no safe level of exposure

---

[1097] *Village of Wilsonville v. S.C.A. Services*, 77 Ill.App.3d 618, 396 N.E. 2d 552 (1979), aff'd 82 Ill. 2d 1, 426 N.E. 2d 824 (1981) (operation of a hazardous waste); *Branch v. Western Petroleum*, 657 P.2d 267 (Utah 1982) (nuisance per se for violation state statute in hazardous waste case).
[1098] See, *Brown v. Petrolane, Inc.*, 102 Cal.App.3d 720, 162 Cal. Rptr., 551 (1980).
[1099] *King v. Columbian Carbon Co.*, 152 F.2d 636, 640 (5th Cir. 1945)
[1100] New Jersey DEP, *DEP ANALYSIS DEMONSTRATES BENEFITS OF POLLUTION PREVENTION*, March 21 2007, https://www.nj.gov/dep/newsrel/2007/07_0014.htm
[1101] *Molina v. on Semiconductor Corp.*, C.A. No. N10C-12-267 JRJ (Del. Super. Ct. Mar. 27, 2013)

without "significant adverse health effects." These chemicals included: Benzene, Methylene Chloride, Chloroform, Vinyl Chloride, Formaldehyde, 1,3-Butadiene.[1102] Apple released into the air chemicals categorized under 42 U.S.C. Section 7412(b) as "Hazardous Air Pollutants" and Cal. Code Regs. Tit. 17, § 93001 as "Hazardous Air Pollutants Identified as Toxic Air Contaminants" including: Benzene, Chlorine, Chloroform, Cresol, Ethylbenzene, Formaldehyde, Hexane, Phenol, Phosphine, Phosphorus, Toluene, Vinyl Chloride, Arsine. [1103]

1411.   Under RCRA, corporations engage in "knowing endangerment" when they violate RCRA requirements concerning the transport, treatment, storage, disposal, or export of hazardous wastes; and they knowingly place someone in imminent danger of death or serious bodily injury.[1104]

1412.   Apple not only knew what it was doing, but the emissions were a business decision in order to be able to report reduced waste sent to landfills. Apple could emit chemicals without auditing but could not sent waste out as easily. So, as Apple's hazardous waste output peaked in 2018, Apple began finding ways to dispose of that waste extralegally including through air emissions and flushing it into the sewers. Apple's 2020 Environmental Responsibility Report says: "*In 2018, we launched our commitment to send zero waste to landfill for our offices, retail stores, and data centers. That commitment aims to eliminate waste sent to landfills from these sites.*"[1105] Apple added, "*Hazardous waste generated at Apple facilities is another challenge we're actively addressing*" without further elaboration.[1106]

---

[1102] Cal. Code Regs. Tit. 17, § 93000 - Substances Identified as Toxic Air Contaminants
[1103] Cal. Code Regs. Tit. 17, § 93001 - Hazardous Air Pollutants Identified as Toxic Air Contaminants
[1104] *Ashley Crooks et. al.,* Environmental Crimes, 51 Am. Crim. L. Rev. 1051, 1125–30 (2014)
[1105] Apple, Environmental Responsibility Report, 2020, https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2020.pdf
[1106] Id.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                           DECEMBER 21 2023

### iii.     Nuisance Per Se / Absolute Nuisance

1413.   Further, Apple's knowing and intentional releases of hazardous waste into the air and water trigger strict liability under the nuisance claim, or "nuisance per se".[1107]

1414.   Now and since 2015, defendant's officers, agents, and employees knew or should have known that the factory emitted and is emitting the gases and particulates referred to and knew or should have known that those emissions would injure the health of persons living near the factory and cause such conditions as plaintiff's. In September 2020, Gjovik informed one of defendant's employees overseeing the silicon fabrication factory, of Gjovik's injuries caused by emissions. Nevertheless, defendant's officers, agents, and employees did nothing to reduce or eliminate the emissions. On the contrary, such persons authorized production of the objectionable emissions.

1415.   A Hazardous Waste manager at 3250 Scott Blvd in 2020, Ryan Spartz, wrote in his LinkedIn profile for the time: "*Continued waste profile project ...working with account manager and adding additional TSDFs to find cost savings for client. Research and implement other cost-saving methods ... come up with innovate methods for disposal of unique wastes.*" Spartz did not elaborate on his hazardous waste disposal "innovations."

1416.   As with the Love Canal (*US v Hooker Chemicals*) case where 21,800 tons of toxic waste was released into the waters, and here where at least 7.8 tons of toxic waste was released into the air, the activities are a nuisance per se.[1108] "If the abnormally dangerous activity involves a risk of harm to others that substantially impairs the use and enjoyment of neighboring lands or interferes with rights common to all members of the public the impairment or interference may be actionable on the basis of a public or a private nuisance. The rule of strict

---

[1107] *Copart, Monarch Chemicals, and Amax, Inc. v. Sohio Prods. Co.*, 121 Misc.2d 814, 469 N.Y.S.2d 282 (1983) (sustaining nuisance cause of action on theory of strict liability for abnormally dangerous activity, and that it "may reasonably be deemed the case [that the activity is inherently dangerous] where the disposal of hazardous wastes are involved...." 479 N.Y.S.2d at 1014.)
[1108] United States v. Hooker Chemicals & Plastics Corp., 722 F. Supp. 960, 966–67 (W.D.N.Y. 1989)

liability stated in § 519 frequently is applied by many courts in these cases under the name of "absolute nuisance," even when the harm that results is physical harm to person, land or chattels."[1109]

### iv.    Continuing Nuisance

1417.    The statute of limitations for an ordinary nuisance claim is three years.[1110] Where a nuisance is continuing, plaintiffs may file an action for continuing nuisance at any time before the nuisance is abated.[1111]

1418.    The classic example of a continuing nuisance is an ongoing disturbance caused by noise, vibration, or foul odor.[1112] With a continuing nuisance, every continuation of the nuisance (or trespass) gives rise to a separate damages claim and an action alleging a continuing nuisance may be maintained at any time before the nuisance is abated or within three years thereafter.[1113] With respect to a permanent nuisance, the statute of limitations commences to run on the date plaintiff discovered, or should have discovered, the contamination.[1114]

1419.    The Superfund Amendments and Reauthorization Act of 1986 ("SARA") which entitled "State Procedural Reform" and which purports to preempt state statutes of limitation by establishing a "federally required commencement date" of the date of discovery, i.e., when "the plaintiff knew (or reasonably should have known) that the personal injury or property damage is

---

[1109] Restatement (Second) of Torts § 520 (1977)
[1110] Cal. Code Civ. P § 338(b); *California Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners*, NO. CIV. S-02-2389 LKK/DAD, 16 (E.D. Cal. Aug. 16, 2007)
[1111] *Jordan v. City of Santa Barbara*, 46 Cal. App. 4th 1245, 1256 (1996) ("[P]ersons harmed by [continuing nuisance] may bring successive actions for damages until the nuisance is abated"); See *Chevron U.S.A. v. Superior Court*, 44 Cal. App. 4th 1009, 1017 (1994) (finding that where a three year statute of limitations applies, an action for continuing nuisance is timely if it "has been filed before abatement of the nuisance . . . or within three years after abatement").
[1112] Mangini v. Aerojet-Gen. Corp., 230 Cal. App. 3d 1125, 1146, 281 Cal. Rptr. 827, 840 (Ct. App. 1991)
[1113] Mangini v. Aerojet-General Corp. (Mangini II), supra, 12 C4th at 1093, 51 CR2d at 275; Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 C3d 862, 869.
[1114] *Hicks v. Hines Inc.*, 826 F.2d 1543 (6th Cir. 1987); *Gehr v. Baker Hughes Oil Field Operations, Inc*, 165 CA4th at 667, 81 CR3d at 224.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

referred to ... or caused or contributed to by the hazardous substance or pollutant or contaminant concerned."[1115]

1420.   An action alleging a continuing nuisance may be maintained at any time before the nuisance is abated or within three years thereafter.[1116] The nuisance was continuing through at least 2023, and Gjovik was actively exposed and harmed by the nuisance within three years prior to filing the complaint.

### v.   Enforcement

1421.   The violation of a statute may raise a presumption that the violator was negligent. The presumption arises if (1) defendant violated a statute; (2) the violation proximately caused plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute was designed to prevent; and (4) plaintiff was among the class of persons the statute was intended to protect.[1117]

## H.   INFLICTION OF EMOTIONAL DISTRESS

1422.   Apple inflicted IIED and/or NIED upon Gjovik in California from the start of the limitations period until Gjovik left California on August 31, 2021, at which point, Apple then inflicted IIED and/or NIED upon Gjovik starting once she arrived in New York on September 1 2022. Apple's extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, or negligently causing, emotional distress – actually and proximately caused Gjovik to suffer severe or extreme emotional distress due to Apple's conduct.[1118] Apple's conduct had no legitimate purpose.

---

[1115] Superfund Amendments and Reauthorization Act of 1986 ("SARA") Section 203; CERCLA Section 309

[1116] Mangini v. Aerojet-General Corp. (Mangini II), supra, 12 C4th at 1093, 51 CR2d at 275; Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 C3d 862, 869, 218 CR 293, 297; and see Gehr v. Baker Hughes Oil Field Operations, Inc., supra, 165 CA4th at 667, 81 CR3d at 224.

[1117] Cal.Ev.C. § 669; *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 CA4th 1502, 1526-1527, 119 CR3d 529, 546-547.

[1118] *Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998). *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012)

1423.   Apple caused Gjovik to suffer "*emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.*"[1119] Apple's conduct was extreme and outrageous, and it exceeds all bounds of decency usually tolerated by a decent society – and is of a nature which is especially calculated to cause, and does cause, mental distress.[1120]

1424.   An employer is liable for the willful and malicious torts of its employees committed in the scope of employment.[1121]

### i.   Retaliation & Interrogation

1425.   Generally, wrongfully motivated personnel decisions are not considered conduct "*beyond the bounds of human decency*" for the purposes of an IIED claim.[1122] However, Punitive damages are still often awarded for employment retaliation in cases of "*systematic courses of retaliation*" by creating an "*intimidating, hostile, and offensive working environment.*"[1123]  In addition, certain fact patterns of employer retaliation and coworker harassment have been found sufficient for a claim of IIED.[1124]

1426.   Apple abused its position of power over Gjovik and exploited that power differential in its campaign of terror against Gjovik. Apple has an extreme amount of power and

---

[1119] *Hughes v. Pair*, 46 Cal.4th 1035, 1051 (Cal. 2009); *Potter v. Firestone Tire Rubber Co*, 6 Cal.4th at p. 1004.

[1120] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 617 (Cal. Ct. App. 1989); Prosser, Law of Torts (4th ed. 1971) p. 54; *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 229-30 (Cal. Ct. App. 1983).

[1121] *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [ 256 Cal.Rptr. 766, 769 P.2d 948]. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 618 (Cal. Ct. App. 1989)

[1122] *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80; *Koerber v. Encyclopedia Britannica*, Inc., No. B312047, 9 (Cal. Ct. App. Jul. 13, 2022)

[1123] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 620 (Cal. Ct. App. 1989)

[1124] *Schoen v. Freightliner LLC*, 224 Or. App. 613, 199 P.3d 332 (2008); *Robel v. Roundup Corp.*, 148 Wash. 2d 35, 59 P.3d 611, 13 A.D. Cas. (BNA) 1557 (2002); *Hall v. May Dep't Stores Co*., 292 Or. 131, 138, 637 P.2d 126, 131 (1981); *Harris v. Procter & Gamble Cellulose Co*., 73 F.3d 321, 11 I.E.R. Cas. (BNA) 605 (11th Cir. 1996) (IIED allegation sufficient when employee suffered continuous harassment, threats of termination, humiliation, supervisory indifference, and false accusations after plaintiff reported allegedly dangerous workplace conditions to defendant).

control over Gjovik and its other employees,  as one of the largest and most powerful companies

in the history of the world, and as such their deranged conduct should be deemed to be

outrageous and the Gjovik's emotional reaction to be deemed severe.[1125]

1427.   Gjovik began complaining to Apple around July 2021 that they were inflicting

emotional distress (IIED) upon her. Starting in April 2021, Apple pressured Gjovik to file

complaints and request that Gjovik did not feel comfortable filing including a worker's

compensation claim for a fainting spell three years prior, an ADA accommodation request for

vapor intrusion exposure, and FMLA leave in response to her manager's retaliation against her.

Gjovik had nonconsensual investigations opened on her behalf with the purpose of agitating her

management and coworkers, and thus pressuring her to quit. The farcical investigations found no

issues (despite no investigation) and thus positioned Gjovik as being unreasonable despite never

wanting the investigations.

1428.   Further, Okpo pressured Gjovik to meet with him on a video chat without

witnesses on September 3 and September 7, supposedly to discuss a second investigation into

Gjovik's concerns, despite Gjovik's continued protests to keep things in writing, and ultimately

Okpo's requests were fraudulent as he apparently wanted to interrogate Gjovik but intended to

deceive her in order to get her to join a video call. Employer conduct that is deceitful and certain

to cause harm, or deceitful with intent to cause harm, can support an IIED claim.[1126]

1429.   Finally, on September 9 2021, Gjovik was contacted by a "Workplace Violence

and Threat Assessment" investigator demanding to get on the phone with Gjovik 'within the

---

[1125] *Graham v. Commonwealth Edison Co.,* 742 N.E.2d 858, 866-68 (Ill. App. Ct. 2000).

[1126] See, *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 4 Media L. Rep. (BNA) 2537 (3d Cir. 1979) (applying Pennsylvania law); *Corkery v. SuperX Drugs Corp*., 602 F. Supp. 42, 36 Fair Empl. Prac. Cas. (BNA) 1815, 37 Empl. Prac. Dec. (CCH) *P 35408 (M.D. Fla. 1985) (applying Florida law); M. B. M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681, 118 L.R.R.M. (BNA) 2925 (1980); *Rulon-Miller v. International Business Machines Corp*., 162 Cal. App. 3d 241, 208 Cal. Rptr. 524, 1 I.E.R. Cas. (BNA) 405, 117 L.R.R.M. (BNA) 3309 (1st Dist. 1984); *Toney v. State of California*, 54 Cal. App. 3d 779, 126 Cal. Rptr. 869 (5th Dist. 1976).

hour.' Gjovik asked to keep communication in writing as she felt it was witness intimidation the day before her affidavit and the investigator responded by suspending all of Gjovik's account access, and she was fired a few hours later. [1127]

1430.   Like Apple attempted to do with Gjovik, when an employee is forced into an meeting by her employer's security team where the interrogator accused her of crimes and threatened prosecution, without evidence of misconduct by her, for the purpose of scaring her and scaring other employees – including making vague allegations against her without providing specifics or evidence – and was plausibly a deliberate and systematic tactic to threaten and frighten the employee into a confession – and the 9th Circuit and Oregon Supreme Court have found sufficient for a claim of IIED.[1128]

1431.   Like Apple did to Gjovik, an employer retaliating against an employee for reporting safety concerns by opening a sham investigation and coercing coworkers to falsely accuse the whistleblower of unlawful conduct including harassment and falsifying documents, all for the sole purpose of retaliating against the employee, is sufficient to constitute extreme and outrageous behavior.[1129]  It is unlawful for an employer to "*deliberately, and in furtherance of his employer's objectives, used psychic distress as a tool to coerce an employe into admitting a crime when defendant knew that there was no proof of the employe's guilt*."[1130]

---

[1127] *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 501 N.Y.S.2d 871 (1st Dep't 1986) ("Employer investigative conduct may become extreme and outrageous under certain circumstances, such as, for example, when interrogation continues for a long time, accusations of guilt are made but the evidence on which the accusations are based is not disclosed, and threats to seek prosecution are made unless a confession is given."); see *Hall v. May Dept. Stores Co.*, 292 Or. 131, 637 P.2d 126 (1981); *Smithson v. Nordstrom, Inc.*, 63 Or. App. 423, 664 P.2d 1119 (1983).

[1128] *Hall v. May Dep't Stores Co.*, 292 Or. 131, 132-133, 637 P.2d 126, 131 (1981), cited in *McGanty v. Staudenraus*, Supreme Court of Oregon, En Banc. September 08, 1995 321 Or. 532 901 P.2d 841. [Ninth Circuit cases citing and approving of *Hall v May*'s analysis of employer caused IIED through malicious interrogations: *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1374 (9th Cir. 1990); *Miller v. AT&T Network Systems*, 850 F.2d 543 (9th Cir. 1988); *Dutson v. Farmers Ins. Exchange*, 35 F.3d 570 (9th Cir. 1994)]

[1129] Graham v. Commonwealth Edison Co., 742 Illinois (2000).

[1130] *Lewis v. Oregon Beauty Supply Co.* 302 Or. 616, 627 (Or. 1987), citing Hall v May, supra; see also: *Kaminski v. United Parcel Service,* 120 A.D.2d 409, 410–12, 501 N.Y.S.2d 871, 872–73 (1st Dep't 1986)

1432.   When an employer's conduct is both coercive and retaliatory, courts have

generally found the conduct to be extreme and outrageous, constituting a claim for intentional

infliction of emotional distress.[1131]

1433.   Apple's behavior was outrageous for reasons including: abuse a relation or

position which gives him power to damage Gjovik's interest; knowledge that Gjovik is

susceptible to injuries through mental distress; and acting intentionally or unreasonably with the

recognition that the acts are likely to result in Gjovik becoming ill through mental distress.[1132]

Apple knew Gjovik was especially susceptible to emotional distress when it intentionally

inflicted emotional distress upon her.[1133] An employer was found liable for IIED against

employee after retaliating against employee who asked for payment for work by threatening

employee with deportation, lawsuits, false criminal charges, and sabotage of his professional

career.[1134]

1434.   Much of Apple's retaliation against Gjovik was punishment for her protected

activity and also a chilling warning to Gjovik's coworkers about what would happen to them if

they were to speak out. Gjovik had been organizing her coworkers around complaints of

discrimination, retaliation, and cover-ups prior to be forced on leave and then fired. Adverse

employment actions in itself can be a sufficient allegation of IIED against an employer if the

---

(holding that a three-hour interrogation about an alleged theft, accompanied by threats, loud and profane language, and intimation of possible criminal prosecution, sufficiently stated a cause of action for infliction of emotional distress).

[1131] *Rudis v. National College of Education*, 191 Ill.App.3d 1009, 1014 (1989); *Milton v. Illinois Bell Telephone Co.*, 101 Ill.App.3d 75, 77, 56 Ill.Dec. 497, 427 N.E.2d 829, 831 (1981) (The court found the employer's conduct in coercing plaintiff to do something illegal and then retaliating against him when he refused to do so constituted extreme and outrageous behavior.)

[1132] *Agarwal v. Johnson*, 25 Cal.3d 932, 946 (Cal. 1979); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 881 (Cal. Ct. App. 1989).

[1133] *Alcorn v. Anbro Eng., Inc.,* supra, 2 C3d at 498, 86 CR at 90, fn. 3 - If defendant proceeds in face of knowledge that plaintiff is peculiarly susceptible to emotional distress, defendant's conduct may become "extreme and outrageous" although it would not be so if defendant had been unaware of plaintiff's condition.

[1134] *Tekstrom, Inc. v. Savla*, 2006 WL 2338050 (Del. Super. Ct. 2006), judgment aff'd, 2007 WL 328836 (Del. 2007).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

employee was organizing their coworker sand representing the concerns of their colleagues

about discrimination in the workplace, and the adverse actions were "*a tactic designed to stifle*

*opposition to sexual harassment.* "[1135] In *Dias v Sky Chefs* (where a sufficient allegation of IIED

was found), like with Gjovik, following speaking up for herself and her coworkers – the

employee faced harassment and criticisms, her benefits were interfered with, she was told to stop

talking to her coworkers, she was followed, her work location was changed, and then she was

fired.[1136]

### ii.    Burglary, Surveillance, Threats, and Stalking

1435.    Apple's conduct was not mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities.[1137] Apple's misconduct towards Gjovik was/is extreme,

outrageous, persistent, and omnipresent. Apple's conduct left Gjovik in such fear for her safety,

the safety of her dog, the integrity of her electronics and utilities, and the safety of her chattels –

that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her

home, or even failing to properly secure entry to her home, would place her in danger and she

could be killed. Gjovik was and is under a justified belief that leaving her dog at home

unattended could result in harm to her dog and that he could be killed by Apple.[1138] Apple has

physically interacted with Gjovik's dog once, during at least one break-in to Gjovik's home,

leaving a scent of cigarettes on the dog's body along with other signs of break-in, trespass to

chattels, and additional modification of Apple's unlawful surveillance systems.

---

[1135] *Dias v. Sky Chefs, Inc*., 919 F.2d 1370, 1374 (9th Cir. 1990) quoting Hall, 637 P.2d at 133 n. 3 ("permissible" acts may become impermissible if done with illicit intent and knowledge of predictable illicit result).
[1136] *Dias v. Sky Chefs, Inc*., 919 F.2d 1370, 1373 (9th Cir. 1990).
[1137] Rest.2d Torts, § 46; *Molko v.Holy Spirit Assn*. (1988) 46 Cal.3d 1092, 1122 [ 252 Cal.Rptr. 122, 762 P.2d 46], overruled on another ground in *Aguilar v. Atlantic Richfield Co*., supra, 25 Cal.4th 826, 853, fn. 19;
[1138] ICAN Foundation, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1436.   Apple did follow through on many of its threats (like suing Gjovik), and frequently combined online harassment with physical in-person harassment confirming to Gjovik online what they were doing in person, all of which makes Apple's conduct menacing, and not trivial.[1139]

1437.   Also, sufficient allegations for intention to cause or reckless disregard of the probability of causing emotional distress may be satisfied by threats concerning Gjovik's health and that of the Gjovik's family – like threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap.*"[1140]

### iii.   False Police Reports

1438.   Apple and their agents filed numerous false reports against Gjovik with federal, state/local, and foreign (international) law enforcement. Appleseed testified that she filed reports to the FBI and local/state police about Gjovik, which were false. Appleseed made allegations of criminal conduct against Gjovik publicly and to Gjovik's coworkers. Someone (assumably Apple) also reported Gjovik's social media posts to German law enforcement.

1439.   An employer filing false police reports against an employee, and telling coworkers about it, is a sufficient claim for IIED.[1141] Knowingly false accusations of crimes made by employer against employee sufficient for IIED claim.[1142] Allegations that an institution

---

[1139] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[1140] *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 230 (Cal. Ct. App. 1983)
[1141] *Free v. Kramer*, 2022 WL 3920863 (D. Colo. 2022).
[1142] Fahmy v. Duane reade, Inc., 2005 WL 2338711 (S.D. N.Y. 2005) (applying New York law; noting that false accusations of criminal conduct can meet the extreme and outrageous standard in some situations); Fahmy v. Duane reade, Inc., 2005 WL 2338711 (S.D. N.Y. 2005) (applying New York law; noting that false accusations of criminal conduct can meet the extreme and outrageous standard in some situations); Contreras v. Crown Zellerbach Corp., 88 Wash. 2d 735, 565 P.2d 1173, 36 Fair Empl. Prac. Cas. (BNA) 571, 15 Empl. Prac. Dec. (CCH) P 7853 (1977) (attempting to implicate the plaintiff in criminal activity, when there is no basis for the implication, may be considered extreme and outrageous conduct).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

harassed and denylisted a victim of potentially false allegations and pressured the victim to drop criminal charges against members of the institution, was sufficient for claim of IIED.[1143]

### iv.    Surveillance / Gobbling

1440.   Further, Apple's supposed (but pretextual) reason for firing Gjovik was two topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct, but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination, despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans) being highly unlawful, unethical, and in some cases illegal. Apple's use of Gobbler and requests to scan Gjovik's ear canals, and retaliation for complaining about it, did cause Gjovik harm. Even if the harm caused to Gjovik by Apple's threats against Gjovik related to Gjovik's complaints about the Face Gobbler and complaints about ear canal scanning requests, was completely unintentional and merely negligent acts/omissions, Apple is still liable for the negligent infliction of emotional distress they caused Gjovik.[1144]

1441.   Apple intentional and malicious coercion of Gjovik to use the Face Gobbler application did cause injury to Gjovik. However, even if the harm caused to Gjovik by Apple's use of the Gobbler application was completely unintentional and merely negligent acts/omissions, Apple is still liable for the negligent infliction of emotional distress they caused Gjovik.

1442.   In fact, New York courts have repeatedly awarded damages for Infliction of Emotional Distress due to the use of cameras in bathrooms with the act itself finding NIED,[1145] and the act by an employer in a work restroom finding IIED.[1146]

---

[1143] *Gibson Bros., Inc. v. Oberlin College*, 2022-Ohio-1079, 187 N.E.3d 629 (Ohio Ct. App. 9th Dist. Lorain County 2022).

[1144] *Slaughter v. Legal Process Courier Service* (1984) 162 Cal.App.3d 1236, 1249); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 900 (Cal. Ct. App. 1989).

[1145] *Brown v. New York Design Ctr., Inc.*, N.Y. App. Div. 1st Dep't (Mar. 9, 2023).

1443.   Gjovik protested "Gobbler," for among other reasons, it is taking photos of her while naked and while in the bathroom, and while naked in the bathroom. Here, Gjovik complained of conduct found to be NIED and Apple then implicitly threatened to sue Gjovik if she was to protest it again, and Apple blamed their highly unlawful retaliation against Gjovik on Gjovik's outcry about unlawful conduct.[1147]

1444.   However, Apple's use of Gobbler was likely criminal and as such is "outrageous per se" in California under Cal. Penal Code § 653(n).[1148] Apple's many other criminal acts were also "outrageous per se" including witness intimidation, witness retaliation, burglary, extortion, threats, and surveillance. Allegations of surveillance have been a factor in finding sufficiency of allegations of IIED.[1149]

### v.   Exposure & Concealment

1445.   The *Abbatiello v. Monsanto* Court explained "that an allegation of knowingly subjecting individuals to exposure to a highly toxic substance, while purposefully concealing from those so exposed the serious injuries that might result from such exposure, and in reckless disregard of these risks, may constitute extreme and outrageous conduct." [1150]

[1146] *Sawicka v. Catena*, 79 A.D.3d 848, 912 N.Y.S.2d 666 (2d Dep't 2010) – (Male employer's conduct in installing video camera in workplace restroom in order to surreptitiously view and record female employees while they used restroom was conduct which was unquestionably outrageous and extreme, and caused employees' emotional distress, as required for employees to sustain claim for intentional infliction of emotional distress.)
[1147]
[1148] *Cramer v. Consolidated Freightways, Inc.* (9th Cir. 2001) 255 F3d 683, 697 (en banc)—employer concealed video cameras and audio listening devices behind two-way mirrors in employee restrooms in violation of Pen.C. § 653n.
[1149] *Hooper v. North Carolina*, 379 F. Supp. 2d 804, 201 Ed. Law Rep. 137 (M.D. N.C. 2005) – (police chief and university chancellor engaged in unlawful wiretapping and surveillance of her); *Williams v. Agency, Inc.*, 2014 WL 496656 (E.D. Va. 2014) – (secret videotaping of woman having sexual encounter inside her house).
[1150] *Abbatiello v. Monsanto Co.,* 522 F. Supp. 2d 524, 536 (S.D.N.Y. 2007); see *also German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 571 (S.D.N.Y. 1995) (denying motion to dismiss where landlords knowingly exposed tenants to lead paint, "a highly toxic substance to children," thereby putting them at risk for physical and mental injuries).

### vi.    Fear of Cancer

1446.   Further, Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and/or negligent conduct exposed Gjovik to carcinogens including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress, and acted with reckless disregard of the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer and Apple's conduct was a substantial factor in causing Gjovik's severe emotional distress. [1151]

1447.   Apple's conduct was despicable (base, vile, contemptible), and subjected Gjovik to cruel and unjust hardship, and was carried out with a willful and/or conscious disregard of Gjovik's rights and safety. Like in *Field v Philadelphia*, Apple deliberately vented deadly substances on Gjovik and then deliberately made false statements to conceal their actions, all of which could be considered criminal actions. [1152]

1448.   Apple intentionally misrepresented and/or concealed a material fact known to Apple (that Apple was responsible for Gjovik's 2020 illness) wanting to cause Gjovik harm by Gjovik not being able to litigate with all material facts and not able to take necessary preventative measure for her health, with an apparent goal that Gjovik will soon die of cancer

---

[1151] *Potter v. Firestone Tire and Rubber Co*. (1993) 6 Cal.4th 965, 1001 [recognizing potential cause of action for emotional distress damages from fear of cancer resulting from exposure to toxins, as well as damages liability for medical monitoring costs]

[1152] *Field v. Philadelphia Elec. Co*., 388 Pa. Super. 400, 428 (Pa. Super. Ct. 1989) , ("They told Field that his badge readings indicated that he had not been exposed to radiation, and they told him that his survey meter had malfunctioned when it indicated that he had been exposed to radiation…We can visualize no conduct more outrageous in character, so extreme in degree, that went beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community, than to vent highly radioactive steam upon another. ")

and disease, homeless and bankrupt – as Apple's social media accounts threatened two years ago.[1153]

1449.   Apple had a duty to follow environmental and health/safety laws, which it breached repeatedly and egregiously, resulting in emissions of carcinogenic chemicals. Reliable medical and scientific opinion will confirm that Gjovik's risk of developing cancer was significantly increased by the exposure caused by Apple and has resulted in actual risk that is significant.[1154] It appears Apple may have already caused Gjovik to develop cancer on her thyroid and struggled to obtain timely diagnostics and medical advice as Gjovik found herself on Medicaid.[1155] The latest ultrasounds in 2023 showed additional morphology of the growth.

1450.   As a proximate result of the acts of defendant, Gjovik suffered severe emotional distress including the fear of developing cancer and an increased risk of developing cancer. Gjovik also suffered a wide array of physical symptoms attributed to the toxic chemicals at 825 Stewart Drive and 3250 Scott Blvd including spasms, nausea, hair loss, rashes, hives, burns, dizziness, headache, hallucination, arrythmia, etc. Gjovik required and will continue to require frequent medical monitoring and psychiatric treatment.

### vii.   Deranged Gag-Order

1451.   Appleseed's retaliatory litigation filed against Gjovik in 2022 was admittedly due to Gjovik's complaints about witness intimidation and harassment by Apple, including by Appleseed. The point of the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the trauma she was experiencing with threat of incarceration if she were to even complain privately. Appleseed emailed Gjovik demanding Gjovik alter her federal

---

[1153] CollegeHospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, 725.
[1154] D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D; *Potter v. Firestone Tire & Rubber Co.*, 2 Tx.L.R. 862 (Cal. Super. Ct., Monterey County, Case No. 81723, 1987). (In addition to its cancerphobia award, the court also awarded 2.6 million in punitive damages.
[1155] CACI No. 1601. Intentional Infliction of Emotional Distress - Fear of Cancer, HIV, or AIDS

598

testimony and Appleseed said because Gjovik refused, she sued Gjovik. Allegation of witness

intimidation and/or pressure to suborn perjury are sufficient for a claim of IIED.[1156] Anonymous

emails with false allegations of criminal and vile acts may be sufficient for a claim of IIED.[1157]

1452.    During that litigation, the petitioner from Apple's Global Security team, wrote in

email to Gjovik saying that Gjovik complaining about Apple's death threats and Gjovik

complaining about Apple trying to make her suicidal was "*harmful to Apple*" and Appleseed

said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then

threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal

testimony (February 5 2022).

1453.    After the gag order, Gjovik then could not complain about what occurred without

risking years of incarceration. However, Appleseed then proceeding to continue to stalk, harass,

defame, disquiet, disturb, and intimidate Gjovik knowing she could get Gjovik incarcerated for

multiple years if Gjovik responded in anyway.

1454.    They day after the lawsuit, Appleseed also reported one of Gjovik's legal filings

to Gjovik's webserver alleging it was "child pornography" (the filing alleged witness

intimidation by Apple and was addressed (and previously submitted to) to US government

agencies investigating Gjovik's charges, as well as to District Attorney's offices. A sufficient

allegation of IIED was found when coworkers retaliated against a financial whistleblower by

filing false reports accusing him of sexually abusing children.[1158]

1455.    A district court found that lawsuits against employees, along with public

allegations of criminal misconduct and lack of professionalism made by employer against those

---

[1156] *Alexander v. U.S.*, 721 F.3d 418 (7th Cir. 2013); *Shmueli v. Corcoran Group*, 9 Misc. 3d 589, 802 N.Y.S.2d 871 (Sup 2005).
[1157] *Juzwiak v. Doe*, 415 N.J. Super. 442, 2 A.3d 428, 259 Ed. Law Rep. 724 (App. Div. 2010).
[1158] *Cimmino v. Marcoccia*, 2009 WL 2961461 (Conn. Super. Ct. 2009).

employees, in retaliation for the employees speaking to the media about the employer's operations is a sufficient allegation of IIED.[1159]

### viii.   Gjovik's Injuries

1456.   When Gjovik explains to people what Apple has done to her, when she shows them Apple's emails and posts, shows them the evidence she gathered of their physical intrusions and harassment, the default response is not to simply shake their head with disappointment. No, it is to exclaim something such as "*Outrageous!!*"[1160] Further, these actions have caused fear in those around Gjovik, as well as in Gjovik herself. Gjovik has lost many friends through this – which she cannot blame them as Apple's menacing is likely smoke from the fire of actionable threats of violence and mayhem.[1161]

1457.   Apple's conduct of course left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation*".[1162] However, as a direct and proximate result of Apple's conduct, Gjovik also experienced overwhelming anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment [and] worry.*"[1163] Apple's conduct resulted in Post-Traumatic Stress Disorder and anxiety symptoms. Gjovik grappled with depersonalization and derealization.

1458.   Apple's actions were so extreme and caused such severe disruption to Gjovik's life, Gjovik suffered panic attacks worrying about losing her home and not having food or being able to care for her dog.[1164] Gjovik cried every day. Gjovik kept a "go bag" by her front door in case some Apple-captured police offer showed up to haul her away to prison in Seattle. Gjovik

---

[1159] *Pete v. Tacoma School District No.* 10, 198 F. Supp. 3d 1206 (W.D. Wash. 2016).
[1160] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[1161] Rest.2d Torts, § 46, com. d. p. 73.
[1162] *Koerber v. Encyclopaedia Britannica, Inc.*, No. B312047, 10-11 (Cal. Ct. App. Jul. 13, 2022)
[1163] *Crisci v. Security Ins. Co.*,66 Cal.2d 425, 433 [ 58 Cal.Rptr. 13, 426 P.2d 173]; Rest.2d Torts, § 46, com. j. *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397 (Cal. Ct. App. 1970).
[1164] *Alcorn v. Anbro Engineering*, Inc.,2 Cal.3d 493, 498; *Fletcher v. Western National Life Ins. Co.,* 10 Cal.App.3d 376, 398 (Cal. Ct. App. 1970).

had to arrange guardians for her dog and drafted a signed letter she posted on the door and gave to the guardians that instructed the police to allow the guardians to pick up Gjovik's eight-pound Chihuahua from the pound if Gjovik was arrested and incarcerated. Gjovik was and is constantly on edge.

1459.   Apple's intentional and malicious surveillance of Gjovik during the retaliation period and also prior when she was an employee using one device for personal and work, as requested by Apple, empowered Apple with massive amounts of data to know Gjovik's "*work, home, personal lifestyle, patterns of living, and daily comings and goings.*"[1165] Gjovik was harmed by Apple's extensive and oppressive surveillance, and threats of surveillance. Even if the harm caused to Gjovik by Apple's surveillance policies and practices was completely unintentional and merely negligent acts/omissions, Apple is still liable for the negligent infliction of emotional distress they caused Gjovik. [1166]

1460.   Apple also has access to weapons, having weapons is part of Apple Global Security's self-image and the self-image of their ex-law enforcement and ex-military staff, Apple's threats have extended to Gjovik's friends and been made directly to Gjovik's friends, Apple has a history of abuse and violence, Apple has destroyed Gjovik's property, Apple has enlisted others to monitor and harass Gjovik, Apple has made unwanted attempts to communicate with Gjovik directly and through third-parties.

1461.   Apple is notoriously obsessed with power and revenge, and Apple (one of the most wealthy and powerful companies in the history of the modern world) surely has the means to carry out any of their threats or any act of violence it desires against Gjovik.[1167]

1462.   Apple smeared Gjovik's image and credibility beyond repair

---

[1165] US DOJ, *Model Protocol for Community Oriented Police Response to Stalking,* https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-w0045-pub.pdf
[1166] *Slaughter v. Legal Process Courier Service* (1984) 162 Cal.App.3d 1236, 1249); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 900 (Cal. Ct. App. 1989).
[1167] US DOJ, Model Protocol for Community Oriented Police Response to Stalking.

1463. As documented in legal filings, emails, doctor appointments, and in therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, severe depression requiring anti-depressants due to suicidal ideation and crying uncontrollable for hours every day. Gjovik suffers from paralyzing anxiety, and it has been difficult to even get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between overeating and under eating, but overall gained over forty pounds starting in late 2021. Gjovik's body has been stuck in PTSD "hyperarousal" and she is constantly hyper-alert and vigilant, listening for sounds that there could be another break in, or anther stalker outside her home waiting to harass her. Gjovik has not been able to 'relax' for over three years.

1464. Gjovik seriously considered suicide several times in 2021 – 2023.

1465. Apple had full knowledge of Gjovik's precarious situation, and the prior impact to her mental health before Apple started retaliating about Gjovik's office. Apple knew the retaliation about the office would further traumatize Gjovik after Apple had previously traumatized her due to the 3250 Scott Blvd emissions. Then, Apple intentionally terrorized Gjovik more in addition to the office retaliation – with holistic, expansive, passionate terrorism of Gjovik assumably in hope that Gjovik killed herself or died of cancer quicker than she would have otherwise. Gjovik has spoken and written about this extensively over the last six months after discovering what Apple did at 3250 Scott Blvd and realizing the incredibly depravity of Apple's conduct.

1466. In California, there is a two-year statute of limitations to file a complaint for IIED or NIED.[1168] New York as a one-year (from act) statute of limitations for IIED and three years

---

[1168] Cal. Code Civ. Proc. § 335.1; *Wassmann v. South Orange County Community College District*, No. G053411, California Court of Appeal (June 12, 2018)

(from act) for NIED.[1169] Gjovik argues Apple's conduct was IIED, but if not then, or concurrently also NIED. NIED does not require 'extreme and outrageous conduct.'[1170]

1467.    In a civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than the later of two years from the date of injury or two years after plaintiff "*becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another* …"[1171] Gjovik did not discover Apple's HVAC/TCE mess until June 2022 and did not discovery Apple's secret silicon fabrication until February 2023. Knowing injuries exist and knowing the general actions that may cause such injuries is not enough, instead the victim must become aware of the actual, specific cause of the injuries.[1172]

### ix.    Eggshell / Target

1468.    Beyond the broader scope of the claim, what distinguishes this claim from the Bane Act or Ralph Act claims, is Apple's deranged harassment, threats, and intimidation was intentional and malicious, following and with full knowledge that in 2020, Apple's emissions of toxic chemicals and gases into Gjovik's home left Gjovik unable to function and disabled, even formally on state short-term disability from May through September 2020.

1469.    Gjovik did not know what was making her ill at the time and was told it could be fatal illness or injury. Gjovik did not understand what the cause of her injury was and was

---

[1169] CPLR 215(3); 14 N.Y.Prac., New York Law of Torts 1:40
[1170] *Brown v. New York Design Ctr., Inc.*, 2023 WL 2417772 (N.Y. App. Div. 1st Dep't Mar. 9, 2023). *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583; Burgess v. Superior Court (1992) 2 Cal.4th 1064.
[1171] CCP § 340.8(a); D. Common Law Environmental Hazards Liability, Cal. Prac. Guide Real Prop. Trans. Ch. 5-D
[1172] *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986); *Gregg v. Hawaii, Dep't of Pub. Safety,* 870 F.3d 883, 886–89 (9th Cir. 2017).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

warned by doctors that her fainting spells could lead to death if she was to fall and whack her head, and that if she had a fatal arrythmia that exercise could provoke a lethal heartbeat, and as such Gjovik was put on bed rest for months – concurrently while being poisoned by Apple's fabrication emissions while she was at home and in bed. Apple's actions made Gjovik fear for her life, caused severe physical injuries, put Gjovik at high risk for cancer and disease in her lifetime, put Gjovik's dog at risk for cancer and disease, made Gjovik's hair fall out, caused growths and rashes that may permanently disfigure Gjovik, and then proceeded to cover up what Apple did to Gjovik, while intentionally harassing, intimidating, threatening, and terrorizing Gjovik – knowing that the increased stress they were causing Gjovik was to make Gjovik even more likely to develop cancer and disease.

1470.   Apple could have acted with some decency and reserve, but instead Apple bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, sued her, and reported her to law enforcement, repeatedly threatened to harm and "*ruin*" and "*destroy*" her, and even sent her emails pretending to be government employees threatening her to shut up about Apple's chemical leaks. Through all of this, Apple went out of their way to act like deranged maniacs whose conduct clearly exceeded all bounds of decency usually tolerated by society.

I.   **ADVERSE/NEGATIVE EVENTS GENERALLY**

1471.   There are an incredible number of ways employers retaliate against their employees. Employees injured by retaliation may describe it using legal or functional terms, or even vague artful declarations [complaint of "*some kind of weird retaliation*"[1173] ], but the language used to summarize the retaliation does not change the facts. This section applies to all claims that include employment retaliation as an element.

---

[1173] *Redacted v. Art Institute Of California*, 173 Cal.App.4th 986, 1020 (Cal. Ct. App. 2009).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### i.   2021-01 Hostile Work Environment

1472.   To establish a hostile environment, harassment must be "so severe or pervasive" as to "alter the conditions of the victim's employment and create an abusive working environment."[1174] Prior to her termination, and for some time, Apple had created and maintained an abuse and hostile work environment for Gjovik. Gjovik has been actively looking for a new role at Apple, interviewing with several teams, and telling West and Powers that she was doing so.[1175] While some roles feel through (headcount canceled, etc.), other roles were expressly blocked by West.

1473.   The harassment Gjovik suffered would have detrimentally affected a reasonable person and did detrimentally affect Gjovik.[1176] The discriminatory conduct was frequent, pervasive, and severe; Gjovik suffered humiliation and harassment that unreasonably interfered with Gjovik's ability to do her job. The harassment included abuse and threats of abuse that seriously scared and harassed Gjovik for not legitimate or lawful reasons.[1177]

1474.   Where the harassment was previously not severe enough to alter the terms and conditions of her employment, once the retaliation began, all actions noted were sufficient to be "*retaliatory harassing conduct*." [1178]   In addition, or in the alternative, harassment and similar

---

[1174] *Fisher v. San Pedro Peninsula Hosp*. (1989) 214 CA3d 590, 608, 262 CR 842, 851 (adopting federal case law for hostile environment sexual harassment claims under California law); *Alexander v. Community Hosp. of Long Beach* (2020) 46 CA5th 238, 262, 259 CR3d 340, 364

[1175] Gjovik's 2020 annual performance review self-assessment noted under goals that she would "Continue to look for opps @ Apple with a legal/policy focus. In the meantime, appreciate any projects that focus on strategy, comms, research, or implementing new policy (transferable to next phase of career)."

[1176]

[1177] California Courts, *Understanding Harassment Laws*, https://www.courts.ca.gov/1258.htm

[1178] *See, e.g.*, *Martinelli v. Penn Millers Ins. Co*., 269 F. App'x 226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*, an employee claiming "retaliation by workplace harassment" is "no longer required to show that the harassment was severe or pervasive"); *EEOC v. Chrysler Grp., LLC*, No. 08-C-1067, 2011 WL 693642, at *8-11 (E.D. Wis. Feb. 17, 2011) (holding that reasonable jury could conclude employees were subjected to unlawful retaliation under *Burlington Northern* standard when human resources supervisor verbally harassed them by screaming and pounding his fists on the table while threatening termination if they filed grievances). *See* Federal Sector Equal Employment Opportunity, 77

abuse occurred repeatedly over the course of Gjovik's employment and thus constitutes a hostile

work environment even if not severe.[1179] In addition or in the alternative, causation is seen from

evidence that harassment by supervisors and coworkers intensified shortly after Gjovik filed

complaints.[1180]

1475.   After Gjovik's protected activity reporting her illness next to Apple's facility at

3250 Scott Blvd, reporting concerns about Apple's dealings related to the COVID-19 vaccine,

and complaining about safety issues at her office. Apple increased the severity of her hostile

work environment through retaliatory harassment. Apple also refused to remedy the issues it

created, even blatantly and unreasonable denying transfers.

### ii.    2021-4: Constructive Discharge

1476.   Constructive discharge occurs when the employer's conduct effectively forces an

employee to resign because "under all the circumstances, the working conditions are so

unusually adverse that a reasonable employee in plaintiff's position would have felt compelled to

resign."[1181] The requisite knowledge or intent must be on the part of the employer or those who

"effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory

employees." [1182]

1477.   Gjovik's role under David Powers and Dan West had been a hostile work

environment for some time, with repeated escalations to Dan West about it and requesting him to

help, as well as numerous attempts to transfer to other teams at Apple. During this time, Dan

West repeatedly blocked Gjovik's ability to transfer to a different team without coherent

---

Fed. Reg. 43,498, 43,502 (July 25, 2012) (codified at 29 C.F.R. §
1614), https://federalregister.gov/a/2012-18134.
[1179] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)
[1180] *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8-9 (1st Cir. 2006)
[1181] *Turner v. Anheuser-Busch, Inc.*, 7 Cal 4th 1238, 1256, 32 Cal. Rptr. 2d 223, 876 P.2d 1022 (1994).
[1182] *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1251, 32 CR2d at 230 (emphasis added); *Ortiz v. Dameron Hosp. Ass'n* (2019) 37 CA5th 568, 579, 250 CR3d 1, 10—evidence that supervisory employee intentionally created working conditions leading to plaintiff's resignation sufficient to impute knowledge to employer.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

explanation, while also refusing to resolve Gjovik's complaints about a hostile work environment.

1478.   The escalation of harassment and retaliation in March and April 2021, due to Gjovik's protected activity, relocated Gjovik's position from the frying pan and instead straight into the fire, with Apple's Employee Relations and Human Resources teams gleefully adding kindling as they further provoked her managers, coworkers, and leadership at the company about her. On April 29 2021, when Gjovik complained again of the ongoing hostile work environment, and now the new harassment and retaliation, and the unsafe work conditions, Dan West refused to do anything to help. Gjovik said if he did nothing and continued to block her transfers she would have to quit, and West agreed then she should just quit Apple. Although the employee may say, *"I quit,"* the employment relationship is actually severed by the employer's acts against the employee's will. As a result, a constructive discharge is legally regarded as a firing by the employer rather than a voluntary resignation or retirement by the employee.[1183]

1479.   In determining whether a reasonable employee would feel compelled to resign, courts consider such factors as: reassignment to menial or degrading work; badgering, harassment or humiliation by the employer calculated to encourage the employee to resign; offers of continued employment on terms less favorable than the employee's former status.[1184] Intolerable working conditions are those which either are unusually aggravated, or amount to a continuous pattern of objectionable conduct.[1185]

1480.   Apple (via Jenna Waibel) used a sham and nonconsensual sexism investigation to create an extremely hostile work environment for Gjovik with her two managers, and with some

---

[1183] *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1244-1245, 32 CR2d at 226; *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 CA4th 1156, 1166, 104 CR2d 95, 102.
[1184] See *Brown v. Kinney Shoe Corp.* (5th Cir. 2001) 237 F3d 556, 566; Constructive Discharge, Cal. Prac. Guide Employment Litigation Ch. 4-G.
[1185] *Turner v. Anheuser-Busch, Inc.*, supra, 7 C4th at 1246-1247, 32 CR2d at 227-228; *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 CA4th 1156, 1171-1172, 104 CR2d 95, 106—continuous course of harassment, uncorrected by management, can constitute objectively intolerable working conditions.

of the other leaders she had to work with, and with Human Resources. In response to this and to Gjovik's continued protected activity, Gjovik's managers then began reassigning her work to other people, dramatically increasing her workload with unfavorable projects, harassing her and threatening discipline through "warnings" (David Powers, March 2021) about her exercising her rights, while also denying requests for transfers and instead telling her she "can just quit" (Dan West, April 29 2021).

1481.   Gjovik notified numerous people in positions of authority of the intolerable conditions, so Apple was aware of what happened and did nothing, or intentionally made it worse. Gjovik notified Apple of constructive discharge starting in April of 2021, again in May, June, July, August, and September 2021.[1186]

1482.   As in *Zilmer*, when Apple 'quadrupled' Gjovik's workload, Apple knew Gjovik could not take on the workload and the increase was false and pretextual, creating a wrongful constructive discharge.[1187] Similarly, as in *Colores*, frequent reorganization of Gjovik's duties along with frequent attempts to invent pretextual documents and unlawful demands is a wrongful constructive discharge especially as Apple knew its actions would create stress that would exacerbate Gjovik's medical conditions (PTSD, anxiety, etc.).[1188]

1483.   Further, Apple constructively discharged Gjovik in violation of a public policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision.[1189] Gjovik's constructive discharge was in violation of a "firmly established, fundamental, and substantial" public policy as described with the same factors in the

---

[1186] *Turner v. Anheuser-Busch, Inc*., supra, 7 C4th at 1250, 32 CR2d at 230.
[1187] *Zilmer v. Carnation Co*. (1989) 215 CA3d 29, 38-39, 263 CR 422, 426-427 (disapproved on other grounds by *Turner v. Anheuser-Busch, Inc*., supra, 7 C4th at 1251, 32 CR2d at 230).
[1188] Colores v. Board of Trustees of Calif. State Univ., supra, 105 CA4th at 1310, 130 CR2d at 360.
[1189] *Turner v. Anheuser-Busch, Inc*., 7 Cal 4th 1238, 1256, 32 Cal. Rptr. 2d 223, 876 P.2d 1022 (1994).

608

*Tamney* claims section.[1190] Apple's construction discharge of Gjovik occurred alongside related breach of contract, torts, and criminal conduct by Apple, which injured Gjovik.[1191]

### iii.   2021-07: Increase in Unfavorable Work / Reassignment / Fake Investigations / Misleading Statements

1484.   Apple reassigned Gjovik's projects, gave her unfavorable work, gave her increased workload, and opened fake investigations on her behalf solely to incite retaliation.[1192] Apple used Employee Relation investigators to open fake investigations intended to upset Gjovik's management and coworkers in hope that Gjovik quits. The same team also abused ADA and FMLA processes as vehicles for innovation retaliation tactics, which is deeply disrespectful to the Congressional intent for those statutes.

1485.   Okpo repeatedly told Gjovik that everything they discussed was 'confidential.' Gjovik, annoyed with Okpo's misleading posture, eventually complained to Okpo that he was attempting to mislead her that he would not share what she said with Apple management or legal, at which point Okpo then looked shocked and forlorn that Gjovik actually knew her legal rights, and at which point then confirm the conversation was not confidential between the two of them. Gjovik also complained to Okpo that he was a lawyer and was acting like he was her lawyer, but he represents the corporation, at which point Okpo finally provided a long overdue Upjohn warning.[1193]

---

[1190] Foley v. Interactive Data Corp., 47 Cal. 3d 654, 671 n.11, 254 Cal. Rptr. 211, 765 P.2d 373 (1988); Zamora v. Sacramento Rendering Co., United States District Court for the Eastern District of California, No. Civ. S-05-00789 DFL KJM (January 17 2007).

[1191] *Zamora*, supra.

[1192] *Simers v. Los Angeles Times Communications*, LLC (2018) 18 Cal.App.5th 1248, 1279 [227 Cal.Rptr.3d 695; *Coszalter v. City of Salem,* 320 F.3d 968, 976 (9th Cir. 2003).

[1193] *Upjohn Co. v. United States*, 449 U.S. 383 (1981) – (If an attorney is conducting the investigation, the attorney should provide the employees with an Upjohn warning explaining that the attorney represents the company, not the employee)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                              DECEMBER 21 2023

iv.     2021-08: "Removed from the Workplace and all Workplace
        Interactions"

1486.   Gjovik requested that Apple modify her reporting relationship with her
supervisors while they investigated and as a temporary resolution to the hostile work
environment. Gjovik asked, at the very least, that her prior workload be restored, and that
interactions with her supervisors be kept to writing. This was not an unreasonable request.
"Where the conduct being investigated involves a supervisor and the supervisor's direct or
indirect report, an employer should strongly consider modifying the relevant reporting
relationship pending completion of the investigation to avoid further harassment or intimidation
of the accused or disruption to the work environment."[1194]

1487.   Instead of accepting Gjovik's request, Apple suddenly placed Gjovik "on leave,"
despite her protests, and refusing her attempts to negotiate the terms of the leave. The act of
placing an employee on administrative leave can be an adverse employment action.[1195]  An
employee that complained of discrimination or retaliation leading to an investigation by their
employer into their concerns, "*may be so distressed by the events that led to the investigation, or
by the reactions of the accused to the investigation, that an employer deems it appropriate to
offer the complainant paid leave or another accommodation pending completion of the
investigation. Whatever the accommodation, the employer should ensure it only offers and does
not force it on the complainant to avoid a potential retaliation claim.*"[1196] "Walking off"

---

[1194] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452
[1195] *Whitehall v. Cnty. of San Bernardino*, 17 Cal. App. 5th 352, 367, 225 Cal. Rptr. 3d 321, 332 (2017);
See *Lakeside–Scott v. Multnomah*, 556 F.3d 797, 803 n. 7 (9th Cir.2009); See *Dahlia v. Rodriguez* (9th
Cir. 2013) 735 F.3d 1060, 1078, citing Coszalter v. City of Salem (9th Cir. 2003) 320 F.3d 968, 975.)
*Whitehall v. Cnty. of San Bernardino*, 17 Cal. App. 5th 352, 367, 225 Cal. Rptr. 3d 321, 332 (2017)
[1196] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452; see,
for example, Id, *Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012).

employees from the work site (like "removing them from the workplace") may constitute an adverse action.[1197]

1488.    Courts have found conduct by employers to be probative evidence of retaliatory discrimination when the employee is excellent and had no warnings, but the employer suddenly makes a decision to terminate or discipline the employee, but the employer orchestrates the action in some suspicious way, such as failing to provide any warnings, or choosing to 'walk off' and suspend the employee prior to discipline yet still failing to provide any warning.[1198] This is what Apple did to Gjovik. Apple provided Gjovik no warnings for whatever reason they fired her for, and instead of a warning, they suspended her accounts, then terminated her – and prior she was an excellent employee with no disciplinary issues.

1489.    The Ninth Circuit held over a decade ago that "placement on administrative leave can constitute an adverse employment action."[1199] The proper inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity."[1200] However, it may also qualify as an adverse employment action if there are associated injuries due to the leave, like not being able to take exams required for career advancement, loss of extra pay, and loss of opportunities for work experience. Courts have also found paid administrative leave can be an adverse employment action if the leave is 'stigmatizing.'[1201]

1490.    The Courts have found a preponderance of evidence that protected activity was a contributing factor in the adverse employment action an employee suffered when the employer

---

[1197] *Lawson v. United Airlines, Inc.,* 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg33 -- (Respondent's "walk off" of Complainant on April 2, 2001 was also an adverse employment action. The equivalent of a suspension.")

[1198] Lawson v. United Airlines, Inc., 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg33. -- (see also, "The record demonstrates that Complainant's protected activity was a contributing factor to the adverse employment action he suffered. Furthermore, Respondent has not proven a legitimate, nondiscriminatory reason for Complainant's suspension or subsequent discharge." Id pg 42).

[1199] *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013).

[1200] Id.

[1201] *Retaliation*, Practical Law Practice Note 5-501-1430

611

<mark>failed to seriously respond to the employee's concerns, or did not respond at all, became frustrated with employee's persistence, and pretended to corporate onlookers like they were actually earnestly trying to the help the employee when they were not. [1202]   Once again, this is what Apple did to Gjovik.</mark>

1491.   Gjovik and Apple discussed the potential for administrative leave as an oral contract matter prior to Apple putting her on leave. Gjovik explained the terms she would require if she was to "accept" administrative leave and the terms which would cause her to "reject" an offer of administrative leave, and this was a negotiation to negotiate.  Gjovik made it clear she would "accept" administrative leave as a mitigation to address the retaliation and harassment occurring from her managers as long as the leave was constrained to only that dynamic – and would not impact her ability to visit the office, to organize with coworkers, to use Slack, or any other modifications of the terms and conditions of her employment.

1492.   When Okpo told her it was "putting her on leave" on August 4th, Gjovik said she did not want to go on leave. Apple told Gjovik that they were putting her on leave because she "offered" to go on leave and they "accepted" her offer. Okpo's terms for leave included the terms Gjovik previously mentioned were unacceptable to her. Gjovik told Okpo his statement of putting her on leave had different terms than their prior discussion, and even if she had offered prior, his statement would be a counteroffer, not an acceptance. Okpo said Gjovik had no choice. Gjovik summarized this dynamic in the Issue Confirmation v3, saying that Okpo says the leave "*is voluntary but I also don't have a choice.*" (pg29).

1493.   Under a contracts view, Apple had put Gjovik under economic duress, and used undue influence, in order to attempt to make her accept Apple's oppressive and unfavorable

---

[1202] <mark>Lawson v. United Airlines, Inc., 2002-AIR-6 (DOL ALJ Dec. 20, 2002) pg36 -- (see also, "The record demonstrates that Complainant's protected activity was a contributing factor to the adverse employment action he suffered. Furthermore, Respondent has not proven a legitimate, nondiscriminatory reason for Complainant's suspension or subsequent discharge." Id pg 42).</mark>

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

terms.[1203] Apple also concealed material information (the HVAC mess and US EPA inspection at 825 Stewart Drive and what happened at 3250 Scott Blvd), while making fraudulent and misrepresented statements  (that it was investigating Gjovik's complaints, that the leave was not indefinite, etc.) that Apple intended to induce Gjovik to rely on those statements to Gjovik's detriment.[1204] In addition, even if the leave was offered in way that Gjovik accepted (which she did not), Apple's fraud and misconduct frustrated the purpose of the agreement.[1205]

1494.   Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, mutual assent or consent being necessary to the formation of a contract. Consent is not mutual unless all the parties agree to the same thing in the same sense. Thus, there is no meeting of the minds of the parties to the contract while they are still negotiating terms.[1206]

1495.   Gjovik complained to Okpo when he put her on leave, that he refused to provide her any ETA for updates, or visibility to any next steps. Okpo told her he would get back to her when he felt like it. Gjovik asked if it could be multiple months before she heard back and Okpo said he did not know and would not tell her. Gjovik said if she was not supposed to work for months, that she was not going to check her work email regularly, and when Okpo was ready to

---

[1203] Economic duress occurs when one party commits wrongful acts that are coercive enough to cause a reasonably prudent person, lacking suitable alternatives, to agree to an unfavorable contract. [ *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 CA3d 1058, 1077-1081, 267 CR 457, 466-468 (collecting cases and extensively discussing economic duress); *Perez v. Uline, Inc.* (2007) 157 CA4th 953, 959-960, 68 CR3d 872, 876-877 (stating criteria for invalidating employment settlement agreement due to economic duress); *Hester v. Public Storage* (2020) 49 CA5th 668, 679, 263 CR3d 299, 308]

[1204] Civ.C. §§ 1566-1567; Rest.2d Contracts §§ 7, 161-162, 164 ("Fraud renders apparent consent not given of one's own free will and volition, making the contract voidable."); Civ.C. § 1572(3); Rest.2d Contracts §§ 160-161 (Concealment: When the party suppresses the truth); Civ.C. § 1573(1) (Breach of duty: Conduct by which the actor gains an advantage or misleads another to his or her prejudice.)

[1205] *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 C2d 666, 676-677, 75 CR 889, 896, fn. 13 (collecting cases); ( Frustration of Purpose: This defense applies when performance is not impossible or impracticable, but has become pointless—i.e., the main purpose of a contract has become frustrated.)

[1206] California Civil Code § 1580; 14 Cal. Jur. 3d Contracts § 64; *Cheema v. L.S. Trucking, Inc.*, 252 Cal. Rptr. 3d 606 (Cal. App. 1st Dist. 2019), as modified on reh'g, (Oct. 7, 2019) – (Failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms or have taken some action related to the contract.)

talk to her, he should contact her via her personal email. Gjovik also complained that even Waibel gave her an ETA and idea of next steps. Okpo told Gjovik she should not check her work email anyways but that also he refused to contact her via her personal email. Gjovik complained to Okpo and later to the press and on social media, of "indefinite administrative leave."

1496.   When Gjovik asked to attend a training she previously registered for, and even got approval from the professors to do so, Okpo told Gjovik no "because she is on leave." The denial of previously promised training and the failure to promote may constitute adverse employment actions.[1207]

1497.   This was not an unreasonable statement by Gjovik. Corporate employers are advised to "Decide in advance on a target date for completion of the investigation. Setting and meeting a target completion date ensures that the investigation concludes promptly, allowing for swift corrective action as necessary and minimizing any costly paid administrative leave time for affected employees. It also signals to the affected employees that the employer is taking their concerns seriously."[1208]

**v.     2021-09-09: Interrogation**

1498.   In determining whether company's interrogation of employee tends to be coercive or threatening in light of total circumstances, court considers: the history of employer's attitude toward its employees; the nature of information sought; rank of questioner in employer's hierarchy; the place and manner of conversation; the truthfulness of employee's reply; whether employer had valid purpose in obtaining information sought about protected activities;  whether

---

[1207] Light v Department of Parks & Recreation, 14 Cal.App.5th at p. 93.
[1208] Handling Employment-Related Internal Investigations, Practical Law Practice Note 1-501-9452

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

valid purpose for interrogation, if existent, was communicated to employee; and whether employer assured employee that there would be no reprisals. [1209]

1499.   Here, Gjovik had no warnings, Gjovik was not assured of no reprisals, the interrogator was part of the "Workplace Violence" Team, Apple had been acting adversarial to Gjovik, and its entirely unclear what Apple wanted  to question Gjovik about. The record seems to show Apple simply wanted to fire Gjovik, and they wanted to do it over the phone or a video call in order to obtain something they wanted from Gjovik.

1500.   "The question under California law is not: 'Did the employee in fact commit the act leading to dismissal?' but rather: 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?'"[1210]  There is no evidence Apple ever investigated Gjovik's concerns earnestly.

1501.   Investigative fairness "contemplates listening to both sides and providing employees a fair opportunity to present their position and to correct or contradict relevant statements prejudicial to their case, without the procedural formalities of a trial."[1211] Good cause, in the context of implied employment contracts, means 'fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual.'"[1212]

---

[1209] *Tellepsen Pipeline Services Co. v. N.L.R.B.,* 320 F.3d 554, 171 L.R.R.M. (BNA) 3065, 147 Lab. Cas. (CCH) ¶ 10177 (5th Cir. 2003); West's Key Number Digest, Labor Relations 382.1; 3 Am. Jur. Proof of Facts 2d 699 (Originally published in 1985).

[1210] *Jones v. Costco Wholesale Corp.,* 34 F. App'x 320, 323 (9th Cir. 2002), citing *Cotran,* 69 Cal.Rptr.2d 900, 948 P.2d at 422

[1211] *Silva v. Lucky Stores, Inc.,* 65 Cal. App. 4th 256, 264, (5th Dist. 1998) (citing *Cotran v. Rollins Hudig Hall Intern., Inc.,* 17 Cal. 4th 93, 108, 69 Cal. Rptr. 2d 900, 910; see *Serri v. Santa Clara University,* 226 Cal. App. 4th 830, 873, 172 Cal. Rptr. 3d 732, 769, 304 Ed. Law Rep. 1128 (6th Dist. 2014);

[1212] *King v. United Parcel Service, Inc.,* 152 Cal. App. 4th 426, 438, 60 Cal. Rptr. 3d 359, 370 (3d Dist. 2007); *Ayala v. Costco Wholesale Corporation,* 2018 WL 6307891, *3 (C.D. Cal. 2018); *Lewis v. Dow Chemical Corporation,* 2018 Fair Empl. Prac. Cas. (BNA) 177566, 2018 I.E.R. Cas. (N.D. Cal. 2018).

1502.   Investigative interviews may rise to an actionable level where they lead to an adverse consequence or where the attending circumstances show that a reasonable person subjected to them would be dissuaded from complaining about discrimination.[1213] In *Perez v USPS*, a series of four investigative interviews over seven weeks were found to be an adverse action when the interviews were never "preceded by an explication of its purpose," nor was the employee warned "that the interviews could lead to disciplinary actions," and "each was carried out in an offensive and antagonistic manner" including questioning the employee's "loyalty" while "berating" him.[1214] The Workplace Violence interrogator approached Gjovik first politely like a friend but with an implied threat of general reprisals, and ended the exchange as quickly as it started like they were enemies. The interrogator changed his story twice about what his intent in approaching her was.

1503.   Coercive speech is not protected as free speech either by the First Amendment or by labor laws. Interrogation is afforded protection by the Constitution and by labor laws only to the point that it is free from coercion; and if the questioning is such that the employer may be said to have engaged in conduct reasonably tending to interfere with the free exercise of employee labor rights, then it has passed that limit and violates the law.[1215] Threatening and intimidating federal witnesses and whistleblowers is not a right for corporations protected by the first amendment .

1504.   An employer's decision to arrange a "*cold-blooded tactic of interrogation*" of an employee based on "*scanty evidence*" as an "*intentionally oppressive method of browbeating an employee into a confession*" is plausibly a method "*beyond the outer bounds of socially tolerable*

---

[1213] *Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168, 1185 (W.D. Wash. 2015). See *Ballard v. Donahoe*, 2014 WL 1286193, *12 (E.D.Cal.2014) – (recognizing that "an investigative interview can be deemed adverse if it leads to an adverse consequence"); *Lee v. Hawaii*, 2010 WL 235009, at *7 (D.Haw.2010).
[1214] *Perez v. U.S. Postal Serv.*, 76 F. **Supp.** 3d 1168, 1185 (W.D. **Wash.** 2015)
[1215] 43 Am. Jur. Proof of Facts 2d 699 (Originally published in 1985).

*employer practices*" for an IIED claim.[1216] The tactic combines the intimidation of unlawful debt collection tactics with the coercive dependency of the employee in the employment relationship.[1217] Employers deliberating inflicting distress upon their employees in this way waives their "*privilege of insisting on the employer's legal rights in a permissible way*", even if that way may also cause emotional distress – as it is distinguished from simply trying to cause distress for the sake of causing distress or other unlawful objectives."[1218]

1505.   In an attempt to strike a balance between the employer's interests in preparing its case for trial, and the employee's interest in being free from unwarranted interrogation, agencies and the courts have established specific safeguards designed to minimize the coercive impact of such employer interrogation.[1219]   The employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis, and the questioning must occur in a context free from employer hostility to protected rights and must not be itself coercive in nature. None of this happened with Gjovik; Apple did the opposite.

1506.   If an employer wants to interrogate an employee who has engaged in protected activity and who is about to provide testimony to the government –  the employer is required to communicate to the employee the purpose of the questioning, assure the employee that no reprisal will take place, and obtain employee participation on a voluntary basis.[1220] If the employer interrogates an employee, and the employee requests accommodation for the stress

---

[1216] *Hall v. May Dep't Stores Co.,* 292 Or. 131, 133, 637 P.2d 126, 131 (1981).
[1217] Id.
[1218] Id; Restatement (Second) Torts § 46, comment g.
[1219] 4 A.L.R. Fed. 280 (Originally published in 1970).
[1220] *NLRB v Neuhoff Bros., Packers, Inc.* (1967, CA5) 375 F2d 372 -- (Violation of labor laws when employees were ordered to come to company offices for an unannounced purpose, and management representatives were present, including on at least one occasion a supervisor alleged to have made certain coercive threats, and in the general atmosphere of strong intense feelings.); *Re Johnnie's Poultry Co.* (1964) 146 NLRB 770; 4 A.L.R. Fed. 280; *Louton, Inc.* (1984) 270 NLRB No. 9, 116 BNA LRRM 1084, 1983-84 CCH NLRB ¶ 16266.

(such as an anxiety medication), but the employer denies the request and agitates the employee, the employer may be liable for IIED.[1221]

1507.   Finally, OSHA's description of the "workplace violence" function at the workplace discusses threats, physical assaults, and aggravated assaults.[1222] It's entirely unclear why this interrogator was reaching out to Gjovik except to intimidate her.

### vi.   2021-09-09 Termination

1508.   Apple's termination of Gjovik on September 9 2021 is facially retaliatory and does not require additional analysis.

### vii.   2021-2023: Digital Threats & Harassment

1509.   Apple's technical sophistication enabled it to retaliate against Gjovik in complex and innovative ways. Apple's novel method for a comprehensive, all accompanying harassment campaign against Gjovik included several tactics which make Apple's formal involvement less directly visible. Despite this, Gjovik, her coworkers, and the public all quickly saw these actions were orchestrated and ordered by Apple.

1510.   The success of Apple's short-sighted strategies (such as using fake social media accounts to harass Gjovik) was contingent on a successful outcome that left Gjovik incapable of defending herself, because otherwise, Apple's retaliatory conduct and animosity towards Gjovik was despicable, reprehensible, and attributable to Apple with much effort.[1223]

1511.   Today, what Apple did is not entirely novel. Other large companies have tried to do it and gotten caught, including: eBay, Tesla, Walmart, Google, and others.

---

[1221] *Tandy Corp. v. Bone,* 283 Ark. 399, 678 S.W.2d 312, 52 A.L.R.4th 839 (1984)
[1222] Workplace Violence, Practical Law Practice Note 7-505-7511
[1223] See: Zirpel v. Alki David Prods., Inc., 93 Cal. App. 5th 563, 579–81, 310 Cal. Rptr. 3d 730, 743–45 (2023), reh'g denied (July 10, 2023) – ("When Zirpel voiced his concerns regarding workplace safety, David yelled and screamed obscenities at Zirpel in front of his coworkers, called him a "faggot" and told him to "suck my dick." While screaming at Zirpel, David stood so close to him that spittle flew into Zirpel's face. After telling Zirpel he was fired, David followed Zirpel out of the theater building and continued to scream at him. The totality of the circumstances here supports a finding of reprehensible conduct.")

### viii.   2021-2023: Coworker Harassment; Retaliatory Lawsuits & Police Reports

1512.   Employers can be liable for co-workers' harassing behavior under negligence principles; when the employer must have known or had reason to know of the harassment and failed to take adequate steps to address it.[1224] An employer may even be held liable for a hostile work environment created by third parties, or an anonymous harasser, if the employer is aware of the harassment and fails to take steps to address it.[1225]  Anonymous conduct that creates a hostile work environment does not mean that an employer is held to a lesser standard of liability.[1226] The anonymous nature of severe threats or acts of harassment may, in fact, heighten what is required of an employer.[1227] There is an adverse action against an employee when an employee's "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[1228]

1513.   If the employer refuses to act after there is a complaint of coworker adverse employment action, the employer may still be found responsible.[1229] Where nonsupervisory coworkers harass an employee to punish the employee for complaining, the employer may be liable if it knew or should have known of the retaliation, and either participated in it, encouraged it or failed to stop it.[1230]

---

[1224] 29 C.F.R. § 1604.11(d); see also Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 636 (7th Cir. 2009), EEOC v. Prospect Airport Servs., Inc., 621 F.3d 991, 1001 (9th Cir. 2010).

[1225] See Pryor v. United Air Lines, Inc., 791 F.3d 488 (4th Cir. 2015); Legal Update, Employer May Be Held Liable for Hostile Work Environment Created by Anonymous Racist Note: Fourth Circuit.

[1226] EEOC v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011).

[1227] Pryor v. United Air Lines, Inc., 791 F.3d 488 (4th Cir. 2015).

[1228] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

[1229] Pellier v. British Airways, Plc, No. 02-CV-4195, 2006 WL 132073 (E.D.N.Y. Jan. 17, 2006).

[1230] Kelley v. Conco Cos. (2011) 196 CA4th 191, 213-214, 126 CR3d 651, 670-671; Bohnert v. Roman Catholic Archbishop of San Francisco (ND CA 2015) 136 F.Supp.3d 1094, 1120; Yanowitz v. L'Oreal USA, Inc., supra, 36 C4th at 1060-1061, 32 CR3d at 460.

1514.   In *Centeno-Bernuy v. Perry*, here an employee filed reasonable, good faith labor complaints against an employer and as soon as the learned of the complaints, the employer (themselves or via agent as here with Appleseed) responded by reporting the employee to law enforcement and accusing the employee of extremely serious federal crimes.[1231] In *Centeno-Bernuy,* the employer repeatedly, without merit and in retaliation for the labor activity, reported the workers as "*terrorists*" to INS, claimed they were part of a "*sleeper cell*," claimed they were involved in trafficking and smuggling, and attempted to have them deported. During litigation of the employee's lawsuit against the employer, the employer also alleged the employees and lawyers were involved in "*the biggest operation of trafficking in and smuggling of illegal aliens in the 21st Century*."[1232] The employer was able to get INS to open an investigation into the employees and repeatedly claimed to be working with the agency against the employees. A federal court issues a restraining order against the employer from any further harassment and reports to government or law enforcement about the employees.[1233]

1515.   Here, in 2022, Apple learned Gjovik was working on a federal legal filing documenting Apple's criminal threats and intimidation, and promptly sent Joanna Appleseed after Gjovik, with Appleseed then without merit (and later confirmed by Appleseed to be without merit) reporting Gjovik to the FBI and law enforcement for "criminal blackmail and extortion," among other felonies, Then, days after viewing the legal filing Gjovik planned to submit addressed to the US District Attorney's office as well as several federal and state

---

[1231] *Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128 (W.D.N.Y. 2003).

[1232] Centeno-Bernuy, supra – ("Despite Perry's insistence to government authorities that plaintiffs are terrorists, he admitted at the hearing that he has no evidence that the plaintiffs are terrorists or members of a sleeper cell; it is simply his belief or opinion that they are.")

[1233] Centeno-Bernuy, supra – ("Ordered that defendant …. is restrained and enjoined from contacting or communicating with, in any way, any local, state or federal government official or agency, including but not limited to the United States Attorney General, the United States Attorney, the New York State Attorney General, the United States Department of Labor, the New York State Police, the INS, the United States Department of Homeland Security, and the United States State Department, with regard to the …. and their attorneys; and it is further; Ordered that defendant … is restrained and enjoined from any further retaliation, in any form, against the plaintiffs…")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

agencies,  and part of new charges Gjovik filed that month for the witness intimidation, Appleseed then filed a lawsuit against Gjovik again accusing Gjovik of "criminal blackmail and extortion," claiming Gjovik's NLRB charge against Apple was filed in bad faith, and claiming she feared for her safety from Gjovik, was not sure if Gjovik had a gun, and moved homes because of Gjovik. Appleseed also reported Gjovik's federal legal filing to Gjovik's webserver as "child pornography." Similarly, upon learning of Gjovik's appellate win of Appleseed's retaliatory lawsuit being cited in a SCOTUS brief, Appleseed then again reported (or claimed to have reported) Gjovik to law enforcement and accused Gjovik of more felonies.

The Director of Security of the NLRB, Raymond Hankins, and the supervisory Field Attorney for Region 32, Catherine Ventola, which is handling Ms. Gjovik's NLRB charge which names me, both recommended over the phone that I report Ms. Gjovik's conduct to federal and local authorities, on or around January 25, 2022, and on or around February 4, 2022, respectively. They further advised that they had had numerous operations meetings to discuss how to handle Ms. Gjovik's conduct and my personal and private information being published without my or my family's consent. They advised they would redact information per Exemption 6 of FOIA, and linked me to the relevant guide from the DOJ, but said they did not have jurisdiction over her

*Exhibit: Appleseed's 2/15/22 retaliatory lawsuit testimony claiming NLRB told her to report Gjovik to the police and FBI (which NLRB denied in writing)*

1516.  Just as with *Centeno-Bernuy,* prior to Gjovik's labor complaints, Appleseed nor any other agents of Apple, to Gjovik's knowledge, had reported Gjovik to law enforcement or sued Gjovik alleging Gjovik committed felonies.[1234]

---

[1234] Centeno-Bernuy, supra – ("The Court finds that [employer's] claims that plaintiffs are terrorists are baseless and that he has known from the outset that they were baseless. He has asserted these sensational yet unfounded claims to government authorities for the sole purpose of preventing or dissuading plaintiffs from pursuing the [labor] litigation.")

## J.   RETALIATION PRETEXT GENERALLY

1517.   This section applies to all legal claims that involve adverse and unfavorable employment actions, including but not limited to: Apple's termination of Gjovik on September 9 2021, Apple refusing to provide Gjovik her annual performance review around August-September 2021, co-worker retaliation in July-September 2021, Apple denying Gjovik's requests to attend training during the administrative leave around August 20 2021, forcing Gjovik on indefinite administrative leave on August 4 2021 and "removing her from the workplace and all workplace interactions", increasing Gjovik's workload with unfavorable projects in July 2021, pressuring Gjovik to go on FMLA leave from May-August 2021, pressuring Gjovik to file ADA accommodation requests for workplace safety issues from June-August 2021, refusing to provide Gjovik her mid-year review around April-May 2021, removing Gjovik from previously assigned projects around May-July 2021, opening a bogus, non-consensual investigation simply to make Gjovik a target for her management around April-June 2021, suggesting Gjovik quit around April 2021, denying Gjovik's requests to transfer to other management/teams or mitigate a hostile work environment in January-September 2021.

1518.   A plaintiff can show pretext "either (1) directly by persuading the court that a discriminatory reason more likely motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence."[1235] Circumstantial evidence tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable.[1236]

1519.   A plaintiff does not meet this burden simply by showing that "the employer's decision was wrong, mistaken, or unwise. Rather, the employee must demonstrate such

---

[1235] Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).
[1236] *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir.1998); *Adetuyi v. City & Cnty. of San Francisco*, 63 F. Supp. 3d 1073, 1087 (N.D. Cal. 2014).

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[1237]  Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons.[1238]

### i.    Reasonableness & Credibility

1520.   Gjovik is highly credible. Gjovik was correct in her concerns, validated by experts, encouraged by leaders in environmental health, and repeatedly thanked by coworkers.[1239]  Further, Gjovik was actually about to expose far more safety issues and misconduct then she was aware of at the time. (See, generally, Karen Silkwood).

1521.   On March 10 2021, Dr. Janice Prudhomme, the Asst. Deputy Director for Environmental and Occupational Health for the California Center for Public Health wrote to Gjovik's iCloud email address. The two had been corresponding about Gjovik's medical issues in 2020 and what she discovered about chemicals at her apartment. Gjovik shared a draft of the article she would publish in SF Bay View about her experience. Dr. Prudhomme wrote:

> "Your story is so compelling and you hit on so many important aspects of the many facets of these hazardous waste sites and what appears to be failures from all sides and yes, money seemingly at the root of it all…. I love what you are trying to do and it takes tenacity to fight the big guys. Continuing to bring awareness to impacted communities is noble and will hopefully improve the lives of many. Thank you for sharing this story and all your hard work."

---

[1237] *Horn v. Cushman & Wakefield W., Inc.*, 72 Cal.App.4th 798, 806–07, 85 Cal.Rptr.2d 459 (1999); *Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 966 (N.D. Cal. 2014), aff'd sub nom. *Cuevas v. SkyWest Airlines, Inc.,* 644 F. App'x 791 (9th Cir. 2016).
[1238] *Guz v Bechtel*, 24 Cal.4th at 361, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000); *Day v. Sears Holdings Corp.,* 930 F. Supp. 2d 1146, 1174–75 (C.D. Cal. 2013).
[1239] *Seater v. Southern California Edison Co.,* Decision & Order of Remand (ARB Sept. 27, 1996) ARB No. 96-013; ARB Nos. 96-013 and 97-072, ALJ No. 1995-ERA-13 (A whistleblowers concerns being factually correct is not determinative but can be evidence of pretext)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1522.   In the May 30 2021 letter of recommendation that Dr. Cohen wrote for Gjovik because Gjovik was worried, she was about to get fired by Apple and was looking for a different job elsewhere, Dr. Cohen described Gjovik as:

> Gjovik is very much a self-starter, with a sharp analytical mind, a passionate commitment to doing the right thing, a capacity to work with great energy and to great effect, and a deep sense of personal responsibility. She is also a wonderful collaborator: she listens attentively, respects the insights and expertise of the people she is working with, and expresses, clearly and forthrightly, her own insights and ideas.[1240]

Dr. Cohen is one of the most senior and well-respected executives at Apple.

1523.   In 2017, one of Gjovik's other mentors and another senior executive at Apple, Vice President Tara Bunch, wrote Gjovik a letter of recommendation for law school. Bunch noted that Gjovik is "a *great communicator and collaborator," "a good listener who seeks out the opinions and viewpoints of others*," and "*has the personal courage to contribute her thoughts and speak out on important issues*."[1241]

1524.   Meanwhile, from Gjovik's first meeting with Apple's teams in April 2021 about her office, Apple repeatedly made incorrect and dishonest statements about Gjovik's office and their operations. Further, ongoing Apple has repeatedly made false statements about its actions, about Gjovik's actions, and about the merit of Gjovik's complaints and charges.[1242]

---

[1240] Letter of Recommendation for Ashley Gjovik, Dated May 30 2021, signed J. Cohen.
[1241] Letter of Recommendation, Dated August 23 2017, signed Tara Bunch
[1242] Clemmons v. Ameristar Airways, Inc. , ARB No. 08-067, ALJ No. 2004-AIR-11 (ARB May 26, 2010) (Final Decision and Order) – ("the ALJ found Wachendorfer's statements concerning the reasons Ameristar fired Clemmons to be "incredible." Wachendorfer testified that Clemmons was fired because he had to instruct him how to load the aircraft on January 16, 2003. Substantial evidence supports the ALJ's finding that this reason was pretext because: (1) Wachendorfer did not talk to Clemmons on that day but to his co-pilot; (2) Clemmons was able to load 20 of the 24 pallets on the plane, not 30 percent as Wachendorfer claimed; (3) the problem was not Clemmons's supposed inability but the customer's misrepresentation of the size of the pallets; and (4) Wachendorfer admitted that no other pilot was fired for such a reason.")

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

### ii.      Temporal Proximity

1525.   Apple terminated Gjovik's employment less than two months after Gjovik filed internal and external complaints, participated an internal investigation, participated in an external investigation with a government agency, filed a lawsuit (charge/claim), and otherwise opposed Apple's conduct. At the time of termination, Apple refused to provide a coherent explanation as to why Gjovik was being terminated other than she refused to get on a phone call with a "Workplace Violence" interrogator and instead asked for the exchange to be in writing as she felt his contact was "witness intimidation" the day before a federal affidavit.

1526.   Apple terminated Gjovik within weeks, days, and under some statutes – only a matter of hours – after Gjovik engaged in protected activity. The temporal proximity here is enough for sole substantiation, but there is much additional evidence of pretext. Apple did not follow its own termination policies and process, and others were not terminated for the same actions; others were not terminated for far worse actions. [1243]

1527.   Apple's later disclosed timeline of events around Gjovik's termination reveal, if true (which they are not), that Apple likely planned to terminate Gjovik by no later than August 29 2021. However, Apple contacted Gjovik on September 3 under the premise of discussing the details of Gjovik's complaints about harassment and retaliation.[1244]

### iii.      There is No Defense of Ignorance

1528.   An employer may be liable for wrongful termination when the supervisor who starts the disciplinary process acts with retaliatory animus, but a different supervisor who ultimately fires the employee does not know that the employee has engaged in protected activities so long as the initial supervisor's retaliatory motive was a but-for cause of the

---

[1243] *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that causation could be inferred where the first adverse employment action occurred less than three months after the plaintiff's protected activity); *Erhart v. BofI Holding, Inc.,* 269 F. Supp. 3d 1059, 1076 (S.D. Cal. 2017) (citing *Yartzoff's* temporal standard in a SOX retaliation case)
[1244] Overall v. Tennessee Valley Authority, 97-ERA-53 (ALJ Apr. 1, 1998).

dismissal, the employer may be liable for retaliatory discharge.[1245] If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker.[1246]

1529.   At the time Gjovik was terminated, Gjovik reported to David Powers and Dan West. Dan West reported to Yannick Bertolus, and Yannick Bertolus reported to Dan Riccio, then John Ternus. Yannick Bertolus sent Gjovik her notice of termination, however Bertolus is very close personal friends with West, working together for twenty years – meeting at Palm, and both moving to Apple together, and continuing to work closely as well as spend personal time together. In fact, the Michelin Star restaurant where Gjovik was 'pimped and pandered' by West, was actually also one of Bertolus' favorite restaurants, and the chef came out to talk to Gjovik while she was there, talking about West and him texting about Gjovik that night, but also spending much time telling her very personal stories about Bertolus (which she protested and said was inappropriate for her to hear). It is unfathomable that Bertolus would have terminated Gjovik without knowledge of all of Gjovik's protected activity, including complaints about and to West, one of his close personal friends.

1530.   Here, Apple supposedly started investigating Gjovik on or around August 29 2021, and started interrogating other employees about it as early as September 3 2021, yet Apple repeatedly misled Gjovik about the investigation, instead twice lying to her and attempting to get her on a WebEx call under false pretenses on September 3 and 7 2021. Further, even in the extremely unlikely situation where the "Workplace Violence" interrogator who confronted Gjovik did not know about Gjovik's prior protected action, Gjovik complained about "witness

---

[1245] *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 113 (Cal. Ct. App. 2004).
[1246] *Russell v. McKinney Hosp. Venture* (5th Cir. 2000) 235 F.3d 219, 226; *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

intimidation" the day before her "NLRB affidavit" and the interrogator responded by suspending Gjovik's accounts within minutes. In addition, Apple used Gjovik's Vice President, Bertolus, to terminate her, and again, even in the extremely unlikely (and implausible) circumstance that Bertolus was not aware of Gjovik's prior protected activity, Bertolus cited the Workplace Violence interrogator in the termination letter, thus confirming Bertolus at least knew about Gjovik's NLRB charges and imminent testimony against Apple, prior to terminating her.

1531.   In *Reeves*, there was ample evidence that a manager acted with retaliatory motive when he opposed the employee's efforts to exercise labor rights and protected activity, made accusations against the employee who did these things, suddenly made accusations against the employee over a minor thing, did not properly investigate the employee's alleged misconduct, and instead labeled the misconduct as "*workplace violence*," and referred the matter to a security officer, knowing it could lead to the employee's discharge.[1247] *It was clear "the goal [was] getting rid of a worker who created trouble by complaining about matters that the supervisors preferred to ignore*."[1248] An improper investigation like this can indicate that the investigator was a cat's paw, a conduit for imputation of discriminatory animus.

1532.   Finally, Gjovik's complaints were not simply to her direct supervisor and not known by the larger company. By July 2021, Gjovik's complaints were known by her leadership and coworkers, by Apple Human Resources and Employee Relations (including senior leadership), Apple Legal leadership, Business Conduct and Global Security, and the tens of thousands of coworkers and managers who saw her posts on Apple's Slack tool. By August 2021, all of these people knew about Gjovik's complaints, including millions of people who saw the news articles about Gjovik's internal complaints and complaints filed to the government. It is

---

[1247] *Reeves v. Safeway Stores, Inc*., 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).
[1248] *Reeves v. Safeway Stores, Inc*., 121 Cal.App.4th 95, 115 (Cal. Ct. App. 2004).

impossible that Gjovik's entire leadership chain and all of Apple's human resources and global security teams were not aware of Gjovik's protected conduct.

### iv.   Post Hoc Rationalizations

1533.   The credibility of an employer's after-the-fact reasons for firing an employee is diminished if these reasons were not given at the time of the initial discharge decision.[1249] Simple inconsistencies between reasons and facts have been enough to prove pretext in the "context of a concerted effort to conceal major safety hazards."[1250] "*Poorly veiled threats and an attempt to abruptly terminate*" an employee quickly following protected activity was enough to "*raise an inference that the protected activity was a contributing factor in the unfavorable action*."[1251]

1534.   Apple's proffered explanation for terminating Gjovik does not attempt to explain all of the retaliation Gjovik complained of prior to suspension and termination. Apple positions itself as if Gjovik's Twitter posts about employee privacy occurred in a vacuum and denies that Apple had been mercilessly tormenting Gjovik for months prior. While it is now clear that Apple suddenly forced Gjovik on indefinite administrative leave to remove her prior to the US EPA inspection due to her disclosures, at the time Apple claimed it was some favor to Gjovik as they investigated Gjovik's complaints of discrimination, and retaliation for raising complaints of discrimination, and retaliation for raising complaints of retaliation. Prior to the indefinite administrative leave, Gjovik had already documented and complained of tangible adverse employment actions including: dramatically increasing her workload, assigning her unfavorable work, removing her from favorable work, repeatedly denying transfers, constructive termination, repeatedly suggesting Gjovik take some sort of mental health leave and to see a psychologist for mental issues, opening two sham investigations only attempting to force Gjovik to quit, and

---

[1249] Negron v. Vieques Air Link, Inc., ARB No. 04-021, ALJ No. 2003-AIR-010, slip op. at 8 (ARB Dec. 30, 2004), aff'd Vieques Air Link, Inc. v. U.S. Dept. of Labor, 437 F.3d 102, 109 (1st Cir. 2006).
[1250] St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).
[1251] *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1076 (S.D. Cal. 2017); *Tides v Boeing Co*, 644 F.3d at 814 (9th Circuit 2011); see also 29 C.F.R. § 1980.104(e)(2)(iv).

refusing to remedy harassment and retaliation against Gjovik (while instead taking steps to ensure the harassment and retaliation against Gjovik increased in severity).

1535.   Apple attempts to claim that shortly prior to Gjovik being put on leave on August 4 2021, Gjovik had simply asked to be put on leave. Around this time Gjovik was not only complaining about the retaliation against her, but also a culture of retaliation and cover-ups at Apple. Gjovik was complaining about Apple's abusive use of NDAs and misuse of ADA/FMLA processes to initiate terminations of employees for non-ADA/FMLA reasons. Gjovik had been complaining about the April-June 2021 sham investigation by Jenna Waibel and now also the July-August 2021 sham investigation by Ekelemchi Okpo. Gjovik was complaining about a cover-up at her office including Apple trying to obstruct justice and destroy/hide evidence. Gjovik repeatedly said she planned to sue Apple, that she knew Apple was trying to get her to quit but she refused to quit and they had to address her concerns, and that she believed they were all acting in bad faith. Gjovik also repeatedly asked Apple to intervene to limit the retaliation she was facing by her manager, either by limiting interactions to writing and reverting their changes to her workload, or 'pausing' her work with West and Powers during the investigation. Gjovik asked for a ceasefire of the retaliation, while also saying she refused to remove herself from the workplace (like taking medical leave), and that she was focused on ensuring Apple investigated and documented their findings for the lawsuit she planned to file against them. Apple then claimed Gjovik asked to be removed from the workplace and all workplace interactions, with no updates about her office, and no communicating with her coworkers, and with no ETA whatsoever for any updates or resolution of root cause of the issues.

1536.   Finally, Apple's repeated attempts at concocting a post-hoc defense and personally attacking Gjovik consistently rely on the same narrative – the same narrative Appleseed and others said Gjovik must 'admit to' if they were to ever stop tormenting Gjovik:

that Gjovik wanted to be on leave, that Gjovik leaked IP, that Gjovik deserved to be fired, that Gjovik just wanted attention, and that Gjovik is lying and acting in bad faith. Regardless of the facts (which do not support this narrative other than documentation Apple created itself solely to attempt to support its own false narrative), there is no logical explanation for Gjovik's actions if Apple's narrative was true.

### v.  Shifting Explanations

1537.   Apple's defense consists of roaming, pretextual, fragmented, ever changing, and conflicting narratives. Between at least September 3 2021 and March 2022, Apple's explanation for terminating Gjovik changed multiple times; first presented as a neutral update on the investigation into Gjovik's concerns timed with publication of a defamatory article about Gjovik's NLRB charge (September 3 2021), then shifting to a request to discuss "*inconsistencies*" in Gjovik's complaints (September 7 2021), then some urgent matter related to Workplace Violence and confidential information requiring a response within 'the hour' (September 9 2021), then accusations Gjovik vaguely violated Apple's employment policies and refused to get on the phone with the interrogator (later on September 9 2021), then implying Gjovik was fired due to some of her Twitter posts on August 28 and August 30, including her open and public participation in an article about work conditions at Apple (September 15 2021), then claiming Gjovik was fired for secretly, maliciously leaking confidential, product-related information and refusal to participate with an alleged investigation (March 2022).[1252]

1538.   Concurrently, Apple now claims that it never knew about Gjovik's August 31 2021 SEC whistleblower tip until after it fired Gjovik.  In Apple's March 2022 position statement, Apple's lawyers claimed Apple did investigate Gjovik's complaints about Apple Board Member Ronald Sugar however Apple claimed they "*investigated [Gjovik's concerns]*

---

[1252] *Timmons v. Franklin Electric Coop*., 1997-SWD-2 (ARB Dec. 1, 1998) (shifting explanations for termination point to pretext).

*and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated…*" [1253] In Apple's November 2023 Motion to Dismiss, Apple (via the exact same lawyer) would then claim that actually Gjovik never made any internal complaints about the topic.

1539.   Apple's later explanations for firing Gjovik contradict with the facts at the time of the termination.

1540.   Apple claimed to not know about the article Gjovik participated in published August 30 2021, yet Apple was asked for comment on the article by the publisher several days prior to publication.

1541.   Apple later claims Gjovik tried to conceal her involvement in the article, but the article includes quotes from Gjovik by name and an embedded video of images of Gjovik's face.

### vi.    Evidence of Forbidden Animus

1542.   Apple's animus against Gjovik continued to increase with the additional government charges and complaints she filed, and the continued requests from US EPA due to her disclosures, and any regulatory paperwork or communications required related to hazardous waste at 825 Stewart Drive and 3250 Scott Blvd. Actions related to the continued processing of a complaint may also remind an employer of its pendency or stoke an employer's animus. [1254] Apple retaliation against Gjovik increased as US EPA's interest in Gjovik's office increased, and as Gjovik filed additional government complaints against Apple. Apple's corrupt conduct towards Gjovik became increasingly deranged the more Gjovik spoke out about Apple's Global Security team and membership in the Worldwide Loyalty enterprise, and Apple's history of trouble with the California and US governments.

---

[1253] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorneys for Apple Inc).
[1254] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008); *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).

1543.   Apple's defense for a retaliation claim simply needed to be legitimate and non-retaliatory. However, here, Apple's proffered defense is not legitimate and is retaliatory. Apple cannot defeat a claim of retaliation for protected activity but claiming it did retaliate, but about different protected activity, just not that protected activity. The question is of retaliatory animus and Apple admits its animus openly. Evidence of a stark pattern of retaliatory conduct is "very persuasive" evidence of retaliatory motive.[1255]

1544.   Apple's online harassment cited Gjovik's protected activity as the reason for termination & retaliation. Before she was fired, Apple repeatedly told Gjovik not to speak with coworkers about her concerns about safety, labor, or retaliation. Apple's proffered reasons do not explain the other retaliation against Gjovik from March 2021-August 2021 (hostile work environment, constructive termination, reassigning of projects, increase in workload, assignment of unfavorable projects, etc.). Gjovik's September 9 2021 termination freed Apple from having to respond to Gjovik's discrimination and retaliation complaints, workplace safety complaints, vapor intrusion testing results, or provide her annual performance review the next week.

**vii.   Unlawful Corporate Interrogation of Employee Whistleblower (*Cotran*)**

1545.   The California Supreme Court held that the proper inquiry in adjudicating a breach of contract claim is not whether "the employee in fact commit[ted] the act leading to dismissal." [1256] Rather, it is whether "the factual basis on which the employer concluded a dischargeable act had been committed [was] reached honestly, after an appropriate investigation

---

[1255] *Hammrich v. Potlatch Corp*., 937 F.2d 612, 1991 WL 126366, *2 (9th Cir. June 28, 1991); *Coleman v. Quaker Oats Co*, 232 F.3d at 1283, (9th Cir. 2000).
[1256] Cotran v. Rollins Hudig Hall Int'l., Inc., 17 Cal. 4th 93, 107 (1998),

and for reasons that are not arbitrary or pretextual."[1257] An "adequate investigation," the Court held, "includes notice of the claimed misconduct and a chance for the employee to respond." [1258]

1546.   Apple claims it began investigating Gjovik promptly following a Business Conduct complaint filed on August 28 2021? about one of Gjovik's Twitter posts made on August 29 2021?. The post in question was Gjovik complaining about Apple asking repeatedly to scan her ear canals. There was nothing to investigate about this – Gjovik made the post from her own account. If Apple felt what Gjovik said was some sort of policy violation, they would have known that immediately. Apple then claims they began investigating Gjovik's comments about Face Gobbler at some unknown point, but no later than September 15 2021. Again, there was nothing to investigate about this – Gjovik made these comments under her own name. If Apple believed Gjovik's statements were some facial policy violations worthy of immediate termination, Apple would have known that immediately.

1547.   Meanwhile, Apple repeatedly contacted Gjovik on September 3 and 7 2021, with Okpo asking to talk to Gjovik about Gjovik's concerns, while secretly planning on interrogating Gjovik. This is a known tactic of these big tech companies, with Facebook recently doing something similar where it already planned to fire an employee for 'leaking' yet told the employee the employee was going to be promoted, in order to coerce the employee to enter an interrogation room with security personnel.[1259]

1548.   Gjovik, as documented by her contemporaneous social media posts, was scared Apple was not only about to threaten and punish her, but could also attempt to physical harm her. Further, Gjovik, as documented by her social media posts about the topic, expected Apple to contact her to threaten her to withdraw/drop her government charges against them. Based on

---

[1257] Id at 107.
[1258] Id at 108; Conducting an Effective Workplace Investigation, VLR994 ALI-ABA 459, 465.
[1259] The Guardian, '*They'll squash you like a bug': how Silicon Valley keeps a lid on leakers*, March 16 2018, https://www.theguardian.com/technology/2018/mar/16/silicon-valley-internal-work-spying-surveillance-leakers

information and belief, including stories of other big tech companies engaging in this type of conduct, Gjovik expected the meeting Apple wanted with her to involve unlawful conduct, and that Apple would threaten her to help them with their cover-up of their prior felonious activity. Gjovik requested the communications in writing because she wanted dissuade Apple from violating the law and she wanted to be able to document her refusal to violate the law or enable/aid Apple in violating the law. Gjovik's refusal to join the illegal interrogation was protected.[1260]

1549.   Following Apple's own post-hoc, meandering explanation for Gjovik's termination, Apple would have seen public posts by Gjovik on/around August 28 and August 30 2021 that Apple thought was facially worthy of immediate termination, yet Apple would not suspend Gjovik's accounts or terminate Gjovik until September 9 2021.[1261]

1550.   Gjovik never concealed or misrepresented her activities. Gjovik made disclosures under her own name and never denied she made the disclosures she did. Further, Apple's security training warned employees that even if employees 'leak', that they are unlikely to face discipline unless they lie about it.[1262]

1551.   Apple's termination – failed to follow disciplinary procedures, disregarded termination procedures in manual, and deviated from policy/practice.

### viii.   "Failure to Participate in Investigation"

1552.   Apple claims that Gjovik's public statements about ear canal scans and Face Gobbling were enough to justify Gjovik's immediate termination without warning, and also that

---

[1260] 2003-SOX-32 *Jayaraj v. Pro-Pharmaceuticals, Inc.*, Recommended Decision & Order (ALJ Feb. 11, 2005) (Colleen A. Geraghty) Pg 24
[1261] Apple's Position Statement, "*Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022*", Jessica R. Perry of Orrick, Herrington, & Sutcliffe (attorney's for Apple Inc).
[1262] The Outline, Leaked recording: Inside Apple's global war on leakers, June 20 2017, ("Nine times out of 10, when people get in trouble at Apple, [the Global Security executive] says, it's because they tried to cover up a mistake".) https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

Gjovik was terminated for "*failure to participate in the investigatory process*" for the investigation into Gjovik's public statements twelve days earlier. Gjovik said she was happy to help but asked that the communication stay in writing due to her government charges. Apple then proclaimed she refused to respond without giving her a warning or trying to negotiate.

1553.   Further, Gjovik responded 2 minutes after the first email saying she was happy to help, which is just how she responded to the Business Conduct investigator about the sanctions issues in July 2021 (2 minutes after the email is sent she says happy to help).

1554.   Quite similar to Lawson v U, both there and here, the employer suddenly requested the employee (Gjovik) speak with an investigator (Workplace Violence) about some investigation and the employee inquired what the investigation was about and worried (with contemporaneous statements) that she was about to be terminated or harmed, and then the employer informed the employee that the employee had not participated in the investigation. In addition, again in parallel with Lawson, the employer never informed the employee that refusing to meet with interrogators would be insubordination or noncooperation, or explain the ramifications of a refusal, the employee never explicitly refused to participate in the investigation, the employer never explained why their demanded format for the conversation was the only option, and the employee was never given an opportunity to reconsider the supposed alleged refusal.[1263]

### ix.   Arbitrary and Capricious; Apple's Actions with Gjovik were Contrary to Corporate Policies and Interests

1555.   Apple's proffered explanation for suspending and terminating Gjovik is far-fetched, inconsistent, illogical, and even puts Apple's claims of trade secret protection (for real trade secrets) at risk.

---

[1263]

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

1556.   Even if we believe Apple's statements about Gjovik's termination, that would mean Apple thought Gjovik was 'leaking' "confidential information" as early as August 29 2021, yet took no actions what so ever to warn Gjovik she was under investigation or that she violated a policy, took no actions to restrict Gjovik's access to actual confidential and proprietary information, including trade secrets and patent ideas, even though Apple thought Gjovik was 'leaking.'

1557.   Assuming Apple was made aware of Gjovik's comments and posts about Face Gobbler same day on August 30 2021, Apple would have then seen Gjovik continuing to 'leak' information Apple would later claim was confidential, yet Apple said nothing. On top of all of this, Apple's new claim that it never knew Gjovik filed an SEC tip prior to Gjovik's termination would require that Apple was not monitoring any of Gjovik's Twitter posts between August 31 2021 and September 9 2021 (because Gjovik posted on Twitter repeatedly about her SEC tip, including screenshots of the filing).

1558.   Viewing Apple's 'facts' as true, it would mean Apple thought it had a senior employee with access to highly sensitive, highly confidential information who was actively 'tweeting' statements and screenshots that included supposedly 'confidential, proprietary information', and Apple was supposedly actively investigating Gjovik's Twitter posts, and yet, in this scenario, Apple did not read any of Gjovik's Twitter posts after the start of its investigation and up to Gjovik's termination.

1559.   Apple publicly states that it "*devotes significant resources to network and data security,*" "*takes steps to secure confidential information,*" and "*has implemented systems and*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    DECEMBER 21 2023

*processes intended to secure its information technology systems and prevent unauthorized access to or loss of sensitive data and mitigate the impact of unauthorized access.*"[1264]

1560.   Multiple federal criminal lawsuits against ex-Apple employees note Apple's strict security procedures as well as the extensive harm caused by these ex-employees' misuse of Apple's confidential information. In 2014, an Apple Global Supply Manager was sentenced to prison and ordered to pay over $4.4 Million in restitution for trading "confidential internal Apple information" to external parties in exchange for kickbacks.[1265] In 2022, an ex-Apple firmware engineer pled guilty to theft of Apple's trade secrets.[1266] In 2023, a buyer in Apple's Global Service Supply Chain organization was sentenced to three years in prison and ordered to pay over $19 Million in restitution for wire and mail fraud and financial crimes, all of which were facilitated by his access to "insider information" at Apple.[1267] In 2023, a software engineer was charged with theft of Apple trade secrets.[1268]

1561.   On Jan 9 2019, the Apple manager running Gobbler, posted an article to LinkedIn called "Data Collection" where he wrote, "*During the lead up to Face ID being launched, my*

---

[1264] Apple Inc, 2023 10k, page 11, https://investor.apple.com/sec-filings/sec-filings-details/default.aspx?FilingId=17028298

[1265] United States v. Devine, Case No., 5:10-cr-00603-JW, USDC, Northern District of California (2010-2015) – ("in his role as Apple GSM, Devine had access to confidential company information, including Apple product forecasts and product development plans, known as "roadmaps", pricing targets, and product specifications." Doc #1, pg3, para 5); US DOJ, Former Apple Executive Sentenced to One Year in Prison for Defrauding Apple in Kickback Scheme and Laundering the Proceeds of The Fraud, press release, December 5 2014.

[1266] United States v. Zhang, Case No. 5:18-cr-00312 EJD, USDC, Northern District of California (2018-2023) – ("Zhang used his employment as an Apple employee, working on a secretive program, to obtain intellectual property and trade secrets from Apple", Doc 1, pg12, para38); US DOJ, Former Apple Employee Indicted on Theft of Trade Secrets, July 16 2018.

[1267] United States v. Prasad, Case No. 5:22-cr-00123-BLF, USDC, Northern District of California (2022-2023) – ("by virtue of his position at Apple Defendant had inside information regarding the company's fraud-detection techniques, and he designed his criminal schemes to avoid those techniques," Doc #39, pg4); US DOJ, Former Apple Employee Admits Defrauding Apple of More Than $17 Million, press release, November 1 2022.

[1268] United States v. Wang, Case No. 3:23-cr-00104, USDC, Northern District of California (2023-) – ("Due to Wang's role on the Project, he was granted broad access to the Databases, which contained trade secrets and intellectual property for the Project." Doc #1, pg3, para 9); US DOJ, Former Apple Employee Charged with Theft of Trade Secrets, press release, May 16 2023.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*team went out and collected a large set of potential aggressors to see if we were missing anything in our larger data collections, things would be normal to a regular user.*" Later that year, he posted again about the work Apple did on Face ID, saying that *"tons of data was being collected at the time to cover all the bases."[1269]* Here the head of Gobbler posted publicly about Gobbler, discussing the strategy and performance of the program, which was far more than Gjovik shared. McKeon was not fired. Further, Reigel, Marini, and Memula were held responsible for the inadvertent leak of actual Face ID in 2018 – yet none of them were fired.

1562.   Yet, here, Apple's best proffered explanation for what it did to Gjovik, claims that Apple was put on notice of a supposed active risk to its confidential information, with Gjovik leaking, yet for twelve days, took no steps whatsoever to prevent access by Gjovik to Apple's sensitive data. Gjovik even posted on Twitter on September 7 2021, noting she still had access to highly confidential information and Apple had not removed her access. In *Mattel, Inc. v. MGA Ent., Inc.*, the court found a genuine issue of fact if the company failed to take reasonable efforts to maintain the secrecy of its documents when it did not restrict access to sensitive company files despite the employee interviewing at a competitor and creating a "To Take" folder on his work computer.[1270] This is yet another signal that Apple's post hoc rationalization for terminating Gjovik is false and merely pretext.

**x.**    **Apple Stalks and Surveils any Public Commentary about the Company**

1563.   It is public information that Apple employees have reported when they post on social media about Apple, they quickly hear from Apple about it and a request to stop.[1271] The

---

[1269] Robert McKeon, https://www.linkedin.com/pulse/design-experiment-data-collection-robert-mckeon-aloe/; https://www.linkedin.com/pulse/ml-examining-test-set-robert-mckeon-aloe/

[1270] Mattel, Inc. v. MGA Ent., Inc., 782 F. Supp. 2d 911, 971 (C.D. Cal. 2011).

[1271] The Verge, *Apple's fortress of secrecy is crumbling from the inside*, September 30 2021, ("multiple employees tell The Verge that those who tweet about Apple quickly receive a note from the business communications team asking to chat. They don't always get in trouble, but the message is clear: Apple

contents of a 2018 leaked Apple memo threatening to file criminal charges against employee who "leak" was described by press as Apple's "*aggressive surveillance of its own employees and intensive investigative efforts to catch and punish leakers*" and added that "*Apple is notorious for its culture of secrecy.*"[1272] Apple pretending to be ignorant of Gjovik's social media activity and press interviews is absurd.

### xi.   Great Performance & No Discipline Prior to Complaints

1564.   Before Gjovik was fired, she had excellent performance ratings and an absence of prior complaints against her. Once Apple had indicated they were upset with Gjovik's protected activity and continued to advise Gjovik to not report safety concerns to her coworkers or to the government, nor to discuss concerns about work conditions with her coworkers, Apple then never gave Gjovik another performance review.

1565.   Not only did Apple refuse to give Gjovik any warnings prior to termination, a clear sign of pretext,[1273] Apple also somehow drug out Gjovik's mid-year and annual review without ever providing them to her. In 2020, Gjovik's annual performance review was dated June 2020. However, by the time Gjovik was terminated in September 2021, she had not received her mid-year or annual performance review for 2021 – which was highly unusual and against Apple policies.

### xii.   Apple's Concealment of What they did to Gjovik.

1566.   Apple was also grossly dishonest about Gjovik's protected activity – including a conspiracy to conceal from Gjovik that her disclosures led to an US EPA inspection of her Apple office, that the US EPA identified a number of issues including active vectors for

---

executives are watching.")  https://www.theverge.com/22700898/apple-company-culture-change-secrecy-employee-unrest
[1272] The Guardian, *Apple threatens leakers with criminal action in leaked memo – report*, April 13 2018, https://www.theguardian.com/technology/2018/apr/13/apple-memo-leaked-arrests-criminal-threat
[1273] *Clean Harbors v Herman*, 146 f3d 12 (1st cir 1998) – (evidence that the termination justification was pretext for retaliation included that the employer provided no warnings to the employee prior to termination).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

exposure to TCE and other chemicals, and that Apple was operating a secret semiconductor fabrication plant venting metric tons of solvent fumes directly into the apartment windows where Gjovik lived when she got severely ill from solvent fumes.

1567.   Apple concealed a material fact it is was under a duty to disclose to the Gjovik; Apple intended to defraud Gjovik; and Gjovik sustained damage as a result of the concealment or suppression of the fact.[1274] Apple misrepresented facts, knowing that the facts were false, and that Gjovik reasonably relied on these facts to her detriment.[1275]

1568.   Apple (Waibel, Okpo, Steiger, Jain) told Gjovik her office was safe when they knew about the HVAC/TCE issues, and while Gjovik suspected Apple was misleading her about the air testing and cracked floor, she would have never thought to look into the HVAC if it were not for Apple's statements. Apple (West, Powers) told Gjovik to pursue her claims against Irvine Company for her chemical exposure in 2020, when Apple (Real Estate, Legal, others) knew it was Apple who exposed Gjovik to chemicals, in additional to or instead of Irvine Company. Apple's encouragement of Gjovik to pursue the real estate company misdirected Gjovik and she relied to her detriment on Apple's statements. Apple (Okpo, Lagares, Steiger, Rubenstein, Powers, West) knew the US EPA was going to inspect Gjovik's office due to Gjovik's complaints about unsafe work conditions and CERCLA non-compliance, yet Apple concealed the inspection from Gjovik, and Apple (Lisa Jackson) misled Gjovik by engaging in a public relations blitz with the current head of the US EPA (Michael Reagan) at Apple Park the day before the inspection, causing Gjovik to believe the US EPA had ignored her complaints and causing Gjovik to not follow up with the US EPA until months after she was fired.

---

[1274] *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606, 172 Cal.Rptr.3d 218 (2014*); Mewawalla v. Middleman,* 601 F. Supp. 3d 574, 602 (N.D. Cal. 2022).
[1275] *Molko v. Holy Spirit Assn.*, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122, 762 P.2d 46 (1988) (superseded on other grounds by Cal. C. Civ. P. § 437c(o)(2)); *Mewawalla v. Middleman*, 601 F. Supp. 3d 574, 599–601 (N.D. Cal. 2022).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                      DECEMBER 21 2023

1569.   Cal. Pen.C. § 387(a), (b)(4) prohibits the knowing concealment of occupational hazards. "*A corporation… who has actual knowledge of a serious concealed danger (i.e., one that is not readily apparent and that could foreseeably cause death, great bodily injury or serious exposure) must notify both the [Labor] Division and affected employees. Failure to do so is punishable by up to three years' imprisonment and/or a $25,000 fine (increasing to as much as $1,000,000 for a corporate … defendant*)."[1276]

1570.   Apple was notified of a serious concealed danger (the HVAC/TCE mess at 825 Stewart Dr) by Northrop Grumman likely at some point between November 2020 and May 2021, and then by US EPA on July 27 2021. Apple's response to learning to that notification was to not tell employees, and to remove Gjovik from the workplace and all workplace interactions and conspire and attempt to conceal the issue from Gjovik for nearly a year.

1571.   Apple was notified of a serious concealed danger (that their factory at 3250 Scott Blvd was sickening a community with its silicon fabrication exhaust air pollution) by Gjovik in September 2020. Apple's response to that notification was to not tell Gjovik, to distract Gjovik in order to prevent Gjovik from looking into the matter further, and to continue with their dangerous operations.

1572.   Apple's summary of Gjovik's termination is full of misdirection, inconsistencies, and misrepresentations.

**xiii.   Farfetched and Illogical Narratives**

1573.   Under Apple's narrative, they were a safe and supportive workplace that respected Gjovik and took her concerns seriously. In that case, Gjovik would have every incentive to continue her employment with Apple in good standing, and to not cause trouble, as she was currently making great money working at Apple (more money than she'd ever make in

---

[1276] Cal. Pen.C. § 387(a), (b)(4)

another field) and had access to many benefits through her employment. So, then supposedly despite this, Gjovik suddenly began filing supposedly false claims and making supposedly false allegations "for attention." Apple repeatedly claims that it was not investigating Gjovik until late August 2021, which means Gjovik should have had no reason to think her job was in jeopardy and as such had no reason to take risky actions such as going public about her concerns.

1574.   Further, Apple's favorite inflammatory allegation is that Gjovik 'asked to be on leave' and then lied about it. Apple first claimed Gjovik was lying when she complained the leave was "indefinite" even though Apple admittedly refused to provide any ETA whatsoever for next steps. Gjovik also requested to 'come back' from leave to attend a training she was already registered for, and Apple told her 'no' 'because she was on leave.' Apple also then offered that Gjovik could ask to come back even though she had just asked to come back and in the same email Apple told her she cannot come back. If Gjovik was simply 'looking for attention' she would have taken every opportunity to loudly fight Apple on these clearly abusive tactics, but instead Gjovik was mostly quiet with Apple, as she knew they wanted to fire her and she did not want to be fired, and avoided initiating a conflict that Apple could use as an excuse to initiate a termination.

1575.   Evidence makes clear that in late July and early August, prior to the leave, Gjovik was extremely interested in what was going on with the cracks in the floor of her office and Apple's sudden EH&S activities, and Gjovik was heavily involved in organizing with employees about her concerns on work discussion tools. Gjovik asked for Apple to intervene with her managers who were actively retaliating against her, but there was no incentive whatsoever for Gjovik to ask to be removed / blocked from gathering evidence that supported her cases, or organizing with employees who could help her drive reform at the company.

1576.   Further, Gjovik has repeatedly said she would accept a formal written public apology from Apple for what they did to her, instead of damages. In addition, Gjovik denied Apple's original ~$600k settlement offer because she was afraid Apple was trying to abuse the claim waiver they requested, worrying they were hiding things. If Gjovik just wanted money, she should have taken that amount – which is larger than many jury verdict awards in employment cases – instead of denying the offer. Apple did not want an additional NDA so Gjovik could have gone and written a book about it if she also wanted "attention." Gjovik did none of these things. Instead, Gjovik has sacrificed everything in her life, and exposed some of the most painful and humiliating moments of her life to the public, in hope that everything Gjovik has gone through and fights for can help others and drive change to reform Apple's business practices.

1577.   Then, Apple claims Gjovik 'leaked' confidential information about two topics that it claims was previously known quote, despite one of the topics (ear scans) being well known for years due to disclosures made by Apple itself, and the second topic (Face ID biometric data collection) already being disclosed by Apple and other employees. The only thing previously unknown was that Apple was coercing its employees to allow Apple to collect this sensitive anatomical information from its own employees (and in the case of Gobbler, anyone around their phones), which is a protected disclosure. Finally, Apple claims that Gjovik signed some 'informed consent form' about the Gobbler app yet fails to mention it would have occurred prior to Gjovik even knowing what the app was,[1277] agreements were signed in a military-like locked compound with armed guards, and that Apple also refuses to provide Gjovik a copy of this alleged document.

---

[1277] A common coercive and predatory tactic by Apple: "You signed an NDA that let you see the NDA that had the code name on it. You couldn't see the code name, until you agreed not to discuss the code name.") Terry Lambert, Apple Makes You Sign an NDA Before You Can Even See a Secret Project's Codename, December 2016, https://www.forbes.com/sites/quora/2016/12/08/apple-makes-you-sign-an-nda-before-you-can-even-see-a-secret-projects-codename/?sh=49debf0a4b19

1578.   Next, Apple repeatedly claims repeatedly, vaguely and with much inflammation, that Gjovik 'asked to be on leave" / "wanted to be on leave"'– and even suggests that Apple offered for Gjovik to come back at any time. As discussed in depth in the facts and administrative leave sections, the situation in this case, even facially, was not as simple as "asking for leave" or "not asking for leave" yet Apple constantly leans into this binary dynamic for its key defense, forsaking any of the legal analysis to argue why the administrative leave Gjovik was placed on by Okpo on August 4 2021 aligned with the short-term mitigation or long-term resolutions Gjovik actually asked for, or why it was acceptable for Apple's version of this leave to include terms Gjovik has expressly said she would reject.

1579.   Next, Apple also repeatedly argues Gjovik could come back to work at any time, citing two pieces of evidence – two emails that Apple (Okpo) sent Gjovik, and Gjovik disputed in writing prior to her termination, yet Apple claims Apple's own statements are conclusive. First, Okpo unilaterally sent an email to Gjovik on August 4 2021 claiming he put Gjovik on leave because she asked for it. (See the facts section, Administrative Leave under "Adverse/Negative Actions Generally section, and the May/August Leave comparison section under "Retaliation Pretext Generally" for analysis on this.)

1580.   The second email exchange that Apple cites is around August 20 2021 when Gjovik asked to attend a training she was previously registered for, and noted she was granted permission by the professors (forwarding an email with their permission), however noting the professors asked her to ask Okpo for permission to attend so she didn't 'face disciplinary action.' Okpo responded to Gjovik's email denying Gjovik's request to attend the training and said nothing to reassure Gjovik she would not be disciplined if she wanted to return to work.

1581.   Gjovik then replied to Okpo and complained to him she felt the leave was retaliatory and punitive. After Gjovik's response, Okpo then replied saying Gjovik could <u>request</u>

to come back to work at any time (note, Okpo did not say Gjovik <u>could</u> come back to work at any time – but that she could <u>request</u> to come back). Apple's framing of this supposed 'offer' and combined with its simultaneous rejection of her request to come back for a training – made it clear Apple had no intention to let Gjovik come back, and if Gjovik asked, Apple would use her request as an excuse to force her to resign or otherwise create pretext for removing her from the company.

1582.   Finally, it was clear to Gjovik Apple had initiated her termination as soon as it "removed her from the workplace and all workplace interactions." As discussed in prior sections, parties that Apple told her were supposedly under investigation were put in charge of handling any concerns from Gjovik's coworkers about how that exact person had been treating Gjovik – Gjovik's leadership told her organization they would discuss "the Ashley Issue" at an All Hands meeting two months later – and other signs of animus and plans to terminate Gjovik. Gjovik extended the fantastical world Apple was creating to the extent of querying one of Apple's fake social media accounts, used to harass Gjovik, as to what West was up to with the "Apple Issue" conversations.



*Exhibit: Gjovik's 8/15/21 Twitter Post about "Ashley issue"*

1583.   Further, Apple had done nothing to mitigate Gjovik's concerns about her managers (reassigning her projects, increasing her workload with unfavorable projects, denying her request to work in a different building that wasn't a Superfund site, etc.) and then acted as if Gjovik would want to return to work with all those same issues, but instead of Apple trying to resolve the issues, Apple had now made the issues worse then they were before.

1584.   Gjovik's actions and statements align with what one would expect from a worker worried about safety issues and misconduct at her workplace, and a cover-up of complaints, who then faces multiple waves of retaliation on top of her existing and well-established hostile work environment, and under the increasing pressure created by the employer, the worker scrambles to both protect herself from the employer as well as investigate/document the employers misconduct, while balancing the employees personal injuries from the ongoing harm from the employer, with a good faith attempt to do the right thing for her coworkers and society.

1585.   Apple's false narrative makes no sense. Apple positions Gjovik as some sort of litigation-happy, attention-hungry loon who just wants attention and to create conflict. Apple's position is that Gjovik was a successful, long-time senior employee at the company who was trusted with some of Apple's most important and high-risk projects and decision making processes, who excelled in law school, successfully completed a high-visibility internship in Apple legal working on company-wide ethics policies, and was a trusted advisor and confident with some of Apple's most senior executives – yet Gjovik woke up one morning and decided to become irrationally obsessed with toxic waste and wanted to be a famous whistleblower so started making frivolous complaints about safety issues and filing bad faith reports of non-existent retaliation. In reality, there is no reason any person would subject themselves to these legal processes, on their own and with no support, driving themselves into debt, and losing any personal time or enjoyment during key years of their life.

1586.   Finally, Apple's narrative fails to mention it constructed a gas chamber in Gjovik's office in 2015 and was caught by the US EPA about it in 2021 due to Gjovik's complaints, which led to a mandatory US EPA inspection of Gjovik's office due to Gjovik's reports and where US EPA identified a number of safety issues (all of which were the same issues Gjovik was raising), and also, Apple nearly killed Gjovik in 2020 with their illegal hazardous waste air emissions next only a few hundred feet from her apartment and was hoping Gjovik never learned about any of it.

## IX.   DEMAND FOR RELIEF

**1587.**   **On the First Cause of Action: SOX Retaliation:** Apple violated SOX whistleblower retaliation prohibitions and thus owes Gjovik "make whole relief" with compensatory damages including lost wages (back pay, and front-pay or reinstatement), attorney's fees, and special damages for emotional distress, mental anguish, humiliation, and reputational harm.[1278]

**1588.**   **On the Second Cause of Action: Dodd-Frank Retaliation**: Due to of Apple's violation of the Dodd-Frank Act, Gjovik requests reinstatement (or front pay), two times the amount of back pay owed to the individual, with interest, and compensation for litigation costs, expert witness fees, and reasonable expenses.

**1589.**   **On the Third Cause of Action: Bane Civil Rights Act (§52):** Gjovik was harmed, and Apple's conduct was a substantial factor in causing Gjovik's harm. The Bane Act applies to private actors when they try to or do interfere with a victim's civil rights, as Apple did to Gjovik. Because Apple violated the Bane Act, Gjovik should be awarded compensatory damages, punitive/exemplary damages, attorney's fees with a fee multiplier, injunctive relief

---

[1278] *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1138 (10th Cir. 2013) (upholding an award of "noneconomic compensatory damages" for "emotional pain and suffering, mental anguish, and humiliation").

including a restraining order against Apple to protect Gjovik, treble damages, and a civil penalty of $25,000.[1279] Damages should be up to a maximum of three times the amount of actual damages but in no case less than $4,000 and attorney's fees.[1280]

1590.    Damages should include, but not be limited to: Gjovik's loss of employment, Gjovik's legal costs in fighting retaliatory litigation, costs to hire a 'reputation management firm' to remove or downrank defamatory articles about Gjovik based on Apple's actions and allegations against her, moving costs to flee California and hide in New York, expenses for personal and home security measures, and compensation for her mental anguish and emotional suffering from living in fear.[1281]

1591.   **On the Fourth Cause of Action: Ralph Civil Rights ACT (§51.7):** Gjovik was harmed and Apple's conduct was a substantial factor in causing Gjovik's harm.[1282] Because Apple violated the Ralph Act, Gjovik should be awarded compensatory damages, punitive/exemplary damages, attorney's fees, a restraining order against Apple to protect Gjovik from Apple, and a civil penalty of $25,000.[1283] Damages should include, but not limited to, losses described under The Bane Act above.[1284]

1592.   **On the Fifth Cause of Action: RICO Act:** Between 2017 and 2021, Gjovik's salary increased from $120,000 to $169,000 (an increase of 40%) and she went from $144,717 in

---

[1279] Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b).
[1280] § 52. Denial of civil rights or discrimination; damages; civil action by persons aggrieved; intervention; unlawful practice complaint; waiver of rights by contract
[1281] Cal. Civ. Code §§ 52(c) and 52.1(i); *Rodriguez v. County of LA*, 891 F.3d 776, 808–809 (9th Cir. 2018); Cal. Civ. Code § 52(b); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1446-48 (2006).
[1282] Cal. Civ. Proc. Code § 338. § 14:2. Ralph Act, Calif. Fair Housing and Public Accommodations § 14:2; *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.,* 212 Cal. App. 4th 258, 269 (2012).
[1283] 3068. Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b))
[1284] Judicial Council of California Civil Jury Instruction 3068 Ralph Act - Damages

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

total compensation in 2015, to $386,382 in 2020 (an increase of 267%).[1285]  At the time of her termination, Gjovik held $590,000 in unvested Apple Inc RSUs. Gjovik's next annual performance review was the week after she was terminated, and she had been expecting compensation to be at least what she received the year before (another 3-4% salary increase, a $22,000 bonus, and another $130,000 four-year RSU grant). Gjovik lost tangible pay due to Apple's felonious discharge of her employment.

1593.   RICO injury claims require tangible harm and monetary loss. As described in the RICO section, Gjovik suffered much damage to her chattel property due to Apple's environmental mail and wire fraud, and nonpeaceful use of chemical weapons.

1594.   **On the Sixth Cause of Action: Ultrahazardous Activities**: Because Apple engaged in ultrahazardous activities and caused injury to Gjovik through those activities, Gjovik requests compensatory damages, including for distress and mental anguish.

1595.   **On the Seventh Cause of Action: Cal. Labor Code § 1102.5:** Because Apple retaliated against Gjovik due to Gjovik's whistleblowing in violation of Cal. Labor Code § 1102.5, Apple must pay backpay and benefits, reinstate Gjovik (or pay front pay), pay the employee's actual damages, pay punitive damages, and pay reasonable attorney's fees.[1286] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[1287] Examples of violations are listed in the allegations.

1596.   **On the Eight Cause of Action: Cal. Labor Code § 98.6:** Because Apple violated Cal. Labor Code § 98.6 by discriminating, retaliating, and taking adverse against Gjovik

---

[1285] Note: these calculations are for purposes of proving tangible harm only and are not inclusive of all factors to determine damage amounts, do not contain all damage and remedy types, and are not meant to preclude or interfere with later remedy determinations.
[1286] Cal. Lab. Code § 1102.5(f). *Sargent v. Board of Trustees of the California State University*, Sonoma County Super. Ct. No. SCV-255399 (2021)
[1287] Cal. Lab. Code § 2802

because Gjovik engaged in protected conduct, Gjovik is owed reinstatement (or front pay), reimbursement for lost wages and work benefits, and civil penalties up to $10,000 for each employee for each violation.[1288] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[1289]

1597.   **On the Ninth Cause of Action: Cal. Labor Code § 6310:** Because Apple violated the California Occupational Safety and Health Act by discharging, threatening to discharge, demoting, suspending, and/or discriminating against Gjovik because Gjovik raised workplace safety concerns, Apple must reinstate Gjovik (or pay front pay) and reimburse Gjovik for back pay, and lost wages and work benefits. [1290] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[1291]

1598.   **On the Tenth Cause of Action: Wrongful Discharge in Violation of Public Policy**: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy; the discharged employee may maintain a tort action and recover damages traditionally available in such actions."[1292] Gjovik requests compensatory damages, consequential damages, punitive damages, attorney's fees, and injunctive relief.

1599.   Gjovik requests all remedies available, including back-pay (for lost wages, bonuses, and benefits), compensatory damages (for pecuniary losses, emotional distress, mental anguish, reputational harm, personal humiliation), punitive and exemplary damages for Apple's reckless and callous disregard for Gjovik's rights and health, injunctive and declaratory relief including reinstatement (or front-pay), and purging of negative personnel records.

---

[1288] Cal. Lab. Code § 98.6(b).
[1289] Cal. Lab. Code § 2802
[1290] Cal. Lab. Code § 6310(b).
[1291] Cal. Lab. Code § 2802
[1292] *Tameny v. Atlantic RichfieldCo.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330]

650

**1600.   On the Eleventh Cause of Action: Nuisance**: Cal. Civ. Code § 3501 provides remedies against a private nuisance in a civil action. Gjovik requests damages for annoyance, distress, mental anguish, and nominal damages.[1293] Gjovik seeks compensatory damages for the injury caused by the nuisance, including personal injury.

**1601.**   Damages may be recovered for "annoyance and distress, including mental anguish." Nominal damages are often awarded as well. [1294] Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom.[1295]

**1602.   On the Twelfth Cause of Action: Intentional Inflict of Emotional Distress**: Because Apple inflicted severe emotional distress on Gjovik, Apple shall compensate Gjovik for emotional distress including but not limited to medical bills, lost wages, lost earning capacity, and other compensatory damages. Gjovik should be compensated for her anxiety, depression, insomnia, disordered eating, loss of consortium, PTSD, loss of reputation, and loss of enjoyment of life activities. Apple also should pay Gjovik the maximum number of punitive/exemplary damages due to Apple's outrageous, repugnant, and deranged conduct.[1296] Apple is liable for a variety of special remedies.

**A.   SPECIAL REMEDIES**

**i.   Exemplary/Punitive Damages**

1603.   Gjovik is informed and believes and, on that basis, alleges that Apple was at all relevant times aware of the conduct of all of their employees and agents, and directed, approved,

---

[1293] Kornoff v Kingsburg Cotton Oil Co (1955) 45 Cal.2d 265, 272.

[1294] *Kornoff v Kingsburg Cotton Oil Co* (1955) 45 Cal.2d 265, 272. *Kelly v CB&I Construction, Inc* (2009) 179 Cal.App.4th 442, 456.

[1295] *Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 272 [288 P.2d 507]

[1296] California Civil Jury Instructions (CACI) 1600. See, for example, *Christensen v. Superior Court* (1991) 54 Cal.3d 868; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995; *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590; *Hughes v. Pair* (2009) 46 Cal.4th 1035.

and ratified that conduct.[1297] In addition or in the alternative, Gjovik is informed and believes and, on that basis, alleges that agents of Apple were at all relevant times unfit and Apple was reckless in employing them, and/or they were employed in a managerial capacity and acting in the scope of their employment.[1298]

1604.   Apple engaged in despicable conduct, exposing Gjovik to cruel and unjust hardship, with the intention to cause injury to Gjovik, and with conscious disregard of her rights. Defendants occupied a position of trust which gave them power to damage Gjovik's ability to earn a livelihood. Apple abused that position of trust by maliciously, fraudulently, and oppressively discharging Gjovik and intentionally interfering with her business. Apple's conduct was carried out by and ratified by one or more of Apple's agents, and it was willful and oppressive and done in conscious disregard of her rights. Gjovik is therefore entitled to punitive damages in an amount to be proven at trial.

1605.   Apple's harm against Gjovik was physical as well as economic; Apple's tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; Gjovik had financial vulnerability; the conduct involved repeated actions (was not an isolated incident); and the harm to Gjovik was the result of Apple's intentional malice, trickery, and deceit.[1299]

1606.   Punitive (aka exemplary) damages are appropriate in this case. California law permits awards of punitive damages "for the sake of example and by way of punishing the defendant."[1300] The most important factor in determining the amount of punitive damages to

---

[1297] *Merlo v. Standard Life Acc. Ins. Co.*, 59 Cal.App.3d 5, 18; *Agarwal v. Johnson*, 25 Cal.3d 932, 950 (Cal. 1979).
[1298] *Hale v. Farmers Ins. Exch.,* 42 Cal.App.3d 681, 690-691; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822, *Agarwal v. Johnson*, 25 Cal.3d 932, 950 (Cal. 1979)
[1299] *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419–29, 123 S. Ct. 1513, 1521–26, 155 L. Ed. 2d 585 (2003).
[1300] Civ. Code, § 3294(a); *Zirpel v. Alki David Prods*., B317334, 20 (Cal. Ct. App. Jun. 20, 2023)

award is "reprehensibility."[1301] The harm Apple caused was physical, not just economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions zirpel or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."[1302] These all apply here.

1607.   Under California law, a plaintiff may recover punitive damages in connection with a non-contractual claim if she establishes by clear and convincing evidence that the defendant is guilty of fraud, oppression, or malice. [Cal. Civil Code § 3294(a)].[1303] The California Supreme Court has concluded that an appropriate maximum ratio between punitive and compensatory damages is "10 times the compensatory award."[1304] Malice, for purposes of punitive damages, includes despicable conduct by the defendant with a willful and conscious disregard of the rights or safety of others.[1305]Apple's conduct was despicable,  and so "base, vile or contemptible" that it would be despised and looked down upon by ordinary people.[1306]

1608.   As of December 2023, Apple Inc has a market cap of $3.021 trillion, $61.55 billion in cash, annual revenue of $383.29 billion, and annual gross profit of $170.78 billion.[1307]

### ii.    Medical Monitoring

1609.   Gjovik requests remedy under statutes where available, that Apple provide and pay for medical monitoring for Gjovik, including any needed medical intervention on diseases

---

[1301] State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 419.
[1302] *Zirpel v. Alki David Prods.,* No. B317334, 21-22 (Cal. Ct. App. Jun. 20, 2023).
[1303] *Lupo et all v Quality Assurance Services,* Case No. 16cv737 JM (JMA), U.S. District Court, Southern District of California (July 26 2017); See *Turman v. Turning Point of Cent. California,* Inc., 191 Cal. App. 4th 53, 64 (2010).
[1304] *Zirpel v. Alki David Prods*., No. B317334, 23 (Cal. Ct. App. Jun. 20, 2023).
[1305] Civ. Code, § 3294, subd. (c)(1).
[1306] *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228; *Zirpel v. Alki David Prods*., No. B317334, 22 (Cal. Ct. App. Jun. 20, 2023).
[1307] Yahoo Finance, AAPL, [last visited 12/7/2023], https://finance.yahoo.com/quote/AAPL?p=AAPL; *Adams v. Murakami* (1991) 54 C3d 105, 110, 284 CR 318, 321; see *Barnes v. Logan* (9th Cir. 1997) 122 F3d 820, 821-822.

resulting from Gjovik's exposure to Apple's chemicals and gases. Apple's misconduct puts

Gjovik at "increased risk" for disease.  An application of tort law that allows post-injury, pre-

symptom recovery in toxic tort litigation for reasonable medical surveillance costs is manifestly

consistent with the public interest in early detection and treatment of disease.

1610.   Medical monitoring costs are a recoverable item of damages for plaintiffs who (1)

prove exposure to toxic chemicals as a result of a defendant's tortious conduct and (2) establish

that the need for medical monitoring is a reasonably certain consequence of the exposure.[1308]

The cost of medical monitoring in the future is awarded in California courts where the plaintiff

shows the need for such monitoring is a reasonably certain consequence of the toxic exposure,

and the recommended monitoring is reasonable.[1309] Gjovik will prove this related to both 825

Stewart Drive and 3250 Scott Blvd.

**iii.    Special Damages**

1611.   Gjovik is entitled to compensation for any special damages suffered by her

resulting from Apple's outrageous and defamatory acts.[1310]

1612.   Gjovik now suffers from permanent psychological trauma and damage because of

Gjovik's actions. Because of the threats and intimidation, she feared for her life and the

conspiracy hampered her ability to continue at the same level, causing her significant economic

damage. Gjovik has suffered tremendously because of Apple's efforts.

1613.   Compensatory and consequential damages should include reimbursement for

Gjovik's expenses in undertaking her own version of the *Federal Witness Security Program* and

---

[1308] *Potter v. Firestone Tire & Rubber Co., 2 Tx. L.R. 862 (Cal. Super. Ct., Monterey County, Case No. 81723, 1987)*. (Court finds increased risk of disease and awards damages for, inter alia, medical monitoring as a result of TCE generated by defendant and disposed of in city owned landfill.)
[1309] *Miranda v. Shell Oil Co.*, 7 Cal. Rptr. 2d 623, 74 Ed. Law Rep. 144, Prod. Liab. Rep. (CCH) P 13297 (App. 5th Dist. 1992), review granted and opinion superseded, 10 Cal. Rptr. 2d 182, 832 P.2d 898, 76 Ed. Law Rep. 175 (Cal. 1992).
[1310] *Agarwal v. Johnson*, 25 Cal.3d 932, 952 (Cal. 1979).

654

*Crime Victims Assistance Program*,[1311] in lieu of lack of assistance from the government. Expenses include "*medical costs, mental health counseling … and lost wages.*"[1312] Expenses may also include "*home security installation or improvement, relocation, crime scene clean-up.*"[1313] Injunctive relief includes the right to refuse to be interviewed (interview, deposition, or discovery request) by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant – and to set reasonable conditions on the conduct of any such interview to which the victim consents."[1314] Crime victim assistance costs also cover "*counseling… criminal justice advocacy, and emergency transportation.*"

1614.   Gjovik paid out of pocket for cross-country relocation, warned landlords and neighbors about the stalking and harassment, bought self-defense weapons, purchasing a digital address for her LLC in order to hide her home address wherever possible, installed home security equipment, attempted to remove damaging content from the internet through timely and costly SEO activities, and cleverly obtained 24/7 law enforcement outside her New York apartment at all times through proximity to a state executive building, and other tactics to stay safe.

### iv.    Injunctive Relief

1615.   Gjovik seeks injunctive relief against Apple, including, but not limited to an order that prohibits Apple from coercing their employees to allow Apple to gather and use their personal data in for-profit product development, including requests to participate in medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct in violation of their rights of privacy. Gjovik

---

[1311] US DOJ, *Assistance and Resources for Victims,* https://www.justice.gov/enrd/environmental-crime-victim-assistance/assistance-and-resources-victims; CalVCB, *What is Covered*, https://victims.ca.gov/for-victims/what-is-covered/
[1312] US DOJ, *supra*
[1313] CalVCB, *supra*
[1314] California Office of the Inspector General, *Marsy's Law,* https://oag.ca.gov/victimservices/marsys_law

also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically

obtained data, at the very least of Gjovik's data, including any products developed using

Gjovik's personal data, but especially Gobbler data from 2017-2021, and the naked/undressed

photos Apple obtained from Gjovik during the Batterygate fiasco in 2018.

1616.   Apple coerces employees to participate in these activities to extract their data and

to exploit in research and development of commercial, for-profit products, in violation of the

FTC Act and Cal. Bus. & Prof. Code § 17200. As a result of Defendants' unfair business

practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik and her

former co-workers. Apple should be required to restore these monies to Gjovik and her former

co-workers however Apple's extensive use of these illegal practices will make calculating

damages a challenge. In the absence of injunctive equitable relief, Gjovik and her prior

coworkers will suffer irreparable injury, which cannot readily be remedied by damage remedies.

1617.   Apple should be ordered to disgorge unlawful data, and the fruit of the toxic data,

models built off the unlawful data.

### v.   Physical Injuries and Sickness

1618.   Gjovik is owned damages on account of personal physical injuries or physical

sickness. These damages are exempt income and not taxable to the recipient.[1315]  Any amount

paid by an employer to a former employee "on account of personal physical injuries or

sickness," including any amount paid for emotional distress caused by such injuries/sickness, is

not income to the employee.[1316] Gjovik's injuries include, but are not limited, to the physical

harm to her body caused by the chemical exposure at her office and from the factory outside her

home; the emotional distress suffered by Gjovik due to those physical injuries; and attorney's

---

[1315] 26 USC § 104(a)(2); *Commissioner of Internal Revenue v. Schleier* (1995) 515 US 323, 337, 115 S.Ct. 2159, 2167 (decided under prior version of statute).
[1316] 26 USC § 104(a)(2); 26 CFR § 1.104-1(c)(1).

fees for these claims. Gjovik should also be refunded for all vacation time used to respond to these injuries, and all vacation time lost while on disability due to these injuries, and she should not be taxed for it.

### vi.   Declaratory Relief & Nominal Damages

1619.   Gjovik requests declaratory relief that Apple's NDAs and secrecy oaths related to its experiments on employees, and surveillance of employees, is unlawful. This would allow Gjovik and her coworkers to "to speak freely about their experiences," and seek "treatment and counseling for the harm inflicted by the experiments."[1317]

1620.   Further, where there is no other remedy, provide declaratory relief and nominal damages of $1.00 (or $3.00 where treble damages apply).

---

[1317] *Vietnam Veterans of Am. v. C.I.A.,* No. C 09-0037 CW, 2010 WL 291840, at *6 (N.D. Cal. Jan. 19, 2010)

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

# X.    PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgement in her favor on each and every claim for relief set forth above and award its relief, including but not limited to an Order:

    a.    Entering judgement in her favor

    b.    Awarding her monetary relief, including damages sustained in an amount to be determined at trial.

    c.    Awarding her compensatory damages

    d.    Awarding her consequential damages

    e.    Ordering her restatement at Apple, or else award her front pay and other applicable relevant consequential damages

    f.    Awarding her treble damages

    g.    Awarding her punitive and exemplary damages

    h.    Awarding her special damages

    i.    Awarding her attorney's fees with a fee multiplier

    j.    Awarding costs of suit incurred herein.

    k.    Where applicable, all the above with interest

    l.    Declaratory relief stating Gjovik is a Crime Victim under 18 U.S.C. § 3771 & 34 U.S.C. § 20141(e)(2)

    m.    Declaratory relief stating Gjovik is a Crime Victim under California Labor Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955

    n.    Order her personnel file cleared of negative references.

    o.    Order injunctive relief prohibiting invasions of employee privacy.

    p.    Order injunctive relief forcing disgorgement of software and other products developed using Gjovik's unlawfully obtained personal data.

    q.    Order injunctive relief forcing deletion of unlawfully obtained data of and related to Gjovik.

    r.    Order prohibiting commercial profit by Apple from this 'story' and any revenue or profit to be held for benefit of Plaintiff and disgorged entirely to Plaintiff.

    s.    Where there are no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00.

1    t.    For such other and further relief as the court deems just and proper.

2

3    **Plaintiff demands a Jury Trial.** [1318]

4                                        Respectfully submitted,

5

6

7                                        By_____

8                                             Ashley M. Gjovik
                                             *Pro Se* Complainant
9                                             12/21/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1318] Fed. R. Civ. P. 38(b).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

DATED: December 21 2023

## XI.    CERTIFICATION AND CLOSING

448. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

449. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

450. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.[1319]

Executed on:                  DECEMBER 21 2023

Signature of Plaintiff        _____

Printed Name of Plaintiff     Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816

Email: legal@ashleygjovik.com

Phone: (408) 883-4428

---

[1319] 28 U.S.C.A. § 1746

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

## XII.   APPENDIX I: SUMMARY OF PARTIES / PLACES

**Key People at Apple**
*(witnesses listed elsewhere)*

| Person | Title, Department | Role | Connections to Others |
|---|---|---|---|
| **Yannick Bertolus** | Vice President, Product Integrity | Prior executive of team Gjovik worked in; Sent termination letter; boss' boss | Friends with West, worked together at Palm |
| **Dan West** | Senior Director, Product Systems Quality | Co-manager at time of termination | Reports to Bertolus; Friends with Bertolus, worked together at Palm |
| **David Powers** | Director, Mac Systems Quality | Co-manager at time of termination | Reports to West |
| **Dan Riccio** | Senior Vice President, Hardware Engineering | Prior executive of team Gjovik worked in; Gjovik made complaints about Riccio's statements that implicated corruption | Bertolus used to report to Riccio |
| **Ekelemchi Okpo** | Investigator, Employee Relations | Led July-September 2021 Investigation | Reports to Lagares |
| **Jenna Waibel** | Investigator, Employee Relations | Led April-June 2021 Investigation | Reports to Lagares |
| **Tony Lagares** | Senior Manager, Corporate Employee Relations | Received Gjovik's complaints about a culture of cover-up, corruption, and retaliation at Apple. | Manager of both investigators (Okpo and Waibel) |
| **Helen Polkes** | Human Resources Business Partner, Hardware Engineering | Threatened, intimidated, harassed, and coerced Gjovik in 2021 – including forcing Gjovik to file worker's comp claim. | "HR BP" for Dan West and his organization |
| **Michael Steiger** | Project Manager, EH&S | Oversaw CERCLA at 825 Stewart Drive | Rotating door from EKI and back to EKI, working on Apple projects at EKI and Apple |
| **Debra Rubenstein** | Environmental/EH&S Lawyer, Apple Legal | Met with Gjovik in November 2020 for personal conversation; Oversaw legal matters related to Gjovik's office in 2021 | Involved in several of Apple's other environmental blunders, including the chemical spill at Apple Park in March 2021 |
| **Lisa Jackson** | Vice President, Government Affairs and Lobbying | False public statements; corrupt meddling | Prior US EPA admin including TRW Site; Synertek; Triple Site |
| **Ronald Sugar** | Board Member; Chair of Audit & Finance | (open question) | Per legal/regulatory filings, works very closely with Ronald |

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

| | | | Sugar |
|---|---|---|---|
| **Tom Moyer** | Head of Global Security and Chief Compliance Officer | Oversaw Business Compliance hotline where Gjovik submitted internal complaint on August 23 2021 | Per legal/regulatory filings, works very closely with Ronald Sugar; currently facing criminal charges for bribing Sheriff's Office |
| **Gene Levoff** | Vice President of Corporate Legal; Corporate Secretary | Was in charge of Apple's SEC filings through 2018, including one's Gjovik complains about here; Was in charge of all Apple subsidiaries which would include AC Wellness | Charged with 12 counts of criminal fraud; convicted and sentenced. |
| **Aleks Kagramanov** | Workplace Violence and Threat Assessment | Tried (unsuccessfully) to interrogate Gjovik on Sept. 9 202, 10min after Gjovik posted on Twitter about his team breaking into people's houses. | Also named as agent of employer in famous Google NLRB retaliation case (he is ex-Google) |
| **Evan Buyze** | Manager, Software Engineering | Prior direct supervisor | Conspired with Rica to constructively terminate and retaliate against Gjovik over Batterygate. |
| **Shandra Rica** | Senior Manager, Software Engineering | Prior "skip level" supervisor | Conspired with Rica to constructively terminate and retaliate against Gjovik over Batterygate. |
| **Brad Reigel** | Manager, Software Engineering | Prior direct supervisor; Prior co-worker | Also police officer at local police department |
| **Robert Marini** | Manager, Software Engineering | Prior co-worker | Close personal friends with Garfinkle; friends with Memula and Reigel |
| **Faye Garfinkle** | Manager, Software Engineering | Prior co-worker | Close personal friends with Marini; friends with Mondello and Vyas (who harassed Gjovik in 2021-2022) |
| **Venkat Memula** | Director, Software Engineering | Prior "skip level" supervisor | Assisted Worldwide Loyalty team and Global Security to obtain illegal search warrant for reporter's home in 2010. |
| **Linda Keshishoglou** | Manager, Software Engineering | Prior Direct Supervisor | Reported to Memula |
| **Kristen M** | Human Resources Business Partner, Software Engineering | "HR BP" for Kim Vorrath | Received complaints from Gjovik about Gjovik's managers in Software Engineering, and about Marini. |

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

| Kim Vorrath | Vice President, Software Engineering | Prior executive of team Gjovik worked in | Assigned Gjovik to EFFA role under Rica where Gjovik was constructively terminated |

**Key Companies**

| Agency / Company | Names | Notes |
| --- | --- | --- |
| **Apple Inc** | | |
| **Northrop Grumman (& TRW)** | Prior CEO: Ronald Sugar | Responsible Party for Triple Site & TRW Site Superfunds |
| **Honeywell** | Prior GC: Kate Adams CEO David Cote is ex TRW CEO | Responsible Party for Synertek Superfund |
| **Oaktree Capital** | Execs: Robert Denham (Chevron Board); John Frank (Chevron Board) | TRW/825 Stewart owner 2014-2016 |
| **Chevron** | Lead Board Director: Ronald Sugar; Robert Denham; John Frank | See also, Steven Donziger retaliation |
| **Irvine Company** | Board: Robert Denham (Chevron Board); John Frank (Chevron Board) | Property manager of Santa Clara Square (3255 Scott Blvd) |

**Key Places**

| Location Name | Address | Companies / People |
| --- | --- | --- |
| **TRW Microwave Superfund site; "Stewart 1"** | 825 Stewart Dr Sunnyvale | Apple as Tenant; Northrop Grumman as Responsible Party; Oaktree Capital, Hines, GI Partners, CalSTRS as Owners; AECOM & EKI as Consultants |
| **"Scott 1" (aka "Project Aria")** | 3250 Scott Blvd Santa Clara | Apple as Tenant; Honeywell as Responsible Party |
| **Santa Clara Square Apartments** | 3255 Scott Blvd Santa Clara | Irvine Company as Owner; Honeywell as Responsible Party |
| **Synertek Superfund site** | 3050 Coronado Dr Santa Clara | Honeywell as Responsible Party |
| **Triple Site in Sunnyvale** | Over 100 acres | Apple as Tenant in Multiple Buildings; Irvine Company and Oaktree Capital as Developers / Owners. |
| **Apple Park** | 1 Apple Park Way, Cupertino | Apple as Owner; HP as Responsible Party; EKI as Consultant |
| **"Tantau 9" / "Intersil/Siemens Superfund Site"** | 10900 Tantau Ave, Cupertino | Apple as Tenant; Siemens and GE as Responsible Parties |

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC          DECEMBER 21 2023

### XIII.   APPENDIX III: SUMMARY OF FALSE STATEMENTS

**Senior District Judge Chen's Standing Order Rule #10** [1320]
***Complaints in Federal Securities Fraud Cases***

"Where a plaintiff files a federal securities fraud case, the plaintiff shall attach to its complaint a chart regarding any allegedly fraudulent/misleading statement(s) or omission(s)."

**SOX Act & Dodd Frank Act Whistleblower Retaliation**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 786, 999 | Alysha Johnson. Reuters, December 6, 2016, California EPA says settled with Apple on hazardous waste claims | "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." [1321] | Apple does the bare minimum required and tells employees that | Gjovik to Cohen: "But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me." |
| 2 | 787 | Lisa Jackson, Apple Press Release, 4/21/21 | The resources and community initiatives we're sharing today are all about amplifying voices too often unheard, and giving | Apple showed complete indifference to the health impact of communities around its toxic waste sites; Apple | Gjovik tired to escalate Env Justice concerns & the Inclusion & Diversity team told her |

---

[1320] US Courts, CAND, *Judge Chen's Standing Orders*, https://www.cand.uscourts.gov/wp-content/uploads/judges/chen-emc/Standing-Order-Civil-General-REVISED-12-1-2022.pdf
[1321] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/; Reuters, https://www.reuters.com/article/idUSKBN13V2HS/

1

|  |  |  | people the tools to learn, engage, and be part of the solution… As people around the world celebrate Earth Day, Apple's focus remains on supporting those communities most impacted by climate change and environmental challenges."[1322] | has poor management of its hazardous waste sites | to pitch why Apple shouldn't poison Black people |
|---|---|---|---|---|---|
| 3 | 781 | Abstract, attributed to many statements by Apple | "Cares about Human Rights" | AG: "A company that likes to pretend it cares about human rights… pretends seems to be the important words there…" |  |
|  |  |  |  |  |  |

**RICO Predicate Act: Wire Fraud and/or Mail Fraud**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 986 | Apple, 2021, NMP Manifests in TRI filing | Apple claimed it shipped NMP to waste facilities but there were no manifests so it didn't | Cover-up how many chemicals it vented on Gjovik | It's literally a crime under RCRA |
| 2 | 990 | Apple, 2021, Art Fong | Claimed NMP is priority chemical and eliminated since 2016 | Have tons at 3250 Scott Blvd & launch it into the air | CAA violation |
| 3 | 1007 | Apple to EPA, May 28 2021 | "While proper ventilation and engineering controls can protect the health and safety of those | See, 3250 Scott Blvd emissions | CAA/RCRA violations |

[1322] Apple, *Apple Celebrates Earth Day 2021*, April 21 2021, https://www.apple.com/newsroom/2021/04/apple-celebrates-earth-day-2021/

2

| | | | working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities" | | |
|---|---|---|---|---|---|
| 4 | 1015 | Apple, 2018, to EPA | Apple generates 100% of our operational load through clean energy."[1323] | Proven they do not | |
| 5 | 1018 | Tim Cook, Apple Website, 12/21/21 | "Privacy is a fundamental human right. It's also one of our core values."[1324] | They claim employees have no right to privacy, which either means they're lying or they don' think their employees are humans | See to the left |
| 6 | 1031, 1032 | Apple, Ethics & Compliance Website, Current | "Apple conducts business ethically, honestly, and in full compliance with the law. | See all of Apple's fines, violations, sanctions, investigations | Corruption |
| | 1033 | Business Conduct Policy, Current, Apple | "Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations | See all of Apple's fines, violations, sanctions, investigations | Corruption |

---

[1323] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions* … (at 83 FR 45588, September 18, 2018).
[1324] Apple, Privacy, (last accessed 12/17/2023), https://www.apple.com/privacy/