**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

Plaintiff,

v.

**APPLE INC**, *a corporation*, et al,

Defendant.

**Case No. 3:23-cv-04597-EMC**

**Filed**: September 7, 2023

**District Judge**: Honorable Edward Chen

**THIRD AMENDED COMPLAINT**

**PLAINTIFF'S CLAIMS:**

**A. The RICO Act,**
   18 U.S.C. §§ 1962(a), (c), (d)

**B. Sarbanes-Oxley Act Whistleblower,**
   18 U.S.C. § 1514A

**C. Dodd-Frank Act Whistleblower,**
   15 U.S.C. § 78u-6(h)(1)(A)(iii)

**D. Private Nuisance & Nuisance Per Se**
   Cal. Civil Code § 3479

**E. Ultrahazardous / Abnormally Dangerous Activities (California Strict Liability)**

**F. Bane Civil Rights Act,**
   Cal. Civ Code § 52.1

**G. Ralph Civil Rights Act,**
   Cal. Civ Code § 51.7

**H. Cal. Whistleblower Protection Act**, Cal. Labor Code § 1102.5

**I. Retaliation for Filing Complaints,**
   Cal. Labor Code § 98.6

**J. Retaliation for Safety Activities,**
   Cal. Labor Code § 6310

**K. Termination in Violation of Public Policy**
   California *Tamney claim*

**L. Breach of Implied Contract & Covenant of Good Faith & Fair Dealing**

**M. Infliction of Emotional Distress (IIED/NIED)**

**N. Unfair Competition Law,**
   Cal. Business & Professional Code § 17200

### DEMAND FOR JURY TRIAL

1.     Ashley Gjovik ("Plaintiff") alleges that Apple Inc ("Defendant") has violated numerous federal laws that directly caused her injury, including the RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. § 96] (with predicate acts of wire fraud, mail fraud, securities fraud, witness intimidation, witness retaliation, and non-peaceful use of chemical weapons), SARBANES OXLEY ACT [18 U.S.C. § 1514A], and DODD-FRANK ACT [15 U.S.C. § 78u-6(h)(1)(A)(iii). Additionally, Plaintiff alleges Apple violated several California Labor Codes, including § 1102.5, § 98.6, and § 6310, and several California toxic torts, including private nuisance and ultrahazardous activities. Finally, Plaintiff also alleges Apple intentionally and negligently inflicted emotional distress upon her in the states of California and New York, and the Commonwealth of Massachusetts.

## I.     JURISDICTION & VENUE

2.     This court has jurisdiction over both subject matter and diversity claims. The United States District Courts have original and exclusive jurisdiction over whistleblower retaliation claims under THE SARBANES-OXLEY ACT AND THE DODD-FRANK ACT. This US District Court has federal question jurisdiction over "*all civil actions arising under the Constitution, laws, or treaties of the United States*" [28 U.S.C. § 1331], which provides original jurisdiction over several claims and issues in this case.

3.     The United States District Courts also have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. When the complaint was filed, Plaintiff was domiciled in the state of New York and is now domiciled in the Commonwealth of Massachusetts. Defendant is a corporation headquartered in California.

4.     The federal courts have an independent basis for federal jurisdiction on this case; thus, they may also exercise supplemental jurisdiction because the claims arise from the same case and controversy, share a common nucleus of operative fact, and would ordinarily be expected to be tried in one judicial proceeding. [28 U.S.C. § 1367; *Osborn v. Haley*]. The state claims here require analysis of many of the same facts and legal questions as the federal claims.

5.     Venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district. Many of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California. The plaintiff filed this complaint with the San Francisco Division; however, the San Jose and San Francisco Divisions are proper. [Civil L.R. 3-5(b)].

## II.     PARTIES

6. Ashley Gjovik, (pronounced "JOE-vik"), ("Plaintiff"), was an Apple employee and a covered person under applicable statutes in this complaint. Gjovik is a natural person domiciled in Massachusetts, holding a Juris Doctor, and appearing Pro Se. Gjovik lived in Santa Clara from February 2020 through October 2020 and August 2021 through August 2022. Gjovik lived and worked in San Francisco County from October 2020 through August 2021. Gjovik established a consulting LLC in California in 2022, which she continues to manage with a virtual office in Sacramento at 2108 N St. Ste. 4553 Sacramento, CA, 95816. (The LLC address is used on papers for privacy.)

7. Apple Inc., ("Defendant"), is a business engaged in and affecting interstate commerce and a covered entity under the statutes at issue here. Apple is a corporation headquartered at One Apple Park Way in Cupertino, California. "Apple" refers to its successors and assigns; controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures; and their directors, officers, managers, agents, and employees. Apple is engaged in interstate and foreign commerce and has offices, stores, call centers, and other facilities in numerous US states and foreign countries. Apple's business consists of "*design, manufacture, and marketing*" products and sales of "*various related services.*" As of December 2023, Apple Inc. claimed a market cap of $3.021 trillion and annual revenue of $383.29 billion. [1] Apple's stock ticker symbol is AAPL. At all pertinent times, Apple was the tenant and operator controlling the facilities at 825 Stewart Drive in Sunnyvale and 3250 Scott Boulevard in Santa Clara, California.

### III.   NOTICE OF PENDENCY & CONFLICT OF LAWS

8. Gjovik left her CERCLA ("Superfund") and OSH Act whistleblower retaliation cases with the US Department of Labor as the claim's exclusive jurisdiction is with the US Department of Labor, and there is no way to remove the two charges to the US district courts for a de novo trial. The OSH Act charge is under the "Request for Review" process with the Directorate of Whistleblower Protection Programs, and her CERCLA charge is docketed with the US DOL Office of Administrative Law Judges under 2024-CER-00001 in Boston.

9. Gjovik has six pending NLRB charges. NLRB cases cannot be removed to court for de novo hearings, as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. The NLRB issued a Decision of Merit on two of Gjovik's charges in January 2023, (thus the NLRB will issue a

---

[1] Apple Inc, 2023 10K,.

complaint and sue Apple if Apple does not settle first). Gjovik's two meritorious charges included Apple's Business Conduct Policy, NDAs, Intellectual-Property Agreement, and an email CEO Tim Cook sent his staff in September 2021, shortly after Gjovik was fired.[2] Gjovik's four other charges allege unfair labor practices. Three were under review with the General Counsel's Division of Advice office for some time.[3] The fourth charge was recently filed due to Apple's out-of-court conduct related to this case, including promulgating unlawful work rules.[4]

## IV.   STATEMENT OF FACTS

10.    The Plaintiff, Ashley Gjovik, is a 37-year-old woman residing in Boston, Massachusetts. Gjovik holds a Bachelor of Science in Liberal Studies and a Juris Doctor degree awarded in June 2022. Gjovik also has a certificate in Public International Law and participated in a 'summer abroad' studying international law and transitional justice at the University of Oxford in 2021 and worked for a term for a non-profit organization as a legal caseworker for refugees and asylum seekers in 2021.

11.    Gjovik worked at Apple from 2015 to 2021. At the time of her termination, her title was Senior Engineering Program Manager, and her base salary was $169,000 annually. In the last full year, Gjovik worked at Apple (2020), her total W-2 compensation was $386,382. Gjovik was the co-founder of a large women's community group at Apple. Gjovik worked in a rotation position within Apple's Legal department in 2019-2020, primarily supporting the Government Affairs and Software Product Legal teams' efforts to establish Apple's first company-wide Artificial Intelligence Ethics and Social Responsibility policy.

12.    Since September 2023, Gjovik has been a program manager for an air pollution research project at a non-profit research university. The role is temporary and does not utilize her legal or engineering experience. After two years of searching and hundreds of applications, it was the first and only job offer she could obtain. The role is a far lower seniority than her role at Apple, and in this first job after Apple, Gjovik's salary was reduced by 41% and total compensation lowered by 74%.

### i.    Gjovik's Employment at Apple

13.    Gjovik joined Apple on February 23, 2015, as an Engineering Project Manager in the

---

[2] 32-CA-284441 and 32-CA-284428 (Oct. 12 2021).
[3] 32-CA-282142 (Aug. 26 2021), 32-CA-283161 (Sept. 16 2021), 32-CA-288816 (Jan. 10 2022).
[4] 01-CA-332897 (Dec. 29 2023).

Software Project Management Office until January 2017. She reported to several managers under the same Director (Venkat Memula) during this time. Gjovik experienced severe harassment, discrimination, bullying, and an untenable hostile work environment during those two years, primarily from her coworkers, Rob Marini and Brad Reigel. Memula repeatedly failed to correct their behavior.

14.     Marini bragged that he was known to executives as their "*Little Gestapo*." He quickly made a work tracking ticket titled "*Make Ashley's Life a Living Hell*," then assigned it to Reigel. Marini often planned and orchestrated malicious schemes to harass Gjovik and cause her distress, including getting multiple members of the team to physically attack Gjovik, spreading rumors about Gjovik, secretly recording Gjovik and sharing recordings with their team (a crime in California), and frequently pressuring Gjovik to drink hard alcohol at work. Marini made cruel comments. He once noticed Gjovik made a typo in an XML and told Gjovik that her mother should have had an abortion. Both Marini and Reigel cursed at Gjovik, called her names, and wrote harassing statements and nicknames on whiteboards about her. Memula assigned Gjovik to share an office with Marini. Marini told Gjovik in the first week that all of his prior officemates either quit the company, left the country, or killed themselves. Marini asked Gjovik which path she would choose. Marini once told Gjovik he targeted her with harassment and bullying because she was 'joyful,' and he wanted to 'extinguish' her light.

15.     Reigel was an active police officer, had ammunition in his office, allegedly physically 'flipped a table' in a meeting, and supposedly kept a gun in his car at times. Reigel once kept Gjovik in a conference room with the door closed and berated her for a prolonged period while she wept and begged him to stop. He sometimes made 'joking' comments, like he'd 'smack her' if she did not do what he said.

16.     Gjovik's first manager, Linda Keshishoglou, tried to bribe Gjovik in exchange for Gjovik providing a positive review to Keshishoglou's manager, Memula. Gjovik reported it to Memula and Human Resources. When Keshishoglou left the organization, Gjovik was transferred to report to Reigel. Gjovik attempted to move to a different team but was thwarted and blocked by Reigel, who provided negative feedback about her to the hiring manager and could not explain why.

17.     Gjovik was then transferred under Evan Buyze and Shandra Rica (in Memula's organization) to run Early Field Failure Analysis for the company, where she received very positive feedback and praise until one specific field issue which led to a retaliatory constructive termination. Gjovik's managers had become upset at Gjovik because Gjovik was earnestly trying to investigate a trend

of battery failures in the field, and Gjovik's managers preferred to "ignore it and hope it goes away" and told Gjovik to also "ignore it," which Gjovik refused to do. Buyze and Rica told Gjovik not to tell people why she was leaving their organization, with Rica saying she "*doesn't like people who talk shit.*" This battery failure issue and Apple's resulting response would be nicknamed "*Batterygate.*"

18.     Gjovik joined Product Systems Quality in Hardware Engineering in January 2017 after leaving Software Engineering. Gjovik now reported to Dan West (Senior Director) and David Powers (Director) as a Senior Engineering Program Manager and chief of staff. Both West and Powers engaged in harassing, discriminatory, and inappropriate conduct toward Gjovik – including remarks and decisions that discriminated against Gjovik based on sex, gender, and disability. In December 2017, West also attempted to coerce Gjovik to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Gjovik complained then and later, and in January 2021, West admitted it was "*one of the worst things [he's] ever done.*"

19.     Other leaders in West's organization also discriminated against Gjovik, including John Basanese, who frequently complained that Gjovik was not married and did not have kids, and during company social events, often pressured Gjovik to 'settle down' and 'have kids.' Gjovik complained to Basanese and West about the statements, but Basanese persisted for years. In addition, Powers' US-based team was 90% men, and all of Powers' other direct reports (other than Gjovik) were men.

20.     While Gjovik's performance reviews were positive, outside the reviews, Powers and West frequently gave Gjovik 'feedback' like she was too 'emotional,' 'aggressive,' or 'expressive.' Gjovik gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen and thank her for being honest with him. Powers did not respond well and frequently berated her. In two meetings, Powers criticized Gjovik, making her cry, and then berated her about her crying, making her cry more.

21.     Before Apple's unlawful actions towards Gjovik, Gjovik wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple indefinitely if she could transfer to a better role, not in a hostile work environment like her current role. Gjovik had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) and convince them to hire her upon graduation. She continued mentioning this plan into 2021. Meanwhile, Gjovik's supervisor, West, frustrated several of Gjovik's attempts to transfer to roles

focused on law/legislation/policy – including directly blocking an offer in December 2020 for Gjovik to work on Apple's implementation of circular economy legislation.

### ii.    Apple's Secret Semiconductor Fabrication at 3250 Scott Blvd ("Aria")

22.    In early 2015, Apple started stealth semiconductor fabrication activities in a facility located at 3250 Scott Boulevard in Santa Clara, California, which Apple codenamed "ARIA." The factory is less than three hundred feet from thousands of homes where Gjovik lived in 2020. Apple intentionally vented its fabrication exhaust – unabated – and consisting of toxic solvent vapors, gases, and fumes – into the ambient outdoor air. The factory was only one story, while the apartments were four stories tall, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

23.    Apple Inc. was fully aware of this facility and its operations, including the vast amount of hazardous materials and hazardous waste, as every year, Apple submits a financial assurance document to the Santa Clara Fire Department & Haz Mat agency, which details hazardous waste treatment and disposal operations, and is personally signed by Apple's Chief Financial Officer, Luca Maestri – including affixing a company seal. Each financial assurance filing attached a detailed confirmation letter from Apple's third-party auditor, E&Y. Maestri, who was also on the email distribution list for notification of hazardous waste violations at the facility.

24.    Upon initiating operations, Apple was quickly cited for building, environmental, health/safety, and fire code violations at ARIA in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water, fire code and CalASPA violations, health & safety code violations), 2019 (phosphine and silane spill, phosphine leak, wastewater testing violations), 2020 (fire code violations, using two EPA identification numbers, inaccurate hazmat inventory data, Tetraethyl Orthosilicate spill, no spill plans or training, no business permit, no signature from supervisor on records), 2021 (ozone leak, another phosphine leak), and 2022 (fluorine gas leak and Hexafluorobutadiene leak).

25.    In February 2020, Gjovik moved into an apartment building at 3255 Scott Blvd and became severely ill. Gjovik suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Gjovik also suffered bradycardia (slow heart rate), volatile blood pressure with both hypertension and hypotension and a high frequency of premature ventricular contractions (an arrhythmia). From February 2020 through September 2020, Gjovik

was screened for multiple severe and fatal diseases and disorders, including Multiple Sclerosis, brain tumors, deadly arrhythmias, and Neuromyelitis Optica – instead, all of Gjovik's symptoms were consistent with chemical exposure. Due to the solvent exposure, Gjovik also suffered skin rashes, burns, and hives, and her hair fell out and she had a shaved head for most of 2022 as the bald patches grew back.

26.     Gjovik visited the Emergency Room on February 13, 2020, and Urgent Care (at AC Wellness, Apple's for-profit in-house clinic) on February 20, 2020.  Gjovik subsequently consulted with dozens of doctors, who screened her for all sorts of diseases, subjecting Gjovik to extensive blood draws, urine samples, injections, and scans – including potentially dangerous procedures like MRI and CT scans with contrast, of which Gjovik had multiple. Gjovik was too sick to work and went on disability.

27.     Gjovik transitioned her medical care to a different clinic and provider after her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure to Apple's factory exhaust) and instead suggested Gjovik could be suffering from anxiety and enrolled Gjovik in an Apple internal user study related to blood pressure, requiring Gjovik share her iPhone medical and fitness data with Apple, and participate in weekly life coaching sessions (while being exposed to Apple's solvent vapor and gas exhaust).

28.     While sick in 2020, Gjovik would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure. All of these symptoms match Phosphine and Arsine gas exposure, which can quickly become lethal. Apple has a significant quantity of Arsine gas on site, and Gjovik's medical tests from September 2020, the morning after one of the 3 AM attacks, revealed significant arsenic in her blood with no other explanation than Arsine gas exposure within the prior eight hours.[5]

29.     On September 2, 2020, Gjovik discovered high levels of volatile organic compounds in her indoor air when she was feeling severely ill. Gjovik sought out multiple occupational and environmental exposure doctors, who told Gjovik that all of her symptoms were consistent with solvent and other chemical exposures. After Gjovik discovered her medical issues at the apartment were due to a chemical emergency, Gjovik quickly filed complaints with Santa Clara City HazMat/Fire Department, California EPA, and US EPA. She also called poison, who said what she described also sounded like Benzene

---

[5] US CDC, NIOSH, *Arsine Emergency Response.*

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                          FEBRUARY 27 2024

exposure. Gjovik notified several Apple executives of her findings and activities, including her managers Powers (Director) and West (Sr. Director), her friends J.C. (Senior Director) and A.A. (Senior Manager).

30.     In September 2020, Gjovik hired an industrial hygienist to test the indoor air at her apartment. It returned results showing a number of the chemicals in use by Apple at ARIA including Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, 1,2,4-TMB, and Xylene. However, the TO-17 test only returned chemicals for ½ of the total VOCs it accounted for. The testing panel did not test for NMP, arsine, phosphorus, silane, or chlorine – they may have also been present. In September 2020, Gjovik's blood and urine medical tests showed industrial chemicals, including Arsenic/Arsine, Toluene (Hippuric Acid), and Xylene (2-3-4 Methyl hippuric Acid (2, -3-,4-MHA) in her urine.

31.     In September 2020, Gjovik set up additional air monitors to observe the levels of VOCs in her apartment next to the ARIA factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Gjovik had noticed with her symptoms and ad hoc testing – that the VOCs mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was).

32.     Gjovik noticed an Apple facility at 3250 Scott Boulevard across the street, which was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on at least September 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S had at least two phone calls with a woman who responded who was also actually in charge of Real Estate/EH&S teams involved in Gjovik's Superfund office at 825 Stewart Drive ("Stewart 1") and the activities at ARIA. The Apple Real Estate manager suggested that Gjovik use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. A couple months later, Apple changed the charcoal/carbon in their exhaust filters for the first time in December 2020. (these should have been replaced at least every six months instead of five years).

33.     On. On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around 3250 Scott.[6] More victims and witnesses promptly came forward; some were also Apple employees. On April 5, 2021, Gjovik told West about the other victims, and West warned her she was "*kicking a hornet's nest*." West asked Gjovik not to send

---

[6] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste*, SF Bay View (March 26 2021)

information about Gjovik's chemical exposure at 3255 Scott Blvd to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits*."

34.     On April 5, 2021, Gjovik notified Osman Akhtar, Director of Apple "AC Wellness" employee medical Centers and Clinical Engineering, that after her article was published, more people came forward from the 3255 Scott Blvd apartments reporting illness. "*Two are Apple employees. At least one went through AC Wellness, but no one could figure out what was wrong with them*." Gjovik suggested Akhtar direct the clinic to "*screen local folks*" with unexplained symptoms that match solvent exposure.

35.     On April 29, 2021, Gjovik visited an occupational exposure doctor about her apparent chemical exposure in the apartments next to Apple's ARIA factory and at Stewart 1.[7] The UCSF visit notes summarized Gjovik's 2020 medical symptoms saying:

> "She was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal bleeding, and swollen glands" The visit notes warned: "there remains a concern about potential pathways for residential exposures, and the county and State environmental agencies should address these…. she also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues..."

36.     Gjovik emailed the US EPA and CalEPA about the issues from September 2020 through April 2021; many Apple leaders knew she did so. Starting in early 2021, Gjovik also contacted and met with local, state, and federal politicians about what occurred to her next to ARIA – and Apple was aware of this. For example, Gjovik met with Senator Bob Weickowski and his staff on April 7, 2021. Gjovik also met with Assembly Member Lee's staff once and Mayor Lisa Gillmor several times. On April 7, 2021, Gjovik told West about the meetings. On April 9, 2021, Gjovik contacted the County District Attorney's office, talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes, and met with him on April 16, 2021.

37.     Around the summer of 2021, Apple reported to the US EPA that in the year 2020, they released 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air from the ARIA factory. In 2022, the US EPA severely restricted the legal use of NMP as *"it presents an unreasonable risk of injury to human health"*

---

[7] Dr. Robert Harrison, MD – who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health.

under TSCA. Many of Apple's chemicals at the plant were characterized as "extremely hazardous" or "acutely hazardous" materials. [8 CCR § 5189(b)(1), (c)]

38.     On July 27, 2021, a non-profit organization asked Gjovik to testify as a witness to state Senator Dave Cortese about her experience with hazardous waste clean-up sites in Santa Clara County, and Gjovik accepted. On August 15, 2021, Gjovik posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, and Mayors about 3255 Scott Blvd. In 2022, there was a discussion with the US Representative's office about bringing Gjovik's situation with Apple related to environmental violations to a US House Sub-Committee.

39.     On February 21, 2023, Gjovik discovered the semiconductor fabrication activities at ARIA. Gjovik posted on Twitter in real-time as she learned about it, expressing severe distress.[8] Gjovik began researching the site and Apple's activities, with the findings making Gjovik feel compelled to file a formal complaint about Apple's illegal conduct at ARIA. On June 23, 2023, Gjovik filed complaints about ARIA to the US EPA, CalEPA, the city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with dozens of exhibits. Gjovik also posted on Twitter that she did so and provided a public link.

40.     The US EPA responded and took the lead on an investigation. Gjovik met with the US EPA's RCRA Enforcement & Compliance team several times before they then inspected Apple's factory in August 2023 and January 2024. The August 17, 2023 inspection was coded as an RCRA "*Compliance Evaluation Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all applicable RCRA Regulations and Permits*."[9] The January 16, 2024 inspection was coded as a "*Focused Compliance Inspection*."[10]   Gjovik is still awaiting a report on the results.

### iii.     Gjovik's Office at The TRW Microwave Superfund Site

41.     Gjovik's Apple office from 2017 until her termination was located at 825 Stewart Drive in Sunnyvale, California, also known as the "TRW Microwave" Superfund site, part of the US EPA "Triple Site."[11] The *"Triple Site" is the collective name for three adjacent Superfund sites in Sunnyvale that have

---

[8] "APPLE IS DOING LITERAL ACTUAL GODDAMN SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT SHIT INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT."
- @ashleygjovik
[9] US EPA RCRA, Evaluation Types.
[10] US EPA ECHO, 3250 Scott Blvd # 110001168254.
[11] US EPA, *Triple Site Profile – Background.*

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

jointly contributed to a mile-long groundwater solvent plume. In addition, the *"Offsite Operable Unit"* is roughly a one-hundred-acre area of groundwater contamination from TRW Microwave. It "*includes four schools and over 1,000 residences*."

42.     The "TRW Microwave" Superfund site is a former industrial semiconductor fabrication and manufacturing facility at 825 Stewart Drive ("Stewart 1"). The primary contaminants in the groundwater contamination plume are chlorinated volatile organic compounds, including the carcinogen trichloroethene ("TCE") and its daughter products cis-1,2-dichloroethene and vinyl chloride. The contaminated groundwater under 825 Stewart Drive is as shallow as only 2.6 feet below the ground surface, with shallow TCE concentrations up to 1,400 µg/L and vinyl chloride up to 51 µg/L. [12]

43.     Northrop Grumman conducted an initial vapor intrusion evaluation at Stewart 1 in 2003 and 2004, which indicated that TCE concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels, with results at 5.1 µg/m³ and 5.2 µg/m³ respectively.[13] Indoor air pollution due to vapor intrusion worsened over time, and indoor air concentrations increased to 7.7 µg/m³ in 2013, the "accelerated action level" for TCE in commercial buildings.

44.     In May 2015, Northrop Grumman installed a "sub-slab" ventilation system inside the building. (The "slab" refers to the concrete foundation, and "sub-slab" is under the "slab.") Northrop Grumman installed a ventilation system (horizontal "collection pipes") beneath the slab foundation, which allows vapors to move laterally, and connected the collection pipes to vertical vent risers that vent to the roof to provide a preferred pathway for hazardous waste vapors "that allow sub-slab contaminant vapors to discharge to the atmosphere." The risers vent to the rooftop via wind-powered turbines.

45.     Apple became a tenant in 2015. Apple's installation of a new HVAC system for the building in late 2015 included Apple sawing the sub-slab exhaust vent stacks on the main building roof down from three feet to one foot and then installing the HVAC system intakes in "*close proximity*" to the sub-slab vapor exhaust vents, "*without consideration for the function of the [sub-slab] system vents and their function*."[14] The HVAC intakes for the area of the building where Gjovik worked were in "*the

---

[12] AECOM and GES for Northrop Grumman, *2021 Annual Groundwater Monitoring Report* (March 17, 2022).
[13] Fifth Five Year at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA, March 17 2022.
[14] AECOM for Northrop Grumman, *Evaluation of Passive Sub-Slab Depressurization System, Former TRW Microwave Site*, page 1 (April 15 2022).

*assumed sphere of influence*" of the vent exhaust, including the chemicals TCE and vinyl chloride.

46.    Apple's tampering with the exhaust stacks and indifference towards the exhaust's proximity to HVAC intakes resulted in a significant risk of re-entrainment of the hazardous waste vapors and gases into the HVAC system, and thus into the indoor air of the building where Gjovik and her coworkers would be exposed. California Labor Code § 5143(a)(1) and § 5143(c)(1) prohibit the exhaust of gas and vapor in a way that causes harmful exposure to employees. California Labor Code § 5154.1(e)(4)(d) requires that these types of stacks exhaust upward from at least seven feet above the highest portion of the roof. California Mechanical Code § 407.2.1 requires outdoor air intakes be placed at least 25 feet away from any "*exhaust outlets of ventilating systems… that may collect …. noxious fumes.*" Apple constructed the HVAC intakes only ten feet away from the exhaust vents.

47.    In May 2015, Northrop Grumman's vapor intrusion testing at Stewart 1 reported indoor air pollution of TCE, 1,2-DCE, Toluene, Chloroform, Methylene Chloride, and Ethylbenzene.[15]   From December 2015 to January 2016, Apple managed and submitted a second vapor intrusion testing report to the US EPA.[16] Apple's December 2015 vapor intrusion testing results showed an increase in indoor air pollution and the sub-slab ventilation system compared to the May 2015 results.[17] The highest indoor air reading of TCE doubled between May and December 2015. In May 2015, it was 0.58 µg/m³, and the highest indoor air TCE reading in December 2015 was 1.2 µg/m³.[18] Apple's report also noted a "*noticeable increase*" of TCE, PCE, and chloroform in the sub-slab venting system and high levels of toluene and ethylbenzene in the indoor air.[19] Apple moved employees in and never tested again.

48.    The US EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the EPA must be notified, consulted, and oversee the repairs and subsequent evaluation that the repairs were successful.

49.    On March 17, 2021, Apple announced to Gjovik and Powers' management team that it would test Stewart 1 for "vapor intrusion" but said nothing more. Gjovik informed her coworkers that their office was a Superfund site on March 17, 2021, providing a link to the US EPA website for the office

---

[15] US EPA, TRW Microwave, Site Documents, Vapor Intrusion.
[16] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra.
[17] US EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[18] Id at pages 26-25.
[19] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg11.

and two recent news articles about the site referring to the office as a "*paved over environmental disaster zone.*" [20] Gjovik explained what vapor intrusion was, told them to take it seriously, and expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Gjovik added, *"The chemicals under [the Stewart 1 office], if in high enough quantities, can cause cancer."* Gjovik asked in her email for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Gjovik to discuss her concerns.

50.     Gjovik's coworkers thanked her for sharing this information and informing them about the site. Two of Gjovik's friends, a manager and senior manager at Apple, texted her, affirming her concerns were reasonable and appropriate. One called it "*a really important life-threatening situation,*" and another, after reviewing documentation for the site, questioned, "Why *is the building still open*?" One of the managers noted: *"What is crazy is ... they say no daycare, no elder care, no residential, etc. So, it is fine & dandy for everyone else to get slowly poisoned? ... So glad you are digging into this stuff for all of us."* Around this time, Gjovik also raised concerns about COVID-19 safety, wildfire smoke safety, Right to Know/Prop 65, and Apple's reporting/tracking of injuries.

51.     In late March, Gjovik repeatedly raised concerns about the site to her supervisors. After reviewing hundreds of pages of documentation for the site, Gjovik advised that Apple had been negligent, the site was not safe, and Apple seemed unwilling to comply with CERCLA and health/safety regulations. She said she now believed her fainting spell in 2019 in her office was due to vapor intrusion. She was also shocked and distressed to see the 'hot spot' for the building was her desk with 1,900ug/m3 of TCE in the sub-slab ventilation system. Powers threatened her and ordered her to stop talking with her coworkers about her concerns. He said she must believe whatever EH&S tells her. West first claimed the poisonous gas was sealed under the floor but, after learning the floor was cracked, told Gjovik to quit Apple.

52.     Gjovik met with EH&S thrice on April 2, May 17, and July 7. For some reason, Employee Relations was also there (Jenna Waibel). Gjovik asked questions about the status of the site and the rationale for certain design and monitoring decisions. Gjovik expressed that she was disappointed with some of the answers. EH&S (Michael Stieger) told her Apple Legal and EH&S intentionally do not tell employees if they work on Superfund sites. Apple deliberately does not train workers about safety

---

[20] Alexis C. Madrigal, Not Even Silicon Valley Escapes History, The Atlantic (July 23 2013).

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

procedures related to toxic waste exposure from clean-up sites. Gjovik said that was both unsafe and unwise. Gjovik also complained that the prior testing used insufficient durations and methods, had concerning results, there were known open risks for vapor intrusion vectors (such as 'compromised' sub-slab ports), and the land use covenant is outdated. It must be updated, and they should have tested the indoor air more frequently than every six years. Gjovik also contacted the US EPA on April 22, 2021, asking to consult with their manager for the site and emailed back and forth with the US EPA CERCLA and public relations teams from April through August 2021, and Apple knew she was doing so.

53.     EH&S and Employee Relations notified Gjovik on June 2, 2021, that the foundation of Stewart 1 is cracked and they need to repair it, and then after, they will test the air. Gjovik told them they needed to notify the US EPA, have the US EPA oversee the repair and testing plan, and test the air before and after the repairs. (US EPA later confirmed this). Apple refused and told Gjovik they do not have to tell US EPA anything; they will repair the floor but will not provide details on how/when, and now they may not test the indoor air. Gjovik reported Apple's failure to notify and consult with the US EPA about the cracked slab to the US EPA. Gjovik notified Apple that she was snitching on them to US EPA.

54.     Gjovik also complained to a senior ethics leader at Apple and their friend, Dr. Cohen, that what Apple was doing related to environmental compliance and employee chemical exposure was "*morally wrong*," and Apple was publicly misrepresenting their actual operations. Gjovik also complained to Apple's I&D team about the disparate impact of chemical exposure to non-white and non-male people. The I&D business partner asked Gjovik to write a business case for not poisoning Black people. Gjovik also complained to a friend in Lisa Jackson's Environmental lobbying team about what was going on at her office and complained Apple's public statements seemed fraudulent, and her coworker agreed, saying: ""*uhhh... I kind of feel the need to make sure Lisa is aware. I'm about to present a proposal to several execs on an Environmental Justice program and this kind of feels like not consistent with that.*"

55.     In response to Gjovik's concerns and escalations, Powers and Waibel issued gag orders against Gjovik. Waibel went so far as to provide Gjovik with a five-point balancing test if Gjovik wanted to make statements about Superfund sites or workplace safety to her coworkers and ultimately told Gjovik that there should be no discussions about workplace safety with her coworkers. In their final meeting about the site on July 7, 2021, Waibel and Steiger told Gjovik that Stweart 1 is safe because they say it is safe,

they still have no plans to test the air now, and they will not answer any more of her questions about the site or workplace safety ever again.

56.     Waibel also responded by opening a non-consensual sexism investigation into Gjovik's bosses, where she did not investigate anything but told at least three leaders that Gjovik complained about them, harassed Gjovik's friends, and bullied Gjovik to the extent that she repeatedly made Gjovik cry. Waibel also told Gjovik she had to submit an ADA accommodation request if she did not want to be exposed to the vapor intrusion, attempted to get Gjovik to release all of her medical requests to "Apple Inc.," and then suggested Apple get her an air purifier at her desk for the TCE.

57.     Gjovik complained about Waibel in May and June 2021 to no avail and then began meeting with Waibel's manager, Antonio Lagares, in mid-June 2021. Gjovik complained that Apple was acting insane, and if this is usually how Apple handles employee concerns, then Apple is lying to its employees and the public that it acts in good faith. Lagares agrees with Gjovik and said Apple's marketing makes "*his job harder*." Gjovik asked what type of issues his team would take seriously, and he responded when managers "*send pics of their junk*." Gjovik complained to Lagares that Waibel had already ruined her career at Apple, that she was already constructively terminated by West, that Powers was harassing her more than ever, and that he should have to investigate all of the terrible things Apple's done to her for nearly seven years.

58.     In July 2021, Gjovik discovered that West had been reassigning her best projects (things that would help her receive a positive review). Then Powers suddenly quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail). Powers was snapping at her and harassing her, West was ignoring her, and Gjovik reported these issues to Lagares and Waibel and the HR business partner Helen Polkes. Still, they did nothing, or they also harassed Gjovik. Gjovik became more vocal about her concerns about systemic retaliation and fraud at Apple on Apple's Slack discussion tool and also began threatening Lagares that she planned to sue Apple for what they've done to her and that she is also talking to the press (NYT) about Apple, which led Lagares to assign a new investigator (Ekelemchi Okpo) and open a new investigation into all of Gjovik's concerns going back to 2015.

59.     By late July, Gjovik was openly complaining on Slack, to reporters, with coworkers, and now also on Twitter about Apple's terrible behavior, including intimidation, retaliation, cover-ups, and fraud. Gjovik complained about the Superfund and safety issues, Apple's offensive use of ADA

accommodations, the persistent suggestion that she take FMLA leave in response to their harassment, Apple's illegal NDAs and gag orders, and Apple's antagonistic and obstinate attitude towards legitimate and important concerns. Gjovik repeatedly told Lagares, Okpo, Waibel, and Polkes that she refused to take leave in response to retaliation and harassment; instead, they needed to fix the issues.

60.     On July 26, 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns was to retaliate against her and intimidate her into silence. Gjovik asked if anyone else had been retaliated against for raising concerns. Many of Gjovik's coworkers responded that they had also experienced retaliation from Apple for raising real and reasonable concerns.  Okpo then swiftly interrogated Gjovik for over an hour about her Slack posts and the responses she received from coworkers – repeatedly asking her to stop posting about her concerns and to stop encouraging other employees to post their concerns and instead direct all employees to speak with Okpo privately. Gjovik told him no, and she would not help him retaliate against her coworkers.

61.     Apple and Northrop Grumman were notified on July 26, 2021, that the US EPA was demanding an inspection of Stewart 1 due to Gjovik's reports about the cracked slab and Apple's obstinate and obstructive response and because they discovered what Apple did with the hacksaw, vents, and HVAC on the roof of Stewart 1 in 2015, with the US EPA QA team exclaiming it was "*not appropriate*" and asking for air samples. In response, on August 2nd, Apple suddenly announced they were doing maintenance at Stewart 1 on August 4th. On August 3rd, Lisa Jackson's team scheduled a PR blitz about how safe and thoughtful Apple is, actually. [21] Apple also attempted to make the US EPA sign a four-page single-spaced NDA about the inspection of Stewart 1 that would prohibit the US EPA from speaking about the inspection, and the US EPA declined to sign the NDA.

62.     On July 28, 2021, Gjovik emailed Okpo and Lagares about her discussions with coworkers, discovering a pattern of discrimination and harassment issues across Apple; and what appeared to be systemic cover-ups of those issues instead of actually resolving the problems. She complained Apple fraudulently holds itself out publicly as caring about human rights and the law. It was clear to Gjovik that Okpo would not investigate in good faith and Apple was still trying to get her to quit or else would fire her, and she began fervently complaining about their bad faith behavior and culture of  intimidation.

---

[21] FOIA; Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*.

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

63.     Apple said they may give her a severance package of around $600,000 if Gjovik would sign a preemptive litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm Apple caused to Gjovik through chemical exposure at her office and her apartment.  Gjovik expressed concerns about the settlement amount and her potential medical costs if she were to get cancer from the exposure at her office, not even yet knowing about the factory at ARIA or what Apple did to the HVAC at Stewart 1. Apple wanted all claims waived and denied the severance on those conditions, violating California law. [Cal. Gov't Code § 12964.5(a)].

64.     When Gjovik saw Apple's EH&S notice on August 2nd about maintenance at Stewart 1, she quickly arranged for coworkers in the office to gather evidence of the cracks, warning them that Apple was trying to cover up environmental and safety issues. Gjovik's coworkers gathered photos of the cracks for Gjovik on August 3rd and the morning of August 4th. They also asked many questions Gjovik had asked EH&S. Gjovik shared EH&S's responses, and they were concerned about Apple's position and conduct.

65.     The next day, on the 4th, Okpo immediately forced Gjovik on indefinite administrative leave and refused to provide any ETA for the next steps. Okpo informed her Apple removed her "*from the workplace and all workplace interactions*." Gjovik was very upset and protested, arguing she just wanted to stop interactions with West and Powers while Okpo investigated because of the work assignment changes and harassment. Gjovik also complained that it was illegal for them to tell her to stop talking to her coworkers. Okpo made it clear he also wanted her off Slack. Gjovik told Okpo he could not keep her off Twitter. Gjovik set her out of the office to say Apple put her on indefinite administrative leave and told her to stay off Slack. She also posted a message on Slack about it. Within hours, it was covered in the news worldwide. Okpo sent her several bitter emails about her continuing to speak out, and he was clearly reading her Twitter posts complaining about Apple's conduct.

66.     The night after Gjovik was put on leave, West suddenly scheduled meetings with Gjovik's women's group. Gjovik also heard conversations within her team that confirmed she would be fired soon. Starting around August 5, 2021, the managers in West's organization started raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers say if anyone has concerns about the "*Ashley Issue,*" they should talk to Helen Polkes. They and West mention West's plans to "*discuss the Ashley Issue*" at

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

the upcoming October All Hands meeting. Gjovik realized they would not be discussing the "*Ashley Issue*" at a future all-hands meeting if she was there, and West was already sure Gjovik was about to be fired.

67.     Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5.  When the US EPA inspected, they noted "*freshly sealed cracks*." On August 9, 2021, the US EPA sent travel approval requests to visit Gjovik's office, and the justification for the visit cited Gjovik's disclosures. The US EPA's justification for inspecting was: "*A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system and the protectiveness of human health.*"

68.     On August 19, 2021, the US EPA conducted an onsite inspection of Gjovik's Apple office due to Gjovik's complaints to the US EPA. Notes from the August 19, 2021, site visit and inspection included concerns and issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, and lack of documentation for slab/crack inspections. On August 23, 2021, EPA CERCLA Quality Assurance submitted notes: "*Significant, visible slab cracks, gaps, and penetrations had been sealed… However, large test equipment is bolted to the slab, and it is unclear if these installations penetrate the slab.*"  He added that related to the sub-slab exhaust on the roof above Gjovik's desk, "*vapors could be building up on the roof near the HVAC intake.*"

69.     On May 20, 2022, the US EPA sent a letter to Northrop Grumman about Stewart 1, instructing that: "*EPA requires that one round of indoor air samples be collected... under current conditions.*"[22] The letter included an attached memo from the US EPA's Quality Assurance branch instructing Northrop Grumman (and Apple) that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been modified in a manner that could compromise the system; evaluation of changes to building use,*" in addition to also inspection roof components.[23] The US EPA finally admitted

---

[22] US EPA, Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation, *825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site* (CERCLIS ID# CAD009159088) (May 20 2022).
[23] US EPA, Passive Sub Slab Depressurization (SSD) System Operation and Maintenance (April 25 2022).

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

to Gjovik on May 27, 2022, that there had been an inspection at her office on August 19, 2021 – Apple had been able to conceal it from Gjovik for nearly a year.

70.     On July 28, 2022, Northrop Grumman told the US EPA they were late in responding to the US EPA's questions because Apple and the building owner stopped responding to them for weeks. On January 20, 2023, US EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over seven years. On August 31, 2023, the US EPA published a brief letter responding to Apple's May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since December 2015, calling Apple's testing report and strategy "*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," and "*misleading*."[24]

### iv.     Gjovik's 2021 Complaints and Disclosures

71.     On July 23, 2021, Gjovik was quoted by the New York Times, where Gjovik criticized Apple's COVID-19 response. On July 24, 2021, New York Times made Gjovik's quote "Quotation of the Day" for the entire NYT.[25] Apple Employee Relations expressed that they were upset that Gjovik did this. Gjovik told Lagares she was taking Labor Law and learned she could speak about her work conditions regardless of NDAs. Lagares told her it is annoying to Apple when employees "*figure that out*."

72.     On July 30, 2021, Gjovik posted on Twitter complaining about Apple. "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions*."   After posting this, ex-Apple employees contact Gjovik to share they had similar experiences. Other Big Tech and ex-Apple employees supported Gjovik for speaking out, sending her many encouraging and grateful messages and comments. Gjovik then decided to start sharing more of what was happening between her and Apple on social media to help others understand the issues so they could advocate for employees, hoping it may pressure Apple to act more reasonably.

73.     On July 30, 2021, Gjovik posted on Apple's Slack tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups. Around this time, Gjovik created a new, private Slack group for her coworkers to discuss concerns about Apple retaliating against

---

[24] US EPA, TRW Microwave Site, Re: Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023,
[25] New York Times, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*," July 24 2021.

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

them for raising concerns, but with more privacy due to fear of more retaliation. Many women asked to join the group, and they had just started a discussion around the time when Gjovik was put on leave.

74.     On August 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything Waibel said was fine – Gjovik proceeded to start posting on Twitter about several of the more minor things she complained to Waibel about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no problems, so she is free to talk about it and she would do so. Gjovik posted several examples of the evidence on Twitter, and her posts quickly went viral.

75.     On August 4, 2021, a reporter at The Verge contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik had posted. The reporter wanted to write an article about what Apple did to Gjovik. Gjovik agreed to let her write an article about Gjovik being put on leave. Gjovik also posted on Twitter about it herself first, and other press picked up the story.[26] Apple responded to the media: "*We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and thoroughly investigate whenever a concern is raised; out of respect for the privacy of any individuals involved, we do not discuss specific employee matters.*"

76.     On August 12 -13, 2021, Gjovik filed complaints with US EEOC and California DFEH. In August, Gjovik also shared concerns on social media and with the press, including experiences with her team in 2015, what Apple did to her around Batterygate and related harassment, and her concerns about Apple's long history of criminal and corrupt behavior. On August 17, 2021, Business Insider published an article about some of Gjovik's complaints based on Gjovik's Twitter posts and embedded Gjovik's Twitter posts in the article.[27] The article also noted: "*Insider approached Apple for comment.*"

77.     On August 26, 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so. On August 26, 2021, a news article discussed Apple's employment practices and wrote: "*One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave.*"

---

[26] The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave,*" Aug 5 2021; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" Aug 5 2021; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues.*"
[27] Business Insider, *An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit* (August 17 2021).

78.     On August 29, 2021, Gjovik filed a formal complaint to the US EPA about Apple and her office at Stewart 1, complaining of Apple's "lack of due diligence," complaining about "negligence," and "*recklessness*," and "*violations of Right to Know & OSHA*." Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site*." Gjovik did not know about the US EPA safety inspection ten days prior.

79.     On Sunday, August 29, 2021, at 11:32 AM PST, Gjovik filed a Whistleblower Protection Program complaint with the US Department of Labor, reference number ECN76833. On August 29, 2021, Gjovik filed retaliation and labor code violation charges to the California Department of Labor. (This lawsuit replaced the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830). On September 1, 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor. A question asked: How did your employer know about the protected right you exercised? Gjovik wrote, "*I kept saying, 'Stop it, you guys. There's Labor laws about this.'*"

80.     Gjovik began complaining that Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal studies. Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to speak about it even to a doctor or attorney (as was expressly written in the noted Deed Poll). For example, while Gjovik was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Gjovik complained that Apple's requests were harassing and invasive.

81.     On August 30 and 31, 2021, Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple*." [28]   In Gjovik's posts, she complained of Apple's surveillance of workers, its exploitation of workers, and Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon.

82.     On August 31, 2021, at 7:16 AM PST, the US Department of Labor contacted Gjovik to start intake for Gjovik's Whistleblower Retaliation charges. Gjovik had her interview with the US EEOC

---

[28] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

on September 2, 2021. Gjovik did not request an investigation but did request a Right to Sue letter, which she received on 9, 2021, before her termination. Apple was made aware of Gjovik's US EEOC and Cal. DFEH complained that she was testifying to US EEOC and Cal. DFEH about what Apple did to her by at least August 12, 2021. Gjovik Tweeted about her appointment with the US EEOC.

83.    On September 2-3, 2021, numerous papers were written about Gjovik's charges against Apple. Bloomberg reported about Gjovik's NLRB, US Dept of Labor, California Dept of Labor, and EEOC charges against Apple. Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation, and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing her concerns. *"I should be able to raise concerns about safety and public policy," s*he said in an interview Thursday. Gjovik has also filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office, and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. *"I want to pierce the veil of intimidation and secrecy," she* said in the interview. "*The employees are terrified to speak up about their concerns.*" [29]

On September 2, 2021, Financial Times wrote about Gjovik:

> "Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "*chemical exposure*" at her Apple office in Sunnyvale, California, where more than 100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "*TRW Microwave Superfund site*," a location requiring special oversight owing to previous contamination by hazardous waste materials in the soil and groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at their Cupertino headquarters and Sunnyvale facilities. Gjovik said her concerns were brushed aside and she was warned against speaking up about them. In her letter to the NLRB, she said Apple's employee relations department *"intimidated me not to speak about my safety concerns,"* that a manager advised that she quit Apple and was subject to sexism and a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave."[30]

84.    On September 3, 2021, Gjovik filed complaints with the FDA Office of Criminal

---

[29] Nick Turner, *Apple Worker Complaints Reviewed by Labor Relations Board*, Bloomberg, Sept 2 2021.
[30] Patrick McGee, *US labour board examines retaliation claims against Apple*, Financial Times, Sept. 2 2021, https://www.ft.com/content/484fa8be-925e-495c-91ff-54950b112754

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

Investigations and DOJ National Center for Disaster Fraud about Apple's apparent attempt to "skip the line" on COVID-19 vaccines and hoard the vaccines.[31] On September 3 and 6, 2021, she posted on Twitter about filing the complaints. On September 3, 2021, Gjovik told the FBI about Apple's involvement in concealing possible sanctions violations and smuggling. In the crime field, she wrote: *"Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup."* Gjovik posted on Twitter that she had reported the matter to the FBI. Gjovik had reported the issue to West and Powers, then Business Conduct in July 2021.

85.     On September 3, 2021, Gjovik signed a contract with Business Insider to write an Op-ed about her situation with Apple and proposals on how Apple can address its systemic issues. Gjovik modeled her article and proposals after what she had been learning about Transitional Justice at Oxford. On September 6, 2021, Gjovik posted on social media about her NLRB, CalDOL, and EEOC/DFEH cases with a status update and the report numbers – and also tweeted about her SEC whistleblower tip, FBI, and US Department of Justice complaints.

86.     On September 6, 2021, Gjovik replied to the US EEOC confirming she was working on a draft of her complaint and was targeting to submit it to them by September 8, 2201. On September 8, 2021, Gjovik emailed the US EEOC her draft of the language for her US EEOC charge.  On September 8, 2021, Gjovik replied to the US Department of Labor with copies of her prior filed complaints to the US EEOC, US NLRB, US EPA, CalEPA, and US SEC. Gjovik noted she was working on answering the investigator's questions and would reply by the deadline, which was September 10th.

87.     The press continued to cover what Apple was doing to Gjovik and a growing movement among Apple employees who began speaking out and organizing with each other around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this, too, and Gjovik posted about it repeatedly on Twitter. Gjovik was not only a catalyst for many employees to come forward, but these employees catalyzed Gjovik's view and protest of Apple's misconduct.

88.     On September 9, 2021, at 12:39 PM PST, Gjovik emailed the US EEOC and asked the investigator if she needed anything else from Gjovik to move forward. Then again, at 1:02 PM, asking US

---

[31] US DOJ, NCDF, COVID-19 Hoarding and Price Gouging Task Force.

EEOC how she could sign the charge to meet the deadline. At 2:08 PM, Apple sent a Workplace Violence interrogator to threaten Gjovik, and he suspended her Apple account access at 2:50 PM.

89.     On September 9, 2021, at 4:24 PM PST, the US EEOC investigator emailed Gjovik, saying she posted the final version of the charge and asked Gjovik to sign the charge. On September 9, 2021, at 4:27 PM PST, Gjovik digitally signed her EEOC charge against Apple.

90.     On September 9, 2021, at 4:47 PM PST, Gjovik emailed the US Department of Labor with responses to their questions about her protected activity and Apple's retaliation. Gjovik replied at 5:26 PM PST, informing them Apple's Workplace Violence interrogator had just suspended her account access and threatened her. At 6:54 PM PST, Apple fired Gjovik. At 11:42 PM PST, Gjovik replied to the US Dept. of Labor, informing them Apple fired her.

91.     On September 10, 2021, Gjovik testified to NLRB for her first affidavit. On September 14, 2021, Gjovik had the second part of her NLRB affidavit. She posted about it on Twitter. On December 13, 2021, US DOL docketed Gjovik's SOX, CERCLA, and OSH Act cases. A Financial Times article was published on December 13, 2021, which said:

> "The labour department will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defense company responsible for the dump — and maintenance — of waste materials beneath the Sunnyvale office. Sugar could not be immediately reached for comment. "Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board. "Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."[32]

92.     On December 14, 2021, the US DOJ contacted Gjovik, confirming receipt of a complaint she sent to their antitrust division earlier. On December 26, 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank and witness retaliation claim against Apple, citing 18 USC § 1513.  On June 7, 2022, Gjovik first met with the SEC's Enforcement team about her Apple charges.

---

[32] Financial Times, "*Apple faces probe over whether it retaliated against whistleblower*," Dec 13 2021.

93.     On or around January 10, 2022, Gjovik filed complaints about witness intimidation and witness retaliation to NLRB, the US Department of Labor, and the California Department of Labor. Gjovik drafted several legal documents, including a legal brief, image exhibits, and a detailed dossier containing the accounts and posts Gjovik believed to be Apple. On January 25, 2022, Gjovik emailed the NLRB about her January 10, 2022, witness intimidation charge and attached a 77-page rough draft of the Evidence Report.

94.     On January 31, 2022, Gjovik posted on Twitter that she planned to submit her legal filings about witness intimidation to the US Department of Justice and the whistleblower and labor agencies. Gjovik commented that Apple's actions were "criminal." Gjovik also testified to the NLRB about it on February 10, 2022. Gjovik also contacted Bud Porter at the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on February 21, 2022, and December 15, 2022.

95.     On July 14, 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with inaccurate information. Gjovik won her unemployment insurance appeal, and a decision was issued by an Administrative Law Judge stating:

> Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Before the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times, the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[33]

96.     After Apple fired Gjovik, she filed additional NLRB and California Department of Labor charges about Apple's NDAs and other employment policies, charging they violate labor laws – and the US NLRB agreed with Gjovik, issuing a Decision of Merit on her charges against Apple in January 2023.

**v.     Apple Decides to Investigate Gjovik Instead of Her Concerns.**

97.     Starting on August 4, 2021, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. On the 4th, one posted about Gjovik, that she: "needs

---

[33] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022

psychiatric help and confinement" and that Gjovik "is a psychopath and frankly is a danger to other Apple *Employees*!" The account went on to call Gjovik an "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this."* Thousands of posts like this followed and continue to this day – causing Gjovik severe distress.

98.     While Gjovik was stuck on leave, she repeatedly asked Okpo for updates about her office, and he refused to provide any updates. Gjovik often complained about retaliation and that she did not want to be on leave, but Okpo ignored her. Between August 16-23, 2021, Okpo sent a first draft of an "Issue Confirmation" document that supposedly captured all of Gjovik's complaints that he was investigating, and Gjovik revised it and sent him a final revised version on August 23, 2021. Gjovik also filed a Business Conduct complaint about her concerns about Ronald Sugar, TRW Microwave, and her office. She attached the Issue Confirmation and notified Okpo of the ticket. Gjovik's 33-page version of the Issue Confirmation included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest, racketeering, and environmental crimes. Starting August 17, 2021, Gjovik insisted that all communication with Okpo and Apple be in writing because he repeatedly misrepresented her statements. Okpo ignored her.

99.     Gjovik had previously registered for a three-part training about racial justice with Apple University and wanted to attend. The class was led by her friend Dr. Cohen, and he confirmed he was happy to have her attend as long as Employee Relations approved and did not discipline her for attending. On August 20, 2021, Gjovik asked Okpo if she could attend, and Okpo said she could not participate "*because she's on leave*." Gjovik complained about retaliation. On August 27, 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. The message posted said: "*...we have shared them with the appropriate internal teams for review and investigation,*" with the ticket updated to say, "*Request is closed. This request is closed and can't be reopened."*

100.     Okpo contacted Gjovik twice more (Sept. 3 and Sept. 7, 2021) before Gjovik was fired, asking to meet with her on Webex (denying her request to keep things in writing) and not telling her what the meeting was about. Both times, Gjovik asked Okpo to keep things in writing due to the request misrepresentation and intimidation. If he refused, she requested a Business Conduct review of his decision, noting he's a lawyer and there is a power imbalance. Okpo never responded.

101.    On September 9 2021, at 2:08 PM PST, Gjovik was contacted by Aleks Kagramanov, an Apple "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour.*" The email had no subject line, and Gjovik had never heard of the team. He said he was "*looking into a sensitive IP matter*" and wanted to speak with Gjovik. He said Apple "*sincerely appreciate [her] prioritizing this call and being flexible.*" He never said Gjovik was under investigation.

102.    Gjovik was sure she was about to be fired, but two minutes later, Gjovik promptly responded at 2:10 PM PST, saying she was willing to participate but wanted a written record of their conversations. She said she will respond as quickly as she can. Kagramanov did not respond, so Gjovik replied again. Gjovik responded again at 2:27 PM PST, complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator. Gjovik posted on Twitter complaining of witness intimidation at 2:33 PM PST.

103.    Kagramanov responded at 2:50 PM, saying, "*We are investigating allegations that you improperly disclosed Apple confidential information,*" and claimed she refused to '*participate*' in his farcical investigation. Kagramanov then said he was suspending all of Gjovik's account access.

104.    Gjovik responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate. "*As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.*" Gjovik added: "*I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government.*" "*I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good-faith attempt at that.*" Gjovik added in her 3:07 PM email reply to Kagramanov: "*In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation, and I will consider it as such.*" Gjovik still did not know what she was supposedly accused of.

105.    At 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, West's friend, emailed Gjovik with the subject line "*Your employment status*" and an attached letter saying she was terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking and said she "*failed to cooperate and to provide accurate and complete information during the Apple investigatory process.*" [34]

---

[34] Gizmodo, *Apple Fires Program Manager Who Accused Bosses of Harassment,* Sept 10 2021.

106.    On September 15, 2021, at 7:40 PM PST, Apple's lawyers at O'Melveny & Myers, via Partner David R. Eberhart emailed Gjovik a letter implying Apple terminated her due to her complaining about Apple asking to 3-D scan her ear canals and also because she posted some of the surveillance photos Apple secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app. Gjovik told Eberhart that none of that was confidential and that she had the right to protest and discuss it. Eberhart threatened her and demanded she delete several Twitter posts but never cited any legal authority (because there's none). A lawyer responded to Eberhart more formally a couple of weeks later, on Gjovik's behalf, warning him about Rule 11 sanctions if he attempted to pursue the matter in court as his claims have no basis in fact or law. Eberhart never responded. On December 30, 2022, the US FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans and provided Gjovik with a report tracking number.

### vi.    Threats, Intimidation, Coercion, Harassment

107.    From at least July 2021 through current day – Apple stalked, harassed, and tormented Gjovik with actions including repetitive, unwanted communications to Gjovik; making false accusations against Gjovik; mailing Gjovik menacing packages; physically surveilling Gjovik; gathering information about Gjovik; monitoring Gjovik's activities; harassing Gjovik's friends; using threats and scare tactics to frighten Gjovik; publicizing Gjovik's private information; and encouraging others to harass Gjovik.

108.    Starting in August 2021 and continuing to this day, hundreds of 'throwaways' and fake social media accounts posted about and to Gjovik, making statements that were harassing, threatening, intimidating, defamatory, insulting, and harassing.  There was an extensive digital harassment campaign against Gjovik, even with Apple employees harassing Gjovik under their own names, and other posts were made by Apple employees using aliases, but their real identities were later revealed. Further, starting in at least September 2021 and assumed to continue through the current day, Apple employees undertook a 'whisper campaign' to smear Gjovik's character and create fear, uncertainty, and doubt about Gjovik's allegations against Apple. Apple Global Security employees also sued Gjovik and requested a gag order against Gjovik, saying it was because Gjovik filed an NLRB charge against Apple and because of Gjovik's federal filings to the NLRB and other agencies and DA's office. Gjovik won and it was dismissed.

109.    On September 21, 2021, Tim Cook emailed his staff complaining that someone had spoken publicly to reporters about work conditions. Cook said Apple's "doing *everything in our power to identify*

*those who leaked.*" Cook said, "*People who leak confidential information do not belong here.*" On January 30, 2023, the US NLRB issued a Decision of Merit to Gjovik that Cook's email violated federal law.

110.   Additional intimidation and coercion included, but was not limited to, aggressive surveillance (including lurking Private Investigators in Santa Clara, San Francisco, and Albany, NY), bugging her chattel property [the statue Apple mailed Gjovik from her desk; Gjovik's fig tree, etc.), whatever Apple installed in her attic (photos show cables/cords laid in away landlord denied was them), breaking into her apartment (at least once in 2021 and 2022), breaking into adjacent apartments (at least once in 2021), lurking outside her home, stalking her, blocked calls (September 12, 2021), retaliatory litigation (January 31, 2022), reports of Gjovik to law enforcement (January 2022, May 2023)., lurking sedans and SUVs with dark windows, social accounts making threatening, harassing, and intimidating statements to Gjovik, doxing and attempting to SWAT Gjovik (2021-2023), and someone handling her dog during one of the break-ins (August 2022).

## V.   CAUSES OF ACTION & LEGAL CLAIMS

111.   Gjovik hereby incorporates by reference each and every allegation and fact. Claims and allegations against "Apple" are made broadly to include corporate liability for relevant actors as appropriate for each statute/law and circumstance, including Respondeat superior; labor law's "supervisor" theory; agency theory for agents; negligence theories; the creation a risk which allowed the conduct to arise; acts taken to benefit Apple or which provided benefit to Apple; acts that had become customary; and by concealment and cover-up. Concurrently and in the alternative, Apple may be responsible via aiding, conspiring, inciting, orchestrating, condoning, negligence, permission, condoning, ratifying, authorizing, and other theories. Where any statute of limitations is in question of possibly being expired for an alleged claim, Gjovik, where reasonable, will argue that the statute of limitations should be tolled due to Apple's fraudulent concealment of numerous material facts. Gjovik will also argue, where applicable, the doctrine of continuing violations, equitable tolling, the discovery rule, etc.

### FIRST CAUSE OF ACTION
### (Violation of the RICO Act)

112.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple engaged in RICO Predicate Acts, knowing that the conduct was illegal. Apple's racketeering affects interstate and foreign commerce under 18 U.S. Code

§ 1962 through interstate mail and wires, and other instrumentalities of interstate commerce. RICO Predicate Acts within occurred in multiple states and across state lines and defrauded the US government.

113.    In all counts, the defendant, Apple, is employed by the Enterprise, associated with the Enterprise, conducts the enterprise's affairs, leads the enterprise, and participates in a pattern of racketeering with the enterprise. Apple is heavily involved in the operation and maintenance of the enterprise. Gjovik's injuries from all Predicate Acts and racketeering were "because of" a RICO violation and of a tortious character.  Apple's racketeering led directly to the plaintiff's injuries.

### i.    Apple as the Enterprise-as-Person who Launders Money

114.    In all Predicate Acts and schemes here within, Apple violated 18 U.S. Code § 1962(a) as both the "person" and the "enterprise." As an Enterprise-as-Person and principal culpable for a pattern of predicate offenses, Apple has used and invested the income from its racketeering to establish, operate, and acquire an interest in an enterprise in and affecting interstate commerce. Apple also played an active role in the pattern of racketeering by initiating and benefiting from the activity. As an Enterprise-as-Person, Apple benefited from the racketeering activity because corrupt corporate employees, officers, and agents directly and indirectly used illegal income to operate and establish an enterprise. Apple acquired money through a pattern of racketeering.  For 1962(a) claims, Gjovik was directly injured by both Apple's investment in the enterprise and predicate acts themselves.

115.    Corporations and individuals who knowingly and intentionally dump hazardous waste or otherwise pollute the environment, violating environmental and public safety laws, do so because the practice is less costly and more profitable than complying with the regulations. Apple's intentional evasion of paying required fees and costs associated with proper hazardous waste management and disposal allowed Apple to operate its research and development and fabrication of semiconductor technology at a much lower cost than its competitors who do follow the law. As such, Apple gained a financial advantage, increasing its profits, which it invested in its enterprise. Apple's Acts of Wire and Mail Fraud increased Apple's profits under false pretenses and false statements – including increased sales of products, subscriptions to services, and brand loyalty based on a supposed (and false) progressive image.

116.    Examples of Apple's investment of racketeering profits (i.e., Apple's money laundering) include Apple's investment in progressive non-profit organizations for marketing purposes, despite systemically and intentionally violating the laws and norms those groups aim to enforce and violating the

rights those groups seek to protect. (e.g., ChemFORWARD, GreenAmerica, etc.) and Apple then uses the tangible outcome of those investments (e.g., formal partnerships, press releases, etc.) to further mislead the public, government, and press about Apple's actual operations through additional Acts of Wire Fraud and Mail Fraud by Apple, with the apparent credibility of Apple's materially false claims then bolstered by Apple's new farcical partnerships which were funded by racketeering profits. Apple's investment in non-profit organizations also allowed Apple to 'capture' those groups and ensure the groups do not assist witnesses/informants/victims like Gjovik when attempting to hold Apple accountable.

117.    In addition, Apple instituted an "ESG modifier" for executive pay that can increase or decrease Executive Compensation by 10% based on environmental and other practices. Apple's intentional environmental violations were not just to save money on properly disposing of waste but also to increase bonuses for the executives who would then invest the money in other businesses and enterprises. Apple is giving executives bigger bonuses for illegally disposing of hazardous waste.

### ii.    The Worldwide Loyalty Association-in-Fact Enterprise

118.    In violation of Section 1962(c), Apple (a "Person" under the RICO Act) conducted and participated in the conduct of an associated enterprise (the "Worldwide Loyalty Enterprise" – an enterprise sufficiently distinct from Apple) through a pattern of racketeering activity. Apple and the Worldwide Loyalty Association-In-Fact Enterprise engaged in and effected interstate and foreign commerce through activities including interstate and foreign travel, purchases, documents sent and received via physical mail and shipping, financial transactions, telephone calls, and internet communications.

119.    Each Association-in-Fact Enterprise member is a person or legally incorporated entity conducting business activities throughout the United States and overseas. Members committed, aided, abetted, and conspired to commit violations of Predicate Acts. Apple participated in and directed the formation of the Worldwide Loyalty Association-In-Fact Enterprise. This ongoing organization functions as a continuing unit, including individuals, partnerships, corporations, associations, groups, and other entities and individuals.  The Worldwide Loyalty enterprise entities play different roles in the Acts and scheme, including victim, prize, instrument, and perpetrator of the violation.

120.    For 1962(c) and (d), Apple and the enterprise are distinct and separate entities. The Association-In-Fact Enterprise includes Apple, the corporation, and employees, along with external lawyers (e.g., Jessica Perry, David Eberhardt, etc.), law firms (e.g., Orrick, Morgan Lewis, OMM, MWE,

etc.), trade and non-profit organization (e.g., ChemFORWARD, Omidyar Network, etc.), certain media companies and publishers, certain tech reporters, companies and third-party administrators (e.g., Sedgwick, Northrop Grumman, Oaktree Capital, etc.), certain government employees and agencies, law enforcement officers and agencies (e.g., Santa Clara County Sheriff's Office, Cupertino Police Department, Santa Clara HazMat, etc.), doctors and clinics (e.g., A.C. Wellness Center, etc.), and environmental consultants (e.g. EKI, ACT Environmental, etc.).

### iii.   Apple & the RICO Conspiracy

121.    Apple agreed with others to invest in, acquire, and conduct the affairs of a commercial enterprise in a manner that violates 18 U.S.C. § 1962(a), (b), and (c). Apple knowingly agreed to facilitate a scheme that includes a RICO enterprise's operation or management. Apple adopted the goal of furthering and facilitating the conspiracy. Two or more people agreed to commit a substantive RICO offense, and Apple knew of and agreed to the overall objective. In Violation of Section 1962(d), Apple conspired "*to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity*." Apple undertook criminal acts with the "*intent to commit, and to aid and abet and in connection with another federal crime*." Apple conspired to violate one or more substantive RICO provisions, and members of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy.

### iv.   Relatedness, Pattern, Scheme

122.    Apple's predicate acts have similarities related to purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (e.g., agency capture, intimidation and censorship, obstruction of investigations into Apple's conduct, manipulation of the press and public discourse, lying about labor and environmental practices, whistleblower retaliation, etc.).

123.    The goal of Apple's racketeering does not have an end date, as much of Apple's racketeering conduct is performed to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct while frantically working to cover up its prior criminal conduct by engaging in even more criminal conduct. Cover-ups, by their nature, present a distinct threat of long-term continuation. The threat of Apple's continuing illegal activity extends indefinitely into the future. Apple and the "Worldwide Loyalty" Enterprise are engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance and use of intimidation, threats, and false statements

about its actual practices to increase profits and create and maintain a positive reputation. Apple's scheme has three prongs:

a) Apple intends to refrain from expending the resources required for basic regulatory compliance in most of its basic dealings, thus increasing profits.

b) Apple intends to increase profits further and obtain other financial benefits through a knowingly false reputation of strong regulatory compliance in all its dealings (i.e., promoting itself as an industry leader in environmental responsibility, etc.)

c) Apple intends to bridge the gap between its actual practices and what it reports to its customers, the public and press, and the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors who report issues, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing others to assist in these activities to cover-up the Apple's unlawful activities and fraudulent misrepresentations.

124.     Apple transmits knowingly false information (or omits and fails to transmit required information) via communications with government agencies, the press, and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to a complete lack of environmental sustainability, regulatory oversight, and reporting, despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities.

125.     Apple's self-proclaimed competitive edge requires "*aggressive price competition and resulting downward pressure on gross margins.*" Apple adds that some competitors compete by "*us[ing] illegitimate means*" to develop products. Apple has also stated that its "*global operations are subject to complex and changing laws and regulations on subjects, including privacy; consumer protection; advertising; ... artificial intelligence; labor and employment; anticorruption; ... and environmental, health and safety...*" Apple adds that "*compliance with these laws and regulations is onerous and expensive... laws and regulations can adversely affect [Apple's] business by increasing ... costs.*" Apple admits that to succeed, it must cut costs wherever possible, compete with businesses that engage in illegal activities, and that laws and regulations threaten Apple's business model.

126.     Apple's conduct is neither lawful nor legitimate nor simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws – and censorship, obstruction, and concealment of these acts to profit from a progressive brand.

127.    Apple has engaged in a series of related predicate acts extending over a substantial period of multiple decades. Further, Apple started a series of related predicate acts and will continue these acts until there is intervention. Apple's misconduct is so persistent and egregious, dependent on continued intimidation of witnesses to keep witnesses quiet about what they know, that it is impracticable that Apple would ever voluntarily stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the inertia of organized crime – with both closed-ended and open-ended continuity.

**v.    Predicate Act 1: Criminal Bribery of Executive Officer (Cal. Penal Code § 67)**

128.    Tom Moyer was Apple's Director of Employment Law until September 2009, when he became Chief Compliance Officer and Head of Global Security.[35]  Moyer allegedly committed criminal bribery by paying bribes to public officials in exchange for concealed carry handgun permits for Apple employees. The California Court of Appeals affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings at the Apple Park Visitor's Center, removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[36]

129.    Two Apple Global Security Directors flipped on Moyer and Apple, turning state's evidence and testifying against him/Apple in exchange for immunity.[37] Among other elements and theories of liability, Moyer engaged in the bribe as part of his job, on behalf of Apple, using Apple assets at Apple locations and to benefit Apple. Further, even after Moyer was charged, Apple defended him: *"After learning of the allegations, we conducted a thorough internal investigation and found no wrongdoing*."[38] Yet, there were numerous signs of misconduct and foul play. Gjovik was directly injured as Moyer's teams threatened and obstructed her.

**vi.    Predicate Act 2: Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)**

130.    Apple and agents made repeated statements, publicly and privately, explaining that they were taking actions to harm Gjovik because of Gjovik's actions as a federal witness, victim, and informant.

---

[35] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc*., et al., No. 1:12-CV-2826, and *Texas, et al. v. Penguin Group, et al*., No. 1:12-CV-3394 (October 15 2014).
[36] *State v Moyer* at 26.
[37] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty*/
[38] Ars Technica, *Apple security chief maintains innocence after bribery charges*, (Nov. 24 2020).

Apple violated 18 U.S.C. 1512(a)(2)-(3) when it used the threat of physical force against Gjovik or attempted to do so with intent to influence, delay, or prevent the testimony of Gjovik in an official proceeding (US NLRB, US DOL, US EEOC, etc); or cause or induce Gjovik to withhold testimony, or withhold a record, document, or another object, from an official proceeding; or alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding; and hinder, delay, or prevent Gjovik's communication to a law enforcement officer of information relating to the commission or possible commission of a Federal offense.

131.    Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness, violating federal law. Apple knowingly used intimidation, threatened, and corruptly persuaded Gjovik, attempted to do so, or engaged in misleading conduct toward Gjovik. Apple violated 18 U.S.C. 1512(b) when it acted with intent to influence, delay, and prevent the testimony of Gjovik federal agencies and law enforcement; or cause or induce Gjovik to withhold testimony and withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in the same

132.    Apple executed this with break-ins, stalking, destruction of property, physical and digital harassment, lawsuits, reports to police and FBI (SWATing), and threats of physical violence sent over wires such as threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap.*"

133.    Apple employees and assumed agents of Apple Inc. suggested Apple Inc. should / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion," "ending her," "destroying her," "ruining her,"* and bankrupting her. Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley," "finding out"* for *"fucking around," a "self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."* Apple Inc. agents threatened to denylist Gjovik from the technology, engineering, and legal employment fields, including *"never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the California Bar Association's Moral Character investigation, and never getting a job anywhere again*

*other than working in fast food."* Many communications instructed Gjovik to drop her cases/charges or modify her testimony/evidence.

134.   In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about ARIA and its air emissions. In one of these schemes, Apple sent her an email via the webform on her website claiming to be ex-US EPA enforcement (Comrade Jones) threatened her to stop talking about the NMP release and vapor intrusion at her office. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[39] Apple also maliciously and unlawfully threatened, intimidated, and coerced Gjovik through physical activities, including:

a.   Entered Gjovik's apartment without the consent of Gjovik, and Apple had no lawful reason to do so [California Penal Code § 602.5]

b.   Broke into Gjovik's home and damaged/obstructed/disconnected part of a telephone/cable/electrical line, or equipment connected to the line – and Apple maliciously and unlawfully made an unauthorized connection with part of a line used to conduct electricity or equipment connected to the line [California Penal Code § 591]

c.   Took unwanted photos and videos of Gjovik looking into Gjovik's home windows with an intent to intimidate [California Penal Code § 647i]

d.   Delayed, lingered, prowled, and wandered on the private property of Gjovik's apartments [California Penal Code § 647(h)]

e.   Entered Gjovik's apartment with intent to commit a crime [California Penal Code § 459]

f.   Fled the scene when caught by a neighbor who said she would call police officers.

g.   Used social media accounts to harass Gjovik about the real-world events she was experiencing in real-time.

h.   To follow her when she ran errands [stalking]

i.   Drive up to her New York apartment, capture videos/photos of her, and send someone.

j.   J. Loitered on her New York sidewalk until she left the apartment and notified Gjovik that the person was watching her.

k.   Intentionally listened to or recorded a conversation/communication without consent from all individuals [Cal. Penal Code 632(a)]

l.   Planted listening devices in Gjovik's property to spy on Gjovik [California Penal Code § 632(a)]

135.   Apple violated 18 U.S.C. 1512(c) when Apple corruptly altered, destroyed, and concealed a record, document, or other object or attempted to do so with the intent to impair the object's integrity or availability for use in an official proceeding or otherwise, obstructed, influenced, or impeded any official

---

[39] False Impersonation of Federal Officer or Employee (18 U.S.C. § 912). *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

proceeding, or attempted to do so.  Many environmental crimes involve deception, both before the offense is committed and later when the defendant tries to cover his tracks.[40]

136.    Gjovik was concerned that Apple knowingly altered and concealed a tangible object (e.g., the cracked slab, etc.) with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter within the jurisdiction of any department or agency of the United States (e.g., US EPA, etc.) in violation of 18 U.S.C. § 1519. Gjovik was concerned Apple was or was attempting to, corruptly alter and conceal (e.g., re-seal, etc.) an object (e.g., the slab, etc.) with the intent to impair the object's availability for use in an official proceeding (e.g., US EPA inspection of the cracks in the slab, etc.) in violation of 18 U.S.C. § 1512(c)(1). Gjovik was concerned that Apple knowingly and willfully concealed and covered up by trick/scheme/device (e.g., retaliation, witness intimidation, frantic repairs, etc.) a material fact (e.g., the cracked slab, etc.) in violation of 18 U.S.C. § 1001.

137.    When Gjovik suffered harassment and intimidation that was openly said to be due to her federal cases, the focus was often Gjovik's NLRB charges. The interference extended to a lawsuit against Gjovik 'because of' Gjovik's NRLB charges, emails to Gjovik demanding she alter her testimony, emails demanding Gjovik omit specific evidence, and direct interference with the NLRB investigators overseeing Gjovik's charges and the resulting investigation. (NLRB investigators are considered Federal Officers under criminal statutes).[41]  Appleseed repeatedly tried to delete, and did get deleted, Gjovik's posts and filings, including a copy of a federal legal filing. This occurred when Appleseed was an active Apple employee and after she supposedly quit Apple in late 2021.

138.    Apple violated 18 U.S.C. 1512(d) when Apple knowingly used intimidation, threatened, and corruptly persuaded Gjovik, attempted to do so, or engaged in misleading conduct toward Gjovik. Apple acted with intent to influence, delay, and prevent Gjovik from communicating information relating to the commission or possible commission of an offense to federal officers and law enforcement authorities. There is a reasonable likelihood that at least one of Gjovik's communications targeted by Apple would have been made to a federal officer. The information that Gjovik would have communicated related to the possible commission of a federal offense.

---

[40] United States Department of Justice Executive Office for United States Attorneys, *Environmental Crimes– 2012,* Volume 60, Number 4, pg89 (July 2012).
[41] 9-139.800 Interference with National Labor Relations Board Agent (29 U.S.C. § 162).

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

139.     Apple managers, employees, and agents have referred to Gjovik's complaints to the federal and state government about Apple Inc as "*unsubstantiated*," "*meritless*," "*baseless*," "*dead in the water*," and that there's "*no case*." Apple's agents referred to Gjovik as an "*ambulance chaser*" and her cases as "*shakedown lawsuits*."  Apple manager Ricky Mondello and ex-Apple employees Joanna Appleseed and Shantini Vyas have publicly called Gjovik a "*liar," "predator," "racist," "inconsequential," "not a real whistleblower."* These parties have described Gjovik's protected activities as a "*vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric*," and "*misinformation*."  One wrote, "*You're beyond pathetic. It will be fun to watch you disappear after you lose everything*."

### vii.     Predicate Act 3: Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513)

140.     In violation of § 1513(b)(1), Apple engaged in conduct and thereby caused bodily injury to Gjovik and damaged the tangible property of Gjovik, and threatened to do so, with intent to retaliate against Gjovik for the attendance as a witness or party at an official proceeding, and any testimony given or any record, document, or other object produced by a witness in an official proceeding. In violation of § 1513(e), Apple, with the intent to retaliate, took any action harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(b) offenses.

141.     Gjovik put her career and physical safety at risk to obtain evidence of what she believed to be criminal acts and violations of federal law related to the air emissions at ARIA and the slab at Stewart 1. Apple retaliated against a Federal Witness & Informant in violation of § 1513(e). Apple knowingly, with the intent to retaliate, took actions harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for Gjovik providing to a law enforcement officer truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(e) offenses.

### viii.     Predicate Act 4: NMP- Wire Fraud (18 US Code § 1343)

142.     When Apple filed a Toxics Release Inventory Form R report to the US EPA on June 30, 2021, claiming treatment, disposal, and transportation of  N-Methyl-2-pyrrolidone ("NMP") waste, Apple devised and attempted to devise a scheme or an artifice (falsifying transportation records) to defraud (lying

to the government) to obtain money or property (money it would have otherwise spent on legal disposal), knowingly and willingly participated in the scheme with the specific intent to defraud, and used the mails and interstate wires in furtherance of the scheme in violation of 18 U.S.C. § 1343 and EPCRA 313.

143.     The report was submitted for ARIA and the report's completeness and accuracy were certified under 40 CFR Section 372 by Apple EH&S manager Susan Creighton. The TRI filing noted that 260.17 pounds of NMP were emitted via "stack or point air emissions," and 2,341.51 pounds of NMP "*gaseous waste stream*" were treated onsite. At issue is Apple's notation that 14,742.82 pounds of NMP were transported offsite from ARIA to two disposal facilities. The problem is – that both supposed destination vendors are well-established TSDF waste processing companies that would ensure the use of manifests. Yet, no manifests were ever filed for these three supposed transports.  Under information and belief, Apple did not send that NMP to those three waste facilities and instead disposed of it in some other way, but falsified the TRI filing to make it appear as if Apple did send it to the waste facilities. It is a criminal violation of the Clean Air Act to make false statements and representations, omit material information, and alter or conceal a required document. [42 US Code 7413(c)(2)(A); 18 U.S. Code § 371.]

### ix.     Predicate Act 5: "Zero Waste" - Wire Fraud (18 US Code § 1343)

144.     Starting in 2021, Apple intentionally devised or intended to devise a scheme to defraud using materially false or fraudulent pretenses (e.g., use of the word 'diversion' to mean illegal dumping, etc.), representations (e.g., claiming they are recycling or reducing waste, etc.), or promises (e.g., "zero waste," etc.) over interstate wire communications related to Apple's hazardous waste creation and disposal practices. Apple told the public and government that it is engaging in environmentally friendly practices to reduce waste. However, Apple is only reducing the paper trail and cost of its waste by illegally disposing of dangerous chemicals in neighborhoods. Apple's scheme to defraud under environmental laws was undertaken with a reckless disregard for the truth or falsity of its hazardous waste representations.

145.     Apple reported in its annual Environmental Report, a formal document they transmitted and published over interstate wires, that Apple transported 1,599 tons of hazardous waste in 2021 and 1,839 tons in 2020 to disposal facilities from Apple's corporate facilities globally. Based on California DTSC tracked manifests, 32% (512 tons) of Apple's global hazardous waste transported to

landfills/disposal facilities came from Apple's semiconductor fabrication factory at ARIA.[42] Statements and activities related to waste at this facility are material for Apple Inc.

146.   Apple's Environmental Progress Report is a formal document Apple transmits over interstate wires. Apple reports on the amount of waste that Apple allegedly "*diverted from landfills.*" Apple highlighted this number in the report under the program called "*Zero Waste*" and claimed Apple is moving towards "*waste-free operations.*"[43] Apple said, "*We maintain our commitment to the safe and responsible management of hazardous waste, both onsite and offsite.*"[44] In 2019, Apple published a press release over interstate wires stating, "*Apple has…strengthened its efforts to…reduce pollution. In prioritizing Zero Waste to Landfill, Apple suppliers diverted 1 million tons of garbage in three years.*"[45]

147.   Apple's statements are false and misleading. They are not reducing pollution—Apple is creating incredible amounts of pollution, at least at ARIA, that is an acute danger to public health. Apple is also not innocently '*diverting'* waste from landfills – Apple is '*diverting'* waste by exhausting unabated solvent vapors, fumes, and toxic gases from their one-story exhaust vents – which created dense gas and vapor plumes that surrounded the nearby four-story apartments with thousands of residents, as well as an open-air children's playground and making many people sick.[46]

148.   On August 15, 2021, Alisha Johnson (who reports to Lisa Jackson) emailed over the wire to the US EPA a document with Apple's talking points about Apple's environmental practices. Including: "*In fiscal year 2020, we diverted more than 70% of waste across Apple facilities …. We have active Zero Waste to Landfill goals for retail, corporate facilities, and our supply chain.*" [FOIA document]. Again, these are false and misleading statements. In 2020, at least some of that 70% of 'diverted' waste was the NMP fumes Apple blasted into Gjovik's home. This also explains that Apple's illegal dumping was at the direction of the Board of Directors and executives as a formal "goal."

x.   **Predicate Act 6: E-Waste - Wire Fraud (18 US Code § 1343)**

149.   In 2015-2016, Apple intentionally devised or intended to devise a scheme to defraud using materially false or fraudulent pretenses (e.g., use of the word 'diversion' to mean illegal dumping, etc.),

---

[42] Apple, 2022, Environmental Progress Report, pg 87.
[43] Apple, 2021, Environmental Progress Report, pg 51.
[44] Apple, 2021 Environmental Progress Report, pg 70.
[45] Apple, *Apple releases 13th annual Supplier Responsibility Progress Report*, March 6 2019.
[46] Apple, 2022 Environmental Progress Report, pg 87.

41

representations (e.g., claiming they only use licensed TSDFs, etc.), or promises (e.g., compliance with hazardous waste export laws, etc.) over interstate wire communications related to Apple's electronic waste practices. Apple's fraud was for obtaining money or property, and Apple knowingly and willingly participated in the scheme intending to defraud and used the interstate wires to further the scheme.

150.    In 2013, the California EPA DTSC started investigating Apple for violating e-waste regulations in 2011-2012.  In 2016, based on the investigation results, Apple agreed to a five-year consent decree and was fined by CalEPA DTSC for $450,000 over hazardous/universal waste violations.[47]  "To settle the allegations, Apple has agreed to increase inspections at its facilities in Cupertino and Sunnyvale, according to C[alifornia ]EPA's Department of Toxic Substances Control (DTSC)." Apple was found to have operated off-book waste processing plants, transporting waste without manifests and failing to take proper employee safety precautions. These violations surely included wire and mail fraud elements to pull off such an operation for so long.

151.    In Apple's 2015 Environment Report (a formal document they transmitted and published via wires), Apple said, "*Since 1994, we have diverted more than 508 million pounds of equipment from landfills.*" Apple apparently referred partially to the e-waste it had been illegally disposing of in Santa Clara County.

152.    DTSC caught Apple using unlicensed TSDF transporters, yet Apple's 2016 Environmental Responsibility Report (a formal document they transmitted and published via wires) said, "*Apple disposes of hazardous waste responsibly. We complete regular audits of the Transportation, Disposal, and Storage Facilities (TSDF), where the hazardous waste is ultimately sent to be treated, incinerated, or recycled. Only facilities we audit and approve can accept and treat the hazardous waste we generate, which was 1 million pounds in fiscal year 2015.*"[48]  In the 2016 complaint and settlement, DTSC complained that Apple used unlicensed waste disposers, and it is unclear where the waste was transported to.

153.    In Apple's 2015 and 2016 Environmental Responsibility Reports, the formal document they transmitted and published via wires, Apple said: "*All electronic waste we collect worldwide is processed in the region where it is collected— nothing is shipped overseas for disposal. The vast majority of our recycling is handled in-region, so we can make sure our recycled materials are not being dumped*

---

[47] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016.
[48] Apple, Environmental Responsibility Report, 2016.

*unsafely.*"[49] In the 2016 DTSC complaint and settlement, DTSC noted Apple was illegally shipping e-waste to Canada.

154.    Apple's false statements had a natural tendency to influence, or are capable of influencing, the decision of the decision-making body to which it was addressed. Major publishers covered the 2016 DTSC fine, and Lisa Jackson's ex-US EPA team made false and misleading statements in their comments, which were transmitted over wire:[50]

> "An Apple spokesperson, Alisha Johnson, said: 'This matter involves an oversight in filing paperwork to close one of our recycling facilities as part of our expansion to a larger site. We have worked closely with the DTSC to ensure that going forward, we have the proper permits for our current site…As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond the legal requirements."

Yet, in 2021, Apple told Gjovik they only do the bare minimum of what is required (and Gjovik discovered they still need to do that). Further, the conduct was not an 'oversight in filing paperwork'. Gjovik complained about this before termination as part of her SOX and Dodd-Frank claims.

### xi.    Predicate Act 7: "Green" Energy – Wire Fraud (18 US Code § 1343)

155.    Apple intentionally devised or intended to devise a scheme to defraud using materially false pretenses (e.g., claims of using 'green' energy, etc.), representations (e.g., they were using 'green' energy, etc.), or promises (e.g., they were trying to use 'green' energy, etc.) over interstate wire related to Apple's energy practices. Apple has an energy company subsidiary registered with FERC called "Apple Energy LLC," so Apple's statements about energy are material and subject to high scrutiny.

156.    In 2018, Apple wrote to the EPA, "*Apple generates 100% of our operational load through clean energy.*"[51] For years, Apple's "environmental" branding has centered around a claim of running on "Green Energy." In 2015, it was exposed that Apple's claims about its data center in Maiden, North Carolina, running on 100% green energy, were false. Apple had claimed they did not use fossil fuels at the facility, and it was 100% "green," but records showed they did use fossil fuels, and only <1% of the energy was "green." [52]

---

[49] Apple, Environmental Responsibility Report, 2015; Environmental Responsibility Report, 2016
[50] Reuters, *California EPA says settled with Apple on hazardous waste claims* (Dec 6, 2016).
[51] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions* … (at 83 FR 45588, September 18, 2018).
[52] *Analysts Call Apple Renewable Energy Claims 'Lies,'* The Carolina Journal, 2015.

### xii.      Predicate Act 8: Compliance – Wire Fraud (18 US Code § 1343)

157.     Apple intentionally devised or intended to devise a scheme to defraud using materially false or fraudulent pretenses (e.g., that Apple tries to follow the law, etc.), representations (e.g., that Apple does not break the law, etc.), or promises (e.g., that Apple cares about following the law, etc.) over interstate wire communications related to Apple's regulatory compliance practices. Apple devised and attempted to devise a scheme or an artifice to defraud to obtain money or property, knowingly and willingly participated in the scheme with the specific intent to defraud, and used the mail and interstate wires in furtherance of the scheme.

158.     Apple's Global Whistleblowing Policy states: "*Apple conducts business ethically, honestly, and in compliance with applicable laws and regulations*."[53]  Apple's website has a homepage for "Ethics and Compliance" that leads with a prominent statement, similarly saying: *"Apple conducts business ethically, honestly, and in full compliance with the law.*"[54] Apple's "Business Conduct Policy," produced by Tom Moyer's team, starts with: "*Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations. This applies to every business decision in every company area worldwide."*[55]

159.     Apple states a conclusive, definite fact that the company is ethical, honest, and never violates laws or regulations. Apple's statement is false, as well as preemptive threats against whistleblowers speaking out, as if Apple is never doing anything wrong; there is nothing to blow the whistle about. Reviewing the long list of criminal and civil charges, decisions, and settlements against Apple – it is clear that not "*every business decision in every area of the company worldwide*" is ethical, honest, or in full compliance with the law.

### xiii.      Predicate Act 9: Apple/Levoff -- Securities Fraud (15 USC § 78) & Wire Fraud

160.     Gene Levoff, member of the Worldwide Loyalty Enterprise and officer and agent of Apple, violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and Section 10(b) of the Exchange Act and Rule 10b-5.[56] Gene Levoff was Apple's head of Corporate Law and one of three officers for Braeburn Capital (Apple's $100B+ internal hedge fund subsidiary in Reno, Nevada). Among other duties,

---

[53] Apple, Global Whistleblowing Policy.
[54] Apple, Ethics and Compliance.
[55] Apple, Business Conduct Policy, August 2022.
[56] *US SEC v Gene Daniel Levoff*, 2:19-cv-05536, pg12-13, United States District Court, District of NJ (2019).

Levoff was responsible for "Apple's compliance with securities laws, including providing legal advice in connection with Apple's SEC filings and financial reporting, and for managing Apple's corporate subsidiary structure."[57] He also made numerous false SEC filings about Apple's environmental practices.

161.    Levoff was an Apple executive and associate General Counsel and engaged in unlawful conduct that was precisely the type of his job at Apple, which he was supposedly responsible for preventing and monitoring. Levoff even sent emails to Apple employees warning them not to engage in conduct, which he then turned around and did himself, knowing the violation, and prepared to conceal and obstruct any inquiries into his conduct through his role as the person ultimately responsible for the compliance concerns.

162.    In violation of 18 U.S.C. Section 1962(c), Apple participated in and enabled Levoff's commission of RICO Acts of Securities Fraud and Wire Fraud by continuing to employ him, disclose confidential information to him, and instruct him to send notices to the company that Apple knew Levoff himself was violating. In violation of 18 U.S.C. Section 1962(d), Apple adopted the goal of furthering and facilitating a conspiracy to commit RICO Acts of Securities Fraud and Wire Fraud. Two or more people (Gene Levoff and DOE[58]) agreed to commit a substantive RICO offense, and Apple knew of and agreed to the overall objective of the RICO offense.[59]

### xiv.    Predicate Act 10: Relating to Chemical Weapons [18 USC § 229; §2332(b)(g)(5)(B)]

163.    At ARIA in Santa Clara, Apple knowingly possessed chemicals not intended for peaceful purposes, protective purposes, unrelated military purposes, or law enforcement purposes, as described in 18 U.S.C. § 229F(7) – and those purposes were malicious and were not socially beneficial. Apple intended to release dangerous chemicals in a way that could cause imminent danger of death, serious bodily injury, and mass suffering. These chemicals were toxic and "through their chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." [OPCW Section 299]. Apple attempted to and did acquire, transfer, receive, stockpile, retain, own, possess, use, and threaten to

---

[57] *US SEC v Gene Daniel Levoff*, 2:19-cv-05536, pg4, United States District Court, District of New Jersey (2019).
[58] Additional person(s) named DOE until identity(s) revealed during discovery – it is implausible that Levoff was able to engage in so much fraud without a single person noticing for five years.
[59] Pending discovery, there appears to only be two options: first, Apple's Audit function did notice Levoff's conduct and condoned/ratified it by inaction, similar to the executive direction in *Banko v Apple* related to Embezzlement), or Levoff deleted records of his activities, which would another Predict Act.

use chemical weapons. Apple assisted or induced another person to do the same or attempted to conspire to do the same.

164.    Apple used/stored/released chemicals on Treaty Annex II, including Phosphorus Trichloride, noted in their chemical inventories, and white/yellow/red phosphorus waste, indicated on their manifests. Apple also used chemicals listed on the Department of Homeland Security list of "Chemicals of Mass Effect," including arsine, phosphine, and chlorine gases.[60] Apple repeatedly leaked phosphine gases from the factory at ARIA in 2019 and 2023, at least.

165.    Like other 18 USC 229 cases, highly volatile and poisonous substances were repeatedly released into highly trafficked areas, placing many people at risk of severe harm and mass suffering. Apple also has a history of gassing its employees with Chlorine. At least two chlorine gas leaks have been reported at Apple facilities. In 2012, there was a chlorine gas leak at an Apple factory, which killed one worker and injured another four workers.[61] There was a chlorine gas leak at an Apple data center in 2015, resulting in an evacuation, HazMat response, and multiple employees taken to the hospital.[62] At ARIA, Apple's use, storage, and release (intentional and unintentional) of very toxic gases can produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emission, if it has not already occurred, could easily cause injuries and death.

## SECOND CAUSE OF ACTION

### (Violation of Sarbanes-Oxley Whistleblower Protection)

166.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. At the time of the events alleged in this complaint, Apple's officers, employees, and agents discharged, demoted, suspended, threatened, harassed, and otherwise discriminated against Gjovik in the terms and conditions of her employment because Gjovik provided information, caused information to be provided, and otherwise assisted in an investigation regarding conduct which Gjovik reasonably believed constituted a violation of securities laws or which included fraud on shareholders. Gjovik provided information she thought related to fraud or securities violations as defined in 18 U.S.C. § 1514A(a)(1).

---

[60] DHS CISA, Chemicals of Interest.
[61] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 2012.
[62] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015.

167.    Gjovik complained to Apple about conflicts of interest related to a board member and decision about her office, about apparent self-dealing by corporate insiders including an interested party transaction, Apple's false public statements about Apple's environmental and labor practices, including false statements by a prior government official and now Apple executive; concerns that Apple's internal controls were inadequate; Apple appeared to be silencing and retaliating against whistleblowers and people raising concerns, in order to cover up the issues instead of investigate or resolve problems; Gjovik's complaints about the safety of her office and about the complaint process generally would be overseen by the Board Committee chaired by an officer Gjovik was complaining about; false statements to government and shareholders; material fraudulent conduct; inadequate internal controls; complaints about smuggling and violations of sanctions; and witness intimidation and obstruction of justice.

168.    Gjovik complained about these issues in emails, complaints, and texts, including formal Business Conduct complaints in July 2021 (smuggling/sanctions) and August 2021 (Ronald Sugar/Conflict of Interest and Fraud); the issue confirmation with Okpo in August 2021; complaints to Senior Director Dr. Cohen about the vaccine skipping the line issues in December 2020, Apple's fraudulent conduct in April-May 2021; complaints to Gjovik's friend (N.C.) on Lisa Jackson's team about fraudulent statements about environmental practices in April 2021 and systemic retaliation and coverups in July-August 2021; and additional comments to the press and on social media before her termination.

169.    Gjovik filed an SEC whistleblower tip on August 31, 2021, and directly notified Apple via Twitter, coworkers, and directly to Dr. Cohen, all prior to her termination. Before her termination, Gjovik informed Dr. Cohen directly about her FBI complaint about smuggling/sanctions and FDA/DOJ tip about vaccines. The SOX case was docketed with the US Department of Labor on December 12, 2021.[63]

170.    Gjovik's concerns about fraud and securities rules related to Ronald Sugar and her office were material as Apple makes statements about the conditions of its properties, compliance with regulations, and environmental practices in its SEC filings and communications to shareholders. Gjovik's complaints were reasonable as the allegations included all the essential elements of fraud and even used the word 'fraud.' The property at issue in Gjovik's July-September 2021 complaints is worth $40M+, had a dedicated US EPA webpage for the clean-up, and another company with a property on the Triple Site

---

[63] *Ashley Gjovik v Apple Inc,* Apple Inc./Gjovik/9-3290-22-051; OSHA 11(c) Procedures: 29 CFR Part 1977, EPA Procedures: 29 CFR Part 24, SOX Procedures: 29 CFR Part 1980

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

found the clean-up material enough to file a copy of a remediation agreement, which also notes the TRW Microwave Superfund site, to the US SEC.[64]

171.    Sugar worked at TRW Microwave Inc (headquartered at 825 Stewart Drive) when the site created pollution and clean-up orders were issued. As CFO, he would have signed financial assurance documents. It's improbable that Ronald Sugar was not personally involved in TRW Microwave use and disposal of industrial hazardous materials at Gjovik's office or not personally involved in the environmental clean-up of spills/dumping of those chemicals at Gjovik's office. Gjovik witnesses Apple committing fraud at Stewart 1 when it refused to report issues to the US EPA it was required to report and when it attempted to conceal the problems before she (or the US EPA) could inspect. Gjovik inquired if Ronald Sugar was involved in the fraud due to his conflicts of interest related to the property.

## THIRD CAUSE OF ACTION

### (Violation of Dodd-Frank Whistleblower Protection)

172.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple directly and indirectly discharged, demoted, threatened, suspended, harassed, and otherwise discriminated against Gjovik in the terms and conditions of her employment because Gjovik lawfully provided information to the Commission with her SEC whistleblower tip (filed August 31, 2021), made disclosures to the US SEC led to several meetings with US SEC investigators about her disclosures, and made other protected disclosures.   The 2nd Cause of Action for SOX whistleblower retaliation is incorporated and restated here.

## FOURTH CAUSE OF ACTION

### (Creation & Maintenance of a Private Nuisance; Nuisance Per Se; Absolute Nuisance)

173.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple created and maintained a condition in violation of California Civil Code Section 3479. This nuisance was demonstrably injurious to health, which was indecent and offensive to the senses and obstructed the free use of property. By acting and failing to act, Apple created a condition or permitted a condition to exist that was harmful to health, offensive to the senses, an obstruction to the free use of property, and a fire, explosion, and poisoning hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, negligent, and reckless.

---

[64] US SEC, *Remediation Agreement* (AMD, Fujitsu and FASL), EX-10.15.

174.     Apple is continuously casting pollution upon the property of the owner and tenants of the Santa Clara Square Apartments and the employees who work inside Stewart 1, as it knew it would do when it constructed its exhaust and HVAC systems and hazardous waste handling systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution would continue to fall, not by accident or mishap, but in conformity with the knowledge it had before the construction of the systems. Apple should be presumed to have intended its act's natural, known, and reasonable consequences.

175.     Apple's interference would and did substantially annoy or disturb persons of normal health and sensibilities in the same community. Apple's operations at the factory and Superfund site are both continuing nuisances, and every continuation of the nuisance or trespass gives rise to separate damages claims. Apple has the agency and ability to stop the nuisance (it is not permanent), so until it does, the nuisance Apple created is continuous.  Apple's conduct was a substantial factor in causing Gjovik's harm. Gjovik did not consent to a defendant's conduct, and the seriousness of the harm outweighs the social utility of Apple's conduct. Apple damaged Gjovik's property and injured Gjovik's person. Due to Apple's actions, Gjovik's property was destroyed, the leasehold degraded, she became very ill, and she suffered severe emotional distress.

176.     **Private Nuisance Per Se**: Further, Apple's knowing and intentional releases of hazardous waste into the air and environment around ARIA., in violation of several laws, triggers strict liability under the nuisance claim, or "nuisance per se." Apple's solvent vapor and gas exhausts released dangerous chemicals just feet from thousands of homes, violating federal laws, state laws like Proposition 65, and local toxic gas and nuisance ordinances. For example, the Clean Air Act "*criminalizes knowing or negligent "releases into the ambient air [of] any hazardous air pollutant . . . or extremely hazardous substance" that give rise to imminent danger,*" [42 U.S.C. § 7413(c)(4)– (5)]. Further, Apple also violated RCRA when "*knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter . . . in violation of ... of this section [and] knows at that time that he thereby places another person in imminent danger of death or serious bodily injury*." [42 U.S.C. § 6928(e)].

177.     At ARIA and Stewart 1, Apple discharged air contaminants that caused injury, detriment, nuisance, or annoyance to a considerable number of persons or the public and which endangered the comfort, repose, health, or safety of any of those persons or the public in violation of Cal. Health & Safety Code § 41700. Apple's release of air contaminants did cause actual injury to Gjovik and others, and those

injuries required prescriptions, surgeries, and special monitoring; thus, Apple also violated Cal. Health & Safety Code § 42400, a misdemeanor. In addition, Apple's excessive and improperly treated wastewater discharge into the municipal sewer is water pollution and a nuisance under Cal. Water Code, § 13050.

178.    **Absolute Nuisance**: The rule of strict liability stated in § 519 frequently is applied by many courts in these cases under the name of "absolute nuisance," even when the harm that results is physical harm to person, land, or chattels." The condition Apple created and permitted to exist resulted from abnormally dangerous activity for which strict liability should also exist. The Ultrahazardous activities section is incorporated here for both properties.

### xv.    Part A. – Nuisance at 3250 Scott Blvd, Santa Clara

179.    In or about 2015, Apple constructed, or caused to be constructed, exhaust vents and open tanks at ARIA in Santa Clara, near the common border line of the defendant's and Gjovik's property at 3390 Octavius Drive in Santa Clara. The exhaust vents were installed and maintained negligently, recklessly, and unskillfully. Apple exhausted through the vents and emptied various materials or substances into the open tanks that caused a foul, obnoxious, and disagreeable odor and polluted the atmosphere / ambient air of Gjovik's leasehold property.

180.    Apple's silicon fabrication plant emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property and collect Gjovik's chattel property and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property. Apple created the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their business. The emissions were a business decision to be able to report reduced waste sent to landfills.

### xvi.    Part B.– Nuisance at 825 Stewart Drive, Sunnyvale

181.    In or about 2015, Apple constructed, or caused to be built, exhaust vents and HVAC equipment at Stewart 1, where Gjovik's Apple office was. The exhaust vents were installed and maintained recklessly and negligently. Apple exhausted through the vents and re-entrained into the HVAC system and then into the building's indoor air, various substances that caused a foul, obnoxious, and disagreeable odor and polluted the air where Gjovik was assigned by her employer to work.

182.    Apple has conducted its business at Stewart 1 in such a manner as to constitute a nuisance in that the Superfund site groundwater mega-plume emits large quantities of vapors, chemicals, and other

contaminants into the air. Beneath the building, they are carried by an intentionally designed sub-slab vapor collection system, deliberately routed to the roof, and then re-entrained through the HVAC intake and into Gjovik's office and collect Gjovik's chattel property, and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property. Apple created the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their business and failed to correct it for years after the US EPA complained.

**FIFTH CAUSE OF ACTION**

**(Strict Liability for Ultrahazardous / Abnormally Dangerous Activities)**

183.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple's activities at ARIA and Stewart 1 provided a high degree of risk of significant harm to people and property, and the exercise of reasonable care could not eliminate the risk; the activity's benefits do not outweigh the risks, and these activities are inappropriate for the location and are not common.Apple was engaged in an ultrahazardous activity that caused Gjovik to be harmed. Apple's activities were the proximate cause of that harm, and Apple is responsible for that harm. People who engage in ultrahazardous activities are responsible for the harm these activities cause others, regardless of how carefully they carry out these activities. Apple damaged Gjovik's chattel property (discoloring, weakening, dissolving glues, causing reactions), degraded her extremely expensive leasehold conditions, and harmed Gjovik's mind and body.

### xvii.    Part A. – Ultrahazardous Activities at 3250 Scott Blvd, Santa Clara

184.    Operating a silicon fabrication factory is an ultrahazardous activity when there is a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on. Semiconductor fabrication adjacent to a residential area is an ultrahazardous activity. For decades, it has been known to require pyrophoric gases, which have a "serious fire hazard," combustible and flammable chemicals that must be "carefully monitored and handled by experienced personnel." These chemicals were used only a few hundred feet from homes, and the chemicals in question were emitted from vents. The storage, use, and release of dangerous, highly poisonous gas in a residential area is an activity which, even when

51

conducted with the greatest of care and prudence, could cause damage to others in the neighborhood and thus is ultrahazardous, and Apple knew.

185.   The close proximity to residential areas makes Apple's activities ultrahazardous. Apple's insistence on keeping the existence of the factory secret, Apple failed to put anyone around the facility on notice that Apple's ultrahazardous activities could harm them. Apple's secrecy increases the danger of its activities as well as concealing from victims the cause of their injuries. Apple released chemicals categorized by Cal. Code Regs. Tit. 17, § 93000 as "Substances Identified as Toxic Air Contaminants," of which there is no safe level of exposure without "significant adverse health effects. "Apple released into the air chemicals categorized under 42 U.S.C. Section 7412(b) as "Hazardous Air Pollutants" and Cal. Code Regs. Tit. 17, § 93001 as "Hazardous Air Pollutants Identified as Toxic Air Contaminants."

### xviii.   Part B. – Ultrahazardous Activities at 825 Stewart Drive, Sunnyvale

186.   Stewart 1 is part of a Superfund mega-plume, merging with other megaplumes and impacting a large community with emissions. Operating a business on a Superfund mega-site with a pathway for vapor intrusion and contaminants of concern, including TCE and Vinyl Chloride, is an ultrahazardous activity. The activity has a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on. Recovery from unexpected exposure to toxic fumes in an office building or other building has been recognized as a legitimate legal claim, even where the effects upon the occupants are not permanent.CERCLA sites already have strict liability for hazardous waste contamination. CERCLA imposes strict liability for environmental contamination upon, among others, the owner and operator of a facility – which, in this case, is Northrop Grumman and Apple, respectively. [42 U. S. C. §9607(a).] Superfund sites are relatively uncommon. As of September 2023, there are only 1,336 active Superfund National Priority List sites in the United States.[65]

### SIXTH CAUSE OF ACTION

### (Violation of the Bane Civil Rights Act - Cal. Civ. Code § 52.1)

187.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above,

---

[65] US EPA, Superfund: National Priorities List (NPL),

as though fully set forth in this Claim for Relief. Apple violated the Bane Act when Apple "*interfere[d], or tries to do so, by threats, intimidation, or coercion, with [Gjovik's] exercise or enjoyment of rights secured by federal or state law*." Apple violated the Bane Act with "*an attempted or completed act of interference with a legal right, accompanied by a form of coercion*" with specific intent to violate Gjovik's rights and a reckless disregard for Gjovik's rights. Apple intended to cause harm, but Gjovik was harmed, and Apple's actions were a substantial factor in causing Gjovik's harm.

188.    Apple committed violence and made threats of violence against Gjovik and her property, including threatening messages and social media posts about guns, ruin/destruction, and even her death; sending threatening and dangerous packages in the mail; tampering with Gjovik's chattels to the extent of conversion; surveilling and stalking Gjovik; hacking Gjovik's electronics and utilities; destroying Gjovik's chattels; trespassing and burglarizing Gjovik's home; and other inherently violent misconduct.

189.    Any reasonable person would feel terrorized by Apple's actions, and that was Apple's intent when their Global Security & Legal teams used their background and training to formulate a psychological torture campaign. Apple's intimidation, threats, and terrorization efforts of Gjovik were operated around the clock and the world, with Apple messaging, calling, and posting about Gjovik at all hours of the day, in multiple languages, and from dozens of countries around the world. Apple's harassment of Gjovik came from all corners of the internet, including forums, social media sites, email, texts, website webform, phone calls, blog posts, news articles, and other mediums.

190.    Apple's actions threatened violence and created a reasonable fear of imminent harm. Apple attempted to interfere with Gjovik's exercise of her civil rights through threats, intimidation, and coercion. Apple made threats of violence against Gjovik and her property, which she reasonably believed would be carried out if she exercised her civil rights. Apple acted violently against Gjovik and her property to prevent her from exercising her rights and to retaliate against her for doing so.

191.    In an attempt to prevent Gjovik from exercising her civil rights and to retaliate against her for trying to exercise her civil rights, in violation of Gjovik's civil rights, Apple has maliciously terrorized Gjovik with threats, intimidation, and coercion that interferes with her constitutional and statutory rights. Apple tried to prevent Gjovik from doing things she had a right to do under the law and to force Gjovik to do things she was not required to do. Apple interfered and attempted to interfere by threat, intimidation,

coercion, or with reckless disregard for, Gjovik's exercise and enjoyment of a constitutional or other right under California or federal law. [66]

192.   **A. Right to Provide Testimony to Agencies**: Apple intimidated Gjovik to prevent her from giving testimony. Apple threatened Gjovik after Gjovik's testimony. Apple interfered and attempted to interfere with Gjovik's testimony to labor agencies by threatening her with violence and intimidation, including termination her employment in 2021 and the day before she was to testify to the government about Apple, and sued her in 2022 days before she was to testify to the NLRB about witness intimidation by Apple, and all of which is her right to exercise her labor rights and engage with the government as a citizen of California (at that time) and of the United States.

193.   **B. Right to Meet with Legislatures and Appear as a Legislative Witness**: Starting in late 2021, Gjovik began contacting and meeting with state and federal politicians about all of Apple's unlawful conduct, including to get help with her cases. Apple's threats and intimidation interfered and attempted to interfere with Gjovik's right to appear as a witness before a legislative committee, violating Govt.C. § 9414(a)(1). Apple's harassment of Gjovik was motivated by the fact that Gjovik was or may be a witness before a legislative committee in violation of Govt.C. § 9414(b). Apple's threats and intimidation before Gjovik's termination and Apple's termination of Gjovik were motivated by Gjovik becoming a witness before a legislative committee in violation of Govt.C. § 91414(a)(2). Apple knowingly and maliciously prevented, dissuaded, and attempted to prevent and dissuade Gjovik, a witness and victim, from giving testimony at legal proceedings and inquiries in violation of California Penal Code § 136.1(a).

194.   **C. Right to Report Criminal Acts to Law Enforcement**: Apple attempted to prevent and dissuade Gjovik, who was a victim of a crime and a witness to a crime, from making reports of that victimization to peace officers and law enforcement and prosecuting agencies from causing a complaint to be sought and prosecuted, and seeking the arrest of persons in connection with her victimization. in violation of California Penal Code § 136.1(b). Gjovik was a crime victim under several civil and criminal statutes, including RCRA, CERCLA, CAA, 18 USC 1502, 18 USC 1503, and more.

195.   **E. Constitutional Right to Privacy**: Apple's supposed justification for terminating Gjovik and Apple's conduct (ear scans, face Gobbling, etc.) all violate the California Constitution Article 1 right

---

[66] Intimidating a Witness - California Penal Code 136.1; Threatening a Witness Prior to Testimony - California Penal Code § 137(b); Threatening a Witness After Testimony – Cal. Penal Code § 140(a)

to privacy. Gjovik had the right and continues to have the right to protest invasions of her privacy, and Apple's pretextual termination for firing Gjovik and harassing letter from their law firm threatens, coerces, and intimidates Gjovik to refrain from exercising her Constitutional rights.

196.    **G. Right to Free Speech & Assembly**: Apple interfered and attempted to interfere with Gjovik's civil rights under state and federal law, including her right to participate lawfully in speech and peaceful assembly, opposing any denial of the opportunity to participate in federal civil rights. [18 U.S.C. § 245(b)(5)]. For example, Apple's retaliatory litigation, retaliatory reports to law enforcement, and malicious gag order prohibited Gjovik from doing so, including prohibiting her from sharing public records and her legal filings, from complaining (even privately) about the retaliatory lawsuit and gag order, and violating her right to free speech under the US Constitution, causing irreparable damage to Gjovik. [U.S. Constitution 1st Amendment; California Constitution Article 1; California Labor Code; NLRA, etc.]

**SEVENTH CAUSE OF ACTION**

**(Violation of the Ralph Civil Rights Act - Cal. Civ. Code §51.7)**

197.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. In violation of the Ralph Civil Rights Act, Apple threatened and committed violent acts against the Gjovik. Apple was motivated by its perception of Gjovik's protected characteristics (including its position in a labor dispute). In addition, Gjovik was harmed, and Apple's conduct was a substantial factor in causing the plaintiff's harm.

198.    Apple intimidated Gjovik by the threat of violence against Gjovik and her property, and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and been intimidated by Apple's conduct. Apple's acts of violence and threats were substantial factors in causing Gjovik harm and did cause Gjovik harm to her property and person.

199.    **A. Position in a Labor Dispute**: Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property. Apple's actions were motivated by Apple's perception of Gjovik's position in a labor dispute. Apple made numerous statements about this to Gjovik, including directly complaining about Gjovik's NLRB, EEOC, US DOL, CalDOL, and US DOJ Civil Rights complaints. Undue Influence was present as Apple threatened to seek criminal prosecution of Gjovik for an alleged crime and when Gjovik was entirely innocent of that or any other crime, causing the

Gjovik to fear arrest and imprisonment and the damage that would result to Gjovik's business and reputation, Apple also aided, conspired, and incited these acts. Apple incited and aided with the meritless litigation and police reports against Gjovik and conspired to harass and threaten Gjovik about it.

200. **B**. **Sex/Gender/Family Status/Class**: Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property, and Apple's actions were motivated by Apple's perception of Gjovik's female sex and gender, race, and socioeconomic standing. Apple 's harassment repeatedly referenced Gjovik's gender/sex (e.g., woman, chick, b***h, c**t, Karen, SuperKaren, Karenx100, etc.) and family status (not married and no children) in derogatory ways and as a basis for harassing Gjovik.

201. **C**. **Disabilities/Medical Conditions**: Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property, and Apple's actions were motivated by Apple's perception of Gjovik's disabilities and medical conditions (PTSD, ADHD, autism spectrum, anxiety, depression, syndrome/recovery from solvent exposure). Apple made negative comments about Gjovik and claimed to be harassing Gjovik because of her disabilities. Apple also accused Gjovik of being insane in hundreds/thousands of posts.

202. **D**. **Activism**: Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property, and Apple's actions were motivated by Apple's perception of Gjovik's activism around environmental health and chemical exposure and membership in environmental and activist organizations.violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property. Apple's actions were motivated by Apple's perception of Gjovik's activism around privacy rights.

203. **E**. **Victim of Crime**: Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property, and Apple's actions were motivated by Apple's perception of Gjovik's membership in a protected class of 'victims of environmental crime. 'Under California law, by April 2021, and as early as February 2020, Gjovik was an environmental crime victim because she was a "*victim of a crime that caused physical injury*" and suffered "*physical, psychological, and financial harm due to the attempted commission of a crime or delinquent act*."[67] Under federal law,

---

[67] Cal. Lab. Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955. "*Regardless of whether anyone is arrested.*"

by April 2021 and as early as February 2020, Gjovik was an environmental crime victim who suffered direct physical, emotional, or financial harm as a result of the commission of a federal crime.

## EIGHTH CAUSE OF ACTION

### (Violation of the California Whistleblower Protection Act - Cal. Labor Code § 1102.5)

204.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity in disclosing information to a governmental or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover or correct the violation; or providing information to or testifying before, any public body conducting an investigation, hearing, or inquiry.

205.   Section 1102.5 also covers Gjovik's' public disclosures as due to Apple's extreme power and control over the government agencies who are supposed to be able to regulate it, often the only party in a position to force Apple to correct the issue is the public. Many of Gjovik's public statements in August and September 2021, and statements to coworkers in June and July 2021, all before her termination, noted that was why Gjovik was bringing her complaints forward to her coworkers and the public – so the public pressure may force Apple to do the right thing for once.

206.   Gjovik filed several complaints under multiple laws, which were known to Apple executives, bosses, and administrators (by Gjovik informing them directly, or by Gjovik speaking about them publicly on social media and the press, or by Apple's surveillance of Gjovik before her termination. Complaints to the US EPA and CalEPA, complaints to the Santa Clara County district attorney's office about environmental crimes, complaints to politicians about environmental crimes and public corruption, complaints to US EEOC and DFEH, complaints to US NLRB and CalDOL, and complaints to US DOL about environmental violations, health/safety issues, and securities fraud.

207.   Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations to government agencies, the public, the press, and Apple management. Gjovik had a reasonable cause to believe that the information she disclosed violated the statute and was non-compliant with a rule or regulation.

### 1) §1102.5: Reporting Unlawful Labor/Employment Conduct

208.    Before her termination, Gjovik provided information to public bodies (including the US and California Department of Labor, US NLRB, California DFEH, US EEOC, etc.) about Apple's violations of labor and employment laws, and several agencies were already conducting an inquiry based on Gjovik's information. Gjovik testified before public bodies (US EEOC, US Department of Labor) and was scheduled to testify before public bodies (US NLRB) conducting investigations. Gjovik had reasonable cause to believe that the information provided to and testimony before the public body disclosed a violation of statute and noncompliance with a rule or regulation. Apple knew Gjovik was engaged in protected activity, and Apple retaliated against Gjovik because of her protected activity.

209.    Gjovik had a legal right to protest the Gobbler application, Apple wanting to scan her ear canals, and Apple's unlawful and unethical data collection practices. Face Gobbler violates numerous laws, including the California Constitution Article 1 Right to Privacy and the prohibition on video recording in bathrooms in Cal. Labor Code § 435, and the prohibition on retaliation for Political Activity found in Cal. Labor Code §§ 1101-1102. Employees can refuse to participate in unlawful studies.

### 2) §1102.5: Reporting Environmental & Safety Violations

210.    Before her termination, Gjovik reported violations of environmental and safety laws (CERCLA, OSH Act, etc.) at Stewart 1 to the US EPA from April through August 2021, to the California EPA in August 2021, and to the US Department of Labor OSHA in August through September 2021. Gjovik also reported violations of environmental laws (RCRA, CAA) to the US EPA and California EPA and legislatures (city mayor, county commissioner, state senator, state assemblyman) about ARIA from September 2020 through July 2021. Gjovik also reported environmental violations at Stewart 1 and ARIA to her coworkers, the press, and the public.

### 3) §1102.5: Refusal to Participate in Unlawful Conduct

211.    California Labor Code 1102.5 prohibits employers from terminating employees due to the employee refusing to participate in an activity that would violate state or federal statute, rule, or regulation. Gjovik refused to engage in unlawful acts including participating in Apple's obstruction of justice, violations of environmental law, and Apple's unlawful surveillance and AI data collection. All of these reference constitutional or statutory rights that benefit the public, substantial and fundamental rights firmly established at the time of Gjovik's discharge.

212.    Gjovik refused to help Apple in its efforts to conceal and obstruct investigations and reporting of employee complaints, including apparently civil and criminal legal violations.   Okpo repeatedly told Gjovik to stop posting about it. Gjovik had reasonable cause to believe that her participation in the cover-up would result in a violation of statute and non-compliance with rules or regulations. Apple discharged and discriminated against Gjovik, and Gjovik's disclosures and refusal to participate in Apple's cover-up contributed to Apple's decision to discharge Gjovik.

## NINTH CAUSE OF ACTION

### (Violation of Cal. Labor Code § 98.6 including § 96k, 232, and 232.5)

213.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Under California Labor Code § 98.6, employers may not discharge or discriminate against an employee for engaging in certain activities, including *"filing a complaint with the Labor Commissioner or testifying in such proceedings*." Gjovik exercised labor rights provided under the California Labor Code for herself and other employees. Apple retaliated against Gjovik due to Gjovik's protected activity, and she suffered materially adverse actions with a causal connection to the protected activity. Apple engaged in actions prohibited by this section (termination, suspension, discipline, harassment, etc.) within 90 days of Gjovik's protected activity.[68]

214.    Apple violated Section 98.6 by retaliating against Gjovik due to Gjovik filing a claim with the California Labor Commissioner on August 29, 2021, and instituting and causing to be instituted proceedings related to the rights under the jurisdiction of the California Labor Commissioner, exercising rights provided under California Labor Code on behalf of herself and on behalf of other employees.

215.    Apple violated California Labor Code Section 96(k) when it demoted, suspended, discharged from employment, threatened discharge, or otherwise discriminated against Gjovik for Gjovik's lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involved the exercise of a right protected by the Labor Code or Constitution. Gjovik spoke about work conditions and the terms and conditions of her employment (including pay, complaints of discrimination and harassment, complaints about workplace safety, complaints about retaliation, complaints about employer surveillance and unlawful invasions of employee privacy, complaints about

---

[68] Cal. SB-497: Protected employee conduct. Section 1, Section 98.6(b)(1) [Signed October 8 2023; Effective January 1 2024].

criminal conduct by Apple executives, encouraging employees or organize and report illegal conduct to the government, and about her reports to the government about Apple).

216.    Gjovik engaged in lawful conduct asserting "recognized constitutional rights" and "rights under the Labor Code" occurring during nonworking hours – while she was on leave, away from Apple's premises. Apple retaliated against Gjovik and supposedly discharged Gjovik because of some of this protected conduct. While the reason was a pretext, Apple's admission further implicates its animus and lawlessness. Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back, and Apple said no. Apple cannot then turn around and claim the "leave" was work time or the workplace. Apple told Gjovik she had been "*removed from the workplace*." Until Apple let Gjovik return to work, Gjovik was off duty. Gjovik posting about work conditions in her personal time does not transform Gjovik's personal time into work time.

217.    Apple violated Cal. Labor Code Section 232 when it harassed, disciplined, discriminated against, and fired Gjovik due to Gjovik's discussion of her wages and the wages of Apple employees. Gjovik participated in a pay survey with her coworkers in late July 2021, when she suggested the survey capture information on gender. She also shared her wages on social media and discussed pay with her coworkers on social media in August 2021.

218.    Apple violated California Labor Code § 232.5 when disciplining and discharging Gjovik for disclosing information about Apple's working conditions. Gjovik's protected activities included filing complaints about work conditions and discussing work conditions with coworkers and the public, all covered under § 232.5. Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik and Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple claims its NDAs prohibit Gjovik from speaking about work conditions and that if Gjovik does speak about work conditions, it violates her NDA, and that violation is grounds for immediate termination.

### TENTH CAUSE OF ACTION

### (Violation of Cal. Labor Code § 6310)

219.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple violated § 6310 via discrimination, suspension, discharge, or threat of discharge against Gjovik for Gjovik complaining about unsafe work conditions or

practices, instituting, or causing to be instituted proceedings related to her right to safe and healthful working conditions, testifying about workplace safety, and exercised her rights under the California OSH Act. Apple also took the above negative actions due to fear that Gjovik would engage, or engage further, in the activities above. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

220.    Gjovik filed a Retaliation claim with the California Department of Labor on August 29, 2021, and Apple was notified of such before her termination. Gjovik complained of unsafe work conditions and internal violations of safety laws/rules/standards to Apple, the US EPA, CalEPA, and OSHA. Apple retaliated against Gjovik preemptively out of fear that Gjovik would file additional complaints related to health and safety at the workplace, hoping the retaliation would cause Gjovik to drop her existing complaint out of fear and intimidation and not file additional complaints. Apple swiftly retaliated against Gjovik due to Gjovik's complaints about an unsafe workplace.

221.    Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses and requested information about work-related injury and illness reports or records. Apple knew about Gjovik's complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts. Gjovik complained about possible violations of and issues related to:

    a.  Employee Exposure to Chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal. Code.Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]

    b.  COVID-19 Safety & Communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]

    c.  Wildfire Smoke Safety [Cal.C.Reg. Title 8, § 5141.1]

    d.  Injury Reporting [8 Cal.C.Reg. § 14300]

    e.  Retaliation for Complaining about e-Waste Violations. [Cal. Health/Safety]

    f.  Right-to-Know Protection [Cal. Labor Code §6399.7]

    g.  California Proposition 65 [Cal. Code of Reg. §5194(b)(6)]

    h.  Federal Environmental Statutes [e.g., CERCLA, RCRA, CAA, CWA, SARA, NESHAP]

    i.  OSH Act Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]

222.   Apple also terminated Gjovik due to Gjovik's complaints and protests about injuries due to Apple's fraudulent business practices. Apple also attempted to obtain a waiver of future claims from Gjovik through fraud.

## ELEVENTH CAUSE OF ACTION

### (Wrongful Discharge in Violation of Public Policy - *Tamney*)

223.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple retaliated against Gjovik and discharged Gjovik's employment for a variety of reasons that violated public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "*strong public interest*" reflected in California Labor Code § 1102.5, "*in encouraging employee reports of illegal activity in the workplace*," and the purpose of § 6310 to work in a safe and healthful workplace. Gjovik reported and testified about topics including employment discrimination, an unsafe workplace, refusing to sign a waiver of liability, improper business practices, discussing wages and equal pay with coworkers, and making political statements – all of which implicate public policy for the purpose of a *Tamney* claim.

### xix.   Part A. Data Collection for AI Development

224.   Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Cal. Labor Code section 435, section 1102.5 of the California Labor Code, section 17200 of the Business and Professions 2 Code, the CALIFORNIA PRIVACY RIGHTS ACT, US FTC Act, Article I Section 1 of the California Constitution, Section 637.7 of the California Penal Code, and INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (OHCHR): Article VII on Free Consent.

225.   Apple's supposedly legitimate reason for terminating Gjovik, while false and pretextual, is an illegality itself. Apple claims it fired Gjovik for complaining about Apple surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to the constitutional and statutory right to privacy, which are rights that benefit the public, are substantial and fundamental rights, and which were firmly established at the time of discharge. While this reason is pretextual and false, Apple's decision to use it as their excuse for terminating Gjovik reveals Apple's animus against California employees' privacy rights.

226.    Apple also intruded into Gjovik's seclusion, physically and constructively invading Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor Code § 435.

227.    Apple's use of Gobbler on Gjovik's phone also forced Gjovik to participate in Apple's unlawful acts by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometric information of the public without their knowledge or consent. Apple's termination of Gjovik also stated that if Apple were to warn people what was occurring on her phone, she would be fired. Therefore, Apple's unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for their highly sensitive biometrics.

228.    Apple also violated Section 5 of the FTC Act in unlawfully coercing employees to provide personal and sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable, and misleading statements to consumers.[69] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

**xx.    Part B. Reporting Crime**

229.    Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to her constitutional or statutory rights to report suspected crimes to law enforcement and to district attorneys, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge. Apple retaliated against Gjovik because Apple knew, and Apple suspected, that Gjovik had reported suspected criminal activity by Apple to law enforcement, district attorneys, and Apple. Witness Retaliation statutes forbid retaliation (including termination) against witnesses for providing testimony and cooperating in investigations, and it is captured in state and federal statutes, which include criminal penalties. Thus, this *Tamney* claim for retaliation due to reporting criminal conduct implicates public policy.

---

[69] US FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices*, Consumer Compliance Handbook

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024

### xxi.    Part C. Employment Discrimination & Retaliation

230.    Gjovik reported and testified about topics including complaints about sex/gender and disability discrimination, which are "fundamental" rights for the purpose of a *Tamney* claim. Gjovik filed DFEH and EEOC claims on August 12, 2021, and proceeded to testify and provide evidence, requesting a Right to Sue letter, which she was granted on September 9, 2021, just hours before Apple fired her. Apple retaliated against Gjovik for opposing Apple's discriminatory practices. Gjovik also reported to NLRB and the US Department of Justice Civil Rights before her termination. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

231.    **Part D. Environmental & Health/Safety**: Apple discriminated against and disciplined Gjovik because Gjovik reported and testified about workers' health and safety laws, public health, and safety laws. Gjovik reported CERCLA violations to Apple, the US EPA, and other agencies where Apple's misconduct resulted in several vectors of hazardous waste vapor exposure at Stewart 1.

### xxii.    Part E. Victim/Witness Discrimination

232.    Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge [Cal. Lab. Code § 230(e)]. Further, Apple's also violated Cal. Gov. Code § 9414 (a misdemeanor public offense) by harassing and retaliating against Gjovik, by attempting to prevent and dissuade Gjovik's testimony for a proceeding, and by depriving, threatening, and attempting to deprive or requesting Gjovik not be employed due to Gjovik being a witness for a committee, and giving testimony to a committee as a witness or victim.

233.    Apple knew Gjovik was talking to legislatures about what occurred to her next to ARIA, and Apple knew that it was Apple who was responsible for Gjovik's harm, despite Gjovik not knowing that fact yet. Apple knew Gjovik may testify at legislative committees about the air pollution caused by Apple. Apple undertook an effort to ensure Gjovik did not testify and to harass Gjovik because Gjovik may testify to a committee.  Apple also knew Gjovik was talking to politicians about its retaliation against

Gjovik after her termination, including a State Senator, a US Representative, and a US Senator. Suppose an employer has reason to think the employee plans to be a witness for an agency or committee. In that case, that is enough to protect the employee's related conduct from retaliation.

## TWELFTH CAUSE OF ACTION

### (Breach of Implied Contract & Breach of Covenant of Good Faith and Fair Dealing)

234. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. [70] Gjovik and Apple entered into an employment relationship in 2015 with a signed, written contract. Gjovik substantially performed, or tendered performance, for her job duties. All conditions required for Apple's performance had occurred. Gjovik was no longer an at-will employee and could only be fired by Apple for cause, as Gjovik had a reasonable belief, due to Apple's words or conduct, that she would only be discharged for good cause. Gjovik worked at Apple for over six years, received positive performance reviews, bonuses, salary increases, and RSU stock grants, and was recently promoted. Apple's policies are implied contracts and reflect a progressive discipline process.

235. Further, she was frequently reassured of her continued employment. For instance, in her 2017 annual review, West told Gjovik he "appreciates her willingness to speak truth to authority" and told her to "keep doing this, *and good things will continue to follow."* This was a promise to Gjovik that if she reported unethical and unlawful conduct and held leaders to account, she would have continued employment at Apple. Apple intentionally breached its contract with Gjovik, and Gjovik was damaged due to Apple's breach. Further, in violation of the covenant of good faith and fair dealing, Apple deliberately undermined Gjovik's ability to fulfill her contractual obligations, frustrating her ability to benefit from the agreement. Because Gjovik could only be fired for cause due to an implied contract making her no longer an at-will employee, Apple had a duty to execute the contract's purposes in good faith and could only fire Gjovik in good faith and based on a fair and honest reason.

236. Apple terminated Gjovik in bad faith, and the decision to terminate Gjovik was trivial, arbitrary, inconsistent with usual practices, and unrelated to business goals (know was described as 'irreplaceable' and a 'key performer'). Apple fired Gjovik for dishonest reasons (lying about Gjovik's interactions with the interrogator and concocting a post-hoc rationalization a week later).

---

[70] The SAC Breach of Contract/Covenant claims were previously nested under the *Tamney* claim.

237.     In addition, Apple also breached the employment contract and covenant by intentionally terminating Gjovik right shortly after her annual performance review was due, which would be accompanied by a performance bonus that she had already earned through her successful performance in 2020-2021 (end of the fiscal was June 30, 2021). Further and more maliciously, Apple also intentionally intended to run out the statute of limitations for her claims before her termination, as they almost did for the 30-day CERCLA and the OSH Act. Apple did not act reasonably and in good faith; instead, it acted in bad faith to prevent Gjovik from enjoying the benefits of her employment contract, thus causing Gjovik damage.

**THIRTEENTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

238.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple's conduct was despicable, base, vile, and contemptible, and subjected Gjovik to cruel and unjust hardship – it was carried out with a willful and conscious disregard for Gjovik's rights and safety. Apple could have acted with some decency and reserve. Still, instead, Apple bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, sued her for reporting criminal conduct, reported her to law enforcement, repeatedly threatened to "*ruin*" and "*destroy*" her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks. Through all this, Apple went out of its way to act like deranged maniacs whose conduct exceeded all bounds of decency usually tolerated by society.

239.     **Part A. Intentional Acts – Retaliation, Interrogation, & Termination (Cal.):** Apple abused its position of power over Gjovik and exploited that power differential in its campaign of terror against Gjovik. Apple has extreme power and control over Gjovik and its other employees as one of the world's largest and most influential companies. Apple retaliated against an employee for reporting safety concerns by opening a sham investigation and coercing coworkers to falsely accuse the whistleblower of unlawful conduct, including harassment and falsifying documents, all for the sole purpose of retaliating against the employee, is sufficient to constitute extreme and outrageous behavior, and maliciously interrogating the employee.

240.     Apple's conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Apple's misconduct towards Gjovik was/is extreme, outrageous, persistent, and omnipresent. Apple's conduct left Gjovik fearing for her safety, her dog's safety, the integrity of her electronics and utilities, and the safety of her chattels – that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her house or even failing to secure entry to her home properly would place her in danger, and she could be killed. Gjovik was and is under a justified belief that leaving her dog at home unattended could result in harm to her dog and that Apple could kill him.[71]  Apple's many criminal acts were "outrageous per se," including witness intimidation, witness retaliation, burglary, extortion, threats, and surveillance.

241.     **Part B. Intentional Acts – Gobbler (Cal. & NY)**: Apple's supposed (but pretextual) reason for firing Gjovik was two topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct, but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination, despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans).

242.     Gjovik protested "Gobbler" for, among other reasons, it was taking photos of her while undressed and using the bathroom and engaged in sexual activity. Gjovik complained of misconduct, and Apple then implicitly threatened to sue Gjovik if she were to protest the misconduct again. Apple blamed its highly unlawful retaliation against Gjovik on Gjovik's outcry about the prior unlawful conduct and her associated trauma. Apple traumatized Gjovik by continuing to insist they fired her over Gobbler and that the Gobbler photos were secret, retraumatizing Gjovik about the photos Apple took of her in the bathroom, all while Gjovik lived in New York.

243.     **Part C. Intentional Acts & Fear of Cancer (Cal.)**: Apple's malicious, fraudulent, oppressive, and extreme/outrageous misconduct was directed primarily at Gjovik, and it was calculated to cause Gjovik severe emotional distress, and it was done with the knowledge of Gjovik's presence and with a substantial certainty that Gjovik would suffer severe emotional injury. Apple deliberately vented deadly substances on Gjovik and then deliberately made false statements to conceal their actions, all of which could be considered criminal actions.

---

[71] ICAN, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

244.     Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and negligent conduct exposed Gjovik to carcinogens, including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress and acted with reckless disregard for the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer, and Apple's conduct was a substantial factor in Gjovik's severe emotional distress.

245.     As a proximate result of the acts of the defendant, Gjovik suffered severe emotional distress, including the fear of developing cancer and an increased risk of developing cancer. Gjovik also suffered a wide array of physical symptoms attributed to the toxic chemicals at Stewart 1 and ARIA, including spasms, nausea, hair loss, rashes, hives, burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. Further, the fear and horror of personally being exposed to a cloud of poison gas or knowing that family members have been exposed are absolute emotional trauma in its purest form.

246.     **Part C. Intentional Acts, Carcinogens, and Concealment (NY):** Apple continued harassing and tormenting Gjovik despite and because of it prior to knowingly subjecting Gjovik to exposure to a highly toxic substance while purposefully concealing from Gjovik the serious injuries that might result from such exposure, and in reckless disregard of these risks. Gjovik learned about the 3250 Scott exposure while living in New York.

247.     **Part D. Intentional Acts – Lawsuit (CA & NY):** Apple's retaliatory litigation filed against Gjovik (filed in 2022 with Gjovik in California and not dismissed until 2022-2023 while Gjovik was in NY) was admittedly due to Gjovik's complaints about witness intimidation and harassment by Apple, including by Appleseed. The point of the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the trauma she was experiencing with the threat of incarceration if she were even to complain privately. Apple's actions were so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community.

248.     **Injuries**: When Gjovik explains to people what Apple has done to her when she shows them Apple's communications and exposure records and shows them the evidence she gathered of their

physical intrusions and harassment, the default response is not simply to shake their heads with disappointment. No, it is to exclaim something such as "*Outrageous!!*" Further, these actions have caused fear in those around Gjovik and in Gjovik herself. Gjovik has lost many friends through this – and she cannot blame them as Apple's menacing is smoke from the fire of actionable threats of violence and mayhem. Apple's tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; Gjovik had financial and medical vulnerability; the conduct involved repeated, systemic actions and schemes; and the harm to Gjovik was the result of Apple's intentional malice, trickery, and deceit.

249. Apple's conduct, of course, left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation.*" However, as a direct and proximate result of Apple's conduct, Gjovik also experienced overwhelming anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment*." Apple's conduct resulted in Post-Traumatic Stress Disorder and anxiety symptoms. Gjovik suffered depersonalization and derealization.

250. As documented in legal filings, emails, doctor appointments, and therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, extreme depression requiring anti-depressants due to suicidal ideation, and crying uncontrollably for hours every day. Gjovik suffers from paralyzing anxiety, and it has been difficult even to get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between overeating and undereating but overall gained over sixty pounds in 2020-2022.

251. After Apple's injuries to Gjovik due to chemical exposure in 2020, Gjovik experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression, rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred, and damaged skin, hair loss, worsened asthma, and breathing troubles, etc.). This all occurred during Gjovik's 2L and 3L years of law school, causing her to suffer academically. Gjovik now also faces a significantly increased risk of contracting cancer and other disease in her lifetime. Further, after Apple's psychological and emotional injuries to Gjovik in 2020-2024, Gjovik now suffers from dramatically worsened anxiety, PTSD, and concentration issues – as well as new depression, insomnia, panic attacks, weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits, and moral injury.

1

**FOURTEENTH CAUSE OF ACTION**

2

**(Negligent Infliction of Emotional Distress / Negligence)**

3

252.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above,

4

as though fully set forth in this Claim for Relief. Defendants had a duty to their consumers to exercise a

5

degree of care a reasonable person in the like position would exercise, and Defendants failed to do so. The

6

plaintiff incorporates and restates the 13th Cause of Action for IIED.

7

**FIFTEENTH CAUSE OF ACTION**

8

**(Violation of Cal. Bus. & Prof. Code § 17200, et seq)[72]**

9

253.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above,

10

as though fully set forth in this Claim for Relief. California's Unfair Competition Law ("UCL"), Cal. Bus.

11

& Prof. Code § 17200, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice,

12

including but not limited to any act or practice that constitutes deception, fraud, misrepresentation, or the

13

concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to

14

deceive the consuming public. Apple has engaged in business acts or practices that were unlawful, unfair,

15

deceptive, or misleading, and therefore violated Business and Professions Code section 17200. Gjovik

16

suffered an economic injury due to Apple's Unfair Business Practices.

17

254.    Defendant knew or should have known that its wrongful acts and omissions alleged herein

18

were likely to deceive the consuming public in California. The rest of the United States and Defendant

19

committed those acts and omissions anyway for their financial gain, including improving their financial

20

condition, increasing the likelihood of receiving new capital from investors, increasing their revenue and

21

profits, and increasing the company's value.

22

**xxiii.   Part A. – Unfair and Unethical Use of Employee Biometric Data Collection for Commercial Profit ("The Face Gobbler")**

23

24

255.    Apple is unlawfully coercing employees to provide personal data, including biometrics,

25

which Apple can use for research and development, including training machine learning models, without

26

actual consent or compensation, and in violation of federal competition laws and state and federal data

27

protection laws.   Apple exploited Gjovik's identity without Gjovik's consent and for commercial

28

purposes, violating California's common law Right of Publicity. Apple's unauthorized use and

---

[72] The SAC § 17200 claims were previously nested under § 6310 and *Tamney* claims.

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                      FEBRUARY 27 2024

appropriation of Gjovik's identity, likeness, and private information were for Apple's commercial advantage, and Gjovik suffered injury because of it. Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained, claiming they could fire employees without notice for protesting these unfair business practices.

256. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. Apple's declaration that it can terminate employees for protesting these invasions and warning the public is "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right*." One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics and face-prints of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, and use of toilets– along with biometric information.

257. Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the ICFs and NDAs for the program, and Apple told employees they could not tell anyone what the program would now be doing on their iPhones. Apple was aware Gobbler was not a market-ready product (nor was it intended to be) and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyway while continuing to promise customers that Apple would never collect their data and biometrics.

### xxiv. Part B. – Unfair and Unethical Use of Employees for Medical and Invasive User Studies to Gather Data for Product Development

258. Gjovik's opposition and complaints about Apple's coercion of employees into unpaid labor through aggressive dogfooding (testing internal software/products as if it were a normal personal device) and Apple's weird anatomical and medical experiments on employees were protected conduct. Apple knew it, but Apple fired her anyway and claimed it was because she protested Apple's incessant request to scan her ear canals. Apple's Whistleblowing Policy acknowledges that reports of "*anti-competitive*

*conduct*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures. Apple should obtain ethical and legal data for product development instead of treating its workforce like lab rats.

xxv.   **Part C. – Unfair and Unethical Use of Company Medical Doctors**

259.   At some point before 2018, Apple launched primary care clinics for employees called AC Wellness Network LLC. Apple now runs its primary-care medical service for employees with Apple-employed doctors at its clinics. In 2020, Gjovik's Apple "AC Wellness" doctor was dismissive of Gjovik's medical issues due to the solvent exposure and even tried to blame Gjovik's injuries on "anxiety." Gjovik had to pay a 'co-pay' when she visited "AC Wellness," which she did several times in 2020, as Apple profited from her user study data while failing to treat her injuries caused by Apple. It is illegal for a physician or medical facility to bill a worker if they know the injury may be work-related. [California Labor Code section 3751(b)] Similarly, Apple was grossly abusing the ADA process for non-ADA issues to obtain personal information about the employees. Requiring an employee "to disclose medications that he or she is currently taking" or to authorize the employer "to acquire information concerning the internal state of the tested individual's body" intrudes upon privacy interests protected by the state Constitution. Apple should be enjoined from continuing these practices.

260.   **Parts A-C – Disgorgement**: Injunction and disgorgement are appropriate here, and the court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200, including the power to order restitution and disgorgement. Apple coerces employees and tricks consumers into allowing Apple to extract their data and exploit it in the research and development of commercial, for-profit products, without consent, in violation of the FTC Act and § 17200. As a result of Apple's unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik, her co-workers, and the public. Apple should be required to restore these monies to Gjovik, her former co-workers, and the public. However, Apple's extensive use of these illegal practices will make calculating damages a challenge. Without injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which damage remedies cannot readily remedy. Apple should be ordered to disgorge unlawful data and the fruit of the poisoned data.

261.   Gjovik requests an order that prohibits Apple from using personal employee data in for-profit product development, including medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct violating

their rights of privacy. Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, including Gobbler images.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgment in her favor on each and every claim for relief set forth above and award its relief, including but not limited to an Order:

a.    Enter judgment in her favor and award damages in an amount to be determined at trial.

b.    Double (Dodd-Frank) and Treble (RICO, Bane, Ralph) damages.

c.    "Make whole relief" with compensatory damages, including lost wages (back pay, lost benefits, lost bonuses and pay raises, lost stock grants and vesting, etc.). This should include a refund of Gjovik's use of Vacation and Sick days in response to Apple's misconduct and negligence, payment of those days, and removing negative records from her personnel file.

d.    At least ten years of front-pay (up to retirement age) or a reinstatement of employment at a prior or higher level, with reestablishment of benefits and seniority.

e.    Consequential, expectation, reliance, and 'benefit of the bargain' damages.

f.    A civil penalty of $25,000 per violation under each Bane Act and Ralph Act. (If this request prevents other damages, this request may be waived).

g.    A civil penalty of $10,000 per employee for each violation of Cal. Labor Code § 98.6. (If this request prevents other damages, this request may be waived).

h.    Compensatory damages for pecuniary harm, including lost future wages, lower earning capacity, past and future medical expenses, counseling, medication, physical and digital security expenses, reputation management expenses, mental/emotional injury (PTSD, anxiety, depression, insomnia, disordered eating); property damage, degradation, and conversion; and moving costs to relocate.

i.    Compensatory and special damages for non-pecuniary harm, including emotional distress, humiliation, loss of enjoyment, loss of consortium, annoyance, discomfort, inconvenience, disfigurement, pain and suffering, mental anguish, and reputational harm. Gjovik now suffers from permanent psychological trauma and damage because of Gjovik's actions. Gjovik is entitled to compensation for any special damages she suffered resulting from Apple's outrageous and defamatory acts.

j.    Punitive/Exemplary damages to be determined at trial.

k.   Medical Monitoring coverage for Gjovik, including any needed medical intervention.

l.   Pre-judgment and post-judgment interest.

m.   Offset for tax bracket increase due to lump sum payment.

n.   Declaratory relief stating Gjovik is a Crime Victim under federal and state law.

o.   Order injunctive relief as noted under the Fifteen Cause of Action (17200).

p.   Declaratory relief that Apple's 'user study' secrecy oaths are unlawful. This would allow Gjovik and her coworkers to speak freely about their experiences and seek treatment and counseling for the harm inflicted by the experiments.

q.   Where no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00 (or $3.00 where treble damages apply).

r.   Court /litigation costs, expert witness fees, pro se attorney's fees, and other reasonable expenses.

s.   Such other and further relief as the Court deems just and proper.


Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


By_____

Ashley M. Gjovik
*Pro Se* Complainant

Signed: February 27 2024

## VII.    CERTIFICATION AND CLOSING

448. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.

450. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on                    FEBRUARY 27, 2024


Signature of Plaintiff        _____

Printed Name of Plaintiff      Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816

Email: legal@ashleygjovik.com

Phone: (408) 883-4428

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024