1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 ASHLEY M GJOVIK,                           Case No.  23-cv-04597-EMC

8                    Plaintiff,
                                            **ORDER GRANTING IN PART AND**
9         v.                                **DENYING IN PART DEFENDANT'S**
                                            **MOTION TO DISMISS; DENYING**
10 APPLE INC.,                               **DEFENDANT'S MOTION TO STRIKE;**
                                            **AND GRANTING PLAINTIFF'S**
11                   Defendant.              **MOTION TO STRIKE**

12
                                            Docket Nos. 48, 49, 64
13

14

15         Plaintiff Ashley Gjovik, proceeding pro se,[1] is a former employee of Defendant Apple, Inc.

16 She started to work for Apple in 2015 and was terminated in September 2021.  About two years

17 after she was fired, she initiated this lawsuit.  Ms. Gjovik has asserted fifteen different claims

18 against Apple, both federal and state.  The gist of her suit is that Apple retaliated against her

19 because she complained about conduct at the company, including but not limited to

20 environmentally unsafe conditions.

21         Now pending before the Court are several motions.  The primary motions are two motions

22 filed by Apple: (1) a motion to dismiss the operative third amended complaint ("TAC") and (2) a

23 related motion to strike.  In addition to Apple's motions, there is a motion that Ms. Gjovik has

24 filed.  Specifically, Ms. Gjovik has moved to strike two declarations that were filed by an ex-

25 Apple employee, Cher S. Scarlett, whom Ms. Gjovik has referred to in the TAC as "Joanna

26 Appleseed."  *See* Docket No. 62 (Scarlett Decl.); Docket No. 66 (Supp. Scarlett Decl.).

27

28 ───────────────
[1] Ms. Gjovik appears to have a J.D. from Santa Clara University.

United States District Court
Northern District of California

Having considered the parties' briefs, as well as the oral argument presented at the hearing on May 16, 2024, the Court hereby **GRANTS** in part and **DENIES** in part Apple's motion to dismiss; **DENIES** Apple's motion to strike; and **GRANTS** Ms. Gjovik's motion to strike.

## I.        FACTUAL & PROCEDURAL BACKGROUND

The operative pleading is the third amended complaint ("TAC"). Although the TAC is difficult to follow at times, the main categories of misconduct as described in the TAC are as follows:

(1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment.

(2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, *i.e.*, a Superfund site, and she became ill because of Apple's actions/omissions related to the site.

(3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy.

(4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.

Below, the Court provides more details regarding Apple's alleged misconduct and Ms. Gjovik's termination from employment. To be clear, the discussion below is based on the allegations made in the TAC.

A.        Harassment at Work

In February 2015, Ms. Gjovik began to work for Apple. She started out as an Engineering Project Manager in Software Engineering and continued to work in that office until January 2017. *See* TAC ¶ 13. During her time in that office, she was harassed, primarily by two male co-workers. *See* TAC ¶ 13. In addition, during her time in the office, she investigated a trend of

2

1   battery failures in the field.  When she did not comply with her managers' directive to ignore the

2   problem, she was essentially forced out of that office.  *See* TAC ¶ 17.

3           In January 2017, she left Software Engineering and joined Hardware Engineering as a

4   Senior Engineering Project Manager.  *See* TAC ¶ 18.  There, she was harassed by two of her

5   superiors, including on the basis of her sex and disability.  *See* TAC ¶ 18.  As indicated below,

6   Ms. Gjovik became disabled because of Apple's release of toxic substances into the environment.

7   B.      Chemical Exposure from the Apple ARIA Factory

8           In February 2020, while she was still working for Apple, Ms. Gjovik moved into an

9   apartment building located at 3255 Scott Blvd. in Santa Clara.  *See* TAC ¶ 25.  There was an

10  Apple factory located less than 300 feet away at 3250 Scott Blvd.  *See* TAC ¶ 22.  The factory had

11  the code name "ARIA" and was used for semiconductor fabrication.  *See* TAC ¶ 22.  "Apple

12  intentionally vented its fabrication exhaust – . . . consisting of toxic solvent vapors, gases, and

13  fumes – into the ambient outdoor air."  TAC ¶ 22.

14          Because of Apple's release of toxic substances into the air, Ms. Gjovik became "severely

15  ill," *i.e.*, because she was living in the apartment near the Apple ARIA factory.  TAC ¶ 25.  Ms.

16  Gjovik suffered "severe fainting spells, dizziness, chest pain, palpitations, stomach aches,

17  exhaustion fatigue, . . . strange sensations in her muscle and skin," a slow heart rate, volatile blood

18  pression, and arrythmia.  TAC ¶ 25.  At some point, she became so sick that she went on

19  disability.  *See* TAC ¶ 26.

20          From February through September 2020, Ms. Gjovik sought medical treatment, including

21  at a medical clinic sponsored by Apple, known as AC Wellness.  *See* TAC ¶¶ 25-26.  In or about

22  September 2020, she consulted with "multiple occupational and environmental exposure doctors,

23  who told [her] that all of her symptoms were consistent with solvent and other chemical

24  exposures."  TAC ¶ 29.  Ms. Gjovik hired an industrial hygienist to test the indoor air at her

25  apartment, and the results showed a number of chemicals which were "in use by Apple at ARIA."

26  TAC ¶ 30.  (At that time, Ms. Gjovik knew that there was an Apple facility near her apartment, *see*

27  TAC ¶ 32, but it appears she did not know about the semiconductor fabrication at the factory until

28  February 2023.  *See* TAC ¶ 39.)

United States District Court
Northern District of California

3

1    Subsequently, from September 2020 through April 2021, Ms. Gjovik contacted various

2    governmental agencies about the problem, including the EPA and California EPA.  *See* TAC ¶¶

3    29, 36.

4    In March 2021, Ms. Gjovik wrote an article, which was published in the SF Bay View

5    newspaper, about her chemical exposure experience with the air around her apartment.  This led to

6    other victims coming forward, including other Apple employees.  *See* TAC ¶¶ 33-34.

7    In April 2021, Ms. Gjovik met with several local, state, and federal politicians "about what

8    occurred to her next to ARIA."  TAC ¶ 36.

9    In July and August 2021, Ms. Gjovik continued to meet with local, state, and federal

10   politicians.  *See* TAC ¶ 38.

11   As discussed in more detail, *infra*, in September 2021, Apple terminated Ms. Gjovik.

12   Not until some two years later, in February 2023, did Ms. Gjovik learn that there was

13   semiconductor fabrication taking place at the Apple ARIA factory.  *See* TAC ¶ 39.

14   In June 2023, Ms. Gjovik filed a complaint about the ARIA factory with the EPA and

15   California EPA.  The EPA inspected in August 2023 and January 2024.  Ms. Gjovik is still

16   waiting for the results of the investigation.  *See* TAC ¶ 40.

17   C.   Chemical Exposure from the Apple Stewart 1 Office

18   From about 2017 to the date of her termination (in September 2021), Ms. Gjovik worked at

19   an Apple office located at 825 Stewart Dr. in Sunnyvale.  The office was known as "Stewart 1."  It

20   was located on a Superfund site (*i.e.*, a contaminated site regulated by the EPA).  The

21   contamination was in the groundwater and came about due to a semiconductor fabrication facility

22   that used to be on the site.  *See* TAC ¶¶ 41-42.  It appears that the Northrop Grumman used to

23   operate on the site.  *See* TAC ¶ 43.

24   Apple became a tenant on the site in 2015.  *See* TAC ¶ 45.  In late 2015, after it became a

25   tenant, Apple installed a new HVAC system in the building.  As a part of the installation, Apple

26   sawed off vent stacks on the main building roof; these stacks had been put in place as part of the

27   ventilation of the area beneath the concrete slab foundation, *i.e.*, to allow hazardous waste vapors

28   to discharge to the atmosphere.  After Apple sawed off the vent stacks (from three feet to one

4

foot), it then put the HVAC system in close proximity to the stacks, so that the discharge from the stacks could be taken in by the intake of the HVAC system.  *See* TAC ¶¶ 44-46.  Apple did vapor intrusion testing in December 2015, and the results showed an increase in indoor air pollution (compared to a test that Northrop Grumman had conducted back in May 2015).  Nevertheless, Apple had its employees move into the building.  *See* TAC ¶ 47.

In March 2021, Apple informed Ms. Gjovik and others that it would be conducting vapor intrusion testing for Stewart 1.  *See* TAC ¶ 49.  Ms. Gjovik expressed concern to her superiors because the office was on the Superfund site, and she shared that fact with her coworkers.  *See* TAC ¶¶ 49, 51.  She also met subsequently (on more than one occasion) with Apple's Environmental Health & Safety ("EH&S") office.  *See* TAC ¶ 52.

In April 2021, Ms. Gjovik contacted the EPA about the Superfund site and continued to communicate with the agency through August 2021.  See TAC ¶ 52.

In June 2021, Apple's EH&S office and its Employee Relations office notified Ms. Gjovik that the foundation of Stewart 1 was cracked, that the foundation would need to be repaired, and that air testing would be conducted thereafter.  *See* TAC ¶ 53.  Apple refused to contact the EPA; therefore, Ms. Gjovik reported Apple to the EPA herself (and told Apple that she had done so).  *See* TAC ¶ 53.

By the end of July 2021, Ms. Gjovik made open complaints about Apple's conduct at Stewart 1 to various people: coworkers, the press, and social media.  *See* TAC ¶ 59.

In response, Apple retaliated against Ms. Gjovik.  For example:

- In or about July 2021, Apple issued "gag orders" to Ms. Gjovik, *e.g.*, to prevent her from communicating about safety concerns to her coworkers.  *See* TAC ¶ 55; *see also* TAC ¶ 60 (alleging that an Apple investigator "interrogated" her about communications with coworkers).

- In or about July 2021, Apple opened what Mr. Gjovik seems to allege as an investigation into sexism by Ms. Gjovik's superiors.  There was in fact no real investigation; rather Ms. Gjovik's superiors were simply told that she was complaining about their behavior.  *See* TAC ¶ 56.

- In or about July 2021, Ms. Gjovik discovered that one of her superiors (Mr. West) "had been reassigning her best projects (things that would help her receive a positive review)" to others.  TAC ¶ 58.  At or about the same time, another superior (Mr. Powers) "quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail)."  TAC ¶ 58.

- In or about July 2021, Apple assigned an investigator (Mr. Okpo) to look into Ms. Gjovik's concerns apparently about retaliation and fraud dating back to 2015 but this was essentially a meaningless gesture; there was no intent that the investigator would act in good faith (*e.g.*, he tried to prevent her from communicating with coworkers, and he did not comply with her request to keep things in writing).  *See* TAC ¶¶ 58-60, 62; *see also* TAC ¶¶ 98-100.

- Apple persistently told Ms. Gjovik to take a leave.  *See* TAC ¶ 59.

In late July 2021, the EPA told Apple, as well as Northrop Grumman, that it wanted to inspect Stewart 1.  *See* TAC ¶ 61.  Thereafter, in August 2021, Apple announced that they would begin to do maintenance at the building – implicitly to cover up the problems at the site.  *See* TAC ¶¶ 61, 64.  Ms. Gjovik told her coworkers to take pictures of problems at the site – *e.g.*, cracks in the foundation of the building.  *See* TC ¶ 64.  The next day, Mr. Okpo (the Apple investigator) put Ms. Gjovik on an indefinite administrative leave.  *See* TAC ¶ 65.

In mid-August 2021, the EPA conducted an inspection of Stewart 1.  *See* TAC ¶ 68.  The EPA noted, *inter alia*, that cracks had been sealed but it was not clear whether the foundation slab had been penetrated due to equipment bolted to the slab.  The EPA also noted that there could be a problem given the proximity of the vent stacks on the roof to the HVAC intake.  *See* TAP ¶ 68.

As discussed in more detail, *infra*, in September 2021, Apple terminated Ms. Gjovik.

In May 2022, the EPA instructed Northrop Grumman to do air testing.  *See* TAC ¶ 69.

In January 2023, the EPA again instructed that air testing be done.  *See* TAC ¶ 70.

In August 2023, the EPA commented on vapor intrusion testing that Apple had done in May 2023, "calling Apple's testing report and strategy 'fundamentally incorrect,' having 'no fundamental basis,' and [being] 'not accurate,' 'confusing,' and 'misleading.'"  TAC ¶ 70

(emphasis omitted).

D.  Termination in September 2021

As noted above, Ms. Gjovik was put on indefinite administrative leave in August 2021.  In or about that period (July-August 2021), Ms. Gjovik made various public complaints about Apple.  *See* TAC ¶ 71 *et seq.*  Some complaints were made to coworkers (*e.g.*, through Slack channels), to the press, or to social media; other complaints were filed with governmental agencies such as the EEOC, the California DFEH, the NLRB, the U.S. Department of Labor, the California Department of Labor, and even the SEC and FBI.  The complaints covered a wide range of conduct by Apple – *e.g.*, its response to COVID-19, its response to her complaints about sexism, its response to her complaints about unsafe work conditions, its forcing her on administrative leave, etc.

On September 9, 2021, Apple terminated Ms. Gjovik's employment.  *See* TAC ¶ 90.  The day that she was terminated, Ms. Gjovik was contacted by an Apple Workplace Violence and Threat Assessment investigator (Mr. Kagramanov) via email.  The investigator claimed that he was looking into a sensitive IP matter and demanded to speak to her within the hour.  Ms. Gjovik said she was willing to participate but wanted a written record of their conversation.  The investigator replied that Apple was investigating allegations that she had improperly disclosed confidential information belonging to Apple and falsely asserted that she was refusing to participate in the investigation.  The investigator then suspended all of Ms. Gjovik's account access at Apple (including Slack).  *See* TAC ¶ 101-03; *see also* TAC ¶¶ 83, 88.  Ms. Gjovik reiterated to the investigator that she was willing to participate.  However, a few hours later, she was terminated.  *See* TAC ¶ 105.  "The termination letter repeated an ambiguous charge of leaking and said she 'failed to cooperate and to provide accurate and complete information during the Apple investigatory process.'"  TAC ¶ 105.

About a week later, Apple's outside counsel emailed Ms. Gjovik a letter, suggesting that Apple had terminated her because (1) she had complained about Apple asking to 3-D scan her ear canals and (2) she had "posted some of the surveillance photos Apple secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app."  TAC ¶ 106; *see also* TAC ¶ 80 (alleging that "Apple frequently requested that Gjovik and her coworkers

participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA test, biometrics data collection (like the Gobbler app), and other highly personal studies").

E.    Post-Termination Harassment

Even after Ms. Gjovik was fired from Apple, the company harassed her.  In fact, Apple conducted a campaign of harassment against her from at least July 2021 (*i.e.*, a few months before it terminated her)  The harassment included the following conduct:

- Making repetitive, unwanted communications to Ms. Gjovik.  *See* TAC ¶ 107.

- Making false accusations against Ms. Gjovik.  *See* TAC ¶ 107.

- Mailing to Ms. Gjovik "menacing packages."  TAC ¶ 107.

- Physically surveilling Ms. Gjovik, including through the use of private investigators.  *See* TAC ¶¶ 107, 110.

- Using fake social media accounts to make, *inter alia*, threatening, defamatory, and insulting statements about Ms. Gjovik.  *See* TAC ¶ 108.

- "[B]ugging [Ms. Gjovik's] chattel property" such as the statute on her desk and her fig tree.  TAC ¶ 110 (also alleging that Apple installed cables and cords in her attic).

- Breaking into her apartment and adjacent apartments, and even handling her dog during one of the break-ins.  *See* TAC ¶ 110.

For similar allegations, see also TAC ¶ 132 (alleging that Apple engaged in criminal witness tampering "with break-ins, stalking, destruction of property, physical and digital harassment, lawsuits, reports to police and FBI (SWATing), and threats of physical violence sent over wires such as threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of 'suicide' but 'never mind the double-tap'") (emphasis omitted); and TAC ¶ 134 (alleging that Apple broke into her apartment, messed with her telephone/cable/electrical lines, stalked her, etc.)

8

1    F.    Causes of Action

2        Based on, *inter alia*, the above allegations, Ms. Gjovik has asserted the following causes of

3    action:

4            (1)    Violation of RICO.

5            (2)    Violation of the Sarbanes-Oxley Act (whistleblower).

6            (3)    Violation of the Dodd-Frank Act (whistleblower).

7            (4)    Private nuisance and nuisance per se.

8            (5)    Ultrahazardous/abnormally dangerous activities (strict liability).

9            (6)    Violation of the Bane Civil Rights Act.

10           (7)    Violation of the Ralph Civil Rights Act.

11           (8)    Violation of the California Whistleblower Protection Act.

12           (9)    Retaliation for filing complaints in violation of California Labor Code § 98.6.

13           (10)   Retaliation for safety activities in violation of California Labor Code § 6310.

14           (11)   Termination in violation of public policy.

15           (12)   Breach of implied contract and breach of the implied covenant of good faith

16                  and fair dealing.

17           (13)   Intentional infliction of emotional distress.

18           (14)   Negligent infliction of emotional distress.

19           (15)   Violation of California Business & Professions Code § 17200.

20       In the pending 12(b)(6) motion, Apple moves to dismiss outright 11 out of the 15 causes of

21   action – specifically, Counts 1-3, 5-8 and 12-15.  Apple also moves for partial dismissal of 2 other

22   counts – specifically, Counts 4 and 9.  The only claims that Apple does not challenge in its

23   12(b)(6) motion are Count 10 (retaliation for safety activities) and Count 11 (termination in

24   violation of public policy).

25                          **II.    MOTION TO DISMISS**

26   A.    Legal Standard

27       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

28   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."[2] *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.   Violation of RICO (Count 1)

In Count 1, Ms. Gjovik asserts a claim for violation of RICO, but there are technically subclaims to the extent she has asserted violations of 18 U.S.C. §§ 1962(a), (c), and (d). The factual predicate for the RICO claim, including the subclaims, is muddled. The gist of it (as described in the TAC) seems to be that Apple markets itself as a progressive brand – *e.g.*,

---

[2] On a motion to dismiss, a court generally limits its review to the four corners of the complaint. *See Van Buskirk v. Cnn*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), 'review is limited to the complaint.'"). Accordingly, the Court does not consider the two declarations filed by Ms. Scarlett (and grants Ms. Gjovik's motion to strike the same), nor does it consider the declaration filed by Ms. Gjovik.

A court may still take judicial notice of documents, if appropriate, on a 12(b)(6) motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting that a court may "consider materials outside a complaint" at the 12(b)(6) phase if it can, *e.g.*, take judicial notice of materials). The Court addresses Apple's requests for judicial notice, where necessary, below.

United States District Court
Northern District of California

environmentally responsible – when in fact it is not.  By marketing itself as a progressive brand, Apple benefits financially.  In addition, because Apple does not comply with regulations on health, safety, employment, etc., it gets an edge over its competitors: while the competitors spend money to comply with regulations, Apple saves money by not complying.  Apple conceals the truth that it is not progressive by retaliating against employees who report issues, using unlawful NDAs, and so forth.  *See* TAC ¶¶ 115, 123, 126.  The specific racketeering activity in which Apple engages includes bribery, witness tampering, witness retaliation, wire fraud, securities fraud, and possessing and using chemical weapons.  *See* TAC ¶¶ 128-65 (describing ten predicate acts).

> 1. Section 1962(a)

As noted above, Ms. Gjovik first asserts a claim for violation of § 1962(a).  Section 1962(a) provides in relevant part as follows: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in . . . the establishment or operation of, any enterprise . . . ."  18 U.S.C. § 1962(a).  "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering."  *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir. 1991).

A plaintiff asserting a § 1962(a) claim must prove the following: (1) the defendant received money from a pattern of racketeering activity; (2) the defendant used or invested that money in an enterprise; and (3) the plaintiff was injured as a result of the use or investment of racketeering income.  *See Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993).

Regarding element (3), "an injury resulting from the [use or] investment of racketeering income [is] *distinct* from an injury caused by the predicate acts themselves."  *Id.* (emphasis added).  The former is required because § 1962(a) "'is directed specifically at the use or investment of racketeering income.'"  *Id.*; *see also Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 829 (9th Cir. 2003) (stating that a plaintiff must allege that "funds derived from the alleged racketeering activity . . . were used to injure him"); *NRB Indus. v. R.A. Taylor & Assocs.*, No. 97

11

Civ. 181 (JSR), 1998 U.S. Dist. LEXIS 25, at *4 (S.D.N.Y. Jan. 6, 1998) (stating that "'the essence of a violation of § 1962(a) is *not commission of predicate acts* but investment of racketeering income,'" and therefore, "a plaintiff suing under § 1962(a) must 'allege a "use or investment injury" that is distinct from the injuries resulting from predicate acts'") (emphasis added). *See, e.g.*, *Compagnie De Reassurance D'Ile De Fr. v. New Eng. Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995) ("Even assuming that [plaintiffs] had been defrauded through the use of the mails or international wires, that alone is not enough to show that they were harmed additionally by [defendant's] use or investment of the proceeds of that fraud to establish or operate [the enterprise].").

Furthermore, "[r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008). The rationale behind that principle is that a distinction between § 1962(a) and (c) must be maintained. *See id.* at 1150.

> As the Third Circuit in *Brittingham* explained, "[a] plaintiff must allege . . . more than a remote connection between the use or investment of racketeering income and the injury suffered." 943 F.2d at 304. The *Brittingham* court concluded that the reinvestment of racketeering proceeds is too remote a connection. *See id.* at 305.
>
> If this remote connection were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation . . . Over the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

*Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 960 (C.D. Cal. 2001).

In the instant case, Apple argues that the § 1962(a) claim should be dismissed because Ms. Gjovik has failed to make allegations that satisfy element (3). The Court agrees.

12

United States District Court
Northern District of California

1       For example, Ms. Gjovik argues that "Defendant . . . reinvested its earnings and saved

2  costs back into its enterprise, in order to be able to continue silencing witnesses, including

3  Plaintiff, and to be able to more effectively silence witnesses in order to engage in more fraud and

4  chemical weapon use."  Opp'n at 18.  But, as noted above, "[r]einvestment of proceeds from

5  alleged racketeering activity back into the enterprise to continue its racketeering activity is

6  insufficient to show proximate causation."  *Sybersound*, 517 F.3d at 1149.  The same problem

7  arises to the extent Ms. Gjovik suggests that Apple invested its racketeering profits by (1) hiring

8  lawyers "to harass, intimidate, and coerce . . . witnesses" to its misconduct or by (2) investing in

9  progressive nonprofit organizations "in order to capture and control them, conspire with them, and

10  prevent them from protecting and helping witnesses to Defendant's racketeering."  Opp'n at 18-

11  19.

12       To the extent Ms. Gjovik asserts Apple invested its racketeering profits by bribing local

13  law enforcement, *see* Opp'n at 18, there is another problem.  The bribery incident described in the

14  TAC has to do with Tom Moyer, Apple's Head of Global Security, "paying bribes to public

15  officials in exchange for concealed carry handgun permits for Apple employees."  TAC ¶ 128.

16  Ms. Gjovik fails to explain how this use of racketeering profits injured her; there is no allegation

17  that, *e.g.*, an Apple employee threatened her with a gun obtained through this bribery scheme.

18  And even if that happened, it is clear how Ms. Gjovik's business or property was harmed as a

19  result.  *See Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1271, 1274 (9th Cir.

20  2023) (stating that "[a] civil RICO plaintiff only has standing if, and can only recover to the extent

21  that, he has been injured in his business or property by the conduct constituting the violation";

22  *e.g.*, "a plaintiff must demonstrate (1) harm to a specific property interest cognizable under state

23  law, and (2) that the injury resulted in concrete financial loss") (internal quotation marks omitted).

24       Finally, the Court takes note that, in her papers, Ms. Gjovik recognizes a RICO injury

25  requires an injury to business or property.  Thus, she contends in her opposition that she was

26  injured because her "chattel property" was damaged or destroyed,[3] because she lost an

27

---

28  [3] *See, e.g.*, TAC ¶ 110 (alleging that Apple engaged in "aggressive surveillance (including lurking Private Investigators . . . ), bugging her chattel property (the statute Apple mailed Gjovik from her

13

employment performance bonus, and because she became disabled which thereby caused her "to be away from work and to take a reduced course load in law school while she was exposed to . . . chemical weapon releases."  Opp'n at 17.  Even if the Court were to credit the above allegations, Mr. Gjovik has failed to explain how any of those injuries is causally connected to Apple's use of racketeering income.  Rather, those injuries are the result of Apple's alleged racketeering activity itself (*e.g.*, witness tampering or retaliation and possession or use of chemical weapons).

Accordingly, the Court concludes that Ms. Gjovik has failed to state a plausible § 1962(a) claim.  The alleged relationship between any harm she suffered and the use of racketeering income is too remote as a matter of law.  Because Ms. Gjovik did not, at the hearing, explain how she could overcome the above deficiencies, the Court dismisses the § 1962(a) claim with prejudice. Amendment of the claim would be futile.

2. Section 1962(c)

Section 1962(c) provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

It is well established that, under § 1962(c), the defendant and the enterprise must be distinct from one another; this is based on the language of § 1962(c) itself.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.  The statute's language, read as ordinary English, suggests that principle.").  Thus, Ms. Gjovik must allege an association-in-fact enterprise that consists of more than just Apple.  *See* 18 U.S.C. § 1961(4) (stating that

---

desk; Gjovik's fig tree; etc.), whatever Apple installed in her attic (photos show cables/cords laid in away [sic] landlord denied was them), breaking into her apartment (at least once in 2021 and 2022), breaking into adjacent apartments (at least once in 2021)," etc.); TAC ¶ 180 (alleging that the Apple ARIA factor "emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property and collect Gjovik's chattel property and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property").

"'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

Ms. Gjovik calls the association-fact-enterprise the "Worldwide Loyalty Enterprise."  She asserts that the enterprise is made up of:

(1) Apple and its employees;

(2) Apple's outside counsel;

(3) trade and nonprofit organizations (*e.g.*, that Apple partners with to promote itself as environmentally responsible);

(4) "certain tech reporters";

(5) certain "companies and third-party administrators (e.g., Sedgwick, Northop Grumann, Oaktree Capital, etc.")[4];

(6) "certain governmental employees and agencies, law enforcement officers and agencies (e.g., Santa Clara County Sheriff's Office, Cupertino Police Department, Santa Clara HazMat, etc.")[5];

(7) certain "doctors and clinics (e.g., A.C. Wellness Center, etc.)"[6]; and

(8) certain "environmental consultants (e.g., EKI, ACT Environmental, etc.)."

---

[4] The TAC does not make any other reference to Sedwick or Oaktree Capital.  As noted above, Northrop Grumman appears to have operated a factory on the Superfund site prior to Apple becoming a tenant.

[5] Presumably, Ms. Gjovik makes this allegation because Tom Moyer, Apple's Head of Global Security, allegedly bribed "public officials in exchange for concealed carry handgun permits for Apple employees."  TAC ¶ 128.

[6] A.C. Wellness appears to be "Apple's for-profit in-house clinic."  TAC ¶ 26.  Ms. Gjovik received treatment from doctors there, but

> transitioned her medical care to a different clinic and provider after her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure to Apple's factory exhaust) and instead suggested Gjovik could be suffering from anxiety and enrolled Gjovik in an Apple internal user study related to blood pressure . . . and participate in weekly life coaching sessions . . . .

TAC ¶ 27.

United States District Court
Northern District of California

1    TAC ¶ 120.  As indicated above, she claims that this enterprise "engaged in systemic criminal

2    conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance and use of

3    intimidation, threats, and false statements about its actual practices to increase profits and maintain

4    a positive reputation."  TAC ¶ 123.

5         As an initial matter, the Court notes that some of the persons/entities above may not be

6    distinct from Apple for purposes of RICO.  Agents of Apple can still be considered part of Apple

7    for RICO purposes.  *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016) (stating

8    that "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant

9    and its agents or employees acting within the scope of their roles for the corporation because a

10   corporation necessarily acts through its agents and employees"; acknowledging that, "[w]hen an

11   individual defendant acts through a corporation, he may have formed an association-in-fact with

12   an entity distinct from himself" but, "[i]n contrast to an individual, a corporation cannot act except

13   through its officers, agents, and employees"); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227-28

14   (7th Cir. 1997) (stating that "we cannot imagine . . . applying RICO to a free-standing corporation

15   such as Chrysler merely because Chrysler does business through agents, as virtually every

16   manufacturer does"; "where a large, reputable manufacturer deals with its dealers and other agents

17   in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental,

18   differing not at all from what it would be if these agents were the employees of a totally integrated

19   enterprise, the manufacturer plus its dealers and other agents . . . do not constitute an enterprise

20   within the meaning of the statute"); *Brittingham*, 943 F.2d at 303 (recognizing that the alleged

21   enterprise consisted of not just the defendant companies but also their advertising agencies;

22   however, finding the entities "in reality no different from each other" because "[t]he advertising

23   agencies were defendants' agents, and did no more than conduct the normal affairs of the

24   defendant corporations").

25        The Court also notes that, even if the persons/entities were distinct from Apple, it often is

26   not clear from the TAC how they above were involved in the predicate acts (*i.e.*, racketeering

27   activity).  *See Coronavirus Rptr. v. Apple*, No. 21-cv-05567-EMC, 2021 U.S. Dist. LEXIS

28   249564, at *55 (N.D. Cal. Nov. 30, 2021) (acknowledging plaintiffs' contention that "the alleged

enterprise consisted of [not just Apple but also] Apple's 'crony app developers,' 'law firms,' and 'PR firms' who allegedly 'divert profits,' 'spread Apple's gospel,' or obfuscate 'Apple's competitive agenda,'" but stating that these allegations were insufficient because "none of these groups are alleged to have participated in an alleged enterprise involving the predicate acts of wire and mail fraud[;] [t]he allegations are also conclusory").

Along similar lines, in order for all of the persons/entities above to be deemed part of the association-in-fact enterprise, they must all have shared a common purpose – a purpose of the enterprise.

> [A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.  [In short], an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."

*Boyle v. United States*, 556 U.S. 938, 946 (2009).

In her TAC, Ms. Gjovik alleges that "Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws – and censorship, obstruction, and concealment of these acts to profit from a progressive brand."  TAC ¶ 126.  However, Ms. Gjovik has failed to allege sufficiently that all of the persons above (including, *e.g.*, nonprofit organizations and doctors) shared this purpose; she has not alleged a nonconclusory, factual, and plausible basis for such an assertion as to these non-Apple entities.  *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1214 (11th Cir. 2020) (stating that plaintiff's "RICO complaint may only proceed if we can find facts within it that plausibly yield the inference that these defendants and the other participants in the alleged association-in-fact enterprise acted with the common purpose to engage in a scheme to defraud"; even if a defendant "independently commit[s] fraud," a RICO complaint must be dismissed if "the plaintiff fail[s] to plead that the other participants in the alleged enterprise shared a common purpose to do so"); *cf. Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (indicating that liability under § 1962(c) "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs")

1    (emphasis in original); *Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015

2    U.S. Dist. LEXIS 90725, at *26 (C.D. Cal. July 13, 2015) (finding no common purpose "when the

3    alleged association-in-fact is merely a routine contract for services, because the entities are

4    actually pursuing their individual economic interests, rather than any shared purpose").

5           At the hearing, Ms. Gjovik argued that Apple shared a common purpose with at least one

6    environmental consultant, ACT Environmental.  She asserted that Apple falsified certain EPA-

7    related paperwork and that Apple could not have done so by itself but would have had to conspire

8    with ACT Environmental to do so.  As an initial matter, this was not alleged in the TAC.  Even if

9    Ms. Gjovik was referring to the events described in ¶¶ 142 and 143 of the TAC, she fares no

10   better.  She does not explain why Apple could not have accomplished the false filing without the

11   assistance of the environmental consultant and how the environmental consultant knew that Apple

12   was engaging in fraudulent conduct and joined in the purpose of defrauding authorities.

13          Finally, even if the Court were to credit this incident related to ACT Environmental, it is

14   but one incident.  That is insufficient to support a § 1962(c) claim which requires that a plaintiff

15   allege a *pattern* of racketeering activity, which is "'defined as "at least *two* acts of racketeering

16   activity" within ten years of each other.'"  *Attia v. Google LLC*, 983 F.3d 420, 427 (9th Cir. 2020)

17   (emphasis added).  Moreover, to meet the requirement of a pattern of racketeering activity, a

18   plaintiff must show that the racketeering acts making up the pattern (1) are related and (2)

19   "'amount to or pose a threat of continued criminal activity.'"  *Id.*  "'Related' conduct 'embraces

20   criminal acts that have the same or similar purposes, results, participants, victims, or methods of

21   commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

22   events.'"  *Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (noting, however, that

23   "merely having the same participants is insufficient to establish relatedness").  As for the

24   continuity requirement, a plaintiff "must prove either 'a series of related predicates extending over

25   a substantial period of time' [known as closed-ended continuity], or 'past conduct that by its

26   nature projects into the future with a threat of repetition' [known as open-ended continuity]."  *Id.*

27   at 750.  Notably, predicate acts that last for a few weeks or months alone and that do not threaten

28   future criminal conduct are not enough to establish closed-ended continuity.  *See id.* (stating that

1    "[a]ctivity that lasts only a few months is not sufficiently continuous").  At the hearing, Ms.

2    Gjovik did not make any representations that Apple and ACT Environmental had an enterprise

3    that engaged in a *pattern* of racketeering activity – *i.e.*, more than one predicate act, with such acts

4    being related and that supported either closed-ended or open-ended continuity.

5         The Court therefore dismisses the § 1962(c) claim based on the multiple deficiencies

6    above.  Although the Court has serious concern as to whether Ms. Gjovik can plead a plausible §

7    1962(c) claim, it shall, out of an abundance of caution, give Ms. Gjovik leave to amend.

8         3.    Section 1962(d)

9         Section1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate

10   any of the provisions of subsection (a) . . . or (c) of this section."  *Id.* § 1962(d).  As indicated by

11   this language, Ms. Gjovik's § 1962(d) claim is derivative of her § 1962(a) and § 1962(c) claims.

12   Because the Court has dismissed with prejudice the § 1962(a) claim, the related § 1962(d) is

13   dismissed with prejudice as well.  Because the Court has dismissed the § 1962(c) claim, but with

14   leave to amend, the related § 1962(d) is also dismissed but with leave to amend.

15   C.    Violation of the Sarbanes-Oxley Act (Count 2)

16        In Count 2, Ms. Gjovik asserts a claim for violation of the Sarbanes-Oxley Act ("SOX").

17         Congress enacted the Sarbanes-Oxley Act in the wake of the Enron
           scandal to "'prevent and punish corporate and criminal fraud,
18         protect the victims of such fraud, preserve evidence of such fraud,
           and hold wrongdoers accountable for their actions.'"  "Of particular
19         concern to Congress was abundant evidence that Enron had
           succeeded in perpetuating its massive shareholder fraud in large part
20         due to a 'corporate code of silence'" that "'discourage[d] employees
           from reporting fraudulent behavior not only to the proper
21         authorities, such as the FBI and the SEC, but even internally.'" . . .

22         Congress' response was 18 U.S.C. § 1514A, which prohibits
           publicly traded companies from retaliating against employees who
23         report what they reasonably believe to be instances of [1] criminal
           fraud or [2] securities law violations.  The provision establishes that
24         no employer may "discharge, demote, suspend, threaten, harass, or
           in any other manner discriminate against an employee in the terms
25         and conditions of employment because of" the employee's protected
           whistleblowing activity.
26

27   *Murray v. UBS Sec., LLC*, 144 S. Ct. 445, 449 (2024).

28        For purposes of the instant case, the relevant text from § 1514A is provided below:

United States District Court
Northern District of California

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 . . . , or that is required to file reports under section 15(d) . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee . . . because of any lawful act done by the employee –
>
> (1) to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by –
>
> (A) a Federal regulatory or law enforcement agency; [or]
>
> . . .
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

18 U.S.C. § 1514A.

In its motion, Apple argues that the SOX claim should be dismissed because Ms. Gjovik "fails to allege facts that, even if true, demonstrate she complained about conduct that she reasonably believed violated an enumerated SOX provision." Mot. at 10. Apple is correct.

As a preliminary matter, the Court notes that Ms. Gjovik's opposition spends little time on her SOX claim and fails to address Apple's argument directly. *See* Opp'n at 11 ("Plaintiff responds generally here instead of point by point."). That alone warrants dismissal.

The Court, however, has also independently reviewed the allegations in the TAC and concludes that the claim is deficient. In the TAC, Ms. Gjovik provides a laundry list of matters that she reported, either internally or to a government agency. *See* TAC ¶¶ 167-68. But many of these acts do not have anything to do with the kinds of criminal fraud identified in § 1514A above or with securities law violations. *See, e.g.*, TAC ¶¶ 84, 167-68 (referring to hoarding of COVID-19 vaccines, smuggling, and witness intimidation). While some acts could possibly relate to securities law violations, *see e.g.*, TAC ¶ 167 (referring to false statements about Apple's environmental and labor practices), the acts are described in vague terms, and, in any event, Ms. Gjovik has failed to allege how her subjective belief that there were violations was objectively

20

reasonable: "'[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of fraud must at least approximate the basic elements of a claim of securities fraud,'" including that any misrepresentation or omission be *material*. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009); *see also Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014) (noting that "'it may well be that a complainant's complaint concerns such a trivial matter,' in terms of its relationship to shareholder interests, 'that he or she did not engage in protected activity under [§ 1514A].'"). A conclusory allegation that a misrepresentation or omission is material is not sufficient. Statements that amount to puffery (*e.g.*, claims by Apple that it is a progressive company) are not actionable. *See Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769, at *31-32 (N.D. Cal. Nov. 27, 2018) (stating that vague and amorphous statements – *e.g.*, "'we've got a great product experience'" or results were "'strong'" – "'do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision'"). The allegedly false statements either amount to puffery[7] or, to the extent they pertain to specific incidents about which Apple lied, they were not demonstrably material to shareholders when viewed in the context of the far more global and consequential business and financial issues facing Apple.

One example in the TAC where Ms. Gjovik provides specificity is illustrative of why her claims fall short. (She called out this same example during the hearing on Apple's motion.) In the TAC, Ms. Gjovik alleges that Ronald Sugar is a member of the Apple Board of Directors. *See* TAC ¶ 91. But prior thereto, he "worked at TRW Microwave Inc." (or Northrop Grumman, which appears to be the successor company) which was responsible for creating the pollution that needed cleanup at Stewart 1. TAC ¶ 170; *see also* TAC ¶ 91. According to Ms. Gjovik, "[i]t's improbable that Ronald Sugar was not personally involved in TRW Microwave use and disposal of industrial hazardous materials at [Stewart 1] or not personally involved in the environmental

---

[7] Even statements that are not puffery are not actionable if they are inherently subjective, *i.e.*, if they cannot be measured by an objective standard. *See In re Philip Morris Int'l Inc.*, 89 F.4th 408, 418-19 (2d Cir. 2023).

clean-up of spills/dumping of those chemicals at [Stewart 1]." TAC ¶ 171.  Ms. Gjovik suggests that this created some kind of conflict of interest on the part of Mr. Sugar once he was at Apple. *See* TAC ¶ 171.  She also alleges that she reported this conflict of interest internally in or about August 2021 (*i.e.*, shortly before she was terminated in September 2021).  *See* TAC ¶ 98.  In addition, it appears she reported the conflict of interest to the SEC at about the same time.  *See* TAC ¶ 169 (alleging that she "filed an SEC whistleblower tip on August 31, 2021").

But Ms. Gjovik was not complaining about criminal fraud (in particular, mail fraud, wire fraud, bank fraud, or securities or commodities fraud) or securities law violations, as opposed to, *e.g.*, safety.  *See Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 662 (C.D. Ill. 2023) ("Plaintiff's words, actions, and the animating beliefs he alleges overwhelmingly demonstrate that a concern for nuclear safety, not fraud, motivated his [Issue Reports] and related disclosures to the [U.S. Nuclear Regulatory Commission].").  In the TAC, Ms. Gjovik tries to get around this by alleging that she was "inquir[ing] if Ronald Sugar was involved in [Apple's] fraud [on the EPA, *e.g.*, trying to conceal problems at Stewart 1] due to his conflicts of interest related to the property."  TAC ¶ 171.  But simply labeling Apple's conduct "fraud" does not make it the kind of fraud covered by SOX (*i.e.*, mail fraud, wire fraud, bank fraud, securities or commodities fraud).  Ms. Gjovik's conduct here still seems to be motivated by a concern about safety, not fraud.[8]  In any event, this specific alleged conflict of interest in handling the Stewart I office space would not be sufficiently

---

[8] To support its position that Ms. Gjovik was not reporting a concern about the kinds of fraud identified in § 1514A, Apple has asked the Court to take judicial notice of the complaint Ms. Gjovik filed with the SEC.  *See* Mot. at 11; RJN No. 1, Ex. A (submission to SEC, dated September 1, 2021).  Apple argues that it is appropriate for the Court to take judicial notice because (1) Ms. Gjovik references the complaint she made with the SEC in her TAC, *see* TAC ¶ 169, and (2) she provided a copy of the complaint as an attachment in her prior motion for judicial notice.  *See* Docket No. 35-7, at 3-21.  *See, e.g.*, *Davis v. HSBC Bank*, 691 F.3d 1152, 1160 (9th Cir. 2012) ("Under the 'incorporation by reference' doctrine . . . , 'a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment.'  Specifically, courts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'").

Ms. Gjovik opposes judicial notice but Apple's argument above has merit.  Moreover, Ms. Gjovik's opposition – that the TAC does not rely on the document and/or that the document cannot be authenticated – is not compelling.

material to give rise to a securities fraud claim.

Accordingly, the Court dismisses the SOX claim.  Dismissal is with prejudice, both because of Ms. Gjovik's failure to respond directly to Apple's argument in her opposition and her failure to articulate at the hearing new facts that would suggest a violation of the relevant criminal fraud statutes or securities laws.

D.      Violation of the Dodd-Frank Act (Count 3)

In Count 3, Ms. Gjovik asserts a claim for violation of the Dodd-Frank Act.  The relevant portion of the statute provides as follows:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower –
>
> (i)      in providing information to the Commission in accordance with this section;
>
> (ii)     in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii)    in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A).  (The caption of Ms. Gjovik's TAC cites (iii) above as the relevant subsection.)

The Supreme Court has noted that both SOX and Dodd-Frank

> shield whistleblowers from retaliation, but they differ  in important respects.  Most notably, Sarbanes-Oxley applies to all "employees" who report misconduct to the Securities and Exchange Commission (SEC or Commission), any other federal agency, Congress, or an internal supervisor.18 U. S. C. §1514A(a)(1).  Dodd-Frank delineates a more circumscribed class; it defines "whistleblower" to mean a person who provides "*information relating to a violation of the securities laws t*o the Commission."  15 U. S. C. §78u-6(a)(6). A whistleblower so defined is eligible for an award if original information he or she provides to the SEC leads to a successful enforcement action.  §78u-6(b)-(g).  And, most relevant here, a whistleblower is protected from retaliation for, *inter alia*, "making disclosures that are required or protected under" Sarbanes-Oxley,

United States District Court
Northern District of California

the Securities Exchange Act of 1934, the criminal anti-retaliation proscription at 18 U. S. C. §1513(e), or any other law subject to the SEC's jurisdiction.  15 U. S. C. §78u-6(h)(1)(A)(iii).

*Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 152-153 (2018) (emphasis added).

As indicated in the discussion above, Ms. Gjovik did not directly respond to Apple's challenge to the Dodd-Frank claim; furthermore, she has failed to explain how she provided information relating to a violation of the securities laws.  Accordingly, dismissal of her Dodd-Frank claim, with prejudice, is warranted.

Ms. Gjovik's reliance on *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005 (N.D. Cal. 2015), is unavailing.  She argues that *Wadler* is factually similar to the instant case as it involved an employee who suspected a company of engaging in violations of the Foreign Corrupt Practices Act ("FCPA") and who started an investigation, "only to meet a variety of types of retaliation and obstruction."  Opp'n at 12.  But as Apple points out, the appellate decision in *Wadler* makes clear that a violation of the securities laws was implicated in the case because, as the defendant "correctly conceded in the district court," "one of the FCPA books-and-records provisions . . . is also an SEC regulation within the scope of [SOX]."  *Wadler v. Bio-Rad Labs, Inc.*, 916 F.3d 1176, 1185 (9th Cir. 2019).[9]

E.    Private Nuisance and Nuisance Per Se (Count 4)

In Count 4, Ms. Gjovik asserts a nuisance claim.  Specifically, she maintains two subclaims: (1) private nuisance and (2) private nuisance per se.  Each subclaim is based on Apple's conduct at (a) the ARIA factory (which was located close to Ms. Gjovik's apartment) and (b) Stewart 1 (where Ms. Gjovik's office was located and where the Superfund site was located).[10]

In 1872, the California Legislature codified a number of common law principles regarding the law of nuisance.  For example, the Legislature defined a "nuisance" in Civil Code section 3479 as

---

[9] The Ninth Circuit ultimately held that *other* FCPA provisions were not rules or regulations of the SEC, and therefore could not support a Sarbanes-Oxley claim.  *See Wadler*, 916 F.3d at 1185.

[10] In the TAC, Ms. Gjovik also refers to an "absolute nuisance."  Ms. Gjovik seems to consider an absolute nuisance as something similar to a nuisance per se or an ultrahazardous activity – *i.e.*, as a basis for strict liability to apply.  *See* TAC ¶ 178.  Because Ms. Gjovik has already asserted both a nuisance per se and an ultrahazardous activity, any claim for absolute nuisance would appear to be duplicative.

> anything that is "injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway."

*Mendez v. Rancho Valencia Resort Partners, LLC*, 3 Cal. App. 5th 248, 261 (2016).

California law draws a distinction between public and private nuisances.

> A nuisance is considered a "public nuisance" when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." A "private nuisance" is defined to include any nuisance not covered by the definition of a public nuisance and also includes some public nuisances.

*Id.* at 261-62 (citing Cal. Civ. Code § 3480-81).  Unlike a claim for public nuisance, "'[a] private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land.'"  *Id.* at 262; *see also* CACI 2021 (essential factual elements for a claim of private nuisance).

> [T]he [California] Supreme Court [has] outlined the elements of an action for private nuisance [as follows].  First, the plaintiff must prove an interference with his use and enjoyment of his property.  Second, "the invasion of the plaintiff's interest in the use and enjoyment of the land [must be] substantial, i.e., that it cause[s] the plaintiff to suffer 'substantial actual damage.'"  Third, "'[t]he interference with the protected interest must not only be substantial, but it must also be unreasonable,' i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.'"

*Id.* at 262-63.  The second and third elements are to be judged by an objective standard.  *See id.* at 263.

California law also provides that, in certain instances, something may be deemed a nuisance per se.

> [W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance per se. . . . [T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law.

*Beck Development Co. v. Southern Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1207 (1996); *see also*

25

*City of Costa Mesa v. Soffer*, 11 Cal. App. 4th 378, 382 (1992) ("[T]he legislature has the power to declare certain uses of property a nuisance and such use thereupon becomes a nuisance per se. . . . Nuisances per se are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance.") (internal quotation marks omitted); *Rincon Band of Luiseño Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059, 1102 (2021) ("Nuisances per se are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance.") (internal quotation marks omitted).

    1.    <u>Private Nuisance</u>

Apple moves to dismiss the claim for private nuisance in part. Specifically, it moves to dismiss the private nuisance claim to the extent it is based on Apple's conduct at Stewart 1 (the Superfund site) as opposed to Apple's conduct at the ARIA factory  *See* Reply at 5 ("Apple has not moved to dismiss the private nuisance claim related to [the ARIA] facility."). Apple is not moving to dismiss the claim as related to the ARIA factory because it concedes Ms. Gjovik has met the requirement that "'[a] private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of *his or her* land.'"  *Mendez*, 3 Cal. App. 5th at 262 (emphasis added); *see also* CACI 2021 (providing that one of the essential elements of a claim for private nuisance is that "[name of plaintiff] [owned/leased/occupied/controlled] the property"). This is because Ms. Gjovik is asserting that that Apple's conduct at the ARIA factory affected her nearby apartment. In contrast, Stewart 1 is simply where Ms. Gjovik's office is located. *Cf. Barrous v. BP P.L.C.*, No. 10-CV-02944-LHK, 2011 U.S. Dist. LEXIS 113597, at *20-21 (N.D. Cal. Oct. 3, 2011) (in discussing standing to sue for tort claims, stating that "'[a]ny interest sufficient to be dignified as a property right' will support an action based on a private nuisance, including a tenancy for a term," but "'such right does not inure in favor of a licensee, lodger or employee'").

The Court dismisses the private nuisance claim to the extent it is based on Stewart 1. Apple's position has merit, and, notably, Ms. Gjovik does not address Apple's argument in her opposition. The dismissal is with prejudice.

2.    Private Nuisance Pe Se

As for the claim for nuisance per se, Apple argues for dismissal on the basis that there is no law (including law passed by the state legislature) providing that running a factory (ARIA) or maintaining an office at a Superfund site (Stewart 1) is a nuisance per se.  *See Costa*, 11 Cal. App. 4th at 382 (1992) (stating that "the legislature has the power to declare certain uses of property a nuisance and such use thereupon becomes a nuisance per se") (internal quotation marks omitted). Because the Court agrees with Apple's argument above, it need only concern itself with a claim of private nuisance per se as related to the ARIA factory, and not Stewart 1.

Ms. Gjovik's main response is that releasing "hazardous waste into the air and environment" must be a nuisance per se.  TAC ¶ 176; *see also* Opp'n at 9 (asserting that "'[e]missions of hazardous substances into the environment have constituted nuisances per se'"; quoting *Espinosa v. Roswell Tower, Inc.*, 121 N.M. 306, 310 (N.M. Ct. App. 1995)).  But Ms. Gjovik has failed to cite any *California* authority declaring the release of hazardous substances to be a nuisance.  That the release of hazardous substances may be a violation of federal or state laws, *see, e.g.*, TAC ¶¶ 176 (referring to, *e.g.*, the Clean Air Act and California Health & Safety Code § 41700), does not automatically amount to a declaration by the state legislature that the conduct constitutes a nuisance per se.  Therefore, the claim for nuisance per se is dismissed but with leave to amend, though the Court is skeptical whether such a claim can be stated.

To be clear, even if Ms. Gjovik were to decide *not* to amend the claim for nuisance per se, she would still have a "regular" claim for private nuisance based on the ARIA factory.

F.    Ultrahazardous/Abnormally Dangerous Activities (Count 5)

In Count 5, Ms. Gjovik makes a claim similar to the nuisance per se claim above – *i.e.*, that Apple should be held strictly liable for conducting ultrahazardous activities at (1) the ARIA factory and (2) Stewart 1.

> The modern rule of strict liability without fault for injuries resulting from an ultrahazardous activity was adopted in [California] by the decision in *Luthringer v. Moore* (1948) 31 Cal.2d 489.  Applying the standard set forth in the Restatement of Torts, the Supreme Court stated: "'One who carries on an ultra-hazardous activity is liable to another whose person, land or chattels the actor should recognize [are] likely to be harmed by the unpreventable miscarriage

> of the activity for harm resulting thereto from that which makes the
> activity ultra-hazardous, although the utmost care is exercised to
> prevent the harm. . . . An activity is ultra-hazardous if it (a)
> necessarily involves a risk of serious harm to the person, land and
> chattels of others which cannot be eliminated by the exercise of the
> utmost care, and (b) is not a matter of common usage. . . An activity
> is a matter of common usage if it is customarily carried on by the
> great mass of mankind or by many people in the community. . . .

*Tri-Star Dyeing & Finishing v. Brenntag Pac.*, No. 23STCV00357, 2023 Cal. Super. LEXIS

24088, at *7-8 (L.A. Super. Ct. Apr. 19, 2023).

Consistent with the above,

> Section 520, Restatement Second of Torts enumerates the
> [following] factors to be considered in determining whether an
> activity is "abnormally dangerous" or "ultrahazardous": "(a)
> existence of a high degree of risk of some harm to the person, land
> or chattels of others; (b) likelihood that the harm that results from it
> will be great; (c) inability to eliminate the risk by the exercise of
> reasonable care; (d) extent to which the activity is not a matter of
> common usage; (e) inappropriateness of the activity to the place
> where it is carried on; and (f) extent to which its value to the
> community is outweighed by its dangerous attributes." Whether a
> particular activity is abnormally dangerous is to be determined by
> the court "upon consideration of all the factors listed in this Section,
> and the weight given to each that it merits upon the facts in
> evidence." Due to the interplay of the various factors, it is
> impossible to define abnormally dangerous activities. "The essential
> question is whether the risk created is so unusual, either because of
> its magnitude or because of the circumstances surrounding it, as to
> justify the imposition of strict liability from the harm that results
> from it, even though it is carried on with all reasonable care. In
> other words, are its dangers and inappropriateness for the locality so
> great that, despite any usefulness it may have for the community, it
> should be required as a matter of law to pay for any harm it causes
> without the need of a finding of negligence." Thus, by its very
> nature, the issue of whether an activity is ultrahazardous cannot be
> decided on demurrer.

*SKF Farms v. Superior Court*, 153 Cal. App. 3d 902, 906 (1984).[11]

In the instant case, Ms. Gjovik claims an ultrahazardous activity related to the ARIA

factory because, "[f]or decades," semiconductor fabrication "has been known to require

pyrophoric gases, which have a 'serious fire hazard,' combustible and flammable chemicals that

---

[11] Note that "[t]he question of whether a case is a proper one for imposing strict liability is one of
law for the court. Moreover, [what] facts are necessary to make an activity ultrahazardous . . . is a
matter for the judgment of the court." *Garcia v. Estate of Norton*, 183 Cal. App. 3d 413, 419
(1986) (internal quotation marks omitted; concluding facts at trial provided "ample evidence from
which the trial court could properly conclude that the subject activity was ultrahazardous").

must be 'carefully monitored and handled by experienced personnel.'"  TAC ¶ 184.  She also

maintains that the ARIA factory released substances identified as toxic air contaminants under

state and federal law for which "there is no safe level of exposure without 'significant adverse

health effects.'"  TAC ¶ 185.

As for Stewart 1, Ms. Gjovik has less to say.  Her allegations are conclusory in nature –

*e.g.*, "[o]perating a business on a Superfund mega-site with a pathway for vapor intrusion and

contaminants of concern, including TCE and Vinyl Chloride, is an ultrahazardous activity."  TAC

¶ 186.

Ms. Gjovik's claim for ultrahazardous activity survives Apple's 12(b)(6) challenge in part.

Regarding the ARIA factory, Ms. Gjovik has made allegations that there are chemicals used for

which there is no safe level of exposure, thus implying they are absolutely prohibited under any

circumstance.  *Cf.* TAC ¶ 37 (alleging that "[m]any of Apple's chemicals at the plant were

characterized as 'extremely hazardous' or 'acutely hazardous' materials").  The claim is viable to

that extent and only to that extent.  However, Ms. Gjovik has also included allegations suggesting

that there are some hazards (in particular, fire hazards) that can be managed with care, *see* TAC ¶

184 (alleging that the chemicals "must be 'carefully monitored and handled by experienced

personnel'"); that suggests the opposite of ultrahazardous.  To that extent, the claim is not viable.

These chemicals are not absolutely prohibited.

As for Ms. Gjovik's claim for ultrahazardous activity based on Stewart 1, it also is not

viable.  In contrast to above, here, Ms. Gjovik simply makes allegations that there are

"contaminants of concern."  TAC ¶ 186.  An issue with "contaminants of concern" is too vague.

At one point in her pleading, Ms. Gjovik suggests that there are contaminants of concern because

some of the chemicals are carcinogens.  *See* TAC ¶ 42 ("The primary contaminants in the

groundwater contamination plume are chlorinated volatile organic compounds, including the

carcinogen trichloroethene ('TCE') and its daughter products cis-1,2-dischloroethene and vinyl

chloride.").  But that fact *in and of itself* is not enough to raise a question of fact as to whether

Apple engaged in ultrahazardous activity.  Carcinogens often may be used subject to regulations.

Furthermore, even if the Court were inclined to rule otherwise on the Stewart 1-based

claim, Apple has fairly argued that the claim should be dismissed for the independent reason: specifically, it is time barred.  There is a two-year statute of limitations for the claim.  *See* Cal. Code Civ. Proc. § 335.1 (providing for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another"); *id.* § 340.8(a) (providing that, "[i]n any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later").  Given that Ms. Gjovik filed suit on September 7, 2023, any claim that accrued before September 7, 2021, is time barred.  Apple points out that, as alleged in the TAC, Ms. Gjovik told Apple in March 2021 (*i.e.*, well before September 2021) that she was concerned about the safety of the Superfund site and that she believed "her fainting spell in 2019 in her office was due to vapor intrusion."  TAC ¶ 51; *see also* TAC ¶ 35 (alleging that, in April 2021, Ms. Gjovik saw an occupational exposure doctor, and the doctor's notes referred to a statement by Ms. Gjovik that she had "'an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues'").  This supports a time bar.

Ms. Gjovik does not have much of a comeback in response.  In her papers, she suggests that there were different kinds of safety issues at Stewart 1 – *e.g.*, some related to the cracked foundation and some related to the HVAC intake.  *See, e.g.*, Opp'n at 9-10 ("Each location/vector, occurrence, and type of injury may be a different claim.  The exposure to the vapor intrusion from the cracked floor is a different vector and exposure[] then [sic] the chlorinated solvent vapors piped into the HVAC system . . . .").  But that gives short shrift to the fact that there was a single contaminated site, from which Ms. Gjovik had a single injury.  *See Berson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 932 (1994) ("'[T]he statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.'  Aggrieved parties generally need not know *the exact manner in which*

30

1    *their injuries were 'effected*, nor the identities of all parties who may have played a role therein.'")

2    (emphasis added).

3        The Court therefore allows the claim based on the Aria factory to proceed (in part), but not

4    Stewart 1.  The dismissal of the Stewart 1-related claim is with prejudice because the time bar

5    makes amendment futile.

6    G.    Violation of the Bane Civil Rights Act (Count 6)

7        In Count 6, Ms. Gjovik has asserted a claim for violation of the Bane Civil Rights Act.

8    The statute allows an individual to bring a private right of action if their "exercise or enjoyment of

9    rights secured by the Constitution or laws of the United States, or of rights secured by the

10   Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as

11   described in subdivision (b)."  Cal Civ Code § 52.1(c).  Subdivision (b) refers to interference and

12   attempts to interfere by a "person or persons,[12] whether or not acting under color of law, . . . by

13   threat, intimidation, or coercion."  *Id.* § 52.1(b).

14       In the instant case, Ms. Gjovik identifies the following rights as having been interfered

15   with: (a) the right to provide testimony to agencies (*e.g.*, the NLRB); (b) the right to meet with

16   legislatures and appear as a legislative witness; (c) the right to report criminal acts to law

17   enforcement; (d) the right to privacy as protected by the California Constitution; and (e) the right

18   to free speech and assembly.  She alleges that Apple interfered with these rights via, *e.g.*,

19           threatening messages and social media posts about guns,
             ruin/destruction, and even her death; sending threatening and
20           dangerous packages in the mail; tampering with Gjovik's chattels to
             the extent of conversion; surveilling and stalking Gjovik; hacking
21           Gjovik's electronics and utilities; destroying Gjovik's chattels;
             trespassing and burglarizing Gjovik's home; and other inherently
22           violent misconduct.

23   TAC ¶ 188; *see also* TAC ¶ 189 (referring to a "psychological torture campaign" with

24   "harassment of Gjovik [coming] from all corners of the internet, including forums, social media

25   sites, email, texts, website webform, phone calls, blog posts, news articles, and other mediums").

26   ───────────────

27   [12] The Bane Act does not itself define "person."  However, the California Civil Code of which the
     Bane Act is a part provides that "the word person includes a corporation as well as a natural
28   person."  Cal. Civ. Code § 14.

United States District Court
Northern District of California

Apple launches a number of challenges to the civil rights claim – *e.g.*, (1) some of the alleged misconduct (*e.g.*, termination of employment, a "harassing" letter from a law firm) cannot support a Bane Act claim, and (2) some of the alleged misconduct was conduct undertaken by an ex-Apple employee (Ms. Scarlett, the individual whom Ms. Gjovik refers to as Ms. Appleseed). The most compelling arguments, however, are that (3) Ms. Gjovik does not identify any specific Apple employee that engaged in misconduct, and (4) Ms. Gjovik has not sufficiently explained how any of the alleged interferences with her rights were done via threat, intimidation, or coercion. *See* Mot. at 19 ("Plaintiff alleges . . . vague and conclusory examples of purported threats, coercion, and intimidation (*see* TAC ¶¶107-10, 188-89) but fails to *tie* them to any purportedly interfered-with right; as such, they cannot ground a Bane Act claim.") (emphasis added). The Court agrees that more clarity is needed on these issues, and therefore grants the motion to dismiss, albeit with leave to amend.

Because the Court is giving Ms. Gjovik leave to amend this claim, it notes that the issue of respondeat superior is a complicated matter that she should also address should she choose to amend. Courts have recognized that respondeat superior can make a public entity vicariously liable for a Bane Act violation. *See, e.g.*, *Uganda Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168-69 (N.D. Cal. 2009) (noting that, under California Government Code § 815.2(a), a city can be held "vicariously liable under the theory of respondeat superior" if the employee was "acting in the course and scope of employment"). There is no reason to think that respondeat superior would not also apply to private entities such as Apple. *See Presbyterian Camp & Conference Centers, Inc. v. Superior Court*, 12 Cal. 5th 493, 503 (2021) ("As a general rule, '[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.") (internal quotation marks omitted). That being said, respondeat superior does not mean that an employer is automatically liable for all of its employee's acts.

Under the general doctrine, "an employer is vicariously liable for the torts of its employees committed within the scope of the employment," and this is true even if the employee commits a willful, malicious, or even criminal tort and the employer has not authorized the employee to

commit the tort. *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 12 Cal. 4th 291, 296 (1995). Furthermore, "California no longer follows the traditional rule that an employee's actions are within the scope of employment only if motivated, in whole or part, by a desire to serve the employer's interests." *Id.* at 297.

However, an employer will not be held liable for an "intentional tort that did not have a causal nexus to the employee's work." *Id.* For instance, "'[i]f an employee inflicts an injury out of personal malice, *not engendered by the employment*, the employer is not liable.'" *Id.* at 298 (emphasis in original).

> The nexus required for respondeat superior liability – that the tort be engendered by or arise from the work – is to be distinguished from "but for" causation. That the employment brought tortfeasor and victim together in time and place is not enough. We have used varied language to describe the nature of the required additional link (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an "outgrowth" of the employment; the risk of tortious injury must be "'inherent in the working environment'" or "'typical of or broadly incidental to the enterprise [the employer] has undertaken.'"
>
> Looking at the matter with a slightly different focus, California courts have also asked whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that "'as a practical matter are sure to occur in the conduct of the employer's enterprise.'" The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.
>
> In what has proved an influential formulation, the court in *Rodgers v. Kemper Constr. Co.*, *supra*, 50 Cal. App. 3d at page 618, held the tortious occurrence must be "a generally foreseeable consequence of the activity." In this usage, the court further explained, foreseeability "merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business."

*Id.* at 298-99; *see also Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 142-43 (1981) (stating that "[t]he test is not whether it is foreseeable that one or more employees might at some time act in such a way as to give rise to civil liability, but rather, whether the employee's act is foreseeable *in light of the duties* the employee is hired to perform") (emphasis in original).

Accordingly, if Ms. Gjovik does amend the Bane Act claim, she must allege specific facts

33

1   to support a basis for respondeat superior liability – *i.e.*, that an intentional tort committed by an

2   Apple employee had a causal nexus to the employee's work.

3   H.   Violation of the Ralph Civil Rights Act (Count 7)

4        In Count 7, Ms. Gjovik asserts a claim for violation of the Ralph Civil Rights Act.  The

5   relevant provision of the statute states as follows:

> All persons within the jurisdiction of this state have the right to be
> free from any violence, or intimidation by threat of violence,
> committed against their persons or property because of political
> affiliation, or on account of any characteristic listed or defined in
> subdivision (b) or (e) of Section 51, or position in a labor dispute, or
> because another person perceives them to have one or more of those
> characteristics.  The identification in this subdivision of particular
> bases of discrimination is illustrative rather than restrictive.

11  Cal Civ Code § 51.7(b)(1).  Section 51(b) refers to the following characteristics: "sex, race, color,

12  religion, ancestry, national origin, disability, medical condition, genetic information, marital

13  status, sexual orientation, citizenship, primary language, or immigration status."  *Id.* § 51(b).

14  Section 51(e) also refers to the same.  *See id.* § 51(e).  According to Ms. Gjovik, Apple threatened

15  and committed violent acts against her based on her making labor-related complaints with

16  government agencies (*e.g.*, the NLRB), her sex, her disabilities, her activism, and her membership

17  in a protected class of victims of environmental crime.  *See* TAC ¶ 199-203.

18       Apple's main argument in its motion to dismiss is that Ms. Gjovik has failed to state a

19  claim because she "does not provide any facts regarding what Apple supposedly did or said to

20  threaten violence or commit violence against her."  Mot. at 19.  As above, more clarity is needed,

21  and thus dismissal is warranted, although with leave to amend.  As above, should Ms. Gjovik

22  decide to amend this claim, any amendment must address whether there is a basis for respondeat

23  superior liability.  *See, e.g.*, *Beliveau v. Caras*, 873 F. Supp. 1393, 1399 (C.D. Cal. 1995)

24  (addressing respondeat superior liability with respect to a claim under the Ralph Civil Rights Act).

25  I.   Violation of the California Whistleblower Act (Count 8)

26       In Count 8, Ms. Gjovik asserts a claim for violation of the California Whistleblower Act.

27  California Labor Code § 1102.5 provides in relevant part as follows:

28       (b)   An employer, or any person acting on behalf of the

34

United States District Court
Northern District of California

1

2

3

4

5

6

7

> employer, shall not retaliate against an employee for [1] disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for [2] providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

8

9

10

> (c)   An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

11   Cal. Lab. Code § 1102.5.  To establish a prima facie violation of § 1102.5, a plaintiff "must show

12   (1) she engaged in protected activity, (2) her employer subjected her to an adverse employment

13   action, and (3) a causal link between the two."  *St. Myers v. Dignity Health*, 44 Cal. App. 5th 301,

14   314 (2019).

15        In the TAC, Ms. Gjovik makes two main allegations in support of her § 1102.5 claim:

16   specifically, that Apple retaliated against her after she complained to various government agencies

17   (*e.g.*, the NLRB, the U.S. Department of Labor, the California Department of Labor, the California

18   DFEH, the EEOC, the EPA, the California EPA, etc.) about (1) the Gobbler application[13] and (2)

19   environmental and safety violations.  (Although Ms. Gjovik also refers, in the TAC, to her refusal

20   to participate in Apple's misconduct, *see* TAC ¶ 211, that allegation is also related to her

21   complaints about the Gobbler application and the environmental and safety violations.)

22        As to the Gobbler application, Apple identifies two alleged deficiencies with the § 1102.5

23   claim: (1) Ms. Gjovik does not sufficiently identify to whom she made her complaint; and (2) Ms.

24   Gjovik has not sufficiently identified what state or federal laws Apple allegedly violated.  The

25   second argument is not persuasive.  Ms. Gjovik has alleged that the Gobbler application violated

26

27

28

---

[13] *See* TAC ¶ 106 (alleging that Apple "was illegally harvesting her biometrics through its face Gobbler app"); TAC ¶ 242 (alleging that the Gobbler app "was taking photos of her while undressed and using the bathroom and engaged in sexual activity").

United States District Court
Northern District of California

the right to privacy protected by the California Constitution.  *See* TAC ¶ 209.  That Ms. Gjovik also cites other statutes that may not be on point, *see* TAC ¶ 209 (referring to California Labor Code § 435 (recording employees in a restroom or locker room or room designated for changing) and § 1101-02 (prohibiting certain employer conduct related to political activities or affiliations of employees), is not dispositive since the § 1102.5 claim could be based on the California Constitution.  However, Apple's first argument has some merit: based on the language of the statute and the fair notice requirements of the Federal Rules of Civil Procedure, Ms. Gjovik should provide information about to whom she complained about the Gobbler application.  Although Ms. Gjovik has referred to various government agencies, it is not clear that she actually complained to those agencies about the Gobbler application specifically as opposed to, *e.g.*, environmental and safety issues.

As for the environmental and safety violations, Apple's only contention is that, again, Ms. Gjovik has failed to adequately identify what state or federal laws it allegedly violated.  In the TAC, Ms. Gjovik has referred to CERCLA, OSHA, the Resource Conservation and Recovery Act, and the Clean Air Act but she has not cited to any specific provisions within those statutes.  The Court need not decide whether the failure to cite specific provisions from these statutes deprived Apple of fair notice of the scope of Ms. Gjovik's claim.  *See Ling La v. San Mateo County Transit Dist.*, No. 14-cv-01768-WHO, 2014 U.S. Dist. LEXIS 131316, at *18 (N.D. Cal. Sept. 16, 2014) ("La's allegation that she disclosed conduct in violation of the Davis-Bacon Act, related federal statutes, and related regulations is also insufficient.  The point of notice pleading is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'  La's citation to a whole statutory framework does not serve this purpose, in particular where La does not use her opposition brief to clarify the specific statutes and regulations that were violated.").  At the hearing, Ms. Gjovik indicated that she had a list of provisions at hand, and, as the Court is already giving Ms. Gjovik leave to amend other claims, she may supplement this claim by including the specific provisions in the amended pleading.

J.     Retaliation for Filing Complaints in Violation of California Labor Code § 98.6 (Count 9)

In Count 9, Ms. Gjovik asserts a claim for violation of California Labor Code § 98.6.  The

36

statute provides in relevant part as follows:

> A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter [covering the Division of Labor Standards Enforcement], including the conduct described in subdivision (k) of Section 96,[14] and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2,[15] or because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to their rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that they are owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in a proceeding pursuant to that section, or because of the exercise by the employee or applicant for employment on behalf of themselves or others of any rights afforded them.

Cal. Lab. Code § 98.6(a).  As with a § 1102.5 claim, a prima facie case for a § 98.6 violation consists of the following showing: "(1) [the plaintiff] engaged in protected activity, (2) her employer subjected her to an adverse employment action, and (3) a causal link between the two." *St. Myers*, 44 Cal. App. 5th at 314.

In the instant case, Ms. Gjovik's § 98.6 claim is predicated on the protections provided in California Labor Code § 96(k), 232, and 232.5.

- As noted above, § 96(k) refers to "[c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises."  Cal. Lab. Code § 96(k); *see also Grinzi v. San Diego Hospice Corp.*, 120 Cal. App. 4th 72, 85 (2004) (stating that, "[b]y its plain language, . . . 98.6, subdivision (a) limits the rights of employers to discharge at-will employees for section 96, subdivision (k) conduct").

- Section 232 provides that no employer may, *inter alia*, "[d]ischarge, formally discipline, or otherwise discriminate against an employee who discloses the amount

---

[14] California Labor Code § 96(k) refers to "[c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises."  Cal. Lab. Code § 96(k).

[15] Chapter 5 relates to political affiliations.

United States District Court
Northern District of California

1    of his or her wages." *Id.* § 232(c).

2    • Section 232.5 provides that no employer may, *inter alia*, "[d]ischarge, formally

3        discipline, or otherwise discriminate against an employee who discloses

4        information about the employer's working conditions." *Id.* § 232.5(c).

5    In the pending motion, Apple does not move to dismiss the § 98.6 claim in its entirety.

6    Rather, it takes issue with the claim only to the extent that Ms. Gjovik asserts that she was

7    retaliated against for engaging in "lawful conduct asserting 'recognized constitutional rights.'"

8    TAC ¶ 216 (alleging that "Gjovik engaged in lawful conduct asserting 'recognized constitutional

9    rights' and 'rights under the Labor Code' . . . during nonworking hours – while she was on leave,

10   away from Apple's premises[;] Apple retaliated . . . because of some of this protected conduct").

11   Apple argues that Ms. Gjovik has failed to allege any specific constitutional rights that were

12   violated.  Apple adds that, to the extent the constitutional right claimed is the First Amendment or

13   comparable rights under the California Constitution, Ms. Gjovik cannot claim a violation because

14   those rights provide protection vis-à-vis a state actor only, and not a private one.  *See, e.g.*, *Grinzi*,

15   120 Cal. App. 4th at 85 ("[T]o successfully establish a tortious discharge claim under this

16   provision of section 98.6, Grinzi must allege her discharge occurred because she asserted a

17   recognized constitutional right. . . [But] the First Amendment free speech guarantees at issue are

18   only recognized against *government* interference.  Grinzi does not have a recognized constitutional

19   right protecting her against private acts implicating her employment under the First Amendment . .

20   . .") (emphasis in original); *Yu v. Univ. of La Verne*, 196 Cal. App. 4th 779, 790 (2011) ("A

21   person's free speech rights under the federal and state constitutions are not infringed unless there

22   is state action.").

23   Apple's argument above is meritorious; thus, dismissal is justified to the extent Ms. Gjovik

24   is claiming lawful conduct involving the assertion of constitutional rights.  To be sure, Ms. Gjovik

25   now refers, in her opposition brief, to a number of other rights under the California Constitution:

26   the right to privacy (art. I, § 1), the right to safety (art. I, § 1), the right to be free of discrimination

27   (art. I, §§ 8, 31), the right to be free from water pollution (art. X, § 2), and the right to be protected

28   as a victim of a crime (art. I, § 28), some of which do not require state action in the same way as

United States District Court
Northern District of California

1    the federal Constitution does.  *See* Opp'n at 7.  Those allegations, however, are not specified or

2    otherwise fairly noticed in the TAC, and thus the Court does not consider them at this juncture.

3    Ms. Gjovik has leave to amend the claim.

4    K.    Breach of Implied Contract and Breach of the Implied Covenant of Good Faith and Fair

5           Dealing (Count 12)

6           In Count 12, Ms. Gjovik asserts both (1) a claim for breach of implied contract and (2) a

7    claim for breach of the implied covenant of good faith and fair dealing.[16]

8           Regarding breach of implied contract, Ms. Gjovik admits at first that she and Apple

9    entered into an express employment agreement ("signed [and] written") in 2015.  TAC ¶ 234.

10   However, she then suggests that, at some point, the parties entered into an implied contract –

11   specifically, she was "no longer an at-will employee and could only be fired by Apple for cause,

12   as [she] had a reasonable belief, due to Apple's words or conduct, that she would only be

13   discharged for good cause."  TAC ¶ 234; *see also* TAC ¶ 235 (referring to "an implied contract

14   making her no longer an at-will employee").  Implicitly, Apple breached the implied contract

15   because it fired her in bad faith, *i.e.*, without good cause.

16          In addition to the above, Ms. Gjovik also seems to suggest that an implied contract was

17   created because one of her superiors told her that he appreciated her willingness to speak the truth

18   and that, if she continued to do so, "'good things will continue to follow.'  This was a promise to

19   Gjovik that if she reported unethical and unlawful conduct and held leaders to account, she would

20   have continued employment at Apple."  TAC ¶ 235.  Implicitly, Apple breached this implied

21   contract because it fired her in response to her complaints about unethical and unlawful conduct.

22          As for breach of the implied covenant of good faith and fair dealing, Ms. Gjovik alleges

23   that "Apple deliberately undermined [her] ability to fulfill her contractual obligations, frustrating

24   her ability to benefit from the agreement."  TAC ¶ 235.  However, Ms. Gjovik does not seem to

25

26   ───────────────────

27   [16] Ms. Gjovik seems to have shaped this claim based on comments made by Judge Seeborg in a
     different case involving Apple.  *See Banko v. Apple*, 20 F. Supp. 3d 749 (N.D. Cal. 2013).  Apple
     has asked the Court to take judicial notice of certain filings in *Banko*, *see* Docket No. 61 (RJN);
28   Ms. Gjovik has filed a conditional nonopposition.  *See* Docket No. 65 (Opp'n at 3) (indicating that
     there is no opposition so long as the Court takes into account additional filings made in *Banko*).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  include any other concrete factual allegations to flesh out this contention.  The one possible

2  allegation that might support a claim for breach of the implied covenant is that Apple fired Ms.

3  Gjovik "shortly after her annual performance review was due, which would be accompanied by a

4  performance bonus that she had already earned."  TAC ¶ 237.

5     Apple moves to dismiss the claim for breach of contract on the basis that Ms. Gjovik has

6  failed to allege any breach.  In support, it provides a copy of the offer letter that Apple gave to Ms.

7  Gjovik.  Apple asks the Court to take judicial notice of the document.  *See* RJN, Ex. B (offer

8  letter).  The Court does not take judicial notice of the offer letter given that Ms. Gjovik appears to

9  challenge its authenticity.  Admittedly, Ms. Gjovik may not be objecting in good faith here.  For

10  example, she asks who Ashley Henderson is (the name of the person on the offer letter), but

11  presumably that was Ms. Gjovik's prior name.

12     Even if the Court were to take judicial notice of the offer letter, however, that still would

13  not favor Apple.  The offer letter does state that "[y]our employment relationship with Apple will

14  be at will" and that, "[b]y signing this letter you agree that these are the only terms and conditions

15  of your employment and acknowledge that you have not relied upon any other promises or

16  representations, except those made in this letter."  RJN, Ex. B (Offer Letter at 2).  However, Ms.

17  Gjovik alleges in the TAC that, *after* the offer letter, Apple made representations to her that

18  created a new contract – an implied contract that she could only be terminated for cause.

19  Similarly, Ms. Gjovik alleges that, *after* the offer letter, Apple represented that she would have

20  continued employment if she continued to "tell the truth."  *Cf. Guz v. Bechtel Nat'l, Inc.*, 24 Cal.

21  4th 317, 352 (2000) (noting that an "employer's personnel policies and practices may become

22  *implied-in-fact* terms of the contract between employer and employee[;] [i]f that has occurred, the

23  employer's failure to follow such policies when terminating an employee is a breach of the

24  contract itself") (emphasis in original).

25     That being said, there is a more fundamental problem with the claim for breach of implied

26  contract: Ms. Gjovik does not identify what words or conduct Apple engaged in that gave rise to a

27  reasonable belief that she could only be terminated for cause.  Getting good performance reviews,

28  bonuses, and promotions *by themselves* is not enough; otherwise, employers would never engage

40

in that conduct for fear of converting at-will employment to employment that can be terminated only for cause. *See* TAC ¶ 234; *see also Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1988) (stating that, "[i]n the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged'"). To the extent Ms. Gjovik is relying on the statement from her superior that good things would happen if she continued to tell the truth, that is too vague a statement to constitute a promise. *Compare Banko*, 20 F. Supp. 3d at 759 (holding that plaintiff had adequately alleged that "his employment agreement evolved to where he could only be fired for cause" – *e.g.*, "Banko avers *repeated oral assurances of job security* and consistent promotions, salary increases and bonuses during the term of his employment that contributed to his reasonable expectation of discharge only for good cause") (emphasis added).

As for the claim for breach of the implied covenant, Apple argues that it is duplicative of the claim for breach of contract itself. But here, Apple does not seem to have taken into account the suggestion in the TAC (albeit, not a clear one) that Apple timed her firing her to deprive her of a performance bonus. *See Guz*, 24 Cal. 4th at 353 n.18 (stating that "the covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits" – *e.g.*, "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned") (emphasis in original).

Accordingly, the Court dismisses the claim for breach of implied contract but allows the claim for breach of the implied covenant to proceed. The Court shall allow Ms. Gjovik to amend her claim for breach of implied contract but only if she can do so in good faith, consistent with her Rule 11 obligations.

L.      Intentional Infliction of Emotional Distress (Count 13)

In Count 13, Ms. Gjovik asserts a claim for intentional infliction of emotional distress ("IIED").

1
2
3
4
5
6

> A cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.  A defendant's conduct is "outrageous" when  it is so extreme as to exceed all bounds of that usually tolerated in a civilized community.  And the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result.

7   *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009) (internal quotation marks omitted).[17]

8       The IIED claim is somewhat confusing.  Ms. Gjovik starts out with a prefatory allegation

9   that Apple

10
11
12

> bugged [her] objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, . . . repeatedly threatened to "ruin" and "destroy" her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks.

13   TAC ¶ 238 (emphasis omitted).  However, she then does not seem to predicate her IIED claim on

14   those allegations but rather spends the bulk of the claim talking about (1) her termination and

15   other employment-related retaliation, (2) the Gobbler application, (3) Apple's environmental

16   pollution; and (4) a retaliatory lawsuit which appears to have filed by Ms. Scarlett, not Apple.  Her

17   opposition is consistent with this approach.  The Court, accordingly, follows suit.

18       As a result, much of the IIED claim (although not all) is problematic.  For example, on (1),

19   Apple correctly argues that a termination or retaliation by itself is not enough to establish

20   outrageous conduct.  California courts have held "[m]anaging personnel is not outrageous conduct

21   beyond the bounds of human decency, [and] [a] simple pleading of personnel management activity

22   is insufficient to support a claim of intentional infliction of emotional distress, even if improper

23   motivation is alleged."  *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 80 (1996); *see also*

24   *Light v. Dep't of Parks & Rec.*, 14 Cal. App. 5th 75, 101 (2017) (stating that "[a] retaliatory

25   motive alone is insufficient to sustain a claim for [IIED]"); *Garcia v. W. Coast Dental Servs.*, No.

26

27
28

---

[17] Ms. Gjovik indicates that her claim is based on not only California but also New York and Massachusetts law.  Because no party has argued that the law at issue matters, the Court focuses on California law only.

United States District Court
Northern District of California

1    22SMCV00228, 2023 Cal. Super. LEXIS 51588, at \*16 (L.A. Cty. Super. Ct. Aug. 2, 2023)

2    (noting that, "[i]n the employment context, a pleading of personnel management activity is

3    insufficient to support a claim of IIED, even if improper motivation, such as retaliation, is

4    alleged").  While IIED claims may be asserted where there is, *e.g.*, race- or sex-based

5    discrimination, Ms. Gjovik has not alleged such discrimination in support of the IIED claim.  *See*

6    *Light*, 14 Cal. App. 5th at 101 (stating that plaintiff "may pursue a claim for [IIED] in the

7    employment context where the conduct at issue violates FEHA and also satisfies the elements of

8    the claim").

9          Apple also correctly asserts that a common law claim based upon mere termination or

10   retaliation would be barred by workers' compensation exclusivity.  This includes allegations of

11   whistleblower retaliation.  *See id.* at 99 (noting that, even though it might seem that whistleblower

12   retaliation is not a risk inherent in the employment relationship, California courts have rejected the

13   argument); *see also Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 903 (2008).

14         As for (2) (pertaining to the Gobbler application), there is a statute-of-limitations problem.

15   There is a two-year limitations period for IIED claims.  *See* Cal. Code Civ. Proc. § 335.1

16   (providing for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for

17   the death of, an individual caused by the wrongful act or neglect of another").  The TAC indicates

18   that Ms. Gjovik began complaining about the Gobbler application in August 2021, *see* TAC ¶¶ 80-

19   81 – more than two years before she filed her original complaint in September 2023.

20         As for (3) (relating to environmental pollution), there is a *partial* time bar.  As discussed

21   above, Ms. Gjovik made complaints about the safety of Stewart 1 back in March 2021 (*i.e.*, more

22   than two years before the original complaint was filed).  *See* TAC ¶ 51 (alleging that Ms. Gjovik

23   told Apple in March 2021 (*i.e.*, well before September 2021) that she was concerned about the

24   safety of the Superfund site and that she believed "her fainting spell in 2019 in her office was due

25   to vapor intrusion").  Ms. Gjovik could still have a claim based on the Aria factory; at least, Apple

26   has not made a statute-of-limitations argument.

27         Finally, on (4) (retaliatory suit brought by Ms. Scarlett), it appears that the alleged

28   retaliatory lawsuit took place after Ms. Scarlett was no longer an Apple employee.  *See* TAC ¶ 137

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (alleging that Ms. Scarlett "supposedly quit Apple in late 2021"); TAC ¶ 247 (alleging that the

2    "retaliatory litigation" was "filed in 2022"); *see also* SAC ¶ 879 (alleging that "Appleseed, as an

3    agent of Apple, filed retaliatory litigation against Gjovik in a Washington state court (including

4    evidence and testimony of the bogus FBI complaint, and testimony she also reported Gjovik to

5    law enforcement")).[18]  That being the case, Ms. Gjovik cannot argue respondeat superior as a basis

6    to hold Apple liable.  And the TAC does not contain any concrete allegations indicating that, post-

7    employment, Ms. Scarlett was part of some kind of conspiracy with Apple.

8         Accordingly, the only partial claim for IIED that survives is based on Apple's conduct at

9    the Aria factory (not time barred).  The Court gives Ms. Gjovik leave to amend if she can do so in

10   good faith.

11   M.   Negligent Infliction of Emotional Distress (Count 14)

12        In Count 14, Ms. Gjovik asserts a claim for negligent infliction of emotional distress

13   ("NIED").  Under California law, a claim for NIED is simply a claim for negligence; it is not an

14   independent tort.  *See Christensen v. Superior Ct.*, 54 Cal. 3d 868, 884 (1991).  Thus, a claim for

15   NIED consists of the traditional negligence elements: duty, breach of duty, causation, and

16   damages.  *See Belen v. Ryan Seacrest Prods., LLC*, 65 Cal. App. 5th 1145, 1165 (2021).

17        Here, Ms. Gjovik's NIED claim is predicated on the same facts asserted in support of the

18   IIED claim.  *See* TAC ¶ 252 ("The plaintiff incorporates and restates the 13th Cause of Action for

19   IIED [in the claim for NIED].").  Thus, it is not surprising that Apple has made one of the same

20   challenges to the NIED claim that it made for the IIED claim – *i.e.*, that the claim is preempted by

21   workers' compensation exclusivity.

22        Apple also raises the contention that it cannot be held liable for a NIED claim because it

23   had no duty to Ms. Gjovik.  *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993)

24   (noting that a "duty may be imposed by law, be assumed by the defendant, or exist by virtue of a

25   special relationship"; adding that, if the duty is assumed by the defendant, then the defendant must

26

27   ─────────────────────
     [18] Although Ms. Gjovik suggests that the Court should not consider the SAC because it has been
28   superseded by the TAC, it is fair to consider allegations to the extent they provide context on the
     TAC.

have "assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object").

Apple argues, for instance, that it did not assume a duty to Ms. Gjovik in which her emotional

condition was an object.  Ms. Gjovik does not clearly respond to this argument in her papers, and

thus the Court dismisses the NIED claim in its entirety.  The Court shall give Ms. Gjovik leave to

amend; in amending, she must include nonconclusory, factual, and plausible allegations as to duty.

She must also bear in mind the Court's ruling above on workers' compensation exclusivity.

N.      Violation of California Business & Professions Code § 17200 (Count 15)

Finally, in Count 15, Ms. Gjovik asserts a claim for violation of California Business &

Professions Code § 17200.  The claim seems to be based on three factual predicates: (1) Apple's

coercing employees to provide personal data for Apple's commercial use, such as with the

Gobbler application, *see* TAC ¶ 255 (alleging that no consent was obtained or compensation

provided); (2) Apple's coercing employees to be a part of invasive studies, *see* TAC ¶ 258; and (3)

Apple's establishment of a health care clinic, called AC Wellness, which it then used improperly.

*See* TAC ¶ 259.  (To be frank, the Court does not understand the allegations made with respect to

(3).)

Apple moves to dismiss the § 17200 claim on the basis that Ms. Gjovik lacks standing –

*i.e.*, she has failed to allege that she lost money to Apple which Apple should be forced to

disgorge.  *See* Cal. Bus. & Prof. Code § 17203 (providing that a "court may make such orders or

judgments . . . as may be necessary to restore to any person in interest any money or property, real

or personal, which may have been acquired by means of such unfair competition"); *see also*

*Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 1497-98 (2007) (noting that the California

Supreme Court has "held that the only remedy expressly authorized by section 17203 was

restitution to individuals who had an ownership interest in money paid to the defendants; there

was nothing, either in the express language of the statute or in its legislative history, to indicate

that the legislature intended to authorize a court to 'order a defendant to disgorge all profits to a

plaintiff who does not have an ownership interest in those profits'").  As an initial matter, the

Court bears in mind that Ms. Gjovik seeks not only disgorgement as a remedy but also injunctive

relief.  *See* TAC ¶ 260.  Apple does not explain why she would not have standing to pursue

45

injunctive relief.  However, Apple otherwise makes a fair point on monetary relief, *i.e.*, that Ms. Gjovik has not clearly alleged how she lost any money or property as a result of Apple's actions.

The Court therefore grants in part and deny in part the motion to dismiss: Ms. Gjovik has standing to pursue injunctive relief but not monetary relief (based on the allegations in the TAC). The Court gives Ms. Gjovik leave to amend.  If Ms. Gjovik chooses to amend, she should clarify her claim based on AC Wellness.

### III.    MOTION TO STRIKE

In addition to a 12(b)(6) motion, Apple has filed a motion to strike pursuant to Federal Rules of Civil Procedure 12(f).  Under Rule 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Apple moves to strike:

> (1) allegations that do not relate to the 15 claims asserted by Ms. Gjovik in the TAC; and
>
> (2) allegations that relate to the claims that Apple is moving to dismiss (assuming that the Court dismisses those claims).

The motion to strike based on (2) is essentially moot.  As the Court is giving Ms. Gjovik to leave to amend on most claims (although not all), she will file a new pleading that supersedes the TAC.

As for (1), Apple has identified about 20 paragraphs that it believes has no relevance to any of the 15 claims Ms. Gjovik has asserted.  Although Apple's position is not without any merit, it is essentially premature.  At this early juncture, it is hard to say that the allegations in those paragraphs are entirely irrelevant.  Apple makes a fair point that the case should be streamlined to focus on the claims that really are potentially viable; however, if Apple is worried about far-reaching discovery, that can be addressed through meet and confers and (if necessary) motion practice.  The Court forewarns both parties that it expects discovery to be conducted in good faith.

### IV.    CONCLUSION

For the foregoing reasons, the Court rules as follows:

- Violation of RICO (Count 1).  The § 1962(a) claim is dismissed with prejudice.

46

The § 1962(c) claim is dismissed with leave to amend.  The § 1962(d) claim is dismissed with prejudice to the extent it is based on a § 1962(a) theory.  The § 1962(d) claim is dismissed with leave to amend to the extent it is based on a § 1962(c) theory.

- Violation of SOX (Count 2).  The claim is dismissed with prejudice.

- Violation of the Dodd-Frank Act (Count 3).  The claim is dismissed with prejudice.

- Private Nuisance and Nuisance Per Se (Count 4).  The claims based on Stewart 1 are dismissed with prejudice.  The per se claim based on the Aria factory is also dismissed but with leave to amend.  The "regular" claim based on the Aria factory is not dismissed as Apple did not challenge it.

- Ultrahazardous Activities (Count 5).  The claim related to the Aria factory is dismissed but only in part.  The claim related to Stewart 1 is dismissed – and with prejudice because of the time bar.

- Violation of the Bane Civil Rights Act (Count 6).  The claim is dismissed with leave to amend.

- Violation of the Ralph Civil Rights Act (Count 7).  The claim is dismissed with leave to amend.

- Violation of the California Whistleblower Act (Count 8).  The claim is dismissed with leave to amend, and/or Ms. Gjovik may supplement the allegations in support of the claim.

- Retaliation for Filing Complaints in Violation of California Labor Code § 98.6 (Count 9).  The claim is dismissed with leave to amend.

- Breach of implied contract and breach of the implied covenant of good faith and fair dealing (Count 12).  The claim for breach of implied contract is dismissed with leave to amend.  The claim for breach of the implied covenant is allowed to proceed.

- Intentional infliction of emotional distress (Count 13).  The claim is dismissed with leave to amend.  The only partial claim for IIED that survives at this juncture is

United States District Court
Northern District of California

1    based on Apple's conduct at the Aria factory (not time barred).

2    • Negligent infliction of emotional distress (Count 14).  The claims is dismissed with

3       leave to amend.

4    • Violation of California Business & Professions Code § 17200 (Count 15).  The

5       claim is dismissed with leave to amend.  Ms. Gjovik has standing to seek injunctive

6       relief but she has not alleged how she has standing for monetary relief.

7    As for the motion to strike, the Court denies it but without prejudice.

8    Ms. Gjovik shall file an amended complaint (again, within the page limits previously set

9    by the Court) by June 17, 2024.  Apple shall then file a response (whether an answer or another

10   motion to dismiss) by July 15, 2024.

11   Although the Court is giving Ms. Gjovik leave to amend on the bulk of the dismissed

12   claims, it suggests that she use some discretion in deciding which claims to amend (as the Court is

13   not requiring her to amend).  As the Court indicated at the hearing, some claims can probably be

14   amended such that they would survive a 12(b)(6) challenge (assuming, as likely, that Apple

15   responds to an amended pleading with another motion to dismiss).  These claims are largely

16   predicated on the theory that Apple retaliated against Ms. Gjovik for complaining about safety.

17   On the other hand, there are also some claims that the Court views with skepticism.  For these

18   claims, the Court is not able to say at this juncture that they are futile; however, their viability

19   appears problematic.  It also is not clear that Ms. Gjovik needs them in her suit; Ms. Gjovik

20   conceded as much by stating at the hearing that she does not intend to litigate all of her claims to a

21   jury, should the case reach that stage).  There are questions as to what these claims really add to

22   her suit.

23   At the hearing, Ms. Gjovik indicated that she was including these claims to ensure her

24   ability to get broad discovery.  But Apple is not contesting (at this point at least) two of her claims

25   (Counts 10 and 11), and these are two of her *primary* claims; thus, Ms. Gjovik's discovery

26   concern seems to be unfounded or at least overstated.  Furthermore, it is more than likely that, if

27   Ms. Gjovik were to replead, *e.g.*, her § 1962(c) claim or Bane and Ralph civil rights claims, Apple

28   would respond with another motion to dismiss, which, in the long run, means that resolution on

United States District Court
Northern District of California

48

her primary claims would be delayed.  Although Ms. Gjovik is free to litigate her case as she chooses (so long as she does so in good faith and in compliance with her Rule 11 obligations), it is not clear that, as a practical matter, the benefit, if any, is worth the burden (*e.g.*, pleading a § 1962 claim is not an easy task given, *e.g.*, the multiple elements needed for a viable claim).

The Court sets an initial case management conference ("CMC") for **July 16, 2024, at 1:30 p.m.**  The parties shall file a joint CMC statement one week in advance.

This order disposes of Docket Nos. 48, 49, and 64.


**IT IS SO ORDERED**.


Dated: May 20, 2024

_____
EDWARD M. CHEN
United States District Judge