**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

Plaintiff,

v.

**APPLE INC**, *a corporation*, et al,

Defendant.

**Case No. 3:23-cv-04597-EMC**

**FOURTH AMENDED COMPLAINT ("4AC")**

**PLAINTIFF'S CLAIMS:**

1. **Termination in Violation of Public Policy**
   California *Tamney* tort claim

2. **Violation of Cal. Whistleblower Protection Act**,
   Cal.Lab.C. § 1102.5

3. **Retaliation for Protected Safety Activities,**
   Cal.Lab.C. § 6310; § 6399.7 via § 6310

4. **Retaliation for Filing Labor Complaints,**
   Cal.Lab.C. § 98.6 via § 98.7

5. **Retaliation for Organizing Around Pay and Work Conditions,**
   Cal.Lab.C. §§ 232, 232.5 via § 98.7

6. **Retaliation for Exercising Constitutional Rights outside of the Workplace,**
   Cal.Lab.C. § 96(k) via § 98.7

7. **Breach of the Implied Covenant of Good Faith and Fair Dealing**

8. **Unfair Competition Law,**
   Cal.B&P.C. § 17200

9. **IIED – Outrageous Conduct**
   California and New York

10. **Tort of Private Nuisance**
    Cal.Lab.C. § 3479

11. **Tort of Ultrahazardous Activities**
    California Strict Liability claim

12. **IIED – Fear of Cancer**
    California / NY tort claims

**DEMAND FOR JURY TRIAL**

## I.   SUMMARY OF THE CASE

1.     Over the last ten years, Apple Inc ("Defendant") intentionally engaged in a course of unlawful conduct and unfair business practices that resulted in direct, severe, and ongoing harm to Ashley Gjovik ("Plaintiff") as a community member, as an employee, and as a consumer.

2.     This lawsuit arises from Apple's disregard of environmental regulations and safety requirements at two different Silicon Valley properties starting in 2015. Apple's unlawful toxic waste dumping in Santa Clara (unrelated to her employment relationship with Apple) severely disabled and nearly killed Gjovik in 2020. Gjovik began filing complaints about the public safety issue, and Apple began retaliating against her for doing so, knowing what they had done to her. Then, in 2021, Gjovik also discovered numerous safety and compliance issues at her Apple office located on a federally managed toxic waste dump in Sunnyvale. She began also filing complaints about her office, and Apple then retaliated against Gjovik about those complaints well.

3.     During Apple's marathon of retaliation against Gjovik in 2021, Gjovik was in law school studying to become a human rights lawyer. She was in a unique position to effectively report serious environmental and safety issues, and to lobby for general policy reform. Gjovik utilized her knowledge, experience, and resources to confer with numerous government agencies, to meet with a variety of elected officials and their staff, to publish op-eds calling for new legislation, was interviewed and written about by the press, and served as a witness for government agencies and legislative committees. Gjovik organized her workers, lobbied on their behalf, and called for systemic change with Apple's environmental and labor practices. Gjovik's public advocacy also brought awareness to her prior neighbors of the pollution issues where she had lived, leading to additional chemical exposure victims coming forward and joining Gjovik in  complaining to the government and requesting help.

4.     With every action Gjovik took to speak out about matters of public concerns, to

advocate for interests critical to public policy, and to attempt to influence Apple to reform its practices – Apple responded to Gjovik with accelerating retaliation, intimidation, moral harassment, and psychological violence – including Apple's abrupt termination of Gjovik's employment in September of 2021. Apple then required another week to establish a post hoc rationalization as to a non-illegal reason why it fired Gjovik. Apple's best attempt at producing a non-illegal justification was quickly discussed by the press as "*absurd*," it is unlawful itself, and it is the focus of the antitrust claim in this lawsuit. Gjovik planned to pursue charges of retaliation against Apple only through agency adjudication. However, in 2023, after discovering that Apple was also responsible for her severe chemical exposure injuries in 2020, Gjovik also decided to file this lawsuit.

## II.   PROCEDURAL HISTORY

5.      Gjovik now files her Fourth Amended Complaint ("4AC"). The original complaint was filed on September 7 2023. The First Amended Complaint was filed in October 2023 per stipulation, in order to allow Apple more time to prepare, as needed due to Apple's delayed arrival in court, waiting several weeks to respond in any way about this lawsuit. The Second Amended Complaint was filed in December 21 2023 as a matter of course, and dismissed by this court without prejudice and with leave to amend on January 30 2024. The Third Amended Complaint was filed in February 27 2024 and was ruled upon with a decision and order issued May 20 2024. Many claims were allowed to proceed in some form, many claims were granted leave to amend, however two claims (*e.g.* the Sarbanes–Oxley and Dodd-Frank Acts) and several sub-claims (*e.g.,* toxic torts at 825 Stewart Drive, etc.) were dismissed with prejudice.

6.      In the 4AC, Gjovik surrendered several additional claims, despite being granted leave to amend; deciding to focus her limited resources on claims that are already established and to avoid duplicative work. The NIED, Breach of Implied Contract, Bane Act, Ralph Act, and RICO §§ 1962(c) and 1962(d) claims are not included in this 4AC. The majority of the damages to be provided under

the RICO Act are now covered under the whistleblower claims (financial loss) and the 2020 toxic torts (real property damage). The majority of the damages to be provided under NIED and the Bane and Ralph Civil Rights Acts, will instead be pursued under the revised IIED claim. The policy behind the implied contract claim is already captured in the *Tamney* claim. Some facts and allegations were reassigned to other section so the complaint. For clarity moving forward with the remaining claims, sub-claims have now been broken out into separate, formal counts.[1]

### III.    JURISDICTION & VENUE

7.      The United States District Courts have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. When the complaint was filed, Plaintiff was domiciled in the state of New York and is now domiciled in the Commonwealth of Massachusetts. Defendant is a corporation headquartered in California. Venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district. Many of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California. [Civil L.R. 3-5(b)].

### IV.    PARTIES

8.      Ashley Gjovik [2] ("Plaintiff"), was an Apple employee from February 2015 through September 2021, held a leasehold at a Santa Clara property adjacent to Apple's semiconductor fabrication facility in February 2020 through October 2020, and received requests from Apple to participate in secret anatomical experiments starting in 2015. Gjovik is a natural person domiciled in Massachusetts, holding a Juris Doctor, and appearing Pro Se. Gjovik established a consulting LLC in California in 2022, which she continues to manage with a virtual office in Sacramento at 2108 N St. Ste. 4553 Sacramento, CA, 95816. (The LLC address is used on papers for privacy.)

---

[1] Except for the Tamney claim, which is still four grouped sub-claims because I ran out of space.
[2] pronounced "JOE-vik"

9.      Apple Inc., ("Defendant"), is a business engaged in and affecting interstate commerce and a covered entity under the statutes at issue here. Apple is a corporation headquartered at One Apple Park Way in Cupertino, California. "Apple" refers to its successors and assigns; controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures; and their directors, officers, managers, agents, and employees. Apple's business consists of "*design, manufacture, and marketing*" of products and the sales of "*various related services.*" As of December 2023, Apple Inc. claimed a market cap of $3.021 trillion and annual revenue of $383.29 billion.[3]

10.     At all pertinent times, Apple was the tenant and operator controlling the facilities at both 825 Stewart Drive in Sunnyvale and 3250 Scott Boulevard in Santa Clara, California. At both properties, Apple registered its hazardous waste activities under its own name and with Apple EH&S as the contact for the government and public. Apple registered the facility at 3250 Scott Blvd with the local, state, and federal governments for Apple's activities governed by RCRA, EPCRA, the Clean Water Act, and the Clean Air Act. Apple registered the facility at 825 Stewart Drive with the state government for Apple's hazardous waste generation activities governed by RCRA. While not the formal "Potentially Responsible Party" for the site under CERCLA, Apple did order, supervise, and report to US EPA prior CERCLA-related testing performed under Apple's name.

## V.     NOTICE OF PENDENCY & CONFLICT OF LAWS

11.     Gjovik left her CERCLA ("Superfund" – toxic waste dump) whistleblower retaliation cases with the US Department of Labor, as the claim's exclusive jurisdiction is with the US Department of Labor, and there is no way to remove the charge to the US Courts for a de novo trial. Her charge is docketed with the Office of Administrative Law Judges under 2024-CER-00001 in Boston; a trial is scheduled for March 2025; and a pending motion to amend is under consideration by the ALJ (with Gjovik requesting to add three additional claims for RCRA, TSCA, and Clean Air

---

[3] Apple Inc, 2023 10K.

Act whistleblower retaliation).

12.     Gjovik has six pending NLRB charges. NLRB cases cannot be removed to court for de novo hearings, as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. The NLRB issued a Decision of Merit on two of Gjovik's charges in January 2023, (thus the NLRB will issue a complaint and sue Apple if Apple does not settle first). Gjovik's two meritorious charges included Apple's Business Conduct Policy, NDAs, Intellectual-Property Agreement, and an email CEO Tim Cook sent his staff in September 2021 shortly after Gjovik was fired.[4] Gjovik's four other charges allege unfair labor practices. Three were under review with the General Counsel's Division of Advice office for some time.[5]  The fourth charge was filed in 2023 due to Apple's out-of-court conduct related to this case, including promulgating unlawful work rules.[6]

## VI.   STATEMENT OF FACTS

13.     The Plaintiff, Ashley Gjovik, is a 37-year-old woman residing in Boston, Massachusetts. Gjovik holds a Bachelor of Science in Liberal Studies awarded in 2012, and a Juris Doctor degree awarded in June 2022. During law school, Gjovik also obtained a certificate in Public International Law, participated in a 'summer abroad' studying International Law and Transitional Justice at the University of Oxford in 2021, and worked for a term for a non-profit organization in Australia as a legal caseworker for refugees and asylum seekers in 2021.

14.     Gjovik worked at Apple from 2015 to 2021. At the time of her termination, her title was Senior Engineering Program Manager, and her base salary was $169,000 annually. In the last full year Gjovik worked at Apple (2020), her total annual W-2 compensation was $386,382.  Gjovik was the co-founder of a large women's community group at Apple. Gjovik also worked in a rotation position within Apple's Legal department in 2019-2020, primarily supporting the Government Affairs

---

[4] 32-CA-284441 and 32-CA-284428 (Oct. 12 2021).
[5] 32-CA-282142 (Aug. 26 2021), 32-CA-283161 (Sept. 16 2021), 32-CA-288816 (Jan. 10 2022).
[6] 01-CA-332897 (Dec. 29 2023).

and Software Product Legal teams' efforts to establish Apple's first company-wide Artificial Intelligence Ethics and Social Responsibility policy.

15.     Since September 2023, Gjovik's worked a program manager for an air pollution research project at a research university. The role is temporary and does not utilize her legal or engineering experience. After two years of searching and hundreds of applications, it was the first and only job offer she could obtain. The role is a far lower seniority than her role at Apple, and Gjovik's salary was reduced by 41% and total compensation lowered by 74%.

## GJOVIK'S EMPLOYMENT AT APPLE

16.     Gjovik joined Apple on February 23, 2015, as an Engineering Project Manager in the Software Project Management Office until January 2017. She reported to several managers under the same Director (Venkat Memula) during this time. Gjovik experienced severe harassment, discrimination, bullying, and an untenable hostile work environment during those two years, primarily from her coworkers, Rob Marini and Brad Reigel. Memula repeatedly failed to correct their behavior.

17.     Marini bragged that he was known to executives as their "*Little Gestapo.*" He quickly made a work tracking ticket titled "*Make Ashley's Life a Living Hell,*" then assigned it to Reigel. Marini often planned and orchestrated malicious schemes to harass Gjovik and cause her distress, including getting multiple members of the team to physically attack Gjovik, spreading rumors about Gjovik, secretly recording Gjovik and sharing recordings with their team, and frequently pressuring Gjovik to drink hard alcohol at work. Marini often made cruel comments. He once noticed Gjovik made a typo in an XML and told Gjovik that her mother should have had an abortion. Both Marini and Reigel cursed at Gjovik, called her names, and wrote harassing statements and nicknames on whiteboards about her.

18.     Memula assigned Gjovik to share an office with Marini. Marini told Gjovik in the first

week that all of his prior officemates either quit the company, left the country, or killed themselves. Marini asked Gjovik which path she would choose. Marini once told Gjovik he targeted her with harassment and bullying because she was 'joyful,' and he wanted to 'extinguish' her light.

19.     Reigel was an active police officer, had ammunition in his office, allegedly physically 'flipped a table' in a meeting, and supposedly kept a gun in his car at times. Reigel once kept Gjovik in a conference room with the door closed and berated her for a prolonged period while she wept and begged him to stop. He sometimes made 'joking' comments, like he'd 'smack her' if she did not do what he said.

20.     Gjovik's first manager, Linda Keshishoglou, tried to bribe Gjovik in exchange for Gjovik providing a positive review to Keshishoglou's manager, Memula. Gjovik reported it to Memula and HR. When Keshishoglou left the organization, Gjovik was transferred to report to Reigel. Gjovik attempted to move to a different team but was thwarted and blocked by Reigel, who provided negative feedback about her to the hiring manager and could not explain why.

21.     Gjovik was then transferred under Evan Buyze and Shandra Rica (in Memula's organization) to run Early Field Failure Analysis for the company, where she received very positive feedback and praise until one specific field issue occurred and which led to a retaliatory constructive termination. Gjovik's managers had become upset at Gjovik because Gjovik was earnestly trying to investigate a trend of battery failures in the field, and Gjovik's managers preferred to "ignore it and hope it goes away" and told Gjovik to also "ignore it," which Gjovik refused to do. Buyze and Rica told Gjovik not to tell people why she was leaving their organization, with Rica saying she "*doesn't like people who talk shit.*" This battery failure issue and Apple's resulting response would be nicknamed "*Batterygate.*"

22.     Gjovik joined Product Systems Quality in Hardware Engineering in January 2017 after leaving Software Engineering. Gjovik now reported to Dan West (Senior Director) and David Powers

(Director) as a Senior Engineering Program Manager and chief of staff. Both West and Powers engaged in harassing, discriminatory, and inappropriate conduct toward Gjovik – including remarks and decisions that discriminated against Gjovik based on sex, gender, and disability. In December 2017, West also attempted to coerce Gjovik to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Gjovik complained then and later West admitted it was "*one of the worst things [he's] ever done.*"

23.    Other leaders in West's organization also discriminated against Gjovik, including John Basanese, who frequently complained that Gjovik was not married and did not have kids, and during company social events, often pressured Gjovik to 'settle down' and 'have kids.' Gjovik complained to Basanese and West about the statements, but Basanese persisted for years. In addition, Powers' US-based team was 90% men, and all of Powers' other direct reports (other than Gjovik) were men.

24.    While Gjovik's performance reviews were positive, outside the reviews Powers and West frequently gave Gjovik 'feedback' like she was too 'emotional,' 'aggressive,' or 'expressive.' Gjovik gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen and thank her for being honest with him – though generally continued with the same behavior. Powers did not respond well and frequently berated her. In two meetings, Powers criticized Gjovik, making her cry, and then berated her about her crying, making her cry more.

25.    Before Apple's unlawful actions towards Gjovik in 2021, Gjovik wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple indefinitely if she could transfer to a better role (not in a hostile work environment like her current role). Gjovik had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) and convince them to hire her upon graduation. She continued mentioning this plan into 2021. Meanwhile, Gjovik's supervisor, West, frustrated several

of Gjovik's attempts to transfer to other Apple roles focused on law/legislation/policy – including directly blocking an offer in December 2020 for Gjovik to work on Apple's implementation of circular economy legislation.

## APPLE'S SECRET SEMICONDUCTOR FABRICATION

26.    In early 2015, Apple started stealth semiconductor fabrication activities in a facility located at 3250 Scott Boulevard in Santa Clara, California.[7] Like some sort of Skunkworks, Apple codenamed the facility "ARIA" and even tried to use the codename on regulatory paperwork.

27.    The ARIA semiconductor fabrication facility operated less than three hundred feet from thousands of homes where Gjovik lived in 2020. Also within 300 from the building were two public parks (Creekside Park and Meadow Park), picnic tables, outdoor fitness stations, and a children's playground. Within 1,000 feet of ARIA there was also a church, a school, an elder care facility,  and the San Tomas Aquino Creek and public trail. (San Tomas Aquino Creek flows to the Bay and then into the Pacific Ocean).

28.    Apple intentionally vented its fabrication exhaust – unabated – and consisting of toxic solvent vapors, gases, and fumes – into the ambient outdoor air. The factory was one story, while the apartments were four stories tall, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

29.    Apple was fully aware of this facility and its operations, including the vast amount of hazardous materials and hazardous waste, as every year, Apple submitted a financial assurance document to the Santa Clara Fire Department and HazMat agency, which detailed hazardous waste treatment and disposal operations, and is personally signed by Apple's Chief Financial Officer, Luca

---

[7] "Semiconductor Fabrication Facility: A building or a portion of a building in which electrical circuits or devices are created on solid crystalline substances having electrical conductivity greater than insulators but less than conductors. These circuits or devices are commonly known as semiconductors." Cal. Fire Code § 202 (2022).

Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.

30.     Upon initiating operations at ARIA, Apple was quickly cited for building, environmental, health, safety, and fire code violations in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water into storm drains, fire code and CalASPA violations, health and safety code violations, failure to properly monitor wastewater discharge), 2019 (wastewater testing violations), 2020 (fire code violations, using two EPA identification numbers, inaccurate hazmat inventory data, no spill plans or training, no business permit, no signature from supervisor on records, and failure to properly monitor wastewater discharge again),

31.     In February 2020, Gjovik moved into a large, new apartment complex at 3255 Scott Blvd (adjacent to ARIA) and quickly became severely ill. Gjovik suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Gjovik also suffered bradycardia (slow heart rate), volatile blood pressure with both hypertension and hypotension and a high frequency of premature ventricular contractions (an arrhythmia). From February 2020 through September 2020, Gjovik was screened for multiple severe and fatal diseases and disorders, including Multiple Sclerosis, brain tumors, deadly arrhythmias, and Neuromyelitis Optica – instead, all of Gjovik's symptoms were consistent with chemical exposure. Due to the solvent exposure, Gjovik also suffered skin rashes, burns, and hives, and her hair fell out and she had a shaved head for nearly a year as the bald patches slowly grew back.

32.     Due to the sudden illness, Gjovik visited the Emergency Room on February 13 2020, and Urgent Care (at AC Wellness, Apple's for-profit in-house clinic) on February 20 2020. Gjovik subsequently consulted with dozens of doctors, who screened her for all sorts of diseases, subjecting Gjovik to extensive blood draws, urine samples, injections, and scans – including potentially

dangerous procedures like MRI and CT scans with contrast, of which Gjovik had multiple. Gjovik was too sick to work and went on disability.

33.     Gjovik transitioned her medical care to a different clinic and provider after her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure to Apple's factory exhaust). Instead she suggested Gjovik could be suffering from anxiety, and enrolled Gjovik in an Apple internal user study related to blood pressure, requiring Gjovik share her iPhone medical and fitness data with Apple, and participate in weekly life coaching sessions (while being exposed to Apple's solvent vapor and gas exhaust).

34.     While sick in 2020, Gjovik would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure. On September 2 2020, Gjovik discovered elevated levels of volatile organic compounds ("VOCs") in her indoor air. What immediately captured Gjovik's attention was the arge spike in VOCs had occurred the night prior, around 3 AM, while she had been suffering from one of these "dying" spells.

35.     Gjovik sought out multiple occupational and environmental exposure doctors, who told Gjovik that all of her symptoms were consistent with solvent and other chemical exposures. After Gjovik discovered her medical issues at the apartment were due to a chemical emergency, Gjovik quickly filed complaints with Santa Clara City HazMat/Fire Department, California EPA DTSC and Air Resources Board, and US EPA. She also called Poison Control, who said what she described also sounded like Benzene exposure. (Apple reported it was exhausting Benzene into the air).

36.     City Fire Department records for ARIA contain at least sixteen chemical spill/leak incident reports at ARIA within only three years. These incident reports included eight confirmed leaks/spills: leaks of phosphine and silane on June 1 2019 at 9:17 AM; a phosphine leak on October 21 2019 at 11:06 PM; a 17.5 PPM Tetraethyl Orthosilicate ("TEOS") leak on July 17 2020 at 8:58

AM; a major phosphine leak on April 30 2021 at 8:29 AM (peaking at 32 PPB and 0.0001145 pounds of the gas vented into the exterior ambient air); a 5% fluorine gas leak on April 18 2022 at 10:42 AM, a Hexafluorobutadiene leak on May 29 2022 at 2:19 PM, and leaks of two unnamed toxic gases on September 20 2022 at 7:44 AM and December 21 2022 at 1:40 AM.

37.     Notably, almost all of the reported toxic gas leaks during the time frames Gjovik had complained n 2020 that her symptoms seemed to always be the worst around 8-9 AM, 10-11 PM, and sometimes around 2-3 AM. One of the chemical spills that did not occur during those times of concern was root caused to an Apple engineer "accidently" turning on lethal fluorine gas. Similarly, another incident, the TEOS leak, was root caused to an Apple engineer accidently installing the gas for a tool "backwards." Further, less than two weeks following the April 30 2021 phosphine leak, Apple's manifests included sixty pounds of "*vacuum filters contaminated with glass dust*," implying there may have also been a phosphine explosion.

38.     Further, later in 2021-2022, Apple reported to the government. that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of VOCs and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air around ARIA. Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring December 14, 2020 – only after Gjovik had notified Apple EH&S and environmental legal about what occurred to her near ARIA.

39.     In 2022, the US EPA severely restricted the legal use of NMP as "*it presents an unreasonable risk of injury to human health*" under TSCA. Apple also reported that in at least 2019-2021, that ARIA exhausted reportable amounts of mercury, arsenic, carbon monoxide, and formaldehyde into the ambient air around the factory.  Further, Apple reported to the Bay Area Air Quality Management Board that ARIA exhausted an average of 16 pounds a day of isopropyl alcohol vapors.

40.     In September 2020, Gjovik hired an industrial hygienist to test the indoor air at her apartment. She purchased an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Only half the total contaminants were accounted for in the test and the California EPA informed her that testing with Summa canisters for 24 hours is superior and would have yielded better results. Still, Gjovik's limited testing returned results showing a number of the chemicals in use by Apple at ARIA including Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, and Xylene.

41.     In September 2020, Gjovik set up additional air monitors to observe the levels of VOCs in her apartment next to the ARIA factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Gjovik had noticed with her symptoms and ad hoc testing – that the VOCs mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). Gjovik notified several Apple executives of her findings and activities, including her managers Powers (Director) and West (Sr. Director), her friends J.C. (Senior Director) and A.A. (Senior Manager).

42.     In September 2020, Gjovik's blood and urine medical tests returned results with industrial chemicals, including arsenic, mercury, Toluene (Hippuric Acid), and Xylenes (2-3-4 Methyl hippuric Acid. Also noteworthy are the symptoms of Gjovik's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match Phosphine and Arsine gas exposure. Both Phosphine and Arsine are very dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of Arsine gas on site, and Gjovik's medical tests from September 2020, on the morning after one of the 3 AM attacks, revealed significant arsenic in her blood with no other explanation than Arsine gas exposure within the prior eight hours.[8]

43.     Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater

---

[8] US CDC, NIOSH, *Arsine Emergency Response.*

discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, the government mandated testing revealed the presence of 29 μg/L of 1,1-Dichloropropane, 24 μg/L of Trichloroethylene ("TCE"), and 6.7 μg/L of Ethyl tertiary-butyl ether (ETBE). Among other issues, it's unclear why Apple had TCE on site but not in any of its chemical inventories, and then, in addition, why exactly Apple was pouring that TCE down the drain.

44.     ARIA reported an average daily water usage of around 44,000 gallons per day and the sewer pipes carrying ARIA's discharges flowed downhill and directly around the apartment where Gjovik lived in 2020. In 2020, the government had already started investigating the plumbing at her apartment as a possible vector for some unknown solvent vapor pollution.

**THE SEPTEMBER 2020 EMAIL**

45.     In September 2020, Gjovik noticed an Apple facility at 3250 Scott Boulevard across the street, which was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on at least September 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S and Gjovik had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in Gjovik's Superfund office at 825 Stewart Drive ("Stewart 1") and the activities at ARIA.

46.     In September 2021, the Apple EH&S manager, Elizabeth, suggested that Gjovik use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in September 2021, Apple Employee Relations conferred with Elizabeth about Gjovik's environmental concerns only hours before Gjovik was abruptly terminated.

**THE TRW MICROWAVE SUPERFUND SITE**

47.     Gjovik's Apple office from 2017 until her termination was located at 825 Stewart Drive in Sunnyvale, California, also known as the "TRW Microwave" Superfund site, part of the US

EPA "Triple Site."[9] The *"Triple Site"* is the collective name for three adjacent Superfund sites in Sunnyvale that have jointly contributed to a mile-long groundwater solvent plume. In addition, the *"Offsite Operable Unit"* is roughly a one-hundred-acre area of groundwater contamination from TRW Microwave. It "*includes four schools and over 1,000 residences*."

48.    The "TRW Microwave" Superfund site is a former industrial semiconductor fabrication and manufacturing facility at 825 Stewart Drive ("Stewart 1"). The primary contaminants in the groundwater contamination plume are chlorinated volatile organic compounds, including the carcinogen trichloroethene ("TCE") and its daughter products cis-1,2-dichloroethene and vinyl chloride. The contaminated groundwater under 825 Stewart Drive is as shallow as only 2.6 feet below the ground surface, with shallow TCE concentrations up to 1,400 µg/L and vinyl chloride up to 51 µg/L. [10]

49.    The Responsible Party under CERCLA, Northrop Grumman Corporation, conducted an initial vapor intrusion evaluation at Stewart 1 in 2003 and 2004, which indicated that TCE concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels, with results at 5.1 µg/m$^3$ and 5.2 µg/m$^3$ respectively.[11]  Indoor air pollution due to vapor intrusion worsened over time, and indoor air concentrations increased to 7.7 µg/m$^3$ in 2013, the "accelerated action level" for TCE in commercial buildings. [In 2024, the US EPA proposed a full ban on TCE as a whole substance in the United States, prohibiting it under the TSCA as an unreasonable danger to human health).

50.    In May 2015, Northrop Grumman installed a "sub-slab" ventilation system inside the building. (The "slab" refers to the concrete foundation, and "sub-slab" is under the "slab.") Northrop

---

[9] US EPA, Triple Site Profile – Background.
[10] AECOM and GES for Northrop Grumman, *2021 Annual Groundwater Monitoring Report* (March 17, 2022).
[11] Fifth Five Year at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA, March 17 2022.

Grumman installed a ventilation system (horizontal "collection pipes") beneath the slab foundation, which allows vapors to move laterally, and connected the collection pipes to vertical vent risers that vent to the roof to provide a preferred pathway for hazardous waste vapors "*that allow sub-slab contaminant vapors to discharge to the atmosphere.*" The risers vent to the rooftop via wind-powered turbines.

51.     Apple became a tenant in 2015. Apple's installation of a new HVAC system for the building in late 2015 included Apple sawing the sub-slab exhaust vent stacks on the main building roof down from three feet to one foot and then installing the HVAC system intakes in "*close proximity*" to the sub-slab vapor exhaust vents, "*without consideration for the function of the [sub-slab] system vents and their function.*"[12] The HVAC intakes for the area of the building where Gjovik worked were in "*the assumed sphere of influence*" of the vent exhaust, including the chemicals TCE and vinyl chloride.

52.     Apple's tampering with the exhaust stacks and indifference towards the exhaust's proximity to HVAC intakes resulted in a significant risk of re-entrainment of the hazardous waste vapors and gases into the HVAC system, and thus into the indoor air of the building where Gjovik and her coworkers would be exposed. Cal.Lab.C. § 5143(a)(1) and § 5143(c)(1) prohibit the exhaust of gas and vapor in a way that causes harmful exposure to employees. Cal.Lab.C. § 5154.1(e)(4)(d) requires that these types of stacks exhaust upward from at least seven feet above the highest portion of the roof. California Mechanical Code § 407.2.1 requires outdoor air intakes be placed at least 25 feet away from any "*exhaust outlets of ventilating systems… that may collect …. noxious fumes*." Apple constructed the HVAC intakes only ten feet away from the exhaust vents.

53.     In May 2015, Northrop Grumman's vapor intrusion testing at Stewart 1 reported

---

[12] AECOM for Northrop Grumman, Evaluation of Passive Sub-Slab Depressurization System, Former TRW Microwave Site, page 1 (April 15 2022).

indoor air pollution of TCE, 1,2-DCE, Toluene, Chloroform, Methylene Chloride, and Ethylbenzene.[13]  From December 2015 to January 2016, Apple managed and submitted a second vapor intrusion testing report to the US EPA.[14] Apple's December 2015 vapor intrusion testing results showed an increase in indoor air pollution and the sub-slab ventilation system compared to the May 2015 results.[15] The highest indoor air reading of TCE doubled between May and December 2015. In May 2015, it was 0.58 µg/m³, and the highest indoor air TCE reading in December 2015 was 1.2 µg/m³.[16] Apple's report also noted a "*noticeable increase*" of TCE, PCE, and chloroform in the sub-slab venting system, and high levels of toluene and ethylbenzene in the indoor air.[17] Apple moved employees in and never tested again.

54.     US EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the U.S. EPA must be notified, consulted, and oversee the repairs and subsequent evaluation that the repairs were successful. Similarly, there is a public land use covenant attached to the property and that runs with the land, which instructs that major issues with the engineering controls and vapor intrusion systems must be reported, and US EPA must be consulted on the next steps.

**THE MARCH 2021 EMAIL**

55.     On March 17, 2021, Apple announced to Gjovik and Powers' management team that it would test Stewart 1 for "vapor intrusion" but said nothing more. Gjovik informed her coworkers that their office was a Superfund site on March 17 2021, providing a link to the US EPA website for the site, and news articles referring to their office as a "*paved over environmental disaster zone*" [18]

---

[13] US EPA, TRW Microwave, Site Documents, Vapor Intrusion.
[14] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra.
[15] US EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[16] Id at pages 26-25.
[17] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg11.
[18] Alexis C. Madrigal, *Not Even Silicon Valley Escapes History*, The Atlantic (July 23 2013).

due to the "*massive amounts of trichloroethylene in the soil and groundwater from nearly 30 years of chip manufacturing.*"[19]

56.     Gjovik's manager, Powers, immediately forwarded Gjovik's email to Human Resources and West, complaining "*I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her.*" Powers gave Gjovik a 'warning' during their next 1:1 meeting and told her she is not allowed to talk about safety or toxic waste dumps with her coworkers. Things went downhill from there.

57.     On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around ARIA.[20] More victims and witnesses promptly came forward; some were also Apple employees. On April 5, 2021, Gjovik told West about the other victims, and West warned her she was "*kicking a hornet's nest.*" West asked Gjovik not to send information about Gjovik's chemical exposure at her apartment next to ARIA to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*"

58.     On April 5 2021, Gjovik notified the Director of Apple "AC Wellness" employee medical Centers and Clinical Engineering, that after her article was published, more people came forward from the apartments next to ARIA, reporting illness. "*Two are Apple employees. At least one went through AC Wellness, but no one could figure out what was wrong with them.*" Gjovik suggested Akhtar direct the clinic to "*screen local folks*" with unexplained symptoms that match solvent exposure.

59.     Gjovik emailed the U.S. EPA and CalEPA about the issues from September 2020 through April 2021; many Apple leaders knew she did so. Starting in early 2021, Gjovik also

---

[19] Beth Winegarner, *Silicon Valley's Toxic Past Haunts Sunnyvale Neighborhood*, KQED (June 15 2017).
[20] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26 2021)

contacted and met with local, state, and federal politicians about what occurred to her next to ARIA – and Apple was aware of this. For example, Gjovik met with Senator Bob Weickowski and his staff on April 7 2021. Gjovik also met with Assembly Member Lee's staff once and Mayor Lisa Gillmor several times. On April 7 2021, Gjovik told West about the meetings. On April 9 2021, Gjovik contacted the County District Attorney's office, talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes, and met with him on April 16 2021.

60.     Gjovik was also meeting with the California Department of Public Health's Environmental Health office where she was volunteering her time to assist in creating state-wide education resources for tenants and workers around chemical exposure from toxic waste dumps. Around this time Gjovik was also meeting with a prior Silicon Valley mayor who has been involved in advocated for clean up of Silicon Valley's toxic waste sites for decades. Gjovik shared his analysis of the testing and concerns about the clean-up of the property where Gjovik got sick with Mayor Gillmor and asked her for further investigation from the city.

61.     Gjovik explained to her team what vapor intrusion means, told them to take it seriously, and expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Gjovik added, *"The chemicals under [the Stewart 1 office], if in high enough quantities, can cause cancer."* Gjovik asked in her email for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Gjovik to discuss her concerns.

62.     Gjovik's coworkers thanked her for sharing this information and informing them about the site. Two of Gjovik's friends, a manager and senior manager at Apple, texted her, affirming her concerns were reasonable and appropriate. One called it "*a really important life-threatening situation,*" and another, after reviewing documentation for the site, questioned, "*Why is the building*

*still open*?" One of the managers noted: *"What is crazy is ... they say no daycare, no elder care, no residential, etc. So, it is fine & dandy for everyone else to get slowly poisoned?... So glad you are digging into this stuff for all of us."* Around this time, Gjovik also raised concerns about COVID-19 safety, wildfire smoke safety, Right to Know/Prop 65, and Apple's reporting/tracking of injuries.

63.    In late March 2021, Gjovik repeatedly raised concerns about the Superfund site to her supervisors. After reviewing hundreds of pages of documentation for the site, Gjovik advised Apple that Apple had been negligent, that the site was not safe, and she complained Apple seemed unwilling to comply with CERCLA and health/safety regulations. She said she now believed her fainting spell in 2019 in her office was due to vapor intrusion. She was also shocked and distressed to see the 'hot spot' for the building was her desk with 1,900 ug/m3 of TCE in the sub-slab ventilation system. Powers threatened her and ordered her to stop talking with her coworkers about her safety and environmental concerns. He said she must believe whatever EH&S tells her. West first claimed the poisonous gas was sealed under the floor but, after learning the floor was cracked, told Gjovik to quit Apple.

64.    Gjovik met with Apple EH&S on April 2 2021, May 17 2021, and July 7 2021. For some reason, Employee Relations, Jenna Waibel, was also there. Waibel refused to tell Gjovik why she was involved, as Powers had asked for Employee Relations assistance in trying to silence Gjovik about Gjovik's concerns.

65.    Gjovik asked questions about the status of the site and the rationale for certain design and monitoring decisions. Gjovik expressed that she was disappointed with some of the answers. EH&S (Michael Stieger) told her Apple Legal and EH&S intentionally do not tell employees if they work on Superfund site and admitted that Apple deliberately does not train workers about safety procedures related to toxic waste exposure from clean-up sites. Gjovik said that was both unsafe and unwise. Gjovik also complained that the prior testing used insufficient durations and methods, had

concerning results, there were known open risks for vapor intrusion vectors (such as 'compromised' sub-slab ports), and the land use covenant is outdated and requiring revision. Gjovik complained that Apple should have tested the indoor air more frequently than every six years.

66.     Gjovik also contacted the US EPA on April 22 2021, asking to consult with their manager for the site and emailed back and forth with the U.S. EPA CERCLA and public relations teams from April through August 2021, and Apple knew she was doing so.

67.     In response to Gjovik's concerns and escalations, Powers and Waibel issued gag orders against Gjovik. Waibel went so far as to provide Gjovik with a five-point balancing test if Gjovik wanted to make statements about Superfund sites or workplace safety to her coworkers and ultimately told Gjovik that there should be no discussions about workplace safety with her coworkers. In their final meeting about the site on July 7, 2021, Waibel and Steiger told Gjovik that Stweart 1 is safe because they say it is safe, they still have no plans to test the air now, and they will not answer any more of her questions about the site or workplace safety ever again.

68.     Waibel also responded by opening a non-consensual sexism investigation into Gjovik's bosses, where she did not investigate anything but told at least three leaders that Gjovik complained about them. She also harassed Gjovik's friends and bullied Gjovik to the extent that she repeatedly made Gjovik cry in front of her. Waibel also told Gjovik she had to submit an ADA accommodation request if she did not want to be exposed to the vapor intrusion, attempted to get Gjovik to release all of her medical requests to "Apple Inc.," and then suggested Apple get her an air purifier at her desk for the TCE.

69.     Gjovik complained to a senior ethics leader at Apple and their friend, Dr. Cohen, that what Apple was doing related to environmental compliance and employee chemical exposure was "*morally wrong*," and Apple was publicly misrepresenting their actual operations.

70.     Gjovik also complained to a friend in Lisa Jackson's Environmental lobbying team

about what was going on at her office and complained Apple's public statements seemed fraudulent, and her coworker agreed, saying: "*uhhh... I kind of feel the need to make sure Lisa is aware. I'm about to present a proposal to several execs on an Environmental Justice program and this kind of feels like not consistent with that.*"

71. On April 29 2021, Gjovik visited an occupational exposure doctor about her apparent chemical exposure in the apartments next to Apple's ARIA factory and at Stewart 1.[21] The UCSF visit notes summarized Gjovik's 2020 medical symptoms saying:

72. "She was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal bleeding, and swollen glands"…."there remains a concern about potential pathways for residential exposures, and the county and State environmental agencies should address these…. she also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues..."

### THE CRACKED SLAB

73. Apple EH&S and Employee Relations notified Gjovik on June 2 2021, that the foundation of Stewart 1 and they need to repair it, and then after, they will test the air. Gjovik told them they needed to notify the U.S. EPA, have the U.S. EPA oversee the repair and testing plan, and test the air before and after the repairs. (US EPA later confirmed this). Apple refused and told Gjovik they do not have to tell U.S. EPA anything; they will repair the floor but will not provide details on how/when, and now they may not test the indoor air. Gjovik reported Apple's failure to notify and consult with the U.S. EPA about the cracked slab to the U.S. EPA. Gjovik notified Apple that she

---

[21] Dr. Robert Harrison, MD – who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health.

was snitching on them to U.S. EPA.

74.     Gjovik complained about Waibel in May and June 2021 to no avail and then began meeting with Waibel's manager, Antonio Lagares, in mid-June 2021. Gjovik complained that Apple was acting insane, and if this is usually how Apple handles employee concerns, then Apple is lying to its employees and the public that it acts in good faith. Lagares agreed with Gjovik and said Apple's marketing makes "*his job harder*." Gjovik asked what type of issues his team would take seriously, and he responded when managers *"send pics of their junk."* Gjovik complained to Lagares that Waibel had already ruined her career at Apple, that she was already constructively terminated by West, that Powers was harassing her more than ever, and that he should have to investigate all of the terrible things Apple's done to her for nearly seven years.

75.     In July 2021, Gjovik discovered that West had been reassigning her best projects (things that would help her receive a positive review). Then Powers suddenly quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail). Powers was snapping at her and harassing her, West was ignoring her, and Gjovik reported these issues to Lagares and Waibel and the HR business partner Helen Polkes. Still, Apple did nothing, or they also harassed Gjovik. Gjovik became more vocal about her concerns about systemic retaliation and fraud at Apple on Apple's Slack discussion tool and also began threatening Lagares that she planned to sue Apple for what they've done to her and that she is also talking to the press (NYT) about Apple. This led Lagares to assign a new investigator (Ekelemchi Okpo) and open a new investigation into all of Gjovik's concerns going back to 2015.

76.     By late July 2021, Gjovik was openly complaining on Slack, to reporters, with coworkers, and now also on Twitter about Apple's terrible behavior (including intimidation, retaliation, cover-ups, and fraud). Gjovik complained about the Superfund and safety issues, Apple's offensive use of ADA accommodations, the persistent suggestion that she take FMLA leave in

response to their harassment, Apple's illegal NDAs and gag orders, and Apple's antagonistic and obstinate attitude towards legitimate and important concerns. Gjovik repeatedly told Lagares, Okpo, Waibel, and Polkes that she refused to take leave in response to retaliation and harassment; instead, they needed to fix the issues.

77.     Gjovik had still been lobbying legislatures about the need for additional safety protections for workers and tenants on toxic dump sites. A state Senator told Gjovik he would talk to CalEPA about her concerns. Gjovik checked with his office for a status update on that conversation. On July 16 2021, the Senator's Legislative Director wrote to Gjovik confirming and adding her concerns were shared even further, writing: "*I conveyed them myself on the Senator's behalf with the Govender's staff and leadership of both houses.*"

78.     On July 23 2021, Gjovik was quoted by the New York Times, where she criticized Apple's COVID-19 response. On July 24, 2021, New York Times made Gjovik's quote "*Quotation of the Day*" for the entire NYT.[22] Lagares expressed to Gjovik that Apple was upset that Gjovik did this. Gjovik told Lagares she was taking Labor Law and learned she could speak about her work conditions regardless of NDAs. Lagares told her it is "*annoying*" to Apple when employees "*figure that out.*"

79.     On July 26 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns was to retaliate against her and intimidate her into silence. Gjovik asked if anyone else had been retaliated against for raising concerns. Many of Gjovik's coworkers responded that they had also experienced retaliation from Apple for raising real and reasonable concerns. Okpo then swiftly interrogated Gjovik for over an hour about her Slack posts and the responses she received from coworkers – repeatedly asking her to stop posting about her concerns

---

[22] Ashley Gjovik, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans,*" New York Times, July 24 2021.

and to stop encouraging other employees to post their concerns, and instead to direct all employees to speak privately. Gjovik told him no. she would not help him retaliate against her coworkers.

80.    Apple and Northrop Grumman were notified on July 26 2021 that US EPA was demanding an inspection of Stewart 1 due to Gjovik's reports about the cracked slab and Apple's obstinate and obstructive response; and because US EPA discovered what Apple did with the hacksaw, vents, and HVAC on the roof of Stewart 1 in 2015, with the US EPA QA team exclaiming it was "*not appropriate*" and asking for air samples.

81.    On July 27 2021, a non-profit organization asked Gjovik to testify as a witness to state Senator Dave Cortese about her experience with hazardous waste clean-up sites in Santa Clara County, and Gjovik accepted.

82.    On July 28 2021, Gjovik emailed Okpo and Lagares about her discussions with coworkers, and she discovered a pattern of discrimination and harassment issues across Apple; and what appeared to be systemic cover-ups of those issues instead of actually resolving the problems. She complained Apple fraudulently holds itself out publicly as caring about human rights and the law. It was clear to Gjovik that Okpo would not investigate in good faith and Apple was still trying to get her to quit or else would fire her, and she began fervently complaining about their bad faith behavior and culture of  intimidation.

83.    Apple said they may give Gjovik a severance package of around $600,000 if Gjovik would sign a preemptive litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm Apple caused to Gjovik through chemical exposure at her office and her apartment. Gjovik expressed concerns about the settlement amount and her potential medical costs if she were to get cancer from the exposure at her office, not even yet knowing about the ARIA facility  or what Apple did to the HVAC at Stewart 1. Apple wanted

all claims waived and denied the severance on those conditions, violating California law. [Cal. Gov't Code § 12964.5(a)].

84.     A few days before Apple forced her on leave, Gjovik discovered that one of the only two women who ever reported to West at Apple had quit Apple due to the harassment she faced. Gjovik complained to Powers and Powers told her this was a secret and not to tell anyone.

85.     On July 30 2021, Gjovik posted on Twitter complaining about Apple. "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions*."

86.     After posting this, ex-Apple employees contacted Gjovik to share they had similar experiences. Other Big Tech and ex-Apple employees supported Gjovik for speaking out, sending her many encouraging and grateful messages and comments. Gjovik then decided to start sharing more of what was happening between her and Apple on social media to help others understand the issues so they could advocate for the employees, hoping it may pressure Apple to act more reasonably.

87.     On July 30 2021, Gjovik posted on Apple's Slack discussion  tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups. Around this time, Gjovik created a new, private Slack group for her coworkers to discuss concerns about Apple retaliating against them for raising concerns, but with more privacy due to fear of more retaliation. Many women asked to join the group, and they had just started a discussion.

88.     On August 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything Waibel said was fine during the first (sham) investigation – Gjovik proceeded to start posting on Twitter about several of the more minor things she complained to Waibel about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no problems, so she is free to talk about it and she would do so. Gjovik posted several examples of the evidence on

Twitter, and her posts quickly went viral.

89.     In response, on August 2 2021, Apple suddenly announced they were conducting extensive maintenance at Stewart 1 starting on August 4 2021. Then, on August 3 2021, Lisa Jackson's team scheduled a Public Relations blitz about how safe and thoughtful Apple is, actually. [23] Apple also attempted to make the US EPA sign a four-page single-spaced NDA about the inspection of Stewart 1 that would prohibit the US EPA from speaking about the inspection. The US EPA declined to sign the NDA.

90.     When Gjovik saw Apple's EH&S notice on August 2 2021 about maintenance at Stewart 1, she quickly arranged for coworkers in the office to gather evidence of the cracks, warning them that Apple was trying to cover up environmental and safety issues. Gjovik's coworkers gathered photos of the cracks for Gjovik on August 3 2021 and the morning of August 4 2021. They also asked many of the same questions Gjovik had asked EH&S. Gjovik shared EH&S's responses, and they were concerned about Apple's position and conduct. Gjovik informed Apple she and her coworkers were gathering evidence before Apple could cover up the cracks.

## REMOVED FROM THE WORKPLACE

91.     On August 4 2021, Okpo immediately forced Gjovik on indefinite administrative leave and refused to provide any ETA for the next steps. Okpo informed her Apple removed her "*from the workplace and all workplace interactions*." Gjovik was very upset and protested, arguing she just wanted to stop interactions with West and Powers while Okpo investigated because of the work assignment changes and harassment. Gjovik also complained that it was illegal for them to tell her to stop talking to her coworkers. Okpo made it clear he also wanted her off Slack. Gjovik told Okpo he could not keep her off Twitter. Gjovik set her out of the office to say Apple put her on indefinite administrative leave and told her to stay off Slack. She also posted a message on Slack about it.

---

[23] FOIA; Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice.*

92. On August 4 2021, a reporter at The Verge contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik had posted. The reporter wanted to write an article about what Apple did to Gjovik. Gjovik agreed to let her write an article about Gjovik being put on leave. Gjovik also posted on Twitter about it herself first, and other press picked up the story.[24]  Within hours, it was covered in the news worldwide. Okpo sent her several bitter emails about her continuing to speak out, and he was clearly reading the news articles and her Twitter posts complaining about Apple's conduct.

93. Apple responded to the media by repeating the same statement over and over: "*We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and thoroughly investigate whenever a concern is raised; out of respect for the privacy of any individuals involved, we do not discuss specific employee matters.*"

94. Starting on August 4 2021, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. On August 4 2021, one account posted about Gjovik, that she: "*needs psychiatric help and confinement*" and that Gjovik "*is a psychopath and frankly is a danger to other Apple Employees*!" The account went on to call Gjovik an "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this.*" Thousands of posts like this followed and continue to this day – causing Gjovik severe distress.

95. The night after Gjovik was stuck on leave, West suddenly scheduled meetings with Gjovik's women's group. Gjovik also heard conversations within her team that confirmed she would be fired soon. Starting around August 5 2021, the managers in West's organization started raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers told the workers that if anyone

---

[24] The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave*," Aug 5 2021; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" Aug 5 2021; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues.*"

has concerns about the "*Ashley Issue,*" they should talk to Helen Polkes. They also mentioned West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands meeting. Gjovik realized they would not be discussing the "*Ashley Issue*" at a future all-hands meeting if she was there, and West was already sure Gjovik was about to be fired.

96. Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29; and September 3, 4, 5 2021. When the US EPA inspected, they noted "*freshly sealed cracks.*"

97. On August 9 2021, the US EPA sent travel approval requests to visit Gjovik's office, and the justification for the visit cited Gjovik's disclosures. The US EPA's justification for the inspection was: "*A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system and the protectiveness of human health.*"

98. On August 12 2021 and August 13 2021, Gjovik filed complaints with US EEOC and California DFEH. In August, Gjovik also shared concerns on social media and with the press, including experiences with her team in 2015, what Apple did to her around Batterygate and related harassment, and her concerns about Apple's long history of criminal and corrupt behavior. On August 17, 2021, Business Insider published an article about some of Gjovik's complaints based on Gjovik's Twitter posts and embedded Gjovik's Twitter posts in the article.[25] The article also noted: "*Insider approached Apple for comment.*"

---

[25] Business Insider, *An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit,* (August 17 2021).

99.     On August 15 2021, Gjovik posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, and Mayors about her chemical exposure.

100.    Between August 16 2021 through August 23 2021, Okpo sent a first draft of an "Issue Confirmation" document that supposedly captured all of Gjovik's complaints that he was investigating, and Gjovik revised it and sent him a final revised version on August 23 2021.

101.    Starting August 17 2021, Gjovik insisted that all communication with Okpo and Apple be in writing because he repeatedly misrepresented her statements. Okpo ignored her.

102.    On August 19 2021, the US EPA conducted an onsite inspection of Gjovik's Apple office due to Gjovik's complaints to the US EPA. US EPA's notes from the August 19 2021 site visit and inspection included concerns and issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, and lack of documentation for slab/crack inspections.

103.    Gjovik had previously registered for a three-part training about racial justice with Apple University and wanted to attend. The class was led by her friend Dr. Cohen, and he confirmed he was happy to have her attend as long as Employee Relations approved and did not discipline her for attending. On August 20, 2021, Gjovik asked Okpo if she could attend, and Okpo said she could not participate "*because she's on leave*." Gjovik complained about retaliation.

104.    While Gjovik was stuck on leave, she repeatedly asked Okpo for updates about her office, but he refused to provide any updates. Gjovik often complained about retaliation and that she did not want to be on leave, but Okpo ignored her.

105.    Gjovik also filed a Business Conduct complaint about her concerns about Ronald Sugar, TRW Microwave, and her office. She attached the Issue Confirmation and notified Okpo of the ticket. Gjovik's 33-page version of the Issue Confirmation included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest, racketeering, and environmental crimes.

106.    On August 23 2021, U.S. EPA CERCLA Quality Assurance submitted notes: "*Significant, visible slab cracks, gaps, and penetrations had been sealed… However, large test equipment is bolted to the slab, and it is unclear if these installations penetrate the slab*." He added that related to the sub-slab exhaust on the roof above Gjovik's desk, "*vapors could be building up on the roof near the HVAC intake*."

107.    On August 23 2021, a news article discussing Apple's employment practices commented that: "*One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave.*"

108.    On August 26 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so. On August 27 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. The message posted said: "*…we have shared them with the appropriate internal teams for review and investigation,*" with the ticket updated to say, "*Request is closed. This request is closed and can't be reopened.*"

109.    On August 29 2021, Gjovik filed a formal complaint to the U.S. EPA about Apple and her office at Stewart 1, complaining of Apple's "lack of due diligence," complaining about "negligence," and "*recklessness,*" and "*violations of Right to Know & OSHA.*" Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site.*" Gjovik did not know about the US EPA safety inspection ten days prior.

110.    On Sunday, August 29 2021, at 11:32 AM PST, Gjovik filed a Whistleblower Protection Program complaint with the US Department of Labor, reference number ECN76833. On August 29 2021, Gjovik filed retaliation and labor code violation charges to the California Department

of Labor. (This lawsuit replaced the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830). On September 1 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor. A question on the form asked: How did your employer know about the protected right you exercised? Gjovik wrote, *"I kept saying, 'Stop it, you guys. There's Labor laws about this.*"

111.    While Gjovik was stuck on leave, Apple had emailed her three times to ask if they may capture three-dimensional scans of her ears and ear canals, and Gjovik complained that Apple's requests were harassing and invasive.

112.    Gjovik complained that Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal examinations. Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to speak about it even to a doctor or attorney (as was expressly written in one Deed Poll). Gjovik felt the studies themselves were wrong, but also Apple's practices were also wrong related to demanding employee secrecy about the studies.

113.    Around August 30 2021 and August 31 2021, Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple.*" [26] In Gjovik's posts, she complained of Apple's surveillance of workers, its exploitation of workers, and Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon. The article discussed several examples of Apple's invasions of employee privacy, brought forward from Apple employees who wanted assistance from the public in reforming Apple's

---

[26]   The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

practices. In the article, Gjovik complained about the Gobbler app and was quoted saying "*If they did this to a customer, people would lose their goddamn minds.*"

114.    On August 31 2021, at 7:16 AM PST, the U.S. Department of Labor contacted Gjovik to start intake for Gjovik's Whistleblower Retaliation charges. Gjovik had her interview with the U.S. EEOC on September 2, 2021. Gjovik did not request an investigation but did request a Right to Sue letter, which she received on 9, 2021, before her termination. Apple was made aware of Gjovik's U.S. EEOC and Cal. DFEH complained that she was testifying to U.S. EEOC and Cal. DFEH about what Apple did to her by at least August 12, 2021. Gjovik Tweeted about her appointment with the U.S. EEOC.

115.    Around September 2 2021, numerous articles were published about Gjovik's charges against Apple. Bloomberg reported about Gjovik's U.S. NLRB, U.S. Dept. of Labor, Cal. Dept. of Labor, and U.S. EEOC charges against Apple. Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation, and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing her concerns. *"I should be able to raise concerns about safety and public policy," s*he said in an interview Thursday. Gjovik has also filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office, and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. *"I want to pierce the veil of intimidation and secrecy,"* she said in the interview. "*The employees are terrified to speak up about their concerns.*" [27]

On September 2, 2021, Financial Times wrote about Gjovik:

> "Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "*chemical exposure*" at her Apple office in Sunnyvale, California, where more than 100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "*TRW Microwave Superfund site,*" a location requiring special oversight owing to previous contamination by

---

[27] Nick Turner, Apple Worker Complaints Reviewed by Labor Relations Board, Bloomberg, Sept 2 2021.

hazardous waste materials in the soil and groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at their Cupertino headquarters and Sunnyvale facilities. Gjovik said her concerns were brushed aside and she was warned against speaking up about them. In her letter to the NLRB, she said Apple's employee relations department *"intimidated me not to speak about my safety concerns,"* that a manager advised that she quit Apple and was subject to sexism and a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave."[28]

116.     The press continued to cover what Apple was doing to Gjovik and a movement starting among Apple employees who began speaking out and organizing with each other around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this too, and Gjovik posted about it repeatedly on Twitter. Gjovik was not only a catalyst for many employees to come forward, but these employees catalyzed Gjovik's view and protest of Apple's misconduct.

117.     On September 3 2021, Gjovik filed complaints with the U.S. FDA Office of Criminal Investigations and U.S. DOJ National Center for Disaster Fraud about Apple's apparent attempt to "skip the line" on COVID-19 vaccines and hoard the vaccines.[29] On September 3 and 6, 2021, she posted on Twitter about filing the complaints.

118.     On September 3 2021, Gjovik told the FBI about Apple's involvement in concealing possible sanctions violations and smuggling. In the webform field for "crime", she wrote: *"Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup."* Gjovik posted on Twitter that she had reported the matter to the FBI.

---

[28] Patrick McGee, *US labour board examines retaliation claims against Apple*, Financial Times, Sept. 2 2021, https://www.ft.com/content/484fa8be-925e-495c-91ff-54950b112754
[29] US DOJ, NCDF, COVID-19 Hoarding and Price Gouging Task Force.

119.     On September 3 2021, Gjovik signed a contract with Business Insider to write an Op-ed about her situation with Apple and proposals on how Apple can address its systemic issues. Gjovik modeled her article and proposals after what she had been learning about Transitional Justice at Oxford. (Gjovik received perfect grades in the 2021 Oxford program, and Gjovik's faculty advisor for the program would later be selected to become a member of the U.S. Chemical Safety and Hazard Investigation Board in 2023).

120.     Okpo contacted Gjovik again on September 3 2021 and September 7 2021, asking to meet with her on Webex; implicitly denying her request to keep things in writing; and refusing to tell her what the meeting was about. Both times Gjovik asked Okpo to keep things in writing due to the misrepresentation and intimidation. If he refused, she requested a Business Conduct review of his decision, noting he's a lawyer and there is a power imbalance. Okpo never responded.

121.     On September 6 2021, Gjovik posted on social media about her U.S. NLRB, Cal. Dept. of Labor, and U.S. EEOC/Cal.DFEH cases with a status update and the report numbers – and also tweeted about her U.S. SEC whistleblower tip, U.S. FBI, and U.S. Department of Justice complaints. On September 6 2021, Gjovik replied to the U.S. EEOC confirming she was working on a draft of her complaint and was targeting to submit it to them by September 8 2021. On September 8, 2021, Gjovik emailed the U.S. EEOC her draft of the language for her charge.

122.     On September 7 2021, a few days before her termination, Gjovik discovered the second woman to ever report to West had sued Apple over West's retaliation, constructive termination in violation of public policy, and IIED only two years prior. The ex-colleague's complaint explained she witnessed retaliation and intimidation in West's organization, that West spoke openly about his employee's fear of retaliation, and after she raised concerns to West about this, West began retaliating against her too. The complaint alleged there were three sham Employee Relations investigations into her concerns, finding no policy violations related to West's conduct. Employee Relations put her on

administrative leave, waited a few weeks, and then told her she can either accept two months of severance and sign a release of rights to pursue legal action against Apple, or she can return to work as things are except that West will be even more angry at her now. The coworker resigned and filed suit instead. Apple settled shortly after.[30]   Gjovik posted on Twitter about it, expressing her displeasure.

123.     On September 8 2021, Gjovik replied to the US Department of Labor with copies of her prior filed complaints to the U.S. EEOC, U.S. NLRB, U.S. EPA, Cal. EPA, and U.S. SEC. Gjovik noted she was working on answering the investigator's questions and would reply by the deadline, which was September 10 2021. On September 9 2021, at 12:39 PM PST, Gjovik emailed the U.S. EEOC investigator assigned to her case and asked the investigator if she needed anything else from Gjovik to move forward. Then again, at 1:02 PM, asking US EEOC how she could sign the charge to meet the deadline.

### WORKPLACE VIOLENCED

124.     On September 9 2021, at 2:08 PM PST, Gjovik was contacted by Aleks Kagramanov, an Apple "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour.*" The email had no subject line, and Gjovik had never heard of the team. Kagramanov said he was "*looking into a sensitive IP matter*" and wanted to speak with Gjovik. He said Apple "*sincerely appreciate [her] prioritizing this call and being flexible.*" He never said Gjovik was under investigation.

125.     Gjovik was sure she was about to be fired, but two minutes later, Gjovik promptly responded at 2:10 PM PST, saying she was willing to participate but wanted a written record of their conversations. She said she will respond as quickly as she can. Kagramanov did not respond, so

---

[30] *Brown v Apple Inc*, Case No. 18CV330922, Superior Court of the State of California, County of Santa Clara, Complaint (July 2 2018).

Gjovik replied again. Gjovik responded again at 2:27 PM PST, complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator. Gjovik posted on Twitter complaining of witness intimidation and fear of violence from Apple.[31]

126.    Cal.Lab.C. § 6401.9 defines "workplace violence" as the threat or use of physical force, including incidents involving guns and dangerous weapons. There was no legitimate explanation why this team was contacting Gjovik.

127.    Gjovik opined about it on Twitter while she waited for Kagramanov's response, posting at 2:34 PM: "*...so does he investigate the threats & violence, or is he the one that provides that as a service?*"

128.    Kagramanov replied to Gjovik's email at 2:50 PM, now saying: "*We are investigating allegations that you improperly disclosed Apple confidential information.*" Kagramanov then also claimed Gjovik refused to "*participate*" in his farcical investigation and announced he was suspending all of Gjovik's Apple account access. He never shared with Gjovik that he was apparently partnering with an Apple lawyer who assumably would have been waiting on the call/Webex to speak with Gjovik along with Kagramanov. The specific lawyer was previously a New York state criminal Asst. District Attorney in Manhattan prior to joining Apple a few years prior. It's unclear what their plan was if Gjovik was to agree to speak with them.

129.    Gjovik responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate. "*As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.*" Gjovik added: "*I offered to help via email to ensure we have a documented [record] of our*

---

[31] "*Hey #Apple, 'This feels a little like witness intimidation. I let @NLRB know.' Love, Ashley. Clutches panic button & Mace while still laying on the floor pondering the brutality of U.S. capitalism.*" -- @ashleygjovik (September 9 2021 2:33 PM).

*conversations considering everything that's currently going on with my investigation and my complaints to the government… I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good-faith attempt at that."*

130.     Gjovik added in her 3:07 PM email reply to Kagramanov: "*In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation, and I will consider it as such*." Gjovik still did not know what she was supposedly accused of.

131.     On September 9 2021 at 4:24 PM PST, the U.S. EEOC investigator emailed Gjovik, saying she posted the final version of the charge and asked Gjovik to sign the charge. On September 9 2021, at 4:27 PM PST, Gjovik digitally signed her U.S. EEOC charge against Apple. Then, at 4:47 PM PST, Gjovik emailed the U.S. Department of Labor with responses to their questions about her protected activity and Apple's retaliation. Gjovik replied again at 5:26 PM PST, informing them Apple's Workplace Violence interrogator had just suspended her account access and threatened her.

132.     On September 9 2021, at 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, and West's close friend, emailed Gjovik with the subject line "*Your employment status*" and an attached letter saying she was terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking and said she "*failed to cooperate and to provide accurate and complete information during the Apple investigatory process."*

133.     Six days later, on September 15 2021, at 7:40 PM PST, Apple's lawyers at O'Melveny & Myers, via Partner David R. Eberhart emailed Gjovik a letter implying Apple terminated her due to her complaining about Apple asking to 3-D scan her ear canals and also because she posted some of the surveillance photos Apple secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app. Gjovik told Eberhart that none of that was confidential and that she had the right to protest and discuss it. Eberhart threatened her and demanded

she delete several Twitter posts but never cited any legal authority (because there's none). A lawyer

responded to Eberhart more formally a couple of weeks later, on Gjovik's behalf, warning him about

Rule 11 sanctions if he attempted to pursue the matter in court as his claims have no basis in fact or

law. Eberhart never responded.

134.    On September 10 2021, Gjovik testified to U.S. NLRB for her first affidavit. On

September 14 2021, Gjovik had the second part of her NLRB affidavit. She posted about it on Twitter.

135.    On December 13, 2021, US DOL docketed Gjovik's SOX, CERCLA, and OSH Act

cases. A Financial Times article was published on December 13, 2021, which said:

> "The labour department will examine whether Apple retaliated over claims about
> occupational safety and hazardous waste management liability, alongside a third allegation
> that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record
> keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member
> Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop
> Grumman, the defense company responsible for the dump — and maintenance — of waste
> materials beneath the Sunnyvale office. Sugar could not be immediately reached for
> comment. "Gjovik's case was "especially unusual" and noteworthy because of the three
> separate statutes or laws that may have been broken, said Michael Duff, a former attorney at
> the National Relations Labor Board. "Federal agencies exercise what in the context of
> criminal law is known as prosecutorial discretion," he said. "They are very careful of what
> cases they move forward because they have scarce resources, so they must have a strong
> reason to believe they can prevail."[32]

136.    On September 21 2021, Tim Cook emailed his staff complaining that someone had

spoken publicly to reporters about work conditions. Cook said Apple's "doing *everything in our*

*power to identify those who leaked.*" Cook said, "*People who leak confidential information do not*

*belong here.*"[33]

137.    After Apple fired Gjovik, Gjovik filed additional U.S. NLRB and Cal. Dept. of Labor

---

[32] Financial Times, "*Apple faces probe over whether it retaliated against whistleblower,*" Dec. 13 2021.
[33] Macworld, "*Apple's war against leakers is really a battle against the people that matter most,*" Feb. 7 2023.
("…*people who leak confidential information do not belong here*. / Tattooed on Tim Cook's right bicep: 'Loose
lips…' And on his left: '…pink slips.')

charges about Cook's email, and Apple's NDAs and other employment policies, charging they violate labor laws – and the U.S. NLRB agreed with Gjovik, issuing a Decision of Merit on her charges against Apple in January 2023. [34]

### THREATS, INTIMIDATION, COERCION, HARASSMENT

138.    From at least July 2021 through current day – Apple employees stalked, harassed, and tormented Gjovik with actions including repetitive, unwanted communications to Gjovik; making false accusations against Gjovik; mailing Gjovik menacing packages; physically surveilling Gjovik; gathering information about Gjovik; monitoring Gjovik's activities; harassing Gjovik's friends; using threats and scare tactics to frighten Gjovik; publicizing Gjovik's private information; and encouraging others to harass Gjovik.

139.    Starting in August 2021 and continuing to this day, hundreds of 'throwaways and fake social media accounts posted about and to Gjovik, making statements that were harassing, threatening, intimidating, defamatory, insulting, and harassing. There was an extensive digital harassment campaign against Gjovik. Apple employees harassed Gjovik under their own names, and other posts were made by Apple employees using aliases, but their real identities were later revealed. Further, starting in at least September 2021, and assumed to continue through the current day, Apple employees undertook a 'whisper campaign' to smear Gjovik's character and create fear, uncertainty, and doubt about Gjovik's allegations against Apple.

140.    Additional intimidation and coercion included, but was not limited to, aggressive surveillance (including lurking Private Investigators in Santa Clara, San Francisco, and Albany, NY), bugging her chattel property (the statue Apple mailed Gjovik from her desk; Gjovik's fig tree, etc.), whatever Apple installed in her attic (photos show cables/cords laid in away landlord denied was

---

[34] Amanda Silberling, *Labor officials found that Apple execs infringed on workers' rights,* TechCrunch, January 30 2023.

them), breaking into her apartment (at least twice in 2021 and 2022), breaking into adjacent apartments (at least once in 2021), lurking outside her home, stalking her, blocked calls (September 12, 2021), reports of Gjovik to law enforcement, lurking sedans and SUVs with dark windows, social accounts making threatening, harassing, and intimidating statements to Gjovik, and someone handling her dog during one of the break-ins (August 2022).

141.    On December 14 2021, the U.S. Dept. of Justice contacted Gjovik, confirming receipt of a complaint she sent to their antitrust division earlier. On December 26 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank and witness retaliation claim against Apple. On or around January 10 2022, Gjovik filed complaints about witness intimidation and witness retaliation to U.S. NLRB, the U.S. Dept. of Labor, and the Cal. Dept. of Labor. Gjovik drafted several legal documents, including a legal brief, image exhibits, and a detailed dossier containing the accounts and posts Gjovik believed to be Apple.

142.    On January 25 2022, Gjovik emailed the U.S. NLRB about her January 10, 2022, witness intimidation charge and attached a 77-page rough draft of the Evidence Report. On January 31 2022, Gjovik posted on Twitter that she planned to submit her legal filings about witness intimidation to the US Department of Justice and the whistleblower and labor agencies. Gjovik commented that Apple's actions were criminal.

143.    Gjovik testified to the U.S. NLRB about it on February 10, 2022. Gjovik also contacted the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on February 21 2022, and December 15 2022.

144.    On July 14 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with inaccurate information. Gjovik won her unemployment insurance appeal, and a decision was issued by an Administrative Law Judge stating:

Gjovik "received notice from the vice president that she was being discharged. The notice

was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Before the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times, the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[35]

145.    On May 20 2022, the US EPA sent a letter to Northrop Grumman about Stewart 1, instructing that: "*EPA requires that one round of indoor air samples be collected... under current conditions*."[36] The letter included an attached memo from the US EPA's Quality Assurance branch instructing Northrop Grumman (and Apple) that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been modified in a manner that could compromise the system; evaluation of changes to building use*," in addition to also inspection roof components.[37]

146.    On May 27, 2022, the US EPA finally admitted to Gjovik, that there had been an inspection at her office on August 19, 2021 – Apple had been able to conceal it from Gjovik for nearly a year. On July 28 2022, Northrop Grumman told the US EPA they were late in responding to the US EPA's questions because Apple and the building owner stopped responding to them for weeks.

147.    In 2022, there was discussion with the US Representative's office about bringing Gjovik's situation with Apple related to environmental violations to a US House Sub-Committee the US Representative chaired. On December 30, 2022, the U.S. FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans and provided Gjovik with a report tracking

---

[35] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022.
[36] US EPA, Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088) (May 20 2022).
[37] US EPA, Passive Sub Slab Depressurization (SSD) System Operation and Maintenance (April 25 2022).

number. Gjovik notified U.S. FTC in 2023 that she was taking the matter on herself in this lawsuit.

148.    On January 20 2023, US EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over seven years. On August 31, 2023, the US EPA published a brief letter responding to Apple's May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since December 2015, calling Apple's testing report and strategy "*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," and "*misleading*."[38]

### SURPRISE SEMICONDUCTOR FABRICATION

149.    On February 21 2023, Gjovik discovered the semiconductor fabrication activities at ARIA. Gjovik posted on Twitter in real-time as she learned about it, expressing severe distress.[39] Until that day, Gjovik did not know it was Apple who was responsible for making her so ill in 2020. Further, until that day, Gjovik did not know the chemicals she was exposed to in 2020 were potentially lethal to human life.

150.    Gjovik began researching the site and Apple's activities, with the findings making Gjovik feel compelled to file a formal complaint about Apple's illegal conduct at ARIA. On June 23 2023, Gjovik filed complaints about ARIA to the US EPA, CalEPA, the city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with dozens of exhibits. Gjovik also posted on Twitter that she did so and provided a public link.

151.    The US EPA responded and took the lead on an investigation. Gjovik met with the US EPA's RCRA Enforcement & Compliance team several times before they then inspected Apple's factory in August 2023 and January 2024. The August 17, 2023 inspection was coded as an RCRA

---

[38] US EPA, TRW Microwave Site, Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023.
[39] "APPLE IS DOING LITERAL ACTUAL GODDAMN SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT SHIT INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." - @ashleygjovik (Feb. 21 2023 11:29 PM).

"*Compliance Evaluation Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all applicable RCRA Regulations and Permits.*"[40] The January 16, 2024 inspection was coded as a "*Focused Compliance Inspection.*"[41] Gjovik is still awaiting a report on the results. The US EPA notified her they finalized the report but are currently unable to share it with her as Apple apparently declared the report of their (assumed) numerous environmental violations is *Apple Confidential.* Gjovik has a pending FOIA request as well.

## VII.   LEGAL CLAIMS

152.   Gjovik hereby incorporates by reference each and every allegation and fact above and below, into each section where that allegation and/or facts is required to support the claim at issue. Some facts and allegations are not repeated in order to meet page limits.

153.   Where any statute of limitations is in question of possibly being expired for an alleged claim, Gjovik, where reasonable, will argue that the statute of limitations should be tolled due to Apple's fraudulent concealment of numerous material facts. Gjovik will also argue, where applicable, the doctrine of continuing violations, equitable tolling, and the discovery rule.

### COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (California *Tamney* tort claim)

154.   Apple retaliated against Gjovik and discharged Gjovik's employment for a variety of reasons that violated public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace.*" Certain concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5, 1102.5, and 6310. The following sub-claims are included in addition:

### i.   Illegal Data Harvesting [Cal. Const. Article I, Section 1; FTC Act]

---

[40] US Environmental Protection Agency, RCRA, Evaluation Types.
[41] US Environmental Protection Agency, ECHO, 3250 Scott Blvd # 110001168254.

155.    Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Article I Section 1 of the CALIFORNIA CONSTITUTION; the CALIFORNIA PRIVACY RIGHTS ACT; the U.S. FTC ACT; Cal.Pen.C. § 637.7, and the INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS: Article VII on Free Consent.

156.    Apple's supposedly legitimate reason for terminating Gjovik, while false and pretextual, is an illegality itself. Apple claims it fired Gjovik for complaining about Apple's surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to her constitutional and statutory right to privacy, which are rights that benefit the public, are substantial and fundamental rights, and which were firmly established at the time of discharge. Apple's decision to use this as their excuse for terminating Gjovik reveals Apple's animus against California employees' privacy rights.

157.    Apple also intruded into Gjovik's seclusion, physically and constructively invading Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor Code § 435. The Gobbler app did take videos and photos of Gjovik in the bathroom and Gjovik has copies of those images.

158.    Apple's use of Gobbler on Gjovik's phone also forced Gjovik to participate in Apple's unlawful acts by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometric information of the public without their knowledge or consent. Apple's termination of Gjovik also stated that if Apple were to warn people what was occurring on her phone, she would be fired. Therefore, Apple's unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for their highly sensitive biometrics.

159.    Apple also violated Section 5 of the FTC Act in unlawfully coercing employees to

provide personal and sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable, and misleading statements to consumers.[42] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them. (This sub-claim is connected to the Cal. B&P Code § 17200 *et seq.* claim).

### ii. Employment Discrimination [Cal. DFEH; U.S. EEOC]

160. Gjovik reported and testified about topics including complaints about sex, gender, and disability discrimination, which are "fundamental" rights for the purpose of a *Tamney* claim. Gjovik filed Cal. DFEH and U.S. EEOC claims on August 12 2021, and proceeded to testify and provide evidence, requesting a Right to Sue letter, which she was granted on September 9 2021, just hours before Apple fired her.

161. Apple retaliated against Gjovik for opposing Apple's discriminatory practices. Gjovik also reported to U.S. NLRB and the U.S. Department of Justice Civil Rights before her termination. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

### iii. Crime Victim/Witness Discrimination [Cal. Labor Code § 230(e)]

162. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge [Cal. Lab. Code §

---

[42] US FTC, FTC Act Section 5: Unfair or Deceptive Acts or Practices, Consumer Compliance Handbook

230(e)]. Gjovik was a "*victim of a crime that caused physical injury*" and she suffered "*physical, psychological, and financial harm due to the attempted commissions of a crime or delinquent act.*"

### iv.    Legislative Witness Discrimination [Cal. Gov. Code § 9414]

163.    Apple knew Gjovik was talking to legislatures about what occurred to her next to ARIA, and Apple knew that it was Apple who was responsible for Gjovik's harm, despite Gjovik not knowing that fact yet. Apple knew Gjovik may testify at legislative committees about the air pollution caused by Apple. Apple undertook an effort to ensure Gjovik did not testify and to harass Gjovik because Gjovik may testify to a committee.

164.    Apple also knew Gjovik was talking to elected officials about its retaliation against Gjovik after her termination, including a State Senator, a US Representative, and a US Senator. It is enough to establish a nexus that Apple had reason to think Gjovik planned to be a witness for an agency or committee. It is also illegal under California Penal code to intimidate witnesses, or to threaten witnesses before and/or after testimony. [Cal Penal Code 140(a) 137(b) 136.1].

165.    Further, Apple's also violated Cal. Gov. Code § 9414 (a misdemeanor public offense) by harassing and retaliating against Gjovik, by attempting to prevent and dissuade Gjovik's testimony for a proceeding, and by depriving, threatening, and attempting to deprive or requesting Gjovik not be employed due to Gjovik being a witness for a committee, and giving testimony to a committee as a witness or victim.

### COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION ACT
### (Violation of Cal.Lab.C. § 1102.5)

166.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity in disclosing information to a governmental or law enforcement agency, to a person with authority over the employee, or to another

employee who has authority to investigate, discover or correct the violation; or providing information to or testifying before, any public body conducting an investigation, hearing, or inquiry.

167.   Cal.Lab.C. § 1102.5 also covers Gjovik's' public disclosures as due to Apple's extreme power and control over the government agencies who are supposed to be able to regulate it, often the only party in a position to force Apple to correct the issue is the public. Many of Gjovik's public statements in August and September 2021, and statements to coworkers in June and July 2021, all before her termination, noted that was why Gjovik was bringing her complaints forward to her coworkers and the public – so the public pressure may force Apple to do the right thing for once. At the very least, Apple was monitoring Gjovik's social media activity and articles, so Apple was informed of her disclosures through that surveillance.

168.   Gjovik filed several complaints under multiple laws, which were known to Apple executives, bosses, and administrators (by Gjovik informing them directly, or by Gjovik speaking about them publicly on social media and the press, or by Apple's surveillance of Gjovik before her termination.

−Violations of CERCLA and implementing contracts
    a) Made complaints to Apple about reporting requirements. Then notification to Apple that complaints were filed to the government.
    b) Filed complaints to the US EPA and CalEPA. Complaints to US EPA trigged a proceeding with an inspection and corrective actions due to Gjovik's disclosures.

−Violations of the RCRA
    a) Made complaints to the CalEPA in September 2020 – April 2021 about the soil and groundwater contamination in the property next to ARIA.
    b) Made complaints to Apple management about Apple's statements to her directly contract in a 2016 article about a large settlement Apple made with DTSC over numerous RCRA violations.
    c) Made complaints to Apple management about Powers and West sabotaging a hardware reuse program she created, which reduced hazardous waste.
    d) Wrote article and published in SF Bay View in March 2021 raising concerns about environmental safety violations at her apartment next to ARIA: *"I thought I was dying; my apartment was built on toxic waste."*

−<u>Violations of the Clean Air Act</u>
   a) Made complaints to US EPA and CalEPA in September 2020 – April 2021 about the ambient air around Apple's ARIA.
   b) Complaint to California Air Resource Board triggered proceeding with investigator contacting her for information and conducting an inspection.

−<u>Fraud related to environmental crimes</u>
   a) Made complaints and inquiries to the Santa Clara County District Attorney's office in April – May 2021.
   b) Made complaints to the US EPA in July 2021.  Made formal complaint to Apple in August 2021.
   c) Statutes: 42 U.S.C. §§ 7401-7671; 42 U.S.C.  §§ 9601-9675; 42 U.S.C. §§ 11001-11050 TSCA, 15 U.S.C. §§ 2601-2692

   − <u>Violations of the anti-retaliation provisions of environmental laws</u>
   a) 42 U.S.C. § 9610, and 42 U.S.C § 7622, and 15 U.S.C. § 2622
   b) Filed complaints to the U.S. EPA, CalEPA, and U.S. Dept. of Labor around August 29 2021.

   − <u>Violations of the NLRA</u>
   a) Filed complaints to U.S. NLRB about NLRA § 8(a)(1) violations on August 26 2021.
   b) Complaints initiated a proceeding with an NLRB field agent contacting Gjovik for an interview in early September 2021.

   − <u>Violations of Cal. Labor Code and OSH Act</u>
   a) Filed complaints to Cal.DOL, CalOSHA, and US Dept. of Labor re: CCR, Title 8, General Industry Safety Order 5194.

   − <u>Violations of the OSH Act at 29 U.S.C. § 660</u>
   a) Filed complaints to CalOSHA, US Dept. of Labor
   b) Complaint initiated a proceeding with a Wage & Hour investigator contacting Gjovik for information in early September 2021.

   − <u>California Constitution Article 1, § 1 Right to Privacy</u>
   a) Made complaint to Apple management in August 2021.
   b) Shared concerns with reporter for advocacy article in August 2021: *"Apple Cares about Privacy, Unless You're an Apple Employee."*
   c) Made complaints on social media in August – September 2021.

   − <u>Anti-Discrimination Laws  (Basis of Sex and Disability)</u>
   a) Filed complaints to U.S. Dept. of Justice Civil Rights in August 2021.
   b) Filed complaints to U.S. EEOC and Cal.DFEH in August 2021, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e; California Government Code § 12920.

   − <u>Smuggling and Violations of Sanctions</u>
   a) Made complaints to West and Powers in 2020 and again in July 2021.
   b) Filed a complaint to Apple Business Conduct in July 2021.
   c) Notification to West and Powers she escalated in July 2021.
   d) Filed a complaint to the US FBI in September 2021.

169.    Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations to government agencies, the public, the press, and Apple management. Gjovik had a reasonable cause to believe that the information she disclosed violated the statute and was non-compliant with a rule or regulation.

## COUNT THREE: CAL. LABOR CODE § 6310
### (Violation of Cal. Labor Code § 6310)

170.    Apple violated § 6310 via discrimination, suspension, discharge, or threat of discharge against Gjovik for Gjovik complaining about unsafe work conditions or practices, instituting, or causing to be instituted proceedings related to her right to safe and healthful working conditions, testifying about workplace safety, and exercised her rights under the California OSH Act. Apple also took the above negative actions due to fear that Gjovik would engage, or engage further, in the activities above. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

171.    Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers, including chemical exposure. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses, and requested information about work-related injury and illness reports or records. Apple knew about Gjovik's complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts.

172.    Gjovik filed a Retaliation claim with the California Department of Labor on August 29 2021, and Apple was notified of such before her termination. Gjovik complained of unsafe work conditions and internal violations of safety laws/rules/standards to Apple, the U.S. EPA, CalEPA, and

OSHA.

173. Gjovik complained about violations of, and issues related to, numerous topics, including:

–   HazCom and employee exposure to chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal. Code. Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]
–   COVID-19 safety and communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]
–   Wildfire smoke safety [Cal.C.Reg. Title 8, § 5141.1]
–   Employee injury tracking and reporting [8 Cal.C.Reg. § 14300]
–   Efforts to reduce e-waste; and Apple's prior e-waste (Universal Hazardous Waste) violations. [Cal. Health/Safety; RCRA]
–   Environmental safety including vapor intrusion exposure [Cal.Lab.C. § 6406; CERCLA/SARA, RCRA, CAA, CWA, OSH Act HazCom]
–   Right to Know [EPCRA; Cal.Lab.C. § 6399.7] and Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 [Cal. Health & Safety Code §§ 25249.5 to 25249.14].
–   OSH Act Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]

174. Apple retaliated against Gjovik preemptively out of fear that Gjovik would file additional complaints related to health and safety at the workplace. Apple hoped its retaliation would cause Gjovik to drop her existing complaints out of fear and intimidation, and to prevent Gjovik from filing additional complaints.

### COUNT FOUR: CAL. LABOR CODE § 6399.7
### (Violation of Cal.Lab.C. § 6399.7 via § 6310)

175. In violation of the CALIFORNIA HAZARDOUS SUBSTANCES INFORMATION AND TRAINING ACT, Apple did discharge and discriminate against Gjovik because Gjovik filed a complaint; because Gjovik instituted, or caused to be instituted, proceedings under or related to the provisions of this Act; because Gjovik has testified, or was about to testify, in such proceeding; and because Gjovik exercised rights afforded to her pursuant to the provisions of this Act, on her own behalf, and on behalf of others.

176. Gjovik repeatedly complained to Apple about employee's Right to Know about

chemical exposure, about Apple's duty to disclose to workers if they were exposed and if so to what and how much, and to explain the health impacts of those chemical exposures. Apple EH&S told Gjovik that Apple legal decided that Apple employees "*have no Right to Know*." Gjovik then complained about this to the US EPA and other agencies and told Apple she was complaining about them. A violation of the provisions of this section shall be a violation of the provisions of Section 6310." [Cal.Lab.C. §6399.7]

**COUNT FIVE: CAL. LABOR CODE § 98.6**
**(Violation of Cal.Lab.C. § 98.6)**

177.    Apple violated Cal.Lab.C. § 98.6 when Apple did discharge and discriminate against Gjovik for engaging in certain activities, including "*filing a complaint with the Labor Commissioner or testifying in such proceedings*." Gjovik filed a complaint with the California Labor Commissioner on August 29 2021 and Apple was notified she did so through her public statements and notification from the agency.

178.    Apple violated § 98.6 by retaliating against Gjovik due to Gjovik filing a claim with and causing to be instituted proceedings related to the rights under the jurisdiction of the California Labor Commissioner, and for exercising rights provided to her under California Labor Code on behalf of herself and on behalf of other employees. Apple punished her for doing so.

179.    Animus was shown in many of the comments and communications from Apple employees, managers, and agents before and after Apple terminated Gjovik. Comments frequently referenced Gjovik's protected activities, but claimed Gjovik was lying and acting in bad faith, and then argued that because Gjovik make the complaints, she should be punished for it.

180.    Apple retaliated against Gjovik due to Gjovik's protected activity, and she suffered materially adverse actions with a causal connection to the protected activity. Apple engaged in actions prohibited by this section (termination, suspension, discipline, harassment, etc.) within 90 days of

Gjovik's protected activity.[43]

## COUNT SIX: CAL. LABOR CODE §§ 232, 232.5
### (Violation of Cal. Labor Code §§ 232, 232.5, 1101, 1102 via § 98.7)

181.    Apple violated Cal.Lab.C. §§ 232, 232.5 when it harassed, disciplined, discriminated against, and fired Gjovik due to Gjovik's discussion of her wages and the wages of Apple employees. Gjovik participated in a pay survey with her coworkers in late July 2021, when she suggested the survey capture information on gender. She also shared her wages on social media and discussed pay with her coworkers on social media in August 2021.

182.    Apple violated Cal.Lab.C. § 232.5 when disciplining and discharging Gjovik for disclosing information about Apple's working conditions. Gjovik's protected activities included filing complaints about work conditions and discussing work conditions with coworkers and the public, all covered under § 232.5. Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik and Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple claims its NDAs prohibit Gjovik from speaking about work conditions and that if Gjovik does speak about work conditions, it violates her NDA, and that violation is grounds for immediate termination.

183.    Apple violated Cal.Lab.C. § 232.5 and §§ 1101, 1102 when it retaliated against Gjovik for Gjovik's complaints in June and July 2021 which were about work conditions, and which was also political speech. Gjovik discussed with coworkers, raised concerns to Apple, petitioned Apple on behalf of her coworkers, and made statements to her workers about Palestinian and Muslim human rights, and concerns about a recent article that was published alleging Apple is using Uyghur forced

---

[43] Cal. SB-497: Protected employee conduct. Section 1, Section 98.6(b)(1) [Signed October 8 2023; Effective January 1 2024].

labor in its supply chain. Polkes dismissed Gjovik's concerns and suggested that if Gjovik is still worried, that Gjovik could give away some of her salary to Apple's employee-matching benefit program. Gjovik told Polkes she did not want to give Apple her money, but instead wanted Apple to change its practices.

184. Apple violated Cal.Lab.C. §§ 232.5 and 1101(b) when Apple made, adopted, and enforced rules and policies that controlled and directed, or tended to control and direct, the political activities of Gjovik and her coworkers. Apple violated Cal.Lab.C. §§ 232.5 and 1102 when Apple coerced and influenced and attempted to coerce and influence Gjovik and her workers, through threat of discharge, to follow or not follow any particulate course or line of political action or political activity.

## COUNT SEVEN: CAL. LABOR CODE § 96(K)
### (Violation of Cal.Lab.C. § 96(k) via § 98.7)

185. Apple violated Cal.Lab.C. § 96(k) when it demoted, suspended, discharged from employment, threatened discharge, or otherwise discriminated against Gjovik for Gjovik's lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involved the exercise of a right protected by the California Constitution.

186. Gjovik engaged in lawful conduct asserting "recognized constitutional rights" and "rights under the Labor Code" occurring during nonworking hours – while she was on leave, away from Apple's premises. Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back, and Apple said no. Apple cannot then turn around and claim the "leave" was work time or the workplace. Apple told Gjovik she had been "*removed from the workplace*." Until Apple let Gjovik return to work, Gjovik was off duty. Gjovik posting about work conditions in her personal time does not transform Gjovik's personal time into work time.

187. Apple terminated Gjovik for a variety of illegal reasons, including many of the public

statements Gjovik made while on leave in August – September 2021. Gjovik spoke frequently on social media and to the press about harassment and safety issues at Apple; as was her inherent right to be free from discrimination under Cal. Const. Article 1, §§ 8, 31, and her right to physical safety under Cal. Const. Article 1, § 1. Gjovik also spoke frequently about the environmental crimes she witnessed and was victim to at her apartment in 2020 and with Apple's conduct at her Superfund office. Gjovik complained about the intimidation and threats she received and advocated for victim's rights – as was her right under Cal. Const. Article 1, § 28. Apple violated Cal.Lab.C. §96(k) when it retaliated against Gjovik for making these statements, which she had a constitutional right to make, and which she made outside of worktime and outside of the workplace.

188.   In addition, even Apple's supposed legitimate justification for firing Gjovik was simply retaliation for protected statements made by Gjovik outside of worktime and the workplace, and about subjects rooted in her constitution rights. Gjovik was complaining about unlawful and unethical surveillance, and invasions of privacy, by Apple, towards Gjovik and her coworkers. Thus, Apple's supposedly legitimate justification is illegitimate.  Gjovik has a self-executing right to protest invasions of privacy under Cal. Const. Article 1, § 1.

## COUNT EIGHT: COVENANT OF GOOD FAITH AND FAIR DEALING
### (Breach of Breach of Covenant of Good Faith and Fair Dealing)

189.   Gjovik and Apple entered into an employment relationship in 2015 with a signed, written contract and hundreds of supplemental contracts. In addition to the employment agreements and NDAs, Apple's work policies also establish expectations for the employment relationship. Apple's policies reflect a progressive discipline process. Apple's policies and communications to employees frequently promote Apple's employment benefits including performance bonuses offered during the annual review cycle.

190.   Gjovik worked at Apple for over six years, received positive performance reviews,

bonuses, salary increases, and RSU stock grants, and was recently promoted. Gjovik substantially performed, or tendered performance, for her job duties. During each of Gjovik's six annual performance reviews, she always received a salary increase, a large RSU grant, and a performance bonus. All conditions required for Apple's performance had occurred. Apple breached the covenant by intentionally terminating Gjovik when her annual performance review was due, which would have been accompanied by a performance bonus that she had already earned through her successful performance in 2020-2021. (The end of the fiscal was June 30 2021).

191.    In violation of the covenant of good faith and fair dealing, Apple deliberately undermined Gjovik's ability to fulfill her contractual obligations, evading the spirit of the agreement, and frustrating her ability to benefit from the agreement. Gjovik was damaged due to Apple's breach and is owed the performance bonus due to her, with interest.

## COUNT NINE: CAL. UNFAIR COMPETITION LAW
### (Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*)[44]

192.    Apple has engaged in business acts or practices that were unlawful, unfair, deceptive, or misleading, and therefore violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* This UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited to any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

193.    Apple is unlawfully coercing employees to provide personal data, including biometrics, which Apple can use for research and development, including training machine learning models, without actual consent or compensation, and in violation of federal competition laws and state and federal data protection laws. Apple's Whistleblowing Policy acknowledges that reports of

---

[44] The SAC § 17200 claims were previously nested under § 6310 and *Tamney* claims.

"*anti-competitive conduct*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures. Apple should obtain ethical and legal data for product development instead of treating its workforce like lab rats.

194.    Gjovik suffered an economic and/or property injury due to Apple's Unfair Business Practices. Apple knew or should have known that its wrongful acts and omissions alleged herein were likely to deceive the consuming public in California and the rest of the United States. Apple committed those acts and omissions anyway for their financial gain, including improving their financial condition, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the company's value.

195.    Apple repeatedly implied to Gjovik that her participation was not option. Gjovik's annual performance reviews made express note of Gjovik's participation in Apple's studies and experiments and praised her for her unpaid labor in facilitating the numerous invasions into her privacy.

196.    Gjovik participated in several other health, anatomy, and personal data collection studies during her time working for Apple. This included a sleep study with Apple placing a sensor under her while she slept every night, recording her vitals and movements, and sharing the data with Apple for commercial purposes. When Gjovik was invited to participate in these events, the team often would not disclose what the study was until the 'volunteers' arrived physically on site to a secure building where ex-FBI security personal would threaten her and her workers to not even tell their friends or family what happens at Apple, and especially studies like these.

197.    When Apple asked Gjovik to scan her ears and her ear canals, Gjovik declined "indefinitely." Similarly, Gjovik repeatedly declined Apple's requests to study and collect data about her menstruation for product development. Even after Gjovik declined the ear studies, Apple has claimed its secret they even asked her in the first place.

198.    Gjovik also attempted to decline participating in the Gobbler program, but she was tricked into enrollment through Apple's misrepresentations of the years long study and data collection as a one-time social event. Gjovik was only told what the study involved (Gobbler) after she entered a locked compounds with several Apple Global Security guards surrounding her, asking her if she would 'consent.' After that day Gobbler has always been attached to Gjovik's iCloud account. Gjovik still sees Gobbler listed as part of her personal account today and no way to remove it.

199.    Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. Apple's declaration that it can terminate employees for protesting these invasions and warning the public is "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.*" One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics and face-prints of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, and use of toilets– along with biometric information.

200.    Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the non-disclosure agreements for the program, and then Apple told employees they could not tell anyone what the program would now be doing on their iPhones. Apple was aware Gobbler was not a market-ready product (nor was it intended to be) and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyway while continuing to promise customers that Apple would never collect their data and biometrics.

201.    Gjovik's opposition and complaints about Apple's coercion of employees into unpaid

labor through aggressive dogfooding (testing internal software/products as if it were a normal personal device) and Apple's weird anatomical and medical experiments on employees was all protected conduct. In addition, Apple exploited Gjovik's identity without Gjovik's consent and for commercial purposes, violating California's common law Right of Publicity. Apple's unauthorized use and appropriation of Gjovik's identity, likeness, and private information were for Apple's commercial advantage, and Gjovik suffered injury because of it. Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained, claiming they could fire employees without notice for protesting these unfair business practices.

202. Apple requested, coerced, and tricked Gjovik into participating in a number of studies, experiments, and invasions which Gjovik was not compensated for. The studies also caused Gjovik unexpected and otherwise unnecessary expenses. In order to attend these physical meetings, so she could be threatened and intimidated, and expose even more of her personal data to Apple and  to ensure she obtained a positive performance review. Gjovik had to pay out of pocket for Lyft and Uber costs for transportation. Gjovik does not have a driver's license and the company shuttles rarely went to these special, secure buildings. Gjovik is owed restitution for all of the transportation costs, and other operational costs, she paid with her own money as required for these coercive and exploitive studies.

203. Injunction and disgorgement are appropriate here, and the court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200, including the power to order restitution and disgorgement.

204. Apple coerces employees and tricks consumers into allowing Apple to extract their data and exploit it in the research and development of commercial, for-profit products, without consent, in violation of the FTC Act and § 17200. As a result of Apple's unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik, her co-workers, and the

public. Apple should be required to restore these monies to Gjovik, her former co-workers, and the public.

205.     However, Apple's extensive use of these illegal practices will make calculating damages a challenge. Without injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which damage remedies cannot readily remedy. Apple should be ordered to disgorge unlawful data and the fruit of the poisoned data.

206.     Gjovik requests an order that prohibits Apple from using personal employee data in for-profit product development, including medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct violating their rights of privacy.

207.     Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, including Gobbler images.

### COUNT TEN: IIED – OUTRAGEOUS CONDUCT
### (Intentional Infliction of Emotional Distress – Traditional)

208.     The statute of limitations for IIED claims under California state law is two years from the date of injury and under New York state law it is one year from the act. Gjovik lived in California until August 31 2022 and then lived in the state of New York from September 1 2022 up to the date the complaint was filed on September 7 2023. The New York statute of limitations covers Gjovik's presence in New York from September 7 2022 through September 7 2023. The California statute of limitations cover's Gjovik's presence in California from September 7 2021 through September 1 2022.[45] Apple terminated Gjovik's employment on September 9 2021 and thus only two days fall

---

[45] Gjovik also reserves the right to claim IIED under Massachusetts law if Apple continues inflicting emotional distress upon her through the trial.

within this IIED claim's coverage,  and Gjovik's allegations in the claim do not include any employment actions or other conduct which would be subject to Worker's Compensation regulations.

209.    Apple's malicious, fraudulent, oppressive, and extreme/outrageous misconduct was directed primarily at Gjovik, and it was calculated to cause Gjovik severe emotional distress, and it was done with the knowledge of Gjovik's presence and with a substantial certainty that Gjovik would suffer severe emotional injury.

210.    Starting on September 7 2021, Apple engaged in numerous despicable acts designed to cause Gjovik severe emotional distress.  Apple terminated Gjovik's employment on September 9 2021, several named Apple employees posted on social media, under their own names, claiming Gjovik's complaints were bogus, that Gjovik was a liar and bad actor, and that Gjovik deserved the harm Apple was causing her. Five named employees took an active role in posting defamatory and harassing things about Gjovik, contacting Gjovik's friends and associates to speak negatively about Gjovik and urge them to not associate with her, and to create negative rumors about Gjovik in order to ostracize and alienate her.

211.    One of these employees (R.M.) was an Apple manager during the operative times, posted under their own name, and worked in a "security" function at Apple. Some of their posts included defending Apple's practices related to Gobbler. An Apple supervisor making public statements like this represents Apple by the nature of his role.

212.    Another one of these employees, (J.A.), was an Apple employee working in Apple's Global Security team through the end of November 2021. This person repeatedly posted and shared that she had reported Gjovik and Gjovik's actions to "Apple," made accusations against Gjovik and in defense of Apple positioning herself as speaking for Apple, and also repeatedly held herself out as having insider information into Apple's retaliatory actions against Gjovik, including the termination. The function of the Global Security team is to silence workers from speaking publicly about Apple,

1   and this person performed those duties in her harassment of Gjovik.

2   213.    Another employee, (I.S.), was Gjovik's coworker who sat across the aisle from her at

3   Stewart 1 but who was posting on several platforms under an alias. Gjovik did not connect the account

4   to the person until 2023. The account made a number of posts accusing Gjovik of lying and being

5   insane, claiming Gjovik's complaints were meritless, and holding himself out as having insider

6   information about what happened with Gjovik's complaints. This employee sat in the same office as

7   Powers and was likely directly involved, or overheard, numerous material conversations about

8   Gjovik, and felt it appropriate to publicly harass Gjovik in response.

9   214.    There are many more examples. Apple abused its position of power over Gjovik and

10  exploited that power differential in its campaign of terror against Gjovik enlisting multiple employees

11  to carry out there scheme. Apple has extreme power and control over Gjovik and its other employees

12  as one of the world's largest and most influential companies. Apple's conduct was despicable, base,

13  vile, and contemptible, and subjected Gjovik to cruel and unjust hardship – it was carried out with a

14  willful and conscious disregard for Gjovik's rights and safety.

15  215.    In addition to the more traditional severe harassment, Apple engaged in many criminal

16  acts which were "outrageous per se," including witness intimidation, witness retaliation, burglary,

17  extortion, threats, and surveillance. Apple stalked Gjovik in California and New York, sending people

18  to sit outside her apartment, follow her around, and take photos/videos of her inside her home from

19  outside the windows. [Cal.Pen.C. §§ 647(h), 647(i)]. Apple surveilled Gjovik and even bugged her

20  property, including, apparently, directly intercepting her home internet. [Cal.Pen.C. §§ 591, 632(a)].

21  216.    Apple repeatedly broke into Gjovik's home in at least the state of California and

22  Commonwealth of Massachusetts, but probably also the state of New York. [Cal.Pen.C. §§ 459,

23  602.5]. Through all this, Apple went out of its way to act like deranged maniacs whose conduct

24  exceeded all bounds of decency usually tolerated by society.

217.   Apple's conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Apple's misconduct towards Gjovik was/is extreme, outrageous, persistent, and omnipresent. Apple's conduct left Gjovik fearing for her safety, her dog's safety, the integrity of her electronics and utilities, and the safety of her chattels – that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her house or even failing to secure entry to her home properly would place her in danger, and she could be killed. Gjovik was and is under a justified belief that leaving her dog at home unattended could result in harm to her dog and that Apple could kill him.[46] Apple did handle him during one of the break-ins, leaving a strong odor of cigarettes on his little body.

218.   Apple could have acted with some decency and reserve. Still, instead, Apple bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, sued her for reporting criminal conduct, reported her to law enforcement, repeatedly threatened to "*ruin*" and "*destroy*" her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks. [18 USC § 912; April 2023; reported to FBI and US EPA]

219.   When Gjovik explains to people what Apple has done to her when she shows them Apple's communications and exposure records and shows them the evidence she gathered of their physical intrusions and harassment, the default response is not simply to shake their heads with disappointment. No, it is to exclaim something such as "*Outrageous!!*"

220.   Further, these actions have caused fear in those around Gjovik and in Gjovik herself. Gjovik has lost many friends through this – and she cannot blame them as Apple's menacing is smoke from the fire of actionable threats of violence and mayhem. Apple's tortious conduct evinced an

---

[46] ICAN, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

indifference to or a reckless disregard for the health and safety of others; Gjovik had financial and medical vulnerability; the conduct involved repeated, systemic actions and schemes; and the harm to Gjovik was the result of Apple's intentional malice, trickery, and deceit.

221.    As documented in legal filings, emails, doctor appointments, and therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, extreme depression requiring anti-depressants due to suicidal ideation, and crying uncontrollably for hours every day. Gjovik suffers from paralyzing anxiety, and it has been difficult even to get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between overeating and undereating but overall gained over sixty pounds in 2020-2022.

222.    Apple's conduct, of course, left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation.*" However, as a direct and proximate result of Apple's conduct, Gjovik also experienced overwhelming anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment*." Apple's conduct resulted in PTSD and anxiety symptoms. Gjovik suffered depersonalization and derealization.

## COUNT ELEVEN: PRIVATE NUISANCE
### (Creation & Maintenance of a Private Nuisance at 3250 Scott Blvd)

223.    Apple created and maintained a condition in violation of Cal.Civ.C. § 3479. This nuisance was demonstrably injurious to health, which was indecent and offensive to the senses and obstructed the free use of property. By acting and failing to act, Apple created a condition or permitted a condition to exist that was harmful to health, offensive to the senses, an obstruction to the free use of property, and a fire, explosion, and poisoning hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, negligent, and reckless.

224.    Apple is continuously casting pollution upon the property of the owner and tenants of

adjacent properties, as it knew it would do when it constructed its exhaust and HVAC systems and hazardous waste handling systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution would continue to fall, not by accident or mishap, but in conformity with the knowledge it had before the construction of the systems. Apple should be presumed to have intended its act's natural, known, and reasonable consequences.

225.    Apple's interference would and did substantially annoy or disturb persons of normal health and sensibilities in the same community. Apple's operations at the factory and Superfund site are both continuing nuisances, and every continuation of the nuisance or trespass gives rise to separate damages claims. Apple has the agency and ability to stop the nuisance (it is not permanent), so until it does, the nuisance Apple created is continuous.  Apple's conduct was a substantial factor in causing Gjovik's harm. Gjovik did not consent to a defendant's conduct, and the seriousness of the harm outweighs the social utility of Apple's conduct. Apple damaged Gjovik's property and injured Gjovik's person. Due to Apple's actions, Gjovik's property was destroyed, the leasehold degraded, she became very ill, and she suffered severe emotional distress.

226.    In or about 2015, Apple constructed, or caused to be constructed, exhaust vents and open tanks at ARIA in Santa Clara, near the common border line of the defendant's and Gjovik's property. The exhaust vents were installed and maintained negligently, recklessly, and unskillfully. Apple exhausted through the vents and emptied various materials or substances into the open tanks that caused a foul, obnoxious, and disagreeable odor and polluted the atmosphere / ambient air of Gjovik's leasehold property.

227.    Apple's facility emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property and collect Gjovik's chattel property and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property.

Apple created the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their business. The emissions were a business decision to be able to report reduced waste sent to landfills.

### COUNT TWELVE: ULTRAHAZARDOUS ACTIVITIES
### (Strict Liability for Ultrahazardous Activities at 3250 Scott Blvd)

228.    Apple's fabrication activities at ARIA provided a high degree of risk of significant harm to people and property, and the exercise of reasonable care could not eliminate the risk; the activity's benefits do not outweigh the risks, and these activities are inappropriate for the location, Apple's activities at ARIA, directly adjacent to High-Density Residential and numerous sensitive receptors (including parks, schools, and playgrounds) is in violation of city and county zoning rules.

229.    Apple's facility was originally registered simply as an "R&D Facility" (it appears Apple went to much effort to ensure no one knew they were doing semiconductor fabrication at the location). The ARIA building is located on "Light Industrial" zoned land (18.48), however semiconductor fabrication is expressly not allowed on any land other than "Heavy Industrial" zoned land (18.50).   The state Fire Code also includes numerous other regulations targeted at the semiconductor fabrication processes (see, *e.g.*, Cal. Fire Code Ch. 17 – "Semiconductor Fabrication Faculties").

230.    Santa Clara City Code, Santa Clara County Code, and California Fire Code all explain that facilities which process raw materials (10.60.090) and require hazardous material and hazardous waste management, must be located in Heavy Industrial zoned land, must go through an application/review process, and may still be denied if their activities (and emissions) would create a nuisance for other industrial facilities in that area. Further, Santa Clara City Code requires that any industrial zoned properties be located at least 500 feet away from any Residential zoned properties.

231.    Apple stored, used, treated, and released a large quantity of lethal gases at ARIA.

Apple possessed and used substantial amounts of arsine, phosphine, silane, fluorine, chlorine, hydrogen chloride, and phosphorus trichloride. In addition, many of Apple's chemicals at the plant were characterized as "*extremely hazardous substances*,"[47] "*highly toxic gases*,"[48] and/or "*acute and extremely hazardous wastes*."[49] Regardless of other considerations, California Fire Code requires that any storage or processing of highly toxic gases occur no less than twenty feet away from the property lot line and public sidewalks.

232.    Further, California Fire Code strictly prohibits the storage, use, or treatments of toxic gases within 75 feet of air intakes in adjacent buildings. This rule applies in Heavy Industrial zoning, where these activities should have been conducted. Apple intentionally venting unabated toxic gases and lethal chemicals into the ambient air only 250 feet from an open-air children's playground – is exactly the policy justification for Ultrahazardous Activities tort enforcement as a common law zoning mechanism.

233.    Apple conducted semiconductor fabrication activities, with extremely dangerous substances, openly dumping its unabated chemical exhaust into the ambient air, only 150 feet from High-Density Residential with thousands of apartments, and 250 feet away from two public parks and a children's playground. The storage, use, treatment, and release of large quantities of highly toxic, extremely poisonous, acutely lethal gases – directly adjacent to an unsuspecting, High Density Residential area – and directly adjacent to public parks and children's playgrounds – is an activity which, even when conducted with the greatest of care and prudence, can still cause severe injuries, fatalities, and mass human suffering (*e.g.* Bhopal). Thus, these activities – in this location, scenario, and context – are Ultrahazardous Activities.

234.    Apple's use, storage, and release (intentional and unintentional" of highly toxic gases

---

[47] 40 CFR § 355 Appendix; 42 U.S.C. § 11002.
[48] Cal. Fire Code § 202, Chapter 60 (2022).
[49] 40 CFR § 261.11(a)(2).

can produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emissions could easily cause mass fatalities and severe suffering. The condition Apple created and permitted to exist resulted from Ultrahazardous Activities and for which strict liability should also exist.

235.    Apple violated the spirit of the Clean Air Act, if not the law, which "*criminalizes knowing or negligent "releases into the ambient air [of] any hazardous air pollutant . . . or extremely hazardous substance" that give rise to imminent danger,*" [42 U.S.C. § 7413(c)(4)– (5)]. Similarly, Apple's activities likely violated RCRA when Apple "*knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter . . . in violation of ... of this section [and] knows at that time that he thereby places another person in imminent danger of death or serious bodily injury.*" [42 U.S.C. § 6928(e)].

236.    Apple also released chemicals categorized by Cal. Code Regs. Tit. 17, § 93000 as "*Substances Identified as Toxic Air Contaminants,*" of which there is no safe level of exposure without "*significant adverse health effects*. "Apple released into the air chemicals categorized under 42 U.S.C. Section 7412(b) as "*Hazardous Air Pollutants*" and Cal. Code Regs. Tit. 17, § 93001 as "*Hazardous Air Pollutants Identified as Toxic Air Contaminants*."

237.    Apple was engaged in Ultrahazardous Activities that caused Gjovik to be harmed. Apple's activities were the proximate cause of that harm, and Apple is responsible for that harm. People who engage in ultrahazardous activities are responsible for the harm these activities cause others, regardless of how carefully they carry out these activities. Apple damaged Gjovik's chattel property (discoloring, weakening, dissolving glues, causing reactions), degraded her extremely expensive leasehold conditions, and harmed Gjovik's mind and body.

## COUNT THIRTEEN: IIED – FEAR OF CANCER
### (Intentional Infliction of Emotional Distress – Fear of Cancer)

238.     The statute of limitations for IIED claims under California state law is two years from the date of injury and under New York state law it is one year from the act. Gjovik lived in California until August 31 2022 and then lived in the state of New York from September 1 2022 up to the date the complaint was filed on September 7 2023. The New York statute of limitations covers Gjovik's presence in New York from September 7 2022 through September 7 2023. The California statute of limitations cover's Gjovik's presence in California from September 7 2021 through September 1 2022.[50]

239.     At the time of Apple's termination of  Gjovik's employment on September 9 2021, Gjovik still did not know Apple was responsible for what happened to her in 2020. Apple continued harassing and tormenting Gjovik despite and because of it prior to knowingly subjecting Gjovik to exposure to a highly toxic substance while purposefully concealing from Gjovik the serious injuries that might result from such exposure, and in reckless disregard of these risks.

240.     Gjovik's physical exposure to Apple's illegal semiconductor fabrication exhaust was unrelated to her employment and thus Worker's Compensation does not apply. Further, Apple was the operator in control of the facilities at ARIA during the pertinent times, and actions taken related to Apple's hazardous waste can be directly attributed to the corporation.

241.     Apple's malicious, fraudulent, oppressive, and extreme/outrageous misconduct was directed primarily at Gjovik, and it was calculated to cause Gjovik severe emotional distress, and it was done with the knowledge of Gjovik's presence and with a substantial certainty that Gjovik would suffer severe emotional injury. Apple deliberately vented deadly substances on Gjovik and then deliberately made false statements to conceal their actions, all of which could be considered criminal actions. Apple's engaged in this conduct with reckless disregard for the injuries certain to be caused

---

[50] Gjovik also reserves the right to claim IIED under Massachusetts law if Apple continues inflicting emotional distress upon her through the trial.

by that plan of conduct, and knowing people exactly like Gjovik would be exposed to its dangerous, toxic chemical fumes and vapors.

242.     Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and negligent conduct exposed Gjovik to carcinogens, including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress and acted with reckless disregard for the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer, and Apple's conduct was a substantial factor in Gjovik's severe emotional distress.

243.     As a proximate result of the acts of the defendant, Gjovik suffered severe emotional distress, including the fear of developing cancer and an increased risk of developing cancer. Gjovik also suffered a wide array of physical symptoms attributed to the toxic chemicals at Stewart 1 and ARIA, including spasms, nausea, hair loss, rashes, hives, burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. Further, the fear and horror of personally being exposed to a cloud of poison gas or knowing that family members have been exposed are absolute emotional trauma in its purest form.

244.     After Apple's injuries to Gjovik due to chemical exposure in 2020, Gjovik experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression, rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred, and damaged skin, hair loss, worsened asthma, and breathing troubles, etc.). This all occurred during Gjovik's 2L and 3L years of law school, causing her to suffer academically. Gjovik now also faces a significantly increased risk of contracting cancer and other disease in her lifetime. Further, after Apple's psychological and emotional injuries to Gjovik in 2020-2024, Gjovik now suffers from dramatically

worsened anxiety, PTSD, and concentration issues – as well as new depression, insomnia, panic attacks, weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits, and moral injury.

245. Corporations who knowingly and intentionally dump hazardous waste or otherwise pollute the environment, violating environmental and safety laws, do so because the practice is less costly and more profitable than complying with the regulation. Apple's intentional evasion of paying required fees and costs associated with proper hazardous waste management and disposal allow Apple to operate its research and development at a much lower cost than its competitors who do follow the law. In addition, Apple also recently launched a "zero waste" program where Apple purports to be diverting hazardous waste from landfills. Based on Apple's environmental reports, ARIA is responsible for around 30% of Apple's global corporate hazardous waste and at ARIA, Apple's diversions of waste from landfills includes mid-night dumping into apartments and creating toxic vapor clouds in public parks.

246. Even worse, Apple also instituted an environment-social-governance ("ESG") modifier for executive pay (bonuses worth multi-millions of dollars) that can increase or decrease executive compensation 10% based on environmental and other practices. Apple's intentional environmental violations was not just to reduce costs required for properly disposing toxic waste, but Apple's midnight-dumping also to increased bonuses for their executives.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgment in her favor on each and every claim for relief set forth above and award its relief, including, but not limited to, the relief as follows:

i.   A Judgment entered in her favor, and an award of damages in an amount to be determined at trial.

ii.   Employee whistleblower's "make whole relief" with compensatory damages, including lost wages (back pay, lost benefits, lost bonuses and pay raises, lost stock grants and vesting, etc.).

This should include a refund of Gjovik's use of Vacation and Sick days in response to Apple's misconduct and negligence, payment of those days, and removing negative records from her personnel file.

iii. Reinstatement of employment at a prior or higher level, with reestablishment of benefits and seniority, and promise of a respectful and health workplace. If that cannot be provided – then at least ten years of front-pay, or up to retirement age.

iv. Compensatory damages for pecuniary harm, including lost future wages, lost benefits, lower earning capacity, past and future medical expenses, counseling, medication, physical and digital security expenses, reputation management expenses, mental/emotional injury (PTSD, anxiety, depression, insomnia, disordered eating); property damage, degradation, and conversion; and moving costs to relocate.

v. Compensatory and special damages for non-pecuniary harm, including emotional distress, humiliation, loss of enjoyment, loss of consortium, annoyance, discomfort, inconvenience, disfigurement, pain and suffering, mental anguish, and reputational harm. Gjovik now suffers from permanent psychological trauma and damage because of Gjovik's actions. Gjovik is entitled to compensation for any special damages she suffered resulting from Apple's outrageous and defamatory acts.

vi. Compensatory damages for the injury suffered to Gjovik's body, mind, and property by Apple's nuisances and ultrahazardous activities, including cost to replace clothing and other chattel property that were destroyed by Apple's tortfeasing. Costs for medical monitoring and medical intervention for any lifetime illnesses attributable to exposure to the chemicals Apple exposed her to.

vii. Consequential, expectation, reliance, and 'benefit of the bargain' damages, where applicable.

viii. A civil penalty of $10,000 per employee for each violation of Cal.Lab.C. § 98.6 and § 1102.5. (If this request prevents other damages, this request may be waived).

ix. Punitive damages for all available claims (*Tameny*, Cal.Lab.C § 1102.5, Nuisance, Ultrahazardous Activities, and IIED), with amount to be determined at trial.

x. Declaratory relief stating Gjovik is a Crime Victim under federal and state law, so Gjovik can be afforded her relevant rights.

xi. Injunctive relief under § 17200, including declaratory relief that Apple's secrecy oaths for their commercial studies are unlawful. This would allow Gjovik and her coworkers to speak freely about their experiences and seek treatment and counseling for the harm inflicted by the

experiments. Gjovik also requests disgorgement of unlawful data and injunctive orders to prevent further violations, as the court deems appropriate.

xii.  Litigation costs, expert witness fees, pro se attorney's fees, and other reasonable expenses. Pre-judgment and post-judgment interest.  Offset for tax bracket increase due to lump sum payment.

xiii.  Where no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00 (or $2.00 or $3.00 where double or treble damages apply).

xiv.  Such other and further relief as the Court deems just and proper.

Plaintiff hereby requests a trial by jury on all issues so triable.

## IX.  CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

Executed on:  JUNE 18, 2024

Signature of Plaintiff  _____

Printed Name of Plaintiff  Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816
Email: legal@ashleygjovik.com
Phone: (408) 883-4428