**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

Case No. 3:23-CV-04597-EMC

|  |  |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | **Plaintiff's Omnibus Motion for Leave to file Sur-reply and Objections; Sur-reply and Objections.** |
| Plaintiff, | |
| vs. | ***In Opposition to Defendant's Fourth Fed. R. Civ. P. § 12(b)(6) Motion to Dismiss, Third § 12(f) Motion to Strike, and Replies.*** |
| **Apple Inc.**, a corporation, | **Motion Hearing & Case Management Conference:**<br>Dept: Courtroom 5 (Zoom)<br>Judge Edward M. Chen<br>Date: August 28, 2024<br>Time: 9:30 AM PT |
| Defendant. | |

**Request basis: Equity & Fairness.**

**Vigilantibus et non dormientibus jura sub veniunt.**

— 1 —

# TABLE OF CONTENTS

## CONTENTS

**Plaintiff's Motion Requesting Leave to File a Sur-Reply** ....................... 3

**I.    Objections** ................................................................. 6

  A.  Plaintiff concedes nothing! ............................................. 6

  B.  Defendant repeatedly misrepresented Plaintiff's Fourth Amended Complaint and her Opposition to their 4th MTD. ....................... 6

  C.  Defendant does not want this case decided on the merit of the claims... 9

  D.  The Entire Controversy .................................................. 10

**II.   Substantive Arguments** .............................................. 11

  E.  The Ultrahazardous Activities claim states a claim for Ultrahazardous Activities. .............................................................. 11

  F.  Apple trashed the Plaintiff's Property. ................................ 15

  G.  The Statute of Limitations was tolled for the Toxic Torts (Nuisance, Ultrahazardous activities, IIED – Cancer). ............................ 20

  H.  Apple's Unfair Business Practices, in violation of UCL § 17200, caused Plaintiff harm to her property and economically. ..................... 28

  I.  Apple's Conduct was Outrageous, and it Intended to and Did Cause Extreme Distress. ...................................................... 32

  J.  Apple's Knowing Exposure of Plaintiff and her Neighbors to Carcinogens was Evil. ................................................. 44

  K.  Cal.Lab.C. § 6399.7 (via § 6310) includes HAZWOPER .................... 45

  L.  Apple was certainly reading Plaintiff's Twitter posts ................. 55

  M.  Apple violated Cal.Lab.C. § 1102.5 dozens of times. ................... 59

  N.  Claims for Cal.Lab.C. §§ 98.6 + 1101, 1102 (Politics) + 232.5 ............ 67

  O.  Claims for Cal.Lab.C. §§ 232 (Pay) & 232.5 ........................... 71

  P.  Cal.Lab.C. §§ 98.6 + 96k + 232.5 claim (or Tamney &/or UCL). .......... 74

  Q.  Breach of Implied Covenant of Good Faith & Fair Dealing ............... 75

  R.  Plaintiff's request for Cal. Labor Code civil penalties is not relevant for a subsequent 12(b)(6) motion, or 12(f) motion. ...................... 76

**III.   Conclusion** ........................................................... 76

# Plaintiff's Motion Requesting Leave to File a Sur-Reply

1.    Plaintiff, Ashley Gjovik, respectfully submits the following Administrative Motion for Leave to file a Sur-reply in response to Defendant's Replies [Docket 89-90] to her Opposition to Defendant's Motions to Dismiss [Docket 78] and Strike [Docket 79]; and in support of Plaintiff's Oppositions to Defendant's Motions [Docket 84-87].

2.    Attached and incorporated are the sur-replies, proposed supplement, objections, declaration, and request for Judicial Notice. Plaintiff makes this request in the interests of justice, in equity, for the sake of decisions on the merits, because of the extreme power imbalance between Plaintiff and Defendant, and because Plaintiff has already been severely prejudiced by Defendant. [1]

3.    The Defendant made false statements and inferences, that are material to this matter, highly prejudicial, and should be corrected for the record and the Court's consideration. Defendant has also refused to meet/confer in good faith, refused to negotiate in good faith, repeatedly tried to surprise-attack Plaintiff procedurally, repeatedly made attacks on Plaintiff's character and competence, and repeatedly argued in bad faith knowing their arguments contradict the actual facts. Concurrently, Defendant continues to publicly harass, humiliate, and defame the Plaintiff, with a recent example provided in the 7/31 Declaration, which includes extensive harassment about this lawsuit and which Defendant urges this court to ignore.

4.    Defendant is a $3.4T corporation, here represented by a $1.4B/year

---

[1] *Bartlett v. Citibank*, Case No. 17-cv-00712-EMC, 2 n.1 (N.D. Cal. Apr. 19, 2017); *Jackson v. Applied Materials Corp.*, Case No. 20-cv-06007-VKD, 5 n.1 (N.D. Cal. Apr. 8, 2021); *Staley v. Gilead Sciences, Inc.*, 19-cv-02573-EMC, 1 n.3 (N.D. Cal. Jul. 16, 2021); *Alexsam, Inc. v. Wageworks, Inc.*, Case No. 19-cv-04538-EMC, 7 (N.D. Cal. Dec. 21, 2020); *Simmons First National Bank v. Lehman*, Case No. 13-cv-02876-DMR, (N.D. Cal. Apr. 1, 2015).

law firm – with essentially unlimited resources at their disposal. Plaintiff is one person, representing herself. Defendant has drawn this legal matter out for over three years now, attempting everything it can to try to ensure the matter is not decided on the merits.

5.    Defendant's prior 12(b)(6) motion to dismiss filings included tactics which violated FRCP and the local rules, and which Plaintiff expressed she was fearful to engage with as she did not want to break the rules as well.[2] Plaintiff was then punished for her attempt to comply with court rules, having two of her claims dismissed with prejudice partially due to her good intentions.[3] Even if the court will not consider this filing, Plaintiff did not concede & the Plaintiff tried to rebut Defendant's claims.

6.    Plaintiff requests this court's consideration of her arguments, of Defendant's actions, and of the extreme power dynamic between Plaintiff and Defendant. If Defendant is allowed to repeatedly violate the FRCP in order to attack Plaintiff's claims, while Plaintiff is forced to strictly comply with page limit and form rules, then the Defendant will whittle her lawsuit down to a toothpick,

---

[2] "Defendant's actions put Plaintiff in a difficult situation, as to get her 'day in court,' she is expected to object and correct statements made by the opposing party if she does not think they are accurate – yet if she were to do so where Defendant references and quotes its allegations on mooted pleadings, then Plaintiff joins Defendant in conduct this District has described as "wholly improper." *Williams v. County of Alameda*, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014). Instruction the Court "refuses" to allow parties to "engage in such conduct." *Id.* In *Williams v. County of Alameda,* the court refused to 'consider the arguments that [the party] improperly seeks to incorporate by reference.' *Id.* Plaintiff asks this court for similar discretion in response to Defendant's conduct, as Plaintiff does not plan to respond to those arguments." P's Opp to D's MTD at 4-5. Docket No. 54.

[3] "Accordingly, the Court dismisses the SOX claim. Dismissal is with prejudice, both because of Ms. Gjovik's failure to respond directly to Apple's argument in her opposition and her failure to articulate at the hearing new facts that would suggest a violation of the relevant criminal fraud statutes or securities laws… As indicated in the discussion above, Ms. Gjovik did not directly respond to Apple's challenge to the Dodd-Frank claim; furthermore, she has failed to explain how she provided information relating to a violation of the securities laws. Accordingly, dismissal of her Dodd-Frank claim, with prejudice, is warranted… Ms. Gjovik does not clearly respond to this argument in her papers, and thus the Court dismisses the NIED claim in its entirety." *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 23, 24, 45 (N.D. Cal. May. 20, 2024).

— 4 —

regardless of the actual merit of her claims.

7.      Defendant filed a fourth 12(b)(6) motion on July 15 2024 [D's MTD Docket No. 78] requiring extensive research and response drafting in a brief period of time, and then upon a best effort to respond by Plaintiff, Apple declared that anything not squarely addressed was "conceded" and should be dismissed with prejudice. Defendant has also declared a maximum total page limit rule for Plaintiff, forbid Plaintiff from filing requests for judicial notice or declarations, misrepresented (or even falsified) Plaintiff's statements, and repeatedly accused Plaintiff of misconduct and incompetence. Apple justifies its request to bypass FRCP 12(g) and 12(h) claiming 'efficiency' and narrowing of claims. This is a reasonable justification in some situations, but here what Apple means is that Apple wants to avoid this lawsuit and silence the Plaintiff.

8.      Defendant also filed pending motions, supposedly in equity, that are grossly unfair to the Plaintiff, and which could foreclose the majority of this lawsuit. Defendant attempts to railroad her and cause the Plaintiff to unjustly lose her only opportunity to seek a judicial remedy for the concrete and extensive harm Defendant caused in every aspect of her life.

9.      Because Defendant requests to have claims re-considered despite violating FRCP – Plaintiff also makes a request in equity. Plaintiff requests the Court consider her sur-reply (with proposed supplements), objections, declaration, and both requests for judicial notice in addition to her Opposition filings – or provide Plaintiff an opportunity to present proper evidence in a Summary judgement proceeding, if any of her claims would otherwise be dismissed with prejudice.

10.     The proposed supplement herein attempts to address the areas Apple demanded more detail. The point of a Rule 12(b)(6) motion is to determine if the claim could ever be pleaded, not if it's perfectly pleaded today. This supplement shows these claims can all be pleaded, even if some are not pleaded perfectly today.

Additionally, the Second Amended Complaint is referenced to prove the claims can be plead sufficiently with enough time and pages.

## I. OBJECTIONS

### A. Plaintiff concedes nothing!

11.     Apple repeatedly claimed Plaintiff conceded to its arguments. [Reply 8/5 at 4, 5, 9, 10, 13]. **I concede nothing.** Plaintiff responds to substantive points with additional detail herein. As for the Defendant's many misleading and/or inflammatory arguments – Plaintiff asks the Court to review what was actually filed if Apple attempts to quote Plaintiff's documents, as several "quotes" are not actually things she said and are not in the referenced documents. Apple similarly quoted the Court several times in misleading ways that attempt to prejudice the Court against the Plaintiff, [4] and so Plaintiff urges the Court to factcheck Apple's references and quotes to court filings as well. [5]

### B. Defendant repeatedly misrepresented Plaintiff's Fourth Amended Complaint and her Opposition to their 4th MTD.

---

[4] Apple repeatedly intentionally quotes the Court's May 20 2024 Order and Decision, but drops any mention of environmental issues, privacy, or harassment from the quotes, even if it means quoting a sentence fragment. Apple: "As the Court recognized in its May 20, 2024 order regarding Plaintiff's prior complaint, "[*t*]*he gist of [Plaintiff's] suit is that Apple retaliated against her because she complained about conduct at the company[.]*" Dkt. 73 (the "May 20 Order")." Def's MTD at 1, 23. Similar statement also at Def's Reply pg1-2 and MTS pg1.

[5] The Court actually wrote: "*The gist of her suit is that Apple retaliated against her because she complained about conduct at the company, including but not limited to environmentally unsafe conditions.*" May 20 2024 Order, Docket #73 at 1. (Continued at FN 3). The Court added: "*(1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment. (2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, i.e., a Superfund site, and she became ill because of Apple's actions/omissions related to the site. (3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy. (4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.*" -May 20 2024 Order, #73 at 2.

12.     Apple repeatedly uses their own misleading editorializations of statements from both Plaintiff and the Court as justification as to why Plaintiff's meritorious claims should be dismissed with prejudice. Apple wrote in it motions and replies, in different formats that: "*...this Court recognized in its May 20, 2024 order regarding Plaintiff's prior complaint [Apple's misquoting] ...thus dismissal with prejudice of the other claims will facilitate efficient resolution of the ... retaliation claims that would remain and enable appropriately focused discovery and motion practice going forward.*" [D's MTD at 1, 25; D's Replies at 15]. Apple thus also refers to this Court's discovery orders as "inappropriate" and threatens to file even more motions to dismiss after this one.

13.     In addition, despite the chaotic allegations Defendant thew at her, Plaintiff has not pled anything in bad faith, nor does she believe any claims were dismissed due to misconduct or incompetence. The only full claims dismissed with prejudice on substantive points were her pro se, first attempt to plead federal money laundering and securities fraud against a multinational corporation – which is difficult for any attorney to do successfully. Defendant also repeatedly complains about the length, detail, lack of detail, organization, reorganization, and content of her amended complaint – despite filing repeated Motions to Strike previously that urged Plaintiff to engage in significant rewrites.

14.     Defendant declares that existing claims are new even though they are not new, and it is quickly discernable that the claims are not new when reviewing the Plaintiff's complaint revision tracking table and indexes in her Declaration [Exhibits A-C], which Defendant urges this court to ignore. Defendant also repeatedly claims that Plaintiff was allowed or was not allowed to amend things that the Order seemed to say the opposite of whatever Apple is claiming now. [Def's MTD at 2, 5, 20]. Defendant also repeatedly claims Plaintiff pled new claims, theories, and/or "themes" – but the only major difference is Plaintiff voluntarily removing many claims that were given leave to amend hoping Apple

would file an Answer (which Defendant suggests several times is because Plaintiff deserves sanctions...?) and pleading new or revised facts. Plaintiff apologizes if she misunderstood the instructions, but she suspects Apple is just trying to distract and confuse from the substantive issues. [for example, Def's MTD at 1-3; MTS at 2-5, 11].

15.     The other major misrepresentation from the Defendant is falsely quoting Plaintiff about a material matter that could lead to the dismissal of three of her claims and multiple sub-claims. In Apple's 8/5 Reply, counsel wrote:

> Apple: "The operative complaint makes clear that by at least March 2021—over two years before she filed the lawsuit on September 7, 2023— **"she suspect[ed] ... that her injury was caused by wrongdoing."** See 4AC ¶57 ("On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around [the Scott building]" entitled "I thought I was dying: My apartment was built on toxic waste.")." Def's MTD Reply at 9.

16.     However, the quoted text in bold is not anything Plaintiff wrote in her complaints, or in the article cited. In ¶ 57 of Plaintiff's 4AC she wrote:

> Plaintiff: "On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around ARIA. More victims and witnesses promptly came forward; some were also Apple employees. On April 5, 2021, Gjovik told West about the other victims, and West warned her she was "*kicking a hornet's nest*." West asked Gjovik not to send information about Gjovik's chemical exposure at her apartment next to ARIA to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*" 4AC ¶ 57.

Due to the implication attempted by Defendant, the entirety of the SF Bay View article referenced is attached as Exhibit P in the expanded Request for Judicial Notice. The concluding summary in the article is open questions and brick walls – the opposite of what Apple implies.

— 8 —

Plaintiff: "So, what made me sick? While in the end everyone agreed it was VOCs, I may never know for certain if it was the chemicals in the soil or groundwater and, if so, which ones. I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way? I knew that if I couldn't find a solution, there's no way these folks would. It's well known now that toxic waste sites are often located near low-income and racial and ethnic minority communities. So, these folks are more likely to suffer from these issues and have fewer resources to deal with the issues when they face them. It was the moment I really started to understand environmental justice." [6]

17.     Plaintiff reminds Defendant of the U.S. District Court for the Northern District of California's Guidelines for Professional Conduct, Rule 18(c): "A lawyer should not create a false or misleading record of events or attribute to an opposing counsel a position not taken."

**C. Defendant does not want this case decided on the merit of the claims.**

18.     Another argument made by Defendant so provocative as to compel Plaintiff to respond here was Defendant's repeated claims of essentially a new rule that only applies to Plaintiff where she is only allowed to file employment and labor lawsuits, but no other types of lawsuits, regardless of merit. Concurrently Defendant continues to refuse to cooperate outside of Court, even for the employment and labor claims.

19.     In addition, despite the facts related to 3250 Scott Blvd being the factual basis of several claims Defendant is not even challenging, Defendant

---

[6] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26 2021). https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

suggests any reference to 3250 Scott Blvd be stricken from the lawsuit. This would nullify a number of Plaintiff's claims including her *Tamney* claims for Crime Victim [See, SAC ¶859, 4AC ¶ 162] and Legislative Witness [See, SAC ¶858, 4AC ¶ 163-165] retaliation and decimate her 1102.5 retaliation claims related to environmental laws and environmental crimes. Further, both the Crime Victim and Legislative Witness claims could stand alone without *Tamney*, either under their own statutes or standing for the Crime Victim claim as an injured member of the public[7] - but both require a factual basis that includes 3250 Scott Blvd.

20.    Removing all facts related to 3250 Scott Blvd would also prevent Plaintiff from providing a full factual basis for what happened with her and Defendant in all of her claims – including theories for reasonableness, motive, emotional distress, and an eggshell plaintiff in the whistleblower and labor claims. Further, there is already direct evidence of retaliation and animus from Defendant against Plaintiff related to 3250 Scott Blvd. Defendant's motion tries to conceal this.

21.    Finally, Defendant still does not even attempt to explain why it wants to strike the entirety of Section 98.6 from her 4AC despite no express justification or notice of such mentioned in the motions to dismiss or strike.

### D.    The Entire Controversy

22.    Public policy factors the determination of litigation on the merits rather than on procedural grounds – recognizing that justice is best served when all litigants have a chance to be heard. Procedural requirements should be given liberal construction in order to not deprive a litigant of her day in court because of technical requirements.[8]

---

[7] *Angie M. v. Superior Court (Hiemstra),* 37 Cal.App.4th 1217, 1223 (1995).
[8] *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986); *CNC Software, LLC v. Glob. Eng'g Ltd. Liab. Co.*, 22-cv-02488-EMC, 10 (N.D. Cal. May. 12, 2023).

23.     Defendant complains about how many claims there are, nitpicking different versions of counts. This is irrelevant. Plaintiff has one claim for relief for each injury. Here she has injuries requiring remedy starting in 2020 (or earlier depending on the claim), through current day, and for some claims also into the future. She has been injured personally (including physically, mentally, and reputationally)[9], and her real property interests and chattel property were also injured. Plaintiff alleges Defendant caused all of that harm to her and owes her a remedy. That is Plaintiff's claim. That is the entire controversy. There are multiple causes of action she may pursue, but ultimately the complaint and claims will conform to the evidence as the law demands.

## II.  Substantive Arguments

### E.   The Ultrahazardous Activities claim states a claim for Ultrahazardous Activities.

24.     Defendant argues Plaintiff has not addressed Defendant's concerns about whether her claims rise to the level of "Ultrahazardous Activities." [Def.'s MTD at 17-18, D's 8/5 Reply at 10]. First, that is a question of law for the Court to decide and the Court did decide that the Activities were Ultrahazardous in the May 20 2024 Decision and Order.[10]

25.     The only thing that has changed since the May 20 2024 decision is the US EPA Compliance and Enforcement Division released their report of findings from their RCRA inspections of 3250 Scott Blvd in August 2023 and January 2024, which described at least 19 unique violations of the RCRA (and some with hundreds of occurrences); confirmed semiconductor fabrication is

---

[9] "*Apple poisoned me: physically, mentally, spiritually: Ashley Gjøvik, who was fired by the tech giant after blowing the whistle on toxic waste under her office, says her fight will go on*", Index on Censorship, December 2021, https://www.indexoncensorship.org/2021/12/apple-poisoned-me-physically-mentally-spiritually/

[10] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 27-31 (N.D. Cal. May. 20, 2024).

occurring at the facility; reported that Apple has been engaging in RCRA hazardous waste treatment and disposal (including air emissions) without required permits; and explained that Apple has no technology or system in place to monitor the quantity or safety of their air emissions at the plant. [P's 7/31 RJN Exhibit A pg 3-29]. Now Apple is requesting a re-consideration of the toxic torts and framing their request as a favor to the Court.

26.     Defendant also asks the court to disregard Plaintiff's RJN because of a new rule Defendant created about overall page limits per motion practice that only applies to Plaintiff. A RJN with policy materials to support legal analysis is not much different than an amicus brief and should be considered regardless.

27.     Further, Defendant's arguments are strawmen and red herrings. [Def's 7/15 MTD at 17-18]. There is no chemical that is absolutely prohibited without exception. Similarly, no activity is absolutely prohibited in any and all circumstances. Even the most dangerous well established "Ultrahazardous Activities" could perhaps be considered not ultrahazardous if they were conducted in Antarctica.

28.     There is a clear balancing test to examine activities. The analysis of a chemical is part of the danger analysis, but it does not define what is ultrahazardous or not. If the danger is related to a chemical or gas, the chemical does need to be dangerous in order to support an ultrahazardous claim – and these are. Defendant ignores Plaintiff's pleadings, opposition, and request for judicial notice (and encouraged the Court to do the same), but those filings describe the dangers of toxic gases with specific examples provided of Arsine, Phosphine, Silane, Fluorine, Diborane, and Stibine. [P.'s 7/31 RJN Exhibit E; P's Opp to D's MTD ¶ 64-77].

29.     As noted in the RJN at Exhibit E, the Int. Safety Cards for four of these chemicals warns that no exposure to the chemical is safe, and any exposure requires medical attention. Five of these gases are also listed on the 1910 Subpart

— 12 —

H "List of Highly Hazardous Chemicals, Toxics and Reactives"[11] (a list of chemicals that have the potential for catastrophe) and other lists of very dangerous chemicals. These gases are inherently dangerous, and they carry a high degree of risk of serious harm. *See*, RESTATEMENT 2ND OF TORTS § 520 (1997); Cal. H&S C. §§ 25115, 25117, 25122.7, 25532(i)(2).

30.   Similarly, these gases are not the only ultrahazardous substances, as Apple also stores, uses, and self-reported dumping into the air concentrations of mercury and arsenic, and other very dangerous substances.[12] [SAC ¶ 68, 74].

31.   Further, semiconductor fabrication is not a common activity and industry has ample resources to choose where to locate its factories. Thus, its highly inappropriate for Apple locate a fab next to apartments and/or to hide the fab activities while apartments were built next-door, especially as a $3.4 Trillion company with nearly unlimited resources and options. Ca. Health and Saf. Code § 25110.4 defines "buffer zone" as "an area of land that surrounds a hazardous waste facility and on which certain land uses and activities are restricted to protect the public health and safety and the environment from existing or potential hazards caused by the migration of hazardous waste." A buffer was required here, by law and logic, but there was none at all.

32.   While there is usually some justification of a benefit to the community where industry provides jobs and brings in tax money – this is a different situation, because Apple does not pay its taxes and also implicates its

---

[11] "*This appendix contains a listing of toxic and reactive highly hazardous chemicals which present a potential for a **catastrophic** event…y.*" 1910 Subpart H 1910.119 App A; examples: Arsine (7784-42-1), Phosphine (7803-51-2), Stibine (Antimony Hydride) (7803-52-3), Fluorine (7782-41-4), Diborane (19287-45-7).

[12] "Extremely hazardous waste" means any hazardous waste or mixture of hazardous wastes which, if human exposure should occur, may likely result in death, disabling personal injury or serious illness caused by the hazardous waste or mixture of hazardous wastes because of its quantity, concentration, or chemical characteristics. Cal. H&S Code § 25115. See also, "Acutely hazardous waste," Cal. Code Regs. Tit. 22, § 66260.10.

employees in environmental crimes.[13]

33.     That's not the end of the analysis though. It is also critical to determine if there is any way to manage the chemicals safely.[14] The RJN's Exhibits D-O [RJN ¶ 13, 16, 18] explain that when it comes to these specific toxic gases used for semiconductor fabrication, there is no way to avoid a catastrophe. This is often the heaviest factor in the analysis for Ultrahazardous Activities – there is nothing that can be done to limit risk other than strictly restrict the amount of the substance allowed and how far it must be kept away from human life and sensitive environments. That is the case here – as noted by the city, county, and fire code [P's 7/31 RJN Exhibit O], that Apple asks this court to ignore [D's 7/15 MTD at 17]. Even if Apple were to take all reasonable precautions and exercised all reasonable care, there would still be unavoidable risk remaining in their use of toxic gases for semiconductor fabrication at 3250 Scott Blvd directly next to thousands of homes.

34.     The next critical factor is how appropriate the activity is for the location. 7/31 RJN Exhibit B [RJN ¶19-21] shows the position of this fab in relation to residential housing. Not only are there laws in place that are supposed to prevent this from ever happening, but any reasonable person viewing this distance is likely to shout "*Outrageous*!" – as thousands of people did with Plaintiff's recent Twitter thread about the RCRA inspection report for 3250 Scott

---

[13] "*Cupertino's mayor says Apple is 'not willing to pay a dime' in taxes,*" The Verge, May 5 2016, https://www.theverge.com/2016/5/5/11604704/apple-tax-evasion-cupertino-mayor-barry-chang-reform; "*Apple's Agreement With Cupertino Is Taxpayer-Fleecing Collusion,*" Bloomberg, April 18 2023, https://news.bloombergtax.com/tax-insights-and-commentary/apples-agreement-with-cupertino-is-taxpayer-fleecing-collusion; "*Want a lower tax bill? So do Apple and Genentech,*" San Francisco Chronicle, Aug. 12 2018, https://www.sfchronicle.com/business/article/Want-a-lower-tax-bill-So-do-Apple-and-Genentech-13148121.php -- "…In Santa Clara County, Apple is the leading appealer of tax assessments, with 489 open cases dating back to 2004, disputing $8.5 billion in property value…").

[14] Note: Apple argues that because these chemicals are regulated by the RCRA, that shows they are not ultrahazardous – but Apple refers to RCRA's regulation of transport, storage, and disposal of all hazardous wastes.

— 14 —

Blvd.[15] [See also, 7/31 Declaration re: June harassment].

35.     This is already a matter of public concern, and the opportunity to seek justice should not be prematurely or unfairly foreclosed for the Plaintiff or for the thousands of people who could sue Apple over the 3250 Scott matter in the future. It would also be inappropriate to close the matter now while there are open, active investigations into the same issues by the US EPA and BAAQMD enforcement teams which could potentially lead to criminal charges. [7/31 RJN Exhibit A; 8/18 RJN Exhibit T].

### F.   Apple trashed the Plaintiff's Property.

36.     Defendant also complained that Plaintiff did not provide enough detail about the damage to her property from these emissions. [Def's MTD at 15]. Her injuries were detailed, including photographs, in the SAC (for example at 488-492). Regardless, additional photos are included here, as well as the physical reactions cased by the six toxic gases from 7/31 RJN Exhibit E. Additional detail can also be pleaded if needed.

> **Arsine** (Arsenic trihydride). CAS #: 7784-42-1 Physical State; Appearance: colorless compressed liquefied gas with characteristic odor. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. As a result of flow, agitation, etc., electrostatic charges can be generated. Chemical dangers: Decomposes on heating and under the influence of light and moisture. This produces toxic arsenic fumes. Reacts with strong oxidants. This generates explosion hazard. May decompose explosively on shock, friction or concussion. [7/31 RJN Exhibit E; SAC at page 482].

> **Chlorine**. CAS #: 7782-50-5 Physical State; Appearance: Greenish-**yellow** compressed liquefied gas with pungent odor. Physical dangers: The gas is

---

[15] Twitter, Ashley Gjovik, June 23 2024,
https://x.com/ashleygjovik/status/1805006150410162322 [On just the first post of the thread - Impressions: 8M, Engagements: 427k, Likes: 75.36k, Retweets: 13.2k].

heavier than air. Chemical dangers: The solution in water is a strong acid. It reacts violently with bases and is corrosive. The substance is a strong oxidant. Reacts violently with combustible substances and reducing agents. The substance reacts with most organic and inorganic compounds, causing fire and explosion hazard. **Attacks metals, some forms of plastic, rubber and coatings.** [SAC at page 482].

**Diborane**. CAS #: 19287-45-7 Physical State: Appearance is colorless compressed gas with characteristic odor. Physical dangers: The gas mixes well with air, explosive mixtures are easily formed. Chemical dangers: The substance polymerizes. This produces liquid pentaborane. Reacts violently with oxidants. Decomposes rapidly on heating. This produces hydrogen, boric acid and boric oxide. Solubility in water: hydrolyzes to hydrogen and boric acid. [7/31 RJN Exhibit E].

**Fluorine**. CAS #: 7782-41-4 Physical State: Appearance is **yellow** compressed gas with pungent odor. Physical dangers: The gas is heavier than air. Chemical dangers: The substance is a strong oxidant. It reacts with combustible and reducing materials. Reacts violently with water. This produces toxic and corrosive vapors of ozone and hydrogen fluoride. Reacts violently with ammonia, metals, oxidants and many other materials. This generates fire and explosion hazard. Solubility in water: reaction. [7/31 RJN Exhibit E].

**N-methyl-2-pyrrolidone (NMP).** CAS #: 872-50-4. Physical state; appearance: Colorless hygroscopic liquid with characteristic odor. Physical dangers. Chemical dangers: Decomposes on heating and on burning. This produces toxic fumes including **nitrogen oxides.** It reacts violently with strong acids and strong bases. **Attacks copper and its alloys.** [SAC at page 483].

**Phosphine** (Phosphorus trihydride). CAS #: 7803-51-2 Physical State; Appearance: colorless compressed liquefied gas. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. Chemical dangers: Decomposes on heating and on burning. This produces toxic fumes including phosphorus oxides. Reacts violently with air, oxygen, oxidants such as chlorine oxides, nitrogen oxides, metal nitrates, halogens and many other substances. This generates fire and explosion hazard. **Attacks many metals.** [7/31 RJN Exhibit E; SAC at page

482].

**Silane** (Silicon tetrahydride). CAS #: 7803-62-5. Physical State; Appearance: colorless gas with characteristic odor. Physical dangers: The gas is heavier than air. Chemical dangers: The substance may ignite spontaneously on contact with air. Decomposes on heating and on burning. This produces silicon and hydrogen. This generates fire and explosion hazard. The substance is a strong reducing agent. It reacts violently with oxidants. Reacts with potassium hydroxide solution and halogens. [7/31 RJN Exhibit E; SAC at page 482].

**Stibine** (Antimony hydride). CAS #: 7803-52-3 Physical State; Appearance: colorless compressed gas with pungent odor. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. Chemical dangers: Decomposes slowly at room temperature. Decomposes quickly at 200°C. This produces metallic antimony and hydrogen. This increases fire hazard. Reacts violently with chlorine, concentrated nitric acid and ozone. This generates fire and explosion hazard. [7/31 RJN Exhibit E].

**Toluene** (Methylbenzene). CAS #: 108-88-3. Physical State; Appearance: Colorless liquid with characteristic odor. Physical dangers: The vapor mixes well with air, explosive mixtures are easily formed. As a result of flow, agitation, etc., electrostatic charges can be generated. Chemical dangers: Reacts violently with strong oxidants. This generates fire and explosion hazard. [SAC at page 483].

37.   While it's not clear yet which exact chemical caused what exact damage, it's clear some chemicals caused extensive damage (see photos) – as well as that many of the chemicals in use at 3250 Scott Blvd had the potential to cause extensive damage.



*Figure 4: Chemical reaction to copper alloy on Plaintiff's jeans*



*Figure 3: Plaintiff's shoe falling apart in use due to dissolved glues*



*Figure 1: Degraded plastic on Plaintiff's coffee grinder*



*Figure 2: Chemical reaction to copper alloy on Plaintiff's jeans*



*Figure 8: Yellowing of Plaintiff's white fabrics*



*Figure 7: Yellowing of Plaintiff's white fabrics: Yellowing of Plaintiff's white fabrics*



*Figure 6: Yellowing of Plaintiff's white fabrics*



*Figure 5: yellowing of some of Plaintiff's plastics, but not others*

### G.   The Statute of Limitations was tolled for the Toxic Torts (Nuisance, Ultrahazardous activities, IIED – Cancer).

38.   Defendant now demands that Plaintiff must prove how she discovered Apple's fab at 3250 Scott and otherwise her claims should be dismissed. [Def's 7/15 MTD at 16-17 and 8/5 Reply at 7-9]. Apple claims the statute of limitations accrued when Gjovik started to investigate (that's not the law) and that there's no explanation why she didn't file suit in 2020. [Id]. This is all false.

39.   The burden is not on Plaintiff to explain every detail of the facts supporting her tolling theory in a response to a motion to dismiss.[16] Plaintiff pled details about Apple's factory operating as a skunkworks, about how neither she or the government could figure out why she was injured, how Apple failed to have required permits and failed to file required reports to the government (ensuring there was no way someone like Plaintiff could investigate what they were doing), and when she contacted Apple and mentioned the facility in 2020, Apple said nothing to her about their operations there, but instead initiated a massive cover-up of the environmental issues. [4AC]. Out of fear her claims could be dismissed, Plaintiff pleads the additional details of the theory now.

40.   In 2022, Plaintiff was deeply traumatized by what happened to her in 2020-2021 and out of concern for public safety continued to monitor the nearby Superfund sites for any progress, updates, or possible revelations. Plaintiff primarily studied the TRW Microwave site, including monitoring the US EPA webpages and requesting extensive public records through FOIA. She also continued to ask questions and share information with the US EPA team overseeing the TRW Microwave site as they worked on the corrective actions with Apple and Northrop Grumman.

---

[16] Cal.Civ.C. § 458 "In pleading the Statute of Limitations it is not necessary to state the facts showing the defense, ... and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing that the cause of action is so barred."

41.     Plaintiff also kept an eye on the Honeywell "Synertek" Superfund site in Santa Clara next to the apartments where she got sick in 2020. [SAC ¶ 31-35, 166, 168]. Back in 2020-2021, there were only a few theories about how she could have gotten so sick. There was an investigation by the regional US EPA CERCLA team around the Synertek site because its VOC groundwater plume was historically under where these apartments are now.

42.     At this point, Gjovik trusts no one and continued to monitor the groundwater well reporting on CalEPA's Geotracker GAMA application herself.[17] In July 2022, she noticed that US EPA had tested the Synertek wells in 2021 following her complaints (they did not tell her), and there was increasing TCE in the groundwater monitoring well closest to her prior apartment.

43.     Plaintiff's activism was deeply chilled after the retaliatory litigation resulted in a gag order from March 2022 and until the reverse and vacate in November 2022. It became a crime for her to talk to anyone aspects of her claims and complaints, and so she mostly stopped talking until she would no longer face prison time for doing so. She picked up her research again in the winter of 2022/2023. (Note – Plaintiff alleges this duress, Defendant is liable for, also impacted her ability to 'discover' what Defendant did – which was probably part of the reason they did it.)

44.     In early January 2023, while checking for updates, Gjovik noticed the US EPA had uploaded the 2022 Five Year Report for the Synertek site.[18] She read the report and had a number of questions about the report and emailed US EPA and USACE with her inquires on January 11 2023. Her email was organized into four parts she titled: *"Increasing TCE In Well 33-A per GAMA"; "2022 FYR Notes Remediation Injections In 2019 & 2020, With 'Rebound Effect'"; "Santa Clara*

---

[17] CalEPA, Geotracker: Groundwater Ambient Monitoring and Assessment (GAMA), https://www.waterboards.ca.gov/gama/
[18] "*6th 5-year review rpt for Synertek, Inc. Building 1 Superfund site, w/appendices A-F*," 55 pp, Doc. ID 100029800 (September 8 2022). https://semspub.epa.gov/work/09/100029800.pdf

*Square Apartments In FYR"*; and *"3250 Scott Blvd."* (Because Apple has challenged three claims with an implication that Gjovik may be misleading the court about when/how she discovered the site, a copy of the email is attached to the 8/18 Declaration as Exhibit G.

45.     Gjovik was also reviewing the CalEPA CERS portal for information on all of Apple's California facilities as she was building a large spreadsheet of all of Apple's environmental and OSHA failures in California. (As of January 18 2023, there were 162 rows!). She noticed 3250 Scott Blvd had received many inspection violations in late 2020 (probably posted in 2021), including citations for somehow losing 1,700 gallons of diesel in 2020.

46.     In her January 11 2023 email, she wrote to US EPA: "*Was there an inquiry to 3250 about testing? Apple moved in 2015, per CERS records. In 2017, Honeywell General Counsel (Kate Adams) became General Counsel of Apple. Was this considered during any outreach about 3250? I'd be concerned about VI at 3250 not just for workers there, but also due to chemical reactivity with the stockpile of industrial chemicals they're apparently hoarding there, & even losing tracks of thousands of gallons of.*" (referring to the diesel). Gjovik was still focused on vapor intrusion. They did not respond.

47.     Gjovik became especially curious about a few of Apple's California properties that seemed to be more industrial than others. She filed Public Records Act requests for records about these sites. One of these requests (Request 23-127) was filed to Santa Clara city on February 9 2023 and included a request for 3250 Scott Blvd records in addition to three other Apple buildings in Santa Clara. On February 21 2023 the city of Santa Clara responded that it would take a while to gather the records but linked to four prior requests where some records had already been released in the interim. [8/18 Declaration Exhibit H]. The requests with records for 3250 Scott Blvd (Requests 22-1148 and 22-1149, filed October 11 2022) were from AEI Consultants explaining they were working on "property

condition assessment reports," assumably for Apple.

48.    The only documents released were lists of permits. Gjovik skimmed the permits for 3250 Scott Blvd and was flabbergasted to see permits for semiconductor fabrication tools (which she recognized only due to her work on hardware development at Apple). She quickly communicated her findings.

49.    She replied to US EPA complaining they still had not responded to her concerns about the groundwater wells and also added:

> "A new, additional question for you all - is how long have you known that Apple was doing literal actual silicon fab in that 3250 Scott Building since ~2016 through current? Like, back in the 1970s-1980s Silicon Valley silicon fab, and only .2 miles (.3 km) from RESIDENTIAL BUILDINGS.  Apple's buildings permit (attached) notes solvent/chemical evaporation in the yards near the "gas bunkers" & a large number of solvent exhaust ducts to the roof from the variety of clean rooms & fab stations.  The building is registered in CERS but is not a DTSC, Water Board, or US EPA site. A literal silicon fab factory that is spewing toxic chemicals into at least the air is only overseen by the city fire department & which only inspected a couple times - finding open violations but apparently never even following up on them." – Ashley Gjovik (2/22/23 12AM).

Plaintiff was very distressed.

50.    On February 21 2023 around 11:20pm, Gjovik began tweeting about Apple's permits at 3250 Scott Blvd, trying to lead up to a grand reveal of the fab. However, an engineer spoiled the surprise, also recognizing what she did, and quickly posted "*@[account] do you have any IH/OH friends who can say exactly how stupid it is to do modern chip fab next to residential buildings?*" to which Gjovik responded, "*you spoiled the surprise for the non-hardware people, but good job, yes… APPLE IS SO [expletive] DUMB I'M GOING TO SCREAM.*"[19] Gjovik then tweeted out the formal announcement:

---

[19] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628249545367777281

> "APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." [20] [4AC ¶ 149, FN 39].

Gjovik replied to her own post a moment later adding:

> "I've been making muffled screaming noises for about twenty-five minutes now WTAF IS WRONG WITH THEM THEY MUST HAVE KNOWN THEY DID THAT [expletive] TO ME!!! No wonder they gave me that "extreme condition leave" to move out, Apple is the extreme condition." [21] (See, SAC ¶ 694-695).

51.    Gjovik started emailing with a friend, Lenny, about what she found. They met during her activism in late 2020 and emailed each other about environmental matters ongoing. She shared with Lenny she also found a "*cryptic fire department gas leak report from June 2019 at 3250 Scott.*" Apple's name was redacted, and the chemical name misspelled. He explained, "*I believe the correct spelling is phosphine. This is why the county's fire departments led the development of the model hazardous materials storage ordinance…In general, the gas releases have more acute health effects than the releases to groundwater*." Lenny was involved it getting the Santa Clara County toxic gas ordinance passed in the 1980s and she trusted his expertise. [Gjovik's primary witness for the tolling of statute of limitations for environmental claims in this case is Lenny. He was also recently the mayor of Mountain View, as well as a City Council member, and member of the city's Planning Commission in the 1980s. He is also the executive director of the Center for Public Environmental Oversight. Lenny also tried to investigate

---

[20] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628250591779516416
[21] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628256067065880577

how Gjovik was injured and also could not figure out it out in 2020-2022.].

52.     Prior to Gjovik's February 2023 discovery, numerous government agencies and experts had reviewed Gjovik's complaints and the site data; they tried to figure out what could have made her sick. Eventually there was consensus that it was probably not the Superfund site, or the existing Brownfield contamination – and the best guess was maybe something in the building materials at the apartment. That's where it left off and that's why Gjovik wrote "*I thought I was dying...*" in desperation and which was published in March 2021. [8/18 RJN Exhibit P].

53.     Gjovik undertook months of research about the facility at 3250 Scott Blvd, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint, which she filed in early June 2023. A manager in US EPA's Enforcement and Compliance Assurance Division for Hazardous Waste and Chemicals Section confirmed receipt on June 20 2023 and told Gjovik they were reviewing the complaint and documents she provided. She had a call with the manager on June 21 2023. An inspector was assigned, and a formal investigation was opened around July 12 2023. She met with the investigator several times and provided additional evidence and records, leading up to the EPA's August 17-18 2023 unannounced onsite inspections of 3250 Scott Blvd. [P's 7/31 RJN Exhibit A].

54.     Gjovik started working on her first draft of the complaint in this instant civil lawsuit only on or around August 16 2023 and filed suit on September 7 2023, only two days prior to the statute of limitations expiration for her *Tamney* claim, and after only being able to spend roughly three weeks on research and drafting.

55.     Plaintiff's nuisance claim at 3250 Scott Blvd was included in the complaint from the first draft, however she did not think she could complete the required environmental and regulatory research in time, so she prepared to either

— 25 —

request an amendment, or to file a second suit in state court for the toxic torts. When Apple asked Gjovik to draft an amended complaint in October 2023 due to their delayed appearance into the litigation, Gjovik seized the opportunity to proactively merge in the toxic tort claims to this lawsuit.

56.     Earlier, Gjovik spent an incredible amount of time in 2020-2021 researching and investigating, trying to figure out what happened to her next to 3250 Scott Blvd. She reviewed public records for all the nearby next-door buildings including 3250 Scott Blvd. When she pulled 3250 Scott up on the US EPA portal in 2020, the ECHO page noted that there had been no TRI releases reported since the 1990s, cited no violations or issues, and made the office look quite benign. A copy of the exact PDF Plaintiff made of the page during her research in September 2020 is attached, dated September 8 2020. [P's 8/18 RJN U]. This same document was also in the evidence Box folders created for Apple to review from July-August 2021.

57.     Defendant's MTD cited the "*I Thought I was Dying…*" article as some sort of proof that the statute of limitations should expire. Defendant even added a quote (that is not from the article or the complaint) to attempt to cast doubt on Gjovik, as discussed earlier. [D's 7/15 MTD at 16-17]. Thus, in the 2nd RJN, the article is included for the fact of what Gjovik actually said about the matter in 2021. [P's 8/18 RJN Exhibit P].

58.     Plaintiff was exercising a fundamental right as a California citizen to request and review public records about hazardous waste.[22] In doing so, Plaintiff was finally discovered what Apple was doing, based on environmental activities undertaken by Apple and/or the property owner in late 2022.

---

[22] "The Legislature has found that access by the people of this state to public records is a fundamental and necessary right. The Legislature finds that it is necessary to further the public's right of access to public records pertaining to hazardous waste management, information, and cleanup, to assure the fullest opportunity for public participation in permitting and other decisions in order to protect public health and the environment." CA Health & Safety Code § 25103 (2023).

59.    Prior to her discovery of Apple's fab, Plaintiff only knew she was exposed to chemicals somehow – but did not know exactly what those chemicals were, did not know where they came from or how they got in her apartment, and did not know if there was wrongdoing or what type of wrongdoing might have occurred. Further, most of her efforts to investigate were focused on the potential of vapor intrusion occurring from the soil or groundwater under the apartments, and if that was the cause, the liable parties would be her property manager (not Apple), the Superfund responsible party (not Apple), and probably the contractors who worked on the clean-up (also not Apple) – unless Apple was dumping toxic waste in the groundwater too. Even if that was enough to trigger accrual of an action for vapor intrusion, discovery of one potential wrong does not accrue all other wrongs – the discovery rule still applies to other wrongs.

60.    If plaintiffs were required to file all causes of action when one cause of action accrued... they would run the risk of sanctions for filing a cause of action without any factual support.[23] "Indeed, it would be difficult to describe a cause of action filed by a plaintiff, before that plaintiff reasonably suspects that the cause of action is a meritorious one, as anything but frivolous.... the interest of the courts and of litigants against the filing of potentially meritless claims is a public policy concern."[24]

61.    Also, for example, suspecting lung disease was caused by chemicals at work is not enough for statute of limitations accrual – the victim must have knowledge of the specific chemical that caused the injury.[25] IIED accrual occurs when the plaintiff suffers severe distress as result of defendant's conduct, not necessarily at the time of the wrongful conduct itself.[26]

---

[23] Code Civ. Proc., § 128.5; see *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 14 [ 244 Cal.Rptr. 581] [holding lack of factual basis for claim to be grounds for imposing sanctions].
[24] *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 815 (Cal. 2005).
[25] *Rosas v. BASF Corp.*, 236 Cal.App.4th 1378, 1394-99 (Cal. Ct. App. 2015).
[26] *Roman v. County of Los Angeles*, 85 Cal.App.4th 316, 323 (Cal. Ct. App. 2000).

62.     Action accrual in statute of limitations commenced to run at the time the plaintiff becomes aware of her exposure and defendants' responsibility for it. *In re Hawaii Federal Asbestos Cases*, 734 F. Supp. 1563, 1570 (D. Haw. 1990) – ("the statute of limitations does not begin to run until plaintiffs knew or should have known that they have suffered the functional impairment, that defendants manufactured a defective product, and that there exists a causal connection between the two.") Action accrues not simply with knowledge of injury but with knowledge an injury was caused by the wrongdoing of another. *Kernan v. Regents of the Univ. of Cal.*, No. A162750, 7 (Cal. Ct. App. Aug. 29, 2022). Constructive suspicion is not enough. *Nelson v. Indevus Pharmaceuticals, Inc.*, 142 Cal.App.4th 1202, 1205 (Cal. Ct. App. 2006).

63.     Finally, Apple and their agents (including these Orrick attorneys) went out of their way to ensure Plaintiff did not discover what Apple had done to her, including making false statements to the government. They failed to provide her information and tried to point her in other directions, all the while mercilessly harassing and tormenting her. Further they had a duty to disclose not only to her, but to the community and government too, what they were doing and had done, under multiple Right to Know, environmental, health and safety, and labor laws.

## H.   Apple's Unfair Business Practices, in violation of UCL § 17200, caused Plaintiff harm to her property and economically.

64.     Defendant attacks Plaintiff's § 17200 standing and injuries. Plaintiff did more legal research, worried that without pleading restitution, her injunctive claim could be dismissed per Defendant's arguments. She reintegrates content from the SAC, and she proposes a supplemented pleading as follows. This also includes additional injury for standing, though she believes what she pled was sufficient. (Apple argues that a Lyft charge would not count because it's just going to the building before, they do things to her and ignores the fact, she would also

need to take a Lyft to leave the building). Further, studies like Gobbler were injuring her continuously.[27] The Gobbler app still tries to connect to her personal iCloud account, even years after her termination. [8/18 Declaration Exhibit I].

> Plaintiff suffered numerous injuries due to Defendant's Unfair Business Practices including the cost of transportation to visit the "black sites" where Apple conducted some of these studies and hosted the secrecy trainings; and also costs of buying a required safe to store the prototype at home as required by many hardware programs. In addition, the time Plaintiff had to spend on these activities, is time that could have been spent on professional development and consulting. Plaintiff lost the opportunity to make additional income due to Dependent's policies and requests to spend so much time on these studies and data collection.[28]

> But worse, Defendant claims it terminated Plaintiff because she publicly complained about these activities. Plaintiff's UCL claim also argues its unlawful and unfair that Apple requires secrecy about these activities. Thus, terminating her because she did not maintain that secrecy is a direct injury to her financially (i.e., lost income and benefits)[29] and to her property (i.e., trade libel; destroying her possessions from her desk prior to mailing them back to her, etc.) due to Apple's unfair business practices.[30]

> In addition, due to Apple's "live on" policies, Plaintiff's only electronics

---

[27] *Clayworth v Pfizer, Inc.* (2010) 49 C4th 758, 789, 111 CR3d 666 (declining to read into Bus & P C § 17204 requirement that plaintiffs prove compensable loss at outset).

[28] *Cal. Med. Ass'n v. Aetna Health of Cal.*, 14 Cal.5th 1075, 1084-1085, 1089-1090 (Cal. 2023)— "CMA may not have incurred additional out-of-pocket costs in responding to Aetna's allegedly illegal practices; its employees were salaried and would have been paid regardless. But the economic value CMA received from their labor was reduced…That injury suffices for standing purposes."

[29] *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal.App.4th 544, 561 (Cal. Ct. App. 2013 )— "having alleged that he had been forced to pay increased advertising costs and to reduce his prices for services in order to compete, and that he had lost business and the value of his law practice had diminished, succeeded in alleging at least an identifiable trifle of injury as necessary for standing under the UCL."

[30] *Animal Legal Defense Fund v. LT Napa Partners LLC*, 234 Cal.App.4th 1279, 1283-84, (Cal. Ct. App. 2015) – "Where the economic injury is diversion of resources, the proper focus of the inquiry is … on whether the plaintiff 'undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [misconduct].' "

were Apple products, including the ones she bought herself as a consumer. However, due to Apple's extensive surveillance capabilities, Apple's privacy policies which say she has no privacy ever again, and all of Apple's retaliation – Plaintiff had to purchase non-Apple computers, phones, and peripherals in 2021. This cost Gjovik a lot of money, and she lost the money she had invested in the Apple products, and it was only due to Apple's unfair business practices.

In addition to the requested injunctive and declaratory relief, including enjoining these Unfair Business Practices and disgorging at least the data of Gjovik and any products built off that data, Plaintiff also requests restitution of the back pay she is owed from Plaintiff. Because this claim is under UCL and not an employment or labor claim, the after acquired evidence and other imbalanced employment damages policies should not apply here. If Defendant attempts to argue these policies to reduce her damages under the labor and employment claims, Plaintiff asks that the back pay instead be restituted from the UCL claims without deductions, and with interest. [31]

65.     Data and software disgorgement is appropriate here and there is precedent of FTC using software disgorgement as a remedy with at least five cases since 2019, including against Amazon and Cambridge Analytica. [32] There is also recent FTC precedent for enjoining a company's use of biometric technology following violations of the Act. [33]

66.     A California Unfair Competition Law (UCL) claim generally accrues

---

[31] *Espejo v. Copley Press, Inc.*, 13 Cal.App.5th 329, 377 (Cal. Ct. App. 2017) – "[T]he trial court's discretion to award restitution under the UCL is very broad....when necessary in order to arrive at fair compensation, the court in the exercise of a discretion may include interest or its equivalent as an element of damages."

[32] IAPP, *Algorithm disgorgement 'significant part' of FTC's AI enforcement strategy,* https://iapp.org/news/a/algorithm-disgorgement-significant-part-of-ftcs-ai-enforcement-strategy/

[33] US FTC, *"Rite Aid Banned from Using AI Facial Recognition After FTC Says Retailer Deployed Technology without Reasonable Safeguards,"* Dec 19 2023, https://www.ftc.gov/news-events/news/press-releases/2023/12/rite-aid-banned-using-ai-facial-recognition-after-ftc-says-retailer-deployed-technology-without (Rite Aid's unlawful conducted included employees using an app on their mobile phones to capture photos of customers that gathered the person's biometrics without notifying the person. Rite Aid is now prohibited from using facial recognition technology for surveillance purposes for five years.)

when each of the elements of the cause of action (wrongdoing, harm, and causation) are satisfied.[34]   Defendant argues Plaintiff cannot prove the discovery rule for Gobbler, but the discovery rule is not relevant for Gobbler. [Def's MTD at 8].

67.   The UCL also supports equitable tolling which suspends or extends the statute of limitations where a plaintiff has reasonably chosen to pursue one remedy among several remedies and the notice function of the statute of limitations has been served;[35] the continuing violation doctrine by which a series of wrongs or injuries are aggregated, and the limitations period accrues for all of them on commission of the last of them;[36] and the continuous accrual rule by which a series of wrongs or injuries is viewed as each triggering its own limitations period...[37]). All of these apply here.

68.   In addition, there is duress as Apple threatened employees with termination if they were to even speak to their friends about the study [8/18 RJN Exhibit R], let alone file suit. Further, Apple claims it terminated Plaintiff over her speaking publicly about it and may still file a related counterclaim in this lawsuit, thus there is certainly still continuing and imminent harm. In addition, when Gjovik checks the settings of her "personal" iCloud account, it still shows "Gobbler" trying to connect to her data.

69.   It's also unlawful to propose an agreement for sale of consumer goods/services with provisions waiving consumer's right to make statements regarding the seller or its employees or agents or concerning the goods/services, and unlawful to penalize consumers for exercising these rights. Any contract with such terms is contrary to public policy and unenforceable. Cal. Civ Code

---

[34] *Beaver v. Tarsadia Hotels,* C.A.9 (Cal. )2016, 816 F.3d 1170, certiorari denied 137 S.Ct. 113, 580 U.S. 823, 196 L.Ed.2d 41.
[35] 3 Cal. Proc. (5th), Actions, § 720 et seq; § 147 Statute of Limitations., 13 Witkin, Summary 11th Equity § 147 (2024).
[36] 3 Cal. Proc. (5th), Actions, § 564.
[37] 3 Cal. Proc. (5th), Actions, § 522 et seq.

1670.8(a). The deed poll is just one example of the contracts Apple coerced employees to sign and is clearly unenforceable. [4AC ¶112; P's 8/18 RJN Ex. R].

70.    Apple's highly restrictive, and unlawful, policies threatened employees with punishment if they were to even speak to their family about what happen was doing to them. The Deed Poll includes restrictions on speech, a highly intimidating 'opt out' procedure, and a deeply unbalanced exchange between parties. This specific document was provided to Gjovik for a physical safety issue caused by a consumer product that Gjovik had bought with her own money. Gjovik was burned by the product, resulting in rashes and a blister, but Apple's contract says that is now a secret and she could be fired if she told anyone. She had been injured by products prior as well, mostly prototypes that Apple had her "live on" to do QA for them in her personal time, prototype batteries, rough edges, or development lasers. In 2019 Gjovik reported her "live on" iPhone had just blasted her in the face with a flash from the Face ID lasers that burnt her eyes. Apple Global Security rushed over to her and took her iPhone away in a Pelican Case. Is that a secret too?

71.    Cal. HSC 24170-24179.5 provides statutory rights for those harmed by unlawful experiments and to penalize those who conduct unlawful experiments. Among other requirements, human experiments but use informed consent with disclosure of the experiment prior to consent, deciding whether to consent without coercion or undue influence, and providing the participant a copy of the consent form. (Apple followed none of these rules with Gjovik & Gobbler, and other studies). A number of other statutes also protect Gjovik and her coworker from these experiments – including the prohibition of tracking employee's GPS outside of work while Gjovik "lived on" prototype Air Tags, or even the iPhones for that matter

### I.    Apple's Conduct was Outrageous, and it Intended to and Did Cause Extreme Distress.

— 32 —

72.     Defendant claims Plaintiff's IIED complaint is simply complaining that some Apple employees repeatedly called her a liar and said she deserved to be hurt in retaliation for speaking out – that's only a tiny bit of the claim, but that's fairly bad in itself? Numerous cases have held, and the Restatement emphasizes, that there are only a few categories of conduct where an employer may be found to have engaged in IIED, and most common are defamation – especially accusations of dishonestly and/or criminal conduct; denigration and humiliation;[38] deranged harassment;[39] and IIED used as a tool in the employer's cover-up of wrong doing.[40] Calling the employee a liar, especially in retaliation for the employee making labor or whistleblower complaints, is one of the few approved buckets for potential IIED claims.

---

[38] "Cross humiliated Ferrell by publicly …spreading false rumors about her medical leave; coerced her into taking unpaid leave; ridiculed her medical condition; took actions which delayed her medical leave; attempted to "build a file" to get her fired; picked through her trash to retrieve evidence of her errors; and engaged in efforts designed to degrade her and to make her appear incompetent. The complaint also alleges that Cross and Henderson called Ferrell a liar, mentally unstable, a chronic complainer, and often referred to her as a "bitch," a "slut," and a "cunt." *Ferrell v. Cross*, 557 N.W.2d 560, 564 (Minn. 1997). "To be denied a right granted to all other employees for conduct unrelated to her work was to degrade her as a person. His unilateral action in purporting to remove any free choice on her part contrary to his earlier assurances also would support a conclusion that his conduct was intended to emphasize that she was powerless to do anything to assert her rights as an IBM employee. And such powerlessness is one of the most debilitating kinds of human oppression." *Ruben Miller v IBM Corp*, 21 Cal. 3d 910, 927-928.) [162 Cal. App. 3d 256] (1984).

[39] "Actions which may not make an actor liable in one situation may make him liable in another. Here, both Knudson and Elmore had knowledge of Wangen's mental condition at the time of the meeting." *Wangen v. Knudson*, 428 N.W.2d 242, 248 (S.D. 1988); "A statement to the press by a physician assumed to know the facts that a person is suffering from a potentially fatal disease, even though the physician was aware that the person was not stricken with that condition. This, of course, constituted intolerable professional conduct. Disseminating the falsehood through the national press compounded the harm." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir. 1979).

[40] "Plaintiff's contentions of persistent harassment and attempted coercion for filing union grievances, though generalized at this point, are of the type that a trier of fact might find do constitute extreme and outrageous conduct." *Lynn v. Smith*, 628 F. Supp. 283, 292 (M.D. Pa. 1985); "The defendants (acting in conspiracy) dragged her out of her house in the middle of the night after searching it; told her children that she could have killed them and herself; threw her in jail for ten hours; denied her access to a lawyer or court; and told her she would remain in jail unless she agreed to check into a mental institution," *Baltz v. County of Will*, 609 F. Supp. 992 (N.D. Ill. 1985).

73.     Defendant's summary is only a tiny bit of Plaintiff's IIED claim. Further, she was already in a very bad situation and Apple knew it (eggshell), with Plaintiff even complaining to Apple about IIED in August 2021 as part of her Issue Confirmation. In addition, Apple was in a position of power and authority to severely hurt Plaintiff's interests, and Apple did so knowing the harm it was causing and did so in order to cause that harm.

74.     Gjovik's IIED claim captures the post-termination harassment, intimidation, and torment of Plaintiff by Apple – as well as her "emotional distress" damages associated with other claims but with future damages. (i.e., denylisting as part of employment claims). Apple did not challenge the IIED claim in the SAC. Apple's response is that it did not have sufficient page limit to do so. Does that mean Apple plans to file yet another MTD after this one against more claims?

75.     Defendant accuses Plaintiff of misconduct and incompetence related to several claims, including this one – so Plaintiff provides additional details that could be supplemented to the 4AC. (Note: Def. also asks the court to not look at Plaintiff's declaration with emails and social media posts with Apple actively harassing her about this lawsuit – which is all the more reason the Court should review those documents).

76.     First, vicarious liability can be established against employees employed with Apple at the time of the incident, under at least three theories: respondeat superior [Cal. Civ Code 2299, 2316], ratification [Cal. Civ Code 2307, 2310], and alter ego. [see, SAC ¶ 744-7, 844, 880, 1044, 1603-4]. She also argues outgrowth, customary incidents, benefits to employer, and risk inherent in the company's culture – all of which were reasonably foreseeable to Apple. (See SAC ¶ 922-935).

77.     The harassment was undertaken by many Apple employees, under their names and identifying as Apple employees. They also frequently branded the

— 34 —

harassment as an Apple product of some sort, for instance citing Apple products or themes in their fake screennames (for example, "SquareinaRoundHole" referencing the famous Apple commercial), designing threats modeled after Apple heritage (i.e., threatening employees that if they speak publicly about work conditions they will get "Gjovik'd" – an iteration on the phrase "Steve'd" referencing Steve Jobs' habit of abruptly firing people, see SAC at 542).

78.   Several employees who harassed her online did so prior to and after she was terminated, and as an outgrowth of either prior retaliatory harassment (see Messick at SAC at 335, who also repeatedly threatened her with termination in retaliation for her speaking to the press about workplace safety at Apple prior to Gjovik being put on leave. He then took to social media to harass her after).

79.   Or, as a representation of the retaliatory animus of her managers (see, Neoform, SAC at 536-7, her coworker sitting across the aisle from her at 825 Stewart Drive, seeing her manager every day and participating in conversations about Gjovik. Ian took to Twitter and other social media to harass and threaten Gjovik starting in August 2021 and continuing through fall of 2021). Ian's comments included statements like: "*Based on her writings and twitter feed, I would not be surprised in the least to learn she has some kind of psychosis,*" "*You think there are law firms that will want to hire her? She's toxic,*" "*Now Apple has fired her for supposedly 'leaking' insider information. A brief glance at her twitter feed can resolve the 'supposedly' part,*" "*She's entirely to blame for her firing,*" and "*Vexatious litigant incoming!*" (SAC ¶ 536).

80.   Two employees posted horrible things about Gjovik under their own names. Ricky (a manager/supervisor, alter ego, Resp. Sup., ratification) and Shantini (Resp. Sup., ratification). Both accused Gjovik of lying, of acting in bad faith, having poor moral character – and urged people and the press to ignore Gjovik. Ricky specifically referenced Gjovik's protest of Gobbler and government filings as a source of his animus towards her, and Shantini posted a long Twitter

— 35 —

thread repeatedly complaining about Gjovik's government filings against Apple – claiming they were meritless and made in bad faith. This occurred while Gjovik was still an employee, was covered by Apple blogs who asked Apple for comment, and was amplified by other coworkers, including members of her first team at Apple under Venkat Memula. When Gjovik was terminated, Ricky, after posting about how Gjovik was a bad actor for filing government charges against Apple and speaking out about work conditions. They posted in response to the termination: "Sometimes you fuck around, sometimes you find out." Posts were shared and liked by hundreds of employees, with some of them replying and commenting to support the harassment, including by managers and senior leaders at Apple.

81.   Appleseed harassed Gjovik on social media as well as many other mediums (Resp. Sup., ratification). The social media harassment started in late August and early 2021, while both were still employees at Apple. Appleseed's defamatory, intimidating, and harassing comments were posted publicly, and also sent privately to individuals who interacted with Gjovik and expressed support for Gjovik. Public posts usually were positioned as being based on some sort of inside information from Apple Global Security and/or HR ("I know something you don't"), and as if she was speaking on behalf of the company about Gjovik. The content also revolved around animus over Gjovik's NLRB and other government charges against Apple. (See, for example, SAC at 598-604, 609-612, 654-7, 675, 680-3, 685-93, 712-726, 732).

82.   The burner accounts (not representative of real people and created just to harass Gjovik) also showed Apple connections through their activity (for example several accounts were used solely to harass Gjovik and other Apple legal adversaries including Epic Games and Corellium, see SAC at 456).

83.   See harassment examples in the SAC at 414-5, 430-32, 446, 456-81, 563-5, 587, 594, 596-600, 608, 612, 632-33, 635, 637, 650, 644, 886-7 874, 877-85, 1095-1109. See, spying and stalking examples in the SAC at 669, 889-891, 922-

929. See, false police report examples in the SAC at 590-92, 595, 1438. (This was conducted by multiple people – despite Apple's framing of the harassment as coming from a lone gunman).

84.   Apple was aware of the harassment and aware of the distress caused to Gjovik by it, through their surveillance of her online presence, of their own direct participation, the press 'asking for comment' on matters including the harassment, Apple's admitted "investigation" into Gjovik's social media in August-September 2021, employees filing complaints about things Gjovik complained about and/or about Gjovik, and a number of other supporting theories.

85.   Second, there are also agency and conspiracy theories for employees who left Apple after already starting the harassment as an employee, and continued that harassment after, or people who assisted in the harassment, were never an employee, but Apple is still liable for their actions (i.e., third party counsel).

86.   For example, one of Apple's four+ external counsel law firms hired to fight Plaintiff, MWE, was caught multiple times harassing Gjovik online and in real life. The firm filed notice of appearance on Gjovik's NLRB charges in August of 2021. In 2022, the firm somehow knew Appleseed sued Gjovik and quickly requested copies of the order against Gjovik and the entire case file for the matter. How did MWE know about it if they were not involved? How did MWE know the lawsuit was based on Gjovik's NLRB charges against Apple? What did they plan to do with the records?

87.   The firm was also caught in 2023 using a fake Twitter account to harass Gjovik. The account called Gjovik a liar, repeatedly degraded her over the weight she gained during the trauma, and otherwise ridiculed her. Gjovik identified the account was associated with the unique name of one of the attorneys and also spent most of its time harassing Gjovik and unions which the firm, and specific lawyer, was hired to oppose in labor organizing. [See "Praveen" examples

— 37 —

in the SAC ¶ 704, 730].

88.    The lawsuit filed against Gjovik on January 31 2022 was done so, admittedly in the petition and the TRO hearing testimony, because Gjovik filed an NLRB charge against Apple, because Gjovik claims she was retaliated against by Apple, and because Gjovik had complained about harassment from Apple Global Security, including Appleseed. Appleseed publicly posted she was in some sort of dire trouble with Apple in January 2022, and then after filing the lawsuit said the issues were resolved. The night after she filed the lawsuit, she posted a photo of her holding an Apple Global Security "challenge coin." Appleseed also repeatedly claimed some unnamed third-party told her to file the lawsuit. A few days later she also posted that she had personally never sued anyone – despite just suing Gjovik – which begs the question of who she was suing Gjovik for if it wasn't herself. (for example, SAC ¶ 601-605).

89.    The majority of Appleseed's complaints in the lawsuit were arguments focused on a legal filing Gjovik submitted to the government including law enforcement, where she had gathered evidence of the harassment against her, alleging Apple was engaging in criminal conduct. (See, for example, SAC at 600, 608-9, 699-700). Appleseed repeatedly demanded Gjovik alter, withdraw, and conceal this legal filing – and upon winning the first Court of Limited Jurisdiction hearing against Gjovik, then proceeded to report the federal legal filing to Gjovik's web server as "child porn." (SAC ¶ 1077).

90.    The Order prohibited Gjovik from speaking to anyone, even privately, about significant aspects of her litigation against Apple, and it had now become a crime to say/write the name of her office. (Note: Gjovik was certain Apple would use the Order to try to incarcerate Gjovik, and Gjovik did discover that Orrick – counsel here – employ a large number of prior Office of the Attorney General staff from state of Washington, including a prior AG. If Apple wanted to get Gjovik thrown in jail, they had the means to do so.

— 38 —

91.    Apple knew Gjovik had been facing harassment from Appleseed and other Apple employees, and when Gjovik filed her January 2022 NLRB claim, she communicated to Apple to send a cease & desist to a number of employees illegally harassing her, including Appleseed, Ricky, and Shantini – and also asked Apple to get them to stop reporting her to law enforcement. This was around January 11 2022, which was followed by even more reports to law enforcement. (SAC ¶ 593). Gjovik's post asking Apple to stop the harassment was also a subject of the lawsuit, claiming it was illegal for her to post it.

92.    While Appleseed apparently left Apple around December 2021 with a large settlement, she informed Gjovik in January-February 2022 that she remained in contact with Apple, they spoke about Gjovik, and they were both trying to censor her social media posts. Appleseed repeatedly urged Gjovik to drop her allegations against Apple. (SAC ¶ 1452). Appleseed emailed Plaintiff on February 5 2022, harassing Gjovik claiming that Gjovik complaining about Apple's threats of violence against her, and complaining about Apple trying to make her suicidal, was "*harmful to Apple*" and Appleseed said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony (SAC ¶ 1452).

93.    On September 1 2021, an Apple employee, Shantini wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator*. Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies*." Shantini's posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts, as well as named Apple employees and managers. On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB{ XE "NLRB" } charge against Apple, suggesting she was lying. (The blog retracted nearly the majority of the post after Gjovik threatened to sue them for defamation and false light). The

— 39 —

article included quotes from Shantini and Ricky. Ricky also shared Shantini's thread about Gjovik and Ricky stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple. (SAC ¶ 481).

94.    Third, there were a number of 'fake' accounts created solely to harass and interact with Gjovik that knew way too much about Gjovik, too much about Apple's internal operations, and too much about the labor and environmental disputes. Gjovik quickly responded to them either as "Apple HR" or "Apple's lawyers". One of the accounts, Beezie, started harassing Gjovik in August 2021, taking an extremely personal interest in Gjovik's complaints about Apple, and sent Gjovik URLs to the EEOC website. Gjovik responded, *"you sure know a lot about employment law, Beezie."* (SAC ¶ 414-5). The day Gjovik was fired, Beezie posted "*#ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit #coward,"* and then paid to 'promote' her Twitter post. (SAC ¶ 1052). (Note, a payment like that should be discoverable from Twitter).

95.    The next one, Mel Nayer, tried to coerce Gjovik to delete the screenshots of internal documents she had posted, claiming the posts were leading to 'death threats' and proceeded to reference a number of internal Apple tools and systems. Another one, I'mPinkThereforeI'mSpam, posted, "*You'll never work as an attorney,"* (post then liked by other anonymous account "BeezieWacks"), and added "*The nail that sticks out, gets hammered.*" (SAC ¶ 1055).

96.    On September 8-10 2021, yet another one, "crissnovak," started posting about Gjovik on Reddit, sharing a link to Shantini's Twitter posts harassing Gjovik about Gjovik's NLRB and US DOJ complaints, "*Shantini is my hero, best take on "A" with over 200+*

*be cringing*." On September 10 2021, the account posted in a thread about Gjovik: "*The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help*."  The same day the account posted about Gjovik: "*I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity*."  (SAC ¶ 532-533).

97.     On September 11 2021 the crissnovak account posted, "*I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!*" Crissnovak then began threatening other Apple employees they may "*get Gjoviked*!" if they speak out. On September 13 2021, the crissnovak account posted on a thread about Gjovik: "*.... Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood...*" crissnovak sure knows a lot about employment law too. The account added that Gjovik was on the "*chubby side*" and had "*baby teeth lol*." (SAC ¶ 532-533).

98.     Another, FirstNameBunchofNumbers, started harassing Gjovik in 2022, primarily taunting Gjovik about the lawsuit filed against her. The account's profile photo was the docket for Appleseed's lawsuit against Gjovik, and the biography was "*Ashley is a bitch.*" Among other deranged posts, the account tagged Gjovik with a link to the California Moral Character exam and inquired if Gjovik will still be able to be a lawyer with this lawsuit against her. The account added an

— 41 —

image of a smirking teenager.[41] (SAC ¶ 861-868). The retaliatory lawsuit also was filed with the intention of preventing Gjovik from becoming a licensed attorney. Gjovik had a right to become an attorney and Apple egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Apple) harassed Gjovik about exactly this. The same account also posted about Plaintiff: "*honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*" and "*If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law.*" (SAC ¶ 366).

99.   BabyHummingbird was the account who threatened Gjovik that Apple was mailing her a box with the severed head of one of her loved ones, but it really contained her possessions from her desk trashed and covered in glass shards, and a bug planted in one of her items of décor. 18 U.S. Code § 876. The account only posted to and about Gjovik, and its first "like" was an advertisement that read, "*Apple's back better than ever!*" BabyHummingbird also liked posts about Gjovik, including the "*don't get Gjovik'd*" posts.

100.   Gjovik also received messages via the webform on her website, which allowed anonymous people to message her, though it recorded their IP addresses. Messages were often vulgar and offensive, and also sent from IP addresses flagged for spam and malicious conduct. Examples include: "*Cunt*" (9/12/21); "*Nobody wants to see your nasty nudes. Next time use your work phone for work only you stupid moron*" (9/20/21); "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple. Matthew 5:38-42…*" (12/8/21); "*If only Steve Jobs were*

---

[41] "*Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.  [Photo of young girl at computer drinking soda and smiling mischievously] link*: https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines" @FirstNa47437596 February 11 2022.

*still around. He'd drag you ... out to the street by your hair and tell you ... to go work a corner. It's the only talent you'll ever have.*" (4/5/22). Whether or not Apple was behind the fake accounts, Apple fostered an environment where people were rewarded for harassing Gjovik, and ostracized and ridiculed if they supported her. Apple encouraged the abuse.

101.    This type of harassment continued for years. In 2023, after discovering Apple's fab, two fake accounts threatened Gjovik to stop talking about Apple's illegal toxic waste dumping. The first "Sybil," was created just to harass Gjovik about her posts about the chemical NMP and the photos she posted of her damaged property – escalating to calling for Gjovik's Twitter account to be deleted. (SAC at 699-700). Shortly after, another, "Comrade Jones," contacted her claiming to be ex-EPA enforcement and threatened her to stop talking about both Apple's fab and also the vapor intrusion issues at her office. Comrade Jones sent an email via her webform from an IP address flagged for spam and malicious behavior. (SAC at 701-2).

102.    While this claim starts on 9/7/21, in order to plead agency, it must be addressed that it includes continued conduct from individuals and anonymous accounts that began prior to 9/7/21.  As explained in the 4AC and prior complaints, the digital harassment began in early August of 2021. Some of this was conducted by named Apple employees, or known Apple employees using a 'handle', but some of it was from anonymous 'burner' accounts. However, Apple knew it was occurring, that it caused Gjovik distress, but did nothing to stop it (or was behind it themselves) and accepted the benefits it provided them. He who takes the benefit must bear the burden. Cal. Civ Code. § 3521.

103.    These are only a few examples to try to show the variety, network,

and suspicious activity of these accounts.[42]  Gjovik will require discovery to be able to prove Apple's connection to the physical stalking, private investigators, break-ins, digital surveillance, and other activities that occurred and were surely Apple, but did not leave Gjovik concrete evidence of Apple's role in hand. These events are not speculative or vague – they have concrete dates and times, documentation and reporting, photos and videos, and even police reports. [RJN 8/18 Exhibit S, 2022 police report as an example]. Gjovik also asked Apple to stop the conduct, including asking the CEO to stop the burglaries when she notified him of this lawsuit, but there was at least one more burglary after that.

### J.    Apple's Knowing Exposure of Plaintiff and her Neighbors to Carcinogens was Evil.

104.    Defendant now claims that Plaintiff has not pled that Defendant had knowledge that Plaintiff would be impacted by its actions at 3250 Scott Blvd. This is not the test. The test is if the Defendant had knowledge or a reckless disregard for the fact that people just like Plaintiff would be injured. Defendant does not need to know who each person is or their name, but Defendant just needs to know beyond speculation that people would be injured.

105.    Here, this fab is across the street from these apartments – where every employee would see them, every day they're at work.  [7/31 RJN Exhibit B]. Apple spent millions for this fab, entered a long-term lease, and RCRA papers are

---

[42] *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) – "An employer may be liable for hostile work environments created by co-workers and third parties "if it knew or should have known about the harassment and failed to take effective action to stop it … [by] respond[ing] with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*,521 F.3d 306, 319 (4th Cir.2008; "An employer is not subject to a lesser standard simply because an anonymous actor is responsible for the offensive conduct. See *EEOC v. Xerxes Corp.*, 639 F.3d 658, 672-73 (4th Cir.2011) (holding an employer to the same standard for responding to harassment carried out by known and unknown individuals); *Cerros v. Steel Techs., Inc.*,398 F.3d 944, 951 (7th Cir.2005) (noting that a plaintiff's "inability to verify the authorship of … racist graffiti poses no obstacle to his establishing that this graffiti produced or contributed to a hostile work environment)."

signed by the Apple CFO. Every time Apple vented its fab exhaust into the ambient air, Apple knew people just like the Plaintiff would be injured and would be deeply traumatized if and when they discovered what they were exposed to.

106.   Apple's employees and contractors have already revealed not only evidence of knowledge, but also gross recklessness – with one of their ACT Environmental contractors who was leading the hazardous waste disposal efforts in 2020 at the site, when Gjovik was doused in chemicals, bragging in his LinkedIn profile that during that time he found "innovative" ways to save Apple money on hazardous waste disposal. (SAC ¶ 1415). Meanwhile, Gjovik still has bald spots after Apple burned all of her hair off.

107.   Further, Apple's continued harassment of Plaintiff despite everything else that's happened, including her exposures, is sick and depraved. The amount of stress puts her even more at risk for cancer and disease, after she has already suffered great bodily injury from Apple's illegal conduct and emissions. Cal. HSC § 42400.1 Cal. Penal Code § 12022.7.

### K.   Cal.Lab.C. § 6399.7 (via § 6310) includes HAZWOPER.

108.   Plaintiff does not 'concede' to waiving her Section 6399.7 claim. [Def's Reply at 12-13]. First, this claim has been in every complaint in this lawsuit. [7/31 Declaration Exhibits A-C]. Defendant has repeatedly taken advantage of Plaintiff's vulnerability in having to dramatically shorten the length of her complaint and continues to attack claims it knows she has pled and can plead but still exploits the page limits as a loophole. [MTD at 22; Reply at 5].

109.   Second, Defendant argues that Section 6399.7 should not apply in this case essentially because, they claim, there are no hazardous substance information, notification or training requirements for employees working at toxic waste dumps – and no protection from retaliation if those employees ask for information or training about the hazardous substances at those toxic waste dumps

— 45 —

and it irritates their managers. This is false, and probably unlawful for Apple to even claim.

110.   825 Stewart Drive is an active US EPA National Priorities List (NPL) Superfund site. As of mid-2021, the most recent vapor intrusion testing at 825 Stewart Drive was supposedly back in the summer and winter of 2015. The 2015 results were declared 'acceptable' under US EPA vapor intrusion risk levels, however both times the results showed vapor intrusion was actively occurring. During the 2015 testing of the indoor air,, the results identified the presence of TCE (Trichloroethene), PCE (Tetrachloroethene), Chloroform, 1,2-Diclorobenzne, 1,2-Dichlorethane, cDCE (cis-1,2-Dichloroethene), tDCE (trans-1,2-Dichloroethene), CFC-11, CFC 12, and Freon 113 – all of which were also found in the groundwater and/or the sub-slab vent space under the floor.

111.   Plaintiff did not simply "perceive" a "risk" of vapor intrusion – Apple's own tests showed that vapor intrusion was actively occurring. Every single vapor intrusion air test at 825 Stewart Drive always came back showing vapor intrusion. Just because chemical exposure does not exceed the max limits for that chemical, does not nullify exposure to that chemical within 'tolerated' limits for industrial work.

112.   In addition, several other chemicals were identified in the testing with an unknown source, as they are not formal "Contaminants of Concern" under the CERCLA Record of Decision. The 2015 testing of the indoor air and/or sub-slab vent space identified the presence of chemicals including: Benzene, Toluene, Ethylbenzene, 1,1,1-TCA, MEK, Xylenes, Acetone, and Methylene Chloride. These chemicals and Gjovik's exposure to them, if unrelated to the hazardous waste, would be governed by HAZCOM.

113.   Cal. Labor Code §6361 explains the intent of the Hazardous Substance and Information Training Act, "The Legislature finds and declares the following: Hazardous substances in the workplace in some forms and

— 46 —

concentrations pose potential acute and chronic health hazards to employees who are exposed to these substances. Employers and employees have a right and a need to know the properties and potential hazards of substances to which they may be exposed, and such knowledge is essential to reducing the incidence and cost of occupational disease. Employers do not always have available adequate data on the contents and properties of specific hazardous substances necessary for the provision of a safe and healthful workplace and the provision of information and training to employees as is the responsibility of the employer under existing law.... The Legislature, therefore, intends by this chapter to ensure the transmission of necessary information to employees regarding the properties and potential hazards of hazardous substances in the workplace."

114.   Cal. Labor Code § 6399.7 protects employees from retaliation for exercising their rights under this protection: "No person shall discharge or in any manner discriminate against, any employee because such employee has filed any complaint or has instituted, or caused to be instituted, any proceeding under or related to the provisions of this chapter, or has testified, or is about to testify, in any such proceeding, or because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310." (SAC  279-1281, "*§6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7*]").

115.   Under Cal. Labor Code § 6380, "the director, pursuant to Section 6382, shall establish a list of hazardous substances and shall make the list available to manufacturers, employers, and the public." Cal. Code Regs. tit. 8 § 339 is the published "Hazardous Substances List" pursuant to 6380. "The substances on this list are subject to the provisions of Labor Code Sections 6360 through 6399.7 and Section 5194 in Title 8 of the California Code of Regulations."

116.   Cal. Code Regs. Tit. 8 5192(c)(8) requires employee notifications. "Any information concerning the chemical, physical, and toxicologic properties of each substance known or expected to be present on site that is available to the employer and relevant to the duties an employee is expected to perform shall be made available to the affected employees prior to the commencement of their work activities. The employer may utilize information developed for the hazard communication standard, 8 CCR 5194, for this purpose."

117.   Chapter 2.5 (where §§ 6380 and 6399.7 are located) does not define "hazardous substance," however Cal. Code Regs. Tit. 8, § 5161 (where the § 339 list is located) defines "hazardous substance" as "a substance, material, or mixture which by reason of being explosive, flammable, poisonous, corrosive, oxidizing, an irritant, or otherwise harmful, is likely to cause injury or illness. Hazardous substance includes a hazardous chemical as defined in section 5194(c) and hazardous waste as defined in section 5192(a)(3)."

118.   Under Cal. Code Regs. Tit. 8 § 5192(a)(3) (CAL HAZWOPER) the definition of "hazardous substance" includes among other things: "hazardous waste" defined as "a waste or combination of wastes as defined in 40 CFR 261.3, or regulated as hazardous waste in California pursuant to Chapter 6.5, Division 20, California Health and Safety Code, or those substances defined as hazardous wastes in 49 CFR 171.8." Cal. Code Regs. Tit. 8 § 5194(c) (CAL HAZCOM) defines "substance," as "Chemical elements and their compounds in the natural state or obtained by any production process, including any additive necessary to preserve the stability of the product and any impurities deriving from the process used." The definitions under § 5194 do not include "hazardous substance," but instead list "hazardous chemical."

119.   Federal OSHA promulgated the HAZWOPER (29 CFR § 1910.120) standard as a counterpart to the more well known HAZCOM (29 CFR § 1910.1200).   The HAZWOPER (Hazardous Waste Operations and Emergency

Response) standard covers "clean-up operations" "involving hazardous substances" at hazardous waste cleanup sites, including EPA's National Priority Site List. 1910.120(a)(1)(i). Where the standard overlaps with other federal regulations, the more protective of employee safety and health is to apply. 1910.120(a)(2)(i).

120.    Cal. Code Regs. Tit. 8 5192 (a)(2)(A) explains that all requirements of Title 8 of the California Code of Regulations apply pursuant to their terms to hazardous waste operations (whether covered by this section or not). If there is a conflict or overlap, the provision more protective of employee safety and health shall apply without regard to 8 CCR 3202(a). Apple asserts HAZWOPER does not apply and/or has less requirements. Further, HAZWOPER does apply, as does HAZCOM, and HAZWOPER creates additional obligations beyond that of HAZCOM.

121.    Under Cal. Labor Code § 142.7, California's government committed to enacting their own version of HAZWOPER that was at least as protective as the federal version if not more protective. The standard was enacted under Cal. Code Regs. Tit. 8 § 5192 which is to be at least equally protective as the federal version and may provide concurrent coverage at clean-up sites with § 5194, depending on the situation. Specific to US EPA NPL Superfund sites, as that is the situation in this case, § 5192 requires that the employer of any workers working at that Superfund site must develop site health and safety plan, provide hazard training and notifications to the employees, manage a medical surveillance program for potentially exposed workers, complete and maintain a thorough site characterization, and monitor site air quality and employee exposure ongoing. This requirement is not optional, and the employer is responsible for its own employees, regardless of the employer's position in the regulatory oversight of the Superfund site.

122.    Further, these HAZWOPER requirements are more specific and

detailed than the default health and safety obligations an employer has at any site, and those default requirements in California include: "Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein." [43]  Cal. Labor Code § 6400.

123.   Further, § 6407  adds: "Every employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct." Under § 6408, the coverage includes that "all employers shall provide information to employees" including to "observe monitoring or measuring of employee exposure to hazards" (c) "access by employees or their representatives to accurate records of employee exposures to potentially toxic materials or harmful physical agents."

124.   In April 2021, Plaintiff complained to Apple that the US EPA documentation showed there's excess cancer risk at the site due to vapor intrusion, and asked Apple *"Shouldn't employees be notified about this? Prop 65 at least?"* Apple's response was, "*No Prop 65 requirements per internal review.*" (SAC ¶227, 1282-1286). On March 24 2021, Gjovik also complained to her managers that the EPA documentation for the site note an increased cancer risk due to the vapor intrusion exposure pathways. In April 2021 she emailed EPA asking about her Right to Know rights. (SAC ¶ 264). In July 2021, Gjovik, pleaded with Apple to test the air prior to fixing the cracked slab, so she knows what she was exposed to 'for cancer monitoring.' (SAC ¶ 300, 331). Apple said no.

125.   Proposition 65 is incorporated into both Cal. Admin. Code tit. 8, §§ 5192 and 5194 through Cal. Code Regs. Tit. 27, § 25904, Cal. Labor Code Section 6382, and Cal. Code Regs. tit. 8 § 339. Cal. Admin. Code tit. 8, § 5194 also explains at (b)(6)(C) that Proposition 65 notifications are required in the workplace regardless of § 5194 (CAL HAZCOM) coverage. The Occupational Carcinogens

---

[43] *In re western pac. Roofing Corp.* Cal-OSHA App Bd. 1999 WL 276529.

Control Act of 1976 also includes requirements related to employee exposures to carcinogens, including one of the NPL Contaminants of Concern at the site: vinyl chloride. Cal. Lab. Code § 9004. Proposition 65 covers exposure to carcinogens through vapor intrusion.[44] (SAC ¶ 1282, "*§6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)],*" ¶ 1282-1286).

126.   In April 2021, Plaintiff asked Defendant, "*Shouldn't employees be notified this is a remediation site? Ideally informed consent for working there. At the very least Right to Know should require some sort to disclosure?*" Apple responded that they "*decided no legal requirement…*" Plaintiff asked, "W*ould you be willing to at least email or present at a staff meeting — to disclose the … management team … on the history & current conditions of the property & building?*" Apple responded, "*Larger message may be possible, but need to talk to legal.*"

127.   When Gjovik raised the topic in her March 17 2021 email to the management team about the Superfund status of their office, Gjovik's manager, immediately forwarded Gjovik's email to Human Resources and her Senior Director, complaining "*I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her.*" Powers gave Gjovik a 'warning' during their next 1:1 meeting and told her she is not allowed to talk about safety or toxic waste dumps with her coworkers. (4AC ¶ 56).

128.   In April 2021, Gjovik asked EPA about requirements for "*informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & Right to Know — but any guidance you can provide here would be helpful. Also, anything about workers' rights to be able to talk about these sites.*" Plaintiff escalated her concerns to US EPA about the need to "communicate to workers in

---

[44] *Bayview Hunters Point Residents v. Tetra Tech EC, Inc.* (3:19-cv-01417) Docket No. 105, (N.D. Cal.), Order re Motions to Dismiss Re: Dkt. Nos. 64, 77 (03/31/2021); Proposition 65 Notice of Violation, Bayview Hunters Point Residents, July 9, 2020, https://oag.ca.gov/system/files/prop65/notices/2020-02666.pdf

these buildings about how to monitor for their issues (weird smells, weird health issues, etc.) or how to report trouble or what not to mess with (plugs, HVAC, etc.)."

129.   Plaintiff complained to a Senior Director at Apple about Apple's EH&S team, summarizing a conversation with them: "*what happens if someone starts messing with one of the seals on the sub-slab vents because they don't know what it is (and in my building, literal Hades is beneath) — and [Apple EH&S was] like OMG DO NOT LET ANYONE DO THAT. And then [she] was like, what happens if people start feeling sick and it could be VI and they don't know that's happening and [EH&S is] like OMG IF YOU SMELL ANYTHING WEIRD CALL US IMMEDIATELY. And [she's] like, listen you fools, how is anyone supposed to know to do that if they don't even know it's remediation site.*" (SAC ¶ 1205).

130.   On April 21 2021, Gjovik raised concerns to Apple's Inclusion & Diversity team, complaining of disparate impact of chemical exposure at Apple's offices toxic waste sites, disproportionly harming non-white people and women. The I&D manager asked Gjovik to draft a business justification for Apple to not expose Black and Brown people, and women, to industrial chemical vapors. Gjovik complained and asked that Apple should: "*1) inform apple employees of the presence of industrial chemicals in the soil & groundwater beneath their buildings, along with any anticipated health risks 2) empower apple employees to understand these sites and their rights around them (like who at the EPA to call if they have questions about their specific building and want a neutral 3rd party) 3) do ongoing vapor intrusion testing and monitoring on buildings who have VI risk and train employees on site how to identify possible VI issues (medical symptoms, smells, etc.) In a perfect world 4) require informed consent for employees to actually be assigned to work in the worst of these buildings.*" HR never replied. (SAC ¶ 244-246).

131.   Cal. Code Regs. Tit. 8 5192(e) requires training for any and every person who works at a hazardous waste like a NPL Superfund. Even workers

working in areas of the site that are fully characterized and monitored must complete at least 24 hours of offsite instruction and a minimum of one day field training. 5192(e)(3)(C). The training is to cover topics including identification of "safety, health and other hazards present on the site," "work practices by which the employee can minimize risks from hazards," "safe use of engineering controls and equipment on the site," and "medical surveillance requirements including recognition of symptoms and signs which might indicate overexposure to hazards." 5192(e)(2)(B-D).

132.    Under Cal. Labor Code § 142.3(c), "Any occupational safety or health standard ... shall prescribe the use of labels or other appropriate forms of warning as are necessary to ensure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions for safe use or exposure."

133.    Plaintiff complained in March 2021, "*there's a covenant with the government about what can and cannot be done on site. This includes no day care, elder care, hospital use, raising of food, or use of the building as a residence. Further, the site owner is supposed to notify the government agency in charge (now the EPA) if there are any damages to the vapor intrusion mitigation systems — or monitoring of groundwater — or if any soil is to be disturbed on site. Etc. From what I've seen, there are no warnings on site about any of this*." (SAC ¶ 374, 1186). Plaintiff also complained in April 2021, "*The land use covenant requires notice to be given to EPA if any damages to remediation systems — or any subsurface disturbance. How are employees supposed to follow this if there's no notice it's a remediation site?*" Apple responded, "*Not employee's responsibility....*" (SAC ¶ 226).

134.    In July of 2021, Gjovik complained to Apple that their EH&S team refused to provide her any details about work plans or protocols for site management. Upon further inquiry, they disclosed to her there are none and she can just Google it. (SAC ¶ 307). Plaintiff complained in July 2021 that Apple

EH&S kept saying the whole process was routine but eventually admitted they've never done it before for any of their Apple buildings with employees actively working inside." She also complained EH&S "won't give her any details of what the "floor sealing process" entails." (SAC ¶ 304).

135.    Cal. Code Regs. Tit. 8 5192(c) requires a thorough and ongoing site characterization and analysis. This includes ongoing air monitoring. 5192(c)(6). Any information concerning the chemical, physical, and toxicologic properties of each substance known or expected to be present on site that is available to the employer and relevant to the duties an employee is expected to perform shall be made available to the affected employees prior to the commencement of their work activities. The employer may utilize information developed for the hazard communication standard, 8 CCR 5194, for this purpose. Under 5192(c)(8) the employer also must develop and maintain and detailed safety and health plan for the site. 5192(b).

136.    In May 2021, Apple EH&S told Gjovik they would not answer any more of her environmental questions, including any of her prior pending questions. EH&S told her they *"feel it is safe"* so there is no need talking about it further. In July 2021, Apple EH&S told Gjovik they still will not answer her questions, nor will they provide her any guidance around risk and exposure other than "*they feel it is safe.*" (SAC ¶ 307). They also refused to give her copies of prior air testing results. In May 2021, Apple EH&S also said they may not test the air now that Gjovik asked so many questions, and they did delay until the US EPA forced them, but they drug it out until mid-2023. (SAC ¶ 735).

137.    In April 2021, Gjovik complained to her manager about the site: *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to*

— 54 —

*have ever followed up on*." (SAC ¶ 43-44, 229, 236, 306).

138.   Cal. Code Regs. Tit. 8 5192(f) requires medical surveillance of certain employees working at the hazardous waste site including "Any employee who is injured, becomes ill or develops signs or symptoms due to possible overexposure involving hazardous substances or health hazards from an emergency response or hazardous waste operation." 5192(f)(C).

139.   On August 23 2021, Gjovik submitted her "Issue Confirmation" to Apple Employee Relations and Business Conduct. The document included allegations of "Toxic Torts, occupational exposure (2017-current)" and "Violation of OSHA laws & Right to Know statute (2017-current)." (SAC ¶ 447, 784). Gjovik also included similar complaints in her complaints to US EPA on August 29 2021. (SAC ¶ 265).

140.   The legislative intent of the Hazardous Substance Information and Training Act (Lab. Code, § 6360 et seq.) is "to ensure the transmission of necessary information to employees regarding the properties and potential hazards of hazardous substances in the workplace." Lab. Code, § 6361(d).   California courts have found this intent is "merely [an] express[ion of] the broad scope of the undertaking and the legislative commitment to inform California workers of potential risks of hazardous substances." [45] All of this was covered by Section 6399.7, and actionable under Section 6310.

### L.   Apple was certainly reading Plaintiff's Twitter posts.

141.   Defendant continues to argue Plaintiff cannot prove they were surveilling her social media posts. [Def's Reply at 13-14]. First, Plaintiff can prove it. Second, it's beside the point because her posts and the associate content was also covered in the press, and Apple was directly notified of such by the press.

---

[45] *ICN Pharmaceuticals, Inc. v. State of California,* 3 Cal.App.4th 1131, 1136 (Cal. Ct. App. 1992).

Defendant was also repeatedly notified of her social media and press activity by reporters contacting them for 'comment' on the articles published while she was on leave and prior to her termination.

142.   Further, Apple was supposedly investigating Plaintiff's Twitter posts from around August 28 2021-Septembmer 9 2021, (which would assumably include reading her Twitter postings). Even prior to the leave, Plaintiff started threatening to talk to the press in June 2021 and did talk to the press and was quoted by NYT about Apple in July 2021. (See SAC at 539). Apple Employee Relations told Plaintiff they saw it, were aware, and were annoyed she figured out labor laws. Further, in mid-July Plaintiff directly notified Employee Relations that she and other coworkers were posting on social media complaining Apple was invading their privacy with overly aggressive medical release forms for ADA accommodation requests. (See SAC at 363). Employee Relations also interrogated Plaintiff around July 29 2021 about the statements she was making and urged her to stop talking about work conditions, even with her coworkers and on Apple systems. After being put on leave, Plaintiff quickly received an email from Apple Employee Relations on August 5 2021 complaining about the things she was posting on social media. (SAC ¶ 402).

143.   Gjovik observed an incredible response from her coworkers while she was sharing stories and documents in August 2021, with many discussions on Apple's Slack tool for employees, including many employees saying, and telling her, that they had reported the people she complained about and asked Apple to do the right thing with Gjovik. One post even led to a petition within Apple – Gjovik had shared a "Radar" work tracking ticket that was titled with the goal of making her life "a living Hell."

"#Apple makes great products, & some workers have a great experience, but some don't. Everyone who knows me at work knows I've dealt with more abuse than anyone should have. (See: "Make

— 56 —

Ashley's Life a Living Hell"... & they really did). No one seems surprised I finally broke." [Image] 10:55 PM · Aug 12, 2021 https://x.com/ashleygjovik/status/1426014545202479108

Dozens of employees started commenting in the Radar; after seeing it on her social media, demanding Apple improve its conduct. Several people said they had reported the Radar to Human Resources. (SAC ¶ 81, 82). This was around August 16 2021. One would think if dozens/hundreds of employees are complaining about abuse Gjovik faced, as shared on social media, that Apple might think to read her social media.

144.   Finally, as part of the steps leading to Plaintiff's termination, one of the supposed reasons she was to be terminated, as communicated by HR to her VP, was that she failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. [SAC page 125-6, 152] She did however redact the internal records she was posting on Twitter. HR must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Defendant never brought it up again.

145.   Apple apparently  continued to monitor her posts through September 2021 (attempting to get Twitter to delete some of them, admitted in DOL filings) and January 2022 (Applegate wrote to Plaintiff upset that she tried to get Plaintiff's Twitter posts deleted but found out Apple also reported them and it was Apple's reports that resulted in the posts being deleted).

146.   After she was fired, on September 9 2021, Plaintiff was notified her Apple would mail her boxes to return her phone and computers. However, Apple had her old address. The termination letter said she has to talk to Workplace Violence if she has any questions, but she didn't want to talk to Workplace Violence. She tweeted "*my #Apple VP's term letter said they're mailing me a box to return my work stuff (including an iMac Pro?!) & sending my benefits info. They're*

— 57 —

*sending to my old address tho, & they say to work w/ the secret police guy if any issues. @Apple, I don't want to talk to him, he's scary... Can someone please tell @Apple #Apple to have someone reach out for my current address who doesn't work on a team that breaks into people's apartments, maybe? Thx.*"[46] On September 13 2021, three days later, her VP's executive assistant emailed her: "*Could you please verify your shipping address so that I can send out boxes and a return label for your Apple equipment.*" This was not the only time Apple responded directly to Plaintiff's tweets – thus Apple was assumably reading her tweets.

147.   Further in late 2022, Apple's third-party counsel for a fraud class action (Cooley) who is not even involved in these matters (that Plaintiff's aware of) demanded her social media posts be read aloud by a law firm she was consulting for, prior to Apple's counsel then demanding Plaintiff be removed from the matter. When confronted with a motion for attorney's fees, Apple's attorneys then pretended they did not know who Gjovik is.[47] Why is Cooley reading Gjovik's tweets? How many billable hours have been spent on reading Gjovik's tweets?

148.   Further, as mentioned, MWE was reading her posts while they were harassing her under a fake account in 2023-2024. In addition, Orrick's filings have repeatedly referenced Plaintiff's social media.

149.   After Gjovik tweeted what she learned about 3250 Scott Blvd on February 21 2023, around February 25 2023 she received a notification in her LinkedIn account that a "iPhone Product Operations – Capex, Sr. Manager" at Apple had searched for and viewed her LinkedIn profile. Plaintiff then tweeted

---

[46] Twitter, Ashley Gjovik, https://x.com/ashleygjovik/status/1436514656101617665
[47] *Peters v Apple*, Superior Court of California, County of LA, Case No. 19STCV21787, Plaintiffs' *Omnibus Reply in Support of Motion for Attorneys' Fees, Costs, And Class Representative Service Payments* Mar 19 2024 10:31PM PDT "*Apple is well-aware of what "AM Gjovik Consulting LLC" is and why Plaintiffs have an associated cost for that entity. Ashley Gjovik is an Apple former employee who could have provided Plaintiffs with instrumental assistance but for Apple's objection to her expert disclosure... After Gjovik was hired, but before she turned over any materials, Apple objected to Gjovik's assistance, and Plaintiffs were unable to use any of Gjovik's knowledge and expertise.*" Pg9 2/6/24

that day: *"A sr manager for Apple product ops CapEx just looked at my LinkedIn via a direct search. Dude, if this is your doing &/or problem, please get the richest company in the world to give you a little more money so Apple can do something way less dumb & dangerous than this. Thanks."* [48]

150.    Just a few weeks later, Apple filed permit applications for 3250 Scott Blvd to install a new VOC abatement system ($5,300,000) and acid scrubber and exhaust ($3,100,000) [RJN 8/18 Exhibit V]. This was assumably the system that Apple could not actually explain to US EPA in August 2021 how it works or why they installed it the way they did, and basically acted like they had never seen it before on their own roof. [7/31 RJN Exhibit A]. Plaintiff got a $8.4M Capex investment approved via tweet!

151.    Apple is certainly reading Gjovik's Twitter and other social media and has been for years.

### M.    Apple violated Cal.Lab.C. § 1102.5 dozens of times.

152.    Defendant argues Plaintiff's environmental claims should be stricken despite them being the basis for the environmental retaliation claims which they are not challenging. Defendant also tries to strike any mention of 3250 Scott from the entire case, which is the basis of the CAA and RCRA claims, as well as the *Tamney* crime victim[49] and legislative witness claims. (see SAC at 1323-5, 1332-3). Cal. Penal Code Section 1202.4 has broad construction requiring restitution to all victims of crime.[50] Apple can't just strike away its crimes to change that.

153.    Defendant attacks Plaintiff's smuggling and sanctions section, yet those statutes were detailed in her SAC and in emails to Apple in July 2021. Defendant then attacks that she included screenshots her SAC with this content.

---

[48] Ashley Gjovik, Twitter, https://x.com/ashleygjovik/status/1629702912527020034
[49] Cal. Labor Code Section 230(e), Cal. Gov. Code Section 9414, Cal. Penal Code Title 17 Rights of Victims and Witnesses of Crime, Section 67910(b)(3).
[50] *People v Broussard*, 856 P.2d 1134,22 Cal.Rptr.2d 278,5 Cal.4th 1067 (1993).

[Def's MTD at pg14]. She also raised the topic in the August 2021 Issue Confirmation: "*July 2021: escalated concerns one of our PSQ employees was bragging about smuggling iPods into Syria and running a side business transporting people across the Syria/Lebanon border. Complained about general lawlessness in my org.*" Issue Confirmation at 3.

154.   Defendant argues that Plaintiff still has not plead with required specificity which laws she alleges support her Section 1102.5 claim, yet Defendant did not challenge Section 1102.5 in her SAC and many aspects of it was detailed in her Issue Confirmation and other key docs. Accordingly Plaintiff suggests the following supplements:

– **Violations of CERCLA{ XE "CERCLA" } and implementing contracts**

- Made complaints to Apple about CERCLA reporting requirements, then to government, then notification to Apple that complaints were filed to the government. CA Civil Code § 1471 Covenant and Agreement to Restrict Use of Property dated August 10, 1992 (Covenant) and recorded as Instrument Number 11507222 in the official Records of Santa Clara County at Page 613 of Book M338.[51] This legal document was included in the Box folders of evidence she shared with Apple in late July 2021 when they were supposedly investigating her concerns. Cal. HSC 25220; HSC 25117.13. (see SAC at 226, 1207, 1471). Copies of the Cal. EPA Geotracker page for 825 Stewart Dr (SL721251223) sent in emails to managers and EH&S, in Box folders, and included in presentation slide deck made for EH&S in April 2021.

- Filed complaints to the US EPA and CalEPA. Complaints to US EPA trigged a proceeding with an inspection and corrective actions due to

---

[51] "*Covenantor covenants that the Restrictions shall be contained in each and all deeds and leases of any portion of the Property in accordance with Sections 1468, 1469, and 1470 of the California civil code,*" 825 Stewart LUC at pg 9.

Gjovik's disclosures. CERCLA § 103(d)(2); 42 U.S.C. 9603; 42 U.S.C. 9603(b). EPA, 1991. *Record of Decision, Advanced Micro Devices #901/902, Signetics, TRW Microwave. Combined Superfund Sites.* Sunnyvale, California, September 11, 1991.

- Made complaints and inquiries into the oversite and status of another CERCLA site. EPA, 1991, Record of Decision, *Synertek Building #1 Superfund Site,* Santa Clara, California, June 28 1991.

- Complained about Apple trying to cover up the cracked floor before anyone could report it or gather evidence. See, Knowing Alteration, Destruction, or Concealment of Records 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(4).

- Complaints about the Brownfield clean up at 3255 Scott Blvd. Made complaints to the CalEPA, US EPA, and city HazMat in September 2020 – April 2021 about the soil and groundwater contamination in the property next to her apartments and 3250 Scott Blvd. Also complained about Apple offices on Brownfield sites in documents sent to managers and leadership in 2021. Cal. HSC 25403.

## Violations of the RCRA{ XE "RCRA" }

- Made complaints to Apple management that Apple's statements to her directly contradict in a 2016 article about a settlement Apple made with DTSC over numerous RCRA violations where Apple claimed they always go above and beyond legal requirements, when Apple told her they only do the bar minimum – and the case showed evidence of systemic negligence. She sent these complains in emails, in Box folder, in Issue Confirmation, in government filings.
  - *Transportation of hazardous waste without a proper manifest*
  - *Failing to report and track exports of hazardous waste*
  - *Failing to label or otherwise mark used oil containers as "hazardous waste"*

- *Failing to provide notice of closure for the facility in Cupertino*
- *Failing to submit a written closure plan and cost estimate for closing the facility in Cupertino and for eventual closure of the one in Sunnyvale*
- *Failing to demonstrate financial assurance to fund the eventual closure of the two facilities*

- Made complaints to Apple management about Powers and West sabotaging a hardware reuse program she created, which had reduced universal hazardous waste. 22 CA ADC § 66261.9; HSC 25123.8; 25214.9. Included complaints in Issue Confirmation and Box folders.
- Wrote article and published in SF Bay View in March 2021 raising concerns about environmental and safety violations at her apartment: *"I thought I was dying; my apartment was built on toxic waste."* [P's 8/18 RJN Exhibit A].
  - Treatment, storage, or disposal without a permit 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(2)(A)
  - Treatment, storage, or disposal in violation of a permit 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(2)(B) and (C).
  - Knowing Endangerment 42 U.S.C. 6928(e) 40 C.F.R. 260 – 265.

## Violations of the Clean Air Act{ XE "Clean Air Act" }

- Made complaints to US EPA and CalEPA in September 2020 – April 2021 about the ambient air around 3250 Scott Blvd. 42 U.S.C. 7413(c)(4) & (5) [42 U.S.C. 7412(b)(1)] 40 C.F.R. 61 - 63
- Complaint to California Air Resource Board triggered proceeding with investigator contacting her for information and conducting an inspection in 2020 and 2024. 18 U.S.C. 3571. 40 C.F.R. 61. [8/18 RJN Exhibit T].
- Complaints about right to observe monitoring. Cal. Labor Code 340.1.

- Issues causing great bodily injury and Apple's failure to correct the issues. HSC 42400, 12022.7, 41700.

**Violations of Proposition 65**

- Proposition 65 complaints to Apple managers, EH&S, and Employee Relations. Included in the Issue Confirmation. Cal. HSC 25249.5, 25249.14.
- Filed complaint to US EPA (8/29/21), in addition to emails to EPA, complaining of Apple's violations of Right to Know and Prop 65.
- See Section 6399.7 also.

**Other Criminal Conduct**

- Made complaints and inquiries to the Santa Clara County District Attorney's office{ XE "Santa Clara County District Attorney's office" } in April – May 2021 about witness intimidation and environmental crimes.
- Made complaints to the US EPA in July 2021. Made formal complaint to Apple in August 2021.
- Complained in the August 2021 "Issue Confirmation v3" of:
  - Retaliation for whistleblowing (2016, 2020, 2021)
    - Retaliating against a witness (18 USC 1513)
  - Misrepresentation & fraud.
    - 18 U.S.C. § 1001 False Statements
    - 18 U.S.C. § 371 Conspiracy
  - Racketeering.
    - RICO 1962(c), (d). Issue Confirmation sent to Apple in August 2021 and filed to Business Conduct.
    - Twitter posts on Aug 21 2021, see SAC at 446, 443.
    - "Based on my experience, & the non-stop horror stories I now hear EVERY DAY from current & past #Apple employees, I'm now also asking

— 63 —

employee relations to investigate themselves. One "issue" I'm raising to them is literally RICO. @USDOL, I may need to schedule an interview soon. 4:12 PM · Aug 21, 2021, https://x.com/ashleygjovik/status/1429174603713191936

- [Mel Nayer (see IIED) accuses Plaintiff of initiating death threats against her managers]. "Now that we're all fully distracted by whatever the f THAT was, plz keep in mind it happened just hours after I mentioned: 1) The corruption at #Apple may reach R.I.C.O. levels 2) Legal may have taken my nudes to intimidate me as a whistleblower re: that lawsuit Struck a nerve?" 9:13 PM · Aug 21, 2021, https://x.com/ashleygjovik/status/1429250234278825987

- "Progress! ☝ Apple Employee Relations told me today, for the first time, they're actually investigating, conducting witness interviews, & will provide me updates! It's a good start, @tim_cook! It only took a website, 1k Tweets, and dozens of articles. Oh yeah & saying "RICO." 11:42 AM · Aug 22, 2021 https://x.com/ashleygjovik/status/1429468934579712006

- Organized witness tampering.
  - Witness tampering (18 USC 1512)
  - 18 U.S.C. § 371 Conspiracy
- Organized intimidation.
  - 18 U.S.C. § 371 Conspiracy
  - 18 U.S.C. § 1501 Obstruction of Justice
- Corporate corruption.
- Burglary and impersonating police (Twitter posts on 9/9/21, see SAC at 510).
- Pimping & Pandering with Indirect Benefits.
  - Included in issue confirmation and Box Folders.
  - Tweeted about it in August 2021: https://x.com/ashleygjovik/status/1431680707433140226
- Criminal Bribery
  - "In Nov 2020, #Apple's head of Global Security & Business Conduct was charged with bribery. Moyer was accused of bribing the Santa Clara County Sheriff's Office (well known to be corrupt) in exchange for concealed

— 64 —

weapons permits. [Apple's head of global security indicted on bribery charges, From washingtonpost.com," 8:20 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431773819715219458

- "Moyer served as #Apple's chief compliance officer from 2009-13 & one responsibility was to ensure Apple follows anti-bribery laws. The indictment comes 1yr after an Apple attorney in charge of enforcing the co's insider-trading policies was indicted on insider-trading charges." @ashleygjovik, Aug 28, 2021, https://x.com/ashleygjovik/status/1431774126272696328

- 18 USC Section 299 (See SAC at 1241)

## Smuggling{ XE "Smuggling" } and Violations of Sanctions{ XE "Sanctions" }

- Made complaints to West and Powers in 2020 and again in July 2021.
  - Note: Apple lists "violations of sanctions" in their whistleblower policy.
- Notification to managers she escalated in July 2021.
  - Iran Threat Reeducation and Syria Human Rights Act
  - 18 U.S.C. 833; 18 U.S.C. 846
- Filed a complaint to Apple Business Conduct in July 2021.
  - Met with Business Conduct team about it.
  - Included in August 2021 Issue Confirmation (HRC000017207) and Box folders.
- Filed a complaint to the US FBI{ XE "US FBI" } in September 2021. Tweeted about this prior to termination.
  - See SAC at 129-30, 336-40, 489, 913, 1213, 1315.
  - "July 20, 2021 - email with #Apple legal & biz conduct Reported possible violations of sanctions against Syria to my leadership & HR BP. Coworker was bragging about smuggling. No one took action for 10mo. Complained to biz conduct in July. Reported to the @FBI a few days ago.," 6:06 AM · Sep 6, 2021, https://x.com/ashleygjovik/status/1434820337166786563

## Invasions of Privacy (Face Gobbling)

- Plaintiff complained to coworkers and management, complained on social media, complained the press.
  - Plaintiff had complained about a number of privacy issues to Apple

— 65 —

in 2021 prior to complaining about Gobbler, and each time Apple ignored her concerns and became upset when she pressed the matter. Gjovik had to take the matter public in order to get help.

- California Civil Code 1051, 1708.8, 1798.1. California Labor Code 345, California Penal Code 637.7. Cal Con. Art 1.; GDPR; BIPA; OHCHR Art. VII; Wilson Directive; ICCPRA RS 2200A xxi; 18 USC Section 1028.

155.    Defendant argues again that Plaintiff needs to name the specific employees she talked to about Gobbler and her decision to take it public – while acting confused why Plaintiff would be worried about her friend being fired despite Apple concurrently saying talking about it publicly justifies immediate termination. [Def's MTD at 20; Def's Reply at 11-12]. This is a perfect example of why judicial declaratory relief is desperately needed on this matter.

156.    For this pleading it is enough that Gjovik shared details of Gobbler with The Verge and on social media, as she did so under the premise that nothing would change Apple's position except public pressure. Prior to this she had made a number of other privacy complaints, and each time Apple dismissed her complaints and refused to address the issue.

157.    Further, due to the number of complaints she was filing the government at that time, Apple surely perceived she disclosed it to the government or may disclose it to the government.[52] She did report it to numerous government agencies in 2022. Defendant also again asks for proof it was monitoring her social media. The Verge article notes it asked Apple for comment on the article and the article includes a video of Plaintiff's face, so Apple knew the matter was disclosed to the public, and Apple knew Gjovik made it clear she was involved in sharing it, even prior to the article being published. [P's 8/18 RJN Exhibit Q].

---

[52] *People ex rel. Garcia-Brower v. Kolla's Inc.*, No. G057831, 2 (Cal. Ct. App. Sep. 26, 2023).

### N.   Claims for Cal.Lab.C. §§ 98.6 + 1101, 1102 (Politics) + 232.5

158.   Defendant challenges Plaintiff's claims about Palestine, Uyghurs, and work conditions in China claiming it was the first time she's raised the topic. She openly admitted the 4AC appeared to be the first time she detailed it in this civil matter, but it is far from the first time she mentioned it. [P's Opp to D's MTD at 38]. If Apple's lawyers conducted any research at all into this matter, they would have reviewed one of the most critical pre-termination documents, the August 2021 "Issue Confirmation" sent to Employee Relations and Business Conduct. This matter is included expressly in the Issue Confirmation. It was also included in the Box folders where Gjovik shared her evidence for Apple's supposed investigation into her concerns in late July 2021 through September 2021. In addition, this topic later detailed in depth in her Position Statement for her NLRB case.

Apple complains that press coverage of Apple and the matter is not enough for Apple to know it happened. The articles referenced by Gjovik and her colleagues in their complaints were from large publishers, and had been out for several months – so Apple surely was aware.[53] Further, Apple would also be aware if it knew it had forced labor in its supply chain, which Apple clearly does know because it was caught lobbying against a prohibition on Uyghur forced labor.[54] Apple's motion and reply also try to claim this is all unrelated to work conditions

---

[53] "*Seven Apple Suppliers Accused of Using Forced Labor From Xinjiang,*" The Information, May 10 2021, https://www.theinformation.com/articles/seven-apple-suppliers-accused-of-using-forced-labor-from-xinjiang

[54] "*Apple is lobbying against a bill aimed at stopping forced labor in China. Apple wants to water down key provisions of the bill, which would hold U.S. companies accountable for using Uighur forced labor, according to two congressional staffers.*" Washington Post, Nov 21, 2020, https://www.washingtonpost.com/technology/2020/11/20/apple-uighur/ "*Apple Spent $90,000 Lobbying Lawmakers on Uyghur Forced Labor Bill,*" January 22, 2021 3:57 PM, National Review, https://www.nationalreview.com/news/apple-spent-90000-lobbying-lawmakers-on-uyghur-forced-labor-bill/

– but slavery is a work condition?[55]

159.   Defendant challenges Plaintiff's claims under Cal. Labor Code Sections 1101 and 1102 as if they were standalone 1101/1102 claims, but they're not. All topics discussed were also work conditions and so the 1101/1102 claims are not required to be met as fully as if they stood alone. (Cal. Labor Code Section 1103). [Def's 7/15 MTD at 22-23; Reply at 13-14]. That said, they could also stand alone. Either way, please see proposed supplement below.

Plaintiff's activism around Palestine was about work conditions as Gjovik saw many of her Muslim coworkers were facing harassment and abuse for speaking about Palestine.[56] She contacted her managers and HR asking for help for her coworkers, on behalf of her coworkers. "*I'm writing on behalf of myself and in support of the Muslim and Palestine employees at Apple…*" (May 21 2021). There was also heated discussion on Slack about the matter, which Gjovik participated in, and which Apple HR tried to shut down, even eventually deleting the Muslim Slack channel. Gjovik also included this matter in her "Issue Confirmation" she sent Apple in August 2021.

Gjovik made several posts on Twitter in early August 2021 criticizing Apple's use of Uyghur forced labor and Apple lobbying against prohibitions of it.

"#Apple lobbyists are trying to weaken a bill aimed at preventing #forcedlabor in #China. The Uyghur Forced Labor Prevention Act would require US companies to guarantee they don't use these imprisoned          or          coerced          workers.

---

[55] "The mounting evidence is beyond troubling. Despite persistent assurances from Apple that their supply chains were free of forced labor, we now have evidence that it is tainted," said the Chairs. "We urge Apple CEO Tim Cook to divest from Chinese suppliers in Xinjiang who are implicated in forced labor in China. We also ask Apple to engage with U.S. Customs and Border Protection on their China supply chains to ensure that no Apple import is made with forced labor. There must be a concerted, tough, and global response to the atrocities being committed in Xinjiang." *Xinjiang: Chairs Issue Statement about Forced Labor in Apple's Supply Chain,* The Congressional-Executive Commission on China June 8, 2021 https://www.cecc.gov/media-center/press-releases/chairs-issue-statement-about-forced-labor-in-apple%E2%80%99s-supply-chain-in

[56] "*Apple employees call for company to support Palestinians in internal letter,*" The Verge, May 20 2021, https://www.theverge.com/2021/5/20/22446059/apple-employees-palestinians-support-internal-letter-tim-cook

https://washingtonpost.com/technology/2020/11/20/apple-uighur/...". @ashleygjovik Aug 7, 2021. https://x.com/ashleygjovik/status/1424130912774594560

"One of the oldest and most well-known #Apple #iPhone suppliers has been accused of using #forcedlabor by #Uighur Muslims in its factories, adding new scrutiny to Apple's #humanrights record in #China. https://washingtonpost.com/technology/2020/12/29/lens-technology-apple-uighur/.... @ashleygjovik Aug 7, 2021 https://x.com/ashleygjovik/status/1424130035405836288

"What #Apple would like is we all just sit and talk and not have any real consequences," said supporters of the bill. "They're shocked because it's the first time where there could be some actual effective #enforceability." @ashleygjovik Aug 7, 2021, https://x.com/ashleygjovik/status/1424137176946597888

"#Apple's iconic employee uniforms are sourced from a company that was sanctioned by the US gov for its involvement in #forcedlabor & other #humanrights abuses in #China, undermining Apple's claims to avoid suppliers that engage in such practices." @ashleygjovik Aug 7, 2021, https://x.com/ashleygjovik/status/1424131625743384582

Is this what "honor" looks like? "#Apple's lobbying against a bill aimed at stopping forced labor in #China. Apple wants to water down key provisions which would hold U.S. companies accountable." Great article by: @ReedAlbergotti at @washingtonpost https://washingtonpost.com/technology/2020/11/20/apple-uighur/," @ashleygjovik 8:03 PM · Sep 6, 2021 https://x.com/ashleygjovik/status/1435030966729265152. Quote: Tim Cook @tim_cook Sep 6, 2021 This Labor Day we honor and recognize all those whose work and imagination fuels the innovations of tomorrow.

She quickly received a message and a phone call from a senior leader at the company strongly urging her to not criticize those topics and warning her if she does there will be backlash from Apple. She did not stop criticizing the topics and she was fired.

 Employee Relations, Lagares, was also offended by Gjovik's criticism of Apple's use of suicide nets, claiming "it was a vendor" and not him directly. (He managed Apple's labor relations with Beijing). Further, US DOL OSHA apparently decided it was some sort of evidence of misconduct by Plaintiff that she criticized Apple's use of suicide nets and Lagares' involvement, which assumably means Apple raised the matter to US DOL OSHA as one of the reasons for her termination.

> "#Foxconn had large nets installed outside many of the #Apple manufacturing buildings to catch falling bodies. The company hired counsellors and workers were made to sign pledges stating they would not attempt to kill themselves." https://theguardian.com/technology/2017/jun/18/foxconn-life-death-forbidden-city-longhua-suicide-apple-iphone-brian-merchant-one-device-extract... @ashleygjovik Aug 5, 2021 https://x.com/ashleygjovik/status/1423460606217048069

Suicide nets are surely work conditions – and while factory workers are contractors, they were still her coworkers.

160.   All of these examples have some evidence of Apple attempting to prevent participation, and direct and interfere with political activity. Plaintiff also spoke about some purely political matters as well including news coverage that Apple was extorting the legislatures of the states of Georgia and North Dakota. [see SAC at 440].

> "In Aug 2021, #Apple lobbied Georgia legislators on bills impacting the App Store, saying to do what Apple wants or else it would pull out of a $25 million investment in a historically Black college in Atlanta. https://politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299... " @ashleygjovik 8:18 PM · Aug 28, 2021. https://x.com/ashleygjovik/status/1431773140934352897

> Re: #Apple "We don't want to put the state in a position where we need to spend our taxpayer $ in litigation; these are some very big companies," Jerry Klein, a Republican state senator, said on the floor of the Senate. "Let's stay out of the courts." [North Dakota

— 70 —

lawmakers vote down a bill that threatened Apple's and Google's revenues. (Published…From nytimes.com), @ashleygjovik 8:35 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431777441802960898

""#Apple's been able to intimidate & use a lot of money to kill legislation. They do it in different ways in each state, but it all comes down to strong-arming the legislature." Apple has threatened jobs, offered massive investments, & threatened litigation https://politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299…,@ashleygjovik, 8:30 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431776176301740033

She also protested Apple's use of a British flag for Chagos emoji, including filing a formal complaint in June 2021 (Radar 79525856). She was also trying to organize with Pussy Riot about "activism at Apple," and Apple knew she was going to meet with them because she told Apple University about it. (see SAC at 527-8).

161.   The point of this is that Apple likely fired Plaintiff for a variety of illegal reasons, and until discovery is underway, it likely impossible to proactively list all of those illegal reasons – and Apple may be actively trying to dismiss some of those reasons now so they can later uses them as defenses and/or avoid discovery of documents showing their liability.

## O.   Claims for Cal.Lab.C. §§ 232 (Pay) & 232.5

162.   Defendant challenges Plaintiff's § 232 claim as new and insufficient. [D's MTD at 22-23; Reply at 13-14]. However, it's not new – it's been in prior complaints. [7/31 Declaration Exhibit A-C]. [See SAC at 1229-31, 1250].

163.   Further, Defendant's feigned confusion is a ruse. Defendant does know exactly what she's talking about. Please see a proposed supplement to this

section below.[57]

In August of 2021 Gjovik participated in an employee driven pay survey that was being shared on Slack. Gjovik suggested adding a question about gender and added it herself in the spreadsheet.

In the evening of August 3 2021, Gjovik posted on a popular Slack group at Apple, linking to three of Apple's policies, and quoting "Nothing in these guideless should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions." Gjovik encouraged her coworkers to speak out and organize. Gjovik was put on leave the next morning. Gjovik posted on Twitter about doing this a few days later.

> "There's a strange idea in #Apple that speaking out about #workconditions violates our employment contract (a doc many of us never got a copy of nor is there a formal way to req) but I took pics & mine has rights in a footnote. I also reminded folks the eve before put on leave. @ashleygjovik 1:33 PM · Aug 9, 2021. https://x.com/ashleygjovik/status/1424785998152495107

After Plaintiff was put on leave, the pay survey was shutdown, supposedly because there was a question about gender. There was news coverage of Apple shutting down pay surveys and public criticism about the matter:
- *Apple keeps shutting down employee-run surveys on pay equity — and labor lawyers say it's illegal, the company bans surveys that include diversity data,*

---

[57] ***Apple keeps shutting down employee-run surveys on pay equity — and labor lawyers say it's illegal,*** The Verge, August 9, 2021, "Apple insists it does not have a problem with pay inequality. Skeptical Apple employees have been trying to verify that claim by sending out informal surveys on how much people make, particularly as it relates to women and underrepresented minorities. But the company has shut down three of those surveys, citing stringent rules on how employees can collect data. ...The first known survey began in the spring and asked people to volunteer salary information in addition to how they identify in terms of race, ethnicity, gender, and disability. After about 100 responses, Apple's people team — the company's name for what is commonly called human resources — asked employees to take the survey down, saying the demographic questions constituted personally identifying information, or PII. Last week, employees tried to start another pay equity survey but were again told to take it down **because it included a question on gender.** When they created a new survey without the gender question, the Apple people team allegedly said it had to be shut down because it was hosted on the company's corporate Box account." https://www.theverge.com/2021/8/9/22609687/apple-pay-equity-employee-surveys-protected-activity

Aug 9, 2021, "Apple did not respond to a request for comment from *The Verge*." [58]

- *Apple just banned a pay equity Slack channel but let's fun dogs channel lie. The company's rules around Slack usage are not being evenly enforced,* Aug 31, 2021, Apple did not immediately respond to a request for comment from *The Verge*.[59]

- *"Apple says it has pay equity, but an informal employee survey suggests otherwise: Employees say there's a six percent wage gap between the salaries of men and women who responded to the survey,"* Aug 23, 2021. In response to a request for comment from *The Verge*, Apple spokesperson Rachel Tulley sent the company's already public statement on pay equity." [60]

Gjovik also tweeted out her salary in solidarity to those organizing around pay. An NLRB charge was filed about Apple shutting down the pay surveys in September 2021, prior to Gjovik's termination, and NLRB issued a decision of merit in January 2023. Gjovik also found a prior US DOJ lawsuit against Apple for salary price fixing, posted about it, and compared it to Apple's recent actions shutting down pay surveys.

"The DOJ announced in 2010 that it had settled with #Apple & others, establishing that they would cease their illegal hiring practices. The DoJ noted this complaint is part of a larger antitrust inquiry into employment practices by high tech firms." 4:51 PM · Aug 31, 2021 https://x.com/ashleygjovik/status/1432808176026472448

"Lawsuit accuses Apple, others of fixing worker pay: large tech companies conspired with one another to lowball salaries." @ashleygjovik 4:55 PM · Aug 31, 2021 https://x.com/ashleygjovik/status/1432809271746383878

---

[58] "Last week, employees tried to start another pay equity survey but were again told to take it down because it included a question on gender. When they created a new survey without the gender question, the Apple people team allegedly said it had to be shut down because it was hosted on the company's corporate Box account."
"https://www.theverge.com/2021/8/9/22609687/apple-pay-equity-employee-surveys-protected-activity

[59] "Pay equity has been a hot topic among Apple employees over the past few months. The company has shut down multiple employee surveys aimed at gathering data on how much workers make." https://www.theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel

https://www.theverge.com/2021/8/23/22633141/apple-pay-equity-survey-results-wage-gap

Not much has changed in 16 years…. 8/31 - ″Apple just banned a pay equity Slack channel but let's fun dogs channel lie″ https://theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel @ashleygjovik 3:58 PM · Aug 31, 2021

**P.   Cal.Lab.C. §§ 98.6 + 96k + 232.5 claim (or Tamney &/or UCL).**

164.   Defendant again argues that Cal. Labor Code § 96(k) does not have a private right of action, which is only partially true. Standing alone, § 96k likely does not have a private right of action. [D's MTD at 23-24, Reply at 14]. However, combined with overlapping §§ 232.5 and 98.6 claims, there surely is a private right of action for § 96(k).

165.   Case law for § 96(k) is sparse, which is why Plaintiff does not make conclusive declarations as Defendant does. However, in this case, the employee would be not only be speaking about work conditions outside work hours and not on work property, but those work conditions would be rooted in inalienable Constitutional rights. As mentioned, this claim could likely also be pursued under *Tamney* as a ConTort. Further, § 96(k) could probably also be pursued under a UCL claim as well, or instead.

166.   Otherwise, would only the under resourced, five-years-behind-on-their-caseload CalDOL DIR office be able to pursue a § 96(k) claim? Have they ever pursued one? No private action at all effectively nullifies the statute. An interpretation which gives effect is preferred to one which makes void. Cal. Civ Code § 3541.

167.   Apple also claims, "her Seventh Claim does not make any mention of Section 98.6," but this is patently false. *See*, "Violation of Cal.Lab.C. § 96(k) via § 98.7)" [4AC page 55 line 13-14]. "Violation of Cal. Labor Code § 98.6 including § 96k, 232, and 232.5." [TAC page 59 line 8]. And so on. Plaintiff even discussed complimentary Cal. Labor Code § 980 protections as well in her SAC at 403.

168. Finally, Defendant still does not explain why it is suggesting striking the entirety of her Section 98.6 claim despite not expressly arguing it should be dismissed. Is Defendant trying to dismiss her 98.6 claim or not? [MTS pg53-54 Exhibit A]. Is Apple hoping the court approves all requests in the MTS without checking that the motion relates to what Apple says it does?

### Q.   Breach of Implied Covenant of Good Faith & Fair Dealing

169. Despite Plaintiff's claim for a breach of the implied covenant of good faith/fair dealing being approved to move forward in the May 20 2024 decision ("the Court…allows the claim for breach of the implied covenant to proceed…")[61] Defendant now rechallenges it with no new basis, and then claims Plaintiff did not sufficiently defend herself from their Blitzkrieg of a 4th MTD and so now her claim should be forfeited, despite already being approved. Further, Defendant says Plaintiff can't amend either. [MTD at 24-25; 14-15 Reply at 14-15].

170. Plaintiff has not alleged in her 4AC that Defendant violated any express terms of an employment contract, but rather, Defendant violated the *implied* covenant of good faith and fair dealing that applies to all contracts. Plaintiff does not allege one specific contract governs her relationship with Apple as Apple used hundreds of contracts and policies during her employment, and several of them were recently found to violate federal law. Its unclear which contract(s) govern at this point, or if any do (instead now an implied contract). The implied covenant of good faith and fair dealing would apply to any of these scenarios.

171. Defendant also argues her performance bonus is prospective and not earned. (Def's MTD at 24). Plaintiff pled that her performance bonus was already vested by the time she was terminated, citing the end of the review year.

---

[61] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 41 (N.D. Cal. May. 20, 2024).

### R.  Plaintiff's request for Cal. Labor Code civil penalties is not relevant for a subsequent 12(b)(6) motion, or 12(f) motion.

172.   Plaintiff has explained that these motions are not meant to be used to strike/dismiss penalties at this phase in the proceeding. [P's Opp to MTD at 19]. Further, couldn't a compromise just be Plaintiff contacting CalDOL after she wins and asking them if they want to fine Apple in addition to her lawsuit?  Do we have to decide this now?

## III. Conclusion

In Apple's latest Motions, Apple attempts to dismiss all but three of Plaintiff's claims, and even then, tries to dismiss significant portions of those three remaining claims as well.

A large corporation operated a secret, off-book factory, engaging in the illegal dumping of toxic waste for several years [P's 7/31 RJN, Exhibit A]. When an employee discovered the illegal activities, the corporation engaged in surveillance, harassment, and threats to silence her. Despite these efforts, she continued her investigation, gathering evidence and reporting to federal authorities. In response, the corporation deployed covert agents to obstruct her and her claims.

The corporation now requests that the court disregard these actions and limit its liability to a single day, September 9, 2021, arguing that excluding years of misconduct and potentially criminal conduct and focusing solely on the events occurring over a few hours on one day, will be more efficient. The corporation seeks to dismiss the victim's statements, judicially noticeable evidence, and her arguments, asking the court to accept their assertion of innocence and to characterize the situation as a misunderstanding.

Defendant's Motion to Dismiss and Motion to Strike should be denied. Plaintiff also respectfully requests that if any claims are dismissed or stricken, she

at least be given an opportunity to try to amend. Plaintiff also respectfully requests Apple be ordered to file their answer and prohibited from filing additional 12(b)(6) or 12(f) motions.

Dated: August 18, 2024.

Signature:

_____

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428