**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| | Case No. 3:23-CV-04597-EMC |
| **ASHLEY M. GJOVIK**, *an individual*, | **PLAINTIFF'S 2ND REQUEST FOR JUDICIAL NOTICE (SUPPLEMENT TO 7/31)** |
| Plaintiff, | |
| vs. | ***In Support of Plaintiff's Opposition to Defendant's Motions to Dismiss & to Strike*** |
| **APPLE INC.**, a corporation, | |
| Defendant. | **Motion Hearing & Case Management Conference:**<br>Dept: Courtroom 5 (Zoom)<br>Judge Edward M. Chen<br>Date: August 28, 2024<br>Time: 9:30 AM PT |

# I. Judicial Notice Arguments; Points & Authorities

Plaintiff Ashley Gjovik respectfully requests, pursuant to Fed. R. Civ. E. 201, that the Court take judicial notice of the following of the public records described below and attached as Exhibits.  Plaintiff incorporates her Memorandum of Points and Authorities filed 7/31.

I verified the authenticity of each of these documents. A true and correction version of each document is attached in each exhibit. I declare under penalty of perjury this is true and correction.

Dated: August 18, 2024.

Signature:

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**:
Boston, Massachusetts
**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

## A. Appendix I: Exhibits re: First Request (7/31 Repeated)

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS | FACTS TO BE NOTICED |
|---|---|---|---|
| **EXHIBIT A** | **US EPA RCRA Inspection Report for 3250 Scott Blvd** | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - US EPA alleged it identified at least 19 unique violations of the RCRA during RCRA-specific inspections in August 2023 and January 2024.<br>- These inspections occurred due to a public (Gjovik's) tip & Apple was informed about this by US EPA in August 2023.<br>- US EPA alleged that Apple is treating and disposing of RCRA-regulated hazardous waste without required permits, reporting, or transportation manifests.<br>- The chemical exhaust for some of the factory operations is released directly into the outdoor air.<br>- The chemical exhaust for some of the factory operations is routed into a 55-gallon carbon drum that EPA alleges Apple. |
| **EXHIBIT B** | **Map: Location of 3250 Scott Blvd Santa Clara, CA, 95054.** | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Distance between 3250 Scott Blvd and adjacent buildings. |

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS | FACTS TO BE NOTICED |
|---|---|---|---|
| EXHIBIT C | *Hazardous Production Gases* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Dangers of these gases. |
| EXHIBIT D | *Silicon Valley toxics pose a 'Bhopal' peril* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| EXHIBIT E | ICSC for: Arsine, Phosphine, Stibine, Fluorine, Diborane, Silane | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Dangers of these chemicals. |
| EXHIBIT F | San Jose Mercury News, LSI LOGIC advertisement. | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Industry concerns about locating children or other sensitive populations near conductor fabrication. |
| EXHIBIT G | Letter from California Assemblymember Connelly | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Government concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| EXHIBIT H | *Warning to Silicon Valley on computer chip gases* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS | FACTS TO BE NOTICED |
|---|---|---|---|
| **EXHIBIT I** | *Activist calls semiconductor industry history's most dangerous* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| **EXHIBIT J** | *Blast scene 'pretty brutal'* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| **EXHIBIT K** | *Residents flee homes in fear of new blast* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| **EXHIBIT L** | *Toxic gas leak is 'inevitable' doctor warns* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| **EXHIBIT M** | *Deadly gas stored next door to South Bay homes* | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Public concerns about the potential for catastrophe due to the use of toxic gases in semiconductor fabrication. |
| **EXHIBIT N** | **Modeling Toxic Gas Releases Using a Screening Model** | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - The potential for catastrophe from the gases used for semiconductor fabrication. |
| **EXHIBIT O** | **International Fire and Zoning Code; California Fire Code** | Ultrahazardous Activities, Nuisance, IIED, *Tamney*, Cal. Labor Code § 1102.5 | - Code requirements for semiconductor fabrication and use of toxic gases. |

## B. Appendix II: Exhibits for Second Request (New)

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS | FACTS TO BE NOTICED |
|---|---|---|---|
| **EXHIBIT P** | *I Thought I was Dying; My Apartment was built on Toxic Waste*, SF Bay View | Ultrahazardous Activities, Nuisance, IIED, statute of limitations | - Incorporated by Reference:<br>- What Gjovik actually said in March 2021. |
| **EXHIBIT Q** | Apple Cares about Privacy Unless You Work at Apple | Section 17200 | - Incorporated by Reference:<br>- Gjovik's statements about Gobbler. |
| **EXHIBIT R** | Example Deed Poll ("comfort study") | Section 17200 | - Incorporated by Reference:<br>- Apple's use of restrictive covenants, and the terms of those documents, related to medical studies and product studies on employees. |
| **EXHIBIT S** | 2022 Police Report "civil matter" of Apple privacy policies | Section 17200; IIED Outrage | - Police report summarized that Apple bugging Gjovik's property and surveilling her was a civil issue due to Apple's aggressive "surveillance" policies for employees. (No required mens rea). |
| **EXHIBIT T** | CARB Investigation of 3250 Scott Blvd | Ultrahazardous Activities, Nuisance, IIED, | - Another open investigation into the fab at 3250 Scott Blvd. |

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS | FACTS TO BE NOTICED |
|---|---|---|---|
| **EXHIBIT U** | <u>2020 ECHO Page for 3250 Scott Blvd</u> | Ultrahazardous Activities, Nuisance, IIED, statute of limitations | - Incorporated by Reference:<br>- The content in page referenced as of September 8 2020. |
| **EXHIBIT V** | <u>April 2023 Permit Application for a new "VOC Abatement System" at 3250 Scott Blvd.</u> | Ultrahazardous Activities, Nuisance, IIED, Twitter posts generally | - Timing and content of application.<br>- Rule 407 exception: impeachment. |

**Appendix: Exhibits**

**P. Exhibit P: Ashley Gjovik, "I thought I was Dying; My Apartment was**

## I thought I was dying: My apartment was built on toxic waste

🌐 sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

March 26, 2021

March 26, 2021

*by Ashley Gjovik*

There's another epidemic occurring today alongside COVID-19 – it's an outbreak of new housing developments on toxic land and water with laissez-faire oversight. The SF Bay Area and Silicon Valley are two of the most polluted regions in the entire country, yet the paperwork often appears to be rushed through to build residences on toxic soil and groundwater.

In some cases, there are claims the data was manipulated or ignored to reduce expenses and shorten project timelines. Some of these approvals and subsequent lawsuits include Hunters Point, Treasure Island, Point Isabel and the Richmond Zeneca site.

While much recent media coverage has focused on the development of these future residential sites, one looming question remains open: What happens if these sites are approved with inadequate remediation plans and the residents experience health issues due to the hazardous materials?

I moved into a new apartment complex, the Santa Clara Square Apartments, in February 2020. I was living on a remediation site but didn't know it until I was so sick that I thought I could be dying. Over the next seven months, I proceeded to live out the nightmare many feared following the bare-bones clean-up plans for sites like Hunters Point and Zeneca.

After I realized the site could be causing my mystery illness, I hit brick wall after brick wall trying to get help. I expect none of the current residents actually know what they're sitting on or what happened to me. I want to change that. I also want to shed light on the systemic failures I discovered and the extent that financial interests appear to be prioritized over public health by those in charge of these sites.

### My story

This apartment complex had no physical or written appearance of danger from chemicals, other than a brief and vague note about the presence of "agricultural chemicals" buried towards the end of the "Resident Handbook." Though I was in good health, I began experiencing chest pain, dizzy spells, palpitations and weakness within days of moving into my new apartment.

I feared the worst and headed to the emergency room. Over the next few weeks, my condition only worsened, with bizarre muscle numbness and spasms and the onset of daily lower-fainting spells where I would get so dizzy that I would have to immediately lie down, sometimes for hours, before I could regain balance.

I spoke with dozens of doctors who performed extensive testing to try to identify the cause of my sudden and worsening cardiac and neurological issues. The doctors were perplexed. While the tests showed my blood pressure, heart rate and other vitals were abnormal, no tests or imaging could identify why.

After moving into Apartment #349 in the Santa Clara Square Apartments (SCSA), Ashley's heart rate immediately decreased well below expected levels. Her doctors later explained to her that VOC exposure depresses the central nervous system and could cause exactly that type of report. Her heart rate returned to normal as soon as she moved out.

1/9

**Built on Toxic Waste," SF Bay View, March 2021.**

My doctors screened me for all sorts of severe, permanent and often fatal illnesses. The symptoms were so debilitating and unpredictable that I felt I had no control over my body. I really thought I could be dying.

I bought books on coping with terminal illness; notified friends of the location of my will and power of attorney documentation. I slept with my phone by my bed in case I had to call 911 in the middle of the night. I was utterly terrified.

I spent the next six months on medical leave and disability, contemplating what my future would hold. I work full time as a program manager while attending law school to become a public interest attorney. But faced with an apparent severe long-term disability or even a fatal illness, I had to consider if I needed to quit my job and drop out of school – and what that would mean for my future.

In September 2020 I stumbled upon the first hint of what was actually happening to me. At that time, the wildfires were burning and smoky air covered the Bay Area. I have asthma, so I tried to weatherproof my apartment, blocking all outside air from entering and running air purifiers.

My indoor air quality monitors showed low particulate levels and everything looked great. However, shortly after, I started getting nosebleeds and hallucinations. I'd wake up almost every night thinking there were massive earthquakes shaking my bed.

A friend suggested I check if carbon monoxide might be causing hallucinations. I checked a new, more advanced air quality monitor and, to my surprise, the monitor showed very high levels of something called "tVOCs." I didn't know what that meant, but I noticed something compelling.

Ashley purchased numerous air quality monitors to be able to monitor the "tVOCs" in her apartment. She quickly found a long history of VOCs in the soil and groundwater on her apartment's property as well as at nearby sites, including several EPA Superfund sites less than a mile away.

One of my most bizarre symptoms since moving in was waking up every few weeks exactly at 3 a.m. and feeling like I was choking and going to vomit. When I looked, the "tVOCs" on my monitor spiked exactly at 3 a.m. I also noticed the tVOCs seemed to rise and fall at different times of the day when I was having the worst symptoms. I began to think that there was an important correlation between this data and my symptoms.

The air quality monitor read that the VOCs repeatedly spiked exactly at 3 a.m. each night – correlating directly to her sudden 3 a.m. feelings of nausea and choking.

I spent the next few days buying more air quality monitors for additional data points, all of which showed high levels of tVOCs, rising and falling. I contacted my property manager, Irvine Company, about my concerns. Irvine Company knew I had been sick and was also helping me investigate the "earthquakes."

I told them about the high tVOCs and that I thought it could be causing my health issues and the earthquake hallucinations. I asked them to investigate, but they refused to help.

Within a few days, I learned that Volatile Organic Compounds (VOCs) are high vapor pressure compounds emitted as gases, and "tVOCs" are the total amount of VOCs present in a certain location. I learned from reading government documentation that unexpectedly high levels of tVOCs, especially when their emissions fluctuate, can be caused by something called "vapor intrusion," which is when solvents and other hazardous materials are in the ground – soil or water – and as they evaporate, the vapors rise up and "intrude" into buildings.

I was vaguely aware of the EPA Superfund program and knew there were sites all over Silicon Valley, so I started searching online to see the details of the sites closest to me. I found the environmental impact report for the property where I was living, which is when things really got eerie.

2/9

Apparently, the 1,800-unit Santa Clara Square apartment complex was built on industrially zoned land that required a clean-up – remediation – plan authorized by the California Department of Toxic Substances Control (DTSC). The site development notice stated, "Environmental investigations at the site have shown the presence of arsenic, lead and pesticides in shallow soils related to historical agricultural use."

The clean-up activities seemed to focus only on these specific contaminants. Per the report submitted to DTSC, most of the contaminants were apparently not removed as part of clean-up, but instead kept on-site. Thousands of cubic yards of hazardous soil were buried under the parking garages in "containment cells." They also wrote that they left toxic soil around certain trees for "1.5 times the tree canopy width" and simply put fabric on top of the toxic soil with "3 inches of clean soil or mulch."

There were also land use restrictions required by the government for the garages which were now the ceiling of the "containment cells" and the trees with toxic soil, which they called "TPZs." These areas, just yards away from me, were not to be used for "residential human habitation," hospitals, schools or day cares.

> "My beautiful view became haunting." The Department of Toxic Substances Control approved certain areas of the SCSA as "Tree Protection Zones" – areas specifically authorized to keep toxic soil on site and only protected by a thin fabric and a few inches of much.

I was horrified to learn all of these facts and then see maps of the site with my apartment unit right above areas with the bright red "Class 1 hazardous waste" shading and to know the redwood trees outside my window were surrounded by hazardous soil. My beautiful view became haunting.

At that point, I started calling lawyers and doctors and reporting my concerns to government agencies. I knew the situation was likely going to be complicated and that the tVOC readings on my personal monitors were not going to be conclusive on their own, but my gut told me something was terribly wrong.

I'll spoil the surprise – if there is any – and tell you now: I never got an answer to what happened to me, nor was I able to get anyone in charge to earnestly investigate. I only have more questions. Let my situation illustrate all the ways the system is currently set up to support financial interests instead of public health.

## Will the property owner help?

I sent Irvine Company numerous emails and phone calls pleading for help. The day I found the high tVOCs I wrote, "I think my apartment might be poisoning me" and sent a description of "sick building syndrome," pointing out that I've been experiencing almost all of those symptoms since moving in.

That day, I asked Irvine to investigate and test to identify which VOCs were causing the issues and provide guidance on how to mitigate the exposure. I talked to the service manager on the phone and stressed the same message.

***"The chemicals are still pouring out full blast. I felt so terribly sick, I've ended up sitting in the outdoor courtyard with [my dog] waiting for it to hopefully stop tonight … [We] need a better plan than [me] sleeping outdoors."***

Two days later after no response I wrote, "I'm sitting by an open window right now trying to catch my breath. I feel like I'm choking." I sent them screenshots and photos of the air monitor readings, again asking for help. More days passed with no response.

One night was so bad I ended up sleeping outside on a community lounge chair out of desperation. At 2 a.m., I wrote them again: "The chemicals are still pouring out full blast. I felt so terribly sick, I've ended up sitting in the outdoor courtyard with [my dog] waiting for it to hopefully stop tonight … [We] need a better plan than [me] sleeping outdoors."

The general manager for the complex finally responded: "We had PGE out on Friday and they tested the surrounding stairwells, the area of your apartment home on the [exteriors as] well [as your] building, and there are no gas leaks or chemical spills. As of now, there is no evidence suggesting that your apartment home is unsafe. What are you wanting to do at this point? If you feel that your health and safety are in jeopardy you need to call 9-1-1 or emergency service."

I read her message and was like, "You have to be kidding me." However, a few days after I found the environmental impact report and started notifying agencies of my concerns, Irvine Company did make a suspiciously unsolicited offer to let me break my lease – with nearly a year remaining – and move out without penalty. It seemed bizarre that they would email me out of nowhere offering to let me leave without paying the $7,500 penalty to break my lease.

Irvine Company then rented out my unit with only eight days of turn-around, despite my protests demanding an investigation. They also hired a hazardous waste public relations consultant, presumably to try to get me to let the issue go.

The consultant promoted herself as "one of the state's leading public affairs strategists for redevelopment of property in the Bay Area," but within a couple of days, she seemed convinced something bad was going on in my apartment and started requesting the company to investigate as well.

After her attempts, she said they stopped giving her updates. She said twice, in writing, "It sure seems something is going on [in your apartment]."

    Several maps of the Santa Clara Square Apartments area show grading and remediation plans along with soil sampling sites mapped by the property manager, Irvine Co., the developer, Roux, Inc., and the California Department of Toxic Substances Control (DTSC). In each of the first two maps, the areas lined in red are sites contaminated by "Class 1" hazardous materials. In the first photograph, you can see that Ashley's apartment, circled and labelled "#349," is right on top of a Class 1 site. Considering Ashley's symptoms and relief of those symptoms upon moving, it is very likely the remediation plans were faulty or inadequate or, as is claimed by Dr. Ahimsa Porter Sumchai to be the case with Hunters Point and Treasure Island – totally impossible.

The consultant introduced herself to me saying,"I would be happy to talk with you about the steps that were taken to ready the site for the community and residential land use." And I was like, "How on earth did you know I was looking into that?"

I also found it strange that I had not told Irvine Company that I discovered the environmental impact report, yet Irvine Company seemed to have found out I knew and proactively reached out to me about it via the consultant.

At one point, Irvine Company communicated through the consultant that they may do some testing, but only after they found out I was bringing in an industrial hygienist of my own. Both the California Department of Toxic Substances Control (DTSC) and the consultant told me they never heard if Irvine Company actually did any testing or not.

I did try to do my own testing, but it was incredibly expensive and turned out to be insufficient. I wanted to get some formal data in the brief time before I moved out, so I hired an industrial hygienist to sample the indoor air and some of the topsoil. Despite the $1,555 I had to pay for it, the results were inconclusive. Apparently a different test – a "summa canister" – over a longer period of time would have been better.

Then, through searching and public records requests, I found a number of reported issues at Irvine Company sites in the area. First, a report from 2019, where one of my neighbors at the same complex complained about blue tap water and paid for a private lab test showing "very high" levels of lead, copper and other contaminants in the water.

I found no records of any actions taken by Irvine Company to address that report. Next, I found an article from 2014 stating Irvine Company appeared to offer a quid pro quo to the Santa Clara city government as part of another development agreement for a site nearby, stating, "If the city would approve the … project" and "resolve litigation challenges," then "Irvine would donate one million dollars" to an unrelated city project.

4/9

Then, I found an article about another nearby Irvine Company site under litigation against the city of Sunnyvale over an incomplete environmental assessment report. So, my situation didn't sound like a one-off, even with this specific company.

*In 2014 Irvine Company appeared to offer a quid pro quo to the Santa Clara city government as part of another development agreement for a site nearby, stating, "If the city would approve the … project" and "resolve litigation challenges," then "Irvine would donate one million dollars" to an unrelated city project.*

It's so broken that it's up to the property owner to test and confirm there's an issue in these situations – if they suspect the property could be making a tenant sick, it does not seem to be in their financial interest to actually confirm that suspicion. I also realized how intimidating, if not impossible, it is for an individual to go up against these big, powerful companies.

## Will the agency in charge help?

When I complained to DTSC about the VOCs in my apartment, the site manager initially offered to look into it. She admitted it sounded like my health issues were the result of VOC fumes in my unit, even putting in writing, "It seems like something is happening in your unit."

She said she contacted the Irvine Company's environmental attorneys to suggest testing, but quickly retreated, saying there was actually nothing she could do to help me. She wrote, "I'm not trying to shut down on you. We've been working collaboratively with our contacts at the Irvine Company. And they've started to push back that if the problem isn't related to the soil or groundwater contamination, that we [DTSC] don't have authority."

It was my understanding from our phone calls that DTSC only had authority over the chemicals that were listed as "contaminants of concern" in the Environmental Assessment Report, none of which were VOCs.

Then the DTSC manager tried to tell me that she suspected the VOCs were "coming from an indoor source, such as construction materials or [industrial] cleaning products." I kept asking if that was true, then who had authority over that type of issue. I never got a clear answer, other than DTSC saying "not us."

I tried asking local indoor air and public health agencies, but they said the same: "Not us." This was just the beginning of the story with DTSC.

The developer, Roux, Inc., claimed in their second clean-up completion report that "no volatile organic compounds (VOCs) in soil vapor were identified as COCs at the Site" and that "several different VOCs were detected in soil vapor samples [but well] below their respective [screening levels]." That wasn't even accurate according to the other reports!

Then they said, "Several VOCs were detected in groundwater beneath the site, but they were all below their applicable screening levels for risk to indoor air." The EIR states no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Based on what I discovered next, this all appeared to be some expert wordsmithing and spin, possibly to avoid addressing data about onsite chemicals that would have made the clean-up much more costly.

In an environmental impact report conducted on the SCSA site by Impact Sciences, a firm hired by property manager Irvine Company, the report claims that no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Impact Sciences also makes it clear the development and testing of the site were done on an "expedited schedule." What kind of costs were cut and timeframes shortened at this toxic site in the name of developer dollars?

5/9

In an environmental impact report conducted on the SCSA site by Impact Sciences, a firm hired by property manager Irvine Company, the report claims that no VOCs pose a "significant risk with respect to potential vapor intrusions issues." Impact Sciences also makes it clear the development and testing of the site were done on an "expedited schedule." What kind of costs were cut and timeframes shortened at this toxic site in the name of developer dollars?

In reading the EIR (Environmental Impact Report) response plan and thousands of pages of reports, I quickly noticed there seemed to be many VOCs found on site. The reports even said the VOCs were above residential limits and, in some cases, even above vapor intrusion risk levels.

When I first presented this to the DTSC manager, she acknowledged it is unusual to have chemicals above residential limits not considered contaminants of concern, saying, "In general, if the chemicals are present at the subsurface at concentrations exceeding residential levels, they would typically be considered contaminants of concern."

A few of the reports tried to explain why several specific VOCs weren't part of the clean-up plan, saying samples were only found in a couple spots or just a general statement that they do not believe the chemical will create a risk to public health. However, I couldn't find any explanations for some of the chemicals.

I was thinking: "If you don't want me to be worried about this chemical's impact to my health, you should tell me exactly why it wasn't included in the clean-up despite being above residential limits." All I heard was crickets and I got more suspicious.

One of the chemicals, vinyl chloride, was found above vapor intrusion risk levels, with no explanation that I could find as to why it was not included in the remediation plan. In fact, vinyl chloride is a breakdown product of the contaminants at one of the Superfund sites uphill from my apartment.

When I asked DTSC for reasoning as to why the VOCs weren't part of the clean-up plan, I never got a straight response. I began to get very worried about the integrity of everything that was approved. I raised additional questions to DTSC.

It appeared the least amount of pre-excavation testing, if any, was done on the property directly under my apartment building. Further, after excavation, Roux said they did no post-excavation testing on the remaining soil. I kept asking why so little testing was done there. I asked why conclusive statements were being made about my apartment unit based on what appeared to be very little data. I never got a straight answer.

I asked about a rogue "500-gallon underground storage tank" filled or previously filled with an unknown chemical. Apparently, no one knows where it is under the property, though it was expected to be slightly uphill from my unit. I asked if that could be under my unit or leaking under my unit. No answer.

I asked why Roux and Irvine Company apparently planned to install a vapor intrusion mitigation system beneath one of the buildings, and why they originally planned for four buildings though the rest were cancelled mid-way.

The completion report said, "While not an environmental remedy, because there are no significant risks, a VIMS consisting of a vapor barrier and a sub-slab venting system has been designed and installed."Installing these apparently could cost millions of dollars. It's curious to me that Roux would plan to build four VIMS, or even build one, if they really thought VOCs were not an issue.

I argued back and forth with DTSC for months about next steps. At several points, she told me if I could give them proof of chemicals in my body and apartment that could cause my symptoms and be linked to the chemicals on site, then they "can continue to investigate further."

*One of the doctors even wrote in the visit notes that she recommended the government look into the VOCs in the soil and groundwater as the potential cause for my VOC exposure and subsequent illness.*

6/9

I kept pushing back that they were asking a normal resident to pay for and perform seemingly industrial testing. I was also very concerned that a government agency seemed to be asking for my medical records. At one point they said they were happy to talk directly with one of my doctors. WTF.

Despite all this complexity, a DTSC press release described the Santa Clara Square project as "fast-track[ed]" and that the department worked on "an accelerated schedule to help the developer meet certain deadlines."Impact Sciences, the firm that Irvine Company hired to create the final environmental impact report, also wrote on their public website that the final environmental assessment report for the Santa Clara Square Apartments was "completed on a highly expedited schedule."

When I inquired to DTSC about what fast-tracking means, they told me it's not a term that they "typically use." I then shared their own press release with DTSC, and they seemed to be surprised by it. Further, I found the Santa Clara Planning Commission meeting notes which state the commission asked Irvine Company to "proceed with construction as expeditiously as possible in contrast to utilizing the full-term length of the [development] agreement."

## Can doctors help?

I saw two doctors who specialize in chemical exposure, and they both decided that based on the timeline of my illness, the VOC readings in my unit and my specific symptoms, that my mystery illness sounded like symptoms of VOC exposure.

One of the doctors even wrote in the visit notes that she recommended the government look into the VOCs in the soil and groundwater as the potential cause for my VOC exposure and subsequent illness. I gave in and shared her note with DTSC, but apparently the doctor's recommendation was insufficient to make them act despite my begrudging acquiescence in sharing private medical data.

## Can other agencies help?

I talked to the city, county and state health departments. I talked to the planning and code enforcement agencies. I talked with several of the California EPA agencies. I've also been talking with the federal EPA. All of the agencies that did respond said the only agency who can act is DTSC. Otherwise, the property manager must act on their own initiative.

Many of these agency employees I talked to said over the phone said that they were concerned to hear about the conditions of the site and risk to the community and they offered apologies for not being able to help.

I talked to the federal EPA and state water boards regarding the Superfund site uphill from my apartment. They said they were confident I was not impacted by the contamination from that site, despite the historical chemical plume under the apartment's property. I asked them if they would do testing from a groundwater well closer to the location of my apartment – they hadn't for many years – but they said no.

From 1974-1985, Synertek, Inc., leased the area directly uphill from where the Santa Clara Square Apartments currently stand. Synertek manufactured semiconductors, crucial to the production of microchips for computers and other technologies. The manufacturing involved highly toxic chemicals, and several tanks stored underground on site leaked VOCs into the groundwater, contaminating the soil around the area. In 1987, the area was deemed a Superfund site by the Environmental Protection Agency. In spite of this, or the VOCs known to be on site of the SCSA property, the DTSC did not make VOCs a part of their remediation plan for the apartments, further increasing Ashley's concern about the integrity of DTSC, the developer, property manager and City of Santa Clara.

When I asked generally if there was a way for someone to test one of the groundwater wells near my apartment to see what could be under my apartment since there's so many chemical release sites nearby, they said only Irvine Co. could do so.

## Will the city help?

I wrote and left voicemails with the mayor of Santa Clara and the district representative for the property, explaining what happened and asking for help. I received no response for five weeks. I finally received a response and will meet with the mayor in April.

I wonder – do they even want to help me? On top of the city's request for Irvine Company to expedite development, I found additional reports that make me worry the city will quickly side with Irvine Company.

In Irvine Company's pitch to the Santa Clara City Council, in addition to other benefits, they promoted the increased valuation of the property for tax purposes by $1.6 billion. Apparently, they expected the city would make over $1.5 million every year in new tax revenue from the site. Irvine's presentation told the City Council they would receive more than $50 million in fees and benefits to the City of Santa Clara as result of the development agreement. The pitch also boasted over 10,000 new jobs.

There's a housing crisis in Silicon Valley. Not all developers have the money to invest in cleaning up sites and building large-scale developments. Irvine Company is one of the few who can. In addition, an influx of that much money and jobs must be very enticing for a city council.

## Can the legal system help?

I reached out to environmental attorneys. It quickly became an issue that my lease agreement included litigation and class action waivers. I was also advised that it is extremely difficult to pursue the default lawsuit for what I experienced in these types of situations, a "toxic tort," especially against a powerful company with deep pockets like Irvine Company.

The owner, Donald Bren, is reportedly worth $15.3 billion. Beyond that, I was advised that court actions to force DTSC to act after the fact are rarely successful.

Some familiar with Irvine Company warned me that the company can be highly litigious, and if I fought them on this issue, it would be an uphill battle the entire way. As such, I was also advised not to warn my neighbors, since the company may try to retaliate.

*I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way?*

This was one of the hardest parts – I desperately wanted to warn my neighbors and tell everyone what I found. I believed the warning and took the advice because of a few previous experiences with Irvine Company, including the bizarre and mandatory class action and litigation waivers.

After discovering all this information about the property, my previous interactions with them and all the warnings I was given by folks who knew of their reputation, I realized I had no idea what Irvine Company was actually capable of. However, I refuse to stay silent.

This article is my first public statement on what happened, and I'm doing it despite my fear of retaliation, because I am deeply worried about the health and safety of the folks living on that property and the apparent systemic failures in preventing and addressing these types of issues.

## Better, but no help

I moved out of the Santa Clara apartment two weeks after the email from Irvine Company letting me break my lease. My health seemed to return to normal within a week. No more fainting spells, chest pain, numbness or the like.

I now live in San Francisco and continue my fight over what happened to me in Santa Clara. I'm also starting to study environmental law so I can advocate for others harmed by these types of situations.

So, what made me sick? While in the end everyone agreed it was VOCs, I may never know for certain if it was the chemicals in the soil or groundwater and, if so, which ones.

We need a better system. My story does not bode well for the recent approvals of laissez-faire remediation plans across the Bay Area. We all know who will be most impacted by these types of sites. It was not lost on me for a moment that my experience dealing with this issue was going to result in a best-case scenario ending because of how much privilege and how many resources I have.

I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way?

I knew that if I couldn't find a solution, there's no way these folks would. It's well known now that toxic waste sites are often located near low-income and racial and ethnic minority communities. So, these folks are more likely to suffer from these issues and have fewer resources to deal with the issues when they face them. It was the moment I really started to understand environmental justice.

What can be done to address the situation? From my experience, I think in the near term we need to put an enormous amount of pressure on the city councils approving these sites. With the current process for dealing with issues, it seems whatever is approved by these cities will be binding on their community for generations to come.

I emailed the Richmond City Council saying as much before they proceeded to approve the Zeneca site – an action for which they are currently being sued by environmental and community groups.

I also wish everyday people were better equipped to understand environmental exposure with tools to empower them to access data about the specific environments around them. I want people to be able to efficiently identify potential sources of chemical exposure and know the right agency and representative to call if they want to learn more about nearby sites.

I'm working on a project to create a portal for this now and I'm really looking forward to launching it. I wish I had these tools and this knowledge last year.

We need to re-think the general oversight of these sites in the SF Bay Area. There are so many of these sites and there seems to be very little accountability. Maybe it's due to resource constraints. I do want to believe most people are acting in good faith, but something needs to change.

The toxicity of the land coupled with seemingly blind support of financial interests really seems to have become a public health hazard with the worst impact on our already-marginalized communities.

*Ashley Gjovik is an advocate for human rights and civil liberties, including healthy environments. She is currently a law student studying public interest law and policy. Ashley can be reached at ashleygjovik@protonmail.com.*

## Update

Could thousands more be sick from chemical exposure? To learn more, visit the new chemical exposure education website Ashley has launched here: whatsintheair.org.

9/9

**Q. Exhibit Q: "Apple Cares about Privacy Unless You Work at Apple," The Verge, August 30 2021.**

Apple cares about privacy, unless you work at Apple - The Verge        8/30/21, 9:43 AM

THE VERGE



APPLE

# APPLE CARES ABOUT PRIVACY, UNLESS YOU WORK AT APPLE

*The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs*

By Zoe Schiffer   @ZoeSchiffer   Aug 30, 2021, 12:33pm EDT

Illustration by Alex Castro / The Verge

     acob Preston was sitting down with his manager during his first week at Apple when he was told, with little fanfare, that he needed to link his personal Apple ID and work account.

The request struck him as odd. Like anyone who owns an Apple product, Preston's Apple ID was intimately tied to his personal data — it connected his devices to the company's various services, including his iCloud backups. How could he be sure his personal messages and documents wouldn't land on his work laptop? Still, he was too giddy about his new job as a firmware engineer to care. He went ahead and linked the accounts.

Three years later, when Preston handed in his resignation, the choice came back to haunt him. His manager told him to return his work laptop, and — per Apple protocol — said he shouldn't wipe the computer's hard drive. His initial worry had come to pass: his personal messages were on this work laptop, as were private documents concerning his taxes and a recent home loan. Preston pushed back, saying some of the files contained highly

https://www.theverge.com/22648265/apple-employee-privacy-icloud-id      Page 1 of 9

personal information and there was no reasonable way to make sure they were all removed from the laptop without wiping it completely.

He was told the policy wasn't negotiable.

Preston's story is part of a growing tension inside Apple, where some employees say the company isn't doing enough to protect their personal privacy and, at times, actively seeks to invade it for security reasons. Employees

> *"IF THEY DID THIS TO A CUSTOMER, PEOPLE WOULD THEIR GODDAMN MINDS."*

have been asked to install software builds on their phones to test out new features prior to launch — only to find the builds expose their personal messages. Others have found that when testing new products like Apple's Face ID, images are recorded every time they open their phones. "If they did this to a customer, people would lose their goddamn minds," says Ashley Gjøvik, a senior engineering program manager.

Apple employees also can't use their work email addresses to sign up for iCloud accounts, so many use their personal accounts.

The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute.

Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises."

Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises" (emphasis added).

Many employees have a choice between getting an Apple-owned phone or having the company pay for their phone plan. But one source tells *The Verge* that trying to maintain two phones can become impractical. In software engineering, certain employees are expected to download a "live-on" program that puts out daily builds with bug fixes. "You can't have a successful live-on program without people treating these devices exactly the

same as a personal phone," the source says. "So a work device or a work account just won't cut it."

## ST LINK YOUR PERSONAL WITH YOUR NNECT WORK ACCOUNT"

None of these policies are unique. Tech companies almost always have rules in place to search employees' corporate devices, including personal devices used for work. It's also common practice for tech companies to ask employees to test new software, which could potentially expose personal information. But Apple sets itself apart from other tech giants through its commitment to consumer privacy. As Tim Cook said at the CPDP Computers, Privacy and Data Protection conference in January 2021, businesses built on buying and selling user data, without the knowledge or consent of consumers, "[degrade] our fundamental right to privacy first, and our social fabric by consequence." The lack of employee privacy has made the perceived hypocrisy particularly irksome to some workers.

Now, as employees begin to push back against a variety of Apple norms and rules, these policies are coming under the spotlight, raising the question of whether the company has done enough to safeguard personal employee data. It might seem like a company obsessed with secrecy would be sympathetic to its employees' wishes to have confidential information of their own. But at Apple, secrecy requires the opposite: extensive knowledge, and control, over its workforce.

This is how it starts: a new Apple employee is told during onboarding that collaborating with their colleagues will require them to make extensive use of iCloud storage, and their manager offers a two terabyte upgrade. This will link their personal Apple ID to their work account — in fact, the instructions for accessing this upgrade explicitly say "you must link your personal Apple ID with your AppleConnect work account." The connection will give them access to collaborative apps like Pages and Numbers that they might need to do their jobs. (Apple employees who do not have a business need to collaborate do not go through this process.)

Employees *could* pause during onboarding and say they want to create a new Apple ID specifically for work or use a different phone. But most do not — it seems a little paranoid, and the Apple instructions say to go ahead and use your personal account. What's more,

most Apple devices don't support using multiple Apple IDs. To switch between iCloud accounts on an iPhone, you have to completely sign out of one ID and into another — a clunky, disruptive process. It is far easier culturally and technically to simply link personal and work accounts, which adds a new Apple Work folder to the employee's iCloud account.

In theory, this Apple Work folder is where all of the collaborative documents for employees are supposed to live in order to keep personal and work files separate. In practice, the owner of a document often forgets to store files in the work folder, and documents quickly become intermingled. In fact, when Apple employees create a document in, say, Pages, the app automatically enters the personal email address used for their Apple ID. "I asked my manager about it and it's just sort of an issue everyone deals with," Preston says.

> *"I GET MAD THAT I HAVE TO* *MY PERSONAL PHONE TO TE.* *BOSS."*

Employees can choose to not sync certain folders, like their photo libraries. But others, like messages, can be trickier. Apple adopted Slack in 2019, but some teams still use iMessage as a primary way to communicate, which makes opting out of a message sync nearly impossible.

Over the past few weeks, employees have been discussing the difficulty of setting up different Apple IDs to keep work and personal files separate, noting that while it's possible, there are significant technical hurdles. "I don't understand why they didn't create an Apple ID and iCloud account from our work email address during the onboarding process," one employee said on Slack. "I get mad that I have to use my personal phone to text my boss," said another.

---

Concerns about data privacy are not ubiquitous inside Apple. Many employees who spoke to *The Verge* said they were aware the company gave itself extensive rights to search their data, but — for various reasons — weren't overly worried about the fallout.

"When I joined Apple, I personally expected it to be pretty invasive and took some serious steps to separate my work and personal life," one source says.

For other employees, however, the mixing of personal and work data has already had real consequences. In 2018, the engineering team Ashley Gjøvik worked on was involved in a lawsuit. The case had nothing to do with Gjøvik personally, but because she'd worked on a project related to the litigation, Apple lawyers needed to collect documents from her phone and work computer.

*A THAT HAS YOUR FACE IN*
*D DATA."*

Gjøvik asked the lawyers to confirm that they wouldn't need to access her personal messages. She says her team discouraged the use of two phones; she used the same one for work and personal and, as a result, had private messages on her work device.

A member of the legal team responded that while the lawyers did not need to access Gjøvik's photos, they did not want her to delete any messages. During an in-person meeting, Gjøvik says she told the lawyers the messages included nude photos she'd sent to a man she was dating — a sushi chef who lived in Hawaii. Surely, those weren't relevant to the lawsuit. Could she delete them? She says the lawyers told her no.

---

n 2017, Apple rolled out an app called Gobbler that would allow employees to test Face ID before it became available to customers. The process was routine — Apple often launched new features or apps on employees' phones, then collected data on how the technology was used to make sure it was ready for launch.

Gobbler was unique in that it was designed to test face unlock for iPhones and iPads. This meant that every time an employee picked up their phone, the device recorded a short video — hopefully of their face. They could then file "problem reports" on Radar, Apple's bug tracking system, and include the videos if they found a glitch in the system. "All data that has your face in it is good data," said an internal email about the project. After rumors of criticism, Apple eventually changed the codename to "Glimmer."

Unlike other Apple features, Glimmer wasn't automatically installed on employee phones. It required an informed consent form so employees would know what they were getting into. Still, for some people on engineering teams, participation was encouraged — even expected, according to two staff members. Once it was installed, some data that didn't contain personally identifiable information would automatically upload to Radar, unless

employees turned off this setting.

Apple was careful to instruct employees not to upload anything sensitive, confidential, or private. But it didn't tell people what was happening with the hundreds of images they didn't upload in Radar reports.

The reports themselves were also a cause for concern. When employees file Radar tickets, they include detailed information about the problems they are seeing. In 2019, Gjøvik filed a ticket about Apple's photo search capabilities. "If I search for 'infant' in my photo library, it returns a selfie I took of myself in bed after laparoscopic surgery to treat my endometriosis," she wrote, including four images in the ticket. The default sharing settings for the ticket included all of software engineering.

Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "Radar is forever."

*"THEY'RE THE ONE TECH CO[...]*
*THAT TAKES PRIVACY SERIO[...]*

What's more, when employees file Radar tickets, they are often asked to include diagnostic files, internally called "sysdiagnose" to give Apple more information about the problem. If they are filing a bug about iMessage, they might be asked to install a sysdiagnose profile that exposes their iMessages to the team tasked with fixing the issue. For employees using a live-on device, default settings can mean that, as they are filing a Radar ticket, a sysdiagnose profile is being automatically created in the background, sending data to Apple without the employee realizing it.

When sysdiagnose profiles are not included, employees have been known to post memes calling out the omission.





jøvik is currently on administrative leave from Apple due to an ongoing investigation into claims she made about harassment and a hostile work environment. If she leaves the company, she'll likely face the same conundrum as Jacob Preston, related to the mixing of her personal and work files.

Employees likely wouldn't care too much about this were it not for another Apple rule that bars them from wiping their devices when they leave the company. If they do, they'll be in direct violation of their employment agreement, leaving them vulnerable to legal action.

After Preston gave notice, he received a checklist from his manager that explicitly said: "Do **not** wipe or factory reset any Apple owned units (such as laptops, Mac, ipads, and iPhones)."

"Before joining Apple I had a lot of respect for the company," Preston says. "They're the one tech company that takes privacy seriously. But then they go and have these policies that are hypocritical and go against their stated values. It's sort of hard to reconcile. It's like now that I'm leaving, my privacy isn't a concern anymore."

Apple did not respond to a request for comment from *The Verge*. ∎

GOOGLE

### How police laid down a geofence dragnet for Kenosha protesters

POLICY

### Elizabeth Holmes' defense likely includes testimony accusing her ex-partner of abuse

GOOGLE

### Google allegedly offered Netflix a break on the usual Play Store commission

# R. Exhibit R: Example User Study Contract, Deed Poll for Physical Injury

Participant Initials __AG__

### EXPERIMENTAL SUBJECT INFORMED CONSENT FORM

████ Comfort Study - Intake and Evaluation

**INTRODUCTION**

You have been invited to participate in a voluntary research study undertaken by Apple Inc. *("Apple")*. Before saying yes to participating in this study, you need to read and understand the details of what you will be asked to do. This form talks about the purpose, procedures, benefits, and risks of the study, so you can make an informed decision. This form also talks about your right to remove yourself from the study at any time. A member of the study team will answer any questions you may have about this form and about the study. Please read this form carefully, and feel free to ask anything about the information you are given.

If you wish to proceed with the study after you have finished reading this form, you must initial each page and then sign the form on the last page. Your decision to participate in the study is voluntary. You are not required to participate in this study as a condition of your employment, and you may refuse to participate or withdraw from participation at any time. If you choose to participate, your study records may be kept by Apple for a period of up to 5 years, but will **not** become a part of your personnel file.

**NATURE AND PURPOSE OF STUDY**

A small percentage of people participating in a wrist-worn prototype evaluation study have experienced skin irritation that may be associated with prolonged contact with the prototype. As one of the individuals who experienced skin irritation, you are being asked to participate in a study to help Apple understand and evaluate the irritation you experienced.

This study involves evaluation of your skin under the supervision of the Apple User Study team and a board certified dermatologist. The study will be conducted at Apple's User Study labs on campus, with further information collection and consultation by email and phone.

It is expected that your participation in this study will require approximately 1-2 hours of time over a one to two week period. Your participation will take place as part of your normal working hours if you choose to participate.

**STUDY PROCEDURES**

The following procedures will be conducted:
·   The Apple study team will work with you to schedule an appointment for an initial evaluation.
·   Initial Evaluation Appointment at the Apple User Study Lab (60 minute appointment):
    ○   You will read and review this Informed Consent Form and will have the opportunity to ask questions about the study and have your questions answered.
    ○   You may be asked to complete a health history questionnaire.
    ○   A nurse may ask you questions about your skin irritation.
    ○   A nurse will photograph any areas where you exhibit or exhibited skin irritation.
    ○   o The nurse will de-identify your health history questionnaire and photos and send to board certified dermatologists [under contract with Apple] for evaluation.
·   You may be asked to return to the Apple User Study Labs for follow up evaluations.
·   Throughout the study, you may be asked questions related to your experience participating in this study.
·   Study personnel at the Apple User Study Labs may take photographs of any areas exhibiting reactions. You may refuse to have photographs taken.

Apple Confidential
████ mfort Study Informed Consent (Intake and Evaluation) November 2015                    Page 1 of 4



Participant Initials

**PERSONAL INFORMATION COLLECTED**

The following information may be collected in the course of the study:

- Name
- Year of Birth
- Gender
- Ethnicity
- Health history questionnaire information
- Allergies (including foods, materials, drugs, etc.)
- Photographic or other imaging of the area(s) where skin sensitivity occurred
- Study personnel may also ask to take photographs or other images of any area exhibiting a reaction, though such photographs will not be taken without your permission.
- Description/log of symptoms, side-effects, reactions.

The data collected will not become a part of your personnel file. Please see the Confidentiality, Transfer and Use of Information Collection section for additional details.

**RISKS AND DISCOMFORTS**

No risks or side effects are anticipated or expected, and all intake and evaluation will be non-invasive.

**CONTACTS**

If a study-related problem should occur, or if you desire to voice complaints or concerns about the study, please contact ▓▓▓▓▓▓▓▓▓▓ Senior Counsel, Apple Inc. at ▓▓▓▓▓▓▓▓ or ▓▓▓▓▓▓ Human Studies Review Board Chairman at Apple Inc., at ▓▓▓▓▓▓▓▓ or ▓▓▓▓▓▓▓▓

**BENEFITS**

You are not expected to experience any direct benefit from being in this study; however, the results of this study may help Apple to develop and market future products.

**COSTS AND COMPENSATION**

There are no costs to you for being in this study. You will be compensated for your time via your usual salary. If you are hourly, all time spent reviewing user study correspondence, and otherwise communicating or providing feedback to the user study team should be on the clock.

**VOLUNTARY PARTICIPATION/WITHDRAWAL**

Your participation in this study is voluntary. Choosing to participate, refusing to participate, or changing your participating status will have no effect on your position, performance evaluation, job advancement, or standing within Apple or the Apple entity which employs you. If you are an hourly employee (in some locations referred to as "non-exempt"), the time you spend participating in the study should be reported as time worked. If you decide to withdraw from this study at any time, you may do so without penalty. There are no known medical consequences for you if you withdraw. If you decide to withdraw from the study we request that you inform ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ You may also withdraw without providing notice, but in that case you may be contacted by a member of the study team to simply confirm your withdrawal. You may be terminated from this study by the Investigator for reasons of, but not limited to: (1) any condition or situation which risks your health, (2) your failure to follow directions, (3) cancellation or discontinuation of the study, or (4) at Apple's request.

Participant Initials 

**CONFIDENTIALITY, TRANSFER AND USE OF INFORMATION COLLECTED**

Your personal information held by Apple will be maintained for a period not to exceed 5 years on secure servers located in or near Cupertino, California, to which physical access is restricted. Database-level access to the data will also be restricted and password-protected. Personal information (such as your name) and non-personal information will be stored separately to ensure that only database administrators can attribute the non-personal information to study participants.

Non-personally identifiable study records may be transferred to Apple entities in other countries, including the United States of America when data is collected outside the United States. The data may be used for purposes related to this or similar studies, including selection and recruitment efforts for future studies. If we wish to use the data collected for a purpose unrelated to this study, we will seek your consent before doing so. Any personal information collected as part of the study will be otherwise collected, held and used as set out in Apple's privacy policy. Upon the termination of your employment with Apple, any information that may be used to personally identify you will be deleted within one year, and all study data will be separated from any such information that Apple may have collected about you as part of this study. Apple reserves the right to retain any analysis or other data in de-identified form. Information on correction of, access to or deletion of your personal information, and making a complaint about a breach, is set out in Apple's privacy policy.

Apple may provide data collected from the study to third parties who will process the data on Apple's behalf, subject to the same obligations as contained herein with respect to use and confidentiality. The data collected may also be used for related purposes to this or similar studies. If we wish to use the data collected for a purpose unrelated to this study, we will seek your consent before providing the data to other teams and/or projects within Apple for use in connection with engineering or development efforts. Study information that identifies you will be protected and treated as confidential, although total confidentiality cannot be guaranteed.

**YOUR CONFIDENTIALITY OBLIGATIONS**

By agreeing to participate in this study you acknowledge that any information about the study, including any study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.

**What is Considered Confidential?**
The fact that Apple is conducting this study, the types and methods of data collection, and any other detail about the study, or how it is conducted, are confidential. Any information that you learn about the study, including technical information and the identity of Apple personnel in the study or working on the study, and any other information identified as non-public information is considered confidential and proprietary information that belongs to Apple and must not be disclosed by you.

**Who Needs to Know?**
Do not assume that anyone, including other Apple employees, need to know about information from the study. **Most Apple employees do not know about the study**. Do not talk to anyone about the study unless you are authorized to do so by a relevant person.

**No Disclosures Outside of Apple and the Study Personnel.**
It is of utmost importance that no confidential information be communicated to anyone outside of Apple or the study personnel, including friends, family members, professional colleagues, and especially, the press.

**CONSENT & DEED POLL (where applicable)**
**in favor of Apple Inc., its affiliates and subsidiaries**

I have read and understand this consent form and the risks and benefits described.

Confidential                                                                                    Page 3 of 4
...omfort Study Informed Consent (Intake and Evaluation) November 2015

Participant Initials 

I understand that I will receive a copy of this consent form after I sign it.

I understand that I may withdraw my consent at any time.

My questions have been answered.

This form is being signed voluntarily by me indicating that I consent to participate in this study.

I agree that I will keep confidential all information disclosed to me during the study.

I grant Apple the right to use, process and disclose to third parties any health information that may be collected as part of the study.

This consent is valid from one year from the date of my signature, unless I withdraw my consent earlier. I understand that regardless of the status of my consent or participation, my confidentiality obligations will remain in full force and effect.

*Ashley Gjovik*

Participant's Name (printed)

█████████████

*12/17/2020*

Date

Apple Confidential
Comfort Study Informed Consent (Intake and Evaluation) November 2015

## S. Exhibit S: Police Report, Santa Clara Police Department, May 31 2022.



| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 4/8/24, 6:19 AM | | | I/NetViewer : Event Chronology |

**P2205310079 - 1062 – MEET WITH CITIZEN**
**1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS**

☑ System Comments

| Date/Time | Terminal | Operator | |
|---|---|---|---|
| 05/31/22 14:05:00 | pd3 | 7266 | EVENT CREATED – **Type:** 1062 – MEET WITH CITIZEN, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Agency:** SCPD, **Group:** PD, **Beat:** PD03, **Status:** P, **Priority:** 4 |
| 05/31/22 14:05:00 | pd3 | 7266 | INITIAL CALL – **Call Source:**          **Caller Name:**          **Caller Phone Number:**          **Caller Address:** |
| 05/31/22 14:05:01 | pd3 | 7266 | EVENT REMARK – SPECIAL ADDRESS COMMENT: |
| 05/31/22 14:05:01 | pd3 | 7266 | EVENT REMARK – PARK CENTRAL APTS - COMPLEX CODE 1179 |
| 05/31/22 14:05:01 | pd3 | 7266 | EVENT REMARK – SPECIAL ADDRESS COMMENT: |
| 05/31/22 14:05:01 | pd3 | 7266 | EVENT REMARK – PARK CENTRAL APTS - COMPLEX CODE 1179 |
| 05/31/22 14:05:01 | pd3 | 7266 | EVENT REMARK – RP ADV SHE IS A FACEBOOK WHISTLE BLOWER- AFTER LEAVING THE COMPANY, SHE REC'D A PACKAGE FROM FACEBOOK CONTAINING A STATUE, BROKEN GLASS AND ROCKS. BELIEVES THE STATUE IS LISTENING IN ON HER PHONE CALLS AND EMITTING AND ELECTRICAL ENERGY Priority : Normal |
| 05/31/22 14:05:01 | vsrvpdcaddb1 | 7266 | EVENT REMARK – ** LOI search completed at 05/31/22 14:05:01 |
| 05/31/22 14:05:28 | pd3 | 7266 | EVENT REMARK – SHE ALSO BELIEVES FACEBOOK TRIED TO BREAK INTO HER APT TO GET THE DEVICE BACK |
| 05/31/22 14:32:00 | pd8 | 5252 | EVENT REMARK – ** LOI information for Event # P2205310079 was viewed at: 05/31/22 14:32:00 |
| 05/31/22 14:32:00 | pd8 | 5252 | EVENT REMARK – ** >>>> by: Paul Vogelsanger on terminal: pd8 |
| 05/31/22 15:25:36 | pd8 | 5252 | EVENT UPDATED – Total Assigned Units: 1, |
| 05/31/22 15:25:36 | pd8 | 5252 | UNIT UPDATED – **Unit:** 503, **Status:** DP, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |
| 05/31/22 15:25:37 | pd8 | 5252 | EVENT UPDATED – **First Unit Dispatched Time:** 05/31/22 15:25:36, **Primary Employee Id:** 7570, **Primary Unit Id:** 503, |
| 05/31/22 15:25:40 | pd8 | 5252 | EVENT UPDATED – **First Unit Enrouted Time:** 05/31/22 15:25:40, |
| 05/31/22 15:25:40 | pd8 | 5252 | UNIT UPDATED – **Unit:** 503, **Status:** ER, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |
| 05/31/22 15:42:20 | vSRVPDMOB1a | 0 | EVENT UPDATED – **First Unit Arrived Time:** 05/31/22 15:42:20, |
| 05/31/22 15:42:20 | vSRVPDMOB1a | 0 | UNIT UPDATED – **Unit:** 503, **Status:** AR, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |
| 05/31/22 16:06:43 | 6974 | 6974 | EVENT REMARK – |
| 05/31/22 16:42:20 | pd8 | 0 | UNIT UPDATED – **Unit:** 503, **Status:** –, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |
| 05/31/22 16:44:32 | pd8 | 5252 | UNIT UPDATED – **Unit:** 503, **Status:** CU, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |
| 05/31/22 17:30:37 | $503 | 7570 | EVENT REMARK – THE COMPANY IS APPLE, NOT FACEBOOK. I WENT AND GOT THE STATUE, SHE ASKED ME TO DESTROY IT. SPOKE WITH RP AT LENGTH. THIS IS A CIVIL ISSUE REGARDING PIRIVACY POLICIES AT APPLE. NEG 647J. NO CRIME Priority : Normal |
| 05/31/22 17:30:49 | $503 | 7570 | DISPOSITION ASSIGNED – NR |
| 05/31/22 17:30:49 | $503 | 7570 | EVENT UPDATED – Total Assigned Units: 0, |
| 05/31/22 17:30:49 | $503 | 7570 | EVENT CLOSED – |
| 05/31/22 17:30:49 | $503 | 7570 | UNIT UPDATED – **Unit:** 503, **Status:** AM, **Location:** 1050 BENTON ST SC,2310;2: @PARK CENTRAL APARTMENTS, **Employees:** 7570 |

vsrvpdcadint1a/NetViewer/InquiryCommand/EventChronology?eventID=P2205310079&isFDIDSearch=False&isSearchResult=False&eid=288736

SANTA CLARA POLICE DEPARTMENT CONTROLLED DOCUMENT By: _Ashley Gjovik_  By: _WU6_ Date:_4/8/24_ DO NOT DUPLICATE

# T. Exhibit T: CARB



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**COMPLAINT INVESTIGATION REPORT**

## Complaint - (CPM448152)

**TASK NUMBER**
CPE290153

**Complaint Details**

Complaint Type: **Other**
Occurrence Date & Time: **9/4/2020 9:00 AM**
Complaint Description: **This facility's doing semiconductor fab since 2015, but without required permits, and illegally zoned. They did not ask for a proper CARB permit until 2024, after the US EPA RCRA enforcement inspections. RCRA found the operator was treating and disposing of haz waste without permit, including air emissions. The site is across the street from thousands of apartments & a playground. I filed a Complaint in 2020 due to a chemical emergency from unknown source. This is the source. Please investigate.**

**Alleged Location**

Emission Source: **Business**
Site/Facility Name: **Apple, Inc**
Address: **3250 Scott Boulevard, Santa Clara, CA, 95054-5054**

**Complaint Status**

**Unconfirmed**
Emission was no longer present

**Reporting Inspector**

**Erin Phillips**
Inspector
--

**INSPECTION DATE**
7/22/2024 1:23 PM

### INFORMATION

Name: **Ashley Gjovik**
Address: ████████████████
Phone: ████████
Contact Options: **Complainant willing to share contact information**
Email: **ashleymgjovik@protonmail.com**
Follow Up: **Provide Complaint Report by Email**

### RESPONSE

How complainant was initially contacted: **By phone - Spoke with complainant**
Time Contacted: **7/22/2024 1:23 PM**
Contacted after-hours / IR:
Complainant Statements: **Emission is still going**
Complainant available to meet with the R/I:
Location where complainant observed the emissions: **N/A**
Other Statements: **C stated they were injured by emissions from Apple in 2020. C no longer lived in the Bay Area and was monitoring Apple's compliance activity. C shared RCRA and fire code reports and violations with R/I via email.**

8/5/2024 9:42:43 AM          375 Beale Street, Suite 600 - San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV          Page 1 of 2

 

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**COMPLAINT INVESTIGATION REPORT**

 **Complaint - (CPM448152)**

 **TASK NUMBER**
**CPE290153**

---

 **INVESTIGATIONS**

Investigation conducted at: **Phone investigation only**
Emissions observed by R/I at time of investigation: **No**          Date & Time: **7/22/2024 1:23 PM**
R/I observed emissions with complainant:                    Date & Time:
Emissions observed by R/I, if applicable:
Investigation conducted in general area where complainant observed alleged emissions:
Investigation conducted upwind and downwind of alleged site or potential source of emissions:
Emissions observed and traced to source:          Date & Time:      **Different site or facility from alleged**
Investigation conducted at source of emissions:          Date & Time:
                                                    Site or Facility Name: **Apple, Inc**
                                                    Name/Title of Site of Facility Contact:
Alleged site and/or source of emissions informed of the complaint:
Other potential source(s) of emissions observed in the area:

---

 **INVESTIGATIONS  (continued)**

Visible Emissions:
Sample(s) taken:          Lab Sample#:
Wind data:          Direction:          Speed (mph):          Location:
Air District Permit:
Complaint referred to other agency:          Date & Time:
                                          Agency Name:
                                          Contact:
                                          Telephone Number: **#Error**
                                          Email:
NOV/NTC Issued:
Complainant Notified of Investigation Findings:          Date & Time: **TBU**

---

 **FACILITY OR SITE INFORMATION**

**Facility #22839      -      Permitted**
3250 Scott Boulevard, Santa Clara, CA 95054-5054

 **GENERAL COMMENTS**

General Comments: R/I informed the AQ Inspection Specialist assigned to the alleged facility, of the complaint.

---

# U. Exhibit U: US EPA ECHO Detailed Facility Report: 3250 Scott Blvd, Santa Clara, CA (September 8 2020).



## Detailed Facility Report

### Facility Summary

**APPLE INC**

**3250 SCOTT BOULEVARD, SANTA CLARA, CA 95054**

FRS (Facility Registry Service) ID: 110001168254
EPA Region: 09
Latitude: 37.37963
Longitude: -121.9717
Locational Data Source: FRS
Industry:
Indian Country: N

#### Enforcement and Compliance Summary

| Statute | Insp (5 Years) | Date of Last Inspection | Compliance Status | Qtrs with NC (Noncompliance) (of 12) | Qtrs with Significant Violation | Informal Enforcement Actions (5 years) | Formal Enforcement Actions (5 years) | Penalties from Formal Enforcement Actions (5 years) | EPA Cases (5 years) | Penalties from EPA Cases (5 years) |
|---|---|---|---|---|---|---|---|---|---|---|
| CAA | -- | -- | | -- | -- | -- | -- | -- | -- | -- |
| RCRA | -- | -- | No Violation Identified | 0 | 0 | -- | -- | -- | -- | -- |

#### Regulatory Information

Clean Air Act (CAA): No Information
Clean Water Act (CWA): No Information
Resource Conservation and Recovery Act (RCRA): Active

#### Other Regulatory Reports

Air Emissions Inventory (EIS): 1278911
Greenhouse Gas Emissions (eGGRT): No Information
Toxic Releases (TRI): 95051NTRSL3250S
Compliance and Emissions Data Reporting Interface (CEDRI): No Information

(CAT000623983), Active
(CAR000278176)
Safe Drinking Water Act
(SDWA): No Information

Known Data Problems

## Facility/System Characteristics

### Facility/System Characteristics

| System | Statute | Identifier | Universe | Status | Areas | Permit Expiration Date | Indian Country | Latitude | Longitude |
|---|---|---|---|---|---|---|---|---|---|
| FRS | | 110001168254 | | | | | N | 37.37963 | -121.9717 |
| EIS | CAA | 1278911 | | | | | N | 37.37912 | -121.97187 |
| TRI | EP313 | 95051NTRSL32505 | Toxics Release Inventory | Last Reported for 1991 | | | N | 37.37963 | -121.9717 |
| RCRAInfo | RCRA | CAT000623983 | LQG | Active (H ) | | | N | 37.379142 | -121.971777 |
| RCRAInfo | RCRA | CAR000278176 | LQG | Active (H ) | | | N | | |

### Facility Address

| System | Statute | Identifier | Facility Name | Facility Address |
|---|---|---|---|---|
| FRS | | 110001168254 | APPLE INC | 3250 SCOTT BOULEVARD, SANTA CLARA, CA 95054 |
| EIS | CAA | 1278911 | MICREL SYNERGY SEMICONDUCTOR | 3250 SCOTT BOULEVARD, SANTA CLARA, CA 95054 |
| TRI | EP313 | 95051NTRSL32505 | HARRIS/INTERSIL INC | 3250 SCOTT BLVD, SANTA CLARA, CA 95051 |
| RCRAInfo | RCRA | CAT000623983 | APPLE INC | 3250 SCOTT BLVD, SANTA CLARA, CA 95054 |
| RCRAInfo | RCRA | CAR000278176 | APPLE INC | 3250 SCOTT BLVD STE 100, SANTA CLARA, CA 95054 |

### Facility SIC (Standard Industrial Classification) Codes

| System | Identifier | SIC Code | SIC Description |
|---|---|---|---|
| TRI | 95051NTRSL32505 | 3674 | Semiconductors And Related Devices |

### Facility NAICS (North American Industry Classification System) Codes

| System | Identifier | NAICS Code | NAICS Description |
|---|---|---|---|
| TRI | 95051NTRSL32505 | 334413 | Semiconductor and Related Device Manufacturing |
| RCRAInfo | CAR000278176 | 334111 | Electronic Computer Manufacturing |
| RCRAInfo | CAT000623983 | 334111 | Electronic Computer Manufacturing |

### Facility Tribe Information

| Reservation Name | Tribe Name | EPA Tribal ID | Distance to Tribe (miles) |
|---|---|---|---|
| No data records returned | | | |

## Enforcement and Compliance

### Compliance Monitoring History (5 years)

| Statute | Source ID | System | Activity Type | Compliance Monitoring Type | Lead Agency | Date | Finding (if applicable) |
|---------|-----------|--------|---------------|----------------------------|-------------|------|-------------------------|
| No data records returned | | | | | | | |

*Entries in italics are not counted in EPA compliance monitoring strategies or annual results.*

### Compliance Summary Data

| Statute | Source ID | Current SNC (Significant Noncompliance)/HPV (High Priority Violation) | Current As Of | Qtrs with NC (Noncompliance) (of 12) | Data Last Refreshed |
|---------|-----------|----------------------------------------------------------------------|---------------|--------------------------------------|---------------------|
| RCRA | CAT000623983 | No | 09/05/2020 | 0 | 09/04/2020 |
| RCRA | CAR000278176 | No | 09/05/2020 | 0 | 09/04/2020 |

### Three-Year Compliance History by Quarter

| Statute | Program/Pollutant/Violation Type | QTR 1 | QTR 2 | QTR 3 | QTR 4 | QTR 5 | QTR 6 | QTR 7 | QTR 8 | QTR 9 | QTR 10 | QTR 11 | QTR 12+ |
|---------|----------------------------------|-------|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|---------|
| | RCRA (Source ID: CAR000278176) | 10/01-12/31/17 | 01/01-03/31/18 | 04/01-06/30/18 | 07/01-09/30/18 | 10/01-12/31/18 | 01/01-03/31/19 | 04/01-06/30/19 | 07/01-09/30/19 | 10/01-12/31/19 | 01/01-03/31/20 | 04/01-06/30/20 | 07/01-09/30/20 |
| | Facility-Level Status | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified |
| | RCRA (Source ID: CAT000623983) | 10/01-12/31/17 | 01/01-03/31/18 | 04/01-06/30/18 | 07/01-09/30/18 | 10/01-12/31/18 | 01/01-03/31/19 | 04/01-06/30/19 | 07/01-09/30/19 | 10/01-12/31/19 | 01/01-03/31/20 | 04/01-06/30/20 | 07/01-09/30/20 |
| | Facility-Level Status | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified | No Violation Identified |

### Informal Enforcement Actions (5 Years)

| Statute | System | Source ID | Type of Action | Lead Agency | Date |
|---------|--------|-----------|----------------|-------------|------|
| No data records returned | | | | | |

*Entries in italics are not counted as "informal enforcement actions" in EPA policies pertaining to enforcement response tools.*

### Formal Enforcement Actions (5 Years)

| Statute | System | Law/Section | Source ID | Action Type | Case No | Lead Agency | Case Name | Issued/Filed Date | Settlements/Actions | Settlement/Action Date | Federal Penalty | State/Local Penalty | SEP Cost | Comp Action Cost |
|---------|--------|-------------|-----------|-------------|---------|-------------|-----------|-------------------|---------------------|------------------------|-----------------|---------------------|----------|------------------|
| No data records returned | | | | | | | | | | | | | | |

## Environmental Conditions

### Watershed(s)

| 12-Digit WBD (Watershed Boundary Dataset) HUC (RAD (Reach Address Database)) | WBD (Watershed Boundary Dataset) Subwatershed Name (RAD (Reach Address Database)) | State Water Body Name (ICIS (Integrated Compliance Information System)) | Beach Closures Within Last Year | Beach Closures Within Last Two Years | Pollutants Potentially Related to Impairment | Watershed with ESA (Endangered Species Act)-listed Aquatic Species? |
|---|---|---|---|---|---|---|
| No data records returned | | | | | | |

## Assessed Waters From Latest State Submission (ATTAINS)

| State | Report Cycle | Assessment Unit ID | Assessment Unit Name | Water Condition | Cause Groups Impaired | Drinking Water Use | Ecological Use | Fish Consumption Use | Recreation Use | Other Use |
|---|---|---|---|---|---|---|---|---|---|---|
| No data records returned | | | | | | | | | | |

## Air Quality

| Nonattainment Area? | Pollutant(s) | Applicable Nonattainment Standard(s) |
|---|---|---|
| Yes | Ozone | 8-Hour Ozone (1997), 8-Hour Ozone (2008), 8-Hour Ozone (2015) |
| No | Lead | |
| Yes | Particulate Matter | PM-2.5 (2006) |
| Yes | Carbon Monoxide | Carbon Monoxide (1971) |
| No | Nitrogen Dioxide | |
| No | Sulfur Dioxide | |

## Pollutants

### Toxics Release Inventory History of Reported Chemicals Released in Pounds per Year at Site

| TRI Facility ID | Year | Total Air Emissions | Surface Water Discharges | Off-Site Transfers to POTWs (Publicly Owned Treatment Works) | Underground Injections | Releases to Land | Total On-site Releases | Total Off-site Transfers |
|---|---|---|---|---|---|---|---|---|
| No data records returned | | | | | | | | |

### Toxics Release Inventory Total Releases and Transfers in Pounds by Chemical and Year

| Chemical Name |
|---|
| No data records returned |

## Demographic Profile

### EJSCREEN EJ Indexes

Eleven primary environmental justice (EJ) indexes of EJSCREEN, EPA's screening tool for EJ concerns. EPA uses these indexes to identify geographic areas that may warrant further consideration or analysis for potential EJ concerns. The index values below are for the Census block group in which the facility is located. Note that

use of these indexes does not designate an area as an "EJ community" or "EJ facility." EJSCREEN provides screening level indicators, not a determination of the existence or absence of EJ concerns. For more information, see the EJSCREEN home page.

| Census Block Group EJ Indexes (percentile) | |
|---|---|
| Particulate Matter (PM 2.5) | 86.3 |
| Ozone NATA Diesel PM | 84.9 |
| NATA Air Toxics Cancer Risk | 87 |
| NATA Respiratory Hazard Index (HI) | 89 |
| Traffic Proximity | 89.4 |
| Lead Paint Indicator | 81 |
| Superfund Proximity | 99.7 |
| Risk Management Plan (RMP) Proximity | 93.8 |
| Hazardous Waste Proximity | 98.7 |
| Wastewater Discharge Proximity | 81.3 |

| Number of EJ Indexes Above 80th Percentile |
|---|
| 11 |

View EJSCREEN Report

**Demographic Profile of Surrounding Area (3 Miles)**

This section provides demographic information regarding the community surrounding the facility. ECHO compliance data alone are not sufficient to determine whether violations at a particular facility had negative impacts on public health or the environment. Statistics are based upon the 2010 U.S. Census and 2006-2010 American Community Survey 5-Year Summary and are accurate to the extent that the facility latitude and longitude listed below are correct. EPA's spatial processing methodology considers the overlap between the selected radii and the census blocks (for U.S. Census demographics) and census block groups (for ACS demographics) in determining the demographics surrounding the facility. For more detail about this methodology, see the DFR Data Dictionary.

| General Statistics | |
|---|---|
| Total Persons | 159,905 |
| Population Density | 5,662/sq mi. |
| Percent Minority | 69% |
| Households in Area | 59,606 |
| Housing Units in Area | 62,652 |
| Households on Public Assistance | 1,464 |
| Persons Below Poverty Level | 29,396 |

| Geography | |
|---|---|
| Radius of Selected Area | 3 mi. |
| Center Latitude | 37.37963 |
| Center Longitude | -121.9717 |
| Land Area | 100% |
| Water Area | 0% |

| Income Breakdown - Households (%) | |
|---|---|
| Less than $15,000 | 4,142 (7.02%) |
| $15,000 - $25,000 | 3,713 (6.29%) |

| Age Breakdown - Persons (%) | |
|---|---|
| Children 5 years and younger | 13,198 (8%) |
| Minors 17 years and younger | 33,753 (21%) |
| Adults 18 years and older | 126,153 (79%) |
| Seniors 65 years and older | 14,285 (9%) |

| Race Breakdown - Persons (%) | |
|---|---|
| White | 64,549 (40%) |
| African-American | 4,351 (3%) |
| Hispanic-Origin | 35,006 (22%) |
| Asian/Pacific Islander | 65,727 (41%) |
| American Indian | 894 (1%) |
| Other/Multiracial | 24,385 (15%) |

| Education Level (Persons 25 & older) - Persons (%) | |
|---|---|
| Less than 9th Grade | 6,273 (5.8%) |
| 9th through 12th Grade | 5,132 (4.74%) |
| High School Diploma | 16,937 (15.66%) |
| Some College/2-year | 26,965 (24.93%) |

| | |
|---|---|
| $25,000 - $50,000 | 8,692 (14.73%) |
| $50,000 - $75,000 | 8,727 (14.79%) |
| Greater than $75,000 | 33,736 (57.17%) |

| | |
|---|---|
| B.S./B.A. (Bachelor of Science/Bachelor of Arts) or More | 52,868 (48.87%) |

# V. Exhibit V: Santa Clara city Permit Applications for VOC



**CITY OF SANTA CLARA BUILDING DIVISION**

# Building Permit Application

Staff will Assign **PERMIT NO.**

| **FOR ALL TYPES OF BUILDING PERMITS** Use this form to apply for a building, electrical, mechanical, or plumbing permit. Check all that apply. | **PROJECT IDENTIFICATION** All applicants must fill out this section |
|---|---|

**PROJECT ADDRESS:** 3250 Scott Blvd.  Santa Clara, CA Zip: **95054**

**PARCEL NUMBER (APN):**  FLOOD ZONE:

**APPLICANT** Name: Graham Copland
Person Submitting

Email: gcopland@iesengineering.net  Phone: (559) 375-3757

**\*LEGAL OWNER** (if different from Applicant) Name: Khalil Jenab

Email:  Phone:

**DESIGN PROFESSIONAL IN CHARGE** if any
Firm Name: Integrated Engineering Services  State License #:

Email: rmichael@iesengineering.net  Phone: (408) 718-0927

**VALUATION** (Cost of all labor and materials) $  5,300,000

**PERMIT TYPE** Check all that apply to the project:  ☑Building  ☑Electrical  ☑Mechanical  ☑Plumbing

**BRIEFLY DESCRIBE SCOPE OF WORK:**

Installation of a new screen wall and mechanical yard area for a new VOC abatement system. Two new solvent exhaust fans will be installed on the roof to support the new VOC abatement system.

**THE APPLICANT MAY BE:**

- A Licensed Contractor
- An Owner-Builder (all property owners who apply are "Owner-Builders")
- An Agent acting for the Contractor or Owner-Builder. See page 2 of this form to authorize an agent.

**NOTE TO OWNER-BUILDER APPLICANTS**

In compliance with state law, the City will provide you with a notice and the Owner's Acknowledgment and Verification of Information Form that explain the legal implications of construction on your property. You will need to sign and submit this acknowledgment prior to permit issuance.

**NOTE TO COMMERCIAL APPLICANTS**

In conformance to the Title 17 California Code of Regulations of the State Board's Division of Drinking Water standards, all building permits, with the exception of Single Family Residences, reviewed by Water and Utilities are now subject to a determination whether or not the domestic, irrigation, and fire services need to be upgraded. If the existing service(s) is currently sub standard or does not have a back-flow preventer device, the service may need to be upgraded.

## DECLARATIONS  All applicants must fill out this section.

**WORKERS' COMPENSATION DECLARATION.** WARNING: Failure to secure workers' compensation coverage is unlawful and shall subject an employer to criminal penalties and civil fines up to $100,000, in addition to the cost of compensation, damages as provided for in Labor Code Section 3706, interest, and attorney's fees. I hereby affirm under penalty of perjury one of the following declarations:

**Check only one box:**

☐ a) I have and will maintain a certificate of consent to self-insure for workers' compensation, issued by the Director of Industrial Relations as provided for by Labor Code Section 3700, for the performance of the work for which this permit is issued. My policy number is: _____

☐ b) I have and will maintain workers' compensation insurance, as required by Labor Code Section 3700, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy are:

| CARRIER: | PHONE: |
|---|---|
| POLICY #: | EXPIRES: |

☐ c) I certify that, in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that, if I should become subject to the workers' compensation provisions of Labor Code Section 3700, I shall comply with those provisions.

*Graham Copland* (signature)  Graham Copland  4/4/23

• SIGNATURE Licensed Contractor, Property Owner OR Authorized Agent  PRINT NAME  DATE

Santa Clara Permit Center (408) 615-2420  permitcenter@santaclaraca.gov  Santa Clara City Hall, 1500 Warburton Ave. CA  95050

**Abatement and Acid Exhaust Systems at 3250 Scott Blvd. (April 4 2023).**

**Building Permit Application**                                           PAGE 2 of 2

**APPLICANT INFORMATION** Fill out only the applicant section that applies to you.

### A. LICENSED CONTRACTOR or AUTHORIZED AGENT AS APPLICANT

| COMPANY NAME: | | LICENSE CLASS: | |
|---|---|---|---|
| CONTRACTOR'S STATE LIC: | EXP: | CITY BUSINESS LIC: | EXP: |

**LICENSED CONTRACTOR DECLARATION:** I hereby affirm under penalty of perjury that I am licensed under provisions of Business and Professions Code Division 3, Section 7000 of Chapter 9, and my license is in full force and effect.

| • SIGNATURE of Contractor OR Authorized Agent | PRINT NAME | DATE |
|---|---|---|

### B. OWNER-BUILDER or AUTHORIZED AGENT AS APPLICANT

**OWNER-BUILDER DECLARATION:** I hereby affirm under penalty of perjury that I am exempt from the Contractors' State License Law for the reason checked below. Per Business and Professions Code Section 7031.5, any city or county that requires a permit to construct, alter, improve, demolish, or repair any structure, prior to its issuance, also requires the permit applicant to file a signed statement that he or she is either licensed (pursuant to Contractors' State License Law Chapter 9 Section 7000) OR that he or she is exempt from licensure and provides the basis for the alleged exemption. Any violation of Section 7031.5 by a permit applicant subjects the applicant to a civil penalty of up to $500.00. **Check only one box:**

☐ a) I, as owner of the property, or my employees with wages as their sole compensation, will do (__) ALL or (__) PORTIONS of the work, and the structure is not intended or offered for sale. Per Business and Professions Code Section 7044, the Contractors' State License Law does not apply to an owner of property who, through employees' or personal effort, builds or improves the property, provided that the improvements are not intended or offered for sale. If the building or improvement is sold within one year of completion, the Owner-Builder will have the burden of proving that it was not built or improved for the purpose of sale.

☑ b) I, as owner of the property, am exclusively contracting with licensed contractors to construct the project. Per Business and Professions Code Section 7044, the Contractors' State License Law does not apply to an owner of property who builds or improves thereon, and who contracts for the projects with a licensed contractor pursuant to the Contractors' State License Law.

☐ c) I am exempt from licensure under the Contractors' State License Law for the following reason:

By my signature below I acknowledge that, except for my personal residence in which I must have resided for at least one year prior to completion of the improvements covered by this permit, I cannot legally sell a structure that I have built as an Owner-Builder if it has not been constructed in its entirety by licensed contractors. I understand that a copy of the applicable law, Business and Professions Code Section 7044, is available upon request when submitting this application or at the following website: http://www.leginfo.ca.gov/calaw.html. I also certify to each of the following:

- I am the property owner or authorized to act on the property owner's behalf.
- I have read this application and the information I have provided is correct.
- I agree to comply with all applicable city and county ordinances and state laws relating to building construction.
- I authorize representatives of this city or county to enter the above-identified property for inspection purposes.

| *Graham Copland* (signature) | Graham Copland | 4/4/23 |
|---|---|---|
| • SIGNATURE Owner-Builder OR Authorized Agent | PRINT NAME | DATE |

### C. AUTHORIZING AN AGENT TO BE THE APPLICANT   To be completed by the Licensed Contractor or Owner-Builder

Check one: ☐ Licensed Contractor ☐ Owner-Builder

| AGENT NAME: | PHONE #: |
|---|---|
| AGENT ADDRESS: | |
| PROJECT ADDRESS: | |

| FOR THE LICENSED CONTRACTOR WHO IS AUTHORIZING AN AGENT: I authorize the above-named person to act as my agent to apply for, sign, and file the documents required to obtain a building permit for the project at the listed address. I declare under penalty of perjury that I am the Licensed Contractor for the property listed at the above Project Address, I have filled out this section, and I certify the accuracy of the information provided. | FOR THE OWNER-BUILDER WHO IS AUTHORIZING AN AGENT: Except for the Owner's Acknowledgment and Verification of Information Form which is my personal responsibility, I authorize the above-named person to act as my agent to apply for, sign, and file the documents required to obtain a building permit for my property. I declare under penalty of perjury that I am the Property Owner at the above Project Address; I have filled out this section; and I certify the accuracy of the information provided. |
|---|---|

| • SIGNATURE of Contractor OR Owner-Builder *who is authorizing the agent* | PRINT NAME | DATE |
|---|---|---|

Santa Clara Permit Center (408) 615-2420        permitcenter@santaclaraca.gov        Santa Clara City Hall, 1500 Warburton Ave. CA  95050

(BLDG)/(NA)/(FORMS)/(Information)/(AA)a Permit Application 9-2019.doc



CITY OF SANTA
CLARA BUILDING
DIVISION

# Building Permit Application

Staff will Assign **PERMIT NO.**

---

**FOR ALL TYPES OF BUILDING PERMITS**
Use this form to apply for a building, electrical, mechanical, or plumbing permit. Check all that apply.

**THE APPLICANT MAY BE:**

- A Licensed Contractor

- An Owner-Builder (all property owners who apply are "Owner-Builders")
- An Agent acting for the Contractor or Owner-Builder. See page 2 of this form to authorize an agent.

**NOTE TO OWNER-BUILDER APPLICANTS**

In compliance with state law, the City will provide you with a notice and the Owner's Acknowledgment and Verification of Information Form that explain the legal implications of construction on your property. You will need to sign and submit this acknowledgment prior to permit issuance.

**NOTE TO COMMERCIAL APPLICANTS**

In conformance with the Title 17 California Code of Regulations of the State Board's Division of Drinking Water standards, all building permits, with the exception of Single Family Residences, reviewed by Water and Utilities are now subject to a determination whether or not the domestic, irrigation, and fire services need to be upgraded. If the existing service(s) is currently sub standard or does not have a back-flow preventer device, the service may need to be upgraded.

## PROJECT IDENTIFICATION   All applicants must fill out this section

| PROJECT ADDRESS: 3250 Scott Blvd. | Santa Clara, CA Zip: 95054 |
|---|---|

| PARCEL NUMBER (APN): | FLOOD ZONE: |
|---|---|

**APPLICANT** Name:  Graham Copland
Person Submitting

| Email:  gcopland@iesengineering.net | Phone:  (559) 375-3757 |
|---|---|

**\*LEGAL OWNER** (if different from Applicant) Name:  Khalil Jenab

| Email: | Phone: |
|---|---|

| **DESIGN PROFESSIONAL IN CHARGE** if any
Firm Name:  Integrated Engineering Services | State License #: |
|---|---|

| Email:   rmichael@iesengineering.net | Phone:  (408) 718-0927 |
|---|---|

**VALUATION** (Cost of all labor and materials) $   3,100,000

**PERMIT TYPE** Check all that apply to the project:   ☑Building   ☑Electrical   ☑Mechanical   ☑Plumbing

BRIEFLY DESCRIBE SCOPE OF WORK:

Installation of a new, additional acid scrubber for the existing acid scrubbed exhaust system. Two TPU filters will be demolished, and the TPU exhaust fans and process vacuum skid will be relocated to make room for the new acid scrubber.

## DECLARATIONS   All applicants must fill out this section.

**WORKERS' COMPENSATION DECLARATION.** WARNING: Failure to secure workers' compensation coverage is unlawful and shall subject an employer to criminal penalties and civil fines up to $100,000, in addition to the cost of compensation, damages as provided for in Labor Code Section 3706, interest, and attorney's fees. I hereby affirm under penalty of perjury one of the following declarations:

Check only one box:

☐ a) I have and will maintain a certificate of consent to self-insure for workers' compensation, issued by the Director of Industrial Relations as provided for by Labor Code Section 3700, for the performance of the work for which this permit is issued. My policy number is:

☐ b) I have and will maintain workers' compensation insurance, as required by Labor Code Section 3700, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy are:

| CARRIER: | PHONE: |
|---|---|
| POLICY #: | EXPIRES: |

☐ c) I certify that, in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that, if I should become subject to the workers' compensation provisions of Labor Code Section 3700, I shall comply with those provisions.

*Graham Copland*                    Graham Copland                    4/4/23

● **SIGNATURE** Licensed Contractor, Property Owner OR
Authorized Agent                    PRINT NAME                    DATE

Santa Clara Permit Center (408) 615-2420          permitcenter@santaclaraca.gov          Santa Clara City Hall, 1500 Warburton Ave. CA  95050

**Building Permit Application**                                                     PAGE 2 of 2

**APPLICANT INFORMATION** Fill out only the applicant section that applies to you.

### A. LICENSED CONTRACTOR or AUTHORIZED AGENT AS APPLICANT

| COMPANY NAME: | | LICENSE CLASS: | |
|---|---|---|---|
| CONTRACTOR'S STATE LIC: | EXP: | CITY BUSINESS LIC: | EXP: |

LICENSED CONTRACTOR DECLARATION: I hereby affirm under penalty of perjury that I am licensed under provisions of Business and Professions Code Division 3, Section 7000 of Chapter 9, and my license is in full force and effect.

● SIGNATURE of Contractor OR Authorized Agent                    PRINT NAME          DATE

### B. OWNER-BUILDER or AUTHORIZED AGENT AS APPLICANT

OWNER-BUILDER DECLARATION: I hereby affirm under penalty of perjury that I am exempt from the Contractors' State License Law for the reason checked below. Per Business and Professions Code Section 7031.5, any city or county that requires a permit to construct, alter, improve, demolish, or repair any structure, prior to its issuance, also requires the permit applicant to file a signed statement that he or she is either licensed (pursuant to Contractors' State License Law Chapter 9 Section 7000) OR that he or she is exempt from licensure and provides the basis for the alleged exemption. Any violation of Section 7031.5 by a permit applicant subjects the applicant to a civil penalty up to $500.00. **Check only one box:**

☐ a) I, as owner of the property, or my employees with wages as their sole compensation, will do (__) ALL or (__) PORTIONS of the work, and the structure is not intended or offered for sale. Per Business and Professions Code Section 7044, the Contractors' State License Law does not apply to an owner of property who, through employees' or personal effort, builds or improves the property, provided that the improvements are not intended or offered for sale. If the building or improvement is sold within one year of completion, the Owner-Builder will have the burden of proving that it was not built or improved for the purpose of sale.

☑ b) I, as owner of the property, am exclusively contracting with licensed contractors to construct the project. Per Business and Professions Code Section 7044, the Contractors' State License Law does not apply to an owner of property who builds or improves thereon, and who contracts for the projects with a licensed contractor pursuant to the Contractors' State License Law.

☐ c) I am exempt from licensure under the Contractors' State License Law for the following reason:

By my signature below I acknowledge that, except for my personal residence in which I must have resided for at least one year prior to completion of the improvements covered by this permit, I cannot legally sell a structure that I have built as an Owner-Builder if it has not been constructed in its entirety by licensed contractors. I understand that a copy of the applicable law, Business and Professions Code Section 7044, is available upon request when submitting this application or at the following website: http://www.leginfo.ca.gov/calaw.html. I also certify to each of the following:

▪ I am the property owner or authorized to act on the property owner's behalf.
▪ I have read this application and the information I have provided is correct.
▪ I agree to comply with all applicable city and county ordinances and state laws relating to building construction.
▪ I authorize representatives of this city or county to enter the above-identified property for inspection purposes.

*Graham Copland*                          Graham Copland                          4/4/23
● SIGNATURE Owner-Builder OR Authorized Agent              PRINT NAME          DATE

### C. AUTHORIZING AN AGENT TO BE THE APPLICANT  To be completed by the Licensed Contractor or Owner-Builder

Check one: ☐ Licensed Contractor  ☐ Owner-Builder

| AGENT NAME: | PHONE #: |
|---|---|
| AGENT ADDRESS: | |
| PROJECT ADDRESS: | |

| FOR THE LICENSED CONTRACTOR WHO IS AUTHORIZING AN AGENT: I authorize the above-named person to act as my agent to apply for, sign, and file the documents required to obtain a building permit for the project at the listed address. I declare under penalty of perjury that I am the Licensed Contractor for the property listed at the above Project Address, I have filled out this section, and I certify the accuracy of the information provided. | FOR THE OWNER-BUILDER WHO IS AUTHORIZING AN AGENT: Except for the Owner's Acknowledgment and Verification of Information Form which is my personal responsibility, I authorize the above-named person to act as my agent to apply for, sign, and file the documents required to obtain a building permit for my property. I declare under penalty of perjury that I am the Property Owner at the above Project Address; I have filled out this section; and I certify the accuracy of the information provided. |
|---|---|

● SIGNATURE of Contractor OR Owner-Builder *who is authorizing the agent*          PRINT NAME          DATE

Santa Clara Permit Center (408) 615-2420          permitcenter@santaclaraca.gov          Santa Clara City Hall, 1500 Warburton Ave. CA  95050