**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

|  |  |
|---|---|
| **Ashley M. Gjovik,** *an individual*, | D.C. Case No. 3:23-CV-04597-EMC |
|  | Ninth Circuit Case No. 24-6058 |
| Plaintiff, |  |
|  | **Plaintiff's Fifth** |
| vs. | **Amended Complaint** |
|  |  |
| **Apple Inc.,** *a corporation, et al.*, | Claims: Civil Litigation |
| Defendant. |  |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 2

SUMMARY OF THE CASE ........................................................................................... 1

JURISDICTION & VENUE ........................................................................................... 2

PARTIES ...................................................................................................................... 3

PROCEDURAL HISTORY ............................................................................................. 3

STATEMENT OF FACTS ............................................................................................... 4

    I.    LOCATION 1: 3250 SCOTT BLVD, SANTA CLARA ............................................. 4

    II.    GJOVIK'S CHEMICAL INJURIES IN 2020 .......................................................... 6

    III.    LOCATION 2: 825 STEWART DR., SUNNYVALE ............................................. 10

    IV.    GJOVIK'S EMPLOYMENT AT APPLE ............................................................... 12

    V.    GJOVIK'S INQUIRIES & COMPLAINTS ............................................................ 15

    VI.    CONTINUED INVESTIGATION ....................................................................... 34

LEGAL CLAIMS: RETALIATION .............................................................................. 40

    VII.    KNOWLEDGE OF PROTECTED ACTIVITIES ..................................................... 41

    VIII.    COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY* CLAIM) ......... 42

        A.    *Illegal Data Harvesting [Cal. Const. Article I, Section 1; FTC Act]* ...................... 43

        B.    *Employment Discrimination [Cal. DFEH; U.S. EEOC]* ........................................... 44

        C.    *Crime Victim/Witness Discrimination [Cal. Labor Code § 230(e)]* ......................... 44

        D.    *Legislative Witness Discrimination [Cal. Gov. Code § 9414]* ................................ 44

    IX.    COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION ACT ........................ 45

    X.    COUNT THREE: CAL. LABOR CODE § 6310 ................................................... 46

    XI.    COUNT FOUR: CAL. LABOR CODE § 98.6 ...................................................... 47

        E.    *Violation of Cal.Lab.C. § 98.6* ............................................................................ 47

        F.    *Violation of Cal. Labor Code § 232.5 via §§ 98.6, 98.7* ....................................... 48

        G.    *Violation of Cal. Labor Code §§ 232, 232.5 via §§ 98.6, 98.7* .............................. 48

     H.    *Violation of Cal.Lab.C. § 96(k) via §§ 98.6, 98.7* ................................ *50*

**LEGAL CLAIMS: TOXIC TORTS** ....................................................................... **51**

   XII.   Tolling Theories ........................................................................... 51

   XIII.   Count Five: Private Nuisance ................................................... 53

   XIV.   Count Six: IIED – Fear of Cancer ............................................ 54

**LEGAL CLAIMS: OUTRAGEOUS CONDUCT** .............................................. **57**

   XV.   Count Seven: IIED – Outrageous Conduct ............................. 57

     I.    *Vicarious Liability* ..................................................................... *58*

     J.    *Excerpts of Harassment* ............................................................ *62*

     K.    *Outrageous Per Se* ...................................................................... *69*

     L.    *Injuries and Impact* ................................................................... *70*

     M.    *Statute of Limitations* ............................................................... *72*

**PRAYER FOR RELIEF** ......................................................................................... **73**

**CERTIFICATION AND CLOSING** ................................................................... **75**

# SUMMARY OF THE CASE

1.      This lawsuit arises from Apple Inc's ("Defendant") reckless disregard of environmental regulations and safety requirements at two different Silicon Valley properties, and subsequent concealment of their unlawful acts and the extensive harm they caused.

2.      In 2020, Apple severely injured and nearly killed Ashley Gjovik ("Plaintiff") with Apple's unlawful toxic waste dumping from a stealth semiconductor fabrication facility in Santa Clara, California. (Gjovik did not discover that Apple was responsible for her injuries until 2023, but Apple is believed to have known by mid-2021). In 2021, Gjovik also exposed that Apple was violating health, safety, and environmental rules and regulations at her team's office located on a triple Superfund site in Sunnyvale, California ("the Triple Site").[1]

3.      Gjovik filed environmental and safety complaints and partnered with numerous government agencies to document and investigate the issues. Apple repeatedly made statements to Gjovik instructing her not to talk to her coworkers or the government about her safety and compliance concerns, pressured her to not ask questions, prevented her from gathering evidence, and attempted to conceal their unlawful activities from her and from the government.

4.      Apple management retaliated against Gjovik as soon as Gjovik started asking questions and expressing concerns, repeatedly said the retaliation was because of her safety and environmental complaints, they incited and encouraged others to harass and intimidate Gjovik, and Apple took negative employment actions against Gjovik in an attempt to coerce her to quit the company; but when she did not quit, Apple fired her.

5.      Apple's explanation for terminating Gjovik has changed multiple times, was not shared at all with Gjovik until a week after her termination, and the proffered reason is pretextual but unlawful itself. Over three years later, Apple still has not disclosed who initiated the decision to terminate Gjovik's employment and has refused Gjovik's requests for them to provide this information.

6.      During Apple's marathon of retaliation against Gjovik in 2021, Gjovik was in law school studying to become a human rights lawyer. She was in a unique position to effectively report serious environmental and safety issues, and to lobby for general policy reform. Gjovik utilized her knowledge, experience, and resources to confer with numerous government agencies, to meet with a variety of elected

---

[1] The "Triple Site" refers to three specific toxic waste dumps in Sunnyvale, California with a merged mega-plume of solvent pollution in the groundwater. One of the three plumes (the "TRW Microwave" site) is directly beneath Gjovik's office.

officials and their staff, to publish op-eds calling for new legislation, was interviewed and written about by the press, and served as a witness for government agencies and legislative committees.

7.    Gjovik spoke out publicly, organized with her coworkers, lobbied on their behalf, and called for systemic change with Apple's environmental and labor practices. Gjovik's public advocacy also brought awareness to her prior neighbors of the pollution issues where she had lived in 2020, leading to additional chemical exposure victims coming forward and joining Gjovik in complaining to the government and requesting help.

8.    In 2021, Gjovik filed timely retaliation and discrimination complaints with multiple administrative agencies including the U.S. NLRB, U.S. EEOC, U.S. Dept. of Labor, California Dept. of Labor, and California DFEH. The U.S. EEOC and state claims were merged into this civil lawsuit. The U.S. Dept. of Labor CERCLA whistleblower retaliation case is currently with the Administrative Review Board.[2]

9.    The U.S. NLRB is actively prosecuting Apple over their unlawful employment policies, per Gjovik's Oct. 2021 charge. NLRB will initiate prosecution imminently against Apple for its retaliation and unfair labor practices committed against Gjovik, including suspending her and terminating her employment.[3]

10.    Over the last three years, due to Gjovik's investigations and advocacy, there have been multiple government inspections of Apple's two facilities noted above, resulting in citations for environmental and safety regulatory violations, ordered corrective actions, and required monitoring. Gjovik still speaks with the U.S. EPA regularly as a community advocate about Apple and the two facilities.

11.    Apple continued harassing and retaliating against Gjovik after she was fired and through current day, intentionally interfering with and severely damaging her career, reputation, relationships, finances, physical condition, mental health, and just about every other aspect of her life.

# Jurisdiction & Venue

12.    The United States District Courts have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332].

13.    When the complaint was filed, Plaintiff was domiciled in the state of New York and is now domiciled in the Commonwealth of Massachusetts. Defendant is a corporation headquartered in California.

14.    Venue is proper in the District Court of Northern California because Apple is headquartered

---

[2] *Ashley Gjovik v Apple Inc,* 2024-CER-00001 (OALJ), 2024-0060 (ARB); CERCLA 42 U.S.C. §9610, Clean Air Act 42 U.S.C. §7622, RCRA 42 U.S.C. §6971, TSCA 15 U.S.C. §2622
[3] NLRA 29 U.S. Code § 158

and operates in this district. Many of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California. [Civil L.R. 3-5(b)].

# PARTIES

15.     Ashley Gjovik [4] ("Plaintiff"), is a natural person currently domiciled in Boston, Massachusetts. Gjovik holds a recently awarded Juris Doctor degree from Santa Clara University School of Law and is appearing Pro Se.[5]

16.     Gjovik is a 38-year-old white woman with multiple disabilities including ADHD, PTSD, anxiety, panic disorder, depression, and autism.

17.     Gjovik was an employee of Apple Inc from Feb. 2015 through Sept. 2021.

18.     Gjovik held a leasehold at a Santa Clara residential property (3255 Scott Blvd) adjacent to Apple's semiconductor fabrication facility (3250 Scott Blvd) in Feb. 2020 through Oct. 2020.

19.     Apple Inc., ("Defendant"), is a business engaged in and affecting interstate commerce and a covered entity under the federal statutes at issue here.[6] Apple is a corporation headquartered at One Apple Park Way in Cupertino, California. Apple says it "*designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services.*" As of Nov. 2024, Apple Inc. claimed a market cap of $3.4 trillion and annual revenue of $394.33 billion.[7]

20.     At all pertinent times, Apple was the tenant and operator controlling the facilities at both 825 Stewart Dr. in Sunnyvale and 3250 Scott Blvd. in Santa Clara, California. At both properties, Apple registered its state and federal RCRA activities under its own name and with Apple EH&S as the contact for the government and public.

# PROCEDURAL HISTORY

21.     Gjovik now files her Fifth Amended Complaint ("5-AC"). Gjovik filed her original complaint on Sept. 7 2023. The First Amended Complaint was filed in Oct. 2023 per stipulation, in order to allow Apple more time to prepare, as needed due to Apple's delayed arrival in court. The Second Amended Complaint was filed on Dec. 21 2023 as a matter of course but was dismissed sua sponte by this court without

---

[4] Pronounced "JOE-vik"
[5] Gjovik established a consulting LLC in California in 2022, which she continues to manage with a virtual office in Sacramento at 2108 N St. Ste. 4553 Sacramento, CA, 95816. The LLC address is used on papers for privacy.
[6] "Apple" refers to its successors and assigns; controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures; and their directors, officers, managers, agents, and employees.
[7] Apple Inc, 2024 10K, https://investor.apple.com/sec-filings/default.aspx

prejudice and with leave to amend on Jan. 30 2024, ordering Gjovik to reduce the complaint length by over 500 pages. The Third Amended Complaint was filed on Feb. 27 2024, met with a Motion to Dismiss and Motion to Strike, and was ruled upon with a decision and order issued May 20 2024. The Fourth Amended Complaint was filed on June 18 2024, also met with Motions to Dismiss and Strike, and was ruled upon with a decision and order issued Oct. 1 2024. Gjovik was ordered to revise her complaint again.

22.    On Oct. 1 2024, Gjovik filed an appeal to the Ninth Circuit Court of Appeals, contesting denied injunctions, collateral orders, and the dismissal with prejudice of dozens of her claims mostly due to discretionary procedural reasons not related to the potential merit of the claims. Gjovik filed a pending Motion to Stay pending appeal.

23.    If the Ninth Circuit accepts the appeal, Gjovik intends to appeal at least the dismissals of her claims for RICO §§ 1962(a) and 1962(d); RICO §§ 1962(c) and 1962(d); whistleblower retaliation under the Sarbanes–Oxley and Dodd-Frank Acts; violations of the Bane Civil Rights Act and the Ralph Civil Rights Act; Ultrahazardous Activities; Absolute Nuisance; Nuisance Per Se; Cal. Business and Professions Code §§ 17200 *et seq*.; Cal. Labor Code § 6399.7 and the "Right to Know" generally; Breach of the Implied Covenant of Good Faith and Fair Dealing; Negligent Infliction of Emotional Distress; IIED with a basis of defamation and accusations of dishonesty; retaliation for protected labor complaints about slavery, apartheid, genocide, and "Muslim human rights"; and whistleblower protection for protected disclosures about smuggling, violations of sanctions, violations of environmental laws, federal crimes committed in furtherance of violations of environmental laws, racketeering, and certain privacy invasions violating the California Constitution.

# STATEMENT OF FACTS

## I.    Location 1: 3250 Scott Blvd, Santa Clara

24.    In early 2015, Apple started stealth semiconductor fabrication activities in a facility located at 3250 Scott Blvd. in Santa Clara, California.[8]  Like some sort of Skunkworks, Apple codenamed the facility "ARIA" and even tried to use the codename on regulatory paperwork.

25.    The ARIA semiconductor fabrication facility operated less than three hundred feet from thousands of homes where Gjovik lived in 2020 (the Santa Clara Square Apartments). Also within 300 from

---

[8] "Semiconductor Fabrication Facility: A building or a portion of a building in which electrical circuits or devices are created on solid crystalline substances having electrical conductivity greater than insulators but less than conductors. These circuits or devices are commonly known as semiconductors." Cal. Fire Code § 202 (2022).

the building were two public parks (Creekside Park and Meadow Park), picnic tables, outdoor fitness stations, and a children's playground. Within 1,000 feet of ARIA there was also a church, a school, an elder care facility, and the San Tomas Aquino Creek and public trail. (San Tomas Aquino Creek flows to the Bay and then into the Pacific Ocean).

26.     Upon initiating operations at ARIA, Apple was quickly cited for building, environmental, health, safety, and fire code violations in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water into storm drains, fire code and CalASPA violations, health and safety code violations, failure to properly monitor wastewater discharge), 2019 (wastewater testing violations), 2020 (fire code violations, using two EPA identification numbers, inaccurate hazmat inventory data, no spill plans or training, no business permit, no signature from supervisor on records, and failure to properly monitor wastewater discharge again).

27.     Apple intentionally vented its fabrication exhaust – unabated – and consisting of toxic solvent vapors, gases, and fumes – into the ambient outdoor air. The factory was one story, while the apartments were four stories tall, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

28.     City Fire Dept. records for ARIA contain at least sixteen chemical spill/leak incident reports at ARIA within only three years. These incident reports included eight confirmed leaks/spills: leaks of phosphine and silane on June 1 2019 at 9:17 AM; a phosphine leak on Oct. 21 2019 at 11:06 PM; a Tetraethyl Orthosilicate ("TEOS") leak on July 17 2020 at 8:58 AM; a major phosphine leak on April 30 2021 at 8:29 AM; a 5% fluorine gas leak on April 18 2022 at 10:42 AM, a Hexafluorobutadiene leak on May 29 2022 at 2:19 PM, and leaks of two unnamed toxic gases on Sept. 20 2022 at 7:44 AM and Dec. 21 2022 at 1:40 AM.

29.     Further, later in 2021-2022, Apple reported to the government. that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of VOCs and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air around ARIA. In 2022, the U.S. EPA severely restricted the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under TSCA.

30.     Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring Dec. 14, 2020 – only after Gjovik had notified Apple EH&S and environmental legal about what occurred to her near ARIA. Apple also reported to the Bay Area Air Quality Management Board (BAAQMB) (in difficult to find agency filings) that in at least 2019-2021, ARIA exhausted reportable amounts of mercury, arsenic, carbon monoxide, and formaldehyde into the ambient air around the factory.

31.    Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, the government mandated testing revealed the presence of 29 µg/L of 1,1-Dichloropropane, 24 µg/L of Trichloroethylene ("TCE"), and 6.7 µg/L of Ethyl tertiary-butyl ether (ETBE). Among other issues, it's unclear why Apple had TCE on site but not in any of its chemical inventories, and then, in addition, why exactly Apple was pouring that TCE down the drain.

32.    ARIA reported an average daily water usage of around 44,000 gallons per day and the sewer pipes carrying ARIA's discharges flowed downhill and directly around the apartment where Gjovik lived in 2020. In 2020, the government had already started investigating the plumbing at her apartment as a possible vector for some unknown solvent vapor pollution.

33.    Apple was fully aware of this facility and its operations, including the vast amount of hazardous materials and hazardous waste, as every year, Apple submitted a financial assurance document to the Santa Clara Fire Dept. and HazMat agency, which detailed hazardous waste treatment and disposal operations, and is personally signed by Apple's Chief Financial Officer, Luca Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.

## II.    Gjovik's Chemical Injuries in 2020

34.    In Feb. 2020, Gjovik moved into a large, new apartment at the Santa Clara Square Apartments (adjacent to ARIA) and quickly became severely ill. Gjovik suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Gjovik also suffered bradycardia (slow heart rate), volatile blood pressure with both hypertension and hypotension and a high frequency of premature ventricular contractions (an arrhythmia).

35.    From Feb. 2020 through Sept. 2020, Gjovik was screened for multiple severe and fatal diseases and disorders, including Multiple Sclerosis, brain tumors, deadly arrhythmias, and Neuromyelitis Optica – instead, all of Gjovik's symptoms were consistent with chemical exposure. Due to the solvent exposure, Gjovik also suffered skin rashes, burns, and hives, and her hair fell out and she had a shaved head for nearly a year as the bald patches slowly grew back.

36.    Due to the sudden illness, Gjovik visited the Emergency Room on Feb. 13 2020, and Urgent Care (at AC Wellness, Apple's for-profit in-house clinic) on Feb. 20 2020. Gjovik subsequently consulted with dozens of doctors, who screened her for all sorts of diseases, subjecting Gjovik to extensive blood draws,

urine samples, injections, and scans – including potentially dangerous procedures like MRI and CT scans with contrast, of which Gjovik had multiple. Gjovik was too sick to work and went on disability.

37.    Gjovik transitioned her medical care to a different clinic and provider after her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure to Apple's factory exhaust). Instead, she suggested Gjovik could be suffering from anxiety, and enrolled Gjovik in an Apple internal user study related to blood pressure, requiring Gjovik share her iPhone medical and fitness data with Apple, and participate in weekly life coaching sessions (while being exposed to Apple's solvent vapor and gas exhaust).

38.    While sick in 2020, Gjovik would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure. On Sept. 2 2020, Gjovik discovered elevated levels of volatile organic compounds ("VOCs") in her indoor air. What immediately captured Gjovik's attention was the large spike in VOCs had occurred the night prior, around 3 AM, while she had been suffering from one of these "dying" spells.

39.    Gjovik sought out multiple occupational and environmental exposure doctors, who told Gjovik that all of her symptoms were consistent with solvent and other chemical exposures. After Gjovik discovered her medical issues at the apartment were due to a chemical emergency, Gjovik quickly filed complaints with Santa Clara City HazMat/Fire Dept., Cal. EPA DTSC and Air Resources Board, and U.S. EPA. She also called Poison Control, who said what she described also sounded like Benzene exposure. (Apple reported it was exhausting benzene into the air).

40.    Notably, almost all of the reported toxic gas leaks during the time frames Gjovik had complained in 2020 that her symptoms seemed to always be the worst around 8-9 AM, 10-11 PM, and sometimes around 2-3 AM. One of the chemical spills that did not occur during those times of concern was root caused to an Apple engineer "accidently" turning on lethal fluorine gas. Similarly, another incident, the TEOS leak, was root caused to an Apple engineer accidently installing the gas for a tool "backwards." Further, less than two weeks following the April 30 2021 phosphine leak, Apple's manifests included sixty pounds of "*vacuum filters contaminated with glass dust*," implying there may have also been a phosphine explosion.

41.    The TEOS leak occurred on July 17 2020, and that day Gjovik was suddenly covered in hives, rashes, and other skim abnormalities. She called and got a same day visit with a dermatologist who had no idea what was causing Gjovik's issues.

42.    In Sept. 2020, Gjovik hired an industrial hygienist to test the indoor air at her apartment. She

purchased an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Only half the total contaminants were accounted for in the test and the California EPA informed her that testing with Summa canisters for 24 hours is superior and would have yielded better results. Still, Gjovik's limited testing returned results showing a number of the chemicals in use by Apple at ARIA including Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, and Xylene.

43.    In Sept. 2020, Gjovik set up additional air monitors to observe the levels of VOCs in her apartment next to the ARIA factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Gjovik had noticed with her symptoms and ad hoc testing – that the VOCs mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). Gjovik notified several Apple executives of her findings and activities, including her managers Powers (Director) and West (Sr. Director), her friends J.C. (Senior Director) and A.A. (Senior Manager).

44.    In Sept. 2020, Gjovik's blood and urine medical tests returned results with industrial chemicals, including arsenic, mercury, toluene, and Xylenes. Also noteworthy are the symptoms of Gjovik's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match Phosphine and Arsine gas exposure. Both Phosphine and Arsine are very dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of Arsine gas on site, and Gjovik's medical tests from Sept. 2020, on the morning after one of the 3 AM attacks, revealed significant arsenic in her blood with no other explanation than Arsine gas exposure within the prior eight hours.[9]

45.    In Sept. 2020, Gjovik noticed an Apple facility at 3250 Scott Blvd. across the street, which was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on at least Sept. 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S and Gjovik had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in Gjovik's Superfund office at 825 Stewart Dr. ("Stewart 1") and the activities at ARIA.

46.    In Sept. 2020, the Apple EH&S manager, Elizabeth, suggested that Gjovik use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in Sept. 2021, Apple Employee Relations, Waibel, conferred with Elizabeth about Gjovik's environmental concerns

---

[9] US CDC, NIOSH, *Arsine Emergency Response*.

only hours before Gjovik were abruptly terminated.

47.     In Oct. 2020, Gjovik asked her manager from Apple Legal, Joyce, if she knew anyone who practiced environmental law because Gjovik may be interested in the field and wanted to learn more. Gjovik was introduced to Deborah Rubenstein, Apple's EH&S counsel. Rubenstein met with Gjovik twice on a video chat, on Nov. 2 2020 and Nov. 6 2020. Gjovik spoke about her experience in 2020 and what she had learned about remediation sites. During the conversation the lawyer admitted to Gjovik that Apple did not have EH&S counsel prior to her, that she was still catching up, that Apple needed to be doing inspections and testing that it had not done, and she was trying to get them to start soon.

48.     Rubenstein was Apple's legal representative with the U.S. EPA for the Aug. 2021 inspection of Gjovik's Superfund office. Rubenstein was and is likely also in charge of EH&S legal matters for ARIA.

49.     On Feb. 21 2023, Gjovik discovered the semiconductor fabrication ("fab") activities at ARIA. Gjovik posted on Twitter in real-time as she learned about it, expressing severe distress.[10] Until that day, Gjovik did not know it was Apple who was responsible for making her so ill in 2020. Further, until that day, Gjovik did not know the chemicals she was exposed to in 2020 were potentially lethal to human life.

50.     Gjovik undertook months of research about the facility at 3250 Scott Blvd, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint. On June 23 2023, Gjovik filed complaints about ARIA to the U.S. EPA, CalEPA, the city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with dozens of exhibits. Gjovik also posted on Twitter that she did so and provided a public link.

51.     A manager in U.S. EPA's Enforcement and Compliance Assurance Division for Hazardous Waste and Chemicals Section confirmed receipt on June 20 2023 and told Gjovik they were reviewing the complaint and documents she provided. She had a call with the manager on June 21 2023. An inspector was assigned, and a formal investigation was opened around July 12 2023. She met with the investigator several times and provided additional evidence and records, leading up to the EPA's Aug. 17-18 2023 unannounced onsite inspections of 3250 Scott Blvd.

52.     The U.S. EPA team responded and took the lead on an investigation of the hazardous waste activities at 3250 Scott Blvd. Gjovik met with the U.S. EPA's RCRA Enforcement & Compliance team several times before they then inspected Apple's factory in Aug. 17 and 18 2023 and Jan. 16 2024. The Aug.

---

[10] "APPLE IS DOING LITERAL ACTUAL GODDAMN SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT SHIT INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." - @ashleygjovik (Feb. 21 2023 11:29 PM).

17, 2023 inspection was coded as an RCRA "*Compliance Evaluation Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all applicable RCRA Regulations and Permits*."[11] The Jan. 16, 2024 inspection was coded as a "*Focused Compliance Inspection.*"[12]

53.    Per the formal report, the U.S. EPA inspectors identified at least 19 unique violations of the RCRA at 3250 Scott Blvd, including provisions which have both civil and criminal enforcement. Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation. U.S. EPA also found Apple was emitting exhaust from its fabrication activities through a system that did not have required permits and did not have any monitoring. The U.S. EPA also found Apple was storing hazardous waste unlabeled and piled in corners, sometimes with lids left off containers so they do not explode, and failing to perform any inspections of the waste on weekends, and instead just hoping for the best until they return on Mondays. The enforcement action(s) are still underway.

54.    Gjovik started working on her first draft of the complaint in this instant civil lawsuit only on or around Aug. 16 2023 and filed suit on Sept. 7 2023, only two days prior to the statute of limitations expiration for her *Tamney* claim, and after only being able to spend roughly three weeks on research and drafting.

55.    Gjovik also filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including Rule 2-1-301 failure to obtain "Authority to Construct" (Aug. 29 & Sept. 12 2024); Rule 2-1-302 failure to obtain a "Permit to Operate" (Aug. 29 & Sept. 12 2024); and Rule 9-7-307 for exceeding the "Final Emission Limits" for NOx and CO emissions. These latest citations establish that Apple was not only operating ARIA without required permits, but Apple was also illegally exhausting toxic chemicals.

### III.   Location 2: 825 Stewart Dr., Sunnyvale

56.    Gjovik's Apple office at the time of her termination was located at 825 Stewart Dr. in Sunnyvale, California, also known as the "TRW Microwave" Superfund site, part of the U.S. EPA "Triple Site."[13] The *"Triple Site"* is the collective name for three adjacent Superfund sites in Sunnyvale that have jointly contributed to a mile-long groundwater solvent plume. In addition, the *"Offsite Operable Unit"* is roughly a one-hundred-acre area of groundwater contamination from TRW Microwave. It "*includes four*

---

[11] US Environmental Protection Agency, RCRA, Evaluation Types.
[12] US Environmental Protection Agency, ECHO, 3250 Scott Blvd # 110001168254.
[13] U.S. EPA, Triple Site Profile – Background.

*schools and over 1,000 residences*."

57.     The "TRW Microwave" Superfund site is a former industrial semiconductor fabrication and manufacturing facility at 825 Stewart Dr. ("Stewart 1"). The primary contaminants in the groundwater contamination plume are chlorinated volatile organic compounds, including the carcinogen TCE and its daughter products cis-1,2-dichloroethene and vinyl chloride. The contaminated groundwater under 825 Stewart Dr. is as shallow as only 2.6 feet below the ground surface, with shallow TCE concentrations up to 1,400 µg/L and vinyl chloride up to 51 µg/L. [14]

58.     The Responsible Party under CERCLA, Northrop Grumman, conducted an initial vapor intrusion evaluation at Stewart 1 in 2003 and 2004, which indicated that TCE concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels, with results at 5.1 µg/m³ and 5.2 µg/m³ respectively.[15]    Indoor air pollution due to vapor intrusion worsened over time, and indoor air concentrations increased to 7.7 µg/m³ in 2013, the "accelerated action level" for TCE in commercial buildings. [In 2024, the U.S. EPA proposed a full ban on TCE as a whole substance in the United States, prohibiting it under the TSCA as an unreasonable danger to human health).

59.     In May 2015, Northrop Grumman installed a "sub-slab" ventilation system inside the building. (The "slab" refers to the concrete foundation, and "sub-slab" is under the "slab.") Northrop Grumman installed a ventilation system (horizontal "collection pipes") beneath the slab foundation, which allows vapors to move laterally, and connected the collection pipes to vertical vent risers that vent to the roof to provide a preferred pathway for hazardous waste vapors "*that allow sub-slab contaminant vapors to discharge to the atmosphere.*" The risers vent to the rooftop via wind-powered turbines.

60.     Apple became a tenant in 2015. Apple's installation of a new HVAC system for the building in late 2015 included Apple sawing the sub-slab exhaust vent stacks on the main building roof down from three feet to one foot and then installing the HVAC system intakes in "*close proximity*" to the sub-slab vapor exhaust vents, "*without consideration for the function of the [sub-slab] system vents and their function*."[16] The HVAC intakes for the area of the building where Gjovik worked were in "*the assumed sphere of influence*" of the vent exhaust, including the chemicals TCE and vinyl chloride.

61.     Apple's tampering with the exhaust stacks and indifference towards the exhaust's proximity

---

[14] AECOM and GES for Northrop Grumman, *2021 Annual Groundwater Monitoring Report* (March 17, 2022).
[15] Fifth Five Year at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report Former TRW Microwave Site, 825 Stewart Drive, Sunnyvale, CA, March 17 2022.
[16] AECOM for Northrop Grumman, Evaluation of Passive Sub-Slab Depressurization System, Former TRW Microwave Site, page 1 (April 15 2022).

to HVAC intakes resulted in a significant risk of re-entrainment of the hazardous waste vapors and gases into the HVAC system, and thus into the indoor air of the building where Gjovik and her coworkers would be exposed. Cal.Lab.C. § 5143(a)(1) and § 5143(c)(1) prohibit the exhaust of gas and vapor in a way that causes harmful exposure to employees. Cal.Lab.C. § 5154.1(e)(4)(d) requires that these types of stacks exhaust upward from at least seven feet above the highest portion of the roof. California Mechanical Code § 407.2.1 requires outdoor air intakes be placed at least 25 feet away from any "*exhaust outlets of ventilating systems… that may collect …. noxious fumes.*" Apple constructed the HVAC intakes only ten feet away from the exhaust vents.

62.    In May 2015, Northrop Grumman's vapor intrusion testing at Stewart 1 reported indoor air pollution of TCE, 1,2-DCE, Toluene, Chloroform, Methylene Chloride, and Ethylbenzene.[17] From Dec. 2015 to Jan. 2016, Apple managed and submitted a second vapor intrusion testing report to the U.S. EPA.[18] Apple's Dec. 2015 vapor intrusion testing results showed an increase in indoor air pollution and the sub-slab ventilation system compared to the May 2015 results.[19] The highest indoor air reading of TCE doubled between May and Dec. 2015. In May 2015, it was 0.58 $\mu g/m^3$, and the highest indoor air TCE reading in Dec. 2015 was 1.2 $\mu g/m^3$.[20] Apple's report also noted a "*noticeable increase*" of TCE, PCE, and chloroform in the sub-slab venting system, and high levels of toluene and ethylbenzene in the indoor air.[21] Apple moved employees in and never tested again.

63.    U.S. EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the U.S. EPA must be notified, consulted, and oversee the repairs and subsequent evaluation that the repairs were successful. Similarly, there is a public land use covenant attached to the property and that runs with the land, which instructs that major issues with the engineering controls and vapor intrusion systems must be reported, and U.S. EPA must be consulted on the next steps.

## IV.   Gjovik's Employment at Apple

64.    Gjovik worked at Apple from 2015 to 2021. At the time of her termination, her title was Senior Engineering Program Manager, and her base salary was $169,000 annually. In the last full year Gjovik worked at Apple, her total annual W-2 compensation was $386,382. Gjovik was the co-founder of a large

---

[17] U.S. EPA, TRW Microwave, Site Documents, Vapor Intrusion.
[18] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra.
[19] U.S. EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[20] Id at pages 26-25.
[21] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site, supra at pg11.

women's community group at Apple. Gjovik also worked in a rotation position within Apple's Legal Dept. in 2019-2020, primarily supporting the Government Affairs and Software Product Legal teams' efforts to establish Apple's first company-wide Artificial Intelligence Ethics and Social Responsibility policy.

65.     Gjovik joined Apple on Feb. 23, 2015, as an Engineering Project Manager in the Software Project Management Office and worked in that Dept. until Jan. 2017. Gjovik reported to several managers under the same Director (Venkat Memula) during this time. Gjovik experienced severe harassment, discrimination, bullying, and an untenable hostile work environment during those two years, primarily from her coworkers, Rob Marini and Brad Reigel. Memula repeatedly failed to correct their behavior.

66.     Marini bragged that he was known to executives as their "*Little Gestapo*." He quickly made a work tracking ticket titled "*Make Ashley's Life a Living Hell*," then assigned it to Reigel. Marini often planned and orchestrated malicious schemes to harass Gjovik and cause her distress, including getting multiple members of the team to physically attack Gjovik, spreading rumors about Gjovik, secretly recording Gjovik and sharing recordings with their team, and frequently pressuring Gjovik to drink hard alcohol at work. Marini often made cruel comments. He once noticed Gjovik made a typo in an XML and told Gjovik that her mother should have had an abortion. Both Marini and Reigel cursed at Gjovik, called her names, and wrote harassing statements and nicknames on whiteboards about her.

67.     Memula assigned Gjovik to share an office with Marini. Marini told Gjovik in the first week that all of his prior officemates either quit the company, left the country, or killed themselves. Marini asked Gjovik which path she would choose. Marini once told Gjovik he targeted her with harassment and bullying because she was '*joyful*,' and he wanted to '*extinguish*' her light.

68.     Reigel was an active police officer, had ammunition in his office, allegedly physically 'flipped a table' in a meeting, and supposedly kept a gun in his car at times. Reigel once kept Gjovik in a conference room with the door closed and berated her for a prolonged period while she wept and begged him to stop. He sometimes made 'joking' comments, like he'd 'smack her' if she did not do what he said.

69.     Gjovik's first manager, Linda Keshishoglou, tried to bribe Gjovik in exchange for Gjovik providing a positive review to Keshishoglou's manager, Memula. Gjovik reported it to Memula and HR. When Keshishoglou left the organization, Gjovik was transferred to report to Reigel. Gjovik attempted to move to a different team but was thwarted and blocked by Reigel, who provided negative feedback about her to the hiring manager and could not explain why.

70.     Gjovik was then transferred under Evan Buyze and Shandra Rica (still in Memula's organization) to run a program called "Early Field Failure Analysis" for new product launches, where she

received very positive feedback and praise until one specific field issue occurred and which led to a retaliatory constructive termination. Gjovik's managers had become upset at Gjovik because Gjovik was earnestly trying to investigate a trend of battery failures in the field, and Gjovik's managers preferred to "ignore it and hope it goes away" and told Gjovik to also "ignore it," which Gjovik refused to do. Buyze and Rica told Gjovik not to tell people why she was leaving their organization, with Rica saying she "*doesn't like people who talk shit*."

71.     This battery failure issue and Apple's resulting response would be publicly nicknamed "*Batterygate*." Over the last few years, Apple has been fined more than $600M over their conduct related to the *Batterygate* issues.

72.     Gjovik joined Product Systems Quality in Hardware Engineering in Jan. 2017 after leaving Software Engineering organization. Gjovik now reported to Dan West (Senior Director) and David Powers (Director) as a Senior Engineering Program Manager and chief of staff. Both West and Powers engaged in harassing, discriminatory, and inappropriate conduct toward Gjovik – including remarks and decisions that discriminated against Gjovik based on sex, gender, and disability.

73.     In Dec. 2017, West also attempted to coerce Gjovik to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Gjovik complained then and later, in late 2020, West admitted it was "*one of the worst things [he's] ever done*."

74.     Other leaders in West's organization also discriminated against Gjovik, including John Basanese, who frequently complained that Gjovik was not married and did not have kids, and during company social events, often pressured Gjovik to 'settle down' and 'have kids.' Gjovik complained to Basanese and West about the statements, but Basanese persisted for years.

75.     While Gjovik's performance reviews were positive, outside the reviews Powers and West frequently gave Gjovik 'feedback' like she was too 'emotional,' 'aggressive,' or 'expressive. Gjovik gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen and thank her for being honest with him – though generally continued with the same behavior.

76.     Powers did not respond well and frequently berated her. In two meetings, Powers unfairly criticized Gjovik about issues where others were at fault and they harmed Gjovik, which made Gjovik cry, and then Powers berated Gjovik about her crying and demanded she stop, which made her cry more. She complained to West about this several times.

77.     Before Apple's unlawful actions towards Gjovik in 2021, Gjovik wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple indefinitely if

she could transfer to a better role (not in a hostile work environment like her current role). Gjovik had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) and convince them to hire her upon graduation. She continued mentioning this plan into 2021.

78.     Meanwhile, Gjovik's supervisor, West, frustrated several of Gjovik's attempts to transfer to other Apple roles focused on law, legislation, and policy – including directly blocking an offer in Dec. 2020 for Gjovik to work on Apple's implementation of circular economy legislation.

## V.    Gjovik's Inquiries & Complaints

79.     On March 17, 2021, Gjovik's team administrative assistant sent an email on behalf of EH&S announcing to Gjovik and Powers' management team that it would be testing Stewart 1 for "vapor intrusion," but said nothing more.

80.     Gjovik replied and informed her coworkers that their office was a Superfund site on March 17 2021, providing a link to the U.S. EPA website for the site, and news articles referring to their office as a "*paved over environmental disaster zone*" [22] due to the "*massive amounts of trichloroethylene in the soil and groundwater from nearly 30 years of chip manufacturing*."[23]

81.     Gjovik explained to her team what vapor intrusion means, told them to take it seriously, and expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Gjovik added, *"The chemicals under [the Stewart 1 office], if in high enough quantities, can cause cancer."*

82.     Gjovik's manager, Powers, immediately forwarded Gjovik's email to Human Resources and West, complaining "I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her." Powers gave Gjovik a 'warning' during their next 1:1 meeting and told her she is not allowed to talk about safety or toxic waste dumps with her coworkers. Things went downhill from there.

83.     Gjovik asked in her email for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Gjovik to discuss her concerns.

84.     Gjovik's coworkers thanked her for sharing this information and informing them about the site. Two of Gjovik's friends, a manager and senior manager at Apple, texted her, affirming her concerns

---

[22] Alexis C. Madrigal, *Not Even Silicon Valley Escapes History,* The Atlantic ( July 23 2013).
[23] Beth Winegarner, *Silicon Valley's Toxic Past Haunts Sunnyvale Neighborhood*, KQED ( June 15 2017).

were reasonable and appropriate.

85.     One manager called the situation "*a really important life-threatening situation,*" and another, after reviewing documentation for the site, questioned, "*Why is the building still open*?" One of the managers noted: "*What is crazy is … they say no daycare, no elder care, no residential, etc. So, it is fine & dandy for everyone else to get slowly poisoned? … So glad you are digging into this stuff for all of us.*" Around this time, Gjovik also raised concerns about COVID-19 safety, wildfire smoke safety, Right to Know, Proposition 65, and Apple's reporting and tracking of injuries.

86.     On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around ARIA.[24] It went 'viral' starting April 2 2021. More victims and witnesses promptly came forward after reading the article; some were also Apple employees.

87.     On April 5, 2021, Gjovik told West about the other victims, and West warned her she was "*kicking a hornet's nest.*" West asked Gjovik not to send information about Gjovik's chemical exposure at her apartment next to ARIA to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*"

88.     In late March 2021, Gjovik repeatedly raised concerns about the Superfund site to her supervisors. After reviewing hundreds of pages of documentation for the site, Gjovik advised Apple that Apple had been negligent, that the site was not safe, and she complained Apple seemed unwilling to comply with CERCLA and health/safety regulations. She said she now believed her fainting spell in 2019 in her office was due to vapor intrusion. She was also shocked and distressed to see the 'hot spot' for the building was her desk with 1,900 ug/m3 of TCE in the sub-slab ventilation system.

89.     Gjovik connected the vapor intrusion risk to a strange fainting spell she experienced at the office in Sept. of 2019. The only other time she felt a dizzy spell like that was when she was exposed to chemicals at her apartment. Gjovik began complaining she was worried her 2019 fainting spell was due to vapor intrusion at the office.

90.     Powers threatened her and ordered her to stop talking with her coworkers about her safety and environmental concerns. He said she must believe whatever EH&S tells her. West first claimed the poisonous gas was sealed under the floor but, after learning the floor was cracked, told Gjovik if she does not like her work conditions, she can leave her role and find a new job.

91.     On April 5 2021, Gjovik notified the Director of Apple "AC Wellness" employee medical

---

[24] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26 2021)

Centers and Clinical Engineering, that after her article was published, more people came forward from the apartments next to ARIA, reporting illness. "*Two are Apple employees. At least one went through AC Wellness, but no one could figure out what was wrong with them.*" Gjovik suggested Akhtar direct the clinic to "*screen local folks*" with unexplained symptoms that match solvent exposure.

92.     Gjovik emailed the U.S. EPA and CalEPA about the issues from Sept. 2020 through April 2021; many Apple leaders knew she did so. Starting in early 2021, Gjovik also contacted and met with local, state, and federal politicians about what occurred to her next to ARIA – and Apple was aware of this. For example, Gjovik met with Senator Bob Weickowski and his staff on April 7 2021. Gjovik also met with Assembly Member Lee's staff once and Mayor Lisa Gillmor several times. On April 7 2021, Gjovik told West about the meetings. On April 9 2021, Gjovik contacted the County District Attorney's office, talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes, and met with him on April 16 2021.

93.     Gjovik was also meeting with the California Dept. of Public Health's Environmental Health office where she was volunteering her time to assist in creating state-wide education resources for tenants and workers around chemical exposure from toxic waste dumps.

94.     Around this time Gjovik was also meeting with a prior Silicon Valley mayor who has been involved in advocated for clean-up of Silicon Valley's toxic waste sites for decades. Gjovik shared his analysis of the testing and concerns about the clean-up of the property where Gjovik got sick with Mayor Gillmor and asked her for further investigation from the city.

95.     Gjovik met with Apple EH&S on April 2 2021, May 17 2021, and July 7 2021. For some reason, Employee Relations, Jenna Waibel, was also there. Waibel refused to tell Gjovik why she was involved, as Powers had asked for Employee Relations assistance in trying to silence Gjovik about Gjovik's concerns. Waibel and Polkes were texting and emailing about how to silence Gjovik starting at least in early April 2021.

96.     In Feb. 2021, Gjovik had completed her self-review for Apple's mid-year review cycle, however Powers never provided Gjovik her review. Powers told his managers to complete their mid-year reviews with their teams in the spring but never mentioned it to Gjovik. Gjovik also completed her annual performance self-review around June 2021, however, Powers never provided that review to her either. Apple has repeatedly refused to provide any discovery documents related to these reviews and/or confirmation of their existence.

97.     Gjovik asked questions to Apple EH&S about the status of the site and the rationale for certain design and monitoring decisions. Gjovik expressed that she was disappointed with some of the

answers.

98.    EH&S (Michael Stieger) told her Apple Legal and EH&S intentionally do not tell employees if they work on Superfund site and admitted that Apple deliberately does not train workers about safety procedures related to toxic waste exposure from clean-up sites.

99.    Gjovik said that was both unsafe and unwise. Gjovik also complained that the prior testing used insufficient durations and methods, had concerning results, there were known open risks for vapor intrusion vectors (such as 'compromised' sub-slab ports), and the land use covenant is outdated and requiring revision. Gjovik complained that Apple should have tested the indoor air more frequently than every six years.

100.    On April 11 2021, Gjovik emailed Powers forwarding her emails with Steiger and Waibel about "*compromised*" and "*missing*" sub-slab vents per the documentation, telling Powers, *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on."*

101.    By April 14 2021, Powers became very hostile towards Gjovik and was snapping at her meetings to the extent one of Gjovik's coworkers witnessed it and confirmed it was not appropriate. Gjovik then complained to West about it, which resulted in the 'you can just quit if you don't like it'-type response.

102.    On April 21 2021, Gjovik complained to the Apple Human Resources I&D team about disparate impact of chemical exposure. Apple HR responded asking her to write a business proposal as to why Apple should not poison Black people. Gjovik then complained to a Senior Director she was friends with, that Apple is acting very unethically, and she was deeply concerned. She told him someone needs to straighten out Apple EH&S and legal about workplace safety and environmental compliance matters.

103.    Gjovik also contacted the U.S. EPA on April 22 2021, asking to consult with their manager for the site and emailed back and forth with the U.S. EPA CERCLA and public relations teams from April through Aug. 2021, and Apple knew she was doing so. The U.S. EPA directly notified Apple about Gjovik's outreach around April 28 2021.

104.    In response to Gjovik's concerns and escalations, Powers and Waibel issued gag orders against Gjovik. Waibel went so far as to provide Gjovik with a five-point balancing test if Gjovik wanted to make statements about Superfund sites or workplace safety to her coworkers and ultimately told Gjovik that there should be no discussions about workplace safety with her coworkers. (In Sept. 2024, the NLRB issued a decision of merit that there is substantial evidence that Waibel's 'five-point balancing test' violated federal

labor laws.)

105.    Gjovik complained to a senior ethics leader at Apple and their friend, Dr. Cohen, that what Apple was doing related to environmental compliance and employee chemical exposure was "*morally wrong*," and Apple was publicly misrepresenting their actual operations.

106.    Gjovik also complained to a friend in Lisa Jackson's Environmental lobbying team about what was going on at her office and complained Apple's public statements seemed fraudulent, and her coworker agreed, saying: "*uhhh... I kind of feel the need to make sure Lisa is aware. I'm about to present a proposal to several execs on an Environmental Justice program and this kind of feels like not consistent with that.*"

107.    On April 29 2021, Gjovik visited an occupational exposure doctor about her apparent chemical exposure in the apartments next to Apple's ARIA factory and at the Stewart 1 office.[25] Gjovik's UCSF visit notes summarized Gjovik's 2020 medical symptoms saying:

> "She was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesia, blurry vision, abnormal vaginal bleeding, and swollen glands"...."there remains a concern about potential pathways for residential exposures, and the county and State environmental agencies should address these.... she also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues..."

108.    Gjovik continued to attend medical appointments and comply with ordered testing and monitoring in response to her injuries and illness in 2020 (due to the chemical exposure). On April 30 2021, she went to Stanford Hospital for a CT Angio with and without contrast. She had been having palpitations again, and on May 10 2021, told her manager, Powers, that her doctor said she needed another echocardiogram  to ensure the chemical exposure did not cause permanent injury to her heart. On May 21 2021, she went to UCSF for a mammogram, with the order coded as testing in response to industrial chemical exposure. Apple knew Gjovik was extremely vulnerable.

109.    On May 17 2021, Gjovik met with EH&S (Steiger) and Waibel again. They informed her they may not test the indoor air now, they won't answer anymore of her safety or environmental questions, and Steiger (the EH&S lead for environmental safety at her office) is imminently and abruptly leaving Apple. Gjovik became concerned about a cover-up and started complaining about her meeting with the Apple EH&S lawyer in Nov. 2020, sharing with at least one coworker that the lawyer had told her Apple had been

---

[25] Dr. Robert Harrison, MD – who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health.

negligent and needed to catch up on testing and inspections. Gjovik also reported this to Employee Relations, Okpo, in July 2021.

110.    Apple EH&S and Employee Relations, Waibel, notified Gjovik on June 2 2021, that the foundation of Stewart 1 and they need to repair it, and then after, they will test the air. Gjovik told them they needed to notify the U.S. EPA, have the U.S. EPA oversee the repair and testing plan, and test the air before and after the repairs. (U.S. EPA later confirmed this). Apple refused and told Gjovik they do not have to tell U.S. EPA anything; they will repair the floor but will not provide details on how/when, and now they may not test the indoor air.

111.    Waibel also responded by opening a non-consensual sexism investigation into Gjovik's bosses, where she did not investigate anything but told at least three leaders that Gjovik complained about them. She also harassed Gjovik's friends and bullied Gjovik to the extent that she repeatedly made Gjovik cry in front of her.

112.    Waibel also told Gjovik she had to submit an ADA accommodation request if Gjovik did not want to be exposed to the vapor intrusion, attempted to get Gjovik to release all of her medical requests to "Apple Inc.," and then suggested Apple get her an air purifier at her desk for the TCE. Gjovik complained that ADA accommodations are not supposed to be used for employees to ask their bosses not to poison them. By July 2021, somehow Waibel even got ahold of a copy of Gjovik's May 2021 mammogram results.

113.    Gjovik complained about Waibel in May and June 2021 to no avail and then began meeting with Waibel's manager, Antonio Lagares, in mid-June 2021.

114.    Gjovik complained that Apple was acting insane, and if this is usually how Apple handles employee concerns, then Apple is lying to its employees and the public that it acts in good faith. Lagares agreed with Gjovik and said Apple's marketing makes "*his job harder*."

115.    Gjovik asked what type of issues his team would take seriously, and he responded when managers "*send pics of their junk*." Gjovik complained to Lagares that Waibel had already ruined her career at Apple, that she was already constructively terminated by West, that Powers was harassing her more than ever, and that he should have to investigate all of the terrible things Apple's done to her for nearly seven years.

116.    On July 2 2021, Apple Employee Relations, Waibel, and EH&S notified Gjovik via email that there were cracks in the slab/floor of Gjovik's office and that they will be sealing the cracks, then testing the air. Gjovik replied asking if they can also test the air before sealing the cracks, explaining she wanted to know if she was exposed to chemicals through the cracks and if so which ones, she said "*for cancer monitoring*."

Waibel told Gjovik no – Apple will not test the air prior to repairing the floor.

117.    Just two days earlier, on June 30 2021, Apple EH&S and/or legal filed the first and only TRI filing to the U.S. EPA for air emissions at ARIA in 2020. It's unclear why Apple never submitted a TRI filing prior to the 2020, or why Apple never submitted a TRI filing after the 2020 record. Under information and belief, the TRI filing was submitted in an effort to try to manufacture for Apple some sort of statute of limitations excuse later, if Gjovik ever found out what they did – without them having to tell Gjovik, or share the information in a way they thought she could find it.

118.    In their final meeting about the site on July 7, 2021, Waibel and Steiger told Gjovik that Stweart 1 is safe because they say it is safe, they still have no plans to test the air now, and they will not answer any more of her questions about the site or workplace environmental safety ever again.

119.    In early July 2021, Gjovik reported Apple's failure to notify and consult with the U.S. EPA about the cracked slab to the U.S. EPA. Gjovik notified Apple that she was snitching on them to U.S. EPA. Gjovik also complained to Lagares:

> "The only reason I can think of that they're refusing to do this testing after they previously planned on doing it, was that all the questions I was asking were very good questions and revealed major gaps/issues — so they're going out of their way to not have evidence of their negligence."

Gjovik implored Lagares to look into EH&S's conduct, saying

> "I think everyone is forgetting I work in engineering & I am in law school. I know how toxic torts work…. right now, it feels like I am not only being harassed by my manager and my HR BP, but it appears there is a conspiracy to force me back into what appears to be a very physically unsafe office building."

120.    In early July 2021, Gjovik discovered that West had been reassigning her best projects (things that would help her receive a positive review). Then on July 15 2021, Powers suddenly quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail). Powers was snapping at her and harassing her, West was ignoring her, and Gjovik reported these issues to Lagares and Waibel and the HR business partner Helen Polkes. Still, Apple did nothing, or they also harassed Gjovik.

121.    Gjovik became more vocal about her concerns about systemic retaliation and fraud at Apple on Apple's Slack discussion tool and also began threatening Lagares that she planned to sue Apple for what they've done to her and that she is also talking to the press about Apple (specifically The New York Times and Washington Post). This led Lagares to assign a new investigator (Ekelemchi Okpo) and open a new investigation into all of Gjovik's concerns going back to 2015.

122.    By late July 2021, Gjovik was openly complaining on Slack, to reporters, with coworkers, and

now also on Twitter about Apple's terrible behavior (including intimidation, retaliation, cover-ups, and fraud). Gjovik complained about the Superfund and safety issues, Apple's offensive use of ADA accommodations, the persistent suggestion that she take FMLA leave in response to their harassment, Apple's illegal NDAs and gag orders, and Apple's antagonistic and obstinate attitude towards legitimate and important concerns. Gjovik repeatedly told Lagares, Okpo, Waibel, and Polkes that she refused to take leave in response to retaliation and harassment; instead, they needed to actually fix the issues.

123.    Gjovik had still been lobbying legislatures about the need for additional safety protections for workers and tenants on toxic dump sites. A state Senator told Gjovik he would talk to CalEPA about her concerns. Gjovik checked with his office for a status update on that conversation. On July 16 2021, the Senator's Legislative Director wrote to Gjovik confirming and adding her concerns were shared even further, writing: "*I conveyed them myself on the Senator's behalf with the Govender's staff and leadership of both houses.*"

124.    On July 18 2021, Gjovik had sent her weekly status to Powers and the management team and at the very bottom she added a little personal note that a state hazardous waste bill she had been lobbying for passed and she was very excited about it. Powers became very upset and escalated the comment to Employee Relations, Waibel, asking for guidance on how to 'coach' Gjovik about it and ensure Gjovik understand not to talk about such things in the workplace.

125.    Around July 20 2021, Gjovik notified U.S. EPA about the cracked floor/slab at her Superfund office, and that Apple was insisting they do not have to tell the U.S. EPA and that they refuse to the test the air until after they seal the floor. Gjovik expressed it was her understanding that Apple needed to notify the U.S. EPA of the cracks and obtain EPA approval of a workplan for the testing and sealing plans.

126.    On July 21 2021, one of Gjovik's coworkers, a manager, contacted her privately and asked if she was okay. He said he was worried because it seemed like things were tense with her and her position in the team.

127.    Around July 21 2021, Employee Relations, Okpo, started asking Gjovik for the .eml version of files for some especially damning emails with Gjovik and her management, assumably collecting evidence in preparation for Gjovik suing them, which she had already began threatening to do.

128.    Around July 23 2021, Gjovik spoke on the phone with one of the only two women who ever reported to West at Apple, and who had quit Apple due to the harassment she faced from West and his team. She validated Gjovik, confirming she reported many of the same issues that Gjovik had been reporting, and that West and his management, or Human Resources, had done nothing to actually fix the issues.

129.    On July 23 2021, Gjovik was quoted by the New York Times, where she criticized Apple's

COVID-19 response. On July 24, 2021, New York Times made Gjovik's quote "*Quotation of the Day*" for the entire NYT.[26]

130.    Lagares expressed to Gjovik that Apple was upset that Gjovik did this. Gjovik told Lagares she was taking Labor Law and learned she could speak about her work conditions regardless of NDAs. Lagares told her it is "*annoying*" to Apple when employees "*figure that out.*"

131.    Apple and Northrop Grumman were notified on July 26 2021 that U.S. EPA was demanding an inspection of Stewart 1 due to Gjovik's reports about the cracked slab and Apple's obstinate and obstructive response; and because U.S. EPA discovered what Apple did with the hacksaw, vents, and HVAC on the roof of Stewart 1 in 2015, with the U.S. EPA QA team exclaiming it was "*not appropriate*" and asking for air samples.

132.    On July 26 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns was to retaliate against her and intimidate her into silence. Gjovik asked if anyone else had been retaliated against for raising concerns. Many of Gjovik's coworkers responded that they had also experienced retaliation from Apple for raising real and reasonable concerns.

133.    On July 27 2021, Okpo then swiftly interrogated Gjovik for over an hour about her Slack posts and the responses she received from coworkers – repeatedly asking her to stop posting about her concerns and to stop encouraging other employees to post their concerns, and instead to direct all employees to speak privately. Gjovik told him no. she would not help him retaliate against her coworkers. Okpo said he was "notified" about Gjovik's posts and Gjovik expressed concern as to who all was spying on her.

134.    During the July 27 2021 meeting, Okpo said Apple may give Gjovik a severance ("exit") package of around $600,000 if Gjovik would sign a preemptive litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm Apple caused to Gjovik through chemical exposure at her office and her apartment. Gjovik expressed concerns about the settlement amount and her potential medical costs if she were to get cancer from the exposure at her office, not even yet knowing about the ARIA facility or what Apple did to the HVAC at Stewart 1. Apple wanted all claims waived and denied the severance on those conditions, violating Cal. Gov't Code § 12964.5(a).

135.     On July 27 2021, a non-profit organization asked Gjovik to testify as a witness to state Senator

---

[26] Ashley Gjovik, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*," New York Times, July 24 2021.

Dave Cortese about her experience with hazardous waste clean-up sites in Santa Clara County, and Gjovik accepted.

136.    On July 28 2021, Gjovik emailed Okpo and Lagares about her discussions with coworkers, and she discovered a pattern of discrimination and harassment issues across Apple; and what appeared to be systemic cover-ups of those issues instead of actually resolving the problems. She complained Apple fraudulently holds itself out publicly as caring about human rights and the law. It was clear to Gjovik that Okpo would not investigate in good faith and Apple was still trying to get her to quit or else would fire her, and she began fervently complaining about their bad faith behavior and culture of intimidation.

137.    On July 28 2021, Gjovik messaged a coworker (a manager) saying she had just met with Employee Relations, Okpo, and asked for a "citizen oversight type role" to help reform Apple's HR practices. She said Okpo told her, sure, but that she has to say in her same role. Gjovik wrote: "*I hit my desk hard enough gesticulating & screaming that I spilled coffee on everything, but I have no regrets…*" and "*…I looked him dead in the eye and said YOU CANT HEAL IN THE SAME ENV[IRONMENT] YOU ARE HARMED IN.*"

138.    The next time Okpo met with Gjovik, on July 29 2021, he asked her if she wanted to have a lawyer attend to represent her during their conversations. Apple was fully aware and on notice of incoming litigation from Gjovik by July 2021.

139.    On July 30 2021, Gjovik posted on Twitter complaining about Apple:

> "They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions."

140.    After posting this, ex-Apple employees contacted Gjovik to share they had similar experiences. Other Big Tech and ex-Apple employees supported Gjovik for speaking out, sending her many encouraging and grateful messages and comments. Gjovik then decided to start sharing more of what was happening between her and Apple on social media to help others understand the issues so they could advocate for the employees, hoping it may pressure Apple to act more reasonably.

141.    On July 30 2021, Gjovik posted on Apple's Slack discussion tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups. Around this time, Gjovik created a new, private Slack group for her coworkers to discuss concerns about Apple retaliating against them for raising concerns, but with more privacy due to fear of more retaliation. Many women asked to join the group, and they had just started a discussion.

142.    On Aug. 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything

Waibel said was fine during the first (sham) investigation – Gjovik proceeded to start posting on Twitter about several of the more minor things she complained to Waibel about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no problems, so she is free to talk about it and she would do so. Gjovik posted several examples of the evidence on Twitter, and her posts quickly went viral.

143.    In response, on Aug. 2 2021, Apple suddenly announced they were conducting extensive maintenance at Stewart 1 starting on Aug. 4 2021. Then, on Aug. 3 2021, Lisa Jackson's team scheduled a Public Relations blitz about how safe and thoughtful Apple is, actually. [27] Apple also attempted to make the U.S. EPA sign a four-page single-spaced NDA about the inspection of Stewart 1 that would prohibit the U.S. EPA from speaking about the inspection. The U.S. EPA declined to sign the NDA.

144.    When Gjovik saw Apple's EH&S notice on Aug. 2 2021 about maintenance at Stewart 1, she quickly arranged for coworkers in the office to gather evidence of the cracks, warning them that Apple was trying to cover up environmental and safety issues. Gjovik's coworkers gathered photos of the cracks for Gjovik on Aug. 3 2021 and the morning of Aug. 4 2021. They also asked many of the same questions Gjovik had asked EH&S. Gjovik shared EH&S's responses, and they were concerned about Apple's position and conduct. Gjovik informed Apple she and her coworkers were gathering evidence before Apple could cover up the cracks.

145.    On Aug. 4 2021, Okpo immediately forced Gjovik on indefinite administrative leave and refused to provide any ETA for the next steps. Okpo informed her Apple removed her "*from the workplace and all workplace interactions.*"

146.    Gjovik was very upset and protested, arguing she just wanted to stop interactions with West and Powers while Okpo investigated because of the work assignment changes and harassment. Gjovik also complained that it was illegal for them to tell her to stop talking to her coworkers.

147.    Okpo made it clear he also wanted her off Slack. Gjovik told Okpo he could not keep her off Twitter. Gjovik set her out of the office to say Apple put her on indefinite administrative leave and told her to stay off Slack. She also posted a message on Slack about it.

148.    On Aug. 4 2021, a reporter at an online blog contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik had posted. The reporter wanted to write an article about what Apple did to Gjovik. Gjovik agreed to let her write an article about Gjovik being put on leave. Gjovik also posted on Twitter about

---

[27] FOIA; Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*.

it herself, and additional outlets picked up the story.[28]   Within hours, it was covered in the news worldwide.

149.     Okpo sent Gjovik several bitter emails about her continuing to speak out. He was clearly reading the news articles and her Twitter posts complaining about Apple's conduct.

150.     Gjovik made three Twitter posts about the situation on Aug. 4 2021. The first post was at 1:16 PM PST. Gjovik wrote:

> "So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, & #unsafeworkconditions, I am now on indefinite paid administrative leave per #Apple employee relations, while they investigate my concerns. This seems to include me not using Apple's internal Slack."

The second post was at 2:12 PM PST. Gjovik wrote,

> "#Apple employee relation's 1st #sexism investigation only arose while I was complaining about unsafe work conditions and related #intimidation. They tried to quickly brush me off & prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review."

Gjovik's third Twitter post was at 2:33 PM and said,

> "When I say "unsafe #workconditions," I mean physically unsafe; #dangerous chemicals; #OSHA. You will hear much more about this in a bit."

151.     Apple responded to the media by repeating the same statement over and over: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and thoroughly investigate whenever a concern is raised; out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."

152.     Starting on Aug. 4 2021, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. On Aug. 4 2021, one account posted about Gjovik, that she: "*needs psychiatric help and confinement*" and that Gjovik "*is a psychopath and frankly is a danger to other Apple Employees*!" The account went on to call Gjovik an "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this.*" Thousands of posts like this followed and continue to this day – causing Gjovik severe distress.

153.     The night after Gjovik was stuck on leave, West suddenly scheduled meetings with Gjovik's women's group. Gjovik also heard conversations within her team that confirmed she would be fired soon.

---

[28] The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave*," Aug 5 2021; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" Aug 5 2021; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues.*"

Starting around Aug. 5 2021, the managers in West's organization started raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers told the workers that if anyone has concerns about the "*Ashley Issue,*" they should talk to Helen Polkes. They also mentioned West's plans to "*discuss the Ashley Issue*" at the upcoming Oct. All Hands meeting. Gjovik realized they would not be discussing the "*Ashley Issue*" at a future all-hands meeting if she was there, and West was already sure Gjovik was about to be fired. One of her friends who was a manager in West's organization told her that all of the managers were instructed to try not to write anything down about employee issues, because he said, they said, Gjovik had done such a good job of documenting her conflict with them and they're in trouble.

154.     Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: Aug. 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29; and Sept. 3, 4, 5 2021. When the U.S. EPA inspected, they noted "*freshly sealed cracks.*"

155.     On Aug. 9 2021, the U.S. EPA sent travel approval requests to visit Gjovik's office, and the justification for the visit cited Gjovik's disclosures. The U.S. EPA's justification for the inspection was:

> "A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system and the protectiveness of human health."

156.     On Aug. 12 2021 and Aug. 13 2021, Gjovik filed complaints with US EEOC and Cal. DFEH. In Aug., Gjovik also shared concerns on social media and with the press, including experiences with her team in 2015, what Apple did to her around Batterygate and related harassment, and her concerns about Apple's long history of criminal and corrupt behavior. On Aug. 17, 2021, Business Insider published an article about some of Gjovik's complaints based on Gjovik's Twitter posts and embedded Gjovik's Twitter posts in the article.[29] The article also noted: "*Insider approached Apple for comment.*"

157.     On Aug. 15 2021, Gjovik posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, and Mayors about her chemical exposure.

158.     Between Aug. 16 2021 through Aug. 23 2021, Okpo sent a first draft of an "Issue Confirmation" document that supposedly captured all of Gjovik's complaints that he was investigating, and Gjovik revised it and sent him a final revised version on Aug. 23 2021.

---

[29] Business Insider, *An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit,* (August 17 2021).

159.    Starting Aug. 17 2021, Gjovik insisted that all communication with Okpo and Apple be in writing because he repeatedly misrepresented her statements. Okpo ignored her.

160.    On Aug. 19 2021, the U.S. EPA conducted an onsite inspection of Gjovik's Apple office due to Gjovik's complaints to the U.S. EPA. U.S. EPA's notes from the Aug. 19 2021 site visit and inspection included concerns and issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, and lack of documentation for slab/crack inspections.

161.    Gjovik had previously registered for a three-part training about racial justice with Apple University and wanted to attend. The class was led by her friend Dr. Cohen, and he confirmed he was happy to have her attend as long as Employee Relations approved and did not discipline her for attending. Gjovik texted with a coworker on Lisa Jackson's team expressing concern that Okpo might not let her go, but joked "*I think it would be extra fun for the evidence for the judge if they try to prohibit me from participating in social justice initiatives with an invite confirmed from our Chief Ethics officer.*"

162.    On Aug. 20, 2021, Okpo told Gjovik that she was not allowed to participate in the racial justice workshop "*because she's on leave.*" Gjovik complained about retaliation.

163.    While Gjovik was stuck on leave, she repeatedly asked Okpo for updates about her office, but he refused to provide any updates. Gjovik often complained about retaliation and that she did not want to be on leave, but Okpo ignored her.

164.    Gjovik also filed a Business Conduct complaint about her concerns about Ronald Sugar, TRW Microwave, and her office. She attached the Issue Confirmation and notified Okpo of the ticket. Gjovik's 33-page version of the Issue Confirmation included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest, racketeering, and environmental crimes.

165.    Gjovik complained about Apple EH&S and Employee Relations conduct related to the environmental issues at her office, referring to their activities as "*negligent, reckless,*" that they "*misrepresented their activities,*" and that they "*intimidated [her] not to speak out about [her] safety concerns.*" Finally, Gjovik links to evidence to support her claims (U.S. EPA websites), the policies she is asking if Apple is in compliance with (Apple's Audit and Finance Committee Charter, Corporate Governance Guidelines), and an Apple Press Release about Sugar joining the Board of Directors in 2010.

166.    On Aug. 23 2021, U.S. EPA CERCLA Quality Assurance captured notes about the inspection, writing:"Significant, visible slab cracks, gaps, and penetrations had been sealed…However, large test equipment is bolted to the slab, and it is unclear if these installations penetrate the slab." He added that

related to the sub-slab exhaust on the roof above Gjovik's desk, "vapors could be building up on the roof near the HVAC intake."

167.     On Aug. 23 2021, a news article discussing Apple's employment practices commented that: "One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave."

168.     On Aug. 26 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so. On Aug. 27 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office. The message posted said: "…*we have shared them with the appropriate internal teams for review and investigation,*" with the ticket updated to say, "*Request is closed. This request is closed and can't be reopened.*"

169.     On Aug. 29 2021, Gjovik filed a formal complaint to the U.S. EPA about Apple and her office at Stewart 1, complaining of Apple's "lack of due diligence," complaining about "*negligence*," and "*recklessness*," and "*violations of Right to Know & OSHA*." Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site*." Gjovik did not know about the U.S. EPA safety inspection ten days prior.

170.     On Sunday, Aug. 29 2021, at 11:32 AM PST, Gjovik filed a Whistleblower Protection Program complaint with the US Dept. of Labor, reference number ECN76833.  On Aug. 29 2021, Gjovik filed retaliation and labor code violation charges to the California Dept. of Labor. On Sept. 1 2021, Gjovik posted on Twitter that she had filed a complaint with the California Dept. of Labor. A question on the form asked: How did your employer know about the protected right you exercised? Gjovik wrote, "*I kept saying, 'Stop it, you guys. There's Labor laws about this.*"

171.     While Gjovik was stuck on leave, Apple had emailed her three times to ask if they may capture three-dimensional scans of her ears and ear canals, and Gjovik complained that Apple's requests were harassing and invasive. Gjovik complained that Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal examinations. Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to speak about it even to a doctor or attorney (as was expressly written in one Deed Poll). Gjovik felt the studies themselves were wrong, but

also Apple's practices were also wrong – especially related to demanding employee secrecy about the studies.

172.    Around Aug. 30 2021 and Aug. 31 2021, Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple*." [30]  In Gjovik's posts, she complained of Apple's surveillance of workers, its exploitation of workers, and Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon.

173.    The article discussed several examples of Apple's invasions of employee privacy, brought forward from Apple employees who wanted assistance from the public in reforming Apple's practices. In the article, Gjovik complained about the Gobbler app and was quoted saying "*If they did this to a customer, people would lose their goddamn minds.*"

174.    On Aug. 31 2021, at 7:16 AM PST, the U.S. Dept. of Labor contacted Gjovik to start intake for Gjovik's Whistleblower Retaliation charges. Gjovik had her interview with the U.S. EEOC on Sept. 2, 2021. Gjovik did not request an investigation but did request a Right to Sue letter, which she received on 9, 2021, before her termination. Apple was made aware of Gjovik's U.S. EEOC and Cal. DFEH complained that she was testifying to U.S. EEOC and Cal. DFEH about what Apple did to her by at least Aug. 12, 2021. Gjovik Tweeted about her appointment with the U.S. EEOC.

175.    Around Sept. 2 2021, numerous articles were published about Gjovik's charges against Apple. Bloomberg reported about Gjovik's U.S. NLRB, U.S. Dept. of Labor, Cal. Dept. of Labor, and U.S. EEOC charges against Apple. Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation, and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing her concerns. *"I should be able to raise concerns about safety and public policy," s*he said in an interview Thursday. Gjovik has also filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office, and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. *"I want to pierce the veil of intimidation and secrecy," she said in the interview. "The employees are terrified to speak up about their concerns*." [31]

On Sept. 2, 2021, Financial Times wrote about Gjovik:

> "Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "*chemical exposure*" at her Apple office in Sunnyvale, California, where more than

---

[30] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021.
[31] Nick Turner, Apple Worker Complaints Reviewed by Labor Relations Board, Bloomberg, Sept 2 2021.

100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "*TRW Microwave Superfund site*," a location requiring special oversight owing to previous contamination by hazardous waste materials in the soil and groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at their Cupertino headquarters and Sunnyvale facilities. Gjovik said her concerns were brushed aside and she was warned against speaking up about them. In her letter to the NLRB, she said Apple's employee relations Dept. "*intimidated me not to speak about my safety concerns*," that a manager advised that she quit Apple and was subject to sexism and a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave."[32]

176.     The press continued to cover what Apple was doing to Gjovik and a movement starting among Apple employees who began speaking out and organizing with each other around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this too, and Gjovik posted about it repeatedly on Twitter. Gjovik was not only a catalyst for many employees to come forward, but these employees catalyzed Gjovik's view and protest of Apple's misconduct.

177.     On Sept. 3 2021, Gjovik signed a contract with Business Insider to write an Op-ed about her situation with Apple and proposals on how Apple can address its systemic issues. Gjovik modeled her article and proposals after what she had been learning about Transitional Justice at Oxford. (Gjovik received perfect grades in the 2021 Oxford program, and Gjovik's faculty advisor for the program would later be selected to become a member of the U.S. Chemical Safety and Hazard Investigation Board in 2023).

178.     Okpo contacted Gjovik again on Sept. 3 2021 and Sept. 7 2021, asking to meet with her on Webex; implicitly denying her request to keep things in writing; and refusing to tell her what the meeting was about. Both times Gjovik asked Okpo to keep things in writing due to the misrepresentation and intimidation. If he refused, she requested a Business Conduct review of his decision, noting he is a lawyer and there is a power imbalance. Okpo never responded.

179.     On Sept. 5 2021, Gjovik messaged Josh, her friend and a Senior Director, complaining about Apple Employee Relations, commenting she had been researching Apple's labor history and the issues were "*very systemic*" and with "*lots of bad faith conduct*," but "*not completely diabolical*." (Gjovik would later refer to this dynamic instead as '*Waco meets Enron*.')

---

[32] Patrick McGee, *US labour board examines retaliation claims against Apple*, Financial Times, Sept. 2 2021, https://www.ft.com/content/484fa8be-925e-495c-91ff-54950b112754

180.    Gjovik complained to Josh that her current interactions with Apple Employee Relations made her feel "like a very tired mom who really wants their kid to clean up the room and has asked 1 million times and they're not doing it and she's like I'm really disappointed with you we both know you're better than this."

181.    On Sept. 6 2021, Gjovik posted on social media about her U.S. NLRB, Cal. Dept. of Labor, and U.S. EEOC/Cal.DFEH cases with a status update and the report numbers – and also tweeted about her U.S. SEC whistleblower tip, U.S. FBI, and U.S. Dept. of Justice complaints. On Sept. 6 2021, Gjovik replied to the U.S. EEOC confirming she was working on a draft of her complaint and was targeting to submit it to them by Sept. 8 2021. On Sept. 8, 2021, Gjovik emailed the U.S. EEOC her draft of the language for her charge.

182.    On Sept. 7 2021, a few days before her termination, Gjovik discovered the second woman to ever report to West had sued Apple over West's retaliation, constructive termination in violation of public policy, and IIED only two years prior. The ex-colleague's complaint explained she witnessed retaliation and intimidation in West's organization, and that West spoke openly about knowledge of his employee's fear of retaliation. She said after she raised concerns to West about this, West began retaliating against her too.

183.    The complaint alleged there were three sham Employee Relations investigations into her concerns, finding no policy violations related to West's conduct. Employee Relations put her on administrative leave, waited a few weeks, and then told her she can either accept two months of severance and sign a release of rights to pursue legal action against Apple, or she can return to work as things are except that West will be even more angry at her now. The coworker resigned and filed suit instead. Apple settled shortly after.[33] Gjovik posted on Twitter about it, expressing her displeasure.

184.    On Sept. 8 2021, Gjovik replied to the US Dept. of Labor with copies of her prior filed complaints to the U.S. EEOC, U.S. NLRB, U.S. EPA, Cal. EPA, and U.S. SEC. Gjovik noted she was working on answering the investigator's questions and would reply by the deadline, which was Sept. 10 2021. On Sept. 9 2021, at 12:39 PM PST, Gjovik emailed the U.S. EEOC investigator assigned to her case and asked the investigator if she needed anything else from Gjovik to move forward. Then again, at 1:02 PM, asking US EEOC how she could sign the charge to meet the deadline.

185.    Around 1 AM the morning of Sept. 9 2021, it occurred to Gjovik, and she shared her thoughts in real-time on Twitter, that Apple was likely spying on her personal devices because they were

---

[33] *Brown v Apple Inc*, Case No. 18CV330922, Superior Court of the State of California, County of Santa Clara, Complaint ( July 2 2018).

administrators of Apple servers, even for customers, and their work policies say they will spy on employee's personal devices. (Note: The NLRB is now suing Apple over that policy). Gjovik began frantically removing her data from iCloud servers, including migrating her email, photos, and documents.

186.    On Sept. 9 2021, at 2:08 PM PST, Gjovik was contacted by Aleks Kagramanov, an Apple "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour*." The email had no subject line, and Gjovik had never heard of the team. Kagramanov said he was "*looking into a sensitive IP matter*" and wanted to speak with Gjovik. He said Apple "*sincerely appreciate [her] prioritizing this call and being flexible*." He never said Gjovik was under investigation.

187.    Gjovik was sure she was about to be fired, but two minutes later, Gjovik promptly responded at 2:10 PM PST, saying she was willing to participate but wanted a written record of their conversations. She said she will respond as quickly as she can. Kagramanov did not respond, so Gjovik replied again. Gjovik responded again at 2:27 PM PST, complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator. Gjovik posted on Twitter complaining of witness intimidation and fear of violence from Apple.[34] Cal.Lab.C. § 6401.9 defines "workplace violence" as the threat or use of physical force, including incidents involving guns and dangerous weapons. There was no legitimate explanation why this team was contacting Gjovik. Gjovik opined about it on Twitter while she waited for Kagramanov's response, posting at 2:34 PM: "...*so does he investigate the threats & violence, or is he the one that provides that as a service*?"

188.    Kagramanov replied to Gjovik's email at 2:50 PM, now saying: "*We are investigating allegations that you improperly disclosed Apple confidential information*." Kagramanov then also claimed Gjovik refused to "*participate*" in his farcical investigation and announced he was suspending all of Gjovik's Apple account access. He never shared with Gjovik that he was apparently partnering with an Apple lawyer who assumably would have been waiting on the call/Webex to speak with Gjovik along with Kagramanov. The specific lawyer was previously a New York state criminal Asst. District Attorney in Manhattan prior to joining Apple a few years prior. It's unclear what their plan was if Gjovik was to agree to speak with them.

189.    Gjovik responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate.

"As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all." Gjovik added: "I offered to help via email to ensure we have a documented [record] of

---

[34] "*Hey #Apple, 'This feels a little like witness intimidation. I let @NLRB know.' Love, Ashley. Clutches panic button & Mace while still laying on the floor pondering the brutality of U.S. capitalism.*" -- @ashleygjovik (September 9 2021 2:33 PM).

our conversations considering everything that's currently going on with my investigation and my complaints to the government... I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that."

190.     Gjovik added in her 3:07 PM email reply to Kagramanov: "In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation, and I will consider it as such." Gjovik still did not know what she was supposedly accused of.

191.     On Sept. 9 2021 at 4:24 PM PST, the U.S. EEOC investigator emailed Gjovik, saying she posted the final version of the charge and asked Gjovik to sign the charge. On Sept. 9 2021, at 4:27 PM PST, Gjovik digitally signed her U.S. EEOC charge against Apple. Then, at 4:47 PM PST, Gjovik emailed the U.S. Dept. of Labor with responses to their questions about her protected activity and Apple's retaliation. Gjovik replied again at 5:26 PM PST, informing them Apple's Workplace Violence interrogator had just suspended her account access and threatened her.

192.     On Sept. 9 2021, at 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, and West's close friend, emailed Gjovik with the subject line "*Your employment status*" and an attached letter saying she was terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking and said she "*failed to cooperate and to provide accurate and complete information during the Apple investigatory process.*"

## VI.   Continued Investigation

193.     Six days later, on Sept. 15 2021, at 7:40 PM PST, Apple's lawyers at O'Melveny & Myers, via Partner David R. Eberhart emailed Gjovik a letter implying Apple terminated her due to her complaining about Apple asking to 3-D scan her ear canals and also because she posted some of the surveillance photos Apple secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app.

194.     Gjovik told Eberhart that none of that was confidential and that she had the right to protest and discuss it. Eberhart threatened her and demanded she delete several Twitter posts but never cited any legal authority (because there's none). A lawyer responded to Eberhart more formally a couple of weeks later, on Gjovik's behalf, warning him about Rule 11 sanctions if he attempted to pursue the matter in court as his claims have no basis in fact or law. Eberhart never responded.

195.     On Sept. 10 2021, Gjovik testified to U.S. NLRB for her first affidavit. On Sept. 14 2021, Gjovik had the second part of her NLRB affidavit. She posted about it on Twitter.

196.     On Sept. 21 2021, Tim Cook emailed all Apple staff complaining that someone had spoken

publicly to reporters about work conditions. Cook said Apple's "doing *everything in our power to identify those who leaked*." Cook said, "*People who leak confidential information do not belong here*."[35]

197.     On Dec. 13, 2021, US DOL docketed Gjovik's SOX, CERCLA, and OSH Act cases. A Financial Times article was published on Dec. 13, 2021, which said:

"The labour Dept. will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defense company responsible for the dump — and maintenance — of waste materials beneath the Sunnyvale office. Sugar could not be immediately reached for comment. "Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board. "Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."[36]

198.     On May 20 2022, the U.S. EPA sent a letter to Northrop Grumman about Stewart 1, instructing that: "*EPA requires that one round of indoor air samples be collected... under current conditions*."[37] The letter included an attached memo from the U.S. EPA's Quality Assurance branch instructing Northrop Grumman (and Apple) that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been modified in a manner that could compromise the system; evaluation of changes to building use*," in addition to also inspection roof components.[38]

199.     On May 27, 2022, the U.S. EPA finally admitted to Gjovik, that there had been an inspection at her office on Aug. 19, 2021 – Apple had been able to conceal it from Gjovik for nearly a year. On July 28 2022, Northrop Grumman told the U.S. EPA they were late in responding to the U.S. EPA's questions because Apple and the building owner stopped responding to them for weeks.

200.     On July 14 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was

---

[35] Macworld, "*Apple's war against leakers is really a battle against the people that matter mos*t," Feb. 7 2023. ("*…people who leak confidential information do not belong here*. / Tattooed on Tim Cook's right bicep: 'Loose lips…' And on his left: '…pink slips.')

[36] Financial Times, "*Apple faces probe over whether it retaliated against whistleblower*," Dec. 13 2021.

[37] U.S. EPA, Re: EPA Technical Comments on the Passive SSDS O&M Plan and SSDS Evaluation, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088) (May 20 2022).

[38] U.S. EPA, Passive Sub Slab Depressurization (SSD) System Operation and Maintenance (April 25 2022).

mysteriously closed with inaccurate information. Gjovik won her unemployment insurance appeal, and a decision was issued by an Administrative Law Judge stating:

Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Before the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times, the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[39]

201.    In 2022, there was discussion with the US Representative's office about bringing Gjovik's situation with Apple related to environmental violations to a US House Sub-Committee the US Representative chaired.

202.    On Dec. 30, 2022, the U.S. FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans and provided Gjovik with a report tracking number. Gjovik notified U.S. FTC in 2023 that she was taking the matter on herself in this lawsuit.

203.    After Apple fired Gjovik, Gjovik filed additional U.S. NLRB and Cal. Dept. of Labor charges about Cook's email, and Apple's NDAs and other employment policies, charging they violate federal labor laws – and the U.S. NLRB agreed with Gjovik, issuing a Decision of Merit on her charges against Apple in Jan. 2023, and complaint in Sept. 2024.[40]

204.    On Jan. 20 2023, U.S. EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over seven years. On Aug. 31, 2023, the U.S. EPA published a brief letter responding to Apple's May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since Dec. 2015, calling Apple's testing report and strategy "*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," and "*misleading.*"[41]

205.    Plaintiff's activism was deeply chilled after the retaliatory litigation resulted in a gag order from March 2022 and until the reverse and vacate in Nov. 2022. It became a crime for her to talk to anyone aspects of her claims and complaints, and so she mostly stopped talking until she would no longer face prison time for doing so. She picked up her research again in the winter of 2022/2023. (Note – Plaintiff alleges this

---

[39] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022.
[40] Amanda Silberling, *Labor officials found that Apple execs infringed on workers' rights,* TechCrunch, January 30 2023.
[41] U.S. EPA, TRW Microwave Site, Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023.

Defendant is liable for this duress, and that it also impacted her ability to 'discover' what Defendant did – which was probably part of the reason they did it.)

206.    In 2022, Plaintiff was deeply traumatized by what happened to her in 2020-2021 but out of concern for public safety continued to monitor the nearby Superfund sites for any progress, updates, or possible revelations. Plaintiff primarily studied the TRW Microwave site, including monitoring the U.S. EPA webpages and requesting extensive public records through FOIA. She also continued to ask questions and share information with the U.S. EPA team overseeing the TRW Microwave site as they worked on the corrective actions with Apple and Northrop Grumman.

207.    Plaintiff also kept an eye on the Honeywell "Synertek" Superfund site in Santa Clara next to the apartments where she got sick in 2020. Back in 2020-2021, there were only a few theories about how she could have gotten so sick. There was an investigation by the regional U.S. EPA CERCLA team around the Synertek site because its VOC groundwater plume was historically under where these apartments are now. Gjovik was monitoring the groundwater well reporting on CalEPA's Geotracker GAMA application.[42] In July 2022, she noticed that U.S. EPA had tested the Synertek wells in 2021 following her complaints (they did not tell her), and there was increasing TCE in the groundwater monitoring well closest to her prior apartment.

208.    In early Jan. 2023, while checking for updates, Gjovik noticed the U.S. EPA had uploaded the 2022 Five Year Report for the Synertek site.[43]  She read the report and had a number of questions about the report and emailed U.S. EPA and USACE with her inquires on Jan. 11 2023. Her email was organized into four parts she titled: *"Increasing TCE In Well 33-A per GAMA"; "2022 FYR Notes Remediation Injections In 2019 & 2020, With 'Rebound Effect'"; "Santa Clara Square Apartments In FYR";* and *"3250 Scott Blvd.".*

209.    Gjovik was also reviewing the CalEPA CERS portal for information on all of Apple's California facilities as she was building a large spreadsheet of all of Apple's environmental and OSHA failures in California. (As of Jan. 18 2023, there were 162 rows!). She noticed 3250 Scott Blvd had received many inspection violations in late 2020 (probably posted in 2021), including citations for somehow losing 1,700 gallons of diesel in 2020.

210.    In her Jan. 11 2023 email, she wrote to U.S. EPA: "Was there an inquiry to 3250 about testing? Apple moved in 2015, per CERS records. In 2017, Honeywell General Counsel (Kate Adams) became

---

[42] CalEPA, Geotracker: Groundwater Ambient Monitoring and Assessment (GAMA),
https://www.waterboards.ca.gov/gama/
[43] "*6th 5-year review rpt for Synertek, Inc. Building 1 Superfund site, w/appendices A-F*," 55 pp, Doc. ID 100029800
(September 8 2022). https://semspub.epa.gov/work/09/100029800.pdf

General Counsel of Apple. Was this considered during any outreach about 3250? I'd be concerned about VI at 3250 not just for workers there, but also due to chemical reactivity with the stockpile of industrial chemicals they're apparently hoarding there, & even losing tracks of thousands of gallons of." (referring to the diesel). Gjovik was still focused on vapor intrusion. They did not respond.

211.    Gjovik became especially curious about a few of Apple's California properties that seemed to be more industrial than others. She filed Public Records Act requests for records about these sites. One of these requests (Request 23-127) was filed to Santa Clara city on Feb. 9 2023 and included a request for 3250 Scott Blvd records in addition to three other Apple buildings in Santa Clara. On Feb. 21 2023 the city of Santa Clara responded that it would take a while to gather the records but linked to four prior requests where some records had already been released in the interim. [8/18 Declaration Exhibit H]. The requests with records for 3250 Scott Blvd (Requests 22-1148 and 22-1149, filed Oct. 11 2022) were from AEI Consultants explaining they were working on "property condition assessment reports," assumably for Apple.

212.    The only documents released were lists of permits. Gjovik skimmed the permits for 3250 Scott Blvd and was flabbergasted to see permits for semiconductor fabrication tools (which she recognized only due to her work on hardware development at Apple). She quickly communicated her findings.

213.    She replied to U.S. EPA complaining they still had not responded to her concerns about the groundwater wells and also added:

> "A new, additional question for you all - is how long have you known that Apple was doing literal actual silicon fab in that 3250 Scott Building since ~2016 through current? Like, back in the 1970s-1980s Silicon Valley silicon fab, and only .2 miles (.3 km) from RESIDENTIAL BUILDINGS. Apple's buildings permit (attached) notes solvent/chemical evaporation in the yards near the "gas bunkers" & a large number of solvent exhaust ducts to the roof from the variety of clean rooms & fab stations. The building is registered in CERS but is not a DTSC, Water Board, or U.S. EPA site. A literal silicon fab factory that is spewing toxic chemicals into at least the air is only overseen by the city fire Dept. & which only inspected a couple times - finding open violations but apparently never even following up on them." – Ashley Gjovik (2/22/23 12AM).

The Plaintiff was very distressed.

214.    On Feb. 21 2023 around 11:20pm, Gjovik began tweeting about Apple's permits at 3250 Scott Blvd, trying to lead up to a grand reveal of the fab. However, an engineer spoiled the surprise, also recognizing what she did, and quickly posted "*@[account] do you have any IH/OH friends who can say exactly how stupid it is to do modern chip fab next to residential buildings?*" to which Gjovik responded, "*you spoiled the surprise for the non-hardware people, but good job, yes... APPLE IS SO [expletive] DUMB I'M GOING TO*

*SCREAM.*"[44] Gjovik then tweeted out the formal announcement:

> "APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT."[45]

Gjovik replied to her own post a moment later adding:

> "I've been making muffled screaming noises for about twenty-five minutes now WTAF IS WRONG WITH THEM THEY MUST HAVE KNOWN THEY DID THAT [expletive] TO ME!!! No wonder they gave me that "extreme condition leave" to move out, Apple is the extreme condition."[46]

215.    Gjovik started emailing with a friend, Lenny, about what she found. They met during her activism in late 2020 and emailed each other about environmental matters ongoing. She shared with Lenny she also found a "*cryptic fire Dept. gas leak report from June 2019 at 3250 Scott.*" Apple's name was redacted, and the chemical name misspelled. Lenny explained,

> "*I believe the correct spelling is phosphine. This is why the county's fire Dept.'s led the development of the model hazardous materials storage ordinance…In general, the gas releases have more acute health effects than the releases to groundwater.*"

216.    Lenny was involved it getting the Santa Clara County toxic gas ordinance passed in the 1980s and she trusted his expertise. [Lenny was also recently the mayor of Mountain View, as well as a City Council member, and member of the city's Planning Commission in the 1980s. He is also the executive director of the Center for Public Env. Oversight. Lenny also tried to investigate how Gjovik was injured and also could not figure out it out in 2020-2022.].

217.    Prior to Gjovik's Feb. 2023 discovery, numerous government agencies and experts had reviewed Gjovik's complaints and the site data; they tried to figure out what could have made her sick. Eventually there was consensus that it was probably not the Superfund site, or the existing Brownfield contamination – and the best guess was maybe something in the building materials at the apartment. That's where it left off and that's why Gjovik wrote "*I thought I was dying…*" in desperation and which was published in March 2021.  This led to Gjovik filing a complaint to U.S. EPA in June 2023 about ARIA.

218.    From Sept. 2023 through Sept. 2024, Gjovik worked as program manager for an air pollution research project at a research university. The role was temporary and did not utilize her legal or engineering experience. After two years of searching and hundreds of applications, it was the first and only job offer she

---

[44] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628249545367777281
[45] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628250591779516416
[46] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628256067065880577

could obtain.[47] The role was far lower seniority than her role at Apple, and Gjovik's salary was reduced by 41% and total compensation lowered by 74%. Gjovik is now back on Medicaid and applying for EBT and unemployment insurance.

219.    On Sept. 27 2024, the U.S. EPA published the "Five Year Report" for the Triple Site, including the TRW Microwave site. Gjovik was invited to provide a comment as a community member, which she did, and it was included in the final public report. The report reiterated that a new Record of Decision is still needed and needs to address vapor intrusion.

220.    However, the report also revealed that investigation into elevated levels of TCE in the outdoor air is now focusing on the shallow groundwater at two sites, including Gjovik's office. Additional testing and evaluations were ordered, because if true, the contaminated groundwater plume just a couple feet below the surface maybe be releasing dangerous levels of TCE into the outdoor air of the entire property and neighboring properties.

221.    The U.S. EPA also shared the raw data for the indoor air testing with Gjovik, and it showed that there continued to be vapor intrusion inside but with chemicals at 'acceptable' levels, with the exception of elevated levels of benzene. The report and analysis still have not been released.

222.    The NLRB issued a complaint against Apple on Sept. 27 2024, over Apple's Business Conduct Policy, NDAs, Intellectual-Property Agreement, [48] The NLRB issued a Decision of Merit in Jan. 2023, (thus the NLRB will issue a complaint and sue Apple if Apple does not settle first) about an email CEO Tim Cook sent his staff in Sept. 2021 shortly after Gjovik was fired.[49] [50]

223.    In Oct. 2024, NLRB issued a decision of merit that there is substantial evidence that Apple's placement of Gjovik on leave was an unlawful suspension, and both the suspension and termination of her employment violated federal labor laws.

# LEGAL CLAIMS: RETALIATION

224.    Gjovik hereby incorporates by reference each and every allegation and fact above and below, into each section where that allegation and/or facts is required to support the claim at issue. Some facts and allegations are not repeated in order to meet page limits. Where any statute of limitations is in question of

---

[47] With the exception of brief expert consulting work for a large law firm on a class action fraud lawsuit – consulting which abruptly ended upon Apple's counsel demanding that Gjovik be removed from working on the lawsuit – perhaps one of the most direct examples of denylisting ever.
[48] 32-CA-284428
[49] 32-CA-284441
[50] 32-CA-282142, 32-CA-283161

possibly being expired for an alleged claim, Gjovik, where reasonable, will argue that the statute of limitations should be tolled due to Apple's fraudulent concealment of numerous material facts. Gjovik will also argue, where applicable, the doctrine of continuing violations, equitable tolling, and the discovery rule.

## VII.    Knowledge of Protected Activities

225.    Gjovik started threatening Apple that she'd talk to the press about her work conditions back in June 2021 and did talk to the press and was quoted by NYT about Apple starting in July 2021. Apple Employee Relations told Gjovik they saw it, were aware, and were annoyed she figured out labor laws.  Gjovik and her social media posts were covered by the press. Gjovik provided quotes and additional information. Each time a new article was published, Apple's public relations team was directly notified by the press, requesting comment.

226.    Further, in mid-July 2021 Gjovik directly notified Employee Relations that she and other coworkers were posting on social media complaining Apple was invading their privacy with overly aggressive medical release forms for ADA accommodation requests. Employee Relations also interrogated Plaintiff around July 29 2021 about the statements she was making and urged her to stop talking about work conditions, even with her coworkers and on Apple systems.

227.    After being put on leave on Aug. 4 2021, and speaking out on Twitter and in the press, Gjovik quickly received an email from Apple Employee Relations, Okpo, on Aug. 5 2021 complaining about what she said and falsely accusing her of lying. (In Sept. 2024, the NLRB issued a decision of merit that there is substantial evidence that Okpo's email violated federal labor laws.)

228.    Gjovik observed an incredible response from her coworkers while she was sharing stories and documents in Aug. 2021, with many discussions on Apple's Slack tool for employees, including many employees saying, and telling her, that they had reported the people she complained about and asked Apple to do the right thing with Gjovik. One post even led to a petition within Apple – Gjovik had shared a "Radar" work tracking ticket that was titled with the goal of making her life "a living Hell."

229.    "#Apple makes great products, & some workers have a great experience, but some don't. Everyone who knows me at work knows I've dealt with more abuse than anyone should have. (See: "Make Ashley's Life a Living Hell"... & they really did). No one seems surprised I finally broke." [Image] 10:55 PM · Aug 12, 2021 https://x.com/ashleygjovik/status/1426014545202479108

230.    Dozens of employees started commenting in the Radar; after seeing it on her social media, demanding Apple improve its conduct. Several people said they had reported the Radar to Human Resources. This was around Aug. 16 2021. One would think if dozens/hundreds of employees are

complaining about abuse Gjovik faced, as shared on social media, that Apple might think to read her social media.

231.    Per Apple's 2022 position statement, Apple was also supposedly investigating Plaintiff's Twitter posts from around Aug. 28 2021-Sept. 9 2021 – which would assumably include reading Gjovik's Twitter postings.

232.    Finally, as part of the steps leading to Plaintiff's termination, one of the supposed reasons she was to be terminated, as communicated by Human Resources to her VP, was that she supposedly failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. She did however redact the internal records she was posting on Twitter. Apple HR must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Apple never raised the matter to Gjovik and Gjovik only discovered this fact via discovery.

233.    Apple apparently  continued to monitor her posts after Sept. 2021 (attempting to get Twitter to delete some of them, admitted in U.S. Dept. of Labor filings) and through Jan. 2022 (Applegate wrote to Plaintiff upset that she tried to get Plaintiff's Twitter posts deleted but found out Apple also reported them and it was Apple's reports that resulted in the posts being deleted).

234.    Apple is certainly reading Gjovik's Twitter and other social media and has been for years. Apple also had knowledge of Gjovik's activities through direct updates form Gjovik, information shared by agencies arising out of Gjovik's complaints, press coverage of Gjovik, and any surveillance they were conducting of her personal and work devices (which Apple's policies said they would do).

235.    For Cal. Labor Code Section 98.6 and 1102.5, any issues with statute of limitations related to the claims or remedies (*i.e.* penalties/fines), is equitably tolled by Gjovik's timely complaints sitting in the Cal. Dept. of Labor queue for years before Gjovik kicked the claims out into this lawsuit. This lawsuit replaced the California Dept. of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830. Gjovik filed the initial claim on Aug. 29 2021, prior to Apple terminating her employment.

## VIII.    Count One: Wrongful Discharge in Violation of Public Policy (*Tamney* claim)

236.    Apple retaliated against Gjovik and discharged Gjovik's employment for a variety of reasons that violated public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace*." Certain concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5,

1102.5, and 6310. The following sub-claims are included in addition:

### A. Illegal Data Harvesting [Cal. Const. Article I, Section 1; FTC Act]

237.     Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Article I Section 1 of the CALIFORNIA CONSTITUTION; the CALIFORNIA PRIVACY RIGHTS ACT; the U.S. FTC ACT; Cal.Pen.C. § 637.7, and the INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS: Article VII on Free Consent.

238.     Apple's supposedly legitimate reason for terminating Gjovik, while false and pretextual, is an illegality itself. Apple claims it fired Gjovik for complaining about Apple's surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to her constitutional and statutory right to privacy, which are rights that benefit the public, are substantial and fundamental rights, and which were firmly established at the time of discharge. Apple's decision to use this as their excuse for terminating Gjovik reveals Apple's animus against California employees' privacy rights.

239.     Apple also intruded into Gjovik's seclusion, physically and constructively invading Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor Code § 435. The Gobbler app did take videos and photos of Gjovik in the bathroom and Gjovik has copies of those images.

240.     Apple's use of Gobbler on Gjovik's phone also forced Gjovik to participate in Apple's unlawful acts by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometric information of the public without their knowledge or consent. Apple's termination of Gjovik also stated that if Apple were to warn people what was occurring on her phone, she would be fired. Therefore, Apple's unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for their highly sensitive biometrics.

241.     Apple also violated Section 5 of the FTC Act in unlawfully coercing employees to provide personal and sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable, and misleading statements to consumers.[51] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer

---

[51] US FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices,* Consumer Compliance Handbook.

protection laws protecting them. (This sub-claim is connected to the Cal. B&P Code § 17200 *et seq.* claim).

## B.    Employment Discrimination [Cal. DFEH; U.S. EEOC]

242.    Gjovik reported and testified about topics including complaints about sex, gender, and disability discrimination, which are "fundamental" rights for the purpose of a *Tamney* claim. Gjovik filed Cal. DFEH, and U.S. EEOC claims on Aug. 12 2021, and proceeded to testify and provide evidence, requesting a Right to Sue letter, which she was granted on Sept. 9 2021, just hours before Apple fired her.

243.    Apple retaliated against Gjovik for opposing Apple's discriminatory practices. Gjovik also reported to U.S. NLRB and the U.S. Dept. of Justice Civil Rights before her termination. Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

## C.    Crime Victim/Witness Discrimination [Cal. Labor Code § 230(e)]

244.    Apple discriminated against Gjovik (including terminating her employment) due to Gjovik's actions related to a constitutional and statutory right to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge [Cal. Lab. Code § 230(e)]. Gjovik was a "*victim of a crime that caused physical injury*" and she suffered "*physical, psychological, and financial harm due to the attempted commissions of a crime or delinquent act.*"

## D.    Legislative Witness Discrimination [Cal. Gov. Code § 9414]

245.    Apple knew Gjovik was talking to legislatures about what occurred to her next to ARIA, and Apple knew that it was Apple who was responsible for Gjovik's harm, despite Gjovik not knowing that fact yet. Apple knew Gjovik may testify at legislative committees about the air pollution caused by Apple. Apple undertook an effort to ensure Gjovik did not testify and to harass Gjovik because Gjovik may testify to a committee.

246.    Apple also knew Gjovik was talking to elected officials about its retaliation against Gjovik after her termination, including a State Senator, a US Representative, and a US Senator. It is enough to establish a nexus that Apple had reason to think Gjovik planned to be a witness for an agency or committee. It is also illegal under California Penal code to intimidate witnesses, or to threaten witnesses before and/or after testimony. [Cal Penal Code 140(a) 137(b) 136.1].

247. Further, Apple's also violated Cal. Gov. Code § 9414 (a misdemeanor public offense) by harassing and retaliating against Gjovik, by attempting to prevent and dissuade Gjovik's testimony for a proceeding, and by depriving, threatening, and attempting to deprive or requesting Gjovik not be employed due to Gjovik being a witness for a committee, and giving testimony to a committee as a witness or victim.

## IX.   Count Two: California Whistleblower Protection Act
### (Violation of Cal.Lab.C. § 1102.5)

248. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief. Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity in disclosing information to a governmental or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover or correct the violation; or providing information to or testifying before, any public body conducting an investigation, hearing, or inquiry.

249. Cal.Lab.C. § 1102.5 also covers Gjovik's' public disclosures as due to Apple's extreme power and control over the government agencies who are supposed to be able to regulate it, often the only party in a position to force Apple to correct the issue is the public. Many of Gjovik's public statements in Aug. and Sept. 2021, and statements to coworkers in June and July 2021, all before her termination, noted that was why Gjovik was bringing her complaints forward to her coworkers and the public – so the public pressure may force Apple to do the right thing for once. At the very least, Apple was monitoring Gjovik's social media activity and articles, so Apple was informed of her disclosures through that surveillance.

250. Gjovik filed several complaints under multiple laws, which were known to Apple executives, bosses, and administrators (by Gjovik informing them directly, or by Gjovik speaking about them publicly on social media and the press, or by Apple's surveillance of Gjovik before her termination.

251. Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations to government agencies, the public, the press, and Apple management. Gjovik had a reasonable cause to believe that the information she disclosed violated the statute and was non-compliant with a rule or regulation.

252. Violations of the anti-retaliation provisions of environmental laws, specifically, 42 U.S.C. §§ 9610 and 7622 and 15 U.S.C. 2622. Violations of the anti-retaliation provisions of environmental laws. 42 U.S.C. § 9610, and 42 U.S.C § 7622, and 15 U.S.C. § 2622. Filed complaints to the U.S. EPA, CalEPA, and U.S. Dept. of Labor around Aug. 29 2021.

253.    Violation of § 8(a)(1) of the NLRA. Filed complaints to U.S. NLRB about NLRA § 8(a)(1) violations on Aug. 26 2021. Complaints initiated a proceeding with an NLRB field agent contacting Gjovik for an interview in early Sept. 2021. NLRB issued a decision of merit on Gjovik's claims and filed suit against Apple in Oct. 2024.

254.    Filed complaints to CalDOL, CalOSHA, and US Dept. of Labor re: CCR, Title 8, General Industry Safety Order 5194

255.    Violation of 29 U.S.C. § 660; Violations of the OSH Act at 29 U.S.C. § 660. Filed complaints to CalOSHA, US Dept. of Labor. Complaint initiated a proceeding with a Wage & Hour investigator contacting Gjovik for information in early Sept. 2021.

256.    Violation of the California Constitution's right to privacy (but not related to Gobbler); Made complaint to Apple management in Aug. 2021. Shared concerns with reporter for advocacy article in Aug. 2021: "Apple Cares about Privacy, Unless You're an Apple Employee." Made complaints on social media in Aug. – Sept. 2021.

257.    Violation of 42 U.S.C. § 2000e and California Government Code § 12920. Anti-Discrimination Laws (Basis of Sex and Disability). Filed complaints to U.S. Dept. of Justice Civil Rights in Aug. 2021. Filed complaints to U.S. EEOC and Cal.DFEH in Aug. 2021, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e; California Government Code § 12920.

## X.    Count Three: Cal. Labor Code § 6310

258.    Apple violated § 6310 via discrimination, suspension, discharge, or threat of discharge against Gjovik for Gjovik complaining about unsafe work conditions or practices, instituting, or causing to be instituted proceedings related to her right to safe and healthful working conditions, testifying about workplace safety, and exercised her rights under the California OSH Act. Apple also took the above negative actions due to fear that Gjovik would engage, or engage further, in the activities above. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

259.    Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers, including chemical exposure. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses, and requested information about work-related injury and illness reports or records. Apple knew about Gjovik's complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts.

260.    Gjovik filed a Retaliation claim with the California Dept. of Labor on Aug. 29 2021, and Apple was notified of such before her termination. Gjovik complained of unsafe work conditions and internal violations of safety laws/rules/standards to Apple, the U.S. EPA, CalEPA, and OSHA.

261.    Gjovik complained about violations of, and issues related to, numerous topics, including:

– HazCom and employee exposure to chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal. Code. Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]

– COVID-19 safety and communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]

– Wildfire smoke safety [Cal.C.Reg. Title 8, § 5141.1]

– Employee injury tracking and reporting [8 Cal.C.Reg. § 14300]

– Efforts to reduce e-waste; and Apple's prior e-waste (Universal Hazardous Waste) violations. [Cal. Health/Safety; RCRA]

– Environmental safety including vapor intrusion exposure [Cal.Lab.C. § 6406; CERCLA/SARA, RCRA, CAA, CWA, OSH Act HazCom]

– Right to Know [EPCRA; Cal.Lab.C. § 6399.7] and Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 [Cal. Health & Safety Code §§ 25249.5 to 25249.14].

– OSH Act Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]

262.    Apple retaliated against Gjovik preemptively out of fear that Gjovik would file additional complaints related to health and safety at the workplace. Apple hoped its retaliation would cause Gjovik to drop her existing complaints out of fear and intimidation, and to prevent Gjovik from filing additional complaints.

## XI.    Count Four: Cal. Labor Code § 98.6

### E.    Violation of Cal.Lab.C. § 98.6

263.    Apple violated Cal.Lab.C. § 98.6 when Apple did discharge and discriminate against Gjovik for engaging in certain activities, including *"filing a complaint with the Labor Commissioner or testifying in such proceedings."* Gjovik filed a complaint with the California Labor Commissioner on Aug. 29 2021 and Apple was notified she did so through her public statements and notification from the agency.

264.    Apple violated § 98.6 by retaliating against Gjovik due to Gjovik filing a claim with and causing to be instituted proceedings related to the rights under the jurisdiction of the California Labor Commissioner, and for exercising rights provided to her under California Labor Code on behalf of herself

and on behalf of other employees. Apple punished her for doing so.

265.    Animus was shown in many of the comments and communications from Apple employees, managers, and agents before and after Apple terminated Gjovik. Comments frequently referenced Gjovik's protected activities, but claimed Gjovik was lying and acting in bad faith, and then argued that because Gjovik make the complaints, she should be punished for it.

266.    Apple retaliated against Gjovik due to Gjovik's protected activity, and she suffered materially adverse actions with a causal connection to the protected activity. Apple engaged in actions prohibited by this section (termination, suspension, discipline, harassment, etc.) within 90 days of Gjovik's protected activity.[52]

### F.    Violation of Cal. Labor Code § 232.5 via §§ 98.6, 98.7

267.    Apple violated Cal.Lab.C. § 232.5 when disciplining and discharging Gjovik for disclosing information about Apple's working conditions. Gjovik's protected activities included filing complaints about work conditions and discussing work conditions with coworkers and the public, all covered under § 232.5.

268.    Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik and Apple's proffered supposedly legitimate reason for terminating Gjovik.

269.    Apple claims its NDAs prohibit Gjovik from speaking about work conditions and that if Gjovik does speak about work conditions, it violates her NDA, and that violation is grounds for immediate termination.

### G.    Violation of Cal. Labor Code §§ 232, 232.5 via §§ 98.6, 98.7

270.    Apple violated Cal.Lab.C. §§ 232, 232.5 when it harassed, disciplined, discriminated against, and fired Gjovik due to Gjovik's discussion of her wages and the wages of Apple employees.

271.    Gjovik participated in a pay survey with her coworkers in late July 2021, when she suggested the survey capture information on gender. In Aug. of 2021 Gjovik participated in an employee pay survey that was being shared on Slack. Gjovik suggested adding a question about gender and added it herself in the spreadsheet.[53]

272.    She also shared her wages on social media and discussed pay with her coworkers on social media in Aug. 2021, the Defendant knew and retaliated against her because she did so.

---

[52] Cal. SB-497: Protected employee conduct. Section 1, Section 98.6(b)(1) [Signed October 8 2023; Effective January 1 2024].
[53] Cal. Labor Code  § 1197.5

273.    In the evening of Aug. 3 2021, Gjovik posted on a popular Slack group at Apple, linking to three of Apple's policies, and quoting "Nothing in these guideless should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions." Gjovik encouraged her coworkers to speak out and organize. Gjovik was put on leave the next morning. Gjovik posted on Twitter about doing this a few days later.

"There's a strange idea in #Apple that speaking out about #workconditions violates our employment contract (a doc many of us never got a copy of nor is there a formal way to req) but I took pics & mine has rights in a footnote. I also reminded folks the eve before put on leave. @ashleygjovik 1:33 PM · Aug 9, 2021.

274.    After Plaintiff was put on leave, the pay survey was shutdown, supposedly because there was a question about gender. There was news coverage of Apple shutting down pay surveys and public criticism about the matter:

*Apple keeps shutting down employee-run surveys on pay equity — and labor lawyers say it's illegal, the company bans surveys that include diversity data,* Aug 9, 2021, "Apple did not respond to a request for comment from *The Verge*." [54]

*Apple just banned a pay equity Slack channel but let's fun dogs channel lie. The company's rules around Slack usage are not being evenly enforced,* Aug 31, 2021, Apple did not immediately respond to a request for comment from *The Verge*.[55]

*"Apple says it has pay equity, but an informal employee survey suggests otherwise: Employees say there's a six percent wage gap between the salaries of men and women who responded to the survey,"* Aug 23, 2021. In response to a request for comment from *The Verge*, Apple spokesperson Rachel Tulley sent the company's already public statement on pay equity." [56]

275.    Gjovik also tweeted out her salary in solidarity to those organizing around pay. An NLRB charge was filed about Apple shutting down the pay surveys in Sept. 2021, prior to Gjovik's termination, and

---

[54] "Last week, employees tried to start another pay equity survey but were again told to take it down because it included a question on gender. When they created a new survey without the gender question, the Apple people team allegedly said it had to be shut down because it was hosted on the company's corporate Box account."
"https://www.theverge.com/2021/8/9/22609687/apple-pay-equity-employee-surveys-protected-activity
[55] "Pay equity has been a hot topic among Apple employees over the past few months. The company has shut down multiple employee surveys aimed at gathering data on how much workers make."
https://www.theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel
https://www.theverge.com/2021/8/23/22633141/apple-pay-equity-survey-results-wage-gap

NLRB issued a decision of merit in Jan. 2023. Gjovik also found a prior US DOJ lawsuit against Apple for salary price fixing, posted about it, and compared it to Apple's recent actions shutting down pay surveys.

> "The DOJ announced in 2010 that it had settled with #Apple & others, establishing that they would cease their illegal hiring practices. The DoJ noted this complaint is part of a larger antitrust inquiry into employment practices by high tech firms." @ashleygjovik Aug 31, 2021

> "Lawsuit accuses Apple, others of fixing worker pay: large tech companies conspired with one another to lowball salaries."
> @ashleygjovik 4:55 PM · Aug 31, 2021

> Not much has changed in 16 years.... 8/31 - "Apple just banned a pay equity Slack channel but let's fun dogs channel lie" https://theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel @ashleygjovik 3:58 PM · Aug 31, 2021

All of these posts were made prior to Apple supposedly opening an extensive investigation into Gjovik's Twitter posts, per Apple, thus Apple admits it had reviewed the posts prior to terminating Gjovik.

### H.  Violation of Cal.Lab.C. § 96(k) via §§ 98.6, 98.7

276.    Apple violated Cal.Lab.C. § 96(k) when it demoted, suspended, discharged from employment, threatened discharge, or otherwise discriminated against Gjovik for Gjovik's lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involved the exercise of a right protected by the California Constitution.

277.    Gjovik engaged in lawful conduct asserting "recognized constitutional rights" and "rights under the Labor Code" occurring during nonworking hours – while she was on leave, away from Apple's premises. Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back, and Apple said no. Apple cannot then turn around and claim the "leave" was work time or the workplace. Apple told Gjovik she had been "*removed from the workplace*." Until Apple let Gjovik return to work, Gjovik was off duty. Gjovik posting about work conditions in her personal time does not transform Gjovik's personal time into work time.

278.    Apple terminated Gjovik for a variety of illegal reasons, including many of the public statements Gjovik made while on leave in Aug. – Sept. 2021. Gjovik spoke frequently on social media and to the press about harassment and safety issues at Apple; as was her inherent right to be free from

discrimination under Cal. Const. Article 1, §§ 8, 31, and her right to physical safety under Cal. Const. Article 1, § 1. Gjovik also spoke frequently about the environmental crimes she witnessed and was victim to at her apartment in 2020 and with Apple's conduct at her Superfund office. Gjovik complained about the intimidation and threats she received and advocated for victim's rights – as was her right under Cal. Const. Article 1, § 28. Apple violated Cal.Lab.C. §96(k) when it retaliated against Gjovik for making these statements, which she had a constitutional right to make, and which she made outside of worktime and outside of the workplace.

279.    In addition, even Apple's supposed legitimate justification for firing Gjovik was simply retaliation for protected statements made by Gjovik outside of worktime and the workplace, and about subjects rooted in her constitution rights. Gjovik was complaining about unlawful and unethical surveillance, and invasions of privacy, by Apple, towards Gjovik and her coworkers. Thus, Apple's supposedly legitimate justification is illegitimate. Gjovik has a self-executing right to protest invasions of privacy under Cal. Const. Article 1, § 1.

# LEGAL CLAIMS: TOXIC TORTS

## XII.    Tolling Theories

280.    Gjovik spent an incredible amount of time in 2020-2021 researching and investigating, trying to figure out what happened to her next to 3250 Scott Blvd. She reviewed public records for all the nearby next-door buildings including 3250 Scott Blvd. When she pulled 3250 Scott up on the U.S. EPA portal in 2020, the ECHO page noted that there had been no TRI releases reported since the 1990s, cited no violations or issues, and made the office look quite benign.

281.    Gjovik discovered ARIA when she received request from her public records request about environmental and safety compliance at multiple Apple buildings. One request returned a list of permits for ARIA, and she realized it was fab. Prior to her discovery of Apple's fab, Plaintiff only knew she was exposed to chemicals somehow – but did not know exactly what those chemicals were, did not know where they came from or how they got in her apartment, and did not know if there was wrongdoing or what type of wrongdoing might have occurred.

282.    Apple managed ARIA as an unmarked office building without any designation as to who was using the building or what they were using it for. In the regulatory paperwork that did exist (mostly city HazMat citations and leak/spill reports), Apple repeatedly tried to use the code name ARIA and to disguise their activities—repeatedly failing to use the proper codes to designate semiconductor fabrication.

283.    Apple was engaged in ultrahazardous activities with strict liability, and also had a critical duty to warn others of the danger of their activities at the facility. This duty was based on common laws, but also statutes – both civil and penal. They also had a statutory obligation to comply with permitting requirements and to notify the government of their activities, which they failed to do at every opportunity. Finally, they also had a duty under federal Right to Know to notify the community of the chemicals they released – but they did not do that either. Instead, Apple ran this plant as an old-school Silicon Valley "*Skunkworks*" project.

284.    In late 2020 and early 2021, Gjovik was actively researching the area around the Santa Clara Square Apartments. Her March 2021 article in SF Bay View summarized what she found and complained that she still had no answers. As much as she did not want to raise additional safety/environmental concerns with her cantankerous employer, Gjovik did look at records for 3250 Scott Blvd. She searched the site on state and federal EPA websites and could not find it any active permits or recent filings on California's Geotracker or Envirosor databases, or on the U.S. EPA's TRI and RCRA pages.

285.    Gjovik did see that 3250 Scott was registered as a Hazardous Waste Generator, however that is not uncommon in Silicon Valley. Due to Silicon Valley's history, most areas had been industrial or near industrial activities at some point, and most technology offices perform research and development, which creates hazardous waste. None of those scenarios would explain Gjovik's 3 AM heart failure in her bed in a three-story apartment. The government explained that whatever caused Gjovik's injury was something extreme and unusual. The government agencies said they also had searched environmental databases and also could not find anything that stood out to them as

286.    Apple also used illegal NDAs to unlawfully silence its employees about health/safety and environmental issues (see NLRB's lawsuit against Apple arising from Gjovik's complaints). Apple took active, unlawful steps to ensure its activities would be concealed and to make it more difficult for anyone to figure out what they were doing. Similarly, Apple was bullying agencies to avoid creating documentation about their activities or speaking about it, for example the very long NDA Apple attempted to get US EPA to sign prior to inspection Gjovik's office in Aug. 2021.

287.    In addition, worsening this issue, Apple also often conducts very strange activities at its research and development facilities, which Gjovik had seen over her six years with the company, and had never seen those operations cause severe injuries – they were just weird. This includes cellular technology buildings with large empty room with foam walls and a chair that spins in circles; robots "running" with their smart watches; reliability testing with machines that drop, touch, impact, spill, and anything else you

can imagine; and so on. Gjovik's office at 825 Stewart Dr. included labs for performance and thermal testing, Wi-Fi and connectivity testing, stability labs, and other industrial activities but which Gjovik had never seen cause any injuries like what she experienced next to ARIA.

288.    Gjovik also repeatedly spoke with Apple about ARIA starting in Sept. 2020 (EH&S), Nov. 2020 (Legal), etc. and Apple never said anything about the facility being used for anything dangerous or abnormal. Gjovik assumed if there was something she should know about the facility, that Apple would have told her – and because they did not tell her this, she could focus her research on other buildings.

289.    The Santa Clara city Fire Dept. did not force Apple to request proper permits, or even properly cite Apple for hazardous waste violations – which is a long-standing deficiency with the agency. The California EPA has multiple corrective actions for the Fire Dept. including actually inspecting, documenting issues, following up to ensure corrective actions, and properly characterizing facilities.[57]

290.    Finally, Apple also appears to have been staging a possible statute of limitations defense when it filed its first and only TRI and EIS reports to the US EPA, which were only for 2020, the year Gjovik was injured. Apple filed the TRI document on June 30 2021 and the EIS document on Aug. 26 2021, both prior to Apple's termination of Gjovik's employment.

# XIII.    Count Five: Private Nuisance
## (Creation & Maintenance of a Private Nuisance at 3250 Scott Blvd)

291.    Apple created and maintained a condition in violation of Cal.Civ.C. § 3479. This nuisance was demonstrably injurious to health, which was indecent and offensive to the senses and obstructed the free use of property. By acting and failing to act, Apple created a condition or permitted a condition to exist that was harmful to health, offensive to the senses, an obstruction to the free use of property, and a fire, explosion, and poisoning hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, negligent, and reckless.

292.    Apple is continuously casting pollution upon the property of the owner and tenants of adjacent properties, as it knew it would do when it constructed its exhaust and HVAC systems and hazardous waste handling systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution would continue to fall, not by accident or mishap, but in conformity with the knowledge it had before the construction of the systems. Apple should be presumed to have intended its act's natural, known,

---

[57] CalEPA Certified Unified Program Agency, Evaluation Progress Report, *CUPA: Santa Clara city Fire Department – Hazardous Materials Division,* July 2020 – Dec. 2020.

and reasonable consequences.

293.    Apple's interference would and did substantially annoy or disturb persons of normal health and sensibilities in the same community. Apple's operations at the factory and Superfund site are both continuing nuisances, and every continuation of the nuisance or trespass gives rise to separate damages claims. Apple has the agency and ability to stop the nuisance (it is not permanent), so until it does, the nuisance Apple created is continuous.  Apple's conduct was a substantial factor in causing Gjovik's harm. Gjovik did not consent to a defendant's conduct, and the seriousness of the harm outweighs the social utility of Apple's conduct. Apple damaged Gjovik's property and injured Gjovik's person. Due to Apple's actions, Gjovik's property was destroyed, the leasehold degraded, she became very ill, and she suffered severe emotional distress.

294.    In or about 2015, Apple constructed, or caused to be constructed, exhaust vents and open tanks at ARIA in Santa Clara, near the common border line of the defendant's and Gjovik's property. The exhaust vents were installed and maintained negligently, recklessly, and unskillfully. Apple exhausted through the vents and emptied various materials or substances into the open tanks that caused a foul, obnoxious, and disagreeable odor and polluted the atmosphere / ambient air of Gjovik's leasehold property.

295.    Apple's facility emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property and collect Gjovik's chattel property and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property. Apple created the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their business. The emissions were a business decision to be able to report reduced waste sent to landfills.

## XIV.    Count Six: IIED – Fear of Cancer

296.    Apple deliberately vented toxic, carcinogenic, and lethal substances into the ambient air around the Santa Clara Square Apartments where Gjovik lived in 2020. Apple's engaged in this conduct with reckless disregard for the injuries certain to be caused by that plan of conduct, and knowing people exactly like Gjovik would be exposed to its dangerous, toxic chemical fumes and vapors.

297.    Semiconductor fabrication, like what Apple is doing at ARIA, is an ultrahazardous activity and absolute nuisance when conducted next to homes due to the extremely toxic gases, reactive and pyrophoric gases, and the sheer quantity of dangers, toxic chemicals that are on site and in use for fabrication. Apple's conduct was also a nuisance to Gjovik, and Apple's exhaust trespassed into Gjovik's home, and assaulted Gjovik's body.

298.    Where there is not strict liability, Apple had a concrete, critical duty to warn those around the facility – but instead, Apple failed to file required permits, failed to properly characterize the facility, put no signs in front to designate the type of activity, filed only one TRI report, repeatedly tried to avoid filing spill/leak reports to CalOES, and also deliberately made false statements to conceal their actions.

299.    Apple's activities at ARIA violated rules, regulations, and statutes at local, state, and federal levels. Apple has already received notice of dozens of violations, now also including for illegal chemical emissions.

300.    Apple's unlawful and outrageous conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and negligent conduct exposed Gjovik to carcinogens, including TCE, Toluene, Arsine, and Vinyl Chloride.

301.    Apple intended to cause tenants at the Santa Clara Square Apartments distress and acted with reckless disregard for the probability that people like Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer, and Apple's conduct was a substantial factor in Gjovik's severe emotional distress.

302.    As a proximate result of the acts of the defendant, Gjovik suffered severe emotional distress, including the fear of developing cancer and other disease, and an increased risk of developing cancer and other disease. It is documented that Apple used and exhausted carcinogenic chemicals into the ambient air outside the Santa Clara Square Apartments. It is also documented by an industrial hygienist running a two-hour TO-17 that those same carcinogenic chemicals that Apple exhausted were also found in the indoor air of Gjovik's apartment. Gjovik was also able to capture evidence of some of the chemicals in her blood and urine. Gjovik was extensively exposed.

303.    This fear extended to her dog as well, a tiny eight-pound Chihuahua-mix who was also exposed to the semiconductor fabrication exhaust with Gjovik. Gjovik discusses this at every veterinarian appointment and always orders a full CBC and metabolic workup for him if she can afford it.

304.    Gjovik suffered a wide array of physical symptoms attributed to the toxic chemicals at Stewart 1 and ARIA, including spasms, nausea, hair loss, rashes, hives, burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. These physical manifestations of the injuries and exposure from dangerous carcinogenic chemicals establishes reasonable fear of future disease.

305.    Further, the fear and horror of personally being exposed to a cloud of poison gas or knowing

that family members have been exposed are absolute emotional trauma in its purest form.

306.    After Apple's injuries to Gjovik due to chemical exposure in 2020, Gjovik experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression, rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred, and damaged skin, hair loss, worsened asthma, and breathing troubles, etc.).

307.    This all occurred during Gjovik's 2L and 3L years of law school, causing her to suffer academically. Gjovik now also faces a significantly increased risk of contracting cancer and other disease in her lifetime. Further, after Apple's psychological and emotional injuries to Gjovik in 2020-2024, Gjovik now suffers from dramatically worsened anxiety, PTSD, and concentration issues – as well as new depression, insomnia, panic attacks, weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits, and moral injury.

308.    At the time of Apple's termination of Gjovik's employment on Sept. 9 2021, Gjovik still did not know Apple was responsible for what happened to her in 2020. Apple continued harassing and tormenting Gjovik despite and because of it prior to knowingly subjecting Gjovik to exposure to a highly toxic substance while purposefully concealing from Gjovik the serious injuries that might result from such exposure, and in reckless disregard of these risks.

309.    Gjovik's physical exposure to Apple's illegal semiconductor fabrication exhaust was unrelated to her employment and thus Worker's Compensation does not apply. Further, Apple was the operator in control of the facilities at ARIA during the pertinent times, and actions taken related to Apple's hazardous waste can be directly attributed to the corporation.

310.    Apple had knowledge and a reckless disregard for the fact that people just like Plaintiff would be injured by its illegal dumping. Defendant knew beyond speculation that people would be injured. This fab is across the street from these apartments – where every employee would see them, every day they're at work. Apple spent millions for this fab, entered a long-term lease, and RCRA papers are signed by the Apple CFO. Every time Apple vented its fab exhaust into the ambient air, Apple knew people just like the Plaintiff would be injured and would be deeply traumatized if and when they discovered what they were exposed to.

311.    Apple's employees and contractors have already revealed not only evidence of knowledge, but also gross recklessness – with one of their ACT Environmental contractors who was leading the hazardous waste disposal efforts in 2020 at the site, when Gjovik was doused in chemicals, bragging in his LinkedIn profile that during that time he found "innovative" ways to save Apple money on hazardous waste disposal. Meanwhile, Gjovik still has bald spots after Apple burned all of her hair off.

312.    Corporations who knowingly and intentionally dump hazardous waste or otherwise pollute the environment, violating environmental and safety laws, do so because the practice is less costly and more profitable than complying with the regulation.  Apple's intentional evasion of paying required fees and costs associated with proper hazardous waste management and disposal allow Apple to operate its research and development at a much lower cost than its competitors who do follow the law. In addition, Apple also recently launched a "zero waste" program where Apple purports to be diverting hazardous waste from landfills. Based on Apple's environmental reports, ARIA is responsible for around 30% of Apple's global corporate hazardous waste and at ARIA, Apple's diversions of waste from landfills includes mid-night dumping into apartments and creating toxic vapor clouds in public parks.

313.    Even worse, Apple also instituted an environment-social-governance ("ESG") modifier for executive pay (bonuses worth multi-millions of dollars) that can increase or decrease executive compensation 10% based on environmental and other practices. Apple's intentional environmental violations was not just to reduce costs required for properly disposing toxic waste, but Apple's midnight-dumping also to increased bonuses for their executives.

314.    Further, Apple's continued harassment of Plaintiff despite everything else that's happened, including her exposures, is sick and depraved. The amount of stress puts her even more at risk for cancer and disease, after she has already suffered great bodily injury from Apple's illegal conduct and emissions. Cal. HSC § 42400.1 Cal. Penal Code § 12022.7.

# LEGAL CLAIMS: OUTRAGEOUS CONDUCT

## XV.   Count Seven: IIED – Outrageous Conduct

315.    Apple's malicious, fraudulent, oppressive, and extreme/outrageous misconduct was directed primarily at Gjovik, and it was calculated to cause Gjovik severe emotional distress, and it was done with the knowledge of Gjovik's vulnerabilities and knowledge of Apple's power to harm Gjovik's interests, and done with a substantial certainty that Gjovik would suffer severe emotional injury. Apple's actions were outrageous (violations of civil laws) and outrageous per se (violation of penal laws).

316.    Numerous cases have held, and the Restatement emphasizes, that there are only a few categories of conduct where an employer may be found to have engaged in IIED, and most common are defamation – especially accusations of dishonestly and/or criminal conduct; denigration and humiliation; deranged harassment; and IIED used as a tool in the employer's cover-up of wrong doing. Calling the employee a liar, especially in retaliation for the employee making labor or whistleblower complaints, is one

of the few approved buckets for potential IIED claims.

317.    Apple's outrageous conduct with civil liability includes defamation, trade libel, fraud, invasion of privacy, tortious interference with business relationships, true threats, interference with the exercise of civil rights, discrimination based on sex, discrimination based on disability, and retaliation for conduct protected by statutes and the Constitution (*i.e.*, discrimination based on sex).  In addition to the tortious harassment, Apple engaged in many criminal acts which were "*outrageous per se*," including witness intimidation, witness retaliation, burglary, extortion, threats, and surveillance.

318.    From at least July 2021 through current day – Apple employees stalked, harassed, and tormented Gjovik with actions including repetitive, unwanted communications to Gjovik; making false accusations against Gjovik; gathering information about Gjovik; monitoring Gjovik's activities; harassing Gjovik's friends; and using threats and scare tactics to frighten Gjovik. Starting in Aug. 2021 and continuing to this day, hundreds of 'throwaway accounts' and other fake social media accounts posted about and to Gjovik, making statements that were threatening, intimidating, defamatory, insulting, and harassing.

319.    There was an extensive digital harassment campaign against Gjovik. Apple employees harassed Gjovik under their own names, and other posts were made by Apple employees using aliases, but their real identities were later revealed. The posts mostly focused around claiming Gjovik's claims against Apple were meritless, that Gjovik was committing perjury by reporting issues to the government, and that enforcement action needed to be taken against Gjovik.

320.    Starting in at least Sept. 2021, and assumed to continue through the current day, Apple employees undertook a 'whisper campaign' to smear Gjovik's character and create fear, uncertainty, and doubt about Gjovik's allegations against Apple. At least five named employees took an active role in posting defamatory and harassing things about Gjovik, contacting Gjovik's friends and associates to speak negatively about Gjovik and urge them to not associate with her, and to create negative rumors about Gjovik in order to ostracize and alienate her.

## I.    Vicarious Liability

321.    Vicarious liability can be established against employees employed with Apple at the time of the incident, under at least three theories: respondeat superior [Cal. Civ Code 2299, 2316], ratification [Cal. Civ Code 2307, 2310], and alter ego. Gjovik also argues outgrowth, customary incidents, benefits to employer, and risk inherent in the company's culture – all of which were reasonably foreseeable to Apple.

322.    The harassment was undertaken by many Apple employees, under their names and identifying as Apple employees. They also frequently branded the harassment as an Apple product of some

sort, for instance citing Apple products or themes in their fake screennames (for example, "*SquareinaRoundHole*" referencing the famous Apple commercial), designing threats modeled after Apple heritage (i.e., threatening employees that if they speak publicly about work conditions they will get "*Gjovik'd*" – an iteration on the phrase "Steve'd" referencing Steve Jobs' habit of abruptly firing people).

323.    Several employees who harassed her online did so prior to and after she was terminated, and as an outgrowth of either prior retaliatory harassment (see Messick, who also repeatedly threatened her with termination in retaliation for her speaking to the press about workplace safety at Apple prior to Gjovik being put on leave. He then took to social media to harass her after).

324.    Another one of these employees, Appleseed, was an Apple employee working in Apple's Global Security team through the end of Nov. 2021. This person repeatedly posted and shared that she had reported Gjovik and Gjovik's actions to "Apple," made accusations against Gjovik and in defense of Apple positioning herself as speaking for Apple, and also repeatedly held herself out as having insider information into Apple's retaliatory actions against Gjovik, including the termination. The function of the Global Security team is to silence workers from speaking publicly about Apple, and this person performed those duties in her harassment of Gjovik.

325.    In January-February 2022, Appleseed admitted to being in active contact with Apple and also Brad Reigel and Rob Marini, or a conduit to them. Vyas and Mondello also admitted to being friends with Faye Garfinkle, a best firend of Rob Marini ("*Little Gestapo*"). On February 22 2022, Appleseed posted on Twitter that Apple employees *"in [Apple] Global Security inform [her] when they see anything in reference to [her], or what reasonable seems like it is referencing [her]."* On January 31 2022, Appleseed sued Gjovik in a Washington state court requesting an anti-harassment restraining order.[58]   In February 2023, Appleseed admitted that Apple has provided her insider information about Okpo's investigation into her complaints and what his findings were.

326.    On September 9 2021, Appleseed posted on Twitter that Gjovik's NLRB charge would not be successful and that she had some type of insider information against Gjovik. Appleseed and Apple have confirmed that Appleseed filed a Business Conduct complaint against Gjovik on September 15 2021 which included private messages between Gjovik and Appleseed and which Appleseed later admitted "served no legal purpose." It is clear that Apple involved Appleseed in their fabrication of a paper trail on the same day

---

[58] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik,* 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

they sent Eberhart to harass Gjovik about the Face Gobbler.

327.    There were a number of 'fake' accounts created solely to harass and interact with Gjovik that knew way too much about Gjovik, too much about Apple's internal operations, and too much about the labor and environmental disputes. Gjovik quickly responded to them either as "Apple HR" or "Apple's lawyers". One of the accounts, Beezie, started harassing Gjovik in August 2021, taking an extremely personal interest in Gjovik's complaints about Apple, and sent Gjovik URLs to the EEOC website. Gjovik responded, *"you sure know a lot about employment law, Beezie."* The day Gjovik was fired, Beezie posted "*#ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit #coward,"* and then paid to 'promote' her Twitter post. (SAC ¶ 1052). (Note, a payment like that should be discoverable from Twitter).

328.    Around this time, a fake Twitter account called "Mel Nayer," which was clearly Apple and even referenced internal Apple tools, began replying to Gjovik's posts making threats and wild allegations. Nayer demanded Gjovik delete "*the work screenshots*" because "*lives are at risk*" and there were "*death threats.*" Nayer added, "*people at Apple have been fired for sharing less.*" The account claimed to be an Apple employee.

329.    The burner accounts (not representative of real people and created just to harass Gjovik) also showed Apple connections through their activity (for example several accounts were used solely to harass Gjovik and other Apple legal adversaries including Epic Games and Corellium).

330.    Many of the public forum posts about Gjovik were so hateful and vile, even the pro-Apple moderators were complaining the posts about Gjovik were *"full of toxicity"* and noted there were also a "*number of pretty unpleasant posts [about Gjovik that] [the public] cannot see as [Moderators] have removed them.*" [Sept. 11 2021 ]. Others also commented the digital harassment of Gjovik was "out of hand," the entire thread was "*people tearing this woman down,*" and "*Jesus I know you guys like your iPhone, but God damn.*" The harassing comments continued well past after Gjovik was fired and continued as long as Gjovik continued to pursue her charges against Apple.

331.    Apple knew Gjovik had been facing harassment from Appleseed and other Apple employees, and when Gjovik filed her January 2022 NLRB claim, she communicated to Apple to send a cease & desist to a number of employees illegally harassing her, including Appleseed, Ricky, and Shantini – and also asked Apple to get them to stop reporting her to law enforcement. This was around January 11 2022, which was followed by even more reports to law enforcement – including by someone in Germany. Gjovik's post asking Apple to stop the harassment was also a subject of the lawsuit, claiming it was illegal for her to post it.

332.    One of these employees, Ricky, was an Apple manager during the operative times, posted under their own name, and worked in a "security" function at Apple. Some of their posts included defending Apple's practices related to Gobbler. An Apple supervisor making public statements like this represents Apple by the nature of his role.

333.    While Appleseed apparently left Apple around December 2021, she informed Gjovik in January-February 2022 that she remained in contact with Apple, they spoke about Gjovik, and they were both trying to censor her social media posts. Appleseed repeatedly urged Gjovik to drop her allegations against Apple. Appleseed emailed Plaintiff on February 5 2022, harassing Gjovik claiming that Gjovik complaining about Apple's threats of violence against her, and complaining about Apple trying to make her suicidal, was "*harmful to Apple*" and Appleseed said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony.

334.    Gjovik complained about the harassment multiple times to Apple and Apple never did anything (that Gjovik is aware of) to try to stop or limit that harassment, and instead seemed to incite it further.  Apple was aware of the harassment and aware of the distress caused to Gjovik by it, through their surveillance of her online presence, of their own direct participation, the press 'asking for comment' on matters including the harassment, Apple's admitted "investigation" into Gjovik's social media in August-September 2021, employees filing complaints about things Gjovik complained about and/or about Gjovik, and a number of other supporting theories.

335.    One employee, Ian, was Gjovik's coworker who sat across the aisle from her at Stewart 1 but who was posting on several platforms under an alias. Gjovik did not connect the account to the person until 2023. The account made a number of posts accusing Gjovik of lying and being insane, claiming Gjovik's complaints were meritless, and holding himself out as having insider information about what happened with Gjovik's complaints. This employee sat in the same office as Powers and was likely directly involved, or overheard, numerous material conversations about Gjovik, and felt it appropriate to publicly harass Gjovik in response.

336.    There are other types of agency and liability. For example, one of Apple's four+ external counsel law firms hired to fight Plaintiff, MWE, was caught multiple times harassing Gjovik online and in real life. The firm filed notice of appearance on Gjovik's NLRB charges in August of 2021. In 2022, the firm somehow knew Appleseed sued Gjovik and quickly requested copies of the order against Gjovik and the entire case file for the matter. How did MWE know about it if they were not involved? How did MWE know

the lawsuit was based on Gjovik's NLRB charges against Apple? What did they plan to do with the records?

337.    The firm was also caught in 2023 using a fake Twitter account to harass Gjovik. The account called Gjovik a liar, repeatedly degraded her over the weight she gained during the trauma, and otherwise ridiculed her. Gjovik identified the account was associated with the unique name of one of the attorneys and also spent most of its time harassing Gjovik and unions which the firm, and specific lawyer, was hired to oppose in labor organizing. [See "Praveen"].

338.    The lawsuit filed against Gjovik on January 31 2022 was done so, admittedly in the petition and the TRO hearing testimony, because Gjovik filed an NLRB charge against Apple, because Gjovik claims she was retaliated against by Apple, and because Gjovik had complained about harassment from Apple Global Security, including Appleseed. Appleseed publicly posted she was in some sort of dire trouble with Apple in January 2022, and then after filing the lawsuit said the issues were resolved. The night after she filed the lawsuit, she posted a photo of her holding an Apple Global Security "challenge coin." Appleseed also repeatedly claimed some unnamed third-party told her to file the lawsuit. A few days later she also posted that she had personally never sued anyone – despite just suing Gjovik – which begs the question of who she was suing Gjovik for if it wasn't herself.

### J.    Excerpts of Harassment

339.    On September 1 2021, an Apple employee, Shantini wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator*. Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies*." Shantini's posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts, as well as named Apple employees and managers.

340.    On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB charge against Apple, suggesting she was lying. (The blog retracted nearly the majority of the post after Gjovik threatened to sue them for defamation and false light). The article included quotes from Shantini and Ricky. Ricky also shared Shantini's thread about Gjovik and Ricky stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple.

341.    Another one, Mel Nayer, tried to coerce Gjovik to delete the screenshots of internal documents she had posted, claiming the posts were leading to 'death threats' and proceeded to reference a number of internal Apple tools and systems. Another one, I'mPinkThereforeI'mSpam, posted, "*You'll never work as an attorney*," (post then liked by other anonymous account "BeezieWacks"), and added "*The nail that sticks out, gets hammered*."

342.    On September 8-10 2021, yet another one, "crissnovak," started posting about Gjovik on

Reddit, sharing a link to Shantini's Twitter posts harassing Gjovik about Gjovik's NLRB and US DOJ complaints, "*Shantini is my hero, best take on "A" with over 200+* ❤️*s. ALOT seem to agree: entitled, obnoxious, toxic, vindictive employee. To me, zero credibility. I would not even want to be on the same sidewalk with that.*" The same account posted on September 9 2021, "*Good riddance. They should have fired her weeks ago.*," "*Santa Clara University Law must be cringing.*" On September 10 2021, the account posted in a thread about Gjovik: "*The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help.*"  The same day the account posted about Gjovik: "*I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity.*"

343.     On September 11 2021 the crissnovak account posted, "*I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!*" Crissnovak then began threatening other Apple employees they may "*get Gjoviked!*" if they speak out.

344.     On September 13 2021, the crissnovak account posted on a thread about Gjovik: "*…. Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood…*" crissnovak sure knows a lot about employment law too. The account added that Gjovik was on the "*chubby side*" and had "*baby teeth lol.*"

345.     As a representation of the retaliatory animus of her managers (see, Neoform, her coworker sitting across the aisle from her at 825 Stewart Drive, seeing her manager every day and participating in conversations about Gjovik. Ian took to Twitter and other social media to harass and threaten Gjovik starting in August 2021 and continuing through fall of 2021). Ian's comments included statements like: "*Based on her writings and twitter feed, I would not be surprised in the least to learn she has some kind of psychosis,*" "*You think there are law firms that will want to hire her? She's toxic,*" "*Now Apple has fired her for supposedly 'leaking' insider information. A brief glance at her twitter feed can resolve the 'supposedly' part,*" "*She's entirely to blame for her firing,*" and "*Vexatious litigant incoming!*"

346.     Gjovik also received messages via the webform on her website, which allowed anonymous people to message her, though it recorded their IP addresses. Messages were often vulgar and offensive, and also sent from IP addresses flagged for spam and malicious conduct. Examples include: "*Cunt*" (9/12/21);

"*Nobody wants to see your nasty nudes. Next time use your work phone for work only you stupid moron*" (9/20/21); "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple. Matthew 5:38-42...*" (12/8/21); "*If only Steve Jobs were still around. He'd drag you ... out to the street by your hair and tell you ... to go work a corner. It's the only talent you'll ever have.*" (4/5/22). Whether or not Apple was behind the fake accounts, Apple fostered an environment where people were rewarded for harassing Gjovik, and ostracized and ridiculed if they supported her. Apple encouraged the abuse.

347.    An example of one of the more egregious digital threats includes, but is not at all limited to this post from Sept. 22 2021, which as published on a discussion thread linked to an article about Gjovik's NLRB charge against Apple's CEO Tim Cook for sending a threatening email to staff claiming any internal information is confidential:

> "I said it in the last thread about bad, criminal employees, and I'll say it again. It's time for Apple to take out the trash. Do whatever it takes to identify and catch the leakers and then ruin their lives. Fire them, prosecute and go after them. Do whatever it takes. Hunt them down like wild animals. Leakers and other activist employees who believe that they can do as they please have no business being at Apple. I want to see them gone and I want to see them destroyed. Trashy employees do not belong at Apple. And who is surprised that the leakers go running to the garbage site called the Verge? They already had one campaign that backfired on them when the lunatic woman leaker [Gjovik] was fired, now it is time to get rid of any remaining leakers and criminals. Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death and all Apple would need to do is to make it apply to corporations and not just nations… People just need to be optimistic and patient." (PacManDaddy, Reddit, Sept 22 2021).

348.    As Gjovik was fired, an account replied to one of Gjovik's posts saying, "*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" (Sept. 9 2021, "EarlyRiser").

349.    On Oct. 1 2021, another account later identified to be an account Apple created to harass Gjovik, commented on Gjovik's post about getting cut by the broken class in the box Apple mailed – asking Gjovik to post photos of her bloody wounds. The next day, on Oct. 2 2021, the account tried to convince Gjovik to allow it to remotely access Gjovik's computer and modify the configuration.

350.    Gjovik also received bizarre, hostile, and obscene messages sent to her via her websites contact webform. Someone sent Gjovik an email from an IP associated with Apple's first manufacturing plant in Fremont in which the person (self-named "The Messenger") warned Gjovik to drop her cases against Apple and justifies this with quotes from the Christian Bible. (Dec.8 2021, Weebly webform). The account complaints that Gjovik is retaliating against Apple.

351.    Social media post in thread about Gjovik: "*Tomorrow's headline: Apple Whistleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here)*" (Dec. 21 2021, now deleted Reddit user).

352.    On December 29, 2021, Appleseed messaged one of Gjovik's friends claiming Gjovik was "*perjuring herself.*" On December 30, 2021, Appleseed messaged once of Gjovik's friends saying Appleseed was "*one of Apple's witnesses against [Gjovik]*".

353.    On February 15, 2022, Appleseed submitted a statement to the Washington state courts saying she complained about Gjovik to the FBI and also to the Chief Security Officer of the National Labor Relations Board, the previous Chief of Physical Security at The White House and a Security Manager at the Department of Defense.[59]

354.    Appleseed sent Gjovik a lengthy email on February 5, 2022 (over 3,000 words) making false accusations against Gjovik, unlawful demands of Gjovik, threats against Gjovik and demanded Gjovik withdraw allegations and evidence about Appleseed from Gjovik's federal charges against Apple (charges about obstruction of justice & witness tampering). Appleseed in great hostility told Gjovik she believed one of Gjovik's SEC Whistleblower filings: "*contained absolutely no material information for shareholders.*" Appleseed informed Gjovik she reported Gjovik to the FBI, and also told Gjovik that she reported Gjovik to Apple for Gjovik complaining that Apple was trying to make her kill herself, and that Apple could have Gjovik assassinated, which Appleseed complained was "*extremely harmful*" to her and Apple.

355.    On February 5 2022, Appleseed posted on Twitter claiming the NLRB accused Gjovik of extortion and told Appleseed to report Gjovik to the FBI (which she also testified at the ex parte hearing on January 31 2022, and which the NLRB fervently denied) and Appleseed later blamed on an illegal drug relapse. In Appleseed's posts she mentions Gjovik is a federal witness. Appleseed then claimed "*multiple people*" were reporting Gjovik to Gjovik's law school at Santa Clara University and claimed "*the authorities had to get involved*" with Gjovik.

356.    Appleseed filed an FBI report against Gjovik charging Gjovik with "*criminal extortion and blackmail,*" and apparently reported Gjovik to a police department.[60] (mid-Jan 2022, Appleseed).

---

[59] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, (Vacated) King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

[60] *C.S. v Gjovik,* 22-2-03849-7 SEA, (Appeal of Court of Limited Jurisdiction – Reversed & Vacated), King County Superior Court, State of Washington (2022); *C.S. v Gjovik*, 22CIV01704KCX, King County District Court, Court of Limited Jurisdiction, State of Washington (2022).

357.    In the February 15, 2022, testimony Appleseed also claimed, without any evidence to support prima facie elements of the charges, that Gjovik committed "*criminal cyber-harassment, blackmail, and extortion.*" The majority of Appleseed's complaints in the lawsuit were arguments focused on a legal filing Gjovik submitted to the government including law enforcement, where she had gathered evidence of the harassment against her, alleging Apple was engaging in criminal conduct. Appleseed repeatedly demanded Gjovik alter, withdraw, and conceal this legal filing – and upon winning the first Court of Limited Jurisdiction hearing against Gjovik, then proceeded to report the federal legal filing to Gjovik's web server as "child porn."

358.    The Order prohibited Gjovik from speaking to anyone, even privately, about significant aspects of her litigation against Apple, and it had now become a crime to say/write the name of her office. (Note: Gjovik was certain Apple would use the Order to try to incarcerate Gjovik, and Gjovik did discover that Orrick – counsel here – employ a large number of prior Office of the Attorney General staff from state of Washington, including a prior AG. If Apple wanted to get Gjovik thrown in jail, they had the means to do so.

359.    Another account, FirstNameBunchofNumbers, started harassing Gjovik in 2022, primarily taunting Gjovik about the lawsuit filed against her. The account's profile photo was the docket for Appleseed's lawsuit against Gjovik, and the biography was "*Ashley is a bitch.*" Among other deranged posts, the account tagged Gjovik with a link to the California Moral Character exam and inquired if Gjovik will still be able to be a lawyer with this lawsuit against her. The account added an image of a smirking teenager.[61]

360.    The retaliatory lawsuit also was filed with the intention of preventing Gjovik from becoming a licensed attorney. Gjovik had a right to become an attorney and Apple egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Apple) harassed Gjovik about exactly this. The same account also posted about Plaintiff: "*honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*" and "*If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law.*"

361.    On April 17, 2022, a Telegraph profile was published about Gjovik titled "*Apple whistleblower*

---

[61] "*Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik. [Photo of young girl at computer drinking soda and smiling mischievously] link*: https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines" @FirstNa47437596 February 11 2022.

*Ashley Gjøvik:* '*My life is a goddamn nightmare now*'', and the reporter posted the article on Twitter. Appleseed and her friends then quickly replied to the post and 'quote-tweeted' the post making allegations against Gjovik, and making derogatory statements about Gjovik, and harassing the reporter for writing about Gjovik. After Appleseed's protest, The Telegraph changed the subtitle of the article about Gjovik from something positive to saying that what happened to Gjovik was the "*consequences of her actions."* If Gjovik complained, Appleseed could try to have Gjovik incarcerated.

362.    On June 8 2022, Appleseed ("SquareInARoundHole") edited Gjovik's Wikipedia article deleting over 8,000 characters and accusing Gjovik of "libel" based on Gjovik's accusations against Lisa Jackson and Ronald Sugar. (account confirmed by Wikipedia to be Appleseed, and had to be banned three times for vandalizing Gjovik's public article).

363.    On January 23 2023, after the retaliatory lawsuit against Gjovik was already dismissed and vacated, Appleseed then filed another document in which she accused Gjovik of a variety of torts (defamation, harassment) and criminal acts (criminal wiretapping, perjury), threatened to report Gjovik to the Bar Association, and threatened to sue Gjovik again. The next day Appleseed posted on Twitter about Gjovik, with some of the language as her legal filing*: "If you lack the moral fortitude to admit that you misrepresented, omitted, misquoted, or otherwise altered facts to exaggerate and fit a narrative… sincerely, don't bother engaging in the public space. You will eventually be hit with a boomerang of your own making."*

364.    On January 24 2023, Appleseed replied to the post above and added "*A YEAR OF THIS [EXPLETIVE] A YEARRRRRRRRRR".* (sic) Appleseed filed the lawsuit against Gjovik on January 31 2022 (a year prior) and was clearly referring to Gjovik and threatening her with being "*hit*" if she did not leave "*the public space.*"

365.    Appleseed harassed Gjovik on social media as well as many other mediums (Resp. Sup., ratification). The social media harassment started in late August and early 2021, while both were still employees at Apple. Appleseed's defamatory, intimidating, and harassing comments were posted publicly, and also sent privately to individuals who interacted with Gjovik and expressed support for Gjovik. Public posts usually were positioned as being based on some sort of inside information from Apple Global Security and/or HR ("I know something you don't"), and as if she was speaking on behalf of the company about Gjovik. The content also revolved around animus over Gjovik's NLRB and other government charges against Apple.

366.    In February 19 2023, Joanna Appleseed contacted Gjovik with an email saying she knows Gjovik does not "*wish to hear from [her]"* and then proceeded to make more accusations against Gjovik, and

compare their relationship to each other and Apple, to the movie "Annihilation."

367.    On March 2 2023 and for several days following, a Twitter account created specifically to interact with Gjovik about her claims about N-Methyl-2-pyrrolidone (NMP), "Sybil", replied repeatedly to her posts. Sybil repeatedly claimed NMP is completely safe, not banned, and that Gjovik was lying about the yellow clothes and rusty jeans, and it was occurring simply because Gjovik did not know how to do laundry properly. Even after blocking the NMP account, it continued to stalk Gjovik's posts and continue posting, next calling for Gjovik's account to be suspended due to supposedly spreading misinformation about NMP. Under information and belief, Sybil was Apple.

368.    On March 11 2023, a fake account ("Comrade Jones", sorry@butno.com) sent Gjovik an email claiming to be an ex-EPA compliance/enforcement employee. The account attempted to get Gjovik to stop talking about the vapor intrusion documentation for 825 Stewart Drive and tried to get Gjovik to stop talking about the NMP. The account made threats to intimidate Gjovik. The IP came from a location known for spam accounts. Under information and belief, "Comrade Jones" was Apple.

369.    On May 13 2023, Appleseed replied to her prior post ridiculing Gjovik with a new post that said "I'm a lawyer" with an image of a boy sticking a flute up his nose, implying that was Gjovik. Between on May 13 – 15 2023, Appleseed suddenly made around forty posts on Twitter that made negative remarks and allegations against Gjovik. Appleseed included Gjovik's name and other personally identifiable information in several of the posts and tagged Gjovik's acquaintances, and even included images of the documents in Appleseed's lawsuit against Gjovik so it was clear Appleseed was posting about Gjovik – and Appleseed also uploaded a video showing Appleseed cyberstalking Gjovik. Appleseed "tagged," among others, the Twitter accounts of the Washington state AG's office and US President Joe Biden.

370.    Throughout the May 13-15 2023 posts, Appleseed repeatedly referred to Gjovik as a "harasser", called Gjovik a "liar," and accused Gjovik of perjury and "fabricating evidence," committing fraud, and accused Gjovik of defamation, stalking, and harassment. Appleseed once again claimed Gjovik's pleas for Appleseed to stop harassing her was some sort of criminal act by Gjovik. Appleseed also began vaguely accusing an acquaintance of Gjovik of perjury, lying, harassment, and falsifying evidence.

371.    Appleseed posted that she had recently reported Gjovik to law enforcement and "*the proper authorities*," and the non-profit organizations EFF and ACLU, and invited any "*civil liberties group or attorneys*" to contact her about Gjovik. (May 13-15 2023, Twitter, Appleseed).

372.    On May 26-27 2023, Appleseed attempted to contact Gjovik through a third-party (a current Apple employee domiciled in another country) and conspired with him and attempted to get Gjovik on the

phone with her without Gjovik knowing it would be Appleseed on the other line. When Gjovik saw through the plan and complained to the third-party, that person explained Appleseed wanted to talk to Gjovik about Gjovik's evidence against

373.    Appleseed contacted one of Gjovik's friends via LinkedIn, identifying herself as "*Apple Global Security*," and trying to learn about Gjovik's "*friends or family*," claiming she wants to "*help*" Gjovik, and admitting she has been extensively cyberstalking Gjovik. (May 31 2023, LinkedIn, Appleseed).

### K.  Outrageous Per Se

374.    Apple mailed Gjovik a package with her personal effects from her desk, with a shipping notice on Sept. 29 2021. Gjovik asked on Twitter what they thought Apple was mailing her and one account, later revealed to clearly be associated with Apple public relations or global security, posted an image from a movie implying that Apple had mailed Gjovik the severed head of one of her loved ones.

375.    BabyHummingbird was the account who threatened Gjovik that Apple was mailing her a box with the severed head of one of her loved ones, but it really contained her possessions from her desk trashed and covered in glass shards, and a bug planted in one of her items of décor. 18 U.S. Code § 876. The account only posted to and about Gjovik, and its first "like" was an advertisement that read, "*Apple's back better than ever!*" BabyHummingbird also liked posts about Gjovik, including the "*don't get Gjovik'd*" posts.

376.    Apple broke / destroyed Gjovik's possessions from her desk and mailed them to her and/or packing Gjovik's items to ensure they are broken in transit (Gjovik received a box with rocks and broken glass on Sept. 30 2021). Inside the package, which arrived on Sept. 30 2021, planted inside one of her personal items (a gifted statue that says "sue the [expletive]!") was some sort of electronic device, assumably a listening device.

377.    There were three highly suspicious "call-drops" during phone calls at Gjovik's home over a period of ten days in 2022. They occurred at May 16 2022 at 6:29 PM PST, May 24 at 2:03 PM, May 26 at 1:59 PM. One of the calls was interstate, and another was international. The third call was with the Santa Clara County DA's office. These drops led Gjovik to discover hacking on her network on May 28 2022, and then the bugged objects in her home on May 29 2022, including the statue from her desk.

378.    Gjovik called the Santa Clara city police on May 31, 2022 [re: report 2205310079] to report the listening device Apple planted in her chattel property and the call drops, internet interference that led to her to search her items for bugs, and the attempted break-in. The police took possession of the statue. Gjovik later found her fake fig tree was also producing RF and EMF signals and threw it in the trash and complained on Twitter about it.

379. Gjovik contacted the FBI May 30 2022 to report hacking and the bugged object. The FBI agent she talked to advised Gjovik to give the object to the local police. Several hours later Gjovik heard someone trying to break into her apartment through the front door. Gjovik posted on Twitter about it, blaming Apple.

380. Apple stalked Gjovik in California and New York, sending people to sit outside her apartment, to follow her around, and take photos/videos of her inside her home from outside the windows. [Cal.Pen.C. §§ 647(h), 647(i)]. Apple repeatedly broke into Gjovik's home in at least the state of California. [Cal.Pen.C. §§ 459, 602.5].

381. Gjovik called the Santa Clara city police on August 9, 2022 [re: report 2208090087] to report Apple breaking into her attic and installing some sort of electronic equipment. After Gjovik reported the attic situation to law enforcement the police said they would come by the next day to create the report. Gjovik left her home to run an errand. When Gjovik returned, the day before the police were to arrive and search her attic, she found two signs that someone had broken into her apartment and entered the attic. First, her dog's belly smelled strongly of cigarettes despite him not leaving the apartment while she was gone and Gjovik not smoking cigarettes. After noticing the odor, Gjovik quickly inspected her closet where the entrance to the attic is and found attic insulation stuff on the floor despite having just vacuumed before she left. Under information and belief, Apple broke into Gjovik's apartment again, this time to retrieve whatever they installed in her attic, before law enforcement arrived.

382. Apple surveilled Gjovik and even bugged her property, including, apparently, directly intercepting her home internet. [Cal.Pen.C. §§ 591, 632(a)].

383. Apple trespassed on Gjovik's back porch in Boston, Massachusetts at some point between 1am and 7am before her first day of work at her new job (Sept. 28 2023), leaving the door wide open to show someone had been inside. (This never happened again after & Gjovik complained to Tim Cook about it when she filed this lawsuit).

## L.   Injuries and Impact

384. Apple's conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Apple's misconduct towards Gjovik was/is extreme, outrageous, persistent, and omnipresent. Apple's conduct left Gjovik fearing for her safety, her dog's safety, the integrity of her electronics and utilities, and the safety of her chattels – that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her house or even failing to secure entry to her home properly would place her in danger, and she could be killed. Gjovik was and is under a justified belief that leaving her

dog at home unattended could result in harm to her dog and that Apple could kill him.[62] Apple did handle him during one of the break-ins, leaving a strong odor of cigarettes on his little body.

385.    Apple could have acted with some decency and reserve. Still, instead, Apple bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, sued her for reporting criminal conduct, reported her to law enforcement, repeatedly threatened to "*ruin*" and "*destroy*" her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks. [18 USC § 912; April 2023; reported to FBI and U.S. EPA]

386.    When Gjovik explains to people what Apple has done to her when she shows them Apple's communications and exposure records and shows them the evidence she gathered of their physical intrusions and harassment, the default response is not simply to shake their heads with disappointment. No, it is to exclaim something such as "*Outrageous!!*"

387.    Further, these actions have caused fear in those around Gjovik and in Gjovik herself. Gjovik has lost many friends through this – and she cannot blame them as Apple's menacing is smoke from the fire of actionable threats of violence and mayhem. Apple's tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; Gjovik had financial and medical vulnerability; the conduct involved repeated, systemic actions and schemes; and the harm to Gjovik was the result of Apple's intentional malice, trickery, and deceit.

388.    As documented in legal filings, emails, doctor appointments, and therapy sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to the point of vomiting, extreme depression requiring anti-depressants due to suicidal ideation, and crying uncontrollably for hours every day. Gjovik suffers from paralyzing anxiety, and it has been difficult even to get up and walk around, with Gjovik generally spending all day in some form of the 'fetal position.' Gjovik has alternated between overeating and undereating but overall gained over sixty pounds in 2020-2022.

389.    Apple's conduct, of course, left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation.*" However, as a direct and proximate result of Apple's conduct, Gjovik also experienced overwhelming anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment.*" Apple's conduct resulted in PTSD and anxiety symptoms. Gjovik suffered

---

[62] ICAN, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

depersonalization and derealization.

390. On Dec. 26 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank and witness retaliation claim against Apple. On or around Jan. 10 2022, Gjovik filed complaints about witness intimidation and witness retaliation to U.S. NLRB, the U.S. Dept. of Labor, and the Cal. Dept. of Labor. Gjovik drafted several legal documents, including a legal brief, image exhibits, and a detailed dossier containing the accounts and posts Gjovik believed to be Apple.

391. On Jan. 25 2022, Gjovik emailed the U.S. NLRB about her Jan. 10, 2022, witness intimidation charge and attached a 77-page rough draft of the Evidence Report. On Jan. 31 2022, Gjovik posted on Twitter that she planned to submit her legal filings about witness intimidation to the US Dept. of Justice and the whistleblower and labor agencies. Gjovik commented that Apple's actions were criminal. Gjovik testified to the U.S. NLRB about it on Feb. 10, 2022. Gjovik also contacted the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on Feb. 21 2022, and Dec. 15 2022. Yet, Apple continued with the harassment, unphased.

392. Apple abused its position of power over Gjovik and exploited that power differential in its campaign of terror against Gjovik enlisting multiple employees and other agents to carry out their scheme. Apple has extreme power and control over Gjovik and its other employees as one of the world's largest and most influential companies. Apple's conduct was despicable, base, vile, and contemptible, and subjected Gjovik to cruel and unjust hardship. It was carried out with a willful and conscious disregard for Gjovik's rights and safety.

393. Through all this, Apple went out of its way to act like deranged maniacs whose conduct exceeded all bounds of decency usually tolerated by society. But this is not new for Apple. CNN described working at Apple as "*a brutal and unforgiving place*" and even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment.[63] A Gawker reporter described the culture of working at Apple as "*bullying, manipulation and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful,*" and "*deeply disturbing.*"[64]

## M. Statute of Limitations

394. The statute of limitations for IIED claims under California state law is two years from the date of injury and under New York state law it is one year from the act. Gjovik lived in California until Aug.

---

[63] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011.
[64] Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011.

31 2022 and then lived in the state of New York from Sept. 1 2022 up to the date the complaint was filed on Sept. 7 2023.

395.    The New York statute of limitations covers Gjovik's presence in New York from Sept. 7 2022 through Sept. 7 2023. The California statute of limitations cover's Gjovik's presence in California from Sept. 7 2021 through Sept. 1 2022.[65] Apple terminated Gjovik's employment on Sept. 9 2021 and thus only two days fall within this IIED claim's coverage,  and Gjovik's allegations in the claim do not include any employment actions or other conduct which would be subject to Worker's Compensation regulations.

# PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgment in her favor on each and every claim for relief set forth above and award its relief, including, but not limited to, the relief as follows:

    i.    A Judgment entered in her favor, and an award of damages in an amount to be determined at trial.

    ii.   Employee whistleblower's "make whole relief" with compensatory damages, including lost wages (back pay, lost benefits, lost bonuses and pay raises, lost stock grants and vesting, etc.). This should include a refund of Gjovik's use of Vacation and Sick days in response to Apple's misconduct and negligence, payment of those days, and removing negative records from her personnel file.

    iii.  Reinstatement of employment at a prior or higher level, with reestablishment of benefits and seniority, and promise of a respectful and health workplace. If that cannot be provided – then at least ten years of front-pay, or up to retirement age.

    iv.   Compensatory damages for pecuniary harm, including lost future wages, lost benefits, lower earning capacity, past and future medical expenses, counseling, medication, physical and digital security expenses, reputation management expenses, mental/emotional injury (PTSD, anxiety, depression, insomnia, disordered eating); property damage, degradation, and conversion; and moving costs to relocate.

    v.    Compensatory and special damages for non-pecuniary harm, including emotional distress, humiliation, loss of enjoyment, annoyance, discomfort, inconvenience, disfigurement, pain and suffering, mental anguish, and reputational harm. Gjovik now suffers from permanent psychological trauma and damage because of Gjovik's actions. Gjovik is entitled to compensation for any special

---

[65] Gjovik also reserves the right to claim IIED under Massachusetts law if Apple continues inflicting emotional distress upon her through the trial.

damages she suffered resulting from Apple's outrageous and defamatory acts.

vi.    Compensatory damages for the injury suffered to Gjovik's body, mind, and property by Apple's nuisances and ultrahazardous activities, including cost to replace clothing and other chattel property that were destroyed by Apple's tortfeasing. Costs for medical monitoring and medical intervention for any lifetime illnesses attributable to exposure to the chemicals Apple exposed her to.

vii.    Consequential, expectation, reliance damages, where applicable.

viii.    A civil penalty of $10,000 per employee for each violation of Cal.Lab.C. § 98.6 and § 1102.5. (If this request prevents other damages, this request may be waived).

ix.    Punitive damages for all available claims (*Tamney*, Cal.Lab.C § 1102.5, Nuisance, and IIED), with amount to be determined at trial.

x.    Declaratory relief stating Gjovik is a Crime Victim under federal and state law, so Gjovik can be afforded her relevant rights.

xi.    Litigation costs, expert witness fees, pro se attorney's fees, and other reasonable expenses. Pre-judgment and post-judgment interest.  Offset for tax bracket increase due to lump sum payment.

xii.    Where no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00 (or $2 or $3 where double or treble damages apply).

xiii.    Such other and further relief as the Court deems just and proper.


Plaintiff hereby requests a trial by jury on all issues so triable.

# CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Nov. 7 2024

Respectfully submitted,

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Physical Address**:
Boston, Massachusetts
**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816
**Email**: legal@ashleygjovik.com
**Phone**: (408) 883-4428