**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **ASHLEY M. GJOVIK,** *an individual*, | D.C. Case No. 3:23-CV-04597-EMC |
|  | Ninth Circuit Case No. 24-6058 |
| Plaintiff, |  |
| vs. | **PLAINTIFF'S FIFTH** |
|  | **AMENDED COMPLAINT** |
|  | **Nov. 20 2024, Abbreviated Version** |
| **APPLE INC.,** *a corporation, et al.,* | No substantive changes from Dkt. 128. |
| Defendant. | Claims: Civil Litigation |

1

# TABLE OF CONTENTS

2

TABLE OF CONTENTS ...................................................................................................II

3
4

SUMMARY OF THE CASE ................................................................................................1

5

JURISDICTION & VENUE ................................................................................................ 2

6

PARTIES ...................................................................................................................... 3

7

PROCEDURAL HISTORY .................................................................................................. 3

8
9

STATEMENT OF FACTS ................................................................................................... 4

10

LEGAL CLAIMS............................................................................................................ 41

11

    COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY............................ 43

12

    COUNT TWO: CAL. WHISTLEBLOWER PROTECTION ACT (CAL.LAB.C. § 1102.5) ............... 45

13

    COUNT THREE: CAL. LABOR CODE § 6310 ...................................................................... 47

14

    COUNT FOUR: CAL. LABOR CODE § 98.6 ......................................................................... 48

15

    COUNT FIVE: PRIVATE NUISANCE ...................................................................................51

16

    COUNT SIX: IIED – FEAR OF CANCER ............................................................................. 54

17

    COUNT SEVEN: IIED – OUTRAGEOUS CONDUCT................................................................ 58

18
19

PRAYER FOR RELIEF .................................................................................................... 74

20

CERTIFICATION AND CLOSING........................................................................................ 75

21

22

23

24

25

26

27

28

## Summary of the Case

1. This lawsuit arises from Apple Inc's (Defendant, or "Def.") reckless disregard of environmental regulations & safety requirements at two different Silicon Valley properties, & subsequent concealment of their unlawful acts & the extensive harm they caused.

2. In 2020, Apple severely injured & nearly killed Ashley Gjovik (Plaintiff, or "Pl.") with Apple's unlawful toxic waste dumping from a stealth semiconductor fabrication facility in Santa Clara, Cal. (Pl. did not discover that Apple was responsible for her injuries until 2023, but Apple is believed to have known by mid-2021). In 2021, Pl. also exposed that Apple was violating health, safety, & env. rules & regulations at her team's office located on a triple Superfund site in Sunnyvale, California ("the Triple Site").

3. Pl. filed env. & safety complaints & partnered with numerous gov. agencies to document & investigate the issues. Apple repeatedly made statements to Pl. instructing her not to talk to her coworkers or the gov. about her safety & compl. concerns, pressured her to not ask questions, prevented her from gathering evidence, & attempted to conceal their unlawful activities from her & from the government.

4. Apple mgmt. retaliated against Pl. as soon as Pl. started asking questions & expressing concerns, repeatedly said the retaliation was because of her safety & env. complaints, they incited & encouraged others to harass & intimidate Pl., & Apple took negative employment actions against Pl. in an attempt to coerce her to quit the company; but when she did not quit, Apple fired her.

5. Apple's explanation for terminating Pl. has changed multiple times, was not shared at all with Pl. until a week after her termination, & the proffered reason is pretextual but unlawful itself. Over three years later, Apple still has not disclosed who initiated the decision to terminate Pl.'s employment & has refused Pl.'s requests for them to provide this info.

6. During Apple's marathon of retaliation against Pl. in 2021, Pl. was in law school studying to become a human rights lawyer. She was in a unique position to effectively report serious env. & safety issues, & to lobby for general policy reform. Pl. utilized her knowledge, experience, & resources to confer with numerous gov. agencies, to meet with a variety of elected officials & their

1  staff, to publish op-eds calling for new legislation, was interviewed & written about by the press, &
2  served as a witness for gov. agencies & leg. committees.

3       7.    Pl. spoke out publicly, organized with her coworkers, lobbied on their behalf, & called for
4  systemic change with Apple's env. & labor practices. Pl.'s public advocacy also brought awareness
5  to her prior neighbors of the pollution issues where she had lived in 2020, leading to additional
6  chem. exposure victims coming forward & joining Pl. in complaining to the gov. & requesting help.

7       8.    In 2021, Pl. filed timely retaliation & discrim. complaints with multiple admin. agencies
8  including the U.S. NLRB, U.S. EEOC, U.S. DOL, Cal. DOL, & Cal. DFEH. The EEOC & DFEH
9  claims were merged into this civil lawsuit. The U.S. DOL whistleblower retaliation case is currently
10  with the Administrative Review Board. U.S. NLRB is actively prosecuting Apple over their
11  unlawful employment policies, per Pl.'s Oct. 2021 charge. NLRB will initiate prosecution
12  imminently against Apple for its retaliation & unfair labor practices committed against Pl.,
13  including suspending her & terminating her employment. [29 U.S. Code § 158].

14      9.    Over the last three years, due to Pl.'s investigations & advocacy, there have been multiple
15  gov. inspections of Apple's two facilities noted above, resulting in citations for env. & safety
16  regulatory violations, ordered corrective actions, & required monitoring. Pl. still speaks with the
17  U.S. EPA ("EPA") regularly as a community advocate about Apple & the two facilities. Apple
18  continued harassing & retaliating against Pl. after she was fired & through current day, intentionally
19  interfering with & severely damaging her career, reputation, relationships, finances, physical
20  condition, mental health, & just about every other aspect of her life.

21                          ᴊᴜʀɪsᴅɪᴄᴛɪᴏɴ & Vᴇɴᴜᴇ

22      10.   The U.S. Dist. Courts have diversity jurisdiction over this case because the amount in
23  controversy exceeds $75,000 & the parties are of diverse state citizenship. [28 U.S.C. § 1332].
24  When the complaint was filed, Pl. was domiciled in the state of NY & is now domiciled in the
25  Commonwealth of Massachusetts. Def. is a corporation hq'd in Cal. Venue is proper in Dist. Court
26  of Nor. Cal. because Apple is headquartered & operates in this district. Many of Pl.'s claims arose
27  from acts, omissions, & injuries within the Dist. of Nor. Cal. [Civil L.R. 3-5(b)].

28

1

**PARTIES**

2

3    11.  Ashley Gjovik, ("Pl."), is a natural person currently domiciled in Boston, Massachusetts.

4    Pl. holds a recently awarded Juris Doctor degree from Santa Clara University School of Law & is

5    appearing Pro Se. Pl. is a 38-year-old white woman with multiple disabilities including ADHD,

6    PTSD, anxiety, panic disorder, depression, & autism. Pl. was an employee of Apple Inc from Feb.

7    2015 through Sept. 2021.  Pl. held a leasehold at a Santa Clara residential property at 3255 Scott

8    Blvd, adjacent to Apple's semiconductor fab. at 3250 Scott Blvd in Feb. 2020 through Oct. 2020.

9    Pl. established a consulting LLC in Cal. in 2022, which she continues to manage with a virtual office
in Sacramento. The LLC address is used on papers for privacy.

10
11    12.  Apple Inc. is a business engaged in & affecting interstate commerce & a covered entity

12    under the federal statutes at issue here. Apple is a corporation hq'd at One Apple Park Way in

13    Cupertino, Cal. Apple says it "*designs, manufactures & markets smartphones, personal computers,*

14    *tablets, wearables & accessories, & sells a variety of related services.*" As of Nov. 2024, Apple Inc.

15    claimed a market cap of $3.4T & annual revenue of $394.33B. At all pertinent times, Apple was the

16    tenant & operator controlling the facilities at both 825 Stewart Dr. in Sunnyvale & 3250 Scott Blvd.

17    in Santa Clara, Cal. At both properties, Apple registered its state & federal RCRA activities under
its own name & with Apple EH&S as the contact for the gov. & public.

18
**PROCEDURAL HISTORY**

19

20    13.  Pl. now files her 5th Amended Complaint ("5-AC"), in an abbreviated version but with the

21    same substantive content as the prior 5-AC version. Pl. filed her original complaint on Sept. 7 2023.

22    The 1st Amended Complaint was filed in Oct. 2023 per stipulation, in order to allow Apple more

23    time to prepare, as needed due to Apple's delayed arrival in court. The 2nd Amended Complaint

24    was filed on Dec. 21 2023 as a matter of course but was dismissed sua sponte by this court without

25    prejudice & with leave to amend on Jan. 30 2024, ordering Pl. to reduce the complaint length by

26    over 500 pages. The 3rd Amended Complaint was filed on Feb. 27 2024, met with a Motion to

27    Dismiss & Motion to Strike, & was ruled upon with a decision & order issued May 20 2024. The

28    4th Amended Complaint was filed on June 18 2024, also met with Motions to Dismiss & Strike, &

was ruled upon with a decision & order issued Oct. 1 2024. Pl. was ordered to revise her complaint again.

14.   On Oct. 1 2024, Pl. filed an appeal to the 9th Circuit Court of Appeals, contesting denied injunctions, collateral orders, & the dismissal with prejudice of dozens of her claims mostly due to discretionary procedural reasons not related to the potential merit of the claims. Pl. filed a pending Motion to Stay pending appeal.

15.   If the 9th Circuit accepts the appeal, Pl. intends to appeal at least the dismissals of her claims for RICO §§ 1962(a) & 1962(d); RICO §§ 1962(c) & 1962(d); whistleblower retaliation under the Sarbanes–Oxley & Dodd-Frank Acts; violations of the Bane Civil Rights Act & the Ralph Civil Rights Act; Ultrahazardous Activities; Absolute Nuisance; Nuisance Per Se; Cal. Business & Professions Code §§ 17200 *et seq.*; Cal. Labor Code § 6399.7 & the "Right to Know" generally; Breach of the Implied Covenant of Good Faith & Fair Dealing; Negligent Infliction of Emotional Distress; IIED with a basis of defamation & accusations of dishonesty; retaliation for protected labor complaints about slavery, apartheid, genocide, & "Muslim human rights"; & whistleblower protection for protected disclosures about smuggling, violations of sanctions, violations of env. laws, federal crimes committed in furtherance of violations of env. laws, racketeering, & certain privacy invasions violating the Cal. Constitution.

## Statement of Facts

16. **Location 1: 3250 Scott Blvd, Santa Clara:** In early 2015, Apple started stealth semiconductor fabrication ("fab.") activities in a facility located at 3250 Scott Blvd. in Santa Clara, Cal.  Like some sort of skunkworks, Apple codenamed the facility "ARIA" & even tried to use the codename on regulatory paperwork.

17.   The ARIA fab. operated less than 300 ft from thousands of homes where Pl. lived in 2020 (Santa Clara Square Apartments, "SCSA"). Also within 300 ft from the building were two public parks (Creekside Park & Meadow Park), picnic tables, outdoor fitness stations, & a children's playground. Within 1000 ft of ARIA there was also a church, a school, elder care facility, & the San Tomas Aquino Creek & public trail. (the Creek flows to the SF Bay & then into the Pacific Ocean).

18.  Upon initiating operations at ARIA, Apple was quickly cited for building, env., health, safety, & fire code violations in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water into storm drains, fire code & Cal. ASPA violations, health & safety code violations, failure to properly monitor wastewater discharge), 2019 (wastewater testing violations), 2020 (fire code violations, using two EPA ID numbers, inaccurate hazmat inventory data, no spill plans or training, no business permit, no signature from supervisor on records, & failure to properly monitor wastewater discharge again).

19.  Apple intentionally vented its fab. exhaust, unabated, & consisting of toxic solvent vapors, gases, & fumes, into the ambient outdoor air. The factory was one story, while the apartments were four stories high, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows & the 'fresh air intake' vents.

20.  City Fire Dept. records for ARIA contain at least sixteen chem. spill/leak incident reports at ARIA within only three years. These incident reports included eight confirmed leaks/spills: leaks of phosphine & silane on June 1 2019; a phosphine leak on Oct. 21 2019; a Tetraethyl Orthosilicate ("TEOS") leak on July 17 2020; a major phosphine leak on April 30 2021; a 5% fluorine gas leak on April 18 2022, a Hexafluorobutadiene leak on May 29 2022, & leaks of two unnamed toxic gases on Sept. 20 2022 & Dec. 21 2022.  Further, later in 2021-2022, Apple reported to the gov. that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of VOCs & 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air around ARIA. In 2022, the EPA severely restricted the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under TSCA.

21.  Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring Dec. 14, 2020 – only after Pl. had notified Apple EH&S & env. legal about what occurred to her near ARIA. Apple also reported to the Bay Area Air Quality Management Boar, in difficult to find agency filings, that in at least 2019-2021, ARIA exhausted reportable amounts of mercury, arsenic, carbon monoxide, & formaldehyde into the ambient air around the factory.

22.  Apple's leaks, spills, & releases were not limited to the air. Apple's wastewater discharge

monitoring repeatedly showed the presence of heavy metals & organic solvents. In 2017, the gov. mandated testing revealed the presence of 29 µg/L of 1,1-Dichloropropane, 24 µg/L of Trichloroethylene ("TCE"), & 6.7 µg/L of Ethyl tertiary-butyl ether (ETBE). Among other issues, it's unclear why Apple had TCE on site but not in any of its chem. inventories, & then, in addition, why exactly Apple was pouring that TCE down the drain.

23.   ARIA reported an average daily water usage of around 44,000 gallons per day & the sewer pipes carrying ARIA's discharges flowed downhill & directly around the apartment where Pl. lived in 2020. In 2020, the gov. had already started investigating the plumbing at her apartment as a possible vector for some unknown solvent vapor pollution.

24.   Apple was fully aware of this facility & its operations, including the vast amount of haz. materials & haz. waste, as every year, Apple submitted a financial assurance document to the Santa Clara Fire Dept. which detailed haz. waste treatment & disposal operations, & was signed by Apple's CFO, Luca Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. Maestri was also on the email distribution list for notification of haz. waste violations at the facility.

25.   **Pl.'s Chemical Injuries in 2020:** In Feb. 2020, Pl. moved into a large, new apartment at the SCSA (adjacent to ARIA) & quickly became severely ill. Pl. suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, & strange sensations in her muscles & skin. Pl. also suffered bradycardia, volatile B.P. with hypertension & hypotension & a high frequency of premature ventricular contractions. From Feb. - Sept. 2020, Pl. was screened for multiple severe & fatal diseases & disorders, including M.S., brain tumors, deadly arrhythmias, & NMO – but instead, all of Pl.'s symptoms were consistent with chem. exposure. Due to the solvent exposure, Pl. also suffered skin rashes, burns, & hives, & her hair fell out & she had a shaved head for nearly a year as the bald patches slowly grew back.

26.   Due to the sudden illness, Pl. visited the E.R. on Feb. 13 2020, & Urgent Care (at AC Wellness, Apple's for-profit clinic) on Feb. 20 2020. Pl. subsequently consulted with dozens of dr.s, who screened her for all sorts of diseases, subjecting Pl. to extensive blood draws, urine samples, injections, & scans – including potentially dangerous procedures like MRI & CT scans with

1    contrast, of which Pl. had multiple. Pl. was too sick to work & went on disability.

2        27.   Pl. transitioned her medical care to a different clinic & provider after her Apple primary

3    care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure

4    to Apple's factory exhaust). Instead, she suggested Pl. could be suffering from anxiety, & enrolled

5    Pl. in an Apple internal user study related to B.P., requiring Pl. share her iPhone medical & fitness

6    data with Apple, & participate in weekly life coaching sessions (while being exposed to Apple's

7    solvent vapor & gas exhaust).

8        28.   While sick in 2020, Pl. would wake up occasionally at 3 AM feeling like she was dying &

9    with symptoms of heart failure & asphyxia. Heart monitoring showed arrhythmias, bradycardia, &

10   low B.P. On Sept. 2 2020, Pl. discovered elevated levels of volatile organic compounds ("VOCs")

11   in her home. What immediately captured Pl.'s attention was the large spike in VOCs had occurred

12   the night prior, around 3 AM, while she had been suffering from a "dying" spell.

13       29.   Pl. sought out multiple occupational & env. exposure dr.s, who told Pl. that all of her

14   symptoms were consistent with solvent & other chem. exposure. After Pl. discovered her medical

15   issues at the apartment were due to a chem. emergency, Pl. quickly filed complaints with Santa

16   Clara City HazMat / Fire Dept., Cal. EPA DTSC & BAAQMD, & EPA. She also called Poison

17   Control, who said what she described also sounded like Benzene exposure. (Note: Apple reported

18   it was exhausting benzene into the air).

19       30.   Notably, almost all of the reported toxic gas leaks during the time frames Pl. had complained

20   in 2020 that her symptoms seemed to always be the worst around 8-9 AM, 10-11 PM, & sometimes

21   around 2-3 AM. One of the few chem. spills that did not occur during those times was root caused

22   to an Apple engineer "accidently" turning on lethal fluorine gas. Similarly, another incident was

23   root caused to an Apple engineer accidently installing the gas for a tool "backwards." Less than 2

24   weeks following the April 2021 phosphine leak, Apple's manifests included 60lbs of "*vacuum filters*

25   *contaminated with glass dust*," implying there may have been a phosphine explosion.

26       31.   The TEOS leak occurred on July 17 2020. That day Pl. was suddenly covered in hives,

27   rashes, & skin abnormalities. She visited a dermatologist who had no idea what caused the rash.

28       32.   In Sept. 2020, Pl. hired an industrial hygienist to test the indoor air at her apartment. She

purchased an inspection, soil testing, & a two-hour sorbent tube-based TO-17 air panel. Only half the total contaminants were accounted for in the test & the Cal. EPA informed her that testing with Summa canisters for 24hrs is superior & would have yielded better results. Still, Pl.'s limited testing returned results showing a number of the chemicals in use by Apple at ARIA including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, & xylene.

33.  In Sept. 2020, Pl. set up additional air monitors to observe the levels of VOCs in her apartment next to the ARIA factory (though she was not aware of the factory exhaust at that time). The results of the data validated what Pl. had noticed with her symptoms & ad hoc testing – that the VOCs mostly spiked early in the morning & late at night as if they were being exhausted from an automated mechanical system (which it was). Pl. notified several Apple executives of her findings & activities, including her managers Powers & West, & her friends J.C. & A.A.

34.  In Sept. 2020, Pl.'s blood & urine medical tests returned results with industrial chemicals, including arsenic, mercury, toluene, & xylenes. Also noteworthy are the symptoms of Pl.'s 3 AM attacks, (including both subjective reporting & physical real-time heart monitoring) match phosphine & arsine gas exposure. Both phosphine & arsine are very dangerous, exposure can be fatal, & there are no antidotes. Apple has a significant quantity of arsine gas onsite, & Pl.'s medical tests from Sept. 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood with no other explanation than arsine gas exposure within the prior 8hrs.

35.  In Sept. 2020, Pl. noticed an Apple facility at ARIA. across the street, which was also on the Superfund groundwater plume. Pl. mentioned the facility to Apple on at least Sept. 8, 9, 10, & 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S (Elizabeth) & Pl. had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in SD01 & the activities at ARIA. In Sept. 2020, Elizabeth suggested that Pl. use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in Sept. 2021, Apple Employee Relations ("E.R."), Waibel, conferred with Elizabeth about Pl.'s env. concerns only hours before Pl. were abruptly terminated.

1    36.  In Oct. 2020, Pl. asked her manager from Apple Legal, Joyce, if she knew anyone who

2   practiced env. law because Pl. may be interested in the field & wanted to learn more. Pl. was

3   introduced to Deborah (D.R.), Apple's EH&S counsel. D.R. met with Pl. twice on a video chat, on

4   Nov. 2 2020 & Nov. 6 2020. Pl. spoke about her experience in 2020 & what she had learned about

5   remediation sites. During the conversation the lawyer admitted to Pl. that Apple did not have

6   EH&S counsel prior to her, that she was still catching up, that Apple needed to be doing inspections

7   & testing that it had not done, & she was trying to get them to start soon. D.R. was Apple's legal

8   representative with the EPA for the Aug. 2021 inspection of Pl.'s Superfund office. D.R. was & is

9   likely also in charge of EH&S legal matters for ARIA.

10    37.   On Feb. 21 2023, Pl. discovered the semiconductor fab. activities at ARIA. Pl. posted on

11   Twitter in real-time as she learned about it, expressing severe distress.

12   > APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM
13   > THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE
     > VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO
14   > THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." - @ashleygjovik
15   > (Feb. 21 2023 11:29 PM).

16    38.  Until that day, Pl. did not know it was Apple who was responsible for making her so ill in

17   2020. Further, until that day, Pl. did not know the chemicals she was exposed to in 2020 were

18   potentially lethal to human life.

19    39.  Pl. undertook months of research about ARIA, consulting with more experts, meeting with

20   gov. agencies, requesting more public records, & drafting a formal complaint. On June 23 2023, Pl.

21   filed complaints about ARIA to the EPA, CalEPA, the city of Santa Clara, & Santa Clara County.

22   Pl. drafted a 28-page memo with dozens of exhibits. Pl. also posted on Twitter that she did so &

23   provided a public link.

24    40.  A manager in EPA's Enf. & Compl. div. for Haz. Waste & Chemicals confirmed receipt on

25   June 20 2023 & told Pl. they were reviewing the complaint & documents she provided. She had a

26   call with the manager on June 21 2023. An inspector was assigned, & a formal investigation was

27   opened around July 12 2023. Pl. met with the EPA's RCRA Enf. & Compl. team several times before

28   they then inspected Apple's factory in Aug. 17 & 18 2023 & Jan. 16 2024. The Aug. 17, 2023

inspection was coded as an RCRA "*Compl. Evaluation Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all applicable RCRA Regulations & Permits*." The Jan. 16, 2024 inspection was coded as a "*Focused Compl. Inspection.*"

41.  Per the formal report, the EPA inspectors identified at least 19 unique violations of the RCRA at ARIA, including provisions with both civil & criminal enf. Apple was found to be illegally treating, storing, disposing, & transporting haz. waste without permits, manifests, or other required documentation. EPA also found Apple was emitting exhaust from its fab. activities through a system that did not have required permits & did not have any monitoring. The EPA also found Apple was storing haz. waste unlabeled & piled in corners, sometimes with lids left off containers so they do not explode, & failing to perform any inspections of the waste on weekends, & instead just hoping for the best until they return on Mondays. The enf. action(s) are still underway.

42.  Pl. started working on her first draft of the complaint in this instant civil lawsuit only on or around Aug. 16 2023 & filed suit on Sept. 7 2023, only two days prior to the statute of limitations expiration for her *Tamney* claim, & after only being able to spend roughly three weeks on research & drafting. Pl. also filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including Rule 2-1-301 failure to obtain "Authority to Construct" (Aug. 29 & Sept. 12 2024); Rule 2-1-302 failure to obtain a "Permit to Operate" (Aug. 29 & Sept. 12 2024); & Rule 9-7-307 for exceeding the "Final Emission Limits" for NOx & CO emissions. These latest citations establish that Apple was not only operating ARIA without required permits, but Apple was also illegally exhausting toxic chemicals.

**43.  Location 2: 825 Stewart Dr.:** Pl.'s Apple office at the time of her termination was located at 825 Stewart Dr. in Sunnyvale, Cal., also known as the "TRW Microwave" Superfund site, part of the EPA "Triple Site." The "Triple Site" is the collective name for three adjacent Superfund sites in Sunnyvale that have jointly contributed to a mile-long groundwater solvent plume. In addition, the *"Offsite Operable Unit"* is roughly a one-hundred-acre area of groundwater contamination from TRW Microwave. It "*includes four schools & over 1,000 residences.*"

44.  The "TRW Microwave" Superfund site is a former industrial semiconductor fab. & manufacturing facility at 825 Stewart Dr. ("SD01"). The primary contaminants in the groundwater

1   contamination plume are chlorinated VOCs, including the carcinogen TCE & its daughter products

2   cis-1,2-dichloroethene & vinyl chloride. The contaminated groundwater under 825 Stewart Dr. is

3   as shallow as only 2.6 feet below the ground surface, with shallow TCE concentrations up to 1,400

4   µg/L & vinyl chloride up to 51 µg/L.

5       45.   The Responsible Party under CERCLA, Northrop Grumman Co. ("NGC"), conducted an

6   initial vapor intrusion ("V.I.") evaluation at SD01 in 2003 & 2004, which indicated that TCE

7   concentrations in indoor air present an inhalation risk exceeding acceptable health & safety levels,

8   with results at 5.1 µg/m$^3$ & 5.2 µg/m$^3$ respectively.  Indoor air pollution due to V.I. worsened over

9   time, & indoor air concentrations increased to 7.7 µg/m$^3$ in 2013, the "accelerated action level" for

10  TCE in commercial buildings. [In 2024, the EPA proposed a full ban on TCE as a whole substance

11  in the U.S., prohibiting it under the TSCA as an unreasonable danger to human health).

12      46.  In May 2015, NGC installed a "sub-slab" ventilation system inside the building. (The

13  "slab" refers to the concrete foundation, & "sub-slab" is under the "slab.") NGC installed a

14  ventilation system, horizontal collection pipes beneath the slab foundation, which allows vapors to

15  move laterally, & connected the collection pipes to vertical vent risers that vent to the roof to

16  provide a preferred pathway for haz. waste vapors "*that allow sub-slab contaminant vapors to*

17  *discharge to the atmosphere.*" The risers vent to the rooftop via wind-powered turbines.

18      47.  Apple became a tenant in 2015. Apple's installation of a new HVAC system for the building

19  in late 2015 included Apple sawing the sub-slab exhaust vent stacks on the main building roof down

20  from three feet to one foot & then installing the HVAC system intakes in "*close proximity*" to the

21  sub-slab vapor exhaust vents, "*without consideration for the function of the [sub-slab] system vents &*

22  *their function*." The HVAC intakes for the area of the building where Pl. worked were in "*the*

23  *assumed sphere of influence*" of the vent exhaust, including the chemicals TCE & vinyl chloride.

24      48.  Apple's tampering with the exhaust stacks & indifference towards the exhaust's proximity

25  to HVAC intakes resulted in a significant risk of re-entrainment of the haz. waste vapors & gases

26  into the HVAC system, & thus into the indoor air of the building where Pl. & her coworkers would

27  be exposed. Cal.Lab.C. § 5143(a)(1) & § 5143(c)(1) prohibit the exhaust of gas & vapor in a way that

28  causes harmful exposure to employees. Cal.Lab.C. § 5154.1(e)(4)(d) requires that these types of

stacks exhaust upward from at least seven feet above the highest portion of the roof. Cal. Mechanical Code § 407.2.1 requires outdoor air intakes be placed at least 25 feet away from any "*exhaust outlets of ventilating systems… that may collect …. noxious fumes*." Apple constructed the HVAC intakes only ten feet away from the exhaust vents.

49.  In May 2015, NGC's V.I. testing at SD01 reported indoor air pollution of TCE, 1,2-DCE, toluene, chloroform, methylene chloride, & ethylbenzene.  From Dec. 2015 to Jan. 2016, Apple managed & submitted a second V.I. testing report to the EPA. Apple's Dec. 2015 V.I. testing results showed an increase in indoor air pollution & the sub-slab ventilation system compared to the May 2015 results. The highest indoor air reading of TCE doubled between May & Dec. 2015. In May 2015, it was 0.58 µg/m³, & the highest indoor air TCE reading in Dec. 2015 was 1.2 µg/m³. Apple's report also noted a "*noticeable increase*" of TCE, PCE, & chloroform in the sub-slab venting system, & high levels of toluene & ethylbenzene in the indoor air.  Apple moved employees in & never tested again.

50.  EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the EPA must be notified, consulted, & oversee the repairs & subsequent evaluation that the repairs were successful. Similarly, there is a public land use covenant attached to the property & that runs with the land, which instructs that major issues with the engineering controls & V.I. systems must be reported, & EPA must be consulted on the next steps.

**51.  Pl.'s Employment at Apple:** Pl. worked at Apple from 2015 to 2021. At the time of her termination, her title was Sr. Eng. Program Manager, & her base salary was $169,000 annually. In the last full year Pl. worked at Apple, her total annual W-2 compensation was $386,382. Pl. was the co-founder of a large women's community group at Apple. Pl. also worked in a rotation position within Apple's Legal Dept. in 2019-2020, primarily supporting the Gov. Affairs & Software Product Legal teams' efforts to establish Apple's first company-wide Artificial Intelligence Ethics & Social Responsibility policy.

52.  Pl. joined Apple on Feb. 23, 2015, as an Eng. Project Manager in the Software Project Mgmt. Office & worked in that Dept. until Jan. 2017. Pl. reported to several managers under the

1   same Director during this time. Pl. experienced severe harassment, discrim., bullying, & an

2   untenable hostile work environment during those two years, primarily from her coworkers, Rob

3   (R.M.) & Brad (B.R.). The director, Venkat (V.M.) repeatedly failed to correct their behavior.

4      53.   R.M. bragged that he was known to executives as their "*Little Gestapo*." He quickly made a

5   work tracking ticket titled "*Make Ashley's Life a Living Hell*," then assigned it to B.R. R.M. often

6   planned & orchestrated malicious schemes to harass Pl. & cause her distress, including getting

7   multiple members of the team to physically attack Pl., spreading rumors about Pl., secretly

8   recording Pl. & sharing recordings with their team, & frequently pressuring Pl. to drink hard alcohol

9   at work. R.M. often made cruel comments. He once noticed Pl. made a typo in an XML & told Pl.

10   that her mother should have had an abortion. Both R.M. & B.R. cursed at Pl., called her names, &

11   wrote harassing statements & nicknames on whiteboards about her.

12      54.   V.M. assigned Pl. to share an office with R.M. R.M. told Pl. in the first week that all of his

13   prior officemates either quit the company, left the country, or killed themselves. R.M. asked Pl.

14   which path she would choose. R.M. once told Pl. he targeted her with harassment & bullying

15   because she was '*joyful*,' & he wanted to '*extinguish*' her light.

16      55.   B.R. was an active police officer, had ammunition in his office, allegedly physically 'flipped

17   a table' in a meeting, & supposedly kept a gun in his car at times. B.R. once kept Pl. in a conference

18   room with the door closed & berated her for a prolonged period while she wept & begged him to

19   stop. He sometimes made 'joking' comments, like he'd 'smack her' if she did not do what he said.

20      56.   Pl.'s first manager, Linda (L.K.), tried to bribe Pl. in exchange for Pl. providing a positive

21   review to L.K.'s manager, V.M. Pl. reported it to V.M. & HR. When L.K. left the organization, Pl.

22   was transferred to report to B.R. Pl. attempted to move to a different team but was thwarted &

23   blocked by B.R., who provided negative feedback about her to the hiring manager & could not

24   explain why.

25      57.   Pl. was then transferred under Evan (E.B.) & Shandra (S.R.) (still in V.M.'s org.) to run a

26   program called "Early Field Failure Analysis" for new product launches, where she received very

27   positive feedback & praise until one specific field issue occurred & which led to a retaliatory

28   constructive termination. Pl.'s managers had become upset at Pl. because Pl. was earnestly trying

to investigate a trend of battery failures in the field, & Pl.'s managers preferred to "ignore it & hope it goes away" & told Pl. to also "ignore it," which Pl. refused to do. E.B. & S.R. told Pl. not to tell people why she was leaving their organization, with Rica saying she "*doesn't like people who talk shit*." This battery failure issue & Apple's resulting response would be publicly nicknamed "*Batterygate*." Over the last few years, Apple has been fined more than $600M over their conduct related to the *Batterygate* issues.

58.   Pl. joined Product Systems Quality in Hardware Eng. in Jan. 2017 after leaving Software Eng. org. Pl. now reported to Dan West (Sr. Director) & David Powers (Director) as a Sr. Eng. Program Manager & chief of staff. Both West & Powers engaged in harassing, discriminatory, & inappropriate conduct toward Pl. – including remarks & decisions that discriminated against Pl. based on sex, gender, & disability.

59.   In Dec. 2017, West also attempted to coerce Pl. to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Pl. complained then & later, in late 2020, West admitted it was "*one of the worst things [he's] ever done*." Other leaders in West's organization also discriminated against Pl., including John (J.B.), who frequently complained that Pl. was not married & did not have kids, & during company social events, often pressured Pl. to 'settle down' & 'have kids.' Pl. complained to J.B. & West about the statements, but J.B. persisted for years.

60.   While Pl.'s performance reviews were positive, outside the reviews Powers & West frequently gave Pl. 'feedback' like she was too 'emotional,' 'aggressive,' or 'expressive.' Pl. gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen & thank her for being honest with him – though generally continued with the same behavior. Powers did not respond well & frequently berated her. In two meetings, Powers unfairly criticized Pl. about issues where others were at fault & they harmed Pl., which made Pl. cry, & then Powers berated Pl. about her crying & demanded she stop, which made her cry more. She complained to West about this several times.

61.   Before Apple's unlawful actions towards Pl. in 2021, Pl. wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple

indefinitely if she could transfer to a better role (not in a hostile work environment like her current role). Pl. had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) & convince them to hire her upon graduation. She continued mentioning this plan into 2021.

62.    Meanwhile, Pl.'s supervisor, West, frustrated several of Pl.'s attempts to transfer to other Apple roles focused on law, legislation, & policy – including directly blocking an offer in Dec. 2020 for Pl. to work on Apple's implementation of circular economy legislation.

63.    Pl.'s Inquiries & Complaints

64.    On March 17, 2021, Pl.'s team admin. assistant sent an email on behalf of EH&S announcing to Pl. & Powers' mgmt. team that it would be testing SD01 for "V.I.," but said nothing more. Pl. replied & informed her coworkers that their office was a Superfund site on March 17 2021, providing a link to the EPA website for the site, & news articles referring to their office as a "*paved over environmental disaster zone*" due to the "*massive amounts of trichloroethylene in the soil & groundwater from nearly 30 years of chip manufacturing.*" Pl. explained to her team what V.I. means, told them to take it seriously, & expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Pl. added, *"The chemicals under [the SD01 office], if in high enough quantities, can cause cancer."*

65.    Pl.'s manager, Powers, immediately forwarded Pl.'s email to Human Resources ("H.R.") & West, complaining "I think Ashley should be keeping these emails private & not needlessly scaring the team about something she doesn't know about. I want to have a talk with her." Powers gave Pl. a 'warning' during their next 1:1 meeting & told her she is not allowed to talk about safety or toxic waste dumps with her coworkers. Things went downhill from there.

66.    Pl. asked in her email for details of what type of testing was to be performed & for what duration, if there would be a risk assessment, & if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Pl. to discuss her concerns.  Pl.'s coworkers thanked her for sharing this info. & informing them about the site. Two of Pl.'s friends, a manager & senior manager at Apple, texted her, affirming her concerns were reasonable & appropriate.

67.   One manager called the situation "*a really important life-threatening situation*," & another, after reviewing documentation for the site, questioned, "*Why is the building still open?*" One of the managers noted: "*What is crazy is … they say no daycare, no elder care, no residential, etc. So, it is fine & dandy for everyone else to get slowly poisoned? … So glad you are digging into this stuff for all of us.*" Around this time, Pl. also raised concerns about COVID-19 safety, wildfire smoke safety, Right to Know, Prop. 65, & Apple's reporting & tracking of injuries.

68.   On March 26, 2021, the SF Bay View newspaper published an article Pl. wrote about her chem. exposure experience with the air around ARIA. It was titled "*I thought I was dying: My apartment was built on toxic waste.*" It went 'viral' starting April 2 2021. More victims & witnesses promptly came forward after reading the article; some were also Apple employees.

69.   On April 5, 2021, Pl. told West about the other victims, & West warned her she was "*kicking a hornet's nest.*" West asked Pl. not to send info. about Pl.'s chem. exposure at her apartment next to ARIA to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*"

70.   In late March 2021, Pl. repeatedly raised concerns about the Superfund site to her supervisors. After reviewing hundreds of pages of documentation for the site, Pl. advised Apple that Apple had been negligent, that the site was not safe, & she complained Apple seemed unwilling to comply with CERCLA & health/safety regulations. She said she now believed her fainting spell in 2019 in her office was due to V.I. She was also shocked & distressed to see the 'hot spot' for the building was her desk with 1900 ug/m3 of TCE under the slab. Pl. connected the V.I. risk to a strange fainting spell she experienced at the office in Sept. of 2019. The only other time she felt a dizzy spell like that was when she was exposed to chemicals at her apartment. Pl. began complaining she was worried her 2019 fainting spell was due to V.I. at the office.

71.   Powers threatened her & ordered her to stop talking with her coworkers about her safety & env. concerns. He said she must believe whatever EH&S tells her. West first claimed the poisonous gas was sealed under the floor but, after learning the floor was cracked, told Pl. if she does not like her work conditions, she can leave her role & find a new job.

72.   On April 5 2021, Pl. notified the Director of Apple "AC Wellness" employee medical

Centers & Clinical Eng., that after her article was published, more people came forward from the apartments next to ARIA, reporting illness. "*Two are Apple employees. At least one went through AC Wellness, but no one could figure out what was wrong with them.*" Pl. suggested Akhtar direct the clinic to "*screen local folks*" with unexplained symptoms that match solvent exposure.

73.  Pl. emailed the EPA & CalEPA about the issues from Sept. 2020 through April 2021; many Apple leaders knew she did so. Starting in early 2021, Pl. also contacted & met with local, state, & federal politicians about what occurred to her next to ARIA – & Apple was aware of this. For example, Pl. met with Senator Bob Weickowski & his staff on April 7 2021. Pl. also met with Assembly Member Lee's staff once & Mayor Lisa Gillmor several times. On April 7 2021, Pl. told West about the meetings. On April 9 2021, Pl. contacted the County Dist. Attorney's office, talked to Bud Porter, Supervising Deputy Dist. Attorney for Environmental Crimes, & met with him on April 16 2021.

74.  Pl. was also meeting with the Cal. Dept. of Public Health's Environmental Health office where she was volunteering her time to assist in creating state-wide education resources for tenants & workers around chem. exposure from toxic waste dumps. Around this time Pl. was also meeting with a prior Silicon Valley mayor who has been involved in advocated for clean-up of Silicon Valley's toxic waste sites for decades. Pl. shared his analysis of the testing & concerns about the clean-up of the property where Pl. got sick with Mayor Gillmor & asked her for further investigation from the city.

75.  Pl. met with Apple EH&S on April 2 2021, May 17 2021, & July 7 2021. For some reason, E.R., Jenna Waibel, was also there. Waibel refused to tell Pl. why she was involved, as Powers had asked for E.R. assistance in trying to silence Pl. about Pl.'s concerns. Waibel & Polkes were texting & emailing about how to silence Pl. starting at least in early April 2021.

76.  In Feb. 2021, Pl. had completed her self-review for Apple's mid-year review cycle, however Powers never provided Pl. her review. Powers told his managers to complete their mid-year reviews with their teams in the spring but never mentioned it to Pl. Pl. also completed her annual performance self-review around June 2021, however, Powers never provided that review to her either. Apple has repeatedly refused to provide any discovery documents related to these reviews

1    and/or confirmation of their existence.

2    77.  Pl. asked questions to Apple EH&S about the status of the site & the rationale for certain

3    design & monitoring decisions. Pl. expressed that she was disappointed with some of the answers.

4    EH&S (Michael Stieger) told her Apple Legal & EH&S intentionally do not tell employees if they

5    work on Superfund site & admitted that Apple deliberately does not train workers about safety

6    procedures related to toxic waste exposure from clean-up sites. Pl. said that was both unsafe &

7    unwise. Pl. also complained that the prior testing used insufficient durations & methods, had

8    concerning results, there were known open risks for V.I. vectors (such as 'compromised' sub-slab

9    ports), & the land use covenant is outdated & requiring revision. Pl. complained that Apple should

10   have tested the indoor air more frequently than every six years.

11   78.  On April 11 2021, Pl. emailed Powers forwarding her emails with Steiger & Waibel about

12   "*compromised*" & "*missing*" sub-slab vents per the documentation, telling Powers,

13   > None of this sounds safe. Based on all this data, seems more likely that not that my
14   > fainting spell in Mike's office in 2019 was very likely related to the chemicals on this
15   > Superfund site. If not the TCE, PCE, or chloroform — then the levels of ethylbenzene
     > & Toluene exceeding max industrial limits in 2015 that no one seems to have ever
16   > followed up on.

17   79.  By April 14 2021, Powers became very hostile towards Pl. & was snapping at her meetings

18   to the extent one of Pl.'s coworkers witnessed it & confirmed it was not appropriate. Pl. then

19   complained to West about it, which resulted in the 'you can just quit if you don't like it'-type

20   response.

21   80.  On April 21 2021, Pl. complained to the Apple H.R. I&D team about disparate impact of

22   chem. exposure. Apple HR responded asking her to write a business proposal as to why Apple

23   should not poison Black people. Pl. then complained to a Sr. Director she was friends with, J.C.,

24   that Apple is acting very unethically, & she was deeply concerned. She told him someone needs to

25   straighten out Apple EH&S & legal about workplace safety & env. compl. matters.

26   81.  Pl. also contacted the EPA on April 22 2021, asking to consult with their manager for the

27   site & emailed back & forth with the EPA CERCLA & public relations teams from April through

28   Aug. 2021, & Apple knew she was doing so. The EPA directly notified Apple about Pl.'s outreach

1    around April 28 2021.

2        82.  In response to Pl.'s concerns & escalations, Powers & Waibel issued gag orders against Pl.

3    Waibel went so far as to provide Pl. with a five-point balancing test if Pl. wanted to make statements

4    about Superfund sites or workplace safety to her coworkers & ultimately told Pl. that there should

5    be no discussions about workplace safety with her coworkers. (In Sept. 2024, the NLRB issued a

6    decision of merit that there is substantial evidence that Waibel's 'five-point balancing test' violated

7    federal labor laws.)

8        83.  Pl. complained to a senior ethics leader at Apple & their friend, Dr. Cohen, that what Apple

9    was doing related to env. compl. & employee chem. exposure was "*morally wrong*," & Apple was

10   publicly misrepresenting their actual operations. Pl. also complained to a friend in Lisa Jackson's

11   Environmental lobbying team about what was going on at her office & complained Apple's public

12   statements seemed fraudulent, & her coworker agreed, saying: "*uhhh… I kind of feel the need to make*

13   *sure Lisa is aware. I'm about to present a proposal to several execs on an Environmental Justice program*

14   *& this kind of feels like not consistent with that.*"

15       84.  On April 29 2021, Pl. visited an occupational exposure dr. about her apparent chem.

16   exposure in the apartments next to Apple's ARIA factory & at the SD01 office. Pl.'s UCSF visit

17   notes summarized Pl.'s 2020 medical symptoms saying:

18       "She was experiencing severe dizzy spells, a large decrease in resting heart rate,
         palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of
19       breath, multiple growths (mole, polyp, nodules), nausea, paresthesia, blurry vision,
         abnormal vaginal bleeding, & swollen glands"…."there remains a concern about
20       potential pathways for residential exposures, & the county & State env. agencies should
         address these…. she also notes an unexplained episode of fainting at work in Sept 2019
21       at her office on a Superfund site with a long history of V.I. issues…"

22

23       85.  Pl. continued to attend medical appointments & comply with ordered testing & monitoring

24   in response to her injuries & illness in 2020 (due to the chem. exposure). On April 30 2021, she

25   went to Stanford Hospital for a CT Angio with & without contrast. She had been having

26   palpitations again, & on May 10 2021, told her manager, Powers, that her dr. said she needed

27   another echocardiogram to ensure the chem. exposure did not cause permanent injury to her heart.

28   On May 21 2021, she went to UCSF for a mammogram, with the order coded as testing in response

1   to industrial chem. exposure. Apple knew Pl. was extremely vulnerable.

2   86.   On May 17 2021, Pl. met with EH&S & Waibel again. They informed her they may not test
3   the indoor air now; they won't answer anymore of her safety or env. questions, & Steiger was
4   imminently & abruptly leaving Apple. Pl. became concerned about a cover-up & started
5   complaining about her meeting with the Apple EH&S lawyer in Nov. 2020, sharing with at least
6   one coworker that the lawyer had told her Apple had been negligent & needed to catch up on testing
7   & inspections. Pl. also reported this to Okpo in July 2021.

8   87.   Apple EH&S & E.R., Waibel, notified Pl. on June 2 2021, that the foundation of SD01 &
9   they need to repair it, & then after, they will test the air. Pl. told them they needed to notify the
10  EPA, have the EPA oversee the repair & testing plan, & test the air before & after the repairs. (EPA
11  later confirmed this). Apple refused & told Pl. they do not have to tell EPA anything; they will repair
12  the floor but will not provide details on how/when, & now they may not test the indoor air. Waibel
13  also responded by opening a non-consensual sexism investigation into Pl.'s bosses, where she did
14  not investigate anything but told at least three leaders that Pl. complained about them. She also
15  harassed Pl.'s friends & bullied Pl. to the extent that she repeatedly made Pl. cry in front of her.

16  88.   Waibel also told Pl. she had to submit an ADA accommodation request if Pl. did not want
17  to be exposed to the V.I., attempted to get Pl. to release all of her medical requests to Apple Inc., &
18  then suggested Def. get her an air purifier at her desk for the TCE. Pl. complained that ADA
19  accommodations are not supposed to be used for employees to ask their bosses not to poison them.
20  By July 2021, somehow Waibel even got ahold of a copy of Pl.'s May 2021 mammogram results.

21  89.   Pl. complained about Waibel in May & June 2021 to no avail & then began meeting with
22  Waibel's manager, Antonio Lagares, in mid-June 2021. Pl. complained that Apple was acting
23  insane, & if this is usually how Apple handles employee concerns, then Apple is lying to its
24  employees & the public that it acts in good faith. Lagares agreed with Pl. & said Apple's marketing
25  makes "*his job harder*." Pl. asked what type of issues his team would take seriously, & he responded
26  when managers "*send pics of their junk*." Pl. complained to Lagares that Waibel had already ruined
27  her career at Apple, that she was already constructively terminated by West, that Powers was
28  harassing her more than ever, & that he should have to investigate all of the terrible things Apple's

1   done to her for nearly seven years.

2      90.  On July 2 2021, E.R., Waibel, & EH&S notified Pl. via email that there were cracks in the
slab/floor of Pl.'s office & that they will be sealing the cracks, then testing the air. Pl. replied asking
if they can also test the air before sealing the cracks, explaining she wanted to know if she was
exposed to chemicals through the cracks & if so which ones, she said "*for cancer monitoring*." Waibel
told Pl. no – Apple will not test the air prior to repairing the floor.

      91.  Just two days earlier, on June 30 2021, Apple EH&S and/or legal filed the first & only TRI
filing to the EPA for air emissions at ARIA in 2020. It's unclear why Apple never submitted a TRI
filing prior to the 2020, or why Apple never submitted a TRI filing after the 2020 record. Under
info. & belief, the TRI filing was submitted in an effort to try to manufacture for Apple some sort
of statute of limitations excuse later, if Pl. ever found out what they did – without them having to
tell Pl. or share the info. in a way they thought she could find it.

      92.  In their final meeting about the site on July 7, 2021, Waibel & Steiger told Pl. that Stweart 1
is safe because they say it is safe, they still have no plans to test the air now, & they will not answer
any more of her questions about the site or workplace env. safety ever again.

      93.  In early July 2021, Pl. reported Apple's failure to notify & consult with the EPA about the
cracked slab to the EPA. Pl. notified Apple that she was snitching on them to EPA. Pl. also
complained to Lagares:

> "The only reason I can think of that they're refusing to do this testing after they
> previously planned on doing it, was that all the questions I was asking were very
> good questions & revealed major gaps/issues — so they're going out of their way to
> not have evidence of their negligence."

Pl. implored Lagares to look into EH&S's conduct, saying

> "I think everyone is forgetting I work in engineering & I am in law school. I know
> how toxic torts work…. right now, it feels like I am not only being harassed by my
> manager & my HR BP, but it appears there is a conspiracy to force me back into what
> appears to be a very physically unsafe office building."

      94.  In early July 2021, Pl. discovered that West had been reassigning her best projects (things
that would help her receive a positive review). Then on July 15 2021, Powers suddenly quadrupled
her workload with highly unfavorable projects (things that were certain to upset people & fail).

Powers was snapping at her & harassing her, West was ignoring her, & Pl. reported these issues to Lagares & Waibel & the H.R. B.P. Helen Polkes. Still, Apple did nothing, or they also harassed Pl.

95.   Pl. became more vocal about her concerns about systemic retaliation & fraud at Apple on Apple's Slack discussion tool & also began threatening Lagares that she planned to sue Apple for what they've done to her & that she is also talking to the press about Apple (specifically The NYT & Washington Post). This led Lagares to assign a new investigator (Ekelemchi Okpo) & open a new investigation into all of Pl.'s concerns going back to 2015.

96.   By late July 2021, Pl. was openly complaining on Slack, to reporters, with coworkers, & now also on Twitter about Apple's terrible behavior (including intimidation, retaliation, cover-ups, & fraud). Pl. complained about the Superfund & safety issues, Apple's offensive use of ADA accommodations, the persistent suggestion that she take FMLA leave in response to their harassment, Apple's illegal NDAs & gag orders, & Apple's antagonistic & obstinate attitude towards legitimate & important concerns. Pl. repeatedly told Lagares, Okpo, Waibel, & Polkes that she refused to take leave in response to retaliation & harassment; instead, they needed to actually fix the issues.

97.   Pl. had still been lobbying legislatures about the need for additional safety protections for workers & tenants on toxic dump sites. A state Senator told Pl. he would talk to CalEPA about her concerns. Pl. checked with his office for a status update on that conversation. On July 16 2021, the Senator's Leg. Dir. wrote to Pl. confirming & adding her concerns were shared even further, writing: "*I conveyed them myself on the Senator's behalf with the Govender's staff & leadership of both houses.*" On July 18 2021, Pl. had sent her weekly status to Powers & the mgmt. team & at the very bottom she added a little personal note that a state haz. waste bill she had been lobbying for passed & she was very excited about it. Powers became very upset & escalated the comment to E.R., Waibel, asking for guidance on how to 'coach' Pl. about it & ensure Pl. understand not to talk about such things in the workplace.

98.   Around July 20 2021, Pl. notified EPA about the cracked floor/slab at her Superfund office, & that Apple was insisting they do not have to tell the EPA & that they refuse to the test the air until after they seal the floor. Pl. expressed it was her understanding that Apple needed to notify

1   the EPA of the cracks & obtain EPA approval of a workplan for the testing & sealing plans.

2   99.   On July 21 2021, one of Pl.'s coworkers, a manager, contacted her privately & asked if she

3   was okay. He said he was worried because it seemed like things were tense with her & her position

4   in the team. Around July 21 2021, E.R., Okpo, started asking Pl. for the .eml version of files for

5   some especially damning emails with Pl. & her mgmt., assumably collecting evidence in preparation

6   for Pl. suing them, which she had already began threatening to do. Around July 23 2021, Pl. spoke

7   on the phone with one of the only two women who ever reported to West at Apple, & who had quit

8   Apple due to the harassment she faced from West & his team. She validated Pl., confirming she

9   reported many of the same issues that Pl. had been reporting, & that West & his mgmt., or H.R.,

10  had done nothing to actually fix the issues.

11  100. On July 23 2021, Pl. was quoted by the NYT, where she criticized Apple's COVID-19

12  response. On July 24, 2021, NYT made Pl.'s quote "*Quotation of the Day*" for the entire NYT.

13  Lagares expressed to Pl. that Apple was upset that Pl. did this. Pl. told Lagares she was taking Labor

14  Law & learned she could speak about her work conditions regardless of NDAs. Lagares told her it

15  is "*annoying*" to Apple when employees "*figure that out.*"

16  101. Apple & NGC were notified on July 26 2021 that EPA wanted an inspection of SD01 due

17  to Pl.'s reports about the cracked slab & Apple's obstinate & obstructive response; & because EPA

18  discovered what Apple did with the hacksaw, vents, & HVAC on the roof of SD01 in 2015, with the

19  EPA QA team exclaiming it was "*not appropriate*" & asking for air samples.

20  102. On July 26 2021, Pl. posted on Apple's Slack complaining that Apple's response to her

21  concerns was to retaliate against her & intimidate her into silence. Pl. asked if anyone else had been

22  retaliated against for raising concerns. Many of Pl.'s coworkers responded that they had also

23  experienced retaliation from Apple for raising real & reasonable concerns. On July 27 2021, Okpo

24  then swiftly interrogated Pl. for over an hour about her Slack posts & the responses she received

25  from coworkers – repeatedly asking her to stop posting about her concerns & to stop encouraging

26  other employees to post their concerns, & instead to direct all employees to speak privately. Pl. told

27  him no. she would not help him retaliate against her coworkers. Okpo said he was "notified" about

28  Pl.'s posts & Pl. expressed concern as to who all was spying on her.

1    103. During the July 27 2021 meeting, Okpo said Apple may give Pl. a severance ("exit")

2    package of around $600,000 if Pl. would sign a preemptive litigation waiver. Apple agreed Pl. would

3    not have to sign another NDA but did make the severance negotiation contingent on Pl. executing

4    a waiver of all claims, while Apple concurrently intentionally concealed material facts about harm

5    Apple caused to Pl. through chem. exposure at her office & her apartment. Pl. expressed concerns

6    about the settlement amount & her potential medical costs if she were to get cancer from the

7    exposure at her office, not even yet knowing about the ARIA facility or what Apple did to the HVAC

8    at SD01. Apple wanted all claims waived & denied the severance on those conditions, violating Cal.

9    Gov't Code § 12964.5(a).

10    104. On July 27 2021, a non-profit organization asked Pl. to testify as a witness to state Senator

11    Dave Cortese about her experience with haz. waste clean-up sites in Santa Clara County, & Pl.

12    accepted.

13    105. On July 28 2021, Pl. emailed Okpo & Lagares about her discussions with coworkers, & she

14    discovered a pattern of discrim. & harassment issues across Apple; & what appeared to be systemic

15    cover-ups of those issues instead of actually resolving the problems. She complained Apple

16    fraudulently holds itself out publicly as caring about human rights & the law. It was clear to Pl. that

17    Okpo would not investigate in good faith & Apple was still trying to get her to quit or else would

18    fire her, & she began fervently complaining about their bad faith behavior & culture of intimidation.

19    106. On July 28 2021, Pl. messaged a coworker (a manager) saying she had just met with E.R.,

20    Okpo, & asked for a "citizen oversight type role" to help reform Apple's HR practices. She said

21    Okpo told her, sure, but that she has to stay in her same role. Pl. wrote: "*I hit my desk hard enough*

22    *gesticulating & screaming that I spilled coffee on everything, but I have no regrets…*" & "*… I looked him*

23    *dead in the eye & said YOU CAN'T HEAL IN THE SAME ENV[IRONMENT] YOU ARE*

24    *HARMED IN*." The next time Okpo met with Pl., on July 29 2021, he asked her if she wanted to

25    have a lawyer attend to represent her during their conversations. Apple was on notice of incoming

26    litigation from Pl. by July 2021. On July 30 2021, Pl. posted on Twitter complaining about Apple:

27             "They offered EAP & suggested medical leave after I spoke up about sexism,
              discrim., & a hostile work environment. They also suggested requesting ADA
28             disability accommodations after I raised concerns about unsafe work conditions."

After posting this, ex-Apple employees contacted Pl. to share they had similar experiences. Other Big Tech & ex-Apple employees supported Pl. for speaking out, sending her many encouraging & grateful messages & comments. Pl. then decided to start sharing more of what was happening between her & Apple on social media to help others understand the issues so they could advocate for the employees, hoping it may pressure Apple to act more reasonably. On July 30 2021, Pl. posted on Apple's Slack discussion tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, & cover-ups. Around this time, Pl. created a new, private Slack group for her coworkers to discuss concerns about Apple retaliating against them for raising concerns, but with more privacy due to fear of more retaliation. Many women asked to join the group, & they had just started a discussion.

107. On Aug. 2 2021, out of frustration with Okpo & Lagares refusing to re-investigate anything Waibel said was fine during the first (sham) investigation – Pl. proceeded to start posting on Twitter about several of the more minor things she complained to Waibel about. She told Okpo & Lagares that it was work conditions, & they claimed they investigated & found no problems, so she is free to talk about it & she would do so. Pl. posted several examples of the evidence on Twitter, & her posts quickly went viral.

108. In response, on Aug. 2 2021, Apple suddenly announced they were conducting extensive maintenance at SD01 starting on Aug. 4 2021. Then, on Aug. 3 2021, Lisa Jackson's team scheduled a Public Relations blitz about how safe & thoughtful Apple is, actually. Apple also attempted to make the EPA sign a four-page single-spaced NDA about the inspection of SD01 that would prohibit the EPA from speaking about the inspection. The EPA declined to sign the NDA.

109. When Pl. saw Apple's EH&S notice on Aug. 2 2021 about maintenance at SD01, she quickly arranged for coworkers in the office to gather evidence of the cracks, warning them that Apple was trying to cover up env. & safety issues. Pl.'s coworkers gathered photos of the cracks for Pl. on Aug. 3 2021 & the morning of Aug. 4 2021. They also asked many of the same questions Pl. had asked EH&S. Pl. shared EH&S's responses, & they were concerned about Apple's position & conduct. Pl. informed Apple she & her coworkers were gathering evidence before Apple could cover up the cracks.

1    110. On Aug. 4 2021, Okpo immediately forced Pl. on indefinite admin. leave & refused to
2    provide any ETA for the next steps. Okpo informed her Apple removed her "*from the workplace &*
3    *all workplace interactions*." Pl. was very upset & protested, arguing she just wanted to stop
4    interactions with West & Powers while Okpo investigated because of the work assignment changes
5    & harassment. Pl. also complained that it was illegal for them to tell her to stop talking to her
6    coworkers.  Okpo made it clear he also wanted her off Slack. Pl. told Okpo he could not keep her
7    off Twitter. Pl. set her out of the office to say Apple put her on indefinite admin. leave & told her to
8    stay off Slack. She also posted a message on Slack about it.

9    111. On Aug. 4 2021, a reporter at an online blog contacted Pl. after Pl.'s coworkers told the
10   reporter what Pl. had posted. The reporter wanted to write an article about what Apple did to Pl.
11   Pl. agreed to let her write an article about Pl. being put on leave. Pl. also posted on Twitter about it
12   herself, & additional outlets picked up the story.   Within hours, it was covered in the news
13   worldwide. Okpo sent Pl. several bitter emails about her continuing to speak out. He was clearly
14   reading the news articles & her Twitter posts complaining about Apple's conduct. Pl. made three
15   Twitter posts about the situation on Aug. 4 2021. The first post was at 1:16 PM PST. Pl. wrote:
16        "So, following raising concerns to #Apple about #sexism, #hostileworkenvironment, &
          #unsafeworkconditions, I am now on indefinite paid admin. leave per #Apple E.R., while
17        they investigate my concerns. This seems to include me not using Apple's internal Slack."

18   The second post was at 2:12 PM PST. Pl. wrote,
19        "#Apple employee relation's 1st #sexism investigation only arose while I was complaining
          about unsafe work conditions & related #intimidation. They tried to quickly brush me off
20        & prevented me from raising more concerns. This time, I gave them 558 pieces of
21        evidence to review."

22   Pl.'s third Twitter post was at 2:33 PM & said,
23        "When I say "unsafe #workconditions," I mean physically unsafe; #dangerous chemicals;
          #OSHA. You will hear much more about this in a bit."
24
25   112. Apple responded to the media by repeating the same statement over & over: "We are & have
26   always been deeply committed to creating & maintaining a positive & inclusive workplace. We take
27   all concerns seriously & thoroughly investigate whenever a concern is raised; out of respect for the
28   privacy of any individuals involved, we do not discuss specific employee matters."

113. Starting on Aug. 4 2021, Pl. began receiving harassing & threatening replies & comments from clearly fake social media accounts. On Aug. 4 2021, one account posted about Pl., that she: "*needs psychiatric help & confinement*" & that Pl. "*is a psychopath & frankly is a danger to other Apple Employees*!" The account went on to call Pl. an "*ambulance chasing psychopath*" & said, "*Apple needs to bring the hammer & make an example of people like this.*" Thousands of posts like this followed & continue to this day – causing Pl. severe distress.

114. The night after Pl. was stuck on leave, West suddenly scheduled meetings with Pl.'s women's group. Pl. also heard conversations within her team that confirmed she would be fired soon. Starting around Aug. 5 2021, the managers in West's organization started raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers told the workers that if anyone has concerns about the "*Ashley Issue,*" they should talk to HR. They also mentioned West's plans to "*discuss the Ashley Issue*" at the upcoming Oct. All Hands. Pl. realized they would not be discussing the "*Ashley Issue*" at a future All Hands if she was there, & West was already sure Pl. was about to be fired. One of her friends who was a manager in West's org. told her all of the managers were instructed to not to write anything down about employee issues, because he said, they said, Pl. did such a good job of documenting her conflict with them & they're in trouble.

115. Pl. saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: Aug. 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29; & Sept. 3, 4, 5 2021. When the EPA inspected, they noted "*freshly sealed cracks.*" On Aug. 9 2021, the EPA sent travel approval requests to visit Pl.'s office, & the justification for the visit cited Pl.'s disclosures. The EPA's justification for the inspection was:

> "A site visit to an Apple office building is necessary to conduct a visual inspection of the building's V.I. mitigation measures. An Apple employee recently contacted EPA & notified EPA that there were cracks in the building's foundation. If true & cracks are significant, this could impact the effectiveness of the VI mitigation system & the protectiveness of human health."

116. On Aug. 12 2021 & Aug. 13 2021, Pl. filed complaints with U.S. EEOC & Cal. DFEH. In Aug., Pl. also shared concerns on social media & with the press, including experiences with her team in 2015, what Apple did to her around Batterygate & related harassment, & her concerns about

Apple's long history of criminal & corrupt behavior. On Aug. 17, 2021, Business Insider published an article about some of Pl.'s complaints based on Pl.'s Twitter posts & embedded Pl.'s Twitter posts in the article. The article also noted: "*Insider approached Apple for comment.*" On Aug. 15 2021, Pl. posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, & Mayors about her chem. exposure.

117. Between Aug. 16 2021 through Aug. 23 2021, Okpo sent a first draft of an "Issue Confirmation" document that supposedly captured all of Pl.'s complaints that he was investigating, & Pl. revised it & sent him a final revised version on Aug. 23 2021. Starting Aug. 17 2021, Pl. insisted that all communication with Okpo & Apple be in writing because he repeatedly misrepresented her statements. Okpo ignored her.

118. On Aug. 19 2021, the EPA conducted an onsite inspection of Pl.'s Apple office due to Pl.'s complaints to the EPA. EPA's notes from the Aug. 19 2021 site visit & inspection included concerns & issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, & lack of documentation for slab/crack inspections.

119. Pl. had previously registered for a three-part training about racial justice with Apple University & wanted to attend. The class was led by her friend Dr. Cohen, & he confirmed he was happy to have her attend as long as E.R. approved & did not discipline her for attending. Pl. texted with a coworker on Lisa Jackson's team expressing concern that Okpo might not let her go, but joked "*I think it would be extra fun for the evidence for the judge if they try to prohibit me from participating in social justice initiatives with an invite confirmed from our Chief Ethics officer.*"

120. On Aug. 20, 2021, Okpo told Pl. that she was not allowed to participate in the racial justice workshop "*because she's on leave.*" Pl. complained about retaliation. While Pl. was stuck on leave, she repeatedly asked Okpo for updates about her office, but he refused to provide any updates. Pl. often complained about retaliation & that she did not want to be on leave, but Okpo ignored her. Pl. also filed a Business Conduct complaint about her concerns about Ronald Sugar, TRW Microwave, & her office. She attached the Issue Confirmation & notified Okpo of the ticket. Pl.'s 33-page version of the Issue Confirmation included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest,

racketeering, & env. crimes.

121. Pl. complained about Apple EH&S & E.R. conduct related to the env. issues at her office, referring to their activities as "*negligent, reckless,*" that they "*misrepresented their activities,*" & that they "*intimidated [her] not to speak out about [her] safety concerns.*" Finally, Pl. links to evidence to support her claims (EPA websites), the policies she is asking if Apple is in compl. with (Apple's Audit & Finance Committee Charter, Corporate Governance Guidelines), & an Apple Press Release about Sugar joining the Board of Directors in 2010.

122. On Aug. 23 2021, EPA CERCLA Quality Assurance captured notes about the inspection, writing: "Significant, visible slab cracks, gaps, & penetrations had been sealed… However, large test equipment is bolted to the slab, & it is unclear if these installations penetrate the slab." He added that related to the sub-slab exhaust on the roof above Pl.'s desk, "vapors could be building up on the roof near the HVAC intake."

123. On Aug. 23 2021, a news article discussing Apple's employment practices commented that: "*One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual admin. leave.*" On Aug. 26 2021, Pl. filed an NLRB charge against Apple & posted on Twitter that she did so. On Aug. 27 2021, Apple's Business Conduct team closed Pl.'s complaint about Ronald Sugar & Pl.'s Superfund office. The message posted said: "…*we have shared them with the appropriate internal teams for review & investigation,*" with the ticket updated to say, "*Request is closed. This request is closed & can't be reopened.*"

124. On Aug. 29 2021, Pl. filed a formal complaint to the EPA about Apple & her office at SD01, complaining of Apple's "lack of due diligence," complaining about "*negligence,*" & "*recklessness,*" & "*violations of Right to Know & OSHA.*" Pl. complained, "*Apple's response has been to misrepresent their activities & the site, intimidate me to not speak about workplace safety concerns related to the site, & have refused to notify the EPA of changed circumstances at the site.*" Pl. did not know about the EPA safety inspection ten days prior.

125. On Aug. 29 2021, at 11:32 AM PST, Pl. filed a W.P.P. complaint with the US Dept. of Labor (DOL), reference number ECN76833. On Aug. 29 2021, Pl. filed retaliation & labor code violation

charges to the Cal. DOL. On Sept. 1 2021, Pl. posted on Twitter that she had filed a complaint with the Cal. DOL. A question on the form asked: How did your employer know about the protected right you exercised? Pl. wrote, *"I kept saying, 'Stop it, you guys. There's Labor laws about this."*

126. While Pl. was stuck on leave, Apple had emailed her three times to ask if they may capture three-dimensional scans of her ears & ear canals, & Pl. complained that Apple's requests were harassing & invasive. Pl. complained that Apple frequently requested that Pl. & her coworkers participate in invasive, oppressive, & humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), & other highly personal examinations. Apple did not disclose the details of the experiments until after Pl. signed a secrecy oath & 'consented' to the activity, & then repeatedly threatened Pl. with termination if she was to speak about it even to a dr. or attorney (as was expressly written in one Deed Poll). Pl. felt the studies themselves were wrong, but also Apple's practices were also wrong – especially related to demanding employee secrecy about the studies.

127. Around Aug. 30 2021 & Aug. 31 2021, Pl. posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple.*" In Pl.'s posts, she complained of Apple's surveillance of workers, its exploitation of workers, & Apple's culture of intimidation & retaliation, & she compared working at Apple to being in a panopticon.  The article discussed several examples of Apple's invasions of employee privacy, brought forward from Apple employees who wanted assistance from the public in reforming Apple's practices. In the article, Pl. complained about the Gobbler app & was quoted saying "*If they did this to a customer, people would lose their goddamn minds."*

128. On Aug. 31 2021, the U.S. DOL contacted Pl. to start intake for Pl.'s W.P.P.  charges. Pl. had her interview with the U.S. EEOC on Sept. 2, 2021. Pl. did not request an investigation but did request a Right to Sue letter, which she received on 9, 2021, before her termination. Apple was made aware of Pl.'s U.S. EEOC & Cal. DFEH complained that she was testifying to U.S. EEOC & Cal. DFEH about what Apple did to her by at least Aug. 12, 2021. Pl. Tweeted about her appointment with the U.S. EEOC.

Around Sept. 2 2021, numerous articles were published about Pl.'s charges against Apple.

Bloomberg reported about Pl.'s U.S. NLRB, U.S. DOL, Cal. DOL, & U.S. EEOC charges against Apple. Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation, & forced paid admin. leave. Pl.'s situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing her concerns. *"I should be able to raise concerns about safety & public policy,"* she said in an interview Thursday. Pl. has also filed complaints with the Occupational Safety & Health Administration, Cal.'s labor commissioner's office, & the Equal Employment Opportunity Commission, according to documents she provided. Pl. said her goal is to bring light to systematic problems at Apple & try to improve policies. *"I want to pierce the veil of intimidation & secrecy,"* she said in the interview. "*The employees are terrified to speak up about their concerns*."

On Sept. 2, 2021, Financial Times wrote about Pl.:

> "Pl.'s specific   complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "*chem. exposure*" at her Apple office in Sunnyvale, Cal., where more than 100 employees are based. Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "*TRW Microwave Superfund site*," a location requiring special oversight owing to previous contamination by haz. waste materials in the soil & groundwater beneath the building. In 2016, Apple paid $450,000 to settle state claims that it mishandled haz. electronic waste at their Cupertino headquarters & Sunnyvale facilities. Pl. said her concerns were brushed aside & she was warned against speaking up about them. In her letter to the NLRB, she said Apple's E.R. Dept. *"intimidated me not to speak about my safety concerns,"* that a manager advised that she quit Apple & was subject to sexism & a "dramatically increased" workload. Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments & similar stories of workplace harassment — but she had since been banned from using Slack as part of her admin. leave."

129. The press continued to cover what Apple was doing to Pl. & a movement starting among Apple employees who began speaking out & organizing with each other around work conditions & human rights. Apple workers, past & present, began publicly sharing their own stories of discrim., retaliation, & cover-ups. The press wrote about this too, & Pl. posted about it repeatedly on Twitter. Pl. was not only a catalyst for many employees to come forward, but these employees catalyzed

1    Pl.'s view & protest of Apple's misconduct.

2        130. On Sept. 3 2021, Pl. signed a contract with Business Insider to write an Op-ed about her
3    situation with Apple & proposals on how Apple can address its systemic issues. Pl. modeled her
4    article & proposals after what she had been learning about Transitional Justice at Oxford. (Pl.
5    received perfect grades in the 2021 Oxford program, & Pl.'s faculty advisor for the program would
6    later be selected to become a member of the U.S. Chemical Safety & Hazard Investigation Board
7    in 2023).

8        131. Okpo contacted Pl. again on Sept. 3 2021 & Sept. 7 2021, asking to meet with her on Webex;
9    implicitly denying her request to keep things in writing; & refusing to tell her what the meeting was
10   about. Both times Pl. asked Okpo to keep things in writing due to the misrepresentation &
11   intimidation. If he refused, she requested a Business Conduct review of his decision, noting he is a
12   lawyer & there is a power imbalance. Okpo never responded.

13       132. On Sept. 5 2021, Pl. messaged Josh (J.C.), her friend & a Sr. Director, complaining about
14   Apple E.R., commenting she had been researching Apple's labor history & the issues were "*very*
15   *systemic*" & with "*lots of bad faith conduct*," but "*not completely diabolical*." (Pl. would later refer to
16   this dynamic instead as '*Waco meets Enron*.') Pl. complained to J.C. that her current interactions
17   with Apple E.R. team made her feel "*like a very tired mom who really wants their kid to clean up the*
18   *room & has asked 1 million times & they're not doing it & she's like I'm really disappointed with you we*
19   *both know you're better than this.*"

20       133. On Sept. 6 2021, Pl. posted on social media about her U.S. NLRB, Cal. DOL, & U.S. EEOC
21   / Cal. DFEH cases with a status update & the report numbers – & also tweeted about her U.S. SEC
22   whistleblower tip, U.S. FBI, & U.S. Dept. of Justice complaints. On Sept. 6 2021, Pl. replied to the
23   U.S. EEOC confirming she was working on a draft of her complaint & was targeting to submit it to
24   them by Sept. 8 2021. On Sept. 8, 2021, Pl. emailed the U.S. EEOC her draft of the language for
25   her charge.

26       134. On Sept. 7 2021, a few days before her termination, Pl. discovered the second woman to
27   ever report to West had sued Def. over West's retaliation, constructive termination in violation of
28   public policy, & IIED only two years prior. The ex-colleague's complaint explained she witnessed

1  retaliation & intimidation in West's organization, & that West spoke openly about knowledge of his
2  employee's fear of retaliation. She said after she raised concerns to West about this, West began
3  retaliating against her too.

4      135. The complaint alleged there were three sham E.R. investigations into her concerns, finding
5  no policy violations related to West's conduct. E.R. put her on admin. leave, waited a few weeks, &
6  then told her she can either accept two months of severance & sign a release of rights to pursue
7  legal action against Def., or she can return to work as things are except that West will be even more
8  angry at her now. The coworker resigned & filed suit instead. Def. settled shortly after. Pl. posted
9  on Twitter about it, expressing her displeasure.

10      136. On Sept. 8 2021, Pl. replied to the US DOL with copies of her prior filed complaints to the
11  U.S. EEOC, U.S. NLRB, EPA, Cal. EPA, & U.S. SEC. Pl. noted she was working on answering the
12  investigator's questions & would reply by the deadline, which was Sept. 10 2021. On Sept. 9 2021,
13  at 12:39 PM PST, Pl. emailed the U.S. EEOC investigator assigned to her case & asked the
14  investigator if she needed anything else from Pl. to move forward. Then again, at 1:02 PM, asking
15  U.S. EEOC how she could sign the charge to meet the deadline.

16      137. Around 1 AM the morning of Sept. 9 2021, it occurred to Pl., & she shared in real-time on
17  Twitter, that Def. was likely spying on her personal devices because they were administrators of
18  Def. servers, even for customers, & their work policies say they will spy on employee's personal
19  devices. (Note: The NLRB is now suing Def. over that policy). Pl. began frantically removing her
20  data from iCloud servers, including migrating her email, photos, & documents.

21      138. On Sept. 9 2021, at 2:08 PM, Pl. was contacted by Aleks Kagramanov, an Def. "*Workplace*
22  *Violence & Threat Assessment*" investigator asking to speak with Pl. on the phone "*within the hour*."
23  The email had no subject line, & Pl. did not know the team. Kagramanov said he's "*looking into a*
24  *sensitive IP matter*" & wanted to speak with Pl. He said Def. "*sincerely appreciate [her] prioritizing*
25  *this call & being flexible*." He never said Pl. was under investigation.

26      139. Pl. was sure she was about to be fired, but two minutes later, Pl. promptly responded at 2:10
27  PM, saying she was willing to participate but wanted a written record of their conversations. She
28  said she will respond as quickly as she can. Kagramanov did not respond, so Pl. replied again. Pl.

responded again at 2:27 PM, complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" & telling him she forwarded his emails to her NLRB investigator. Pl. posted on Twitter complaining of witness intimidation & fear of violence from Def.

> Hey #Apple, 'This feels a little like witness intimidation. I let @NLRB know.' Love, Ashley. Clutches panic button & Mace while still laying on the floor pondering the brutality of U.S. capitalism." -- @ashleygjovik (September 9 2021 2:33 PM).

140. Cal.Lab.C. § 6401.9 defines "workplace violence" as the threat or use of physical force, including incidents involving guns & dangerous weapons. There was no legitimate explanation why this team was contacting Pl. Pl. opined about it on Twitter while she waited for Kagramanov's response, posting at 2:34 PM: *"...so does he investigate the threats & violence, or is he the one that provides that as a service?"*

141. Kagramanov replied to Pl.'s email at 2:50 PM, now saying: *"We are investigating allegations that you improperly disclosed Apple confidential information."* Kagramanov then also claimed Pl. refused to "participate" in his farcical investigation & announced he was suspending all of Pl.'s Def. account access. He never shared with Pl. that he was apparently partnering with an Def. lawyer who assumably would have been waiting on the call/Webex to speak with Pl. along with Kagramanov. The specific lawyer was previously a NY state criminal Asst. Dist. Attorney in Manhattan prior to joining Def. a few years prior. It's unclear what their plan was if Pl. was to agree to speak with them. Pl. responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate.

> "As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all." Pl. added: "I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation & my complaints to the gov.… I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that."

Pl. added in her 3:07 PM email reply to Kagramanov: "In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation & additional retaliation, & I will consider it as such." Pl. still did not know what she was supposedly accused of.

142. On Sept. 9 2021, the U.S. EEOC investigator emailed Pl., saying she posted the final version of the charge & asked Pl. to sign the charge. Pl. digitally signed her U.S. EEOC charge against Def. Then, Pl. emailed the U.S. DOL with responses to their questions about her protected activity & Def.'s retaliation. Pl. replied again at 5:26 PM PST, informing them Def.'s Workplace Violence interrogator had just suspended her account access & threatened her.

143. On Sept. 9 2021, at 6:54 PM, Yannick Bertolus, Pl.'s V.P. & West's close friend, emailed Pl. with the subject line "*Your employment status*" attaching a letter saying she was terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking & said she "*failed to cooperate & to provide accurate & complete information during the Apple investigatory process.*"

144. **Continued Investigation:** Six days later, on Sept. 15 2021, at 7:40 PM PST, Def.'s lawyers at O'Melveny & Myers, via Partner David R. Eberhart emailed Pl. a letter implying Def. terminated her due to her complaining about Def. asking to 3-D scan her ear canals & also because she posted some of the surveillance photos Def. secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app.  Pl. told Eberhart that none of that was confidential & that she had the right to protest & discuss it. Eberhart threatened her & demanded she delete several Twitter posts but never cited any legal authority (because there's none). A lawyer responded to Eberhart more formally a couple of weeks later, on Pl.'s behalf, warning him about Rule 11 sanctions if he attempted to pursue the matter in court as his claims have no basis in fact or law. Eberhart never responded.

145. On Sept. 21 2021, Tim Cook emailed all Def. staff complaining that someone had spoken publicly to reporters about work conditions. Cook said Def.'s "doing *everything in our power to identify those who leaked*." Cook said, "*People who leak confidential information do not belong here*."

146. On Sept. 10 2021, Pl. testified to U.S. NLRB for her first affidavit. On Sept. 14 2021, Pl. had the second part of her NLRB affidavit. She posted about it on Twitter. On Dec. 13, 2021, US DOL docketed Pl.'s SOX, CERCLA, & OSH Act cases. A Financial Times article was published on Dec. 13, 2021, which said:

> "The labour Dept. will examine whether Apple retaliated over claims about occupational safety & haz. waste mgmt. liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial

1  record keeping. Pl. pointed to a potential conflict of interest regarding Apple board
2  member Ronald Sugar, chair of the audit committee, as he was previously chief
3  executive of NGC, the defense company responsible for the dump — &
4  maintenance — of waste materials beneath the Sunnyvale office. Sugar could not be
5  immediately reached for comment. "Pl.'s case was "especially unusual" &
6  noteworthy because of the three separate statutes or laws that may have been
7  broken, said Michael Duff, a former attorney at the National Relations Labor Board.
   "Federal agencies exercise what in the context of criminal law is known as
   prosecutorial discretion," he said. "They are very careful of what cases they move
   forward because they have scarce resources, so they must have a strong reason to
8  believe they can prevail."

9  147. On May 20 2022, the EPA sent a letter to NGC about SD01, instructing that: "EPA requires

10 that one round of indoor air samples be collected... under current conditions." The letter included

11 an attached memo from the EPA's Q.A. branch instructing NGC (& Def.) that there should be an

12 annual inspection of "verification that the floor slab & barrier system have not been breached or

13 otherwise compromised; evaluation to confirm that the building has not been modified in a manner

14 that could compromise the system; evaluation of changes to building use," in addition to also

15 inspection roof components.

16 148. On May 27, 2022, the EPA finally admitted to Pl., that there had been an inspection at her

17 office on Aug. 19, 2021 – Def. had been able to conceal it from Pl. for nearly a year. On July 28 2022,

18 NGC told the EPA they were late in responding to the EPA's questions because Def. & the building

19 owner stopped responding to them for weeks.

20 149. On July 14 2022, Pl. argued her unemployment insurance appeal. Prior, the case was

21 mysteriously closed with inaccurate info. Pl. won her unemployment insurance appeal, & a decision

22 was issued by an Administrative Law Judge stating:

23     Pl. "received notice from the vice president that she was being discharged. The notice
       was vague & incomplete & stated that the claimant had disclosed confidential info. &
24     had not fully participated in some investigation. Although the claimant requested
       specific info. from the employer, no specific info. was provided. Before the separation
25     of the employment the claimant received great performance reviews & prior to the
       separation the claimant received no oral or written warning notifying her that job was
26     in jeopardy. At all times, the claimant performed her job duties to the best of her ability.
27     In this matter the evidence shows that the claimant was discharged for reasons other
28

than misconduct connected with the most recent work."

150. In 2022, there was discussion with the US Representative's office about bringing Pl.'s situation with Def. related to env. violations to a U.S. House Sub-Committee the US Rep. chaired. On Dec. 30, 2022, the U.S. FTC confirmed they received Pl.'s complaint about Def.'s Face Gobbler & ear scans & provided Pl. with a report tracking number. Pl. notified U.S. FTC in 2023 that she was taking the matter on herself in this lawsuit.

151. After Def. fired Pl., Pl. filed additional U.S. NLRB & Cal. DOL charges about Cook's email, & Def.'s NDAs & other employment policies, charging they violate federal labor laws – & the U.S. NLRB agreed with Pl., issuing a Decision of Merit on her charges against Def. in Jan. 2023, & complaint in Sept. 2024.

152. On Jan. 20 2023, EPA told NGC to plan to do V.I. testing at Pl.'s office in March 2023. Def. still had not done it for over seven years. On Aug. 31, 2023, the EPA published a brief letter responding to Def.'s May 2023 V.I. testing results at Pl.'s Def. office, the first testing since Dec. 2015, calling Def.'s testing report & strategy "*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," & "*misleading*."

153. Pl.'s activism was deeply chilled after the retaliatory litigation resulted in a gag order from March 2022 & until the reverse & vacate in Nov. 2022. It became a crime for her to talk to anyone aspects of her claims & complaints, & so she mostly stopped talking until she would no longer face prison time for doing so. She picked up her research again in the winter of 2022/2023. (Note – Pl. alleges this Def. is liable for this duress, & that it also impacted her ability to 'discover' what Def. did – which was probably part of the reason they did it.)

154. In 2022, Pl. was deeply traumatized by what happened to her in 2020-2021 but out of concern for public safety continued to monitor the nearby Superfund sites for any progress, updates, or possible revelations. Pl. primarily studied the TRW Microwave site, including monitoring the EPA webpages & requesting extensive public records through FOIA. She also continued to ask questions & share info. with the EPA team overseeing the TRW Microwave site as they worked on the corrective actions with Def. & NGC.

155. Pl. also kept an eye on the Honeywell "Synertek" Superfund site in Santa Clara next to the

apartments where she got sick in 2020. Back in 2020-2021, there were only a few theories about how she could have gotten so sick. There was an investigation by the regional EPA CERCLA team around the Synertek site because its VOC groundwater plume was historically under where these apartments are now.  Pl. was monitoring the groundwater well reporting on Cal. EPA's Geotracker GAMA application. In July 2022, she noticed that EPA had tested the Synertek wells in 2021 following her complaints (they did not tell her), & there was increasing TCE in the groundwater monitoring well closest to her prior apartment.

156. In early Jan. 2023, while checking for updates, Pl. noticed the EPA had uploaded the 2022 Five Year Report for the Synertek site. She read the report & had a number of questions about the report & emailed EPA & USACE with her inquires on Jan. 11 2023. Her email was organized into four parts she titled: *"Increasing TCE In Well 33-A per GAMA"; "2022 FYR Notes Remediation Injections In 2019 & 2020, With 'Rebound Effect'"; "SCSA In FYR"; &* ARIA.

157. Pl. was also reviewing the Cal. EPA CERS portal for info. on all of Def.'s Cal. facilities as she was building a large spreadsheet of all of Def.'s env. & OSHA failures in Cal. (As of Jan. 18 2023, there were 162 rows!). She noticed ARIA had received many inspection violations in late 2020 (probably posted in 2021), including citations for somehow losing 1,700 gallons of diesel in 2020. In her Jan. 11 2023 email, she wrote to EPA:

> "Was there an inquiry to 3250 about testing? Apple moved in 2015, per CERS records. In 2017, Honeywell General Counsel (Kate Adams) became G.C. of Apple. Was this considered during any outreach about 3250? I'd be concerned about V.I. at 3250 not just for workers there, but also due to chemical reactivity with the stockpile of industrial chemicals they're apparently hoarding there, & even losing tracks of thousands of gallons of." (referring to the diesel).

Pl. was still focused on V.I. They did not respond.

**158.**      Pl. became especially curious about a few of Def.'s Cal. properties that seemed to be more industrial than others. She filed Public Records Act requests for records about these sites. One of these requests (Request 23-127) was filed to Santa Clara city on Feb. 9 2023 & included a request for ARIA records in addition to three other Def. buildings in Santa Clara. On Feb. 21 2023 the city of Santa Clara responded that it would take a while to gather the records but linked to four

prior requests where some records had already been released in the interim. The requests with records for ARIA (filed Oct. 11 2022) were from AEI Consultants explaining they were working on "*property condition assessment reports*," assumably for Def.

**159.** The only documents released were lists of permits. Pl. skimmed the permits for ARIA & was flabbergasted to see permits for semiconductor fab. tools (which she recognized only due to her work on hardware development at Def.). She quickly communicated her findings. She replied to EPA complaining they still had not responded to her concerns about the groundwater wells & also added:

> "A new, additional question for you all - is how long have you known that Apple was doing literal actual silicon fab in [ARIA] since ~2016 through current? Like, back in the 1970s-1980s Silicon Valley silicon fab, & only .2 miles (.3 km) from RESIDENTIAL BUILDINGS.  Apple's buildings permit (attached) notes solvent/chemical evaporation in the yards near the "gas bunkers" & a large number of solvent exhaust ducts to the roof from the variety of clean rooms & fab stations.  The building is registered in CERS but is not a DTSC, Water Board, or EPA site. A literal silicon fab factory that is spewing toxic chemicals into at least the air is only overseen by the city fire Dept. & which only inspected a couple times - finding open violations but apparently never even following up on them."
> – Ashley Gjovik (2/22/23 12AM).

The Pl. was very distressed.

160. On Feb. 21 2023 around 11:20pm, Pl. began tweeting about Def.'s permits at ARIA, trying to lead up to a grand reveal of the fab. However, an engineer spoiled the surprise, also recognizing what she did, & quickly posted "*@[account] do you have any IH/OH friends who can say exactly how stupid it is to do modern chip fab next to residential buildings?*" to which Pl. responded, "*you spoiled the surprise for the non-hardware people, but good job, yes… APPLE IS SO [expletive] DUMB I'M GOING TO SCREAM.*" Pl. then tweeted out the formal announcement:

> "APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT."

Pl. replied to her own post a moment later adding:

> "I've been making muffled screaming noises for about twenty-five minutes now WTAF IS WRONG WITH THEM THEY MUST HAVE KNOWN THEY DID THAT

1  [expletive] TO ME!!! No wonder they gave me that "extreme condition leave" to move
2  out, Apple is the extreme condition."

3  161. Pl. started emailing with a friend, Lenny, about what she found. They met during her
4  activism in late 2020 & emailed each other about env. matters ongoing. She shared with Lenny she
5  also found a "*cryptic fire Dept. gas leak report from June 2019 at [ARIA]*." Def.'s name was redacted,
6  & the chemical name misspelled. Lenny explained:

7  I believe the correct spelling is phosphine. This is why the county's fire Dept.'s led the
   development of the model haz. materials storage ordinance…In general, the gas releases
8  have more acute health effects than the releases to groundwater.

9  Lenny was involved it getting the Santa Clara County toxic gas ordinance passed in the 1980s &
10 she trusted his expertise. Lenny was also recently the mayor of Mountain View, as well as a City
11 Council member, & member of the city's Planning Comm. in the 1980s. He is also the executive
12 director of the Center for Public Env. Oversight. Lenny also tried to investigate how Pl. was injured
13 & also could not figure out it out in 2020-2022.

14 162. Prior to Pl.'s Feb. 2023 discovery, numerous gov. agencies & experts reviewed Pl.'s
15 complaints & the site data; they tried to figure out what could have made her sick. Eventually there
16 was consensus that it was probably not the Superfund site, or the existing Brownfield contamination
17 – & the best guess was maybe something in the building materials at the apartment. That's where
18 it left off & that's why Pl. wrote "*I thought I was dying…*" in desperation & which was published in
19 March 2021.  This led to Pl. filing a complaint to EPA in June 2023 about ARIA.

20 163. From Sept. 2023 through Sept. 2024, Pl. worked as program manager for an air pollution
21 research project at a research university. The role was temporary & did not utilize her legal or
22 engineering experience. After two years of searching & hundreds of applications, it was the first &
23 only job offer she could obtain. The role was far lower seniority than her role at Def., & Pl.'s salary
24 was reduced by 41% & total compensation lowered by 74%. Pl. is now back on Medicaid & applying
25 for EBT & unemployment insurance.

26 164. On Sept. 27 2024, the EPA published the "Five Year Report" for the Triple Site, including
27 the TRW Microwave site. Pl. was invited to provide a comment as a community member, which
28 she did, & it was included in the final public report. The report reiterated that a new Record of

1    Decision is still needed & needs to address V.I. However, the report also revealed that investigation
2    into elevated levels of TCE in the outdoor air is now focusing on the shallow groundwater at two
3    sites, including Pl.'s office. Additional testing & evaluations were ordered, because if true, the
4    contaminated groundwater plume just a couple feet below the surface maybe be releasing
5    dangerous levels of TCE into the outdoor air of the entire property & neighboring properties. The
6    EPA also shared the raw data for the indoor air testing with Pl., & it showed that there continued
7    to be V.I. inside but with chemicals at 'acceptable' levels, with the exception of elevated levels of
8    benzene. The report & analysis still have not been released.

9        165. The NLRB issued a complaint against Def. on Sept. 27 2024, over Def.'s Business Conduct
10   Policy and NDAs. The NLRB issued a Decision of Merit in Jan. 2023, (thus the NLRB will issue a
11   complaint & sue Def. if Def. does not settle first) about an email CEO Tim Cook sent his staff in
12   Sept. 2021 shortly after Pl. was fired.  In Oct. 2024, NLRB issued a decision of merit that there is
13   substantial evidence that Def.'s placement of Pl. on leave was an unlawful suspension, & both the
14   suspension & termination of her employment violated federal labor laws.

15                                          **Legal Claims**

16       **166.** Pl. hereby incorporates by reference each & every allegation & fact above & below, into each
17   section where that allegation and/or facts is required to support the claim at issue. Some facts &
18   allegations are not repeated in order to meet page limits. Where any statute of limitations is in
19   question of possibly being expired for an alleged claim, Pl., where reasonable, will argue that the
20   statute of limitations should be tolled due to Def.'s fraudulent concealment of numerous material
21   facts. Pl. will also argue, where applicable, the doctrine of continuing violations, equitable tolling,
22   & the discovery rule.

23       167. **Knowledge of Protected Activities:** Pl. started threatening Def. that she'd talk to the press
24   about her work conditions back in June 2021 & did talk to the press & was quoted by NYT about
25   Def. starting in July 2021. Def. E.R. told Pl. they saw it, were aware, & were annoyed she figured
26   out labor laws. Pl. & her social media posts were covered by the press. Pl. provided quotes &
27   additional info. Each time a new article was published, Def.'s public relations team was directly
28

notified by the press, requesting comment.

168. Further, in mid-July 2021 Pl. directly notified E.R. that she & other coworkers were posting on social media complaining Def. was invading their privacy with overly aggressive medical release forms for ADA accommodation requests. E.R. also interrogated Pl. around July 29 2021 about the statements she was making & urged her to stop talking about work conditions, even with her coworkers & on Def. systems.

169. After being put on leave on Aug. 4 2021, & speaking out on Twitter & in the press, Pl. quickly received an email from Def.'s E.R., Okpo, on Aug. 5 2021 complaining about what she said & falsely accusing her of lying. (In Sept. 2024, the NLRB issued a Decision of Merit that there is substantial evidence that Okpo's email violated federal labor laws.)

170. Pl. observed an incredible response from her coworkers while she was sharing stories & documents in Aug. 2021, with many discussions on Def.'s Slack tool for employees, including many employees saying, & telling her, that they had reported the people she complained about & asked Def. to do the right thing with Pl. One post even led to a petition within Apple. Pl. shared a Radar work tracking ticket that was titled with the goal of making her life "*a living Hell.*"

> "#Apple makes great products, & some workers have a great experience, but some don't. Everyone who knows me at work knows I've dealt with more abuse than anyone should have. (See: "Make Ashley's Life a Living Hell"... & they really did). No one seems surprised I finally broke." [Image] 10:55 PM · Aug 12, 2021

171. Dozens of employees started commenting in the Radar; after seeing it on her social media, demanding Def. improve its conduct. Several people said they had reported the Radar to H.R. around Aug. 16 2021. One would think if dozens/hundreds of employees are complaining about abuse Pl. faced, as shared on social media, that Def. might think to read her social media. Per Def.'s 2022 position statement, Def. was also supposedly investigating Pl.'s Twitter posts from Aug. 28 2021-Sept. 9 2021, which would assumably include reading Pl.'s Twitter posts.

172. Finally, as part of the steps leading to Pl.'s termination, one of the supposed reasons she was to be terminated, as communicated by H.R. to her VP, was that she supposedly failed to participate in the E.R. investigation by redacting the evidence she provided E.R. However, she did not redact any records in her Box folders for E.R. She did however redact the internal records she

1  was posting on Twitter. Def. H.R. must have gotten confused & mixed up their Twitter stalking

2  screenshots with the records Pl. provided them directly. Def. never raised the matter to Pl., & Pl.

3  only discovered this fact via discovery.

4  173. Def. apparently  continued to monitor her posts after Sept. 2021 (attempting to get Twitter

5  to delete some of them, admitted in U.S. DOL filings) & through  Jan. 2022 ( J.A. wrote to Pl. upset

6  that she tried to get Pl.'s Twitter posts deleted but found out Def. also reported them & it was Def.'s

7  reports that resulted in the posts being deleted) & onward.  Def. is certainly reading Pl.'s Twitter

8  & other social media & has been for years. Def. also had knowledge of Pl.'s activities through direct

9  updates form Pl., info. shared by agencies arising out of Pl.'s complaints, press coverage of Pl., &

10  any surveillance they were conducting of her personal & work devices (which Def.'s policies said

11  they would do).

12  174. For Cal. Labor Code §§ 98.6 & 1102.5, any issues with statute of limitations related to the

13  claims or remedies (*i.e.* penalties/fines), is equitably tolled by Pl.'s timely complaints sitting in the

14  Cal. DOL queue for years before Pl. kicked the claims out into this lawsuit. This lawsuit replaced

15  the Cal. DOL DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830. Pl. filed the initial claim on

16  Aug. 29 2021, prior to Def. terminating her employment.

17  <u>**Count One: Wrongful Discharge in Violation of Public Policy**</u>

18  175. Def. retaliated against Pl. & discharged Pl.'s employment for a variety of reasons that

19  violated public policy. Among other unlawful reasons, Pl. was terminated in violation of the "*strong*

20  *public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace.*" Certain

21  concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k),

22  98.6, 232, 232.5, 1102.5, & 6310. These sub-claims are included in addition:

23  **176. Illegal Data Harvesting [Cal. Const. Article I, Section 1; FTC Act]:** Def.'s coercive &

24  unlawful data collection of biometric, genetic, anatomical, & surveillance data is a gross & egregious

25  violation of Article I Section 1 of the Cal. Constitution; the Cal. Privacy Rights Act; the U.S. FTC

26  Act; Cal.Pen.C. § 637.7, & the Int. Cov. on Civil & Political Rights: Article VII.

27  177. Def.'s supposedly legitimate reason for terminating Pl., while false & pretextual, is an

28

illegality itself. Def. claims it fired Pl. for complaining about Def.'s surveillance of employees, including coercive data collection of biometrics & invasive 24/7 video recording. Def. discriminated against Pl. (including terminating her employment) due to Pl.'s actions related to her constitutional & statutory right to privacy, which are rights that benefit the public, are substantial & fundamental rights, & which were firmly established at the time of discharge. Def.'s decision to use this as their excuse for terminating Pl. reveals Def.'s animus against Cal. employees' privacy rights.

178. Def. also intruded into Pl.'s seclusion, physically & constructively invading Pl.'s privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], & Def. surveilled Pl. & forced Pl. to surveil others with the always-on video camera in her iPhone, including in bathrooms & locker rooms in violation of Cal. Labor Code § 435. The Gobbler app did take videos & photos of Pl. in the bathroom & Pl. has copies of those images. Def.'s use of Gobbler on Pl.'s phone also forced Pl. to participate in Def.'s unlawful acts by facilitating Def.'s secret capture, storage, & processing of photos, videos, & biometrics of the public without their knowledge or consent. Def.'s termination of Pl. stated that if she were to warn people what was occurring on her phone, she would be fired. Therefore, Def.'s unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for sensitive biometrics.

179. Def. also violated § 5 of the FTC Act in unlawfully coercing employees to provide personal & sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, & are unreasonable, & misleading statements to consumers. Employees can be consumers under the FTC Act as an employee of Def. who goes out & buys an iPhone is an Def. customer who now owns an Def. product with consumer protection laws protecting them.

180. **Employment Discrim. [Cal. DFEH; U.S. EEOC]:** Pl. reported & testified about topics including complaints about sex, gender, & disability discrim., which are "fundamental" rights for the purpose of a *Tamney* claim. Pl. filed Cal. DFEH, & U.S. EEOC claims on Aug. 12 2021, & proceeded to testify & provide evidence, requesting a Right to Sue letter, which she was granted on Sept. 9 2021, just hours before Def. fired her. Def. retaliated against Pl. for opposing Def.'s

discriminatory practices. Pl. also reported to U.S. NLRB & the U.S. DOJ. Civil Rights before her termination. Def. discriminated against Pl. (including terminating her employment) due to Pl.'s actions related to a constitutional & statutory right to be protected from discrim. due to her sex & due to her disabilities, which is a right that benefits the public, is a substantial & fundamental right, & which was firmly established at the time of discharge.

**181. Crime Victim/Witness Discrim. [Cal. Labor Code § 230(e)]:** Def. discriminated against Pl., including terminating her employment, due to Pl.'s actions related to constitutional & statutory rights to be protected from crime & seek justice for injury caused by crime, which is a right that benefits the public, is a substantial & fundamental right, & which was firmly established at the time of discharge. Pl. was a "*victim of a crime that caused physical injury*" & suffered "*physical, psychological, & financial harm due to the attempted commissions of a crime...*"

**182. Leg. Witness Discrim. [Cal. Gov. Code § 9414]:** Def. knew Pl. was talking to legislatures about what occurred to her next to ARIA, & Def. knew that it was Def. who was responsible for Pl.'s harm, despite Pl. not knowing that fact yet. Def. knew Pl. may testify at leg. committees about the air pollution caused by the Def. The Def. undertook an effort to ensure Pl. did not testify & to harass Pl. because Pl. may testify to a committee. Def. also knew Pl. was talking to elected officials about its retaliation against Pl. after her termination, including a State Senator, a U.S. Rep., & a U.S. Senator. It is enough to establish a nexus that Def. had reason to think Pl. planned to be a witness for an agency or committee. It is also illegal under Cal. P.C. to intimidate witnesses, or to threaten witnesses before and/or after testimony. [Cal P.C. 140(a) 137(b) 136.1]. Further, Def.'s also violated Cal. Gov. Code § 9414 (a misdemeanor public offense) by harassing & retaliating against Pl., by attempting to prevent & dissuade Pl.'s testimony for a proceeding, & by depriving, threatening, & attempting to deprive or requesting Pl. not be employed due to Pl. being a witness for a committee, & giving testimony to a committee as a witness or victim.

## Count Two: Cal. Whistleblower Protection Act (Cal.Lab.C. § 1102.5)

183. Pl. re-alleges & incorporates by reference each & every allegation set forth above, as though fully set forth in this Claim for Relief. Def. violated § 1102.5 when it took adverse employment

action against Pl. due to Pl.'s protected activity in disclosing info. to a governmental or law enf. agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover or correct the violation; or providing info. to or testifying before, any public body conducting an investigation, hearing, or inquiry.

184. Cal.Lab.C. § 1102.5 also covers Pl.'s' public disclosures as due to Def.'s extreme power & control over the gov. agencies who are supposed to be able to regulate it, often the only party in a position to force Def. to correct the issue is the public. Many of Pl.'s public statements in Aug. & Sept. 2021, & statements to coworkers in June & July 2021, all before her termination, noted that was why Pl. was bringing her complaints forward to her coworkers & the public – so the public pressure may force Def. to do the right thing for once. At the very least, Def. was monitoring Pl.'s social media activity & articles, so Def. was informed of her disclosures through that surveillance.

185. Pl. filed several complaints under multiple laws, which were known to Def. exec.'s, bosses, & administrators (by Pl. informing them directly, or by Pl. speaking about them publicly on social media & the press, or by Def.'s surveillance of Pl. before her termination. Def. discharged & discriminated against Pl. in retaliation for Pl.'s disclosure of info. about Def.'s unlawful acts & omissions. Pl. disclosed Def.'s violations of numerous laws as incorporated from allegations to gov. agencies, the public, the press, & Def. mgmt. Pl. had a reasonable cause to believe that the info. she disclosed violated the statute & was non-compliant with a rule or regulation.

Pl. complained of violations of the anti-retaliation provisions of env. laws, specifically, 42 U.S.C. §§ 9610 & 7622 & 15 U.S.C. 2622. Violations of the anti-retaliation provisions of env. laws. 42 U.S.C. § 9610, & 42 U.S.C § 7622, & 15 U.S.C. § 2622. Filed complaints to the EPA, CalEPA, & U.S. DOL around Aug. 29 2021. Pl. complained of violations of § 8(a)(1) of the NLRA. Filed complaints to U.S. NLRB about NLRA § 8(a)(1) violations on Aug. 26 2021. Pl. initiated a proceeding with an NLRB field agent contacting Pl. for an interview in early Sept. 2021. NLRB issued a decision of merit on Pl.'s claims & filed suit against Def. in Oct. 2024. Pl. also filed complaints to Cal. DOL, & U.S. DOL re: CCR, Title 8, General Industry Safety Order 5194.

Pl. complained of violations of 29 U.S.C. § 660; Violations of the OSH Act at 29 U.S.C. § 660. Filed complaints to CalOSHA, US DOL. Complaint initiated a proceeding with a Wage &

Hour investigator contacting Pl. for info. in early Sept. 2021. Pl. complained of violations of the Cal. Constitution's right to privacy; made complaint to Def. mgmt. in Aug. 2021, shared concerns with reporter for advocacy article in Aug. 2021: *"Apple Cares about Privacy, Unless You're an Apple Employee,"* and made complaints on social media in Aug. – Sept. 2021. Pl. complained of violations of 42 U.S.C. § 2000e & Cal. Gov. Code § 12920 anti-discrim. laws (sex & disability). Pl. filed complaints to U.S. DOJ Civil Rights in Aug. 2021, and to U.S. EEOC & Cal. DFEH in Aug. 2021 (Title VII of the Civil Rights Act, 42 U.S.C. §2000e; Cal. Gov. Code § 12920).

## Count Three: Cal. Labor Code § 6310

186. Def. violated § 6310 via discrimination, suspension, discharge, or threat of discharge against Pl. for Pl. complaining about unsafe work conditions or practices, instituting, or causing to be instituted proceedings related to her right to safe & healthful working conditions, testifying about workplace safety, & exercised her rights under the Cal. OSH Act. Def. also took the above negative actions due to fear that Pl. would engage, or engage further, in the activities above. Pl.'s safety complaints & inquiries were a substantial motivation reason for Def.'s decision to discharge, discipline, & discriminate against Pl.

187. Def. discriminated against & discharged Pl. because Pl. complained about safety & health conditions or practices at the workplace to Def. managers & her coworkers, including chem. exposure. Def. discriminated against & discharged Pl. because Pl. reported work-related injuries & illnesses & requested info. about work-related injury & illness reports or records. Def. knew about Pl.'s complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, & social media posts.

188. Pl. filed a Retaliation claim with the Cal. DOL on Aug. 29 2021, & Def. was notified of such before her termination. Pl. complained of unsafe work conditions & internal violations of safety laws/rules/standards to Def., the EPA, Cal. EPA, & OSHA.

Pl. complained about violations of, & issues related to, numerous topics, including:
- HazCom & employee exposure to chemicals [Cal.Lab.C. §§ 6398, 6400-6405, 6408; 8 Cal. Code. Reg. § 340.2; 29 CFR Z; OSH Act § 1910.1020]
- COVID-19 safety & communication [Cal.Labor.C. §§ 6325; 6409.6, 6432]

– Wildfire smoke safety [Cal.C.Reg. Title 8, § 5141.1]

– Employee injury tracking & reporting [8 Cal.C.Reg. § 14300]

– Efforts to reduce e-waste; & Def.'s prior e-waste (Universal Haz. Waste) violations. [Cal. Health/Safety; RCRA]

– Environmental safety including V.I. exposure [Cal.Lab.C. § 6406; CERCLA/SARA, RCRA, CAA, CWA, OSH Act HazCom]

– Right to Know [EPCRA; Cal.Lab.C. § 6399.7] & Proposition 65, the Safe Drinking Water & Toxic Enforcement Act of 1986 [Cal. Health & Safety Code §§ 25249.5 to 25249.14].

– OSH Act Workplace Violence [Cal.Lab.C. §§ 6401.7, 6401.9]

Def. retaliated against Pl. preemptively out of fear that Pl. would file additional complaints related to health & safety at the workplace. Def. hoped its retaliation would cause Pl. to drop her existing complaints out of fear & intimidation, & to prevent Pl. from filing additional complaints.

### Count Four: Cal. Labor Code § 98.6

189. Def. violated Cal.Lab.C. § 98.6 when Def. did discharge & discriminate against Pl. for engaging in certain activities, including *"filing a complaint with the Labor Commissioner or testifying in such proceedings."* Pl. filed a complaint with the Cal. Labor Commissioner on Aug. 29 2021 & Def. was notified she did so through her public statements & notification from the agency. Def. violated § 98.6 by retaliating against Pl. due to Pl. filing a claim with & causing to be instituted proceedings related to the rights under the jurisdiction of the Cal. Labor Commissioner, & for exercising rights provided to her under Cal. Labor Code on behalf of herself & on behalf of other employees. Def. punished her for doing so.

190. Animus was shown in many of the comments & communications from Def. employees, managers, & agents before & after Def. terminated Pl. Comments referenced Pl.'s protected activities, but claimed Pl. was lying & acting in bad faith, & argued that because Pl. make complaints, she should be punished. Def. retaliated against Pl. due to Pl.'s protected activity, & she suffered adverse actions with a causal connection to the protected activity. Def. engaged in actions prohibited by this section within 90 days of Pl.'s protected activity.

**191. Violation of Cal. Labor Code § 232.5 via §§ 98.6, 98.7:** Def. violated Cal.Lab.C. § 232.5 when disciplining & discharging Pl. for disclosing info. about Def.'s working conditions. Pl.'s

protected activities included filing complaints about work conditions & discussing work conditions with coworkers & the public, all covered under § 232.5. Def. discharged, disciplined, & discriminated against Pl. due to her disclosure of info. about Def.'s work conditions. This applies to both the true reason Def. fired Pl. & Def.'s proffered reason for terminating Pl.. Def. claims its NDAs prohibit Pl. from speaking about work conditions & that if Pl. does speak about work conditions, it violates her NDA, & that violation is grounds for immediate termination.

**192. Violation of Cal. Labor Code §§ 232, 232.5 via §§ 98.6, 98.7:** Def. violated Cal.Lab.C. §§ 232, 232.5 when it harassed, disciplined, discriminated against, & fired Pl. due to Pl.'s discussion of her wages & the wages of Def. employees. Pl. participated in a pay survey with her coworkers in late July 2021, when she suggested the survey capture info. on gender. In Aug. of 2021 Pl. participated in an employee pay survey that was being shared on Slack. Pl. suggested adding a question about gender & added it herself in the spreadsheet. (§ 1197.5)

**193.** She also shared her wages on social media & discussed pay with her coworkers on social media in Aug. 2021, the Def. knew & retaliated against her because she did so. In the evening of Aug. 3 2021, Pl. posted on a popular Slack group at Def., linking to three of Def.'s policies, & quoting "*Nothing in these guideless should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions.*" Pl. encouraged her coworkers to speak out & organize. Pl. was put on leave the next morning. Pl. posted on Twitter about doing this a few days later.

> "There's a strange idea in #Apple that speaking out about #workconditions violates our employment contract (a doc many of us never got a copy of nor is there a formal way to req) but I took pics & mine has rights in a footnote. I also reminded folks the eve before put on leave. @ashleygjovik 1:33 PM · Aug 9, 2021.

After Pl. was put on leave, the pay survey was shutdown, supposedly because there was a question about gender. There was news coverage of Def. shutting down pay surveys & public criticism about the matter:

> Apple keeps shutting down employee-run surveys on pay equity — & labor lawyers say it's illegal, the company bans surveys that include diversity data, Aug 9, 2021, "Apple did not respond to a request for comment from The Verge."

> Apple just banned a pay equity Slack channel but let's fun dogs channel lie. The company's rules around Slack usage are not being evenly enforced, Aug 31, 2021, Apple

did not immediately respond to a request for comment from The Verge.

"Apple says it has pay equity, but an informal employee survey suggests otherwise: Employees say there's a six percent wage gap between the salaries of men & women who responded to the survey," Aug 23, 2021. In response to a request for comment from The Verge, Apple spokesperson Rachel Tulley sent the company's already public statement on pay equity."

194. Pl. also tweeted out her salary in solidarity to those organizing around pay. An NLRB charge was filed about Def. shutting down the pay surveys in Sept. 2021, prior to Pl.'s termination, & NLRB issued a decision of merit in Jan. 2023. Pl. also found a prior US DOJ lawsuit against Def. for salary price fixing, posted about it, & compared it to Def.'s recent actions shutting down pay surveys.

"The DOJ announced in 2010 that it had settled with #Apple & others, establishing that they would cease their illegal hiring practices. The DoJ noted this complaint is part of a larger antitrust inquiry into employment practices by high tech firms." @ashleygjovik Aug 31, 2021

"Lawsuit accuses Apple, others of fixing worker pay: large tech companies conspired with one another to lowball salaries." @ashleygjovik 4:55 PM · Aug 31, 2021

Not much has changed in 16 years.... 8/31 - "Apple just banned a pay equity Slack channel but let's fun dogs channel lie" https://theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel @ashleygjovik 3:58 PM · Aug 31, 2021

All of these posts were made prior to Def. supposedly opening an extensive investigation into Pl.'s Twitter, per Def., thus Def. admits it reviewed the posts prior to terminating Pl..

195. **Violation of Cal.Lab.C. § 96(k) via §§ 98.6, 98.7**: Def. violated Cal.Lab.C. § 96(k) when it demoted, suspended, discharged from employment, threatened discharge, & discriminated against Pl. for Pl.'s lawful conduct occurring during nonworking hours away from the employer's premises, & that conduct involved the exercise of rights protected by the Cal. Const.

196. Pl. engaged in lawful conduct asserting "recognized constitutional rights" & "rights under the Labor Code" occurring during nonworking hours – while she was on leave, away from Def.'s premises. Def. put Pl. on leave. Pl. did not want to be on leave. Pl. asked to come back, & Def. said no. Def. cannot then turn around & claim the "leave" was work time or the workplace. Def. told

1   Pl. she had been "*removed from the workplace*." Until Def. let Pl. return to work, Pl. was off duty. Pl.

2   posting about work conditions in her personal time does not transform Pl.'s personal time into work

3   time.

4       197. Def. terminated Pl. for a variety of illegal reasons, including many of the public statements

5   Pl. made while on leave in Aug. – Sept. 2021. Pl. spoke frequently on social media & to the press

6   about harassment & safety issues at Def.; as was her inherent right to be free from discrim. under

7   Cal. Const. Article 1, §§ 8, 31, & her right to physical safety under Cal. Const. Article 1, § 1. Pl. also

8   spoke frequently about the env. crimes she witnessed & was victim to at her apartment in 2020 &

9   with Def.'s conduct at her office. Pl. complained about the intimidation & threats she received &

10  advocated for victim's rights – as was her right under Cal. Const. Article 1, § 28. Def. violated

11  Cal.Lab.C. §96(k) when it retaliated against Pl. for making these statements, which she had a

12  constitutional right to make, & which she made outside of worktime & outside of the workplace.

13      198. In addition, even Def.'s supposed legitimate justification for firing Pl. was simply retaliation

14  for protected statements made by Pl. outside of worktime & the workplace, & about subjects rooted

15  in her constitution rights. Pl. was complaining about unlawful & unethical surveillance, & invasions

16  of privacy, by Def., to Pl. & her coworkers. Def.'s supposedly legitimate justification is illegitimate.

17  Pl. has a self-executing right to protest invasions of privacy under Cal. Const. Art. 1, § 1.

18                          <u>**Count Five: Private Nuisance**</u>

19      199. **Tolling Theories:** Pl. spent an incredible amount of time in 2020-2021 researching &

20  investigating, trying to figure out what happened to her next to ARIA.  She reviewed public records

21  for all the nearby next-door buildings including ARIA. When she pulled 3250 Scott up on the EPA

22  portal in 2020, the ECHO page noted that there had been no TRI releases reported since the 1990s,

23  cited no violations or issues, & made the office look quite benign.

24      200. Pl. discovered ARIA when she received request from her public records request about env.

25  & safety compl. at multiple Def. buildings. One request returned a list of permits for ARIA, & she

26  realized it was fab. Prior to her discovery of Def.'s fab, Pl. only knew she was exposed to chemicals

27  somehow – but did not know exactly what those chemicals were, did not know where they came

28

from or how they got in her apartment, & did not know if there was wrongdoing or what type of wrongdoing might have occurred. Def. managed ARIA as an unmarked office building without any designation as to who was using the building or what they were using it for. In the regulatory paperwork that did exist (mostly city HazMat citations & leak/spill reports), Def. repeatedly tried to use the code name ARIA & to disguise their activities—repeatedly failing to use the proper codes to designate semiconductor fab.

201. Def. was engaged in ultrahazardous activities with strict liability, & also had a critical duty to warn others of the danger of their activities at the facility. This duty was based on common laws, but also statutes – both civil & penal. They also had a statutory obligation to comply with permitting requirements & to notify the gov. of their activities, which they failed to do at every opportunity. Finally, they also had a duty under federal Right to Know to notify the community of the chemicals they released – but they did not do that either. Instead, Def. ran this plant as an old-school Silicon Valley "*Skunkworks*" project.

202. In late 2020 & early 2021, Pl. was actively researching the area around the SCSA. Her March 2021 article in SF Bay View summarized what she found & complained that she still had no answers. As much as she did not want to raise additional safety/env. concerns with her cantankerous employer, Pl. did look at records for ARIA. She searched the site on state & federal EPA websites & could not find it any active permits or recent filings on Cal.'s Geotracker or Envirosor databases, or on the EPA's TRI & RCRA pages.

203. Pl. did see that 3250 Scott was registered as a Haz. Waste Generator, however that is not uncommon in Silicon Valley. Due to Silicon Valley's history, most areas had been industrial or near industrial activities at some point, & most technology offices perform research & development, which creates haz. waste. None of those scenarios would explain Pl.'s 3 AM heart failure in her bed in a three-story apartment. The gov. explained that whatever caused Pl.'s injury was something extreme & unusual. The gov. agencies said they also had searched env. databases & also could not find anything that stood out to them.

204. Def. also used illegal NDAs to unlawfully silence its employees about health/safety & env. issues (see NLRB's lawsuit against Def. arising from Pl.'s complaints). Def. took active, unlawful

steps to ensure its activities would be concealed & to make it more difficult for anyone to figure out what they were doing. Similarly, Def. was bullying agencies to avoid creating documentation about their activities or speaking about it, for example the very long NDA Def. attempted to get EPA to sign prior to inspection Pl.'s office in Aug. 2021.

205. In addition, worsening this issue, Def. also often conducts very strange activities at its R&D facilities, which Pl. had seen over her six years with the company, & had never seen those operations cause severe injuries – they were just weird. This includes cellular technology buildings with large empty room with foam walls & a chair that spins in circles; robots "running" with their smart watches; reliability testing with machines that drop, touch, impact, spill, & anything else you can imagine; & so on. Pl.'s office at 825 Stewart Dr. included labs for performance & thermal testing, Wi-Fi & connectivity testing, stability labs, & other industrial activities but which Pl. had never seen cause any injuries like what she experienced next to ARIA.

206. Pl. also repeatedly spoke with Def. about ARIA starting in Sept. 2020 (EH&S), Nov. 2020 (Legal), etc. & Def. never said anything about the facility being used for anything dangerous or abnormal. Pl. assumed if there was something she should know about the facility, that Def. would have told her – & because they did not tell her this, she could focus her research on other buildings. The Santa Clara city Fire Dept. did not force Def. to request proper permits, or even properly cite Def. for haz. waste violations – which is a long-standing deficiency with the agency. The Cal. EPA has multiple corrective actions for the Fire Dept. including actually inspecting, documenting issues, following up to ensure corrective actions, & properly characterizing facilities.

207. Finally, Def. also appears to have been staging a possible statute of limitations defense when it filed its first & only TRI & EIS reports to the EPA, which were only for 2020, the year Pl. was injured. Def. filed the TRI document on June 30 2021 & the EIS document on Aug. 26 2021, both prior to Def.'s termination of Pl.'s employment.

208. **Creation & Maintenance of a Private Nuisance at 3250 Scott Blvd:** Def. created & maintained a condition in violation of Cal.Civ.C. § 3479. This nuisance was demonstrably injurious to health, which was indecent & offensive to the senses & obstructed free use of property. By acting & failing to act, Def. created a condition & permitted a condition to exist that was harmful to health,

& a fire, explosion, & poisoning hazard. Def.'s conduct in acting or failing to act was intentional, unreasonable, negligent, & reckless. Def. is continuously casting pollution upon the property of the owner & tenants of adjacent properties, as it knew it would do when it constructed its exhaust & HVAC & haz. waste systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution would continue to fall, not by accident or mishap, but in conformity with the knowledge it had before the construction of the systems. Def. should be presumed to have intended its act's natural, known, & reasonable consequences.

209. Def.'s interference would & did substantially annoy or disturb persons of normal health & sensibilities in the same community. Def.'s operations at the factory & Superfund site are both continuing nuisances, & every continuation of the nuisance or trespass gives rise to separate damages claims. Def. has the agency & ability to stop the nuisance (it is not permanent), so until it does, the nuisance Def. created is continuous.  Def.'s conduct was a substantial factor in causing Pl.'s harm. Pl. did not consent to a defendant's conduct, & the seriousness of the harm outweighs the social utility of Def.'s conduct. Def. damaged Pl.'s property & injured Pl.'s person. Due to Def.'s actions, Pl.'s property was destroyed, the leasehold degraded, she became very ill, & she suffered severe emotional distress.

210. In or about 2015, Def. constructed, or caused to be constructed, exhaust vents & open tanks at ARIA in Santa Clara, near the common border line of the Def.'s & Pl.'s property. The exhaust vents were installed & maintained negligently, recklessly, & unskillfully. Def. exhausted through the vents & emptied various materials or substances into the open tanks that caused a foul, obnoxious, & disagreeable odor & polluted the atmosphere / ambient air of Pl.'s property.

211. Def.'s facility emits large quantities of vapors, dust, chemicals, & other contaminants into the air, which are carried by the natural winds & air currents onto Pl.'s property & collect Pl.'s chattel property & are generally injurious to Pl.'s health, are offensive to the senses, & interfered with Pl.'s comfortable enjoyment of life & property. Def. created the nuisance due to unnecessary, unreasonable, & injurious methods of operation of their business. The emissions were a business decision to be able to report reduced waste sent to landfills.

### Count Six: IIED – Fear of Cancer

212. Def. deliberately vented toxic, carcinogenic, & lethal substances into the ambient air around the SCSA where Pl. lived in 2020. Def. engaged in this conduct with reckless disregard for the injuries certain to be caused by that plan of conduct, & knowing people exactly like Pl. would be exposed to its dangerous, toxic chem. fumes & vapors.

213. Semiconductor fab., like what Def. is doing at ARIA, is an ultrahazardous activity & absolute nuisance when conducted next to homes due to the extremely toxic gases, reactive & pyrophoric gases, & the sheer quantity of dangers, toxic chemicals that are on site & in use for fab. Def.'s conduct was also a nuisance to Pl., & Def.'s exhaust trespassed into Pl.'s home, & assaulted Pl.'s body. Where there is not strict liability, Def. had a concrete, critical duty to warn those around the facility – but instead, Def. failed to file required permits, failed to properly characterize the facility, put no signs in front to designate the type of activity, filed only one TRI report, repeatedly tried to avoid filing spill/leak reports to Cal. OES, & also deliberately made false statements to conceal their actions.

214. Def.'s activities at ARIA violated rules, regulations, & statutes at local, state, & federal levels. Def. has already received notice of dozens of violations, now also including for illegal chem. emissions. Def.'s unlawful & outrageous conduct caused Pl. to suffer severe emotional distress when Def. exposed Pl. to carcinogenic chemicals. Def.'s conduct with the carcinogen chemicals was outrageous. Def.'s intentional, reckless, & negligent conduct exposed Pl. to carcinogens, including TCE, toluene, arsine, & vinyl chloride. Def. intended to cause tenants at the SCSA distress & acted with reckless disregard for the probability that people like Pl. would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Pl. suffered severe emotional distress from a reasonable fear of developing cancer, & Def.'s conduct was a substantial factor in Pl.'s severe emotional distress.

215. As a proximate result of the acts of the defendant, Pl. suffered severe emotional distress, including the fear of developing cancer & other disease, & an increased risk of developing cancer & other disease. Her fear extended to her dog as well, a tiny eight-pound Chihuahua-mix who was also exposed to the semiconductor fab. exhaust with Pl.. Pl. discusses this at every veterinarian appointment & always orders a CBC & metabolic workup for him if she can afford it.

216. It is documented that Def. used & exhausted carcinogenic chemicals into the ambient air outside the SCSA. It is also documented by an industrial hygienist running a two-hour TO-17 that those same carcinogenic chemicals Def. exhausted were also found in the indoor air of Pl.'s home. Pl. was also able to capture evidence of some of the chemicals in her blood & urine. Pl. was extensively exposed.

217. Pl. suffered a wide array of physical symptoms attributed to the toxic chemicals at SD01 & ARIA, including spasms, nausea, hair loss, rashes, hives, burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. These physical manifestations of the injuries & exposure from dangerous carcinogenic chemicals establishes reasonable fear of future disease. Further, the fear & horror of personally being exposed to a cloud of poison gas or knowing that family members have been exposed are absolute emotional trauma in its purest form.

218. After Def.'s injuries to Pl. due to chem. exposure in 2020, Pl. experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression, rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred, & damaged skin, hair loss, worsened asthma, & breathing troubles, etc.).

219. This all occurred during Pl.'s 2L & 3L years of law school, causing her to suffer academically. Pl. now also faces a significantly increased risk of contracting cancer & other disease in her lifetime. Further, after Def.'s psychological & emotional injuries to Pl. in 2020-2024, Pl. now suffers from dramatically worsened anxiety, PTSD, & concentration issues – as well as new depression, insomnia, panic attacks, weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits, & moral injury.

220. At the time of Def.'s termination of Pl.'s employment on Sept. 9 2021, Pl. still did not know Def. was responsible for what happened to her in 2020. Def. continued harassing & tormenting Pl. despite & because of it prior to knowingly subjecting Pl. to exposure to a highly toxic substance while purposefully concealing from Pl. the serious injuries that might result from such exposure, & in reckless disregard of these risks. Pl.'s physical exposure to Def.'s illegal fab. exhaust was unrelated to her employment & thus Worker's Compensation does not apply. Further, Def. was the operator in control of the facilities at ARIA during the pertinent times, & actions taken related to

Def.'s haz. waste can be directly attributed to the corporation.

221. Def. had knowledge & a reckless disregard for the fact that people just like Pl. would be injured by its illegal dumping. Def. knew beyond speculation that people would be injured. This fab is across the street from these apartments – where every employee would see them, every day they're at work. Def. spent millions for this fab, entered a long-term lease, & RCRA papers are signed by the Def. CFO. Every time Def. vented its fab exhaust into the ambient air, Def. knew people just like the Pl. would be injured & would be deeply traumatized if & when they discovered what they were exposed to.

222. Def.'s employees & contractors have already revealed not only evidence of knowledge, but also gross recklessness – with one of their ACT Env. contractors who were leading the haz. waste disposal efforts in 2020 at the site, when Pl. was doused in chemicals, bragging in his LinkedIn profile that during that time he found "*innovative*" ways to save Def. money on haz. waste disposal. Meanwhile, Pl. still has bald spots after Def. burned all of her hair off.

223. Corporations who knowingly & intentionally dump haz. waste or otherwise pollute the environment, violating env. & safety laws, do so because the practice is less costly & more profitable than complying with the regulation. Def.'s intentional evasion of paying required fees & costs associated with proper haz. waste mgmt. & disposal allow Def. to operate its research & development at a much lower cost than its competitors who do follow the law. In addition, Def. also recently launched a "zero waste" program where Def. purports to be diverting haz. waste from landfills. Based on Def.'s env. reports, ARIA is responsible for around 30% of Def.'s global corporate haz. waste & at ARIA, Def.'s diversions of waste from landfills includes mid-night dumping into apartments & creating toxic vapor clouds in public parks.

224. Even worse, Def. also instituted an ESG modifier for executive pay (bonuses worth multi-millions of dollars) that can increase or decrease executive compensation 10% based on env. & other practices. Def.'s intentional env. violations were not just to reduce costs required for properly disposing toxic waste, but Def.'s midnight-dumping also to increased bonuses for their executives. Further, Def.'s continued harassment of Pl. despite everything else that's happened, including her exposures, is sick & depraved. The amount of stress puts her even more at risk for cancer & disease,

1  after she has already suffered great bodily injury from Def.'s illegal conduct & emissions. Cal.
2  H.S.C. § 42400.1 Cal. P. C. § 12022.7.

3                   **Count Seven: IIED – Outrageous Conduct**

4  225. Def.'s malicious, fraudulent, oppressive, & extreme/outrageous misconduct was directed
5  primarily at Pl., & it was calculated to cause Pl. severe emotional distress, & it was done with the
6  knowledge of Pl.'s vulnerabilities & knowledge of Def.'s power to harm Pl.'s interests & done with
7  a substantial certainty Pl. would suffer severe emotional injury. Def.'s actions were outrageous
8  (violations of civil laws) & outrageous per se (violation of penal laws).

9  226. Numerous cases have held, & the Rest. emphasizes, that there are only a few categories of
10 conduct where an employer may be found to have engaged in IIED, & most common are defamation
11 – especially accusations of dishonestly and/or criminal conduct; denigration & humiliation;
12 deranged harassment; & IIED used as a tool in the employer's cover-up of wrongdoing. Calling the
13 employee a liar, especially in retaliation for the employee making labor or whistleblower complaints,
14 is one of the few approved buckets for potential IIED claims.

15 227. Def.'s outrageous conduct with civil liability includes defamation, trade libel, fraud,
16 invasion of privacy, tortious interference with business relationships, true threats, interference with
17 the exercise of civil rights, discrim. based on sex, discrim. based on disability, & retaliation for
18 conduct protected by statutes & the Constitution (*i.e.*, discrim. based on sex). In addition to the
19 tortious harassment, Def. engaged in many criminal acts which were "*outrageous per se*," including
20 witness intimidation, witness retaliation, burglary, extortion, threats, & surveillance.

21 228. From at least July 2021 through current day – Def. employees stalked, harassed, &
22 tormented Pl. with actions including repetitive, unwanted communications to Pl.; making false
23 accusations against Pl.; gathering info. about Pl.; monitoring Pl.'s activities; harassing Pl.'s friends;
24 using threats & scare tactics to frighten Pl. Starting in Aug. 2021 & continuing today, hundreds of
25 'throwaway accounts' & other fake social media accounts posted about & to Pl., making statements
26 that were threatening, intimidating, defamatory, insulting, & harassing. There was an extensive
27 digital harassment campaign against Pl.. Def. employees harassed Pl. under their own names, &

28

other posts were made by Def. employees using aliases, but their real identities were later revealed. The posts mostly focused around claiming Pl.'s claims against Def. were meritless, that Pl. was committing perjury by reporting issues to the gov., & that enf. action needed to be taken against Pl..

229. Starting in at least Sept. 2021, & assumed to continue through the current day, Def. employees undertook a 'whisper campaign' to smear Pl.'s character & create fear, uncertainty, & doubt about Pl.'s allegations against Def.. At least five named employees took an active role in posting defamatory & harassing things about Pl., contacting Pl.'s friends & associates to speak negatively about Pl. & urge them to not associate with her, & to create negative rumors about Pl. in order to ostracize & alienate her.

230. **Vicarious Liability**: Vicarious liability can be established against employees employed with Def. at the time of the incident, under at least three theories: respondeat superior [Cal. Civ Code 2299, 2316], ratification [Cal. Civ Code 2307, 2310], & alter ego. Pl. also argues outgrowth, customary incidents, benefits to employer, & risk inherent in the company's culture – all of which were reasonably foreseeable to Def.. The harassment was undertaken by many Def. employees, under their names & identifying as Def. employees. They also frequently branded the harassment as an Def. product of some sort, for instance citing Def. products or themes in their fake screennames (for example, "*SquareinaRoundHole*" referencing the famous Def. commercial), designing threats modeled after Def. heritage (i.e., threatening employees that if they speak publicly about work conditions they will get "*Pl.'d*" – an iteration on the phrase "Steve'd" referencing Steve Jobs' habit of abruptly firing people).

231. Several employees who harassed her online did so prior to & after she was terminated, & as an outgrowth of either prior retaliatory harassment (see C.M., who also repeatedly threatened her with termination in retaliation for her speaking to the press about workplace safety at Def. prior to Pl. being put on leave. He then took to social media to harass her after). Another one of these employees, J.A., was an Def. employee working in Def.'s Global Security team through the end of Nov. 2021. This person repeatedly posted & shared that she had reported Pl. & Pl.'s actions to "Def.," made accusations against Pl. & in defense of Def. positioning herself as speaking for Def., & also repeatedly held herself out as having insider info. into Def.'s retaliatory actions against Pl.,

including the termination. The function of the Global Security team is to silence workers from speaking publicly about Def., & this person performed those duties in her harassment of Pl.

232. In Jan.-Feb. 2022, J.A. admitted to being in active contact with Def. & also B.R. & R.M., or a conduit to them. S.V. & R.M. also admitted to being friends with Faye (F.G.), a best friend of R.M. ("*Little Gestapo*"). On Feb. 22 2022, J.A. posted on Twitter that Def. employees *"in [Def.] Global Security inform [her] when they see anything in reference to [her], or what reasonable seems like it is referencing [her]."* On Jan. 31 2022, J.A. sued Pl. in a WA state court requesting an anti-harassment restraining order. In Feb. 2023, J.A. admitted that Def. has provided her insider info. about Okpo's investigation into her complaints & what his findings were. On Sept. 9 2021, J.A. posted on Twitter that Pl.'s NLRB charge would not be successful & that she had some type of insider info. against Pl.. J.A. & Def. have confirmed that J.A. filed a Business Conduct complaint against Pl. on Sept. 15 2021 which included private messages between Pl. & J.A. & which J.A. later admitted "served no legal purpose." It is clear that Def. involved J.A. in their fab. of a paper trail on the same day they sent Eberhart to harass Pl. about the Face Gobbler.

233. There were a number of 'fake' accounts created solely to harass & interact with Pl. that knew way too much about Pl., too much about Def.'s internal operations, & too much about the labor & env. disputes. Pl. quickly responded to them either as "*Def. HR*" or "*Def.'s lawyers*". One of the accounts, Beezie, started harassing Pl. in Aug. 2021, taking an extremely personal interest in Pl.'s complaints about Def., & sent Pl. URLs to the EEOC website. Pl. responded, *"you sure know a lot about employment law, Beezie."* The day Pl. was fired, Beezie posted "*#ashleygjovik the world is both pandering to you & also reaming you. This sounds about right. #narcissist #youdeserveit #coward,"* & then paid to promote her post. (Note, a payment like that should be discoverable from Twitter).

234. Around this time, a Twitter account, "*Mel Nayer,*" which was Def. & even referenced internal Def. tools, began replying to Pl.'s posts making threats & wild allegations. Nayer demanded Pl. delete "*the work screenshots*" because "*lives are at risk*" & there were "*death threats.*" Nayer added, "*people at Apple have been fired for sharing less.*" The account claimed to be an Apple employee. The burner accounts (not representative of real people & created just to harass Pl.) also showed Apple connections through their activity (for example several accounts were used solely to

1    harass Pl. & other Apple legal adversaries including Epic Games & Corellium).

2    235. Many of the public forum posts about Pl. were so hateful & vile, even the pro-Apple

3    moderators were complaining the posts about Pl. were *"full of toxicity"* & noted there were also a

4    "*number of pretty unpleasant posts [about Pl. that] [the public] cannot see as [Moderators] have removed*

5    *them.*" [Sept. 11 2021]. Others also commented the digital harassment of Pl. was "out of hand,"

6    the entire thread was "*people tearing this woman down,*" & "*Jesus, I know you guys like your iPhone,*

7    *but God damn.*"    The harassing comments continued well past after Pl. was fired & continued as

8    long as Pl. continued to pursue her charges against Def..

9    236. Def. knew Pl. had been facing harassment from J.A. & other Def. employees, & when Pl.

10    filed her Jan. 2022 NLRB claim, she communicated to Def. to send a cease & desist to a number of

11    employees illegally harassing her, including A.S., R.M., & S.V. – & also asked Def. to get them to

12    stop reporting her to law enf.. This was around Jan. 11 2022, which was followed by even more

13    reports to law enf. – including by someone in Germany. Pl.'s post asking Def. to stop the harassment

14    was also a subject of the lawsuit, claiming it was illegal for her to post it.

15    237. One of these employees, Ricky (R.M.), was an Def. manager during the operative times,

16    posted under their own name, & worked in a "security" function at Def.. Some of their posts

17    included defending Def.'s practices related to Gobbler. An Def. supervisor making public

18    statements like this represents Def. by the nature of his role.

19    238. While J.A. apparently left Def. around Dec. 2021, she informed Pl. in Jan.-Feb. 2022 that

20    she remained in contact with Def., they spoke about Pl., & they were both trying to censor her social

21    media posts. J.A. repeatedly urged Pl. to drop her allegations against Def.. J.A. emailed Pl. on Feb.

22    5 2022, harassing Pl. claiming that Pl. complaining about Def.'s threats of violence against her, &

23    complaining about Def. trying to make her suicidal, was "*harmful to Apple*" & J.A. said she

24    "*reported*" Pl. "*to Apple*" for making those statements, before proceeding to then threaten Pl. with

25    litigation & unspecified reprisals if Pl. did not alter her federal testimony.

26    239. Pl. complained about the harassment multiple times to Def. & Def. never did anything (that

27    Pl. is aware of) to try to stop or limit that harassment, & instead seemed to incite it further.  Def.

28    was aware of the harassment & aware of the distress caused to Pl. by it, through their surveillance

of her online presence, of their own direct participation, the press 'asking for comment' on matters including the harassment, Def.'s admitted "investigation" into Pl.'s social media in Aug.-Sept. 2021, employees filing complaints about things Pl. complained about and/or about Pl., & a number of other supporting theories.

240. One employee, Ian, was Pl.'s coworker who sat across the aisle from her at SD01 but who was posting on several platforms under an alias. Pl. did not connect the account to the person until 2023. The account made a number of posts accusing Pl. of lying & being insane, claiming Pl.'s complaints were meritless, & holding himself out as having insider info. about what happened with Pl.'s complaints. This employee sat in the same office as Powers & was likely directly involved, or overheard material conversations about Pl., & felt it appropriate to publicly harass Pl. in response.

241. There are other types of agency & liability. For example, one of Def.'s four+ external counsel law firms hired to fight Pl., MWE, was caught multiple times harassing Pl. online & in real life. The firm filed notice of appearance on Pl.'s NLRB charges in Aug. of 2021. In 2022, the firm somehow knew J.A. sued Pl. & quickly requested copies of the order against Pl. & the entire case file for the matter. How did MWE know about it if they were not involved? How did MWE know the lawsuit was based on Pl.'s NLRB charges against Def.? What did they plan to do with the records? The firm was also caught in 2023 using a fake Twitter account to harass Pl.. The account called Pl. a liar, repeatedly degraded her over the weight she gained during the trauma, & otherwise ridiculed her. Pl. identified the account was associated with the unique name of one of the attorneys & also spent most of its time harassing Pl. & unions which the firm, & specific lawyer, was hired to oppose in labor organizing.

242. The lawsuit filed against Pl. on Jan. 31 2022 was done so, admittedly in the petition & the TRO hearing testimony, because Pl. filed an NLRB charge against Def., because Pl. claims she was retaliated against by Def., & because Pl. had complained about harassment from Def. Global Security, including A.S., J.A. publicly posted she was in some sort of dire trouble with Def. in Jan. 2022, & then after filing the lawsuit said the issues were resolved. The night after she filed the lawsuit, she posted a photo of her holding an Def. Global Security "challenge coin." J.A. also repeatedly claimed some unnamed third-party told her to file the lawsuit. A few days later she also

1  posted that she had personally never sued anyone – despite just suing Pl. – which begs the question
2  of who she was suing Pl. for if it wasn't herself.

3  243. **Excerpts of Harassment**: On Sept. 1 2021, an Def. employee, Shantini ("S.V.") wrote a
4  long Twitter thread accusing Pl. of being a *liar, racist, & a predator.* S.V. claimed Pl. made "*bogus,*
5  *unsubstantiated filings with the DOJ & other regulatory bodies*." S.V.'s posts were quickly reshared by
6  *Beezie Wacks* & Mel Nayer, & other fake accounts, as well as named Def. employees & managers.
7  On Sept. 3 2021, 9to5Mac.com published an article about Pl. alleging there was doubt to the merits
8  of her NLRB charge against Def., suggesting she was lying. (The blog retracted nearly the majority
9  of the post after Pl. threatened to sue them for defamation & false light). The article included quotes
10  from S.V.& R.M. R.M. also shared S.V.'s thread about Pl. & R.M. stated Pl. was on a "*warpath*" &
11  had a "*vendetta*" against Def.

12  244. Another one, Mel Nayer, tried to coerce Pl. to delete the screenshots of internal documents
13  she had posted, claiming the posts were leading to 'death threats' & proceeded to reference a
14  number of internal Def. tools & systems. Another one, *I'mPinkThereforeI'mSpam,* posted, "*You'll*
15  *never work as an attorney*," (post then liked by other anonymous account *"BeezieWacks"*), & added
16  "*The nail that sticks out, gets hammered*."

17  245. On Sept. 8-10 2021, yet another one, "*crissnovak*," started posting about Pl. on Reddit,
18  sharing a link to S.V.'s Twitter posts harassing Pl. about Pl.'s NLRB & US DOJ complaints,
19  "*Shantini is my hero, best take on "A" with over 200+ [likes]. ALOT seem to agree: entitled, obnoxious,*
20  *toxic, vindictive employee. To me, zero credibility. I would not even want to be on the same sidewalk with*
21  *that.*" The same account posted on Sept. 9 2021, "*Good riddance. They should have fired her weeks*
22  *ago.*," "*Santa Clara University Law must be cringing.*"

23  246. On Sept. 10 2021, the account posted in a thread about Pl.: "*The only thing toxic in all of this*
24  *is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person.*
25  *She needs serious help.*" The same day the account posted about Pl.: "*I think when the NLRB, EEOC*
26  *slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt*
27  *these agencies are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only*
28  *perpetuate it. She needs to learn a hard lesson in life & gain some maturity.*"

247. On Sept. 11 2021 the *crissnovak* account posted:

"I so hope Apple, NGC, Irvine Company sue her & teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!"

*Crissnovak* then began threatening other Apple employees they may "*get Pl.ed!*" if they speak out.

On Sept. 13 2021, the *crissnovak* account posted on a thread about Pl.:

".... Apple (w/it's army of lawyers) can sue her & it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood…"

*crissnovak* sure knows a lot about employment law too. The account added that Pl. was on the "*chubby side*" & had "*baby teeth lol.*"

248. As a representation of the retaliatory animus of her managers (see, Ian, aka Neoform, her coworker sitting across the aisle from her at SD01, seeing her manager every day & participating in conversations about Pl.. Ian took to Twitter & other social media to harass & threaten Pl. starting in Aug. 2021 & continuing through fall of 2021). Ian's comments included statements like: "*Based on her writings & twitter feed, I would not be surprised in the least to learn she has some kind of psychosis,*" "*You think there are law firms that will want to hire her? She's toxic,*" "*Now Apple has fired her for supposedly 'leaking' insider information. A brief glance at her twitter feed can resolve the 'supposedly' part,*" "*She's entirely to blame for her firing,*" & "*Vexatious litigant incoming!*"

249. Pl. also received messages via the webform on her website, which allowed anonymous people to message her, though it recorded their IP addresses. Messages were often vulgar & offensive, & also sent from IP addresses flagged for spam & malicious conduct. Examples include: "*Cunt*" (9/12/21); "*Nobody wants to see your nasty nudes. Next time use your work phone for work only you stupid moron*" (9/20/21); "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple. Matthew 5:38-42…*" (12/8/21); "*If only Steve Jobs were still around. He'd drag you … out to the street by your hair & tell you … to go work a corner. It's the only talent you'll ever have.*" (4/5/22). Whether or not Def. was behind the fake accounts, Def. fostered an environment

where people were rewarded for harassing Pl., & ostracized & ridiculed if they supported her. Def. encouraged the abuse.

250. An example of one of the more egregious digital threats includes but is not at all limited to this post from Sept. 22 2021, which as published on a discussion thread linked to an article about Pl.'s NLRB charge against Def.'s CEO Tim Cook for sending a threatening email to staff claiming any internal info. is confidential:

> "I said it in the last thread about bad, criminal employees, & I'll say it again. It's time for Apple to take out the trash. Do whatever it takes to identify & catch the leakers & then ruin their lives. Fire them, prosecute & go after them. Do whatever it takes. Hunt them down like wild animals. Leakers & other activist employees who believe that they can do as they please have no business being at Apple. I want to see them gone & I want to see them destroyed. Trashy employees do not belong at Apple. And who is surprised that the leakers go running to the garbage site called the Verge? They already had one campaign that backfired on them when the lunatic woman leaker [Pl.] was fired, now it is time to get rid of any remaining leakers & criminals. Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death & all Apple would need to do is to make it apply to corporations & not just nations. People just need to be optimistic & patient." (*PacManDaddy*, Sept 22 2021).

251. As Pl. was fired, an account, "*EarlyRiser*," replied to Pl.'s posts saying, "*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co$t you.*" On Oct. 1 2021, another account later identified to be an account Def. created to harass Pl., commented on Pl.'s post about getting cut by the broken glass in the box Def. mailed, asking Pl. to post photos of her bloody wounds. The next day, on Oct. 2 2021, the account tried to convince Pl. to allow it to remotely access Pl.'s computer & modify the config.

252. Pl. also received bizarre, hostile, & obscene messages sent to her via her websites contact webform. Someone sent Pl. an email from an IP associated with Def.'s first manufacturing plant in Fremont in which the person (self-named "The Messenger") warned Pl. to drop her cases against Def. & justifies this with quotes from the Christian Bible. (Dec.8 2021, Weebly webform). The account complained that Pl. is retaliating against Def.. On Dec. 21 2023, on social media, one post read: "*Tomorrow's headline: Apple Whistleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here).*"

253. On Dec. 29, 2021, J.A. messaged one of Pl.'s friends claiming Pl. was "*perjuring herself*." On Dec. 30, 2021, J.A. messaged once of Pl.'s friends saying J.A. was "*one of Apple's witnesses against [Pl.]*". On Feb. 15, 2022, J.A. submitted a statement to the Washington state courts saying she complained about Pl. to the FBI & also to the Chief Security Officer of the National Labor Relations Board, the previous Chief of Physical Sec. at The White House & a Sec. Manager at the Dept. of Defense.

254. J.A. sent Pl. a lengthy email on Feb. 5, 2022 (over 3,000 words) making false accusations against Pl., unlawful demands of Pl., threats against Pl. & demanded Pl. withdraw allegations & evidence about J.A. from Pl.'s federal charges against Def. (charges about obstruction of justice & witness tampering). J.A. in great hostility told Pl. she believed one of Pl.'s SEC whistleblower filings: "*contained absolutely no material information for shareholders.*" J.A. informed Pl. she reported Pl. to the FBI, & also told Pl. that she reported Pl. to Def. for Pl. complaining that Def. was trying to make her kill herself, & that Def. could have Pl. assassinated, which J.A. complained was "*extremely harmful*" to her & Def..

255. On Feb. 5 2022, J.A. posted on Twitter claiming the NLRB accused Pl. of extortion & told J.A. to report Pl. to the FBI (which she also testified at the ex parte hearing on Jan. 31 2022, & which the NLRB fervently denied) & J.A. later blamed on an illegal drug relapse. In A.S.'s posts she mentions Pl. is a federal witness. J.A. then claimed "*multiple people*" were reporting Pl. to Pl.'s law school at Santa Clara University & claimed "*the authorities had to get involved*" with Pl.. J.A. filed an FBI report against Pl. charging Pl. with "*criminal extortion & blackmail*," & apparently reported Pl. to a police department.

256. On Feb. 15, 2022, testimony J.A. also claimed, without any evidence to support prima facie elements of the charges, that Pl. committed "*criminal cyber-harassment, blackmail, & extortion*." The majority of A.S.'s complaints in the lawsuit were arguments focused on a legal filing Pl. submitted to the gov. including law enf., where she had gathered evidence of the harassment against her, alleging Def. was engaging in criminal conduct. J.A. repeatedly demanded Pl. alter, withdraw, & conceal this legal filing – & upon winning the first Court of Limited Jurisdiction hearing against Pl., then proceeded to report the federal legal filing to Pl.'s web server as "child porn."

257. The Order prohibited Pl. from speaking to anyone, even privately, about significant aspects of her litigation against Def., & it had now become a crime to say/write the name of her office. (Note: Pl. was certain Def. would use the Order to try to incarcerate Pl., & Pl. did discover that Orrick – counsel here – employ a large number of prior Office of the A.G. staff from state of Washington, including a prior A.G. If Def. wanted to get Pl. thrown in jail, they had the means to do so.

258. Another account, "*FirstNameBunchofNumbers*," started harassing Pl. in 2022, primarily taunting Pl. about the lawsuit filed against her. The account's profile photo was the docket for A.S.'s lawsuit against Pl., & the biography was "*Ashley is a bitch.*" Among other deranged posts, the account tagged Pl. with a link to the Cal. Moral Character exam & inquired if Pl. will still be able to be a lawyer with this lawsuit against her. The account added an image of a smirking teenager.

> Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.  [Photo of young girl at computer drinking soda & smiling mischievously]  link: calbar.ca.gov/Admissions/Moral-Character/Guidelines" @FirstNa47437596 February 11 2022.

259. The retaliatory lawsuit also was filed with the intention of preventing Pl. from becoming a licensed attorney. Pl. had a right to become an attorney & Def. egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Def.) harassed Pl. about exactly this. The same account also posted about Pl.:

> "Honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in & help?" & "If they read her TL they see that she's a nutjob & can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law."

260. On April 17, 2022, a Telegraph profile was published about Pl. titled "*Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now*'", & the reporter posted the article on Twitter. J.A. & her friends then quickly replied to the post & 'quote-tweeted' the post making allegations against Pl., & making derogatory statements about Pl., & harassing the reporter for writing about Pl.. After A.S.'s protest, The Telegraph changed the subtitle of the article about Pl. from something

1  positive to saying that what happened to Pl. was the "*consequences of her actions.*" If Pl. complained,

2  J.A. could try to have Pl. incarcerated.

3    261. On June 8 2022, J.A. edited Pl.'s Wikipedia article deleting over 8000 characters & accusing

4  Pl. of libel based on Pl.'s accusations against Lisa Jackson & Ronald Sugar. (account confirmed by

5  Wikipedia to be J.A. & had to be banned three times for vandalizing Pl.'s public article).  On Jan.

6  23 2023, after the retaliatory lawsuit against Pl. was already dismissed & vacated, J.A. then filed

7  another document in which she accused Pl. of a variety of torts (defamation, harassment) &

8  criminal acts (criminal wiretapping, perjury), threatened to report Pl. to the Bar Association, &

9  threatened to sue Pl. again. The next day J.A. posted on Twitter about Pl., with some of the

10  language as her legal filing*:*

11      "If you lack the moral fortitude to admit that you misrepresented, omitted,
        misquoted, or otherwise altered facts to exaggerate & fit a narrative… sincerely,
12      don't bother engaging in the public space. You will eventually be hit with a
        boomerang of your own making." On Jan. 24 2023, J.A. replied to the post above &
13      added "A YEAR OF THIS [EXPLETIVE] A YEARRRRRRRRRRR". (sic)

14

15   J.A. filed the lawsuit against Pl. on Jan. 31 2022 (a year prior) & was clearly referring to Pl. &

16  threatening her with being "*hit*" if she did not leave "*the public space.*"

17    262. J.A. harassed Pl. on social media as well as many other mediums (Resp. Sup., ratification).

18  The social media harassment started in late Aug. & early 2021, while both were still employees at

19  Def.. A.S.'s defamatory, intimidating, & harassing comments were posted publicly, & also sent

20  privately to individuals who interacted with Pl. & expressed support for Pl.. Public posts usually

21  were positioned as being based on some sort of inside info. from Def. Global Security and/or H.R.,

22  & as if she was speaking on behalf of the company about Pl.. The content also revolved around

23  animus over Pl.'s NLRB & other gov. charges against Def.. On Feb. 19 2023, J.A. contacted Pl. with

24  an email saying she knows Pl. does not "*wish to hear from [her]*" & then proceeded to make more

25  accusations against Pl., & compare their relationship to each other & Def., to the movie

26  "Annihilation."

27    263. On March 2 2023 & for several days following, a Twitter account created specifically to

28  interact with Pl. about her claims about N-Methyl-2-pyrrolidone ("NMP"), "Sybil", replied

repeatedly to her posts. Sybil repeatedly claimed NMP is completely safe, not banned, & Pl. was lying about the yellow clothes & rusty jeans, & it was occurring simply because Pl. did not know how to do laundry properly. Even after blocking the NMP account, it continued to stalk Pl.'s posts & continue posting, next calling for Pl.'s account to be suspended due to supposedly spreading misinfo. about NMP. Under info. & belief, Sybil was Def..

264. On March 11 2023, a fake account ("Comrade Jones", sorry@butno.com) sent Pl. an email claiming to be an ex-EPA compl./enf. employee. The account attempted to get Pl. to stop talking about the V.I. documentation for 825 Stewart Drive & tried to get Pl. to stop talking about the NMP. The account made threats to intimidate Pl.. The IP came from a location known for spam accounts. Under info. & belief, "Comrade Jones" was Def..

265. On May 13 2023, J.A. replied to her prior post ridiculing Pl. with a new post that said "I'm a lawyer" with an image of a boy sticking a flute up his nose, implying that was Pl.. Between on May 13 – 15 2023, J.A. suddenly made around forty posts on Twitter that made negative remarks & allegations against Pl.. J.A. included Pl.'s name & other personally identifiable info. in several of the posts & tagged Pl.'s acquaintances, & even included images of the documents in A.S.'s lawsuit against Pl. so it was clear J.A. was posting about Pl. – & J.A. also uploaded a video showing J.A. cyberstalking Pl.. J.A. "tagged," among others, the Twitter accounts of the Wash. state AG's office & U.S. President Joe Biden.

266. Throughout the May 13-15 2023 posts, J.A. repeatedly referred to Pl. as a "*harasser*", called Pl. a "*liar*," & accused Pl. of perjury & "*fabricating evidence,*" committing fraud, & accused Pl. of defamation, stalking, & harassment. J.A. once again claimed Pl.'s pleas for J.A. to stop harassing her was some sort of criminal act by Pl.. J.A. also began vaguely accusing an acquaintance of Pl. of perjury, lying, harassment, & falsifying evidence. J.A. posted that she had recently reported Pl. to law enf. & "*the proper authorities*," & the non-profit organizations EFF & ACLU, & invited any "*civil liberties group or attorneys*" to contact her about Pl.. (May 13-15 2023, Twitter, A.S.).

267. On May 26-27 2023, J.A. attempted to contact Pl. through a third-party (a current Def. employee domiciled in another country) & conspired with him & attempted to get Pl. on the phone with her without Pl. knowing it would be J.A. on the other line. When Pl. saw through the plan &

1  complained to the third-party, that person explained J.A. wanted to talk to Pl. about Pl.'s evidence
2  against

3   268. J.A. contacted one of Pl.'s friends via LinkedIn, identifying herself as "*Apple Global*
4  *Security*," & trying to learn about Pl.'s "*friends or family*," claiming she wants to "*help*" Pl., &
5  admitting she has been extensively cyberstalking Pl.. (May 31 2023, LinkedIn, A.S.).

6   269. **Outrageous Per Se**: Def. mailed Pl. a package with her personal effects from her desk, with
7  a shipping notice on Sept. 29 2021. Pl. asked on Twitter what they thought Def. was mailing her &
8  one account, *BabyHummingbird*, later revealed to clearly be associated with Def. public relations or
9  global security, posted an image from a movie implying that Def. had mailed Pl. the severed head
10 of one of her loved ones. The box really contained Pl.'s possessions from her desk trashed &
11 covered in glass shards, & a bug planted in one of her items of décor. 18 U.S.C. § 876. The account
12 only posted to/about Pl., & its first "like" was an ad that read, "*Apple's back better than ever!*" It
13 also liked posts about Pl., including "*don't get Pl.'d.*"

14  270. Def. broke & destroyed Pl.'s possessions from her desk & mailed them to her and/or packing
15 Pl.'s items to ensure they are broken in transit (Pl. received a box with rocks & broken glass on Sept.
16 30 2021). Inside the package, which arrived on Sept. 30 2021, planted inside one of her personal
17 items (a gifted statue that read "*sue the [expletive]*!") was some sort of electronic device, assumably
18 a listening device. There were three highly suspicious "call-drops" during phone calls at Pl.'s home
19 over a period of ten days in 2022. They occurred on May 16 2022 at 6:29 PM PST, May 24 at 2:03
20 PM, May 26 at 1:59 PM. One of the calls was interstate, & another was international. The third call
21 was with the Santa Clara County DA's office. These drops led Pl. to discover hacking on her
22 network on May 28 2022, & then the bugged objects in her home on May 29 2022, including the
23 statue from her desk.

24  271. Pl. called the Santa Clara city police on May 31, 2022 [re: report 2205310079] to report the
25 listening device Def. planted in her chattel property & the call drops, internet interference that led
26 to her to search her items for bugs, & the attempted break-in. The police took possession of the
27 statue. Pl. later found her fake fig tree was also producing R.F. & E.M.F. signals & threw it in the
28 trash & complained on Twitter about it. Pl. contacted the FBI May 30 2022 to report hacking & the

bugged object. The FBI agent she talked to advised Pl. to give the object to the local police. Several hours later Pl. heard someone trying to break into her apartment through the front door. Pl. posted on Twitter about it, blaming Def..

272. Def. stalked Pl. in Cal. & NY, sending people to sit outside her apartment, to follow her around, & take photos/videos of her inside her home from outside the windows. [Cal.Pen.C. §§ 647(h), 647(i)]. Def. repeatedly broke into Pl.'s home in at least the state of Cal. [Cal.Pen.C. §§ 459, 602.5].

273. Pl. called the Santa Clara city police on Aug. 9, 2022 [re: report 2208090087] to report Def. breaking into her attic & installing some sort of electronic equipment. After Pl. reported the attic situation to law enf. the police said they would come by the next day to create the report. Pl. left her home to run an errand. When Pl. returned, the day before the police were to arrive & search her attic, she found two signs that someone had broken into her apartment & entered the attic. First, her dog's belly smelled strongly of cigarettes despite him not leaving the apartment while she was gone & Pl. not smoking cigarettes. After noticing the odor, Pl. quickly inspected her closet where the entrance to the attic is & found attic insulation stuff on the floor despite having just vacuumed before she left. Under info. & belief, Def. broke into Pl.'s apartment again, this time to retrieve whatever they installed in her attic, before law enf. arrived.

274. Def. surveilled Pl. & even bugged her property, including, apparently, directly intercepting her home internet. [Cal.Pen.C. §§ 591, 632(a)]. Def. trespassed on Pl.'s back porch in Boston, Massachusetts at some point between 1am & 7am before her first day of work at her new job (Sept. 28 2023), leaving the door wide open to show someone had been inside. (This never happened again after & Pl. complained to Tim Cook about it when she filed this lawsuit).

275. **Injuries & Impact**: Def.'s conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Def.'s misconduct towards Pl. was/is extreme, outrageous, persistent, & omnipresent. Def.'s conduct left Pl. fearing for her safety, her dog's safety, the integrity of her electronics & utilities, & the safety of her chattels – that Pl. was confined to her home. Pl. was & is under a justified belief that leaving her house or even failing to secure entry to her home properly would place her in danger, & she could be killed. Pl. was & is under a justified

1    belief that leaving her dog at home unattended could result in harm to her dog & that Def. could
2    kill him. Def. could have acted with some decency & reserve. Still, instead, Def. bugged Pl.'s objects
3    & home, sent her possessions to her in a box with broken glass & threatened it could contain a
4    severed head, sued her for reporting criminal conduct, reported her to law enf., repeatedly
5    threatened to "*ruin*" & "*destroy*" her, & even sent her emails pretending to be gov. employees
6    threatening her to stop speaking about Def.'s chem. leaks. [18 USC § 912; April 2023; reported to
7    FBI & EPA]

8        276. When Pl. explains to people what Def. has done to her when she shows them Def.'s
9    communications & exposure records & shows them the evidence she gathered of their intrusions
10   & harassment, the default response is not simply to shake their heads with disappointment. No, it
11   is to exclaim something such as "*Outrageous!!*" Further, these actions caused fear in those around
12   Pl. & in Pl. herself. Pl. has lost many friends through this & she cannot blame them as Def.'s
13   menacing is smoke from the fire of actionable threats of violence & mayhem. Def.'s tortious
14   conduct evinced an indifference to or a reckless disregard for the health & safety of others; Pl. had
15   financial & medical vulnerability; the conduct involved repeated, systemic actions & schemes; &
16   the harm to Pl. was the result of Def.'s intentional malice, trickery, & deceit.

17       277. As documented in legal filings, emails, dr. appointments, & therapy sessions throughout
18   these two years – Pl. has suffered severe insomnia, nausea from stress to the point of vomiting,
19   extreme depression requiring anti-depressants due to suicidal ideation, & crying uncontrollably for
20   hours every day. Pl. suffers from paralyzing anxiety, & it has been difficult even to get up & walk
21   around, with Pl. generally spending all day in some form of the 'fetal position.' Pl. has alternated
22   between overeating & undereating but overall gained over sixty pounds in 2020-2022. Def.'s
23   conduct, of course, left Pl. with "*discomfort, worry, anxiety, upset stomach, concern, & agitation.*"
24   However, as a direct & proximate result of Def.'s conduct, Pl. also experienced overwhelming
25   anguish, illness, "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger,*
26   *chagrin, disappointment.*" Def.'s conduct resulted in PTSD & anxiety symptoms. Pl. suffered
27   depersonalization & derealization.

28       278. On Dec. 26 2021, Pl. posted on Twitter about her intention to pursue a Dodd-Frank &

witness retaliation claim against Def.. On or around Jan. 10 2022, Pl. filed complaints about witness intimidation & witness retaliation to U.S. NLRB, the U.S. DOL, & the Cal. DOL. Pl. drafted several legal documents, including a legal brief, image exhibits, & a detailed dossier containing the accounts & posts Pl. believed to be Def.. On Jan. 25 2022, Pl. emailed the U.S. NLRB about her Jan. 10, 2022, witness intimidation charge & attached a 77-page rough draft of the Evidence Report. On Jan. 31 2022, Pl. posted on Twitter that she planned to submit her legal filings about witness intimidation to the U.S. Dept. of Justice & the whistleblower & labor agencies. Pl. commented that Def.'s actions were criminal. Pl. testified to the U.S. NLRB about it on Feb. 10, 2022. Pl. also contacted the Santa Clara Dist. Attorney's office about the developments with Def., complaining about witness intimidation & witness retaliation on Feb. 21 2022, & Dec. 15 2022. Yet, Def. continued with the harassment, unphased.

279. Def. abused its position of power over Pl. & exploited that power differential in its campaign of terror against Pl. enlisting multiple employees & other agents to carry out their scheme. Def. has extreme power & control over Pl. & its other employees as one of the world's largest & most influential companies. Def.'s conduct was despicable, base, vile, & contemptible, & subjected Pl. to cruel & unjust hardship. It was carried out with a willful & conscious disregard for Pl.'s rights & safety. Through all this, Def. went out of its way to act like deranged maniacs whose conduct exceeded all bounds of decency usually tolerated by society. But this is not new for Def.. CNN described working at Def. as "*a brutal & unforgiving place*" & even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment. A Gawker reporter described the culture of working at Def. as "*bullying, manipulation & fear*" & described Def.'s leadership as "*rude, dismissive, hostile, spiteful,*" & "*deeply disturbing.*"

280. **Statute of Limitations**: The statute of limitations for IIED claims under Cal. state law is two years from the date of injury & under NY state law it is one year from the act. Pl. lived in Cal. until Aug. 31 2022 & then lived in the state of NY from Sept. 1 2022 up to the date the complaint was filed on Sept. 7 2023. The NY statute of limitations covers Pl.'s presence in NY from Sept. 7 2022 through Sept. 7 2023. The Cal. statute of limitations cover's Pl.'s presence in Cal. from Sept. 7 2021 through Sept. 1 2022. (Pl. also reserves the right to claim IIED under Massachusetts law if

1    Def. continues inflicting emotional distress upon her through the trial).

2    281. Def. terminated Pl.'s employment on Sept. 9 2021 & thus only 2 days fall within this IIED

3    claim's coverage.  Pl.'s allegations do not include any employment actions or other conduct which

4    could be subject to Worker's Comp.

5                              P r a y e r   f o r   R e l i e f

6    WHEREFORE, Pl. prays that this court enter judgment in her favor on each & every claim for relief

7    set forth above & award its relief, including, but not limited to, the relief as follows:

8        i.    A Judgment entered in her favor, & an award of damages in an amount to be determined at trial.

9       ii.    Employee whistleblower's "make whole relief" with compensatory damages, including lost

10   wages (back pay, lost benefits, lost bonuses & pay raises, lost stock grants & vesting, etc.). This should

11   include a refund of Pl.'s use of Vacation & Sick days in response to Def.'s misconduct & negligence,

12   payment of those days, & removing negative records from her personnel file.

13      iii.    Reinstatement of employment at a prior or higher level, with reestablishment of benefits &

14   seniority, & promise of a respectful & health workplace. If that cannot be provided – then at least ten

15   years of front-pay, or up to retirement age.

16      iv.    Compensatory damages for pecuniary harm, including lost future wages, lost benefits, lower

17   earning capacity, past & future medical expenses, counseling, medication, physical & digital security

18   expenses, reputation mgmt. expenses, mental/emotional injury (PTSD, anxiety, depression,

19   insomnia, disordered eating); property damage, degradation, & conversion; & moving costs to

20   relocate.

21       v.    Compensatory & special damages for non-pecuniary harm, including emotional distress,

22   humiliation, loss of enjoyment, annoyance, discomfort, inconvenience, disfigurement, pain &

23   suffering, mental anguish, & reputational harm. Pl. now suffers from permanent psychological trauma

24   & damage because of Pl.'s actions. Pl. is entitled to compensation for any special damages she suffered

25   resulting from Def.'s outrageous & defamatory acts.

26      vi.    Compensatory damages for the injury suffered to Pl.'s body, mind, & property by Def.'s

27   nuisances & ultrahazardous activities, including cost to replace clothing & other chattel property that

28

1  were destroyed by Def.'s tortfeasing. Costs for medical monitoring & medical intervention for any

2  lifetime illnesses attributable to exposure to the chemicals Def. exposed her to.

3      vii.    Consequential, expectation, reliance damages, where applicable.

4      viii.   A civil penalty of $10,000 per employee for each violation of Cal.Lab.C. § 98.6 & § 1102.5. (If

5  this request prevents other damages, this request may be waived).

6      ix.    Punitive damages for all available claims (*Tamney*, Cal.Lab.C § 1102.5, Nuisance, & IIED), with

7  amount to be determined at trial.

8      x.    Declaratory relief stating Pl. is a Crime Victim under federal & state law, so Pl. can be afforded

9  her relevant rights.

10     xi.    Litigation costs, expert witness fees, pro se attorney's fees, & other reasonable expenses. Pre-

11  judgment & post-judgment interest.  Offset for tax bracket increase due to lump sum payment.

12     xii.   Where no damages or other relief are available, entry of declaratory relief & nominal damages

13  of $1.00 (or $2 or $3 where double or treble damages apply).

14     xiii.  Such other & further relief as the Court deems just & proper.

15  Pl. hereby requests a trial by jury on all issues so triable.

16              ## Certification and Closing

17      282. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

18  knowledge, information, and belief that this complaint is not being presented for an improper

19  purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is

20  supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing

21  existing law; the factual contentions have evidentiary support or, if specifically so identified, will

22  likely have evidentiary support after a reasonable opportunity for further investigation or discovery;

23  and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the

24  Clerk's Office with any changes to my address where case-related papers may be served. I declare

25  under penalty of perjury under the laws of the United States of America that the foregoing is true

26  and correct.

27

28

1    Dated: Nov. 20 2024

2

3    Respectfully submitted,

4

5

6

7    _____

8    **/s/ Ashley M. Gjovik**

9    *Pro Se Plaintiff*

10

11   **Physical Address**:
     Boston, Massachusetts
12   **Mailing Address:**
     2108 N St. Ste. 4553 Sacramento, CA, 95816
13   **Email**: legal@ashleygjovik.com
     **Phone**: (408) 883-4428
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28