**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **ASHLEY M. GJOVIK,** *an individual,* <br><br> Plaintiff, <br><br> vs. <br><br> **APPLE INC.,** *a corporation, et al.,* <br><br> Defendant. | D.C. CASE NO. 3:23-CV-04597-EMC <br><br> NINTH CIRCUIT CASE NO. 24-6058 <br><br> **PLAINTIFF'S FIFTH AMENDED COMPLAINT** <br><br> CLAIMS: CIVIL LITIGATION <br><br> DEMAND FOR JURY TRIAL. |

# Table of Contents

**SUMMARY OF THE CASE** ................................................................................................. 1

**JURISDICTION AND VENUE** .......................................................................................... 2

**PARTIES** ........................................................................................................................... 3

**PROCEDURAL HISTORY** ................................................................................................ 3

**STATEMENT OF FACTS** ................................................................................................. 4

**LEGAL CLAIMS** ............................................................................................................ **40**

    KNOWLEDGE OF PROTECTED ACTIVITIES ........................................................................ 40

    COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY .......................... 42

    COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION (CAL.LAB.C. § 1102.5) ........... 45

    COUNT THREE: CALIFORNIA LABOR CODE § 6310 ............................................................ 46

    COUNT FOUR: CALIFORNIA LABOR CODE § 98.6. .............................................................. 47

    TOXIC TORT TOLLING THEORIES .................................................................................... 50

    COUNT FIVE: PRIVATE NUISANCE .................................................................................. 53

    COUNT SIX: TORT OF FEAR OF CANCER & DISEASE ........................................................ 56

    COUNT SEVEN: TORT OF OUTRAGE ................................................................................ 60

        *Burglary, SWATing, & Destruction of Property* ........................................................ 61

        *Defamation, Trade Libel, Intimidation, Retaliation* ................................................... 63

        *Stalking, Obstruction, & Deranged Harassment* ...................................................... 65

        *Injuries and Impact* ................................................................................................. 68

    VICARIOUS LIABILITY, RATIFICATION, & NEGLIGENCE ..................................................... 69

**CONCLUSION & PRAYER FOR RELIEF** ................................................................... **74**

# SUMMARY OF THE CASE

1. This lawsuit arises from Apple Inc.'s ("Defendant") reckless disregard of environmental regulations and safety requirements at two different Silicon Valley properties and subsequent concealment of their unlawful acts and the extensive harm they caused.

2. In 2020, Apple severely injured and nearly killed Ashley Gjovik ("Plaintiff") with Apple's unlawful toxic waste dumping from a stealth semiconductor fabrication facility in Santa Clara, California (Plaintiff did not discover that Apple was responsible for her injuries until 2023, but Apple is believed to have known by mid-2021). In 2021, Plaintiff also exposed that Apple violated health, safety, and environmental rules and regulations at her team's office on a triple Superfund site in Sunnyvale, California.

3. Plaintiff filed environmental and safety complaints and partnered with numerous government agencies to document and investigate the issues. Apple repeatedly made statements to Plaintiff instructing her not to talk to her coworkers or the government about her safety and compliance concerns, pressured her not to ask questions, prevented her from gathering evidence, and tried to conceal their unlawful activities from her and the government.

4. Apple management retaliated against Plaintiff when she asked questions and expressed concerns. They repeatedly said the retaliation was because of her safety and environmental complaints. They incited and encouraged others to harass and intimidate the Plaintiff. Apple took negative employment actions against Plaintiff to coerce her into quitting the company, but Apple fired her when she did not stop.

5. Apple's explanation for firing the Plaintiff has changed multiple times and was not communicated until a week after her termination. The reason proffered is pretextual but unlawful itself. Three years later, Apple still has not admitted who initiated the decision to terminate Plaintiff's employment and has refused Plaintiff's requests for them to provide this information.

6. During Apple's marathon of retaliation against Plaintiff in 2021, Plaintiff was in law school studying to become a human rights lawyer. She was in a position to report serious environmental and safety issues effectively and to lobby for policy reform. Plaintiff used her knowledge, experience, and resources to confer with government agencies, meet with various elected officials

and their staff, publish op-eds calling for legislation, was interviewed and written about by the press, and served as a witness for government agencies and legislative committees.

7. Plaintiff spoke out publicly, organized with coworkers, lobbied on their behalf, and called for change in Apple's environmental and labor practices. Plaintiff's advocacy also brought awareness to her prior neighbors of the pollution issues where she had lived in 2020, leading to more chemical exposure victims joining Plaintiff in complaining to the government.

8. In 2021, Plaintiff filed retaliation and discrimination complaints with multiple administrative agencies, including the U.S. NLRB, U.S. EEOC, U.S. Department of Labor, California Department of Labor, and California DFEH. The EEOC and DFEH claims were merged into this lawsuit. The U.S. Department of Labor whistleblower retaliation case is currently with the Administrative Review Board.[1] U.S. NLRB is prosecuting Apple for unlawful employment policies, per Plaintiff's October 2021 charge.[2] NLRB will start prosecution imminently against Apple for its retaliation and unfair labor practices committed against Plaintiff.

9. Over the last three years, due to Plaintiff's investigations and advocacy, multiple government inspections of Apple's two facilities have been noted, resulting in citations for environmental and safety regulatory violations, ordered corrective actions, and required monitoring. The plaintiff still regularly speaks with the U.S. EPA ("EPA") as a community advocate.

10. Apple continued harassing and retaliating against Plaintiff after she was fired and through the current day, intentionally interfering with and severely damaging her career, reputation, relationships, finances, physical condition, mental health, and every aspect of her life.

## JURISDICTION AND VENUE

11. The U.S. District Courts have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. When the complaint was filed, Plaintiff was domiciled in New York and is now domiciled in the

---

[1] *Ashley Gjovik v Apple Inc*, 2024-CER-00001 (OALJ), 2024-0060 (ARB); CERCLA 42 U.S.C. §9610, Clean Air Act 42 U.S.C. §7622, RCRA 42 U.S.C. §6971, TSCA 15 U.S.C. §2622.
[2] NLRA 29 U.S. Code § 158.

Commonwealth of Massachusetts. Apple is a corporation headquartered in California. The venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district. Many of Plaintiff's claims arose from acts, omissions, and injuries within the District of Northern California [Civil L.R. 3-5(b)].

<u>**PARTIES**</u>

12. Ashley Gjovik, ("Plaintiff"), is a natural person currently domiciled in Boston, Massachusetts.[3] The plaintiff holds a recently awarded Juris Doctor degree from Santa Clara University School of Law and is appearing as a pro se. The plaintiff was an employee of Apple Inc. from February 2015 through September 2021. The plaintiff held a leasehold at a Santa Clara residential property at 3255 Scott Blvd, next to Apple's semiconductor fabrication at 3250 Scott Blvd, from February 2020 through October 2020.

13. Apple Inc. is a business engaged in and affecting interstate commerce and a covered entity under the federal statutes at issue here.[4] Apple is a corporation headquartered at One Apple Park Way in Cupertino, California Apple says it "*designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services.*" As of November 2024, Apple Inc. claimed an annual revenue of $394.33B.[5]

14. At all pertinent times, Apple was the tenant and operator controlling the facilities at both 825 Stewart Drive in Sunnyvale and 3250 Scott Blvd. in Santa Clara, California at both properties, Apple registered its state and federal Resource Conservation and Recovery Act activities under its own name and with Apple EH&S as the contact for the government and public.

<u>**PROCEDURAL HISTORY**</u>

15. Plaintiff now files her 5th Amended Complaint ("5-AC"), in an abbreviated version but with the same substantive content as the prior 5-AC version. The plaintiff filed her original complaint on September 7 2023. The 1st Amended Complaint was filed in October 2023 per

---

[3] The plaintiff established a consulting LLC in California in 2022, which she manages with a virtual office in Sacramento. The LLC address is used on papers for privacy.
[4] "*Apple*" refers to its successors and assigns; controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures; and their directors, officers, managers, agents, and employees.
[5] Apple Inc, 2024 10K, https://investor.apple.com/sec-filings/default.aspx

stipulation, to allow Apple more time to prepare, as needed due to Apple's delayed arrival in court.

16. The 2nd Amended Complaint was filed on December 21 2023 as a matter of course but was dismissed sua sponte by this court without prejudice and with leave to amend on January 30 2024, ordering Plaintiff to reduce the length by over five hundred pages.

17. The 3rd Amended Complaint was filed on February 27 2024, met with a Motion to Dismiss and Motion to Strike, and was ruled upon with a decision and order issued May 20 2024. The 4th Amended Complaint was filed on June 18 2024, also met with Motions to Dismiss and Strike, and was ruled upon with a decision and order issued October 1 2024. The plaintiff was ordered to revise her complaint again.

18. On October 1, 2024, the Plaintiff filed an appeal to the 9th Circuit Court of Appeals, contesting denied injunctions, collateral orders, and the dismissal with prejudice of dozens of her claims, mostly due to discretionary procedural reasons not related to the potential merit of the claims. The plaintiff filed a pending Motion to Stay pending appeal.

## STATEMENT OF FACTS

19. **3250 Scott Blvd, Santa Clara:** In early 2015, Apple started stealth semiconductor fabrication activities in a facility located at 3250 Scott Blvd. in Santa Clara, California. Like some sort of skunkworks, Apple codenamed the facility "*Aria*" and even tried to use the codename on regulatory paperwork. Apple's intentional actions to obfuscate the owner and nature of the facility delayed Plaintiff's discovery of Apple's fabrication activities for years.

20. The 3250 Scott fabrication operated less than three hundred feet from thousands of homes where Plaintiff lived in 2020, the Santa Clara Square Apartments. Within three hundred feet of the building were two public parks, picnic tables, outdoor fitness stations, and a children's playground. Within one thousand feet of 3250 Scott, there was also a church, a school, an elder care facility, and the San Tomas Aquino Creek, which flows into the Pacific Ocean.

21. At 3250 Scott, Apple was cited for building, environmental, health, safety, and fire code violations in 2015 (stop work order due to construction without permits), 2016 (spill of cooling water into storm drains, fire code and California ASPA violations, health and safety code violations, failure to monitor wastewater discharge adequately), 2019 (wastewater testing violations), 2020

(fire code violations, using two EPA ID numbers, inaccurate hazardous materials inventory data, no spill plans or training, no business permit, no signature from supervisor on records, and failure to monitor wastewater discharge again adequately).

22. Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the apartments were four stories high, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

23. Santa Clara City Fire Department records for 3250 Scott include at least sixteen chemical spill reports at 3250 Scott within only three years. These reports included eight confirmed leaks/spills: leaks of phosphine and silane on June 1 2019; a phosphine leak on October 21 2019; a tetraethyl orthosilicate leak on July 17 2020; a significant phosphine leak on April 30 2021; a 5% fluorine gas leak on April 18 2022, a hexafluorobutadiene leak on May 29 2022, and leaks of two unnamed toxic gases on September 20 2022 and December 21 2022.

24. Later, in 2021-2022, Apple reported to the government that in 2020, Apple released at least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air. In 2022, the EPA severely restricted the legal use of NMP as "*it presents an unreasonable risk of injury to human health*" under the TSCA.

25. Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring December 14, 2020 – only after Plaintiff had notified Apple EH&S and environmental legal about what occurred to her near 3250 Scott. Apple also reported to the Bay Area Air Quality Management Board ("BAAQMD"), in difficult-to-find agency filings, that in at least 2019-2021, 3250 Scott exhausted reportable amounts of mercury, arsenic, carbon monoxide, and formaldehyde into the ambient air around the factory.

26. The leaks, spills, and releases were not limited to the air. Apple's wastewater discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, government-mandated testing revealed the presence of 29 µg/L of 1,1-dichloropropane, 24 µg/L of trichloroethylene, and 6.7 µg/L of ethyl tertiary-butyl ether. It is unclear why Apple had

1   trichloroethylene on site but not in any of its chemical inventories, and why exactly Apple was

2   pouring that trichloroethylene down the drain.

3       27. 3250 Scott reported an average daily water usage of around 44,000 gallons, and the sewer

4   pipes carrying 3250 Scott's discharges flowed downhill and directly around the apartment where

5   Plaintiff lived in 2020. In 2020, the government had already started investigating the plumbing at

6   her apartment as a vector for some unknown solvent vapor pollution.

7       28. Apple was fully aware of this facility and its operations, as every year, Apple submitted a

8   financial assurance document to the Santa Clara Fire Department which detailed hazardous waste

9   treatment and disposal operations and was signed by Apple's Chief Financial Officer, Luca Maestri

10   – including affixing a company seal. Financial assurance filings also attached a detailed confirmation

11   letter from Apple's third-party auditor, E&Y, on behalf of Apple. Maestri was also on the email

12   distribution list for notification of hazardous waste violations at the facility.

13       29. **Chemical Injuries in 2020:** In February 2020, Plaintiff moved into a new apartment at

14   the Santa Clara Square Apartments (adjacent to 3250 Scott) and quickly became severely ill with

15   severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and

16   strange sensations in her muscles and skin. The plaintiff also suffered bradycardia, volatile blood

17   pressure with hypertension and hypotension, and a high frequency of premature ventricular

18   contractions. Due to the solvent exposure, Plaintiff also suffered skin rashes, burns, and hives, and

19   her hair fell out and she had a shaved head for a year as the bald patches slowly grew back.

20       30. Plaintiff visited the emergency room on February 13 2020, and Urgent Care (at Apple's

21   for-profit clinic) on February 20 2020. Plaintiff then consulted with dozens of doctors who

22   screened her for all sorts of diseases, subjecting Plaintiff to extensive blood draws, urine samples,

23   injections, and scans – including potentially dangerous procedures like MRI and CT scans with

24   contrast. From February - September 2020, Plaintiff was screened for multiple severe and fatal

25   diseases and disorders, including M.S., brain tumors, deadly arrhythmias, and NMO. The plaintiff

26   was too sick to work and went on disability.

27       31. Plaintiff transitioned her medical care to a different clinic and provider after her Apple

28   primary care provider at AC Wellness refused to help her triage her 2020 medical issues. Instead,

she suggested Plaintiff was suffering from anxiety and enrolled Plaintiff in an Apple internal study related to blood pressure, requiring Plaintiff to share her iPhone medical and fitness data and participate in weekly life coaching sessions (while being exposed to Apple's solvent vapor and gas exhaust).

32. While sick in 2020, Plaintiff would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure. On September 2 2020, Plaintiff discovered elevated levels of volatile organic compounds in her home. What immediately captured Plaintiff's attention was the significant spike in volatile organic compounds that had occurred the night prior, around 3 AM, while she had been suffering from a "dying" spell.

33. Plaintiff sought out occupational and environmental exposure doctors, who told Plaintiff that all her symptoms were consistent with solvent and other chemical exposure. The plaintiff quickly filed complaints with the Santa Clara Fire Department, U.S. EPA California EPA. She also called Poison Control, who said what she described sounded like Benzene exposure. Before moving out Plaintiff also gathered extensive video, photo, medical monitoring, and air monitoring data – which supports the claims in this lawsuit.

34. All the reported toxic gas leaks during the time frames Plaintiff her symptoms in 2020 were the worst around 8-9 AM, 10-11 PM, and sometimes around 2-3 AM. One of the few chemical spills that did not occur during those times was caused by an Apple engineer accidentally turning on lethal fluorine gas. Another incident was root caused to an Apple engineer accidentally installing the gas for a tool "backwards." In the two weeks following the April 2021 phosphine leak, Apple's manifests included sixty pounds of "*vacuum filters contaminated with glass dust*" implying there may have been a phosphine explosion. The TEOS leak occurred on July 17 2020. That day Plaintiff was covered in hives, rashes, and skin abnormalities. She visited a dermatologist who had no idea what caused the rash.

35. In September 2020, Plaintiff hired an industrial hygienist to evaluate the indoor air at her apartment. She ordered an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Plaintiff's testing returned results showing several of the chemicals in use by Apple at 3250

1  Scott including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol,

2  ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, and xylene.

3      36. In September 2020, Plaintiff set up more air monitors to observe the levels of volatile

4  organic compounds in her apartment next to the 3250 Scott factory (though she was not aware of

5  the factory exhaust at that time). The results of the data confirmed what Plaintiff had noticed with

6  her symptoms and ad hoc testing – that the volatile organic compounds mostly spiked early in the

7  morning and late at night as if they were being exhausted from an automated mechanical system

8  (which it was). The plaintiff notified several Apple executives of her findings and activities,

9  including her managers Powers and West, and her Apple coworkers, Josh and Aidria.

10      37. In September 2020, Plaintiff's blood and urine test results showed industrial chemicals,

11  including arsenic, mercury, toluene, and xylenes. Also noteworthy are the symptoms of Plaintiff's

12  3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match

13  phosphine and arsine gas exposure.[6]

14      38. Phosphine and arsine are extremely dangerous, exposure can be fatal, and there are no

15  antidotes. Apple has a significant quantity of arsine gas onsite, and Plaintiff's medical tests from

16  September 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood with

17  no other explanation than arsine gas exposure within the prior 8 hours.

18      39. In September 2020, Plaintiff noticed an Apple facility at 3250 Scott across the street,

19  which was on the same Superfund groundwater plume as her apartment. The plaintiff mentioned

20  the facility to Apple in September 2020, inquiring if anyone was familiar with the area because

21  Apple had an office there. Apple EH&S (Elizabeth) and Plaintiff had at least two phone calls. The

22  woman who responded oversaw EH&S teams involved in 825 Stewart Drive and the activities at

23  3250 Scott. In September 2020, Elizabeth suggested that Plaintiff use a special paid leave to move

24  out of the apartment called '*extreme condition leave*' designated for disasters. Later, in September

25  2021, Apple Employee Relations, Waibel, conferred with Elizabeth about Plaintiff's environmental

26  concerns only hours before Plaintiff was abruptly fired.

27

28  [6] US CDC, NIOSH, *Arsine Emergency Response.*

40. In October 2020, Plaintiff asked her manager from Apple Legal, Joyce, if she knew anyone who practiced environmental law because Plaintiff may be interested in the field and wanted to learn more. The plaintiff was introduced to Deborah, Apple's EH&S counsel. Deboarh met with Plaintiff twice on a video chat, in November 2020. The plaintiff spoke about her experience in 2020.

41. During the conversation the lawyer admitted to Plaintiff that Apple did not have EH&S counsel before her, that she was still catching up, that Apple needed to be doing inspections and testing that it had not done, and that she was trying to get them to start soon. Deborah was Apple's legal representative with the EPA for the August 2021 inspection of Plaintiff's Superfund office. Deborah was and is also in charge of EH&S legal matters for 3250 Scott.

42. On February 21, 2023, the Plaintiff discovered the semiconductor fabrication activities at 3250 Scott. She shared the discovery on Twitter that day, expressing severe distress about Apple engaging in potentially lethal and ultrahazardous activities directly next to apartments. The plaintiff's posts also complained explicitly about the presumed toxic exhaust Apple would release from the roof of 3250 Scott and into the windows of her apartment. Until that day, Plaintiff did not know it was Apple who was responsible for making her so ill in 2020 and did not know these chemicals were potentially lethal to human life.

43. Plaintiff undertook months of research about 3250 Scott, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint. On June 23 2023, Plaintiff filed complaints about 3250 Scott to the EPA, CalEPA, the city of Santa Clara, and Santa Clara County.

44. U.S. EPA's Enforcement and Compliance div. for Hazardous Waste and Chemicals assigned an inspector and a formal investigation was opened around July 12 2023.[7]  Plaintiff met with the EPA's Resource Conservation and Recovery Act Enforcement and Compliance team several times before they inspected Apple's factory in August 2023 and January 2024.

45. Per the formal report, the EPA inspectors identified at least 19 unique violations of the

---

[7] US Environmental Protection Agency, ECHO, 3250 Scott Blvd # 110001168254.

civil and criminal provisions of the Resource Conservation and Recovery Act at 3250 Scott. Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation.

46. EPA found Apple was emitting exhaust from its fabrication activities through a system that did not have required permits and did not have any monitoring. The EPA also found Apple did not inspect the waste on weekends, instead hoping for the best until they returned on Mondays. The enforcement action(s) is still underway.

47. The plaintiff filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including failure to obtain "*Authority to Construct,*"[8] failure to obtain a "*Permit to Operate,*"[9] and for exceeding the "*Final Emission Limits*" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO) emissions.[10] This confirmed that Apple was operating 3250 Scott without required permits and also illegally exhausting toxic chemicals.

48. **825 Stewart Drive:** Plaintiff's Apple office at the time of her termination was located at 825 Stewart Drive in Sunnyvale, California, also known as the "*TRW Microwave*" Superfund site, part of the EPA Triple Site (three adjacent Superfund sites in Sunnyvale, forming a mile-long groundwater solvent mega-plume).

49. The "TRW Microwave" Superfund site is a former industrial semiconductor manufacturing facility at 825 Stewart Drive The primary contaminants in the groundwater plume are chlorinated volatile organic compounds, including the carcinogen trichloroethylene and its daughter products cis-1,2-dichloroethene and vinyl chloride. The contaminated groundwater under 825 Stewart Drive is as shallow as only 2.6 feet below the ground surface, with shallow trichloroethylene concentrations up to 1,400 μg/L and vinyl chloride up to 51 μg/L.[11]

50. Northrop Grumman, the primary Potentially Responsible Party under the Comprehensive Environmental Response, Compensation, and Liability Act, conducted an initial vapor intrusion evaluation at 825 Stewart Drive in 2003 and 2004. The assessment indicated that

---

[8] Rule 2-1-301: August 29 and September 12, 2024.
[9] Rule 2-1-30: August 29 and September 12, 2024.
[10] Rule 9-7-307: September 12, 2024.
[11] AECOM for Northrop Grumman, *2021 Annual Groundwater Monitoring Report* (3/17/2022).

trichloroethylene concentrations in indoor air present an inhalation risk exceeding acceptable health and safety levels, with results at 5.1 µg/m3 and 5.2 µg/m3, respectively.[12]

51. Indoor air pollution due to vapor intrusion worsened over time, and indoor air concentrations increased to 7.7 µg/m³ in 2013, the accelerated action level for trichloroethylene in commercial buildings. In 2024, the EPA proposed a full ban on trichloroethylene as a whole substance in the U.S., prohibiting it under the TSCA as an unreasonable danger to human health.

52. In May 2015, Northrop Grumman installed a sub-slab ventilation system inside the building. (The slab refers to the concrete foundation, and the sub-slab is under the slab.) Northrop Grumman installed horizontal collection pipes beneath the slab foundation, which allows vapors to move laterally. It connected the collection pipes to vertical vent risers, allowing sub-slab contaminant vapors to discharge into the atmosphere. The risers vent to the rooftop via wind-powered turbines.

53. Apple became a tenant in 2015. Apple's installation of a new HVAC system in late 2015 included sawing the sub-slab exhaust vent stacks on the main building roof down from three feet to one foot and then installing the HVAC system intakes in close proximity to the sub-slab vapor exhaust vents, without consideration for the function of the sub-slab system vents and their function.[13] The HVAC intakes for the area of the building where Plaintiff worked were in the assumed sphere of influence of the vent exhaust, including the chemicals trichloroethylene and vinyl chloride.

54. Apple's tampering with the exhaust stacks and indifference towards the exhaust's proximity to HVAC intakes resulted in a significant risk of re-entrainment of the hazardous waste vapors and gases into the HVAC system, and thus into the indoor air of the building where Plaintiff and her coworkers would be exposed. California law prohibits the exhaust of gas and vapor in a way that causes harmful exposure to employees and requires that these types of stacks exhaust upward

---

[12] Fifth Five Year at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring Report,825 Stewart Drive, Sunnyvale CA, March 17, 2022.
[13] AECOM for Northrop Grumman, Evaluation of Passive Sub-Slab Depressurization System, Former TRW Microwave Site, page 1 (April 15, 2022).

1  from at least seven feet above the highest portion of the roof and outdoor air intakes be placed at

2  least twenty-five feet away from any "*exhaust outlets of ventilating systems… that may collect ….*

3  *noxious fumes*."[14]  Apple constructed the HVAC intakes only ten feet away from the exhaust vents.



*Figure 1: Exhaust Diagram from ASHRAE Handbook*



*Figure 2: Image with annotations of the roof of 825 Stewart Drive*

---

[14] Cal.Lab.C. §§ 5143(a)(1); 5143(c)(1); 5154.1(e)(4)(d); Cal.Mech.C. § 407.2.1.

55. In May 2015, Northrop Grumman's vapor intrusion testing at 825 Stewart Drive reported indoor air pollution of trichloroethylene, 1,2-dichloroethylene, toluene, chloroform, methylene chloride, and ethylbenzene.[15] From December 2015 to January 2016, Apple managed and submitted a second vapor intrusion testing report to the EPA.[16]

56. Testing results showed an increase in indoor air pollution and the sub-slab ventilation system compared to the May 2015 results. The highest indoor air reading of trichloroethylene doubled between May and December 2015. In May, it was 0.58 μg/m³ while the highest indoor air trichloroethylene reading in December was 1.2 μg/m³.

57. Apple's report also noted a "*noticeable increase*" of trichloroethylene, tetrachloroethylene, and chloroform in the sub-slab venting system and elevated levels of toluene and ethylbenzene in the indoor air.[17] Apple moved employees in and never tested again.

58. EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the EPA must be notified, consulted, and oversee the repairs and subsequent evaluation that the repairs were successful. Similarly, there is a public land use covenant attached to the property that runs with the land, which instructs that serious issues with the engineering controls and vapor intrusion systems must be reported, and EPA must be consulted on the next steps.

59. **Employment at Apple:** Plaintiff worked at Apple from 2015 to 2021. At the time of her termination, her title was Senior Engineering Program Manager, and her base salary was $169,000. In the last full year, Plaintiff worked at Apple, her total annual W-2 compensation was $386,382.

60. Plaintiff joined Apple on February 23, 2015, as an Engineering Project Manager in the Software Project Management Office and worked in that Department until January 2017. The plaintiff reported to several managers under the same Director during this time. Plaintiff experienced severe harassment, discrimination, bullying, and an untenable hostile work environment during those two years, primarily from her coworkers, Rob Marini and Brad Reigel.

---

[15] U.S. EPA, TRW Microwave, Site Documents, Vapor Intrusion.
[16] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site.
[17] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site.

1    The director, Venkat Memula, repeatedly failed to correct their behavior.

2        61.  Memula assigned Plaintiff to share an office with Marini. Marini told Plaintiff in the first

3    week that all his prior officemates either quit the company, left the country, or killed themselves.

4    Marini asked Plaintiff which path she would choose.

5        62.  Marini bragged that he was known to executives as their "*Little Gestapo*." Marini often

6    planned and orchestrated malicious schemes to harass Plaintiff and cause her distress, including

7    getting multiple members of the team to attack Plaintiff physically, spreading rumors about

8    Plaintiff, and frequently pressuring Plaintiff to drink hard alcohol at work. Marini often made cruel

9    comments. He once told Plaintiff that her mother should have had an abortion. Both Marini and

10   Reigel cursed at Plaintiff, called her names, and wrote harassing statements and nicknames on

11   whiteboards about her. Marini made a work tracking ticket for all to see titled "*Make Ashley's Life*

12   *a Living Hell*" and then assigned it to Reigel.

13       63.  Reigel was an active police officer, had ammunition in his office, and supposedly kept a

14   gun in his car at times. Reigel once kept Plaintiff in a conference room with the door closed and

15   berated her for a prolonged period while she wept and begged him to stop. He sometimes made

16   '*joking*' comments, like he would 'smack her' if she did not do what he said.

17       64.  The plaintiff's first manager, Linda, tried to bribe the Plaintiff in exchange for a positive

18   review from Linda's manager, Memula. The plaintiff reported this to Memula and Human

19   Resources. When Linda left the organization, the Plaintiff was later transferred to report to Reigel.

20   The plaintiff tried to move to a different team but was blocked by Reigel, who provided negative

21   feedback about her to the hiring manager and could not explain why.

22       65.  Plaintiff was then transferred under Evan Buyze and Shandra Rica, still in Memula's

23   organization, to run a program called "Early Field Failure Analysis" for new product launches,

24   where she received positive feedback and praise until one specific field issue occurred which led to

25   a retaliatory constructive termination.

26       66.  Plaintiff's managers had become upset because Plaintiff was earnestly trying to

27   investigate a trend of battery failures in the field. Plaintiff's managers preferred to "ignore it and

28   hope it goes away" and told Plaintiff to also "ignore it," which Plaintiff refused to do. Buyze and

Rica told Plaintiff not to tell people why she was leaving their organization, with Shandra saying she "*doesn't like people who talk shit*." This battery failure issue and Apple's resulting response would be publicly nicknamed "*Batterygate*." Apple has been fined over $600M over their conduct related to the *Batterygate* issues.

67. Plaintiff joined Product Systems Quality in Hardware Engineering in January 2017. Plaintiff now reported to senior director Dan West and director David Powers as a Senior Engineering Program Manager and chief of staff. Both West and Powers engaged in harassing, discriminatory, and inappropriate conduct toward Plaintiff – including remarks and decisions that discriminated against Plaintiff based on sex, gender, and disability.

68. In December 2017, West tried to coerce Plaintiff to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Plaintiff complained. Later, in 2020, West admitted it was "*one of the worst things [he's] ever done*." Other leaders in West's organization also discriminated against Plaintiff, including John, who often pressured Plaintiff to "*settle down*" and "*have kids*." The plaintiff complained to John and West about the statements, but John persisted for years.

69. While Plaintiff's performance reviews were positive, Powers and West often gave Plaintiff 'feedback' outside the reviews, like she was too emotional, aggressive, or expressive. The plaintiff gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen and thank her for being honest with him, though he continued with the same behavior. Powers did not respond well and often berated her.

70. Plaintiff wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple if she could transfer to a better role (not in a hostile work environment). The plaintiff had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) and convince them to hire her upon graduation. She continued mentioning this plan into 2021.

71. Plaintiff's supervisor, West, frustrated several of Plaintiff's attempts to transfer to other Apple roles focused on law, legislation, and policy – including directly blocking an offer in 2020 for Plaintiff to work on Apple's implementation of circular economy legislation.

72. On March 17, 2021, the Plaintiff's team administrative assistant sent an email on behalf of EH&S announcing to the Plaintiff and Powers' management team that it would be testing 825 Stewart Drive for vapor intrusion but saying nothing more.

73. Plaintiff replied and informed her coworkers that their office was a Superfund site on March 17 2021, providing a link to the EPA website for the site and news articles referring to their office as a "*paved over environmental disaster zone*" due to the "*massive amounts of trichloroethylene in the soil and groundwater from nearly 30 years of chip manufacturing.*"[18]

74. Plaintiff explained to her team what vapor intrusion means, told them to take it seriously, and expressed concerns that Apple employees "*should be better informed about these types of environmental risks at our offices."* The plaintiff added, "*The chemicals under [the 825 Stewart Drive office] if in high enough quantities, can cause cancer."*

75. Plaintiff's manager, Powers, forwarded Plaintiff's email to Human Resources and West, complaining, "I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about." During their next weekly meeting, powers gave Plaintiff a 'warning' and forbade her from discussing safety or toxic waste dumps with her coworkers. Things went downhill from there.

76. *The plaintiff* asked in her email for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Plaintiff to discuss her concerns. The plaintiff's coworkers thanked her for sharing this information and informing them about the site. Two of Plaintiff's friends, a manager and senior manager at Apple, texted her, affirming her concerns were reasonable and appropriate.

77. One manager called the situation "*a really important life-threatening situation,*" after reviewing documentation for the site, another questioned, "*Why is the building still open*?" One of the managers noted: "*What is crazy is … they say no daycare, no elder care, no residential, etc. So, it is fine and dandy for everyone else to get slowly poisoned? … So glad you are digging into this stuff for all of*

---

[18] Alexis C. Madrigal, *Not Even Silicon Valley Escapes History,* The Atlantic ( July 23, 2013); Beth Winegarner, *Silicon Valley's Toxic Past Haunts Sunnyvale Neighborhood,* KQED ( June 15, 2017).

*us.*" Around this time, Plaintiff also raised concerns about various workplace safety concerns, including COVID-19 safety, wildfire smoke safety, Right to Know, Proposition 65, and Apple's reporting and tracking of injuries.

78. On March 26, 2021, the SF Bay View newspaper published an article Plaintiff wrote about her chemical exposure experience with the air around 3250 Scott, titled "*I thought I was dying: My apartment was built on toxic waste.*"[19] After reading the article, more victims and witnesses came forward; some were also Apple employees.

79. On April 5, 2021, Plaintiff told West about the other victims, and West warned her she was "*kicking a hornet's nest.*" West asked Plaintiff not to send information about Plaintiff's chemical exposure at her apartment next to 3250 Scott to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*"

80. In late March 2021, the Plaintiff repeatedly raised concerns about the Superfund site to her supervisors. After reviewing hundreds of pages of documentation for the site, Plaintiff advised that the site was unsafe and complained that Apple seemed unwilling to comply with environmental and health/safety regulations. She was distressed to see that the 'hot spot' for the building was her desk with 1900 ug/m3 of trichloroethylene under the slab.

81. Plaintiff connected the vapor intrusion risk to a strange fainting spell she experienced at the office in September 2019. The only other time she felt a dizzy spell like that was when Apple exposed her to industrial chemicals at her apartment in 2020. The plaintiff began complaining she was worried her 2019 fainting spell was due to vapor intrusion at the office.

82. Powers threatened her and ordered her to stop talking with her coworkers about her safety and environmental concerns. He said she must believe whatever EH&S tells her. West first claimed Apple sealed the poisonous gas under the floor but, after learning the floor was cracked, told Plaintiff if she did not like her work conditions, she could leave her role and find a new job.

83. On April 5, 2021, Plaintiff notified the Director of Apple "AC Wellness" employee medical Centers that more people came forward from the apartments next to 3250 Scott, reporting

---

[19] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26, 2021).

illness, due to her article. "*Two are Apple employees. At least one went through AC Wellness, but no one could figure out what was wrong with them.*" The plaintiff suggested directing the clinic to "*screen local folks*" with symptoms that match solvent exposure.

84. From September 2020 through April 2021, the plaintiff emailed the EPA and California EPA about the issues; many Apple leaders knew she did so. Starting in early 2021, Plaintiff also contacted and met with local, state, and federal politicians about what occurred to her next to 3250 Scott—and Apple was aware of this. For example, the Plaintiff met with Senator Bob Weickowski and his staff on April 7, 2021.

85. Plaintiff also met with Assembly Member Lee's staff once and Mayor Lisa Gillmor several times. On April 7 2021, Plaintiff told West about the meetings. On April 9 2021, Plaintiff contacted the County District Attorney's office, talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes, and met with him on April 16 2021.

86. Plaintiff was also meeting with the California Department of Public Health's Environmental Health office, where she volunteered to help create state-wide education resources for tenants and workers around chemical exposure from toxic waste dumps. Around this time, the plaintiff met a prior Silicon Valley mayor who had advocated for the clean-up of Silicon Valley's toxic waste sites for decades. Plaintiff shared his analysis of the testing and concerns about the property clean-up where Plaintiff got sick with Mayor Gillmor and asked her for further investigation from the city.

87. Plaintiff met with Apple EH&S on April 2 2021, May 17 2021, and July 7 2021. For some reason, Employee Relations, Jenna Waibel was also there. Waibel refused to tell Plaintiff why she was involved, as Powers had asked for help from Apple's Employee Relations team to assist him in silencing Plaintiff. Around early April 2021, Waibel and Polkes texted and emailed about their plans to silence Plaintiff.

88. In February 2021, Plaintiff completed her self-review for Apple's mid-year review cycle; however, Powers never provided Her with her review. Powers told his managers to complete mid-year reviews with their teams in the spring but never mentioned it to the Plaintiff. The plaintiff also completed her annual performance self-review around June 2021; however, Powers never reviewed

1    her. Apple has repeatedly refused to provide any discovery documents related to these reviews and

2    confirm their existence.

3         89.  Plaintiff asked questions to Apple EH&S about the status of the site and the rationale for

4    design and monitoring decisions. EH&S (Michael Stieger) told her Apple Legal and EH&S

5    intentionally do not tell employees if they work on Superfund sites and admitted that Apple does

6    not train workers about safety procedures related to toxic waste exposure from clean-up sites. The

7    plaintiff said that was both unsafe and unwise.

8         90.  The plaintiff also complained that the prior testing used insufficient durations and

9    methods and had concerning results, there were known open risks for vapor intrusion vectors (*e.g.,*

10   compromised sub-slab ports), and the land use covenant is outdated and requires revision. The

11   plaintiff complained that Apple should have tested the indoor air more often than every six years.

12        91.  On April 11, 2021, Plaintiff emailed Powers, forwarding her emails with Steiger and

13   Waibel about compromised and missing sub-slab vents per the documentation, telling Powers,

14   *"None of this sounds safe."*

15        92.  By April 14, 2021, Powers had become very hostile towards Plaintiff and was snapping at

16   her meetings. Complaining to West about it resulted in the response, 'You can just quit if you don't

17   like it.'

18        93.  On April 21 2021, Plaintiff complained to Apple's Human Resources Inclusion &

19   Diversity team about the disparate impact of chemical exposure in Apple buildings. Apple Human

20   Resources asked her to write a business proposal about why Apple should not poison Black people.

21        94.  The plaintiff then complained to her friend Josh, a Senior Director, that Apple's actions

22   related to environmental compliance and employee chemical exposure were "morally wrong" and

23   that Apple was publicly misrepresenting its actual operations.

24        95.  The plaintiff also complained to a friend in Lisa Jackson's Environmental lobbying team

25   about what was happening at her office and that Apple's public statements seemed fraudulent. Her

26   coworker agreed, saying: "*Uhhh… I kind of feel the need to make sure Lisa is aware. I'm about to present*

27   *a proposal to several execs on an Environmental Justice program and this kind of feels like not consistent*

28   *with that."*

96. The plaintiff also emailed back and forth with the EPA public relations teams from April through August 2021, and Apple knew she was doing so. The EPA informed Apple about the Plaintiff's outreach around April 28 2021.

97. In response to the Plaintiff's concerns and escalations, Powers and Waibel issued gag orders against the Plaintiff. Waibel even went as far as to provide Plaintiff with a five-point balancing test if she wanted to tell her coworkers about Superfund sites or workplace safety. She told the Plaintiff there should be no discussions about workplace safety with her coworkers.[20]

98. On April 29 2021, Plaintiff visited an occupational exposure doctor about her chemical exposure in the apartments next to Apple's 3250 Scott factory and at the 825 Stewart Drive office. UCSF visit notes summarized Plaintiff's 2020 medical symptoms, saying:

> She was experiencing severe dizzy spells, a significant decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesia, blurry vision, abnormal vaginal bleeding, and swollen glands"…."there remains a concern about potential pathways for residential exposures, and the county and State environmental agencies should address these…. she also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues…[21]

99. Plaintiff continued to attend medical appointments and follow ordered testing and monitoring in response to her injuries and illness. On April 30 2021, she went to Stanford Hospital for a CT angiography with and without contrast. She had been having palpitations again, and on May 10 2021, she told her manager, Powers, that her doctor said she needed another echocardiogram to ensure the chemical exposure did not cause permanent injury to her heart. Apple knew Plaintiff was highly vulnerable.

100. On May 17 2021, Plaintiff met with EH&S and Waibel again. They informed her they might not test the indoor air, they would not answer her safety or environmental questions, and Steiger was abruptly leaving Apple. The plaintiff became concerned about a cover-up and started

---

[20] In September 2024, the NLRB issued a decision of merit that there is substantial evidence that Waibel's 'five-point balancing test' violated federal labor laws.

[21] Dr. Robert Harrison, MD – who directs the UCSF Occupational Health Services department and the Worker Investigation Program for the California Department of Public Health.

complaining about her meeting with Apple EH&S lawyer in November 2020. She shared with at least one coworker that the lawyer had told her Apple had been negligent and needed to catch up on testing and inspections.

101. Apple EH&S and Employee Relations, Waibel, notified Plaintiff on June 2, 2021, that Apple will repair the foundation of 825 Stewart Drive before they test the air. The plaintiff complained that they were legally required to notify the EPA, have the EPA oversee the repair and testing plan, and test the air before and after the repairs. EPA later confirmed this. Apple refused and told Plaintiff they do not have to tell EPA anything; they will repair the floor but will not provide details on how or when, and now they may not test the indoor air.

102. Waibel responded to Plaintiff's complaints by opening an investigation into Plaintiff's bosses for sexism despite Plaintiff asking Waibel not to do that and complaining it would only cause more retaliation. Waibel did not investigate anything but told at least three leaders that Plaintiff complained about them. She also harassed Plaintiff's friends and Plaintiff.

103. Waibel also told Plaintiff that if Plaintiff did not want to be exposed to vapor intrusion at her office, Plaintiff must submit an Americans with Disabilities Act accommodation request and Plaintiff to release all of her medical records to "Apple Inc." Waibel then suggested Apple provide the Plaintiff with an air purifier at her desk to help with the trichloroethylene air pollution. The plaintiff complained that Americans with Disabilities Act accommodations are not intended for employees to ask their bosses not to poison them. By July 2021, somehow, Waibel even got ahold of Plaintiff's May 2021 mammogram results.

104. The plaintiff complained about Waibel in May and June 2021 to no avail and then began meeting with Waibel's manager, Antonio Lagares, in mid-June 2021. The plaintiff complained that Apple was acting insane, and if this is usually how Apple handles employee concerns, then Apple is lying to its employees and the public that it acts in good faith. Lagares agreed with Plaintiff and said Apple's marketing makes "*his job harder*." Plaintiff complained to Lagares that Waibel had already ruined her career at Apple, that she was already constructively terminated by West, that Powers was harassing her more than ever, and that he should have to investigate all of the terrible things Apple's done to her for nearly seven years.

105. On July 2, 2021, Employee Relations, Waibel, and EH&S notified Plaintiff via email that there were cracks in the slab/floor of Plaintiff's office and that they would seal the cracks and then test the air. The plaintiff asked if they could also test the air before sealing the cracks. She explained she wanted to know if she was exposed to chemicals through the cracks and, if so, which ones. She said, "*for cancer monitoring.*"

106. On June 30, 2021, two days before hinting at the existence of cracks in the slab, Apple EH&S and legal filed the first and only Toxics Release Inventory filing to the EPA for air emissions at 3250 Scott in 2020. It is unclear why Apple never submitted a Toxics Release Inventory filing before 2020 or after the 2020 record.

107. Under information and belief, the Toxics Release Inventory filing was submitted to try to manufacture for Apple some statute of limitations excuse later if the Plaintiff ever found out what they did—without them having to share the information in a way they thought she would not notice.

108. In July 2021, Plaintiff notified the EPA about the cracked slab at her toxic waste dump site office, and Apple insisted they did not have to tell the EPA and refused to test the air until after they sealed the floor. The plaintiff expressed it was her understanding that Apple needed to notify the EPA of the cracks and obtain EPA approval for a work plan for the testing and sealing plans. The plaintiff notified Lagares, Okpo, and Waibel that she was reporting them to EPA. The plaintiff also complained to Lagares that Apple EH&S was "*going out of their way to avoid having evidence of their negligence.*"

109. In early July 2021, Plaintiff discovered that West had been reassigning her best projects (things that would help her receive a positive review). Then, on July 15 2021, Powers suddenly quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail). Powers was snapping at and harassing her, West was ignoring her, and Plaintiff reported these issues to Lagares, Waibel, and Human Resources Business Partner Helen Polkes. Still, Apple did nothing, or they also harassed Plaintiff.

110. The plaintiff became more vocal about her concerns about retaliation and fraud at Apple on Apple's Slack discussion tool and began threatening Lagares that she planned to sue Apple for

what they had done to her and that she was also talking to the press about Apple. This led Lagares to assign a new investigator, Ekelemchi Okpo, and open an additional investigation into Plaintiff's concerns starting in 2015.

111. By late July 2021, Plaintiff was openly complaining on Slack, to reporters, with coworkers, and now also on Twitter about Apple's terrible behavior (including intimidation, retaliation, cover-ups, and fraud). The plaintiff complained about the Superfund and safety issues, Apple's offensive use of accommodations, the persistent suggestion that she take leave in response to their harassment, Apple's illegal non-disclosure agreements and gag orders, and Apple's antagonistic and obstinate attitude towards legitimate and important concerns. The plaintiff repeatedly told Tony Lagares, Ekelemchi Okpo, Jenna Waibel, and Helen Polkes that Apple needed to fix the systemic issues.

112. The plaintiff had still been lobbying politicians for expanded safety protections for workers and tenants on toxic dump sites. A Senator told the Plaintiff he would talk to the California EPA about her concerns. The plaintiff checked with his office for a status update. On July 16 2021, the Senator's Legislative Director wrote to Plaintiff confirming and informed Plaintiff he *"conveyed [her concerns] [himself] on the Senator's behalf with the Govender's staff and leadership of both houses*."

113. On July 18 2021, Plaintiff had sent her weekly status to Powers and the management team, and at the very bottom, she added a little personal note that a state hazardous waste bill she had been lobbying for passed, and she was excited about it. Powers became upset and escalated the comment to Employee Relations, Waibel, asking for guidance on how to 'coach' Plaintiff about it and ensure Plaintiff understand not to talk about such things in the workplace.

114. Around July 23, 2021, Plaintiff spoke on the phone with one of the three women who ever reported to West at Apple and had quit Apple due to the harassment she faced from West and his team. She validated the Plaintiff, confirming she noted many of the same issues that the Plaintiff had been reporting and that West and his management, or Human Resources, had done nothing to address the problems.

115. On July 23 2021, the New York Times quoted Plaintiff in an article about "return to work," with Plaintiff criticizing Apple's COVID-19 response. On July 24, 2021, the New York

1    Times made Plaintiff's quote "*Quotation of the Day*" for the entire New York Times.[22]

2        116. Lagares told Plaintiff that Apple was upset that Plaintiff was talking to the press and

3    criticizing Apple. The plaintiff told Lagares she was taking Labor Law and learned she could speak

4    about her work conditions regardless of non-disclosure agreements. Lagares told her it is

5    "*annoying*" to Apple when employees "*figure that out*."

6        117. Apple and Northrop Grumman were notified on July 26, 2021, that EPA wanted an

7    inspection of 825 Stewart Drive due to the cracked slab (that Plaintiff brought to EPA's attention)

8    and because EPA discovered what Apple did with the hacksaw, vents, and HVAC on the roof in

9    2015, with the EPA Quality Assurance team exclaiming it was "*not appropriate*" and asking for air

10   samples.[23]

11       118. On July 26 2021, Plaintiff posted on Apple's Slack, complaining that Apple's response

12   to her concerns was to retaliate against her and intimidate her into silence. Many of Plaintiff's

13   coworkers responded that they had also experienced retaliation from Apple for raising real and

14   reasonable concerns. On July 27 2021, Okpo interrogated Plaintiff for over an hour about her Slack

15   posts and responses from coworkers – repeatedly asking her to stop posting and encouraging others

16   to post their concerns and instead directing all employees to speak privately. The plaintiff told him

17   no. She would not help him retaliate against her coworkers.

18       119. During the July 27, 2021, meeting, Okpo said Apple may give the Plaintiff a severance

19   ("exit") package of around $600,000 if she signs a preemptive litigation waiver. Apple agreed that

20   Plaintiff would not have to sign another non-disclosure agreement but made the severance

21   negotiation contingent on Plaintiff waiving all claims. The plaintiff expressed concerns about the

22   settlement amount and her potential medical costs if she were to get cancer from the exposure at

23   her office.

24       120. At the time, the plaintiff did not know about the activities and spills at the 3250 Scott

25   facility near her apartment or what Apple had done to the HVAC at 825 Stewart Drive. Apple was

26   intentionally concealing those facts. Apple wanted all claims waived and denied the severance on

27   ――――――――――――――――

28   [22] "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*," New York Times, July 24, 2021.
     [23] U.S. EPA, TRW Microwave Site, Vapor Intrusion FOIA documents.

those conditions, violating California Gov't Code § 12964.5(a).

121.  On July 27 2021, a non-profit organization asked Plaintiff to testify as a witness to state Senator Dave Cortese about her experience with hazardous waste clean-up sites in Santa Clara County, and Plaintiff accepted.

122.  On July 28, 2021, the Plaintiff emailed Okpo and Lagares about her discussions with coworkers. She discovered a pattern of discrimination and harassment issues across Apple and systemic cover-ups of those issues. She complained that Apple fraudulently holds itself out publicly as caring about human rights and the law. It was clear to Plaintiff that Okpo was still trying to get her to quit, or she would be fired.

123.  On July 28 2021, Plaintiff asked for a "citizen oversight -type role" to help reform Apple's Human Resources practices. Okpo said it may be possible but that she must stay in her same role. The plaintiff asked Okpo what the outcome of his investigation could be. Okpo informed Plaintiff that he would propose a "non-binding suggestion" to Plaintiff's senior leadership (the same ones she complained about). The plaintiff realized Apple had designed an Employee Relations system to retaliate and cover up issues.

124.  On July 30 2021, Plaintiff posted on Twitter complaining about Apple: "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions.*"

125.  After posting this, ex-Apple employees contacted Plaintiff to share similar experiences. The plaintiff decided to start sharing more of what was happening between her and Apple on social media to help others understand the issues so they could advocate for the employees, hoping it would pressure Apple to act more reasonably.

126.  On July 30 2021, Plaintiff posted on Apple's Slack discussion tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups.

127.  On August 2, 2021, the Plaintiff started posting on Twitter about several minor things she complained to Waibel about. She told Okpo and Lagares it was work conditions so that she could talk about it. The plaintiff posted several examples on Twitter.

1      128. In response, on August 2, 2021, Apple suddenly announced they were conducting

2   extensive maintenance at 825 Stewart Drive starting August 4, 2021. Then, on August 3, 2021, Lisa

3   Jackson's environmental lobbying team scheduled a Public Relations blitz about how safe and

4   thoughtful Apple is. [24]

5      129. Apple also tried to get the EPA to sign a non-disclosure agreement about the inspection

6   of 825 Stewart Drive that would prohibit the EPA from discussing the inspection. The EPA

7   declined to sign the non-disclosure agreement.

8      130. When Plaintiff saw Apple's EH&S notice on August 2, 2021, about maintenance at 825

9   Stewart Drive, she quickly arranged for coworkers in the office to gather evidence of the cracks,

10  warning them that Apple was trying to cover up environmental and safety issues.

11     131. Plaintiff's coworkers gathered photos of the cracks for Plaintiff. They also asked many

12  of the same questions the plaintiff had asked EH&S. The plaintiff shared EH&S's responses and

13  was concerned about Apple's position and conduct. The plaintiff informed Apple that she and her

14  coworkers were gathering evidence before Apple could cover up the cracks.

15     132. On August 4, 2021, Okpo forced the Plaintiff on indefinite administrative leave and

16  refused to provide any estimated period for the next steps. Okpo informed her that Apple removed

17  her "*from the workplace and all workplace interactions*." The plaintiff complained that it was illegal

18  for them to tell her to stop talking to her coworkers. Okpo made it clear he also wanted her off Slack.

19  The plaintiff told Okpo he could not keep her off Twitter. The plaintiff posted on Slack, informing

20  her coworkers of what Okpo had just done.

21     133. On August 4 2021, a reporter at an online blog contacted Plaintiff after coworkers told

22  the reporter what Plaintiff had posted. The plaintiff agreed to let her write an article about the

23  Plaintiff being put on leave. The plaintiff also posted about it on Twitter, and more outlets picked

24  up the story. [25]

25

---

26  [24] FOIA; Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice.*

27  [25] *e.g.,* The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave,*" 8/5/2021; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave,*" 8/5/2021;

28  Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues,*" 8/5/2021.

134. Okpo sent Plaintiff several bitter emails about her continuing to speak out. He was reading the news articles and her Twitter posts complaining about Apple's conduct. The plaintiff made three Twitter posts on August 4 2021.

> So, following up on raising concerns with #Apple about #sexism, #hostileworkenvironment, and #unsafeworkconditions, I am now on indefinite paid administrative leave per #Apple Employee Relations while they investigate my concerns. This seems to include me not using Apple's internal Slack.
>
> Apple employee relations' first sexism investigation only arose while I was complaining about unsafe work conditions and related intimidation. They tried quickly brushing me off and prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review.
>
> When I say "unsafe #workconditions," I mean physically unsafe, #dangerous chemicals, #OSHA. You will hear much more about this in a bit.

135. Starting on August 4 2021, Plaintiff began receiving harassing and threatening replies and comments from clearly fake social media accounts. On August 4 2021, one account posted about Plaintiff, that she: "*needs psychiatric help and confinement*" and that Plaintiff "*is a psychopath and frankly is a danger to other Apple Employees*!" The account went on to call Plaintiff an "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this.*" Thousands of posts like this followed and continue to this day – causing Plaintiff severe distress.

136. After Plaintiff was on leave, she heard conversations within her team confirming she would be fired soon. Managers in West's organization mentioned West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands. The plaintiff realized they would not discuss the "*Ashley Issue*" at a future All Hands if she were there. One of Plaintiff's friends, a manager in West's organization, told her Apple instructed all the managers to not to write anything about employee issues because they were in trouble.

137. The plaintiff saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5, 2021.

138. When the EPA inspected, they noted "*freshly sealed cracks.*" On August 9 2021, the EPA sent travel approval requests to visit Plaintiff's office, and the justification for the visit cited Plaintiff's disclosures. The EPA's justification for the inspection was: "*A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system and the protectiveness of human health.*"

139. In August 2021, the Plaintiff filed complaints with the U.S. EEOC and California DFEH. The plaintiff also shared concerns on social media and with the press.

140. On August 17, 2021, Business Insider published an article about some of Plaintiff's complaints based on Plaintiff's Twitter posts and embedded Plaintiff's Twitter posts in the article. The article also noted: "*Insider approached Apple for comment.*" [26]

141. On August 15 2021, Plaintiff posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, and Mayors about her chemical exposure.

142. Between August 16, 2021, and August 23, 2021, Okpo sent a first draft of an "Issue Confirmation" document that captured all of the Plaintiff's complaints that he would then investigate.

143. The document was incomplete and contained misleading statements, and the formatting implied that multiple people drafted it. The plaintiff asked for a Microsoft Word version, but Okpo refused, validating her suspicion that the document was an Apple legal and human resources group project.

144. The plaintiff created her own version, supplemented and corrected Okpo's content, and sent Okpo a final version on August 23, 2021.

145. Starting August 17 2021, Plaintiff insisted that all communication with Okpo and Apple be in writing because he repeatedly misrepresented her statements while documenting her complaints. Okpo never replied to her emails about it.

---

[26] Business Insider, *An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit (August 17,* 2021).

146. On August 19 2021, the EPA conducted an onsite inspection of Plaintiff's Apple office due to Plaintiff's complaints to the EPA. EPA's notes from the August 19, 2021, site visit and inspection included concerns and issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, and lack of documentation for inspections of the slab.

147. The plaintiff had previously registered for a three-part training about racial justice at Apple University and wanted to attend. Her friend Josh led the class, and he confirmed he would be happy to have her participate if Employee Relations approved and did not discipline her for attending. On August 20, 2021, Okpo told Plaintiff she could not participate "*because she's on leave.*" The plaintiff complained about retaliation and said she did not want to be on leave, but Okpo ignored her.

148. While the Plaintiff was on leave, she repeatedly asked Okpo for updates about her office, but he refused to provide any. The plaintiff also complained about Apple Board Member Ronald Sugar and her office. Sugar was a top executive at TRW Microwave when they manufactured semiconductors and microwave equipment at the plaintiff's office. Before joining Apple's board, Sugar was the CEO of Northrop Grumman – the responsible party for the toxic waste cleanup under her office.

149. The plaintiff included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest, racketeering, and environmental crimes.

150. On August 23 2021, a member of EPA's Quality Assurance team captured notes about the inspection of 825 Stewart, writing: "*Significant, visible slab cracks, gaps, and penetrations had been sealed… However, large test equipment is bolted to the slab, and it is unclear if these installations penetrate the slab.*" He added that related to the sub-slab exhaust on the roof above Plaintiff's desk, "*vapors could be building up on the roof near the HVAC intake.*"

151. On August 23, 2021, a news article discussing Apple's employment practices commented, "*One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave.*"

152. On August 26 2021, Plaintiff filed an NLRB charge against Apple and posted on Twitter that she did so. The next day, on August 27 2021, Apple's Business Conduct team closed Plaintiff's complaint about Ronald Sugar and Plaintiff's office. A couple of days later, around August 30 2021, a third-party law firm (McDermott, Will, & Emery) filed a notice of appearance for five attorneys in Gjovik's NLRB claim against Apple.

153. Apple did not fire Plaintiff until September 9, 2021, raising the question of whether opposing counsel in this lawsuit (Orrick, Herrington & Sutcliffe) was also retained by Apple for this dispute prior to Plaintiff's termination and, if so, if they covertly interacted with Plaintiff or Plaintiff's coworkers, or otherwise influenced the situation.

154. On August 29 2021, Plaintiff filed a formal complaint to the EPA about Apple and her office at 825 Stewart Drive, complaining of Apple's *"lack of due diligence,* "*negligence*," "*recklessness*," "*violations of Right to Know and OSHA*," intimidation, misrepresentations, and refusal to " *notify the EPA of changed circumstances at the site*." The plaintiff did not know about the EPA safety inspection ten days prior.

155. On August 29 2021, Plaintiff filed a Whistleblower Protection Program complaint with the U.S. Department of Labor, reference number ECN76833. On August 29 2021, Plaintiff filed retaliation and labor code violation charges to the California Department of Labor.

156. On September 1 2021, Plaintiff posted on Twitter that she had filed a complaint with the California Department of Labor. A question on the form asked: How did your employer know about the protected right you exercised? Plaintiff wrote, *"I kept saying, 'Stop it, you guys. There's Labor laws about this."*

157. While Plaintiff was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Plaintiff complained that Apple's requests were harassing and invasive.

158. Plaintiff complained that Apple often asked that Plaintiff and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection, and other highly personal examinations. Apple did not disclose the details of the experiments until after Plaintiff signed a secrecy oath and 'consented' to the

activity, and then repeatedly threatened Plaintiff with termination if she was to speak about it even to a doctor or attorney (as was expressly written in one Deed Poll).

159.  Around August 30, 2021, and August 31, 2021, Plaintiff shared an article titled "Apple Cares about Privacy Unless You Work at Apple" and confirmed the blog interviewed her and she provided information for the article, including multiple images of secret photos Apple took of her in her home from the Gobbler application.

160.  In her posts she complained of Apple's surveillance of workers and Apple's culture of intimidation and retaliation and compared working at Apple to being in a panopticon. [27]  The article discussed several examples of Apple's invasions of employee privacy, which were brought forward by Apple employees who wanted the public's help in reforming Apple's business and labor practices.

161.  In the article, Plaintiff complained about the Gobbler app installed on her phone taking photos of her anytime, including at home; and was quoted saying, "*If they did this to a customer, people would lose their goddamn minds.*"

162.  On August 31 2021, the U.S. Department of Labor contacted Plaintiff to start intake for Plaintiff's Whistleblower Protection Program charges.

163.  Newspapers published articles about the Plaintiff's charges against Apple starting around September 2, 2021. Bloomberg reported about Plaintiff's U.S. NLRB, U.S. Department of Labor, California Department of Labor, and U.S. EEOC charges. The same day, the Financial Times and Reuters also wrote about the Plaintiff's complaints. [28]

164.  The press continued to cover what Apple was doing to Plaintiff, and a movement started among Apple employees who began speaking out and organizing around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this, too. The plaintiff was not only a catalyst for many employees to come forward, but these employees also catalyzed the

---

[27] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* 8/30/2021.
[28] Bloomberg, *Apple Worker Complaints Reviewed by Labor Relations Board*, 9/2/2021; Financial Times, *US labour board examines retaliation claims against Apple*, 9/2/2021.

1   plaintiff's view and protest of Apple's misconduct.

2   165. Okpo contacted Plaintiff again on September 3, 2021, and September 7 2021, asking to

3   meet with her on Webex (a video conferencing platform), implicitly denying her request to keep

4   things in writing, and refusing to tell her what the meeting was about. Both times, Plaintiff asked

5   Okpo to keep things in writing due to the misrepresentation and intimidation. If he refused, she

6   requested a Business Conduct review of his decision, noting he is a lawyer and there is a power

7   imbalance. Okpo never responded.

8   166. On September 5 2021, Plaintiff messaged Josh, her friend and a Senior Director,

9   complaining about Apple Employee Relations, commenting she had been researching Apple's labor

10  history and the issues were "*very systemic*" and with "*lots of bad faith conduct*," but "*not completely

11  diabolical*." (Plaintiff would later refer to this dynamic instead as '*Waco meets Enron*.')

12  167. In late August and early September 2021, Plaintiff posted on social media about her U.S.

13  NLRB, California Department of Labor, U.S. EEOC, and California DFEH cases with a status

14  update and the report numbers. Around that time, Plaintiff also tweeted about her U.S. SEC

15  whistleblower tip, U.S. FBI, and U.S. Department of Justice complaints.

16  168. The plaintiff interviewed with the U.S. EEOC on September 2, 2021. On September 6,

17  2021, the Plaintiff replied to the U.S. EEOC confirming she was working on a draft of her complaint

18  and targeted sending it to them by September 8, 2021.

19  169. On September 7 2021, Plaintiff discovered the second woman to ever report to West

20  had sued Apple over West's retaliation, constructive termination in violation of public policy, and

21  Intentional Infliction of Emotional Distress only two years prior. The ex-colleague's complaint

22  explained she saw reprisals and intimidation in West's organization and that West spoke openly

23  about knowledge of his employee's fear of retaliation. She said that after she raised concerns with

24  West about these issues, West began retaliating against her, too.

25  170. The complaint alleged three sham Employee Relations investigations into her concerns,

26  finding no policy violations related to West's conduct. Employee Relations put her on

27  administrative leave, waited a few weeks, and then told her she could either accept two months of

28  severance and sign a release of rights to pursue legal action against Apple, or she could return to

work as things are except that West will be even more angry at her now. She was West's administrative assistant. The coworker resigned and filed suit instead.[29] Apple settled shortly after. The plaintiff complained about it on Twitter and messaged the legal filings to West's current administrative assistant, informing her about it.

171. On September 8 2021, Plaintiff replied to the U.S. Department of Labor with copies of her prior filed complaints to the U.S. EEOC, U.S. NLRB, EPA, California EPA, and U.S. SEC. The plaintiff noted she was working on answering the investigator's questions and would reply by the deadline, which was September 10 2021.

172. On September 8, 2021, Plaintiff emailed the U.S. EEOC her draft of the language for her charge. The Plaintiff did not request an investigation but did request a Right to Sue letter, which she received before her termination. On September 9 2021, at 12:39 PM PST, Plaintiff emailed the U.S. EEOC investigator assigned to her case and asked the investigator if she needed anything else from Plaintiff to move forward. Then again, at 1:02 PM, asking the U.S. EEOC how she could sign the charge to meet the deadline.

173. On the morning of September 9, 2021, it occurred to Plaintiff, and she shared in real-time on Twitter, that Apple was likely spying on her personal phone and computer because their work policies say they are allowed to spy on employees' personal devices (Apple-made devices communicating with Apple servers).[30] Plaintiff began removing her data from her accounts on Apple servers, including migrating her email, photos, and documents.

174. On September 9 2021, at 2:08 PM, a man named Aleks Kagramanov, an Apple "*Workplace Violence and Threat Assessment*" investigator, contacted the Plaintiff, asking to speak with her on the phone "*within the hour*." The email had no subject line, and Plaintiff did not know the team. Kagramanov said he was "*looking into a sensitive IP matter*" and wanted to speak with Plaintiff. He said Apple "*sincerely appreciates [her] prioritizing this call and being flexible*." He never said the Plaintiff was under investigation.

---

[29] *Brown v Apple Inc*, Case No. 18CV330922, Superior Court of the State of California, County of Santa Clara, Complaint ( July 2 2018).
[30] The NLRB is now suing Apple over that policy.

175.    The plaintiff was certain she was about to be fired, but she promptly responded at 2:10 PM, saying she was willing to participate but wanted a written record of their conversations. She said she would respond as quickly as she could.

176.    Kagramanov did not respond, so Plaintiff responded again at 2:27 PM, complaining of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to the NLRB attorney assigned to her NLRB case. The plaintiff also posted on Twitter complaining of witness intimidation and fear of violence from Apple. [31]

177.    There was no legitimate explanation for why this team was contacting Plaintiff.[32] The plaintiff opined about it on Twitter while she waited for Kagramanov's response, posting at 2:34 PM: "*...so does he investigate the threats and violence, or is he the one that provides that as a service?*"

178.    Kagramanov replied to Plaintiff's email at 2:50 PM: "*We are investigating allegations that you improperly disclosed Apple's confidential information.*" Kagramanov also claimed Plaintiff refused to participate in his farcical investigation and announced he was suspending all of Plaintiff's Apple account access.

179.    Kagramanov never disclosed that an Apple lawyer was also waiting on the call to speak with her and Kagramanov. This specific lawyer was a New York state criminal Assistant District Attorney in Manhattan before joining Apple a few years prior. It is unclear what their plan was if the Plaintiff agreed to speak with them.

180.    Plaintiff responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate. "*As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.*" She added: "*I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government... I would really like the opportunity to remedy any actual issues.*" The plaintiff still did not

---

[31] "*Hey #Apple, 'This feels a little like witness intimidation. I let @NLRB know.' Love, Ashley. Clutches panic button & Mace while still laying on the floor pondering the brutality of U.S. capitalism.*" -- @ashleygjovik (September 9, 2021, 2:33 PM).

[32] Cal.Lab.C. § 6401.9 defines "workplace violence" as the threat or use of physical force, including incidents involving guns and dangerous weapons.

1    know what she was accused of.

2    181. She added, "*In the meantime, without any additional context or effort to communicate with*

3    *me in email, this really does feel like intimidation and additional retaliation, and I will consider it as*

4    *such.*"

5    182. On September 9, 2021, the U.S. EEOC investigator posted the final version of the

6    charge and asked the Plaintiff to sign it. The plaintiff digitally signed her U.S. EEOC charge against

7    Apple. Then, the Plaintiff emailed the U.S. Department of Labor with responses to their questions

8    about her protected activity and Apple's retaliation. The plaintiff replied again at 5:26 PM PST,

9    informing them Apple's Workplace Violence interrogator had just suspended her account access

10    and threatened her.

11    183. On September 9 2021, at 6:54 PM, Yannick Bertolus, Plaintiff's Vice President and

12    West's close friend, sent Plaintiff an email with the subject line "*Your employment status*" and

13    attached a letter providing vague and ambiguous reasons as the basis for Apple's decision to end

14    her employment.

15    184. On September 15 2021, at 7:40 PM PST, nearly a week after Apple fired the Plaintiff,

16    Apple's lawyers at O'Melveny and Myers, via Partner David R. Eberhart, emailed Plaintiff a letter

17    implying Apple terminated her due to her complaining about Apple asking to 3-D scan her ear

18    canals and also because she posted some of the surveillance photos Apple secretly took of her at

19    home through her phone when it was illegally harvesting her biometrics through its face Gobbler

20    application.[33] Eberhart threatened her and demanded she delete several Twitter posts but never

21    cited any legal authority.

22    185. The plaintiff told Eberhart that nothing he mentioned was confidential and that she had

23    the right to protest and discuss her work conditions. She deleted the posts Eberhart referenced

24    because Apple had effectively intimidated her with their threats. However, a lawyer responded to

25    Eberhart more formally a couple of weeks later, on Plaintiff's behalf, warning Eberhart about Rule

---

27    [33] At this point, Apple had retained at least two law firms to defend it from Plaintiff's claims, which again

28    raises the question of whether Orrick, Herrington & Sutcliffe were also retained and, if so, what role they
played in the actions Apple took against Plaintiff.

1    11 sanctions if he tried to pursue the matter in court as his claims have no basis in fact or law.

2    Eberhart never responded. The posts Eberhart coerced Plaintiff to delete are below.



*Figure 3: The Twitter posts that Apple claims justified Plaintiff's immediate termination.*



186. On September 21, 2021, Apple CEO Timothy Cook emailed all Apple staff, complaining that an Apple employee had spoken publicly to reporters about work conditions. Cook said Apple is "*doing everything in our power to identify those who leaked.*" Cook said, "*People who leak confidential information do not belong here.*"

187. On September 10 and 14, 2021, Plaintiff testified to the U.S. NLRB for her first sworn statement. On December 13, 2021, the U.S. Department of Labor docketed Plaintiff's Sarbanes–Oxley Act, Comprehensive Environmental Response, Compensation, and Liability Act, and OSH Act cases. Financial Times published an article about it on December 13, 2021, and Plaintiff's claims were referenced on the front page.[34]

188. On May 20 2022, the EPA sent a letter to Northrop Grumman about 825 Stewart Drive, instructing that: "*EPA requires that one round of indoor air samples be collected… under current conditions.*"[35] This request confirmed Apple had to test the air in Plaintiff's office, and it was not optional or voluntary as they had insisted.

189. EPA's letter included an attached memo from the EPA's team of vapor intrusion experts instructing Northrop Grumman and Apple that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been modified in a manner that could compromise the system; evaluation of changes to building use,*" in addition to also inspection roof components.[36] This further validated Plaintiff that she was correct and Apple should have followed her advice.

190. On May 27, 2022, the EPA admitted to the Plaintiff that an inspection had been conducted at her office on August 19, 2021—Apple had been able to conceal it from the Plaintiff for a year.

191. On July 28, 2022, Northrop Grumman told the EPA they were late responding to its questions because Apple and the building owner had stopped responding for weeks regarding the EPA's requests related to CERCLA obligations.

---

[34] Financial Times, "*Apple faces probe over whether it retaliated against a whistleblower,*" Dec. 13 2021.
[35] U.S. EPA, re: EPA Technical Comments on the Passive SSDS O&M Plan and Evaluation, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site, May 20 2022.
[36] U.S. EPA, Passive SubSlab Depressurization System Operation & Maintenance, April 25 2022.

1      192. On July 14 2022, Plaintiff argued her unemployment insurance appeal. Before this, the

2  agency had rejected her claim based on inaccurate information from Apple. Plaintiff won her

3  appeal, and a decision was issued by an Administrative Law Judge saying: "*The evidence shows that*

4  *the [plaintiff] was discharged for reasons other than misconduct connected with the most recent work.*"[37]

5      193. In 2022, the US Representative's office discussed bringing the Plaintiff's complaints

6  about Apple's environmental violations to a US House Subcommittee that the US Representative

7  chaired.

8      194. After Apple fired Plaintiff, Plaintiff filed additional U.S. NLRB and California

9  Department of Labor charges about Cook's email and Apple's non-disclosure agreements and

10  other employment policies, charging they violated federal labor laws – and the U.S. NLRB agreed

11  with Plaintiff, issuing a Decision of Merit on her charges against Apple in January 2023, and

12  complaint in September 2024.

13      195. On January 20 2023, EPA told Northrop Grumman to plan to do vapor intrusion testing

14  at Plaintiff's office in March 2023. On August 31, 2023, the EPA published a letter responding to

15  Apple's May 2023 testing results at Plaintiff's Apple office, the first testing since December 2015,

16  complaining that Apple's testing report and strategy "*fundamentally incorrect*," had "*no*

17  *fundamental basis*," was "*not accurate*," "*confusing*," and "*misleading*."[38]

18      196. From September 2023 through September 2024, Plaintiff worked as a program manager

19  for an air pollution research project at a research university. The role was temporary and did not

20  use her legal or engineering experience. After two years of searching and hundreds of applications,

21  it was the first and only job offer she could obtain.[39]

22      197. The role at the university was far lower in seniority than her role at Apple. The

23  university offered the Plaintiff a salary that was 41% less than her salary at Apple, and her total

24  compensation was reduced by 74%. The position ended after the one-year contract, and now

25  
26  ---

[37] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022.

27  [38] U.S. EPA, TRW Microwave Site, Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023.
[39] Except for brief expert consulting work for a large law firm on a class action fraud lawsuit – consulting
28  which abruptly ended upon Apple's counsel demanding that Gjovik be removed from working on the lawsuit – a direct example of denylisting.

1    Plaintiff is back on Medicaid and unemployment insurance and applying for the Supplemental

2    Nutrition Assistance Program support.

3    198. On September 27, 2024, the EPA published the "Five Year Report" for the Triple Site,

4    including the TRW Microwave site. The report reiterated that a new Record of Decision is still

5    needed to address the vapor intrusion at 825 Stewart. The report also revealed that the investigation

6    into elevated levels of trichloroethylene in the outdoor air is now focused on the shallow

7    groundwater beneath 825 Stewart, Plaintiff's office.[40]

8    199. U.S. ACE and EPA ordered more testing and evaluations because, if true, the

9    contaminated groundwater plume just a couple of feet below the surface at the Plaintiff's Apple

10   office is releasing dangerous levels of trichloroethylene into the outdoor air and the neighboring

11   properties.

12   200. The EPA shared the raw data from Apple's 2023 indoor air testing with Plaintiff. The

13   results showed that vapor intrusion still occurs inside but with chemicals at 'acceptable' levels,

14   apart from unexplained elevated levels of benzene.

15   201. On September 27, 2024, the NLRB issued a complaint against Apple regarding its

16   Business Conduct Policy, non-disclosure agreements, non-competes, and other employment

17   policies – including its misconduct, social media, and surveillance policies. [41]

18   202. The NLRB issued a Decision of Merit in January 2023 (thus, the NLRB will issue a

19   complaint and sue Apple if Apple does not settle first) about an email Chief Executive Officer Tim

20   Cook sent his staff in September 2021 (shortly after the Plaintiff was fired). [42]

21   203. In October 2024, the NLRB issued a decision of merit stating that there is substantial

22   evidence that Apple's placement of Plaintiff on leave was an unlawful suspension and that both the

23   suspension and termination of her employment violated federal labor laws.[43] Plaintiff is unable to

24   get a straight answer from the NLRB about consolidating the pending email and retaliation claims,

25
26   [40] U.S. ACE & U.S. EPA, *Sixth Five-Year Review Report for Advanced Micro Devices 901/902 & TRW Microwave Superfund Sites Includes The Companies' "Offsite" Operable Unit ,* Sept. 27 2024,
     https://semspub.epa.gov/work/09/100038437.pdf
27   [41] 32-CA-284428
     [42] 32 CA-284441
28   [43] 32-CA-282142, 32-CA-283161

1  raising an inference that there may be evidence that Cook's email was about Plaintiff and the still

2  unnamed executives who decided to terminate Plaintiff's employment.

3  **LEGAL CLAIMS**

4  **204.** Plaintiff now incorporates by reference every allegation and fact above and below into

5  each section where that allegation and facts is needed to support the claim at issue. Some facts and

6  allegations are not repeated to meet page limits. Where any statute of limitations is in question of

7  being expired for an alleged claim, Plaintiff, where reasonable, will argue that the statute of

8  limitations should be tolled due to Apple's fraudulent concealment of many material facts (some of

9  which Apple continues to conceal, including the identity of who proposed to fire her). Where

10  applicable, the plaintiff will also claim the doctrine of continuing violations, equitable tolling, and

11  the discovery rule.

12  **205.** For California Labor Code §§ 98.6 and 1102.5, any issues with statute of limitations

13  related to the claims or remedies (*i.e.*, penalties/fines) are equitably tolled by Plaintiff's timely

14  complaints sitting in the California Department of Labor queue for years before Plaintiff kicked the

15  claims out into this lawsuit. This lawsuit replaced the California Department of Labor DIR case

16  *Ashley Gjovik v Apple Inc*, RCI-CM-842830. Plaintiff filed the first claim on August 29 2021, before

17  Apple terminating her employment.

18  KNOWLEDGE OF PROTECTED ACTIVITIES

19  **206.** The plaintiff threatened Apple that she would talk to the press about her work

20  conditions in June 2021. She did talk to the press and was quoted by the New York Times about

21  Apple starting in July 2021. Apple Employee Relations told Plaintiff they saw it, were aware, and

22  were annoyed she figured out labor laws. The press covered the plaintiff and her social media posts

23  through August and September 2021. The plaintiff provided quotes, commentary, and more

24  information to journalists for their articles. Each time a new article was published, the press directly

25  notified Apple's public relations team, requesting comment.

26  **207.** In mid-July 2021, the plaintiff notified Employee Relations that she and other

27  coworkers were posting on social media, complaining that Apple was invading their privacy with

28  overly aggressive medical release forms for Americans with Disabilities Act accommodation

requests. Apple Employee Relations interrogated Plaintiff on July 29, 2021, about her discussions with her coworkers about their work conditions (a culture of retaliation and cover-ups at Apple) on Apple's Slack discussion tool. Okpo urged her to stop discussing work conditions and asked her to direct her coworkers to speak with him privately. The plaintiff told Okpo she would not help him intimidate and retaliate against her coworkers.

208.   After Okpo put Plaintiff on leave on August 4, 2021, Plaintiff began speaking out more on Twitter and to the press. The plaintiff was still discussing work conditions. Okpo quickly emailed Plaintiff on August 5, 2021, complaining about her, discouraging her from speaking out, and falsely accusing her of lying.[44]

209.   Plaintiff observed an incredible response from her coworkers while she was sharing stories and documents in August 2021, with many discussions on Apple's Slack tool for employees, including many employees saying and telling her that they had reported the people she complained about and asked Apple to do the right thing with Plaintiff. One of Plaintiff's posts even led to a petition within Apple. The plaintiff shared a Radar work tracking ticket that Marini titled with the goal of making her life "*a living Hell*" and assigned it to Reigel. After learning of the Radar from Plaintiff's social media, dozens of employees started commenting on the Radar, condemning the bullying, and demanding Apple improve its conduct. Several people told Plaintiff they reported the Radar to Human Resources around August 16 2021.

210.   Then, in Apple's 2022 position statement to U.S. Department of Labor, Apple claimed it was investigating Plaintiff's Twitter posts starting from around August 28 2021 and through September 9, 2021. This claim from Apple implies they were reading all of Plaintiff's Twitter posts and monitoring her other social media activity. Either Apple was surveilling her as they claimed in 2022 and thus knew about all of the protected activity and harassment, or Apple lied to the federal government in 2022.

211.   Finally, another fact conclusively evidencing Apple's knowledge of Plaintiff's activities – is that as part of the steps leading to Plaintiff's termination, one of the supposed reasons she was

---

[44] In September 2024, the NLRB issued a Decision of Merit, saying that there is substantial evidence that Okpo's email violated federal labor laws.

to be terminated, as communicated by Human Resources to her VP, was that Plaintiff supposedly failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. The plaintiff did, however, redact the internal records she posted on Twitter. Apple Human Resources must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Apple never raised the matter to Plaintiff, and Plaintiff only discovered this fact via discovery.

212. Apple continued to monitor her posts after September 2021 (attempting to get Twitter to delete some of them, admitted in U.S. Department of Labor filings) and through January 2022 (Appleseed wrote to the Plaintiff, upset that she tried to get the Plaintiff's Twitter posts deleted but found out Apple also reported them, and it was Apple's reports that resulted in the posts being deleted). Apple has undoubtedly read Plaintiff's Twitter and other social media for years. Apple also knew about Plaintiff's activities through direct updates from Plaintiff, information shared by agencies arising out of Plaintiff's complaints, press coverage of Plaintiff, and any surveillance they were conducting of her personal and work devices (which Apple's policies said they would do).

## COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

213. Apple retaliated against Plaintiff and discharged Plaintiff's employment for multiple reasons that violated public policy. Among other unlawful reasons, Apple suspended and fired Plaintiff in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace*." Specific concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5, 1102.5, and 6310. These sub-claims are included in addition.

214. **Illegal Data Harvesting [California Constitution Article I, Section 1; FTC Act]:** Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Article I Section 1 of the California Constitution; the California Privacy Rights Act; the U.S. FTC Act; Cal.Pen.C. § 637.7, and the International Covenant on Civil and Political Rights: Article VII.

215. While false and pretextual, Apple's proffered reason for terminating Plaintiff is illegal

1  itself. Apple claims it fired Plaintiff for complaining about Apple's surveillance of employees,

2  including coercive data collection of biometrics and invasive 24/7 video recording.

3      216. Apple discriminated against Plaintiff, including ending her employment, because of

4  Plaintiff's actions related to her constitutional and statutory right to privacy, which are substantial

5  and fundamental rights that benefit the public and were firmly established at the time of discharge.

6  Apple's decision to use this as their excuse for firing the Plaintiff reveals Apple's animus against

7  California employees' privacy rights.

8      217. Apple also intruded into Plaintiff's seclusion, physically and constructively invading

9  Plaintiff's privacy in violation of California Civ. Code § 1708.8(a), (b), (d), and Apple surveilled

10  Plaintiff and forced Plaintiff to surveil others with the always-on video camera in her iPhone,

11  including in bathrooms and locker rooms, in violation of California Labor Code § 435.

12      218. The Gobbler application captured videos and photos of the plaintiff in the bathroom;

13  the plaintiff has copies of those images. Apple's use of Gobbler on Plaintiff's phone also forced

14  Plaintiff to take part in Apple's unlawful acts by facilitating Apple's secret capture, storage, and

15  processing of photos, videos, and biometrics of the public without their knowledge or consent.

16  Apple's termination of Plaintiff claimed that she would be fired if she warned people about the

17  surveillance occurring on her phone. Therefore, Apple's unfair business practices made consent

18  from the public impossible. The public had a reasonable expectation of privacy for sensitive

19  biometrics.

20      219. Apple also violated § 5 of the FTC Act in unlawfully coercing employees to provide

21  personal and sensitive data for commercial product development, which was also engaging in unfair

22  acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable

23  and misleading statements to consumers. Employees can be consumers under the FTC Act as an

24  employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple

25  product with consumer protection laws protecting them.

26      **220. Employment Discrimination [California DFEH; U.S. EEOC]:** The Plaintiff

27  reported and testified about complaints about sex, gender, and disability discrimination, which are

28  fundamental rights for a *Tamney* claim. The plaintiff filed California DFEH and U.S. EEOC claims

on August 12 2021, then testified and provided evidence. She requested a Right to Sue letter, granted on September 9 2021, just hours before Apple fired her. Apple retaliated against Plaintiff for opposing Apple's discriminatory practices. Before her termination, the plaintiff also filed employment discrimination claims with the U.S. NLRB and the U.S. Department of Justice Civil Rights Department.

**221.** Apple discriminated against Plaintiff because of Plaintiff's actions exercised her constitutional and statutory rights to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

**222. Crime Victim/Witness Discrimination [California Labor Code § 230(e)]:** The plaintiff was a "*victim of a crime that caused physical injury*" and suffered "*physical, psychological, and financial harm due to the attempted commissions of a crime.*" Apple discriminated against Plaintiff due to Plaintiff's actions related to constitutional and statutory rights to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

**223. Legislative Witness Discrimination [California Government Code § 9414]:** Apple knew Plaintiff was speaking with politicians about what occurred to her next to 3250 Scott. West and Plaintiff even texted about it. Apple also knew it was responsible for Plaintiff's harm, and Plaintiff's contacts with legislatures risked exposing what Apple did.

**224.** Apple knew Plaintiff may testify at legislative committees about the air pollution caused by Apple, even if she did not yet know it was Apple. Apple undertook an effort to ensure Plaintiff did not testify and to harass Plaintiff because Plaintiff may testify to a committee. Apple also knew Plaintiff was talking to elected officials about its retaliation against Plaintiff after her termination, including a State Senator, a U.S. Representative, and a U.S. Senator. Apple had reason to believe Plaintiff planned to be a witness for an agency or committee.

**225.** Under Cal P.C. 140(a) 137(b) 136.1., it is illegal to intimidate or threaten witnesses before and after testimony. Further, Apple also engaged in a misdemeanor public offense under California Government Code § 9414 to harass and retaliate against the Plaintiff, attempting to

1  prevent and dissuade the Plaintiff's testimony in a proceeding and depriving, threatening, and

2  attempting to deprive or requesting that the Plaintiff not be employed due to the Plaintiff's being a

3  witness for a committee and giving testimony to a committee as a witness or victim.

4  COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION (CAL.LAB.C. § 1102.5)

5      226. Plaintiff re-alleges and incorporates by reference every allegation set forth above, as

6  though fully in this Claim for Relief. Apple violated § 1102.5 when it took adverse employment

7  action against Plaintiff due to Plaintiff's protected activity in disclosing information to a

8  governmental or law enforcement agency, to a person with authority over the employee, and to

9  another employee who has authority to investigate, discover, or correct the violation; and providing

10  information to or testifying before, any public body conducting an investigation, hearing, or inquiry.

11  Apple was watching Plaintiff's social media activity and articles, so Apple was also informed of her

12  disclosures through that surveillance.

13      227. Cal.Lab.C. § 1102.5 covers Plaintiff's public disclosures due to Apple's extreme power

14  and control over the government agencies who are supposed to be able to regulate it; often, the

15  public is the only party in a position to force Apple to correct an issue. Many of Plaintiff's public

16  statements in August and September 2021, and statements to coworkers in June and July 2021, all

17  before her termination, explained that was why Plaintiff was bringing her complaints forward to her

18  coworkers and the public – so the public pressure may force Apple to do the right thing.

19      228. Plaintiff filed several complaints under multiple laws known to Apple executives,

20  bosses, and administrators by Plaintiff informing them directly, by Plaintiff speaking about them

21  publicly on social media, the press, and by Apple's surveillance of Plaintiff before her termination.

22      229. Apple discharged and discriminated against Plaintiff in retaliation for Plaintiff's

23  disclosure of information about Apple's unlawful acts and omissions. The plaintiff disclosed

24  Apple's violations of numerous laws to government agencies, the public, the press, and Apple

25  management. The plaintiff had reasonable cause to believe that the information she disclosed

26  evidenced Apple's violations of the statutes and non-compliance with rules and regulations.

27      230. The plaintiff complained of violations of environmental laws and the anti-retaliation

28

1    provisions of environmental regulations.[45] The plaintiff filed complaints to the EPA, CalEPA, and

2    the U.S. Department of Labor around August 29 2021. The plaintiff filed complaints to the U.S.

3    NLRB about NLRA § 8(a)(1) violations on August 26 2021. The plaintiff initiated proceedings, and

4    an NLRB field agent contacted the Plaintiff for an interview in early September 2021.[46] Plaintiff

5    also filed complaints to the California Department of  Labor and the U.S. Department of Labor re:

6    CCR, Title 8, General Industry Safety Order 5194.

7        231.   The plaintiff complained of violations of 29 U.S.C. § 660. She filed complaints with the

8    California Department of Labor and the U.S. Department of Labor. In early September 2021, the

9    plaintiff initiated proceedings with a Wage and Hour investigator.

10       232.   The plaintiff complained of violations of the California Constitution's right to privacy,

11    made a complaint to Apple management in August 2021, and shared concerns with a reporter for

12    an advocacy article in August 2021 titled *Apple Cares about Privacy, Unless You're an Apple*

13    *Employee,"* and made complaints on social media in August – September 2021.

14       233.   The plaintiff complained of 42 U.S.C. § 2000e violations and California Government

15    Code § 12920 anti-discrimination laws. In August 2021, the plaintiff filed complaints to the U.S.

16    Department of Justice Civil Rights Department, the U.S. EEOC, and California DFEH.[47]

17                    COUNT THREE: CALIFORNIA LABOR CODE § 6310.

18       234.   Apple violated § 6310 by discrimination, suspension, discharge, and threat of discharge

19    against Plaintiff because Plaintiff complained about unsafe work conditions and practices,

20    instituted and caused to be instituted proceedings related to her right to safe and healthful working

21    conditions, testified about workplace safety, and exercised her rights under the California OSH Act.

22    Apple also took the above negative actions for fear that Plaintiff would engage, or engage further,

23    in the above activities. The plaintiff's safety complaints and inquiries motivated Apple to

24    discharge, discipline, and discriminate against the Plaintiff.

25       235.  Apple discriminated against and discharged Plaintiff because Plaintiff complained

26

27    [45] 42 U.S.C. §§ 9610 and 7622 and 15 U.S.C. 2622.

28    [46] NLRB issued a decision of merit on Plaintiff's claims and sued Apple in Oct. 2024.
     [47] Title VII of the Civil Rights Act, 42 U.S.C. §2000e; Cal. Government Code § 12920.

1    about safety and health conditions or practices at the workplace to Apple managers and her

2    coworkers. Apple discriminated against and discharged Plaintiff because Plaintiff reported work-

3    related injuries and illnesses and requested information about work-related injury and illness

4    reports or records.

5         236.  Apple knew about Plaintiff's complaints through conversations, emails, meeting notes,

6    internal complaints, external complaints, public interviews, and social media posts. Plaintiff filed a

7    Retaliation claim with the California Department of Labor on August 29 2021, and Apple was

8    notified of such before her termination. The plaintiff complained of unsafe work conditions and

9    internal violations of safety laws, rules, and standards to Apple, EPA, California EPA, and OSHA.

10        237.  The plaintiff complained about violations of, and issues related to, multiple topics,

11   including Hazard Communication and employee exposure to chemicals;[48] COVID-19 safety and

12   communication;[49] wildfire smoke safety;[50] employee injury tracking and reporting;[51] e-waste

13   reduction and Apple's prior e-waste violations;[52] environmental safety, including vapor intrusion

14   exposure,[53] Right to Know and Proposition 65,[54] the Safe Drinking Water and Toxic Enforcement

15   Act of 1986,[55] and Workplace Violence under the OSH Act.[56]

16        238.  Apple retaliated against Plaintiff preemptively out of fear that Plaintiff would file more

17   workplace health and safety complaints. Apple hoped its retaliation would cause Plaintiff to drop

18   her existing complaints out of fear and intimidation and prevent her from filing more complaints.

19                          COUNT FOUR: CALIFORNIA LABOR CODE § 98.6.

20        239.  Apple violated Cal.Lab.C. § 98.6 when Apple discharged and discriminated against

21   Plaintiff for engaging in certain activities, including *"filing a complaint with the Labor Commissioner*

22

23   [48] Cal.Lab.C. §§ 6398, 6400-6405, 6408; Cal.C.Reg., Title 8, § 340.2; 29 CFR Z § 1910.1020.
     [49] Cal.Lab.C. §§ 6325; 6409.6, 6432.

24   [50] Cal.C.Reg., Title 8, § 5141.1.
     [51] Cal.C.Reg., Title 8, § 14300.

25   [52] Cal. Health and Safety Code; Resource Conservation and Recovery Act.
     [53] Cal.Lab.C. § 6406; the Comprehensive Environmental Response, Compensation, and Liability Act; the

26   Superfund Amendments and Reauthorization Act; Resource Conservation and Recovery Act; Clean Air
     Act; and the Occupational Safety & Health Act.

27   [54] The Emergency Planning and Community Right-to-Know Act; Cal.Lab.C. § 6399.7.
     [55] Cal. Health and Safety Code §§ 25249.5 to 25249.14.

28   [56] Cal.Lab.C. §§ 6401.7, 6401.9.

1    *or testifying in such proceedings*.” The plaintiff filed a complaint with the California Labor

2    Commissioner on August 29, 2021, and Apple knew she did so through her public statements and

3    the notification from the agency.

4    240. Apple violated § 98.6 by retaliating against Plaintiff because Plaintiff filed a claim and

5    caused to be instituted proceedings related to the rights under the jurisdiction of the California

6    Labor Commissioner and for exercising rights provided to her under the California Labor Code on

7    behalf of herself and on behalf of other employees. Apple punished her for doing so.

8    241. Apple's forbidden animus was revealed in multiple comments and communications

9    from employees, managers, and agents before and after Apple fired Plaintiff. Comments referenced

10   Plaintiff's protected activities but claimed Plaintiff was lying and acting in bad faith and argued that

11   Plaintiff should be punished because Plaintiff made those complaints.

12   242. Apple retaliated against Plaintiff due to Plaintiff's protected activity, and she suffered

13   adverse actions with a causal connection to the protected activity. Apple engaged in actions

14   prohibited by this section within 90 days of Plaintiff's protected activity.

15   243. **Violation of California Labor Code § 232.5 via §§ 98.6, 98.7:** Apple violated

16   California Labor Code §§ 232 and 232.5 by disciplining, discriminating against, and terminating

17   the Plaintiff for discussing her wages and working conditions. The Plaintiff engaged in protected

18   activities under § 232.5, which includes sharing information about wages and work conditions with

19   coworkers and the public. In violation of these protections, Apple retaliated against Plaintiff for

20   disclosing information regarding Apple's work conditions and wages, including her participation

21   in employee pay surveys, social media posts, and public advocacy.

22   244. In late July 2021, the Plaintiff participated in a pay survey among coworkers. The

23   plaintiff suggested adding a question about gender to the survey. In August 2021, she participated

24   in another pay survey shared via Slack, where she again included a gender-related question.

25   245. In August 2021, the Plaintiff also openly discussed her wages on social media and

26   encouraged her coworkers to do the same. Apple was aware of her actions and retaliated by placing

27   her on leave on August 4, 2021, the day after she shared a post on Slack referencing Apple's policies

28   on employees' right to speak freely about wages, hours, and working conditions. Her post

1    encouraged her colleagues to speak out and organize.

2    246. Apple retaliated more when it shut down the pay survey, reportedly because it included

3    a question about gender. The closure of the survey and the later media coverage criticizing Apple's

4    actions sparked public concern about pay equity at the company. Articles published in August 2021

5    noted that Apple had shut down employee-run surveys on pay equity. The articles criticized

6    Apple's policies on diversity data in these surveys. The Plaintiff also shared information and

7    commented on Twitter about an earlier U.S. Department of Justice lawsuit against Apple for illegal

8    wage-fixing practices. Apple admitted to reviewing Plaintiff's public posts on social media before

9    firing her, which further underscores the retaliatory nature of the actions taken against her.[57]

10    247. The Plaintiff's actions to raise awareness about wage discrepancies and to speak out

11    against these practices were consistent with her rights under labor laws that protect wage disclosure

12    and organizing activities.[58]  A charge was filed with the NLRB in September 2021 about Apple

13    shutting down the pay surveys. The NLRB issued a decision in January 2023 that there is

14    substantial evidence Apple violated labor laws by doing so, further confirming the Plaintiff's claims.

15    248. **Violation of Cal.Lab.C. § 96(k) via §§ 98.6, 98.7**: Apple violated Cal.Lab.C. § 96(k)

16    when it demoted, suspended, discharged from employment, threatened discharge, and

17    discriminated against Plaintiff because of Plaintiff's lawful conduct that occurred during

18    nonworking hours away from the employer's premises, and the conduct involved the exercise of

19    rights protected by the California Constitution.

20    249. The plaintiff engaged in lawful conduct asserting recognized constitutional rights and

21    rights under the Labor Code during nonworking hours while on leave away from Apple's premises.

22    Apple put the Plaintiff on leave, but the plaintiff did not want to be on leave. The plaintiff asked to

23    come back, but Apple said no. Apple cannot turn around and claim the leave was work time or the

24    workplace. Apple told Plaintiff she had been "*removed from the workplace*." Until Apple let Plaintiff

25

---

26    [57] The Verge, *Apple keeps shutting down employee-run surveys on pay equity,* 8/9/202; The
    Verge, *Apple just banned a pay equity Slack channel but let's fun dogs channel lie*,
27    8/31/2021.
    [58] The Verge, *Apple says it has pay equity, but informal employee survey suggests otherwise*,
28    8/23/2021.

1  return to work, Plaintiff was off duty. Plaintiff posting about work conditions in her personal time

2  does not transform Plaintiff's personal time into work time.

3     250. Apple fired Plaintiff for various illegal reasons, including many of the public statements

4  Plaintiff made while on leave in August – September 2021.

5     251. Apple fired Plaintiff for complaining on social media and to the press about harassment

6  and safety issues at Apple, as was her inherent right to be free from discrimination under California

7  Constitution Article 1, §§ 8, 31, and her right to physical safety under California Constitution

8  Article 1, § 1.

9     252. Apple fired Plaintiff for complaining on social media and to the press about unlawful

10  and unethical surveillance and invasions of privacy by Apple to Plaintiff and her coworkers. Apple's

11  legitimate justification is illegitimate. Plaintiff has a self-executing right to protest invasions of

12  privacy under California Constitution Art. 1, § 1.

13     253. Apple fired the Plaintiff for complaining on social media and to the press about the

14  environmental crimes she witnessed and was a victim of at her apartment in 2020 and Apple's

15  conduct at her office.

16     254. Apple fired Plaintiff for complaining on social media and to the press about the

17  intimidation and threats she received due to her status as a crime victim and because she advocated

18  for crime victim's rights – as was her right under California Constitution Article 1, § 28.

19     255. Apple violated Cal.Lab.C. § 96(k) when it retaliated against Plaintiff for making any and

20  all of these statements, which she had a constitutional right to make and which she made outside

21  of worktime and outside of the workplace.

22                          <u>TOXIC TORT TOLLING THEORIES</u>

23     256. In 2022, Plaintiff continued monitoring the *TRW Microwave* and Honeywell *Synertek*

24  Superfund sites. She requested public records via FOIA and engaged with the EPA's corrective

25  actions involving Apple and Northrop Grumman. The cause of her illness remained unclear in

26  2020-2021, but EPA investigations into solvent contamination from the *Synertek* site's groundwater

27  plume near her apartment suggested a potential link.

28     257. In July 2022, Plaintiff discovered that the EPA had conducted groundwater testing in

2021, following her complaints, revealing increased levels of trichloroethylene near her former residence. She contacted the EPA and U.S. Army Corps of Engineers in January 2023 for further clarification on the health risks and the agency's remediation efforts.

258. Simultaneously, Plaintiff investigated Apple's facilities for environmental violations, compiling a database of over 160 sites. When she found inspection records for Apple's 3250 Scott facility on January 11, 2023, she asked the EPA about potential vapor intrusion.

259. On February 21, 2023, after filing multiple Public Records Act requests about various Apple buildings, Plaintiff received documents revealing disturbing information about Apple's operations at 3250 Scott – permits for semiconductor fabrication equipment. Recognizing the significance of this discovery from her prior experience working on hardware bring-up at Apple, she publicly connected Apple's hazardous manufacturing activities at 3250 Scott to her 2020 illness.

260. The plaintiff's findings were further substantiated through communication with an environmental safety expert. Lenny highlighted the acute health risks of gases used in semiconductor manufacturing and pointed out a 2019 gas leak report that mentioned phosphine— an indicator of Apple's toxic emissions at 3250 Scott. This information confirmed Plaintiff's belief that Apple's activities at the facility caused her illness.

261. Throughout 2020-2022, Plaintiff spent significant time researching potential causes of her illness, reviewing environmental databases and public records for nearby facilities, including 3250 Scott. Records on the EPA's Toxics Release Inventory (TRI) and other federal and state databases showed no significant toxic chemical releases from 3250 Scott. Without knowledge of the semiconductor operations at the facility, Plaintiff could not connect these records to her illness or find the source of her exposure.

262. The plaintiff noticed that 3250 Scott was registered as a hazardous waste generator—a designation common in Silicon Valley—but she could not have connected this to her injury. The region's history of industrial activity and the current presence of research and development facilities that generate hazardous waste did not raise any alarms. Furthermore, the unusual nature of Plaintiff's illness—including manifesting as a sudden heart failure while sleeping in her

apartment—was not something typical of the environmental risks she had seen associated with the local tech industry.

263.  Government agencies, including the EPA, had also investigated the area and found no records that would indicate a direct link to her health issues. They, too, could not identify a clear cause, which further obscured Plaintiff's ability to connect the dots before discovering Apple's involvement in February 2023.  Apple further obstructed transparency by pressuring government agencies like the fire department and EPA to avoid documenting or discussing its activities. Notably, Apple tried to force the EPA to sign an extensive and unlawful NDA before allowing an inspection of Plaintiff's office in August 2021—another clear example of its attempts to prevent the discovery of its hazardous operations.

264.  Additionally, Plaintiff had worked at Apple for several years and was familiar with the company's unconventional, often eccentric, research and development activities. While often questionable, these operations never caused harm like she experienced in 2020. The plaintiff had no reason to suspect that Apple's activities were related to her injury.

265.  In 2020 and 2021, Plaintiff raised concerns about nearby facilities, including 3250 Scott, with Apple's Environmental Health & Safety (EH&S) and Legal departments. Apple's failure to warn her implicitly reassured her that nothing unusual or hazardous occurred at the facility, leading Plaintiff to assume that 3250 Scott posed no significant health risk. As a result, she focused her research on other potential sources of contamination.

266.  By early 2023, government agencies, including the EPA, had conducted extensive investigations into the Plaintiff's illness, ruling out nearby Superfund contamination and vapor intrusion. The prevailing theory was that Plaintiff's symptoms were caused by something in the building materials at her apartment, not industrial contamination. However, Plaintiff's discovery of Apple's semiconductor fabrication activities at 3250 Scott in February 2023 revealed the true cause of her illness, as the facility's toxic emissions were the source of her exposure.

267.  Apple intentionally concealed its hazardous operations at 3250 Scott, using misleading permits and improper classifications that obscured the facility's true nature. This deception, coupled with Apple's failure to disclose relevant information and its use of non-disclosure

1  agreements to silence employees and avoid regulatory oversight, prevented Plaintiff from

2  identifying the source of her illness until February 2023. Apple has unclean hands.

3      268. Upon learning of the semiconductor fabrication at 3250 Scott, Plaintiff immediately

4  identified the facility's toxic emissions as the plausible cause of her severe health problems and set

5  to work on further research, filing complaints, and initiating litigation. Apple's deliberate efforts to

6  hide its operations effectively prevented Plaintiff from bringing her claims in a timely manner.

7      269. Therefore, the statute of limitations for Plaintiff's toxic tort claims, including nuisance

8  and intentional infliction of emotional distress (IIED) based on fear of cancer, should be tolled until

9  February 2023, the date when Plaintiff first discovered the nature of Apple's hazardous activities

10  at 3250 Scott. Before this discovery, Plaintiff had no reasonable basis to suspect that Apple's

11  operations were responsible for her illness.

COUNT FIVE: PRIVATE NUISANCE

13      **270. Creation and Maintenance of a Private Nuisance at 3250 Scott Blvd:** In operating

14  an unpermitted semiconductor fabrication facility next to an apartment complex, Apple created

15  and maintained a condition violating Cal.Civ.C. § 3479. This nuisance was demonstrably injurious

16  to health, indecent, and offensive to the senses, and obstructed the unrestricted use of property. By

17  acting and not acting, Apple created a condition and allowed a condition to exist that was harmful

18  to health, as well as a fire, explosion, and poisoning hazard. Apple's conduct in acting or not acting

19  was intentional, unreasonable, negligent, and reckless.

20      **271.** Apple continuously casts pollution upon the owner's property and tenants of adjacent

21  properties, as it knew it would do when it constructed its exhaust HVAC and hazardous waste

22  systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution

23  would continue to fall, not by accident or mishap, but in conformity with the knowledge it had

24  before the construction of the systems. Apple should be presumed to have intended its act's natural,

25  known, and reasonable consequences.

26      **272.** Apple's interference would and did substantially annoy or disturb persons of normal

27  health and sensibilities in the same community. Apple's operations at the factory and Superfund

28  site are both continuing nuisances, and every continuation of the nuisance or trespass gives rise to

1    separate damages claims. Apple has the agency and ability to stop the nuisance (it is not

2    permanent), so until it does, the nuisance Apple created will continue.

3    273.  Apple's conduct was a substantial factor in causing Plaintiff's harm. Plaintiff did not

4    consent to the defendant's conduct, and the seriousness of the harm outweighs the social utility of

5    Apple's conduct. Apple damaged Plaintiff's property and injured Plaintiff's person. Due to

6    Apple's actions, Plaintiff's property was destroyed, the leasehold degraded, she became terribly ill,

7    and she suffered severe emotional distress.

8    274.  Apple's exhaust caused injury to Plaintiff's body and mind, Plaintiff's dog, and

9    Gjovik's property. For example, the chemicals and gases turned her white clothes yellow, yellowed

10   her plastics, caused reactions on the copper fasteners of her jeans, and dissolved the glues in her

11   shoes and jewelry.  The chemicals harmed Plaintiff's body, causing rashes, hives, tumors, scarring,

12   burns, heart and lung issues, neurological issues, and severe trauma.





*Figure 8: Yellowing of Plaintiff's white fabrics.*

*Figure 7: Yellowing of Plaintiff's white fabrics: Yellowing of Plaintiff's white fabrics.*



*Figure 6: Yellowing of Plaintiff's white fabrics.*

*Figure 5: yellowing of some of Plaintiff's plastics, but not others.*

1
2
3
4
5
6
7



Figure 4: Chemical reaction to copper alloy on Plaintiff's jeans.



Figure 3: Plaintiff's shoe falling apart in use due to dissolved glues.

8
9
10
11
12
13
14
15
16



Figure 1: Degraded plastic on Plaintiff's coffee grinder.



Figure 2: Chemical reaction to copper alloy on Plaintiff's jeans.

17

275. In or about 2015, Apple constructed, or caused to be built, exhaust vents and open tanks

18  at 3250 Scott near the common borderline of Apple's and Plaintiff's property. The exhaust vents

19  were installed and maintained negligently, recklessly, and unskillfully. Apple exhausted through the

20  vents and emptied various substances into the open tanks, which caused a foul, obnoxious, and

21  disagreeable odor and polluted the ambient and indoor air of Plaintiff's property.

22  276. Apple's facility emits large quantities of vapors, chemicals, and other contaminants into

23  the air, which are carried by the natural winds and air currents onto Plaintiff's property and collect

24  Plaintiff's chattel property, and are generally injurious to Plaintiff's health, are offensive to the

25  senses, and interfered with Plaintiff's comfortable enjoyment of life and property. Apple created

26  the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their

27  business. The emissions were a business decision to be able to report reduced waste sent to landfills.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16        *Figure 4: Image of 3250 Scott in relation to the apartments.*

17

18              COUNT SIX: TORT OF FEAR OF CANCER & DISEASE

19        277. Apple deliberately vented toxic, carcinogenic, and lethal substances into the ambient

20   air around the Santa Clara Square Apartments where Plaintiff lived in 2020. Apple engaged in this

21   conduct with reckless disregard for the injuries specific to be caused by that plan of conduct, and

22   knowing people exactly like Plaintiff would be exposed to its dangerous, toxic chemical fumes and

23   vapors.

24        278. Semiconductor fabrication, like what Apple is doing at 3250 Scott, is an ultrahazardous

25   activity and absolute nuisance when conducted next to homes due to the highly toxic gases, reactive

26   and pyrophoric gases, and the sheer quantity of dangers, poisonous chemicals that are on-site and

27   in use for fabrication  Apple's conduct was also a nuisance to Plaintiff, and Apple's exhaust

28   trespassed into Plaintiff's home, and assaulted Plaintiff's body.

279. Where there is no strict liability, Apple had a concrete, critical duty to warn those around the facility – but instead, Apple failed to file required permits, failed to characterize the facility properly, put no signs in front to designate the type of activity, filed only one Toxics Release Inventory report, repeatedly tried to avoid filing mandatory spill/leak reports to the government and also deliberately made false statements to conceal their misconduct.

280. Apple's activities at 3250 Scott violated rules, regulations, and statutes at local, state, and federal levels. Apple has already received notice of dozens of violations, including illegal chemical emissions. Apple's unlawful and outrageous conduct caused Plaintiff to suffer severe emotional distress when Apple exposed Plaintiff to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and negligent conduct exposed Plaintiff to carcinogens, including trichloroethylene, toluene, arsine, and vinyl chloride.

281. Apple knew it would cause tenants at the Santa Clara Square Apartments distress and acted with reckless disregard for the probability that people like Plaintiff would suffer emotional distress knowing she was present where there were lethal and carcinogenic chemicals. The plaintiff suffered severe emotional distress from a reasonable fear of developing cancer and disease, and Apple's conduct was a substantial factor in Plaintiff's severe emotional distress.

282. As a proximate result of the acts of the defendant, Plaintiff suffered severe emotional distress, including the fear of developing cancer and other diseases and an increased risk of developing cancer and other diseases. Her fear also extended to her dog, a tiny eight-pound Chihuahua mix exposed to the semiconductor fabrication exhaust with Plaintiff. The plaintiff discusses this at every veterinarian appointment and always orders a CBC and metabolic workup for him if she can afford it.

283. It is documented that Apple used and exhausted carcinogenic chemicals into the ambient air outside the Santa Clara Square Apartments. It was also reported by an industrial hygienist running a two-hour TO-17 that the same carcinogenic chemicals Apple had exhausted were also found in the indoor air of the plaintiff's home. Plaintiff was also able to capture evidence of some of the chemicals in her blood and urine. The plaintiff was extensively exposed.

284. The plaintiff suffered a wide array of physical symptoms attributed to the toxic

1  chemicals at 825 Stewart Drive and 3250 Scott, including spasms, nausea, hair loss, rashes, hives,
2  burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. These
3  physical manifestations of the injuries and exposure to dangerous carcinogenic chemicals establish
4  a reasonable fear of future disease.  Further, the fear and horror of personally being exposed to a
5  cloud of poison gas or knowing that family members have been exposed are absolute emotional
6  trauma in its purest form.

7  285. After Apple's injuries to Plaintiff due to chemical exposure in 2020, Plaintiff
8  experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression,
9  rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred,
10  and damaged skin, hair loss, worsened asthma, and breathing troubles, etc.).

11  286. This occurred during Plaintiff's second and third years of law school, causing her to
12  suffer academically. Plaintiff now also faces a significantly increased risk of contracting cancer and
13  other diseases in her lifetime. Further, after Apple's psychological and emotional injuries to
14  Plaintiff in 2020-2024, Plaintiff now suffers from dramatically worsened anxiety, post-traumatic
15  stress disorder, and concentration issues – as well as new depression, insomnia, panic attacks,
16  weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits,
17  and moral injury.

18  287. At the time of Apple's termination of Plaintiff's employment on September 9 2021,
19  Plaintiff still did not know Apple was responsible for what happened to her in 2020. Apple
20  continued harassing and tormenting Plaintiff despite and because of it before knowingly subjecting
21  Plaintiff to exposure to a highly toxic substance while purposefully concealing from Plaintiff the
22  severe injuries that might result from such exposure and in reckless disregard of these risks. The
23  plaintiff's physical exposure to Apple's illegal fabrication exhaust was unrelated to her
24  employment, and thus, Worker's Compensation does not apply. Further, Apple was the operator
25  in control of the facilities at 3250 Scott during the pertinent times, and actions taken related to
26  Apple's hazardous waste can be directly attributed to the corporation.

27  288. Apple had knowledge and a reckless disregard for the fact that people just like Plaintiff
28  would be injured by its illegal dumping. Apple knew beyond speculation that people would be

injured. This fabrication is across the street from these apartments – where every employee would see them daily. Apple spent millions on this facility and entered into a long-term lease, and Apple's Chief Financial Officer signed the Resource Conservation and Recovery Act papers. Every time Apple vented its fabrication exhaust into the ambient air, Apple knew people like the Plaintiff would be injured and deeply traumatized when they discovered what they were exposed to.

289. Apple's employees and contractors have already revealed not only evidence of knowledge but also gross recklessness – with one of their ACT Environmental contractors who was leading the hazardous waste disposal efforts in 2020 at the site, when Plaintiff was doused in chemicals, bragging in his LinkedIn profile that during that time he found "*innovative*" ways to save Apple money on hazardous waste disposal. Meanwhile, Plaintiff still has bald spots after Apple burned all her hair off. These issues were not new to Apple either, as Apple is notorious for failed manufacturing attempts in the U.S.,[59] as well as gassing their own employees at data centers.[60]

290. Corporations that knowingly and intentionally dump hazardous waste or otherwise pollute the environment, violating environmental and safety laws, do so because the practice is less costly and more profitable than complying with the regulation. Apple's intentional evasion of paying required fees and costs associated with proper hazardous waste management and disposal allows it to operate its research and development at a much lower price than its competitors, who follow the law. In addition, Apple also recently launched a "*zero waste*" program where Apple purports to divert hazardous waste from landfills. Apple's environmental reports show 3250 Scott is responsible for around 30 percent of Apple's global corporate hazardous waste. At 3250 Scott, Apple's diversions of waste from landfills include midnight dumping into apartments and creating toxic vapor clouds in public parks.[61]

291. Apple also instituted an ESG modifier for executive pay (bonuses worth multi-millions

---

[59] NY Times, "*Apple Computers Used to Be Built in the U.S. It Was a Mess.*," Dec 2018; CultureofMac, *A brief history of Apple's misadventures in manufacturing: Part 1*, 2019.
[60] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015; NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 2012.
[61] Apple, *Apple releases 13th annual Supplier Responsibility Progress Report*, March 6 2019./

1  of dollars) that can increase or decrease executive compensation by 10% based on environmental

2  and other practices. Apple's intentional environmental violations were not just to reduce costs

3  required for properly disposing of toxic waste, but Apple's midnight-dumping also to increase

4  bonuses for their executives. Further, Apple's continued harassment of Plaintiff despite everything

5  else that has happened, including her exposures, is sick and depraved. The amount of stress puts

6  her even more at risk for cancer and disease after she has already suffered significant bodily injury

7  from Apple's illegal conduct and emissions.[62]

8  COUNT SEVEN: TORT OF OUTRAGE

9  292.  Apple's actions toward Plaintiff were intentional, malicious, and extreme, targeting

10  Plaintiff with the specific purpose of causing emotional distress. Apple's conduct was calculated to

11  inflict severe emotional harm, with full knowledge of Plaintiff's vulnerabilities and the foreseeable

12  consequences of their actions. Apple acted with the substantial certainty that Plaintiff would suffer

13  extreme emotional distress in California, New York, and Massachusetts.

14  293.  The Plaintiff lived in California until August 31, 2022, in New York from September 1,

15  2022, to September 7, 2023, and in Massachusetts from September 23, 2023, to the present. The

16  California statute of limitations covers the Plaintiff's residence in California from September 7,

17  2021, through September 1, 2022; the New York statute of limitations applies from September 7,

18  2022, to September 23, 2023; and the Massachusetts statute of limitations applies from September

19  23, 2023, to the present.

20  294.  Many ways Apple tortured and tormented Plaintiff would be impossible for most other

21  corporations and businesses. To harass the Plaintiff to the extent that Apple did needs the

22  resources, connections, and impunity of a corporation as large, wealthy, and politically connected

23  as Apple is. However, even though most companies cannot do these things, that does not restrain

24  Apple and other huge corporations from engaging in this misconduct. Corporations like Apple are

25

26

27

28  ───────────────
[62] California H.S.C. § 42400.1 California P. C. § 12022.7.

1   infamous for deranged harassment, stalking, and surveillance of their critics.[63]

2   295.  Conversely, the Plaintiff had never experienced anything like what Apple had done to

3   her. She lived a quiet, private life and had a good relationship with most people. There is no one

4   else except Apple that Plaintiff could plausibly attribute responsibly for the things that have

5   occurred to her since 2020. No one else would have the motive or resources to do these things, and

6   the harassment was perfectly timed with her conflict with Apple. Discovery will show most of this

7   conduct, if not all of it – was initiated, carried out, authorized, ratified, and supported by Apple.

8   *Burglary, SWATing, & Destruction of Property*

9   296.  On September 29, 2021, Apple mailed Plaintiff a package containing her personal

10  items, which were intentionally damaged and covered in glass shards. (18 U.S.C. § 876). The

11  package also contained a hidden listening device, which further violated the Plaintiff's privacy and

12  caused her emotional harm. The deliberate destruction of Plaintiff's personal belongings, including

13  planting a listening device in one of her items, was part of an ongoing campaign to frighten,

14  torment, and emotionally distress Plaintiff. Apple employees' actions in posting provocative

15  messages about the Plaintiff were meant to distress her further.

16  297.  Before the package arrived at Plaintiff's home on September 30, 2021, Plaintiff asked

17  on Twitter what people thought Apple was mailing her. One account, *BabyHummingbird*, later

18  revealed to be associated with Apple public relations or global security, posted an image from a

19  movie implying that Apple had mailed Plaintiff the severed head of one of Plaintiff's loved ones.

20  The account only posted to/about Plaintiff, and its first "like" was an ad that read, "*Apple's back*

21  *better than ever!*" It also liked posts harassing Plaintiff made by other suspicious accounts.

22

23  [63] e.g., Bloomberg, *When Elon Musk Tried to Destroy a Tesla Whistleblower, March 13 2019;*
    U.S. DOJ, *eBay Inc. to Pay $3 Million in Connection with Corporate Cyberstalking Campaign*

24  *Targeting Massachusetts Couple,* January 11 2024; PBS, *Feds charge eBay $3 million over*

25  *employees who sent live spiders and cockroaches to couple,* January 11 2024; VICE, *Secret*
    *Amazon Reports Expose the Company's Surveillance of Labor and Environmental Groups,*

26  November 23 2020; BGR, *Apple accused of impersonating police during effort to recover lost*
    *iPhone 5,* Dec. 192018, LA Times, *How the FBI and the L.A. Times destroyed Jean Seberg's*

27  *life,* June 7 2020; Lubbers, E  . 2015. *Undercover Research—Corporate and Police Spying*
    *on Activists. An Introduction to Activist Intelligence as a New Field of Study.* Surveillance

28  & Society13(3/4): 338-353 (2020); etc.

1

298. Later, in May 2022, the Plaintiff experienced three suspicious call dropouts (May 16 at 6:29 P.M., May 24 at 2:03 P.M., and May 26 at 1:59 P.M.), which led her to discover hacking on her network (May 28, 2022) and surveillance devices placed within her home, including the previously mentioned bugged statue (May 29, 2022).

299. The plaintiff reported the matter to the FBI on May 30, 2022, and the FBI directed her to the local police to take physical possession of the statue. That night, around midnight, someone tried to break into Plaintiff's home but fled upon Plaintiff's dog barking. The plaintiff called the police on May 31, 2022, and the police filed a report (SC PD Report No. 2205310079) about the statue and the attempted break-in and took possession of the statute. The plaintiff alleged Apple was behind it all, explaining to the police that she was a safety and environment whistleblower and that Apple had not responded well.

300. After that, the plaintiff still experienced suspicious network activity, which led her to find that someone had installed some sort of electronic equipment in her fake fig tree. It was giving off radio frequency and electromagnetic signals, as the statue did. The plaintiff was hesitant to report more issues because she knew she potentially sounded insane. She was exhausted and resorted to throwing the fig tree in a dumpster.

301. These acts were done with the intent to invade Plaintiff's privacy and cause emotional harm. After reporting these intrusions to the police and the FBI, Plaintiff endured further violations, including attempted break-ins, which she attributed to Apple. These actions were aimed at intimidating and distressing the Plaintiff. The acts were outrageous and done with the knowledge that by reporting the things Apple was doing to her, she risked harming her own credibility. It would sound crazy if people were unaware that corporations engaged in misconduct like this. This was all part of Apple's scheme.

302. Around September 2021, the Plaintiff heard two men in her apartment attic, walking around and doing something for a few hours directly above her office. Later, Plaintiff's property manager, Prometheus, explained to Plaintiff that the only way to access her attic was through the closet in her bedroom – but Plaintiff did not see anyone enter or exit. Upon further investigation,

1  neighboring units shared the same attic space, including one vacant unit, with thin plywood

2  separating the units. The plaintiff also found strange-looking cords and cables in the attic, and the

3  property manager said they had never seen them before, and they did not know what they were.

4  303. On August 9, 2022, Plaintiff reported to the FBI and the police that in September 2021,

5  Apple had apparently broken into her attic and installed surveillance equipment. [SCPD Report

6  No. 2208090087]. Despite filing a report to law enforcement, Apple entered Plaintiff's home again

7  before law enforcement arrived, leaving insulation under the attic entry and her dog smelling

8  strongly of cigarettes. All of this further aggravated her emotional distress.[64]

9  304. On September 28, 2023, early in the morning before Plaintiff's first day at her new job,

10  Apple trespassed on Plaintiff's property in Massachusetts, leaving evidence of entry into her

11  backyard. This invasion of privacy and the emotional distress caused by the prior actions led

12  Plaintiff to report the intrusion to Apple's CEO, Tim Cook when she filed this lawsuit.

13  305. Later, Apple entered her apartment again, leaving evidence that someone had been

14  inside. In February 2024, Apple staged a fake carbon monoxide alarm in Plaintiff's basement to get

15  Plaintiff out of her house and, upon returning with an all-clear from the fire department, found no

16  evidence of the gas; she found her laptop, reporting an alert that the bottom case while she was

17  outside.

18  306. Apple employees continued to stalk and harass Plaintiff, following her physical and

19  digital movements, taking photos of her, and breaking into her home.

20  307. The plaintiff found no evidence that Apple broke into her home in New York, but she

21  intentionally moved into a house directly across the street from the Governor's mansion. The

22  governor's mansion provided a 24/7 state police presence and video surveillance, which deterred

23  Apple for a year. However, she was harassed by at least two private investigators in front of her

24  building, both engaging in conduct that left no doubt they were there specifically to harass the

25  Plaintiff.

26  ***Defamation, Trade Libel, Intimidation, Retaliation***

27

28  [64] Cal.Pen.C. §§ 647(h), 647(i); Cal.Pen.C. §§ 459, 602.5.

1    308. Apple's defamatory statements, falsely accusing Plaintiff of dishonesty and criminal

2    conduct, were made with malicious intent as part of a broader campaign of harassment and

3    retaliation for Plaintiff's protected whistleblower activities, including labor complaints. Apple's

4    actions, including defamation, trade libel, fraud, invasion of privacy, and interference with business

5    relationships, were extreme, outrageous, and retaliatory. They involved true threats, civil rights

6    interference, and discriminatory conduct based on sex and disability.

7    309. From July 2021 onward, Apple employees repeatedly harassed Plaintiff through

8    unwanted communications, surveillance, false accusations, and intimidation of her friends,

9    creating a smear campaign to discredit Plaintiff's whistleblowing. Starting in August 2021, fake

10    social media accounts used by Apple spread defamatory statements and threats against Plaintiff,

11    accusing her of perjury and calling for punitive action.

12    310. On September 1, 2021, Apple employee Shantini Vyas tweeted defamatory statements

13    about Plaintiff, accusing Plaintiff of lying and making unsubstantiated complaints to the

14    government. These posts were shared by other Apple employees, Apple managers, and fake

15    accounts, further harassing Plaintiff.

16    311. On September 3, 2021, 9to5Mac.com published an article casting doubt on Plaintiff's

17    NLRB charge against Apple, based on quotes from Vyas and Apple manager Mondello. The article

18    was planted only a couple of days after the McDermott, Will, & Emery law firm had filed a notice

19    of appearance in the Plaintiff's NLRB case. The blog article was retracted a few days later after the

20    Plaintiff threatened legal action.

21    312. Apple employees, including "crissnovak," posted defamatory content about Plaintiff in

22    September 2021, including disparaging remarks about Plaintiff's mental health, career prospects,

23    and legal actions, with threats to undermine her reputation. Ian ("Neoform"), a coworker,

24    participated in the harassment, posting defamatory comments on social media about Plaintiff's

25    alleged mental health issues and involvement in her firing. On September 10, 2021, crissnovak

26    threatened legal and professional consequences for the Plaintiff, including stating she would be

27    financially ruined. These posts were part of a broader campaign to intimidate and threaten Plaintiff.

28    313. From late 2021 through 2022, Apple employee Appleseed continued the harassment,

spreading false accusations about Plaintiff to Plaintiff's friends, filing false reports to law enforcement, and making threats in emails and public posts. Appleseed's social media posts from December 2021 to May 2023 included accusations of perjury, defamation, and stalking while also threatening Plaintiff with legal and professional consequences, including retaliation through law enforcement and civil litigation.

314. Throughout this period, Apple and its agents used social media to amplify the harassment, posting defamatory statements, insulting comments, and threatening messages to discredit and intimidate Plaintiff. Apple's campaign of harassment and intimidation was calculated to cause emotional distress, humiliation, and harm to Plaintiff's personal and professional life, leaving her in a state of fear, anxiety, and distress.

### *Stalking, Obstruction, & Deranged Harassment*

315. The Plaintiff was subjected to a sustained and aggressive campaign of harassment, which began with online attacks across multiple platforms, including social media, email, forums, and the webform on Plaintiff's website. This harassment involved offensive, threatening, and defamatory messages designed to cause severe emotional distress. The messages were often sent from IP addresses associated with spam or malicious activity, single-use accounts solely created to harass the Plaintiff, and even accounts self-identifying as Apple employees.

316. Apple's agents have publicly repeatedly called Plaintiff a liar, predator, bitch, cunt, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, racist, lacking credibility, dishonest, malicious, a sociopath, a narcissist, ambulance chaser, a provocateur, a whore, unhinged, insane, a lunatic, fat, chubby, overweight, universally hated, a psychopath, paranoid, bipolar, psychotic, schizophrenic, not a real whistleblower, not a real activist, a grifter, a Karen, a Super Karen, Karenx100, a typical feminist, and a classic cow.

317. The same accounts described Gjovik's litigation and protected activities as a vendetta, warpath, perjury, unsubstantiated, merciless, baseless, fabricated nonsense, misleading rhetoric, dead in the water, shakedown lawsuits, and misinformation.

318. In December 2021, a particularly bizarre email came from an IP address tied to Apple's original manufacturing plant in Fremont, California. The sender, identifying as "The Messenger,"

1   warned Plaintiff to drop her legal actions against Apple, using Bible verses to justify the threat and

2   accusing Plaintiff of retaliation against the company.

3      319. On December 8 2021, Gjovik received an email from her website webform from a

4   "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from

5   "The Messenger," said, "*Remember what Jesus Christ taught about retaliation. You are retaliating*

6   *back at Apple*." The email then quoted Matthew 5:38-42 from the Christian Bible. Under

7   information and belief, the email came from Apple at or around Apple's first manufacturing facility

8   in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data

9   center.

10     320. One of the most disturbing threats was posted on a forum on September 22, 2021,

11  where an individual, in response to Plaintiff's NLRB charge against Apple over Tim Cook's

12  September 2021 email, suggested that Plaintiff should be executed, urging Apple to "*ruin [her] life*"

13  and "*hunt [her] down like wild animals*."[65] Additionally, on December 21, 2021, a social media post

14  explicitly stated, "*Tomorrow's headline: Apple Whistleblower found dead of a heart attack at 22 (never*

15  *mind the double tap, nothing to see here).*" These were just a few instances of the many hostile and

16  hostile communications Plaintiff received, which included threats of violence, personal attacks, and

17  derogatory remarks.

18     321. The plaintiff's ongoing legal efforts, including filing charges related to witness

19  intimidation and retaliation, only worsened the harassment. On January 10, 2022, Plaintiff filed

20  official complaints concerning Apple's retaliatory actions with various agencies, including the U.S.

---

22  [65] "I said it in the last thread about bad, criminal employees, and I'll say it again. It's
23  time for Apple to take out the trash. Do whatever it takes to identify and catch the
    leakers and then ruin their lives. Fire them, prosecute and go after them. Do whatever
24  it takes. Hunt them down like wild animals. Leakers and other activist employees who
    believe that they can do as they please have no business being at Apple. I want to see
25  them gone and I want to see them destroyed. Trashy employees do not belong at Apple.
    And who is surprised that the leakers go running to the garbage site called the Verge?
26  They already had one campaign that backfired on them when the lunatic woman leaker
    [Plaintiff] was fired, now it is time to get rid of any remaining leakers and criminals.
27  Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death and all
    Apple would need to do is to make it apply to corporations and not just nations. People
28  just need to be optimistic and patient." (*PacManDaddy*, 9/22/2021).

1   NLRB and the U.S. Department of Labor. Following this, Plaintiff received a barrage of more

2   attacks across multiple platforms, including threats designed to intimidate and silence her.

3       322. In early 2023, the harassment intensified when a Twitter account, "*Sybil*," began to

4   stalk Plaintiff's social media posts relentlessly. This account falsely claimed that Plaintiff's

5   statements about N-Methyl-2-pyrrolidone were misleading and even accused her of improperly

6   laundering clothes. Despite Plaintiff blocking the account, Sybil continued to harass her by creating

7   new accounts and spreading false information, further disrupting Plaintiff's social media presence.

8   Plaintiff reported these activities to the FBI and U.S. EPA, suspecting that these accounts were part

9   of an orchestrated effort to intimidate her into abandoning her claims against Apple.

10      323. Additionally, on March 11, 2023, a fake email account named *"Comrade Jones"* posed

11  as a former EPA compliance officer and tried to persuade Plaintiff to cease discussing Apple's

12  environmental misconduct, including the company's involvement in hazardous activities related to

13  N-Methyl-2-pyrrolidone. This account was linked to IP addresses flagged for spam and malicious

14  activity.

15      324. The harassment continued through other creative tactics. On February 19, 2023,

16  Appleseed emailed Plaintiff, acknowledging that Plaintiff did not wish to hear from her, yet

17  continued defamatory statements about Plaintiff, likening their interactions to the movie

18  *Annihilation.*[66] In 2023, Appleseed also contacted Plaintiff's friends, claiming to be from Apple

19  Global Security and attempting to obtain personal information about Plaintiff and her personal

20  relationships.

21      325. On May 26-27, 2023, Appleseed tried to engage Plaintiff through a third party to speak

22  directly to Plaintiff about her evidence against Apple – wanting to ask Plaintiff to withdraw

23  testimony and conceal evidence. This effort to contact Plaintiff was part of Appleseed's broader

24  campaign of defamation and intimidation, which included repeatedly vandalizing Plaintiff's

25

26  [66] In the 2018 movie "*Annihilation*," a group of scientists ventures into a mysterious
    location where reality bends & mutates; and plants, animals, & people undergo
27  terrifying transformations. On their journey, the scientists encounter grotesque
    creatures & bizarre mind-warping phenomena. The further they travel, the more they
28  lose themselves and go insane.

Wikipedia page in 2022 and making multiple false allegations in various public forums from 2021 through the current day.

326. Despite being blocked by Plaintiff from all social media platforms since November 2021, Appleseed remained aware of this case and its progress, evidenced by her repeated submission of unwanted and harassing letters to the court, further defaming Plaintiff and strongly indicating ongoing cyberstalking.

327. This sustained pattern of online and offline harassment, including threats of violence, intimidation, cyberstalking, defamation, and attempts to obstruct Plaintiff's legal efforts, constitutes extreme and outrageous conduct that fulfills the prima facie elements of Intentional Infliction of Emotional Distress (IIED).

*Injuries and Impact*

328. Apple's conduct was extreme, outrageous, and persistent beyond mere insults or annoyances. Their actions caused Plaintiff to fear for her safety, the safety of her dog, and the integrity of her property, leaving her feeling confined and in constant danger. The plaintiff justifiably believed that leaving her home or not securing it would result in her death or harm to her dog. This fear was a direct result of Apple's ongoing harassment and threats.

329. Rather than acting decently, Apple bugged Plaintiff's property, sent her possessions in a package with a threatening implication, sued her for reporting criminal conduct, and falsely impersonated government employees to intimidate her. Apple repeatedly threatened to ruin Plaintiff's life for multiple years.

330. Plaintiff's disclosures to others about Apple's actions consistently result in expressions of shock and disbelief. These actions have caused significant emotional distress, leading to the loss of friends and a general atmosphere of fear and anxiety. Apple's behavior exhibited a reckless disregard for Plaintiff's health and safety, exploiting her financial and medical vulnerabilities through systematic, malicious conduct.

331. As documented in medical records, Plaintiff has had severe insomnia, nausea, extreme depression, suicidal ideation, uncontrollable crying, paralyzing anxiety, and significant weight fluctuations, including gaining sixty pounds. Apple's conduct directly caused these symptoms. In

addition to physical symptoms like anxiety and upset stomach, Plaintiff experienced overwhelming emotional distress, including shock, horror, shame, humiliation, and PTSD. These effects have caused depersonalization and derealization. Due to these injuries, Plaintiff saw medical doctors and psychologists and was prescribed new and additional psychiatric medication for depression, anxiety, and PTSD.

332. Apple abused its significant power over Plaintiff, exploiting the power differential to carry out a systematic campaign of terror through multiple employees and agents. Apple could manipulate and control Plaintiff's environment as one of the world's largest corporations. Apple's actions were despicable, vile, and contemptible, subjecting Plaintiff to severe hardship and suffering. The conduct was willfully malicious, exceeding all bounds of decency tolerated by society.

333. But this is not new for Apple. CNN described working at Apple as "*a brutal and unforgiving place*," even after employees leave, "the fear of retribution persists for years," resulting in silence about what occurred during their employment. A Gawker reporter described the culture of working at Apple as "*bullying, manipulation, and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful*," and "*deeply disturbing*."[67]

### Vicarious Liability, Ratification, & Negligence

334. Plaintiff's claim for liability against Apple is firmly based on multiple agency theories, including respondeat superior, ratification, and alter ego, which establish Apple's direct responsibility for the actions of its employees and agents. These theories support the argument that Apple is vicariously liable for the unlawful actions of its employees who harassed, retaliated against, and sought to silence Plaintiff. The harassment was carried out by multiple Apple employees, including individuals within Apple's Global Security team, acting in their official capacity and in furtherance of Apple's interests.

335. The harassment was also the outgrowth of prior conduct and risk inherent in the company's culture – all of which were reasonably foreseeable to Apple. The harassment was

---

[67] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011; Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011.

1   undertaken by many Apple employees, under their names and identifying as Apple employees, but

2   also an extensive amount of clearly fake social media accounts – often created solely to harass the

3   Platiniff, that knew way too much about Plaintiff and her dispute with Apple, and took an extremely

4   biased position against Plaintiff and in defense of Apple. T

5       336.  Social media accounts, both named employees and anonymous,  also frequently acted

6   in concert and branded the harassment as an Apple product. For instance, citing Apple products

7   or themes in their fake screen names (for example, "*SquareinaRoundHole*" referencing the famous

8   Apple commercial), designing threats modeled after Apple heritage (i.e., threatening employees

9   that if they speak publicly about work conditions, they will get *"Gjovik'd"* – an iteration on the

10  phrase  *"Steve'd"*  referencing  Steve  Jobs'  habit  of  abruptly  firing  people  without  proper

11  justification). The burner accounts (not representative of real people and created just to harass

12  Plaintiff) also showed Apple connections through their activity and were used solely to harass

13  Apple legal adversaries including Plaintiff, Epic Games, and Corellium.

14      337.  The posts on many public forums (*e.g.*, Reddit, HackerNews, AppleInsider, etc.)  about

15  Plaintiff were so hateful and vile that even pro-Apple moderators were complaining the posts about

16  Plaintiff were "*full of toxicity*" and noted there were also a "*number of pretty unpleasant posts [about*

17  *Plaintiff that] [the public] cannot see as [Moderators] have removed them.*" Others commented the

18  harassment of Plaintiff was *"out of hand,"* the entire thread was "*people tearing this woman down,*"

19  and "*Jesus, I know you guys like your iPhone, but God damn.*" HackerNews threads were often so

20  biased and hateful that established accounts would complain that the harassment was coming from

21  burner accounts that appeared to be "*Apple Global Security*" or "*Apple Public Relations.*"

22      338.  The single-use anonymous accounts also became overly involved. For instance, the

23  Twitter account "Mel Nayer" repeatedly referenced internal Apple tools and began replying to

24  Plaintiff's posts, making threats and wild allegations. Nayer demanded Plaintiff delete "the work

25  screenshots" because "lives are at risk" and there were vague "death threats." Nayer added,

26  "*People at Apple have been fired for sharing less*." The account claimed to be an Apple employee.

27      339. Another suspicious account, "*crissnovak*," also identified as an Apple employee,

28  amplified the named employee's Twitter posts harassing Plaintiff about Plaintiff's NLRB and US

1   DOJ complaints. "*Apple (w/it's army of lawyers) can sue her, and it would be an easy win because it's a*
2   *simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging*
3   *especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would*
4   *be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining*
5   *their own reputation/livelihood.*"

6   340. One employee, Ian (a.k.a. "*Neoform*"), was Plaintiff's coworker who sat across the aisle
7   at 825 Stewart Drive. He posted on several platforms under an alias, and Plaintiff did not identify
8   the person behind the account until 2023. The account made many posts accusing Plaintiff of lying
9   and being insane, claiming Plaintiff's complaints were meritless and holding himself out as having
10  insider information about what happened with Plaintiff's complaints and termination. This
11  employee sat in the same office as Powers and was directly involved or overheard material
12  conversations about Plaintiff and felt it appropriate to publicly harass Plaintiff in response.

13  341. Apple employees, particularly those working in Apple's Global Security team, were
14  central in harassing Plaintiff. For example, Appleseed made public threats and defamatory
15  statements and posted online as if she was representing Apple's interests. For example, Appleseed
16  directly communicated that she had reported Plaintiff's actions to Apple, positioned herself as
17  speaking on Apple's behalf, and even shared insider information about Apple's retaliatory actions
18  against Plaintiff. Her actions included filing a Business Conduct complaint against Plaintiff,
19  engaging in a public smear campaign, incessantly claiming Plaintiff leaked trade secrets, and
20  collaborating with other Apple employees to create a fabricated paper trail to discredit Plaintiff and
21  enable Apple to lie about why it fired Plaintiff.

22  342. Apple was aware of Appleseed's conduct, and where it did not incite or authorize it, it
23  did nothing to stop it. It accepted all benefits provided to it, demonstrating the company's tacit
24  approval or active encouragement of these actions. Further, other Global Security employees
25  harassed Gjovik for years, even as recently as last month, with an Apple Global Security Crisis
26  Manager, Vicki, calling Plaintiff on October 2, 2024, to harass Plaintiff about Plaintiff's struggle to
27  litigate against Apple's army of attorneys. Vicki's call occurred during a workday and during work
28  hours, and the intent and content of the communication were all related to her official duties as a

1    Global Security Crisis Manager.

2    343. Many other employees, including Ricky Mondello, also participated in the harassment.

3    Mondello, an Apple Security team manager, made online statements defending Apple's business

4    practices related to Plaintiff's allegations while defaming Plaintiff and repeatedly posting under his

5    name. The fact that these actions were taken by individuals in managerial and security roles within

6    Apple further strengthens the argument that Apple is vicariously liable for this behavior. These

7    actions, taken by employees acting within the scope of their roles, were directly related to the

8    retaliation Plaintiff faced for speaking out about Apple's workplace and environmental issues.

9    344. Moreover, Apple fostered an environment where employees were rewarded for

10   silencing dissent. For example, it's unclear how Ricky got involved in harassing the Plaintiff, but it

11   came to light that he is friends with Plaintiff's first team at Apple, including Marini. There were

12   multiple conspiracies, from Apple's Global Security, Legal, Public Relations, and Human

13   Resources teams – but also with the managers and executives who Gjovik complained about.

14   345. In another example, Appleseed admitted to being in direct contact with Apple

15   employees, including those in Global Security, and was actively involved in attempts to censor

16   Plaintiff's social media posts and silence her complaints. On one occasion, she posted on Twitter

17   that Apple Global Security employees alerted her to any posts referencing Plaintiff. This network

18   of employees acting in concert to harass Plaintiff indicates a coordinated effort, which Apple failed

19   to prevent or address and likely incited, encouraged, and rewarded.

20   346. Apple's failure to intervene is particularly evident when considering that Plaintiff

21   repeatedly reported the harassment to Apple through a variety of forums. Despite these

22   complaints, Apple did nothing to stop the harassment. In fact, Apple appeared to enable retaliatory

23   behavior by encouraging its employees to continue their abusive conduct. For example, after

24   Plaintiff's NLRB charge, Apple employees, including Appleseed and Vicki, continued their online

25   attacks and publicly mocked Plaintiff's legal efforts. This sustained harassment was tolerated by

26   Apple and seemed to be an integral part of the company's response to Plaintiff's public criticisms.

27   347. Additionally, external legal counsel hired by Apple, including the firm McDermott and

28   Will & Emery, was implicated in the harassment. Despite having no formal direct involvement in

1   Appleseed's retaliatory litigation against Plaintiff, the firm promptly requested the defamatory

2   paper trail created by Appleseed to use in their defense of Plaintiff's NLRB charges against Apple.

3   348. The firm's attorneys were aware of Plaintiff's complaints and used fake social media

4   accounts to attack her. McDermott, Will & Emery employees not only degraded Plaintiff publicly

5   but also engaged in behavior that directly mirrored the retaliatory tactics employed by Apple

6   employees. The firm's participation in harassment, along with Apple's failure to address it,

7   reinforces the argument that Apple is liable for the conduct of its agents.

8   349. Apple's knowledge of the harassment is clear from multiple sources. Not only did

9   Plaintiff directly inform Apple of the harassment, but Apple also conducted its own "investigation"

10  into Plaintiff's social media activity. Despite this awareness, Apple failed to intervene, sending a

11  message that such behavior was permissible and even expected. This inaction, coupled with

12  Apple's culture of retaliating against employees who speak out, was further amplified following

13  Tim Cook's illegal email in September 2021, directly contributing to the severe emotional distress

14  experienced by Plaintiff.

15  350. The conduct of Apple employees was not merely incidental to their jobs but was an

16  outgrowth of Apple's corporate culture, which emphasized silencing internal dissent at all costs.

17  Apple encouraged and rewarded the retaliation against Plaintiff, fostering an environment where

18  employees felt emboldened to engage in online harassment, create fake accounts to attack Plaintiff

19  and undermine her legal efforts.

20  351. Furthermore, Apple's active involvement in creating a paper trail to falsely accuse

21  Plaintiff, as evidenced by the complaints filed by Appleseed, demonstrates a direct link between

22  Apple's corporate interests and the harassment Plaintiff endured. The company's participation in

23  fabricating false claims, including the use of McDermott, Will & Emery to coordinate the smear

24  campaign, indicates that Apple is responsible for the emotional distress suffered by Plaintiff.

25  352. In conclusion, Apple's actions, or lack thereof, demonstrate clear liability under the

26  principles of vicarious liability, agency, and respondeat superior. Apple must be held accountable

27  for the harassment and retaliation against Plaintiff, as its employees acted within the scope of their

28  roles, facilitated a toxic work environment, and directly contributed to Plaintiff's emotional

distress. The evidence shows that Apple not only failed to stop the harassment but also accepted its benefits and actively participated in and encouraged it, making the company liable for the actions of its employees and agents.

## CONCLUSION & PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this court enter judgment in her favor on every claim for relief set forth above and award its relief, including, but not limited to, the relief as follows:

– A Judgment entered in her favor, and an award of damages in an amount to be determined at trial.

– Employee whistleblowers "make whole relief" with compensatory damages, including lost wages (including but not limited to: back pay, lost benefits, lost bonuses and pay raises, lost stock grants and vesting, etc.).

– Reinstatement of employment at a prior or higher level, re-establishing benefits and seniority and the promise of a respectful and healthy workplace. If that cannot be provided, then at least ten years of front-pay or up to retirement age.

– Compensatory damages for financial harm, including lost future wages, lost benefits, lower earning capacity, past and future medical expenses, counseling, medication, physical and digital security expenses, reputation management expenses, mental/emotional injury (post-traumatic stress disorder, anxiety, depression, insomnia, disordered eating); property damage, degradation, and conversion; and moving costs to relocate.

– Compensatory and special damages for non-pecuniary harm, including emotional distress, humiliation, loss of enjoyment, annoyance, discomfort, inconvenience, disfigurement, pain and suffering, mental anguish, and reputational harm. Plaintiff now suffers from permanent psychological trauma and damage because of Plaintiff's actions. Plaintiff is entitled to compensation for any special damages she suffered resulting from Apple's outrageous and defamatory acts.

– Compensatory damages for the injury suffered to Plaintiff's body, mind, and property by Apple's nuisances and ultrahazardous activities, including the cost to replace ruined clothing and other degraded chattel property that was damaged by Apple's tortfeasing.

– Costs for medical monitoring and medical intervention for any lifetime illnesses attributable

to the chemicals Apple exposed her to.

– Consequential, expectation, reliance damages, where applicable.

– A civil penalty of $10,000 per employee for each violation of Cal.Lab.C. § 98.6 and § 1102.5. (If this request prevents other damages, this request may be waived).

– Punitive damages for all available claims (*Tamney*, Cal.Lab.C § 1102.5, Nuisance, and Intentional Infliction of Emotional Distress), with the amount to be decided at trial.

– Declaratory relief stating Plaintiff is a Crime Victim under federal and state law so that Plaintiff can be afforded her relevant rights.

– Litigation costs, expert witness fees, pro se attorney's fees, and other reasonable expenses. Pre-judgment and post-judgment interest. The offset for the tax bracket increase is due to the lump sum payment.

– Where no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00 (or $2 or $3 where double or treble damages apply).

– Such other and further relief as the Court deems just and proper.

Plaintiff hereby requests a trial by jury on all issues so triable.

# CERTIFICATION & CLOSING

353.  Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 26 2024

Respectfully submitted,

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Email**: legal@ashleygjovik.com
**Phone**: (408) 883-4428