1  **Ashley M. Gjovik, JD**
   *In Propria Persona*
2  2108 N St. Ste. 4553
   Sacramento, CA, 95816
3  (408) 883-4428
4  legal@ashleygjovik.com

5

6

7              UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9

10                                      CAND No. 3:23-CV-04597-EMC

11                                      9th Cir No.: 24-6058

12

13  ASHLEY M. GJOVIK, *an individual*,

14                                      PLAINTIFF'S OPPOSITION TO

15       Plaintiff,                     DEFENDANT'S FIFTH MOTION

16                                      TO DISMISS.

17  vs.

18

19                                      *Fed. R. Civ. P. § 12(b)(6)*

20  APPLE INC., a corporation,

21                                      **Motion Hearing:**
                                        Dept: Courtroom 5 (& Zoom)
22       Defendant.                     Judge: Honorable Edward M. Chen
                                        Date: February 13, 2025
23                                      Time: 1:30 PM PT

24

25

26

27

28

# TABLE OF CONTENTS

## CONTENTS

Plaintiff's Opposition to Defendant's Fifth Motion to Dismiss ......................1

A.    Summary of the Case .................................................... 2

B.    The Court Has Already Allowed Defendant to File Multiple Motions To Dismiss, Which Is A Violation of the Federal Rules Of Procedure. .................7

C.    Defendant's Repeated Motions to Strike Claims And Specific Scenarios Are Improper And Impair Plaintiff's Right to a Fair Trial ...........................7

D.    The Danger of Further Dismissals: The Court Must Recognize the Implications Of Striking Evidence And Factual Allegations ..........................8

E.    This Is An Employee's Civil Rights And Public Safety Lawsuit, And The Court Must Not Allow The Defendant To Escape Accountability Through Procedural Games ................................................................ 9

F.    Plaintiff Represents the Interests Of Thousands Of People, And Allowing Abusive Litigation Tactics Would Be Against The Public Interest .................10

G.    Statute Of Limitations Tolling And The Reasonable Person Standard .... 11

H.    The Tamney Termination in Violation Of Public Policy Claim Is Inextricably Linked To Plaintiff's Toxic Tort Claims And Rests On Strong Public Policy Considerations ................................................... 13

I.    Tolling Due to Fraud And Continuing Violations ............................... 16

J.    The Standard for IIED Claims Against Corporations, Employees, and Ex-Employees ........................................................................ 19

K.    The Plaintiff's Allegations of IIED Are Not Only Plausible, But Demonstrably Severe ............................................................. 21

L.    Conclusion ............................................................... 26

### Plaintiff's Opposition to Defendant's Fifth Motion to Dismiss

1. Plaintiff, Ashley Gjovik, respectfully submits the following Opposition to Defendant's Motion to Dismiss her Fifth Amended Complaint ("5AC"). Defendant's motion represents yet another attempt by the Defendant to erode the substance of Plaintiff's case through repeated procedural tactics. Defendant's motion to dismiss is part of an ongoing strategy designed to whittle away at Plaintiff's claims, and it continues a pattern of improper filings that has been allowed by the Court despite clear violations of the procedural rules. As demonstrated below, the Defendant's motion must be denied, and the Court must not allow the Defendant to continue to break the rules or dismiss claims for random reasons that fail to address the core merits of the case.

2. Concurrently filed is an *Opposition* to Defendant's *Request for Judicial Notice* (also addressed here), Plaintiff's *Request for Judicial Notice,* Plaintiff's *Notice of Pendency,* and Plaintiff's *Motion to Amend* her Complaint.

3. This case represents a critical moment to address systemic abuses by Apple Inc., encompassing violations of whistleblower protection laws, labor statutes, environmental regulations, and fundamental principles of fairness and safety. The plaintiff, Ashley Gjovik, a former Senior Engineering Program Manager at Apple, brought to light unsafe work conditions, environmental hazards, and unlawful labor practices. In response, Apple retaliated against Gjovik, exacerbating the harm she endured and demonstrating a troubling corporate culture that prioritizes secrecy and profit over compliance, safety, and integrity.

4. Central to this matter is Apple's operation of an unpermitted semiconductor fabrication plant adjacent to residential apartments, which emitted toxic gases and caused significant health issues for residents, including Gjovik. Compounding this environmental negligence was Apple's systematic retaliation

when Gjovik raised legitimate concerns. These actions reflect broader patterns of misconduct by Apple, evidenced by multiple enforcement actions taken by the Department of Justice over the past 15 years related to employment practices, anti-competitive behavior, and unlawful labor policies. In this context, addressing Apple's violations in this case is both a legal necessity and a moral imperative.

5.     *Disclaimer*: Plaintiff, representing herself pro se in three separate litigations / adjudications against Defendant, is unable to keep up with the paperwork from Apple's army of lawyers. Due to the court issuing a hard deadline for filings, Plaintiff regrets any and all typos, omissions, errors – and also discloses the use of generative AI to assist her in drafting this response. Previously Plaintiff had tried to prioritize quality over deadlines, but without a choice and unable to compete with the defendant's endless resources, Plaintiff files this response in the best condition she is able. Plaintiff concedes none of her claims, disagrees with all of Apple's arguments, and any failure to address a point by Plaintiff should be assumed to be due to the deadline to file, not to any concession to the merit. Plaintiff also did not have time to include legal citations before the deadline and will file an appendix of legal sources when she files her concurrently filed motions.

### A.  SUMMARY OF THE CASE

6.     Ashley Gjovik, a former Senior Engineering Program Manager at Apple Inc., uncovered and reported significant workplace safety concerns, environmental hazards, and unlawful labor practices during her employment. Among these issues was Apple's operation of an unpermitted semiconductor fabrication facility adjacent to a residential apartment complex, which emitted toxic gases and caused severe health issues for nearby residents, including Gjovik. Apple failed to disclose the existence of the facility or its hazardous emissions, violating multiple environmental regulations, including the Resource

— 2 —

Conservation and Recovery Act (RCRA). Regulatory investigations have since confirmed at least 19 RCRA violations and additional breaches of air quality regulations. When Ms. Gjovik raised concerns related to these hazards and broader workplace safety issues, she became the target of retaliation and harassment by Apple, including her termination.

7.    The retaliation against Gjovik extended beyond her dismissal. Apple engaged in a sustained campaign of harassment, including coercive statements and threats, as documented by the National Labor Relations Board (NLRB), which found substantial evidence of unlawful retaliation and violations of the National Labor Relations Act. Apple's actions included suspending and ultimately terminating Ms. Gjovik for her protected activities, which included reporting workplace safety concerns, whistleblowing on labor violations, and raising concerns about harassment and discrimination.

8.    The retaliation against Gjovik extended beyond her dismissal. Apple engaged in a sustained campaign of harassment, including coercive statements and threats, as documented by the National Labor Relations Board (NLRB), which found substantial evidence of unlawful retaliation and violations of the National Labor Relations Act. Apple's actions included suspending and ultimately terminating Ms. Gjovik for her protected activities, which included reporting workplace safety concerns, whistleblowing on labor violations, and raising concerns about harassment and discrimination. Despite clear legal protections under federal and state whistleblower statutes, Apple has repeatedly denied liability, opting instead to deflect and mischaracterize Gjovik's efforts as breaches of confidentiality. The facts of this case demonstrate a troubling pattern of corporate misconduct, disregard for safety, and retaliation against an employee who sought accountability and transparency.

9.    Gjovik's claims of retaliation are supported by substantial evidence, including findings by the National Labor Relations Board (NLRB), which

— 3 —

1   determined that Apple engaged in coercive actions against her in direct response
2   to her protected activities. Internal email correspondence further confirms that
3   Apple's adverse actions were motivated by Gjovik's efforts to raise critical
4   workplace and safety concerns. This evidence leaves little doubt regarding the
5   retaliatory nature of Apple's conduct. (See concurrently filed *Notice of Pendency*).

6       10.    The toxic tort claims are equally compelling. The Environmental
7   Protection Agency (EPA) has cited Apple for nineteen distinct violations of the
8   Resource Conservation and Recovery Act (RCRA). Additionally, the Bay Area Air
9   Quality Management District (BAAQMD) identified six serious violations,
10  including operating without proper permits and venting toxic gases. These
11  regulatory findings provide incontrovertible evidence of Apple's environmental
12  misconduct. Medical records and expert testimony establish a clear link between
13  Ms. Gjovik's exposure to hazardous substances and the severe health issues she
14  has endured. The concealment of these operations from local residents and
15  employees underscores Apple's alarming disregard for public safety.

16      11.    Apple's broader pattern of misconduct is equally concerning. The
17  company's decision to conceal the existence of its knowing environmental
18  violations and retaliate against those who raised concerns reflects a willful and
19  reckless indifference to its legal and ethical obligations. Such actions,
20  compounded by persistent harassment, have inflicted severe emotional and
21  financial harm on Gjovik, raising significant questions about Apple's commitment
    to lawful and fair business practices.

22      12.    Gjovik has already prevailed on comparable questions of law and fact
23  in city, county, state, and federal government determinations and adjudications.
24  The NLRB and California government both found that Apple's proposed
25  justification for terminating Gjovik's employment is false and pretextual. The
26  NLRB has found substantial evidence that Apple illegally suspended and fired
27  Gjovik and made multiple illegal threats and coercive statements to her. The
28

NLRB filed suit and demanded Apple apologize and reinstate Gjovik's employment. The trial is last this year.

13.    The U.S. EPA and BAAQMD already found that Apple's operation of a semiconductor fabrication plant at 3250 Scott violates numerous environmental laws – including illegal operations without a permit, illegal emissions generally, and illegal treatment and disposal of hazardous waste. Gjovik was subjected to unlawful retaliation for raising legitimate concerns about workplace safety, harassment, and environmental hazards. These actions contravene the California Labor Code and other statutes. Supporting evidence includes internal emails and documents directly acknowledging adverse actions taken in response to Gjovik's protected activities. Further, findings from the NLRB establishing substantial evidence of Apple's retaliation, including coercive statements, suspension, and termination.

14.    Apple's operation of an unpermitted semiconductor fabrication plant exposed Gjovik and other residents to hazardous emissions, resulting in severe health consequences. Apple's failure to disclose these activities or obtain proper permits violates the Resource Conservation and Recovery Act (RCRA) and local environmental regulations. Supporting evidence includes EPA citations documenting nineteen separate violations of the RCRA; BAAQMD findings of six additional violations, including operating without permits and venting toxic gases; medical records and expert testimony linking the toxic exposure to Gjovik's health issues.

15.    Apple's intentional concealment of environmental hazards, coupled with persistent harassment and retaliation, caused Ms. Gjovik severe emotional distress and financial harm, in violation of California's common law torts and unfair business practices statutes. Supporting evidence includes detailed records of harassment and retaliatory conduct, and documentation linking these actions to the plaintiff's economic and emotional damages.

16.    This case represents a critical moment to address systemic abuses by Apple Inc., encompassing violations of whistleblower protection laws, labor statutes, environmental regulations, and fundamental principles of fairness and safety. The plaintiff, Ashley Gjovik, a former Senior Engineering Program Manager at Apple, brought to light unsafe work conditions, environmental hazards, and unlawful labor practices. In response, Apple retaliated against Gjovik, exacerbating the harm she endured and demonstrating a troubling corporate culture that prioritizes secrecy and profit over compliance, safety, and integrity.

17.    Apple's broader pattern of misconduct is equally concerning. The company's decision to conceal the existence of its knowing environmental violations and retaliate against those who raised concerns reflects a willful and reckless indifference to its legal and ethical obligations. Such actions, compounded by persistent harassment, have inflicted severe emotional and financial harm on Gjovik, raising significant questions about Apple's commitment to lawful and fair business practices.

18.    Gjovik has already prevailed on comparable questions of law and fact in city, county, state, and federal government determinations and adjudications. The NLRB and California government both found that Apple's proposed justification for terminating Gjovik's employment is false and pretextual. The NLRB has found substantial evidence that Apple illegally suspended and fired Gjovik and made multiple illegal threats and coercive statements to her. The NLRB filed suit and demanded Apple apologize and reinstate Gjovik's employment. The trial is last this year.

19.    The U.S. EPA and BAAQMD already found that Apple's operation of a semiconductor fabrication plant at 3250 Scott violates numerous environmental laws – including illegal operations without a permit, illegal emissions generally, and illegal treatment and disposal of hazardous waste.

— 6 —

### B.   The Court Has Already Allowed Defendant to File Multiple Motions To Dismiss, Which Is A Violation of the Federal Rules Of Procedure.

20.    Under Rule 12(h), the Defendant is permitted only one motion to dismiss. However, the Court has already allowed Defendant to file multiple motions, which they have used to re-challenge claims and re-litigate issues that have already been addressed in previous motions. The repeated filing of 12(b)(6) motions is not only an abuse of procedural rules but also an attempt by the Defendant to drag out the litigation and place an unnecessary burden on Plaintiff.

21.    The Defendant's filings have been allowed despite the clear limitations set forth in Rule 12(g) and 12(h). These rules prevent parties from repeatedly challenging claims that have already been addressed, and the Court's decision to allow Defendant to file multiple motions has led to unnecessary delays and increased costs for Plaintiff. Furthermore, the Defendant is attempting to use these motions as a way to avoid liability by focusing on technical arguments and procedural errors, rather than addressing the substantive merit of the claims.

### C.   Defendant's Repeated Motions to Strike Claims And Specific Scenarios Are Improper And Impair Plaintiff's Right to a Fair Trial

22.    The Defendant's repeated motions to dismiss and its targeted attacks on sub-claims and specific factual allegations are not only improper, but they also fundamentally undermine the integrity of this lawsuit. The Defendant's strategy is to act as if striking these individual claims or scenarios means erasing entire categories of evidence, facts, and allegations from the case. This is a grave distortion of the purpose of a lawsuit, which is to reflect the full reality of the unlawful conduct and harm that the plaintiff has suffered. Federal lawsuits are not games of procedural minutiae; they are designed to allow the plaintiff to fully present all relevant facts and evidence in support of their claims.

23.    If the Defendant is allowed to continue its pattern of striking specific facts and sub-claims, this lawsuit will be severely limited in scope, leaving it devoid of the very evidence that is essential to proving the underlying unlawful conduct. A lawsuit is not a fiction; it is meant to represent the full breadth of what occurred. If the Defendant succeeds in convincing the Court to dismiss more claims based on technical arguments, the resulting case will not reflect reality. The trial cannot fairly proceed if critical evidence and factual scenarios are eliminated, and Plaintiff is left with a hollow case that is no longer a true representation of the facts.

24.    Moreover, this issue is not hypothetical—Defendant has already misled the Court in prior motions to dismiss, resulting in the dismissal of multiple claims and sub-claims that were supported by concrete, direct evidence. These claims were not speculative or based on insufficient allegations; they were backed by clear facts, including documentary evidence and witness testimony. By allowing Defendant to strip away these claims based on narrow procedural arguments, the Court has inadvertently allowed Defendant to reduce the scope of the case and limit the evidence that will be available at trial. If the Court continues to dismiss claims and factual allegations on these improper grounds, it risks creating a legal environment where a corporation can avoid accountability simply by erasing the evidence it does not like through procedural motions. This would create a dangerous precedent, suggesting that a corporation can escape the full application of the law merely by manipulating the litigation process.

## D.  The Danger of Further Dismissals: The Court Must Recognize the Implications Of Striking Evidence And Factual Allegations

25.    Allowing Defendant to continue striking key evidence and factual allegations from this case would severely undermine the ability of this lawsuit to reflect reality. The Court must recognize that the purpose of these motions is not

— 8 —

1  to protect the integrity of the law or the fairness of the proceedings, but to allow

2  the Defendant to erase inconvenient facts from the lawsuit entirely. This is an

3  abuse of the judicial process, and the Court must not allow it to continue. The

4  claims that the Defendant seeks to strike are not insignificant; they represent core

5  aspects of the Plaintiff's case, and their removal would irreparably harm

6  Plaintiff's ability to prove the unlawful conduct at issue.

7      26.    If Defendant is permitted to succeed in further whittling away

8  Plaintiff's claims, the Court will face the troubling question of whether a U.S.

9  Court can effectively render the law inapplicable to a corporation simply by

10  dismissing claims that it finds undesirable. Such a decision would have profound

11  consequences, not only for Plaintiff's case but for the principles of justice and

12  fairness in federal litigation. The law must apply equally to all parties, regardless

13  of their size, resources, or legal sophistication. If the Court continues to dismiss

14  claims and evidence based on narrow procedural arguments, it risks signaling to

15  the Defendant that it can escape liability simply by evading the substance of the

16  case through procedural tactics.

17      **E.    THIS IS AN EMPLOYEE'S CIVIL RIGHTS AND PUBLIC
        SAFETY LAWSUIT, AND THE COURT MUST NOT ALLOW THE
18       DEFENDANT TO ESCAPE ACCOUNTABILITY THROUGH
        PROCEDURAL GAMES**

19

20      27.    This lawsuit is an employee's civil rights and public safety case

21  against a large corporation with substantial resources. Defendant has at least four

22  law firms and a full team of attorneys working on this case, while Plaintiff is

23  representing herself. The disparity in resources is striking, and the Defendant's

24  repeated use of procedural motions to dismiss represents an unconscionable abuse

25  of the judicial process. The Defendant is leveraging its vast legal resources to

26  attack Plaintiff's claims and sub-claims on technical grounds, hoping to wear her

27  down and prevent a fair hearing of the actual merits of the case.

28

28.   The Court should not allow this procedural abuse to continue. Allowing Defendant to use these motions to strike facts and claims would not only undermine the integrity of the case but would also perpetuate an injustice, where a large corporation can use its resources to manipulate the litigation process and avoid facing the consequences of its actions. This is not merely an academic exercise in legal theory; this is a real case with real consequences for the Plaintiff, who has been subjected to unlawful retaliation and other harmful actions.

29.   While the Court may have allowed Defendant's motions in the past, that does not mean it must continue to do so now. The Court has the authority to stop Defendant's abuse of the legal process and to draw a line, ensuring that Plaintiff's case is allowed to move forward based on the evidence, rather than on technical procedural arguments. The Court must ensure that the Defendant is held accountable for its actions, and that Plaintiff is given a fair opportunity to present her case in full, without the Defendant's efforts to eliminate key facts, claims, and evidence.

### F.   PLAINTIFF REPRESENTS THE INTERESTS OF THOUSANDS OF PEOPLE, AND ALLOWING ABUSIVE LITIGATION TACTICS WOULD BE AGAINST THE PUBLIC INTEREST

30.   In addition to her own claims, Plaintiff represents the interests of thousands of other individuals who have been harmed by the conduct of the Defendant, and the Court must consider the broader implications of dismissing claims on arbitrary and technical grounds. The factory at the heart of this lawsuit, which is subject to Plaintiff's nuisance, IIED, and whistleblower claims, is currently facing enforcement actions from both federal and local government agencies due to much of the same harmful conduct that Plaintiff is challenging here. The government is investigating and taking action against the factory's emissions, which are linked to significant public health risks, and Plaintiff's claims represent the direct interests of thousands of individuals who have been

1    exposed to the factory's toxic exhaust.

2        31.    Allowing the Defendant's motions to strike or dismiss claims based

3    on technicalities could create serious legal conflicts, especially regarding issue

4    preclusion and claim preclusion. If this Court were to dismiss claims with

5    prejudice on discretionary and procedural grounds, such as by accepting the

6    Defendant's arguments regarding the statute of limitations for toxic torts —

7    arguments that rely on selective public documents — it could effectively rule on

8    the statute of limitations for thousands of potential plaintiffs. Such a ruling, if

9    made against the Plaintiff, would extinguish the legal rights of those individuals,

10   many of whom have suffered significant harm from the same toxic emissions, all

11   based on a procedural decision that does not reflect the merits of their claims.

12   This would be a miscarriage of justice, as it could prevent entire classes of affected

13   individuals from seeking redress for the harms they have suffered.

14       32.    Furthermore, in the employment and labor claims, Plaintiff is also

15   representing the interests of over a hundred thousand employees. The NLRB has

16   filed a complaint against Defendant, highlighting illegal retaliation practices,

17   including the use of overly broad NDAs, and requested national remedies for these

18   violations. This is not a hypothetical situation; this is a real government

19   investigation into practices that affect workers across the country. The NLRB's

20   involvement and its request for national remedies underscores the importance of

21   Plaintiff's claims and demonstrates that this lawsuit is not only about one

22   individual's grievance but also about enforcing broader protections for workers. If

23   this Court allows further arbitrary dismissals or grants Defendant undue

24   procedural favors, the consequences would be far-reaching, directly impacting the

25   lives of thousands of employees, and perpetuating unjust practices in the

26   workforce.

27   **G.   STATUTE OF LIMITATIONS TOLLING AND THE REASONABLE
          PERSON STANDARD**

28

— 11 —

1     33.     The Defendant's argument regarding the statute of limitations for

2   Plaintiff's nuisance and IIED claims is flawed both factually and legally. First and

3   foremost, the question before the Court is not whether Plaintiff herself should

4   have discovered the source of the emissions but rather whether a reasonable

5   person in Plaintiff's position would have been able to identify the source. This is

6   a factual question that must be determined by a jury. The legal standard for tolling

7   the statute of limitations, as established by both California law and federal

8   precedent, is based on what a reasonable person should have known or discovered,

9   not the plaintiff's personal diligence or awareness.

10     34.     Plaintiff's claims in this case are not simply based on subjective

11   awareness; rather, they are grounded in the objective standard of a reasonable

12   person. As Plaintiff has detailed in her complaints, she made several complaints

13   to multiple government agencies—agencies whose responsibility it is to

14   investigate illegal emissions and dangerous environmental hazards. These

15   agencies, including the U.S. Environmental Protection Agency (EPA) and the

16   California EPA, undertook investigations into the potential sources of the

17   chemical exposure but were unable to identify the origin of the emissions. This

18   fact is pivotal to the Court's analysis: if these agencies, tasked with enforcing

19   environmental laws and regulations, could not identify the source of the emissions

20   after thorough investigations, it is unreasonable to hold Plaintiff personally liable

21   for failing to identify the same source.

22     35.     In essence, the argument the Defendant presents—accusing Plaintiff

23   of failing to conduct a reasonable investigation into the emissions—is flawed when

24   compared to the investigations conducted by the very agencies responsible for

25   enforcing environmental laws. If the Court were to adopt Defendant's argument

26   and determine that Plaintiff was negligent in her investigation, it would be unfairly

27   holding her to a higher standard than the government agencies that could not

28   locate the source of the emissions. It would imply that a random tenant in an

apartment complex, with no specialized knowledge or resources, should have known more about the source of the hazardous emissions than the very federal and state agencies tasked with this responsibility.

36.    This argument is further bolstered by the fact that the Plaintiff complained about the chemical exposure to the appropriate authorities, the very agencies charged with investigating and responding to environmental hazards. The Defendant's attempt to dismiss the nuisance and IIED claims based on a purported failure to investigate by Plaintiff disregards these facts and overlooks the reality that the standard for tolling the statute of limitations is based on what a reasonable person would have known under the same circumstances. Given the inability of the EPA and California EPA to pinpoint the source of the emissions, there is no reasonable basis to claim that Plaintiff, in her role as a tenant, could have discovered the source sooner.

37.    In addition, this Court should also consider the impact of Plaintiff's Ultrahazardous Activities strict liability claim, which was dismissed at the Defendant's request on discretionary grounds. This claim, as well as the claims for nuisance and IIED, are closely intertwined with issues of public safety and environmental harm. The dismissal of the Ultrahazardous Activities claim is currently under appeal with the Ninth Circuit, is included in the Motion to Amend, and the resolution of that appeal could have a significant impact on the viability of these claims. The potential preclusive effect of such a dismissal cannot be overlooked, as it relates to both Plaintiff's individual claims and the broader legal context of this case, including the severe potential harm to public health and safety that Plaintiff is seeking to address.

## H. The Tamney Termination in Violation of Public Policy Claim Is Inextricably Linked To Plaintiff's Toxic Tort Claims And Rests On Strong Public Policy Considerations

38.    Defendant's efforts to sever the connection between Plaintiff's Tamney termination in violation of public policy claim and her toxic tort allegations—specifically those rooted in Defendant's criminal environmental conduct at its factory—are fundamentally flawed and unsupportable under the law. Plaintiff's termination claim is grounded in retaliation for her being a victim of crime and for her involvement as a legislative witness, both of which arise directly from the same toxic emissions that are central to Plaintiff's toxic tort claims. Defendant's attempt to treat these claims as entirely distinct is not only legally untenable but also directly undermines the public policy protections afforded to employees who expose criminal conduct and advocate for public safety.

39.    First, it is crucial to note that Defendant has never moved to dismiss the Tamney claim. This omission implicitly acknowledges that Plaintiff has sufficiently pled a violation of public policy, particularly with regard to retaliation for being a victim of Defendant's criminal conduct. The Defendant's factory, which is the focus of Plaintiff's toxic tort allegations, engaged in hazardous operations that resulted in significant harm to Plaintiff's health. In retaliation for Plaintiff's exposure to these dangers, and for her subsequent efforts to report and expose Defendant's unlawful activities, Defendant took negative employment actions, including Plaintiff's wrongful termination. Defendant's refusal to challenge this claim suggests recognition that Plaintiff's termination was a direct consequence of her victimization by Defendant's criminal actions.

40.    However, in a contradictory maneuver, Defendant simultaneously argues that its criminal conduct at the factory is irrelevant to the employment claims. Defendant cannot credibly maintain this position while acknowledging the harmful effects of its environmental violations, which directly impacted Plaintiff's health and well-being. Defendant's attempt to disconnect its unlawful operations from the retaliatory actions it took against Plaintiff is not only illogical but demonstrates a fundamental misunderstanding of the law. If Defendant's activities

— 14 —

1    at the factory were indeed criminal, as Plaintiff alleges, and these activities caused
2    harm to Plaintiff, it follows that any adverse employment actions taken against
3    Plaintiff due to her victimization by those very criminal activities should be
4    viewed as a violation of public policy.

5        41.    Additionally, Defendant's arguments concerning the statute of
6    limitations further implicate the severity of its actions and the knowledge it had
7    of Plaintiff's suffering. By asserting that Plaintiff should have discovered the
8    source of the emissions based on building permits, Defendant is, in effect,
9    admitting that it knew its operations were hazardous and capable of causing severe
10   harm. If Defendant is to argue that it knew its factory operations could have deadly
11   consequences, it simultaneously must accept the corollary that Plaintiff's
12   retaliatory termination was directly tied to her exposure to Defendant's criminal
13   conduct. The fact that Defendant harassed, retaliated against, and ultimately
14   terminated Plaintiff after the very actions it now acknowledges as potentially
15   deadly occurred further solidifies the inextricable link between Plaintiff's toxic
16   tort claims and her employment retaliation claims.

17       42.    Moreover, Defendant's attempt to isolate these claims fails to account
18   for the broader legal framework that ties them together. Plaintiff's original
19   Complaint included claims under the Bane Act, the Ralph Act, and RICO, all of
20   which bridge the gap between the employment retaliation and toxic tort claims.
21   These statutes explicitly recognize that unlawful employment actions, including
22   retaliation for being a victim of a crime, are inherently connected to unlawful
23   conduct that affects public safety and the well-being of employees. However,
24   Plaintiff voluntarily refrained from repleading these claims in subsequent filings,
25   based on the Court's May 20 decision, which suggested that doing so might obviate
26   the need for Defendant to file yet another motion to dismiss. Despite this,
27   Defendant filed an additional motion to dismiss, and now, once again, seeks
28   dismissal of claims it has already previously litigated. This abuse of the procedural

1   process is not only a violation of the Court's directions but also a direct affront
2   to the public policy considerations at stake, which include the protection of
3   employees from retaliatory conduct and the broader societal interest in upholding
4   environmental laws.

5   43.    Defendant's actions in this case are not simply an attempt to defend
6   against Plaintiff's claims—they are an attempt to evade accountability for criminal
7   conduct and to undermine a legitimate civil rights lawsuit. The public policy
8   implications of this case are immense, as allowing Defendant to continue its
9   pattern of procedural abuse would not only deprive Plaintiff of a fair opportunity
10  to pursue justice but would also undermine the ability of future victims of
11  corporate misconduct to seek legal remedies. The public has a vested interest in
12  ensuring that employers cannot retaliate against employees who expose illegal or
13  dangerous activities, especially when those activities put public health and safety
14  at risk. Allowing Defendant to continue to use technical arguments to dismiss well-
15  pled claims related to its own criminal conduct would set a dangerous precedent,
16  one that would embolden corporations to retaliate against victims of their own
17  unlawful actions without fear of legal consequences.

## I.    TOLLING DUE TO FRAUD AND CONTINUING VIOLATIONS

19  44.    In addition to the discovery rule, Plaintiff also asserts that tolling is
20  appropriate due to fraudulent concealment and continuing violations, which
21  Defendant's own conduct directly supports. Defendant's acknowledgment of the
22  unlawfulness, danger, and potential deadly consequences of its factory operations,
23  coupled with its deliberate concealment of this knowledge from Plaintiff, forms
24  the basis for Plaintiff's fraudulent misrepresentation claim. Defendant not only
25  failed to inform Plaintiff of its hazardous activities, but it also intentionally
26  suppressed the truth about the source of the toxic emissions that severely harmed
27  Plaintiff. Defendant's actions in this case amount to a fraudulent cover-up

28

designed to prevent Plaintiff from learning that Defendant was responsible for the very harm she suffered. Such fraudulent concealment tolls the statute of limitations, as it would be patently unjust to allow Defendant to benefit from its own egregious misconduct and subsequent attempts to hide the truth.

45. Defendant's admissions make clear that it was aware of its own dangerous and unlawful activities, yet it chose to remain silent when Plaintiff sought answers about the source of the harmful exposure. Plaintiff made Defendant aware of her exposure and subsequent harm as early as September 2020, but Defendant deliberately failed to disclose to Plaintiff that its own operations were the cause. This concealment was not merely an omission; it was a strategic attempt to mislead Plaintiff and prevent her from discovering the truth, a fraudulent misrepresentation that directly impacted Plaintiff's ability to pursue her legal claims. It would be a miscarriage of justice to allow Defendant to benefit from this fraudulent concealment by arguing that the statute of limitations has expired.

46. Moreover, as both parties agree that Plaintiff's Tamney claims are based on Defendant's unlawful retaliation for Plaintiff's victimization by Defendant's criminal conduct, and for Plaintiff's subsequent legislative actions in response to those harms, Plaintiff's claims also satisfy the requirements for tolling due to continuing violations. Defendant's ongoing illegal activities at its factory, and its continued retaliatory actions against Plaintiff, constitute a series of continuing wrongs that extend beyond the expiration of the statute of limitations. Both the retaliatory actions taken against Plaintiff and the environmental harm caused by Defendant's factory emissions constitute a continuing pattern of misconduct, further justifying tolling of the statute of limitations under the doctrine of continuing violations.

47. It is paramount to note that allowing Defendant to avoid tolling through its fraudulent conduct would not only result in an injustice to Plaintiff,

— 17 —

but would also violate public policy considerations. Plaintiff's claims arise from the very type of corporate misconduct that the law seeks to prevent, including criminal acts of witness intimidation and retaliation, wire fraud, and mail fraud. To permit Defendant to escape liability for such behavior would not only undermine the purpose of the statute of limitations but also embolden corporations to engage in similar cover-ups with impunity. Allowing Defendant to avoid tolling by concealing its actions would encourage corporate actors to exploit the procedural protections afforded by the statute of limitations as a shield for their wrongful conduct.

48.    Moreover, public policy strongly favors the tolling of the statute of limitations in cases where fraud or continuing violations are involved, particularly when such violations directly affect public health, safety, and the rights of individuals. Plaintiff's claims are not isolated or theoretical—they represent real harm to Plaintiff, as well as to a broader group of affected individuals. The Defendant's actions not only harmed Plaintiff but also violated the public trust by subjecting thousands of individuals to dangerous emissions and retaliating against those who sought to expose this harm. The interests of justice demand that Plaintiff's claims proceed and that Defendant be held accountable for its ongoing and fraudulent misconduct.

49.    Plaintiff has continued to suffer from severe and debilitating health effects related to the toxic exposures at the apartment complex adjacent to the Apple facility. After experiencing a recurrence of hair loss—similar to what occurred in 2020-2021—Plaintiff has sought medical attention and has begun to receive a diagnosis related to an unusual infection. The pathogen, which thrives in nitrogen-rich environments like those found in toxic waste dumps, appears to be the cause of Plaintiff's hair loss and other symptoms. During Plaintiff's time at the apartment complex, the physical manifestation of this pathogen was evident, and Plaintiff brought concerns to the property manager. At least one other tenant,

— 18 —

a fellow Apple employee, also lodged complaints regarding similar health issues.

50.    Further investigation has revealed the presence of this pathogen on personal items such as hairbrushes and hairbands, which were not used following the initial hair loss incident, and were preserved in storage. Despite Plaintiff's continued notifications to Apple about these findings, and the invitation extended to the company to participate in testing and analysis of the pathogens, Apple has failed to respond meaningfully and has instead made false allegations in relation to discovery while concurrently refusing to allow Plaintiff to contact Judge Westmore. This ongoing exposure to harmful chemicals and pathogens continues to cause significant physical harm, which is exacerbated by Apple's refusal to acknowledge or address the severity of the situation.

51.    It would be contrary to public policy to allow the statute of limitations to bar Plaintiff's claims while the full extent of the harm continues to be uncovered. Plaintiff has diligently investigated the ongoing physical harm caused by the toxic exposure, despite facing significant personal and financial challenges, including crippling debt and limited resources. It is telling that Plaintiff continues this investigation in good faith, seeking medical attention and pursuing a diagnosis, while Apple—despite being continuously notified—has not participated in any way other than through harassment and deflection. Apple's refusal to engage with the ongoing discovery of harmful pathogens and its continued neglect of Plaintiff's serious health concerns further underscores the importance of allowing the statute of limitations to be tolled during this period of investigation. Denying such tolling would effectively prevent the full extent of Plaintiff's claims from being heard and would undermine the public interest in holding companies accountable for environmental violations that cause harm to individuals and the community at large.

J.    **The Standard for IIED Claims Against Corporations, Employees, and Ex-Employees**

— 19 —

52.    Apple argues that it cannot be held liable for IIED based on the actions of its employees, specifically citing the Plaintiff's ex-employee status and the conduct of Appleseed, a former employee of Apple's Global Security division. However, California, New York, and Massachusetts law do not bar IIED claims against corporations, and there is no legal requirement that an ex-employee must have an ongoing employment relationship for such claims to proceed. In fact, there is a well-established legal precedent that allows individuals to bring IIED claims against their former employers when those claims arise from the employer's conduct or the conduct of its agents, even if those agents are former employees.

53.    Apple's motion to dismiss the Plaintiff's claim for intentional infliction of emotional distress (IIED) misrepresents both the nature of the allegations and the applicable legal standards. As established in the Complaint, the conduct at issue goes far beyond the downplayed version Apple provides in its motion. The Plaintiff has outlined severe, reprehensible actions directly tied to retaliation for whistleblowing activities, misconduct that was committed by Apple's employees and agents within the scope of their employment and as part of a business-related scheme to stifle protected activities.

54.    Apple's argument relies on an unduly narrow and misleading interpretation of the law. If taken to its logical extreme, Apple's position would effectively prevent former employees from ever bringing claims for IIED— particularly in cases where, as here, the actions of the employer's agents were conducted at the behest of the employer and directly tied to business interests. If the law were to adopt Apple's view, it would nullify the ability of workers, including ex-employees, to seek recourse for harm caused by their former employers' misconduct, even when the actions in question are intentionally harmful and undertaken with malice.

55.    Further, Apple's argument presupposes that IIED claims should only be actionable in the most extreme scenarios—namely, when a CEO or high-level

officer personally orders the intentional infliction of emotional distress. This is a flawed and overly restrictive standard that disregards both the legal principles underlying IIED claims and the realities of corporate operations, where such conduct is often carried out by employees and agents of the corporation, such as Appleseed, at the direction of corporate leaders or to further corporate goals.

### K.  THE PLAINTIFF'S ALLEGATIONS OF IIED ARE NOT ONLY PLAUSIBLE, BUT DEMONSTRABLY SEVERE

56.    Apple continues to argue that the Plaintiff's allegations fail to meet the threshold for IIED, asserting that the actions described do not constitute "outrageous" conduct under the applicable legal standard. However, as previously detailed, the conduct at issue is precisely the type of outrageous conduct that courts have held actionable in IIED claims. Appleseed's conduct—including but not limited to the sending of intimate photographs to Apple Global Security, the explicit threats and harassment tied to the Plaintiff's whistleblowing activities, and the subsequent retaliatory termination—is the embodiment of the "extreme and outrageous" behavior required to establish a claim for IIED.

57.    Moreover, Apple's failure to take any corrective action after being made aware of Appleseed's conduct suggests an intentional disregard for the Plaintiff's rights and well-being. The failure to intervene or act in response to such extreme misconduct reinforces the Plaintiff's claim that Apple's conduct was not merely negligent but intentional, and intended to cause harm in furtherance of Apple's broader strategy to silence the Plaintiff. Apple's argument that these acts were isolated or unintentional is unpersuasive and ignores the broader context in which these actions occurred, specifically the coordinated campaign of retaliation orchestrated by Apple against a whistleblower.

58.    IV. The Court Should Consider the New Information Regarding Appleseed's Role and Apple's Knowledge

59.    Apple also seeks to minimize the role of Appleseed in the underlying

— 21 —

1   events, disregarding the fact that Appleseed's actions were carried out within the
2   scope of her employment, under Apple's direction, and with Apple's full
3   knowledge. Appleseed, as a member of Apple's Global Security team, had a
4   professional mandate to prevent "leaking" and protect corporate interests, which
5   included retaliating against individuals who engaged in whistleblowing activities
6   that might harm Apple's business interests. This crucial context—now bolstered
7   by the Plaintiff's new evidence of coordinated misconduct—further supports the
8   Plaintiff's IIED claim against Apple.

9       60.     Apple's attempt to dismiss the IIED claim without addressing the
10   pattern of retaliatory actions that have now been thoroughly documented—
11   conduct that includes the wrongful and intentional use of explicit images as an
12   alleged justification for the Plaintiff's firing—reveals the corporate malfeasance
13   at the core of this case. It is apparent that Appleseed's actions were carried out
14   with the knowledge and support of Apple, and were designed to achieve the
15   corporate aim of retaliating against and punishing the Plaintiff for engaging in
16   protected whistleblowing activities.

17   **L.  V. The Plaintiff Should Be Allowed to Replead the
18       IIED Claim in Light of New Evidence and Legal
19       Violations**

20       61.     As outlined in the Plaintiff's motion to amend the Complaint, there
21   is substantial new evidence that warrants repleading the IIED claim. Specifically,
22   the federal and state enforcement actions taken against Apple's business practices,
23   coupled with Apple's admission to knowledge of the conduct described in the
24   motion to dismiss, provide a strong factual and legal basis for repleading the IIED
25   claim. The Plaintiff respectfully requests an opportunity to amend the Complaint
26   to reflect these new facts and legal developments, and to more fully present the
27   ongoing and intentional nature of Apple's misconduct. This Court has the power
28   to allow the Plaintiff to correct deficiencies in the Complaint and should do so in

1    this case, particularly given the gravity of the allegations and the potential public

2    interest involved.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Unauthorized Amendments:**

2        62.    Defendant claims that Plaintiff has introduced new allegations in the

3    amended complaint that were not allowed by the Court's prior orders. Specifically,

4    Defendant argues that Plaintiff expanded the factual bases for her claims (e.g.,

5    new allegations of harm in the private nuisance claim and expanded facts in the

6    IIED claims). These amendments, however, were made to clarify and address

7    Defendant's prior motions and the Court's instructions. Plaintiff's amendments

8    do not introduce new legal theories or impermissible claims, and the allegations

9    are consistent with the original complaint. Therefore, the motion to dismiss based

10   on unauthorized amendments should be denied.

11       63.    **Private Nuisance Claim:**

12       64.    Defendant argues that Plaintiff's private nuisance claim is time-

13   barred, contending that the statute of limitations began to run in March 2021 when

14   Plaintiff knew of the injuries and suspected the facility as the source. Plaintiff

15   disputes this argument, asserting that the statute of limitations did not begin to

16   run until February 2024, when Plaintiff fully discovered the connection between

17   her health issues and the facility's emissions. The delayed discovery rule applies

18   here, as Plaintiff could not have reasonably known the full extent of the exposure

19   earlier, particularly given the complex and secretive nature of Defendant's

20   operations.

21       65.    Defendant further argues that Plaintiff failed to exercise reasonable

22   diligence in investigating the facility. However, the public records Defendant

23   points to—such as building permits—were not readily available or understandable

24   to Plaintiff in the context of a toxic tort claim. The records were not sufficient to

25   put Plaintiff on notice of the facility's hazardous emissions, especially given the

26   complexity and secrecy of Defendant's operations.

27       66.    **IIED (Fear of Cancer) Claim:**

28

— 24 —

67.    Defendant asserts that the IIED claim is time-barred for the same reasons as the private nuisance claim. However, Plaintiff contends that the statute of limitations did not begin to run until February 2024 when she discovered the true nature of her exposure and its potential impact on her health. Prior to this discovery, Plaintiff could not have reasonably feared the potential for cancer or other health issues.

68.    Defendant also argues that Plaintiff has failed to allege that Defendant's conduct was specifically directed at her. However, Plaintiff need not demonstrate that Defendant's actions were aimed solely at her. The reckless disregard for harm caused by Defendant's actions, which exposed Plaintiff to hazardous chemicals, is sufficient to meet the legal standard for IIED. Plaintiff's claim is based on the exposure to chemicals, which was a risk to all individuals in the vicinity of Defendant's operations.

69.    **Labor Code § 1102.5 Claim:**

70.    Defendant claims that Plaintiff's § 1102.5 retaliation claim is time-barred because Plaintiff did not allege equitable tolling. However, Plaintiff filed a complaint with the California Department of Industrial Relations (DIR) in August 2021, which tolled the statute of limitations for this claim. The DIR complaint was sufficiently detailed to put Defendant on notice of Plaintiff's retaliation claims, which involved reporting workplace safety violations and environmental hazards.

71.    Defendant also argues that the DIR complaint did not provide sufficient notice to Defendant regarding the specific legal violations now alleged in this lawsuit. This argument is without merit, as Plaintiff's DIR complaint referenced workplace safety and environmental concerns that directly relate to the statutory protections under § 1102.5.

72.    **Labor Code § 98.6 Claim:**

73.    Plaintiff's claim under § 98.6 is similarly not time-barred. Plaintiff filed the DIR complaint, which tolled the statute of limitations for this claim. Defendant's argument that Plaintiff failed to establish causation is also without merit. Plaintiff's claims are based on retaliation for her protected activities, including raising concerns about environmental hazards and workplace safety.

74.    **Labor Code §§ 232 and 232.5 Claim:**

75.    Plaintiff has sufficiently alleged retaliation related to her protected wage disclosures under these provisions. Defendant's failure to intervene and address this retaliation does not absolve Defendant from liability under these statutes.

## M. Conclusion

76.    Defendant's motion to dismiss should be denied in its entirety. Plaintiff's claims are timely, legally sufficient, and supported by factual allegations that meet the required legal standards. Defendant's arguments are based on incorrect interpretations of the law and facts, and they improperly seek to resolve issues of fact at this early stage of the litigation. The claims should be allowed to proceed to discovery.For these reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss and allow this case to move forward.

Dated: January 22, 2025.

Signature:

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email:** legal@ashleygjovik.com
**Physical Address:** Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone:** (408) 883-4428