1    **Ashley M. Gjovik, JD**

2    *In Propria Persona*
     2108 N St. Ste. 4553
3    Sacramento, CA, 95816
     (408) 883-4428
4    legal@ashleygjovik.com

5

6

7              # UNITED STATES DISTRICT COURT

8              # NORTHERN DISTRICT OF CALIFORNIA

9

10                                          CAND No. 3:23-CV-04597-EMC

11                                          9TH CIR No.: 24-6058

12   **ASHLEY M. GJOVIK**, *an individual*,

13                                          **PLAINTIFF'S OPPOSITION TO**

14        Plaintiff,                        **DEFENDANT'S FIFTH MOTION TO**

15                                          **DISMISS. (FINAL)**

16        vs.

17

18                                          *Fed. R. Civ. P. § 12(b)(6)*

19   **APPLE INC.**, a corporation,

20                                          **MOTION HEARING:**
                                            Dept: Courtroom 5 (& Zoom)
21        Defendant.                        Judge: Honorable Edward M. Chen
                                            Date: February 13, 2025
22                                          Time: 1:30 PM PT

23

24

25              **ADDENDUM: FINAL 2.0;**

26   **REVISED WITH LEGAL CITATIONS & MISSING SECTIONS**

27

28

# TABLE OF CONTENTS

A.    Summary of the Case ........................................................................ 2

B.    Legal Standard ................................................................................. 3

C.    The Court Has Already Allowed Defendant to File Multiple Motions to Dismiss, Which Is a Violation of the Federal Rules of Procedure. ................. 5

D.    Defendant's Repeated Motions to Strike Claims and Specific Scenarios Are Improper and Impair Plaintiff's Right to a Fair Trial ............................ 7

E.    The Danger of Further Dismissals: The Court Must Recognize the Implications of Striking Evidence and Factual Allegations ........................... 8

F.    This is an Employee's Civil Rights and Public Safety Lawsuit, And the Court Must Not Allow the Defendant to Escape Accountability Through Procedural Games ................................................................................. 9

G.    Plaintiff Represents the Interests of Thousands of People, & Allowing Abusive Litigation Tactics Would Be Against the Public Interest ................. 10

H.    Statute of Limitations Tolling and The Reasonable Person Standard ... 12

I.    The Tamney Termination in Violation of Public Policy Claim Is Inextricably Linked to Plaintiff's Toxic Tort Claims and Rests on Strong Public Policy Considerations .................................................................... 14

J.    Tolling Due to Fraud and Continuing Violations ................................. 17

K.    The Standard for IIED Claims Against Corporations, Employees, and Ex-Employees .................................................................................... 20

L.    The "Intent" for IIED – Fear of Cancer is defined in Firestone. ......... 23

M.    The Plaintiff's Allegations of IIED Are Not Only Plausible, But Demonstrably Severe ......................................................................... 26

N.    Tolling & Scope of Cal. Labor Code Claims: .................................... 29

O.    Allegations of "New" Allegations .................................................... 34

P.    Conclusion .................................................................................... 35

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) ................................................................................ 3

*Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148 (1987) ........................... 20

*Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) .......... 3

*Glus v. Brooklyn Eastern Dist. Terminal,* 359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770 (1959). .............................................................................. 1

*Sause v. Bauer,* 138 S. Ct. 2561 (2018) ........................................................ 5

**Trial and Circuit Court Cases**

*Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009) 10

*Avila v. Willits Envtl. Remediation Trust,* 633 F.3d 828, 841 (9th Cir.2011) ........13

*Baker v. Putnal,* 75 F.3d 190, 34 Fed. R. Serv. 3d 1221 (5th Cir. 1996). ............... 6

*Berger v. McHugh*, 26 F. Supp. 107, 1 Fed. R. Serv. 9, 1 Fed. R. Serv. 72 (M.D. Pa. 1939) ................................................................................... 5

*Brauch v. Birmingham*, 49 F. Supp. 229 (N.D. Iowa 1943) .................................. 1

*Brooks v. Pennsylvania R. Co.,* 91 F. Supp. 101 (S.D. N.Y. 1950). ........................ 5

*Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000) . 4

*Cafasso v. Gen. Dynamics C4 Sys.,* 637 F.3d 1047, 1058 (9th Cir. 2011) .............. 3

*Citizens for Better Environment v. Gorsuch,* 718 F.2d 1117, 1127 (9th Cir. 1983). 10

*Coppola v. Smith*, 935 F. Supp. 2d 993, 1030 (E.D. Cal. 2013)...........................13

*Crosby v. L.A. County*, 124 Cal.App.4th 1151 (2004) ...................................... 27

*Daniel v. Cnty. of Santa Barbara,* 288 F.3d 375, 380 (9th Cir. 2002) .................. 4

*EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 48 Fed. R. Serv. 3d 540 (3d Cir. 2000) ............................................................................... 22

*Frey v. City of Herculaneum,* 44 F.3d 667 (8th Cir. 1995) .................................. 6

*Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 248–49 (9th Cir. 1997)................... 3

1    *Golden Gate Water Ski Club v. County of Contra Costa* (App. 1 Dist. 2008) 80
2        Cal.Rptr.3d 876, 165 Cal.App.4th 249. ....................................................... 10
3    *Graehling v. Village of Lombard*, Ill., 58 F.3d 295, 11 A.D.D. 378 (7th Cir. 1995) 22
4    *Hebbe v. Pliler,* 627 F.3d 338 (9th Cir. 2010). ................................................... 5
5    *Hernandez v. Coughlin*, 18 F.3d 133 (2d Cir. 1994) ........................................... 5
6    *Holmes v. New York City Housing Authority,* 398 F.2d 262 (2d Cir. 1968);
7        *Calabrese v. Chiumento,* 3 F.R.D. 435 (D.N.J. 1944)....................................... 1
8    *Jenkins v. Yellowstone Props., Inc.*, 17-CV-7764 (VEC) (S.D.N.Y. Sep. 12, 2019) 21
9    *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988) ........ 4
10   *Kasten v. Saint-Gobain Performance Plastics Corp.,* 570 F.3d 834, 844 (9th Cir.
11       2009)................................................................................................... 12
12   *Leather v. Eyck,* 180 F.3d 420 (2d Cir. 1999) .................................................... 5
13   *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir. 1989)................................. 4
14   *Mangini v. Aerojet–Gen. Corp.,* 230 Cal.App.3d 1125, 1150, 281 Cal.Rptr. 827
15       (1991). ................................................................................................ 12
16   *Martin v. Livingstone Securities Corp*., 192 F. Supp. 862 (D. Mass. 1961) ........... 5
17   *McGinn v. Exec. Office of Energy & Envtl. Affairs*, Civil Action No. 19-cv-11551-
18       IT (D. Mass. Sep. 30, 2020) ..................................................................... 21
19   *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325 (4th Cir. 1996)......................... 22
20   *Murray v. Oceanside Unified School District,* 79 Cal. App. 4th 1338 (2000) ....... 20
21   *Nanouk v. United States*, 974 F.3d 941 (9th Cir. 2020) .................................... 22
22   *Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 993
23       (9th Cir. 2000). ....................................................................................37
24   *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir. 1987)........................................ 4
25   *Northrop v. Hoffman of Simsbury, Inc*., 134 F.3d 41, 39 Fed. R. Serv. 3d 492 (2d
26       Cir. 1997) ............................................................................................. 1
27   *People v. Gross* (2015) 238 Cal.App.4th 1313, 1318, 190 Cal.Rptr.3d 472 ............11
28   *People v. Plains All Am. Pipeline, L.P.*, 101 Cal. App. 5th 872, 879 (2024), *review*

*denied* (Aug. 14, 2024) ................................................................................11

*People v. Valdez* (1994) 24 Cal.App.4th 1194, 1203, 30 Cal.Rptr.2d 4. ...............11

*Porter v. Karavas,* 157 F.2d 984 (C.C.A. 10th Cir. 1946) ....................................... 5

*Robins v. Rarback*, 325 F.2d 929, 7 Fed. R. Serv. 2d 134 (2d Cir. 1963) .............. 5

*Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009) .............................................. 20

Rodriguez *v. Bar-S Food Co.,* 539 F. Supp. 710 (D. Colo. 1982) ....................... 23

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d
410 (3d Cir. 1999) ................................................................................. 22

*Vaughn v. American Multi Cinema, Inc.*, 09 Civ. 8911 (BSJ) (S.D.N.Y. Sep. 14,
2010) .................................................................................................... 21

*Wilderman v. Nelson*, 467 F.2d 1173 (8th Cir. 1972). ........................................ 5

**Statutes**

Cal. Pen. Code, § 1202.4, subd. (a)(3)(B). ........................................................11

Civ. Code, § 3490 ..................................................................................... 10

**Rules & Regulations**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 3

Fed. R. Civ. P. 8(a) .................................................................................... 3

Fed. R. Civ. P. 8(d)(1). ............................................................................... 3

Fed. R. Civ. P. 8(e) .................................................................................... 3

**Treatises**

§ 1233 Statement of Particular Matters—Conspiracy, 5 Fed. Prac. & Proc. Civ. §
1233 (4th ed.) ....................................................................................... 23

§ 1234 Statement of Particular Matters—Constitutional Rights, 5 Fed. Prac. &
Proc. Civ. § 1234 (4th ed.) ...................................................................... 10

§ 1241 Statement of Particular Matters—Fraud, Mistake, and Conditions of
Mind, 5 Fed. Prac. & Proc. Civ. § 1241 (4th ed.) ........................................33

35B C.J.S. Federal Civil Procedure § 813. ..................................................... 5

35B C.J.S. Federal Civil Procedure § 825 ................................................... 5

35B C.J.S. Federal Civil Procedure § 833. ................................................ 18

35B C.J.S. Federal Civil Procedure § 852. .................................................. 4

35B C.J.S. Federal Civil Procedure § 853 ................................................. 36

47 Cal. Jur. 3d Nuisances § 89 ................................................................ 10

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ................................................................................................. 4

5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (3d ed. 2010) ............................................................................................... 3

57 Am. Jur. Trials 395 (Originally published in 1995). .................................. 14

**Constitutions**

Cal. Const., art. I, § 28, subd. (b)(13)(A) ................................................ 11

Cal. Const., art. I, § 28, subd. (b)(13)(B). ............................................... 11

## Plaintiff's Opposition to Defendant's
## Fifth Motion to Dismiss

1.     Plaintiff, Ashley Gjovik, respectfully submits the following Opposition to Defendant's Motion to Dismiss portions of her Fifth Amended Complaint ("5AC"). Defendant's motion represents yet another attempt by the Defendant to erode the substance of Plaintiff's case through repeated procedural tactics. Defendant's motion to dismiss is part of an ongoing strategy designed to whittle away at Plaintiff's claims, and it continues a pattern of improper filings that has been allowed by the Court despite clear violations of the procedural rules. As demonstrated below, the Defendant's motion must be denied, and the Court must not allow the Defendant to continue to break the rules or dismiss claims for random reasons that fail to address the core merits of the case.[1]

2.     Concurrently filed is an *Opposition* to Defendant's *Request for Judicial Notice* (also addressed here)*, Plaintiff's *Request for Judicial Notice,* Plaintiff's *Notice of Pendency,* and Plaintiff's *Motion to Amend* her Complaint.

3.     This case represents a critical moment to address systemic abuses by Apple Inc., encompassing violations of whistleblower protection laws, labor statutes, environmental regulations, and fundamental principles of fairness and safety. The plaintiff, Ashley Gjovik, a former Senior Engineering Program Manager at Apple, brought to light unsafe work conditions, criminal conduct, environmental hazards, and unlawful labor practices. In response, Apple retaliated against Gjovik, exacerbating the harm she endured and demonstrating a troubling corporate culture that prioritizes secrecy and profit over compliance, safety, and integrity.

4.     Central to this matter is Apple's operation of an unpermitted semiconductor fabrication plant adjacent to residential apartments, which emitted toxic gases and caused significant health issues for residents, including Gjovik. Compounding this environmental negligence was Apple's systematic retaliation when Gjovik raised legitimate concerns. These

---

[1] *See, e.g., Brauch v. Birmingham*, 49 F. Supp. 229 (N.D. Iowa 1943); *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 39 Fed. R. Serv. 3d 492 (2d Cir. 1997); *Holmes v. New York City Housing Authority,* 398 F.2d 262 (2d Cir. 1968); *Calabrese v. Chiumento,* 3 F.R.D. 435 (D.N.J. 1944).; *Glus v. Brooklyn Eastern Dist. Terminal,* 359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770 (1959).

actions reflect broader patterns of misconduct by Apple, evidenced by multiple enforcement actions taken by the Department of Justice over the past 15 years related to employment practices, anti-competitive behavior, and unlawful labor policies. In this context, addressing Apple's violations in this case is both a legal necessity and a moral imperative.

5.    *Disclaimer*: Plaintiff, representing herself pro se in three separate litigations / adjudications against Defendant, is unable to keep up with the paperwork from Apple's army of lawyers. Due to the court issuing a hard deadline for filings, Plaintiff regrets any and all typos, omissions, errors – and also discloses the use of generative AI to assist her in drafting this response. Previously Plaintiff had tried to prioritize quality over deadlines, but without a choice and unable to compete with the defendant's endless resources, Plaintiff files this response in the best condition she is able. Plaintiff concedes none of her claims, disagrees with all of Apple's arguments, and any failure to address a point by Plaintiff should be assumed to be due to the deadline to file, not to any concession to the merit. Plaintiff also did not have time to include legal citations before the deadline and now files this revised version with legal citations and the addition of missing sections.

## A.    Summary of the Case

6.    Apple failed to disclose the existence of the facility or its hazardous emissions, violating multiple environmental regulations, including the Resource Conservation and Recovery Act (RCRA). Regulatory investigations have since confirmed at least 19 RCRA violations and additional breaches of air quality regulations. When Gjovik raised concerns related to these hazards and broader workplace safety issues, she became the target of retaliation and harassment by Apple, including her termination. Despite clear legal protections under federal and state whistleblower statutes, Apple has repeatedly denied liability, opting instead to deflect and mischaracterize Gjovik's efforts as breaches of confidentiality. The facts of this case demonstrate a troubling pattern of corporate misconduct, disregard for safety, and retaliation against an employee who sought accountability and transparency.

7.    The NLRB and California government both found that Apple's proposed justification for terminating Gjovik's employment is false and pretextual. The NLRB has found

1  substantial evidence that Apple illegally suspended and fired Gjovik and made multiple illegal
2  threats and coercive statements to her. The NLRB filed suit last month and demanded Apple
3  apologize and reinstate Gjovik's employment. The trial is later this year. (See concurrently filed
4  *Notice of Pendency*).

5        8.     Additionally, the Bay Area Air Quality Management District (BAAQMD) identified
6  six serious violations, including operating without proper permits and venting toxic gases. These
7  regulatory findings provide incontrovertible evidence of Apple's environmental misconduct.
8  Medical records and expert testimony establish a clear link between Gjovik's exposure to hazardous
9  substances and the severe health issues she has endured. The concealment of these operations from
10  local residents and employees underscores Apple's alarming disregard for public safety.

11  **B.  LEGAL STANDARD**

12

13        9.     Plaintiffs in federal court are required to give only "*a short and plain statement of the*
14  *claim showing that the pleader is entitled to relief.*" Fed. R. Civ. P. 8(a). Furthermore, Rule 8(d)(1)
15  requires "*[e]ach allegation [to] be simple, concise, and direct.*" Fed. R. Civ. P. 8(d)(1). The purpose of
16  Rule 8 is to " '*give the defendant fair notice of what the ... claim is and the grounds upon which it rests.*'
17  " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)
18  (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957)). The Federal
19  Rules require that all pleadings be "*construed so as to do justice.*" See Fed. R. Civ. P. 8(e). *Cafasso v.*
20  *Gen. Dynamics C4 Sys.,* 637 F.3d 1047, 1058 (9th Cir. 2011), 637 F.3d at 1059 (quoting 5 Charles A.
21  Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (3d ed. 2010)).

22       10.    The Federal Rules also allow a court to dismiss a cause of action for "failure to state
23  a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Ninth Circuit is particularly
24  hostile to motions to dismiss under Rule 12(b)(6). See, e.g., *Gilligan v. Jamco Dev. Corp.,* 108 F.3d
25  246, 248–49 (9th Cir. 1997) ("*The Rule 8 standard contains a powerful presumption against rejecting*
26  *pleadings for failure to state a claim.*"). However, in *Twombly*, the Supreme Court rejected the notion
27  that "*a wholly conclusory statement of a claim would survive a motion to dismiss whenever the pleadings*
28  *left open the possibility that a plaintiff might later establish some set of undisclosed facts to support*

— 3 —

recovery." *Twombly*, 550 U.S. at 561, 127 S. Ct. at 1968. Instead, the Court adopted a "*plausibility standard,*" in which the complaint must "*raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." Id.* at 556, 127 S. Ct. at 1965. For a complaint to meet this standard, the "*[f]actual allegations must be enough to raise a right to relief above the speculative level.*" Id. at 555, 127 S. Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("*[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action*"); *Daniel v. Cnty. of Santa Barbara,* 288 F.3d 375, 380 (9th Cir. 2002) (" *'All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.' "*) (quoting *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000)).

11. When a Plaintiff appears pro se, the Court must construe the allegations of the Complaint liberally and must afford the Plaintiff the benefit of any doubt. *See Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir. 1988). Moreover, in determining whether a complaint states a claim on which relief may be granted, allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir. 1989). A pro se litigant must be given leave to amend his or her complaint unless it is absolutely clear that the deficiencies of the complaint cannot be cured by amendment. *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir. 1987).

12. As a general rule, doubtful issues will not be decided as a matter of law on a motion to dismiss a complaint.[1] The Federal Rules of Civil Procedure do not sanction the disposition of doubtful issues of fact or of law on motions to dismiss for insufficiency of the pleadings.[2] In ruling on a motion to dismiss, doubt should ordinarily be resolved against the motion." 35B C.J.S. Federal Civil Procedure § 852.

13. "Where, in an action by an employee against the employer, the pleadings raise a triable issue of fact, a motion to dismiss the complaint will be denied… it is an abuse of discretion for the court to dismiss an employee's complaint against the employer for failure to comply with the Rules merely because of the presence of superfluous matter so long as the complaint puts the employer on notice of the employee's claim, provides more information than the Rules require, and

1  appears to state a claim." 35B C.J.S. Federal Civil Procedure § 825; *Wilderman v. Nelson*, 467 F.2d

2  1173 (8th Cir. 1972).

### C.  THE COURT HAS ALREADY ALLOWED DEFENDANT TO FILE MULTIPLE MOTIONS TO DISMISS, WHICH IS A VIOLATION OF THE FEDERAL RULES OF PROCEDURE.

14.    Under Rule 12(h), the Defendant is permitted only one motion to dismiss. However, the Court has already allowed Defendant to file multiple motions, which they have used to re-challenge claims and re-litigate issues that have already been addressed in previous motions. The repeated filing of 12(b)(6) motions is not only an abuse of procedural rules but also an attempt by the Defendant to drag out the litigation and place an unnecessary burden on the Plaintiff.

15.    The Defendant's filings have been allowed despite the clear limitations set forth in Rule 12(g) and 12(h). These rules prevent parties from repeatedly challenging claims that have already been addressed, and the Court's decision to allow Defendant to file multiple motions has led to unnecessary delays and increased costs for Plaintiff. Furthermore, the Defendant is attempting to use these motions as a way to avoid liability by focusing on technical arguments and procedural errors, rather than addressing the substantive merit of the claims.[2]

16.    In considering a motion to dismiss for failure to state a claim, District Courts are required to interpret a *pro se* complaint liberally. *Sause v. Bauer,* 138 S. Ct. 2561 (2018).; 35B C.J.S. Federal Civil Procedure § 813.  The standard governing motions to dismiss for failure to state a claim applies with even greater force where the plaintiff alleges civil rights violations1, and especially where the complaint is submitted pro se.[3] *Hebbe v. Pliler,* 627 F.3d 338 (9th Cir. 2010).

17.    In order to survive a motion to dismiss for failure to state a claim on which relief can be granted, a civil rights complaint must contain facts which state the claim as a matter of law and

---

[2] *Martin v. Livingstone Securities Corp*., 192 F. Supp. 862 (D. Mass. 1961); *Porter v. Karavas,* 157 F.2d 984 (C.C.A. 10th Cir. 1946); *Berger v. McHugh*, 26 F. Supp. 107, 1 Fed. R. Serv. 9, 1 Fed. R. Serv. 72 (M.D. Pa. 1939); *Robins v. Rarback*, 325 F.2d 929, 7 Fed. R. Serv. 2d 134 (2d Cir. 1963); *Brooks v. Pennsylvania R. Co.,* 91 F. Supp. 101 (S.D. N.Y. 1950).

[3]*See, e.g., Leather v. Eyck,* 180 F.3d 420 (2d Cir. 1999); *Frey v. City of Herculaneum,* 44 F.3d 667 (8th Cir. 1995); *Hernandez v. Coughlin*, 18 F.3d 133 (2d Cir. 1994); 35B C.J.S. Federal Civil Procedure § 821.

1  must not be conclusory. The court must accept as true the allegations the plaintiff makes in the

2  complaint and must not adopt a portion of the defendant's claims as fact without acknowledging

3  any contradiction with the complaint. *Frey v. City of Herculaneum*, 44 F.3d 667 (8th Cir. 1995); *Baker*

4  *v. Putnal,* 75 F.3d 190, 34 Fed. R. Serv. 3d 1221 (5th Cir. 1996).

5       18.    Apple's attempt to have claims related to *environmentally unsafe working conditions*

6  dismissed, as if they are merely peripheral to the actual issues at hand, demonstrates an alarming

7  disregard for both the severity of the claims and the underlying facts. These claims are not

8  incidental or irrelevant—far from it. They are integral to understanding the context of the

9  retaliation and the very real harm that occurred. They are the protected activity and that is exactly

10  why Apple attempts to coerce the court to eliminate it from the lawsuit.

11       19.    Plaintiff's allegations are not an attempt to turn this case into a broad critique of

12  Apple's environmental practices. Rather, they directly reflect how unsafe working conditions,

13  including exposure to toxic substances, caused both physical harm and emotional distress. The

14  severity of these environmental issues goes beyond simple inconvenience or discomfort; they

15  directly contributed to Plaintiff's health problems and exacerbated the adverse actions taken

16  against her by Apple. Dismissing these claims would ignore the fundamental context of this

17  lawsuit—where toxic emissions and unsafe work conditions were not just tolerated but condoned

18  by the company.

19       20.    Apple's argument to exclude these allegations borders on absurdity. It suggests that

20  a company's failure to address hazardous working conditions, resulting in harm to its employees,

21  should be swept under the rug in a case about wrongful termination, as if a claim of retaliation

22  would transmogrify a lawsuit including any other topic to only be exclusively about employment

23  matters. To treat these critical environmental issues as tangential to the real claim—especially

24  when the failure to address them is central to the retaliatory conduct Plaintiff endured—is a gross

25  mischaracterization of the case's heart and purpose.

26       21.    The suggestion that these environmental claims should be excised from the lawsuit,

27  as though they are nothing more than a side note, is both an insult to the Plaintiff's experience and

28  a desperate attempt by Apple to erase inconvenient facts. These issues are not "*sprawling critiques*"

or minor complaints; they are serious, fact-based allegations that tie directly into the retaliatory actions Plaintiff faced for speaking out against unsafe practices. The notion that Apple can simply dismiss these claims as irrelevant or time-barred—despite their clear and direct impact on the Plaintiff's health and career—highlights the company's complete lack of accountability.

22.     In sum, the environmental claims in this case are not going anywhere. They represent serious misconduct, deliberate negligence, and retaliation, and Apple's attempt to belittle and discard them serves only to underscore the company's failure to take responsibility for its actions. Rather than trying to pretend these issues don't exist, Apple would do well to address them with the seriousness they deserve, instead of acting like an obstinate child refusing to acknowledge the consequences of their own mess.

### D.  Defendant's Repeated Motions to Strike Claims and Specific Scenarios Are Improper and Impair Plaintiff's Right to a Fair Trial

23.     The Defendant's repeated motions to dismiss and its targeted attacks on sub-claims and specific factual allegations are not only improper, but they also fundamentally undermine the integrity of this lawsuit. The Defendant's strategy is to act as if striking these individual claims or scenarios means erasing entire categories of evidence, facts, and allegations from the case. This is a grave distortion of the purpose of a lawsuit, which is to reflect the full reality of the unlawful conduct and harm that the plaintiff has suffered. Federal lawsuits are not games of procedural minutiae; they are designed to allow the plaintiff to fully present all relevant facts and evidence in support of their claims.

24.     If the Defendant is allowed to continue its pattern of striking specific facts and sub-claims, this lawsuit will be severely limited in scope, leaving it devoid of the very evidence that is essential to proving the underlying unlawful conduct. A lawsuit is not fiction; it is meant to represent the full breadth of what occurred. If the Defendant succeeds in convincing the Court to dismiss more claims based on technical arguments, the resulting case will not reflect reality. The trial cannot fairly proceed if critical evidence and factual scenarios are eliminated, and Plaintiff is left with a hollow case that is no longer a true representation of the facts.

— 7 —

25.     Moreover, this issue is not hypothetical—Defendant has already misled the Court in prior motions to dismiss, resulting in the dismissal of multiple claims and sub-claims that were supported by concrete, direct evidence. These claims were not speculative or based on insufficient allegations; they were backed by clear facts, including documentary evidence and witness testimony. By allowing Defendant to strip away these claims based on narrow procedural arguments, the Court has inadvertently allowed Defendant to reduce the scope of the case and limit the evidence that will be available at trial. If the Court continues to dismiss claims and factual allegations on these improper grounds, it risks creating a legal environment where a corporation can avoid accountability simply by erasing the evidence it does not like through procedural motions. This would create a dangerous precedent, suggesting that a corporation can escape the full application of the law merely by manipulating the litigation process.

### E.   The Danger of Further Dismissals: The Court Must Recognize the Implications of Striking Evidence and Factual Allegations

26.     Allowing Defendant to continue striking key evidence and factual allegations from this case would severely undermine the ability of this lawsuit to reflect reality. The Court must recognize that the purpose of these motions is not to protect the integrity of the law or the fairness of the proceedings, but to allow the Defendant to erase inconvenient facts from the lawsuit entirely. This is an abuse of the judicial process, and the Court must not allow it to continue. The claims that the Defendant seeks to strike are not insignificant; they represent core aspects of the Plaintiff's case, and their removal would irreparably harm Plaintiff's ability to prove the unlawful conduct at issue.

27.     If Defendant is permitted to succeed in further whittling away Plaintiff's claims, the Court will face the troubling question of whether a U.S. Court can effectively render the law inapplicable to a corporation simply by dismissing claims that it finds undesirable. Such a decision would have profound consequences, not only for Plaintiff's case but for the principles of justice and fairness in federal litigation. The law must apply equally to all parties, regardless of their size, resources, or legal sophistication. If the Court continues to dismiss claims and evidence based on

— 8 —

narrow procedural arguments, it risks signaling to the Defendant that it can escape liability simply by evading the substance of the case through procedural tactics.

### F. THIS IS AN EMPLOYEE'S CIVIL RIGHTS AND PUBLIC SAFETY LAWSUIT, AND THE COURT MUST NOT ALLOW THE DEFENDANT TO ESCAPE ACCOUNTABILITY THROUGH PROCEDURAL GAMES

28.     This lawsuit is an employee's civil rights and public safety case against a large corporation with substantial resources. Defendant has at least four law firms and a full team of attorneys working on this case, while Plaintiff is representing herself. The disparity in resources is striking, and the Defendant's repeated use of procedural motions to dismiss represents an unconscionable abuse of the judicial process. The Defendant is leveraging its vast legal resources to attack Plaintiff's claims and sub-claims on technical grounds, hoping to wear her down and prevent a fair hearing of the actual merits of the case.

29.     The Court should not allow this procedural abuse to continue. Allowing Defendant to use these motions to strike facts and claims would not only undermine the integrity of the case but would also perpetuate an injustice, where a large corporation can use its resources to manipulate the litigation process and avoid facing the consequences of its actions. This is not merely an academic exercise in legal theory; this is a real case with real consequences for the Plaintiff, who has been subjected to physical injury, unlawful retaliation, and other harmful actions.

30.     While the Court may have allowed Defendant's motions in the past, that does not mean it must continue to do so now. The Court has the authority to stop Defendant's abuse of the legal process and to draw a line, ensuring that Plaintiff's case is allowed to move forward based on the evidence, rather than on technical procedural arguments. The Court must ensure that the Defendant is held accountable for its actions, and that Plaintiff is given a fair opportunity to present her case in full, without the Defendant's efforts to eliminate key facts, claims, and evidence.

31.     Because "fundamental rights and important questions of public policy are at issue, the district court should give the complaint special consideration and should not dismiss unless it

— 9 —

1    is clear that no legally cognizable claim can be stated."[4]

2    **G.  Plaintiff Represents the Interests of Thousands of**
3    **People, & Allowing Abusive Litigation Tactics Would Be**
4    **Against the Public Interest**

5    32.    In addition to her own claims, Plaintiff represents the interests of thousands of other
6    individuals who have been harmed by the conduct of the Defendant, and the Court must consider
7    the broader implications of dismissing claims on arbitrary and technical grounds. *"The federal courts*
8    *have long recognized that private citizens may serve as 'private attorneys general' in order to enforce*
9    *environmental laws that protect the public interest. This serves as an important safeguard against*
10   *environmental degradation and ensures that government agencies act to protect public health and welfare."*
11   *Citizens for Better Environment v. Gorsuch,* 718 F.2d 1117, 1127 (9th Cir. 1983).

12   33.    The factory at the heart of this lawsuit, which is subject to Plaintiff's nuisance,
13   IIED, and whistleblower claims, is currently facing enforcement actions from both federal and local
14   government agencies due to much of the same harmful conduct that Plaintiff is challenging here.
15   The government is investigating and acting against the factory's emissions, which are linked to
16   significant public health risks, and Plaintiff's claims represent the direct interests of thousands of
17   individuals who have been exposed to the factory's toxic exhaust.

18   34.    The state and federal EPA have already confirmed Apple was operating the
19   semiconductor fabrication factory illegally. The air board cited Apple specifically for failing to
20   request permission to operate – requiring a planning code review. (See request for *Judicial Notice*).
21   Violations of a planning code constitute a "*public nuisance.*" *Golden Gate Water Ski Club v. County*
22   *of Contra Costa* (App. 1 Dist. 2008) 80 Cal.Rptr.3d 876, 165 Cal.App.4th 249.  The Civil Code
23   expressly provides that no lapse of time can legalize a public nuisance, amounting to an actual
24   obstruction of public right.  Civ. Code, § 3490; 47 Cal. Jur. 3d Nuisances § 89.

25   35.    Allowing the Defendant's motions to strike or dismiss claims based on technicalities
26   could create serious legal conflicts, especially regarding issue preclusion and claim preclusion. If

27   _____

28   [4] *Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009); § 1234 Statement of
     Particular Matters—Constitutional Rights, 5 Fed. Prac. & Proc. Civ. § 1234 (4th ed.)

1   this Court were to dismiss claims with prejudice on discretionary and procedural grounds, such as

2   by accepting the Defendant's arguments regarding the statute of limitations for toxic torts—

3   arguments that rely on selective public documents—it could effectively rule on the statute of

4   limitations for thousands of potential plaintiffs. Such a ruling, if made against the Plaintiff, could

5   extinguish the civil legal rights of those individuals, many of whom have suffered significant harm

6   from the same toxic emissions, all based on a procedural decision that does not reflect the merits

7   of their claims. This would be a miscarriage of justice, as it could prevent entire classes of affected

8   individuals from seeking redress for the harms they have suffered.[5]

9       36.    Further, Plaintiff is the victim of crime and is entitled to restitution for the harm

10  caused by the Defendant. However, she is stuck waiting for the government to complete

11  enforcement actions while concurrently chasing a civil statute of limitations. "*It is the unequivocal*

12  *intention of the People of the State of California that all persons who suffer losses as a result of criminal*

13  *activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing*

14  *the losses they suffer.*" Cal. Const., art. I, § 28, subd. (b)(13)(A). "*Restitution shall be ordered from the*

15  *convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim*

16  *suffers a loss.*" Cal. Const., art. I, § 28, subd. (b)(13)(B).[6] Cal. Pen. Code, § 1202.4, subd. (a)(3)(B).

17  "*A victim's right to restitution is ... a constitutional one; it cannot be bargained away or limited, nor can*

18  *the prosecution waive the victim's right to receive restitution.*" *People v. Gross* (2015) 238 Cal.App.4th

19  1313, 1318, 190 Cal.Rptr.3d 472. "The Legislature left no discretion or authority with the trial court

20  or the prosecution to bargain away the victim's constitutional and statutory right to restitution."

21  *People v. Valdez* (1994) 24 Cal.App.4th 1194, 1203, 30 Cal.Rptr.2d 4.

22      37.    Furthermore, in the employment and labor claims, Plaintiff is also representing the

23  interests of over a hundred thousand employees. The NLRB has filed a complaint against

24  Defendant, highlighting illegal retaliation practices, including the use of overly broad NDAs, and

25

26  [5] ("Environmental crimes have far-reaching impacts on the community and can result in complex
    restitution determinations.") *People v. Plains All Am. Pipeline, L.P.*, 101 Cal. App. 5th 872, 879 (2024),
27  *review denied* (Aug. 14, 2024)
    [6] See, e.g. *People v. Plains All Am. Pipeline, L.P.*, 101 Cal. 5th 872, 885 (2024), *review denied* (Aug. 14,
28  2024).

1    requested national remedies for these violations. This is not a hypothetical situation; this is a real

2    government investigation into practices that affect workers across the country. The NLRB's

3    involvement and its request for national remedies underscores the importance of Plaintiff's claims

4    and demonstrates that this lawsuit is not only about one individual's grievance but also about

5    enforcing broader protections for workers. If this Court allows further arbitrary dismissals or grants

6    Defendant undue procedural favors, the consequences would be far-reaching, directly impacting

7    the lives of thousands of employees, and perpetuating unjust practices in the workforce. *Kasten v.*

8    *Saint-Gobain Performance Plastics Corp.,* 570 F.3d 834, 844 (9th Cir. 2009).[7]

### H.   Statute of Limitations Tolling and The Reasonable Person Standard

11

12    38.    Defendant argues that Plaintiff's private nuisance claim is time-barred, contending

that the statute of limitations began to run when Plaintiff knew of her injuries. Plaintiff disputes

this argument, asserting that the statute of limitations did not begin to run until February 2024,

when Plaintiff fully discovered the connection between her health issues and the facility's

emissions. The delayed discovery rule applies here, as Plaintiff could not have reasonably known

the full extent of the exposure earlier, particularly given the complex and secretive nature of

Defendant's operations.

18    39.    California has adopted the delayed discovery rule and "because the federal standard

under CERCLA is more generous than California law in tolling the statute of limitations when a

plaintiff's discovery of her claims is delayed, the federal commencement date preempts California's

discovery rule." *Mangini v. Aerojet–Gen. Corp.,* 230 Cal.App.3d 1125, 1150, 281 Cal.Rptr. 827

(1991). Under the federal discovery rule, the "California limitations period [does] not commence

until Plaintiff[ ] knew or should have known of [his or her] claim." *O'Connor,* 311 F.3d at 1146. "A

plaintiff knows or reasonably should know of a claim when he or she knows both the existence and

the cause of his injury." *Id.* at 1147; *see also Avila v. Willits Envtl. Remediation Trust,* 633 F.3d 828,

26

27    ---

[7] ("*The public policy of protecting whistleblowers is to encourage employees to report unlawful activity and to protect them from retaliation. Public policy supports the enforcement of laws intended to protect employees from retaliatory actions that hinder the ability to report unlawful conduct.*")

28

841 (9th Cir.2011). *Coppola v. Smith*, 935 F. Supp. 2d 993, 1030 (E.D. Cal. 2013)

40.    The Defendant's argument regarding the statute of limitations for Plaintiff's nuisance and IIED claims is flawed both factually and legally. First and foremost, the question before the Court is not whether Plaintiff herself should have discovered the source of the emissions but rather whether a reasonable person in Plaintiff's position would have been able to identify the source. This is a factual question that must be determined by a jury. The legal standard for tolling the statute of limitations, as established by both California law and federal precedent, is based on what a reasonable person should have known or discovered, not the plaintiff's personal diligence or awareness.

41.    Plaintiff's claims in this case are not simply based on subjective awareness; rather, they are grounded in the objective standard of a reasonable person. As Plaintiff has detailed in her complaints, she made several complaints to multiple government agencies—agencies whose responsibility it is to investigate illegal emissions and dangerous environmental hazards. These agencies, including the U.S. Environmental Protection Agency (EPA) and the California EPA, undertook investigations into the potential sources of the chemical exposure but were unable to identify the origin of the emissions. This fact is pivotal to the Court's analysis: if these agencies, tasked with enforcing environmental laws and regulations, could not identify the source of the emissions after thorough investigations, it is unreasonable to hold Plaintiff personally liable for failing to identify the same source.

42.    In essence, the argument the Defendant presents—accusing Plaintiff of failing to conduct a reasonable investigation into the emissions—is flawed when compared to the investigations conducted by the very agencies responsible for enforcing environmental laws. If the Court were to adopt Defendant's argument and determine that Plaintiff was negligent in her investigation, it would be unfair holding her to a higher standard than the government agencies that could not locate the source of the emissions. It would imply that a random tenant in an apartment complex, with no specialized knowledge or resources, should have known more about the source of the hazardous emissions than the very federal and state agencies tasked with this responsibility.

43.    This argument is further bolstered by the fact that the Plaintiff complained about

— 13 —

the chemical exposure to the appropriate authorities, the very agencies charged with investigating and responding to environmental hazards. The Defendant's attempt to dismiss the nuisance and IIED claims based on a purported failure to investigate by Plaintiff disregards these facts and overlooks the reality that the standard for tolling the statute of limitations is based on what a reasonable person would have known under the same circumstances. Given the inability of the EPA and California EPA to pinpoint the source of the emissions, there is no reasonable basis to claim that Plaintiff, in her role as a tenant, could have discovered the source sooner.

44.     This district has denied a motion to dismiss without leave to amend even when the plaintiff received a letter from the U.S. EPA notifying them that drying cleaning activities caused PCE contamination of drinking water and wells, noting that the letter did not explain the exact source of the issue, did not confirm the plaintiff was definitely effected by the issue, and instead implied an investigation was underway. *Coppola v. Smith*, 935 F. Supp. 2d 993, 1030–32 (E.D. Cal. 2013).

45.     Defendant asserts that the IIED claim is time-barred for the same reasons as the private nuisance claim. However, even if that was true, which it is not, Plaintiff contends that the statute of limitations did not begin to run until February 2024 when she discovered the true nature of her exposure and its potential impact on her health. Prior to this discovery, Plaintiff could not have reasonably feared the potential for cancer or other health issues. 57 Am. Jur. Trials 395 (Originally published in 1995).

46.     In addition, this Court should also consider the impact of Plaintiff's Ultrahazardous Activities strict liability claim, which was dismissed at the Defendant's request on discretionary grounds. This claim, as well as the claims for nuisance and IIED, are closely intertwined with issues of public safety and environmental harm.

## I.     The Tamney Termination in Violation of Public Policy Claim Is Inextricably Linked to Plaintiff's Toxic Tort Claims and Rests on Strong Public Policy Considerations

47.     Defendant's efforts to sever the connection between Plaintiff's Tamney termination in violation of public policy claim and her toxic tort allegations—specifically those rooted in

Defendant's criminal environmental conduct at its factory—are fundamentally flawed and unsupportable under the law. Plaintiff's termination claim is grounded in retaliation for her being a victim of crime and for her involvement as a legislative witness, both of which arise directly from the same toxic emissions that are central to Plaintiff's toxic tort claims. Defendant's attempt to treat these claims as entirely distinct is not only legally untenable but also directly undermines the public policy protections afforded to employees who expose criminal conduct and advocate for public safety.

48.     First, it is crucial to note that Defendant has never moved to dismiss the Tamney claim. This omission implicitly acknowledges that Plaintiff has sufficiently pled a violation of public policy, particularly with regard to retaliation for being a victim of Defendant's criminal conduct. The Defendant's factory, which is the focus of Plaintiff's toxic tort allegations, engaged in hazardous operations that resulted in significant harm to Plaintiff's health. In retaliation for Plaintiff's exposure to these dangers, and for her subsequent efforts to report and expose Defendant's unlawful activities, Defendant took negative employment actions, including Plaintiff's wrongful termination. Defendant's refusal to challenge this claim suggests recognition that Plaintiff's termination was a direct consequence of her victimization by Defendant's criminal actions.

49.     However, in a contradictory maneuver, Defendant simultaneously argues that its criminal conduct at the factory is irrelevant to the employment claims. Defendant cannot credibly maintain this position while acknowledging the harmful effects of its environmental violations, which directly impacted Plaintiff's health and well-being. Defendant's attempt to disconnect its unlawful operations from the retaliatory actions it took against Plaintiff is not only illogical but demonstrates a fundamental misunderstanding of the law. If Defendant's activities at the factory were indeed criminal, as Plaintiff alleges, and these activities caused harm to Plaintiff, it follows that any adverse employment actions taken against Plaintiff due to her victimization by those very criminal activities should be viewed as a violation of public policy.

50.     Additionally, Defendant's arguments concerning the statute of limitations further implicate the severity of its actions and the knowledge it had of Plaintiff's suffering. By asserting

— 15 —

that Plaintiff should have immediately discovered the source of the emissions based on building permits, Defendant is, in effect, admitting that it knew its operations were hazardous and capable of causing severe harm. If Defendant is to argue that it knew its factory operations could have deadly consequences, it simultaneously must accept the corollary that Plaintiff's retaliatory termination was directly tied to her exposure to Defendant's criminal conduct. The fact that Defendant harassed, retaliated against, and ultimately terminated Plaintiff after the very actions it now acknowledges as potentially deadly occurred further solidifies the inextricable link between Plaintiff's toxic tort claims and her employment retaliation claims.

51. Moreover, Defendant's attempt to isolate these claims fails to account for the broader legal framework that ties them together. Plaintiff's original Complaint included claims under the Bane Act, the Ralph Act, IIED, and RICO Act, all of which bridge the gap between the employment retaliation and toxic tort claims. These statutes explicitly recognize that unlawful employment actions, including retaliation for being a victim of a crime, are inherently connected to unlawful conduct that affects public safety and the well-being of employees. However, Plaintiff voluntarily refrained from repleading these claims in subsequent filings, based on the Court's May 20 decision, which suggested that doing so might obviate the need for Defendant to file yet another motion to dismiss. Despite this, Defendant filed an additional motion to dismiss, and now, once again, seeks dismissal of claims it has already previously argued. This abuse of the procedural process is not only a violation of the Court's rules but also a direct affront to the public policy considerations at stake, which include the protection of employees from retaliatory conduct and the broader societal interest in upholding environmental laws.

52. Defendant's actions in this case are not simply an attempt to defend against Plaintiff's claims—they are an attempt to evade accountability for criminal conduct and to undermine a legitimate civil rights lawsuit. The public policy implications of this case are immense, as allowing Defendant to continue its pattern of procedural abuse would not only deprive Plaintiff of a fair opportunity to pursue justice but would also undermine the ability of future victims of corporate misconduct to seek legal remedies. The public has a vested interest in ensuring that employers cannot retaliate against employees who expose illegal or dangerous activities, especially

1   when those activities put public health and safety at risk. Allowing Defendant to continue to use

2   technical arguments to dismiss well-pled claims related to its own criminal conduct would set a

3   dangerous precedent, one that would embolden corporations to retaliate against victims of their

4   own unlawful actions without fear of legal consequences.

### J.   Tolling Due to Fraud and Continuing Violations

53.     In addition to the discovery rule, Plaintiff also asserts that tolling is appropriate due

to fraudulent concealment and continuing violations, which Defendant's own conduct directly

supports. Defendant's acknowledgment of the unlawfulness, danger, and potential deadly

consequences of its factory operations, coupled with its deliberate concealment of this knowledge

from Plaintiff, forms the basis for Plaintiff's fraudulent misrepresentation claim. Defendant not

only failed to inform Plaintiff of its hazardous activities, but it also intentionally suppressed the

truth about the source of the toxic emissions that severely harmed Plaintiff. Defendant's actions in

this case amount to a fraudulent cover-up designed to prevent Plaintiff from learning that

Defendant was responsible for the very harm she suffered. Such fraudulent concealment tolls the

statute of limitations, as it would be patently unjust to allow Defendant to benefit from its own

egregious misconduct and subsequent attempts to hide the truth.

54.     Defendant's admissions make clear that it was aware of its own dangerous and

unlawful activities, yet it chose to remain silent when Plaintiff sought answers about the source of

the harmful exposure. Plaintiff made Defendant aware of her exposure and subsequent harm as

early as September 2020, but Defendant deliberately failed to disclose to Plaintiff that its own

operations were the cause. This concealment was not merely an omission; it was a strategic attempt

to mislead Plaintiff and prevent her from discovering the truth, a fraudulent misrepresentation that

directly impacted Plaintiff's ability to pursue her legal claims. It would be a miscarriage of justice

to allow Defendant to benefit from this fraudulent concealment by arguing that the statute of

limitations has expired.

55.     Moreover, as both parties agree that Plaintiff's Tamney claims are based on

Defendant's unlawful retaliation for Plaintiff's victimization by Defendant's criminal conduct, and

for Plaintiff's subsequent legislative actions in response to those harms, Plaintiff's claims also satisfy the requirements for tolling due to continuing violations. Defendant's ongoing illegal activities at its factory, and its continued retaliatory actions against Plaintiff, constitute a series of continuing wrongs that extend beyond the expiration of the statute of limitations. Both the retaliatory actions taken against Plaintiff and the environmental harm caused by Defendant's factory emissions constitute a continuing pattern of misconduct, further justifying tolling of the statute of limitations under the doctrine of continuing violations.

56.    It is paramount to note that allowing Defendant to avoid tolling through its fraudulent conduct would not only result in an injustice to Plaintiff but would also violate public policy considerations. Plaintiff's claims arise from the very type of corporate misconduct that the law seeks to prevent, including criminal acts of witness intimidation and retaliation, wire fraud, and mail fraud. To permit Defendant to escape liability for such behavior would not only undermine the purpose of the statute of limitations but also embolden corporations to engage in similar cover-ups with impunity. Allowing Defendant to avoid tolling by concealing its actions would encourage corporate actors to exploit the procedural protections afforded by the statute of limitations as a shield for their wrongful conduct.

57.    Moreover, public policy strongly favors the tolling of the statute of limitations in cases where fraud or continuing violations are involved, particularly when such violations directly affect public health, safety, and the rights of individuals. Plaintiff's claims are not isolated or theoretical—they represent actual harm to Plaintiff, as well as to a broader group of affected individuals. The Defendant's actions not only harmed Plaintiff but also violated the public trust by subjecting thousands of individuals to dangerous emissions and retaliating against those who sought to expose this harm. The interests of justice demand that Plaintiff's claims proceed, and that Defendant be held accountable for its ongoing and fraudulent misconduct. "*Tort actions which properly state a claim on the pleadings are sufficient as against motions to dismiss in actions alleging strict liability, fraudulent misrepresentation, interference with the plaintiff's property rights, and damages resulting from a trespass.*" 35B C.J.S. Federal Civil Procedure § 833.

58.    Plaintiff has continued to suffer from severe and debilitating health effects related

to the toxic exposures at the apartment complex adjacent to the Apple facility. After experiencing a recurrence of hair loss—similar to what occurred in 2020-2021—Plaintiff has sought medical attention and has begun to receive a diagnosis related to an unusual infection. The pathogen, which thrives in nitrogen-rich environments like those found in toxic waste dumps, appears to be the cause of Plaintiff's hair loss and other symptoms. During Plaintiff's time at the apartment complex, the physical manifestation of this pathogen was evident, and Plaintiff brought concerns to the property manager. At least one other tenant, a fellow Apple employee, also lodged complaints regarding the same observation.

59.     Further investigation has revealed the presence of this pathogen on personal items such as hairbrushes and hairbands, which were not used following the initial hair loss incident and were preserved in storage. Despite Plaintiff's continued notifications to Apple about these findings, and the invitation extended to the company to participate in testing and analysis of the pathogens, Apple has failed to respond meaningfully and has instead made false allegations in relation to discovery while concurrently refusing to allow Plaintiff to contact Judge Westmore. This ongoing exposure to harmful chemicals and pathogens continues to cause significant physical harm, which is exacerbated by Apple's refusal to acknowledge or address the severity of the situation.

60.     It would be contrary to public policy to allow the statute of limitations to bar Plaintiff's claims while the full extent of the harm continues to be uncovered. Plaintiff has diligently investigated the ongoing physical harm caused by the toxic exposure, despite facing significant personal and financial challenges, including crippling debt and limited resources. It is telling that Plaintiff continues this investigation in good faith, seeking medical attention and pursuing a diagnosis, while Apple—despite being continuously notified—has not participated in any way other than through harassment and deflection. Apple's refusal to engage with the ongoing discovery of harmful pathogens and its continued neglect of Plaintiff's serious health concerns further underscores the importance of allowing the statute of limitations to be tolled during this period of investigation. Denying such tolling would effectively prevent the full extent of Plaintiff's claims from being heard and would undermine the public interest in holding companies accountable for environmental violations that cause harm to individuals and the community at large.

1

2

**K.  THE STANDARD FOR IIED CLAIMS AGAINST CORPORATIONS, EMPLOYEES, AND EX-EMPLOYEES**

3

61.    Apple argues that it cannot be held liable for IIED based on the actions of its

4

employees, specifically citing the Plaintiff's ex-employee status and the conduct of Appleseed, a

5

former employee of Apple's Global Security division. However, California, New York, and

6

Massachusetts law do not bar IIED claims against corporations, and there is no legal requirement

7

that an ex-employee must have an ongoing employment relationship for such claims to proceed.

8

*Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009);[8] *Murray v. Oceanside Unified School District,* 79 Cal.

9

App. 4th 1338 (2000);[9] *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148 (1987).[10]

10

62.    The plaintiff's allegations—including threats, harassment, exposure to harmful

11

substances, and the orchestrated misconduct involving multiple employees acting under Apple's

12

direction—go far beyond what is considered ordinary or even tolerable within the workplace. To

13

dismiss this claim on the grounds that it is uncommon for such claims to survive a motion to dismiss

14

would effectively establish a precedent that leaves individuals who are subjected to this level of

15

corporate retaliation without recourse. It would suggest that only the most extreme cases of

16

misconduct—where corporate involvement is irrefutable—are allowed to proceed, while the vast

17

majority of employees subjected to less extreme, but nonetheless damaging behavior, would be left

18

without remedy.

19

63.    It is not uncommon for corporate misconduct, especially when coupled with

20

_____

21

[8] The California Supreme Court held that a claim for IIED could proceed based on the allegation that an

22

employer subjected an employee to retaliatory and extreme conduct after the employee reported unlawful activities (in this case, the company's failure to follow regulations and concerns about corporate practices). While the Court ultimately focused on retaliation claims, it recognized that emotional distress claims could

23

stem from the employer's extreme and outrageous conduct in retaliation.

24

[9] The court ruled that the plaintiff's IIED claim could proceed based on allegations that her employer had retaliated against her for whistleblowing on misconduct related to violations of the law and unsafe working

25

conditions. The court found that the plaintiff's allegations of extreme behavior by the employer were sufficient to overcome a motion to dismiss. The plaintiff alleged that after she reported the misconduct, she

26

faced severe emotional distress, which could potentially form the basis for an IIED claim.

[10] The California Supreme Court allowed the IIED claim to proceed, holding that the employer's alleged

27

retaliation against a whistleblower could be extreme enough to support an IIED claim. The plaintiff alleged that after reporting the misconduct, she was subjected to threats, harassment, and other extreme behavior

28

by her employer.

1  extreme retaliation, to cause employees to abandon their claims, either out of fear of further harm,

2  loss of employment, or financial distress. This is exactly the objective of corporations who engage

3  in these scorched earth tactics.

4      64.    This creates a dangerous precedent where the conduct at issue—actions that are

5  criminal in nature when perpetrated by individual actors outside of a corporate context—is allowed

6  to be overlooked when committed by a corporation's agents and employees, especially when the

7  corporation's management is complicit, if not actively directing, such behavior. It would effectively

8  shield corporations from accountability for grave misconduct simply because it is rare for

9  employees to persist in litigation against their former employers who have subjected them to such

10  harmful actions.

11      65.    There is an established legal precedent that allows individuals to bring IIED claims

12  against their former employers when those claims arise from the employer's conduct or the

13  conduct of its agents, even if those agents are former employees. *See, e.g.*, *McGinn v. Exec. Office of*

14  *Energy & Envtl. Affairs*, Civil Action No. 19-cv-11551-IT (D. Mass. Sep. 30, 2020);[11] *Jenkins v.*

15  *Yellowstone Props., Inc.*, 17-CV-7764 (VEC) (S.D.N.Y. Sep. 12, 2019);[12] *Vaughn v. American Multi-*

16  *Cinema, Inc.*, 09 Civ. 8911 (BSJ) (S.D.N.Y. Sep. 14, 2010).[13]

17      66.    Apple's motion to dismiss the Plaintiff's claim for intentional infliction of emotional

18

19

20

21

---

22  [11] The court allowed the IIED claim to proceed. The plaintiff's claim related to retaliation for whistleblowing and environmental issues, which was not dismissed at the motion-to-dismiss stage. The court acknowledged

23  the serious nature of the allegations and permitted the IIED claim to survive initial scrutiny.

24  [12] The plaintiff brought IIED claims alongside allegations of discrimination, hostile work environment, and whistleblower retaliation. The court allowed the IIED claim to proceed, finding that the allegations of

25  harassment and retaliation, particularly in the context of whistleblowing, were sufficiently serious to warrant further legal examination.

26  [13] This case involved a claim of retaliatory termination under New York's Whistleblower Law, with the plaintiff also alleging IIED. The court allowed the IIED claim to proceed, rejecting the employer's motion

27  to dismiss. The case involved retaliation after the plaintiff reported unsafe working conditions and other

28  concerns. The court found that the plaintiff's allegations of extreme and outrageous conduct were enough to survive a motion to dismiss.

distress (IIED) misrepresents both the nature of the allegations and the applicable legal standards.[14] A fact issue will preclude the granting of a motion to dismiss the complaint when it has legal probative force as to a controlling genuine issue of material fact, with examples including: whether the defendant is an *"employer"* within the meaning of a particular statute; a question of respondeat superior; whether knowledge of the plaintiff's agent should be imputed to the plaintiff; reasonable reliance; or whether some act has been coerced.[15]

67.    As established in the Complaint, the conduct at issue goes far beyond the downplayed version Apple provides in its motion. The Plaintiff has outlined severe, reprehensible actions directly tied to retaliation for whistleblowing activities, misconduct that was committed by Apple's employees and agents within the scope of their employment and as part of a business-related scheme to stifle protected activities.

68.    Apple's argument relies on an unduly narrow and misleading interpretation of the law. If taken to its logical extreme, Apple's position would effectively prevent former employees from ever bringing claims for IIED—particularly in cases where, as here, the actions of the employer's agents were conducted at the behest of the employer and directly tied to business interests. If the law were to adopt Apple's view, it would nullify the ability of workers, including ex-employees, to seek recourse for harm caused by their former employers' misconduct, even when the actions in question are intentionally harmful and undertaken with malice.

69.    Further, Apple's argument presupposes that IIED claims should only be actionable in the most extreme scenarios—namely when a CEO or high-level officer personally orders the intentional infliction of emotional distress. This is a flawed and overly restrictive standard that disregards both the legal principles underlying IIED claims and the realities of corporate

---

[14] *Nanouk v. United States*, 974 F.3d 941 (9th Cir. 2020).—("Issue of whether policy considerations underlying government's delay in discovering and remediating hot spot of contaminated soil on Air Force radio relay station site were grounded in social, economic, and political policy involved fact questions that could not be resolved on motion to dismiss neighboring property owner's nuisance and trespassing claims against United States pursuant to Federal Tort Claims Act's (FTCA) discretionary function exception."
[15] See e.g., *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325 (4th Cir. 1996); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410 (3d Cir. 1999); *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 48 Fed. R. Serv. 3d 540 (3d Cir. 2000); *Graehling v. Village of Lombard*, Ill., 58 F.3d 295, 11 A.D.D. 378 (7th Cir. 1995).

operations, where such conduct is often carried out by employees and agents of the corporation, at the direction of corporate leaders or to further corporate goals. Labor-management disputes and civil rights cases also utilize the conspiracy doctrine. § 1233 Statement of Particular Matters— Conspiracy, 5 Fed. Prac. & Proc. Civ. § 1233 (4th ed.)[16]

## L. The "Intent" for IIED – Fear of Cancer is defined in Firestone.

70.     In addition to the distressing harassment and retaliation directed by Apple and its agents, it is essential to understand that the plaintiff's claim of emotional distress arises from the profound physical harm caused by Apple's illegal semiconductor fabrication facility. Contrary to Apple's attempt to minimize the plaintiff's suffering to vague and inconsequential symptoms, the plaintiff experienced severe, life-threatening medical issues as a result of exposure to the toxic emissions from the factory. These issues are well-documented in medical records, including laboratory tests, cardiology and dermatology visits, MRI scans, and physical evidence of tumors and growths, which required surgical removal. The plaintiff's heart rate and blood pressure were dangerously affected, arrythmia was detected, and numerous other serious health problems, including burns and rashes, were caused by Apple's environmental misconduct.

71.     Apple's motion to dismiss attempts to downplay the plaintiff's extensive and documented medical issues resulting from exposure to the toxic emissions at its illegal semiconductor fabrication facility. The plaintiff did not simply experience vague symptoms of dizziness, as Apple would like the court to believe; rather, the evidence overwhelmingly supports that the plaintiff suffered severe, life-threatening health issues directly linked to the factory's environmental violations. The plaintiff's medical records, spanning numerous specialists and diagnostic tests, paint a clear picture of the physical devastation caused by Apple's reckless actions.

72.     The plaintiff's heart rate dramatically slowed, as captured on an Apple Watch, and

---

[16] See, e.g., Rodriguez *v. Bar-S Food Co.,* 539 F. Supp. 710 (D. Colo. 1982) -- A complaint filed by members of a union local alleging that the former employer, the former employer's parent corporation, and the successor employer conspired to deprive the members of their rights was sufficient to state a civil conspiracy claim.

arrythmia was confirmed by heart monitor logs, with blood pressure spikes and volatility documented through 24-hour blood pressure monitors and at-home readings. Dermatology records show severe burns and rashes, accompanied by photographic and video evidence of these conditions. Tumors and growths, which were discovered through ultrasound and MRI scans, required physical removal via surgery. These symptoms were not a result of mere dizziness but the direct and dangerous impact of toxic chemical exposure. Apple's attempt to minimize or dismiss the severity of these issues is not only a distortion of the facts, but an offensive attempt to downplay the catastrophic harm it has caused to the plaintiff. This disregard for the plaintiff's well-being further underscores the malicious intent behind Apple's actions, which are central to the plaintiff's claims of intentional infliction of emotional distress.

73. Apple's argument that the plaintiff must plead that Apple specifically knew the plaintiff was in the apartment at the time the harmful chemicals were released, with the intent to harm the plaintiff, is a misreading of both the law and the allegations in this case. The applicable legal standard for an IIED claim involving fear of cancer, as articulated in *Firestone v. Southern California Gas Co.*, does not require the plaintiff to establish that the defendant had specific knowledge of the plaintiff's location or was actively targeting the plaintiff. Instead, the focus is on whether the defendant's conduct was so extreme and outrageous that it could reasonably be expected to cause emotional distress to someone in the plaintiff's position—someone who was exposed to a dangerous and toxic environment as a result of the defendant's actions.

74. In *Firestone*, the California court clarified that the standard for IIED in such cases does not require a specific intent to harm the plaintiff, but rather the knowledge that a person like the plaintiff—someone living in close proximity to the release of toxic chemicals—would be exposed to the harmful substance. The law recognizes that if a defendant's actions are outrageous enough to expose individuals to toxic substances, and the defendant knew that such exposure would cause harm or fear, the defendant can be held liable for the emotional distress that results.

75. Apple's argument also mischaracterizes the judge's prior ruling. While the Court's order may have been unclear, the law is clear that the plaintiff need not prove that Apple specifically targeted the plaintiff in order to satisfy the IIED standard. Instead, it is enough to plead that Apple

— 24 —

1  knew its actions—releasing toxic chemicals into the environment where the plaintiff lived—would
2  expose individuals like the plaintiff to harm and emotional distress. This is consistent with
3  California law, which does not impose a requirement for specific targeting of the plaintiff, but rather
4  focuses on the outrageousness of the conduct and the foreseeability of harm.

5    76.    To the extent that Apple now claims that the higher standard of specific intent
6  applies, this is a misinterpretation of both the facts and the legal standard. The plaintiff has alleged,
7  and will continue to prove, that Apple's conduct was outrageous, reckless, and directly linked to
8  the distress caused by the toxic exposure, which resulted in ongoing emotional harm, including the
9  well-founded fear of developing cancer. Apple's insistence on a higher standard of intent is
10  misplaced and does not align with the principles outlined in California law.

11    77.    The plaintiff's IIED claim cannot be viewed in isolation from the broader context
12  of Apple's conduct, which involves a sustained and escalating campaign of harm that began with
13  the company's actions leading to the plaintiff's near-death exposure to toxic emissions at its illegal
14  factory. Apple's actions in nearly killing the plaintiff through its reckless environmental violations
15  created a life-threatening situation, the effects of which are compounded by its subsequent
16  retaliation, harassment, and firing. What would have been egregious conduct on its own is
17  magnified exponentially by the knowledge that Apple had already inflicted catastrophic harm on
18  the plaintiff's physical and mental well-being.

19    78.    If a normal person were to realize that their actions had nearly caused someone's
20  death, a reasonable response would be to express genuine concern for the victim's well-being, offer
21  to make amends, and assure that such an event would never happen again. Instead, Apple's
22  response has been to escalate the harm. Rather than attempting to reconcile, provide restitution,
23  or even acknowledge the magnitude of its misconduct, Apple retaliated by firing the plaintiff,
24  ruining their reputation, and causing further emotional distress through the abusive actions of its
25  agents. In their motion to dismiss, Apple attempts to downplay these actions, trivializing the gravity
26  of the situation and dismissing the plaintiff's pain, which only serves to highlight the intentional
27  nature of their misconduct. Apple's actions reflect an awareness that they had already caused
28  irreparable harm, but instead of taking responsibility or showing remorse, they continued to act

1    with cruelty and indifference, compounding the distress caused by their previous actions.

2    79.    The intentionality of Apple's conduct is evident in the way it escalated its harmful

3    behavior, knowing full well the profound physical, emotional, and professional damage it had

4    already inflicted. This pattern of abuse demonstrates that the harm was not accidental, nor was it

5    simply a response to an isolated event. Instead, it is clear that Apple has actively sought to

6    perpetuate and deepen the distress caused to the plaintiff, which strengthens the basis for the IIED

7    claim.

8    80.    In conclusion, the plaintiff has sufficiently pleaded that Apple knew or should have

9    known that its conduct would expose the plaintiff to harm and emotional distress. To require a

10    pleading standard higher than that set forth in *Firestone* is not only unnecessary but also contrary

11    to established law governing IIED claims in the context of toxic exposure.

12    **M.  THE PLAINTIFF'S ALLEGATIONS OF IIED ARE NOT ONLY**
13    **PLAUSIBLE, BUT DEMONSTRABLY SEVERE**

14    81.    Apple continues to argue that the Plaintiff's allegations fail to meet the threshold

15    for IIED, asserting that the actions described do not constitute "outrageous" conduct under the

16    applicable legal standard. However, as previously detailed, the conduct at issue is precisely the type

17    of outrageous conduct that courts have held actionable in IIED claims.

18    82.    Moreover, Apple's failure to take any corrective action after being made aware of

19    the conduct suggests an intentional disregard for the Plaintiff's rights and well-being. The failure

20    to intervene or act in response to such extreme misconduct reinforces the Plaintiff's claim that

21    Apple's conduct was not merely negligent but intentional and intended to cause harm in

22    furtherance of Apple's broader strategy to silence the Plaintiff. Apple's argument that these acts

23    were isolated or unintentional is unpersuasive and ignores the broader context in which these

24    actions occurred, specifically the coordinated campaign of retaliation orchestrated by Apple against

25    a whistleblower.

26    83.    Further, Apple's attempt to dismiss Plaintiff's legitimate concern for her eight-

27    pound dog's health due to the environmental hazards caused by its operations is not only a

28    misguided interpretation of the law but also an attempt to censor Plaintiff's real-life anxieties

caused by Defendant's conduct. The notion that Plaintiff should not be allowed to express worry over the potential harm to her beloved pet is an affront to the fundamental principles of justice and the ability of a litigant to fully articulate the emotional, psychological, and real-life consequences of a defendant's wrongful actions.

84.     Plaintiff's concern about the potential harm to her dog, including the fear that her pet may develop cancer due to the toxic environment caused by Apple's operations, is not merely a trivial complaint. It is a direct response to the pervasive environmental hazards Apple has knowingly inflicted on Plaintiff's surroundings. Apple's attempt to dismiss this concern by framing it as "*irrelevant*" or "*unreasonable*" is a transparent effort to downplay the serious impact of their environmental violations on both Plaintiff and her pet. The anxiety caused by exposure to toxic substances is valid and real, and it is precisely the kind of harm that Plaintiff is entitled to bring before the court.

85.     California law and policy acknowledge that the legal rights of pet owners extend beyond the mere ownership of an animal as property. Under California law, pets are regarded as more than just property. While animals may still be classified as property in certain contexts, California courts have recognized the emotional value pets provide to their owners, and the harm that comes from seeing them injured or threatened by negligence. In cases involving harm to pets, courts have allowed pet owners to seek compensation not only for the cost of veterinary care but also for the emotional distress caused by the harm to their animals.

86.     In *Crosby v. L.A. County*, 124 Cal.App.4th 1151 (2004), for example, the court acknowledged that the "*emotional distress suffered by the owner of an animal is compensable when the animal is harmed or killed due to negligence or other wrongful acts.*" Furthermore, California's Civil Code Section 3340 allows pet owners to seek damages for the wrongful killing of their animals, reflecting the recognition of pets as beings of emotional importance to their owners. While this statute does not specifically address the worry or anxiety caused by the fear of future harm to a pet, it sets a broader precedent for the legal recognition of emotional distress claims related to pets.

87.     Therefore, Plaintiff's concern for her dog is not an extraneous or irrelevant matter to be discarded. It is rooted in legitimate anxiety over the potential health consequences resulting

— 27 —

from Defendant's conduct. Plaintiff's claim is not a vague or speculative complaint—it is a direct consequence of the toxic emissions and the emotional toll caused by Apple's hazardous actions. Dismissing these claims would effectively silence Plaintiff's real-life concerns and the emotional harm she suffers as a result of Defendant's environmental misconduct.

88.    Furthermore, Apple's motion under Rule 12(b)(6) or 12(f) is inappropriate for striking such claims. Rule 12(b)(6) motions are designed to address the legal sufficiency of claims, not to determine the emotional or psychological impacts of a defendant's conduct on the plaintiff's personal life. Rule 12(f) motions, which seek to strike certain allegations from a pleading, are equally inappropriate here, as Plaintiff's concern for her dog is not "*immaterial*," "*impertinent*," or "*scandalous*." It reflects the real-life consequences of the Defendant's actions. Plaintiff's emotional distress, including worry about her pet's health, is a relevant and legitimate claim of harm that should not be dismissed or struck from the record.

89.    Apple's motion to dismiss Plaintiff's concerns about her dog's potential harm should be denied. Plaintiff has every right to bring forward the emotional and psychological impact of Defendant's actions, including the distress caused by fear for her pet's health. Apple's effort to downplay or censor these concerns is both legally unsound and a violation of Plaintiff's right to fully present the scope of the harm caused by Defendant's conduct.

90.    Apple also seeks to minimize the role of Appleseed in the harassment campaign and underlying events, disregarding the fact that Appleseed's actions were carried out within the scope of her employment, under Apple's direction, and with Apple's full knowledge. Appleseed, as a member of Apple's Global Security team, had a professional mandate to prevent "leaking" and protect corporate interests, which included retaliating against individuals who engaged in whistleblowing activities that might harm Apple's business interests. This crucial context—now bolstered by the Plaintiff's new evidence of coordinated misconduct—further supports the Plaintiff's IIED claim against Apple.

91.    Apple's attempt to dismiss the IIED claim without addressing the pattern of retaliatory actions that have now been thoroughly documented—conduct that includes the wrongful and intentional use of explicit images as an alleged justification for the Plaintiff's firing—

reveals the corporate malfeasance at the core of this case. It is apparent that Appleseed's actions were carried out with the knowledge and support of Apple and were designed to achieve the corporate aim of retaliating against and punishing the Plaintiff for engaging in protected whistleblowing activities. (See *Motion to Amend*).

### N.    Tolling & Scope of Cal. Labor Code Claims:

92.    Defendant claims that Plaintiff's § 1102.5 retaliation claim is time-barred because Plaintiff did not allege equitable tolling. However, Plaintiff filed a complaint with the California Department of Industrial Relations (DIR) in August 2021, which tolled the statute of limitations for this claim. The DIR complaint sufficiently put Defendant on notice of Plaintiff's retaliation claims, which involved reporting workplace safety violations and environmental hazards. Defendant also argues that the DIR complaint did not provide sufficient notice to Defendant regarding the specific legal violations now alleged in this lawsuit. This argument is without merit, as Plaintiff's DIR complaint referenced workplace safety and environmental concerns that directly relate to the statutory protections under § 1102.5.

93.    Apple's argument that the plaintiff's § 1102.5 claim is barred by the statute of limitations due to the DIR complaint allegedly not providing notice of the specific legal violations now referenced in the current lawsuit is not only factually incorrect but also legally unsupported. The law clearly provides that the filing of a complaint with the California Department of Industrial Relations (DIR) tolls the statute of limitations for claims related to retaliation, including claims under § 1102.5, as long as the claim is related to the general subject matter of the DIR complaint.

94.    This tolling provision is designed to allow an employee to seek redress through the proper administrative channels without the risk of losing their rights due to technicalities. The plaintiff filed a timely complaint with DIR in August 2021, and the failure of the agency to investigate within a reasonable time frame is not the plaintiff's fault, nor does it negate the tolling effect. In this case, when the plaintiff was forced to remove the complaint to federal court due to the substantial delays at DIR, the tolling effect continued to apply to the claims filed in the current lawsuit.

95.     Apple's contention that the tolling only applies to workplace safety claims is unfounded. The law does not limit tolling to a narrow interpretation of the complaint's subject matter. The filing of the DIR complaint placed Apple on notice of the general allegations of retaliation for raising concerns about workplace safety and other related matters, including anti-retaliation provisions, privacy violations, and other forms of discrimination. The plaintiff's claims in the current lawsuit are simply a more detailed and formal articulation of the same core facts and concerns raised directly to Apple in 2021,  and to multiple agencies over the last three years.

96.     The fact that the plaintiff's complaint now includes specific references to additional laws, such as the NLRA, the Civil Rights Act, and other relevant statutes, does not change the fact that Apple was already put on notice of the retaliation allegations when the DIR complaint was filed. Apple cannot claim surprise over these specific allegations, as the core of the claims has been consistently communicated, both before and after the removal of the case to federal court.

97.     Regarding Apple's repeated claims of lack of notice, it is important to emphasize that a 12(b)(6) motion must be evaluated based on the current complaint in the current lawsuit, not on any previous filings or complaints the plaintiff may have made in the past. The defendant's challenge to the claims should be directed at the allegations in the operative complaint, not at any perceived deficiencies in prior complaints or investigations. Apple's continued attempts to dismiss claims based on a misunderstanding of the statute of limitations, as well as their argument that the plaintiff's current allegations are "new," ignore the fundamental principle that the current lawsuit is based on the facts and claims that have already been brought to their attention through detailed memos, emails, and formal filings—most notably, the issue confirmation sent to Apple's legal and employee relations departments in August 2021.

98.     Moreover, Apple's claims that the NLRA and Department of Labor cases are "*new*" to them are similarly disingenuous. These actions were filed simultaneously with the DIR complaint in August 2021, and Apple's legal team filed a notice of appearance in the NLRA case just days after the complaint was filed. Apple's argument that these claims were somehow not included in their notice process is without merit. If Apple's legal theory were correct, the test for notice would not be whether the defendant has been properly informed of the claims in the current

1  lawsuit, but rather whether every single attorney and law firm representing the defendant has been

2  personally notified of every single previous complaint and case ever filed by the plaintiff. This is an

3  absurd standard and would effectively nullify the legal process as we know it. Instead, the proper

4  test is whether the defendant was on notice of the claims in the current lawsuit, which is plainly the

5  case here.

6       99.  Plaintiff's claim under § 98.6 is similarly not time barred. Plaintiff filed the DIR

7  complaint, which tolled the statute of limitations for this claim. Defendant's argument that Plaintiff

8  failed to establish causation is also without merit. Plaintiff's claims are based on retaliation for her

9  protected activities, including raising concerns about environmental hazards and workplace safety.

10  Plaintiff has sufficiently alleged retaliation related to her protected wage disclosures under these

11  provisions. Defendant's failure to intervene and address this retaliation does not absolve Defendant

12  from liability under these statutes.

13       100.  Apple's attempt to dismiss Plaintiff's Labor Code Section 98.6 claim for penalties,

14  and the associated claims under Sections 232 and 232.5, reflects a fundamental misunderstanding

15  of the factual basis of Plaintiff's claims and a deliberate effort to sidestep the core issues in this

16  case. Apple suggests that the Section 98.6 claim is time-barred, despite clear evidence of ongoing

17  retaliation that ties directly into Plaintiff's protected activities, including her interactions with

18  social media, press involvement, and internal communications that Apple admits to monitoring.

19       101.  First, Plaintiff's claim under Section 98.6 is not premised solely on the filing of a

20  DIR complaint in 2021. Rather, it is rooted in a broader pattern of retaliation—both formal and

21  informal—that occurred well after the August 2021 complaint. This includes the Defendant's

22  surveillance of Plaintiff's social media, internal discussions about workplace safety, and the

23  company's retaliation following those activities. Apple is well aware of these activities. They

24  monitored Plaintiff's social media, interrogated her about her online posts, and later admitted to

25  doing so in internal communications. Apple cannot now claim ignorance about these retaliatory

26  actions, especially considering that the Defendant was actively engaged in the investigation of

27  Plaintiff's actions outside the workplace.

28       102.  Apple also attempts to downplay the significance of the NLRB charge about pay

filed just seven days before Plaintiff was fired. This charge, which was reported in the press, and the subject of a Shareholder Proposal regarding unlawful confidential rules at the company, filed in Aug. 2021, directly pertains to the retaliatory conduct that Plaintiff faced for engaging in protected activities. Apple's suggestion that these events did not alert the company to the need for investigation is not only disingenuous but ignores the clear public record. Apple's own involvement with the press and its subsequent actions against Plaintiff only serve to underline the ongoing retaliation and the company's knowledge of Plaintiff's protected activities. The public nature of these events, including the press reports and the NLRB charge, demonstrates that Apple knew or should have known that its actions were retaliatory.

103.    Apple further argues that the 2021 DIR Complaint could not have alerted them to investigate the facts underlying the Section 98.6 claim, but this is a mischaracterization of the timeline and the facts. The retaliation did not stop after the August 2021 DIR Complaint; instead, it escalated, with Plaintiff being subjected to further harassment, surveillance, and ultimately, termination. Apple's claim that the earlier complaint does not establish a nexus between the retaliatory actions and the Section 98.6 claims is unconvincing. Equitable tolling applies because Plaintiff's allegations involve a continuous pattern of retaliatory actions, not isolated events that ended with the filing of the 2021 complaint.

104.    Moreover, Apple's argument that Plaintiff has not properly pled knowledge of her wage disclosures under Sections 232 and 232.5 is disingenuous. Plaintiff has clearly stated that she openly discussed her wages on social media, which was actively monitored by Apple. In fact, Apple's interrogation of Plaintiff about these conversations, and its knowledge of Plaintiff's social media activity, directly links the retaliation to these disclosures. Plaintiff does not need to demonstrate that Apple's executives specifically reviewed every social media post in real-time. The key issue is that Apple knew, or had reason to know, about these disclosures and acted in direct retaliation, as evidenced by the company's increased surveillance, and questioning of Plaintiff about her online activities.

105.    It is also critical to recognize that Apple's claim that Plaintiff failed to establish a causal link between the disclosures and retaliatory actions is based on a selective reading of the

— 32 —

1   facts. The timeline is clear: Plaintiff posted about her wages, Apple surveilled her social media and

2   Slack activity, Plaintiff was questioned about it, and then she faced retaliation, culminating in her

3   termination. This sequence of events provides the causal link needed to support her claims under

4   Sections 232 and 232.5. To claim that these disclosures and the resulting retaliation are

5   disconnected is to ignore the plain facts that Apple itself created by actively monitoring Plaintiff's

6   activities and engaging in retaliatory actions. Further, according to the second sentence of Rule

7   9(b), malice, intent, knowledge, and other conditions of mind may be alleged generally.[17]

8          106.    Finally, Apple's argument that Plaintiff's claims are time-barred under Section 98.6

9   is misplaced. The claim is not about the DIR complaint alone—it is about ongoing retaliation and

10  retaliatory conduct that continues up to and beyond Plaintiff's termination. The one-year statute

11  of limitations does not bar these claims because the actions Plaintiff complains of are part of an

12  ongoing pattern of unlawful retaliation. The timeline of Plaintiff's retaliation claims, including the

13  press reports, social media posts, and NLRB charge, make clear that these events occurred within

14  the applicable time frame and that the retaliatory actions were not isolated to one single event or

15  complaint.

16         107.    Apple's attempt to dismiss these claims on the grounds of timeliness and failure to

17  plead knowledge is not only legally flawed but also an attempt to evade responsibility for its

18  retaliatory conduct. The evidence is clear: Apple knew of Plaintiff's protected activities, monitored

19  her social media, and acted in direct retaliation. The claims under Labor Code Sections 98.6, 232,

20  and 232.5 are well-founded, timely, and supported by clear facts. Apple's motion to dismiss these

21  claims should be denied.

22         108.    In response to Apple's baseless assertion that it lacked knowledge of Plaintiff's wage

23  disclosures, Plaintiff is filing a request for judicial notice of news articles published at the time,

24  which reported on the pay complaints and allegations. These articles are highly relevant, as they

25  were widely circulated and explicitly discussed Apple's compensation practices, making it clear

---

[17] § 1241 Statement of Particular Matters—Fraud, Mistake, and Conditions of Mind, 5 Fed. Prac. & Proc. Civ. § 1241 (4th ed.); *Pleading Conditions of the Mind under Rule 9(b): Repairing the Damage Wrought by Iqbal,* 41 Cardozo L. Rev. 1015 (2020).

that Defendant was aware of the issues raised publicly. Furthermore, Plaintiff could also submit additional evidence to establish Apple's knowledge of her wage disclosures, including screenshots of relevant Slack conversations, Twitter posts, and other communications where Plaintiff openly discussed her wage and defendant admitted to monitoring her social media. However, such evidence is not necessary to survive this motion—Apple's attempt to force a full evidentiary hearing at the motion to dismiss stage is nothing more than a tactic to complicate and delay the proceedings. This is precisely the type of issue that should be addressed during discovery, not prematurely in a Rule 12(b)(6) motion.

### O.   ALLEGATIONS OF "NEW" ALLEGATIONS

109.    Apple claims that Plaintiff's nuisance claim now contains new allegations unrelated to the statute-of-limitations problem, particularly regarding Apple's conduct (e.g., the EH&S legal matters and testing inspections, as well as Plaintiff's personal injury, including hives and yellowing of clothing). These are not new allegations. They were in prior filings and are further elaborations of facts previously presented in the case. If Apple attempts to exclude these as "*new*," they are disregarding the fact that these allegations were always part of the factual basis supporting Plaintiff's claims and directly discussed on prior filings. For instance, Plaintiff previously included actual photographs of the yellowed clothes.

110.    Defendant claims that Plaintiff has introduced new allegations in the amended complaint that were not allowed by the Court's prior orders. Specifically, Defendant argues that Plaintiff expanded the factual bases for her claims (e.g., new allegations of harm in the private nuisance claim and expanded facts in the IIED claims). These amendments, however, were made to clarify and address Defendant's prior motions and the Court's instructions. Plaintiff's amendments do not introduce new legal theories or impermissible claims, and the allegations are consistent with the original complaint. Therefore, the motion to dismiss based on unauthorized amendments should be denied.

111.    Apple claims Plaintiff added new statutory violations (environmental laws) that were not part of Plaintiff's prior filings and that the Court only allowed you to amend to plead

— 34 —

tolling. The inclusion of environmental violations isn't a new claim. Rather, Plaintiff's complaints about workplace safety and toxic emissions that were made well before the specific statutory references were clarified. These violations are not newly alleged legal grounds but are part of the broader set of complaints that have consistently been the foundation of Plaintiff's retaliation claim. Plaintiff's previous complaints, whether expressed in general terms or with more specificity, always referenced environmental concerns.

112.    Apple's claim that Plaintiff has added new allegations in Plaintiff's post-termination IIED claim (such as impersonation on social media and additional attacks) should also be addressed. These are not new facts. They are details supporting Plaintiff's IIED claim based on Apple's continued harassment, which Plaintiff has consistently alleged. The fact that these attacks continued post-termination is crucial to understanding the ongoing harm Plaintiff has faced. If these instances were not detailed in the prior filings does not make them *"new"* but rather an important part of illustrating the continuation of the retaliatory conduct, which is relevant to Plaintiff's IIED claim. Further, most of these were noted in prior filings – but Plaintiff literally does not have the time to go back and find all of these references document them and report them to the court. If this litigation is a competition of who can dedicate the most resources to working on legal filings – the defendant will win, but that is not the point of lawsuits.

113.    Apple claims the Plaintiff introduced entirely new examples of complaints Plaintiff raised (e.g., disparate impact of chemical exposure, safety concerns in 2021), as well as additional adverse actions (e.g., failure to provide performance reviews, lack of safety responses, etc.). These are not *"new"* allegations as they were in multiple prior complaints. Plaintiff cannot rebut all of these false allegations against her without exceeding page limits and filing deadlines, which is certainly one of the aims of Defendant making these accusations.

### P.    Conclusion

114.    Defendant's motion to dismiss should be denied in its entirety. Plaintiff's claims are timely, legally sufficient, and supported by factual allegations that meet the required legal standards. Defendant's arguments are based on incorrect interpretations of the law and facts, and

1    they improperly seek to resolve issues of fact at this early stage of the litigation. The claims should

2    be allowed to proceed to discovery. For these reasons, Plaintiff respectfully requests that the Court

3    deny Defendant's motion to dismiss and allow this case to move forward.

4        115.    "Generally, questions of fact cannot be resolved or determined on a motion to

5    dismiss a complaint for failure to state a claim on which relief can be granted. It is not for the court

6    to weigh the evidence as fact-finding has no part in resolving a motion to dismiss for failure to state

7    a claim. Accordingly, an action may not be summarily disposed of on a motion to dismiss where it

8    involves a question of fact which should be heard and determined at the trial. The plaintiff is not

9    taken to have consented to the determination of controverted questions of fact averred in the

10   complaint in a summary manner or otherwise than by a formal trial." 35B C.J.S. Federal Civil

11   Procedure § 853

12       116.    Plaintiff respectfully asserts that she does not concede any argument made by the

13   Defendant. While the Court may have noted that some of Plaintiff's points appear to merit further

14   discussion, Plaintiff maintains that all of her claims are valid and deserving of full consideration.

15   Plaintiff is a single individual, currently grappling with serious physical health issues, who has been

16   given only two weeks to respond to yet another motion filed by a team of attorneys representing a

17   well-resourced Defendant.

18       117.    Furthermore, this case is already burdened by a docket of 149 entries, and the

19   Defendant has not even filed a formal answer yet. It is critical that Plaintiff's case is heard in its

20   entirety, and she requests that the Court permit her to amend her complaint to address any points

21   on which the Court may find merit in the Defendant's arguments. This includes the concurrent

22   motion to re-add the RICO, Ultrahazardous Activities, Bane, and Ralph claims, which are central

23   to Plaintiff's allegations and to ensuring the full scope of her claims is presented. Plaintiff does not

24   consent to the conversion of any pending motion into a Rule 56 motion and instead demands a full

25   evidentiary hearing as provided to her by law.

26       118.    *"The importance of citizen enforcement in environmental matters cannot be overstated.*

27   *Private parties can help fill the gap when government agencies lack the resources to pursue enforcement of*

28   *environmental laws, and ensure that violators of environmental regulations are held accountable." Natural*

1    *Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 993 (9th Cir. 2000).

2

3

4    Dated: January 22, 2025.

5

6    Signature:

7

8

9

10

11    —————————————————

12    **/s/ Ashley M. Gjovik**

13    *Pro Se Plaintiff*

14
       **Email**: legal@ashleygjovik.com
15    **Physical Address**: Boston, Massachusetts
       **Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
16    **Phone**: (408) 883-4428

17

18

19

20

21

22

23

24

25

26

27

28