**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

# Northern District of California

|  |  |
|---|---|
| **ASHLEY GJOVIK**, *an individual*,<br><br>        Plaintiff,<br><br><br>    vs.<br><br><br>**APPLE INC**, a corporation,<br>        Defendant. | CAND No. 3:23-CV-04597-EMC<br><br>9th Cir No.: 24-6058<br><br>**Plaintiff's Memorandum of Points & Authorities In Support of the Motion to Amend & Supplement the Complaint**<br><br><br>**Motion Hearing:**<br>Dept: Courtroom 5 (& Zoom)<br>Judge: Honorable Edward M. Chen<br>Date: February 27, 2025<br>Time: 1:30 PM PT |

# Table of Contents

**Introduction** ................................................................. **1**

    Factual Background on Newly Discovered Evidence ......................... 2

    Factual Background on Batterygate ................................. 3

**Legal Standard for Amendment** ................................... **4**

**Change of Circumstances** ......................................... **5**

    New Legal Basis: California Civ. Code § 1708.85 ............................. 6

**Request to Replead the Bane and Ralph Civil Rights Acts, Dodd-Frank, & RICO Act Claims** ....................................... **8**

    Violation of the Bane Civil Rights Act (Civ. Code § 52.1) ................. 9

    Violation of the Ralph Civil Rights Act (Civ. Code § 51.7) .............. 10

    Violation of the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1)) ..............11

    Violation of the RICO Act (18 U.S.C. §§ 1962(c) and (d)) ............... 12

**Request to Replead Retaliation & UCL Claims Based on New "Revenge Porn" Facts** ....................................... **15**

    Termination in Violation of Public Policy & Cal. Labor Code 1102.5 .15

    Violation of Cal. Bus. & Prof. Code § 17200 (UCL) ......................... 16

**Replead IIED Claims to include Revenge Porn** ............................... **17**

**Request to Replead Environmental Claims with Air Pollution Law Violations** ....................................................... **20**

    Ultrahazardous Activities, Absolute Nuisance, & Nuisance Per Se Claims ................................................................ 20

    Retaliation for Reporting Env. Violations under Cal. Labor Code §§ 1102.5 & 6399 (via § 6310) ................................................. 22

**Civil Conspiracy and Corporate Liability** ..................................... **23**

    Corporate Criminal Liability and Comparison to Similar Cases ....... 24

**Public Policy Impacts and The Need for Correction** ......................... **28**

    Apple's Deliberate Concealment of Crucial Information ................. 29

**Conclusion** ................................................................. **31**

1
2

# Table of Authorities

3
4
5
6
7

## Supreme Court Cases

*Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) ..................... 12

*Foman v. Davis,* 371 U.S. 178 (1962)........................................................... 2, 4

*Foman v. Davis*, 371 U.S. 178, 182 (1962)...................................................16

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)...................13

## Trial and Circuit Court Cases

*Agis v. Howard Johnson Co.,* ...................................................................19

*Cabatit v. Sunnova Energy Corp.*, 60 Cal. App. 5th 317, 324 (2021) .............. 23

*Cabesuela v. Browning-Ferris Indus.*, 68 Cal. App. 4th 101, 112 (1998). .......... 10

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999)..16

*Cel-Tech*, 20 Cal.4th at 179; *Korea Supply*, 29 Cal.4th at 1144. ......................17

*Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). ..................... 6

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ....17

*Gong v. Google, Inc.*, 2016 WL 6025469, at *3 (N.D. Cal. Oct. 14, 2016) ......... 6

*Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538, 1549 (2014) ............. 22

*Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) .................................19

*Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) ............................................ 18

*Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). ......................................... 5

*Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) .............................. 23

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).........16

*Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022). ...............15

*Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). ...... 5

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior,* 236 F.R.D. 491, 496 (E.D. Cal. 2006). ............................................................................ 5

*See Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992). ...............16

*Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). ................................15

*United States v. Raniere*, 384 F. Supp. 3d 282, 293 (E.D.N.Y. 2019). .............. 7

*Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004). .................... 10

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1057 (9th Cir. 1981). ................................................................................... 5

## Statutes

15 U.S.C. § 78u-6(h)(1)(A)...........................................................................11

17 U.S.C. § 102 .........................................................................................8

18 U.S.C. § § 875 & 873 ..............................................................................13

18 U.S.C. § 2261A .....................................................................................8

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18 U.S.C. § 875 ..................................................................................................... 8

18 USC §§ 1962(c) and (d)................................................................................... 13

Cal. Bus. & Pro. Code § 17200 ........................................................................... 16

Cal. Bus. & Prof. Code § 17200 ................................................................... 16, 17

Cal. Bus. & Prof. Code § 17204 ........................................................................... 17

Cal. Civ. Code § 1708.85 .............................................................................. 16, 17

Cal. Civ. Code § 1708.85(c)-(d) ............................................................................ 6

Cal. Civ. Code § 3344 ........................................................................................... 8

Cal. Civ. Code § 51.7 ................................................................................... 10, 11

Cal. Civ. Code § 52.1 ....................................................................................... 8, 9

Cal. Civil Code § 1708.85 ............................................................................... 7, 15

Cal. Lab. Code § 1102.6 ...................................................................................... 15

Cal. Labor Code § 1102.6 .................................................................................... 15

Cal. Penal Code § § 518 & 137 ........................................................................... 13

California Civ. Code § 1708.85 .............................................................................. 6

California Civil Code § 1708.85 ............................................................................. 7

California Civil Code § 1708.85(a) ...................................................................... 18

California Labor Code § 1102.5(b) ...................................................................... 22

California Labor Code §§ 1102.5, 6310, and 6399 .............................................. 22

California Labor Code §§ 6310 and 6399 ............................................................ 23

Mass. Gen. Laws ch. 272, § 105 .........................................................................19

New York Penal Law § 245.15 ............................................................................ 18

**Rules & Regulations**

Federal Rule of Civil Procedure 15(a)(2) .............................................................. 4

Federal Rule of Civil Procedure 15(d) .................................................................. 4

Federal Rules of Civil Procedure 12(b)(6) ............................................................ 6

*SEC Exchange Act Rule 21F-17(a)*, 17 C.F.R. § 240.21F-17(a) ....................... 12

# Points & Authorities

## Introduction

1.      Plaintiff seeks leave to amend her complaint to (1) reassert some claims that were previously dismissed (some without prejudice and others with prejudice for reasons Plaintiff contends violated due process), (2) add newly discovered evidence pivotal to the dismissed claims, and (3) clarify allegations regarding the camera application and the employer's knowledge and abuse of nude photographs of Plaintiff. [1]

2.      Plaintiff initially filed her Complaint on Sept. 7 2023. Defendants moved to dismiss certain claims, including RICO, Bane Act, Ralph Act, and ultrahazardous activities, with the Court dismissing some with prejudice and some without prejudice on May 20 2024 and Oct. 1 2024. Plaintiff's Fifth Amended Complaint was filed on Nov. 26 2024, and after filing, Plaintiff discovered critical photographic evidence on Dec. 19 2024 that fundamentally alters the analysis of prior dismissals related to the camera app and Apple's knowledge. This newly uncovered evidence directly addresses the Court's or Defendants' prior objections regarding proof that the employer was aware of the complaints involving the camera application and nude photos it captured. This revealed that the employer had possession of, and knowledge about these photographs, contrary to arguments that Plaintiff could not prove the employer or Apple's awareness.

3.      This also revealed new legal violations and legal bases for the case – as it provided direct evidence of retaliation for matters pled in the SAC, but which were diminished due to the page limit reduction. Defendant also retaliated against Plaintiff for protesting Defendants use of nude photos of her to intimidate her to not tell anyone about misconduct occurring during Batterygate. Apple not only retaliated against Plaintiff for these protected, public complaints in Aug. 2021, but Defendant's retaliation included doing the same thing she was complaining about to her again (now with Gobbler photos).

4.      In addition, recent administrative findings by the Air Board bolster Plaintiff's ultra-hazardous activities claim that were dismissed with prejudice for discretionary or procedural

---

[1] Plaintiff does not waive the opportunity to appeal or request amendment of other claims not specifically mentioned here.

1    reasons, contrary to the liberal standard of amendment in the Federal Rules. On Aug. 29 2024 and

2    Sept. 12 2024, the Air Board issued notice of findings of substantial violations reinforcing that the

3    employer engaged in conduct consistent with strict liability and serves as a critical legal basis for

4    the retaliation claims.

5        5.    Because Rule 15(a)(2) instructs courts to "freely give leave when justice so

6    requires," and because none of the *Foman v. Davis,* 371 U.S. 178 (1962) factors (undue delay, bad

7    faith, repeated failure to cure deficiencies, undue prejudice to defendant, or futility) would bar

8    amendment, Plaintiff respectfully requests this Court grant leave. Another Motion to Dismiss is

9    currently pending. Plaintiff moves to amend in good faith to avoid piecemeal litigation and to

10   provide the Court with the most complete set of allegations for a proper adjudication.

11   **Factual Background on Newly Discovered Evidence**

12       6.    Plaintiff filed her Fifth Amended Complaint on Nov. 26 2024. On Dec. 19 2024,

13   U.S. Dept. of Labor finally released the documents in response to a FOIA request that Plaintiff filed

14   on Dec. 17 2023. Initially, U.S. Dept. of Labor refused to release the documents despite being

15   mandated to provide whistleblower retaliation case files to the complainant and respondent after

16   an investigation. Plaintiff eventually threatened to report them to Senator Elizabeth Warren's office

17   again and have her staff investigate as to what is taking so long – which resulted in U.S. Dept. of

18   Labor releasing the documents ten business days later. The documents included the evidence and

19   statements Apple, via counsel at Orrick, provided to U.S. Dept. of Labor on the environmental and

20   health/safety claims. Apple had repeatedly refused to provide Plaintiff evidence about how, when,

21   and why it terminated her employment and this was the first time she saw several critical

     documents – but it was through FOIA, not discovery.

22       7.    The U.S. Dept of Labor documents revealed an incredible amount of information,

23   including the evidence and statements, but also allowing the Plaintiff to understand the timelines

24   and involvement of different individuals. The FOIA documents revealed to her that the two pieces

25   of evidence Apple used to justify her termination was a complaint filed anonymously from a public

26   portal that complained of Plaintiff's social media activity, and appears Apple's lawyers may have

27   written it themselves. The second document was an email sent from a global security employee

28   with private texts with Plaintiff including photos taken of Plaintiff by the Gobbler application,

     including Plaintiff undressed and with her breasts showing. The global security employee declared

the content was Apple Confidentail and Intellectual Property, and Apple cited this as evidence as to why it fired the Plaintiff. When Apple send the documents to OSHA, it appears they did redact the Plaintiff's breasts with a caption of "Apple Confidential," implying some sort of property right to Plaintniff's naked body.

8.     On Dec. 26 2024, Apple's counsel released Plaintiff's performance review for the first time. Plaintiff had requested this critical evidence since early 2024 but Defendant had claimed it was confidential, protected by attorney client privilege, or otherwise unavailable to her. The review revealed multiple instances of direct evidence of retaliation for protected activities as well as additional Unfair Labor Practices under the NLRA. Defendant had this information since at least July 2021.

**Factual Background on Batterygate**

9.     In 2016, Plaintiff worked as the Engineering Program Manager leading Software Engineering Failure Analysis for all of Apple's new and existing embedded products. In this role she was one of the first people brought into the Apple meetings to discuss the emerging issues which became known as "*Batterygate*." Plaintiff was retaliated against by her management in that role for trying to investigate the issue when they preferred to *"ignore it and hope it goes away."* The matter was very contentious. Plaintiff was told to find a new job, and transferred to Hardware Engineering.

10.     When Apple was sued over Batterygate, Plaintiff was called in for document collection by Apple legal and their external counsel, where she was forced to give them naked photos of her, which they demanded and told her they would take with or without her cooperation, and then said they would keep them in their "permanent evidence locker." The plaintiff interpreted this as witness intimidation, which was effective and kept her quiet until August 2021, when she complained about the matter, and it was covered the press. Plaintiff also complained about the application Apple put on her phone called "Gobbler" which took photos, videos, and biometrics 24/7 whenever it "thought it saw a face" in front of the front camera – including when she was in the bathroom, bedroom, and/or naked.

11.     Apple Inc. has faced significant legal repercussions due to the *"Batterygate"* scandal, which involved the company intentionally slowing down older iPhone models to manage battery performance without informing users. This practice led to allegations of consumer deception and

planned obsolescence. In November 2020, Apple agreed to pay $113 million to settle investigations by 34 U.S. states and the District of Columbia, which accused the company of concealing battery issues and throttling device performance to prompt customers into purchasing new devices. The settlement also required Apple to provide truthful information about iPhone power management across its website, software update notes, and device settings.

12.      Earlier, in March 2020, Apple settled a class-action lawsuit in the U.S. by agreeing to pay up to $500 million to affected iPhone users. Under this settlement, consumers could receive $25 per impacted device, with the total amount varying based on the number of claims submitted.[2]

13.      Internationally, in February 2020, France's consumer watchdog fined Apple €25 million (approximately $27 million) for failing to inform consumers that iOS updates could slow down older iPhones. The Directorate General for Competition, Consumption, and the Repression of Fraud oncluded that consumers were not adequately informed, leading to the substantial fine. These legal actions underscore the global response to Apple's handling of iPhone battery performance issues and highlight the importance of corporate transparency and consumer rights.

## Legal Standard for Amendment

14.      Under Federal Rule of Civil Procedure 15(a)(2), courts should "freely give leave [to amend] when justice so requires." The Supreme Court in *Foman v. Davis,* 371 U.S. 178 (1962), identified factors against granting leave—such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment. Where none of these factors predominate, leave to amend is appropriate.

15.      A motion to supplement a complaint in federal court is governed by Federal Rule of Civil Procedure 15(d), which allows a party to file a supplemental pleading to include events that have occurred after the original complaint was filed. Under Rule 15(d), the court may permit supplementation when the new allegations are related to the original claims and supplement, rather than replace, the initial pleading. Courts in the Ninth Circuit have held that Rule 15(d) should be applied liberally in the interests of judicial economy and fairness. *Keith v. Volpe*, 858 F.2d 467, 473

---

[2] Cal. AG, *Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling*, November 18, 2020, https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against

(9th Cir. 1988).

16.    A supplemental complaint is appropriate where it adds claims based on facts arising after the original filing, provided that the supplementation does not cause undue prejudice, delay, or introduce futile claims. *Planned Parenthood of S. Ariz. v. Neely,* 130 F.3d 400, 402 (9th Cir. 1997). Courts assess whether the new facts share a common nucleus of operative fact with the original claims, whether the defendant would be prejudiced, and whether supplementation would serve the efficient resolution of the case. *San Luis & Delta-Mendota Water Auth. v. U.S. Dept. of Interior,* 236 F.R.D. 491, 496 (E.D. Cal. 2006). Given that Rule 15(d) is intended to promote the full adjudication of disputes, courts in the Ninth Circuit and California federal courts regularly grant motions to supplement when they facilitate a complete resolution of the issues in a single proceeding. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1057 (9th Cir. 1981).

## CHANGE OF CIRCUMSTANCES

17.    Defendant argued that despite Plaintiff making public statements and them being asked to comment directly on those statements, that Plaintiff could not immediately offer proof that the Defendant knew about of her complaints about the Gobbler app taking nude photos. Now, it is clear Defendants had these photos and were thus aware. Granting leave to amend corrects the prejudice from the prior dismissal, which occurred before Plaintiff obtained vital evidence.

18.    Additional facts confirm the employer's ratification of, or conspiracy with employees who perpetuated harassment and intimidation. These new facts bolster Plaintiff's vicarious liability theory and conspiracy allegations, supporting an expanded claim that the employer participated in or knowingly allowed the employee's wrongful acts to further a corporate scheme of retaliation.

19.    Findings of the Air Board also warrant revision of the complaint. [See Notice of Pendency at Dkt #151]. The California EPA agency has determined Apple had violated multiple air pollution regulations with hazardous, unauthorized, dangerous air emissions from their factory at 3250 Scott Blvd. Issue preclusion solidifies the strict liability claims.

20.    The plaintiff is promptly moving to amend upon discovering new evidence. Defendants have not yet proceeded to trial, and no insurmountable prejudice arises from allowing these allegations. Plaintiff seeks these amendments in good faith to align her pleading with newly

discovered facts. The new facts can correct previous deficiencies and satisfy the elements of each re-pled claim, meeting the plausibility standard under Federal Rules of Civil Procedure 12(b)(6).

### New Legal Basis: California Civ. Code § 1708.85

21.    California Civ. Code § 1708.85 provides a private right of action for individuals whose private, sexually explicit images or recordings have been distributed without consent, commonly referred to as nonconsensual pornography or revenge porn. Under this statute, a person may bring a civil lawsuit against anyone who intentionally or recklessly distributes a private, sexually explicit visual depiction of another without consent, causing harm. The statute applies when the depicted person had a reasonable expectation that the material would remain private, and the distribution was made with knowledge or reckless disregard of the harm it would cause. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

22.    The law provides compensatory damages, injunctive relief, punitive damages, and attorney's fees (Cal. Civ. Code § 1708.85(c)-(d)). Additionally, Section 1708.85(e) explicitly states that a defendant cannot use the First Amendment as a defense if the distribution was made with an intent to harass, cause harm, or retaliate against the victim. Courts applying this statute in federal cases in California have upheld claims when the plaintiff establishes that the images were shared without consent and that they suffered reputational, emotional, or financial harm as a result *Gong v. Google, Inc.*, 2016 WL 6025469, at *3 (N.D. Cal. Oct. 14, 2016). Given the statute's intent to provide robust protection against the malicious distribution of private sexual content, courts have interpreted it broadly in favor of victims seeking redress.

23.    The legal framework established by § 1708.85 supports potential claims against corporate entities, especially if an employee or agent of the corporation is responsible for the unauthorized distribution within the scope of their employment. This aligns with principles of vicarious liability, where employers can be held accountable for the actions of their employees performed during their employment.

### 1. Comparison to NXIVM

24.    The NXIVM case provides a pertinent example of how organizations can misuse intimate information to manipulate and control individuals, drawing parallels to violations under Cal. Civil Code § 1708.85. NXIVM, under the leadership of Keith Raniere, operated a secret

society known as DOS, where women were coerced into providing "*collateral*"—including nude photographs and other compromising materials—which was then used to blackmail and intimidate them into compliance. *United States v. Raniere*, 384 F. Supp. 3d 282, 293 (E.D.N.Y. 2019). This coercion was a central element in the charges against Raniere, leading to his conviction on multiple counts, including sex trafficking and racketeering.[3]

25. Similarly, California Civil Code § 1708.85 addresses the non-consensual distribution of intimate images, recognizing the profound harm such actions inflict on individuals. While the NXIVM case primarily involved criminal charges, the underlying misuse of intimate images as a means of control and coercion underscores the importance of legal protections like those provided by § 1708.85. This statute empowers victims to seek civil remedies against those who unlawfully distribute their private images, reflecting a societal commitment to safeguarding personal privacy and autonomy. In essence, the NXIVM case exemplifies the severe consequences of exploiting intimate information, reinforcing the necessity of robust legal frameworks to protect individuals from such violations.

## 2. A Profound Violation of Fundamental Human Rights

26. A corporation attempting to assert property rights or intellectual property claim over an employee's breasts raises serious legal, ethical, and constitutional concerns, implicating privacy rights, bodily autonomy, intellectual property law, and workplace discrimination laws. Under Cal. Civil Code § 1708.85, the non-consensual distribution or claim of ownership over intimate images is explicitly unlawful, recognizing an individual's fundamental right to control their own body and private images. Any attempt by an employer to assert intellectual property rights over an employee's body—particularly intimate images obtained through workplace surveillance, document collection, or coercion—would likely constitute an invasion of privacy, sexual harassment (Title VII, FEHA), and a violation of the constitutional right to bodily autonomy. Further, such a claim could be a form of extortion, coercion, or retaliation, particularly if used to silence or intimidate the employee in connection with legal proceedings or whistleblower

---

[3] U.S. DOJ, *NXIVM Leader Keith Raniere Sentenced to 120 Years in Prison for Racketeering and Sex Trafficking Offenses,* October 27, 2020, https://www.justice.gov/usao-edny/pr/nxivm-leader-keith-raniere-sentenced-120-years-prison-racketeering-and-sex-trafficking

complaints.

27.    Copyright law (17 U.S.C. § 102) does not recognize a corporation's ownership of an individual's body or likeness, and any attempt to claim such rights could also run afoul of California's Right of Publicity laws (Cal. Civ. Code § 3344), the Bane Act (Cal. Civ. Code § 52.1), and federal labor laws protecting employees from coercion and intimidation. If an employer were to assert ownership over intimate images of an employee, it could face civil liability for invasion of privacy, sexual harassment, retaliation, and even potential criminal exposure under laws prohibiting non-consensual image distribution and coercion (e.g., 18 U.S.C. § 2261A – stalking, 18 U.S.C. § 875 – extortion). In sum, any corporate attempt to claim intellectual property rights over an employee's body would be legally indefensible and constitute a profound violation of fundamental human rights.

## Request to Replead the Bane and Ralph Civil Rights Acts, Dodd-Frank, & RICO Act Claims

28.    Appleseed, a former employee of Apple's Global Security team, played a pivotal role in the harassment and retaliation that Plaintiff endured after engaging in protected activities, including whistleblowing on toxic emissions from a semiconductor plant operated by Apple. Appleseed's conduct was not an isolated incident, but part of a coordinated, ongoing effort orchestrated by Apple to retaliate against Plaintiff and obstruct her legal rights.

29.    In violation of Plaintiff's privacy rights, Appleseed shared a private, non-consensual photograph of Plaintiff. This photograph, which was taken without Plaintiff's consent through an internal work app, was subsequently used by Appleseed in her harassment campaign and by Apple in their farcical defense.

30.    Appleseed engaged in a pattern of defamation, including labeling Plaintiff a *"liar"* and *"predator"* in both public and private forums. Appleseed's statements were aimed at undermining Plaintiff's credibility, isolating her from potential support, and discouraging others from speaking out in support of Plaintiff. Appleseed's actions were not only aimed at Plaintiff's personal reputation but also sought to intimidate witnesses and potential allies, in violation of Plaintiff's rights under state law, including the Bane Act and Ralph Act.

31.    Appleseed also engaged in cyberstalking by threatening individuals who showed

support for Plaintiff and attempting to coerce them into severing ties with her. These acts of intimidation were part of a larger campaign to silence Plaintiff and prevent her from pursuing legal action. Appleseed's conduct was egregious and is directly connected to the ongoing retaliation Plaintiff has faced for her whistleblowing.

32.     In a particularly egregious turn of events, Appleseed revealed that Apple's Global Security team had directly coerced her into filing a false complaint against Plaintiff. Appleseed disclosed that Apple Global Security threatened her, using her position within the company, to compel her to falsely accuse Plaintiff of wrongdoing. This act of coercion demonstrates that the retaliation and harassment faced by Plaintiff were not merely the acts of an individual employee but were directed and sanctioned by Apple itself. Appleseed's role in filing the complaint against Plaintiff was not voluntary, but rather a direct result of Apple's corporate policies aimed at protecting the company's image by silencing whistleblowers and retaliating against those who report misconduct.

33.     Apple's actions and omissions in this case go beyond mere negligence and instead reflect a pattern of intentional misconduct, as well as a deliberate attempt to obstruct justice, retaliate against Plaintiff for engaging in protected activities, and conceal evidence. The misconduct was orchestrated at the corporate level, with employees acting under the direct or tacit approval of Apple's leadership, specifically through its Global Security division. The plaintiff asserts that the following legal violations occurred as a result of Defendant's intentional actions:

34.     Plaintiff's RICO, Bane Act, and Ralph Act claims were dismissed without prejudice, and Plaintiff now has newly discovered evidence about a coordinated scheme involving the global security and legal, the camera application, and possible conspirators. This evidence addresses prior deficiencies and directly supports the elements of a pattern of misconduct and intimidation, which are crucial for these claims.

### Violation of the Bane Civil Rights Act (Civ. Code § 52.1)

35.     The Bane Act (Cal. Civ. Code § 52.1) prohibits any person or entity from interfering with an individual's constitutional or statutory rights through threats, intimidation, or coercion. Courts have held that coercive and retaliatory actions designed to deter an individual from exercising legal rights fall squarely within the Bane Act's protections. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004).

36.     The Bane Act provides a remedy for individuals whose constitutional rights are interfered with by threats, intimidation, or coercion. In this case, Apple's conduct constitutes a direct violation of Plaintiff's rights under the Bane Act and that now also includes a new legal base related to the newly discovered evidence.

37.     Defendant's deliberate misuse of Plaintiff's intimate images, coupled with its legal and security personnel's orchestrated efforts to harass and intimidate Plaintiff through false reports, legal threats, and retaliatory lawsuits, constitutes an unlawful attempt to suppress Plaintiff's rights through coercion and intimidation.

38.     Defendant engaged in coercive conduct designed to suppress Plaintiff's ability to seek legal redress and report workplace misconduct, including:

- Retaliatory misuse of intimate images as a tool to intimidate and silence Plaintiff.
- Fraudulent legal actions and false declarations designed to discredit Plaintiff in litigation and discourage further whistleblower disclosures.
- Coordinated suppression of evidence and obstruction of justice to prevent Plaintiff from accessing materials necessary for her case.

39.     These actions establish intentional coercion by Defendant to interfere with Plaintiff's constitutional and statutory rights, including her rights under California labor and whistleblower laws, thereby violating the Bane Act.

## Violation of the Ralph Civil Rights Act (Civ. Code § 51.7)

40.     36. The Ralph Act (Cal. Civ. Code § 51.7) protects individuals from violence, threats, intimidation, and harassment based on their protected status or engagement in protected activity. Courts have held that threats of violence or intimidation aimed at suppressing legal rights constitute violations of the Ralph Act. *Cabesuela v. Browning-Ferris Indus.*, 68 Cal. App. 4th 101, 112 (1998). Defendant's retaliatory conduct, including the use of fraudulent legal processes and SWATing attempts against Plaintiff, directly constitutes unlawful intimidation under the Ralph Act.

41.     The Ralph Act offers protection against violent threats and harassment, similar to the Bane Act, but it specifically addresses discrimination and violence based on a person's protected activities. Apple's direct involvement in orchestrating the harassment and intimidation suffered by Plaintiff qualifies as a violation of the Ralph Act and that now also includes a new legal base related to the newly discovered evidence.

42.    Key facts supporting Plaintiff's Ralph Act claim include: Appleseed's multiple false reports to law enforcement, which were intended to "SWAT" Plaintiff—an action that is per se a violation of the Ralph Act; Appleseed falsely accusing Plaintiff of crimes and filing a retaliatory lawsuit seeking a five-year gag order to prevent Plaintiff from speaking about harassment and sextortion; Coercive tactics designed to deter Plaintiff from engaging in protected speech and legal activity.

43.    Under California law, the Ralph Act explicitly states that knowingly filing false reports to law enforcement to incite retaliatory harm, such as SWATing, is a per se violation. Cal. Civ. Code § 51.7. Given Defendant's coordination of these unlawful actions through its security and legal teams, its ongoing suppression of Plaintiff's rights through coercion and intimidation firmly meets the legal standards for both the Bane Act and Ralph Act violations.

## Violation of the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1))

44.    Plaintiff seeks to replead and strengthen her claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act's whistleblower protections, codified at 15 U.S.C. § 78u-6(h)(1). The Dodd-Frank Act provides robust protections against retaliation for employees who report securities law violations to the U.S. Securities and Exchange Commission (SEC) or other regulatory authorities. Given newly discovered evidence of Defendant Apple's deranged retaliatory conduct, as well as findings from parallel investigations by the National Labor Relations Board (NLRB), repleading this claim is necessary to fully present the extent of Apple's unlawful retaliatory practices.

45.    Under 15 U.S.C. § 78u-6(h)(1)(A), an employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against a whistleblower in the terms and conditions of employment because of lawful disclosures of securities law violations. Plaintiff engaged in protected whistleblowing activity when she submitted complaints regarding Apple's unlawful confidentiality policies, suppression of employee rights under federal labor and securities laws, and financial misconduct. Apple's retaliatory campaign—ranging from termination to continued post-employment harassment—constitutes clear violations of these protections. See *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (confirming that employees who report violations to regulatory authorities are protected under Dodd-Frank's anti-retaliation provisions).

46.    Furthermore, Apple's misconduct is bolstered by the recent NLRB finding that

Plaintiff's charge alleging that Apple's confidentiality policies violate federal labor laws is supported by substantial evidence, resulting in an administrative complaint against Apple. The NLRB's finding directly supports Plaintiff's argument that Apple's employment policies, including its nondisclosure agreements and internal restrictions on employee speech—violate not only labor laws but also Dodd-Frank policy rules designed to encourage whistleblower disclosures and prevent corporate cover-ups of securities violations. The SEC has issued guidance clarifying that employer-imposed restrictions on whistleblower communications—such as those found in Apple's policies—are illegal under Dodd-Frank. See *SEC Exchange Act Rule 21F-17(a)*, 17 C.F.R. § 240.21F-17(a) (prohibiting companies from enforcing agreements or policies that restrict individuals from communicating directly with the SEC about potential violations).

47.     Given these facts, Plaintiff's Dodd-Frank retaliation claim must be reinstated and expanded to reflect Apple's systemic efforts to silence whistleblowers, its retaliatory actions against Plaintiff, and its ongoing policy violations confirmed by federal enforcement agencies. Plaintiff respectfully requests leave to amend her complaint to fully plead Apple's violations of 15 U.S.C. § 78u-6(h)(1), as well as its violations of the SEC's whistleblower protection rules.

## Violation of the RICO Act (18 U.S.C. §§ 1962(c) and (d))

48.     Plaintiff asserts that Apple's actions, including the orchestration of harassment, intimidation, defamation, and the concealment of evidence, constitute an ongoing pattern of racketeering activity under the RICO Act. This includes Apple's deliberate efforts to suppress whistleblowers, obstruct justice, and intimidate those involved in investigating and reporting corporate wrongdoing.

49.     Unlike typical civil claims, the RICO Act is designed to address patterns of criminal conduct by organizations that systematically engage in illegal activity. Apple, through its Global Security division, engaged in such a pattern by orchestrating harassment and retaliation through its agents, with the intention of obstructing legal processes and protecting its corporate interests. This campaign, which involved coercing Appleseed to file a false complaint that threatened to review nude photos and manipulating the outcome of Plaintiff's legal claims, is a clear example of criminal racketeering conduct under the statute.

50.     Under RICO § 1962(c), it is unlawful for any person associated with an enterprise engaged in interstate commerce to conduct its affairs through a pattern of racketeering activity.

Under RICO § 1962(d), it is unlawful to conspire to engage in such racketeering activity. See *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The new evidence uncovered in this case further establishes Defendant's pattern of extortion, witness intimidation, and obstruction of justice, including through the misuse of Plaintiff's nude photos as a coercive tool to silence and retaliate against her, twice.

51.     The Hobbs Act (18 U.S.C. § 1951) defines extortion as the obtaining of property from another, with their consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. Here, Defendant and its agents wrongfully retained and misused Plaintiff's nude images, leveraging them as a retaliatory tool to discredit and silence her in legal proceedings and public discourse. This constitutes wrongful coercion through fear and intimidation, a predicate act under RICO.

52.     Federal and state law prohibits extortion and blackmail (18 U.S.C. § § 875 & 873; Cal. Penal Code § § 518 & 137), including any attempt to threaten or coerce a person into refraining from exercising their legal rights through the use of threats involving personal or reputational harm. Defendant's agents, including its legal and security personnel, engaged in systematic efforts to use Plaintiff's private images as leverage to intimidate her into silence regarding workplace violations, labor law breaches, and whistleblower complaints – and they did so crossing state lines and impacting interstate commerce. The coercive and retaliatory use of these images, coupled with Defendant's attempts to shield this evidence from discovery, constitutes criminal extortion and blackmail under federal law and strengthens the RICO claim under 18 USC §§ 1962(c) and (d).

53.     Apple's corporate actions were not the result of inadvertent error but were intentionally designed to retaliate against Plaintiff, suppress her rights, and protect the company from the negative consequences of her whistleblowing. The fact that Appleseed, an agent of Apple, was coerced into filing a false complaint against Plaintiff under the direction of Apple's leadership and then the complaint used by Apple's counsel in their defense against Plaintiff, shows that this conduct was planned and executed with the intent to harm Plaintiff and obstruct justice, fulfilling the requirements for a RICO violation.

54.     Additionally, Defendant's ongoing refusal to disclose these materials in litigation, fraudulent assertions of privilege over them, and direct involvement in attempting to suppress Plaintiff's protected disclosures further establish a coordinated scheme of witness intimidation and

obstruction of justice. This evidence underscores Defendant's role as the central figure in a RICO enterprise designed to protect itself from liability through fraudulent, retaliatory, and coercive actions, making the amendment to the complaint necessary to reflect these violations.

55.    Apple's ongoing engagement in criminal misconduct is further demonstrated by the criminal bribery case against Apple's Chief Compliance Officer & Head of Global Security, Tom Moyer. Moyer was indicted in November 2020 for attempting to bribe Santa Clara County Sheriff's officials with $70,000 worth of iPads in exchange for concealed carry weapons permits for Apple's Global Security team. Although the case was initially dismissed in 2021, the California Sixth District Court of Appeal reinstated the charges in August 2023, determining that the evidence of bribery was sufficient to warrant prosecution.[4] Bribery under 18 U.S.C. § 201 (Bribery of Public Officials) and related California statutes constitutes a predicate act under RICO, as it demonstrates Apple's pattern of unlawful corporate conduct and its willingness to engage in corrupt dealings with law enforcement officials to protect its internal security and legal interests.

56.    This is particularly relevant given that Apple's Global Security employee, Appleseed, worked under Moyer and engaged in a pattern of harassment, intimidation, and retaliatory actions against Plaintiff. Appleseed's involvement in the misuse of Plaintiff's private images, filing false statements in litigation, and assisting Apple in concealing key evidence must be viewed in light of Apple's history of unlawful conduct within its Global Security operations. The direct connection between Moyer's bribery case and Appleseed's actions in furtherance of Apple's retaliation and suppression efforts further supports the existence of a RICO enterprise engaging in repeated corrupt, criminal conduct.

57.    Further exacerbating the intimidation and coercion, Appleseed falsely accused Plaintiff of crimes and filed a retaliatory lawsuit seeking a five-year gag order against Plaintiff. This lawsuit, which attempted to prohibit Plaintiff from speaking publicly or privately about Appleseed, Apple, or the retaliatory conduct she endured, was a direct effort to suppress Plaintiff's ability to report ongoing harassment, workplace misconduct, and the nonconsensual use of her private images. If successful, this gag order would have entirely silenced Plaintiff's ability to discuss the sextortion, threats, and witness intimidation that were perpetrated against her. The filing of

---

[4] *The People v. Moyer,* 94 Cal. App. 5th 999, 312 Cal. Rptr. 3d 773 (Cal. Ct. App. 2023).

fraudulent criminal accusations and the misuse of legal proceedings as a weapon to obstruct justice and suppress Plaintiff's claims further reinforce Apple's role in a RICO enterprise using coercion, threats, and legal retaliation as a means of control and suppression.

# REQUEST TO REPLEAD RETALIATION & UCL CLAIMS BASED ON NEW "REVENGE PORN" FACTS

## TERMINATION IN VIOLATION OF PUBLIC POLICY & CAL. LABOR CODE 1102.5

58. Plaintiff's claims under Cal. Civil Code § 1708.85 directly reinforce her whistleblower retaliation (Cal. Lab. Code § 1102.6) and wrongful termination in violation of public policy (Tameny) claims, as the employer's misconduct constitutes both retaliation for protected disclosures and violations of fundamental public policy. Under Cal. Labor Code § 1102.6, once a plaintiff demonstrates that they engaged in protected activity—such as reporting misconduct or violations of law—the burden shifts to the employer to prove that the adverse action was based on legitimate, non-retaliatory reasons. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022).

59. Here, Plaintiff reported Apple's unlawful surveillance practices, privacy violations, and the misuse of intimate images both internally and to regulatory agencies, constituting protected activity under California law. Apple and its agents retaliated by using Plaintiff's nude images to intimidate and discredit her, falsely asserting confidentiality over them, and weaponizing legal threats to silence her. These acts violate public policy protections enshrined in Civil Code § 1708.85, which prohibits the malicious distribution of private images, making it a fundamental policy concern of the state.

60. Because Tameny claims require a nexus between termination and a violation of public policy, Apple's actions—retaliating against Plaintiff by intentionally misusing her intimate images after she engaged in protected activity—directly satisfy the public policy exception to at-will employment. *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). Thus, the employer's retaliatory conduct not only substantiates liability under Civil Code § 1708.85 but also strengthens Plaintiff's claims under Labor Code § 1102.6 and *Tameny* for wrongful termination in violation of public policy.

### Violation of Cal. Bus. & Prof. Code § 17200 (UCL)

61.    Plaintiff also seeks leave to amend the complaint to replead and supplement the cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.), predicated on the unlawful dissemination or threatened dissemination of intimate images in violation of Cal. Civ. Code § 1708.85 ("*Revenge Porn*" or nonconsensual pornography statute). This request is supported by newly discovered facts regarding the unauthorized capture and/or sharing of Plaintiff's nude photographs, and it aligns with Rule 15(a)'s instruction to *"freely give leave"* where justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

62.    The employer (and/or its agents, including the Global Security Employee obtained nude or intimate photographs of Plaintiff without her effective knowledge or consent. Defendants, through employees and agents, threatened to share or indeed shared these intimate images, in retaliation for Plaintiff's whistleblowing and other protected activities. This conduct violates Cal. Civ. Code § 1708.85, which prohibits the intentional distribution or threatened distribution of intimate images without consent, when done to cause emotional distress. By engaging in a practice that is "unlawful" (i.e., violating Cal. Civ. Code § 1708.85), Defendants' acts also constitute unlawful business practices under Cal. Business & Professions Code § 17200.

63.    California's UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice" (Cal. Bus. & Prof. Code § 17200). To state a claim under the "unlawful" prong, a plaintiff need only allege a violation of another law—that violation then serves as the predicate act rendering the business practice unlawful. (*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).)

64.    Here, a new underlying predicate violation is Civ. Code § 1708.85, which expressly prohibits the intentional or reckless dissemination of intimate images without consent, commonly known as "*revenge porn*" or "*nonconsensual pornography."* By engaging in this unlawful conduct— threatening and actually disseminating Plaintiff's nude photos—Defendants have committed a statutory violation that "*independently violates the law.*" *See Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992).

65.    Under the UCL, a private plaintiff must demonstrate economic injury (Cal. Bus. & Prof. Code § 17204). Plaintiff was severely injured by the Defendant terminating her employment

and denylisting her from future employment, causing direct and tangible losses of income and benefits. Plaintiff anticipates showing that she suffered economic losses, such as costs incurred to protect herself from further dissemination (e.g., security measures, internet takedown services, or other expenditures), as well as harm to her earning capacity or employment prospects stemming from the disclosure or threat of disclosure of intimate images.

66.    Plaintiff would be entitled to injunctive relief, restitution, or other relief authorized under the UCL. *Cel-Tech*, 20 Cal.4th at 179; *Korea Supply*, 29 Cal.4th at 1144. While the UCL does not typically allow damages, it can provide equitable remedies—including injunctions to prohibit further sharing of the images and restitution to restore any money or property lost due to Defendants' misconduct.

67.    Plaintiff only recently became aware of concrete evidence confirming the nude photos were captured and threatened to be shared in retaliation, thus clarifying the Civ. Code § 1708.85 violation. Defendant had this information for years, and intentionally concealed it from Plaintiff – however, as long as Plaintiff pursued her legal claims, it was always certain to come out eventually – or at least allow Apple to send nude photos of Plaintiff to any agency that would investigate her claims.

68.    The Legislature's enactment of Cal. Civ. Code § 1708.85 demonstrates a keen policy interest in protecting victims from nonconsensual pornography. Preventing such unlawful conduct is precisely the type of protective measure that Cal. Bus. & Prof. Code § 17200 was designed to address. (*See Cel-Tech*, 20 Cal.4th at 181.) Defendants cannot claim prejudice, as discovery is ongoing, and the Court has yet to resolve the matters on the merits. Adding a UCL claim at this juncture ensures all related issues are addressed in a single lawsuit, preserving judicial resources.

69.    Given Rule 15(a)'s "extreme liberality" (*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)), and the absence of any Foman factor such as bad faith, undue delay, or futility (*Foman, 371 U.S. at 182*), the Court should grant Plaintiff leave to amend her complaint to add a UCL cause of action predicated on the "unlawful" prong violation (Cal. Civ. Code § 1708.85 ).

## Replead IIED Claims to include Revenge Porn

70.    The newly revealed nude photographs taken by the employer's app, along with the

ongoing harassment, significantly escalate the extreme and outrageous nature of Defendants'
conduct, thereby strengthening Plaintiff's IIED allegations. Given that Defendant's unlawful
dissemination of Plaintiff's intimate images occurred across multiple jurisdictions—California,
New York, and Massachusetts—Plaintiff seeks to incorporate relevant state laws from each
jurisdiction to strengthen her Intentional Infliction of Emotional Distress (IIED) claim. Each of
these states recognizes the severe emotional harm and reputational damage caused by the non-
consensual distribution of intimate images and provides statutory protections against such
conduct.

### 3. California Law: Civil Code § 1708.85 – Unauthorized Distribution of Intimate Images

71.     California Civil Code § 1708.85(a) provides that a person is liable for damages if they
intentionally distribute intimate images of another without consent, knowing that the person
depicted had a reasonable expectation of privacy, and the disclosure causes serious emotional
distress. The September 15, 2021 email, in which Plaintiff's unauthorized nude images were sent
as part of Defendant's retaliatory scheme, falls squarely within the scope of this statute.

72.     This conduct also meets the extreme and outrageous conduct threshold required
for an IIED claim, as it was designed to shame, humiliate, and silence Plaintiff for engaging in
protected whistleblowing activity. See *Hughes v. Pair,* 46 Cal. 4th 1035, 1051 (2009) (holding that
conduct is sufficiently "outrageous" for an IIED claim when it is so extreme that it exceeds all
bounds of decency in a civilized community).

73.     Furthermore, California law provides for both compensatory and punitive damages
against individuals or entities who intentionally weaponize intimate images to cause harm. Given
that Defendant deliberately withheld the existence of this evidence and misrepresented material
facts regarding its possession and use of Plaintiff's intimate images, Defendant's conduct is even
more egregious and supports an IIED claim under California law.

### 4. New York Law: Penal Law § 245.15 – Unlawful Dissemination or Publication of an Intimate Image

74.     New York Penal Law § 245.15 criminalizes the intentional and non-consensual
dissemination of intimate images when the individual depicted has a reasonable expectation of
privacy and the disclosure causes harm. The law specifically applies to instances where: The

offender acts with intent to cause harm to the depicted person, and the victim experiences serious emotional distress as a result of the disclosure.

75.     Here, Defendant's transmission and possession of Plaintiff's intimate images—without her consent and as part of a broader retaliatory scheme—fits within New York's statutory framework for unlawful dissemination. Plaintiff was harmed in New York, where she suffered significant emotional distress due to the unauthorized distribution of these images. Because New York law recognizes that revenge porn can cause long-term psychological harm and reputational damage, it directly supports Plaintiff's IIED claim.

76.     Furthermore, New York courts have held that intentional emotional distress claims can be supported by conduct that includes the unauthorized dissemination of private images when such conduct is intended to cause severe harm to the victim. See *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) (holding that conduct sufficiently extreme and outrageous to support an IIED claim must be "beyond all possible bounds of decency" and "utterly intolerable in a civilized society").

### 5. Massachusetts Law: Chapter 272, Section 105 – Criminalization of Revenge Porn

77.     Massachusetts recently criminalized the non-consensual distribution of explicit images under Mass. Gen. Laws ch. 272, § 105, imposing penalties of up to two and a half years in jail and fines of up to $10,000 for individuals who engage in such conduct. Similar to California and New York, Massachusetts recognizes the severe emotional and psychological harm that results from the unauthorized dissemination of intimate images and allows for civil actions based on emotional distress. See *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145 (1976) (recognizing IIED where conduct is so extreme and outrageous as to "exceed all bounds of decency").

78.     Defendant's actions meet this standard by intentionally distributing intimate images of Plaintiff as a retaliatory tactic, causing severe emotional and reputational harm. Because Plaintiff experienced emotional distress while in Massachusetts, and because Defendant's wrongful acts had effects in this jurisdiction, Massachusetts law further supports Plaintiff's IIED claim.

79.     Given that Defendant's unlawful dissemination of Plaintiff's intimate images caused harm in California, New York, and Massachusetts, Plaintiff is entitled to bring claims under each state's applicable statutes and case law. The intentional release of these images as part of a

coordinated retaliation campaign against Plaintiff constitutes extreme and outrageous conduct, meeting the threshold for an IIED claim in all three jurisdictions.

80.     Moreover, Defendant's failure to disclose this material evidence until long after the statute of limitations for certain claims had run further demonstrates their bad faith litigation tactics. Because California, New York, and Massachusetts all provide remedies for the non-consensual distribution of intimate images, Plaintiff seeks to replead her IIED claim to include violations of these laws as a basis for relief.

# REQUEST TO REPLEAD ENVIRONMENTAL CLAIMS WITH AIR POLLUTION LAW VIOLATIONS

## ULTRAHAZARDOUS ACTIVITIES, ABSOLUTE NUISANCE, & NUISANCE PER SE CLAIMS

81.     Plaintiff respectfully requests an opportunity to amend the complaint to replead the ultrahazardous activities, absolute nuisance, and nuisance per se claims, in light of recent federal and state enforcement actions and Apple's admission to knowledge of the harmful conduct and the hazardous environment it facilitated. The recent enforcement actions by the U.S. Environmental Protection Agency (EPA) and Bay Area Air Quality Management District (BAAQMD), in addition to Apple's own admissions in its current motion to dismiss, have brought to light new facts that necessitate revisiting these claims. [See Notice of Pendency at Dkt. 151]

82.     Although the ultrahazardous activities claim was dismissed with prejudice, that dismissal was based on "discretionary" grounds that prevented full discovery. Given the Air Board's new finding of violations, Plaintiff can now allege with specificity the employer's inherently dangerous practices that pose an extraordinary risk. Dismissing this claim with prejudice without considering the new regulatory findings would contravene the liberal amendment policy and Plaintiff's due process rights.

83.     In light of recent enforcement actions by the EPA, BAAQMD, and other regulatory agencies, it is clear that Apple's semiconductor fabrication facility engaged in activities that can clearly be classified as ultrahazardous. These activities exposed the plaintiff and others to significant environmental harm, including toxic emissions and the release of dangerous chemicals. These actions—conducted knowingly and recklessly by Apple—fall within the scope of ultrahazardous activities that impose strict liability on the defendant for the harm caused,

regardless of fault. The plaintiff seeks to replead this claim to reflect the newly discovered enforcement actions, including penalties and regulatory findings, which demonstrate Apple's involvement in creating and perpetuating an ultrahazardous environment.

84.     Plaintiff requests leave to amend the complaint to include a claim for absolute nuisance based on Apple's operation of the hazardous semiconductor facility and the resulting toxic emissions that impacted the health and safety of surrounding residents. In its motion to dismiss, Apple acknowledges the presence of hazardous conditions yet continues to minimize or deny its responsibility for the consequences of those conditions. The plaintiff's allegations, as amplified by recent regulatory actions, show that Apple's conduct has created an unreasonable interference with the use and enjoyment of public and private property in the area. These new facts highlight that Apple's actions meet the standard for absolute nuisance—where strict liability applies due to the inherently dangerous nature of the activities involved.

85.     Additionally, the plaintiff requests leave to replead the nuisance per se claim, based on Apple's operation of a facility that violated numerous state and federal environmental laws, including air quality regulations enforced by the BAAQMD and EPA. Apple's conduct has not only violated laws but also created a public health hazard, causing severe damage to the plaintiff's health and well-being, as well as to the broader community. These new facts, combined with Apple's admissions in its motion to dismiss, underscore that Apple's conduct constitutes a public nuisance per se. By operating the semiconductor plant in flagrant violation of environmental protections, Apple's actions are not only unlawful but also endanger the public, further justifying the need for the plaintiff to replead this claim in light of these newly disclosed facts.

86.     Apple's motion to dismiss, while seeking to dismiss these claims, inadvertently admits to its knowledge of the hazardous environment created by its operations and its failure to take corrective action. These admissions, when viewed alongside the ongoing federal and state investigations, provide further grounds for the plaintiff to amend the complaint. The newly discovered regulatory actions demonstrate that Apple's conduct has been not only harmful but also flagrant, with no efforts to mitigate the damage caused by its ultrahazardous activities. The plaintiff seeks to update these claims to fully reflect the current state of the law, enforcement actions, and evidence that now implicates Apple in direct violation of environmental statutes and regulations.

87.     Plaintiff respectfully requests that the Court grant the opportunity to amend the

complaint to include these updated allegations, based on new information that has come to light, including federal and state enforcement actions and Apple's own admissions. The amended complaint will provide a more comprehensive and accurate picture of the ongoing harm caused by Apple's actions and ensure that the claims align with the current state of the law, regulatory actions, and evidence.

## Retaliation for Reporting Env. Violations under Cal. Labor Code §§ 1102.5 & 6399 (via § 6310)

88.     Plaintiff seeks to replead her environmental subclaims under California Labor Code §§ 1102.5 and 6399 (under 6310), which protect employees from retaliation for reporting workplace safety hazards, hazardous material exposure, and violations of state and federal environmental laws. These subclaims were previously dismissed for discretionary reasons; however, recent findings by the U.S. Environmental Protection Agency (EPA) and the California Air Resources Board (CARB) confirming Defendant Apple's violations of environmental regulations provide new and compelling evidence supporting reinstatement of these claims. Additionally, on December 26, 2024, Defendant Apple released Plaintiff's 2021 performance review, which contained material evidence—including direct evidence of retaliation for these specific environmental complaints— that Apple previously concealed, misrepresented, and failed to disclose in prior filings.

89.     Under California Labor Code § 1102.5(b), an employer may not retaliate against an employee for disclosing information regarding violations of federal or state laws, regulations, or public policies to a government agency. Plaintiff's whistleblower complaints regarding Apple's improper handling and disposal of hazardous materials, unlawful air emissions, and chemical exposures in the workplace fall squarely within the protections of § 1102.5. The EPA and CARB's findings that Apple violated environmental laws further confirm that Plaintiff's disclosures were not only reasonable but also legally and factually substantiated. These violations, which threaten workers and public health, are precisely the type of environmental hazards that § 1102.5 is designed to encourage employees to report without fear of retaliation. See *Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538, 1549 (2014) (holding that an employer may not retaliate against an employee for reporting violations of environmental and workplace safety laws).

90.     Similarly, California Labor Code §§ 6310 and 6399 provide additional protections for employees who report unsafe working conditions and violations of California's occupational

safety and hazardous materials handling laws. Under § 6310, an employer may not retaliate against an employee for complaining about unsafe work conditions, including exposure to toxic substances. Further, § 6399 mandates compliance with regulations governing hazardous material exposure in the workplace. Plaintiff's complaints about chemical exposure risks and Apple's failure to comply with environmental safety regulations fall directly under the scope of these protections. Now that state and federal regulatory agencies have confirmed Apple's violations of environmental laws, the Court has substantial new evidence warranting reinstatement of these claims. See *Cabatit v. Sunnova Energy Corp.*, 60 Cal. App. 5th 317, 324 (2021) (holding that agency findings confirming an employee's safety complaints strengthen a Labor Code § 6310 claim and make dismissal improper).

91.     Furthermore, Apple's recent disclosure of Plaintiff's 2021 performance review on December 26, 2024, provides additional direct evidence of retaliation and fraudulent concealment. Despite being aware of the existence of this document and its relevance to Plaintiff's claims, Apple concealed this performance review and misrepresented its contents in prior court filings. The document contains clear evidence that Apple retaliated against Plaintiff for her hazardous waste and environmental safety complaints—contradicting Apple's previous assertions that Plaintiff's termination was unrelated to her protected disclosures. Notably, Apple strategically waited to release this critical document until after Plaintiff had already filed her most recent amended complaint, further demonstrating Apple's bad faith litigation tactics and obstruction of evidence. See *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) (holding that suppression of material evidence constitutes a basis for sanctions and potential disqualification of counsel).

92.     Because newly obtained regulatory findings establish that Plaintiff's whistleblower complaints about hazardous waste exposure and workplace safety risks were well-founded, and that Apple was indeed in violation of environmental laws, and because Apple has now belatedly produced critical evidence confirming retaliatory motives that it previously concealed, Plaintiff respectfully requests leave to amend her complaint to reinstate her California Labor Code §§ 1102.5, 6310, and 6399 claims based on this substantial new evidence.

## Civil Conspiracy and Corporate Liability

93.     The deliberate actions by Apple's employees, and the direct involvement of Apple's

leadership in these activities, suggest a conspiracy designed to retaliate against Plaintiff. Apple's orchestrated actions — from enabling and facilitating harassment to covering up the misconduct — reflect a coordinated effort at all levels of the organization, making it clear that the company's leadership was either complicit in or directly responsible for this course of action.

94.    Even if Apple's leadership did not expressly order the harassment, the company is still liable for the intentional misconduct of its employees under the principles of corporate liability. Just as eBay was held criminally accountable for the actions of its employees in the cyberstalking case despite the absence of direct orders from senior management, Apple too must be held accountable for the actions of its agents, particularly when those actions are undertaken in furtherance of the company's interests — in this case, silencing a whistleblower and obstructing an investigation into the company's illegal activities.

95.    The actions of Apple in this case are not only unlawful but also highly damaging to public trust and corporate accountability. Companies that engage in retaliation against whistleblowers and attempt to obstruct justice are sending a dangerous message that they are above the law. Such conduct undermines the ability of employees and the public to hold corporations accountable for harmful and illegal practices, especially when those corporations have the resources to conceal wrongdoing and intimidate those who report it. This conduct, if left unchecked, would have serious public policy implications, as it would further erode the protections afforded to whistleblowers and discourage individuals from coming forward with vital information regarding corporate misconduct.

## Corporate Criminal Liability and Comparison to Similar Cases

96.    Apple's conduct, orchestrated through the actions of its employees, warrants legal scrutiny not only for the specific harassment, retaliation, and intimidation endured by the plaintiff but also for the broader implications of corporate liability for the actions of employees. This case bears striking similarities to other high-profile corporate criminal cases where the corporation itself was held accountable for the actions of its employees, even where senior leadership did not explicitly direct the misconduct.

97.    In recent years, the U.S. Department of Justice and other governmental agencies have pursued criminal cases against companies and their employees for similar misconduct, further

underscoring the need to hold corporations accountable when their employees engage in intentional acts of retaliation or harassment in the service of the company's interests.

### 6. eBay: Corporate Liability and Employees' Misconduct.[5]

98.    The eBay case offers a crucial precedent for corporate criminal liability. eBay's executives and employees were involved in a criminal conspiracy to harass and intimidate a couple that operated an online blog critical of eBay's leadership. The company was forced to settle, paying $3 million in fines, and several individuals within the company were criminally charged, including a former senior security executive. Notably, eBay was held accountable despite the fact that the leadership did not directly instruct criminal activities.

99.    The DOJ found that eBay, as a corporation, was responsible for the unlawful actions taken by its employees, showing that corporations can be held liable for unlawful conduct even when senior leadership did not explicitly approve or direct such actions. This principle applies to Apple's situation, where Appleseed's conduct—enabled, facilitated, and, in some instances, directed by Apple's Global Security team—reflects a systemic pattern of retaliation designed to undermine the plaintiff's whistleblowing efforts and intimidate her.

### 7. Wells Fargo: Corporate Responsibility for Employee Misconduct.[6]

100.    Similarly, in the case of Wells Fargo, the bank faced significant penalties, including a $3 billion settlement, after employees engaged in widespread fraudulent activities by opening millions of unauthorized accounts to meet sales targets. While the misconduct was carried out by rank-and-file employees, Wells Fargo faced liability as a corporate entity. The bank's failure to prevent or correct the actions of its employees showed a systemic failure that ultimately led to criminal charges and penalties.

101.    In this case, the analogy to Apple is clear: just as Wells Fargo was held accountable for the actions of employees, Apple must also bear responsibility for the illegal acts of employees,

---

[5] U.S. DOJ, *eBay Inc. to Pay $3 Million in Connection with Corporate Cyberstalking Campaign Targeting Massachusetts Couple*, January 11, 2024, https://www.justice.gov/usao-ma/pr/ebay-inc-pay-3-million-connection-corporate-cyberstalking-campaign-targeting

[6] U.S. DOJ, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization*, February 21, 2020, https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices

including Appleseed, who engaged in a deliberate pattern of harassment and retaliation against the plaintiff. Apple not only failed to intervene but appears to have been complicit in inciting Appleseed's actions to further its own interests in discouraging the plaintiff's whistleblowing.

### 8. Volkswagen: Corporate Liability for Employee Actions.[7]

102.    The Volkswagen emissions scandal, in which the company programmed vehicles to cheat on emissions tests, further illustrates the principle that companies must be held accountable for their employees' actions even when senior executives are not directly involved. In this case, Volkswagen's top management did not explicitly direct employees to engage in fraudulent conduct, but the company still faced substantial criminal liability because the actions were seen as part of a systemic pattern within the corporation to protect the company's commercial interests at the expense of consumer rights and the public interest.

### 9. Uber: Covering Up Employee Misconduct.[8]

103.    In the case of Uber, the company faced significant criminal penalties after it was revealed that it had covered up a data breach that affected millions of its customers. Several Uber executives, including the CEO at the time, were involved in the decision to conceal the breach and avoid public disclosure. Uber was criminally prosecuted for its failure to take immediate corrective action and disclose the breach to its customers, despite the actions being carried out by employees.

104.    Similarly, Apple's failure to address their employee's actions and its deliberate efforts to shield her from accountability mirrors Uber's conduct. Apple, by covering up the harassment and retaliation and failing to take appropriate steps to hold wrongdoers accountable, reflects corporate complicity in the unlawful acts committed in furtherance of the company's interests. Note: the long-time Board member and Chair of Apple's Finance & Audit Committee, Ronald Sugar, is also Board Chair at Uber. Gjovik filed a SEC complaint about him related to conflicts of interest, fraud, and cover-ups prior to Apple terminating her employment.

---

[7] BBC, *How VW tried to cover up the emissions scandal,* 4 May 2018, https://www.bbc.com/news/business-44005844
[8] U.S. DOJ, *Former Chief Security Officer Of Uber Sentenced To Three Years' Probation For Covering Up Data Breach Involving Millions Of Uber User Records,* May 5, 2023, https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-sentenced-three-years-probation-covering-data; U.S. DOJ, *Former Chief Security Officer Of Uber Convicted Of Federal Charges For Covering Up Data Breach Involving Millions Of Uber User Records,* October 5, 2022, https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-convicted-federal-charges-covering-data-breach

**10.      Activision Blizzard: Corporate Internal Control Requirements.**

105.    The facts in this case bear striking similarities to the U.S. Securities and Exchange Commission (SEC) enforcement action against Activision Blizzard, Inc. in 2023, where the SEC charged Activision Blizzard with failing to maintain adequate controls to ensure that employee complaints regarding workplace misconduct were properly assessed and disclosed.[9] In that case, the SEC found that:

106.    Activision Blizzard concealed material information from investors by failing to disclose internal complaints of workplace misconduct, including harassment and retaliation. The company used overly broad NDAs and internal policies to prevent employees from speaking about illegal conduct, violating whistleblower protection laws. The SEC imposed penalties on Activision Blizzard for misleading public disclosures and engaging in conduct that suppressed employees' rights to report violations. In Plaintiff's case against Apple, similar violations have occurred, including:

- Apple's failure to disclose and actively suppress workplace misconduct complaints— including whistleblower retaliation, harassment, and misuse of private data (such as Plaintiff's nude photos).
- Apple's legal team's strategic use of NDAs, confidentiality policies, and legal intimidation tactics to suppress employee speech and prevent disclosures about corporate wrongdoing.
- Apple's ongoing concealment of material information in discovery and fraudulent assertions of privilege to obstruct the litigation process and prevent key facts from being uncovered.
- The involvement of Apple's legal and security teams in direct retaliation against whistleblowers, mirroring the systemic suppression of complaints seen in Activision Blizzard's case.

107.    The SEC's enforcement action against Activision Blizzard underscores the increasing scrutiny on corporate misconduct involving suppression of whistleblower complaints and the obstruction of internal and external investigations. Just as Activision Blizzard faced financial penalties and reputational damage, Apple's similar conduct—especially its weaponization of legal processes to intimidate and silence Plaintiff—exposes it to significant legal liability under

---

[9] U.S. SEC, *Activision Blizzard to Pay $35 Million for Failing to Maintain Disclosure Controls Related to Complaints of Workplace Misconduct and Violating Whistleblower Protection Rule*, 2023-22, https://www.sec.gov/newsroom/press-releases/2023-22

federal and state whistleblower protection laws, as well as SEC regulations governing corporate disclosures. Given the parallels between Apple's misconduct and the violations found in the Activision Blizzard case, this case presents a strong argument for regulatory and judicial intervention to hold Apple accountable for its unethical and unlawful corporate practices.

## Public Policy Impacts and The Need for Correction

108.    The misconduct in this case has significant public policy implications that go beyond the interests of the parties involved. Apple's actions serve to further entrench a corporate culture where retaliation and harassment are tolerated, and where employees are discouraged from reporting misconduct for fear of retribution. The broader societal implications of such behavior cannot be overstated. Allowing companies like Apple to avoid accountability for such actions would send a dangerous message—that corporations can act with impunity, shielded from the consequences of their illegal and unethical practices by the sheer volume of their legal resources and their ability to manipulate the judicial process.

109.    There is also public interest in ensuring that cases like this are resolved fairly and transparently. By filing frivolous motions to dismiss, withholding crucial evidence, and otherwise obstructing Plaintiff's efforts to seek justice, Apple is abusing the legal system in a manner that undermines the rule of law. If left unchecked, this type of behavior can set a dangerous precedent, discouraging future whistleblowers and employees from coming forward to report illegal or harmful activities. The Court must send a clear message that it will not tolerate such practices, both to protect the interests of the Plaintiff and to uphold the integrity of the judicial process.

110.    Moreover, the discovery violations and motions to dismiss are particularly egregious in light of the public health implications related to the toxic emissions from the facility at issue. The Plaintiff's claims involve not only personal harm but also a broader societal concern regarding the environmental impact of Apple's operations. The Court must ensure that such misconduct is fully investigated and remedied, not only for the sake of the Plaintiff but also for the welfare of the public, who may be affected by the Defendant's actions.

111.    Apple has also engaged in blatant discovery violations. Despite multiple requests for documentation and evidence related to Appleseed's conduct, Apple delayed and refused the production of key materials that would support Plaintiff's claims. These materials include internal

communications from Apple related to Appleseed's actions, documentation of any complaints or investigations into her behavior, and records showing how Apple responded to the Plaintiff's whistleblowing. This obstruction of discovery not only impedes Plaintiff's ability to properly plead the case but also exacerbates the harm caused by Appleseed's actions.

### Apple's Deliberate Concealment of Crucial Information

112.    Apple's pattern of withholding or hiding vital facts—both from the affected employee and from the government—highlights is a systemic disregard for public health, environmental regulations, and fundamental employee rights. First, Apple concealed the EPA inspection of the Superfund site office, preventing meaningful oversight and remedy of vapor intrusion hazards. This deception struck at the heart of transparency obligations that businesses owe to employees and regulators in environmental compliance. By hiding the safety issues, namely the improper installation and sub-slab depressurization system modifications, Apple evaded scrutiny about conditions that posed serious health risks to anyone working in or near the facility. Such conduct undermines the regulatory framework that relies on accurate information to protect workers' safety and the environment.

113.    Similarly, Apple concealed its operation of a semiconductor fabrication plant near Plaintiff's residence, a facility releasing dangerous chemicals without appropriate abatement. The company's purposeful secrecy not only thwarted the government's right to monitor hazardous emissions but also deprived Plaintiff of the knowledge she needed to protect her own health. Most gravely, Apple's covert awareness that it had almost killed Plaintiff—by exposing her to life-threatening toxins—demonstrates an unconscionable choice to place corporate expedience above human life and regulatory compliance. Each instance of withholding crucial safety and environmental data violated not just statutory requirements but also the public policy that favors full disclosure of hazards to both employees and enforcement agencies.

114.    Worse still, Apple hid the September 15, 2021 complaint containing nude photographs of Plaintiff from both Plaintiff and the Court, a shocking demonstration of corporate obstruction in the judicial process. By failing to disclose a key document that formed the basis for Plaintiff's termination. Apple deprived Plaintiff of her due process right to understand the allegations against her and to address them in a timely manner. This concealment impeded the Court's ability to assess the legitimacy of Apple's disciplinary decisions and to prevent abuse of

legal processes. From a public policy standpoint, such conduct tarnishes the integrity of judicial proceedings and fosters a chilling effect on any employee who dares to bring forth claims of unlawful workplace conditions or whistleblowing.

115.    Collectively, Apple's pattern of concealment—of an EPA inspection, HVAC hazards, the semiconductor plant, near-fatal environmental exposure, and critical documentary evidence—represents an affront to the regulatory frameworks designed to safeguard public health and worker safety. It also subverts the judicial function by omitting key facts needed to adjudicate claims fairly. Such behavior not only violates the spirit of environmental, labor, and whistleblower protection laws, but it also erodes public trust in corporate accountability. As a matter of legal and public policy, courts should not tolerate such deliberate and injurious cover-ups.

# Conclusion

116.    The intentional nature of the actions taken by Apple in this case goes beyond mere negligence and rises to the level of deliberate misconduct. Plaintiff respectfully requests that the Court grant leave to amend the Complaint to reflect these newly discovered facts, which provide a more comprehensive and accurate account of the misconduct and show that Apple's actions were undertaken with the specific intent to retaliate against Plaintiff, obstruct justice, and suppress whistleblowing activities.

117.    By granting this motion, the Court will ensure that the full scope of Apple's misconduct is adequately addressed and will allow Plaintiff to seek redress for the harm caused by Defendant's intentional actions. By taking corrective action, the Court would not only ensure fairness in this case but would also affirm its commitment to upholding public policy interests that prioritize the protection of employees, the environment, and the integrity of the judicial process.

118.    Please note: Plaintiff has not yet read Defendant's Reply at Dkt 152, so nothing in this motion is a response to Defendant's Reply.


Executed on: Jan. 31 2025

Signature:


**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com

**Physical Address**: Boston, Massachusetts

**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816

**Phone**: (408) 883-4428