**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| | CAND No. 3:23-CV-04597-EMC |
| | 9th Cir No.: 24-6058 |
| **ASHLEY M. GJOVIK**, *an individual*, | **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE** |
| Plaintiff, | |
| vs. | *In Support of Plaintiff's Motion to Amend & Motion to Disqualify* |
| **APPLE INC.**, a corporation, | **Motion Hearing:** |
| | **Dept: Courtroom 5 (& Zoom)** |
| Defendant. | **Judge: Honorable Edward M. Chen** |
| | **Date: Feb 27 2025** |
| | **Time: 1:30 PM** |

1  **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF**
2  **MOTIONS TO AMEND AND TO DISQUALIFY DEFENSE COUNSEL**

3  **I.    INTRODUCTION**

4
5       Plaintiff Ashley Gjovik, appearing pro se, respectfully requests that this Court take judicial
6  notice of publicly available and official government records that directly support Plaintiff's Motions
7  to Amend the Complaint and Motion to Disqualify Defense Counsel Orrick, Herrington & Sutcliffe
8  LLP ("Orrick"). Judicial notice is warranted under Federal Rule of Evidence 201(b), as the facts
9  contained in these official records, public documents, and prior court filings are not subject to
10  reasonable dispute and are capable of accurate and ready determination from sources whose
11  accuracy cannot reasonably be questioned.

12
13  **II.    FACTS SUBJECT TO JUDICIAL NOTICE**

14      Plaintiff seeks judicial notice of the following publicly available and official records, which
15  are highly relevant to Apple's knowledge of the claims at issue, Apple's involvement in misconduct,
16  and the disqualification of its legal counsel. Plaintiff has attached seven exhibits categorized into
17  three groups.

18
19  **Group 1: OSHA FOIA Documents**

20   1.  **Exhibit A: Apple's Official Filings in the U.S. Department of Labor ("DOL") Case**
21       **Containing the Email with Plaintiff's Nude Photos** – These documents establish that
22       Apple was in possession of these images, knowingly transmitted them, and relied on them
23       in legal proceedings. This supports the motion to disqualify due to Orrick's involvement
24       and bad-faith litigation tactics. Courts may take judicial notice of prior administrative filings
25       under *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244,
26       248 (9th Cir. 1992).

— 1 —

1   Given that Apple has repeatedly attempted to suppress or downplay its involvement with these

2   images in the present case, judicial notice of these DOL filings contradicts Apple's litigation

3   position and further supports the disqualification of Orrick due to their direct participation in

4   misconduct involving Plaintiff's personal images. Judicial notice of prior administrative

5   proceedings is proper under *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,

6   971 F.2d 244, 248 (9th Cir. 1992) (courts may take notice of proceedings in other courts and

7   agencies if they have a direct relation to matters at issue).

8

9   **GROUP 2: BATTERYGATE SEXTORTION AND RELATED RETALIATION**

10      2.   **Exhibit B: August 30, 2021, News Article Discussing Plaintiff's Twitter Posts About**

11           **Batterygate Sextortion** – The article reports on Plaintiff's public disclosures regarding

12           Apple's misconduct, supporting Apple's knowledge of her claims prior to her termination.

13           Courts may take judicial notice of news articles when relevant to the public record. *See Von*

14           *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

15

16      3.   **Exhibit C: Plaintiff's Twitter Posts from August and September 2021 Regarding**

17           **Batterygate Sextortion** – These social media posts demonstrate that Plaintiff publicly

18           complained about Apple's unlawful actions before her termination, contradicting Apple's

19           claims that it was unaware of her concerns. Courts have taken judicial notice of public social

20           media posts. *See Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

21

22   **Group 3: Crystal Brown v. Apple Lawsuit and Related Retaliation**

23      4.   **Exhibit D: Court Filing from Crystal Brown v. Apple Showing Orrick and Jessica**

24           **Perry as Defense Counsel** – This filing proves that Orrick was actively involved in

25           defending Apple in a lawsuit regarding similar employment law violations. Judicial notice

26           of court records is well-established. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th

27           Cir. 2014).

28

1       5. **<u>Exhibit E</u>: Plaintiff's September 7, 2021, Social Media Posts Discussing Crystal**

2          **Brown v. Apple** – Plaintiff publicly commented on discovering the lawsuit, highlighting

3          Apple's pattern of misconduct. She was fired two days later, supporting her retaliation

4          claim.

5

6    Because these documents are official records, court filings, and publicly available documents that

7    contradict Apple's litigation positions and support Plaintiff's motions to amend and disqualify

8    counsel, judicial notice is proper.

9

10   **GROUP 4: RESTRAINING ORDER LITIGATION FROM APPLESEED**

11

12      6. **<u>Exhibit F</u>: Plaintiff's December 2022 Motion Filed Against Appleseed in Restraining**

13         **Order Litigation** – Plaintiff explicitly stated in this filing that Apple was coercing

14         Appleseed into participating in a harassment campaign against her, supporting the

15         argument that Apple was directing or ratifying Appleseed's conduct. Courts may take

16         judicial notice of prior litigation. See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d

17         741, 746 n.6 (9th Cir. 2006).

18      7. **<u>Exhibit G</u>: Plaintiff's January 2023 Motion Filed Against Appleseed in Restraining**

19         **Order Litigation** – Plaintiff requested that the court refer Appleseed's conduct to the

20         District Attorney for criminal review, further demonstrating Apple's continued

21         involvement in coercing Appleseed into retaliatory conduct.

22

23

24   **GROUP 5: PUBLIC JOB DESCRIPTIONS FOR APPLE SECURITY EMPLOYEES**

      8. **<u>Exhibit H</u>: Job Description for the Crisis Manager Who Contacted Plaintiff on**

25         **October 2, 2024**

26

27

28

— 3 —

1
2      These official job postings are relevant to understanding the responsibilities and duties of Apple's
3      Global Security personnel, including those involved in this case; and the role of Appleseed, who
4      has engaged in extensive harassment and interference with Plaintiff's legal proceedings, and whose
5      job duties likely included direct coordination with Apple's executives and legal teams.
6
7      Judicial notice of job postings is proper where they are publicly available on a company's official
8      website or widely recognized employment platforms. See *Peralta v. Hispanic Business, Inc.*, 419 F.3d
9      1064, 1068 (9th Cir. 2005) (holding that publicly available employment records and job descriptions
10     may be subject to judicial notice as reliable and readily verifiable sources).
11
12
13   **III.    LEGAL STANDARD**
14          Under Federal Rule of Evidence 201(b), a court may take judicial notice of facts that are
15     "not subject to reasonable dispute because they... can be accurately and readily determined from
16     sources whose accuracy cannot reasonably be questioned." Courts regularly take judicial notice of:
17          -   Prior administrative filings and agency records (*Robinson Rancheria Citizens Council*, 971
18              F.2d at 248).
19          -   Publicly available employment records and job descriptions (*Peralta v. Hispanic Business,
20              Inc.*, 419 F.3d at 1068).
21          -   Filings in related litigation (*Rosales-Martinez v. Palmer*, 753 F.3d at 894).
22
23   **IV.    REQUEST FOR JUDICIAL NOTICE**
24     Plaintiff respectfully requests that this Court take judicial notice of:
25          1.  Apple's official filings in the U.S. DOL case that contain the email with Plaintiff's
26              unauthorized nude images.
27          2.  Publicly available job descriptions for Apple Global Security employees, including the
28

1    Crisis Manager who harassed Plaintiff on October 2, 2024.

2    3.   Plaintiff's January 2023 filing in the Appleseed litigation, wherein Plaintiff documented

3         Apple's direct involvement in coercing Appleseed into targeting Plaintiff.

4         These documents are reliable, publicly available, and not subject to reasonable dispute,

5    warranting judicial notice under Federal Rule of Evidence 201(b). Given that Apple has taken

6    contradictory positions regarding its knowledge, involvement, and responsibility for Appleseed's

7    actions, judicial notice is necessary to prevent Apple from benefitting from misrepresentations and

8    omissions in its legal arguments.

9

10   **V.    CONCLUSION**

11        For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Request

12   for Judicial Notice and consider the publicly available and administrative records that demonstrate

13   Apple's prior knowledge, involvement, and misconduct, all of which directly support Plaintiff's

14   pending motions.

15

16   Respectfully submitted,

17

18

19   Dated: Jan. 31, 2024.

20

21   Signature:

22

23

24

25

26   _____

27   **/s/ Ashley M. Gjovik**

28   *Pro Se Plaintiff*

1

2  **Email**: legal@ashleygjovik.com

3  **Physical Address**:
   Boston, Massachusetts

4  **Mailing Address:**

5  2108 N St. Ste. 4553 Sacramento, CA, 95816

6  **Phone**: (408) 883-4428

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.    APPENDIX: EXHIBITS

## REQUEST FOR JUDICIAL NOTICE

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS & REQUETS |
|---|---|---|
| EXHIBIT A | *FOIA docs for Ashley Gjovik v. Apple, CERCLA, OSHA, & SOX Retaliation cases* | Motion to Amend & Motion to Disqualify |
| EXHIBIT B | *Batterygate Sextortion - Article* | Motion to Amend & Motion to Disqualify |
| EXHIBIT C | *Batterygate Sextortion – Social Media Posts* | Motion to Amend & Motion to Disqualify |
| EXHIBIT D | *Crystal Brown v. Apple Inc (2018-2019)* | Motion to Amend & Motion to Disqualify |
| EXHIBIT E | *Crystal Brown v. Apple Inc (2018-2019)* | Motion to Amend & Motion to Disqualify |
| EXHIBIT F | *C.S. v. Ashley Gjovik, Dec. 2022 Legal Filing, King County Superior Court* | Motion to Amend & Motion to Disqualify |
| EXHIBIT G | *C.S. v. Ashley Gjovik, Jan. 2023 Legal Filing, King County Superior Court* | Motion to Amend & Motion to Disqualify |
| EXHIBIT H | *Job Postings for Apple Global Security* | Motion to Amend & Motion to Disqualify |

# Exhibits

# Exhibit A

*Apple's filings to U.S. Dept. of Labor*
*For the Gjovik v. Apple whistleblower case,*
*Released to Plaintiff through FOIA*



**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

orrick.com

March 4, 2022

**VIA ELECTRONIC MAIL**

Jessica R. Perry

E    jperry@orrick.com
D    +1 650 614 7350
F    +1 650 614 7401

(b) (7)(C)

Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
(b) (7)(C)

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

Re:    *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

Dear (b) (7)(C) :

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

I.    **INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

4161-3255-5828





March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by *intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press*, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## II.    FACTUAL BACKGROUND

### A.    Apple Prohibits Discrimination, Harassment, and Retaliation.

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

### B.    Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was



promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the termination of her employment on September 10, 2021.[2]

Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties as an Apple employee." "Proprietary information" includes, inter alia, non-public "materials or information relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of Apple's rules and policies regarding proprietary information" and understood that breach of the agreement could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings." To safeguard information about Apple's products, employees are prohibited from disclosing confidential information without prior approval of management.

As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. On each occasion, Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple required all participants— as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed the Alpha Study Consent Form and expressly acknowledged that any information about the study, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.").

---

[2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

[3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from further unauthorized disclosure.





March 4, 2022
Page 4

### C.      Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.





March 4, 2022
Page 5

**D.  Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.  Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, ***Ms. Gjovik admitted to disclosing confidential information*** about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.  Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.  Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.





March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- March 22, 2021: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- April 2, 2021: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- April 9, 2021: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."





March 4, 2022
Page 7

- <u>April 11, 2021</u>: Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- <u>April 27, 2021</u>: Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- <u>May 17, 2021</u>: Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- <u>May 18, 2021</u>: Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- <u>June 10, 2021</u>: Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- <u>July 2, 2021</u>: ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- <u>July 7, 2021</u>: Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.




March 4, 2022
Page 8

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

### 2. Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

### 3. Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).





March 4, 2022
Page 9

> I want to confirm our conversation a few minutes ago. ***Per your request, you are now on paid administrative leave so as to not interact with your managers***.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

## III.    ARGUMENT

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.




March 4, 2022
Page 10

### A.    Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The *only* reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.





**B.      Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.**

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.





### C. Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant*, 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.*, 402 F. App'x 936 (5th Cir. 2010); *Williams*, 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

### D. Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that *"[p]er your request, you are now on paid administrative leave"*—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced*, 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.



(b) (7)(C)
March 4, 2022
Page 13

## IV.    <u>CONCLUSION</u>

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By:    _____
    Jessica R. Perry

| From: | (b) (7)(C) |
|---|---|
| To: | Mantoan, Kathryn G. |
| Cc: | Perry, Jessica R. |
| Subject: | Apple Inc./Gjovik/9-3290-22-051: Request for Information |
| Date: | Friday, September 16, 2022 4:07:00 PM |

Ms. Mantoan and Ms. Perry,

After review of your March 4, 2022 response, the following information is needed for the subject complaint investigation.

1. Documentation to support Ms. Gjovik intentionally disclosed confidential information about Apple products on Twitter and to the press. This may include, but is not limited to copies of any text messages between Ms. Gjovik and another employee, tweets, press articles, reports from Business Conduct Helpline, or emails.

2. Copy of Apple's policy regarding disclosure of confidentiality/proprietary information.

3. Copy of Apple's Misconduct and Discipline Policy.

4. Copy of Ms. Gjovik's signed non-disclosure agreement regarding confidential/proprietary information.

5. Documentation to support Ms. Gjovik refused to cooperate with Apple's internal investigation. This may include, but is not limited to emails, meeting notes, phone call logs, or a signed statement from the company investigator(s) or company official(s) that attempted to contact Ms. Gjovik.

6. From January 2021 to present, please provide information of other Apple employees who have been terminated for disclosing confidential information and specifically identify the individuals that were terminated for posting on social media and/or communicating with the press. At minimum provide the following for each employee: 1) name or identifier, 2) job title, 3) date of termination, and 4) reason for termination.

A response is needed by September 30, 2022. Please identify which evidence contains confidential business information and Apple requests to receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Let me know if you have any questions.

Regards,



Whistleblower Protection Program
U.S. Department of Labor – OSHA



**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

+1 415 773 5700

orrick.com

September 30, 2022

**VIA ELECTRONIC MAIL**

**Kathryn G. Mantoan**

E  kmantoan@orrick.com
D  +1 415 773 5887
F  +1 415 773 5759

(b) (7)(C)
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
(b) (7)(C)

Re:    *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

Dear (b) (7)(C) :

Apple provides the following information and supporting documents in response to the Department of Labor's request for additional information on September 16, 2022.

1.  **REQUEST**:  Documentation to support Ms. Gjovik intentionally disclosed confidential information about Apple products on Twitter and to the press. This may include, but is not limited to copies of any text messages between Ms. Gjovik and another employee, tweets, press articles, reports from Business Conduct Helpline, or emails.

    **RESPONSE**:  Please see Exhibits 1-10, which show that Ms. Gjovik disclosed Apple's confidential product information to external third parties, namely Twitter and a reporter from The Verge publication.

2.  **REQUEST**:  Copy of Apple's policy regarding disclosure of confidentiality/proprietary information.

    **RESPONSE**:  Please see Apple's Confidentiality and Intellectual Property Agreement that Ms. Gjovik signed upon hire (Exhibit 11), and Apple's Business Conduct Policy (Exhibit 12), which also contains a confidentiality provision.

3.  **REQUEST**:  Copy of Apple's Misconduct and Discipline Policy.

    **RESPONSE**:  Please see Exhibit 13.

4.  **REQUEST**:  Copy of Ms. Gjovik's signed non-disclosure agreement regarding confidential/proprietary information.

    **RESPONSE**:  Please see the two agreements that Ms. Gjovik signed in which she agreed to not disclose Apple's confidential information: Exhibit 11 (executed copy of Apple's Confidentiality and Intellectual Property Agreement), Exhibit 1 (executed copy of the Alpha Study consent form).





5. **REQUEST**:  Documentation to support Ms. Gjovik refused to cooperate with Apple's internal investigation. This may include, but is not limited to emails, meeting notes, phone call logs, or a signed statement from the company investigator(s) or company official(s) that attempted to contact Ms. Gjovik.

   **RESPONSE**:  Please see Exhibits 14-15, which shows that Ms. Gjovik refused to be interviewed as part of Apple's internal investigation.

6. **REQUEST**:    From January 2021 to present, please provide information of other Apple employees who have been terminated for disclosing confidential information and specifically identify the individuals that were terminated for posting on social media and/or communicating with the press. At minimum provide the following for each employee: 1) name or identifier, 2) job title, 3) date of termination, and 4) reason for termination.

   **RESPONSE**:  Please see Exhibit 16, which identifies ▮▮▮ other Apple employees who have been terminated for violating their confidentiality obligations.

Please note that this letter and Exhibits 1-8 and 11-16 (the "Materials") contain confidential business information protected from disclosure under Exemption 4 of the Freedom of Information Act, 5 U.S.C. § 552(b)(4). Apple requests to receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering the Materials.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.


By:    */s/ Kathryn G. Mantoan*

       Kathryn G. Mantoan

# Exhibit 4

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

Case: 2021-8-4406 - Hotline Web
Apple US
Concern

## Case Snapshot

**Opened:** 08/29/2021
**Days open:** 1
**Last modified:** 08/31/2021 8:17 PM
**Date closed:** 08/31/2021
**Intake method:** Hotline Web
**Status:** Closed
**Alert:** None

## General Case Info

**Case number:**
2021-8-4406

**Received/Reported date:**
08/29/2021

**Language:**
English

**Assigned tier:**
Apple US

**Issue**

**Primary issue:**
Concern

## Case Details

**Reported tier information**

**Case type:**
Allegation

**Intake method:**
Hotline Web

**Location**

**Organization/Building name:**
Apple

**Country:**
United States

**Reporter contact information**

**Reporter anonymous:**
Yes

**Case Information**

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC     Document 155-2     Filed 01/31/25     Page 29 of 109

**Are you an Apple Employee?**
Yes

**Who was involved?**
Ashley Gjøvik

**Details:**
Ashley Gjøvik keeps Twitting about Apple. While I don't know how truthful as her claims and what she is allowed to share about her experience, I think she's also going too far by sharing screenshots of internal emails about Apple's research about ▓Omega Study▓:
https://twitter.com/ashleygjovik/status/1431824501457633283.

While the overall claims she's making should be investigated thoroughly (and I want to believe that this is currently the case and that Apple will do the right thing), it also feels like she's trying to see how far she can push things before getting fired, and keeps turning any narrative to her advantage. I wouldn't be surprised if she's looking to get fired to then fire back publicly at Apple some more (which would help her future career as a lawyer).

In any case, regardless of all this one again, I don't think Ashley sharing screenshots of internal research that could benefit unreleased products is appropriate. Maybe she should lose access to her email account while she's on leave.

## Follow-ups

### Reporter Additional Information
There are no additional notes for this incident.

### Questions/Comments and Reporter Responses

**08/31/2021 -** ▓(b) (7)(C)▓
**Question:** Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and investigation.

Please be assured that Apple has a strict policy prohibiting retaliation against employees who raise complaints to managers, PBP, and Business Conduct, or who participate in the investigation into any such complaint. It would be very helpful if you would be willing to speak to or correspond with an investigator - your information will be handled confidentially. Please follow up on a regular basis, or, should you choose, share a way for us to contact you for any additional questions.

## Attachments

### Files from Reporter

|   | File | Description | Date |
|---|------|-------------|------|
| #1 | Capture ▓(b) (7)(C)▓ 2021-08-29 à 19.22.09.png | Tweet | 08/29/2021 |

## Case Notes

**08/31/2021 8:17 PM -** ▓(b) (7)(C)▓
HRC▓(b) (7)(C)▓

# Exhibit 7

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions.  Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

**From:** Business Conduct <                              >
**Date:** September 15, 2021 at 12:57:59 PM PDT
**To:**
**Subject: Case HRC000068489 - Evidence Regarding Confidential IP Leak**
**Reply-To:** Business Conduct <                    >

Hello,

The Business Conduct Helpline received concern for your review  Please see the case details below

Reporter (b) (7)(C)

Hi all,

I am sending this information in good faith regarding a very public situation regarding Ashley Gjovik and an internal application I am not disclosed on code named Alpha   My goal is to ensure that this gets to the correct people, and I do not want it to come out at a later time that I was aware of this, and did not do the right thing

I want to expressly state that I played no part in any of this leak, and would not under any circumstances engage in such behavior  I respect Apple's policies in this regard, despite working to change some things regarding workplace issues

On (b) (7)(C)     Ashley informed me that she had sent Zoe Schiffer from the Verge details and images from Alpha  , which does not align what she is saying publicly, denying leaking any unreleased IP to the public

She specifically told me she sent her all of the screenshots she sent me, which I've attached

(b) (7)(C)                    <mailto                    >



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE



IMAGE REDACTED - CONFIDENTIAL

Its' not clear what they actual upload and dont upload

oh is this on your device

Sorry I'm trying to understand

Default settings

IMAGE REDACTED - CONFIDENTIAL

iMessage

12:22

5G E

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.





IMAGE REDACTED - CONFIDENTIAL

iMessage

12:23

5G E

333

Ashley

Alpha is an application to
DESCRIPTION REDACTED - CONFIDENTIAL

DESCRIPTION REDACTED - CONFIDENTIAL
Thanks for your assistance in this
important effort.

DESCRIPTION REDACTED - CONFIDENTIAL

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 155-2    Filed 01/31/25    Page 36 of 109



IMAGE REDACTED - CONFIDENTIAL

IMAGE REDACTED - CONFIDENTIAL

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

IMAGE REDACTED - CONFIDENTIAL



I'm helping Zoe with the privacy article. I gave her Alpha details because that bothers me too

I have nudes in there too that I think get uploaded

I'm even letting her include a few pics from Alpha saying its me as long as she removes any app UI and code/strings/numbers

IMAGE REDACTED - CONFIDENTIAL

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.



IMAGE REDACTED - CONFIDENTIAL

IMAGE REDACTED - CONFIDENTIAL

iMessage

12:23

5G E

333

Ashley ›

IMAGE REDACTED - CONFIDENTIAL

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 130-2    Filed 01/31/25    Page 39 of 109

IMAGE REDACTED - CONFIDENTIAL

yeah this is Internal hw, internal sw

DESCRIPTION REDACTED - CONFIDENTIAL

IMAGE REDACTED - CONFIDENTIAL

& I have no idea what that means

But I never even had to launch the app for it to DESCRIPTION REDACTED - CONFIDENTIAL

I'd guess there's a privacy review

iMessage

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 259-2    Filed 01/31/25    Page 42 of 109



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE



CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 155-2    Filed 01/31/25    Page 44 of 109





CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

# Exhibit 8

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 155-2    Filed 01/31/25    Page 47 of 109

| From: | (b) (7)(C) | < ████████████ > |
| Sent: | Wednesday, September 15, 2021 7:41 PM | |
| To: | ashleygjovik@icloud.com | |
| Subject: | Correspondence on behalf of Apple Inc. | |
| Attachments: | Gjovik, Ashley M. IPA.pdf; Sep_15_Gjovik_Letter_FINAL.pdf | |

Please see the attached correspondence.

Sincerely,

(b) (7)(C)

&nb=p;

## O&=8217;Melveny

(b) (7)(C)
████████████

O: +(b) (7)(C) ████████ =o:p>

O'Melveny & Myers LLP<=pan style="font-size:9.0pt;line-height:110%;color:black;mso-fareast-lang=age:JA">
Two Embarcadero Center, 28th Floor=/o:p>
San Francisco, CA 94111
Website<=a> | LinkedIn

*This =essage and any attached documents contain information from the law firm of=O'Melveny & Myers LLP that may be confidential and/or privileged. If y=u are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received =his transmission in error, please notify the sender immediately by reply e=mail and then delete this message.*

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 159-2    Filed 01/31/25    Page 48 of 109



O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823

T: +1 415 984 8700
F: +1 415 984 8701
omm.com

File Number:
600,000-3 (Apple Inc.)

September 15, 2021



**VIA E-MAIL**

Ms. Ashley Gjovik
1050 Benton Street, Apt 2310
Santa Clara, CA 95050
ashleygjovik@icloud.com

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:

https://twitter.com/ashleygjovik/status/1431824501457633283

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-internal user study project. Please remove those images from any public location and refrain from further public disclosures about that project.

The second is the image contained in the following tweet:

https://twitter.com/ashleygjovik/status/1432400136471072769

The related video is located here:

https://volume-assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application during confidential Apple-internal user studies. Please remove that image and video from any public location and refrain from further public disclosures about that application or related user studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you are represented by counsel in this matter, please identify your counsel.

/ / /

Century City • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo
CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE



Sincerely,

(b) (7)(C)


(b) (7)(C)
of O'MELVENY & MYERS LLP

CONFIDENTIAL – EXEMPT FROM FOIA DISCLOSURE

# Exhibit 9

This page was received by OSHA with redactions.  Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Monday, September 20, 2021 11:37 AM
**To:** (b) (7)(C) . < >
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]

Hi (b) (7)(C),

I hope you're well. I chatted with a journalist over at Vox and they mentioned you'd need to reach out formally with any requests like this. Let me know if you need help getting contact information for their legal team. They thought you might already have it, but if not, I can try to get you a contact over there.

—
**Ashley M. Gjøvik**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik | twitter.com/ashleygjovik
 (415) 964-6272 (Signal Preferred)

> On Sep 17, 2021, at 12:40 PM, (b) (7)(C) . < > wrote:
>
> Dear Ms. Gjovik --
>
> Thank you for your email.

1

Based on your September 15 email, we understood that you were in communication with others about removal of the video hosted by Vox. Consequently, we have not separately communicated with Vox. Please let us know the status of the communications you referenced.

Sincerely,



**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Friday, September 17, 2021 11:48 AM
**To:** (b) (7)(C) . <_____>
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]

Hi 

Again, I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Would you please let me know — have you already sent a request to Vox for them to remove the video? Have you received a response from them separately?

—
**Ashley M. Gjøvik**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022

On Sep 16, 2021, at 8:49 PM, (b) (7)(C) . <_____> wrote:

Dear Ms. Gjovik —
Thank you for your email.

2

This page was received by OSHA with redactions. Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 159-2    Filed 01/31/25    Page 53 of 109

I look forward to further information about Apple's request to remove the video. In the meantime, I note that there are additional tweets that also contain the same or similar images from confidential Apple-internal user studies:

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Please remove those images from any public location, remove any similar images, and refrain from further public disclosures of the same or similar information.
Sincerely,


---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Wednesday, September 15, 2021 8:58 PM
**To:** (b) (7)(C)          <                              >
**Subject:** Re: Correspondence on behalf of Apple Inc.

[EXTERNAL MESSAGE]
Hello (b)(7)(C) ,

I hope you're well.  Thank you for your email.

I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1431824501457633283
https://twitter.com/ashleygjovik/status/1432400136471072769

As for the video hosted by Vox, I do not have the power to delete it as Vox is in control of their own servers, not me. I am talking others about your request and someone will get back to you related to the Vox hosted video.

—
Ashley M. Gjøvik
Santa Clara University School of Law
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022

This page was received by OSHA with redactions.  Redactions made by OSHA for FOIA contain Exemptions per the FOIA.

Case 3:23-cv-04597-EMC    Document 155-2    Filed 01/31/25    Page 54 of 109

On Sep 15, 2021, at 7:40 PM, (b) (7)(C)                  <                              > wrote:

Please see the attached correspondence.

Sincerely,


David

### O'Melveny



O: +1 (b) (7)(C)

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Website | LinkedIn

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

<Gjovik, Ashley M. IPA.pdf><Sep_15_Gjovik_Letter_FINAL.pdf>

# Exhibit B

*Batterygate Extortion - Article*

**Apple cares about privacy, unless you work at Apple**
*The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs*
by Zoë Schiffer
Aug 30, 2021, 12:33 PM EDT

The Verge    Apple cares about privacy, unless you work at Apple

customer, people would lose their goddamn minds," says Ashley Gjøvik, a senior engineering program manager.

Apple employees also can't use their work email addresses to sign up for iCloud accounts, so many use their personal accounts.

The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute.

Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises."

Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises" (emphasis added).

Many employees have a choice between getting an Apple-owned phone or having the company pay for their phone plan. But one source tells *The Verge* that trying to maintain two phones can become impractical.

Apple did not respond to a request for comment from *The Verge*.

https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

# EXHIBIT C

*Batterygate Extortion – Social Media Posts*



**Ashley M. Gjøvik**
@ashleygjovik                                                        •••

Sooo, #Apple has pics of my boobs. During a discovery thing 3yr ago, legal forced me to hand-over all my texts. They refused to let me delete anything, even "fully personal," even when I said "by fully personal I mean nudes." They said they're in their "permanent evidence locker"

7:13 PM · Aug 19, 2021

POST: AUG 19 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1428495420917837826





**Ashley M. Gjøvik**
@ashleygjovik

···

I questioned this aggressively. Apple R&D pressures us to have one iPhone for work & personal (so we can "live on" / dogfood). I said, if there's texts that aren't with employees and have nothing to do with work, I should be able to delete them or at least attachments. "Nope."

7:16 PM · Aug 19, 2021

POST: AUG 19 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1428496048415133699/





**Ashley M. Gjøvik**
@ashleygjovik

...

Also, I was in a room of attorneys and I said, ok what if I show you those pics / texts and you confirm it's just personal stuff & then you watch me delete only what you approved? (I offered to let them see my nudes in order to not copy them). Nope! Send your nudes! #Apple

9:55 PM · Aug 19, 2021

POST: AUG 19 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1428536076654637061

× **Post Analytics**

**Ashley M. Gjøvik** @ashleygjovik · Aug 19, 2021
Replying to @ashleygjovik

Also, I was in a room of attorneys and I said, ok what if I show you those pics / texts and you confirm it's just personal stuff & then you watch me delete only what you approved? (I offered to let them see my nudes in order to not copy them). Nope! Send your nudes! #Apple

| ♡ 552 | ⇄ 53 | ◯ 16 |
|---|---|---|

| Impressions ⓘ | Engagements ⓘ | Detail expands ⓘ |
|---|---|---|
| **122K** | **6,309** | **1,781** |

| | New followers ⓘ | Profile visits ⓘ |
|---|---|---|
| | **1** | **3,531** |



POST: AUG 19 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1428499560062586883





POST: SEPT. 7 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1435444339019182083



POST: SEPT. 7 2021 | FIRED: SEPT. 9 2021
https://x.com/ashleygjovik/status/1435444945117073414

# Exhibit D

## *Crystal Brown v. Apple Inc* (2018-2019)

## Answer filed by Jessica Perry of Orrick.

1  Angela M. Alioto (SBN 130328)
2  Angela Mia Veronese (SBN 269942)
   H. Larry Elam III (SBN 178836)
3  LAW OFFICES OF JOSHEPH L. ALIOTO
   AND ANGELA ALIOTO
4  700 Montgomery Street
5  San Francisco, CA 94111-2104
   Telephone: (415) 434-8700
6  Facsimile: (415) 438-4638
7  Attorneys for Plaintiff CRYSTAL BROWN

E-FILED
7/2/2018 9:31 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV330922
Reviewed By: V. Taylor

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9               **FOR THE COUNTY OF SANTA CLARA**

10

11  CRYSTAL BROWN, an individual,          **CASE NO.:** 18CV330922

12                                         **COMPLAINT FOR DAMAGES:**
              Plaintiff,
13                                         1. **RETALIATION IN VIOLATION**
14       v.                                   **OF FEHA;**
                                           2. **FAILURE TO TAKE**
15  APPLE INC., and Does 1 through 100, inclusive,   **REASONABLE STEPS TO**
                                              **INVESTIGATE AND PREVENT**
16            Defendants.                     **RETALIATION IN VIOLATION**
                                              **OF FEHA;**
17                                         3. **CONSTRUCTIVE TERMINATION**
18                                            **IN VIOLATION OF PUBLIC**
                                              **POLICY; AND**
19                                         4. **INTENTIONAL INFLICTION OF**
20                                            **EMOTIONAL DISTRESS.**

21                                         **DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

                              - 1 -
                     **COMPLAINT FOR DAMAGES**

E. Fang

1   JESSICA R. PERRY (STATE BAR NO. 209321)
    ANJALI PRASAD (STATE BAR NO. 318440)
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
3   Menlo Park, CA  94025-1015
    Telephone:     (650) 614-7400
4   Facsimile:     (650) 614-7401
    jperry@orrick.com
5   aprasad@orrick.com

6   Attorneys for Defendant
    APPLE INC.
7

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 8/15/2018 9:41 AM
Reviewed By: E. Fang
Case #18CV330796
Envelope: 1836668**

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF SANTA CLARA

10

11  CRYSTAL BROWN, an individual,              Case No. 18CV330796

12              Plaintiff,                      **DEFENDANT APPLE INC.'S ANSWER
                                               TO PLAINTIFF CRYSTAL BROWN'S**
13         v.                                   **COMPLAINT**

14  APPLE INC., and Does 1 through 100,        Date Action Filed: June 28, 2018
    inclusive,
15
                Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit E

## *Crystal Brown v. Apple Inc* (2018-2019)

**Plaintiff's public Twitter posts upon discovery of the lawsuit on Sept. 7 2021 & she is fired two days later on Sept. 9 2021.**



Sept. 7 2021



**Ashley M. Gjøvik**
@ashleygjovik

Good morning, friends, @tim_cook, & @Apple! How are you? Oh good. I'm doing ok, thx for asking. Yeah, I JUST F'N FOUND A LAWSUIT AGAINST MY LITERAL #APPLE BOSS FROM 2019 FOR RETALIATION, CONSTRUCTIVE TERMINATION, & IIED THAT YOU MOTHER F'ERS SETTLED. "No policy violations" my a$$



10:26 AM · Sep 7, 2021



https://x.com/ashleygjovik/status/1435248108066127885



https://x.com/ashleygjovik/
status/1435250123114643458

Sept. 7 2021



https://x.com/ashleygjovik/status/1435251922315870215



Sept. 7 2021



**Ashley M. Gjøvik**
@ashleygjovik                                      ...

"#Apple, its officers & managing agents have knowingly retained, promoted, coddled, & protected VICIOUS employees known by its managing agents to by misogynist"
My Sr. Dir even said he understood why a woman might think speaking truthfully would jeopardize her career on his team.

> notified that these two women had d each of them, acted or failed to a
> ed the belief that "she could be mo igation not to discriminate against
> jeopardize her job by speaking trut have knowingly retained, promote
> e view that complaints by employe aging agents to be misogynist. The
> loyee's supervisor. In fact, Mr. ▓ , made a conscious decision that th
> equesting the meeting that he was hibiting employment discriminatio
> from employees when they are her espicable, cruel and oppressive. Th
> e boss, retaliation, etc." an amount to be proven at trial.

10:47 AM · Sep 7, 2021

https://x.com/ashleygjovik/status/1435253419632037897

✕    **Post Analytics**



| ♡ 17 | ⟲ 3 | ♡ 1 |
|---|---|---|

| Impressions ⓘ | Engagements ⓘ | Detail expands ⓘ |
|---|---|---|
| **11,162** | **932** | **221** |

| New followers ⓘ | Profile visits ⓘ |
|---|---|
| **0** | **49** |



Sept. 7 2021

**Ashley M. Gjøvik**
@ashleygjovik

She was blocked from even transferring to a different role by my #Apple Sr. Director. Then he sabotaged her review & threaten to put her on coaching. She complained to Employee Retaliations about the retaliation and they did nothing.

7      27.   Prior to applying for a position, Plaintiff reached out to the managers and confirmed
8    that the position remained opened. However, when Plaintiff applied for the positions, she was told
9    that they were all closed. Plaintiff later received confirmation from management that the positions
10   she had applied for were not closed at the time she attempted to apply. Plaintiff believe that Mr.
11   ▮▮▮ made sure that she would not be able to continue working at APPLE, even in a new role by
12   intentionally sabotaging a transfer to another team.
13      28.   In late August 2017, Plaintiff received her performance review from Mr. ▮▮▮
14   which was based on false and erroneous facts. After receiving her 2017 performance evaluation
15   and convinced that Mr ▮▮▮ was actively preventing her from leaving his organization to join
16   another within APPLE, Plaintiff took her complaints to APPLE Employee Relations.
17      29.   In late August 2017, Plaintiff made a formal complaint to APPLE Corporate
18   Employee Relations where she detailed of the negative interactions she was having with Mr. ▮▮▮
19   believing that they stemmed directly from her notifying him that two APPLE employees had been
20   made to suffer discrimination and harassment simply because they were women and for sticking up
21   for ▮▮▮
22      30.   After taking her complaints about Mr. ▮▮▮'s conduct toward her to Employee
23   Relations, Plaintiff received no relief. Mr.▮▮▮continued to micromanage her, criticize her work,
24   find fault with her decisions, and threaten to place her on an Apple documented coaching plan.
25   Plaintiff interpreted the coaching plan as an affirmative plan to end her e▮
26      31.   Whenever Plaintiff pressed Employee Relations to step in
27   his retaliatory treatment, Employee Relations would only pass her compl
28   senior" in Employee Relations. In all, Plaintiff's complaints were passe

- 7 -

**COMPLAINT FOR DAMAGES**

1    Employee Relations representatives, not counting the original representati▮

10:58 AM · Sep 7, 2021

**Post Analytics**

**Ashley M. Gjøvik** @ashleygjovik · Sep 7, 2021

She was blocked from even transferring to a different role by my #Apple Sr. Director. Then he sabotaged her review & threaten to put her on coaching. She complained to Employee Retaliations about the retaliation and they did nothing.

| ♡ 6 | ↻ 5 | ○ 0 |

| Impressions ⓘ | Engagements ⓘ | Detail expands ⓘ |
| 9,057 | 505 | 85 |

| New followers ⓘ | Profile visits ⓘ |
| 0 | 13 |

https://x.com/ashleygjovik/status/1435256137016754183

Sept. 7 2021



https://x.com/ashleygjovik/status/1435259779920777226



https://x.com/ashleygjovik/status/1435260787438678022

Sept. 7 2021



Ashley M. Gjøvik
@ashleygjovik

She came back from med leave and ⬜ #Apple Employee Retaliations finds "no policy violations"
Offers her:
1) termination or
2) constructive termination
Like me, she asks if she can report to Dir who keeps telling us we should be married & have kids by now, but RICO Sr Dir says no

11:24 AM · Sep 7, 2021

https://x.com/ashleygjovik/status/1435262737962078211

Sept. 7 2021



https://x.com/ashleygjovik/status/1435264846736494593



Sept. 7 2021



**Ashley M. Gjøvik**
@ashleygjovik                                    ...

The woman from that #Apple lawsuit against my boss, she took this photo of me back in 2017.
It's always been one of my favorite portraits.
I'm having so many feelings, now knowing what she went through & why she disappeared.
I'm never going to look at this the same way again.



12:55 PM · Sep 7, 2021



**Ashley M. Gjøvik** @ashleygjovik · Sep 7, 2021                    ...
She must have seen me, and known who came before me, and knew what she knew. Maybe she was thinking RUN. Maybe she was thinking I'd have better luck.
The last year I struggled w/ the same. Even refused to recruit an incredible intern, kept almost screaming GET OUT.

  ♡ 1          ⟲ 1          ♡ 17          ılıl                🔖  ⬆

**Ashley M. Gjøvik** @ashleygjovik · Sep 7, 2021                    ...
Maybe she wanted to say RUN but worried if she did it could be used against her somehow.

Maybe she did tell me to run and I didn't hear it.

Everyone option is both right & wrong when you're set up to fail.

GIRL IF YOU SEE THIS PLZ CALL ME OMG. 🖤 😭 🖤

  ♡ 1          ⟲ 2          ♡ 19          ılıl                🔖  ⬆

https://x.com/ashleygjovik/status/1435285602669264898

# Exhibit F

## *C.S. v. Gjovik (2022-2023)*

Electronically Filed

FＣＧＧ０ＢＤＥＣＧＧＡＩｈＩＣｈＣＥＡＣＥＴ

ＧＣＯＱｘＥＦＩＥＩＳＯＹ

King County District Court

1    **Ashley M. Gjovik (pro se)**

2

3

4    # IN THE KING COUNTY DISTRICT COURT
     # IN AND FOR THE STATE OF WASHINGTON

5

6    ## East Division, Redmond Courthouse

7

8

9                                    **KC DC No.:** 22CIV01704KCX
                                     **Court of Limited Jurisdiction**
10                                   **Honorable Judge Lisa O'Toole**

11   CHER SCARLETT, et al
                                     **APPEALS & CHALLENGES:**
12   Petitioner/Appellee,            **KC SUPERIOR COURT NO:** 22-2-03849 SEA
                                     **US DC AT SEATTLE NO:** 2:22-CV-00807-RAJ-BAT
13

14            v.                     **Re: Reverse & Remand of**
                                     **Anti-Harassment Order**
15

16   ASHLEY GJOVIK                   **Notice of Intention to File Motions upon Remand:**

17   Respondent/Appellant.
                                     **Motion for Dismissal with Prejudice**
18                                       - RCW 4.105.* - Unif. Public Expression Prot. Act
                                         - RCW 4.24.510 – Comm to Gov Agency
19                                       - CRLJ12(h)(3) - Lack of Subject Matter Jurisdiction
                                         - CRLJ13(a) - Inability to Join Indispensable Party
20                                       - CRLJ12(h)(2) - Failure to State a Claim
                                         - RCW 49.32.050 – Jurisdiction of Labor Disputes
21

22                                   **Motions for Sanctions**
                                         - Rule 11 Sanctions – Abusive Litigation
23                                       - RCW 4.84.185 – Fines for Frivolous Claims

24                                   **Motion for Relief from Judgement/Proceeding**
                                         - CRLJ60(b)(1)&(4) – Surprise, Irregularity, Fraud,
25                                         Misrepresentation, Misconduct
                                         - CRLJ60(b)(5) – Judgement is Void
26                                       - CRLJ60(b)(11) – Equity (Unclean Hands)

27

28

**King County District Court, Court of Limited Jurisdiction**
RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

# Notice of Intent Upon Remand

## 1.    Summary & Case History

The King County Superior Court reversed the prior judgement against Gjovik on September 26 2022 & send a mandate to the Court of Limited Jurisdiction for reverse and remand on November 17 2022.

This unfortunate matter was injected into the King County court system by Petitioner, Cher Scarlett, by her own admittance & under oath, <u>because of</u> an US NLRB charge Ashley Gjovik filed against Apple in January 2021 (2/1 Transcript), and further, Scarlett claimed Gjovik's supposed "harassment" of Scarlett started in early December 2021 when Gjovik had complained that "[Scarlett] was bullying [Gjovik]." (3/1 Transcript, pg 11). The crux of this lawsuit is Scarlett complaining that Gjovik's complaints of Scarlett's harassment & defamation of Gjovik, are somehow harassment of Scarlett.

Gjovik began reporting Apple Inc to the federal government in April of 2021 and filed her first formal charges against Apple in August of 2021. Scarlett began attacking Gjovik in June of 2021, escalating to public attacks in August of 2021, and then filed her own charges against Apple in September of 2021 which she later withdrew and accepted a settlement & payment from Apple around November 2021. Gjovik began to block Scarlett from communicating with her in August 2021 and completely blocked Scarlett in September 2021. Gjovik filed additional California and federal charges against Apple in January 2022 alleging witness intimidation and retaliation by a number of past and current Apple employees and managers, including but not at all limited to, Scarlett. Scarlett continued to attack Gjovik and Gjovik's cases against Apple for over a year, including this meritless and retaliatory litigation at hand.[1]

Much new evidence has come to light following the initial decision against Gjovik in this court, evidence which appears to begin to explain Scarlett's otherwise inexplicable and obsessive conduct towards Gjovik and further supports Gjovik's accusations of Apple Inc's culpability and liability for Scarlett's actions, including this lawsuit. Perhaps most important was the discovery in mid-March 2022, disclosed by Apple Inc & after Gjovik's gag-order, that Scarlett had filed a

---

[1] See docket & court filings for this matter, for the Superior Court appeal, and in Gjovik's attempted Constitutional Challenge in US District court – including Scarlett's own statements, briefs, & evidence

## King County District Court, Court of Limited Jurisdiction
### Re: Reverse & Remand of Anti-Harassment Order Against Ashley Gjovik

"Business Conduct" complaint against Gjovik to Apple on September 15 2021, while Scarlett still worked for Apple Global Security & Legal, alleging Gjovik had violated some Apple policy & included personal communications between Scarlett and Gjovik resulting from Scarlett requesting private information from Gjovik about Gjovik's dispute with Apple. (See Superior Court Exhibits). None of the information provided by Scarlett was actually material to Gjovik's cases, as admitted by Scarlett. However, under information & belief, Scarlett submitted this complaint & provided this information to Apple as part of her settlement agreement. At the same time Scarlett had been speaking to the press & making public statements requesting additional whistleblowers contact her and provide her with private information about their own disputes with Apple.

Regardless of Scarlett's intentions with the second point, it is clear she became obsessed with covering up what she did to Gjovik as it would cause much controversy with her now being held out as a "labor leader" among Apple employees.[2] As such, Scarlett set out to discredit both Gjovik and Gjovik's charges against Apple, no doubt in hope that Gjovik's case would never be decided on the merits where it may come to light what Scarlett did in September of 2021. This lawsuit is clearly part of Scarlett's cover-up and is an extension of her self-admitted long-running history of fraud. (see Scarlett's own court filings noting check fraud, student loan fraud, business fraud, etc). Scarlett made much of Gjovik's comments about Scarlett's husbands criminal record, but failed to disclose the crux of Gjovik's concerns about Scarlett's husband –his criminal record included making false statements & obstruction of law enforcement, & this was directly relevant to Gjovik's allegations of fraud by Scarlett.

Under information & belief, Apple orchestrated the situation to manipulate Scarlett into attacking Gjovik in ways that benefited Apple but which Scarlett may have believed were for her own self-preservation due to Apple's coercion. As such, and discussed later, Apple is an indispensable party in this matter – and the primary and exclusive jurisdiction for this matter is the California and federal agencies where this matter was under review long before Scarlett injected this dispute into the Washington court system – wasting much time & resources within the Washington court system, as well as implicating the state of Washington in Apple & Scarlett's witness intimidation efforts against Gjovik.

---

[2] The Washington Post, *"She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple."* Oct 14 2021

## King County District Court, Court of Limited Jurisdiction
### RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

Without this information, and after hours of manipulative, fraudulent, and highly inflammatory testimony by Scarlett - this Court of Limited Jurisdiction decided against Ashley Gjovik on March 1 2022. Gjovik appealed the decision to the King County Superior Court, raising 16 issues and errors from this trial court. Gjovik also brought the matter to a U.S. District Court arguing preemption & challenging the state of Washington's anti-harassment statutes as violating the U.S. Constitution facially & applied, however Gjovik's case was dismissed under the *Rooker-Feldman Doctrine* as a state appeal was underway. [3]

On September 26 2022, after reviewing the briefs and trial record and only deciding on a subset of the raised issues, a Superior Court judge issued an order reversing the decision of the Court of Limited Jurisdiction and finding Gjovik's conduct to be "protected per case law and constitutional protections." (KCSC Order pg 15). [4]  Even without reviewing Gjovik's allegations or evidence of Scarlett's fraud, unclean hands, or the court's lack of subject matter jurisdiction - Superior Court Judge Robertson found the Court of Limited Jurisdiction's ruling still "amounted to an unconstitutional prior restraint on [Gjovik]" and the decision was "entered in error." (Id).[5] The Superior Court found no evidence to justify a five-year order, nor any evidence of directed conduct to justify any order restricting distance and other prohibitions of direct contact. (KCSC Order pg 9).[6] The Superior Court found "no evidence of actual malice" by Gjovik and instead said the evidence about Gjovik's "expression of opinion… was not proved to be motivated by malice, but rather by activism." (Id).[7]

Scarlett did not file Motion for Reconsideration or Notice of Appeal.[8] The Superior Court transmitted their mandate to the Court of Limited Jurisdiction on Nov 17 2022.[9]

## 2. Remand Leading to Additional Proceedings

---

[3] *Gjovik v state of Washington, etc all*, 2:22-CV-00807-RAJ-BAT, US DISTRICT COURT IN THE WESTERN DISTRICT OF WASHINGTON
[4] *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Order, September 26 2022
[5] *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Order, September 26 2022
[6] *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Order, September 26 2022, *"Despite the lack of "direct" communication to Petitioner, as conceded under oath, the court imposed distance restrictions, prohibitions against surveillance, and prohibitions against direct/third person communications to Petitioner. The court made no specific findings to support the order (five years)."* Pg9
[7] *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Order, September 26 2022
[8] LRALJ 9.2 Entry of Decision; LCR 59
[9] LRALJ 12.1 Mandate; *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Mandate of Superior Court on RALJ Appeal

**King County District Court, Court of Limited Jurisdiction**
RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

The Superior Court's Mandate is unclear if it calls for a new trial in the Court of Limited Jurisdiction. RALJ 9.1 states that the Superior Court may "reverse, affirm, or modify" OR "remand the case." The use of "or" instead of "and" implies a reverse of the decision does not call for further proceedings.[10] However, the Mandate itself states the lower court decision is reversed AND "this Matter is remanded to the Court of Limited Jurisdiction."[11]

Gjovik files this Notice in anticipation of the potential for further proceedings. However, if the Court of Limited Jurisdiction agrees with the Superior Court decision, & simply reverses the prior decisions, this Notice will be moot.

### 3. Notice of Intent to Re-Up Prior Filed Motions to Dismiss with Prejudice

If the remand of the case by the Superior Court leads to additional proceedings in the Court of Limited Jurisdiction, Gjovik submits notice of her intent to preserve a number of previously filed motions & to file additional motions on the matter.  Gjovik intends to preserve her previously filed motions, which were never ruled on by the Court of Limited Jurisdiction, including under RCW 4.105.010-903[12] & RCW 4.24.510.[13] Gjovik also plans to request payment from Scarlett for Gjovik's legal costs, attorney's fees, & other expenses from dealing with this ordeal following the meritless & retaliatory petition & smear campaign by Scarlett. (RCW 4.24.510[14]; RCW 4.105.090[15]).

Gjovik plans to modify her motion for RCW 4.24.510, a witness protection statute, and request the full statutory fine of $10,000.00 from Scarlett instead of Gjovik's previous good faith waiver of the fine last February[16] as Scarlett has continued to harass, defame, and intimidate

---

[10] RALJ 9.1(e)

[11] *Scarlett v Gjovik*, KCSC, No 22-2-03849-7 SEA, Mandate of Superior Court on RALJ Appeal

[12] RCW 4.105 UNIFORM PUBLIC EXPRESSION PROTECTION ACT

[13] RCW 4.24.510 Communication to government agency or self-regulatory organization—Immunity from civil liability. *"A person who communicates a complaint or information to any branch or agency of federal, state, or local government, or to any self-regulatory organization that regulates persons involved in the securities or futures business and that has been delegated authority by a federal, state, or local government agency and is subject to oversight by the delegating agency, is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization."*

[14] RCW 4.24.510 *"A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense"*

[15] RCW 4.105.090 Costs, attorneys' fees, and expenses. *"the court shall award court costs, reasonable attorneys' fees, and reasonable litigation expenses related to the motion"*

[16] RCW 4.24.510: *"A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages*

## King County District Court, Court of Limited Jurisdiction
RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

Gjovik following the order against Gjovik, including reporting one of Gjovik's federal legal filings to a webservice as "child porn."

Notes on the intent of RCW 4.24.510 explains: *"SLAPP suits are designed to intimidate the exercise of First Amendment rights and rights under Article I, section 5 of the Washington state Constitution."* The Superior Court found that not only were Scarlett's allegations not supported by evidence to prove unlawful conduct, but the outcome of Scarlett's petition, (which Gjovik additionally argues was obtained by fraud, surprise, & other misconduct by Scarlett) did in fact chill Gjovik's *"exercise of First Amendment rights and rights under Article I, section 5 of the Washington state Constitution"*.

Gjovik's initial RCW 4.105 Anti-SLAPP motion rightful explained (now affirmed in part by the Superior Court judge):

> "Scarlett failed to establish a prima facie case as to each essential element of harassment, thus … the case should be dismissed with prejudice & noting … that Gjovik prevailed under the motion. Scarlett's request for a harassment order against Gjovik is not grounded in fact or law. The request also serves an improper purpose as it attempts to further intimidate and retaliate against a federal and California state witness, victim, and informant. Scarlett's request is an extension of her concerted effort to coerce Gjovik to withdraw, alter, and omit statements to government bodies, statements on issues under consideration by government bodies, and to chill, if not restrict, Gjovik's First Amendment free speech on matters of public concern…. UPEPA (RCW 4.105.010) applies to no-contact orders (9) if the requested order against Respondent arises from any act of Respondent, related to the gathering, receiving, posting, or processing of information for communication to the public, for the creation, dissemination, exhibition, or promotion of a literary, political, or journalistic work regardless of the means of distribution, no matter the method or extent of distribution."
> (*Feb 14 2022 Motion for Continuance & Notice of Intent to File Motion for Anti-SLAPP*, pg 2-3).

Gjovik's initial 4.24.510 motion also rightfully captured Scarlett's intent with this litigation:

> "Scarlett threatened, harassed, and coerced Gjovik to withdraw allegations about her from Gjovik's government charges to at least the U.S. NLRB. Scarlett is using this this petition to further intimidate Gjovik and is using a civil action to deter Gjovik who simply wishes to report information to federal agencies. RCW 4.24.510 was enacted to protect whistleblowers exactly like Gjovik from actors exactly like Scarlett."
> (*Feb 14 2022, Motion to Dismiss due to Public Policy*, pg 3)

---

*of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith."*

No. 22CIV01704KCX

ASHLEY M. GJOVIK (PRO SE)

**Page 6 of 9**

**King County District Court, Court of Limited Jurisdiction**
RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

Indeed, Gjovik objected in this court room on March 1 2022 that Scarlett was "trying to compel [Gjovik] to testify on [Gjovik's] federal charges" which named Scarlett as an agent of Apple in Apple's retaliation against Gjovik for Gjovik's protected activity.

During trial, Gjovik introduced numerous witness statements and evidence of posts and communications from third parties concurring Gjovik's view on this matter & that Scarlett was indeed the one attacking Gjovik, not the other way around. (2/14-3/1/2022 Witness Statements; Gjovik Evidence; DARVO addendum). Scarlett's response was generally the same to all parties – Scarlett would then claim her conduct towards Gjovik was justified because, she claimed, Gjovik's lawsuits & charges against Apple were "meritless," "perjury," and "lies." Scarlett has not been able to find a single 3rd party willing to make a statement under oath in support of Scarlett's allegations against Gjovik. In fact, before Gjovik was served for this matter, one of Scarlett's own named witnesses suggested Gjovik request a restraining order against Scarlett, not the other way around.

## 4. Intention to File New Motions to Dismiss & Vacate

A significant amount of additional evidence has come to light following the March 1 2022 decision. Gjovik intends to file a motion for the court to relieve Gjovik from a final judgment, order, and/or proceeding: due to mistake, surprise, & irregularity in Scarlett obtaining the judgement/order (CRLJ60-b-1); due to fraud, fraud on the court, and other misconduct by Scarlett (CRLJ60-b-4); the judgement as void due to lack of subject matter jurisdiction, inability to join indispensable party (Apple Inc), and due to decision by Superior Court reversing prior judgement (CRLJ60-b-5); & other reasons justifying relief from the judgement/proceedings (CRLJ60-b-11). [17] This includes misconduct by Gjovik's attorney related to the March 1 2022 hearing, including but not limited to, Gjovik's attorney failing to even notify Gjovik that Scarlett offered to settle the matter outside court before the hearing. Gjovik's attorney, Mr. Blair, received a warning from the Washington Bar Association for that misconduct.[18]

Gjovik also plans to motion for dismissal due to Scarlett's failure to state a claim upon which relief can be granted & failure to join a party indispensable to the matter at hand (e.g.

---

[17] CRLJ 60 RELIEF FROM JUDGMENT OR ORDER
[18] Washington State Bar Association, ODC File No. 22-00809

## King County District Court, Court of Limited Jurisdiction
### RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

Apple Inc). CRLJ12(h)(2). Scarlett's own filings and testimony, and the District & Superior court records revealed all of the supposedly "private" information Scarlett protested was actually public information and/or shared broadly by Scarlett herself including names, criminal histories, and quotes made by Scarlett to large publishers and the press. In fact, in Superior Court, Scarlett would also admit her allegations of extortion and blackmail by Gjovik were based on a conversation Scarlett was not part of, nor had she viewed, and upon viewing she realized "that it was not Ms. Gjovik's idea to extort." (Scarlett's Brief)[19] Further, Scarlett's allegations about Gjovik related to Wikipedia, were not only baseless but actually more fraud, as it was Scarlett who had made harassing and disparaging edits to Gjovik's biography article for nearly a year before finally getting caught & banned by Wikipedia on November 21 2022. [20] [21]

Gjovik also intends to motion for dismissal with prejudice due to lack of subject matter jurisdiction, something she objected to frequently in all hearings she was present at & has her arguments have been further strengthened by evidence acquired after the March 1 2022 hearing. CRLJ12(h)(3). There is clearly federal preemption of this matter under 18 U.S. Code § 1514 & the All Writs Act (as well as RCW 5.105.010(2)(b-c) & RCW 4.24.500).

There is additionally no subject matter for this court under RCW 49.32.050 & the Garmon & Machinist doctrines of NLRA preemption. (see Superior Court Appellant Brief). These arguments are further strengthened by the discovery that Apple's defense lawyers (the firm MWE) requested copies of the recordings from the hearings in this matter, no doubt to make their own transcripts & use them in Apple's defense of Gjovik's allegations of harassment by Scarlett on behalf of Apple. If there was no overlap of Gjovik's pending NLRB (and other agency) charges which named Scarlett, Apple's lawyers would have no interest in going to the

---

[19] Scarlett v Gjovik, KCSC, No 22-2-03849-7 SEA, Brief of the Appellee (Scarlett), September 26 2022
[20] Wikipedia editors/administrators: "*We'll start with the obvious connection here: CodeHitchhiker is Cher Scarlett (voluntarily acknowledged, verified by GorillaWarfare)… The fact is clear here that they are the same person…. I'd call this  Likely from a technical perspective….I am blocking CodeHitchhiker indefinitely as a suspected sockpuppet. Due to the BLP implications here, I will blank and categorize her userpage in lieu of tagging. @CodeHitchhiker: This is a shame.*"
https://en.wikipedia.org/w/index.php?title=Wikipedia:Sockpuppet_investigations/SquareInARoundHole&oldid=112
3071985
[21] Wikipedia editors/administrators: "It seems Bobrossghost was also used for months for socking at Ashley Gjøvik. We can say that Gjøvik was herself not wrong by accusing SquareInARoundHole of harassment.[17] This whole chapter looks like a clear case of WP:NOTHERE."
https://en.wikipedia.org/wiki/Wikipedia:Sockpuppet_investigations/SquareInARoundHole/Archive

**King County District Court, Court of Limited Jurisdiction**
RE: REVERSE & REMAND OF ANTI-HARASSMENT ORDER AGAINST ASHLEY GJOVIK

trouble of requesting, listening to, and transcribing hours of hearings on this matter. (see CLJ Docket "Request for Copy" on 4/6/22 & 3/4/22).

## 7. Conclusion

Finally, Gjovik also requests for Judge O'Toole's consideration of referring this matter to the local District Attorney's office for review of possible witness intimidation and perjury charges against Scarlett under RCW 9A.72,[22] RCW 9.62.010,[23] or similar due to Scarlett's egregious misconduct in this matter and her history of self-admitted fraud and financial crimes again governments and institutions. Perhaps most disturbing in this matter was Scarlett's ex parte testimony on February 1 2022 where she claimed the US NLRB suggested she seek legal or law enforcement intervention against Gjovik – an allegation that the US NLRB Asst. General Counsel denied in writing, saying they never told Scarlett anything about the merits of my cases or gave her any advice on taking any sort of legal action against me. (see Superior Court Exhibits).

In conclusion, I submit this notice of intention to file additional motions if further proceedings are called for. If Scarlett would prefer to request dismissal of her petition & this case, Gjovik would agree to have the matter dismissed.[24]

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Respectfully submitted,

**Ashley M. Gjovik (pro se)**
Dated: December 1 2022

---

[22] RCW 9A.72 PERJURY AND INTERFERENCE WITH OFFICIAL PROCEEDINGS
[23] RCW 9.62.010 Malicious prosecution.
[24] CRLJ 41 DISMISSAL OF ACTIONS: *(1) Mandatory. Any action shall be dismissed by the court: (i) By stipulation. When all parties who have appeared so stipulate in writing; or (ii) By plaintiff before resting. Upon motion of the plaintiff at any time before plaintiff rests at the conclusion of plaintiff's opening case. (2) Permissive. After plaintiff rests after plaintiff's opening case, plaintiff may move for a voluntary dismissal without prejudice upon good cause shown and upon such terms and conditions as the court deems proper.*
https://www.courts.wa.gov/forms/?fa=forms.contribute&formID=60
https://www.courts.wa.gov/forms/documents/FL%20All%20Family%20163%20Motion%20for%20Dismissal.doc

# Exhibit G

## *C.S. v. Gjovik (2022-2023)*

Electronically Filed

ﬔﬔ︓ﬗﬔ﹍﹍﹍﹍﹍﹍﹍

﹍﹍﹍﹍﹍﹍﹍﹍﹍

King County District Court

1    Ashley M. Gjovik (pro se)                                   Judge E. Rania Rampersad

2

3

# IN THE KING COUNTY DISTRICT COURT
# IN AND FOR THE STATE OF WASHINGTON

## East Division, Redmond Courthouse

**WA District Court No.:** 22CIV01704KCX

**Honorable Judge E. Rania Rampersad**

**CHER SCARLETT,** et al

Petitioner/Appellee,

**REPLY TO PETITIONER'S MOTION TO STRIKE**

**& REQUEST FOR EQUITABLE INTERVENTION**

v.

**ASHLEY GJOVIK**

Respondent/Appellant.

**WITH EMBEDDED EXHIBITS**

**JANUARY 16 2023**

<u>ASSOCIATED CASES</u>

**WA COURT OF LIMITED JURISDICTION**
**Honorable Judge Lisa O'Toole**

**WA SUPERIOR COURT NO**: 22-2-03849 SEA
**Honorable Judge Andrea Robertson**

**US DC NO:** 2:22-CV-00807-RAJ-BAT
**Honorable Judge Richard A. Jones**

## King County District Court: Scarlett v Gjovik

### Reply to Motion to Strike

This case was introduced by petition of Cher Scarlett to the King County Court of Limited Jurisdiction requesting a TRO & anti-harassment restraining order against Gjovik on January 31 2022.  In her petition and this case, Scarlett made allegations of misconduct by Gjovik, supposedly starting in December 2021 through February 2022 (after the petition was filed). She infers in her Motion to Strike that Gjovik is somehow still harassing her, despite Gjovik's compliance with the unlawful gag-order for over six months & Scarlett acknowledging even after the order was lifted, Gjovik still refuses to say Scarlett's name publicly (which is out of fear and due to acute PTSD).[1] In the motion, last month Scarlett wrote, "*I have been harassed by Ms. Gjovik for over a year and simply cannot continue fighting with her*" – despite Gjovik not initiating contact with Scarlett for almost **sixteen months** now – and it is Scarlett who instead continues to initiate contact with Gjovik – with Gjovik's friends about Gjovik – and with Gjovik's law school, the Bar association, in court, and with law enforcement about Gjovik.

Scarlett's allegations against Gjovik included an NLRB charge Gjovik filed against Apple Inc, Apple Inc's supposed justification for terminating Gjovik's employment, Twitter posts Gjovik made complaining of harassment and intimidation by Cher Scarlett in retaliation for reporting Apple Inc to the government, Twitter posts Gjovik made complaining of Scarlett's habit of making false statements, complaints of Scarlett harassing Gjovik's friends while claiming she was a "defense witness" for Apple despite nothing being at trial yet, and legal filings Gjovik made to the NLRB, US DOL, US DOL, and California government about the dispute with Apple Inc (which Gjovik also published & discussed publicly). Gjovik complained immediately that the lawsuit, this matter, was further witness intimidation & retaliation, & has continued to complain as such for almost a year now.

On September 26 2022, the Honorable Judge Andrea Roberson found there was no basis for a finding of unlawful harassment by Gjovik and ordered the decision against Gjovik to be reversed & remanded. On December 2 2022, Gjovik submitted a notice of intent to file/re-file motions if the case was to be remanded for further hearings in District Court.

On December 12, 2022, the honorable Judge E. Rania Rampersad published a Judicial Review order on this matter, agreeing with Judge Roberson & deciding the Order against Gjovik

---

[1] "*Ms. Gjovik has stopped using my name,*" Scarlett's Motion to Strike, page 5

## King County District Court: Scarlett v Gjovik

is to be vacated and Cher Scarlett's case against Ashely Gjovik was dismissed. Judge Rampersad denied Gjovik's intent to file/re-file motions as the case was dismissed.

On December 27 2022, Cher Scarlett stated her intention to not appeal the matter, but instead filed a motion to strike Gjovik's entire December 2nd filing, & threatened to start new litigation on the same facts, & to report Gjovik to the Bar Association.

### Scarlett's Motion to Strike

A Motion to Strike is to be filed within 20 days following service of a pleading and may request to strike insufficient defenses, or matters that are redundant, immaterial, impertinent, or scandalous.[2] Scarlett files a Motion to Strike an entire document which the court already reviewed and ruled on. Scarlett also files the Motion past the 20-day deadline for a legitimate motion to strike, which this is not.

Scarlett attempted something similar in Superior Court, at one point motioning to strike Gjovik's entire appellant brief, brief exhibits, and the exhibit of the legal filing that Scarlett had alleged contained the supposed unlawful harassment but was never presented to a court as evidence.[3] Through this ordeal Scarlett has attempted to silence Gjovik, Scarlett has avoided presenting evidence of her claims (because there usually is none), and to attempt to strike or somehow seal Gjovik's defenses against Scarlett, including Gjovik's evidence. Scarlett wants the court and others to believe her at her word, as she makes horrific allegations against Gjovik without evidence, & while attempting to prevent Gjovik from defending herself or gather/preserve evidence of the harassment.

Scarlett also used this frivolous Motion to Strike to submit a nine-page document making new, additional allegations against Gjovik – and more threats against Gjovik, at least one of which Scarlett then proceeded to fulfill. Indeed, Gjovik was contacted by the Bar Association on December 23 2022 (the day Scarlett signed the Motion to Strike), with the Bar suddenly & formally asking Gjovik for information about any new litigation or complaints made about Gjovik. Under information and belief, Scarlett reported Gjovik to the Bar Association on December 23 2022 – likely alleging much of what she included in the Motion to Strike.

---

[2] Washington Courts, Superior Court Rules, https://www.courts.wa.gov/court_rules/pdf/CR/SUP_CR_12_00_00.pdf
[3] Scarlett v Gjovik, King County Superior Court, 22-2-03849-7 SEA, "Motion to Strike"

## King County District Court: Scarlett v Gjovik

11
12
13

This does not mean I will not exercise my right to file for a new order with a better understanding of the law, and reporting such conduct to the Bar Association.

*Scarlett's Motion to Strike, signed Dec 23 and submitted Dec 27 2022.*



*Email Gjovik received from the California Bar Association on Dec 23 2022.*

## New Allegations & Threat of Further Litigation

Scarlett did not appeal this matter, but is instead threatening new litigation based on the same facts, and also wants to seal/strike as much of the prior court record as possible.

In Motioning to Strike and making new allegations – Scarlett is hoping to make it more difficult for the next Judge, in her **next** lawsuit against Gjovik in these courts, which Scarlett already threatened to file, to be able to figure out what is actually happening. Scarlett's inflammatory accusations & manipulative testimony are used to exploit the goodwill of Judges who want to error on the side of caution related to matters of safety. Scarlett's manipulation is not fair to Gjovik, to the Judges involved, or the legal system.

For example, while Scarlett's Motion to Strike now accuses Gjovik of **perjury** for complaining on Twitter about "SWATing"[4] – Scarlett not only admittedly reported Gjovik to the FBI and local law enforcement, alleging federal crimes including blackmail and extortion, but in her argument for a TRO in this court, Scarlett also argued that she & her family's physical safety were in danger due to Gjovik to the extent she was looking to relocate her home, said she was

---

[4] Motion to Strike: "*Ms. Gjovik's posts also contained defamation that could not be reasonably considered by the court to have been for any other purpose but malicious. For example, in the court record I asked about a number of posts in which Ms. Gjovik made statements that she knew to be fabricated and damaging to encourage others to harass me. **An example was a post in which Ms. Gjovik wrote that I had her "SWATed".** The court is quite clear on what constitutes actual malice: "with knowledge that it was false or with reckless disregard of whether it was false or not. **Ms. Gjovik has never been SWATed, so it's unreasonable to opine that post was about "activism".** **The purpose was to make people believe I had put Ms. Gjovik's life in danger by making a hoax call to emergency services or law enforcement to have armed authorities dispatched to her home which never happened.** The court did err in opining that these postings were protected by the first amendment.*" (pg4)

## King County District Court: Scarlett v Gjovik

unsure if Gjovik owned a firearm & worried Gjovik was "unwell". These allegations and actions could easily result in armed law enforcement to decide to investigate and make a surprise visit to the alleged perpetrator's home.

6. How did the incidents you describe above make you, the minor, or the vulnerable adult feel?

I am looking for another place to move to immediately for our safety. I am scared of what she will do if no one stops her. I am afraid of what will happen if her charges are not meritous. I am afraid of this woman and her followers.

Pt for an Or for Protection – Harassment/Stalking (PTORAH, PTORSTK) – Page 4 of 7
WPF UHST-02.0200 (07/2019) – RCW 10.14.040, .800, RCW 7.92.030
KCDC July 2019

*Scarlett's Petitioner for a Restraining Order against me, Jan 31 2022, pg 4*

9. Does possession of a firearm or other dangerous weapon by the respondent present a serious and imminent threat to public health or safety, or to the health or safety of a victim? Please describe:

Unsure, behavior leads me to believe she is unwell

10. Do you have any evidence of the harassment or stalking conduct other than testimony?
- [ ] No
- [x] Yes. I have attached the following evidence:
  - [ ] Copy of mail or written notes
  - [ ] Copy of text messages
  - [ ] Copy of email messages
  - [x] Copy of social media messages
  - [x] Police report
  - [ ] Declaration or Affidavit from the following witness: _____
  - [ ] Other (describe): _____

*Scarlett's Petitioner for a Restraining Order against me, Jan 31 2022, pg 5*

**Emergency temporary protection (up to 14 days) until the court hearing:**

- [x] An emergency exists as described below. I request that a **Temporary Protection Order** granting the relief I requested above for a no-contact, surveillance, exclude from places, or stay away order be issued immediately, without prior notice to the respondent, be effective until the hearing.
- [ ] I also request a temporary surrender of all firearms, other dangerous weapons, and concealed pistol licenses without notice to the other party because irreparable injury could result if an order is not issued until the hearing.

What irreparable harm would result if an order is not issued immediately without prior notice to the respondent?

I have already struggled to find employment because of her harassment, along with harassment from her followers that could lead to misuse of 911 dispatch resulting in irreparable harm to myself or to my child.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Dated: 1/31/2022 _____ at Kirkland _____ Washington.

## King County District Court: Scarlett v Gjovik

*Scarlett's Petitioner for a Restraining Order against me, Jan 31 2022, pg 7*



*Scarlett's E-Filed Evidence, February 15 2022, pg 40-43*

Scarlett also admitted in February of 2022 that the FBI complaint was a meritless report ("*I was in a terrible place mentally, had relapsed…*") & also claimed "*another government agency*" told her to file it. Once again, another claim that the government was somehow sponsoring her harassment of Gjovik, without any evidence, and a claim Scarlett never brought up again after this email.

> 8) Yes, I reported you to the FBI. I was in a terrible place mentally, had relapsed, and you were posting ~~private/personal information about me because you thought I was testifying against you and just to do~~ the harm, and I was BEGGING you to stop. on my distress by finding a way to make a material gain via GFM and Twitter. It's abusive, Ashley. And another government agency with insight into this suggested I report it to the FBI because they believe what you did was a federal crime.

*Feb 5 2022 email; Scarlett's E-Filed Evidence, February 15 2022, pg 40-43*

Further, Gjovik's complaint about SWATing was posted in an effort to stop contact by Scarlett, who had begun reaching out to people supporting Gjovik on Twitter about her Apple lawsuit, and telling them not to support Gjovik, and making inflammatory allegations against Gjovik. This was in February **after** Scarlett has filed the Petition for a restraining order & before Gjovik was served. One person asked if Scarlett & Gjovik could "talk it out" & Gjovik's response was a request to not encourage contact due to the severity of Scarlett's harassment, including a

## King County District Court: Scarlett v Gjovik

comment made by Scarlett: *"I literally don't want her to exist in my world lol,"* which Gjovik read as Scarlett wishing Gjovik was dead.



*Scarlett's E-Filed Evidence Feb 15 2022- Gjovik's E-Filed Evidence Feb 14 2022*

Now, Scarlett also alleges Gjovik committed a gross misdemeanor (§ 9.73.030) with Scarlett apparently claiming that Gjovik complaining about harassing messages sent to Gjovik by Scarlett – and sent by Scarlett to Gjovik's friends about Gjovik which Gjovik's friends provided to Gjovik so Gjovik could report it to the government – is somehow Gjovik "wiretapping" Scarlett.[5] Scarlett even claims she may sue Gjovik again now alleging this criminal wiretapping statute. Gjovik providing evidence of directed harassment by Scarlett against Gjovik is not wiretapping, nor is it criminal conduct by Gjovik – and the allegation of such is even more federal witness intimidation and retaliation.

As for the new allegation that Gjovik was re-publishing defamatory content, indeed the legal document Scarlett continues to reference but refuses to allow to be admitted into evidence, was Gjovik complaining to the government about harassment, defamation, and intimidation by Apple against Gjovik. Gjovik quoted hundreds of posts made by accounts alleged to be Apple Inc, that made horrible defamatory posts about Gjovik & she complained it included unlawful defamation in violation of labor and whistleblower laws. It cannot be unlawful to provide evidence of defamation in a legal filing alleging defamation. Scarlett also attempts to make an extensive legal filing about Apple Inc harassing Gjovik, now somehow about Scarlett.

---

[5] Page 2 of Scarlett's Motion to Strike *(As such, Ms. Gjovik's decision to publish these private communications without my consent was not protected by the first amendment, but instead a gross misdemeanor under Wash. Rev. Code Ann. § 9.73.030. The court erred in not considering I lacked the background in law to argue the legal basis for the lower court's order.)*

## King County District Court: Scarlett v Gjovik

Scarlett also now claims she never said she has a history of fraud & alleges Gjovik's reference to Scarlett's prior statements is now **perjury by Gjovik**.

> 2) On page 3, Ms. Gjovik perjures herself again by claiming I "self-admitted" to student loan fraud and business fraud. Ms. Gjovik is referring to my disclosure that I enrolled in college to get student loans to help care my infant as a single mother in poverty. These loans were obtained under my own identity, I attended class at the institutions the loans were drawn on, and the loans are in good-standing. I was approved for $20,000 of student loan debt relief by the Department of Education in November. The "business fraud" Ms. Gjovik is referring to is my own disclosure that I had to pretend I was a designer or project manager so that I didn't experience homelessness with my infant due to sexism in the technology industry. It's ironic that Ms. Gjovik wishes to be a human rights attorney and claims her harassment was in the name of activism when she uses my being discriminated as a woman software engineer and living in poverty. The "check fraud" Ms. Gjovik is referring to is me overdrawing my own bank accounts. These accounts have all since paid off. The banks never took any action against me and I've never been charged with any crimes. My husband's criminal record is not material and decades old.

*Motion to Strike page 6*

Scarlett's own Evidence includes quotes by Scarlett saying she "*invented whole companies*," "*enroll[ed] in college multiple times and withdrawing for the student loans*," and engaged in "*check fraud*." Scarlett notes her involvement in "check fraud" was published by the Washington Post. It does not appear Scarlett has alleged defamation by Washington Post.

> 2) I have lied about my education in the past, and my role, tried to hide my gender, and invented whole companies. I had an infant, was making poverty wages at multiple hourly jobs, and I was trying to survive. I did what I needed to do, including enrolling in college multiple times and withdrawing for the students loans.
>
> I've been very open about my past, going far beyond that. I WaPo did a very thorough background check on me and it would have taken more than the limit of 2,000 words to disclose everything. They chose to disclose the check fraud because it was the most extreme and fewest words.

*Email from Scarlett to Gjovik, Scarlett's E-Filed Evidence, CLJ, February 15 2022, pg 62-66*

Scarlett makes many statements in her Motion supposedly quoting allegations made by Gjovik, but it is unclear what source she is referencing and many are simply untrue. Scarlett's comments about being a defense witness for Apple were her own statements to a friend of Gjovik's while trying to convince the friend not to support Gjovik, which Gjovik's friend

## King County District Court: Scarlett v Gjovik

complained about in a witness statement in support of Gjovik filed to this court, yet Scarlett now apparently claims it is "wiretapping."



*Gjovik's Evidence & D.U. Witness Statement, CLJ, Feb 14 2022 & Feb 17 2022*

Scarlett also now claims she did not write some of the things in Gjovik's legal filing which Gjovik cited were statements by Scarlett, but Scarlett does not point to anything specific, and fails to mention that in that document, which she refuses to let a court review, included links/URLs to her comments, made from Scarlett's own accounts on Twitter and other social media, most of which are still available today from an account Scarlett is actively using.[6]

Scarlett accuses Gjovik of "**perjury**" for refencing witness statements admitted to the trial record during the Court of Limited Jurisdiction hearings. However, per the court transcript from the March 1st hearing, Judge O'Toole "*incorporated in by this reference*" including "*statements of the witnesses that Ms. Gjovik has submitted.*" Neither the lower court or the

---

[6] Motion to Strike: "*Ms. Gjovik's postings were not about activism. Her purpose in publishing these things was meant to paint me in a false light. Some of Ms. Gjovik's publications, as is in the court record, misappropriated my name by publishing others' publications and claiming they were written by me. Ms. Gjovik did this with the purpose of maligning my character to pursue a personal vendetta which is not protected.*"

## King County District Court: Scarlett v Gjovik

appellate court "dismissed" the witness statements & they continue to be part of the court record. (Note it appears Scarlett refers to Gjovik as Scarlett in her legal filing)

> ### Giovik?
> 6) On page 7, Scarlett references witness testimony she provided as proof she wasn't harassing me. These statements provided no defense for Ms. Gjovik's behavior and contained hearsay and perjured statements. These were dismissed by both the lower court and the appellate court. Ms. Gjovik's statement that I couldn't find any witnesses is nonsense. Ms.

*Motion to Strike page 7*

```
21        THE COURT:  Okay.  Thank you.  So give me a minute here.
22        All right.  So I've certainly heard the testimony, I've
23     reviewed the documents.  Both parties have produced a number
24     of documents and a number of written statements, all of
25     those are incorporated in by this reference, including the

 1     statements of the witnesses that Ms. Gjovik has submitted,
 2     and the filings that both Ms. Gjovik and Ms. Scarlett have
 3     filed in our electronic court records, and I do incorporate
 4     all of those by this reference.  And I've certainly listened
 5     to the testimony and argument of all parties.
```

*Court Transcript, CLJ Hearing, March 1 2022*

Scarlett also complains about Gjovik commenting about Scarlett's criminal record. Gjovik's comment appears to only have been revealed to Scarlett after Gjovik had to submit evidence to this court in defense of Scarlett's allegations and provided the conversation with a 3rd party that Scarlett alleged was **extortion**, despite Scarlett not being part of the conversation and Scarlett being the person who instigated the conversation attempting to get Gjovik to voluntarily agree to a gag-order preventing Gjovik from complaining of Scarlett's harassment– which Gjovik did not agree to.

### King County District Court: Scarlett v Gjovik



*1:1 text messages, Gjovik's E-Filed Evidence, CLJ, Feb 14 2022, page 27*

Regardless, Gjovik made an off-hand comment about Scarlett having a criminal record in a private conversation that only had to become public after Scarlett sued Gjovik. Scarlett also publicly comments that she **has committed crimes** and that she has **been to jail** at least three times. Gjovik's comment about Scarlett's "criminal record" is not defamation.



*Twitter posts by Scarlett*

Finally, Scarlett's comments about the NLRB's involvement in this matter continue to contradict statements by the NLRB and Scarlett's own testimony.  Scarlett previously asserted she was suing Gjovik because of Gjovik's NLRB charge against Apple, and associated filings. [9] (Gjovik did make allegations about Scarlett's conduct as an agent of Apple, or under a negligence theory, but not as a named party.) Scarlett also makes random references to the FOI Act, which is inapplicable to private individuals and NLRB said they did not provide legal advice on the matter. Scarlett also continues to infer the NLRB provided her some type of secret guidance about this matter, which the NLRB denied.

---

[7] https://twitter.com/cherthedev/status/1027234912288604161
[8] https://twitter.com/cherthedev/status/1279872398087663616
[9] Motion to Strike page 5-6

## King County District Court: Scarlett v Gjovik

19
20      9) On page 9, Ms. Gjovik misrepresents my conversations with the NLRB. The chief
21  security officer advised me that the NLRB did not have jurisdiction and instead advised me that
22  harassment would be under the jurisdiction of local law enforcement and that extortion would be
23  under the jurisdiction of the FBI. Local law enforcement advised me to seek an anti-harassment
24  order. As Ms. Gjovik is aware, I have emails and a voicemail from the agency which corroborate
25  this. In my conversations with the NLRB, it was determined that providing their statements in
26  writing would constitute a conflict of interest. I went forward with the document they provided me
27  instead, the FOIA guidelines which I used in court to successfully argue my point. I asked her to
28

*Motion to Strike page 7-8, Dec 23 2022*

How did the respondent make these statements?  ☐ in person  ☐ mail/written notes
☐ e-mail  ☐ text  ☐ phone  ☒ social media (such as Facebook and Twitter)
☐ other (describe): _____

**B.** Describe other incidents of harassment or stalking.  For **each** incident, include the date, time (on or about), location, what was said, how statements were made, and what was done to a victim.

because of the monetary value associated with her demands in exchange to stop harassing
me. Another friend, Janneke Parrish, also tried to get her to stop, she said she made similar
possibly extorting requests to stop.

I also reported her behavior to her University, and to Twitter. Neither of these seems to have
deterred her from continuing to engage in the harassment.

On January 11, 2022, she filed an NLRB charge against Apple, Inc, claiming that I was
harassing her on Apple's behalf. I have not harassed her. On January 31, 2022, she published
a "memo" for that charge containing defamatory and private information about me (and
others) on a platform called Scribd. Ordinarily, this information would be redacted and
confidential by the NLRB. She has shopped this information around to the press in an
attempt to make it public record, for malicious purposes. Much of the information she has
reposted is my personal medical information, which I have not given her consent to share.

https://www.scribd.com/document/555822358/US-NLRB-Ashley-Gjovik-Apple-Inc-Jan-10-
2022-Charge-Draft-1

https://twitter.com/ashleygjovik/with_replies (there's a lot more here)

*Scarlett's Petition for a Restraining Order, Jan 31 2022, pg 4*

## King County District Court: Scarlett v Gjovik

12. Is there any other litigation between the victim/s and the respondent? This includes all matters - pending or past - such as parenting plans, landlord-tenant disputes, employment disputes, or property disputes. If yes, provide case number/s if known, type of case, and name of court:

NLRB Charge CA-288816 - charge against Apple, Inc, which contains false/misleading information about me made in bad faith by Ashley Gjovik

➢ **Requests**

*Scarlett's Petition for a Restraining Order, Jan 31 2022, pg 6*

```
13              MS. SCARLETT:  Okay.  So they have to --

14              THE COURT:  -- click on outside links.

15              MS. SCARLETT:  -- print outs?  One of the

16   documents that she -- and this is what caused me to do this,

17   is because the director of security at the National Labor

18   Relations Board believes that she filed a charge with the

19   intent to harass me on January 11th.  It is 191 pages long and

20   mentions me 288 times.

21              THE COURT:  All right.  And -- and how do you

22   know that someone from the National Labor Relations Board

23   believes this was solely to harass --

24              MS. SCARLETT:  They contacted me.  I have a

25   voicemail from them.
```
Anderson Transcription Solutions LLC

*Scarlett's ex parte Testimony, Petition for a TRO, Feb 1 2022*

## King County District Court: Scarlett v Gjovik

///

We started a movement called #AppleToo together, but after she made other members of the group uncomfortable with her punching down on collective action, defensive aggression after constructive feedback about a racist Twitter post she made, and her wishes to use the movement as private leverage for her own cases against Apple, she voluntarily parted ways

///

In late August of 2021, Ms. Gjovik shared with me that she had leaked information protected by our non-disclosure agreements to Zoe Schiffer of the Verge, and she was terminated a week later for those policy violations. Ms. Gjovik was later denied unemployment benefits by the state of California after they determined she was terminated for just cause, per her sharing the letter from unemployment on Twitter. I shared an opinion on the application Blind that it would be difficult to prove her retaliatory discharge claims to the NLRB and the Department of Labor because she had, in fact, leaked those documents. In December of 2021, she initiated a

///

Ms. Gjovik stated she was cyberharassing me because I was testifying against her on behalf of Apple in her cases against them, and further because I reported her conduct to the FBI. This is untrue, as Alexander Hajduk, an investigating officer of the NLRB, and I both told her. I was cited in their defense with a text message conversation she posted on Twitter, not testifying against her.

////

The Director of Security of the NLRB, Raymond Hankins, and the supervisory Field Attorney for Region 32, Catherine Ventola, which is handling Ms. Gjovik's NLRB charge which names me, both recommended over the phone that I report Ms. Gjovik's conduct to federal and local authorities, on or around January 25, 2022, and on or around February 4, 2022, respectively. They further advised that they had had numerous operations meetings to discuss how to handle Ms. Gjovik's conduct and my personal and private information being published without my or my family's consent. They advised they would redact information per Exemption 6 of FOIA, and linked me to the relevant guide from the DOJ, but said they did not have jurisdiction over her

Ms. Gjovik's cyberharassment of me appears to be in part for exercising my own first amendment rights in expressing my opinion that her retaliatory discharge case would be hard to prove because of the bonafide fact that she had leaked private documents about unreleased intellectual property owned by Apple to the press, and additionally because I was cited in Apple's defense case in her charges against the company. I took the time to apologize for exercising those first amendment rights, because it clearly hurt her feelings, despite my right to say such things, and her public assertions that she supported such rights.

*Scarlett's written Testimony, CLJ Petition for a Restraining Order, Feb 15 2022*

## King County District Court: Scarlett v Gjovik



*Gjovik's E-Filed Evidence, Feb 14 2022*

```
 1        MR. BLAIR:  That sounds like an argument, Your Honor.
 2        THE COURT:  Just tell us the question.
 3   Q.   (By Ms. Scarlett)  Why do you think -- why have you made
 4        statements like that that I am stalking anybody who --
 5        stalking you, coercing you, harassing you, intimidating you,
 6        threatening you, and telling people that bad things will
 7        happen to them if they support you?
 8            Why were you saying that I was harassing, defaming,
 9        swatting, threatening, illegally coercing you to modify
10        federal charges.  Why we were saying -- it should be
11        mentioned that I am currently under investigation by
12        numerous federal agencies and law enforcement for federal
13        witness intimidation and obstruction of justice.
14            Why have you said that I'm in active communication with
15        Apple helping Apple in their campaign of harassment, threats
16        and horror against the safety whistle blower.  Why did you
17        say I'll report you to Apple if I leak Apple's crimes?  Why
18        did you say --
19        MR. BLAIR:  Your Honor, can we have some help here?  I
```

*Scarlett's oral Testimony, CLJ, Hearing for a Restraining Order, March 1 2022*

**King County District Court: Scarlett v Gjovik**



*Email from NLRB; Gjovik's Superior Court Appellant Brief Exhibit A (page 3)*

This case has been buttressed by falsehoods & inflammatory allegations. Even before Gjovik was served, after Scarlett filed the petition and testified at a TRO hearing, Scarlett then proceeded to send Gjovik a long & intimidating email on February 5 2022 which repeatedly said she did not believe Gjovik's cases/charges against Apple have merit, & Scarlett demanded Gjovik modify Gjovik's federal legal filings to remove (not redact) evidence and allegations about Scarlett.

In this email, Scarlett positioned that she was not adversarial to Gjovik, and even said would she never voluntarily testify against Gjovik, after she had already testified against Gjovik *ex parte* on February 1 2022 for this matter but would not serve Gjovik until mid-day February 14 2022, the day before the actual hearing. [10]

---

[10] See Gjovik's Reply Brief & Evidence, King County CLJ, Feb 14 2022

## King County District Court: Scarlett v Gjovik

1) I am not testifying against you, nor on Apple's behalf. I wouldn't do that unless I was subpoenaed, and I don't believe they would have me do that, because cross-examination would allow me to answer questions that would discuss their culture of surveillance.

I am named in their defense, which I was only informed of as a courtesy. I am upset by it, given what I've been through, which is why I mentioned it.

*Feb 5 2022 Email; Scarlett's E-Filed CLJ Evidence, February 15 2022, pg 62-66*

## Conclusion

Cher Scarlett makes it clear in her Motion to Strike that she still believes there should be a finding of unlawful harassment against Gjovik, & Scarlett condemns the decisions to reverse and vacate made by the Honorable Andrea Robertson & Honorable Rania Rampersad. However, Scarlett says she will not appeal the decision and has allowed the window for appeal to expire, yet Scarlett also threatens to sue Gjovik again (assumably in this same court) for the same facts that were already found to not be harassment, while also removing documents from the record.

I understand and appreciate this courts hesitancy to dismiss with prejudice or issue sanctions (as it would create Full Faith & Credit issues, as well is implicate jurisdictional concerns), however Scarlett actively threatens to continue this nightmare in your courts. If the court would feel comfortable doing so, I would like to request consideration of the addition of Cher Scarlett to the local and/or state vexatious petitioner's list or another remedy in the court's wisdom on matters such as this.

In conclusion, Scarlett's Motion to Strike should be denied, this matter should be closed, & something should be done to prevent Cher Scarlett from continuing this meritless persecution that is not only terrorizing me, but also wasting the court's critical time & resources.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct. Respectfully submitted,

**Ashley M. Gjovik (pro se)**
Dated: January 16 2023

# Exhibit H

*Apple Global Security "Crisis Manager" Job Posting*

3/11/22, 12:00 AM                    Crisis Manager AMR, Global Security | Apple | LinkedIn



**Crisis Manager AMR, Global Security**

Apple · Austin, TX (On-site) · 3 days ago · **17 applicants**

🧰 Full-time

🏢 10,001+ employees · Computers and Electronics Manufacturing

👥 413 connections · 39 school alumni

🎯 Actively recruiting

Apply     Save

## About the job

### Summary

Do you instinctively know how and when to take action? Do you love performing under intense pressure? As part of our Global Security group, you'll help manage the security needs of Apple's most valuable assets: our people and innovations. Along with your team, you'll be part of an important system that protects Apple employees and their work around the world!

Your work will help create solutions to a variety of unique security challenges, ranging from the physical security of Apple facilities to the protection of our supply chain. You'll play a meaningful role in preserving the highest standard of security for one of the most-watched companies in the world. Apple's Global Security Organization has built a global crisis management team with responsibilities to support our colleagues and business in times of significant need.

Apple's Crisis Management program works to a rhythm of Prepare, Coordinate and Respond. This role will require you to operate in all three pillars and a high level of knowledge and experience in the technical aspects of Crisis Management. Equally important, is stakeholder and partner management, persuading & influencing others and managing excellent internal and external relationships.

 

Home    My Network    **Jobs**

**Key Qualifications**

10+ years in crisis management or equivalent experience

Prepare:

Excellent knowledge of security risks, in all their forms, across the Americas region.

Conducted proactive ground assessments of geographical locations, transportation options, hotels, event venues, distribution centers and third party premises to design suitable crisis response plans.

Built relationships with law enforcement, government agencies and security professionals in each country.

Designed and tested crisis response plans (for low–medium-high scenarios)

Delivered preparedness training to colleagues

Trained Crisis Management teams on a crisis management plan and response tactics.

Tested local response capabilities and CMT readiness

Presentations to an executive level audience

Travel domestically and internationally

**Description**

Coordinate

To work collaboratively with Apple business units, to develop an understanding about the CM

  

Home    My Network    Jobs

business

To be the go to person for questions and advice about country risks and response plans relating to CM

Deliver security briefings to add context and provide calm reassurance

Develop an excellent understanding of Apple's assets (current and future plans) across the multiple business units

Assess, vet and manage specialist security vendors in each country.

Complete and maintain city or county assessments to ensure Apple has a single version of assets, in addition to a solid appreciation of our security capabilities.

Develop risk mitigation strategies/plans for Apple's assets based upon, country/city risk assessments, in-country reviews and business growth plans.

Respond

To lead the crisis response during live incidents in the Americas and other regions as required

To provide calm, confident and well assessed context

Exercise excellent judgment

To make decisions with ambiguity in a dynamic situation

To bring the CMT (s) together, provide a situation report and guide them through the Crisis Management Plan

To work with all partners to achieve the right outcome for Apple

To quickly and accurately identify the risks to Apple when an incident occurs

 

Home    My Network    **Jobs**

To complete the initial communications to Apple colleagues via the appropriate method

To conduct a debrief of the incident, decisions and the efficiency of actions

Work to close any gaps, re-train and design new mitigation

**Education & Experience**

Bachelors degree preferred

Apple is an Equal Opportunity Employer that is committed to inclusion and diversity. We also take affirmative action to offer employment and advancement opportunities to all applicants, including minorities, women, protected veterans, and individuals with disabilities. Apple will not discriminate or retaliate against applicants who inquire about, disclose, or discuss their compensation or that of other applicants.

Role Number: 200305252