**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

**ASHLEY GJOVIK**, *an individual*,

   Plaintiff,

vs.

**APPLE INC**, a corporation,

   Defendant.

**Judge**: The Honorable Edward Chen

**Case No.** 3:23-CV-04597-EMC


**Ashley Gjovik's Declaration**

 **in Support of Plaintiff's Reply**

**re: Plaintiff's Motion to Disqualify**

Civil L.R. 7-3, 7-5

# Declaration Of Ashley M. Gjovik In Support Of Plaintiff's Reply In Support Of Motion To Disqualify Orrick, Herrington & Sutcliffe Llp

Pursuant to 28 U.S.C. § 1746, I, Ashley M. Gjovik, hereby declare as follows:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I make this Declaration based upon my personal knowledge and in support of my pending Motion to Disqualify the Defendant's counsel]. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

I submit these exhibits in support of my Motion & Reply because they are directly relevant to Apple's opposition and to the key factual issues before the Court. It is well established that courts may consider extrinsic evidence when ruling on a motion to disqualify counsel (*In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 588 (1991)). Courts recognize that motions to disqualify opposing counsel are fact-intensive and require an examination of the record and supporting evidence (*SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999)).

Additionally, courts permit parties to submit new evidence in reply if it rebuts arguments made in the opposition Because Apple's opposition contains factual misstatements, mischaracterizations, and omissions, Plaintiff submits these exhibits to correct the record and provide the Court with the necessary factual basis to resolve the motion. Courts have broad discretion to consider documents submitted with motions and declarations when they assist in ruling on a motion. Because these exhibits establish Apple's attorneys' conflicts of interest, their involvement in retaliatory conduct, and their manipulation of legal proceedings, they are directly relevant to Plaintiff's disqualification motion.

1.  Attached hereto as Exhibit A is a true and correct copy of Defendant's discovery responses, claiming Attorney Client Privilege for facts over a six-month period, as referenced on page 2 of the Reply.

2.  Attached hereto as Exhibit B is a true and correct copy of Defendant's initial disclosures, which do not include it's only witness for the U.S. Dept. of Labor proceeding, and responses to Request for Production, which refuse production,  as referenced on page 3 of the Reply.

3.  Attached hereto as Exhibit C is a true and correct copy of the April 1 2024 Meet & Confer transcript, documenting quoted text on multiple pages in the Reply.

4.  Attached hereto as Exhibit D is a true and correct copy of the documents related to Apple's legal interactions with Appleseed, as mentioned on page 5-6 of the Reply.

5.  Attached hereto as Exhibit E is a true and correct copy of Defendant's communications with U.S. Dept. of Labor in the Ashley Gjovik v. Apple Inc OSHA investigation, and the OSHA investigation log, showing Appleseed as the only witness, as referenced on multiple pages of the Reply.

6.  Attached hereto as Exhibit F is a true and correct copy of Apple's counsel's request for copies of court records from Appleseed's lawsuit against the Plaintiff, and the notices of appearance for MWE and Orrick, as mentioned in the Reply.

DECLARATION OF ASHLEY GJOVIK | 3:23-CV-04597-EMC

7. Attached hereto as Exhibit G is a true and correct copy of Appleseed's communications with OSHA as a defense witness for Apple, as released by U.S. Dept of Labor in Dec. 2024, and mentioned in the Reply.

8. Attached hereto as Exhibit H is a true and correct copy of the chapter in my U.S. Dept. of Labor complaint that Apple reported to OSHA as "leaking," which includes information that reveals Apple filed a falsified Informed Consent Form for the Gobbler study, as referenced on page 8 of the Reply. ].

9. Attached hereto as Exhibit I is a true and correct copy of some of the social media posts I alleged that I believe are not only Apple, but I now believe are the Orrick attorneys, as referenced on page 10 of the Reply.

The documents attached as exhibits are referenced in my Reply and provide supporting evidence for the arguments therein. These documents include records produced by Apple, communications, court filings, agency determinations, and other materials directly relevant to the issues before the Court.

Finally, Apple's counsel also accuses me of misconduct due to typos in my legal citations in my motion, and accuses me of using AI to generate the complaint. I already disclosed I started using AI tools to assist me after Judge Chen warned me I cannot be late on deadlines – because I was already trying to finish as quickly as I could, and without additional resources, or extensions, then the quality is what must

DECLARATION OF ASHLEY GJOVIK | 3:23-CV-04597-EMC

suffer, unfortunately. I did confirm all four cases are relevant and they do support my arguments. However, the complaint unfortunately used quotes around summaries (not actually quotes), and the citations for *Smith v. Superior Court* were slightly incorrect, with the correct citation being *Smith v. Superior Court*, 68 Cal.2d 547, 68 Cal. Rptr. 1, 440 P.2d 65 (Cal. 1968).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of February 2025, in Boston, Massachusetts

Signature:

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

# EXHIBIT A

1  (Additional counsel on following page)

2  JESSICA R. PERRY (SBN 209321)
   jperry@orrick.com
3  MELINDA S. RIECHERT (SBN 65504)
   mriechert@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, CA  94025-1015
   Telephone:    +1 650 614 7400
6  Facsimile:    +1 650 614 7401

7  KATHRYN G. MANTOAN (SBN 239649)
   kmantoan@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
9  405 Howard Street
   San Francisco, CA 94105-2669
10 Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759

11

12 Attorneys for Defendant Apple Inc.

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17 ASHLEY GJOVIK,                          Case No. 23-cv-4597-EMC

18              Plaintiff,                 **DEFENDANT APPLE INC.'S INITIAL
                                           DISCOVERY UNDER GENERAL
19      v.                                 ORDER 71**

20 APPLE INC.,

21              Defendant.

22

23

24

25

26

27

28

1    KATE E. JUVINALL (SBN 315659)
     kjuvinall@orrick.com
2    ORRICK, HERRINGTON & SUTCLIFFE LLP
     631 Wilshire Blvd., Suite 2-C
3    Santa Monica, CA 90401
     Telephone:    +1 310 633 2800
4    Facsimile:     +1 310 633 2849

5    RYAN D. BOOMS (SBN 329430)
     rbooms@orrick.com
6    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1152 15th Street, N.W.
7    Washington, D.C. 20005-1706
     Telephone:    +1 202 339 8400
8    Facsimile:     +1 202 339 8500

9    Attorneys for Defendant
     Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Apple Inc. responds to Northern District of California General Order No. 71: Initial Discovery Protocols For Employment Cases Alleging Adverse Action ("Gender Order 71") as follows:

Defendant provides these responses based on the information and documents currently available to it, given that discovery in this action is ongoing. Nothing contained in these responses shall in any way limit Defendant's ability to make all uses at trial or otherwise of the information or documents referenced herein or of any information, documents or other evidence that may be discovered in the future. Defendant has made its best effort to respond accurately to each category, but reserves the right to amend its objections and responses upon completion of its search for responsive documents.

Defendant objects to each and every category to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege. If supplying any of the requested documents would result in waiving any applicable privilege or objection based on any such privilege, Defendant objects to providing the documents and will not do so. If Defendant inadvertently produces any documents falling within any applicable privilege, Defendant does not intend to waive the applicable privilege.

Defendant objects to each and every category to the extent that it seeks documents and/or information that is protected from disclosure by the rights of privacy of third-party non-litigants.

Defendant objects to each and every category to the extent that it seeks electronically stored information ("ESI") from sources that are not reasonably accessible because of undue burden and expense. To the extent that any categories call for ESI from sources that are not reasonably accessible without undue burden or cost within the meaning Federal Rule of Civil Procedure 26(b)(2)(B), or for which the burden or cost of retrieval and review would not be proportional to the needs of the case (including where the burden or expense would outweighs its likely benefit), Defendant will not supply or render such ESI.

Subject to and without waiving any of the above objections, and incorporating each of them by this reference into each response below, Defendant responds to General Order 71 as follows:

/ / /

1        **1. <u>Production of Documents By Defendant</u>**

2        <u>Category A</u>:

3        All communications concerning the factual allegations or claims at issue in this lawsuit

4    among or between: (i) The plaintiff and the defendant; (ii) The plaintiff's manager(s), and/or

5    supervisor(s), and/or the defendant's human resources representative(s).

6        <u>Response to Category A</u>:

7        Subject to the preliminary statement and foregoing objections set forth above, Defendant

8    responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

9    dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

10   After a diligent search and reasonable inquiry Defendant will produce, pursuant to a protective

11   order regarding the treatment of confidential information ("the Confidentiality Order"), non-

12   privileged communications concerning Plaintiff and the factual allegations or claims at issue in this

13   lawsuit directly related to her alleged wrongful termination, between Plaintiff and Yannick

14   Bertolus, Aleks Kagramanov, Ekelemchi Okpo, Dave Powers, Michael Steiger, Jenna Waibel,

15   and/or Dan West from March 1, 2021 to September 9, 2021. After a diligent search and reasonable

16   inquiry Defendant will also produce non-privileged correspondence concerning Plaintiff and the

17   factual allegations or claims at issue in this lawsuit directly related to her alleged wrongful

18   termination, between or among Yannick Bertolus, Aleks Kagramanov, Ekelemchi Okpo, Dave

19   Powers, Michael Steiger, Jenna Waibel, and/or Dan West from March 1, 2021 to September 9,

20   2021.

21       <u>Category B</u>:

22       Responses to claims, lawsuits, administrative charges, and complaints by the plaintiff that

23   rely upon any of the same factual allegations or claims as those at issue in this lawsuit.

24       <u>Response to Category B</u>:

25       Subject to the preliminary statement and foregoing objections set forth above, Defendant

26   responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

27   dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

28   The only complaints made by Plaintiff of which Defendant is aware that may be related to her

1  wrongful termination claims in this lawsuit are certain administrative charges she filed with the

2  National Labor Relations Board ("NLRB") and with the United States Department of Labor

3  ("DOL"). Defendant will not be producing its responses to the NLRB Charges because the NLRB

4  cases are still open, and as a result the responses are not available to Plaintiff nor are they subject

5  to a FOIA request. *See* NLRB Freedom of Information Act Manual,

6  https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-

7  1727/march2008foiamanual.pdf, at 87 (stating that "[t]he FOIA is not intended to function as a

8  private discovery tool," and citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)

9  and *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 644 F.2d 969, 982 (3d Cir. 1981)). As for

10  Plaintiff's case before the DOL, to the extent that any factual allegations overlap, Defendant will

11  not be producing its response because on December 8, 2023, the DOL issued a finding of no cause

12  on Plaintiff's claims, and Plaintiff communicated to Defendant that same day her intent to appeal.

13  As of the date of this filing, Plaintiff's time to appeal the DOL Secretary's Findings has not yet run.

14  Category C:

15  Documents concerning the formation and termination, if any, of the employment

16  relationship at issue in this lawsuit, irrespective of the relevant time period.

17  Response to Category C:

18  Subject to the preliminary statement and foregoing objections set forth above, Defendant

19  responds: After a diligent search and reasonable inquiry, Defendant will produce Plaintiff's

20  personnel file, which includes her offer letter and termination letter.

21  Category D:

22  The plaintiff's personnel file, in any form, maintained by the defendant, including files

23  concerning the plaintiff maintained by the plaintiff's supervisor(s), manager(s), or the defendant's

24  human resources representative(s), irrespective of the relevant time period.

25  Response to Category D:

26  Subject to the preliminary statement and foregoing objections set forth above, Defendant

27  responds: After a diligent search and reasonable inquiry, Defendant will produce Plaintiff's

28  personnel file. No other files identified in Category D exist.

1    Category E:

2    The plaintiff's performance evaluations and formal discipline.

3    Response to Category E:

4    Subject to the preliminary statement and foregoing objections set forth above, Defendant

5    responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

6    Confidentiality Order, Plaintiff's performance reviews. Defendant will also produce the

7    termination letter related to Plaintiff.

8    Category F:

9    Documents relied upon to make the employment decision(s) at issue in this lawsuit.

10    Response to Category F:

11    Subject to the preliminary statement and foregoing objections set forth above, Defendant

12    responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

13    Confidentiality Order, non-privileged documents relied on to make the decision to terminate

14    Plaintiff's employment.

15    Category G:

16    Workplace policies or guidelines relevant to the adverse action in effect at the time of the

17    adverse action. Depending upon the case, those may include policies or guidelines that address: (i)

18    Discipline; (ii) Termination of employment; (iii) Promotion; (iv) Discrimination; (v) Performance

19    reviews or evaluations; (vi) Misconduct; (vii) Retaliation; and (viii) Nature of the employment

20    relationship.

21    Response to Category G:

22    Subject to the preliminary statement and foregoing objections set forth above, Defendant

23    responds: After a diligent search and reasonable inquiry Defendant will produce policies relevant

24    to Plaintiff's alleged wrongful termination of employment (the only issues/claims not presently

25    subject to a pending motion to dismiss), including the Confidentiality and Intellectual Property

26    Agreement that Plaintiff signed, and relevant portions of Defendant's Business Conduct Policy and

27    EEO Policy. Defendant will produce its internal facing Misconduct and Discipline Policy pursuant

28    to a Confidentially Order.

DEF.'S INITIAL DISCOVERY (GEN. ORDER 71)
[23-CV-4597-EMC]

1    Category H:

2    The table of contents and index of any employee handbook, code of conduct, or policies

3    and procedures manual in effect at the time of the adverse action.

4    Response to Category H:

5    Subject to the preliminary statement and foregoing objections set forth above, Defendant

6    responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

7    dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

8    After a diligent search and reasonable inquiry, Defendant will produce the table of contents of its

9    Business Conduct Policy effective October 2020, which was in effect at the time of the alleged

10    adverse action at issue in this lawsuit (Plaintiff's termination).

11    Category I:

12    Job description(s) for the position(s) that the plaintiff held.

13    Response to Category I:

14    Subject to the preliminary statement and foregoing objections set forth above, Defendant

15    responds: Defendant will produce job descriptions for the particular position(s) that Plaintiff held

16    if it is able to locate any after a diligent search and reasonable inquiry.

17    Category J:

18    Documents showing the plaintiff's compensation and benefits. Those normally include

19    retirement plan benefits, fringe benefits, employee benefit summary plan descriptions, and

20    summaries of compensation.

21    Response to Category J:

22    Subject to the preliminary statement and foregoing objections set forth above, Defendant

23    responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

24    Confidentiality Order, non-privileged documents showing Plaintiff's compensation and benefits

25    from during her employment with Defendant.

26    Category K:

27    Agreements between the plaintiff and the defendant to waive jury trial rights or to arbitrate

28    disputes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Response to Category K:

Subject to the preliminary statement and foregoing objections set forth above, Defendant responds: After a diligent search and reasonable inquiry, no responsive documents exist.

Category L:

Documents concerning investigation(s) of any complaint(s) about the plaintiff or made by the plaintiff, if relevant to the plaintiff's factual allegations or claims at issue in this lawsuit and not otherwise privileged.

Response to Category L:

Subject to the preliminary statement and foregoing objections set forth above, Defendant responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment. After a diligent search and reasonable inquiry, Defendant will produce, pursuant to a Confidentiality Order, responsive, non-privileged, non-work-product documents that are directly related to Plaintiff's alleged wrongful termination.

Category M:

Documents in the possession of the defendant and/or the defendant's agent(s) concerning claims for unemployment benefits unless production is prohibited by applicable law.

Response to Category M:

Subject to the preliminary statement and foregoing objections set forth above, Defendant responds: After a diligent search and reasonable inquiry, Defendant does not have any responsive documents.

Category N:

Any other document(s) upon which the defendant relies to support the defenses, affirmative defenses, and counterclaims, including any other document(s) describing the reasons for the adverse action.

Response to Category N:

There is no operative answer on file. Defendant will produce non-privileged documents in support of its defenses and affirmative defenses at the appropriate time after its answer is filed.

1    Defendant's investigation of Plaintiff's claims is ongoing and Defendant reserves the right to

2    amend this response, to supplement documents produced in support of this response, and to rely on

3    such information and documents as evidence in this action.

4            **2.  Production of Information By Defendant**

5            Defendant has provided, to the best of its knowledge and ability at this time, complete and

6    accurate information required by Rule 26(a)(1)(A) and General Order 71. As set forth below,

7    Defendant reserves its right to supplement or delete from the responses below as more information

8    is obtained through the discovery process.

9            Category A:

10           Identify the plaintiff's supervisor(s) and/or manager(s).

11           Response to Category A:

12           Linda Keshishoglou, Evan Buyze, and David Powers.

13           Category B:

14           Identify person(s) presently known to the defendant who were involved in making the

15   decision to take the adverse action.

16           Response to Category B:

17           Defining "adverse action" as the termination of Plaintiff's employment, Yannick Bertolus

18   made the decision to terminate Plaintiff's employment.

19           Category C:

20           Identify persons the defendant believes to have knowledge of the facts concerning the

21   claims or defenses at issue in this lawsuit, and a brief description of that knowledge.

22           Response to Category C:

23           Defendant believes the following individuals are likely to have discoverable information

24   relevant to facts regarding Plaintiff's claims for alleged wrongful termination of employment—the

25   only issues/claims not presently subject to a pending motion to dismiss—as alleged with

26   particularity in the pleadings:

27           1.      Plaintiff (information regarding complaints to Defendant, and termination of

28                   Plaintiff's employment)

2.  Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Plaintiff's employment)

3.  Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Plaintiff's employment)

4.  Ekelemchi Okpo (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

5.  David Powers (SW Development Engineer Director) (information regarding complaints to Defendant)

6.  Michael Steiger (Environmental Health and Safety Manager) (information regarding complaints to Defendant and Defendant's policies)

7.  Jenna Waibel (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

8.  Dan West (Hardware Development Engineer Senior Director) (information regarding complaints to Defendant)

Except for Plaintiff, all individuals identified above may only be contacted through Defendant's counsel. Following discovery and receipt of additional information regarding the nature of Plaintiff's claims, additional witnesses may be identified, and Defendant reserves the right to supplement this list accordingly.

Category D:

State whether the plaintiff has applied for disability benefits and/or social security disability benefits after the adverse action. State whether the defendant has provided information to any third party concerning the application(s). Identify any documents concerning any such application or any such information provided to a third party.

Response to Category D:

To Defendant's knowledge, Plaintiff has not applied for disability benefits or social security disability benefits. As a result, Defendant has not provided information to any third party concerning any such application.

1    Dated: December 18, 2023                    ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                               By:      /s/ Jessica R. Perry

4                                                       JESSICA R. PERRY
                                                      Attorneys for Defendant
5                                                          APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **From:** | Juvinall, Kate <kjuvinall@orrick.com> |
| **Sent:** | Tuesday, December 19, 2023 1:29 PM |
| **To:** | Ashley M. Gjovik (Legal Matters) |
| **Cc:** | Booms, Ryan; Riechert, Melinda; Mantoan, Kathryn G.; Perry, Jessica R.; Mahoney, Brian; harry.johnson; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com |
| **Subject:** | RE: Gjovik v Apple | Requesting signed instruments under CLC § 432 |

Ashley,

As you know, the federal rules of civil procedure allow you to request these types of documents during discovery after the Rule 26(f) conference occurs.

We are not aware of any statute governing contracts that allows you to seek these types of documents outside of the formal discovery process. If you are referring to a specific statute, please send us the citation.

Best,
Kate

---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Friday, December 15, 2023 3:09 PM
**To:** Juvinall, Kate <kjuvinall@orrick.com>
**Cc:** Booms, Ryan <rbooms@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com
**Subject:** RE: Gjovik v Apple | Requesting signed instruments under CLC § 432

**[EXTERNAL]**

FYI, I talked with two people at CalDOL DIR today about Section 432 and both said it applies to ex-employees of California employers. I'm now waiting for written confirmation from the California Labor Commissioner's Office.

—
**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Thursday, December 14th, 2023 at 8:06 PM, Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com> wrote:

> Thank you for the update. I received your email about Section 432. I find the legal analysis in the cases cited questionable, and neither of the two cases are controlling, so I will be researching the topic further. I also plan to call the CalDOL office to discuss it with them as well, so I will get back you later on my challenge.
>
> I will also request a copy of the Face Gobbler ICF from Apple once more, now under contract law. Apple has cited that alleged Gobbler ICF in their defense, and claim it is evidence supporting their decision to terminate me. However, Apple has not provided me a copy of that document, and when I attempted to access that document prior to my termination, I could not -- the prior link said it no longer existed. If I was to sign such a thing, it assumably had

obligations that lasted longer than 1 year, and thus statute of frauds is implicated. If there is no proof of signed document, then there is no contract. Further, I will be arguing bad faith conduct by Apple, and further evidence of lack of consent and lack of mutual assent, if they continue to refuse to provide a copy of the document they claim is symbolic of my 'consent'. Finally, without providing me even confirmation the document does even exist still, I will also be treating the document as assumed to be non-existent in my amended complaint and opposition.

If my request is denied again, I will of course also be requesting the document in discovery.

Thanks,
-Ashley

—
**Ashley M. Gjøvik**
**BS, JD, PMP**


Sent with Proton Mail secure email.

On Thursday, December 14th, 2023 at 7:18 PM, Juvinall, Kate <kjuvinall@orrick.com> wrote:

> Hi Ashley – confirming receipt of your email. We separately responded today regarding your LC section 432 request and will follow-up regarding your request under the CPRA.
>
>
> Thank you,
>
> Kate
>
> _____
>
> **From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
> **Sent:** Friday, December 8, 2023 6:35 PM
> **Cc:** Booms, Ryan <rbooms@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com
> **Subject:** RE: Gjovik v Apple | Requesting signed instruments under CLC § 432
>
>
> **[EXTERNAL]**
>
> *Removing OMM who confirmed they're no longer on this either*
>
>
> Hello,
>
>
> **Contracts**

2

First, since Gobbler is the crux of Apple's legal defense in this matter, I'd think that the alleged Gobbler NDA would be easily on hand and it should only take a couple days at most to send over. Its been 10 days now. Please send or confirm it no longer exists.

**CPRA**

Second, the US DOL decision today (which I am appealing on both claims) appears to make direct reference to my personal information that was on my personal iPhone and personal iCloud account, including my discussions with non-employees on their iPhones and my personal iPhone, which must have been collected by Apple, and shared by Apple. Prior filings also reference my personal text messages (copied by Global Security) and my social media posts. All of this is personal information.

Considering this, under the CPRA, I am requesting copies of my personal information held by Apple including "where it came from, retention policies, and third-party disclosures." Among more standard types of data, personal information also includes "*geolocation, biometrics, and internet activity*" data. [see Morgan Lewis article]. This also includes but is not limited to: "in*formation collected and analyzed concerning a consumer's health... and sex life.*" [see Orrick article].

If Apple would like to deny the request for certain types of data, please provide information on what exception they relied on to deny the request and for what category of data they applied it.

I also opt out of the sale or sharing of that data, automated decision making based on that data, and ask to limit the use/disclosure of that information.

That information includes, but is not limited to: *"The CPRA also grants employees a new right to limit use and disclosure of "sensitive personal information," which is defined to include (1) precise geolocation data, (2) racial or ethnic origin, (3) union membership, (4) the contents of certain employee email and text messages, and (5) biometric information."* [see Morgan Lewis article].

Finally, I reserve my right to also request a deletion of that data.

I am filing this request as an ex-Apple employee, but also as someone with an active business based in California who owns and uses Apple products, thus a standard 'consumer.'

*A business cannot discriminate against a consumer because the consumer exercised any of the consumer's California rights, unless the price or service difference is reasonably related to the value provided to the business by the consumer's data.* [see Orrick article].

Thank you.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Sunday, December 3rd, 2023 at 11:08 PM, Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com> wrote:

Thank you for the update, MWE. Moving MWE to bcc.

Morgan Lewis - I now assume you are assigned to all five NLRB charges (including the two open cases).
You guys should fix up your notices of appearance - it still shows MWE on most of the NLRB case webpages.

If Morgan Lewis is not retained for some of the NLRB charges, please confirm, and let me know if I should ask Apple who is, or if Apple is handling them directly, or if you know who else is handling them if not you.

Thank you.

-Ashley

—

**Ashley M. Gjøvik**

BS, JD, PMP

Sent with Proton Mail secure email.

On Saturday, December 2nd, 2023 at 5:17 PM, Foster, Christopher
<Cfoster@mwe.com> wrote:

> MWE does not represent any party in these referenced
> matters.

> Thank you,

> Chris

> CHRISTOPHER FOSTER
> Partner
> McDermott Will & Emery LLP  415 Mission Street, Suite 5600, San Francisco, CA 94105-2616
> Tel +1 628 218 3826    Email cfoster@mwe.com
> Biography | Website | vCard | Twitter | LinkedIn
> * Admitted to practice law in California, Washington, and Idaho

> **From:** Ashley M. Gjovik (Legal Matters)
> <legal@ashleygjovik.com>
> **Sent:** Saturday, December 2, 2023 9:18 AM
> **To:** Foster, Christopher <Cfoster@mwe.com>;
> McConnell, Julie <Jmcconnell@mwe.com>; Booms,
> Ryan <rbooms@orrick.com>; Riechert, Melinda
> <mriechert@orrick.com>; Mantoan, Kathryn G.
> <kmantoan@orrick.com>; Juvinall, Kate
> <kjuvinall@orrick.com>; jperry <jperry@orrick.com>;
> Mahoney, Brian <brian.mahoney@morganlewis.com>;
> harry.johnson <harry.johnson@morganlewis.com>;
> kelcey.phillips@morganlewis.com;
> mark.stolzenburg@morganlewis.com;
> crystal.carey@morganlewis.com; Eberhart, David R.
> <deberhart@omm.com>
> **Subject:** Re: Gjovik v Apple | Requesting signed
> instruments under CLC § 432

Some people who received this message don't often get email from legal@ashleygjovik.com. Learn why this is important

**[ External Email ]**

+ OMM if they're still on this too

Removing Sayed at MWE who per OoO apparently left in Feb '23 (@Chris, Ron left around that time too, and Julie is on leave, so if there are others on your firm now on my NLRB cases, please loop them in).

Can someone from one of these firms please at least confirm receipt of my request? I sent this Tuesday and haven't heard anything back from any of you.

If this request needs to be submitted directly to Apple, please let me know - however y'all are representing Apple and I'm supposedly supposed to go through you with my requests and questions during litigation/adjudication.

It's unclear to me if the NLRB NDA adjudication is now represented by both MWE and Morgan Lewis, or if Morgan Lewis is only on the Cook email and my 1/10/22 witness intimidation and witness retaliation charge, and MWE is still on the NDAs and employment policies and 8/26 & 9/16/21 unfair labor/retaliation charges. If someone can clear that up too please, it would be appreciated.

I also don't know who Apple hired to represent them on the California Dept of Labor cases but I assume that is moot now that I rolled them into the federal civil suit.

Can we also do a roles and responsibilities matrix, maybe?

Thank you.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Tuesday, November 28th, 2023 at 12:25 AM, Ashley
M. Gjøvik (Legal Matters) <legal@ashleygjovik.com>
wrote:

Hello Apple lawyers,

I am requesting copies of all instruments I
signed (physical and electronic signatures)
relating to my obtainment and holding of
employment at Apple Inc.

This request is governed by California Labor
Code, Article 3, § 432. The litigation
exception to § 1198.5 does not apply to §
432.

I am requesting that the Face Gobbler
related instrument(s) be released first and
expeditiously, and not saved for a bulk
release with the others. If Apple does not
have a copy of any signed Face Gobbler
related instruments, I would like confirmation
of that fact and swiftly.

For all instruments, I am requesting to
receive records digitally, which should not be
an issue as almost all of them were signed
digitally. You can share the documents via
email attachments or via a shared document
repository as long as it allows me to
download them without alteration.

As we are over two years into this litigation,
I'd expect these records should already be
on hand, and as such I do not expect any
prolonged delays.

Thank you for your cooperation. Please let
me know if you have any questions.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is a PRIVATE communication. This
message and all attachments are a private
communication sent by a law firm and may be
confidential or protected by privilege. If you are not the
intended recipient, you are hereby notified that any
disclosure, copying, distribution or use of the information
contained in or attached to this message is strictly
prohibited. Please notify the sender of the delivery error
by replying to this message, and then delete it from your
system. Our [Privacy Policy](#) explains how we may use
your personal information or data and any personal
information or data provided or made available to us.
Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit [http://www.mwe.com/](http://www.mwe.com/) for more information
about our Firm.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by la
received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immedia
the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

(Additional counsel on following page)

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Respondent
Apple Inc.

UNITED STATES DEPARTMENT OF LABOR

OFFICE OF ADMINISTRATIVE LAW JUDGES

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>                    Complainant,<br><br>          v.<br><br>APPLE INC.,<br><br>                    Respondent. | OALJ Case No.:    2024-CER-00001<br>OSHA Case No.:    9-3290-22-051<br><br>**RESPONDENT APPLE INC.'S INITIAL DISCLOSURES PURSUANT TO JANUARY 19, 2024 NOTICE OF DOCKETING AND 29 C.F.R. § 18.50(c)(1)** |

1 | KATE E. JUVINALL (SBN 315659)
kjuvinall@orrick.com
2 | ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-C
3 | Santa Monica, CA 90401
Telephone:     +1 310 633 2800
4 | Facsimile:      +1 310 633 2849

5 | RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
6 | ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
7 | Washington, D.C. 20005-1706
Telephone:     +1 202 339 8400
8 | Facsimile:      +1 202 339 8500

9 | Attorneys for Respondent
Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     Pursuant to the January 19, 2024 Notice of Docketing and 29 C.F.R. § 18.50(c)(1),

2 Respondent Apple Inc. ("Apple" or "Respondent") hereby submits the following Initial Disclosures

3 to Complainant Ashley Gjovik ("Complainant"). Apple makes these Initial Disclosures based upon

4 information currently available to it and reserves the right to supplement all disclosures as discovery

5 progresses. Apple makes these disclosures concerning the claims and defenses properly at issue in

6 OALJ Case No. 2024-CER-00001, which are limited to the Comprehensive Environmental

7 Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9610 claim and

8 defenses addressed in the Secretary of Labor's December 8, 2023 findings in OSHA Case No. 9-

9 3290-22-051.[1] *See* 29 C.F.R. § 24.100 *et seq.* (setting forth procedures required to make and appeal

10 determinations regarding alleged whistleblower retaliation under CERCLA).[2]

11     These disclosures are made without waiving the right to object on the grounds of

12 competency, privilege, relevancy and materiality, hearsay or any other proper ground and the right

13 to object on any and all grounds, at any time, to any discovery request or proceeding involving or

14 relating to the subject matter of these Initial Disclosures.

15     **Category 1: The name and, if known, the address and telephone number of each**

16 **individual likely to have discoverable information—along with the subjects of that**

17 **information—that the disclosing party may use to support its claims or defenses, unless the**

18 **use would be solely for impeachment.**

19     The following are persons who may have information that Respondent may use to support

20 its defenses in this case:

21     1.     Complainant (information regarding complaints to Respondent regarding the issues

22     raised in Complainant's August 29, 2021 (ECN76833) complaint that are properly

23

---

24 [1] The December 8, 2023 Findings addressed issues raised by Complainant regarding 825 Stewart Drive in complaints filed on August 29, 2021 (ECN76833) and November 2, 2021 (ECN78416).

25 However, the November 2, 2021 complaint is not at issue in this appeal because it addressed only a claim under the Sarbanes-Oxley Act.

26 [2] Complainant also appears to seek review of claims under the Solid Waste Disposal Act, Resource Conservation and Recovery Act, and Clean Air Act, but any such claims were not timely raised in

27 her initial complaint and are thus not properly at issue. *See* 29 C.F.R. §§ 24.103, 24.105. To the extent the ALJ decides to consider any of these claims, Respondent reserves the right to amend

28 these initial disclosures accordingly.

the subject of this proceeding (the "Complaints"), and the reasons for the alleged adverse action(s))

2.   Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Complainant's employment)

3.   Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Complainant's employment)

4.   Ekelemchi Okpo (Employee Relations Business Partner) (information regarding the Complaints to Respondent, the alleged adverse action(s), and Respondent's policies)

5.   Michael Steiger (Environmental Health and Safety Manager) (information regarding the Complaints to Respondent and Respondent's policies)

6.   Jenna Waibel (Employee Relations Business Partner) (information regarding the Complaints to Respondent, the alleged adverse action(s), and Respondent's policies)

Except for Complainant, all individuals identified above may be contacted through Respondent's counsel. Following discovery and receipt of additional information regarding the nature of Complainant's claims, additional witnesses may be identified, and Respondent reserves the right to supplement this list accordingly.

**Category 2: A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following are the descriptions by category of all documents and things that Respondent currently has in its possession, custody or control that may be used to support its defenses:

- The personnel file Respondent maintained on Complainant
- Complainant's compensation and payroll records
- Documents regarding Complainant's Complaints (as defined above) to Respondent from March 2021 through Complainant's termination of employment
- Documents sufficient to show that Northrop Grumman is the responsible party for the relevant Superfund site cleanup

2

1 • Documents regarding Respondent's policies and procedures in effect from March
2 2021 to Complainant's termination of employment

3 • Documents regarding the termination of Complainant's employment

4 To the extent these documents consist of electronically stored information, these documents are
5 located on servers, computers, and other electronic storage media, that are either (a) located at
6 Respondent's corporate headquarters or in the possession of Respondent's employees, or (b) in the
7 possession of Respondent's outside counsel. To the extent any tangible documents or things on
8 these subjects exist in the possession, custody or control of Respondent, they are located at
9 Respondent's headquarters and may be obtained through Respondent's outside counsel.

10 **Category 3: A computation of each category of damages claimed by the disclosing**
11 **party—who must also make available for inspection and copying as under § 18.61 the**
12 **documents or other evidentiary material, unless privileged or protected from disclosure, on**
13 **which each computation is based, including materials bearing on the nature and extent of**
14 **injuries suffered.**

15 Apple does not claim any damages at this time.

16

17 Dated: February 9, 2024                            By: /s/Jessica R. Perry
18                                                         JESSICA R. PERRY
                                                         Attorneys for Respondent Apple Inc.
19

20

21

22

23

24

25

26

27

28

1    (Additional counsel on following page)

2    JESSICA R. PERRY (SBN 209321)
      jperry@orrick.com
3    MELINDA S. RIECHERT (SBN 65504)
      mriechert@orrick.com
4    ORRICK, HERRINGTON & SUTCLIFFE LLP
      1000 Marsh Road
5    Menlo Park, CA  94025-1015
      Telephone:     +1 650 614 7400
6    Facsimile:     +1 650 614 7401

7    KATHRYN G. MANTOAN (SBN 239649)
      kmantoan@orrick.com
8    ORRICK, HERRINGTON & SUTCLIFFE LLP
      The Orrick Building
9    405 Howard Street
      San Francisco, CA 94105-2669
10   Telephone:     +1 415 773 5700
      Facsimile:     +1 415 773 5759

11

   Attorneys for Defendant Apple Inc.

12

13                UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16

17    ASHLEY GJOVIK,                   Case No. 23-cv-4597-EMC

18           Plaintiff,          **DEFENDANT APPLE INC.'S INITIAL**
                                     **DISCLOSURES PURSUANT TO FED. R.**
19       v.                      **CIV. P. 26(A)(1)**

20    APPLE INC.,

21           Defendant.

22

23

24

25

26

27

28

KATE E. JUVINALL (SBN 315659)
kjuvinall@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-C
Santa Monica, CA 90401
Telephone:     +1 310 633 2800
Facsimile:     +1 310 633 2849

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone:     +1 202 339 8400
Facsimile:     +1 202 339 8500

Attorneys for Defendant
Apple Inc.

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendant Apple Inc. identifies the following witnesses and documents, and makes the following initial disclosures.[1] Defendant makes these disclosures based on information currently available to it at this time, following a good faith inquiry in accordance with Rule 26. Defendant reserves the right to amend and/or supplement these disclosures if and as any further information becomes available during discovery and to rely upon such information as evidence in this action. Defendant makes the following disclosures to expedite the discovery process and without waiving the Federal Rules of Evidence, including the protections of the attorney-client privilege, the work-product doctrine, and any other applicable privilege. Defendant expressly reserves its rights under those privileges and protections. By making these disclosures, Defendant does not concede that the disclosed evidence is relevant or admissible as evidence at trial, and reserves the right to assert any and all evidentiary objections.

Further, the only claims at issue in this lawsuit and not subject to Defendant's forthcoming motion to dismiss—due on July 15, 2024—are those directly related to the allegedly wrongful termination of Plaintiff's employment and/or alleged retaliation during the course of her employment. Thus, Defendant identifies individuals likely to have discoverable information regarding those factual allegations and claims clearly at issue, as well as documents, data compilations, and tangible things that Defendant may use to support its claims or defenses.

**Rule 26(a)(1)(A): The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to**

---

[1] Defendant does not believe it is required to provide initial disclosures under FRCP 26(a) because Northern District of California General Order No. 71: Initial Discovery Protocols For Employment Cases Alleging Adverse Action ("GO 71") applies. GO 71 "applies to all employment cases filed in this court after February 1, 2018, that challenge one or more actions alleged to be adverse." GO 71 by its terms is "intended to supersede the parties' obligations to make initial disclosures pursuant to F.R.C.P. 26(a)(1)" in applicable cases. Here, Plaintiff's case "challenge[s] one or more [employment] actions alleged to be adverse" in her wrongful termination and whistleblower retaliation claims. Defendant served its GO 71 disclosures on December 18, 2023 and supplemented those disclosures with additional document productions on April 5, 2024 and May 15, 2024; to date Defendant has produced 418 documents totaling 1,549 pages pursuant to GO 71. Plaintiff has indicated that she does not believe GO 71 applies to this case, and accordingly Defendant makes these FRCP 26(a)(1) disclosures without conceding that they are required in this matter. The parties met and conferred regarding topics set forth in the Standing Order for All Judges of the Northern District of California: Contents of Joint Statement Management Statement on June 25, 2024.

**support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Subject to the preliminary statement set forth above, Defendant responds:

1.  Plaintiff (information regarding complaints to Defendant, and termination of Plaintiff's employment)

2.  Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Plaintiff's employment)

3.  Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Plaintiff's employment)

4.  Ekelemchi Okpo (Labor Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

5.  Michael Steiger (Environmental Health and Safety Manager) (information regarding complaints to Defendant and Defendant's policies)

6.  Jenna Waibel (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

Except for Plaintiff, all individuals identified above may only be contacted through Defendant's counsel. Following discovery and receipt of additional information regarding the nature of Plaintiff's claims, additional witnesses may be identified, and Defendant reserves the right to supplement this list accordingly.

**Rule 26(a)(1)(B):    A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Subject to the preliminary statement set forth above, Defendant responds:

1.  E-mail communications concerning Plaintiff, complaints she made to Defendant regarding perceived issues at 825 Stewart, and/or the termination of her employment between Plaintiff and Yannick Bertolus, Antone Jain, Aleks Kagramanov, Antonio

1               Lagares, Ekelemchi Okpo, Helen Polkes, Dave Powers, Michael Steiger, Jenna

2               Waibel, and/or Dan West from March 1, 2021 to September 9, 2021.

3       2.     E-mail communications concerning Plaintiff, complaints she made to Defendant

4               regarding perceived issues at 825 Stewart, and/or the termination of her employment

5               between or among Yannick Bertolus, Antone Jain, Aleks Kagramanov, Antonio

6               Lagares, Ekelemchi Okpo, Helen Polkes, Dave Powers, Michael Steiger, Jenna

7               Waibel, and/or Dan West from March 1, 2021 to September 9, 2021.

8       3.     The personnel file Defendant maintained on Plaintiff.

9       4.     Plaintiff's performance reviews.

10      5.     Documents relied on to make the decision to terminate Plaintiff's employment.

11      6.     Policies relevant to the termination of Plaintiff's employment.

12      7.     Job descriptions for positions Plaintiff held.

13      8.     Documents showing Plaintiff's compensation and benefits.

14      9.     Documents that are directly related to Plaintiff's termination.

15      These documents are in the possession of Defendant's counsel.

16      Defendant reserves the right to supplement the categories of documents as more information

17 becomes available through the discovery process. By listing documents or categories of documents,

18 Defendant does not waive the right to object to discovery requests to which any document or

19 category of documents may be responsive.

20      **Rule 26(a)(1)(C):  Computation of any category of damages claimed by the disclosing**

21 **party.**

22      Apple does not claim any damages at this time.

23      **Rule 26(a)(1)(D):  Any insurance agreement under which any person carrying on an**

24 **insurance business may be liable to satisfy part or all of a judgment which may be entered in**

25 **the action or to indemnify or reimburse for payments made to satisfy the judgment.**

26      There is no applicable insurance policy that presently covers Plaintiff's claims in this

27 lawsuit.

28

DEF.'S FRCP 26(A)(1) INITIAL DISCLOSURES
[23-CV-4597-EMC]

1    Dated: July 9, 2024                    ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                           By: _____
                                                  *Melinda Riechert*
4                                               MELINDA S. RIECHERT
                                                Attorneys for Defendant
5                                                   APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    (Additional counsel on following page)

2    JESSICA R. PERRY (SBN 209321)
     jperry@orrick.com
3    MELINDA S. RIECHERT (SBN 65504)
     mriechert@orrick.com
4    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1000 Marsh Road
5    Menlo Park, CA 94025-1015
     Telephone:    +1 650 614 7400
6    Facsimile:    +1 650 614 7401

7    KATHRYN G. MANTOAN (SBN 239649)
     kmantoan@orrick.com
8    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
9    405 Howard Street
     San Francisco, CA 94105-2669
10   Telephone:    +1 415 773 5700
     Facsimile:    +1 415 773 5759

11
     Attorneys for Defendant Apple Inc.
12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17   ASHLEY GJOVIK,                          Case No. 23-cv-4597-EMC

18              Plaintiff,                    **DEFENDANT APPLE INC.'S
                                             RESPONSES TO PLAINTIFF'S
19         v.                                 PART 1, REQUEST FOR
                                             PRODUCTION OF PHASE 1
20   APPLE INC.,                              DISCOVERY**

21              Defendant.

22

23

24

25

26

27

28

1    KATE E. JUVINALL (SBN 315659)
     kjuvinall@orrick.com
2    ORRICK, HERRINGTON & SUTCLIFFE LLP
     631 Wilshire Blvd., Suite 2-C
3    Santa Monica, CA 90401
     Telephone:     +1 310 633 2800
4    Facsimile:      +1 310 633 2849

5    RYAN D. BOOMS (SBN 329430)
     rbooms@orrick.com
6    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1152 15th Street, N.W.
7    Washington, D.C. 20005-1706
     Telephone:     +1 202 339 8400
8    Facsimile:      +1 202 339 8500

9    Attorneys for Defendant
     Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Defendant Apple Inc. responds to Plaintiff Ashley Gjovik's Part 1, Request for Production

2    of Phase 1 Discovery[1] ("Requests"), served on October 30, 2024, as follows:

3    **RESPONSES TO REQUESTS FOR PRODUCTION**

4    **REQUEST FOR PRODUCTION NO. 1:**

5    The case file from Defendant's Employee Relations Case Management Platform concerning

6    Jenna Waibel's investigation into Gjovik starting at or before March 2021 (or whatever it was coded

7    as when Waibel became involved in March 2021) through September 10 2021. (Including notes or

8    comments from people other than Waibel).

9    **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

10    Defendant does not have any documents responsive to this Request because Ms. Waibel

11    never conducted an investigation into Plaintiff.

12    **REQUEST FOR PRODUCTION NO. 2:**

13    The case file from Defendant's Employee Relations Case Management Platform concerning

14    Jenna Waibel's Investigation into Gjovik's concerns starting in March 2021 through September 10

15    2021. (Including notes or comments from people other than Waibel).

16    **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

17    Defendant objects to this Request to the extent it seeks information outside of the claims

18    properly at issue in the Fourth Amended Complaint ("4AC") as explained in the Court's October

19    1, 2024 Order: Count I – Wrongful Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25;

20    Count III – Labor Code §6310; Count VI – Labor Code §232.5 ¶182; and Count VII – Labor Code

21    §96(k). *See* Dkt. 112 at 38-41. Defendant objects to this Request to the extent it seeks information

22    protected from disclosure by the attorney-client privilege and/or attorney work product doctrine.

23    Defendant objects to this Request to the extent it seeks disclosure of a confidential internal

---

[1] On October 1, 2024, the Court limited discovery to "'Phase 1' discovery (*i.e.,* discovery needed for the settlement conference) on Counts 1 [wrongful termination] and 3 [retaliation] (which Apple did not contest at all in its motion to dismiss) and those parts of the retaliation claims above that were not challenged or otherwise survived." Dkt. 112 at 41. These Requests improperly seek information about a number of issues and claims outside of that scope, which is not relevant to Plaintiff's employment-related claims and for which discovery is thus not proper at this time.

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

1  Employee Relations investigation that includes sensitive and private information about third

2  parties. *See* Fed. R. Civ. Proc. 26(c).

3       Subject to and without waiving the forgoing objections, Defendant did not maintain a case

4  file concerning Ms. Waibel's investigation into concerns Plaintiff raised in an "Employment

5  Relations Case Management Platform." Defendant interprets "case file" to mean the investigation

6  documents maintained by Ms. Waibel relating to concerns raised by Plaintiff. Defendant has not

7  identified any responsive, non-privileged documents as the investigation was conducted at the

8  direction and under the supervision of counsel. Defendant will produce a categorical privilege log.

9  **REQUEST FOR PRODUCTION NO. 3:**

10       The case file from Defendant's Employee Relations Case Management Platform concerning

11  Ekelemchi Okpo's investigation into Gjovik's concerns starting in July 2021 through September

12  10 2021. (Including notes or comments from people other than Okpo).

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

14       Defendant objects to this Request to the extent it seeks information outside of the claims

15  properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful

16  Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

17  VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41.

18  Defendant objects to this Request to the extent it seeks information protected from disclosure by

19  the attorney-client privilege and/or attorney work product doctrine. Defendant objects to this

20  Request to the extent it seeks disclosure of a confidential internal Employee Relations investigation

21  that includes sensitive and private information about third parties. *See* Fed. R. Civ. P. 26(c).

22       Subject to and without waiving the forgoing objections, Defendant did not maintain a case

23  file concerning Mr. Okpo's investigation into concerns raised by Plaintiff in an "Employment

24  Relations Case Management Platform." Defendant interprets "case file" to mean the investigation

25  documents maintained by Mr. Okpo relating to concerns raised by Plaintiff. Defendant has not

26  identified any responsive, non-privileged documents as the investigation was conducted at the

27  direction and under the supervision of counsel. Defendant will produce a categorical privilege log.

28  / / /

**REQUEST FOR PRODUCTION NO. 4:**

The case file from Respondent's Employee Relations Case Management Platform concerning any investigation into Gjovik starting on August 4 2021 through September 10 2021. (Including notes or comments from people other than Okpo).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Defendant objects to this Request to the extent it seeks information outside of the claims properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41. Defendant objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and/or attorney work product doctrine. Defendant objects to this Request to the extent it seeks disclosure of a confidential internal Employee Relations investigation that includes sensitive and private information about third parties. *See* Fed. R. Civ. P. 26(c).

Subject to and without waiving the forgoing objections, Defendant did not maintain a case file regarding an investigation into Plaintiff from August 4, 2021 to September 10, 2021, in an "Employment Relations Case Management Platform." Defendant interprets "case file" to mean the investigation documents related to Aleks Kagramanov's investigation into Plaintiff posting confidential documents on the internet. Defendant does not have any responsive, non-privileged documents as the investigation was conducted at the direction and under the supervision of counsel. Defendant will produce a categorical privilege log.

**REQUEST FOR PRODUCTION NO. 5:**

All documents concerning the August 2021 "Issue Confirmation", document for Plaintiff [*sic*], and from document Plaintiff [*sic*], including drafts (with time stamps and/or metadata) and associated emails or other communications, through Sept. 10 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Defendant objects to this Request to the extent it seeks information outside of the claims properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41. Defendant objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and/or attorney work product doctrine. Defendant objects to this Request to the extent it seeks disclosure of confidential, sensitive, and private information about third parties. *See* Fed. R. Civ. P. 26(c).

Subject to and without waiving the forgoing objections, Defendant understands this Request to seek all documents concerning the August 2021 Issue Confirmation sent between Plaintiff and Defendant, including drafts. Defendant will produce all responsive, non-privileged documents located after a reasonably diligent search as they are kept in the usual course of business subject to entry of an appropriate protective order in this matter.

**REQUEST FOR PRODUCTION NO. 6:**

The Business Conduct system record for Complainant's August 2021 Business Conduct Complaint including any notes, updates, status, and/or resolution. Also any emails were sent by Business Conduct about the Complaint through Sept. 10 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Defendant does not have any documents responsive to this Request because the Business Conduct complaint that Gjovik filed in August 2021 (regarding a separate alleged conflict of interest) is not related to Plaintiff's claims presently at issue in the 4AC and as defined in the Court's October 1, 2024 Order. *See* Dkt. 112 at 38-41.

**REQUEST FOR PRODUCTION NO. 7:**

All indoor air testing results and reports, air test plans, cracked slab repair plans, cracked slab inspection reports, cracked slab sealing reports, SSD/SSV maintenance reports, engineer certifications of work performed, invoices, work orders, related to the CERCLA engineering controls at 825 Stewart Drive from Jan 1 2021 through Sept 10 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Defendant objects to this Request because it seeks information outside of the claims properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

1  VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41.

2  Defendant objects to this Request to the extent it seeks information protected from disclosure by

3  the attorney-client privilege and/or attorney work product doctrine. Defendant also objects to this

4  Request on the grounds that it is overbroad and unduly burdensome, and it seeks information that

5  is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

6  **REQUEST FOR PRODUCTION NO. 8:**

7  Any status report, meeting notes, or other type of summary sent to or from Gjovik's

8  management chain and/or Helen Polkes, Jenna Waibel, Ekelemchi Okpo, or Tony Lagares

9  concerning the August 19 2021 US EPA inspection of 825 Stewart Drive, from July 25 2021

10  through Sept. 10 2021.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

12  Defendant objects to this Request because it seeks information outside of the claims

13  properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful

14  Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

15  VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41.

16  Defendant objects to this Request to the extent it calls for information protected from disclosure by

17  the attorney-client privilege and/or attorney work-product doctrine. Defendant also objects to this

18  Request on the grounds that it is overbroad and unduly burdensome, and it seeks information that

19  is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

20  **REQUEST FOR PRODUCTION NO. 9:**

21  All documents in possession of Gjovik's management chain, Helen Polkes, Jenna Waibel,

22  Ekelemchi Okpo, Tony Lagares, Atone Jain, Michael Seiger, or Tom Huynh that concern both the

23  Plaintiff and the property at 3250 Scott Blvd, from Sept. 1 2020 through Spet. [*sic*] 10 2021.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

25  Defendant objects to this Request because it seeks information outside of the claims

26  properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful

27  Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

28  VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41.

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

1  Defendant objects to this Request to the extent it seeks information protected from disclosure by

2  the attorney-client privilege and/or attorney work product doctrine. Defendant also objects to this

3  Request on the grounds that it is overbroad and unduly burdensome, and it seeks information that

4  is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

5  **REQUEST FOR PRODUCTION NO. 10:**

6      Any "safety plan" or "EHS plan" or "operations and maintenance plan" for 825 Stewart

7  Drive or 3250 Scott Blvd in place between Jan. 1 2020 and Sept. 10 2021.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

9      Defendant objects to this Request because it seeks information outside of the claims

10  properly at issue in the 4AC as explained in the Court's October 1, 2024 Order: Count I – Wrongful

11  Discharge; Count II – Labor Code §1102.5 ¶168, lines 9-25; Count III – Labor Code §6310; Count

12  VI – Labor Code §232.5 ¶182; and Count VII – Labor Code §96(k). *See* Dkt. 112 at 38-41.

13  Defendant objects to this Request to the extent it seeks information protected from disclosure by

14  the attorney-client privilege and/or attorney work product doctrine. Defendant also objects to this

15  Request on the grounds that it is overbroad and unduly burdensome, and it seeks information that

16  is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

17      Subject to and without waiving the forgoing objections, Defendant understands this Request

18  to seek documents regarding Defendant's voluntarily vapor intrusion mitigation program at 825

19  Stewart Dr. and/or 3250 Scott Blvd. Defendant has already produced all responsive documents

20  located after a reasonably diligent search between Defendant and Plaintiff during her employment

21  regarding Defendant's voluntary vapor intrusion mitigation program at 825 Stewart Dr.: APL-

22  GAELG_00000530,        APL-GAELG_00000556,        APL-GAELG_00000560,        APL-

23  GAELG_00000564,        APL-GAELG_00000567,        APL-GAELG_00000582,        APL-

24  GAELG_00000591,        APL-GAELG_00000621,        APL-GAELG_00000664,        APL-

25  GAELG_00000676,        APL-GAELG_00000705,        APL-GAELG_00000717,        APL-

26  GAELG_00000771,        APL-GAELG_00000775,        APL-GAELG_00000798,        APL-

27  GAELG_00000806,        APL-GAELG_00000830,        APL-GAELG_00000869,        APL-

28  GAELG_00000878,        APL-GAELG_00000946,        APL-GAELG_00000948,        APL-

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

1  GAELG_00000950,        APL-GAELG_00000955,        APL-GAELG_00000959,        APL-

2  GAELG_00001186,        APL-GAELG_00001190,        APL-GAELG_00001200,        APL-

3  GAELG_00001205,        APL-GAELG_00001208,        APL-GAELG_00001361,        APL-

4  GAELG_00001377, APL-GAELG_00001391, and APL-GAELG_00001509.

5       Defendant is not producing any documents regarding the voluntary vapor intrusion

6  mitigation program at 825 Stewart Dr. that were not provided to Plaintiff during her employment,

7  as they are not responsive to Plaintiff's claims presently at issue in the 4AC and as defined in the

8  Court's October 1, 2024 Order. *See* Dkt. 112 at 38-41. Nor is Defendant producing any documents

9  regarding 3250 Scott Blvd., as they are also not relevant to the claims properly at issue in the 4AC

10 and as defined in the Court's October 1, 2024 Order. *See id.*

11 **REQUEST FOR PRODUCTION NO. 11:**

12      All documents or communications with Gjovik's management chain, Helen Polkes, Jenna

13 Waibel, Ekelemchi Okpo, or Tony Lagares, concerning Complainant's 2021 mid-year performance

14 review, dated from Jan 1 2021 through Sept. 10 2021.

15 **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

16      Defendant does not have any documents responsive to this Request because Defendant did

17 not conduct a mid-year performance review for Plaintiff in 2021.

18 **REQUEST FOR PRODUCTION NO. 12:**

19      All documents or communications with Gjovik's management chain, Helen Polkes, Jenna

20 Waibel, Ekelemchi Okpo, or Tony Lagares, concerning Complainant's 2021 annual performance

21 review and compensation determination dated from Jan 1 2021 through Sept. 10 2021. This

22 includes the peer feedback received in the HR tool from Gjovik's peers, and any drafts of the review

23 in that tool.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

25      Defendant objects to this Request to the extent it seeks information protected from

26 disclosure by the attorney-client privilege and/or attorney work product doctrine.

27

28

1        Subject to and without waiving the forgoing objections, Defendant will produce all

2  responsive, non-privileged documents located after a reasonably diligent search as they are kept in

3  the usual course of business. Defendant will produce a categorical privilege log.

4  **REQUEST FOR PRODUCTION NO. 13:**

5        Any drafts, comments, or revisions of the termination letter and notice sent to Complainant

6  on Sept. 9 2021. (Please include timestamps when possible).

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

8        Defendant objects to this Request to the extent it seeks information protected from

9  disclosure by the attorney-client privilege and/or attorney work product doctrine.

10        Subject to and without waiving the forgoing objections, Defendant has already produced all

11  responsive, non-privileged documents located after a reasonably diligent search: APL-

12  GAELG_00001143,      APL-GAELG_00001176,      APL-GAELG_00001166,      APL-

13  GAELG_00001144,      APL-GAELG_00001513,      APL-GAELG_00001548,      APL-

14  GAELG_00001538, and APL-GAELG_00001516. Defendant will produce a categorical privilege

15  log.

16  **REQUEST FOR PRODUCTION NO. 14:**

17        Any email discussion, meeting notes, or other documents between Plaintiff's management

18  chain, Human Resources, Employee Relations, or Global Security that involved planning whether

19  or not they would terminate Plaintiff, and how they would terminate Plaintiff dated from Jan. 1

20  2021 through Sept. 10 2021.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

22        Defendant objects to this Request to the extent it seeks information protected from

23  disclosure by the attorney-client privilege and/or attorney work product doctrine.

24        Subject to and without waiving the forgoing objections, Defendant has already produced all

25  responsive, non-privileged documents located after a reasonably diligent search: APL-

26  GAELG_00001513,      APL-GAELG_00001548,      APL-GAELG_00001538,    and     APL-

27  GAELG_00001516. Defendant will produce a categorical privilege log.

28

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

1  **REQUEST FOR PRODUCTION NO. 15:**

2       Any documents, contracts, or agreements that Plaintiff supposedly signed, accepted, or

3  otherwise responded to related to the "Gobbler"/"Glimmer" app between Jan. 1 2016 and Sept. 10

4  2021. This includes any Informed Consent Forms and/or NDAs.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

6       Defendant objects to this Request to the extent it seeks disclosure of confidential and

7  proprietary Apple product information.

8       Subject to and without waiving the forgoing objections, Defendant will produce all

9  responsive documents located after a reasonably diligent search subject to appropriate protections.

10  **REQUEST FOR PRODUCTION NO. 16:**

11       Any emails or other documents, in possession of her management chain (David Powers,

12  Dan West, Yannick Bertolus, John Ternus, Tim Cook) or Human Resources/Employee Relations

13  (Helen Polkes and her management chain, Waibel and Okpo and their management chain)

14  discussing the Aug. 31 2021 "Apple Cares About Privacy, Unless you Work at Apple," Verge

15  article, dated from Aug. 20 2021 through Sept. 10 2021.

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

17       Defendant objects to this Request to the extent it seeks information protected from

18  disclosure by the attorney-client privilege and/or attorney work product doctrine. Defendant objects

19  to this Request as overbroad because it seeks documents from custodians who were not involved

20  in the decision to terminate Plaintiff's employment. For that reason, Defendant also objects to this

21  Request on the grounds that it seeks information that is neither relevant nor reasonably calculated

22  to lead to the discovery of admissible evidence.

23       Subject to and without waiving the forgoing objections, Defendant limits this Request to

24  custodians that were involved in the decision to terminate Plaintiff's employment (who Defendant

25  has already identified for Plaintiff), including Yannick Bertolus, Megan Bowman, Aleks

26  Kagramanov, Ekelemchi Okpo, Joni Reicher, Jennifer Waldo, and Adelmise Warner. Defendant

27  will produce responsive, non-privileged documents located after a reasonably diligent search as

28

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

1  they are kept in the ordinary course of business on a rolling basis. Defendant will produce a
2  categorical privilege log.

3  **REQUEST FOR PRODUCTION NO. 17:**

4        Any responses transmitted from Apple to The Verge and/or the reporter Zoe Schiffer, about
5  the Apple Cares About Privacy, Unless you Work at Apple," Verge article, in response to the
6  reporter's request for comment prior to publication. (Including any responses after publication,
7  through Sept. 10 2021).

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

9        Defendant understands this Request to seek communications from Defendant's PR team to
10 The Verge and/or Zoe Schiffer. Defendant does not have any documents that are responsive to this
11 Request.

12 **REQUEST FOR PRODUCTION NO. 18:**

13       Whatever email or emails that Orrick referred to in their U.S. Dept. of Labor response in
14 2022, that were dated at or around July 20 2021, that Orrick says includes comments from Plaintiff
15 about a medical leave or administrative leave.

16 **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

17       Defendant has already produced the responsive documents: APL-GAELG_00001451 and
18 APL-GAELG_00001053.

19
20 Dated: November 29, 2024                    ORRICK, HERRINGTON & SUTCLIFFE LLP
21
22                                            By: _____*/s/ Melinda S. Riechert*_____
                                                   MELINDA S. RIECHERT
23                                                 Attorney for Defendant
                                                   APPLE INC.
24
25
26
27
28

APPLE'S RESPONSES TO PLAINTIFF'S PART 1,
REQUEST FOR PRODUCTION OF PHASE 1
DISCOVERY [23-cv-4597-EMC]

legal.ashleygjovik@proton.mail.com/4597con Mail

# RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1

| | |
|---|---|
| From | Riechert, Melinda <mriechert@orrick.com> |
| To | legal@ashleygjovik.com |
| CC | Mantoan, Kathryn G.<kmantoan@orrick.com>, Perry, Jessica R.<jperry@orrick.com>, Booms, Ryan<rbooms@orrick.com>, Juvinall, Kate<kjuvinall@orrick.com> |
| Date | Wednesday, June 19th, 2024 at 8:45 PM |

We objected to that list for the reasons stated in our objections. If there are specific documents you think are missing, let us what they are and which request you think they are responsive to.

"Apple's response" refers to Apple's response to your complaints.

**Melinda Riechert**

Partner

Orrick
Silicon Valley 

T 650/614-7423
M 6507591929
mriechert@orrick.com



**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Wednesday, June 19, 2024 5:38 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1


[EXTERNAL]


Hello,


I already provided the list of documents I am requesting. That list is in the request for production I filed May 15 2024.


—

**Ashley M. Gjøvik**

**BS, JD, PMP**


Sent with Proton Mail secure email.


On Wednesday, June 19th, 2024 at 8:22 PM, Riechert, Melinda <mriechert@orrick.com> wrote:


> Again we disagree.  We are required to produce documents even if you already have them.  We have produced the documents Apple relied on to terminate your employment. We have produced the personnel file.  If there are specific documents you want that you did not receive in the 1549 pages of documents we produced, you should send document requests asking specifically for those documents.

**Melinda Riechert**

Partner

Outlook [ashley.gjovik@protonmail.com] Proton Mail

Orrick

Silicon Valley 

T 650/614-7423
M 6507591929
mriechert@orrick.com



---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Wednesday, June 19, 2024 5:14 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1

**[EXTERNAL]**

Hello,

I will be fling the motion to compel, will provide Apple's response, and note that Apple has said it will not meet/confer further until the Motion to Dismiss is decided upon.

Please note - I disagree with your summary of documents provided to me thus far. As noted previously, the majority of documents provided were documents I already had in my possession (such as email I sent or received, or HR paperwork I filled out).

Further, the documents provided are not all documents in Apple's possession related to my complaints, or my personnel file (the ER investigation records etc,; and Apple is still holding back NDAs and other documents requested), nor has Apple provided a single document "supporting the decision to terminate my employment." I am not certain what you mean when you say "Apple's response" but I am certain there are far more documents than the ~10 you shared with me that mostly only span from March-May 2021, and almost no documents from July-Sept, and none of which include EH&S deliberations between April-September.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, June 19th, 2024 at 7:59 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

> Ashley,
>
> We disagree with your email, including that Apple has violated the Court's order to participate in discovery and that Apple's responses are in bad faith or otherwise inappropriate.

While Judge DeMaio has declined to rule on Apple's motion to stay discovery pending a ruling on the motion to amend, we disagree that means Apple must produce <u>all</u> documents you seek in RFP Set One. Indeed, even though it is Apple's position that there are no claims at issue given the pending motion to dismiss, given the Court's request that the parties cooperate and as a showing of good faith, Apple produced 1,549 pages of documents showing the complaints you made to Apple during your employment beginning in March 2021, Apple's response, documents supporting the decision to terminate your employment, your personnel file, etc. These documents are responsive to your August 29, 2021 complaint and the December 10, 2021 case summary, which are the operative complaints while your motion to amend is under review.

Once there is certainty about the pleadings, Apple can better determine what additional documents are relevant and proportional to the needs to the case, and we can further meet and confer at that time.

Thank you,

**Melinda Riechert**

Partner

Orrick
Silicon Valley 

T 650/614-7423
M 6507591929
mriechert@orrick.com



**From:** Ashley M. Gjøvik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Wednesday, June 19, 2024 4:14 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1


[EXTERNAL]


Hello,


I have not received a response.


Please provide an update or I will proceed with filing the motion to compel.


-Ashley


—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Friday, June 14th, 2024 at 9:38 PM, Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com> wrote:

> Hello,
>
> Thank you for the meet/confer on this.
>
> Because each of Apple's objections to each of my requests appears to include mostly the exact same content (copy/paste), please consider the concerns noted to apply to requests 1-61.
>
> **A) Court Order**
>
> Specific to:
>
> *"Respondent is unable to determine what nonprivileged matters are "relevant" to any claims or defenses that will proceed in this matter given the Court's May 23, 2024 Order. At this time, it is unclear what (if any) claims, and thus what defenses, will proceed and thus it is impossible to determine what matters would be "relevant to any party's claim or defense." If Complainant's Motion to Amend is denied and Respondent's Motion to Dismiss is granted, for example, there would be no claims before this Court and no discovery would be proper". - Apple's response*
>
> the response violates the court's order:
>
> *"the litigation schedule as set out in the Notice of Hearing issued on March 27, 2024, **has not changed.** Until the Motion to Stay Discovery has been ruled upon, parties are expected to cooperate with each other in the discovery process. Judge DeMaio declines Respondent's request for a conference call at this time.... Respondent will supplement this Response pursuant to 29 C.F.R. § 18.53, if appropriate, following resolution of which claims, if any, are properly before this Court. Discovery is ongoing, and Respondent reserves the right to amend and/or supplement this response." - DOL OALJ*

Apple is currently expected to respond to my discovery requests under the CERCLA claim, regardless of their motion to dismiss. As already noted, I have not requested anything related to 3250 Scott yet, and am waiting for the motion to amend to be ruled upon.

**B) Vague, Overbroad, Unduly Burdensome, Not Proportional**

*Respondent objects to this Request on the grounds that "[term]" and "[term]" lacks particularity and is overbroad, unduly burdensome, and not proportional to the needs of the case. -Apple*

This is a boilerplate objection. Blanket, unsupported objections that a discovery request is "vague, overly broad, or unduly burdensome" are, by themselves, meaningless. A party objecting on these bases must explain the specific and particular ways in which a request is vague, overly broad, or unduly burdensome.

The "vague, ambiguous or confusing" objection. Here again, absent more, this "objection" is useless. The party objecting on these grounds "'must explain the specific and particular way in which a request is vague.'" Heller, 303 F.R.D. at 491 (quoting Consumer Elec. Ass'n. v. Compras & Buys Magazine, Inc., 2008 WL 4327253, at 2 (S.D. Fla. Sep. 18, 2008)). Heller v. City of Dallas, 303 F.R.D. 466, 491 (N.D. Tex. 2014)

The "overly broad and unduly burdensome" objection. See  Fischer v. Forrest, 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017) at *3 ("[S]tating that the requests are 'overly broad and unduly burdensome' is meaningless boilerplate.  Why is it burdensome?  How is it overly broad?  This language tells the Court nothing."); Heller v. City of Dallas, 303 F.R.D. 466, (N.D. Tex. 2014) at 490-91("the party resisting discovery [must] show how the requested discovery was overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revaling the nature of the burden").

"'reasonably' implies a requirement such categories be reasonably particularized from the standpoint of the party who is subjected to the burden of producing the materials. Any other interpretation places too great a burden on the party on whom the demand is made."  When faced with this objection, the meet and confer process should be utilized to provide responding party with an understanding of what

documents the demand is seeking and, if necessary, narrow the scope of the specific category. Calcor Space Facility, Inc. v. Superior Court (1997) 53 CA4th 216

## C) Not Relevant / Admissible Evidence

*Respondent objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible evidence.  -Apple*

§ 18.401 Definition of relevant evidence. Relevant evidence means <u>evidence having **any** tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable</u> than it would be without the evidence.

An objection that a discovery request is not relevant must include a specific explanation describing why the request lacks relevance and/or why the requested discovery is disproportionate in light of the factors enumerated in Federal Rule of Civil Procedure. Further, Federal Rules provide that information within this scope of discovery "need not be admissible in evidence" to be discoverable.

## D) Burden/Expense

*Respondent objects to this Request to the extent that the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case the amount in controversy, the parties resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.  -Apple*

Objections that requests are "overly broad and unduly burdensome" are "meaningless boilerplate" because that "language tells the Court nothing." Fischer v. Forrest, 2017 U.S. Dist. LEXIS 28102 (S.D.N.Y. Feb. 28, 2017),

Apple takes in $383B annual revenue. It's hard to believe Apple would be burdened by these requests due to Apple's "resources."

**E) Privilege**

*Respondent objects to this Request to the extent it calls for information protected from disclosure by the attorney-client privilege, attorney work-product doctrine, or any other applicable privileges.  -Apple*

Objections based upon privilege must identify the specific nature of the privilege being asserted, as well as identify such things as the nature and subject matter of the communication at issue, the sender and receiver of the communication and their relationship to each other, among others.

You need to tell me what material there is that is being withheld under any of these privileges, and which privilege you contend applies, so I may seek the assistance of the Court in resolving your claims of privilege.

§ 18.51 (e) Claiming privilege or protecting hearing-preparation materials—(1) Information withheld. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as hearing-preparation material, the party must:

(i) Expressly make the claim; and

(ii) Describe the nature of the documents, communications, or tangible things not produced or disclosed —and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

"The existence of the privilege and the applicability of any exception to the privilege is a question of fact for the judge. The burden of proving that the attorney-client privilege applies to a communication rests on the party asserting the privilege. This burden extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including (1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been

waived." Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 303 (2009).   Before asserting the privileges or stating the documents don't exist; counsel needs to review the documents ("diligent search") and speak to their client ("reasonable inquiry") to determine whether or not the privileges are applicable.  See Scottsdale Ins. Co v. Superior Court (1997) 59 CA4th 263 Footnote 5.

Attorney client privilege is narrowly construed and not self-executing. Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. (Bermuda), 425 Mass. 419, 421 (1997).  See Attorney Gen. v. Facebook, Inc., 487 Mass. 109, 122 (2021); District Attorney for the Plymouth Dist. v. Board of Selectmen of Middleborough, 395 Mass. 629, 633–634 (1985).

Privileged material is already excluded from the scope of discovery under Civil Rule 26(b)(1) and a generic assertion of privilege is, in and of itself, useless under Civil Rule 26(b)(5)(A)(ii).  See Schultz v. Sentinel Ins. Co., Ltd., 2016 WL 3149686, at*7 (D. S.D. Jun. 3, 2016) ("boilerplate 'general objections' fail to preserve any valid objection at all because they are not specific to a particular discovery request and they fail to identify a specific privilege or to describe the information withheld pursuant to the privilege"); Liguria Foods, 2017 WL 976626, at *11 (failure to provide privilege log renders privilege objections ineffective).

To assert a privilege or work product protection, a party must create a privilege log that identifies each document or communication being withheld, along with the basis for the claim. Mass. R. Civ. P. 26(b)(5). see also, C.C.P. §2031.240

 "Simply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents does not satisfy the burden." (Kamakana v. City and County of Honolulu (9th Cir. 2006) 447 F.3d 1172, 1184.)

**F) Privacy Rights of Third Parties**

*Respondent objects to this Request to the extent it seeks information protected from disclosure by the privacy rights of third parties.  -Apple*

The right of privacy is protected by Article I, Section 1 of the California Constitution and the U.S. Constitution [Griswold v. State of Connecticut (1965) 381 US 479]  However, the protection is not

absolute. In each case, the court would carefully balance the interests involved—the claim of privacy vs. the public interest in obtaining just results in litigation.  See California Civil Discovery Practice, 4th Edition, (CEB 2019) §3.157A citing Williamson v. Superior Court (1978) 21 Cal3d 829, 835; Hill v. National Collegiate Athletic Ass'n (1994) 7 C4th 1, 15; and Binder v. Superior Court (1987) 196 CA3d 893, 901 for the test that the court will use.  Also, the court most likely will take the documents in camera for a determination. See California Practice Guide: Civil Procedure Before Trial (TRG 2019) §8:322 citing Schnabel v. Superior Court (Schnabel) (1993) 5 C4th 704, 714.

"Even when Sefic offered to accept redacted materials however, the company nevertheless consistently failed to produce any documents in response. When objection is made only to part of an item, the objecting party

should specifically identify that part, and make production of the remainder of the document; Marconi's response to the motion instead continued to assert the same blunderbuss objection without acknowledgment of Sefic's offer to accept redacted documents and without reference to legal authority in support of its position." SEFIC v Marconi Wireless, US DOJ, Office of Chief Administrative Hearing officer, OCAHO Case No. 06B000 (2007).

## G) Trade Secret, Proprietary, Confidential

*Respondent objects to this Request to the extent it seeks disclosure of confidential, trade secret, or proprietary business information.  -Apple*

Which records do you contend are proprietary and confidential and why? You must at least tell me if any responsive materials exist, so that I may seek the assistance of the Court in resolving your objection.

Trade secrets are already protected from disclosure through the IPA & NDAs I already signed. Trade secrets and other truly confidential information can also be redacted.

The mere fact that documents are proprietary is not necessarily justification for confidentiality. For example, a federal court in Kentucky rejected Home Depot's argument that its training manuals and standard operating procedures should be protected. (Mitchell v. Home Depot U.S.A. (W.D. Ky. Jun. 14, 2012) No. 3:11-CV-332, 2012 WL 2192279, *5.)

"Courts are generally unwilling to seal business information where the parties fail to explain why the specific, urgent need for confidentiality overrides the public's right of access, or where the business records are outdated or limited in scope" Tourangeau v. Nappi Distribs., 2:20-cv-00012-JAW, 14 (D. Me. Mar. 14, 2022)

## H) Overbroad

*Respondent objects to this Request because it is overbroad as to time. -Apple*

If there is an objection based upon an unduly broad scope, such as time frame or geographic location, discovery should be provided as to those matters within the scope that are not disputed.

Generalized objections to an opponent's discovery requests are insufficient. See, e.g., Mancia v. Mayflower Textile Servs. Co.,253 F.R.D. 354, 358 (D. Md. 2008) (" Boilerplate objections that a request for discovery is overbroad and unduly burdensome . . . are improper unless based on particularized facts." ) (citations and quotation marks omitted); Walker v. Lakewood Condo. Owners Ass.n,186 F.R.D. 584, 587 (C.D. Cal. 1999) (" Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all." ) Autoridad de Carreteras y Transportacion v. Transcore Atl., Inc., 319 F.R.D. 422, 427 (D.P.R. 2016)

"if an item were overbroad — I find that no item is overbroad — that fact would be no excuse for he failure to produce those responsive documents that do concern the subject matter of the adversary proceeding and would fall within the scope of a properly limited request." In re E.J. Sciaba Contracting Company, Inc., Case No. 03-20344-RS, Adversary Proceeding No. 04-1357, 4 (Bankr. D. Mass. Jan. 17, 2006)

## I) Boilerplate Responses

Judge Bennett observes that no judicial jurisdiction in the United States "authorizes, condones, or approves of this practice[.]" According to Judge Bennett, boilerplate objections are "obstructionist" and this obstructionist discovery practice is a firmly entrenched "culture" in some parts of the country,

notwithstanding that it involves practices that are contrary to the rulings of every federal and state court to address them. Liguria Foods, Inc. v. Griffith Labs, Inc., 2017 U.S. Dist. LEXIS 35370 (N.D. Iowa Mar. 13, 2017)

Cafaro v. Zois, 2016 WL 903307, at *1 (S.D. Fla. Mar. 9, 2016) ("Boilerplate objections may also border on a frivolous response to discovery requests").

Heller v. City of Dallas, 303 F.R.D. 466, 482-85 (N.D. Tex. 2014) ("Counsel should cease and desist from raising these free-standing and purportedly universally applicable 'general objections' in responding to discovery requests.");

Boilerplate general objections are sanctionable in California per Korea Data Systems Co. Ltd. v. Superior Court (1997) 51 Cal.App.4th 1513 and may result in waivers of privilege per Burlington Northern & Santa Fe Ry Co. v. U.S. Dist. Court 408 F.3d 1142, 2005 WL 1175 922 (9th Cir.2005) [trial court affirmed in holding boilerplate objection without identification of documents is not the proper assertion of a privilege.]

## J) Supplement Response

Objections that reserve the "right" to supplement responses. Parties are required to supplement their responses under Civil Rule 26(e)(1). This "objection" is pointless. See Heller, 303 F.R.D. at 484.

## K) Partial Responses

§ 18.61 (b)(2)(iii) Objections. An objection to part of a request must specify the part and permit inspection of the rest.



**L) Truthfulness**

Counsel must be careful not to assert objections to requests for production of documents (such as through boilerplate objections) that do not exist or not in the attorney or party's possession, custody or control.  Such a response violates an attorney's ethical duty under Bus & Prof Code §6068(d) to act truthfully and, therefore, constitutes bad faith.  See Bihun v. AT&T Info. Sys. (1993) 13 CA4th 976, 991. The point of Bihun is that by asserting a privilege to a document the attorney impliedly represents that the responding attorney has reviewed the document and contends that the privilege applies; if the document does not exist or is not in the possession of the attorney, those implied representations are made in bad faith.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Friday, June 14th, 2024 at 7:53 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

> Ashley
>
> We disagree that our discovery responses are in bad faith, that we have violated the court's order to participate in discovery, and that our objections are not well taken.  Nevertheless, we are willing to meet and confer regarding your concerns.  Please

send us a list of your specific concerns about each of our responses and we will provide you with our response to them.

**Melinda Riechert**

Partner

Orrick

Silicon Valley 

T 650/614-7423
M 6507591929
mriechert@orrick.com



---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Friday, June 14, 2024 4:42 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1

[EXTERNAL]

Hello,

The discovery response send today is clearly sent in bad faith and I believe it directly violates the courts order that Apple participate in discovery and cooperate with my requests.

The documents actually shared today appear to be just resending all of the documents Apple previously sent me in the fake civil discovery.

The objections to overbroad or vague terms, even if true, are also in bad faith because I volunteered numerous times to help clarify and narrow, and Apple never bothered to engage in that process.

I will be filing a § 18.57 motion to compel - probably Monday after I submit the amended civil complaint. If Apple would like to avoid the motion to compel, I'm happy not to file it if Apple will actually cooperate and produce documents by the deadline already in place.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Thursday, June 13th, 2024 at 6:17 PM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](#)> wrote:

> Thank you!

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Thursday, June 13th, 2024 at 6:15 PM, Riechert, Melinda
<[mriechert@orrick.com](#)> wrote:

> Ashley,
>
> Apple will timely respond to your Requests for Production, Set One.
>
> Thank you
>
> **Melinda Riechert**
>
> Partner
>
> Orrick
> Silicon Valley  
>
> T 650/614-7423
> M 6507591929
> [mriechert@orrick.com](#)

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Thursday, June 13, 2024 12:04 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** RE: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Production, Set 1

[EXTERNAL]

Hello,

I never saw a response to this message, or the message from DOL OALJ about my pending request for production / discovery.

I sent you my request on 5/15. 30 days after 5/15, starting 5/16, would be 6/15 (pushing to Monday 6/17) for the deadline.

I just wanted to check in an ensure you're still working towards that deadline and plan to respond to the request on time?

Again, let me know if you have any questions, or if there's anything I can do to clarify requests.

Thank you,

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, June 5th, 2024 at 3:11 PM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](#)> wrote:

> Hello!
>
> I've never done discovery before so maybe this is a weird offer, but I do want to make things easier on Apple if I can -- and I know my request included some stuff that will probably include content Apple may consider 'confidential.' I believe the NDAs and IPA I signed prior would cover my responsibilities with that kind of information, however, if it would be less effort for Apple, I'd be open to visiting some Apple location or Orrick office around here where I could directly review the more sensitive documents (ie that include content about unreleased new customer products, budgets, etc) and then if there's specific documents I decide I need copies of, then I can ask for those specifically.
>
> I assume you'll want to do this sort of thing for the security camera footage too. I'm okay with watching it on site, or over a screenshare, and then designating which sections (start/end) I would like copies of, and I don't expect those EHS-related sections to contain anything terribly confidential.
>
> Let me know what Apple would prefer and the easiest way for me to get access to the relevant records, but not over burden Apple with any confidentiality concerns.

Thanks!

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, May 29th, 2024 at 8:54 PM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](mailto:legal@ashleygjovik.com)> wrote:

> Hello,
>
> As mentioned several times in email, and in the NLRB charge, General Order 71 does not apply to our civil lawsuit.
>
> For the US DOL OALJ case, Apple filed a motion to stay on May 22nd and it was accepted to the docket.
>
> The next day, on May 23rd, in an order dated May 23rd, Judge DeMaio wrote that *"**all other pending matters** before the court in this matter"* *"will be held in **abeyance until** Complainant's Motion to Amend has been f**ully ruled on**."*
>
> Your motion to stay is a *"other pending matter"* as it is a **matter**, and it is **pending**.
>
> Please provide me more detail on what definitions you disagree with. Do you not view the motion to stay as *pending*? and/or you do not see it as a *matter*?

Judge DeMaio also wrote that "*Any __changes__ to the litigation __schedule__ can be addressed __after__ any amended Complaint is submitted and __responded to__.*"

The March 27 2024 Order from Judge DeMaio started discovery under § 18.50 ("*any party may seek discovery at any time after a judge issues an initial notice or order...*"), and the schedule in Judge DeMaio's Order is still in effect, and your motion to stay is requesting a ***change*** to the litigation ***schedule*** (to stop/pause/delay already scheduled and initiated discovery).

The other events in the "*litigation schedule*" per the 3/27 Order would be the end of discovery, the prehearing statement, preparation of exhibits, and the trial. But neither of us have filed a request to modify the *schedule* of any of these things. The only event in the ***"litigation schedule"*** that one of us has requested to *change* the *schedule* of is the start of discovery (requested by Apple).

Please provide more detail on why you believe this does not apply to Apple. Do you not believe starting/stopping a phase of litigation is a change to the "***schedule***"? Do you question whether staying/pausing a phase of litigation is a "***change***" from the original plan?

Full quote: "*the Court will allow Complainant to submit proposed amendments t....Furthermore, all other pending motions before the Court in this matter, including Respondent's Motion to Dismiss and Motion for Judicial Notice, will be held in abeyance until Complainant's Motion to Amend has been fully ruled on. Any changes to the litigation schedule can be addressed after any amended Complaint is submitted and responded to.*" (5/23/24 Order)

If you feel confident in your prior assessment, I suggest we email the OALJ staff and ask them to confirm your interpretation of the Judge's terminology. They have been very responsive and it would save us all time to ask them directly.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, May 29th, 2024 at 8:29 PM, Riechert, Melinda
<[mriechert@orrick.com](#)> wrote:

> Ashley,
>
> We disagree that Apple's motion to stay discovery is no longer at
> issue; it is still properly before the ALJ.
>
> Additionally, the ND Cal case and the OALJ case are two separate
> cases with separate issues. If you would like to engage in a meet and
> confer about Apple's GO71 production in the ND Cal case, we are
> happy to do that.
>
> As for the OALJ case, any discussion about Apple's document
> production is premature because Apple has not yet produced any
> documents. We can address any concerns you have after Apple has
> produced responsive documents and you have had a chance to
> review them.
>
> Thank you,

**Melinda Riechert**

Partner

Orrick
Silicon Valley Ⓥ

T 650/614-7423
M 6507591929
mriechert@orrick.com

---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Tuesday, May 28, 2024 7:55 AM
**To:** Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>
**Subject:** Re: Ashley Gjovik v Apple Inc 2024-CER-00001 Request for Prouduction, Set 1

[EXTERNAL]

Hello Apple's lawyers,

I just wanted to close the loop on our prior email from last week. Last week I said I planned to file an opposition to your motion to stay discovery, however, per Judge DeMario's May 23rd order (quoted below), its my understanding that he is

not considering your motion to stay, and any changes to his prior order (that already started discovery) will not be made until after he decides on the amended complaint.

*"....Furthermore, all other pending motions before the Court in this matter, including Respondent's Motion to Dismiss and Motion for Judicial Notice, will be held in abeyance until Complainant's Motion to Amend has been fully ruled on. Any changes to the litigation schedule can be addressed after any amended Complaint is submitted and responded to."* (5/23/24 Order)

Thus, I will not be filing an opposition because your 30 day deadline from 5/15 for this request is still in place -- instead I will file a short notice about this when I file the amended complaint.

I also wanted to sync on redactions. You already tried to start discovery in the civil case (which I still object to), and after reviewing the documents you voluntarily shared with me, I want to express my concerns about some of the redactions. A few examples are below. These are just some examples - all of the documents should be reviewed:

- APL-GAELG_00001248 | There are two large redactions labeled as "Attorney Client Privilege" however neither Polkes (HR) or Waibel (ER) are attorneys so ACP is not applicable
- APL-GAELG_00001285 | First names are redacted on several pages and the names are important context. (there are a bunch of docs with this issue)
- APL-GAELG_00001262 | The subject of a calendar invite between Polkes (HR) and Waibel (ER) is partially redacted despite it being about my safety concerns. This seems unjustified.
- APL-GAELG_00001254 | There is a 2-3 line redaction from an iMessage exchange between Polkes (HR) and Waibel (ER) labeled Attorney Client Privilege but there are no attorneys in the text message exchange.
- APL-GAELG_00001380 | An entire paragraph is redacted in an email from Waibel (ER0 to Lagares (ER) about me.
- and so on

If it is more efficient for Apple, Apple does not need to generally re-send me documents it already sent in formal discovery for other jurisdictions - but for this first US DOL round, I do ask that Apple resend the documents it send prior in its

pseudo-civil-discovery so we have them established as formal discovery documents for authentication. Hopefully you can review and correct the prior redactions as needed prior to resending.

As noted in my request for production, I'm also asking for a redaction/privilege log. There are many redactions of text that simply say "redacted". If there's a standard way to classify Intellectual Property, Attorney-Client Privilege, etc. please us that, or if not we can agree on some terms for clarification. If you insist on redacting all email addresses and phone numbers, I ask that you notate that its an email address or phone number in the redaction. I'm willing to compromise on project code names and you can use a term like "project code name" or "NPS" or something, but its not IP. I'd also prefer the reason for redaction be noted on the document's redaction and also included in a log (like the US gov does with FOIA), but at least having it in a log will help.

Thanks,

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, May 15th, 2024 at 9:03 PM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](#)> wrote:

> Hello Apple's lawyers,
>
> Attached is my first request for production from Apple for the US Dept. of Labor OALJ CERCLA case.

I look forward to a response within 30 days, as required by law.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit _http://www.orrick.com_.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# Exhibit B

1  (Additional counsel on following page)

2  JESSICA R. PERRY (SBN 209321)
   jperry@orrick.com
3  MELINDA S. RIECHERT (SBN 65504)
   mriechert@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, CA  94025-1015
   Telephone:    +1 650 614 7400
6  Facsimile:    +1 650 614 7401

7  KATHRYN G. MANTOAN (SBN 239649)
   kmantoan@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
9  405 Howard Street
   San Francisco, CA 94105-2669
10 Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759

11

12 Attorneys for Defendant Apple Inc.

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16

17 ASHLEY GJOVIK,                    Case No. 23-cv-4597-EMC

18              Plaintiff,           **DEFENDANT APPLE INC.'S INITIAL**
                                     **DISCOVERY UNDER GENERAL**
19       v.                          **ORDER 71**

20 APPLE INC.,

21              Defendant.

22

23

24

25

26

27

28

1   KATE E. JUVINALL (SBN 315659)
    kjuvinall@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    631 Wilshire Blvd., Suite 2-C
3   Santa Monica, CA 90401
    Telephone:     +1 310 633 2800
4   Facsimile:     +1 310 633 2849

5   RYAN D. BOOMS (SBN 329430)
    rbooms@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1152 15th Street, N.W.
7   Washington, D.C. 20005-1706
    Telephone:     +1 202 339 8400
8   Facsimile:     +1 202 339 8500

9   Attorneys for Defendant
    Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Defendant Apple Inc. responds to Northern District of California General Order No. 71:

2  Initial Discovery Protocols For Employment Cases Alleging Adverse Action ("Gender Order 71")

3  as follows:

4    Defendant provides these responses based on the information and documents currently

5  available to it, given that discovery in this action is ongoing. Nothing contained in these responses

6  shall in any way limit Defendant's ability to make all uses at trial or otherwise of the information

7  or documents referenced herein or of any information, documents or other evidence that may be

8  discovered in the future. Defendant has made its best effort to respond accurately to each category,

9  but reserves the right to amend its objections and responses upon completion of its search for

10  responsive documents.

11    Defendant objects to each and every category to the extent that it seeks information

12  protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other

13  applicable privilege. If supplying any of the requested documents would result in waiving any

14  applicable privilege or objection based on any such privilege, Defendant objects to providing the

15  documents and will not do so. If Defendant inadvertently produces any documents falling within

16  any applicable privilege, Defendant does not intend to waive the applicable privilege.

17    Defendant objects to each and every category to the extent that it seeks documents and/or

18  information that is protected from disclosure by the rights of privacy of third-party non-litigants.

19    Defendant objects to each and every category to the extent that it seeks electronically stored

20  information ("ESI") from sources that are not reasonably accessible because of undue burden and

21  expense. To the extent that any categories call for ESI from sources that are not reasonably

22  accessible without undue burden or cost within the meaning Federal Rule of Civil Procedure

23  26(b)(2)(B), or for which the burden or cost of retrieval and review would not be proportional to

24  the needs of the case (including where the burden or expense would outweighs its likely benefit),

25  Defendant will not supply or render such ESI.

26    Subject to and without waiving any of the above objections, and incorporating each of them

27  by this reference into each response below, Defendant responds to General Order 71 as follows:

28    / / /

1    **1.  Production of Documents By Defendant**

2    Category A:

3    All communications concerning the factual allegations or claims at issue in this lawsuit

4    among or between: (i) The plaintiff and the defendant; (ii) The plaintiff's manager(s), and/or

5    supervisor(s), and/or the defendant's human resources representative(s).

6    Response to Category A:

7    Subject to the preliminary statement and foregoing objections set forth above, Defendant

8    responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

9    dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

10   After a diligent search and reasonable inquiry Defendant will produce, pursuant to a protective

11   order regarding the treatment of confidential information ("the Confidentiality Order"), non-

12   privileged communications concerning Plaintiff and the factual allegations or claims at issue in this

13   lawsuit directly related to her alleged wrongful termination, between Plaintiff and Yannick

14   Bertolus, Aleks Kagramanov, Ekelemchi Okpo, Dave Powers, Michael Steiger, Jenna Waibel,

15   and/or Dan West from March 1, 2021 to September 9, 2021. After a diligent search and reasonable

16   inquiry Defendant will also produce non-privileged correspondence concerning Plaintiff and the

17   factual allegations or claims at issue in this lawsuit directly related to her alleged wrongful

18   termination, between or among Yannick Bertolus, Aleks Kagramanov, Ekelemchi Okpo, Dave

19   Powers, Michael Steiger, Jenna Waibel, and/or Dan West from March 1, 2021 to September 9,

20   2021.

21   Category B:

22   Responses to claims, lawsuits, administrative charges, and complaints by the plaintiff that

23   rely upon any of the same factual allegations or claims as those at issue in this lawsuit.

24   Response to Category B:

25   Subject to the preliminary statement and foregoing objections set forth above, Defendant

26   responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

27   dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

28   The only complaints made by Plaintiff of which Defendant is aware that may be related to her

1   wrongful termination claims in this lawsuit are certain administrative charges she filed with the

2   National Labor Relations Board ("NLRB") and with the United States Department of Labor

3   ("DOL"). Defendant will not be producing its responses to the NLRB Charges because the NLRB

4   cases are still open, and as a result the responses are not available to Plaintiff nor are they subject

5   to a FOIA request. *See* NLRB Freedom of Information Act Manual,

6   https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-

7   1727/march2008foiamanual.pdf, at 87 (stating that "[t]he FOIA is not intended to function as a

8   private discovery tool," and citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)

9   and *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 644 F.2d 969, 982 (3d Cir. 1981)). As for

10  Plaintiff's case before the DOL, to the extent that any factual allegations overlap, Defendant will

11  not be producing its response because on December 8, 2023, the DOL issued a finding of no cause

12  on Plaintiff's claims, and Plaintiff communicated to Defendant that same day her intent to appeal.

13  As of the date of this filing, Plaintiff's time to appeal the DOL Secretary's Findings has not yet run.

14          Category C:

15          Documents concerning the formation and termination, if any, of the employment

16  relationship at issue in this lawsuit, irrespective of the relevant time period.

17          Response to Category C:

18          Subject to the preliminary statement and foregoing objections set forth above, Defendant

19  responds: After a diligent search and reasonable inquiry, Defendant will produce Plaintiff's

20  personnel file, which includes her offer letter and termination letter.

21          Category D:

22          The plaintiff's personnel file, in any form, maintained by the defendant, including files

23  concerning the plaintiff maintained by the plaintiff's supervisor(s), manager(s), or the defendant's

24  human resources representative(s), irrespective of the relevant time period.

25          Response to Category D:

26          Subject to the preliminary statement and foregoing objections set forth above, Defendant

27  responds: After a diligent search and reasonable inquiry, Defendant will produce Plaintiff's

28  personnel file. No other files identified in Category D exist.

1    <u>Category E</u>:

2    The plaintiff's performance evaluations and formal discipline.

3    <u>Response to Category E</u>:

4    Subject to the preliminary statement and foregoing objections set forth above, Defendant

5 responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

6 Confidentiality Order, Plaintiff's performance reviews. Defendant will also produce the

7 termination letter related to Plaintiff.

8    <u>Category F</u>:

9    Documents relied upon to make the employment decision(s) at issue in this lawsuit.

10    <u>Response to Category F</u>:

11    Subject to the preliminary statement and foregoing objections set forth above, Defendant

12 responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

13 Confidentiality Order, non-privileged documents relied on to make the decision to terminate

14 Plaintiff's employment.

15    <u>Category G</u>:

16    Workplace policies or guidelines relevant to the adverse action in effect at the time of the

17 adverse action. Depending upon the case, those may include policies or guidelines that address: (i)

18 Discipline; (ii) Termination of employment; (iii) Promotion; (iv) Discrimination; (v) Performance

19 reviews or evaluations; (vi) Misconduct; (vii) Retaliation; and (viii) Nature of the employment

20 relationship.

21    <u>Response to Category G</u>:

22    Subject to the preliminary statement and foregoing objections set forth above, Defendant

23 responds: After a diligent search and reasonable inquiry Defendant will produce policies relevant

24 to Plaintiff's alleged wrongful termination of employment (the only issues/claims not presently

25 subject to a pending motion to dismiss), including the Confidentiality and Intellectual Property

26 Agreement that Plaintiff signed, and relevant portions of Defendant's Business Conduct Policy and

27 EEO Policy. Defendant will produce its internal facing Misconduct and Discipline Policy pursuant

28 to a Confidentially Order.

1    Category H:

2        The table of contents and index of any employee handbook, code of conduct, or policies

3    and procedures manual in effect at the time of the adverse action.

4        Response to Category H:

5        Subject to the preliminary statement and foregoing objections set forth above, Defendant

6    responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

7    dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

8    After a diligent search and reasonable inquiry, Defendant will produce the table of contents of its

9    Business Conduct Policy effective October 2020, which was in effect at the time of the alleged

10    adverse action at issue in this lawsuit (Plaintiff's termination).

11    Category I:

12        Job description(s) for the position(s) that the plaintiff held.

13        Response to Category I:

14        Subject to the preliminary statement and foregoing objections set forth above, Defendant

15    responds: Defendant will produce job descriptions for the particular position(s) that Plaintiff held

16    if it is able to locate any after a diligent search and reasonable inquiry.

17    Category J:

18        Documents showing the plaintiff's compensation and benefits. Those normally include

19    retirement plan benefits, fringe benefits, employee benefit summary plan descriptions, and

20    summaries of compensation.

21        Response to Category J:

22        Subject to the preliminary statement and foregoing objections set forth above, Defendant

23    responds: After a diligent search and reasonable inquiry Defendant will produce, pursuant to a

24    Confidentiality Order, non-privileged documents showing Plaintiff's compensation and benefits

25    from during her employment with Defendant.

26    Category K:

27        Agreements between the plaintiff and the defendant to waive jury trial rights or to arbitrate

28    disputes.

DEF.'S INITIAL DISCOVERY (GEN. ORDER 71)
[23-cv-4597-EMC]

1    Response to Category K:

2    Subject to the preliminary statement and foregoing objections set forth above, Defendant

3    responds: After a diligent search and reasonable inquiry, no responsive documents exist.

4    Category L:

5    Documents concerning investigation(s) of any complaint(s) about the plaintiff or made by

6    the plaintiff, if relevant to the plaintiff's factual allegations or claims at issue in this lawsuit and not

7    otherwise privileged.

8    Response to Category L:

9    Subject to the preliminary statement and foregoing objections set forth above, Defendant

10    responds: The only claims at issue in this lawsuit and not presently subject to a pending motion to

11    dismiss are those directly related to the alleged wrongful termination of Plaintiff's employment.

12    After a diligent search and reasonable inquiry, Defendant will produce, pursuant to a

13    Confidentiality Order, responsive, non-privileged, non-work-product documents that are directly

14    related to Plaintiff's alleged wrongful termination.

15    Category M:

16    Documents in the possession of the defendant and/or the defendant's agent(s) concerning

17    claims for unemployment benefits unless production is prohibited by applicable law.

18    Response to Category M:

19    Subject to the preliminary statement and foregoing objections set forth above, Defendant

20    responds: After a diligent search and reasonable inquiry, Defendant does not have any responsive

21    documents.

22    Category N:

23    Any other document(s) upon which the defendant relies to support the defenses, affirmative

24    defenses, and counterclaims, including any other document(s) describing the reasons for the

25    adverse action.

26    Response to Category N:

27    There is no operative answer on file. Defendant will produce non-privileged documents in

28    support of its defenses and affirmative defenses at the appropriate time after its answer is filed.

1   Defendant's investigation of Plaintiff's claims is ongoing and Defendant reserves the right to

2   amend this response, to supplement documents produced in support of this response, and to rely on

3   such information and documents as evidence in this action.

4         **2.  Production of Information By Defendant**

5         Defendant has provided, to the best of its knowledge and ability at this time, complete and

6   accurate information required by Rule 26(a)(1)(A) and General Order 71. As set forth below,

7   Defendant reserves its right to supplement or delete from the responses below as more information

8   is obtained through the discovery process.

9         Category A:

10        Identify the plaintiff's supervisor(s) and/or manager(s).

11        Response to Category A:

12        Linda Keshishoglou, Evan Buyze, and David Powers.

13        Category B:

14        Identify person(s) presently known to the defendant who were involved in making the

15  decision to take the adverse action.

16        Response to Category B:

17        Defining "adverse action" as the termination of Plaintiff's employment, Yannick Bertolus

18  made the decision to terminate Plaintiff's employment.

19        Category C:

20        Identify persons the defendant believes to have knowledge of the facts concerning the

21  claims or defenses at issue in this lawsuit, and a brief description of that knowledge.

22        Response to Category C:

23        Defendant believes the following individuals are likely to have discoverable information

24  relevant to facts regarding Plaintiff's claims for alleged wrongful termination of employment—the

25  only issues/claims not presently subject to a pending motion to dismiss—as alleged with

26  particularity in the pleadings:

27        1.     Plaintiff (information regarding complaints to Defendant, and termination of

28              Plaintiff's employment)

2.     Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Plaintiff's employment)

3.     Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Plaintiff's employment)

4.     Ekelemchi Okpo (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

5.     David Powers (SW Development Engineer Director) (information regarding complaints to Defendant)

6.     Michael Steiger (Environmental Health and Safety Manager) (information regarding complaints to Defendant and Defendant's policies)

7.     Jenna Waibel (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

8.     Dan West (Hardware Development Engineer Senior Director) (information regarding complaints to Defendant)

Except for Plaintiff, all individuals identified above may only be contacted through Defendant's counsel. Following discovery and receipt of additional information regarding the nature of Plaintiff's claims, additional witnesses may be identified, and Defendant reserves the right to supplement this list accordingly.

Category D:

State whether the plaintiff has applied for disability benefits and/or social security disability benefits after the adverse action. State whether the defendant has provided information to any third party concerning the application(s). Identify any documents concerning any such application or any such information provided to a third party.

Response to Category D:

To Defendant's knowledge, Plaintiff has not applied for disability benefits or social security disability benefits. As a result, Defendant has not provided information to any third party concerning any such application.

1   Dated: December 18, 2023                ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                           By:      /s/ Jessica R. Perry

4                                                  JESSICA R. PERRY
                                                 Attorneys for Defendant
5                                                    APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **From:** | Juvinall, Kate <kjuvinall@orrick.com> |
| **Sent:** | Tuesday, December 19, 2023 1:29 PM |
| **To:** | Ashley M. Gjovik (Legal Matters) |
| **Cc:** | Booms, Ryan; Riechert, Melinda; Mantoan, Kathryn G.; Perry, Jessica R.; Mahoney, Brian; harry.johnson; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com |
| **Subject:** | RE: Gjovik v Apple | Requesting signed instruments under CLC § 432 |

Ashley,

As you know, the federal rules of civil procedure allow you to request these types of documents during discovery after the Rule 26(f) conference occurs.

We are not aware of any statute governing contracts that allows you to seek these types of documents outside of the formal discovery process. If you are referring to a specific statute, please send us the citation.

Best,
Kate

---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Friday, December 15, 2023 3:09 PM
**To:** Juvinall, Kate <kjuvinall@orrick.com>
**Cc:** Booms, Ryan <rbooms@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com
**Subject:** RE: Gjovik v Apple | Requesting signed instruments under CLC § 432

**[EXTERNAL]**

FYI, I talked with two people at CalDOL DIR today about Section 432 and both said it applies to ex-employees of California employers. I'm now waiting for written confirmation from the California Labor Commissioner's Office.

—
**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Thursday, December 14th, 2023 at 8:06 PM, Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com> wrote:

> Thank you for the update. I received your email about Section 432. I find the legal analysis in the cases cited questionable, and neither of the two cases are controlling, so I will be researching the topic further. I also plan to call the CalDOL office to discuss it with them as well, so I will get back you later on my challenge.
>
> I will also request a copy of the Face Gobbler ICF from Apple once more, now under contract law. Apple has cited that alleged Gobbler ICF in their defense, and claim it is evidence supporting their decision to terminate me. However, Apple has not provided me a copy of that document, and when I attempted to access that document prior to my termination, I could not -- the prior link said it no longer existed. If I was to sign such a thing, it assumably had

obligations that lasted longer than 1 year, and thus statute of frauds is implicated. If there is no proof of signed document, then there is no contract. Further, I will be arguing bad faith conduct by Apple, and further evidence of lack of consent and lack of mutual assent, if they continue to refuse to provide a copy of the document they claim is symbolic of my 'consent'. Finally, without providing me even confirmation the document does even exist still, I will also be treating the document as assumed to be non-existent in my amended complaint and opposition.

If my request is denied again, I will of course also be requesting the document in discovery.

Thanks,
-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Thursday, December 14th, 2023 at 7:18 PM, Juvinall, Kate <kjuvinall@orrick.com> wrote:

> Hi Ashley – confirming receipt of your email. We separately responded today regarding your LC section 432 request and will follow-up regarding your request under the CPRA.
>
>
> Thank you,
>
> Kate
>
> ---
>
> **From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
> **Sent:** Friday, December 8, 2023 6:35 PM
> **Cc:** Booms, Ryan <rbooms@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com
> **Subject:** RE: Gjovik v Apple | Requesting signed instruments under CLC § 432
>
>
> [EXTERNAL]
>
> *Removing OMM who confirmed they're no longer on this either*
>
>
> Hello,
>
>
> **Contracts**

First, since Gobbler is the crux of Apple's legal defense in this matter, I'd think that the alleged Gobbler NDA would be easily on hand and it should only take a couple days at most to send over. Its been 10 days now. Please send or confirm it no longer exists.

## CPRA

Second, the US DOL decision today (which I am appealing on both claims) appears to make direct reference to my personal information that was on my personal iPhone and personal iCloud account, including my discussions with non-employees on their iPhones and my personal iPhone, which must have been collected by Apple, and shared by Apple. Prior filings also reference my personal text messages (copied by Global Security) and my social media posts. All of this is personal information.

Considering this, under the CPRA, I am requesting copies of my personal information held by Apple including "where it came from, retention policies, and third-party disclosures." Among more standard types of data, personal information also includes "*geolocation, biometrics, and internet activity*" data. [see Morgan Lewis article]. This also includes but is not limited to: "in*formation collected and analyzed concerning a consumer's health... and sex life.*" [see Orrick article].

If Apple would like to deny the request for certain types of data, please provide information on what exception they relied on to deny the request and for what category of data they applied it.

I also opt out of the sale or sharing of that data, automated decision making based on that data, and ask to limit the use/disclosure of that information.

That information includes, but is not limited to: *"The CPRA also grants employees a new right to limit use and disclosure of "sensitive personal information," which is defined to include (1) precise geolocation data, (2) racial or ethnic origin, (3) union membership, (4) the contents of certain employee email and text messages, and (5) biometric information."* [see Morgan Lewis article].

Finally, I reserve my right to also request a deletion of that data.

I am filing this request as an ex-Apple employee, but also as someone with an active business based in California who owns and uses Apple products, thus a standard 'consumer.'

*A business cannot discriminate against a consumer because the consumer exercised any of the consumer's California rights, unless the price or service difference is reasonably related to the value provided to the business by the consumer's data.* [see [Orrick article](#)].

Thank you.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Sunday, December 3rd, 2023 at 11:08 PM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](mailto:legal@ashleygjovik.com)> wrote:

Thank you for the update, MWE. Moving MWE to bcc.

Morgan Lewis - I now assume you are assigned to all five NLRB charges (including the two open cases).
You guys should fix up your notices of appearance - it still shows MWE on most of the NLRB case webpages.

If Morgan Lewis is not retained for some of the NLRB charges, please confirm, and let me know if I should ask Apple who is, or if Apple is handling them directly, or if you know who else is handling them if not you.

Thank you.

-Ashley

—

**Ashley M. Gjøvik**

BS, JD, PMP

Sent with Proton Mail secure email.

On Saturday, December 2nd, 2023 at 5:17 PM, Foster, Christopher <Cfoster@mwe.com> wrote:

> MWE does not represent any party in these referenced matters.
>
> Thank you,
>
> Chris
>
> CHRISTOPHER FOSTER
> Partner
> **McDermott Will & Emery LLP**  415 Mission Street, Suite 5600, San Francisco, CA 94105-2616
> **Tel** +1 628 218 3826    **Email** cfoster@mwe.com
> **Biography | Website | vCard | Twitter | LinkedIn**
> * Admitted to practice law in California, Washington, and Idaho
>
> ---
>
> **From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
> **Sent:** Saturday, December 2, 2023 9:18 AM
> **To:** Foster, Christopher <Cfoster@mwe.com>; McConnell, Julie <Jmcconnell@mwe.com>; Booms, Ryan <rbooms@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>; jperry <jperry@orrick.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; kelcey.phillips@morganlewis.com; mark.stolzenburg@morganlewis.com; crystal.carey@morganlewis.com; Eberhart, David R. <deberhart@omm.com>
> **Subject:** Re: Gjovik v Apple | Requesting signed instruments under CLC § 432

Some people who received this message don't often get email from legal@ashleygjovik.com. Learn why this is important

**[ External Email ]**

+ OMM if they're still on this too

Removing Sayed at MWE who per OoO apparently left in Feb '23 (@Chris, Ron left around that time too, and Julie is on leave, so if there are others on your firm now on my NLRB cases, please loop them in).

Can someone from one of these firms please at least confirm receipt of my request? I sent this Tuesday and haven't heard anything back from any of you.

If this request needs to be submitted directly to Apple, please let me know - however y'all are representing Apple and I'm supposedly supposed to go through you with my requests and questions during litigation/adjudication.

It's unclear to me if the NLRB NDA adjudication is now represented by both MWE and Morgan Lewis, or if Morgan Lewis is only on the Cook email and my 1/10/22 witness intimidation and witness retaliation charge, and MWE is still on the NDAs and employment policies and 8/26 & 9/16/21 unfair labor/retaliation charges. If someone can clear that up too please, it would be appreciated.

I also don't know who Apple hired to represent them on the California Dept of Labor cases but I assume that is moot now that I rolled them into the federal civil suit.

Can we also do a roles and responsibilities matrix, maybe?

Thank you.

-Ashley

—

6

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Tuesday, November 28th, 2023 at 12:25 AM, Ashley M. Gjovik (Legal Matters) <[legal@ashleygjovik.com](mailto:legal@ashleygjovik.com)> wrote:

Hello Apple lawyers,

I am requesting copies of all instruments I signed (physical and electronic signatures) relating to my obtainment and holding of employment at Apple Inc.

This request is governed by California Labor Code, Article 3, § 432. The litigation exception to § 1198.5 does not apply to § 432.

I am requesting that the Face Gobbler related instrument(s) be released first and expeditiously, and not saved for a bulk release with the others. If Apple does not have a copy of any signed Face Gobbler related instruments, I would like confirmation of that fact and swiftly.

For all instruments, I am requesting to receive records digitally, which should not be an issue as almost all of them were signed digitally. You can share the documents via email attachments or via a shared document repository as long as it allows me to download them without alteration.

As we are over two years into this litigation, I'd expect these records should already be on hand, and as such I do not expect any prolonged delays.

Thank you for your cooperation. Please let me know if you have any questions.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our [Privacy Policy](#) explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit [http://www.mwe.com/](http://www.mwe.com/) for more information about our Firm.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by la received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immedia the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

1    (Additional counsel on following page)

2    JESSICA R. PERRY (SBN 209321)
     jperry@orrick.com
3    MELINDA S. RIECHERT (SBN 65504)
     mriechert@orrick.com
4    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1000 Marsh Road
5    Menlo Park, CA 94025-1015
     Telephone:    +1 650 614 7400
6    Facsimile:     +1 650 614 7401

7    KATHRYN G. MANTOAN (SBN 239649)
     kmantoan@orrick.com
8    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
9    405 Howard Street
     San Francisco, CA 94105-2669
10   Telephone:    +1 415 773 5700
     Facsimile:     +1 415 773 5759

11

12   Attorneys for Respondent
     Apple Inc.

13

14                UNITED STATES DEPARTMENT OF LABOR

15             OFFICE OF ADMINISTRATIVE LAW JUDGES

16

17   ASHLEY GJOVIK,                      OALJ Case No.:    2024-CER-00001
                                      OSHA Case No.:    9-3290-22-051
18             Complainant,

                                  **RESPONDENT APPLE INC.'S INITIAL**
19       v.                              **DISCLOSURES PURSUANT TO**
                                  **JANUARY 19, 2024 NOTICE OF**
20   APPLE INC.,                         **DOCKETING AND 29 C.F.R. §**
                                  **18.50(c)(1)**
                 Respondent.
21

22

23

24

25

26

27

28

4134-7275-2462

1  KATE E. JUVINALL (SBN 315659)
   kjuvinall@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   631 Wilshire Blvd., Suite 2-C
3  Santa Monica, CA 90401
   Telephone:    +1 310 633 2800
4  Facsimile:    +1 310 633 2849

5  RYAN D. BOOMS (SBN 329430)
   rbooms@orrick.com
6  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1152 15th Street, N.W.
7  Washington, D.C. 20005-1706
   Telephone:    +1 202 339 8400
8  Facsimile:    +1 202 339 8500

9  Attorneys for Respondent
   Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the January 19, 2024 Notice of Docketing and 29 C.F.R. § 18.50(c)(1), Respondent Apple Inc. ("Apple" or "Respondent") hereby submits the following Initial Disclosures to Complainant Ashley Gjovik ("Complainant"). Apple makes these Initial Disclosures based upon information currently available to it and reserves the right to supplement all disclosures as discovery progresses. Apple makes these disclosures concerning the claims and defenses properly at issue in OALJ Case No. 2024-CER-00001, which are limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9610 claim and defenses addressed in the Secretary of Labor's December 8, 2023 findings in OSHA Case No. 9-3290-22-051.[1] *See* 29 C.F.R. § 24.100 *et seq.* (setting forth procedures required to make and appeal determinations regarding alleged whistleblower retaliation under CERCLA).[2]

These disclosures are made without waiving the right to object on the grounds of competency, privilege, relevancy and materiality, hearsay or any other proper ground and the right to object on any and all grounds, at any time, to any discovery request or proceeding involving or relating to the subject matter of these Initial Disclosures.

**Category 1: The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following are persons who may have information that Respondent may use to support its defenses in this case:

1.    Complainant (information regarding complaints to Respondent regarding the issues raised in Complainant's August 29, 2021 (ECN76833) complaint that are properly

---

[1] The December 8, 2023 Findings addressed issues raised by Complainant regarding 825 Stewart Drive in complaints filed on August 29, 2021 (ECN76833) and November 2, 2021 (ECN78416). However, the November 2, 2021 complaint is not at issue in this appeal because it addressed only a claim under the Sarbanes-Oxley Act.

[2] Complainant also appears to seek review of claims under the Solid Waste Disposal Act, Resource Conservation and Recovery Act, and Clean Air Act, but any such claims were not timely raised in her initial complaint and are thus not properly at issue. *See* 29 C.F.R. §§ 24.103, 24.105. To the extent the ALJ decides to consider any of these claims, Respondent reserves the right to amend these initial disclosures accordingly.

the subject of this proceeding (the "Complaints"), and the reasons for the alleged adverse action(s))

2.    Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Complainant's employment)

3.    Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Complainant's employment)

4.    Ekelemchi Okpo (Employee Relations Business Partner) (information regarding the Complaints to Respondent, the alleged adverse action(s), and Respondent's policies)

5.    Michael Steiger (Environmental Health and Safety Manager) (information regarding the Complaints to Respondent and Respondent's policies)

6.    Jenna Waibel (Employee Relations Business Partner) (information regarding the Complaints to Respondent, the alleged adverse action(s), and Respondent's policies)

Except for Complainant, all individuals identified above may be contacted through Respondent's counsel. Following discovery and receipt of additional information regarding the nature of Complainant's claims, additional witnesses may be identified, and Respondent reserves the right to supplement this list accordingly.

**Category 2: A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following are the descriptions by category of all documents and things that Respondent currently has in its possession, custody or control that may be used to support its defenses:

- The personnel file Respondent maintained on Complainant

- Complainant's compensation and payroll records

- Documents regarding Complainant's Complaints (as defined above) to Respondent from March 2021 through Complainant's termination of employment

- Documents sufficient to show that Northrop Gruman is the responsible party for the relevant Superfund site cleanup

1

2

3

4

5

6

7

8

9

- Documents regarding Respondent's policies and procedures in effect from March 2021 to Complainant's termination of employment

- Documents regarding the termination of Complainant's employment

To the extent these documents consist of electronically stored information, these documents are located on servers, computers, and other electronic storage media, that are either (a) located at Respondent's corporate headquarters or in the possession of Respondent's employees, or (b) in the possession of Respondent's outside counsel. To the extent any tangible documents or things on these subjects exist in the possession, custody or control of Respondent, they are located at Respondent's headquarters and may be obtained through Respondent's outside counsel.

10

11

12

13

14

**Category 3: A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under § 18.61 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

15

16

Apple does not claim any damages at this time.

17

18

19

Dated: February 9, 2024                          By: /s/Jessica R. Perry
_____
JESSICA R. PERRY
Attorneys for Respondent Apple Inc.

20

21

22

23

24

25

26

27

28

1   (Additional counsel on following page)

2   JESSICA R. PERRY (SBN 209321)
    jperry@orrick.com
3   MELINDA S. RIECHERT (SBN 65504)
    mriechert@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
5   Menlo Park, CA  94025-1015
    Telephone:    +1 650 614 7400
6   Facsimile:    +1 650 614 7401

7   KATHRYN G. MANTOAN (SBN 239649)
    kmantoan@orrick.com
8   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
9   405 Howard Street
    San Francisco, CA 94105-2669
10  Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759

11
    Attorneys for Defendant Apple Inc.
12

13                  UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                   SAN FRANCISCO DIVISION

16

17  ASHLEY GJOVIK,                          Case No. 23-cv-4597-EMC

18             Plaintiff,                    **DEFENDANT APPLE INC.'S INITIAL
                                             DISCLOSURES PURSUANT TO FED. R.**
19      v.                                   **CIV. P. 26(A)(1)**

20  APPLE INC.,

21             Defendant.

22

23

24

25

26

27

28

1   KATE E. JUVINALL (SBN 315659)
    kjuvinall@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    631 Wilshire Blvd., Suite 2-C
3   Santa Monica, CA 90401
    Telephone:    +1 310 633 2800
4   Facsimile:    +1 310 633 2849

5   RYAN D. BOOMS (SBN 329430)
    rbooms@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1152 15th Street, N.W.
7   Washington, D.C. 20005-1706
    Telephone:    +1 202 339 8400
8   Facsimile:    +1 202 339 8500

9   Attorneys for Defendant
    Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendant Apple Inc. identifies the following witnesses and documents, and makes the following initial disclosures.[1] Defendant makes these disclosures based on information currently available to it at this time, following a good faith inquiry in accordance with Rule 26. Defendant reserves the right to amend and/or supplement these disclosures if and as any further information becomes available during discovery and to rely upon such information as evidence in this action. Defendant makes the following disclosures to expedite the discovery process and without waiving the Federal Rules of Evidence, including the protections of the attorney-client privilege, the work-product doctrine, and any other applicable privilege. Defendant expressly reserves its rights under those privileges and protections. By making these disclosures, Defendant does not concede that the disclosed evidence is relevant or admissible as evidence at trial, and reserves the right to assert any and all evidentiary objections.

Further, the only claims at issue in this lawsuit and not subject to Defendant's forthcoming motion to dismiss—due on July 15, 2024—are those directly related to the allegedly wrongful termination of Plaintiff's employment and/or alleged retaliation during the course of her employment. Thus, Defendant identifies individuals likely to have discoverable information regarding those factual allegations and claims clearly at issue, as well as documents, data compilations, and tangible things that Defendant may use to support its claims or defenses.

**Rule 26(a)(1)(A):  The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to**

---

[1] Defendant does not believe it is required to provide initial disclosures under FRCP 26(a) because Northern District of California General Order No. 71: Initial Discovery Protocols For Employment Cases Alleging Adverse Action ("GO 71") applies. GO 71 "applies to all employment cases filed in this court after February 1, 2018, that challenge one or more actions alleged to be adverse."  GO 71 by its terms is "intended to supersede the parties' obligations to make initial disclosures pursuant to F.R.C.P. 26(a)(1)" in applicable cases. Here, Plaintiff's case "challenge[s] one or more [employment] actions alleged to be adverse" in her wrongful termination and whistleblower retaliation claims. Defendant served its GO 71 disclosures on December 18, 2023 and supplemented those disclosures with additional document productions on April 5, 2024 and May 15, 2024; to date Defendant has produced 418 documents totaling 1,549 pages pursuant to GO 71. Plaintiff has indicated that she does not believe GO 71 applies to this case, and accordingly Defendant makes these FRCP 26(a)(1) disclosures without conceding that they are required in this matter. The parties met and conferred regarding topics set forth in the Standing Order for All Judges of the Northern District of California: Contents of Joint Statement Management Statement on June 25, 2024.

**support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Subject to the preliminary statement set forth above, Defendant responds:

1.    Plaintiff (information regarding complaints to Defendant, and termination of Plaintiff's employment)

2.    Yannick Bertolus (Hardware Engineering Vice President) (information regarding termination of Plaintiff's employment)

3.    Aleks Kagramanov (Employee Relations Business Partner) (information regarding termination of Plaintiff's employment)

4.    Ekelemchi Okpo (Labor Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

5.    Michael Steiger (Environmental Health and Safety Manager) (information regarding complaints to Defendant and Defendant's policies)

6.    Jenna Waibel (Employee Relations Business Partner) (information regarding complaints to Defendant and Defendant's policies)

Except for Plaintiff, all individuals identified above may only be contacted through Defendant's counsel. Following discovery and receipt of additional information regarding the nature of Plaintiff's claims, additional witnesses may be identified, and Defendant reserves the right to supplement this list accordingly.

**Rule 26(a)(1)(B):    A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Subject to the preliminary statement set forth above, Defendant responds:

1.    E-mail communications concerning Plaintiff, complaints she made to Defendant regarding perceived issues at 825 Stewart, and/or the termination of her employment between Plaintiff and Yannick Bertolus, Antone Jain, Aleks Kagramanov, Antonio

1    Lagares, Ekelemchi Okpo, Helen Polkes, Dave Powers, Michael Steiger, Jenna

2    Waibel, and/or Dan West from March 1, 2021 to September 9, 2021.

3    2.    E-mail communications concerning Plaintiff, complaints she made to Defendant

4    regarding perceived issues at 825 Stewart, and/or the termination of her employment

5    between or among Yannick Bertolus, Antone Jain, Aleks Kagramanov, Antonio

6    Lagares, Ekelemchi Okpo, Helen Polkes, Dave Powers, Michael Steiger, Jenna

7    Waibel, and/or Dan West from March 1, 2021 to September 9, 2021.

8    3.    The personnel file Defendant maintained on Plaintiff.

9    4.    Plaintiff's performance reviews.

10    5.    Documents relied on to make the decision to terminate Plaintiff's employment.

11    6.    Policies relevant to the termination of Plaintiff's employment.

12    7.    Job descriptions for positions Plaintiff held.

13    8.    Documents showing Plaintiff's compensation and benefits.

14    9.    Documents that are directly related to Plaintiff's termination.

15    These documents are in the possession of Defendant's counsel.

16    Defendant reserves the right to supplement the categories of documents as more information

17    becomes available through the discovery process. By listing documents or categories of documents,

18    Defendant does not waive the right to object to discovery requests to which any document or

19    category of documents may be responsive.

20    **Rule 26(a)(1)(C):  Computation of any category of damages claimed by the disclosing**

21    **party.**

22    Apple does not claim any damages at this time.

23    **Rule 26(a)(1)(D):  Any insurance agreement under which any person carrying on an**

24    **insurance business may be liable to satisfy part or all of a judgment which may be entered in**

25    **the action or to indemnify or reimburse for payments made to satisfy the judgment.**

26    There is no applicable insurance policy that presently covers Plaintiff's claims in this

27    lawsuit.

28

1   Dated: July 9, 2024                                    ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                                          By: _____
                                                                     Melinda Riechert
4                                                               MELINDA S. RIECHERT
                                                                 Attorneys for Defendant
5                                                                    APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  (Additional counsel on following page)

2  JESSICA R. PERRY (SBN 209321)
   jperry@orrick.com
3  MELINDA S. RIECHERT (SBN 65504)
   mriechert@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, CA 94025-1015
   Telephone:    +1 650 614 7400
6  Facsimile:    +1 650 614 7401

7  KATHRYN G. MANTOAN (SBN 239649)
   kmantoan@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
9  405 Howard Street
   San Francisco, CA 94105-2669
10 Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759

11
   Attorneys for Respondent
12 Apple Inc.

13                UNITED STATES DEPARTMENT OF LABOR

14             OFFICE OF ADMINISTRATIVE LAW JUDGES

15

16
   ASHLEY GJOVIK,                          OALJ Case No.:    2024-CER-00001
17                                         OSHA Case No.:    9-3290-22-051
                 Complainant,
18                                         **RESPONDENT APPLE INC.'S**
        v.                                 **OPPOSITION TO MOTION TO**
19                                         **COMPEL FURTHER RESPONSES**
   APPLE INC.,                             **AND PRODUCTION**
20
                 Respondent.
21

22

23

24

25

26

27

28

1   KATE E. JUVINALL (SBN 315659)
    kjuvinall@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    631 Wilshire Blvd., Suite 2-C
3   Santa Monica, CA 90401
    Telephone:     +1 310 633 2800
4   Facsimile:     +1 310 633 2849

5   RYAN D. BOOMS (SBN 329430)
    rbooms@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    2100 Pennsylvania Avenue NW
7   Washington, D.C. 20037
    Telephone:     +1 202 339 8400
8   Facsimile:     +1 202 339 8500

9   Attorneys for Respondent
    Apple Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT PROCEDURAL BACKGROUND ............................................. 2

III.    LEGAL STANDARD ........................................................................................ 4

IV.     LEGAL ARGUMENT ...................................................................................... 6

      A.      Complainant Has Not Demonstrated the Relevance of the Documents She Seeks Through Her Requests. ................................................................. 6

      B.      Apple Has Cooperated in Discovery, Producing Hundreds of Documents Even Though their Discoverability is Unclear at This Stage of the Matter. ........... 6

      C.      Apple's Objections Were Appropriate and Properly Tailored. ............................... 8

V.      CONCLUSION ................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazing Ins., Inc. v. DiManno,*
    2020 WL 5440050 (E.D. Cal. Sept. 10, 2020) ........................................................... 9

*Belaire-West Landscape, Inc. v. Superior Ct.,*
    149 Cal. App. 4th 554 (2007) ................................................................................... 10

*Blanton v. Biogen IDEC, Inc.,*
    ARB Case No. 2006-SOX-4, 2006 WL 3246815 (Apr. 18, 2006) ............................ 5

*Campaign Legal Ctr. v. Iowa Values,*
    2024 WL 81278 (D.D.C. Jan. 8, 2024) ..................................................................... 5

*Cima v. Wellpoint Health Networks, Inc.,*
    2006 WL 1064054 (S.D. Ill. Apr. 20, 2006) ............................................................ 7

*Duggan v. Astrue,*
    2010 WL 2035285 (N.D. Cal. May 19, 2010) .......................................................... 7

*Duran v. City of Porterville,*
    2013 WL 12430031 (E.D. Cal. Jan. 17, 2013) ......................................................... 7

*Hill v. Nat'l Collegiate Athletic Assn.,*
    7 Cal.4th 1 (1994) .................................................................................................. 10

*Hilliard v. Cnty. of Henrico,*
    ALJ Case No. 2018-NTS-00006 (Aug. 17, 2018) .................................................... 7

*In re: Jiminez & Sons Landscaping, Inc.,*
    ARB Case No. 2021-TNE-00019, 2021 WL 11714734 (Sept. 8, 2021) .............. 5, 6

*Makaeff v. Trump Univ., LLC,*
    2013 WL 990918 (S.D. Cal. Mar. 12, 2013) ........................................................... 9

*Mayfield v. Bank of America, N.A.,*
    2010 WL 11647218 (N.D. Ga. Nov. 4, 2010) .......................................................... 7

*McNiece v. Dominion Nuclear Connecticut, Inc.,*
    ARB Case No. 15-083, 2016 WL 7212569 (Nov. 30, 2016) .................................... 5

*Mi Familia Vota v. Hobbs,*
    343 F.R.D. 71 (D. Ariz. 2022) ................................................................................. 5

*Morris v. Barra,*
    2012 WL 4900203 (S.D. Cal. 2012) ........................................................................ 7

*Nieman v. Southeastern Grocers*,
 ARB Case. No. 2018-0058, 2020 WL 6117907 (Oct. 5, 2020) ................................. 8

*Nieves v. Just Energy New York Corp.*,
 2020 WL 6720871 (W.D.N.Y. Nov. 16, 2020) .......................................................... 7

*Packman v. Chicago Trib. Co.*,
 267 F.3d 628 (7th Cir. 2001) ..................................................................................... 5

*Palmer v. Cognizant Tech. Sols. Corp.*,
 2019 WL 9359775 (C.D. Cal. Feb. 4, 2019) .............................................................. 6

*Pioneer Electronics (USA), Inc. v. Superior Ct.*,
 40 Cal.4th 360 (2007) .............................................................................................. 10

*Powers v. Pinnacle Airlines*,
 ARB Case No. 2005-SOX-65, 2005 WL 4889053 (July 19, 2005) ........................... 8

*Securities and Exchange Commission v. Jarkesy*,
 Case No. 22-859, 2024 WL 3187811 ........................................................................ 1

*Servicios Funerarios GG, S.A. de C.V. v. Advent Int'l Corp.*,
 2023 WL 7332836 (D. Mass. Nov. 7, 2023), *aff'd*, 2024 WL 2748348 (D.
 Mass. May 29, 2024).................................................................................................. 5

*Simkus v. United Airlines, Inc.*,
 ALJ Case Nos. 2018-SOX-00035, 2018-SWD-00003 (Oct. 16, 2018) ................... 7

*Thaht Sin v. Mass. Dept. of Corr.*,
 2012 WL 1570810 (D. Mass. May 2, 2012) .............................................................. 7

*Thomas v. Felker*,
 2011 WL 2225133 (E.D. Cal. June 7, 2011).............................................................. 7

*VeroBlue Farms USA Inc. v. Wulf*,
 345 F.R.D. 406 (N.D. Tex. 2021) .............................................................................. 9

*Ware v. BNSF Railway Co.*,
 ALJ Case No. 2020-FRS-00063 (Mar. 5, 2021) ....................................................... 7

**Statutes**

Cal. Civ. Code § 1798.140(v)(1)............................................................................. 10

**Other Authorities**

29 C.F.R. § 18.51(a)................................................................................................... 4

29 C.F.R. § 18.51(b) .......................................................................................... 5, 8, 9

1

## I.     __INTRODUCTION__[1]

On May 15, 2024, Complainant served sixty-one (61) separate requests for production ("Requests") on Apple in this putative whistleblower retaliation case, seeking a sweeping range of materials untethered to the needs of this case (if any claims survive the current round of motion practice)—for example, all security footage from an office building where Apple rents space (825 Stewart) for a two-week period in August 2021 (Request No. 43); all badge access records for a five-week period for that same building (Request No. 44); and every document concerning certain maintenance issues for that building for a period of over nine years (Request No. 47). On June 5, 2024, this Court advised the parties (*via* email) that it was holding all motions other than Complainant's Motion to Amend "in abeyance," and directed the parties to "cooperate with each other in the discovery process" in the interim.

Apple has done so. It produced 418 documents spanning 1,549 pages in response to Complainant's requests for production despite its currently pending and potentially dispositive Motion to Dismiss. Apple's initial document production included a full range of documents that **_might_** become relevant to Complainant's CERCLA whistleblower retaliation claim **_if_** that claim survives Apple's Motion to Dismiss. Presently, Apple's production exceeds what is proportional to the needs of the case because the pleadings are not yet settled. Moreover, if the Court grants the Motion to Dismiss, this case—along with Apple's discovery obligations—would end.

Despite this good faith production, Complainant complains Apple has somehow "refused to cooperate" by failing to immediately produce all the documents she seeks through **_sixty-one_** sweeping requests. But it was Complainant who has refused to meet and confer in good faith regarding the reasonableness and proportionality of her requests. Many of the Requests are not relevant to Complainant's CERCLA retaliation claim even if it survives. Others provide either no time limits or unreasonable time limits wholly untethered to the alleged internal complaints on which Complainant's CERCLA retaliation claim is premised.

---

[1] On June 27, 2024, the United States Supreme Court issues its decision in *Securities and Exchange Commission v. Jarkesy*, Case No. 22-859, 2024 WL 3187811. Apple is still evaluating the potential relevance of that decision to this proceeding and submits this opposition without prejudice to any rights or remedies *Jarkesy* may afford it.

Discovery in this matter is not a free-for-all, open-ended opportunity for Complainant to demand any and every document she may want from Apple; it should be conducted with an eye towards the needs of this case and adjudication of the particular claims (if any) that would proceed to hearing in this matter. Apple's responses give due consideration to the discoverability of the documents sought through each request and are proportional to the needs of this case at this stage, especially given that the pleadings are still not settled and thus it remains uncertain to what claims and allegations the assessment of relevance and proportionality must be tethered. This Court should deny Complainant's premature and unnecessary motion to compel.

## II.    RELEVANT PROCEDURAL BACKGROUND

The procedural posture of this case—and the claims that currently are and are not at issue, and the status of motion practice regarding the pleadings—is important framing within which to consider the present motion.  As this Court's May 23, 2024 order made clear, "[b]ased on the regulations found at 29 C.F.R. Part 24, the operative complaint in this matter is the August 29, 2021, online complaint filed before OSHA."  Order on Operative Complaint (May 23, 2024) (the "May 23 Order") at 1. On April 2, 2024, Complainant filed a motion to amend, seeking to add additional legal claims, alleged protected activity, and alleged adverse actions beyond those in the operative complaint; on April 16, 2024, Apple filed a Motion to Dismiss the lone claim that exists in the currently operative complaint (*i.e.*, a CERCLA whistleblower claim premised on alleged retaliation for Gjovik's various complaints related to alleged safety issues at Apple's office location in a building at 825 Stewart). Specifically, Apple moved this court for an order dismissing the operative OALJ Complaint on the grounds that Complainant fails to state a claim upon which relief can be granted because (1) Apple is not a "Covered Person" under CERCLA with respect to the site at issue; and (2) Complainant does not allege protected activity under CERCLA.[2]  Both motions are fully briefed and pending before the Court.

On May 15, 2024, Complainant served her sixty-one Requests on Apple, seeking wide-

---

[2] On April 30, 2024, Complainant filed a brief in opposition to Apple's Motion to Dismiss. On May 10, 2024, Apple filed a motion for leave to file a reply in support of its Motion to Dismiss (along with a copy of Apple's proposed reply brief), and Complainant filed a motion for leave to file a sur-reply.

ranging information about not only her alleged complaints and the reasons for her termination but also about various individuals whose relation to her is unclear and about myriad site inspections dating back nearly a decade, over six years before she made the complaints that she alleges prompted the termination of her employment. *See* Mot., Ex. A. On May 22, 2024, Apple filed a motion to stay discovery pending resolution of its Motion to Dismiss. The Court then issued the May 23 Order, permitting Complainant to "submit proposed amendments to the August 29, 2021, online complaint" and Apple to respond, and stating that all pending motions would be "held in abeyance until Complainant's Motion to Amend has been fully ruled on." *Id.* at 2.

On June 3, 2024, Apple sought clarity from this Court whether it would consider and rule on Apple's motion to stay discovery pending resolution of its Motion to Dismiss and requested a conference to discuss the issue given that Complainant would soon be filing a new amended complaint. This Court clarified *via* email on June 5, 2024, that "the litigation schedule as set out in the Notice of Hearing issued on March 27, 2024, **has not changed**" (emphasis in original) and directed both parties to "cooperate with each other in the discovery process" until the motion to amend had been decided. The Court also directed Complainant to file her proposed amended complaint (consistent with the May 23 Order) by the next day. Complainant missed her deadline and instead filed her new proposed amended complaint the following day on June 7, 2024.

Consistent with the Court's June 5, 2024 instructions, Apple responded to Complainant's Requests on June 14, 2024, and produced 418 documents. *See* Mot., Ex. B; Riechert Decl. ¶2. While it is Apple's position that discovery is not appropriate until a decision is made as to whether any of Gjovik's claims may proceed (and if so, which ones), Apple has produced documents of potential relevance to the only claim in the operative complaint before this Court— a CERCLA whistleblower retaliation claim. These documents include Complainant's personnel file, payroll records, stock records, leave of absence records, benefits records, job descriptions, performance reviews, agreements and policies, termination letter and related emails, calendar files, documents regarding Complainant's complaints about vapor intrusion testing and exposure at 825 Stewart and 825 Stewart's status as a Superfund site, documents regarding the decision to terminate Complainant's employment and communications with the custodians that notified

Complainant of her termination, communications between HR, communications between Apple's HR custodians and Apple's EH&S custodians, communications between Complainant and all of these custodians, communications between Complainant and the EPA, communications between Complainant and her direct and skip-level managers, communications between these managers and HR custodians, and communications between Complainant and other Apple employees. *See* Riechert Decl. ¶3. Apple further agreed to meet and confer with Complainant as appropriate regarding the scope of the requests following the Court's ruling on Complainant's motion to amend and Apple's Motion to Dismiss.

Upon receipt of Apple's responses and production of documents, Complainant notified Apple that she believed she was entitled to full discovery on all sixty-one Requests.  Apple attempted in good faith to engage with Complainant regarding specific documents she contended were missing from the initial production, but Complainant refused.  Instead, she repeatedly referred back to her original Requests, dismissed all of Apple's objections and proportionality concerns out of hand, and filed the instant motion on June 19, 2024.  *See* Mot., Ex. C (correspondence between the parties between June 14, 2024 and June 19, 2024).

## III.   LEGAL STANDARD

29 C.F.R. section 18.50, *et seq.* set forth rules about discovery for administrative hearings before the OALJ.  Parties may obtain discovery concerning any nonprivileged matter that is "relevant to any party's claim or defense," subject to an ALJ's limitations. 29 C.F.R. § 18.51(a). However, a request for production "must describe with reasonable particularity each item or category of items to be inspected," and the receiving party is permitted in response to "either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons." *Id.* §§ 18.61(b)(1)(ii), (2)(ii).

The Court "must" limit discovery when "[t]he discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," as well as when "[t]he burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the

1   importance of the discovery in resolving the issues." 29 C.F.R. § 18.51(b)(4)(i), (iii).

2   Discoverability under the operative rules is therefore expressly tethered to and governed by the

3   claims (and related defenses) at issue in the matter, which in turn inform "the needs of the case"

4   and the "issues" that would need to be resolved.  "ALJs have wide discretion to limit the scope of

5   discovery and will be reversed only when such evidentiary rulings are arbitrary or an abuse of

6   discretion." *McNiece v. Dominion Nuclear Connecticut, Inc.*, ARB Case No. 15-083, 2016 WL

7   7212569, at *5 (Nov. 30, 2016).

8            While the regulations generally address the scope and limits of discovery, they do not

9   specifically address motions to compel. *See* 29 C.F.R. §§ 18.50 *et seq*. "The Federal Rules of

10  Civil Procedure (FRCP) apply to situations not controlled by Part 18 or rules of special

11  application." *Blanton v. Biogen IDEC, Inc.*, ARB Case No. 2006-SOX-4, 2006 WL 3246815, at

12  *2 (Apr. 18, 2006). Under the FRCP, the moving party bears the initial burden of showing that

13  the requested information is relevant and that the opposing party's response is inadequate or

14  incomplete. *See, e.g., Campaign Legal Ctr. v. Iowa Values*, 2024 WL 81278, at *5 (D.D.C. Jan. 8,

15  2024); *Mi Familia Vota v. Hobbs*, 343 F.R.D. 71, 80 (D. Ariz. 2022); *Servicios Funerarios GG,*

16  *S.A. de C.V. v. Advent Int'l Corp*., 2023 WL 7332836, at *2 (D. Mass. Nov. 7, 2023), *aff'd*, 2024

17  WL 2748348 (D. Mass. May 29, 2024); *Packman v. Chicago Trib. Co.*, 267 F.3d 628, 647 (7th

18  Cir. 2001) (denial of discovery proper unless moving party can show "actual and substantial

19  prejudice resulting from the denial of discovery").  Only if the moving party establishes a need

20  for the requested discovery would the burden then shift to the party opposing discovery to show

21  why it should not be permitted.  *See id.*; *accord In re: Jiminez & Sons Landscaping, Inc.*, ARB

22  Case No. 2021-TNE-00019, 2021 WL 11714734, at *1 (Sept. 8, 2021) (only if moving party

23  makes "threshold showing of relevance" must opposing party and Court consider, *inter alia*,

24  "whether the burden outweighs the probative value").  Such a showing would be informed by the

25  considerations of proportionality and burden that the regulations outline, all of which tie back to

26  the needs of a particular case in light of the particular claims at issue.

27  / / /

28  / / /

APPLE'S OPPOSITION TO MOTION TO COMPEL
OALJ CASE NO.: 2024-CER-00001
OSHA CASE NO.: 9-3290-22-051

1    **IV.    LEGAL ARGUMENT**

2       **A.    Complainant Has Not Demonstrated the Relevance of the Documents She
        Seeks Through Her Requests.**

3

4       Complainant's motion to compel makes no effort to satisfy her burden to show that any or

5    all of the documents she sought in her sixty-one Requests but has not received are relevant to this

6    matter.  She likewise made no such effort in the meet and confer process, instead simply

7    reiterating her entitlement to everything and her contention that every one of Apple's tailored

8    objections to particular requests must be improper. *See* Mot., Ex. C.  Because Complainant has

9    failed to demonstrate the relevance of any particular document(s) sought, her motion fails even

10   absent consideration of Apple's objections.  *See In re: Jiminez & Sons Landscaping, Inc.*, 2021

11   WL 11714734, at *1.

12      **B.    Apple Has Cooperated in Discovery, Producing Hundreds of Documents Even
        Though their Discoverability is Unclear at This Stage of the Matter.**

13

14      Complainant contends that Apple has "refuse[d] to engage in properly scheduled

15   discovery."  Mot. at 5.  But Apple has engaged in a manner appropriate and proportional to the

16   needs of the case at this stage.  The set of claims that will go forward in this matter—if any—

17   remains unsettled.  Unless Complainant's Motion to Amend is granted, the only claim at issue

18   will be a CERCLA whistleblower retaliation claim regarding alleged complaints about 825

19   Stewart; but Apple has argued that claim should be dismissed on the pleadings because

20   Complainant has not stated a claim under CERCLA's particular whistleblower provision.[3]  When

21   the pleadings are unsettled, the scope of the claims and issues is unclear and a party responding to

22   discovery cannot reasonably determine whether the information sought is relevant or proportional

23   to the needs of the cases.  *See, e.g., Palmer v. Cognizant Tech. Sols. Corp.*, 2019 WL 9359775, at

24   *1 (C.D. Cal. Feb. 4, 2019) (limiting discovery ordered with pending motion to where the parties

25

26   [3] As noted in prior submissions to this Court, Complainant separately filed an OSHA
     whistleblower retaliation claim (on which DOL/OSHA found no merit following administrative
27   review); a SOX whistleblower retaliation claim (which Judge Chen of the Northern District of
     California dismissed with prejudice); and state law whistleblower retaliation claims (at least some
28   of which will go forward in her federal case).

could "mutually agree to engage in certain aspects of the discovery process," because otherwise "permitting discovery at this juncture may lead to premature and needless disputes regarding Defendants' discovery responses"). This is why courts routinely stay discovery pending resolution of a motion to dismiss. *See, e.g.*, *Ware v. BNSF Railway Co.*, ALJ Case No. 2020-FRS-00063 (Mar. 5, 2021) (granting respondent's motion to stay written discovery pending resolution of motion to dismiss); *Simkus v. United Airlines, Inc.*, ALJ Case Nos. 2018-SOX-00035, 2018-SWD-00003 (Oct. 16, 2018) (same).[4] Requiring the parties to engage in comprehensive discovery at this early juncture would not be an efficient use of resources, including both those of the parties and this Court. *See, e.g., Cima v. Wellpoint Health Networks, Inc.*, 2006 WL 1064054, at *4 (S.D. Ill. Apr. 20, 2006) ("A ruling on [the pending motion to dismiss] will necessarily result in greater certainty of what claims remain pending. It would be wasteful for the parties to engage in extensive discovery prior to a ruling on the motion.").

Here, the Court has not stayed discovery and has directed the parties to "cooperate with each other in the discovery process" while the initial round of motions are pending. Apple has done so. It produced 418 documents spanning 1,549 pages in response to Complainant's Requests that would be relevant to the operative complaint should it survive Apple's Motion to

---

[4] *See also Hilliard v. Cnty. of Henrico*, ALJ Case No. 2018-NTS-00006 (Aug. 17, 2018) (staying discovery because "if the Court grants Respondent's Motion to Dismiss, the discovery requests will be moot"); *Duran v. City of Porterville*, 2013 WL 12430031, at *1-2 (E.D. Cal. Jan. 17, 2013) ("[W]hen a case is still in the pleadings stage and a motion to dismiss is pending, a motion to compel discovery is considered premature absent extraordinary circumstances."); *Morris v. Barra*, 2012 WL 4900203, at *2 (S.D. Cal. 2012) ("Given that this case is still in the pleading stage, the Court finds that merits-based discovery is inappropriate at this time, as its relevancy is outweighed by the burden and expense of production[.]"); *Thomas v. Felker*, 2011 WL 2225133 (E.D. Cal. June 7, 2011) ("Plaintiff is apprised that any motion to compel will be found premature until the court has issued its final ruling on the motion to dismiss[.]"); *Duggan v. Astrue*, 2010 WL 2035285 (N.D. Cal. May 19, 2010); *Nieves v. Just Energy New York Corp.*, 2020 WL 6720871, at *4 (W.D.N.Y. Nov. 16, 2020) (granting motion to stay pending motion to dismiss because discovery was "premature" and if motion to dismiss were granted "then discovery would not occur"); *Thaht Sin v. Mass. Dept. of Corr.*, 2012 WL 1570810, at *7 (D. Mass. May 2, 2012) ("Because the stay was ordered pending resolution of the motion to dismiss, discovery will proceed following the resolution of that motion in this order[.]"); *Mayfield v. Bank of America, N.A.*, 2010 WL 11647218, at *2 (N.D. Ga. Nov. 4, 2010) (denying motion to compel discovery based on pending motion to dismiss and no answer on file).

1   Dismiss.[5]  *See, e.g., Nieman v. Southeastern Grocers*, ARB Case. No. 2018-0058, 2020 WL

2   6117907, at *6 (Oct. 5, 2020) (1,100 pages of documents produced sufficient to demonstrate

3   reasons for termination); *Powers v. Pinnacle Airlines*, ARB Case No. 2005-SOX-65, 2005 WL

4   4889053, at *9-10 (July 19, 2005) (limiting discovery in whistleblower case under certain

5   environmental acts to employee's complaints and termination and not the underlying acts

6   themselves).   These documents include Complainant's personnel file, payroll records, stock

7   records, leave of absence records, benefits records, job descriptions, performance reviews,

8   agreements and policies, termination letter and related emails, calendar files, communications

9   between Complainant and her managers and/or Apple's HR and EH&S representatives, and

10   communications between these representatives regarding Complainant's complaints spanning

11   from the time Complainant made inquiries through her date of termination. *See* Riechert Decl. ¶3.

12   These documents reveal witnesses and dates, as well as Apple's and other individual's responses

13   to Complainant's concerns. *Id.* Not only does the production include communications with

14   Complainant, but it also includes communications about her internal complaints among other

15   individuals. *Id.* There are also documents explaining the termination of Complainant's

16   employment. *Id.* Given that it is unclear whether Complainant can even plead a viable cause of

17   action in this forum, Apple's production is more than proportional to the needs of the case as it

18   currently stands. 29 C.F.R. § 18.51(b)(4)(iii); *see also Nieman*, 2020 WL 6117907, at *6.

19   **C.     Apple's Objections Were Appropriate and Properly Tailored.**

20        Complainant also contends that Apple's objections are "boilerplate, non-specific, and in

21   bad faith." Mot. at 5.  As argued above, absent a threshold showing of relevance as to particular

---

22   [5] That Apple has already produced these documents to Complainant in other proceedings also
23   alleging whistleblower retaliation (albeit under different statutes) is irrelevant to whether
     Complainant's motion to compel should be granted at this stage of this matter.  Indeed, given that
24   Complainant has put her termination at issue in multiple different forums—alleging she was a
     whistleblower, and that her termination was a result of protected activity, in each forum—it is
25   entirely unsurprising that documents that would be potentially relevant (and thus discoverable) in
     one matter would be in another as well.  Similarly, Complainant laments that Apple's production
26   is deficient in part because (*inter alia*) it includes "communications she directly sent or received"
27   and thus "already has in her possession." Mot. at 11. But Complainant's decision to retain
     documents related to her employment with Apple post-termination likewise has nothing to do
28   with Apple's discovery obligations.

documents sought, Complainant has not made even an initial showing of an entitlement to relief. Nor does she make any effort to argue that any particular objections are improper as to any specific request, instead broadly attacking any response that contained (*inter alia*) a relevance or proportionality objection without meeting that objection as to particular categories of documents (for example, Request Nos. 43, 44, and 47 cited above).

If this Court were to consider Apple's objections and subsequent attempts to meet and confer, it would see that Apple made good faith objections targeted to the specific Requests at issue. There are no general objections in Apple's response. Instead, Apple specifically addressed each of Complainant's Requests and asserted objections appropriate to the particular Request, as well as noting where it was producing documents (and which documents) as well as its willingness to meet and confer with Complainant including regarding "discovery limitations set forth in 29 C.F.R. § 18.51(b)(4)."

Complainant broadly argues that everyone of Apple's objections is "boilerplate." Mot. at 5. They are not. "[C]opying and pasting an objection, by itself does not render that objection a boilerplate objection"—particularly if multiple requests suffer from the same deficiencies and are subject to the same objections. *VeroBlue Farms USA Inc. v. Wulf*, 345 F.R.D. 406, 419 (N.D. Tex. 2021) (citing *Amos v. Taylor*, 2020 WL 7049848, at *7 (N.D. Miss. Dec. 1, 2020)). Rather "[o]bjections are typically deemed 'boilerplate' when they are identical and ***not tailored to the specific discovery request***." *Id.* (emphasis added); *see also Amazing Ins., Inc. v. DiManno*, 2020 WL 5440050, at *5 (E.D. Cal. Sept. 10, 2020); *Makaeff v. Trump Univ., LLC*, 2013 WL 990918, at *5 (S.D. Cal. Mar. 12, 2013). Here, Apple's objections are tailored to each specific discovery Request.

For example, Apple asserted relevance objections where appropriate given that the claims (if any) that will go forward in this matter are indeterminate at present, as well where the documents sought plainly bear no relation to the claims that could even conceivably be a part of this action. For example, Request No. 61 seeks "[a]ll documents concerning 825 Stewart Drive with Ronald Sugar between April 1 2021 through December 31 2021." But Mr. Sugar was the subject of Complainant's complaint about conduct she characterizes as violative of SOX (and

thus as related to her SOX whistleblower retaliation claim).  *See* Riechert Decl. ¶4, Ex. A (Dec. 10, 2021 Case Activity Worksheet). Complainant elected to "kick out" that claim to federal court (where it was subsequently dismissed with prejudice); there is no legitimate basis to continue to seek documents regarding Mr. Sugar in this forum.

As concerns privilege, Apple asserted that objection only as to those Requests that it believes may seek the discovery of information protected by the attorney client privilege and/or work product doctrine; for the remainder; Apple did not assert the objection. *See* Mot. Ex. B, Responses to Request Nos. 43-55.

Apple likewise did not assert a third-party privacy objection to those Requests that did not appear to seek third party information. *See id.*, Responses to Request Nos. 1, 43. But as to others, their express language appears designed to seek confidential information regarding and communications with third parties.  *See, e.g.,* Mot. Ex. A,  Request No. 31 (seeking "all documents concerning" Apple and Northrup Grumman), 32 (seeking "all documents concerning" Apple and Oaktree Capital, 33 (seeking "all documents concerning" Apple and Hines), 34 (seeking "all documents concerning" Apple and GI Partners), 35 (seeking "all documents concerning" Apple and CalSTRS).

Many other Requests could be understood to seek confidential information regarding third-party Apple employees, such that Apple appropriately objected. *See, e.g.*, *id.*, Request  Nos. 2, 4, 8, 21-25.  The California Constitution protects an individual's privacy rights, and an employer has a legal duty to protect its employees' private information.  *See Belaire-West Landscape, Inc. v. Superior Ct.*, 149 Cal. App. 4th 554, 558 (2007); *Pioneer Electronics (USA), Inc. v. Superior Ct.*, 40 Cal.4th 360, 370 (2007); *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal.4th 1, 20, 40 (1994); *see also* Cal. Civ. Code § 1798.140(v)(1) (employee personal information including "professional or employment-related information protected under the California Consumer Privacy Act of 2018"). That is precisely what Apple is doing here.  Apple's assertion of that objection as to particular Requests was entirely appropriate.

Apple also appropriately objected to those Requests that appear to seek documents that may contain confidential, proprietary, and/or trade secret information.  *See, e.g.,* Mot. Ex. B,

Response to Request Nos. 40 ("All documents sent by or received by Antone Jain and concerning 825 Stewart Drive"), 41 ("All documents concerning EHS records and reports for 825 Stewart Drive"); 42 ("All documents concerning indoor air test plans, testing, and results for 825 Stewart Drive"); 49 ("All documents concerning the 'Gobbler' / 'Glimmer' Informed Consent Forms and/or NDAs"); 53 ("All documents concerning IRB review of the practice of scanning employee ears"). Complainant has to date failed to engage in discussions regarding appropriate measures to protect Apple's confidential information in this matter, including entry of an appropriate protective order. Particularly given that it is unclear what if any claims will go forward, Complainant's wholesale insistence on discovery of Apple's confidential information without a willingness to meet and confer regarding Apple's concerns as to these specific Requests is not well taken.

Apple did not object on vagueness grounds to those Requests that described with sufficient particularity the information sought. *See* Mot. Ex. B, Responses to Request Nos. 1, 43, 44, 45, 55. For the others, Apple objected and identified the vague and ambiguous language contained in the Request in its response and objected to the extent it was intended to impose a disproportionate burden on Apple, which Complainant could have attempted to address through the meet and confer process had she chosen to engage. *See, e.g.*, *id.*, Responses to Request Nos. 10 ("[a]ll documents" and "off-boarding"), 24 ("[a]ll documents" and "about Complainant and Jenna Waibel"), 26 ("[a]ll documents" and "about Complainant"), 39 ("all documents" and "concerning 825 Stewart Drive").

Finally, Apple appropriately limited its objections regarding scope and overbreadth to those Requests that are objectionable on those bases. For those Requests that are not overbroad as to time, Apple does not assert an objection on that basis. *See id.*, Responses to Request Nos. 1, 4, 43, 44, 45. Other Requests are overbroad because they have no time restriction whatsoever and are "unlimited in time." *See id.*, Responses to Request Nos. 2, 8, 10, 12, 16-18 32-35, 49-54. Other Requests are overbroad because they seek information from after Complainant's employment ended, which bear no obvious relevance to evaluating whether she was terminated for CERCLA-protected activities during her employment. *See id.,* Responses to Request Nos. 3,

5, 6, 7, 9-11, 13-15, 29. And still other Requests are overbroad because they seek documents pre-dating when Complainant alleges in the operative August 29, 2021 complaint that she first made protected complaints (*i.e.*, before March 17, 2021). *See id.*, Responses to Request Nos. 19-28, 30-31, 36, 37, 38, 39, 40, 41, 42, 45, 46, 47, 48, 56-61.

In sum, Apple's objections were appropriately selected for and tailored to the specific Request to which Apple was responding.  Complainant's refusal to acknowledge the validity of any of those objections—while also failing to make any showing as to the relevance or proportionality of the documents she seeks—is not a sound basis on which to grant her motion.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Apple respectfully requests that the Court deny Complainant's motion to compel.

Dated: July 3, 2024

By: _____
*Melinda Riechert*
MELINDA S. RIECHERT
Orrick, Herrington & Sutcliffe LLP
Attorneys for Respondent Apple Inc.

# Exhibit C

Meet and Confer

April 01, 2024

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

Meet and Confer

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4  ASHLEY GJOVIK,                )
                                  )
 5            Plaintiffs,         )
                                  )
 6   vs.                          )  Case No. 23-cv-4597-EMC
                                  )
 7  APPLE INC.,                   )
                                  )
 8            Defendants.         )
                                  )
 9

10

11

12            OALJ 26(f) MEET AND CONFER

13              TELEPHONIC MEETING

14       _____

15              Monday, April 1, 2024

16

17

18

19

20

21

22

23

24  REPORTED BY:
    ANGELA KOTT, CSR 7811
25  JOB NO: 10139539
```

```
 1                    TELEPHONIC APPEARANCES

 2   FOR THE PLAINTIFF:
             ASHLEY GJOVIK
 3           2108 N Street, Suite 4553
             Sacramento, California 95816
 4           415.964.6272
             Ashleymgjovik@protonmail.com
 5


 6
     FOR THE DEFENDANT:
 7           ORRICK, HERRINGTON & SUTCLIFFE LLP
             BY:  MELINDA RIECHERT, Attorney at Law
 8               KATHRYN G. MANTOAN, Attorney at Law
             1000 Marsh Road
 9           Menlo Park, California 94025
             650.614.7400
10           mriechert@orrick.com
             Kmantoan@orrick.com
11

12

13
                           ---oOo---
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S        10:33 a.m.

 2

 3              MS. RIECHERT:  We're ready to go on the

 4   record.  We have a court reporter here and we are here

 5   to talk about the 26(f) rules for the DOL.

 6              And I thought it would be good if we started.

 7              Do you have them in front of you, Ashley?

 8              MS. GJOVIK:  Yeah, I do.

 9              MS. RIECHERT:  All right.  Great.

10              So the first one talks about initial

11   disclosures.  And I think we agree that we're done

12   with that, right?  We've each done our initial

13   disclosures.

14              MS. GJOVIK:  And, yeah, I was going to look

15   at it again and see.  I might need to amend a couple

16   details on the damages, but it looks like we have five

17   days after today to potentially do that.

18              MS. RIECHERT:  And then the next one, the

19   basis of the claims and defenses.

20              I thought it would be helpful if you started

21   by telling us what you think the issues are that the

22   DOL is going to decide.

23              MS. GJOVIK:  Yeah, so I didn't know before

24   this meeting -- I'm sorry.  We're on the record?

25              MS. RIECHERT:  Yeah.
```

1          MS. GJOVIK:  I didn't know before this

2    meeting of some of the details of my request for

3    amendment was the basis.  I'm also unaware of the

4    details of OSHA's complaint, what they included and

5    what they did not.

6          So I'm also going to be motioning -- which

7    might be unnecessary -- but to add the adverse

8    employment actions I had previously complained of as

9    well as specific protected activity under CERCLA that

10   was not addressed in the determination.

11          The real center of my complaints are around

12   the cracked slab.  The reporting the cracks to the

13   EPA, the EPA conducting the inspection on August 19th

14   due to my reports -- in their official

15   documentation it was because of my reports.  But there

16   were a number of issues.  And Apple apparently sealing

17   the cracks right after I was put on leave.

18          So that whole timeline of events I think is

19   the primary claims -- really goes to the CERCLA

20   claims, but there's also, as noted in the brief, a

21   number of other issues.

22          There was a the sub-slat de-pressurization

23   system concerns, the sub-slat ports.  A number of

24   issues to do with the vapor intrusion mitigation

25   system, with very specific technical inquiries and

1  feedback I gave Apple, and also then shared with EPA

2  and then forwarded back to Apple.  The EPA then agreed

3  with me during the inspection.

4       So the protected activity under CERCLA, you

5  know, it started in, you know, mid-March, but what

6  seems like the -- the most critical time seems to be

7  in July, June and July, once the cracks were

8  identified and I started raising concerns specific to

9  the cracks and a duty to ensure there's oversight, and

10  being told there's not, and then us back and forth,

11  and again, leading to the inspection.

12       And then I definitely will also be raising

13  that Apple, I'm going to argue, went out of their way

14  to make sure I never found out there was an

15  inspection.  And even in the responses to OSHA there

16  was no mention of the inspection, which is clearly

17  material.  So I'm going to add that as an argument

18  under pretext for the adverse employment actions.

19       These are all things that I had in my claims

20  with OSHA.  We have the hostile work environment,

21  which I complained of directly, and counsel addressed

22  in their answer even.

23       And the change in work -- losing projects

24  that were good for review, increase of projects that

25  were destined to fail.  High increase in workload

1    overall.  The leave with the not being able to go to a

2    training.  Not being able to come back.

3            Then of course the -- I'm going to definitely

4    raise the two outreach attempts by employee relations,

5    Ekelemchi Okpo.

6            THE REPORTER:  I'm sorry.  I didn't get that.

7            MS. GJOVIK:  Ekelemchi Okpo is his name.

8            MS. RIECHERT:  Can you spell that?

9            MS. GJOVIK:  Are you guys new?

10           MS. RIECHERT:  The court reporter is new, and

11   she doesn't know all the names here.  So she needs

12   to --

13           MS. GJOVIK:  Oh, right.  Say Mr. Okpo,

14   O-k-p-o.

15           THE REPORTER:  Thank you.

16           MS. GJOVIK:  Sorry.  You're welcome.

17           So Mr. Okpo reaching out to me on September

18   3rd and September 7th, what appeared to be under the

19   pretext of giving me an update on my concerns, but

20   then come to find out that was after Apple started

21   investigating me.

22           So I'll definitely be interested in any kind

23   of documentation around what he was attempting to do.

24   My assumption was something negative against me while

25   pretending to be addressing my concerns.  So I'm

1    interested in any documentation around that.

2         And then of course, the events leading up to

3    the outreach from -- I can't say his last name -- the

4    workplace violence investigator, Cragaminov something,

5    just the workplace violence.

6         The, you know, the events leading up to that.

7    The decision behind it, who made the decision, when

8    they made the decision.

9         And then also for pretext, of course, I'll be

10   very interested in any documentation around the things

11   I heard that were occurring as soon as I was put on

12   leave, including all the staff meetings where they

13   talked about "the Ashley issue."

14        Dan West apparently going around -- D-a-n

15   W-e-s-t, supervisor Dan West -- saying he's planning

16   on talking about "the Ashley issue" at the October

17   all-hands, which is when I knew I was never coming

18   back in my opinion.  And other communication that was

19   happening very early on in that period.

20        And also for -- I assume Apple is sticking

21   with their original defense.  And if so, rebutting, of

22   course, the failure to cooperate.  We're arguing I was

23   trying to cooperate and there's ample precedent of

24   requesting written communications in situations such

25   as that.

1          But then also pointing out the Gobbler stuff

2   is not only protected, but other employees had already

3   spoken out in more detail and were not disciplined,

4   were promoted.  Same thing for the ear thing.  That

5   was already public.

6          So pointing out that that clearly wasn't --

7   you know, would have been fired anyways.

8          I think that's pretty much my summary.

9          THE REPORTER:  I'm sorry.  The "ear thing"?

10  E-a-r, thing?

11         MS. GJOVIK:  The ear thing, e-a-r.  Yeah,

12  Apple wanted to scan my ear canals and kept asking.

13  And I said please stop.  And they said we fired you

14  because you told people we wanted to scan your ear

15  canals.

16         And I said, "That's weird."

17         THE REPORTER:  And one more thing.  The

18  "Gobbler stuff"?

19         MS. GJOVIK:  So Gobbler, G-o-b-b-l-e-r.  Face

20  Gobbler.  It was an app that was taking pictures and

21  biometrics of faces whenever they were in front of an

22  iPhone camera.

23         And I complained about it and put pictures it

24  took of me without me like triggering it in my home

25  and complained about it.  And Apple said that was

1  secret, too.

2  MS. RIECHERT:  Okay.  That sounds like that's

3  pretty thorough.  We, of course -- our defenses are

4  set forth in the decision of the investigator that

5  you're appealing from, so I think you pretty much

6  understand what our defenses are.

7  And with respect to your request to amend, we

8  would -- you know, I'm still looking into the e-mail

9  that you sent this morning, which I haven't had a full

10 chance to review yet, but we do think that you should

11 not be allowed to amend because it's barred by the

12 statute of limitations.

13 And you know, our belief that this case is

14 all about -- is retaliation.  Was there a basis -- you

15 know, did the company retaliate, did the company fire

16 you because it retaliated against you because of your

17 complaints.

18 That's the only issue that we see is the

19 issue in the case.

20 MS. GJOVIK:  Okay.  So I encourage you to

21 look at the e-mails I sent and hopefully get back to

22 me soon.  I'm planning on filing it tomorrow.  For now

23 I'll put opposed, unless I hear otherwise.

24 But the precedence is extremely clear on

25 these cases once they're referred to the Office of

1   Administrative Law judges, that the statute of

2   limitations applies to the adverse employment actions,

3   not the motive.

4          So there is a ton of precedent of people

5   adding additional claims later, especially when

6   there's new knowledge of a new motive they weren't

7   aware of at that time, sometimes during discovery and

8   later.

9          So there's no statute of limitations of the

10  protected activity.  You know, employers always will

11  argue, you know, maybe it's too much temporal

12  proximity, or something like that.  But ample

13  precedent of adding it on and allowing an

14  investigation during the OALJ proceedings.

15          MS. RIECHERT:  So do you have any questions

16  about what our defenses are or the positions that

17  we're taking?

18          As I say, I think they are pretty clear from

19  the decision below and with respect to the statute of

20  limitations, and that the new claims are under -- that

21  you're trying to raise, we don't believe it's

22  appropriate to raise those new claims at this stage

23  and it would be barred by the statute of limitations.

24          MS. GJOVIK:  You're saying that for the Clean

25  Air Act and the RCRA?

1        MS. RIECHERT:  Yes.  And also, you know, we

2   also claim that you had an obligation to exhaust your

3   administrative remedies and that you did not timely

4   exhaust your administrative remedies under these new

5   claims you're trying to add.

6        MS. GJOVIK:  Tell me more about that.

7        MS. RIECHERT:  Yeah.  So you're supposed to

8   file a claim, I think it's within 30 days of learning

9   of the basis for the retaliation.  And we believe that

10  you knew that in February of 2023 and you didn't file

11  a claim within 30 days.

12        So that's one of the defenses asserted.

13        MS. GJOVIK:  You're welcome to whatever

14  defenses you would like to, but again, I'm going to

15  encourage you to go read some of the notes I sent you.

16  The statute of limitations has nothing to do with

17  motive, other than retaliation.

18        So once you're aware of an adverse employment

19  action, that's when you file.  It doesn't matter the

20  reasons why, other than you thought it was

21  retaliation.  You can figure out the rest later.

22        Sometimes people just have like a feeling it

23  was retaliation.  They go through discovery, they find

24  out, oh, it was a bunch -- so you're welcome to argue

25  it.  I don't think it will be successful.

1          I do have a lot of questions about Apple's

2    defense, actually.

3          Would you mind walking me through, like I

4    just did with my claims, to walk me through Apple's

5    plan on the defense.

6          MS. RIECHERT:  Yeah, I mean, I think as I

7    said, I don't want to repeat everything that was said

8    in the Judge's order below.

9          But if you want to know what our defenses

10   are, we agree with the decision of the Administrative

11   Law Judge below -- yeah, of the investigator, excuse

12   me, below, that for all the reasons that he denied

13   your claim, those are our defenses to the claim.  So

14   the claims that you had asserted before OSHA that we

15   knew about.

16          And then we have additional defenses to the

17   potential new claims, including the lack of exhaustion

18   and the statute of limitations.

19          MS. GJOVIK:  Okay.  I'm going to ask again,

20   one more time, if you wouldn't mind -- I mean, the

21   determination from OSHA now is moot and completely

22   irrelevant in the Office of Administrative Law Judge

23   case.

24          The decision was also very brief and

25   confusing and you probably read my response.  So I was

1   transparent with you and I walked you through an

2   overview of my claims.

3           I would appreciate it if you could please

4   walk me through your claims, not just saying "whatever

5   the investigator said."

6           MS. RIECHERT:  Yeah, but that is our claim,

7   right?

8           So if you want to know what our claims are,

9   just read the investigator's opinion.  That's a

10  summary of our claims.  It doesn't -- we only have

11  half an hour today and it doesn't seem fruitful for us

12  to -- for me to just read through what the

13  investigator said.

14          MS. GJOVIK:  So the rules in, you know,

15  reference to the Judge's order was for us to meet and

16  confer and discuss our claims and defenses.

17          Because that decision is irrelevant here, I

18  feel like you have not yet walked me through your

19  defenses for my CERCLA claim.

20          MS. RIECHERT:  Right.  But the point is, our

21  defenses are what's in the order below.  I realize

22  this is a de novo hearing, but you can just look at

23  what the investigator below found.  That's what our

24  defenses are.

25          Why do you need me to read the opinion of the

1  investigator below to tell you what our defenses are?

2  That doesn't seem like it would be a fruitful use

3  of --

4           MS. GJOVIK:  I'm asking you on behalf of

5  Apple to meet and confer with me and explain to me

6  Apple's defense plans related to this case, which so

7  far has just been "Go look at that order," which I'm

8  going to say just one more time, I don't think that's

9  sufficient.

10          I would appreciate a good-faith effort to

11  just -- you don't have to go as thorough as I did, but

12  at least summarize, I would appreciate.

13          MS. RIECHERT:  Yes.  Well, obviously, one of

14  the defenses is that you -- that was not the reasons

15  that you were fired from your job, the fact that you'd

16  made complaints.

17          And as you've said in your claim, the reasons

18  you were fired is for disclosing confidential

19  information that was, we believe, was confidential and

20  that you had no right to disclose and you did

21  disclose.

22          And so the primary defense of the claim is

23  that you were not in fact retaliated against for

24  filing your letters with the EPA about the cracked

25  slab.

Meet and Confer

1      MS. GJOVIK:  Is Apple going to acknowledge or
2  reference or say anything about the EPA inspection in
3  the --
4      MS. RIECHERT:  The issue in the case is
5  whether you were retaliated against.  So what action
6  did Apple take against you and why did it take those
7  actions.  That's what the issue is in a retaliation
8  case.
9      You know, did you make a complaint?  Were you
10  terminated?  Was there a connection between the two?
11  Would you have been terminated anyway?
12      And then, of course, the other reason that we
13  said you were terminated is for failure to cooperate
14  in the investigation.  And I know you covered that in
15  your discussion as well.  You think you did cooperate
16  and we think you didn't cooperate.
17      So those are really the two primary defenses
18  that we have to the claim, to why you were let go.
19  And again, I don't want to repeat everything that was
20  in the order below from the investigator.
21      MS. GJOVIK:  Okay.  So it sounds like you are
22  saying to me, "We would have fired her anyways," but
23  not addressing any of the prima facie elements,
24  including the protected activity.
25      And I'm aware of how retaliation claims work.

1  And this is a -- you know, we have discovery.  We can

2  do depositions.  We get to really dig into this stuff.

3          And these are topics I'm going to be

4  interested in.  I'm kind of just interested, you know,

5  what is Apple's stance, if Apple knows, or am I

6  basically going to be asking these questions and

7  presenting to the ALJ during the hearing and Apple's

8  just going to sit there and say, "This is irrelevant.

9  We refuse to answer," because that's what I'm getting

10 from your answer right now?

11         MS. RIECHERT:  No.  I'm not -- you shouldn't

12 be getting that from my answer.

13         I agree that the question is, did you engage

14 in protected activity under CERCLA?  And we either

15 will agree on that or we won't agree on that.

16         But that is one of the issues:  Did you

17 engage in protected activity?

18         And then the second issue is:  Were you

19 terminated?  And the answer to that is yes, so we're

20 not -- don't need to dispute that issue.

21         And then were you terminated because you

22 engaged in protected activity?

23         And we say no, that's not why you were

24 terminated.  You were terminated for revealing

25 confidential information and for not cooperating in

1   the investigation.

2           And then the question is, you know, even

3   though you engaged in protected activity, would you

4   have been terminated anyway, even though you didn't --

5   you had engaged in protected activity?

6           So those we see are the legal issues or

7   the -- maybe legal and factual issues in the case.

8           Did you engage in protected activity?  Was

9   adverse action taken in the sense that you were

10  terminated?  And then, were you terminated because you

11  engaged in protected activity?

12          Or were there other reasons --

13          MS. GJOVIK:  I'm sorry.  The inspection I

14  think is absolutely key to two prongs of that test,

15  which is protected activity, and then the next is in

16  causation.

17          As you must be aware, the timing is

18  incredibly suspect of when I was removed from the

19  workplace shortly after Apple was notified of the

20  inspection.  All of the EHS work that occurred

21  immediately after, starting the day I was removed.

22  And the EPA coming in and inspecting, making note of

23  freshly sealed cracks and citing a number of issues.

24          And then despite my direct inquiries as to

25  what the status of the office was, never ever being

1   told that there was any kind of inspection and only

2   found out myself through FOIA to EPA.

3        So I think that is just like drenched in

4   pretext, in my opinion.  And I will be leaning heavily

5   into that for the causation argument.

6        I'm interested if Apple has any kind of

7   defense related to that at all?  And then especially

8   why it was omitted from the messages to OSHA during

9   that investigation.

10        Even, I'm going to argue, misleading

11  statements were made to make it sound like the EPA was

12  just gone after, like, June.  And there was nothing

13  else.  There were no issues.

14        When in fact, EPA said, "We're going to do

15  a -- you know, a federal inspection based on actual

16  disclosures.  We're going to be there."

17        So it's very contrary to the position

18  statement that was filed, which is also, again,

19  another example of pretext.

20        MS. RIECHERT:  Right.  But the issue is, did

21  you make a complaint and was that complaint the reason

22  that you were let go?

23        And so we will either admit that you made the

24  complaint or not, and then that's just a factual

25  issue.  Did you make a complaint?  Was that the reason

1  you were let go?

2        And so if you are saying the complaint you

3  made is the one you made to the EPA, then we can just

4  take that as your fact.  And then we will show why you

5  were let go and that whether you made a complaint to

6  the EPA or not was not the reason.

7        So it's a very simple -- as you said, I think

8  during the hearing with the Judge, it's a really

9  simple issue.  It's a really simple case.  And as I

10 think you said, it would just take less than a week or

11 a week to five days to get it tried.  And we agree.

12 It's a very simple case.

13       MS. GJOVIK:  Okay.  So I'm just going to be

14 clear.  Based on the things you're telling me now, and

15 based on the prior initial disclosures, if Apple later

16 decides they want to add some brand-new defense or

17 witness, I'm going to argue it should have been in the

18 initial disclosures and try to fight the introduction

19 of that evidence, the introduction of that witness.

20       Because the position I've been given right

21 now, which you're assuring me is in good faith and

22 what you plan to do, to me sounds unfeasible for an

23 actual -- so we can put a pin in that.

24       We do have a few more things to talk about.

25       So the motion -- yeah, it sounds like you are

1   set.  You're going to oppose my motion, so I will note

2   "Opposed."

3           MS. RIECHERT:  Just to be clear, I just got

4   your e-mail this morning.  I haven't reviewed it in

5   detail and all the authorities that you cited in it.

6           But we've -- and I understand you're going to

7   file your motion tomorrow.  So if we agree to your

8   motion, we'll let you know by tomorrow.  And if not,

9   you should go ahead and file your motion.

10          MS. GJOVIK:  Okay.  I will plan to file at

11  5:00 p.m. Eastern Standard Time tomorrow if I don't

12  hear from you earlier, if that works for you.

13          MS. RIECHERT:  Okay.

14          MS. GJOVIK:  And then for your motion to

15  dismiss, I also sent a note at the end of that e-mail

16  just reminding, the statutory language is very clear

17  that the CERCLA statute covers all employees and all

18  employers for any proceeding.

19          And the only carve-out you can see when you

20  look at the desk aid and the additional OSHA materials

21  is sometimes public employees do not have coverage

22  depending on it, but it specifically says "all private

23  employers."

24          So I'm arguing -- or I'm interested what

25  Apple's argument is as to why CERCLA does not apply to

**Meet and Confer**

1  them.

2          MS. RIECHERT:  Yeah, so we just disagree with

3  your contention that it applies to all employers and

4  all employees.

5          So I think that you'll see that our position

6  is set forth in our motion to dismiss where we're

7  going to detail all of that.

8          MS. GJOVIK:  Okay.  Again, not very

9  straightforward or transparent on that.  But assume,

10 unless you give me more information that is

11 compelling, that I also oppose that.  So we oppose and

12 oppose.

13         And then the next step will be discovery

14 plan.  Per the rules, discovery is going to start

15 after this call.  And there's definitely a lot of

16 stuff I want to request, but I'm also very familiar

17 with the way Apple sometimes handles discovery in

18 litigation.  So I want to work with Apple on this one.

19         I think it might be best if I start with some

20 very targeted requests, you know, stuff that should

21 not be confidential.  Should not be complicated.  It's

22 probably already on-hand, instead of some kind of

23 broad request.

24         And then from those items, I'm planning on,

25 you know, requesting specific things off of them,

1  depending on how relative they are, how relevant, all

2  of that.

3          Does Apple have any position on their

4  preferred way?

5          Would they prefer a big bulk request  or

6  would you be appreciative if I try to be kind of

7  strategic so there's less burden?

8          MS. RIECHERT:  We will definitely be

9  appreciative if you're strategic.  Just because,

10  obviously, discovery has to be focused on the issues

11  in this case, which is we have already gone through --

12  you've gone through them.  We've gone through them.

13  So we know what the issues in the case are.

14          And so it needs to be super targeted on, did

15  you make a complaint and is that why you were fired.

16          And so as long as you can target those

17  particular issues, we will look at the discovery that

18  you send and we'll respond appropriately.

19          So you're talking about document requests,

20  are you?

21          MS. GJOVIK:  Yes.  For initial -- I would

22  like to delay my request for depositions until I have

23  a better idea of the evidence through discovery.

24          Again, to be thoughtful of people's time and

25  strategic.

1    MS. RIECHERT:  So we think that it's better

2  that we know what the issues in the case are going to

3  be before we do any of this discovery.

4         So for example, if our motion to dismiss is

5  granted, there's no need for discovery.

6         If your motion to amend is granted, then the

7  topics of the discovery will be much broader than they

8  would be if it's just the claims that were brought

9  before the investigator.

10        So it seems to make sense to us that we delay

11 until we get the issues in the case resolved before

12 doing discovery.

13        Does that make sense to you?

14        MS. GJOVIK:  I understand what you're saying,

15 but I do not agree.

16        You know, if we add Clean Air Act and RCRA,

17 we're adding a whole other facility, a different

18 timeframe in addition to the current one.  And my

19 argument is it was all together.  All that retaliation

20 was about all three of them.

21        So anything related to that investigation

22 they were supposedly doing into my concern, any

23 investigation into me.  Any of the weird

24 communications going on with legal and EHS and all

25 those folks, like all of that, I expect to cover all

1  the categories.

2        Once the -- if my amendment or request is

3  granted, I expect to have additional targeted

4  questions specific to that facility that might not

5  have been included in the Superfund request, probably

6  stuff that occurred before the Superfund stuff started

7  going.

8        I also expect, again, for your motion to

9  dismiss to be denied.  You could also -- as he

10  mentioned, the Judge mentioned, you can file that

11  motion at any time.

12        So basically, that would just be saying no

13  discovery at all because we might feel like filing --

14  you know, there's lots of things you could do, and I

15  don't want to pause discovery for that.

16        I've been waiting a very long time for this

17  to finally get going.  I'm very excited to get going.

18  And as I mentioned, I want to act in good faith and

19  try to keep things strategic and work with Apple on

20  this one.  So I'm excited to get going.

21        MS. RIECHERT:  Right.  But if the motion to

22  dismiss is granted -- and I know you don't think it

23  will be and we think it will be -- then there will be

24  no need for any discovery.

25        And so why does each side waste time on

1  discovery on something that may never need to happen?

2          MS. GJOVIK:  There is zero legal precedent

3  for your argument for the motion to be dismissed.

4          MS. RIECHERT:  And I totally disagree.

5          MS. GJOVIK:  I'm very confident that it will

6  not be granted.

7          MS. RIECHERT:  Right.  But we're confident

8  that it will be granted.  So the Judge will decide

9  which of our confidences is best placed.

10          But there's no point in spending time on

11  discovery when, if we're right, the motion is granted,

12  and then there would be no need for discovery.

13          MS. GJOVIK:  Again, you could say a lot to

14  drag it out and drag this whole process out.  I think,

15  you know, to stick to our schedule and ensure we're

16  ready for the hearing and trial, starting discovery

17  early, there's no real, you know, harm.

18          I assume, again, if I'm doing very strategic

19  small things, this is stuff that's probably already

20  on-hand.  It's probably already applicable to other

21  cases anyways.  It doesn't seem like a huge burden.

22          And just pausing the basic procedures within

23  the case at any time Apple thinks it wants to file

24  some motion would be incredibly disruptive.

25          So I'm okay, again, like not doing any kind

 1  of broad, big request anyways at the beginning.  So

 2  I'm going to hold adamant that we stick to the

 3  schedule and the rules as published and start our

 4  discovery right away.

 5          MS. RIECHERT:  Okay.  Well, our time is up

 6  and both of us have other things to talk about.

 7          Do you think we've covered the things we need

 8  to do?  It seems like we covered the things in the

 9  Rule 26(f) report.  And we'll disagree on discovery.

10  And we disagree so far on the motion to amend.

11          And we'll just let the Judges decide

12  unless -- I'll let you know by tomorrow whether we've

13  changed our mind on your motions.

14          MS. GJOVIK:  Okay.  You said we have more

15  things to talk about?  Did you mean you and me or --

16          MS. RIECHERT:  No, I think we covered all the

17  things in the 26(f) report, is what I'm saying.

18          MS. GJOVIK:  Okay.  So with you disagreeing

19  on discovery, I believe, if you want to pause it, you

20  need to file a motion.  Are you planning on filing a

21  motion on that?

22          MS. RIECHERT:  I don't know.  We'll have to

23  decide that.  That's what -- that's the point of our

24  call today, was to find out if that was going to be an

25  issue or not.  And it sounds like it is going to be an

1  issue.

2          And so then we'll have to decide what we want

3  to do about it.

4          MS. GJOVIK:  Okay.  And again, I want to work

5  cooperatively with Apple on discovery.  I know they

6  can get kind of contested.  And, you know, I want --

7  there's information I need.  So if there's feedback

8  about how to do the narrow request and what kind of

9  formatting.

10         Oh, and then is Apple going to request any

11  discovery from me?  I didn't see anything listed that

12  seemed like it would be relevant.

13         MS. RIECHERT:  Well, at this time I don't --

14         MS. MANTOAN:  I'm sorry.  This is --

15  (inaudible).

16         THE REPORTER:  I'm sorry, I can't hear you.

17         (Inaudible)

18         MS. RIECHERT:  I'm late for my call, but we

19  haven't decided because we don't think there should be

20  any discovery until after the issues are decided.

21         So I don't have any discovery planned right

22  now.  But obviously, we'll look at your discovery and

23  then we'll make a decision on what to do about it.

24         MS. GJOVIK:  All right.  Sounds good.  We

25  should probably have a follow-up call after the

1  motions, assuming nothing is kicked out.  I don't

2  think it will be.

3          Thank you for the talk today.

4          MS. RIECHERT:  Thanks a lot.  Bye.

5

6     (Whereupon, the proceedings adjourned at 11:03 a.m.)

7

8                      --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Meet and Confer**

1

2

3             CERTIFICATE OF REPORTER

4

5     I, ANGELA T. KOTT, a Certified Shorthand

6  Reporter, hereby certify that the foregoing

7  proceedings were taken in shorthand by me, at the time

8  and place therein stated, and that the said

9  proceedings were thereafter reduced to typewriting, by

10 computer, under my direction and supervision;

11        I further certify that I am not of counsel or

12 attorney for either or any of the parties nor in any

13 way interested in the event of this cause, and that I

14 am not related to any of the parties thereto.

15

16        DATED:  April 2, 2024.

17

18

19

20        ANGELA T. KOTT, CSR #7811

21

22

23

24

25

# EXHIBIT D



**mwe.com**

Ronald Holland
Attorney at Law
rjholland@mwe.com
+1 628 218 3829

**DOCUMENT: PART OF SCARLETT'S EVIDENCE FOR DISTRICT COURT 22CIV01704KCX
SUBMITTED BY SCARLETT FEB 15 2022 AS EVIDENCE AGAINST GJOVIK
(UNKNOWN / UNCLEAR REASONING BY SCARLETT FOR INCLUDING)**

December 20, 2021

**VIA EMAIL**

Aleksandr L. Felstiner
Levy Ratner
80 Eight Avenue, Floor 8
New York, NY 10011
Email: afelstiner@levyratner.com

Re:    Cher Stewart Settlement – Breach

Dear Alek:

As we discussed last week, it is Apple's position that Ms. Stewart has breached the Confidential Settlement Agreement and General Release ("Settlement Agreement") reached between the parties in Case 32-CA-282396. As you are aware, Ms. Stewart indicated a desire to leave Apple and requested severance. Apple negotiated in good faith to facilitate her departure. Apple took Ms. Stewart at her word when entering into this Agreement, with no knowledge that she was upon execution already in breach of her commitments.

Prior to executing the Agreement, and unbeknownst to Apple at the time, Ms. Stewart had already disclosed draft provisions of the Agreement to Nia Impact Capital. Thus, Ms. Stewart breached the Agreement at the time of execution by having already improperly disclosed the parties' negotiations leading to the Agreement in violation of Paragraph 14. She also breached the Agreement at the time of execution by falsely warranting that she had not previously disclosed any of the Agreement terms, provisions or negotiations leading to the Agreement. Apple learned of Ms. Stewart's breach the day after she received the first settlement payment and notified you accordingly. Subsequently, Ms. Stewart publicly admitted to breaching the Agreement, as Reuters reported on November 25, 2021: "Scarlett, who left Apple last week, said she decided to go public with that information this week, in violation of the terms of her settlement with Apple." Since then, Ms. Stewart has continued to breach the Agreement, including, but not limited to, repeatedly disclosing the Agreement's terms, provisions, and amount of the settlement payments. Most recently, she again breached her agreement on December 14, 2021 when she commented on the amount of the settlement on Twitter. The above examples of breach are an illustrative list of Ms. Stewart's breaches and not intended to be exhaustive.



415 Mission St Suite 5600   San Francisco CA 94105-2616   Tel +1 628 218 3800   Fax +1 628 877 0107

*US practice conducted through McDermott Will & Emery LLP.*

DOCUMENT: PART OF SCARLETT'S EVIDENCE FOR DISTRICT COURT 22CIV01704KCX
SUBMITTED BY SCARLETT FEB 15 2022 AS EVIDENCE AGAINST GJOVIK
(UNKNOWN / UNCLEAR REASONING BY SCARLETT FOR INCLUDING)

Aleksandr L. Felstiner
December 20, 2021
Page 2

You are aware that the parties, through their respective counsel, mutually drafted Paragraph 4 of the Agreement (Timing of Settlement Payment), which expressly conditioned settlement payments on Ms. Stewart's continued compliance with the Agreement's terms and conditions and that any breach by Ms. Stewart would result in nonpayment by Apple. Given that Ms. Stewart breached the Agreement before any settlement payment was due, Apple was released of any obligation to make continued payments to Ms. Stewart or her attorneys. Notwithstanding Ms. Stewart's continuing breaches, the Agreement continues to be in effect and Apple is preserving its right to seek liquidated damages for each separate breach.

Sincerely,

*Ronald J Holland*

Ronald Holland

**McDermott
Will & Emery**

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32

**APPLE INC.**

    **and**

**CHER SCARLETT, an Individual**

Cases **32-CA-282396**
**32-CA-287038**
**32-CA-290101**

AMENDED CONSOLIDATED
COMPLAINT AND NOTICE OF HEARING

On October 30, 2024 an Order Consolidating Cases, Consolidated Complaint and
Notice of Hearing issued in Cases 32-CA-282396, 32-CA-287038, 32-CA-290101, based on
charges filed by Cher Scarlett,[1] an Individual (Charging Party or Scarlett), alleging that
Apple, Inc. (Respondent), is engaged in unfair labor practices that violate the National Labor
Relations Act (the Act), 29 U.S.C. § 151, et seq.  This Amended Consolidated Complaint and
Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the
National Labor Relations Act (the Act), 29 U.S.C. § 151, et seq., and Sections 102.15 and
102.17 of the Board's Rules and Regulations, and alleges that Respondent has violated the
Act as described below.

1.

(a)      The charge in Case 32-CA-282396 was filed by Charging Party on September
1, 2021, and a copy was served on Respondent by U.S. mail on September 2, 2021.

(b)      The charge in Case 32-CA-287038 was filed by Charging Party on November
22, 2021, and a copy was served on Respondent by U.S. mail on December 2, 2021.

---

[1] Cases 32-CA-282396 and 32-CA-287038 were filed under a former name of the Charging Party and
therefore is corrected herein.

(c)     The charge in case 32-CA-290101 was filed by Charging Party on February 4, 2022, and a copy was served on Respondent by U.S. mail on February 4, 2022.

## 2.

(a)     At all material times, Respondent has been a California corporation with its headquarters located in Cupertino, California (Respondent's facility), and retail facilities located throughout the United States, and is engaged in the development, manufacture, and retail sale of consumer electronics and software and provision of customer service and support for those electronics and software.

(b)     In conducting its operations during the 12-month period ending May 31, 2022, a representative period, Respondent, in conducting its operations described above in paragraph 2(a), derived gross revenues in excess of $500,000.

(c)     During the time period described above in paragraph 2(b), Respondent, in conducting its operations described above in paragraph 2(a), purchased and received at its Cupertino, California facility products, goods, and materials valued in excess of $5,000 directly from points outside the State of California.

## 3.

At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

## 4.

At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

2

| | | |
|---|---|---|
| Tim Cook | — | Chief Executive Officer |
| Deirdre O'Brien | — | Senior Vice President |
| Jeannie Wong | — | Manager |
| Ali Stapleton | — | Manager/Slack Administrator |
| Mark Miller | — | Manager |
| Vu Vo | — | Director of Design for Manufacturing |
| Peter Mitchell | — | Manager |
| Meg Richardson | — | Manager |
| Michael Rennaker | — | Manager |

## RESPONDENT VIOLATES SECTION 8(a)(1) OF THE ACT BY MAINTENAINING AN OVERBROAD RULE

**5.**

Since at least May 22, 2021, Respondent has maintained a policy titled, "Sales Incentive Compensation Plan ("SICP")," which outlines financial incentives for reaching specific sales goals and states, *inter alia*:

(a)     in the footer of each page: "Apple Proprietary and Confidential;" and

(b)     under the section heading "Other Provisions," "Apple considers this Plan to be confidential and proprietary information."

**RESPONDENT VIOLATES SECTION 8(a)(1) OF THE ACT BY SELECTIVELY AND DISPARATELY ENFORCING ITS SLACK[2] TERMS OF USE POLICY TO INTERFERE WITH PAY EQUITY DISCUSSIONS**

**6.**

(a)    Since at least June 2, 2021, Respondent has maintained a policy titled, "Terms of Use" (TOU) that governs employees' use of Slack, which states, *inter alia*:

(i)    "Slack is a collaboration and productivity tool provided to [Respondent] users to conduct [Respondent] business. Slack channels are created for the sole purpose of advancing the work, deliverables, or mission of [Respondent] departments and teams."

(ii)    Under the heading "Channel Use," the TOU further states: "Slack channels for approved [Respondent] Employee clubs and Diversity Network Associations (DNAs) are permitted. Slack channels for activities and hobbies not recognized as [Respondent] Employee clubs or DNAs aren't permitted and shouldn't be created."

(b)    About August 31, 2021, Respondent, through Slack Administrator Ali Stapleton, via Slack, enforced its TOU selectively and disparately by denying an employee request to create a Slack channel called #community-pay-equity, stating that Slack was to be used for business purposes only, while permitting other employees to use Slack for non-business purposes.

---

[2]Slack is a business communication platform that allows individuals within a company to collaborate in an organized manner via a virtual "workspace." Within a workspace, Slack organizes conversations into dedicated spaces called "channels."

**RESPONDENT VIOLATES SECTION 8(a)(1) OF THE ACT BY INTERFERING WITH EMPLOYEES' SECTION 7 ACTIVITIES BY PROHIBITING WAGE SURVEYS AND OTHER PROTECTED ACTIVITES AND BY CREATING AN IMPRESSION OF SURVEILLANCE OF EMPLOYEES' SECTION 7 ACTIVITIES**

**7.**

(a)     About March 2021, Respondent, by Manager Vu Vo, over a video call, threatened an employee with unspecified reprisals if the employee discussed a performance bonus that the employee had received.

(b)     Respondent, through Manager Peter Mitchell:

(i)     About May 12, 2021, told an employee not to speak to the press after the employee communicated on social media about the employee's workplace concerns and after the employee was quoted in the press about those workplace concerns.

(ii)     About May 13, 2021, told the employee that the employee must notify him (Mitchell) in advance if the employee wishes to speak to the press.

(iii)     About July 1, 2021, told an employee that he was upset that the employee had not told him in advance that the employee would be talking to the press about employees' working conditions, including a group concern about remote work.

(c)     About July 19, 2021, Respondent, through Employee Relations Representative Meg Richardson:

(i)     told an employee to remove the employee's Tweet regarding how to request continued remote work arrangements at Respondent's facility; and

(ii)     sought the names of other employees that the employee had spoken with concerning remote work.

(d)     About August 10, 2021, Respondent, by Manager Mark Miller, in a telephone call to an employee:

5

(i)       created an impression of surveillance saying that he (Miller) and others in Respondent's senior leadership had seen the employee's posts about pay equity on Slack and that Respondent was monitoring those discussions;

(ii)      told the employee not to participate in the wage and pay discussions on Slack or fill out the online wage survey that Scarlett had posted; and

(iii)     impliedly threatened the employee with unspecified reprisals if the employee continued to participate in discussions about wages on Slack or participate in Scarlett's online pay equity survey.

(e)     About August 15, 2021, Respondent, by Manager Michael Rennaker, in a telephone call, told an employee that Respondent did not want employees talking about wages and/or pay equity issues.

(f)     In emails dated August 24, 25, and 30, 2021, Respondent, by Manager Jeannie Wong, refused to meet with employees collectively about their concerns regarding compensation and group concerns regarding data revealed by employee wage surveys and insisted on meeting with employees in individual meetings.

(g)     About August 26, 2021, Respondent, by Manager Jeannie Wong, in a WebEx video conference meeting:

(i)       interrogated an employee about why and how the employee got involved with Scarlett's pay equity survey and who else was involved; and

(ii)      impliedly threatened the employee with unspecified reprisals by warning the employee that Slack was intended for Respondent's business use only and that the employee should be careful with what the employee shared over Slack.

6

(h)     About August or September 2021, Respondent, by Manager Mark Miller, in a video call, impliedly threatened termination and/or other reprisals by telling an employee to track the hours the employee spent on the wage survey project and to engage in protected activities only outside of work hours, and specifically on weekends, in case Respondent tried to discipline or discharge the employee for a drop in performance.

(i)     About early-September 2021, Respondent, by Senior Vice President Deirdre O'Brien, in a video posted to Respondent's intranet, told employees to talk to their managers or HR/People Business Partner if they had concerns about their pay.

**RESPONDENT CONSTRUCTIVELY FIRES SCARLETT BY MAKING CONTINUED EMPLOYMENT CONTINGENT UPON HER CEASING HER SECTION 7 ACTIVITIES IN VIOLATION OF SECTION 8(a)(1) OF THE ACT**

**8.**

(a)     Since at least May 2021, and continuing to date, Scarlett engaged in concerted activities, with or on behalf of Respondent's other employees for the purposes of mutual aid and protection, by, among other things, engaging in the following conduct:

(i)     Scarlett Tweeted, spoke to media reporters, and engaged in Slack discussions about workplace issues including, but not limited to, pay equity and Respondent's remote work policy.

(ii)     Scarlett participated in a conversation thread in Respondent's Slack channel called "Women in Software Engineering," where other employees were discussing concerns about sexism and gender discrimination in the workplace.

(iii)    In about the summer of 2021, Scarlett helped found the "Apple Too" movement, an effort modeled after the "Me Too" movement,[3] to encourage her fellow employees to share stories and create transparency around incidents of discrimination, inequity, racism, and sexism they experienced in the course of their employment with Respondent.

(iv)    About August 4, 2021, Scarlett participated in an online pay survey that a fellow employee of Respondent had created.

(v)    About August 7, 2021, Scarlett created and posted an online pay equity survey where Respondent's employees could anonymously share information about their wages, job levels, years of experience, and personal demographics in order to identify potential pay disparities, and then posted the wage survey on her personal Twitter[4] account, where some of Respondent's employees followed her.

(vi)    About August 7, 2021, Scarlett posted a link to the pay equity survey in one of Respondent's Slack channels, #talk-benefits, that some of Respondent's employees had previously attempted to use to discuss pay equity issues and conduct wage surveys.

(vii)    About August 24, 2021, Scarlett and other Respondent employees requested a group meeting with Respondent's management to share group concerns regarding data revealed by the wage surveys.

(viii)    About August 26, 2021, Scarlett and other employees showed Respondent's HR Representative Jeannie Wong a presentation regarding the wage survey's

---

[3] The "Me Too" movement is an awareness campaign centered on addressing sexual harassment and sexual abuse of women in the workplace that grew to prominence in the fall of 2017.
[4] "X", formerly "Twitter" (2006–2023), is an online social media platform and microblogging service that distributes short messages of no more than 280 characters.

methodology and results and the group's finding that there was possible gender-based pay disparity in some of Respondent's departments.

      (b)     Since at least September 1, 2021, to about November 15, 2021, Respondent made it known that Respondent was conditioning continued employment of Scarlett on her abandoning Section 7 activities by:

           (i)     telling employees not to participate in Scarlett's online pay survey;

           (ii)     telling employees their participation in Scarlett's online pay survey was not condoned;

           (iii)     telling employees that participation in Scarlett's pay survey could lead to demotion and/or harm their careers and/or violate their employment agreements;

           (iv)     telling Scarlett's former legal representative that Respondent's executives were having a headache from Scarlett's Tweeting about them and therefore telling Scarlett to stop; and

           (v)     repeatedly telling Scarlett to take medical leave and offering her a severance agreement rather than addressing her requests for: a company-wide statement clarifying employees' right to discuss pay, to engage in protected concerted activities, to freely speak to the press about workplace issues, and to access Slack to discuss pay and workplace issues; and for a formal platform for Respondent to receive employee group concerns.

      (c)     By the conduct described above in paragraph 8(b), Respondent caused the termination of employee Scarlett.

(d)    Respondent engaged in the conduct described above in paragraphs 8(b) and (c) because Scarlett engaged in the conduct described above in paragraph 8(a), and to discourage employees from engaging in these or other protected concerted activities.

**9.**

By the conduct described above in paragraphs 5, 6, 7, and 8, Respondent has been interfering with, restraining and coercing employees in the exercise of their rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

**10.**

The unfair labor practices of Respondent described above affect commerce within the meaning of Sections 2(6) and (7) of the Act.

**REMEDIES**

**11.**

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraphs 5 through 8, the General Counsel seeks an Order requiring Respondent to: (1) physically and electronically post the Notice to Employees at all its facilities including, but not limited to, posting on Respondent-sponsored Slack communication channels, intranet portals, and by e-mail; (2) email a copy of the Notice to Employees to all its supervisors and managers; (3) physically and electronically post the Explanation of Employee Rights poster in the same manner as the posting of the Notice to Employees; (4) have a Board Agent conduct a training session for its managers and supervisors on their obligations under the Act, on work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director); and (5) have a Board Agent conduct a training session for its employees on their rights under the Act, on

10

work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director).

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraph 8 the General Counsel seeks an Order requiring Respondent to: (1) offer employee Scarlett reinstatement to her former job position or, if that job no longer exists, to a substantially equivalent position, without prejudice to Scarlett's seniority or any other rights or privileges previously enjoyed; (2) send a letter to Scarlett apologizing for constructively terminating her, expunge all Respondent's records of such termination, and inform her, in writing, that her termination has been expunged from Respondent's records and will not be used against her in any way; (3) make employee Scarlett whole for all losses incurred as a result of the unfair labor practices described above, including for all pecuniary losses incurred as a result of her unlawful termination; and (4) provide a neutral job reference to all prospective employers with the correct job titles and positions of employee Scarlett.

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraph 5 the General Counsel seeks an Order requiring Respondent to rescind the rules described in all their forms, or revise them in all their forms, to make clear to employees, in writing, that these rules do not interfere with employees' right to engage in Section 7 activities for mutual aid and protection; to rescind all disciplines or terminations issued to all employees pursuant to the unlawful rules; and to make all employees whole for losses incurred as a result of being suspended or terminated pursuant to the unlawful rules.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the Amended Consolidated Complaint. The answer must be **received by this office on or before November 14, 2024.**

An answer must be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a Complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely,

12

the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Amended Consolidated Complaint are true.

## **NOTICE OF HEARING**

**PLEASE TAKE NOTICE THAT** on June 24, 2025, at 9:00 a.m., at the Oakland Regional Office of the National Labor Relations Board located at 1301 Clay Street, Suite 1510N, Oakland, California 94612, at a conference room to be determined, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Amended Consolidated Complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

**DATED AT** Oakland, California this 31st day of October 2024.

Christy Kwon
Regional Director
National Labor Relations Board
Region 32
1301 Clay Street, Suite 1510N
Oakland, CA 94612-5224

Attachments

13

Form NLRB-4338
(2-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**

**NOTICE**

**Cases: 32-CA-282396**
**32-CA-287038**
**32-CA-290101**

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end. An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.

However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements **will not be granted** unless good and sufficient grounds are shown *and* the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds thereafter must be set forth in *detail;*

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request;

*and*

(5) Copies must be simultaneously served on all other parties (*listed below*), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Tim Cook, Chief Executive Officer
Apple, Inc.
One Apple Parkway
Cupertino, CA 95014
Email: tcook@apple.com
**SERVED VIA E-ISSUANCE**

Tim Cook, Chief Executive Officer
Apple, Inc.
One Infinite Loop
Cupertino, CA 95014
Email: tcook@apple.com
**SERVED VIA E-ISSUANCE**

Harry I. Johnson III, Attorney
Morgan, Lewis & Bockius LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Email: harry.johnson@morganlewis.com
**SERVED VIA E-ISSUANCE**

Brian J. Mahoney, Attorney
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Email: brian.mahoney@morganlewis.com
**SERVED VIA E-ISSUANCE**

Mark L. Stolzenburg, Attorney
Morgan, Lewis & Bockius, LLP
110 North Wacker Drive Suite 2800
Chicago, IL 60606
Email: mark.stolzenburg@morganlewis.com
**SERVED VIA E-ISSUANCE**

Kelcey J. Phillips, Attorney at Law
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Email: kelcey.phillips@morganlewis.com
**SERVED VIA E-ISSUANCE**

Julie McConnell Esq.
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001
Email: jmcconnell@mwe.com
**SERVED VIA E-ISSUANCE**

Laurie M. Burgess, Attorney
Burgess Law Offices PC
498 Utah Street
San Francisco, CA 94110
Email: lburgess@burgess-laborlaw.com
**SERVED VIA E-ISSUANCE**

Cher Scarlett
11115 Champagne Point Rd NE
Kirkland, WA 98034
Email: lburgess@burgess-laborlaw.com
**SERVED VIA E-ISSUANCE**

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD
## REGION 32

**APPLE INC.**

   **and**

**CHER SCARLETT, an Individual**

**Cases: 32-CA-282396**
**32-CA-287038**
**32-CA-290101**

**Date: October 31, 2024**

## AFFIDAVIT OF SERVICE OF AMENDED CONSOLIDATED COMPLAINT AND NOTICE OF HEARING

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Tim Cook, Chief Executive Officer
Apple Inc.
One Apple Parkway
Cupertino, CA 95014
Email: tcook@apple.com
**SERVED VIA E-ISSUANCE**

Tim Cook, Chief Executive Officer
Apple Inc.
One Infinite Loop
Cupertino, CA 95014
Email: tcook@apple.com
**SERVED VIA E-ISSUANCE**

Harry I. Johnson III, Attorney
Morgan, Lewis & Bockius LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Email: harry.johnson@morganlewis.com
**SERVED VIA E-ISSUANCE**

Brian J. Mahoney, Attorney
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Email: brian.mahoney@morganlewis.com
**SERVED VIA E-ISSUANCE**

Mark L. Stolzenburg, Attorney
Morgan, Lewis & Bockius, LLP
110 North Wacker Drive Suite 2800
Chicago, IL 60606
Email: mark.stolzenburg@morganlewis.com
**SERVED VIA E-ISSUANCE**

Kelcey J. Phillips, Attorney at Law
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Email: kelcey.phillips@morganlewis.com
**SERVED VIA E-ISSUANCE**

# Exhibit E

# RE: status

From: Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>

To:      Ashley Gjovik <ashleymgjovik@protonmail.com>

Date: Wednesday, January 19th, 2022 at 2:00 PM

Ashley,

Thank you for providing the three attachments. I also received the zip folder you sent.

Below are responses to your questions:

- A) Are you able to let me know if Apple has responded yet? And if so, are you able to share their response so I can respond to it if applicable/needed?

  Apple has requested an extension to submit their position statement and supporting documentation. Once I receive it, you'll be provided a copy. Then you will have an opportunity to do a rebuttal to respond to Apple's response. You'll have the option to provide a written rebuttal or we can do a rebuttal interview via phone.

- B) Am I able to request anything from Apple (or to you to request from Apple) as part of a discovery-type process?

  The OSHA investigation doesn't have a formal discovery process similar to court proceedings. Instead of directly requesting documents from Apple, you can send me a list of items you believe are pertinent to your complaint. It will be reviewed and a determination will made if the document(s) are necessary for the investigation.

  After your complaint has been pending with OSHA for more than 60 days, you have the option of requesting an Expedited Case Process (ECP). ECP allows you to request that OSHA terminate its investigation and issue a determination on your complaint. You will then receive a letter for your appeal rights which enables you to take your complaint directly to an Administrative Law Judge (ALJ). The ALJ procedure has a formal quasi-judicial setting which includes processes such as discovery. Please let me know if you're interested in ECP or would like more information about the process. Note this process is only applicable for your CERCLA and SOX complaints.

Regards,

**Andrea Diangco** (she/her)
Investigator
Whistleblower Protection Program
U.S. Department of Labor – OSHA

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Tuesday, January 18, 2022 1:54 AM
**To:** Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>
**Subject:** RE: status

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Hi,

Thank you!  Hope you had a nice long weekend.

I'm attaching:

- 1) CERCLA memo v2 (amended & expanded)
- 2) Retaliation & pretext memo v1
- 3) Timeline v5

I'm working on a remedies memo, but maybe it's too early for that.  I *think* that's it.  Please do let me know if you need anything else from me & I'll be right on it.

Questions:
- A) Are you able to let me know if Apple has responded yet? And if so, are you able to share their response so I can respond to it if applicable/needed?
- B) Am I able to request anything from Apple (or to you to request from Apple) as part of a discovery-type process?

Thank you!

—

**Ashley M. Gjøvik, B.S., PMP**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
Santa Clara University ACLU Club I&D Director & Environmental Law Society Outreach Chair
Human Rights & International Law Author: https://muckrack.com/ashleygjovik
ashleygjovik.com | +1`415-964-6272 (Signal.app please)

Sent with ProtonMail Secure Email.

Original Message
On Thursday, January 13th, 2022 at 8:58 AM, Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov> wrote:

> Thank you for the update. I also received your email regarding complaint of unsafe work conditions.
>
> **Andrea Diangco** (she/her)
> Investigator
> Whistleblower Protection Program
> U.S. Department of Labor – OSHA
>
> ────────────────────────────
> **From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
> **Sent:** Tuesday, January 11, 2022 8:06 PM
> **To:** Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>
> **Subject:** status
>
> > CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.
>
> I'm working on two things for you still.
>
> I'm writing up a memo on the retaliation campaign and pre-text for the termination.
>
> I'm also revising the CERLCA memo to note specific evidence and i'm extending to include events starting in Sept 2020 with Apple legal about another Superfund site that I think may have been relevant to all this.
>
> Law school started up again & I'm swamped, but my goal is to get you both these by next Monday.
>
> If you need anything else from me, please let me know!
>
> —
> **Ashley M. Gjøvik, B.S., PMP**

**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
Santa Clara University ACLU Club I&D Director & Environmental Law Society Outreach Chair
Human Rights & International Law Author: https://muckrack.com/ashleygjovik
ashleygjovik.com | +1`415-964-6272 (Signal.app please)


Sent with ProtonMail Secure Email.

# RE: status

From: Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>

To:     Ashley Gjovik <ashleymgjovik@protonmail.com>

Date: Monday, January 24th, 2022 at 3:51 PM

Apple is being represented by Orrick and their attorneys are Kathryn Manotoan and Jessica Perry.

Apple has requested an extension until February 9, 2022. Please keep in mind while there are timelines, investigations vary in length of time depending on the complexity of the case.

The information you have provided is being reviewed. I will follow up if there any questions regarding the information.

The investigation is still in the initial phase as OSHA is still waiting to receive Apple's position statement.

**Andrea Diangco** (she/her)
Investigator
Whistleblower Protection Program
U.S. Department of Labor – OSHA

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Wednesday, January 19, 2022 2:29 PM
**To:** Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>
**Subject:** RE: status

> CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Hi Andrea! Thank you!

If Apple uses the same position statement they used for the NLRB case, then my retaliation/pretext memo should cover most of their response, but I'll look forward to seeing their formal US DOL response and responding as needed.

Are you able to share which lawyer(s) are representing Apple for this?

Also I see there's a deadline for for investigations to complete. Are you able to share how long of an extension Apple asked for? And share if there's a point where the timer runs out and its default judgment if Apple's lawyers don't respond?

Thank you for the info on evidence and the ALJ process. I'll think through for evidence -- but I think I want to see the OSHA investigation process through, at least for now. I'm sure Apple will appeal to the ALJs anyways if you decide in my favor so we can save that for later.

Also can you please confirm that you / your team are reading through the memos I send to review and consider next to Apple's statements? Is there anything else I can do / provide to ensure OSHA WPP understand my position and the events? Will y'all send any follow up questions so i can answer/expand if needed?

Can you please also confirm the stage we're in? It sounds like i already met prima facie with evidence for all four statutes (i participated in protected activities under the three statutes, Apple did adverse actions to me, and there's enough evidence to infer causation that the adverse actions were due to the protected activities). if so, it sounds like Apple now needs to offer you some sort of non-discriminatory, legitimate reason(s) for all the adverse actions i noted and provide enough evidence to support that "legitimate" reason was the primary/only reason for the adverse actions

- yeah? My pretext memo tried to counter that already, showing their reason is pretext, and that contributing factor (SOX/CERCLA) & but for (OSHA) causation is met for the discriminatory factor leading to the adverse actions.

Hope all that makes sense. Thanks!

Thank you!

—
**Ashley M. Gjøvik, B.S., PMP**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
Santa Clara University ACLU Club I&D Director & Environmental Law Society Outreach Chair
ashleygjovik.com | +1`415-964-6272


Sent with [ProtonMail](#) Secure Email.



Original Message
On Wednesday, January 19th, 2022 at 2:00 PM, Diangco, Andrea - OSHA <[Diangco.Andrea@dol.gov](mailto:Diangco.Andrea@dol.gov)> wrote:

> Ashley,
>
> Thank you for providing the three attachments. I also received the zip folder you sent.
>
> Below are responses to your questions:
> - A) Are you able to let me know if Apple has responded yet? And if so, are you able to share their response so I can respond to it it if applicable/needed?
>   Apple has requested an extension to submit their position statement and supporting documentation. Once I receive it, you'll be provided a copy. Then you will have an opportunity to do a rebuttal to respond to Apple's response. You'll have the option to provide a written rebuttal or we can do a rebuttal interview via phone.
> - B) Am I able to request anything from Apple (or to you to request from Apple) as part of a discovery-type process?
>   The OSHA investigation doesn't have a formal discovery process similar to court proceedings. Instead of directly requesting documents from Apple, you can send me a list of items you believe are pertinent to your complaint. It will be reviewed and a determination will made if the document(s) are necessary for the investigation.
>
>   After your complaint has been pending with OSHA for more than 60 days, you have the option of requesting an Expedited Case Process (ECP). ECP allows you to request that OSHA terminate its investigation and issue a determination on your complaint. You will then receive a letter for your appeal rights which enables you to take your complaint directly to an Administrative Law Judge (ALJ). The ALJ procedure has a formal quasi-judicial setting which includes processes such as discovery. Please let me know if you're interested in ECP or would like more information about the process. Note this process is only applicable for your CERCLA and SOX complaints.
>
> Regards,
>
> **Andrea Diangco** (she/her)
> Investigator
> Whistleblower Protection Program
> U.S. Department of Labor – OSHA

**From:** Ashley M. Gjøvik <[ashleymgjovik@protonmail.com](mailto:ashleymgjovik@protonmail.com)>
**Sent:** Tuesday, January 18, 2022 1:54 AM
**To:** Diangco, Andrea - OSHA <[Diangco.Andrea@dol.gov](mailto:Diangco.Andrea@dol.gov)>
**Subject:** RE: status

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Hi,

Thank you!  Hope you had a nice long weekend.

I'm attaching:
- 1) CERCLA memo v2 (amended & expanded)
- 2) Retaliation & pretext memo v1
- 3) Timeline v5

I'm working on a remedies memo, but maybe it's too early for that.  I *think* that's it.  Please do let me know if you need anything else from me & I'll be right on it.

Questions:
- A) Are you able to let me know if Apple has responded yet? And if so, are you able to share their response so I can respond to it if applicable/needed?
- B) Am I able to request anything from Apple (or to you to request from Apple) as part of a discovery-type process?

Thank you!

—
**Ashley M. Gjøvik, B.S., PMP**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
Santa Clara University ACLU Club I&D Director & Environmental Law Society Outreach Chair
Human Rights & International Law Author: https://muckrack.com/ashleygjovik
ashleygjovik.com | +1`415-964-6272 (Signal.app please)

Sent with ProtonMail Secure Email.

Original Message
On Thursday, January 13th, 2022 at 8:58 AM, Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov> wrote:

Thank you for the update. I also received your email regarding complaint of unsafe work conditions.

**Andrea Diangco** (she/her)
Investigator
Whistleblower Protection Program
U.S. Department of Labor – OSHA

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Tuesday, January 11, 2022 8:06 PM
**To:** Diangco, Andrea - OSHA <Diangco.Andrea@dol.gov>
**Subject:** status

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

I'm working on two things for you still.

I'm writing up a memo on the retaliation campaign and pre-text for the termination.

I'm also revising the CERLCA memo to note specific evidence and i'm extending to include events starting in Sept 2020 with Apple legal about another Superfund site that I think may have been relevant to all this.

Law school started up again & I'm swamped, but my goal is to get you both these by next Monday.

If you need anything else from me, please let me know!

—
**Ashley M. Gjøvik, B.S., PMP**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
Santa Clara University ACLU Club I&D Director & Environmental Law Society Outreach Chair
Human Rights & International Law Author: https://muckrack.com/ashleygjovik
ashleygjovik.com | +1`415-964-6272 (Signal.app please)


Sent with ProtonMail Secure Email.

**U.S. Department of Labor**
<span style="color:blue">**Occupational Safety and Health Administration**
**San Francisco Federal Building**
**90 7th Street, Suite 2650**
**San Francisco, CA 94103**</span>



**Via UPS**
December 10, 2021

Human Resources/Legal Department
Apple Inc.
One Apple Park Way
Cupertino, CA 95014

Complainant(s): Ashley Gjovik
Respondent(s): Apple Inc.
Case Number: Apple Inc./Gjovik/9-3290-22-051
Law/Statute 1: Section 11(c) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. §660
Law/Statute 2: Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §9610
Law/Statute 3: Sarbanes-Oxley Act (SOX), 18 U.S.C.A. §1514A
Regulation 1: OSHA 11(c) Complaint Procedures: 29 CFR Part 1977
Regulation 2: EPA Complaint Procedures: 29 CFR Part 24
Regulation 3: SOX Complaint Procedures: 29 CFR Part 1980

Dear Sir/Madam:

This office has received a complaint filed by the above-named Complainant(s) against the above-named Respondent(s). The complaint alleges retaliatory employment practices in violation of the Law(s)/Statute(s) cited above. A copy of the complaint allegation is enclosed.

The Occupational Safety and Health Administration's Whistleblower Protection Program (WPP) is responsible for enforcing the anti-retaliation provisions of the law(s) cited above and will conduct its investigation following the procedures outlined in the regulation(s) cited above. You may obtain a copy of the law(s) and regulation(s) at: **_www.whistleblowers.gov_**. Upon request, a printed copy of these materials will be mailed to you.

You have the right to be represented in this matter. If you choose to have a lawyer or someone else represent you, please have that person complete and email to the investigator the enclosed Designation of Representative form.

WPP will send most, if not all, future correspondence by email - this includes final disposition letters that include time sensitive appeal rights.

**<u>WPP policy encourages the voluntary resolution of complaints. If you are interested in settlement discussions and/or Alternative Dispute Resolution (ADR), please contact the assigned investigator.</u>**

This letter will confirm that Respondent(s) are responsible for retaining and maintaining all records, documents, computer files, e-mail, correspondence, memoranda, reports, notes, tools, equipment, objects, photographs, videotapes, digital video, tape recordings, digital recordings, voicemails and

recordings of radio and telephone conversations, and telephone and cellular telephone records, and all other evidence relating to the above-captioned case. The failure of Respondent(s) to maintain and retain such materials may result in court-imposed sanctions. As a party responsible for preserving relevant evidence, you may wish to instruct all individuals with potentially relevant documentation to affirmatively preserve and retain such documentation. You also may wish to suspend any routine document retention/destruction policy that you may have, including email retention policies.

Please provide **within 20 days** a written account of the facts and a statement of your position with respect to the allegation that you have retaliated against Complainant in violation of the law. Please note that a full and complete initial response, supported by appropriate documentation, may help to achieve early resolution of this matter. Your cooperation is critical so that all facts of the case may be considered.

***Please send documents to WPP electronically, if possible, using the investigator's email address below and also send a copy to all named parties listed below:***

ASSIGNED INVESTIGATOR:                     COMPLAINANT(S):

(b) (7)(C)                                                    Ashley Gjovik

Whistleblower Protection Program

U.S. Department of Labor, OSHA

300 Fifth Avenue, Room 1280                       Santa Clara, CA 95050

Seattle, Washington 98104                            ashleymgjovik@protonmail.com

(b) (7)(C)

If the information provided contains personal, identifiable information about individuals other than Complainant, or business sensitive information, please remove this information before sending it to Complainant.

**Please be advised that any request of confidential or proprietary privilege in your submissions to WPP <u>must specifically identify</u> each such privilege for which protection from disclosure under the Freedom of Information Act (FOIA) is made.**

**<u>All communications and submissions should be made to the investigator, identified above.</u>**

Sincerely,

  Digitally signed by (b) (7)(C)
(b) (7)(C)
Date: 2021.12.10 09:46:55
-08'00'

For Ryan Himes

Assistant Regional Administrator

Enclosures:     (1) Designation of Representative Form
                       (2) Alternative Dispute Resolution FAQ
                       (3) Copy of Complaint Allegation

# Exhibit F

Form NLRB-4701
(1-03)

## NATIONAL LABOR RELATIONS BOARD

### NOTICE OF APPEARANCE

| | |
|---|---|
| APPLE, INC.<br><br>                    Employer.<br><br>          And<br><br>ASHLEY GJOVIK<br><br>                    Charging Party. | CASE NO. 32-CA-282142 |

☒   **REGIONAL DIRECTOR**          ☐   **EXECUTIVE SECRETARY**          ☐   **GENERAL COUNSEL**
      **Region 32**                                  **NATIONAL LABOR RELATIONS BOARD**          **NATIONAL LABOR RELATIONS BOARD**
      **1301 Clay Street, Room 300N**
      **Oakland, CA 94612-5211**

**THE UNDERSIGNED HEREBY ENTERS APPEARANCE AS REPRESENTATIVE APPLE, ICN. IN THE ABOVE-CAPTIONED MATTER.**

**CHECK THE APPROPRIATE BOX(ES) BELOW:**

☒      **REPRESENTATIVE IS AN ATTORNEY**

☒      **IF REPRESENTATIVE IS AN ATTORNEY, IN ORDER TO ENSURE THAT THE PARTY MAY RECEIVE COPIES OF CERTAIN DOCUMENTS OR CORRESPONDENCE FROM THE AGENCY IN ADDITION TO THOSE DESCRIBED BELOW, THIS BOX MUST BE CHECKED. IF THIS BOX IS NOT CHECKED, THE PARTY WILL RECEIVE ONLY COPIES OF CERTAIN DOCUMENTS SUCH AS CHARGES, PETITIONS AND FORMAL DOCUMENTS AS DESCRIBED IN SECTIONS 102.14 AND 102.113 OF THE BOARD'S RULES AND REGULATIONS.**

### *(REPRESENTATIVE INFORMATION)*

*NAME:*  Ronald J. Holland, Christopher Foster, Syed H. Mannan

*MAILING ADDRESS:*  415 Mission Street, Suite 5600, San Francisco, California 94105

*E-MAIL ADDRESS:* rjholland@mwe.com; cfoster@mwe.com; smannan@mwe.com

*OFFICE TELEPHONE NUMBER:*  628-218-3800

*CELL PHONE NUMBER:* 415-999-4833 (Holland)          *FAX:* 628-877-0107

*SIGNATURE:*  *Ronald J Holland*
                 *(Please sign in ink.)*

*DATE:*   **August 31, 2021**



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



| | |
|---|---|
| REGION 32 | Agency Website: www.nlrb.gov |
| 1301 Clay St Ste 300N | Telephone: (510)637-3300 |
| Oakland, CA 94612-5224 | Fax: (510)637-3315 |

Download
NLRB
Mobile App

August 30, 2021

Apple Inc.
One Apple Park Way
Cupertino  CA  95014

> Re:    Apple Inc.
>         Case 32-CA-282142

Dear Sir or Madam:

Enclosed is a copy of a charge that has been filed in this case.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Examiner ALEXANDER M. HAJDUK whose telephone number is (510)671-3024.  If this Board agent is not available, you may contact Supervisory Attorney CATHERINE VENTOLA whose telephone number is (510)671-3049.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent.  Sending us your written account of the facts and a statement of your position is not

Apple Inc.                                    - 2 -
Case 32-CA-282142

enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

We will not honor requests to limit our use of position statements or evidence. Specifically, any material you submit may be introduced as evidence at a hearing before an administrative law judge regardless of claims of confidentiality. However, certain evidence produced at a hearing may be protected from public disclosure by demonstrated claims of confidentiality.

Further, the Freedom of Information Act may require that we disclose position statements or evidence in closed cases upon request, unless an exemption applies, such as those protecting confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Correspondence:**  All documents submitted to the Region regarding your case MUST be filed through the Agency's website, www.nlrb.gov. This includes all formal pleadings, briefs, as well as affidavits, documentary evidence, and position statements. The Agency requests all evidence submitted electronically to be in the form it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).

If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge. If you cannot e-file your documents, you must provide a statement explaining why you do not have access to the means for filing electronically or why filing electronically would impose an undue burden.

Apple Inc.                                    - 3 -
Case 32-CA-282142

In addition, this Region will be issuing case-related correspondence and documents, including complaints, compliance specifications, dismissal letters, deferral letters, and withdrawal letters, electronically to the email address you provide. Please ensure that you receive important case-related correspondence, please ensure that the Board Agent assigned to your case has your preferred email address. These steps will ensure that you receive correspondence faster and at a significantly lower cost to the taxpayer. If there is some reason you are unable to receive correspondence via email, please contact the agent assigned to your case to discuss the circumstances that prevent you from using email.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request. *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

VALERIE HARDY-MAHONEY
Regional Director

Enclosures:
1. Copy of Charge
2. Commerce Questionnaire

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**APPLE INC.**

     Charged Party

       and

**ASHLEY MARIE GJOVIK**

     Charging Party

**Case 32-CA-282142**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on August 30, 2021**,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Apple Inc.
One Apple Park Way
Cupertino  CA  95014

| | |
|---|---|
| August 30, 2021 | Caroline Barker, Designated Agent of NLRB |
| Date | Name |
| | /s/  Caroline Barker |
| | Signature |

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case **32-CA-282142** | Date Filed **08/26/2021** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a. Name of Employer<br><br>Apple Inc. | b. Tel. No. (408) 996-1010 |
| | c. Cell No. |
| | f. Fax No. |
| d. Address *(Street, city, state, and ZIP code)*<br><br>One Apple Park Way<br>CA Cupertino 95014 | e. Employer Representative |
| | g. e-Mail |
| | h. Number of workers employed 200 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Computer Hardware | j. Identify principal product or service |
|---|---|

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 1 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)* | |
|---|---|
| Ashley Marie Gjovik          Title: | |

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>1050 Benton Street  #2310<br>CA Santa Clara 95050 | 4b. Tel. No. |
|---|---|
| | 4c Cell No |
| | 4d. Fax No. |
| | 4e. e-Mail  ashleygjovik@icloud.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No. |
|---|---|
| By *(signature of representative or person making charge)*     Ashley Marie Gjovik     Title: *(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | Fax No. |
| Address: Santa Clara CA 95050          08/26/2021 06:48:23 PM *(date)* | e-Mail  ashleygjovik@icloud.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

32-CA-282142    08/26/2021

**Basis of the Charge**

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, discussing wages, hours, or other terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Forced on paid admin leave | 08/04/2021 |
| Ashley Gjovik | Substantial increase in workload &unfavorable work | 07/15/2021 |
| Ashley Gjovik | Reduction of supervisory responsibilities | 05/06/2021 |
| Ashley Gjovik | Job reassignment | 05/06/2021 |
| Ashley Gjovik | employee feedback "warning" from manager | 03/22/2021 |
| Ashley Gjovik | Retaliatory, nonconsensual ER investigation | 04/09/2021 |
| Ashley Gjovik | Constructive term; fail to resolve hostile wk env | 04/29/2021 |
| Ashley Gjovik | ER shared my ID with sexual harasser w/out consent | 05/20/2021 |
| Ashley Gjovik | Manager insists I must return to unsafe work env | 06/21/2021 |
| Ashley Gjovik | Harassment from manager | 06/28/2021 |
| Ashley Gjovik | Forced 2 submit ADA request due to unsafe work env | 07/02/2021 |
| Ashley Gjovik | Manager refuses to consider remote work | 06/21/2021 |
| Ashley Gjovik | Withholding of work | 07/28/2021 |

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Forced on paid admin leave | 08/04/2021 |
| Ashley Gjovik | Substantial increase in workload &unfavorable work | 07/15/2021 |
| Ashley Gjovik | Reduction of supervisory responsibilities | 05/06/2021 |
| Ashley Gjovik | Job reassignment | 05/06/2021 |
| Ashley Gjovik | employee feedback "warning" from manager | 03/22/2021 |

32-CA-282142    08/26/2021

| Ashley Gjovik | Retaliatory, nonconsensual ER investigation | 04/09/2021 |
| Ashley Gjovik | Constructive term; fail to resolve hostile wk env | 04/29/2021 |
| Ashley Gjovik | ER shared my ID with sexual harasser w/out consent | 05/20/2021 |
| Ashley Gjovik | Manager insists I must return to unsafe work env | 06/21/2021 |
| Ashley Gjovik | Harassment from manager | 06/28/2021 |
| Ashley Gjovik | Forced 2 submit ADA request due to unsafe work env | 07/02/2021 |
| Ashley Gjovik | Manager refuses to consider remote work | 06/21/2021 |
| Ashley Gjovik | Withholding of work | 07/28/2021 |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prohibit employees from discussing wages, hours, or other terms or conditions of employment.

U.S. Department of Labor

Occupational Safety and Health Administration
San Francisco Federal Building
90 7th Street, Suite 2650
San Francisco, CA  94103



## DESIGNATION of REPRESENTATIVE FORM

**Please Complete The Information In The Boxes Below.  Use Blue Or Black Ink.**

**Email or Fax This Form To The Assigned Investigator As Soon As Possible**

**Re:**   Apple Inc./Gjovik/9-3290-22-051

**The undersigned is the authorized representative of the named party below in the above-captioned matter.**

| Party's Name (Type or print in the box below) | Representative's Name (Type or print in the box below) |
|---|---|
| Apple Inc. | Jessica R. Perry; Kathryn G. Mantoan |
| **Representative's Signature (Sign below)** | **Street Address or P.O. Box (Type or print in the box below)** |
| *Kathryn G Mantoan* | 1000 Marsh Road |
| **Date (Type or print in the box below)** | **City, State, ZIP (Type or print in the box below)** |
| 1/7/2022 | Menlo Park, CA 94025 |
| **Telephone (Type or print in the box below)** | **FAX (Type or print in the box below)** |
| (650) 614-7400 | (650) 614-7401 |
| **E-mail Address (Type or print in the box below)** | |
| jperry@orrick.com; kmantoan@orrick.com | |

**OSHA will email all correspondence including the Secretary's Findings at the conclusion of this investigation.**

**Petition: Jan 31 2022**
**Order: March 1 2022**
**Reverse of Order: Sept 26 2022**
**PETITION FOUND TO BE MERITLESS**

**FILED**
KING COUNTY, WASHINGTON

NOV 14 2022

SEA
SUPERIOR COURT CLERK

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF KING

CHER SWAN SCARLETT,
                    Petitioner/Respondent

v.

ASHLEY MARIE GJOVIK,
                    Respondent/Appellant

NO. 22-2-03849-7 SEA

MANDATE OF SUPERIOR COURT
ON RALJ APPEAL

**Court of Limited Jurisdiction**
No(s). 22CIV01704KCX

### I. BASIS

Pursuant to RALJ 9.2(c) and (d), the Clerk of the Superior Court shall transmit to the Court of Limited Jurisdiction and to all parties a mandate, which is the written notification of the Superior Court decision on an RALJ Appeal. The notification shall include as part of the final judgment, a summary of expenses allowed as costs pursuant to the RALJ 9.3(a),(c), and (f). The costs listed below shall be collected by the Clerk of the Court of Limited Jurisdiction. When the costs awarded include the Superior Court filing fee, it shall be collected by the Clerk of the Court of Limited Jurisdiction and forwarded to the Superior Court Clerk.

### II. NOTIFICATION

Therefore, this is to certify that the order of the **King County Superior Court** of the State of Washington, filed on **September 26, 2022**, became the decision terminating review of this court in the above-entitled case. This cause is mandated to the **King County District Court, East Division, Redmond Courthouse**, from which the appeal was taken, for further proceeding in accordance with the decision. A copy of the decision is attached.

### III. DECISION

The decision of the ☒ SUPERIOR COURT ☐ COURT OF APPEALS ☐ SUPREME COURT:

A.   ☐ Affirms     ☒ Reverses     ☐ Modifies     ☐ Dismisses     ☐ Denies     ☐ Remands

B.   The appeal was heard in Superior Court before the Honorable **Andrea Robertson**.

C.   This Matter is remanded to the Court of Limited Jurisdiction.

Mandate on RALJ Appeal
Auth: RALJ 9.2(c) & (d); RALJ 9.3(a), (c) & (f), II.2(a)
Eff. 09/01/2018

DOCKET CODE: MNDRLJ



FILED

MAR 0 4 2022

KCDC - East Division
Redmond



**KING COUNTY DISTRICT COURT**
**REQUEST FOR COURT RECORD**

**Requestor's Information**

Name: _RICHARD KAHNENBERGER_
Agency/Company: _WSSH LEGAL_
Address: _2225 4TH AVE_
State, City, Zip Code: _SEATTLE 98121_
Phone: _206 374 - 0100_
Email: _____

**Case Number:**
**Full names of Parties.**
Plaintiff: _____
Defendant: _____

**Fees**

| | |
|---|---|
| Certified Copies | $5.00 to certify the first page of the document. $1.00 per each additional page. |
| Regular Copies | $0.25 per page if it is an electronic document. $0.50 per page if it is not an electronic document. |
| Copy of Hearing | $10 per CD or Thumb Drive |

**Recording of Hearing**

| Date | Time | Courtroom | Certified Copies? |
|---|---|---|---|
| | | | ☐Yes ☐No |
| | | | ☐Yes ☐No |

**Request for Document(s)**

| Name of Document: | Certified Copies |
|---|---|
| 1. Court ordered. Protection order | ☐Yes ☒No |
| 2. | ☐Yes ☐No |
| 3. | ☐Yes ☐No |
| 4. | ☐Yes ☐No |
| 5. | ☐Yes ☐No |

*Add an additional sheet for more documents.

Dated: _03/04/2022_

Requester's Signature

You may submit your request in person via fax (206-205-0450), or email.
kcdc.webmaster@kingcounty.gov.
For additional information contact: 206-205-9200.
**Internal Use Only:**
Amount Due: $_1.00_ Payment Received: ☒Yes ☐No    Clerk initials _ETC_

Request for Court Records
KCDC – September 2017





**KING COUNTY DISTRICT COURT**
**REQUEST FOR COURT RECORD**

FILED

APR 0 6 2022

KCDC - East Division
Redmond

### Requestor's Information

| | |
|---|---|
| Name: | Scott Bride |
| Agency/Company: | McDermott Will & Emery LLP |
| Address: | 500 N. Capitol St. NW |
| State, City, Zip Code: | Washington, DC 20001 |
| Phone: | (202) 756-8467 |
| Email: | sbride@mwe.com |

Case Number: 22 CIV 01704 KCX

**Full names of Parties.**
Plaintiff: Cher Swan Scarlett
Defendant: Ashlie Marie Gjovik

### Fees

| Certified Copies | $5.00 to certify the first page of the document. |
|---|---|
| | $1.00 per each additional page. |
| Regular Copies | $0.25 per page if it is an electronic document. |
| | $0.50 per page if it is not an electronic document. |
| Copy of Hearing | $10 per CD or Thumb Drive |

### Recording of Hearing

| Date | Time | Courtroom | Certified Copies? |
|---|---|---|---|
| 3/1/2022 | | East Division, Redmond | ☐Yes ■No |
| 2/15/2022 | | East Division, Redmond | ☐Yes ■ No |
| 2/1/2022 | | East Division, Redmond | No |

### Request for Document(s)

| Name of Document: | Certified Copies? |
|---|---|
| 1. | ☐Yes ☐No |
| 2. | ☐Yes ☐No |
| 3. | ☐Yes ☐No |
| 4. | ☐Yes ☐No |
| 5. | ☐Yes ☐No |

*Add an additional sheet for more documents.

Dated: April 5, 2022                    Scott Bride
                                        Requester's Signature

You may submit your request in person via fax, or email. kcdc.webmaster@kingcounty.gov.
For additional information contact: 206-205-9200.

**Internal Use Only:**
Amount Due: $ 10.00  Payment Received: ☒Yes ☐ No        Clerk initials ETC

Request for Court Records
KCDC – September 2017



# Filed by Ashley Gjovik

**NLRB National Labor Relations Board**

 **MENU**

Home

## Case Search Results

## Apple, Inc.

E-File    Follow

**Case Number:** 32-CA-282142          **Location:** Sunnyvale, CA
**Date Filed:** 08/26/2021          **Region Assigned:** Region 32, Oakland, California
**Status:** Open

### Docket Activity

Items per page    10

| Date ⬇F | Document | Issued/Filed By |
|---|---|---|
| 04/04/2022 | Amended Charge Letter* | NLRB - GC |
| 04/04/2022 | Amended Charge Letter* | NLRB - GC |
| 04/01/2022 | Signed Amended Charge Against Employer* | Charging Party |
| 08/30/2021 | Initial Letter to Charged Party* | NLRB - GC |
| 08/30/2021 | Initial Letter to Charging Party* | NLRB - GC |
| 08/26/2021 | Signed Charge Against Employer* | Charging Party |

The Docket Activity list does not reflect all actions in this case.

\* This document may require redactions before it can be viewed. To obtain a copy, please file a request through our FOIA Branch.

### FOIA Records

NLRB-2021-001319
NLRB-2021-001318

### Related Documents

Related Documents data is not available.

### Allegations

- 8(a)(1) Coercive Statements (Threats, Promises of Benefits, etc.)
- 8(a)(1) Concerted Activities (Retaliation, Discharge, Discipline)

### Participants

| Participant | Address | Phone |
|---|---|---|
| **Charged Party / Respondent** Legal Representative Foster, Christopher McDermott Will & Emery LLP | 415 Mission Street, Suite 5600 San Francisco, CA 94105 | (628)218-3826 |
| **Charged Party / Respondent** Legal Representative Holland, Ronald McDermott Will & Emery LLP | 415 Mission Street, Suite 5600 San Francisco, CA 94105-2533 | (415)590-5120 |
| **Charged Party / Respondent** Legal Representative Mannan, Syed McDermott Will & Emery LLP | 415 Mission Street Suite 5600 San Francisco, CA 94105 | (628)218-3804 |
| **Charged Party / Respondent** Employer Apple, Inc. | Cupertino, CA 95014 | |
| **Charging Party** Individual | | |

### Related Cases

Back to top



**NLRB National Labor Relations Board**

# Filed by Ashley Gjovik

 MENU

Home

## Case Search Results

## Apple, Inc.

E-File    Follow

**Case Number:** 32-CA-283161                    **Location:** Sunnyvale, CA
**Date Filed:** 09/16/2021                      **Region Assigned:** Region 32, Oakland, California
**Status:** Open

### Docket Activity

Items per page | 10 |

| Date ⬇ | Document | Issued/Filed By |
|---|---|---|
| 09/20/2021 | Initial Letter to Charged Party* | NLRB - GC |
| 09/16/2021 | Signed Charge Against Employer* | Charging Party |

The Docket Activity list does not reflect all actions in this case.

* This document may require redactions before it can be viewed. To obtain a copy, please file a request through our FOIA Branch.

### FOIA Records

NLRB-2021-001374

### Related Documents

Related Documents data is not available.

### Allegations

- 8(a)(3) Discharge (Including Layoff and Refusal to Hire (not salting))
- 8(a)(1) Coercive Statements (Threats, Promises of Benefits, etc.)

### Participants

| Participant | Address | Phone |
|---|---|---|
| **Charged Party / Respondent**<br>Legal Representative<br>Foster, Christopher<br>McDermott Will & Emery LLP | 415 Mission Street, Suite 5600<br>San Francisco, CA<br>94105 | (628)218-3826 |
| **Charged Party / Respondent**<br>Legal Representative<br>Holland, Ronald<br>McDermott Will & Emery LLP | 415 Mission Street, Suite 5600<br>San Francisco, CA<br>94105-2533 | (415)590-5120 |
| **Charged Party / Respondent**<br>Legal Representative<br>Mannan, Syed<br>McDermott Will & Emery LLP | 415 Mission Street<br>Suite 5600<br>San Francisco, CA<br>94105 | (628)218-3804 |
| **Charged Party / Respondent**<br>Employer<br>Apple, Inc. | Cupertino, CA<br>95014 | |
| **Charging Party**<br>Individual | | |

### Related Cases

Related Cases data is not available.

### Most Popular Pages

Who We Are



**NLRB National Labor Relations Board**

# Filed by Ashley Gjovik

 **MENU**

Home

## Case Search Results

## Apple, Inc.

E-File    Follow

**Case Number:** 32-CA-288816                    **Location:** Cupertino, CA
**Date Filed:** 01/10/2022                       **Region Assigned:** Region 32, Oakland, California
**Status:** Open

### Docket Activity

Items per page | 10

| Date ⬇ | Document | Issued/Filed By |
|---|---|---|
| 01/12/2022 | Initial Letter to Charging Party* | NLRB - GC |
| 01/12/2022 | Initial Letter to Charged Party* | NLRB - GC |
| 01/10/2022 | Signed Charge Against Employer* | Charging Party |

The Docket Activity list does not reflect all actions in this case.

* This document may require redactions before it can be viewed. To obtain a copy, please file a request through our FOIA Branch.

### FOIA Records

NLRB-2022-000532

### Related Documents

Related Documents data is not available.

### Allegations

- 8(a)(1) Coercive Statements (Threats, Promises of Benefits, etc.)
- 8(a)(1) Coercive Actions (Surveillance, etc)
- 8(a)(4) Discipline

### Participants

| Participant | Address | Phone |
|---|---|---|
| **Charged Party / Respondent**<br>Legal Representative<br>Holland, Ronald<br>McDermott Will & Emory LLP | 415 Mission St<br>Ste 5600<br>San Francisco, CA<br>94105-2616 | (628)218-3829 |
| **Charged Party / Respondent**<br>Employer<br>Apple, Inc. | Cupertino, CA<br>95014 | |
| **Charging Party**<br>Individual | | |

### Related Cases

Related Cases data is not available.

### Most Popular Pages

Who We Are
National Labor Relations Act
Cases & Decisions
Recent Charges & Petitions Filings
The Law
The Right to Strike
Case Search
Contact Us
Frequently Asked Questions

1
2

## V.    EXHIBIT E: Apple Legal Memo about Messages between Petitioner & Gjovik

3
4
5



6
7

Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
+1 650 614 7400
orrick.com

8

Re:    *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

9
10

    E.    **Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, *Ms. Gjovik admitted to disclosing confidential information* about the Alpha study to Zoe Schiffer, a reporter from The Verge:

11
12
13

        I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

14
15

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

16
17

    F.    **Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

18

        1.    **Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

19
20

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

21
22

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

23

4161-3255-5828

24

*^ Note: Petitioner is not even directly named*

**GJOVIK LEGAL FILING IN SUPERIOR COURT APPEAL
SEE ORRICK DOC ON PRIOR PAGE**

1 | *Aug 20 2021 Text Messages (Petitioner & Gjovik, photos are of Gjovik)*



APPELANT BRIEF – APPENDIX: EXHIBITS
CASE NO. 22-2-03849-7 SEA

ASHLEY M. GJOVIK
PO BOX 119 SANTA CLARA, CA 95050
(408) 883-4428

– PAGE 22 –

# Exhibit G

| | |
|---|---|
| **From:** |  |
| **To:** | |
| **Subject:** | Re: Important witness information regarding case #9-3290-22-051 |
| **Date:** | Friday, May 12, 2023 11:35:07 AM |
| **Attachments:** | Screen Shot 2023-05-10 at 9.03.44 PM.png |

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Sorry, I missed one!

(b) (7)(C)



**Ashley M. Gjøvik**
@ashleygjovik                                                    ...

I still love #Apple products & brand. I devoted nearly 7 years & much
blood/sweat/tears ensuring Apple's products are exceptional. However,
Apple the corporation needs a reckoning. Apple's policy of "secrecy"
should not shield it from public scrutiny about human rights & dignity.

> Working at Apple in "normal" times, I walked in circles around their glass-walled
> panopticon, only able to badge into select lockdowns (a constant reminder that
> Apple has absolute control over my resources and access), and was immersed in a
> culture where it is implicitly forbidden to critique Apple policies or even speak
> openly to your coworkers with concerns about your employment & work
> conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other
> "powers that be." I realize now that during those times, I didn't question a lot of
> things that I should have. Not just the abuse I suffered, but also the constant
> invasion of privacy — and perhaps those two things are linked.
>
> There seems to be limitless ways Apple can access employee data and monitor us.
> I recently shared how violating it felt for Apple to demand to copy & permanently
> store my nudes for completely unrelated litigation. After the public outcry, I
> questioned other policies & actions Apple had taken. The internal "Glimmer" app
> had always troubled me, but I never voiced that concern, because inside we don't
> question the way things are or what we're asked to do. But now, in the light of day,
> considering everything Apple's already done to me, this app, the photos & data it
> gathers, and how little we know about what it does with all of that — is deeply
> troubling and I felt compelled to make it public. Apple's policy of "secrecy" should
> not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021

**8** Retweets    **1** Quote    **35** Likes    **1** Bookmark

On May 12, 2023, at 11:23 AM, (b) (7)(C) wrote:

Hello (b) (7)(C),

I again apologize for the cold email, but in document house cleaning, I found
documents material to Ms. Gjovik's case with DOL.

As I said previously, Ms. Gjovik's exit plan was planned far in advance, before
any action she took in seeking to find whistleblower protection to intentionally get
fired or leverage a settlement.

Ms. Gjovik had informed  she had wanted to leave Apple in 2020 and started talking to lawyers in January of 2021, which is proven by the messages she sent in he screenshot below. Also shows Ms. Gjovik's clear motive for a settlement and refusal to engage in collective action.



<ashley-response-plan-nda.jpg><ashley-no-coalition.jpg><ashley-wants-to-use-stories-for-settlement.jpg><Ashley-Jan-Feb.jpg>
<Screen Shot 2023-05-12 at 11.03.00 AM.png><Screen Shot 2023-05-12 at 11.01.53 AM.png><Screen Shot 2023-05-12 at 11.01.32 AM.png><Screen Shot 2023-05-12 at 10.59.54 AM.png><paid-exit-request.jpg>

**U.S. DEPARTMENT OF LABOR**
**Occupational Safety and Health Administration**

**Report of Investigation**

December 11, 2023

TO:              Megan Eldridge, Supervisory Investigator

FROM:         **(b) (7)(C)**

CASE:           Apple/Gjovik/9-3290-22-051

STATUTE(S):   SOX, CERCLA, OSHA 11(c)

**Complainant 1**                          **Complainant 1 Representative**
Ashley Gjovik                                None

**Respondent 1**                           **Respondent 1 Representative**
Apple Inc.                                    Jessica R. Perry
1 Apple Park Way                            Kathryn G. Mantoan
Cupertino, CA 95014                        1000 Marsh Road
                                             Menlo Park, CA 94025
                                             650-614-7400
                                             jperry@orrick.com
                                             kmantoan@orrick.com

| Ashley Gjovik | Sr. Engineer Program Manager | See above. | **No** |
|---|---|---|---|
| (b) (7)(C) | | | |

**Witnesses Not Interviewed:**

| **Name** | **Job Title** | **Reason Not Interviewed** |
|---|---|---|
| Dan West | Senior Director | Sufficient information obtained to make a determination. |
| (b) (7)(C) | | Sufficient information obtained to make a determination. |
| | | Sufficient information obtained to make a determination. |
| | | Sufficient information obtained to make a determination. |
| | | Sufficient information obtained to make a determination. |
| | | Sufficient information obtained to make a determination. |
| | | Sufficient information obtained to make a determination. |
| David Powers | Management | Sufficient information obtained to make a determination. |
| | | CP provided a list of potential witnesses and government witnesses to interview, but they were not interviewed because sufficient evidence was obtained to make a determination. |

**Fact Chronology (Chart):**

| Date | Time | Event | Source | Exhibit |
|---|---|---|---|---|
| 02/2015 | | RP hired CP as an iOS Build Engineer Project Manager at RP's Sunnyvale, CA location. (Fact) | Intake Interview RP Position Statement | 2-A 4-A |
| ▮ | | ▮ | ▮ | ▮ |
| ▮ | | ▮ | ▮ | ▮ |
| ▮ | | ▮ | ▮ | ▮ |





| | | | | |
|---|---|---|---|---|
| ████ | ████ | ████ | ████ | ████ |
| 8/20/21 | | CP sent a text message to another employee revealing she disclosed information about the Alpha study to a reporter from The Verge. (Fact) | Text Message | 4-C, pg. 24-38 |
| ████ | ████ | ████ | ████ | ████ |
| 8/28/21 | | CP tweeted details about a proprietary study RP was conducting codenamed "Omega". (Fact) | RP Position Statement Screenshot of Tweet | 4-A 4-C, pg. 12-14 |
| 8/29/21 | | RP received a formal complaint through its Business Conduct Hotline that CP disclosed confidential information about the Omega study on Twitter. (Fact) | RP Position Statement Hotline Complaint | 4-A 4-C, pg. 16-17 |
| 8/29/21 | | CP filed whistleblower complaint online. (Fact) | Online Complaint Form | 1-B |
| 8/29/21 | | CP filed online complaint with DLSE. (Fact) | DLSE Complaint | 3-68 |
| 8/29/21 | 4:44pm EDT | CP filed online complaint with EPA to report environmental concerns. CP claimed she was concerned for the safety of employees because of RP's lack of due diligence regarding the Superfund site. (Fact) | EPA Complaint | 3-62 |
| 8/30/21 | 8:37am | CP filed online complaint with California EPA. (Fact) | CalEPA Complaint | 3-69 |
| 8/30/21 | | CP tweeted photographs and a video of herself created by the Alpha application. CP also linked an article by The Verge in which CP | Intake Interview RP Position Statement Article Screenshot of Tweet | 2-A 4-A 4-B 4-C, pg. 19 |

| | | disclosed she participated in the Alpha study. (Fact) | | |
|---|---|---|---|---|
| 8/31/21 | 11:19pm | CP tweeted that she filed a complaint with SEC. She also listed other government agencies she filed complaints with. (Fact) | CP's Tweet | 3-112, pg. 36-28 |
| ███ | ███ | ████████████ (b) (7)(C) ████████████ | ███ | ███ |
| | ███ | ████ (b) (7)(C) ████ | | ███ |
| | ███ | ████ (b) (7)(C) ████ | ███ | ███ |
| | ███ | ████ (b) (7)(C) ████ | ███ | ███ |
| ███ | | ████████████ | ███ | ███ |
| 9/9/21 | | CP filed a complaint with EEOC. (Fact) | Email | 3-141 |
| 9/15/21 | | Another employee made a report to the Business Conduct Helpline about CP disclosing information about the Alpha study. (RP assertion) | RP Position Statement | 4-A |
| 9/15/21 | 7:40pm | RP's attorney issued a letter to CP to remove images and video from | Letter | 4-C, pg. 41-42 |

| | | her Twitter because it violates the confidentiality and intellectual property agreement she signed. (Fact) | | |
|---|---|---|---|---|
| | 8:58pm | CP replied to RP's attorney that she disagreed the posts fall under confidential and proprietary information, but she removed the two posts cited. (Fact) | Email | 4-C, pg. 50-53 |
| ██████ | | ██████████████████ | ██████ | ██ |

## ANALYSIS



---

█ See *In the Matter of Douglas Dennehy v. MBDA, Inc., et al.*, ARB Case No.: 2018-0027 (January 8, 2021).

2 See *In the Matter of Ed Slavin v. City of St. Augustine, Florida, et al.*, ARB Case No.: 07-002 (March 31, 2008).

# Exhibit H

**Ashley M. Gjovik**
Juris Doctor Candidate
Public International Law Certificate Candidate
Santa Clara University, Class of 2022

# U.S. DEPARTMENT OF LABOR

## WHISTLEBLOWER PROTECTION PROGRAM

MS. ASHLEY GJOVIK

        Complainant, pro se,

v.

APPLE INC., *et al.,*

        Respondent.

**Case No.:**
U.S. Dept of Labor: 9-3290-22-051

**COMPLAINT (REDACTED VERSION)**

**DATE: FEBRUARY 2022**

**Associated Cases:**
U.S. SEC: 16304-612-987-465
U.S. EPA Complaint
U.S. NLRB: 32-CA- 282142, 283161, 284428, 284441, & 288816

**Federal Charges**:
-CERCLA, 42 U.S.C. §9610
-SOX 18 U.S.C.A. §1514A
-OSH Act §11(c) 29 U.S.C. §660
-18 U.S.C. §1512; §1513; §1505; §1001; §371; §876
-Dodd-Frank 15 U.S.C. §78u-6(h)(1)(A)(iii)
-National Labor Relations Act §8(a)(1) & (4)

# U.S. Department of Labor
## ASHLEY GJOVIK V APPLE INC. | COMPLAINT
### CASE: APPLE INC./GJOVIK/9-3290-22-051

| | |
|---|---|
| **I. OUTLINE** | 5 |
| **II. INTRODUCTION** | 13 |
| SUMMARY OF THIS BRIEF | 13 |
| GJOVIK'S SUCCESSFUL PERFORMANCE AT APPLE (2015-2021) | 15 |
| APPLE'S PREVIOUS HOSTILE WORK ENVIRONMENT & RETALIATION AGAINST GJOVIK (2015-2020) | 22 |
| SUMMARY OF APPLE'S POSITION STATEMENT | 34 |
| **III. JURISDICTION** | 36 |
| **IV. PROTECTED ACTIVITIES** | 36 |
| *Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)* | 37 |
| CERCLA (U.S. EPA Superfund) Whistleblower Law | 37 |
| CERCLA Jurisdiction ("Stewart 1" Apple Office) | 40 |
| Gjovik's Protected CERCLA Activity | 44 |
| *Sarbanes-Oxley Act* | 79 |
| SOX Whistleblower Law | 79 |
| Gjovik had an Objectively Reasonable, Subjective Belief that Apple was Committing Fraud Due to a Conflict of Interest | 82 |
| Gjovik's Complaints Of Fraud Against Ronald Sugar & Apple Inc. were Directly Tied to the SEC, SOX, Dodd-Frank, & 15 U.S. Code § 77x | 83 |
| Gjovik's Activity Was Protected by SOX Whistleblower Protection | 88 |
| *Section 11(c) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. §660* | 98 |
| OSH Act Whistleblower Law | 98 |
| Gjovik's Protected COVID-19 OSHA Activity | 102 |
| Gjovik's Protected Activity Around Chemical Exposure Concerns | 106 |
| Gjovik's Protected Activity Around Workplace Injury Concerns | 107 |
| KNOWLEDGE OF PROTECTED ACTIVITIES | 112 |
| *Apple was Aware of Gjovik's Protected Activity when it Took Adverse Actions* | 113 |
| **V. WHISTLEBLOWER RETALIATION** | 114 |
| RETALIATION LEGAL STANDARD | 114 |
| GJOVIK WAS SUBJECTED TO ADVERSE & UNFAVORABLE EMPLOYMENT ACTIONS | 117 |
| *Hostile Work Environment* | 118 |
| March: Threats, Discrimination, Intimidation, & Harassment | 119 |
| April: Nonconsensual Sexism Investigation; 1st Sham Employee Relations Investigation | 121 |
| April: More Censorship, Threats, & Harassment | 122 |
| *April: Constructive Discharge* | 126 |
| Apple Created/Worsened a Hostile Work Environment so Severe Any Reasonable Person would Quit | 127 |
| *May: Sham Investigations* | 132 |
| Apple's first "Investigation" was Nonconsensual, Doxed Her, and was a Sham | 133 |
| *May-July: Change in Workload & Work Responsibilities* | 137 |
| West Excluded Gjovik from Projects & Removed Project Supervision | 137 |
| Powers' Dramatically Increased Gjovik's Workload with Unfavorable Projects | 139 |
| *June/July: 2nd Employee Retaliations Investigation* | 141 |
| Second Employee Relations Investigation & Failure to Stop Retaliation | 141 |
| *August: Indefinite Administrative Leave* | 153 |
| Administrative Leave as an Adverse Action | 153 |
| Apple Retaliated Against Gjovik with Admin Leave | 154 |
| Removal from Workplace & Workplace Interactions | 157 |
| Apple Denied Gjovik Access to Training She Previously Registered for | 157 |
| Apple was Gas Lighting Gjovik on The Nature of the Admin Leave | 160 |
| Apple Wanted to Fire Gjovik & Was Looking for a Reason | 167 |
| *Defamation by Publication* | 172 |
| The Law of Employer Defamation by Publication | 172 |
| The September 3 2021 9to5Mac Article | 173 |

**U.S. Department of Labor**

**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**

CASE: APPLE INC./GJOVIK/9-3290-22-051

*September Termination* ..................................................................................................................*177*
    Law of Retaliatory Terminations (Violation of Public Policy)..........................................................178
    Gjovik Termination was Shocking, but not at all Surprising.............................................................181
    Apple's Allegations Reference Gjovik's Statutorily Protected Off-Duty Conduct ..........................185
*Defamation & Trade Libel by Proffered Reason of Termination* .................................................*187*
    Termination as Defamation ...............................................................................................................187
    "Maybe I Know Something You Don't".............................................................................................189
*Post-Employment Threats of Violence, Bankruptcy, Litigation, & "Ruin"*...............................*190*
    Apple's Continues to Threaten, Intimidate, & Coerce Gjovik to Withdraw her Charges ...............192
    Apple's Continues to Retaliate Against Gjovik for Her Federal & California Charges ....................202
    Mailing Threatening Communications (18 U.S. Code § 876)............................................................208
*Retaliatory Litigation* ...................................................................................................................*208*
    Apple Engaged its Lawyers to further Retaliate Against Gjovik for her Protected Activities ..........210
    Apple Caused Ex-Employee To File Harassment Lawsuit [Update: Gjovik won the appeal] ..........212
*Retaliatory Reports to Law Enforcement* ......................................................................................*215*
    Retaliatory Reports to the FBI & Federal Security Officers ............................................................215
*Denial of Unemployment Benefits* ................................................................................................*216*
    California Unemployment Benefits Denial Due to "Misconduct" Allegation [Update: Gjovik won the appeal]..........217
    Apple Denied Gjovik's Unemployment rights...................................................................................219
THEORIES OF EMPLOYER LIABILITY ..............................................................................................220
   *Negligence* ....................................................................................................................................*220*
   *Coworker Retaliation* ...................................................................................................................*221*
    Apple Unleashed its Employees & Managers Against Gjovik to Punish her for her Protected Activity ..................223
   *Vicarious Responsibility (Respondeat Superior & Cat's Paw)* .....................................................*227*
   *Conspiracy to Harass & Defame* ..................................................................................................*229*
    Social Media Based Threats & Intimidation ....................................................................................233

**VI. APPLE REQUIRED "GOOD CAUSE" TO FIRE GJOVIK** ..............................................................**235**

   *Gjovik was No Longer an At-Will Employee* .................................................................................*235*
    "Good Cause" Required for Terminations ........................................................................................236

**VII. BREACH OF DUTY OF GOOD FAITH & FAIR DEALING** ..........................................................**240**

   APPLE'S BREACHED IT'S CONTRACTUAL DUTY TO GJOVIK WHEN IT FIRED HER .................................240
    Apple's Opportunistic Firing of Gjovik to Deny her Owed Benefits ...............................................243
    Apple's Punishment of Gjovik for Performing Contractually Obligated Duties ..............................244

**VII. CAUSATION** ..........................................................................................................................**248**

   GJOVIK'S PROTECTED ACTIVITIES WERE SUBSTANTIAL, CONTRIBUTING FACTORS & BUT FOR THE RETALIATION &
   UNFAVORABLE EMPLOYMENT ACTIONS ............................................................................................248
   *Temporal Proximity* ......................................................................................................................*249*
    Gjovik Faced Retaliation & Adverse Actions Days after Protected Activities..................................251
   *Contributing Factor (SOX)* ...........................................................................................................*254*
   *Motivating Factor (CERCLA)* ........................................................................................................*256*
   *Substantial Reason / But For (OSHA)* ...........................................................................................*258*
   *Apple Retaliated Against Gjovik Because Of her Protected Activities* ..........................................*260*

**VIII. APPLE'S "NONDISCRIMINATORY" REASONS FOR TERMINATION WERE DISCRIMINATORY,
UNLAWFUL, AND PURELY PRETEXT** ...........................................................................................**265**

   APPLE'S ALLEGATIONS ....................................................................................................................266
   *"Failure to cooperate information during the Apple investigatory process"* .................................*266*
    Voluntary decision review ................................................................................................................266
    Law of Corporate Investigations.......................................................................................................267
    "Apple's Sleazy Secret Police"..........................................................................................................269
   *"Disclosure of confidential product-related information"* ............................................................*274*
    Gjovik did not Violate her IPA with Apple ......................................................................................276
   ANALYSIS: PRIVACY ........................................................................................................................278

# U.S. Department of Labor
## ASHLEY GJOVIK V APPLE INC. | COMPLAINT
### CASE: APPLE INC./GJOVIK/9-3290-22-051

*Privacy in California* ..............................................................................................278
*Apple's Position on Privacy* ....................................................................................280
    Criticism ..............................................................................................................281
*Privacy in Employment* ...........................................................................................282
    Termination in Violation of Protection Against wrongful employer intrusions into protected employee privacy interests ..........284
*Apple Cares about Privacy, Unless You're an Apple Employee* ...............................286
THE FACE "GOBBLER" ..............................................................................................291
  *Surveillance Laws* ...................................................................................................291
    Federal .................................................................................................................291
    California ..............................................................................................................292
  *Gjovik's General Concerns about Surveillance* .......................................................292
  *Apple's Face Gobbler App* .......................................................................................293
  *Gjovik was Deeply Disturbed by Apple taking Photos 24/7 of her Breasts, her in Bed, her Using the Toilet, and other Inherently Private Things* ...........................................................................................301
    Gjovik's Tweets & Interview Were Opposition to Practices Believed to Be Unlawful ...........303
  *Protected Concerted Activity* ..................................................................................308
  *Face Gobbling Comparators & Contrastors* ...........................................................311
APPLE, THE "EAR CANAL INNOVATOR" .....................................................................317
  *Biometrics Laws/Policy* ...........................................................................................317
  *Apple's Public Information About Ear Studies & Biometrics* ...................................319
    It's Not a Secret Apple Does User Studies ...........................................................322
  *Gjovik was Deeply Disturbed by the Persistent, Increasing Requests to Image her Ear Canals* ...................323
    Gjovik's Tweets Was Opposition to Practices Believed to Be Unlawful ...............324
  *Coercion is not Consent* ...........................................................................................327
    Contracts signed by Gjovik during employment with Apple were Coerced by Apple ..........329
  *Unconscionability* ...................................................................................................331
BOTH EAR CANAL SCANNING & THE "GOBBLER" APPLICATION ARE BOTH HIGHLY OFFENSIVE TO THE REASONABLE PERSON ..................................................................................................................332
NO WARNINGS OR RISK MITIGATION .......................................................................334
    Privacy Concerns Reviewed by Ronald Sugar ....................................................337

**IV. PRETEXT** ........................................................................................................**337**

APPLE INC'S PROFFERED EXPLANATION FOR UNFAVORABLE EMPLOYMENT ACTIONS IS MERELY PRETEXT ...................339
  *Significant, Unexplained Deviations from Established Policies or Practices* .............342
    Apple Significantly Deviated from its Established Policies in its Actions towards Gjovik ...........344
    Apple Was Roasted by the California Supreme Court for Labor Hypocrisy & Pretext ...........345
  *Post Hoc Rationalizations: Conflicting Reasons & Shifting Explanations as to why Disciplinary Actions were Administered* .........................................................................................................347
    Bogus, Post-Hoc "Justification" ..........................................................................348
    The Sham Discrimination & Retaliation Investigation .........................................349
    ██████ ██████ .................................................................................................352
     .........................................................................................................................355
    The Sept 15 Business Conduct Complaint .............................................................355
  *Cover-Ups, Lies, & Fraud* ......................................................................................364
    Apple's Conflicts of Interest ................................................................................366
    Apple's Elaborate & Poorly Executed Cover-Up ................................................368
    Apple Leaders Lisa Jackson and Alisha Johnson Have a History of Chemical Exposure Coverups ...........370
    California DTSC Sued Apple in 2016 for $450k in Hazardous Waste Violations ...........371
  *History of Hostility Toward Regulations; Deliberate Violations of Regulations* ...........372
    Apple has Engaged in a Long History of Deliberate Violations of Laws .............374

**V. REQUESTED REMEDIES** ..................................................................................**377**

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

An employer may proffer a legitimate non-retaliatory reason for the challenged action. Commonly asserted legitimate, non-discriminatory reasons for taking an adverse employment action often include insubordination and/or unsatisfactory performance.[753]  Examples of non-retaliatory reasons include:

- poor performance;
- inadequate qualifications for position sought;
- qualifications, application, or interview performance inferior to the selectee;
- negative job references;
- misconduct (e.g., threats, insubordination, unexcused absences, employee dishonesty, abusive or threatening conduct, or theft); and
- reduction in force or other downsizing.

Apple cites none of these reasons.

## Apple's Allegations

### *"Failure to cooperate information during the Apple investigatory process"*

The way Apple terminated Gjovik was highly irregular. On Sept 9 Gjovik received an email with no subject line from an Apple employee she'd never heard of. As in *Kolchinsky*, it was clear that Apple's interrogator's email to Gjovik on September 9th requesting to talk "within the hour" was purely pretextual and simply additional furtherance of the conspiracy to remove Gjovik from the company due to her protected activities and to hide the company's unlawful activities. The interrogator's email came unexpectedly, without a subject line, and without any reasoning or explanation as to why Gjovik was even being contacted.

Apple is accusing Gjovik of something that had no factual basis. Apple accused Gjovik of failing to cooperate in an investigation when Gjovik 1) replied in only two minutes 2) said she was happy to participate 3) reiterated minutes later she was happy to participate.

In the *Thomas v. Arizona Public Service* ERA Whistleblower case, the Dept of Labor court found pretext when one of the proffered reasons for not promoting a whistleblower employee was he

---

[753] Richardson v. Petasis_ 160 F. Supp. 3d 88.pdf, 60 F. Supp. 3d 88, *118; 2015 U.S. Dist. LEXIS 163484,

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

"lacked initiative and willingness to work overtime."[754] However, later, the employer admitted there were actually "no occasions for the employee to work overtime, therefore willingness to work overtime was not a factor."[755]

Similarly, in the *Adams v. Coastal Production Operators* ERA Whistleblower case, the Dept of Labor court found pretext where one of an employer's proffered reason for firing a whistleblower employee was "abandonment of his crew" when in reality, **1) the employer fired the employee <u>before the employee left the area,</u>** 2) the employer did not ask the employee to stay with the crew until a replacement arrived, and 3) alternative transportation was available for the crew.[756]

### LAW OF CORPORATE INVESTIGATIONS

The law governing corporate investigations includes employment laws governing employers' ability to discipline and terminate employees for failure to cooperate in investigations, including both substantive and procedural rights of employee.[757] Employees do not always have a duty to answer their employer's questions even about workplace conduct.[758] Employees may be required to cooperate, at least if the employer had a formal policy requiring them do to so, but only in limited circumstances.[759]

In many countries, employers cannot use the threat of termination to pressure employees to cooperate because employment laws either preclude such threats or impose procedural impediments to employee discipline.[760] Even when employees are obligated to cooperate, labor laws often preclude employers from immediately threatening to fire employees who refuse to cooperate. Even

---

[754] *Thomas v. Arizona Public Service Co.,* 89-ERA-19 (Sec'y Sept. 17, 1993).

[755] *Thomas v. Arizona Public Service Co.,* 89-ERA-19 (Sec'y Sept. 17, 1993).

[756] *Adams v. Coastal Production Operators, Inc.,* 89- ERA-3 (Sec'y Aug. 5, 1992).

[757] Jennifer Arlen* and Samuel W. Buell, The Law Of Corporate Investigations And The Global Expansion Of Corporate Criminal Enforcement, CORPORATE CRIMINAL ENFORCEMENT, 93 S. Cal. L. Rev. 697 (May 2020)

[758] Hans Van Bavel & Frank Staelens, *Belgium, in* The International Comparative Legal Guide to: Corporate Investigations 2018 25, 29 (2d ed. 2018).

[759] Code du travail [C. trav.] [Labor Code] art. L.1232-1 (Fr.). In Germany, employees **may** have a right to resist if the employment agreement does not specify a right to cooperate or if the employee's personality rights preempt the employer's right to information. *See* Bundesarbeitsgericht [BAG] [Federal Labor Court] Sept. 7, 1995, 8 AZR 828/93 (Ger.). *See also* Michael Kempter & Bjorn Steinat , *Compliance - arbeitsrechtliche Gestaltungsinstrumente und Auswirkungen in der Praxis* [ *Compliance - Employment-Related Design Instruments and Effects in Practice*], Neue Zeitschrift fur Arbeitsrecht [NZA] 1505, 1511 (2017).

[760] *See* Restatement (third) of Emp't Law § 2.01 (Am. Law Inst. 2014); *see* Samuel Estreicher & Jeffrey M. Hirsch, *Comparative Wrongful Dismissal Law: Reassessing American Exceptionalism*, 92 N.C. L. Rev. 343, 347 (2014).

when termination for non-cooperation is possible, employers often cannot threaten termination until less extreme forms of discipline, such as a formal warning letter or suspension, have failed, and, even then, only in some circumstances. [761]

    To justify termination, the employee's repeated refusal must provide the employer reasonable grounds for concluding that the employee cannot be trusted in the future. The employer may be unable to establish this if the employee is otherwise trustworthy and is not implicated in the offense, or if the employer did not terminate other non-cooperative employees.[762]

    Companies conducting internal investigations overseas may not be able to both threaten to fire employees in order to induce them to talk and maintain confidentiality of investigative findings.[763]

---

[761] For example, in Australia an employer must warn an employee prior to commencing procedures to fire him. *See* Estreicher & Hirsch, *supra* note 69, at 359-60. Even then, termination will not be permitted if it is deemed harsh, unjust, or unreasonable under the circumstances. *See Mocanu v Kone Elevators Pty Ltd.*, [2018] FWC 1335 (Austl.). In England, Wales, Germany, and Italy, companies are expected to proceed through stages, beginning with a warning, and moving to more serious sanctions short of dismissal, before seeking dismissal. Employers may need to delay sanction until obtaining the employee's justification. *See* Burgerliches Gesetzbuch [BGB] [Civil Code], §§622, 626 (Ger.) (employers should warn first, unless a compelling reason justifies termination without notice); Bundesarbeitsgericht [BAG] [Federal Labor Court], June 10, 2010, 2 AZR 541/09; Erfurter Kommentar zum Arbeitsrecht [Comment on Labor Law] P 198 (19th ed. 2019) (Ger.); Carlton et al., *supra* note 137, at 179; Gianfranco Di Garbo et al., *Italy*, *in* Corporate Internal Investigations: Overview of 13 Jurisdictions, *supra* note 110, at 245, 270-71; Sebastian Lach et al., *Germany*, *in* The Practitioner's Guide to Global Investigations, *supra* note 110, at 569; Joanna Ludlam & Henry Garfield, *England and Wales*, *in* Corporate Internal Investigations: Overview of 13 Jurisdictions, *supra* note 110, at 105, 126-27; Carlton et al., *supra* note 137, at 179; Burkard Gopfert et al., *"Mitarbeiter als Wissenstrager" - Ein Beitrag zur aktuellen Compliance-Diskussion* [ *Employees as Knowledge Carriers - A Contribution to the Current Compliance Discussion*], Neue Juristische Wochenschrift [NJW] 1703, 1707 (2008) (Ger.); Volker Rieble, *Schuldrechtliche Zeugenpflicht von Mitarbeitern* [ *Obligatory Witnessing of Employees*], Zeitschrift fur Wirtschaftsrecht [ZIP] 1273 (2003) (Ger.).

[762] In Germany and Austria, employers cannot reliably fire an employee for refusing to cooperate even when the employee had a duty to do so. Employers must establish that termination is needed to protect the employer, and not as a punishment. Failure to cooperate may not constitute adequate cause for dismissal if the employee is not implicated and has otherwise proved trustworthy. *See* Bundesarbeitsgericht [BAG] [Federal Labor Court] Oct. 23, 2008, 2 AZR 483/07, para. 32 (Ger.); *see also* Philipp Becker et al., *Investigations in Germany*, *in* Corporate Internal Investigations: An International Guide, *supra* note 107, at 225, 263 (discussing Germany). Repeated failure to cooperate may provide cause for termination in Germany if the employer sends the employee a formal warning letter and the employee commits a subsequent violation. Lach et al., *supra* note 143, at 717. These substantive and procedural limitations on dismissal apply even if the employer has concluded that the employee committed misconduct. Bundesarbeitsgericht [BAG] [Federal Labor Court] Oct. 23, 2008, 2 AZR 483/07, para. 32 (Ger.). Repeated failure can justify termination in Austria if it provides evidence of untrustworthiness, yet threat of termination is a last resort, and the employer's right to take such action must be found in a law, a collective agreement, or a works agreement. Georg Krakow & Alexander Petsche, *Austria*, *in* Corporate Internal Investigations: Overview of 13 Jurisdictions, *supra* note 110, at 1, 24-25, 33-34.

[763] Indeed, some countries apply the principle of *ne bis in idem (*double jeopardy) to disciplinary procedures. In such countries, a company's decision to sanction the employee for failing to cooperate may prevent the company from later terminating the employee for the misconduct should the evidence reveal the employee was involved. In France, it appears that an employer discovering misconduct or gross misconduct cannot sanction an employee unless the employer begins the dismissal process within two months of becoming aware of the misconduct. Matthew Cowie & Karen Coppens, *Multi-Jurisdictional Criminal Investigations - Emerging Good Practice in Anglo-French Investigations*, *in* The International Comparative Legal Guide to: Corporate Investigations 2018, supra note 139, at 4, 6. In Belgium, an employer who has

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

Labor laws can also impose procedural burdens likely to dissuade companies from disciplining non-cooperative employees, particularly when investigating misconduct of which the government is unaware.

In *Kolchinsky*, a whistleblower began suffering retaliation shortly after protected activity, and alleges that he was excluded from meetings, demoted and had his salary and bonuses reduced. Soon after, he was transferred to a "support" role, a move that the plaintiff perceived as retaliatory and detrimental to his future promotion prospects. Although the **plaintiff asserted that he otherwise cooperated with the investigators,** he declined to meet with the investigative team without his own attorney present, and as a consequence, the defendant *suspended him for failure to cooperate*. The plaintiff alleged in his SOX whistleblower complaint that this suspension amounted to constructive termination, noting that his name was removed from the company's directory, he was forced to return all company property, and was told that he would not be doing any work for the company again.[764]

The employer's argument that the Complainant was suspended and later discharged solely because he refused to meet with outside auditors to discuss issues the Complainant had raised without a personal attorney present was not convincing. Rather, the ALJ found that the evidence established that the "investigation" of the Complainant's complaints was *orchestrated* by the President/CEO and Chairman, acting in concert with the outside auditors, in such a manner as to *justify* the Complainant's termination. Thus, the purported "insubordination" of refusing to appear without a personal attorney present was mere pretext.[765]

### "APPLE'S SLEAZY SECRET POLICE"

In stark contrast to international labor standards, Gizmodo profiled Apple's Global Security team in 2009, illustrating how this "Worldwide Loyalty Team," as they were called, *"does KGB-style*

---

received a credible allegation of misconduct against an employee whom he would like to discipline has only three working days to inform the employee of the factual basis for dismissal and then to discuss it with the employee. The clock begins running before the firm completes its investigation. Carl Beverage, *Belgium, in* International Labor and Employment Laws 3-1, 3-28 (William L. Keller et al. eds., 2009). In Italy, an employer seeking to terminate an employee is required to provide written notice to the employee of his misconduct as soon as the employer detects a violation. The employee has five days to reply. Only then may the employer decide whether to terminate, if warranted. Bruno Cova & Francesca Petronio, *Italy, in* The European, Middle Eastern and African Investigations Review 2017 34, 37 (2017).

[764] *Kolchinsky v. Moody's Corp.* , No. 10 Civ. 6840(PAC), 2012 WL 639162 (S.D.N.Y. Feb. 28, 2012)
[765] *Welch v. Cardinal Bankshares Corp.* , 2003-SOX-15 (ALJ Jan. 28, 2004),

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

lockdowns [of employees] and Gestapo interrogations that end in suicides." [766] The team is an *"internal secret police team known for its network of informers, and ruthless, systematic pursuit of leakers*." [767] "Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to the CEO."[768]

The article explained that Apple held its security policies out as "*voluntary*" meanwhile: "management recommends that you relinquish your phones. If you don't do it they will fire you, or they will investigate why you didn't want to give them your cellphone. Simultaneously, everyone is asked to sign NDA's during the investigations, even though they already signed Apple NDAs to work there." [769]

Apple's Global Security team is currently led by Thomas Moyer (who was indicted by Santa Clara County in 2020 for "bribery" of local law enforcement).[770] Apple's Global Security team has a sketchy history, including Apple employees accused in 2011 of impersonating policemen and searching a man's San Francisco home for a lost prototype, threatening to have the man deported if he did not cooperate. [771] Apple was also accused in 2010 of a violation of California's shield law with an illegal search warrant, when they searched the home of a journalist, again looking for a prototype. [772] Gawker described Apple's secret police as "*sleazy*."

The Gizmodo article described Apple employee's experience with this *Gestapo* as " knowing how it feels to be watched, to always be considered guilty of crimes against another kind of state. Knowing how it felt to have no privacy whatsoever when he was working right here, in a little Californian town called Cupertino, in a legendary place located in One Infinite Loop." [773]

---

[766] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[767] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[768] Gizmodo, *Apple Gestapo: How Apple Hunts Down Leaks*, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058
[769] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[770] The Washington Post, *Apple's head of global security indicted on bribery charges*, Nov 24 2020, https://www.washingtonpost.com/technology/2020/11/23/apple-sheriff-bribery/
[771] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[772] CNET, *Apple pushed security executive out*, https://www.cnet.com/news/source-apple-pushed-security-executive-out/ ; MarketWatch,*Police task force oversight committee has included Apple*, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27
[773] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

Gjovik was not aware of any Workplace Violence team until this encounter. Upon reviewing Apple policies, the only mention of "Workplace Violence" includes: *"Workplace violence includes, but is not limited to, physical aggression, verbal or written threats, stalking, or destruction of property"* and *"As a manager, it's your responsibility to help Apple provide a safe workplace. Promptly report any potential threat or incident of workplace violence to your People Business Partner who will contact a member of Apple's Threat Assessment Team to assess the situation and determine appropriate action."* It's entirely unclear why this team was contacting Gjovik if not to intimidate and threaten her. Gjovik suspects, and has been quoted as such, that this "Workplace Violence team" is the latest version of the "Worldwide Loyalty Team." When Gjovik searched LinkedIn for the team name within Apple, the only other employees who showed up was "executive security" and the employee who broke into the SF man's apartment in 2011.

Silicon Valley companies have stacked what they often call their "trust and safety" teams with former police officers and national intelligence analysts. The industry's intense focus on reputation can lead their security units astray. [774] When working for tech companies, private investigators have access to more data, deal with far less red tape, and they have the ability to quickly cross jurisdictions and borders. [775] The "*Pinkerton promise*" is attractive to some Silicon Valley firms. *The Guardian* reported on March 16 that Google and Facebook have both retained Pinkerton to monitor staff for leaks. *"Among other services, Pinkerton offers to send investigators to coffee shops or restaurants near a company's campus to eavesdrop on employees' conversations,"* Olivia Solon reported. A Pinkerton representative told Solon that the firm's reach may not end with simply IP concerns. *"Through LinkedIn searches, The Guardian found several former Pinkerton investigators to have subsequently been hired by Facebook, Google, and __Apple__,"* Solon wrote. [776]

---

[774] The New York Times, *EBay's Critics Faced an Extreme Case of an Old Silicon Valley Habit,* July 27 2020, https://www.nytimes.com/2020/06/27/technology/ebay-silicon-valley-security-reputation.html
[775] The New York Times, *EBay's Critics Faced an Extreme Case of an Old Silicon Valley Habit,* July 27 2020, https://www.nytimes.com/2020/06/27/technology/ebay-silicon-valley-security-reputation.html
[776] The Guardian, *They'll squash you like a bug': how Silicon Valley keeps a lid on leakers,* March 2018, https://www.theguardian.com/technology/2018/mar/16/silicon-valley-internal-work-spying-surveillance-leakers ; The New Republic, *The Pinkertons Still Never Sleep*, March 23 2018, https://newrepublic.com/article/147619/pinkertons-still-never-sleep

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

Further, as in *Kolchinsky,* Gjovik agreed to participate in the investigation, however noted the prior retaliation and current government investigations and simply requested to keep discussion in writing (similar to Kolchinsky requesting his lawyer be present), a far cry from "*failure to cooperate.*" Gjovik was not aware of any Workplace Violence team until this encounter. Upon reviewing Apple policies, the only mention of "Workplace Violence" includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or written threats, stalking, or destruction of property*" and "*As a manager, it's your responsibility to help Apple provide a safe workplace. Promptly report any potential threat or incident of workplace violence to your People Business Partner who will contact a member of Apple's Threat Assessment Team to assess the situation and determine appropriate action.*" It's entirely unclear why this team was contacting Gjovik if not to intimidate and threaten her.

Apple's Business Conduct policy simply stated "*You are also required to fully cooperate in any Apple investigation.*" [777] It said nothing about cooperation requiring no paper trail of what occurred. Gjovik **agreed to cooperate within two minutes** of the request. Gjovik did not breach her requirement to cooperate, regardless of whatever the requirement was even lawful under the circumstances. In fact, only a month before, Gjovik was participating in a Business Conduct investigation into the possible sanctions violation where she also 1) responded in two minutes 2) said she was happy to help. No concerns were raised by Apple about that exchange. It's unclear how this was different.

> **On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov wrote:**
>
> **Subject: [No Subject]**
> Hi Ashley,
> This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.
> As part of Apple's policy, your cooperation and participation is imperative. Thank you in advance, and talk soon.
> Best, Aleks Kagramanov, Employee Relations, AMR Threat Assessment & Workplace Violence (TAT) Apple

---

[777] Apple Inc, *Business Conduct Policy*, Rev Oct 2020 (Current)

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*On Sep 9, 2021, at 2:10 PM, Ashley Gjovik wrote:*
Hi Aleks! Happy to help! Please send any questions / updates via email so we keep everything
written please. I will respond via email as quickly as I can. Thanks!

*On Sep 9, 2021, at 2:27 PM, Ashley Gjovik wrote:*
FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware
you just reached out to me the day before my Affidavit is supposed to be taken.
This feels a little like witness intimidation, etc...

*On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov  wrote:*
We are investigating allegations that you improperly disclosed Apple confidential information.
**<span style="color:red">Since you have chosen not to participate in the discussion</span>**, we will move forward with the
information that we have, and given the seriousness of these allegations, we are suspending
your access to Apple systems.
Best, Aleks Kagramanov, Employee Relations, AMR Threat Assessment & Workplace
Violence (TAT) Apple

*On Sep 9, 2021, at 3:07 PM, Ashley Gjovik wrote:*
Hi Aleks,
As mentioned, I'm definitely willing to participate in your investigation. I only asked that the
discussion be kept to email — I said nothing about not participating in the discussion at all.
I offered to help via email to ensure we have a documented record of our conversations
considering everything that's currently going on with my investigation and my complaints to
the government.
I have been speaking out about work conditions, about workplace safety, concerns about
discrimination & retaliation, and about concerns about intimidation and corruption (as reported
to the government in public record).
I'm very concerned about what you are calling "serious allegations." Can you please provide me
additional detail on what these allegations are? And when you say move forward, are you
simply suspecting my access to Apple system? Or are you doing something more — and if so
what?
Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the
opportunity to remedy any actual issues. Please let me know what the issues are so I can make a
good faith attempt at that.
In the meantime, without any additional context or effort to communicate with me in email, this
really does feel like intimidation and additional retaliation and I will consider it as such.
Best,-Ashley

*Date: September 9, 2021 at 6:54 PM*
*Subject: Employment Status*
 *To: Ashley Gjovik*
*From: Yannick Bertolus (VP)*
Hi Ashley, Please see attached.
ATTACHMENT: Re: Termination of employment

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA). We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process. Your access to Apple systems has been suspended as of today and your employment will terminate on September 10, 2021. You will receive your final pay which will include regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period.



*"Disclosure of confidential product-related information"*

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
#### CASE: APPLE INC./GJOVIK/9-3290-22-051

An employee has a duty to obey the employer's lawful and reasonable orders within the scope of the contract of employment.[778]  If the employer's order is reasonable and lawful, the claimant's willful disobedience, without justification, would constitute misconduct. [779]  However, Congress, the state legislature, and the courts have recognized that not every demand of an employer is a lawful one,[780] even if the employee originally agreed to comply with such a demand.[781] Noncompliance with an employer's order (or rule) is justified if the order (or rule) is unreasonable or unlawful.[782] Disobedience to unlawful demands does not constitute insubordination.[783] This exception may apply even if the illegality of the rule has not been established by any court before the refusal to obey.[784]

The Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[785] Further, information regarding an employer's illegal activities is not protectable by means of restrictive covenant. [786] Facts relating to actual, alleged, or potential violations of the law are generally not protectable trade secrets. An employee's agreement not to disclose such information may, in some situations, be unenforceable as against public policy.[787] The Restatement also says, "*if information is known generally to the public or widely in the employer's industry, or is readily obtainable by others through proper means, it is not a trade secret.*" [788]

Compliance is not required if the order is unreasonable, including if: the employee has a reasonable and good-faith doubt of the authority of the individual issuing the order; compliance would impose a new and unreasonable burden on the claimant; the rule does not relate to or affect the

---

[778] Labor Code section 2856; *May v. New York Motion Picture Corporation* (1920), 45 Cal. App. 296, 187 P. 785, 788).
[779] California EDD, *Misconduct MC 225: Insubordination*
[780] Labor Code sections 222.5, 552, 922, 923, 1101, 1102, 1196, 1198, 1199, 1250, 1252, 1292 to 1294, 1350 to 1351, 1391 to 1393, 1420, and 2855; Labor-Management Relations Act of 1947, 29 U.S.C.A. section 141; *Lockheed Aircraft Corporation v. Superior Court* (1946), 28 Cal. 2d 481, 171 P. 2d 21, 166 A.L.R. 701; *Fort v. Civil Service Commission* (1964), 61 Cal. 2d 331, 38 Cal. Rptr. 625, 392 P. 385; *Bowling v. Unemployment Insurance Commission* (1966), Circuit Court of Lester Co., Civil Case No. 1725, reported in 4 Commerce Clearing House Unemployment Insurance Reporter, "Kentucky," paragraph 8285),
[781] Civil Code section 1676; Labor Code section 2855; *DeHaviland v. Warner Brothers Pictures* (1945), 67 Cal. App. 2d 255, 153 P. 2d 983; *Liberio v. Vidal* (1966), 240 Cal. App. 2d 273, 49 Cal. Rptr. 520; *Heaps v. Toy* (1942), 54 Cal. App. 2d 178, 128 P. 2d 813).
[782] California EDD, *Misconduct MC 225: Insubordination*
[783] *Douglas Santos v Standard Stations Inc*, California Unemployment Insurance Appeals Board, Benefit Dec No 75- 69-1743, Precedent Benefit Decision No P-B-66 (1975)
[784] *Parrish v. Civil Service Commission* (1967), 66 A.C. 253, 66 Cal. 2d ___, 57 Cal. Rptr. 623.
[785] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret*, Comment*
[786] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret*, Comment*
[787] *EEOC v. U.S. Steel Corp.*, 671 F. Supp. 351, 358 (W.D. Pa. 1987); *Chambers v. Capital*, 159 F.R.D. 441, 444 1995); *EEOC v. Astra, Inc.*, 94 F.3d 738, 745 (1st Cir. 1996)
[788] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret*, Comment*

employer's business interests; or if the employee reasonably and in good faith believes compliance would result in a violation of the law, objects or makes a reasonable effort to object to the employer, and the employer makes no reasonable effort to explain the basis for the order to the employee.[789] On the contrary, examples of "reasonable rules" including showing up for work, performing work to the best of one's ability, obeying a reasonable employer order and refraining from fighting or sleeping on the job.[790]

As previously discussed, Apple is notorious for oppressing & silencing their workforce. An opinion piece was written by Anil Dash about the issue. Dash is "recognized as one of the most prominent voices advocating for a more humane, inclusive & ethical technology industry," was an advisor to the Obama White House, and is a Board Member of the EFF (Electronic Frontier Foundation) an international, non-profit digital rights group.[791] Dash wrote about Apple:

> The sad truth is that Apple is still stuck in an **anachronistic, 1984 mode** of communicating with the world. If Apple doesn't evolve, it'll become a pathetic-looking giant, constantly playing whack-a-mole with information leaks, diminishing its relevance by antagonizing the very creators it has so long sought to identify with. … The reckoning Apple has reached, whether it's admitted or not, is that its **secrecy is compromising its humanity…**It's incumbent upon Apple to do the moral thing here. Treat your employees, customers, suppliers and partner companies better, by letting them participate in the thing most of your products are designed for: Human self-expression. If the ethical argument is unpersuasive, then focus on the long-term viability of your marketing and branding efforts, and realize that a technology company that is determined to prevent information from being spread is an organization at war with itself. **Civil wars are expensive, have no winners, and incur lots of casualties**.[792]

Apple clearly did not listen.

**GJOVIK DID NOT VIOLATE HER IPA WITH APPLE**

Less than four hours later after her accounts were suspended on Sept 9, Gjovik received an email notice that she was being terminated.  According to the termination letter, Gjovik *"disclosed confidential product-related information in violation of Apple policies and [her] obligations under the Intellectual Property Agreement (IPA). [The Company] also found that [she] failed to cooperate and to provide accurate and complete information during the Apple investigatory process."*  The letter took Gjovik by surprise, considering that she had not disclosed any information in violation of the IPA, and

---

[789] 22 CCR § 1256-36. *Discharge for Misconduct -Insubordination*; California EDD, *Misconduct MC 225: Insubordination*
[790] California EDD, *Misconduct*, https://www.edd.ca.gov/UIBDG/Misconduct_MC_5.htm
[791] EFF, Anil Dash, https://www.eff.org/about/staff/anil-dash
[792] Anil Dash, Apple: Secrecy Does Not Scale, Anil Dash, https://anildash.com/2009/07/31/apple_secrecy_does_not_scale/

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

considering that she offered her assistance in the investigatory process. The rationale for Gjovik's termination was pretextual. Not only did Gjovik did not disclose any information in violation of the IPA, but Apple knew that her disclosures were not violations of the IPA.

Apple's reasons for terminating Gjovik are pretextual and in no way could be proven with clear & convincing evidence that Apple would have taken the actions it did to Gjovik in the absence of Gjovik's protected activities. First, Apple's reasons for the termination do not explain the reasoning for the hostile work environment, change in work responsibilities, sham investigations, construction termination, suspension, or other adverse action that occurred before the events Apple points to. Next, Apple has not taken negative actions against others who did similar actions as Gjovik, with the only difference being Gjovik's protected conduct. Further, substantial, compelling evidence points to forbidden animus and retaliatory motive in Apple's actions against Gjovik starting in the spring of 2021. **As noted in _Kinzel_, if animus is found for one adverse employment action, that animus may be imputed upon other adverse action happening in close temporal proximity.[793]**

In August and September 2021, Gjovik expressed public concerns about Apple Inc's surveillance of employees, including an internal iPhone application which took photos and videos whenever it thought it saw a face and shared the data with Apple engineering teams. Gjovik saw the images her phone was capturing of her, including: her naked, her in bed, her in the bathroom, her friends if near her, at the doctor's office, personal documents in the background, etc.

Numerous federal and state labor laws protect employee's ability to speak out about work conditions and labor issues. All of the information shared by Gjovik was about work conditions, safety concerns, labor concerns, and other protected activities. Even the implied, supposedly "legitimate" reasons for Gjovik's termination are themselves protected statements with Gjovik expressing concerns about Apple's surveillance, intimidation, and intrusive personal data collection of its employees.

The public policy protecting whistleblowers would be completely thwarted if the employer could retaliate with impunity against any employee who decided to reveal improper conduct by the employer.[794] A California court wrote that an employer claiming a whistleblower had "unclean hands"

---

[793] _Kinzel v. Discovery Drilling,_ Inc. Supreme Court of Alaska June 25, 2004, Decided Supreme Court No. S-10190, No. 5820

[794] . (See **334 _Harris v. City of Santa Monica_ (2013) 56 Cal.4th 203, 229-230, 152 Cal.Rptr.3d 392, 294 P.3d 49; _Green v. Ralee Engineering Co._ (1998) 19 Cal.4th 66, 90, 78 Cal.Rptr.2d 16, 960 P.2d 1046 Whitehall v. County of San Bernardino, 17 Cal.App.5th 352 (2017)

in the case before them, "*brings to mind the image of Prefect Louis exclaiming his shock at hearing gambling was occurring at Rick's American Café while counting his winnings in the movie Casablanca.*"[795]

## Analysis: Privacy

### Privacy in California

Article I, section 1 of the California Constitution provides that the right of "privacy" is among the people's inalienable rights. California appellate courts and at least one federal court have consistently held, in varying contexts, that Article I, section 1 provides some protection against non-governmental intrusion, as well as state conduct.[796] The legislative history (ballot argument) stated,

> "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us."[797]

California courts have found, "*The constitutional [privacy] provision is self-executing; hence, it confers a judicial right of action on all Californians. Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.*" [798]

While a California employee sacrifices some privacy rights when he enters the workplace, the employee's privacy expectations must be balanced against the employer's interests.[799] Privacy, like the other inalienable rights listed first in our Constitution, is at least as fundamental as the antitrust statutes in *Tameny* or the perjury statutes in *Petermann*. The right of privacy is unquestionably a fundamental

---

[795] Whitehall v. County of San Bernardino, 17 Cal.App.5th 352 (2017)
[796] *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825; *Cutter v. Brownbridge* (1986) 183 Cal.App.3d 836; *Miller v. National Broadcasting Company* (1986) 187 Cal.App.3d 1463; *Chico Feminist Women's Health Center v. Scully* (1989) 208 Cal.App.3d 230; *Chico Feminist Women's Health Center v. Butte Glenn Medical S.* (1983) 557 F.Supp. 1190; *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034; *Semore v. Pool* (1990) 217 Cal.App.3d 1034; Luck v. Southern Pacific Trans. Co. (1990) 218 Cal.App.3d 1.
[797] *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034.
[798] *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034.
[799] *Semore v. Pool* (1990) 217 Cal. App. 3d 1088

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

interest of our society.[800] California accords privacy the constitutional status of an inalienable right, on a par with defending life and possessing property. [801]

While plaintiff could contractually agree not to assert his right to privacy, the employer cannot be allowed to use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy.[802] If the intrusion violates the right to privacy, it is illegal whether or not it is pursuant to an agreement. If pursuant to such an agreement, the agreement would be unenforceable because it would be against public policy. The public policy here "*affects the duty not to intrude on the right of privacy, which inures to the benefit of the public at large rather than to a particular employer or employee.*" [803]

In California, it is a misdemeanor to invade someone else's privacy by using a device to view someone inside a private room (PC 647j1) or secretly photographing someone in a private room (PC 647j3). Under federal law, it is a crime to "capture an image of a private area of an individual without their consent and when the individual has a reasonable expectation of privacy."[804] Further, California Labor Code 435(a) states that "no employer may cause an audio or video recording to be made of an employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order."

## *Apple's Position on Privacy*

Apple says, "**_Apple believes that privacy is a human right_**."[805] Apple's website says, *"Privacy is a fundamental human right. At Apple, it's also one of our core values. Your devices are important to so many parts of your life. What you share from those experiences, and who you share it with, should be up to you.*"[806]

---

[800] *Rulon-Miller v. International Business Machines Corp*. (1984) 162 Cal. App. 3d 241, 255 [208 Cal. Rptr. 524], quoting *City and County of San Francisco v. Superior Court* (1981) 125 Cal. App. 3d 879, 882 [178 Cal. Rptr. 435].
[801] *Vinson v. Superior Court* (1987) 43 Cal. 3d 833, 841 [239 Cal. Rptr. 292, 740 P.2d 404] [limiting right to discover one's sexual history, habits and practices in action for sexual harassment and emotional distress].
[802] *Foley v. Interactive Data Corp*., 47 Cal.3d at p. 670 (1988)
[803] *Semore v. Pool* (1990) 217 Cal. App. 3d 1088
[804] 18 U.S.C. § 1801 (2018)
[805] Apple Inc, *iCloud security overview*, https://support.apple.com/en-us/HT202303 (Last Checked Mar 23 2022)
[806] Apple Inc, *Privacy*, https://www.apple.com/privacy/ (Last Checked Mar 23 2022)

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

Robert McKeon, Apple's "data hungry" "Gobbler" user study manager, write in a public article about Apple Face ID development, *"As a democratic republic, we expect to have privacy as a lack of privacy is tied to tyranny. The founding of our nation was opposed to tyranny, at least ideologically, even though we have had some major issues with the subject*."[807]

On April 24 2019, McKeon posted on LinkedIn an article about privacy, Personally identifiable information (PII) & his work developing Face ID at Apple.[808] McKeon wrote that despite running user studies that gathered personal data for years, that he " *did not participate in having [his] data collected." He said he "was an anomaly for other researchers. [He] didn't feel comfortable with it, and data collection was voluntary. Not everyone was happy with the concept that [he] would ask for people's help but wouldn't help [himself]. I was stubborn in my belief that I didn't feel the system was private enough. I didn't want my picture in research papers either…. [he] then went on to collect 4,600 3D face scans of ~500 subjects."* McKeon concluded, *"Privacy is an essential component in the company's DNA."* [809]

CRITICISM

Thomas le Bonniec, an ex-Apple contractor and whistleblower, wrote to regulators in 2019: "*It is worrying that Apple keeps ignoring and violating fundamental rights and continues their massive collection of data. "I am extremely concerned that big tech companies are basically wiretapping entire populations despite European citizens being told the EU has one of the strongest data protection laws in the world. Passing a law is not good enough: it needs to be enforced upon privacy offenders*."[810] Le Bonniec, said Apple has been, "*operating on a moral and legal grey area and they have been doing this for years on a massive scale. They should be called out in every possible way*."[811]

Le Bonniec exposed that Siri is recording when it is not triggered by the users. Thousands of recordings were sent to Apple in order for hundreds of Apple employees to listen, analyse and transcribe

[807] https://towardsdatascience.com/face-recognition-3d-face-recognition-from-infancy-to-product-209126575b56
[808] https://www.linkedin.com/pulse/privacy-machine-learning-pii-robert-mckeon-aloe/
[809] https://towardsdatascience.com/face-recognition-3d-face-recognition-from-infancy-to-product-209126575b56
[810] The Guardian, *Apple whistleblower goes public over lack of action,* May 2020,,
https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action
[811] he Guardian, *Apple whistleblower goes public over lack of action,* May 2020,,
https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

their content. The public statement reveals that Apple collected millions of confidential messages, full of intimate details, political opinions, sexual preferences, and discussions between persons in a room, without the users even being aware of it. In 2019, Apple admitted that these practices were not up to the privacy standards. According to today's disclosures it seems that contrary to Apple's statement, no end was put to the recording of Apple's users.[812]

### *Privacy in Employment*

The Restatement explains that Employees have protected interests, including "the privacy of the employee's person (including aspects of his physical person, bodily functions, and personal possessions) as well as the privacy of the physical and electronic locations, and the privacy of the employee's information of a personal nature." [813] An employer may have liability for a wrongful intrusion tort if the intrusion is highly offensive to a reasonable person in the circumstances. [814] The test looks to (1) the intrusion upon seclusion or solitude (2) committed in a highly offensive manner. [815]

An employee has a protected privacy interest against employer intrusion into: (1) the employee's physical person, bodily functions, and personal possessions; and (2) physical and electronic locations, including employer-provided locations, as to which the employee has a reasonable expectation of privacy. An employer intrudes upon an employee's protected privacy interest under this Section by such means as an examination, search, or surveillance. [816]

An employee has a protected privacy interest in the employee's physical person, private physical functions, and personal possessions. This includes the employee's body, bodily fluids, and other bodily by-products. An employer's job requirement that an employee provide a urine sample as part of a test for unlawful drug use is an intrusion into a protected privacy interest. An employer observing an employee

---

[812] Noyb, "*Siri: Are you recording me?" "No but I am listening to you*," May 2020, https://noyb.eu/en/former-apple-employee-blows-whistle-apple-again
[813] *Restatement of the Law, Employment Law* § 7.02, Protected Employee Privacy Interests
[814] *Restatement of the Law, Employment Law* § 7.02, Protected Employee Privacy Interests**,** *Comments*
[815] § 652B Intrusion Upon Seclusion
[816] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

engaged in private physical functions in a bathroom stall is an intrusion into a protected privacy interest.[817]

When it comes to personal property or locations that the employee owns or has access to outside of the workplace, employees will generally enjoy the same expectations of privacy against employer intrusions as they do with respect to other third-party intrusions. The reasonableness of those privacy expectations will be a function of the nature of the location, the ease of observation or interference by others, and the likelihood of the intrusion. Even though the employee might not expect an employer to intrude into nonworkplace locations, the employee cannot expect a greater level of freedom from intrusion by the employer than by the general public. By the same token, the employer is not privileged to intrude upon an employee's privacy outside the workplace simply because the employer is otherwise pursuing a legitimate business interest. [818]

In order for employees to have a reasonable expectation of privacy in the absence of express policy allowing employee private activity in a particular location, the location must itself be one that is customarily treated as private. The office bathroom is the quintessential example of a work location that is generally treated as a private place. Other places often treated as private include lockers, desks, private offices, and the break room. [819]

The employer is subject to liability under this Section for violating an employee's protected autonomy interest recognized in only if the employer lacks a reasonable and good-faith belief that exercising the personal autonomy interest interferes with the employer's legitimate business interests. [820] The implied duty of good faith and fair dealing that is contained in every employment agreement and implicit in every employment relationship recognizes that *"by entering into an employment relationship, each party to the relation-ship undertakes a duty to cooperate with the other party in realizing the common purpose of their contractual relationship."* [821] If the employer discharges an employee because

---

[817] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*
[818] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*
[819] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*
[820] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*
[821] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

of protected conduct, beliefs, or affiliations without showing the justification required, the employer prevents the employee from performing the employment agreement for reasons unrelated to the requirements of the employment relationship itself.[822]

This protection for autonomy is as a default rule. Because it is not established as a common-law tort, it is best addressed as a matter of contract. The default rule recognizes a sphere of protection. The purpose is not only to protect civic and personal life, but also to mirror the likely implicit bargain between the employer and employee about where the employment relationship ends and personal life begins. [823]

### TERMINATION IN VIOLATION OF PROTECTION AGAINST WRONGFUL EMPLOYER INTRUSIONS INTO PROTECTED EMPLOYEE PRIVACY INTERESTS

An employer who discharges an employee for refusing to consent to a wrongful employer intrusion upon a protected employee privacy interest under this Chapter is subject to liability for wrongful discharge in violation of well-established public policy.[824] There are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly when some recognized fact of public policy is threatened. [825] When an employee alleges that his or her discharge was related to an employer's invasion of his or her privacy, if the court determined that the discharge was related to a substantial and highly offensive invasion of the employee's privacy, that the discharge violated public policy. [826]

The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. When an employee successfully refuses to submit to an employer's wrongful intrusion into

---

[822] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*

[823] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*

[824] *Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy* § 7.07, Discharge in Retaliation for Refusing Privacy Invasion

[825] *Borse v. Piece Goods Shop, Inc., 963 F.2d 611 (3d Cir. 1992); Geary v. United States Steel Corp., 319 A.2d 174 (Pa. 1974)*

[826] *963 F.2d at 623*. See also *Twigg v. Hercules Corp., 406 S.E.2d 52, 55 (W. Va. 1990)* ("[I]t is contrary to public policy in West Virginia for an employer to require an employee to submit to drug testing, since such testing portends an invasion of an individual's right to privacy.").

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests. [827]

The common law is the source for these privacy protections. Courts have also pointed to federal and state constitutional privacy provisions, as well as to federal and state legislation, as additional sources of the public policy underlying employee privacy claims. The purposes of the public-policy cause of action are furthered by enabling the employee to protect his or her personal interests by refusing the intrusion and to resist an employer policy or action that is likely to affect other employees and the public interest. [828]

Privacy protections are generally the result of a balance among employee privacy interests, employer business interests, and public interests in safety. This policy is critical to the proper enforcement of common-law privacy protections. It is similar to the antiretaliation provisions in many employment-law statutes. Antiretaliation provisions protect employees who exercise their rights under the statutes. The Supreme Court has broadly interpreted statutes protecting employees claiming retaliation for exercising statutory rights[829] The decisions recognizing protection against wrongful discharge for privacy violations typically balance the employee's privacy interests and the interests of the employer and society.[830]

---

[827] *Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy*
§ 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*
[828] *Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy*
§ 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*
[829] See *Kasten v. Plastic Corp., 131 S. Ct. 1325 (2011)* (FLSA antiretaliation provision applies to oral as well as written complaints); *LP, 131 S. Ct. 863 (2011)* (Title VII antiretaliation provision prohibits retaliation against the fiancé of an employee who engaged in protected conduct); *County 129 S. Ct. 846 (2009)* (Title VII protects against retaliation for speaking about discrimination in an internal investigation) ; See generally Richard Moberly, *The Supreme Court's Antiretaliation Principle*, 61 Case W. Res. L. Rev. 375, 378 (2011). For an insightful discussion of the need for protection against termination based on a refusal to consent to invasions of privacy, see Pauline T. Kim, *Privacy Rights, Public Policy, and the Employment Relationship*, 57 Ohio St. L.J. 671 (1996).
[830] See *Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 623 (3d Cir. 1992)* (applying Pennsylvania law; noting that other courts have "balance[d] the employee's privacy interest against the employer's interests" in determining whether there was a proposed invasion of privacy); *Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1135 (Alaska 1989)* (holding that the right to privacy "must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare"); *Gilmore v. Inc., 878 P.2d 360, (Okla. 1994)* (balancing the employee's concerns against the employer's legitimate interests in a drug-free workplace); *Eagle Point Oil Co., 609 A.2d 11, 20 (N.J. 1992)* ("[A]lthough employees have a right to be protected from intrusions of privacy, we must also consider the competing public interests in

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
#### CASE: APPLE INC./GJOVIK/9-3290-22-051

Courts have recognized an action for violation of privacy rights even when the employee ultimately agrees to submit to the challenged procedure, either through termination in violation of public policy or through a violation of an implied covenant of good faith and fair dealing..[831]  Numerous courts have recognized that discharge based on an employee's refusal to consent or submit to an invasion of their privacy rights is actionable as a violation of public policy[832]

### *Apple Cares about Privacy, Unless You're an Apple Employee*

---

[831] *safety. To constitute a 'clear mandate of public policy' supporting a wrongful-discharge cause of action, the employee's individual right (here, privacy) must outweigh the competing public interest (here, public safety)."); Twigg v. Hercules Corp., 406 S.E.2d 52, 55 (W. Va. 1990) (permitting an employer to compel testing as a condition of employment "based upon reasonable good faith objective suspicion of an employee's drug usage or where an employee's job responsibility involves public safety or the safety of others").*

[831] See, e.g., *v. Inc., 878 P.2d 360, 366 (Okla. 1994)* (holding that an employer's demand that the employee "undergo a drug test to continue his at-will employment status may be viewed as so intrusive by itself as to meet the *nonconsensual* element of this test"); *Luck v. Southern Pacific Railroad Co., 267 Cal. Rptr. 618 (Ct. App. 1990)*,

[832] *v. Nabors Alaska Inc., 768 P.2d 1123, 1130 (Alaska 1989)* (finding that "there is a public policy supporting the protection of employee privacy" and that "[v]iolation of that policy by an employer may rise to the level of a breach of the implied covenant of good faith and fair dealing"); *Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363, 1366 (3d Cir. 1979)* (holding that "a cause of action exists under Pennsylvania law for tortious discharge" if the discharge resulted from a refusal to submit to a polygraph examination); *Cordle v. General Hugh Mercer Corp., 325 S.E.2d 111, 117 (W. Va. 1984)* (holding that termination for refusal to submit to a polygraph test was a wrongful termination in violation of public policy); *Cort v. Bristol-Myers Co., 431 N.E.2d 908, 912 n.9 (Mass. 1982)* (applying Mass. G.L. ch. 214, § 1B; "[I]n the area of private employment there may be inquiries of a personal nature that are unreasonably intrusive and no business of the employer and that an employee may not be discharged with impunity for failure to answer such requests."); *id. at 915* (Abrams, J., concurring) (endeavoring to "explicitly state the opinion's underlying premise: that an employee at will has an action for bad faith discharge if an employer discharges the employee for failure to provide private information"); *Hennessey v. Coastal Eagle Point Oil Co., 609 A.2d 11, 19 (N.J. 1992)* (finding that "existing [New Jersey state] constitutional privacy protections may form the basis for a clear mandate of public policy supporting a wrongful discharge claim"); *Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 626 (3d Cir. 1992)* (applying Pennsylvania law; holding that "dismissing an employee who refused to consent to urinalysis testing and to personal property searches would violate public policy if the testing tortiously invaded the employee's privacy"); *Health Center v. Court of Co., 52 Cal. App. 4th 1234, 1244 (Ct. App. 1997)* ("An action for wrongful termination of employment in violation of public policy may lie if the employer conditions employment upon required participation in unlawful conduct by the employee."); *id. at 1245* (holding that "the constitutional right to privacy [in California] forms a sufficient touchstone of public policy to support [a] wrongful discharge claim"); *Twigg v. Hercules Corp., 406 S.E.2d 52, 55 (W. Va. 1990)* (finding that mandatory drug testing violated the state's public policy concerning the employee's right of privacy).

**U.S. Department of Labor**
**ASHLEY GJOVIK v APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



**September 15 Emails from Apple Lawyers**

September 15, 2021
From: David R. Eberhart, O'Melveny & Myers LLP
To: Ms. Ashley Gjovik
Subject:
File Number: 600,000-3 (Apple Inc.)

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:
https://twitter.com/ashleygjovik/status/1431824501457633283[833]

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-internal user study project. Please remove those images from any public location and refrain from further public disclosures about that project.

---

[833] *WayBack Machine | Internet Archive:*
https://web.archive.org/web/20210829034222/https://twitter.com/ashleygjovik/status/1431824501457633283

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

The second is the image contained in the following tweet:
https://twitter.com/ashleygjovik/status/1432400136471072769[834]

The related video is located here:
https://volume-
assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application during confidential Apple-internal user studies. Please remove that image and video from any public location and refrain from further public disclosures about that application or related user studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you are represented by counsel in this matter, please identify your counsel.

**Gjovik Reply to Apple Lawyers**

Hello David,  I hope you're well.  Thank you for your email. I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested. As for the video hosted by Vox, I do not have the power to delete it as Vox is in control of their own servers, not me. I am talking others about your request and someone will get back to you related to the Vox hosted video.

**September 16 Email from Apple Lawyers**

8:49pm
David Eberhard with O'Melveny & Myers

"I look forward to further information about Apple's request to remove the video.

In the meantime, I note that there are additional tweets that also contain the same or similar images from confidential Apple-internal user studies:
https://twitter.com/ashleygjovik/status/1432381395955900416 [835]
https://twitter.com/ashleygjovik/status/1432381497370034184 [836]

Please remove those images from any public location, remove any similar images, and refrain from further public disclosures of the same or similar information.

---

[834] *WayBack Machine | Internet Archive:*
https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[835] *WayBack Machine | Internet Archive:*
https://web.archive.org/web/20210830170534/https://twitter.com/ashleygjovik/status/1432381395955900416
[836] *WayBack Machine | Internet Archive:*
https://web.archive.org/web/20210830170723/https://twitter.com/ashleygjovik/status/1432381497370034184

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

**Gjovik Reply to Apple Lawyers**

Hi David, Again, I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.
**October 6 2021: Cease & Desist sent to Apple**

From: David L. Hecht, Partner
To: David R. Eberhart, O'Melveny & Myers LLP
Cc: Erika Heath, Esq. Ashley M. Gjøvik
Date: October 6, 2021
Re: Ashley Gjøvik

Dear Mr. Eberhart,
I represent Ms. Gjovik. I am in receipt of your letter dated September 15, 2021 and subsequent email communication with my client. Going forward, please direct all such correspondence to me.
As you are aware, Ms. Gjovik has already complied with your September 15, 2021 demand to remove certain images from some of her Twitter posts. However, I write regarding the inappropriateness of your requests, which may comprise copyright misuse. While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.
Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect. The IPA does not cover the images/video that Ms. Gjovik posted. For example, you take issue with Ms. Gjovik's post of screenshots of an automated email sent to Ms. Gjovik from "Ask," "an internal survey solution." The email itself was not marked as confidential. Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential. The content of the automated email also contained nothing that could be considered secret or otherwise proprietary: there was no disclosure of the content, methodology, identity of any participants in the survey (other than Ms. Gjovik), or any of the survey's findings. The posted image of the email merely noted what was already known to the public: Apple was conducting 3D scans of human ears to "collect representative ear geometry data across age, gender, and ethnic groups" and to benefit "audio research efforts and better our understanding of ear geometry variance." It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPods products. In fact, Apple's Vice President of Product Marketing, Greg Joswiak, spoke publicly about the 3D ear scans over a year ago:
*"We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Joswiak says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."*
See Jeremy White, The secrets behind the runaway success of Apple's AirPods, Wired (September 5, 2020), available at https://www.wired.co.uk/article/apple-airpods-success.
Accordingly, Ms. Gjovik cannot face restriction in disclosing a non-confidential email about the mere existence of a survey concerning 3D ear scanning (scanning that Apple had already publicly disclosed

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

much earlier) sent to her during the period in which Apple put her on administrative leave. Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual.

Your September 15, 2021 letter and subsequent email communication also takes issue with image/video that you contend "were generated by a confidential internal Apple application during confidential Apple-internal user studies." Apple holds no copyright to these images, which were not authored by a human. As you are aware, United States copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." Trade-Mark Cases, 100 U.S. 82, 94 (1879). Because copyright law is limited to "original intellectual conceptions of the author," Apple would be unable to register any of the images or video generated by the "Glimmer" app since a human being did not create the work. Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884). Apple therefore cannot allege infringement of any copyright by Ms. Gjøvik.

To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such. You also have not alleged how mere images of Ms. Gjøvik, in her home, taken by the Glimmer app, on Ms. Gjøvik's own phone, could quality as confidential and/or proprietary information under the IPA. For example, your letter fails to acknowledge that the images posted were (a) taken by an automated process running on Ms. Gjøvik's own iPhone and (b) captured her own likeness and portions of her living space. There can be no doubt that Ms. Ms. Gjøvik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the non-proprietary images Ms. Gjøvik posted, she intentionally rendered unreadable any conceivably non-public information when posting these otherwise non- proprietary images. Your claims of any violation of the IPA based on the posting of these images appear, therefore, to have no basis in fact or law.

Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021 letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.

Sincerely, David L. Hecht, Hecht Partners LLP

U.S. Department of Labor
ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

## The Face "Gobbler"

Apple tells customers, "*Privacy is incredibly important to Apple. … Face ID data doesn't leave your device and is never backed up to iCloud or anywhere else*."[837] On April 24 2019, McKeon posted on LinkedIn an article about privacy, Personally identifiable information (PII) & his work developing Face ID at Apple.[838] Robert McKeon, Apple's "*data hungry*" "Gobbler" user study manager, explains what PII is in a public article about Apple Face ID development, "*PII covers any data that could be linked back to the original subject just by having that data or some combination of data. Face images are inherently PII data. Some times data is PII because when combined with other subject information, you could determine the subject's identity. The resulting issues with Face ID is clear, but with health data, it may not be obvious to everyone. For example, if I participate in a user study, and some health issue is discovered. If my health insurance company gets a hold of that data, maybe they would increase my rates. I'm not sure what they would do with that data, but people have been known to misuse data and PII data before.*"[839]

## *Surveillance Laws*

### FEDERAL

Under the NLRA, employers may not monitor or surveil employees participating in protected concerted activities. In a recent decision by a National Labor Relations Administrative Law Judge, Boeing Corporation was instructed to cease and desist from: creating the impression that its employees protected concerted activities are under surveillance & interfering with, restraining, or coercing employees in the exercise of their Section 7 rights. [840]

The potential for secret video surveillance may itself constitute an intrusion even if the employees have no direct evidence that they were ever captured on video. [841] Intrusion is created by the potential for a hidden camera to record or transmit private images and did not require proof that the

---

[837] Apple, About Face ID advanced technology, https://support.apple.com/en-us/HT208108
[838] https://www.linkedin.com/pulse/privacy-machine-learning-pii-robert-mckeon-aloe/
[839] https://towardsdatascience.com/face-recognition-3d-face-recognition-from-infancy-to-product-209126575b56
[840] Gov Docs, More video surveillance in the workplace. But is it legal?, https://www.govdocs.com/can-employers-use-video-surveillance-monitor-workers/
[841] Hernandez *v.Hillsides Inc., 211 P.3d 1063 (Cal. 2009*

camera was in fact used in such a manner. [842] Purpose relates to the result desired by the actor; motive is his subjective reason for desiring the result. Neither purpose nor motive must be proven to show intent. If the videotaping was an act of volition and the resulting exposure of the girls was the expected or natural consequence of that act, intent has been proved.[843]

Further, 18 U.S.C. § 1801 makes it a federal crime to capture images of a private area of an individual (naked or undergarment clad genitals, pubic area, buttocks, or female breast) without their consent and to knowingly do so under circumstances in which the individual has a reasonable expectation of privacy. [844] Convictions result in fines and/or up to one year of prison.

## CALIFORNIA

The California state Constitution guarantees the privacy of its citizens in the workplace, schools, government buildings and other property. California employees have the right to privacy, even at the workplace, in areas where there is a reasonable expectation of being left alone.  For example, the California Labor Code prohibits video or audio monitoring of employees in restrooms, showers, locker rooms, and dressing rooms.[845] Further, California Penal Code section 647j PC makes it a crime for a person unlawfully to invade someone else's privacy via a device to view in a private room, or by secret recording or photograph of a person's body.[846] A conviction is a misdemeanor punishable by up to 6 months in jail and/or a fine of up to $1000.[847]

## *Gjovik's General Concerns about Surveillance*

In August 2021, Gjovik expressed public concerns about Apple Inc pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals which Gjovik

---

[842] *Koeppel v. Speirs, 808 N.W.2d 177 (Iowa 2011)*,
[843] Koeppel *v.Speirs  Co., 383 S.E.2d 2, 7-8 (S.C. Ct. App. 1989)* Johnson *v. Allen Inc., 211 P.3d 1063, 1079 (Cal. 2009)*
[844] 18 U.S. Code § 1801 - Video voyeurism, https://www.law.cornell.edu/uscode/text/18/1801
[845] California Labor Code § 435, Contracts and Applications for Employment,
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=LAB&sectionNum=435.#:~:text=435
[846] California Penal Code Section 647(j) PC, Criminal Invasion of Privacy in California,
[847] California Code, Penal Code - PEN § 647, https://codes.findlaw.com/ca/penal-code/pen-sect-647.html

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

believed could capture data about employees which could then be used for biometric identification and surveillance.

Around 1am on September 9 2021, the day Gjovik was fired, Gjovik was tipped off that Apple may be surveilling her through her work and personal devices. Gjovik posted publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my [personal] iCloud email and iMessages?"* To which members of the Info Sec community assured Gjovik Apple was doing that and more. Gjovik immediately began removing her data from Apple's servers.

Bizarrely, two hours later, at 2:27 AM Sept 9 2021, a self-declared "burner" Twitter account, with zero posts or "likes" ever, sent her a direct message accusing her of making a claim that was *"verifiably incorrect and complete misrepresentation of facts."*[848] The user claimed that when Gjovik posted she found the *Crystal Brown v Apple* lawsuit, and said Apple settled (which Apple did), she was "unequivocally misrepresenting facts, most likely with malicious intent.*" The user said, "as someone attending law school, you should have known better."* This user would later contact GJOVIK again on January 9 2022 accusing her of committing a federal crime. Gjovik asked the user to identify themself. The user refused and instead urged her to talk to her lawyer about 18 U.S. Code § 1512, a law Gjovik previously posted publicly she plans to pursue a charge against Apple for violating. It is under information and belief this user was an agent of Apple or acting on Apple's direction attempting to intimidate Gjovik to stop posting about her surveillance and privacy concerns. Gjovik even responded on Jan 9, saying hi to "Apple Legal" and asking them to leave her alone. The user then deleted it's account.

### Apple's Face Gobbler App

Apple formally announced Face ID on September 12, 2017.[849] Apple Platform Security published the following on Apple's website, *"Face ID provides intuitive and secure authentication enabled by the TrueDepth camera system, which uses advanced technologies to accurately map the*

---

[848] @Guybrus55626232, see screenshots
[849] Apple announced Face ID during the unveiling of the iPhone X on September 12, 2017, https://www.theverge.com/2017/9/12/16288806/apple-iphone-x-price-release-date-features-announced

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*geometry of a user's face. Face ID uses neural networks for determining attention, matching, and antispoofing.."*[850]

Privacy concerns quickly arose after launch, with articles in Nov 2017 covering privacy experts concerns about the privacy of biometrics gathered/stored by Face ID.[851] Concerns were raised by American Civil Liberties Union and the Center for Democracy and Technology and others. The Verge attempted to reassure customers in 2017, saying Apple *"won't send faceprint data to the cloud, which means your face data stays on your phone,"* [852]  however Apple was asking employees to frequently upload their "faceprint data" to Apple and with apple's MDM profiles and other security tools, it's doubtful whether the data would even need to be "uploaded" or if Apple already had access. However, even for customers who supposedly had privacy of their face data, the Verge wrote, *"that's not an absolute assurance. Apple could always break from that playbook in some way they haven't discussed, or hackers could make some incredible new breakthrough."* [853]

Verge went on to say, *"Soon, millions of people will be enrolled into Face ID, giving Apple control over a powerful facial recognition tool. In the current system, that data stays on phones, but that could always change. The hashing would make it difficult for anyone other than Apple to use the data, but there's no real limit on what they use it for, particularly if they start to store information outside of specific phones. On Twitter, privacy advocates worried about Face ID data being used for retail surveillance or attention tracking in ads…. with one of the world's most ambitious companies showing off a powerful new toy, it would be foolish not to wonder what comes next."* [854]

---

[850] Apple, https://support.apple.com/guide/security/touch-id-and-face-id-security-sec067eb0c9e/web
[851] App developer access to iPhone X face data spooks some privacy experts, https://www.reuters.com/article/us-apple-iphone-privacy-analysis/app-developer-access-to-iphone-x-face-data-spooks-some-privacy-experts-idUSKBN1D20DZ
[852]   The five biggest questions about Apple's new facial recognition system, https://www.theverge.com/2017/9/12/16298156/apple-iphone-x-face-id-security-privacy-police-unlock
[853]   The five biggest questions about Apple's new facial recognition system, https://www.theverge.com/2017/9/12/16298156/apple-iphone-x-face-id-security-privacy-police-unlock
[854]   The five biggest questions about Apple's new facial recognition system, https://www.theverge.com/2017/9/12/16298156/apple-iphone-x-face-id-security-privacy-police-unlock

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



855

---

855 https://twitter.com/ashleygjovik/status/1432400136471072769
https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



^ The Twitter Posts Apple's Lawyer's Demanded That Gjovik Delete ^

[856] https://twitter.com/ashleygjovik/status/1432381395955900416
https://web.archive.org/web/20210830170534/https://twitter.com/ashleygjovik/status/1432381395955900416
[857] https://twitter.com/ashleygjovik/status/1432381497370034184
https://web.archive.org/web/20210830170723/https://twitter.com/ashleygjovik/status/1432381497370034184

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

 Zoe Schiffer



Overall Score: -0.448044091463089
# of Frames Displayed: 9/15
Face ID Result: Success
Face Detection Result: Success    Aug 20 12:50pm



i think the best response is prob just this face i made
Aug 20 12:51pm

and htere's one topless in those pics i sent... so you can say, indeed an employee saw the app was taking pics of them naked
Aug 20 12:51pm

i was hoping it woudl have caught a more flattering view... but whatever....
Aug 20 12:51pm

i feel like you might be on the floor right now
Aug 20 12:53pm

Lmao this is my face the entire time I'm writing this article
Aug 20 12:53pm



**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



^ Gjovik's conversations with Zoe Schiffer, The Verge journalist, on August 20, 2021 planning for the article. Gjovik was concerned about retaliation from Apple for mentioning anything about the app, especially providing pictures, but was concerned enough about the intrusion of privacy to go forward. She wanted people to take her concerns about the app seriously and thought the best way to do that was to show how invasive it is.

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

---

**Gjovik: I think the best response [to this app] is probably just this face I made. There's one topless in those pics I sent… so you can say, indeed an employee saw the app was taking pics of them naked.**

**Gjovik: I feel like you might be on the floor right now.**

**Journalist: LMAO this is my face the entire time I'm writing this article**

**Gjovik: I'm also changing my mood about maybe letting you use one of the pics it took of me, but remove any code or numbers. A photo of me is not Apple IP; especially a photo of me drunk making pirate faces."**

**Journalist: [The photos] definitely illuminates how invasive this [app] is. Say which one you're okay with and I'll get the team to redact.**

*Aug 20 2021*

---

On August 3 2017, Robert McKeon emailed an unknown list of employees, including Gjovik about the Gobbler/Glimmer user study. He said mentioned requirements for participation (having a specific device and disclosure), then installing the Gobbler app. McKeon wrote, "*Then, as you continue to use your device, use the Gobbler application to periodically upload data that has been logged.*" The email went on to say, "*To participate, please take the time to download the ICF (Informed Consent Form) from the Attaché link below and review it. Please select the ICF for the Country/Region you work:*" listing the USA, Brazil, Tel Aviv, and the EU but not France or Germany.

McKeon wrote, "*We have instituted an electronic ICF process, where shortly, you will receive an email from (address) asking you to complete your registration with Gobbler where you will be asked to confirm you have had an opportunity to review this ICF. This will enable you to use*

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*Gobbler to upload data."* He said they started a documentation page that employees can reference for help, tips and tricks, but that employees had to be "whitelisted" to participate. McKeon then wrote, "**In terms of data collection, we want more**. The algorithm uses deep learning and the more data the better." McKeon wrote that the Gobbler algorithms are "hungry for data." McKeon added, "For uploading data: **all data that has your face in it is good data**."

**GJOVIK DID NOT RESPOND OR ACT ON THE EMAIL; IT WAS A WEIRD EMAIL**

On Aug 7 2021 Gjovik received an email from ssp_usg@apple.com with a subject line "Social Hour Study: You're Invited!," and in the body of the email saying "*Come join us! We look forward to seeing you there!*" The email appeared to be a mandatory social event, though Gjovik was confused that the email said not to attend if she was *"taking photosensitizing medications or have any known photosensitizing medical conditions."* Gjovik promptly accepted, assuming it was expected of her.

**NOTHING IN APPLE'S INVITE SAID IT WAS ABOUT FACE ID/GOBBLER/GLIMMER**

Gjovik received another response right after from the same email, subject line "Social Hour Study: Registration." This time the email said it was from the "Sensor Software & Prototyping User Studies Group." The email said, *"Hello there! Thank you very much for responding to our invite! ..... You will receive an iCal invite to the event shortly. If you prefer a different day/time than the one scheduled, reply to this email or comment on iCal. Please arrive at MA3B Patio at your scheduled time. Do not hesitate to reach out if you have any questions or concerns regarding the study. See you soon!*" This again sounded like some sort of mandatory social event, however the email also stated "*Prior to your participation, we kindly request that you do the following: Review the ICF and email sign the ICF by registering your email and completing the short pre-study survey that will be sent.*" During Gjovik's time at Apple, she was forced to sign hundreds of agreements to get access to everything from offices, conference rooms, documentation, and the basic to do her job, so she "signed" the ICF as requested (they did say '*please sign*' after all.) As far as Gjovik can tell, she never received a confirmation she

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

signed it, nor did she get a copy of the ICF, and when she tried to access the ICF[858] again in 2021 the link went to page saying with an error message.

## NOTHING IN APPLE'S RESPONSE SAID IT WAS ABOUT FACE ID/GOBBLER/GLIMMER

Gjovik showed up to the "Social Event" as requested. It said to meet in a parking lot south of Infinite Loop but still on Apple property. The temperature that day was very hot. As Gjovik approached the destination, she saw a ~40ft diameter circular compound, with ~10ft high fence around it. There was a chain link fence, with black plastic lining it and then another chain link fence and more black plastic. On top, there were security cameras pointed inside and outside. There were one, maybe two, **armed** security guards standing outside the compound. One of the guards checked Gjovik in and told her to sit at a picnic table until called. Gjovik was hot, dehydrated, and scared. Gjovik wanted to leave, but didn't want to ask to leave, because then the armed guard might get upset or suspicious, so Gjovik waited. They finally let in 4 or 5 employees. They open the first door of the gate, we go in, then they close the outer gate and open the inner gate -- so no one on the outside could see in. The gate was locked.

Upon entering, the inside of the compound looked like a "luau" with four stations: a picnic table in one quarter, then a bar next to it with a bartender wearing a Hawaiian shirt & a lei, then some kind of game, and the final quarter had a few seats in a circle. There's was music playing in the background & they were told to sit in the circle. The armed guard left and there were two guys left. The bartender guy is at the bar. The other guy sits with us in the circle. Assumed both are Global Security members. The bartender had an intense military mustache and also some sort of military tattoos on his arms. The guy briefing the employees seemed like one of the NSA types, not Marines like the others. The NSA-type guy provided the security briefing. Meanwhile, Gjovik wants out but is locked in a compound with 10ft high gates, security cameras, and **an armed guard**. She wants to leave but thinks "*I'm too young to die.*"

The NSA-type guy explains what we're doing, we're going to enroll in Face ID and we're going to test it on iPhones with this Gobbler app and we must complete a set list of testing objectives before we are allowed to leave. The ICF had to be complete before we could set up the accounts, and he was

---

[858] https://attache.apple.com/AttacheWeb/gdl?id=e8eb246f-9694-4c1e-859d-2069797f27c2&ek=ydTMSjj3VqcaptLZpe6T2w==

**Page 300 of 380**

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

helping us set up the Gobbler accounts on the test phones. Then we have to try to enroll in Face ID and then complete our task list. It was like 12 tasks (put sunglasses on & take 10-20x pics, make a goofy face & take 10-20x pics, etc). He explained this testing was specifically because they were having trouble with direct sunlight conditions, so even though they wanted to keep all testing in lockdowns, they set up this compound in the 100-degree sun so we could do real world testing for them.

Gjovik was miserable and wanted to leave, so she did the testing because she wanted to escape the compound. Gjovik knew one of the other employees there, Tim Altman, a QA Manager in Software Engineering, and talked to him a little bit. When they were done, the guard unlocked the inner gate, then had them step in, closed the inner door, and opened the outer door and let them out. After that, the Gobbler app was always pre-installed and logged in on Gjovik's iPhones, even if she changed phones. Gjovik kept trying to log out and turn it off, but it would keep reopening and logging back in and collecting more videos/photos.

On Apple's internal "Living On" help page, it explains that when you "live on" Apple devices, *"You are encouraged to make full use of your living on devices as you regularly would, and try to log as many bugs as possible. This will help us provide a better and bug free product to our customers."* [859] The page also has a section on Gobbler/Glimmer, explaining *"Glimmer is an app that's included in internal development installs of Face ID equipped devices*" an *"Some data should not be submitted from certain regions."* Another internal page about Glimmer states, "Glimmer is an Apple Internal app which helps gather valuable information for debugging Face ID enrollment and authentication issues." That page said, "*For now, Glimmer is only available for Apple employees working in the United States.*" The page suggests uploading data from the app "*captured in employee's homes*." [860]

Apple's internal "Face ID FAQ" page says "*Users are encouraged to use Face ID in all places Touch ID is replaced on iPhone X. This includes for unlock, the App Store and 3rd party apps. Additionally, please use in a variety of conditions: From the bright outdoors to the darkest rooms. In workday, evening and weekend attire. With and without makeup.*" [861] It said the Gobbler data "*can be previewed and included in radars and/or **donated** otherwise via the Gobbler to help make the feature*

---

[859] https://confluence.sd.apple.com/display/DevPubs/Living+On
[860] https://confluence.sd.apple.com/display/FID/Using+Glimmer
[861] Apple, Face ID FAQ, https://confluence.sd.apple.com/display/FID/Face+ID+FAQ Page 1 of 3

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*better (there are many other things beside training the neural nets, that the data can be used for to improve the product)."* The page did not elaborate further. [862]

It was extraordinarily unclear what data was being automatically uploaded, how and when. The app & it's documentation pages were unclear enough (in 2019 Gjovik saw notes that the app launches automatically, and uploads data automatically, and/or uploads logs at 2am every morning) – but none of this took into account whether the data was being backed up on employee iCloud backups, synced via iCloud, and/or accessed/copied by Apple's corporate MDM profiles – or other Global Security surveillance of employee phones. It also disturbed Gjovik the app was taking photos/videos without any notification, which made her think that Apple, if it wanted to, could activate her cameras and watch her without her knowing at anytime as well.

In the documentation pages, several restrictions were noted. One said, "Data gathering may be restricted in some countries. You will be notified if that is the case."[863] Another said, "Data privacy laws only allow us to gather and upload data from the US, Canada or Israel. Please do not upload any data gathered outside of these countries." [864] Gjovik also saw in notes that the app was forbidden to be used in Japan and China, but then at some point, they decided to gather some logs there anyways. The entire thing seemed incredibly murky and concerning.

### Gjovik was Deeply Disturbed by Apple taking Photos 24/7 of her Breasts, her in Bed, her Using the Toilet, and other Inherently Private Things

An individual is protected from retaliation for opposing any unlawful practice. Protected "opposition" activity broadly includes the many ways in which an individual may communicate explicitly or implicitly opposition to perceived employment discrimination. The manner of opposition must be reasonable, and the opposition must be based on a reasonable good faith belief that the conduct opposed is, or could become, unlawful.[865]

---

[862] Apple, Face ID FAQ, https://confluence.sd.apple.com/display/FID/Face+ID+FAQ Page 1 of 3
[863] Standard Operating Procedure (SOP) for Glimmer usage
[864] Apple, Face ID FAQ, https://confluence.sd.apple.com/display/FID/Face+ID+FAQ Page 1 of 3 ;
https://confluence.sd.apple.com/display/D22Software/ICF+Procedure+for+Gobbler
[865] Enforcement Guidance on Retaliation and Related Issues, August 01, 2016, https://plus.lexis.com/api/permalink/6ee6fa70-59a5-4841-83f4-ffb9a1c6a4be/?context=1530671

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

The opposition clause of Title VII has an "expansive definition," and "great deference" is given to the EEOC's interpretation of opposing conduct.[866] As the Supreme Court stated in *Crawford v. Metropolitan Government of Nashville and Davidson County*, "'[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' *virtually always* 'constitutes the employee's *opposition* to the activity.'" [867]

The opposition clause applies if an individual explicitly or implicitly communicates his or her belief that the matter complained of is, or could become, harassment or other discrimination. The communication itself may be informal and need not include the words "harassment," "discrimination," or any other legal terminology, as long as circumstances show that the individual is conveying opposition or resistance to a perceived potential EEO violation. [868]  However, using the words "harassment" or discrimination" hold weight, as seen in *Ogden v. Wax Works, Inc*., where there the court found plaintiff "opposed discriminatory conduct" when she told her harasser, who was also her supervisor, to stop harassing her.[869]

The scope of the opposition clause is not limited to complaints made *to the employer*. Complaints about the employer to others that the employer learns about can be protected opposition.[870] Although opposition typically involves complaints to managers,[871] it may be a reasonable manner of opposition to inform others of alleged discrimination, including others outside the company including:

---

[866] *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579, 580 n.8 (6th Cir. 2000)).

[867] Enforcement Guidance on Retaliation and Related Issues, August 01, 2016, *Crawford*, 555 U.S. at 276 (first emphasis added) (adopting the Commission's position in the *EEOC Compliance Manual*, as quoted in Brief for the United States as Amicus Curiae).

[868] *Okoli v. City of Balt.*, 648 F.3d 216, 224 (4th Cir. 2011) (ruling that it was sufficient to constitute "opposition" that plaintiff complained about "harassment" and described some facts about the sexual behavior in the workplace that was unwelcome, and that she did not need to use the term "sexual harassment" or other specific terminology); *EEOC v. Go Daddy Software*, *Inc.*, 581 F.3d 951, 964 (9th Cir. 2009) (holding that allegations need not have identified all incidents of the discriminatory behavior complained of to constitute opposition because "a complaint about one or more of the comments is protected behavior");

[869] *Ogden v. Wax Works, Inc*., 214 F.3d 999, 1007 (8th Cir. 2000) (ruling that reasonable jury could conclude plaintiff "opposed discriminatory conduct" when she told her harasser, who was also her supervisor, to stop harassing her).

[870] B. Lindemann, P. Grossman, & C. Weirich, *Employment Discrimination Law* 15-20 (5th ed. 2012) (collecting cases).

[871] *Cf. Crawford*, 555 U.S. at 276 (endorsing the EEOC's position that communicating to one's employer a belief that the employer has engaged in employment discrimination "virtually always" constitutes "opposition" to the activity, and stating that any exceptions would be "eccentric cases"); *see, e.g.*, *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 438 (4th Cir. 2012) (holding that plaintiff's meeting with a corporate executive to protest a supervisor's direction to falsify time records to avoid overtime was FLSA protected activity).

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

coworkers, legislatures, **newspaper reporters**, or "**anyone else**."[872] Depending on the circumstances, calling public attention to alleged discrimination may constitute reasonable opposition, provided that it is connected to an alleged violation of the EEO laws. [873] Opposition may include even activities such as making informal or public protests against discrimination.[874] Most opposition is "reasonable," and conduct must be extreme to become unprotected, such as committing or threatening violence to life or property. [875] As with participation, a retaliation claim based on opposition is not defeated merely because the underlying challenged practice ultimately is found to be lawful.[876]

On August 30 2021, Gjovik expressed OPPOSITION to/about her employer, Apple Inc, in regard to Apple's DISCRIMINATION & HARASSMENT against her, UNFAIR LABOR PRACTICES, and/or Apple's unlawful INVASION into her fundamental, constitutionally protected PRIVACY interests.

---

[872] *See Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 42 (1st Cir. 2013) (observing that "there is no dispute that writing one's legislator is protected conduct"); *Conetta v. Nat'l Hair Care Ctrs., Inc.*, 236 F.3d 67, 76 (1st Cir. 2001) (ruling that employee's complaints of sexual harassment to coworker who was a son of general manager was protected opposition); *Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000)* (stating that "there is no qualification on . . . the party to whom the complaint is made known," and it may include management, unions, other employees, newspaper reporters, or "anyone else").

[873] *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir. 1983) (observing that all actions of opposition to an employer's practices constitute some level of disloyalty, and therefore in order to reach the level of being unreasonable, such opposition must "significantly disrupt[] the workplace" or "directly hinder[]" the plaintiff's ability to perform his or her job); *EEOC v. Kidney Replacement Servs.*,No. 06-13351, 2007 WL 1218770, at *4-6 (E.D. Mich. 2007) (concluding that medical workers engaged in reasonable opposition when they raised their sexual harassment complaints directly to the onsite supervisor at the correctional facility to which their employer had assigned them, even though they were in effect raising a complaint to their employer's customer).

[874] *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Crown Zellerbach*, 720 F.2d at 1013-14 (holding that employer violated Title VII when it imposed disciplinary suspension in retaliation for public protest letter by several employees of an "affirmative action award" given to a major customer; reasoning that even though the letter could potentially harm the employer's economic interests, it was a reasonable manner of opposition because it did not interfere with job performance).

[875] Enforcement Guidance on Retaliation and Related Issues, August 01, 2016, https://plus.lexis.com/api/permalink/6ee6fa70-59a5-4841-83f4-ffb9a1c6a4be/?context=1530671

[876] *Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) ("[A] plaintiff [in an opposition case] does not need to prove that the employment practice at issue was in fact unlawful under Title VII . . . [A plaintiff] must only show that she had a "reasonable belief" that the employment practice she protested was prohibited under Title VII."); *see also Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980) ("Limiting retaliation protections to those individuals whose discrimination claims are meritorious would 'undermine[] Title VII's central purpose, the elimination of employment discrimination by informal means; destroy[] one of the chief means of achieving that purpose, the frank and non-disruptive exchange of ideas between employers and employees; and serve[] no redeeming statutory or policy purposes of its own.'"). For this reason, if an employer takes a materially adverse action against an employee because it concludes that the employee has acted in bad faith in raising EEO allegations, it is not certain to prevail on a retaliation claim, since a jury may conclude that the claim was in fact made in good faith even if the employer subjectively thought otherwise. *Cf. Sanders v. Madison Square Garden*, 525 F. Supp. 2d 364, 367 (S.D.N.Y. Sept. 5, 2007) ("[I]f an employer chooses to fire an employee for making false or bad accusations, he does so at his peril, and takes the risk that a jury will later disagree with his characterization.") *; see also supra* note 18.

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

**GJOVIK'S TWEETS & INTERVIEW WERE OPPOSITION TO PRACTICES BELIEVED TO BE UNLAWFUL**

Gjovik was interviewed by Zoe Schiffer at The Verge for an article about a topic that Gjovik has been passionate about for over a decade: digital privacy. Gjovik had grown deeply disturbed by the horrific lack of privacy for Apple corporate employees and was very happy to expose to the issue to the public, as the anti-privacy policy for employees was a "feature" not a "but" to Apple, and thus there was no internal complaint process on the matter, and even if there was, it seemed like a certain way to face additional retaliation. In the article that was published on August 30, Gjovik was quoted as saying / or Schiffer summarized on the following topics:

Gjovik provided Apple's "*Employee Workplace Search & Privacy Policy*" to Schiffer back in June and Schiffer quoted it for the article.

- Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises." Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises"

**Gobbler/Glimmer**

- Others have found that when testing new products like Apple's Face ID, images are recorded every time they open their phones. "If they did this to a customer, people would lose their goddamn minds," says Ashley Gjøvik, a senior engineering program manager
- In 2017, Apple rolled out an app called Gobbler that would allow employees to test Face ID before it became available to customers. **The process was routine** — Apple often launched new features or apps on employees' phones, then collected data on how the technology was used to make sure it was ready for launch.
- Gobbler was unique in that it was designed to test face unlock for iPhones and iPads. This meant that every time an employee picked up their phone, the device recorded a short video — hopefully of their face. They could then file "problem reports" on Radar, Apple's bug tracking system, and include the videos if they found a glitch in the system. "**All data that has your face in it is good data," said an internal email about the project. After rumors of criticism, Apple eventually changed the codename to "Glimmer."**
- Unlike other Apple features, Glimmer wasn't automatically installed on employee phones. It required an informed consent form so employees would know what they were getting into. Still, for some people on engineering teams, **participation was encouraged — even expected**, according to two staff members. Once it was installed, some data that didn't contain personally

**Page 305 of 380**

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
#### CASE: APPLE INC./GJOVIK/9-3290-22-051

identifiable information would automatically upload to Radar, unless employees turned off this setting. Apple was careful to instruct employees not to upload anything sensitive, confidential, or private. **But it didn't tell people what was happening with the hundreds of images** they didn't upload in Radar reports.

### Radar & Sysdiagnose

- The reports themselves were also a cause for concern. When employees file Radar tickets, they include detailed information about the problems they are seeing. In 2019, Gjøvik filed a ticket about Apple's photo search capabilities. "If I search for 'infant' in my photo library, it returns a selfie I took of myself in bed after laparoscopic surgery to treat my endometriosis," she wrote, including four images in the ticket. The default sharing settings for the ticket included all of software engineering. Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "Radar is forever."

- What's more, when employees file Radar tickets, they are often asked to include diagnostic files, internally called "sysdiagnose" to give Apple more information about the problem. If they are filing a bug about iMessage, they might be asked to install a sysdiagnose profile that exposes their iMessages to the team tasked with fixing the issue. For employees using a live-on device, default settings can mean that, as they are filing a Radar ticket, a sysdiagnose profile is being automatically created in the background, sending data to Apple without the employee realizing it. When sysdiagnose profiles are not included, employees have been known to post memes calling out the omission.

Apple Legal taking Gjovik's nude photos after she was unlawfully constructively terminated during "Batterygate" in 2016, and she believes the nudes were taken as some sort of "collateral" threat:

- The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute…… For other employees, however, the mixing of personal and work data has already had real consequences. In 2018, the engineering team Ashley Gjøvik worked on was involved in a lawsuit. The case had nothing to do with Gjøvik personally, but because she'd worked on a project related to the litigation, Apple lawyers needed to collect documents from her phone and work computer. Gjøvik asked the lawyers to confirm that they wouldn't need to access her personal messages. She says her team discouraged the use of two phones; she used the same one for work and personal and, as a result, had private messages on her work device. A member of the legal team responded that while the lawyers did not need to access Gjøvik's photos, they did not want her to delete any messages. During an in-person meeting, Gjøvik says she told the lawyers **the messages included nude photos** she'd sent to a man she was dating — a sushi chef who lived in Hawaii. Surely, those weren't relevant to the lawsuit. Could she delete them? She says the lawyers told her no.

# U.S. Department of Labor

## ASHLEY GJOVIK V APPLE INC. | COMPLAINT

### CASE: APPLE INC./GJOVIK/9-3290-22-051

Apple was contacted several days before the article was published for comment, with the Verge giving Apple insight to the high level topics to be covered. The Verge reported in the article: "Apple did not respond to a request for comment."[877]

Gjovik's own Twitter Posts on Aug 30-31 about the Article & her Disclosures Included:

- Apple has an internal culture of **surveillance**, **intimidation**, & alienation. Employees are closely monitored & our data hoarded in the name of secrecy & quality. We're told we have no expectation of privacy, while Apple says publicly: **privacy is a human right**. [878]
- Apple probably considers what they're doing to employees "**internal information**." Why? For secrecy? For quality? Or because Apple knows **the public would be outraged**, & that outrage might start to "deprogram" their employees? [879]
- Cult: "great devotion to a person, idea, object, movement, or work." Information control: "**encourage spying on other members**" Behavior control: "instill obedience"[880]
- I still love Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. **Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.**
- We're learning about Apple's long history of systemic oppression & **retaliation** against employees when employees express concerns about discrimination, harassment, & other abuse. Why wouldn't Apple try to use our data & their internal **surveillance** infrastructure against us?[881]

Like cases of refusing polygraph tests, it doesn't matter if the employee agreed to take the tests when signing the employment contract, the employee has a statutory right to deny requests for polygraph tests. An employer citing a rule that conflicts with statutorily protected right will not establish disqualifying misconduct. Gjovik is a whistleblower protected by California & federal public policy & anti-retaliation laws.  Apple's reasons for Gjovik's termination were so farfetched and pretextual, a detailed article was written about exactly that, titled "***Apple Wanted Her Fired. It Settled on an Absurd Excuse.***"[882]  The article explained the background of Gjovik's whistleblowing at her Superfund office as clearly the actual reason for Gjovik's termination.

---

[877] The Verge, APPLE CARES ABOUT PRIVACY, UNLESS YOU WORK AT APPLE, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[878] https://twitter.com/ashleygjovik/status/1432381777658613762; https://twitter.com/ashleygjovik/status/1432381235926499332
[879] https://twitter.com/ashleygjovik/status/1432383062273191937
[880] https://twitter.com/ashleygjovik/status/1432382993046200323
[881] https://twitter.com/ashleygjovik/status/1432381802602110976
[882] Gizmodo, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



**ASHLEY M. GJØVIK**
@ashleygjovik

I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

Working at Apple in "normal" times, I walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other "powers that be." I realize now that during those times, I didn't question a lot of things that I should have. Not just the abuse I suffered, but also the constant invasion of privacy — and perhaps those two things are linked.

There seems to be limitless ways Apple can access employee data and monitor us. I recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but I never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and I felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021 · Twitter Web App

883 https://twitter.com/ashleygjovik/status/1432416891201490946

*Protected Concerted Activity*

Under the NLRA, "concerted activity" must involve work-related complaint or grievance, further some group interest, seek specific remedy or result, and be not unlawful or otherwise improper. [884] Concerted activities are protected whether they take place before, after, or at the same time a demand is made. [885]If an employee acts with or on behalf of other employees, and not solely by and on behalf of the employee alone, in an activity for mutual aid or protection, which includes everything in which the employees could be said to have a legitimate interest, then the employee engaged in a concerted activity.[886] Employees have the right to engage in concerted activities for their mutual aid or protection even though no union activity be involved or collective bargaining be contemplated.[887] Employees have a legitimate interest in acting concertedly in making known their views to management without being discharged for that interest.[888]

Amongst other protected activity, Gjovik was organizing with other employees around employee surveillance & data collection concerns. Whether proven with temporal proximity to NLRB charge on August 26th, through a pattern of retaliation animus, or through a direct link if Apple cites the surveillance application – Gjovik is a protected whistleblower.

[Placeholder: add more here later]

Messages between Cher Scarlett & Ashley Gjovik
- July 19 2021
  - Gjovik: Has there been talk of a class action yet. Maybe you or I can reach out to a class action firm and see "hey any interest in suing the shit out of Apple"
  - Scarlett: The only thing I heard was via Zoe. I almost wish I needed to ask for accommodations so I could be the one.
- July 20 2021
  - Gjovik: [NYT article]
  - Scarlett: Bugs me that no one will touch the disability stuff though.

---

[884] *Shelly & Anderson Furniture Manufacturing Co. v. N.L.R.B.* (1974), 497 F 2d 1200.
[885] *N.L.R.B. v. Washington Aluminum Co.* (1962), 370 US 9, 50 LRRM 2235.
[886] *Richard Venegas, Laminating Corporation of America*, CUIAB, Case No. 78-1693, No. P-B-399
[887] *N.L.R.B. v. Phoenix Mutual Life Insurance Co.* (1948), 167 F 2d 983, 6 ALR 2d 408, cert. den. 335 U.S. 845, 93 L Ed 395, 69 S. Ct. 68
[888] *N.L.R.B. v. Phoenix Mutual Life Insurance Co.* (1948), 167 F 2d 983, 6 ALR 2d 408, cert. den. 335 U.S. 845, 93 L Ed 395, 69 S. Ct. 68

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

- o Gjovik: I wonder if it was too nebulous about what's actually happening with it for him to tackle in a day. I brought it up with him too.
  - o Scarlett: That's probably it. I just don't want to be erased.
- July 23 2021
  - o Gjovik [NYT article]  I guess if I am going for the jugular about Superfunds, there's probably no need to paint me as a wall flower….
  - o Gjovik: The EPA got back to me yesterday and it sounds like they're putting Apple in a time out
  - o Scarlett: is that good
  - o Gjovik: Very good. There are huge gaps and issues in Apple's oversight of the building and they're being super dodgy about all of it. The guy in charge appears to have just gotten fired. EH&S keeps telling me they won't answer any more of my questions with no explanation why. They found cracks in the floor where the chemicals could be coming from but refuse to test the air for said chemicals until after they fix the floor etc. I also realized a couple weeks ago that one of the Apple board of directors, Sugar, was CEO & President of the company who created the chemical mess under my office, for like 10 years, and now he's chairing Apple's finance committee which I think would oversee budget and stuff for clean ups like this. I've been trying to get the EPA to interrogate everyone to find out what's going on and they were dragging their feed, but finally gave in to my yelling last night.
  - o Scarlett: That's awesome
  - o Gjovik: I just really want people to stop trying to poison / murder me. Why is that so hard to ask for
  - o Scarlett: You would think that would be a given
- Aug 3
  - o Gjovik: [Screenshot of Gjovik telling Okpo "I do have a hard stop at 1pm – I have a lunch meeting with the Washington Post"]. So this is where I'm at with Employee Relations
  - o Scarlett: Damn. How is WaPo going
  - o Gjovik: Ugh these guys. Jack fell through with NYT. Reed is wishy washy with WaPo
  - o Scarlett: ugh
  - o Gjovik: Reuters reached out too though and CBS. Talking to them tomorrow.
  - o Scarlett: [clapping emoji]
  - o Gjovik: Zoe will quote me in her sexism piece. She was like should I keep it quiet you're talking to me still and I sent her that screenshot [with Okpo] and I'm like you're good
  - o Scarlett: Niceee. Oh I should ping her. I think I'm being underpaid.
  - o Gjovik: Really really need to do a salary spreadsheet thing. And we need dudes to show theirs too. Nike did that and there was a massive lawsuit.
- Aug 4
  - o Gjovik: [screenshot of out of office message saying she's on admin leave]
  - o Scarlett: WHAT
  - o Gjovik: Read above
  - o Scarlett: I see. What the fuck
  - o Gjovik: #Apple. I told him I wanted to take it tomorrow so I can share my info with the other women and he sent me an email right after saying take it right now.

**U.S. Department of Labor**

**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**

CASE: APPLE INC./GJOVIK/9-3290-22-051

- o Scarlett: They cannot possibly think this is a good idea.
- o Scarlett: I tried to FaceTime you. I'm really freaking out.
- o Gjovik: Sorry was with Zoe. One sec.
- o Scarlett: oooh ok.
- Aug 13
  - o Scarlett: you have a lawyer right
  - o Gjovik: I talked to tons of the since January but no one retained. My shits too complicated for them. Because all this started with me saying stop poisoning me thing it means it all hinges on a very niche area of law. They said wait until I get fired and then we'll figure out the various area of law that apple violated & call back. I have been working with a firm in LA since February but they never locked it down. They've been looking over all the new evidence for a week and deciding if they'll take me on. They're supposed to get back today.
  - o Gjovik: What if some of us just started tweeting our salaries and levels and shit. Kind of like an Apple age/sex/location but a fuck you to them for what they're doing to you. You think enough people would ble willing to make it public to make a statement at least? I would.
  - o Scarlett: Mmm idk
  - o Gjovik: Apple S/B/R/L/L or whatever. Something in your back pocket. How are you today?
  - o Scarlett: Filing a report with business conduct [screenshot]
  - o Gjovik: I gave your info to the Information, Wayne Ma, for the Slack piece. Also this is happening, please feel free to share. [see screenshot below]
  - o Scarlett: Do you think what's happening to me counts as part of this? Or the women in general
  - o Gjovik: I mean they're probably looking for sexism stuff but the pay equity is def that.
  - o Scarlett: ya
  - o Gjovik: And pay equity now = you. Congrats & condolences
  - o Scarlett: Lmao
- Aug 17 1:44pm
  - o Scarlett: Shit is so wild. All of it. Draconian.
  - o Gjovik: [screenshot of email from Gjovik about Apple skipping the line on vaccines]
  - o Gjovik: When I keep saying "tip of the iceberg on Twitter" its less for Twitter and more for Apple cause the shit they're sitting on..
  - o Scarlett: I mean for sure they know
  - o Gjovik: Did I already tell you about the vaccine thing? There's usually a bigger response to that one. I'm trying to get Reed to write about the vax stuff too. I want them to dig and see if they can find the draft contracts.
  - o Scarlett: You didn't.
  - o Gjovik: Dec 7 2020 [screenshot] Dan Riccio SVP of Hardware was demoted and reassigned less than 1month after
  - o Scarlett: What the fuck
  - o Gjovik: [screenshot] Because of me… and Sr Director says "never occurred to me not to believe you."
  - o Gjovik: Fuck you Apple ER

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

- o Scarlett: Thank you for reporting that too
- o Gjovik: Oh course, wtf is wrong with them
- o Scarlett: Disturbing. Truly.
- o Gjovik: I dedicate this one to you [screenshot of tweet yelling about Apple putting Apple Confidential on everything ]
- o Scarlett: Do you think you and I should be going through the same law firm?
- o Scarlett: Also [screenshot of Timnit Gebru Twitter account] Did not notice this
- o Gjovik: Lol she is actively plotting with me on Signal. And the Google WalkOut ladies too. We're about to do some shite.
- o Scarlett: Wait. Include me. Hello.
- o Scarlet: And for lawyer Zoe hooked me up with a NYC lawywer who is putting me on retainer with no fee. Just % of winnings if lawsuit. I just feel so alone and islated. It would be nice to be part of something bigger. And not feel so terrified.
- o Gjovik: omg girl ok give me 5min and I'll call you
- o Scarlett: Lmao ok thank you

- Aug 17 7:32am
  - o Scarlett: HOW DID YOU NOT TELL ME YOU GOT ISSUE CONFIRMATION
  - o Scarlett: "Apple Confidential" – As if slapping that on anything makes it covered by NDA
  - o Gjovik: they might as well put all caps ASHLEY DON'T TWEET THIS ONE WE MEAN IT THIS TIME
  - o Gjovik: Cause that's all they're saying.

- Aug 20 11:57am
  - o Scarlett: So my lawyer wants to sue Apple
  - o Gjovik: oooh!!
  - o Scarlett: I sent them the complaint I sent to business conduct and they were pretty like yes this is a slam dunk and idk what to do. I could proceed I guess and refuse to sign an NDA. Even if that means no $$. Thoughts?
  - o Gjovik: Hmmm yeah this is the tough part. Would you lawyer take the case if you say you'd refuse to sign an NDA? That's usually where I lose lawyers. If you haven't asked, I'd ask. This is where you negotiation with your own lawyer – what you're willing to sign and not sign, how much $ they'd take etc. they you both figure out if its even worth going forward. Even if you don't sue, you can still keep them in case Appl does something to you, and then renegotiate the plan then
  - o Scarlett: Signing and NDA is not in my agreement with them
  - o Gjovik: Also if you do sue, are you willing to go through discovery and deposition and all that with apple cause they're notoriously awful
  - o Scarlett: Contingency fee I negotiated to 40% which honestly is fine I don't care
  - o Gjovik: so is it worth making yourself be abused by them more for the end result. Maybe it is maybe its not
  - o Scarlett: I think it is to expose it. Because what have I really done here. They shouldn't have the power to abuse me.

## *Face Gobbling Comparators & Contrastors*

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

**Apple Platform Security**

On Feb 18 2021, Apple Platform Security published the following on Apple's website, *"Apple developed the facial matching neural networks **using over a billion images**, including infrared (IR) and depth images **collected in studies conducted with the participants' informed consent.** Apple then worked with participants from around the world to include a representative group of people accounting for gender, age, ethnicity, and other factors. The studies were augmented as needed to provide a high degree of accuracy for a diverse range of users."* [889]

**Was Apple Platform Security fired?**

An Apple Engineering Manager, ███████████, led the Video Engineering Face ID teams for years, and was DRI for the Gobbler/Glimmer app, and also posted prolifically & publicly about Apple & Face ID internal strategy, for years. ███████ LinkedIn[890] notes from March 2016 through Jul 2017, he worked on Face ID on the iPhone X including *"DOE [Design of Experiment] for multiple user studies, "Engineering User Studies DOE, Collection, and Analysis."* ███████ posted publicly that in 2018, he worked on *"Face ID / prototype data collection, logging analysis, DRI for Internal tools for Video Engineering, Coordinated efforts for data collections to improve RGB Face Detector and Portrait Mode, Engineering User Studies & Carry data plus Analysis..."* ███████ posted publicly that in 2019 he worked on *"Face ID internal logs processing pipeline and dashboard, Face ID exploration DOE and analysis, Face ID internal logging analysis, Internal data collection app DRI, & 3D point cloud analysis..."* Finally, ███████ LinkedIn notes in 2020 his key projects included, **"*Face ID & People Detection in Magnifier for blind and low-visibility users."***

███████ public LinkedIn and Medium posts have included much internal Apple information stretching back to at least 2018 & his LinkedIn implies he's been promoted and frequently given increasing responsibility, despite his public disclosures. On July 2 2018, ███████ documented Apple's product development process and posted it on LinkedIn titling it *"Chaos Inducted Prioritization."*[891] On



---

[889] Apple Platform Security: Facial matching security, Published Date: February 18, 2021, https://support.apple.com/guide/security/facial-matching-security-sece151358d1/web
[890] https://www.linkedin.com/in/███████████
[891] https://www.linkedin.com/pulse/chaos-induced-prioritization-███████████

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

Dec 26 2018, ███ posted on LinkedIn about an internal Apple study he lead which caused an experimental feature to be "put on hold indefinitely." [892]

On Feb 26 2019, ███ posted on LinkedIn about his work on Face ID algorithms. He said, he *"worked on Design of Experiment for user studies, failure analysis, and deep net training."* ███ said, *"There was a large list of unknowns because nobody had lived on a phone with Face ID. We had to imagine how people would use the phone and in what ways different from Touch ID to see what data to test. This involved designing the data collection, collecting the data, and analyzing it. We also did any engineering studies requested by others and analyzed the resulting data to understand if we needed more data."* ███ wrote that in December he was working on " a large make-up study [he] had spent months designing and doing small engineering studies to help support the DOE." He said he, "found a lot of incorrect labels from the big user study [he] designed. …[He] fixed all the labels and finish the analysis." [893]

On Jan 9 2019, ███ posted to LinkedIn an articled called "Data Collection" where he wrote, "During the lead up to Face ID being launched, my team went out and collected a large set of potential aggressors to see if we were missing anything in our larger data collections, things would be normal to a regular user." [894] On May 13 2019, ███ posted to LinkedIn about the work Apple did on Face ID, that "**<u>Tons of data was being collected</u>** at the time to cover all the bases." [895]

On Nov 17 2020, ███ published an article to Medium titled "Face Recognition: 3D Face Recognition from Infancy to Product."[896] ███ wrote, *"Face ID was a huge project. On initial launch, about 1,000 engineers were working on the entire hardware module, software, and infrastructure….We collected an amazing amount of data. 1,000,000,000 images were collected as announced in the Keynote. That's a number difficult to imagine and not just the collection, but the infrastructure and processing requirements to even train an algorithm on such a set of data."*

He wrote, *"We all learned very quickly that data would solve almost any issue….. We weren't asked to limit our thinking to what was affordable or possible but to expand our thinking to what was necessary to drive innovation."* [897]

---

892 https://www.linkedin.com/pulse/fail-fast-first███
893 https://www.linkedin.com/pulse/thoughts-leaving███aloe/
894 https://www.linkedin.com/pulse/design-experiment-data-collection███
895 https://www.linkedin.com/pulse/ml-examining-test-se███
896 https://towardsdatascience.com/face-recognition-3d-face-recognition-from-infancy-to-product-209126575b56
897 https://towardsdatascience.com/face-recognition-3d-face-recognition-from-infancy-to-product-209126575b56

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

**Was the manager in charge of Gobbler fired?**

Apple formally announced Face ID on September 12, 2017.[898] However, details of Face ID were "leaked" months prior. On July 30 2017, the Apple Release Mgmt team posted HomePod firmware publicly which included unreleased product details in the code, including Face ID & iPhone X. The press covered the leak, writing: *"code indicates the existence of infra-red face unlock in BiometricKit, which is the framework responsible for Touch ID. The code further suggests that Apple's face unlock feature will be able to detect partially occluded face and faces from various angles. The codename for the project Pearl ID. The code also shows the iPhone 8 codename as D22."* [899]

Face ID was further "leaked" on Sept 8 2017 when the to-be released iOS build was made public. This leak was also covered by the press, writing: *"Leaked iPhone 8 firmware reveals animated emoji, Face ID, and updated AirPods."* [900] That leak also included *"details on wireless charging and a status bar update in iOS 11. According to the leak, the new facial recognition system will be capable of substituting for Touch ID everywhere the current system is used, both unlocking the phone and confirming purchases on iTunes, the App Store, and Apple Pay."*[901] One outlet wrote, *"Face ID appears to be the official marketing name for what's been referenced as Pearl ID, the facial recognition features that will likely replace the Touch ID fingerprint recognition feature."*[902]

Gjovik was told by numerous people that both of those leaks came from her previous team in Software Engineering, currently run by ▮▮▮▮▮ (the guy who used to yelled at her and bring ammo to work). Gjovik was told how the leaks happened (which she will not share here, but an testify if needed). She was told both leaks were attributed directly to ▮▮ ▮▮▮ via his negligence, as well as the negligence of ▮▮▮▮▮▮▮ (Gjovik's previous director). Gjovik was told that ▮▮▮▮ was

---

[898] Apple announced Face ID during the unveiling of the iPhone X on September 12, 2017,
https://www.theverge.com/2017/9/12/16288806/apple-iphone-x-price-release-date-features-announced
[899] HomePod firmware seemingly confirms iPhone 8 front design & support for 'Face ID', Jul. 30th 2017 ,
https://9to5mac.com/2017/07/30/iphone-8-design-and-face-unlock-homepod-code/
[900] Leaked iPhone 8 firmware reveals animated emoji, Face ID, and updated AirPods,
https://www.theverge.com/2017/9/9/16280026/apple-iphone-face-id-animoji-features-leak
[901] iPhone X will unlock with facial recognition instead of the home button,
https://www.theverge.com/2017/9/12/16270352/apple-iphone-x-home-button-removed-unlock-touch-id;
[902] iOS 11 GM leak confirms D22 'iPhone X' features: Portrait Lighting, True Tone Display, revised ,
https://9to5mac.com/2017/09/08/ios-11-gm-d22-iphone-8-details/

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

demoted from a Director to a Senior Manager following the leaks and that ███ was given a 30-day notice, directly by Tim Cook, to find a new job at Apple or else would be fired.

Apple accuses Gjovik of sharing information (that was already generally known about a feature released to the public nearly four years ago and/or a topic protected by the California Constitution), and using that to justify their egregious termination of Gjovik. Meanwhile, ███ and ███ were responsible for actually "leaking" actual "IP" to the public before a product announce but **were not fired.** ███ and ███ were also notorious for a history of bad behavior & discipline during their Apple tenures. **Not fired**. The difference? ███ and ███ did not participate in protected activity.

███ AND ███ **WERE NOT** FIRED.

During the 2017 announce of Face ID, Marketing VP Phil Schiller said, "*To create Face ID we worked with thousands of people across the world and the team took over a billion images*" and with that, "*they developed multiple neural networks.*" [903] Schiller said, "*the team even worked with professional mask makers and make-up artists in Hollywood to prevent attempts to beat Face ID.*" He said, "*these are actual masks used by the engineering team to train the neural networks.*"

**Was Phil Schiller fired?**

An Apple Senior Data Scientist, ███ [904] currently includes on her LinkedIn profile that during 2017-2019, she worked in Video Engineering on Face ID. She posted that her role included, "*(Face ID] Data Mining and Algorithm Retrospective Failure Analysis*," and she "*Built internal dashboard-based website for real-time monitoring of (Face ID) key metrics*" amongst other duties. An Apple Project Manager, ███, [905] posted that she worked on Face ID Computer Vision in 2018, with duties including:

- "Project Managed a **highly confidential** Face ID Special Project Task by coordinating and documenting project requirement needs and worked cross-functionally with Video Engineering

---

[903] Apple, Apple iPhone X - Full Announcement From Apple's 2017 Keynote,
https://www.youtube.com/watch?v=Umy1GN3rlJQ
[904] ███
[905] ███

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

team, iPad Product Marketing manager, Face ID Algorithm engineers, and Apple's Global Security team to **prep for on-site testing of new, unannounced iPad Pro** in an industry-specific facility before product launch."

- " Led **special iPad Pro QA Mount study in select industry environments**. Documented findings by writing Special Report and presented to top Video Engineering leadership with test findings, recommendations and Call to Action prep for product launch."


**Were ██ & ██ fired?**


There is plenty of "internal" Apple information available publicly online, seemingly without Apple's attempting to remove or redact it. For example, there is a wiki page dedicated to internal software builds with screenshots, codenames, builds numbers.[906] Another page details an internal application used for "flashing iDevices" including mentions of an internal VPN app, source paths, restore components & operations, and troubleshooting.[907] Another page details internal and factory firmware bundles and yet another discusses internal software updates. [908]

Internal software and application details & screenshots have also been included in forums and discussion threads.[909] Internal Apple applications are also available for download on archive.org.[910] A 2015 Business Insider article details the following internal applications: AppleConnect, AppleWeb, Retail Daily Download, GKTank, Inferno, iPlano, MobileGenius, MobileRadar, Operator, Receipts, Red Zone Mobile, Skybox, Switchboard, ToughFighter 2, & Unibox.[911]  A wiki page, created in 2011 & last updated May 2021, lists the names of over a hundred Apple internal apps, tools, and bundles including apps like Glimmer, Magneto, Siri Debug, & LiveOn.[912] Many of the apps listed also link to detailed

---

[906] The iPhone Wiki, *Internal UI Builds,* https://www.theiphonewiki.com/wiki/InternalUI_Builds
[907] The iPhone Wiki, *PurpleRestore,* https://www.theiphonewiki.com/wiki/PurpleRestore
[908] The iPhone Wiki, *Internal Firmware,* https://www.theiphonewiki.com/wiki/Internal_Firmware; *Internal OTA Updates,* https://www.theiphonewiki.com/wiki/Internal_OTA_Updates
[909] Reddit, *Apple Internal App,* https://web.archive.org/web/20220111143937/https://www.reddit.com/r/Apple_Internal/comments/s1edzi/apple_internal_app ; BetaArchive, *Apple Internal Apps,* https://www.betaarchive.com/forum/viewtopic.php?t=34855l; *Apple Park App,* https://www.reddit.com/r/Apple_Internal/comments/ruasj4/apples_internal_apps_with_apple_park/
[910] Archive.org, *Various macOS Internal Applications,* https://archive.org/details/macOSInternalApplications; *Apple Internal Apps,* https://archive.org/details/troubleshoot-plan-genius-v-1.0
[911] Business Insider, *Here are the secret apps that only Apple employees can use,* Sept 29 2015, https://www.businessinsider.com/apps-only-apple-employees-get-to-download-and-use-2014-11?op=1
[912] The iPhone Wiki, *Apple Internal Apps,* https://www.theiphonewiki.com/wiki/Apple_Internal_Apps

U.S. Department of Labor
ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

descriptions & screenshots including: iOS Menu, [913]  iTrack,[914] Radar,[915]  Tap-to-Radar,[916] Switchboard,[917] PurpleSNIFF,[918] Apple U,[919] & AppleConnect.[920]

The information currently publicly available about Apple's internal tools must have been provided by numerous current and ex-Apple employees. There is no news coverage or lawsuits to be found of terminations of employees for sharing this type information, nor does it appear Apple has made any effort to take the information down. In addition, this information doesn't' seem to be shared in furtherance of any protected topics, contrast with Gjovik's protected disclosures about employee surveillance and intimidation.

## Apple, the "Ear Canal Innovator"

### Biometrics Laws/Policy

Facial recognition or "faceprinting" uses biological characteristics to verify an individual's identity by extracting an individual's face geometry data in order to confirm a subsequent match of the individual's face. Geometric attributes of faces include distance between the eyes, width of the nose, and other features. Face geometry is a physiological characteristic and qualifies as a "biometric identifier."[921]

Biometrics is "the science of automatic identification or identity verification of individuals using physiological or behavioral characteristics."  Traditionally, these physiological traits have included digitally scanned fingerprints, digital photo analysis through facial recognition technology, iris scans, and DNA. Increasingly, physiological identifiers that can be digitally captured, stored, and analyzed include more experimental biometrics, including gait, skeletal bone scans, scars and tattoos, ear shape and eyebrow shape, breathing rates, and eye pupil dilation, among other identifiers. [922]

---

[913] The iPhone Wiki, iOS Menu, https://www.theiphonewiki.com/wiki/IOS_Menu
[914] The iPhone Wiki, iTrack, https://www.theiphonewiki.com/wiki/IOS_Menu
[915] The iPhone Wiki, Radar, https://www.theiphonewiki.com/wiki/Radar
[916] The iPhone Wiki, Tap-to-Radar, https://www.theiphonewiki.com/wiki/Tap-to-Radar
[917] The iPhone Wiki, Switchboard, https://www.theiphonewiki.com/wiki/Switchboard_(App_Store)
[918] The iPhone Wiki, PurpleSNIFF, https://www.theiphonewiki.com/wiki/PurpleSNIFF
[919] The iPhone Wiki, Apple U, https://www.theiphonewiki.com/wiki/Apple_U
[920] The iPhone Wiki, AppleConnect, https://www.theiphonewiki.com/wiki/AppleConnect_(Application)
[921] *Hazlitt v. Apple Inc.*, 543 F. Supp. 3d 643, 646 (S.D. Ill. 2021)
[922] BIOMETRIC CYBERINTELLIGENCE AND THE POSSE COMITATUS ACT, 66 Emory L.J. 697

## U.S. Department of Labor
### ASHLEY GJOVIK V APPLE INC. | COMPLAINT
CASE: APPLE INC./GJOVIK/9-3290-22-051

Issues of biometric privacy have arisen with increasing frequency over the last several years as biometric scanners have become cheaper and more prevalent. Though advocates have been sounding the alarm about biometric privacy for decades, by 2018 even Microsoft was calling for greater regulation of facial recognition technology. Along with this increased concern has come a wave of litigation against technology companies that use facial recognition to identify people in photographs and employers that use fingerprint biometric scanners for employee timekeeping. In the trenches of the Northern District of California, for example, Facebook is facing more than $ 30 billion in potential liability for violations of biometric privacy laws.[923]

The Snowden disclosures reveal the increasing importance of biometric data as a component of mass surveillance and a critical tool in intelligence gathering. There is currently a rapid expansion of biometric databases among the intelligence community, the U.S. military,  and in the public and private sectors generally. [924] The legislature notes that the "overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information."  This is because, unlike social security numbers and other personal information, biometrics "*are biologically unique to the individual so that once compromised, the individual has no recourse, [and] is at heightened risk for identity theft.*" [925]

An *Applied Intelligence* paper published in October of 2020 explained "that ears have  a large amount of specific and unique features that allow for person identification."[926] The article explained, "the human ear is a perfect source of data for passive person identification as it does not involve the cooperativeness of the human whom we are trying to recognize" & "acquisition of a human ear is also easy as the ear is visible even in the mask wearing scenarios." [927]  The article stated tracking ear biometrics "can be useful in identifying persons in a massive crowd when combined with a proper surveillance system." [928]

---

[923] ARTICLE: From Identification to Identity Theft: Public Perceptions of Biometric Privacy Harms, 10 U.C. Irvine L. Rev. 107
[924] BIOMETRIC CYBERINTELLIGENCE AND THE POSSE COMITATUS ACT, 66 Emory L.J. 697
[925] *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 U.S. Dist. LEXIS 149604, at *3-4 (N.D. Ill. Sep. 15, 2017)
[926] Ahila Priyadharshini, R., Arivazhagan, S. & Arun, M. A deep learning approach for person identification using ear biometrics. *Appl Intell* **51**, 2161–2172 (2021). https://doi.org/10.1007/s10489-020-01995-8
[927] Ahila Priyadharshini, R., Arivazhagan, S. & Arun, M. A deep learning approach for person identification using ear biometrics. *Appl Intell* **51**, 2161–2172 (2021). https://doi.org/10.1007/s10489-020-01995-8
[928] Ahila Priyadharshini, R., Arivazhagan, S. & Arun, M. A deep learning approach for person identification using ear biometrics. *Appl Intell* **51**, 2161–2172 (2021). https://doi.org/10.1007/s10489-020-01995-8

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

 In 2021, FTC Commissioner Rohit Chopra declared that "Today's facial recognition surveillance technologies are discriminatory and dangerous."[929] Commissioner Chopra elaborated: "With the tsunami of data being collected on individuals, we need all hands-on deck to keep these companies in check. State and local governments have rightfully taken steps to enact bans, moratoria, and other restrictions on the use of these technologies." [930]

After decades of research of anthropometric measurements of ear photographs of thousands of people, it has been found that no two ears are alike, even in the cases of identical and fraternal twins, triplets, and quadruplets  Ear can be easily captured from a distance without a fully cooperative subject although it can sometimes be hidden by hair, muffler, scarf, and earrings.  It is possible to use the infrared images of ears to overcome the problem of occlusion of the ear by hair. [931]

The potential cybersurveillance consequences of mass biometric data collection are not yet fully known. What is known, however, is that mass biometric data storage and analysis can lead to multiple unprecedented legal challenges as big data tools and new forms of cybersurveillance technologies place increasing strain on existing privacy law doctrine.[932] Studies have also found that generally, people not comfortable with the next generation of biometric uses: using facial recognition.[933]

## Apple's Public Information About Ear Studies & Biometrics

On September 5 2020, Apple VP of Marketing , Greg Joswiak ("Joz") was interviewed by Wired about Apple AirPods.[934]  *"We had done work with Stanford to **3D-scan hundreds of different ears** and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population,"* Joswiak says. *"With AirPods Pro, we took that research further – **studied more***

---

[929] U.S. Federal Trade Commission, *In the Matter of Everalbum and Paravision,*
https://www.ftc.gov/system/files/documents/public_statements/1585858/updated_final_chopra_statement_on_everalbum_for_circulation.pdf ; https://twitter.com/chopracfpb/status/1348670577050005504
[930] U.S. Federal Trade Commission, *In the Matter of Everalbum and Paravision,*
https://www.ftc.gov/system/files/documents/public_statements/1585858/updated_final_chopra_statement_on_everalbum_for_circulation.pdf
[931] 3D Ear Biometrics  BIR BHANU, HUI CHEN, Center for Research in Intelligent Systems, University of California, Riverside, CA, USA , Springer
[932] *BIOMETRIC CYBERINTELLIGENCE AND THE POSSE COMITATUS ACT*
[933] ARTICLE: From Identification to Identity Theft: Public Perceptions of Biometric Privacy Harms, 10 U.C. Irvine L. Rev. 107
[934] The secrets behind the runaway success of Apple's AirPods: The wireless headphones have been a surprise hit. Here's how: Sept 5 2020, https://www.wired.co.uk/article/apple-airpods-success

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."*

On December 9 2021, two Apple Product Design executives were interviewed by Wallpaper about Apple's product design team. [935] The article said, "*When AirPods' development began a decade or so ago, human factors researcher Kristi Bauerly found herself researching the 'crazily complex' human ear. '**We moulded and scanned ears**, worked with nearby academics, focusing on outer ears for the earbud design and inner ears for the acoustics,' she says. **Thousands of ears were scanned,** and only by bringing them all together did the company find the 'design space' to work within. '**I think we've assembled one of the largest ear libraries anywhere,'** Hankey says. 'The database is where the design starts,' Bauerly continues, 'and then we iterate and reiterate*.' "

On July 28 2021, Apple AI/ML Research published a paper about internal studies they were doing around biometrics (breath rate) and AirPods. [936] The paper was further published in August 2021 with IEEE[937] & on Apple's own website.[938] "The paper hints at the integration of biometric health sensors in headphones used while participating in sports. The company is … [a] ear-canal innovator."[939]

The 2021 paper notes, "**data was collected from 21 healthy** *individuals from both indoor and outdoor environments. Participants spanned the ages of 22 to 60 and were split fairly evenly between genders. Several participants provided six pulse rate measurements per audio sample submitted, each of which spanned a six-minute active period. All data was recorded using microphone-enabled, nearrange headphones, specifically Apple's AirPods.*" Apple noted, "*In this paper, we take the first step towards developing a breathlessness measurement tool by estimating respiratory rate (RR) on exertion in a healthy population using audio from wearable headphones*." [940] The study sounds like another "internal" Apple user study.

---

[935] Inside Apple Park: first look at the design team shaping the future of tech, Dec 9 2021, https://www.wallpaper.com/design/apple-park-behind-the-scenes-design-team-interview
[936] Estimating Respiratory Rate From Breath Audio Obtained Through Wearable Microphones, *[Submitted on 28 Jul 2021],* https://arxiv.org/abs/2107.14028
[937] A. Kumar, V. Mitra, C. Oliver, A. Ullal, M. Biddulph and I. Mance, "Estimating Respiratory Rate From Breath Audio Obtained Through Wearable Microphones," *2021 43rd Annual International Conference of the IEEE Engineering in Medicine & Biology Society (EMBC)*, 2021, pp. 7310-7315, doi: 10.1109/EMBC46164.2021.9629661.
[938] Estimating Respiratory Rate From Breath Audio Obtained Through Wearable Microphones, August 2021, https://machinelearning.apple.com/research/estimating-respiratory-rate
[939] Can you ID me now? Apple les for ear- canal biometrics patent, Jan 28, 2022,, https://www.biometricupdate.com/202201/can-you-id-me-now-apple-files-for-ear-canal-biometrics-patent
[940] Estimating Respiratory Rate From Breath Audio Obtained Through Wearable Microphones, August 2021, https://machinelearning.apple.com/research/estimating-respiratory-rate

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

In August of 2021, Patently Apple wrote that, *"Apple began discussing integrating health sensors into future sports-oriented headphones in a patent application that was published back in April 2009 and filed in 2008. To top it all off, in June of this year,* **Apple's VP of Technology talked about health sensors on Apple Watch and possibly AirPods**.*"* [941]

Apple is currently hiring for a role, with a description posted on LinkedIn saying, *"As part of the Acoustics User Studies team, you will work closely with acoustic engineers and multi-functional partners to design and* **conduct perceptual user studies for new audio feature development**. *You will drive the entire end-to-end study cycle, from definition and scope of the study question to data analysis and results delivery. Our team dives deep into emerging technical areas,* **such as spatial audio and headphones technologies.** *Our Acoustics User Studies team drives the development of groundbreaking audio technologies and products through acoustic and perceptual studies.* **We design and carry out studies that influence hardware design, optimize software algorithms,** *and recommend engineering requirements that are perceptually relevant."* [942]

On Dec 20 2020, press covered a new patent from Apple around AirPod biometrics.[943] Apple's patent filings describe a system for deriving biometrics using embedded biometric sensors on the AirPods (Earbuds).[944] The patent captures waveforms associated with the cycling profusion of blood to the skin, so multiple biometric parameters can be collected, including, for example, heart rate, blood volume, and respiratory rate. By using LEDs that emit different wavelengths of light additional data can be gathered, such as, for example, VO2 max (i.e., the maximal rate of oxygen absorption by the body). A pulse oximeter in the area of the tragus is believed to be particularly accurate. The electrodes on the earbuds can be configured to measure the galvanic skin response (GSR). A GSR can help determine the amount of stress being experienced by the user at any given moment in time. Another use of this design will lend itself well for measuring electrocardiogram (EKG) data or impedance cardiography (ICG) related data. [945]

---

[941] Apple's Machine Learning Research Team have Published a Paper on using Specialized Health Sensors in Future AirPods, https://www.patentlyapple.com/patently-apple/2021/08/apples-machine-learning-research-team-have-published-a-paper-on-using-specialized-health-sensors-in-future-airpods.html

[942] Apple Perceptual Audio Evaluation Specialist, https://www.linkedin.com/jobs/view/2975662157
[943] Apple's future AirPods/earbuds could facilitate biometric measurements, Niel Smith, December 30, 2020 https://www.myhealthyapple.com/apples-future-airpods-earbuds-could-facilitate-biometric-measurements/
[944] Patent number 10856068
[945] Patent number 10856068

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

**IT'S NOT A SECRET APPLE DOES USER STUDIES**

Just searching LinkedIn for "Apple User Study," numerous people and positions are returned with detailed descriptions of the roles and projects. Apple is positioning that user studies are inherently secret within Apple.   On the contrary, with a quick search I found a role for a *"Engineering Program Manager - User Studies*" that will "Drive user study related requirements (e.g. identify and recruit user study participants, security and legal compliance, logistics, etc.), decision-making and integrity around user study efforts."[946] I found a role for, "User Study Operations Manager - Sensing Technologies, which will "*Lead the team that plans and executes user studies and data collection for sensor and health technology development and feature delivery. In this highly visible position, you will collaborate with cross-functional and cross-discipline teams across Apple to execute on user studies ranging from small, focused research studies to large-scale worldwide operations."* [947]

I found an employee listing his position as "*User Study Facilitator at Apple*," with a description of "*Coordinating User Studies for Human Engineering - Physiology Team, Leading participant appointments by communicating study requirements, privacy and legal compliance."* [948] I found a role, "*Health Study EPM*," that will "*Drive user study related requirements (e.g. identify and recruit user study participants, security and legal compliance, logistics, etc.), decision-making and integrity around user study efforts*."[949] I found a role, "*User Study Operations Manager - Sensing Technologies*," that hints to future products saying *"Our study operations have enabled Apple to ship new sensors, multiple health features, and numerous Machine Learning (ML) solutions. But our ambitions are bigger still, with much more to come."* [950]

I found a role, "User Studies Operations Engineer, that will "will work closely with product development team; designing, leading, executing, and monitoring large-scale studies in support of algorithm development."[951] I found a "*Data Collection Facilitator - Learning and Education*," that will "*Conduct in-person user study sessions. Administer screening and consent forms, interview and debrief participants, observe behavior, and administer complex testing protocols involving diverse hardware*

---

[946] https://www.linkedin.com/jobs/view/2944349227
[947] https://www.linkedin.com/jobs/view/2942922643
[948] Justin Fong, www.linkedin.com/in/justinf2108
[949] https://www.linkedin.com/jobs/view/2938135938
[950] https://www.linkedin.com/jobs/view/2911203208
[951] https://www.linkedin.com/jobs/view/2944339533

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

*and software.*"[952] I found a role, "*LiveOn Program Manager,*" that defines an entire team, "*The LiveOn team grew to enable unreleased products to be "lived on" by Apple employees outside of labs, networks and campuses.*"[953]

There's more! I found a role, "ISE, System Experience — Senior User Studies Researcher," that will "develop and conduct Apple-internal in-person and remote user studies on iOS, iPadOS, and macOS platforms and features." [954] I found a role, "Human Factors Engineer – Audio," that will "*Develop user study criteria and detailed methodology for projects which focus on product comfort and span from formative to evaluative and qualitative to quantitative*" & "*Conduct user-centered research and evaluation on a diverse user population utilizing experimental data and scientific publications,*" and that needs "*Expertise with biometric data systems (eye tracking, EEG, GSR), Expertise with motion capture systems, and Experience with photogrammetry.*" [955]

### Gjovik was Deeply Disturbed by the Persistent, Increasing Requests to Image her Ear Canals

On Aug 10 2018 Gjovik was invited to a "HE User Study" for "anthropometry HH" sent by two employees who previous asked for photos of her ears, and discussed wanting to scan her ears. Gjovik replied, "*Hi, I'm sorry - but I need to cancel indefinitely. I really wanted to help with this, but I just started part-time law school. I'm already underwater, and need to focus on my core work responsibilities & school.*" Gjovik assumed she'd be taken off the list for ear studies, if not all user studies. [956]

Then in 2021, while Gjovik was put on Admin Leave in August, she received three separate emails asking to scan her ears/ear canals, again. The email was titled, "HE 3D Ear Scan Invitation!" The emails said, "*You're invited to a voluntary in-person study where we will capture high-resolution 3D scans of participants' ears. The goal of this effort is to collect representative ear geometry data across age, gender, and ethnic groups. These 3D scans are extremely valuable to audio research efforts and better our understanding of ear geometry variance.*" The email said she'd be asked to review an ICF

---

[952] https://www.linkedin.com/jobs/view/2944353441
[953] https://www.linkedin.com/jobs/view/2945797951
[954] https://www.linkedin.com/jobs/view/2944351127
[955] https://www.linkedin.com/jobs/view/2944349447
[956] Aug 10 2018, Gjovik to stephanie_juachon@apple.com, yifang_tsai@apple.com

prior to taking a recruitment survey" and then another ICF for study participation. Gjovik did not respond to any of the emails nor did she sign any of the ICFs. [957]

      Gjovik was disturbed by Apple's lack of respect for its employee's privacy. She also wondered if Apple could be sending her these on purpose, since she already opted out, in order to harass her further. The emails didn't say Apple Confidential, nor did they include anything that appeared actually secret or material. Regardless, Gjovik redacted them heavily since her only point was to protest an employer pressuring its employees to gather such sensitive information (biometrics).

## GJOVIK'S TWEETS WAS OPPOSITION TO PRACTICES BELIEVED TO BE UNLAWFUL

      An individual is protected from retaliation for opposing any unlawful practice. Protected "opposition" activity broadly includes the many ways in which an individual may communicate explicitly or implicitly opposition to perceived employment discrimination. The manner of opposition must be reasonable, and the opposition must be based on a reasonable good faith belief that the conduct opposed is, or could become, unlawful.[958]

      The scope of the opposition clause is not limited to complaints made *to the employer*. Complaints about the employer to others that the employer learns about can be protected opposition.[959] Although opposition typically involves complaints to managers,[960] it may be a reasonable manner of opposition to inform others of alleged discrimination, including others outside the company including: coworkers, legislatures, **newspaper reporters**, or "**anyone else**."[961] Depending on the circumstances,

---

[957] https://ask.apple.com/survey/02cf4a74-465b-4669-ba8b-a6717582bc59

[958] Enforcement Guidance on Retaliation and Related Issues, August 01, 2016, https://plus.lexis.com/api/permalink/6ee6fa70-59a5-4841-83f4-ffb9a1c6a4be/?context=1530671

[959] B. Lindemann, P. Grossman, & C. Weirich, *Employment Discrimination Law* 15-20 (5th ed. 2012) (collecting cases).

[960] *Cf. Crawford*, 555 U.S. at 276 (endorsing the EEOC's position that communicating to one's employer a belief that the employer has engaged in employment discrimination "virtually always" constitutes "opposition" to the activity, and stating that any exceptions would be "eccentric cases"); *see, e.g.*, *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 438 (4th Cir. 2012) (holding that plaintiff's meeting with a corporate executive to protest a supervisor's direction to falsify time records to avoid overtime was FLSA protected activity).

[961] *See Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 42 (1st Cir. 2013) (observing that "there is no dispute that writing one's legislator is protected conduct"); *Conetta v. Nat'l Hair Care Ctrs., Inc.*, 236 F.3d 67, 76 (1st Cir. 2001) (ruling that employee's complaints of sexual harassment to coworker who was a son of general manager was protected opposition); *Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000)* (stating that "there is no qualification on . . . the party to whom the complaint is made known," and it may include management, unions, other employees, newspaper reporters, or "anyone else").

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

calling public attention to alleged discrimination may constitute reasonable opposition, provided that it is connected to an alleged violation of the EEO laws. [962] Opposition may include even activities such as making informal or public protests against discrimination.[963] Most opposition is "reasonable," and conduct must be extreme to become unprotected, such as committing or threatening violence to life or property. [964] As with participation, a retaliation claim based on opposition is not defeated merely because the underlying challenged practice ultimately is found to be lawful.[965]

      On August 28 2021, Gjovik expressed OPPOSITION to/about her employer, Apple Inc, in regard to Apple's DISCRIMINATION & HARASSMENT against her, UNFAIR LABOR PRACTICES, and/or Apple's unlawful INVASION into her fundamental, constitutionally protected PRIVACY interests.

> **"I'm still over here in Apple's time-out chair & they keep telling me to respect my abuser's privacy & be silent. Meanwhile I got 3x of these in the last month since being on leave. NO, APPLE, STOP IT. I can't tell if they're harassing me or just being super intrusive or both."**

---

[962] *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir. 1983) (observing that all actions of opposition to an employer's practices constitute some level of disloyalty, and therefore in order to reach the level of being unreasonable, such opposition must "significantly disrupt[] the workplace" or "directly hinder[]" the plaintiff's ability to perform his or her job); *EEOC v. Kidney Replacement Servs.*, No. 06-13351, 2007 WL 1218770, at *4-6 (E.D. Mich. 2007) (concluding that medical workers engaged in reasonable opposition when they raised their sexual harassment complaints directly to the onsite supervisor at the correctional facility to which their employer had assigned them, even though they were in effect raising a complaint to their employer's customer).

[963] *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Crown Zellerbach*, 720 F.2d at 1013-14 (holding that employer violated Title VII when it imposed disciplinary suspension in retaliation for public protest letter by several employees of an "affirmative action award" given to a major customer; reasoning that even though the letter could potentially harm the employer's economic interests, it was a reasonable manner of opposition because it did not interfere with job performance).

[964] Enforcement Guidance on Retaliation and Related Issues, August 01, 2016, https://plus.lexis.com/api/permalink/6ee6fa70-59a5-4841-83f4-ffb9a1c6a4be/?context=1530671

[965] *Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) ("[A] plaintiff [in an opposition case] does not need to prove that the employment practice at issue was in fact unlawful under Title VII . . . [A plaintiff] must only show that she had a "reasonable belief" that the employment practice she protested was prohibited under Title VII."); *see also Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980) ("Limiting retaliation protections to those individuals whose discrimination claims are meritorious would 'undermine[] Title VII's central purpose, the elimination of employment discrimination by informal means; destroy[] one of the chief means of achieving that purpose, the frank and non-disruptive exchange of ideas between employers and employees; and serve[] no redeeming statutory or policy purposes of its own.'"). For this reason, if an employer takes a materially adverse action against an employee because it concludes that the employee has acted in bad faith in raising EEO allegations, it is not certain to prevail on a retaliation claim, since a jury may conclude that the claim was in fact made in good faith even if the employer subjectively thought otherwise. *Cf. Sanders v. Madison Square Garden*, 525 F. Supp. 2d 364, 367 (S.D.N.Y. Sept. 5, 2007) ("[I]f an employer chooses to fire an employee for making false or bad accusations, he does so at his peril, and takes the risk that a jury will later disagree with his characterization.") *; see also supra* note 18.

**U.S. Department of Labor**

**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**

CASE: APPLE INC./GJOVIK/9-3290-22-051



---

966 *Aug 28 Twitter Post:* https://twitter.com/ashleygjovik/status/1431824501457633283
https://web.archive.org/web/20210829034222/https://twitter.com/ashleygjovik/status/1431824501457633283

**U.S. Department of Labor**

**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**

CASE: APPLE INC./GJOVIK/9-3290-22-051



### Coercion is not Consent

Companies can process personal data if they obtain either subjects' voluntary affirmative consent to process data for the specific purpose intended or have a legitimate justification. Companies generally cannot rely on blanket consent inserted in an employee contract or handbook to justify either widespread monitoring. Broad consent arguably does not satisfy the GDPR's requirement that the subject affirmatively consent to the specific purpose for which the data will be processed. Consent also must be truly voluntary. As a result, corporations in countries such as Germany and France tend not to rely on consent because employees must be expressly asked for it, must be able to refuse without risk of sanction, and can withdraw it at any time. Moreover, in the corporate investigation context, courts tend to assume that such consent is involuntary because of the imbalance of power between the employer and employee.[967]

U.S. organizations that control or process the personal data of European Union residents likely are subject to the EU's new data protection requirements, the General Data Protection Regulation (GDPR). A common practice in the U.S. is to rely on blanket consent clauses in employment contracts or handbooks that permit employers to process employee personal data. U.S. employers often also rely on implied consent from employees. However, such practices may not be considered valid forms of consent for lawful processing of personal data under the GDPR. The GDPR provides that consent must be *"freely given, specific, informed and unambiguous."* Moreover, the GDPR adds, consent is

---

[967] ARTICLE: THE LAW OF CORPORATE INVESTIGATIONS AND THE GLOBAL EXPANSION OF CORPORATE CRIMINAL ENFORCEMENT, 93 S. Cal. L. Rev. 697 May 2020

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

not *"freely given"* where a *"clear imbalance of power"* between the data controller (*i.e.,* employer) and the data subject (*i.e.,* employee) exists.[968]

The Article 29 Working Party emphasized the imbalance of power in the employment context: "*Given the dependency that results from the employer/employee relationship, it is unlikely that the data subject is able to deny his/her employer consent to data processing without experiencing the fear or real risk of detrimental effects as a result of a refusal. It is unlikely that an employee would be able to respond freely to a request for consent from his/her employer to, for example, activate monitoring systems such as camera-observation in a workplace, or to fill out assessment forms, without feeling any pressure to consent.*" The Working Party also advises that the imbalance of power in the employment relationship makes voluntary consent questionable and, for most work-related data processing, the GDPR lawful basis relied upon "*cannot and should not*" be the employee's consent. [969]

Employee monitoring may result in the collection of non-employees' personal data. The GDPR and the BDSG also apply to the collection, processing, and use of non-employees' personal data. Accordingly, the employer must have a valid legal basis for processing non-employees' personal data and must notify nonemployees about potential personal data collection. [970]

On Jan 9 2019, McKeon posted to LinkedIn an articled called "Data Collection" about Face ID development at Apple, where he wrote, "*Some countries allow data like face images to be collected, but the laws vary. The aim is to not be in any gray zone about data. Face images are considered Personally Identifiable Information (PII), and in the past few years, especially since GDPR, governments have paid particular attention to privacy. China, for example, doesn't allow PII data to be exported. In the US, you can generally collect PII data in public, but in Europe, you can not. Unlike the US, in France and Germany, **they don't believe an employee can consent to a user study by their employer that collects PII data because the simple employee/employer relationship is a form of coercion**. Usually, there is some compensation for a user study, but keep in mind, too much compensation could also be seen as financial coercion.*"

---

[968] Is Employee Consent under EU Data Protection Regulation Possible?, Joseph J. Lazzarotti and Maya Atrakchi, February 27, 2018
[969] Is Employee Consent under EU Data Protection Regulation Possible?, Joseph J. Lazzarotti and Maya Atrakchi, February 27, 2018
[970] Employee Monitoring (Germany), Resource ID: W-008-3362, HOLGER LUTZ AND SIMONE BACH, BAKER MCKENZIE, WITH PRACTICAL LAW DATA PRIVACY ADVISOR

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

The predominant view of the courts, is that consent is not effective if it is not freely given.[971] Consent must be given freely and voluntarily to be valid." [972] The general rule should be that an employee does not voluntarily consent if the alternative is termination. [973] **Even in the context of initial employment, consent to a particular type of invasion does not mean consent to all varieties of that invasion, reasonable or unreasonable.[974]**

**CONTRACTS SIGNED BY GJOVIK DURING EMPLOYMENT WITH APPLE WERE COERCED BY APPLE**

Multiple GDPR factors invaliding employee to employer consent are present here. First, when Gjovik first responded to the initial email, she had no idea what she consented to/initiated., as it was "*vague or unclear.*" Next, Gjovik has no "*clear records to demonstrate they consented,*" as no receipt was sent and she was never given a copy of the ICF. It appears Apple also no longer has a copy of the ICF, otherwise it seems they would have provided it to Gjovik on Sept 15 or quoted it in their position statement. Next, there was "*a clear imbalance of power between [the employer] and the individual,*" the "*employee would be penalized for refusing consent,*" and "*there was no genuine free choice over whether to opt in.*" Between the general pressure for Apple R&D employees to "live on" new products and software, and to participate in studies, and Gjovik's performance reviews mentioning her participation in these program, but also that barbed wire, compound with armed guards, too.

Next, apparently later some employees were given the option to use the app but not be "whitelisted" so their PII would not be uploaded, but Gjovik was not given this option nor even told it was an option, so "*consent was a precondition of a service, but the processing is not necessary for that service.*" Finally, once Gjovik apparently signed the ICF and after the Gobbler app was installed on her

---

[971] See *Stores, Inc. v. Lee, 74 S.W.3d 634, 647 (Ark. 2002)*
[972] *Papa Gino's of America, Inc., 780 F.2d 1067, 1072 (1st Cir. 1986)* (applying New Hampshire law; employee contracted away certain rights by accepting employment from employer who forbade drug use, but employer's demand that employee submit to polygraph exceeded scope of employee's consent to allow reasonable investigation into drug use).
[973] See *Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 625 (3d Cir. 1992)* (applying Pennsylvania law and stating that "an employee's consent to a violation of public policy is no defense to a wrongful discharge action when that consent is obtained by the threat of dismissal."); *Leibowitz v. H.A. Wintson Co., 493 A.2d 111, 115 (Pa. Super. Ct. 1985)* (employee release authorizing polygraph test is invalid when employer requires employee to sign as a condition of continued employment); *Polsky v. Radio Shack, 666 F.2d 824, 829 (3d Cir. 1981)* (applying Pennsylvania law and stating that "where an employee can show compulsion under threat of job termination to sign a release from liability . . . , the employee need not show duress to invalidate the release because it would contravene Pennsylvania's public policy");
[974] *Frye v. IBP, Inc., 15 F. Supp. 2d 1032, 1041 (D. Kan. 1998)*

**Page 330 of 380**

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

phone (surrounded by armed ex-military), she had no way to disable the app, nor was given anyway to withdraw consent. Gjovik had talked to other employees about the app with similar concerns over the years. Thus, the "consent' was invalid because Apple *"did not tell people about their right to withdraw consent"* and *"people cannot easily withdraw consent."* [975]

While living on was often an actual responsibility of a role in Gjovik's Software Engineering team, she continued to feel pressure in Hardware Engineering as well. One example, in Gjovik's 2019 annual performance review, Powers wrote, "She is an amazing bug finder. Everything she touches seems to break. Said one person, "I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid." It helps that she's constantly living on as many unreleased products as she can, and is diligent about filing bugs. Good stuff! "[976] There were many comments like this.

In 2019, Gjovik was injured by her prototype iPhone. She notified the senior manager in Dan Wests org who managed development iPhone quality, Reed Johnson, telling him her iPhone *"flashed a really bright white light"* at her and that it *"hurt her eyes."* Johnson asked her to report the issue to a Safety team, which she did, and the team took the iPhone from her for failure analysis. The Safety team never told her what happened, but their vague response after testing the device led Gjovik to believe the lasers may have malfunctioned, burning her eyes. The Safety team did not offer any medical evaluation or assistance for Gjovik. There was also no information provided if the "Glimmer/Gobbler" application may have contributed to the injury. Gjovik still found no way disable the app. In fact, as discussed, even after Gjovik was fired, Gobbler was still attempting to access her personal phone.

---

[975] Information Commissioner's Office Consultation: GDPR consent guidance Start date: 2 March 2017 End date: 31 March 2017
[976] Apple Inc, Ashley Gjovik 2019 Annual Review

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051



*After Gjovik was fired; on her fully personal iPhone*

## *Unconscionability*

A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [977] Under this standard, the unconscionability doctrine "'has both a procedural and a substantive element." The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." [978] A contract's substantive fairness "must be considered in light of any procedural unconscionability" in its making. [979] "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." [980]

A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion." [981] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power "on a take-it-or-leave-it basis." [982] The pertinent question is

---

[977] *Sonic II, supra*, 57 Cal.4th at p. 1133.)
[978] (*Pinnacle, supra*, 55 Cal.4th at p. 246.)
[979] *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 912 [190 Cal. Rptr. 3d 812, 353 P.3d 741]
[980] *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125-26, 251 Cal. Rptr. 3d 714, 725-26, 447 P.3d 680, 689-90 (2019)
[981] *Armendariz, supra*, 24 Cal.4th at p. 113
[982] *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 [200 Cal. Rptr. 3d 7, 367 P.3d 6] (*Baltazar*); see *Armendariz*

whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. [983]

"The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the  proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's view of the proposed contract was aided by an attorney." [984]

Employees who have worked in a job for a substantial length of time have likely come to rely on the benefits of employment. For many, the sudden loss of a job may create major disruptions, including abrupt income reduction and an unplanned reentry into the job market. In both the prehiring and posthiring settings, courts must be "particularly attuned" to the danger of oppression and overreaching.[985]

## Both Ear Canal Scanning & the "Gobbler" Application are both Highly Offensive to the Reasonable Person

The roots of American common-law privacy protections are generally attributed to the "right to be let alone," which Warren and Brandeis described as "the right of determining, ordinarily, to what extent [a person's] thoughts, sentiments, and emotions shall be communicated to others."[986] The tort of wrongful employer intrusion upon a protected employee privacy interest is an application to the employment relationship of the intrusion-upon-seclusion tort developed in Restatement Second, Torts § 652B and adopted by most jurisdictions. [987] The intrusion tort runs against a person who "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another" if the intrusion would be "highly offensive to a reasonable person." [988]

---

[983] See *Baltazar*, at pp. 1245–1246; *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1267–1268 [215 Cal. Rptr. 3d 785].)
[984] (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332, 1348 [182 Cal. Rptr. 3d 235],
[985] *Armendariz*, at p. 115; see *Baltazar, supra*, 62 Cal.4th at p. 1244; *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 126-27, 251 Cal. Rptr. 3d 714, 726-27, 447 P.3d 680, 690-91 (2019)
[986] Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 195, 198 (1890)
[987] *Restatement of the Law, Employment Law,* § 7.01, Employee Right of Privacy
[988] *Restatement of the Law, Employment Law,* § 7.01, Employee Right of Privacy

# U.S. Department of Labor
## ASHLEY GJOVIK V APPLE INC. | COMPLAINT
### CASE: APPLE INC./GJOVIK/9-3290-22-051

It applies not only to intrusions by those who have no preexisting relationship with the injured person but also to unwarranted, offensive intrusions by parties who have ongoing contacts with each other, such as those in the employment relationship. [989] In some states, courts have prohibited or regulated certain methods of information collection through the public-policy tort.[990] The public policy at issue in these cases is the common-law protection from privacy invasions or specific statutes prohibiting certain invasions, such as anti-polygraph statutes. [991]

An employer is subject to liability for a wrongful intrusion upon an employee's protected privacy interest if the intrusion would be highly offensive to a reasonable person under the circumstances. [992] The "highly offensive" test is derived from the intrusion-upon-seclusion tort as established in § 652B of the Restatement Second, Torts. The intrusion has to be "a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct *to which the reasonable man would strongly object."[993]*

**Responses to Gjovik's disclosures included, but were not limited to:**

- "Excuse me WHAT"[994]
- "This is creepy. I don't have words to express what is running through my head. "[995]
- "Straight up abusive and creepy behavior how can deployed iOS devices even run stuff like this?"[996]
- "Whatttt" [997]
- "What the hell…."[998]

---

[989] *Restatement of the Law, Employment Law,* § 7.01, Employee Right of Privacy
[990] See *Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363, 1366 (3d Cir. 1979)* (holding that "a cause of action exists under Pennsylvania law for tortious discharge" if the discharge resulted from a refusal to submit to polygraph examination, in violation of Pennsylvania's anti-polygraph statute); *Cordell v. General Hugh Mercer Corp., 325 S.E.2d 111, 117 (W. Va. 1984)* (holding that termination for refusal to submit to polygraph test was a wrongful termination in violation of public policy); Hennesey *v. Coastal Eagle Point Oil Co., 609 A.2d 11 (N.J. 1992)* (public policy provides restrictions on employer drug testing); *Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 626 (3d Cir. 1992)* (applying Pennsylvania law; holding that "dismissing an employee who refused to consent to urinalysis testing and to personal property searches would violate public policy if the testing tortiously invaded the employee's privacy"); Baughman *v. Wal-Mart Stores, Inc., 592 S.E.2d 824 (W. Va. 2003)* (public policy prohibits drug testing of incumbent employees without good-faith objective suspicion of drug use or safety considerations).
[991] *Restatement of the Law, Employment Law,* § 7.01, Employee Right of Privacy
[992] *Restatement of the Law, Employment Law,* § 7.06, Wrongful Employer Intrusions
[993] Restatement Second, Torts § 652B, Comment *d.*; *Restatement of the Law, Employment Law,* § 7.06, Wrongful Employer Intrusions, *Comments*
[994] https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[995] https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[996] https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[997] https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[998] https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

- "Ah, but does the employee handbook say workers are human?" [999]
- "I've heard a manager say we don't have civil rights as employees" [1000]
- "if anyone talks about apple privacy. show them this" [1001]
- "No, just no." [1002]
- This entire article is.. wow. [1003]
- Because privacy is a fundamental human right* * that you need to give up to work for the company that cares so much about privacy. [1004]
- [inserte su referencia a 1984 aquí] [1005]
- This is terrible and so bothersome on many levels. [1006]
- Quel enfer... [1007]

## No Warnings or Risk Mitigation

In in four years of Gjovik's last role at Apple, Gjovik was responsible for ensuring confidentiality, secrecy, and security compliance across David Powers organization as well as with Dan West's management team. Gjovik was looked to as a guide on Apple's compliance policies on these matters, and even developed a FAQ page for the organizations employees, working closely with New Product Security and Software Security teams to write the content. Gjovik had to report her own management to the New Product Security team (informally) several times for violating Apple's confidentiality rules including sharing details of highly secret new hardware and software projects with those who were not "disclosed" on them per Apple policy and process. Gjovik was often looked to by her teammates to weigh in on whether something was confidential or not.

As Apple notes in their position statement, Gjovik had access to an enormous amount of highly sensitive, highly confidential internal information.

> **Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.**
> As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. [1008]

---

[999] https://twitter.com/ashleygjovik/status/1432381235926499332
[1000] https://twitter.com/ashleygjovik/status/1432381235926499332
[1001] https://twitter.com/verge/status/1432381006670147587
[1002] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1003] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1004] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1005] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1006] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1007] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[1008] Apple's US Dept of Labor position statement

Up until a few hours before she was fired, Gjovik had access to future product roadmaps; unreleased hardware/product design and configuration; future operation system source code; access to all Research & Development finance ordering accounts at the company, including the executive office;[1009] information on the manufacturing process and supply chain; competitive analysis; product pricing information; product launch dates; marketing plans; customer feedback and usage trends; access to future software features and projects; access to submit code to the OS releases and view what others submitted.

Gjovik also worked for Apple Legal as an intern and project manager in the summer of 2019, during which time (and probably still in September) she had access to all of Apple's external software- & hardware-related contracts (with Google, Intel, etc); legal strategy around SLAs; open-source software usage, and employee legal training; and other confidential attorney work product. [1010]

Gjovik also worked in a role in 2016 managing software failure analysis for all of Apple's new product launches (iPhone, iPad, Mac, etc). In this role, Gjovik was given access to customer purchase data; product sales data; marketing strategy; customer surveys responses; customer devices and logs; AppleCare support call logs. Gjovik was invited to "closed door meetings" with members of the executive team, to discuss the strategy to address highly sensitive customer hardware and software failures.

**Gjovik has not breached and will not breach her duty to keep the above information confidential.**

Despite Apple claiming they fired Gjovik for "leaking" confidential information, during those 10-12 days following her supposed "leaks," Gjovik said, "*the company made no attempt to keep her from viewing any sensitive data. 'I hadn't lost any of my account access. I still had access to the next four years of the Mac roadmap. I still had access to source code for future releases. I still had access to concept review documents.'*"[1011] One would think if Apple actually thought Gjovik unlawfully leaked

---

[1009] See Evidence Files: Email from/to Jackie Franks and Tammy Davis on March 9 2017
[1010] Restatement Third, The Law Governing Lawyers § 109
[1011] Gizmodo, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

**U.S. Department of Labor**
**ASHLEY GJOVIK V APPLE INC. | COMPLAINT**
CASE: APPLE INC./GJOVIK/9-3290-22-051

information, they would have removed that access immediately. Or sent some sort of warning. Anything. But, there was nothing until an email with no subject line from a Workplace Violence interrogator on Sept 9th.

Gjovik understands her responsibilities under the IPA and has followed the agreement diligently, and has also tried to ensure others do as well, including superiors. In Gjovik's annual performance review feedback to West about Powers in the fall of 2020, she wrote about continued concerns about Powers following his IPA obligations:

> "Dave still struggles with security and confidentiality rules and procedure. Not only does he outright resist &/or forget it exists, but he still gives me criticism when I try to ensure we follow the rules provided from NPS, etc. This came up again last year with the issue I raised to you about Jane/ Megan & the very secret project. I thought I got him back on the rails, but looking at my emails from when I was gone, he went back and did it again, despite explicit instructions from NPS to not do what he did. I've explained to him that EPMs are expected to always be the adults in the room, and that I will be held accountable for his actions around secrecy if I'm aware of what he's doing. He still pushes back on me and appears angry when I bring it up.

Gjovik was speaking of Powers behavior during the (non public) early phase of Apple's transition from Intel to Apple silicon for Mac computers (a verry, very secret phase of the project), and Powers frequent deviations from explicit NPS instructions on the matter. Further, Gjovik had also expressed concerns about West's compliance with his IPA to Apple NPS in the past, including but not limited to when West shared the entire future iPad development roadmap with his extended management team without disclosures or need to know. Gjovik reported this issue to NPS and met with them to discuss it. To Gjovik's knowledge, no one followed up with West. (Come to find out, the Global Security manager Gjovik had met with, Scott Nishi, used to manage executive protection at Northrop Grumman before joining Apple.)[1012]

Another incident was when West wanted to allow all of his employees to bring their (non-employee) families on site into the team's secure lockdowns (a very unusual thing to do with Apple's secrecy policies, and West's team working on prototype hardware). West and Powers were quite laisse-faire about allowing family members to see internal product information, and only insisted the families did not see "prototype hardware." Gjovik argued with her managers fervently and influenced them to ensure the family members did not see or have access to any internal product information.

---

[1012] https://www.linkedin.com/in/scott-nishi-963591109/

However, through the years, West and Powers continued to press on Gjovik that Apple's secrecy rules don't apply to them.

# IV. Pretext

In proving pretext, the complainant shows that the employer's explanation is a 'phony reason.'[1013] An employee may offer evidence "that the employer's proffered explanation is unworthy of credence."[1014] Without direct evidence of pretext, the plaintiff must prove pretext indirectly by showing one of the following: (1) Defendant's explanation of Plaintiff's discharge had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the allegedly discriminatory action.[1015] The evidence may include, for example, suspicious timing, verbal or written statements, comparative evidence that a similarly situated employee was treated differently, falsity of the employer's proffered reason for the adverse action, or any other pieces of evidence which, when viewed together, may permit an inference of retaliatory intent. [1016]

Adverse actions retaliatory can be found when the employer engages in a bad faith or a sham internal investigation against an employee after the employee blew the whistle about conduct. Pretext was found when a defendant launched investigation into allegedly improper conduct by plaintiff shortly after she engaged in protected activity. [1017] The offered reason for a termination "distracting other workers" was found to be pretext when it was not mentioned in the termination notice and the employer had two opportunities to stop the distraction but did not act. [1018]

Actions related to the continued processing of a complaint may remind an employer of its pendency or stoke an employer's animus. Moreover, an opportunity to engage in a retaliatory act may not arise right away. In these circumstances, a materially adverse action might occur long after the

---

[1013] USDOL/OALJ Reporter (HTML) at 8, quoting *Kahn v. U.S. Secretary of Labor* , 64 F.3d 271, 277 (7th Cir. 1995), citing *Pignato v. Am. Trans Air, Inc.* , 14 F.3d 342, 349 (7th Cir. 1994).; Gale v. Ocean Imaging , ARB No. 98 143, ALJ No. 1997 ERA 38 (ARB July 31, 2002),
[1014] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1091 (9th Cir. 2008); *Cornwell*, 439 F.3d at 1028 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256)
[1015] *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir. 1994) (citing *Smith v. General Scanning, Inc.,* 876 F.2d 1315, 1319 (7th Cir. 1989)). *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001)
[1016] *Ortiz*, 2016 WL 4411434, at *34. *Hossaini v. W. Mo. Med. Ctr.*, 97 F.3d 1085, 1089 (8th Cir. 1996)
[1017] *Hossaini v. W. Mo. Med. Ctr.*, 97 F.3d 1085, 1089 (8th Cir. 1996)
[1018] *Priest v Baldwin Associates,* 84-ERA-30 (Sec'y June 11, 1986),

# Exhibit I

## Important Dates:

Aug. 4 2021 – Apple puts Gjovik on indefinite administrative leave.

Aug. 12 2021 – Court decision in favor of employee in *Schulze v. Apple* (a different employment case with these same attorneys).

Aug. 12 2021 – Gjovik files an EEOC complaint against Apple.

Aug. 12 2021 – Beezie Wacks (Twitter account) appears.

Aug. 21 2021 – Mel Nayer (Twitter account) appears.

Aug. 26 2021 – Gjovik files a NLRB charge against Apple.

Aug. 29 2021 – Apple claims it started investigating Gjovik.

Sept. 9 2021 – Apple fires Gjovik.

Sept. 15 2021 – Appleseed files a complaint and Apple's counsel (OMM) email Gjovik to complain about her social media posts.

Sept. 16 2021 – I'mPinkThereforeI'mSpam (Twitter account) appears.

Dec. 10 2021 – U.S. Dept. of Labor case docketed.

Jan. 7 2022 – Orrick files Notice of Rep. for Apple in the U.S. Dept of Labor case.

Jan. 10 2022 – Gjovik files third NLRB charge against Apple.

Jan. 10 2022 – FirstNameBunchofNumbers (Twitter account) appears.

Jan. 15 2022 – Further Parthing (Twitter account) appears.

Jan. 31 2022 – Appleseed sues Gjovik.

Feb. 5 2022 – Appleseed threatens Gjovik to withdraw testimony & evidence.

March 1 2022 – Gag order issued against Gjovik by the state of Washington.

March 4 2022 – Orrick files its position statement to U.S. Dept of Labor.

March 4 2022 – A law firm, assumably Orrick, picks up a copy of the gag order issued against Gjovik on March 1 2022.

March 2022 – Twitter accounts go inactive.

Nov. 14 2022 – Gag order against Gjovik is reversed following successful appeal.

Nov. 17 2022 – Orrick lawyers report Gjovik's OSHA complaint to OSHA as "leaking."

Jan. 23 2023 – NLRB finds in favor of Gjovik on the unlawful work policies & NDAs charges.

Jan. 26 2023 – Appleseed testifies against Gjovik to U.S. Dept of Labor.

# Beezie Wacks (@beezie_wacks)

📊 **accountanalysis**     60 Tweets   Load More                    @ beezie_wacks    Analyze

**60** selected out of **60** retrieved Tweets.                    ⓘ ⚪

**Beezie Wacks**
@beezie_wacks                                                    🌢 🔓 ⚙

**60**           **350**        **2**           **186**        **0**
TWEETS        FOLLOWING    FOLLOWERS    LIKES         LISTED

Cetaphiliac

📅 2021-08-05, 00:26 (6 months ago)
🪪 1423183498290941952
📍 Sunnyvale, CA

### Daily Rhythm



### Tweetvolume by Date

### Day of Week

### Tweet Type

Reply (49)
Tweet (7)
Retweet (3)
Self-Reply (1)

### Language of Tweets

English (57)
Unknown (3)

### Used Interface

Twitter for iPhone (55)
Twitter Web App (5)



**Used Hashtags**

- #ashleygjovik (6)
- #narcissist (2)
- #youdeserveit (2)
- #coward (1)
- #facepalm (1)
- #facts (1)

**Hostnames of URLs**

- www.uscourts.gov (1)

**Replied Users**

- @cherthedev (17)
- @ashleygjovik (8)
- @cherthediv (2)
- @lawjolla (2)
- @mobileopinions (2)
- @sarahmya2000 (2)
- @_shantini_ (1)
- @blklivesmatter (1)
- @business (1)
- @chouiev (1)
- Others (12)

**Retweeted Users**

- @beezie_wacks (3)

**Quoted Users**



**Beezie Wacks**
@beezie_wacks

Replying to @ashleygjovik

So basically, anyone who talks to you is gonna get outed on any public forum you post to? Are you someone who can be trusted, like ever? If you're gonna be a lawyer, who has attorney-client expectations, what client will trust you won't use their words against them later?

1:47 PM · Aug 12, 2021 · Twitter for iPhone

**1** Quote Tweet

Tweet your reply                                            Reply

**Linda Dong** 🍉 @lindadong · Aug 12
Replying to @beezie_wacks and @ashleygjovik
You only follow 3 female apple employees

♡ 5

**More Replies**

**Secret Lair Arcade** @LairArcade · Aug 12
Replying to @beezie_wacks and @ashleygjovik
Who are you?

💬 1                                  ♡ 1

**Beezie Wacks** @beezie_wacks · Aug 13
You remind me of the babe!



**Ashley M. Gjøvik** @ashleygjovik · Aug 13

I'm fairly sure EEOC only applies if you're my employer. Are you trying to tell me something, Beezie?

Tim, is that you?

>  **Beezie Wacks** @beezie_wacks · Aug 13
>
> Replying to @ashleygjovik
>
> Wow. Gaslight, much? Two posts, one asking about your execution of confidentiality is "harassment?" eeoc.gov/harassment - do provide.

💬 2          ⟲          ♡ 8          ⬆          ⚠ Tip



**Beezie Wacks** @beezie_wacks · Aug 13



💬          ⟲          ♡ 1          ⬆          ⚠ Tip

 **Ashley M. Gjøvik** @ashleygjovik · Aug 13     · · ·
You created a Twitter account just to harass me… I think you mean "we pay you too much," Beezie.



← **Beezie Wacks**
8 Tweets                                                    **Follow**

💬          ⇄          ♡          ⬆️

**Beezie Wacks** @beezie_wacks · Aug 12          · · ·
Replying to @ashleygjovik
So basically, anyone who talks to you is gonna get outed on any public forum you post to? Are you someone who can be trusted, like ever? If you're gonna be a lawyer, who has attorney-client expectations, what client will trust you won't use their words against them later?

💬 2          ⇄ 1          ♡          ⬆️

**Beezie Wacks** @beezie_wacks · Aug 13
Replying to @ashleygjovik
Clearly, they paid you too much for tweeting.

💬 1          ⇄          ♡ 9          ⬆️          ⚠️ Tip

Show more replies

 **Ashley M. Gjøvik** @ashleygjovik · Aug 13     · · ·
Replying to @beezie_wacks
You sure know a lot about employment law, Beezie.

💬 1          ⇄          ♡ 1          ⬆️          ⚠️ Tip

 **Beezie Wacks** @beezie_wacks · Aug 13     · · ·





**Beezie Wacks** @beezie_wacks · Sep 10
Or maybe she simply violated policies and truly believed she could get away with it. #facts

**Beezie Wacks** @beezie_wacks · Sep 10
Replying to @business
Apparently, "work" doesn't mean what she thinks it means. And why did she have nude photos on her work-issued phone?? #facepalm

1    ♡ 3

← **Tweet**

**I'mPinkThereforeI'mSpam**
@i_mspam

Replying to @ashleygjovik and @B_Schmidt

**You'll never work as an attorney**

11:42 PM · Sep 16, 2021 · Twitter Web App

**1** Like

**Liked by**

**Beezie Wacks**
@beezie_wacks
Cetaphiliac

Follow



**Beezie Wacks** @beezie_wacks · Sep 10

Did you ever notice that #ashleygjovik would block or disparage anyone who disagreed with her and accuse them of bullying? #classicnarcissist #narcissist #abuse #blockedbyashley

💬    ⟲    ♡    ⬆    ⚠ Tip



**Beezie Wacks** @beezie_wacks · Sep 10

#ashleygjovik how many times did you retweet your quotes about his devastated you are to lose you job at the company you loved so much as a G3-using child? Do you love yourself that much that you set a new bar for narcissism? #ashleythenarcissist

💬    ⟲    ♡    ⬆    ⚠ Tip



**Beezie Wacks** @beezie_wacks · Sep 10

What's been a travesty is seeing all the people who joined #ashleygjovik in her narcissistic rage fest. What good has she done for humanity other than demonstrate that behaving like a child in the Twitterverse gets you fired? Thanks for the lesson!

💬    ⟲    ♡    ⬆    ⚠ Tip



**Beezie Wacks**
@beezie_wacks

What's been a travesty is seeing all the people who joined #ashleygjovik in her narcissistic rage fest. What good has she done for humanity other than demonstrate that behaving like a child in the Twitterverse gets you fired? Thanks for the lesson!

7:36 AM · Sep 10, 2021 · Twitter for iPhone



**Beezie Wacks** @beezie_wacks · Sep 10

What's been a travesty is seeing all the people who joined #ashleygjovik in her narcissistic rage fest. What good has she done for humanity other than demonstrate that behaving like a child in the Twitterverse gets you fired? Thanks for the lesson!

💬    ⟲    ♡    ⬆    ⚠ Tip

## Promoted Tweet

 **Beezie Wacks** @beezie_wacks · Sep 10                              ···
#ashleygjovik the world is both pandering to you and also reaming you. This
sounds about right. #narcissist #youdeserveit #coward

💬        ⇄        ♡        ⬆        ⚠ Tip

 **Beezie Wacks** @beezie_wacks · Sep 10                              ···
#ashleygjovik was such a tool..used by others to make a point, and by her own
narcissistic ego to be flagellated by her inner child. It's a very sad way to live.

💬        ⇄        ♡        ⬆        ⚠ Tip

 **Beezie Wacks** @beezie_wacks · Sep 11                              ··
Hey @ashleygyovik you went to law school and achieved a high GPA with such
diligence at @SantaClaraUniv So how supported were you at work? #ashleygyovik

💬        ⇄        ♡        ⬆        ⚠ Tip

 **Beezie Wacks**                                               ···
@beezie_wacks

@_shantini_ You're brilliant. About A: The company gave
her paid leave, she wasn't satisfied. She wanted an
investigation, she wasn't satisfied. Seemed like she
wanted to control her employer. #narcissist #toxic

4:38 PM · Sep 10, 2021 · Twitter Web App

**Mel Nayer (@mel_nayer, Twitter)**



**mel nayer** @mel_nayer · 2h
Replying to @mel_nayer @ashleygjovik and 2 others
I honestly don't know how this went sideways after supporting you. I only suggested taking the screenshots because people involved are getting death threats and I thought that could undermine your case. Goodbye!

💬 4          🔁          ♡ 2          ⬆️

**mel nayer**
@mel_nayer

Replying to @ashleygjovik

I deleted the tweet. You should delete your screenshots because I think I've proven the point that it was reckless of YOU to share it because of how easy identities could be compromised.

6:05 PM · Aug 21, 2021 · Twitter for iPhone

💬          🔁          ♡          ⬆️

Tweet your reply                                    Reply

**Ashley M. Gjøvik** @ashleygjovik · 19s
Replying to @mel_nayer
Thank you for deleting the Tweet. No I will not be deleting the screenshots of your Tweets. Also, if it does come out that you're working for Apple in some way, you have not only threatened me, intimidated me, but you are also pressuring me to destroy evidence. F all of that.

💬          🔁 1          ♡          ⬆️          📊



**mel nayer**
@mel_nayer

Replying to @ashleygjovik

And I'm not telling you to destroy evidence. By all means share them with ER, just not publicly where people in your org could be put at risk.

6:20 PM · Aug 21, 2021 · Twitter for iPhone

**mel nayer**
@mel_nayer

Replying to @cherthedev and @ashleygjovik

I do not work for Apple or ER or such. Threats are anecdotal. Posting screenshots of an active HR investigation puts everyone involved at risk because a search can be done on who these individuals are on LinkedIn by the timeline and title shared.

11:54 PM · Aug 21, 2021 · Twitter for iPhone

**mel nayer**
@mel_nayer                                          •••

Replying to @ashleygjovik

You are paranoid af, which I can understand, workplace abuse causes serious trauma. I don't work for Apple, look me up. How exactly does a concern for the identities of a confidential HR investigation threaten/intimidate you? That was NOT my intention at all.

12:24 AM · Aug 22, 2021 · Twitter for iPhone

♡        ⟲        ♡        ⬆

Tweet your reply                              **Reply**

**Ashley M. Gjøvik** @ashleygjovik · 23m     •••
Replying to @mel_nayer
I'd be certain your tweets are indeed Apple backed trolling if you also suggested "I consider EAP or medical leave" due to "my mental health issues." That's Apple ER in a nutshell. 😭
Also "look me up," 1st thing I did & the only Mel Nayer showing up is a well known journalist.

♡ 1        ⟲        ♡        ⬆        �╷ᴵ╷

**Ashley M. Gjøvik** @ashleygjovik · 22m     •••
Also, you say you're not an Apple employee but you sent me this telling me to "check Slack," you mentioned the Directory app, and also the HR/ER specific org chart tool...

> **mel nayer** @mel_nayer · Aug 19          •••
> Hey, this is a fight worth fighting. Over the years I've met several female Apple employees mention the same abuse and they stop short of reporting it due to retaliation. Now they are speaking out because of you. Check slack!
>
> ♡        ⟲ 3        ♥ 19        ⬆

♡ 1        ⟲        ♡ 1        ⬆        ᄀᴵᄀ



**mel nayer** @mel_nayer · Aug 19

Replying to @timnitGebru and @ashleygjovik

I am following/supporting her. I can't help to think though, that if #AshleyGjovik were Black Apple would have fired her weeks ago. White women, even when they are victims of workplace abuse, are treated with a level of privilege.

💬 1          ⟲          ♡          ⬆

💬          ⟲          ♡ 4          ⬆          ⚠ Tip

This Tweet was deleted by the Tweet author. Learn more

**Ashley M. Gjøvik** @ashleygjovik · Aug 21, 2021

I think we both want #Apple to be successful, Beezie. Let's work together instead of against each other. 🖤

I know it will be painful to reckon with the way things have been, but the way things can be are worth the work. I'm willing to help Apple get there. I hope you are to!

💬          ⟲          ♡ 12          ⬆          ⚠ Tip

This Tweet was deleted by the Tweet author. Learn more

**Ashley M. Gjøvik**
@ashleygjovik

Replying to @mel_nayer @tnare and @DavidPluskal

If during the lawsuits we track down your account & see you work/consult for Apple, then your note just now: "people at Apple have been fired for sharing less" won't age well. Then you're not "just trying to help," you are actually threatening & intimidating a whistleblower

4:00 PM · Aug 21, 2021 · Twitter Web App

**2** Retweets   **18** Likes



**Vallery Lancey** @vllry · Aug 16    •••
I just looked this up. It still exists.

> 🔵 **Ashley M. Gjøvik** @ashleygjovik · Aug 12
>
> #Apple makes great products, & some workers have a great experience,
> but some don't. Everyone who knows me at work knows I've dealt with
> more abuse than anyone should have. (See: "Make Ashley's Life a Living
> Hell"... & they really did). No one seems surprised I finally broke.
>
> ⬤ ⬤ ⬤  22892159: Make Ashley's Life a Living Hell            ⓥ  ⌄
>
> **Make Ashley's Life a Living Hell**
> Created by [redacted] on September 28, 2015 at 10:22 PM
> * SUMMARY
> [redacted]
>
> **Discussion** ⌄   **Related Problems**   **Related Tests**
>
> 9/28/15, 10:22 PM   [redacted]  ORIGINATOR                    [redacted]
>                     [redacted] I think this one's on you.
>                     Added to the problem's description
>
> 9/28/15, 10:23 PM   [redacted] set Milestone to [redacted]
>
> 9/28/15, 10:23 PM   [redacted]  RESOLVER                       [redacted]
>                     MUAHAHAHAHAHAHAHAH
>                     Milestone set to [redacted]
>                     Priority set to 1

💬 14        ⟲ 70              ❤ 293           ↑

**mel nayer** @mel_nayer · 3h    •••
InNOway condoning the workplace  abuse @ashleygjovik is claiming. But this
is an ACTIVE @Apple investigation and the managers accused are now
receiving death threats. Stop sharing confidential info/screenshots that could
reveal identity of those involved. #ashleygjovik #apple

💬 1        ⟲              ♡ 1              ↑

**mel nayer** @mel_nayer · 3h    •••
After a search in org chart/directory , the identity of these managers is now
known and their lives are at risk.

💬 3        ⟲              ♡              ↑

**First Name (@FirstNa47437596)**

← **FirstnameBunchofnumbers**
151 Tweets



🏛 King District Court - Kcdc

 Name: Gjovik, Ashley Marie - Respondent

**Follow**

**FirstnameBunchofnumbers**
@FirstNa47437596

@ me if you are being personally victimized by Ashley Gjovik and I'll post screenshots of it here.

 Joined June 2021

**0** Following   **0** Followers

**Tweets**        Tweets & replies        Media        Likes

📌 **Pinned Tweet**

 **FirstnameBunchofnumbers** @FirstNa47437596 · 14h        ···

Since I'm not affiliated with any parties in any cases, I'm just gonna go ahead and park her abusive tweets here, just in case anyone wants to take action on their own behalf and others she is suing are forced to delete proof of her bad behavior.

        ⟲        ♡        ⬆

❮ Botometer                    FAQ   API   Publications   Bot Repo   BEV   Lite   @EvacuateBayArea ▾

# @FirstNa47437596 👤

🏛 King District Court - Kcdc

name: Gjovik, Ashley Marie - Respondent

| | | | |
|---|---|---|---|
| **Screen name** | @FirstNa47437596 | **Tweets** | 123 |
| **Display name** | FirstnameBunchofnumbers | **Following** | 0 |
| **Description** | Fuck Apple. Ashley's a bitch. | **Followers** | 0 |
| **Location** | | **Likes** | 1 |
| **URL** | | **Lists** | 0 |
| **Date joined** | Thu Jun 24, 2021 | | |
| **Most recent post** | Sun Feb 13, 2022 | | |
| **Twitter user ID** | 1408219697108058113 | | |
| **Tweet language** | en | | |
| **Recent tweets per week** | 3.6 | | |
| **Retweet ratio** | 10% | | |

## Tweets by day of week *Last 120 tweets*



## Tweets by hour of day *Last 120 tweets*





**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 11   •••
calbar.ca.gov/Admissions/Mor...



**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 11   •••
Can you still be admitted to the bar if you have had an anti-harassment
judgement filed against you? Asking for Ashley Gjovik

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 11   •••
A search of public records indicates Ashley has a court date coming up!

urt - Kcdc                                                          Ca

Marie - Respondent

wonka to me.

💬 2     🔁     ♡ 3     ⬆     ⚠ Tip

**Antrunt**
@Antrunt                                          •••

Replying to @nickdring and @ashleygjovik

This woman has serious mental issues because she's mostly lying and trying to make Apple the bad guy (in her case). She took nudes on a prototype device and then com how

✕     **Retweeted by**

○  **FirstnameBunchofnumbers**          **Follow**
    @FirstNa47437596
    I hate bullying.



**FirstnameBunchofnumbers**          •••
@FirstNa47437596

I don't care about any company. I'm here for the personal attacks.

9:32 AM · Feb 20, 2022 · Twitter for Android

💬          🔁          ♡          ⬆

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13
A fun pack of unsubstantiated charges against all kinds of people.



@ashleygjovik

Apple manager Ricky Mondello & employees Cher Scarlett & Shantini Vyas called me a liar, predator, racist, inconsequential, not a real whistleblower/activist; & described my protected activities as a vendetta, warpath, perjury, fabricated nonsense, misleading rhetoric, & misinfo.



**FirstnameBunchofnumbers** @FirstNa47437596 · Jan 10
Attn someone at @SantaClaraUniv: could you review the cyberbullying of Cher Scarlett coming from the account of your law student @ashleygjovik? Do you condone this behavior? Is this in line with the the terms of your code of conduct?

♡ 1          ↻ 1          ♡ 1          ⬆          ⚖ Tip

Show this thread

**FirstnameBunchofnumbers** @FirstNa47437596 · Jan 12
She's also using @pugnaciouspoet - same MO - Cher-themed account with the same writing style

♡ 1          ↻          ♡ 1          ⬆          ⚖ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Jan 12
@santaclaralaw this is a bad case of cyberbullying by one of your students that reflects poorly on your student body. Do you condone this?

♡          ↻          ♡ 1          ⬆          ⚖ Tip



**Ashley M. Gjøvik** @ashleygjovik · 12h    ···

Disturbing realization tonight. A couple months ago I was approached by 2 women w/ what appeared to be established accounts

They were armed with oppo research & way too much  joint interest in me

They tried to bait me, but I didn't bite. They're blocked now

Plz be careful

💬 2              ⟲              ♡ 12              ⬆

**Mohammed S Hussain** @m_s_hussain · 5h    ···

There are some real nasty folks out there...stay safe and take caution.

💬              ⟲              ♡ 1              ⬆

**FirstnameBunchofnumbers**              ···
@FirstNa47437596

Replying to @m_s_hussain and @ashleygjovik

You really shouldn't encourage this. This woman is mentally ill and going after anyone and everyone personally. There's apparently a pending civil case against her for it. Be careful who you associate with.

1:55 PM · Feb 13, 2022 · Twitter for Android

💬              ⟲              ♡              ⬆

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 11

I honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?

> **Kovacs** @notabotfr · Feb 11
>
> Replying to @JeansSquirrel @ashleygjovik and 2 others
>
> Jean, she genuinely sees Apple agents where they don't exist. That's the reason why she was banned from Wikipedia. Shock of the century that she thinks I'm one too. If you really wanted to support her you'd tell her the same.

◯          ⟲          ♡ 1          ↑          ⚠ Tip

⟲ FirstnameBunchofnumbers Retweeted

**Kovacs** @notabotfr · Feb 11

Replying to @ashleygjovik @JeansSquirrel and 2 others

Hi yes, this is #Apple/#Wikipedia/#God speaking. You were banned from Wikipedia for falsely accusing some random dude of being the woman you're obsessed with. You are mentally ill and need psychological/psychiatric help. Anyone supporting your delusions is not your friend.

◯          ⟲ 2          ♡          ↑          ⚠ Tip

⟲ FirstnameBunchofnumbers Retweeted

**rileysmith** @rileysm86 · Jan 28

Replying to @DarnellCrosland and @iamcardib

What does that even mean, "followed"? Did he follow her home? To her car? Was he just making friendly conversation as they were walking out? Stop making repugnant and defaming accusations against LaFountain with zero context. He's going to get a huge libel payday from you guys.

◯ 2          ⟲ 1          ♡ 1          ↑          ⚠ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13

If Apple turns people into crazies like Ashley Gjovik then they need to shut that shit down NOW

♡ 1    �17    ♡ 1    ↑    ⚠ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13

We don't need iPhones this bad, that woman is NUTS

♡    �17    ♡ 1    ↑    ⚠ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13

You know what's so interesting? How one manages to live so comfortably in such an "expensive" area w/plenty of extra funds for wasting lawyers time, no money woes, and no desire to ever get another job.
Who's really funding this? 🤔
Let's see, who is Apple's biggest competitor?

♡    �17    ♡    ↑    ⚠ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13

Posting random stats about my account does nothing except make you look like a nut ball with matchbox sign

♡    �17    ♡    ↑    ⚠ Tip

�17 **FirstnameBunchofnumbers Retweeted**

🤖 @600nanometer · Feb 13

Replying to @FirstNa47437596

and the "clue" that she needed to be targeted: radio silence after ashley published a 300 page paranoia report of all her online interactions.

i guess if you don't endorse the conspiracy theory, you're a co-conspirator.

♡ 1    �17 1    ♡ 1    ↑    ⚠ Tip

**FirstnameBunchofnumbers** @FirstNa47437596 · Feb 13

The only accounts left engaging her are the Pick Mes who are interested in her, um, other attributes 💁‍♀️

♡    �17    ♡ 1    ↑    ⚠ Tip

 **FirstnameBunchofnumbers** @FirstNa47437596 · Mar 2
🙌🙌🙌🙌🙌🙌🙌



## Ashley M. Gjøvik 🔒
@ashleygjovik

Apple & Northrop Grumman Safety Whistleblower | Ashley Gjovik v Apple Inc (SOX, CERCLA, OSHA, CA DoL, & NLRB) | ⚔️ Nolite te Bastardes Carborundorum

◎ Gagged Gadfly n the Plutocracy

🔗 linktr.ee/ashleygjovik   ▦ Joined March 2021

**1,692** Following   **16.9K** Followers

# These Tweets are protected.

← **Tweet**

**Draken BlackKnight - the vaccine works, idiots** @DrakenBlk... · 1h    · · ·
...shouldn't they be offering a fat settlement right about now?

💬 2          ⟲          ♡ 1          ⬆

**FirstnameBunchofnumbers**          · · ·
@FirstNa47437596

Replying to @DrakenBlkKn and @ashleygjovik

If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law

2:37 PM · Feb 13, 2022 · Twitter for Android

💬          ⟲          ♡          ⬆

**Draken BlackKnight - the vaccine works, idiots** @DrakenBlk... · 1h    · · ·
Replying to @FirstNa47437596 and @ashleygjovik
Hi Apple

💬 1          ⟲          ♡ 1          ⬆

**Ashley M. Gjøvik** @ashleygjovik · 29m          · · ·
Indeed.

Hey Apple, we've talked about this.

Go away. Thanks.



💬          ⟲          ♡          ⬆

**More Tweets**



**FirstnameBunchofnumbers** @FirstNa47437596 · Jan 15  ···

Don't direct hate at fellow victims of the same injustices. Punching down is never a good look or the right thing to do.

♡ 1

⤴ Tip

---

⟲ **FirstnameBunchofnumbers Retweeted**

**Ricky Mondello** @rmondello · Sep 1, 2021  ···

Corporations don't need anyone's defense. They have money, lawyers, and a brand to protect them.

But _the truth_ is critically important. We need to recognize when someone is manipulating the empathy and good will of others to fuel a personal vendetta and warpath.

> 🍎 **Shantini** @shantinix · Sep 1, 2021
>
> Okay at the risk of "gestures wildly at Twitter"
>
> Apple is a big company. It's got some problems. But it's a great place to work for a lot of people.
>
> A certain employee has made it their mission to bring down Apple through whatever means necessary.
>
> Including straight LIES.
>
> Show this thread

💬 4       ⟲ 14       ♡ 143       ⤴       ⚠ Tip

Show this thread

**I'mPinkThereforeI'mSpam (@i_mspam, Twitter)'**





**I'mPinkThereforeI'mSpam** @i_mspam · 14m
Replying to @B_Schmidt and @ashleygjovik
She's a senior manager at Apple and going on a tirade against them over the ground beneath the building. What did she expect to have happen to her?

💬 1          ⟲          ♡          ⬆          ⚠ Tip

**Bree Schmidt** @B_Schmidt · 3m
Probably for Apple to not violate laws, but what do I know.

💬 1          ⟲          ❤ 1          ⬆          ⚠ Tip

**Ashley M. Gjøvik** @ashleygjovik · 1m
Hey Siri, how do you gather "direct evidence" to prove retaliation for protected activities?

💬 1          ⟲          ♡ 1          ⬆          ᪶          ⚠ Tip

**Bree Schmidt**
@B_Schmidt

Replying to @ashleygjovik and @i_mspam

Love that one of their spam accounts admits Apple will just fire you rather than address the problem. It's cheaper that way.

12:56 PM · Jan 30, 2022 · TweetDeck

💬 1          ⟲          ♡ 3          ⬆          ᪶          ⚠ Tip

**Bree Schmidt** @B_Schmidt · 45m
Love that one of their spam accounts admits Apple will just fire you rather than address the problem. It's cheaper that way.

💬 2          ⟲ 1          ❤ 4          ⬆          ⚠ Tip

**I'mPinkThereforeI'mSpam** @i_mspam · 3m
Replying to @B_Schmidt and @ashleygjovik
Go smash some avocado on toast.

💬 1          ⟲          ♡          ⬆          ⚠ Tip

**I'mPinkThereforeI'mSpam**
@i_mspam                                    · · ·

Replying to @B_Schmidt and @ashleygjovik

"The nail that sticks out, gets hammered."

2:11 PM · Jan 29, 2022 · Twitter Web App

💬          🔁          ♡          ⬆️                ⚠️ Tip

**Tweet your reply**                          [ Reply ]

**Ashley M. Gjøvik** @ashleygjovik · 5s          · · ·
Replying to @i_mspam and @B_Schmidt
Thanks, Jenna. I'll add that quote to the implicit & explicit threats of
violence section of the memo.

💬          🔁          ♡          ⬆️          📊          ⚠️ Tip



**Ashley M. Gjøvik** @ashleygjovik · Sep 16, 2021          · · ·
The stories I've heard from retail are HORRIFIC. There needs to be a
reckoning... and it needs to start with #Apple retail and AppleCare. It
sounds like the things of nightmares over there. 😭

💬 2          🔁          ♡ 2          ⬆️          ⚠️ Tip

**I'mPinkThereforeI'mSpam** @i_mspam · Sep 16, 2021          · · ·
You'll never work as an attorney

💬 1          🔁          ♡ 1          ⬆️          ⚠️ Tip

**CrissNovak (Reddit)**

Single comment thread                                    See full discussion

 **crissnovak** • 4y ago • Edited 4y ago

Shantini is my hero, best take on "A" with over 200+ s. ALOT seem to agree: entitled, obnoxious, toxic, vindictive employee. To me, zero credibility. I would not even want to be on the same sidewalk with that. Why Zoë continues to give "A" the time of day, I don't know, and I've lost all respect for her as a journalist. It's not newsworthy, it's a dumpster fire.

https://twitter.com/*shantini*/status/1433270352919072771?s=20

⬆ 1 ⬇    💬 Reply    🏅 Award    ↗ Share    ⋯

  **r/apple** • 4 yr. ago
crissnovak

# Ashley Gjøvik fired by Apple.

`Discussion`

🚫  Sorry, this post has been removed by the moderators of r/apple.

⬆ 1 ⬇    💬 0    ↗ Share



r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** commented 4 yr. ago

Tweeting doesn't make your story true. I need to hear both sides and I need to see facts before I make a judgement. No doubt, her character was on display with those angry profanity ridden Tweets. Not someone I would ever want to work with.

⇧ 76 ⇩    💬 Reply    ↗ Share    ...

r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** commented 4 yr. ago

Santa Clara University Law must be cringing. Prospective law students must be crossing that one off their list. Lol

⇧ 68 ⇩    💬 Reply    ↗ Share    ...

r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** commented 4 yr. ago

Good riddance. They should have fired her weeks ago.

⇧ 7 ⇩    💬 Reply    ↗ Share    ...



**r/apple** • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** commented 4 yr. ago

I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies are. Dear Apple please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity.

⬆ 2 ⬇   ⬭ Reply   ⤳ Share   ⋯

**r/apple** • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **newtothered** 4 yr. ago

Exactly, she's "badass" with a part-time Santa Clara JD, she's going to get steamrolled lololol

⬆ 2 ⬇   ⬭ Reply   ⤳ Share   ⋯

**r/apple** • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **GoneCollarGone** 4 yr. ago

She was NOT a senior executive at Apple. Not even an engineer. She was a Sr. Program Manager. I think she exaggerates her achievements/bio, which tanks her credibility right out the gate.

⬆ 29 ⬇   ⬭ Reply   ⤳ Share   ⋯

**r/apple** • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **poo4** 4 yr. ago

And then when that didn't pan out for her, seems like she tried to do the same sht with Apple. The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help.

⬆ 26 ⬇   ⬭ Reply   ⤳ Share   ⋯

 r/apple • [deleted by user]

**crissnovak** commented 4 yr. ago

I honestly don't know a respectable lawyer that would go down this path with her, especially with all her Tweets out there. If she really did leak IP, I think she's basically screwed. Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple, but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood and for what "likes"? From her Tweets, I think she has this grandiose delusion that she's some "badass", but I think she comes off as a Karen. Shame on the "journalists" (ahem Verge) that are exploiting her and just adding to her ruin. I think what she needs is mental help; what she doesn't need is people motivating her to dig an even deeper hole she's in. Sad

⬆ 12 ⬇    ◯ Reply    ⇗ Share    ⋯

r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **bartturner** 4 yr. ago

A whistleblower of what illegal activities at Apple? Simply calling yourself a "whistleblower" doesn't absolve you from your employment contract with Apple. She allegedly shared intellectual property, that's an immediate fire able offense. Good on Apple on this one. I'm actually impressed by the way they handled her. Didn't stoop down to her level. They just left her alone to angry Tweet for months so she can expose herself. Brilliant move by a brilliant company.

⬆ 1 ⬇    ◯ Reply    ⇗ Share    ⋯

r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** commented 4 yr. ago

I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think She thinks she going to get rich, but she's going straight to the poor house. $300K + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!

⬆ 3 ⬇    ◯ Reply    ⇗ Share    ⋯



r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **cherpxo** 3 yr. ago

Lmao "familiar"?! Girl, you better know it solid or get Gjøviked! If you bring little value to Apple (can't code your way out of a paper cup) they'll fire you for the slightest transgression. Apple is ruthless like that.

⬆ 1 ⬇   💬 Reply   ↗ Share   ⋯

r/apple • Apple fires senior engineering program manager Ashley Gjøvik for allegedly leaking information

**crissnovak** replied to **cherpxo** 4 yr. ago

You seem to be Tweeting/Redditing a lot on company time, even that's enough to get you fired. Hopefully you're not doing it on company devices.

⬆ 0 ⬇   💬 Reply   ↗ Share   ⋯

r/apple • [deleted by user]

**crissnovak** commented 4 yr. ago

Naeh, chubby side +baby teeth lol

⬆ 3 ⬇   💬 Reply   ↗ Share   ⋯

r/apple • Apple's fortress of secrecy is crumbling from the inside - The Verge

3 yr. ago

[removed]

⬆ 9 ⬇   💬 Reply   ↗ Share   ⋯

r/apple • Tim Cook says employees who leak memos do not belong at Apple, according to leaked memo

**crissnovak** commented 3 yr. ago

I feel like it's only a matter of time now before all of Zoë's sources will get fired. Apple doesn't mess around and I think this is a message that they about to clean house. Hope it was worth it (FYI, I'm still preordering the new iPhone)...Look at Gjøvik, went from $300K+ plus RSUs (poof!) to a GoFund me. Keep blabbing to Zoe, girls, it's clicks and money in her pocket while y'all go bankrupt going up against Apple.

⬆ 3 ⬇   💬 Reply   ↗ Share   ⋯

# Further Parthing (@one_more_time_2, Twitter)

📊 **accountanalysis**   |   25 Tweets   |   Load More                    ⊚ one_more_time_2   |   Analyze

---

**25** selected out of **25** retrieved Tweets.                    ❓  ⚪

**Further Parthing**
@one_more_time_2

**25**           **29**            **2**            **19**          **0**
TWEETS    FOLLOWING   FOLLOWERS    LIKES      LISTED

When the paparazzi are your friends, it makes your enemies even sweeter.

📅 2022-01-15, 07:31 (25 days ago)
🪪 1482374774881861632

---

### Daily Rhythm



### Tweetvolume by Date

### Day of Week

### Tweet Type
Reply (24)
Self-Reply (1)

### Language of Tweets
English (24)
Haitian Creole (1)

### Used Interface
Twitter for iPhone (25)

📊 accountanalysis     | 25 Tweets | Load More |          | @one_more_time_2 | Analyze |

**Used Hashtags**

Tweets

**Hostnames of URLs**

registry.theknot.com (1)

0.0     0.2     0.4     0.6     0.8     1.0
Tweets

**Replied Users**

@ashleygjovik (19)
@cherthedev (4)
@thesignalsnetw (1)

0        5        10       15
Tweets

**Retweeted Users**

Tweets

**Quoted Users**

Tweets





**Ashley M. Gjøvik** @ashleygjovik · 20h

O hai. @Apple, this u? 👀 twitter.com/one_more_time_...

This Tweet is from an account you blocked.    **View**

💬 7    🔁    ❤️ 5    ⬆️    📊    ⚠️ Tip

**Further Parthing**
@one_more_time_2

Replying to @ashleygjovik and @Apple

Whistleblowers deserve a better voice than yours or Chers or any one person. I hope Twitter shuts you down for some perspective. Your Tweets are like a feminist version of @ProudBoysUS @TrumpWarRoom

3:54 PM · Feb 4, 2022 · Twitter for iPhone

💬    🔁    ❤️    ⬆️    ⚠️ Tip

← **Further Parthing**
11 Tweets

**Follow**



**Ashley M. Gjøvik** @ashleygjovik · Feb 3        …

📜 #Apple orchestrated an extensive propaganda & harassment campaign against me starting with  damaging false accusations, & numerous threats of retaliation, termination, litigation, blacklisting, & violence. This is now part of my NLRB, US & CA DOL cases.

> scribd.com
> Ashley Gjovik v Apple Inc – Propaganda Campaig…
> Ashley Gjovik v Apple Inc – Propaganda, Threats, & Retaliation Campaign Evidence Report for US …

💬 3        ⟲ 9        ♡ 113        ↑        ⑊        ⚠ Tip



**Further Parthing** @one_more_time_2 · 1m        …

I don't think there's nice things in there, nor do your opinions of others sound nice either. It seems hypocritical to make a 200+ NLRB complaint but not share written inventory of those YOU have offended with your words and actions.

💬        ⟲        ♡        ↑        ⚠ Tip



**Further Parthing** @one_more_time_2 · 5m        …

Now people will associate whistleblowing with this 200+ page NLRB complaint that is too saturated with bias. Your bias. It's unconscionable how you shared so many names.

💬        ⟲        ♡        ↑        ⚠ Tip



**Further Parthing** @one_more_time_2 · 6m        …
Replying to @ashleygjovik and @Apple

I hope you use your powers for good and not this pedantry of attacking every minute bit of dissension. What a joke. You have only harmed whistleblowing with your distracting tirades.

💬        ⟲        ♡        ↑        ⚠ Tip



← **Further Parthing**
20 Tweets

**Follow**

**Ashley M. Gjøvik** @ashleygjovik · 7m

Replying to @one_more_time_2 and @Apple

You're posting too quickly. Please slow down so I can WayBack Archive all this bullshit you're spewing.

💬 2     🔁     ♡     ⬆     ⑃     ⚠ Tip

**Further Parthing** @one_more_time_2 · 2m

Opinions are just opinions and ppl don't agree just like you call what I wrote bullshit. I won't argue, you can think what you like! Sticks and stones..but words won't hurt. Didn't you learn that?

💬     🔁     ♡     ⬆     ⚠ Tip

**Further Parthing** @one_more_time_2 · 3m

Replying to @ashleygjovik and @Apple

I am following your complaint becuz it is interesting. But the content is just so overwhelming, it reads more like a high school letter about how you didn't like what others wrote about you. It is a waste of government resources just to read it

💬     🔁     ♡     ⬆     ⚠ Tip

**Further Parthing** @one_more_time_2 · 11m

Replying to @ashleygjovik and @Apple

No, none of those are. But one can see how you think that is. There are lots of people out there not in tech who read about you and then come here and lurk and are appalled by your tweets.

💬 2     🔁     ♡     ⬆     ⚠ Tip