```
 1                 IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

    ASHLEY M. GJOVIK                    3:23-CV-04597-EMC
 4
             VERSUS                     FEBRUARY 21, 2025
 5
    APPLE, INC.                         SAN FRANCISCO, CA
 6

 7


 8         BEFORE THE HONORABLE EDWARD M. CHEN
                UNITED STATES DISTRICT JUDGE
 9

10           TRANSCRIPT OF MOTION HEARING

11

12

    A P P E A R A N C E S:
13

    FOR THE GOVERNMENT:
14                        ASHLEY M. GJOVIK, ESQUIRE
                          2108 N. ST
15                        SACRAMENTO, CA 95816
                          ashleymgjovik@protonmail.com
16
    FOR THE DEFENDANT:
17                        MELINDA S. RIECHERT, ESQUIRE
                          ORRICK, HERRINGTON & SUTCLIFFE LLP
18                        1000 MARSH ROAD
                          MENLO PARK, CA 94025
19                        mriechert@orrick.com

20

21


22   ------------------------------------------------------
             BETH A. KRUPA, RMR, CRR (VIA ZOOM)
23              United States Court Reporter
                   401 West Evans Street
24                 Florence, SC  29501
              Beth_krupa@scd.uscourts.gov
25
            (Stenotype/Computer-Aided Transcription)
```

```
 1                SAN FRANCISCO, CA, FEBRUARY 21, 2025

 2                HONORABLE EDWARD M. CHEN, PRESIDING

 3                            *  *  *

 4          (Proceedings commence at 9:15 a.m.)

 5              THE CLERK:  Next case is Gjovik versus Apple,

 6    Inc., Case No. 23-4597.  Please state your appearance for

 7    the record beginning with the plaintiff.

 8              MS. GJOVIK:  My name is Ashley Gjovik.  Good

 9    morning, Your Honor.

10              THE COURT:  All right.  Good morning.

11              MS. RIECHERT:  Melinda Riechert from Orrick

12    representing Apple.

13              THE COURT:  All right.  Good morning,

14    Ms. Riechert.  Okay.  We're on for defendant's motion to

15    dismiss portions of the fifth amended complaint and so

16    let me address, ask the parties to address some of the

17    key issues as I see them.

18              First has to do with the statute of

19    limitations.  And I will say at the outset that I think

20    Ms. Gjovik is correct in that with respect to the delay

21    discovery rule, federal law applies even though there may

22    be state claims.

23              I think the Ninth Circuit has held in the

24    O'Connor Boeing case that federal standard applies and

25    there's a slight difference between the state and federal
```

1    standard.  I think the federal standard requires that

2    the -- it turns on whether the defendant knows or

3    reasonably should have known of the cause and not just

4    mere suspicion to the extent the state court -- state law

5    could be construed to have that more lenient standard.

6         So here the question of known or should have

7    known turns on inquiry notice, in my view, and that is

8    whether or not a reasonable inquiry that would have been

9    undertaken would have put the plaintiff on notice of her

10    claim and here the -- it's clear that Ms. Gjovik had

11    reason to believe there was some kind of a problem given

12    all the activities.

13         Her contention here is that she didn't

14    know -- she had no reason to know that specifically

15    that -- of the actual nature of the activities that were

16    going on at the plant that was nearby and that would have

17    given rise to the kind of alleged injuries she claims.

18         But she knew there was something going on and

19    knew that there was some risk of toxics and in her

20    filings reflect that she believed there were reported

21    amounts of various chemicals, including arsenic, carbon

22    monoxide, mercury, et cetera.

23         But the key question it seems to me is whether

24    she knew it or not at the time.  There appears to have

25    been a public file containing the permit that made it

1   clear what was -- that there was semiconductor

2   fabrication going on.

3           So that's what I would like to -- so if that's

4   evident, then there's a very good argument that one would

5   be on inquiry notice, and that inquiry notice would have

6   led to the discovery of, in fact, that the Aria factory

7   was engaged in semiconductor fabrication.

8           I take it that's the defense argument, that

9   given the public information that the notice

10  requirement -- the should have known requirement was

11  satisfied; is that correct, Ms. Riechert?

12          MS. RIECHERT:  Correct, Your Honor.

13          THE COURT:  I'll let you respond to that,

14  Ms. Gjovik.  I know you say you did not know, but that's

15  not the standard.  The standard is should have known and

16  based on a reasonable inquiry would have uncovered the

17  fact that the Aria factory was, in fact, engaged in

18  semiconductor fabrication.

19          MS. GJOVIK:  Thank you, Your Honor.  I think

20  this is a very unique case that has such a strong holding

21  for the reasonable inquiry where when I knew that there

22  was something going on, I alerted just about every

23  government agency that could possibly be implicated by

24  that.

25          And as a project manager, ensured that they all

1    did an inquiry on their behalf to see if they could

2    figure out what was going on.

3          Many agencies took this extraordinarily

4    seriously, the EPA looked into it for weeks.  They were

5    distracted also by the super fund issues, but I had the

6    city looking at it, I had the state governments looking

7    at it.

8          It went on for some time.  That was the article

9    I published was frustration that even with all of these

10   experts, all of these agencies trying to figure out what

11   was going on, they couldn't figure it out.

12         So if this standard, if we would say, I was on

13   inquiry notice, I should have figured it out.  But the

14   federal EPA could not figure it out and it's their job to

15   regulate these things and they would have even more

16   access than I would have to the records, then no one is

17   ever going to meet this legal standard.

18         THE COURT:  Well, let me ask you, when you say

19   couldn't figure out, maybe they did not, at least in

20   their view find a -- come up with a specific finding.

21   But the issue is not conclusively determining -- what if,

22   in fact, there were no emissions that were sufficiently

23   concerning, that doesn't mean that you couldn't bring a

24   claim.

25         And to bring a claim, all you have to know is

1  what the source is.  So the fact that the agencies

2  couldn't come to a conclusion doesn't necessarily mean

3  that you didn't have sufficient reason to believe that it

4  was coming from this factory, because it was engaged in

5  semiconductor manufacture.

6          MS. GJOVIK:  Well, first, I would say that

7  evidence that Apple filed, there's no actual evidence

8  that was available at the time.  They just said it's

9  available now and it's a very difficult website to

10  navigate.

11          I spent a freakish amount of time investigating

12  this.  I had friends intervening, telling me I just need

13  to move on.  This is, again, where I'm concerned, that if

14  I didn't do enough, I don't think anyone would have ever

15  done enough.

16          I didn't find that for some time.  The public

17  records portal points you to a complete different place.

18  It doesn't ever send you there.  I think there's also an

19  issue that if we say that the standard for semiconductor

20  exposure would be looking at the permits and knowing that

21  semiconductor fab, again, it's going to be very hard for

22  anyone to ever meet that standard.

23          It's just because I worked in hardware at Apple

24  and was around the semiconductor process that those words

25  meant something to me.  So there's a lot of people that

1    don't understand the ultra hazardous nature of that type

2    of operation and it is Silicon Valley, so there's tons of

3    industrial facilities all over the place doing different

4    kinds of level of industrial work.

5         Sometimes it's a problem, sometimes it's not.

6    So it's very difficult to try to -- and so the EPA

7    explained to me their process when they were

8    investigating and evaluating to try to figure out if

9    there were red flags.

10        And they go through the filings.  They go

11   through -- the problem here was, Apple was not

12   filing -- they were not registered as semiconductor fab

13   in the required systems.  They were not filing their

14   error emission reports to the federal government.

15        They did file some for the local government,

16   but they were not registered for semiconductor fab, and

17   that is something that they face violations for now.

18   They're written up by the Bay Area Air Quality Management

19   District.

20        This also, the violations raise the issue, once

21   the government found out what they were doing, it was so

22   facially illegal, they faced so many inspections, and

23   they've been written up, violations and investigations,

24   that, again, to say I should have been able to figure it

25   out, if these agencies who it's their job to figure it

1    out and once they figured out what Apple specifically was

2    doing in this situation, jumped on it and opened very

3    formal extensive investigations and are working on

4    enforcement actions.  I don't think anyone would ever

5    meet that standard if to say that I did not do enough.

6         THE COURT:  Okay.  Well, hold on for a second.

7    You also allege that there are filings that show that the

8    facility exhausted reportable amounts of mercury,

9    arsenic, carbon monoxide, formaldehyde in the ambient air

10   around the factory and Apple says that was available

11   through the Bay Area Air Quality Management District

12   publicly online back in August of 2021.

13        So why wouldn't that be enough to bring -- to

14   believe that you had a claim?  It was -- if you're

15   brining in arsenic, carbon monoxide, formaldehyde, maybe

16   you don't know every substance and maybe fabrication of,

17   you know, of these chips and stuff could have even more,

18   but at that point why wouldn't there be enough notice to

19   say there's a problem here and I've got a claim?

20        MS. GJOVIK:  So there's an argument there could

21   be, but what I put on that claim, again, we're

22   in -- we're in Silicon Valley which is even worse than

23   San Francisco when it comes to the industrial operations

24   near residential and schools, and just about every office

25   you're going to be around is probably going to be

1    emitting something.

2          And this was a conversation, this was reflected

3    in the article I wrote in my frustration, that there's a

4    lot of air pollution around here and it's trying to

5    figure out what is unusual enough that it could cause

6    such a severe health issue.

7          And the issues I was having and the other

8    victims were having, was so severe, it had to be

9    something that was just, you know, a very, very, extreme

10   dangerous activity.

11         Again, once the Bay Area Air Quality Management

12   District, who received those filings from Apple and knew

13   the address, once they found out that Apple was actually

14   doing semiconductor fabrication, had multiple

15   inspections, they're written up for multiple violations,

16   they failed to register.

17         They're supposed to get permission from the air

18   board to even operate in a location like that.  There's a

19   whole planning process and zoning that they surely would

20   have been denied.

21         So one of the big issues here is what Apple was

22   doing was so egregiously inappropriate, like, no one

23   would think to screen for something like that, and that's

24   why I argued ultra hazardous.

25         To me, this is the same thing as your neighbor

1    drilling for oil next to your backyard.  Where you're

2    like, you're doing what?  That's crazy.  That's so

3    dangerous.  You can't do that.

4              So it's -- this is kind of an unusual one.  I

5    also, like, I'm carrying a lot of burden of thousands of

6    other victims.  So, again, I did freakish amounts of

7    research.

8              I have an engineering background.  I have the

9    legal background, in law school learning enough that I

10   could navigate some of this.  I was frequently told by

11   these agencies that I was, like, the best researcher

12   they've ever seen.

13             So if I did not do enough, no one would have

14   ever done enough.  And if I was to file a complaint, I

15   think it's an argument against judicial economy, that if

16   there's so many buildings around that area and there's so

17   many potential sources, whether it was existing

18   contamination that they're not properly venting and

19   controlling or new stuff, I'm going to file a complaint

20   with like 15 potential parties listed.

21             And what would I even -- I would say, chemicals

22   came from maybe the ground, maybe the water, maybe the

23   sewers, maybe the exhaust, here's a list of like 20

24   suspects.

25             That would just clog the pipes of all of the

1    Silicon Valley, especially, courts, because

2    it's -- that's just too vague.  You -- you need another

3    step forward.  And we've been having, I think, what,

4    three motions to dismiss now discussing my toxic tort

5    cases.

6            So they're very hard to get through and I think

7    just having, you know, file it if you think you were

8    exposed to chemicals would -- would not be good for the

9    courts.

10           THE COURT:  All right.  Let me ask Ms. Riechert

11   to respond in terms of how easy it would have been to

12   find that the source of these various chemicals in the

13   air was emanating from this factory, the Aria factory

14   because it was doing semiconductor fabrication.

15           MS. RIECHERT:  Yes, Your Honor.  So the

16   documents that she relies on to support her claim, she

17   found in 2023.  Those documents were all available in

18   2021, in 2020.

19           So there's no reason if she could find them in

20   2023 that she couldn't have found them earlier in 2021

21   and 2020 and that's the essential part of the claim.  She

22   hasn't shown that she could not have found them earlier

23   if she used reasonable diligence.

24           THE COURT:  And what's the proof?  We're

25   getting an echo here.  I'm not sure why that is.  Why --

1   what's your proof that these were, in fact, available as

2   of 2020 and 2021?

3         MS. RIECHERT:  We submitted all of that with

4   our motion, Your Honor, in a request for judicial notice

5   which has the links, how we got to the links, how they

6   were available, when they were made public.

7         THE COURT:  It relies on the way back?

8         MS. RIECHERT:  Some of it in the way back --

9         MS. GJOVIK:  No.

10        MS. RIECHERT:  -- but you can see the

11   information on the website.  If you go through all the

12   RJN, you can see how we found all of that --

13        MS. GJOVIK:  I objected.  There's no way back.

14   There's no proof that was even available other than the

15   day --

16        THE COURT:  Hold on.  Hold on.  You are not to

17   interrupt.  I will come back to you.

18        So continue, Ms. Riechert.

19        MS. RIECHERT:  Yes, Your Honor.  So in the RJN,

20   we go through all the documents that she now relies on to

21   support her claim that she found in -- she says she found

22   in 2023.  And we show how that stuff was available on the

23   website in 2020 or 2021.

24        One of them we don't have a way back going back

25   that far.  That doesn't mean it wasn't available before

1    then, we just didn't have a way back.  But for all of the

2    others, we show that they were available in 2020 and 2021

3    and she could have found them then if she used the same

4    diligence in 2023, that she uses -- she should have used

5    that same diligence in 2021.

6         So if she did find them in 2023, they were

7    available in 2021.  So why didn't she find them in 2021?

8    Maybe they were difficult to find, but she ultimately

9    found them.  And so, therefore, she could have found them

10   earlier.

11        THE COURT:  What's your response to the notion

12   that there's at least a factual question here about how

13   reasonably or how easily they were -- could have, this

14   record, this information about the factory could have

15   been found when she went to all these different agencies

16   and as she put it, they couldn't figure it out?

17        MS. RIECHERT:  The agencies couldn't figure out

18   because there was no problem.  Believe me, they would

19   have come after Apple if there was a problem.  It's the

20   plaintiff who's claiming there's a problem not the

21   agencies.

22        But we have submitted all of this evidence to

23   show that it was available.  It's not disputed that it

24   was available back then.  We submitted all of the

25   evidence that showed it was.

1          So there is no factual dispute about whether it
2    was available in 2021, and there's no dispute that she
3    found it in 2023.  And if she had done in 2023 -- in 2021
4    what she did in 2023, she would have found it because it
5    was there and there's no factual dispute on that.
6          THE COURT:  All right.  I'll let you respond to
7    that specific point that what you found in 2023 could
8    have been found two years earlier.
9          MS. GJOVIK:  Thank you, Your Honor.  There's no
10   evidence that it was available then, that was my
11   objection, that they have not proven that it was
12   available at the time, how it would have been accessed.
13          I think that's fact finding.  That's something
14   that gets past motion to dismiss 12(b)(6) where it's
15   talking to agencies, where it's understanding what a
16   reasonable person would be expected to do.
17          If I may, I also just want to say that I also
18   have the additional arguments of fraud and some version
19   of duress of where she asks, why couldn't I figure that
20   out in 2021.
21          One of the factors would be the extensive
22   harassment and retaliation I was facing, that was a bit
23   distracting from my environmental investigations.
24          THE COURT:  All right.  Well, so it seems like
25   the key is how -- whether that information was available

1    and how accessible it was back in 2021, and I will take a

2    closer look at your request for judicial notice, because

3    that may be key in whether or not there's a factual

4    question there.

5          MS. RIECHERT:  What she did is she has her

6    request for judicial notice where she says how she found

7    all of this stuff and then we responded that with respect

8    to all of the stuff that you list in your RJN that you

9    found in 2023, all of that stuff was available in 2021.

10         THE COURT:  Okay.

11         MS. RIECHERT:  So we went through all of the

12   exhibits in her RJN and we showed Exhibit 1 was

13   available, Exhibit 2 was available, Exhibit 3 was

14   available, so all of the ones you rely on now were

15   available in 2021.

16         THE COURT:  All right.  Let me turn to the

17   retaliation claims.  I know there's other issues with

18   respect to the environmental claim and I have a pretty

19   good handle on those other issues, if we get there, if we

20   get past the statute of limitations.

21         Retaliation claim, with respect to the

22   Section 1102.5, the California whistleblower, with

23   respect to tolling, the key is whether the prior

24   administrative filings would have been sufficiently

25   similar in nature as to give -- to alert the defendant

1    about the claims that are being made in this lawsuit.

2         It doesn't have to be precisely coextensive,

3    but it has to give, sort of, reasonable, again, sort of

4    inquiry notice.

5         And it seems to me that in looking at the

6    filings, that there is enough for retaliation based on

7    some of the disclosures and the activities and the claims

8    that were made in the DIR complaint with respect to

9    retaliation for workplace issues, workplace safety.

10        But I don't see anything in there that would

11   have alerted the defendant about the violation of privacy

12   rights.  That seems to be a different kind of animal than

13   a workplace safety and the complaints were -- I don't see

14   much about -- I see something about environmental safety

15   that can be inferred and maybe about organization and

16   other things, but not about privacy.

17        So I'll let you respond to that problem,

18   Ms. Gjovik.

19        MS. GJOVIK:  Thank you, Your Honor.  So one

20   thing I've raised is privacy is inherent in this lawsuit

21   because of Apple's defense which is they're allowed to

22   invade my privacy.

23        So this would have been raised in part of the

24   discussion no matter what in these type of adjudications

25   and Apple would have known that because it's their

1   defense.

2           They would have had to know whether we have to

3   debate whether that's a proper reason to fire someone, if

4   that's really why they fired me.  We'd have to talk about

5   my complaints about invasion of privacy.

6           The citation that Apple uses for the article

7   where I talk about this thing that really upset them, the

8   article is called Apple Cares About Privacy Unless You

9   Work At Apple.

10          And it's an interview with current and prior

11  employees talking about privacy as a work condition, and

12  concerned about hypocrisy from Apple.

13          THE COURT:  Well, what we're talking about is

14  tolling the statute of limitations which would otherwise

15  run because of your filing in another forum, that gives

16  you the benefit of extending the statute of limitations

17  through tolling.

18          But in order to get that benefit, that pursuit

19  in another forum such as the Department of Public

20  Relations have to serve the function of the lawsuit.

21          It has to put the defendant on notice of the

22  nature of the claim and I'm -- I find that that -- was on

23  notice of retaliation based upon workplace reported

24  safety violations and environmental, it's the privacy

25  aspect that is brought in this suit but not -- I don't

1    see it in the DIR complaint.

2              MS. GJOVIK:  You are correct, and I am trying

3    to have a creative policy argument.  But if we're going

4    by prima facie, you are correct.  It was not in the

5    original complaint.

6              THE COURT:  Let me ask about the 98 points.

7              MS. RIECHERT:  May I respond on that point?

8              THE COURT:  Okay.  Go ahead.

9              MS. RIECHERT:  So there were a number of claims

10   that we believe that she's asserting retaliation for

11   under 1102.5 that are not covered by her DIR complaint

12   for workplace safety.

13             THE COURT:  All right.  So under the privacy,

14   what else do you claim is not?

15             MS. RIECHERT:  The NLRA claim under Section

16   8(a)(1) of the National Labor Relations Act.  That was

17   not raised.  That's not a workplace safety issue and that

18   was not raised in her DIR complaint.

19             There's an OSHA complaint, 29 U.S.C. 660 which

20   is OSHA 11-C, that was not raised in her DIR complaint.

21   There's the right of privacy, there's 42 U.S.C. 2000(e),

22   that had nothing to do with workplace safety.

23             And then the last one is the antidiscrimination

24   laws of the government code in California 1298 -- 12920.

25   So those were all claims that she's now saying she was

1   retaliated against for making, but none of those were

2   covered by the DIR complaint related to workplace safety.

3          THE COURT:  Why wouldn't the OSHA claim of

4   retaliation be covered or at least implied by the DIR

5   complaint?

6          MS. RIECHERT:  It would have to be very

7   implied, I think, for it to be covered.

8          THE COURT:  I mean, at least it's within the

9   realm of the kind of things we're talking about.

10          MS. RIECHERT:  Possibly.  I would want to make

11   one other point with respect to her allegations under

12   1102.5 which is that a number of the things that happened

13   to her, she says, after she made -- relate to the conduct

14   that occurred after she made the DIR complaint and,

15   therefore, they could not have been covered by the DIR

16   complaint.

17          For example, she talks about that she was

18   retaliated against for making the DIR complaint, but

19   obviously, if she's retaliated against for making the

20   complaint, the things that happened to her could not have

21   been in the DIR complaint because they occurred after the

22   DIR complaint.

23          THE COURT:  But it's still outside the

24   limitations period, because if she complained about

25   issues within the limitations period, then you don't need

1   the tolling.

2           MS. RIECHERT:  Correct.  We're talking about

3   things that occurred outside of the limitations period,

4   but were not tolled by the DIR complaint because they

5   occurred after the DIR complaint but outside the

6   limitations period.

7           THE COURT:  What would be your response to, as

8   you know in the Title 7 exhaustion arena, which is a

9   little bit analogous, that that exhaustion is deemed

10  satisfied not only by things that are raised in an EOC

11  complaint, but things that are reasonably related or

12  reasonably could be expected to have grown out of the

13  original complaint.

14          And one could argue here, if you use that kind

15  of notion, that retaliation for the DIR complaint even

16  though, you know, you expect somebody to file another DIR

17  complaint, it seems like it's transactionally related and

18  it would be --

19          MS. GJOVIK:  I did, I did.

20          THE COURT:  Let me ask Ms. Riechert to respond

21  to that first.

22          MS. RIECHERT:  Yes, Your Honor.  So there are a

23  lot of rules with the EOC, as you know, where it has to

24  be covered by the complaint or arise out of it.  If the

25  complaint is for discrimination, then you allege

1    retaliation.

2            That's not covered by the original complaint,

3    and so you have to allege amended complaint.  If you

4    allege race discrimination, and then you later allege age

5    discrimination, you have to amend your complaint.

6            She didn't amend the DIR complaint, and so

7    these things that were not related to workplace safety,

8    including discrimination and things like that, do not

9    relate back and are not tolled because they don't relate

10   to workplace safety, but was in the DIR complaint.

11           THE COURT:  But the DIR complaint did raise a

12   retaliation claim, it's just that now she's raising

13   further acts of retaliation, so it's not like, you know,

14   a brand new -- it does seem different to me.  I don't

15   know if there's case law on this, but it feels different.

16   I'll let Ms. Gjovik respond to that question.

17           MS. GJOVIK:  Sorry, I jumped in again.  I just

18   get very excited about labor rights.

19           So first I just want to make clear that when I

20   filed that complaint, it was not specific to safety.  It

21   was all the labor rights.  I got very, very excited to

22   learning about all the wonderful labor laws in

23   California.

24           I was not aware that California is the, like,

25   the leading law with state labor protections, and this is

1    when I was getting very engaged about LRB, and California

2    has the right to talk about work conditions, talking

3    about invasion of privacy.  That's why I took part in

4    that article.

5         I want to point out that all of this happened

6    well before I was fired.  This stuff is definitely

7    included in those complaints and some of the things that

8    the counsel just said were incorrect.

9         So like the NLRB, I filed my NLRB complaint

10   prior to the DIR complaint and Apple was served.  And

11   they had notice of counsel that they were representing

12   that NLRB charge.  I think it's like the same day I filed

13   the DIR charge.

14        So I think it's a bit of puzzling they're doing

15   of maybe it wasn't the exact same lawyer and stuff, but

16   like Apple as a company was aware and all of this was

17   growing out of the complaints that I made to Apple which

18   were very extensively documented.

19        This is stuff that rooted out of the issue

20   confirmation I wrote with them, which is a long detailed

21   document of all of my concerns which covered a huge broad

22   of issues.  That was about August 22nd that that was

23   filed.

24        I wasn't fired until September 9th.  They said

25   that they were investigating all of those things,

1     supposedly.  So they were fully on notice there and I

2     started discovery with them.  I called it prediscovery.

3     I told them I was suing them at that point and I gave

4     them over 500 documents to support these claims they were

5     making.

6            And, again, it was -- they actually said that

7     they would not investigate the safety issues.  So

8     everything they were supposedly investigating was not

9     safety, even though I kept bringing up the safety issues,

10    too.

11           THE COURT:  All right.  Let me -- let me ask

12    about the other retaliation basis, the Labor Code 98.6,

13    that one of the keys there is whether or not there's a

14    sufficient allegation that Apple knew that Ms. Gjovik was

15    engaged in the activity because without the knowledge, as

16    I previously mentioned, you can't retaliate.

17           There is some suggestion here, at least, for

18    instance, the timing of the events that's alleged, that

19    the day after Ms. Gjovik shared a post on Slack

20    referencing the policies on rights to speak freely about

21    wages, et cetera, she was placed on leave, that Apple was

22    aware of the survey because they shut it down.

23           Maybe it's a little thin, but isn't that

24    enough, Ms. Riechert, to -- especially if the inferences

25    are to be drawn in favor of the pleader to find a basis

1    for knowledge?

2          MS. RIECHERT:  Yes, Your Honor.  My

3    understanding on the Slack is that she said that she was

4    questioned about the Slack posts on July 27, 2021, but

5    she didn't participate in the pay survey until August of

6    2021.

7          And, therefore, even if the company had been

8    asking her about her Slack in July of 2021, it would not

9    have found something that she later put in Slack and,

10   therefore, it couldn't -- there would be no reason to say

11   that it knew that she had posted the paid survey in

12   August of '21 just because they looked at her Slack on

13   July 28th -- July 27, 2021.

14         THE COURT:  All right.  Your response to that

15   specific point, Ms. Gjovik?

16         MS. GJOVIK:  Yeah.  So I think that is

17   completely disconnected from the reality of corporations

18   who highly prioritize keeping their employees quiet about

19   concerns and not having stuff aired publicly.

20         We've seen this with Apple and other tech

21   companies, even the CEOs sending emails yelling at their

22   employees to not speak about anything publicly, keep it

23   all private.

24         Apple, like these other companies, does the

25   same thing.  Once you're on a list, they're going to

interrogate you ongoing.  They're going to keep an eye on what you're doing.

There are probably hundreds of articles about Apple once you're on their list, they're following up with you, saying, hey, we said stop posting that.

So to think that they became concerned about what I was doing and then I continued to escalate my advocacy to think that they stopped paying attention, I think is -- doesn't make any sense.

And then especially since they said they started investigating me, supposedly over a week before they fired me, my question then would be, what did they investigate if they were saying that they fired me for making statements that were leaking, wouldn't they then inherently be searching all of my social media, Slack, conversations with employees, to try to figure out whatever they're looking for about that leaking unless they weren't investigating and it was just pretential?

THE COURT:  Do you want to respond, Ms. Riechert, to that?

MS. RIECHERT:  Yes, Your Honor.  She's required to allege facts that show that Apple did know that she was complaining about her wages and she just hasn't alleged those facts in the complaint.

THE COURT:  All right.  Well, I'm going to take

1    these matters under submission and we'll determine what

2    sort of survives and what doesn't.

3          I will say that matters that were repled in

4    this complaint that were outside the scope of what I had

5    allowed, I'm going to look at that and there may be

6    things that are not cognizable here.

7          I also will feel that whatever I rule with

8    respect to this complaint, I am not inclined to allow

9    further amendments to the pleadings here.

10         We need to get going on this case and there's

11   been enough back and forth on the pleadings, but I will

12   rule on those matters once we -- I rule on what's before

13   me now.

14         MS. RIECHERT:  I would just like to make one

15   more point, Your Honor, if I could.

16         THE COURT:  Okay.

17         MS. RIECHERT:  You've admonished the plaintiff

18   in this case that she needs to comply with the rules,

19   meet the deadlines, meet the page limit requirements and

20   yet she's continuing to not do that.

21         She filed her opposition late.  She filed --

22   the second version of the opposition was late and it was

23   30-some pages long.

24         So again, it violated your rules by being late

25   and I just think it's really important that we make it

1    clear, you make it clear to the plaintiff that she's got

2    to comply with your rules.  She's got to get these things

3    done on time and she's got to comply with the page limit

4    requirements.

5             THE COURT:  Right.  I am going to say that in

6    my order, whatever I decide, that I expect at this point,

7    I've given dispensation, because she's not represented

8    although she has a legal education.

9             But from this point on, the rules are going to

10   be enforced.  So I will make that clear and I'm going to

11   make that clear in the order.  Whatever goes forward from

12   here, that's going to be my expectation.

13            So I will take the matter under submission, but

14   it's my intent to close the pleading stage of this case

15   and move forward with whatever is left and we'll set a

16   further schedule at that point.

17            MS. RIECHERT:  There is another motion by the

18   plaintiff to further amend the complaint that is set for

19   hearing.

20            THE COURT:  Well, I've already indicated that

21   my inclination is to close the pleadings in this case.

22   We've already had now a fifth amended complaint.  We need

23   to move forward with what we've got after I decide the

24   issue before me now.  So you will hear from me shortly.

25            MS. RIECHERT:  Thank you very much, Your Honor.

1          THE COURT:  Thank you, everyone.

2          MS. GJOVIK:  Thank you, Your Honor.

3          THE CLERK:  This hearing is concluded.

4      (Proceedings adjourned at 9:49 a.m.)

5      ************************************************

6                 CERTIFICATE OF REPORTER

7      I certify that the foregoing is a correct transcript

8  of the proceedings taken from my stenographic notes in

9  the above-entitled matter.

10

11  /S/ Beth A  Krupa_              __March 28, 2025___
                                   Date
12  Beth A. Krupa, RMR, CRR
    Official Court Reporter
13  U.S. District Court
    District of South Carolina

14

15

16

17

18

19

20

21

22

23

24

25

Beth A. Krupa, RMR, CRR