**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJOVIK,** *an individual*, | Case No. 3:23-CV-04597-EMC |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION TO STRIKE DEFENDANT'S AMENDED ANSWER** |
| vs. | *& Concurrently Filed:* **REQUEST FOR CASE SCHEDULE & SUMMARY JUDGEMENT** |
| **APPLE INC.,** *a corporation*, | **HEARING:** Courtroom 5, 17th Fl. & Zoom Judge Edward M. Chen July 31 2025 1:30 PM PST |
| Defendant. | |

# TABLE OF CONTENTS

**DEFENDANTS' AFFIRMATIVE DEFENSES REMAIN FACTUALLY DEFICIENT** ................................................................. 1

Defendants Cannot Identify Their Actual Termination Reason ................... 2

The September 15, 2021 Email Represents a Pattern of Coordinated Misconduct ......................................................................... 3

The Workers' Compensation Defense Is Legally and Economically Incoherent ............................................................................ 9

Failure To Mitigate Requires Factual Basis, Not Automatic Inclusion ......... 9

The Administrative Leave Non-Defense ................................................ 10

**DEFENDANTS IMPROPERLY CLAIM PROTECTED ACTIVITY CONSTITUTES MISCONDUCT** .................................................... 11

**DEFENDANTS' SHIFTING AND CONTRADICTORY CITATION STANDARDS PROVE BAD FAITH** ................................................. 12

**APPLE'S PLAYBOOK OF ABUSE** .................................................. 14

**DEFENDANTS' OPPOSITION TO CASE MANAGEMENT PROVES BAD FAITH** ................................................................................ 15

**CONCLUSION** .......................................................................... 16

# REPLY IN SUPPORT OF MOTION TO STRIKE

Following this Court's order instructing Apple to amend their Answer to plead facts and specific allegations to support their affirmative defenses (Dkt. No. 215), Apple's affirmative defenses remain factually deficient. More damaging, Defendants′ opposition relies on unauthenticated evidence from a witness they swore they never contacted, while simultaneously claiming the conduct referenced in that evidence was not the reason for Plaintiff′s termination.

This creates an impossible contradiction: if the Verge article disclosures were not the termination reason, Defendants still have not articulated any legitimate reason for termination after multiple opportunities to do so. Meanwhile, their own witness swears under oath that Apple was investigating the Verge disclosures (including Plaintiff′s prominent participation) before Plaintiff's termination, destroying Apple's after-acquired evidence defense.

Rather than address these fundamental pleading failures, Defendant resorts to personal attacks, mischaracterizes this Court′s orders, and again improperly seeks sanctions without following proper procedures.

## DEFENDANTS′ AFFIRMATIVE DEFENSES REMAIN FACTUALLY DEFICIENT

Defendant′s central opposition argument is to claim this Court told them they need not plead facts. This is demonstrably false and mischaracterizes the Court's May 19 Order. The Order repeatedly required concrete allegations and facts. (Dkt. 215). It's unclear what Apple thinks the court ordered them to do when it granted leave to amend if it was not to add facts and specific allegations. The Court′s instruction that allegations ″need not be extensive″ does not mean no facts are required. Defendant cannot transform a directive about the quantity of required facts into permission to plead no facts at all.

Despite the Court′s order and Defendant′s amendment, Plaintiff still has no meaningful understanding of what Defendant actually claims happened. Instead of facts, Defendant added identical boilerplate language to multiple defenses: ″*Apple determined that [Plaintiff] had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies.*″ This copy-paste pleading fails to provide the specific factual allegations the Court required.

Plaintiff cannot prepare a meaningful defense without knowing which specific policies were allegedly violated, what specific conduct constituted violations, when these alleged violations occurred,

who made these determinations and based on what evidence, and how these alleged violations connected to the termination decision.

## Defendants Cannot Identify Their Actual Termination Reason

Defendant's shifting explanations for Plaintiff's termination reveal they cannot maintain a consistent narrative, which undermines all their affirmative defenses: In prior proceedings, Defendant claimed they terminated Plaintiff for tweeting about Apple wanting to perform detailed scans of her ears and ear canals. However, this information (Apple's ear scans) was already publicly available before Plaintiff's tweets, and Plaintiff already expressly refused to participate, in writing, back in 2019, neutralizing any legitimate basis for termination.

Apple now claims the Gobbler disclosures are "after-acquired evidence" learned post-termination, so it cannot be the termination reason. They also vaguely mention refusing to cooperate, but their own records show they were already preparing to terminate the Plaintiff well in advance, and an ALJ already found this excuse was pretext contradicted by the actual evidence. (Dkt. 220-5). Apple mentions redacting information, but if this refers to Twitter posts, they must specify this and explain why redacted social media posts justify termination, especially with concurrent claims of "leaking". If this refers to Plaintiff's reluctance to identify her friend (who was subsequently forced to leave the country), they must explain why reasonably protecting a potential deportation target justifies termination.

Defendants appear to recognize that each potential termination reason creates liability under different legal theories. Rather than commit to a defensible position, they plead vaguely to preserve maximum flexibility. This strategic evasion violates basic pleading requirements and prevents meaningful case resolution. Rule 8 requires defendants to state their actual defenses, not preserve the right to deploy whatever story proves most convenient at trial and use as a blanket basis for egregiously invasive and harassing discovery requests, as they are currently doing.

Defendants attempt to save their after-acquired evidence defense with an impossible distinction: they claim they knew about the Verge article but not about Plaintiff's "admission" of involvement. This position defies logic and their own evidence. The article quoted Plaintiff by name and included photographs of her. Any reasonable reader would understand Plaintiff's involvement from the article itself. Defendants cannot claim they read an article featuring someone's name, quotes, and photographs

without understanding that person participated in the article.

Defendants' privilege log shows they expected litigation related to Plaintiff and the article before her termination, proving they understood her involvement. They cannot manufacture an after-acquired evidence defense when their own documents prove they knew about the conduct before termination.

## The September 15, 2021 Email Represents a Pattern of Coordinated Misconduct

Defendants' reliance on the September 15, 2021 email reveals far more serious problems. This email represents evidence of coordinated misconduct between Defendants and a witness who has systematically deceived courts while furthering Defendants' litigation strategy. ("*Apple specifically alleges that it learned of Plaintiff's admission that she had disclosed confidential product-related information to a journalist at the Verge—not of the article—after her termination*," Dkt. 224 at 10).

The email was sent by Jonanna Appleseed, someone Defendant's counsel previously claimed no contact with. It contains intimate photographs of Plaintiff taken by Apple's application without consent (potentially criminal conduct that Defendants now cite to support their defenses). After sending this email, Appleseed proceeded to sue Plaintiff to obtain a gag order preventing Plaintiff from telling anyone if she discovered Appleseed's misconduct (among other unlawful objectives); filed multiple declarations with this court making false accusations against Plaintiff while pretending to be uninvolved with Apple (Dkt. No. 62, 66, 99, 176); and successfully helped to get Plaintiff's RICO, Bane Act, Ralph Act, 17200, and IIED claims dismissed through these false declarations.

Previously Appleseed swore she had never met Gjovik and did not interact with her. ("*The Plaintiff and I did not work together and never met each other in the course of our work.*," Dkt. 66 at 2). Appleseed also swore that Gjovik and she had "*mutual friends*", but this is false. (Dkt 176 at 2). Appleseed swore these imaginary friends told her Gjovik was providing her phone to Apple as evidence at advice of Gjovik's counsel, but Apple never asked for Gjovik's phone, Gjovik never provided it to Apple, and Gjovik's counsel at the time was thus never involved. ("*A mutual friend told me [Gjovik] was planning to hand over her device to Apple at the advice of her attorney.,*" Declaration at Dkt 176, pg 3). Appleseed also swore that "*only the Plaintiff and [Appleseed] knew about [their] conversations,*" Declaration at Dkt 176, pg4). Yet, she does not know who Gjovik shared information with, and Apple's privilege log shows they approved extensive digital surveillance of Gjovik on August 26 2021 and forward. (Dkt. 221, Privilege

Log).
- P.L. No. 219, 221, 230: 8/26-8/30/2021: "*Search Request*"
- P.L. No. 180: 8/18-8/19/21: "*ACP Data Request*"
- P.L. No. 182: 8/20/21: "*ACP: APPROVAL REQUEST: Backup Collection and Email / Communications Preservation Backup preserve.numbers,*"
- P.L. No. 229: 8/30/21: "*Additional info re iCloud@Apple*"
- P.L. No. 241: 9/1-9/2/2021: "*Wiping of Device Qs related to A.G.*"
- 9/15/21: Appleseed sends the email in question to Apple's lawyers.

The premise for why Appleseed sent the Sept. 15 2021 email is entirely fabricated and is only explained by Apple coercing her to do so through veiled threats and fabricated allegations about Gjovik.

Appleseed also swears she was under investigation by Apple for the content in the Verge article prior to Gjovik's termination. ("*On or around Sept. 2 2021… Apple's internal counsel reached out to inquire if I would speak with them… I realized that I had been subject to investigation for the leak of Alpha and that's what [Gjovik] had been terminated for leaking.*" Dkt 176 at 3). Apple confirms in their Department of Labor filings that Alpha is indeed Gobbler. (Dkt. 35-5 at 24).

Gjovik was prominently featured in the Verge article (by name, interview quotes, identifiable photos of her taken by the app), so Apple necessarily knew about Gjovik's involvement before firing Gjovik. Quotes from the article in question related to Gjovik include:

"Employees … have found that when testing new products like Apple's Face ID, images are recorded every time they open their phones. "If they did this to a customer, people would lose their goddamn minds," *says Ashley Gjøvik,* a senior engineering program manage… The mixing of personal and work data has already had real consequences. In 2018, the engineering team **Ashley Gjøvik** worked on was involved in a lawsuit. The case had nothing to do with **Gjøvik** personally, but because she'd worked on a project related to the litigation, Apple lawyers needed to collect documents from her phone and work computer. **Gjøvik** asked the lawyers to confirm that they wouldn't need to access her personal messages. She says her team discouraged the use of two phones; she used the same one for work and personal and, as a result, had private messages on her work device. A member of the legal team responded that while the lawyers did not need to access **Gjøvik's** photos, they did not want her to delete any messages. During an in-person meeting, **Gjøvik** says she told the lawyers the messages included nude photos she'd sent to a man she was dating — a sushi chef who lived in Hawaii. Surely, those weren't relevant to the lawsuit. Could she delete them? She says the lawyers told her no…. In 2019, **Gjøvik** filed a ticket about Apple's photo search capabilities. "If I search for 'infant' in my photo library, it returns a selfie I took of myself in bed after laparoscopic surgery to treat my endometriosis," she wrote, including four images in the ticket. The default sharing settings for the ticket included all of software engineering. Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "Radar is forever."… **Gjøvik** is currently on administrative leave from Apple due to an ongoing

investigation into claims she made about harassment and a hostile work environment."[1] (emphasis added).



*The Verge: Apple cares about privacy, unless you work at Apple (8/30/2021)* [2]

---

[1] The Verge, *Apple cares about privacy, unless you work at Apple: The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs,* August 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[2] The Verge, *Apple cares about privacy, unless you work at Apple,* Aug. 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

Apple's own witness, Appleseed, swears Apple was investigating the Verge article (including Gjovik's involvement) before Gjovik's termination. Appleseed also swore she did not think Gjovik's actions were misconduct prior to the termination and does not believe she is a witness in this case. (*"I hadn't realized at the time it was a Business Conduct violation"*; *"I referred to myself as a witness... I used this term incorrectly.,"* Declaration at Dkt 176 at 4). Apple's key defense witness, who has expressed extensive animus toward Gjovik, is actually, ultimately, a witness in support of Gjovik's version of events.

Apple privilege log (Dkt No. 221) also repeatedly mentions the Verge article in relation to Gjovik including the entries:

- P.L. No. 242: 8/27-8/28/2021: *"Re: [TIME SENSITIVE] Request for comment from The Verge"*
- P.L. No. 242: 9/1-9/2/2021, "*Re: Internal application*" (includes emails sent by Gjovik's Sr. VP & three senior directors in HR and legal)
- P.L. No. 225, 228: 8/14-8/30: *"Re: Coverage Summary - employee issues on social and in media"*
- P.L. No. 255: 9/1-9/7/2021, "*Re: (AG) Fwd: Internal application (Glimmer/Gobbler) privileged and confidential*" (includes emails sent by Gjovik's Sr. VP, two legal and HR senior directors, and a global security executive).
- P.L. No. 273: 9/7-9/9/2021: "*Re: (AG) Fwd: Internal application (Glimmer/Gobbler) privileged and confidential*" with attachment "*AG Talking Points.pages*" (includes emails sent by two Apple legal senior directors and the "Workplace Violence" team).
- P.L. No. 291: 9/9/2021: "*Re: Twitter TOUs [CD035452] Privileged & Confidential"* (with emails from Apple's Trademark/Copyright legal team, Apple's HR legal team, and Workplace Violence team).

It's unclear what they were investigating if they thought the article was not a violation of their policies, but thought something Gjovik did beyond the article was, but concurrently claim they didn't learn about the secret issue until after they fired her.

There was also mention of "*Re: Ashley Gjovik. Case HRC000019497 (complaint re ear scan invitation)*" (P.L. No. 236-238, 8/31-9/1) but this was the already public information. Plaintiff sent a Cease & Desist letter to Apple on Oct. 6 2021 directly citing the public statements made by Apple years prior, disclosing that they were doing 3D scans of human ears. (Dkt. 220-6). Despite this, Apple lied to U.S. Dept of Labor saying, "*the details of [the ear scans] were not known except to a small select group within Apple, and certainly not outside Apple.*" (Dkt. 35-5 at 24).[3]

---

[3] WIRED, May 9 2020, "We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Greg Joswiak, Apple's vice president of product marketing says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population." https://www.wired.com/story/apple-airpods-success/

Apple also claimed in their March 2022 sworn position statement to U.S. Dept of Labor that Apple terminated Gjovik because she "*violated Apple policy by intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press.*" (Dkt. 35-5). In this statement they claim they did not know about the Verge article until after they fired her, which is contradicted by the evidence, and their latest statements in this case. Apple's March 2022 statement said:

> "On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, Ms. Gjovik admitted to disclosing confidential information about the Alpha study to Zoe Schiffer, a reporter from The Verge: I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha]….Ms. Gjovik's very involvement with the Alpha (Gobbler) study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it. Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision…. Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure…. The only reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy.[4]"

Dkt. 35-5 at 25 and 29-30, Position Statement written by Jessica Perry of Orrick.

Notably there are no entries in the privilege log for Sept. 15 2021 or any mention of the email that Apple quotes, despite Apple's counsel contacting Gjovik on Sept. 15 2021 about her Twitter posts and the Verge article.

Further, Apple via Orrick cited the email that Appleseed sent on Sept. 15 2021 in their June 30 2025 opposition (Dkt. 224) but also swore prior that they never verified the email or interviewed the sender (Appleseed) about the events alleged. ("*No Orrick attorney has communicated with Ms. [Appleseed]*," Dkt. 167, 167-1). This means Apple's counsel never verified the authenticity of the evidence. Apple via Orrick also swears the email and Gjovik's participation in the Verge article is not the reason Apple fired her. ("*The September 15 email was sent six days after Plaintiff's termination and thus was not—and could not have been—a "basis" for Plaintiff's termination.*", Id.)

---

[4] Note: U.S. NLRB found this policy violates federal labor law, sued Apple over it, and forced Apple to rescind the terms that Apple fired Gjovik under. (Dkt. 203).

Using evidence from someone who committed potential crimes, obtained gag orders to prevent discovery of misconduct, and filed false court declarations – represents systematic abuse of the litigation process that extends far beyond simple authentication problems – especially when the Defendant claims this isn't even the reason they fired Gjovik. This also raises the question as to why Apple actually fired Gjovik, because Apple still has not said. Apple's also actively seeking sanctions and gag orders against Gjovik related to this Verge article and the content disclosed (Dkt. 219), despite arguing that this is not the reason Apple fired her.

Notably, in contrast to Apple's sworn statements in response to Gjovik's 2024 Motion to Disqualify Orrick from this matter (Dkt. 156), Apple's Privilege Logs reveals that Apple's Orrick counsel in this lawsuit were indeed retained by Apple no later than August 17 2021, and were actively engaged in the dispute with Gjovik at least three weeks prior to Gjovik's termination on Sept. 9 2021.

It appears Jessica Perry, esq. (Orrick) was brought in by Apple around Aug. 12 2021 as an "external investigator" for Gjovik's claims. Perry was actively involved and sent several emails to large groups at Apple about Gjovik including on Aug. 17 2021, Aug. 23-25, 2021, Aug. 25-26 2021, and Sept. 7-8 2021. (Dkt. 221). On Aug. 26 2021, Apple Legal and HR execs were exchanging a Keynote slide deck titled "*Draft Exit Outcomes ACP.key*" (P.L. No. 218) and on Aug. 27 2021, then authorized digital surveillance of Gjovik (P.L. No. 219) – all signifying that Perry had already advised to Apple that Apple should terminate Gjovik's employment and prepare to be sued over it. This all occurred prior to Gjovik's supposed misconduct on Aug. 30 2021.  Entries included:

— **8/12/21: Gjovik files EEOC complaint against Apple**
— P.L. NO 154-155 8/12/2021:  "*External investigator/AG*" (assumably deciding to bring Perry on).
— P.L. NO 168: 8/17/2021: "*Re: ACP: Fwd: Employee Relations Investigation: Ashley Gjovik's Issue Confirmation*" (rec: Jessica Perry/Orrick)
— P.L. No. 177: 8/17/2021: "*Re: ACP: Response to AG's 8/16 email*" (sent by Perry/Orrick)
— **8/19/21 – U.S. EPA inspection of Gjovik's Superfund site office**
— P.L. No. 211: 8/23-8/25/2021: "*Re: Gjovik - Chart of Witnesses and Claims*" (sent by Perry/Orrick)
— P.L. No. 216: 8/25-8/26/2021: "*Re: Gjovik - Chart of Witnesses and Claims With Gjovik Revisions Chart of Witnesses and Claims 4154- 1082-1425 3.xlsx*"  (sent by Perry/Orrick)
— **8/26/21 – Gjovik files NLRB charge against Apple**
— P.L. No. 218: 8/26/21: "*Draft Exit Outcomes ACP.key*"
— P.L. No. 219: 8/27/21: "*ACP - Search Request*"
— **8/28-30/2021 – Supposed Misconduct by Gjovik**
— P.L. No. 256: 9/7-9/8/2021: "*Re: Draft - Response to AG*" (sent by Perry/Orrick).
— **9/9/2021 – Apple terminated Gjovik's employment.**

These public facts and sworn declarations establish that Apple knew about Gjovik's participation in the Verge article participation well before her termination. Apple's after-acquired evidence defense is factually contradicted by their own witness's sworn statements. The burden shifts to Apple to articulate a legitimate reason for termination Gjovik, and Apple has failed to do so.

## THE WORKERS' COMPENSATION DEFENSE IS LEGALLY AND ECONOMICALLY INCOHERENT

The Court specifically asked whether Apple was *"aware of any workers' compensation awarded to Ms. Gjovik during the time she was employed with Apple."* (May 19 Order at 6). Instead of answering this direct question, Defendants pivoted to claiming offset rights for unknown workers' compensation from unknown future employers. This position creates multiple legal and economic problems. First, workers' compensation provides wage replacement for lost income. Defendants already claim offset rights for wages from other employment under their failure to mitigate defense (which has its own deficits). Claiming additional offset for workers' compensation wage replacement from the same employment constitutes impermissible double-counting of the same financial benefit.

More fundamentally, Defendants seek to offset employment damages with medical benefits Plaintiff may have received for workplace injuries. This would punish Plaintiff for seeking medical treatment and has no basis in law. Employment damages compensate for lost wages and other economic harm. Reducing employment damages because someone who received medical care, from a different party, is economically incoherent and legally unsupported. Further, the Defendant's pivot appears to be an attempt to deflect away from their attempted misuse of Worker's Compensation in 2021 in order to create legal defenses as to what they did to Gjovik at the fab at 3250 Scott Blvd and her Superfund site office.[5]

## FAILURE TO MITIGATE REQUIRES FACTUAL BASIS, NOT AUTOMATIC INCLUSION

Affirmative defenses must be based on facts suggesting the defense has merit, not speculation that discovery might reveal something. For failure to mitigate, employers need some indication that plaintiff

---

[5] (P.L. 052, Saturday 5/22/21: "*Privileged & Confidential—Fwd: Request for Denial Authorization on Environmental/Chemical Exposure Claim - Ashley Gjovik, Claim 30217483107-0001.*")

actually failed to seek employment or rejected reasonable opportunities, like evidence plaintiff refused job offers, statements that she wouldn't seek work, or documentation showing rejection of reasonable employment opportunities. Without such factual basis, courts would essentially allow every employer to assert this defense regardless of circumstances.

If employers could assert failure to mitigate based solely on claimed ignorance, this would fundamentally alter the *McDonnell Douglas* burden framework by adding an automatic fourth burden requiring employees to disprove mitigation failures regardless of supporting evidence. This additional burden appears nowhere in employment protection statutes, appellate decisions, or standard jury instructions. Every employment case would automatically include mitigation discovery, transforming what should be a fact-specific defense into a universal burden shift that effectively rewrites the balance Congress and state legislatures struck in employment protection laws.

Defendants' approach (claiming ignorance of facts in pleadings to justify speculative defenses) would eliminate Rule 11's factual basis requirement entirely. Every employment defendant could automatically assert failure to mitigate by stating "we don't know if plaintiff looked for work." This transforms affirmative defenses from fact-based legal theories into automatic discovery hooks, rendering the entire concept of pleading requirements meaningless.

## The Administrative Leave Non-Defense

Next, Defendants' handling of the administrative leave issue exemplifies their evasive pleading strategy. Plaintiff noted that Apple placed her on administrative leave twice in 2021 and asked which instance Defendants referenced. Defendants responded that they meant *"the August one"* but failed to explain how this supports any affirmative defense. If Defendants claim Plaintiff *"requested"* administrative leave in August 2021, and that somehow supports their affirmative defenses, they must explain how this request relates to her September 2021 termination, when and how she supposedly requested this leave (with dates, names, etc.), which affirmative defense this fact supports, why an employee requesting leave could justify subsequent termination, and how leave requests connect to Apple's "policy violations" or other claimed defenses

When challenged on these logical gaps, Defendants' counsel responded essentially that the court said, *"they don't have to plead facts"*. This exchange proves Defendants are asserting allegations without

any connection to legal theories, without factual basis, and violating the basic requirement that affirmative defenses provide fair notice of the defense being asserted.

Further, Plaintiff already made a contemporaneous public statement about the August 2021 leave where she stated, verbatim:

> "For months, I have been raising concerns with Apple employee relations about years of experiences with sexism, a hostile work environment, sexual harassment, unsafe working conditions, and retaliation," Gjøvik says in an interview with *The Verge*. "I asked them to mitigate the hostile work environment while they investigate, and they initially offered me EAP therapy and medical leave. I told them that made no sense, and said they should talk to my leadership and set up oversight and boundaries. I added that if there was no other option they could give me paid administrative leave. They apparently made no effort to set boundaries and instead said they were placing me on administrative leave and implied they did not want me on Slack where I had been vocal about my concerns with certain policies at the company. They also implied they didn't want me to meet one-on-one with other women at the company about their concerns with Apple policies, which I had been doing."

(The Verge, August 4 2021.)[6] It's entirely unclear why Apple's claims this is misconduct by the Plaintiff.

# DEFENDANTS IMPROPERLY CLAIM PROTECTED ACTIVITY CONSTITUTES MISCONDUCT

Defendants' affirmative defenses characterize Plaintiff's protected activity as *"misconduct"* that supports their defenses. Specifically, Defendants argue that Plaintiff's participation in government proceedings and public advocacy about labor rights constitutes wrongdoing that justifies their termination decision or reduces their liability. Protected activity cannot be misconduct as a matter of law. California Labor Code §§ 1102.5 and 98.6/98.7 explicitly protects disclosures to government agencies. The National Labor Relations Act protects participation in NLRB proceedings. Defendants cannot simultaneously acknowledge these activities are protected while characterizing them as misconduct supporting affirmative defenses.

Defendants' circular logic fails. Defendants argue that Plaintiff's post-termination protected activity (filing government complaints about their conduct and participate in proceedings) constitutes "misconduct" that supports their defense against claims that they retaliated for her pre-termination protected activity. This creates an impossible legal standard: employees who exercise statutory rights

---

[6] The Verge, *Apple places female engineering program manager on administrative leave after tweeting about sexism in the office,* Aug. 4 2021, https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

after alleged retaliation would provide their employers with defenses to the original retaliation claims. Such a rule would eviscerate whistleblower protection statutes.

Defendants seek to use Plaintiff's NLRB charges as evidence of her "*misconduct*," while simultaneously being sued by the NLRB based on those same charges. They cannot argue that conduct the NLRB found meritorious enough to pursue in federal court constitutes employee misconduct supporting employer defenses.

This defense must be struck. An affirmative defense premised on protected activity fails as a matter of law. Courts cannot permit employers to escape retaliation liability by recharacterizing the employee's exercise of statutory rights as misconduct. Defendants' attempt to use Plaintiff's government participation and public advocacy as defensive ammunition violates the fundamental purpose of employment protection statutes and should be stricken with prejudice.

## DEFENDANTS' SHIFTING AND CONTRADICTORY CITATION STANDARDS PROVE BAD FAITH

Defendants' attack on Plaintiff's failure to cite cases demonstrates their shifting and contradictory positions designed to create procedural excuses rather than address substantive issues. For example, in response to Plaintiff's Second Amended Complaint, Apple complained Plaintiff cited too many cases and should not be allowed to use footnotes. (Dkt. 41-42). Later, in response to Plaintiff's Fifth Amended Complaint, Apple motioned to dismiss the complaint due to Plaintiff's line spacing, margins, and font choice. (Dkt. 131). More recently, Apple attacked Plaintiff for using AI as a tool for draft briefing and for citing Westlaw cases she couldn't independently verify because she cannot afford Westlaw anymore because Apple fired her, destroyed her reputation, and have dragged out this legal dispute for forty-six months. (Dkt. 199-201).

Further, Apple criticized Plaintiff for using AI tools to help draft filings which is not against any rules, and is a feature regularly advertised by companies like Lexis and Westlaw. Apple then attempted to get Reuters Legal to write a smear article about Gjovik, citing this court's comments about her use of AI and positioning it as some sort of gross misconduct by Gjovik (again trying to denylist her). The article was only pulled after Gjovik explained to Reuters that Apple had prompted their article in an attempt to fabricate evidence for their NLRB defense. (detailed in Plaintiff's 2025 NLRB Position Statement).

Now Apple claims that failure to cite cases in legal filings is sanctionable conduct without

explaining why or proving that Plaintiff's conduct actually violated any rules. Further, Apple now violates the court's May 19 2025 order warning Apple they must pursue sanctions under formal motions, not in footnotes or as part of unrelated motions. ("*if Apple seeks Rule 11 sanctions in the future based on filings made by Ms. Gjovik, then it must comply with the rule's procedures, including the safe harbor.*" Order at Dkt. 215, page 12).

Defendants have done neither. They filed no separate motion and provided no safe harbor period. Their request for sanctions buried in an opposition brief violates Rule 11's safe harbor requirement (they must serve Plaintiff and allow 21 days to withdraw/correct), Due Process (sanctions requests require separate motions with proper notice); this Court's express instructions (the Court already told Apple how to seek sanctions properly).

This chronological progression proves Defendants will attack Plaintiff's legal filings, including citation practices, regardless of what she does. When she cites many cases, it's too many. When she cites fewer cases, it's too few. When she uses available research tools, those are improper. If she adjusts her margin spacing, that's also misconduct. This pattern shows bad faith harassment rather than legitimate procedural concerns.

As for citations, Rule 11 requires legal contentions be warranted by existing law, not that every motion must cite cases. Simple enforcement motions routinely proceed without extensive citations, particularly when the legal basis was established in a prior granted motion, as here. Defendants cannot point to any rule requiring case citations in all motions. Further, Defendant has harassed Gjovik about her citations, making her unwilling to risk citing incorrect citations, thus defaulting to no citations if none are required, which Apple now also attempts to criminalize.

Further, Defendants weaponize judicial dicta from this court from prior, unrelated matters and which resulted in no actual sanctions. This is a transparent attempt to distract from Defendant's pleading deficiencies and intimidate Plaintiff through a quilt of warnings (all directly provoked by Apple's counsel) rather than address the substantive legal issues. Defendants cannot use out-of-context judicial commentary from unrelated matters, or reciting entries of external dockets, as evidence supporting current sanctions requests.

In addition, Defendant's attacks on Plaintiff's credibility and good faith are contradicted by federal agency validation of her claims. The NLRB found *"substantial evidence"* of federal labor law violations

following a two-year investigation, sued Apple for firing Gjovik and demanded they reinstate her and apologize, and forced Defendants to change their national confidentiality policies based on Plaintiff's complaints. (Dkt. No's 35-4, 37-3, 111, 151, 171, 203, 220).

Defendants now argue that Plaintiff is acting in "bad faith" despite NLRB validation; saying her NLRB charges are frivolous despite the ongoing federal lawsuit against Defendants; and claiming that she has engaged in sanctionable frivolous conduct despite prevailing in multiple state and federal proceedings. This position requires the Court to conclude that federal investigators, attorneys, and decision-makers were completely fooled by Plaintiff's alleged misconduct over a two-year period. Defendants offer no explanation for how someone acting in the "bad faith" they claim could systematically prevail in federal proceedings with experienced agency attorneys.

# APPLE'S PLAYBOOK OF ABUSE

The true pattern of litigation abuse comes from Defendants' systematic violations of court orders and procedural rules. Defendants are mischaracterizing court orders to avoid pleading requirements; claiming the court said no facts were required when the order repeatedly demanded "concrete allegations"; interpreting "need not be extensive" as "need not exist"; using identical boilerplate language across multiple defenses instead of specific factual allegations; using unauthenticated evidence from witnesses they denied contact with; citing evidence from sources they previously claimed no communication with; and violating basic evidence authentication rules.

Defendant is also using potentially criminal evidence (non-consensual intimate images) while claiming victim "consented" to criminal acts against her; seeking sanctions while violating court instructions on sanctions procedures; requesting pre-filing orders without following rule 11's safe harbor requirements; ignoring this court's express instruction to "comply with the rule's procedures"; and burying sanctions requests in opposition briefs instead of separate motions with proper notice.

Defendant is also making logically impossible legal arguments; claiming they knew about an article but not about the named, photographed participant's involvement; distinguishing between "knowledge of article" and "knowledge of admission" when the article itself contains the admission; and building entire defenses on factual premises their own evidence contradicts.

Defendant is also proposing economically incoherent damage offsets; double-counting wage

offsets (employment income + workers comp for same employment); seeking to offset employment damages with medical benefits for workplace injuries; and punishing Plaintiff is she had sought medical treatment for physical injuries.

# DEFENDANTS' OPPOSITION TO CASE MANAGEMENT PROVES BAD FAITH

Defendants' fierce opposition to any limitation on discovery reveals their true litigation strategy: using deficient affirmative defenses to justify unlimited fishing expeditions while avoiding case resolution.

If Defendants' legal positions are as strong as they claim, they should welcome early case resolution through summary judgment practice. Instead, they fight to continue expensive discovery while opposing any schedule or limitation. This behavior suggests they know their defenses cannot withstand scrutiny and prefer to exhaust Plaintiff's resources through protracted litigation.

Summary judgment is appropriate because key facts are undisputed. Under the *McDonnell Douglas* framework, Plaintiff has established her prima facie case with undisputed facts. Defendant's privilege log notes they were surveilling her Slack and Twitter posts about protected conduct like "contaminated sites" (P.L. No. 072, 086, 099, 148, 285, 286, etc.); her disclosures to U.S. EPA triggered an onsite inspection of her office prior to her termination; NLRB served Apple notice of Gjovik's charge in August 2021; and NLRB found "substantial evidence" of protected disclosures. Further, Termination is clearly an adverse action, and temporal proximity of weeks is well within statutory 90-day presumption.

Once Plaintiff establishes her prima facie case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for termination. Defendants have had multiple opportunities to plead and have failed to identify any specific reason for Plaintiff's termination. Vague references to unspecified *"policy violations"* do not meet this legal burden as a matter of law.

The law does not require employers to have compelling reasons for termination—only that they articulate some legitimate, non-retaliatory reason. It needs to be specific so it can be disproved. Discovery cannot cure the absence of a stated reason. The legal framework requires Defendants to first articulate their legitimate reason, then discovery is designed to develop facts about disputed issues, but there is no factual dispute because there is no defense. Employers lose retaliation claims as a matter of law when they cannot articulate the specific reason for termination because there is no legitimate reason for the employee to rebut.

Defendants seek years of Plaintiff's medical records and social media accounts while admitting they *"don't know what they'll find."* (Meet & Confer transcript, Dkt. 220). This fishing expedition approach proves they are hoping to manufacture defenses through discovery rather than articulating legitimate reasons they already possess. If Defendants had documentation supporting their termination decision, they should produce it and proceed to summary judgment rather than seeking to harass Plaintiff through unlimited discovery.

This case lacks any scheduling order or case management structure, allowing Defendants to pursue unlimited discovery without meaningful deadlines or limitations. The Court should establish a case schedule that includes summary judgment briefing after Defendants either articulate their specific defenses with supporting documentation or admit they cannot do so. (See concurrently filed administrative motion).

# CONCLUSION

Defendants find themselves trapped in contradictory sworn statements that expose the absence of any legitimate defense. They use unauthenticated evidence from someone they swore they never contacted to support defenses about conduct they claim was not the termination reason. Their own witness swears Apple was investigating Plaintiff's Verge article participation before termination, destroying any after-acquired evidence claim. Defendants still cannot articulate what the actual termination reason was, failing their basic burden under *McDonnell Douglas* after opportunity to amend.

This is precisely the type of case where summary judgment prevents waste of judicial resources on employers who cannot meet their threshold obligation to state why they terminated an employee. Defendants' affirmative defenses should be stricken with prejudice, and the Court should establish a case schedule leading to prompt summary judgment resolution on the prima facie case, followed by a jury trial to establish appropriate remedies.

Defendants' affirmative defenses remain factually deficient and should be stricken. Their procedural attacks are hypocritical and improper. Their opposition confirms they cannot or will not properly plead their defenses even after being given clear guidance. The Court should grant Plaintiff's motion to strike and deny Defendants' improper request for sanctions.

Respectfully submitted,

_____

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*
Boston, Massachusetts.
Dated: July 2 2025