Debtor's Motion For Order
To Show Cause and Sanctions
Against Creditor Apple Inc. (21011446)


Chapter 7 Case No: 25–11496


# Exhibit C

August 28 2025

8/28/25, 12:41 PM    CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures | Consumer Financial Protection Bureau

Case 3:23-cv-04507-EMC    Document 252-5    Filed 08/28/25    Page 2 of 49


Consumer Financial
Protection Bureau

# CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures

*Companies illegally mishandled transaction disputes and misled iPhone purchasers about interest-free payment options*

**OCT 23, 2024**

**Washington, D.C.** – Today, the Consumer Financial Protection Bureau (CFPB) took action against Apple and Goldman Sachs for customer service breakdowns and misrepresentations that impacted hundreds of thousands of Apple Card users. The CFPB found that Apple failed to send tens of thousands of consumer disputes of Apple Card transactions to Goldman Sachs, and when Apple did send disputes to Goldman Sachs, the bank did not follow numerous federal requirements for investigating the disputes. Apple and Goldman launched Apple Card despite third-party warnings to Goldman that the Apple Card disputes system was not ready due to technological issues. These failures meant that consumers faced long waits to get money back for disputed charges, and some had incorrect negative information added to their credit reports. The CFPB is ordering Goldman Sachs to pay at least $19.8 million in redress and a $45 million civil money penalty, and Apple to pay a $25 million civil money penalty. The CFPB is also banning Goldman Sachs from launching a new credit card unless it can provide a credible plan that the product will actually comply with the law.

The CFPB also found that Apple and Goldman Sachs misled consumers about interest-free payment plans for Apple devices. Many customers thought they would automatically get interest-free monthly payments when buying Apple devices with their Apple Card. Instead, they were charged interest. In some cases, Apple did not even show the interest-free payment option on its website on certain browsers. Goldman Sachs also misled consumers about the application of some refunds, which led to consumers paying additional interest charges.

"Apple and Goldman Sachs illegally sidestepped their legal obligations for Apple Card borrowers. Big Tech companies and big Wall Street firms should not behave as if they are exempt from federal law," said CFPB Director Rohit Chopra. "The CFPB is banning Goldman Sachs from offering a new consumer credit card unless it can demonstrate that it can actually follow the law."

Goldman Sachs Group, Inc. (NYSE: GS), is one of the largest financial institutions in the world. It operates Goldman Sachs Bank USA, headquartered in New York City. Goldman Sachs primarily focuses on investment banking and investment management, not consumer finance. Apple Card was Goldman Sachs's first significant experiment in credit card lending.

8/28/25, 12:41 PM          CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures | Consumer Financial Protection Bureau

Case 3:23-cv-04597-EMC     Document 252-5     Filed 08/28/25     Page 3 of 49

Apple Inc. (NASDAQ: AAPL) is a multinational technology company headquartered in Cupertino, California. Apple entered the financial services market in 2014 and has offered several consumer financial products, including Apple Pay, a mobile payment system and digital wallet service; Apple Cash, a digital debit card allowing for peer-to-peer payments; Apple Pay Later, a Buy Now, Pay Later product; and Apple Card, the company's first credit card.

# Apple Card Partnership

Apple's business model relies on substantial revenue and profits from sales of its devices, such as iPhones, iPads, and MacBooks. Many of Apple's products are more expensive than other brands, leading many consumers to finance purchases with payment plans and credit products.

In August 2019, Apple introduced Apple Card in partnership with Goldman Sachs Bank, marking a significant expansion into consumer lending for both companies. The partnership allowed Apple to provide a financing mechanism to ratchet up sales of its devices, including iPhones and iPads. The Apple Card also sought to induce more spending at Apple's retail stores and Apple's App Store.

Goldman Sachs' involvement in Apple Card was part of the bank's foray into consumer finance, which began in 2016 with the launch of its Marcus brand. Despite limited experience in the consumer credit card market, the Apple Card partnership offered Goldman Sachs a prime opportunity to establish itself in the market.

With the Apple Card, Goldman Sachs extends credit to consumers and handles account servicing. Apple designed the customer-facing interfaces used to manage Apple Card accounts on Apple devices. That includes a "Report an Issue" feature which allows consumers to dispute Apple Card transactions. Apple was also deeply involved in marketing and advertising.

Apple and Goldman's agreement incentivized an earlier introduction of Apple Card by giving Apple the right to impose a $25 million penalty for each 90-day delay caused by Goldman. Four days before launch, the Goldman Sachs board of directors learned that critical Apple Card disputes systems were "not fully ready" due to technological issues, but the companies proceeded anyway.

Later, in December 2019, Goldman Sachs and Apple introduced a new feature called Apple Card Monthly Installments, which allows users to finance the purchase of certain Apple devices with Apple Card directly from Apple through interest-free monthly installments, similar to a Buy Now, Pay Later product.

# Servicing and Communications Meltdowns

When Apple's customers experienced improper charges or filed disputes, the systems developed by the companies failed to address them. Under federal law, when consumers dispute transactions as fraudulent or unauthorized financial institutions must conduct a timely inquiry on what went wrong. Goldman Sachs failed to adhere to this requirement. Separately, many disputes submitted to Apple

were not even sent to Goldman Sachs at all. Additionally, Apple's deceptive marketing materials and illegal conduct caused consumers to pay interest on purchases of iPhones and other Apple devices with Apple Card that they believed would be covered by an interest-free payment plan. The CFPB's investigation found violations of the Consumer Financial Protection Act and the Truth in Lending Act. The CFPB also found that the companies harmed consumers by:

- **Failing to process or share consumer disputes:** Apple Card users were directed to dispute transactions through a "Report an Issue" feature in the Wallet app. For some disputes, Apple sent consumers a separate link in the Messages app asking for more information. Apple failed to send these disputes to Goldman Sachs if the second form was incomplete. Even after Goldman Sachs alerted Apple to this issue, the problem persisted. As a result, neither Apple nor Goldman Sachs investigated tens of thousands of such disputes and cardholders were unfairly held responsible for disputed transactions.

- **Failing to investigate cardholder disputes:** For the disputes that Apple did send to Goldman Sachs, the bank failed to consistently send acknowledgment notices within 30 days, conduct reasonable investigations, or send resolution letters explaining the determinations of its investigations within 90 days. These failures led to Goldman Sachs illegally placing damaging information on consumers' credit reports and holding cardholders responsible for potentially fraudulent or unauthorized purchases.

- **Misleading cardholders about a payment plan for iPhones and other Apple products:** The marketing of the Apple Card Monthly Installments plan led consumers to believe they would automatically receive interest-free financing when purchasing iPhones and other Apple devices with their Apple Card. The plan allowed cardholders to purchase Apple devices through a series of interest-free payments over a period of six months to two years. However, many cardholders were unknowingly charged interest because they were not automatically enrolled as expected. They also faced confusing checkout options about enrolling in the plan. For online purchases, Apple only presented the payment plan as an option to consumers using Apple's own Safari browser. Due to Apple and Goldman's actions, instead of making interest-free payments, thousands of cardholders purchased Apple devices on interest-bearing revolving balances and incurred interest charges.

- **Misleading cardholders about refunds:** Cardholders with an Apple Card Monthly Installments plan essentially had two card balances – the plan balance and their interest-bearing revolving balance. For more than 10,000 cardholders, Goldman Sachs misled consumers about how it would apply certain refunds between the two balances. Contrary to Goldman's representations, portions of refunds for unrelated purchases were applied to the interest-free plan balance instead of the interest-bearing revolving balance. As a result, consumers incurred additional and unexpected interest expenses.

# Enforcement Action

Under the Consumer Financial Protection Act, the CFPB has the authority to take action against institutions that violate federal consumer financial laws, including by engaging in unfair, deceptive,

8/28/25, 12:41 PM       CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures | Consumer Financial Protection Bureau

Case 3:23-cv-04597-EMC       Document 252-5       Filed 08/28/25       Page 5 of 49

or abusive acts and practices. The CFPB also has the authority to enforce the Truth in Lending Act and Regulation Z.

Today's order against Apple requires the company to pay a civil money penalty of $25 million, which will be paid into the CFPB's victims relief fund (https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/civil-penalty-fund/).

The CFPB is also ordering Goldman Sachs to pay at least $19.8 million in redress to victims for its role in marketing, offering, and servicing the Apple Card. Goldman Sachs must also pay a $45 million civil money penalty. Before introducing any new credit card product, Goldman Sachs must give the CFPB a credible plan for how the product will comply with the law. If Goldman Sachs makes another attempt to enter the credit card market, the CFPB plans to closely police the company to avoid repeat offenses.

Read today's order against Apple (cfpb.gov/enforcement/actions/apple-inc/).

Read today's order against Goldman Sachs (cfpb.gov/enforcement/actions/goldman-sachs-bank-usa/).

Consumers can submit complaints about financial products and services by visiting the CFPB's website (cfpb.gov/complaint/) or by calling (855) 411-CFPB (2372).

Employees who believe their company has violated federal consumer financial protection laws are encouraged to send information about what they know to whistleblower@cfpb.gov. To learn more about reporting potential industry misconduct, visit the CFPB's website (https://www.consumerfinance.gov/enforcement/information-industry-whistleblowers/).

---

*The Consumer Financial Protection Bureau is a 21st century agency that implements and enforces Federal consumer financial law and ensures that markets for consumer financial products are fair, transparent, and competitive. For more information, visit www.consumerfinance.gov.*

## Topics

- **ENFORCEMENT** (CFPB.GOV/ABOUT-US/NEWSROOM/?TOPICS=ENFORCEMENT)
- **CREDIT CARDS** (CFPB.GOV/ABOUT-US/NEWSROOM/?TOPICS=CREDIT-CARDS)

**PRESS INFORMATION**

If you want to republish the article or have questions about the content, please contact the press office.

Go to press resources page (cfpb.gov/about-us/newsroom/press-resources/)

8/28/25, 12:41 PM    CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures | Consumer Financial Protection Bureau

Case 3:23-cv-04597-EMC   Document 252-5   Filed 08/28/25   Page 6 of 49

🇺🇸 An official website of the United States government



Apple Inc. | Consumer Financial Protection Bureau

# Apple Inc.

On October 23, 2024, the Bureau issued an order against Apple Inc. In December 2017 Apple and Goldman Sachs Bank USA (Goldman) entered an agreement to offer Apple Card, a credit card integrated with Apple software that offers both market-rate APRs and interest-free financing for qualifying Apple products. Goldman agreed to extend the credit offered through Apple Card and to investigate disputes submitted by consumers. Apple designed the consumer-facing interfaces that consumers used to manage Apple Card accounts on Apple devices, including the "Report an Issue" functionality in the "Wallet" application that allowed consumers to dispute Apple Card transactions using the "Messages" application, and developed the creative approach and design of Apple Card advertisements. Despite warnings to Goldman's board on August 16, 2019 that the Apple Card disputes system was "not fully ready" due to technological issues, Goldman and Apple introduced the Apple card four days later on August 20, 2019. The Bureau found that Apple engaged in unfair acts or practices by failing to send transaction disputes to Goldman in violation of the CFPA. Separately, in December 2019, Goldman and Apple introduced Apple Card Monthly Installments (ACMI), which allowed Apple Card users to finance the purchase of certain Apple devices directly from Apple through the payment of interest-free monthly installments. The Bureau found that Apple engaged in deceptive acts or practices by misleading consumers to expect that purchases of Apple devices would automatically be enrolled in ACMI. The Bureau also found that Apple engaged in abusive acts or practices through its material interference with consumers' understanding of ACMI enrollment by not even displaying the ACMI option in certain circumstances. The order requires Apple to pay a $25 million civil money penalty and to come into compliance with the law.

The Bureau separately took action against Goldman (https://content.consumerfinance.gov/enforcement/actions/goldman-sachs-bank-usa/) for its role in marketing, offering, and servicing the Apple Card. The order against Goldman requires it to pay $19.8 million in redress to consumers and a $45 million civil money penalty and to come into compliance with the law.

## RELATED DOCUMENTS

Consent Order ⬇ (https://files.consumerfinance.gov/f/documents/cfpb_apple-inc-consent-order_2024-10.pdf)

Stipulation ⬇ (https://files.consumerfinance.gov/f/documents/cfpb_apple-inc-stipulation_2024-10.pdf)

## PRESS RELEASE

CFPB Orders Apple and Goldman Sachs to Pay Over $89 Million for Apple Card Failures (cfpb.gov/about-us/newsroom/cfpb-orders-apple-and-goldman-sachs-to-pay-over-89-million-for-apple-card-failures/)

**CASE DOCKET**

View case filings (cfpb.gov/administrative-adjudication-proceedings/administrative-adjudication-docket/apple-inc/)

---

**ACTION DETAILS**

## Forum

Administrative Proceeding

## Docket number

2024-CFPB-0012

## Initial filing date

OCT 23, 2024

## Status

Post Order/Post Judgment

See status definitions (cfpb.gov/enforcement/actions/enforcement-action-definitions/)

## Products

- CREDIT CARDS

---

**FURTHER READING**

### 💬 Blog

Back from the Dead: Zombie Second Mortgages (cfpb.gov/about-us/blog/back-fro

m-the-dead-zombie-second-mortgages/)

JAN 17, 2025

📰 Newsroom

CFPB Reaches Settlement with FirstCash, Inc. and Its Subsidiaries for Military Lending Act Violations (cfpb.gov/about-us/newsroom/cfpb-reaches-settlement-with-firstcash-inc-and-its-subsidiaries-for-military-lending-act-violations/)

JUL 11, 2025

View more (cfpb.gov/activity-log/?topics=servicemembers&topics=credit-cards&topics=enforcement&topics=add-on-products&topics=mortgages)

---

🇺🇸 An official website of the United States government



# Apple Inc.

**CASE DOCKET**

| Document | Date filed | Short description |
| --- | --- | --- |
| 002 ⬇ (https://files.consumerfinance.gov/f/documents/cfpb_apple-inc-stipulation_2024-10.pdf) | 10/23/2024 | Stipulation (Filed by *Consumer Financial Protection Bureau*) |
| 001 ⬇ (https://files.consumerfinance.gov/f/documents/cfpb_apple-inc-consent-order_2024-10.pdf) | 10/23/2024 | Consent order (Filed by *Consumer Financial Protection Bureau*) |

**PROCEEDING DETAILS**

## Category

Administrative proceeding

## Institution type

Nonbank

## Status

Post-order/Post-judgment

## File number

2024-CFPB-0012

## Topics

## Date filed

8/28/25, 12:41 PM
Appleinc. | Consumer Financial Protection Bureau
Case 3:23-cv-04597-EMC    Document 252-5    Filed 08/28/25    Page 11 of 49

OCT 23, 2024

**CONTACT INFORMATION**

## Administrative adjudication docket clerk

Submit docket information for any ongoing administrative adjudication process, or request information related to the docket or the function of the CFPB's administrative law judge (ALJ).

✉ **EMAIL**

docketclerk@consumerfinance.gov

🇺🇸 An official website of the United States government

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

File No. 2024-CFPB-0012

| | |
|---|---|
| In the matter of:<br><br>**APPLE INC.** | **STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against Apple Inc. (Respondent), under 12 U.S.C. §§ 5563 and 5565, for its credit card marketing and servicing in violation of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 and 5536.

Respondent, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consents to the issuance of a Consent Order substantially in the form of the one to which this Stipulation and Consent to the Issuance of a Consent Order is attached (Consent Order), and which is incorporated by reference.

In consideration of the above premises, Respondent agrees to the following:

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## Consent

2.    Respondent agrees to the issuance of the Consent Order, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

3.    Respondent agrees that the Consent Order will be deemed an "order issued with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4) and agrees that the Consent Order will become a final order, effective upon its entry on the administrative docket, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4.    Respondent voluntarily enters into this Stipulation and Consent to the Issuance of a Consent Order (Stipulation).

5.    The Consent Order resolves only Respondent's potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section V of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondent acknowledges that no promise or

representation has been made by the Bureau or any employee, agent, or representation of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6.    Respondent agrees that the facts described in Section V of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order.

7.    The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8.    Respondent agrees that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

**Waivers**

9.    Respondent, by consenting to this Stipulation, waives:

    a.    Any right to service of the Consent Order, and agrees that entry of the Consent Order on the administrative docket will constitute notice to Respondent of its terms and conditions;

b.      Any objection to the jurisdiction of the Bureau, including, without

limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

c.      The rights to all hearings under the statutory provisions under which

the proceeding is to be or has been instituted; the filing of proposed

findings of fact and conclusions of law; proceedings before, and a

recommended decision by, a hearing officer; all post-hearing

procedures; and any other procedural right available under section

1053 of the CFPA, 12 U.S.C. § 5563, or 12 C.F.R. part 1081;

d.      The right to seek any administrative or judicial review of the Consent

Order;

e.      Any claim for fees, costs or expenses against the Bureau, or any of its

agents or employees, and any other governmental entity, related in

any way to this enforcement matter or the Consent Order, whether

arising under common law or under the terms of any statute,

including, but not limited to the Equal Access to Justice Act and the

Small Business Regulatory Enforcement Fairness Act of 1996; for

these purposes, Respondent agrees that Respondent is not the

prevailing party in this action because the parties have reached a good

faith settlement;

f.    Any other right to challenge or contest the validity of the Consent

Order;

g.    Such provisions of the Bureau's rules or other requirements of law as

may be construed to prevent any Bureau employee from participating

in the preparation of, or advising the Director as to, any order,

opinion, finding of fact, or conclusion of law to be entered in

connection with this Stipulation or the Consent Order; and

h.    Any right to claim bias or prejudgment by the Director based on the

consideration of or discussions concerning settlement of all or any

part of the proceeding.

APPLE INC. BY:


_____    __October 18, 2024__

Katherine Adams                             Date

Senior Vice President & General Counsel

Apple Inc.

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2024-CFPB-0012

|  |  |
|---|---|
| In the Matter of:<br><br><br><br>**APPLE INC.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the credit card marketing and servicing of Apple Inc. (Apple or Respondent, as defined below) and has identified the following violations of law: (1) in connection with receiving and processing transaction disputes submitted by Apple Card users, Respondent engaged in unfair acts or practices by failing to send transaction disputes to Goldman Sachs Bank USA (Goldman), in violation of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1)(B); and (2) in connection with marketing Apple Card and designing the checkout processes for the purchase of Apple devices from Apple, Respondent (a) engaged in deceptive acts or practices through representations that

misled consumers to expect that purchases of Apple devices made with Apple Card

would be automatically enrolled in Apple Card Monthly Installments (ACMI), in

violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a),

5536(a)(1)(B), and (b) engaged in abusive acts or practices through its material

interference with consumers' understanding of ACMI enrollment, in violation of

sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(d)(1), 5536(a)(1)(B).

Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau

issues this Consent Order (Consent Order).

# I.

## Overview

1.    In December 2017, Apple and Goldman entered an agreement to offer Apple

Card, a credit card integrated with Apple's software that offers both market-

rate APRs and interest-free financing for qualifying products.

2.    Pursuant to the agreement, Apple designed the consumer-facing interfaces

that consumers use to manage Apple Card accounts on Apple devices,

including a Report an Issue functionality in the Wallet application that

allows consumers to dispute Apple Card transactions, and developed the

creative approach and design of Apple Card advertisements. Apple and

Goldman further agreed that Goldman would extend the credit offered

through Apple Card and investigate disputes submitted by consumers.

3.    Apple and Goldman's agreement incentivized an earlier introduction of Apple Card by giving Apple the right to seek $25 million in liquidated damages for each 90-day delay caused by Goldman.

4.    Apple and Goldman introduced Apple Card on August 20, 2019.

5.    When consumers disputed Apple Card transactions via Apple's Report an Issue functionality by completing an initial form, the disputes were initially sent to Apple, which was supposed to send them to Goldman for investigation. Beginning in June 2020, in tens of thousands of instances, Apple failed to do so.

6.    In June 2020, Apple added a new "forms feature" to the Report an Issue functionality, which asked consumers to provide additional information by completing an additional form. However, when tens of thousands of consumers did not complete the additional form, Apple failed to send the disputes to Goldman, and neither Apple nor Goldman investigated these disputes.

7.    Separately, in December 2019, Apple and Goldman introduced Apple Card Monthly Installments (ACMI), which allows Apple Card users to finance the purchase of certain Apple devices directly from Apple through the payment of interest free monthly installments, similar to a "Buy Now, Pay Later" (BNPL) product.

8.     Through representations in advertisements emphasizing the ease and
simplicity of Apple Card and through representations during the ACMI
enrollment process, Apple and Goldman misled consumers to expect that
purchases of Apple devices would automatically be enrolled in ACMI when
they were not. In addition, by not even displaying the ACMI option in
certain circumstances, Apple materially interfered with consumers'
understanding of ACMI.

## II.

## Jurisdiction

9.     The Bureau has jurisdiction over this matter under sections 1053 and 1055
of the CFPA, 12 U.S.C. §§ 5563 and 5565.

## III.

## Stipulation

10.     Respondent has executed a "Stipulation and Consent to the Issuance of a
Consent Order," dated October 18, 2024 (Stipulation), which is incorporated
by reference and is accepted by the Bureau. By this Stipulation, Respondent
has consented to the issuance of this Consent Order by the Bureau under
sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without
admitting or denying any of the findings of fact or conclusions of law, except

that Respondent admits the facts necessary to establish the Bureau's

jurisdiction over Respondent and the subject matter of this action.

## IV.

## Definitions

11.    The following definitions apply to this Consent Order:

a.    "Adverse Report" means an adverse report to any person about a

consumer's credit standing, or report that an amount or account is

delinquent, because the consumer failed to pay the disputed amount or

related finance or other charges. 12 C.F.R. § 1026.13(d)(2).

b.    "Apple Card" means an Apple-branded credit card that operates on an

Apple software user interface through which Goldman Sachs Bank

USA, or another bank, extends credit.

c.    "Apple Card Monthly Installments (ACMI)" means an Apple Card

payment option allowing users to finance the purchase of eligible

Apple products through the payment of interest-free monthly

installments.

d.    "Billing Error" means: (1) a reflection on or with a periodic statement

of an extension of credit that is not made to the consumer or to a

person who has actual, implied, or apparent authority to use the

consumer's credit card or open-end credit plan; (2) a reflection on or

5

with a periodic statement of an extension of credit that is not

identified in accordance with the applicable provisions of Regulation

Z; or (3) a reflection on or with a periodic statement of an extension of

credit for property or services not accepted by the consumer or the

consumer's designee, or not delivered to the consumer or the

consumer's designee as agreed. 12 C.F.R. § 1026.13(a)(1)-(3).

e.    "Billing Error Notice" means a written notice from an Apple Card

user that: (1) is received by Respondent at the address disclosed in a

periodic statement, annual statement, or alternative summary

statement, as applicable, no later than 60 days after Goldman

transmitted the first periodic statement that reflects the alleged Billing

Error; (2) enables Respondent to identify the consumer's name and

account number; (3) to the extent possible, indicates the user's belief

and the reasons for the belief that a Billing Error exists, and the type,

date, and amount of the error; and (4) that the consumer does not

subsequently withdraw. 12 C.F.R. § 1026.13(b).

f.    "Board" means Respondent's duly elected and acting Board of

Directors.

g.    "Consumer Reporting Agency" (CRA) means any person which, for

monetary fees, dues, or on a cooperative nonprofit basis, regularly

engages in whole or in part in the practice of assembling or evaluating

consumer credit information or other information on consumers for

the purpose of furnishing consumer reports to third parties, and which

uses any means or facility of interstate commerce for the purpose of

preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

h.    "Effective Date" means the date on which the Consent Order is

entered on the administrative docket.

i.     "Enforcement Director" means the Assistant Director of the Office of

Enforcement for the Consumer Financial Protection Bureau, or their

delegate.

j.    "Executive Officers" means the General Counsel and Secretary,

Senior Vice President for Services, and Vice President of Internet

Services responsible for managing Apple Card for Respondent.

k.    "Goldman" means Goldman Sachs Bank USA.

l.    "Messages" means a software application designed by Apple through

which users can send messages to other consumers or businesses,

including Messages Disputes.

m.    "Messages Dispute" means a dispute concerning a transaction made

with Apple Card that a consumer submitted through Wallet and that is

passed to Messages through the Report an Issue functionality.

n.    "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

o.    "Relevant Period" includes from January 1, 2019, to the Effective Date.

p.    "Report an Issue" means a functionality designed by Respondent that allows users to submit a dispute through Wallet concerning an Apple Card transaction, including a Messages Dispute.

q.    "Respondent" means Apple Inc., and its successors and assigns.

r.    "Wallet" means an application designed by Respondent that allows consumers to manage their use of Apple Card.

**V.**

**Bureau Findings and Conclusions**

The Bureau finds the following:

12.    Respondent is a multinational technology company headquartered in Cupertino, California. Respondent provides several consumer financial products, including Apple Card.

13.     Respondent is a "service provider" under the CFPA because it "provides a

material service" to Goldman "in connection with the offering or provision"

of Apple Card, and "participates in designing, operating, or maintaining"

Apple Card. 12 U.S.C. § 5481(26)(A), (A)(i).

### Findings and Conclusions as to Respondent's Failure to Send Messages Disputes to Goldman

14.     Respondent designed and operated the Report an Issue functionality, which

provided a way for consumers to submit Apple Card disputes on Apple

devices using the Wallet and Messages applications.

15.     When Apple Card users submitted disputes, including disputes submitted

using the Report an Issue functionality, Goldman and Respondent

contractually agreed that Goldman would investigate the disputes.

16.     On Apple devices, Apple Card users can select Apple Card transactions and

click "Report an Issue." After completing an initial form by selecting issue

types and then selecting "Done," the Messages application on consumers'

devices opens and generates a prefilled message based on the issue selected.

After consumers press send, Respondent designed the Report an Issue

functionality to connect them to Goldman.

17.     From August 2019 until at least May 24, 2021, the "Billing Rights

Summary" in the Apple Card Customer Agreement provided consumers

with a physical mailing address to contact Goldman and stated, "You may

also contact us using Messages." From August 2019 until at least July 31, 2021, Apple Card monthly statements also provided consumers with the same information.

18.   As a result, from August 2019 through at least July 31, 2021, Messages Disputes could qualify as Billing Error Notices.

19.   On June 25, 2020, Respondent added a new "forms feature" to the Report an Issue functionality, which Respondent had proposed and designed. For consumers who selected certain issue types and then sent the initial message, the "forms feature" sends consumers a link to an additional form in Messages. From when Respondent introduced this functionality through at least July 31, 2021, the message above this link read: "Ok. We'll need a little more information about this transaction."

20.   Through at least July 31, 2021, when consumers did not complete and submit the additional form, Respondent failed to send tens of thousands of Billing Error Notices to Goldman for resolution. In this circumstance, neither Respondent nor Goldman attempted to further contact the consumer about the Billing Error Notice or conducted any investigation of the Billing Error Notice.

21.   Respondent's failure to send Billing Error Notices through the Report an Issue functionality to Goldman caused substantial injuries to consumers,

including to consumers who: (1) did not receive credits for disputed

transactions for an extended period; and (2) were the subject of Adverse

Reports to CRAs by Goldman concerning disputed amounts before Goldman

or Respondent reviewed the Billing Error Notices at issue, which may have

affected consumers' creditworthiness.

22.    These injuries were not reasonably avoidable because neither Respondent

nor Goldman took steps necessary to make consumers aware that, if

consumers did not complete the additional form, the Billing Error Notices at

issue would not be investigated.

23.    Respondent's failure to send Billing Error Notices to Goldman for resolution

did not create any countervailing benefits to consumers or to competition.

24.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive"

acts or practices. 12 U.S.C. § 5536(a)(1)(B).

25.    By failing to send Billing Error Notices to Goldman for resolution, Apple

engaged in unfair acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Representations about ACMI Enrollment**

26.    Respondent designed the advertisements for Apple Card Monthly

Installments, or ACMI, and the checkout process for enrolling purchases of

Apple devices on Respondent's website in ACMI.

27.    Respondent's advertisements for ACMI emphasized the ease and simplicity
of Apple Card and the ACMI enrollment process. For example, iPhone users
who opened their Wallet application received an advertisement that
described ACMI enrollment as follows: "[p]urchase a new iPhone from
Apple with interest-free monthly payments." ACMI advertisements also told
consumers "[i]f you have Apple Card already, there's no additional
application" for ACMI, and that if consumers did not have an Apple Card,
they could "[e]asily apply right at checkout."

28.    Through at least July 2020, the checkout process on Respondent's website
presented consumers purchasing iPhones with an option to "Pay in full" or
"Pay monthly." The checkout process did not explain that "Pay monthly"
referred to ACMI, or provide further details about ACMI, until after
consumers selected this option.

29.    In addition, Respondent's customer service representatives informed some
consumers that iPhones purchased with an Apple Card would be
automatically enrolled in ACMI.

30.    In fact, purchases of Apple devices with Apple Card were not automatically
enrolled in ACMI. Instead, consumers had to opt into ACMI during the
checkout process for purchases made online and in Apple stores.

31.    Consumers submitted tens of thousands of complaints related to ACMI enrollment.

32.    Thousands of consumers complained that they were charged interest on purchases of Apple devices with Apple Card that they believed would be automatically enrolled in ACMI.

33.    From December 2019 through at least July 2020, Respondent's representations in Apple Card advertisements, in Respondent's checkout process for enrolling online purchases in monthly installments, and inside some of Respondent's physical stores, misled consumers to expect that purchases of Apple devices made with Apple Card would be automatically enrolled in ACMI.

34.    Until at least August 2020, after consumers had already purchased Apple devices without enrolling in ACMI, Apple and Goldman required consumers to return the devices and repurchase before they could be enrolled in ACMI.

35.    Consumers' belief that their purchases of Apple devices with Apple Card would be automatically enrolled in ACMI was reasonable under the circumstances.

36.    Respondent's representations were material because they related to the costs associated with purchasing an Apple device from Respondent and were likely to mislead consumers acting reasonably.

37.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive"

acts or practices. 12 U.S.C. § 5536(a)(1)(B).

38.    By making material representations that reasonably misled consumers about

enrollment in ACMI, Respondent engaged in deceptive acts or practices. 12

U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Material Interference with
Consumer's Understanding of ACMI Enrollment**

39.    Until at least January 2020, if consumers did not select a phone plan carrier

during the checkout process for purchasing Apple devices from

Respondent's website, Respondent did not display an option to enroll in

ACMI.

40.    Until at least July 2020, when consumers used a browser other than

Respondent's "Safari" or used "Safari" in private mode during the checkout

process for purchasing Apple devices from Respondent's website,

Respondent did not display an option to enroll in ACMI.

41.    From December 2019 through at least July 2020, Respondent interfered with

consumers' ability to understand that they were required to affirmatively opt

into ACMI when purchasing Apple devices from Respondent's websites or

mobile applications by: (1) not displaying the ACMI option on a browser

other than "Safari" or on "Safari" in private mode; and (2) making

representations in advertisements and the online checkout process for ACMI

14

that misled consumers to expect that purchases of devices designed by
Respondent made with Apple Card would be automatically enrolled in
ACMI.

42.    This interference was material because it did, in fact, impede consumers'
actual understanding of whether ACMI enrollment occurred automatically,
as indicated by the complaints Respondent received from consumers who
believed that their purchases of Apple devices with Apple Card would be
enrolled automatically in ACMI.

43.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive"
acts or practices. 12 U.S.C. § 5536(a)(1)(B).

44.    By materially interfering with consumers' understanding about their
enrollment in ACMI, Respondent violated the CFPA's prohibition on
abusive acts or practices. 12 U.S.C. §§ 5531(a), (d)(1), 5536(a)(1)(B).

## VI.

## Conduct Provisions

## Prohibited Conduct

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45.    Respondent and its officers, agents, servants, employees, and attorneys, and
all other persons in active concert or participation with them who receive
actual notice of this Consent Order, whether acting directly or indirectly, in

connection with marketing or servicing Apple Card, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, and is prohibited from:

a.    Failing to send Billing Error Notices and Messages Disputes to Goldman or another entity that is supposed to investigate Billing Error Notices and Messages Disputes;

b.    Misrepresenting that purchases of Apple devices made with Apple Card are automatically enrolled in ACMI; and

c.    Interfering with consumers' ability to understand that they are required to affirmatively opt into ACMI when purchasing ACMI eligible Apple devices from Respondent's websites or mobile applications by: (1) not displaying the ACMI option, including on a browser other than "Safari" or a "Safari" browser in private mode when that browser supports purchasing ACMI eligible Apple devices from Respondent's websites; or (2) misrepresenting that purchases of Apple devices made with Apple Card would be automatically enrolled in ACMI.

## Affirmative Requirements

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

16

46.    Respondent must take the following affirmative actions in connection with the marketing and servicing of Apple Card:

a.    Establish, implement, and maintain policies and procedures to ensure Respondent's compliance with sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536;

b.    Establish, implement, and maintain testing to ensure Respondent's compliance with sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536 prior to implementing a material change to the user experience for ACMI or to the manner by which Respondent handles Messages Disputes;

c.    Establish, implement, and maintain policies and procedures to ensure that when consumers submit a Messages Dispute, Respondent sends it to Goldman, or another entity that is supposed to investigate Messages Disputes; and

d.    Display a prominent disclosure in iPhone buy-flows on the Apple online store explaining that a cellular carrier selection is required to obtain financing with ACMI if this remains an ACMI eligibility requirement.

## VII.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

47.     Within 60 days of the Effective Date, Respondent must create and
implement a comprehensive compliance plan designed to ensure that
Respondent's marketing and servicing of Apple Card complies with all
applicable laws that the Bureau enforces, including Federal consumer
financial laws, and the terms of this Consent Order (Compliance Plan). The
Compliance Plan must include, at a minimum:

   a.     Detailed steps for addressing each action required by this Consent
Order;

   b.     A mechanism to ensure that the Board is kept apprised of the status of
compliance actions; and

   c.     Specific timeframes and deadlines for implementation of the steps
described above.

Respondent will provide the Compliance Plan to the Bureau upon request.

## VIII.

## Role of the Board and Executives

**IT IS FURTHER ORDERED** that:

48.    Respondent's Board has the ultimate responsibility for ensuring that Respondent complies with this Consent Order.

49.    Respondent's Executive Officers and the Audit and Finance Committee of Respondent's Board must review all plans and reports required by this Consent Order, and any submissions to the Bureau prior to such submission.

50.    One year after the Effective Date Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, the accuracy of which is sworn to under penalty of perjury, and which, at a minimum:

a.    Describes the steps that Respondent's Board and Executive Officers have taken to reasonably assess whether Respondent is complying with the Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order;

b.    Describes in detail whether and how Respondent has complied with the Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order, including the manner of verification of such compliance and any corrective actions taken to remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

    c.     Attaches a copy of each Order Acknowledgment obtained under

          Section XI unless previously submitted to the Bureau.

51.    Respondent's Board and Executive Officers must:

    a.     Authorize whatever actions are necessary for Respondent to assess

          whether Respondent is complying with the Compliance Plan, and each

          applicable paragraph and subparagraph of the Consent Order;

    b.     Authorize whatever actions, including corrective actions, are

          necessary for Respondent to fully comply with the Compliance Plan,

          and each applicable paragraph and subparagraph of the Consent

          Order; and

    c.     Require timely reporting by management to Respondent's Board and

          Executive Officers on the status of compliance obligations.

## MONETARY PROVISIONS

## IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

52.    Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the

      violations of law described in Section V of this Consent Order, Respondent

      must pay a civil money penalty of $25 million to the Bureau.

53.    Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

54.    The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

55.    Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.    Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.    Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

56.    To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the

Bureau makes from the Civil Penalty Fund. If the court in any Related

Consumer Action offsets or otherwise reduces the amount of compensatory

monetary remedies imposed against Respondent based on the civil money

penalty paid in this action or based on any payment that the Bureau makes

from the Civil Penalty Fund, Respondent must, within 30 days after entry of

a final order granting such offset or reduction, notify the Bureau, and pay the

amount of the offset or reduction to the U.S. Treasury. Such a payment will

not be considered an additional civil money penalty and will not change the

amount of the civil money penalty imposed in this action.

57.    In the event of any default on Respondent's obligations to make payment

under this Consent Order, interest, computed under 28 U.S.C. § 1961, as

amended, will accrue on any outstanding amounts not paid from the date of

default to the date of payment, and will immediately become due and

payable.

58.    Respondent must relinquish all dominion, control, and title to the funds paid

to the fullest extent permitted by law and no part of the funds may be

returned to Respondent.

59.    Respondent acknowledges that its Taxpayer Identification Number (Social

Security Number or Employer Identification Number), which Respondent

previously submitted to the Bureau, may be used for collecting and reporting

on any delinquent amount arising out of this Order, in accordance with 31

U.S.C. § 7701.

60. Within 30 days of the entry of a final judgment, consent order, or settlement

in a Related Consumer Action, Respondent must notify the Enforcement

Director of the final judgment, consent order, or settlement in writing. That

notification must indicate the amount of redress, if any, that Respondent paid

or is required to pay to consumers and describe the consumers or classes of

consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## X.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

61. Respondent must notify the Bureau of any development that may affect

compliance obligations arising under this Consent Order, including but not

limited to a dissolution, assignment, sale, merger, or other action that would

result in the emergence of a successor company; the creation or dissolution

of a subsidiary, parent, or affiliate that engages in any acts or practices

subject to this Consent Order; the filing of any bankruptcy or insolvency

proceeding by or against Respondent; or a change in Respondent's name or

address. Respondent must provide this notice, if practicable, at least 30 days

before the development, but in any case no later than 14 days after the development.

62. Within 7 days of the Effective Date, Respondent must:

a. Designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent;

b. Identify all businesses related to Apple Card for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and website addresses; and

c. Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

63. Respondent must report any change in the information required to be submitted under Paragraph 62 at least 14 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

## XI.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

64.    Within 7 days of the Effective Date, Respondent must submit to the

Enforcement Director an acknowledgment of receipt of this Consent Order,

sworn under penalty of perjury.

65.    Within 30 days of the Effective Date, Respondent must deliver a copy of this

Consent Order to each of its board members and Executive Officers, as well

as to any managers, employees, service providers, or other agents and

representatives who have responsibilities related to the subject matter of the

Consent Order.

66.    For 5 years from the Effective Date, Respondent must deliver a copy of this

Consent Order to any business entity resulting from any change in structure

referred to in Section X, any future board members and Executive Officers,

as well as to any managers, employees, service providers, or other agents

and representatives who will have responsibilities related to the subject

matter of the Consent Order before they assume their responsibilities.

67.    Respondent must secure a signed and dated statement acknowledging receipt

of a copy of this Consent Order, within 30 days of delivery, from all persons

receiving a copy of this Consent Order under this Section.

68.    Ninety days from the Effective Date, Respondent must submit to the Bureau

a list of all persons and their titles to whom this Consent Order has been

delivered under the Section of this Order titled "Order Distribution and

Acknowledgment" and a copy of all signed and dated statements acknowledging receipt of this Consent Order under Paragraph 67.

## XII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

69.  Respondent must create and retain the following business records:

    a.    All documents and records necessary to demonstrate full compliance with the Compliance Plan and each provision of this Consent Order, including all submissions to the Bureau;

    b.    Copies of all Respondent's sales scripts; training materials; policies and procedures; testing materials; advertisements; websites; and other marketing materials related to Apple Card, including any such materials prepared or approved by Respondent for use by a third party on Respondent's behalf;

    c.    Documents sufficient to demonstrate the experience of consumers on each materially different version of an advertisement on each website and mobile application on which Respondent, whether acting directly or through any sole proprietorship, partnership, limited liability company, corporation, subsidiary, branch, division, affiliate, or other entity, advertises, promotes, markets, offers for sale, sells, or provides

26

Apple Card; and

d.     All consumer complaints and refund requests related to Respondent's

marketing and servicing of Apple Card (whether received directly

from consumers through channels designed for such purposes or

indirectly through the Better Business Bureau or a federal or state

government agency), and any responses to those complaints or

requests.

70.     All documents and records must be maintained in their original electronic

format. Data should be maintained in such a way that access, retrieval,

auditing and production are not hindered.

71.     Respondent must make the documents identified in Paragraph 69 available

to the Bureau upon the Bureau's request.

## XIII.

## Notices

**IT IS FURTHER ORDERED** that:

72.     Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re* Apple

Inc., File No. 2024-CFPB-0012," and send them to the following email:

Enforcement_Compliance@cfpb.gov addressed as follows:

ATTN: Enforcement Director
Consumer Financial Protection Bureau
Office of Enforcement

## XIV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

73. Respondent must cooperate fully to help the Bureau determine the identity

and contact information of, and the amount of injury sustained by, each

consumer who submitted a Messages Dispute that Apple failed to send to

Goldman through the Report an Issue functionality between June 25, 2020

and July 31, 2021. Respondent must provide such information in its or its

agents' possession or control within 14 days of receiving a written request

from the Bureau.

74. Within 30 days of the Effective Date, Respondent must complete all steps

necessary to register for the Bureau's Company Portal, including providing

the information required at www.consumerfinance.gov/company-signup and

in the Bureau's Company Portal Boarding Form (OMB No. 3170-0054).

Respondent, in connection with responding to consumer complaints and

inquiries on the Company Portal, must comply with the timely response

requirements set forth in section 1034(b)(1)-(3) of the CFPA, 12 U.S.C. §
5534(b).

## XV.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

75.    Within 14 days of receipt of a written request from the Bureau, Respondent

must submit additional Compliance Reports or other requested information,

including sworn testimony or documents, which must be made under penalty

of perjury regarding: (a) this matter, (b) anything related to or associated

with the conduct described in Section V, or (c) compliance with the Consent

Order.

76.    Respondent must permit Bureau representatives to interview any employee

or other person affiliated with Respondent who has agreed to such an

interview regarding: (a) this matter; (b) anything related to or associated

with the conduct described in Section V; or (c) compliance with the Consent

Order. The person interviewed may have counsel present.

77.    Nothing in this Consent Order will limit the Bureau's lawful use of civil

investigative demands under 12 C.F.R. § 1080.6 or other compulsory

process.

## XVI.

### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

78. Respondent may seek a modification to non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

79. The Enforcement Director may, in their discretion, modify any non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) if they determine good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

## XVII.

### ADMINISTRATIVE PROVISIONS

**IT IS FURTHER ORDERED** that:

80. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 81. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

30

81.    The Bureau releases and discharges Respondent from all potential liability

for law violations that the Bureau has or might have asserted based on the

practices described in Section V of this Consent Order, to the extent such

practices occurred before the Effective Date and the Bureau knows about

them as of the Effective Date. The Bureau may use the practices described in

this Consent Order in future enforcement actions against Respondent and its

affiliates, including, without limitation, to establish a pattern or practice of

violations or the continuation of a pattern or practice of violations or to

calculate the amount of any penalty. This release does not preclude or affect

any right of the Bureau to determine and ensure compliance with the

Consent Order, or to seek penalties for any violations of the Consent Order.

82.    This Consent Order is intended to be, and will be construed as, a final

Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563,

and expressly does not form, and may not be construed to form, a contract

binding the Bureau or the United States.

83.    This Consent Order will terminate on the later of 5 years from the Effective

Date or 5 years from the most recent date that the Bureau initiates an action

alleging any violation of the Consent Order by Respondent if such action is

initiated within 5 years of the Effective Date. If such action is dismissed or

the relevant adjudicative body rules that Respondent did not violate any

provision of the Consent Order, and the dismissal or ruling is either not

appealed or upheld on appeal, then the Consent Order will terminate as

though the action had never been filed. The Consent Order will remain

effective and enforceable until such time, except to the extent that any

provisions of this Consent Order have been amended, suspended, waived, or

terminated in writing by the Bureau or its designated agent.

84.    Calculation of time limitations will run from the Effective Date and be based

on calendar days, unless otherwise noted.

85.    Should Respondent seek to transfer or assign all or part of its operations that

are subject to this Consent Order, Respondent must, as a condition of sale,

obtain the written agreement of the transferee or assignee to comply with all

applicable provisions of this Consent Order.

86.    The provisions of this Consent Order will be enforceable by the Bureau. For

any violation of this Consent Order, the Bureau may impose the maximum

amount of civil money penalties allowed under section 1055(c) of the CFPA,

12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to

enforce this Consent Order in federal district court, the Bureau may serve

Respondent wherever Respondent may be found and Respondent may not

contest that court's personal jurisdiction over Respondent.

87.  This Consent Order and the accompanying Stipulation contain the complete

agreement between the parties. The parties have made no promises,

representations, or warranties other than what is contained in this Consent

Order and the accompanying Stipulation. This Consent Order and the

accompanying Stipulation supersede any prior oral or written

communications, discussions, or understandings.

88.  Nothing in this Consent Order or the accompanying Stipulation may be

construed as allowing Respondent, its Board, its Executive Officers, its

officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 23rd day of October, 2024.

*Rohit Chopra*
_____
Rohit Chopra
Director
Consumer Financial Protection Bureau