Ashley M. Gjøvik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

**FILED** 

SEP 02 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**C 25 07360**

NC

| | |
|---|---|
| **ASHLEY M. GJØVIK,**<br>*an individual,*<br><br>    **PLAINTIFF,**<br><br>    **vs.**<br><br>**APPLE INC.,**<br>*a corporation,*<br><br>**CITY OF SANTA CLARA,**<br>*a local government,*<br><br>**MR. KALIL/KHALIL JENAB**<br>*individually,* & as<br>*Agent/Member/Manager* of:<br>**JENAB FAMILY LP,**<br>**JENAB FAMILY VENTURES LLC,**<br>& as *Trustee/Agent* of:<br>**THE JENAB FAMILY TRUST,**<br><br>    **DEFENDANTS.** | **CASE NO.** *TO BE ASSIGNED.*<br><br>**ENVIRONMENTAL<br>CITIZEN SUIT**<br><br>    **RESOURCE CONSERVATION<br>    & RECOVERY ACT (RCRA),**<br>    42 U.S.C. § 6972<br><br>    **CLEAN AIR ACT,**<br>    42 U.S.C. § 7604<br><br>    **CLEAN WATER ACT,**<br>    33 U.S.C. § 1365<br><br>    **EMERGENCY PLANNING<br>    & COMMUNITY<br>    RIGHT-TO-KNOW ACT<br>    (EPCRA),**<br>    42 U.S.C. § 11046<br><br>    **TOXIC SUBSTANCES<br>    CONTROL ACT (TSCA),**<br>    15 U.S.C. § 2619<br><br>**PUBLIC NUISANCE**<br>**CAL. CIV. CODE 3491** |

## DEMAND FOR JURY TRIAL

1
2

# TABLE OF CONTENTS

3  INTRODUCTION..................................................................1

4  JURISDICTION, VENUE, & NOTICE ....................................1

5  3250 SCOTT BLVD, SANTA CLARA.........................................3

6
7  PARTIES............................................................................4

8  I.    PLAINTIFF: ASHLEY GJOVIK..........................................4

9  II.   DEFENDANT: APPLE INC. ..............................................5

10  III.  CITY OF SANTA CLARA ...............................................7

11  IV.   MR. KALIL/KHALIL JENAB .........................................8

12  GENERAL ALLEGATIONS ......................................................9

13  V.    THE PROPERTY AND OPERATIONS .................................9

14  VI.   THE PREMISE AND ZONING .......................................21

15  VII.  THE POLLUTION AND CONTAMINATION......................24

16  VIII. VIOLATIONS DURING CONSENT DECREE (2016-2020) ................................26

17  IX.   PERSONAL INJURIES AND STANDING ........................29

18  X.    FAILURE OF ENFORCEMENT AGENCIES .......................33

19  LEGAL CLAIMS...................................................................36

20  XI.   FIRST CAUSE OF ACTION: RCRA CITIZEN SUIT PURSUANT TO THE RCRA §
21  6972(A)(1)(A)................................................................36

22  XII.  SECOND CAUSE OF ACTION: ABATEMENT OF IMMINENT AND SUBSTANTIAL
23  ENDANGERMENT PURSUANT TO THE RCRA § 7002(A)(1)(B)................................38

24  XIII. THIRD CAUSE OF ACTION: CLEAN AIR ACT CITIZEN SUIT..........................41

     XIV.  FOURTH CAUSE OF ACTION: CLEAN WATER ACT CITIZEN SUIT...............45
25
     XV.   FIFTH CAUSE OF ACTION: EMERGENCY PLANNING AND COMMUNITY RIGHT-
26
     TO-KNOW ACT CITIZEN SUIT...........................................................49
27
     XVI.  SIXTH CAUSE OF ACTION: TOXIC SUBSTANCES CONTROL ACT CITIZEN SUIT
28

53

XVII.    SEVENTH CAUSE OF ACTION: PUBLIC NUISANCE (CAL. CIV CODE § 3491 ET SEQ.)    54

RELIEF SOUGHT ................................................................................ 57

XVIII.    INJUNCTIVE & DECLARATORY RELIEF .................................. 57

XIX.    CIVIL PENALTIES.......................................................................... 58

XX.    SUPPLEMENTAL ENVIRONMENTAL PROJECTS........................... 58

XXI.    COSTS AND FEES........................................................................... 58

CERTIFICATION ................................................................................ 59

CERTIFICATE OF SERVICE .................................................................. 60

# INTRODUCTION

1.     This is an environmental Citizen Suit brought pursuant to the provisions of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, Clean Air Act, 42 U.S.C. § 7604, Clean Water Act, 33 U.S.C. § 1365, Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11046, and Toxic Substances Control Act, 15 U.S.C. § 2619 (collectively referred to herein as the "Citizen Suit Provisions," and this action as the "Citizen Suit.")

2.     This Citizen Suit is brought in order to enforce the terms of, and to effectuate the congressional intent of, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., Clean Water Act, 33 U.S.C. § 1251 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., and Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., (collectively referred to herein as the "Federal Environmental Statutes").

3.     The California Public Nuisance claim is brought under California Civil Code § 3491 in order to enforce the terms of, and effectuate the legislative intent of, California Civil Code Division 4, Part 3 "Nuisance," including other related and/or incorporated state and local code, and certain rights and responsibilities under the California Constitution.

# JURISDICTION, VENUE, & NOTICE

4.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to the Citizen Suit Provisions of the Federal Environmental Statutes under 28 U.S.C. § 1331 (an action arising under the laws of the United States); and/or 28 U.S.C. § 1332 (diversity of citizenship between parties with more than $75,000 at stake in statutory fines) and 28 U.S.C. § 1367 (supplemental jurisdiction). Additionally, this Court has an additional and independent basis for providing relief under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 1651 (injunctive relief), and under principles of equity and public policy.

5.     On and around June 30 2025, Plaintiff provided Sixty Day Notice to Defendants and U.S. EPA of her intent to file a Citizen Suit against Defendants over Defendants' violations of Federal Environmental Statutes. Defendants were notified via electronic mail and formally served via a process server and/or Certified Mail.

6.     Plaintiff formally served Notice and receipts of service of the Notice to the Administrator of the U.S. EPA and the Regional Administrator of U.S. EPA Region IX. Plaintiff

1    also sent electronic versions of the Sixty Day Notice to the U.S. EPA Enforcement and Compliance
2    team, the California EPA, the BAAQMD, and the U.S. DOJ ENRD.

3       7.    The Sixty-Day Notice provided Defendant and agencies with sufficient information
4    to determine the requirements Plaintiff alleges Defendant violated, the types of activities alleged to
5    constitute the violations, sufficient information to determine the facts of the violations, and the
6    contact information for the Plaintiff.

7       8.    More than sixty days have passed since the Notice was served upon Defendant and
8    the state and federal agencies. During this time, neither the EPA, nor the State of California, has
      commenced or is diligently prosecuting a court action to redress the violations alleged herein.

9       9.    Following service of the Sixty Day Notice, the City never responded to the Plaintiff.
10      10.   Following service of the Sixty Day Notice, Mr. Jenab *et al.* responded for the first
11    time on August 29 at 6:08 PM (the last business day before the filing date), in response to Plaintiff's
12    requests for information in preparation of filing the Complaint and arranging Service.

13      11.   Following service of the Sixty Day Notice, Apple did not respond directly to this
14    matter until August 29 2025 at 5:56 PM (the last business day before the filing date), at which point
15    Apple's counsel sent Plaintiff a sort of informal Motion to Dismiss. Apple's counsel still did not
16    confirm if they were retained for the litigation, would not confirm details for service, and the
17    attorney was expressly named as a wrongdoer in the Notice and his letter defended his own actions.
18    Plaintiff objected to the conflict, suggested she would pursue Disqualification if that individual
19    proceeded, and also asked again for the Service information. Apple did not respond.

20      12.   Plaintiff provided Notice of the actual and threatened endangerment, injury, and
21    damage alleged herein by mailing notices of endangerment and of intent to file suit pursuant to
22    RCRA § 7002(b)(2)(A), to the U.S. EPA the California EPA, and Defendants. The U.S. EPA,
23    California EPA, and City of Santa Clara received this notice in 2023 and still have not acted. The
24    Defendant Apple received this notice directly and constructively since 2020, and again formally in
      this latest Notice, but had not stopped their violations.

25      13.   Under Local Rules, a *Pro Se* Plaintiff must open new cases with a physical paper
26    Complaint left with the Courthouse Clerk. After this case is docketed and electronic filing is
27    granted for the Plaintiff, the Plaintiff will post Exhibits for the Complaint including copies of the
28    Sixty Day Notice and Proof of Service of the Notice.

14.     Venue is proper in the Northern District of California, because the source of the violations is located within this judicial District, the violations and endangerment occurred and occur in the District, the release and damage occur and occurred at properties and business operations within this District, Defendants reside in the District, and this District inherently represents local community interests related to this matter.

15.     This case was filed at the San Jose Division due to the close proximity to the facility but could also be transferred to the San Francisco Division to manage concurrently with existing litigation (*Ashley Gjovik v. Apple Inc.,* N.D. Cal., Case No. 3:23-cv-04597, 2023-). Notice of Pendency will be posted on the pending case in the San Francisco Division. Plaintiff leaves assignment to the Court's discretion.

## 3250 SCOTT BLVD, SANTA CLARA

16.     The violations, nuisance, endangerment, and harm for which Plaintiff seeks relief arises from the property and operations located at 3250 Scott Blvd in Santa Clara, California (the "Property", APN 216-29-117).

17.     The vertical and horizontal extent of the releases, pollution, and contamination at, and emanating from the Property, including locations where contamination has come to be located or threatens to become located, are hereby referred to as the "Premise" and generally refers to a radius of roughly ~1,000 feet around the Property.

18.     The Property and the Premise have been impacted by contamination at and emanating from the operations of Apple Inc at 3250 Scott Boulevard ("Apple Operations"). The Property and the Premise have also been impacted by contamination at and emanating from other historic semiconductor operations at the Property and at the adjacent 3050 Coronado Blvd, a.k.a. the "Synertek Inc Building 1" Superfund site ("Synertek Operations," CAD990832735). Public records show that Defendant Mr. Jenab *et al.* owns both the 3250 Scott Boulevard and 3050 Coronado Boulevard properties.

19.     The Apple Operations at the Property are occurring less than ~300 feet from thousands of homes. Also, within ~500 feet from the Property and Apple Operations are two public city parks, picnic tables, outdoor fitness stations, large swimming pools, and a children's playground. Within 1,000 feet there is also a church, grocery store, urgent care facility, a school, elder care facility, and the San Tomas Aquino and Saratoga Creeks and public trail.

# PARTIES

## I. PLAINTIFF: ASHLEY GJOVIK

20.     Ashley Gjovik (pronounced "JOE-vik") is the Plaintiff in this action ("Plaintiff") and is a citizen of the United States, prior resident of California, and current resident of Massachusetts domiciled in Boston. Plaintiff uses her California LLC address (2108 N St. Ste. 4553 Sacramento, CA, 95816) on legal papers for privacy, but this action is brought by her as an individual.

21.     Plaintiff worked for Defendant Apple Inc from 2015 until Apple terminated her employment in 2021. Plaintiff lived next to the Property and Apple Operations, at the Santa Clara Square Apartments, in 2020, where she became severely ill and injured due to chemical exposure.

22.     Plaintiff graduated from Santa Clara University in 2022 with a Juris Doctor degree and Certificate in Public International Law with honors. During her legal education in 2018-2022, Plaintiff was an Emery Merit Scholar; made Dean's List every year; received CALI Excellence for the Future Awards for obtaining top grades in Property Law, Statutory Analysis and the Legislative Process, and Public Health Law; and also received Witkin Award for Academic Excellence award in Property Law. Plaintiff feels confident she can proceed effectively as a *pro se* Plaintiff.

23.     Plaintiff has not taken the bar exam is not an attorney, as she has been focused on her legal battle with her ex-employer, Apple Inc, after the company nearly killed her with its environmental violations at the Property in 2020, causing contamination of the Premise where she lived in 2020; took adverse actions against her in her employment, including suspending and firing her in 2021; and then undertook a multi-year scheme of retaliation, harassment, and obstruction through current day, which is captured in the pending RICO Lawsuit.

24.     In 2023, Plaintiff filed a related action, concerning the same, similar, and related subject matter, against Defendant Apple Inc in the matter of *Ashley Gjovik v. Apple Inc.,* N.D. Cal., Case No. 3:23-cv-04597 (the "RICO Lawsuit"). In that matter, Plaintiff's claims against Apple included Private Nuisance, Ultrahazardous Activities, IIED – Fear of Cancer, and RICO with environmental-related Predicate Acts, amongst other claims.

25.     In 2023-2024, the NLRB found in Plaintiff's favor against Apple, with the NLRB filing a Complaint against Apple, alleging the company violated federal labor law when it

1    threatened, suspended, and terminated the Plaintiff's employment in 2021 in retaliation for

2    Plaintiff's protected concerted activities around environmental, health, and safety issues (*Apple,*

3    *Ashley Gjovik,* 32-CA-282142, 32-CA-283161).

4        26.    The NLRB also found in Plaintiff's favor regarding her charges that Apple's

5    employment policies (including NDAs and other confidentiality policies) violate federal labor law.

6    NLRB filed a Complaint against Apple on Sept. 27 2024. On April 4 2025, the NLRB, Plaintiff, and

7    Apple entered a trilateral national settlement with extensive injunctive and declaratory remedies to

8    be completed by Apple, including an ongoing consent agreement. (*Apple, Gjovik, 3*2-CA-284428).

9        27.    Plaintiff also had a U.S. Dept. of Labor Whistleblower Retaliation case against the

10   Apple under CERCLA, RCRA, CAA, and TSCA. However, the ALJ decided, based on Apple's

11   counsel's Motion to Dismiss, that the CERCLA generally does not apply to Apple, even when

12   operating on a Triple Superfund Site – and then the ALJ refused to hear the remainder of the

13   Plaintiff's arguments. The case was filed in 2021, dismissed in 2024, and is still awaiting an

14   appellate decision. (*Ashley Gjovik v Apple Inc*, OALJ 2024-CER-00001, ARB 2024-0060).

## II. DEFENDANT: APPLE INC.

15       28.    Apple Inc. is a corporation headquartered in California at 1 Apple Park Way,

16   Cupertino, CA 95014. Apple Inc "Apple" refers also to its employees, Directors, Board, legal

17   counsel, subsidiaries, affiliates, contractors, and other agents. (Cal. Civ. C. § 2295 et seq.).

18       29.    Apple rents and operates a semiconductor manufacturing facility at 3250 Scott Blvd,

19   Santa Clara, California. Apple has operated this facility since approximately 2015 without required

20   federal air permits, hazardous waste permits, or other required approvals. Instead, Apple has

21   misrepresented its operations as a simple research and development facility.

22       30.    Apple is fully aware of the relevant environmental violations as its currently employs

23   a prior U.S. EPA Administrator (Lisa Jackson)and much of her prior U.S. EPA staff, in its

24   Government Affairs and Lobbying team.

25       31.    Further, Apple has stated to the U.S. EPA and public that is a leader in

26   environmental compliance, including in applying for U.S. EPA "chemical safety" awards as

27   recently as last year. Apple's Supplier Responsibility documents also extensively detail the

28   environmental and safety legal obligations for operations at its factories. Apple knew what the law

1    is and intentionally chose to violate those laws in pursuit of the economic benefits of

2    noncompliance.

3        32.    Apple has been subject to multiple environmental lawsuits and consent agreements

4    in the United States including recently in California and North Carolina.[1]

5        33.    The only other known modern instance of Apple operating a semiconductor

6    manufacturing facility in the United States was described by a union leader, as published in The

     American Prospect, as "*easily the most unsafe sites*" the leader had "*ever walked on.*"[2]
7
8        34.    Public records show that it appears the last time Apple operated a manufacturing

9    facility in the SF Bay Area was in the 1990s, and it was later described by the NYT as "*Apple
     Computers Used to Be Built in the U.S. It Was a Mess.*"[3]

10       35.    Apple has also been caught exposing its employees to legal gases including in North

11   Carolina,[4] China,[5] and in recently in Arizona. In Arizona, the gas exposure was handled by lying to

12   the employees that the evacuation alarm was simply a fire drill. "*People were told that there was an*

13   *active-shooting drill, and they were running, and [told] to evacuate the area. So, our guys got out of the*

14   *area. And they found out later that it was a gas leak. And they were just trying to hide that. So, no one*

15   *trusts them.*" (The American Prospect, June 22 2023).

16       36.    Apple executives were fully aware of Property and its Operations, including the vast

17   number of hazardous materials and hazardous waste, as every year, Apple submitted a financial

18   assurance document to the Santa Clara Fire Department which detailed hazardous waste treatment

19   and disposal operations, and was signed by Apple's CFO, Luca Maestri – including affixing a

20   company seal. Each financial assurance filing also attached a detailed confirmation letter from

21   Apple's third-party auditor, E&Y, on behalf of Apple. Mr. Maestri was also on the email distribution

22

23   _____

[1] The Carolina Journal, *Apple clean energy project fined for environmental violations*, Don Carrington, Oct. 6
2017, https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/

24   [2] The American Prospect, *Chipmaker's Scramble to Build Marred by Mistakes and Injuries*, June 22 2023,
https://prospect.org/labor/2023-06-22-tsmc-semiconductor-factory-phoenix-accidents/

25   [3] NYT, "*Apple Computers Used to Be Built in the U.S. It Was a Mess,*" Dec. 15 2018,
https://www.nytimes.com/2018/12/15/business/apple-california-manufacturing-history.html

26   [4] The Guardian, *Five injured in chlorine gas leak at Apple data centre: Workers treated at the scene in North
Carolina by paramedics before being taken to hospital after exposure to noxious fumes*, June 2 2015.

27   https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre

28   [5] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 27 2012,
https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-china-flna714480

1  list for notification of hazardous waste violations at the facility.

2  ### III.  CITY OF SANTA CLARA

3      37.    Defendant City of Santa Clara is a municipal corporation organized under the laws

4  of California, with its principal place of business located at 1500 Warburton Avenue Santa Clara,

5  CA 95050. The current City Attorney is Glen R. Googins.[6]

6      38.    The City Fire Department has "hazardous materials divisions" which are "under the

7  direct supervision of the Assistant Fire Chief or Deputy Fire Chief." These divisions include

8  hazardous materials administration, training, legislative, and inspection divisions. 2.85.070

9      39.    The City has been delegated authority by California EPA to implement and enforce

10  various federal environmental programs within its jurisdiction, including but not limited to air

11  quality permitting, wastewater pretreatment oversight, hazardous waste regulation, and emergency

12  planning coordination.

13  "The City of Santa Clara Fire Department has been designated the Certified
   Program Agency by the State of California Environmental Protection Agency's
   (CalEPA). The CUPA protects Californians from hazardous waste and hazardous
14  materials by ensuring consistency throughout the state regarding the
   implementation of administrative requirements, permits, inspections, and
15  enforcement at the local regulatory level."

16  (Santa Clara City Code 15.60.020, 15.60.130).

17      40.    The City has assumed regulatory oversight responsibilities over the Facility's

18  environmental compliance through its delegated authority under state and federal environmental

19  programs.

    "The City does hereby assume responsibility for the enforcement and
20  implementation of the Hazardous Waste Generator Program, Onsite Hazardous
   Waste Treatment Program, and Tiered Permitting Program... Hazardous Materials
21  Release Response Plans and Inventories (Business Plans) Program, ... Hazardous
   Materials Area Plan Program... California Accidental Release Prevention (CalARP)
22  Program..."

23  (Santa Clara City Code 15.60.020).

24      41.    The City has knowingly permitted and facilitated the Operations at the Property

25  since 2015, failed to enforce federal environmental regulations, and concealed violations from

26  affected residents and other regulatory agencies.

27      42.    The City Fire Department has been under CUPA corrective action oversight by

28
---
[6] Santa Clara, City Attorney, https://www.santaclaraca.gov/our-city/departments-a-f/city-attorney-s-office

CalEPA for years. The most recent status report, dated Sept. 16 2024, notes that the Santa Clara government was still unable to correct multiple systemic deficiencies, including that:

- The City is not consistently following up and documenting return to compliance in CERS for Hazardous Waste Generators;
- the City is not ensuring all businesses comply with Hazardous Materials Business Plans;
- The City is not inspecting CalARP stationary source facilities;
- the City is not inspecting each facility subject to HMBP requirements at least once every three years;
- the City is not inspection all Hazardous Waste Generator facilities with appropriate frequency; and
- the City is not regulating all facilities subject to the Hazardous Waste Generator Program.

(CUPA Corrective Action Report, Sept. 16 2024).

## IV. MR. KALIL/KHALIL JENAB

43.     Khalil/Kalil Jenab, is named individually; as Agent and/or Member and/or Manager of Jenab Family LP and/or Jenab Family Ventures LLC; and as Trustee of the Jenab Family Trust ("Mr. Jenab *et al.*"). During the timeframe in question, investigative reports also show the property was owned by "The Woodruff Trust." Mr. Jenab is a Vice Chairman at Cushman & Wakefield and is a licensed Real Estate Salesperson (License No. 00848988).

44.     Mr. Jenab is listed as the current owner of the Property and regulatory filings reference the mailing address 108 Sylvian Way, Los Altos, CA, 94022. However, on August 29 2025, Mr. Jenab corresponded in email saying, "for the record, the property is held by Jenab Family LP" and "Cushman & Wakefield has no ownership interest or involvement with the subject property and should not be identified as a party."

45.     An Intelius Location Report on August 29 2025 noted that the Property has been transferred multiple times since 2017, including between the "Lindsey Family Trust," Julia A Lindsey, Kathleen J Woodruff, "Lindsey Julia Family Trust," "Lindsey Property Trust," Jenab Family Trust," "191 Baypointe LLC," "Woodruff Kathleen Trust," "Jenab Family Ventures LLC," "Jenab 1997 Family Trust," and "Jenab Family LP."

46.     Mr. Jenab is listed as an Agent for 191 Baypointe LLC along with James Lindsey, the two appear to be long-time business partners, and its unclear if James Lindsey *et al.* also still own

1    the Property. Plaintiff reserves the right to amend to add Mr. Lindsey (and/or his LPs, LLCs, trusts,

2    etc.) if needed. ("Mr. Jenab *et al.* and Mr. Lindsey *et al.*").

3        47.    Either Mr. Jenab *et al.*, or he and Mr. Lindsey *et al.*, as property owners, were and

4    are responsible for maintenance ("the owner, occupant, lessee, or tenant of any property within

5    the city shall be responsible for the maintenance of property and premises in a manner consistent

6    with the provisions of this chapter and this Code." Santa Clara City Code 8.30.04).

7        48.    Mr. Jenab *et al.* was and is aware because he was copied on, received, and signed

8    documents related to permits and regulated operations. "correction and abatement of violations…

9    shall be the responsibility of the owner or the owner's authorized agent… In no event is notice

10   necessary before abatement, when the hazard is a clear and present danger to the public welfare.

11   All costs related to such abatement shall become a lien on the subject property." (Santa Clara City

12   Code 15.60.100).

# GENERAL ALLEGATIONS

## V. THE PROPERTY AND OPERATIONS

13       49.    Apple started semiconductor manufacturing operations at the Property no later

14   than 2015. The Property is used for semiconductor fabrication and manufacturing, which requires

15   specific permits and oversight (the "Operations").

16       50.    Per City records, Apple began planning use of the facility around 2014, with August

17   11 2014 meeting notes between Apple and the city Fire Dept. (2014_095 AA) noting that at that

18   time "*no residential use was proposed*" so there was "*no off site consequences studies*" are assumed, and

19   also noted that one area in Apple's facility may need "*explosion control.*" (pg2). These notes also

20   expressly stated "*air permit will be thru BAAQMD*" and that they need to discuss "CalARP" with

21   the fire department. (pg1).

22       51.    In 2015, Apple registered the facility as a Large Quantity Generator, for Hazardous

23   Chemical Management, Chemical Storage, Hazardous Waste Treatment, and an above ground

24   storage tank (CAR000278176). Apple did not request any air permits for semiconductor

25   manufacturing.

26       52.    However, none of the Defendants reported to the regulating agencies (U.S. EPA,

27   Cal. EPA, BAAQMD, the San Jose Wastewater Treatment Facility, etc.) that Apple was doing

1    semiconductor manufacturing at the Property. Instead, the agencies discovered this due to Citizen

2    Complaints and/or monitoring.

3        53.    The semiconductor manufacturing processes has three major categories: blank

4    wafer production (where blank wafers are produced, usually at dedicated facilities); semiconductor

5    fabrication (where integrated circuits are produced on the wafers); and assembly and packaging

6    (where the wafers are cut into individual integrated circuits which are then mounted into a package

7    for assembly on a printed circuit board). (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2,

    *Semiconductor Manufacturing*)

8        54.    Semiconductor wafers may be made from materials like silicon, gallium arsenide, or

9    indium phosphide. In general, all substrates will have the same processing steps and similar

10    emissions of regulated pollutants. However, different substrates require the use of different

11    processing materials for etching, doping, and layering operations resulting in different hazardous

12    air pollutant emissions. (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2, *Semiconductor*

13    *Manufacturing*). These activities are dangerous, use a variety of hazardous materials and toxic

14    gases, and create extensive amounts of hazardous waste and emission.

15        55.    In September 2015, Defendants installed an "Acid Waste Neutralization" system

16    under the RCRA "Permit by Rule" regulations. The first required inspection under 22 CCR

17    66265.192 was in September 2015, the inspections were required every five years, and Defendants

18    did not complete their next inspection until November 2020 – two months overdue. The

19    specifications in the records obtained by U.S. EPA show the system was designed for the Property

20    in December of 2014 and was built in January 2015. (Oct. 2022, TRC Assessment).

21        56.    In or around 2015, Defendants installed a "Heavy Metals Rinse" (HMR) System

22    under the RCRA "Permit by Rule" regulations. The specifications obtained by U.S. EPA showed

23    that the system was designed for the Property in or around July of 2013 and winter of 2014. It

24    appears Defendants did not qualify the complete system until 2017. Defendants noted "The system

25    generally handles heavy metals (potentially toxic) waste liquids generated from laboratory

26    activities." (Oct. 2022 TRC Assessment). It is unclear why Defendants referred to 'potentially

    toxic' heavy metals, as heavy metals are inherently hazardous under RCRA.

27        57.    Upon initiating Operations at the Property, Defendant Apple was quickly cited for

28    building, environmental, health, safety, and fire code violations in at least 2015 (stop work order

1    due to construction without permits), 2016 (spill of cooling water into storm drains, fire code and

2    California ASPA violations, health and safety code violations, failure to properly monitor

3    wastewater discharge), 2019 (wastewater testing violations), 2020 (fire code violations, using two

4    EPA ID numbers, inaccurate hazardous materials inventory data, no spill plans or training, no

5    business permit, no signature from supervisor on records, and failure to properly monitor

6    wastewater discharge again).

7         58.    The City inspected the Property on August 24 2016 and found Apple failed "to have

8    a business plan readily available to personnel of the business or the unified program facility with

9    responsibilities for emergency response or training. HSC 6.95 25505(c)" and Apple was not

10   inspecting their fire sprinkler systems on a quarterly basis or maintaining records on site. The City

11   also noted that Apple needed to "2401 - add the diversion tank to the [Acid Waste Neutralization]

     on CERS as tank 5." The Inspection Report from the city reported the inspection took 90 minutes.

12        59.    In November 2016, Apple submitted an RCRA Hazardous Waste Generator

13   application to the California EPA for Operations at the Property. In November of 2016, a couple of

14   weeks later, California DTSC approved Apple's request for a Tiered Permit/Permit-by-Rule at the

15   Property, which is owned by Mr. Jenab *et al.*

16        60.    In November of 2016, California EPA DTSC approved the "Santa Clara Square

17   Apartment"" development as a Brownfield restoration, including a clean-up of contamination from

18   the Synertek Superfund site owned by Mr. Jenab *et al.*

19        61.    Neither California EPA nor Defendants ever disclosed to the public that Apple was

20   operating a semiconductor manufacturing facility across the street from the apartments. (see EIR

21   and related documents).

22        62.    Defendants installed a "Solvent Waste System" in 2017 but did not report or

     register it under the RCRA or other environmental laws.

23        63.    Defendants noted: "the solvent waste lift station, collection cabinet and associated

24   ancillary p1pmg were constructed in 2015. The solvent tank was constructed in June 2017, and

25   installation of the tank and ancillary piping was completed in 2018." (Oct. 2022 TRC Assessment).

26   The assessment notes the tank is governed by RCRA:

27            Purpose: 22 CCR 66265.192 requires that owners of a new hazardous waste tank
              system (subject to 22 CCR 67450.2 "Permit by Rule") to ensure that the tank system
28            is adequately designed and constructed, and obtain and keep on file at the Facility a

1    written assessment reviewed and certified by an independent, qualified, professional
     engineer, registered in California that attests to the tank system's integrity.

2    However, despite requesting an RCRA related assessment, and receiving a formal document

3    significance the RCRA applicability, Defendants never reported the storage and treatment system.

4        64.    Further, the specifications obtained by U.S. EPA show the system was designed for

5    Apple in December 2014 with pressure tests occurring in Sept. 2015, despite Apple later claiming

6    they did not use the system until 2017. The Assessment also did not discuss the exhaust system for

7    the tank. This was noted in the U.S. EPA RCRA Inspection report. Defendants were assumably

8    exhausting hazardous solvent waste emissions directly into the ambient air.

9        65.    City records for the Property contain at least sixteen chemical spill/leak incident

10   reports at 3250 Scott within only three years. These incident reports included eight confirmed

11   leaks/spills: leaks of phosphine and silane on June 1 2019; a phosphine leak on October 21 2019; a

12   Tetraethyl Orthosilicate ("TEOS") leak on July 17 2020; a major phosphine leak on April 30 2021;

13   a 5% fluorine gas leak on April 18 2022, a Hexafluorobutadiene leak on May 29 2022, and leaks of

14   two unnamed toxic gases on September 20 2022 and December 21 2022.

15       66.    On Sunday June 1 2019, a toxic gas alarm went off at the facility triggered by silane

16   and phosphine gases. Apple stated they were 'purging their lines' but did not place the system in

17   'test mode,' and said that the release was part of routine operations. (Santa Clara City Fire

18   Department Incident Report 2019-1904285). No notice was made to the public and no report was

19   filed to the county, state, or federal governments.

20       67.    On Monday, October 21, 2019, a toxic gas alarm went off at the facility triggered by

21   phosphine gas and Apple said, "the gas cabinet would remain shut down and that it would be

22   serviced by the appropriate technician." (Santa Clara City Fire Department Incident Report 2019-

23   1908541). No notice was made to the public and no report was filed to the county, state, or federal

24   governments.

25       68.    On Friday, July 17, 2020 an alarm went off due to a Tetraethyl Orthosilicate (TEOS)

26   leak. The report noted "An engineer was working on tool, and the plumbing had been installed

27   backward." (Santa Clara City Fire Department Incident Report 2020-2005200).

28       69.    Monday, August 17, 2020 a toxic gas alarm went off at the Property and City report
     noted that Apple said: "the building had a power outage which caused a shutdown and subsequent
     activation of all of the toxic gas alarms. Once the system came back online, the meters were checked

1    and all showed readings that no gasses were released" revealing that Apple's toxic gas alarms did

2    not function during power outages and thus would not detect releases during those times. (Santa

3    Clara City Fire Department Incident Report 2020-2006068)

4        70.    In 2020, the City cited Apple for fire code violations, using two EPA ID numbers,

5    inaccurate hazardous materials inventory data, no spill plans or training, no business permit, no

6    signature from supervisor on records, and failure to properly monitor wastewater discharge again).

7        71.    In September 2020, Plaintiff notified Apple of the chemical exposure at her

8    apartment and spoke with an executive in Apple's EH&S team about it at that time. (Plaintiff saw

9    an Apple building was next door, the Property, and thought Apple may have insights into the risk

     of the Synertek Superfund site).

10       72.    In September 2020, Plaintiff notified the City Fire Department about her chemical

11   exposure injuries next to the Property and requested an investigation.

12       73.    Under information and belief, by September 2020, at least Apple and the City

13   knew the Property was responsible for Plaintiff's severe injuries in 2020.

14       74.    The City's inspection of the facility on Oct. 13 2020 was coded as HWG/Routine

15   and Permit by Rule/Routine. The City's notification to Apple included the following violations:

16       75.    **RCRA Hazardous Waste Generator; Permit by Rule (PBR)**
           • **Minor Violation: 3010002 - Hazardous Waste Generator: Identification
17           Number.** Facility has two IDs, inactivate the ID not currently in use and provide
             documentation for reason on keeping two different IDs.
18         • **Minor Violation: 2405 HSC 25200.3(f) (CA), HSC 25201.5(d)(7)(A)', CCR
             67450.2(b)(3)(B):** Plot plan correctly shows unit locations. (3210).
19           Administration/Documentation – General. Plot plan does not show location of
             FTU-01 and FTU-02, also plot plan labeling is not readable. Citation: 22 CCR
20           Multiple ; 40 CFR 1 265; HSC 6.5 Multiple; 22 CCR Multiple ; 40 C.F.R. 1 265;
21           HSC 6.5 Multiple; 40 CFR 1 265; HSC 6.5 Multiple

22       76.    **HMRRP - Hazardous Materials Release Response Plans (HMRRP)**
           • **Minor Violation: Failure to electronically submit complete and accurate
23           hazardous material inventory information for all hazardous materials on site at
             or above reportable quantities.** HSC 6.95 25505(a)(1), 25506, 25508(a)(1),
24           25508(a)(3). Provide correct inventory with corrected reporting measurements -
             1700 gallons Diesel Is missing, Argon is reported in pounds, zero amount of chlorine
25           reported; update chemical inventory on CERS with corrected list and amounts of
26           chemicals on site.

27       77.    **Aboveground Petroleum Storage Act (APSA)**
           • **Class II Violation: 2517 HSC 25270.6(a)(1) or (2) Failed to file tank facility**
28

statement or business plan. (4010032). Failure to submit a tank facility statement on or before January 1 annually unless a current Business Plan has been submitted. Last submittal on 5/18/18, submit details on CERS within 30 days. Citation: HSC 6.67 25270.6(a)(1); HSC 6.67 25270.6(a)(2); HSC 6.67 25270.6(a)(1), 25270.6(a)(2)

- **Minor Violation: 2528 HSC 25270.12(a) 25270.4.5(a) SPCC Plan shall include training program (40 C.F.R. 112.7(f)) (4020001).** Failure to provide the following training to all oil-handling personnel: 1. Operation and maintenance of equipment to prevent discharges. 2. Discharge procedure protocols. 3. Applicable pollution control laws, rules, and regulations. 4. General facility operations. 5. Contents of the SPCC Plan. Provide training record for tank inspection personnel. Citation: HSC 6.67 25270.4.5(a); 40 CFR 1 112.7(f)(1); HSC 6.67 25270.4.5(a)

- **Minor Violation: 2529 HSC 25270.12(a), 25270.4.5(a).** Records of inspections or tests not signed by supervisor or inspector (40 CFR 112.7(e)) (4010021). Failure to comply with one or more of the following requirements: 1. Have record of inspections and tests, including integrity tests, signed by the appropriate supervisor or inspector. 2. Keep written procedures and records of inspections and tests, including integrity tests, for at least three years. 3. Keep comparison records. Citation: 40 CFR 1 112.7(e); 40 CFR 1 112.8(c)(6); HSC 6.67 25270.4.5(a)

- **Minor Violation: 2547 Failed to conduct annual spill prevention briefings (40 CFR 112.7(f)(3)) (4010023).** Failure to include in the SPCC plan an adequate description of employee training. Training shall address, at a minimum: operation and maintenance of equipment to prevent discharges; discharge procedure protocols; applicable pollution control laws, rules, and regulations; general facility operations; content of the facility SPCC plan; and annual discharge prevention briefings for oil-handling personnel to assure adequate understanding of the SPCC plan. Provide record of annual briefing (not available on site). Citation: 40 CFR 1 112.7(f)(1), 112.7(f)(3); HSC 6.67 25270.4.5 (a)

- **Minor Violation: 2502 H&SC 25270.4.5(a)** Facility owner/operator shall implement SPCC Plan element(s). [ref. CFR 112.3] (4010001). Failure to prepare a Spill Prevention, Control, and Countermeasures (SPCC) Plan. Citation: 40 CFR 1 112.3, 112.6; HSC 6.67 25270.4.5(a)

78. The City's inspection of the facility on October 26 2020 was coded as HWLQG/Routine. (Oct. 26 2020 email sent to Luca Maestri and Tom Huynh at Apple).

79. Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring December 14 2020. This occurred after Plaintiff had notified Apple EH&S and environmental legal about what occurred to her near the Property.

80. The City's inspection of the facility on December 23 2020 was recorded as Permit by Rule/Not Routine, HW-LGQ/Routine, HMRRP/Not Routine, and ASPA/Not Routine.

81. The City noted new violations at the Property including failure to provide five-year certification for the fire sprinkler/standpipe system (0064), that fire alarms were not tested on an

1  annual basis and records were not maintained on site (0078), and that there were no annual test
2  reports for the toxic gas alarms (0082).

3    82.    At least two RCRA violations were recorded and reported, with an email
4  notification sent from the City to Apple. However, that notification contained no information about
5  what the violation was, and the violation was not recorded in the city's list of violations found
6  during inspections. (Dec. 23 2020 email sent to Luca Maestri and Tom Huynh at Apple).

7    83.    The city reported six total violations at the Property to CERS. This consisted of
8  five violations of the Aboveground Petroleum Storage Act and one violation of the Hazardous
9  Materials Release Response Plans. All reported violations were dated Oct. 13 2020. No RCRA
   violations were reported to CERS or the U.S. EPA. (CERS 385316 / 10633816).

10   84.    In December 2020, Apple filed its first manifests to dispose of solvent saturated
11  activated carbon, signifying they changed their carbon filters for the first time and/or legally
12  disposed of the filters for the first time. The 2024 U.S. EPA RCRA report notes that Apple reported
13  the management of activated carbon as a waste only started around December 14 2020. EPA also
14  noted the solvent saturated carbon is an RCRA waste and Apple had been unlawfully disposing of
15  it as non-RCRA waste. (EPA CEI pg 13-14).

16   85.    On Friday April 30 2021, a toxic gas alarm went off due to another phosphine leak.
17  The city noted "the ventilation system was increased to exhaust the gas out of the facility as fast as
18  possible." (Santa Clara City Fire Department Incident Report 2021-2103124). The City added
19  Apple's "EHS staff was advised to contact CAL OES for their required notification" and noted the
20  Fire Dept. "contacted CAL OES to obtain an incident number 21-2288." (Santa Clara City Fire
21  Department Incident Report 2021-2103124). The Fire Department used the codename "ARIA" in
22  their own report, and the term "Responsible Party" in the CalOES report and never used Apple's
23  actual name in either report. Apple never reported the leak to California OES or any other
   government agency.

24   86.    On June 30 2021, Apple via Susan Creighton ("Global Research EHS Manager")
25  filed Apple's only TRI report for the facility. Apple reported that in 2020 disposed of 260.17 pounds
26  of NMP through "Stack or Point Air Emissions" gas "gaseous" waste and used an "absorber" as
27  a treatment method that had an expected efficient of > 50% but < or = 95%. Apple also reported
28  treating 2,342 pounds of NMP onsite and transporting an additional 14743 pounds for offsite

*GJOVIK V. APPLE, SANTA CLARA, JENAB ET AL.* | COMPLAINT | PAGE 15 OF 63

1    treatment. (95051NTRSL3250S doc. Cont. No. 1320219310885).

2        87.    In 2021, Apple also reported releasing at least 7.8 tons (15,608 pounds) of volatile

3    organic compounds into the atmosphere around the Property in 2020. (U.S. EPA TRI/NEI).

4        88.    On Monday, April 18, 2022 toxic gas alarms went off at the Property. The City

5    report noted Apple said "an employee accidentally turned on the bottle for 5% gas fluorine while it

6    was in the cabinet. The system automatically alarmed upon detection of the gas and evacuated it to

7    the atmosphere as designed" and the "the sensor inside the cabinet was reading at 4.38 PPM, but

8    the staff advises that the sensor may be over saturated and takes time before it drops."(Santa Clara

9    City Fire Department Incident Report 2022-2203209). No notice was made to the public and no

     report was filed to the county, state, or federal governments.

10       89.    On Sunday, May 29, 2022 toxic gas alarms went off due to a Hexafluorobutadiene

11   leak. The city noted "Per the engineer who developed the exhaust system, if the identified levels

12   for the leak have zeroed out then you can allow 30 minutes of the exhaust system to work, and the

13   entire lab should be safe to make entry." (sic). The city added "The chemical is a known respiratory

14   and fire hazard." (Santa Clara City Fire Department Incident Report 2022-2204500). No notice

15   was made to the public and no report was filed to the county, state, or federal governments.

16       90.    The City previously denied there were 2023 incident reports in response to Public

17   Records Requests. However, in 2023, there were at least two incident reports. The first report was

18   on Friday, January 13 2023 in response to a toxic gas or fire alarm but was "cancelled while still

19   enroute." (Incident Report 2023-2300384). The second report was for Friday, May 12 2023 where

20   all alarm activations were spiked levels that immediately returned to normal. The report noted that

21   Apple "stated this would not happen if there was a gas release... There was a power outage that

22   appeared to cause the alarm... The Facilities Manager stated they would have their alarm system

     checked." (Incident Report 2023-2304092).

23       91.    During three federal RCRA inspections in August 2023 and January 2024, the U.S.

24   EPA found at least 19 unique violations of the RCRA, with over hundred unique occurrences.

25   Among other issues was literal piles of toxic waste.

26       92.    U.S. EPA's also discovered that Apple was operating an unpermitted 1,700 gallon

27   hazardous waste storage and treatment system which was venting solvent exhaust into the

28   atmosphere. U.S. EPA noted that "the tank was marked with the words, 'Hazardous Waste,' and

1    used for the accumulation of spent solvent waste. At the time of the inspection, the solvents were

2    being managed as California Only Waste." (Attachment A, page 6).





U.S. EPA photo 4a dated 8/17/23.          U.S. EPA photo 13a dated 1/16/2024.



U.S. EPA photo 6a dated 8/17/23.          Photos from Apple's SWT report (2022).

93.     The U.S. EPA told Apple to notify the BAAQMD of the tank (2024 EPA Inspection

Report), and on September 13 2023, Apple applied for a permit with Tom Huynh writing:

Apple Inc. (Apple) currently owns and operates emission sources under BAAQMD
Plant #22839, located in Santa Clara, CA. Apple is requesting an authority to
construct and permit to operate for a 1,700 gallon solvent waste tank (S-NEW) at
the facility. S-NEW is a horizontal aboveground tank receiving waste solvent and

water from solvent spray benches and wet benches from S-1 (Semiconductor Fab Research and Development Facility)... We appreciate BAAQMD's ongoing support. If you have any questions regarding the attached application, please call me at [number].

(Apple Inc. Plant #22839, Ref. 0664430).

94.     Among other issues, Apple did not disclose in their letter that they had been operating this tank since 2017, and Apple appeared to be coercing BAAQMD to not create a paper trail of questions or concerns.

95.     The specifications for the tank were attached on page 29 and the document was reviewed and signed by Apple's contractors on October 18 2016. The contractor records dated October 2016 show fabrication and pressure testing occurred before the claimed operational date.

96.     In August 2023, the U.S. EPA found this tank was venting the solvent exhaust to the roof, and Apple was using a 55-gallon container filled with "Activated Carbon" for abatement, but the U.S. EPA noted "the container was not labeled or identified in Apple's air permit or their RCRA tank assessment." The U.S. EPA also captured a photo of the exhaust and noted that it was:

"A photo of three vents connected to Apple's 55-gallon container filled with 'Activated Carbon'. The two vents on the left are emergency vents for the double-walled tank. The vent on the right is the main vent."

(U.S. EPA, Attachment A, page 8, photograph 7b). Notably, the exhaust vent is extremely narrow and pointed downward, away from the air flow at roof level.

97.     After Plaintiff learned of Apple's activities at 3250 Scott Blvd and announced her discovery publicly in February 2023, Defendant Apple then proceeded to file permits in early April for "*installation of a new VOC abatement system*" with "*two new solvent exhaust fans.*" (Permit BLD23-68895).

98.     The U.S. EPA's August 2023 inspection reported noted that the exhaust system for the solvent tank was not referenced in Apple's October 2022 system assessment. Per U.S. EPA, Apple claimed the device was already included in their BAAQMD permit, however EPA noted it was never mentioned in that application. (U.S. EPA CEI pg13-14).

99.     It appears that based on the timelines and inconsistencies, Apple obtained the new activated charcoal abatement system after they realized that Plaintiff learned about the Defendants activities at the Property. Defendants then rushed to install the new system prior to the U.S. EPA inspection, and in their haste, it appears they connected the wrong vent pipes, venting to the curved down backup pipe as a primary exhaust. Then upon EPA questioning Defendants about it, it

1   appears Defendants decided to present the issue as negligence instead of an intentional cover-up.



*U.S. EPA photo 7b dated 8/17/23.*

100.    U.S. EPA's Aug 17 2024 Compliance Evaluation Inspection cited    Apple    for violations of RCRA requirements related to hazardous waste generators and RCRA permits including 262.11 (generators must determine if their solid waste is a hazardous waste), 270.1(c) (RCRA permits are required for hazardous waste storage, treatment, and disposal), and .262.17(a)(5)(i)-(ii) (must label hazardous waste containers).

101.    **Hazardous Waste Generators:**
- **262.17(a)(1)(iv): Management of containers.** "A container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste. A container holding hazardous waste must not be opened, handled, or stored in a manner that may rupture the container or cause it to leak."
- **262.17(b): Time limits.** "A large quantity generator who accumulates hazardous waste for more than 90 days is subject to the requirements of 40 CFR parts 124, 264 through 268, and part 270 of this chapter, and the notification requirements of section 3010 of RCRA for treatment, storage, and disposal facilities, unless it has been granted an extension to the 90-day period."

(U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).[7]

102.    Per U.S. EPA's report, the Santa Clara City Fire Department made an unexpected visit to Apple's factory the morning of the U.S. EPA's inspection, effectively putting Apple on notice and obstructing the U.S. EPA's ability to surprise Apple, as is standard with unannounced

---

[7] U.S. EPA, 3250 Scott Blvd, Apple Inc, https://echo.epa.gov/detailed-facility-report?fid=110001168254

1   hazardous waste inspections.

2       103.    The U.S. EPA report noted that the U.S. EPA inspection was unannounced. The

3   City of Santa Clara Assistant Fire Marshall apparently said he had scheduled inspections three

4   weeks prior. (pg3).

5       104.    However, there is no record of these inspections on CERS or in the agency records,

6   and the City has repeatedly refused to respond to Public Records Requests related to this supposed

7   pre-planned inspection.

8       105.    Then U.S. EPA's January 16 2025 Focused Compliance Inspection of Apple's

9   facility found additional violations including:

    106.    **Hazardous Waste Generators:**

10
- **262.11:** "A person who generates a solid waste, as defined in 40 CFR 261.2, must
11   make an accurate determination as to whether that waste is a hazardous waste in order
   to ensure wastes are properly managed according to applicable RCRA regulations."

12
- **262.17(a)(5)(i)(C): Containers.** "A large quantity generator must mark or label its
13   containers with the following... the date upon which each period of accumulation
   begins clearly visible for inspection on each container."

14
- **262.17(a)(5)(ii)(B): Tanks.** "A large quantity generator accumulating hazardous
15   waste in tanks must do the following... mark or label its tanks with an indication of
   the hazards of the contents...; hazard communication consistent with the
16   Department of Transportation requirements at 49 CFR part 172 subpart E (labeling)
17   or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA
   Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label
18   consistent with the National Fire Protection Association code 704)."

19
- **262.20(a)(1): Paper manifest.** "A generator that transports or offers for transport a
20   hazardous waste for offsite treatment, storage, or disposal, or a treatment, storage, or
   disposal facility that offers for transport a rejected hazardous waste load, must prepare
21   a Manifest...."

22       107.    **TSD IS-Tank System Standards:**

23
- **265.195(a): Daily inspection requirements:** "The owner or operator must inspect,
   where present, at least once each operating day, data gathered from monitoring and
24   leak detection equipment (e.g., pressure or temperature gauges, monitoring wells) to
25   ensure that the tank system is being operated according to its design."

26       108.    **TSD-IS Air Emission Standards and Leaks**
- **Subpart BB 265.1063(b)(3):** "Leak detection monitoring, as required in §§ 265.1052
27   through 265.1062, shall comply with the following requirements...The instrument
28   shall be calibrated before use on each day of its use by the procedures specified in

Reference Method 21."

- **Subpart CC 265.1083(c)(1):** "A tank, surface impoundment, or container for which all hazardous waste entering the unit has an average VO concentration at the point of waste origination of less than 500 parts per million by weight (ppmw)... The average VO concentration shall be determined using the procedures specified in § 265.1084(a) of this subpart. The owner or operator shall review and update, as necessary, this determination at least once every 12 months following the date of the initial determination for the hazardous waste streams entering the unit."

109. **Permits (Generally)**

- **270.1(c):** "RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR part 261. The terms "treatment," "storage," "disposal," and "hazardous waste" are defined in § 270.2. Owners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit...If a post-closure permit is required, the permit must address applicable 40 CFR part 264 groundwater monitoring, unsaturated zone monitoring, corrective action, and post-closure care requirements of this chapter."

(U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).[8]

110.    The most recent update for the Property that Plaintiff could find was posted by the City on or around June 10 2025. The City cited Apple for a number of fire code violations at the facility including noting that "it is unclear what the emergency power off button serves in FACP room," "clear storage in front of exterior exit door obstructing egress in the small parts room," and "MOCVD bunker - relocate 'danger' sign from exit door." (Santa Clara, Permit FOP 25-10526).

111.    The U.S. EPA ECHO website shows the majority of 2023-2024 RCRA violations at the Property are still open. (See U.S. EPA records for the site, to be filed subsequently as an exhibit).

## VI. THE PREMISE AND ZONING

112.    The Property has been zoned as "Light Industrial" since at least 2008. (S.C.C. 2010-2035 General Plan). Light Industrial Zoning is intended for "manufacturing, warehousing (including data centers), and wholesale establishments." (S.C.C.C. 18.16.010(B)(3)). In the 2010-2023 Santa Clara City General Plan, the Property is designated for "Low Intensity Office/R&D" Land Use. (S.C.C. 2010-2035 General Plan). "Research and Development" includes "research, and the design, development and testing of electrical, electronic, magnetic, optical and mechanical

---

[8] U.S. EPA, 3250 Scott Blvd, Apple Inc, https://echo.epa.gov/detailed-facility-report?fid=110001168254

1     components in advance of product manufacturing" and "may allow for minor

2     manufacturing."(S.C.C.C. 18.160.180).

3         113.    The City and County have a "Heavy Industrial" zoning designation that is

4     intended, conditionally, for activities like semiconductor manufacturing. "Heavy Industrial"

5     zoning is intended for "heavy manufacturing and other facilities that use and store noxious and

6     hazardous materials." (S.C.C.C. 18.16.010(B)(4)). This Zone includes "manufacturing" and

7     "fabrication" and "that produces odors... hazardous waste materials, or particulates that may

8     negatively affect other uses on the same site or neighboring properties" and requires approval of a

9     Conditional Use Permit. (S.C.C.C. 18.160.090, 18.16.020, Table 2-13. S.C.D.F.C. 12.2; S.C.C.

10     2010-2035 General Plan). "This district should be located so as to minimize adverse effects on

    adjoining areas."(SCCZO §§ 2.40.010, 2.10.040; Heavy Industrial Only Table 2.40-1).

11         114.    After being put on notice about the public safety issue created by the facility, the

12     City updated the 2023-2025 General Plan to still designate the Property as "Low Intensity

13     Office/R&D" but updated the Land Use for all properties surrounding the Property to "High

14     Density Residential" including additional public "Open Space." (S.C.C. 2010-2035 General Plan).

15         115.    Today, the Premise, with adjacent and nearby properties within ~1,000ft of the

16     Property and its Operations, includes:

- The Santa Clara Square Apartments (including homes, playgrounds, fitness trails, swimming pools, BBQs),
- The Santa Clara Square Clubhouse (3405 Montgomery Dr),
- Saratoga and San Tomas Aquino Creeks,
- San Tomas Aquino Creek/Saratoga Creek Trail,
- Meadow Park (3355 Octavius Dr),
- Creekside Park (3225 Scott Blvd),
- Carbon Health Urgent & Primary Care (2712 Augustine Dr #120),
- Whole Foods grocery store (2732 Augustine Dr Ste 1600),
- Grace Adult Day Health Care (3010 Olcott St),
- Bay Area Driving Academy (3080 Olcott St C 150),
- University of California, Santa Cruz Silicon Valley Extension (3175 Bowers Ave),
- Silicon Valley Christian Assembly church (3131 Bowers Ave).
- Opa! Authentic Greek (2722 Augustine Dr Ste 130),
- Woof Gang Bakery & Grooming (2722 Augustine Dr Suite 140),
- Gong Cha (2712 Augustine Dr #110),
- Commons East Café (2515 Augustine Dr),

- Sweetgreen (2532 Augustine Dr),
- Barebottle Brewing Company (2520 Augustine Dr),
- OrangeTwist spa (2722 Augustine Dr #120),
- Sonder Living (2712 Augustine Dr #130),
- Bafang Dumpling (2702 Augustine Dr #120),
- Lee's Sandwiches (3243 Coronado Pl),
- Club Pilates (3347 Coronado Pl),
- Starbucks (3253 Coronado Pl),
- Charisma Nails & Waxing (3233 Coronado Pl),
- Pacific Catch (3315 Coronado Pl),
- Chipotle Mexican Grill (3249 Coronado Pl),
- Bishops Barbershop (3237 Coronado Pl),
- Jaks Authentic Indian & Modern Vibe (3333 Coronado Pl).

116.    Further, there is an open planning/development application to convert an industrial building (3240 Scott Blvd) next to the Property (3250 Scott Blvd) into "five-story residential redevelopment."[9] These buildings directly share a property line.

117.    The Environmental Impact Report for the development of the apartments was finalized in December of 2015, at least six months after Apple started operations, and the EIR never mentioned Apple's facility despite being directly across the street from the development.

118.    The City was actively involved in Apple's new facility yet approved the EIR despite knowing and intentional omission of Apple's fabrication activities.[10]  When Apple was seeking approval from the city for the facility in 2014-2015, City documents noted zoning concerns if there was residential adjacent, and the need for air permits, but those concerns were not revisited in subsequent approvals.

119.    The apartments went through a full multi-year EIR process with multiple government agencies and public notice/comment, however it was never disclosed that Apple was operating a stealth semiconductor fabrication facility, and emitting tons of toxic chemicals into the atmosphere.[11] The City of Santa Clara knew Apple was doing this and never included it in the EIR,

---

[9] Preliminary Plans for 3240 Scott Boulevard, Santa Clara, SF YIMBY, April 25 2024, https://sfyimby.com/2024/04/preliminary-plans-for-3240-scott-boulevard-santa-clara.html
[10] It is unclear whether The Irvine Company was aware of Apple's activities.
[11] City of Santa Clara, SCSA, https://www.santaclaraca.gov/Home/Components/BusinessDirectory/BusinessDirectory/121/3650?alpha=S

nor did they ever warn residents about it.[12]

120.   The Property and its Operations are an illegal nonconformity: "an illegally created …structure, or use that was illegally constructed, created, installed, or initiated without proper permits or approvals, and which does not comply with the provisions of this Zoning Code." (SCCC 18.160.140). "No provision of [the City's] Zoning Code shall validate or legalize any land use, structure, or subdivision constructed, created, established, or maintained in violation of the City's Zoning Code. (SCCC 18.02.04).



Above: Google Street View of the apartments and Meadow Park to the right,
and with the Property behind the apartments and to the left, in a deep smog haze; January 2023).

## VII. THE POLLUTION AND CONTAMINATION

121.   The Final 2016 EIR for the Santa Clara Square Apartments noted unexpected findings of Benzene and Vinyl Chloride in the shallow topsoil (<1") on the property where the apartments were to be developed. It was noted as an anomaly, despite its close proximity to Property (directly across the street, near the hazardous waste treatment systems), and the absence of any alternative modern contamination source in the area.

122.   In addition, beginning around 2021, TCE began spiking in groundwater samples collected directly downgradient from Apple's facility. Earlier, in 2017 the NPDES sampling of Apple's wastewater showed expected TCE in Apple's discharge (24 ug/L).

---

[12] CalEPA, DTSC, SCSA,
https://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=60002212

123.     Apple's inventories, manifests, chemical reporting never included TCE. This implies Apple was covertly using TCE at the facility and quietly disposing of it by pouring it down the drain and into the sewer.

124.     TCE is a manmade chemical. TCE is not naturally occurring in the environment. As a toxic, long-lived, volatile, chlorinated hydrocarbon, and likely carcinogen, TCE is strictly regulated by the state of California and the federal government. TCE is a hazardous substance as that term is defined in federal law, 42 U.S.C. § 9601(14) and state law, Cal. Health & Safety Code § 25281(h). When TCE is discarded or disposed of into the environment, including soil, groundwater, or surface water, it becomes a hazardous waste and solid waste as defined in federal law, 42 U.S.C. § 6903(5), (27), respectively.

125.     Environmental investigations at and around the Property demonstrate that that soil, soil vapor, and groundwater are impacted by chlorinated volatile organic compounds, including trichloroethylene ("TCE") and its breakdown products (i.e., DCE, vinyl chloride, etc.). During its operations at the Property, Apple handled, generated, disposed of, released, used, or stored these chemicals. Apple operated its business at the Property when these chemicals appear to have been released into the environment.

126.     The facility, apartments, and other surrounding buildings and public access ways sit on a federal Superfund site (the Synertek site) and state-managed Brownfield clean-up site. The areas is already saturated with hazardous waste, and efforts are supposed to be underway to clean up the existing contamination, not create new and more contamination. Based on sampling data and historical records, some of these chemicals cannot be explained as being from historic sources such as the Synertek Operation, now owned by Mr. Jenab *et al.*; however, Mr. Jenab *et al.*, as owners of the Property, are also responsible for Apple's Operations.

127.     Activities at the Property generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Property. During rain events, this pollution washes off of those surfaces and flows into the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay Watershed, of which the San Francisco Bay is a part. Stormwater from the Facility discharges into the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay, of which the San Francisco Bay is a part.

128.     Operations and emissions at the Property occur outdoors and may cause pollutants

1    to be exposed to rainfall. The types of pollutants released by the Property into the immediate

2    environment are known to include, or have the potential to include, among other contaminants,

3    total suspended solids, hazardous materials, heavy metals, nitrogen, and other pollutants. The

4    industrial materials stored, and the pollutants generated at the Property are exposed to stormwater

5    flows.

6         129.    The San Tomas Aquino Creek is located ~ 700 feet from the factory. The Creek is

7    exposed, and air pollution can easily settle in the water and on the banks of the creek. The Creek

8    flows north out to Guadalupe Slough, into the SF Bay, and into the Pacific Ocean.

9         130.    The Saratoga Creek historically runs directly between Apple's buildings at 3260

10   Scott Blvd and 3250 Scott Blvd, under the Santa Clara Square Apartments, and flowing north to

11   the bay from Saratoga and the St. Cruz Mountains. The EIR and related investigations for the

12   apartment development, compared with historical records for the area, strongly suggest the

13   Saratoga Creek continues to run through the area as an underground aquifer, large natural spring,

14   and active serpentine hydrothermal system.[13]

## VIII.   Violations During Consent Decree (2016-2020)

15        131.    During the period of most egregious violations (including Plaintiff's physical and

16   injuries and harm to her property), Apple was operating under an active Consent Decree with the

17   State of California for hazardous waste violations at another facility. (*People of the state of California*

18   *v. Apple Inc* 16CV303579 Superior Court of the state of California County of Santa Clara). The

19   timing of consent decree termination immediately following Company's knowledge of plaintiff's

20   poisoning demonstrates consciousness of guilt and obstruction of justice.

21        132.    The Complaint was filed under Cal. Health and Safety Code, §§ 25100 et seq. and

22   Paragraph 31 listed the violations which included:

23   - "Causing **treatment and disposal of hazardous waste at an unauthorized point**, at
       and from Sunnyvale Facility (Health & Saf. Code,§ 25189.2, subds. (c) and (d)).

24   - **Transportation of hazardous waste without manifests** from Sunnyvale Facility
25     (Health & Saf. Code §25160, Cal. Code Regs., tit. 22, §§ 66262.20, 66262.23. 66268.7).

26   - **Failure to report and track export of hazardous waste** from Tantau Avenue Facility

---

[13] Gjøvik, Ashley M. *"Deep Time Geology in Santa Clara County: Evidence for Two Billion Years of Active Continental Margin Processes."* The Journal of Decolonized Ecology and Evolution 1, no. 1 ( July 15, 2025). https://doi.org/10.5281/zenodo.15892989.

(Health & Saf. Code § 25162.1, Cal. Code Regs, tit. 22, §§ 66273.40, 66262.53, 66262.56, 66262.57).

- **Failure to label or otherwise clearly mark** used oil containers as **"Hazardous Waste"** (Cal. Code Regs., tit. 22, § 66262.34, subd. (f))."

*The People of California v. Apple Inc,* Complaint, page 7, paragraph 31 (2016).

133.    The permanent injunction, Ordered Dec. 08 2016, and docketed Dec. 12 2016, included the following:

"The terms of this Stipulation and the Final Judgment shall apply to and be binding on (a) Apple its successors, and its officers, directors, and employees, and all persons acting within the control of Apple …<ins>at any facility in California owned or operated by Apple at which electronic waste or any other hazardous waste is treated,</ins> or recycled ("Apple Facility") and (b) the Department and any successor agency of the Department that may have responsibility for, and  jurisdiction over, the subject matter of the Complaint and Final Judgment….

Section 7: Apple shall be enjoined and ordered as follows:
a. Apple shall ensure that its officers, directors, and employees, representatives, and all persons acting within the control of Apple **at any Apple Facility** comply with **all of the laws and regulations specifically identified in the violations alleged in Paragraph 31** of the Complaint.
b. Any officer or employee of Apple assuming responsibility for, or oversight of, hazardous waste management at Apple, including Apple's Facility manager, primary and secondary emergency coordinators, and the technicians responsible for baghouse maintenance and operations, must attend and successfully complete Modules 1-V relating to hazardous waste at California Compliance School within six months of their hire, promotion, or assumption of  responsibility unless they have attended the California Compliance School and passed the relevant modules within the last five years before the date of their hiring, promotion, or assumption of responsibility.
c. Apple shall ensure that e-waste labeled as Universal Waste, including shredded e- waste, is not mixed or otherwise placed in containers with dust derived from its shredding operations.
d. Apple **shall conduct weekly inspections of all areas of its facilities where hazardous waste is generated or accumulated**, including an inspection of all municipal waste containers and e-waste containers to inspect for improper management of hazardous waste. **Apple shall maintain a written log on-site of the inspections** required by Cal. Code of Regs, tit. 22, section 66265.15. The log shall be furnished upon request, and shall be made available at all reasonable times for inspection, to any officer, employee or representative of DTSC or the local Certified Unified Program Agency ("CUPA")."

Emphasis added.

134. On Dec. 09-11 2020, Apple and the California Department of Justice stipulated to end the permanent injunction against Apple.

135. The document was prepared and filed by Apple's defense counsel, William F. Tarantino (head of environmental litigation at Morrison & Foerster, and prior staff at U.S. EPA Region IX Office of Regional Counsel for prosecution of violations of the CAA, CWA, and RCRA).[14] Scott B. Murray signed for Apple on Dec. 11 2020 as "Director, Commercial Litigation."

136. Reed Soto, Deputy Attorney General, signed on behalf of the California government dated Dec. 9 2020. The stipulation included the text: "The Department has reviewed Apple's history of compliance with the terms of the Final Judgment, and the Department, as of this date, has no information that Apple has not substantially complied with its obligations under the Final Judgment."

137. Around 2022-2023, Plaintiff requested copies of any communications, drafts, or memorandums related to the decision to end the consent agreement through Public Records Requests. Both the California AG office and CalEPA claimed there were no records or documentation. =

138. The City did not report any RCRA or related violations at the Property on CERS or to the U.S. EPA from 2016 through 2020. In 2023, the City told the U.S. EPA that there were no RCRA violations in any prior inspections. (see 2024 U.S. EPA RCRA Inspection Report details).

139. If Apple started using their 1,700 gallon Solvent Waste Tank in 2017, then the October 2020 inspection would have been the first time the City saw the tank in use. The City would have known the tank was being operated without RCRA permits and that it was exhausting to the ambient air around the Premise. Yet the City made no note of it.

140. If the City reported Apple's unauthorized hazardous waste tank, Apple would have been in violation of Apple's consent agreement with the state of California, and those violations would have prevented Apple from ending the permanent injunction.

141. The Order ending the consent agreement was signed by the court on December 22 2020 and docketed January 14 2021. (*The People of California v. Apple Inc*, 16-cv-303579, Superior Court of California, Santa Clara County).

---

[14] William F. Tarantino, MoFo, https://www.mofo.com/people/william-tarantino

## IX. PERSONAL INJURIES AND STANDING

142.    Plaintiff Ashley Gjovik was a resident of Santa Clara County, California, who have been and continue to be injured by the ongoing violations described herein. Plaintiffs resided within the direct exposure pathway of uncontrolled emissions, pollution, and contamination from the semiconductor manufacturing facility operated by Apple Inc. at 3250 Scott Blvd, Santa Clara, California.

143.    Plaintiff was a resident of the ~1,800-unit apartment complex at the Santa Clara Square Apartments, located across the street from the Property. Plaintiff has standing as persons who have been and continue to be injured by the ongoing violations described herein; and Plaintiff did suffer injuries and ongoing injuries.

144.    In February 2020, Plaintiff moved into a large, new apartment at the Santa Clara Square Apartments and quickly became severely ill. Plaintiff suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Plaintiff also suffered bradycardia, volatile blood pressure with hypertension and hypotension and a high frequency of premature ventricular contractions.

145.    From February - September 2020, Plaintiff was screened for multiple severe and fatal diseases and disorders, including Multiple sclerosis, brain tumors, fatal arrhythmias, and Neuromyelitis optica. Plaintiff also suffered skin rashes, burns, and hives, and her hair fell out and she had a shaved head for nearly a year as the bald patches slowly grew back.

146.    Due to the sudden illness, Plaintiff visited the Emergency Room on February 13 2020, and Urgent Care on February 20 2020. Plaintiff subsequently consulted with dozens of doctors who screened her for all sorts of diseases, subjecting Plaintiff to extensive blood draws, urine samples, injections, and scans – including potentially dangerous procedures like MRI and CT scans with contrast, of which Plaintiff had multiple. Plaintiff was too sick to work and went on disability.

147.    While sick in 2020, Plaintiff would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure On September 2 2020, Plaintiff discovered elevated levels of volatile organic compounds in her home. What immediately captured Plaintiff's attention was the large spike in volatile organic compounds had occurred the night prior, around 3 AM, while she

1    had been suffering from a "dying" spell.

2        148.    Plaintiff sought multiple occupational and environmental exposure doctors, who
3    told Plaintiff that all of her symptoms were consistent with solvent and other chem. exposure. After
4    Plaintiff discovered her medical issues at the apartment were due to a chem. emergency, Plaintiff
5    quickly filed complaints with City, California EPA DTSC and BAAQMD, and EPA. She also called
6    Poison Control, who said what she described also sounded like Benzene exposure. (Note:
7    Defendants reported they were exhausting benzene into the air).

8        149.    Notably, almost all of the reported toxic gas leaks during the time frames Plaintiff
9    had complained in 2020 that her symptoms seemed to always be the worst around 8-9 AM, 10-11
10   PM, and sometimes around 2-3 AM. One of the few chem. spills that did not occur during those
     times was root caused to an Apple engineer "accidently" turning on lethal fluorine gas.

11       150.    Similarly, another incident was root caused to an Apple engineer accidently
12   installing the gas for a tool "backwards." Less than 2 weeks following the April 2021 phosphine
13   leak, Apple's manifests included 60lbs of "*vacuum filters contaminated with glass dust*," implying
14   there may have been a phosphine explosion.

15       151.    The TEOS leak occurred on July 17 2020. That day Plaintiff was suddenly covered
16   in hives, rashes, and skin abnormalities. She visited a dermatologist who had no idea what caused
17   the rash.

18       152.    In September 2020, Plaintiff hired an industrial hygienist to test the indoor air at
19   her apartment. She purchased an inspection, soil testing, and a two-hour sorbent tube-based TO-
20   17 air panel. Only half the total contaminants were accounted for in the test and the California EPA
21   informed her that testing with Summa™ canisters for 24-hours is superior and would have yielded
     better results.

22       153.    Still, Plaintiff's limited testing returned results showing a number of the chemicals
23   in use by Apple at 3250 Scott including acetone, acetonitrile, acetaldehyde, benzene, 1,2-
24   dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene
25   chloride, toluene, and xylene.

26       154.    In September 2020, Plaintiff set up additional air monitors to observe the levels of
27   volatile organic compounds in her apartment next to the 3250 Scott factory (though she was not
28   aware of the factory exhaust at that time). The results of the data validated what Plaintiff had

noticed with her symptoms and ad hoc testing – that the volatile organic compounds mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). Plaintiff notified several Apple executives of her findings and activities, including her Apple managers.

155.    In September 2020, Plaintiff's blood and urine medical tests returned results with industrial chemicals, including arsenic, mercury, toluene, and xylenes. Also noteworthy are the symptoms of Plaintiff's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match phosphine and arsine gas exposure.

156.    Both phosphine and arsine are extremely dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of arsine gas onsite.

157.    Plaintiff's medical tests from September 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood but not her urine. There is no other plausible explanation except that she was exposed to arsine gas within hours prior to the test, overnight, in her bedroom.

158.    In September 2020, Plaintiff noticed an Apple facility at 3250 Scott Blvd, near her apartment and  also on the Synertek Superfund groundwater plume. Plaintiff has realized her symptoms and observations represented chemical exposure, but her best guess at a source was the Synertek Superfund contamination, on the property owned by Mr. Jenab *et al.*

159.    Plaintiff mentioned the facility to Apple on at least September 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S and Plaintiff had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in the activities at the Property.

160.    In September 2020, Apple's EH&S Director suggested that Plaintiff use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in September 2021, Apple Employee Relations, conferred with Apple EH&S about Plaintiff's environmental concerns only hours before Apple abruptly terminated the Plaintiff's employment.

161.    In October 2020, Plaintiff asked her manager from Apple Legal if she knew anyone who practiced environmental law because Plaintiff may be interested in the field and wanted to learn more. Plaintiff was introduced to Apple's EH&S counsel. They met twice on a video chat, on November 2 2020 and November 6 2020. Plaintiff spoke about her experience in 2020 and what

1    she had learned about remediation sites.

2        162.    During the conversation, the lawyer admitted to Plaintiff that Apple did not have
3    EH&S counsel prior to her, that she was still catching up, that Apple needed to be doing inspections
4    and testing that it had not done, and she was trying to get them to start soon.

5        163.    On February 21 2023, Plaintiff discovered the semiconductor fabrication activities
     at 3250 Scott. Plaintiff posted on Twitter in real-time as she learned about it, expressing severe
6    distress.
             "APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3
7            KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING
             and APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF and THE
8            YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR
             APARTMENT."
9    @ashleygjovik (February 21 2023 11:29 PM).

10       164.    Until that day, Plaintiff did not know it was Apple who was responsible for making
11   her so ill in 2020. Further, until that day, Plaintiff did not know the chemicals she was exposed to
12   in 2020 were potentially lethal to human life. Plaintiff had described the experience as "thinking
     she was dying" but did not realize she likely could have actually died.[15]
13
14       165.    Plaintiff undertook months of research about 3250 Scott, consulting with more
15   experts, meeting with government agencies, requesting more public records, and drafting a formal
16   complaint. On June 23 2023, Plaintiff filed complaints about 3250 Scott to the EPA, CalEPA, the
17   city of Santa Clara, and Santa Clara County. Plaintiff drafted a 28-page memo with dozens of
     exhibits. Plaintiff also posted on Twitter that she did so and provided a public link.

18       166.    An RCRA Enforcement manager in EPA's Enforcement and Compliance division
19   for Hazardous Waste and Chemicals confirmed receipt on June 20 2023. The U.S. EPA department
20   told Plaintiff they were reviewing the complaint and documents she provided.

21       167.    Plaintiff had a call with the RCRA Enforcement manager on June 21 2023. An
22   inspector was assigned, and a formal investigation was opened around July 12 2023. Plaintiff met
23   with the EPA's RCRA Enforcement and Compliance team several times.

24       168.    The U.S. EPA RCRA team then inspected Apple's factory in August 17 and 18 2023
25   and January 16 2024. The August 17, 2023 inspection was coded as a "*Compliance Evaluation
     Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all*
26

27   _____

28   [15] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste,* SF Bay View, March 26 2021,
     https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

1    *applicable RCRA Regulations and Permits.*" The January 16, 2024 inspection was coded as a "*Focused*
2    *Compliance Inspection.*"

3        169.    Per the formal report, the EPA inspectors identified at least 19 unique violations of
4    the Resource Conservation and Recovery Act at 3250 Scott, including provisions with both civil
5    and criminal enforcement.  Apple was found to be illegally treating, storing, disposing, and
6    transporting hazardous waste without permits, manifests, or other required documentation.

7        170.    The U.S. EPA also found Apple was emitting exhaust from its fabrication activities
8    through a system that did not have required permits and did not have monitoring.  The EPA also
9    found Apple was storing hazardous waste unlabeled and piled in corners, sometimes with lids left
10    off containers so they do not explode, and failing to perform any inspections of the waste on
     weekends, and instead just hoping for the best until they return on Mondays.

11        171.    Plaintiff started working on her first draft of the complaint in this instant civil
12    lawsuit only on or around August 16 2023 and filed suit on September 7 2023, only two days prior
13    to the statute of limitations expiration for her *Tamney* claim, and after only being able to spend
14    roughly three weeks on research and drafting.

15        172.    Plaintiff also filed a complaint with the BAAQMD in July of 2024, which resulted
16    in at least six violation notices thus far; including Rule 2-1-301 failure to obtain "Authority to
17    Construct" (August 29 and September 12 2024); Rule 2-1-302 failure to obtain a "Permit to
18    Operate" (August 29 and September 12 2024); and Rule 9-7-307 for exceeding the "Final Emission
19    Limits" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO) emissions.

20        173.    Plaintiff has an active whistleblower retaliation and labor violation lawsuit against
21    Defendant Apple Inc, with claims approved to move ahead including  a termination in violation of
22    policy, retaliation against her as a victim of crime (these environmental crimes), and retaliation for
     acting as a legislative witness (including about this chemical exposure).

23    ## X.   FAILURE OF ENFORCEMENT AGENCIES
24

25        174.    The U.S. EPA is the federal agency responsible for enforcing the Clean Air Act,
26    RCRA, TSCA, CWA, and EPCRA. The U.S. EPA has actual knowledge of the violations described
27    herein through its 2023-2025 investigation. Despite this knowledge and the imminent and
28    substantial endangerment to public health, the U.S. EPA/U.S. DOJ has failed to take meaningful

1    enforcement action and most of the violations are still open.

2        175.    The California EPA delegated federal environmental oversight of operational

3    activities to the regional air board (BAAQMD), the San Jose Regional Wastewater Treatment

4    Facility, and the City Fire Department. The CUPA overseeing the facility at 3250 Scott Blvd is the

5    Santa Clara City Fire Department and Hazardous Materials team. The City of Santa Clara Code

6    Enforcement oversees stormwater discharges. The City opted out of Santa Clara County Dept. of

7    Env. Health oversight for unknown reasons.

8        176.    The U.S. EPA was made aware of the chemical emergency in Sept. of 2020 and

9    failed to diagnose the source to this location at 3250 Scott Blvd. The Santa Clara City Fire

10   Dept./HazMat was made aware of the chemical exposure in Sept. of 2020 and must have known it

11   was due to Apple's facility but said nothing. The Mayor of Santa Clara was put on notice about the

     health issues, including with reports from additional victims in spring of 2021, but did nothing.

12       177.    The City has violated the Clean Air Act at § 304(a)(3) by an unreasonable delay in

13   enforcement of the CAA despite actual knowledge of severe and ongoing violations of the CAA.

14   The City has violated the RCRA at § 7002(a)(1)(B) by failure to prevent or abate an ongoing

15   imminent and substantial endangerment to the public and environment.

16       178.    The City has violated the Cal PRA in denying Public Records related to the facility.

17   The City has obstructed the U.S. EPA investigation into operations at the facility. The City has

18   concealed violations from EPA, BAAQMD, and affected residents. The City has unlawfully issued

19   building permits for unpermitted hazardous waste treatment facility. The City has approved the

20   facility's "R&D" designation while knowing actual semiconductor manufacturing operations. The

21   City failed to require federal permits before allowing operations to commence.

22       179.    Apple has other facilities in Santa Clara (i.e., 335 Brokaw Rd Apple Inc

23   CAR000276360, 2630 Walsh Ave Apple Inc CAT000603704, etc.) that show the same pattern of

24   egregious violations of environmental, health/safety, and fire code laws – and the same pattern of

     agency neglect and failure to enforce environmental laws.

25       180.    On Dec. 18 2024, the NLRB filed a Complaint against Apple that alleged, among

26   other federal labor violations, the Defendant "directed employees to refrain from talking about

27   workplace environmental health and safety concerns with other employees," including by

28   "threaten[ing] employees with discipline…" "told employees to use the following five-point

1    balancing test in advance of communicating workplace health and safety concerns to other

2    employees…," and told "employees to first communicate their workplace health and safety

3    concerns directly with [Apple]" prior to speaking with coworkers or the government. (*Apple Inc &*

4    *Ashley Gjovik*, 32-CA-282142, 32-CA-283161).

5           181.    On Jan. 2 2025, Apple filed an Answer to NLRB's Complaint and argued the

6    NLRB's Complaint violated the U.S. Constitution including by violating Apple's rights under the

7    First Amendment (Freedom of Speech & Assembly), Fifth Amendment (Takings Clause) Rights,

     Seventh Amendment (Right to Jury Trial), and reliance on federal labor case law decided under
8
     *Chevron* deference. (*Apple Inc & Ashley Gjovik*, 32-CA-282142, 32-CA-283161).
9
            182.    Apple's counsel Melinda Riechert testified that "*The agencies couldn't figure out*
10
     *[what Apple was doing at 3250 Scott] because there was no problem. Believe me, they would have come after*
11
     *Apple if there was a problem. It's [Gjovik] who's claiming there's a problem not the agencies.*" (Feb. 21
12
     2025, page 13 at lines 17-21). (*Gjovik v. Apple,* 3:23-CV-04597-EMC, Northern District of
13
     California).

14          183.    As of February 2025, Apple's agents have testified to a federal court that

15   government agencies have not identified any "problems" with Apple's operations at 3250 Scott

16   and they are not "coming after Apple" related to the site.

17          184.    On April 4 2025, NLRB, Plaintiff, and Apple entered a trilateral national settlement

18   agreement regarding Apple's work policies (32-CA-284428).

19          185.    On March 25 2025, Apple's defense counsel on that same NLRB case was

     nominated to become the new General Counsel of the NLRB.[16] The NLRB then cancelled the
20
     hearing for Plaintiff's retaliation case and it has not been rescheduled.
21
            186.    Plaintiff's personal toxic tort claims were dismissed by a U.S. Court due to
22
     expiration of statute of limitations, finding that based on just the permits the City of Santa Clara
23
     approved for Apple's Operations, that Plaintiff should have figured out Defendants were operating
24
     an off-books fab next to Plaintiff's home, assumed it was Apple who nearly killed the Plaintiff in
25
     2020, and sued Apple prior to 2023 – regardless of Apple intentionally covering up their activities,
26
     and their ongoing harassment and retaliation against her. (*Gjovik v. Apple,* 3:23-CV-04597-EMC,

27

28   [16] Sludge, *Trump NLRB Pick Has History of Crushing Unions, June 2 2025,*
     https://readsludge.com/2025/06/02/trump-nlrb-pick-has-history-of-crushing-unions/

1    Northern District of California).

2        187.    The U.S. EPA, Cal. EPA, Santa Clara County, and city of Santa Clara received

3    Plaintiff's complaint about the Property and Operations in June 2023. The complaint noted that

4    Plaintiff may pursue a citizen suit over the issues if the U.S. EPA does not act.

5        188.    The U.S. EPA confirmed they opened an RCRA investigation, did conduct

6    inspections, did document violations, sent Apple an administrative Notice of Show Cause, but has

7    taken no further public actions. The EPA has failed to commence an enforcement action against

8    the Defendants for clear RCRA violations. The EPA has failed to issue emergency orders to address

imminent endangerment, including immediate installation of required emission controls.

9        189.    The U.S. EPA never confirmed they were investigating the CAA violations, despite

10   being directly asked to by the Plaintiff, and the BAAQMD finding at least six air quality violations

11   at the site. Despite conducting a comprehensive inspection in 2023-2024 that documented

12   extensive violations including potential criminal violations, EPA has failed to open any investigation

13   into any violations of the CAA, CWA, EPCRA, or TSCA. The Defendants, and the U.S. and

14   California EPA agencies, have failed to notify residents of exposure.

15                              **LEGAL CLAIMS**

16   XI.  **FIRST CAUSE OF ACTION: RCRA CITIZEN SUIT PURSUANT TO**
17        **THE RCRA § 6972(A)(1)(A)**

18       190.    Plaintiff incorporates the allegations contained in all other paragraphs as though

19   fully set forth herein.

20       191.    Pub. L. 89–272, title II, § 7002(a)(1)(A) of RCRA, under which Plaintiff brings this

21   action, is RCRA's citizen enforcement provision for violations of any "permit, standard, regulation,

22   condition, requirement, prohibition, or order" under the RCRA. (42 U.S.C. § 6972). The express

23   terms of the statute allow it to be brought against "any person," including "the United States and

24   any other governmental instrumentality or agency." *Id.*

25       192.    As required by § 7002(b)(1) of the RCRA, sixty-day notice of violations was

26   provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA, and the

27   Defendants on June 30 2025. Further, notice of violations was provided by the U.S. EPA to the

     Defendant(s) and California EPA and its CUPA, over a year ago including demands to correct the

28

1   violations, but the violations have not been corrected. Further, no notice is required for claims
2   brought under Subchapter III "Hazardous Waste Management," per § 7002(b)(1)(iii).

3        193.   The Defendants have violated the RCRA, and enforcement is available under 2
4   U.S.C. § 6901. The Facility generates, transports, treats, and disposes of hazardous waste subject
5   to RCRA regulation. The Defendants violations are in the past, but also ongoing, and also expected
6   to continue in the future without judicial intervention. The entirety of the U.S. EPA RCRA CEI
7   report is incorporated here, including facts, allegations, and RCRA violations.

8        194.   **DUMPING:** Defendants have violated 42 U.S.C. § 3001-3005 by improper
9   treatment and disposal of hazardous waste, including open dumping of hazardous waste into the
    air, soil, and water.

10       195.   **DUMPING & PUBLIC DANGER:** Defendants have violated 42 U.S.C. § 6973
11  (Section 7003) by creating and maintaining an imminent and substantial endangerment to the
12  community and the environment.

13       196.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 6922, 40
14  C.F.R. Part 262 (Section 3002) by failure to properly characterize hazardous waste streams;
15  improper storage of hazardous waste beyond regulatory time limits; failure to properly manifest
16  hazardous waste shipments; and inadequate personnel training and emergency procedures.

17       197.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 6923,
18  (Section 3003) by failing to keep required records, failing to properly label waste, failing to comply
19  with manifest rules, and transporting hazardous waste without manifests and without proper
20  categorization.

21       198.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 6924,
22  (Section 3004) by failing to comply with treatment, storage, and disposal standards. The
23  Defendants have violated 40 C.F.R. Part 264-265, through uncontrolled air emissions from
24  hazardous waste treatment tanks; failure to install required air emission control devices; failure to
25  conduct required air emission monitoring and testing; and failure to maintain emission control
    equipment in proper working order.

26       199.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 6925, 40
27  C.F.R. Parts 264, 270 (Section 3005) by operating hazardous waste treatment facility without
28  required RCRA permit; operating without other required permits; and violating permit terms and

1    conditions.

2        200.    **FEDERAL DELEGATION:** The City serves as the primary oversight agency for
3    RCRA permit compliance for multiple aspects of the Facility's hazardous waste operations. The
4    City has allowed unpermitted hazardous waste activities and processes to occur at the Facility and
5    failed to report RCRA violations to appropriate state and federal agencies despite having knowledge
6    of such violations.

7        201.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly treated,
8    stored, and/or disposed of a hazardous waste without a permit. 42 U.S.C. 6928(d)(2)(A); 40 C.F.R.
     260 – 265.

9        202.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly treated,
10   stored, and/or disposed of a hazardous waste  in knowing violation of a material permit condition.
11   42 U.S.C. 6928(d)(2)(B) and (C); 40 C.F.R. 260 – 265.

12       203.    **KNOWING  AND  WILLFUL  VIOLATIONS:**  Defendants'  knowingly
13   transported or causes to be transported a hazardous waste without a manifest where one is required
14   by the regulations. 42 U.S.C. 6928(d)(5).

15       204.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' omitted material
16   information and made false material statements in documents filed or used for purposes of
17   compliance with Subtitle C RCRA hazardous waste regulations. 42 U.S.C. 6928(d)(3).

18       205.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' Generates, stored,
19   treated, transported, disposed of, exported, or otherwise handles hazardous waste and knowingly
20   alters, destroys, conceals, or fails to file records required to be maintained or filed pursuant to
21   Subtitle C. 42 U.S.C. 6928(d)(4); 40 C.F.R. 260 – 265.

22       206.    **KNOWING AND WILLFUL VIOLATIONS:** Defendant Apple also terminated
23   the Plaintiff in violation of the RCRA's anti-retaliation provision at 42 U.S. Code § 6971 (*"employee*
     *protection"*), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

24
25   **XII.  SECOND CAUSE OF ACTION: ABATEMENT OF IMMINENT AND
26        SUBSTANTIAL ENDANGERMENT PURSUANT TO THE RCRA §
          7002(A)(1)(B)**

27       207.    Plaintiff incorporates the allegations contained in all other paragraphs as though
28   fully set forth herein.

208.     Pub. L. 89–272, title II, § 7002(a)(1)(B) of RCRA, under which Plaintiff brings this action, is RCRA's citizen enforcement provision for abatement of imminent and substantial endangerment. (42 U.S.C. § 6972). Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when a "solid or hazardous waste… may present an imminent and substantial endangerment to health or the environment." *Id.*

209.     The express terms of the statute enable that "any person may commence a civil action on his own behalf… against":

- "any person, including the United States and any other governmental instrumentality or agency;" including,
- "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility;" who contributed to,
- "past or present handling, storage, treatment, transportation, or disposal" of "any solid or hazardous waste ;" which may,
- "present an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

210.     Under Section 1004(5) of RCRA, "hazardous waste" is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

211.     Under RCRA § 1004(27), "solid waste" includes "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial… operations" but not "industrial discharges which are point sources subject to permits under section 1342 of Title 33" (NPDES). 42 U.S.C. § 6903(27).

212.     Under Section 1004(3) of RCRA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). An "open dump" refers to "any facility or site where solid waste is disposed" which is not permitted for the disposal of hazardous waste. 42 U.S.C. § 6903(14).

213.     As required by § 7002(b)(2) of the RCRA, constructive ninety-day notice of

1   violations was provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA,

2   and the Defendants. Further, notice of violations was provided by the U.S. EPA to the Defendant(s)

3   and California EPA and its CUPA, over a year ago including demands to correct the violations, but

4   the violations have not been corrected. Further, no notice is required for claims brought under

5   Subchapter III "Hazardous Waste Management," per § 7002(b)(2)(A)(iii). At the time of filing,

6   Plaintiff had no knowledge of commencement of diligent prosecution (civil or criminal) by the

7   federal or state governments on this matter.

8       214.   **IMMINENT AND SUBSTANTIAL ENDANGERMENT:** The solid and

9   hazardous wastes handled, stored, treated, transported, and disposed of by Defendants at the

    Facility present an imminent and substantial endangerment to health and the environment.

10      215.   Defendants operate a 1,700-gallon unpermitted hazardous waste treatment tank

11  that vents toxic solvent vapors directly into the atmosphere without any emission controls, located

12  300 feet from a 2,000-unit apartment complex where families and children live.

13      216.   In 2023-2024, U.S. EPA inspectors found piles of unlabeled toxic waste stored in

14  open containers and documented Defendants were leaving the Property and Operations

15  unsupervised on weekends.

16      217.   In 2023-2024, U.S. EPA inspectors documented that Defendants had been venting

17  hazardous waste exhaust unabated, and found Defendants recently installed makeshift carbon

18  filters for only some vents, without monitoring or verification they were abating the exhaust, and

19  without air permits.

20      218.   Defendants emit, leak, and release extremely hazardous gases including arsine,

    phosphine, and fluorine that can cause immediate death upon exposure.

21      219.   These ongoing illegal releases have already caused severe chemical poisoning of

22  nearby residents, including documented presence of arsenic, mercury, and industrial solvents in

23  victims' blood and urine, with symptoms consistent with acute toxic gas exposure occurring during

24  nighttime emission events.

25      220.   Approximately 3,000 residents live within 1,000 feet of the facility, including

26  families with children who use adjacent parks and playgrounds, creating substantial risk of mass

27  exposure.

28      221.   The endangerment will continue without judicial intervention because Defendants

1   have failed to install required emission controls or obtain proper permits despite years of notice
2   from regulatory agencies.

3       222.   **KNOWING AND WILLFUL VIOLATIONS:** Defendants' transported, treated,
4   stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1) - (7) and knew
5   that such acts put another person in imminent danger of death or serious bodily injury. 42 U.S.C.
6   6928(e); 40 C.F.R. 260 – 265.

7       223.   **KNOWING AND WILLFUL VIOLATIONS:** Defendant Apple also terminated
8   the Plaintiff in violation of the RCRA's anti-retaliation provision at 42 U.S. Code § 6971 (*"employee
    protection"*), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

9       224.   **REMEDIAL ACTION REQUIRED:** Defendants caused or contributed to the
10  past or present handling, storage, treatment, transportation, generation, release, or disposal of
11  chemicals  in the environment in, at, and around the Property, including soil, land, subsurface
12  strata, air, vapor, groundwater, surface water, and groundwater, because Defendants released or
13  otherwise discarded chemicals, or controlled and/or operated the Property from which chemicals
14  were released or otherwise discarded, and failed to prevent or abate the contamination caused by
15  the chemicals .

16      225.   Once the various discharges of chemicals, whether intentional, sudden, and
17  accidental, or otherwise were released into the environment, these chemicals continued to spread
18  and migrate within the environment in, at, and around the Property and Premise, including soil,
19  land, subsurface strata, air, vapor, groundwater, surface water, and the groundwater. Once released
20  into the environment, these chemicals continued to spread and migrate within the environment at
21  the Property, causing additional harm to the environment and continuing to threaten public health
    and the environment.

22      226.   The Site needs to be further investigated and characterized so that a remedial action
23  plan can then be developed and implemented at the Site, and regulatory closure obtained. Plaintiff
24  is entitled to injunctive relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), restraining Defendants
25  and requiring them to take such action, including a complete, timely, and appropriate investigation
26  and abatement of all actual and potential endangerments arising from the released solid wastes and
27  hazardous wastes at and emanating to or from the Site.

28  **XIII.  THIRD CAUSE OF ACTION: CLEAN AIR ACT CITIZEN SUIT**

227.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

228.    The Defendants have violated the Clean Air Act through unpermitted air emissions, air emissions in violation of air pollution standards, and failure to obtain required permits related to exhaust and air releases. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention. Enforcement is available under 42 USC § 7604(a).

229.    The BAAQMD (Rule 30, etc.) and U.S. EPA (NESHAP, 40 CFR Part 63 Subpart BBBBB, etc.) have air emission regulations specific to Semiconductor Manufacturing, which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated. The County has Ordinances (SCCOC Sec. B11-360, etc.) related to Toxic Gases which also were not complied with and which have been and are being violated.

230.    The Facility conducts activities that require permits under the Clean Air Act. The Defendants and their agents conduct these activities, and the Defendant have knowledge that these activities require Clean Air Act permits but have failed to ensure that proper permits were obtained. The Defendants have allowed the  Facility to continue operating without required Clean Air Act permits despite having actual knowledge of the permit requirements. These unpermitted activities constitute ongoing violations of the  Clean Air Act.

231.    Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the apartments were four stories high, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

232.    The California Air Resources Act, Health and Safety Code sections 39000 et seq., contains provisions required by the federal Clean Air Act. The State Air Resources Board (ARB) is responsible for developing the state implementation plan required by the federal CAA. (Cal. Health & Safety Code § 39602).

233.    On May 1 2023, Apple obtained a Bay Area Air Quality Management District Permit to Operate a "Semiconductor fab." (Plant No. 22839). Apple previously had no air permits for their fabrication exhaust. The permit conditions included maximum limits for chemical usage and emissions. The permit included max annual usage limits of arsine (78lb/yr), Phosphine (198lb/yr),

1    Silane (19lb/yr), and Chlorine (1lb/yr). (Permit, page 8). Apple filed an updated request to include

2    the exhaust from their unpermitted hazardous waste treatment tank on September 15 2023, and it

3    was approved around April 2024. (Permit 32236).

4         234.    Plaintiff filed a complaint against Apple with the BAAQMD in July of 2024 and

5    shared the U.S. EPA RCRA inspection report with them, leading them conduct their own onsite

6    investigations on Aug. 29 2024 and Aug. 12 2024. BAAQMD then cited Apple for a number of air

7    quality violations at the facility including multiple violations of 2-1-301 and 2-1-302 (Permit

8    Requirements – Authority to Construct and Permit to Operate) and 9-7-307.1 (NOx and CO

9    Emission limits). (Violations A64215A, A64215B, A64219A, A64218A, A64216A, and A64216B).

10        235.    Apple also reported some emissions to the Bay Area Air Quality Management

11   Board, in difficult to find agency filings, and with unknown methodology as to how they estimated

12   the emissions if they had no monitoring systems. (Plant No. 22839, "Facility Search Tool").

13        236.    The most recent Criteria Pollutant Cal. ARB data is from 2023. In 2023, Apple

14   reported 6.95 tons of TOG, 6.9 tons of ROG, and 0.24 tons of NOX. (Plant No. 22839, 2023).

15        237.    The most recent Cal. ARB Toxic data is from 2022. In 2022, Apple reported

16   emitting 5,730 pounds of Isopropyl Alcohol fumes, 5 pounds of diesel exhaust, 1.35 pounds of

17   benzene, 0.15 pounds of formaldehyde, and also reportable amounts of nickel, manganese,

18   cadmium, lead, toluene, arsenic, mercury, beryllium, and Chromium VI. (Plant No. 22839, 2022).

19        238.    The U.S. EPA website shows that Apple's only filed one TRI report for its

20   Operations at the Facility, in 2021. It is unclear why no reports were filed prior or after, and why

21   Apple chose to file a report only for the year in which it nearly killed its employee, Plaintiff, with its

22   illegal emissions.

23        239.    Apple then cited that same report in the RICO Lawsuit as a basis for why the court

24   should dismiss the Plaintiff's claims, saying the report should have put her on notice to sue Apple

25   earlier. Apple then apparently never filed another TRI report.

26        240.    The one TRI report was filed in or around June 2021 with emission data from 2020.

27   That TRI report includes emissions at the Property in 2020 (when Plaintiff became severely ill next

28   to the Property) of 16,084 pounds of Criteria Air Pollutants, 15,608 pounds of volatile organic

1   compounds (VOCs), 372 pounds of Nitrogen oxides, and 260 pounds of TRI Air Toxics (NMP).[17]

2   241.   The 2020-2021 TRI report included air emissions of Benzene, Carbon Monoxide,

3   Sulfur Dioxide, Formaldehyde, Toluene, Nickel, Lead, Arsenic, Mercury, Acetaldehyde,

4   Chrysene, Fluoranthene, Xylene, Naphthalene, Benz[a]anthracene, Chromium VI, Beryllium,

5   Manganese, and Cadmium.

6   242.   **DUMPING:**  The Defendants have violated 42 U.S.C. § 7410 (Section 110) by

7   dumping hazardous substances into the atmosphere that exceed state-specific emission limits.

8   243.   **DUMPING:** The Defendants have violated 42 U.S.C. § 7411 (Section 111) by

9   dumping hazardous substances into the atmosphere which exceed emission standards, including

    chemicals like Arsine, Phosphine, Silane, Benzene, Mercury, and NMP.

10  244.   **DUMPING:** The Defendants have violated 42 U.S.C. § 7412 (Section 112) by

11  dumping hazardous substances into the atmosphere that knowingly and intentionally does not

12  comply with MACT standards.

13  245.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 7411

14  (Section 111) by failing to comply with standards of performance for stationary sources.

15  246.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 7412

16  (Section 112) by failing to comply with national emission standards for hazardous air pollutants.

17  247.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 7410

18  (Section 110) by failing to comply with state implementation plan requirements.

19  248.   **PERMITS/STANDARDS:** The Defendants have violated 42 U.S.C. § 7491

20  (Section 169) by failing to comply with visibility protection standards.

21  249.   **KNOWING AND WILLFUL VIOLATIONS:** Defendants' who were owners or

22  operators of a stationary source, knowingly constructed a new source, modified an existing source,

23  emitted a hazardous pollutant, and failed to comply with a requirement in violation of an applicable

    NESHAP. 42 U.S.C. 7413(c)(1).

24  250.   **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly made false

25  material statements, representations, or certifications in; omitted material information from; and

26  altered, concealed, or failed to file or maintain a document filed or required to be maintained under

27

28  ───────────────

[17] U.S. EPA, https://echo.epa.gov/air-pollutant-report-new?fid=110001168254

1    the CAA. 42 U.S.C. 7413(c)(2)(A).

2    251.  **KNOWING AND WILLFUL VIOLATIONS**: Defendants' knowingly falsified,

3    tampered with, and/or failed to install a monitoring device or method required by CAA. 42 U.S.C.

4    7413(c)(2)(C).

5    252.  **KNOWING AND WILLFUL VIOLATIONS**: Defendants' knowingly failed to

6    notify or report as required by the CAA. 42 U.S.C. 7413(c)(2)(B).

7    253.  **KNOWING AND WILLFUL VIOLATIONS**: Defendants' negligently and

8    knowingly released into the ambient air hazardous air pollutant listed under Section 7412 of the

9    Clean Air Act and extremely hazardous substances listed pursuant to 42 U.S.C.11002(a)(2) at the

10   time of the release, and negligently and knowingly put another person(s) in imminent danger or

     death or serious bodily injury. 42 U.S.C. 7413(c)(4)&(5), 42 U.S.C. 7412(b)(1).

11   254.  **KNOWING AND WILLFUL VIOLATIONS**: Defendants' who were owners or

12   operators of a source subject to the operating permits program, knowingly operated the source

13   without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1) [42 U.S.C.

14   7661(1)-(2), 42 U.S.C. 7661a(a)].

15   255.  **KNOWING AND WILLFUL VIOLATIONS**: Defendant Apple also terminated

16   the Plaintiff in violation of the CAA's anti-retaliation provision at 42 U.S. Code § 7622 (*"employee*

17   *protection"*), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

18   **XIV.  FOURTH CAUSE OF ACTION: CLEAN WATER ACT CITIZEN**

19   **SUIT**

20   256.  Plaintiff incorporates the allegations contained in all other paragraphs as though

21   fully set forth herein.

22   257.  The Defendants have violated the Clean Water Act, and enforcement is available

23   under 33 USC § 1365(a)(1). The Defendants violations are in the past, but also ongoing, and also

24   expected to continue in the future without judicial intervention.

25   258.  The Porter-Cologne Water Quality Control Act, California Water Code sections

26   13300- 13999 and Title 23 of the California Administrative Code, is analogous to the federal Clean

27   Water Act (CWA) in that it regulates discharges that may affect the quality of the state's waters.

28   The California Act is broader in scope than the federal CWA, however, in that it includes

     groundwater, while the CWA regulates only surface waters. The PorterCologne Act is implemented

1    by the State Water Resources Control Board.

2        259.    Apple has a permit San Jose-Santa Clara Regional Wastewater Facility (SC-461B).

3    On November 19 2015 the San Jose-Santa Clara Regional Wastewater Facility notified Apple of

4    their status as a Significant Industrial User as defined under 40 CFR 403.3(t)(i) and (ii), and of

5    their responsibilities as industrial users under the RCRA. (Permit SC-461B). The Facility is also

6    regulated by the Industrial Stormwater Permit.

7        260.    The Wastewater Facility also discovered Apple was doing semiconductor

8    fabrication and revoked Apple's prior "research and development" NPDES permit and issued a

9    different and more comprehensive one specific for semiconductor fabrication on Oct. 21 2016. The

10   Wastewater Facility said the new permit was to comply with 40 C.F.R. 469 Subpart A. The

11   Wastewater Facility also cc'd Mike Vasquez, the Environmental Compliance Officer for the City

     of Santa Clara.

12       261.    On March 30 2016, Apple was cited by the San Jose-Santa Clara Regional

13   Wastewater Facility for Failure to Use Proper Sample Method in Discharge Reports in violation of

14   40 CFR 403.12 (g)(3) and SCCC-13.10.580. On April 11 2016, Apple was cited by the San Jose-

15   Santa Clara Regional Wastewater Facility for Inappropriate sample frequency in violation of 40

16   CFR 403.12(h) and SCCC-13.10.500. On May 11 2016, Apple was also cited for Late Reporting

17   Discharge Reports in violation of SCCC-13.10.580. (Permit SC-461B Warning Notice WN-

18   009174). The Notice of Violation explained:

19           "The permit conditions contained in the San José-Santa Clara Regional Wastewater
             Facility Industrial Discharge Permit, SC-461B for Apple, Inc. requires sample analyses by
20           40 CFR 136 methods and sampling during the monitoring period from 9/1/2015 to
             2/29/2016 for Self-Monitoring Report due on 3/31/2016. Apple, Inc. failed to analyze
21           samples collected for Self-Monitoring Report (SMR) using 40 CFR 136 methods and failed
             to sample during the monitoring period. Apple, Inc. did re-analyze samples using correct
22           methods, but the final and complete self-monitoring report was not received until
23           5/11/2016, after the permit required due date of 3/31/2016."

24   (Warning Notice WN-009174, May 23 2016).

25       262.    On March 30 2016, the San Jose-Santa Clara Regional Wastewater Facility approved

26   a request for Apple to discharge wastewater from their "deionization system and fab plumbing" to

27   the sewer system but instructed all discharges must comply with 40 CFR 403.5 "National

28   Pretreatment Standards: Prohibited Discharges" and warned Apple that "The discharge of water

1    or wastewater which causes pollution or violation of any effluent limitations, national standard of

2    performance, or national pretreatment or toxicity standard may result in the assessment of civil

3    penalties and/or suspension of sewer service to your facility." (March 30 2016).

4         263.    On June 6 2016, Apple responded via Linda Knudsen, explaining despite operating

5    for a year at the facility, "Inadequate systems were in place to predict a permit response

6    requirement in a timely manner" and "Procedures with the lab were not set up for collection of

7    samples." Knudsen noted that one of the remedies taken was that "Apple reviewed plans with the

     City to ensure accurate understanding of the requirements for the submittal."

8
         264.    On June 9 2016, a Santa Clara City Stormwater Inspector reported that Apple had
9
    dumped cooling water into the storm drains. The ticket was not updated until Feb. 10 2022, six
10
    years later, when it was closed as completed 27 minutes after being assigned. (Santa Clara Spill
11
    Ticket #1657490).

12         265.    On September 21 2020, Apple was cited by the San Jose-Santa Clara Regional

13    Wastewater Facility for inappropriate sample frequencies in violation of 40 CFR 403.12(g) and

14    SCCC-13.10.420.

15             "The permit condition contained in the San José-Santa Clara Regional Wastewater
             Facility Industrial Permit, SC-461B for Apple, Inc., requires sampling during the
16            monitoring period from 3/1/2020 to 8/31/2020 for Self-Monitoring Report due on
             9/30/2020. Apple, Inc., did not collect samples during the monitoring period."
17
    (Warning Notice WN-009573, Jan. 29 2021).
18
         266.    3250 Scott reported an average daily water usage of around 44,000 gallons per day
19
    and the sewer pipes carrying 3250 Scott's discharges flowed downhill and directly around the
20
    apartment where Plaintiff lived in 2020. In 2020, the government had already started investigating
21
    the plumbing at her apartment as a possible vector for some unknown solvent vapor pollution.
22
         267.    On February 11 2021, Apple via Tom Huynh, submitted a letter to San Jose-Santa
23
    Clara Regional Wastewater Facility blaming staffing due to COVID.

24         268.    Santa Clara city Code Enforcement team then conducted their first Stormwater

25    Inspection of the facility on April 5 2022. The reported noted that two bioretention areas were

26    missing required cobblestones or had too many, the other bioretention area "*does not appear to be a*

27    *bioretention area or other stormwater treatment facility*" and noted that none of Apple's storm drains

28    at the facility had required "*No Dumping*" medallions. Santa Clara city marked them "in

1   compliance – implement corrective actions." Upon reinspection on June 3 2022, the bioretention

2   areas had not been corrected and the storm drains still did not have "No Dumping" medallions.

3   No updated reports were provided by the city.

4       269.    The Facility discharges wastewater into the City's sewer system, which ultimately

5   reaches the Pacific Ocean. The City operates the municipal wastewater treatment system and has

6   delegated authority under the CWA's National Pollutant Discharge Elimination System (NPDES)

7   pretreatment program.

8       270.    "Any pollutant that flows into the storm drain ends up in our creeks, the San

9   Francisco Bay and eventually the ocean. The City of Santa Clara has three ephemeral creeks

10  (Calabazas Creek, Saratoga Creek and San Tomas Aquino Creek) and the Guadalupe River. ...

11  Nothing besides clean water may be dumped or allowed to flow into a storm drain. "[18] The San

12  Tomas Aquino Creek and Saratoga Creek flow to the San Francisco Bay and then into the Pacific

13  Ocean, the Waters of the United States under Section 301/402.

14      271.    Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater

15  discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In

16  2017, the government mandated testing revealed the presence of 29 µg/L of 1,1-Dichloropropane,

17  24 µg/L of Trichloroethylene ("trichloroethylene"), and 6.7 µg/L of Ethyl tertiary-butyl ether

18  (ETBE).

19      272.    Among other issues, it's unclear why Apple had trichloroethylene on site but not in

20  any of its chem. inventories, and then, in addition, why exactly Apple was pouring that

21  trichloroethylene down the drain.

22      273.    **DUMPING:** The Defendants have violated 33 U.S.C. §§ 1311, 1316, 1317 with

23  unpermitted discharges, discharges in violation of effluent limits, and without NPDES permits.

24      274.    **DUMPING:** The Defendants have violated 33 U.S.C. §§ 1313, 1345 with violations

25  of water quality standards and unlawful disposal of sewage sludge.

26      275.    **DUMPING:** The Defendants have violated 33 U.S.C. § 1342 (NPDES) by

27  discharging without appropriate permits. Industrial stormwater discharge without permit ▢

28  Violation of stormwater permit conditions

---

[18] Santa Clara City, Stormwater Pollution Prevention, https://www.santaclaraca.gov/our-
city/departments-g-z/public-works/environmental-programs/stormwater-pollution-prevention

276.   **PERMITS/STANDARDS:** The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging in violation of permit terms and conditions. Defendants have falsified discharge monitoring and have not reported what they're actually discharging. Defendants have failed to pretreat discharge.

277.   **FEDERAL DELGATION:**  The City has knowledge that discharges from the Facility into the sewer system are causing downstream residents to become ill. Despite this knowledge, the City has failed to take appropriate enforcement action to stop the harmful discharges.

278.   **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3)

## XV.  FIFTH CAUSE OF ACTION: EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT CITIZEN SUIT

279.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein. The Defendants have violated the EPCRA, and enforcement is available under 42 U.S. Code § 11046. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention.

280.   An owner or operator of a new or modified facility that will be used for the handling of acutely hazardous materials must prepare an RMPP. (Health & Safety Code §§ 25531- 25541.). Anyone required to file a plan is also required to report releases or threatened releases of hazardous materials to the administering agency. (Health & Safety Code § 25507; Cal. Code Regs. tit. 19, § 2703.). CalARP is California's program to implement the federal Accidental Release Prevention program (ARP) with certain additional provisions specific to California.

281.   EPCRA § 326(a)(1)(A), under which Plaintiff brings this action, is EPCRA's citizen enforcement provision for the owner and operator Defendants' failure to submit emergency notices under section 11004(c), submit material safety data sheets or a lists under section 11021(a), complete and submit an inventory form under section 11022(a), and complete and submit a toxic chemical release form under section 11023(a). (42 U.S. Code § 11046).

282.   "Complete and accurate records are absolutely essential to meaningful compliance with EPCRA Section 313 reporting requirements." (*EPCRA for Semiconductor Manufacturing*, EPA

1    745-R-99-007). Facilities "must submit an EPCRA Section 313 report for each EPCRA Section 313

2    chemical or chemical category that exceeds a threshold for manufacturing, OR processing, OR

3    otherwise use (providing you meet the employee and SIC Code criteria)." (*EPCRA for*

4    *Semiconductor Manufacturing,* EPA 745-R-99-007).

5        283.    "Any person may commence a civil action on his own behalf." (42 U.S. Code §

6    11046(a)(1)). The district court shall have jurisdiction in actions brought under subsection (a)

7    against an owner or operator of a facility to enforce the requirement concerned and to impose any

     civil penalty provided for violation of that requirement. (42 U.S. Code § 11046(c)).

8

9        284.    "One of the primary goals of EPCRA is to increase the public's knowledge of, and

     access to, information on both the presence of toxic chemicals in their communities and on releases

10   into the environment and other waste management activities of those chemicals." (*EPCRA for*

11   *Semiconductor Manufacturing,* EPA 745-R-99-007). "Most semiconductor manufacturing industry

12   facilities fall under SIC Code 3674 (Semiconductors and Related Devices) and are required to

13   prepare a report (or reports) if they meet the employee and chemical activity thresholds." (*EPCRA*

14   *for Semiconductor Manufacturing,* EPA 745-R-99-007). There is a formal 187 page U.S. EPA guide

15   dedicated to EPCRA reporting requirements for Semiconductor Manufacturing. (*EPCRA for*

16   *Semiconductor Manufacturing,* EPA 745-R-99-007).

17       285.    Plaintiff spent an incredible amount of time in 2020-2021 researching and

18   investigating, trying to figure out what happened to her next to the Property. She reviewed public

19   records for the nearby next-door buildings, including 3250 Scott. When she pulled looked up the

20   Property on the U.S. EPA portal in 2020, the ECHO page noted that there had been no Toxics

21   Release Inventory releases reported since the 1990s, cited no violations or issues, and made the

22   office look quite benign. Apple managed and continues to manage 3250 Scott as an unmarked office

23   building without any designation as to who was using the building or what they were using it for. In

24   the regulatory paperwork that did exist, Apple repeatedly tried to use code names and to disguise

     their activities.

25       286.    On August 16 2025, Plaintiff and other concerned community members held a rally

26   and press conference outside the Property to discuss Plaintiff's plan to file this lawsuit. Community

27   members expressed concern that there was no Apple logo on the building and there was no

28   indication that industrial or hazardous activities were occurring in the facility. The community

1  members did locate an NFPA 704 Fire Diamond at an entrance near the street (4-4-4-W placard

2  indicating the Operations at the Property are lethal, may detonate, can explode under normal

3  conditions, and to not add water or else it will make things worse).

4      287.   On August 16 2025, two people came out of the Property and demanded the

5  community members to not approach or photograph the entrance and Fire Diamond. One person

6  had an Apple badge. The other person refused to confirm they work for Apple, claimed to work for

7  the 49ers, and then claimed to be associated with law enforcement.

8      288.   Defendants were engaged in ultrahazardous activities with strict liability, and

9  Defendants had a critical duty to warn others of the danger of their activities at the facility.

10  Defendants also had a statutory obligation to comply with permitting requirements and to notify

11  the government of their activities, which they failed to do at every opportunity. Defendants also

12  had a duty under federal Right to Know to notify the community of the chemicals they used and

13  released – but they did not do that either. Apple also used illegal non-disclosure agreements to

14  unlawfully silence its employees about health/safety and environmental issues. Defendants ran

15  Operations at the Facility as an old-school Silicon Valley "*skunkworks*" project.[19] (Cal. Penal Code

16  Section 387).

17      289.   **STANDARDS:** The Defendants have violated EPCRA §302, 42 U.S.C. § 11002

18  ("Emergency planning notification") by failure to notify State Emergency Response Commission

19  (SERC) and failure to designate facility representative. "A person responsible for a facility must, as

20  soon as he or she has knowledge of an unauthorized discharge from or at such facility, immediately

21  notify the local fire agency and the Director of such discharge." (S.C.C.C., § B11-395; Ord. No.

22  NS-517.72, § 2, 4-15-03).

23      290.   **STANDARDS:** The Defendants have violated EPCRA § 304, 42 U.S.C. § 11004,

24  ("Emergency Release Notification") by failing to report releases of extremely hazardous

25  substances and CERCLA substances that exceeded reportable quantities and failing to provide

26  community notifications. The Defendant's did not report the releases, actions taken to respond

---

[19] See, for example, the Lockheed "Skunkworks" case, NYT, *Jury Awards $760 Million in Chemical Trial,* Aug. 8 1998, ("One factor in the case was that the Stealth fighter's secrecy could have increased exposure to the chemicals. … the chemical companies knew about those conditions and did not provide adequate warning"), https://www.nytimes.com/1998/08/08/business/jury-awards-760-million-in-chemical-trial.html

1  and contain the release, or known or anticipated health risks associated with the release. The City

2  has knowledge of chemical releases from the Facility but has failed to require Defendants to make

3  reports and failed to notify the community as required under EPCRA § 304.

4  291.    Further, the California Fire Code requires that NFPA 704 Fire Diamonds be placed

5  at "entrances to locations where hazardous materials are stored, dispensed, used, or handled in

6  quantities requiring a permit." (Chapter 50, § 5003.5).

7  292.    **STANDARDS**: The Defendants have violated the EPCRA §§ 311 and 312

8  (Hazardous Chemical Inventory Reporting) by failing to keep an accurate and up-to-date inventory

   of hazardous chemicals and failing to report those inventories to the state and local government.

9  293.    Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists

10  extensive amounts of very dangerous substances including Silane, Chlorine gas, Ammonia ($NH_3$),

11  sulfuric acid, and dichlorosilane.[20] Apple's hazardous waste manifests for the site show that in 2024

12  its still processing at least 120 tons of arsenic, at least 50 tons of ignitable waste, and at least 36 tons

13  of corrosive waste at this single facility. It's also disposed of at least 46.85 tons of "unspecified

14  solvent mixture" as "non-RCRA" waste in just 2025.[21]

15  294.    **STANDARDS**: EPCRA § 326(a)(1)(C), under which Plaintiff brings this action, is

16  EPCRA's citizen enforcement provision the state government's emergency response agency

17  (delegated here through CUPA to the City of Santa Clara), for failure to provide a mechanism for

18  public availability of information in accordance with section 11044(a). (42 U.S. Code § 11046).

19  295.    **STANDARDS**: EPCRA § 326(a)(1)(D), under which Plaintiff brings this action, is

20  EPCRA's citizen enforcement provision the state government's emergency response agency

21  (delegated here through CUPA to the City of Santa Clara), for failure to respond to a request for

   tier II information under section 11022(e)(3). (42 U.S. Code § 11046).

22  296.    **STANDARDS**: The Defendants have violated the EPCRA § 313, 42 U.S.C. §

23  11023, ("Toxic Chemical Release Inventory") by failing to report toxic chemical releases (TRI

24  reporting) TRI reporting failures for TCE, NMP, arsenic compounds. The City has failed to ensure

25  that the Facility submits required Toxics Release Inventory (TRI) reports under EPCRA § 313.

26

27  ───────────────────

28  [20] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals
    [21] U.S. EPA, https://hwts.dtsc.ca.gov/facility/CAR000278176

*GJOVIK V. APPLE, SANTA CLARA, JENAB ET AL.* | COMPLAINT | PAGE 52 OF 63

## XVI. SIXTH CAUSE OF ACTION: TOXIC SUBSTANCES CONTROL ACT CITIZEN SUIT

297.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

298.    Plaintiff brings this action under TSCA's citizen enforcement provision 15 U.S. Code § 2619 for violation of this chapter. The statute expressly authorizes civil actions by "any person" against "any person" or "any...governmental instrumentality or agency." (15 USC § 2619(a)(1)). This includes corporations. 15 U.S. Code § 2615(b). Defendants violated the Chapter, including §§ 2605 and 2614.

299.    The Defendants have violated the TSCA through conduct related to lead, and multiple violations of other rules and orders. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention. Enforcement is available under 15 USC § 2619(a).

300.    **STANDARDS:** The Defendants have violated the TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") by unlawful manufacturing, processing, and/or distribution; violations of use restrictions; and failure to comply with phase-out requirements, including with, but not limited to, NMP, TCE, and Mercury.

301.    **STANDARDS:** The Defendants have violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, NMP, TCE, and Mercury, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Defendants knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; and for failing or refusing to establish and maintain records, or submit reports, notices and other information. 15 U.S. Code § 2614(1)-(4).

302.    **DUMPING:** The Defendants have violated 15 U.S. Code § 2606 of the TSCA by using and disposing of imminently hazardous chemical substances and mixtures. 15 U.S. Code § 2606(a). The risk to health or the environment is considered imminent because the use and disposal of the chemical substance and mixture, or any combination of such activities, is likely to result in such injury to health or the environment in violation of § 2605, and/or before a final rule under § 2605 of this title can protect against such risk. 15 U.S. Code §§ 2605(a), 2606(f). This includes improper use and disposal of:

- **Trichloroethylene (TCE),** Subpart D, 40 C.F.R. § 751.301, 89 FR 102568, December 17, 2024.
- **NMP (n-methyl-2-pyrrolidone),** 40 CFR Part 751, 89 Fed. Reg. 51134.
- **Mercury,** 15 U.S.C. 2607(b)(10)(D), Part 713, 83 FR 30073.
- **Lead,** 15 U.S. Code § 2681-2689, 40 CFR Part 745, Section 21.

303.    Apple reported to the government that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the atmosphere around 3250 Scott. In 2022, the EPA severely restricted the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under TSCA. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists a number of TSCA regulated chemicals including, but not limited to, extensive amounts of n-methyl-2-pyrrolidone (NMP) and glycol ethers.[22]

304.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly and willfully violated provisions of §§ 2614 and 2689, and knew at the time of the violation that the violation places another person in imminent danger of death or serious bodily injury. 15 U.S.C. 2615(b)(2)(A).

305.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' were subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

306.    **KNOWING AND WILLFUL VIOLATIONS:** Defendant Apple also terminated the Plaintiff in violation of the TSCA's anti-retaliation provision at 15 U.S. Code § 2622 (*"employee protection"*), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

## XVII.  SEVENTH CAUSE OF ACTION: PUBLIC NUISANCE (CAL. CIV CODE § 3491 ET SEQ.)

307.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

308.    From at least 2015 to the present, the Property has been owned, operated, managed, used, and/or directly or indirectly permitted to be used in such a manner as to constitute a public

---

[22] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals

1    nuisance under the California Civil Code. The public nuisance as described herein is injurious to
2    health, indecent or offensive to the senses, and/or an obstruction to the free use of property, and it
3    substantially and unreasonably interferes with the comfortable enjoyment of life or property by
4    those persons living and otherwise conducting their business at or near the Property.

5        309.    Under California Civil Code an nuisance is "Anything which is injurious to health...
6    or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to
7    interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free
8    passage or use, ... of any...stream... or any public park, square, street, or highway." Cal. Civ. C. §
9    3479. "A public nuisance is one which affects at the same time an entire community or
10   neighborhood, or any considerable number of persons, although the extent of the annoyance or
     damage inflicted upon individuals may be unequal." Cal. Civ. C. § 3480.

11       310.    In violation of Santa Clara City Code Chapter 8.30, Defendants have created a
12   public nuisance with conditions which are offensive or annoying to the senses, detrimental to
13   property values and community appearance, an obstruction to or interference with the comfortable
14   enjoyment of adjacent property or premises, and hazardous or injurious to the health, safety, or
15   welfare of the general public.

16       311.    In violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94) ,
17   Defendant's created conditions which are injurious to health, is indecent or offensive to the senses,
18   and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment
19   of life or property; and which affects at the same time an entire community or neighborhood, and
20   considerable number of persons.

21       312.    Defendants created an attractive nuisance in violation of Santa Clara City Code
22   8.30.020(c) by creating unsafe conditions directly adjacent to public parks and a public playground.
23   Defendants spread of smoke, dust, and fumes over a considerable area filled with private
24   residences, effects numerous people, and interferes with the use of public spaces is an express
     public nuisance under the Restatement 2nd of Torts Section 821(b) comment g.

25       313.    Defendants activities are injurious to health, including, but not limited to, the
26   indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere
27   with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use
28   of public streets, public creeks, public parks, and public squares.

314.    Defendants, who, at all times relevant herein, have owned and/or controlled the Property, have been on actual notice of the nuisance, and yet have failed to take reasonable steps to prevent or abate it. As a result of this failure, and of the Defendants' mismanagement of the Property, they have caused or contributed to an acutely serious threat to the health, safety, and welfare of those present at and around the Property, as well as persons in the surrounding community.

315.    The Plaintiff has no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described, and her prior attempt at private nuisance and ultrahazardous activities claims were dismissed due to the Defendant Apple's arguments about tolling of statute of limitations.

316.    Unless the nuisance described in this Complaint is abated, the surrounding community, neighborhood, and the residents of the City will suffer irreparable injury and damage, in that said conditions will continue to be injurious to the enjoyment and free use of the Premise by those who live and work near the Property as well as the general public.

317.    The harm created by Defendants actions and inactions is severe, imminent, prospective, and continuous. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

318.    Defendants conduct in creating and maintaining this nuisance violates dozens or hundreds of statutes and thus is a *per se* nuisance. Defendants creation and maintenance of public nuisance, and willful omission to perform legal duties relating to the removal of a public nuisance, are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health and Safety, Section 372.

319.    This case represents one of the most egregious examples of environmental non-compliance in recent history. A major corporation has operated an unpermitted semiconductor facility for nearly a decade, poisoning residents including their own employee, while regulatory agencies fail to act despite documented knowledge of extensive violations.

320.    Plaintiff is enabled to maintain an action for public nuisance because this public nuisance was especially injurious to herself. Plaintiff was harmed to a different degree and in a different kind, than the general public.

321.    The imminent and substantial endangerment to thousands of residents, including children playing in nearby parks, demands immediate action. Plaintiff has exhausted administrative remedies and has no alternative but to seek judicial enforcement of federal environmental laws designed to protect public health and the environment.

# RELIEF SOUGHT

322.    Plaintiff hereby demands a jury on all issues which can be heard by a jury.

323.    Plaintiff requests the following remedies against all Defendants, jointly and severally, except as specifically noted otherwise, and to the fullest extent authorized by law and deemed appropriate by this Court:

## XVIII.  INJUNCTIVE & DECLARATORY RELIEF

324.    Preliminary and permanent injunctive relief enjoining the Defendant's to comply with all provisions of the RCRA, CAA, CWA, EPCRA, and TSCA at the facility, and jointly and severally abate the consequences of their prior and ongoing violations.

325.    Preliminary and permanent injunctive relief enjoining the Defendant's to jointly and severally abate the consequences of having contributed and/or its contributing to the handling, storage, treatment, transportation and/or disposal of hazardous waste resulting in an imminent and substantial endangerment at and in the vicinity of the site, by developing and implementing a Remedial Action Plan, approved by the court, which fully abates the endangerment.

326.    Injunctive relief is required to ENFORCE the environmental laws that the Defendants are violating, including installation of required emission controls meeting all federal standards, and restoration of the environment caused by these violations.

327.    Injunctive relief is required to RESTRAIN the Defendants from continuing their violations of these environmental laws, including prohibiting all future unpermitted discharges into the air, water, and ground, and ordering a federal monitor to oversee compliance auditing.

328.    Injunctive relief is required to RESTRAIN the Defendants from maintaining their imminent and substantial risk of danger to the public and environment, including remediation of contamination, providing comprehensive air monitoring with real-time public disclosure, and community health monitoring program for all affected residents.

329.    A preliminary injunction is required to order the immediate CESSATION of all

1  semiconductor fabrication operations until full compliance is assured.

2      330.   COMPLIANCE    ORDERS    for    Cleanup    and    Remediation,    and
3  Monitoring/Reporting requirements.

4      331.   A DECLARATION that Defendants are in violation of the RCRA, CAA, CWA,
5  EPCRA, and TSCA.

6  ## XIX.  CIVIL PENALTIES

7      332.   All penalties available under applicable statutes with fines for federal violations to
8  be paid to the U.S. Treasury. Penalties should be enhanced for knowing and willful violations, and
9  should include recovery of economic benefits obtained by avoiding compliance.

10  ## XX.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS

11     333.   The maximum allowable of penalty funds should be directed towards community
12  projects including community air monitoring network installation and operation, medical
13  monitoring program for exposed residents (especially the children), environmental restoration of
14  contaminated areas, and emergency response capability enhancement.

15  ## XXI.  COSTS AND FEES

16     334.   Attorney's fees and costs; expert witness fees and technical consultant costs;
17  environmental investigation and monitoring costs; all other costs and fees the court deems proper.

18     335.   Note: Plaintiff is in Chapter 7 Bankruptcy in Boston and has disclosed this pending
19  litigation but does not believe it to be an "asset." In order to protect the integrity of this litigation,
20  which represents important public rights and interests, Plaintiff does not request any personal
21  damages; however does not waive her right to request such damages in other litigation, as a victim
22  of crime,  later in this litigation, and/or at other times.

23
24
25
26
27
28

# CERTIFICATION

336.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Filed: September 2 2025

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email:** legal@ashleygjovik.com
**Physical Address:** Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone:** (408) 883-4428

# CERTIFICATE OF SERVICE

1

2    I hereby certify that a true and correct copy of the Complaint and Summons will be served upon

3    the Defendants Apple Inc, Kalil/Khalil Jenab, City of Santa Clara.

4

In addition, Personal Service of the Complaint will be made to the U.S. Attorney General

5    pursuant to RCRA § 6972/§ 7002(b)(2)(F), Clean Air Act § 7604, Clean Water Act § 1365.

6

In addition, Certified Mail of the Complaint will be made to the U.S. Environmental Protection

7    Agency Administrator at 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460, pursuant to

RCRA § 6972/§ 7002(b)(2)(F), Clean Air Act § 7604, Clean Water Act § 1365.

8

9    In addition, in addition, electronic mail, or other courtesy notification will be sent to the

California EPA, San Jose Regional Wastewater Facility, Bay Area Air Quality Management

10    District, and U.S. EPA Enforcement and Compliance team.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28