**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJOVIK**, *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br><br> **APPLE INC.**, *a corporation*, <br><br> Defendant. | **Case No. 3:23-CV-04597-EMC** <br><br> **NOTICE OF PENDENCY** <br> Civil L.R. 3-13 |

# TABLE OF CONTENTS

NOTICE OF PENDENCY & CHANGE OF ADDRESS ....................................................... 3

U.S. EPA Enforcement Action ............................................................... 4

U.S. National Labor Relations Board (Threats/Retaliation Case No. 32-CA-282142; 283161) ............................................................................................. 4

U.S. National Labor Relations Board (Feb. 16 2026 Charge) ............................................. 5

U.S. National Labor Relations Board (Northeastern University Charges) ................... 6

Retaliation Cases (CERCLA, RCRA, etc.) with the U.S. Dept. of Labor Admin. Review Board & Defendant's Motion to Dismiss in the San Jose Courthouse ............................ 7

Expanded Citizen Suit against the City of Santa Clara (and Additional Parties). ......... 9

Injuries and Environmental Violations in Boston, MA & Claims against City of Boston, et al ............................................................................................ 10

CONCLUSION ................................................................................ 11

EXHIBITS ..................................................................................... 12

Exhibit A: EPA Settlement Agreement ........................................................... 13

Exhibit B: NLRB Settlement Discussion ......................................................... 14

Exhibit C: NLRB Complaint ..................................................................... 15

Exhibit D: NLRB Charge (Feb. 16 2026). ......................................................... 16

APPENDIX: PRIOR NOTICES OF PENDENCY ........................................................... 17

# NOTICE OF PENDENCY & CHANGE OF ADDRESS

The Plaintiff respectfully and promptly files this Notice of Pendency of **Other Action/ Proceeding under Civil Local Rule 3-13.** Exhibits are attached or filed concurrently where beneficial to consolidate for reference in this case.

Plaintiff intended to file this Notice earlier (as stated in the Jan. 6 2026 Joint Status at Dkt. 269 p. 9), however the Plaintiff had to first complete the research and drafting of her Boston-based CERCLA Petition/Clean Water Act Notice (a multi-purpose vehicle for those claims and which details her injuries, the harms, underlying facts, and responsible parties – the facts of which were not fully known until research was completed). That matter required an extensive amount of time and effort due to the complexity of the matter, occurred while the Plaintiff was still suffering injuries, and the disclosures were mandatory and urgent under bankruptcy law.

Upon discovering the nature of the acute harm and obtaining financial assistance to relocate, the Plaintiff urgently fled Boston and relocated to California as of Feb. 1 2026. While the Plaintiff's address with this Court does not need updated in the filing system because she used her LLC's address, she does notify this Court she now resides in California again. She is still insolvent, is now unhoused and living in a hotel in San Jose paid for by public donations, and with no permanent address. However, she is once again a resident of the great state of California.

Regarding the Notice of Pendency, the Plaintiff's provides a summary table below indicating the matters this Court may be most interested in reviewing or which are urgently pressing:

| PENDING MATTER | CONNECTION | ISSUE/ACTION |
|---|---|---|
| **US NLRB** | Remedies | Per the NLRB in Nov. 2025, Apple stated to the NLRB that Apple wants to settle the Plaintiff's retaliation claims against Apple. No further information was provided. |
| **ENV. CITIZEN SUIT (SAN JOSE)** | Causes of Action | Apple is asking Judge Pitts to "dismiss" causes of action in this case, from that case, even though they are not in that case. Apple is additionally asking Judge Pitts to issue findings on the merits of the claims in this case as a basis for dismissing claims int eh Env. Citizen Suit. |
| **BOSTON PERSONAL INJURY & ENV. CLAIMS** | Remedies; Contribution; Other. | The Plaintiff has suffered severe injuries and harm in Boston between Sept. 2023 and Jan. 2026 and it will provide Apple arguments about its own liability for harms caused by others. |

# U.S. EPA Enforcement Action

On Oct. 27 2025, the US EPA entered a Consent Agreement & Final Order with Apple over some of the hazardous waste violations from Aug. 2023 and Jan. 2024, reported to the EPA by the Plaintiff, and arising out of Plaintiff's testimony and evidence regarding Apple's illegal chip fab at 3250 Scott Blvd. See, *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025). (See, Exhibit A).

The EPA's press release stated that the enforcement action occurred due to "a tip and complaint from the public" (the Plaintiff) and Apple's hazardous waste violations created a risk to "human health and the environment in the community of Santa Clara." The Consent Agreement and press release noted that among other issues, Apple was not controlling its air emissions and had failed to install required air control technology at the facility. See, "EPA Takes Action Against Apple for Inadequate Hazardous Waste Management," Nov. 18 2025, https://www.epa.gov/newsreleases/epa-takes-action-against-apple-inadequate-hazardous-waste-management

The US EPA has also recently released documents to the Plaintiff through a FOIA requests which now publicly confirm there was a formal criminal enforcement investigation into Apple about Apple's violations and emissions at the chip fab, and that investigation also arose from the Plaintiff's complaints and disclosures. This is material for the Plaintiff's pending claim of employment retaliation due to the Plaintiff's status a victim of violent environmental crime and where Apple was the party who committed the crime that harm the Plaintiff, prior to Apple then also retaliating against the Plaintiff about the same injuries and violations. Additionally, the Bay Area Air Quality Management District violations and penalties are still pending a settlement with Apple (Facility No.: 22839).

# U.S. National Labor Relations Board
# (Threats/Retaliation Case No. 32-CA-282142; 283161)

The Plaintiff's NLRB cases 32-CA-282142 (filed August 26, 2021); 32-CA-283161 (filed September 16, 2021) were partially dismissed by Apple's own defense counsel on the same cases, who is now the General Counsel of the NLRB, which is a clear conflict of interest.

The NLRB served a revised Complaint against Apple on Sept. 25 2025 with a hearing scheduled

for Dec. 16 2025. (Exhibit C). The Plaintiff appealed the dismissals and the appeal is pending. On Nov. 21 2025, the NLRB Board Agent notified the Plaintiff that Apple "has expressed a strong interest in settling the cases." (Exhibit B). NLRB has not provided the Plaintiff additional information, Apple's counsel is this case have not commented on this, and Apple's separate counsel in the NLRB matter refuse to communicate directly with the Plaintiff.

# U.S. National Labor Relations Board
## (Feb. 16 2026 Charge)

On Feb. 16 2026 the Plaintiff filed new NLRB charge against Apple (Inq. No. 1-3770086421). (Exhibit D). The charge primarily covers Apple's conduct related to this litigation, including Apple creating and maintaining a seven-week-long gag order they used against the Plaintiff regarding her speech about subject matter expressly protected by the NLRA: including, her protests about Apple violating the NLRA, testimony about NLRB proceedings, and testimony about Protected Concerted Activity with her coworkers at Apple.

Further, Apple's conduct during the deposition included threats and unlawful work rules that expressly stated the Plaintiff required Apple's prior authorization before speaking with coworkers about work conditions, attempted to enforce the same policy terms Apple settled with the NLRB and the Plaintiff in April 2025 promising to withdraw those terms and not enforce them, and Apple repeatedly asked the Plaintiff why she thought she had a right to speak about work conditions or organize with her coworkers and complained when she tried to speak about labor rights during the deposition.

The Plaintiff mentioned this generally prior in the parties' Jan. 6 2026 Joint Status update ("*Defendant continues to abuse privilege and confidentiality claims and engaged in conduct during the Dec. 2025 deposition that likely violated the NLRA at least twice.*" Dkt. 269 at p. 9).

Subsequently, Apple finally narrowed its confidentiality designations beyond a blanket claim covering multiple hours regardless of the content of the speech captured in its general decree of secrecy; however those designations included and centered around the Plaintiff's anatomy, bodily movements, sexual activity and sex partners, and genital secretions. Worse, this testimony arose when the Plaintiff was complaining about Apple violating employee privacy related to these topics and was referencing Protected Concerted Activity where she was advocated on behalf of Apple employees for Apple to cease its improper

conduct and to respect the privacy and bodily autonomy of its employees.

This is all clearly a matter for the NLRB to review and this Court would have limited jurisdiction under *Garmon* preemption and the *Machinists* doctrine, but Apple also insisted that the discovery Magistrate Judge actually had exclusive jurisdiction to hear all of issues while Apple concurrently would claim the underlying subject matter of it designation is confidential and so they cannot tell the Judge that Apple's very secret designation is actually about the Plaintiff's "cervical mucus."

Ultimately, this was also another violation and illegal work rule by the Defendant attempting to forbid the Plaintiff from participating in NLRB Proceedings or from filing additional charges. The Plaintiff refuses to acknowledge Apple's illegitimate claims to confidentiality and accordingly has already shared its improper claims with her coworkers so they are aware of their employer's ongoing misconduct. She also indicated that if Apple moves to enforce its illegal destinations or punish her for exposing their most recent NLRA violations, she will file an additional NLRB charge, and, well, *turtles all the way down.*

## U.S. National Labor Relations Board (Northeastern University Charges)

Apple's counsel has recently indicated they intend to inject another NLRB matter into this Court's proceeding, with an adjudication against a different Employer (Northeastern University), and to raise legal and factual issues arising out of that external case with that non- party as part of this instant proceeding. Thus, the Plaintiff notifies this court she has pending NLRB charges against Northeastern University with a partial decision of merit issued in 2025 and an appeal pending for charges which the NLRB Board Agent previously said represented "the most extreme direct evidence of retaliation they had ever seen," prior to abruptly and inexplicably dismissing the same parts of those charges, promptly following the nomination of Apple's own defense counsel as the new NLRB General Counsel.

The NLRB case numbers are 01-CA-342355 & 01-CA-350371. Among other issues, the Plaintiff has complained for some time that there is strong circumstantial evidence indicating that Apple's lawyers conspired with counsel for Northeastern University regarding the university's retaliation against the Plaintiff, including the abrupt termination of her employment while she was on protected medical leave, suffering a severe nervous breakdown in the summer of 2024 due to the concurrent retaliation by the university and Apple. That alleged interference is now documented in the Plaintiff's Feb. 16 2026 NLRB

charge against Apple noted above, will statute of limitations tolling arising out of Apple's recent notice of an intent to subpoena Northeastern University for extensive records regarding the Plaintiff's protected activity at the university.

If Apple decides to inject that matter into this proceeding it will create a great deal of chaos as there were also multiple federal agency investigations into Northeastern University based on the Plaintiff's complaints and whistleblower disclosures, and the university's stated explanation for taking negative actions against the Plaintiff was that the Plaintiff was reporting compliance issues and labor law violations, and the university did not like that and told her to stop, and the university also ordered the Plaintiff to stop talking to her coworkers about work conditions, stop communicating with the university's legal and compliance departments, and also declared the Plaintiff does not understand "policies" or "regulations."

If Apple was involved in the Plaintiff's subsequent termination by the university, that's clearly a claim of Denylisting against Apple, and likely implicates Apple in Northeastern University's alleged labor law violations and federal grant fraud scheme (which was under investigation by the DOJ as of 2025 based on the Plaintiff's disclosures and complaints). Plaintiff also promptly disclosed this new counter-claim against Disputed Creditor Apple in her pending Chapter 7 Bankruptcy proceeding (25-11496) and her pending Adversary Proceeding against the Dept. of Education requesting student loan forgiveness due to Apple's retaliation (25-01104).

## Retaliation Cases (CERCLA, RCRA, etc.) with the U.S. Dept. of Labor Admin. Review Board & Defendant's Motion to Dismiss in the San Jose Courthouse

Plaintiff notifies the Court of the status of related proceedings involving several anti-retaliation claims also at issue in this action. Plaintiff has retaliation claims in this instant case under numerous environmental statutes including the CERCLA, Clean Water Act, and RCRA. She also has a pending adjudications under those statutes before the U.S. Department of Labor which have been generally stalled with the agency since 2021. The Dept. of Labor Administrative Law Judge dismissed the matter without an evidentiary hearing or any formal A.P.A. adjudication (5 U.S.C. § 554), under the theory that Apple has no liability for retaliation unless it is also a formally designated Potentially Responsible Party under CERCLA and the employee's work location is the same CERCLA site where the employer is the PRP,

which essentially nullified the CERCLA anti-retaliation statute nationally. The Plaintiff's appeal to the Administrative Review Board has been pending since Aug. 2024 with no updates from the Board.

CERCLA separately vests exclusive original jurisdiction over all controversies arising under CERCLA in the district courts (42 U.S.C. § 9613(b)). California whistleblower and labor codes also allow litigation of retaliation under those federal statutes outside of the Dept. of Labor, as what is scheduled in this case. If/when the Dept. of Labor adjudication is appealed it would be brought to this District Court (as the location nearest to the violations at issue, which occurred at the Triple Superfund site in Sunnyvale), but no statute or regulation establishes a standard of review for such an appeal and there have only ever been a handful of CERCLA retaliation cases since 1980.

This Court should also be aware that the Defendant has filed a Motion to Dismiss in the pending Citizen Environmental Suit (*Gjovik v Apple, Santa Clara, et al.*) before Judge Pitts, arguing that the Plaintiff has somehow pled and docketed retaliation litigation (under RCRA, CERCLA, and other statutes) in that case and is asking Judge Pitts to "dismiss" her non-existent causes of action from his proceeding under *Mendoza v. Amalgamated Transit*, 30 F.4th 879 (9th Cir. 2022). [1] (*See*, 5:25-cv-07360-PCP, Dkt. 60 at 36).[2]

The Citizen Suit Complaint references Plaintiff's termination as factual background and expressly identifies this action and the Department of Labor proceeding as the forums in which those claims are tracked. No retaliation cause of action is asserted in the Citizen Suit and no private retaliation claim could be asserted in a public law case with a private attorney general enforcing substantive federal environmental statutes. As a reminder, this Court also ruled that this case and the Citizen Suit case are unrelated, and the causes of action at issue in both cases have not changed following this Court's ruling. (Dkt. 261, *Related Case Order*). Apple appears to be attempting to obtain a favorable "dismissal" of Plaintiff's retaliation

---

[1] **Plaintiff**: "Defendant Apple also terminated the Plaintiff in violation of the RCRA's antiretaliation provision at 42 U.S. Code § 6971 ("employee protection"), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication. In 2025, NLRB took enforcement action against Apple over its unlawfully restrictive confidentiality policies and work rules, which prevented employees from discussing work conditions or reporting safety issues, including the Plaintiff, who was the Charging Party and party to the national settlement agreement. Concealment of safety risks only increases the dangers presented at The Chip Fab." (5:25-cv-07360-PCP, Dkt. 48 at 84, cited as a fact supporting the existence of an imminent and substantial endangerment to public health and the environment).

[2] **Defendant**: "Plaintiff concedes she already brought her anti-retaliation claims under RCRA. (See FAC ¶ 396.) She has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." See *Mendoza v. Amalgamated Transit Union Int'l,* 30 F.4th 879, 886 (9th Cir. 2022) (citation omitted). The Court should dismiss them." (5:25-cv-07360-PCP, Dkt. 60 at 36).

claims that actually dismisses nothing but will create confusion and additional chaos.

In the Citizen Suit, in the same Motion to Dismiss and mooted one prior, Apple also cites and includes the Plaintiff's mandatory Bankruptcy disclosures which include potential legal claims, as required by law and if she did not make such disclosures she could be charged with criminal fraud. Apple's motion asks to introduce Plaintiff's filing of potential legal claims and pending actions, as evidence to support some sort of allegation that all of Plaintiff's claims are meritless and she is some sort of vexatious litigant. Apple asks to have the Citizen Suit dismissed partially based on this theory, and such a decision by Judge Pitts would pre-judge all claims in this proceeding, prior to Summary Judgment or Trial.

Due to the Boston matters, frantic relocation, and all of the urgent and complex work being manufacturing by Apple's counsel, the Plaintiff has not even begun to prepare her three Oppositions to the three pending Motions to Dismiss. Her response is due to be filed in 3 days and accordingly she is filing a request for an extension to Judge Pitts following filing this Notice. However, if that request is denied or not responded by the deadline, Plaintiff's response (expected to be deficient and incomplete due to the timeline) may not adequately address what Apple is attempting to do, and may risk creating conflicting decisions / orders from other courts in this District regarding the claims in front of this Court for this case.

## Expanded Citizen Suit against the City of Santa Clara (and Additional Parties).

In Nov. 2025, while conducting research and drafting her Amended Complaint in the Environmental Citizen Suit (5:25-cv-07360), the Plaintiff discovered that Apple's chip fab at 3250 Scott Blvd (the basis of some of the protected activity in retaliation claim in this case, including the Crime Victim Retaliation claims), was actually located directly above an ancient creek (the Saratoga Creek System) which City of Saratoga had captured and hidden in a "storm drain" system in the 1960s-1970s, and routed to release into the San Tomas Creek as if it was stormwater runoff, erasing the creek from maps and never disclosing its secret presence under the San Tomas Industrial Park.

Additionally, research revealed that the San Tomas Industrial Park and surrounding areas around Great America and Agnew's, are geologically and hydrologically wetlands. The area was previously known as "Bayside" and the North/Central area of Santa Clara is an extension of the San Francsico Baylands directly adjacent to the National Wildlife Refuge. The area was also Prime Farm Land and the home to

internally famous orchardists and some of the original pioneers that settled Santa Clara and established what became known as the "Valley of Heart's Delight."

The City of Santa Clara and other Defendants illegally imprisoned and buried the Saratoga Creek, filled the wetlands and capped them with concrete, while installing "stormwater" systems to covertly drain the tidally influenced Bayland and active artesian water systems. Plaintiff also discovered that Apple's chip fab is located atop a two by three block, high pressure, shallow, poorly contained "artesian feature" with enough deep aquifer pressure to push water up 10-30 feet into the air above ground and risks to create a geyser – directly under Apple's chip fab full of extremely dangerous chemicals and gases, including many which react violently with water.

The Plaintiff filed her Amended Complaint on Nov. 29 2025 (5:25-cv-07360-PCP, Dkt. 48) and continued researching. Then on Dec. 11, 2025, the Plaintiff finalized a new Sixty-Day Notice, and initiated service of the Notice the US EPA, Attorney General, U.S. Army Corps, and Defendants pursuant to 33 U.S.C. § 1365(b) for violations of Clean Water Act including 33 U.S.C. § 1344. (5:25-cv-07360-PCP, Dkt. 55 at 9-87). The notice alleges that between approximately 1950 and 1985, the City of Santa Clara and various developers/corporations discharged fill material into Saratoga Creek System and adjacent jurisdictional wetlands, including filling at least five hundred acres of tideland-adjacent wet meadow through grading, placement of fill material, burial in pipes, and construction of residential and industrial development.

This included the installation of "drop" infrastructure that blocks Chinook Salmon migration and accordingly violates the Endangered Species Act. The fill material remains in place, and the buried creek continues flowing through underground infrastructure (under Apple's chip fab), each day the unpermitted fill remains constitutes a continuing violation, and Apple's pollution land directly into these waters. The expanded scope of the Citizen Suit primarily looks to the past filling but also greatly increases the risk associated with Apple's ongoing violations due to the potential structural failure caused by a ruptured geyser and resulting chemical explosion directly adjacent to 1,800+ residential apartments.

## Injuries and Environmental Violations in Boston, MA & Claims against City of Boston, et al.

The Plaintiff has suffered severe injuries in Boston, Massachusetts from Sept. 2023 – Jan. 2026.

These include extreme physical injuries and emotional distress, property damage, and economic damage including violations by external parties that directly led to the Plaintiff's inability to meet deadlines and actively participate in this proceeding. The Plaintiff had already initiated litigation against the several parties regarding the dangerous, unfinished 1864 basement she was renting however due to unfolding events and recently revealed facts, the situation became far more complex than expected.

Due to the Plaintiff's disclosure obligations in her Ch. 7 Bankruptcy (all potential legal claims) and in discovery in this proceeding (especially related to overlapping injuries) the Plaintiff dropped everything to research and drafts a complaint summarizing the violations and harms, and to seek federal government intervention in the matter, as it's also a wide-spread public safety issue and she is not the only one harmed. The Plaintiff will also need to withdraw her pending state litigation about the basement as the claims are expanded, must be first released in bankruptcy, and she'd need to refile in federal court in California.

The Plaintiff also, apparently, accidently stumbled into perhaps one of the most complex environmental violation cases and remediation sites in federal history, including discovering, what appears to be, a long-searched for geological formation (a bolide impact site) providing "proof" to a global hypothesis that may fundamentally change the scientific understating of the geology of New England and earth's modern history.  The Plaintiff also discovered she was living in the middle of a 200yr+ old cesspool full of sewage, deep sea organisms, decades of radioactive waste, ancient sewers under her floor allowing the tides to push sewer gases and marine organisms into her floor twice a day, and many other surprise detailed in Attachemnt 1. Apple was made aware of these events unfolding, Plaintiff requested Apple give her some space while she tries to work through it, and Apple responded by taking the actions described here-within.  The Boston-based claims were disclosed it the Plaintiff's Bankruptcy case on Feb. 13 2026 and the CERCLA Petition is being served to EPA, et al. via Certified Mail and with email notices.

# CONCLUSION

The Plaintiff respectfully submits this notice to ensure the Court is fully informed of pending and anticipated proceedings that may affect the claims, defenses, and efficient resolution of this action.

The Plaintiff will continue to keep the Court apprised of material developments in these related matters as they arise. If the Court would like any additional information or has any rquests for the Plaintiff or both parties, please let me/use know.

Respectfully,



**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

Dated: Feb. 17 2026

# EXHIBITS

**Exhibit A:**

- U.S. EPA Settlement Agreement (Oct. 27 2025)


**Exhibit B:**

- NLRB email re: settlement (Nov. 21 2025)


**Exhibit C:**

- NLRB Complaint (Sept. 25 2025).


**Exhibit D:**

- NLRB Charge and Cover Letter (Feb. 16 2026)


**Exhibit E: (filed at 5:25-cv-07360-PCP, Dkt. 55, p. 9-87).**
- Sixty Day Notice for Expanded Citizen Suit re: the Saratoga Creek System & the Santa Clara Baylands (Dec. 2025).


**Exhibit F (Attachment 1):**
- CERCLA Petition and Clean Water Act Citizen Suit Notice re: City of Boston, Commonwealth of Massachusetts, Boston University, Harvard University, Boston Medical Center/Boston City Hospital, Du Pont, P&G-Gillette, et al. (Feb. 13 2026).

# Exhibit A: EPA Settlement Agreement

FILED
Oct 27, 2025
2:45 pm
U.S. EPA REGION IX
HEARING CLERK
Regional .

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION IX

| | | |
|---|---|---|
| In the matter of: | ) | U.S. EPA Docket No. |
| | ) | |
| | ) | RCRA-09-2026-0006 |
| Apple, Inc. | ) | |
| CAR 000 278 176 | ) | |
| | ) | CONSENT AGREEMENT AND |
| | ) | FINAL ORDER PURSUANT TO |
| Respondent. | ) | 40 C.F.R. SECTIONS 22.13 AND |
| | ) | 22.18 |
| | ) | |

## CONSENT AGREEMENT

### A. PRELIMINARY STATEMENT

1. This is a civil administrative enforcement action instituted pursuant to Section 3008(a)(1) of the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6928(a)(1), and the Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties and the Revocation/Termination or Suspension of Permits, as codified at 40 C.F.R. Part 22 ("Consolidated Rules").

2. The Administrator has delegated enforcement authority under Section 3008 of RCRA, 42 U.S.C. § 6928, to the Regional Administrator of the EPA Region 9, who in turn has delegated this authority to the Director of the Enforcement and Compliance Assurance Division, hereinafter, "Complainant."

3. Respondent is Apple Inc., a California corporation ("Respondent").

4. This Consent Agreement and Final Order ("CA/FO"), which contains the elements of a complaint required by 40 C.F.R. § 22.14(a)(1)-(3) and (8), simultaneously commences and concludes this penalty proceeding, as authorized by 40 C.F.R. §§ 22.13(b) and 22.18(b)(2) and (3).

5. Complainant and Respondent agree that settling this action without the filing of a complaint or the adjudication of any issue of fact or law is in their respective interest and in the public interest.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

6. Notice of this action has been given to the State of California pursuant to Section 3008(a)(2) of RCRA, 42, U.S.C. § 6928(a)(2).

### B. PARTIES BOUND

7. This CA/FO shall apply to and be binding on Respondent, Respondent's officers, directors, partners, agents, employees, contractors, successors and assigns. Action or inaction of any persons, firms, contractors, employees, agents, or corporations acting under, through, or for Respondent shall not excuse any failure of Respondent to fully perform its obligations under this CA/FO. Changes in ownership, real property interest, or transfer of personal assets shall not alter Respondent's obligations under this CA/FO.

### C. STATUTORY AND REGULATORY FRAMEWORK

8. Subtitle C of RCRA requires the EPA Administrator to promulgate regulations establishing a hazardous waste management program. Section 3006 of RCRA, 42 U.S.C. § 6926, provides, *inter alia*, that authorized state hazardous waste management programs are carried out under Subtitle C of RCRA. Therefore, a violation of any requirement of a law under an authorized state hazardous waste program is a violation of a requirement of Subtitle C of RCRA.

9. The State of California received authorization to administer the hazardous waste management program in lieu of the federal program pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, and 40 C.F.R. Part 271, on or about August 1, 1992. This authorization was updated on September 26, 2001 (*see* 66 FR 49118, September 26, 2001), on October 7, 2011 (*see* 76 FR 62303, October 7, 2011), and again on January 14, 2020 (*see* 85 FR 2038, as corrected [*see* 86 FR 29207, June 1, 2021]). The authorized hazardous waste program is established pursuant to the Hazardous Waste Control Law, Chapter 6.5 of Division 20 of the California Health and Safety Code, and the regulations promulgated thereunder at Title 22, Division 4.5 of the California Code of Regulations, 22 C.C.R. §§ 66001 *et seq*. The State is authorized for all the hazardous waste management regulations referenced in this CA/FO.[1]

10. A violation of the State of California's authorized hazardous waste program, found at Health & Safety Code § 25100 *et seq.*, constitutes a violation of Subtitle C of RCRA and, therefore, a person who violates California's authorized hazardous waste program is subject to the powers vested in the EPA Administrator by Section 3008 of RCRA, 42 U.S.C. § 6928.

---

1. All citations to the "C.C.R." refer to Division 4.5 of Title 22 of the current California Code of Regulations. EPA is enforcing California hazardous waste management program requirements as approved and authorized by the United States. As a convenience, corresponding Federal citations are provided in brackets.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

11. Section 3008 of RCRA, 42 U.S.C. § 6928, authorizes the EPA Administrator to issue orders assessing a civil penalty and/or requiring compliance immediately or within a specified time for violation of any requirement of Subtitle C of RCRA, Section 3001 of RCRA et seq., 42 U.S.C. § 6921 *et seq*.

## D.    GENERAL ALLEGATIONS

12. In or about June 2023, EPA received a report of potential regulatory violations ("Tip and Complaint") at Respondent's facility located at 3250 Scott Boulevard, Santa Clara, California, EPA ID CAR 000 278 176 (the "Facility").

13. On August 17-18, 2023, and on January 16, 2024, EPA conducted inspections at the Facility. EPA informed Respondent that the EPA inspection was related to a Tip and Complaint from the public. During the August 17, 2023 inspection, EPA was accompanied by a representative of the Santa Clara Fire Department (the local Certified Unified Program Agency under California's hazardous waste program). During the August 18, 2023 inspection, both an EPA RCRA inspector and an EPA risk management program representative were onsite at the Facility.

14. During and after each inspection, EPA requested additional information from the Facility. Respondent provided responses to these inspection-related information requests from EPA.

15. On April 30, 2024, EPA sent Respondent a Notice of Violation and Request for Information pursuant to Section 3007(a) of RCRA, 42 U.S.C. § 6927(a).

16. On April 30, 2024, EPA sent Respondent a Compliance Evaluation Inspection Report containing findings, observations, and areas of concern from EPA's inspections and also identifying potential violations.

17. On November 6, 2024, EPA sent Respondent a second Request for Information pursuant to Section 3007(a) of RCRA, 42 U.S.C. § 6927(a).

18. Respondent provided responses to the Notice of Violation and to each Request for Information. Respondent also undertook compliance actions to address and resolve regulatory issues identified by EPA during the inspections and in related communications to Respondent, including areas of concern and potential violations.

19. On June 26, 2025, EPA sent Respondent a Notice of Potential Enforcement pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

20. Based upon the factual findings EPA made during the inspections that were initiated following review of the Tip and Complaint, and additional information obtained in connection with and subsequent to the inspections, EPA has determined that

3

In the Matter of Apple, Inc.
Consent Agreement and Final Order

Respondent violated California Health & Safety Code § 25100 *et seq*. and the regulations adopted pursuant thereto, as approved and authorized by the United States.

21.  Because Respondent has undertaken compliance actions to address and resolve regulatory issues identified by EPA during the inspections and in related communications to Respondent, including the issues described specifically in the Counts below, EPA is not requiring additional compliance actions in this CA/FO.

22. Respondent is a "person" as defined in 22 C.C.R. § 66260.10 [40 C.F.R. § 260.10].

23. Respondent is the "owner" and/or "operator" of a facility as defined in 22 C.C.R. § 66260.10 [40 C.F.R. § 260.10].

24. Respondent is a "generator" of hazardous waste as defined in 22 C.C.R. § 66260.10 [40 C.F.R. § 260.10].

25. Respondent is or has been engaged in "treatment," "storage," and/or "disposal" of "hazardous waste" as defined in 22 C.C.R. §§ 66260.10 and 66261.3 [40 C.F.R. §§ 260.10 and 261.3].

26. At the Facility, Respondent generates and accumulates, or has generated and accumulated, "hazardous waste" as defined in California Health & Safety Code § 25117, and 22 C.C.R. §§ 66260.10 and 66261.3 [*see also* RCRA § 1004(5), and 40 C.F.R. §§ 260.10 and 261.3]. These hazardous wastes include but are not limited to the following hazardous waste codes: D001, D002, D003, D004, D011, D035, F003 and F005.

27. At the time of the Inspection, Respondent did not apply for or have a permit or grant of interim status to store hazardous waste under 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1].

28. At the time of the Inspection and at all times relevant to this CA/FO, Respondent has generated over 1,000 kg of hazardous waste per calendar month, and is therefore considered a Large Quantity Generator pursuant to 22 C.C.R. § 66262.13 [40 C.F.R. § 262.13].

## Count I
### Failure to make an accurate waste determination

29. Paragraphs 1 through 28 above are incorporated herein by reference.

30. 22 C.C.R. § 66262.11 [40 C.F.R. § 262.11] requires a person who generates a waste, as defined by 22 C.C.R. § 66261.2, to determine if that waste is a hazardous waste. Pursuant to 22 C.C.R. §§ 66262.11(a)-(b), to make such a determination, the generator shall first determine if the waste is excluded from regulation under 22 C.C.R. § 66261.4

4

or Section 25143.2 of the California Health and Safety Code, and shall then determine if the waste is listed as a hazardous waste in Title 22, Division 4.5, Chapter 11, Article 4 of the California Code of Regulations, 22 C.C.R. §§ 66261.30-66261.50. The generator is then required to determine whether the waste exhibits any of the characteristics set forth in Title 22, Division 4.5, Chapter 11, Article 3 of the California Code of Regulations, 22 C.C.R. §§ 66261.20-66261.24.

31. During the inspection EPA observed six 1-gallon containers of corrosive waste and three small containers of unknown waste that were not marked as hazardous waste or dated, though they were subsequently determined to be hazardous waste. In addition, EPA inspectors observed that the contents of the 1700-gallon solvent waste tank were being managed as Non-RCRA Hazardous Waste Liquid (CA-133 waste).  Certain solvents utilized in Respondent's process are characteristic for ignitability (D001 waste) and/or corrosivity (D002 waste) when spent.

32. Respondent subsequently updated its characterization and management of the spent solvent waste stream to comply with RCRA requirements.

33.  EPA alleges that by failing to determine if these wastes were hazardous wastes in accordance with 22 C.C.R. §§ 66261.20-24, Respondent failed to make an accurate hazardous waste determination in violation of 22 C.C.R. § 66262.11 [40 C.F.R. § 262.11].

## Count II
### Failure to determine land disposal restriction requirements and provide written notification of determination

34. Paragraphs 1 through 28 above are incorporated herein by reference.

35. 22 C.C.R. § 66268.7(a) [40 C.F.R. § 268.7(a)] requires a generator of hazardous waste to determine if waste has to be treated before it can be land disposed, to certify that the waste has been examined and that an appropriate Land Disposal Restriction (LDR) determination has been made, to notify an off-site facility receiving waste of the appropriate LDR determination, and to maintain on-site any records relied upon to make an appropriate LDR determination.  Alternatively, the generator may choose not to make the determination of whether the waste requires treatment, in which case the generator must notify the receiving facility of the applicable hazardous waste codes and direct the facility to make the appropriate determination, and place a copy of the notification in the generator's file.

36. During the inspection and attendant records review EPA observed that on 105 days between June 29, 2022, and March 1, 2024, Respondent shipped hazardous waste from the solvent waste tank offsite for treatment or disposal under the waste code CA-133 (California-only hazardous waste – water with solvents), and without an accompanying RCRA hazardous waste code. Respondent did not notify the off-site receiving facility of

In the Matter of Apple, Inc.
Consent Agreement and Final Order

the LDR determination for this waste stream (with appropriate records) nor direct the receiving facility to make such determination.

37. Respondent subsequently updated its characterization and management of the spent solvent waste stream to comply with RCRA requirements.

38.  EPA alleges that by failing to determine whether hazardous waste from the solvent waste tank met LDR standards (with appropriate records and notification to the receiving facility) or to direct the receiving facility to make such a determination (with identification of applicable RCRA hazardous waste codes), Respondent violated 22 C.C.R. § 66268.7(a) [40 C.F.R. § 268.7(a)].

## Count III
### Accumulation of hazardous waste over 90 days in central accumulation area

39. Paragraphs 1 through 28 above are incorporated herein by reference.

40. 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1] requires that, with certain exceptions, owners and operators must have interim status or obtain a permit for treatment, storage, or disposal of hazardous waste.

41. 22 C.C.R. § 66262.17(a) [40 C.F.R. § 262.17(a)] exempts generators of hazardous waste from the permit requirements of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1] and allows generators to accumulate hazardous waste on-site for up to ninety days provided that they meet certain conditions.

42. During the inspection EPA observed one 5-gallon waste container containing D002 waste that had been stored at the Facility for more than ninety days. The container was stored on-site from March 2, 2023, until August 17, 2023, when it was sent off-site for disposal.

43. Where a generator fails to comply with the conditional requirements for the permit exemption, it is operating a hazardous waste management facility without a permit in violation of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1]. Therefore, EPA alleges that Respondent operated without a permit for storage of hazardous waste in violation of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1] due to failure to meet the condition for exemption in 22 C.C.R. § 66262.17(a) [40 C.F.R. § 262.17(a)] limiting hazardous waste accumulation time to 90 days.

## Count IV
### Failure to determine applicability of air emission standards for tanks and to control air emissions from the Solvent Waste Lift Station tank

44. Paragraphs 1 through 28 above are incorporated herein by reference.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

45. 22 C.C.R. § 66265.1085(b) [40 C.F.R. § 265.1085(b)] states that the owner or operator of a tank subject to Subpart CC shall control air pollutant emissions from each tank, and 22 C.C.R. § 66265.1085(c) [40 C.F.R. § 265.1085(c)] describes the requirements for Tank Level 1 controls, including that each opening on a fixed roof be either equipped with a closure device or connected by a closed-vent system that is vented to a control device.

46. During the inspection and attendant document review, EPA determined that the solvent waste lift station tank is a "tank" within the meaning of 22 C.C.R. § 66260.10 [40 C.F.R. § 260.10].

47. During the inspection and attendant document review, EPA observed that piping from the solvent waste lift station tank that may contain solvent exhaust was connected to the general exhaust system, which vents directly to the atmosphere.

48. In response to EPA's observations, Respondent subsequently installed a conservation pressure/vacuum breather vent to serve as a closure device on the solvent waste lift station tank.

49. EPA alleges that Respondent violated 22 C.C.R. § 66265.1085(b) [40 C.F.R. § 265.1085(b)] by failing to route emissions from the solvent waste lift station tank to an appropriate control device.

<u>Count V</u>
**Failure to label containers as to their contents and with dates clearly visible for inspection**

50. Paragraphs 1 through 28 and 40 above are incorporated herein by reference.

51. 22 C.C.R. § 66262.17(a)(5)(A) [40 C.F.R. § 262.17(a)(5)(i)] exempts generators of hazardous waste from the permit requirements of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1] and allows generators to accumulate hazardous waste on-site for up to 90 days provided that they meet certain conditions, including that that waste is accumulated in containers that are labelled and clearly marked for visual inspection with: the words "Hazardous Waste;" the composition and physical state of the wastes; an indication of the hazards of the contents; and the date upon which the period of accumulation began.

52. During the August 17, 2023 inspection EPA documented two 5-gallon containers of corrosive (D002) waste in Respondent's central accumulation area that were not labelled or dated, and eleven 5-gallon containers of corrosive (D002) waste with labels that were not clearly visible for inspection. During the January 16, 2024 inspection, EPA documented three 5-gallon containers of corrosive (D002) waste in Respondent's central accumulation area and eight 5-gallon containers of ignitable (D001) waste with labels that were not clearly visible for inspection.

53. Where a generator fails to comply with the conditional requirements for the permit exemption, it is operating a hazardous waste management facility without a permit in violation of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1]. Therefore, EPA alleges that Respondent operated without a permit for storage of hazardous waste in violation of 22 C.C.R. § 66270.1 [40 C.F.R. § 270.1] due to failure to meet the condition for exemption in 22 C.C.R. § 66262.17(a)(5)(A) [40 C.F.R. § 262.17(a)(5)(i)] relating to labelling of hazardous waste storage containers.

## Count VI
### Failure to follow container management standards for central accumulation area

54. Paragraphs 1 through 28 above are incorporated herein by reference.

55. 22 C.C.R. § 66265.173(a) [40 C.F.R. § 265.173(a)] states that a container holding hazardous waste shall always be closed during accumulation, except when it is necessary to add or remove waste.

56. During the inspection, EPA observed one 55-gallon container marked as corrosive liquid (D002) that was open in Respondent's central accumulation area.

57. EPA alleges that Respondent violated 22 C.C.R. § 66265.173(a) [40 C.F.R. § 265.173(a)] by failing to follow container management standards, specifically, with respect to the one 55-gallon container that was open, to maintain containers closed, in the central accumulation area.

## Count VII
### Failure to perform and document daily inspections of hazardous waste tank

58. Paragraphs 1 through 28 above are incorporated herein by reference.

59. 22 C.C.R. § 66265.195 [40 C.F.R. § 265.195] requires the owner or operator of a tank system to inspect at least once each operating day and to document in the operating record that specific items enumerated in the regulation have been inspected.

60. During the inspection and attendant record review, EPA determined that Respondent failed to perform and document daily inspections on its solvent waste lift station tank, and failed to perform and document inspections of its solvent waste tank on weekends and holidays when there was hazardous waste being stored in the tanks.

61. EPA alleges that Respondent violated 22 C.C.R. § 66265.195 [40 C.F.R. § 265.195] by failing to perform daily inspections of the solvent waste lift station tank and solvent waste tank.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

## E.    CIVIL PENALTY

62. Respondent agrees to pay a civil penalty in the amount of TWO HUNDRED SIXTY-ONE
THOUSAND TWO HUNDRED EIGHTY-THREE DOLLARS ($261,283) ("Assessed Penalty")
within thirty (30) calendar days of the Effective Date of this CA/FO. The Effective Date of
this CA/FO as defined in Section K, below, is the date the Final Order, signed by the
Regional Judicial Officer, is filed with the Regional Hearing Clerk.

63. Respondent shall pay the Assessed Penalty and any interest, fees, and other charges due
using any method, or combination of appropriate methods, as provided on the EPA
website: https://www.epa.gov/financial/makepayment. For additional instructions see:
https://www.epa.gov/financial/additional-instructions-making-payments-epa.

64. When making a payment, Respondent shall:

   a. Identify every payment with Respondent's name and the docket number of this
   Agreement, RCRA-09-2026-0006.

   b. Concurrently with any payment or within 24 hours of any payment, Respondent
   shall serve proof of such payment to the following persons via electronic mail:

   **Regional Hearing Clerk**
   U.S. Environmental Protection Agency, **Region 9**
   R9HearingClerk@epa.gov

   Christopher Rollins
   Enforcement and Compliance Assurance Division
   U.S. Environmental Protection Agency - Region 9
   rollins.christopher@epa.gov

   and

   U.S. Environmental Protection Agency
   Cincinnati Finance Center
   CINWD_AcctsReceivable@epa.gov

   "Proof of payment" means, as applicable, a copy of the check, confirmation of credit
   card or debit card payment, or confirmation of wire or automated clearinghouse
   transfer, and any other information required to demonstrate that payment has been
   made according to EPA requirements, in the amount due, and identified with the
   appropriate docket number and Respondent's name.

65. Interest, Charges, and Penalties on Late Payments. Pursuant to 31 U.S.C. § 3717, 31
C.F.R. § 901.9, and 40 C.F.R. § 13.11, if Respondent fails to timely pay the full amount of

In the Matter of Apple, Inc.
Consent Agreement and Final Order

the Assessed Penalty per this Agreement, EPA is authorized to recover, in addition to the amount of the unpaid Assessed Penalty, the following amounts.

  a.  Interest. Interest begins to accrue from the Filing Date. If the Assessed Penalty is paid in full within thirty (30) days, interest accrued is waived. If the Assessed Penalty is not paid in full within thirty (30) days, interest will continue to accrue until any unpaid portion of the Assessed Penalty as well as any interest, penalties, and other charges are paid in full. To protect the interests of the United States the rate of interest is set at the IRS large corporate underpayment rate, any lower rate would fail to provide Respondent adequate incentive for timely payment.

  b.  Handling Charges. Respondent will be assessed monthly a charge to cover EPA's costs of processing and handling overdue debts. If Respondent fails to pay the Assessed Penalty in accordance with this Agreement, EPA will assess a charge to cover the costs of handling any unpaid amounts for the first thirty (30) day period after the Filing Date. Additional handling charges will be assessed every thirty (30) days, or any portion thereof, until the unpaid portion of the Assessed Penalty as well as any accrued interest, penalties, and other charges are paid in full.

  c.  Late Payment Penalty. A late payment penalty of six percent (6%) per annum, will be assessed monthly on all debts, including any unpaid portion of the Assessed Penalty, interest, penalties, and other charges, that remain delinquent more than ninety (90) days. Any such amounts will accrue from the Filing Date.

66. Late Penalty Actions. In addition to the amounts described in the prior Paragraph, if Respondent fails to timely pay any portion of the Assessed Penalty, interest, or other charges and penalties per this Agreement, EPA may take additional actions. Such actions EPA may take include, but are not limited to, the following.

  a.  Refer the debt to a credit reporting agency or a collection agency, per 40 C.F.R. §§ 13.13 and 13.14.

  b.  Collect the debt by administrative offset (i.e., the withholding of money payable by the United States government to, or held by the United States government for, a person to satisfy the debt the person owes the United States government), which includes, but is not limited to, referral to the Internal Revenue Service for offset against income tax refunds, per 40 C.F.R. Part 13, Subparts C and H.

  c.  Suspend or revoke Respondent's licenses or other privileges, or suspend or disqualify Respondent from doing business with EPA or engaging in programs EPA sponsors or funds, per 40 C.F.R. § 13.17.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

   d.  Refer this matter to the United States Department of Justice for litigation and
       collection, per 40 C.F.R. § 13.33.

67. <u>Allocation of Payments.</u> Pursuant to 31 C.F.R. § 901.9(f) and 40 C.F.R. § 13.11(d), a
    partial payment of debt will be applied first to outstanding handling charges, second to
    late penalty charges, third to accrued interest, and last to the principal that is the
    outstanding Assessed Penalty amount.

68. <u>Tax Treatment of Penalties.</u> Penalties, interest, and other charges paid pursuant to this
    Agreement shall not be deductible for purposes of federal taxes.

## F.    ADMISSIONS AND WAIVERS OF RIGHTS

69. In accordance with 40 C.F.R. § 22.18(b), for the purpose of this proceeding, Respondent:

    a.  admits the jurisdictional allegations of this CA/FO;

    b.  neither admits nor denies specific factual allegations contained in this CA/FO;

    c.  consents to the assessment of any stated civil penalty, to the issuance of any
        specified compliance or corrective action order, and to any conditions specified
        in this CA/FO; and

    d.  waives any right to contest the allegations and its right to appeal the proposed
        final order accompanying this consent agreement.

70. By signing this Consent Agreement, Respondent waives any rights or defenses that
    Respondent has or may have for this matter to be resolved in federal court, including
    but not limited to any right to a jury trial, and waives any right to challenge the
    lawfulness of the final order accompanying the consent agreement.

## G.    CERTIFICATION OF COMPLIANCE

71. In executing this CA/FO, Respondent certifies under penalty of law to EPA that it has
    taken steps necessary to comply with RCRA, 42 U.S.C. § 6901 *et seq.*, and its
    implementing regulations for the specific violations at the Facility alleged in this CA/FO.

72. This certification is made to the best of Respondent's knowledge and belief formed after
    reasonable inquiry of individuals immediately responsible for compliance at the Facility.

## H.    DELAY IN PERFORMANCE/STIPULATED PENALTIES

73. In the event Respondent fails to meet any requirement set forth in this CA/FO,
    Respondent shall pay stipulated penalties as follows: FIVE HUNDRED DOLLARS ($500)

In the Matter of Apple, Inc.
Consent Agreement and Final Order

per day for the first to fifteenth day of delay, ONE THOUSAND DOLLARS ($1,000) per day for the sixteenth to thirtieth day of delay, and FIVE THOUSAND DOLLARS ($5,000) per day for each day of delay thereafter. For the purposes of this Section, Respondent's obligation to meet any and all requirements set for this in this CA/FO shall include completion of any and all activities required under this CA/FO in a manner acceptable to EPA and within the specified time schedules in and approved under this CA/FO.

74. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations.

75. Stipulated penalties shall begin to accrue on the day after performance is due and shall continue to accrue through the final day until performance is complete. All stipulated penalties owed to EPA shall be due within thirty (30) days of receipt by Respondent of a notification of noncompliance. Such notification shall describe the noncompliance and shall indicate the amount of penalties due.

76. In addition to any stipulated penalties assessed, interest and penalties shall accrue in accordance with 40 C.F.R. § 13.11.

77. Payment of stipulated penalties shall be made in accordance with the procedure set forth for payment of penalties in Section E of this CA/FO.

78. The payment of stipulated penalties specified in this Section shall not be deducted by Respondent or any other person or entity for federal taxation purposes.

79. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CA/FO.

I.    **RESERVATION OF RIGHTS**

80. In accordance with 40 C.F.R. § 22.18(c), full compliance with this CA/FO shall only resolve Respondent's liability for federal civil penalties for the violations specifically alleged herein and does not in any case affect the right of the EPA to pursue appropriate injunctive or other equitable relief or criminal sanctions for any violations of law.

81. This CA/FO is not a permit or modification of any existing permit issued pursuant to any federal, state, or local laws or regulations. This CA/FO shall in no way relieve or affect Respondent's obligations under any applicable federal, state or local laws, regulations, or permits.

82. Nothing in this CA/FO shall be construed to limit the authority of the EPA to take enforcement action against Respondent for any future violations of RCRA and the

In the Matter of Apple, Inc.
Consent Agreement and Final Order

implementing regulations, including the authorized California hazardous waste program, and to enforce the terms and conditions of this CA/FO.

83. Respondent reserves any and all rights to dispute the merits of, and to contest or otherwise challenge, the factual and legal allegations contained in this CA/FO in any proceeding unrelated to the implementation of this CA/FO initiated by EPA, and this CA/FO shall not be construed to limit any of Respondent's rights or defenses in any proceeding unrelated to implementation of this CA/FO initiated by EPA.

## J.    MISCELLANEOUS

84. This CA/FO can be signed in counterparts.

85. The headings in this CA/FO are for convenience of reference only and shall not affect interpretation of this CA/FO.

86. Each party to this action shall bear its own costs and attorneys' fees.

87. EPA and Respondent consent to entry of this CA/FO without further notice.

88. By signing this CA/FO, Respondent acknowledges that this CA/FO will be available to the public and agrees that this CA/FO does not contain any confidential business information or personally identifiable information.

89. Pursuant to 26 U.S.C. § 6050X and 26 C.F.R. § 1.6050X-1, EPA is required to send to the Internal Revenue Service ("IRS") annually, a completed IRS Form 1098-F ("Fines, Penalties, and Other Amounts") with respect to any court order or settlement agreement (including administrative settlements), that require a payor to pay an aggregate amount that EPA reasonably believes will be equal to, or in excess of, $50,000 for the payor's violation of any law or the investigation or inquiry into the payor's potential violation of any law, including amounts paid for "restitution or remediation of property" or to come "into compliance with a law." EPA is further required to furnish a written statement, which provides the same information provided to the IRS, to each payor (i.e., a copy of IRS Form 1098-F). Failure to comply with providing IRS Form W-9 or Tax Identification Number ("TIN"), as described below, may subject Respondent to a penalty, per 26 U.S.C. § 6723, 26 U.S.C. § 6724(d)(3), and 26 C.F.R. § 301.6723-1. To provide EPA with sufficient information to enable it to fulfill these obligations, Respondent shall complete the following actions as applicable:

   a. Respondent shall complete an IRS Form W-9 ("Request for Taxpayer Identification Number and Certification"), which is available at https://www.irs.gov/pub/irs-pdf/fw9.pdf;

In the Matter of Apple, Inc.
Consent Agreement and Final Order

    b.  Respondent shall therein certify that its completed IRS Form W-9 includes Respondent's correct TIN or that Respondent has applied and is waiting for issuance of a TIN;

    c.  Respondent shall email its completed Form W-9 to Jessica Chalifoux in EPA's Cincinnati Finance Department at chalifoux.jessica@epa.gov, on or before the date the Respondent's penalty payment is due, pursuant to Paragraph 65, or within 7 days should the order become effective between December 15 and December 31 of the calendar year. EPA recommends encrypting IRS Form W-9 email correspondence; and

    d.  In the event that Respondent has certified in its completed IRS Form W-9 that it does not yet have a TIN but has applied for a TIN, Respondent shall provide EPA's Cincinnati Finance Division with Respondent's TIN, via email, within five (5) days of Respondent's receipt of a TIN issued by the IRS.

## K.    EFFECTIVE DATE

90. In accordance with 40 C.F.R. §§ 22.18(b)(3) and 22.31(b), the effective date of this CA/FO (Effective Date) shall be the date that the Final Order contained in this CA/FO, having been approved and issued by the Regional Judicial Officer, is filed with the Regional Hearing Clerk.

IT IS SO AGREED.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

FOR RESPONDENT, APPLE INC.:

10/23/2025
**Date**

Elizabeth Schmidt
Director of Environment, Health and Safety
Apple Inc.

In the Matter of Apple, Inc.
Consent Agreement and Final Order

FOR COMPLAINANT, U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION IX:

AMY MILLER-
BOWEN

Digitally signed by AMY
MILLER-BOWEN
Date: 2025.10.27 09:27:12
-07'00'

Amy C. Miller-Bowen, Director
Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region IX

16

In the Matter of Apple, Inc.
Consent Agreement and Final Order

## **FINAL ORDER**

IT IS HEREBY ORDERED that this Consent Agreement and Final Order pursuant to 40 C.F.R.
Sections 22.13 and 22.18 (U.S. EPA Docket No. RCRA-09-2026-0006 be entered and that
Respondent pay a civil penalty of TWO HUNDRED SIXTY-ONE THOUSAND TWO HUNDRED
EIGHTY-THREE DOLLARS ($261,283), due within thirty (30) days from the Effective Date of this
Consent Agreement and Final Order, in accordance with all terms and conditions of this
Consent Agreement and Final Order.

This Final Order shall be effective upon filing by the Regional Hearing Clerk.

Beatrice
Wong

Digitally signed by
Beatrice Wong
Date: 2025.10.27
14:43:39 -07'00'

**Beatrice Wong**
**Regional Judicial Officer**
**United States Environmental Protection Agency,**
**Region IX**

## CERTIFICATE OF SERVICE

I certify that the original of the fully executed Consent Agreement and Final Order in the matter of Apple, Inc. (Docket No. RCRA-09-2026-0006) was filed with Regional Hearing Clerk, U.S. EPA, Region IX, 75 Hawthorne Street, San Francisco, CA 94105, and that a true and correct copy of the same was served on the parties, via electronic mail, as indicated below:

**RESPONDENT:**              Elizabeth Schmidt
                             Director of Environment, Health and Safety
                             1 Apple Park Way, M/S 319 EHS
                             Cupertino, CA 95014
                             Eschmidt@apple.com

**COMPLAINANT:**             Tessa Allen
                             Assistant Regional Counsel
                             U.S. EPA – Region IX
                             Hazardous Waste Section II (ORC-3-2)
                             75 Hawthorne Street
                             San Francisco, CA 94105
                             Allen.Tessa@epa.gov

Tu, Ponly    Digitally signed by Tu, Ponly
             Date: 2025.10.27
             14:46:46 -07'00'
_____
Ponly Tu
Regional Hearing Clerk
Office of Regional Counsel, Region IX

cc (via email):
Tara Frost, U.S. EPA, Frost.Tara@epa.gov
Christopher Rollins, U.S. EPA, Rollins.Christopher@epa.gov
Augustus Winkes, Beveridge & Diamond PC, Awinkes@bdlaw
Aaron Goldberg, Beveridge & Diamond PC, Agoldberg@bdlaw.com

# Exhibit B:
# NLRB Settlement Discussion

## NLRB Case 32-CA-282142 & 32-CA-283161 Apple Inc. (status of hearing)

| | |
|---|---|
| From | Pereda, Elvira <Elvira.Pereda@nlrb.gov> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| Date | Friday, November 21st, 2025 at 11:22 AM |

**CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulations at 32 CFR Part 2002 apply to all executive branch agencies that designate or handle information that meets the standards for CUI.

Good morning Ashley,

Hope you're doing well. I wanted to let you know that in the coming days, the Region is going to be issuing a order postponing the hearing regarding the two above cases. The Employer has expressed a strong interest in settling the cases. If the Employer signs off on a settlement, the Region will then provide you with an opportunity to review the settlement.

If you have any questions, feel free to give me a call. My schedule is pretty flexible on Monday and Tuesday of next week.

Thanks,

Elvira T. Pereda

Field Attorney| National Labor Relations Board | Region 21
312 N. Spring Street 10th Fl., Los Angeles, CA 90012
✉ Elvira.Pereda@nlrb.gov | ☎ (213) 634-6512 | | 🖷 (213) 894-2778

Parties must electronically file documents through https://www.nlrb.gov/cases-decisions/filing

Follow us on Twitter: @NLRB/@NLRBGC
Twitter en Español: @NLRBes/@NLRBGCes

NLRB on Facebook: https://www.facebook.com/NLRBpage
NLRB en Español: https://www.nlrb.gov/es

Please be aware that this email may be subject to public disclosure under the Freedom of Information Act or other authorities, though exceptions may apply for certain case-related information, personal privacy, and other matters.

# Exhibit C:
# NLRB Complaint

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**


**APPLE INC.**

    **and**                                **Cases  32-CA-282142**
                                                  **32-CA-283161**

**ASHLEY MARIE GJØVIK, an Individual**


**ORDER SEVERING CASES, AMENDED COMPLAINT**
**AND NOTICE OF HEARING**


On December 18, 2024, an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Consolidated Complaint) issued in these matters. Thereafter, on September 25, 2025, an Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 issued.

Accordingly, IT IS HEREBY ORDERED that Case 32-CA-283161 is SEVERED from Case 32-CA-282142.

Pursuant to Section 102.17 of the Rules and Regulations of the National Labor Relations Board (the Board), the Consolidated Complaint and Notice of Hearing issued on December 18, 2024, is amended as follows:

This Amended Complaint is based on a charge in Case 32-CA-282142 filed by Ashley Marie Gjøvik (Charging Party). It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 and 102.17 of the Board's Rules and Regulations and alleges that Apple Inc. (Respondent) has violated the Act as described below:

1.    (a)    The original charge in Case 32-CA-282142 was filed by the Charging Party on August 26, 2021, and a copy was served on Respondent by U.S. mail on August 30, 2021.

(b)    The amended charge in Case 32-CA-282142 was filed by the Charging Party on April 1, 2022, and a copy was served on Respondent by U.S. mail on April 4, 2022.

2.    (a)    At all times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, California has retail facilities throughout the United States, has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

(b)    Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

3.    At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

4.    At all material times, the following individuals held the position set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| Jenna Waibel | Corporate Employee Relations Representative |
| David Powers | Software Development Engineering Director |
| Ekelemchi Okpo | Corporate Employee Relations Representative |

5.    About March 22, 2021, Respondent, by David Powers, by telephone:

(a)    Directed employees to refrain from talking about workplace environmental health and safety concerns with other employees.

(b)    Impliedly threatened employees with discipline by telling employees that the instruction to refrain from talking about workplace environmental health and safety concerns with other employees, was a warning.

6.    About April 27, 2021, Respondent, by Jenna Waibel:

(a)    By telephone, told employees to use the following five-point balancing test in advance of communicating workplace health and safety concerns to other employees:

- o  make sure the information is complete

- o  make sure the information is accurate

- o  that it does not cause panic

- o  that it does not make an assessment about safety; and

- o  that people talk to the Employer's Environmental Health and Safety (EHS) department directly.

(b)    By email, told employees that when discussing terms and conditions of employment, they should ensure that the information shared was as accurate and complete as possible.

(c)    By email, told employees to refrain from discussing their terms and conditions of employment by telling employees to first communicate their workplace health and safety concerns directly with Respondent.

7.    Respondent, by Ekelemchi Okpo:

(a)    About August 4, 2021, during a video meeting, directed employees not to use Slack while on administrative leave in connection with Respondent's investigation into employees' concerns about working conditions.

(b)    About August 5, 2021, by email, told employees that he was "disappointed" that they "misrepresented" their discussion on August 4, 2021.

8.    By the conduct described above in paragraphs 5 through 7 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

9.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be **electronically filed with this office on or before Thursday, October 9, 2025.**  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website pursuant to Section 102.5(c) of the Board's Rules and Regulations.  To file electronically, go to the E-Filing tab on nlrb.gov, click on **E-File Case Documents**, and follow the detailed instructions.  The responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed or electronically signed by counsel or non-attorney representative for represented parties or by the party if not

represented. See Sections 102.7 and 102.21.  Service of the answer on each of the other parties must be by email, if possible, or in accordance with Section 102.5(g) of the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## **NOTICE OF HEARING**

PLEASE TAKE NOTICE THAT on **December 16, 2025,** at 9:00 am. at the National Labor Relations Board, Region 21, 312 N. Spring Street, 10th Floor, Los Angeles, CA 90012, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this amended complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: September 25, 2025

David Selder, Acting Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

# Exhibit D:
# NLRB Charge (Feb. 16 2026).

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Apple Inc | b. Tel. No.<br>(408) 996-1010 |
|---|---|
| | c. Cell No. |
| | f. Fax. No. |

| d. Address *(Street, city, state, and ZIP code)*<br>One Apple Park Way<br><br>CA Cupertino 95014 | e. Employer Representative<br><br>Tim  Donald Cook<br>CEO | g. e-mail<br><br>tcook@apple.com |
|---|---|---|
| | | h. Number of workers employed<br>500 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Computer Hardware | j. Identify principal product or service<br>Consumer technology |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections)  1,4                                             of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

### 2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*<br>Ashley Marie Gjovik | |
|---|---|

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>2108 N. St  Ste. 4553<br>CA Sacramento  95816 | 4b. Tel. No.<br>(415) 964-6272 |
|---|---|
| | 4c. Cell No.<br>(415) 964-6272 |
| | 4d. Fax No. |
| | 4e. e-mail<br>ashleymgjovik@protonmail.com |

| 5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)* |
|---|

### 6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| | | |
|---|---|---|
| _(signature of representative or person making charge)_ | Ashley Marie Gjovik<br>_(Print/type name and title or office, if any)_ | Tel. No.<br>(415) 964-6272 |
| | | Office, if any, Cell No.<br>(415) 964-6272 |
| Address   2108 N. St  Ste. 4553<br>Sacramento  CA 95816          Date  02/16/2026 11:59:50 PM | | Fax No. |
| | | e-mail<br>ashleymgjovik@protonmail.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

# Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, discussing wages, hours, or other terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Threats, gag orders, denylisting, & retaliation | |

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Threats, gag orders, denylisting, & retaliation | |

**8(a)(4)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) filed charges or cooperated with the NLRB.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Threats, gag orders, denylisting, & retaliation | |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prohibit employees from discussing wages, hours, or other terms or conditions of employment.

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from contacting and/or filing charges with the National Labor Relations Board.

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from engaging in protected concerted activities.

| Work Rule |
|---|
| Unlawful surveillance |
| Unlawful seven-week gag order on PCA |

| |
|---|
| Unlawful gag order on PCA about bodily autonomy |
| Unlawful demand for prior "whitelisting" of PCA |
| Unlawful prohibition on filing Board charges |
| Violation of Settlement Agreement |

**Ashley M. Gjovik, JD**
*In Propria Persona*
San Jose, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
legal@ashleygjovik.com

# UNITED STATES

# NATIONAL LABOR RELATIONS BOARD

**ASHLEY M. GJOVIK,**

*an individual*,


Charging Party,


&


**APPLE INC.,**

*a corporation,*


Charged Party.

Case No. _____

Respondent: Apple Inc.


**NLRB CHARGE
COVER LETTER
FEB. 16 2026**

# UNFAIR LABOR PRACTICE CHARGE COVER LETTER

**Re: Unfair Labor Practice Charge Against Apple Inc.**

**Charging Party**: Ashley Gjovik

**Charged Party:** Apple Inc., One Apple Park Way, Cupertino, CA 95014

## I.    INTRODUCTION

1.    On Feb. 16 2026, I filed a new unfair labor practice charge against Apple Inc. alleging violations of Sections 8(a)(1) and 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(4). This filing presents TEN COUNTS:

2.    <u>Regarding the DECEMBER 16 2025 DEPOSITION, the Employer ordered:</u>
-   (1) Retaliatory gag orders about and following Protected Concerted Activity;
-   (2) A **<u>seven-week</u>** long gag order and prohibition on Protected Concerted Activity;
-   (3) Unlawful work rules issued through confidentiality designations of deposition testimony about working conditions, discussing of Protected Concerted Activity, and the subject of NLRB charges/cases;
-   (4) Continued threats and enforcement of rescinded confidentiality and work policies (including the IPA, Misconduct and Discipline policy, and others) and in retaliation for Protected Concerted Activity.
-   (5) Issuance of work rules and enforcement of prior work rules in violation of the April 2025 National Settlement Agreement in Case 32-CA-284428 (again);
-   (6) Unlawful work rules conditioning the right to protest or discuss the employer's unlawful surveillance on whether the coworker was also subjected to the same unlawful conduct by the employer;
-   (7) Accusing the employee of "leaking" to a coworker when the employee and coworker were expressly discussing ways to improve work conditions;

3.    <u>Regarding THE EMPLOYEE'S EMPLOYMENT, the employer conducted:</u>
-   (8) Years of unlawful surveillance of the employee through "whitelisting" of the employee's personal device for continuous 24/7 audio, video, biometric, and GPS capture, only recently admitted to the employee and while claiming the actions were lawful and it was misconduct for the employee to protest;

4.    <u>Regarding THE TERMINATION OF THE EMPLOYEE'S EMPLOYMENT AND ONGOING DENYLISTING:</u>
-   (7) Threatening to cite the employee's subsequent employer's termination of the employee's

employment in order to deny the employee remedies for this employer's unlawful retaliation and in further retaliation for the employee's protected activity, after the employer ordered that subsequent employer to terminate the same employee, and the subsequent employer did terminate the employee, driving the employee in Chapter 7 bankruptcy and homelessness.

Regarding THE EMPLOYEE'S PARTICIPATION IN BOARD PROCEEDINGS:
- (10) Declaring the employee's only recourse for NLRA violations is "confidential" memos to the Charged Party, and "sealed" escalations to a Magistrate Judge; banning the employee from filing NLRB charges.

This charge is filed on February 16, 2026, within the six-month limitations period under Section 10(b) for all allegations.

1. **Count: Retaliatory Gag Order Immediately Following Protected Concerted Activity Discussing the Settlement Agreement**

5.     During the Dec. 16 2025 Deposition I exercised my rights under the NLRA, repeatedly mentioned the NLRA, and repeatedly objected to the Employer's line of questioning as potential violations of the NLRA.

6.     The Employer then responded by declaring anything I said going forward was now "*Confidential*" indicating I could face Contempt of Court and Sanctions if I was to share the Employer's questions or the content of my statements with anyone else including coworkers, the public, or the NLRB. Part of this exchange is at Exhibit A and an excerpt is below:

- Employer: "…I'm asking you now whether you understood that conduct warranting immediate termination could include violating confidential… information obligations…."
- Me: "Asked and answered. · I already said I don't understand that."
- Employer: "You did not understand that that was a policy violation?"
- Me: "Well, I understand that it's on the policy as written, as stated, but I don't understand what it means."
- Employer: "You don't understand what it means to violate your confidential… information obligations?· Is that what you're saying?"
- Me: "Asked and answered.· I already said I don't. And [objection, the] NLRB… said those terms were unlawful and that Apple could no longer enforce them and had to withdraw them from their policies."
- Employer: "I'm going to designate the next section of this deposition as

confidential pursuant to the protective order. Any… testimony you give until I say it's not confidential pursuant to the protective order is going to be covered by the protective order.· Do you understand that?"

- Me: "No.· How can you claim that my statements are confidential if what I said is not confidential?"
- Employer: "…I'm designating this as confidential pursuant to the protective order.· And if you disagree, then follow the procedures in the protective order."
- Me: "… But, Melinda, I don't think you can just say -- you don't know what I'm going to say and if I say stuff that's clearly not confidential, you just can't proactively say it's confidential…. You can't just proactively say that something is confidential when I'm actively talking about the NLRA saying that Apple is misusing confidentiality terms… to hide protected statements and then you're saying whatever I say next is under a confidentiality order without knowing what I'm going to say.· That's not right, Melinda.· I object."
- Employer: "…The following portion of the deposition is designated as confidential pursuant to the protective order."

[Exhibit A].

## 2. Count: Unlawful Seven-Week Gag Order

7.      Apple abused the Protective/Confidentiality Order in the civil lawsuit to declare Protected Concerted Activity was "confidential" and to put a six-week gag order on me about my Protected Concerted Activity, Apple's NLRA violations during that deposition and prior, and Apple's misuse of the Court's order.

8.      This was the same Order that Apple insisted on having in the civil litigation, for which I objected in that litigation, escalated to the US Judge, requested injunctive relief from the Ninth Circuit to block, and for which I filed a Charge with the NLRB about, certain that Apple would use it to restrict my Protected Concerted Activity and to violate the NLRB Consent Agreement.

9.      During the deposition, Apple responded to my objections and my exercise of my rights by asking for a Court to waive Apple's liability for its plan to engage in such severe harassment of me in that litigation that Apple believed it would drive me to commit suicide. Apple's lawyer indicated it was Apple's lawyer "job" to harass me

to the point of suicide.

10.     Apple further asked the Judge to order me not to complain about Apple's harassment that could cause me to kill myself or to communicate if I want to kill myself. The Judge then ordered me to not express "emotions" and consoled Apple for their distress about hearing my objections to their conduct while they engaged in conduct they themselves admitted on the record they thought would foreseeably drive me to commit suicide. Apple then demanded a confidentiality order to censor my speech about my protected disclosures and their misconduct, and applied it to my Protected Concerted Activity.

11.     Apple has now used this Protective Order (that the same Judge then pressured me and coerced me to "stipulate to" against my will, at the same time the statements above were made about driving me to suicide), to declare that roughly 72% of Appe's deposition of me was considered by Apple to be "Confidential." (pages 65-234 were marked confidential, with the entire transcript ranging from page 8 to page 344, and totally 336 pages).

12.     Apple's lawyers repeatedly argued it had a right to pre-declare an entire portion of the deposition to be confidential regardless of what was said, and that any objection I had must go through the "Protective Order" process after the fact. When I objected during the deposition and insisted Apple's counsel follow the rules, Apple's counsel declared I was being uncooperative, and instead I must continue as Apple ordered. Apple finally agreed to narrow their claims but only after the fact, and they took seven weeks (50 days). All of Apple's conduct violated the Order.

13.     The Protective Order expressly said that "for testimony given in deposition… the Designating Party identify on the record, before the close of the deposition…  all protected testimony" (5.2(b)) however, any designation must be limited "to specific material that qualifies under appropriate standards… so that other portions of… communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order." (5.1). The Order further states "mass,

indiscriminate, or routinized designations are prohibited." (5.1).

14.     Apple insisted that it was authorized by the order to declare anything said from that point on was "Confidential," use that Confidentiality claim on over 70% of the deposition, and leave that claim as a gag order for 7 weeks, covering content that ultimately 99% of which even Apple admitted was not confidential.   Apple finally produced its list of narrowed Confidentiality designations on Feb. 4 2026, seven weeks (fifty days) later. Until that point, Apple claimed that entire 72% of the deposition transcript was Confidential on par with Trade Secrets and proprietary information.

### 3. COUNT: PROHIBITION ON DISCUSSING WORK CONDITIONS RELATED TO EMPLOYER STUDIES ON GENITALS, SEXUAL INTERCOURSE, AND BODILY SECRETIONS

15.     The "narrowed" confidentiality claims that Apple communicated on Feb. 4 2026 were on a six-page PDF that was not dated or signed and which Apple refused to email to me directly. They emailed it to the Court Reporter and said it was for "my awareness." When I demanded they serve me a copy directly, and sign and date it, they refused. I asked multiple times and they would not sign or date it, or send it to me directly, but did claim that was Apple narrowing its Confidentiality claims.

16.     Apple also insisted my only recourse was to write them a memorandum arguing why I do not think Apple's claims are justified and why I think each disputed item is not confidential, and if we do not agree, Apple will escalate the matter to the Judge who coerced me to enter that Protective Order while currently issuing a gag order against me to not have "emotions" and to not complain or warn anyone if Apple was to drive me to suicide. This same Judge has denied every request I've filed and found in favor of Apple for everything Apple has requested.

17.     Apple's recent confidentiality claims included a final list of over 140 items—including clearly arbitrary terms like the letter "N" and the term "hardware," immaterial codenames, and general engineering development phrases – none of which is confidential, but is also not material to this matter or the retaliation case and

accordingly is not raised here.

18.    What is material here is Apple is claiming the very subject matter of my Protected Concerted Activity is "confidential." Additionally, many of the terms Apple is claiming are "confidential" are highly sensitive, personal, and protected subject matter under a variety of other laws including the terms: "

19.    Examples of deposition transcript content that Apple designated was "confidential" for seven weeks, and then expressly claimed terms and the subject matter was "confidential" include:

### NLRA Violation, Example One:
- Employer: (did you tell your manager you didn't want to do that study?)
- Employee "…I was complaining more generally of, like, Apple is doing some really invasive stuff that seems weird.· Like when they were doing the ovulation study or they were asking females to measure our cervical mucus.· I was pointing out, like, I think Apple is crossing some lines --
- (Court Reporter asks for clarification)
- Employee: "They were doing ovulation studies where they were measuring female employees' cervical mucus, and I said I think that's too far.
- Employer: "….Were there other studies that you were asked to participate in that you said, no, thank you?"
- Employee: "Yes.· There was one that I had signed up for and pulled out because I didn't realize the terms until it was underway and it bothered me, … it's a sensor on the bed where you're sleeping and it's monitoring your vitals… But Apple asked for NDAs of any cosleepers.· So if you were to ever have anyone over like if you were dating and wanted to have sex with them or they're going to sleep in your bed, they had to get registered with Apple and sign an NDA … if they were to be there, and I found that very disturbing."

**Deposition Transcript pages 164-165 (entirely "confidential" for 50 days).**
Apple's active confidentiality claims include: **"ovulation study or they were asking females to measure our cervical mucus," "ovulation," "measuring female employees' cervical mucus,"** and **"ovulation."**

### NLRA Violation, Example Two:
- Employer:  "Was there anything else you said to [Supervisor] about your unhappiness with studies that Apple was doing?"
- Employee: Yeah.· I think it was generally just kind of like a -- we need a boundary here of what --

- because, you know, I would do a lot of the LiveOn on, like, … And that′s a lot different than my employer asking to request status of my cervical mucus.· And so it was kind of, like, I feel like we need to sort as a company what we're doing here generally and using myself as kind of case study of my reaction to some of those requests.· But as -- I don′t remember them ever really doing anything different, and I remember even making privacy, kind of, invasion complaints even I think, like, in May 2021 –"

- Employer: "Way beyond my question."

**Deposition Transcript pages 170. (entirely "confidential" for 50 days).**

Apple's active confidentiality claims include: "<span style="color:red">**my cervical mucus**</span>"


**<u>NLRA Violation, Example Three:</u>**

- The Employer asked me about my protests about the ear scans: "what did you feel invasive about an ear scanning study?"

- Employee: Ears are very personal, and they are an -- they're an orifice.· You know, it′s a bodily orifice.· It′s kind of like the mucus – the cervical mucus secretion.· Not as bad as that one, but it′s like that -- that′s something that′s so personal that it doesn′t seem appropriate for an employer to ask.· And because I participated in these studies, I know that it involves pressing up against my body, putting things, like, on my body. Things where I'm like -- like I mentioned earlier, physically  uncomfortable during the process, even somewhat painful.· And like the thought of – and they can last a long time.· So, like, the thought of Apple spending a bunch of time scanning, like, the inside of my ears and my ears made me have a visceral reaction that I didn′t want that.· And that I was also why I just -- I said no.· That was one of the very few things I said no expressly in email. I said no.· I think I made an excuse, like, I'm too busy, but I'm not going to do that.· And then Apple wanted to keep -- they're going to keep these images of our ears.· And they bragged publicly earlier that they had the biggest, like, ear library in the world, and that was concerning to me.· It′s concerning to me that they′d brag about that, and I don′t want my ears in their giant ear library.· You know, like, my ears are personal to me.· I don′t want them to just be in a library of ears.

- Employer: "Okay."

- Employee: "And because I had said no and they asked three times in a very short period of time, I was -- I was wondering why are they asking me so much, and it looked like it was going to an email group, but you don′t really know who is on what group.· And so I was -- I was disturbed about them still wanting to scan my ears.

- Employer: Do you agree that posting these emails was a breach of your confidentiality agreement with Apple?

- Employee: No, I don′t agree.

- Employer: And why not?

- Employee: …None of this is -- none of that was even secret information.· And I was complaining about something that I thought was an invasion of privacy.· I have a constitutional right to privacy in this great state of California where I can protest about my employer trying to invade my privacy…   And I wanted them to stop doing this kind of stuff, and this was the exact same time I was calling out other conduct and systemic issues at Apple that I did not approve of and wanted them to reform on, and so this fit with me trying to call out stuff that I thought crossed a line…."

**Deposition Transcript pages 236-238). (entirely "confidential" for 50 days).**
Apple's active confidentiality claims include: "**mucus -- the cervical mucus secretion**"

20.    Apple    claimed    confidentiality    and    some    sort    of    business interest/ownership rights to my own testimony, my own words, describing my complaints about invasive workplace practices directed at me and my coworkers' bodies, my organizing activity with and on behalf of coworkers, my protected disclosures and advocacy, and my genital secretions and sexual activity.

21.    Apple does not own my vagina, has no legitimate interest in who I have sex with, and its outrageous Apple would even imply it could make these claims, let along expressly argue these claims on an unsigned PDF and demand I be the one to argue why Apple employees' genital secretions are not Apple Confidential.

### 4. Count: Continued Enforcement of Rescinded Policies

I filed NLRB charges (Case 32-CA-284428 and related cases), resulting in a General Counsel complaint and national settlement. I filed a federal retaliation lawsuit where I invoked NLRA and other rights during the deposition. All of this is protected under Section 7 and Section 8(a)(4).

Apple's counsel interrogated me at deposition about the policies and terms they claimed they had rescinded and would not enforce, whether I was "permitted" or "authorized" to discuss work conditions with coworkers, whether talking about work conditions was a "breach of [my] confidentiality obligations," and whether my coworkers were "whitelisted" by Apple to communicate with me about work

conditions. I objected and repeatedly reminded Apple about the rights their employees, including me, having under the NLRA and warned the attorney that she appeared to be repeatedly violating the NLRA in her questioning.

Apple's lawyer then declared 72% of the deposition was "confidential" for seven weeks, and then claimed my cervical mucus was Apple Confidential and the burden was on me to argue why it was not, and then we could raise the dispute Apple ownership of its facts around its employee's cervical mucus to the Judge who already issued an implied gag order against me to not have "emotions" while Apple pursued its plan to drive me to suicide.

Apple's questioning and conduct regarding the deposition and protective order enforces the prior secrecy, coercion, and confidentiality framework Apple agreed to rescind in the April 2025 settlement. Apple is exploiting the Court's deference to an extremely powerful, local corporation in a very public and closely watched lawsuit to threaten its employees and chill their protected activity through its ongoing harassment of the Charging Party.

### 5. COUNT: VIOLATION OF THE SETTLEMENT AGREEMENT

22.    As stated above and below, Apple also issued new work rules that clearly violate the terms of the Settlement Agreement, including:

- (1) Revised IPA, Appendix A, § I(C): "[N]othing in this Agreement restricts Your right to... discuss or disclose information about Your or others' wages, hours, or working conditions." Apple designated my testimony about my working conditions as confidential.
- (2) Notice: "WE WILL NOT advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information." Apple's counsel asked me under oath whether discussing working conditions was a "breach of your confidentiality obligations."
- (3) Additional Terms: "The Charged Party agrees that it will not enforce the definition of Proprietary Information... to the extent that such definition covers terms and conditions of employment." Apple's designations enforce that definition through a different mechanism.
- (4) Catch-all: "WE WILL NOT in any like or related manner interfere with your rights under Section 7."

Violation of a settlement agreement resolving 8(a)(1) charges is itself an independent 8(a)(1) violation. The settlement's Performance provision provides that upon non-compliance, the Regional Director will reissue the October 3, 2024 complaint, the allegations will be deemed admitted, Apple's answer deemed withdrawn, and the Board may enter a full remedy order without trial. A Court of Appeals judgment may be entered ex parte.

23. The settlement was the Board's remedy for Apple's unlawful confidentiality policies. If Apple can reimpose the substance of those policies through a protective order designation in any employee litigation and without consequence, the settlement is a nullity. Every Apple employee who saw the settlement notice and believed the rules had changed is now learning that they have not.

24. As noted, I also previously filed a charge with the Board alleging that Apple violated the April 2025 settlement agreement through its litigation conduct in this same federal case. The Region and Compliance Office, declined to investigate or take action on that charge, and refused to state any findings in writing. This was after Apple's own defense counsel was appointed to be the new NLRB General Counsel.

25. The Region's prior refusal to act has emboldened Apple. Since the Region declined to investigate the first reported violation, Apple's conduct has escalated: Apple now designates the word "cervical mucus" as its confidential business information and interrogates former employees under oath about whether discussing working conditions with coworkers was a "breach of confidentiality obligations." The trajectory is clear. Each time the Board declines to enforce its own settlement, Apple pushes further. This charge presents the Board with a choice: enforce the agreement it brokered, or watch it become a nullity and see just how far Apple will go.

### 6. Count: Unlawful Surveillance

26. Apple was surveilling me at all times, including all Section 7 activity conducted through or in the presence of my personal phone: conversations with coworkers about working conditions, communications with the NLRB, communications

with journalists, organizing discussions, and personal conversations outside work touching on employment concerns.

27.    Apple placed my cell phone and my personal iCloud account on a "whitelist", causing it to continuously capture and automatically upload photographs, video, audio recordings, biometric data, and GPS location whenever the camera detected a face—24/7 including outside the workplace—without any prior review or consent, but lied for years that I consented and was approving uploads.

28.    This was not limited to work hours or Apple premises. The device recorded in my home, including images of me in states of undress. This also violates the federal Wiretap Act, 18 U.S.C. § 2511 (interception of communications without consent), Cal. Penal Code § 632 (felony recording of confidential communications), Cal. Penal Code § 647(j) (invasion of privacy), and other statutes. Apple also obtained dismissal of my related state-law claims by representing it was not doing exactly what it was actually doing.

29.    Section 8(a)(1) prohibits employer surveillance that would reasonably tend to coerce employees in the exercise of Section 7 rights. See *Nat'l Steel & Shipbuilding Co.,* 324 NLRB 499 (1997); *Aladdin Gaming, LLC*, 345 NLRB 585 (2005). Continuous 24/7 audio and video capture from an employee's personal device— recording conversations with coworkers, the NLRB, journalists, and family—is surveillance that would chill any reasonable employee from exercising Section 7 rights. The federal Wiretap Act violation is an aggravating factor the Board may consider.

30.    An employee whose personal phone is recording and uploading everything cannot freely discuss working conditions with coworkers, contact the Board, or communicate with journalists. Once the data is captured, its also collateral and inherently coercive. The surveillance captured the full scope of Section 7 activity— including the protected disclosures and organizing that are the subject of this litigation. I became aware of the QA whitelisting and its implications within the past six months, as Apple withheld this information for years and only recently admitted it, and so I file this charge within a tolled Section 10(b) limitations period.

### 7. COUNT: UNLAWFUL WORK RULES RELATED TO ORGANIZING WITH COWORKERS ABOUT WORKPLACE SURVEILLANCE

31.     I discussed Apple's surveillance practices with a coworker as part of organizing efforts to improve working conditions. I testified that we were "organizing together" "making Apple better" and that sharing information about invasive workplace practices with a fellow employee was "absolutely NLRA... protected concerted activity of coworkers trying to make a better workplace." This included "my protest that Apple was requesting us to share all of our medical records directly with Apple if we were to request disability or ADA accommodations." (Deposition transcript page 295-296).

32.     Apple's counsel asked repeatedly whether my coworker was "whitelisted" to talk about work conditions with me—establishing a rule that an employee may only discuss the employer's surveillance with coworkers who were also subjected to the same surveillance. The premise is that a coworker who was not "whitelisted"—i.e., not also subjected to criminal surveillance—has no right to receive information about it, and that sharing it with her is a confidentiality breach. Apple then designated my testimony about sharing this information as confidential. This creates a work rule: discussion of the employer's criminal surveillance is permitted only among its victims, and discussing it with any other coworker violates confidentiality obligations.

33.     Section 8(a)(1) prohibits rules that condition the exercise of Section 7 rights on employer authorization. An employee's right to discuss working conditions with coworkers does not depend on whether the employer "whitelisted" the listener for the same labor violations. The right to discuss working conditions is unconditional under Section 7. A rule that permits discussion of employer misconduct only among its victims—and treats discussion with anyone else as a confidentiality breach—is an unlawful work rule restricting Section 7 activity.

- Employer: "Do you agree that sharing this information with [coworker] was a breach of your confidentiality obligations with Apple?"
- Employee: "Absolutely not."
- Employer: "Why not?"
- Employee: :One, [coworker] was an active Apple employee."

- Employer: "…Do you believe you were able to share confidential information about Apple with all Apple employees?"
- Employee: "Confidential is a broad term I don't understand.· But second, some of this stuff was highly protected.· This includes naked photos of me. I shared –"
- Employer: "I'm just asking you a question.· Do you agree that sharing this information with [coworker] was a breach of your confidentiality obligations…?.. "Do you believe that you were entitled to share all confidential information you got from Apple with all Apple employees?..."
- Employer: "….Where is the naked photo?..."
- Employee: "….the AI is just taking photos whenever it thinks it sees a face.· It doesn't care if you're topless…   I had photos it was taking that include my nipples and other parts of my naked body."
- Employee: "….And then -- what was I saying?· Why it was -- oh, because we were organizing about work conditions.· I was protesting this and said I don't like this.· I want Apple to stop.· And if she was organizing with me at that time  … trying to help improve our work conditions, then sharing this with her for her understand -- and she seemed very upset about this as well -- was absolutely NLRA, the National Labor Relations Act, and California Labor Law, protected concerted activity of coworkers trying to make a better workplace for themselves and their other coworkers.· And whistleblower disclosures that something is going on that seems unethical or unlawful, and there's nothing in here that's trade secret and other reasons…."
- Employer: "Do you know if [coworker] was whitelisted…"
- Employee: "I have no idea."
- Employer: "But you had no reason to believe that she was whitelisted"
- Employee: "It's a very, like, weird question.· I don't know how to answer your question."
- Employer: "Okay.· Well, you couldn't answer my whitelisted question.· You were totally incapable of [answering] it."
- Employer: "Do you have any reason to believe that you were permitted to share [work condition] information with [coworker]?·
- Employer: "….So I don't know how to answer that question with the "permitted" term."
- Employer: "Okay.· You don't know what "permitted" means?"
- Employee :"I don't know what "permitted" means."
- Employer: "How about allowed?· Is that any better? A-L-L-O-W-E-D?"
- Employee :"No."
- Employer: "Okay.· Don't know what "permitted" and "allowed" mean. · · · · Okay.· Are Apple employees allowed to share confidential information with Apple – Apple employees who are not … who are not whitelisted to receive the confidential information?"
- Employee :"I don't know what "allowed" or "whitelisted" means in your question."
- Employer: "Okay."

**Deposition pages 298-305. (entirely "confidential" for 50 days).**

34.    Apple's rules and threats isolate victims of employer misconduct from the coworkers best positioned to help them. Apple declares that an employee who discovers her employer is illegally recording her, and taking naked photos of her, can only discuss it with other employees who are also being illegally recorded and having naked photos also taken of them—and those employees may not know they're being recorded, and if they do know they may be horrified about it, so the practical effect is silence. It conditions the right to discuss working conditions on the employer's own authorization, which must accompany the employer surveilling the employee and hoarding nude photos of that employee, which is the antithesis of Section 7 and closer to a sex cult then corporate employment.

### 8.  Count: "Leaking" Work Conditions to Coworkers

35.    See above.

### 9.  Count: Termination of Subsequent Employment with another Employer ordered by the Prior Employer

36.    Recent actions and statements have made it clear that Apple was directly involved in Northeastern University's termination of my employment in the autumn of 2024. I suspected this for some time and accused Apple of it prior, however only recently did Apple implicitly confirm this.

37.    Apple provided me notice it intended to subpoena extensive employment records from Northeastern University to use as evidence against me in the Apple retaliation litigation and adjudication. Apple knows there is an NLRB case against NEU and that I allege retaliation for numerous types of protected activity including opposing what amounted to be systemic federal grant fraud by that university. Apple indicated it would request records from NEU to made it look like I was at fault and use my protected activity at NEU in its defense in the Apple litigation.

38.    I complained to Apple again that based on the timing and extremely suspicious circumstances of that termination, I was certain Apple was behind the second firing, and if Apple sent the subpoena they threatened, I would then subpoena NEU's lawyers for any communications with Apple or Apple's lawyers.

39.     Apple then dropped that matter completely and has not raised it again. Apple has not said a word about it since I assured them I was certain there would at least be phone call records between these entities leading up to the abrupt notice of termination while I was on protected medical leave, which had just been extended by NEU and made the termination absurd. Apple's silence confirms their culpability.

## 10.    Count: Prohibiting the Employee from Filing NLRB Charges

40.     Under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959), when activity is arguably subject to Section 7 or Section 8 of the NLRA, federal courts must defer to the exclusive competence of the Board. Under *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976), the Board's preemptive jurisdiction extends to conduct that Congress intended to leave unregulated as well as conduct it intended to regulate.

41.     The federal district court lacks jurisdiction to determine whether Apple's designation of testimony about Section 7 activity as confidential constitutes interference with NLRA rights. That determination belongs exclusively to the Board.

42.     Accordingly, Apple's insistence that my "only option" is to argue to Apple and the Judge who indicated she doesn't care if kill myself as a result of Apple's conduct, and that I have no other recourse for Apple's misconduct, is also a violation of the NLRA.  Apple's statements indicate that I am not "allowed" to file an NLRB charge over their confidentiality designations because they say the non-consensual Protective Order somehow stripped the NLRB of jurisdiction and/or is a gag order on me from reporting NLRA violations to the NLRB – but none of that is true.

43.     The opposite is true. If Apple violates the NLRA, and interferes with Board proceedings, then Garmon preemption removes the federal district court's jurisdiction to review the matter at all. Accordingly, Apple's directive to not file charges to the NLRB and only route complaints to a venue with no jurisdiction to adjudicate them, is Apple illegally prohibiting me from filing NLRB charges.

44.

## II.    CONCLUSION

45.    This Cover Letter is filed in support of the Feb. 16 2026 Charge.

46.    In addition, a detailed Legal Memorandum will be subsequently filed as well with additional exhibits and evidence.

47.    The alleged violations in this charge are clearly within the scope of the NLRA. Apple's unlawful conduct during and related to the deposition occurred as part of a civil lawsuit, but directly arose out of NLRA activity, interfere with NLRA rights, and threaten to interfere with NLRB proceedings.

48.    My disclosure here of the subject matter of Apple's claims to confidentiality may cause Apple to escalate and even seek sanctions against me for violating their protective order. If Apple does such a thing, then an additional NLRB charge will be filed to capture the continuing violations of the NLRA by Apple.


Respectfully submitted,


/s/ **Ashley M. Gjovik**
*Pro Se Charging Party*
San Jose, California
Dated: Feb. 16 2026

# EXHIBIT A

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

 1   leak, that we had to report it.  I reported it.
 2   But, again, like even the -- the first sentence of
 3   that email says "not sure how much this matters,"
 4   and then I reported it anyways.
 5        Q.  And you reported it because you thought it
 6   might be a breach of their confidentiality
 7   obligations to Apple; correct?
 8        A.  Yeah.
 9            MS. RIECHERT:  Mr. Videographer, if you
10   could mark as Exhibit Number 6, tab 6-02 Apple's
11   misconduct and discipline policy.
12            THE VIDEOGRAPHER:  Exhibit 6.
13            (DEPOSITION EXHIBIT 6 WAS MARKED.)
14            THE WITNESS:  Okay.  It's open.
15   BY MS. RIECHERT:
16        Q.  Looking at Exhibit 6, which is Apple's
17   misconduct and discipline policy, do you agree that
18   that is a copy of Apple's misconduct and discipline
19   policy?  And because you asked me to do that before,
20   I would note that on the bottom right-hand corner
21   are Bates numbers that were placed -- we believe
22   were placed on this document by you.  These were
23   documents produced by you.
24        A.  Oh, I see, yes.  And the timestamp on the --
25   this one has a timestamp.  The business conduct

1   policy didn't have a timestamp.  This timestamp

2   matches when I downloaded this document, and this is

3   an exhibit in the NLRB case with the settlement

4   agreement I mentioned.

5        Q.  The question is do you agree that this was a

6   policy that was in effect during your employment at

7   Apple?

8        A.  What does "in effect" mean?

9        Q.  That it was in existence.

10       A.  Yes.  This policy was in existence at my

11  time at Apple as of the date I downloaded it, which

12  is dated on the document as May 4, 2021.

13       Q.  And do you agree that you were aware of this

14  policy at the time you downloaded this document on

15  May 4, 2021?

16       A.  Yes.

17       Q.  And you read it during your employment at

18  Apple; correct?

19       A.  The policy we're looking at -- all I know

20  is -- existed as worded as of May 2021.  Apple might

21  have had different versions earlier, and I don't

22  have copies of the prior policies from, like, 2015.

23  But I know that this definitely existed in May of

24  2021.

25       Q.  And you understood it; correct?



1       A.  That's broad.  Can you be more narrow in

2   your question?

3       Q.  Did you understand the policy when you read

4   it and downloaded it?

5       A.  Yeah.  What does "understand" mean?

6       Q.  Know what it means.

7       A.  I'd say no.  And that was one of the

8   reasons -- so I was downloading -- I downloaded a

9   bunch of policies at that point.  I had become very

10  concerned that they were unlawful, and I had been

11  making statements about that with coworkers and on

12  Slack, and that was when I started --

13      Q.  But you've gone beyond the question.  My

14  question is did you understand this policy when you

15  read it and downloaded it on May 4, 2021?

16      A.  That's what I was going to say.  I didn't --

17  the terms were so broad.  One of the reasons it was

18  flagged for me --

19          (Reporter asks for clarification.)

20  BY MS. RIECHERT:

21      Q.  The question is did you understand it or did

22  you not understand it?

23      A.  No, I didn't understand it.

24      Q.  Okay.  Which parts of it did you not

25  understand?



1        A.   These are -- I can go through the terms and

2    a lot of these terms were flagged in my complaint to

3    NLRB about this particular policy --

4        Q.   You're going way beyond my question.  The

5    question is --

6        A.   I know.  You're asking what I didn't

7    understand.  I'd like to answer that question.

8        Q.   Okay.  Which terms did you not understand?

9    I don't need to talk about the NLRB.  I just want to

10   know which terms you did not understand.

11       A.   Appropriate is vague and over -- so terms

12   that I feel are vague and overbroad in such a way

13   that you cannot understand what is actually being

14   requested and which likely become unlawful that they

15   are so overbroad because they restrict protected

16   behavior and conduct are terms appropriate,

17   behavior, policies, guidance, ethics, discretion,

18   appropriate, guidelines, not limited to, warnings.

19            (Reporter interruption.)

20            THE WITNESS:  Can you see me?  I turned my

21   video off so I wasn't just staring at me.  Can you

22   see me here?

23            THE VIDEOGRAPHER:  Yes.

24   BY MS. RIECHERT:

25       Q.   If you don't want to look at yourself in the

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

1    video.  I can take yourself --

2        A.  I did, but then she said she can't see my

3    face, but then I couldn't see where my face was.  So

4    I was concerned she couldn't see my face.

5            Conduct.  Let's see, not limited to, policy

6    violations, confidential, proprietary.

7        Q.  You didn't understand what those words meant

8    is what you're telling me?

9        A.  Uh-huh.  I'm still going.  Oh, using Apple

10   equipment for electronic resources because that to

11   me also meant, like, our personal iPhones or

12   computers too.  It was very unclear.

13       Q.  I withdraw that question, and I'm going to

14   ask you another question.

15           Did you --

16       A.  I still have more though.

17       Q.  I understand.  I'm just going to withdraw

18   that question.

19           Did you understand that this policy said

20   that it was a policy violation for you to violate

21   your confidential proprietary information --

22   proprietary and trade secret information

23   obligations, including those stated in Apple's

24   intellectual property agreement?

25       A.  So you're referring to under policy



**TALTY COURT REPORTERS, INC.**                          **60**
**408.244.1900 - www.taltys.com**

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

1    violations, the first bullet?

2        Q.  Correct.

3        A.  Can I read it just so it's on the record of

4    what you're asking?

5        Q.  Absolutely.

6        A.  So the policy violations -- the policy says,

7    "Violating confidential, proprietary, and trade

8    secret information obligations (including those

9    stated in Apple's intellectual property agreement),"

10   and that is under "Conduct warranting immediate

11   termination.  Conduct that may warrant immediate

12   termination of employment includes, but is not

13   limited to," and then the bullet you just said.

14       So I can confirm that the document that

15   we're reviewing, that is the text as I just read, is

16   on that document and that I had a copy of that

17   document.

18       Q.  And you understood it?

19       A.  No.  I just said I don't understand this

20   document.

21       Q.  Okay.  Didn't understand that part of the

22   document?

23       A.  I don't understand most of the document.  I

24   was still going of listing all the words I don't

25   understand.



1    Q.  Okay.  I'm asking you now whether you

2  understood that conduct warranting immediate

3  termination could include violating confidential,

4  proprietary, and trade secret information

5  obligations including those stated in Apple's

6  intellectual property agreement?

7    A.  Asked and answered.  I already said I don't

8  understand that.

9    Q.  You did not understand that that was a

10  policy violation?

11    A.  Well, I understand that it's on the policy

12  as written, as stated, but I don't understand what

13  it means.

14    Q.  You don't understand what it means to

15  violate your confidential, proprietary, and trade

16  secret information obligations?  Is that what you're

17  saying?

18    A.  Asked and answered.  I already said I don't.

19  And the objections of NLRB already said that was

20  unlawful that Apple would --

21        (Reporter admonition.)

22        THE WITNESS:  NLRB said those terms were

23  unlawful and that Apple could no longer enforce them

24  and had to withdraw them from their policies.

25        MS. RIECHERT:  I'm going to designate the

 1  next section of this deposition as confidential

 2  pursuant to the protective order.

 3  BY MS. RIECHERT:

 4      Q.  Any information that -- testimony you give

 5  until I say it's not confidential pursuant to the

 6  protective order is going to be covered by the

 7  protective order.  Do you understand that?

 8      A.  No.  How can you claim that my statements

 9  are confidential if what I said is not confidential?

10      Q.  Because under the protective order, I have

11  the right to designate deposition testimony as

12  confidential.  If you disagree with that, then you

13  have the right, under the protective order, to

14  follow the procedures in the protective order.

15      A.  Yeah, but I believe you -- sorry.  Go ahead.

16      Q.  But meanwhile, I'm designating this as

17  confidential pursuant to the protective order.  And

18  if you disagree, then follow the procedures in the

19  protective order.

20      A.  Yes.  But, Melinda, I don't think you can

21  just say -- you don't know what I'm going to say and

22  if I say stuff that's clearly not confidential, you

23  just can't proactively say it's confidential.

24      Q.  I have the right to do that under the

25  protective order, and you have the right to



1     challenge it if you disagree.

2          A.   Well, I'm filing objections immediately then

3     that you can't just proactively say that something

4     is confidential when I'm actively talking about the

5     NLRA saying that Apple is misusing confidentiality

6     terms and the stuff to hide protected statements and

7     then you're saying whatever I say next is under a

8     confidentiality order without knowing what I'm going

9     to say.  That's not right, Melinda.  I object.

10          MS. RIECHERT:  All right.  So why don't we

11     take a break before I ask my question?

12          If the videographer would bring in the

13     tab Number 2-04 into the chat.

14          We're going to take a five-minute break, and

15     I am designating the following information as

16     confidential pursuant to the protective order.

17          Let's take a five-minute break.

18          THE WITNESS:  Okay.

19          THE VIDEOGRAPHER:  This marks the end of

20     Media Number 1.  We are now going off the record.

21     The time is 10:19 a.m.

22          (Off the record:  10:19 a.m. to 10:29 a.m.)

23          THE VIDEOGRAPHER:  We are now on the record.

24     The time is 10:29 Pacific Standard Time.  This marks

25     the beginning of Media Number 2 in the deposition of



1    Ashley Gjovik on December 16, 2025.

2            Please continue.

3            (DEPOSITION EXHIBIT 7 WAS MARKED.)

4            MS. RIECHERT:  The following portion of the

5    deposition is designated as confidential pursuant to

6    the protective order.

7                (THE FOLLOWING PAGES, 66 TO 305, WERE

8    DESIGNATED CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.)

9                        -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1              ::: CONFIDENTIAL :::

2          (THE FOLLOWING PAGES, 66 TO 305, WERE

3   DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.)

4   BY MS. RIECHERT:

5      Q.  Please look at Exhibit Number 7 and let me

6   know if this is a document that you received in

7   connection with your employment at Apple.

8      A.  Yes.  And lodging again that I don't like

9   the blanket confidentiality when we don't know what

10  we're going to talk about.  And also lodging that

11  I've tweeted this document.  This is already public

12  record.  It's not confidential.

13         But this does appear to be an email that I

14  believe I did receive from Apple.  It's dated

15  August 7, 2017.

16     Q.  And when did you tweet the document?

17     A.  I think multiple times.  And it's on my

18  website.  It's part of my government complaints in

19  the exhibits for the government cases.

20     Q.  Did you tweet this document during your

21  employment at Apple?

22     A.  I don't think so, no.

23     Q.  You were invited to participate in a data

24  collection social hour; correct?

25     A.  I -- can I just read the email?



1    Q.  Absolutely.

2    A.  Yeah.  So the email was sent from --

3    Q.  Okay.  Don't read it out loud.  Just read it

4  to yourself.

5    A.  No.  I want to read it for the record so

6  they know what we're talking about.

7    Q.  No, please don't.  Please read it to

8  yourself.

9    A.  But you said it's confidential.

10    Q.  The exhibit -- the exhibit is in the record,

11  and so you don't need to read it into the record

12  because the exhibit is already part of the record.

13    A.  What did you just ask me?  What was the

14  question?

15    Q.  The question is were you invited to

16  participate in a data collection social hour?

17    A.  But you're reading the email and you're

18  saying I can't read the email.

19    Q.  No.  I'm saying you can read the email.  I

20  just don't want you to read it out loud into the

21  record.

22    A.  But you -- the question you're asking me

23  reflects what is said in the email.  So for me to

24  confirm what the email said would answer your

25  question, and you're saying I can't read the email.



# APPENDIX: PRIOR NOTICES OF PENDENCY

See, Dkt. No. 100, August 27 2024.
*Ashley Gjovik v Apple Inc,* ARB Case No. 2024-0060, OALJ Case No. 2024-CER-00001 [CERCLA, 42 U.S.C. § 9610].

See, Dkt. No. 111, Sept. 30 2024.
*Apple, Inc . and Ashley Gjovi[k] ,* Case No. 32-CA-284428, U.S. National Labor Relations Board

See, Dkt. No. 151, Jan. 22 2025.
Ashley Gjovik v Apple Inc , ARB Case No. 2024-0060, OALJ Case No. 2024-CER-00001

See, Dkt. No. 225 , July. 1 2025.
In re: Apple, Inc ., Case No. CAR000278176 Notice of Enforcement Action

See, Dkt. No. 226 , July 1 2025.
U.S. EPA Citizen Suit RCRA, CAA, CWA, EPCRA, TSCA + Public Nuisance

See, Dkt. No. 237 , July 21 2025.
Related Case in the District of Massachusetts, United States Bankruptcy Court Chapter 7 Bankruptcy 11 U.S.C. § 701 et seq

See, Dkt. No. 238 Filed 07/29/25
Related Case in the District of Massachusetts, United States Bankruptcy Court Adversary Proceeding; Discharge Under 11 U.S.C. § 523(a)(8)

See, Dkt. No. 257 Filed 09/08/25
U.S. EPA Citizen Suit & Public Nuisance Gjovik v. Apple, Santa Clara , and K. Jenab, et al. Case No. 5:25-cv-07360