UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
----------------------------------x
ASHLEY GJOVIK, an individual,      :
                Plaintiff,         : U.S. D.C. Case No.:
   v.                              : 3:23-CV-04597-EMC
APPLE INC, a corporation,          :
                Defendant.         :
----------------------------------x
```

Telephonic Conference Call

Wednesday, July 2, 2025

AT:

3:09 p.m.

Taken via Zoom videoconference

**CERTIFIED**

Court Reporter:
KATHERINE SCHILLING, RPR
CA CSR No. 14163

Page 2

1                    A P P E A R A N C E S
2        Appearing for the Plaintiff, ASHLEY GJOVIK, an
         individual:
3             ASHLEY M. GJOVIK, PRO SE
              2108 N Street
4             Suite 4553
              Sacramento, California 95816
5             (408) 883-4428
              legal@ashleygjovik.com
6             (Present via videoconference)
7
8        Appearing for the Defendant, APPLE INC, A
         CORPORATION:
9             MELINDA S. RIECHERT, PARTNER
              ORRICK, HERRINGTON & SUTCLIFFE, L.L.P.
10            1000 Marsh Road
              Menlo Park, California 94025-1015
11            (650) 614-7423
              mriechert@orrick.com
12            (Present via videoconference)
13
14            In the presence of:
              MAGISTRATE JUDGE KANDIS A. WESTMORE
15            OAKLAND COURTHOUSE
              1301 Clay Street
16            Oakland, California94612
              (Present via videoconference)
17
18       ALSO PRESENT:
19            Cindy C. Fan, Deputy Clerk
20
21
22
23
24
25

3:23-CV-04597-EMC

1                P R O C E E D I N G S

2       (3:09 p.m.)

3            THE COURT:  Okay.  And so I received the

4       request for a telephonic conference, and Apple,

5       I believe, is requesting entry of the Northern

6       District's Model Protective Order and for the court

7       to fashion alternative procedures to resolve further

8       discovery disputes.

9            I just want to start off by saying that,

10      Ms. Gjovik, I think it's a challenge because, you

11      know, you're representing yourself and whenever you

12      represent yourself, you know, it's too personal for

13      you.  It's a very different thing to represent

14      yourself, because you can't separate yourself and

15      your personal feelings and emotions and all that

16      stuff with what's required to just sort of

17      objectively represent yourself in the case against

18      Apple.

19            And so you're probably not used to some

20      of the things that are normal, everyday processes

21      that the court does.  And so I just wanted to let

22      you know just sort of upfront, when it comes to the

23      court's Model Protective Order, the court has placed

24      the Model Protective Order on the court's website

25      because after years of dealing with the need for

3:23-CV-04597-EMC

Page 4

1   protective orders to, you know, address the need to

2   protect confidential or proprietary information,

3   trade secrets, things like that, and that being sort

4   of a regular occurrence and a need to deal with that

5   issue in discovery, instead of having a different

6   protective order every time in every case, the court

7   decided that it would be a better use of everyone's

8   time and preserve limited -- the limited

9   jurisdictional resources that we have by creating

10  this Model Order.

11          And so it has everything in it that

12  a protective order needs to have in it, it addresses

13  all of the usual topics and issues related to

14  designating certain information confidential and how

15  it should be used in discovery.  And all of the

16  district judges and magistrate judges in the

17  Northern District got together and agreed on that

18  Model Order.  So we put it on the court's website so

19  that the parties could simply just use it, instead

20  of reinventing the wheel and having to create a, you

21  know, new protective order every time for every

22  case.

23          And so I think, you know, when you're

24  representing yourself and you're not an attorney who

25  regularly appears in the Northern District and is

Page 5

1   not used to that, you might think that there's

2   something, you know, improper or -- you know, in

3   this case, I think you're feeling somewhat ambushed

4   about it.  But it's really just a very standard

5   procedure for parties to enter into this protective

6   order.  And, in fact, we expect people to use it.

7          So if -- and then if you're going to want

8   to make any changes to it, then you look at my

9   standing order, and all the judges have standing

10  orders.  You look at the standing order, and the

11  standing order will tell you, if you are going to

12  make changes to it for any particular specific

13  reason having to do with this case, then you need to

14  explain what the changes are and do a red line

15  version of it and do a declaration that you attach

16  to it, explaining to the judge what changes you've

17  made and why.

18          And that cuts down on the amount of work

19  all of us have to do.  Because I don't want to read

20  your entire protective order because I'm expecting

21  it to be just the same standard Model Protective

22  Order and maybe you might have a few little changes

23  here or there.  But I just wanted to start it off

24  with that, and so we don't have discovery disputes

25  over protective orders, I guess, is sort of the

3:23-CV-04597-EMC

Page 6

1    point that I'm getting at, Ms. Gjovik.

2         MS. GJOVIK:  I understand, your Honor.  And

3    thank you so much for that explanation and your

4    thoughtfulness about my position.  And I just

5    quickly want to say that I was willing to enter it.

6    It was how the defendant said they planned to apply

7    it was my objection.

8         THE COURT:  Okay.

9         MS. GJOVIK:  I completely understand the

10   economic view of -- and efficient view of the way to

11   use it.  I mentioned in my response -- we can go in

12   more detail -- the defendant's only explanation of

13   how they want to use it was to declare part of the

14   deposition confidential.  It wasn't even producing

15   documents, and the documents were actually evidence

16   in other proceedings, that basically they don't want

17   to give to that agency.  It did not seem like what

18   the protective order was intended for --

19        THE COURT:  Uh-huh.

20        MS. GJOVIK:  -- being the subject matter.

21   What they want to use it for appeared to be their

22   attempt to do a summary judgment motion without

23   summary judgment.  They want to say they fired me

24   for something confidential, whether or not if it was

25   confidential.  During the deposition, neither gave

3:23-CV-04597-EMC

Page 7

1    me a copy of what it was, didn't say that -- and

2    this is in the meet-and-confer transcript

3    I uploaded.

4              Didn't say that that part of the

5    deposition was confidential under the protective

6    order, so I couldn't even challenge what they did,

7    because I didn't have evidence to the document.  And

8    that's where I was, like, this is not -- I don't

9    think this is what the protective order is for.

10        THE COURT:  No, that's not --

11        MS. GJOVIK:  It's something else.

12        THE COURT:  Yes.  That's not how the

13    protective order is used.  You're -- I got the

14    impression from what I read that maybe you didn't

15    understand the purpose of the protective order,

16    because I thought you were wanting -- you were

17    saying that they should give it to you first -- give

18    you the documents first before designating anything

19    confidential.  And that you might want to be

20    publishing things on your website or publish things

21    online.

22              And so my understanding of that was that,

23    you know, if that's what you want to use this stuff

24    for that has been designated confidential, then of

25    course the protective order would prevent you from

Page 8

1   being able to do that.  But that's the whole purpose

2   of a protective order is to make sure you don't make

3   public -- you know, confidential information public.

4           But what you're describing is something

5   entirely different.  If Apple is saying "you can't

6   use deposition transcript" -- I'm not sure for that

7   purpose, but I mean that's the whole point of

8   a deposition transcript, is for you to be able to

9   use it in the litigation.  So I'm not really sure

10  what all of that really means.

11          And so maybe, Ms. Riechert, you could

12  clarify a little bit more about what Apple's

13  position was about the example that Ms. Gjovik just

14  gave.

15      MS. RIECHERT:  Certainly.  What we had

16  discussed with her is that my -- we have not yet

17  taken her deposition.  But during her deposition, it

18  is possible that she might have confidential

19  information that we don't want published on

20  a website.  And if that came up in the deposition,

21  we would want to designate that portion of the

22  deposition testimony as covered by the protective

23  order.  It's standard.  I do it in all my cases.

24      THE COURT:  Oh, absolutely.

25      MS. GJOVIK:  I'm objecting to that.  I'm

3:23-CV-04597-EMC

Page 9

1    sorry, that's not what the conversation was.  The

2    transcript shows that's not what you guys said.

3    Sorry.

4         THE COURT:  Okay.  So I think that what

5    Ms. Riechert just said is -- you know, whether or

6    not that's what she said before or not -- that would

7    be correct, that confidential information that is

8    covered under the protective order, it can come in

9    the form of deposition testimony.  It could be in

10   the form of documents that had been produced.  It

11   can be in video.  I mean, there's many, many

12   different ways that confidential and proprietary

13   information can be recorded.

14        MS. GJOVIK:  I understand.  She specifically

15   said in the transcript it was for document

16   authentication and specifically said it was this

17   informed consent agreement that she says is

18   basically the basis for Apple's justification for my

19   termination, and they won't give me the copy, and

20   they won't produce it but they want to show me

21   during the deposition, have me authentic it, but

22   then we'll declare that confidential.

23            And that's in -- I mention in my

24   opposition it's in the meet-and-confer transcript as

25   well.  And that's where I was, like, whoa, whoa,

3:23-CV-04597-EMC

Page 10

1   whoa, that does not sound like what this is intended

2   for.  This also seems like it's going to be highly

3   prejudicial to me.

4        THE COURT:  Right.

5        MS. GJOVIK:  And that's where I was trying to

6   put my foot down.  But as you mention, I'm

7   representing myself, and I just graduated law

8   school, basically.  So I've never done anything like

9   this before.

10       THE COURT:  Right.

11       MS. GJOVIK:  And I might not be using the

12  language that is best interpreted.  But that was me

13  trying to advocate for my rights but also saying

14  "I don't think this is what this order is about."

15       THE COURT:  Right.

16       MS. GJOVIK:  I think that's the intention.

17       MS. RIECHERT:  And it is correct that one of

18  the documents we are relying on to support the fact

19  that we terminated Ms. Gjovik because she revealed

20  confidential information is a document that she

21  signed consenting to her participation in a study

22  that Apple was running and agreeing that any

23  information she got as a result of that study is

24  confidential.

25            There is information on that consent form

3:23-CV-04597-EMC

1    that is confidential.

2         MS. GJOVIK:  No --

3         MS. RIECHERT:  We have produced it and

4    redacted the confidential information.  But if

5    I show her the redacted copy at the deposition and

6    say "Is this a copy of the document you signed?" she

7    would say "no" and she would be correct because

8    I would be showing her the redacted copy.

9         THE COURT:  Right.

10        MS. RIECHERT:  So what I want to show her at

11   the deposition --

12        MS. GJOVIK:  No --

13        MS. RIECHERT:  -- is the unredacted copy and

14   say "is this a copy" --

15        MS. GJOVIK:  Objection again.  No.  The

16   transcript says clearly you say it's not that.

17   Because I called out that that document you're

18   referring to is what you gave to the Department of

19   Labor, and I said "That is not the agreement you're

20   talking about."  That was the year prior.  And

21   I said you gave the Department of Labor a false

22   document, and you said even in these transcripts

23   that are on the docket that you want to show me the

24   real document then and have me authenticate the real

25   one.  But you have not produced, and you've said in

3:23-CV-04597-EMC

Page 12

1    transcripts you will not produce it to me.  You will

2    only show it in the deposition.

3         MS. RIECHERT:  I have given you the

4    unredacted --

5         MS. GJOVIK:  And I said I do not agree to

6    that.

7         MS. RIECHERT:  -- the redacted version.

8    I have not given you the unredacted version, but

9    I would like to show that to you at your deposition.

10   And that's why that would need to be under the

11   protective order.

12        MS. GJOVIK:  It is contrary to the prior

13   transcripts and the prior conversations where you

14   said there's a different document, and the one that

15   you guys say you produced, you didn't even produce

16   until I got it from OSHA, through Jolla.  I don't

17   know if you guys produced that one after.

18             And then you're saying -- because I said

19   "That's not the one I sent.  That's 2018."  That's

20   a completely different program, and I accused you of

21   misleading the Department of Labor with that

22   agreement as well, and I said there was a different

23   one in 2017 that I had signed under the armed guards

24   in the hot parking lot and all of that.  And you

25   have not given me a copy, you won't give me a copy.

3:23-CV-04597-EMC

1    In the transcript, you expressly said you would only

2    show me a copy during deposition but would not

3    produce it.  That is in the transcript.

4        THE COURT:  Okay.  So I don't -- you know, I'm

5    not going to read all of these pages and pages

6    that -- I mean, this is just way too voluminous for

7    this issue.  And we have to separate --

8        MS. GJOVIK:  So sorry.

9        THE COURT:  We have to separate out the issue

10   of the protective order from the scope of discovery.

11   And so what I'm addressing at this moment is the

12   protective order and the fact that it has not yet

13   been signed by the parties.

14            And I'm prepared to just enter the

15   protective order as it is written because that's the

16   Model Protective Order.  And then that will govern

17   how you -- how the parties deal with confidential

18   information.  And so Apple cannot refuse to produce

19   the information once you have that protective order

20   in place, because then you're -- you know, you need

21   to comply with the protective order regarding how

22   you deal with any confidential information that is

23   produced to you in this litigation.

24            So they're just making sure that they

25   have that order in place so that once they do

3:23-CV-04597-EMC

Page 14

1    produce it to you, you can't go and put it out there
2    in the public.  I mean -- and, Ms. Riechert, you can
3    correct me if I'm wrong, but I think that that's
4    what this is about.  And if you really are going to
5    be withholding documents entirely that should be
6    produced, then that will be the subject of another
7    discovery joint -- that would be a joint letter that
8    you would write about why it should be produced or
9    why it shouldn't be produced and providing each
10   party's, you know, position about that.

11          But right now, what I'm talking about is
12   just getting this protective order done and getting
13   it signed by the parties and filed so that I can
14   sign off on it.  And then that will be the thing
15   that you use to govern how you deal with
16   confidential and proprietary information.

17        MS. GJOVIK:  So as long as I'm not removed of
18   my right to file objections, as Apple requested, the
19   combination, then of the protective order with them
20   asking that I can't file opposition --

21        THE COURT:  Opposition to what?

22        MS. GJOVIK:  -- I find disturbing.

23        THE COURT:  What are you talking about?

24        MS. GJOVIK:  Their fashioning another remedy
25   for discovery.  Said that they want to build the

3:23-CV-04597-EMC

Page 15

1    request whenever they wanted and not let me file any

2    objections.  And they said that they wouldn't talk

3    to me anymore going forward.  There was no way to

4    meet and confer about anything.  And they've said

5    that they won't even communicate with me until this

6    call, apparently they get approval if they can just

7    not talk to me anymore.  So the combination --

8            THE COURT:  I haven't seen anything.

9            MS. GJOVIK:  -- of all of these things --

10           MS. RIECHERT:  I think she's talking about the

11   alternative remedies that we requested.  But right,

12   now we're focussing on the protective order.

13           THE COURT:  Oh, okay.  Right.

14           MS. GJOVIK:  I'm saying protective order --

15   I understand the court's view and you did

16   a wonderful job explaining it, and I will go along

17   with it.  As long as I can preserve my right to

18   actually object, which is their fashioning another

19   remedy, that she wants to skip over right now.  I'm

20   saying the protective order, it would be a gross

21   violation of my constitutional rights if it was

22   placed on me and I had no way to object or challenge

23   any of the things they were doing under it.

24           THE COURT:  Well, what you would do is, under

25   the protective order, you know, you do have rights

1  under the protective order.  So, you know, there's

2  a --

3      MS. GJOVIK:  They asked to waive them.  It's

4  part 2 of this call.  That was the problem.

5      THE COURT:  You said what?

6      MS. GJOVIK:  They're asking to waive those

7  rights as part 2 of this call.

8      MS. RIECHERT:  No, not at all.

9      MS. GJOVIK:  Is my concern.

10      THE COURT:  I didn't see anything asking to

11  waive anything in the protective order.  They just

12  want me to enter the protective order so that that

13  becomes the order of the court.

14      MS. GJOVIK:  Understood.  Then the later part

15  of their motion asked to --

16      THE COURT:  Right, I got that.  But let's deal

17  with one thing at a time.  Okay.

18      MS. GJOVIK:  Yeah.

19      THE COURT:  So the first thing is just the

20  protective order itself.  I don't think you should

21  feel any particular coercion or anything about that,

22  because I've already explained to you about this is

23  the standard Model Protective Order approved by all

24  the judges on this court.  So, you know, you're not

25  being forced to do anything that's against your

3:23-CV-04597-EMC

Page 17

1    rights.

2          And, in fact, if you read the whole

3    thing, you know, you'll see that there are -- there

4    is a process for -- you know, you can challenge

5    designations, if they designate something

6    confidential and you don't agree that it's

7    confidential, you know --

8          MS. GJOVIK:  I'm so sorry if my statements are

9    offensive.  I know you guys spent, it sounds like,

10   a lot of time on this in trying to find a way to

11   improve these processes.  I just want to underline

12   that my concerns were rooted in the way that this

13   was to be applied based on the conversations with

14   opposing counsel over the last two years.  So it was

15   more of the application of the official policy, not

16   necessarily the policy itself.

17         THE COURT:  Okay.  All right.  And so if we're

18   okay -- if we -- you know, if we're finished with

19   that issue and you're prepared to go ahead and just

20   sign off on the Model Protective Order, then we can

21   move on to the next issue, which --

22         MS. GJOVIK:  Yes.

23         THE COURT:  -- is --

24         MS. RIECHERT:  Could we just focus on that,

25   when will the parties be signing -- I can sign it

3:23-CV-04597-EMC

Page 18

1   today, if that helps.  I just want to be sure we get

2   this in.

3          THE COURT:  Yeah.  I think that the parties

4   should just get it signed as soon as possible and

5   then get it to me.  You know, Ms. Riechert, you

6   could just go ahead and, you know, once you get

7   her -- get Ms. Gjovik's signature on it, go ahead

8   and e-file it, and I will sign it.  It's pretty

9   straightforward.

10              So Ms. Gjovik, can you sign it as soon as

11  possible?

12         MS. GJOVIK:  Yes, that's fine.  I'll send it

13  today.

14         THE COURT:  Okay.  Today would be great.  And

15  then, Ms. Riechert, you can sign it or whoever

16  signs --

17         MS. RIECHERT:  Yes.

18         THE COURT:  -- can sign it.  And then you

19  submit that to me --

20         MS. RIECHERT:  Yeah.

21         THE COURT:  -- and then I'll sign it.  That

22  becomes the court's order.  And then the next

23  question -- I mean, the next issue is the fashioning

24  of alternative procedures for discovery disputes.

25              Now, Apple is requesting to do, I guess,

3:23-CV-04597-EMC

1    have an exception from my standing order.  My

2    standing order requires people to meet and confer in

3    person or via videoconference.  So Apple is

4    requesting to meet and confer in writing over

5    a five-business-day period.

6              And, you know -- so Ms. Riechert, maybe

7    you can just sort of explain why you think that

8    would be a better procedure and more efficient.

9    I will acknowledge, Ms. Gjovik, that sometimes when

10   one party is not represented by an attorney and then

11   ends up having to have meet-and-confer sessions with

12   an attorney, we do sometimes make exceptions.  For

13   instance, in case management conferences, you know,

14   for case -- when you have to prepare a case

15   management conference statement, sometimes we will

16   just, instead of requiring a joint case management

17   statement, we will allow the parties to file

18   a separate one because it's just too difficult

19   sometimes for a pro se person to get together with

20   an attorney and write a joint case management

21   statement for various reasons.  So we'll make an

22   exception.

23             MS. GJOVIK:  I have --

24             THE COURT:  Yes.  So I'm just letting you

25   know --

3:23-CV-04597-EMC

Page 20

1    MS. GJOVIK:  I don't necessarily object to
2  this at a face level.
3    THE COURT:  Okay.
4    MS. GJOVIK:  It was more of the not -- me not
5  being able to file objections and them being able to
6  get whatever they want approved without me filing
7  something in addition.  That's where I objected.
8        I'd actually prefer to have stuff in
9  writing with them due to all the many ongoing issues
10  that we've been having, especially the "he said/she
11  said" stuff.  So I actually don't object to having
12  stuff in writing versus the Zoom calls at a basic
13  level.
14    THE COURT:  Okay, okay.  And I agree with you.
15  I don't agree with the part of the proposal that you
16  would not be able to file an opposition unless leave
17  is granted.  I don't agree with that.  So I would
18  not impose that requirement.  I would --
19    MS. GJOVIK:  Okay.
20    THE COURT:  -- allow you to -- it says here,
21  "If leave to file an opposition is granted, the
22  opposing party has five days to file."  I would just
23  give you five days to file.  I mean, you don't need
24  me to grant you leave to file an opposition.
25    MS. GJOVIK:  Thank you.

3:23-CV-04597-EMC

Page 21

1    THE COURT:  So I'm with you on that.

2    MS. GJOVIK:  Thank you.

3    THE COURT:  So if --

4    MS. RIECHERT:  I just wanted to point out the

5    reason for that, you may recall that the plaintiff

6    filed four briefs with you, four separate briefs,

7    letter briefs about discovery issues.  And when she

8    does that, we have to spend a lot of time responding

9    to them.

10    THE COURT:  Yeah.

11    MS. RIECHERT:  And then the whole thing is

12    moot because she couldn't meet and confer, and

13    meanwhile we've spent all this time responding.  And

14    this has been true of the 10 or so motions that the

15    plaintiff has filed in this case, is we spend a lot

16    of time filing our positions.

17    MS. GJOVIK:  Objection again.  You filed it.

18    MS. RIECHERT:  Excuse me, I haven't --

19    MS. GJOVIK:  Melinda, you filed it without

20    meet and confer --

21    MS. RIECHERT:  I hadn't finished yet.

22    MS. GJOVIK:  -- without a the joint letter.

23    MS. RIECHERT:  I hadn't finished yet.

24    So there's been a lot of motions filed,

25    and then we file our positions, and the motions are

Page 22

1    dismissed.  And we're just spending a lot of time.

2         THE COURT:  Right.

3         MS. RIECHERT:  And in the Ninth Circuit, the

4    same thing.  She files motions, motions for

5    reconsideration, and it's becoming very burdensome

6    to keep responding to motions when there's no basis

7    for the motion.  And so that was what led me to say

8    why don't we at least see if there's a basis for the

9    motion before we have to spend a lot of time and

10   effort opposing it, and then the motion gets

11   withdrawn because there was no basis for it.  As

12   with the four letters that she filed previously

13   with --

14        THE COURT:  I get that.  I understand what

15   you're saying about the motion filing, and that's an

16   excessive amount of motions.  But this is about

17   opposing -- from what I'm understanding, is that the

18   parties would be meeting and conferring, according

19   to Apple's proposal.  The parties would meet and

20   confer in writing over this five-day business --

21   five-business-day period.  And then the letter brief

22   requesting relief, "If the dispute remains

23   unresolved after the five business days, the

24   initiating party may file a unilateral letter,"

25   meaning not a joint letter, "no longer than" --

3:23-CV-04597-EMC

Page 23

1    I changed it to five pages.

2         MS. RIECHERT:  Mm-hmm.

3         THE COURT:  Just because that's my standard

4    number of pages anyway.  And I just -- so I just

5    kept it as five.  "But no opposition filed until the

6    court grants leave to file."  That's the part that

7    I don't agree with, and I don't think an opposition

8    to that unilateral letter brief is the same thing as

9    filing a motion.  She would be able to file an

10   opposition to that letter brief.  And only --

11        MS. RIECHERT:  It's --

12        THE COURT:  Only in opposition to that letter

13   brief.

14        MS. RIECHERT:  It's more our filing in

15   opposition to her letter briefs, because she's the

16   one that has been filing all the letter briefs.  And

17   my hope was that somebody would take a look at the

18   brief and say "This doesn't need to be responded to,

19   and so don't bother to respond."

20        MS. GJOVIK:  Objection.  Objection.  Those

21   four briefs were trying to get ahead of all the

22   issues that we have, like, a very long list of very

23   big conflicts, your Honor, that need to be dealt

24   with.

25              This is coming after I accused them of

3:23-CV-04597-EMC

Page 24

1    evidence spoliation.  They claimed they don't have

2    data that they absolutely would have if they had not

3    deleted it.  I was asking for a deposition.  They

4    said they'd never talk to me again.  They haven't

5    produced documents.  This is a clever approach by

6    Apple's counsel to try to get ahead of me raising

7    very real discovery disputes, and most of this is

8    rooted in those four discovery letters where I --

9    I'm -- I was a program manager at Apple.  I knew

10   that this was going to blow up later.

11            I was trying to get ahead of it.  Counsel

12   is not cooperating.  The transcripts show that they

13   have not been cooperating on very basic things.

14   They refused to create a discovery plan.  They've

15   refused to do very basic planning.  And most of the

16   motions I've filed, they did grant it.  I filed

17   multiple motions of strike that were granted.

18   I filed a motion to strike Apple's answer that was

19   granted.  They're acting like I'm filing meritless

20   motions.  That is not true.  They filed six motions

21   to dismiss concurrently.  They drew this out, 18

22   months.

23            So this is a very unfair kind of ambush

24   over a phone call to try and make it sound like I'm

25   filing frivolous things and have no points, when

3:23-CV-04597-EMC

Page 25

1    your Honor admittedly does not have time to read all

2    this.  You're helping with discovery, and I really

3    appreciate that and understand you can't get up to

4    speed on a very complex case.  But they're taking

5    advantage of that right now.  And they're trying to

6    take away my rights based on this smear over the

7    phone.  And I find that very concerning.

8         THE COURT:  I think what they're saying is

9    they don't want to have to file an opposition if you

10   file a letter brief.  They want to not have to file

11   an opposition to it.  I was thinking they were

12   trying to prevent you from filing --

13        MS. RIECHERT:  Not at all.  Not at all.

14        THE COURT:  Oh, okay.

15        MS. GJOVIK:  Sounds like they're asking now to

16   prescreen --

17        MS. RIECHERT:  We just don't want to file an

18   opposition.

19        THE COURT:  Well, I think any party can oppose

20   a letter brief that's filed.  You can choose not to

21   file an opposition if you want.

22        MS. RIECHERT:  No --

23        MS. GJOVIK:  If that's their position, I don't

24   object.  My interpretation of that is they basically

25   want to put me on a vexatious petitioner list for

3:23-CV-04597-EMC

1    motions, including discovery motions, and to have

2    everything screened with the parties so that --

3          THE COURT:  No, it's not.

4          MS. GJOVIK:  -- it is probably meritless.

5          THE COURT:  That's not happening.  That's not

6    what's happening.

7          MS. GJOVIK:  Thank you.

8          THE COURT:  We're just trying to figure out

9    what the process should be, especially if you really

10   do have a long list of discovery issues.  And I have

11   to tell you, you know, Ms. Gjovik, your proposal

12   that I should be intimately involved in the

13   discovery process through, "structured discovery

14   conferences," that is just not something that can

15   happen.

16         MS. GJOVIK:  I understand now.

17         THE COURT:  You know, our court does not have

18   those kind of resources.

19         MS. GJOVIK:  I understand.

20         THE COURT:  Yeah.  I mean, that could be like

21   a --

22         MS. GJOVIK:  I was naive coming in about the

23   resources available to you guys.

24         THE COURT:  Yes.  I mean, generally in very

25   difficult, complicated cases where the parties

3:23-CV-04597-EMC

Page 27

1  cannot engage in a civil, you know, discovery

2  process and the number of discovery disputes becomes

3  excessive and overwhelming, what will happen is the

4  court might refer the case to a special master.

5  That would be somebody that --

6         MS. GJOVIK:  I asked for that at the

7  beginning.

8         THE COURT:  That would be outside of the

9  court.  Because the court doesn't have the time.

10        MS. GJOVIK:  Oh.

11        THE COURT:  The court can't do that.  We don't

12  have those kinds of resources to be dealing with

13  that level of constant battle over discovery.

14        MS. GJOVIK:  I see.

15        THE COURT:  And that's also a very expensive

16  process, because if there's a special master

17  appointed, you have to pay that special master.  The

18  parties have to pay for that.

19        MS. GJOVIK:  I see.

20        THE COURT:  You know?  And I don't know if you

21  want to spend money on -- I mean, it can be very --

22        MS. GJOVIK:  I don't have any.

23        THE COURT:  Okay.  Well, it can be very

24  expensive.  And so you being pro se, I doubt that

25  Judge Chen would want to impose that kind of

3:23-CV-04597-EMC

Page 28

1  financial burden on you.  But at the same time, if
2  this is going to be one of those cases where it's
3  just a constant thing taking up so many court
4  resources because you can't figure out a way to work
5  together on discovery in this case, you know,
6  something has got to give because --
7       MS. GJOVIK:  I also -- I had asked softly with
8  you but also filed a motion to Judge Chen.  The
9  discovery is clearly just being used to harass me by
10 the other side, and they're not participating.  But
11 I already have enough to prove my prima facie.  The
12 NLRB is suing Apple over the same thing, based on my
13 charges.
14       I had an ALJ already in my favor.  I have
15 enough evidence to get the case forward and asked if
16 could you just stop discovery and go to summary
17 judgment.  I would love discovery and get more
18 information from them, but they've been using it as
19 an opportunity to -- very invasive requests, like 10
20 years of medical history based on vaporware
21 affirmative defenses and all this stuff.  And
22 I would just like to go to trial.  They fired me in
23 2021.  This has taken forever.  I just want to be
24 made whole and move on with my life.  So I --
25       THE COURT:  But, Ms. Gjovik, you can't do

3:23-CV-04597-EMC

Page 29

1    that, though.  I mean, that's just not how it works.
2    So when you file a lawsuit, you have to do discovery
3    or you could choose not.  I mean, it's up to you.
4    But they're entitled to do discovery.  They're
5    entitled to assert affirmative defenses, and they're
6    entitled to discovery to prove their affirmative
7    defenses.  And I know it can feel like a real burden
8    and a pain, but that's just litigation.

9         MS. GJOVIK:  I understand.  Judge Chen did
10   approve my motion to strike almost all of their
11   affirmative defenses.  He did grant them leave to
12   amend, but I just -- I filed another motion to
13   strike because they still have not pled any facts.
14   They've actually made multiple false statements
15   contradicting each other.  And I feel confidant that
16   the remainder probably of their affirmative defenses
17   will be removed.

18         And I think it's also noteworthy that the
19   specific documents they've been talking about under
20   that gag order -- sorry, not gag order, protective
21   order, and I'm signing it.  It's fine -- that they
22   want to restrict my speech about are not even
23   related to something they said they terminated over.
24   They're arguing that it's actually part of an
25   affirmative defense, which I'm arguing to get

3:23-CV-04597-EMC

Page 30

1    stricken again.  But it's not even the reason for

2    the termination.

3            So one of the reasons I've been really

4    trying to push for a discovery plan, which we don't

5    even have, is to get alignment on what the actual

6    prima facie is and what the actual approved, if

7    affirmative defenses are to go forward, and make

8    sure that the things that are happening are all tied

9    to those things so we can actually be focused and

10   efficient, and hopefully easier to agree upon scope

11   and relevance.  Because right now, you know, the

12   majority of their requests they're making, including

13   this escalation, is over something that's based on

14   an affirmative defense that was stricken that they

15   have repled but it's subject to another motion to

16   strike and may not even go forward.

17       THE COURT:  Right.

18       MS. RIECHERT:  I would like to correct one

19   thing that was said is that, as you can see from the

20   length of the docket, there have, indeed, been

21   numerous motions.  But it is inaccurate to say that

22   the plaintiff has won most of the motions.

23   Actually, the only motion that she has won is a

24   motion to strike the affirmative defense, some of

25   the affirmative defenses, on the grounds there were

3:23-CV-04597-EMC

Page 31

1   not enough facts in there with leave to amend.

2           We amended the answer, we added the

3   facts.  She then filed a second motion to strike

4   those same affirmative defenses.  And you will see

5   that they're just constant motions.  She filed

6   a motion to disqualify Orrick from the case, which

7   was denied.  She --

8           MS. GJOVIK:  Three additional motions to

9   strike were approved to your witnesses' unilateral

10  declarations.  All three of those were stricken.

11  That's four motions to strike.

12          MS. RIECHERT:  That's what -- we did not file

13  the declarations of Apple John and Joanna Appleseed.

14  She filed them.  And, yes, the court struck them as

15  the court should have, but that had nothing to do

16  with us.  So I'm just saying that there are just

17  constant motions.  It's just like -- she filed

18  another motion today that has -- we have to respond

19  by Monday.

20          THE COURT:  What motion?

21          MS. RIECHERT:  It's an administrative motion

22  to stop all discovery and let her file her summary

23  judgment motion in 60 to 90 days.

24          MS. GJOVIK:  No.  It's asking for a case

25  schedule.

3:23-CV-04597-EMC

Page 32

1    MS. RIECHERT:  And now I have an associate --

2    MS. GJOVIK:  We have no case schedule.

3    MS. RIECHERT:  Hold on a second.  I now have

4  to have an associate work over the July 4th weekend

5  to prepare an opposition to that motion, which is

6  due on Monday, to explain why we've been trying to

7  take your deposition and we still haven't taken it.

8  We've sent you discovery.  You haven't responded to

9  any of it.  And so --

10    MS. GJOVIK:  If you want to stipulate to

11  a week extension, we can.  But this is also asking

12  for a case schedule.  We don't even have a trial

13  scheduled.  We have no case schedule.  It's a very

14  basic thing that is completely in my right to

15  request.

16    MS. RIECHERT:  We're absolutely fine with

17  having a case management conference.

18    THE COURT:  Well, nobody is going to -- no

19  judge is going to just stop discovery.  That's not

20  going to happen.  So that's just not a request

21  that's going to get granted.  There is an

22  entitlement to discovery.  If Judge Chen has not

23  given you a schedule then, yes, you should ask for

24  one.  I mean, but that usually is done during case

25  management, so I'm not sure what's going on with

3:23-CV-04597-EMC

Page 33

1    that.

2         MS. GJOVIK:  We don't have any future case

3    management conferences either, which is why I filed

4    a motion.

5              And, again, Melinda, if you guys want

6    a week extension, just ask me.  Again, you said you

7    wouldn't talk to me anymore, but if you'd sent me an

8    email --

9         THE COURT:  Do you have a cutoff?  Oh, so you

10   don't have any --

11        MS. GJOVIK:  Yeah, the hearing is on the 31st.

12        THE COURT:  Oh, for discovery.

13        MS. RIECHERT:  There's a hearing on the 31st

14   to her second motion to strike our affirmative

15   defenses.

16        THE COURT:  Oh.

17        MS. RIECHERT:  But now she filed another

18   motion.  So it's just like I wake up every morning,

19   there seems to be another motion, two of them this

20   morning.  And this was the reason why we asked for

21   leave to have her -- to not have to keep opposing

22   these motions until somebody at least looks at them

23   and decides if this is the kind of motion that an

24   opposition is due.  So --

25        MS. GJOVIK:  The second one was a reply in

3:23-CV-04597-EMC

1    support of --

2        MS. RIECHERT:  Hold a second.  I am talking.

3    So for example, this administrative motion to stay

4    all discovery and let her file a summary judgment

5    motion in 60 to 90 days, I'm going to have a spend

6    time with my associate this weekend opposing it,

7    when there's absolutely no basis for it.  And it's

8    very frustrating with each of these motions that we

9    have spent time opposing them when there's

10   absolutely no merit to the motion.

11            So that was the basis for my arguing in

12   here.  If she files another motion, like she did the

13   four discovery letters, like the motion to

14   disqualify, like whatever, somebody just should take

15   a look at it and say, "Is this the kind of motion

16   that you need to spend time responding to?"  That

17   was the basis for that part of my request for other

18   assistance in connection with this case.

19       THE COURT:  Okay.  So I want to make sure that

20   I focus -- stick to, you know, my domain which is

21   discovery.  Fortunately for me, I don't have to deal

22   with all the rest of this case.

23            But -- but in terms of, you know, the

24   procedure for discovery, I am fine with the

25   alternative procedure proposed, which is that the

3:23-CV-04597-EMC

Page 35

1  parties meet and confer in writing over
2  a five-business-day period, that the letter brief --
3  a unilateral letter brief can be filed by the party
4  who is requesting the relief if there's no agreement
5  reached during the meet-and-confer period.
6            And, you know, I suppose one compromise
7  could be -- I'm not going to deny the other side the
8  opportunity to file an opposition, just because
9  there could be time where, you know, Apple is the
10 one requesting relief, and she should be able to
11 oppose it in five business days if she wants to.
12           But if Apple does not want to file an
13 opposition until, you know, after the court reviews
14 it, you know, that's a little bit odd, because it
15 seems to me Apple could simply say in a very short,
16 you know, statement that this is not warranted, that
17 whatever she's asking for is not available.  I mean,
18 I don't think you have to go on and on about it.  Or
19 you can submit something that says, you know, you
20 would just request the court to just decide, you
21 know, based on what's argued.
22           But not having anything submitted at all,
23 just a sort of -- not a good process for me.  And to
24 be deciding whether or not, you know, somebody
25 should be permitted to file an opposition really

3:23-CV-04597-EMC

Page 36

1   does start to sound like interfering with the
2   opportunity for both sides to be heard.  And so I'm
3   just not comfortable saying no opposition is filed
4   unless the court grants leave to file an opposition,
5   even though I understand your complaint,
6   Ms. Riechert.  I understand you feel burdened by the
7   motions.
8           And my domain is discovery, and so for in
9   the discovery context, I will give five days for the
10  other side who -- you know, the non-requesting party
11  to file an opposition.  If you don't file an
12  opposition, I will decide it based on what's been
13  submitted in the brief by the requesting party.
14      MS. GJOVIK:  Thank you, your Honor.
15      THE COURT:  But, you know, you can't -- you
16  know, you should be careful what you wish for
17  because --
18      MS. RIECHERT:  We're not going to do that,
19  believe me, because that's like a non-opposition.
20  We're certainly opposing these thing that are being
21  requested, as we did with the last four discovery
22  briefs that were filed.
23      THE COURT:  Right.
24      MS. RIECHERT:  So we will spend the time.  We
25  will oppose it.

3:23-CV-04597-EMC

1        THE COURT:  Okay.

2        MS. RIECHERT:  But perhaps at some point in

3    the future it becomes clearer that there should be

4    some limits on our obligation to --

5        MS. GJOVIK:  Objection --

6        MS. RIECHERT:  -- responding to these motions

7    that have no merit.

8        THE COURT:  Right.  And the other thing --

9        MS. GJOVIK:  Unless there is --

10        THE COURT:  Ms. Gjovik, let me just explain

11    something else to you.  Okay.  And this is going to

12    be good for you to just know, since you said you

13    just graduated from law school and you're going

14    to -- maybe you're going to be a lawyer, practice

15    law or something, I'm not sure.

16            But when you appear in court, simply

17    because you're on an opposing side does not mean

18    that every single part of the litigation process has

19    to be contentious.  You know, when you take -- when

20    at some point, you know, you become a member of the

21    bar and you get sworn in and you take that oath for

22    the State of California to become a member of the

23    bar, one of the things that it talks about is

24    civility, you know, and talking and behaving in

25    a way that's civil.

3:23-CV-04597-EMC

Page 38

1    An attorney -- the reason why that was
2    added to the oath is because so many lawyers were
3    just arguing and bickering with each other all the
4    time, and civil litigation became a really very
5    uncivil experience.  And so, you know, the state bar
6    added that to the oath just as a reminder to those
7    who enter the practice of law, that you have to
8    treat each other well.  You know, that you have to
9    be civilized.  It is impossible to -- it makes
10   litigation just unbearable when everybody's fighting
11   over every single thing.
12        You can agree to do certain things.  You
13   can agree to provide certain information.  And then
14   you can agree to disagree on certain things.  And
15   then once you have an opportunity to talk everything
16   through in a very calm and civil way, not emotional,
17   but in a calm and civil way and then you can still
18   not agree based on the law on a particular thing,
19   that's the thing that you just narrow it down to and
20   then present that to the court.
21        That's what the meet-and-confer part is
22   about, to just really sit down with each other.
23   That's why the court started requiring people to do
24   it in person and to do it by video.  Because in the
25   past, doing it in writing was a real pain.  It

3:23-CV-04597-EMC

Page 39

1   was -- it was a disaster in a lot of ways because

2   what attorneys did is they would just keep papering

3   each other and they would just write letter after

4   letter after letter, back and forth, back and forth,

5   back and forth, and drive everyone and themselves

6   crazy.

7           So that's why we started requiring people

8   to meet and confer in person because the theory is

9   that if you are face-to-face, you're less likely to

10  engage in ridiculousness and just make up a bunch of

11  stuff that you can just slap on a page and send it

12  to someone.  You know, when I was practicing,

13  I would just get email after email after email from

14  opposing counsel, and they're just racking up their

15  billable hours and wasting my time.  But if you sit

16  down at the table with each other, or you sit down

17  on the screen looking at each other face-to-face, it

18  just is encouraging a little bit more cooperation.

19  Generally that's what's happens.

20          But the dynamic that I pointed out to you

21  at the beginning of this call, Ms. Gjovik, is that

22  this is personal for you, and you cannot separate

23  the fact that this is personal for you.  So when

24  you're talking about your issue that you're having

25  in the case and the way that you're perceiving the

Page 40

1   way discovery is being used and all of that, I can
2   hear the emotion in what you're saying.  I can hear
3   it.  Because you can't separate yourself from it.
4          So I think, you know, to the extent
5   possible -- I don't know how much, you know, or how
6   hard you've tried to find an attorney or how much
7   you've consulted with the pro bono help desk on some
8   things, but I really think --
9       MS. GJOVIK:  I worked with the clinic a lot.
10      THE COURT:  Did you?
11      MS. GJOVIK:  They've been wonderful.  They
12  didn't know how to handle the situation with the way
13  that opposing counsel has been handling things.
14      THE COURT:  Uh-huh.
15      MS. GJOVIK:  And I really appreciate you
16  laying all that out and talking through it, but I do
17  feel like those transcripts are very reflective of
18  me trying my best, as -- you know, I was very high
19  up at Apple, and I would lead huge meetings with
20  executives on various contentious topics, and I feel
21  like I'm very good at trying to navigate these
22  things and try to get to the root of issues.
23          And I think those transcripts reflect
24  that opposing counsel has been very obstructive and
25  also trying to trigger me on some of this to cause

3:23-CV-04597-EMC

Page 41

1   reaction.  Melinda -- I said I was willing to

2   continue these meet-and-confers.  I agree with you.

3        THE COURT:  Mm-hmm.

4        MS. GJOVIK:  I feel like we made the most

5   progress when we had these Zoom meetings and we'd

6   try to talk through stuff.

7        THE COURT:  Okay.

8        MS. GJOVIK:  And I think the transcript shows

9   that too.  I was trying to get deliverables at the

10  end and get agreement on things and follow-up

11  emails.

12       THE COURT:  Right.

13       MS. GJOVIK:  And it is here defense counsel

14  asking to not have those meetings, not me.  I'm

15  saying that I won't object if they really want that.

16  But I do hear you on both sides, though.  This is

17  very emotional for me.

18            I did try looking at attorneys once.

19  Most attorneys will not take cases against Apple,

20  especially employment cases, because they'll drag it

21  out for a long time, and there's a ton of motion

22  practice, and they often will make accusations

23  against the other side's attorney, and all this

24  stuff.

25            So it's not economically or

3:23-CV-04597-EMC

Page 42

1    reputationally feasible for them to be in cases with

2    Apple, and they'll be very honest about that.  And

3    the other side is, my case is complicated.  There's

4    a lot of environmental law.  There's a lot niche

5    topics, privacies that require specialists, that

6    would require multiple firms or require me to narrow

7    my claims, which I don't feel like I can do without

8    putting the integrity of the case at risk because

9    I believe the full breadth is necessary --

10           THE COURT:  Okay.

11           MS. GJOVIK:  -- to argue.  So as much as I did

12   not want to be pro se on this, it was important for

13   me to do that, because I wasn't looking -- you know,

14   an attorney might take it to try to get a settlement

15   from Apple, like a quick payout.  But that's not

16   what I wanted.

17           THE COURT:  Right.

18           MS. GJOVIK:  You know, I wanted to protect my

19   rights, and to protect my coworkers, and to get

20   stuff on the record, and all of that stuff.

21           THE COURT:  Okay.

22           MS. GJOVIK:  So that's why I'm trying to do

23   it.  I do really appreciate your patience, though,

24   in understanding of this is very new to me.

25           THE COURT:  Yeah, I mean, I sympathize with

Page 43

1  you a lot because it's just difficult to do, even if

2  you're not just somebody who just finished law

3  school.  I mean, I would never represent myself,

4  ever.  I just wouldn't do it.  And I'm a judge, and

5  I wouldn't do it.  I mean, it's just --

6          MS. GJOVIK:  Yeah.

7          THE COURT:  I cannot -- when I'm dealing with

8  things in life in general, I can fight for anyone

9  else.  You know, anybody asks me for help, I can go

10  to battle for them.  But I cannot fight for myself

11  in an objective way, because it's too emotional for

12  me.

13          And so it's really hard for you.  I'm not

14  saying you shouldn't do it.  I understand, you have,

15  you know, the claims that you really want to pursue,

16  and you have every right to do it.  I'm just saying,

17  you know, to the best of your ability, if you can

18  try to take a deep breath sometimes and just

19  remember that, you know, you're dealing with

20  attorneys who are used to just dealing with other

21  attorneys most of the time.  And so they're just

22  going to do their thing that they normally do.  And

23  it may or may not be personal.  You know, it's just,

24  try to be -- I'd try to be a little more objective,

25  you know, about it.

3:23-CV-04597-EMC

1       MS. GJOVIK:  I've been consulting with other
2   attorneys who will litigate with Apple.  It's kind
3   of a club of those willing.  And this sounds like
4   the stuff that's happening is kind of a normal Rambo
5   lawyer procedure, so I am trying to take it less
6   personally.
7       THE COURT:  Yes, yes.  It's just sort of part
8   of, you know, the --
9       MS. GJOVIK:  Culture.
10      THE COURT:  Yeah.  It's like, you know --
11      MS. GJOVIK:  Yeah.
12      THE COURT:  It's like challenging you to
13  a duel, you know, and you have --
14      MS. GJOVIK:  It is.  It really is.  And
15  especially for you.  I know you're so busy.  And
16  I've trying to empathize with judges, now learning
17  that you guys basically have to babysit so many
18  adults and corporations with these discovery
19  disputes constantly.  And I don't think I would be
20  able to do that.  So thank you for your service.
21          I will -- in raising issues, I will try
22  to be as focused as I can and not emotional and
23  really highlight, as you mentioned, the concrete
24  legal issues, and your standing order is very clear
25  on that as well.

3:23-CV-04597-EMC

Page 45

1      THE COURT:  Yes.

2      MS. GJOVIK:  And if I'm not doing good, please

3  feel free to give me feedback on that of how I can

4  be more helpful.  I do expect that with discovery

5  going forward, that there will be a number of issues

6  we're going to have to raise, and I want to make the

7  best use of your time and help the case go forward.

8      THE COURT:  Yes.  And for me, you know, you

9  can try out this meet-and-confer process, this

10  alternative procedure that Apple has proposed.  And

11  if that turns out to be a disaster, we can rethink

12  it.  I really don't think that meeting and

13  conferring in writing is better than meeting and

14  conferring in person.

15      MS. GJOVIK:  Yeah.

16      THE COURT:  But I also have not, you know,

17  experienced whatever happens when you have done

18  that.  You do have -- I mean, I'm sort of witnessing

19  a little bit of it today in the way that you're sort

20  of -- your conversation is going, and it's a little

21  contentious.  But it's not too bad.

22      MS. GJOVIK:  Yeah.

23      THE COURT:  You know, and I think that if this

24  writing it over a period of five days turns out to

25  not be a really good procedure, then we can address

3:23-CV-04597-EMC

Page 46

1    it at a later date.

2         MS. GJOVIK:  Yeah.

3         THE COURT:  But I really would encourage the

4    parties, both sides, to just do things that

5    facilitate communication -- more communication and

6    more resolution.  Because I can tell you right now

7    that the court is never going to grant relief.  That

8    doesn't make sense.  The court is never going to

9    just say, for instance, "Oh, yeah, let's just do no

10   more discovery, and let's have motions."

11            I mean, you can always file a dispositive

12   motion, I suppose, unless Judge Chen has some rule

13   that says you can't file before a certain date.

14   Because usually if you have no dates set, you know,

15   then you can just file one at some point.  You know,

16   usually the court will set a last date to file or

17   a last date to hear a dispositive motion.  But if

18   you feel like you have all the evidence that you

19   need to file a motion for summary judgment, you

20   know, go ahead and file it.  I mean, I don't know,

21   I would doubt it --

22        MS. GJOVIK:  I'm waiting for him to weigh in

23   on the second motion to strike, because if he does

24   strike the remainder of their affirmative defenses,

25   then I feel like I'm clear to go.

Page 47

1    THE COURT:  Okay, all right.

2    MS. GJOVIK:  Which is why I combined it.

3    THE COURT:  But they do have to take your
4  deposition.  They're entitled to take your
5  deposition.  And so, you know, I'm hoping that
6  I don't have to deal with any discovery dispute
7  about that.  Because, you know, you filed this case,
8  so have to be deposed.

9    MS. GJOVIK:  I agreed to do it.  I did have
10  some request of making sure that I can get a copy of
11  the recording and having clear ground rules.  The
12  case has IED claims against them ongoing since they
13  fired me.  So there's been a lot of -- there's been
14  a lot going on, and I just want to make sure that my
15  rights are protected.  But I did not oppose to being
16  deposed.

17    THE COURT:  Okay.

18    MS. RIECHERT:  But that's the problem, you
19  see.

20    MS. GJOVIK:  I wanted good ground rules.

21    MS. RIECHERT:  There's always a condition to
22  it.  "You have to agree not to harass me.  You have
23  to agree not to trigger me."  I can't agree to that
24  when I'm doing this deposition.  We just need to
25  have the right to take the deposition, and she has

3:23-CV-04597-EMC

Page 48

1    the right to stop it and come to court if she thinks

2    it's inappropriate.  But we really need a date for

3    this deposition, and we've been trying to get one

4    for many, many months.

5         THE COURT:  That's true.  So why don't the two

6    of you just pick a date for a deposition?  It's

7    really simple.  And then --

8         MS. GJOVIK:  I'm sorry, the email they sent

9    said they won't talk to me anymore.  They won't even

10   email.  They said they weren't going to -- they were

11   going to somehow --

12        THE COURT:  Well, they have to talk to you.

13        MS. GJOVIK:  -- ask your permission to not --

14   that's what I'm saying.  So she's saying now that

15   I won't even respond to the dates.  But I have a

16   bunch of outstanding stuff, and they just kept

17   replying that they won't talk to me anymore, and

18   I didn't know how to move forward with that.

19            So I'm happy to talk with her about

20   scheduling this stuff.  I just don't want her to

21   frame this like I'm ignoring them when they

22   expressly said they won't communicate with me

23   anymore.

24        THE COURT:  Right.

25        MS. RIECHERT:  Let me first explain that.  So

3:23-CV-04597-EMC

1    I get an email from her that says "I'm thinking

2    about the Boeing case where the guy committed

3    suicide.  Every time you write to me, it triggers my

4    PTSD" --

5         MS. GJOVIK:  I didn't say that.

6         MS. RIECHERT:  "I'm not getting medication for

7    my PTSD, and I need" -- I quoted it in the

8    declaration in support.  "And so whenever you write

9    to me, it harasses me and triggers my PTSD" --

10        MS. GJOVIK:  I didn't say that, I didn't say

11   that.

12        MS. RIECHERT:  And so -- hold a second.

13        MS. GJOVIK:  That's not what I said.

14        MS. RIECHERT:  I'm still talking.  It's in the

15   papers that we submitted.

16            That's why I felt nervous about

17   communicating with her, because I don't want to be

18   responsible for her committing suicide and

19   triggering her PTSD when she's unmedicated because

20   she can't afford her medication.  So that's the

21   reason that we stopped writing to her.  And this is

22   in my declaration --

23        THE COURT:  Right.

24        MS. RIECHERT:  -- paragraph 9.  "I could no

25   long afford basic necessities.  I'm thinking about

Page 50

1    the Stokes vs. Boeing case.  Your recent conduct" --

2         MS. GJOVIK:  That was like a month prior.  You

3    did this is after I requested deposition of the

4    corporation.  This is when I requested a 30(b)(6)

5    deposition and accused you of evidence spoliation.

6              Then all of a sudden you decided you

7    weren't going to talk to me anymore.  And then cited

8    that email from a month prior where I just asked for

9    a couple days' extension on discovery stuff.  That

10   wasn't an ongoing email, that wasn't every email you

11   sent.  I just said, "I'm having trouble, something

12   bad just happened, can I have a couple days'

13   extension before I send you this stuff?"  And you

14   decided that it's some kind of misconduct.

15        MS. RIECHERT:  No.  I just was citing --

16        THE COURT:  Well, everybody should be --

17        MS. RIECHERT:  -- what you said to me, and I'm

18   not going to be responsible for having you commit

19   suicide or triggering your PTSD.  If my emails have

20   that effect on you, then I don't want to trigger

21   you.  I have no desire to cause you any harm.

22        MS. GJOVIK:  That's not true.  Then, like,

23   five days later you accuse me of perjury in your

24   amended answer.

25        MS. RIECHERT:  So what we write in pleadings

3:23-CV-04597-EMC

Page 51

1    is protected.  I'm just talking about when I sent

2    you emails that I --

3        MS. GJOVIK:  Anyway, I'm happy to move forward

4    on this stuff.  I think it would be good if we just

5    maybe closed everything that happened prior, start

6    fresh.  We can use this new procedure, see how it

7    works. I'm happy to work with them to schedule some

8    of the basic stuff.

9        THE COURT:  Yeah.

10       MS. GJOVIK:  Get it going.

11       THE COURT:  I think so.  I think so.  And

12   I think that there's no way to avoid talking to each

13   other because you are in litigation.  So that's just

14   not -- Ms. Riechert, I'm sorry.  I know that's

15   stressful for you to receive --

16       MS. RIECHERT:  It is.  It's very stressful.

17   I have a -- my best friend committed suicide, and

18   I'm still suffering from it.  And to have someone

19   write me and say "I'm thinking about this guy

20   committed suicide because he was a whistleblower,

21   and you're triggering me," it's very stressful for

22   me, and I shouldn't have to go through that.

23       THE COURT:  I agree.  And so, Ms. Gjovik,

24   that's what I'm saying.  Just try to get the

25   emotional -- as much as possible, try to keep your

3:23-CV-04597-EMC

Page 52

1    personal emotional stuff out of you being your

2    lawyer.  So it's almost like you have to wear two

3    hats.  You know, you have to put on your "I'm the

4    lawyer right now, and so I'm just going to be

5    factual and I'm going to apply the law to the facts

6    when I'm having these discussions and interactions.

7    And then when I'm emotional and I need to cry or I'm

8    stressed out or I need to go talk to somebody," or

9    whatever, that's separate from this.

10           Do not mix those things, because those

11   things are actually not even relevant.  I mean, it's

12   terrible if you are feeling that way, for sure.  But

13   those kinds of things are absolutely not relevant to

14   resolving the discovery issues or resolving any

15   other issues in this case.  And case in point --

16       MS. GJOVIK:  I understand your Honor.  They're

17   misrepresenting that.  Again, I was just asking for

18   a couple days' extension, and they --

19       THE COURT:  And everybody should be giving --

20   everybody should be giving everybody extensions and

21   being, you know, flexible and willing to do that.

22   That's in the guidelines, the Northern District

23   guidelines for professional conduct, is that if

24   somebody asks for an extension, you should liberally

25   grant them because you might need one, one day.

Page 53

1      MS. RIECHERT:  I've always granted extensions
2  whenever anybody has asked for them, in this case
3  and in every other case.
4      THE COURT:  Okay, all right.  Good.  So let's
5  just try to just, like refresh, like Ms. Gjovik
6  said.  We'll start fresh. we'll start --
7      MS. GJOVIK:  Start fresh.
8      THE COURT:  -- with this new procedure.
9  I will issue some kind of minutes or like a brief
10  order, minute order, describing the new process that
11  you're going to use for your discovery disputes.
12  And I will also say, you know, this will be -- you
13  know, this will be a trial period.  And, you know,
14  to let me know if it's not working.
15      MS. GJOVIK:  Thank you.
16      THE COURT:  Because I really don't think that
17  it's a better thing to do than to talk in person,
18  but we'll give it a try.  And then I will -- and
19  then I will give the other side, you know, the five
20  days to file an opposition.
21          And with respect to the protective order,
22  I'm going to indicate that the parties are going to
23  sign the Model Protective Order today and get it
24  filed so that I can sign off on it tomorrow.
25      MS. GJOVIK:  Sounds good.

3:23-CV-04597-EMC

Page 54

1    THE COURT:  Okay.  And then hopefully, you
2    know, the meeting and conferring will go more
3    smoothly, and then you can just try your best to
4    narrow your issues.  If you have a long list, just
5    try to narrow them down to figure out which ones are
6    the ones that are actually important to the
7    resolution of this case, which ones can you agree to
8    disagree on, are they important enough to file
9    a joint letter on, or which things can you reach
10   some compromise on.  That's the goal of the
11   meet-and-confer process.  And then --
12        MS. GJOVIK:  I do think it would be helpful to
13   have an actual discovery plan.  I think it will
14   be --
15        THE COURT:  Oh, I think having a discovery
16   plan --
17        MS. GJOVIK:  -- (unclear words - overlapping
18   speakers) challenging.
19        THE COURT:  Yeah.  I think having a discovery
20   plan is a great idea.
21        MS. GJOVIK:  Melinda didn't want one.
22        MS. RIECHERT:  I think we have a different
23   definition of what a discovery plan is.
24        THE COURT:  That may be a problem.
25        MS. RIECHERT:  I have the one that's in the

3:23-CV-04597-EMC

Page 55

1    joint case management conference statement.  She

2    wants a project plan like you would if you were

3    developing software.

4           MS. GJOVIK:  It's just a discovery plan --

5           MS. RIECHERT:  This day you do this, and on

6    this day you do that, and that's --

7           THE COURT:  Well, yeah, the plan --

8           MS. GJOVIK:  The joint case management

9    statement, you just said you don't want one.  That's

10   not a plan to say you don't want one.

11          MS. RIECHERT:  No, the one that's in the joint

12   case management conference statement that says this

13   is the discovery plan, that's the one that --

14          THE COURT:  Oh, so you already have one, then?

15   You put it in --

16          MS. RIECHERT:  Yes.  It's in the joint case --

17          MS. GJOVIK:  No, we don't have -- we don't.

18          THE COURT:  Okay.  Because there is a place in

19   the case management conference statement for your

20   discovery plan.

21          MS. RIECHERT:  Yes.

22          MS. GJOVIK:  And we don't have one, though.

23   We haven't presented one.  There's no scope or

24   timing or dependencies or anything at a very basic

25   level.

3:23-CV-04597-EMC

Page 56

1       THE COURT:  Mm-mm.

2       MS. RIECHERT:  We have the one that's in the

3  joint case management conference statement.  I think

4  what the plaintiff is wanting --

5       MS. GJOVIK:  What does it say?

6       MS. RIECHERT:  -- is something more detailed

7  than that.

8       THE COURT:  Oh.

9       MS. GJOVIK:  But what does that say?

10      MS. RIECHERT:  I've asked her to send me

11  one --

12      MS. GJOVIK:  That doesn't say anything.

13      THE COURT:  Well, why don't you submit -- how

14  about, why don't you just submit, Ms. Gjovik, if you

15  have a proposal for a plan --

16      MS. GJOVIK:  Yeah.

17      THE COURT:  -- beyond what's in the joint case

18  management statement, why don't you just write up

19  something and present it to Ms. Riechert to

20  consider?

21      MS. GJOVIK:  I had sent them templates I had

22  downloaded from Westlaw when I still had access.

23  And they just haven't responded to it.  So they

24  weren't responding anymore ongoing.  So that's where

25  we've left it.

3:23-CV-04597-EMC

Page 57

1          MS. RIECHERT:  I --

2          MS. GJOVIK:  But if they're willing to discuss

3     those drafts I sent and consider them, that would be

4     helpful.  In the prior meet-and-confer, they said

5     that they might look at them, but then never

6     followed up.

7          MS. RIECHERT:  What you sent me is templates

8     from Westlaw.  I need you to send me what you want

9     in this case with all the dates and whatever it is

10    you want in it.  Then I will certainly consider it.

11    But a template isn't helpful for this case.

12         THE COURT:  Right, like fill it in.  If you

13    have a template, Ms. Gjovik, use that to create your

14    proposal with the actual substance.

15         MS. GJOVIK:  Okay.  Yes.  I can do that.

16    I think it would be a helpful to do one of the

17    versions where we stipulated to and just put it on

18    the docket so it's there for any future disputes to

19    look back to.  A lot of the conflicts that have been

20    happening, I think, would have been absolutely

21    addressed more quickly if there had been an

22    agreed-upon discovery plan to kind of keep things

23    flowing in a line.  But I'm also a program manager,

24    so I'm biased.

25         THE COURT:  Okay.  I haven't seen what's in

3:23-CV-04597-EMC

Page 58

1    your case management statement to know what that

2    looks like versus maybe what you might be wanting.

3    But I just say that whenever anybody wants to

4    propose something, go ahead and just, you know,

5    provide all of the details of what your proposal is.

6    Because you're not required to do more than what's

7    in the joint case management statement.  So if

8    there's some real specifics that you think would be

9    helpful to streamline this process, then --

10          MS. GJOVIK:  Judge Chen had asked us several

11   times, ordered us to create one outside of the case

12   management process.

13          MS. RIECHERT:  Not correct.

14          MS. GJOVIK:  So I'm not sure what exactly he

15   was looking for as well.

16          MS. RIECHERT:  Not correct.

17          THE COURT:  Who did what?

18          MS. GJOVIK:  In the orders.

19          MS. RIECHERT:  She's saying Judge Chen ordered

20   us to create a discovery plan.

21          MS. GJOVIK:  Said we need to create a

22   discovery plan -- yeah.

23          MS. RIECHERT:  And there's no such order.  I

24   am in compliance.

25          MS. GJOVIK:  Through multiple orders.

Page 59

1    MS. RIECHERT:  You send me the order, and

2    we'll comply with it.  But I'm in compliance with

3    all of Judge Chen's orders.

4    MS. GJOVIK:  Okay.  Okay, I'll send them.

5    THE COURT:  Okay.  So that's good.  Oh, shoot.

6    I have another meeting I'm late for.  I just got a

7    notification on my screen.  I didn't realize we've

8    been talking for over an hour.  Okay, so --

9    MS. GJOVIK:  Oh, wow, I'm sorry, your Honor.

10    THE COURT:  -- I have to go.  But I'm -- so

11    I'm going to issue minutes indicating what we've

12    agreed to.  And then, you know, hopefully I only

13    hear from you on discovery disputes after you've

14    really done a thorough meet-and-confer, and then

15    just keep in mind some of the things that I've said

16    in terms of suggestions.

17    MS. GJOVIK:  I really appreciate it.

18    MS. RIECHERT:  Thank you very much.

19    THE COURT:  All right, all right.  Have a good

20    rest of your afternoon.

21    MS. RIECHERT:  Thank you.  Will do.

22    MS. GJOVIK:  Thank you, your Honor.

23

24    (4:13 p.m.)

25

3:23-CV-04597-EMC

Page 60

1                CERTIFICATE OF COURT REPORTER

2

3    I, Katherine Schilling, hereby certify that the

4    testimony in the foregoing transcript, numbered pages

5    3 through 59, taken on July 2, 2025, was recorded by

6    me in machine shorthand and was thereafter transcribed

7    by me; and that the foregoing transcript is a true and

8    accurate verbatim record of the said testimony.

9

10

11   I further certify that I am not a relative, employee,

12   counsel, or financially involved with any of the

13   parties to the within cause, nor am I an employee or

14   relative of any counsel for the parties, nor am I in

15   any way interested in the outcome of the within cause.

16

17

18   Signed:  ........................

19   Name:  Katherine Schilling, RPR, CSR 14163

20   Date:  JULY 21, 2025

21

22

23

24

25