Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY M. GJOVIK**, *an individual*,

Plaintiff,

vs.

**APPLE INC.**, *a corporation,*

Defendant.

**CASE NO.**

**3:23-CV-04597-EMC (KAW)**

**DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S DISCOVERY LETTER AT DKT. 315**

## DECLARATION & EXHIBITS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S DISCOVERY LETTER AT DKT. 315

I, Ashley M. Gjovik, declare as follows:

1.  I am the Plaintiff in this action, proceeding in propria persona. I have personal knowledge of the facts set forth in this declaration and could testify competently thereto if called as a witness.

2.  Attached hereto as **Exhibit A** are true and correct copies of the transcript sections that Defendant Apple Inc. cited in its Letter at Dkt 315 but did not attach.:

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 23 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# EXHIBIT A

THE VIDEOGRAPHER:  Will the court reporter please identify herself for the record and then swear in the witness.

THE REPORTER:  My name is Julie Anderson.  I am a California Certified Shorthand Reporter.  My license number is 11422.

ASHLEY MARIE GJOVIK,

having been duly sworn remotely by the California Certified Shorthand Reporter, testified as follows:

-oOo-

EXAMINATION BY MS. RIECHERT

BY MS. RIECHERT:

Q.  Good morning.  You have just taken an oath to tell the truth in this deposition, and even though we are on Zoom and not before a judge or a jury, the oath you took has the same force and effect as an oath you would take in court.

Do you understand that?

A.  Yes, ma'am.

Q.  So it's really important that you tell the truth, the whole truth, and nothing but the truth.

Do you understand that?

A.  Yes.  But also objection.  I don't know what exactly you're doing right now.  These aren't really deposition questions.  Right?



Q.  My question -- I'm entitled to ask you if you understand that what you're testifying today needs to be the truth, the whole truth, and nothing but the truth.

Do you understand that's what the oath requires you to do?

A.  I file objection on the basis I don't know what the form of this question is or the basis, but, yes, I agree that I understand that I need to tell the truth during depositions and I should not lie or omit material information.

Q.  You understand that if you later give testimony in this case either in written form, in the form of a declaration, or orally in front of a judge or a jury and you give testimony that is inconsistent with the testimony that you give today, that I can comment on the fact that you've changed your answer and that can affect your credibility negatively?

A.  I object again on the form of I don't know what this question is.  It's leading.  It seems to be calling for legal conclusions and a verbal stipulation and object on that general premise. But, again, you -- actually, no, I object.  Form of question.  That was compound, ambiguous, complex,



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

argumentative, leading.  And so try again.  New form.

Q.  Please answer the question.  Even though you can pose an objection to the question, the judge at some point will rule on your objection, but I'm entitled to an answer to the question.  So please answer the question.

A.  Restate your question then.  Say it again.

Q.  Yes.  Do you understand that if you give testimony at some later point in this case, either written testimony in the form of a declaration or oral testimony before a judge or a jury, that you have -- that I have the right to comment on the fact that your answers are different if your testimony is inconsistent and this can affect your credibility negatively?

A.  Objection again.  Complex, compound.

And you're asking me to confirm that I believe you have a right that appears to be asking me for a legal analysis and stipulation, which that's -- I don't think that's a question.  So if you -- if you're asking do you have a right to exercise things under the Civil Rules of Procedure then, yes, you have a right.  But, otherwise, I need you to reframe that.  That was -- that was, like, 19



different statements and questions all merged together.

Q.   Okay.  Can you not answer the question?  Is that what you're telling me?  You don't understand the question?

A.   I don't understand your question.

Q.   Okay.  So if you later give testimony in this case, and that can be written testimony or oral testimony, that's inconsistent with the testimony you give today, then I have the right to comment on the fact that your testimony is inconsistent and that can affect your credibility negatively.

Do you understand that?  That's a yes-or-no question.

A.   Again, you're --

(Simultaneous speakers.)

BY MS. RIECHERT:

Q.   That's a yes-or-no question.

A.   You're asking me to agree to you having a right and me -- I knew this was going to be complicated because you guys are partners.  You do this forever and you're really good at this.  But, Melinda, that's a weird -- like you're asking me for a verbal stipulation to you objecting to things later without the facts being known or what the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

thing is you're going to mention later.  That's not a deposition question.  Like, if you want -- ask me simple straightforward questions and I'll answer them.

Q.   It's a straightforward question.  If you give inconsistent testimony later in the case, I have the right to comment on the fact that your testimony is inconsistent and that can affect --

A.   Objection.  Calling for a legal conclusion.

(Simultaneous speakers.  Reporter clarification.)

THE WITNESS:  Sorry.

BY MS. RIECHERT:

Q.   You can answer the question.

A.   Objection.  Calling for legal conclusion.

Q.   You may answer the question.

A.   Objection.  Calling for legal conclusion.

Q.   Yeah.  Objections don't stop you from answering the question.  There's no judge here to rule on your objections, and therefore you still have to answer the question even though you object and then the judge at some later point will decide if my question was improper, in which case he will not consider your answer.  But meanwhile you have to answer the questions.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.   But you're asking if I believe -- if I believe you have a right?

Q.   I'm telling you that I have a right to comment on the fact that if you give inconsistent testimony later, that can affect your credibility. I'm -- it's a benefit that I'm telling you that don't give inconsistent testimony later.  This is the time to give your testimony in this case.  And if it's inconsistent later, then I will -- I may comment on the fact that your answers are inconsistent and that can affect your credibility negatively.

A.   I understand that's your position.

Q.   Okay.  So you understand.  Thank you.

It's very important that you give audible answers to my questions.  So even though in normal conversation we might shake our heads or go "uh-huh," in deposition you need to answer yes or no.

Do you understand that?

A.   Yes.

Q.   It's very important that you understand my questions.  If you don't understand the question, please ask for a clarification, and I will repeat it or rephrase it.  But if you answer the question, I'm



**TALTY COURT REPORTERS, INC.**                **14**
**408.244.1900 - www.taltys.com**

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.   And at the time you were employed at Apple -- during the time you worked at Apple, you understood that you had an obligation to keep product-related information confidential; correct?

A.   Objection.  Vague.

Q.   The question is, did you -- did you have an understanding that you had an obligation to keep product-related information confidential?

And you can object that it's vague, but you still have to answer the question.

A.   It's calling for a legal conclusion.

Q.   You may answer the question.  So you can put objections in.  As I said, the judge can't rule on the objections.  He'll rule later.  But meanwhile, you still have to answer the questions.

A.   I know.  I'm going through my head of the other objections I need to make to this.  Okay.  So your -- say your question again.

Q.   During the time that you were employed by Apple, you understood that you had an obligation to keep product-related information confidential; correct?

A.   So I'm objecting of complex.  Vague.  Ambiguous.  Leading.  Calls for legal analysis.

And I'm going to answer yes.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.   You understood, did you not, during your employment with Apple that you had an obligation not to disclose confidential product-related information you learned during your employment at Apple; correct?

A.   Can you define "product information," please?

Q.   Just answer the question, please. Information regarding Apple's products if you would like it that -- confidential information about Apple's products. Did you understand during your employment at Apple that you had an obligation not to disclose confidential information about Apple's products while you were employed at Apple?

A.   While I was employed at Apple? Actually can you restate the question right before? Can we go back to the question right before this one? Can you resay that one again, too, please?

Q.   Sure. During the time that you were employed at Apple, you understood that you had an obligation to keep confidential information about Apple's products confidential?

A.   I'm actually going to go back to that one and I'd like to revise my answer as -- as I'm sorting through this and just for the record of --



because this is so critical to Apple's defense arguments and also my labor rights arguments, that I'm going to say -- say, no, I did not understand my -- my obligation and that I -- I understood Apple wanted us to not talk about that stuff, and I knew that.  And I knew that we could face punishment if we were to talk about that stuff.  But I did not understand that I had an obligation.  So I'm going to say no to -- I'm going to revise that first one to no.  And for your second one, I'm also going to say no.

Q.  Did you understand at the time that you signed the confidential information agreement that we've marked as Exhibit Number 3 -- did you understand at the time you signed that that you had an obligation to keep confidential information about Apple's products confidential under the terms of the agreement?

A.  And so for all three of these questions: Very compound, ambiguous, complex, leading, form.

Can you -- if you want more direct answers from me, can you define "confidential"?

Q.  Yeah.  Confidential is defined in the agreement.

A.  As defined in the agreement.  Okay.  And



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

when you say "keep confidential," what do you mean?

Q.    Mean not to disclose outside of Apple confidential information about Apple's products?

A.    So lodged all those objections, and I'm going to say -- I'm going to say no again to the specifics.  Since your question is asking if I understand my obligation, I'm going to say -- say -- oh, and calling for legal conclusion.

No, I did not understand the obligation.

Q.    You did not understand that the confidential -- confidentiality and intellectual property agreement that you signed that we've marked as Exhibit 3 -- are you saying you did not understand that that agreement required you to keep confidential confidential product information that you learned during your employment at Apple?

A.    Because the terms right now being used are so broad and vague and ambiguous, as I objected, I cannot say that I agreed that I understand an obligation with such broad terms.  So if you were to narrow these terms to something specific, like new hardware models or new software release, I could answer you much more directly.  But because these terms are so broad and encompass things that are protected and part of my case, I cannot say that I



**TALTY COURT REPORTERS, INC.**          **33**
408.244.1900 - www.taltys.com

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

understand that I have an obligation to not share the things that I am arguing I do have a right and did have a right.

Q.   So is it your position that you are not bound to the terms of this confidentiality and intellectual property agreement with respect to confidential information about Apple's products?

A.   Actually, no, I'm not because --

(Reporter clarification.)

THE WITNESS:  The NLRB, The National Labor Relations Board --

(Reporter admonition.)

THE WITNESS:  So the NLRB, myself, and Apple in April of this year entered into a binding national settlement agreement where Apple agreed to withdraw those terms and not enforce them.  Apple did not admit to doing anything wrong, but the NLRB had filed a complaint arguing that those specific terms you are mentioning right now violate the NLRA and federal labor laws and they are unlawfully overbroad and vague and could be used to interfere with employee's labor rights.  So as of today, it's my understanding based on the trilateral national settlement agreement formally lodged with NLRB that I am not bound to the terms per that agreement.  So



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

while I am still certainly bound regarding things like prototypes or unreleased software features or other clearly intellectual property-related matters, no, I am not bound as written otherwise.

BY MS. RIECHERT:

Q.   So the judge will decide whether the agreement you are referring to releases you from your obligation to keep confidential confidential product information about Apple.  But --

A.   So to be clear, I still am bound for -- for stuff that, like I said.  Like, I don't think that releases me from intellectual property-type secrecy.  Like, that's still binding on me.  So, again, if you narrow your terms that you're asking me questions, I can ask more directly, but if you keep them broad, I can't -- I can't answer -- give you direct answers.

Q.   I'm talking only about confidential product information.  Confidential information about Apple's products.  Things you learned about while you worked at Apple that were confidential.  Did you understand that things about Apple's products that you learned about while you worked at Apple is and remains confidential and you can't disclose that outside of Apple?

A.   Objections to vague and misleading and



argumentative and complex because you can have product-related topics that still implicate labor rights and whistleblower protections, financial regulation compliance.  SEC allows disclosers.

So I would say no when -- when the language used is just "product related."  It would have to be more specific to something actually tied to intellectual property.

Q.  So other than what you just testified to, do you understand that you have to keep confidential product-related intellectual property confidential information confidential?

A.  Can you restate again?

Q.  Yes.  Other than the exceptions you've just talked about, do you understand that you must keep confidential intellectual property information about Apple's products confidential and you can't disclose those other than to the SEC and the other entities you listed?

A.  If you can revise that to say more broadly of any government agencies or Congress or other places where there's protection for making disclosure.  Because you can disclose trade secrets to, like, certain places where it's authorized.  So I would not agree you can't do that.  And if we're



defining intellectual property as, like, actual trade secrets, I would agree you can't share trade secrets unless it's an authorized place to share it or otherwise LAR public policy supports it, like going to law enforcement or something.

Q.  Okay.  So other than disclosures to Congress or other governmental agencies, do you agree that the confidential information agreement that we've marked as Exhibit Number 3 required you to keep confidential intellectual property trade secret information as defined in the agreement confidential?

A.  Is "trade secret" defined in the agreement? Can you point me to that definition?

Q.  No.  You were the one who used the word "trade secret."  I'm referring to the language in the agreement.  You wanted me to --

A.  So that's compound.

(Simultaneous speakers.  Reporter clarification.)

BY MS. RIECHERT:

Q.  Okay.  I am now going to withdraw my use of the word "trade secret" because I was hoping that since you used that word it would help you.

Do you agree that other than disclosures to



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Congress or other governmental agencies you were required to keep confidential the intellectual property defined in the confidential information agreement that we've marked as Exhibit Number 3 confidential?

A.   Can you point me to where the definition is that you're referring to?

Q.   Look at A -- 1-A.

A.   I don't think those define.

Q.   So are you telling me that you did not believe that you had any obligation to keep Apple proprietary information confidential?

A.   I'm not saying that.  I never said that.  I said that Apple's actual trade secrets and that type of information absolutely needs to be protected. That's how you preserve trade secrets, but I also mentioned that NLRB --

(Reporter admonition.)

THE WITNESS:  I'm so sorry.  Yeah, NLRB -- oh, yeah.  So NLRB said specific terms in this agreement including the definition of confidential and proprietary information were unlawful.

BY MS. RIECHERT:

Q.   So look again at the agreement, both the definition in Section 1 and the paragraph before it.

Do you agree that you were required to keep the confidential information about Apple's products that is defined in this agreement confidential?

A.   Can you point me to where products are defined?

Q.   I'm not asking you about the word "products."  I'm -- I'm not asking -- I'm not saying there's a definition of the word "products."

I'm asking you do you agree that with respect to Apple's product information -- information about Apple's products.  You understand the word "product"?

A.   No.  And I objected earlier because you can have product-related information that could directly implicate labor rights and protected disclosures and employee organizing and lots of protected things, so it -- we need to narrow this.

Q.   Okay.  Tell me then what you think you were required to keep confidential regarding Apple's products or Apple's products during your employment and thereafter.  What were you required to keep confidential?  And, again, I'm excluding your right to disclose to Congress, governmental agencies. What do you think you had to keep confidential?

A.   Melinda, would you like to break this down



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

into multiple time periods?  Because as you know, I had an evolution of understanding of my legal rights, so the things that I'm -- if you're asking me what my belief was, my belief in 2015 would have been much different than 2019 versus 2021 versus 2025.  So if you're calling for a narrative, I can try to speak as slowly as possible for like five minutes about this, but that's not a yes or no answer.

Q.  At the time of your termination what did you believe you were required to keep confidential?

A.  Would you like a narrative answer?  That might be easier.

Q.  No.  I'd just like you to answer the question.

A.  Well, that's what I'm saying.  Are you -- are you now just answering -- like, have me respond versus responding to the intellectual property agreement to tell you what I think I had to keep confidential or do you still want me to refer to the agreement?

Q.  You may refer to the agreement if you like. I think that's the place to start.  But you seem to be having trouble with the agreement, so now I'm asking you a different question.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  Okay.

Q.  Do you think -- what do you think you had to keep confidential at the time of your termination?

A.  At the time of my termination.  So anything that could qualify as actual trade secrets, for sure.  So information that I would know about, you know, like prototypes that were never released, new design ideas that had never been released or announced.  The unique ways that Apple does engineering work and design that give it an advantage over other competitors technically. That -- that kind of stuff.  And then while not product related by, like, confidential stuff where, you know, employee organization, planning, and feedback about employees or management-type stuff that's sensitive more like under the HR umbrella. That kind of stuff is not -- unless there's a reason to share that, that -- that seems confidential.

Oh, and to that point even the -- sometimes even the product design stuff might not be confidential if it becomes evidence of something that could be unlawful.  But I still even today think that that kind of stuff could have protective orders and confidentiality because Apple needs to be able to have confidentiality for its engineering



practices for its competitive advantage.  But that kind of stuff to me seems like -- and this isn't stuff that Apple was very good about keeping secret and controlling access to, would be things like product road maps.  And I -- I actually managed that for overall organization of helping create those documents and control access.  So it would be like the next three to five years or more of what the next products are that we're planning and what their features are, what kind of silicone they're going to have in them.  That kind of stuff was very sensitive.  And then we'd have, like -- especially, like, specifications for new documents where you'd have, like, the diagrams and drawings of what they're going to look like and what their components will be and then also cost and who's going to be manufacturing them and all of those plans.  That kind of stuff we had multiple layers of security for of who even would get access.  So that kind of stuff.  And that kind of stuff is very -- very protected and very sensitive.

Q.  You mentioned in your answer prototypes that were never released.  Are you -- would you agree that that also includes prototypes that had not been released at the time you disclosed it?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  So to be clear, I'm talking about prototype, like a hardware, like a new phone design.  And at the time I was -- at the time my employment ended, if I knew about new hardware designs or like a new iPhone -- the details of the new iPhone, that's confidential.  I wouldn't share that unless I thought that that fell into one of the protected categories and was disclosed in a way that I thought was lawful.

Q.  My question was you had said that you were required to keep confidential prototypes that were never released.  My question is do you agree that you were required to keep confidential prototypes that had not been released at the time you disclosed them even though they were later released?

A.  Yeah.  Those -- I mean, that would fall under the same category with all of my prior objections and caveats and all of that, but that's still stuff that's not released yet, so it's internal information about -- and when I say "prototypes," I mean like what the design looks like, what the specifications are, what the components are, the actual, like, visible images or device of that prototype.

Q.  So you would agree that confidential



information that had not been released at the time you disclosed it, you were required to keep confidential even though it was later released; correct?

A.   No, not as stated, I don't agree with that.

Q.   And why not?

A.   You need to clarify.  You just said confidential information.  You didn't narrow down what you were talking about.

Q.   Right.  You had been talking about prototypes and new designs, and you had said that were never released.  And the point that I'm trying to clarify with you is that -- would you agree that you were required to keep these prototypes and new designs confidential if they had not been released at the time you disclosed them even though they were later released?

A.   As far as the type of confidential information I'm talking about, and specific to Apple's business of products like an iPhone or a consumer-facing product where there's competitive advantage in other folks not knowing what they are doing, yes, generally that is information that Apple wants us to keep confidential and asked us to keep confidential.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.  And would you agree that that would apply to software prototypes?

A.  No, generally.  That would need to be defined because software prototypes are a way different situation than a hardware prototype.

Q.  And so why you are --

A.  If you can break it down.  That was my job. So, like, software, you're going to have a new -- like the most sensitive thing is going to be the new major release, so then the next, like, .o release because I used to manage those.  So the UI of when you open your phone when you have the new release on it, if we're changing the way that we've -- if Apple's changing the way that the desktop looks on your phone and the apps and stuff, that's generally very sensitive.  Apple likes to surprise people. And if there's going to be a new functionality in the apps as well, again, Apple likes to surprise people.

But I would say with software, there's a much different -- there's much different treatment of the secrecy around it different than hardware because a lot of it was framed more as just wanting to surprise people, not about intellectual property, and the -- the control over who had access to

information or could see stuff for software is also much different than hardware.  And like a software prototype, the -- probably the best comparison I can think of would be, like, what a customer would see on whatever the next .o is or the new UI for, like, a new product, but, otherwise, I don't think there's a comparable term of a software prototype.

Q.  So you believe that you were not required to keep software prototypes confidential?

A.  Can you define "prototypes"?

Q.  No.  You used the word.

A.  You said -- you switched to software and said prototypes, your original question.  So I'm telling you, like, software doesn't have a comparison -- easy comparison for the term "prototype."

Q.  So when you used the word "prototypes," you were only referring to hardware?  That's what you're telling me; right?

A.  Yeah.  Proto -- like, proto -- prototypes generally refers to a new hardware design and model, like a physical thing.  We use that term "prototype" for we built this, like, physical thing that's a first stab at whatever this product line would be.  And with software, it's much different especially



when you have an integrated operating system like iOS, and now especially macOS as well, where you don't really have, like, a standalone "look at this new thing I built" like you would with hardware.

Q.  Do you agree that you agreed -- you were required to keep confidential testing you were doing on new features for Apple products?

A.  Do you want to make that question more specific, or I can do my objections because that's -- that's vague.  Products is broad and testing is broad and all of those are very broad umbrella terms.

Q.  Okay.  So let's go back to my original question, which is you said you were required to keep prototypes confidential if they had never been released.  And my question to you is, do you agree that you were required to keep prototypes confidential if they had not been released at the time you disclosed them even though they were later released?

A.  Well, we're still talking about hardware prototypes; right?

Q.  Whatever you were referring to when you said "prototypes that were never released."

A.  I was talking about, like, a new iPhone



model.

Q.  Okay.

A.  A new iPhone hardware model.

Q.  And do you agree that you were required to keep that information confidential if it had not been released at the time you disclosed it even though it was later released?

A.  Yeah.  And I think trade secret probably requires that.

Q.  You then went on to say that new design ideas you had to keep confidential if they were never released.  And my question to you is do you agree that new design ideas had to be kept confidential if they had not been released at the time that you disclosed them even though you later released them -- excuse me -- even though they were later disclosed?

A.  First I'd object to the mischaracterization of the way you stated it.  It was far more broad than what I said.  And then this question is also becoming compound and vague.

So, like, the new design ideas would be like -- again, I said that under the hardware.  So, like, the -- a new form factor or something.  So are you reasking?  Because that was asked and answered.



Are you asking a new question?  If so, can you please differentiate what the difference is?

Q.  Yes.  Previously you said that new design ideas that had never been released had to be kept confidential.  My question is, when you made that answer, were you saying that new design ideas were confidential if they had not been released at the time you disclosed them even though they were later released?

A.  Yeah.  And I believe that's asked and answered.  I don't know what the difference is between what I said and that.

Q.  So you said "never released," and I'm --

A.  Oh, you said never.  Not released at the time.

Q.  Thank you.

A.  Yeah.

MS. RIECHERT:  Could you please put in the chat tab 6-01.

THE VIDEOGRAPHER:  Stand by.

BY MS. RIECHERT:

Q.  6-01.  I'd like to show you a copy of Apple's business conduct policy.

THE VIDEOGRAPHER:  This will be Exhibit 4?

MS. RIECHERT:  Correct.

policy didn't have a timestamp.  This timestamp matches when I downloaded this document, and this is an exhibit in the NLRB case with the settlement agreement I mentioned.

Q.   The question is do you agree that this was a policy that was in effect during your employment at Apple?

A.   What does "in effect" mean?

Q.   That it was in existence.

A.   Yes.  This policy was in existence at my time at Apple as of the date I downloaded it, which is dated on the document as May 4, 2021.

Q.   And do you agree that you were aware of this policy at the time you downloaded this document on May 4, 2021?

A.   Yes.

Q.   And you read it during your employment at Apple; correct?

A.   The policy we're looking at -- all I know is -- existed as worded as of May 2021.  Apple might have had different versions earlier, and I don't have copies of the prior policies from, like, 2015.  But I know that this definitely existed in May of 2021.

Q.   And you understood it; correct?



A.   That's broad.  Can you be more narrow in your question?

Q.   Did you understand the policy when you read it and downloaded it?

A.   Yeah.  What does "understand" mean?

Q.   Know what it means.

A.   I'd say no.  And that was one of the reasons -- so I was downloading -- I downloaded a bunch of policies at that point.  I had become very concerned that they were unlawful, and I had been making statements about that with coworkers and on Slack, and that was when I started --

Q.   But you've gone beyond the question.  My question is did you understand this policy when you read it and downloaded it on May 4, 2021?

A.   That's what I was going to say.  I didn't -- the terms were so broad.  One of the reasons it was flagged for me --

(Reporter asks for clarification.)

BY MS. RIECHERT:

Q.   The question is did you understand it or did you not understand it?

A.   No, I didn't understand it.

Q.   Okay.  Which parts of it did you not understand?



A.  These are -- I can go through the terms and a lot of these terms were flagged in my complaint to NLRB about this particular policy --

Q.  You're going way beyond my question.  The question is --

A.  I know.  You're asking what I didn't understand.  I'd like to answer that question.

Q.  Okay.  Which terms did you not understand?  I don't need to talk about the NLRB.  I just want to know which terms you did not understand.

A.  Appropriate is vague and over -- so terms that I feel are vague and overbroad in such a way that you cannot understand what is actually being requested and which likely become unlawful that they are so overbroad because they restrict protected behavior and conduct are terms appropriate, behavior, policies, guidance, ethics, discretion, appropriate, guidelines, not limited to, warnings.

(Reporter interruption.)

THE WITNESS:  Can you see me?  I turned my video off so I wasn't just staring at me.  Can you see me here?

THE VIDEOGRAPHER:  Yes.

BY MS. RIECHERT:

Q.  If you don't want to look at yourself in the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

information from Glimmer?

A.    Review information?

Q.    Yes.

A.    That's different than whitelisting.

Q.    Okay.  Well, you couldn't answer my whitelisted question.  You were totally incapable of asking it, so I'm trying another one to see if I can get to the end of it.

A.    So you're asking if she has Gobbler on her phone, so it was taking --

Q.    No.  I started off by asking if you had any reason to believe that she was whitelisted for Glimmer.  Is the answer to that, yes, no, or I don't know?

A.    That's a thing that happens in the engineering teams in the background, so I had no way to know.

Q.    So, yes, no, or I don't know?

A.    I don't know.

Q.    Okay.  Making progress.

Do you have any reason to believe that you were permitted to share Glimmer information with Cher Scarlett?  Yes, no, or I don't know?

A.    What was the term you used, "permitted"?

Q.    Yes.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  So I don't know how to answer that question with the "permitted" term.

Q.  Okay.  You don't know what "permitted" means?

A.  I don't know what "permitted" means.

Q.  How about allowed?  Is that any better? A-L-L-O-W-E-D?

A.  No.

Q.  Okay.  Don't know what "permitted" and "allowed" mean.

Okay.  Are Apple employees allowed to share confidential information with Apple -- Apple employees who are not --

A.  I don't know.

Q.  -- who are not whitelisted to receive the confidential information?

A.  I don't know what "allowed" or "whitelisted" means in your question.

(THE PRECEDING PAGES, 66 TO 305, WERE DESIGNATED CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.)

-oOo-

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

the guides and documentation, and I found out he was already assigning that to other people without talking to me.

Q. So that was a project that you were working on; correct?

A. I was solely that -- yes. And I created that and that was solely assigned to me, and he was assigning it to other people.

Q. Okay. And when was that?

A. June and July of 2021.

Q. And did you tell him you wanted to continue to work on the PSQ portal project?

A. Sorry. Ask that again.

Q. Did you tell Dan that you wanted to continue to work on the PSQ portal project?

A. He had canceled all my one-on-ones with him at that point --

Q. Yes, no -- yes or no or I don't know. Did you tell Dan that you wanted to continue to work on the PSQ portal project?

A. At what time frame?

Q. Any time frame?

A. Yeah.

Q. After he took you off the project and assigned it to others, did you tell him, "Hey, I

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

want to continue working on the PSQ portal project"?

A.   At that point we weren't in communication.

Q.   Okay.  So is the answer yes or no?  These are very simple questions and if we get simple answers, then we could be able to move on.

A.   You're asking me if I complained at a point where there was a bunch of open investigations and he refused talking to me --

Q.   No, I'm asking --

A.   -- so saying no is misleading and out of context.

Q.   Okay.  I just want to know whether you talked to him.  I'm not asking for the context.

A.   I complained to other people.  Multiple other people about this.  I filed a formal --

(Reporter admonition.)

BY MS. RIECHERT:

Q.   The question is did you ask Dan to continue to working -- work on the PSQ portal project after he assigned it to others in July of 2021?

A.   Melinda, she asked me to slow down so she could write what I wrote.  Do you want to not record what I said?

Q.   No.  I want you to answer that question.

THE WITNESS:  Julie, do you still need me to

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

say what I said?

BY MS. RIECHERT:

Q.   No.  I need you to answer the question.

A.   I'm not asking you, Melinda.

I said I filed multiple complaints to other people, and I lodged a formal complaint about Dan taking that project away.

Go ahead, Melinda.

Q.   Okay.  Can you answer the question now?

A.   Yeah.  Please ask again.

Q.   Okay.  Did you ask Dan to let you to continue to work on the PSQ portal project after he assigned it to others?

A.   He never assigned the overall PSQ project -- portal project to others.  He assigned specific projects within that project.

Q.   Okay.  Did you ask Dan to assign back to you projects within the PSQ project?

A.   Asked and answered.  I already answered that.

Q.   Okay.  What's the answer?

A.   No, because he wouldn't talk to me anymore.

Q.   Okay.  Isn't that a simple answer?  We had to go through all of those questions.  All you needed to say no, and then if you want to say, no,

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

because he wouldn't talk to you anymore.

A.  I don't want you mischaracterizing my answers, Melinda.

Q.  I just want you to answer the question.

Did you have no conversations with Dan after July 2021?

A.  He had canceled our one-on-ones.

Q.  Is the answer yes, no, or I don't know?

A.  I believe I sent emails to him at that point.

Q.  Did you have any conversations with Dan after July 2021?

A.  I said I think I sent him emails.  I don't think he responded.

Q.  Okay.  So the answer is, no, I did not have any conversations with him after July of 2021 other than emails; correct?

A.  I guess so.

Q.  Okay.  Thank you.

Did you retain responsibilities related to the PSQ portal project?

A.  At what point?

Q.  At any point after he assigned the project within the project to others?

A.  I believed I had some responsibilities.