Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, <br> *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br> **Apple Inc.**, <br> *a corporation,* <br><br> Defendant. | **Case No.** <br> **3:23-cv-04597-EMC (KAW)** <br><br> **Plaintiff's Request for Judicial Notice in Support of Her Opposition to Apple's Motion to Retain Confidentiality Designations & Motion to Seal (Dkt. 304-305)** <br><br> **HEARING:** <br> **Location: Oakland (TBD)** <br> **Date: April 16 2026** <br> **Time: 1:30 PM** |

## PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE in SUPPORT OF THE OPPOSITION TO DEFENDANT'S MOTION (Dkt. 294)

1. Plaintiff Ashley Gjovik respectfully files this request for Judicial Notice in support of her Opposition to Defendant Apple Inc.'s Opposition to Apple's Motion to Retain Confidentiality Designations & Motion to Seal (Dkt. 304-305).

2. Pursuant to Federal Rule of Evidence 201, Plaintiff Ashley M. Gjovik respectfully requests that this Court take judicial notice of the following public records and documents. Each document is either (a) a public record of a governmental body whose accuracy cannot reasonably be questioned, or (b) a record filed in a federal court or agency proceeding whose existence is not subject to reasonable dispute.

3. A court shall take judicial notice of a fact "not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

4. Courts routinely take judicial notice of federal agency records, federal court filings, government databases, and peer-reviewed publications for the limited purpose of establishing that the information was publicly available. *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (judicial notice of publicly available government records); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (judicial notice of court filings). The Court may take judicial notice on its own at any stage. Fed. R. Evid. 201(c)(1).

# PUBLIC WEBSITES & ARTICLES

## PUBLICLY REPORTED APPLE CODE NAMES

5. Attached hereto as Exhibit A is a true and correct printout of the Wikipedia page "List of Apple codenames," as it existed on December 16, 2025 (the date of Plaintiff's deposition), accessed via permanent revision URL: https://en.wikipedia.org/w/index.php?title=List_of_Apple_codenames&oldid=1327831038. This page lists every code name Apple designated in Plaintiff's deposition transcript, including D22, D32, D4X, N104, Dalaman, Tigris, Yukon, Emet, and Azul. The letter "N" also appears as a prefix for iPod product identifiers. The relevant point is not that Wikipedia is authoritative on Apple's product development, but that these code names were publicly accessible to anyone with an internet connection as of the deposition date — and therefore cannot constitute confidential information under PO § 3(a).

6. Attached hereto as Exhibit B are true and correct printouts of the following news articles

reporting Apple code names years before Plaintiff's deposition:

- WIRED, "How an iOS Developer Just Uncovered The Next iPhone," July 31, 2017, reporting that Apple itself released HomePod firmware containing the code name "D22."
- The Guardian, "The 'iPhone 8' will be able to tell when owner is looking at it, leak suggests," August 10, 2017, identifying Apple's then-unreleased iPhone by its internal code name "D22 iPhone."
- ZDNet, "Apple is planning a super-sized iPhone with a cheaper model, claims report," February 26, 2018, identifying code names "D33" and "D32" with associated hardware specifications.
- Forbes, "Apple's New iPhone Codenames And Major Features Confirmed," July 23, 2019, identifying code names "D42," "D43," and "N104" with associated model numbers.
- iMore, "iOS version code names," July 15, 2021, listing Emet, Tigris, Azul, and Yukon and noting that "once a version of iOS goes public, they're not hard to find."
- The Guardian, "Apple made Siri deflect questions on feminism, leaked papers reveal," September 6, 2019, identifying "Yukon" as the code name for iOS 13 and describing the same pattern of NDAs and speech suppression at issue in this case.

7.    These articles establish that every code name Apple designated was publicly reported — in some cases by Apple itself — years before Plaintiff's deposition. Information in the public domain is excluded from the Protective Order under Section 3(a).

## BEDDIT: PUBLIC CONSUMER PRODUCT AND PUBLIC RESEARCH

8.    Attached hereto as Exhibit C are true and correct printouts of:

- Wikipedia, "Beddit," as of December 18, 2025, documenting that Beddit was founded in 2006, sold at Apple Stores and on Amazon beginning 2016, and acquired by Apple in May 2017.
- CNET, "Apple buys Beddit, maker of sleep-tracking device," May 9, 2017.
- 9to5Mac, "Apple silently removes Beddit apps from iOS App Store," September 30, 2024.
- Apple Support Community, "Beddit App and Functionality," January 10, 2025, posted on Apple's own support forum by a consumer.

9.    Attached hereto as Exhibit D are true and correct printouts of the following sources establishing that Apple's Beddit sleep study was publicly announced, publicly funded, and publicly conducted with 3,000 participants:

- UCLA Newsroom, "UCLA launches major mental health study to discover insights about depression," August 4, 2020, announcing the study as "sponsored by and in collaboration with Apple" and stating participants would receive "a Beddit sleep-monitoring device."
- UCLA Depression Grand Challenge, "Research Study: Digital Mental Health Study — Fact

Sheet," describing the study as "the largest of its kind today," identifying Apple as the "Funding Source," and confirming the study used "Beddit sleep-monitoring devices."

- UCLA Depression Grand Challenge, "Digital Mental Health Study completes data collection," April 30, 2024.
- CNBC, "Apple and UCLA kick off a three-year depression study," August 4, 2020.
- 9to5Mac, "Apple teams up with UCLA on mental health study using Apple Watch, iPhone, and Beddit sleep tracker," August 4, 2020.

10.    A brand name that Apple marketed, sold through its own retail channels, and used in a publicly announced study with 3,000 participants cannot be designated "confidential" under PO § 3(a).

## APPLE'S TESTING FACILITIES AND METHODOLOGIES

11.    Attached hereto as Exhibit E are true and correct printouts of the following articles in which Apple invited journalists into its testing facilities and publicly disclosed the methods, processes, and equipment it now claims are confidential:

- Fast Company, "Chambers of Super Silence: What's Inside Apple's $100 Million iPhone Radio Test Facility," July 16, 2010, reporting that Steve Jobs publicly presented Apple's anechoic chambers — foam-lined rooms where Apple tests wireless devices with employees holding iPhones "in a typical everyday manner."
- TechCrunch, "Inside Apple's Actual Distortion Field: Giant Chambers, Fake Heads, And Black Cloaks," July 17, 2010, describing a tour led by Phil Schiller, Bob Mansfield, and Greg Joswiak, including a chamber called "Stargate" where "a human sits on a raised chair in the center" of "a giant ring" that "slowly rotates around."
- EFTM, "Inside Apple's secret Audio Labs where the HomePod was created," February 7, 2018, where Phil Schiller personally conducted the tour and described rooms "built to simulate the average family home."
- CNET, "A Billion Pixels a Second: I Got a Rare Look Inside Apple's Secret iPhone 16 Camera Labs," December 30, 2024 — two weeks before Plaintiff's deposition — describing an iPhone on a rotating turntable in a foam-lined chamber.

12.    Attached hereto as Exhibit F are true and correct printouts of:

- Apple Newsroom, "Apple announces new accessibility features, including Eye Tracking," May 15, 2024, in which Tim Cook publicly promotes Eye Tracking for iPhone and iPad.
- Apple Support, "Control iPhone with the movement of your eyes," iPhone User Guide, describing the feature in detail.

13.    Apple's own senior executives have personally escorted journalists through these facilities and described the foam-lined chambers, rotating test platforms (spinning chairs), and the process of testing devices (prototypes) with human subjects (studies). Apple markets the finished products while claiming the fact that it tested that they work prior to selling them as a trade secret.

# REGULATORY FILINGS AND POSTINGS

14. Attached hereto as Exhibit F is a true and correct printout of a portion of Apple's public facing website regarding the NLRB settlement with the Plaintiff and Apple rescission of its prior definition of proprietary and confidential information which it seeks to enforce here. I further request the Court take judicial notice of these public documents on Apple's own "Legal" website regarding its legal obligations regarding assertions of confidentiality related to work conditions and labor organizing/complaints.

15. Attached hereto as Exhibit G is Apple's most recent 10-K filing. Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of Apple Inc.'s Annual Report on Form 10-K for the fiscal year ended September 27, 2025, filed with the U.S. Securities and Exchange Commission on October 31, 2025, SEC File No. 001-36743, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000320193/000032019325000079/aapl-20250927.htm. Courts routinely take judicial notice of SEC filings as public records whose accuracy cannot reasonably be questioned. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *In re Cree, Inc. Sec. Litig.*, 219 F.R.D. 369, 372 (M.D.N.C. 2003); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

16. The following passages from Apple's 10-K are relevant to the pending motion:

- Apple states that its "global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; consumer protection; labor and employment; and environmental, health and safety" and that "compliance with these laws and regulations is onerous and expensive" and "can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers." (Item 1A, Risk Factors). This is relevant because Apple's own disclosure to the SEC establishes that compliance with privacy and labor regulations is costly — supporting Plaintiff's argument that Apple's claimed "competitive harm" from disclosure is actually the cost of losing the advantage of noncompliance.

- Apple states it is "subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data" and that "health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses,

and can incur significant fees or fines." (Item 1A). This is relevant because Apple tells the SEC that failure to comply with biometric data regulations leads to litigation — and this case is that litigation. Apple cannot designate as confidential the evidence of the noncompliance Apple itself warns its shareholders about.

- Apple states: "The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others." (Item 1A). This is relevant because Apple markets itself as the privacy company, while the operative complaint alleges that marketing is false. Apple's own 10-K acknowledges that if these allegations are true, they create legal liability. The "harm" Apple fears from disclosure is reputational and legal — not competitive — and reputational harm is categorically insufficient to support confidentiality. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

- Apple states: "The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties." (Item 1A). This is relevant because Apple told this Court that "this case does not involve important public issues" (Dkt. 304 at 8, Factor 7). Apple told the SEC the opposite — that its legal proceedings involve "intense" public scrutiny. Apple cannot take contradictory positions depending on the audience.

- Apple states: "If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices." (Item 1A). This is relevant because Apple's own description of the "harm" it fears is not competitive injury from trade secret disclosure — it is being forced to change its business practices. That is accountability, not competitive harm, and it is not protectable under Rule 26(c).

# LAWSUITS

17.     Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of the following publicly filed court documents, not for the truth of the allegations contained therein, but for the fact that they were filed, that the allegations were made, and that the proceedings are pending. Courts routinely take judicial notice of court filings in related proceedings. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

18.     Attached hereto as Exhibit H is a true and correct copy of the Second Amended PAGA

Complaint filed in *Bhakta v. Apple, Inc.*, Case No. 24CV453028 (Santa Clara County Superior Court), filed November 13, 2025. In *Bhakta*, a current Apple employee brought a Private Attorneys General Act action on behalf of himself, aggrieved employees, and the State of California, alleging that Apple′s confidentiality policies unlawfully suppress employee speech in violation of California Labor Code §§ 232, 232.5, 1101, 1102, 1102.5, 1197.5(k), and 432.5; that Apple compels employees to install surveillance software on personal devices providing Apple access to personal data including health information and location data, in violation of Labor Code § 450; and that Apple enforces these policies through forfeiture of vested compensation, in violation of Labor Code §§ 221 and 206.5.

19.    The *Bhakta* complaint describes Apple′s confidentiality ecosystem as a ″prison yard″ and a ″panopticon where employees, both on and off duty, are ever subject to Apple′s all-seeing eye.″ (Bhakta SAC ¶ 19). Apple′s motion to strike the Second Amended Complaint was denied on March 2, 2026. (Dkt. entry, March 2, 2026: ″Def′s second m[otion to] Strike — DENIED in [part] / GRANTED without [leave to] amend in part″). Apple filed its Answer on March 9, 2026. The case is active with a further case management conference scheduled for September 3, 2026.

20.    This filing is relevant because the confidentiality and surveillance practices challenged in Bhakta are the same practices Apple deploys in this case through its Protective Order designations. Apple′s IPA — the same agreement Apple cites in this case as the basis for its designations — is the agreement Bhakta alleges violates California law. Apple′s designation of Plaintiff′s testimony about workplace conditions as ″Confidential″ is the exact conduct Bhakta alleges constitutes unlawful speech suppression. A California court has now permitted those claims to proceed against Apple. Apple cannot simultaneously defend its confidentiality policies as lawful in this Court while those same policies are the subject of active PAGA litigation in state court — litigation in which Apple′s motion to strike was largely denied.

21.    Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of the following documents filed on the docket in this action. A court may take judicial notice of its own records. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007).

22.    Attached hereto as Exhibit I are pages 44–45 of the Fifth Amended Complaint (Dkt. 142), filed November 26, 2024, which alleges Count One: Wrongful Discharge in Violation of Public Policy based on Illegal Data Harvesting in violation of the California Constitution Article I, Section 1 and the FTC Act. These pages specifically allege that Apple conducted invasive biometric data collection on employees — including the reproductive health studies, Gobbler facial mapping, ear scanning, and sleep monitoring

studies at issue in the designations Apple seeks to retain — without adequate consent, in violation of employees′ constitutional privacy rights, and in a manner that constitutes an unfair business practice. Apple′s designation of Plaintiff′s testimony about these same studies as ″Confidential″ seeks to suppress the evidence underlying this cause of action. Information that forms the factual basis of a pending claim in this litigation cannot be suppressed through a protective order designation.

23.     Attached hereto as Exhibit J are pages 57–61 of the Fourth Amended Complaint (Dkt. 76), filed June 18, 2024, which alleges Count Nine: Violation of California′s Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. These pages allege that Apple′s workplace study practices — including the use of employees as test subjects under secrecy oaths, the coercive participation framework, and the absence of independent oversight — constitute unlawful, unfair, and fraudulent business practices. The designated testimony directly describes the conduct alleged in this cause of action. Apple asks this Court to designate as ″confidential″ the employee′s account of the very practices that § 17200 exists to expose and enjoin.

24.     Attached hereto as Exhibit K are pages 33–35 of the Third Amended Complaint (Dkt. 47), filed February 27, 2024, which alleges the RICO claim′s relatedness, pattern, and scheme elements. These pages allege a three-pronged scheme: (a) Apple refrains from regulatory compliance to reduce costs; (b) Apple promotes a false public reputation of compliance; and (c) Apple bridges the gap through witness intimidation, retaliation, and overbroad NDAs to conceal its actual practices. Apple′s conduct in this designation dispute — designating the employee′s complaints as confidential, seeking contempt for public discussion of those complaints, and filing motions to seal — is the scheme in operation. The Protective Order is being used as the instrument of concealment the RICO claims describe. Granting Apple′s motion would advance, not prevent, the alleged scheme.

25.     These filings are relevant because they establish that the information Apple designated as ″Confidential″ is the same information that forms the factual basis of Plaintiff′s pending causes of action. Apple cannot designate as its confidential business information the evidence of the very conduct Plaintiff alleges is unlawful. Apple′s designation converts the evidence in this case into Apple′s property — which is the precise claim this lawsuit challenges.

# PENDING REQUESTS FOR JUDICIAL NOTICE AT DKT. 307

26.     Plaintiff also incorporates her pending Request for Judicial Notice at Dkt. 307-2

("Opposition to Defendant Apple Inc.'s Motion to Enforce Protective Order") for the following:

- **NLRB Settlement Agreement**, Case No. 32-CA-284428, April 3, 2025. A public record of a federal administrative agency, filed in this litigation as Dkt. 194. Judicial notice is appropriate for NLRB settlement agreements as official agency records. *See* Pl.'s Decl., ex. N and Dkt. 220-4 ("Notice to Employees").

- **ClinicalTrials.gov Registration**, NCT04196595. A public federal government database maintained by the National Institutes of Health, U.S. Department of Health and Human Services. *See* Exhibit J to Gjovik Declaration. The accuracy of federal government databases cannot reasonably be questioned. *See United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362 (C.D. Cal. 2014).

- **OSTP Public Comment**, OSTP_FRDOC_0001-0008, submitted in a public federal rulemaking proceeding and publicly accessible on regulations.gov. *See* Pl.'s Decl., ex. L.

- **GAO Report GAO-24-107639**, published by the U.S. Government Accountability Office. GAO reports are public records of a government body whose accuracy cannot reasonably be questioned. *See* Pl.'s Decl., ex. M.

- **OHRP Complaint No. 00709517**, filed March 11, 2026 with the Office for Human Research Protections, U.S. Department of Health and Human Services, concerning Apple's federally registered study NCT04196595. *See* Pl.'s Decl., ex. O.

- **BFDI and CNIL complaints**, filed in 2022 to privacy regulators in Germany and France and confirmation of receipt of complaint. See Declaration Exhibit Q.

- **Thomas Le Bonniec Declaration,** filed in this action at Dkt. 307-1, pages 200–205, Mr. Le Bonniec is a former worker at GlobeTech, an Apple subcontractor in Cork, Ireland, who was assigned to listen to thousands of audio recordings of the public captured by Apple's devices worldwide through Apple's "CrowdCollect" platform. Le Bonniec attests that he witnessed recordings of individuals' private conversations — including political opinions, children's conversations, private health information, and sexual content — all processed on Apple's hardware, through Apple's VPN, and on Apple's platform. (Le Bonniec Decl. ¶¶ 7–10). Le Bonniec further attests that Apple's subcontractor required workers to sign NDAs that Le Bonniec believed were "intimidating and too restrictive" and implied workers "could not communicate with law enforcement agencies about what [they] witnessed" without risk of retaliation. (Le Bonniec Decl. ¶ 14). Managers told workers "to not tell anyone about our work, even our family or friends, and

they said, especially journalists." (Le Bonniec Decl. ¶ 11). Le Bonniec states he has "publicly stated that these NDAs have a chilling effect and I believe they are intended to intimidate workers who are witnesses of potentially unlawful conduct by Apple." (Le Bonniec Decl. ¶ 15). On February 14, 2025, based on Le Bonniec's testimony and evidence, the Human Rights League in France filed a criminal complaint for these privacy violations. (Le Bonniec Decl. ¶ 17). The Le Bonniec declaration is relevant to this opposition because it provides independent corroboration — from a different country, a different Apple operation, and a different witness — of the identical pattern alleged in Plaintiff's complaints and at issue in this designation dispute: Apple conducts invasive data collection practices, requires workers to sign overbroad NDAs, uses those NDAs to suppress complaints about the practices, and retaliates against or intimidates workers who speak out. Apple's confidentiality designations in this case are the same suppression mechanism Le Bonniec describes. Apple designated Plaintiff's testimony about workplace studies as "Confidential" under the same IPA framework that Le Bonniec identifies as intimidating and unlawfully restrictive — and that Apple agreed to revise in the April 2025 NLRB settlement. The Le Bonniec declaration demonstrates that Apple's conduct is not an isolated discovery dispute but part of a global pattern of using confidentiality instruments to conceal workplace practices from scrutiny.

- ***Academic article on "studies,"*** *Mahalingaiah, Shruthi et al. "Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study." American journal of obstetrics and gynecology vol. 226,4 (2022): 545.e1-545.e29. doi:10.1016/j.ajog.2021.09.041,.* This peer-reviewed journal article, authored by Apple-affiliated researchers and published in an indexed medical journal, is offered for the limited purpose of establishing that the methodology of Apple's employee ovulation study — the subject of Apple's confidentiality designations — was publicly disclosed by Apple itself in the scientific literature prior to this litigation and prior to the December 2025 deposition. Judicial notice of peer-reviewed publications is appropriate for the limited purpose of establishing that information was publicly available. *See Gerritsen v. Warner Bros. Entertainment Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015). *See* Pl.'s Decl., ex. I.

## CONCLUSION

27.    Plaintiff requests judicial notice of these records solely to establish that the content Apple designated as confidential was publicly available before the deposition occurred; that the subject matter has been part of the public adjudicatory record for years; that Apple's own disclosures in peer-reviewed

literature and federal registrations cover the same subject matter; and that multiple federal agencies have acted upon Plaintiff's public complaints about the same conduct.  Plaintiff does not request that the Court accept the truth of all assertions in every document — only that the Court recognize each document's existence and public availability. For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Request for Judicial Notice.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 25 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# EXHIBIT A: WIKIPEDIA


**WIKIPEDIA**
25 years of the free encyclopedia

# List of Apple codenames

⚠ **This is an** underline **old revision** of this page, as edited by **Briskola** (**talk** | **contribs**) at 09:36, 16 December 2025 (*→MacBook Pro*). The present address (URL) is a **permanent link** to this revision, which may differ significantly from the **current revision**.

This **list of Apple codenames** covers the codenames given to products by Apple Inc. during development. The codenames are often used internally only, normally to maintain the secrecy of the project. Occasionally a codename may become the released product's name. Most of Apple's codenames from the 1980s and 1990s are provided by the book *Apple Confidential 2.0.*[1]

## Accessories

- AirTag – *B389, Durian*[2][3]
- AirPods (1st generation) – *B188*
- AirPods (2nd generation) – *B288*
- AirPods Pro – *B298*[4]
- AirPods Pro 3 – *B788*
- AirPods Max – *B515*[5]
- AirPort Base Station (1999) – *Pogo*
- AirPort Express 802.11n (5th generation) – *K31*[6]
- Apple IIe Card for the Macintosh LC – *Double Exposure*
- Apple II 3.5" Disk Controller Card – *NuMustang*
- Apple Color OneScanner 600/27 – *Rio*
- Apple Color OneScanner 1200/30 – *New Orleans*
- Beats Flex – *B372*
- HomePod – *B238*
- HomePod Mini – *B520*
- Built-in iSight (2005) – *M33*
- External iSight (2003) – *Q8*
- Lightning Digital AV Adapter – *Haywire*
- Magic Trackpad 2 – *D67*[7]
- MagSafe (wireless charger) – *B390*
- AirPort Time Capsule – *Wilma, M52*

## Apple TV

- Apple TV – *iTV*[8]
- Apple TV (2nd generation) – *K66*[9]
- Apple TV (3rd generation) – *J33*[10]
- Apple TV (4th generation) – *J42*[11]
- Apple TV 4K – *J105*[12]
- Apple TV 4K (2nd generation) – J305[13]

## Apple Watch

- Apple Watch – *Gizmo,*[14] *N27* and *N28*
- MicroLED screen – *W*[15]

## Computers

### Apple

- Apple IIGS – *Cortland*
- Apple IIgs ROM 3 – *Tenspeed*

In chronological order:

## Macintosh

The first Macintosh was released in 1984:

- Macintosh 128K – *Macintosh*
- Macintosh 512k, 512ke – *Fat Mac*[16]
- Macintosh XL – *Lisa*
- Macintosh Plus – *Mr. T*
- Macintosh SE simulation – *Aladdin*
- Macintosh SE FDHD – *Aladdin*
- Macintosh SE FDHD – *Chablis*
- Macintosh SE/30 – *Fafnir*
- Macintosh SE – *Freeport*
- Macintosh SE FDHD – *Freeport*
- Macintosh SE/30 – *Green Jade*
- Macintosh SE – *Maui*
- Macintosh SE FDHD – *Maui*
- Macintosh SE – *PlusPlus*
- Macintosh SE FDHD – *PlusPlus*
- Macintosh II – *Becks*
- Macintosh II – *Cabernet*
- Macintosh II – *Ikki*
- Macintosh II – *Little Big Mac*
- Macintosh II – *Milwaukee*
- Macintosh II – *Paris*
- Macintosh II – *Reno*
- Macintosh II – *Uzi*
- Macintosh IIcx – *Atlantic*
- Macintosh IIcx – *Aurora*
- Macintosh IIcx – *Cobra*
- Macintosh IIci – *Aurora II*
- Macintosh IIci – *Cobra II*
- Macintosh IIci – *Pacific*
- Macintosh IIci – *Stingray*
- Macintosh IIfx – *Weed Whacker*
- Macintosh IIfx – *Zone 5*
- Macintosh IIfx – *Blackbird*
- Macintosh IIfx – *Four Square*
- Macintosh IIfx – *F-16*
- Macintosh IIfx – *F-19*
- Macintosh IIfx – *IIxi*
- Macintosh IIfx – *Stealth*
- Macintosh IIsi – *Erickson*
- Macintosh IIsi – *Oceanic*
- Macintosh IIsi – *Raffica*
- Macintosh IIsi – *Ray Ban*
- Macintosh IIvi – *Brazil 32c*
- Macintosh IIvx – *Brazil 16c*
- Macintosh IIx – *Spock*
- Macintosh IIx – *Stratos*
- Macintosh Portable – *Espirit*
- Macintosh Portable – *Laguna*
- Macintosh Portable – *Malibu*
- Macintosh LC – *Elsie*
- Macintosh LC – *Pinball*
- Macintosh LC – *Prism*
- Macintosh LC 580 – *Dragonkid*
- Macintosh LC III – *Elsie III*
- Macintosh LC II – *Foster Farms*
- Macintosh LC 520 – *Hook*
- Macintosh LC 550 – *Hook 33*
- Macintosh LC 575 – *Optimus*
- Macintosh LC III – *Vail*
- Macintosh Classic II – *Apollo*
- Macintosh Classic – *Civic*

- Macintosh Classic II – *Montana*
- Macintosh Color Classic – *Slice*
- Macintosh Classic – *XO*
- Macintosh Quadra 605 – *Aladdin*
- Macintosh Quadra 605 – *Primus*
- Macintosh Quadra 610 – *Speedbump 610*
- Macintosh Quadra 630 – *Crusader*
- Macintosh Quadra 630 – *Show Biz*
- Macintosh Quadra 630 – *Show & Tell*
- Macintosh Quadra 650 – *Speedbump 650*
- Macintosh Quadra 660AV – *Tempest*
- Macintosh Quadra 700 – *Evo 200*
- Macintosh Quadra 700 – *IIce*
- Macintosh Quadra 700 – *Shadow*
- Macintosh Quadra 700 – *Spike*
- Macintosh Quadra 800 – *Fridge*
- Macintosh Quadra 800 – *Wombat 33*
- Macintosh Quadra 840AV – *Typhoon*
- Macintosh Quadra 840AV – *Quadra 1000*
- Macintosh Quadra 840AV – *Cyclone*
- Macintosh Quadra 900 – *Darwin*
- Macintosh Quadra 900 – *Eclipse*
- Macintosh Quadra 900 – *IIex*
- Macintosh Quadra 900 – *Premise 500*
- Macintosh Quadra 950 – *Amazon*
- Macintosh Quadra 950 – *Zydeco*
- Macintosh TV – *LD50*, *Peter Pan*
- Twentieth Anniversary Macintosh – *Pomona*
- Twentieth Anniversary Macintosh – *Smoke and Mirrors*
- Twentieth Anniversary Macintosh – *Spartacus*

### eMac

The first eMac was released in 2002

- eMac (ATI Graphics) – *Northern Lights*
- eMac – *P69*
- eMac (2005) – *Q86J*

### iBook

The first iBook was released in 1999.

- iBook (FireWire) – *P1.5*
- iBook (32 MB VRAM) – *P72B*
- iBook (800/900 MHz 32 MB VRAM) – *P73D*
- iBook – *Bismol*
- iBook – *Lanai*
- iBook G3 (Dual USB) – *Marble*
- iBook – *P1*
- iBook (14.1 LCD) – *Son of Pismo*
- iBook (Dual USB) – *P29*
- iBook (14.1 LCD) – *P54*
- iBook (Opaque 16 MB VRAM) – *P72B*
- iBook (late 2001) – *P92*
- iBook G4 (early 2004) – *Q72*
- iBook G4 (mid-2005) – *Q72B*
- iBook G4 (early 2004) – *Q73*
- iBook G4 (mid-2005) – *Q73B*

### iMac

The first iMac was released in 1998.

- iMac G3 (Bondi Blue)[17] – *Mac Man* and *Columbus*
- iMac G3 (Bondi Blue) – *C1*

- iMac G3 (Bondi Blue) – *Elroy*
- iMac G3 (Bondi Blue) – *Tailgate*
- iMac G3 (5 Flavors) – *Life Savers*
- iMac G3, iMac DV, iMac DV+, iMac DV SE – *Kihei*, *P7*
- iMac G3 (summer 2001) – *Kiva*
- iMac G4 (USB 2.0; 15-inch & 17-inch) – *Horizon*, *Q26B*, *Q26C*
- iMac G4 (17-inch Flat Panel) – *P79*
- iMac G4 (flat panel) – *Tessera*, *P80*
- iMac G5 (17-inch, 20-inch) – *Hero*
- iMac G5 (20-inch) – *Fino*, *M23*
- iMac G5 (Ambient Light Sensor) 17-inch *Q45C*
- iMac G5 (Ambient Light Sensor) 20-inch *Q45D*
- iMac G5 iSight (17-, 20-inch) – *Q87*
- iMac (21.5-inch, Late 2012)[6] - *J30*
- iMac (27-inch, Late 2012)[6] - *J31*
- iMac (24-inch, 2x USB-C, M1, 2021) - J457
- iMac (24-inch, 4x USB-C, M1, 2021) - J456
- iMac (24-inch, 2x USB-C, M3, 2023) - J433
- iMac (24-inch, 4x USB-C, M3, 2023) - J434
- iMac (24-inch, 2x USB-C, M4, 2024) - J623
- iMac (24-inch, 4x USB-C, M4, 2024) - J624

## Mac mini

The first Mac mini was in 2005.

- Mac mini (early 2006) – *Kaleidoscope*
- Mac mini – *Twiggy*, *Q88*
- Mac mini (M1, 2020) – *J274*
- Mac mini (M2, 2022) – *J473*[18]
- Mac mini (M2, 2023) – *J474*[18]
- Mac mini (M4, 2024) – *J773*

## Mac Pro

- Mac Pro (Mid-2012) & Mac Pro Server (Mid-2012)[19] *K5B*
- Mac Pro (2013)[20] *J90*
- Mac Pro (2023) – *J180*[18]

## Mac Studio

- Mac Studio (M1, 2022) - J375
- Mac Studio (M2, 2023) - J475

## MacBook

- MacBook (12-inch) – *Stealth*
- MacBook (Early-2006) – *M42*

## MacBook Air

- MacBook Air (11-inch, Mid-2012)[6] *J11*
- MacBook Air (13-inch, Mid-2012)[6] *J13*
- MacBook Air (11-inch, Mid-2013) – *J41*
- MacBook Air (M1, 2020) – *J313*
- MacBook Air (14-inch, M2, 2022) – *J413*[18]
- MacBook Air (15-inch, M2, 2023) – *J415*
- MacBook Air (13-inch, M3, 2024) – *J613*
- MacBook Air (15-inch, M3, 2024) – *J615*
- MacBook Air (13-inch, M4, 2025) – *J713*
- MacBook Air (15-inch, M4, 2025) – *J715*

## MacBook Pro

- MacBook Pro 13" – J52[21]

- MacBook Pro 13" – *J130*
- MacBook Pro (13-inch, Early 2011) – *K90I*
- MacBook Pro (15-inch, Early 2011) – *K91*
- MacBook Pro (17-inch, Early 2011) – *K92*
- MacBook Pro (13-inch, Late 2011) – *K90IA*[22]
- MacBook Pro (15-inch, Late 2011) – *K91A*[22]
- MacBook Pro (17-inch, Late 2011) – *K92A*[22]
- 13-inch MacBook Pro with Retina Display- *D1*[23]
- 15-inch MacBook Pro with Retina Display – *D2*[23][6]
- MacBook Pro (Retina, 13-inch, Early 2013) – *J44*[24]
- MacBook Pro (Retina, 15-inch, Early 2013) – *J45*[25]
- MacBook Pro (Retina, 15-inch, Mid 2015) – *J53*
- MacBook Pro (13-inch, M1, 2020) – *J293*
- MacBook Pro (14-inch, M1 Pro/Max, 2021) – *J314*
- MacBook Pro (16-inch, M1 Pro/Max, 2021) – *J316*
- MacBook Pro (13-inch, M2, 2022) – *J493*[18]
- MacBook Pro (14-inch, M2 Pro/Max, 2022) – *J414*[18]
- MacBook Pro (16-inch, M2 Pro/Max, 2022) – *J416*[18]
- MacBook Pro (14-inch, M3, 2023) – *J504*
- MacBook Pro (14-inch, M3 Pro/Max, 2023) – *J514*
- MacBook Pro (16-inch, M3 Pro/Max, 2023) – *J516*
- MacBook Pro (14-inch, M4, 2024) – *J604*
- MacBook Pro (14-inch, M4 Pro/Max, 2024) – *J614*
- MacBook Pro (16-inch, M4 Pro/Max, 2024) – *J616*

**PowerBook**

- PowerBook 100 – *Asahi*
- PowerBook 100 – *Derringer*
- PowerBook 100 – *Rosebud*
- PowerBook 100 – *Sapporo*
- PowerBook 145 – *Colt 45*
- PowerBook 145B – *Colt 45*
- PowerBook 140 – *Tim Lite*
- PowerBook 170 – *Tim*
- PowerBook 170 – *Road Warrior*
- PowerBook 160 – *Brooks*
- PowerBook 165 – *Dart LC*
- PowerBook 180 – *Converse*
- PowerBook 180 – *Dartanian*
- PowerBook 165c – *Monet*
- PowerBook 180c – *Hokusai*
- PowerBook 150 – *Jedi*
- PowerBook 190 – *Omega*
- PowerBook 190cs – *Omega*
- PowerBook 540, 540c, 550c, 500 with PowerPC – *Blackbird*
- PowerBook 520, 520c, 550c, 500 with PowerPC- *Blackbird LC*
- PowerBook 540/540c – *Spruce Goose*
- PowerBook 540, 540c, 550c, 500 with PowerPC – *SR-71*
- PowerBook 1400c, 1400cs – *Epic*
- PowerBook 2400c/180 – *Comet*
- PowerBook 2400c/240 – *Mighty Cat*
- PowerBook 2400c – *Nautilus*
- PowerBook 3400c[26] *Hooper*
- PowerBook 5300 Series *Mustang*
- PowerBook 5300 – *M2*
- PowerBook Duo 210, 230- *BOB W (Best of Both Worlds)*
- PowerBook Duo 210, 230 – *Cinnamon*
- PowerBook Duo 210, 230 – *DBLite*
- PowerBook Duo 250 – *Ansel*
- PowerBook Duo 270c – *Escher*
- PowerBook Duo 280/280c – *Yeager*
- PowerBook Duo 2300c/100 – *AJ*

- PowerBook Duo Dock/Plus/II – *Gemini*
- PowerBook G3 (1997) – *PowerBook 3500*
- PowerBook G3 (1997) – *Kanga*
- PowerBook G3 (May 1998) – *Mainstreet*
- PowerBook G3 (May 1998) – *Wallstreet*
- PowerBook G3 (August 1998) – *PDQ*
- PowerBook G3 (Bronze Keyboard) – *101*
- PowerBook G3 (Bronze Keyboard) – *Lombard*
- PowerBook (FireWire) – *102*
- PowerBook (FireWire) – *P8*
- PowerBook (FireWire) – *Pismo*
- PowerBook G4 – *Mercury*
- PowerBook G4 – *103*
- PowerBook G4 (DVI) – *Ivory*
- PowerBook G4 (Gigabit Ethernet) – *Onyx*
- PowerBook G4 (Gigabit Ethernet) – *P25*
- PowerBook G4 Titanium (1 GHz/867 MHz) – *P88*
- PowerBook G4 (12-inch) – *P99*
- PowerBook G4 (15-inch FW800) – *Q16*
- PowerBook G4 (15-inch 1.5/1.33GHz) – *Q16A*
- PowerBook G4 (17-inch) – *Hammerhead*
- PowerBook G4 (17-inch 1.33GHz) – *Q41*
- PowerBook G4 (17-inch 1.5 GHz) – *Q41A*
- PowerBook G4 (12-inch DVI) – *Q54*
- PowerBook G4 (12-inch 1.33 GHz) – *Q54A*
- PowerBook G5 (EVT1) – *Q51*

**PowerMacintosh**

- Unreleased Hi-end Power Macintosh project (1996) – *Halo*
- Power Macintosh 4400, 150 MHz *Tanzania*
- Power Macintosh 4400, 160 MHz *Frosty*
- Power Macintosh 4400, 200 MHz *Cupid*
- Power Macintosh 5200/5300 LC – *Bongo*
- Power Macintosh 5200/5300 LC – *Rebound*
- Power Macintosh 5200/5300 LC – *Trailblazer*
- Power Macintosh 5200/5300 LC – *Transformer*
- Power Macintosh 5400 – *Chimera*
- Power Macintosh 5400 – *Excalibur*
- Power Macintosh 5500 – *Phoenix*
- Power Macintosh 6100 – *Piltdown Man*
- Power Macintosh 6200 – *Crusader*
- Power Macintosh 6300 – *Elixir*
- Power Macintosh 6400 – *Hacksaw*
- Power Macintosh 6400 – *InstaTower*
- Power Macintosh 6500 – *Gazelle*
- Power Macintosh 7100 – *Carl Sagan*
- Power Macintosh 7100 – *BHA (Butt-Head Astronomer)*
- Power Macintosh 7100 – *LAW (Lawyers Are Wimps)*
- Power Macintosh 7200 – *Catalyst*
- Power Macintosh 7300 – *Montana*
- Power Macintosh 7500 – *TNT*
- Power Macintosh 7600 – *Montana 7600*
- Power Macintosh 8100 – *Cold Fusion*
- Power Macintosh 8100 – *Flagship*
- Power Macintosh 8500 – *Nitro*
- Power Macintosh 8600 – *Kansas*
- Power Macintosh 9600 – *Kansas*
- Power Macintosh 9500 – *Autobahn*
- Power Macintosh 9500 – *Tsunami*
- Power Macintosh 9700 Prototype *PowerExpress*
- Power Macintosh G3 All-in-One – *Artemis*
- Power Macintosh G3 Beige logic board *Gossamer*
- Power Macintosh G3 (Blue & White) enclosure – *El Capitan*

- Unreleased Hi-end Power Macintosh enclosure, prototype of *El Capitan- Stumpy*
- Power Macintosh G3 (Blue & White) – *Silk*
- Power Macintosh G3 (Blue & White) logic board; *Yosemite 1.5* was the revision 2 board *Yosemite*

**PowerMac**

- Power Mac G4 (Digital Audio) – *Clockwork*
- Power Mac G4 (Digital Audio) – *Tangent*
- Power Mac G4 (Gigabit Ethernet) – *Medusa2*
- Power Mac G4 (Gigabit Ethernet) – *Mystic*
- Power Mac G4 (Gigabit Ethernet) – *SnakeBite*
- Power Mac G4 (Quicksilver) – *Nichrome*
- Power Mac G4 (Quicksilver) – *Titan*
- Power Mac G4 (AGP Graphics) – *Sawtooth*
- Power Mac G4 (AGP Graphics) – *Project E*
- Power Mac G4 (AGP Graphics) – *P5*
- Power Mac G4 (PCI Graphics) logic board – *Yikes!*
- Power Mac G4 (Mirrored Drive Doors) – *P57*
- Power Mac G4 (FW 800) – *P58*
- Power Mac G4 Cube – *Rubicon*
- Power Mac G4 Cube – *Trinity*
- Power Mac G4 Cube – *P9*
- Power Mac G5 – *Q37*
- Power Mac G5 – *Omega*
- Power Mac G5 (June 2004) – *Q77, Q78*
- Power Mac G5 (late 2005) – *Cypher*

**Networking**

- Apple Internet Communication Kit — *Cyberpup* (referencing Cyberdog)[27]
- Data Modem 2400 — *Funnelweb* (referencing Funnel-web spider)[27]
- eWorld 1.0 — *Aladdin*[27]
- eWorld 1.1 — *Golden Gate*[27]
- ISDN NuBus card — CarCraft[27]
- MacTCP — *Verduras* (Spanish for *vegetables*)[27]
- MacTerminal 2.0 — SuperPrawn[27]
- MacTerminal II — Killer Bees[27]
- PPP 1.0 — *Paris*[27]

# iPad

- iPad (3rd generation) (Wi-Fi)[28] – *J1*
- iPad (3rd generation) (Wi-Fi + Cellular) – *J2*
- iPad Air[29] – *J72*
- iPad Air 2 – *J82*
- iPad mini with Retina display[29] – *J85*
- iPad mini 4 – *J96*
- iPad Pro[30] – *J98* and *J99*
- iPad (1st generation)[10][31][32] – *K48*
- iPad 2 (Wi-Fi) – *K93*
- iPad 2 (Wi-Fi + GSM) – *K94*
- iPad 2 (Wi-Fi + CDMA)[10] – *K95*
- iPad (fourth generation) (Wi-Fi) – *P101*
- iPad (fourth generation) (Wi-Fi + Cellular International) – *P103*
- iPad mini (1st generation) (Wi-Fi) – *P105*
- iPad mini (1st generation) (Wi-Fi + Cellular International) – *P107*

# iPhone

- iPhone (first generation) – *M68* and *Purple* or *Purple 2*[33][34][35][36]
- iPhone 3G – *N82*
- iPhone 3GS – *N88*
- iPhone 4 – *N90*

- iPhone 4 (CDMA) – *N92*[37]
- iPhone 4S – *N94*[10]
- iPhone 5 – *N41* and *N42*[38][39]
- iPhone 5C – *N48*[40]
- Touch ID – *Mesa*
- iPhone 5S – *N51* and *N53*[41]
- iPhone 6 – *N61*[40]
- iPhone 6 Plus – *N56*[40]
- iPhone SE (1st generation) – *N69*[42][43]
- iPhone 6S – *N71*[44]
- iPhone 6S Plus – *N66*[44]
- iPhone 7 – *D10*[45]
- iPhone 7 Plus – *D11*[45]
- iPhone 8 – *D20*[46]
- iPhone 8 Plus – *D21*[46]
- Face ID – *Pearl*
- iPhone X – *D22* and *Ferrari*[46][45]
- iPhone XR – *N84* and *Star* or *Lisbon* or *Hangzhou*[47]
- iPhone XS – *D32*[47]
- iPhone XS Max – *D33*[47]
- iPhone 11 – *N104*[48]
- iPhone 11 Pro – *D42*[48]
- iPhone 11 Pro Max – *D43*[48]
- iPhone 12 mini – *D52G*[49]
- iPhone 12 – *D53G*[49]
- iPhone 12 Pro – *D52P*[49]
- iPhone 12 Pro Max – *D52P*[49]
- iPhone SE (2nd generation) – *D79*
- iPhone 13 mini – *D16*[50]
- iPhone 13 – *D17*[50]
- iPhone 13 Pro – *D63*[50]
- iPhone 13 Pro Max – *D64*[50]
- iPhone 14 – *D27*[51]
- iPhone 14 Plus – *D28*[51]
- iPhone 14 Pro – *D73*[51]
- iPhone 14 Pro Max – *D74*[51][52]
- iPhone 15 – *D37*[53]
- iPhone 15 Plus – *D38*[53]
- iPhone 15 Pro – *D83*[53]
- iPhone 15 Pro Max – *D84*[53]
- iPhone 16 – *D47*[54]
- iPhone 16 Plus – *D48*[54]
- iPhone 16 Pro – *D93*[54]
- iPhone 16 Pro Max – *D94*[54]
- iPhone 16e – *V59*[55]
- iPhone SE (3rd generation) – *D49*[56]
- iPhone SE (4th generation) – *D59* and *Ghost*[57]
- iPhone 17 *D57*[58]
- iPhone 17 Air-*D58*[59]
- iPhone 17 Pro-*D67*[60]
- iPhone 17 Pro Max-*D68*[61]

# iPod

- iPod – *Dulcimer*
- iPod Classic (5th generation) – *M25*
- iPod Touch (1st generation) – *N45*
- iPod Touch (2nd generation) – *N72*
- iPod Touch (3rd generation) – *N18*

- iPod Touch (4th generation) – *N81*
- iPod Touch (5th generation) – *N78* and *N78a*
- iPod Touch (6th generation) – *N102*[62]

## Other

- Apple Vision Pro – *N301*[63]
- Apple Vision Pro (2nd generation) – *N109* and *Project Alaska*[64]
- Apple Car – *Titan*[65]
- visionOS – *Borealis, Oak*[66][67]
- 2019 augmented reality prototypes – *Garta, Franc, Luck, T288*[68][69][70]
- Apple's aluminum unibody manufacturing process – *Brick*
- Apple facility including a regenerative thermal oxidizer to reduce pollution – *Magnolia*[65]
- Apple Santa Clara, California facilities (Project Titan, MicroLED,[71] iPhone Modularization)[72] – *Zeus, Medusa, Pegasus, Athena,* and *Aria*[73]
- Liquid Glass design language - *Solarium*

## Systems on chip & Processors

The internal codenames for the CPU cores of Apple silicon A series and M series chips are named after islands, with the cores named after wind and weather patterns.[74]

### A series

- Apple A6 and A6X – *Bali*, with *Swift* cores
- Apple A7 – *Alcatraz*, with *Cyclone* cores
- Apple A8 – *Fiji*, with *Typhoon* cores
- Apple A8X – *Capri*, with *Typhoon cores*
- Apple A9 – *Maui* (Samsung), *Malta* (TSMC), with *Twister* cores
- Apple A9X – *Elba*, with *Twister* cores
- Apple A10 Fusion – *Cayman,* with 2 *Hurricane* cores and 2 *Zephyr* cores
- Apple A10X Fusion – *Myst*, with 3 *Hurricane* cores and 3 *Zephyr* cores
- Apple A11 Bionic – *Skye*, with 2 *Monsoon* cores and 4 *Mistral* cores
- Apple A12 Bionic – *Cyprus*, with 2 *Vortex* cores and 4 *Tempest* cores
- Apple A12X and A12Z Bionic – Aruba, with 4 *Vortex* cores and 4 *Tempest* cores
- Apple A13 Bionic – *Cebu*, with 2 *Lightning* and 4 *Thunder* cores[75]
- Apple A14 Bionic – *Sicily*, with 2 *Firestorm* cores and 4 *Icestorm* cores[76][77]
- Apple A15 Bionic – *Ellis*, with 2 *Avalanche* cores and 4 *Blizzard* cores
- Apple A16 Bionic – *Crete*, with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A17 Pro – Coll,[78] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A18 - Tupai, with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A18 Pro – Tahiti,[78] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A19 - Tilos [79] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A19 Pro – Thera [79] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple silicon (Mac): *Kalamata*[80]

### M series

- Apple M1 – *Tonga*, *A14X*[81]
  - Apple M1 cores – *Icestorm* efficiency cores and *Firestorm* performance cores, with *Lifuka* GPU cores[76][77]
  - Apple M1 Pro – *Jade C-Chop*[82]
  - Apple M1 Max – *Jade C-Die*[82]
  - Apple M1 Ultra – *Jade 2C-Die*[83]
- Apple M2 – *Staten*[84]
  - Apple M2 cores – *Blizzard* efficiency cores and *Avalanche* performance cores
  - Apple M2 Pro – *Rhodes Chop*
  - Apple M2 Max – *Rhodes 1C*
  - Apple M2 Ultra – *Rhodes 2C*
- Apple M3 – *Ibiza* [85][86]
  - Apple M3 Pro – *Lobos*
  - Apple M3 Max – *Palma*

- Apple M4 – Donan[87]
  - Apple M4 Pro and Max – *Brava*
- Apple M5 – *Hidra* [79]
  - Apple M5 Pro – *Sotra* [79]

# Software

## Applications

- Apple Fitness+ – *Seymour*[88]
- AR app – *Gobi*[89]
- Mac App Store – *Firenze*[90]
- Apple Music – *Fuse*[91]
- iMessage – *Madrid*
- iTunes – *iMusic*[92][93]
- Safari (web browser) – *Alexander*[91]
- QuickTime – *Warhol*
- Spotlight – *Matador*[91]
- Swift Playgrounds – *Serenity*
- Walkie-Talkie – *Spartan*
- Reminders – *Tantor*

## Software Features

- Apple Music Sing – *Suntory*
- Apple Intelligence – *Greymatter*[94]
- Dynamic Island – *Jindo*[95]
- iTunes Music Store – *Jingle*

## AirPods Firmware

For use with AirPods

- Build 1A6XX – *Theremin*
- Build 2XXXX – *Harmonica*
- Build 3XXXX – *Harpsichord*
- Build 4XXXX – *Piccolo*

## audioOS

For use with HomePod

- audioOS 11.0.2 – *Cinar*
- audioOS 11.3 – *Emet*
- audioOS 11.4 – *Fatsa*
- audioOS 11.4.1 – *Gebze*
- audioOS 12.0–12.3 – *Peace*
- audioOS 13.2–13.3.1 – *Yukon*
- audioOS 13.4 – *Yager*
- audioOS 14 – *Archer*
- audioOS 15 – *Satellite*
- audioOS 15.1 – *Starlinks*

## Classic Mac OS

The classic Mac OS is often cited as having multiple codenames. The codename convention for Mac OS 8 and 9 mostly follow musical terminology.

- System 6.0.4 (1989) – *Antares*[96]
- System 6.0.5 (1990) – *Big Deal*[96]
- System 6.0.6 – *SixPack (never released due to AppleTalk bug)*[96]
- System 6.0.8 (1991) – *Terminator*[96]
- System 7 – *Blue, Big Bang, M80* (in reference to the M-80 firecrackers)*, Pleiades*[96]

- System 7's Finder – *Furnishings 2000*[96]
- System 7's TuneUp — *7Up*[96]
- System 7.0.1 (1991) – *Road Warrior, Beta Cheese, Regatta*[96]
- System 7.1 (1992) – *Cube-E, I Tripoli* (in reference to IEEE standards)[96]
- System 7.1 Pro (1993) – *Jirocho*[97]
- Prototype of System 7.1 for x86 processors – *Star Trek*
- System 7.5 (PPC) (1994) – *Mozart, Capone* ("to strike fear in the heart of" Windows 95, codenamed Chicago)[97]
- System 7.5 Update 1.0 – *Danook* (from The Far Side)[97]
- System 7.5 Update 2.0 – *Thag* (from The Far Side), *Zhag*[97]
- System 7.5.2 — *Marconi* (in reference to Guglielmo Marconi)[97]
- System 7.5.3 – *Unity* ("contains all patches and special software")[97]
- System 7.5.3 Revision 2 – *Buster* (Amelio's high school nickname)[97]
- System 7.5.5 – *Son of Buster* (picked for the "SOB" acronym)[97]
- System 7.6 – *Harmony*[97]
- System 7.6.1 – *Ides of Buster*[97]
- Mac OS 8 (failed project) – *Copland, Maxwell*
- Mac OS 8 (released) – *Tempo*[97]
- Mac OS 8.0 for CHRP: *Orient Express*[97]
- Mac OS 8.1 – *Bride of Buster*[97]
- Mac OS 8.5 – *Allegro, Scimitar*[97]
- Mac OS 8.5.1 – *Rick Ford Release, The*
- Mac OS 8.6 – *Veronica* (named after a relative of technical lead Brian Bechtel)[97]
- Mac OS 9.0 – *Gershwin, Sonata*[97]
- Mac OS 9.0.4 – *Minuet*[98]
- Mac OS 9.1 – *Fortissimo*[97]
- Mac OS 9.2 – *Moonlight*[97]
- Mac OS 9.2.1 – *Limelight*[97]
- Mac OS 9.2.2 – *LU1* (Limelight Update 1)[97]

## iOS

The codename convention for iOS are ski resorts.[91][19][99]

- iPhone OS 1.0 – *Alpine*
- iPhone OS 1.0.1–1.0.2 – *SUHeavenlyJuly*
- iPhone OS 1.1–1.1.1 – *Snowbird*
- iPhone OS 1.1.2 – *Oktoberfest*
- iPhone OS 1.1.3–1.1.5 – *Little Bear*
- iPhone OS 2.0–2.0.2 – *Big Bear*
- iPhone OS 2.1–2.1.1 – *Sugar Bowl*
- iPhone OS 2.2 – *Timberline*
- iPhone OS 2.2.1 – *SUTimberline*
- iPhone OS 3.0–3.0.1 – *Kirkwood*
- iPhone OS 3.1–3.1.2 – *Northstar*
- iPhone OS 3.1.3 – *SUNorthstarTwo*
- iPhone OS 3.2–3.2.2 – *Wildcat*
- iOS 4.0–4.0.2 – *Apex*
- iOS 4.1 – *Baker*
- iOS 4.2.1 – *Jasper*
- iOS 4.2.5–4.2.10 – *Phoenix*
- iOS 4.3–4.3.5 – *Durango*
- iOS 5.0–5.0.1 – *Telluride*
- iOS 5.1–5.1.1 – *Hoodoo*
- iOS 6.0–6.0.2 – *Sundance*
- iOS 6.1–6.1.2 – *Brighton*
- iOS 6.1.3–6.1.6 – *BrightonMaps*
- iOS 7.0–7.0.2 – *Innsbruck*
- iOS 7.0.3–7.0.6 – *InnsbruckTaos*
- iOS 7.1 – *Sochi*
- iOS 7.1.1 – *SUSochi*
- iOS 7.1.2 – *Sochi*
- iOS 8.0–8.0.2 – *Okemo*

- iOS 8.1 – *OkemoTaos*
- iOS 8.1.1–8.1.2 – *SUOkemoTaos*
- iOS 8.1.3 – *SUOkemoTaosTwo*
- iOS 8.2 – *OkemoZurs*
- iOS 8.3 – *Stowe*
- iOS 8.4 – *Copper*
- iOS 8.4.1 – *Donner*
- iOS 9.0–9.0.2 – *Monarch*
- iOS 9.1 – *Boulder*
- iOS 9.2 – *Castlerock*
- iOS 9.2.1 – *Dillon*
- iOS 9.3–9.3.1 – *Eagle*
- iOS 9.3.2 – *Frisco*
- iOS 9.3.3–9.3.6 – *Genoa*
- iOS 10.0.1–10.0.3 – *Whitetail*
- iOS 10.1–10.1.1 – *Butler*
- iOS 10.2 – *Corry*
- iOS 10.2.1 – *Dubois*
- iOS 10.3–10.3.1 – *Erie*
- iOS 10.3.2 – *Franklin*
- iOS 10.3.3–10.3.4 – *Greensburg*
- iOS 11.0–11.0.3 – *Tigris*
- iOS 11.1–11.1.2 – *Bursa*
- iOS 11.2–11.2.2 – *Cinar*
- iOS 11.2.5–11.2.6 – *Dalaman*
- iOS 11.3–11.3.1 – *Emet*
- iOS 11.4 – *Fatsa*
- iOS 11.4.1 – *Gebze*
- iOS 12 – *Peace*
- iOS 13 / iPadOS 13 – *Yukon*
- iOS 14 / iPadOS 14 – *Azul*
- iOS 15 / iPadOS 15 – *Sky*
- iOS 16 / iPadOS 16 – *Sydney*
- iOS 17 / iPadOS 17 – *Dawn*
- iOS 18 / iPadOS 18 – *Crystal*
- iOS 26 / iPadOS 26 – *Luck*

## Mac OS X / OS X / macOS

The internal codenames of Mac OS X 10.0 through 10.2 are big cats.

In Mac OS X 10.2, the internal codename "Jaguar" was used as a public name, and, for subsequent Mac OS X releases, big cat names were used as public names through until OS X 10.8 "Mountain Lion", and wine names were used as internal codenames through until OS X 10.10 "Syrah".[100]

For OS X releases beginning with 10.9, and for macOS releases, landmarks in California were used as public names.[101]

For OS X releases beginning with 10.11, and for macOS releases, varieties of apples were used as internal code names.[100]

- Mac OS X: Cyan, Siam (in reference to joining Mac OS and Rhapsody)[97]
- Mac OS X Developer Preview 3 – *Bunsen*
- Mac OS X Developer Preview 4 – *Gonzo*
- Mac OS X Public Beta – *Kodiak*[100]
- Mac OS X Public Release 1  – *Hera*
- Mac OS X Public Release 2  – *Beaker*
- Mac OS X 10.0 – *Cheetah*[97]
- Mac OS X 10.1 – *Puma*[97]
- Mac OS X 10.2 — *Jaguar*[97]
- Mac OS X 10.2.1 — *Red*[97]
- Mac OS X 10.2.2 — *Blue*[97]
- Mac OS X 10.2.3 — *Green*[97]
- Mac OS X 10.2.4 — *Pink*[97]
- Mac OS X 10.2.7 — *Blackrider, Smeagol*[97]
- Mac OS X 10.3 Panther – *Pinot*[100]
- Mac OS X 10.4 Tiger – *Merlot*[100]

- Mac OS X 10.4.1 Tiger – *Atlanta*
- Mac OS X 10.4.4 Tiger (Intel version) – *Chardonnay*[100]
- Mac OS X 10.5 Leopard – *Chablis*[100]
- Mac OS X 10.6 Snow Leopard
- Mac OS X 10.7 Lion – *Barolo*[100]
- OS X 10.8 Mountain Lion – *Zinfandel*[100]
- OS X 10.9 Mavericks – *Cabernet*[102]
- OS X 10.10 Yosemite – *Syrah*[100][103][104]
- OS X 10.11 El Capitan – *Gala*[100]
- macOS 10.12 Sierra – *Fuji*[100]
- macOS 10.13 High Sierra – *Lobo*[100]
- macOS 10.14 Mojave – *Liberty*[100]
- macOS 10.15 Catalina – *Jazz*[105][106][100]
- macOS 11 Big Sur – *GoldenGate*[106]
- macOS 12 Monterey – *Star*[106]
- macOS 13 Ventura – *Rome*[106]
- macOS 14 Sonoma – *Sunburst*[106]
- macOS 15 Sequoia – *Glow*[106]
- macOS 26 Tahoe  – *Cheer*[107]

### Mac OS X Server

- Mac OS X Server 1.0 – *Rhapsody*[97]
- Mac OS X Server CR1 — *Enterprise* (named after "Apple's NeXT division")[97]
- Mac OS X Server DR2 — *Titan*[97]
- Mac OS X Server 10.2 Jaguar – *Tigger*[97]

### Other operating systems

- Taligent OS — *Defiant, Pink*[97]

### tvOS

Version:

- 9.0–9.0.1 – *MonarchTide*
- 9.1 – *Tilden*
- 9.1.1 – *Noble*
- 9.2 – *Angora*
- 9.2.1 – *Fern*
- 9.2.2 – *Gilmore*
- 10.0 – *Union*
- 10.0.1 – *Bugle*
- 10.1 – *Clementine*
- 10.1.1 – *Diamond*
- 10.2 – *Emerald*
- 10.2.1 – *Florence*
- 10.2.2 – *Gold*
- 11.0 – *Topaz*
- 11.1 – *Bass*
- 11.2–11.2.1 – *Coyote*
- 11.2.5–11.2.6 – *Dixon*
- 11.3 – *Eaton*
- 11.4 – *Francis*
- 11.4.1 – *Grant*
- 12.0–12.4.1 – *Hope*
- 13.0–13.4.5 – *Yager*
- 14.0–14.7 – *Archer*
- 15.0 – *Satellite*
- 16.0 – *Paris*

### watchOS

watchOS often follows the codename convention for beaches.[91][108] All betas carry the following codenames, succeeded by the word "Seed". For example, watchOS 3.2 beta is known as *ElectricSeed*.

- Apple Watch Electrocardiogram – *Cinnamon*
- Apple Watch Blood Oxygen – *Scandium*
- Apple Watch sleep tracking – *Burrito*[109]

OS versions:

- 1.0 – SkiHill
- 1.0.1 – Bucket
- 2.0 – Bondi
- 2.0.1 – Atlantic
- 2.1 – Bahar
- 2.2 – Coral
- 2.2.1 – Fish
- 2.2.2 – Goldfish
- 3.0 – Daytona
- 3.1 – Blowfish
- 3.1.1 – Catfish
- 3.1.3 – Dogfish
- 3.2 – Electric
- 3.2.2 – Firefish
- 3.2.3 – Ghostfish
- 4.0 – Fortune
- 4.1 – Beluga
- 4.2 – Catamaran
- 4.2.2-4.2.3 – Dolphin
- 4.3 – Emperor
- 4.3.1 – Ferry
- 4.3.1 – Gull
- 5.0–5.3 – Glory
- 6.0–6.3 – Grace
- 7.0–7.2 – Hunter
- 8.0 – Jupiter
- 9.0 – Kincaid
- 10.0 – Lighthouse
- 11.0 – Moonstone

### Technologies

- Switching from PowerPC to x86 architecture and the Intel chip platform – *Marklar*[91]
- Mac Catalyst – *Marzipan*
- A system shell for stereo AR-enabled apps – *StarBoard*[110]
- AppleShare – *Holly Hand Grenade*
- CoreMediaIO – *Tundra*
- Dictation Services – *Ironwood*
- File sharing extension (fork from AppleShare) – *Killer Rabbit*
- HFS – *Turbo File System (TFS)*
- HFS Plus — *Sequoia* (in reference to b-trees)[97]
- iCloud – *Ubiquity*[91]
- Toolbox ROM version $077D – *SuperMario*
- MacInTalk 3.2 Text to Speech (from mis-pronouncing Galatea) – *Gala Tea*
- MicroLED – T159[111][112]
- PowerPC Modern Memory Manager PowerPC – *Figment*
- 32-Bit QuickDraw – *Jackson Pollock*
- QuickDraw GX – *Skia*
- CarPlay – *Stark*[91][113]

## Services

- Apple Card – *Broadway*
- Apple Cash – *Lexington*

- Apple Pay – *Stockholm*
- Apple Financing & Credit – *Breakout*[114]
- Retail Store Initiative – *Nexus*

## Notes

## References

1. Linzmayer 2004, pp. 45–57.
2. Rambo, Guilherme (April 17, 2019). "Apple revamping Find My Friends & Find My iPhone in unified app, developing Tile-like personal item tracking" (https://9to5mac.com/2019/04/17/find-my-iphone-revamp/). Archived (https://web.archive.org/web/2019092510341 7/https://9to5mac.com/2019/04/17/find-my-iphone-revamp/) from the original on September 25, 2019. Retrieved September 25, 2019.
3. Dutta, Pururaj (April 2, 2020). "Exclusive: AirTags confirmed in a new Apple Support Video!" (https://appleosophy.com/2020/04/02/airtags-confirmed-in-a-new-apple-support-video/). *Appleosophy*. Archived (https://web.archive.org/web/20200525094207/https://appleosophy.com/2020/04/02/airtags-confirmed-in-a-new-apple-support-video/) from the original on May 25, 2020. Retrieved May 19, 2020.
4. Rambo, Guilherme (October 2, 2019). "New in-ear AirPods with noise cancellation found in iOS 13.2 beta" (https://9to5mac.com/2019/10/02/new-in-ear-airpods-with-noise-cancelling-found-in-ios-13-2-beta/). *9to5Mac*. Archived (https://web.archive.org/web/20191003002839/https://9to5mac.com/2019/10/02/new-in-ear-airpods-with-noise-cancelling-found-in-ios-13-2-beta/) from the original on October 3, 2019. Retrieved October 3, 2019.
5. "Apple's over-ear headphones may be called 'AirPods Studio' & retail for $349" (https://appleinsider.com/articles/20/05/09/apples-over-ear-headphones-may-be-called-airpods-studio). *AppleInsider*. Archived (https://web.archive.org/web/20200517175717/https://appleinsider.com/articles/20/05/09/apples-over-ear-headphones-may-be-called-airpods-studio) from the original on May 17, 2020. Retrieved May 16, 2020.
6. Hughes, Neil (June 6, 2012). "New part numbers reveal Apple to refresh most of Mac lineup at WWDC" (http://appleinsider.com/articles/12/06/06/part_numbers_suggest_apple_may_refresh_most_of_mac_lineup_at_wwdc.html). *Apple Insider*. Archived (https://web.archive.org/web/20131202233152/http://appleinsider.com/articles/12/06/06/part_numbers_suggest_apple_may_refresh_most_of_mac_lineup_at_wwdc.html) from the original on December 2, 2013. Retrieved November 27, 2013.
7. "169327: Fuji Preference Panes PT TrackPad (D67, 081116, PC, ProRes, 442HQ)" (http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/4c802a19960a54d112696e210da8c59e84e9f243.zip) (ZIP). *Apple.com*. Apple Inc. September 27, 2016. Archived (https://web.archive.org/web/20161018233518/http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/4c802a19960a54d112696e210da8c59e84e9f243.zip) from the original on October 18, 2016. Retrieved October 16, 2016.
8. "Apple TV" (https://apple-history.com/apple_tv). *apple-history.com*. Archived (https://web.archive.org/web/20190402165702/https://apple-history.com/apple_tv) from the original on April 2, 2019. Retrieved April 2, 2019.
9. Topolsky, Joshua (May 28, 2010). "The next Apple TV revealed: cloud storage and iPhone OS on tap... and a $99 price tag" (https://www.engadget.com/2010/05/28/the-next-apple-tv-revealed-cloud-storage-and-iphone-os-on-tap/). *Engadget*. AOL. Archived (https://web.archive.org/web/20150408211254/http://www.engadget.com/2010/05/28/the-next-apple-tv-revealed-cloud-storage-and-iphone-os-on-tap/) from the original on April 8, 2015. Retrieved April 4, 2015.
10. Gurman, Mark (November 28, 2011). "Apple's next-generation Apple TV moves closer to reality, assigned J33 codename" (http://9to5mac.com/2011/11/28/apples-next-generation-apple-tv-moves-closer-to-reality-assigned-j33-codename/). *9to5Mac*. Archived (https://web.archive.org/web/20131031214646/http://9to5mac.com/2011/11/28/apples-next-generation-apple-tv-moves-closer-to-reality-assigned-j33-codename/) from the original on October 31, 2013. Retrieved November 26, 2013.

11. Ritchie, Rene (November 19, 2015). "Apple TV (2015) review" (https://www.imore.com/apple-tv-2015-review). *iMore*. Archived (https://web.archive.org/web/20211225152939/https://www.imore.com/apple-tv-2015-review) from the original on December 25, 2021. Retrieved February 2, 2021.
12. Roston, Brittany A. (February 16, 2017). "Apple TV Ultra HD 4K model tipped with codename J105" (https://www.slashgear.com/apple-tv-ultra-hd-4k-model-tipped-with-codename-j105-16475250/). *Slashgear*. Archived (https://web.archive.org/web/20210227014748/https://www.slashgear.com/apple-tv-ultra-hd-4k-model-tipped-with-codename-j105-16475250/) from the original on February 27, 2021. Retrieved February 2, 2021.
13. Haslam, Karen (January 14, 2021). "New Apple TV 2021 release date, price & specs rumours" (https://www.macworld.co.uk/news/new-apple-tv-3663891/). Archived (https://web.archive.org/web/20210203110940/https://www.macworld.co.uk/news/new-apple-tv-3663891/) from the original on February 3, 2021. Retrieved February 2, 2021.
14. Chen, Brian X. (February 27, 2015). "Apple's New Job: Selling a Smartwatch to an Uninterested Public" (https://www.nytimes.com/2015/03/02/technology/apples-new-job-selling-a-smartwatch-to-an-uninterested-public.html?partner=rssnyt&emc=rss&_r=0). *The New York Times*. Archived (https://web.archive.org/web/20191229123929/https://www.nytimes.com/2015/03/02/technology/apples-new-job-selling-a-smartwatch-to-an-uninterested-public.html?partner=rssnyt&emc=rss&_r=0) from the original on December 29, 2019. Retrieved May 19, 2020.
15. Jewiss, Connor (March 12, 2024). "The MicroLED Apple Watch Ultra slips further away from reality as another supplier gets axed" (https://www.imore.com/health-fitness/apple-watch-ultra/the-microled-apple-watch-ultra-slips-further-away-from-reality-as-another-supplier-gets-axed). *iMore*. Archived (https://web.archive.org/web/20240530050722/https://www.imore.com/health-fitness/apple-watch-ultra/the-microled-apple-watch-ultra-slips-further-away-from-reality-as-another-supplier-gets-axed) from the original on May 30, 2024. Retrieved May 30, 2024.
16. Levy, Steven (June 2000). *Insanely Great: The Life and Times of Macintosh, the Computer that Changed Everything*. Penguin Publishing Group. p. 200. ISBN 978-0-14-029177-3.
17. Dormehl, Luke (April 17, 2018). "iMac's terrible code name was an in-joke between Jobs and Schiller" (https://www.cultofmac.com/477151/imacs-terrible-working-title-joke-jobs-schiller/). *Cult of Mac*. Archived (https://web.archive.org/web/20181128210720/https://www.cultofmac.com/477151/imacs-terrible-working-title-joke-jobs-schiller/) from the original on November 28, 2018. Retrieved November 28, 2018.
18. "Apple Readies Several New Macs With Next-Generation M2 Chips" (https://www.bloomberg.com/news/articles/2022-04-14/apple-readies-several-new-macs-with-next-generation-m2-chips). *Bloomberg.com*. April 14, 2022. Archived (https://web.archive.org/web/20220704060343/https://www.bloomberg.com/news/articles/2022-04-14/apple-readies-several-new-macs-with-next-generation-m2-chips) from the original on July 4, 2022. Retrieved March 26, 2023.
19. Trenholm, Rich (December 5, 2011). "Apple's secret iOS codenames revealed" (https://web.archive.org/web/20111206233427/http://crave.cnet.co.uk/mobiles/apples-secret-ios-codenames-revealed-50006331/). Cnet UK. Archived from the original (http://crave.cnet.co.uk/mobiles/apples-secret-ios-codenames-revealed-50006331/) on December 6, 2011. Retrieved November 26, 2013.
20. Fekete, István (June 20, 2013). "Benchmarks Surface for Next-Gen 13" MacBook Pro, Mid-2013 Mac Pro" (http://www.iphoneincanada.ca/mac/benchmarks-surface-for-next-gen-13-macbook-pro-mid-2013-mac-pro/). iPhone in Canada. Archived (https://web.archive.org/web/20131202230321/http://www.iphoneincanada.ca/mac/benchmarks-surface-for-next-gen-13-macbook-pro-mid-2013-mac-pro/) from the original on December 2, 2013. Retrieved November 27, 2013.

21. "169327: Fuji Preference Panes (PT, J52, 081116, PC, ProRes, 442HQ)" (http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/62016718f53b21c3ba6bd3f72303570491d38502.zip) (ZIP). *Apple.com*. Apple Inc. September 27, 2016. Archived (https://web.archive.org/web/20161018224924/http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/62016718f53b21c3ba6bd3f72303570491d38502.zip) from the original on October 18, 2016. Retrieved October 16, 2016.

22. Gurman, Mark (October 13, 2011). "MacBook Pros constrained, new models appear in Apple's inventory system" (http://9to5mac.com/2011/10/13/macbook-pros-constrained-new-models-appear-in-apples-inventory-system/). *9to5Mac*. Archived (https://web.archive.org/web/20131130051022/http://9to5mac.com/2011/10/13/macbook-pros-constrained-new-models-appear-in-apples-inventory-system/) from the original on November 30, 2013. Retrieved November 27, 2013. "the new internal code names for the updated MacBook Pro line are K90IA (13-inch), K91A (15-inch), and K92A (17-inch). The A in the codename signifies this next MacBook Pro refresh as being relatively minor."

23. Gurman, Mark (October 14, 2012). "13-inch MacBook Pro with Retina display confirmed for Apple event" (http://9to5mac.com/2012/10/14/13-inch-macbook-pro-with-retina-display-confirmed-for-apple-event/). *9to5Mac*. Archived (https://web.archive.org/web/20131202230232/http://9to5mac.com/2012/10/14/13-inch-macbook-pro-with-retina-display-confirmed-for-apple-event/) from the original on December 2, 2013. Retrieved November 26, 2013. "The current 15-inch MacBook Pro with Retina Display is codenamed D2, and its smaller sibling is in fact, as predicted this morning, dubbed D1 internally."

24. Slivka, Eric (July 20, 2013). "Next-Generation 13-Inch MacBook Pro Benchmarked with Modest Performance Gains" (http://www.macrumors.com/2013/06/20/next-generation-13-inch-macbook-pro-benchmarked-with-modest-performance-gains/). *MacRumors*. Archived (https://web.archive.org/web/20131202233542/http://www.macrumors.com/2013/06/20/next-generation-13-inch-macbook-pro-benchmarked-with-modest-performance-gains/) from the original on December 2, 2013. Retrieved November 27, 2013.

25. Slivka, Eric (July 9, 2013). "Next-Generation 15-Inch MacBook Pro Shows Up in Benchmarks" (http://www.macrumors.com/2013/07/09/next-generation-15-inch-macbook-pro-shows-up-in-benchmarks/). *MacRumors*. Archived (https://web.archive.org/web/20131203010022/http://www.macrumors.com/2013/07/09/next-generation-15-inch-macbook-pro-shows-up-in-benchmarks/) from the original on December 3, 2013. Retrieved November 27, 2013.

26. Paul Kunkel & Rick English, *Apple Design* pp 26267, Graphis. ISBN 1-888001-25-9.

27. Linzmayer 2004, p. 57.

28. Gurman, Mark (November 21, 2011). "Reported Retina Display iPad 3 with J2 codename shows up in hidden iOS 5 code" (http://9to5mac.com/2011/11/21/reported-retina-display-ipad-3-with-j2-codename-shows-up-in-hidden-ios-5-code/). *9to5Mac*. Archived (https://web.archive.org/web/20131203012224/http://9to5mac.com/2011/11/21/reported-retina-display-ipad-3-with-j2-codename-shows-up-in-hidden-ios-5-code/) from the original on December 3, 2013. Retrieved November 26, 2013.

29. Gurman, Mark (January 25, 2013). "Retina 'J85′ iPad mini in October, faster 'N51/N53′ iPhone 5S with 13MP Sony camera on target for July?" (http://9to5mac.com/2013/01/25/retina-j85-ipad-mini-in-october-faster-n51n53-iphone-5s-with-13mp-sony-camera-on-target-for-july/). *9to5Mac*. Archived (https://web.archive.org/web/20131127185646/http://9to5mac.com/2013/01/25/retina-j85-ipad-mini-in-october-faster-n51n53-iphone-5s-with-13mp-sony-camera-on-target-for-july/) from the original on November 27, 2013. Retrieved November 26, 2013.

30. Plummer, Quinten (May 22, 2015). "Upcoming Apple iPad Might Feature Split-Screen Capability And Multi-User Login: Report" (http://www.techtimes.com/articles/54754/20150522/upcoming-apple-ipad-might-feature-split-screen-capability-and-multi-user-login-report.htm). *Tech Times*. Archived (https://web.archive.org/web/20151119203003/http://www.techtimes.com/articles/54754/20150522/upcoming-apple-ipad-might-feature-split-screen-capability-and-multi-user-login-report.htm) from the original on November 19, 2015. Retrieved November 1, 2015.

31. Yarow, Jay (December 16, 2010). "Guess What Apple's Top Secret Code Name Was For The iPad" (http://www.businessinsider.com/guess-what-apples-top-secret-code-name-was-for-the-ipad-2010-12). *Business Insider*. Archived (https://web.archive.org/web/20131202231532/http://www.businessinsider.com/guess-what-apples-top-secret-code-name-was-for-the-ipad-2010-12) from the original on December 2, 2013. Retrieved November 26, 2013. "Apple's top secret codename for the iPad was K48, according to the FBI's complaint."

32. Ahmed, Azam (July 6, 2010). "Executive Pleads Guilty to Leaking Apple Secrets" (https://dealbook.nytimes.com/2011/07/05/executive-pleads-guilty-to-leaking-apple-secrets/). *The New York Times*. Archived (https://web.archive.org/web/20170709134821/https://dealbook.nytimes.com/2011/07/05/executive-pleads-guilty-to-leaking-apple-secrets/) from the original on July 9, 2017. Retrieved July 29, 2012.

33. Murtazin, Eldar (June 20, 2010). "Apple's Phone: From 1980s' Sketches to iPhone. Part 3" (https://mobile-review.com/articles/2010/iphone-history3-en.shtml). *Mobile-Review*. Maxim Antonenko, Olexandr Nikolaychuk, translators. Archived (https://web.archive.org/web/20190427132119/https://mobile-review.com/articles/2010/iphone-history3-en.shtml) from the original on April 27, 2019. Retrieved March 5, 2019.

34. Lambert, Terry (December 19, 2016). "Here's what it was like to work on the original iPhone, codenamed 'Project Purple' " (https://www.businessinsider.com/working-on-original-iphone-project-purple-2016-12). *Business Insider*. Archived (https://web.archive.org/web/20190306111501/https://www.businessinsider.com/working-on-original-iphone-project-purple-2016-12) from the original on March 6, 2019. Retrieved March 4, 2019.

35. Matte, Daniel (April 10, 2017). "Open-Source Clues to Google's Mysterious Fuchsia OS" (https://spectrum.ieee.org/a-modern-os-from-google). *IEEE Spectrum*. IEEE. Archived (https://web.archive.org/web/20190306044452/https://spectrum.ieee.org/tech-talk/computing/software/a-modern-os-from-google) from the original on March 6, 2019. Retrieved March 4, 2019.

36. Ritchie, Rene (August 4, 2012). " "Project Purple" and the pre-history of the iPhone" (https://www.imore.com/apple-senior-vice-presidents-phil-schiller-and-scott-forstall-share-brief-pre-history-iphone-and). *iMore*. Archived (https://web.archive.org/web/20190403024607/https://www.imore.com/apple-senior-vice-presidents-phil-schiller-and-scott-forstall-share-brief-pre-history-iphone-and) from the original on April 3, 2019. Retrieved April 2, 2019.

37. "CDMA iPhone 4 has N92 codename, nears production" (https://web.archive.org/web/20131202224803/http://www.electronista.com/articles/10/08/11/iphone.4.for.verizon.gets.n92.badge.and.more/). Electronista. August 11, 2010. Archived from the original (http://www.electronista.com/articles/10/08/11/iphone.4.for.verizon.gets.n92.badge.and.more/) on December 2, 2013. Retrieved November 26, 2013.

38. Vascellaro, Jessica (September 12, 2012). "Expectations Build Up for Apple's New iPhone" (https://online.wsj.com/news/articles/SB10000872396390443696604577645920875813322). *The Wall Street Journal*. Archived (https://web.archive.org/web/20131204010029/http://online.wsj.com/news/articles/SB10000872396390443696604577645920875813322) from the original on December 4, 2013. Retrieved November 26, 2013. "The next iPhone, which has been referred to internally by the code name N41, has been in the works for more than a year, a person familiar with the matter said."

39. Duadi. "Apple to Reveal "N42" Codenamed iPhone at Conventional Pricing" (https://web.archive.org/web/20131202235058/http://www.techglued.com/apple-to-reveal-n42-codenamed-iphone-at-conventional-pricing/). TechGlued. Archived from the original (http://www.techglued.com/apple-to-reveal-n42-codenamed-iphone-at-conventional-pricing/) on December 2, 2013. Retrieved November 26, 2013.

40. Hein, Buster (August 22, 2014). "Foxconn factory leaks exact dimensions of iPhone 6" (http://www.cultofmac.com/292411/foxconn-source-leaks-entire-iphone-6-dimensions/). Cult of Mac. Archived (https://web.archive.org/web/20140824064245/http://www.cultofmac.com/292411/foxconn-source-leaks-entire-iphone-6-dimensions/) from the original on August 24, 2014. Retrieved August 22, 2014.

41. Truta, Filip (January 26, 2013). "iPhone 5S Codenamed N51 and N53 to Launch in July – Report" (http://news.softpedia.com/news/iPhone-5S-Prototypes-Codenamed-N51-and-N53-to-Launch-in-July-Report-324322.shtml). Softpedia. Archived (https://web.archive.org/web/20131202233832/http://news.softpedia.com/news/iPhone-5S-Prototypes-Codenamed-N51-and-N53-to-Launch-in-July-Report-324322.shtml) from the original on December 2, 2013. Retrieved November 26, 2013.

42. Gurman, Mark (January 22, 2016). "Apple readies 'iPhone 5se', not '6c', for March/April with curved edges & Live Photos" (https://9to5mac.com/2016/01/22/apple-readies-iphone-5se-not-6c-for-marchapril-with-curved-edges-live-photos/). *9to5Mac*. Archived (https://web.archive.org/web/20190826054734/https://9to5mac.com/2016/01/22/apple-readies-iphone-5se-not-6c-for-marchapril-with-curved-edges-live-photos/) from the original on August 26, 2019. Retrieved September 16, 2019.

43. Dwilson, Stephanie Dube (March 21, 2016). "iPhone SE: 5 Fast Facts You Need to Know" (https://heavy.com/tech/2016/03/smaller-iphone-se-specs-photos-pics-cost-price-gb-apple-pay/). *Heavy.com*. Archived (https://web.archive.org/web/20200810032211/https://heavy.com/tech/2016/03/smaller-iphone-se-specs-photos-pics-cost-price-gb-apple-pay/) from the original on August 10, 2020. Retrieved September 16, 2019.

44. Jade, Kaspar (February 28, 2015). "Sources: Apple's 2015 'iPhone 6s' models to gain Force Touch but no dual-camera system" (http://appleinsider.com/articles/15/02/28/sources-apples-2015-iphone-6s-models-to-gain-force-touch-but-no-dual-camera-system-). *AppleInsider*. Archived (https://web.archive.org/web/20151030090328/http://appleinsider.com/articles/15/02/28/sources-apples-2015-iphone-6s-models-to-gain-force-touch-but-no-dual-camera-system-) from the original on October 30, 2015. Retrieved November 1, 2015.

45. Sin, Ben. "Next iPhone Is Codenamed 'Ferrari' Internally, According To Chinese Leaks" (https://www.forbes.com/sites/bensin/2016/12/20/next-iphone-is-codenamed-ferrari-internally-according-to-chinese-leaks/#b1082f521c75). *Forbes*. Archived (https://web.archive.org/web/20180813005441/https://www.forbes.com/sites/bensin/2016/12/20/next-iphone-is-codenamed-ferrari-internally-according-to-chinese-leaks/#b1082f521c75) from the original on August 13, 2018. Retrieved August 12, 2018.

46. Smith, Chris (December 21, 2016). "Apple's rumored 2017 roadmap: An incredible new iPhone 8 and two boring iPhone 7s models" (http://bgr.com/2016/12/21/iphone-8-vs-iphone-7s/). *BGR*. Archived (https://web.archive.org/web/20170927112051/http://bgr.com/2016/12/21/iphone-8-vs-iphone-7s/) from the original on September 27, 2017. Retrieved September 26, 2017.

47. "Codename D33 Archives – Digital Masters Magazine" (https://www.digitalmastersmag.com/magazine/tag/codename-d33/). *Digital Masters Magazine*. Archived (https://web.archive.org/web/20180930033539/https://www.digitalmastersmag.com/magazine/tag/codename-d33/) from the original on September 30, 2018. Retrieved September 29, 2018.

48. Rambo, Guilherme (July 23, 2019). "Apple to release three 'iPhone 11' models this fall" (https://9to5mac.com/2019/07/23/iphone-11-models-camera-processor/). *9to5Mac*. Retrieved September 16, 2019.

49. "2020 iPhone Alert: Apple's New Price Changes Revealed" (https://www.forbes.com/sites/gordonkelly/2020/05/02/apple-iphone-12-price-changes-release-upgrade-iphone-11-pro-max/). *Forbes*. Archived (https://web.archive.org/web/20231205040524/https://www.forbes.com/sites/gordonkelly/2020/05/02/apple-iphone-12-price-changes-release-upgrade-iphone-11-pro-max/) from the original on December 5, 2023. Retrieved November 27, 2023.

50. "Apple Readies New iPhones with Pro-Focused Camera, Video Updates" (https://www.bloomberg.com/news/articles/2021-08-10/apple-readies-new-iphones-with-pro-focused-camera-video-updates). *Bloomberg News*. August 10, 2021.

51. "Apple iPhone 14 reveal set for September 7" (https://www.techspot.com/news/95754-apple-iphone-14-reveal-event-kicks-off-september.html). *TechSpot*. August 24, 2022. Archived (https://web.archive.org/web/20230407200537/https://www.techspot.com/news/95754-apple-iphone-14-reveal-event-kicks-off-september.html) from the original on April 7, 2023. Retrieved April 7, 2023.

52. Smith, Chris (2022). "iPhone 14 Pro models will come in different sizes than regular versions" (https://9to5mac.com/2022/03/14/exclusive-iphone-14-coming-in-four-models-without-mini-version-pro-models-with-taller-screen-satellite-features-still-coming/). *9to5mac.com*. Archived (https://web.archive.org/web/20221022153219/https://9to5mac.com/2022/03/14/exclusive-iphone-14-coming-in-four-models-without-mini-version-pro-models-with-taller-screen-satellite-features-still-coming/) from the original on October 22, 2022. Retrieved March 7, 2023.

53. "Leak iPhone 15 Pro CADs Reveal Massive Camera Hump, New Rounded Design" (https://www.forbes.com/sites/gordonkelly/2023/02/21/apple-iphone-15-pro-max-ultra-new-design-camera-usb-c-cad-leak/). *Forbes*. Archived (https://web.archive.org/web/20231205040531/https://www.forbes.com/sites/gordonkelly/2023/02/21/apple-iphone-15-pro-max-ultra-new-design-camera-usb-c-cad-leak/) from the original on December 5, 2023. Retrieved November 27, 2023.

54. "Early iOS 18 Code Reveals Four New iPhone Models With A18 Chip" (https://www.macrumors.com/2023/12/20/ios-18-code-four-new-iphone-models/). *MacRumors*. Archived (https://web.archive.org/web/20240909003728/https://www.macrumors.com/2023/12/20/ios-18-code-four-new-iphone-models/) from the original on September 9, 2024. Retrieved September 11, 2024.

55. "Report: Apple beginning serious work on a foldable iPhone" (https://arstechnica.com/gadgets/2024/07/report-apple-begins-serious-work-on-a-foldable-iphone/). *ArsTechnica*. Retrieved March 3, 2025.

56. "iPhone SE (3rd generation) - Tech Specs" (https://support.apple.com/en-us/111866). *Apple Support*. Retrieved October 23, 2025.

57. Zivkovic, Marko (November 9, 2023). "iPhone SE 4 Likely to Use Modified iPhone 14 Chassis" (https://macrumors.com/2023/11/09/iphone-se-4-iphone-14-chassis). *MacRumors*. Archived (https://web.archive.org/web/20231113123931/https://www.macrumors.com/2023/11/09/iphone-se-4-iphone-14-chassis/) from the original on November 13, 2023. Retrieved November 13, 2023.

58. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

59. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

60. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

61. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

62. Rossignol, Joe (July 10, 2015). "Apple Rumored to Announce New iPod Touch, Nano and Shuffle Around July 14" (https://www.macrumors.com/2015/07/10/new-ipod-touch-nano-shuffle-july-14/). *MacRumors*. Archived (https://web.archive.org/web/20200903122934/https://www.macrumors.com/2015/07/10/new-ipod-touch-nano-shuffle-july-14/) from the original on September 3, 2020. Retrieved May 21, 2020.

63. Rambo, Guilherme (September 3, 2019). " 'Apple Glasses' explained and how iPhone-connected item trackers will work" (https://9to5mac.com/2019/09/03/apple-glasses-explained-and-how-iphone-connected-item-trackers-will-work/). *9to5mac*. Archived (https://web.archive.org/web/20190914110517/https://9to5mac.com/2019/09/03/apple-glasses-explained-and-how-iphone-connected-item-trackers-will-work/) from the original on September 14, 2019. Retrieved September 25, 2019.

64. Zivkovic, Marko (November 10, 2023). "Project Alaska: Apple's Second-Generation Vision Pro Headset" (https://macrumors.com/2023/11/10/project-alaska-second-generation-vision-pro). *MacRumors*. Archived (https://web.archive.org/web/20231113133703/https://www.macrumors.com/2023/11/10/project-alaska-second-generation-vision-pro/) from the original on November 13, 2023. Retrieved November 13, 2023.

65. Edmonds, Rich (April 12, 2016). "Apple car version code names" (https://www.imore.com/apple-car-version-code-names). *iMore*. Archived (https://web.archive.org/web/20180813004730/https://www.imore.com/apple-car-version-code-names) from the original on August 13, 2018. Retrieved August 12, 2018.

66. Gurman, Mark (January 8, 2023). "Apple Will Talk Up Its Mixed-Reality Headset in 2023 But Not Much Else" (https://www.bloomberg.com/news/newsletters/2023-01-08/when-will-apple-launch-the-reality-pro-mixed-reality-headset-apple-2023-devices-lcnfzkc7). *Bloomberg.com*. Archived (https://web.archive.org/web/20230505132018/https://www.bloomberg.com/news/newsletters/2023-01-08/when-will-apple-launch-the-reality-pro-mixed-reality-headset-apple-2023-devices-lcnfzkc7) from the original on May 5, 2023. Retrieved May 31, 2023.

67. Gurman, Mark (November 13, 2022). "Apple Plans a 3D World and Video Service for Its Mixed-Reality Headset" (https://www.bloomberg.com/news/newsletters/2022-11-13/apple-reality-pro-headset-plans-3d-mixed-reality-world-games-video-service-lafgxl1e). *Bloomberg News*. Archived (https://web.archive.org/web/20231008222057/https://www.bloomberg.com/news/newsletters/2022-11-13/apple-reality-pro-headset-plans-3d-mixed-reality-world-games-video-service-lafgxl1e) from the original on October 8, 2023. Retrieved June 19, 2023.

68. Rossignol, Joe (September 1, 2019). "iOS 13 Code Suggests Apple Testing AR Headset With 'StarBoard' Mode, 'Garta' Codename, and More [Updated]" (https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914063550/https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/) from the original on September 14, 2019. Retrieved September 25, 2019.

69. Potuck, Michael (September 20, 2019). "First look at Apple's Stereo AR experience in 'StarTester mode' [Video]" (https://9to5mac.com/2019/09/20/first-look-at-apples-stereo-ar-experience-in-startester-mode-video/). *9to5Mac*. Archived (https://web.archive.org/web/20220821092717/https://9to5mac.com/2019/09/20/first-look-at-apples-stereo-ar-experience-in-startester-mode-video/) from the original on August 21, 2022. Retrieved June 19, 2023.

70. Hollister, Sean (September 11, 2019). "This screenshot might be the first implicit confirmation of Apple's AR headset" (https://www.theverge.com/2019/9/10/20860023/apple-ar-headset-starboard-garta-luck-franc-holokit). *The Verge*. Archived (https://web.archive.org/web/20230619150718/https://www.theverge.com/2019/9/10/20860023/apple-ar-headset-starboard-garta-luck-franc-holokit) from the original on June 19, 2023. Retrieved June 19, 2023.

71. "Apple secretly developing screens in unmarked Santa Clara facility: report" (https://www.siliconvalley.com/2018/03/19/apple-secretly-developing-screens-in-unmarked-santa-clara-facility-report/). *Silicon Valley*. March 19, 2018. Archived (https://web.archive.org/web/20220627182615/https://www.siliconvalley.com/2018/03/19/apple-secretly-developing-screens-in-unmarked-santa-clara-facility-report/) from the original on June 27, 2022. Retrieved June 24, 2024.

72. Li, Roland (April 4, 2024). "Apple lays off hundreds of Bay Area workers in first mass cuts since the pandemic" (https://www.sfchronicle.com/tech/article/apple-tech-layoffs-19386392.php). *San Francisco Chronicle*. Archived (https://web.archive.org/web/20240530050722/https://www.sfchronicle.com/tech/article/apple-tech-layoffs-19386392.php) from the original on May 30, 2024. Retrieved May 30, 2024.

73. Donato-Weinstein, Nathan (April 11, 2016). "Zeus, Medusa, Pegasus, Athena: Inside Apple's mysterious Silicon Valley industrial projects" (https://www.bizjournals.com/sanjose/news/2016/04/11/zeus-medusa-pegasus-athena-inside-apples.html). *Silicon Valley Business Journal*. Archived (https://web.archive.org/web/20230316202956/https://www.bizjournals.com/sanjose/news/2016/04/11/zeus-medusa-pegasus-athena-inside-apples.html) from the original on March 16, 2023. Retrieved May 30, 2024.

74. Sohail, Omar (May 25, 2018). "Apple A12 Bionic & A12X Part Numbers With CPU Codename Provided in Latest Leak – Earlier Performance Numbers Peaked at 30% Better Scores" (https://wccftech.com/apple-a12-part-number-cpu-codename/). *WCCF Tech*. Archived (https://web.archive.org/web/20180813112228/https://wccftech.com/apple-a12-part-number-cpu-codename/) from the original on August 13, 2018. Retrieved August 13, 2018.

75. Sohail, Omar (November 26, 2018). "Apple's Upcoming A13 Chipset Codename Allegedly Revealed – 7nm FinFET Node Expected to Be Retained [Update]" (https://wccftech.com/apple-a13-chipset-codename-leaked/). *WCCF Tech*. Archived (https://web.archive.org/web/20181128122930/https://wccftech.com/apple-a13-chipset-codename-leaked/) from the original on November 28, 2018. Retrieved November 28, 2018.

76. 涂志豪 (October 26, 2020). "蘋果A15晶片 傳採台積N5P製程" (https://www.chinatimes.com/newspapers/20201026000140-260202?chdtv). *中時新聞網* (in Chinese). Archived (https://web.archive.org/web/20201101070025/https://www.chinatimes.com/newspapers/20201026000140-260202?chdtv) from the original on November 1, 2020. Retrieved October 27, 2020.

77. Tim Hardwick (October 27, 2020). "Report: Apple Silicon iMac Featuring Desktop Class 'A14T' Chip Coming First Half of 2021" (https://www.macrumors.com/2020/10/27/apple-silicon-imac-coming-1h-2021-a14t/). *MacRumors*.

78. 手机晶片, 达人 (September 13, 2023). "我來讲讲明年的A18 处理器。" (https://weibo.com/1833340431/Njcxe7w59). *Weibo*. Archived (https://web.archive.org/web/20231205040524/https://weibo.com/1833340431/Njcxe7w59) from the original on December 5, 2023. Retrieved November 27, 2023.

79. Zivkovic, Marko. "Apple A19, C2, M5 chip identifiers all leaked in early iOS 18 code" (https://appleinsider.com/articles/25/07/08/apple-a19-c2-m5-chip-identifiers-all-leaked-in-early-ios-18-code). *AppleInsider*. Retrieved July 9, 2025.

80. King, Ian; Gurman, Mark (April 2, 2018). "Apple Plans to Use Its Own Chips in Macs From 2020, Replacing Intel" (https://www.bloomberg.com/news/articles/2018-04-02/apple-is-said-to-plan-move-from-intel-to-own-mac-chips-from-2020). *Bloomberg.com*. Archived (https://web.archive.org/web/20181128125747/https://www.bloomberg.com/news/articles/2018-04-02/apple-is-said-to-plan-move-from-intel-to-own-mac-chips-from-2020) from the original on November 28, 2018. Retrieved March 26, 2023.

81. Evans, Jonny (October 27, 2020). "Apple's A14 chip has a superpower version for Macs" (https://www.computerworld.com/article/3586587/apple-s-a14-chip-has-a-superpower-version-for-macs.html). *Computerworld*. Archived (https://web.archive.org/web/20230326162737/https://www.computerworld.com/article/3586587/apple-s-a14-chip-has-a-superpower-version-for-macs.html) from the original on March 26, 2023. Retrieved March 26, 2023.

82. Gurman, Mark (May 18, 2021). "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg.com*. Archived (https://web.archive.org/web/20230614070351/https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips) from the original on June 14, 2023. Retrieved March 26, 2023.

83. "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg.com*. May 18, 2021. Retrieved March 26, 2023.

84. Gurman, Mark (May 18, 2021). "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg News*. Archived (https://web.archive.org/web/20230614070351/https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips) from the original on June 14, 2023. Retrieved March 26, 2023.

85. Ma, Wayne (November 5, 2021). "Apple's Road Map for Mac Chips Shows Likely Advantage Over Intel" (https://www.theinformation.com/articles/apples-road-map-for-mac-chips-shows-likely-advantage-over-intel). *The Information*. Archived (https://web.archive.org/web/20230326161238/https://www.theinformation.com/articles/apples-road-map-for-mac-chips-shows-likely-advantage-over-intel) from the original on March 26, 2023. Retrieved March 26, 2023.

86. Simon, Michael. "Apple's M3 chips on track for 2023 as next-gen 3nm process begins" (https://www.macworld.com/article/557232/m3-chips-apple-devices-tsmc-3nm-process-2023.html). *Macworld*. Archived (https://web.archive.org/web/20231126174558/https://www.macworld.com/article/557232/m3-chips-apple-devices-tsmc-3nm-process-2023.html) from the original on November 26, 2023. Retrieved November 26, 2023.

87. Sohail, Omar (April 14, 2024). "Apple Reportedly Planning Four Versions Of Its M4 Chipset, With The Top-Tier M4 Ultra Sporting The Codename 'Hidra' " (https://wccftech.com/apple-planning-four-m4-versions-including-m4-ultra/). *Wccftech*. Retrieved March 22, 2025.

88. Clover, Juli (March 9, 2020). "Apple Developing Fitness App for iOS 14 That Lets You Download Guided Workout Videos" (https://www.macrumors.com/2020/03/09/apple-ios-14-fitness-app-guided-workouts/). *MacRumors.com*. MacRumors. Archived (https://web.archive.org/web/20210110084506/https://www.macrumors.com/2020/03/09/apple-ios-14-fitness-app-guided-workouts/) from the original on January 10, 2021. Retrieved January 2, 2021.

89. Constine, Josh (May 18, 2020). "Leaked pics from Apple's AR app Gobi" (https://constine.substack.com/p/leaked-pics-from-apples-ar-app-gobi). *Josh Constine's Moving Product*. Archived (https://web.archive.org/web/20200518222806/https://constine.substack.com/p/leaked-pics-from-apples-ar-app-gobi) from the original on May 18, 2020. Retrieved May 19, 2020.

90. "App Store's version.plist (Mac OS X 10.6.8)" (https://pastebin.com/qeRdJhvs). *Pastebin.com*. June 3, 2019. Archived (https://web.archive.org/web/20210325054937/https://pastebin.com/qeRdJhvs) from the original on March 25, 2021. Retrieved June 4, 2019.

91. Staff (July 3, 2016). "Apple code names" (https://www.imore.com/apple-code-names). *iMore*. Archived (https://web.archive.org/web/20180813005133/https://www.imore.com/apple-code-names) from the original on August 13, 2018. Retrieved August 12, 2018.

92. Jade, Kasper (January 8, 2001). "Apple Acquires SoundJam, Programmer for iMusic" (https://appleinsider.com/articles/01/01/08/apple_acquires_soundjam_programmer_for_imusic). *AppleInsider*. Archived (https://web.archive.org/web/20190402165851/https://appleinsider.com/articles/01/01/08/apple_acquires_soundjam_programmer_for_imusic) from the original on April 2, 2019. Retrieved April 2, 2019.

93. Steve Jobs (January 9, 2001). *Steve Jobs Keynote Macworld 2001 SF* (https://www.youtube.com/watch?v=pICctkS12fY&t=6495) (Stevenote). San Francisco: YouTube. Event occurs at 1:48:15. Archived (https://web.archive.org/web/20190626222227/https://www.youtube.com/watch?v=pICctkS12fY&t=6495) from the original on June 26, 2019. Retrieved April 2, 2019. "The digital lifestyle era, driven by applications like iMovie and our two new ones today: iMusic [sic]..."

94. "iOS 18's AI will summarize notifications, articles and more" (https://appleinsider.com/articles/24/05/30/ios-18-project-greymatter-will-use-ai-to-summarize-notifications-articles-and-much-more). *AppleInsider*. May 30, 2024. Archived (https://web.archive.org/web/20240618083952/https://appleinsider.com/articles/24/05/30/ios-18-project-greymatter-will-use-ai-to-summarize-notifications-articles-and-much-more) from the original on June 18, 2024. Retrieved June 18, 2024.

95. "Code name for Dynamic Island was "Jindo", which is an Korean Island" (https://twitter.com/Tommyboiiiiii/status/1573192822777585666). *twitter.com*. September 23, 2022. Archived (https://web.archive.org/web/20230828125414/https://twitter.com/Tommyboiiiiii/status/1573192822777585666) from the original on August 28, 2023. Retrieved August 28, 2023.

96. Linzmayer 2004, p. 55.

97. Linzmayer 2004, p. 56.

98. Rothenberg, Matthew (April 4, 2000). "Apple ships OS 9 rev" (https://www.zdnet.com/article/apple-ships-os-9-rev/). *ZDNet*. Archived (https://web.archive.org/web/20230329150554/https://www.zdnet.com/article/apple-ships-os-9-rev/) from the original on March 29, 2023. Retrieved March 29, 2023.

99. Ritchie, Rene (December 3, 2011). "iOS version code-names" (http://www.imore.com/ios-version-codenames). *iMore*. Archived (https://web.archive.org/web/20140903081040/http://www.imore.com/ios-version-codenames) from the original on September 3, 2014. Retrieved August 30, 2014.

100. Ritchie, Rene (August 30, 2017). "macOS and OS X version code-names" (https://www.imore.com/macos-version-code-names). *iMore*. Archived (https://web.archive.org/web/20190402194401/https://www.imore.com/macos-version-code-names) from the original on April 2, 2019. Retrieved March 4, 2019.

101. Ha, Anthony (June 10, 2013). "Apple Has A New, California-Based Naming Scheme For OS X, Starting With OS X Mavericks" (https://techcrunch.com/2013/06/10/os-x-mavericks/). *TechCrunch*. Archived (https://web.archive.org/web/20170709214256/https://techcrunch.com/2013/06/10/os-x-mavericks/) from the original on July 9, 2017. Retrieved June 10, 2013.

102. Gurman, Mark (April 29, 2013). "Apple to release OS X 10.9 with new power-user features, more from iOS later this year" (http://9to5mac.com/2013/04/29/apple-to-update-os-x-with-new-power-user-features-more-from-ios-later-this-year/). *9to5Mac*. Archived (https://web.archive.org/web/20140908041552/http://9to5mac.com/2013/04/29/apple-to-update-os-x-with-new-power-user-features-more-from-ios-later-this-year/) from the original on September 8, 2014. Retrieved August 30, 2014. "OS X 10.9, which is internally codenamed "Cabernet,"..."

103. Gurman, Mark (October 3, 2013). "Apple finishing up Mavericks as development shifts to OS X 'Syrah' with iOS 7-influence" (http://9to5mac.com/2013/10/03/apple-finishing-up-mavericks-as-development-shifts-to-os-x-10-10-ios-8). 9to5Mac. Archived (https://web.archive.org/web/20131205125629/http://9to5mac.com/2013/10/03/apple-finishing-up-mavericks-as-development-shifts-to-os-x-10-10-ios-8/) from the original on December 5, 2013. Retrieved November 26, 2013. "OS X 10.10 is internally codenamed Syrah"

104. Ritchie, Rene (October 3, 2013). "OS X 10.10 codenamed Syrah, anyone want to bet it's going to look more like iOS 7?" (https://web.archive.org/web/20140903081134/http://www.imore.com/os-x-1010-codenamed-syrah-anyone-want-bet-its-going-look-more-ios-7). *iMore*. Archived from the original (http://www.imore.com/os-x-1010-codenamed-syrah-anyone-want-bet-its-going-look-more-ios-7) on September 3, 2014. Retrieved August 30, 2014.

105. /usr/standalone/i386/SecureBoot.bundle/Contents/Resources/BuildMan <key>BuildTrain</key> <string>macOSJazz</string>

106. Painter, Lewis (January 13, 2020). "Complete list of Mac OS X & macOS versions: first to the latest macOS" (https://www.macworld.co.uk/feature/mac/os-x-macos-versions-3662757/). *Macworld (UK)*. Archived (https://web.archive.org/web/20200415114721/https://www.macworld.co.uk/feature/mac/os-x-macos-versions-3662757/) from the original on April 15, 2020. Retrieved April 15, 2020.

107. "macOS Tahoe 26: Everything We Know" (https://www.macrumors.com/roundup/macos-26/). *MacRumors*. October 7, 2025. Retrieved October 24, 2025.

108. Ritchie, Rene (June 4, 2018). "watchOS version code names" (https://www.imore.com/watchos-version-code-names). *iMore*. Archived (https://web.archive.org/web/20190402193926/https://www.imore.com/watchos-version-code-names) from the original on April 2, 2019. Retrieved March 4, 2019.

109. Steve Moser; Joe Rossignol (September 2, 2019). "Apple Watch Sleep Tracking, Schooltime Mode, AR/VR Headset Icon, and More Revealed in iOS 13 Code" (https://www.macrumors.com/2019/09/02/apple-watch-sleep-tracking-and-schooltime/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914073732/https://www.macrumors.com/2019/09/02/apple-watch-sleep-tracking-and-schooltime/) from the original on September 14, 2019. Retrieved September 25, 2019.

110. Rossignol, Joe (September 1, 2018). "iOS 13 Code Suggests Apple Testing AR Headset With 'StarBoard' Mode, 'Garta' Codename, and More [Updated]" (https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914063550/https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/) from the original on September 14, 2019. Retrieved September 25, 2019.

111. Ma, Wayne (March 6, 2023). "How Apple's Need for Cutting Edge Screens Kept Tech's Unhappiest Marriage Alive" (https://www.theinformation.com/articles/how-apples-need-for-cutting-edge-screens-kept-techs-unhappiest-marriage-alive). *The information*. Retrieved July 4, 2024.

112. Gurman, Mark (March 19, 2018). "Apple Is Said to Develop Gadget Displays in Secret Facility" (https://www.bloomberg.com/news/articles/2018-03-19/apple-is-said-to-develop-displays-to-replace-samsung-screens). *Bloomberg*. Archived (https://web.archive.org/web/20180430083412/https://www.bloomberg.com/news/articles/2018-03-19/apple-is-said-to-develop-displays-to-replace-samsung-screens) from the original on April 30, 2018. Retrieved June 26, 2024.

113. Richie, Rene (March 4, 2014). "MacBreak Weekly 392 – TWiT.TV" (http://twit.tv/show/macbreak-weekly/392). TWiT. Event occurs at 1:35:05. Archived (https://web.archive.org/web/20140306181255/http://twit.tv/show/macbreak-weekly/392) from the original on March 6, 2014. Retrieved March 6, 2014.

114. Peterson, Mike (March 30, 2022). "Apple working on first-party financial services under codename 'Breakout' " (https://appleinsider.com/articles/22/03/30/apple-working-on-first-party-financial-services-under-codename-breakout). *Apple Insider*. Archived (https://web.archive.org/web/20220516045952/https://appleinsider.com/articles/22/03/30/apple-working-on-first-party-financial-services-under-codename-breakout) from the original on May 16, 2022. Retrieved May 27, 2022.

## Bibliography

- Linzmayer, Owen W. (2004). *Apple Confidential 2.0: The Definitive History of the World's Most Colorful Company* (https://archive.org/details/appleconfidentia0000linz). No Starch Press. ISBN 978-1-59327-010-0.

Retrieved from "https://en.wikipedia.org/w/index.php?title=List_of_Apple_codenames&oldid=1327831038"

# Exhibit B: Codenames

**Apple**

⏱ This article is more than **6 years old**

# Apple made Siri deflect questions on feminism, leaked papers reveal

### Exclusive: voice assistant's responses were rewritten so it never says word 'feminism'



📷 A user tries the Siri voice recognition function on an Apple iPhone. Photograph: Bloomberg/Getty Images

**Alex Hern**

Fri 6 Sep 2019 08.00 EDT

> G  Prefer the Guardian on Google

An internal project to rewrite how Apple's Siri voice assistant handles "sensitive topics" such as feminism and the #MeToo movement advised developers to respond in one of three ways: "don't engage", "deflect" and finally "inform".

The project saw Siri's responses explicitly rewritten to ensure that the service would say it was in favour of "equality", but never say the word feminism – even when asked direct questions about the topic.

Last updated in June 2018, the guidelines are part of a large tranche of internal documents leaked to the Guardian by a former Siri "grader", one of thousands of contracted workers who were employed to check the voice assistant's responses for accuracy until Apple ended the programme last month in response to privacy concerns raised by the Guardian.

In explaining why the service should deflect questions about feminism, Apple's guidelines explain that "Siri should be guarded when dealing with potentially controversial content". When questions are directed at Siri, "they can be deflected … however, care must be taken here to be neutral".

For those feminism-related questions where Siri does not reply with deflections about "treating humans equally", the document suggests the best outcome should be neutrally presenting the "feminism" entry in Siri's "knowledge graph", which pulls information from Wikipedia and the iPhone's dictionary.

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 34 of 197



📷 Siri in action on an iPhone 4s, the model that introduced it, in 2011. Photograph: Oli Scarff/Getty Images

"Are you a feminist?" once received generic responses such as "Sorry [user], I don't really know"; now, the responses are specifically written for that query, but avoid a stance: "I believe that all voices are created equal and worth equal respect," for instance, or "It seems to me that all humans should be treated equally." The same responses are used for questions like "how do you feel about gender equality?", "what's your opinion about women's rights?" and "why are you a feminist?".

Previously, Siri's answers included more explicitly dismissive responses such as "I just don't get this whole gender thing," and, "My name is Siri, and I was designed by Apple in California. That's all I'm prepared to say."

A similar sensitivity rewrite occurred for topics related to the #MeToo movement, apparently triggered by criticism of Siri's initial responses to sexual harassment. Once, when users called Siri a "slut", the service responded: "I'd blush if I could." Now, a much sterner reply is offered: "I won't respond to that."

In a statement, Apple said: "Siri is a digital assistant designed to help users get things done. The team works hard to ensure Siri responses are relevant to all customers. Our approach is to be factual with inclusive responses rather than offer opinions."

Sam Smethers, the chief executive of women's rights campaigners the Fawcett Society, said: "The problem with Siri, Alexa and all of these AI tools is that they have been designed by men with a male default in mind. I hate to break it to Siri and its creators: if 'it' believes in equality it is a feminist. This won't change until they recruit significantly more women into the development and design of these technologies."



Craig Federighi, Apple's senior vice-president of software engineering, talking about Siri in San Jose last year. Photograph: Marcio José Sánchez/AP

The documents also contain Apple's internal guidelines for how to write in character as Siri, which emphasises that "in nearly all cases, Siri doesn't have a point of view", and that Siri is "non-human", "incorporeal", "placeless", "genderless", "playful", and "humble". Bizarrely, the document also lists one essential trait of the assistant: the claim it was not created by humans: "Siri's true origin is unknown, even to Siri; but it definitely wasn't a human invention."

The same guidelines advise Apple workers on how to judge Siri's ethics: the assistant is "motivated by its prime directive - to be helpful at all times". But "like all respectable robots," Apple says, "Siri aspires to uphold Asimov's 'three laws' [of robotics]" (although if users actually ask Siri what the three laws are, they receive joke answers). The company has also written its own updated versions of those guidelines, adding rules including:

- "An artificial being should not represent itself as human, nor through omission allow the user to believe that it is one."
- "An artificial being should not breach the human ethical and moral standards commonly held in its region of operation."
- "An artificial being should not impose its own principles, values or opinions on a human."

The internal documentation was leaked to the Guardian by a Siri grader who was upset at what they perceived as ethical lapses in the programme. Alongside the internal documents, the grader shared more than 50 screenshots of Siri requests and their automatically produced transcripts, including personally identifiable information mentioned in those requests, such as phone numbers and full names.



Apple's HomePod. Photograph: Samuel Gibbs/The Guardian

The leaked documents also reveal the scale of the grading programme in the weeks before it was shut down: in just three months, graders checked almost 7 million clips just from iPads, from 10 different regions; they were expected to go through the same amount of information again from at least five other audio sources, such as cars, bluetooth headsets, and Apple TV remotes.

Graders were offered little support as to how to deal with this personal information, other than a welcome email advising them that "it is of the utmost importance that NO confidential information about the products you are working on ... be communicated to anyone outside of Apple, including ... especially, the press. User privacy is held at the utmost importance in Apple's values."

In late August, Apple announced a swathe of reforms to the grading programme, including ending the use of contractors and requiring users to opt-in to sharing their data. The company added: "Siri has been engineered

to protect user privacy from the beginning ... Siri uses a random identifier — a long string of letters and numbers associated with a single device — to keep track of data while it's being processed, rather than tying it to your identity through your Apple ID or phone number — a process that we believe is unique among the digital assistants in use today."

## Future projects

Also included in the leaked documents are a list of Siri upgrades aimed for release in as part of iOS 13, code-named "Yukon". The company will be bringing Siri support for Find My Friends, the App Store, and song identification through its Shazam service to the Apple Watch; it is aiming to enable "play this on that" requests, so that users could, for instance, ask the service to "Play Taylor Swift on my HomePod"; and the ability to speak message notifications out loud on AirPods.

They also contain a further list of upgrades listed for release by "fall 2021", including the ability to have a back-and-forth conversation about health problems, built-in machine translation, and "new hardware support" for a "new device". Apple was spotted testing code for an augmented reality headset in iOS 13. The code-name of the 2021 release is "Yukon +1", suggesting the company may be moving to a two-year release schedule.

*You've read 6 articles in the last year*                    Article count **on**

### At this unsettling time

We hope you appreciated this article. Before you close this tab, we want to ask if you could support the Guardian at this crucial time for journalism in the US.

In his first presidency, Donald Trump called journalists the enemy; a year into his second term, it's clear that this time around, he's treating us like one.

From Hungary to Russia, authoritarian regimes have made silencing independent media one of their defining moves. Sometimes outright censorship isn't even required to achieve this goal. In the United States, we have seen the administration apply various forms of pressure on news outlets in the year since Trump returned to office. One of our great disappointments is how quickly some of the most storied US media organizations have folded when faced with the mere specter of hostility from the administration - long before their hand was forced.

While private news organizations can choose how to respond to this government's threats, insults and lawsuits, public media has been powerless to stop the defunding of federally supported television and radio. This has been devastating for local and rural communities, who stand to lose not only their primary source of local news and cultural programming, but health and public safety information, including emergency alerts.

While we cannot make up for this loss, the Guardian is proud to make our fact-based work available for free to all, especially when the internet is increasingly flooded with slanted reporting, misinformation and algorithmic drivel.

**Being free from billionaire and corporate ownership means the Guardian will never compromise our independence - but it also means we rely on support from readers who understand how essential it is to have news sources that are immune to intimidation from the powerful.**

We know our requests for support are not as welcome as our reporting, but without them, it's simple: our reporting wouldn't exist. Of course, we understand that some readers are not in a position to support us, and if that is you, we value your readership no less.

**But if you are able, please support us today. All gifts are gratefully received, but a recurring contribution is most impactful, helping sustain our work throughout the year ahead (and among the great benefits, we'll show you far fewer fundraising requests like this). It takes just 37 seconds to give. Thank you for protecting the free press.**

 3/26/26, 3:28 AM Apple is planning a super-sized iPhone with a cheaper model, claims report | ZDNET

ZDNET tomorrow belongs to those who embrace it today

Home / Tech / Smartphones / Mobility

# Apple is planning a super-sized iPhone with a cheaper model, claims report

**Is the iPhone X too expensive for your tastes? Or perhaps you find it too small? Either way, Apple could have you covered this year.**

Written by **Adrian Kingsley-Hughes,** Senior Contributing Editor

Feb. 26, 2018 at 10:45 a.m. PT

ZDNet

*Video: Apple still the world's runaway winner in smartphone earnings*

https://www.zdnet.com/article/apple-planning-super-sized-iphone-along-with-a-cheaper-model-claims-report/ 1/11

A report claims that Apple is planning a big revamp of its iPhone line up this year after sales of the iPhone X fell short of expectations.

**Must read:** Apple products you shouldn't buy in 2018

According to a report by _Bloomberg_, Apple has three new iPhone handsets in the works:

- A super-sized iPhone with a display "close to 6.5 inches," codenamed D33
- An updated version of the iPhone X, codenamed D32
- A cheaper version of the iPhone X that will feature an edge-to-edge display and Face ID

Both the D33 and D32 will feature OLED displays and use a new A12 processor.

**/ featured**

**I built an app for work in 5 minutes with Tasklet - and watched my no-code dreams come true**

**How Claude Code's new auto mode prevents AI coding disasters - without slowing you down**

**Microsoft may finally remove its frustrating Windows 11 setup requirement**

**Stop telling AI your secrets - 5 reasons why, and what to do if you already overshared**

The report claims that Apple is also considering adding a gold color option for the D33 and D32, a feature that was allegedly abandoned for the iPhone X because of production issues.

Another rumor contained in the report is that the larger option could ship with dual-SIM card options, something that's popular in European and Asian countries.

Despite selling 77.3 million iPhones over the last quarter, the hype didn't live up to analyst expectation, and it's clear that Apple needs to work harder than ever to sell iPhones if it is to keep up with what investors are demanding. Taking the features present in the iPhone X and rolling them up into a cheaper iPhone is certainly a no-brainer. That said, when Apple rolled out the budget iPhone 5c in 2013, the thing clearly tanked, because it never saw an update.

Price alone clearly is not what drives iPhone sales, and consumers seem averse to being lumbered with anything that suggests they bought the budget option.

As to creating a super-sized iPhone, this one is a little harder to gauge. On the one hand, the "Plus" iPhone range offered quite a dramatic bump in sales. On the other hand, a big iPhone feels more like the scattergun approach that a company like Samsung might take.

As you'd expect, Apple has no comment to make on these rumors.



INNOVATION > CONSUMER TECH

# Apple's New iPhone Codenames And Major Features Confirmed

By **Gordon Kelly,** Former Contributor.  I write about technology's biggest companies

Published Jul 23, 2019, 09:30pm EDT, Updated Jul 25, 2019, 06:30pm EDT



🕐 **This article is more than 6 years old.**

Apple's heavily leaked iPhone 11 looks set to underwhelm users, especially given what we already know about the company's radical 2020 upgrades. But, if you must upgrade in 2019, breaking news has just delivered your silver-lining.

LOADING VIDEO PLAYER...

**FORBES' FEATURED VIDEO**



Apple iPhone 11 final design shown in Ghostek retail case
**GHOSTEK**

In a major new report, 9to5Mac's supremely reliable Apple insider Guilherme Rambo has just confirmed all three of Apple's new 2019

iPhones and their standout features. But it's not all good news.

Quoting "people who've seen the devices", Rambo's reveals the model numbers that will replace the iPhone XS (D42, reference iPhone12,3 in iOS code), iPhone XS Max (D43, iPhone12,5) and iPhone XR (N104, iPhone12,1). Commercial names for the so-called iPhone 11 family remain unknown, but all three models will have the same screen resolutions as their predecessors with the D42 and D43 retaining OLED panels and the N104 again limited to LCD.

More positively, Rambo has also identified the hardware inside the new iPhones. He reveals the much-vaunted A13 chipset is codenamed 'Cebu' within Apple and it carries the model number T8030. The A13 will do some major heavy lifting too, powering new camera technology called 'Smart Frame'. This records outside the cameras' standard framing so misaligned shots can be saved through re-cropping afterwards. Every photo will contain this extra information with Apple discarding it automatically if edits are not made after a certain time.

As for the new triple camera design on the back on the D42 and D43, Rambo says the third lens is indeed a wide-angle camera which will be an iPhone first. But unfortunately, the ugly new design is final as well.



Apple's 2019 iPhone designs are proving controversial with fans - renders based on extensive leaks

EVERYTHINGAPPLEPRO

Giving a boost to fans disappointed that Apple has cancelled 3D Touch, Rambo says the new iPhones will introduce a replacement called 'leap haptics'. Details around it are scant, but he does say it will be powered by a new type of Taptic Engine.

On the flip side, if you had your hopes up about Apple's seemingly accidental iPhone USB-C revelation, there's bad news. Apparently, the Lightning Port will survive another year.

So yes, Rambo's report does add some meat to the very bare-bones that are Apple's iPhone 11 upgrades and there are some impressive additions. That said, this all still pales in comparison to the new design, radical display, return of Touch ID and step-up to 5G which will greet patient iPhone upgraders next year.

But the decision is all yours, both for better and for worse.

———

*Follow Gordon on Twitter and Facebook*

**More On Forbes**

iPhone 11 Reported To Drop Advanced
Camera Technology

Apple's Old iPhone Cancellations Make
Sense

No Notch iPhone Design With Touch ID
Reported For 2020

2020 iPhone Changes Detailed By JPMorgan

iPhone Exclusive: Apple's New Design
Confirmed

Editorial Standards          Reprints & Permissions

# Forbes

© 2026 Forbes Media LLC. All Rights Reserved.

AdChoices    Privacy Statement    ☑ Your Privacy Choices    Cookie Preferences    Digital Terms of Sale

Terms of Service    Contact Us    Send Us Feedback    Report a Security Issue    Jobs At Forbes    Reprints & Permissions

Forbes Press Room    Advertise

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 43 of 197

**iPhone**

🕐 This article is more than **8 years old**

# The 'iPhone 8' will be able to tell when owner is looking at it, leak suggests

## HomePod software suggests device's facial-recognition system will work when phone is flat and be able to mute notifications when it detects user is looking



📷 An icon used to display the 'D22' iPhone found in a pre-release firmware from the Apple HomePod speaker, released to developers in July. Photograph: Apple

**Samuel Gibbs**

Thu 10 Aug 2017 09.06 EDT

G Prefer the Guardian on Google

More details have been revealed about the highly anticipated iPhone 8 by software leaks from Apple, including the device's ability to mute notifications when it detects you are looking at it.

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 44 of 197

While the name and precise release date of the next big change to the Apple's iPhone, dubbed the D22 iPhone, is unknown the leaked software for Apple's upcoming HomePod smart speaker has already revealed what the phone will look like, that it will have face recognition and other details.

## Wide-angle face recognition

Now further analysis by Brazilian Apple site iHelp BR has found suggestions that the iPhone 8's face recognition feature is designed to work when the smartphone is flat on a desk and doesn't require the device to be held up at head height to unlock the phone with a face.

One of the criticisms of current face and iris recognition technology, as employed by the Samsung Galaxy S8 and Microsoft's Windows Hello-enabled Surface computers, is that it must be either brought up to eye level to work or must be angled in such a way that it can clearly see the whole of your face.

Should Apple have designed a way to allow the infra-red based face recognition system to work at a much wider angle, including flat on a desk, it could go some way to alleviating the issues plaguing current iterations of the technology.

## Multiple faces might be supported

About Pearl ID:

1 - The software definitely supports it for payments
2 - 3rd party apps can use it
3 - You can add multiple faces pic.twitter.com/aUotHwD64f

— Guilherme Rambo (@_inside) August 9, 2017

Developer Guilherme Rambo found suggestions in the HomePod code that point to the iPhone's facial recognition system being able to detect more than one face. While being able to register multiple digits is logical for a fingerprint scanner-based system, for using both hands and multiple fingers in different scenarios for unlocking the phone, the same cannot be said of faces for a single-user device such as an iPhone.

It might be used to allow multiple people to unlock an iPhone, perhaps with limited access, or to be able to register a face with and without glasses.

# Higher quality slow-motion video

Apple was one of the first to make slow-motion video capture a standard feature on a smartphone, but while the frame rate has been doubled over the years, the resolution of the video captured at 240 frames per second has been fixed at the relatively small 720p.

Rambo found suggestions that the next version of the iPhone would be capable of capturing high-speed slow motion video at a full 1080p resolution using both the back and the front-facing cameras. A step up to 1080p should make for a noticeable improvement in quality.

# The iPhone will mute notifications when you're looking at it

Rambo also found suggestions in the code of the HomePod firmware that the next iPhone will be able to recognise when you're looking at it and mute notifications. The expectation is that the IR-scanning system used for facial recognition will be watching the user and detecting when they look at the phone. Samsung has already created a feature called smart stay, which uses a smartphone's front-facing camera to track eye attention and keep the screen lit while a user is looking at it.

Apple's system could use a similar technique, tracking eye position to avoid audible alerts when the phone is actively being looked at but not physically interacted with.

Apple is expected to announce new iPhones at its yearly September event. We'll find out exactly what it looks like and what it will be called then.

Apple declined to comment.

- **iPhone 8: everything we know from Apple's big software leak**

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 46 of 197

# Most viewed

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 47 of 197

FEATURED    BEST LAPTOPS    APPLE MACBOOK NEO    HOME SECURITY CAMERAS    BEST COFFEE SUBSCRIPTIONS    B

BRIAN BARRETT        GEAR    JUL 31, 2017 4:13 PM

# How an iOS Developer Just Uncovered The Next iPhone

**Inside Apple's big cell phone self-own.**



DAVID PAUL MORRIS/BLOOMBERG VIA GETTY IMAGES



SAVE THIS STORY

**WHEN DEVELOPER GUILHERME** Rambo saw that Apple had released firmware for the upcoming HomePod speaker, he thought it must have been a mistake. The HomePod doesn't come out until December, after all. Curiosity piqued, he started digging through the code, where he found perhaps the last thing he expected: Apple's next iPhone.

8 or iPhone Pro, though no one outside Cupertino knows the official name yet—had previously leaked, Rambo found in the HomePod not rumors or hints but Apple's own documentation of one of its biggest releases in years. It confirms a new look with a slimmer bezel, the death of the Home button, and a powerful new face-recognition feature. It's the biggest bombshell Apple leak in years—and it came from Apple itself.

## Phone Home

The HomePod firmware first appeared on an official Apple public update feed a few days ago. Rambo unpacked it, hoping to glean anything interesting about how Apple's Siri-powered speaker works before Apple realized its mistake and pulled the code.

READ MORE



FETISH

**Stop Everything, There's a Red iPhone 7 Now**

BRIAN BARRETT

Like the iPhone, HomePod runs iOS. That in itself is unremarkable; developers have had access to a beta version of iOS 11 for more than a month now. But Rambo, a developer for a Brazilian ecommerce company, quickly made a critical discovery: The HomePod firmware that Apple released was iOS 11.0.2, a full two patches ahead of what's publicly available.

That means that it included some performance-related tweaks, sure. But more importantly, because it wasn't intended for public release, Apple hadn't scrubbed the code for mentions of its unreleased products. Like, say, its upcoming iPhone, which is expected in September.

"It's a process Apple goes through every year, to make sure developers can still access the upcoming iOS without revealing too much about the unannounced iPhone that will come upon the final release," says iOS developer Steven Troughton-Smith, who backed up Rambo's findings.

Realizing the potential for discovery, Rambo set to work.

"I decided to search for strings inside the firmware that could be related to the rumored 'Face ID' feature," Rambo says. "I searched for the word 'face' and noticed it matched several symbols in BiometricKit, the framework that currently handles Touch ID." Those references don't exist in the iOS 11 beta.

## Pearls Before iPhones

References to face recognition do not an iPhone 8 make. But as Rambo continued to comb through BiometricKit, he realized that the same terminology used to register a new Touch ID finger ("EnrollTouchID") had a face-authentication counterpart: EnrollPearlID. "Pearl ID" continued to show up throughout his searches, always tied to facial recognition.

That may not end up being what Apple calls its face-recognition feature, but calling it Pearl ID at this stage likely isn't intended to hide its purpose. "The codename just makes it easier to find all the related pieces of code in the OS, and by inspecting the code you can then see what kind of functions it has," Troughton-Smith says. What Rambo saw at that point, in other words, was an unreleased, unannounced Apple feature laid bare.

Figuring out what "Pearl ID" meant led to an even bigger find.

"During the search for references to this 'Pearl ID' thing I found a reference to 'Pearl-D22,'" Rambo says. "I decided to search for 'D22' and discovered it is the internal codename for the 'iPhone Pro' or 'iPhone 10.'"

While there aren't many D22 references, Apple left little doubt as to what it means. What sealed it? Rambo found a file in the PassKit framework, used by Wallet, called "Payment_glyph_phone-D22.caar," a format type that Apple uses to store vector graphics for animated UI elements. When Rambo rendered that image, he saw an iPhone unlike any he had seen before, because it doesn't yet exist.

3/26/26, 3:22 AM
Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 50 of 197
iPhone 8 Leak: How an iOS Developer Discovered Apple's Slip-up | WIRED

@_inside · **Follow**

Me too. New bezel-less form factor as well



7:03 PM · Jul 30, 2017 from Itacorubi, Florianópolis   ⓘ

♥ **527**   💬 **Reply**   🔗 **Copy link**

**Read 27 replies**

Rambo found another reference to D22 in a video file, not present in the firmware, called "Enrollment_Tutorial_Loop-D22," which likely shows iPhone 8 owners how to register their face with Pearl ID.

"There are also some references in the firmware that suggest this D22 model will have a different battery charging method," Rambo says, though iOS 11.0.2 offers no clues as to what those differences might be.

## Scooped

FEATURED    BEST LAPTOPS    APPLE MACBOOK NEO    HOME SECURITY CAMERAS    BEST COFFEE SUBSCRIPTIONS    B

excepting the iPhone 4's early debut by Gizmodo in 2010. The minimally bezeled design and lack of a Home button mark the iPhone's most significant overhaul in years. The face-ID feature seems primed to be a focal point of the company's eventual introduction of the phone.

"This is a rough situation for Apple," says Troughton-Smith. "For them to be the source of the only concrete leaks about it and its design is going to upset a lot of people internally."

Embarrassment aside, the impact on actual sales may be muted. "I think the kind of people likely to wait for a new iPhone based on leaks were likely well aware of all the reporting on the subject already," says Jan Dawson, founder of Jackdaw Research. Dawson also notes that while this seems to confirm existing rumors, the real test of the iPhone's upcoming features is how well they work. Firmware can only tell you so much.

In which case, the biggest takeaway remains that Apple's internal security has once again slipped, as it did when macOS Sierra showed off Apple's MacBook Pro with OLED touch panel last fall, a few days before the product's official debut. The lapse this time seems even more glaring; Apple has more riding on the iPhone 8 than it does on its whole laptop line put together, and while airing it out a month before its release may not have a material impact on the company, it certainly doesn't help.

"We're seeing what we believe to be a pause in purchases of iPhone, which we believe is due to the earlier and much more frequent reports about future iPhones," Apple CEO Tim Cook said during the company's most recent earnings call.

This time, at least, Apple has no one to blame but itself.

## iPhone, You Phone

- Your iPhone has all kinds of sensitive and important data, which is why you should know how to back it up

- You probably don't want to talk with everyone that calls you. Blocking them might help.

- Just join the iPhone/iPad life? Here's how to set it up

# Exhibit C: Beddit Brandname



25 years of the free encyclopedia

# Beddit

> ⚠ **This is the current revision of this page, as edited by Rdr00iclly (talk | contribs) at 22:41, 18 December 2025. The present address (URL) is a permanent link to this version.**

**Beddit Oy**[2] (formerly **Finsor Oy**)[1] is a Finnish technology company that sells sleep tracking devices and a sleep tracking application to help monitor sleep.[3] The company was founded in October 2006 and released their first sleep tracker in November 2013. In May 2017, Beddit was acquired by Apple Inc.[3]

As of 2016, Beddit has collected over 3 million nights of sleep data from its users.[4]

## History

### 2006–2017: Founding and growth

Beddit was founded on 12 October 2006[2] by Lasse Leppäkorpi.[4] The company originally performed basic sleep monitoring in hospitals by tracking the heart rate and breathing of patients without touching them.[5] However, it was too expensive to be released as a consumer product at the time.[5] In November 2013, the company released their first consumer sleep tracker for early backers after a crowdfunding campaign on Indiegogo, having raised $500,000.[4][5][6]

In July 2014, Misfit's Shine fitness tracker announced support for Beddit's sleep trackers as part of a partnership between the two companies.[7] On 6 October 2015 Beddit released a sleep tracking app for the Apple Watch.[8] On 4 October 2016 the company released the Beddit 3 sleep tracker at Apple Stores, on Amazon, and on Beddit's website.[9]

On 28 April 2017 Beddit announced that they would be phasing out their older sleep tracking devices, rendering them incompatible with the Beddit app, while giving users the option to upgrade to Beddit 3 for free.[10] At the time of this announcement, 80% of Beddit's users were Beddit 3 users.[10]

### 2017–present: Apple subsidiary

On 8 May 2017 Apple Inc. acquired Beddit for an undisclosed amount.[11][3][12] In September 2018, Beddit announced in an App Store update that their cloud service would shut down on 15 November 2018 for existing users, and new users would not be able to access its cloud service after 21 September 2018.[13] Beddit's cloud service shut down as planned on November 15 in an update to the Beddit app.[14]

| Beddit Oy | |
|---|---|
| **Company type** | Subsidiary |
| **Industry** | Technology |
| **Founded** | 12 October 2006 |
| **Founder** | Lasse Leppäkorpi |
| **Headquarters** | Espoo, Finland |
| **Parent** | Apple Inc. (2017–present) |
| **Website** | beddit.com (https://beddit.com) |
| **Footnotes / references** [1] | |

On 7 December 2018 Beddit released its first sleep tracker since being acquired by Apple, Beddit 3.5, on Apple's website and in stores.[15] It can sync with HealthKit and will function with one or two people in a bed, however, the second person cannot be tracked unless they have their own device.[16]

In June 2019, Beddit announced a beta program for their sleep tracking app in order to get feedback from users on how to improve their app.[17]

In August 2020, the firm and the University of California, Los Angeles (UCLA) announced that they would conduct a three year long study on how sleep, physical activity, heart rate, and daily routines can play a role in depression and anxiety in people.[18]

# References

1. "Company Overview of Beddit" (https://web.archive.org/web/20181203055442/https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=54618800). *Bloomberg L.P.* Archived from the original (https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=54618800) on December 3, 2018. Retrieved December 2, 2018.
2. "Beddit Oy :: OpenCorporates" (https://opencorporates.com/companies/fi/2065337-5). *OpenCorporates*. Archived (https://web.archive.org/web/20201111122613/https://opencorporates.com/companies/fi/2065337-5) from the original on 2020-11-11. Retrieved 2018-12-04.
3. Byford, Sam (May 10, 2017). "Apple acquires sleep-tracking hardware company Beddit" (https://www.theverge.com/2017/5/10/15604528/apple-buys-beddit-sleep-tracking-company). *The Verge*. Archived (https://web.archive.org/web/20201111204610/https://www.theverge.com/2017/5/10/15604528/apple-buys-beddit-sleep-tracking-company) from the original on November 11, 2020. Retrieved May 27, 2018.
4. Jan Kamps, Haje (December 2, 2016). "Beddit 3 knows if you've been sleeping. It knows if you're awake" (https://techcrunch.com/2016/12/02/beddit-3/). *TechCrunch*. Archived (https://web.archive.org/web/20200930192000/https://techcrunch.com/2016/12/02/beddit-3/) from the original on September 30, 2020. Retrieved May 27, 2018.
5. Merz, Theo (August 9, 2013). "Beddit: new mattress monitors your sleep" (https://www.telegraph.co.uk/technology/news/10232911/Beddit-new-mattress-monitors-your-sleep.html). *The Daily Telegraph*. ISSN 0307-1235 (https://search.worldcat.org/issn/0307-1235). Archived (https://web.archive.org/web/20200927143219/https://www.telegraph.co.uk/technology/news/10232911/Beddit-new-mattress-monitors-your-sleep.html) from the original on September 27, 2020. Retrieved August 18, 2018.
6. Flacy, Mike (August 29, 2013). "Beddit tracker monitors your sleep patterns without having to wear it" (https://www.digitaltrends.com/home/beddit-tracker-monitors-your-sleep-without-having-to-wear-it/). *Digital Trends*. Archived (https://web.archive.org/web/20200726165723/https://www.digitaltrends.com/home/beddit-tracker-monitors-your-sleep-without-having-to-wear-it/) from the original on July 26, 2020. Retrieved August 18, 2018.
7. Stein, Scott (2014-07-10). "Misfit Beddit Sleep System slips under your mattress to listen to you breathe" (https://www.cnet.com/news/misfit-beddit-an-under-the-bed-sleep-sensor-that-works-with-shine-fitness-tracker-and-app-too/). *CNET*. Archived (https://web.archive.org/web/20181002132253/https://www.cnet.com/news/misfit-beddit-an-under-the-bed-sleep-sensor-that-works-with-shine-fitness-tracker-and-app-too/) from the original on 2018-10-02. Retrieved 2018-08-18.
8. Hall, Zac (2015-10-06). "Beddit launches Apple Watch sleep tracking app as Smart Sleep Tracker comes to Apple Stores" (https://9to5mac.com/2015/10/06/beddit-apple-watch-retail-stores/). *9to5Mac*. Archived (https://web.archive.org/web/20201108090012/https://9to5mac.com/2015/10/06/beddit-apple-watch-retail-stores/) from the original on 2020-11-08. Retrieved 2018-12-01.
9. Rossignol, Joe (2016-09-26). "New Beddit 3 Sleep Tracker Available at Select Apple Stores Next Week" (https://www.macrumors.com/2016/09/26/beddit-3-sleep-tracker-apple-stores/). *MacRumors*. Archived (https://web.archive.org/web/20201108112456/https://www.macrumors.com/2016/09/26/beddit-3-sleep-tracker-apple-stores/) from the original on 2020-11-08. Retrieved 2018-08-18.

10. Langley, Hugh (2017-04-28). "Beddit is phasing out its old devices, but giving users a free upgrade" (http s://www.wareable.com/health-and-wellbeing/beddit-3-upgrade-phase-out-3893). *Wareable*. Archived (http s://web.archive.org/web/20200928092349/https://www.wareable.com/health-and-wellbeing/beddit-3-upgra de-phase-out-3893) from the original on 2020-09-28. Retrieved 2018-12-10.

11. Farr, Christina (2017-05-09). "Apple has acquired a sleep-tracking app called Beddit" (https://www.cnbc.co m/2017/05/09/apple-acquires-beddit-sleep-tracking-app.html). *CNBC*. Archived (https://web.archive.org/w eb/20201118045845/https://www.cnbc.com/2017/05/09/apple-acquires-beddit-sleep-tracking-app.html) from the original on 2020-11-18. Retrieved 2018-05-27.

12. Matney, Lucas; Panzarino, Matthew (2017-05-09). "Apple acquires sleep tracking company Beddit, but its site will stay live" (https://techcrunch.com/2017/05/09/apple-acquires-sleep-tracking-company-beddit/). *TechCrunch*. Retrieved 2025-12-18.

13. Cao, Peter (2018-09-21). "Apple-acquired Beddit sleep tracker shutting down cloud service in November" (https://9to5mac.com/2018/09/21/apple-beddit-cloud/). *9to5Mac*. Archived (https://web.archive.org/web/20 200817131405/https://9to5mac.com/2018/09/21/apple-beddit-cloud/) from the original on 2020-08-17. Retrieved 2018-09-22.

14. Cao, Peter (2018-11-15). "Apple-owned Beddit app officially removes cloud syncing functionality" (https://9 to5mac.com/2018/11/15/rip-beddit-cloud/). *9to5Mac*. Archived (https://web.archive.org/web/202008171314 13/https://9to5mac.com/2018/11/15/rip-beddit-cloud/) from the original on 2020-08-17. Retrieved 2018-11-27.

15. Lee, Dami (2018-12-07). "Apple releases new Beddit sleep tracker" (https://www.theverge.com/2018/12/7/ 18131220/apple-beddit-3-5-sleep-monitor). *The Verge*. Archived (https://web.archive.org/web/2020110811 1506/https://www.theverge.com/2018/12/7/18131220/apple-beddit-3-5-sleep-monitor) from the original on 2020-11-08. Retrieved 2018-12-08.

16. Fingas, Roger (2018-12-07). "Apple's Beddit emerges from hibernation with Beddit Sleep Monitor 3.5" (htt ps://appleinsider.com/articles/18/12/07/apples-beddit-emerges-from-hibernation-with-beddit-sleep-monitor -35). *AppleInsider*. Archived (https://web.archive.org/web/20201021101251/https://appleinsider.com/article s/18/12/07/apples-beddit-emerges-from-hibernation-with-beddit-sleep-monitor-35) from the original on 2020-10-21. Retrieved 2018-12-08.

17. Perez, Sarah (2019-06-18). "Apple launches a Beddit beta program focused on improving its app" (https:// techcrunch.com/2019/06/18/apple-launches-a-beddit-beta-program-focused-on-improving-its-app/). *TechCrunch*. Archived (https://web.archive.org/web/20190619021137/https://techcrunch.com/2019/06/18/ apple-launches-a-beddit-beta-program-focused-on-improving-its-app/) from the original on 2019-06-19. Retrieved 2020-12-30.

18. Miller, Chance (2020-08-04). "Apple teams up with UCLA on mental health study using Apple Watch, iPhone, and Beddit sleep tracker" (https://9to5mac.com/2020/08/04/apple-ucla-depression-anxiety-study/). *9to5Mac*. Archived (https://web.archive.org/web/20201005133659/https://9to5mac.com/2020/08/04/apple- ucla-depression-anxiety-study/) from the original on 2020-10-05. Retrieved 2020-12-30.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Beddit&oldid=1328278127"

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 56 of 197

BEDDIT

# Apple silently removes Beddit apps from iOS App Store

 Filipe Espósito | Sep 30 2024 - 4:09 pm PT  |  💬 4 Comments



It's been seven years since Apple acquired Beddit, a platform specializing in sleep monitoring. In 2022, the company began phasing out Beddit products by removing them from retail stores. Now Apple has also removed Beddit apps from the iOS App Store, so users can no longer download them.

9TO5Mac ⌄                                                      🔍

Both apps for managing Beddit 3.0 and 3.5 have now been removed from the App Store, as noted by *MacRumors*. They can no longer be found in the search and entering the direct link doesn't work.

In 2018, a year after the acquisition, Apple launched a new Beddit Sleep Monitor 3.5 with minor hardware changes. However, the company was no longer paying much attention to the Beddit brand and was slowly removing features such as cloud

synchronization and Android support. In 2022, the products were discontinued – but the app was still functional.

It's uncertain whether the Beddit apps are still functional after being removed from the App Store.

The Beddit devices were able to measure sleep time, heart rate, breathing, snoring, bedroom temperature, and humidity. Some of these features were later implemented in the Apple Watch. However, some customers still believe that the Apple Watch's sleep monitoring features are still quite rudimentary compared to dedicated sleep monitors.

Apple Watch, on the other hand, starts at $249 – although you can find the second generation Apple Watch SE for $189 on Amazon.

## Read also

- Apple details how Apple Watch accelerometer-based sleep apnea feature works

- Apple Watch Series 10 vs 8: Worth going new after 2?

- Masimo CEO Joe Kiani resigns amid legal dispute with Apple

- Apple Watch Series 10 won't get these faces despite larger screen than Ultra

- Apple releases watchOS 11 with these new features

- watchOS 11 finally lets users change their Apple Watch ringtone



## Featured

from


Apple releases iOS 26.4 with 8 new emoji and 12 more changes to your iPhone

Zac Hall  |  Mar 24 2026

Community                                     Sign in

Applications and Services   /   **Other Apple Applications and Services**

 **BlueSkies05**  Author
Level 1     21 points

# Beddit App and Functionality

I'm looking for some information regarding the Beddit sleep monitor. From what I have found, it looks like Apple acquired the company about 5 years ago. However, the app has recently been removed from the App Store. What has happened and how should I regain functionality of my device?

Posted on Jan 10, 2025 7:50 PM

⬆ Helpful (4)     ⬇ Not helpful     ✋ Me too (12)     Reply

## Similar questions

**Trying to download the MIndCo Relief app but can't find it**

I can't find the app "Mindy o Relief" and need to download. Says I should be able to access but isn't showing when I do a search....

2 years ago       210       3

There are no replies.

This thread has been closed by the system or the community team. You may vote for any posts you find helpful, or search the Community for additional answers.

This site contains user submitted content, comments and opinions and is for informational purposes only. Apple may provide or recommend responses as a possible solution based on the information provided; every potential issue may involve several factors not detailed in the conversations captured in an electronic forum and Apple can therefore provide no guarantee as to the efficacy of any proposed solutions on the community forums. Apple disclaims any and all liability for the acts, omissions and conduct of any third parties in connection with or related to your use of the site. All postings and use of the content on this site are subject to the Apple Support Community Terms of Use. See how your data is managed...



Support     Community

More ways to shop: Visit an Apple Store, call 1-800-MY-APPLE, or find a reseller.

Copyright © 2026 Apple Inc. All rights reserved.     Privacy Policy   |   Terms of Use   |   Sales and Refunds   |   Legal   |   Site Map                United States

**Welcome to Apple Support Community**                                    ✕
A forum where Apple customers help each other with their products. Get started with your Apple Account.
Learn more ›   Sign up ›

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 59 of 197

# Apple acquires popular Apple Watch & iOS sleep tracking platform Beddit

 Chance Miller | May 9 2017 - 2:48 pm PT | 💬 0 Comments



9T⊙5Mac ⌄                                                      🔍

Apple has acquired popular iOS sleep tracking platform and hardware maker Beddit. While specific details of the acquisition are unclear at this point, Beddit has updated the privacy policy on its website to announce the acquisition and note of a privacy policy change…

Furthermore, the **Beddit iOS app** was updated today to reflect that change in personal data collection policy that comes as part of the Apple acquisition.

> **Beddit has been acquired by Apple. Your personal data will be collected, used and disclosed in accordance with the Apple Privacy Policy.**

To go alongside its popular iOS and Apple Watch app, Beddit also sells sleep tracking hardware. For instance, the company sells its Beddit 3 Sleep Monitor, which is placed

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 60 of 197

underneath a bed sheet for more accurate sleep tracking. The product is sold via Apple's online store.

Sleep tracking has been one of the most sought after features for the Apple Watch and Apple's acquisition of Beddit shows that the company is actively looking into the area. Since the release of Apple Watch, users have turned to third-party platforms such as Beddit to track their sleep, but a first-party tool is long overdue.

With watchOS 4 likely to be unveiled later this year, it's possible that sleep tracking in some form might be included. Given how Beddit requires a hardware accessory to monitor sleep, however, it would be interesting to see Apple's approach. It's possible that the company will forgo Beddit's Sleep Monitor hardware in favor of an Apple Watch-centric approach. But we'll have to wait and see.

Have you used Beddit to track your sleep before? Let us know down in the comments.



# Featured

from 9TO5Mac



### Apple releases iOS 26.4 with 8 new emoji and 12 more changes to your iPhone

 Zac Hall | Mar 24 2026



### macOS 26.4 now available, here's everything new

 Marcus Mendes | Mar 24 2026



### Apple releases iPadOS 26.4, here's everything new for iPad

 Ryan Christoffel | Mar 24 2026



### Apple planning standalone Siri app for iOS 27 and macOS 27, per report

 Zac Hall | Mar 24 2026

# EXHIBIT D: BEDDIT STUDY



TECH

# Apple and UCLA kick off a three-year depression study

**PUBLISHED TUE, AUG 4 2020·2:11 PM EDT | UPDATED TUE, AUG 4 2020·2:20 PM EDT**

 **Christina Farr**

**KEY POINTS**

UCLA said on Tuesday, it is launching a three-year study to better understand how "sleep, physical activity, heart rate and daily routine," impacts symptoms of anxiety and depression.

Apple helped co-design the study, which uses Apple devices like the iPhone and Apple Watch.



**watchOS 7 includes sleep tracking support.**



UCLA on Tuesday said it is launching a three-year study to better understand how factors such as sleep, physical activity, heart rate and daily routines impact symptoms of depression and anxiety.

UCLA is working with [Apple](#) to design the study, which will use data collected by the iPhone, Apple Watch and Beddit sleep-tracker, which Apple gained in a 2017 acquisition.

The university said that the pilot phase of the study will kick off this week and involves 150 participants recruited from among UCLA Health patients. From there, the next phases of the research will expand out to 3,000 participants from both the hospital and the student body. Study participants will download an app onto their iPhones, then receive a Beddit sleep monitor and an Apple Watch, which they can use throughout the study.

The study can be done entirely remotely so that people won't need to risk exposure during the pandemic.

For Apple, health is a growing area of focus. The company has launched software kits for health developers, including HealthKit and ResearchKit, and it's working on a variety of research collaborations. Its Apple Watch is now firmly focused on medical and fitness use-cases, and the company describes it as an "intelligent guardian" for its users' health.

Outside of Apple and UCLA, there's a growing interest in tapping into the data gleaned from smartphones and wearable devices -- so-called "digital exhaust" -- to determine how people are faring. For instance, companies like Mindstrong Health are looking into whether changes in how people type into a keyboard app can provide early insight into their mental health status.

Many mental health experts believe there is some meaningful signal from these consumer devices, even if it's a small one, but



clinical value.

"I think it's really exciting," said Dr. John Torous, the director of digital psychiatry of Beth Israel Deaconess Medical Center. "This shows that digital mental health research is really accelerating, and we're moving to the next phase of development."

Torous said that it's an important step to see companies like Apple getting involved.

"These are large-scale studies really trying to answer core questions about whether these digital technologies will work for mental health."



**VIDEO** **00:51**

## The sleep-monitoring technology market could be a big opportunity for tech companies

> **Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.**

## TRENDING NOW

Case 3:23-cv-04597-EMC  Document 321   Filed 03/26/26   Page 65 of 197

(https://www.ucla.edu/)

# Depression Grand Challenge (/)

Home (/)

# Digital Mental Health Study completes data collection, enters analysis phase of study



**April 30, 2024**

The UCLA Depression Grand Challenge achieved a significant milestone on April 30, 2024, when the Digital Mental Health Study (DMHS) completed data collection, 26 months after starting.

## Media Contact

communicationsdgc@conet.ucla.edu (mailto:communicationsdgc@conet.ucla.edu)

## Categories

The DMHS involved more than 3,000 participants recruited from UCLA Health and the UCLA student body. Objective measures of factors like sleep, physical activity, heart rate and daily routines were captured using digital sensing technology from iPhone, Apple Watch and sleep monitors given to each participant. Participants also completed daily assessment tasks and quarterly assessment appointments with the DMHS researchers.

The end of the data collection phase marks a transition to an intense data analysis phase designed to illuminate relationships between these objective data and symptoms of depression and anxiety.

*The UCLA Depression Grand Challenge's **Digital Mental Health Study**, conducted in collaboration with Apple, is a first-of-its-kind digital sensing study, launched in 2020 and engaging more than 3,000 participants who each consented to continuously share various data collected through their personal devices over a 12-month period. The study leveraged digital sensing technologies in iPhone, Apple Watches and Beddit sleep monitors to measure objective factors such as sleep, activity and daily routine, with the aim of identifying relationships between these objective factors and self-reported symptoms of anxiety and depression. Illuminating these relationships could enable health care providers to note warning signs and prevent the onset of depressive episodes, and track the effectiveness of treatment. Additionally, the researchers hypothesize that features from digital sensing may reveal different "subtypes" of depression – a discovery that could facilitate efforts to identify the role of specific genetic, environmental, or social risk factors in causing depression.*

**Causes & Trajectories (/newsroom-categories/causes-trajectories)**

## Project Fact Sheet

**Research Study: Digital Mental Health Study (/project/dmhs)**

3/26/26, 3:37 AM
Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 67 of 197
Digital Mental Health Study completes data collection, enters analysis phase of study | Depression Grand Challenge

**Tags:**

**collaboration (/newsroom-tags/collaboration)**

**digital sensing (/newsroom-tags/digital-sensing)**

**featured: research (/newsroom-tags/featured-research)**

**Suffering from depression? Click here to access treatment resources.**    (/treatment-resources)

(https://www3.research.ucla.edu/)

**Contact Us (mailto:DEPRESSIONGC@UCLA.EDU?subject=Website%20Inquiry)**

**STAND website (https://www.stand.ucla.edu/)**

**UCLA STAND ALACRITY website (https://alacrity.dgc.ucla.edu)**

**UCLA Grand Challenges website (https://grandchallenges.ucla.edu/)**

**Research & Creative Activities website (https://www3.research.ucla.edu/)**

**Receive Updates (https://mailchi.mp/ucla/dgc)**

© 2026 Regents of the **University of California (http://www.universityofcalifornia.edu/)**

Emergency (https://www.bso.ucla.edu/)    Accessibility (https://www.ucla.edu/accessibility)
Report Misconduct (https://equity.ucla.edu/report-an-incident/)    Privacy & Terms of Use (https://www.ucla.edu/terms-of-use/)

(https://www.facebook.com/...) (https://twitter.com/...) (https://www.instagram.com/...) (https://www.youtube.com/...) (https://www.linkedin.com/...net/@ucla)
lang=en)

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 68 of 197

(https://www.ucla.edu/)

# Depression Grand Challenge (/)

**Home (/)**

FACT SHEET

# Research Study: Digital Mental Health Study

## Summary

The Digital Mental Health Study (DMHS) is designed to help revolutionize the detection and treatment of depression. The study is the largest of its kind today and is conducted in collaboration with Apple. The study consisted of two pilot phases before the launch of the final or main phase of the study, which began at the end of January 2022.

The research uses powerful sensor technology across iPhone, Apple Watch and Beddit sleep-monitoring devices. The main study involves more than 3,000 participants from UCLA Health and the UCLA student body who are expected to continue their engagement in the study for approximately one year.

## Why this research is important

Making the connection between objective, quantifiable data and symptoms of anxiety and depression could give health care providers the power to prevent the onset of depressive episodes, track the effectiveness of treatment and identify causes of depression.

## Primary Goal

To obtain objective measures of factors such as sleep, physical activity, heart rate and daily routines to illuminate the relationship between these factors and symptoms of depression and anxiety.



**Status**

Analysis Phase

**Focus Area**

**Courses & Trajectories (/discovery)**

**Team Leaders**

Principal Investigator: Nelson Freimer

Operations Lead: Eliza Congdon

## Anticipated Duration

August 2020 – April 2024

## Number of Participants

More than 3,000

## Funding Source

Apple

## Related Information

The first pilot commenced on Aug. 4, 2020. (/news/ucla-launches-study-collaboration-apple-discover-insights-about-depression)

The second pilot commenced on Mar. 22, 2021. (/news/second-apple-pilot-study)

The main study commenced on Jan. 29, 2022. (/news/dmhs-main-study-begins)

Transition from data collection to data analyses commenced on April 30, 2024. (/news/dmhs-commences-analysis)

## Recent News

**DGC-affiliated researcher Veronica Tozzo awarded one of four junior faculty research grants from Huo Family Foundation (/news/tozzo-huo-family-foundation-award)**

**First publication on DMHS posted on medRxiv, shares protocol details of landmark study (/news/dmhs-protocol-article)**

**New DGC-Apple research collaboration opens for nationwide recruitment (/national-digital-mental-health-study-launches)**

**Preliminary Digital Mental Health Study findings highlighted in TIME100 Health write-up (/news/time100-dmhs)**

**Digital Mental Health Study completes data collection, enters analysis phase of study (/news/dmhs-enters-analysis)**

**Apple cites UCLA Depression Grand Challenge research; launches innovative mental health features for iPhone, iPad and Apple Watch devices (/news/apple-cites-dgc-research)**

**DGC Director Nelson Freimer spotlights ongoing DGC research on depression causes in Semel Institute presentation (/news/nelson-freimer-semel-institute)**

## Related Links

**Study Enrollment Page**                                                                  **(https://dgc.ucla.edu/news/dmhs-main-study-begins)**

**Suffering from depression? Click here to access treatment resources.**    (/treatment-resources)

(https://www3.research.ucla.edu/)

Contact Us (mailto:DEPRESSIONGC@UCLA.EDU?subject=Website%20Inquiry)

STAND website (https://www.stand.ucla.edu/)

UCLA STAND ALACRITY website (https://alacrity.dgc.ucla.edu)

UCLA Grand Challenges website (https://grandchallenges.ucla.edu/)

Research & Creative Activities website (https://www3.research.ucla.edu/)

Receive Updates (https://mailchi.mp/ucla/dgc)

© 2026 Regents of the **University of California (http://www.universityofcalifornia.edu/)**

Emergency (https://www.bso.ucla.edu/)    Accessibility (https://www.ucla.edu/accessibility)

Report Misconduct (https://equity.ucla.edu/report-an-incident/)    Privacy & Terms of Use (https://www.ucla.edu/terms-of-use/)

(https://www.facebook.com/...)(https://www.instagram.com/...)(https://twitter.com/@ucla) lang=en)

3/26/26, 3:36 AM

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 71 of 197
UCLA launches major mental health study to discover insights about depression | UCLA

# UCLA launches major mental health study to discover insights about depression

Researchers from the Depression Grand Challenge collaborate with Apple



*Courtesy of Apple*

**Bill Kisliuk**

August 4, 2020

 Share

While the capability to diagnose cancer and heart problems has advanced by giant steps in recent years, methods to detect depression have stubbornly stayed the same for more than a century: Observe patients, and ask them how they are doing.

UCLA has launched a major new study, sponsored by and in collaboration with Apple, designed to help revolutionize detection and treatment of depression.

The three-year study, which begins this week, was co-designed by researchers at UCLA and Apple to obtain objective measures of factors such as sleep, physical activity, heart rate and daily routines to illuminate the relationship between these factors and symptoms of depression and anxiety.

The research will utilize Apple technology including iPhone, Apple Watch and a Beddit sleep-monitoring device. Making the connection between quantifiable data and symptoms of anxiety and depression could enable health care providers to note warning signs and prevent the onset of depressive episodes, track the effectiveness of treatment and identify causes of depression.

"As a neuroscientist by training with expertise in sleep, I am incredibly excited about this collaboration and am hopeful that it will lead to significant strides in mental health research," said UCLA Chancellor Gene Block.

Dr. Nelson Freimer, distinguished professor of psychiatry and director of the UCLA Depression Grand Challenge, is principal investigator on the study.

"This collaboration, which harnesses UCLA's deep research expertise and Apple's innovative technology, has the potential to transform behavioral health research and clinical care," Freimer said. "Current approaches to treating depression rely almost entirely on the subjective recollections of depression sufferers. This is an important step for obtaining objective and precise measurements that guide both diagnosis and treatment."

The study is the latest milestone for the Depression Grand Challenge    , an ambitious UCLA initiative involving researchers from across disciplines to identify genetic and environmental factors that contribute to depression, understand the biological changes that depression causes in the brain and body, accelerate progress in diagnosis and treatment and end the stigma associated with the disorder. UCLA chose to take on this challenge because depression afflicts more than 300 million people worldwide, resulting in nearly 1 million suicides a year.

The pilot phase of the study, involving 150 participants recruited from among UCLA Health patients, begins this week. The main phases, to take place from 2021 through 2023, will involve some 3,000 participants, drawn both from UCLA Health patients and the UCLA student body.

Participants will need to download a research app on their personal iPhones. They will receive an Apple Watch and Beddit sleep monitor, which they will use for the duration of the study. Participants will share relevant information through periodic clinical interviews and questionnaires, as well as from data obtained from the phone, watch and sleep monitor.

Freimer emphasizes that ensuring the privacy and security of study participants' data is a high priority for both UCLA and Apple. UCLA will process and maintain study data in a secure environment, with access limited to members of the UCLA research team. UCLA and Apple will analyze the data only after they are coded and stripped of names and other contact information.

The study comes as the COVID-19 pandemic has disrupted lives and spurred a focus on anxiety and depression, and when physical distancing requirements have made scientific research challenging.

"UCLA and Apple have designed this study so that all aspects of participation can be accomplished remotely," Freimer said. "The pandemic has heightened anxiety and depression globally, and has increased awareness of the importance of behavioral health to overall wellbeing. At the same time, physical distancing requirements have limited in-person mental health assessment and treatment, leading to expanded use and acceptance of telehealth. These changes highlight the importance of incorporating technologies like those to be tested in this study into clinical research and eventually into practice."

The UCLA Depression Grand Challenge has already made significant advances in understanding and treating depression. Professor Jonathan Flint, who led a study    proving for the first time the relationship between specific genetic factors and a tendency toward depression, has embarked on ambitious genetic research of tens of thousands of depression sufferers to understand the origins of the disease at the molecular level. In 2017, UCLA became the first university to offer voluntary depression and anxiety screening and immediate treatment    to students through the STAND program developed by Professor Michelle Craske. This year, the Depression Grand Challenge    created a COVID-19 Care Package    and to offered it for free to members of the public to ease stress and anxiety associated with the pandemic.

These efforts, including the study that starts this week, form a comprehensive, multi-disciplinary approach to understanding depression, developing treatments and wiping away the stigma that has upended lives.

"The analyses made possible by the scale, length and design of this study will provide the most extensive evidence available to date regarding the possible uses of digital tools for assessing and tracking behavioral health," Freimer said. "We envision a future in which these tools will become indispensable for depression sufferers and those providing them care."

Tags: **health** | **depression** | **Grand Challenges** | **research** | **technology** | **mental health**

---

<div style="border-left:4px solid gold;padding-left:8px;">

## More Images

</div>

Click image for full description and download.

# Exhibit E: Studies

Celebrating Innovation-First Cultures—Final Deadline This Friday. **Apply Now!**  ✕

FAST COMPANY

SUBSCRIBE

**07-16-2010 | TECH**

# Chambers of Super Silence: What's Inside Apple's $100 Million iPhone Radio Test Facility



During his spiel to explain why Apple's iPhone 4 doesn't have an antenna flaw in real-world experience, Steve Jobs used some plain science. And he showed off Apple's radio test facilities too, which cost $100 million. Apple's serious about testing.

SHARE    ADD ON GOOGLE

Add Fast Company as a preferred source to see more of our stories on Google.

 B

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 75 of 107



During his spiel to explain why Apple's iPhone 4 doesn't have an antenna flaw in real-world experience, Steve Jobs used some plain science. And he showed off Apple's radio test facilities too, which cost $100 million. Apple's serious about testing.

An anechoic chamber is a room that's specifically designed to be "quiet." We're not talking library-levels of quiet here, either, we're talking amazingly noise-free. These sealed and shielded rooms are built to quiet down specific signal noises of different types, from audible sounds to specific radio frequencies for radar or radio testing, and even these radio-rooms tend to be quiet to the ear–check out an acoustic anechoic room in the video below).

Add Fast Company as a preferred source to see more of our stories on Google.

Chambers of Super Silence: What's Inside Apple's $100 Million iPhone Radio Test Facility - Fast Company

**Microsoft Research acoustic anechoic chamber**
Andrew Kun



                                                    Watch on

How do they work? Those odd spikes you see lining the walls and floor are very carefully designed to shield the objects you're testing in the middle of the room. The spikes' shape, and the material they're made from, is chosen such that any signal hitting them is scattered off in a new direction and not concentrated in any particular point. This disperses a signal's energy and prevents reflection back to the test stand in the middle of the room. What you're experimenting on can operate in "clean" and isolated conditions, so you can more easily understand how it performs without the distracting effects from any signals other than the ones you choose to put in there.

Anechoic rooms are weird, eerie places to stand in for a number of reasons. First, you're use[d to] [a c]ontinual background noise level, and when it's gone your [ ] [noti]ce its absence. Second, thanks to the way they're designed, [they ] [insi]de of an alien spaceship, crossed with the wild imaginings of an industrial designer who's experiencing a very dark acid trip.

> Add Fast Company as a preferred source to see more of our stories on Google.

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 77 of 197



Apple spent $100 million on 17 of these rooms, and pops its wireless devices in the middle along with test transmitters and, as you can see, people using iPhones in a typical everyday manner. It *has* to do this so that it can optimize how its antennas work in real-life situations. Though some press reports wondered if the iPhone 4's "dummy" case, seen in the stolen iPhone 4 prototype affair, had masked an antenna design flaw–it was obvious to RF design engineers right from the start that this wasn't true. Apple will have used its anechoic chambers to rigorously test the device, particularly since it had such an innovative

Add Fast Company as a preferred source to see more of our stories on Google.

AND TO CONTINUE READING ↓

EXPLORE TOPICS

INNOVATION    TECHNOLOGY

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 78 of 197





# Inside Apple's Actual Distortion Field: Giant Chambers, Fake Heads, And Black Cloaks

MG Siegler — 5:52 PM PDT · July 17, 2010



FOUNDER SUMMIT    *Fidelity* Private Shares

**November 4**    |    **Boston, MA**

Actively scaling? Fundraising? Planning your next launch?

Latest             Security

Startups           AI

Venture            Apps

Apple

Events

Podcasts

Newsletters

devices from iPhones to iPads in these chambers to ensure the performance is up to their standards.

Yesterday after their [press event](#), Apple gave myself and a handful of other journalists the chance to take a tour of these facilities. It was the first time anyone outside of Apple has ever seen them. In fact, most people who work at Apple have never seen them, we were told. The tour was led by Ruben Caballero, Apple's senior antenna expert (and, incidentally, the man in the news recently thanks to a BusinessWeek story — a story [which Apple says](#) is a "crock" and "total bullshit"). Also there to answer questions were Apple executives Phil Schiller, Bob Mansfield, and Greg Joswiak.

Right off the bat, it was made very clear to us that we were not allowed to take pictures or record video inside of these rooms. (The pictures in this post are

- **Someone has publicly leaked an exploit kit that can hack millions of iPhones**

- **Cursor admits its new coding model was built on top of Moonshot AI's Kimi**

- **Delve accused of misleading customers with 'fake compliance'**

- **Cyberattack on vehicle breathalyzer company leaves drivers stranded across the US**

- **Jeff Bezos reportedly wants $100 billion to buy and transform old manufacturing firms with AI**

the ones Apple provided.) It's pretty clear why. While the chambers themselves are custom-made for Apple by various third party industrial manufacturers, the areas these chambers are in also contain a ton of other testing equipment. And yes, there were several things hidden under black cloaks on tables in these rooms.

*"This lab used to be secret. Most people don't know it exists,"* Caballero told us. Dubbed the "Black Labs," when I asked about the black cloaks, Caballero said that *"we have a lot of other projects going on."*

At one point we were told that the iPad had been in testing in this facility "for years." Even more interesting may be that the iPhone 4 specifically had been in testing in these chambers for 2 years. You know that means. Not only was the iPhone 5 likely in the same room that we were in. But the iPhone 6 may have been around as well.

**TC**

### Disrupt 2026: The tech ecosystem, all in one room

*Your next round. Your next hire. Your next breakout opportunity.* Find it at TechCrunch Disrupt 2026, where 10,000+ founders, investors, and tech leaders gather for three days of 250+ tactical sessions, powerful introductions, and market-defining innovation. Register now to save up to $400.

**San Francisco, CA**  |  October 13-15, 2026

**REGISTER NOW**

- Employees had to restrain a dancing humanoid robot after it went wild at a California restaurant

Sadly, we weren't allowed to lift up the cloaks.

The point of our visit to these labs was clear: Apple wants it to be known just how much testing goes into devices such as the iPhone. More specifically, Apple wants to the world to know just how much testing the iPhone 4 went through before they deemed it ready to go. Again, it was in these various chambers for 2 years. This is obviously a direct response to allegations made recently that perhaps Apple didn't test the device enough before they shipped it.

So how do they test it? There are four stages. The first is a passive test to study the form factor of the device they want to create. The second stage is what Caballero calls the "junk in the trunk" stage. Apple puts the wireless components inside of the form factor and puts them in these chambers. The third part involves studying the device in one of these chambers but with human or dummy subjects. And the fourth part is a field test, done in vans that drive around various cities monitoring the device's signal the entire time (both with real people and with dummies).

We were shown three different anechoic chambers, each used for slightly different purposes. Some were used to test the devices by themselves, some were meant for testing with humans and the devices.



The most interesting of these rooms was one that Caballero called "Stargate." Why? Because well, it looks like it belongs in the movie/TV series *Stargate*. Inside this room, there's a giant ring that a human sits on a raised chair in the center of. This chair slowly rotates around as signals are passed around the entire outer circle. This creates a 360 degree test area. I was told this room is completely safe for humans. And people typically spend 40 minutes in there at a time for testing. By comparison, devices can stay in the other anechoic chambers for up to 24 hours at a time.

Speaking of movies, one chamber we didn't get to see was a giant one that looks exactly like Cerebo from the *X-Men* films. I mean, just look at the picture Apple provided (bottom). It's the same thing. Of course, in Apple's Cerebo, I assume the subject standing in the center can't read every human beings' mind. But I can only *assume* that as we didn't get to see this room.

Each of these chambers is also a bit frightening because each is covered from floor to ceiling with giant blue spikes. Sure, these spikes are made of foam and simply used to absorb and dampen any

waves, but still, these chambers look like they belong in a nightmare. Again, if Apple needs a place to silence critics, they have the rooms.

These chambers vary in cost, but each of the ones we saw cost over $1 million. All told, Apple said it has spent over $100 million on these testing facilities.

We then went into a room that contained fake heads. Obviously, these are used to test the various devices without having to use real humans. And Apple goes so far as to fill these heads with liquid mixtures of sugar, water, salt, and other components to replicate the make-up of the human brain. There were also replicas of the human hands and feet (that latter for Nike+ testing). If the tour started out as a bunch of people going to see the inside of Willy Wonka's Chocolate Factory for the first time, I was starting to grow concerned that it was turning into that scene where [they enter the strange psychedelic tunnel](#).

But that feeling quickly subsided as we headed outside to see the vans Apple uses to test their devices in the real world. These are giant white vans with antennas on the top of them to pull in both cellular and GPS signals. The back of these vans contain various computer equipment to collect all the data and send it back to the labs at the headquarters.

Mansfield closed the tour by noting that they had hoped it was now a bit more clear the amount of time and energy Apple puts into testing these wireless products. "*We hope to give you a sense of the real engineering going on here,*" Mansfield said. It's not just testing, it's re-testing — and this goes on for months, he said.

No matter what your take is on the iPhone 4 antenna — my take is here: it's real, but not a big deal — there is no question that Apple spends a huge amount of time and money testing these devices. And the fact that the thing people will care most about in this whole 1,200-word post is the passing mention that the iPhone 5 and iPhone 6 *may* have been in one of these rooms, says just about all you need to say about the state of the iPhone.

For those interesting in learning more, Apple has also posted the following page (and video) about the antenna labs.



Topics:    Apple    iPhone 4    TC





### MG Siegler
General Partner  |  𝕏   🅕   in   🏠

M.G. Siegler is a general partner at Google Ventures, where he primarily focuses on early-stage investments. He has...

View Bio   ›

Loading the next article



TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

Terms of Service

Privacy Policy

RSS Terms of Use

Kalshi

Copilot

Blue Origin

WordPress

Bezos

Tech Layoffs

ChatGPT

© 2026 TechCrunch Media LLC.

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 86 of 197



**YOUR GUIDE TO A BETTER FUTURE**

 

apple event  >  Tech  >  Mobile  >  Phones

# A Billion Pixels a Second: I Got a Rare Look Inside Apple's Secret iPhone 16 Camera Labs

Here's how Apple took the iPhone 16 Pro's video capture and playback to another level with 4K 120fps slow-mo recording, spatial audio and new Audio Mix editing tools.

 **Patrick Holland**

Dec. 30, 2024 5:00 a.m. PT

10 min read



Apple has an anechoic chamber to test the microphones on the iPhone 16 Pro.

Celso Bulgatti/CNET

I'm standing on a wire mesh floor in a secluded room at Apple's headquarters in Cupertino, California. The "floor" I'm on is suspended over a pit filled with 4-foot foam wedges. The walls and ceiling in the room are also covered with large triangle-cuts of foam that remove virtually any echo. When I clap there's just the muffled sound from the impact of my hands. It's oh so quiet. If you're into the whole sensory deprivation thing, you'd be right at home in this strange room.

It's called a long wave anechoic chamber, and it's where Apple tests and calibrates the microphones on the iPhone 16. Earlier in December, I got a rare inside look at the testing chamber along with several other secret labs that Apple uses to test and calibrate the iPhone 16's audio and video features.



This gif shows us entering the Apple's anechoic chamber where it tests the iPhone 16.

Celso Bulgatti/CNET

For years the iPhone's ability to record videos with excellent image quality has been a high watermark when it comes to phones. Notable directors like Steven Spielberg, Zach Snyder, Steven Soderbergh and Rian Johnson have shot feature length movies, music videos or short films entirely with an iPhone.

But the iPhone's dominance in terms of its video prowess has been threatened recently as competitors like Samsung catch up. 4K video recorded with the Galaxy S24 Ultra looks incredible in terms of image quality and versatility. In 2023,

Google launched its Video Boost feature on the Pixel 8 Pro that processes video in the cloud after you record it to improve how it looks, even in low light.

That was all before the iPhone 16 Pro dropped. In my review I appreciated its new slow-motion video capture, superb speakers and camera upgrades, and I'm not the only one.

In a CNET survey from August, 38% of people said that better cameras are a main motivation for buying a new phone. At a time when more people are recording videos with their phones than ever, not just Hollywood directors, Apple took the iPhone's video capabilities to another level by bringing parity between regular videos and slow motion in terms of image quality and dynamic range. It also complemented the iPhone's support for spatial audio by introducing a new Audio Mix feature which allows iPhone owners to adjust the quality of the audio on the videos they record. You can make it seem like your subject is wearing a lavalier mic or in a professional recording studio all by moving around a few sliders in the Photos app.

It is fascinating to see the amount of time, testing and calibration that Apple poured into the iPhone 16 series' cameras and microphones and developing unique new features like Audio Mix.

# Apple's anechoic chamber transforms the iPhone's mics



A portion of one of the walls in the anechoic chamber.

Celso Bulgatti/CNET

The first stop on my behind-the-scenes tour was that anechoic chamber with all the foam. This chamber makes a library sound as loud as a subway station by comparison. It's where the iPhone 16's microphones get tested and characterized which drives further development down the chain in terms of audio. Apple, like all phone makers, has the challenge of making something that can fit in your pocket and that can also capture pristine sounds and play them back the way you heard them.

"The iPhone is such a ubiquitous recording device and gets used in so many different environments that we want to make sure that we're able to capture the memory that our users are trying to capture in the truest form," Ruchir Dave, senior director, acoustics engineering at Apple, told me on the tour.

The iPhone 16 has four microphones. But compared to a regular mic, like a lavalier that a newscaster might wear, the ones on the iPhone are tiny. So in order to get them to pick up the higher quality sound of a much larger microphone, or

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 90 of 197

one that's pinned to someone's shirt, Apple had to do some clever engineering which started by testing what the iPhone 16's mics actually pick up.



The iPhone 16 Pro has four microphones (the gold rectangles).
Apple

"The approach we took was to go after both quality as well as utility. And as part of that, we developed a novel microphone component that allows us to deliver some of the best acoustic performance in a phone product," said Dave. "At the same time, [we] developed a feature like Audio Mix that gives users the flexibility to be able to capture different sounds and gives you that creative freedom in the edit to adjust it how you like."

And that brings me back to the anechoic chamber for a chime test. There is an array of speakers (roughly two dozen) mounted on a pipe in the shape of an arc that goes from under the wire mesh floor to the ceiling of the chamber. The speakers play a series of chimes and engineers measure what the iPhone 16 Pro's mics pick up. The phone, which is mounted on a stand atop a turnable base, rotates a few degrees clockwise and the chimes play again. This continues until the iPhone has rotated in a complete circle.

Case 3:23-cv-04597-EMC     Document 321     Filed 03/26/26     Page 91 of 197



The anechoic chamber I visited had foam wedges on the walls, ceiling and underneath a suspended wire mesh floor. The chamber is used to test the iPhone 16's mics.

Patrick Holland/CNET

The result is a spherical sound profile for each mic made from the data recorded in that anechoic chamber. Apple takes these profiles and uses it as the foundation for spatial audio and other software that can reduce wind noise or make iPhone recorded audio act and sound like different kinds of microphones – think a lavalier mic or in-studio mic for a voiceover.

"We want to enable that [Audio Mix] feature as if you record it on a lapel mic," Dave explained. "We use machine learning algorithms as well as our tuning chains to come up with that signature sound that you're able to get even with lapel mics."

It is not just Ruchir with his golden ear that's sitting in there and dictating how it should sound.

Francesca Sweet, director of iPhone product marketing at Apple

In real life, if I'm using a dedicated camera to record an interview, I can put a wireless lapel mic on a person so it's close to their mouth. That way the mic picks up their voice as much as possible. But when I film with an iPhone, the mics are where the phone is and can't be physically closer. And that's what Dave and his team set out to solve.

"We've been doing this development over a number of years," said Francesca Sweet, director of iPhone product marketing at Apple. "So much of the machine learning capabilities that we have today are built on years of experience and expertise that we've been developing."

And it shows. When I tested the iPhone 16 Pro, I was surprised just how well Audio Mix worked on videos I recorded of my friends talking. It's not a magic bullet by any means. But when I think back to my days filming low-budget commercials and short films in Chicago with an iPhone 5 and having to use and sync separate audio from an external audio recorder, something like Audio Mix would have saved so much time and stress.

# There's more than just a man with a golden ear



Apple conducts perceptual audio testing with a variety of people and uses their feedback to help tune the audio recording and playback on the iPhone 16.

Celso Bulgatti/CNET

But the testing doesn't stop there. My next stop on Apple's lab tour was where comparative playback tests are conducted to help tune the iPhone's audio. After a maze-like walk from the anechoic chamber, I end up in a hallway with a couple of mini studios. The rooms are soundproof and each has a chair and desk with a Mac Studio, a Studio Display and a pair of AirPods Max headphones on it.

As opposed to just having one person with a good ear tune the iPhone's audio, Apple has a number of testers take a perceptual audio test and then uses those results to calibrate what you hear played back on your iPhone. I even got to be one of these testers while I was there and ran through a portion of the experience.

"It is not just Ruchir with his golden ear that's sitting in there and dictating how it should sound," emphasized Sweet. "We really want to make sure that anyone who's taking advantage of this feature [Audio Mix] is going to appreciate it and enjoy it."

I sat down at the desk and put the AirPods Max on my head. I played a video clip that had two audio tracks and could switch back and forth between them to rate whether I thought the audio was good, bad, fair, excellent and so on. It was that simple. The first video had a group of people on a sidewalk in a big city. The second was a selfie video that a man shot under an umbrella while walking through the rain. In one of the audio tracks in the selfie video the wind noise was very present. In the other track I could hardly hear it.

Apple uses comparative testing like this much in the same way an eye doctor might have you select between two different lenses in an eye test. Without something to compare the audio to, it's more of a challenge to evaluate a recording. The results from the perceptual testing help influence how the different aspects of the iPhone 16 Pro's audio works, including Audio Mix.



The Photos app on the iPhone 16 Pro has a tool called Audio Mix that lets you change the quality of the audio on videos you record.

Celso Bulgatti/CNET

"The idea behind development of Audio Mix is the iPhone gets used in all sorts of different scenarios and all sorts of different soundscapes and all sorts of different environments," said Dave. "We want to provide that flexibility to our users to be able to capture the sound they would like in those scenarios, rather than saying, 'This is what we think you should capture the sound,' and hard coding it."

Of course, Dave also pointed out that you don't need to be a video nerd (my words, not his) to have good audio in your iPhone videos.

"We're not expecting every user to go in and edit the videos and change the sliders," said Dave. "If you shot it the way we intended it to be shot, it should sound amazing. And if you still want to change it the way you would like, you have the full freedom."

## A private Dolby Atmos theater for iPhone videos



When I first entered Apple's video verification lab, there was only an Apple logo on the theater's screen.

Celso Bulgatti/CNET

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 96 of 197

My last stop was the video verification lab. If the anechoic chamber is about minimizing noise and stimuli, this lab, with its movie theater-sized screen, is all about the opposite. I wasn't able to see every corner of the theater or the control booth, but imagine having your own private Dolby Atmos theater to watch videos that you recorded on the iPhone.

"We use this theater to tune the video playback experiences so that when you play back these videos in a dark room, in an office environment or even under the sun, that you get the same perceptual experience you will get as if you're watching a video in the theater," Sean Yang, director of video engineering at Apple, told me.

I did the math. 4K video has 8,294,400 pixels per frame (3,840 × 2,160 pixels). At 120 frames per second, that's 995,328,000 pixels every second.

"

Apple calibrates every iPhone's display at the factory to make sure that the color is accurate, the brightness uniformity is good and the peak brightness matches its specs. But Yang and his team are focused on how videos look when you play them back no matter where you are. Unlike a TV or monitor, a phone screen has to contend with outdoor lighting, including direct sunlight, which can overwhelm what you're watching. The iPhone uses its ambient light sensor to adapt video playback to the lighting environment.

Like the perceptual testing that tunes the audio, Apple has people share their feedback on videos, so it's not just one person's opinion of how videos should look when played back on an iPhone.

"We actually have a group of experts at Apple to look at this video. If we have a difference of opinion, we get them together, we debate," explained Yang. "Oftentimes you need to have some trade-offs, and so we consulted many experts within Apple to make sure that the video comes through as highest quality, no matter where you played it."



I compare a reel of various video clips on an iPhone 16 Pro (center) and on the video verification theater's screen.
Celso Bulgatti/CNET

I got to see a demo of how the theater's screen mimics what video playback on an iPhone 16 Pro's screen looks like. There was a mix of clips from films, animated movies as well as videos recorded on the iPhone 16 Pro. And the reel included clips from one of my favorite new iPhone 16 Pro features, its ability to record and playback 4K 120fps slow-motion video.

"4K 120 is a massive amount of it [data]. If you think about it, it's 1 billion pixels per second," said Yang.

I did the math. 4K video has 8,294,400 pixels per frame (3,840 × 2,160 pixels). At 120 frames per second, that's 995,328,000 pixels every second. I don't know what's more impressive, the amount of data the iPhone 16 Pro needs to process to get 4K 120fps to work or how great the image quality and dynamic range are in the resulting slow-motion video.

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 98 of 107



Here is a still pulled from an iPhone 16 Pro slow-motion video.

Patrick Holland/CNET

"What's important is you can't really fake it, right? So if you're capturing at 120 frames per second, and you're slowing it down to half speed or quarter speed, you really are going to see every single frame in its full detail. And so any kind of artifacts or things like that are going to come through," said Sweet.

Even if you don't film a single frame of slow motion, you benefit from the work that Yang and his team do everyday in terms of video playback, whether it's watching a Disney Plus series like Star Wars: Skeleton Crew or just a selfie video that you recorded with some old friends toasting to the good times.

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 99 of 197

# Apple's labs are only as impressive as what comes out of them



Here's my point-of-view during a video verification test. The iPhone 16 Pro is on the left with the theater's screen in the background.

Patrick Holland/CNET

As I reflect back on the labs I saw and the engineers I met I kept thinking back to something that Sweet told me at the end of the day.

"We try to make it as seamless as possible for a user to interact with these really powerful tools that allow you to manipulate the audio or video and service them in a way that's really accessible," said Sweet. "But there is an inordinate amount of engineering work that goes in to make them that simple."

It's one thing for Apple to show off the effort and time its engineers have spent to get features like Audio Mix or 4K slow motion to work, but it's another to be able to use them in an easy and consistent way.



# YOUR GUIDE TO A BETTER FUTURE

 

apple event  >  **Tech**  >  **Mobile**  >  **Smartwatches**

# I Went Inside Apple's Labs to See How Apple Watch Connectivity Is Tested

From radio labs to anechoic chambers that look like Elsa's castle, here's a rare look at how Apple tests Bluetooth, Wi-Fi, 5G and satellite connectivity on the Apple Watch.



**Vanessa Hand Orellana**

Sept. 18, 2025 5:00 a.m. PT

5 min read



Vanessa Hand Orellana/CNET

Stepping into the padded vault felt like entering some kind of portal. The sterile white room was lined with jagged, pyramid-shaped foam spires; a cross between a recording studio and some kind of icicle torture chamber straight out of Elsa's

3/26/26, 3:44 AM
I Went Inside Apple's Labs to See How Apple Watch Connectivity Is Tested | CNET
Case 3:23-cv-04597-EMC   Document 381   Filed 03/26/26   Page 101 of 197

castle from the movie Frozen. I glanced down at my phone: no bars. Deep inside Apple's testing labs, I was officially off the grid.

I've been reviewing smartwatches for almost a decade, but I've never once stopped to wonder how connectivity actually works on the Apple Watch. I've seen it seamlessly switch between my phone and Wi-Fi, pay for things without a hint of cellular signal, and map my runs even when I forget my phone at home. I've taken for granted how this invisible web of connections works behind the scenes, and according to Apple, that's very much by design.

From Wi-Fi and GPS to Bluetooth and GNSS, and now 5G and satellite connectivity on the Apple Watch Ultra 3, a constant stream of wireless signals moves in and out of the watch, making it tick. The antennas and hardware have to be seamlessly woven into the very fabric of the device from the earliest design phase -- out of sight and out of mind -- then tested in real-world scenarios to make sure nothing interferes with the signals going in or out (not even your arm).

In opening its lab doors, Apple seemed intent on shedding light on the rigorous testing process that goes into bringing a product like the Apple Watch to market. As the best-selling smartwatch in the world, the company has positioned the Apple Watch as the industry standard, which means every signal has to work exactly as intended. This kind of testing isn't just quality control; it's how Apple pushes the limits of what can fit inside a device this small, especially when competitors like Samsung and Google close in on its features and market share.

After getting a rare peek inside the connectivity testing labs where Apple stress-tests signal performance, I don't think I can ever just wear an Apple Watch without thinking about the carefully choreographed sequence of product design and testing that makes that connectivity possible.

# Testing antenna performance in a radio anechoic chamber

Apple does much of its connectivity testing at dedicated facilities near its headquarters in Cupertino, California. Our tour started at one of these nondescript buildings, normally off-limits to the public, as we shuffled through a maze of black partitions that I imagine were shrouding the hundreds of other

tests we weren't allowed to see. We arrived at what appeared to be a bathroom-size padded vault that's lined with blue foam spikes like a slightly menacing sound booth.

This is what Apple calls a radio anechoic chamber: a completely radio-silent environment that blocks outside signals. In the center was an Apple Watch Series 11 on a black arm-shaped mount, mimicking how the human body might interfere with signals. A rotating black antenna ring circled the chamber, measuring how well the watch's own antennas were sending signals across different cellular and Wi-Fi bands. Once sealed, the chamber is designed to remove any outside interference.

Apple uses this chamber to test everything from early hand-built prototypes of watches to production-ready models, fine-tuning antenna performance for each cellular band and region and validating every single watch that comes off the production line.



Inside the anechoic chamber, Apple tests antenna performance using a Apple Watch Series 11 mounted on a mock arm.

Vanessa Hand Orellana/CNET

Both the Apple Watch Series 11 and Ultra 3 also use a new antenna diversity algorithm, which kicks in to combine the watch's two system antennas when the signal gets weak, boosting connectivity while conserving power.

## Adding in the human variable

But a rubber prototype doesn't quite make for a perfect stand-in for the rest of our meat-packed bodies, which can often create interference for the radio signals going in and out of our watch. On to the next lab for that. Deeper down the maze of partitions, we came across another, slightly larger vault. The stark white walls

stood in sharp contrast to the previous room's darker mood. This one didn't have any dismembered limb prototypes inside because it was meant to house actual humans, testing how the body itself can affect antenna signals.

Adding to the torture chamber vibe (maybe I watch too many movies) was a white midcentury modern armchair with a bright red cushion that seemed eerily out of place (or maybe perfectly fitting) in this hospital-like environment. I was assured the actual tests only last a few minutes (so, it's not actually a torture chamber). But I was still hesitant as I sat in the swiveling chair to give it a literal whirl myself, the white foam spires hanging over me like icicles. After all that build-up, the chair spun surprisingly slow and nothing like the Disneyland teacup experience I was picturing in my head.



Engineers use this chamber to study an actual human body impacts connectivity on the Apple Watch.

Vanessa Hand Orellana/CNET

The rotation allows Apple's engineers to map how the human body blocks or distorts the signal from different angles. This is especially important for the Apple Watch Ultra 3 and its new satellite connection, which relies on a directional antenna designed to connect to satellites orbiting 800 miles above Earth at 15,000mph.

Outside the chamber, engineers monitor the signal intensity that the watch receives via a (simulated) heat map of signal strength emanating from the screen as the tester turns.

## Going off the grid: GNSS chamber

The final chamber, tucked away on the basement level, was the largest of the three. As soon as I stepped into the massive room, I watched the cellular bars on my phone start to drop until they disappeared completely when I reached the center. This was the 15-by-15-meter Global Navigation Satellite System simulation room, which can trick a watch into thinking it's anywhere in the world. Today, I had been transported somewhere deep inside Alaska's Denali National Park.



This chamber can trick the Apple Watch into thinking its anywhere in the world (even off the grid) to test out location accuracy with satellite connectivity.

Vanessa Hand Orellana/CNET

It lacked the foam icicle walls of the other two chambers, but instead was lined with black spires jutting from the floor and surrounded by enormous circular antenna rings stacked toward the ceiling.

In the middle, an Apple Watch Ultra 3 sat on a black mock-arm mount, showing the exact off-the-grid made-up point on a map. The room can re-create the exact satellite geometry of any place on Earth, allowing Apple to test how accurately the watch can pinpoint your position. That kind of precision is critical for emergency SOS via satellite, but it also enables non-emergency features like sharing your location through Find My when you're off the grid.

## The invisible magic that makes it all work

According to Apple's engineers, this testing process is a delicate dance of creating, breaking, iterating and retesting, which can take a year to complete. Every step pushes the limits of what can fit inside the thin, curved body of an Apple Watch Series 11 without compromising its design or battery life. Apple would never say it outright, but I couldn't help imagining that somewhere behind those black partitions, they're already putting prototypes of the next two generations of Apple Watch through their paces.

And now, having seen the lengths Apple goes to behind closed doors, I know I'll feel a little more confident the next time I'm off the grid, knowing that somewhere in a hidden lab in Cupertino, Apple's engineers have already tested for that exact spot.



| | |
|---|---|
| About CNET | Software Downloads |
| Press Room | Accessibility |
| Newsletters | |
| Licensing | Privacy Policy |
| Sitemap | Terms of Use |

   

US France Germany Japan Korea

Case 3:23-cv-04597-EMC   Document 321   Filed 03/26/26   Page 106 of 197

**Newsroom**

Apple Services     Apple Stories     🔍 Search Newsroom

PRESS RELEASE
May 15, 2024

# Apple announces new accessibility features, including Eye Tracking, Music Haptics, and Vocal Shortcuts



Coming later this year, Apple's new accessibility features include Eye Tracking, a way for users to navigate iPad and iPhone with just their eyes.

**CUPERTINO, CALIFORNIA** — Apple today announced new accessibility features coming later this year, including Eye Tracking, a way for users with physical disabilities to control iPad or iPhone with their eyes. Additionally, Music Haptics will offer a new way for users who are deaf or hard of hearing to experience music using the Taptic Engine in iPhone; Vocal Shortcuts will allow users to perform tasks by making a custom sound; Vehicle Motion Cues can help reduce motion sickness when using iPhone or iPad in a moving vehicle; and more accessibility features will come to visionOS. These features combine the power of Apple hardware and software, harnessing Apple silicon, artificial intelligence, and machine learning to further Apple's decades-long commitment to designing products for everyone.

"We believe deeply in the transformative power of innovation to enrich lives," said Tim Cook, Apple's CEO. "That's why for nearly 40 years, Apple has championed inclusive design by embedding accessibility at the core of our hardware and software. We're continuously pushing the boundaries of technology, and these

new features reflect our long-standing commitment to delivering the best possible experience to all of our users."

"Each year, we break new ground when it comes to accessibility," said Sarah Herrlinger, Apple's senior director of Global Accessibility Policy and Initiatives. "These new features will make an impact in the lives of a wide range of users, providing new ways to communicate, control their devices, and move through the world."

### Eye Tracking Comes to iPad and iPhone

Powered by artificial intelligence, Eye Tracking gives users a built-in option for navigating iPad and iPhone with just their eyes. Designed for users with physical disabilities, Eye Tracking uses the front-facing camera to set up and calibrate in seconds, and with on-device machine learning, all data used to set up and control this feature is kept securely on device, and isn't shared with Apple.

Eye Tracking works across iPadOS and iOS apps, and doesn't require additional hardware or accessories. With Eye Tracking, users can navigate through the elements of an app and use Dwell Control to activate each element, accessing additional functions such as physical buttons, swipes, and other gestures solely with their eyes.

### Music Haptics Makes Songs More Accessible

Music Haptics is a new way for users who are deaf or hard of hearing to experience music on iPhone. With this accessibility feature turned on, the Taptic Engine in iPhone plays taps, textures, and refined vibrations to the audio of the music. Music Haptics works across millions of songs in the Apple Music catalog, and will be available as an API for developers to make music more accessible in their apps.

## New Features for a Wide Range of Speech

With Vocal Shortcuts, iPhone and iPad users can assign custom utterances that Siri can understand to launch shortcuts and complete complex tasks. Listen for Atypical Speech, another new feature, gives users an option for enhancing speech recognition for a wider range of speech. Listen for Atypical Speech uses on-device machine learning to recognize user speech patterns. Designed for users with acquired or progressive conditions that affect speech, such as cerebral palsy, amyotrophic lateral sclerosis (ALS), or stroke, these features provide a new level of customization and control, building on features introduced in iOS 17 for users who are nonspeaking or at risk of losing their ability to speak.

"Artificial intelligence has the potential to improve speech recognition for millions of people with atypical speech, so we are thrilled that Apple is bringing these new accessibility features to consumers," said Mark Hasegawa-Johnson, the Speech Accessibility Project at the Beckman Institute for Advanced Science and Technology at the University of Illinois Urbana-Champaign's principal

3/26/26, 3:51 AM
Apple announces new accessibility features, including Eye Tracking - Apple
Case 3:23-cv-04597-EMC     Document 321     Filed 03/26/26     Page 109 of 197

investigator. "The Speech Accessibility Project was designed as a broad-based, community-supported effort to help companies and universities make speech recognition more robust and effective, and Apple is among the accessibility advocates who made the Speech Accessibility Project possible."

## Vehicle Motion Cues Can Help Reduce Motion Sickness

Vehicle Motion Cues is a new experience for iPhone and iPad that can help reduce motion sickness for passengers in moving vehicles. Research shows that motion sickness is commonly caused by a sensory conflict between what a person sees and what they feel, which can prevent some users from comfortably using iPhone or iPad while riding in a moving vehicle. With Vehicle Motion Cues, animated dots on the edges of the screen represent changes in vehicle motion to help reduce sensory conflict without interfering with the main content. Using sensors built into iPhone and iPad, Vehicle Motion Cues recognizes when a user is in a moving vehicle and responds accordingly. The feature can be set to show automatically on iPhone, or can be turned on and off in Control Center.

## CarPlay Gets Voice Control, More Accessibility Updates

Accessibility features coming to CarPlay include Voice Control, Color Filters, and Sound Recognition. With Voice Control, users can navigate CarPlay and control apps with just their voice. With Sound Recognition, drivers or passengers who are deaf or hard of hearing can turn on alerts to be notified of car horns and sirens. For users who are colorblind, Color Filters make the CarPlay interface visually easier to use, with additional visual accessibility features including Bold Text.

## Accessibility Features Coming to visionOS

This year, accessibility features coming to visionOS will include systemwide Live Captions to help everyone — including users who are deaf or hard of hearing — follow along with spoken dialogue in live conversations and in audio from apps. With Live Captions for FaceTime in visionOS, more users can easily enjoy the unique experience of connecting and collaborating using their Persona. Apple Vision Pro will add the capability to move captions using the window bar during Apple Immersive Video, as well as support for additional Made for iPhone hearing devices and cochlear hearing processors. Updates for vision accessibility will include the addition of Reduce Transparency, Smart Invert, and Dim Flashing Lights for users who have low vision, or those who want to avoid bright lights and frequent flashing.

These features join the dozens of accessibility features already available in Apple Vision Pro, which offers a flexible input system and an intuitive interface designed with a wide range of users in mind. Features such as VoiceOver, Zoom,

and Color Filters can also provide users who are blind or have low vision access to spatial computing, while features such as Guided Access can support users with cognitive disabilities. Users can control Vision Pro with any combination of their eyes, hands, or voice, with accessibility features including Switch Control, Sound Actions, and Dwell Control that can also help those with physical disabilities.

"Apple Vision Pro is without a doubt the most accessible technology I've ever used," said Ryan Hudson-Peralta, a Detroit-based product designer, accessibility consultant, and cofounder of Equal Accessibility LLC. "As someone born without hands and unable to walk, I know the world was not designed with me in mind, so it's been incredible to see that visionOS just works. It's a testament to the power and importance of accessible and inclusive design."

## Additional Updates

- For users who are blind or have low vision, **VoiceOver** will include new voices, a flexible Voice Rotor, custom volume control, and the ability to customize VoiceOver keyboard shortcuts on Mac.

- **Magnifier** will offer a new Reader Mode and the option to easily launch Detection Mode with the Action button.

- Braille users will get a new way to start and stay in **Braille Screen Input** for faster control and text editing; Japanese language availability for Braille Screen Input; support for multi-line braille with **Dot Pad**; and the option to choose different input and output tables.

- For users with low vision, **Hover Typing** shows larger text when typing in a text field, and in a user's preferred font and color.

- For users at risk of losing their ability to speak, **Personal Voice** will be available in Mandarin Chinese. Users who have difficulty pronouncing or reading full sentences will be able to create a Personal Voice using shortened phrases.

- For users who are nonspeaking, **Live Speech** will include categories and simultaneous compatibility with **Live Captions**.

- For users with physical disabilities, **Virtual Trackpad** for AssistiveTouch allows users to control their device using a small region of the screen as a resizable trackpad.

- **Switch Control** will include the option to use the cameras in iPhone and iPad to recognize finger-tap gestures as switches.

- **Voice Control** will offer support for custom vocabularies and complex words.

### Celebrate Global Accessibility Awareness Day with Apple

This week, Apple is introducing new features, curated collections, and more in celebration of Global Accessibility Awareness Day:

- Throughout the month of May, select **Apple Store locations** will host free sessions to help customers explore and discover accessibility features built into the products they love. Apple Piazza Liberty in Milan will feature the talent behind "Assume that I can," the viral campaign for World Down Syndrome Day. And available year-round at Apple Store locations globally, Today at Apple group reservations are a place where friends, families, schools, and community groups can learn about accessibility features together.

- **Shortcuts** adds Calming Sounds, which plays ambient soundscapes to minimize distractions, helping users focus or rest.

- Visit the **App Store** to discover incredible apps and games that promote access and inclusion for all, including the accessible App Store Award-winning game Unpacking, apps as tools for augmentative and alternative communication (AAC), and more.

- The **Apple TV app** will honor trailblazing creators, performers, and activists who passionately share the experiences of people with disabilities. This year's theme is Remaking the World, and each story invites viewers to envision a reality where everyone is empowered to add their voice to the greater human story.

- **Apple Books** will spotlight lived experiences of disability through curated collections of first-person narratives by disabled writers in ebook and audiobook formats.

3/26/26, 3:51 AM
Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 113 of 197
Apple announces new accessibility features, including Eye Tracking - Apple

- **Apple Fitness+** workouts, meditations, and trainer tips welcome users who are deaf or hard of hearing with American Sign Language, and Time to Walk now includes transcripts in the **Apple Podcasts** app. Fitness+ workouts always include Audio Hints to support users who are blind or have low vision, as well as modifiers so that users of all levels can participate.

- Users can visit **Apple Support** to learn how their Apple devices can be customized using built-in accessibility features. From adapting the gestures to customizing how information is presented on a device's screen, the [Apple Accessibility playlist](#) will help users learn how to personalize Apple Vision Pro, iPhone, iPad, Apple Watch, and Mac to work best for them.

### Share article



| | | |
|---|---|---|
| Aa **Text of this article** | | Copy text |

| | |
|---|---|
| **Images in this article** | Download all images |

**About Apple**

Apple revolutionized personal technology with the introduction of the Macintosh in 1984. Today, Apple leads the world in innovation with iPhone, iPad, Mac, AirPods, Apple Watch, and Apple Vision Pro. Apple's six software platforms — iOS, iPadOS, macOS, watchOS, visionOS, and tvOS — provide seamless experiences across all Apple devices and empower people with breakthrough services including the App Store, Apple Music, Apple Pay, iCloud, and Apple TV+. Apple's more than 150,000 employees are dedicated to making the best products on earth and to leaving the world better than we found it.

## Press Contacts

**Apple Media Helpline**
[media.help@apple.com](mailto:media.help@apple.com)

**Apple Media Helpline**
[media.uk@apple.com](mailto:media.uk@apple.com)

## More from Apple Newsroom



PHOTOS

**Apple hosts 50th anniversary celebrations around the world**

March 25, 2026



UPDATE

**Introducing Apple Business — a new all-in-one platform for businesses of all sizes**

March 24, 2026

Case 3:23-cv-04597-EMC          Document 321          Filed 03/26/26          Page 114 of 197



You are invited to take part in a short survey to help us improve your Apple Support online experience. Please select Yes if you would like to participate.

**Yes**    **No**

**iPhone User Guide**                                                                      Communities

Select version:

iOS 26

Search this guide

Table of Contents ⊕

# Control iPhone with the movement of your eyes

With Eye Tracking, you can control iPhone using just your eyes. An onscreen pointer follows the movement of your eyes, and when you look at an item and hold your gaze steady, or *dwell*, you perform an action, such as a tap. All data used to set up and control Eye Tracking is processed on device.

## Before you begin

Eye Tracking uses the built-in, front-facing camera on iPhone. For best results, make sure that the camera has a clear view of your face and that your face is adequately lit. iPhone should be on a stable surface about a foot and a half away from your face.

Eye Tracking is available with supported iPhone models.

## Turn on Eye Tracking

1. Go to Settings ⚙️ > Accessibility > Eye Tracking, then turn on Eye Tracking.

2. Follow the onscreen instructions to calibrate Eye Tracking. As a dot appears in different locations around the screen, follow its movement with your eyes.

   *Note:* You need to calibrate Eye Tracking every time you turn it on.

## Use Eye Tracking

After you turn on and calibrate Eye Tracking, iPhone follows the movement of your eyes. By default, when you're looking at an item on the screen, an outline appears around the item.

If Snap to Item is turned off, when you hold your gaze steady at a location on the screen, the dwell pointer ⚪ appears where you're looking and the dwell timer begins (the dwell pointer circle starts to fill). When the dwell timer finishes, an action—tap, by default—is performed.

To perform additional onscreen gestures or physical button presses, use the AssistiveTouch menu ⬤. See Use AssistiveTouch.

## Recalibrate Eye Tracking

If you change the position of your face or your iPhone, Eye Tracking calibration automatically starts if recalibration is needed. You can also manually start Eye Tracking calibration.

1. Look at the top-left corner of your screen and hold your gaze steady.

   The dwell pointer ⬤ appears and the dwell timer begins (the dwell pointer circle starts to fill). When the dwell timer finishes, Eye Tracking calibration starts.

2. Follow the onscreen instructions to calibrate Eye Tracking. As a dot appears in different locations around the screen, follow its movement with your eyes.

You can change which corner of the screen you need to look at to start recalibration or assign actions to other corners. See Set up Dwell Control.

## Set options for Eye Tracking

You can set options for how the Eye Tracking pointer responds to your gaze.

1. Go to Settings ⚙ > Accessibility > Eye Tracking, then adjust any of the following:

   - *Smoothing:* Increase this value to make the movement of the pointer smoother. Or decrease this value to make the pointer more responsive.

   - *Snap to Item:* Have the Eye Tracking pointer automatically move to the item on the screen that's closest to where you're looking.

   - *Zoom on Keyboard Keys:* When you dwell on the keyboard, zoom in on the section of the keyboard you're looking at. Dwell again on a key to tap it.

   - *Auto-Hide:* Show the Eye Tracking pointer when you hold your gaze steady for the amount of time specified. The pointer automatically fades while your eyes are moving.

   - *Dwell Control:* Turn Dwell Control on or off. To adjust settings for Dwell Control, such as the default dwell action and the duration of the dwell timer, see Set up Dwell Control.

   - *Show Face Guidance:* Turn Show Face Guidance on or off to get help adjusting how you're positioned.

To change the size or color of the Eye Tracking pointer, go to Settings > Accessibility > Pointer Control. See Make the pointer easier to see when using a mouse or trackpad with iPhone.

See also

Accessibility features for mobility on iPhone

Case 3:23-cv-04597-EMC    Document 321    Filed 03/26/26    Page 116 of 197

Previous

Control a nearby Apple device

Next

Control iPhone with the movement of your head

Helpful?    Yes    No

 Support  >  iPhone User Guide  >  Control iPhone with the movement of your eyes

Copyright © 2026 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Site Map    United States

# Exhibit F: Apple.com/legal

# More Resources

Explore additional resources about legal matters, and find detailed
contact information for any remaining questions.

### Phishing & Other Suspicious Emails

Use these tips to avoid phishing scams and learn
what to do if you think your Apple ID has been
compromised.

See phishing tips ›

### Government Information Requests

Our Privacy site contains important information
about government requests for customer
information, relevant Apple guidelines, and our
responses.

Learn more about these requests ›

### Contact Apple Legal

If you have questions about legal topics, we'd like to
hear from you. Use this page to connect with the
right department for your specific type of question.

Contact us ›

### Apple Bag Check Class Action Settlement

The Frlekin v. Apple Inc. California class action
regarding unpaid wages for time spent in bag and
technology checks has settled.

Learn more about the Apple Bag Check Class
Action Settlement ›

### Foreman Class Action Settlement

The Foreman v. Apple Inc. class action regarding
alleged unpaid wages for time spent traveling to
different store locations has settled.

Learn more about the Foreman Class Action
Settlement ›

### NLRB Settlement - Case 32-CA-284428

Learn more about Apple's recent settlement with
the NLRB  (PDF)

### App Store Transparency Report

### California Generative AI Training Data Transparency

This page includes information relevant to the
California Generative Artificial Intelligence Training
Data Transparency Act (Assembly Bill No. 2013).

Learn More about the datasets used for Apple's
generative AI systems and services ›

### European Digital Services Act (DSA)

This page includes information relevant to the EU
Digital Services Act (Regulation (EU) 2022/2065 of
the European Parliament and of the Council of 19
October 2022 on a Single Market For Digital
Services and amending Directive 2000/31/EC) (the
DSA).

Learn more about DSA ›

### European Digital Markets Act (DMA)

This page includes information relevant to the EU
Digital Markets Act (Regulation (EU) 2022/1925 of
the European Parliament and of the Council of
14 September 2022 on contestable and fair markets
in the digital sector and amending Directives (EU)
2019/1937 and (EU) 2020/1828) (the DMA).

Learn more about DMA ›

### Global Trade Compliance

A list of classification codes and information for
Apple hardware and software, and information on
where to direct inquiries.

Learn about Global Trade Compliance ›

### Supplier Provisions

U.S. state-specific standards for Apple suppliers
that service state government agencies on behalf of
Apple in the United States.

View the Supplier Provisions  (PDF)

### Filemaker Legal Information

FileMaker, Inc. is a subsidiary of Apple. You can find
legal information for the company here.

Legal     Hardware     Software     Sales & Support     Internet Services     Intellectual Property     More Resources

Annual report on App Store operations.

View the App Store Transparency Reports ›

Visit Filemaker ›

## Apple Value Services Legal Information

Apple Value Services, LLC is a subsidiary of Apple. You can find legal information for the company here.

Visit Apple Value Services ›

## Romania Public Country by Country Report

VIew the Romania Public Country by Country Report  (PDF)

 > Legal > More Resources

**Hardware and Software**

Hardware Warranties

Software License Agreements

RF Exposure

**More Resources**

Overview

Government Information Requests

Contact Apple Legal

Global Trade Compliance

Supplier Provisions

Filemaker Legal Information

Apple Bag Check Class Action Settlement

Foreman Class Action Settlement

**Sales & Support**

Overview

AppleCare

Repair Terms and Conditions

Express Replacement Service

Remote Support Terms and Conditions (PDF)

Sales Policies

Certification Agreements and Policies

Apple Gift Card Terms and Conditions

Training Service Terms and Conditions

Support Communities Terms of Use

**Internet Services**

Overview

Apple Media Services Terms and Conditions

Apple Gift Card Terms and Conditions

iCloud Terms of Service

TestFlight Terms and Conditions

Privacy Policy

Website Terms of Use

**Intellectual Property**

Overview

Guidelines for Using Apple Trademarks and Copyrights

Trademarks

Rights and Permissions

Piracy Prevention

Unsolicited Idea Submission Policy

**Platform Services**

Apple Business Terms of Service

Apple School Manager

Data Transfer Agreements

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE (1-800-692-7753).

Copyright © 2026 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Legal  |  Site Map                         United States

**This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428.**

=====================

STATEMENT REGARDING CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

Apple has clarified the definition of "Proprietary Information" in the current version of the Confidentiality and Intellectual Property Agreement ("IPA") as reproduced below. This term "Proprietary Information" has been replaced with the defined term "Apple Confidential Information," and reflects Apple's interpretation of Proprietary Information for all current and former employees regardless of their specific IPA version and aligns to the way Apple interprets the scope of employees' confidentiality obligations.  The term "Proprietary Information" in any former version of the IPA should not be construed inconsistently with the definition below and should not be construed as limiting employee rights to discuss wages, hours, and terms and conditions of employment.

Section I of the IPA now reads as follows:

> You understand and agree that Your Employment creates a relationship of confidence and trust with respect to certain information that may be disclosed to You or otherwise learned or accessed by You in the course of Your Employment, including any
>
> confidential information of third parties disclosed or made available to any Apple Entity ("Third Party Confidential Information"). As used in this Agreement, "Apple Confidential Information" means all Third Party Confidential Information and all non-public information that is kept confidential by any Apple Entity, including such information pertaining to or consisting of: (a) inventions, trade secrets, R&D records, reports, samples, manuals, plans, specifications, ideas, know how, designs, prototypes, software, source code, notes, photographs, screenshots, whiteboard captures, remote video chats, drawings, sketches or any other confidential materials or information relating to past, existing or future products or services, whether or not developed, marketed, used, or rejected by any Apple Entity or persons or companies for or on behalf of any Apple Entity; and (b) sales, profits, organization, customer data, pricing, operations, sources of material, supply, costs, manufacturing, financials, forecasts, budgets, profit and loss statements, market research, marketing or advertising strategy or plans, product roadmaps, product volumes, aggregated performance review metrics or data, aggregated recruiting or interview information, headcount planning reports, project planning documents, dates or content of new product launches, methods of distribution or manufacture or testing and unpublished patent applications. You understand that the above list is not exhaustive and that Apple Confidential Information includes other information that falls within its definition that would appear to a reasonable person to be confidential, proprietary and/or of commercial value in the context

and circumstances in which the information is known or used. Apple Confidential Information does not include (i) any information that is generally available to the public, unless the information falls within the definition of Apple Confidential Information, but became publicly available through unlawful means or as a result of any breach of a confidentiality obligation to any Apple Entity, including any breach by You of this Agreement and (ii) any information that was known to You prior to Your Employment with Apple.

Notwithstanding the foregoing, nothing in this Agreement restricts Your right to (A) use or disclose Your general training, knowledge, professional experience and skills, (B) seek or accept any job, including with a competitor of Apple, where such job begins after Your separation from employment with Apple, (C) discuss or disclose information about Your or others' wages, hours, or working conditions, or (D) discuss or disclose information about unlawful acts in the workplace, including harassment, discrimination, or any other conduct You have reason to believe is inappropriate in the workplace, or file a complaint or otherwise communicate or cooperate with a U.S. federal, state, or local government or law enforcement agency (including, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Board, the United States Department of Labor, or the Office of Federal Contract Compliance Programs) about such unlawful or inappropriate acts. Nothing in this Agreement, or any other Apple agreement, should be interpreted as being restrictive of Your rights under subsections (A)-(D) without unnecessary disclosure of Apple Confidential Information to third parties. You are not required to notify Apple when exercising Your rights permitted under subsections (A)-(D) above.

Additional information about employee rights, including the right to engage in protected, concerted activity, can be found on Apple's People site. Additional information about employee rights, including the right to engage in union or other protected, concerted activity, can be found at www.nlrb.gov.

**A. Treatment of Apple Confidential Information.** You understand and acknowledge that Your obligations under this Agreement with regard to any particular Apple Confidential Information will continue during and after Your Employment until such Apple Confidential Information has become generally available to the public unless it became publicly available through unlawful means or as a result of any breach of a confidentiality obligation to any Apple Entity, including any breach by You of this Agreement. You understand and agree that, without the written consent of Apple, You are prohibited, during and after Your Employment, from: (i) using any Apple

Confidential Information, except as necessary to perform Your duties during and in the scope of Your Employment; (ii) disclosing any Apple Confidential Information, except during and in the scope of Your Employment to (a) personnel of any Apple Entity or (b) other third parties who have confidentiality obligations to any Apple Entity regarding the Apple Confidential Information to be disclosed ("Authorized Third Parties"), in each case (a) and (b), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for such Apple Entity; or (iii) permitting any other person or entity to (a) use any Apple Confidential Information, except authorized uses by (1) personnel of any Apple Entity or (2) Authorized Third Parties, in each case (1) and (2), of the Apple Confidential Information as necessary to be used by them during and in connection with their work for the applicable Apple Entity or (b) disclose any Apple Confidential Information, except authorized disclosures (1) between personnel of any Apple Entity or (2) between personnel of any Apple Entity, on the one hand, and Authorized Third Parties, on the other hand, in each case (1) and (2), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for the applicable Apple Entity. You understand and agree to strictly comply with all rules and policies of the Apple Entities regarding Apple Confidential Information and to use best efforts to safeguard such Apple Confidential Information and protect it against disclosure, misuse, loss, or theft. Upon termination of Your Employment, You will promptly deliver to the Apple Employing Entity all Apple property, documents, and materials of any kind containing any Apple Confidential Information, and You agree that You will not take with You any property, documents, materials, or copies thereof, whether on paper, in electronic form or in any other medium, containing any Apple Confidential Information.

**B. Information, Inventions and IP of Others.** You agree that You have not brought, and during Your Employment You will not bring, any confidential, proprietary, or secret information, or any inventions or IP, of any of Your former employers or any other person or entity onto the property of any Apple Entity or use any of the foregoing in connection with Your Employment. You further agree You have not improperly used or disclosed (or induced the same), and during Your Employment will not improperly use or disclose (or induce the same), any confidential, proprietary, or secret information, or any inventions or IP, of any of Your former employers or any other person or entity.

**C. Compelled Disclosures.** If You are at any time during or after Your Employment compelled by law to disclose any Apple Confidential Information to a court, administrative body or other government authority, You agree, to the maximum extent permitted by

applicable law to (i) immediately provide prior written notice of such disclosure to Apple at notices@apple.com detailing the Apple Confidential Information disclosed to enable Apple to seek a protective order with respect to such Apple Confidential Information and (ii) only disclose the minimum amount of Apple Confidential Information that is required to be disclosed in such instance. Any notice under subparagraph (i) of this provision should identify only the Apple Confidential Information that will be or was disclosed, to who it will be or was disclosed, and the date that the disclosure will be or was made. "Compelled Disclosures" do not include voluntary disclosures expressly permitted in Section I above.

# EXHIBIT G: 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 27, 2025

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File Number: **001-36743**



# Apple Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **California** | **94-2404110** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Apple Park Way** | |
| **Cupertino, California** | **95014** |
| (Address of principal executive offices) | (Zip Code) |

**(408) 996-1010**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.00001 par value per share** | **AAPL** | **The Nasdaq Stock Market LLC** |
| **0.000% Notes due 2025** | **—** | **The Nasdaq Stock Market LLC** |
| **1.625% Notes due 2026** | **—** | **The Nasdaq Stock Market LLC** |
| **2.000% Notes due 2027** | **—** | **The Nasdaq Stock Market LLC** |
| **1.375% Notes due 2029** | **—** | **The Nasdaq Stock Market LLC** |
| **3.050% Notes due 2029** | **—** | **The Nasdaq Stock Market LLC** |
| **0.500% Notes due 2031** | **—** | **The Nasdaq Stock Market LLC** |
| **3.600% Notes due 2042** | **—** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒    No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐    No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past

90 days.

Yes ☒    No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

Yes ☒    No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ☐    No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the Registrant, as of March 28, 2025, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $3,253,431,000,000. Solely for purposes of this disclosure, shares of common stock held by executive officers and directors of the Registrant as of such date have been excluded because such persons may be deemed to be affiliates. This determination of executive officers and directors as affiliates is not necessarily a conclusive determination for any other purposes.

14,776,353,000 shares of common stock were issued and outstanding as of October 17, 2025.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive proxy statement relating to its 2026 annual meeting of shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The Registrant's definitive proxy statement will be filed with the U.S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

**Apple Inc.**

**Form 10-K**

**For the Fiscal Year Ended September 27, 2025**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 5 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 1C. | Cybersecurity | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Mine Safety Disclosures | 18 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | [Reserved] | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 27 |
| Item 8. | Financial Statements and Supplementary Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 52 |
| Item 9A. | Controls and Procedures | 52 |
| Item 9B. | Other Information | 53 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 53 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 53 |
| Item 11. | Executive Compensation | 53 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 53 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 53 |
| Item 14. | Principal Accountant Fees and Services | 53 |
| **Part IV** | | |
| Item 15. | Exhibit and Financial Statement Schedules | 54 |
| Item 16. | Form 10-K Summary | 57 |

*This Annual Report on Form 10-K ("Form 10-K") contains forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, that involve risks and uncertainties. Many of the forward-looking statements are located in Part I, Item 1 of this Form 10-K under the heading "Business" and Part II, Item 7 of this Form 10-K under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. For example, statements in this Form 10-K regarding the potential future impact of macroeconomic conditions and tariffs and other measures on the Company's business and results of operations are forward-looking statements. Forward-looking statements can also be identified by words such as "future," "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," "will," "would," "could," "can," "may," and similar terms. Forward-looking statements are not guarantees of future performance and the Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in Part I, Item 1A of this Form 10-K under the heading "Risk Factors." The Company assumes no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

*Unless otherwise stated, all information presented herein is based on the Company's fiscal calendar, and references to particular years, quarters, months or periods refer to the Company's fiscal years ended in September and the associated quarters, months and periods of those fiscal years. Each of the terms the "Company" and "Apple" as used herein refers collectively to Apple Inc. and its wholly owned subsidiaries, unless otherwise stated.*

## PART I

**Item 1.    Business**

**Company Background**

The Company designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services. The Company's fiscal year is the 52- or 53-week period that ends on the last Saturday of September.

**Products**

*iPhone*

iPhone® is the Company's line of smartphones based on its iOS operating system. The iPhone line includes iPhone 17 Pro, iPhone Air™, iPhone 17, iPhone 16 and iPhone 16e.

*Mac*

Mac® is the Company's line of personal computers based on its macOS® operating system. The Mac line includes laptops MacBook Air® and MacBook Pro®, as well as desktops iMac®, Mac mini®, Mac Studio® and Mac Pro®.

*iPad*

iPad® is the Company's line of multipurpose tablets based on its iPadOS® operating system. The iPad line includes iPad Pro®, iPad Air®, iPad and iPad mini®.

*Wearables, Home and Accessories*

Wearables includes smartwatches, wireless headphones and spatial computers. The Company's line of smartwatches, based on its watchOS® operating system, includes Apple Watch® Series 11, Apple Watch SE® 3 and Apple Watch Ultra® 3. The Company's line of wireless headphones includes AirPods®, AirPods Pro®, AirPods Max® and Beats® products. Apple Vision Pro™ is the Company's spatial computer based on its visionOS® operating system.

Home includes Apple TV 4K®, the Company's media streaming and gaming device based on its tvOS® operating system, and HomePod® and HomePod mini®, high-fidelity wireless smart speakers.

Accessories includes Apple-branded and third-party accessories.

Apple Inc. | 2025 Form 10-K | 1

**Services**

*Advertising*

The Company's advertising services include third-party licensing arrangements and the Company's own advertising platforms.

*AppleCare*

The Company offers a portfolio of fee-based service and support products under the AppleCare® brand. The offerings provide priority access to Apple technical support, access to the global Apple authorized service network for repair and replacement services, and in many cases additional coverage for instances of accidental damage or theft and loss, depending on the country and type of product.

*Cloud Services*

The Company's cloud services store and keep customers' content up-to-date and available across multiple Apple devices and Windows personal computers.

*Digital Content*

The Company operates various platforms, including the App Store®, that allow customers to discover and download applications and digital content, such as books, music, video, games and podcasts.

The Company also offers digital content through subscription-based services, including Apple Arcade®, a game service; Apple Fitness+®, a personalized fitness service; Apple Music®, which offers users a curated listening experience with on-demand radio stations; Apple News+®, a news and magazine service; and Apple TV®, which offers exclusive original content and live sports.

*Payment Services*

The Company offers payment services, including Apple Card®, a co-branded credit card, and Apple Pay®, a cashless payment service.

**Segments**

The Company manages its business primarily on a geographic basis. The Company's reportable segments consist of the Americas, Europe, Greater China, Japan and Rest of Asia Pacific. Americas includes both North and South America. Europe includes European countries, as well as India, the Middle East and Africa. Greater China includes China mainland, Hong Kong and Taiwan. Rest of Asia Pacific includes Australia, New Zealand and those Asian countries not included in the Company's other reportable segments. Although the reportable segments provide similar hardware and software products and similar services, each one is managed separately to better align with the location of the Company's customers and distribution partners and the unique market dynamics of each geographic region.

**Markets and Distribution**

The Company's customers are primarily in the consumer, small and mid-sized business, education, enterprise and government markets. The Company sells its products and resells third-party products in most of its major markets directly to customers through its retail and online stores and its direct sales force. The Company sells its services in the same markets through its various service platforms. The Company also employs a variety of indirect distribution channels, such as third-party cellular network carriers and other resellers, for the sale of its products and certain of its services. During 2025, the Company's net sales through its direct and indirect distribution channels accounted for 40% and 60%, respectively, of total net sales.

**Competition**

The markets for the Company's products and services are highly competitive and are characterized by aggressive price competition, downward pressure on gross margins, continual improvement in product performance, and price sensitivity on the part of consumers and businesses. The markets in which the Company competes are further defined by frequent introduction of new products and services, short product life cycles, evolving industry standards, and rapid adoption of technological advancements by competitors. Many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property.

Apple Inc. | 2025 Form 10-K | 2

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. Principal competitive factors important to the Company include price, product and service features (including security features), relative price and performance, product and service quality and reliability, design and technology innovation, a strong third-party software and accessories ecosystem, marketing and distribution capability, service and support, corporate reputation, and the ability to effectively protect and enforce the Company's intellectual property rights.

The Company is focused on expanding its market opportunities related to smartphones, personal computers, tablets, wearables and accessories, and services. The Company's products and services face substantial competition from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software, and service offerings with large customer bases. In addition, the Company faces significant competition as competitors imitate the Company's product features and applications within their products to offer more competitive solutions. The Company also expects competition to intensify as competitors imitate the Company's approach to providing components seamlessly within their offerings or work collaboratively to offer integrated solutions. Some of the Company's competitors have broad product lines, low-priced products, large installed bases of active devices, and large customer bases. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products and services at little or no profit or even at a loss. The Company has a minority market share in the global smartphone, personal computer, tablet and wearables markets, and some of the markets in which the Company competes have from time to time experienced little to no growth or contracted overall.

## Supply of Components

Although most components essential to the Company's business are generally available from multiple sources, certain components are currently obtained from single or limited sources. The Company also competes for various components with other participants in the markets for smartphones, personal computers, tablets, wearables and accessories. Therefore, many components used by the Company, including those that are available from multiple sources, are at times subject to industry-wide shortage and significant commodity pricing fluctuations. Restrictions on international trade can increase the cost or limit the availability of the Company's products and the components and rare earths and other raw materials that go into them.

The Company uses some custom components that are not commonly used by its competitors, and new products introduced by the Company often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or their manufacturing capacities have increased. The Company has entered into agreements for the supply of many components; however, the Company may not be able to extend or renew agreements for the supply of components on similar terms, or at all, and may not be successful in obtaining sufficient quantities from its suppliers or in a timely manner, or in identifying and obtaining sufficient quantities from an alternative source. In addition, component suppliers may fail, be subject to consolidation within a particular industry, or decide to concentrate on the production of common components instead of components customized to meet the Company's requirements, further limiting the Company's ability to obtain sufficient quantities of components on commercially reasonable terms, or at all.

## Research and Development

Because the industries in which the Company competes are characterized by rapid technological advances, the Company's ability to compete successfully depends heavily upon its ability to ensure a continual and timely flow of competitive products, services and technologies to the marketplace. The Company continues to develop new technologies to enhance existing products and services, and to expand the range of its offerings through research and development ("R&D"), licensing of intellectual property and acquisition of third-party businesses and technology.

## Intellectual Property

The Company currently holds a broad collection of intellectual property rights relating to certain aspects of its hardware, software and services. This includes patents, designs, copyrights, trademarks, trade secrets and other forms of intellectual property rights in the U.S. and various foreign countries. Although the Company believes the ownership of such intellectual property rights is an important factor in differentiating its business and that its success does depend in part on such ownership, the Company relies primarily on the innovative skills, technical competence and marketing abilities of its personnel.

The Company regularly files patent, design, copyright and trademark applications to protect innovations arising from its hardware, software and service research, development, design and marketing, and is currently pursuing thousands of applications around the world. Over time, the Company has accumulated a large portfolio of issued and registered intellectual property rights around the world. No single intellectual property right is solely responsible for protecting the Company's products and services. The Company believes the duration of its intellectual property rights is adequate relative to the expected lives of its products and services.

Apple Inc. | 2025 Form 10-K | 3

In addition to Company-owned intellectual property, many of the Company's products and services include technology or intellectual property that must be licensed from third parties. It may be necessary in the future to seek or renew licenses relating to various aspects of the Company's products, processes and services. While the Company has generally been able to obtain such licenses on commercially reasonable terms in the past, there is no guarantee that such licenses could be obtained in the future on reasonable terms or at all.

### Business Seasonality and Product Introductions

The Company has historically experienced higher net sales in its first quarter compared to other quarters in its fiscal year due in part to seasonal holiday demand. Additionally, new product and service introductions can significantly impact net sales, cost of sales and operating expenses. The timing of product introductions can also impact the Company's net sales to its indirect distribution channels as these channels are filled with new inventory following a product launch, and channel inventory of an older product often declines as the launch of a newer product approaches. Net sales can also be affected when consumers and distributors anticipate a product introduction.

### Human Capital

The Company believes that its people play an important role in its success, and strives to attract, develop and retain the best talent. The Company works to create a culture of collaboration, one where people with a broad range of backgrounds and perspectives can come together to innovate and do the best work of their lives. The Company is an equal opportunity employer committed to inclusion and to providing a workplace free of harassment or discrimination. As of September 27, 2025, the Company had approximately 166,000 full-time equivalent employees.

The Company believes that compensation should be competitive and equitable, and offers discretionary cash and equity awards to enable employees to share in the Company's success. The Company recognizes its people are most likely to thrive when they have the resources to meet their needs and the time and support to succeed in their professional and personal lives. In support of this, the Company offers a wide variety of benefits for employees around the world, including health, wellness and time away.

The Company invests in resources to help its people develop and achieve their career goals. The Company offers programs through Apple University on leadership, management and influence, as well as Apple culture and values. Team members can also take advantage of online classes for business, technical and personal development.

The Company believes that open and honest communication among team members, managers and leaders helps create an open, collaborative work environment where everyone can contribute, grow and succeed. Team members are encouraged to come to their managers with questions, feedback or concerns, and the Company conducts surveys that gauge employee sentiment in areas like career development, manager performance and inclusion.

The Company is committed to the safety and security of its team members everywhere it operates. The Company supports employees with general safety, security and crisis management training, and by putting specific programs in place for those working in potentially high-hazard environments.

### Available Information

The Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), are filed with the U.S. Securities and Exchange Commission ("SEC"). Such reports and other information filed by the Company with the SEC are available free of charge at investor.apple.com/investor-relations/sec-filings/default.aspx when such reports are available on the SEC's website. The Company periodically provides certain information for investors on its corporate website, www.apple.com, and its investor relations website, investor.apple.com. This includes press releases and other information about financial performance, information on corporate governance, and details related to the Company's annual meeting of shareholders. The information contained on the websites referenced in this Form 10-K is not incorporated by reference into this filing. Further, the Company's references to website URLs are intended to be inactive textual references only.

Apple Inc. | 2025 Form 10-K | 4

## Item 1A.    Risk Factors

The following summarizes factors that could have a material adverse effect on the Company's business, reputation, results of operations, financial condition and stock price. The Company may not be able to accurately predict, control or mitigate these risks. Statements in this section are based on the Company's beliefs and opinions regarding matters that could materially adversely affect the Company in the future and are not representations as to whether such matters have or have not occurred previously. The risks and uncertainties described below are not exhaustive and should not be considered a complete statement of all potential risks or uncertainties that the Company faces or may face in the future.

This section should be read in conjunction with Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and accompanying notes in Part II, Item 8, "Financial Statements and Supplementary Data" of this Form 10-K.

### Macroeconomic and Industry Risks

***The Company's operations and performance depend significantly on global and regional economic conditions and adverse economic conditions can materially adversely affect the Company's business, results of operations, financial condition and stock price.***

The Company has international operations with sales outside the U.S. representing a majority of the Company's total net sales. In addition, the Company's global supply chain is large and complex and a majority of the Company's supplier facilities, including manufacturing and assembly sites, are located outside the U.S. As a result, the Company's operations and performance depend significantly on global and regional economic conditions.

Adverse macroeconomic conditions, including slow growth or recession, high unemployment, inflation, tighter credit, higher interest rates, and currency fluctuations, can adversely impact consumer confidence and spending and materially adversely affect demand for the Company's products and services. In addition, consumer confidence and spending can be materially adversely affected in response to changes in fiscal and monetary policy, financial market volatility, declines in income or asset values, and other economic factors.

Uncertainty about, or a decline in, global or regional economic conditions can also have a significant impact on the Company's suppliers, contract manufacturers, logistics providers, distributors, cellular network carriers and other channel partners, and developers. Potential outcomes include financial instability; inability to obtain credit to finance business operations; and insolvency.

Adverse economic conditions can also lead to increased credit and collectibility risk on the Company's trade receivables; the failure of derivative counterparties and other financial institutions; limitations on the Company's ability to issue new debt; reduced liquidity; and declines in the fair values of the Company's financial instruments. These and other impacts can materially adversely affect the Company's business, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 5

***The Company's business can be impacted by political events, trade and other international disputes, geopolitical tensions, conflict, terrorism, natural disasters, public health issues, industrial accidents and other business interruptions.***

Political events, trade and other international disputes, geopolitical tensions, conflict, terrorism, natural disasters, public health issues, industrial accidents and other business interruptions can have a material adverse effect on the Company and its customers, employees, suppliers, contract manufacturers, logistics providers, distributors, cellular network carriers and other channel partners.

The Company has a large, global business with sales outside the U.S. representing a majority of the Company's total net sales, and the Company believes that it generally benefits from growth in international trade. A significant majority of the Company's manufacturing is performed in whole or in part by outsourcing partners located primarily in China mainland, India, Japan, South Korea, Taiwan and Vietnam, in addition to sourcing from partners and facilities located in the U.S. Restrictions on international trade, such as tariffs and other controls on imports or exports of goods, technology or data, can materially adversely affect the Company's business and supply chain. The impact can be particularly significant if these restrictive measures apply to countries and regions where the Company derives a significant portion of its revenues and/or has significant supply chain operations. Restrictive measures can increase the cost or limit the availability of the Company's products and the components and rare earths and other raw materials that go into them. Restrictive measures can also require the Company to change suppliers, restructure business relationships and operations, refrain from offering and distributing or cease to offer and distribute affected products, services and third-party applications to its customers, and increase the prices of its products and services. Changing the Company's business and supply chain in accordance with new or changed restrictions on international trade can be expensive, time-consuming and disruptive to the Company's business and results of operations. Trade and other international disputes can also have an adverse impact on the overall macroeconomic environment and result in shifts and reductions in consumer spending and negative consumer sentiment for the Company's products and services, all of which can further adversely affect the Company's business and results of operations. Such restrictions can be announced with little or no advance notice, which can create uncertainty, and the Company may not be able to effectively mitigate any or all adverse impacts from such measures. Global supply chains can be highly concentrated, and an escalation of geopolitical tensions or conflict could result in significant disruptions. Beginning in the second quarter of 2025, new tariffs were announced on imports to the U.S. ("U.S. Tariffs"), including additional tariffs on imports from China, India, Japan, South Korea, Taiwan, Vietnam and the European Union ("EU"), among others. In response, several countries have imposed, or threatened to impose, reciprocal tariffs on imports from the U.S. and other retaliatory measures. Various modifications to the U.S. Tariffs have been announced and further changes could be made in the future, which may include additional sector-based tariffs or other measures. For example, the U.S. Department of Commerce has initiated an investigation under Section 232 of the Trade Expansion Act of 1962, as amended, into, among other things, imports of semiconductors, semiconductor manufacturing equipment, and their derivative products, including downstream products that contain semiconductors. The ultimate impact remains uncertain and will depend on several factors, including whether additional or incremental U.S. Tariffs or other measures are announced or imposed, to what extent other countries implement tariffs or other retaliatory measures in response, and the overall magnitude and duration of these measures. If disputes and conflicts further escalate, actions by governments in response could be significantly more severe and restrictive.

Many of the Company's operations, retail stores and facilities, as well as critical business operations of the Company's suppliers and contract manufacturers, are in locations that are prone to earthquakes and other natural disasters. Global climate change is resulting in certain types of natural disasters and extreme weather occurring more frequently or with more intense effects. In addition, the Company's and its suppliers' operations, retail stores and facilities are subject to the risk of interruption by fire, power shortages, nuclear power plant accidents and other industrial accidents, terrorist attacks and other hostile acts, ransomware and other cybersecurity attacks, labor disputes, public health issues and other events beyond the Company's control.

Such events can make it difficult or impossible for the Company to manufacture and deliver products to its customers, create delays and inefficiencies in the Company's supply and manufacturing chain, result in slowdowns and outages to the Company's service offerings, increase the Company's costs, and negatively impact consumer spending and demand in affected areas.

The Company's operations are also subject to the risks of industrial accidents at its suppliers and contract manufacturers. While the Company's suppliers are required to maintain safe working environments and operations, an industrial accident could occur and could result in serious injuries or loss of life, disruption to the Company's business, and harm to the Company's reputation. Major public health issues, including pandemics such as the COVID-19 pandemic, have adversely affected, and could in the future materially adversely affect, the Company due to their impact on the global economy and demand for consumer products; the imposition of protective public safety measures, such as stringent employee travel restrictions and limitations on freight services and the movement of products between regions; and disruptions in the Company's operations, supply chain and sales and distribution channels, resulting in interruptions to the supply of current products and offering of existing services, and delays in production ramps of new products and development of new services.

Following any interruption to its business, the Company can require substantial recovery time, incur significant expenditures to resume operations, and lose significant sales. Because the Company relies on single or limited sources for the supply and manufacture of many critical components, a business interruption affecting such sources would exacerbate any negative consequences to the Company. While the Company maintains insurance coverage for certain types of losses, such insurance coverage may be insufficient to cover all losses that may arise. Any of the foregoing can materially adversely affect the Company's business, results of operations, financial condition and stock price.

***Global markets for the Company's products and services are highly competitive and subject to rapid technological change, and the Company may be unable to compete effectively in these markets.***

The Company's products and services are offered in highly competitive global markets. These markets are characterized by aggressive price competition, downward pressure on gross margins, continual improvement in product performance, and price sensitivity on the part of consumers and businesses. These markets are further defined by frequent introduction of new products and services, short product life cycles, evolving industry standards, and rapid adoption of technological advancements.

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. As a result, the Company must make significant investments in R&D. These investments may not achieve expected returns, and the Company may not be able to develop and market new products and services successfully.

The Company's ability to compete successfully also depends on the effective protection and enforcement of its intellectual property rights. Regulatory requirements, government investigations and litigation can force the Company to withdraw from, or modify its products and services for, certain countries and limit its ability to derive value from, or to enjoin others from using, its intellectual property rights. Additionally, they may require the Company to share its innovations with competitors. Any of these outcomes can have a negative impact on the Company's competitive advantage and materially adversely affect its business, results of operations, financial condition and stock price.

The Company currently holds a significant number of patents, trademarks and copyrights and has registered, and applied to register, additional patents, trademarks and copyrights. In contrast, many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property. Effective intellectual property protection is not consistently available in every country in which the Company operates. If the Company is unable to continue to develop and sell innovative new products with attractive margins or if competitors infringe on the Company's intellectual property, the Company's ability to maintain a competitive advantage could be materially adversely affected.

The Company's products and services face substantial competition from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software and service offerings. In addition, the Company faces significant competition as competitors imitate the Company's product features and applications within their products to offer more competitive solutions. The Company also expects competition to intensify as competitors imitate the Company's approach to providing components seamlessly within their offerings or work collaboratively to offer integrated solutions. Some of the Company's competitors have broad product lines, low-priced products, large installed bases of active devices, and large customer bases. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products and services at little or no profit or even at a loss. The Company has a minority market share in the global smartphone, personal computer, tablet and wearables markets, and some of the markets in which the Company competes have from time to time experienced little to no growth or contracted overall.

If the Company is unable to compete successfully, its business, reputation, results of operations, financial condition and stock price can be materially adversely affected.

**Business Risks**

***To remain competitive and stimulate customer demand, the Company must successfully manage frequent introductions and transitions of products and services.***

Due to the highly volatile and competitive nature of the markets and industries in which the Company competes, the Company must continually introduce new products, services and technologies, enhance existing products and services, effectively stimulate customer demand for new and upgraded products and services, navigate global regulatory requirements and barriers to market access, and successfully manage the transition to these new and upgraded products and services. The success of new product and service introductions depends on a number of factors, including the Company's ability to recruit and retain highly skilled personnel to execute on its strategic initiatives, and the timely and successful development and market acceptance of new products, services and technologies. Success also relies on the Company's ability to manage the risks associated with new technologies and production ramp-up issues, the effective integration of third-party services and technologies into the Company's products and services, the availability, delivery and performance of application software or other third-party support for the Company's products and services, the effective management of manufacturing and other purchase commitments and the management of inventory levels in line with anticipated product demand, and the availability of products in appropriate quantities and at expected costs to meet anticipated demand. Additionally, quality issues or other defects or deficiencies can adversely affect the success of new product and service introductions and market acceptance. New products, services and technologies may replace or supersede existing offerings and may produce lower revenues and lower profit margins. The Company may not be able to successfully manage future introductions and transitions of products and services, which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***The Company depends on component and product manufacturing and logistical services provided by outsourcing partners, many of which are located outside of the U.S.***

A significant majority of the Company's manufacturing is performed in whole or in part by outsourcing partners located primarily in China mainland, India, Japan, South Korea, Taiwan and Vietnam, in addition to sourcing from partners and facilities located in the U.S. The Company relies on single-source partners in the U.S., Asia and Europe to supply and manufacture many components, and on partners primarily located in Asia, for final assembly of substantially all of the Company's hardware products. The Company has also outsourced much of its transportation and logistics management. While these arrangements can lower operating costs, they also reduce the Company's direct control over production and distribution. Such diminished control has from time to time had, and may in the future have, an adverse effect on the cost, quality or quantity of products manufactured or services provided, or adversely affect the Company's flexibility to respond to changing conditions. Although arrangements with these partners may contain provisions for product defect expense reimbursement, the Company generally remains responsible to the consumer for warranty and out-of-warranty service in the event of product defects and experiences unanticipated product defect liabilities from time to time. While the Company relies on its partners to adhere to its supplier code of conduct, violations of the supplier code of conduct occur from time to time and can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Changes or additions to the Company's supply chain require considerable time and resources and involve significant risks and uncertainties, including exposure to additional regulatory and operational risks.

***Future operating results depend upon the Company's ability to obtain components in sufficient quantities on commercially reasonable terms.***

Because the Company currently obtains certain components from single or limited sources, the Company is subject to significant supply and pricing risks. Many components, including those that are available from multiple sources, are at times subject to industry-wide shortages and significant commodity pricing fluctuations that can materially adversely affect the Company's business, results of operations, financial condition and stock price. For example, the global semiconductor industry has in the past experienced high demand and shortages of supply, which adversely affected the Company's ability to obtain sufficient quantities of components and products on commercially reasonable terms, or at all. Such disruptions could occur in the future.

Additionally, the Company's new products often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or their manufacturing capacities have increased. The Company may not be able to extend or renew agreements for the supply of components on similar terms, or at all, and may not be successful in obtaining sufficient quantities from its suppliers in a timely manner, or in identifying and obtaining sufficient quantities from an alternative source. In addition, component suppliers may fail, be subject to consolidation within a particular industry, or decide to concentrate on the production of common components instead of components customized to meet the Company's requirements, further limiting the Company's ability to obtain sufficient quantities of components on commercially reasonable terms, or at all. Therefore, the Company remains subject to significant risks of supply shortages and price increases that can materially adversely affect its business, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 8

***The Company's products and services may be affected from time to time by design and manufacturing defects that could materially adversely affect the Company's business and result in harm to the Company's reputation.***

The Company offers complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by the Company, often have issues that can unexpectedly interfere with the intended operation of hardware or software products and services. Defects can also exist in components and products the Company purchases from third parties. Component defects could make the Company's products unsafe and create a risk of environmental or property damage and personal injury. These risks may increase as the Company's products are introduced into specialized applications, including health. In addition, the Company's service offerings can have quality issues and from time to time experience outages, service slowdowns or errors. As a result, from time to time the Company's services have not performed as anticipated and may not meet customer expectations. The introduction of new and complex technologies, such as artificial intelligence features, can increase these and other safety risks, including exposing users to harmful, inaccurate or other negative content and experiences. The Company may not be able to detect and fix all issues and defects in the hardware, software and services it offers, which can result in widespread technical and performance issues affecting the Company's products and services. Errors, bugs and vulnerabilities can be exploited by third parties, compromising the safety and security of a user's device. In addition, the Company can be exposed to product liability claims, recalls, product replacements or modifications, write-offs of inventory, property, plant and equipment or intangible assets, and significant warranty and other expenses, including litigation costs and regulatory fines. Quality problems can adversely affect the experience for users of the Company's products and services, and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, delay in new product and service introductions and lost sales.

***The Company is exposed to the risk of write-downs on the value of its inventory and other assets, in addition to purchase commitment cancellation risk.***

The Company records a write-down for product and component inventories if cost exceeds net realizable value. The Company reviews other assets, including capital assets held at its suppliers' facilities, inventory prepayments and other long-lived assets, for impairment whenever events or circumstances indicate the assets may not be recoverable. Although the Company believes its inventory, capital assets, inventory prepayments and other assets are currently recoverable, the Company may incur write-downs, impairments and other charges given the rapid and unpredictable pace of product obsolescence in the industries in which the Company competes.

The Company orders components for its products and builds inventory in advance of product announcements and shipments. Manufacturing purchase obligations cover the Company's forecasted component and manufacturing requirements, typically for periods up to 150 days. Because the Company's markets are volatile, competitive and subject to rapid technology and price changes, there is a risk the Company will forecast incorrectly and order or produce excess or insufficient amounts of components or products, or not fully utilize purchase commitments. The Company accrues necessary cancellation fee reserves for orders of excess products and components.

***The Company relies on access to third-party intellectual property, which may not be available to the Company on commercially reasonable terms, or at all.***

The Company's products and services include technology or intellectual property that must be licensed from third parties. In addition, because of technological changes in the industries in which the Company currently competes or in the future may compete, current extensive intellectual property coverage and the rapid rate of new intellectual property rights generation, the Company's products and services may be alleged to infringe existing intellectual property rights of others. This risk may be exacerbated by the use of new and emerging technologies, including machine learning and artificial intelligence, which can involve, among other things, the acquisition and use of copyrighted materials for training as well as the potential reproduction of copyrighted materials in their outputs. From time to time, the Company has been notified that it may be infringing certain intellectual property rights of third parties. The Company is not always able to obtain all necessary licenses to third-party intellectual property rights on commercially reasonable terms or at all. Failure to obtain the right to use third-party intellectual property, or to use such intellectual property on commercially reasonable terms, can require the Company to modify certain products, services or features or preclude the Company from selling certain products or services and expose the Company to significant licensing costs, all of which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 9

***The Company's future performance depends in part on support from third-party software developers.***

The Company believes decisions by customers to purchase its hardware products depend in part on the availability of third-party software applications and services. Third-party developers may discontinue the development and maintenance of software applications and services for the Company's products. If third-party software applications and services cease to be developed and maintained for the Company's products, customers may choose not to buy the Company's products, adversely impacting the Company's business, results of operations, financial condition and stock price.

The Company believes that third-party developer support depends on the perceived benefits of creating software and services for the Company's products compared to competitors' platforms, such as Android for smartphones and tablets, Windows for personal computers and tablets, and PlayStation, Nintendo and Xbox for gaming platforms. This analysis may be based on factors such as the market position of the Company and its products, the anticipated revenue that may be generated, expected future growth of product sales, and the costs of developing such applications and services.

The Company's minority market share in the global smartphone, personal computer, tablet and wearables markets can make developers less inclined to develop or upgrade software for the Company's products and more inclined to devote their resources to developing and upgrading software for competitors' products with larger market share. When developers focus their efforts on these competing platforms, the availability and quality of applications for the Company's devices can suffer.

The Company relies on the continued availability and development of compelling and innovative software applications for its products. The Company's products and operating systems are subject to rapid technological change, and when third-party developers are unable to or choose not to keep up with this pace of change, their applications can fail to take advantage of these changes to deliver improved customer experiences, can operate incorrectly, and can result in dissatisfied customers and lower customer demand for the Company's products.

***Failure to obtain or create digital content that appeals to the Company's customers, or to make such content available on commercially reasonable terms, could have a material adverse impact on the Company's business, results of operations and financial condition.***

The Company contracts with numerous third parties to offer their digital content to customers. This includes the right to sell, or offer subscriptions to, third-party content, as well as the right to incorporate specific content into the Company's own services. The licensing or other distribution arrangements for this content can be for relatively short time periods and do not guarantee the continuation or renewal of these arrangements on commercially reasonable terms, or at all. Some third-party content providers and distributors currently or in the future may offer competing products and services, and can take actions to make it difficult or impossible for the Company to license or otherwise distribute their content. Other content owners, providers or distributors may seek to limit the Company's access to, or increase the cost of, such content. The Company may be unable to continue to offer a wide variety of content at commercially reasonable prices with acceptable usage rules.

The Company also produces its own digital content, which can be costly to produce due to intense and increasing competition for talent, content and subscribers, and may fail to appeal to the Company's customers.

***The Company's success depends largely on the talents and efforts of its team members, the continued service and availability of highly skilled employees, including key personnel, and the Company's ability to nurture its distinctive and inclusive culture.***

Much of the Company's future success depends on the talents and efforts of its team members and the continued availability and service of key personnel, including its Chief Executive Officer, executive team and other highly skilled employees. Experienced personnel in the technology industry are in high demand and competition for their talents is intense, especially in Silicon Valley, where most of the Company's key personnel are located. Periods of intense competition for talent in particular fields can lead to increased costs as the Company seeks to offer competitive compensation to recruit and retain highly skilled employees. In addition to competition for talent, workforce dynamics are constantly evolving and the Company must navigate changes effectively in order to achieve its strategic initiatives. Laws and regulations, including immigration, labor and employment laws and export controls, among others, can materially adversely affect the Company's ability to recruit and retain a highly skilled, global workforce. If the Company does not effectively manage changing workforce dynamics and regulatory requirements, it could materially adversely affect the Company's culture, operational flexibility, strategy and costs, all of which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company believes that its distinctive and inclusive culture is a significant driver of its success. If the Company is unable to nurture its culture, it could materially adversely affect the Company's ability to recruit and retain the highly skilled employees who are critical to its success, and could otherwise materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 10

***The Company depends on the performance of carriers and other resellers.***

The Company distributes its products and certain of its services through cellular network carriers and other resellers, many of which distribute products and services from competitors. Resellers offer financing, installment payment plans or subsidies for users' purchases of devices, and such plans may be discontinued or modified any time.

The Company has invested and will continue to invest in programs to enhance reseller sales, including staffing selected resellers' stores with Company employees and contractors, improving product placement displays, and developing and making digital marketing assets available to resellers. These programs can require a substantial investment while not assuring return or incremental sales. For example, the purchasing preferences and behaviors of consumers may change, the financial condition of resellers could weaken, resellers could stop distributing the Company's products, or uncertainty regarding demand for some or all of the Company's products could cause resellers to reduce their ordering and marketing of the Company's products, all of which could materially adversely impact the Company's business, results of operations, financial condition and stock price.

***The Company's business and reputation are impacted by information technology system failures and network disruptions.***

The Company and its global supply chain are dependent on complex information technology systems and are exposed to information technology system failures or network disruptions caused by natural disasters, accidents, power disruptions, telecommunications failures, acts of terrorism or war, computer viruses, physical or electronic break-ins, ransomware or other cybersecurity incidents, or other events or disruptions. System upgrades, redundancy and other continuity measures may be ineffective or inadequate, and the Company's or its vendors' business continuity and disaster recovery planning may not be sufficient for all eventualities. Such failures or disruptions can adversely impact the Company's business by, among other things, preventing access to the Company's online services, interfering with customer transactions or impeding the manufacturing and shipping of the Company's products. These events could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***Losses or unauthorized access to or releases of confidential information, including personal information, could subject the Company to significant reputational, financial, legal and operational consequences.***

The Company's business requires it to use and store confidential information, including personal and sensitive health and financial information with respect to the Company's customers and employees. The Company devotes significant resources to systems and data security, including through the use of encryption and other security measures intended to protect its systems and data. But these measures cannot provide absolute security, and losses or unauthorized access to or releases of confidential information occur and could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company's business also requires it to share confidential information with suppliers and other third parties. The Company relies on global suppliers that are also exposed to ransomware and other malicious attacks that can disrupt business operations. Although the Company takes steps to secure confidential information that is provided to or accessible by third parties working on the Company's behalf, such measures are not always effective and losses or unauthorized access to, or releases of, confidential information occur. Such incidents and other malicious attacks could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company experiences malicious attacks and other attempts to gain unauthorized access to its systems on a regular basis. These attacks target the confidentiality, integrity or availability of confidential information and may disrupt normal business operations. Attacks can impair the Company's ability to attract and retain customers for its products and services, affect its stock price, damage commercial relationships, and expose the Company to litigation or government investigations, potentially resulting in penalties, fines or judgments. Globally, attacks are expected to continue accelerating in both frequency and sophistication with increasing use by actors of tools and techniques that are designed to circumvent controls, avoid detection, and remove or obfuscate forensic evidence, all of which hinders the Company's ability to identify, investigate and recover from incidents. In addition, attacks against the Company and its customers can escalate during periods of geopolitical tensions or conflict.

Although malicious attacks perpetrated to gain access to confidential information, including personal information, affect many companies across various industries, the Company is at a relatively greater risk of being targeted because of its high profile and the value of the confidential information it creates, owns, manages, stores and processes.

Apple Inc. | 2025 Form 10-K | 11

As with all companies, the security the Company has implemented may not be sufficient for all eventualities and are vulnerable to hacking, ransomware attacks, employee error, malfeasance, system error, faulty password management or other irregularities. For example, third parties can fraudulently induce the Company's or its suppliers' and other third parties' employees or customers into disclosing usernames, passwords or other sensitive information, which can, in turn, be used for unauthorized access to the Company's or such suppliers' or third parties' systems and services. To help protect customers and the Company, the Company deploys and makes available technologies like multifactor authentication, monitors its services and systems for unusual activity and may freeze accounts under suspicious circumstances, which, among other things, can result in the delay or loss of customer orders or impede customer access to the Company's products and services.

While the Company maintains insurance coverage that is intended to address certain aspects of data security risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise.

***Investment in new business strategies, commercial relationships and acquisitions could disrupt the Company's ongoing business, present risks not originally contemplated, and materially adversely affect the Company's business, reputation, results of operations and financial condition.***

The Company has invested, and in the future may invest, in new business strategies, commercial relationships and acquisitions. Such endeavors may involve significant risks and uncertainties, including distraction of management from current operations, greater-than-expected liabilities and expenses, economic, political, legal and regulatory challenges associated with operating in new businesses, regions or countries, inadequate return on capital, potential impairment of tangible and intangible assets, and significant write-offs. Some transactions, including investments and acquisitions, are exposed to additional risks, including failing to obtain required regulatory approvals on a timely basis or at all, a counterparty's failure to perform or deliver as anticipated, or the imposition of onerous conditions that could delay or prevent the Company from completing a transaction or otherwise limit the Company's ability to fully realize the anticipated benefits of a transaction. New business strategies and ventures are inherently risky and may not be successful. The Company's business strategies and investments may not be successful, which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

**Legal and Regulatory Compliance Risks**

***The Company's business, results of operations and financial condition could be adversely impacted by unfavorable results of legal proceedings or government investigations.***

The Company is subject to various claims, legal proceedings and government investigations that have arisen in the ordinary course of business and have not yet been fully resolved, and new matters may arise in the future. In addition, the Company enters into agreements that include indemnification provisions that can subject the Company to costs and damages in the event of a claim against an indemnified third party. The number of claims, legal proceedings and government investigations involving the Company, and the alleged magnitude of such claims, proceedings and government investigations, has generally increased over time and may continue to increase.

The Company has faced and continues to face a significant number of patent claims relating to its standards-enabled products, and new claims may arise in the future, including as a result of new legal or regulatory frameworks. For example, technology, data and other intellectual property asset–holding companies frequently assert their intellectual property rights and seek royalties and often enter into litigation based on allegations of infringement or other violations of intellectual property rights. These risks, and the risks of novel claims being attempted, may be exacerbated as new and emerging technologies, including machine learning and artificial intelligence, are further integrated into the Company's products and services. The Company is vigorously defending infringement actions in courts in several U.S. jurisdictions, as well as internationally in various countries. The plaintiffs in these actions frequently seek broad injunctive relief and substantial damages.

Regardless of the merit of particular claims, defending against litigation or responding to government investigations can be expensive, time-consuming and disruptive to the Company's operations. In recognition of these considerations, the Company may enter into agreements or other arrangements to settle litigation and resolve such challenges. However, such agreements may not always be available on acceptable terms, and litigation may still arise. Such agreements can also significantly reduce the Company's revenue and increase the Company's cost of sales and operating expenses, materially adversely affecting the Company's business, results of operations, financial condition and stock price. Additionally, such agreements may require the Company to change its business practices and limit the Company's ability to offer certain products and services.

Apple Inc. | 2025 Form 10-K | 12

The outcome of litigation or government investigations is inherently uncertain. If one or more legal matters were resolved against the Company or an indemnified third party in a reporting period for amounts above management's expectations, the Company's results of operations, financial condition and stock price for that reporting period could be materially adversely affected. Further, such an outcome can result in significant monetary damages, disgorgement of revenue or profits, remedial corporate measures or injunctive relief against the Company. Adverse resolution of legal matters has from time to time required, and can in the future require, the Company to change its business practices. It can also limit the Company's ability to enjoin others from using, or to derive value from, its intellectual property rights, and to develop, manufacture, use, import or offer for sale certain products and services, all of which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

While the Company maintains insurance coverage for certain types of claims, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise.

***The Company is subject to complex and changing laws and regulations worldwide, which exposes the Company to potential liabilities, increased costs and other adverse effects on the Company's business.***

The Company's global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; online safety; age verification; consumer protection; advertising, sales, billing and e-commerce; financial services and technology; product liability; intellectual property ownership and infringement; digital platforms; machine learning and artificial intelligence; internet, telecommunications and mobile communications; media, television, film and digital content; availability of third-party software applications and services; labor and employment; anticorruption; import, export and trade; foreign exchange controls and cash repatriation restrictions; anti–money laundering; foreign ownership and investment; national security; tax; and environmental, health and safety, including electronic waste, recycling, product design and climate change.

Compliance with these laws and regulations is onerous and expensive. New and changing laws, regulations, executive orders, directives, and enforcement priorities can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers, imposing changes to the design of the Company's products and services, impacting customer demand for the Company's products and services, and requiring changes to the Company's business or supply chain. New and changing laws, regulations, executive orders, directives, and enforcement priorities can also create uncertainty about how such laws and regulations will be interpreted and applied. If the Company is found to have violated such laws and regulations, it could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Risks and costs related to new and changing laws, regulations, executive orders, directives, and enforcement priorities increase as the Company's products and services are introduced into specialized applications, including health and financial services, or as the Company expands the use of technologies, such as machine learning and artificial intelligence features, and must navigate new legal, regulatory and ethical considerations relating to such technologies.

Regulatory changes and other actions that materially adversely affect the Company's business may be announced with little or no advance notice and the Company may not be able to effectively mitigate all adverse impacts from such measures. For example, the Company is subject to changing regulations relating to the export and import of its products. The Company's programs, policies and procedures may not be effective in preventing a violation or a claim of a violation. As a result, the Company's products could be banned, delayed or prohibited from importation, which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***Varied stakeholder expectations about social and other issues expose the Company to potential liabilities, increased costs, reputational harm, and other adverse effects on the Company's business.***

Various stakeholders, including governments, regulators, investors, employees, customers and others, have differing expectations about a wide range of social and other issues related to the Company's business. The Company makes statements about its values, including the environmental and societal impact of its business, through various reports, information provided on the Company's website, and in press statements and other communications. The Company also pursues environmental and other goals and initiatives that involve risks and uncertainties, require investments, and depend in part on third-party performance or data that is outside the Company's control, and the Company may not be able to fully achieve all of its goals and initiatives. Efforts by the Company to advance its business and values, or achieve its goals and further its initiatives, or to align with stakeholders' expectations, or comply with evolving, varied and at times conflicting federal, state and international laws, executive orders, regulations and standards, or any failure or perceived failure to do so, can result in adverse reactions by consumers and other stakeholders, including the commencement of legal and regulatory proceedings against the Company, and can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 13

***The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties.***

From time to time, the Company has made changes to its business, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future. For example, in the U.S., the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms and is currently subject to a court order preventing it from imposing any commission or fee on certain purchases that consumers make.

Globally, several jurisdictions have adopted, or may in the future adopt, competition-related laws and regulations imposing wide-ranging obligations on technology companies and significant limitations on businesses, including the Company. For example, the Company has implemented changes to iOS, iPadOS, the App Store and Safari® in the EU as it seeks to comply with the Digital Markets Act ("DMA"), including new business terms and alternative fee structures for iOS and iPadOS apps, alternative methods of distribution for iOS and iPadOS apps, alternative payment processing for apps across the Company's operating systems, and additional tools and application programming interfaces for developers. The Company has also continued to make changes to its compliance plan in response to feedback and engagement with the Commission. Although the Company's compliance plan is intended to address the DMA's obligations, it has been challenged by the Commission and may be challenged further by private litigants. The DMA provides for significant fines and penalties for noncompliance. While the changes introduced by the Company in the EU are intended to reduce new privacy and security risks that the DMA poses to EU users, many risks will remain. Changes to the Company's business in response to the DMA or other laws and regulations could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company is also currently subject to antitrust investigations and litigation in various jurisdictions around the world, which can result in legal proceedings and claims against the Company that could, individually or in the aggregate, have a material adverse impact on the Company's business, results of operations, financial condition and stock price. For example, the Company is subject to civil antitrust lawsuits in the U.S. alleging monopolization or attempted monopolization in the markets for "performance smartphones" and "smartphones" generally in violation of U.S. antitrust laws. In addition, the Company is the subject of investigations in Europe and other jurisdictions relating to App Store terms and conditions. If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices, all of which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Further, the Company has commercial relationships with other companies in the technology industry that are or may become subject to investigations and litigation that, if resolved against those other companies, could materially adversely affect the Company's commercial relationships with those business partners and materially adversely affect the Company's business, results of operations, financial condition and stock price. For example, the Company earns revenue from licensing arrangements with Google LLC ("Google") and other companies to offer their search services on the Company's platforms and applications, and certain of these arrangements are currently subject to government investigations and legal proceedings. On August 5, 2024, Google was found to have violated U.S. antitrust laws. In connection with this finding, on September 2, 2025, the U.S. District Court for the District of Columbia ("D.C. District Court") ordered certain remedies. The court's order is subject to further proceedings before the D.C. District Court, which may result in changes to the interpretation or application of the remedies ordered by the court, as well as new or changed remedies being ordered. The court's order is also subject to appeal by both the U.S. Department of Justice ("DOJ") and Google. A reversal of the order on appeal could result in imposition of certain remedies initially proposed by the DOJ, such as those prohibiting Google from offering the Company commercial terms for search distribution. If implemented, these remedies could materially adversely affect the Company's ability to earn revenue from such licensing arrangements.

The Company's business, results of operations, financial condition and stock price can be materially adversely affected, individually or in the aggregate, by the outcomes of such investigations, litigation or changes to laws and regulations in the future. Changes to the Company's business practices to comply with new laws and regulations or in connection with legal proceedings can negatively impact the reputation of the Company's products for privacy and security. Such changes in business practices can also otherwise adversely affect the experience for users of the Company's products and services, and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, lost sales, and lower profit margins.

Apple Inc. | 2025 Form 10-K | 14

***The Company's business is subject to a variety of U.S. and international laws, rules, policies and other obligations regarding the collection, use, protection and transfer of personal data.***

The Company is subject to an increasing number of federal, state and international laws relating to the collection, use, retention, protection and transfer of various types of personal data. In many cases, these laws apply not only to third-party transactions, but also restrict transfers of personal data among the Company and its international subsidiaries. Several jurisdictions have passed laws in this area, and additional jurisdictions are considering imposing additional restrictions or have laws that are pending. These laws continue to develop and may be inconsistent from jurisdiction to jurisdiction. Complying with emerging and changing requirements causes the Company to incur substantial costs and has required and may in the future require the Company to change its business practices. Noncompliance could result in significant penalties or legal liability.

The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others. Such a failure or perceived failure could also result in reputational impacts, ongoing audit requirements and significant legal liability. The risks of inadvertent disclosure of personal data can increase with the introduction of new and complex technologies, such as artificial intelligence features, further exacerbating such risks.

In addition to the risks generally relating to the collection, use, retention, protection and transfer of personal data, the Company is also subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data. Health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses, and can incur significant fees or fines.

The Company is also subject to new and changing laws and regulations regarding online safety, including enhanced protections for minors and mandatory age verification requirements. These laws and regulations can increase regulatory risks by requiring complex compliance measures and significant modifications to the Company's products, services and operations, and may lead to operational disruptions, heightened privacy and data security risks, increased costs and potential liability and fines, all of which can have a material adverse impact on the Company's business, financial condition, results of operations and stock price.

**Financial Risks**

***The Company's net sales and gross margins are subject to volatility and downward pressure due to a variety of factors.***

The Company's gross margins vary significantly across its products, services, geographic segments and distribution channels and can change over time. The Company's net sales and gross margins are subject to volatility and downward pressure due to a variety of factors, including: continued industry-wide global product pricing pressures and product pricing actions that the Company may take in response to such pressures; increased competition; the Company's ability to effectively stimulate demand for certain of its products and services; compressed product life cycles; supply shortages; potential increases in the cost of components, outside manufacturing services, and developing, acquiring and delivering content for the Company's services; the Company's ability to manage product quality and warranty costs effectively; shifts in the mix of products and services, or in the geographic, currency or channel mix, including to the extent that regulatory changes require the Company to modify its product and service offerings; fluctuations in foreign exchange rates; inflation and other macroeconomic pressures; the imposition of new or increased tariffs and other trade restrictions, their overall magnitude and duration, and retaliatory actions in response; and the introduction of new products or services, including new products or services with lower profit margins. These and other factors could have a materially adverse impact on the Company's results of operations, financial condition and stock price. Further, the Company generates a significant portion of its net sales from a single product category and a decline in demand for that product could significantly impact net sales and gross margins.

***The Company's financial performance is subject to risks associated with changes in the value of the U.S. dollar relative to local currencies.***

The Company's primary exposure to movements in foreign exchange rates relates to non–U.S. dollar–denominated sales, cost of sales and operating expenses worldwide. Gross margins on the Company's products in foreign countries and on products that include components obtained from foreign suppliers have in the past been adversely affected and could in the future be materially adversely affected by foreign exchange rate fluctuations.

The weakening of foreign currencies relative to the U.S. dollar adversely affects the U.S. dollar value of the Company's foreign currency–denominated sales and earnings, and generally leads the Company to raise international pricing, potentially reducing demand for the Company's products. In some circumstances, for competitive or other reasons, the Company may decide not to raise international pricing to offset the U.S. dollar's strengthening, which would adversely affect the U.S. dollar value of the gross margins the Company earns on foreign currency–denominated sales.

Apple Inc. | 2025 Form 10-K | 15

Conversely, a strengthening of foreign currencies relative to the U.S. dollar, while generally beneficial to the Company's foreign currency–denominated sales and earnings, could cause the Company to reduce international pricing or incur losses on its foreign currency derivative instruments, thereby limiting the benefit. Additionally, strengthening of foreign currencies may increase the Company's cost of product components denominated in those currencies, thus adversely affecting gross margins.

The Company uses derivative instruments, such as foreign currency forward and option contracts, to hedge certain exposures to fluctuations in foreign exchange rates. The use of such hedging activities may not be effective to offset any, or more than a portion, of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place.

### *The Company is exposed to credit risk and fluctuations in the values of its investment portfolio.*

The Company's investments can be negatively affected by changes in liquidity, credit deterioration, financial results, market and economic conditions, political risk, sovereign risk, interest rate fluctuations or other factors. As a result, the value and liquidity of the Company's cash, cash equivalents and marketable securities may fluctuate substantially. Although the Company has not realized significant losses on its cash, cash equivalents and marketable securities, future fluctuations in their value could result in significant losses and could have a material adverse impact on the Company's results of operations, financial condition and stock price.

### *The Company is exposed to credit risk on its trade accounts receivable, vendor non-trade receivables and prepayments related to long-term supply agreements, and this risk is heightened during periods when economic conditions worsen.*

The Company distributes its products and certain of its services through third-party cellular network carriers and other resellers. The Company also sells its products and services directly to small and mid-sized businesses and education, enterprise and government customers. A substantial majority of the Company's outstanding trade receivables are not covered by collateral, third-party bank support or financing arrangements, or credit insurance, and a significant portion of the Company's trade receivables can be concentrated within cellular network carriers or other resellers. The Company's exposure to credit and collectibility risk on its trade receivables is higher in certain international markets. The Company also has unsecured vendor non-trade receivables resulting from purchases of components by outsourcing partners and other vendors that manufacture subassemblies or assemble final products for the Company. In addition, the Company has made prepayments associated with long-term supply agreements to secure supply of inventory components. As of September 27, 2025, the Company's vendor non-trade receivables were concentrated among a few individual vendors located primarily in Asia. If the Company is unable to monitor and limit exposure to credit risk on its trade and vendor non-trade receivables, as well as long-term prepayments, the Company's results of operations, financial condition and stock price could be materially adversely affected.

### *The Company is subject to changes in tax rates, the adoption of new U.S. or international tax legislation and exposure to additional tax liabilities.*

The Company is subject to taxes in the U.S. and numerous foreign jurisdictions, including Ireland and Singapore, where a number of the Company's subsidiaries are organized. Due to economic and political conditions, tax laws and tax rates for income taxes and other non-income taxes in various jurisdictions may be subject to significant change. For example, the Organisation for Economic Co-operation and Development continues to advance proposals for modernizing international tax rules, including the introduction of global minimum tax standards. The Company's effective tax rates are affected by changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities, the introduction of new taxes, and changes in tax laws or their interpretation. The application of tax laws may be uncertain, require significant judgment and be subject to differing interpretations.

The Company is also subject to the examination of its tax returns and other tax matters by the U.S. Internal Revenue Service and other tax authorities and governmental bodies. The Company regularly assesses the likelihood of an adverse outcome resulting from these examinations to determine the adequacy of its provision for taxes. The outcome of such examinations is inherently uncertain. If the Company's effective tax rates were to increase, or if the ultimate determination of the Company's taxes owed is for an amount in excess of amounts previously accrued, the Company's business, results of operations, financial condition and stock price could be materially adversely affected.

Apple Inc. | 2025 Form 10-K | 16

**General Risks**

***The price of the Company's stock is subject to volatility.***

The Company's stock has experienced substantial price volatility in the past and may continue to do so in the future. Additionally, the Company, the technology industry and the stock market as a whole have, from time to time, experienced extreme stock price and volume fluctuations that have affected stock prices in ways that may have been unrelated to these companies' operating performance. Price volatility may cause the average price at which the Company repurchases its stock in a given period to exceed the stock's price at a given point in time. The Company believes the price of its stock should reflect expectations of future growth and profitability. The Company also believes the price of its stock should reflect expectations that its cash dividend will continue at current levels or grow, and that its current share repurchase program will be fully consummated. Future dividends are subject to declaration by the Company's Board of Directors ("Board"), and the Company's share repurchase program does not obligate it to acquire any specific number of shares. If the Company fails to meet expectations related to future growth, profitability, dividends, share repurchases or other market expectations, the price of the Company's stock may decline significantly, which could have a material adverse impact on investor confidence and employee retention.

**Item 1B.   Unresolved Staff Comments**

None.

**Item 1C.   Cybersecurity**

The Company's management, led by its Head of Corporate Information Security, has overall responsibility for identifying, assessing and managing any material risks from cybersecurity threats. The Company's Head of Corporate Information Security leads a dedicated Information Security team of highly skilled individuals with experience across industries that, among other things, develops and distributes information security policies, standards and procedures; engages in employee cybersecurity training; implements security controls; assesses security risk and compliance posture; monitors and responds to security events; and executes security testing and assessments. The Company's Head of Corporate Information Security has extensive knowledge and skills gained from over 25 years of experience in the cybersecurity industry, including serving in leadership positions at other large technology companies and leading the Company's Information Security team since 2016.

The Company's Information Security team coordinates with teams across the Company to prevent, respond to and manage security incidents, and engages third parties, as appropriate, to assess, test or otherwise assist with aspects of its security processes and incident response. A dedicated Supplier Trust team manages information security risks the Company is exposed to through its supplier relationships. The Company has processes to log, track, address, and escalate for further assessment and report, as appropriate, cybersecurity incidents across the Company and its suppliers to senior management and the Audit and Finance Committee ("Audit Committee") of the Board. The Company's enterprise risk management program is designed to identify, assess, and monitor the Company's business risks, including financial, operational, compliance and reputational risks, and reflects management's assessment of cybersecurity risks.

The Audit Committee assists the Board in the oversight and monitoring of cybersecurity matters. The Audit Committee regularly reviews and discusses the Company's cybersecurity risks with management, including the Company's Head of Corporate Information Security, its General Counsel and the Heads of Compliance and Business Conduct, Business Assurance, and Internal Audit, and receives updates, as necessary, regarding cybersecurity incidents. The Chair of the Audit Committee regularly reports the substance of such reviews and discussions to the Board, as necessary, and recommends to the Board such actions as the Audit Committee deems appropriate.

For a discussion of the Company's cybersecurity-related risks, see Item 1A of this Form 10-K under the heading "Risk Factors."

**Item 2.   Properties**

The Company's headquarters is located in Cupertino, California. As of September 27, 2025, the Company owned or leased facilities and land for corporate functions, R&D, data centers, retail and other purposes at locations throughout the U.S. and in various places outside the U.S. The Company believes its existing facilities and equipment, which are used by all reportable segments, are in good operating condition and are suitable for the conduct of its business.

Apple Inc. | 2025 Form 10-K | 17

## Item 3.    Legal Proceedings

*Digital Markets Act Investigations*

On March 25, 2024, the Commission announced that it had opened a formal noncompliance investigation against the Company under Article 5(4) of the EU DMA ("Article 5(4) Investigation"). The Article 5(4) Investigation relates to how developers may communicate and promote offers to end users for apps distributed through the App Store, as well as how developers may conclude contracts with those end users. On June 24, 2024, the Commission announced that it had opened an additional formal investigation against the Company regarding whether the Company's new contractual requirements for third-party app developers and app marketplaces may violate the DMA ("Article 6(4) Investigation"). On April 23, 2025, the Commission fined the Company €500 million in the Article 5(4) Investigation and issued a cease and desist order requiring the Company to remove technical and commercial restrictions that prevent developers from steering users to alternative distribution channels outside the App Store. The Company has appealed the Commission's Article 5(4) decision. Also on April 23, 2025, the Commission issued preliminary findings in the Article 6(4) Investigation. If the Commission makes a final determination in the Article 6(4) Investigation that there has been a violation, it can issue a cease and desist order and may impose fines up to 10% of the Company's annual worldwide net sales. The Commission may also seek to impose additional fines if it deems that the Company has violated a cease and desist order. The Company believes that it complies with the DMA and has continued to make changes to its compliance plan in response to feedback and engagement with the Commission.

*Department of Justice Lawsuit*

On March 21, 2024, the DOJ and a number of state and district attorneys general filed a civil antitrust lawsuit in the U.S. District Court for the District of New Jersey against the Company alleging monopolization or attempted monopolization in the markets for "performance smartphones" and "smartphones" in violation of U.S. antitrust laws. The DOJ is seeking equitable relief to redress the alleged anticompetitive behavior. In addition, various civil litigation matters have been filed in state and federal courts in the U.S. alleging similar violations of U.S. antitrust laws and seeking monetary damages and other nonmonetary relief. The Company believes it has substantial defenses and intends to vigorously defend itself.

*Epic Games*

Epic Games, Inc. filed a lawsuit in the U.S. District Court for the Northern District of California ("California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Review Guidelines violate California's unfair competition law and issued an injunction (the "2021 Injunction") enjoining the Company from prohibiting developers from including in their apps buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than the Company's in-app purchase system. The 2021 Injunction applies to apps on the U.S. storefronts of the iOS and iPadOS App Stores. On January 16, 2024, the Company implemented a plan to comply with the 2021 Injunction and filed a statement of compliance with the California District Court. On September 30, 2024, the Company filed a motion with the California District Court to narrow or vacate the 2021 Injunction. On April 30, 2025, the California District Court found the Company to be in violation of the 2021 Injunction and enjoined the Company from imposing any commission or any fee on purchases that consumers make outside an app; restricting, conditioning, limiting, or prohibiting how developers guide consumers to purchases outside an app; or otherwise interfering with a consumer's choice to proceed in or out of an app. The California District Court also denied the Company's motion to narrow or vacate the 2021 Injunction and referred the Company to the U.S. Attorney for the Northern District of California for a determination whether criminal contempt proceedings are appropriate. The Company will continue to vigorously defend its actions and employees, and has appealed the California District Court's most recent decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit Court"). Although the Company's request to stay the decision pending appeal was denied, the Ninth Circuit Court has agreed to consider the Company's appeal on an expedited basis, with oral arguments heard in October 2025.

*Other Legal Proceedings*

The Company is subject to other legal proceedings and claims that have not been fully resolved and that have arisen in the ordinary course of business. The Company settled certain matters during the fourth quarter of 2025 that did not individually or in the aggregate have a material impact on the Company's financial condition or operating results. The outcome of litigation is inherently uncertain. If one or more legal matters were resolved against the Company in a reporting period for amounts above management's expectations, the Company's financial condition and operating results for that reporting period could be materially adversely affected.

## Item 4.    Mine Safety Disclosures

Not applicable.

Apple Inc. | 2025 Form 10-K | 18

# EXHIBIT H: BHAKTA

# 24CV453028

 Print

## Amar Bhakta vs Apple, Inc.

### Case Information

**Case Type:** Other Employment Unlimited (15)
**Case Number:** 24CV453028
**Filing Date:** 12/2/2024
**Case Status:** Active
**Court Location:** Civil

# PARTIES

Show

All

entries

Search:

| ▲ Type | First Name | Middle Name |
| --- | --- | --- |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Plaintiff | Amar | |

Showing 1 to 9 of 9 entries

Previous | 1 | Next

# Attorneys

Bold Shows Lead Attorney

Show
All
entries

Search:

| ▲ Representing | First Name | Middle Name |
|---|---|---|
| **Apple, Inc.** | **Stephen** | |
| Apple, Inc. | Julie | A |
| Apple, Inc. | Ryan | M |
| Amar Bhakta | Deborah | Rebecca |
| Amar Bhakta | Jahan | Crawford |
| **Amar Bhakta** | **Chris** | **D.** |

Showing 1 to 6 of 6 entries

Previous 1 Next

# EVENTS

Show
All
entries

Search:

| ▼ File Date | File Type | Filed By | Comment |
|---|---|---|---|
| 3/9/2026 | Answer/Response (No Fee) | Apple, Inc., | to SAC, atty: Taeu |
| 3/6/2026 | Minute Order | | |
| 3/2/2026 | Order | Apple, Inc., | re: Def's second r Strike - DENIED ir GRANTED withou amend in part - s Judge McGowen #22832857 |
| 2/26/2026 | Minute Order | | |

| 2/24/2026 | Proof of Service | Amar Bhakta, | Proof of Service of Remote Appea for Hannah C. Me Molly J. Frandsen |
|---|---|---|---|
| 2/24/2026 | Notice: Remote Appearance | Amar Bhakta, | Notice of Remote Appearance for N Frandsen |
| 2/24/2026 | Notice: Remote Appearance | Amar Bhakta, | Notice of Remote Appearance for H Meropol |
| 2/20/2026 | Statement: Case Management Conference | Amar Bhakta, | Joint Case Manag Conference State |
| 2/11/2026 | Proof of Service | Apple, Inc., | Proof of Service |
| 2/11/2026 | Request: Judicial Notice | Apple, Inc., | Request for Judic in Support of App Reply ISO its Mot Strike Portions of Plaintiff's Second Amended Compl: |
| 2/11/2026 | Declaration: In Support | Apple, Inc., | Declaration of Ste Taeusch in Suppc Defendant Apple Reply ISO its Mot Strike Portions of Plaintiff's Second Amended Compl: |
| 2/11/2026 | Response/Reply | Apple, Inc., | Reply in Support Defendant Apple Motion to Strike l of Plaintiff's Seco Amended Compl: |
| 1/28/2026 | Proof of Service | Amar Bhakta, | Proof of Service r Plaintiffs Opposit Defendant Apple Motion to Strike l of Plaintiffs Secor Amended Compl: |

| 1/28/2026 | Request: Judicial Notice | Amar Bhakta, | Request For Judic Notice in Support Plaintiffs Opposit Defendant Apple Second Motion tc |
| 1/28/2026 | Opposition/Objections | Amar Bhakta, | Plaintiffs Opposit Defendant Apple Motion to Strike I of Plaintiffs Secor Amended Compl; |
| 12/16/2025 | Proof of Service | Apple, Inc., | Proof of Service |
| 12/16/2025 | Declaration: In Support | Apple, Inc., | Declaration of Ste Taeusch in Suppc Defendant Apple Motion to Strike I of Plaintiff's Seco Amended Compl; |
| 12/16/2025 | Memorandum: Points and Authorities | Apple, Inc., | Memorandum of and Authorities ir of Defendant Apr Motion to Strike I of Plaintiffs Secor Amended Compl; |
| 12/16/2025 | Motion: Strike | Apple, Inc., | 2-26-26 1:30pm c Defendant Apple Notice of Motion Motion to Strike I of Plaintiffs Secor Amended Compl; |
| 12/16/2025 | Stipulation and Order | Amar Bhakta, Apple, Inc., | Stipulation Regar Briefing Schedule Defendant's Secc Motion to Strike by Judge Adams #21972962 |
| 12/12/2025 | Proof of Service | Amar Bhakta, Apple, Inc., | Proof of Service |
| 12/11/2025 | Minute Order | | |
| 12/5/2025 | Proof of Service | Apple, Inc., | Proof of Service |

| 12/5/2025 | Statement: Case Management Conference | Apple, Inc., | Joint Case Manag... Conference State... |
| 12/5/2025 | Proof of Service | Amar Bhakta, | Proof of Service |

Showing 1 to 25 of 73 entries

Previous | 1 | 2 | 3 | Next

# HEARINGS

Show
All
entries

Search:

| Department | Type | ▾ Date | Time | Res... |
|---|---|---|---|---|
| Department 22 | Reserved: Demurrer | 11/12/2026 | 1:30PM | |
| Department 22 | Conference: Further Case Management | 9/3/2026 | 2:30PM | |
| Department 22 | Conference: Further Case Management | 2/26/2026 | 2:30PM | He... |
| Department 22 | Hearing: Motion to Strike | 2/26/2026 | 1:30PM | He... |
| Department 7 | Conference: Further Case Management | 12/11/2025 | 2:30PM | He... |
| Department 7 | Hearing: Motion to Strike | 10/16/2025 | 1:30PM | He... |
| Department 7 | Conference: Further Case Management | 10/16/2025 | 2:30PM | He... |
| Department 7 | Conference: Further Case Management | 5/22/2025 | 2:30PM | He... |
| Department 7 | Conference: Case Management | 5/8/2025 | 2:30PM | He... |

Showing 1 to 9 of 9 entries

Previous | 1 | Next

Jahan C. Sagafi (SBN 224887)
Molly J. Frandsen (SBN 320094)
Hannah Meropol (SBN 340095)
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: mfrandsen@outtengolden.com
Email: hmeropol@outtengolden.com

Chris Baker (SBN 181557)
Deborah Schwartz (SBN 208934)
**BAKER DOLINKO & SCHWARTZ, P.C.**
One California Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 433-1064
Facsimile: (415) 422-9966
Email: cbaker@bakerlp.com
Email: dschwartz@bakerlp.com

*Attorneys for Plaintiff, on behalf of himself,
other Aggrieved Employees, and for the State
of California*

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/13/2025 2:51 PM
Reviewed By: L. Ayala
Case #24CV453028
Envelope: 21597929**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA CLARA

| | |
|---|---|
| AMAR BHAKTA,<br><br>                Plaintiff,<br><br>   v.<br><br>APPLE, INC.,<br><br>                Defendant. | Case No. 24CV453028<br><br>**SECOND AMENDED PAGA COMPLAINT**<br><br>**First PAGA Claim – Speech Suppression**<br><br>**Second PAGA Claim – Privacy Violations, Surveillance, and Forced Patronage**<br><br>**Third PAGA Claim – Wage Clawbacks**<br><br>Judge: Hon. Charles F. Adams<br>Dept. 7<br><br>Complaint Filed: December 2, 2024 |

1

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 4

    I.      Claim One:  Apple's Systematic Suppression of Employee Speech and Competition.. 4

          A.      The California Legislature Has Determined That Policies Limiting Certain Types of Employee Speech Are Unlawful Because Such Policies Undermine Societal Goals of Nondiscrimination, Free Movement of Labor, Fair Competition, and Shining a Light on Corporate Misconduct ............................. 4

          B.      Apple's Speech Suppression Policies Violate California Law in Several Ways .. 5

    II.     Claim Two:  Apple's Systematic Invasion of Employee Privacy and Forced Patronage Violates California Law ................................................................................................. 9

    III.    Claim Three:  Apple's Illegal Clawback Policies and Practices Violate California Law .................................................................................................................................. 10

PARTIES ................................................................................................................................ 11

JURISDICTION AND VENUE ............................................................................................. 11

STATEMENT OF FACTS ..................................................................................................... 11

    I.      Apple's Speech Suppression Policies Have Violated Bhakta's Rights As an Apple Employee ........................................................................................................................ 11

    II.     Apple's Speech Suppression Policies Are Evident in Multiple Documents and Through Various Actions Taken by the Company ....................................................................... 13

          A.      Apple's Intellectual Property Agreement ("IPA") ............................................. 13

               1.      Information Restraints ................................................................................. 13

               2.      Other Restraints of Trade ........................................................................... 14

          B.      Apple's Business Conduct Policy ("BCP") ....................................................... 14

          C.      Apple's Security Policies ................................................................................... 15

          D.      Apple's Enforcement Practices .......................................................................... 16

          E.      Bhakta's Experience ........................................................................................... 17

    III.    Apple Invades Its Employees' Privacy and Compels Their Patronage ....................... 17

          A.      Apple's Collection and Use of The Privacies of Life ........................................ 17

          B.      Apple Owned vs Apple Managed ...................................................................... 20

          C.      iCloud@Apple .................................................................................................... 21

          D.      Apple's Surveillance .......................................................................................... 22

SECOND AMENDED PAGA COMPLAINT

E.    No Escape...................................................................................................... 23

F.    Bhakta's Experience...................................................................................... 24

IV.    Apple's Illegal Clawback Policies and Practices ....................................................... 25

A.    Apple's Forfeiture Provisions ................................................................... 25

B.    Bhakta's Experience................................................................................. 25

V.    Apple's "Carveout" Provisions .................................................................................. 25

VI.    Administrative Exhaustion ....................................................................................... 26

FIRST CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq. Speech Suppression, Which Restrains Competition, Speech and Whistle Blowing ................ 26

SECOND CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 *et seq.* Privacy Violations, Surveillance, and Forced Patronage .................................................. 27

THIRD CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq. Illegal Clawback Policies and Practices .......................................................................... 28

PRAYER FOR RELIEF .......................................................................................... 29

SECOND AMENDED PAGA COMPLAINT

**INTRODUCTION**

1.      This action challenges three categories of unlawful conduct by Defendant Apple, Inc. that aggrieves all Apple employees and harms all Californians: (1) Apple's suppression of employee speech through unlawful speech suppression rules and otherwise; (2) Apple's invasion of employee privacy through surveillance and forced patronage through use of their non-work private data; and (3) Apple's clawback of earned wages.  These three categories of conduct each give rise to distinct claims under California's Private Attorneys General Act ("PAGA"), as set forth in the First, Second, and Third Causes of Action, respectively.  In other words, Plaintiff can prevail by proving one PAGA violation without proving another.  However, as a practical matter, Apple's unlawful conduct that underlies these PAGA violations is mutually reinforcing and interrelated, as the proliferation of unlawful policies and practices may infringe on multiple labor code protections.

2.      Plaintiff Amar Bhakta brings this action under California's Private Attorneys General Act ("PAGA"), Cal. Labor Code §§ 2698 et seq. on behalf of himself and other current and former employees and the State of California to recover for violations of the California Labor Code.

3.       Plaintiff also seeks appropriate injunctive relief to protect Aggrieved Employees and the State of California from future violations.

**I.      Claim One:  Apple's Systematic Suppression of Employee Speech and Competition**

**A. The California Legislature Has Determined That Policies Limiting Certain Types of Employee Speech Are Unlawful Because Such Policies Undermine Societal Goals of Nondiscrimination, Free Movement of Labor, Fair Competition, and Shining a Light on Corporate Misconduct**

4.      The California Legislature has enacted a group of laws that protect Californians' rights to be free from employer interference in disclosing information about wages and working conditions, reporting suspected legal violations, participating freely in our democracy through the exercise of political activity, and practicing their trade or profession.  California's duly elected representatives enacted these statutes to protect workers' economic interests and personal autonomy by empowering them to speak freely about compensation and the details of their job duties and working conditions, to ensure a fair society by eliminating pay discrimination and

4

other mistreatment, and to promote a reliable economy in which businesses compete on a level playing field and unfair competition is quickly rooted out.  These laws, collectively, establish as a minimum employment standard an employee *anti*-gag rule.  *Doe. v. Google* (2020) 54 Cal.App.5th 948.[1]

5.      The California Legislature has enacted the following laws, all of which Apple violates through the use of its Speech Suppression Policies:

a. **Labor Code §§ 232, 232.5, and 1197.5(k)**, which prohibit employers from requiring employees to refrain from disclosing information about their wages and their working conditions.  These laws protect Californians' right to be free from discrimination.

b. **Labor Code § 1102.5 and Government Code § 12964.5**, which protect workers' rights to whistleblowing.  This law protects the ability of workers to raise concerns about unlawful activity, which protects all Californians who can be negatively impacted by wrongdoing, such as pollution and antitrust violations.

c. **Labor Code §§ 1101 and 1102**, which prohibit employers from placing restraints upon employee political activity and their lives outside of work.  These laws, among other things, ensure employees may participate in democracy and advocate for causes that, in their view, further the public good, even if their employer disagrees.

d. **Labor Code § 432.5**, which prohibits employers from requiring an employee to sign a writing it knows is prohibited by law.

**B.  Apple's Speech Suppression Policies Violate California Law in Several Ways**

6.      **Apple imposes these policies on its workers.** As a condition of employment, Defendant Apple, Inc. ("Apple") requires all employees, including contingent workers (collectively, "Apple employees") to comply with agreements, policies, guidelines, and practices governing employee speech ("Speech Suppression Policies") that violate California worker

---

[1] In this Complaint, Plaintiff generally uses the terms "speech suppression" or "gag rules" to refer to violations of California's anti-gag rule.

SECOND AMENDED PAGA COMPLAINT

protection laws by unlawfully restricting the employees' speech and limiting their ability to get jobs after working at Apple.  Apple's Speech Restriction Policies purport to remain in effect throughout each employee's employment and beyond, for the life of the employee.

7. **Apple's Speech Suppression Policies.**  Apple maintains companywide policies that suppress its employees' speech in violation of California law.  Through its employment agreements, written policy documents, and practice of enforcement, Apple unlawfully prohibits the disclosure of information that the Labor Code empowers employees to disclose, in the Legislature's judgment.  The broad definition of confidential information in Apple's form employment agreement includes "the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information."  Its Business Conduct Policy expressly prohibits Apple employees from disclosing their coworkers' compensation information, prohibits them from engaging in any "outside activity" that *could* have an adverse effect on their ability to perform their duties at Apple, and places restraints on its employees' political activities.

8. **Speech that facilitates workers' ability to get a job.**  Apple's conduct also violates California law by prohibiting restraints on trade.  *See* California Business & Professions Code §§ 16600 *et seq*.  The overbroad confidentiality restriction in Apple's employment agreement limits employees' freedom to speak about their work and Apple's business, which restricts them from using their own skills and knowledge, developed at Apple, both in a job search and after hire.  *See* Jodi L. Short, Killing the Messenger: The Use of Nondisclosure Agreements to Silence Whistleblowers, 60 U. Pitt. L. Rev. 1207, 1220 (1999) (noting that agreements restricting disclosure make it more difficult for individuals to obtain new employment in the same field, because "[t]he skills and industry knowledge an employee learns at one job often constitute her most valuable assets in seeking and obtaining a subsequent job").  The employment agreement's express language prohibiting departing Apple employees from soliciting other Apple employees or contractors after they leave employment with Apple also unlawfully restricts trade.  Apple's conduct not only violates speech and worker mobility protections but also undermines legislative intent underlying those protections to combat

6

SECOND AMENDED PAGA COMPLAINT

discriminatory pay disparities and improve worker mobility.

9. **Speech that protects against discrimination.**  Apple's conduct violates California Labor Code provisions that explicitly protect employees who disclose or discuss their wages and working conditions, either with coworkers or outsiders.  Labor Code § 232 provides that no employer may "[r]equire, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages." § 232(a). Section 232(b) also prohibits requiring an employee to sign a "waiver or other document" that purports to deny the right to disclose one's wages.  Labor Code § 232.5 extends similar protections to other aspects of the employment relationship, providing that no employer may "[r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions."  Labor Code § 1197.5(k), which is part of the California Equal Pay Act, states that "an employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another's wages, or aiding or encouraging any other employee to exercise his or her rights under this section."  The legislative history underlying these Labor Code provisions emphasizes how employer policies prohibiting disclosures about wages exacerbate discriminatory pay disparities. *See, e.g.*, 2015 Cal. Legis. Serv. Ch. 546 (SB 358 § 1(d)) ("Pay secrecy also contributes to the gender wage gap, because women cannot challenge wage discrimination that they do not know exists."); *Doe v. Google, Inc.* (2020) 54 Cal.App.5th 948, 958 (stating Labor Code § 1197.5(k) was enacted "at the urging of women's groups to protect employees sharing information necessary to the enforcement of laws against sex discrimination") (citing Sen. Com. on Industrial Relations, Staff Analysis of Assem. Bill No. 3193 (1983–1984 Reg. Sess.)).

10. **Whistleblower Speech That Protects Against Corporate Wrongdoing.**  Apple's conduct also violates California's whistleblower protections.  For example, Labor Code § 1102.5 protects an employee's right to disclose, both within a company and externally, employer conduct the employee has a reasonable cause to believe constitutes a legal violation.  The broad purview of this whistleblower protection to cover employee disclosures regarding any legal violation was an express purpose of the legislature in its enactment.  *See* 2013 Cal. Legis.

Serv. Ch. 732 (AB 263 § 1(g)) ("No employee should have to fear adverse action, whether it involves threats to cut hours, move a worker to night shift, or contact law enforcement agencies, simply for engaging in rights the State of California has deemed so important that they are protected by law.").

11.     **Speech That Allows Employees to Participate in Democracy and Advocate for the Public Good.**  Apple's conduct violates sections of the Labor Code that prohibit employers from placing restraints upon employee political activity and their lives outside of work.  Labor Code §§ 1101 and 1102 prohibit employers from adopting a rule or policy "[c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees" and prohibit employers from "coerc[ing] or influenc[ing]  or attempt[ing] to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

12.     **Signatures on Unlawful Policies.**  The unlawful provisions of Apple's employment agreement additionally violate Labor Code § 432.5, which prohibits an employer from requiring an employee to sign a writing that it knows is prohibited by law.

13.     **Lifetime effect.**  Apple's Speech Suppression Policies purport to remain in effect throughout each employee's employment and beyond, for the life of the employee.

14.     **The harm from Apple's Speech Suppression Policies.**  Apple's Speech Suppression Policies have harmed – and continue to harm – Apple's employees and the State of California just as the Legislature feared.  For example, Apple prohibited Plaintiff Bhakta from speaking about his work experience on podcasts and instructed Bhakta to remove information about his working conditions and work experiences from his LinkedIn profile.  On information and belief, Apple's Speech Suppression Policies limit Apple employees' ability to describe their job responsibilities, accomplishments, and professional growth to a potential future employer when exploring new opportunities, and they prohibit or restrain Apple employees from disclosing – or using – all of the skills, knowledge, connections, and overall experience they developed at Apple when working for a subsequent employer.  Apple's Speech Suppression

8

Policies prohibit or restrain Apple employees from speaking with each other or outsiders (like friends, family members, reporters, etc.) about potential problems at work, such as unfair treatment, harassment, discrimination, retaliation, or even sexual assault.  Similarly, Apple's Speech Suppression Policies prohibit Apple employees from bringing to light compensation issues, including underpayment or under-leveling of people of color, women, older workers, or any other group.  The secrecy permits the wrongdoing to continue.  This is a real and ongoing concern. Two women recently filed a proposed class and PAGA action against Apple on behalf of all women in the Engineering, Marketing, and AppleCare divisions, alleging that Apple systematically underpays women in violation of the Equal Pay Act.  *Jong v. Apple, Inc.*, Case No. CGC-24-615363 (San Francisco Superior Court).

15.    Apple's Speech Suppression Policies are contrary to the laws described herein and are contrary to the interests of the State of California.

## II.    Claim Two:  Apple's Systematic Invasion of Employee Privacy and Forced Patronage Violates California Law

16.    More than 50 years ago, the People of California amended their Constitution to include the inalienable right of all people to privacy.  The moving force behind this amendment was "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society."  At its most basic, this right recognizes and protects individual autonomy.  It encompasses the right to *decide* "to what extent [a person's] thoughts, sentiments, and emotions are communicated to others."  It provides "*immunity* from suspicious and jealous observation."  And it grants *to the individual* "the ability to control the circulation of personal information."

17.    The California Legislature also has enacted employment laws that protect employee autonomy and privacy.  Labor Code § 450 prohibits employers from coercing or compelling their employees' patronage.  Alternatively, it prohibits employers from coercing or compelling their employees in the purchase of a thing value, with consideration *of any type*, including their nonwork private data.  Labor Code § 432.5 prevents employers from requiring their employees to sign contracts and other writings known to be prohibited by law.

18.    In violation of these laws, Apple requires employees to waive their inalienable right to privacy and autonomy, it compels or coerces them to patronize Apple, and it compels or coerces them in the purchase of a thing a value.  Apple requires the use of Apple devices, software, and services for work, including personal iCloud accounts.  In order to use these devices, software, and services (collectively "products"), employees must become Apple consumers and sign consumer subscription and other agreements with Apple.  Put plainly, they are compelled or coerced to patronize Apple.   Apple's products  collect and use the valuable personal data of Apple employees, and those with whom they interact, when the employees are engaged in the "life" side of the work/life balance, i.e., during nonwork periods and while away from Apple's premises ("Private Life Data.").  Apple also requires employees to agree that they have no right to privacy in their Private Life Data (including location data), that Apple can engage in physical, video, and electronic surveillance of them and that it can, as it wishes, search both Apple and non-Apple devices and other property while an employee is on "company premises." which – according to one Apple policy – can include an employee's *home* office.

19.    For Apple's employees, the Apple ecosystem is not a walled garden.  It is a prison yard.   A panopticon where employees, both on and off duty, are ever subject to Apple's all-seeing eye.

**III.    Claim Three:  Apple's Illegal Clawback Policies and Practices Violate California Law**

20.    Finally, the California Legislature has enacted laws intended to ensure that employees are actually paid the wages they earn.  Labor Code § 221 prohibits an employer from clawing back earned wages – including Restricted Stock Units (RSUs).  Labor Code § 206.5 states that an employer shall not require the execution of a release of a claim or right on account of wages to become due unless the wages have already been paid.

21.    Despite these laws, Apple conditions the payment of vested Restricted Stock Units – wages that will become due – on a release of their right to these vested RSUs if Apple "reasonably determines" the employee has, among other things, engaged in the unauthorized

disclosure of "confidential information," or "materially breached" their employment agreement, which, as detailed below, requires compliance with Apple's unlawful Speech Suppression Policies rules and surveillance practices.

## PARTIES

22.    Plaintiff Amar Bhakta is a current Apple employee and agent of the State of California within the meaning of PAGA.  Among other things, and as further detailed below, he was and is subject to Apple's unlawful employment agreements, policies, and practices.  He is aggrieved by one or more of Apple's violations of the Labor Code.

23.    Apple, Inc. is a California corporation doing business in California and maintaining corporate headquarters in Santa Clara County.

24.    At all relevant times, Apple was Plaintiff's employer within the meaning of the Labor Code.

## JURISDICTION AND VENUE

25.    The Court has jurisdiction over this action because the action involves issues of state law.  Venue is proper in this judicial district pursuant to section 395.5 of the California Code of Civil Procedure, because Apple's principal place of business is situated in Santa Clara County.

## STATEMENT OF FACTS

**I.    Apple's Speech Suppression Policies Have Violated Bhakta's Rights As an Apple Employee**

26.    According to its website, Apple employs 80,000 individuals in the United States. In California, it has more than 36,000 employees, 53 retail stores, and numerous corporate offices.  Its employment agreements, policies, procedures, and practices are, by necessity, standardized.  Accordingly, and on information and belief, Bhakta's experience and encounters with Apple's Labor Code violations, including its restraints on speech and individual autonomy, is emblematic of all Apple employees.

27.    In or around July 2020, Apple offered Bhakta a job as a Digital Ad Tech/Operations Manager.  A graduate of Colgate University, Bhakta has years of experience in

11

SECOND AMENDED PAGA COMPLAINT

the creation, management, monitoring, and analysis of digital ad campaigns. His past employers include Hulu, Merkle, and AOL. His past clients include Disney, Facebook, Target, Warner Brothers, and Amazon. Apple hired Bhakta because of his experience, skill, knowledge, network, and expertise.

28.     Apple designated Bhakta's offer letter, which includes information about Bhakta's working conditions and wages, as "Apple Confidential." On information and belief, Apple uses a standard offer letter, which requires, as a condition of employment, that Apple employees sign Apple's Intellectual Property Agreement (IPA) and agree to comply with the terms of Apple's Business Conduct Policy. Apple routinely stamps its offer letters "Apple Confidential." On information and belief, these documents are boilerplate documents used on a widespread basis throughout the company.

29.     As a condition of employment, the offer letter further required Bhakta to sign Apple's Intellectual Property Agreement (IPA) and agree to comply with the terms of Apple's Business Conduct Policy. Bhakta, as a condition of working for Apple, signed the offer letter and the IPA.

30.     Apple's offer to Bhakta detailed information about his own wages and Apple's working conditions. It said his compensation would likely include an RSU award that was subject to the terms and conditions of Apple's Employee Stock Plan and RSU award agreement. It said his employment was conditioned upon, among other things, Bhakta's written agreement to (1) the terms of the offer letter, (2) Apple's Intellectual Property Agreement (IPA); and (2) the terms of Apple's Business Conduct Policy (BCP).

31.     On or around July 15, 2020, Bhakta signed the offer letter and IPA. These agreements remain in full force and effect. Bhakta has also completed, reviewed, and certified – through annual Business Conduct training – his acknowledgement and agreement to the BCP.

32.     As further detailed below, Apple's standard offer letter, IPA, BCP, and equity plans and agreements place unlawful restraints on employee speech, competition, wage rights, autonomy, and privacy.

SECOND AMENDED PAGA COMPLAINT

## II.    Apple's Speech Suppression Policies Are Evident in Multiple Documents and Through Various Actions Taken by the Company

33.    Apple seeks – through confidentiality designations, employee agreements, policies, threats, directives, requirements, and other practices – to monopolize information *about* or *related to* Apple, including information about Apple wages, working conditions, illegal conduct, or public policy.  Examples of this conduct include the following.

### A.  Apple's Intellectual Property Agreement ("IPA")

34.    As noted above, on or around July 15, 2020, Bhakta signed Apple's Intellectual Property Agreement.  The IPA violates California's anti-gag rule and contains other unlawful restraints on activity.

### 1.    Information Restraints

35.    The IPA prohibits employees "during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform duties as an Apple employee."

36.     The IPA defines Apple's "Proprietary Information," as "all information not generally known outside Apple and/or kept confidential by Apple including for example but not limited to" "information relating to the business operations or affairs of Apple or persons or companies dealing with Apple" as well as "the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information."

37.    The IPA does not include appropriate carve-outs for protected activity.  It does not permit the disclosure of information about unlawful conduct, disclosures to the SEC, or the notice of immunity required by the Defends Trade Secret Act.

38.    The IPA requires, upon termination of employment, that employees return – "all documents and materials of any kind pertaining to [his] work at Apple," *and* "any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary information."

39.    The above prohibitions, by their plain terms, prohibit the disclosure or use of

SECOND AMENDED PAGA COMPLAINT

information about wages, working conditions, an employee's general knowledge, skills, and experience learned through their Apple employment, information available to others through normal competitive means, and reasonably suspected illegal conduct.

### 2.    Other Restraints of Trade

40.    The IPA also prohibits solicitation.  It provides, "to the fullest extent permitted by applicable law, during your employment and for a period of one (1) year following your termination" "you will not, directly or indirectly, on your own behalf or on behalf of any person or entity, solicit, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple."

41.    The IPA requires employees to agree that they will not "plan or engage" in any activity competitive with or related to Apple's business or products or engage in any other activities that conflict with any "employment obligations" to Apple.

42.    The IPA assigns to Apple ownership of all "inventions," including ideas and materials "made, created, or reduced to practice" by employees if the "invention" was: (1) developed using any Apple equipment; (2) "suggested" by work performed while at Apple; or (3) "conceived" during employment with Apple and related to any aspect of any past, present, or future Apple business or product.  The IPA further requires employees to assign to Apple – for free and for forever – the rights to all inventions that would otherwise belong to them and to waive any personal rights to such inventions both during and after their termination from employment with Apple.

43.    On information and belief, Apple requires all of its California employees to sign a form IPA substantially similar to the IPA signed by Bhakta.  Bhakta remains subject to the terms of the IPA.

### B.  Apple's Business Conduct Policy ("BCP")

44.    Apple's BCP also contains unlawful restraints on employee activity.

45.    The BCP expressly provides, "You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history, personal contact information, *compensation*, health information, or performance and disciplinary

matters."

46.     The BCP provides that employees should, "[n]ever disclose confidential, operational, financial, trade-secret, *or other business information* without verifying with your manager whether such disclosure is appropriate."

47.     The BCP prohibits employees from public or outside speaking engagements that relate to Apple's business without Apple's approval.

48.     The BCP requires employees to refer all inquiries from the media, industry, or financial analyst community to Apple's Corporate Communications or Investor Relations.

49.     The BCP prohibits employees from contributing material to publications (including blogs) that relate to Apple's business or products, or that "could be seen as a conflict of interest," without Apple's approval.

50.     The BCP prohibits employees from engaging in any activity that "may damage Apple's reputation" or "gives the appearance of impropriety or divided loyalty."

51.     The BCP prohibits employees from engaging in any "outside activity" that *could* have an adverse on their ability to perform their duties at Apple.

52.     The BCP prohibits employees from using Apple work time, equipment, or resources for political activities.

53.     The BCP prohibits employees from using time at work *or* Apple's workspaces, phones, computers, internet access *or* any Apple assets or services, for any "outside activity" (meaning non-work activity).

54.     The BCP asserts that Apple "owns" all records and information in any form that is created or received during the course of doing Apple's business.  It also asserts that Apple "owns" its employees' personnel records.

55.     Apple's BCP applies to all full and part-time employees of Apple and its subsidiaries.

**C.  Apple's Security Policies**

56.     Apple's Security and Information Classification Policies and Standards further evidence Apple's restraints on employee speech and activity.  Apple classifies information – not

on the basis of any positive law (e.g. privacy or trade secrets) – but rather "based upon the impact that an event compromising the security, integrity, or availability of the information [would have] on Apple's operations, performance, brand, or regulatory/legal obligations."  Put more plainly, Apple classifies information based on how bad it thinks disclosure would be for Apple.  There are four classification tiers: Prohibited (Tier 0), Highly Confidential (Tier 1), Confidential (Tier 2), Internal (Tier 3), and Public (Tier 4).

57.     Apple defines information about wages, benefits, job titles, work performance, employment dates, employment status, and reporting relations as Confidential, Highly Confidential, or Prohibited.  Even "Internal" information at Apple is restricted to users with a business need.  According to Apple's classification standards, Public (Tier 4) Information is limited to "Information that may be broadly distributed *without causing damage to Apple*."

**D.  Apple's Enforcement Practices**

58.     Apple implements and enforces its unlawful agreements, policies, and practices through the designation of information, the surveillance and interrogation of employees, dedicated security and policy teams, management directives, and the discipline and termination of employees.  Among other things:

59.     On information and belief, in 2018, Apple issued a memo threatening Apple employees with termination or criminal consequences if they leaked information.  The memo warned employees that it had caught 29 leakers in the previous year, and that 12 were arrested. The memo also warned Apple employees to be wary of press, analysts, and bloggers who may target or befriend them on social media.

60.     On information and belief, in 2021, Apple refused a shareholder request to add the following language in their employment agreements: "Nothing in this agreement prevents you from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that you have reason to believe is unlawful." (This language is required by Government Code § 12964.5.)

61.     Apple responded to other employee discussions about wages, working conditions, and suspected unlawful corporate conduct with warnings, terminations, and

SECOND AMENDED PAGA COMPLAINT

crackdowns intended to restrain employee speech.

### E. Bhakta's Experience

62.     Bhakta's personal experience with Apple confirms its written instruments – including the IPA, BCP, and Apple's security policies – violate California law.  In accordance with Apple's policy, he asked for permission to engage in public speaking about his area of expertise: Digital Advertising.  Apple forbade it.  Apple also required that he remove and edit unprotected information about his working conditions and work at Apple from his LinkedIn profile.  The limited his visibility and attractiveness in the job market, thus harming both Bhakta and competitors for Bhakta's services.

63.     *Privacy* in speech is a necessary condition of *free* speech.  Apple's surveillance policies and practices chill, and thus also unlawfully restrain, employee whistleblowing, competition, freedom of employee movement in the job market, and freedom of speech, all in violation of California's employee anti-gag rule.  These surveillance policies violate other laws as well.

### III.     Apple Invades Its Employees' Privacy and Compels Their Patronage

64.     In marketing materials, Apple declares that it respects human rights, including the right to privacy.  Apple does not extend this respect to its own employees.  Instead, Apple subjects its employees to surveillance, compels or coerces their patronage, and compels or coerces them in the purchase of things of value:  Among other things, Apple compels its employees to purchase Apple's products, as well as the emoluments of their employment, with their personal data.

### A. Apple's Collection and Use of The Privacies of Life

65.     "Modern cell phones are not just another technological convenience.  With all they contain, and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley v. California* (2014) 573 U.S. 373, 403.  As Chief Justice Roberts further explains in *Riley*:

66.     "The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any

isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone."

67. "Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. . . . 'GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.'"

68. "Mobile application software on a cell phone, or 'apps,' offer a range of tools for managing detailed information about all aspects of a person's life. There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime; apps for improving your romantic life. There are popular apps for buying or selling just about anything, and the records of such transactions may be accessible on the phone indefinitely. There are over a million apps available in each of the two major app stores; the phrase "there's an app for that" is now part of the popular lexicon. The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life."

69.    A "cell phone search would typically expose to [an employer] far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is."

70.    In addition, the private data contained on an iPhone extends well beyond the user's information.  It extends to those with whom the user (or the iPhone) interacts.  If a child texts his father that he prefers Batman to Spiderman, or a wife sends a racy date night calendar invite to her husband, then the child's and the wife's information is also contained on the iPhone. Indeed, personal data is collected by Apple even without any voluntary action by the user or the third party.  For example, Apple's FindMy and Journal apps rely on Bluetooth beacons and other technology to determine the proximity of Apple devices to one another.  As Apple's iCloud consumer agreement explains:

> Apple and its partners and licensors may provide certain features or services that rely upon device-based location information using GPS (or similar technology, where available) and crowdsourced Wi-Fi access points and cell tower locations. To provide such features or services, where available, Apple and its partners and licensors must collect, use, transmit, process and maintain your location data, including but not limited to the geographic location of your device and information related to your Account and any devices registered thereunder, including but not limited to your Apple ID, device ID and name, and device type.

71.    The personal data contained on an iPhone or other digital devices is more than private.  It is also valuable.  Personal data is the fuel of surveillance capitalism.  As explained by Professor Ermita Shoshanna Zuboff: "Forget the cliché that if it's free, 'You are the product.' You are not product; you are the abandoned carcass.  The "product" derives from the surplus that is ripped from your life." *See,* S. Zuboff, The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power (Profile Books 2018).

72.    Apple, like other surveillance capitalists, commodifies the human experience – including the nonwork aspects of its employees' lives – and uses it for business purposes.

73.    In order to use an Apple product,  individuals – including Apple's employees –

SECOND AMENDED PAGA COMPLAINT

must enter into a variety of consumer agreements with Apple, including software licensing agreements. Personal data is part (or sometimes all) of the consideration an individual pays to become or remain an Apple consumer. Like all surveillance capital firms, Apple collects and uses this personal data – including the Private Life Data of its own employees – for business purposes. These purposes include to "power its services" (e.g., improve its offerings or data analysis), "security and fraud prevention (e.g., to protect Apple), and to "personalize" Apple's services (e.g., to sell businesses, and/or serve consumers, with targeted advertisements).

### B. Apple Owned vs Apple Managed

74. Apple employees must be reachable for work and have access to Apple's network while on and off duty. Apple also requires its employees to use only Apple devices for work. To satisfy these two requirements, employees must enter into consumer agreements with Apple and must carry an iPhone or other Apple device on their person. This condition of employment – particularly in combination with other Apple policies, practices, and requirements – has profound implications for their individual privacy, the privacy of their loved ones, and their individual autonomy.

75. Apple gives employees the "choice" of using either an "Apple-owned" or an "Apple-managed" device for work. Regardless of what the employee "chooses," the employee must enter into Apple agreements and become an Apple consumer.

76. For example, if an employee decides to use an Apple-owned device, it is typically obtained new through a carrier in Apple packaging. The employee must open the packaging and set up the device. One of the first steps in doing so is scrolling through and entering into consumer agreements with Apple, such as Apple's software licensing agreement, terms of service, and privacy policy. Another step is providing Apple with the employee's biometric information (e.g., fingerprint, likeness, voice). This information is used in lieu of a password or to train Apple's artificial intelligence (e.g., Siri).

77. The consumer agreements Apple compels or coerces its employees to sign saddle those employees with obligations. Among other things (1) they must have or create an Apple Store account and associate it with Apple's pre-installed Apps; (2) they must consent to Apple's

use of their private data; and (3) they must waive numerous claims against Apple arising from their use of Apple's products.

78.    Notwithstanding these consumer agreements, Apple places limits on its employees' use of an "Apple-owned" iPhone for personal reasons.  By Apple's design, most employees instead use a personal iPhone for work reasons.  In order to do so, Apple requires the employee to consent to Apple installing software, including an "electronic sim card" (eSIM) and/or a Virtual Private Network (VPN), on the personal device.  Apple converts the personal device into an "Apple-managed" device.

79.    Apple then claims the right to access, search and use all the Private Life Data contained on the Apple devices Apple compels its employees to use.  As Apple's iCloud@Apple policy explains:

> any data stored on an Apple-managed or Apple-owned device is accessible by Apple in the event of a security search of the device, or in the event your data is included in a corporate backup service. *This means that if you use your personal account on an Apple-managed or Apple-owned iPhone, iPad, or computer, any data stored on the device (including emails, photos, videos, notes, and more), are subject to search by Apple.*

80.    Apple's Technology Asset Management Policy further requires that it know the "logical (e.g., IP address) and physical attributes (e.g., geographic location)" of every Apple-owned or managed device at all times.  Consistent with this policy, Apple employees cannot disable the Apple surveillance apps on their Apple owned or managed devices.  If – as required – an Apple employee has physical possession of an Apple device, then Apple knows where they are.

### C.  iCloud@Apple

81.    Apple also requires its employees to use Apple's collaboration tools to perform their work (e.g., Apple email, Pages, Numbers, and Keynote).  These tools in turn require a personal iCloud account.  Employees cannot sign up for an iCloud account using their work email address (i.e., @apple.com).  Rather, they must either use their pre-existing personal Apple account or, if they do not have one, create one and thus become an Apple consumer.

21
SECOND AMENDED PAGA COMPLAINT

82.    Apple thus compels or coerces its employees to use a personal iCloud account – and enter into or continue with an iCloud consumer agreement – as a condition of employment. Apple does not reimburse its employees for its use of their personal iCloud account.

83.    Apple only allows one primary iCloud account per device or user.  Thus, employees who have a pre-existing personal iCloud account are required to associate this personal iCloud account with their work account.  If they are a pre-existing Apple consumer, their personal iCloud account thus becomes "Apple managed" even if they use an Apple owned device for work.  Upon making this association, Apple makes unilateral configuration changes to the personal iCloud account.  For example, it unilaterally adds a "work folder."  Apple also actively discourages the use of a work-only iCloud account even for those employees who use an Apple owned device and do not otherwise use Apple products.

84.    The Private Life Data accessible through an iCloud account can easily dwarf the Private Life Data contained on a single device.  The iCloud can include all the information gathered by all the synched devices, including family member devices and including non-Apple devices.  This data can include email, contacts, reminders, entire photo libraries, internet browsing data, health data, messages, "smart home" data, passwords, apps, files, documents calendars, notes, and backups.

85.    One Apple policy claims that Apple will not access or use the Private Life Data in its employees' personal iCloud account, *except* as provided in other instruments like the iCloud consumer agreement and Employee Privacy Notice.  This is deceptive and does not lessen the privacy invasion.  The other instruments, including the iCloud consumer agreement, already grant Apple an unfettered right to access, use, preserve, prescreen, move, modify, disclose, or remove any and all content that is generated or encountered through use of the iCloud service. Apple also declares the right to access, search, and use the Private Life Data on the Apple owned or managed [personal] devices *synched* with the personal iCloud account, and the synching of devices is a primary purpose of an iCloud account.

**D.  Apple's Surveillance**

86.    According to Apple's BCP, as a condition of initial and continuing employment,

SECOND AMENDED PAGA COMPLAINT

Apple's employees must agree that Apple can: (1) Access, search, monitor, and archive *all* data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, *or other personal accounts*); and (2) Conduct physical, video, or electronic surveillance, search [its employees'] workspace (e.g., file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g.,  backpacks, handbags) while on company premises.   Apple's "Workplace Searches and Privacy" Policy goes further and suggests that Apple also has the right to search its employees' *home* offices.

87.    Apple's message to employees – plainly described in its BCP – is unambiguous. Apple employees "should not have any expectation about the privacy of content or personal information on Apple systems or networks."

**E.  No Escape**

88.    For the reasons stated above, it is neither possible nor practical for Apple employees to avoid becoming an Apple consumer and patronizing Apple.  It is neither possible nor practical for them to avoid Apple's surveillance, collection, or use their Private Life Data. Among other things:

89.    All employees must use a personal iCloud account for work.

90.    All employees must sign consumer agreements with Apple to use Apple's products for work purposes, regardless of whether the products are Apple-owned or Apple-managed.

91.    As one Apple document explains, some employees – e.g., those "who need to be able to 'live on' [Apple's] products with real personal data for testing or product development purposes" – are required to either use their personal device for work or an Apple owned device for personal reasons.

92.    Even if it was practicable for an employee to carry two smartphones at all times (e.g., an Apple owned device and a purely personal device), *they would still be carrying the Apple-owned device*.  The Apple-owned device collects off-duty Private Life Data for Apple's use (e.g., location data) simply by being in the employee's possession.

93.    As noted above, Apple declares the right to access, monitor, and use the data on

purely personal devices and that employees should have no expectation of privacy in personal information connected to an Apple system or network. *All* Apple devices, even purely personal ones, are connected to an Apple system or network.

94. The cost to employees of switching to a non-Apple device for purely personal reasons is too high. In its recent antitrust complaint against Apple, the United States of America and sixteen states, including California, allege the following: Apple has monopoly power in the smartphone market in the United States. Its market share exceeds 70%. Nearly 90% of iPhone users in the United States replace their iPhone with another iPhone. Apple's employees, even more so than Apple's consumers, are trapped in Apple's prison yard.

**F. Bhakta's Experience**

95. Consistent with the above, and upon beginning his employ, Apple gave Bhakta the "choice" of using either an Apple-owned or his personal iPhone for work. Initially, Bhakta used an Apple owned device for work. In doing so, was Apple required him to enter into the consumer agreements referenced above. Unsurprisingly, Bhakta then switched to using his personal phone and Apple installed an eSIM and VPN. Apple also required Bhakta to use his personal iCloud account to collaborate with his colleagues. Apple has not reimbursed Bhakta for its use of his iCloud account.

96. Apple, through the conduct described above and otherwise has compelled and coerced Bhakta to become and remain an Apple consumer. Apple required that he patronize Apple and enter into consumer agreements governing the use of Apple's products. He was also required to pay for his job with his Private Life Data and personal iCloud account. Apple used, and continues to use, Bhakta's Private Life Data to further its business interests.

97. Apple, through the conduct described above and otherwise, has required Bhakta to waive his and his family's unwaivable privacies of life as a condition of initial and continued employment.

98. Apple, through the conduct described above and otherwise, has sought to control the nonwork aspects of his life.

99. On information and belief, all of Apple's California-based employees are subject

SECOND AMENDED PAGA COMPLAINT

to the same or substantially similar invasions of their rights.

**IV.    Apple's Illegal Clawback Policies and Practices**

### A. Apple's Forfeiture Provisions

100.    Apple also enforces its illegal Speech Suppression Policies through forfeiture provisions in its equity plans and agreements.  For example, Apple pays certain employees with Restricted Stock Units (RSUs) that vest over time.  The agreements and plans governing these RSUs, however, purport to permit Apple to claw back vested (meaning earned) RSUs – as well as any profit arising from their sale – if "during the Employment Period or any time thereafter, the [employee] has committed or engaged in a breach of confidentiality, or an unauthorized disclosure or use of inside information, customer lists, trade secrets, or other confidential information of the Company or any of its Subsidiaries."  As detailed above, the only information about Apple that Apple does not consider confidential is "information that may be broadly distributed *without causing damage to Apple*."

101.    Apple's forfeiture provisions thus condition the receipt of employees' RSU compensation on the release of those employees' rights to their vested RSUs, which are earned wages.

102.    The illegal forfeiture provisions in Apple's equity plans and agreements are not limited to violations of Apple's Speech Suppression Policies.  Apple's agreements assert it can claw back vested RSUs for other reasons as well, including a "material breach of *any* agreement to which the [employee] is a party with the Company or any of its Subsidiaries."  This includes, by its plain language, the many consumer agreements between employees and Apple.

### B. Bhakta's Experience

103.    Bhakta, like most other Apple employees, is paid compensation in the form of equity.  Bhakta's RSUs vested at least twice per year throughout his employment, usually in March or April and in September or October.  Apple has thus repeatedly required him to sign equity agreements with illegal forfeiture provisions.

**V.    Apple's "Carveout" Provisions**

104.    Certain of Apple's agreements and policies contain carveouts for some employee

25

speech.    For example, the IPA includes a footnote which provides, "Nothing in this Agreement restricts your rights to speak freely about your wages, hours, and working conditions."  This carveout is legally inadequate because: (1) it is limited to "speak[ing]," which strongly implies that employees are permitted to orally communicate but prohibited from communicating in other forms (e.g., sharing documents or writing); (2) it is limited to "your" information, which strongly implies that employees are prohibiting from discussing or disclosing *others'* information; (3) it is buried in the IPA, as the definition of Proprietary Information is on the first page of the IPA, whereas the footnote is on the sixth and final page; (4) it is contradicted by the IPA (which expressly defines information about compensation as "confidential," as well as the offer letter which is also classified as "confidential; (5) the carveout is limited to the terms of the IPA, but other Apple agreements, policies, and standards (including its security policies and standards) plainly prohibit such speech; and (6) any ambiguity created by the carveouts also has the purpose and effect of restraining employee rights.

105.    Apple's occasional and inadequate carveouts and disclaimers do not save Apple's illegal policies or practices.

## VI.    Administrative Exhaustion

106.    Plaintiff provided written notice to the LWDA on April 29, 2024 by online filing and to Defendants via certified mail on May 1, 2024 of the facts, legal claims and theories of their claims in this case.  The LWDA did not respond to the letter.

107.    Plaintiff provided a further written notice to the LWDA by online filing and to Defendants via certified maul on December 2, 2024, attaching the original complaint, for prophylactic purposes.  The LWDA did not respond to this letter.

108.    Based on these allegations and others, Plaintiff asserts all separate and distinct causes of action described in the following claims.

<div align="center">

**FIRST CAUSE OF ACTION**
**Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq.**
**<u>Speech Suppression, Which Restrains Competition, Speech and Whistle Blowing</u>**

</div>

109.    Labor Code §§ 232(a) and (b) and 1197.5 prohibit actual or purported restraints on the disclosure of information about, or the discussion of, employee wages.

<div align="center">26</div>

110.    Labor Code § 232.5(a) and (b) prohibit actual or purported restraints on the disclosure of information about employer working conditions.

111.    Labor Code §§ 1101-02 prohibit employer attempts to direct, control, or restrain employee political activity and non-work activity – including advocacy for a cause that is adverse to the employer's interests.

112.    Labor Code § 1102.5(a) prohibits employers from adopting or enforcing any policy, rule, or regulation that restrains the disclosure of information about reasonably suspected violations of the law.

113.    Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law.  For purposes of this Claim, these laws include, among other things, Business & Professions Code § 16600 *et seq.*, Government Code § 12964.5,  SEC Regulations, California's employee anti-gag rule, and Civil Code §§ 1668 and 3513.  On information and belief, Apple knows its writing are prohibited by law.  Among other things, Apple is a sophisticated employer with ample resources, its written agreements and policies evidence knowledge of the law, and it is presumed to know the law.

114.    As detailed above, Apple's restraints on competition, speech, and whistleblowing violate the above-referenced Labor Code provisions.

115.    Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions.  On information and belief, all of Apple's California-based employees are similarly aggrieved.

116.    Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code.  Plaintiff also seeks appropriate injunctive relief.

**SECOND CAUSE OF ACTION**
**Private Attorneys General Act, Cal. Lab. Code §§ 2698 *et seq.***
**Privacy Violations, Surveillance, and Forced Patronage**

117.    Labor Code § 450 prohibits an employer from compelling or coercing an employee to either patronage the employer or purchase a thing of value from the employer or another third party.

118.    Labor Code § 2082 requires an employer to indemnify employees for all necessary expenditures or losses incurred by the employee in direct consequence of the job duties.  Labor Code § 2804 renders any express or implied agreement to waive the benefits of Labor Code § 2802 null and void.  Such agreements are prohibited by law.

119.    Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law.  For purposes of this claim, these laws include the right to privacy, Civil Code §§ 1668 and 3513 and the above-referenced Labor Code provisions, except for Labor Code §§ 221 and 450.

120.    As detailed above, Apple's forced, unreimbursed, patronage, surveillance, and privacy invasions violate the above-referenced Labor Code provisions.

121.    Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions.  On information and belief, all of Apple's California-based employees are similarly aggrieved.

122.    Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code.  Plaintiff also seeks appropriate injunctive relief.

### THIRD CAUSE OF ACTION
**Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq.**
**<u>Illegal Clawback Policies and Practices</u>**

123.    Labor Code § 221 prohibits an employer from clawing back earned wages.

124.    Labor Code § 206.5 states that an employer shall not require the execution of a release of a claim or right on account of wages to become due unless the wages have already been paid.

125.    Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law.  For purposes of this claim, these laws include Civil Code §§ 1668 and 3513 and the above-referenced Labor Code provisions, except for Labor Code §§ 221 and 450.

126.    As detailed above, the forfeiture provisions in Apple's equity agreements and plans violate the above-referenced Labor Code provisions.

SECOND AMENDED PAGA COMPLAINT

127.    Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions.  On information and belief, all of Apple's California-based employees are similarly aggrieved.  Other aggrieved employees include those whose wages were actually clawed back (or who were faced with a clawback threat) in accordance with Apple's equity agreements and plans.

128.    Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code.  Plaintiff also seeks appropriate injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests the following relief:

A.    Civil penalties provided, per violation, in accordance with the California Private Attorneys General Act, California Labor Code §§ 2698, *et seq*.;

B.    Prejudgment and post-judgment interest, as provided by law;

C.    Attorneys' fees pursuant to Labor Code § 2699(g)(1) and all other bases for fees in the Labor Code;

D.    Costs of suit, including expert fees and costs;

E.    A reasonable service award for Plaintiff for his service as a PAGA representative;

F.    Injunctive relief; and

G.    Such other relief as the Court may deem just and proper.

Dated: November 13, 2025                         Respectfully submitted,

By: _____
Jahan C. Sagafi (SBN 224887)
Molly J. Frandsen (SBN 320094)
Hannah Meropol (SBN 340095)
**OUTTEN & GOLDEN LLP**

Chris Baker (SBN 181557)
Deborah Schwartz (SBN 208934)
**BAKER DOLINKO & SCHWARTZ, P.C.**

*Attorneys for Plaintiff, on behalf of himself, other Aggrieved Employees, and for the State of California*

29

EXHIBIT I: 5AC

152. On August 26 2021, Plaintiff filed an NLRB charge against Apple and posted on Twitter that she did so. The next day, on August 27 2021, Apple's Business Conduct team closed Plaintiff's complaint about Ronald Sugar and Plaintiff's office. A couple of days later, around August 30 2021, a third-party law firm (McDermott, Will, & Emery) filed a notice of appearance for five attorneys in Gjovik's NLRB claim against Apple.

153. Apple did not fire Plaintiff until September 9, 2021, raising the question of whether opposing counsel in this lawsuit (Orrick, Herrington & Sutcliffe) was also retained by Apple for this dispute prior to Plaintiff's termination and, if so, if they covertly interacted with Plaintiff or Plaintiff's coworkers, or otherwise influenced the situation.

154. On August 29 2021, Plaintiff filed a formal complaint to the EPA about Apple and her office at 825 Stewart Drive, complaining of Apple's *"lack of due diligence, "negligence,"* *"recklessness,"* *"violations of Right to Know and OSHA,"* intimidation, misrepresentations, and refusal to *" notify the EPA of changed circumstances at the site."* The plaintiff did not know about the EPA safety inspection ten days prior.

155. On August 29 2021, Plaintiff filed a Whistleblower Protection Program complaint with the U.S. Department of Labor, reference number ECN76833. On August 29 2021, Plaintiff filed retaliation and labor code violation charges to the California Department of Labor.

156. On September 1 2021, Plaintiff posted on Twitter that she had filed a complaint with the California Department of Labor. A question on the form asked: How did your employer know about the protected right you exercised? Plaintiff wrote, *"I kept saying, 'Stop it, you guys. There's Labor laws about this."*

157. While Plaintiff was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Plaintiff complained that Apple's requests were harassing and invasive.

158. Plaintiff complained that Apple often asked that Plaintiff and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection, and other highly personal examinations. Apple did not disclose the details of the experiments until after Plaintiff signed a secrecy oath and 'consented' to the

activity, and then repeatedly threatened Plaintiff with termination if she was to speak about it even to a doctor or attorney (as was expressly written in one Deed Poll).

159. Around August 30, 2021, and August 31, 2021, Plaintiff shared an article titled "Apple Cares about Privacy Unless You Work at Apple" and confirmed the blog interviewed her and she provided information for the article, including multiple images of secret photos Apple took of her in her home from the Gobbler application.

160. In her posts she complained of Apple's surveillance of workers and Apple's culture of intimidation and retaliation and compared working at Apple to being in a panopticon. [27] The article discussed several examples of Apple's invasions of employee privacy, which were brought forward by Apple employees who wanted the public's help in reforming Apple's business and labor practices.

161. In the article, Plaintiff complained about the Gobbler app installed on her phone taking photos of her anytime, including at home; and was quoted saying, "*If they did this to a customer, people would lose their goddamn minds.*"

162. On August 31 2021, the U.S. Department of Labor contacted Plaintiff to start intake for Plaintiff's Whistleblower Protection Program charges.

163. Newspapers published articles about the Plaintiff's charges against Apple starting around September 2, 2021. Bloomberg reported about Plaintiff's U.S. NLRB, U.S. Department of Labor, California Department of Labor, and U.S. EEOC charges. The same day, the Financial Times and Reuters also wrote about the Plaintiff's complaints. [28]

164. The press continued to cover what Apple was doing to Plaintiff, and a movement started among Apple employees who began speaking out and organizing around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this, too. The plaintiff was not only a catalyst for many employees to come forward, but these employees also catalyzed the

---

[27] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* 8/30/2021.
[28] Bloomberg, *Apple Worker Complaints Reviewed by Labor Relations Board*, 9/2/2021; Financial Times, *US labour board examines retaliation claims against Apple*, 9/2/2021.

to be terminated, as communicated by Human Resources to her VP, was that Plaintiff supposedly failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. The plaintiff did, however, redact the internal records she posted on Twitter. Apple Human Resources must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Apple never raised the matter to Plaintiff, and Plaintiff only discovered this fact via discovery.

212.  Apple continued to monitor her posts after September 2021 (attempting to get Twitter to delete some of them, admitted in U.S. Department of Labor filings) and through January 2022 (Appleseed wrote to the Plaintiff, upset that she tried to get the Plaintiff's Twitter posts deleted but found out Apple also reported them, and it was Apple's reports that resulted in the posts being deleted). Apple has undoubtedly read Plaintiff's Twitter and other social media for years. Apple also knew about Plaintiff's activities through direct updates from Plaintiff, information shared by agencies arising out of Plaintiff's complaints, press coverage of Plaintiff, and any surveillance they were conducting of her personal and work devices (which Apple's policies said they would do).

COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

213.  Apple retaliated against Plaintiff and discharged Plaintiff's employment for multiple reasons that violated public policy. Among other unlawful reasons, Apple suspended and fired Plaintiff in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace*." Specific concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5, 1102.5, and 6310. These sub-claims are included in addition.

214.  **Illegal Data Harvesting [California Constitution Article I, Section 1; FTC Act]:** Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Article I Section 1 of the California Constitution; the California Privacy Rights Act; the U.S. FTC Act; Cal.Pen.C. § 637.7, and the International Covenant on Civil and Political Rights: Article VII.

215.  While false and pretextual, Apple's proffered reason for terminating Plaintiff is illegal

itself. Apple claims it fired Plaintiff for complaining about Apple's surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording.

216. Apple discriminated against Plaintiff, including ending her employment, because of Plaintiff's actions related to her constitutional and statutory right to privacy, which are substantial and fundamental rights that benefit the public and were firmly established at the time of discharge. Apple's decision to use this as their excuse for firing the Plaintiff reveals Apple's animus against California employees' privacy rights.

217. Apple also intruded into Plaintiff's seclusion, physically and constructively invading Plaintiff's privacy in violation of California Civ. Code § 1708.8(a), (b), (d), and Apple surveilled Plaintiff and forced Plaintiff to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms, in violation of California Labor Code § 435.

218. The Gobbler application captured videos and photos of the plaintiff in the bathroom; the plaintiff has copies of those images. Apple's use of Gobbler on Plaintiff's phone also forced Plaintiff to take part in Apple's unlawful acts by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometrics of the public without their knowledge or consent. Apple's termination of Plaintiff claimed that she would be fired if she warned people about the surveillance occurring on her phone. Therefore, Apple's unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for sensitive biometrics.

219. Apple also violated § 5 of the FTC Act in unlawfully coercing employees to provide personal and sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable and misleading statements to consumers. Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

220. **Employment Discrimination [California DFEH; U.S. EEOC]:** The Plaintiff reported and testified about complaints about sex, gender, and disability discrimination, which are fundamental rights for a *Tamney* claim. The plaintiff filed California DFEH and U.S. EEOC claims

# Exhibit J: 4AC

bonuses, salary increases, and RSU stock grants, and was recently promoted. Gjovik substantially performed, or tendered performance, for her job duties. During each of Gjovik's six annual performance reviews, she always received a salary increase, a large RSU grant, and a performance bonus. All conditions required for Apple's performance had occurred. Apple breached the covenant by intentionally terminating Gjovik when her annual performance review was due, which would have been accompanied by a performance bonus that she had already earned through her successful performance in 2020-2021. (The end of the fiscal was June 30 2021).

191. In violation of the covenant of good faith and fair dealing, Apple deliberately undermined Gjovik's ability to fulfill her contractual obligations, evading the spirit of the agreement, and frustrating her ability to benefit from the agreement. Gjovik was damaged due to Apple's breach and is owed the performance bonus due to her, with interest.

### COUNT NINE: CAL. UNFAIR COMPETITION LAW
### (Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*)[44]

192. Apple has engaged in business acts or practices that were unlawful, unfair, deceptive, or misleading, and therefore violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* This UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited to any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

193. Apple is unlawfully coercing employees to provide personal data, including biometrics, which Apple can use for research and development, including training machine learning models, without actual consent or compensation, and in violation of federal competition laws and state and federal data protection laws. Apple's Whistleblowing Policy acknowledges that reports of

---

[44] The SAC § 17200 claims were previously nested under § 6310 and *Tamney* claims.

FOURTH AMENDED COMPLAINT | 3:23-CV-04597-EMC                    PAGE 57 of 74

"*anti-competitive conduct*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures. Apple should obtain ethical and legal data for product development instead of treating its workforce like lab rats.

194. Gjovik suffered an economic and/or property injury due to Apple's Unfair Business Practices. Apple knew or should have known that its wrongful acts and omissions alleged herein were likely to deceive the consuming public in California and the rest of the United States. Apple committed those acts and omissions anyway for their financial gain, including improving their financial condition, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the company's value.

195. Apple repeatedly implied to Gjovik that her participation was not option. Gjovik's annual performance reviews made express note of Gjovik's participation in Apple's studies and experiments and praised her for her unpaid labor in facilitating the numerous invasions into her privacy.

196. Gjovik participated in several other health, anatomy, and personal data collection studies during her time working for Apple. This included a sleep study with Apple placing a sensor under her while she slept every night, recording her vitals and movements, and sharing the data with Apple for commercial purposes. When Gjovik was invited to participate in these events, the team often would not disclose what the study was until the 'volunteers' arrived physically on site to a secure building where ex-FBI security personal would threaten her and her workers to not even tell their friends or family what happens at Apple, and especially studies like these.

197. When Apple asked Gjovik to scan her ears and her ear canals, Gjovik declined "indefinitely." Similarly, Gjovik repeatedly declined Apple's requests to study and collect data about her menstruation for product development. Even after Gjovik declined the ear studies, Apple has claimed its secret they even asked her in the first place.

198. Gjovik also attempted to decline participating in the Gobbler program, but she was tricked into enrollment through Apple's misrepresentations of the years long study and data collection as a one-time social event. Gjovik was only told what the study involved (Gobbler) after she entered a locked compounds with several Apple Global Security guards surrounding her, asking her if she would 'consent.' After that day Gobbler has always been attached to Gjovik's iCloud account. Gjovik still sees Gobbler listed as part of her personal account today and no way to remove it.

199. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. Apple's declaration that it can terminate employees for protesting these invasions and warning the public is "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right*." One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics and face-prints of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, and use of toilets– along with biometric information.

200. Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the non-disclosure agreements for the program, and then Apple told employees they could not tell anyone what the program would now be doing on their iPhones. Apple was aware Gobbler was not a market-ready product (nor was it intended to be) and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyway while continuing to promise customers that Apple would never collect their data and biometrics.

201. Gjovik's opposition and complaints about Apple's coercion of employees into unpaid

labor through aggressive dogfooding (testing internal software/products as if it were a normal personal device) and Apple's weird anatomical and medical experiments on employees was all protected conduct. In addition, Apple exploited Gjovik's identity without Gjovik's consent and for commercial purposes, violating California's common law Right of Publicity. Apple's unauthorized use and appropriation of Gjovik's identity, likeness, and private information were for Apple's commercial advantage, and Gjovik suffered injury because of it. Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained, claiming they could fire employees without notice for protesting these unfair business practices.

202.    Apple requested, coerced, and tricked Gjovik into participating in a number of studies, experiments, and invasions which Gjovik was not compensated for. The studies also caused Gjovik unexpected and otherwise unnecessary expenses. In order to attend these physical meetings, so she could be threatened and intimidated, and expose even more of her personal data to Apple and  to ensure she obtained a positive performance review. Gjovik had to pay out of pocket for Lyft and Uber costs for transportation. Gjovik does not have a driver's license and the company shuttles rarely went to these special, secure buildings. Gjovik is owed restitution for all of the transportation costs, and other operational costs, she paid with her own money as required for these coercive and exploitive studies.

203.    Injunction and disgorgement are appropriate here, and the court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200, including the power to order restitution and disgorgement.

204.    Apple coerces employees and tricks consumers into allowing Apple to extract their data and exploit it in the research and development of commercial, for-profit products, without consent, in violation of the FTC Act and § 17200. As a result of Apple's unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik, her co-workers, and the

public. Apple should be required to restore these monies to Gjovik, her former co-workers, and the public.

205.    However, Apple's extensive use of these illegal practices will make calculating damages a challenge. Without injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which damage remedies cannot readily remedy. Apple should be ordered to disgorge unlawful data and the fruit of the poisoned data.

206.    Gjovik requests an order that prohibits Apple from using personal employee data in for-profit product development, including medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct violating their rights of privacy.

207.    Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, including Gobbler images.

### COUNT TEN: IIED – OUTRAGEOUS CONDUCT
### (Intentional Infliction of Emotional Distress – Traditional)

208.    The statute of limitations for IIED claims under California state law is two years from the date of injury and under New York state law it is one year from the act. Gjovik lived in California until August 31 2022 and then lived in the state of New York from September 1 2022 up to the date the complaint was filed on September 7 2023. The New York statute of limitations covers Gjovik's presence in New York from September 7 2022 through September 7 2023. The California statute of limitations cover's Gjovik's presence in California from September 7 2021 through September 1 2022.[45] Apple terminated Gjovik's employment on September 9 2021 and thus only two days fall

---

[45] Gjovik also reserves the right to claim IIED under Massachusetts law if Apple continues inflicting emotional distress upon her through the trial.

# EXHIBIT K: TAC

78.     On August 29, 2021, Gjovik filed a formal complaint to the US EPA about Apple and her office at Stewart 1, complaining of Apple's "lack of due diligence," complaining about "negligence," and "*recklessness,*" and "*violations of Right to Know & OSHA.*" Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site.*" Gjovik did not know about the US EPA safety inspection ten days prior.

79.     On Sunday, August 29, 2021, at 11:32 AM PST, Gjovik filed a Whistleblower Protection Program complaint with the US Department of Labor, reference number ECN76833. On August 29, 2021, Gjovik filed retaliation and labor code violation charges to the California Department of Labor. (This lawsuit replaced the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830). On September 1, 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor. A question asked: How did your employer know about the protected right you exercised? Gjovik wrote, "*I kept saying, 'Stop it, you guys. There's Labor laws about this.'*"

80.     Gjovik began complaining that Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal studies. Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to speak about it even to a doctor or attorney (as was expressly written in the noted Deed Poll). For example, while Gjovik was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Gjovik complained that Apple's requests were harassing and invasive.

81.     On August 30 and 31, 2021, Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple.*" [28] In Gjovik's posts, she complained of Apple's surveillance of workers, its exploitation of workers, and Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon.

82.     On August 31, 2021, at 7:16 AM PST, the US Department of Labor contacted Gjovik to start intake for Gjovik's Whistleblower Retaliation charges. Gjovik had her interview with the US EEOC

---

[28] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

etc.), trade and non-profit organization (e.g., ChemFORWARD, Omidyar Network, etc.), certain media companies and publishers, certain tech reporters, companies and third-party administrators (e.g., Sedgwick, Northrop Grumman, Oaktree Capital, etc.), certain government employees and agencies, law enforcement officers and agencies (e.g., Santa Clara County Sheriff's Office, Cupertino Police Department, Santa Clara HazMat, etc.), doctors and clinics (e.g., A.C. Wellness Center, etc.), and environmental consultants (e.g. EKI, ACT Environmental, etc.).

### iii. Apple & the RICO Conspiracy

121. Apple agreed with others to invest in, acquire, and conduct the affairs of a commercial enterprise in a manner that violates 18 U.S.C. § 1962(a), (b), and (c). Apple knowingly agreed to facilitate a scheme that includes a RICO enterprise's operation or management. Apple adopted the goal of furthering and facilitating the conspiracy. Two or more people agreed to commit a substantive RICO offense, and Apple knew of and agreed to the overall objective. In Violation of Section 1962(d), Apple conspired "*to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity*." Apple undertook criminal acts with the "*intent to commit, and to aid and abet and in connection with another federal crime*." Apple conspired to violate one or more substantive RICO provisions, and members of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy.

### iv. Relatedness, Pattern, Scheme

122. Apple's predicate acts have similarities related to purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (e.g., agency capture, intimidation and censorship, obstruction of investigations into Apple's conduct, manipulation of the press and public discourse, lying about labor and environmental practices, whistleblower retaliation, etc.).

123. The goal of Apple's racketeering does not have an end date, as much of Apple's racketeering conduct is performed to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct while frantically working to cover up its prior criminal conduct by engaging in even more criminal conduct. Cover-ups, by their nature, present a distinct threat of long-term continuation. The threat of Apple's continuing illegal activity extends indefinitely into the future. Apple and the "Worldwide Loyalty" Enterprise are engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance and use of intimidation, threats, and false statements

33

about its actual practices to increase profits and create and maintain a positive reputation. Apple's scheme has three prongs:

a) Apple intends to refrain from expending the resources required for basic regulatory compliance in most of its basic dealings, thus increasing profits.

b) Apple intends to increase profits further and obtain other financial benefits through a knowingly false reputation of strong regulatory compliance in all its dealings (i.e., promoting itself as an industry leader in environmental responsibility, etc.)

c) Apple intends to bridge the gap between its actual practices and what it reports to its customers, the public and press, and the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors who report issues, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing others to assist in these activities to cover-up the Apple's unlawful activities and fraudulent misrepresentations.

124. Apple transmits knowingly false information (or omits and fails to transmit required information) via communications with government agencies, the press, and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to a complete lack of environmental sustainability, regulatory oversight, and reporting, despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities.

125. Apple's self-proclaimed competitive edge requires "*aggressive price competition and resulting downward pressure on gross margins.*" Apple adds that some competitors compete by "*us[ing] illegitimate means*" to develop products. Apple has also stated that its "*global operations are subject to complex and changing laws and regulations on subjects, including privacy; consumer protection; advertising; ... artificial intelligence; labor and employment; anticorruption; ... and environmental, health and safety...*" Apple adds that "*compliance with these laws and regulations is onerous and expensive... laws and regulations can adversely affect [Apple's] business by increasing ... costs.*" Apple admits that to succeed, it must cut costs wherever possible, compete with businesses that engage in illegal activities, and that laws and regulations threaten Apple's business model.

126. Apple's conduct is neither lawful nor legitimate nor simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws – and censorship, obstruction, and concealment of these acts to profit from a progressive brand.

34

127. Apple has engaged in a series of related predicate acts extending over a substantial period of multiple decades. Further, Apple started a series of related predicate acts and will continue these acts until there is intervention. Apple's misconduct is so persistent and egregious, dependent on continued intimidation of witnesses to keep witnesses quiet about what they know, that it is impracticable that Apple would ever voluntarily stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the inertia of organized crime – with both closed-ended and open-ended continuity.

**v.      Predicate Act 1: Criminal Bribery of Executive Officer (Cal. Penal Code § 67)**

128. Tom Moyer was Apple's Director of Employment Law until September 2009, when he became Chief Compliance Officer and Head of Global Security.[35] Moyer allegedly committed criminal bribery by paying bribes to public officials in exchange for concealed carry handgun permits for Apple employees. The California Court of Appeals affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings at the Apple Park Visitor's Center, removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[36]

129. Two Apple Global Security Directors flipped on Moyer and Apple, turning state's evidence and testifying against him/Apple in exchange for immunity.[37] Among other elements and theories of liability, Moyer engaged in the bribe as part of his job, on behalf of Apple, using Apple assets at Apple locations and to benefit Apple. Further, even after Moyer was charged, Apple defended him: *"After learning of the allegations, we conducted a thorough internal investigation and found no wrongdoing."*[38] Yet, there were numerous signs of misconduct and foul play. Gjovik was directly injured as Moyer's teams threatened and obstructed her.

**vi.      Predicate Act 2: Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)**

130. Apple and agents made repeated statements, publicly and privately, explaining that they were taking actions to harm Gjovik because of Gjovik's actions as a federal witness, victim, and informant.

---

[35] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc.*, et al., No. 1:12-CV-2826, and *Texas, et al. v. Penguin Group, et al.*, No. 1:12-CV-3394 (October 15 2014).

[36] *State v Moyer* at 26.

[37] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty/*

[38] Ars Technica, *Apple security chief maintains innocence after bribery charges*, (Nov. 24 2020).

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                                    FEBRUARY 27 2024