Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

**ASHLEY GJOVIK**,
*an individual*,

       **Plaintiff**,

       v.

**APPLE INC.**,
*a corporation*,

       **Defendant**.

</td><td>

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT AND PRELIMINARY INJUNCTION**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

</td></tr>
</table>

0

# I.    DECLARATION OF ASHLEY GJOVIK IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION

I, Ashley Gjovik, declare as follows:

1.    I am the Plaintiff in this action, appearing in propria persona. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to them. I submit this Declaration in support of my Motion for Summary Judgment and Preliminary Injunction, and to provide good cause for the late filing of the Motion.

## A.    GOOD CAUSE FOR LATE FILING

2.    I file this Motion two days after the April 22, 2026 deadline set by the Court's scheduling order. I respectfully request that the Court accept the filing as timely under Fed. R. Civ. P. 6(b)(1)(B) upon a showing of excusable neglect. The factors under *Pioneer Investment Services, Inc. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 395 (1993), and *Ahanchian v. Xenon Pictures, Inc*., 624 F.3d 1253, 1261 (9th Cir. 2010), each support acceptance of the filing.

3.    ***Reason for Delay:*** The operative discovery record in this matter materially changed in the two weeks preceding the filing date. On or about April 14 2026, Defendant first produced records showing the August 4-18, 2021 crack-sealing activity at my office at 825 Stewart Drive (APL-GAELG_013). This is documentary support for one of the environmental safety-retaliation theories advanced in the Motion under California Labor Code § 6310 and it was the first disclosure Apple's ever made regarding its EH&S activities at the building after it placed me on leave (see Ex. 17).

4.    On April 6, 2026, per the Court's Order (Dkt. 327) granting the Plaintiff's motion to compel (Dkt. 309), Defendant served verified amended responses to Plaintiff's Interrogatories, Sets Two and Three, which are cited throughout the Motion and which contain Defendant's sworn basis for key facts including the "*misleading complaint*" termination reason (Rog No. 2, Set Two, AD #1), Defendant's identification of the August 23, 2021 Issue Confirmation as the document setting forth the

1

protected activity (Rog No. 3, Set Three), and Defendant's sworn position that the privacy speech and the alleged confidential disclosure are the same conduct (Rog No. 8, Set Three).

5.      Despite the me requesting depositions in August 2025, Defendant's witnesses were only made available for deposition beginning April 3, 2026 (McKeon) then April 7 2026 (Okpo), then April 13 2026 (West), then April 16 2026 (Kragmanov), and April 17 2026 (Bertolus). Defendant refused to make the corporation available and, per my motions to this court, Apple Inc has been ordered to sit for that deposition in May 11-14, 2026 (Dkt. 357, 352, 346). Apple has not responded to emails about this.

6.      The deposition of Yannick Bertolus — the Apple Vice President who sent my termination letter and approved the termination decision — did not occur until April 17, 2026, one day after the discovery cutoff. Apple said that was the earliest he could be made available (Dkt. 346).

7.      Prior to taking these depositions, I did not expect to reveal such surprising evidence. However, once the depositions were underway – and especially with the Bertolus deposition – I realized the evidentiary basis for my case was much different then I previously thought. It forced me to have to change my strategy in filing this Motion as to reflect the strongest evidence in the case – which is apparently related to sexual harassment, discrimination based on gender, and retaliation arising from complaints of sexual misconduct.

8.      I had to pay for an expedited transcript of the Bertolus deposition and I only received the certified transcript on April 22, 2026, the day before the Motion was due. The Bertolus transcript is cited at approximately thirty locations in the Motion and is material to the direct-evidence, cat's-paw, and same-decision analyses. Filing without thorough review would have required submitting a motion based on an incomplete record that excluded the testimony of the supposed central decisionmaker.

9.      ***Prejudice to Defendant***: No prejudice to Defendant arises from the delay. The hearing date set by the Court is unaffected. The Plaintiff set the response day out an additional day to compensation for the same-day delay. The delay is just hours. It should have no effect on the hearing

date, the opposition schedule, or any other deadline set by the Court. I've only been working on the Motion and supporting papers and have tried to limit any delay as much as possible.

10. ***Good Faith***: I appear in propria persona without counsel or support staff. I was very ill for approximately one week during the April 2026 deposition period, which further compressed the time available. I have concurrent deadlines in a parallel environmental citizen-suit case (5:25-cv-07360), in which I was required to prepare and file oppositions to dispositive motions by three defendants (including Apple). I requested extensions multiple times in that case and was unable to prepare every filing simultaneously. I have worked continuously to complete this Motion as promptly as practicable and have filed on the earliest date the record permitted an accurate filing.

11. I also have a discovery motion in this case scheduled for April 23, 2026, which I had previously advised the parties and the Court I lacked capacity to prepare alongside the present Motion but no modification was allowed. I filed that Motion at midnight (358) and it took several hours to prepare. The factors under *Pioneer* and *Ahanchian* favor acceptance of the filing. I respectfully request that the Court accept the Motion as timely filed.

### B.    DEPOSITION TESTIMONY OF YANNICK BERTOLUS

12. On April 17, 2026, I conducted the deposition of Yannick Bertolus, the Apple Vice President who sent my termination letter on September 9, 2021. The following paragraphs authenticate specific testimony by Mr. Bertolus that I have cited or intend to cite in connection with this Motion.

13. ***Testimony Regarding the "Redacted" Text Exchange***: During the April 17, 2026 deposition, I questioned Mr. Bertolus about what he personally reviewed before approving the termination of my employment. Mr. Bertolus testified that the "*misleading*" finding supporting one of the three stated termination reasons rested on what he described as a "redacted text exchange" with Dan West. When I asked Mr. Bertolus to clarify whether "*redacted*" meant "*black boxes over text*," Mr.

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                    APRIL 24 2026

Bertolus responded: "*No*." When I asked what he did mean by "redacted," Mr. Bertolus responded: *"I mean what you presented to the investigator versus the full text exchange."* Ex. 32, Bertolus Dep.

14.    ***Testimony That Mr. Bertolus Had "Absolutely No Idea" of the Subject Matter***: Later in the same deposition, I showed Mr. Bertolus the full text exchange between Dan West and me that Apple itself had produced in discovery, marked as Apple Deposition Exhibit 28. When I asked Mr. Bertolus whether he had been aware at the time of my termination that the subject matter of the text exchange was the Chez TJ sous chef Andrew, Mr. Bertolus responded*: "I remember that it was Chez TJ. I had absolutely no idea it was Andrew. Even when it was presented to me just now, I thought it was Jared himself, not Andrew*." Mr. Bertolus added: "*That tells you how much I didn't know the details of all that."* Ex. 32, Bertolus Dep.

15.    Mr. Bertolus further testified that his recollection of the text exchange at the time of the termination decision was "*not even as much . . . as what you've just shown me today*." Ex. 32, Bertolus Dep. The text exchange I showed Mr. Bertolus was the copy Apple had produced in discovery.

16.    ***Testimony Regarding Appropriate Senior-Subordinate Communications***: During the April 17, 2026 deposition, I questioned Mr. Bertolus regarding text messages that Dan West — Mr. Bertolus's direct report and my skip-level manager — had exchanged with me concerning the Chez TJ dinner. The text exchange included language I had walked Mr. Bertolus through, including references to "*mail order brides*"; Mr. West's statement that the head chef Jared's idea was "*to set [me] up with Andrew*"; my description of drinking "*too much to remember*" while Jared was telling me "*secrets about Yannick*"; and Mr. West's agreement that the evening could be characterized as *"a plot to get [me] too drunk to remember Yannick's dirty laundry*."

17.    I asked Mr. Bertolus whether this was an appropriate way for a senior director to communicate with a subordinate Engineering Program Manager. Mr. Bertolus's response, in full, was: *"I would need to have more context to make a -- you seem pretty feminine -- I don't even want to even go*

*there and speculate. But you seem pretty -- I don't know. I still don't see the relevance of all this.*" Ex. 32, Bertolus Dep.

18.     I don't know what Mr. Bertolus meant by that but it made me feel uncomfortable and embarrassed. Later in the same deposition, I referred back to Mr. Bertolus's use of the word "feminine." Mr. Bertolus responded: "*Can you say that again? What would I have said? I don't remember saying that.*" Ex. 32, Bertolus Dep.

19.     ***Testimony Confirming Apple's "Bad Faith Complaints" Theory***: Also during the April 17, 2026 deposition, I asked Mr. Bertolus whether Apple's view of my alleged misconduct as to the West text exchange rested on a view that I had made "bad faith complaints." Mr. Bertolus answered: "*Yes. . . . As it relates to that text exchange, yes.*" Ex. 32, Bertolus Dep.

20.     ***Testimony Summarizing the Three Termination Reasons***; Also during the April 17, 2026 deposition, Mr. Bertolus summarized the three reasons for my termination in his own words as follows: "*You were terminated because you violated your confidentiality agreement when you posted those -- that picture on Twitter, failed to cooperate in the investigation right after that, and misguided the employee relation investigator by showing only a snippet of that text exchange.*" Ex. 32, Bertolus Dep.

### C.    DEPOSITION TESTIMONY OF ALEKS KAGRAMANOV

21.     On April 16, 2026, I conducted the deposition of Aleks Kagramanov, the Apple Employee Relations investigator who contacted me on September 9, 2021 and determined that I had "refused to cooperate" with Apple's investigation. The following paragraphs authenticate specific testimony by Mr. Kagramanov.

22.     ***Testimony Regarding What Mr. Kagramanov Would Have Said During the September 9, 2021 Call.*** During the April 16, 2026 deposition, I questioned Mr. Kagramanov about what he would have said during the call he attempted to schedule with me on September 9, 2021. Mr. Kagramanov

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                                    APRIL 24 2026

testified: "*I typically would say, you know, that we keep these conversations confidential, not to discuss this beyond, you know, the individuals involved in this process, protect the integrity of the investigation . . .*" Ex. 35, Kagramanov Dep. 30:1-7.

23.      ***Testimony Regarding Whether the Confidentiality Instruction Would Have Applied to My NLRB Affidavit.*** I asked Mr. Kagramanov whether his confidentiality instruction would have prohibited me from describing the call to the federal agency investigator to whom I was scheduled to provide an affidavit the following day, September 10, 2021. Mr. Kagramanov testified: "*I can't -- I can't, like, speculate what would have been said at that time.*" Ex. 35, Kagramanov Dep. 92:4-14.

24.      I then asked Mr. Kagramanov what his answer would have been if I had asked him directly during the call whether I could share the content of the call with the government in my NLRB affidavit. Mr. Kagramanov testified: *"I would probably take partnership with my management team because I'm not familiar with that process."* Ex. 35, Kagramanov Dep. 94:22-24.

25.      ***Testimony That Mr. Kagramanov Would Pause the Call to Consult Management***. I asked Mr. Kagramanov whether consulting management meant he would cancel or pause the call. Mr. Kagramanov testified that if I raised the question in real time during the call, *"I wouldn't, you know, commit to a specific response. I would probably take some counsel."* Ex. 35, Kagramanov Dep. 96:23 – 97:1.

26.      ***Testimony Regarding Stacked Restrictions on the Call***: I asked Mr. Kagramanov what his response would have been if I had requested to bring a coworker as a witness, to make an audio recording, or to make a video recording of the call. Mr. Kagramanov testified that he would have declined each of these requests. Mr. Kagramanov further testified that the entire interview would have been "confidential by default." Ex. 35, Kagramanov Dep. 97:4-13.

27.      ***Testimony That No Written Apple Policy Required Live Meetings***: Mr. Kagramanov testified that no written Apple policy required live investigation meetings or prohibited written-

communication investigations; that he decided on his own that my request to conduct the investigation in writing was a "refusal to participate"; and that he could not recall any other case in three years at Apple of suspending an employee's system access within one hour of initial contact, or any other case of communicating directly with SVP Deirdre O'Brien. Ex. 35, Kagramanov Dep. 58:11-18, 59:3-4, 72:6-13, 130:13 – 131:5.

### D.  DEPOSITION TESTIMONY OF EKELEMCHI OKPO

28.    On April 7, 2026, I conducted the deposition of Ekelemchi Okpo, the Apple Employee Relations investigator who conducted an investigation of my internal complaints and produced the "*misleading complaint*" finding that is one of the three stated reasons for my termination. The following paragraphs authenticate specific testimony by Mr. Okpo.

29.    ***Testimony Articulating the Basis for the "Misleading" Finding***. During the April 7, 2026 deposition, I questioned Mr. Okpo about the basis for his "misleading" finding. Mr. Okpo testified: "*I found that there were misrepresentations of facts based on your framing of the concerns around Dan allegedly pressuring you into romantically engaging with a sous chef*." When I asked what the conflicting facts were, Mr. Okpo testified: "*The claim that Dan pressured you into engaging with the sous chef. However, I found the full text thread where you use language like 'the sous chef being cute,' you know, at one point you mentioned that you had met another gentleman, and, sorry, it wouldn't work out with the sous chef. And Dan was very explicit 'no pressure from me at all.' And so two very inconsistent scenarios there.*" Ex. 34, Okpo Dep. 121:7-19.

30.    I asked Mr. Okpo whether, in his experience as an investigator, employees sometimes go along with behavior by their superiors that they feel is inappropriate but do not feel comfortable objecting to in the moment. Mr. Okpo was not permitted to answer the question due to an objection by Apple's counsel. Ex. 34, Okpo Dep. 121:20 – 122:1.

7

31.    ***Testimony That the Investigation Was "Completely Contingent on Oral Communication".*** Mr. Okpo testified that he closed his entire investigation of my complaints — including my complaints of sexual harassment, hostile work environment, discrimination, workplace safety, and retaliation — on September 9, 2021, the date of my termination. Ex. 34, Okpo Dep. 122:22 – 123:9.

32.    I asked Mr. Okpo whether, if I had agreed to participate in a live phone call with him, he would have reopened the investigation. Mr. Okpo answered: "Absolutely." I then asked whether that meant the investigation was "completely contingent on oral communication." Mr. Okpo answered: "Correct. That allows an investigator to conduct a thorough investigation." Ex. 34, Okpo Dep. 123:10-17.

33.    ***Testimony That No Written Apple Policy Required Oral-Only Investigations***. Mr. Okpo testified that no Apple written policy required investigations to be conducted orally or prohibited written-communication investigations. Ex. 34, Okpo Dep. 105:6-10. Mr. Okpo further testified that he did not understand why I was asking to keep investigation communications in writing. Ex. 34, Okpo Dep. 104:13-15.

34.    ***Testimony That the Scope of Mr. Okpo's Investigation Expressly Excluded EHS Concerns***. Mr. Okpo testified that he wrote to me during the investigation stating: "As a reminder, the scope of my investigation does not include the concerns that you have raised with our Environmental Health and Safety team. Those concerns will be handled by our team of EHS experts." Ex. 34, Okpo Dep. 44:13-19.

35.    Mr. Okpo further testified that his understanding was that an earlier Apple investigator, Jenna Waibel, had previously looked into my complaints of retaliation for raising Environmental Health and Safety concerns, and that Ms. Waibel's investigation had closed in June 2021. Ex. 34, Okpo Dep. 37:25 – 38:4. Mr. Okpo did not identify any other Apple investigator as having investigated my

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                    APRIL 24 2026

complaints of retaliation for EHS reporting during the period between the closure of Ms. Waibel's investigation and my termination on September 9, 2021. Apple's counsel invoked privilege over further testimony concerning what Mr. Okpo did or did not do as to those complaints. Ex. 34, Okpo Dep. 38:8 – 39:25; 50:5 – 51:17.

### E.   DEPOSITION TESTIMONY OF DAN WEST

36.   On April 13, 2026, I conducted the deposition of Dan West, the Apple Senior Director whose conduct was the subject of my hostile-work-environment complaint and who reported to Yannick Bertolus at the time of my termination. The following paragraphs authenticate specific testimony by Mr. West.

37.   ***Testimony That Apple's Employee Relations Investigators Found Mr. West's Conduct "Not Appropriate".*** During the April 13, 2026 deposition, Mr. West testified that Apple's Employee Relations investigators advised him, following their investigation of my complaints, that his conduct toward me had been "not appropriate." Mr. West testified: "The biggest one that I recall was around our relationship and me being very clear about separating friendship from work. . . . That's really the extent of it, is we got too friendly, and that's not appropriate." When I asked what Apple's investigators had identified as inappropriate, Mr. West identified the text messages between us and his payment for my meal at Chez TJ. Mr. West testified that he paid "between 100 and 150" dollars for my dinner. Mr. West testified: "I was your skip-level leader at the time, and that's just not a very common occurrence." Ex. 36, West Dep. 24:10 – 26:25.

38.   ***Testimony Acknowledging the Power Imbalance***. Mr. West testified that he was my skip-level manager at the time of the conduct underlying my harassment complaint and that, as he put it, "I was your boss's boss." Ex. 36, West Dep. 108:8-9. Mr. West testified that "there can be a power imbalance" between supervisors and subordinates, and that "[i]t can be more difficult for employees sometimes to say no to stuff if it's their supervisor asking." Ex. 36, West Dep. 107:22 – 108:1. Mr. West

9

further testified that he "sometimes" wonders, when asking something of employees in his organization, whether they would honestly tell him no or might be afraid to tell him no. Ex. 36, West Dep. 108:11-15.

39.     Mr. West testified that his subsequent recognition that the Chez TJ conduct was inappropriate came from guidance he received from Ekelemchi Okpo, Apple's Employee Relations investigator. Ex. 36, West Dep. 108:25 – 109:5.

40.     ***Testimony Regarding Reinstatement and Equivalent Position.*** I asked Mr. West how Apple would respond if a court or other legal authority ordered Apple to reinstate my employment. Mr. West testified: "If the authority -- if the law says do something, we'll do it." When I asked what job I would be given upon reinstatement, Mr. West testified: "My assumption would be it would be an equivalent job in the organization." Ex. 36, West Dep. 86:5-25.

41.     ***Testimony That My Position Was Not Backfilled***. Mr. West testified that my specific position was not backfilled after my termination, and that the head-count allocation was instead "repurposed . . . to do another function," which Mr. West believed was "an engineering task." Mr. West further testified that head-count planning at Apple for the relevant period occurred in "the late spring and summer of 2021" — before the date of the conduct Apple identifies as the trigger for my termination. Ex. 36, West Dep. 49:19 – 51:10.

42.     ***Death of Andrew, the Non-Party Witness Underlying Defendant's "Misleading Complaint" Finding.*** I learned on April 13, 2026, during the deposition of Dan West, that Andrew — the sous chef at Chez TJ whose interaction with me on December 29, 2017 Defendant identifies as the factual basis for its "*misleading complaint*" finding leading to the termination of my employment— is now deceased. I had no prior knowledge of Andrew's death. The first time I was informed of his death was during the West deposition on April 13, 2026.

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                    APRIL 24 2026

43.    At the time of the West deposition, I had only very recently learned, for the first time, from Okpo, that Defendant's "misleading complaint" finding rested on text-message statements I had made during and after the December 29, 2017 dinner.

44.    Defendant had only disclosed this as the factual basis for the "misleading complaint" finding in its April 6, 2026 verified amended response to Plaintiff's Interrogatory No. 2, Set Two, AD #1. Ex. 47. In the nearly five years between my termination on September 9, 2021 and April 6, 2026, Defendant had not previously disclosed that its "*misleading*" rationale rested on Mr. West arranging sexual relationships for me and my response to that sexual interference.

45.    During the April 13, 2026 deposition of Mr. West, I asked Mr. West to recall approximately what age Andrew would have been in 2017. Mr. West answered: "He's since passed away. Back then — ." Ex. 36, West Dep. 96:14. My immediate response, on the record, was: "He did? That's — Melinda — I'm going to yell at her later. This is really messed up. Go ahead, Mr. West." Ex. 36, West Dep. 96:15-17. "Melinda" is a reference to Melinda S. Riechert of Orrick, Herrington & Sutcliffe LLP, Defendant's counsel attending the deposition on Defendant's behalf.

46.    Moments later on the record, I stated: "I didn't know he passed away. That's upsetting. I'm sorry. Apple opened a whole can of worms here, Mr. West." Ex. 36, West Dep. 96:20-22.

47.    My statement that "Apple opened a whole can of worms" reflected my contemporaneous understanding that Defendant's litigation position — that I had been "misleading" in my harassment complaint because I had apparently expressed interest in dating Andrew during the late night encounter Mr. West arranged — was a position Defendant continued to maintain despite the fact that the only non-party witness who could speak to his own state of mind, understanding, or experience of the arrangement had died. It also forced me to have to intrude into the privacy of Andrew's family and memory of Andrew in order to litigate this case. I find this very disturbing and concerning.

48.     I found, and continue to find, Defendant's continued reliance on this rationale after Andrew's death to be extremely distressing. Defendant's position is apparently that my complaint about the December 29, 2017 conduct is contradicted by my in-the-moment statements during the encounter. Andrew, the only other non-party to the encounter, cannot corroborate, contradict, or provide his own account. Defendant has nonetheless maintained the "misleading complaint" rationale throughout this litigation, including in its Amended Answer (Answer ¶ 211), then detailed in its April 6, 2026 verified amended interrogatory response (Ex. 47), and through Mr. Bertolus's April 17, 2026 sworn testimony (Ex. 32).

49.     At no point since Andrew's death has Defendant withdrawn, modified, or qualified the "misleading complaint" rationale. During the April 13, 2026 disclosure of Andrew's death during the West deposition, I raised my concern about Defendant's continued reliance on this rationale with Defendant's counsel.

### F.     IRREPARABLE HARM SUPPORTING PRELIMINARY INJUNCTION

#### i.     Financial Insolvency & Homelessness

50.     I am currently in Chapter 7 bankruptcy (25-11496). I do not have a permanent residence. I am living in a motel, the cost of which is paid for solely by public donations from my social media followers. I am completely insolvent. I testified to these facts on the record during the April 13, 2026 deposition of Dan West, and Mr. West did not dispute them. Ex. 36, West Dep. 86:1 – 87:8.

51.     The financial harm from my termination is ongoing and compounding. My Apple compensation at the time of my termination, reflected in Exhibit 44, included a salary of $169,000 a year and for now I would just like to have that bi-weekly pay reinstated so I can pay rent, bills, purchase food, and other necessities.

52.      Since my termination, I have been unable to secure comparable compensation. The loss of income from a senior engineering program management position at Apple, combined with my

inability to secure comparable employment since September 9, 2021, has contributed directly to my current bankruptcy, homelessness, and insolvency.

53.    I have been publicly identified in press coverage of this litigation and of Defendant's public characterizations of the termination, and any internet search with my name promptly returns articles, including a Wikipedia article, declaring me a "leaker" who was fired for cause. I disagree with these assertions and have consistently blamed Apple for the ongoing vandalism of that Wikipedia article.

## G.    LOSS OF HEALTH COVERAGE

54.    At the time of my termination on September 9, 2021, I was enrolled in Apple-provided medical, dental, and vision insurance. Attached as Exhibit 45 is true and correct documentation of those plans. Since my termination, I have been without Apple-sponsored health coverage and for most of the last five years I've only had Medicaid which does not provide coverage for things like dental or my contact lenses.

55.    As a result of the loss of coverage combined with my financial circumstances, I have been unable to obtain prescriptions I need, run out of contact lenses, and had issues with my teeth (including ½ of one of my molars falling out) that I cannot get repaired because I do not have money to pay out of pocket..

56.    The harm from loss of coverage is ongoing and cumulative. Each month without coverage represents additional deferred care and additional out-of-pocket cost that, given my current insolvency and homelessness, I am unable to absorb. Restoration of coverage pending final judgment is necessary to prevent further deferral of care and to mitigate the continuing health consequences of the loss of coverage.

### i.    Feasibility of Reinstatement

57.    As set forth above, Mr. West — Apple's Senior Director who reported to the Vice President who sent my termination letter — testified under oath that if Apple were ordered by a court to

reinstate my employment, Apple would comply, and that his assumption was that reinstatement would be to "an equivalent job in the organization." Ex. 36, West Dep. 86:5-25. Defendant's own witness has confirmed on the record that reinstatement is feasible.

### H.    AUTHENTICATION OF EXHIBITS

58.    I authenticate the following exhibits filed in support of Plaintiff's Motion. Unless otherwise stated, each exhibit is a true and correct copy of the document described.

59.    Attached as Exhibit 1 is the "alarming" email from EH&S in March 2021.

60.    Attached as Exhibit 2 is Apple Business Conduct Ticket HRC00015205, produced by Defendant in discovery.

61.    Attached as Exhibit 3 is Apple Business Conduct Ticket HRC000015213, produced by Defendant in discovery.

62.    Attached as Exhibit 4 is Apple Business Conduct Ticket HRC00015667, produced by Defendant in discovery.

63.    Attached as Exhibit 5 is Apple Business Conduct Ticket HRC000015730, produced by Defendant in discovery.

64.    Attached as Exhibit 6 is Apple Business Conduct Ticket HRC000015725, produced by Defendant in discovery.

65.    Attached as Exhibit 7 is Apple Business Conduct Ticket HRC000016297, produced by Defendant in discovery.

66.    Attached as Exhibit 8 is Apple Business Conduct Ticket HRC000016312, produced by Defendant in discovery.

67.    Attached as Exhibit 9 is Apple Business Conduct Ticket HRC00016422, produced by Defendant in discovery.

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                                    APRIL 24 2026

68.    Attached as Exhibit 10 is Apple Business Conduct Ticket HRC00017148, produced by Defendant in discovery.

69.    Attached as Exhibit 11 is Apple Business Conduct Ticket HRC000017207, produced by Defendant in discovery.

70.    Attached as Exhibit 12 is my correspondence with the U.S. Environmental Protection Agency regarding vapor-intrusion conditions at 825 Stewart Drive, beginning April 2021.

71.    Attached as Exhibit 13 is Apple's request that EPA sign a non-disclosure agreement covering EPA's inspection of 825 Stewart Drive, and related correspondence reflecting EPA's refusal.

72.    Attached as Exhibit 14 is EPA's August 2021 inspection documentation for 825 Stewart Drive.

73.    Attached as Exhibit 15 is the EPA's October 7, 2021 letter documenting "freshly sealed cracks" and related concerns at 825 Stewart Drive.

74.    Attached as Exhibit 16 is Apple document APL-GAELG_00002159, the March 18, 2021 email from Michael Steiger to Elizabeth Schmidt, Scott Sidlow, and Sue Creighton, produced by Defendant in discovery.

75.    Attached as Exhibit 17 is Apple documents APL-GAELG-00003870 through APL-GAELG-00003874, produced by Defendant in discovery, reflecting crack-sealing activity at 825 Stewart Drive beginning August 4, 2021.

76.    Attached as Exhibit 18 is Apple documents APL-GAELG-00001509 through APL-GAELG-00001512, the September 9, 2021 12:24 PM email from Jenna Waibel to Elizabeth Schmidt and Antone Jain, produced by Defendant in discovery.

77.    Attached as Exhibit 19 is Apple document APP 00001761 (also bates-stamped PL_PROD_11_06500), the August 23, 2021 Issue Confirmation I finalized and transmitted to Apple Employee Relations, produced by Defendant in discovery.

15

78.     Attached as Exhibit 20 is my charge filed August 12, 2021 with the California Department of Fair Employment and Housing and the U.S. Equal Employment Opportunity Commission.

79.     Attached as Exhibit 21 is the Right to Sue letter issued September 9, 2021.

80.     Attached as Exhibit 22 is my NLRB charge in Case No. 32-CA-282142, filed August 26, 2021.

81.     Attached as Exhibit 23 is my California Labor Commissioner complaint filed August 29, 2021.

82.     Attached as Exhibit 24 is Defendant Apple Inc.'s Responses to Plaintiff's Interrogatories, Set One, verified by Megan Bowman on August 4, 2025.

83.     Attached as Exhibit 25 is Apple's March 4, 2022 Position Statement submitted by Jessica R. Perry of Orrick, Herrington & Sutcliffe LLP to the U.S. Department of Labor, OSHA, in Ashley Gjovik v. Apple Inc., Case No. 9-3290-22-051.

84.     Attached as Exhibit 26 is the September 15, 2021 email from David Eberhart of O'Melveny & Myers to me.

85.     Attached as Exhibit 27 is Bertolus Deposition Exhibit 1 (my August 30, 2021 Twitter post).

86.     Attached as Exhibit 28 is Bertolus Deposition Exhibit 35 (The Verge article titled "Apple Cares About Privacy, Unless You Work at Apple," dated August 30, 2021).

87.     Attached as Exhibit 29 is Bertolus Deposition Exhibit M (the September 9, 2021 termination letter).

88.     Attached as Exhibit 30 is Bertolus Deposition Exhibit N (the September 9, 2021 email chain between Megan Bowman and Yannick Bertolus).

16

89.    Attached as Exhibit 31 is Bertolus Deposition Exhibit P (the September 9, 2021 6:54 PM email from Yannick Bertolus to me transmitting the termination letter).

90.    Attached as Exhibit 32 is a true and correct copy of the cited pages of the certified deposition transcript of Yannick Bertolus, taken April 17, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, the testimony regarding the "redacted text exchange," the admission that Mr. Bertolus had "absolutely no idea it was Andrew," the exchange in which Mr. Bertolus used the word "feminine" in response to a question about appropriate senior-subordinate communications and later denied having said it, the exchange in which Mr. Bertolus confirmed Apple's theory that I had made "bad faith complaints," and Mr. Bertolus's summary of the three termination reasons, each quoted above.

91.    Attached as Exhibit 33 is Okpo Deposition Exhibit B, the August 16, 2021 draft Issue Confirmation sent by Mr. Okpo to me.

92.    Attached as Exhibit 34 is a true and correct copy of the cited pages of the certified deposition transcript of Ekelemchi Okpo, taken April 7, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 35–47, 48–51, 71, 102–105, 106, 116, 118, 121–123, and any additional pages cited in the Motion .

93.    Attached as Exhibit 35 is a true and correct copy of the cited pages of the certified deposition transcript of Aleks Kagramanov, taken April 16, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 29–30, 38–39, 57–59, 65, 69, 72–73, 91–97, 106, 115–116, 118–119, 120, 130–131, and any additional pages cited in the Motion.

94.    Attached as Exhibit 36 is a true and correct copy of the cited pages of the certified deposition transcript of Dan West, taken April 13, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 15, 24–26, 42–43, 49–51, 52, 58, 81, 85–

87, 93, 94, 95, 96, 101, 105, 106, 107–109, 113, and any additional pages cited in the Motion or in Section V above.

95.     Attached as Exhibit 37 is a true and correct copy of the cited pages of the certified deposition transcript of Robert McKeon, including pages 46, 59, 72, 81, 87, 88, 90, 93, 99, 101, and any additional pages cited in the Motion, together with the reporter's certification and cover sheet.

96.     Attached as Exhibit 38 is Apple's Business Conduct Policy referenced in my termination letter.

97.     Attached as Exhibit 39 is Apple's Confidentiality and Intellectual Property Agreement.

98.     Attached as Exhibit 40 is Apple's Social Media and Online Communications Policy.

99.     Attached as Exhibit 41 is emails with Kragamanov.

100.     Attached as Exhibit 42 is the NLRB complaint issued against Apple concerning Apple's confidentiality and related employment policies (NLRB Case No. 32-CA-284428 and related), introduced as an exhibit at the Bertolus deposition.

101.     Attached as Exhibit 43 is the national settlement agreement between Apple, the NLRB, and me regarding the foregoing policies.

102.     Attached as Exhibit 44 is my most recent Apple W-2 and pay records reflecting my compensation in effect on September 9, 2021.

103.     Attached as Exhibit 45 is documentation regarding my Apple-provided medical, dental, and vision insurance plans in effect on September 9, 2021.

104.     Attached as Exhibit 46 is the annual performance review feedback Apple produced during discovery.

105.     Attached as Exhibit 47 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Two, verified on April 6, 2026.

PLAINTIFF'S DECLARATION | 3:23-CV-04597-EMC                                           APRIL 24 2026

106. Attached as Exhibit 48 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Three, verified on April 6, 2026.

107. Attached as Exhibit 49 is Defendant Apple Inc.'s Responses to Plaintiff's Requests for Admission, including without limitation the responses cited in the Motion.

108. Exhibit 50 is the Court's Order dated January 13, 2026 (Dkt. No. 273).

## I.    VERIFICATION

109. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

110. Executed on April 24, 2026, at San José, California.

_____

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed April 24 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

19

## II.    EXHIBITS

# EXHIBIT 1

59.    Attached as Exhibit 1 is the "alarming" email from EH&S in March 2021.

| | |
|---|---|
| **Subject:** | Fwd: 3-+14087837834-1619213246000-1.wav |
| **From:** | "Michael Steiger" < [Redacted] |
| **Received(Date):** | Mon, 26 Apr 2021 00:18:56 +0000 |
| **To:** | "Elizabeth Schmidt" [Redacted] ,"Scott Sidlow" [Redacted] |
| **Attachment:** | 3-+14087837834-1619213246000-1.wav |
| **Date:** | Mon, 26 Apr 2021 00:18:56+0000 |

Scott & Elizabeth —

Ashley called EPA - listen to attached VM.

This might be alarming if we had significant VI concerns.   But as you know we have a very robust VI program.  I'm pleased that EPA reached out to us on this.  As they suggest, an alignment on discussion points with Ashley is a good idea, and would be straightforward.

I don't personally know this particular EPA project manager that called me, but I've dealt with EPA on VI issues before.

I will work with legal & ER on this to be sure we have a good plan, but again I'm not concerned about the EPA side of this.

Sent from my iPhone

Begin forwarded message:

> From: Michael Steiger [Redacted]
> Date: April 24, 2021 at 7:27:56 AM PDT
> To: Debra Rubenstein [Redacted] , Helen Polkes <polkes@apple.com>, Isela Perez [Redacted] , Moshe' Shifman [Redacted] Jenna Waibel [Redacted] >, Antone Jain [Redacted]
> Subject: 3-+14087837834-1619213246000-1.wav
>

| |
|---|
| Attorney Client Privilege |

>
>
> Sent from my iPhone

APL-GAELG_00004035

Scott & Elizabeth —

Ashley called EPA - listen to attached VM.

This might be alarming if we had significant VI concerns.   But as you know we have a very robust VI program.  I'm pleased that EPA reached out to us on this.  As they suggest, an alignment on discussion points with Ashley is a good idea, and would be straightforward.

 I don't personally know this particular EPA project manager that called me, but I've dealt with EPA on VI issues before.

I will work with legal & ER on this to be sure we have a good plan, but again I'm not concerned about the EPA side of this.

Sent from my iPhone

Begin forwarded message:

**From:** Michael Steiger | Redacted |

**Date:** April 24, 2021 at 7:27:56 AM PDT

**To:** Debra Rubenstein | Redacted |>, Helen Polkes| Redacted |Isela Perez | Redacted |, Moshe' Shifman | Redacted |, Jenna Waibel | Redacted | Antone Jain <| Redacted |>

**Subject: 3-+14087837834-1619213246000-1.wav**

Attorney Client Privilege

Sent from my iPhone

# EXHIBIT 2

Attached as Exhibit 2 is Apple Business Conduct Ticket HRC00015205, produced by Defendant in discovery.

# Ethics

Manage Attachments (2): Screen Shot 2021-07-23 at 2.04.15 PM.png  [download]   Screen Shot 2021-07-23 at 2.04.43

| | | | |
|---|---|---|---|
| **Number** | HRC000015205 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Anonymous User | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-07-23 13:59:42 |
| **HR Service Subtype** | Report a concern | **Opened by** | CST Guest |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**    Speaking about Apple to the media

**Description:**

CASE
2021-7-4227 - Other

A HW employee was quoted in The NY Times speaking about Apple's return to work practice that goes into effect in the fall. The matter was raised to ER to determine if this violates the policy on public communication.

**Additional comments:**

**Work notes (Private)**

Conversation


**2021-08-09 16:31:51  Timos Gies**  - Changed:  Case Resolution, State, Work notes

Case Resolution: Duplicate Report

State: Closed Complete   was: Pending

ER confirmed they already have a case open on this matter, so I have closed this as a duplicate.

**2021-07-29 18:16:11**  Case HRC000015205 -- work notes added  - Email sent

Sent: timos| Redacted |

**2021-07-29 18:16:04  Antonio Lagares**  - Changed:  Work notes

Hi Timos,

We are aware of this matter and it is part of a broader investigation and collaboration with ER/Legal.

TL

APL-GAELG_00002331

On Jul 29, 2021, at 11:09, Business Conduct <[Redacted]> wrote:

Hi,

This anonymous report is considered a Business Conduct matter. Please keep us advised of the outcome of this investigation.

The reporter has been asked if they are willing to speak with an investigator and we will provide updates if they reply. Best regards,

Timos

***

Select your employment category.:
Apple Employee
Please identify the person(s) engaged in this behavior:
Ashley Gjovik - EPM
Is management aware of this problem?
Do Not Know / Do Not Wish To Disclose
What is the general nature of this matter?
Going on record representing Apple to the media
Where did this incident or violation occur?
New York Times article
Please provide the specific or approximate time this incident occurred:
Friday, July 23
How long do you think this problem has been going on?
Don't know
How did you become aware of this violation?
Other
If other, how?
read it on a Slack channel after being made aware of it by a coworker
Details:
Person represented Apple in a way that doesn't seem to represent the company appropriately. Of course, if they were authorized to speak on behalf of Apple it is different, but it did not appear that way.

Article link: https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html <https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html>

Link also provided on the Slack channel citing additional coverage of the article: https://law.scu.edu/news/ashley-gjovik-jd-22-quoted-in-the-the-new-york-times-responding-to-apples-plans-for-employees-to-return-to-the-office-this-fall/ <https://law.scu.edu/news/ashley-gjovik-jd-22-quoted-in-the-the-new-york-times-responding-to-apples-plans-for-employees-to-return-to-the-office-this-fall/>

Portion of article relevant to this (quote in fourth paragraph):

"In June, Apple's chief executive, Tim Cook, told employees that they would be required to return to the office at least three days a week, starting in September. About 1,800 employees sent Mr. Cook a letter calling for a more flexible approach.

He did not respond, but days later Apple posted an internal video in which company executives doubled down on bringing workers back to the office. In the video, Dr. Sumbul Desai, who helps run Apple's digital health division, encouraged workers to get vaccinated but stopped short of saying they would be required to, according to a transcript viewed by The Times.

The video didn't sit well with some employees.

APL-GAELG_00002332

"OK, you want me to put my life on the line to come back to the office, which will also decrease my productivity, and you're not giving me any logic on why I actually need to do that?" said Ashley Gjovik, a senior engineering program manager.

When the company delayed its return-to-office date on Monday, a group of employees drafted a new letter, proposing a one-year pilot program in which people could work from home full time if they chose to. The letter said an informal survey of more than 1,000 Apple employees found that roughly two-thirds would question their future at the company if they were required to return to the office."
Department:
Hardware

<Screen Shot 2021-07-23 at 2.04.15 PM_MSG1627582131193_1895.png><Screen Shot 2021-07-23 at 2.04.43 PM_MSG1627582131174_3649.png>

**2021-07-29 18:15:51**  Re: Case HRC000015205: Speaking to Reporters, Hardware  -  Email Received

 Received: CST Guest

**2021-07-29 11:10:11  Timos Gies**  - Changed:  Business Conduct Policy, Description, Investigation Team, Title

Business Conduct Policy: Public Communications

 Description:
 CASE 2021-7-4227 - Other A HW employee was quoted in The NY Times speaking about Apple's return to work practice that goes into effect in the fall. The matter was raised to ER to determine if this violates the policy on public communication.

Investigation Team: Employee Relations

Title: Speaking about Apple to the media  was: NEW CASE ADDED FROM HOTLINE: Case 2021-7-4227 - Other

**2021-07-29 11:10:10  Timos Gies**  - Changed:  Pending Reason, State, Work notes

Pending Reason: Process

State: Pending  was: Work in Progress

Pending Reason - Pending ER review

**2021-07-29 11:04:09**  Case HRC000015205: Speaking to Reporters, Hardware  -  Email sent

 Sent: US_Corp_ER_BC[ Redacted ]

**2021-07-29 11:03:57  Timos Gies**  - Changed:  System update

 System update:
 Inserted File Name: Screen Shot 2021-07-23 at 2.04.43 PM.png / By: timos[ Redacted ]

**2021-07-29 11:03:57  Timos Gies**  - Changed:  System update

 System update:
 Inserted File Name: Screen Shot 2021-07-23 at 2.04.15 PM.png / By: timos[ Redacted ]

**2021-07-29 11:00:38  Timos Gies**  - Changed:  State, Subject person

State: Work in Progress  was: Ready

Subject person: Ashley Gjovik  was: Anonymous User

**2021-07-28 17:00:11**  Case HRC000015205 has been assigned to you  -  Email sent

 Sent: timos[ Redacted ]

APL-GAELG_00002333

**2021-07-28 17:00:08  Kathleen Emery**  - Changed:  Assigned to

Assigned to: Timos Gies

**2021-07-23 13:59:42  CST Guest**  - Changed:  Assignment group, Description, HR service, HR Service Subtype, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

Description:
CASE 2021-7-4227 - Other NOTIFICATION RULE New cases LINK TO CASE https://apple.ethicspointvp.com/case.aspx?caseId=8826 Please click the link above to view case information. NAVEX Global www.navexglobal.com This is a system-generated email. If you would like to be unsubscribed, please contact your administrator. NAVEX Global reference: d712add9-8511-4498-91dc-cbd42d066021 *************** CONFIDENTIALITY NOTICE *************** This e-mail and any attachments may contain private, confidential, and privileged information for the sole use of the intended recipient. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please contact the sender at NAVEX Global, keep the contents confidential and immediately delete the message and any attachments from your system. ********************************************************

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: CST Guest

Opened for: Anonymous User

Priority: 3 - Low

Restricted: false

Source: Inbound Email

State: Ready

Subject person: Anonymous User

Title: NEW CASE ADDED FROM HOTLINE: Case 2021-7-4227 - Other

**2021-07-23 13:59:38**  NEW CASE ADDED FROM HOTLINE: Case 2021-7-4227 - Other  -  Email Received

Received: noreply@navexglobal.com

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Public Communications | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

| | |
|---|---|
| **Case Resolution** | Duplicate Report |

## Comments/Worknotes

APL-GAELG_00002334

## HR Tasks    Parent = HRC000015205                                               0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
| No records to display | | | | | |

## Interactions    Sys ID in                                                        0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | |

## Child Cases    Parent = HRC000015205                                            0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | | | | |

## Knowledge    Source Task = HRC000015205                                         0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | | |

## Related Cases    Active = true AND Record ID [Document ID] = 28c25699b72130104c5dfcbb6a8c0290        0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|
| No records to display | | | |

## Attachments    Active = true AND Record sys ID = 28c25699b72130104c5dfcbb6a8c0290        2 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|
| Screen Shot 2021-07-23 at 2.04.15 PM.png | false | timos-1169384853 | 2021-07-29 11:03:56 |
| Screen Shot 2021-07-23 at 2.04.43 PM.png | false | timos-1169384853 | 2021-07-29 11:03:56 |

APL-GAELG_00002335

# EXHIBIT 3

Attached as Exhibit 3 is Apple Business Conduct Ticket HRC000015213, produced by Defendant in discovery.

## Ethics

Manage Attachments (7): IMG_1383.jpeg  [download]   Screen Shot 2021-07-24 at 1.49.23 PM.png  [download]   Screen

| | | | |
|---|---|---|---|
| **Number** | HRC000015213 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-07-24 14:05:56 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**   Concerns with ee posts

**Description:**

An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office.
Referred to ER

**Additional comments:**

**Work notes (Private)**

Conversation    ☑ **All (40)**   ☑ **Assigned to (1)**   ☑ **Assignment group (1)**   ☑ **Additional comments (1)**   ☑ **Source (1)**   ☑ **Description (2)**   ☑ **HR service (1)**   ☑ **Opened by (1)**   ☑ **Opened for (1)**   ☑ **Priority (1)**   ☑ **Title (3)**   ☑ **State (3)**   ☑ **Subject person (2)**   ☑ **Case Resolution (1)**   ☑ **Business Conduct Policy (1)**   ☑ **Investigation Team (1)**   ☑ **HR Service Subtype (1)**   ☑ **Restricted (1)**   ☑ **System update (7)**   ☑ **Work notes (3)**   ☑ **Email (7)**

**2021-08-02 15:44:40  Kathleen Emery** - Changed:  State

State: Closed Complete  was: Work in Progress

**2021-08-02 15:44:34  Kathleen Emery** - Changed:  Work notes

ER acknowledged

**2021-07-28 17:57:40**  Case HRC000015213 -- work notes added  - Email sent

Sent: kemery Redacted

**2021-07-28 17:57:38  Antonio Lagares** - Changed:  Work notes

We are aware and addressing this issue.

TL

On Jul 28, 2021, at 17:47, Business Conduct Redacted wrote:

APL-GAELG_00002339

Hi ER

I am forwarding this email and attachments from [Redacted] PBP for ISS, about Ashley Gjovik's twitter posts and false accusations.

We do not need an update.

Kathleen

////

Hi Business Conduct,

An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office and that we are putting people's lives at risk).

This same employee is part of the remote work advocacy Slack channel, and has also made some troubling comments in that Slack channel.

As a member of the People Team who has been involved in helping with the communications to employees who have expressed concern about returning to work, I know we have taken great care in connecting with our employees to understand their perspective and to address these concerns in a thoughtful way. It's very concerning to me that someone would go out of their way to accuse Apple of putting people's lives at risk in such public news forums, including making statements that are not true.

Thanks,
[Redacted]

https://twitter.com/ashleygjovik/status/1418969039099994112
<https://twitter.com/ashleygjovik/status/1418969039099994112>
[Redacted] |  People Business Partner - AI/ML | [Redacted]
<mailto:[Redacted]

Additional information:

Full-length article in which the original quote and other Apple confidential information originally appears:

https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html?referringSource=articleShare <https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html?referringSource=articleShare>

Specific excerpts:
There is no mention of the fact that People Business Partners individually reached out and contacted the 1500+ employees who signed the letter to better understand their individual situations and summarize this info to share back with Tim, only a statement that "Tim did not respond".

Tweets where multiple Apple employees are publicly sharing and commenting on internal Apple documents in a way that could be damaging to our employment

<84e08ca5-4ac5-425b-860d-e7dbb95b9ea5_MSG1627519457976_4238.png><Screen Shot 2021-07-24 at 1.49.35 PM_MSG1627519462591_6904.png><image0_MSG1627519460351_3278.png>
<image1_MSG1627519461439_7471.png><86147da3-eb20-412d-a3c6-95e15d60f1aa_MSG1627519459955_8905.png><IMG_1383_MSG1627519462191_7424.jpeg><Screen Shot 2021-07-

APL-GAELG_00002340

24 at 1.49.23 PM_MSG1627519462193_2943.png>

**2021-07-28 17:57:10**  Re: Hardware Employees comments Twitter post Case HRC000015213  -  Email Received

Received: CST Guest

**2021-07-28 17:48:08  Kathleen Emery**  - Changed:  Case Resolution, Description, Investigation Team, Title

Case Resolution: Directed to Appropriate Resources

Description:
An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office. Referred to ER

Investigation Team: Employee Relations

Title: Concerns with ee posts  was: Concerning by Apple employee

**2021-07-28 17:44:10**  Case HRC000015213 -- comments added  -  Email sent

Sent: [ Redacted ]

**2021-07-28 17:43:50  Kathleen Emery**  - Changed:  Additional comments, Assigned to, Business Conduct Policy, HR Service Subtype, State, Subject person, Title

HI [ Redacted ]
Thanks for reaching out regarding Ashley Gjovi's comments. I forwarded the emails to ER for Hardware.
Kathleen

Assigned to: Kathleen Emery

Business Conduct Policy: Not Business Conduct

HR Service Subtype: Report a concern

State: Work in Progress  was: Ready

Subject person: Ashley Gjovik  was [ Redacted ]

Title: Concerning by Apple employee  was: Concerning comments in NYT Article and on Twitter by Apple employee

**2021-07-28 17:37:35**  Hardware Employees comments Twitter post Case HRC000015213  -  Email sent

Sent: US_Corp_ER_BC [ Redacted ]

**2021-07-25 09:14:02  Help Central**  - Changed:  System update

System update:
Inserted File Name: image0.png / By [ Redacted ]

**2021-07-25 09:14:02  Help Central**  - Changed:  System update

System update:
Inserted File Name: 86147da3-eb20-412d-a3c6-95e15d60f1aa.png / By: [ Redacted ]

**2021-07-25 09:14:02  Help Central**  - Changed:  System update

System update:
Inserted File Name: image1.png / By: [ Redacted ]

**2021-07-25 09:14:02  Help Central**  - Changed:  System update

System update:

APL-GAELG_00002341

Inserted File Name: 84e08ca5-4ac5-425b-860d-e7dbb95b9ea5.png / By: | Redacted |

**2021-07-25 09:13:51** | Redacted | - Changed: Work notes

Additional information:

Full-length article in which the original quote and other Apple confidential information originally appears:

https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html?referringSource=articleShare

Specific excerpts:

There is no mention of the fact that People Business Partners individually reached out and contacted the 1500+ employees who signed the letter to better understand their individual situations and summarize this info to share back with Tim, only a statement that "Tim did not respond".

Tweets where multiple Apple employees are publicly sharing and commenting on internal Apple documents in a way that could be damaging to our employment

Sent from my iPhone

> On Jul 24, 2021, at 2:06 PM, Business Conduct | Redacted | wrote:
>
>
>
> Thank you for contacting
> Business Conduct Office
> A case has been created for you regarding your inquiry and we will reply with more information as soon as we can. If you have any additional details or questions you'd like to share, please put them in a reply to this email.
> Your reply to this email will be automatically posted to the Case Activity Log.
>

**2021-07-25 09:13:49** Re: Business Conduct Helpline Case HRC000015213 has been opened - Email Received

Received: | Redacted |

**2021-07-24 14:06:10** Business Conduct Helpline Case HRC000015213 has been opened - Email sent

Sent: | Redacted |

**2021-07-24 14:06:03** **Help Central** - Changed: System update

System update:
Inserted File Name: Screen Shot 2021-07-24 at 1.49.35 PM.png / By: | Redacted |

**2021-07-24 14:06:03** **Help Central** - Changed: System update

System update:
Inserted File Name: Screen Shot 2021-07-24 at 1.49.23 PM.png / By: | Redacted |

**2021-07-24 14:06:03** **Help Central** - Changed: System update

System update:
Inserted File Name: IMG_1383.jpeg / By: kmichallik@apple.com

APL-GAELG_00002342

**2021-07-24 14:05:56** [ Redacted ] - Changed:  Assignment group, Description, HR service, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

Description:
Hi Business Conduct, An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office and that we are putting people's lives at risk). This same employee is part of the remote work advocacy Slack channel, and has also made some troubling comments in that Slack channel. As a member of the People Team who has been involved in helping with the communications to employees who have expressed concern about returning to work, I know we have taken great care in connecting with our employees to understand their perspective and to address these concerns in a thoughtful way. It's very concerning to me that someone would go out of their way to accuse Apple of putting people's lives at risk in such public news forums, including making statements that are not true. Thanks, [ Redacted ] https://twitter.com/ashleygjovik/status/1418969039099994112 [ Redacted ]  People Business Partner - AI/ML | [ Redacted ]

HR service: Business Conduct Helpline - Deactivated

Opened by:
Opened for: [ Redacted ]

Priority: 3 - Low

Restricted: false

Source: Inbound Email

State: Ready

Subject person: [ Redacted ]

Title: Concerning comments in NYT Article and on Twitter by Apple employee

**2021-07-24 14:05:51** Concerning comments in NYT Article and on Twitter by Apple employee - Email Received

Received: [ Redacted ]

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

**Case Resolution**   Directed to Appropriate Re

## Comments/Worknotes

APL-GAELG_00002343

## HR Tasks   Parent = HRC000015213                                                                        0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|

No records to display

## Interactions   Sys ID in                                                                                 0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|

No records to display

## Child Cases   Parent = HRC000015213                                                                       0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|

No records to display

## Knowledge   Source Task = HRC000015213                                                                   0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|

No records to display

## Related Cases   Active = true AND Record ID [Document ID] = a5cd536db729b0104c5dfcbb6a8c02cb                0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|

No records to display

## Attachments   Active = true AND Record sys ID = a5cd536db729b0104c5dfcbb6a8c02cb                            7 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|
| 84e08ca5-4ac5-425b-860d-e7dbb95b9ea5.png | false | | 2021-07-25 09:13:49 |
| 86147da3-eb20-412d-a3c6-95e15d60f1aa.png | false | | 2021-07-25 09:13:49 |
| image0.png | false | | 2021-07-25 09:13:48 |
| image1.png | false | Redacted | 2021-07-25 09:13:48 |
| IMG_1383.jpeg | false | | 2021-07-24 14:05:51 |
| Screen Shot 2021-07-24 at 1.49.23 PM.png | false | | 2021-07-24 14:05:51 |
| Screen Shot 2021-07-24 at 1.49.35 PM.png | false | | 2021-07-24 14:05:51 |

APL-GAELG_00002344

# EXHIBIT 4

3.      Attached as Exhibit 4 is Apple Business Conduct Ticket HRC00015667, produced by Defendant in discovery.

## Ethics

| | | | |
|---|---|---|---|
| **Number** | HRC000015667 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Self-service |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-04 12:09:18 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**   Employee discussing Apple in the media

**Description:**

A HW employee is discussing Apple in the media. This matter was already raised to ER in case HRC000015205.

**Additional comments:**

**Work notes (Private)**

Conversation ☑All (23) ☑Assigned to (1) ☑Assignment group (1) ☑Additional comments (1) ☑Source (1) ☑ ☑Description (1) ☑HR service (1) ☑Opened by (1) ☑Opened for (1) ☑Priority (2) ☑Title (2) ☑State (2) ☑Subject person (2) ☑Case Resolution (1) ☑Business Conduct Policy (1) ☑Investigation Team (1) ☑HR Service Subtype (1) ☑Restricted (1) ☑Email (2)

**2021-08-10 17:26:20  Timos Gies** - Changed: Business Conduct Policy, Case Resolution, Description, Investigation Team, Priority, State, Subject person, Title

Business Conduct Policy: Public Communications

Case Resolution: Duplicate Report

Description:
A HW employee is discussing Apple in the media. This matter was already raised to ER in case HRC000015205.

Investigation Team: Employee Relations

Priority: 3 - Low  was: 2 - Moderate

State: Closed Complete  was: Ready

Subject person: Ashley Gjovik  was: Redacted

Title: Employee discussing Apple in the media  was: Business Conduct Helpline case for Redacted

**2021-08-10 17:24:10** Case HRC000015667 -- comments added - Email sent

Sent: Redacted

**2021-08-10 17:23:51  Timos Gies** - Changed: Additional comments

Hi Redact

APL-GAELG_00002353

Thank you for reaching out to Business Conduct.

We have raised this concern to the appropriate internal partners to review and take action as necessary.

Best regards,

Timos

**2021-08-10 16:00:09**  **Timos Gies**  - Changed:  Assigned to

Assigned to: Timos Gies

**2021-08-04 12:09:40**  Business Conduct Helpline Case HRC000015667 has been opened  -  Email sent

Sent: Redacted

**2021-08-04 12:09:23** Redacted - Changed:  Assignment group, HR service, HR Service Subtype, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: Redacted

Opened for: Redacted

Priority: 2 - Moderate

Restricted: false

Source: Self-service

State: Ready

Subject person: Redacted

Title: Business Conduct Helpline case for Redacted

Variables

**Ask or Report**

Report a concern

**Name**

Redacted

**Apple email address**

Redacted

**Preferred phone number**

Redacted

**Explain what happened ***

APL-GAELG_00002354

It has come to my attention that an employee is posting Apple policy details and/or may be talking to the press about Apple.

**Date**

July 30, 2021

**Time**

**Location \***

https://twitter.com/ashleygjovik

**List team members and/or people involved \***

Ashley Gjovik

**Have you reported this to anyone else? If so, who? \***

No

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Public Communications | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

**Case Resolution**   Duplicate Report

## Comments/Worknotes

---

### HR Tasks   Parent = HRC000015667                                          0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
| No records to display | | | | | |

---

### Interactions   Sys ID in                                          0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|

APL-GAELG_00002355

No records to display

---

## Child Cases    Parent = HRC000015667                                                    0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|

No records to display

---

## Knowledge    Source Task = HRC000015667                                              0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|

No records to display

---

## Related Cases    Active = true AND Record ID [Document ID] = 5c8b27c5b7313010ffd7f0bf6a8c02fd                    0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|

No records to display

---

## Attachments    Active = true AND Record sys ID = 5c8b27c5b7313010ffd7f0bf6a8c02fd    0 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|

No records to display

APL-GAELG_00002356

# EXHIBIT 5

4.      Attached as Exhibit 5 is Apple Business Conduct Ticket HRC000015730, produced by Defendant in discovery.

## Ethics

Manage Attachments (1): EthicsPoint Incident Management - 4277.pdf  [download]

| | | | |
|---|---|---|---|
| **Number** | HRC000015730 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Anonymous User | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-05 07:39:41 |
| **HR Service Subtype** | Report a concern | **Opened by** | CST Guest |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**   Postings on Twitter

**Description:**

Case 2021-8-4277 - Inappropriate Behavior

User is concerned that Ashley Gjovik and ⬚Redacted⬚ are posting Apple information on twitter that should not be publicly shared. This case is already being looking into by business partners, so this will be closed as a duplicate. See HRC000015205 for work.

**Additional comments:**

**Work notes (Private)**

Conversation  ☑All (24)  ☑Assigned to (1)  ☑Assignment group (1)  ☑Source (1)  ☑Description (3)  ☑HR service (1)  ☑Opened by (1)  ☑Opened for (1)  ☑Priority (1)  ☑Title (2)  ☑State (2)  ☑Subject person (2)  ☑Case Resolution (1)  ☑Business Conduct Policy (1)  ☑Investigation Team (1)  ☑HR Service Subtype (1)  ☑ Restricted (1)  ☑System update (1)  ☑Email (2)

**2021-08-11 14:00:16  Timos Gies** - Changed: Business Conduct Policy, Case Resolution, Description, Investigation Team, State

Business Conduct Policy: Not Business Conduct

Case Resolution: Duplicate Report

Description:
Case 2021-8-4277 - Inappropriate Behavior User is concerned that Ashley Gjovik and ⬚Redacted⬚ are posting Apple information on twitter that should not be publicly shared. This case is already being looking into by business partners, so this will be closed as a duplicate. See HRC000015205 for work.

Investigation Team: Employee Relations

State: Closed Complete  was: Ready

**2021-08-06 10:48:10**  Case HRC000015730 has been assigned to you  - Email sent

Sent: timos⬚Redacted⬚

**2021-08-06 10:47:52  Owen O'Malley** - Changed: Assigned to, Description, Subject person, Title

APL-GAELG_00002358

Assigned to: Timos Gies

Description:
Case 2021-8-4277 - Inappropriate Behavior User is concerned that Ashley Gjovik and [Redacted] are posting Apple information on twitter that should not be publicly shared.

Subject person: Ashley Gjovik  was: Anonymous User

Title: Postings on Twitter  was: NEW CASE ADDED FROM HOTLINE: Case 2021-8-4277 - Inappropriate Behavior

**2021-08-06 10:47:46  Owen O'Malley**  - Changed:  System update

System update:
Inserted File Name: EthicsPoint Incident Management - 4277.pdf / By: oomalley5@apple.com

**2021-08-05 07:39:41  CST Guest**   - Changed:  Assignment group, Description, HR service, HR Service Subtype, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

Description:
CASE 2021-8-4277 - Inappropriate Behavior NOTIFICATION RULE New cases LINK TO CASE https://apple.ethicspointvp.com/case.aspx?caseId=8876 Please click the link above to view case information. NAVEX Global www.navexglobal.com This is a system-generated email. If you would like to be unsubscribed, please contact your administrator. NAVEX Global reference: ae2d6fae-385e-48e0-9402-41c843516636 *************** CONFIDENTIALITY NOTICE *************** This e-mail and any attachments may contain private, confidential, and privileged information for the sole use of the intended recipient. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please contact the sender at NAVEX Global, keep the contents confidential and immediately delete the message and any attachments from your system. *******************************************************

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: CST Guest

Opened for: Anonymous User

Priority: 3 - Low

Restricted: false

Source: Inbound Email

State: Ready

Subject person: Anonymous User

Title: NEW CASE ADDED FROM HOTLINE: Case 2021-8-4277 - Inappropriate Behavior

**2021-08-05 07:39:35**  NEW CASE ADDED FROM HOTLINE: Case 2021-8-4277 - Inappropriate Behavior  - Email Received

Received: noreply@navexglobal.com

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |

APL-GAELG_00002359

| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |
|---|---|---|---|

## Resolution

| **Case Resolution** | Duplicate Report |
|---|---|

## Comments/Worknotes

---

## HR Tasks   Parent = HRC000015730                                    0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|

No records to display

---

## Interactions   Sys ID in                                         0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|

No records to display

---

## Child Cases   Parent = HRC000015730                              0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|

No records to display

---

## Knowledge   Source Task = HRC000015730                          0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|

No records to display

---

## Related Cases   Active = true AND Record ID [Document ID] = fc78b751b7713010c2ed797d9a8c029c                    0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|

No records to display

---

## Attachments   Active = true AND Record sys ID = fc78b751b7713010c2ed797d9a8c029c          1 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|
| EthicsPoint Incident Management - 4277.pdf | false | Redacted | 2021-08-06 10:47:44 |

APL-GAELG_00002360

# EXHIBIT 6

5.      Attached as Exhibit 6 is Apple Business Conduct Ticket HRC000015725, produced by Defendant in discovery.

# Ethics

Manage Attachments (2): Screenshot 2021-08-05 at 09.53.10.png  [download]  Pasted image - 1628702750592 -

| | | | |
|---|---|---|---|
| **Number** | HRC000015725 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-05 02:03:03 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**    Employee inciting others to talk to press/leak on Slack

**Description:**

This employee is on indefinite leave and ER is investigating the comments.
referred to ER

**Additional comments:**

**Work notes (Private)**

Conversation    ☑ **All (29)**   ☑ **Assigned to (1)**   ☑ **Assignment group (1)**   ☑ **Additional comments (1)**   ☑ **Source (1)**   ☑ **Description (3)**   ☑ **HR service (1)**   ☑ **Opened by (1)**   ☑ **Opened for (1)**   ☑ **Priority (1)**   ☑ **Title (1)**   ☑ **State (3)**   ☑ **Subject person (2)**   ☑ **Case Resolution (1)**   ☑ **Business Conduct Policy (1)**   ☑ **Investigation Team (1)**   ☑ **HR Service Subtype (1)**   ☑ **Restricted (1)**   ☑ **System update (2)**   ☑ **Work notes (1)**   ☑ **Email (4)**

**2021-08-11 17:24:07**   **Kathleen Emery**   - Changed:   Work notes

.

**2021-08-11 10:27:27**   **Help Central**   - Changed:   System update

System update:
Inserted File Name: Pasted image - 1628702750592 - 0567_MSG1628702750762_0067.png / By:
kemery   Redacted

**2021-08-11 10:27:27**   **Kathleen Emery**   - Changed:   State

State: Closed Complete   was: Work in Progress

**2021-08-11 10:27:24**   **Kathleen Emery**   - Changed:   Business Conduct Policy, Case Resolution, Description, Investigation Team

Business Conduct Policy: Not Business Conduct

Case Resolution: Directed to Appropriate Resources

Description:
This employee is on indefinite leave and ER is investigating the comments. referred to ER

Investigation Team: Employee Relations

APL-GAELG_00002365

**2021-08-11 10:24:35**  Hardware Ashley Gjovik Non-BC Case HRC000015725  -  Email sent

Sent: US_Corp_ER_BC [ Redacted ]

**2021-08-11 10:23:57  Kathleen Emery**  - Changed:  Assigned to, Description, HR Service Subtype, State, Subject person

Assigned to: Kathleen Emery

Description:
I think an employee is encouraging other fellow employees to talk to/leak to journalists about internal discussions on Slack. I've added a link to their message on Slack and a screenshot.: https://a1391190.slack.com/archives/C01AQGGMC6A/p1628105468472500? thread_ts=1628047506.341700&cid=C01AQGGMC6A Also, there as been a series of leaked informal polls and drafts of open letters to Tim coming from that channel: https://a1391190.slack.com/archives/C01AQGGMC6A

HR Service Subtype: Report a concern

State: Work in Progress  was: Ready

Subject person: Ashley Gjovik  was: [ Redacted ]

**2021-08-11 10:23:40**  Case HRC000015725 -- comments added  -  Email sent

Sent: [ Redacted ]

**2021-08-11 10:23:37  Kathleen Emery**  - Changed:  Additional comments

Hello [Redacte]
Thank you for contacting the Business Conduct office.
We are looking into the Slack comments.
Kathleen

**2021-08-05 02:03:23  Help Central**  - Changed:  System update

System update:
Inserted File Name: Screenshot 2021-08-05 at 09.53.10.png / By: [ Redacted ]

**2021-08-05 02:03:10**  Business Conduct Helpline Case HRC000015725 has been opened  -  Email sent

Sent: [ Redacted ]

**2021-08-05 02:03:03** [ Redacted ]  - Changed:  Assignment group, Description, HR service, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

Description:
I think an employee is encouraging other fellow employees to talk to/leak to journalists about internal discussions on Slack. I've added a link to their message on Slack and a screenshot.: https://a1391190.slack.com/archives/C01AQGGMC6A/p1628105468472500? thread_ts=1628047506.341700&cid=C01AQGGMC6A Also, there as been a series of leaked informal polls and drafts of open letters to Tim coming from that channel: https://a1391190.slack.com/archives/C01AQGGMC6A It looks like that person might not be the most averse to these practices. Worth checking. All the best, [Redacte]
[ Redacted ] 🇬🇧 Wallet and Apple Pay QE. [ Redacted ]

HR service: Business Conduct Helpline - Deactivated

Opened by: [ Redacted ]
Opened for:

Priority: 3 - Low

APL-GAELG_00002366

Restricted: false

Source: Inbound Email

State: Ready

Subject person: [ Redacted ]

Title: Employee inciting others to talk to press/leak on Slack

**2021-08-05 02:02:39** Employee inciting others to talk to press/leak on Slack  -  Email Received

Received: [ Redacted ]

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

**Case Resolution**    Directed to Appropriate Re

## Comments/Worknotes

---

## HR Tasks    Parent = HRC000015725       0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
| No records to display | | | | | |

---

## Interactions    Sys ID in       0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | |

---

## Child Cases    Parent = HRC000015725       0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | | | | |

---

## Knowledge    Source Task = HRC000015725       0 Knowledge

APL-GAELG_00002367

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|--------|--------|-----------|--------------|--------|--------------|----------|-------------|----------|--------------------|

No records to display

## Related Cases   Active = true AND Record ID [Document ID] = 616b2e59b77130104c5d7244aa8c02e1

0 Related Records

| Related Record ID | Title | State | Created |
|-------------------|-------|-------|---------|

No records to display

## Attachments   Active = true AND Record sys ID = 616b2e59b77130104c5d7244aa8c02e1

2 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|-----------|--------|-------------|-------------|
| Pasted image - 1628702750592 - 0567.png | false | kemery-3131 | 2021-08-11 10:25:50 |
| Screenshot 2021-08-05 at 09.53.10.png | false | Redacted | 2021-08-05 02:02:39 |

APL-GAELG_00002368

# EXHIBIT 7

6.      Attached as Exhibit 7 is Apple Business Conduct Ticket HRC000016297, produced by Defendant in discovery.

## Ethics

Manage Attachments (1): Screen Shot 2021-08-17 at 10.59.38 AM.png  [download]

| | | | |
|---|---|---|---|
| **Number** | HRC000016297 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-17 11:06:46 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**   PBP sharing SLACK postings

**Description:**

PBP was notified of a situation on slack,
ER and I advised PBP to share this with Debbie Rice and Adelmise as they are already investigating and BCHL doesn't need to be included

**Additional comments:**

**Work notes (Private)**

Conversation

☑ **All (39)**   ☑ **Assigned to (1)**   ☑ **Assignment group (1)**   ☑ **Source (1)**   ☑ **Description (4)**   ☑ **HR service (1)**   ☑ **Opened by (1)**   ☑ **Opened for (1)**   ☑ **Priority (3)**   ☑ **Title (2)**   ☑ **State (3)**   ☑ **Subject person (2)**   ☑ **Case Resolution (1)**   ☑ **Business Conduct Policy (1)**   ☑ **Investigation Team (1)**   ☑ **HR Service Subtype (1)**   ☑ **Restricted (1)**   ☑ **System update (1)**   ☑ **Work notes (6)**   ☑ **Email (7)**

**2021-09-01 13:15:33  Kathleen Emery** - Changed:  State

State: Closed Complete   was: Work in Progress

**2021-09-01 13:14:51  Kathleen Emery** - Changed:  Description, Title

Description:
PBP was notified of a situation on slack, ER and I advised PBP to share this with Debbie Rice and Adelmise as they are already investigating and BCHL doesn't need to be included

Title: PBP sharing SLACK postings   was: Complaint / On Notice

**2021-08-27 21:32:38  Kathleen Emery** - Changed:  Description

Description:
PBP was notified of a situation on slack, Referred to ER and Debbie Rice

**2021-08-24 16:32:29  Debbie Rice**  - Changed:  Work notes

Hi-
 Thanks.

APL-GAELG_00002383

> On Aug 24, 2021, at 2:55 PM, Adelmise Warner ⟨ Redacted ⟩ > wrote:
>
> +Debbie
>
> Thanks, Krista. ⟨ Attorney Client Privilege ⟩
>

⟨ Attorney Client Privilege ⟩

> Adelmise
>
>> On Aug 24, 2021, at 2:33 PM, Krista Heieck ⟨ Redacted ⟩ wrote:
>>
>> Hi Kathleen -
>>
>> I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.
>>
>> Adelmise, Kathleen please connect with each other on the question that you have. ⟨Red⟩ and I are not involved in this directly
>>
>> Thank you
>> Krista
>>
>>
>> Krista Heieck
>>
>> Corporate Employee Relations
>>  Apple, Inc.
>> Santa Clara Valley
>> ⟨ Redacted ⟩
>>
>>
>> For assistance with HR Programs and services, see People Web or contact the People Support at ⟨ Redacted ⟩ or ⟨ Redacted ⟩
>>
>>  Apple HR
>>
>>
>> This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.
>>
>>> On Aug 24, 2021, at 1:57 PM, Business Conduct ⟨ Redacted ⟩ ⟨ Redacted ⟩ > wrote:
>>>
>>> Hi ⟨Red⟩ and Krista
>>>

APL-GAELG_00002384

>>> I understand Debbie Rice and Adelmise are working some issues with Ashley - the employee who was mentioned in the Slack message you sent us.
>>>
>>> I am curious, if ER is copied, does business conduct need to be copied too? My assumption is no, but i would love your input!
>>>
>>> take care
>>>
>>> Kathleen
>>>
>>>
>>
>

Debbie Rice
Global Employment Law
 Apple Inc.
(she/her/hers)

**2021-08-24 16:32:28  Debbie Rice** - Changed:  Work notes

Hi-
| Attorney Client Privilege | Thanks.

> On Aug 24, 2021, at 2:55 PM, Adelmise Warner | Redacted | wrote:
>
> +Debbie
>
> Thanks, Krista. | Attorney Client Privilege |
>

| Attorney Client Privilege |

> Adelmise
>
>> On Aug 24, 2021, at 2:33 PM, Krista Heieck | Redacted | wrote:
>>
>> Hi Kathleen -
>>
>> I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.
>>
>> Adelmise, Kathleen please connect with each other on the question that you have. Red and I are not involved in this directly
>>
>> Thank you
>> Krista
>>
>>
>> Krista Heieck
>>
>> Corporate Employee Relations

APL-GAELG_00002385

>> 🍎 Apple, Inc.
>> Santa Clara Valley
>>

```
                        Redacted
```

>>
>>
>> For assistance with HR Programs and services, see People Web or contact the People Support at [ Redacted ] or
[ Redacted ]
>>
>> 🍎 Apple HR
>>
>>
>> This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.
>>
>>> On Aug 24, 2021, at 1:57 PM, Business Conduct [ Redacted ] [ Redacted ] wrote:
>>>
>>> Hi [Re] and Krista
>>>
>>> I understand Debbie Rice and Adelmise are working some issues with Ashley - the employee who was mentioned in the Slack message you sent us.
>>>
>>> I am curious, if ER is copied, does business conduct need to be copied too? My assumption is no, but i would love your input!
>>>
>>> take care
>>>
>>> Kathleen
>>>
>>>
>>
>

Debbie Rice
Global Employment Law
🍎 Apple Inc.
(she/her/hers)

**2021-08-24 16:32:24**  Re: a situation on slack Case HRC000016297  - Email Received

Received: drice@apple.com

**2021-08-24 14:56:32  Adelmise Rosemé Warner**  - Changed: Work notes

+Debbie

Thanks, Krista. [ Attorney Client Privilege ]

```
                        Attorney Client Privilege
```

APL-GAELG_00002386

Attorney Client Privilege

Adelmise

> On Aug 24, 2021, at 2:33 PM, Krista Heieck Redacted wrote:
>
> Hi Kathleen -
>
> I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.
>
> Adelmise, Kathleen please connect with each other on the question that you have. Re and I are not involved in this directly
>
> Thank you
> Krista
>
>
> Krista Heieck
>
> Corporate Employee Relations
> Apple, Inc.
> Santa Clara Valley

Redacted

>
>
> For assistance with HR Programs and services, see People Web or contact the People Support at Redacted or Redacted
>
> Apple HR
>
>
> This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.
>
>> On Aug 24, 2021, at 1:57 PM, Business Conduct Redacted Redacted wrote:
>>
>> Hi Red and Krista
>>
>> I understand Debbie Rice and Adelmise are working some issues with Ashley - the employee who was mentioned in the Slack message you sent us.
>>
>> I am curious, if ER is copied, does business conduct need to be copied too? My assumption is no, but i would love your input!
>>
>> take care
>>
>> Kathleen
>>
>>
>

APL-GAELG_00002387

**2021-08-24 14:56:31  Adelmise Rosemé Warner** - Changed:  Work notes

+Debbie

Thanks, Krista. | Attorney Client Privilege |

| Attorney Client Privilege |

Adelmise

> On Aug 24, 2021, at 2:33 PM, Krista Heieck [ Redacted ] wrote:
>
> Hi Kathleen -
>
> I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.
>
> Adelmise, Kathleen please connect with each other on the question that you have. [Red]and I are not involved in this directly
>
> Thank you
> Krista
>
>
> Krista Heieck
>
> Corporate Employee Relations
> 🍎 Apple, Inc.
> Santa Clara Valley

| Redacted |

>
>
> For assistance with HR Programs and services, see People Web or contact the People Support at [ Redacted ] or

| Redacted |

>
> 🍎 Apple HR
>
>
> This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.
>
>> On Aug 24, 2021, at 1:57 PM, Business Conduct [ Redacted ]

| Redacted | wrote:
>>
>> Hi [Red]and Krista
>>

APL-GAELG_00002388

>> I understand Debbie Rice and Adelmise are working some issues with Ashley - the employee who was mentioned in the Slack message you sent us.
>>
>> I am curious, if ER is copied, does business conduct need to be copied too? My assumption is no, but i would love your input!
>>
>> take care
>>
>> Kathleen
>>
>>
>

**2021-08-24 14:56:25**  Re: a situation on slack Case HRC000016297  -  Email Received

Received: adelmise ┌─────────────┐
                    │  Redacted   │
                    └─────────────┘

**2021-08-24 14:35:34  Krista Heieck**  - Changed:  Work notes

Hi Kathleen -

I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.

Adelmise, Kathleen please connect with each other on the question that you have. [Red] and I are not involved in this directly

Thank you
Krista


Krista Heieck

Corporate Employee Relations
 Apple, Inc.
Santa Clara Valley

┌─────────────────────┐
│      Redacted       │
└─────────────────────┘


For assistance with HR Programs and services, see People Web or contact the People Support at ┌─────────────┐ or
                                                                                               │  Redacted   │
┌──────────────────────────────────────────┐                                                  └─────────────┘
│                 Redacted                  │
└──────────────────────────────────────────┘

 Apple HR


This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

> On Aug 24, 2021, at 1:57 PM, Business Conduct ┌─────────────────────┐ wrote:
                                                │      Redacted       │
                                                └─────────────────────┘
>
> Hi [Re] and Krista
>
> I understand Debbie Rice and Adelmise are working some issues with Ashley - the employee who was mentioned in the Slack message you sent us.

APL-GAELG_00002389

>
> I am curious, if ER is copied, does business conduct need to be copied too? My assumption is no, but i would love your input!
>
> take care
>
> Kathleen
>
>

**2021-08-24 14:35:26**  Re: a situation on slack Case HRC000016297  -  Email Received

Received: kheieck [Redacted]

**2021-08-24 13:59:07  Kathleen Emery**  - Changed:  Description

Description:
PBP was notified of a situation on slack, and wanted to pull this group together My attention was drawn to https://a1391190.slack.com/archives/CK1KDPQCF/p1629104867200500 today, which shows some

**2021-08-24 13:58:21  Kathleen Emery**  - Changed:  Priority, Subject person

Priority: 3 - Low  was: 2 - Moderate

Subject person: Ashley Gjovik  was: [Redacted]

**2021-08-24 13:57:50  Kathleen Emery**  - Changed:  Assigned to, Business Conduct Policy, Case Resolution, HR Service Subtype, Investigation Team, Priority, State

Assigned to: Kathleen Emery

Business Conduct Policy: Not Business Conduct

Case Resolution: Directed to Appropriate Resources

HR Service Subtype: Report a concern

Investigation Team: Employee Relations

Priority: 2 - Moderate  was: 3 - Low

State: Work in Progress  was: Ready

**2021-08-24 13:57:12**  a situation on slack Case HRC000016297  -  Email sent

Sent: [Redacted] , kheieck [Redacted]

**2021-08-17 11:09:38  Krista Heieck**  - Changed:  Work notes

[Reda] I will escalate this. There is an active open investigation.

Thank you for forwarding

Krista Heieck

Corporate Employee Relations
 Apple, Inc.
Santa Clara Valley
(408) 796-9162 (Mobile)
kheieck@apple.com

APL-GAELG_00002390

For assistance with HR Programs and services, see People Web or contact the People Support at [ Redacted ] or

[ Redacted ]

 Apple HR

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

> On Aug 17, 2021, at 11:04 AM, [ Redacted ] wrote:
>
> Hi,
>
> I was notified this morning of a situation happening on slack, and wanted to pull this group together as I am new to supporting ACS.
> Please let me know if this is already being investigated.
>
> _____
>
>
> Hi [ Redacte ]
> I'm sorry to be a thorn in your side twice in one week. Thanks very much for helping out as PBP for ACS SRE!
> My attention was drawn to https://a1391190.slack.com/archives/CK1KDPQCF/p1629104867200500 <https://a1391190.slack.com/archives/CK1KDPQCF/p1629104867200500> today, which shows some (alleged) harassment of a female engineer (non-ACS-SRE). I wanted to highlight it to you, as I think that's the right thing to do.
> Please let me know if I should be doing something else. Thanks!
>
> <Screen Shot 2021-08-17 at 10.59.38 AM.png>
> [ Redacted ]
> People Business Partner
>  Apple
> IS&S People
> [ Redacted ]
>

**2021-08-17 11:09:32** Re: Complaint / On Notice  -  Email Received

   Received: kheieck [ Redacted ]

**2021-08-17 11:07:10** Business Conduct Helpline Case HRC000016297 has been opened  -  Email sent

   Sent: [ Redacted ]

**2021-08-17 11:07:02 Help Central**  - Changed: System update

   System update:
   Inserted File Name: Screen Shot 2021-08-17 at 10.59.38 AM.png / By: [ Redacted ]

**2021-08-17 11:06:46** [ Redacted ]  - Changed: Assignment group, Description, HR service, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

   Assignment group: BCGC SN Access

   Description:
   Hi, I was notified this morning of a situation happening on slack, and wanted to pull this group together as I am new to supporting ACS. Please let me know if this is already being investigated.

APL-GAELG_00002391

_____ Hi Redacted I'm sorry to be a thorn in your side twice in one week. Thanks very much for helping out as PBP for ACS SRE! My attention was drawn to https://a1391190.slack.com/archives/CK1KDPQCF/p1629104867200500 today, which shows some (alleged) harassment of a female engineer (non-ACS-SRE). I wanted to highlight it to you, as I think that's the right thing to do. Please let me know if I should be doing something else. Thanks! Red Neal People Business Partner  Apple IS&S People Redacted

HR service: Business Conduct Helpline - Deactivated

Opened by: Redacted

Opened for:

Priority: 3 - Low

Restricted: false

Source: Inbound Email

State: Ready

Subject person: Redacted

Title: Complaint / On Notice

**2021-08-17 11:06:27**  Complaint / On Notice  -  Email Received

Received: Redacted

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

| | |
|---|---|
| **Case Resolution** | Directed to Appropriate Re |

## Comments/Worknotes

---

## HR Tasks   Parent = HRC000016297                                      0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
No records to display

---

## Interactions   Sys ID in                                             0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|
No records to display

APL-GAELG_00002392

## Child Cases     Parent = HRC000016297

0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|

No records to display

## Knowledge     Source Task = HRC000016297

0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|

No records to display

## Related Cases     Active = true AND Record ID [Document ID] = 8feade55a1ce3010c2edc514e70f7e4f

0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|

No records to display

## Attachments     Active = true AND Record sys ID = 8feade55a1ce3010c2edc514e70f7e4f

2 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|
| Screen Shot 2021-08-17 at 10.59.38 AM.png | false | Redacted | 2021-08-17 11:06:27 |
| smime.p7s | false | | 2021-08-24 14:56:25 |

APL-GAELG_00002393

# EXHIBIT 8

7.      Attached as Exhibit 8 is Apple Business Conduct Ticket HRC000016312, produced by Defendant in discovery.

## Ethics

Manage Attachments (1): IMG_6710.jpeg  [download]

| | | | |
|---|---|---|---|
| **Number** | HRC000016312 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-17 14:06:01 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | Redacted |
| | | **Restricted** | ☐ |

**Title**    Posting images of Radar to Twitter

**Description:**

An IS&T employee reported a Twitter post where an employee shared an image from Radar. This is a duplicate of a matter that ER is already supporting. This case will be closed as a duplicate.

**Additional comments:**

**Work notes (Private)**

Conversation

☑ **All (32)**   ☑ **Assigned to (1)**   ☑ **Assignment group (1)**   ☑ **Additional comments (1)**   ☑ **Source (1)**   ☑
☑ **Description (3)**   ☑ **HR service (1)**   ☑ **Opened by (1)**   ☑ **Opened for (1)**   ☑ **Priority (3)**   ☑ **Title (2)**   ☑ **State (3)**   ☑ **Subject person (2)**   ☑ **Case Resolution (1)**   ☑ **Business Conduct Policy (1)**   ☑ **Investigation Team (1)**   ☑ **HR Service Subtype (1)**   ☑ **Restricted (1)**   ☑ **System update (1)**   ☑ **Watch list (1)**   ☑ **Email (5)**

**2021-08-24 16:32:45  Timos Gies**  - Changed:  State

State: Closed Complete  was: Work in Progress

**2021-08-24 16:29:17  Timos Gies**  - Changed:  Business Conduct Policy, Case Resolution, Description, Investigation Team

Business Conduct Policy: Not Business Conduct

Case Resolution: Duplicate Report

Description:
An IS&T employee reported a Twitter post where an employee shared an image from Radar. This is a duplicate of a matter that ER is already supporting. This case will be closed as a duplicate.

Investigation Team: Employee Relations

**2021-08-24 16:26:47  Timos Gies**  - Changed:  Priority, State, Subject person

Priority: 3 - Low  was: 2 - Moderate

State: Work in Progress  was: Ready

Subject person: Ashley Gjovik  was:  Redacted

**2021-08-24 16:26:41**  Case HRC000016312: A comment has been added to your case  - Email sent

APL-GAELG_00002377

Sent: [Redacted]

**2021-08-24 16:26:40**  Case HRC000016312: A comment has been added to your case  -  Email sent

Sent: [Redacted]

**2021-08-24 16:26:31**  **Timos Gies**  - Changed:  Additional comments

Hi [Redac]

Thank you for reaching out to Business Conduct.

This has been shared with the appropriate partners for their review.

**2021-08-24 16:23:40**  Case HRC000016312 has been shared with you  -  Email sent

Sent: [Redacted]

**2021-08-24 16:23:38**  **Timos Gies**  - Changed:  Description, HR Service Subtype, Priority, Title, Watch list

Description:

HR Service Subtype: Report a concern

Priority: 2 - Moderate  was: 1 - Critical

Title: Posting images of Radar to Twitter  was: Fwd: Twitter forward.

Watch list: [Redacted]

**2021-08-24 15:50:37**  **Timos Gies**  - Changed:  Assigned to

Assigned to: Timos Gies

**2021-08-17 14:06:11**  **Help Central**  - Changed:  System update

System update:
Inserted File Name: IMG_6710.jpeg / By: [Redacted]

**2021-08-17 14:06:10**  Business Conduct Helpline Case HRC000016312 has been opened  -  Email sent

Sent: [Redacted]

**2021-08-17 14:06:01** [Redacted] - Changed:  Assignment group, Description, HR service, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

Description:
Hello Business Conduct & Employee Relations teams, I wanted to pass along this tweet from an Apple employee, which was raised as a concern to [Redact] by a member of his team that found it online. It appears to be a screen shot from Radar (our bug tracking system that my team in IS&T owns), showing some interactions between an Apple employee (Ashley) and other Radar users. The URL to the tweet is: https://twitter.com/ashleygjovik/status/1426014545202479108?s=20 Business Conduct/ER seemed like the appropriate escalation path for this. In the event that you would like us to take any action with respect to the content in Radar, please let us know. Thanks, [Redac] > Begin forwarded message: > > From: [Redacted] > Subject: Twitter forward. > Date: August 16, 2021 at 10:26:03 PM PDT > To: [Redacted] > Hi [Redac] > > [Redact] forwarded following snapshot from Twitter, he forwarded just like as title said "Radar is forever". > Both [Redacted] [Redact] and Ashley M. Gjovik seems to be still employees in Apple though Ashley seems to be on indefinite leave. > > [Redact] was suggesting that we should report to Ashley's management. I wanted to check with you as I thought it was clear abuse of Radar and was not sure if we had to take any action, now that we came to know about it. > > Thanks, > [Redacte] > > >

APL-GAELG_00002378

HR service: Business Conduct Helpline - Deactivated

Opened by:

Opened for: | Redacted |

Priority: 1 - Critical

Restricted: false

Source: Inbound Email

State: Ready

Subject person: | Redacted |

Title: Fwd: Twitter forward.

**2021-08-17 14:05:57** Fwd: Twitter forward. - Email Received

Received: | Redacted |

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

| | |
|---|---|
| **Case Resolution** | Duplicate Report |

## Comments/Worknotes

---

## HR Tasks   Parent = HRC000016312                    0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
| No records to display | | | | | |

---

## Interactions   Sys ID in                    0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|
| No records to display | | | | | | | | |

---

## Child Cases   Parent = HRC000016312                    0 HR Cases

| Opened | People Subject | People HR | Assignment | Assigned |
|---|---|---|---|---|

APL-GAELG_00002379

| Number | State | for | Business Partner | person | Business Partner | service | Title | group | to | Opened | Updated |
|--------|-------|-----|------------------|--------|------------------|---------|-------|-------|-----|--------|---------|

No records to display

## Knowledge   Source Task = HRC000016312

0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|--------|--------|------------|--------------|--------|--------------|----------|-------------|----------|--------------------|

No records to display

## Related Cases   Active = true AND Record ID [Document ID] = 30f3c755b74630104c5dfcbb6a8c0266

0 Related Records

| Related Record ID | Title | State | Created |
|-------------------|-------|-------|---------|

No records to display

## Attachments   Active = true AND Record sys ID = 30f3c755b74630104c5dfcbb6a8c0266

1 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|-----------|--------|-------------|-------------|
| IMG_6710.jpeg | false | Redacted | 2021-08-17 14:05:57 |

APL-GAELG_00002380

# EXHIBIT 9

8.    Attached as Exhibit 9 is Apple Business Conduct Ticket HRC00016422, produced by Defendant in discovery.

## Ethics

| | | | |
|---|---|---|---|
| **Number** | HRC000016422 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Self-service |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-19 12:29:47 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**    Employee blog of work experience

**Description:**

Duplicate report of a Hardware employee's blog about their experience at Apple. ER is already aware of this concern.

**Additional comments:**

**Work notes (Private)**

Conversation   ☑ **All (24)**   ☑ **Assigned to (1)**   ☑ **Assignment group (1)**   ☑ **Additional comments (1)**   ☑ **Source (1)**   ☑ ☑ **Description (1)**   ☑ **HR service (1)**   ☑ **Opened by (1)**   ☑ **Opened for (1)**   ☑ **Priority (2)**   ☑ **Title (2)**   ☑ **State (3)**   ☑ **Subject person (2)**   ☑ **Case Resolution (1)**   ☑ **Business Conduct Policy (1)**   ☑ **Investigation Team (1)**   ☑ **HR Service Subtype (1)**   ☑ **Restricted (1)**   ☑ **Email (2)**

**2021-08-26 13:36:38**   **Timos Gies**   - Changed: State

State: Closed Complete   was: Work in Progress

**2021-08-26 13:35:57**   **Timos Gies**   - Changed: Business Conduct Policy, Case Resolution, Description, Investigation Team

Business Conduct Policy: Not Business Conduct

Case Resolution: Duplicate Report

Description:
Duplicate report of a Hardware employee's blog about their experience at Apple. ER is already aware of this concern.

Investigation Team: Employee Relations

**2021-08-26 13:13:39**   **Timos Gies**   - Changed: Priority, Subject person

Priority: 3 - Low   was: 2 - Moderate

Subject person: Ashley Gjovik   was:   Redacted

**2021-08-26 13:13:27**   **Timos Gies**   - Changed: Title

Title: Employee blog of work experience   was: Business Conduct Helpline case for   Redacted

**2021-08-26 13:13:10**   Case HRC000016422: A comment has been added to your case   - Email sent

APL-GAELG_00002372

Sent: Redacted

**2021-08-26 13:13:05  Timos Gies**  - Changed:  State

State: Work in Progress  was: Ready

**2021-08-26 13:13:04  Timos Gies**  - Changed:  Additional comments

Hi Redact

Thank you for reaching out to Business Conduct. This matter has been raised to the appropriate business partners for their review.

**2021-08-26 12:20:26  Timos Gies**  - Changed:  Assigned to

Assigned to: Timos Gies

**2021-08-19 12:30:11**  Business Conduct Helpline Case HRC000016422 has been opened  -  Email sent

Sent: Redacted

**2021-08-19 12:29:49** Redacted  - Changed:  Assignment group, HR service, HR Service Subtype, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: Redacted
Opened for: Redacted

Priority: 2 - Moderate

Restricted: false

Source: Self-service

State: Ready

Subject person: Redacted

Title: Business Conduct Helpline case for Redacted

Variables



**Ask or Report**

Report a concern

**Name**

Redacted

**Apple email address**

Redacted

**Preferred phone number**

Redacted

APL-GAELG_00002373

**Explain what happened ***

Hi, I was forwarded this link to another employee's blog. I haven't done more than skim the first few screenshots, but wanted to make sure it's getting appropriate attention from business conduct.

https://www.ashleygjovik.com/ashleys-apple-story.html

**Date**

8/18/21

**Time**

11:14PM

**Location ***

n/a, iMessage

**List team members and/or people involved ***

Ashley Gjovik

**Have you reported this to anyone else? If so, who? ***

no

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

**Case Resolution**    Duplicate Report

## Comments/Worknotes

---

## HR Tasks    Parent = HRC000016422                                          0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
| No records to display | | | | | |

APL-GAELG_00002374

## Interactions  Sys ID in                                                                                    0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|--------|--------|-------------------|------------|-------|------|-------------|---------|------------|

No records to display

## Child Cases  Parent = HRC000016422                                                                      0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|--------|-------|------------|-------------------------|----------------|-------------------------|------------|-------|------------------|-------------|--------|---------|

No records to display

## Knowledge  Source Task = HRC000016422                                                                   0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|--------|--------|------------|--------------|--------|--------------|----------|-------------|----------|--------------------|

No records to display

## Related Cases  Active = true AND Record ID [Document ID] = c430c146a0023010c1ea2be30226d1aa            0 Related Records

| Related Record ID | Title | State | Created |
|-------------------|-------|-------|---------|

No records to display

## Attachments  Active = true AND Record sys ID = c430c146a0023010c1ea2be30226d1aa                        0 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|-----------|--------|-------------|-------------|

No records to display

APL-GAELG_00002375

# EXHIBIT 10

9.      Attached as Exhibit 10 is Apple Business Conduct Ticket HRC00017148, produced by Defendant in discovery.

## Ethics

Manage Attachments (4): slack-fu-rdar-22892159.png  [download]   rdar-22892159.png  [download]   EthicsPoint Incident

| | | | |
|---|---|---|---|
| **Number** | HRC000017148 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-23 11:44:59 |
| **HR Service Subtype** | Report a concern | **Opened by** | Non-Apple User |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**   Hurtful Comments on Radar

**Description:**

Case 2021-8-4372 -manager reported a hardware employee was sad and fearful based on Radar comments to "Make Ashley's Life a Living Hell".
Referred to ER

**Additional comments:**

**Work notes (Private)**

☑ **All (36)**  ☑ **Assigned to (1)**  ☑ **Assignment group (1)**  ☑ **Additional comments (1)**  ☑ **Source (1)**  ☑
**Description (3)**  ☑ **HR service (1)**  ☑ **Opened by (1)**  ☑ **Opened for (2)**  ☑ **Priority (1)**  ☑ **Title (2)**  ☑ **State**
Conversation **(3)**  ☑ **Subject person (2)**  ☑ **Case Resolution (1)**  ☑ **Business Conduct Policy (1)**  ☑ **Investigation Team (1)**
☑ **Opened for contact (1)**  ☑ **Subject person contact (1)**  ☑ **HR Service Subtype (1)**  ☑ **Restricted (1)**  ☑
**System update (5)**  ☑ **Work notes (1)**  ☑ **Email (4)**

**2021-08-30 08:36:13  Kathleen Emery** - Changed: State

State: Closed Complete   was: Work in Progress

**2021-08-30 07:25:43  Help Central** - Changed: System update

System update:
Inserted File Name: EthicsPoint Incident Management - 4372_1630333528847.pdf / By: [Redacted]

**2021-08-30 07:25:28  Pam Oyanagi** - Changed: System update

System update:
File: EthicsPoint Incident Management - 4372.pdf has been renamed to EthicsPoint Incident Management - 4372_1630333528847.pdf / By: undefined

**2021-08-30 07:25:28  Pam Oyanagi** - Changed: Work notes

Hi Kathleen - I will forward this to my leadership who are looking into/handling related concerns involving this employee. Thank you.

> On Aug 29, 2021, at 6:12 PM, Business Conduct [Redacted] wrote:

APL-GAELG_00002437

>
> Hi ER
>
> I know you are already aware of this issue.
>
> We received a report from [ Redacted ] an employee reporting concern for what Ashley went through with the 2015 Make Ashley's Life Hell radar
>
> Please let me know if you have any questions.
>
> Kathleen
>
>
>

**2021-08-30 07:25:21**  Re: Hardware ee Ashley Gjovik hurtful comments Radar Case 2021-8-4372 HRC000017148  - Email Received

Received: CST Guest

**2021-08-29 18:14:07  Kathleen Emery**  - Changed:  Description

Description:
Case 2021-8-4372 -manager reported a hardware employee was sad and fearful based on Radar comments to "Make Ashley's Life a Living Hell". Referred to ER

**2021-08-29 18:12:12**  Hardware ee Ashley Gjovik hurtful comments Radar Case 2021-8-4372 HRC000017148  - Email sent

Sent: US_Corp_ER_BC [ Redacted ]

**2021-08-29 17:58:10**  Case HRC000017148: A comment has been added to your case  - Email sent

Sent: [ Redacted ]

**2021-08-29 17:57:44  Kathleen Emery**  - Changed:  Additional comments

HI [Redact]
Thank you for contacting the Business Conduct office with concern about Ashley Gjovik. We are looking into this.
Regards
Kathleen

**2021-08-29 17:56:54  Kathleen Emery**  - Changed:  Business Conduct Policy, Case Resolution, Investigation Team, State

Business Conduct Policy: Not Business Conduct

Case Resolution: Directed to Appropriate Resources

Investigation Team: Employee Relations

State: Work in Progress  was: Ready

**2021-08-27 11:28:12  Owen O'Malley**  - Changed:  Assigned to, Description, Opened for, Subject person, Title

Assigned to: Kathleen Emery

Description:
Case 2021-8-4372 - Concern [Reda] says Ashley was sad and fearful based on a comment on Radar to "Make Ashley's Life a Living Hell".

Opened for: [ Redacted ] was: Non-Apple User

APL-GAELG_00002438

Subject person: Ashley Gjovik     was: Non-Apple User

Title: Hurtful Comments on Radar     was: NEW CASE ADDED FROM HOTLINE: Case 2021-8-4372 - Concern

**2021-08-27 11:28:01  Owen O'Malley**  - Changed:  System update

System update:
Inserted File Name: EthicsPoint Incident Management - 4372.pdf / By: oomalley5@apple.com

**2021-08-27 11:27:50  Owen O'Malley**  - Changed:  System update

System update:
Inserted File Name: rdar-22892159.png / By: oomalley5@apple.com

**2021-08-27 11:27:45  Owen O'Malley**  - Changed:  System update

System update:
Inserted File Name: slack-fu-rdar-22892159.png / By: oomalley5@apple.com

**2021-08-23 11:44:59  CST Guest**  - Changed:  Assignment group, Description, HR service, HR Service Subtype, Opened by, Opened for, Opened for contact, Priority, Restricted, Source, State, Subject person, Subject person contact, Title

Assignment group: BCGC SN Access

Description:
CASE 2021-8-4372 - Concern NOTIFICATION RULE New cases LINK TO CASE
https://apple.ethicspointvp.com/case.aspx?caseId=8971 Please click the link above to view case information.
NAVEX Global www.navexglobal.com This is a system-generated email. If you would like to be unsubscribed,
please contact your administrator. NAVEX Global reference: 2e081225-2ae5-48b0-839e-ff9a35b61fd3 ***************
CONFIDENTIALITY NOTICE *************** This e-mail and any attachments may contain private, confidential, and
privileged information for the sole use of the intended recipient. If you are not the intended recipient, any
dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message
in error, please contact the sender at NAVEX Global, keep the contents confidential and immediately delete the
message and any attachments from your system. *******************************************************

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: Non-Apple User

Opened for: Non-Apple User

Opened for contact: noreply@navexglobal.com

Priority: 3 - Low

Restricted: false

Source: Inbound Email

State: Ready

Subject person: Non-Apple User

Subject person contact: noreply@navexglobal.com

Title: NEW CASE ADDED FROM HOTLINE: Case 2021-8-4372 - Concern

**2021-08-23 11:44:52**  NEW CASE ADDED FROM HOTLINE: Case 2021-8-4372 - Concern  - Email Received

Received: noreply@navexglobal.com

APL-GAELG_00002439

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

**Case Resolution**    Directed to Appropriate Re

## Comments/Worknotes

---

## HR Tasks    Parent = HRC000017148                                      0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|---|---|---|---|---|---|
No records to display

---

## Interactions    Sys ID in                                               0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|---|---|---|---|---|---|---|---|---|
No records to display

---

## Child Cases    Parent = HRC000017148                                    0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|---|---|---|---|---|---|---|---|---|---|---|---|
No records to display

---

## Knowledge    Source Task = HRC000017148                                0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|---|---|---|---|---|---|---|---|---|---|
No records to display

---

## Related Cases    Active = true AND Record ID [Document ID] = e13d111fb74230104c5df0bf6a8c02d5          0 Related Records

| Related Record ID | Title | State | Created |
|---|---|---|---|
No records to display

---

## Attachments    Active = true AND Record sys ID = e13d111fb74230104c5df0bf6a8c02d5          4 Attachment Metadatas

APL-GAELG_00002440

| File name | Hidden | Uploaded by | Uploaded on |
|---|---|---|---|
| EthicsPoint Incident Management - 4372.pdf | false | Redacted | 2021-08-27 11:28:00 |
| EthicsPoint Incident Management - 4372.pdf_1630333807590 | false | | 2021-08-30 07:25:19 |
| rdar-22892159.png | false | | 2021-08-27 11:27:49 |
| slack-fu-rdar-22892159.png | false | | 2021-08-27 11:27:44 |

APL-GAELG_00002441

# EXHIBIT 11

10.    Attached as Exhibit 11 is Apple Business Conduct Ticket HRC000017207, produced by Defendant in discovery.

# Ethics

Manage Attachments (3): Gjovik - Issue Confirmation v3- Revised .pdf  [download]   A. Gjovik.SN.png  [download]

| | | | |
|---|---|---|---|
| **Number** | HRC000017207 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 2 - Moderate |
| **Opened for** | Ashley Gjovik | **Source** | Self-service |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-23 16:29:47 |
| **HR Service Subtype** | Report a concern | **Opened by** | Ashley Gjovik |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title**    Business Conduct Helpline - Ashley Gjovik

**Description:**

directed to Debbie Rice and Adelmise

**Additional comments:**

**Work notes (Private)**

Conversation

☑ **All (28)**  ☑ **Assigned to (1)**  ☑ **Assignment group (1)**  ☑ **Additional comments (1)**  ☑ **Source (1)**  ☑
☑ **Description (1)**  ☑ **HR service (1)**  ☑ **Opened by (1)**  ☑ **Opened for (1)**  ☑ **Priority (1)**  ☑ **Title (1)**  ☑ **State (3)**  ☑ **Subject person (1)**  ☑ **Case Resolution (1)**  ☑ **Business Conduct Policy (1)**  ☑ **Investigation Team (1)**
☑ **HR Service Subtype (1)**  ☑ **Restricted (1)**  ☑ **System update (1)**  ☑ **Work notes (2)**  ☑ **Email (6)**

**2021-08-27 21:39:35  Kathleen Emery**  - Changed:  Business Conduct Policy, Case Resolution, Description, Investigation Team, State

Business Conduct Policy: Not Business Conduct

Case Resolution: Directed to Appropriate Resources

Description:
directed to Debbie Rice and Adelmise

Investigation Team: Employee Relations

State: Closed Complete  was: Work in Progress

**2021-08-27 21:38:40**  Case HRC000017207: A comment has been added to your case  - Email sent

Sent: ashleygjovik [ Redacted ]

**2021-08-27 21:38:18  Kathleen Emery**  - Changed:  Additional comments

Hi Ashley
Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and investigation.
Kathleen

**2021-08-24 06:29:12  Debbie Rice**  - Changed:  Work notes

APL-GAELG_00002396

Hi-

| Attorney Client Privilege |
|---|

Thanks,
Debbie

> On Aug 23, 2021, at 9:31 PM, Business Conduct <businessconduct.support@apple.com> wrote:
>
>
> Hi Again
>

r

| Attorney Client Privilege |
|---|

>
>
>
>
>
>
>
> <Ashley.3 of 3.png>

**2021-08-24 06:29:08**  Re: Ashley Case HRC000017207  -  Email Received

Received: drice | Redacted |

**2021-08-23 21:32:31 Kathleen Emery**  - Changed: State

State: Work in Progress  was: Ready

**2021-08-23 21:31:47**  re: Ashley Case HRC000017207  -  Email sent

Sent: drice | Redacted |, adelmise | Redacted |

**2021-08-23 18:54:21 Debbie Rice**  - Changed: Work notes

Thanks- | Attorney Client Privilege |
Debbie

> On Aug 23, 2021, at 6:49 PM, Business Conduct | Redacted | wrote:
>
>
> Hi Debbie
>
> | Attorney Client Privilege |
>
>
>
>
> <A. Gjovik.SN.png>
> <Gjovik - Issue Confirmation v3- Revised .pdf>

APL-GAELG_00002397

**2021-08-23 18:54:18**  Re: Need info re ticket/complaint filed HRC000017207  - Email Received

Received: drice

**2021-08-23 18:49:29  Kathleen Emery**  - Changed:  Assigned to

Assigned to: Kathleen Emery

**2021-08-23 18:49:12**  Re: Need info re ticket/complaint filed HRC000017207  - Email sent

Sent: drice [Redacted] adelmise [Redacted]

**2021-08-23 16:30:10**  New Case HRC000017207 has been created.  - Email sent

Sent: ashleygjovik [Redacted]

**2021-08-23 16:29:51  Ashley Gjovik**  - Changed:  System update

System update:
Inserted File Name: Gjovik - Issue Confirmation v3- Revised .pdf / By: [Redacted]

**2021-08-23 16:29:48  Ashley Gjovik**  - Changed:  Assignment group, HR service, HR Service Subtype, Opened by, Opened for, Priority, Restricted, Source, State, Subject person, Title

Assignment group: BCGC SN Access

HR service: Business Conduct Helpline - Deactivated

HR Service Subtype: Report a concern

Opened by: Ashley Gjovik

Opened for: Ashley Gjovik

Priority: 2 - Moderate

Restricted: false

Source: Self-service

State: Ready

Subject person: Ashley Gjovik

Title: Business Conduct Helpline - Ashley Gjovik

Variables

**Ask or Report**

Report a concern

**Name**

Ashley Gjovik

**Apple email address**

ashleygjovik [Redacted]

**Preferred phone number**

4082049976

APL-GAELG_00002398

**Explain what happened \***

Ronald Sugar used to be CEO/President of TRW Microwave & Northrup Grumman. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee, which appears to oversee the due diligence programs for offices on chemical clean-up sites, including the TRW Microwave Superfund. His previous companies caused the contamination that is now being cleaned up under my office. See page 33 of attached PDF.

**Date**

8/23/2021

**Time**

4:30pm

**Location \***

825 Stewart Ave Sunnyvale CA (TRW Microwave Superfund site)

**List team members and/or people involved \***

Ronald Sugar

**Have you reported this to anyone else? If so, who? \***

Yes, Employee Relations in July 2021

☑ **I confirm that the details provided in this form and associated attachments, include only what's relevant for this request. I have not included any unnecessary medical or sensitive personal information.**

For details about what is considered sensitive information, see the Data Tiers Table on IS&T Web.

## Service Details

| | | | |
|---|---|---|---|
| **Business Conduct Policy** | Not Business Conduct | **Results** | |
| **Business Conduct Sub-Policy** | | **Directed by counsel** | ☐ |
| **Investigation Team** | Employee Relations | **Whistleblower** | ☐ |

## Resolution

| | |
|---|---|
| **Case Resolution** | Directed to Appropriate Re |

## Comments/Worknotes

APL-GAELG_00002399

## HR Tasks    Parent = HRC000017207        0 HR Tasks

| Number | State | Title | Assignment group | Assigned to | Task type |
|--------|-------|-------|------------------|-------------|-----------|
| No records to display | | | | | |

## Interactions    Sys ID in        0 Interactions

| Number | Opened | Short description | Opened for | State | Type | Assigned to | Updated | Updated by |
|--------|--------|-------------------|------------|-------|------|-------------|---------|------------|
| No records to display | | | | | | | | |

## Child Cases    Parent = HRC000017207        0 HR Cases

| Number | State | Opened for | People Business Partner | Subject person | People Business Partner | HR service | Title | Assignment group | Assigned to | Opened | Updated |
|--------|-------|-----------|-------------------------|----------------|-------------------------|-----------|-------|------------------|-------------|--------|---------|
| No records to display | | | | | | | | | | | |

## Knowledge    Source Task = HRC000017207        0 Knowledge

| Number | Active | Article ID | Article type | Author | Base Version | Can Read | Cannot Read | Category | Configuration item |
|--------|--------|-----------|--------------|--------|--------------|----------|-------------|----------|-------------------|
| No records to display | | | | | | | | | |

## Related Cases    Active = true AND Record ID [Document ID] = 01f89ad3b702301020fdf0bf6a8c02e4        0 Related Records

| Related Record ID | Title | State | Created |
|-------------------|-------|-------|---------|
| No records to display | | | |

## Attachments    Active = true AND Record sys ID = 01f89ad3b702301020fdf0bf6a8c02e4        1 Attachment Metadatas

| File name | Hidden | Uploaded by | Uploaded on |
|-----------|--------|-------------|-------------|
| Gjovik - Issue Confirmation v3- Revised .pdf | false | a_henderson-973551757 | 2021-08-23 16:27:38 |

APL-GAELG_00002400

# EXHIBIT 12

11.     Attached as Exhibit 12 is my correspondence with the U.S. Environmental Protection Agency regarding vapor-intrusion conditions at 825 Stewart Drive, beginning April 2021.

# Fwd: Questions about TRW Microwave

**From: Ashley Gjovik <ashleygjovik@apple.com>**            Wed, Jul 28, 2021 at 5:13 PM EDT (GMT-04:00)
To: Ekelemchi Okpo <eokpo@apple.com>; Antonio Lagares (ER) <alagares@apple.com>

FYI, latest update from the EPA on Apple/Northrup Grumman & the Stewart 1/TRW Microwave Superfund site.

—

**Ashley M. Gjøvik**
☐ Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

> Begin forwarded message:
>
> **From:** Ashley Gjovik <ashleygjovik@icloud.com>
> **Subject: Fwd: Questions about TRW Microwave**
> **Date:** July 28, 2021 at 2:13:07 PM PDT
> **To:** Ashley Marie Gjovik <ashleygjovik@apple.com>
>
> —
>
> **Ashley M. Gjøvik**
> Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
> https://www.linkedin.com/in/ashleygjovik/
> https://muckrack.com/ashleygjovik
>
>> Begin forwarded message:
>>
>> **From:** "PerezSullivan, Margot" <PerezSullivan.Margot@epa.gov>
>> **Subject: RE: Questions about TRW Microwave**
>> **Date:** July 28, 2021 at 1:24:00 PM PDT
>> **To:** Ashley Gjovik <ashleygjovik@icloud.com>
>>
>> Hi Ashley,
>>
>> Thanks again for your continued interest in this site and providing your on-the-ground observations. EPA communicates regularly with responsible parties on issues related to superfund sites as part of the agency's CERCLA obligations. Similarly, EPA also routinely follows up on concerns raised by the public in regards to superfund sites. The agency takes these communications and on-the-ground observations seriously. Please continue to check the website for any site updates.
>>
>> Please do connect me with the reporter you're working with on this and thank you again for voicing your concerns and providing us with such detailed information.
>>
>> Margot
>>
>> Margot Perez-Sullivan
>> U.S. Environmental Protection Agency
>> D: 415.947.4149 C: 415.412.1115
>> E: perezsullivan.margot@epa.gov
>>
>> **From:** Ashley Gjovik <ashleygjovik@icloud.com>
>> **Sent:** Tuesday, July 27, 2021 6:31 PM

**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>

**Subject:** Re: Questions about TRW Microwave

Thank you very much, Margot. I look forward to hearing how the conversation goes and if any changes will be made to the plan of record.

—

**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
https://muckrack.com/ashleygjovik
(415) 964-6272

> On Jul 22, 2021, at 3:15 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:
>
> Hi Ashley, I'm meeting with the site team next week, regarding the reporter you're working with I'm the right person to work with.  Thanks so much for your patience – we will be touch!
>
> Margot Perez-Sullivan
> U.S. Environmental Protection Agency
> D: 415.947.4149 C: 415.412.1115
> E: perezsullivan.margot@epa.gov

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Tuesday, July 20, 2021 5:07 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot! Thanks….I see the May test was 10hr.

Ok, so my question about when the last time a 24hr+ indoor air test was performed in the TRW Microwave/825 Stewart building where the COCs were within the acceptable EPA range for indoor air in industrial buildings…. Is NEVER. They've always failed. Got it.

Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."

If the journalist wants to talk to someone at the EPA about all this, who should I have them reach out to? It's a very big publisher, so I assume they will want to chat. You?

-Ashley

—

**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
https://muckrack.com/ashleygjovik
(415) 964-6272

> On Jul 20, 2021, at 1:05 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley,

Thanks so much for your patience.

The May 2015 indoor air testing was reported in a June 2015 report available on the EPA TRW Microwave website here:https://semspub.epa.gov/src/document/09/1158562.

Your inline screenshot below is from the 1991 Record of Decision for the site, which shows the maximum detected soil concentrations for ethylbenzene at 2 milligram per kilogram (mg/kg) and for toluene at 3 mg/kg.  The concentration values are from 30 years ago and during that time the contaminated soil was removed.  Therefore, these chemicals are not documented in the Record of Decision as chemicals of concern.

For your reference, the attached California Environmental Protection Agency Office of Environmental Health Hazard Assessment has adopted EPA Region 9's screening values for TCE.  TCE is the primary chemical of concern for the site and since 2013, subsequent to the remedial actions taken at the building, TCE indoor air sample results have been less than EPA's applicable health risk screening values.

I hope this information is helpful.

Thank you!
Margot

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Monday, July 19, 2021 6:39 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot,

Checking in — any update? I'm locking this down with a national journalist.

P.S. if you haven't already connected the dots, the "responsible party" for the Sunnyvale TRW Microwave site is *Northrup Grumman,* who's ex-CEO and ex-President (and ex-CFO of TRW Microwave), Ronald Sugar, is a current & long time Apple board member (10yrs+).

So the guy who was running the companies responsible for this site's pollution, clean-up, vapor intrusion etc — is one of only eight Apple board members. He also chaired Apple's Audit & Finance committee, which I assume would oversee budgets for things like… Apple's facility and safety oversight.

If you're trusting they're all doing the right thing, maybe they are, but I'd hope you might poke around a bit and see what exactly this whole floor crack / floor sealing thing is about — in additional to the lack of air testing, and refusal to test the air before they seal the floor.

https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/

*Dr. Sugar served as Chairman and Chief Executive Officer at Northrop Grumman Corporation from 2003 until his retirement in 2010. Previous to Northrop, he held executive positions at Litton Industries and TRW Inc., where he served as chief financial officer.*

PL_PROD_11_08350

https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901181#bkground

*The TRW Site was occupied by Aertech Industries from 1968 until it was sold to TRW Inc (TRW) in 1974. In 1987, TRW sold the facility to FEI Microwave, Inc. In 1993, FEI Microwave stopped production and in 1995 the site was acquired by Stewart Associates and leased to research and development companies until 2001. The exterior of the building was remodeled between 2001 and 2003, including demolition of part of the existing structure and construction of a new two-story building. In December 2002, TRW merged with Northrop Grumman. In 2004, the property was purchased by Pacific Landmark, and then by Hines in 2014 and then GI Partners, the current owner, in 2016. During these changes in site ownership, TRW and then Northrop Grumman retained responsibility for site cleanup.*

https://www.microwaves101.com/encyclopedias/where-are-they-now#trw

*TRW Microwave is long gone, but not the superfund site they left behind in Sunnyvale California. The name TRW comes from the 1958 merger of Thompson Products and Ramo-Wooldridge. TRW followed the "ITT model" of rapid expansion, getting caught cheating on military contracts, polluting ground water and putting employees at danger, then finally retrenchment into obscurity. In addition to credit reporting, TRW produces automotive air bags, another dual opportunity for OSHA violations and site pollution due to highly toxic sodium azide that is used to inflate the bag.*

https://en.wikipedia.org/wiki/Ronald_Sugar

*Sugar served as the president and chief operating officer of TRW Aerospace and Information Systems. From 2000 to 2001, he served as the president and chief operating officer of Litton Industries. He then served as the president and chief operating officer of Northrop Grumman Corporation from 2001 to 2003, and as its chairman and CEO from 2003 to 2009.[3] He was succeeded by Wesley G. Bush.[4] Sugar has also been a director of Chevron Corporation since 2005 and Apple Inc. since 2010.[5]*

—

Ashley M. Gjøvik

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

https://muckrack.com/ashleygjovik

(415) 964-6272

On Jul 7, 2021, at 4:21 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Only updates are:

- They're refusing to test the indoor air \*before\* they seal the floor and won't give me any reasons why other than the 8hr limited testing from 2015
- They won't give me any details of what the "floor sealing process" entails
- They said they only did a "quick walk-through survey" for cracks and only saw what was readily available (I asked if they looked under the carpet by my desk, which is a hot spot in the building, and they said no) — they made sure to say it wasn't an "evaluation" for whatever reason. They admitted this is the first walk through they've done since 2015 in the building.

PL_PROD_11_08351

- When they do test the indoor air they plan to do a 1week passive sampler, with HVAC fully on, and with employees using the facilities as normal. I pointed out HVAC on would bring in outdoor air and dilute the indoor air if VI — and pointed out that if they results come back high, they won't know if its' VI or if it's employees that were cleaning/etc. They told me what they're doing is routine, best practice, and above and beyond what's required. I asked if they could at least do a 48hr summa with HVAC off & employees out in addition to the 1wk one and they said no, saying their way would give better results.
- They kept saying the whole process was routine but eventually admitted they've never done it before for any of their Apple buildings with employees actively working inside.
- They also told me again that now they won't answer any more of my questions about the safety of the building.
- I told them I remain very concerned the building is not safe.

P.S. not sure if you're aware, but apparently TRW Microwave building has NEVER had an EIR. It was made a Superfund after it was already constructed (that's where the leaking/dumping happened). Then they did a negative declaration for the expansion and that was it. I didn't see anything for Apple's remodel either. I PR'd Sunnyvale city records and they sent me what they had. Quite limited.

-Ashley

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Jul 7, 2021, at 1:08 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Margot,

Thank you for your responses! I have a few follow up questions below.

Also, as you mentioned *"it is important for EPA to be aware if there's a significant change to site conditions,"* I would hope you've already been informed that there are apparently cracks in the floor of Stewart 1 and Apple is pursuing a "floor sealing plan." See quote below from Apple EH&S. They apparently did their first formal "vapor intrusion evaluation" walkthrough <u>ever</u> this May and noticed the cracks. I'd ask again, considering this and considering my fainting spell in 2019, if the EPA is still confident that the the vapor intrusion is under control.

> In May we performed step one of a three step process. We did the floor pathway survey, checking for cracks and gaps that can build over time due to natural floor movement. Based on that, we developed a floor sealing plan. Right now, we are in step two scheduling the floor crack sealing work by a contractor (expected within a month according to verbal from the construction management team).

In addition, I'm not sure if you're aware but after I started asking a lot of questions to Apple EH&S about their oversight of TRW Microwave, they went from planning to test the indoor air this year to then saying they may no longer test the air and if they do it's at a TBD time. They offered no explanation for why they decided not to test and also told me they wouldn't answer any more of my questions. Further, the environmental engineer who has overseen Apple's environmental engineering & due diligence program for over seven years is now leaving Apple. He went on medical leave within an hour of my last conversation with them when they said they wouldn't answer my questions and they might not test the air now — and upon coming back from leave he's now leaving Apple imminently. This all seems quite peculiar to me.

Finally, my follow-up questions for the EPA are inline below and also summarized here:

- A) Can you please share a link to the May 2015 indoor air testing report? Apple told me the Dec 2015 report included the May 2015 data and there was no separate May 2015 report. That didn't sound right and I've been trying to track down the detailed May report.
- B) Can you confirm if the May 2015 testing was only 8hrs in duration like the Dec 2015 testing was? Was there any 24hr+ Summa testing ever performed in the TRW building that passed the EPA indoor air thresholds?
- C) I see ethylbenzene and toluene noted as related chemicals for TRW in earlier EPA reports (copy inline). Did you mean to say they're not "contaminants of concern?" Does it change your analysis knowing they have been known to be part of the historical contamination?

I would appreciate a quicker response this time if possible. After I reminded Apple of labor laws & stuff, they clarified they'd "never prohibit me from speaking out about workplace safety concerns," and as such I am now actively looking into publishing something about this.

Apple EH&S reached out with the environmental engineer leaving and are "providing me an update" later this afternoon. I'll let you know if there's anything else they say I think you'll care about — or which raise questions for the EPA.

Thanks!

—

**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
(415) 964-6272

On Jun 7, 2021, at 8:29 AM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, I'm out this week, but wanted to send this on. Thanks!

**Question**: I am curious what the EPA's expectations are for the frequency (how often) & duration (how long/intensive) of indoor air testing in a building like TRW Microwave. Did you approve that they could stop doing indoor air testing after 2015 — or is it up to the responsible party to decide? Are Ethylbenzene and Tolulene COCS for the great Triple Site plume — could they be migrating?

**Response:** *Superfund cleanups are governed by a complex network of laws, regulations, and guidance. Where there are vapor intrusion concerns, assessments and monitoring are conducted based on site-specific information, such as contaminant concentrations, site uses, history, available data, and mitigation measures.*

*At the TRW Microwave Superfund Site, groundwater monitoring has been ongoing. Since 2016, groundwater concentrations for the TRW Microwave site-specific constituents of concern (primarily TCE and breakdown daughter products) have been stable. Because TRW Microwave Site conditions have not changed, EPA believes the remedy in place at the site remains protective and has not required additional ongoing indoor air sampling.*

PL_PROD_11_08353

*The Regional Water Quality Control Board (RWQCB) and EPA have overseen the cleanup actions at the TRW Microwave Site. Over the decades, site remedies have greatly reduced contaminant concentrations, including the primary constituent of concern, TCE in groundwater. TCE concentrations at the TRW Microwave Site have declined from upwards of 10,000 parts per billion (ug/L) in the 1980s to generally less than 100 µg/L today (for context, 1 part per billion would be equal to 1 drop of ink in 1 billion drops of water).*

*The vapor intrusion risk at the site has been addressed under RWQCB and EPA oversight multiple times by the Northrup Grumman Corporation (the responsible party), and the current owner of the property. In 2013 indoor air sampling was conducted in the then unoccupied 825 Stewart Avenue building, which was unfinished and had open conduits in the sub-slab. The results indicated that a few volatile organic compounds were present at concentrations greater than the generic health risk screening values at the time for workers. The 2013 results are available on the EPA TRW Microwave website:*[https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=0901181](https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=0901181)

*Since 2013, the 825 Stewart Avenue building was renovated and Northrup Grumman and the now current property owner proactively implemented a number of protective measures to prevent vapor intrusion into the building:*

- *August/September 2014:*

  *A sub-slab vapor collection system was installed underneath the site building to vent vapors to the atmosphere.*

- *October/November 2014:*

  *Contaminated soil from underneath the building in the former TRW Microwave source area was excavated and removed to prevent contaminants in the soil from volatilizing into the building. Additionally, small diameter groundwater wells inside the building were decommissioned and sealed to eliminate a potential vapor intrusion pathway into the building. These mitigation measures are documented in a 2015 Source Area Soil Removal Report, which can be found on the EPA TRW Microwave website.*

- *December 2014:*

  *To reduce contamination in groundwater and the potential for vapor intrusion, when the building was unoccupied emulsified vegetable oil was injected underneath the building to accelerate the biological degradation of PCE, TCE, and associated by-products. The results are in the annual*

*groundwater monitoring reports, which are available on the EPA TRW Microwave website.*

- o *April 2015:*

  *Openings through pipes, seams, or cracks in the building's concrete sub-slab were sealed to prevent vapor intrusion. Additionally, the spaces between the walls of the three sections of the buildings were also sealed.*

*After the protective measures above were implemented, indoor air sampling was conducted in May 2015. The May sampling event was conducted with the HVAC system turned off as a worst-case scenario. The indoor air results were less than EPA's generic health risk screening values based on a workplace exposure of 250 days per year for 25 years and demonstrated the effectiveness of the post-2013 measures to mitigate vapor intrusion. The results are available in a June 2015 report available on the EPA TRW Microwave website.*

A) Can you please share a link to the May 2015 indoor air testing report? Apple told me the Dec 2015 report included the May 2015 data and there was no separate May 2015 report. That didn't sound right and I've been trying to track down the detailed May report.

B) Can you confirm if the May 2015 testing was only 8hrs in duration like the Dec 2015 testing was? Was there any 24hr+ Summa testing ever performed in the TRW building that passed the EPA indoor air thresholds?

*Due to building renovations subsequent to the May 2015 indoor air sampling event, another indoor air sampling event was conducted in December 2015, which EPA agree with. The indoor air sampling event was conducted with the HVAC system off, except for one zone where it was reported that the HVAC system could not be turned off. The December 2015 results again demonstrated that the chemicals related to the TRW Microwave Superfund Site were less than EPA's indoor air human health risk screening values for workers (note, ethylbenzene and toluene are not associated with the TRW Microwave Superfund Site).*

C)  I see ethylbenzene and toluene noted as related chemicals for TRW in earlier EPA reports. Did you mean to say they're not "contaminants of concern?" Does it change your analysis knowing they have been known to be part of the historical contamination?

i.e.

<1991 Triple Site Toxins.png>

## 2) **Communication**:

**Background**: Next, from what Apple has told me, they said they decided internally that they have no legal obligation to have to inform employees about the status of these buildings related to chemicals in the soil or groundwater, or Superfund status, etc. I pressed further if there's an ethical obligation and they said that would be a "bigger conversation." It sounds like they think they only have to inform employees if there's a concrete and immediate risk to employee health (which I argued… how would they know that if they're not testing?… no answer). I'm also feeling pressure to not talk to co-workers about any of this either (from my direct manager and our employee relations teams).

**Question**: I am curious what the EPA's expectations are for responsible parties related to informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & "Right to Know" — but any guidance you can provide here would be helpful. Also, anything about workers'rights to be able to talk about these sites. I would also appreciate any guidance you have about learning more about possible chemical exposure from this site from an unbiased party. I talked to Dr. Robert Harrison about it yesterday for a bit, but he says we don't have enough data because no one was testing while I was there. I was also going to see if Tracy Barreau and Dr. Prudhomme would take a look informally. Let me know if you know of anyone else who might have thoughts.

*Response:* *EPA is not aware of any regulation or limitation to workers or the public to talk about a Superfund site. EPA supports transparency and providing information to the public, other than where prevented by regulation, guidance, or to protect personally identifiable or confidential business information.*

*There is no specific right-to-know requirement in the TRW Microwave Record of Decision, which documents the remedy selected for the Site. For a site where conditions are protective of human health there is no specific EPA requirement to notifyeach site visitor or construction or office worker of a mitigated potential risk. However, EPA does conduct regular community outreach and provides further transparency to the public though websites, fact sheets, and responses to public inquires. Note that different sites may have different public notification needs or requirements.*

**3) <u>Monitoring</u>**:

**Background**:  Further, because none of us know this is a Superfund site — we don't know not to mess with sub slat vent covers, or to not mess with the HVAC, or to report if there's any usual smells etc. I brought this up with him and he'd said he'd back to me a couple weeks ago — but said that the Env Health Safety team does know and does visit the site. I communicated that does not seem sufficient. In fact, with the wild fire smoke last year, we had EHS turn off the HVAC so outdoor air wasn't being brought it — from what I've seen, it doesn't seem like the vapor intrusion

PL_PROD_11_08356

mitigation system was ever considered when they did turn it off. I believe it was off for a week or two. I brought this up too - and he hasn't gotten back to me either. I know I've seen people kicking at those SS-V plugs not knowing what they are too.

*Response: Thank you for conveying that during the wildfires last year the HVAC system was turned off, as it is important for EPA to be aware if there's a significant change to site conditions. Even with the HVAC system off, the sub-slab vapor collection system will continue to vent vapors that collect under the building to the atmosphere.*

**Question:** Similar question as #2, but I'm curious what the EPA's expectations are for responsible parties (and companies they may lease to) to communicate to workers in these buildings about how to monitor for their issues (weird smells, weird health issues, etc) or how to report trouble or what not to mess with (plugs, HVAC, etc). Etc.

These are my best attempt at mapping results…. But take with a grain of salt… I only play an industrial hygienist on TV. J/k. But seriously, also mapped where I fainted in 2019. Our HR team pushed me to file a workers comp claim about it and the workers comp administrator wanted to call it "continuous trauma" for my time working in at least that building. (Apple had plenty other Superfunds and chemical release sites I visited too). I'm not sure where this will go though… if Apple wasn't testing the indoor air, it seems impossible to know if there were problematic chemicals in the air or not when it happened.

I did have more fainting in the office in 2020, but it was while this was going on too: https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/
So I just assumed the fainting in 2020 was carry over from the apartment I moved into Feb 2020. I haven't been back to the office since last year. I've been fine since I moved out of that apartment in Sept 2020 (and haven't been back to the office either).

*Response: EPA believes the remedy in place at the TRW Microwave Site remains protective. EPA will continue to evaluate the protectiveness of the remedy if conditions at the Site change. EPA will also continue to evaluate the protectiveness at the Site during the mandatory Five-Year Review, which was last completed for the TRW Microwave and the Triple Site in late 2019.*

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

On May 27, 2021, at 12:10 PM, Ashley Gjøvik <ashleygjovik@icloud.com> wrote:

 Hi Margot,

Checking in. 😄

Sent from my iPhone

On May 4, 2021, at 10:58 AM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Margot!

Thank you very much.  No deadline; I understand you're busy. Just generally sooner than later would be great.

P.S. I don't have anything in the pipeline publishing wise about the TRW Microwave site — though I am speaking with several other agencies about it — in addition to talking with Apple directly. As mentioned, as of my last conversation with Apple Employee Relations, I'm unsure if I can actually talk about the site at work without getting in trouble for doing so — let alone publishing anything.

Thanks again! Appreciate your help.

-Ashley

—

**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
*I'm not a lawyer and nothing I say should be considered legal advice.*
https://www.linkedin.com/in/ashleygjovik/
(415) 964-6272

On May 4, 2021, at 10:13 AM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, Thanks so much for sending, I was about to hit send when this came through!  Rest assured, we are working on responses to your questions. I know you've been publishing your work – is there a specific deadline you need us to meet? Please let me know, thank you!

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Friday, April 30, 2021 4:29 PM

PL_PROD_11_08358

**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot,

As discussed, my questions relate to testing, communication, and monitoring/response. I'm already talking to Apple's Env Health & Safety team to hear their side of things — but I'm interested in hearing the EPA's perspective on these topics. I'd like to understand what y'alls expectations are. I understand it will be much high level policy and may be entirely inline with what Apple is already saying — but it'd like to be able to compare/contrast. If the EPA doesn't have their own guidance on items below, that's fine, just let me know.

### 1) <u>Testing</u>:

**Background**: First, from what I've learned from Apple — it sounds like there hasn't been any indoor air testing (sub slat or indoor air) since 2015. (They are currently planning to do testing this year, though they didn't fully explain why they decided to start testing this year after six years). I reviewed the indoor air reports from 2003, 2004, 2013, & 2015. It appears there is a long history of indoor air measurements with chemicals of concern above max industrial risk levels. My desk looks to be in a bit of a hot spot too. In 2015, there was some testing done (May & Dec it appears) but instead of 24/48hr — they did 10hr, at least for Dec. I'm still waiting to see the details of the May testing. And at least in Dec 2015, it appears they weren't able to fully shut off the HVAC either. And the Dec results came back with high levels of Ethylbenzne and Tolulene that were suspected to be resulted to the construction, but does not appear to have been verified by an additional test later. It also appears that the building was vacant until Apple moved my team in there in 2015-ish.

**Question**: I am curious what the EPA's expectations are for the frequency (how often) & duration (how long/intensive) of indoor air testing in a building like TRW Microwave. Did you approve that they could stop doing indoor air testing after 2015 — or is it up to the responsible party to decide? Are Ethylebenze and Tolulene CoCs for the great Triple Site plume — could they be migrating?

### 2) <u>Communication</u>:

**Background**: Next, from what Apple has told me, they said they decided internally that they have no legal obligation to have to inform employees about the status of these buildings related to chemicals in the soil or groundwater, or Superfund status, etc. I pressed further if there's an ethical obligation and they said that would be a "bigger conversation." It sounds like they think they only have to inform employees if there's a concrete and immediate risk to employee health (which I argued… how would they know that if they're not testing?… no answer). I'm also feeling pressure to not talk to co-workers about any of this either (from my direct manager and our employee relations teams).

**Question**: I am curious what the EPA's expectations are for responsible parties related to informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & "Right to Know" — but any guidance you can provide here would be helpful. Also anything about workers rights to be able to talk about these sites. I would also appreciate any guidance you have about learning more about possible chemical exposure from this site from an unbiased party. I talked to Dr. Robert Harrison about it yesterday for a bit, but he says we don't have enough data because no one was testing while I was there. I was also going to see if Tracy Barreau and Dr. Prudhomme would take a look informally. Let me know if you know of anyone else who might have thoughts.

PL_PROD_11_08359

**3) Monitoring**:

**Background**:  Further, because none of us know this is a Superfund site — we don't know not to mess with sub slat vent covers, or to not mess with the HVAC, or to report if there's any usual smells etc. I brought this up with him and he'd said he'd back to me a couple weeks ago — but said that the Env Health Safety team does know and does visit the site. I communicated that does not seem sufficient. In fact, with the wild fire smoke last year, we had EHS turn off the HVAC so outdoor air wasn't being brought it — from what I've seen, it doesn't seem like the vapor intrusion mitigation system was ever considered when they did turn it off. I believe it was off for a week or two. I brought this up too - and he hasn't gotten back to me either. I know I've seen people kicking at those SS-V plugs not knowing what they are too.

**Question:** Similar question as #2, but I'm curious what the EPA's expectations are for responsible parties (and companies they may lease to) to communicate to workers in these buildings about how to monitor for their issues (weird smells, weird health issues, etc) or how to report trouble or what not to mess with (plugs, HVAC, etc). Etc.


These are my best attempt at mapping results…. But take with a grain of salt… I only play an industrial hygienist on TV. J/k. But seriously, also mapped where I fainted in 2019. Our HR team pushed me to file a workers comp claim about it and the workers comp administrator wanted to call it "continuous trauma" for my time working in at least that building. (Apple had plenty other Superfunds and chemical release sites I visited too). I'm not sure where this will go though… if Apple wasn't testing the indoor air, it seems impossible to know if there were problematic chemicals in the air or not when it happened.

I did have more fainting in the office in 2020, but it was while this was going on too: https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/
So I just assumed the fainting in 2020 was carry over from the apartment I moved into Feb 2020. I haven't been back to the office since last year. I've been fine since I moved out of that apartment in Sept 2020 (and haven't been back to the office either).

Anyhow, FYI.

<image001.png>

 <image002.png>

—

Ashley M. Gjøvik

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272


On Apr 29, 2021, at 10:19 AM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Margot! No worries at all. Hope things calm down.

Actually, if you'd prefer, I can send you a note today or tomorrow summarizing my questions. I'll start drafting!

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Apr 29, 2021, at 10:03 AM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Ashley, I have not forgotten about you – I got slammed yesterday afternoon. I will be writing them up and sending them on to ensure I captured all of the items for which you are seeking information. I appreciate your time!

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

**From:** PerezSullivan, Margot
**Sent:** Monday, April 26, 2021 10:57 AM
**To:** ashleygjovik@icloud.com
**Subject:** Questions about TRW Microwave

Hi Ashley,
Michael forwarded your note and asked that I follow up with you.  Please let me know a good time to chat so I can better understand your questions.  I will be out of the office tomorrow, but am working the rest of the week.  Many thanks!
Margot

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

<OEHHA TCE in Indoor Air Risk Fact Sheet, 2018.pdf>

PL_PROD_11_08361

# EXHIBIT 13

12.    Attached as Exhibit 13 is Apple's request that EPA sign a non-disclosure agreement covering EPA's inspection of 825 Stewart Drive, and related correspondence reflecting EPA's refusal.

Message
_____

**From:** Reynolds, Rebekah [Reynolds.Rebekah@epa.gov]
**Sent:** 8/10/2021 7:41:00 PM
**To:** Schulman, Michael [Schulman.Michael@epa.gov]; Plate, Mathew [Plate.Mathew@epa.gov]
**CC:** Poalinelli, Edwin [POALINELLI.EDWIN@EPA.GOV]
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

I spoke with the attorney for apple.

We are not going to be signing the proposed NDA. She is going to send a letter to me saying that everything you create during the Site Walk (e.g., field notes, photos) is being claimed by Apple as CBI and we will treat it as such under our CBI regulations at 40 CFR Part 2. After the visit, you can send apple back everything you created and they can substantiate their claim. You may want to work with the apple representative while you are there to minimize any creation of CBI. So, for example, if it is possible to take a photo at an angle that wouldn't be claimed as CBI that would get you the info you need, you would probably want to do that.

Let me know if you have any questions.

Thanks.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 1:05 PM
**To:** Plate, Mathew <Plate.Mathew@epa.gov>; Reynolds, Rebekah <Reynolds.Rebekah@epa.gov>
**Cc:** Poalinelli, Edwin <POALINELLI.EDWIN@EPA.GOV>
**Subject:** FW: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Matt, FYI below, Apple is very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work underway. Attached are the figures and photos associated with past mitigation measures. I've requested a copy of the NDA, which Rebekah will review and if we can sign. I now also have a Montrose briefing with Enrique at 1-2 pm on Aug 19 that I need to attend, can you do an earlier morning start time? Or, if later, cover some of the site walk for me?

Thanks!
Michael

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 9, 2021 11:41 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I sent them quite a few maps as they were looking for details on each of the areas you want to visit. Here is the list I sent to them and attachments from previous reports that show where these areas are:

1. The sub-slab depressurization system. **Attachment 1** shows the locations of the roof vents and the interior vapor collection riser pipes, which collectively comprise the system.
2. The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. These items are shown on **Attachment 2**; however, much of this may no longer be accessible.

3. Past indoor air sampling locations (see **Attachment 3)**.
4. The location where contaminated soil was excavated from underneath the building (see **Attachment 4)**.
5. The location of groundwater monitoring wells (see **Attachment 5)**.
6. The location of the previous bioremediation system and injection locations (see **Attachment 6)**.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 2:31 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

HI Kurt, I just got the NDA and having it looked at. Can you send me the map you sent Apple showing what we'd be visiting? Thanks, Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 9, 2021 11:24 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – We will all be there the night before so early start is no problem. Just let me know what works for you guys. Also, AECOM has an office in downtown San Jose that we could use for meeting space before or after if you think that would be beneficial. There isn't any meeting space that we could use at the Apple building.  Just let me know on that as I will need to reserve the AECOM space if we want to use it.

Finally, I spoke with Apple last week and they are very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work underway. Based on your request to me, I forwarded Apple a list of there areas we would want to see and some maps showing where these things are/were. They also told me that they would expect all visitors to sign a Non-Disclosure Agreement and that they would forward the agreement directly to you and Matt Plate via email for signature. Not sure what EPA's position is on signing those, but I am just letting you know what Apple has requested.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 2:08 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

Do you have a start time restriction? With traffic it is better for me to have an early morning start. Thanks, Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 2, 2021 7:57 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – Thanks for the confirmation.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 7:27 PM

**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA management has approved the site visit. Have a good weekend.

Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 12:06 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael - GI Partners did not indicate any plans to attend.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 3:04 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, I need to document the number of people for COVID. Do you think the building manager will want to be present?

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 11:54 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We will have the following people attend:

- Michael Shannon – Northrop Grumman's Corporate Manager, Environmental Remediation.
- Holly Holbrook – AECOM's Project Manager
- Myself – Northrop Grumman's Project Manager

I am expecting we will also have an escort from Apple but I have not yet been able to confirm who that will be. I'll let you know as soon as I hear back from Apple.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 11:43 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Re: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt, excluding the EPA, how many people will be on the site walk?

Thanks!

> On Jul 30, 2021, at 7:17 AM, Kurt Batsel <batsel@dextra-group.com> wrote:

Hi, Michael – Sounds good. I confirmed with GI Partners also. The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 12:34 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

Myself and Matt Plate will be able to visit the site on Thursday 8/19. The only caveat is that we both need final approvals for field work considering the current high COVID-19 transmission rates; however, this should not be an issue.

Thank you,
Michael

---

**From:** Schulman, Michael
**Sent:** Wednesday, July 28, 2021 11:41 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, the date is OK for me and looks OK on Matt's calendar, but I'm confirming.

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Wednesday, July 28, 2021 10:46 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We are available on Thursday 8/19. I am still waiting for confirmation from GI Partners and Apple, but I would not expect there to be any issues with them. I will give you final confirmation on it by the end of the week, but I wanted to go ahead and let you know that 8/19 is looking the best for us. We will plan to arrive the evening before so could start as early as you would like in the AM.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,
Thank you,

_____
**Michael Schulman**
Remedial Project Manager
USEPA Region 9
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, May 25, 2021 2:03 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** TWright@gesonline.com; Holbrook, Holly <Holly.Holbrook@aecom.com>
**Subject:** TRW Microwave - 2020 SSD Inspection Memo

Hi, Michael – As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple. Please let me know if you have any questions or need any additional info.

**Kurt R. Batsel, P.E.** | The Dextra Group, Inc.
**T:** 770.578.9696 | batsel@dextra-group.com

Message

| | |
|---|---|
| **From**: | Debra Rubenstein [drubenstein@apple.com] |
| **Sent**: | 8/11/2021 7:16:29 PM |
| **To**: | Reynolds, Rebekah [Reynolds.Rebekah@epa.gov] |
| **CC**: | Colin Scanlon [cscanlon@apple.com] |
| **Subject**: | Letter re CBI for EPA Visit to 825 Stewart Drive, Sunnyvale |
| **Attachments**: | 8-11-21 Letter to EPA re CBI for 825 Stewart Drive.pdf |

Rebekah,

In follow up to our conversation, I enclose a letter on behalf of Apple Inc. claiming CBI relating to any information collected and/or documented during the EPA site visit on August 19, 2021. Any questions let me know.

Debra

*****************************************************************

**Debra Rubenstein** | Senior Counsel I Environment Health & Safety I ⬚ Apple  Inc. | desk +1 669.276.9741 | mobile +1 408.893.9762 |  One Apple Park Way MS  60-2LAW Cupertino, CA 95014 | drubenstein@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.



August 11, 2021


<u>**VIA Email**</u> reynolds.rebekah@epa.gov
Rebekah Reynolds, Assistant Regional Counsel
US EPA Region 9
75 Hawthorne Street
*Mail Code:* ORC-3-2
San Francisco, CA 94105

**Re: 825 Stewart Drive, Sunnyvale, CA – TRW Microwave Superfund Site (the Site)**


Dear Ms. Reynolds,

Please accept this letter on behalf of Apple Inc. (Apple) in follow up to our discussion on August 10, 2021, and to formally request that any information relating to Apple operations at the Site (including but not limited to any hardware, process or other sensitive information) viewed or documented by EPA during its upcoming Site visit on August 19, 2021, be maintained as confidential business information (CBI) pursuant to *40 CFR Part 2, Subpart B, §2.203(b)*.

A CBI claim is defined as "a claim or allegation that business information is entitled to confidential treatment for reasons of business confidentiality, or a request for a determination that such information is entitled to such treatment." *40 CFR §2.201(h)*

"The basis for claims of business confidentiality include the concept of trade secrecy and other related legal concepts which give (or may give) a business the right to preserve the confidentiality of business information and to limit its use or disclosure by others in order that the business may obtain or retain business advantages it derives from its rights in the information. The definition is meant to encompass any concept which authorizes a Federal agency to withhold business information under 5 U.S.C. 552(b)(4), as well as any concept which requires EPA to withhold information from the public for the benefit of a business under 18 U.S.C. 1905 or any of the various statutes cited in §§2.301 through 2.309." *40 CFR §2.201(e)*

We have been informed that EPA is interested in viewing the following areas at the Site:

- The sub-slab depressurization system.
- The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in

**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

ED_013963_00000007-00001

the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The location of groundwater monitoring wells.
- The location of the previous bioremediation system and injection locations.

Some of these areas are located inside the Site building, which is made up of several highly confidential laboratories. As such, EPA may see or be interested in documenting or photographing certain operations and areas, which contain trade secret, proprietary and/or company confidential information. These operations and areas are entitled to protection and should all be maintained as CBI. Therefore, all information collected and documentation created during or relating to the Site visit (e.g. field notes and photographs) are being claimed by Apple as CBI and EPA should treat the information as such under the CBI regulations at 40 CFR Part 2.

If EPA would like to take a photograph during the visit to the Site, we request that EPA asks in advance of taking a photograph to limit, as much as possible, that any materials covered by CBI are being photographed. We will also request that any photographs taken by EPA be shared with Apple at the conclusion of the Site visit and marked as CBI if appropriate.

Should you have any questions or require any additional information in relation to this CBI request, you can reach me at +1.415.893.9762 or at drubenstein@apple.com.


Very truly yours,

Apple Inc., a California corporation

By: *Debra J Rubenstein*

**Debra J Rubenstein**
*Senior Counsel, Environment, Health & Safety*


CC:    Colin Scanlon

**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

Apple Number: NDA202104810699 Environmental Protection Agency

# Apple Confidentiality Agreement

This Apple Confidentiality Agreement (the "**Agreement**") between Apple Inc., a California corporation located at One Apple Park Way, Cupertino, California 95014 United States ("**Apple**") and Environmental Protection Agency, located at Environmental Protection Agency  75 Hawthorne Street  San Francisco, CA 94105, United States, ("**Company**"), is effective as of August 9, 2021 ("**Effective Date**").

## 1. Scope

This Agreement governs any Confidential Information disclosed in connection with the Purpose.

In this Agreement: (i) "**Confidential Information**" means any nonpublic information, or material, which may include product plans, specifications, designs, photographs, costs, prices, project names, business plans, marketing plans, forecasts, orders, materials, components, prototypes, or pre-release products, disclosed by one party or any of its Affiliates (the "**Discloser**") to the other party or any of its Affiliates (the "**Recipient**") in connection with the Purpose, including information Recipient learns from Discloser's employees or Consultants or through inspection of Discloser's property; (ii) "**Purpose**" means Apple's evaluation, purchase or use of Company's, or its Affiliates', goods, services, technology, or other property (including intellectual property, real property, and personal property); (iii) "**Affiliate**" means any entity that Controls, is Controlled by, or is under common Control with a party; (iv) "**Control**" means the legal, beneficial, or equitable ownership, directly or indirectly, of more than 50% of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights; and (v) "**Consultants**" means a party's bankers, accountants, auditors, attorneys, financial advisers, and independent contractors.

Confidential Information also includes: the fact that the parties and their respective Affiliates and Consultants have discussed the Purpose; the substance of their discussions; and the terms, conditions, and existence of this Agreement.

## 2. Disclosure and Use Restrictions

Recipient may only disclose Confidential Information to its employees or Consultants who: (i) have a need to know in order to accomplish the Purpose; and (ii) are bound by a written agreement that prohibits any unauthorized disclosure or use of the Confidential Information that is at least as restrictive as the terms and conditions of this Agreement. Recipient shall not disclose, and shall cause its Consultants not to disclose, Confidential Information to any other person or entity without Discloser's prior written consent in each instance. Recipient and its Consultants may only use Confidential Information for the Purpose. Recipient and its Consultants must use a reasonable degree of care to protect Confidential Information it receives and to prevent any unauthorized use or disclosure of Confidential Information. Recipient shall be directly liable for any liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, as incurred by either party and their respective

V. 03192021 Apple Confidential

Affiliates, related to any unauthorized disclosure or use of Discloser's Confidential Information by Recipient or any of its Consultants.

## 3. Exclusions

Confidential Information does not include information that: (i) was known by Recipient without restriction before receipt of the Confidential Information; (ii) is publicly available through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; or (iv) is independently developed by Recipient. Recipient may disclose Confidential Information to the extent it is required by law if it makes reasonable efforts to provide prior notice to Discloser and seeks protective treatment of the Confidential Information. The fact that a disclosure was legally required will not alter the nature of the Confidential Information.

## 4. Intellectual Property

Except as expressly set forth in this Agreement, nothing in this Agreement is intended to grant a license to or waive any rights in either party's patents, copyrights, trademarks, or mask works. Receipt of Confidential Information will not constitute or be used to show or support notice or knowledge of any patents.

## 5. Feedback

Any ideas, suggestions, or recommendations made by Recipient regarding Discloser's Confidential Information in connection with the Purpose, ("**Feedback**"), may be used and incorporated into Discloser's products, technologies, and services without paying royalties and without any other obligations or restrictions so long as Discloser does not infringe Recipient's patents, copyrights or trademark rights.

## 6. Residuals

In connection with the Purpose, Apple and its Affiliates shall be free to use any ideas, concepts, know-how and techniques retained in the unaided memory of the persons who had access to the Confidential Information ("**Residuals**") for any purpose (subject to any patents or copyrights of Company and its Affiliates), and Apple and its Affiliates have no obligation to limit or restrict the assignment of such persons. A person's memory is unaided if the person has not intentionally memorized the Confidential Information.

## 7. Independent Development

Each party acknowledges that the other party may, currently or in the future: (i) make or use goods, services, or technologies that compete with its own; (ii) develop information internally or receive information from other third parties that may be similar to its own Confidential Information; or (iii) evaluate, invest in, or do business with its competitors or potential competitors. Neither party's execution of this Agreement nor its receipt of any Confidential Information will restrict such activities.

## 8. Warranty

V. 03192021

Apple Confidential

Each party warrants that it has the right to disclose its Confidential Information. All Confidential Information is provided AS IS and without any warranty, express, implied, or otherwise, regarding its accuracy or performance.

## 9. No Press Releases or Other Public Statements

Neither party nor their respective Affiliates or Consultants shall issue press releases or other public statements regarding this Agreement or its subject matter without the other party's prior written approval; provided, however, Apple and its Affiliates may disclose the final results of any supplier responsibility assessments pursuant to its corporate compliance, corporate responsibility, and/or annual reporting programs.

## 10. General Compliance with Laws

The parties shall, and shall cause their respective Affiliates and Consultants to, comply with all applicable laws including export control and sanction controls.

## 11. No Assignment

This Agreement is not assignable or transferable by a party without the prior written consent of the other party. Any purported or attempted assignment, delegation, change of control, or other transfer without such consent will be null and void and will constitute a breach of this Agreement.

## 12. Return of Confidential Information

Upon written notice, Recipient shall return all tangible Confidential Information then in its, its Affiliates' and its Consultants', possession to Discloser and destroy all Confidential Information that cannot be returned, including any emails or other electronic documents containing Confidential Information (but excluding automatic electronic back-ups and archive systems) within 15 days after receipt of such notice.

## 13. Protection Period

Restrictions on use and disclosure of Confidential Information will remain in effect for 7 years from the date the Confidential Information was disclosed, however Confidential Information containing personally identifiable information will remain in effect perpetually.

## 14. Term and Termination

Either party may terminate this Agreement upon 15 days advance written notice to the other party. Upon termination of this Agreement Feedback, and Residual rights, and each party's disclosure and use obligations shall survive.

## 15. Governing Law & Disputes

This Agreement will be governed by the laws of the State of Delaware, without reference to conflict of laws principles. The confidentiality provisions of this Agreement will be enforceable under the Delaware Uniform Trade Secrets Act, Del. Code Ann. Title 6 Secs. 2001 et seq.

Page 3 of 4

V. 03192021

Apple Confidential

ED_006475_00000040-0000

All disputes arising under or in connection with this Agreement will be finally settled under the then current Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such rules. The arbitration will be conducted in English in San Francisco, California. Judgment upon any award rendered by the arbitrator may be confirmed or enforced in any court having jurisdiction. The arbitrators shall award to the prevailing party, if any, its costs and expenses, including its attorneys' fees. The prevailing party shall also be entitled to its attorneys' fees and costs in any action to confirm and/or enforce any arbitration award in any judicial proceedings. All materials in the proceedings created for the purpose of the arbitration, all other documents produced by another party in the proceedings not otherwise in the public domain, and all awards in the arbitration will be deemed "Confidential Information", except to the extent disclosure may be required of a party by legal duty to protect or pursue a legal right or to enforce or challenge an award in legal proceedings before a court or other judicial authority.

Either party may bring court proceedings in any court having jurisdiction to seek an injunction, specific performance, or other equitable relief to enforce any right or obligation under this Agreement. The parties agree that no bond need be posted to obtain injunctive or equitable relief, but if required by law or the court, the parties consent to a bond in the lowest amount permitted by law.

## 16. Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to, and supersedes all prior or contemporaneous oral or written agreements or contractual provisions concerning any Confidential Information disclosed between the parties in connection with the same or similar purpose. Any amendments and waivers must be in writing and signed by both parties. Agreements, addenda, or supplements entered into between the parties prior to the Effective Date and that reference prior confidentiality provisions in connection with the same or similar purpose are amended to reference this Agreement in place of the prior provisions.

## 17. Miscellaneous

Company and Apple shall each ensure that its Affiliates comply with the terms and conditions of this agreement. A written notification addressed to the authorized representative(s) of a party will be deemed to be notice (i) when personally delivered; (ii) when sent by confirmed facsimile; (iii) one day after having been sent by commercial overnight carrier specifying next-day delivery with written verification of receipt; or (iv) three days after having been sent by first class or certified mail postage prepaid. A copy of any notice sent to Apple or its Affiliates must also be sent simultaneously to Apple's General Counsel at [disclosurenotices@apple.com]. The words "include" or "including" will be deemed followed by "without limitation."

Understood and agreed by the parties' authorized representatives:

V. 03192021                                    Apple Confidential

# EXHIBIT 14

13.     Attached as Exhibit 14 is EPA's August 2021 inspection documentation for 825 Stewart Drive.

# 825 Site Visit - Aug 19, 2021

Thursday, August 19, 2021        8:03 AM

- 07:50: Meet on-site:  NGG: Michael Shannon; The Dextra Group: Kurt Batsel; AECOM: Holly Holbrook
- Meet Colin Scanlon - Apple Lease manager: cscanlon@apple.com / Apple, Real Estate & Development Mobile: 510.290.7726
  - HVAC - not sure how operating

- Pre-arrange Site Visit Agenda:
  - The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
  - The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
  - Past indoor air sampling locations.
  - The location where contaminated soil was excavated from underneath the building.
  - The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
  - The emulsified vegetable oil in-situ bioremediation system.
  - The location of groundwater monitoring wells.

- Holly: 4 HVAC zones 1st floor
  - Can't access vent riser pipes - no ports

- Building Elevator Maintenance:
  - Elevator shaft in GW in a pvc sleeve.

- IA-4: Open area in front of elevator.
- Matt: Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for VOCs bc venting into hvac. Would be better / need to extend 10' high.
- Matt: Roof, East bldg stack issues. Vents too close to chiller. Cut too low.
- Photo. PVC pipes in in service room; unk source. Suspect drain from roof (it's flat). Around pipe openings sealed (good). Room is has hvac air (good).
- Older concrete floor cracks well sealed. Photo examples.
- SS-05 under carpet (photo). Identified by Apple. Right SS diameter, but grout sealed. Seems mislabeled as SS-5 location not shown here in 2016 VI rpt. Matt: Seal sub slab ports. Not abandoned properly. Rusted. Use brass and SS. Reinstall or abandon.  Seal and can redrill if needed. Don't need a permanent SS port.
- SS-4 (photo) not poured well.
- Room 12-19 has drain. Room under negative pressure -4. It's hvac well balanced. Sample this room bc of drain and neg pressure.
- Matt: Room 12-14 (w/saw?) pressure 5.6 pascals.  Has positive pressure. Would sample in hallway because has lower pressure. Otherwise sampling vent air.
- Justin with Apple, part of tour. Rooms are supposed to be warm, but have high turn over. Bldg has turn over. Didn't change for COVID. On 24 hrs because do thermal testing overnight.
- IA-2. Environmental room. Raised floor.
- Cube office work area IA-7: 3 pascals lower then hallway.
- IA-8 Has a higher pressure. Unlikely to be an issue here.
- IA sample where pressure is lower
- Need to look at past SS concentrations
- IA-9: Bathroom neg pressure. -15.7 pascals. Drain has no measurable floor, but the drain cover are too small to get tubing down. Can't feel flow. EPA assumption is all drains leak, but not representative.

04292
ED_006475_00000111-00001

Negative means air comes in to roof.

- SS-3 (Photo): Cannot locate SS-10 and SS-11. Indoor building layout has had changes (?) since 2015. AECOM will look at their records.

- Matt / EPA Comments:
  - EPA samples with hvac off because venting changes with economizers and season and we can't control for those future scenarios.
  - 4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller stack, not even sure how extend.
  - Be nice to get the HVAC test and balance reports to know where to sample. Want economizers to be closed and heater on. Usually in January.
  - Want HVAC off for worst case short-term exposure scenario.
  - Destroy the indoor SS ports.
  - Crack inspection documentation.
  - Locate the indoor SS missing ports.
  - Apple is operating bldg (HVAC) perfectly. Pressure right. But, long term we have no control over.
  - Recommend cages around ladders to roof.

-

04293
ED_006475_00000111-00002

Message
_____

**From:**      Plate, Mathew [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2A7EDF98DF8C470C895094D9D93F04D6-MPLATE]
**Sent:**      8/16/2021 6:42:35 PM
**To:**        Qazzaz, Bilal [qazzaz.bilal@epa.gov]; Williams, Jennifer [Williams.Jennifer@epa.gov]
**Subject:**   RE: DRAFT—Travel Request for Pechanga Technical Systems Audit
**Attachments:** SFD 7 Branch SIP HS Framework - MEMORANDUM 1-29-2021R1.docx


It looks fine to me. Here is a copy of the Superfund Travel request for my work Thursday that was approved … in case you have any questions on what to expect:

The "Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic" is a SF document (attached) that links to:
Coronavirus (COVID-19) Guidance Documents for Field Activities | US EPA


## Title
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA Travel Request Form
## Branch
["QA Staff","SFD 7 (CA Clean-up Section Branch)"]
## Name(s) of Staff
Michael Schulman (SFD-7-1); Matt Plate (QA)
## Destination
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
## Proposed Travel Start
2021-08-19
## Description of why this work is urgent and essential
A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.

The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
See less
## Phase and Staff Travel
EPA staff travel
## email
Schulman.Michael@epa.gov
## Guidance
["Pre-Travel considerations and checklist","Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic","The National EPA Guidance: Interim Health and Safety Guidelines Related to COVID-19 for Conducting Superfund Site Work ","CDC recommendation that fully vaccinated wear masks indoors"]
See more

☐Travel Method

Separate vehicles, one person per vehicle, local travel, no overnight stay.

☐Key COVID Measures

Will follow County COVID 19 safety measures. Masks will be worn. EPA staff are vaccinated. Will monitor AQI and red flag warnings prior to travel.

---

**From:** Qazzaz, Bilal <qazzaz.bilal@epa.gov>
**Sent:** Monday, August 16, 2021 11:08 AM
**To:** Williams, Jennifer <Williams.Jennifer@epa.gov>; Plate, Mathew <Plate.Mathew@epa.gov>
**Subject:** FW: DRAFT—Travel Request for Pechanga Technical Systems Audit

Hey guys,

I'd like to send this to Matt by COB Wednesday so please give it a look by then.

---

**From:** Qazzaz, Bilal
**Sent:** Thursday, August 12, 2021 3:15 PM
**To:** Yoshimura, Gwen <Yoshimura.Gwen@epa.gov>
**Cc:** Johnson, AudreyL <Johnson.AudreyL@epa.gov>; Williams, Jennifer <Williams.Jennifer@epa.gov>; Plate, Mathew <Plate.Mathew@epa.gov>
**Subject:** DRAFT—Travel Request for Pechanga Technical Systems Audit

Hi Gwen,

Jennifer, Mat, and I discussed our options and decided to move forward to conduct the Pechanga TSA on-site.

Below is our draft justification for travel.  I'd appreciate if folks review and comment before we submit this to Matt Lakin.

Thank you

The Air and Radiation Division is requesting travel authorization for the following travel:

**Activity:** Technical Systems Audit on the Pechanga Band of Luiseno Indians
**Traveler(s):** Bilal Qazzaz, Jennifer Williams, and Mat Plate

**Travel Dates:** 2021-09-27—2021-09-30
**Destination:** Pechanga Reservation

**Essential Determination:** EPA's guidance document, *Conducting Technical Systems Audits of Ambient Air Monitoring Programs*, defines a TSA as "an <u>on-site</u> review and inspection of a monitoring organization's ambient air monitoring program to assess its compliance with established regulations and guidance governing the collection, analysis, validation, and reporting of ambient air quality data. A TSA is also an opportunity to highlight areas within a monitoring organization where it has shown innovation and improvement, identify areas where programs can be strengthened, and to provide feedback to the organization." The resumption of this essential oversight tool be conducted on-site, is necessary to ensure regulatory ambient air programs are in compliance with EPA regulations and guidance.

**Additional information and considerations related to the safety of the work:** EPA staff will follow all CDC, State of California, and Pechanga Band of Luiseno Indian's guidelines appropriate to their vaccination status.  Work will be conducted indoors and outdoors in small groups, not to exceed 6 persons.  Donning masks and social distancing measures will be taken into account in each work setting throughout the audit.  When necessary, EPA staff will utilize

N95 masks.

**COVID conditions in the departure location:** COVID cases in San Francisco County remain very low. The 7 day positivity rate is 4.7% https://covid19.ca.gov/state-dashboard/#location-san_francisco.  COVID cases in Napa County remain very low.  The 7 day positivity rate is 3.6% https://covid19.ca.gov/state-dashboard/#location-napa.  COVID cases in Los Angeles county remain very low.  The 7 day positivity rate is 4.6 % https://covid19.ca.gov/state-dashboard/#location-los_angeles.

**COVID conditions in the destination location:** COVID cases in Riverside county remains low. The 7 day positivity rate is 12.1% https://covid19.ca.gov/state-dashboard/#location-riverside.

**Travel Method:**
Travel by personal vehicle, rental vehicle, and by plane with three overnight stays.

Bilal Qazzaz | U.S. Environmental Protection Agency R9
Air & Radiation Division | Air Quality Analysis Office
75 Hawthorne St. (AIR-4-2) | San Francisco, CA 94105 | 415.947.3532

Message

_____

**From:**      Schulman, Michael [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35D7024F00644B3D8B5DBA4940506834-SCHULMAN, M]
**Sent:**      7/26/2021 8:02:06 PM
**To:**        Kurt Batsel [batsel@dextra-group.com]
**Subject:**   RE: Site visit: TRW Microwave Site 825 Stewart Drive building


HI Kurt,

I think we can do everything in one day as the reason for the visit will be to document a site walk and visual inspection. Matt may want to take some readings, but I think it would be minor. No plans to conduct indoor air sampling at this time. I think we need a site visit first.

Thank you for circulating.
Michael


**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, July 26, 2021 12:58 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I will circulate those dates with our team and get back to you before the end of the week. A few questions:

- For planning purposed, are you thinking that you can get everything you want to do in a one-day visit?
- Are you planning to do indoor air sampling at the same time? If so, I would want to let the building owner know.

Thanks and I will get back to you shortly

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,
Thank you,

_____

**Michael Schulman**
Remedial Project Manager
USEPA Region 9
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, May 25, 2021 2:03 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** TWright@gesonline.com; Holbrook, Holly <Holly.Holbrook@aecom.com>
**Subject:** TRW Microwave - 2020 SSD Inspection Memo

Hi, Michael – As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple. Please let me know if you have any questions or need any additional info.

**Kurt R. Batsel, P.E.** | The Dextra Group, Inc.
**T:** 770.578.9696 | batsel@dextra-group.com

# EXHIBIT 15

14.     Attached as Exhibit 15 is the EPA's October 7, 2021 letter documenting "freshly sealed cracks" and related concerns at 825 Stewart Drive.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
**75 Hawthorne Street**
**San Francisco, CA  94105**

October 7, 2021

Mr. Kurt Batsel                                                          SENT VIA EMAIL
The Dextra Group, Inc.
On behalf of Northrup Grumman Corp
batsel@dextra-group.com

**Re:   EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue**
**Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Batsel:

Thank you for organizing for me and Matt Plate to conduct the August 19, 2021 site visit of the 825 Stewart Drive building, which is currently leased by Apple, Inc. (Apple). The site visit was attended by Michael Shannon with Northrup Grumman Corp (NGC), you, and NGC's consultant Holly Holbrook with AECOM. During the site visit an Apple leasing manager provided access throughout the building. The purpose of the site visit was for EPA to inspect the following items to assess the potential for vapor intrusion into the building:

- The sub-slab depressurization (SSD) system that was installed underneath the three connected site buildings that passively vents soil gas vapors to the atmosphere.
- The building's concrete slab and the April 2015 cracks that where sealed to prevent potential vapor intrusion.
- The building's concrete slab and penetrations from pipes or seams.
- The previously installed soil gas sampling vapor ports.
- The locations where past indoor air sampling has been conducted.
- The operation of the HVAC system and the HVAC air venting and intakes on the roof.
- The location where contaminated soil was excavated in 2014 from underneath the building.
- The location where the spaces between the walls of the three buildings' sections were sealed in 2015.
- A review of any post-2015 building modifications or changes to the buildings.
- The groundwater emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

Based on EPA's inspection of the building and real-time indoor pressure readings, the building HVAC system is well balanced to maintain a positive pressure within the occupied building areas, and the likelihood for vapor intrusion is low and not expected. EPA understands that

Apple intentionally operates the HVAC system to balance room pressures, heating, and air turn-over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

- **HVAC Operation:** EPA's observations of the HVAC system and pressures within the building were limited to the day of the site visit and the operation of the building at the time. While a balanced HVAC system was observed maintaining a positive pressure, EPA requests that HVAC and building test and balance information for the HVAC systems be provided to EPA to confirm this.

- **Sub-slab Sampling Ports:** The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located (SS-10 and SS-11). These ports need to be located and maintained where future sub-slab sampling will be conducted, or decommissioned if a justification is provided that the ports are no longer needed. EPA also requests an updated figure for the building showing all sub-slab vapor sampling port locations including measurements from exterior and interior walls, their ID names, and callouts presenting historical VOC detections. The figure used to locate the sub-slab ports in the field only showed approximate locations.

- **SSD System Maintenance and Inspections:** In May 2021 GES, on behalf of NGC, prepared the first Annual Maintenance Inspection memorandum for the 825 Steward Ave SSD System. The memorandum documented a November 2020 inspection and NGC prepared the memorandum to address the 2019 EPA Five Year Review Report recommendation to incorporate "long-term stewardship measures for the current vapor mitigation measures in place." EPA asks that NGC document in a work plan or technical memorandum the scope of the annual SSD system maintenance inspections, including how and when the inspections will be reported to EPA.

EPA requests that NGC provide a written response in the next 30-days addressing EPA's comments above. Please feel free to contact me anytime at schulman.michael@epa.gov or

415-972-3064 if you have any questions or comments. Thank you again for your cooperation and participation in the site visit and these follow-up items.

Sincerely,

Digitally signed by MICHAEL
SCHULMAN
Date: 2021.10.07 18:38:47 -07'00'

Michael Schulman
Remedial Project Manager
Superfund & Emergency Response Division

cc:   Joshua Nandi, Northrop Grumman Corp.

3

04301
ED_006475C_00002184-00003

# EXHIBIT 16

15.	Attached as Exhibit 16 is Apple document APL-GAELG_00002159, the March 18, 2021 email from Michael Steiger to Elizabeth Schmidt, Scott Sidlow, and Sue Creighton, produced by Defendant in discovery.

**From:** Michael Steiger [ Redacted ]
**Subject:** Fwd: [Important] Action Needed- SD01 EHS Request
**To:** Elizabeth Schmidt [ Redacted ] Scott Sidlow [ Redacted ], Sue Creighton [ Redacted ]
**Received(Date):** Thu, 18 Mar 2021 08:38:56 -0700
**Date:** Thu, 18 Mar 2021 08:38:56 -0700

Hi all- see below.

I would like to get your input on our comms plan for this— I've setup an ical today for 15 mins. Overall, the risks of VI at this site are low. But the comms plan with this individual are very important to get right.

 A couple of key facts:

1 - Apple is only leasing the facility. Other third parties (Northrup Grumman) are responsible for contamination.

2 - There is a voluntary VI mitigation system on the building installed by owner. Even though it's voluntary and goes beyond compliance, EPA signed off on the system and has concluded that the risk of VI is minimal.

3 - As part of our VI program, we are planning to do some additional floor sealing and indoor air testing. This building was one of our high priority sites for the VI program given that it has a VI mitigation system.

Michael

_____

Michael T. Steiger, P.E. |    Environment, Health and Safety

[ Redacted ]

Begin forwarded message:

**From:** Antone Jain [ Redacted ]

**Subject: [Important] Re: Action Needed- SD01 EHS Request**

**Date:** March 17, 2021 at 11:14:17 AM PDT

**To:** Austin DeBaene [ Redacted ]

**Cc:** Tom Huynh [ Redacted ], Michael Steiger [ Redacted ]

APL-GAELG_00002159

+Michael

**Antone Jain, PE**

**Apple, EHS**

| Redacted |
| --- |

On Mar 17, 2021, at 10:52 AM, Austin De Baene [ Redacted ] wrote:

Hi Antone,
How would you like to proceed?

Regards,

Austin DeBaene, CIH, CSP

EHS Engineer

Apple

Environment, Health & Safety

1 Infinite Loop

Cupertino, CA 95014, USA

| Redacted |
| --- |

Begin forwarded message:

**From:** Jane Markham [ Redacted ]
**Subject: Fwd: Action Needed- SD01 EHS Request**
**Date:** March 17, 2021 at 10:32:35 AM PDT
**To:** Austin De Baene [ Redacted ]

Hi Austin,
Some concerns from a team member working at Stewart- she would like to chat with you on the topic.

Best,

Jane Markham | Product Integrity | [ Redacted ]

APL-GAELG_00002160

Begin forwarded message:

**From:** Ashley Gjovik [_____Redacted_____]
**Subject: Re: Action Needed- SD01 EHS Request**
**Date:** March 17, 2021 at 9:32:23 AM PDT
**To:** Jane Markham [Redacted]
**Cc:** msq-managers

I have questions… Lots of questions…
For those of you who still don't know why I was out on leave so long last year: I was severely poisoned by hazardous waste vapor intrusion at the apartment I was living at —and thought I could by dying, until we figured out what was actually happening and I moved out. I'll share the newspaper article about my experience when it comes out in a couple weeks (biz conduct approved as long as I only talked publicly about residential concerns). Following the experience, the chemical contamination in the Bay Area has become a bit of a personal crusade.
Jane, please let me know if there's someone with EHS I can talk to directly to ask questions? Also, are we allowed to talk to the EPA Project Manager of our site directly too, or must we only go through EHS?

Is Stewart 1 (aka the TRW Microwave Inc Superfund site, part of the notorious "Triple Site") being singled out in anyway for this? Or are all Apple Silicon Valley buildings getting this level of inspection? Or only Apple's Silicon Valley Superfund sites?

Was there a vapor intrusion incident in an Apple building, or Stewart 1 specifically, that led them to do this survey? I just found a report from 2016 saying vapor intrusion was found under the homes next to our office. I found a 2019 EPA settlement agreement for further remediation as well — but I can't find details on how it came about. I'm very curious why they're doing this now.

What type of air monitoring are they doing? Summa canisters? 24, 48hrs? Ongoing? Are there real time alerts if they find VI? Will employees be notified?

Will they test the drinking water? They will always say this type of contamination "shouldn't get into the drinking water," but it can happen. Both the soil & groundwater under our building are contaminated.

They should also be inspecting any labs that have plumbing fixtures, like a sink or an eye wash station, etc. Vapor intrusion is notorious for coming up through pluming as well as utility lines. If they have concerns about VI in our building, managers should also call out any labs with plumbing (so at least the coffee lab).

Will they be sharing their findings? Some sort of risk assessment? We really should be better informed about these types of environmental risks at our offices. The chemicals under SD01 if in high enough quantities, can cause cancer, disruption of nervous and endocrine systems, and birth defects & miscarriages. (Well that's not a very inclusive physical environment for

women!)

If there's any new concerns, like if TCE is actually found in our air or water, I believe the federal Right to Know statute requires Apple to inform employees of the presence of the chemicals. I've never seen any notice or disclosure about the status of SD01 since I've worked there. I was only warned by folks who grew up in the area when I joined MSQ. That's messed up. But also if folks know, then they can report unusual chemical smells, the immediately physical symptoms, etc. And we can get the EPA to jump on any issues sooner than later.

->

<PastedGraphic-8.png>

https://www.nytimes.com/2018/03/26/lens/the-superfund-sites-of-silicon-valley.html

<PastedGraphic-9.png>

<PastedGraphic-10.png>

https://www.theatlantic.com/technology/archive/2013/07/not-even-silicon-valley-escapes-history/277824/

-Ashley

—

**Ashley M. Gjøvik**

Engineering Program Manager

Redacted

On Mar 17, 2021, at 8:46 AM, Jane Markham | Redacted | wrote:

Good Morning,

The Corporate EHS team is conducting a rather large scale project across the SCV building portfolio which includes a vapor intrusion survey within each building. This will require EHS to walk through each space that has exposed flooring and conduct visual observations along with air monitoring.

Can the lab managers for spaces below please confirm if their space has exposed concrete or utility lines coming up through the flooring. Thanks!

| ROOM | Yes/No |
|------|--------|
| Power Rangers (1302) | |

APL-GAELG_00002162

Everquest (1408)

Gauntlet (2015)

Ant Man (2011)

Metroid (1503)

Dark Castle (1514)

Marathon (1522)

The Sims (1515)

Coffee Lab (1516)

The Wall (1401)

Need for Speed (1312)

Best,

Jane Markham | Product Integrity

Redacted

APL-GAELG_00002163

# EXHIBIT 17

16.    Attached as Exhibit 17 is Apple documents APL-GAELG-00003870 through APL-GAELG-00003874, produced by Defendant in discovery, reflecting crack-sealing activity at 825 Stewart Drive beginning August 4, 2021.

Sealing Work Review
825 Stewart Drive, Sunnyvale, California (SD01)

**APPLE NEED TO KNOW – CONFIDENTIAL**

## 1.  IDENTIFIED FLOOR SEALING AREAS DURING EKI 6 MAY 2021 SITE WALK

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 1 | Lab 1026 MPOE Closet | • Unsealed annular gap around electrical grounding rod and through the concrete slab, located inside MPOE closet. | Folder 01 | • Seal the annular gap around the electrical grounding rod. | • Observed feature, sealing was confirmed. | • Y |
| 2 | Main Lobby | • Single crack > 1 mm in concrete slab. | Folder 02 | • Seal the crack in the concrete slab > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 3 | | • Multiple gaps in concrete seams along previous trench work that goes across the lobby. | | • Seal all gaps in the concrete seams > 1 mm wide. | • Observed feature, sealing work is in-progress. | • Partial – Complete sealing work and provide photo of sealed feature. |
| 4 | Elevator | • Single crack > 1 mm in concrete slab (approximately 1.5 feet in length), between the slab and elevator threshold. | Folder 03 | • Seal the crack in the concrete slab > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 5 | Southern Hallway (East of the Main Lobby) | • 4-inch galvanized steel pipe comes through the floor.  Pipe wrap visible in the annular gap between the pipe and the concrete slab. | Folder 04 | • Trim/remove pipe wrap from pipe at floor level or ¼-inch below floor level, if feasible.<br>• Seal around the annular space of the pipe at floor level, sealing the pipe to the concrete slab. | • Observed feature, sealing was confirmed. | • Y |
| 6 | Southern Door Foyer | • Single gap in concrete seam (approximately 4 feet in length) located in foyer of southern entrance. | Folder 05 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 7 | Hallway Outside of Lab 1302 | • Single gap in concrete seam (approximately 1.5 feet in length, along previous trench work that goes across a hallway near Lab 1302. | Folder 06 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 8 | Hallway Outside of Lab 1221 | • Multiple gaps in concrete seams along previous trench work, located in the hallways on each side of the double door nearest Lab 1221. | Folder 07 | • Seal all gaps in the concrete seams > 1 mm wide. | • EKI did not observe this feature. | • Unknown – Complete sealing work and provide photo of sealed feature. |

APL-GAELG_00003870

Sealing Work Review
825 Stewart Drive, Sunnyvale, California (SD01)

**APPLE NEED TO KNOW – CONFIDENTIAL**

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 9 | Room 1203 | • Hole filled with degraded sealant, underneath carpet. | Folder 08 | • Remove degraded sealant at floor level or ¼-inch below floor level, if feasible.<br>• Seal the inside of the hole, sealing to the concrete slab. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 10 | Elevator Mechanical Room | • Multiple gaps in concrete seams within Elevator Mechanical Room. | Folder 09 | • Seal all gaps in the concrete seams > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 11 | Electrical Room 1106 | • Single gap in concrete seam that goes across the Electrical Room. | Folder 10 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 12 | | • Multiple cracks > 1 mm in concrete slab. | | • Seal all cracks in the concrete slab > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |

APL-GAELG_00003871

Sealing Work Review
825 Stewart Drive, Sunnyvale, California (SD01)

APPLE NEED TO KNOW – CONFIDENTIAL

## 2. IDENTIFIED FLOOR SEALING AREAS DURING 11 AUGUST AND 18 AUGUST 2021 SITE WALKS PERFORMED BY APPLE

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 13 | Southern Portion of Central Hallway | • Multiple saw cuts in concrete slab along previous trench work in the hallway. | Folder 2021-08-11 Apple Site Walk | • Seal saw cuts in the concrete slab. | • Observed feature, sealing was confirmed. | • Y |
| 14 | Room 1400 The Wall | • Multiple gaps in concrete slab along concrete seam. | Folder 2021-08-11 Apple Site Walk | • Seal gaps in the concrete slab along concrete seam. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 15 | | • Single crack in concrete slab. | | • Seal the crack in the concrete slab. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 16 | Electrical Room 1501 | • Unsealed annular gap around electrical grounding rod. | Folder 2021-08-11 Apple Site Walk | • Seal the annular gap around the electrical grounding rod. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 17 | Northwest Vestibule | • Three holes (potentially location of former door stop) in concrete slab. | Folder 2021-08-18 Apple Site Walk | • Apple indicated a maintenance ticket would be submitted to re-install the door stop. | • n/a – Per Apple, this feature is not included in ARC Pacific's scope. Apple to address this identified floor sealing area. | • n/a – Per Apple, this feature is not included in ARC Pacific's scope. Apple to address this identified floor sealing area. |
| 18 | Room 1400 The Wall | • One hole in concrete slab, located outside of a chamber. | Folder 2021-08-18 Apple Site Walk | • Seal the inside of the hole. | • n/a – Feature added to ARC Pacific's Scope by Apple on 18 August 2021. | • N – Complete sealing work and provide photo of sealed feature. |

<u>Notes</u>

(a) The Floor Assessment Survey was performed by EKI on 6 May 2021. Apple performed a site walk on 11 August 2021. The sealing confirmation walk was performed by EKI on 18 August 2021. During the 11 August and 18 August 2021 site walks, Apple identified additional floor sealing areas, some of which have been added to ARC Pacific's scope (see Section 2).

(b) Photos are in the SD01 folder located in Box folder: https://apple.box.com/s/ngcbda9ixv48q54wjf3y24kipmesmrep.

(c) Floor receptacles within the building are not within the scope of the Floor Penetration Survey.

(d) Certain electrical equipment and/or wiring may need to be deenergized by a qualified person prior to sealing. Contractor bears all responsibility for de-energizing or lock/tag out of all equipment, wiring, conduits, wireways, etc. to allow for safe contractor access.

(e) Sealant selection is the contractor's responsibility. EKI Environment & Water, Inc., has provided information specific to the use of these recommended sealants including the Floor Sealing Guidelines (EKI, 2021a), the Sealant Selection Matrix (EKI, 2021b), and cut sheets and installation instructions provided by the sealant manufacturers to inform their selection. Contractors can access this information in the Box folder here: https://app.box.com/folder/136387661002.

(f) Contractor must procure and mobilize to the site with all equipment, tools, and supplies (i.e., backer rod, crack chasing bits, etc.) required to perform the sealing work. All sealants must be installed or applied in a manner consistent with the manufacturer's instructions.

APL-GAELG_00003872

Sealing Work Review
825 Stewart Drive, Sunnyvale, California (SD01)

**APPLE NEED TO KNOW – CONFIDENTIAL**

<u>Abbreviations</u>
mm: millimeter

<u>References</u>
EKI, 2021a. *Guidelines for Sealing Existing Slab-on-Grade Concrete Floors to Reduce Sub-Slab Soil Gas Leakage and Vapor Intrusion Potential*, EKI Environment & Water, Inc.,
        5 March 2021.
EKI, 2021b. *Sealant Selection Matrix*, EKI Environment & Water, Inc., 27 April 2021.

APL-GAELG_00003873

Sealing Work Review                                                    **APPLE NEED TO KNOW – CONFIDENTIAL**
825 Stewart Drive, Sunnyvale, California (SD01)

## 3. SUB-SLAB MONITORING POINTS

| Sub-Slab Monitoring Point | Room/Location | Condition of Sub-Slab Monitoring Point (a) | Photos (b) | Notes |
|---|---|---|---|---|
| Confirmed Monitoring Point Locations | | | | |
| SS-2 | Southeast Office Area Hallway | • Monitoring point cover was screwed on tight.<br>• Monitoring point cap was screwed on tight. | Folder SS-2 | |
| SS-3 | Lab 1503 Private Office | • Monitoring point cover was screwed on tight.<br>• Monitoring point cap was screwed on tight. | Folder SS-3 | Due to access restrictions, a lab user observed monitoring point SS-3. |
| SS-4 | Lab 1204 | • Monitoring point cover was screwed on tight.<br>• Monitoring point cap was screwed on but looser than hand-tight.  EKI hand-tightened the monitoring point cap. | Folder SS-4 | On 18 August 2021, EKI and Apple observed monitoring point SS-4 was located in a different aisle of Lab 1204 than previously noted in field maps and figures. EKI corrected the monitoring point SS-4 location on the field map and CAD figures. |
| SS-5 | Outside of Chamber 1205A | • Monitoring point cover was screwed on tight.<br>• Monitoring point cap was screwed on tight. | Folder SS-5 | |
| Unconfirmed Monitoring Point Locations | | | | |
| SS-1 | n/a | • n/a | n/a | Potentially located in Lab 1215. |
| SS-7 | n/a | • n/a | n/a | Potentially located in Lab 1401. |
| SS-10 | n/a | • n/a | n/a | Potentially located in Lab 1503.  Due to access restrictions, a lab user attempted to observe this monitoring point, but was unable to locate it in the lab space. |
| SS-11 | n/a | • n/a | n/a | Potentially located in Lab 1503.<br>Due to access restrictions, a lab user attempted to observe this monitoring point, but was unable to locate it in the lab space. |

Notes
(a)  During the Floor Penetration Survey performed on 6 May 2021, EKI confirmed the location of 4 of the 8 sub-slab monitoring points previously installed by AECOM.
(b)  Photos are in the SD01 folder located in Box folder: https://apple.box.com/s/ngcbda9ixv48q54wjf3y24kipmesmrep.

References
AECOM, 2014. *Vapor Intrusion Evaluation Report – Former TRW Microwave Facility, 825 Stewart Drive, Sunnyvale, California*, AECOM, February 2014.
AECOM, 2016. *Vapor Intrusion Evaluation Report – Former TRW Microwave Facility, 825 Stewart Drive, Sunnyvale, California*, AECOM, February 2016.

APL-GAELG_00003874

# EXHIBIT 18

17.      Attached as Exhibit 18 is Apple documents APL-GAELG-00001509 through APL-GAELG-00001512, the September 9, 2021 12:24 PM email from Jenna Waibel to Elizabeth Schmidt and Antone Jain, produced by Defendant in discovery.

**From:** Jenna Waibel [Redacted]

**Subject:** Updated notes from 7/7 meeting with A. Gjovik

**Received(Date):** Thu, 9 Sep 2021 12:24:52 -0700

**Cc:** Antone Jain [Redacted]

**To:** Elizabeth Schmidt [Redacted]

**Attachment:** smime.p7s

**Date:** Thu, 09 Sep 2021 12:24:52 -0700

Hi Elizabeth,

I'm providing notes to you from our last meeting with Ashley Gjovik to address her EHS concerns, which occurred on 7/7/2021. Antone is copied since he was present the meeting- he can answer additional questions you may have as well.

Antone asked that we add the third bullet point from the bottom, which was missed in the prior notes. Please see below.

———————

Meeting notes 7/7/2021

Present in meeting: Michael Steiger and Antone Jain from EHS, Ashley Gjovik, Jenna Waibel from Employee Relations

The purpose of the meeting was to follow up on Ashley's continued concerns about the safety of the Stewart 1 building.

The meeting was opened explaining Antone's presence since he had not been in prior meetings with Ashley: he joined this meeting to step in for Michael since Michael will be leaving Apple in the following days. Michael explained that Antone is very familiar with the Vapor Intrusion program as well, and is responsible for scheduling the next steps in the testing plan.

- Michael said he wanted to clarify that they always intended to do indoor testing, which Ashley had previously misunderstood: it's the 3rd step in the process they follow.

- Antone walked through testing steps:

    * Routine floor pathway survey

    * Routine maintenance on floor sealing (preventative, optional work)

* Indoor air testing once step 2 is done (about a month from now)

• Ashley expressed concern that the last VI testing was done in 2015, and said that doesn't sound like regular maintenance.

* Michael and Antone said it is standard for the program.

• Ashley asked if the cracks in the floor are deep enough for air to be coming through?

* Antone said he has done numerous floor surveys and there is no reason for concern with the floor condition at SD01. Antone said the last testing in 2015 showed no concerns. This is maintenance, not work done due to concerns.

* Ashley asked if this work was reported to the EPA?

* Michael/ Antone answered that it was not reported since it is voluntary work.

• Ashley asked that EHS conduct a specific air test prior to floor sealing to know what the air contained prior to that building work.

* Michael said testing in advance is not the protocol we follow. He said it is not needed and not in the standard process that is necessary.

• Ashley said her desk is on the hottest spot in the building, and was concerned whether EHS inspected the floor under the carpet.

* Antone said they didn't look under the carpet.

• Ashley asked if they were going to test the Sim City lockdown area since she regularly has to work in there, and that is where she said she had a "fainting spell".

* Antone and Michael said they were pursuing the approval for that access.

APL-GAELG_00001510

• Michael said: We already went above and beyond, and you're asking if we went above and beyond going above and beyond.

• Michael asked Ashley: What would be resolution for you?

  * Ashley said: I'm very anxious to have indoor testing. After all the chemical exposure, and being at an active superfund. She wants to have full remote work.

• Antone explained the testing will be done over a week's time with a passive sampler.

  * Ashley objected to this approach: she asked them to test with the HVAC turned off for 48 hours and with no one in the building.

  * Antone explained: The HVAC will still be on. They don't clear the building. This is more representative of the exposure that would exist with people actually present.

• Michael said he would share a website with the passive sampling device and the EPA passing sampling recommendations.

• Michael clarified that VI and Superfund are separate. Not connected concepts.

• Ashley said she is connected with CA Dept of Public Health Investigations Unit, EPA, and she believes that this Unit considers testing after HVAC off for 48 hours to be the gold standard. Michael said they (CA Dept of Public Health Investigations Unit and EPA) are not the experts in VI.  Antone clarified that different methods of testing give different information, and passive sampling during occupancy is more representative of actual conditions, which is why we do it.

• Michael said the vapor intrusion mitigation system and HVAC system would provide protection even if there were cracks in the floor. It was installed after the 2015 testing as additional mitigation. It's a voluntary system.

APL-GAELG_00001511

- Ashley asked why do we keep calling this "routine" floor testing?

- Antone explained that it is routine for two reasons: 1) it is not triggered by any issues or external factors; we are doing it for preventative maintenance purposes and 2) doing floor surveys and sealing on approximately a five year cadence since tenant improvements in 2015 is a standard time-scale for reviewing potential floor movements.  We have done this at a couple other buildings as part of the routine process of our vapor intrusion program.

- Towards the end, when Ashley started talking about other buildings, Antone said: "The other buildings are not part of the topic of this call."

- Jenna said EHS has committed to providing Ashley the data after the testing is complete, and that questions about buildings other than SD01 were outside the scope this call.

- Ashley changed to a different topic: she said she has two accommodations processes moving forward, but that Helen was bullying her by saying she wasn't likely to get it approved. I told Ashley that bullying is a strong word, and that if she felt strongly that was occurring we should report it and look into that. Ashley said she had already told my boss about it. I asked Ashley that we have any further conversation about that in a separate call, since it does not involve EHS.

We ended the call before the 30 minutes were past- approximately 25 minutes were taken for the entire call. Ashley wished Michael well in his departure from Apple.

**Jenna Waibel**

**Corporate Employee Relations**



Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.**

APL-GAELG_00001512

# EXHIBIT 19

18.     Attached as Exhibit 19 is Apple document APP 00001761 (also bates-stamped PL_PROD_11_06500), the August 23, 2021 Issue Confirmation I finalized and transmitted to Apple Employee Relations, produced by Defendant in discovery.

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

## TABLE OF CONTENTS

1. **SUMMARY OF CONCERNS** .................................................................2

2. **SOFTWARE ENGINEERING** ............................................................4

    A. iOS Release Management Team (2015-2016) ..............................4

      i.    Brad Reigel ...........................................................4

      ii.    Rob Marini ...........................................................4

      iii.    Rob Marini, Aron Talburt, & Brad Reigel (aka "RAB") ...........5

      iv.    Linda Keshishoglou ...............................................5

      v.    Venkat Memula......................................................6

      vi.    Bodhi Gerfen........................................................6

      vii.    Bill Stevenson......................................................7

    B. Spring 2016 Transfer (Component EPM; EFFA EPM) ......................7

      viii.    Stacey Lysik........................................................9

      ix.    Brad Reigel .........................................................9

    C. SWE Failure Analysis Team (2016)........................................9

      x.    Shandra Rica & Evan Buyze.........................................10

3. **HARDWARE ENGINEERING** ...........................................................12

    D. Mac Systems Quality (2017-Current) ....................................12

      xi.    David Powers........................................................12

      xii.    Jason Ivan .........................................................17

    E. Product Systems Quality (2017-Current) ................................18

      xiii.    Dan West ...........................................................19

      xiv.    John Basanese.......................................................22

      xv.    Reed Johnson........................................................23

4. **ADMINISTRATION**........................................................................23

    F. Human Resources .........................................................23

      xvi.    Helen Polkes.......................................................23

    G. Employee Relations.......................................................24

      xvii.    Overall............................................................24

      xviii.    Jenna Waibel......................................................25

      xix.    Ekelemchi Okpo.....................................................28

    H. Apple Real Estate Environment, Health, & Safety ......................29

      xx.    Overall............................................................29

      xxi.    Michael Steiger....................................................31

5. **BOARD OF DIRECTORS** .................................................................33

    I. Finance & Audit Committee................................................33

      xxii.    Ronald Sugar.......................................................33

Page 1 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

# 1. Summary of Concerns

<u>Concerns</u>
- **Date range of incidents:** 2015 to Current
- **Individuals to be investigated, by organization:**
    - *Software Engineering:* Venkat Memula; Brad Reigel; Rob Marini; Aron Talburt; Shandra Rica; Evan Buyze; Stacey Lysik; Bodhi Gerfen
    - *Hardware Engineering*: Dan West; David Powers; John Basansese; Jason Ivan; Reed Johnson
    - *Human Resources / People Team:* Kristen Michalak; Helen Polkes
    - *Employee Relations:* Jenna Waibel; Ekelemchi Okpo
    - *Environment Health & Safety:* Michael Steiger; Antone Jain
    - *Legal:* Deborah Goldsmith
    - *Board of Directors:* Ronald Sugar
- **Concerns Raised (DRAFT)**:
    - Hostile work env based on sex (2015-current)
    - Hostile work env based on disability (2020-current)
    - Failure to resolve hostile work environment (2015-current)
    - Sexual harassment (2015, 2018, 2019)
    - Civil assault & battery (2015)
    - False imprisonment (2015-6)
    - Negligence & battery (2017-2020)
    - Civil assault (2021)
    - Quid pro quo / bribe (2015)
    - Intentional Infliction of Emotional Distress (2015, 2021)
    - Bullying (2015-2016, 2021)
    - ADA & FMLA violations (2020-2021)
    - Unsafe work conditions (2017-current)
    - Toxic tort, occupational exposure (2017-current)
    - Violation of OSHA laws & Right to Know statute (2017-current)
    - Failure to report workplace injuries (2017, 2019)
    - Failure to seek medical attention for life threatening injury (2017)
    - Retaliation for whistleblowing (2016, 2020, 2021)
    - Retaliation for protected concerted activities (2020-2021)
    - Retaliatory constructive termination (2015, 2016, 2016, 2021)
    - RICO (Unknown-current) Misrepresentation & fraud; Racketeering; Organized witness tampering; Organized intimidation; Corporate corruption; Cronyism & nepotism

<u>Workers Compensation Claims:</u>
- Chemical Exposure (# 302174831070001)
    - Filed: 4/26/2021; Dated: 12/4/2019
- Peanut Allergy, Anaphylaxis, & Failure to Provide Medical Treatment (# 302179876420001)
    - Filed: 8/20/2021; Dated: 10/6/2017
- Severe Pertussis due to above Anaphylaxis (# 3021 7987 5030 001)
    - Filed: 8/20/2021; Dated: 10/3/2017

PL_PROD_11_06500

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

## Disability Claim
- Chemical Exposure (# 302048282250-0001)
  - 2020


## Protected Activities & Whistleblowing:
- Aug 5, 2021: Planned for weeks to go to the office this day to get my computer with more evidence. I told ER several times. Was then "removed from the workplace" by ER on 8/4.
- Aug 3-4, 2021: working with colleagues to collect evidence of building floor cracks and EHS activities in order to understand safety risk. Notified ER of this.
- Aug 3, 2021: posted in Remote Work Adv reminder that nothing in Apple's policies "should be interpreted as restricting your right to speak freely bout your wages, hours, or working conditions." Added angel & microphone emoji and said "Friendly reminder" while citing Apple's own polices/quotes.
- July 2021: escalated concerns one of our PSQ employees was bragging about smuggling iPods into Syria and running a side business transporting people across the Syria/Lebanon border. Complained about general lawlessness in my org.
- July 26, 2021: post in Women in SWE slack about employment relations concerns – asking if anyone else had issues with ER's handling of complaints, or if they even feel comfortable reporting issues? Lots of responses.
- July 30, 2021: Tweeted me too about EAP & medical leave in response to hostile work env, and ADA accommodations in response to unsafe work conditions
- July 23-34, 2021: Quoted in NYT with concerns about safety risk in Apple bringing us back on stie with COVID, next date was sleected as quote of the day.
- July 19, 2021: raise concerns in Apple Slack Language-Matters about Dave & Dan saying "open kimono" all the time and never stopping when I ask them to. Let ER know.
- July 16, 2021: My Sedgwick/Apple accommodation follow up question form is shared on Twitter in protest of how invasive it is. I told Cher she could share it publicly after expressing my own frustration and the responding eruption on Slack about it. I also shared the ER Medical Release form I had concerns about on Slack earlier this week and it appears that form or one like it was referenced in The Verge article about Apple's poor behavior around disabilities yesterday. The Verge writer also retweeted my chemical exposure follow up question form too. I told ER, "I'm glad public pressure might influence Apple to correct & improve its employee policies."
- June 14, 2021, I email Tim & Deirdre about Remote Work Advocacy and share a letter, video, survey results, and letter signatures.
- May 20-21 2021, I sent email to Dave, Dan, HR, & ER about concerns Apple not speaking up in support of Palestinians and Muslims; Helen replies not really addressing my concerns. I reply to Helen, Dave, & Dan and re-iterate my concerns and further elaborate my concerns around Muslim inclusion with the recent news of Uyghur forced labor; Helen replies actually addressing this time and lets me know I&D is looking into the whole situation and I'm welcome to talk to them.
- In April 2021, Jenna Waibel investigated David Powers for a creating a hostile work env based on gender and disability & Rob Yepez for sexual harassment.
- April 2021, field workers comp complaint for chemical exposure and notified managers, HR, ER, & EHS.
- April 2021, notified Federal EPA of my concerns about my office building & Apple's oversight of it.

Page 3 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- Starting in March 2021 and continuing to present day, raised safety concerns around my building and workplace to my engineering leadership, Environmental Health and Safety (EHS), employee relations, Apple University, HR, and I&D.
- Dec 2020/Jan 2021: Raised concerns about Apple entering into a private contract to obtain expedited access to COVID-19 vaccines for employees & their families, per Dan Riccio All Hands comments (recorded on video). My interpretation was confirmed, but was told Apple will not do that, although an exec mentioned there were still some ethical concerns about smaller Apple activities around COVID testing & treatments. Dan Riccio was demoted ~1 month after my concerns were rasied, escalated, and confirmed.
- Summer 2019: Intern in Apple Legal.  Main project was organizing and leading discussions with internal, cross-functional Artificial Intelligence engineering leaders around AI ethics and social responsibility. Synthesized research and discussion findings and distilled best practices for ongoing policy discussions with Legal, Government Affairs, Engineering, and other internal groups. Also researched several software legal topics, synthesized findings, and drove discussions with partner teams — which led to new process and strategy. Drafted, reviewed, revised, and/or analyzed several contracts including software license agreements and third-party asset licenses.
- In June 2021, you assisted the Remote Work Advocacy (RWA) Slack channel with drafting a letter and creating a video addressed and sent to Tim Cook and Deirdre O'Brien in response to Apple's Hybrid Working Pilot.

# 2. Software Engineering

## A. iOS Release Management Team (2015-2016)

**Software Engineering:**

### i. Brad Reigel

- **Concerns:** Hostile work env based on sex; bullying; intimidation; retaliation; drinking at work; possession of weapons at work; constructive termination; IIED; assault; battery
- **Examples:**
    - Bullets, knives, gunpowder weapons, threats of violence (I'm going to smack you), locking me in conf rooms to yell at me, calling me names (fat, idiot, stupid).
    - Escalated to Venkat Memula on going. When Linda was leaving, Rob said I was going to get re-orged under Brad but that he was going to report to Venkat because he also didn't want to work for Brad, but laughed that I would have to. Venkat did force me to work for Brad even when I told him I'd have to quit if he did that. Venkat told me it was my job to help Brad become a better manager & person.
    - Flipped me off a lot & told me to fuck off
    - Rob & Venkat told me Brad was awful to me because I reminded him of an ex-wife he hates.
    - Brad closed the "Make Ashley's Life a Living Hell" Radar after I was re-orged under him.
- **Evidence:** Box folder including emails & photos; HR personnel file
- **Witnesses:** Chris Markham, Serita McPherson, Garth Corral

### ii. Rob Marini

Page 4 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- **Concerns:** Hostile work env based on sex; bullying; intimidation; retaliation; drinking at work; IIED; assault; battery
- **Examples:**
  - Marini created a Radar called "Make Ashley's Life a Living Hell," and assigned it to Brad.
  - Marini told you that it was his mission to make you quit
  - Within the first month of joining the team, Marini told you that you should have been aborted.
  - Marini told me Neela said the team shouldn't hire me because I'm a "tattooed floozy and the boys just want to flirt with me." Venkat confirmed and said he "lost her feedback" on purpose. She apologized later.
- **Evidence:**
  - Box folder including emails & photos; HR personnel file
  - Marini reached out 7/27 for first time in months/years to "check in" after I posed in Women-of-SWE slack channel about extensive ER investigation.
- **Witnesses:** Chris Markham, Serita McPherson, Garth Corral

### iii. <u>Rob Marini, Aron Talburt, & Brad Reigel (aka "RAB")</u>

- **Concerns:** Hostile work env based on sex; bullying; intimidation; retaliation; drinking at work; IIED; assault; battery
- **Examples:**
  - Constant drinking in the office, during work hours.
  - Attacking me with dodgeballs & nerf guns even though I told them I have PTSD. At one point, surprise attacked me to make me scream, recorded my scream, re-mixed it and sent it to the entire team while I cried.
  - You stated that you reported this behavior to your skip level manager, Venkat Memula, and you said that his advice was for you to replace their alcohol with food color and water (you informed me that Reigel, Marini and Talburt kept alcohol in their workspaces).
  - Aron looking at rifle specs (pic)
  - Memula, Reigel, Marini & Talburt came up with nicknames for you, and wrote them down on a white board at work including: stupid millennial, professor fun sucker, master of the universe of suck, etc.
  - Frequent late night texts bullying me calling me names, calling other people names, talking about violence & death
  - Forced to drink tequila at a work offsite (Giants game) purchased by and pressured by Marini and Memula. Got sick and threw up and had to leave early. Had said I didn't want to drink numerous times. Vorrath and Michallik were present with us (see photos).
  - Someone created a fake LinkedIn profile of you to harass you.
- **Evidence:** Box folder including emails & photos; HR personnel file
- **Witnesses:** Chris Markham, Serita McPherson, Garth Corral

### iv. <u>Linda Keshishoglou</u>

- **Concerns:** Hostile work env based on sex; quid pro quo; bribe; failure to resolve hostile work environment
- **Examples:**

Page 5 of 34

PL_PROD_11_06503

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- You mentioned that Keshishoglou did not include you in emails, group text, and strategy meetings, but she included your male colleagues (Marini, Talburt, Reigel).
- You stated that Keshishoglou provided no explanation as to why she excluded you from strategy meetings, group text, emails, etc.
- You mentioned that you made Michallik, Memula, Reigel, Talburt and Marini aware of your concerns that Keshishoglou excluded you from strategy meetings, group text, emails, etc. In September 2015, you received your first performance review at Apple (6 months in role) as an ICT3. You told me that Keshishoglou gave you $100K in Restricted Stock Unit (RSU) grants when the max guideline for your role was $60K. You also believe that you should have been rated as "too new to rate".
- You shared that during the same performance review conversation, Keshishoglou asked you to tell Memula that she was a good manager.
- You believe that Keshishoglou asked you to do this in exchange for the compensation you received.
- You shared that you reported this concern with Keshishoglou to Michallik on September 25, 2015 and to Memula on September 29, 2015.

- **Evidence:** Box folder including emails & photos; HR personnel file
- **Witnesses:** Chris Markham, Serita McPherson, Garth Corral

### v.  <u>Venkat Memula</u>

- **Concerns:** Hostile work env based on sex; failure to resolve hostile work environment; constructive termination, intimidation; bullying; forced drinking
- **Examples:**
    - You mentioned that Memula was often drunk at work, and you heard that his leader, Kim Vorrath, told him that he was not allowed to have alcohol in his office.
    - You mentioned that Memula would snuggle up on you while drunk, whisper to you, and say things that made no sense. (Evidence: see photograph of during one instance with documentation of his "phases" of drunkness on whiteboard including these behaviors, then following photo of him "crucifying" himself upon said whiteboard writing.)
    - You mentioned that at the end of your interviews for the role on Haley's team, you were not offered the position due to Stacey & Brad's feedback. Venkat confirm in email that it was not fair. You stated that Vorrath offered you a different role as Engineering Program Manager (EPM) for Early Field Failure Analysis (EFFA), and you informed Venkat that you didn't want the role. You shared that if you didn't accept the EFFA role, then you had no other option but quit or stay in the hostile work env.
- **Evidence:** Box folder including emails & photos; HR personnel file
- **Witnesses:** Chris Markham, Serita McPherson, Garth Corral

### vi.  <u>Bodhi Gerfen</u>

- **Concerns:** Sexual Harassment
- **Examples:**
    - You mentioned that after you joined Apple, you heard that during your on-site interview, Bodhi Gerfen saw you and said something about your ass, and things he wanted to do to your ass.

Page 6 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- You stated that in 2015, Gerfen texted you in the middle of the night talking about your body, your Tinder profile, etc. (see Box folders). You told him to stop and he would not.
- You told me that you reported this text incident to Andie Andragna, your manager, Linda Keshishoglou , Reigel, Marini, and Memula.
- You mentioned that you did not report this text incident to the People team because you believe that based on an unrelated matter that you shared with me, reporting concerns to the People team was frowned upon.

- **Evidence:** Box folder including photos; HR personnel file
- **Witnesses:** Rob Marini, Brad Reigel

### vii. Bill Stevenson

- **Concerns:** Sexual Harassment
- **Examples:**
  - You told me that Bill Stevenson was notorious for sexually harassing people, and it was well known that Stevenson was inappropriate with you.
  - You weren't able to provide specific examples when Stevenson sexually harassed you, but you asked that I speak with Debbie McDaniel who you said witnessed Stevenson's behavior towards you.
  - You stated that Memula and Keshishoglou were aware of Bill's behavior.
  - Bill sent photo of him building massive amounts of fireworks in the desert. "the sky doesn't know what's coming" he said
- **Evidence:** Box folder including emails; HR personnel file
- **Witnesses:** Debbie McDaniel; Rob Marini, Brad Reigel, Aron Talburt, Venkat Memula

## B. Spring 2016 Transfer (Component EPM; EFFA EPM)

Component EPM Interviewing Time Line (as documented to ER and Venkat, and Venakt confirmed)
- Mid-January 2016: Several people reach out to me noticing I seem unhappy doing build EPM work and suggest considering other options, one of which is Haley's team. Based on my previous PM experience and the work I've done at Apple, the person pushes that I set up an informational with Haley to think about the future, even though she doesn't have any open reqs
- Friday 1/29: I set up an informational with Haley and it goes really well. The team seems right up my alley. She also mentions she has a new req opening up. I tell her I'm interested. She says if I tell Brad - she'll set up interviews. I tell her I will, and that I'll have to discuss with Stacey too. Brad complains he's going to set up a new req. I told him I don't even have the job yet. He said "whatever, of course you do".
- Tuesday 2/2: I find time with Stacey to ask her opinion of the opportunity (since she's previously given me career advice / mentorship) and she tells me it would be a great fit, that she loves Haley, and I'd do well in that role. She tells me to tell Brad and go for it. I find Brad and tell him - he's very supportive and gives his blessing. He also says I'd do well in that role. I let Haley know and she says she'll get the interviews set up.
- Tuesday 2/9: First round of interviews for Haley's team. Carina, Josh R, Jury.

Page 7 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- Wednesday 2/10: Stacey runs into me at the VG6 cafeteria and tells me she wants to talk to me about interviewing for her team. Later at our 1:1 she tells me even though the role with Haley is a good fit, she'd love to keep me in the watch program. If it's a Component EPM I want to be, then I should be on her team to keep the program together. She tells me it would be under a new manager (to be promoted) and she'd like to set up interviews before she goes on vacation. I tell her I'm still very excited about the opportunity on Haley's team, but that I'm happy to interview for her team too if that's what she wants. She tells me she'll set up interviews with the manager, Kevin, and maybe someone else the next week and then she'll make her decision when she's back from vacation. I let Brad know that day. He gives his blessing again.
- Thursdays 2/11 Second (maybe final) round of interviews for Haley's team. Ramsey T, Olivier Bonnet, Andre Boule, Haley, Bethany. I'm told by Haley that per Stacey I'm not going to be given a "yes" or "no" on the role in Haley's team until Stacey makes her decision about me joining the watch team. I proactively reach out to the new manager on Stacey's team (Kelsey) to learn more about the role to help in my decision making. We casually discuss for ~15min. It doesn't seem like a good fit for me.
- Monday 2/15-2/19: Stacey's on vacation. No interview are set up. No word from Stacey. I meet with Carina to learn more about the iOS teams, the tools, things to start studying up if it's "yes".
- Monday 2/22: Watch doesn't feel right. I decide to tell Stacey so I don't waste her or Kevin's time. Per Bethany & Haley's offer, I set up 1:1s with them to ask more questions about the role and org. It really feels right. Haley says we should sync up end of the week, and that she's going to reach out to Brad for feedback as part of the potential transition. She mentions Stacey gave her feedback that I saw no sometimes when I should always say yes (no additional detail). Haley tells me all of the interview feedback was positive.
- Tuesday 2/23: I find 5min to talk to Stacey and let her know I'm going to pass on her role. I thank her for the interest but tell her I think Haley's team is a better fit for me and I don't think she should set up interviews for me to join watch. She tells me she agrees that Haley's team is a better fit and I'll do well there. She tells me she'll tell Haley so I can proceed with the process in iOS. She seems fine. I text Haley and give her a head's up on the outcome and that Stacey will be reaching out  I find Brad and warn him Halie will be coming his way. He says he already talked to her and told her I'm great but also provided some feedback. He tells me what the feedback was:
  - 1) I don't have experience speaking in front of execs (although he has no evidence for this other than not physically witnessing it himself)
  - 2) I don't have the experience to troubleshoot complicated issues (although he has no examples, and claims later it's only something I can improve on, not an issue)
- I warn Brad those items sound very negative. He claims they weren't and Halie was fine and I'll still get the job. I asked him to follow up to make sure, and he tells me I'm over reacting and it's a done deal.
- Wednesday 2/24:  Brad tells me he's starting talking transition timing with Haley and Venkat. Venkat wants to keep me on the build team to WWDC, but they're working through the details.
- Friday 2/25  I email Haley seeing if she has an update. She says she's meeting with Stacey at 4:30 and will have an update after. - There was no update. I assume the worst.
- Wednesday 3/2 I meet with Venkat at 4:30 and he share's the news I didn't get the job on Haley's team because: - 1) I don't have experience speaking in front of execs
  - 1) I don't have enough experience to deep dive, understand, drive resolutions
  - 2) I say no sometimes

Page 8 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

Note: Brad & Shandra both expected I'd still get the job. Shandra said about the feedback "Its not terrible feedback though so I'd just wait and see if it comes up, don't force any issues. Have to have faith that Haley has also made her own assessment of you."

### viii. <u>Stacey Lysik</u>

- **Concerns:** Retaliation**,** Intimidation
- **Examples:**
  - See timeline above
- **Evidence:**
  - Box folder including emails; HR personnel file
  - 8/4 email from Aaron Morris (previous Apple EPM, now ARM director) saying "Stacey was working against you as long as 4 years ago while I was on the team. She took steps to harm your advancement. She did the same to Tara." & also "You were wonderful to work with, and I hope that you see great successes in the future."
  - Box folder including emails & photos
- **Witnesses:** Haley Samale, Kristin Mcalik

### ix. <u>Brad Reigel</u>

- **Concerns:** Retaliation
- **Examples:**
  - See timeline above
- **Evidence:** Box folder including emails & photos; HR personnel file
- **Witnesses:** Haley Samale, Kristin Michallik

## C. SWE Failure Analysis Team (2016)

**Role**:
- Managed the Software Engineering failure analysis program for products in the field ("EFFA" & "QIF" for iPhone, iPad, iPod, Mac, and Apple TV) and launch planning for New Product Introduction (N69, J127/J128, D1x, & J79/J80g).
- Drove field issue triage and root cause analysis to resolution for customer software quality issues. Partnered with hardware teams when software or firmware updates were needed to mitigate silicon or component issues.
- Helped engineering teams understand customer facing issues. Presented engineering root cause and corrective actions to executives. Facilitated failure analysis communication between the Software Engineering organization and all other Apple organizations (i.e. Marketing, AppleCare, Hardware Engineering, Supply Chain/Operations, etc.)

**Projects**:
- iPhone Throttling: (battery failures)

PL_PROD_11_06507

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- https://www.forbes.com/sites/rachelsandler/2020/11/18/apple-settles-batterygate-lawsuit-for-113-million/? sh=d65802958f51
- https://www.macrumors.com/2020/05/15/apple-throttling-lawsuit-preliminary-approval/
- https://www.ksla.com/2020/11/18/la-receive-m-apple-iphone-performance-throttling-lawsuit/
- https://www.cnet.com/news/apple-sorry-iphone-battery-slowdown-ios-update-official/
- https://appleinsider.com/articles/19/10/17/apple-hit-with-new-iphone-throttling-class-action-in-california

- iPhone 7 No Service: (silicon failure)
  - https://www.techrepublic.com/article/how-to-fix-the-iphone-7-no-service-status-flaw/ -
  - https://support.apple.com/iphone-7-no-service

- iPad 2 Error 56: (silicon failure)
  - https://forums.macrumors.com/threads/ios-9-3-3-bricked-ipad-air-2-with-error-56.1983418/
  - https://www.macrumors.com/2016/05/16/ios-9-3-2-bricking-some-9-7-ipad-pros/
  - https://www.theregister.com/2016/03/23/ios_93_update_bricks_ipad_2s
  - https://daringfireball.net/linked/2016/05/17/ipad-pro-error-56

- MacBookPro Graphics Corruption: (numerous software issues)
  - https://www.macrumors.com/2016/12/02/new-macbook-pro-graphics-issues/
  - https://discussions.apple.com/thread/7771375
  - https://9to5mac.com/2016/12/07/apple-believes-2016-macbook-pro-graphics-issues-are-addressed-in- macos-10-12-2-update-according-to-craig-federighi-email/

### x.  Shandra Rica & Evan Buyze

- **Concerns:** Retaliation; Intimidation; Constructive Termination
- **Examples:**
  - EO: In 2016, Apple allegedly had products in the field (iPhones) with bad batteries. You shared that you gave Jeff Williams an update on field issues and the meeting went well. After your meeting with Williams, you felt that you were thrown under the bus by your skip level manager, Shandra Rica, and your manager, Evan Buyze, because they failed to update the leadership team on field issues. You told me that you didn't have work assignments for 3 months after this incident, and your responsibilities were taken away. As a result, you believe that this was constructive discharge and you raised your concerns to Michallik on December 7, 2016.
  - Ashley Dec 7 2016 write up to HR:
    - 12/5/16: I get back from vacation and Evan texts me not to talk to anyone or do any work until I meet with them at 2pm. Meeting with Shandra & Evan starts. They ask me how my vacation was. Then Shandra says before they start with "feedback", she wanted to ask me if I still wanted to be in this role. She says my answer will change the direction of the rest of the conversation. I tell her I'm always considering other options and thinking about my long term goals, and have been wondering if it might be time to start exploring other options - but I haven't been actively looking. She says something like "great, so you are ready to move on, this make the rest of this conversation easier". Then she says "let's get into the feedback". She tells me "it's not working". She says while all the other orgs (AppleCare, Product Quality, etc) love me, the image of the EFFA program within SW is not good. She says our house is a mess, and we're in a lot of trouble. They tell me I was overcommunicating and working too hard, it and set an unrealistic expectation

Page 10 of 34

PL_PROD_11_06508

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

because they couldn't cover for me while I was out because "everyone was mad at them." They frequently referenced the Jeff Williams prez.

- I asked what next steps were. Shandra said she and Evan will now be the DRIs so they can repair the SWE relationships and build the role for sustainability. She told me since I was ready to move on, I can focus on informationals and looking for a new role. I asked if I should still be attending meetings or supporting them, and they said I shouldn't attend meetings or provide updates outside of SWE. They said we'd follow up later this week (meeting 2pm 12/8) to discuss next steps. I told them the feedback during the meeting seemed overwhelmingly negative and I wanted to gauge what kind of summary they planned to provide hiring managers about my time in the role. Evan exclaimed "you need to be able to take feedback." I told him, I am listening to the feedback - I'm just trying to understand what message they're planning to provide. Evan said "it will be fair and balanced". Then Shandra suggested that it would be best if I volunteer this role "didn't work out for me" so we can all agree on that. I told her I'd take that suggestion into consideration, but was hesitant to say that when I feel like I accomplished a lot of positive things in the last eight months. She told me she thought saying "it didn't work out" would be best. I said that again this feels like a very negative meeting, and I was wondering if there's a timeline on this transition because this feels like a development plan/HR type conversation. Shandra told me there was no timeline and it's not an HR conversation yet, because I'm agreeing "to leave the role" they "won't have to start that conversation".
- The meeting ended with Shandra advising me not to complain to people about having to move on, because she doesn't like "shit talking". I'm instructed to forward any open asks/questions to them, and to not answer them myself - and to re-direct any new asks to them instead of me.
- I ask HR: If Shandra & Evan didn't know what issues were important, why didn't they ask me? If Shandra & Evan wanted to gate certain decisions, why didn't they ever say that? If info needed to be shared internally, why didn't they agree do that when it was prompted by me? If info shouldn't be shared externally, why didn't we ever discuss those limitations? If timely issue resolution and communication was creating "unrealistic expectations of SW support", why was that never brought up previously? And why do Shandra and Evan feel that resolving major customer software issues and helping AppleCare support those customers isn't something software should be an active partner on? If I hadn't said I was open to moving on, if Shandra would have tried to (or threatened to) put me on a development plan with HR like she insinuated.

- 2/5/16 5pm: following the Mac EFFA exec review, Shandra tells the EFFA teams (AppleCare, Ops, etc) that I no longer work on EFFA and she will now be the DRI
- Met with HR (Kristin) numerous times about this
- Evan announced new role under David & Dan at 7:04pm on the Friday of my last day, many people comment on how that was seen as a final bullying of me
- Evan tried to put negative unfounded comments on my review. He tried to say I had teamwork issues when the only issue was with Brad Reigel (see all the above) and I had 13 "outstanding / exceeds contribution" out of 15 in my peer feedback that year. HR made him fix the review feedback & remove the negativity as she saw it as retaliation (this was during the constructive term).

Page 11 of 34

- Evan kept one thing I didn't agree with and I added a comment stating that but then Evan demanded I remove my comment. I protested. HR texted me "if he doesn't agree with your comments he should discuss this with you. If the concern is different of opinion, at the end of the day he should accept them."
- They also apparently constructively terminated Paula Leuzzi & John Perry
- **Evidence:** Box folder including emails & photos; HR personnel files
- **Witnesses:** Jeff Laberge, Jack Horan, Priya Balasubramanian,

# 3. Hardware Engineering

## D. Mac Systems Quality (2017-Current)

### xi. David Powers

- **Concerns:** Hostile work env based on sex; harassment; bullying
- **Examples:**
  - Aggressive & does not take feedback well. From 2020 feedback:
    - "Dave still struggles to receive feedback, even though he says he wants it, he often snaps back or only hears the parts where he feels he's in the right, and then ignores the rest. As part of the EPM role conversation, we talked in depth about his propensity to change his mind, not communicate in a timely fashion, etc. and he told me it was on me to call him out when he does that. I told him I've had mixed luck with that in the past, and sometimes he just snaps and shuts me down. He said if he does that, I should call him out on that too. I believed he meant it, but didn't see that working out well. And indeed, even a week after that conversation it happened again... he was asking me why I wasn't at a MSQ automation meeting series and I explained I didn't think I was required since I had been focusing on PSQ communications & employee engagement and I have such limited time in the office, that I thought I could just focus on that. And he snapped something at me like "any meeting I invite you do, you need to consider yourself mandatory." And I tried reasoning with him again that the meeting didn't seem to have anything to do with me, and he said something akin to "I'm your manager, do what I say." But then after I attended that meeting the next week and told him again that nothing about it was relevant to what I was working on it, he was like, yeah you're right, you can be optional. So he got there eventually... but he was quite snappish at the beginning. If he puts the responsibility on me to call him out, he needs to temper his snapping. It's not fair for me to have to talk him down while also taking a lashing from him. Additionally, when he does react ok to feedback initially, it's common for him to later turn that feedback against me and make it feedback for me, not for him."
  - Thanks men for my work, frequently. They rarely correct him. See 2020 feedback:
    - "I've called him out on not giving me credit (and worse, giving the men credit for my work) numerous times, and as recently as last week. For my first project back from leave last week he asked me to prepare a MSQ roadshow deck for the SEG VP in just a few days. I was only working two days to start, but because he really wanted to be able to present the next Monday, I focused nearly entirely on that to make it happen for him. I put together the overall format and structure, a dozen slides introducing the org and showing

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

photos of labs & automation, and I also incorporated some content from Jason, & got the managers to input data for their teams. During Staff, Dave introduced the slides they were all working on as "Jason's" slides — despite me having spent my first two days back in the office after four months off, working heads down on this critical slide deck for him. When I called him out on it after the meeting, and he had no real explanation why he did it, and said he'd think about it. "

- Hand Me Down Hardware project (see 2020 feedback to Dan about Dave)
    - One of the biggest drivers for me looking for my next role, probably equal to the lack of role definition & focus, is how quickly he throws me under the bus with the MSQ managers & his PSQ peers. Last year, I briefly mentioned an incident with Reed and Dave's poor handling of it — but this event, despite me being disrespected by Reed & Dave, somehow ended up being a piece of feedback for *me* to improve on, including formally documented in my last annual review. Dave's handling of this issue was so backwards, I knew it wasn't good for my mental health to continue in this role any longer. I didn't want to have to go in depth on this, even when I was so mad last year, but I think I have to now...
    - 1 -Background: I created a brand new program, on my own initiative, to address feedback identified in the Mac QA gaps slide deck we created for the VPs a while back. One of the biggest gaps causing field issues was that SW wasn't getting their HW allocations in a timely fashion and there was 1-2month gap after ship where they didn't have devices to test, while on the flip side MSQ was done testing and was actively scrapping the devices that SW needed. So I worked with these SW directors & senior directors and created a way for us to transfer the HW we'd otherwise be scrapping to the teams who need it the most (those teams specifically identified in that gap exercise — (Sarcone, McCracken, etc.) I shared the idea with Yuan, John, & Reed to see if they had extra HW they were scrapping that they could also share. Reed immediately took issue with the program for the sole reason that he wanted to upgrade his teams admin machines and thought he should take precedence over SW. I explained the catalyst for the program (real world field issues caused by lack of HW to test on), but he persisted that his team was more important (he admitted he was being selfish, but said he didn't care). We talked about this several times and I made it clear that my program wasn't for admin machines, it was to address QA gaps.
    - 2- The Conflict: A couple weeks later, I'm sitting in MSQ Staff and hear Pete ask Dave something about this program and the "pass down from extended staff" and Dave tells him to send an email with the "new process." I'm like, hello, that's my program, what are you talking
    - about? Dave informs me that at extended staff it was decided to prioritize PSQ admin machines before SW. I ask him point blank if Reed initiated that, and he said: yes. I was furious and I wanted to let Dave know. He's not great with interpersonal interactions or conflict— so I wanted to ensure he understood how upset I was about the situation, so it stuck with him. I check my facts first.... I asked another person to confirm that Dave did say it was Reed, and they confirmed. I asked another person, sharing the whole story, if I should be so mad at Reed & Dave, and they're like omg yes. So I talked to Dave. I told him Reed purposely undermined me and he supported him in doing so. I told him he should have handled Reed's request by saying something like "Well that's Ashley's project and she's not here, so let's talk to her after the meeting." At the VERY LEAST, I told Dave he should have directly informed me of what happened instead of having a passing conversation with Pete in front of me. During this first conversation, Dave took all this

Page 13 of 34

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

feedback and apologized. I also texted Reed and let him know I just heard what happened, and asked him to please not go behind my back and if he wants to provide input on my projects, to please work with me directly or at least wait until I'm in the room. Reed just claimed to be updating the SW on his phone and turned off his iMessage with me for like 2 weeks (I think he blocked me?)

- 3- The Aftermath: The next week, Dave told me Reed complained to him that I confronted Reed on what Reed did. At this point, Dave went into protective mode and completely threw me under the bus. He told me I should never confront his peers, and that I didn't even have the data and Reed wasn't the one who said anything at that meeting. I told Dave that he told me directly Reed was the one, and at least one other person heard him say that — but then he snapped at me and told me he never said that. Then he started (mis-)quoting a Women of PSQ speaker at me and told me that if I had slept on it and woke up the next morning before acting, that I wouldn't be upset anymore. He said I was being too emotional, and if I has stopped to think I wouldn't have been aggressive towards Reed. I told him that 1) it was offensive he's using loaded gender terminology on me (emotional, aggressive) 2) if he was trying to appeal to me as a woman by quoting a woman giving advice, he missed it by misrepresenting her message 3) he's getting the situation backwards — the only reason we were talking about this was because I was so deeply offended and felt so dis-respected by him & Reed, but now somehow this is turning into feedback on me.

- 4- Beating a Dead Horse: My "inability to control my emotions" & my "attack on Reed" became continuous feedback points during my mid-year reviews and a few other convos. The first few times I became so upset (because I felt even more unseen and unheard, since Dave completely ignored my initial feedback and then turned it against me) that I would start to getting really sad when he brought it up. One of these times, I had just gotten back from the doctor and my feet were actively bleeding after a surgery and I had to prop them up on a chair while we were talking to control the bleeding (and he knew that)— and he still decided to dig into this again... and I lost it, and started crying. Then he started saying that I can't take feedback (based solely on this pt). So the next few times I'd just stare at a spot on a wall behind him and try to zone out and not respond at all in hopes he'd drop it, but then he started saying I wasn't listening and I still can't take feedback. He also decided to use these convos to stress to me that if any of his peers in PSQ or other orgs disrespect me, that I should never stand up for myself and I should only bring it to him to decide if I should be upset and if so he'll decide what we should do to address it, and he'll be the one to address it. Like, I don't know how to underline how offensive this was. I hope it's clear by the plain meaning of the text and doesn't even need an explanation. And again, this becomes even more atrocious when you consider I'm the only women in MSQ mgmt, and one of the only women in the PSQ "managers." Being told you're not allowed to stand up for yourself if the men do or say anything disrespectful to you, seems like its probably on one of those "things not to do" trainings HR does on gender discrimination. And this issue wasn't a one time thing.... John did something quite offensive & manipulative last January, and Dave told me I wasn't even allowed to tell anyone what he did (let alone talk to him about it).

- Told me I'm not allowed to tell anyone about Jason making Koka quit, or any of the male leader being mean to me.

Page 14 of 34

PL_PROD_11_06512

EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- Dave continually uses the term "open kimono" and refused to stop whenever I protested. Also made me explain why its inappropriate each time.
- Frequently attacking me whenever I try to get him to follow NPS procedures & rules. See 2020 feedback:
    - "Dave still struggles with security and confidentiality rules and procedure. Not only does he outright resist &/or forget it exists, but he still gives me criticism when I try to ensure we follow the rules provided from NPS, etc. This came up again last year with the issue I raised to you about Jane/ Megan & the very secret project. I thought I got him back on the rails, but looking at my emails from when I was gone, he went back and did it again, despite explicit instructions from NPS to not do what he did. I've explained to him that EPMs are expected to always be the adults in the room, and that I will be held accountable for his actions around secrecy if I'm aware of what he's doing. He still pushes back on me and appears angry when I bring it up."
    - 4/8 - After telling Dave numerous times I've suffering from severe PTSD from getting sick last year and "barely hanging on" he texts me and asks me to lead a huge project for a completely different org, dotted-line reporting to a SWE director who sexually harassed me in 2019 (which Dave knows about).
- **Evidence:** Box folder including emails & photos;
- **Witnesses:** Jane Markham, Mike Ertell, Simon Moen, Megan Gaates

- **Concerns:** Hostile work env based on disability
- **Examples:**
    - 4/8 - After telling Dave numerous times I've suffering from severe PTSD from getting sick last year and "barely hanging on" he texts me and asks me to lead a huge project for a completely different org, dotted-line reporting to a SWE director who sexually harassed me in 2019 (which Dave knows about).
    - 4/13 - I notify Jenna of Dave violating my 2020 "return to work" medical accommodations and also giving him feedback about thanking men publicly for my work
    - 5/10 - I notify Dave I need to take sick time for a heart issue and for side effects from chemical exposure treatment
    - 6/28 - 1:1 with Dave where he makes the inappropriate I&D comments & acts hostile towards me
    - 6/28 - I express concern to Helen about Dave making inappropriate and possibly sexist comments about an I&D project I'm working on
    - You stated that around August 2020, Powers told you that it was hard to write your review because you were "sick so much".
    - You stated that when you inquired about working remotely, Powers told you that remote work is "not a thing", and that you must return on-site if EHS says that the building is safe.
- **Evidence:** Box folder including emails & photos
- **Witnesses:** Helen Polkes, Jane Markam**,** Megan Gates

- **Concerns:** Failure to resolve hostile work env
- **Examples:**
    - You mentioned that you shared your concerns with Powers about how Ivan treats you, but you don't believe Powers has done anything about it. Powers told you to smile, stay calm and keep a straight face when men treat you bad at work.

Page 15 of 34

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- You shared that you told Powers and West about Ivan's behavior, and they laughed and mentioned that Ivan made another woman quit (Koka), and that you shouldn't tell anyone about it.
- **Evidence:** Box folder including emails & photos;
- **Witnesses:** Dan West; Bhavna

- **Concerns:** Intimidation to not speak about unsafe work conditions
- **Examples:**
    - 3/22- 1:1 with my manager, Dave Powers. Dave told me I'm not allowed talk to anyone other than him, EH&S, and Jenna about my safety concerns about Stewart or even tell anyone it's a Superfund site. He said he didn't want his team to "know" because they'd be "upset." He also gave me feedback about an I&D training I was hosting, that "I was being too hard on the white man." He also told me this all as employee feedback and said it's only a "warning" because of my "mental health."
    - Continually asked him to help with EHS due to my concerns about safety & he refused
- **Evidence:** Box folder including emails & photos
- **Witnesses:** Mike Ertell, Jane Markham

- **Concerns:** Retaliation & Constructive Termination
- **Examples:**
    - 6/10 - My first 1:1 back with Dave after leave & the investigation. He makes it clear he doesn't think he did anything wrong and it was just me overreacting / misinterpreting. "You mentioned that after Waibel completed her investigation on June 10, 2021, Powers told you that there was no reason for him to receive coaching, and the focus was now on you to change yourself."
    - 6/10 - I notify Jenna what Dave said during that 1:1
    - 6/10 - I then meet with Jenna and she tells me the only other steps are to "complain about her to her manager, but I'm not allowed to discuss any details of the investigation" and to "escalate safety concerns to EHS."
    - 6/10 me to Jenna, Heads up in case you want to follow up on this at all before we talk — I just had my first 1:1 with Dave after being out. Dave made it clear he doesn't think he did anything wrong at all, related to managing me or his interactions with me. He also said he didn't get any coaching. He definitely steering the conversation to insinuate that I was making baseless claims. He did encourage me to escalate issues to ER whenever I think I need too — but then again, mentioned that the focus is now just on me changing myself so I can continue to do my job. I was clear with him that the concerns raised were about gender discrimination, sexism, and hostile work env — and that I think he and Dan have perpetrated those things. I also told him I expected, based on my convo with you last week, there would be changes to his behavior based on the "coaching" you mentioned, but he said none of that happened. I told him I'm very concerned. I also asked him about Stewart 1 & safety (that I don't feel it's safe to return to that building) — but he said if EHS said it's safe, I have to come back. I told him again my concerns about EHS and the history of the building, and the lack of testing. After asking him numerous times, he finally agreed to ask Helen if there's another building I can work in. I asked him if we can request that I fully work remotely and he said "that's not a thing." I told him it is, it's even on the remote FAQs, and that I might meet the rare exception because my job doesn't actually require me to be on site at all. He fought it a bunch but then after I asked a bunch of times he said he'd ask Helen

Page 16 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

about that too. He seemed very unhappy about the last two weeks and our call today. I'm expecting my work relations with him to now get even more unpleasant.

- 6/21 - 1:1 with Dave and I ask to work remotely and he tells me its not a thing. Finally he agrees to ask Helen, but then says Helen said no. Later Helen said he never asked her and he needs to ask Dan instead. (He lied to me)
- You also believe that Powers is retaliating against you by assigning you work that is a substantial increase from your previous responsibilities, and five new large assignments are deeply unfavorable.
- **Evidence:** Box folder including emails & photos
- **Witnesses:** Mike Ertell, Jane Markham, Monu Mathur

### xii. Jason Ivan

- **Concerns:** Hostile work env based on sex; bullying
- **Examples:**
  - 2018 review feedback,
    - "At times, Jason can come across as aggressive, and brash. I've had experiences with him the last few months where my work related requests or questions have been met with negative emotional responses that either are dismissive of my request or show frustration that I'm even asking, and often lack any data or real reasoning why. Jason has also "attacked" some of my ideas, even during meetings with the larger team - without concrete reasons on why he feels things aren't working, and refuses to provide proposals for solutions, and often is hesitant to take such conversations "offline" when in front of a large group. (Example: two weeks ago during Weekly Status when he started complaining that the color status key is "broken", and thus the whole "process is broken" - but refused to offer any other data or any solutions).
    - Jason has mentioned things to me that make it appear he doesn't see me as a peer to him. When I've asked him about his goals for the MSQ EPM role (me), he has expressed a desire that my focus be a type of "Tier 2" lead in his org (essentially dotted line reporting under his managers, Matt & Jeremy), and helping with tasks his leads (Eric, Chris, Philip, etc.) cannot complete or that he doesn't feel they're skilled/networked enough to complete. He has also expressed dismay whenever I pass down information from Dave, and has told me it makes "his job harder" to not get information from Dave directly - but couldn't give me any data beyond that on why his "job is harder". He also is often reluctant (even to a confrontational point) to take any guidance from me about hw project mgmt strategy or even general process/program strategy. It is very difficult for me to be able to provide guidance, feedback, and strategy when Jason doesn't appear to view me as in a role where I should be giving it (or that it not meaningful guidance, feedback, or strategy). If I'm going to continue to support the HW projects from even a high level/ program standpoint, I really need to have Jason take me seriously.
    - Jason often shows reluctance to changing processes or approaches, even if the technology/situation is changing in a way that it's required to take a different approach. Jason also sometimes immediately declines requests for new projects/work from his team, without taking a moment to consider if the request is warranted. (Examples: Jason was reluctant to adjust the J137 test plan, even though this project is "big & new" enough to warrant a new approach - and he probably should have known that pro-actively

Page 17 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

considering his experience here. Jason has been reluctant to provide weekly PSQ Exec J137 quality updates "this early", even though the project is high risk enough to warrant providing regular exec updates.

- Jason can come across as very controlling and negative at times, especially if he feels something I'm working on is "under his jurisdiction." He will try to order me to do things or not do things. (Example: a few weeks ago I wanted to change the wording in some of the headers on the email, and mentioned it to him, and he ordered me not to change anything but wouldn't give me any reasoning why other than "we've changed enough". I believe even though the "Best Status at Apple" is my project, because the status is for HW projects he was trying to exert some control over me/the process).
- Jason has recently been very dismissive of my accomplishments. He's made seemingly bizarre statements about new projects I'm start, claiming none of them are new and he's done some version of them himself at some point in the past (even when no one else agrees thats the case). He also gets extremely defensive if anyone suggests I'm "helping him" in any way. (Example: while working on the Compatibility Module project, Jason was extremely persistent that the requirements he had provided Brian were all that Brian needed to build the tool, and the project meetings were only to ensure Brian follows through - when in reality Jason had provided incomplete project requirements that had also changed several time with unclear communication to the tools team.) (Example: when I kicked off the J160 strategy meetings, if anyone mentioned that this was a "new thing" I was doing, Jason quickly jumped in that it was not new and he's always done this).

- Bahvana Koka previously worked for Dan West and had very very similar concerns with Ivan. She asked West to resolve the hostile work env and West did not. West also told her, like me, it's her fault and relationship issue, and she shouldn't stand up for herself.
- I expressed concern over months that Jason wasn't interviewing / hiring enough women for his open reqs and the reasons he provided sounded sexist & vague. David Powers refused to intervene. Latest concern was moving to offer for Rajesh Kartha despite Jason saying Lauren as a great fit but would try to get her to take a lead role instead of manager. When I looked them up, Rajesh is currently an IC and Lauren is currently a manger. Powers said he'd talk to Ivan but I don't think he ever did, it looks like Ivan is still offering to Kartha, and stopped publishing hiring status after I rasied concerns.
- Expressed concerns when Nirupa Balamurugan was hired on Ivan's team that I wasn't on interview panel and neither was Monu. Also Nirupa was never told she was the first female manager in MSQ in a decade and she was upset when she learned that upon joining.
- You mentioned that Ivan has attacked some of your ideas during meetings without concrete reasons as to why he disagrees with you. You also told me that Ivan refuses to provide proposals or solutions for his concerns.
- You believe that Ivan does not talk to or treat men the same way he treated you and Koka.
- Ivan said he does not see you as a peer.
- Frequently attacking me whenever I try to get him to follow NPS procedures & rules.

- **Evidence:** Box folder including emails & photos
- **Witnesses:** Bhavana Koka, David Powers, Dan West

## E. Product Systems Quality (2017-Current)

Page 18 of 34

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

### xiii. **Dan West**

- **DW Concern 1:** Hostile work env based on sex
- **Examples:**
  - You told me that at an all hands meeting in 2017, West talked about diversity, and said that we didn't have a lot of women leaders in the organization because women don't want to be leaders and they are not ready to be leaders. You told me that West went on to state that the business will bring in female interns, and have males mentor them to become leaders.
  - You mentioned that you complained to West about naming team social events "beer bash". You shared that West's leadership team is all male and the term "beer bash" is masculine. ◦ You told me that male Indian coworkers and women mentioned that they felt excluded by the term "beer bash".
  - You stated that in 2019, West shared a screenshot of his text messages with Steve Rozmus with you. You told me that the screenshot shows a picture Rozmus took of you in the "confidential" bin. Rozmus forwarded the picture to West, and West's response to Rozmus was "she is not confidential, she should be in the blue bin."
  - You stated that in October 2020, Nordine Kadri's "How I Got Here" article included a logo about gender equality, and the woman on the logo looked naked. You escalated to West, and he told you to "assume good intent".
  - You mentioned that you were never invited to West's extended staff meetings even though he assigns most of your work directly to you.
  - 5/8/2018 Dan told a story when he was supposed to present on something but Yannick switched him out and had Dan's direct present instead — and Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan. Dan asked to delete this video.
  - On more note on Dan and I need to find documentation of it — he on several occasions responded to me giving him feedback that upset him with, "I guess sometimes when you invite dogs on the couch you get fleas."
  - Frequently attacking me whenever I try to get him to follow NPS procedures & rules.
  - **Evidence:** Box folder including emails & photos
  - **Witnesses:**

- **DW Concern 2:** Negligence, failure to report work place injuries, failure to seek medical attention, obstruction of justice
- **Examples:**
  - When I was at the final Apple party at the Grace Hopper Convention in 2017, Dan West approached me and gave me a desert and told me to eat it. I asked him what was in it and he just said to eat it. I asked again, and again he said, just eat it. I took a bite and said "is there peanut in this??!" And he smiled and said proudly, "yes!" I yelled at him that I have a peanut allergy (I was fairly certain I told him that previously too). He just stared at me. I told him I need allergy medicine ASAP and I spit the peanut gelato back into the cup. He said he'd get some and disappeared. I started having symptoms of anaphylaxis and hadn't heard from him for about 15min so I tracked him down and he said he was drunk and forgot he was supposed to get me medicine. He said he'd go get it and be back. About maybe 45min after the peanut intake he finally showed up with a single Allegra-type allergy pill. I took it but it was too late and I told

Page 19 of 34

PL_PROD_11_06517

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

him I was having severe symptoms. He disappeared and I never saw him again that night. Another EPM looked after me at the party for a little bit but I felt so sick I wanted to go back to my room and lay down. I got lost walking through the hotel alone, circling for maybe an hour, and when I finally got to my room I puked my guts out in the bathroom and fell asleep on the marble floor there. Dan never followed up or reported it. I told Dave when I got back and Dave said he just sent a joking text to Dan complaining he was trying to "kill his EPM." I saw him text it, so if they both have their iMessage records from that time, it should still be there. Further, I contracted Pertussis/whooping cough during the flight to that conference and ended up getting a full-blown case for the full 100 days despite being fully vaccinated. The theory from the doctors was that I got so sick because while the Pertussis was taking hold, I also got so sick from the peanut allergy via Dan. In addition to standard Pertussis symptoms like coughing so hard I'd vomit every 20 min or so for months — I also bruised my ribs coughing and got bronchitis.

- ▪ May 2018 Fireside Chat video, Kai feedback (and recorded): At some point, when Dan was sharing a story where he felt excluded that Yannick asked Dan's direct instead of Dan to present at a meeting. Later on, Dan found out that Yannick did it partially due to protecting Dan as that meeting was involved with possibility of Apple being sued. This implicitly implies that it is OK to expense Dan's direct, even Yannick out of good intention wanted to protect Dan.

  - - **Evidence**: Box; emails; Workers Comp claim
    - ▪ Peanut Allergy, Anaphylaxis, & Failure to Provide Medical Treatment (# 302179876420001), Filed: 8/20/2021; Dated: 10/6/2017
    - ▪ Severe Pertussis due to above Anaphylaxis (# 3021 7987 5030 001), Filed: 8/20/2021; Dated: 10/3/2017
  - - **Witnesses:** Shikha Pandey, Heidi Zhang, and Marina Sadini

- - **DW Concern 3:** Failure to resolve hostile work env
- - **Examples:**
  - ▪ 4/9 - I met with Dan West and told him that Dave prohibited me from speaking about safety concerns at work and told Jenna I talked to Dan as well — I ask him to talk to Jenna about Stewart 1. I also tell Dave that I can't work for Dave any more and document my ask to him to "think about solutions for DP situation."
  - ▪ 4/14 - I email Dan and tell him I want to report to him or John, and go to a 4-work day schedule — otherwise I'll quit his org. I mentioned again specifically my 2020 review feedback about Dave I sent him and working for Dave "is TERRIBLE for my mental health."
  - ▪ 4/29 - I talked to Dan West and notify him of the ER investigation into Dave, the workers comp claim, and the discussions I'm having with EH&S about Stewart 1. I also tell him about Jenna pressuring me not to speak openly about workplace safety concerns and ask him to help. I also ask him to follow up with Dave about the "no equal outcomes" comment because Dave refuses to follow up with his team on it. I expressed concerns again that Dave was creating a hostile work env that was severely detrimental to my mental health and asked him what can be done. I asked if he reviewed my review feedback about Dave from 2020 (Helen send you that document) and he said he did but "it wasn't actionable" and I'm just "hot & cold about Dave." I asked him if he had thought more about my request to report to him or another one of his directs (not Dave) and he said I can't report to him. I asked why, he said "no more re-orgs." I said, but my role is already more than half supporting you directly. He said no. I said, what about another direct, he said no. He wouldn't give me an explanation. I told him I will likely have to leave PSQ or Apple if he doesn't response the issue, and he said that's fine. I asked what he will do with my role if I leave and he

PL_PROD_11_06518

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

said he'd cancel the EPM role, that "its an experiment that didn't work out," and convert it to engineering headcount. Dan did say that Dave needed to follow up on the "no equal outcomes" dogwhistle-type comment and that he'd talk to him about it.

- You told me that Kai Yun left West's organization because of how she was treated, and West did nothing about it.Yun's team was responsible for high quality Macs with high tech monitors. You believe that Yun's responsibilities were reassigned to a white male outside of West's organization.You believe that West, Basanese and Powers made the decision to reassign the work.

- You shared that on April 29, 2021, you told West that you could no longer work for Powers, and to reorganize your role so that you can report directly to him. You mentioned that West told you that from an organizational structure standpoint, it made no sense for you to report to him. You also told me that during the same conversation, West told you to quit Apple. You shared that West has since stopped meeting with you, and has reassigned your job responsibilities to others.

- **Evidence:** Box folder including emails & photos
- **Witnesses:**


- **DW Concern 4:** Sexual harassment**;** pimping & pandering with receipt of indirect benefits
- **Examples:**
  - 5/8/2018  You shared that during a meeting, West made a "spanking" gesture with his hand to describe how you "keep him in line". Dan asked to delete this video.
  - I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, ten years my junior. I expressed no interest in Andrew or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that.
  - Ashley texted Dan in Dec after the dinner and told him she's dating a professor now and need sto turn down the sous chef and Dan said "I'm not even a little concerned. Regarding Andrew – to bad it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on."
  - Ashley was supposed to go to her office on Aug 5 to retrieve the laptop with the texts send during that night at the restaurant, but ER put me on leave and removed me from the "workplace" on 8/4 before I could & they knew I was planning on it.
  - You told me that in March 2021, West's daughter gave you a ride to Stanford, and during the car ride she told you that they still talk at home about how bizarre the restaurant incident was.
  - You mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting. You told me that when you addressed West

Page 21 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

about his comment, he said he didn't want to sleep with Powers so it wasn't a problem. He then inferred you were only offended because he thought you wanted to sleep with Powers.

- **Evidence:** Box folder including emails & photos
- **Witnesses:**


- **DW Concern 5:** Intentional Infliction of Emotional Distress (IIED)
- **Examples:**
    - You told me that while you were out on leave due to exposure to chemicals at your apartment, a lawyer emailed you and warned you about potential physical violence from the Irvine company because they are known for retaliation. You forwarded the email to West, and he told you to send it to his personal email address because his work email account is routinely scanned for lawsuits. You told me that West was aware of your mental state at that time, including your fear of physical violence from the Irvine company.
    - 5/21 - I notify Dan West that EH&S said they won't answer anymore of my questions about VI.
- **Evidence:** Box folder including emails & photos
- **Witnesses:** David Powers


- **DW Concern 6:** Retaliation & Constructive Termination
- **Examples:**
    - 5/6 - I notify Jenna that in MSQ staff meeting they mention Helen & Dan are worried about attrition and that managers need to be mindful with communication and if someone is thinking about leaving to recommend other options to retain them and say that directly conflicts with Dan telling me he doesn't care if I quit apple because of the hostile work env with Dave.
    - 5/6 — Dan offers to Daniel that he can work on / take over my roles for How I Got Here & From the Desk of Articles
    - 5/18 - Dan staff meeting where he apparently reduced my ownership of the How I Got Here articles to only PSQ and appears to have given Daniel the overall project
    - 7/8 - I find out from Yuan that Dan appears to have re-assigned one of my projects without telling me. You own the "How Did I Get Here" articles for West's org, and Daniel Carr is now involved with this assignment. You told me that West is no longer involving you in projects such as the "Listening Session" project.
    - When I reported the reassignment of work to David Powers he said he had no idea and would look into it ASAP and let me know but never did.
- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** Megan Gates, Jane Markam, Daniel Carr, Helen Polkes; Scott Lilly; David Powers


      xiv.<u>John Basanese</u>


- **Concern:** Hostile work env based on sex
- **Examples:**
    - You mentioned that after a 2018 Fireside Chat event for Women of PSQ, Basanese received written feedback for talking about someone's body size and posture in a way that sounded like it was a disadvantage.
    - Suggesting that people should hug co-workers who are honest with them.

Page 22 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- John told Dave I told him (john) that Dave didn't like David Taylor in order to get a response from Dave Powers. Dave Powers asked me if I actually said it and I said no and David Powers said he believed me but forbid me from telling anyone John said that or confronting John.
- You stated that in 2017/2018, Basanese told you that at your age, you needed to be married with children. You told me that at holiday functions, Basenese made comments like "where is your partner?, don't you have a boyfriend?, settle down and have kids." You mentioned that you told Bassanese to stop, but he wouldn't, so you escalated to West. You stated that Basanese once made this comment at the Caffe at work while West was present.
- When talking about

- **Evidence:** Box including Fireside Chat Video
- **Witnesses:** Dan West, Monu Mathur

### xv. <u>Reed Johnson</u>

- **Concerns:** Intimidation, Undermining
- **Examples:** See the Hand Me Down HW feedback to Dan about Dave in my 2020 feedback. Reed did apologize 10/12/18: "Hey, no worries. I just wanted to make sure Dave didn't think I was sabotaging the HW reuse program. To be honest, the whole conversation in Dan's staff meeting was quick and didn't seem to have any negative impact. Hope more people use the list in the future."
- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** Monu Mathur, Kai Yun, Pete Richardson, Bhava Avula

# 4. Administration

## F. Human Resources

### xvi. <u>Helen Polkes</u>

- **Concern:** Hostile work env based on disability; retaliation; intimidation to not speak about unsafe work conditions
- **Examples:**
  - 4/13 - I notify Helen about the ER investigation into Dave and my concerns about Stewart 1
  - 4/20 - Helen Polkes urged me to file a workers comp claim for my 2019 fainting spell in Stewart 1 that I now believe to be likely caused by vapor intrusion in the building (she basically insisted — she pushed me at least three times to file it).
  - 4/21 - I noticed Jenna, Dan, Dave, & Helen of the workers comp claim being filed
  - You believe that Polkes may be retaliating against you because of the work you've done in support of the RWA Slack channel. You mentioned that on June 30, 2021, you asked Polkes about working remotely, and she said "oh, did you see Deirdre's video?". Polkes was referring to a video in which O'Brien clarified Apple's Hybrid Working Pilot You told me that when you asked Polkes about accommodations for remote work, she said "it sounds like you believe you have a disability and we would need to review it." Finally, you believe that your involvement with the RWA Slack channel may have influenced how Polkes is treating you because she has not been supportive or helpful with your request for remote work.

PL_PROD_11_06521

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- 6/28 - I express concern to Helen about Dave making inappropriate and possibly sexist comments about an I&D project I'm working on
- 6/20 - 1:1 with Helen where she makes the aggressive comments about remote work and role definition
- 7/7 – "Helen said the previous "telecommuting" request process doesn't exist anymore in HWE after Deirdre's video last month"
- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** *You know what y'all did*


## G. Employee Relations

   xvii.   <u>Overall</u>

- **Concerns:** RICO; Organized Intimidation; Organized Witness Tampering; Retaliation
- **Examples:**
  - 7/28 me to ER: The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400 Not even including DMs.... I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing). There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple. As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.
  - Me to ER/HR 7/30: This ADA Remote Work request was suggested by Apple ER in response to me raising concerns about the safety of my workplace. My office is an active EPA Superfund site with a long history of indoor air vapor intrusion with industrial chemicals above max industrial limits for human safety — and also a long history of Apple not actually testing/monitoring the air quality to ensure employee safety. I filed a workers comp claim for a fainting spell in 2019 that I believe was due to the chemicals in the air there. EH&S refused to answer many of my questions about the building and their procedures, and now has refused to answer any more of my questions about it all. However, before shutting me down, EH&S recently noted there's cracks in the floor of the building (which is exactly how vapor intrusion can get into the indoor air) but is refusing to test the air before the fix the cracks. Due to my whistleblowing, the Federal EPA is now involved and sounds like met with them this week. My doctor is working on the paper work you mentioned but we're both struggling to mentally process the fact that I have to fill out such invasive and intimidating paperwork to literally just not get poisoned. I've shared these concerns with ER as well — Antonio Lagares is overseeing my sexism & hostile work environment investigation, and his team was also playing PR agent for EH&S Also, FYI, these Sedgwick forms for this accommodation were Tweeted out by a coworker, who is a disability rights advocate, a couple weeks ago — and I also talking to NYT about this whole debacle ongoing. NYT quoted me last week about my concerns about another workplace safety issue — what I feel is inadequate safety protocols & policies around COVID

Page 24 of 34

PL_PROD_11_06522

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

exposure for employees being forced back into the office this fall in the midst of a global pandemic.

- 8/2 me to ER/HR: My doctor faxed his response to Sedgwick's follow up questions to them today. Attaching for you below since I assume you'll ask them for it anyway. Note: the questions about whether an air purifier could mitigate Superfund vapor intrusion (so severe that a land use covenant with the government prohibits elder care and day care on site) was particularly offensive, but so is the fact itself that you're forcing me to release medical info & fill out forms to not be poisoned.
- 8/4: First ever lunch w/ Dan announced for Women of PSQ group on 8/16 & 9/13, shortly after my articles come out, with HR present. During 8/16, Dan bemoans how he now sympathizes with other "metoo accused" men
- ~8/6: PSQ managers start bringing up "Ashley Issue" in staff meetings and route anyone with concerns to HR. Mention that Dan plans to disucs the "Ashley Issue" during his Oct all hands.
- 8/12: First ever NPS Secrecy & Awareness Training announced for all of PSQ

- **Witnesses**: *You know what y'all did*

### xviii.     Jenna Waibel

- **1st Concern:** Conflict of Interest
- **Examples:**
  - 3/29 - Inexplicitly playing public relations for EH&S while concurrently preforming an "independent & unbiased sexism investigation"
  - 4/3 - I email Jenna notifying her of Dave prohibiting me from speaking about workplace safety concerns and ask her to talk to him or send me an email I can forward with my rights
  - 4/3-9 - Jenna doesn't respond
  - 4/9 - Jenna then offers to launch a formal investigation into Dave
  - 4/9 - I tell Jenna no on the formal investigation but ask her to talk with him
  - 4/12 - Jenna says she'll talk to Dave
  - 4/12 - I reiterate my safety concerns about Stewart 1 to Jenna
  - 7/2 - Jenna tells me EH&S will actually test the air in Stewart 1 now and notifies me of cracks in the floor there and the need for "floor sealing" and that they'll test the air after the floor is fixed
  - 7/2 - I ask EH&S and Jenna if they can test the air before the floor is fixed, to see if those cracks were causing vapor intrusion
  - 7/2 - I submit ADA Medical Request for remote work due to needing to avoid industrial chemical exposure
  - 7/7 - I meet with EH&S and Jenna and they tell me they won't test the air before the cracks are fixed, they refuse to give me any details about what fixing the cracks entail, and again tell me they now won't answer anymore of my questions. I reiterate I don't feel safe in that building and I'm worried about vapor intrusion and I feel they're trying to misrepresent the situation internally
  - 7/7 - I send additional / updated concerns about the safety of Stewart 1 / TRW Microwave to the federal EPA
  - 7/8: meeting notes from me to Jenna & ER: Antone & Michael kept saying this is routine maintenance but said this year is also the first time this routine maintenance process is being kicked off for Apple buildings on chemical clean-up sites with risks of vapor intrusion. I asked if Apple has done this floor-sealing work in other buildings with employees currently working in them and I was told "they have done it for two or three buildings." I said I was concerned they were

Page 25 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

misrepresenting the "routine-ness" of this work this year & I asked which buildings they did the "routine floor sealing" in previously and Jenna told me "they won't discuss buildings I'm not in," "won't answer that question," and "that level of detail is not appropriate for this call." EH&S refuses to test the indoor air before they seal the vapor intrusion pathways, saying the 2015 results show the mitigation was working. I asked if the change of building circumstances (i.e. cracks, holes) don't then need an evaluation to see if there was VI and then confirm the new fixes actually fix it — they said no. When the indoor air is eventually tested at some unknown point it will be with passive samplers with HVAC on & running as normal, and employees inside working as normal. I expressed concerns that HVAC brings in outdoor air and will dilute the air inside — and employees working inside can cause their own chemicals releases which can can disturb / comprise the results. I also mentioned if the results come back high, then EH&S can then say it was the employees causing the chemicals (like they did in 2015 with the unconfirmed "construction" chemicals). Michael and Atone say their testing plan is "protocol" and "over and beyond" Antone/Michael/Jenna will not answer any of my additional questions, or provide additional questions, or provide any guidance around risk & exposure other than "they feel it is safe."

- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** *You know what y'all did*


- **2ⁿᵈ Concern:** Intimidation; Retaliation; Misuse of ADA policies
- **Examples:**
  - Me having to fill out the ADA accommodation remote work request to not be poisoned
  - 4/27 - I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins.
  - 4/27: me to Jenna, I'd like to state that the original reason I reached out to ER was because of comments Dave made to me in my 1:1 with him several weeks ago related to the TRW Microwave EPA Superfund site (aka our office building Stewart 1). I've captured my concerns in separate emails. I know you already talked to him — but I'd like the formal list of concerns to reflect that was the original and primary concern. I also let Dan know that was my primary concern on 4/9 and he also said he would talk to you about it.
  - 4/29, me to Jenna, Talked to Dan West today (my bosses boss). He will not move me out from under Dave. He will not move me under him (Dan), or John, or anyone else. He says he doesn't want anymore re-orgs. My choices are either I stay under Dave (I told him I cannot do this) or I leave the organization or Apple completely. He says he understood this likely means I will leave Apple. Dan said when I leave, the role will likely be recycled into a standard Engineer or Manager role, and the PSQ EPM role will be dissolved. No timeline was set.
  - 5/20 - Jenna tells me she will talk to Rob Yepez about my sexual harassment claim and tell him I was the one who reported it. I ask her not to and that I dont' want him to know it was me and ask her not to look in to it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation.

Page 26 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- 5/21- Jenna offers me Paid Administrative Leave for two weeks starting 5/24 and I say yes. She then tells me I'm not allowed to work at all during that time.

- 6/3 - "wrap up call" with Jenna — she says she found no policy violations and the only next steps are for me "to process this" and work with Helen on "my path forward." I send notes after documenting all of my ongoing concerns that weren't addressed — including that it sounds like she never reviewed my 2020 feedback about Dave to Dan (she said she had no recollection about one of the events)

- 6/3 jenna to me email: Thank you for raising your concerns and for your cooperation in this investigation. As we discussed, Apple takes employee concerns seriously and I have completed a thorough investigation. As part of my process, I reviewed the information and documentation you provided me. I also spoke to others who had information relevant to the investigation. Though I could not confirm that violation of Apple policies occurred, Apple has taken appropriate action to address the findings of the investigation. If, in the future, you have any new concerns and/or experience behavior you feel is retaliatory, please contact your Helen or myself immediately.

- 6/3 me to Jenna, It was good to hear that based on the concerns I raised and the evidence I provided, that there was employee coaching provided to Dan West, David Powers, and some of the men on the MSQ Mgmt team (you didn't provide names). It was also good to hear that employee coaching will be provided ongoing for Dave and Dan related to my concerns. I also appreciate you offering to look into any future issues related to this that rise to retaliation against me or violations of company policy. As mentioned on the phone call today, and documenting here, I do disagree with some of the findings. I do feel like some of the issues should have been considered violations of policy. I also feel like some issues were not properly investigated (including my 2020 feedback about Dave that I sent to Dan, of which you had no memory today of one of the most egregious statements). I also feel like the investigation into Rob Yepez's behavior towards me was closed prematurely — as he told me some very specific things that would have been independently verifiable (i.e. he told me he chartered a private plane in Santorini to fly out himself and a women he was cheating on his wife with after missing their planned flight, etc. — how else would I know that if he wasn't talking to me about how he cheats on his wife). However, I understand that you said the investigation is closed and you will not talk to me about any of these specific issues going forward. Similarly, I don't feel like my concerns about workplace safety in Stewart 1 (aka the TRW Microwave Superfund site) were adequately investigated (no testing) or resolved (EHS & y'all also said you wouldn't answer any more of my questions about that either). As you directed, I'll plan to return to work virtually on Monday with the status quo of my role and reporting structure, and no changes to my role, responsibilities, relationship with Dave or Dan, or anything else. As you directed, I'll reach out to Helen once "I've had time to process this" and work with her to help me figure out a "path forward." As mentioned, I'm not sure what Helen would do or what that means. I raised my ongoing concerns about workplace safety with Dave and Dan before this two weeks off and I'll continue to work with them to identify a way I can "return to work" in September without having to put my health at risk. I also hope EHS will go forward with testing the indoor air in my office, despite their last statement that they might not now (despite years of indoor air vapor intrusion above max EPA industrial limits, and the latest tests showing Ethylbenzene and Tolulene above max EPA industrial limits), and no explanation provided by EHS why they'd decide not to do the testing after previously saying they would do it — other than me pointing out gaps and open questions about the history of the building and Apple's oversight of it). I'm also talking to the Federal EPA about this concurrently.

Page 27 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- 6/8 - I have to present the I&D training I did to Dan staff even though I asked Dave to do it while I was out and asked Jenna if Dave could do it because I don't feel comfortable marketing our I&D training while I'm reporting Dave and a manager (likely Jason) for being sexist
- 6/10 - I then meet with Jenna and she tells me the only other steps are to "complain about her to her manager, but I'm not allowed to discuss any details of the investigation" and to "escalate safety concerns to EHS." She also suggests I request ADA accommodations for remote work so I don't have to go back to Stewart 1. She tells me "I don't need a diagnosis, I just need a doctor signature."
- 6/10: "You said you were concerned that Dave was not coached on gender discrimination: as the investigation did not find any policy violations, the ongoing support for you and Dave to work effectively moving forward is to improve communication between the two of you."-Jenna
- 6/10: "I committed to share your continued concerns with EHS about workplace safety, specifically vapor intrusion in Stewart 1, since they are the appropriate parties to respond. Finally, we talked about the Accommodation process, in response to your concern about the safety of your building with the expectation of returning in September. I advised that now is the right time to begin that process to discuss your accommodation request to continue to work remotely, and pursue documentation from your physician to support that request. Please see the below form to meet with your doctor and begin this process. Since this process can take a while, I recommend we start it now to ensure we have plenty of time in the interactive discussion. " -Jenna
- 7/13: Me: When I talked to Tony last week he told me confidently that no medical staff from Sedgwick would be getting involved in the request, and Sedgwick would simply contact my doctor to confirm he his a doctor and he did sign the paper before approving the request. You might want to sync with Tony before you have the Nurse reach out.This was in line with what you originally told me at the beginning of this process, when you offered the form — that there doesn't need to be a diagnosis and I only need a doctor signature.I can talk to the nurse if I need to, and I do actually have a diagnosis, but it sounds like there's a disconnect on your approach for this.
- 7/13: I refuse to sign that medical release form until it's revised to say I'm only releasing to Sedgwick, not to Apple Inc.
- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** *You know what y'all did*.


### xix. Ekelemchi Okpo

- **Concerns:** Use of Paid Administrative Leave as a Neg Employment Action; Intimidation; Retaliation
- **Examples:**
  - **5/21:** Jenna to me: Hi Ashley, Thanks for our call this morning. I'm glad to hear you are feeling well supported in this offer of time off. We agreed that you would take administrative leave, with full pay and benefits, starting Monday for two weeks, beginning Monday May 24, 2021 while I look into the concerns you have raised. You will return to work on Monday, June 7, 2021. We agreed this time will not be formally submitted in a time off system, and will not decrease your sick time or paid time off balance. For the next two weeks, we agreed you will not do any work. You will post an away message that lets folks know you will be out, but I left it to your judgement on what else you say about your time out. During this time off, I committed to you that I would continue my review and hope to have findings to share by the end of the two week period. We agreed that the best way to reach you is to send you a text message on your work number. Other than that, we agreed you would not do any work or

Page 28 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

respond to work emails during this time. You can continue to contact me with additional information or questions about my investigation at any time.

- 7/27: me to EO & AL: Also as mentioned, I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. I've asked several times now, including today, that all 1:1s with them be in writing only, during the duration of this investigation. I also asked that there not be any new projects added to my workload during the duration of this investigation, and this is especially important now that my manager decided to substantially increase the amount of work I need to do beyond what a single role is capable of, and all unfavorable work. I would like for him not to add any new work beyond what I had a month ago. I do see his current actions with this workload as retaliation and a negative employment action. Also, as I've mentioned, I am actively suffering emotional harm as I'm continued to be exposed to their behavior. I look forward to hearing about next steps on this. Further, as mentioned previously and on going, I am requesting a long term solution to the hostile work environment and unsafe work conditions. At this point it is clear my team will not stop the sexism, harassment, discrimination, and retaliation — so I need to be removed from this situation. As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple ER to resolve, not for me to hide from. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement). The 2nd option is an exit package that will compensate me and provide benefits through that time. As mentioned this would only be a payment & exit to mitigate the current hostile work environment and unsafe work conditions and would not include any litigation/arbitration waiver agreements nor any non-disclosure agreements beyond what I've already signed as an employee. Any further contractual agreements beyond what I've already signed would need to be reviewed by my team of lawyers and the compensation for each would need to be negotiated by each new specific requirement.
- 7/16: Antonio adds EO to the investigation
- 7/28: me to EO, text: EO refuses to respond about putting exchanges in writing before my 1:1 w/ Dave that day, texting EO up to the minute, then I cancel the meeting myself and cc EO
- 8/4: Tells me I'm "being put on leave." Refuses to give me any time of timeline or ETA for updates or conclusion. Says I don't need to check email or work phone at all, but also refuses to contact me on my personal accounts. Says I don't even need to respond to the issue confirmation. I ask to continue to use Slack and he says he wants me "removed from work place interactions." I said I wanted the leave to start 8/5, EO said no, starts today/now. I say this feels like a negative employment action, and EO essentially says it's voluntary but I also don't have a choice.
- 8/20 – I asked to attend an apple university class I was previously invited too (and Dean's Cohen & Stout approved me still attending) and EO told me I couldn't go "because I was on leave."

- **Evidence:** Box folder; emails
- **Witnesses:** *You know what y'all did*

## H. Apple Real Estate Environment, Health, & Safety

### xx. Overall

Page 29 of 34

## EMPLOYEE RELATIONS – ISSUE CONFIRMATION
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- **Concerns:** RICO; Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness Tampering
- **Examples:**
  - Worker's compensation claim was denied on May 22, 2021, right before the announcement that the Irvine company and Apple signed a long term lease agreement on May 24, 2021.
  - Apple has many buildings on chemical clean up sites in Santa Clara County, including Superfund sites
  - Apple doesn't disclose this to employees because it decided its not "legally required" unless they have reason to think the employee safety is at risk (see my email notes)
  - Apple hasn't been doing indoor air testing to monitor for vapor intrusion, which is exactly how they'd know if employee safety is at risk  (see my email notes)
  - Apple was sued by the CA government for $450k for hazardous waste violations: https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
  - Apple said they always do above what the law requires for hazardous waste: ""This matter involves an oversight in filing paperwork to close one of our recycling facilities as part of our expansion to a larger site," Apple spokeswoman Alisha Johnson told Reuters in an emailed statement. "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." https://www.reuters.com/article/us-apple-waste-violations-idUSKBN13V2HS. Alisha Johnson reports to Lisa Jackson at Apple. https://www.bustle.com/life/alisha-johnson-apple-racial-equity-justice-initiative. Lisa was former head fo the federal EPA, Alisha used to be press secretary for the federal EPA: https://impactclimate.mit.edu/apple/
  - Federal EPA only responded after I told them about Ronald Sugar, Michael quitting, the cracks in the floor, and the press.
  - I filed a workers compensation claim for fainting in the office in 2019 due to the chemicals (see notes). Sedgwick was going to pursue it but the claim was mysteriously claimed on Saturday night with a strange voicemail from the investigator and then on monday morning, it was announced Apple signed a mega deal with Irvine Company over the weekend for a massive amount of office space on chemical clean up sites in Sunnyvale
    - https://www.eastbaytimes.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/
    - https://www.mercurynews.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/
  - Me having to fill out the ADA accommodation remote work request to not be poisoned
  - 7/2, Jenna says: Antone recently shared an update on SD01 that I am also forwarding on his behalf: In May we performed step one of a three step process. We did the floor pathway survey, checking for cracks and gaps that can build over time due to natural floor movement. Based on that, we developed a floor sealing plan. Right now, we are in step two scheduling the floor crack sealing work by a contractor (expected within a month according to verbal from the construction management team). Once the floor sealing is complete, we will schedule  step three the indoor air testing at a TBD date.  When that is done, we will provide you the data. Please let me know if you have any questions.

Page 30 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- 7/8: me to Jenna & EHS: Good luck on your next adventure, Michael! And congrats on your promotion / re-org, Antone! I didn't realize Apple hired an external manager, Robert Thomas, two months ago to lead "Global Environmental Compliance!" Does that mean the vapor intrusion due diligence is now formally under Real Estate & Development instead of EH&S? Scott's not doing it anymore? I remember having a phone call with Elizabeth Schmidt in mid-September 2020 about my chemical exposure at my apartment and the building uphill that Apple previously leased for industrial use (it had a groundwater plume flowing in direction of my apartments). She had said she led a Real Estate & Development team — I didn't realize she also had EH&S under her as well. Or was that a recent re-org too? [no reply]

- 7/16: me: to Tony, As previously discussed at length, I have serious concerns about work place safety of my building, and Apple's other buildings on chemical release sites. At least for my building, from what I've seen, Apple appears to have been negligent with properly managing the vapor intrusion from the three toxic groundwater plumes under the building. Also, as mentioned, I believe I have already been injured by the vapor intrusion in 2019 (the workers comp claim I filed). The last time we talked, when I mentioned Jenna offered me remote work to satisfy my personal concerns about having to go back to an office on chemical release site after what already happened there and what happened last to me last year causing the seven months of disability. When you and I talked, you reassured me that medical records wouldn't be requested and that Sedgwick wouldn't do more than simply confirm a doctor said I need an accommodation and then would approve. I also expressed concern that my HR Biz Partner Helen already implied my request woul d be denied and was bullying me about even requesting it. You said you would talk to her and Jenna. I wanted to let you know, Sedgwick sent me this very long list of follow up questions this morning for my doctor to answer. They also required me to sign a medical release form. As mentioned, I was extremely uncomfortable signing the form Jenna sent me which released all my records to "Apple Inc" but Jenna refused to provide a revised form that only said Sedgwick. Sedgwick provided me a better form and I did sign it, because she said if I didn't my request couldn't be processed. Can you please provide some clarity on all this? Does my doctor really need to answer all of these questions Sedgwick is asking for? Or is there a way to reign this all in and do what you said the process would / should be, and as long as a doctor says I need a medical accommodation of full remote work, then that should be approved?

- After EH&S notifies me of cracks in the floor, and misrepresents situation during meeting, I notify the press & Federal EPA. EH&S, via ER, refuses to tell me what they're doing or give any updates. Also refuses to test the air before they fix the cracks. Meanwhile, I'm working with colleagues to gather evidence (pics, air testing) up to the morning of 8/4, and ER knew. Team said EH&S was onsite in our building starting 8/4.
    - 8/11: EHS Walkthrough
    - 8/18: EHS Walkthrough and "Assessment"
    - 8/19: EHS Walkthrough and "Assessment"

- **Evidence:** See Box folder, emails, & links above.
- **Witnesses:** *You know what y'all did*


xxi. **Michael Steiger**

- **Concerns:** Fraud, Misrepresentation, Negligence, Recklessness
- **Examples:**

Page 31 of 34

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**
Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- Development plan approved by city in October 2013:
- Apple's haz waste due diligence leader Michael Steiger joined apple in Dec 2013, after being a director at EKI:
- EKI did the haz waste clean up for Apple Park
- Michael Steiger going on medical leave & quitting, major re-org after
- 5/17: me to EHS & Jenna: "I have access to all publicly available information about the site per the gov websites. The report Michael previously shared should include all details for both May & Dec 2015 testing. Unless VI testing is done in the future, no additional data will be shared. If VI testing is done in SD01 in the future, the results will be shared with me. There is no timeframe for testing for vapor intrusion in Stewart 1. EHS might not test for vapor intrusion in Stewart 1 this year, or near future — they are looking over the building evaluation report and then will make a decision at an unspecified time whether they do VI testing or not. Michael said that as an expert, he and EHS have reviewed the data for SD01 and feel there is no Vapor Intrusion occurring there and they've done what's necessary to ensure the safety of the building for the people working there. (He said this all really quickly, so trying my best to summarize). As for the EthylBenzene & Tolulene, Michael said those are not attributable to vapor intrusion in SD01 because they are not contaminants of concern. And that there was no evidence they exceeded OSHA PEL limits in the building. If I have any non-VI chemical questions, can arrange for a workplace evaluation by Austin. Michael said would never turn HVAC off and if it someone said they did during wildfires, that must be a miscommunication. Questions about land use restrictions are questions for the EPA. Any additional questions I have about the specifics of soil/groundwater chemicals & vapor intrusion at the site, including my pending questions from April, will not be answered by EHS, since EHS has determined they feel confident there is no vapor intrusion in the building based on the historical tests and documents. Jenna said I have a right to share concerns and talk to anyone about my concerns about the building. She said Apple would never restrict my right to speak about work place safety concerns. She said Apple would appreciate if I try to keep information accurate and also route people to EHS with questions, but not a requirement.
- 7/2 Jenna says: I'm sending an iCal for a follow up call next week with EHS. Michael will be leaving Apple shortly after our call, so Antone Jain will be joining our call as well to step into the conversation in Michael's place. As Antone is responsible for scheduling some of the next steps in the testing we have discussed, he is very knowledgable about the program. "
- 7/8: meeting notes from me to Jenna & ER: Antone & Michael kept saying this is routine maintenance but said this year is also the first time this routine maintenance process is being kicked off for Apple buildings on chemical clean-up sites with risks of vapor intrusion. I asked if Apple has done this floor-sealing work in other buildings with employees currently working in them and I was told "they have done it for two or three buildings." I said I was concerned they were misrepresenting the "routine-ness" of this work this year & I asked which buildings they did the "routine floor sealing" in previously and Jenna told me "they won't discuss buildings I'm not in," "won't answer that question," and "that level of detail is not appropriate for this call." EH&S refuses to test the indoor air before they seal the vapor intrusion pathways, saying the 2015 results show the mitigation was working. I asked if the change of building circumstances (i.e. cracks, holes) don't then need an evaluation to see if there was VI and then confirm the new fixes actually fix it — they said no. When the indoor air is eventually tested at some unknown point it will be with passive samplers with HVAC on & running as normal, and employees inside working as normal. I expressed concerns that HVAC brings in outdoor air and will dilute the air

*Page 32 of 34*

**EMPLOYEE RELATIONS – ISSUE CONFIRMATION**

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

inside — and employees working inside can cause their own chemicals releases which can can disturb / comprise the results. I also mentioned if the results come back high, then EH&S can then say it was the employees causing the chemicals (like they did in 2015 with the unconfirmed "construction" chemicals). Michael and Atone say their testing plan is "protocol" and "over and beyond" Antone/Michael/Jenna will not answer any of my additional questions, or provide additional questions, or provide any guidance around risk & exposure other than "they feel it is safe."

- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** *You know what y'all did*


# 5. Board of Directors

## I. Finance & Audit Committee

### xxii.    <u>Ronald Sugar</u>

- **Concerns:** Conflict of Interest, Corruption; Fraud
- **Issues:**
    - Ronald Sugar used to be CEO/President of TRW Microwave then Northrup Grumman.
    - Mr. Sugar is now on the Board of Directors for Apple as chair of the finance & audit committee. The committee appears to oversee the finance and oversight of the due diligence programs for chemical clean-up site offices, including the TRW Microwave Superfund, which is the office I work in.
    - His previous companies (TRW & NG) caused the contamination that is now being cleaned up under my office. My office is designated as the EPA's "TRW Microwave" Superfund site. (Part of the "Triple Site" of 3x Superfund groundwater plumes in Sunnyvale, CA).
    - Is Sugar overseeing the due diligence program for clean-up, testing, employee complaints, finance for this office that his previous company caused the pollution for & is still responsible to clean up?
    - Did he notify the General Counsel of this conflict of interest?
    - Has he taken any actions that are favorable to NG/TRW and forsake proper safety & protection for Apple employees?
    - I have been reporting safety concerns in that office since March 2021 and have escalated further concerns that EH&S has been negligent, reckless, misrepresented their activities, and have intimidated me to not speak out about the safety concerns.
    - The Federal EPA was notified. of my concerns & notified Apple ER & EHS of my contact with the gov at that time..
- **Evidence:** Box folder including emails & photos; emails:
    - The Finance & Audit committee 2020 charter includes responsibilities such as:
        - The purpose of the Committee is to:  1. Assist the Board in oversight and monitoring of: compliance with legal, regulatory and public disclosure requirements; the independent auditors, including their qualifications and independence; enterprise risk management

Page 33 of 34

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

- Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints regarding the Corporation's financial statements or accounting policies.
- https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Audit-and-Finance-Committee-Charter.pdf
  - Guidelines Regarding Director of Conflicts of Interest says
    - Directors should take all reasonable steps to avoid conflicts of interest with the corporation.
    - Any director who becomes aware of an actual or potential conflict of interest with the Corporation at any time shall notify the Corp GC promptly in writing of the material facts of the actual or potential conflict of interest.
  - Corporate Governance Guideline say:
    - The Board expects its directors, as well as officers and employees, to act ethically. Directors are expected to adhere to the Corporation's Business Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.
    - https://s2.q4cdn.com/470004039/files/doc_downloads/2020/20200819-Corporate-Governance-Guidelines.pdf
- https://semspub.epa.gov/work/09/1158562.pdf
- https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/
- https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901181#bkground
- https://www.microwaves101.com/encyclopedias/where-are-they-now#trw

- **Witnesses:** Business Conduct? Gov Affairs? *You know what y'all did*
- **Business Conduct Report:** Support Request HRC000017207
-

PL_PROD_11_06532

# EXHIBIT 20

19.      Attached as Exhibit 20 is my charge filed August 12, 2021 with the California Department of Fair Employment and Housing and the U.S. Equal Employment Opportunity Commission.

**From:** noreply@eeoc.gov
**Subject:** Notice of Scheduled Interview
**Date:** August 12, 2021 at 8:17 PM
**To:** ashleygjovik@icloud.com



You are scheduled for an interview by Phone with the Equal Employment Opportunity Commission (EEOC) regarding your inquiry **556-2021-00608**. This email confirms your appointment with an EEOC representative of the **San Jose** office for **09/02/2021 at 12:00 PM PDT**.

On the day of your interview, please have the password for your EEOC Public Portal user account with you

Before your interview, please visit EEOC Public Portal as soon as possible to provide additional information about your inquiry. Providing additional information is optional, but can help make the interview more productive and efficient. You may add or edit the additional information up until you have your interview with EEOC. The information you provide is confidential and will not be disclosed to your employer during an investigation.

**ANSWERING THESE QUESTIONS IS NOT THE SAME AS FILING A CHARGE OF DISCRIMINATION.**

A charge of discrimination is a signed statement asserting that an organization engaged in employment discrimination. It requests EEOC to take remedial action. The laws enforced by EEOC, except the Equal Pay Act, require you to file a charge before you can file a lawsuit for unlawful discrimination. There are strict time limits for filing a charge.

To change or cancel your appointment, please log into the EEOC Public Portal and select the Schedule an Interview option for your inquiry.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digitalsupport@eeoc.gov and destroy all copies of the original message and attachments.*

# EXHIBIT 21

20.     Attached as Exhibit 21 is the Right to Sue letter issued September 9, 2021.

From: **ANDRAE ALEXANDER** ANDRAE.ALEXANDER@EEOC.GOV  📎
Subject: EEOC Charge NO. 556-2021-00608 Charge Filing Confirmation
Date: September 10, 2021 at 11:06 AM
To: ashleygjovik@icloud.com

AA

RE: Ashley M. Gjovik v. APPLE INC
EEOC Charge NO. 556-2021-00608

This is to confirm that the above-referenced charge was filed with the EEOC San Jose Local Office and dual- filed with the
CA DFEH on September 9, 2021. Attached, you will find: 1) confirmation letter, 2) charge of discrimination, 3) State of
California Department of Fair Employment and Housing Right to Sue. The EEOC has served the Respondent, APPLE INC,
with the charge.

For information regarding the status of charge, please visit the EEOC Public Portal at (https://publicportal.eeoc.gov/portal/.

Should you file a lawsuit against the Respondent regarding this matter and/or settle the matter with the Respondent,
the EEOC will require you to provide a copy of the court complaint and/or settlement agreement.

EEOC San Jose Local Office
96 North Third Street Suite 250
P.O. Box 487
San Jose, CA 95103
(408) 889-1950– office
(408) 291-2603 - fax
sanjgov@eeoc.gov



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**        KEVIN KISH, DIRECTOR
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

EEOC Number: 556-2021-00608C

Case Name: Ashley M. Gjovik v. APPLE INC

Filing Date:   Sep 09, 2021

### NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being dual filed with the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC).  The complaint will be filed in accordance with California Government Code section 12960.  This notice constitutes service pursuant to Government Code section 12962.

PL_PROD_11_05120

The EEOC is responsible for the processing of this complaint and the DFEH will not be conducting an investigation into this matter.  Please contact EEOC directly for any discussion of the complaint or the investigation.

## NOTICE TO COMPLAINANT OF RIGHT TO SUE

This letter is also your Right to Sue notice.  **This Right to Sue Notice allows you to file a private lawsuit in State court**.  According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint.  The lawsuit may be filed in a State of California Superior Court. Government Code section 12965, subdivision (b), provides that such a civil action must be brought within one year from the date of this notice.  Pursuant to Government Code section 12965, subdivision (d)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint.  You should consult an attorney to determine with accuracy the date by which a civil action must be filed.  This right to file a civil action may be waived in the event a settlement agreement is signed.

Be advised, the DFEH does not retain case records beyond three years after a complaint is filed.

DFEH-200-02 (01/2019)

 

2021-09-10          Signed Charge
Letter t...2B.pdf    of Disc...ion.pdf

PL_PROD_11_05121

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br><br>This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br><br>☐ FEPA<br><br>☒ EEOC | Agency(ies) Charge No(s):<br><br>**556-2021-00608** |
|---|---|---|

| CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br><br>**ASHLEY M GJOVIK** | Home Phone<br><br>**415-964-6272** | Year of Birth |
|---|---|---|
| Street Address                                   City, State and ZIP Code<br><br>**1050 BENTON STREET #2310, SANTA CLARA,CA 95050** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  (*If more than two, list under PARTICULARS below.*)

| Name<br><br>**APPLE INC** | No. Employees, Members<br><br>**501+** | Phone No.<br><br>**(408) 996-1010** |
|---|---|---|
| Street Address                                   City, State and ZIP Code<br><br>**1 APPLE PARK WAY, CUPERTINO, CA 95014** | | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Street Address                                   City, State and ZIP Code | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)*<br><br>☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest                Latest<br>**01-01-2017    07-15-2021**<br><br>☒ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)):*

**I have been employed by Apple as a Senior Engineering Program Manager since February 23, 2015, reporting to David Powers (nondisabled/male) Director of MSQ. I am also assigned work by his manager, Dan West (nondisabled/male), Senior Director of PSQ.**

**Since January 2017, Powers subjected me to sex-based discrimination and retaliation by referring to me as emotional/aggressive, giving men credit for my work, criticizing me, excluding me from meetings, and refusing to address harassment/sexism from colleague Jason Ivan. West subjected me to sex-based discrimination and retaliation by excluding me from meetings, making sexual comments and gestures, and personally humiliating me. West failed to address my discrimination concerns about Powers raised since 2017. I find all of this offensive. In March 2021, I began to raise concerns about the safety of my office due to it being an EPA Superfund site, which I believe caused injury and I filed a workers compensation claim. Powers personally attacked me due to my disability by stating that due to expressing safety concerns I would receive an employee warning, and not more, because I**

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br><br>This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br><br>☐ FEPA<br><br>☒ EEOC | Agency(ies) Charge No(s):<br><br>**556-2021-00608** |
|---|---|---|
| **CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**  and EEOC | | |
| *State or local Agency, if any* | | |

**was having mental health issues which I found to be offensive.**

**Around April 9, 2021, Jenna Waibel in Apple Employee Relations launched an investigation into sexual harassment and hostile work environment due to sex, despite me telling her I did not want the investigation due to fear of retaliation, but she persisted only to conclude around June 3, 2021 saying she found no policy violations. After, I complained to Antonio Lagares (nondisabled/male), Senior Manager of Employee Relations, because Waibel failed to investigate all of my allegations, because the hostile work environment continued, and I was subject to retaliation. Soon thereafter, Lagares appointed Ekelemchi Okpo (nondisabled/male), Employee Relations Investigator, to conduct a new investigation into the hostile work environment based on sex and disability I have been subjected to since 2015, and sexual harassment since 2015. Apple alleges they are conducting an investigation.**

**After engaging in protected activity, around May 6, 2021, West reassigned my work to others without explanation and ostracized me. Around July 15, 2021, Powers dramatically increased my workload with unfavorable projects. Around July 2, 2021, Employee Relations forced me to submit a reasonable accommodation request to not be exposed to the hazardous chemicals, instead of addressing my concerns for the health/safety of all employees. Waibel asked I not share my concerns with other employees, refused to take/answer my safety questions, or allow the EH&S team to take/answer my safety questions. In retaliation, on August 4, 2021, Apple placed me on an indefinite paid administrative leave even though I objected. However, to date, Apple argues I requested to be placed on leave, which is misleading.**

**I believe that I was discriminated against due to my disability and retaliated against after engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended. I believe that I was discriminated against due to my sex, female, and retaliation against after engaging in protected activity, in violation of the Title VII of the Civil Rights Act of 1964, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br><br><br>**Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT** | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.    FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

**2.    AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.    PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.    ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT 22

21.     Attached as Exhibit 22 is my NLRB charge in Case No. 32-CA-282142, filed August 26, 2021.

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE INC.**

   **and**                                 **Cases  32-CA-282142**
                                                       **32-CA-283161**

**ASHLEY MARIE GJØVIK, an Individual**

### ORDER CONSOLIDATING CASES, CONSOLIDATED
### COMPLAINT AND NOTICE OF HEARING

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED THAT Cases 32-CA-282142 and 32-CA-283161, filed by Ashley Marie Gjøvik , an Individual (Gjøvik or Charging Party) against Apple, Inc. (Respondent) are consolidated.

This Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below.

1.      (a)      The original charge in Case 32-CA-282142 was filed by the Charging Party on August 26, 2021, and a copy was served on Respondent by U.S. mail on August 30, 2021.

           (b)      The amended charge in Case 32-CA-282142 was filed by the Charging Party on April 1, 2022, and a copy was served on Respondent by U.S. mail on April 4, 2022.

           (c)      The charge in Case 32-CA-283161 was filed by the Charging Party on September 16, 2021, and a copy was served on Respondent by U.S. mail on September 20, 2021.

1



**EXHIBIT  53**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

PL_PROD10_EX053

2.    (a)    At all times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, California has retail facilities throughout the United States, has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

(b)    Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

3.    At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

4.    At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| Jenna Waibel | Corporate Employee Relations Representative |
| David Powers | Software Development Engineering Director |
| Ekelemchi Okpo | Corporate Employee Relations Representative |

5.    About March 22, 2021, Respondent, by David Powers, by telephone:

(a)    Directed employees to refrain from talking about workplace environmental health and safety concerns with other employees.

(b)    Impliedly threatened employees with discipline by telling employees that the instruction to refrain from talking about workplace environmental health and safety concerns with other employees, was a warning.

2

PL_PROD10_EX054

6.    About April 27, 2021, Respondent, by Jenna Waibel:

(a)    By telephone, told employees to use the following five-point balancing test in advance of communicating workplace health and safety concerns to other employees:

o    make sure the information is complete

o    make sure the information is accurate

o    that it does not cause panic

o    that it does not make an assessment about safety; and

o    that people talk to the Employer's Environmental Health and Safety (EHS) department directly.

(b)    By email, told employees that when discussing terms and conditions of employment, they should ensure that the information shared was as accurate and complete as possible.

(c)    By email, told employees to refrain from discussing their terms and conditions of employment by telling employees to first communicate their workplace health and safety concerns directly with Respondent.

7.    Respondent, by Ekelemchi Okpo:

(a)    About August 4, 2021, during a video meeting, directed employees not to talk to other employees about Respondent's investigation of employees' workplace health and safety concerns.

(b)    About August 4, 2021, by email, told employees to refrain from sharing communications about Respondent's investigation into employees' workplace health and safety concerns.

3

(c)    About August 5, 2021, by email, told employees that he was "disappointed" that they "misrepresented" their discussion on August 4, 2021.

8.    (a)    From about March 22, 2021, to about September 2021, Respondent's employee Gjøvik concertedly complained to Respondent regarding the wages, hours, and working conditions of Respondent's employees, by inter alia, raising workplace environmental health and safety concerns.

(b)    From about June 2021, to about September 2021, Respondent's employee Gjøvik engaged in concerted activities for the purposes of mutual aid and protection, by, inter alia, circulating a petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting about workplace complaints and concerns on social media as well as on Respondent's Slack channel platform.

(c)    About August 4, 2021, Respondent suspended its employee Gjøvik.

(d)    About September 9, 2021, Respondent discharged its employee Gjøvik.

(e)    Respondent engaged in the conduct described above in paragraphs 8(c) and 8(d), because Gjøvik engaged in the conduct described above in paragraphs 8(a) and 8(b), and to discourage employees from engaging in these or other concerted activities.

9.    By the conduct described above in paragraphs 5 through 8 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

10.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

4

PL_PROD10_EX056

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraphs 5 through 8, the General Counsel seeks an Order requiring Respondent to: (1) physically and electronically post the Notice to Employees at all its facilities including, but not limited to, posting on Respondent-sponsored Slack communication channels, intranet portals, and by email; (2) email a copy of the Notice to Employees to all its supervisors and managers; (3) physically and electronically post the Employee Rights Notice poster in the same manner as the posting of the Notice to Employees; (4) have a Board Agent conduct a training session for its managers and supervisors on their obligations under the Act, on work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director); and (5) have a Board Agent conduct a training session for its employees on their rights under the Act, on work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director).

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraph 8 the General Counsel seeks an Order requiring Respondent to: (1) offer employee Gjøvik reinstatement to her former job position or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed; (2) send a letter to Gjøvik apologizing for suspending and terminating her, expunge all Respondent's records of such suspension and termination, and inform her, in writing, that her suspension and termination have been expunged from Respondent's records and will not be used against her in any way; (3) make employee Gjøvik whole for all losses incurred as a result of the unfair labor practices described above, including for all direct and foreseeable pecuniary harm incurred as a result of her unlawful

5

suspension an termination; and (4) should Gjøvik waive reinstatement, provide a neutral job reference to all prospective employers with the correct job titles and positions of employee Gjøvik.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

**<u>ANSWER REQUIREMENT</u>**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint. The answer must be **electronically filed with this office on or before January 2, 2025**. Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. Responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a consolidated

6

PL_PROD10_EX058

complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint are true.

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE THAT on **August 4, 2025, at 9:00 am at 312 N Spring Street, 10th Floor, Los Angeles, CA 90012**, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this consolidated complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  December 18, 2024

William B. Cowen, Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

7

PL_PROD10_EX059

FORM NLRB 4338
   (6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 32-CA-282142 and 32-CA-283161

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements ***will not be granted*** unless good and sufficient grounds are shown ***and*** the following requirements are met:

(1)  The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)  Grounds must be set forth in ***detail***;

(3)  Alternative dates for any rescheduled hearing must be given;

(4)  The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5)  Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Crystal S. Carey, Attorney
Morgan, Lewis & Bockius, LLP
101 Park Avenue, 37th Floor
New York, NY 10178-0060
crystal.carey@morganlewis.com

Kelcey J. Phillips, Attorney
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
kelcey.phillips@morganlewis.com

Harry I. Johnson III, Attorney
Morgan, Lewis & Bockius, LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
harry.johnson@morganlewis.com

Mark Stolzenburg, Attorney
Morgan, Lewis & Bockius, LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
mark.stolzenburg@morganlewis.com

Brian J. Mahoney, Attorney
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.mahoney@morganlewis.com

Apple, Inc.
One Apple Park Way
Cupertino, CA 95014

Ashley Marie Gjovik
2108 N Street, Suite 4553
Sacramento, CA 95816
ashleymgjovik@protonmail.com

PL_PROD10_EX060

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law.  **You may be represented at this hearing by an attorney or other representative**.  If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible.  A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations.  The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently.  To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts.  You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**.  The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.    BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations.  In addition, you should be aware of the following:

- **Special Needs**:  If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance.  Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference**:  One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference.  You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.    DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations.  Please note in particular the following:

- **Witnesses and Evidence**:  At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:  Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

PL_PROD10_EX061

Form NLRB-4668
(6-2014)

**in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

PL_PROD10_EX062

# EXHIBIT 23

22.    Attached as Exhibit 23 is my California Labor Commissioner complaint filed August 29, 2021.

STATE OF CALIFORNIA                                         Gavin Newsom, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Labor Commissioner's Office
*Retaliation Complaint Investigation Unit*
2031 Howe Avenue Suite 100
Sacramento, CA 95825
Phone: (916) 263-2991 Email: retaliation@dir.ca.gov

October 22, 2021

Ashley Gjovik
1050 Benton Street #2310
Santa Clara, CA 95050

Re:     Ashley Gjovik v. Apple Inc.
        State Case No. RCI-CM-842830

Dear Ashley Gjovik:

This office has received your retaliation complaint, filed with this office on August 29, 2021, alleging that you suffered unlawful retaliation in violation of California law.

**Parties are encouraged to engage in settlement discussions amongst themselves. Alternatively, if you are interested in participating in an informal meeting to resolve your complaint, please send an email to retaliation@dir.ca.gov with "SETTLEMENT" in the subject line. Your participation is voluntary. Only if both parties agree, your case <u>will be temporarily assigned</u> to a Deputy Labor Commissioner who is experienced in working with parties to reach satisfactory settlements.**

**Please keep in mind that RCI investigations can be lengthy and may not result in your desired outcome. Settlement allows the parties to come to a compromise and provide relief, resolution, and peace of mind.**

As soon as the case is assigned to an investigator, you and the employer will be contacted and given an opportunity to present documents, position statements, or witness names to support your respective positions. Hold on to these documents until the assigned investigator requests them from you.

We suggest that you obtain the first and last names, addresses, and telephone numbers for witnesses who may be able to tell us more about your claim.  Also, please save any documentation that you may have, such as wage statements, emails, letters, text messages, or notices.  It is helpful if you keep notes of any conversations you have had, noting the date and with whom the conversation took place.  Also, if you have a recollection of what happened, it is helpful if you write it down while your memory is fresh.  A chronology of events can be very useful.

Do not delete, destroy, or discard any potential evidence that relates to the claims, facts, or defenses raised by the complaint. This includes, but is not limited to, any relevant electronic evidence, such as text messages, social media posts, emails, or

RCI 4.3 CASE ACCEPTED WITHOUT DEPUTY ASSIGNMENT (REV. 12/20)

PL_PROD_11_04996

State Case No. RCI-CM-842830
October 22, 2021
Page 2 of 2

voicemails. If you have a policy or practice of regularly deleting, destroying, or discarding documents, information, or things, those policies or practices should be suspended in relation to any potential evidence. Deleting, destroying, or discarding any potential evidence is against the law.

Please tell us if your address or phone number changes. If we are unable to contact you, we will be unable to proceed with the investigation, and we will be forced to close your case.

The enclosed "Summary of Procedures" will provide additional information about our process. Again, we will be in contact with you to let you know who the investigator is that will be investigating your complaint.

During the investigation, you are required to mitigate your damages by looking for other employment or working elsewhere. As you apply for employment opportunities, keep detailed records of the positions you apply for, any interviews that you attend, and any employment offers that are made to you. If you do accept an offer, please let me know. Keeping these records will assist the agency with calculating and proving what you may be owed.

If you filed a retaliation complaint because you made a workplace health or safety complaint, you may also file a separate complaint with the U.S. Department of Labor within 30 days of the date of the violation.

Keep in mind that legal claims cannot be brought indefinitely; legal claims have a "statute of limitations," which is a time limit. Filing a complaint with our agency may not prevent the statute of limitations from running out on all the claims you may have, so if you are interested in pursuing this claim or other related claims in a lawsuit, consult with an attorney right away.

Sincerely,

Alejandro Cortez
Deputy Labor Commissioner

RCI 4.3 CASE ACCEPTED WITHOUT DEPUTY ASSIGNMENT (REV. 12/20)

PL_PROD_11_04997

# EXHIBIT 24

23.    Attached as Exhibit 24 is Defendant Apple Inc.'s Responses to Plaintiff's Interrogatories, Set One, verified by Megan Bowman on August 4, 2025.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
|---|---|
| Plaintiff, | **DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE** |
| v. | |
| APPLE INC., | |
| Defendant. | |

**PROPOUNDING PARTY:**  Plaintiff Ashley Gjovik

**RESPONDING PARTY:**    Defendant Apple Inc.

**SET NUMBER:**          One

Defendant Apple Inc. ("Apple") responds to Plaintiff Ashley Gjovik's Interrogatories, Set One, served on July 3, 2025, as follows:

**INTERROGATORY NO. 1:**

State in detail Defendant Apple Inc's complete and formal reason(s) for terminating Employee, Ashley Gjovik's, employment as of the time of the termination on Sept. 9 2021

**RESPONSE TO INTERROGATORY NO. 1:**

Apple objects to this Interrogatory on the grounds that it is vague, overly broad, and unduly burdensome, particularly in its request that Apple state the "complete and formal" reasons for the termination of Plaintiff's employment. This Request imposes an unreasonable demand that could be construed to require an investigation or response beyond what is relevant or proportional to the needs of the case.

Subject to and without waiving the foregoing objections, and based on its understanding of the request, Apple responds as follows:

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated in a user study of an internal and proprietary application called Alpha,[1] which tested face identification for certain Apple devices. Because the application was still in testing phase and unavailable to the public, Apple required all participants— as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the study and signed the Alpha Study Consent Form expressly acknowledging that any information about the study, including her participation, was confidential under the

---

[1] To safeguard Apple's confidential information, the study is referenced as "Alpha" for purposes of this response.

- 1 -

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET ONE
CASE NO. 23-cv-4597-EMC

Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple."

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary study Apple was conducting, the "Omega"[2] study, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. Like the Alpha study, the details of the Omega study were not known except to a small select group within Apple, and certainly not outside Apple, and thus they were covered by Plaintiff's Confidentiality Agreement in which she

_____
[2] To safeguard Apple's confidential information, the study is referenced as "Omega" for purposes of this response.

- 2 -

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET ONE
CASE NO. 23-CV-4597-EMC

agreed to keep non-public information relating to product development and research confidential. Despite this, Plaintiff's tweet both identified the name and purpose of the study regarding an unreleased product under development. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Plaintiff tweeted photographs of herself created by the Alpha application, thus again disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study. The story also included a video comprised of photographs of Plaintiff created by the Alpha application.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research. Additionally, Apple concluded that Plaintiff had failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential information, her violation of her confidentiality agreements regarding disclosure of non-public information relating to product

- 3 -

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET ONE
CASE NO. 23-cv-4597-EMC

development and research, and her refusal to cooperate during Apple's internal investigation process. Apple treated Gjovik the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

Dated: August 4, 2025                    ORRICK, HERRINGTON & SUTCLIFFE LLP

                                          /s/ Melinda S. Riechert
                                          MELINDA S. RIECHERT
                                          Attorneys for Defendant
                                          APPLE INC.

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET ONE
CASE NO. 23-cv-4597-EMC

## VERIFICATION

I, Megan Bowman, declare that I am the Director of Human Resources, Hardware Engineering, for Apple Inc. and I am authorized to make this verification on its behalf. I have read the following:

- **DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE**

Based on information and belief and/or personal knowledge, I believe the matters stated therein to be true and accurate. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed in San Carlos, California on August 4, 2025.

*Megan Bowman*

Megan Bowman

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET ONE
CASE NO. 23-CV-4597-EMC

## CERTIFICATE OF SERVICE

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. On August 4, 2025, I served the following document(s):

- **DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE**

By Electronic Service: On all of the interested parties in this action by transmitting true and correct copies of the documents identified above in portable document format from the email address mriechert@orrick.com to the email addresses below:

> Ashley Gjovik (in pro per)
> ashleymgjovik@protonmail.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2025.

Melinda S. Riechert
.

CERTIFICATE OF SERVICE
CASE NO. 23-CV-4597-EMC

# EXHIBIT 25

24.     Attached as Exhibit 25 is Apple's March 4, 2022 Position Statement submitted by Jessica R. Perry of Orrick, Herrington & Sutcliffe LLP to the U.S. Department of Labor, OSHA, in Ashley Gjovik v. Apple Inc., Case No. 9-3290-22-051.



**Orrick, Herrington & Sutcliffe LLP**

1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

**orrick.com**

March 4, 2022

**VIA ELECTRONIC MAIL**

**Jessica R. Perry**

| | |
|---|---|
| E | jperry@orrick.com |
| D | +1 650 614 7350 |
| F | +1 650 614 7401 |

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

**Re:**    *Ashley Gjovik v. Apple Inc.*, **Case No. 9-3290-22-051**

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

**I.      INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by ***intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press***, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## II.    FACTUAL BACKGROUND

### A.    Apple Prohibits Discrimination, Harassment, and Retaliation.

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

### B.    Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was

4161-3255-5828

PL_PROD_11_02058

Andrea Diangco
March 4, 2022
Page 3

promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the termination of her employment on September 10, 2021.[2]

Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties as an Apple employee." "Proprietary information" includes, inter alia, non-public "materials or information relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of Apple's rules and policies regarding proprietary information" and understood that breach of the agreement could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings." To safeguard information about Apple's products, employees are prohibited from disclosing confidential information without prior approval of management.

As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. On each occasion, Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple required all participants— as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed the Alpha Study Consent Form and expressly acknowledged that any information about the study, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.").

---

[2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

[3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from further unauthorized disclosure.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 4

**C.    Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 5

**D.    Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.    Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, ***Ms. Gjovik admitted to disclosing confidential information*** about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.    Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.    Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- <u>March 22, 2021</u>: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- <u>April 2, 2021</u>: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- <u>April 9, 2021</u>: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 7

- April 11, 2021: Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- April 27, 2021: Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- May 17, 2021: Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- May 18, 2021: Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- June 10, 2021: Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- July 2, 2021: ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- July 7, 2021: Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 8

> building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

### 2.    Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

### 3.    Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 9

> I want to confirm our conversation a few minutes ago. ***Per your request, you are now on paid administrative leave so as to not interact with your managers***.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

## III.     ARGUMENT

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.

4161-3255-5828

PL_PROD_11_02065



Andrea Diangco
March 4, 2022
Page 10

A.    **Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.**

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The **only** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.

4161-3255-5828

PL_PROD_11_02066



Andrea Diangco
March 4, 2022
Page 11

      **B.**      **Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.**

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 12

**C.** **Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.**

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant*, 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.*, 402 F. App'x 936 (5th Cir. 2010); *Williams*, 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

**D.** **Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.**

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that ***"[p]er your request, you are now on paid administrative leave"***—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced*, 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.

4161-3255-5828

PL_PROD_11_02068



Andrea Diangco
March 4, 2022
Page 13

## IV.    CONCLUSION

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By:    _____
        Jessica R. Perry

4161-3255-5828

# EXHIBIT 26

25.    Attached as Exhibit 26 is the September 15, 2021 email from David Eberhart of O'Melveny & Myers to me.

# Fwd: Correspondence on behalf of Apple Inc.

---

**From: Ashley Gjovik <ashleygjovik@icloud.com>**            Fri, Sep 17, 2021 at 12:01 AM EDT (GMT-04:00)
To: Ashley Gjovik <ashleymgjovik@protonmail.com>

---

DRAFT RESPONSE:

Hi David,

Again, I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Would you let me know — have you already sent a request to Vox for them to remove the video? Have you received a response from them separately?

—

Ashley M. Gjøvik
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022


Begin forwarded message:

**From:** "Eberhart, David R." <deberhart@omm.com>
**Subject: RE: Correspondence on behalf of Apple Inc.**
**Date:** September 16, 2021 at 8:49:13 PM PDT
**To:** Ashley Gjovik <ashleygjovik@icloud.com>

Dear Ms. Gjovik –
Thank you for your email.

I look forward to further information about Apple's request to remove the video. In the meantime, I note that there are additional tweets that also contain the same or similar images from confidential Apple-internal user studies:

https://twitter.com/ashleygjovik/status/1432381497370034184
https://twitter.com/ashleygjovik/status/1432381395955900416

Please remove those images from any public location, remove any similar images, and refrain from further public disclosures of the same or similar information.
Sincerely,
David

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Wednesday, September 15, 2021 8:58 PM
**To:** Eberhart, David R. <deberhart@omm.com>
**Subject:** Re: Correspondence on behalf of Apple Inc.


[EXTERNAL MESSAGE]

Hello David,

I hope you're well.  Thank you for your email.

I disagree that the posts fall under the definition of confidential or proprietary information, but in an effort to resolve the matter amicably, I've removed the two Twitter posts you cited, as requested.

https://twitter.com/ashleygjovik/status/1431824501457633283
https://twitter.com/ashleygjovik/status/1432400136471072769

As for the video hosted by Vox, I do not have the power to delete it as Vox is in control of their own servers, not me. I am talking others about your request and someone will get back to you related to the Vox hosted video.

—

**Ashley M. Gjøvik**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022

On Sep 15, 2021, at 7:40 PM, Eberhart, David R. <deberhart@omm.com> wrote:

Please see the attached correspondence.

Sincerely,

David

# O'Melveny

**David R. Eberhart**

deberhart@omm.com
O: +1-415-984-8808

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Website | LinkedIn

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

<Gjovik, Ashley M. IPA.pdf><Sep_15_Gjovik_Letter_FINAL.pdf>



O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823

T: +1 415 984 8700
F: +1 415 984 8701
omm.com

File Number:
600,000-3 (Apple Inc.)

September 15, 2021

**David R. Eberhart**
D: +1 415 984 8808
deberhart@omm.com

**VIA E-MAIL**

Ms. Ashley Gjovik
1050 Benton Street, Apt 2310
Santa Clara, CA 95050
ashleygjovik@icloud.com

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:

https://twitter.com/ashleygjovik/status/1431824501457633283

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-internal user study project. Please remove those images from any public location and refrain from further public disclosures about that project.

The second is the image contained in the following tweet:

https://twitter.com/ashleygjovik/status/1432400136471072769

The related video is located here:

https://volume-assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application during confidential Apple-internal user studies. Please remove that image and video from any public location and refrain from further public disclosures about that application or related user studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you are represented by counsel in this matter, please identify your counsel.

/ / /

Century City • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo



---

Sincerely,

/s/ David Eberhart

David R. Eberhart
of O'MELVENY & MYERS LLP

# EXHIBIT 27

26.    Attached as Exhibit 27 is Bertolus Deposition Exhibit 1 (my August 30, 2021 Twitter post).



**Ashley M. Gjøvik**
@ashleygjovik

We're learning about #Apple's long history of systemic oppression & retaliation against employees when employees express concerns about discrimination, harassment, & other abuse. Why wouldn't Apple try to use our data & their internal surveillance infrastructure against us?



👤 You

9:35 AM · Aug 30, 2021 · Twitter Web App

ıll View Tweet activity

EXHIBIT    1
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

**1** Retweet    **14** Likes

   

 Tweet your reply

Reply

# EXHIBIT 28

27.     Attached as Exhibit 28 is Bertolus Deposition Exhibit 35 (The Verge article titled "Apple Cares About Privacy, Unless You Work at Apple," dated August 30, 2021).

**EXHIBIT** **35**
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937



Illustration by Alex Castro / The Verge

APPLE

# APPLE CARES ABOUT PRIVACY, UNLESS YOU WORK AT APPLE

*The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs*

By Zoe Schiffer   @ZoeSchiffer     Aug 30, 2021, 12:33pm EDT

acob Preston was sitting down with his manager during his first week at Apple when he was told, with little fanfare, that he needed to link his personal Apple ID and work account.

The request struck him as odd. Like anyone who owns an Apple product, Preston's Apple ID was intimately tied to his personal data — it connected his devices to the company's various services, including his iCloud backups. How could he be sure his personal messages and documents wouldn't land on his work laptop? Still, he was too giddy about his new job as a firmware engineer to care. He went ahead and linked the accounts.

**Exhibit 35**
**McKeon Aloe, R.**
04/03/26
@ aptus.

PL_PROD_7-101

Three years later, when Preston handed in his resignation, the choice came back to haunt him. His manager told him to return his work laptop, and — per Apple protocol — said he shouldn't wipe the computer's hard drive. His initial worry had come to pass: his personal messages were on this work laptop, as were private documents concerning his taxes and a recent home loan. Preston pushed back, saying some of the files contained highly personal information and there was no reasonable way to make sure they were all removed from the laptop without wiping it completely.

## "IF THEY DID THIS TO A CUSTOMER, PEOPLE WOULD LOSE THEIR GODDAMN MINDS."

He was told the policy wasn't negotiable.

Preston's story is part of a growing tension inside Apple, where some employees say the company isn't doing enough to protect their personal privacy and, at times, actively seeks to invade it for security reasons. Employees have been asked to install software builds on their phones to test out new features prior to launch — only to find the builds expose their personal messages. Others have found that when testing new products like Apple's Face ID, images are recorded every time they open their phones. "If they did this to a customer, people would lose their goddamn minds," says Ashley Gjøvik, a senior engineering program manager.

Apple employees also can't use their work email addresses to sign up for iCloud accounts, so many use their personal accounts.

The blurring of personal and work accounts has resulted in some unusual situations, including Gjøvik allegedly being forced to hand compromising photos of herself to Apple lawyers when her team became involved in an unrelated legal dispute.

Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises."

PL_PROD_7-102

Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises" (emphasis added).

Many employees have a choice between getting an Apple-owned phone or having the company pay for their phone plan. But one source tells *The Verge* that trying to maintain two phones can become impractical. In software engineering, certain employees are expected to participate in a "live-on" program that puts out daily builds with bug fixes. "You can't have a successful live-on program without people treating these devices exactly the same as a personal phone," the source says. "So a work device or a work account just won't cut it."

## "YOU MUST LINK YOUR PERSONAL APPLE ID WITH YOUR APPLECONNECT WORK ACCOUNT"

None of these policies are unique. Tech companies almost always have rules in place to search employees' corporate devices, including personal devices used for work. It's also common practice for tech companies to ask employees to test new software, which could potentially expose personal information. But Apple sets itself apart from other tech giants through its commitment to consumer privacy. As Tim Cook said at the CPDP Computers, Privacy and Data Protection conference in January 2021, businesses built on buying and selling user data, without the knowledge or consent of consumers, "[degrade] our fundamental right to privacy first, and our social fabric by consequence." The lack of employee privacy has made the perceived hypocrisy particularly irksome to some workers.

Now, as employees begin to push back against a variety of Apple norms and rules, these policies are coming under the spotlight, raising the question of whether the company has done enough to safeguard personal employee data. It might seem like a company obsessed with secrecy would be sympathetic to its employees' wishes to have confidential information of their own. But at Apple, secrecy requires the opposite: extensive knowledge, and control, over its workforce.

PL_PROD_7-103

his is how it starts: a new Apple employee is told during onboarding that collaborating with their colleagues will require them to make extensive use of iCloud storage, and their manager offers a two terabyte upgrade. This will link their personal Apple ID to their work account — in fact, the instructions for accessing this upgrade explicitly say "you must link your personal Apple ID with your AppleConnect work account." The connection will give them access to collaborative apps like Pages and Numbers that they might need to do their jobs. (Apple employees who do not have a business need to collaborate do not go through this process.)

Employees *could* pause during onboarding and say they want to create a new Apple ID specifically for work or use a different phone. But most do not — it seems a little paranoid, and the Apple instructions say to go ahead and use your personal account. What's more, most Apple devices don't support using multiple Apple IDs. To switch between iCloud accounts on an iPhone, you have to completely sign out of one ID and into another — a clunky, disruptive process. It is far easier culturally and technically to simply link personal and work accounts, which adds a new Apple Work folder to the employee's iCloud account.

### "I GET MAD THAT I HAVE TO USE MY PERSONAL PHONE TO TEXT MY BOSS."

In theory, this Apple Work folder is where all of the collaborative documents for employees are supposed to live in order to keep personal and work files separate. In practice, the owner of a document often forgets to store files in the work folder, and documents quickly become intermingled. In fact, when Apple employees create a document in, say, Pages, the app automatically enters the personal email address used for their Apple ID. "I asked my manager about it and it's just sort of an issue everyone deals with," Preston says.

Employees can choose to not sync certain folders, like their photo libraries. But others, like messages, can be trickier. Apple adopted Slack in 2019, but some teams still use iMessage as a primary way to communicate, which makes opting out of a message sync nearly impossible.

Over the past few weeks, employees have been discussing the difficulty of setting up different Apple IDs to keep work and personal files separate, noting that while it's

PL_PROD_7-104

possible, there are significant technical hurdles. "I don't understand why they didn't create an Apple ID and iCloud account from our work email address during the onboarding process," one employee said on Slack. "I get mad that I have to use my personal phone to text my boss," said another.

---

oncerns about data privacy are not ubiquitous inside Apple. Many employees who spoke to *The Verge* said they were aware the company gave itself extensive rights to search their data, but — for various reasons — weren't overly worried about the fallout.

"When I joined Apple, I personally expected it to be pretty invasive and took some serious steps to separate my work and personal life," one source says.

For other employees, however, the mixing of personal and work data has already had real consequences. In 2018, the engineering team Ashley Gjøvik worked on was involved in a lawsuit. The case had nothing to do with Gjøvik personally, but because she'd worked on a project related to the litigation, Apple lawyers needed to collect documents from her phone and work computer.

### "ALL DATA THAT HAS YOUR FACE IN IT IS GOOD DATA."

Gjøvik asked the lawyers to confirm that they wouldn't need to access her personal messages. She says her team discouraged the use of two phones; she used the same one for work and personal and, as a result, had private messages on her work device.

A member of the legal team responded that while the lawyers did not need to access Gjøvik's photos, they did not want her to delete any messages. During an in-person meeting, Gjøvik says she told the lawyers the messages included nude photos she'd sent to a man she was dating — a sushi chef who lived in Hawaii. Surely, those weren't relevant to the lawsuit. Could she delete them? She says the lawyers told her no.

---

PL_PROD_7-105

n 2017, Apple rolled out an app called Gobbler that would allow employees to test Face ID before it became available to customers. The process was routine — Apple often launched new features or apps on employees' phones, then collected data on how the technology was used to make sure it was ready for launch.

Gobbler was unique in that it was designed to test face unlock for iPhones and iPads. This meant that every time an employee picked up their phone, the device recorded a short video — hopefully of their face. They could then file "problem reports" on Radar, Apple's bug tracking system, and include the videos if they found a glitch in the system. "All data that has your face in it is good data," said an internal email about the project. After rumors of criticism, Apple eventually changed the codename to "Glimmer."

Unlike other Apple features, Glimmer wasn't automatically installed on employee phones. It required an informed consent form so employees would know what they were getting into. Still, for some people on engineering teams, participation was encouraged — even expected, according to two staff members. Once it was installed, some data that didn't contain personally identifiable information would automatically upload to Radar, unless employees turned off this setting.

Apple was careful to instruct employees not to upload anything sensitive, confidential, or private. But it didn't tell people what was happening with the hundreds of images they didn't upload in Radar reports.

The reports themselves were also a cause for concern. When employees file Radar tickets, they include detailed information about the problems they are seeing. In 2019, Gjøvik filed a ticket about Apple's photo search capabilities. "If I search for 'infant' in my photo library, it returns a selfie I took of myself in bed after laparoscopic surgery to treat my endometriosis," she wrote, including four images in the ticket. The default sharing settings for the ticket included all of software engineering.

## "THEY'RE THE ONE TECH COMPANY THAT TAKES PRIVACY SERIOUSLY."

Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "Radar is forever."

PL_PROD_7-106

What's more, when employees file Radar tickets, they are often asked to include diagnostic files, internally called "sysdiagnose" to give Apple more information about the problem. If they are filing a bug about iMessage, they might be asked to install a sysdiagnose profile that exposes their iMessages to the team tasked with fixing the issue. For employees using a live-on device, default settings can mean that, as they are filing a Radar ticket, a sysdiagnose profile is being automatically created in the background, sending data to Apple without the employee realizing it.

When sysdiagnose profiles are not included, employees have been known to post memes calling out the omission.

PL_PROD_7-107



jøvik is currently on administrative leave from Apple due to an ongoing
investigation into claims she made about harassment and a hostile work

PL_PROD_7-108

environment. If she leaves the company, she'll likely face the same conundrum as Jacob Preston, related to the mixing of her personal and work files.

Employees likely wouldn't care too much about this were it not for another Apple rule that bars them from wiping their devices when they leave the company. If they do, they'll be in direct violation of their employment agreement, leaving them vulnerable to legal action.

After Preston gave notice, he received a checklist from his manager that explicitly said: "Do **not** wipe or factory reset any Apple owned units (such as laptops, Mac, ipads, and iPhones)."

"Before joining Apple I had a lot of respect for the company," Preston says. "They're the one tech company that takes privacy seriously. But then they go and have these policies that are hypocritical and go against their stated values. It's sort of hard to reconcile. It's like now that I'm leaving, my privacy isn't a concern anymore."

Apple did not respond to a request for comment from *The Verge*. ∎

---

FEATURED VIDEOS FROM THE VERGE

## The $13B casino of NFTs



PL_PROD_7-109



POLICY

Barack Obama is narrator and host of new Netflix nature documentary

POLICY

David Mamet filed a short story about airplanes to back Texas' terrible social media law

GOOGLE

Lawsuit claims Google's 'Order Online' button directs customers away from restaurants' sites

View all stories in Policy

PL_PROD_7-110

PL_PROD_7-111

# EXHIBIT 29

28.     Attached as Exhibit 29 is Bertolus Deposition Exhibit M (the September 9, 2021 termination letter).

Date:  September 9, 2021

To:     Ashley Gjovik                                      Employee ID:293492
From:  Yannick Bertolus
cc:      Personnel file


via Email
ashleygjovik@icloud.com

via FedEx
501 33rd Ave, Apt 406A
San Francisco, CA 94121


  Re:     Termination of employment


Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies.  You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA). We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

Your access to Apple systems has been suspended as of today and your employment will terminate on September 10, 2021. You will receive your final pay which will include regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's People Support at 1-800-473-7411 if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at 800-473-7411.

Page 1 of 2

**EXHIBIT    M**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

PL_PROD_12_0103

As a reminder, your obligations under the IPA continue even after your employment with Apple ends. This includes, but is not limited, the obligation to not disclose Apple's confidential or proprietary information such as unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, personnel information, vendor contacts, etc. If you need a copy of your signed IPA please contact People Support at 800-473-7411.

You are also obligated to return to Apple all Apple owned equipment and devices. You will receive a pre-paid FedEx box to ensure the prompt return of Apple devices. If you need assistance, please contact Aleks Kagramanov at akagramanov@apple.com.

Attachments included

PL_PROD_12_0104

# EXHIBIT 30

29.     Attached as Exhibit 30 is Bertolus Deposition Exhibit N (the September 9, 2021 email chain between Megan Bowman and Yannick Bertolus).

| | |
|---|---|
| **Subject:** | Re: Ashley Gjovik Summary |
| **From:** | "Megan Bowman" [Redacted] |
| **Received(Date):** | Fri, 10 Sep 2021 01:44:58 +0000 |
| **To:** | "Yannick Bertolus" [Redacted] |
| **Attachment:** | AG Term Letter FINAL.pdf |
| **Attachment:** | US_CA_Unemployment_en.pdf |
| **Attachment:** | US_When_Benefits_End_FT_JAN2021_en.pdf |
| **Date:** | Fri, 10 Sep 2021 01:44:58 +0000 |

Ok, thanks.

Here are the attachments you can send to Ashley in an email notifying her of the termination. We will also send this via FedEx tonight. Here is her email address:

[Redacted]

Below is the text and subject line you can use. Please copy me on the email you send to her.

Thanks,
Megan

*****

Subject:  Employment Status

Email Text:
Hi Ashley,
Please see attached.

Yannick

> On Sep 9, 2021, at 6:26 PM, Yannick Bertolus [Redacted] wrote:
>
> Understood.  I agree with the termination decision.
>
> Yannick
>
>> On Sep 9, 2021, at 6:20 PM, Megan Bowman [Redacted] [Redacted] wrote:
>>
>> Yannick,
>>
>> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of our Global Security and ER teams, reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.



**EXHIBIT    N**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

APL-GAELG_00001513
PL_PROD_12_0107

>>
>> Ashley chose not to talk with the team and asked for all communication to be in writing.  She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
>>
>> Ashley disclosed confidential product-related information on Twitter,
and this conduct on its own, warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's ER Investigator.
>>
>> Based on her conduct which violates Apple policies, the People team recommends that her employment be terminated.
>>
>> Thanks,
>> Megan
>>
>

Ok, thanks.

Here are the attachments you can send to Ashley in an email notifying her of the termination. We will also send this via FedEx tonight. Here is her email address: [ Redacted ]

Below is the text and subject line you can use. Please copy me on the email you send to her.

Thanks,

Megan

*****

Subject:  Employment Status

Email Text:

Hi Ashley,

APL-GAELG_00001514

PL_PROD_12_0108

Please see attached.

Yannick

On Sep 9, 2021, at 6:26 PM, Yannick Bertolus [ Redacted ] wrote:

Understood.  I agree with the termination decision.

Yannick

> On Sep 9, 2021, at 6:20 PM, Megan Bowman [ Redacted ] wrote:
>
> Yannick,
>
> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of our Global Security and ER teams, reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.
>
> Ashley chose not to talk with the team and asked for all communication to be in writing.  She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
>
> Ashley disclosed confidential product-related information on Twitter, and this conduct on its own, warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's ER Investigator.
>
> Based on her conduct which violates Apple policies, the People team recommends that her employment be terminated.
>
> Thanks,
> Megan

| | |
|---|---|
| **Subject:** | Employment Status |
| **From:** | \<ybe[ Redacted ]> |
| **Received(Date):** | Fri, 10 Sep 2021 01:53:55 +0000 |
| **To:** | \<ash[ Redacted ] |
| **Cc:** | "Megan Bowman[ Redacted ] |
| **Attachment:** | AG Term Letter FINAL.pdf |
| **Attachment:** | US_CA_Unemployment_en.pdf |
| **Attachment:** | US_When_Benefits_End_FT_JAN2021_en.pdf |
| **Date:** | Fri, 10 Sep 2021 01:53:55 +0000 |

Hi Ashley,

Please see attached.

Yannick

**EXHIBIT    O**
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

APL-GAELG_00001143
PL_PROD_12_0113

# EXHIBIT 31

30.    Attached as Exhibit 31 is Bertolus Deposition Exhibit P (the September 9, 2021 6:54 PM email from Yannick Bertolus to me transmitting the termination letter).

**From:** ybertolus@apple.com
**Subject:** Employment Status
**Date:** September 9, 2021 at 6:54 PM
**To:** ashleygjovik@icloud.com
**Cc:** Megan Bowman mbowman@apple.com

Hi Ashley,

Please see attached.

Yannick



AG Term Letter
FINAL.pdf



US_CA_Unempl
oyment_en.pdf



US_When_Bene
fits_En...en.pdf

**EXHIBIT     P**
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

PL_PROD_12_0114

# EXHIBIT 32

31.      Attached as Exhibit 32 is a true and correct copy of the cited pages of the certified deposition transcript of Yannick Bertolus, taken April 17, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, the testimony regarding the "redacted text exchange," the admission that Mr. Bertolus had "absolutely no idea it was Andrew," the exchange in which Mr. Bertolus used the word "feminine" in response to a question about appropriate senior-subordinate communications and later denied having said it, the exchange in which Mr. Bertolus confirmed Apple's theory that I had made "bad faith complaints," and Mr. Bertolus's summary of the three termination reasons, each quoted above.

Deposition of

# Yannick Bertolus

April 17, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,            )
                             )
          Plaintiff,         )
                             )
  vs.                        )  Case No. 23-cv-04597-EMC
                             )
APPLE, INC.,                 )
                             )
          Defendant.         )
_____)

VIDEOCONFERENCE DEPOSITION OF

YANNICK BERTOLUS

VIDEO-RECORDED VIA ZOOM

Friday, April 17, 2026

Stenographically reported by:

CARRIE GIBSON, CSR No. 13937

JOB No. 10188335

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,            )
                             )
          Plaintiff,         )
                             )
  vs.                        )  Case No. 23-cv-04597-EMC
                             )
APPLE, INC.,                 )
                             )
          Defendant.         )
_____)

Deposition of YANNICK BERTOLUS, taken on behalf of Plaintiff via videoconference, commencing at 1:07 p.m. and ending at 5:00 p.m. on April 17, 2026, reported stenographically by Carrie Gibson, California Certified Shorthand Reporter No. 13937.

**Page 3**

APPEARANCES:

For the Plaintiff:
  A.M. GJOVIK CONSULTING, LLC
  BY:  ASHLEY M. GJOVIK, Pro Se
  (Appearing Via Videoconference)
  2108 North Street
  Suite 4553
  Sacramento, California 95816
  (415) 964-6272
  legal@ashleygjovik.com

For the Defendant:

  ORRICK, HERRINGTON & SUTCLIFFE LLP
  BY:  JESSICA R. PERRY, ESQ.
  (Appearing Via Videoconference)
  1000 Marsh Road
  Menlo Park, California 94025
  (650) 614-7400
  jperry@orrick.com

          (Video-recorded via Zoom by Ms. Gjovik)

**Page 4**

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| MS. GJOVIK | 8 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Printout of Twitter post from Ashley Gjovik, dated 8/30/2021, 1 page | 115 |
| EXHIBIT 2 | Printout of Twitter post from Ashley Gjovik, dated 8/30/2021, 1 page | 119 |
| EXHIBIT 3 | Printout of Twitter post from Ashley Gjovik, dated 8/30/2021, 1 page | 120 |
| EXHIBIT 4 | Printout of Twitter post from Ashley Gjovik, dated 8/28/2021, 1 page | 120 |
| EXHIBIT 28 | Printout of text messages, 39 pages (APL-GAELG_00002678 - 2716) | 159 |
| EXHIBIT 35 | 8/30/2021 article from The Verge entitled "Apple Cares About Privacy Unless You Work At Apple," 11 pages (PL_PROD_7-101 - 7-111) | 121 |
| EXHIBIT 53 | National Labor Relations Board Order Consolidating Cases, Consolidated Complaint, and Notice of Hearing, 10 pages (PL_PROD10_EX053 - EX062) | 132 |

///

**Page 5**

E X H I B I T S (Continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 92 | 9/9/2021 e-mail correspondence between Aleks Kagramanov and Ashley Gjovik, 2 pages (PL-PROD10_EX092 - 093) | 126 |
| EXHIBIT 101 | National Labor Relations Board settlement agreement, 6 pages (PL_PROD10_EX101 - EX106) | 135 |
| EXHIBIT 3866 | Identified floor penetration features and sub-slab monitoring points, marked Apple need to know - confidential, 3 pages (APL-GAELG_00003866 -3868) | 142 |
| EXHIBIT 3870 | Identified floor sealing areas and sub-slab monitoring points, marked Apple need to know - confidential, 5 pages (APL-GAELG_00003870 -3874) | 142 |
| EXHIBIT A | Printout of text messages, 1 page (PL_PROD_12_001) | 151 |
| EXHIBIT B | Printout of text messages, 1 page (PL_PROD_12_002) | 153 |
| EXHIBIT CC | 2015 Apple Confidentiality and Intellectual Property Agreement, 6 pages | 113 |
| EXHIBIT DD | 10/2020 Apple Business Conduct Policy, 19 pages | 113 |
| EXHIBIT EE | National Labor Relations Board Corrected Complaint and Notice of Hearing, 71 pages | 133 |
| EXHIBIT GG | Apple Social Media and Online Communications Policy, 2 pages | 114 |

///

**Page 6**

E X H I B I T S (Continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT I | 4/18/2018-5/10/2018 e-mail correspondence between Ashley Henderson, Dan West, Monu Mathur, and John Basanese, Subject: Women of PSQ event: Fireside chat with Dan West and John Basanese on 5/8, 3 pages (PL_PROD_12_0061 - 0063) | 180 |
| EXHIBIT J | 7/29/2021 email from Ashley Gjovik to Ekelemchi Okpo, Subject: Ashley:Ekelemchi - 7/29 notes, 3 pages (PL_PROD_12_0064 - 0066) | 182 |
| EXHIBIT JJ | Settlement agreement and compliance documents, 61 pages | 136 |
| EXHIBIT LL | United States Environmental Protection Agency consent agreement, 20 pages | 138 |
| EXHIBIT M | 9/9/2021 letter from Yannick Bertolus to Ashley Gjovik, Re: Termination of employment, 2 pages (PL_PROD_12_0103 - 0104) | 110 |
| EXHIBIT N | 9/9/2021 e-mail correspondence between Megan Bowman and Yannick Bertolus, Subject: Ashley Gjovik summary, 3 pages (PL_PROD_12_0107 - 0109; APL-GAELG_00001513 - 1515) | 110 |
| EXHIBIT O | 9/10/2021 email from Yannick Bertolus to Ashley Gjovik, Subject: Employment status, 1 page (PL_PROD_12_0113; APL-GAELG_00001143) | 110 |

///

**Page 7**

E X H I B I T S (Continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT P | 9/9/2021 email from Yannick Bertolus to Ashley Gjovik, Subject: Employment status, with attachment, 1 page (PL_PROD_12_0114) | 110 |
| EXHIBIT Q | 9/13/2021-9/16/2021 e-mail correspondence between Lisa Gonzalez and Ashley Gjovik, Subject: Address verification for shipping boxes, 3 pages (PL_PROD_12_0115 - 0117) | 111 |
| EXHIBIT R | Printout of Yannick Bertolus's LinkedIn profile, 2 pages (PL_PROD_12_0118 - 119) | 113 |

QUESTIONS INSTRUCTED NOT TO ANSWER:

| Page | Line |
|---|---|
| 14 | 6 |
| 14 | 13 |
| 72 | 15 |
| 77 | 3 |
| 79 | 3 |
| 83 | 4 |
| 102 | 14 |
| 147 | 16 |

INFORMATION REQUESTED:
(None)

MARKED FOR REFERENCE:
(None)

**Page 8**

Friday, April 17, 2026
1:07 p.m. - 5:00 p.m.

THE STENOGRAPHER:  Good afternoon.  My name is Carrie Gibson, and I'm a California certified shorthand reporter, license number 13937.

The parties participating in this deposition acknowledge that I will be stenographically reporting this proceeding pursuant to the California Code of Civil Procedure, Section No. 2025.310.

Additionally, after the conclusion of the deposition, the transcript will be handled pursuant to the Federal Rules of Civil Procedure, Rule 30.

Mr. Bertolus, please raise your right hand to be sworn.

YANNICK BERTOLUS, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. GJOVIK:

Q.  Mr. Bertolus you have been subpoenaed to today in the case of Ashley Gjovik v. Apple, Inc. in the northern district of California.  I thank you for

Yannick Bertolus

Page 9

attending. My name is Ms. Ashley Gjovik. I was an employee of Apple. I'm a pro se plaintiff. I'm not an attorney. And I'll be deposing you today. These are my first depositions, so bear with me. I'm trying to do my best.

Do you understand now that you -- oh, sorry. We are recording also in the cloud in Zoom, and I will share that video and audio recording with Apple as well and it could be admitted for the trial, if needed.

Do you understand you're being recorded, as well as stenographically recorded?

A. I do.

Q. Okay. Thank you.

And you understand that you have been sworn in and are testifying under oath today, just as if you were testifying in a courtroom before a judge and jury?

A. I do.

Q. Sorry. You're a little muffled too. I'm sorry.

A. I do.

Q. Thank you.

And do you understand that means you're required to give truthful testimony, and that there

Page 10

are penalties for providing false testimony under oath?

A. Yes.

Q. I'm sorry. Do you have a microphone you might be able to move closer to yourself as well?

A. It's just a Mac.

Q. It's just a Mac.

MS. GJOVIK: Ms. Court Reporter, are you hearing him all right, or should we try to troubleshoot a little bit more?

(Discussion off the record.)

BY MS. GJOVIK:

Q. Okay. Is there any reason you cannot give full, honest, and accurate testimony here today?

A. No.

Q. Thank you.

Have you taken any medication, alcohol, or other substance that might affect your ability to understand my questions or give accurate answers today?

A. No.

Q. Are you suffering any illness, injury, or condition that might affect your ability to testify fully and accurately?

A. No.

Page 11

Q. And you see the court reporter there. She's taking down everything that's said today -- every question I ask and every answer you give -- and that's going to be made into a written transcript. Because she can only take down words, I need you to please give me verbal answers. So if your answer is yes, can you please say yes, rather than only nodding your head?

Are you able to do that?

A. Yes.

Q. Thank you.

Along the same lines, please try to let me finish my question before you start your answer, and I'll do my best to let you finish your answer before I ask my next question. That way we don't talk over each other and the court reporter can get a clean record.

Is that fair?

A. That's fair.

Q. Thank you.

If at any point you don't understand a question I ask, I want you to tell me, and I will stop and I will try to rephrase.

Can you do that please?

A. Yes.

Page 12

Q. Thank you.

And is it fair to say that if you answer a question I ask, I'm entitled to assume you understood the question?

A. Yes.

Q. Thank you.

And if you need to take a break at any point to use the restroom or get water or stretch, that's fine. Just let me know. The only thing I ask is if I asked a question, if you can please answer it before the break.

Is that okay?

A. Yes.

Q. Thank you. Okay. So let's get to it.

Did you do anything to prepare for today's deposition?

MS. PERRY: And I'm going to instruct you that you can testify --

MS. GJOVIK: So we can't hear you.

MS. PERRY: I'm going to object, to the extent that this question asks you about anything that you would have discussed with your lawyers.

MS. GJOVIK: Whoever is speaking is very muffled. And also, we cannot see your face. So if you can please identify the speaker, if it's

**Page 13**

Ms. Perry or Perez.

MS. PERRY: It's Ms. Perry. I'm the one who's going to be speaking today.

MS. GJOVIK: Okay.

MS. PERRY: Ms. Court Reporter, can you hear me?

(Discussion off the record.)

MS. PERRY: I made an objection that the witness can testify as to anything he did to prepare that did not involve communicating with his counsel. Anything he did to prepare for this deposition that involved communicating with counsel would be covered by the privilege.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. You can answer.

A. Sorry.

Can you repeat the question again?

Q. Did you do anything to prepare for today's deposition?

A. Based on what my lawyer just said, no. Only -- I only worked with the lawyers.

Q. Okay. Did you review -- without disclosing anything that's privileged, did you review any documents in preparation for today's deposition? Yes

**Page 14**

or no?

A. Yes.

Q. Roughly how many documents did you review?

A. Two or three.

Q. Two or three.

Are you able to share what those documents are?

MS. PERRY: No. I think that you're asking now for privileged information, so I'm going to instruct him not to answer.

MS. GJOVIK: Okay. Okay. Thank you.

BY MS. GJOVIK:

Q. Has anyone told you what to say today?

MS. PERRY: I'm also going to instruct here, to the extent that you're asking for any communications that would involve his counsel.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

Q. Has anyone told you specific answers to provide to specific questions you are asked today?

A. No.

Q. Thank you. So let's start.

Can you tell me about your experience working at Apple? When did you start, when did you leave, and what roles did you hold?

**Page 15**

MS. PERRY: Objection. Overbroad. Compound.

BY MS. GJOVIK:

Q. Okay. You can answer.

A. Do you mind splitting that? I think there were three questions in there. Do you mind splitting them to three separate questions?

Q. Sure.

When did you start working at Apple?

A. I started working at Apple in 2006.

Q. What was your first role at Apple?

A. My first role at Apple was director of iPod software quality assurance.

Q. Okay. And then when did you leave Apple?

A. I left Apple in -- at the end of 2023.

Q. '23.

Did you take a new job or retire?

A. I retired.

Q. Congrats. Sorry again I had to drag you here. Thank you for being here.

During that time you worked at Apple, what roles did you hold?

A. The last role I had was supervising the project managers in hardware engineering, in addition to the communications team, the tools team, the

**Page 16**

learning and development team, and the inclusion and diversity team. Before that, the job I had before was vice president of product integrity.

Q. Was there another job between that and the iPod team you mentioned?

A. The role evolved over the years. But from memory, it went from -- I mean it was an additional -- additional product lines until the product integrity role.

Q. It's kind of my understanding that it kind of emerged from your original role to create the product integrity work, so it was just an ongoing expansion.

Is that kind of a fair characterization?

A. I guess you could -- I mean --

Q. Rather than making you give me 20 different titles for probably essentially what was --

A. Yes.

Q. Let me rephrase.

Since you started at Apple to that role of running product integrity, was your role generally a leadership role for teams that were doing system quality and product integrity work for Apple's products?

MS. PERRY: Objection. Vague and ambiguous.

Yannick Bertolus

Page 17

BY MS. GJOVIK:

Q. How would you describe -- okay. It sounds like your last role, your final role at Apple, was a little bit different than the prior ones.

How would you describe in generalities those prior roles leading up to your role at the -- leading product integrity?

A. So starting with the iPod role, it was mostly software quality assurance that evolved over the years to add some products like iPhone and then iPad and then the Mac before it morphed into the product integrity role that went beyond software.

Q. And were you always working under hardware engineering?

A. The first role was in the iPod division. So that was more than just hardware engineering.

Q. Different organization structure at Apple back then, I guess.

So did you work in multiple Apple -- like, high-level organizations during your time at Apple? Like, software engineering? Hardware engineering?

A. Well, the first one was in the iPod division. After that, it was in hardware engineering.

Q. Okay. Thank you.

Page 18

And what was your -- as of 2021, what was your title?

A. My -- well, the role changed in 2021. So in the first part of 2021, it was the product integrity role. And then toward the end, it was the latter that I mentioned earlier.

Q. When did the role change?

A. I don't recall exactly. I think it was in the fall of '21.

Q. So if you were the one to send my termination email in September, on September 9th, 2021, is it fair to say that you had not changed roles yet at the time you sent that email?

A. I had not changed roles yet.

Q. Okay. So some point after September 9th, 2021, you then changed roles and moved into your -- the final role you had at Apple; is that right?

A. (Nonverbal response.)

Q. What was your title in the final role?

A. I'm sorry.

In the last role?

Q. Yeah.

A. I don't remember exactly. I think broadly, it was vice president of hardware engineering.

Q. How large was your organization that you led

Page 19

when you were leading product integrity as of 2021?

A. I don't remember exactly the number of employees. But it was under 2,000, I believe.

Q. And then how large was your organization in the final role?

A. Again, I don't remember exactly the number. A few hundred. Under a thousand.

Q. Okay. Can you tell me about the changing of your role at some point after September 2021? Were you asked to change roles? Did you ask to change roles?

How did that come about?

MS. PERRY: Objection. Vague and ambiguous. Overbroad.

MS. GJOVIK: I'm sorry.

Can you say it again?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

BY MS. GJOVIK:

Q. Mr. Bertolus, why did you change roles in 2021?

A. I had found a great successor to take over the role since I was already planning to retire. And an opportunity came up when another vice president retired, and so I took that role.

Page 20

Q. Thank you.

Who was the person to replace you running product integrity?

A. Tom Marieb.

Q. And who was the person that left that you replaced in the final role?

A. Loretta Grow [phonetic].

Q. I didn't know she retired. Good for her.

Okay. And where do you currently reside? Like, generally? Like, a city and state?

A. State of California, county of Monterey, city of Carmel.

Q. That sounds lovely. Congratulations.

And can you tell me a little about your educational background?

A. I have a master's in physics and a postgrad degree in instrumentation technology.

Q. Thank you.

And you worked at Palm prior to Apple; is that correct?

A. I -- my last job before Apple was Palm, yes.

Q. How long ago did you work at Palm?

A. I worked at Palm from 1997 to 2002, and then from 2005 to 2006.

Q. What kind of roles did you hold at Palm?

Yannick Bertolus

Page 21

A. The roles changed over the years.

Do you want to know my last role?

Q. Sure. Your last role, please.

A. My last role was director of software quality assurance.

Q. Thank you.

When -- so I'm going to ask you questions about your role at Apple. And I'm going to be specific for the time period from, let's say, January of 2021 through September of 2021. So I'm going to be targeting kind of the state of product integrity at that time and your role leading that. If I ask a question that's broad and you want me to narrow to make sure that I'm targeting that time frame, let me know, please.

So during that time, who did you report to?

A. During the time you brought up, which was basically the first nine months or so of 2021, I was reporting to John Turnis.

Q. John Turnis.

What was John Turnis's title?

MS. PERRY: Objection. Vague and ambiguous.

MS. GJOVIK: I can't hear you.

MS. PERRY: Objection. Vague and ambiguous.

///

Page 22

BY MS. GJOVIK:

Q. What is John Turnis's job title at Apple as of January 2021 through September 2021?

A. John, during that time, was senior vice president of hardware engineering.

Q. Thank you.

And at that time, who did John Turnis report to?

A. During that time, John reported to Tim Cook.

Q. And what is Tim Cook's title?

A. The CEO of Apple.

Q. Thank you.

And did a person named Dan West report to you during that time?

A. Yes.

Q. What was Dan's title at that time?

A. Dan was a senior director of software quality assurance.

Q. Product system quality.

A. Okay.

Q. Whatever the -- that's fine. There's a bunch of different names, so that's fine.

What was -- how about what was your understanding of Dan West's scope of his organization during that time?

Page 23

A. Dan's role has changed over the years, so I want to make sure that -- it's a long time ago. I could be mistaken. Let me think a minute, because I want to make sure that it's during that period.

Q. I can also give you a hint of what organization I thought I worked in.

At that time, I believe that I worked --

A. Go ahead.

Q. -- at an organization called product system quality.

A. Okay. PSQ okay.

Q. Yeah.

So --

A. He was running PSQ?

Q. That's where I believe I worked under Dan West.

So given that hint, can you describe your understanding of what Dan West's scope of his organization was at that time?

A. Broadly, his role was making sure on the areas he was responsible for that the software behaved as expected.

Q. And that was for all products, or just some?

A. I don't remember exactly which products he was -- or exactly which functions he was in charge

Page 24

of. But typically, hardware products, yes.

Q. Sorry. This was a long time ago, and there's a lot of change.

Just -- it was my understanding that we're responsible for all products, the whole product line, with the product system quality. But I know that there was a lot of expansion of merchant and renaming of everything basically every year.

And do you recall a director named David Powers in your organization?

A. I do.

Q. Okay. Do you recall what David Powers' job role was during that time period I mentioned?

A. He was running one of the teams under Dan.

Q. During that time period, do you recall having any engineering project managers or program managers within your organization?

A. Yes.

Q. About how many?

A. I don't remember.

Q. Do you recall how many Dan West had in his organization during that time period?

A. I don't.

Q. Do you recall me working in your organization?

Yannick Bertolus

Page 25

A. I do.

Q. Do you recall the time period when I worked in your organization?

A. No, I don't. I could be wrong, but --

Q. I'd prefer you don't make any, like, guesses.

A. Yeah. Yeah. That's fine. Yeah.

Q. That's okay.

So I believe I joined your organization in January 2017. And I come from software engineering, where I was running early field failure analysis.

Do you recall ever working with me when I was in software engineering in the early field failure analysis role?

A. I don't remember precisely, no.

Q. That's fine.

Do you recall being involved in the decision to hire me to your organization?

A. Yes.

Q. What do you recall?

A. The only thing I recall is that I was approving every single offer coming to my organization. So if you came in to work into my organization, I was part of the decision process.

Q. Do you recall there being other engineering

Page 26

project managers or program managers prior to my role in Dan West's organization?

A. I don't.

Q. If my role was a new role type that was the first EPM at Apple, is that something that you generally would approve, the creation of a new role type?

MS. PERRY: Objection, to the extent it calls for speculation. Lacks foundation.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. You can answer.

A. I'm sorry.

What?

Q. If a new role type was created, as if I was the first EPM to work in product systems quality, would that be -- would you be involved in approving the creation of a new role type such as that?

A. Yes.

Q. Do you recall anything about creating that new role type?

A. I don't really have recollection of the details of that, no.

Q. It's a trick question. Dan said he snuck it by you. It's in some of the emails.

Page 27

Do you recall my reporting structure during the time period I mentioned?

A. The one thing I remember is that in 2021, you were reporting to David Powers.

Q. Could you speak up, sir.

A. Sorry.

In 2021, you were reporting to David Powers.

Q. What time period would you say that you recall holding your -- the role of senior vice president or vice president of a role like product integrity? Like, what would be the duration of years that -- I want to hone in on your role at that time period I mentioned, but at that full duration of when you were in a role most resembling that, even though I know there was an of renames of organizations.

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

BY MS. GJOVIK:

Q. Can you please share what the time period was that you held the role of VP or senior VP of product integrity or a similar role with a different organizational title?

A. Product integrity, I think the role was created -- and I don't like saying "I think" -- 2013

Page 28

is what comes to mind. But I don't remember precisely.

Q. So that would be 2013 to 2021?

A. Yes.

Q. Did the organization grow in size over time?

A. Yes, it did.

Q. How -- what was the -- do you recall what the size was when it started? How many people?

A. I don't.

Q. And as of that time period that I mentioned in 2021, do you have an estimate of how many people were in that organization?

A. I don't for 2021. I mentioned earlier roughly the number I think when I left it.

I think under 2,000.

Q. Under 2,000. Okay.

During the time period that you were holding that role that you mentioned, how often were employees involuntary terminated in your organization?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

Q. During that time period, how many employees

Page 29

do you recall were involuntarily terminated from your organization?

MS. PERRY: Same objections.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. You can answer.

A. I don't remember the exact name -- or number. Sorry.

Q. Do you think it's over a hundred?

MS. PERRY: Objection, to the extent it calls for speculation.

BY MS. GJOVIK:

Q. Do you recall -- how many specific examples of involuntarily terminations during that time period could you recall right now?

A. It would be a guess.

Q. I could give you, like, a minute just to think through it. I'm looking for, like, how many names could you get in your head right now, thinking back of how many involuntary terminations there were. And if you -- if you have none, you can't think of any names, then I'd like that answer.

A. Between 2013 and 2021, I don't remember them.

Q. Do you remember my involuntary termination?

Page 30

A. Yes, I do.

Q. So the one you remember would be mine?

MS. PERRY: Objection, to the extent it misstates testimony.

BY MS. GJOVIK:

Q. So you said you don't remember any, but then you said you remember mine.

So can you please clarify, Mr. Bertolus, how many involuntary terminations do you remember occurring in your organization during that time period?

MS. PERRY: Objection. Misstates testimony.

BY MS. GJOVIK:

Q. Mr. Bertolus, can you please clarify again how many involuntary terminations you remember occurring in your organization during that time period?

A. I remember your termination. But I couldn't tell you about others.

Q. Okay. Thank you.

I will say their objections make me ask better questions eventually. So I think that's actually -- we do our little dances. We go through that. Thank you for your patience as I worked through that.

Page 31

Q. Mr. Bertolus, do you recall any standard process or policies when an employee was to be involuntary terminated in your organization?

A. I'm sorry.

Can you repeat the question, please?

Q. When there was going to be an involuntary -- okay. I'm sorry. Let me step back.

Now I'm going to ask about the time period that we talked about in 2021. So January to August 2021, do you recall any standard process within Apple that you and your organization were to follow if you needed to involuntarily terminate an employee?

MS. PERRY: Objection, to the extent it lacks foundation.

MS. GJOVIK: He fired me.

BY MS. GJOVIK:

Q. Please answer.

A. Okay. Sorry.

Repeat the question again.

Q. During that time period mentioned, do you recall any standard process or protocol that you were to follow within Apple if an employee needed to be involuntarily terminated within your organization?

A. Typically -- it really depends of -- of the

Page 32

case.

Do you have -- do you have more --

Q. Yeah.

A. Do you want to talk about your case, or just in general? That's the part I'm confused by.

Q. How about for my termination, I feel like -- Apple, I don't think, has actually clarified this directly -- but it was one of the -- like, the immediate terminations. It feels like there's a couple of buckets of, like, putting employees on performance plans versus kind of an immediate termination.

So if we hone in on, like, that kind of category of an -- an employee's just getting fired immediately without being put on some kind of, like, development plan, is there any kind of Apple policies you recollect or protocols or expected process of who to engage or what to do if you need to, like, immediately fire an employee?

A. Okay. So in your case, there was a clear violation of your confidentiality and intellectual property agreement that prompted the -- and that was so egregious that it prompted the termination right away.

Q. Thank you. But that was not the question I

Page 33

asked.

I meant generally, like, a published policy or an HR protocol to follow.

A. The two cases I think you are bringing up is if an employee has performance problem, it's treated differently from when an employee is at fault for an egregious violation of a policy.

Q. Okay. So yeah. And I was -- and I said let's talk about the immediate termination category. So you're describing what sounds like an example of that.

Can you recall any kind of, like, Apple management policies or HR protocols that you were -- managers were expected to follow if an involuntary termination needed to occur in that category?

A. So in your case, I saw examples of -- of what you leaked both on social media and also in articles in the press, and that prompted the termination.

Does that answer your question?

Q. It still does not. I was going to ask you that stuff later, so you're answering ahead of time, which thank you for that.

But I'm still asking if there's, like, a generalized policy or generalized protocol, not

Page 34

specific to me.

A. I don't recall a specific policy. I mean, it's -- there is not.

Q. Okay. And then is it fair to say you understand that category of terminations I'm kind of speaking about, to, like, just immediately fire the employee, versus putting them on, like, some kind of development plan?

A. I do.

Q. Thank you.

Is there, like, a term that Apple managers would use for that category of the immediate firings?

A. The word that comes to mind is termination for fault.

Q. Okay. I don't know. I haven't seen it. But that -- we'll just -- termination for fault, we can use to make sure that I don't have to say the whole gobbledygook. And we'll just use that, it that's okay.

For a termination for fault, do you recall if there are published policies and expectations that someone would have to point to something that was violated in a specific policy to justify that allegation of fault?

MS. PERRY: Objection. Vague. Ambiguous.

Page 35

Overbroad.

MS. GJOVIK: Let me withdraw and try again.

BY MS. GJOVIK:

Q. Mr. Bertolus, for those terminations for fault for employee fault, can you explain -- can you share what you recall about how Apple would determine if an employee was at fault as to justify a termination at fault?

MS. PERRY: Same objections.

MS. GJOVIK: I can't hear you if you objected. I heard a whisper.

MS. PERRY: Same objections.

MS. GJOVIK: Thank you.

THE DEPONENT: We have -- Apple has policies. And when those are violated, then it can lead to termination. And that's the way those are typically phrased.

BY MS. GJOVIK:

Q. Can you clarify, does that mean, like, any Apple policies, if an employee was to violate any terms in any policy, they could be found at fault, justifying immediate termination?

A. Again, your question is fairly broad.

But if we take the example of your termination, there was a clear violation of your

Page 36

confidentiality agreement when you posted product-related information on Twitter, in addition to others. But in this case, a violation of your confidentiality agreement. And if you read that policy that you signed when you started at Apple, it clearly explains that if you violate that policy, you could be terminated.

Q. Okay. Again, you're testifying to my future questions. So that's still relevant. Thank you for answering. But I'm skill asking more generally. And maybe the answer is just no, there's no clear guide of certain policy terms would be considered at fault, justifying immediate termination, and others would not. That's what I'm trying to figure out.

Is there any guide, like, managers of which Apple policies and which terms in those policies would justify the termination for fault?

A. I'm not sure I totally under the question.

If there are policies, those policies are explaining what is expected behavior. And it spells out clearly in there that if there is a violation of that policy, it would be grounds for termination.

Q. Okay. So would you say that it's up to the discretion of the functional leader or HR to just decide if a violation -- if they find that there's a

Yannick Bertolus

Page 37

violation of any Apple policy, it's discretionary for them to decide if it justifies termination for fault?

A. Well, at the end of the day, there is a decision that has to be made. In this case, for you, I made the decision that there was a clear violation of the policy that deserved termination.

Q. Okay. Thank you. I'm still asking more generally, though. And I know you said I'm the only one that you remember, so maybe that's why you keep referencing it.

But I know that -- I remember seeing a lot of, like, HR trainings and manager trainings about this stuff. So I'm just really trying to figure out if Apple just left involuntary terminations up to a very discretionary process or if there was kind of, like, a narrow list of what specific types of violations would properly justify a termination.

So, Mr. Bertolus, is it your understanding that any Apple policy -- like, on the Apple Web, Internet, the IPA -- anything that Apple said is a policy and is required by employees, if an employee was to violate any term in any of those policies, it could potentially justify a termination by fault of the employee?

A. That's pretty vague. I'm sorry.

Page 38

Q. I guess I'm looking for a yes-or-no on that.

MS. PERRY: I think he just told you he doesn't understand your question and it's vague.

MS. GJOVIK: Okay.

MS. PERRY: Do you want to try again?

BY MS. GJOVIK:

Q. Maybe we lean into what you were talking about for mine as a concrete example. You mentioned I violated Apple policies.

Can you -- do you recall which policies that you determined that I violated, specifically by name?

A. Yes. You violated the confidentiality and intellectual property agreement. You also violated the business conduct. There is some others. I don't remember the exact name. But posting on social media. I can't remember the name. A couple around communications. So, you know, there were many. But the two obviously that you violated were the confidentiality agreement and the business conduct.

Q. Okay. And I think this might be a more productive way to do it. We're actually digging in on some actual policies now.

Do you recall which terms in the intellectual property agreement you determined were violated?

Page 39

A. I would need to look at it exactly. But you basically posted on Twitter product-related information. It was also an internal tool, so it's a trade secret. So there were -- that was very egregious.

In addition to that, you failed to cooperate with the investigators, which is a violation of the business conduct. You also misled the ER investigation when they were looking into some workplace concerns that you brought up. So all of that made it very egregious and grounds for termination.

Q. Okay. So the business conduct policy -- I'm sorry. Can you say which specific portions of the business -- it's very long.

Which portions were violated?

A. I wouldn't -- I'd like to reread it again, if you really want me to spell out an excerpt.

Q. I'm sorry. Go ahead.

A. No, that's it.

Q. Okay. If -- I was planning on offering a break at, like, 2:00. We can take a 10:00 p.m., and I can go -- or a 10-minute, and I can go dig up those policies you mentioned and we can look at them together, if that's okay, so you're not just

Page 40

speculating.

A. Yeah, that's okay.

Q. Okay. Sounds good. And then -- so business conduct.

And you said social media too; is that right?

A. Yeah. I would need to -- again, I don't remember the exact title of the policy.

Q. Okay. What do you recall about the policy terms that were violated for the policies you don't remember the name of the policies?

A. A lot of those were kind of covering what was in the confidentiality agreement. Basically, you posted confidential information online.

Q. So that would be, like, the Apple confidentiality policy too, maybe? Like, they kind of had a freestanding what is confidential?

A. Yeah. That's the first one I listed, yeah.

Q. Okay. And you said didn't cooperate with an investigation.

What policy is that?

A. You just said you're going to show them to me. Again, I could be speculating. I mean, maybe it's in the code of conduct.

Q. Oh, I'm sorry. I'm trying to figure out

Page 41

which ones to find for you to look at.

A. Code of conduct.

Q. Okay.

A. Business conduct and the confidentiality agreement.

Q. And there was a stand-alone social media policy. Were you thinking of that, or the subsection in the business conduct policy?

A. I was thinking of, yeah, additional -- those two or three additional policies, yeah.

Q. Yeah. So I have those in a folder I can grab too. There's a social media one and there's a talking to press one. I think you mentioned talking to press. I can get that one, and you can look at it and see if that helps your recollection.

A. Okay.

Q. Okay. Social media, press. And you said something about misleading investigations.

Do you remember what -- is that business conduct or a different policy?

A. Business conduct.

Q. Business conduct. And you said something about trade secrets.

So is that intellectual property agreement?

A. It's in there for sure. I believe it shows

Page 42

up in others as well.

Q. Okay. I'll try to -- I'll look for the main confidentiality one from 2021 as well. Thank you. So we can come back to those.

Okay. Mr. Bertolus, do you recall during the period of let's say January 2019 to September 2021 -- just give a shorter time period of your role in product integrity -- do you recall any employees that worked in your organization suing Apple, alleging retaliation or discrimination?

A. I don't recall.

Q. Do you recall any employees filing charges or complaints with government agencies about labor or employment complaints during the time that they worked at your organization?

A. I don't remember.

Q. During that time period, do you recall employees making complaints that triggered employee relations investigations into the employees' complaints when they worked in your organization?

A. Yes.

Q. Thank you.

Do you remember roughly how many?

A. I don't remember how many.

Q. How many specific examples can you recall by

Page 43

name?

A. I remember that you did, but I don't remember others from memory.

Q. Okay. Do you recall -- during the -- okay. Let's go to the time period of January 2021 and September 2021 in your role.

Do you recall roughly how many offices you had teams working in in Santa Clara County, with, like, dedicated labs or desks?

A. I don't remember exactly. I can try to list them in my head if it helps you, but I might forget some.

Q. Do you recall the building at 825 Stewart Drive?

A. I don't remember the exact address. But I remember a building on that street, yes.

Q. Was it called Stewart 1?

A. Maybe.

Q. What do you recall about that building?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: He said he recalled a building on that street, and I asked him what he recalled about it.

MS. PERRY: Yes. That's vague. Ambiguous.

Page 44

And overbroad.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. You can answer.

A. That was a building occupied by PSQ.

Q. Okay. So I believe you are talking about 825 Stewart Drive.

If it helps to -- did you ever visit this building on Stewart Drive that you remember?

A. I did.

Q. So if I was to get a picture, maybe, of the front of it, would it maybe help you recall and confirm that's the building you're thinking of?

A. I mean, I remember a building next to the Lowe's and Planet Granite. I believe that's the building you're referring to.

Q. It is.

I'm referring to the one -- it's a -- was it a two-story? And you walk up, and there's a big glass front. And you walk in, and there's a very tall lobby and a stairway that goes back. And then there was another hardware team straight back. But if you took a right, then you had David Powers' and Dan West's team. And they moved in, I believe, around 2015, 2016.

Page 45

Does that sound right to you?

A. I don't remember the dates they moved in. I do remember your description of the building, yes.

Q. Okay. So we're probably talking about this Stewart 1 building, where my desk was assigned?

A. I don't know where your desk was. But I do remember that building, yes.

Q. Okay. Thank you.

Were you aware that that building was on a federal EPA Superfund site?

A. Yes.

Q. When did you become aware of that?

A. I became aware of that when you raised concerns about it.

Q. Okay. Interesting.

So just to confirm, you were not involved, then, with any of the renovations or preparing the building for product system quality to move in in 2015, where it required stuff related to the hazardous waste cleanup site; correct?

A. I don't remember, no.

Q. Okay. To your recollection, did you have any other teams working on buildings that were also on federal Superfund sites?

A. Yes.

Page 46

Q. Do you recall which buildings?

A. I don't remember if that was the number. But on Tantau, right across from Apple Park. I believe it was Tantau, but I could be wrong.

Q. Yes. That was -- and that was -- Intersil Siemens Superfund Site, is my understanding of what that one was.

A. I don't remember the specific technicality. I just remember at the time, it was --

Q. When you were -- sorry.

MS. PERRY: Hold on. Hold on. Let him finish his answers, please.

MS. GJOVIK: Yeah.

BY MS. GJOVIK:

Q. Go ahead.

A. I remember at the time where we moved to that building -- but I don't remember the dates -- that I had been told it was a Superfund site.

Q. So for that one, you were told when the team moved in; is that correct?

A. Yes.

Q. To your recollection, did any other close employees in your organization make complaints about working at hazardous waste cleanup sites?

A. I don't remember complaints. No, I don't

Page 47

remember complaints.

Q. To your recollection, did you receive any questions about your teams working on hazardous waste cleanup sites?

A. I don't remember those specifics. I just remember it was a Superfund, because that's the first time I had ever heard the term. And I was seating myself in the building with no concerns whatever.

Q. Okay. Oh, so you do recall being in that building?

A. In Tantau, yes, I was there for -- I can't remember which period. It was while my office was there, yes.

Q. Oh, but not the Stewart Drive one?

A. No. No. No. Not the Stewart Drive. I'm talking about Tantau, which was the only one that I knew about that classification.

Q. Okay. Thank you.

And then do you have any recollection of an Apple building at 3250 Scott Boulevard in Santa Clara, known as Scott 1?

A. No, I don't remember that.

Q. To your recollection, during, let's say, the time period 20- -- January 2018 to September 2021, were any of your teams working on silicon bring-up

Page 48

activities?

A. I don't know about the exact dates you mentioned. But over the course of my career at Apple, some of the functions were silicon bring-up.

Q. Thank you.

As part of that, if there was bring-up validation occurring on site, would your employees sometimes go to the labs where that was occurring?

MS. PERRY: Objection. Vague and ambiguous. Lacks foundation.

BY MS. GJOVIK:

Q. Do you recall any examples where your team -- your employees or teams would visit labs in Santa Clara County where Apple was doing physical silicone bring-up validation activities?

A. I don't remember.

Q. Okay. What about prototyping of silicone? Same question.

A. Yeah, I don't remember either.

Q. Okay. Mr. Bertolus, are you aware of the US EPA enforcement action at the Scott 1 site?

A. No.

Q. Mr. Bertolus, are you aware of my complaints that I got very sick from what I thought was chemical exposure in 2020?

Yannick Bertolus

Page 49

A. Can you repeat the question?

Q. Are you aware that, in 2020, I complained I got very sick from what I thought was chemical exposure?

A. Yes, I do.

Q. Okay. Are you aware that in 2023, when I discovered the building at Scott 1, that I then asserted and sued Apple, alleging that they were the ones that made me sick from chemical exposure in 2020?

A. No.

Q. Are you aware that Apple was fined and had to enter a consent agreement with the federal EPA, due to hazardous waste violations at that facility, at Scott 1?

MS. PERRY: Objection, to the extent it lacks foundation.

MS. GJOVIK: I'm asking him now. But I can go get the consent agreement while I'm getting my policies too.

BY MS. GJOVIK:

Q. Are you aware generally? It was in the press.

A. No.

Q. Okay. Thank you.

Page 50

MS. GJOVIK: Okay. On that, it's okay if we take maybe ten minutes. I'll go look for those policies, and I'd like to get a little something to eat too.

Is ten minutes okay for everyone to take a break?

MS. PERRY: Yes. I think you also want to look for the misconduct policy.

MS. GJOVIK: Speaking objection. He didn't say that one.

MS. PERRY: There's no question pending on the record at all, so it's not a speaking objection.

I'm just informing you that if you're looking for policies --

MS. GJOVIK: Leading the witness.

If he didn't mention it, then why would I grab it?

MS. PERRY: You said you wanted to get the policies. I'm telling you what policies you may want to get if you want to -- it's up to you. You can pick whatever you want.

MS. GJOVIK: They're very good lawyers, Mr. Bertolus. They're paying them so much money, and they're so talented.

If he does not recall that policy and he

Page 51

then signs off on the other ones saying that other one wasn't involved but Apple's lawyers said that that was the one, that shows pretext.

So what she's doing is trying to lead you and me to feed you something that helps their stated justification.

So, Ms. Court Reporter, can we confirm that was still on the record, please, what she just did -- what she said?

THE STENOGRAPHER: We're on the record, yes.

MS. GJOVIK: Yes. Thank you.

But I will get it --

THE DEPONENT: I think I mentioned five policies total. I just didn't remember the name. Maybe the court reporter can bring that up. But I'm pretty sure I said five.

MS. GJOVIK: It will be on the record.

I'll get it. We can look at it. I just don't like it when they do that sneaky stuff. They earn their money, though.

Okay. So 10 minutes. We can come back at 2:10.

Sound good?

THE DEPONENT: Okay. Thank you.

MS. GJOVIK: Thanks.

Page 52

(Off the record from 2:00 p.m. to 2:14 p.m.)

MS. GJOVIK: Back on the record.

I added the additional exhibits into the Google Drive folder I shared earlier.

BY MS. GJOVIK:

Q. And actually, there was a -- you were already volunteering such information that led me to fail to show you a couple things to authenticate. So I'd like to actually go back to those really quickly too, if we may.

Can you see my screen?

A. No. I just see black here.

Q. Okay. Can you see my screen now?

A. No, it's still -- oh, yeah. Now we do.

Q. Okay. So first, just to validate the role you held, I had grabbed your LinkedIn prior. I just want to confirm that this looks accurate, that this looks like your LinkedIn profile. And it's two pages. I can scroll down.

A. Yeah, except I don't have my reading glasses. So hold on.

Q. I'm sorry.

Say it again.

A. I don't have my reading glasses, so -- and

Page 53

your screen is very small.

Q. Oh, let me make it bigger. And then once you read the top of the page, I can then scroll down to the bottom one. Sorry about that.

A. Okay. I'll let you know when you can start scrolling.

Q. Okay.

A. Okay. I'm going to do some math here.

So sorry. 15 years and 3 months, how did you get that? That's what period? 2006 to --

Q. I believe this was 2022.

A. Okay. But why did you stop it in '22?

Q. Oh, because I had grabbed this prior. And then I can't see your profile anymore. I think you might have blocked me on linked.

So just for the record, the date -- the duration, where it says "to present" and the 15 years, as you're saying, this is not current to today.

A. Yeah.

Q. So I'm not asking you to validate that timing.

I'm just asking you to validate that as of, I believe, 2022, 2023 -- or that at some point, this was an accurate representation of your work

Page 54

experience that you published on LinkedIn.

A. Okay. Go ahead and scroll.

So yeah, that's -- I think that's what's on LinkedIn, yeah.

Q. Okay. And then I also want to show you -- this was a letter I received from you via email on September 9.

I'd like you to look at it and tell me if you recall sending me this letter on September 9, 2021.

A. Can you zoom in, please?

Q. Yeah. I'm so sorry.

Is that big enough, or do you need bigger?

A. No. No. That's good. Thank you.

Q. Okay.

A. I can't confirm the employee ID. I can't confirm your address.

And you can scroll, please. Okay. You can scroll.

Yeah. I mean, I would need to compare word-for-word. But yeah, that looks like what I sent at the time.

Q. Okay. Thank you.

Did you write this letter?

A. No, I did not.

Page 55

Q. Do you know who Mr. Aleks Kagramanov is?

A. No, I don't.

Q. Okay. Do you recall who ended up contacting me to arrange me shipping my devices back to Apple?

A. No, I don't.

Q. It was your administrative assistant, Lisa.

Do you recall ever hearing complaints that -- or sorry. Let me back up.

Do you recall who gathered my possessions up at my desk in my office and mailed them back to me?

A. No, I don't.

Q. When an employee in your organization is terminated involuntarily, who would typically be leading the effort to gather their possessions and send them back to them?

A. It's -- it depends case-by-case.

Q. Do you recall ever hearing a complaint from me that my stuff arrived broken and covered in glass shards?

A. No.

Q. Okay. And then you didn't write this, so you can't confirm -- let me see if there's anything else I want to ask.

The letter says:

"Your access to Apple systems has

Page 56

been suspended as of today."

Did you order the suspension of Apple systems?

A. It's part of the process that was followed for your termination.

Q. Can you tell me more about what the process for these terminations entails?

A. That's a broad question.

Do you want something more specific?

Q. Yeah. Let's see.

You said that the suspension of systems is part of the process. And I had asked earlier if there was any kind of process, and I don't feel like I got an answer on that. So I'm trying to drill in a little bit of if there might be some process.

So to your recollection, if an employee is abruptly terminated, is there any kind of, like, checklist or process for at least offboarding them from systems to send their stuff back?

A. Well, I don't -- I don't recall exactly who does what. You would need to talk to the people who do those things, in terms of, you know, what exactly needs to be done in what order.

Q. Okay. Do you have any awareness of anyone trying to call my phone that day or within three days

Yannick Bertolus

Page 57

after the termination from Apple from a blocked number?

A. Sorry --

Q. Sorry. I'm going to withdraw that one. I'm not going to get a good answer on that anyway.

Okay. I want to get that email that you sent. And I apologize again. I'm new to these depositions. And it's much harder than EPM, where you can just ask people, like, "What's going on with your project?" I'm learning.

Okay. So you -- I received an email from you on September 9th. This was produced by Apple. They messed up the time codes. It says September 10th, but with a weird time zone.

Do you recall sending me an email on September 9th, 2021, that looked like this?

A. It says Friday --

Q. The time zones -- Apple's lawyers messed up the time zones when they produced this stuff.

A. So I don't remember the exact date. I mean, I'm confused. Because here, I see the 10th. You're telling me it's the 9th. I do remember sending you an email to notify you of your termination.

Q. Yeah, I'm sorry. They messed up those time zones, so it shifts the thing.

Page 58

But does this look like the email that you sent either on September 9th or September 10th?

A. Well, can you show me the whole email? I just see --

Q. That's the whole email. It just had that letter attached.

A. Okay. So sorry.

Your question is?

Q. Do you recall sending this email?

A. Yes, I do.

Q. Okay. Thank you.

Did you write this email?

A. I believe I got a draft. But I -- you know, of course, before I sent it, I made sure that I was agreeing with the content and it was what I would say.

Q. I can show you that draft if you give me a second, and then you can validate that.

This is a document produced to me by Apple through the litigation. This was an email from Megan Bowman to yourself. Sorry. Again, they messed up the times. So my understanding is this is September 9th. But September 9th or September 10th.

Do you remember this email exchange with Megan Bowman?

Page 59

A. I'm going to want to read it, please.

Q. Do you want it bigger?

A. Yeah, a little bit bigger won't hurt. Yeah. Thank you.

Okay. Do you mind scrolling, please? Okay. Can you scroll, please? Thank you. Can you scroll, please? Please scroll. That's a repeat what was earlier.

Okay.

Q. That's it.

Did you recall that email exchange?

A. Yes.

Q. And who is Megan Bowman?

A. Megan Bowman was in HR in hardware engineering.

Q. Okay. And did you have other conversations with Ms. Bowman about the investigation into me?

A. I'm surprised the lawyers are not jumping in. Because I assume that lawyers were present, and it was confidential.

Q. She's not a lawyer, though. Ms. Bowman is not a lawyer, I don't believe.

A. But there were probably lawyers.

I don't recall --

MS. PERRY: Hold on.

Page 60

Are you -- hold on one second. Because I need to determine if he has any nonprivileged information.

Can we take a brief moment off the record, so I can determine that?

MS. GJOVIK: She's -- is Ms. Bowman a lawyer?

MS. PERRY: It doesn't matter whether Ms. Bowman is a lawyer. If he had communications with Ms. Bowman with counsel, that is potentially privileged. So I want to ask him about what he's referring to --

MS. GJOVIK: Can he --

MS. PERRY: -- to determine whether there was -- this is a privileged conversation.

MS. GJOVIK: We agreed at the beginning he'd answer the questions. So mine was just a yes-or-no.

So we can do a yes-or-no, and then give you a couple minutes before I ask any follow-ups, if that's okay.

MS. PERRY: Are you able to answer this question without seeking legal advice from me?

THE DEPONENT: I'd rather get legal advice.

MS. PERRY: Okay. So we're going to go off the record a second, so I can -- so he can ask me

Page 61

what he wants to ask me.

MS. GJOVIK: Two minutes?

MS. PERRY: Sure.

MS. GJOVIK: Okay.

(Off the record from 2:29 p.m. to 2:32 p.m.)

MS. GJOVIK: Back on the record.

BY MS. GJOVIK:

Q. Did you have any other conversations with Ms. Bowman about the investigation into me, other than the email I showed you?

A. Yes. I had many conversations with Megan that day, many of them with legal present. That's why I was a little confused here.

Yes, I -- I discussed the -- I discussed this beforehand. Yes.

Q. Okay. Is there anything about this conversation that you can share that's not privileged?

MS. PERRY: Sorry. I want to instruct you here only to disclose in response to that question any conversations that you had with Megan where lawyers were not present.

THE DEPONENT: I believe at the time that the -- basically, Megan briefed me on the fact that

Page 62

you failed to participate in -- in the investigation after, and that basically she was going to send me that email that she presented to me.

BY MS. GJOVIK:

Q. Okay. And you mentioned something else about -- it sounds like the -- there's a few investigations going on. There's the investigation -- at least two into me.

Can you specify -- it sounds like you're talking about one of the investigations into me. Can you specify the scope of that one?

A. I'm not sure what you're referring to. The discussions I had that day were about the fact that you leaked the information on Twitter and failed to participate in the investigation.

Q. Yeah, the failed to participate in the investigation. And you had mentioned some stuff earlier, providing misleading information and some other stuff. So there were also investigations into my concerns that employee relations was doing.

Were you referring to those investigations, or just the investigation into me that you mentioned about leaking on Twitter?

A. The -- do you mind breaking down -- sorry. It just -- like, it felt like I get a few questions.

Page 63

Do you mind breaking down the question?

Q. Yeah. And I apologize. Because I'm also trying to sort out all of the things that were happening, and Apple's not being super transparent about it. So -- actually, if we might just take a step back, then. Let's start at the early part.

Mr. Bertolus, do you remember the earliest you became aware that I was raising complaints and concerns about Apple and work conditions at Apple in 2021?

A. I don't remember the specific day. But I believe it was many months. And you said 2021. I don't remember the specific date. But it was many months before you leaked the product information on Twitter.

Q. Do you recall anything about those complaints I was making?

A. What I do remember -- and you brought it up earlier -- were your concerns about the site. And after that, there were, I think, concerns you raised about David Powers and Dan West.

Q. Anything more specific than just worried?

A. No. Because as a general rule, I don't want to get involved. I want to let HR do their work, to avoid any conflict of interest.

Page 64

Q. Do you recall who was leading those investigations into my complaints?

A. I don't.

Q. Do you recall any kind of outcome of those investigations?

MS. PERRY: And I'm just going to instruct you here to the extent that you were updated on the outcome that would have been -- to the extent that you were updated on the outcome in a privileged context, I don't want you to disclose.

MS. GJOVIK: Speaking objection. He has not said whether or not he was updated on any outcome. You just fed that to him. I object to that.

MS. PERRY: You just asked the question. That was the question you asked.

MS. GJOVIK: I said what does he -- does he recall anything, and you said "to the extent you were updated," Ms. Perry.

MS. PERRY: No, that's not -- no --

MS. GJOVIK: Anyway, we can sort that out later.

BY MS. GJOVIK:

Q. Mr. Bertolus would you please answer?

MS. PERRY: So again --

Madam Court Reporter, would you please read

Yannick Bertolus

Page 65

the question back?

(Record read back as follows:

"Q. Do you recall any kind of outcome of those investigations?")

MS. PERRY: Okay. So to the extent that you were -- that any outcomes of the investigations were conveyed to you in a privileged setting, I want you to be careful not to disclose that.

BY MS. GJOVIK:

Q. Can you answer, please?

A. I'm going to follow the advice of -- of legal here.

Q. Okay. So I think why she just did that is that you indicated you tried to separate from -- you don't want to be involved. But we had an employee relations investigator be deposed who said that he was giving you updates. So I think that's why they -- that would be my guess. And that's just me -- commentary. That's not a question for you. But I understand you're passing on that one.

Okay. So do you recall around the time when you were made aware there was an investigation into me?

A. Sorry. Repeat the question. Sorry.

Q. Yeah. Do you remember the time -- like,

Page 66

month, at least -- of when you were made aware there was an Apple investigation into me, into my conduct?

A. Yeah. As I answered, I think a few -- a minute or so ago, I -- it was many months. I don't remember exactly the date.

Q. September or August or earlier?

No recollection?

A. I thought it was many months, not just a month or two.

You're referring to which investigation?

Q. The investigation into my conduct. So me being bad. Apple saying, "Ashley's being bad. We're looking into it."

Do you remember the temporal --

A. Well, yeah --

MS. PERRY: Objection, to the extent it lacks foundation.

Go ahead.

THE DEPONENT: Yeah, I think you're putting words in my mouth here, or you're putting words in Apple's mouth.

All I -- what I referred to earlier where I was made aware that you had concerns about the building and after -- and I don't know exactly when it was. Earlier in 2021. And that you raised some

Page 67

concerns about David Powers and Dan West, and that those were being looked into.

BY MS. GJOVIK:

Q. Thank you. Sorry.

I was trying to clarify that I wasn't asking about that part. I was asking about the investigation into me, like, leaking or whatever the -- my misconduct with the investigations.

I'm asking when you became aware that Apple was investigating me.

A. Oh, that was not months before. That was days before --

Q. Yeah, that's --

A. Yeah.

MS. PERRY: Hold on. Please let him finish his answers before you interrupt him.

BY MS. GJOVIK:

Q. Sorry.

Go ahead.

A. Yeah. So that's was days, not months.

Q. Do you remember roughly how many days?

A. We're talking a week, two weeks. I don't know.

Q. Okay. It was a long time ago.

Is there anything you can share about that

Page 68

investigation that's not privileged?

A. I saw that you leaked information, and I also saw -- and that's the misleading that I referred to earlier -- a redacted text exchange with Dan West. And then I was also notified at the time that you did not participate in the investigation.

Q. Okay. Thank you.

So I still haven't got an answer of what this redacted text exchange is. So you've actually given me the most information of anyone on that.

Can you tell me anything else you remember about what that text exchange was or what was redacted or why that was -- sorry. That was a bunch of -- I got really excited I might get an answer. I'd like to ask you about that redacted text message exchange you mentioned.

Do you recall any content from that message you said you reviewed?

A. I don't remember specifics. But I remember that it was really misleading and that it felt taken totally out of context and that when you saw the whole exchange of texts, it was painting a different picture than what you tried to paint.

Q. Okay. And when you say "redacted," do you mean, like, black boxes over text?

Page 69

A. No.

Q. What did you mean when you said "redacted"?

A. I mean what you presented to the investigator versus the full text exchange.

Q. So if I had presented, like, a screenshot but not the full exchange -- or sorry.

Can you clarify what you meant by what I presented versus the full exchange?

A. I don't remember the -- all those details.

Q. Okay. But it wasn't, like, black boxes intentionally covering up text, to your recollection; is that correct?

A. That's not the way I remember it, no.

Q. That helps. Because I didn't remember that either. Thank you.

Okay. So -- and it was a text message with Mr. West, you said.

Do you remember the time frame of when that text message was?

A. No, I don't.

Q. Okay. And is it your understanding that that issues was the misrepresentation allegation against me?

A. That was an example of you misleading the investigators and a violation of the business

Page 70

conduct.

Q. Okay. Can you -- can you list the other things I did wrong too again, please, again?

A. You mean what warranted your termination?

Q. Yes, please.

A. You disclosed product-related information and -- and trade secrets on Twitter, which was a violation of your confidentiality and intellectual property agreement. And then you failed to cooperate with the investigation. And then there was the -- what we just discussed with the misleading of the ER investigations that looked into your complaints.

Q. Okay. And of course, for the record, I disagree with all this. But I'm not going to fight you about it. That's not what this deposition is.

But when you said failed to cooperate in the investigation, do you recall the details of what that failure to cooperate was?

A. You refused to -- I mean -- yes. You refused to, I believe, answer the phone or the emails or the way they were trying to reach out to you to ask you more questions about your leaking information on Twitter.

Q. Do you recall seeing whatever exchange that was yourself?

Page 71

A. No.

Q. Okay. Do you recall how it was described to you?

MS. PERRY: Okay. I'm going to -- if the question is do you recall, you can answer that question. So let's take this question by question. Because I'm going to instruct you, to the extent these questions ask for privileged information.

MS. GJOVIK: Okay.

THE DEPONENT: So can you repeat the last question, then?

BY MS. GJOVIK:

Q. Do you recall how that allegation -- the facts underlying the allegation of refusal to cooperate were presented to you?

A. No.

Q. We just reviewed that email you had with Ms. Bowman, and she said something about refusal to cooperate.

Do you remember getting any additional details beyond what she said in her own email?

A. No.

Q. Okay. And then the -- the leaking -- it sounds like you reviewed the post at issue.

Can you confirm: Did you review any of the

Page 72

posts that Apple was stating was leaking?

A. I remember quite vividly seeing a picture in black and white, which I believe was a screenshot of an internal tool as part of a user study. That was a violation of your confidentiality agreement, as well as the user study agreement that you had participated in.

Q. Did you see the Twitter post or just the image? Do you recall?

A. I recall seeing the image.

Q. Okay. So you wouldn't have seen them on Twitter yourself, then; someone at Apple showed them to you; is that correct?

A. Yes.

Q. Okay. Do you recall what the content of the image -- or how many images were you shown that you reviewed?

MS. PERRY: So again, I'm going to instruct you not to answer, to the extent that this is getting into what specifically an attorney investigation showed you.

To the extent that you want to ask him questions about what he was aware of, you can do that. But you need to separate that from what investigators showed him or what specifically

Page 73

happened in the investigation.

MS. GJOVIK: We'll bring that to the magistrate. This is Apple's supposed justification for terminating me. You cannot claim a sword and shield on this. But understood. I'll withdraw that last question.

BY MS. GJOVIK:

Q. And I'm going to ask you: Do you recall the content of the photos that you reviewed?

A. I think I answered that just a minute ago. I remember vividly seeing one photo, black and white, which was a screenshot, I believe, of an internal tool. And by posting that, you violated your confidentiality agreement.

Q. Thank you.

I meant, like, what was in the image itself?

A. A room, you.

Q. A photo of me; is that right?

A. Not just you. I mean, you were there, I believe, and then the -- black and white and the room in the background.

Q. Do you know what room?

A. No.

Q. Are you familiar with the Gobbler/Glimmer application that Apple uses?

Page 74

A. Peripherally.

Q. Are you aware that it uses a kind of, like, automated mechanism to capture -- the DRA called it sequences -- so it's, like, photos that you can click on as a video. They call them sequences -- or videos of whatever's in front of the phone's camera whenever it thinks it sees a face?

A. No, I'm not aware of that.

Q. And actually, he clarified it's not even the app that does it; it was some kind of background process. He wasn't even aware of who owned it. The app let's you view the photos it's taking.

And are you aware that not only is it taking the sequences and the photos, but it was gathering biometrics of anything it thought if it was a face in front of it?

MS. PERRY: I'm going to object, to the extent that this commentary lacks foundation.

MS. GJOVIK: I just want him to say no a bunch for the record.

MS. PERRY: I understand what you want. But I'm still making objections, which are that this commentary lacks foundation.

MS. GJOVIK: Okay. I'd like him to answer this one. But I won't drag this out forever.

Page 75

BY MS. GJOVIK:

Q. Can you answer that question, please?

A. In the question, you keep referring to "he." I don't know who "he" is.

Q. Oh, the "he" was Thomas -- or Robert McKeon, who was the DRI of the Gobbler/Glimmer app. I deposed him a couple weeks ago.

But I'm asking you if you're aware that that Gobbler/Glimmer app and the background process behind it was capturing biometrics also in front of the cameras whenever it thought it saw a face?

MS. PERRY: I'm going to object, to the extent it lacks foundation.

MS. GJOVIK: That's fine.

THE DEPONENT: No, I'm not aware.

BY MS. GJOVIK:

Q. Okay. And are you aware -- this will be my last one. I'm sure she'll object too.

But are you aware that this Gobbler/Glimmer app and whatever background process, it was on employee devices and it was operating in the background without notification, gathering all this information 24/7 when it was active on these devices?

MS. PERRY: I'm going to object, to the extent it lacks foundation.

Page 76

MS. GJOVIK: Okay.

THE DEPONENT: No, I'm not aware.

BY MS. GJOVIK:

Q. Sorry. Just one more. I can't help myself.

Are you aware that this app also was gathering these sequences and biometrics whenever it saw someone in front of the device, including gathering naked photos of people that it was putting on the device?

MS. PERRY: Objection. It lacks foundation.

MS. GJOVIK: Yeah.

BY MS. GJOVIK:

Q. You can answer.

A. No, I'm not aware.

Q. Thank you.

Okay. And you said you had not reviewed any of the actual Twitter posts.

Did you mention any -- do you recollect any allegations you had reviewed as part of this termination process regarding talking to the press?

MS. PERRY: Objection --

BY MS. GJOVIK:

Q. Me talking to the press?

MS. PERRY: Objection, to the extent it misstates testimony.

Yannick Bertolus

Page 77

BY MS. GJOVIK:

Q. Sorry.

Mr. Bertolus, as part of this investigation into me and the decision to terminate my employment, was any of my interviews with the press considered as part of that investigation?

MS. PERRY: Again, I'm going to instruct you not to answer with respect to the investigation.

BY MS. GJOVIK:

Q. Mr. Bertolus, earlier in this deposition, you said something about at least knowledge that I was giving interviews with the press.

Did you review any of the articles where I was quoted or interviewed by the press, from, let's say, July 2021 through September 9, 2021?

MS. PERRY: Can you repeat the question, please?

MS. GJOVIK: Yeah.

BY MS. GJOVIK:

Q. Just -- Mr. Bertolus, do you recall reading, reviewing, seeing any of the articles where I was interviewed about my complaints against Apple between July of 2021 and September 9, 2021, prior to terminating me?

MS. PERRY: Okay. And again, I'm going to

Page 78

instruct you, to the extent that this calls for the disclosure of confidential attorney-client privileged communications, that you not disclose those.

THE DEPONENT: What I remember, as I told you earlier, is I saw the picture of that tool. That was a direct violation of your confidentiality and intellectual property agreement. I did mention earlier a Verge article. I don't remember reading it in detail.

And then failure to communicate and misleading the investigators. Those were all violation of Apple policy and grounds for termination.

BY MS. GJOVIK:

Q. Okay. Thank you.

And just to clarify, though, the last one, the misleading, was that part of the investigation into me or an investigation into my complaints?

MS. PERRY: Objection, to the extent it lacks foundation.

MS. GJOVIK: Okay. Let me rephrase.

BY MS. GJOVIK:

Q. For the third one, me misleading with the Dan West text messages, do you recall if that was related to the investigation into me for leaking?

Page 79

A. It was part of the reasons for your termination.

Q. Okay. Do you recall any of the factual details underlying why I was sharing that text message about Dan with Apple?

MS. PERRY: I'm going to instruct you here that this calls for attorney-client privileged information, with respect to the investigation.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. Mr. Bertolus, would you like to review those policies I gathered for us? We can do that now.

A. Yeah.

Q. Yeah. Cool.

Okay. Would you like to maybe start with the intellectual property agreement I signed?

A. Okay.

Q. Okay. Can you see that okay?

A. Yes.

Q. Are you familiar with these enough to know what's contained, or would you like to review it and confirm the content of the one I signed?

A. I'd like to review it, please.

Can you zoom in a tiny bit?

Q. Yeah. Okay. And then just let me know when

Page 80

you want me to scroll down, please.

A. Okay. Thank you.

Okay.

Q. Are you ready now?

A. Oh, yeah. Can you scroll to the first one?

Q. Yeah.

A. Okay. So this, for instance, is clearly something you violated. When it says "proprietary information," it means all information not generally known outside of Apple or kept confidential to Apple, including trade secrets, specification, prototype, software. So that was something that that you clearly violated.

Q. Okay. I'm sorry. I was just going to have you read it all. But if you want to go through and then find the terms that you think are relevant, we can do it that way.

Would you prefer to do it how you were doing it naturally?

A. Yeah. It might being easier, I think, to do it this way, unless you'd rather not.

Q. No, I'd prefer you just to answer what's more naturally for you. So we can do that.

So you were just -- can you explain what you were just identifying for me?

Page 81

A. Yes. Where it says "proprietary information" means all information not generally known outside of Apple and are kept confidential by Apple, including, for example, but not limited to trade secrets -- which is what an internal tool would be specifications, software, or any other materials or information relating to past, existing, and future products that's something you violated with posting that picture.

Q. And can you clarify, are you saying all the things you just said were violated, or if that was more of a broad term, can you narrow in on which specific things you think were violations?

A. I can. I mean, proprietary information, I think, includes it.

Q. And can you explain -- sorry. This is -- you know, law is much more ritualistic than engineering. So I'm just going to ask you to have to do some stuff for the sake of the analysis.

Can you explain to me why you think the leaking -- my leaking was proprietary, how it falls under proprietary?

A. It was an internal tool, and that tool was disclosing features of a product, potentially.

Q. And if -- so if we do it this way, I might

Page 82

have a couple follow-up questions. But we can just keep going back to this, if that's okay.

Do you know what product it could potentially disclose information about?

A. You brought up earlier, I think, that you spoke to Robert.

Q. Mr. McKeon?

A. Yeah. He made it clear that what you disclosed was product-related information.

Q. I'm sorry, Mr. Bertolus.

How do you know that?

A. I know that because I spoke to Robert.

Q. When did you speak to Mr. McKeon?

A. I spoke to him today.

Q. Interesting.

Can you share what else you talked to him about?

A. That's it.

Q. And how long did you talk to Mr. McKeon today?

A. For a few minutes.

Q. Did you talk to Mr. McKeon prior to this deposition, or while we were at break?

A. Prior to this deposition.

Q. Okay. And what was the purpose of talking

Page 83

to Mr. McKeon this morning?

A. Confirming that what you leaked was proprietary.

Q. Whose idea was it for you to talk to Mr. McKeon?

MS. PERRY: I'm going to instruct you not to answer any questions about this further.

BY MS. GJOVIK:

Q. Mr. Bertolus, did you speak with any other nonlawyers today about me, prior to this deposition?

A. Yes.

Q. Who did you speak to, Mr. Bertolus?

A. Somebody in global security.

Q. Do you remember their name?

A. Sophi.

Q. Sophi Jacobs?

A. Yes.

Q. Can you share what you talked to her about?

A. We spoke about the fact that when you leaked the information, you leaked it intentionally, that you had not had the authorization to -- to leak it, and that -- I believe that was it. That it was confidential.

Q. Okay. And can you clarify, when you say "information," specifically what information were you

Page 84

talking about?

A. What you leaked on Twitter.

Q. You're talking about the photos again? Just the photo that you mentioned earlier?

A. Yes.

Q. And before, you said one.

Can you clarify how many photos you discussed?

A. We discussed the photo I was telling you about that I remembered seeing.

Q. So one photo; is that correct?

A. Yes.

Q. And when we take our next break, I might go find these Twitter posts, and we can look at them. There were several photos that were just, like, the pictures of me. And I believe there was one screenshot from inside the application that showed multiple photos.

Is that your recollection, it looked like there -- actually, I'll go find them and we can look at them later. Because I don't want you to speculate. Sorry. I'll withdraw that for now.

Thank you for sharing that. We can go back to this now, if you'd like to keep reading this and see if you can find more violations that I did.

Yannick Bertolus

Page 85

A. Well, the treatment of proprietary information, you violated.

Q. Oh, and we -- sorry. I was going to have you define "proprietary information." And I think that's where -- we'll have to go back. I think that's where we went on that tangent.

In your -- in your view, your personal view -- because you said you had reviewed this and made the determination yourself; is that correct?

A. Yeah.

Q. Yeah.

Why was the information that you reviewed I shared, that -- that photo you said you saw, that screenshot proprietary?

MS. PERRY: Objection. Asked and answered.

MS. GJOVIK: He said because McKeon said this morning.

Is that the answer we're sticking with?

MS. PERRY: No, that's not what he said. You're misstating his testimony.

BY MS. GJOVIK:

Q. Okay. If we don't -- if you don't want to clarify further what "proprietary" means, we can skip that.

If you can go to the next, please.

Page 86

A. Well, I think "proprietary" is very clearly stated here. It means all information not ordinarily known outside of Apple and/or kept confidential by Apple, like that tool.

Q. So would you say the tool, just because it wasn't known outside Apple, and/or because Apple would claim it's confidential?

A. No. Because the tool was an internal tool, which is considered a trade secret. In addition to the fact that, based on that photo, one could -- could speculate on what the features could be of a future product.

Q. Okay. And then you say "trade secret."

Can you clarify -- and we don't have lawyers objecting. And I'm assuming you may be using more of a colloquial use of "trade secret" than the actual, like, legal analysis and statutes of how you'd substantiate trade secret claims.

Can you clarify what you mean by an internal tool being a trade secret?

MS. PERRY: Objection, to the extent it calls for a legal conclusion.

MS. GJOVIK: Yeah, I don't -- I don't want a legal conclusion from him. I want him to explain what he's trying to assert with this statement.

Page 87

THE DEPONENT: Yeah. So -- yeah, you're right. I am not a lawyer.

What I mean by "trade secret" in this case is something that we would not necessarily patent but that is part of our secret recipe of how we do work at Apple -- or I should say how I used to do work at Apple.

BY MS. GJOVIK:

Q. I know. I still say -- even I still sometimes say, like, "I'm with Apple." It's hard to let go when you've been there a while.

Thank you. Okay. So -- so secret sauce.

Is there anything else that you might -- instead of maybe using the word -- you can use "trade secret" if you want to use it. But is there any other terminology you might use to just clarify why you think this would be distinguished from sharing other internal things?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: I can't hear you.

Can you speak up?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

///

Page 88

BY MS. GJOVIK:

Q. Okay. Mr. Bertolus, there's a -- there's a lot of stuff that happens internal Apple that isn't necessarily considered proprietary.

Can you explain why you feel the information that I supposedly leaked counts as proprietary and your use of trade secret?

A. Yeah. I feel I'm going to be repeating myself. You leaked an internal tool, and in addition, that people could speculate on what features are going to be based on that.

Q. Okay. And did you make any determinations that people could speculate for future products based on what information was shared?

A. Can you repeat the question? I feel I've answered it already.

Q. Sir, I know. I'm asking it a couple different ways to get to some very, like, specific things. I'm sorry.

You said that you reviewed the information and made the determination and that the information was proprietary, and proprietary meaning someone could speculate about potential future product. That's just my commentary.

My question for you is: As part of your

Yannick Bertolus

Page 89

analysis and determination in firing me for this leaking, did you determine that someone could make a determination about a future Apple product based on the information I shared?

MS. PERRY: I'm going to instruct you, to the extent that this is asking for privileged information. If you have nonprivileged information that you can share on this, you can go ahead and testify, if you understand the question.

MS. GJOVIK: And I'm specifically asking him for his own decision-making, since he said he made the decision. I don't want privileged.

THE DEPONENT: My decision-making was based on the fact that you posted a picture of an internal tool that is confidential and non-public information, which I see listed clearly as a violation of this document. And -- and I don't think it's far-fetched to think that the fact that people saw or could image what the tool would do that they could conclude what could be a new product that is yet to be released.

BY MS. GJOVIK:

Q. Okay. I'll be satisfied with that for now. Thank you, Mr. Bertolus.

Would you like to keep reading and look for more violations now?

Page 90

A. Yes, please.

Q. Okay.

A. So we discussed that you violated the treatment of proprietary information.

Can you keep scrolling, please? You can keep scrolling. You can keep scrolling. You can keep scrolling, please. You can keep scrolling, please. You can keep scrolling.

And then obviously, it states very clearly that:

"If you breach any part of this agreement, employer is entitled to take any action to the extent permissible under applicable laws under this agreement, including, but not limited to, terminating employees."

Q. Do you want to keep going?

A. Yeah.

Okay. You can keep scrolling.

Q. And, Mr. Bertolus, it says "no implied employment rights."

Is that maybe part of the authorization for that at-fault immediate termination, or --

MS. PERRY: Objection. Vague and ambiguous.

MS. GJOVIK: Okay.

Page 91

BY MS. GJOVIK:

Q. Mr. Bertolus, do you agree with the "no implied employment rights" section of this agreement?

A. Well, if I read it correctly, I understand that there is employment at will. But I'm not sure that it's employment at will in this case. I mean, there was -- again, it was more in relation to your violation, by posting that picture and the other things we've discussed earlier that were egregious violations.

Q. Okay. So generally, like, "at will" means that Apple can just fire me whenever they want?

So that term says:

"Apple's right to terminate your employment at will at any time for any reason, with or without cause or prior notice."

So I think that supports what you're saying, rather than conflicts with it.

So I'll just ask again: Do you agree with that term, in relation to the termination of my employment?

MS. PERRY: Objection. Vague and ambiguous. Also to the extent it calls for a legal conclusion.

MS. GJOVIK: I'll withdraw and rephrase.

Page 92

BY MS. GJOVIK:

Q. Mr. Bertolus, during your time as an executive at Apple, including the 2021 time period we've discussed, do you agree Apple has the right to terminate employment of its employees at will at any time, for any reason, with or without cause or prior notice?

A. That's my understanding, yes.

Q. Okay. Thank you.

And then general provisions.

A. Okay. Okay. And then clearly, you acknowledged that you read and agreed with all this.

Q. Yeah, I signed that. My signature is only redacted because this was shared for another purpose that was public, and I don't want my signature public. But I signed it.

A. Okay.

Q. So anything else you want to add?

A. No.

Q. Okay. So the things that you pointed out as we were walking through this, those were the terms in this agreement you believe were violated that justified my termination; is that correct?

A. Yes, that's correct.

Q. Okay. And then we can look at -- well,

Page 93

let's look at -- you mentioned a social media and online communications policy. I have a copy of that we can look at.

Does this look familiar, like Apple's policy on this topic?

A. Can you --

Q. You want it bigger?

A. Yes, please. Sorry.

Q. I'm so sorry. I keep forgetting.

Okay. Go ahead.

A. Can you please scroll?

Okay. So here, again, it explains you shouldn't be posting on social media any intellectual property or proprietary information. So you violated that.

Q. Okay. Can you be more specific of what was posted that violated it?

A. That picture that we've discussed multiple time today already.

Q. I know. I'm sorry. I just need for the record the full --

A. Okay.

Q. Being a lawyer is really tedious. I'm sorry.

Okay. Go ahead.

Page 94

A. You want to keep scrolling?

Yeah. So it also refers to the IPA and the business conduct. I guess we'll get there next.

Q. Yeah.

A. Keep scrolling, please.

Okay.

Q. So the terms you pointed out when we were speaking, those were the terms you believe were -- I violated that justified my termination; is that correct?

A. Sorry. Repeat the question.

Q. The terms that you pointed out as we scrolled through this, those were the terms in this specific policy you believe I violated that justified my termination; is that correct?

A. That's correct.

Q. Thank you.

And now you'd like to look at the business conduct policy?

A. Okay.

Q. Okay. So I have -- this is the October 2020 version. It's my understanding this was the current version when these events occurred in 2021.

And I have a lot of stuff I still want to ask you on limited time. So I'd prefer if we don't

Page 95

have to go through the whole section. If possible, if you can identify which subsections you'd like to review, I would appreciate that.

A. Yeah, I don't know exactly where it would be.

Q. Oh, do you want -- I'm sorry. I should make it bigger.

A. Yeah.

How many pages is the whole thing? I don't mind scrolling through it quickly to --

Q. Yeah.

A. But --

Q. Yeah, we can go through it. And if you maybe see a header and you're like, that's not applicable, we can just skip it. I don't need you to authenticate the document. If we're just looking for stuff, we can for sure do it that way.

So that sounds good?

A. Okay.

Q. Okay.

A. Okay. Well, confidentiality is there.

You can scroll. You can keep going.

I'm sorry. Is this frozen? Are you scrolling?

Q. Oh, I'm at the bottom of the first page.

Page 96

A. Yeah, I'm done with that page.

Q. Okay.

A. Okay. So this is one:

"You're also required to fully cooperate in any Apple investigation and keep any information shared with you confidential to safeguard the integrity of the investigation."

So that's something you --

Q. Okay. And I'm sorry. If this was an engineering project, I know this would probably annoy you, so I'm so sorry. I remember working for you. But I'm going to have to drill in on this again and ask you to specify which investigation.

So we had the misleading them investigation and then that failure to cooperate.

A. Yeah.

Q. Can you provide additional detail of which one it applies to or both and why?

MS. PERRY: Objection. Compound.

MS. GJOVIK: Sorry. Withdrawn.

BY MS. GJOVIK:

Q. Can you please elaborate your response to specify the specific allegations of misconduct against me and how this policy applies?

Page 97

MS. PERRY: Objection. Vague and ambiguous. Overbroad.

BY MS. GJOVIK:

Q. Mr. Bertolus, you just said that the line you just read is a policy violation that justified my termination related to investigations. You also said that there were two separate violations related to investigation, one about misleading or misrepresenting and one about failure to cooperate.

Can you please elaborate which violation you're talking about with that term you just read?

A. Well, the sentence here would cover both.

Q. And why?

A. Because you did not fully cooperate in the investigation, one, by refusing to answer on the leaks; two, by misleading and not providing full context in that text exchange.

Q. Okay. And I know -- I'm sorry -- this is really annoying.

Okay. So for the first one, for failure to cooperate, can you be more specific? You said refusal to answer. But no one called me that I'm aware of I didn't answer.

So can you specify what the more specific violation is you're referring to?

Page 98

A. Well, you're making statements I can't verify. So it's -- I'm a little confused.

Q. Okay. Well, let me rephrase. Sorry. I'm dealing with very ambiguous information from Apple. So I'm trying to -- trying to frame it right.

The failure to cooperate violation, because that was part of my termination reason, can you provide more details of what your understanding is of how I failed to cooperate?

A. So you posted that -- you leaked on Twitter. And when global security tried to reach out to you, you did not participate in that. That's one. And you also did not fully cooperate in the investigation on your workplace concerns by misguiding the investigator by not showing fully a text exchange.

Q. Thank you.

For the first one, can you provide more details on what exactly my misconduct was that was seen as refusal to cooperate?

MS. PERRY: Objection. Asked and answered.

BY MS. GJOVIK:

Q. Mr. Bertolus, are there any factual details you can provide that underline the allegation that I refused to participate in an investigation with global security on September 9th?

Page 99

A. I think that would be better answered by global security.

Q. Agreed.

But if you made the determination to fire me and said you made that independently yourself and reviewed the information yourself, I would assume that you would have more details than just a blanket assertion.

So I would like to know if you have more details.

A. The leak on Twitter of that internal tool was so egregious that that in itself warranted termination. The fact that you did not cooperate was an addition to that, but not the main reason. The main was your leak.

Q. Thank you.

I'm still trying to hone in on the failure to cooperate, what that actually means, though. So I'm not asking you these questions -- these retaliation lawsuits, Apple says one thing, and then I have to say, like, that's not what they mean, or this is what really happened.

So if they just say something vague, it's hard for me to come up with facts to show what really happened. So I'm just trying to figure out what the

Page 100

actual facts are and the different stories from different people, which is why I'm probably annoying you a lot right now asking this a million times. And I'm so sorry.

But if you -- I'm going to ask again: Do you know any information about what that allegation of refusal to cooperate was with global security on September 9th, other than what you've told me so far?

A. Sorry.

Can you repeat the question again?

Q. Yeah.

Do you have any other information that you recall about the factual details about why I was refusing to cooperate -- why Apple said I was refusing to cooperate when global security contacted me on September 9th, other than what you've shared already?

A. No.

Q. Okay. So then we don't have to keep asking that a million times. I'm sorry.

Okay. So then when you said you determined that it was justified that I should be terminated based on this policy violation we're just reading a million times -- I'm sorry -- and you stated this example of refusal to cooperate, can you explain your

Page 101

determination of why that refusal to cooperate would violate this policy without any factual details of what occurred?

MS. PERRY: Objection. Vague and ambiguous. Misstates testimony. Lacks foundation.

MS. GJOVIK: Let me ask again a different way.

BY MS. GJOVIK:

Q. Mr. Bertolus, is it correct that you just said that you believe I violated this policy term that we just read and we've been discussing when I refused to cooperate when global security contacted me on September 9th, 2021?

A. I mean, you could ask the court reporter. But I think I said that this was an example that covers both things.

Q. I think you -- I'm just trying to avoid objections.

So because you said that, can you provide any factual details of why you believe this policy term and the violation applies to the facts underlying what occurred on September 9th?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: I'm going to keep that one.

Page 102

I'd like him to answer.

THE DEPONENT: So I think you showed me the email that the HR sent to me; right?

BY MS. GJOVIK:

Q. Yes, Megan Bowman's email.

A. I think it stated on there, which is the information I'm getting, that you did not cooperate with global security. And when I read this again today, it says clearly:

"You are also required to fully cooperate in any Apple investigation."

So that looks pretty clear to me.

Q. I'm sorry.

What I'm trying to get you to confirm is that you made the decision to terminate my employment based on that allegation, just based on what was told to you, but not knowing what the factual basis was underlying the allegation.

MS. PERRY: So I'm going to instruct you not to answer, to the extent that this starts to get into what was communicated to you by counsel.

MS. GJOVIK: I think -- I think I have enough now for that. I don't want to keep annoying him.

///

Page 103

BY MS. GJOVIK:

Q. I'm sorry, Mr. Bertolus.

Would you like to continue reading this policy?

A. Yes, please.

Q. Okay. Please let me know more stuff I did wrong.

A. Okay. You can keep going. You can keep going.

Q. And we've already used up, like, 20 minutes on this. So if possible, if we can skip over stuff you don't think is going to be applicable, I'd appreciate it.

A. I mean, you asked me to review this. So --

Q. I know.

A. Keep scrolling, please. You can keep scrolling. Thank you. Okay. You can keep scrolling.

Okay. So this is yet another example when you leaked the information:

"Assets include Apple's proprietary information, such as intellectual property," et cetera.

So:

"Watch what you say. Never

Page 104

disclose confidential trade secrets or other business information without verifying with your manager whether such disclosure is appropriate."

And then you had no authorization to disclose what you did on Twitter. It should be shared on a need-to-know basis. Obviously Twitter, no need to know.

You can keep scrolling to the nondisclosure.

So there again:

"Never share confidential information about Apple's products or services without your manager's approval," which you did.

You can keep scrolling, please. You can keep scrolling. You can --

Q. And I'm actually -- unless you insist, I'm going to be the one to say I think I have enough from this now that you've identified some stuff, because I've struggled to get Apple to identify anything.

So unless you want to go -- insist on going though the whole thing, I would ask if we could do -- maybe do a follow-up response from you, if you'd like to add additional.

I'd like to go to that misconduct and

Yannick Bertolus

Page 105

discipline policy that Ms. Perry asked us to review next, if that's okay?

A. Is there anything -- can you at least scroll, so that we can see if there is --

Q. I'd be super happy to, like, send these policies and have you guys review. And if you can send me, like, a written --

MS. PERRY: No, we're not doing that. Discovery is --

MS. GJOVIK: Okay.

THE DEPONENT: No, we're not doing that.

MS. GJOVIK: Okay.

MS. PERRY: If you want him to answer questions about this, you're going to need to show it to him and allow him to go through it.

MS. GJOVIK: Okay. Well, we're not going to have time. I have too many questions, so we're not going to have time to go through the whole thing.

BY MS. GJOVIK:

Q. But you gave me answers.

So we can, for the record, say that your answer might be incomplete; that there might be more that you would see if we reviewed the whole document.

Is that fair?

A. Yeah, that's okay.

Page 106

Q. Okay. Thank you.

And then Ms. Perry asked us to also look at the misconduct and discipline policy. So I have a copy of that --

MS. PERRY: No. No. No. No. No. Hold on. I did not ask you to look at the policy. You're making statements on the record that are inappropriate and inaccurate, and I object to that.

MS. GJOVIK: Okay. Well, he didn't mention this one. So we don't have a lot of time. So we can just skip this one, then, if we don't need to look at it, Ms. Perry.

MS. PERRY: I'm not here to testify. That's not my role. Your role is to ask questions. He told you that there were multiple policies that he reviewed. And that was what his testimony was. If you want to ask him about the multiple policies that he reviewed, it's your deposition, and you can do that.

MS. GJOVIK: I did. So Mr. Bertolus named the IPA, which we reviewed, and the business conduct policy, which we've now viewed at least part of, and the social media policy.

BY MS. GJOVIK:

Q. Did we look at the social media policy?

Page 107

A. No. But I mentioned -- I mean, there were five in total.

Do you want to go back to the previous one and zoom in?

Q. I would like to look at the social media policy with you, if we have not finished reviewing that one, please.

A. Can you zoom in a little bit, please?

Q. Yes. I'm so sorry.

A. And then scroll up to the --

Q. Are we good?

A. Okay. So once again:

"Protect Apple's confidential information. Our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential," which you violated.

You want to keep scrolling, please?

This refers to the other policy and the business conduct, which we hardly looked at.

You want to keep scrolling?

Okay. I think -- yeah, that looks like something we reviewed already.

Okay.

Page 108

Q. Okay. So can you highlight which terms you think that I violated that justified my termination?

A. Yeah, I just did.

Scroll back up.

Q. Yeah.

A. You violated -- you failed to keep Apple's intellectual property and proprietary information confidential.

Q. By sharing it on Twitter?

A. Yes.

Q. Okay. And you're talking about that one image that we're talking about that shows the screenshot of the UI of the Glimmer app; is that correct?

A. That's correct.

Q. Okay. Thank you.

And just to confirm, are there any other policies that you think I violated that you remember by name that were not the three we just looked at?

A. I remember five total. We've reviewed -- what -- three? There is one you glanced over just now -- before.

Q. That was the one that Ms. Perry and I were fighting about.

I was asking you if you remember the

Page 109

policies by name that you believe I violated.

A.  As I said, I remember that there were five of them.  I didn't remember exactly the names of all of them.

Q.  That's fine.

So I'd just like to look at the ones that you remembered.  And I thank you for doing that.

MS. GJOVIK:  What was that?

THE DEPONENT:  I was asking --

MS. PERRY:  He wants to take a break.

THE DEPONENT:  Yeah.

MS. GJOVIK:  Okay.  Five minutes okay?

MS. PERRY:  Let's take ten.

MS. GJOVIK:  We're really running out of time.

But okay.  Thank you.  Ten minutes.

(Off the record from 3:36 p.m. to 3:49 p.m.)

MS. GJOVIK:  So for the sake of making sure I'm marking these exhibits, I'm going to go -- this won't be questions for you, Mr. Bertolus.  I'm just going through and show her the documents I was showing that she has copies of so she can label them as exhibits for the deposition record.

Okay.  So -- okay.  So for the record, when

Page 110

we were looking at the letter that Mr. Bertolus had sent me on September 9th that he had authenticated, that was Exhibit M.  And that was Plaintiff's production 12_0103, M.

(Exhibit M was marked for identification.)

MS. GJOVIK:  When we were looking at the email exchange between Mr. Bertolus and Ms. Bowman, that is Exhibit N, as in "Nancy."  And that was Plaintiff's production 12_0107.

(Exhibit N was marked for identification.)

MS. GJOVIK:  And when we were looking at the email Mr. Bertolus sent on the 9th where the letter was attached, that is Exhibit O, Plaintiff's production 0113.

(Exhibit O was marked for identification.)

MS. GJOVIK:  And another copy of that showing the attachments is Exhibit P.  It's Plaintiff's production 12_0114.

(Exhibit P was marked for identification.)

MS. GJOVIK:  And when we spoke about Mr. Bertolus's assistant helping me ship my stuff

Page 111

back, the email -- I had not showed this yet.

But the email discussing that is Exhibit Q, Plaintiff's production 12_0115.

(Exhibit Q was marked for identification.)

MS. PERRY:  What are you doing with this document?  That was not a document that we discussed in this deposition.

MS. GJOVIK:  Yeah, but we referenced it.  So since we're doing this anyway, I'd like to say that is the -- let me state my intention then what I want to do with it.

This is the document where I was exchanging with Lisa, Mr. Bertolus's assistant, about returning my stuff, which we discussed earlier in the deposition.  Mr. Bertolus was not part of this email exchange, so I'm not asking him to authenticate it.

MS. PERRY:  Okay.  But we never discussed this, so I don't understand what you're doing.  This is not --

MS. GJOVIK:  You can object with the format of objection.  But please stop whatever this is.

MS. PERRY:  Well, I object to you doing anything with a document you didn't show in this deposition, you didn't ask this witness any questions

Page 112

about, and now you're making representations about what the document is and what it relates to in the testimony.  That's not --

MS. GJOVIK:  No, I'm sorry.  So we spoke earlier about me asking if he knew who helped me ship my stuff back -- who shipped me my stuff from my desk.  He said he didn't know.  I said Lisa, your assistant.  Which there is actually no factual foundation, because he didn't know.

And so I would like to offer this exhibit into the record of that was my exchange with Lisa, just for the sake of having that attached.

MS. PERRY:  No.  I object to that.  We're not going to attach documents that you're testifying about, as opposed to the witness.  So I object to this document being an exhibit to this deposition.

MS. GJOVIK:  Okay.  We can note that for the record.

MS. PERRY:  There's been no foundation laid for the exhibit.

MS. GJOVIK:  We can note that for the record and discuss it after, if you'd like, if you want to object to it.  But we don't have time for this.  Thank you.

And then earlier during the deposition,

Page 113

Mr. Bertolus had authenticated his LinkedIn profile. And that exhibit was Exhibit R. That was Plaintiff's production 12_0118.

(Exhibit R was marked for identification.)

MS. GJOVIK: This is another copy. We can just skip that one. I don't need that one.

And then when we were looking at the agreements Mr. Bertolus was reviewing, we reviewed the intellectual property agreement.

And that was Exhibit -- sorry. These letters are really messed up and disorganized -- Exhibit CC. It was Plaintiff's production 12, intellectual property agreement 2015.

(Exhibit CC was marked for identification.)

MS. GJOVIK: And when we looked at the business conduct policy from October 2020, that was Exhibit DD, Plaintiff's production 12, business conduct policy.

(Exhibit DD was marked for identification.)

MS. GJOVIK: And then we reviewed the social media policy. That was Exhibit GG, Plaintiff's production 12, social media and online.

Page 114

(Exhibit GG was marked for identification.)

MS. GJOVIK: And then let's see.

BY MS. GJOVIK:

Q. So, Mr. Bertolus, while we --

MS. GJOVIK: Is that good, Ms. Court Reporter?

THE STENOGRAPHER: Yeah, that's good.

MS. GJOVIK: Okay. Thank you. Sorry I missed that. I should have confirmed. Again, I'm still learning.

BY MS. GJOVIK:

Q. While we were at break, Mr. Bertolus, I went looking for the photos that seem to be at issue.

So first I'd ask: Are you aware that on September 15th, after I was terminated, that lawyers from external counsel for Apple at O'Melveny & Myers, contacted me concerning some of my Twitter posts and other public statements, and asserting it was related to the reason I was terminated?

A. No, I did not know that.

Q. Okay. So they linked some url's of Twitter posts and some other content. But you didn't bring that up, so I'm not going to talk about the other stuff right now. And I'm going to show you the

Page 115

Twitter post that they linked to that they said they wanted me to delete. And I said I disagree with all this, but I deleted it.

But I'm going to show you the one I think you're talking about. And if you can let me know if that is the one you're talking about. And then I can show you the other three and see if you have anything to say for those too.

So this is the one I think you might be talking about.

MS. GJOVIK: This is Exhibit 1 -- sorry. Now I go into numbered exhibits -- Photo Exhibit 1.

(Exhibit 1 was marked for identification.)

BY MS. GJOVIK:

Q. Does this look like the photo that you reviewed?

A. It was a very long time. It could be. Again, what I said that I vividly remembered was a picture in black and white with you or part of you, what I see in this picture.

There was also a Verge article that we discussed.

Do you have that that I can look at?

Q. We can go to that.

Page 116

But, Mr. Bertolus, you didn't mention that prior.

Why are you just bringing that up now?

MS. PERRY: Objection. Misstates testimony.

MS. GJOVIK: Sorry. Let me clarify.

BY MS. GJOVIK:

Q. Mr. Bertolus, when you listed the reasons I was terminated -- and you did that several times. We went over that. You didn't mention the Verge article.

So why are you raising it now?

A. Maybe the court reporter could go back. But very early in the deposition, I brought it up.

Q. Sorry.

Can you say it again? I can't hear you.

A. Very early in the deposition, I brought it up.

Q. So would you like to correct your testimony of the reasons that I was terminated to include that, or would you just like to review that separately?

A. No. I have said clearly that you violated your confidentiality agreement, and that -- and that Verge article is part of that. If you want to go back to the record, we can go back to the record. I mentioned that early on.

Yannick Bertolus

Page 117

Q. We don't have to dispute what you said prior. It will be on the record.

But if you are confirming now that that is one of the reasons, is the Verge article, can you please provide me more information about what about the Verge article -- or sorry. Yes, we can discuss that next.

For this, though, I believe you previously said that you saw me, you saw a room behind that was black and white, and a screenshot of the UI of an application.

So does the photo embedded in this Twitter post look like the image you were referring to?

A. It looks like -- I'm not saying it's exactly that one. But it looks like it, yes.

Q. Okay. And you had said you didn't -- had not seen the text of the Twitter post prior; correct?

MS. PERRY: Objection. Misstates testimony.

BY MS. GJOVIK:

Q. Okay. Mr. Bertolus, had you seen the Twitter post in full at the time you made the termination decision?

A. I don't recall if I saw it or not.

Q. Okay. I'd just like to read this text for the record. This is a post made from the account at

Page 118

@ashleygjovik on August 30th, 2021.

And it says:

"We're learning about Apple's long history of systemic oppression and retaliation against employees when employees express concerns about discrimination, harassment, and other abuse. Why wouldn't Apple try to use our data and their internal surveillance infrastructure against us."

Mr. Bertolus, do you recall that statement I just read when you were reviewing this content and making the decision to terminate my employment?

A. No.

Q. Okay. Okay. So we can go to the Verge -- would you like to see the other three photos that that law firm e-mailed me? Also, I would like for you to look at them and tell me if you had reviewed those too.

A. Okay.

Q. Okay.

MS. GJOVIK: So this is Photo Exhibit 2. This was a post I made on my Twitter account August 30, 2021. It has two photos of me taken in

Page 119

the Gobbler/Glimmer app.

(Exhibit 2 was marked for identification.)

BY MS. GJOVIK:

Q. And the text says:

"Apple's global security team of ex-US intelligence employees includes ex-NSA, ex-FBI, ex-military, and ex-secret service workers. 'Very little is known about the way it operates'" -- with quotes for the two articles -- "Why wouldn't they use this internal data."

Do you recall reviewing this post when you decided to terminate my employment?

A. No.

Q. Okay. Thank you.

MS. GJOVIK: And then Photo Exhibit 3. This was a post I made on August 30th, 2021, from my Twitter account.

And this was -- I believe this was the embedded video. It's either a screenshot of the video or the embedded video taken from a screen capture on the Gobbler/Glimmer app on my phone.

///

Page 120

(Exhibit 3 was marked for identification.)

BY MS. GJOVIK:

Q. And I posted:

"Totally normal. Nothing weird about any of this. Just the video/photos my internal Apple iPhone captures of me while I'm not paying attention and stores on device, and also maybe uploads too?" and then a link to where the Vox had posted that video I shared with them.

Had you reviewed this when you made the determination to -- or the determination to terminate my employment?

A. I don't remember.

Q. Okay.

MS. GJOVIK: And then the fourth one was a post I made on my Twitter account on August 28th, 2021. And it includes screenshots of two emails I got in my Apple e-mail account, with some redactions.

(Exhibit 4 was marked for identification.)

BY MS. GJOVIK:

Q. And I said:

Page 121

"I'm still over here in Apple's timeout chair, and they keep telling me to respect my abuser's privacy and be silent.  Meanwhile, I got 3x of these in the last month since being on leave.  No, Apple.  Stop it" -- monkey face with covered ears and crying emoji --

"I can't tell if they're harassing me or just being super intrusive or both."

Mr. Bertolus, do you remember reviewing this content when you decided to terminate my employment?

A.  I don't remember.

Q.  Okay.  Thank you.

MS. GJOVIK:  And then the Verge article.

So this is from the McKeon article.  So it's Exhibit 35 McKeon Aloe.  So it will be a double exhibit, I guess.

And this was an article that was published August 30th, 2021 in The Verge, called Apple cares about privacy unless you work at Apple.

(Exhibit 35 was marked for identification.)

BY MS. GJOVIK:

Q.  And it says:

"The company has taken a strong

Page 122

stance on safeguarding its customers' data, but some employees don't believe it protects theirs."

Is this the article you're referring to, Mr. Bertolus?

A.  Can you zoom in, please, and scroll?

Q.  It's 11 pages.  So I'd prefer we don't review the whole thing, because I still have a lot of other questions I'd like to ask.

MS. PERRY:  Well, he can't answer your questions about it unless you allow him to look at the actual --

MS. GJOVIK:  But I didn't have questions, because he didn't bring it up until just now.  He just brought it up midway.  So he asked to see it.

BY MS. GJOVIK:

Q.  What exactly would you like to see, Mr. Bertolus?

A.  The pictures embedded in there that you disclosed.

Q.  So this PDF that I have, for some reason, it didn't save that video in it.  So it doesn't show it in the content of the article.  But --

A.  Can you scroll quickly?

Q.  Yeah.

Page 123

A.  And you're not -- you agree that there were pictures there; right?  So that's --

Q.  Yeah.  Oh, yeah.  I shared that.  And that was also what I screenshot on those Twitter posts.

A.  Okay.  So that was basically, yeah, the violation of your confidentiality agreement.  Yeah.

Q.  Can you tell me what that content was that you're saying was a violation?

A.  The pictures where -- I don't know which other picture you showed me.  But -- but clearly, it was a screenshot of an internal tool, which was a violation of your confidentiality agreement, and that was grounds for termination.

Q.  Mr. Bertolus, did you review this article when you made the decision to terminate my employment?

A.  I don't remember reviewing the whole article.  I just remember a mention of a Verge article.

Q.  Do you recall the -- did you know the title of the article when you made the termination decision?

A.  I don't remember.

Q.  Mr. Bertolus, do you know that in California, workers have a constitutional right to

Page 124

privacy in the Constitution of California that gives them a protected right to protest invasions of privacy by their employer?

A.  No.

Q.  No.

Were you aware that there's even --

MS. PERRY:  Objection, to the extent it misstates the law.

MS. GJOVIK:  Okay.

BY MS. GJOVIK:

Q.  How about this:  Mr. Bertolus, do you think it would be a justified reason to terminate an employee if they were protesting what they thought was egregious violations of their privacy by their employer?

MS. PERRY:  Objection.  Calls for a legal conclusion.

MS. GJOVIK:  He made the determination to --

BY MS. GJOVIK:

Q.  How about this:  Mr. Bertolus, if you have the context of the Twitter posts I just read of what complaints were being made and at least knew that the article -- that the content you just mentioned, that the premise was Apple employees organizing to protest invasions of privacy, would you still have -- are you

Page 125

still certain you would have made the decision you did to terminate my employment?

MS. PERRY: Objection. Calls for speculation. Lacks foundation. Incomplete hypothetical.

MS. GJOVIK: He can answer.

THE DEPONENT: You were terminated because you violated your confidential agreement by posting a screenshot of an internal tool, among other things that we discussed earlier. I can repeat them if you want.

BY MS. GJOVIK:

Q. No thank you.

So just to confirm, no additional facts or data would make you change your mind about the decision you made?

MS. PERRY: Objection. Vague and ambiguous.

BY MS. GJOVIK:

Q. Mr. Bertolus, do you think that additional information could be provided to the context of what happened that might make you reconsider your decision to terminate my employment on September 9th?

A. I'm sorry. The way the question is phrased is complicated.

Based on the data that I had at the time,

Page 126

for me, you made a very egregious mistake, and it violated the Apple policies that we've covered a few times now. And that was grounds for termination.

Q. Okay. And you've used the word "egregious" several times now.

Is that a word you chose, or is that a word that you were told to use?

A. It's a word I chose. I mean, it's very egregious. Sorry. I can try to find a different one. As you know, English is my second language.

Q. No, that's fine. You're welcome to use what words you want. Just it's been used repeatedly by multiple people.

And then you, I believe, testified prior that you had not seen the exchange I had on September 9th with the refusal to cooperate allegation. So I wanted to show you that email exchange.

MS. GJOVIK: This is Exhibit -- Plaintiff's production 10, 92_KF.

(Exhibit 92 was marked for identification.)

BY MS. GJOVIK:

Q. And this is that Aleks Kagramanov reaching out on September 9th at 2:08 p.m., saying:

Page 127

"This is Aleks Kagramanov from employee relations. We're looking into a sensitive intellectual property matter that we would like to speak with you about.

"We would like to connect with you as soon as possible today, within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today.

"I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet. As part of Apple's policy, your cooperation and participation is imperative. Thank you in advance, and talk soon."

Does that e-mail look like what you kind of expected that they sent me?

A. I'm not sure what you mean by expect them to send you. I mean, basically he's saying they need to

Page 128

talk to you as soon as possible. That seems -- it seems appropriate.

Q. You think it's normal for Apple to ask to talk to employees within the hour?

A. What you had done -- I mean, you don't want me to use the term egregious. But what you had done was extremely serious and warranted a response.

Q. Okay. And then I responded two minutes later, at 2:10. And I said:

"Hi, Aleks. Happy to help. Please send any questions/updates via email so we can keep everything written, please. I will respond via email as quickly as I can. Thanks."

And then I responded again at 2:27 p.m. and said:

"FYI, I forwarded your email and my reply to the investigator on my NLRB case, so he's aware you just reached out to me the day before my affidavit is supposed to be taken. This feels a little like witness intimidation."

And then Mr. Kagramanov responded at 2:50 p.m.:

"We are investigating allegations

Page 129

that you improperly disclosed Apple confidential information.

"Since you have chosen not to participate in the discussion, we will move forward with the information that we have.  Given the seriousness of these allegations, we are suspending your access to Apple systems."

And then I responded:

"Hi, Aleks.  As mentioned, I'm definitely willing to participate in your investigation.  I only asked that the discussion be kept to email and said nothing about not participating in the discussion at all.  I offered to help via email to ensure we have a documented record of our conversations, considering everything that's currently going on with my investigation and my complaints to the government" --

And sorry.  That time stamp's off.  It's Eastern.  So that's 3:07 p.m.  That's still within an hour of his original email.

Okay.  Back to reading:

"I have been speaking out about

Page 130

work conditions, about workplace safety, concerns about discrimination and retaliation, and about concerns about intimidation and corruption, as reported to the government in public record.  I'm very concerned about what you are calling 'serious allegations.'

"Can you please provide me additional detail on what these allegations are?  And when you say 'move forward,' are you simply" -- it should say suspending, but it says suspecting -- "my access to Apple system, or are you doing something more?  And if so, what?

"Your email is very unexpected, and I'm caught quite off guard if this is a real issue.  I'd like the opportunity to remedy any actual issues.  Please let me know what the issues are, so I can make a good faith attempt at that.

"In the meantime, without additional context or effort to communicate with me in email, this

Page 131

really does feel like intimidation and additional retaliation, and I will consider it as such."

Mr. Bertolus, have you ever seen any part of this email exchange before I just showed it to you now?

A.  No, I have not.

Q.  Okay.  And now that you've seen this exchange -- and this was authenticated by Mr. Kagramanov -- would you say that it looked like I was refusing to cooperate?

A.  You refused to talk to the investigator, so what we said is factual.

Q.  So to clarify, you know, I was saying I'd talk to him in email.  I just said I didn't want to get on the phone.

So can you clarify, are you saying that the only way to cooperate would be getting on the phone with him?

A.  After leaking proprietary information and violating your confidentiality agreement, I think an appropriate next step would have been to speak to the investigator and cooperate that way.

Q.  Okay.  And do you think that my explanation of why I wanted to keep a written record then was

Page 132

appropriate?

A.  I don't see why, I mean, that's relevant for me to answer that.

Q.  Do you think I should have been able to at least ask to have a witness or record the phone call?

MS. PERRY:  Objection.  Calls for speculation.  Incomplete hypothetical.

MS. GJOVIK:  I can't hear you.

MS. PERRY:  Objection.  Calls for speculation.  Incomplete hypothetical.

BY MS. GJOVIK:

Q.  You can still answer.  Because he made the determination and made an assessment of cooperation.

A.  The primary reason you were terminated is because you violated your confidentiality agreement when you posted those pictures on Twitter.

Q.  Okay.  Thank you.

Mr. Bertolus --

MS. GJOVIK:  So this is Plaintiff's production 10, Exhibit 53 KC.

(Exhibit 53 was marked for identification.)

BY MS. GJOVIK:

Q.  Mr. Bertolus, are you aware that the NLRB had issued a complaint against Apple, suing them for

Page 133

suspending and terminating me in violation of the National Labor Relations Act?

MS. PERRY: Objection. Lacks foundation.

MS. GJOVIK: He can answer.

THE DEPONENT: When was that?

BY MS. GJOVIK:

Q. That was this complaint we're looking at, this exhibit. It was issued December 18, 2024.

A. No, I was not aware. I think you asked me the question earlier, and I answered it already.

Q. I don't know if I did. But okay. Thank you.

And then were you aware that the NLRB, as part of the requested relief, included reinstating my employment and sending me a letter apologizing for suspending and terminating me?

A. No, I was not aware.

Q. Okay. And then, Mr. Bertolus --

MS. GJOVIK: This is Exhibit -- Plaintiff's production 12, Exhibit EE.

(Exhibit EE was marked for identification.)

BY MS. GJOVIK:

Q. Mr. Bertolus, were you aware that the NLRB also issued a complaint to sue Apple over a number of

Page 134

Apple's work policies, employment policies, including all three policies that we reviewed earlier?

MS. PERRY: Objection. Lacks foundation.

MS. GJOVIK: He can answer.

THE DEPONENT: Again, I think you asked before.

No, I was not aware.

BY MS. GJOVIK:

Q. Okay. And so this was issued -- instead of going over all of those things -- okay. So I'll -- the stuff that the NLRB outlined in their complaint included the confidentiality and proprietary information IPA agreement -- and actually, the version that we're reviewing, the reason I had redacted my signature is it was an exhibit for the NLRB for this complaint that they filed, for their docket.

And then also the business conduct policy. So the one I chose, the October 2020 one we reviewed, was also the NLRB's exhibit for their complaint and litigation against Apple. And then let's see.

We talked a little bit about public speaking and press inquiries, publishing articles. Those were included as well. And -- sorry. There's just so many -- so many included.

Page 135

That misconduct and discipline policy is also included. And we reviewed the social media and online communications policy earlier today too. That was also in NLRB's complaint, including the confidentiality terms. And I'm just looking for when they filed this, because you asked this earlier.

So they sent this October 3rd, 2024.

MS. GJOVIK: And then I would ask -- let's see. What is this?

So this is Plaintiff's production 10, Exhibit 101 KG.

(Exhibit 101 was marked for identification.)

BY MS. GJOVIK:

Q. Mr. Bertolus, are you aware that Apple settled that case with the NLRB and entered a trilateral national settlement agreement with NLRB and myself and agreed to withdraw a number of terms from those stated policies and agreed to stop enforcing those terms on their employees?

MS. PERRY: Objection, to the extent it lacks foundation.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. You can answer.

Page 136

A. No, I was not.

Q. Thank you.

So this is -- this is part of the settlement agreement, the official settlement agreement. And that's -- Apple's lawyer's MLS and that AMG is me. It's my initials. And I just want to show you this -- the second part.

Were you aware that Apple had a posting requirement with three pages -- and you should get a copy of these, I'd hope, so you can review them or read them, if you want -- of things they will not do going forward, and they had to post it for their employees to review, including sending it to their prior employees too?

Were you aware they had to do this posting?

A. No.

Q. No.

MS. GJOVIK: And then the Exhibit JJ is the compliance material.

(Exhibit JJ was marked for identification.)

BY MS. GJOVIK:

Q. I just wanted to make sure you saw the actual posting here and had a -- could see this agreement. Since you were the one that interpreted

Page 137

the policies in my case, I thought it would be helpful for you to have this. Hold on a second.

A. So is this still, like, two or three years -- when is that?

Q. They settled this in 2025.

So this is the formal posting, where they have to, like, print it out and show it to everyone. And that charge number, that's my charge that I filed in October 2021. And Apple actually had to post this stuff. It's still on their legal website. They had a requirement to post it publicly on their legal website.

And then we talked earlier --

A. Hold on. You're scrolling pretty quickly.

Is this saying that Apple employees can disclose confidential information, though?

Q. I would say you'd probably want to talk to Apple's lawyers, to get the legal advice from them of how to interpret those terms. I would not be the one to tell you.

But I would say that I don't believe that Apple's version of confidential information, proprietary information -- the list goes on -- is lawful. And I believe they're still violating the terms of the settlement agreement, as I've alleged

Page 138

multiple times, with them trying to assert things just, like, nonpublic information are confidential. But that's a -- that's a whole -- that's a whole mess, Mr. Bertolus.

So you can definitely ask them for copies of this and read it. It's also on my website. You're welcome to check it out under the NLRB section. I just wanted you to know.

Do you have any other questions, or can I go to the next one?

A. No. Go for it.

Q. Okay. Thank you.

MS. GJOVIK: And then Plaintiff's production 12, LL.

(Exhibit LL was marked for identification.)

BY MS. GJOVIK:

Q. We talked earlier about the EPA settlement with Apple. There was Apple's first national settlement with the EPA -- or a formal settlement with the US EPA over that chip fab, where I've alleged that Apple nearly killed me with hazardous waste exhaust.

And you said you didn't know, so I just wanted to have a factual basis to show you a copy

Page 139

that there is a consent agreement. This is what it looks like. It will be attached. I'm not asking you to authenticate it.

I did want to ask: Are you aware that I'm also suing Apple separately under federal citizen suit provisions over that chip fab and trying to get it shut down, because I've argued it's a substantial and imminent danger to the community around it?

A. No.

Q. Okay. And then -- oh, I wanted to ask you, Mr. Bertolus, the -- the stuff with the office, that 825 Stewart Drive, you had said you were aware that I was making complaints about -- questions about vapor intrusion and safety -- right -- prior to the termination?

MS. PERRY: Objection, to the extent it misstates testimony.

MS. GJOVIK: Okay. Just -- he did, so -- it's fine.

BY MS. GJOVIK:

Q. You don't have to answer, sir. I just want to show you -- Apple just produced these documents. Like, I had to compel them and get the judge to fork them over.

But it's definite that, during the

Page 140

inspections in May 2021, they found a number of cracks in the floor and holes in the floor they had to fix. And this is an August 2021 document, documenting all -- I'm not going to make you authenticate it or anything, because you apparently weren't part of this.

But a lot of the stuff they had to fix and all the issues they found -- were you aware they were finding issues during these that they had to repair?

A. No.

Q. Were you aware that the EPA conducted an inspection of my office on August 19, 2021?

MS. PERRY: Objection, to the extent it misstates testimony.

BY MS. GJOVIK:

Q. I just asked: Are you aware that the US EPA conducted an inspection of my office on August 19th, 2021?

A. I don't remember that, no.

Q. Were you aware they found issues requiring corrective actions regarding the vapor intrusion mitigation system?

MS. PERRY: Objection, to the extent it lacks foundation.

MS. GJOVIK: Okay.

Page 141

THE DEPONENT:  No, I was not aware.

BY MS. GJOVIK:

Q.  Okay.  Are you aware that Apple's own documents said that -- let me go back.

Are you aware the EPA conducted that inspection because of my disclosures to the EPA about the cracks in the floor at my office?

MS. PERRY:  Objection, to the extent it lacks foundation.

MS. GJOVIK:  Okay.

THE DEPONENT:  No, I'm not.

BY MS. GJOVIK:

Q.  Are you aware that they requested that inspection in late July -- their records say July 27th, so that's the date I'm going with -- July 27th, 2021, they notified Apple they want to come on site and do an inspection of the cracks in the floor and the HVAC system?

MS. PERRY:  Objection, to the extent it lacks foundation.

MS. GJOVIK:  Okay.

THE DEPONENT:  No, I was not aware.

BY MS. GJOVIK:

Q.  Okay.  Do you recall the date I was placed on administrative leave?

Page 142

A.  No.

Q.  It was August 4th, 2021.  And I had just said I was planning on coming the next day, August 5th, because I wanted to take some more pictures of the cracks in the floor.  And then I was told I can't come back to the office.

And then Apple's own documents here indicate that, I guess as soon as I was told not to come back to the office, they started all the ceiling activity.  And they did their, like, final walk-through inspection to say it was all sealed on August 18th, 2021, the day before the EPA inspection to inspect those cracks.

Were you aware of that time line?

MS. PERRY:  Objection, to the extent it lacks foundation.

MS. GJOVIK:  Okay.

THE DEPONENT:  No.

MS. GJOVIK:  This is another one with additional details.  This is Exhibit -- oh, these are Apple's exhibits.

So this is Exhibit APL-GAELG.  And then the first one is 3870 and then 3866.

(Exhibits 3870 and 3866 were marked for identification.)

Page 143

BY MS. GJOVIK:

Q.  Mr. Bertolus, were you aware that they also found issues with the sub-slab ports in the floor that have the, like, direct access to where the gases are under the floor?  These sub-slab ports?  This page shows the list of stuff.

Were you aware that they --

MS. PERRY:  Did you finish?

BY MS. GJOVIK:

Q.  Were you aware that there were even some of these they could not find in the building?

MS. PERRY:  Objection, to the extent it lacks foundation.

MS. GJOVIK:  Okay.

THE DEPONENT:  No.

BY MS. GJOVIK:

Q.  Thank you.

Okay.  So -- and thank you, Mr. Bertolus.  And I'm sorry I have to do this.  And now things are going to get really weird.  And I'm -- I learned some stuff from Mr. West too that makes this even worse.  And I'm just really -- I almost want to cry that I have to bring this up.  I'm so sorry.

But you had -- you had said that you weren't aware or could not recall the subject matter of the

Page 144

text messages I had with Dan West that were the facts giving rise to the allegations that I was -- I believe you said misrepresenting information; is that correct?

MS. PERRY:  Objection.  Misstates testimony.

BY MS. GJOVIK:

Q.  Mr. Bertolus, the third item in your list of the things I did wrong, and one of them related to text messages with Dan West.

Can you summarize for me your recollection of that allegation, please?

A.  My memory of it, based on my discussion with, I believe global security, is that you mischaracterized an exchange by just showing a short portion and not the whole text exchange.

Q.  Okay.  Mr. Bertolus, out of respect for you and your friends, I'm not going to try to trick you on this topic.  And I'm crying because I didn't know he passed away either.  So I'm really sorry we have to dredge this all up.  And I know you're very close to them.

But Apple has, per the deposition of Mr. Okpo and Mr. West -- oh, sorry.  Mr. West didn't know this either.  And I think he was probably upset too.  But per Mr. Okpo, that allegation about

Yannick Bertolus

Page 145

misleading Mr. -- this is only going to be questions for you. And I'm sorry I'm so disorganized talking about it. I just feel really bad about it.

When I talked to Mr. Okpo, I was asking him why he was reaching out to me a few times in September trying to talk to me and he wouldn't say what it was about. And he said something about inconsistency. So I was trying to figure out what that was. And his testimony was that it was exclusively about me misrepresenting some exchange with Mr. West.

And I believe what you're probably talking about with the screenshots versus the whole text message thread is -- probably what it is -- Apple kind of brought it up. What Apple was apparently referring to was Mr. West and Jared at Chez TJ trying to set me up with Andrew, the sous chef. And they've turned that into a reason that I was terminated, arguing that it sounds like me protesting that it was inappropriate for Mr. West to try to get me to date someone, one of his friends, was false because I thought the sous chef was cute. And it's turned into this whole thing.

And I didn't know he passed away. And I feel really bad about that. And just bad in general

Page 146

to bring this up, because I know they're your friends. But I'm going to have to ask you a lot about that now, because they made that a reason for terminating me. So I feel really bad. I'm sorry. But I'm going to have to ask you a bunch of questions now about Jared and Chez TJ and show you documents and try to -- you know. But I don't mean any offense to you. I'm sorry.

So to start, can you please tell me what you know about a restaurant called Chez TJ in Mountain View?

A. Can you be more specific on --

Q. Have you ever been to a restaurant called Chez TJ in Mountain View?

A. Yes.

Q. Have you gone many times?

A. Yes.

Q. Do you know a prior chef named Jared?

A. Yes.

Q. What's Jared's full name?

A. Jared Gallagher.

Q. And are you aware of a sous chef, line chef, named Andrew?

A. Yes.

Q. What's Andrew's full name?

Page 147

A. I don't know his last name.

Q. Okay. Would you say you're personal friends with Jared?

A. Yes.

Q. And was Mr. West also friends with Jared?

A. I believe so. That would be a question for him.

Q. Yeah.

Mr. Bertolus, were you aware that I had dinner at Chez TJ in 2017?

A. I don't really remember, you know, when, how. No. No. The answer is no.

Q. Were you aware that Jared and Mr. West paid for my entire dinner that night?

A. Can you repeat the question?

Q. Were you aware that night I ate at Chez TJ, and I did, that Jared, that chef, and Mr. Dan West had paid for my entire dinner?

A. Well, I'm surprised the -- my lawyer is not intervening here. Because the only --

MS. PERRY: Are you saying -- are you saying that your knowledge of what actually happened is only through privileged communications with counsel?

THE DEPONENT: Yes.

MS. PERRY: Okay. Then I'm going to --

Page 148

MS. GJOVIK: I'm sorry. I can't hear you. Can you speak up?

MS. PERRY: The witness just confirmed that his only knowledge about this is through privileged communications with counsel. And so I'm going to instruct him not to answer.

MS. GJOVIK: Okay.

BY MS. GJOVIK:

Q. Mr. Bertolus, are you aware that there was a conversation between Mr. West and myself and Jared and myself about me and that sous chef, Andrew, potentially exploring a sexual relationship that night during the dinner?

MS. PERRY: So I'm going to instruct him not to answer, to the extent you're asking him about conversations that happened or anything that was disclosed to him by counsel.

MS. GJOVIK: That's fine. We have limited time --

MS. PERRY: Hold on. I'm not finished.

MS. GJOVIK: Okay.

MS. PERRY: I believe he testified earlier that he saw a text exchange. If you want to ask him about his understanding or interpretation of the text exchange, you can do that, and I'll allow him to

Page 149

answer. But I'm trying to make a distinction between things that would have been communicated to him by counsel, which I will not waive the privilege over.

MS. GJOVIK: Are you done?

MS. PERRY: I am.

MS. GJOVIK: Okay. I did ask him that. He did answer a couple times. So now I'm trying to get into more.

I would ask that if you're going to object under privilege, you just say that briefly, so we don't waste too much time on monologue. If you say objection under privilege, then I'll just move on. Okay?

MS. PERRY: Well, I'm trying to explain to you where that privilege line is, so that you have the option of asking additional questions, if you wish to do so, of the witness.

MS. GJOVIK: I understand. But he already indicated he had no further information on the text exchange -- or that dinner.

MS. PERRY: That's not what he said. You're misstating his testimony.

BY MS. GJOVIK:

Q. Mr. Bertolus, is there anything further you're able to share with me about your knowledge of

Page 150

the text exchange I had with Dan that was subject to the allegation of misrepresentation?

A. The -- I had no knowledge of any of what you discussed, except that -- to the extent that there was a text exchange where you misrepresent or misled the investigator by just pulling out a subset of that discussion. But everything else you brought up about the discussion, the dinner, and all that, I have no recollection of that.

Q. I assumed so. Thank you for confirming. Again, I'm sorry. This is going to be very -- extremely awkward. Okay. So let me get a couple examples.

So when employee relations was investigating my concerns in July, I had given them box folders and evidence and stuff to review. And it was a lot of files, but I have a lot of complaints, so -- sometimes it was just screenshots of stuff for them to review. And I had a couple of the screenshots, I believe, that I had maybe provided them.

And I had complained that I had thought it was inappropriate that Mr. West was trying to arrange relationships with me, especially with, like, his friends and business partners. That's why I was trying to ask for help from Apple to get more

Page 151

professional boundaries. So I did kind of open that door a little bit, and I showed a couple of the texts.

So I'm going to show you a couple of those texts I had with him. And I do have, like, the full ones we can look over for sure.

Okay. Let's start. So -- okay. Here's one.

Does this phone number look like Dan West's phone number?

A. I don't know his phone number by heart like this. I don't even know my kid's phone number.

Q. Okay. That's fine.

So I believe this is Dan West's phone number. I had this conversation with him. And I had just a couple screenshots from my phone.

And actually, I had said I didn't have the full exchange. And one of the reasons I wanted to go back to the office was to get the full exchange, and Apple would not let me. So -- but that's just commentary.

MS. GJOVIK: So this is Exhibit -- Plaintiff's production 12, Exhibit A.

(Exhibit A was marked for identification.)

Page 152

BY MS. GJOVIK:

Q. I was texting with Dan West. And the screenshot I included said:

"So we can call your dinner intervention a plot to get me too drunk to remember Yannick's dirty laundry. Jared had a lot of opinions about YB not racing anymore."

And Dan said:

"Oh, yeah. He wasn't happy."

Then I said:

"I could only imagine the three of you together. All live wires. God save Allison."

Then Dan said:

"Dude, Allison can hang. Maybe you needed to worry three years ago. Not anymore. She stirs the pot then steps back and laughs."

I said:

"Lol. Why are you cliffing her like that."

That was a joke -- an inside joke they had.

He said:

"You sound like an old person when

Page 153

you use it incorrectly."

And then we were just talking about some other stuff.

But for that, I was trying to show that it was -- it also seemed like it was friends of yours too, and that there was -- it seemed like a lot of personal boundary blurring.

MS. GJOVIK:  And another one.  This is Exhibit -- Plaintiff's production 12, Exhibit B, with Dan.

(Exhibit B was marked for identification.)

BY MS. GJOVIK:

Q.  I said:

"They charge you much more for mail" --

I think we were talking about Andrew.  I don't -- I couldn't find all of them.  This is one we were talking about Andrew.

"They charge you much more for mail order blondes in Russia."

Andrew was blond.

He says:

"Well, Andrew now works in the city."

Page 154

I said:

"What a deal.  He got dumped after he kept texting me at 3:00 a.m. and spent his weekends gambling in Chino. Way to make me feel 70 years old."

Dan said:

"Thanks for not yelling at me."

I said:

"I did in realtime."

He said:

"I don't remember you yelling at me.  I'm so sorry."

A.  I'm sorry.  Maybe I'm not supposed to do that during the -- but what's the relevance?

Q.  Sorry.  I can't hear you.

A.  No, I'm -- maybe I'm not supposed to do that in a deposition, but I don't understand the relevance of this.

Q.  Oh, I'm just showing you some of these conversations that they're alleging -- I'm not sure exactly which ones they showed you or they were saying were, like, excerpts.

I wanted to show you some of these conversations Dan and I were having about this topic that Apple apparently alleges is a factual basis for

Page 155

me misrepresenting what happened.  And because I don't have any further information at this time, I'm just showing you some of the stuff.

And then I'm going to ask you, like, were you aware Dan and I were talking about this stuff? Are you aware that this is what Apple was alleging with misrepresenting stuff?

Is that okay?

A.  There's so many questions.

What's the question?

MS. PERRY:  Hold on.  Hold on.  Hold on.

Do you want to -- do you want to continue what you were doing and then ask him questions?  I think he's just confused about what you're trying to do.

MS. GJOVIK:  Oh, yeah, I would.

BY MS. GJOVIK:

Q.  And again, I'm sorry.  This is really weird. And I would never do this on purpose, Mr. Bertolus. I'm so sorry.

So I'm just going to read these, and then I'm going to ask you those questions.  And you're probably going to say you don't know.  But I kind of have to show that Apple, I think, is lying.  This is me trying to defend my case.  I have to, you know,

Page 156

argue against their points.  And since they chose something very deeply, I would assume, personal to you and Mr. West and me too, we just have to go there.

Okay.  So I said the mail order brides because he was setting me up with Andrew.

Then he said:

"Thanks for not yelling at me."

And I said:

"I did in realtime."

And he said:

"I don't remember you yelling at me.  I'm so sorry."

I said:

"I guess that's all that matters."

He says:

"Now I feel even worse.  It's funny.  At the time, I thought it was going to be a good thing."

I was like:

"It's okay.  Again, free dinner. Lots of extra treats.  It all worked out.  Lol.  You and what's-his-face too."

He says:

Yannick Bertolus

Page 157

"Jared."

I said:

"You were both plotting."

He says yeah -- or I say:

"Yeah.  Jared."

He says:

"He's a good friend."

I said:

"I drank too much to remember.  But he kept telling me secrets about Yannick."

Dan said:

"It was actually his idea" -- presumably, to set me up with Andrew.  So Dan's going along with it.

I said:

"I just kept remember thinking Yannick would be pissed" -- with a bunch of s's -- "if he heard this."

And Dan said:

"Probably."

And I said:

"So we can call your dinner intervention a plot to get me too drunk to remember Yannick's dirty laundry."

Page 158

That goes back to Exhibit A.

Mr. Bertolus, were you aware that Mr. West, who reported to you, and I were talking about you in this way?

A.  No.

Q.  Were you aware that Mr. West and I were having conversations about Jared and Andrew about this context?

A.  Nope.

Q.  Do you think this is an appropriate way for a senior director to talk to their EPM?

A.  I would need to have more context to make a -- you seem pretty feminine -- I don't even want to even go there and speculate.  But you seem pretty -- I don't know.  I still don't see the relevance of all this.  But --

Q.  I don't either.  But Apple kind of made it relevant, so that's what we're stuck doing.

So --

A.  So I think --

MS. PERRY:  Hold on.  Hold on.  Just wait for a question.

THE DEPONENT:  Okay.

MS. GJOVIK:  What was that?

MS. PERRY:  No, I was telling him to wait

Page 159

for your next question.

MS. GJOVIK:  Okay.

BY MS. GJOVIK:

Q.  Mr. Bertolus, are you aware from Jared that I also had complained to him he shouldn't be telling me personal information about you while I was having dinner at his restaurant?

A.  No.

Q.  Okay.  And then let's see.  I want to get the more detailed ones.

MS. GJOVIK:  Okay.  So I'm going to show you -- actually, now I have my own more modern one that I'll show you after this.

But this is Apple's Exhibit 28.  So this is Apple AG Depo Exhibit 28.

(Exhibit 28 was marked for identification.)

BY MS. GJOVIK:

Q.  When Apple deposed me, they actually found the text messages from 2017 that I had been looking for and couldn't find, and they attached them.  So this is Apple's copy.

And the chat starts on December 29th, 2017.  That was the night I was eating at Chez TJ.

And Apple has not stated correctly -- so I'm

Page 160

not going to -- I'm not going to state their position.

But it appears they're saying that if the whole record had been showed about what happened that night, that it shows that I was misleading with whatever it was I -- I'm not sure what I even shared with them that they said it was an issue to.  So I can't tell you that either.  But I'm going to show their exhibit.

So it started with me saying:

"Chez TJ tonight.  How much wine do they give you if you add wine pairings?  I'm a lightweight and am leaning towards just doing one to two glasses off the wine menu instead."

Oh, Mr. Bertolus, are you aware that Mr. West and I hung out, like, personally, as friends?

A.  No.

Q.  Are you aware that we texted about personal things in personal time?

A.  Only to the extent that -- of that text exchange that was brought to me -- brought to my attention in how you misguided the investigation.

Q.  Mr. Bertolus, were you aware of what that --

Page 161

I had asked you a couple times if you knew what the text message exchange was about.

Did you know what the subject matter was about when you fired me?

A. I -- at the time, I did. But yeah, I don't have more recollection than -- than that.

Q. Yeah. Okay.

So were you also aware that Mr. West had been suggesting I go to this restaurant, and I had indicated I couldn't afford it. And then when I got my promotion, he said he was going to promote me so that I did go, and so that's why I was telling him that I was there?

MS. PERRY: Objection. Lacks foundation. Calls for speculation.

MS. GJOVIK: That's fine.

THE DEPONENT: What's the question again?

BY MS. GJOVIK:

Q. Were you aware that Mr. West was urging me to go to this restaurant and eat there. I said I couldn't afford there. And then he was going to promote me, and so then I did go. And that's why I'm telling him that I was there?

MS. PERRY: Same objections.

MS. GJOVIK: Yeah.

Page 162

THE DEPONENT: Can you -- sorry. I don't mean to be --

BY MS. GJOVIK:

Q. No, that's fine.

Mr. Bertolus --

A. Wait. Can you ask the question without the --

Q. Let me ask it more simply.

A. Thank you. Yes.

Q. Mr. Bertolus, were you aware that Mr. West and I had been having discussions about Chez TJ, where Mr. West had been urging me to have dinner there?

MS. PERRY: Objection. Lacks foundation. Calls for speculation.

MS. GJOVIK: Okay.

THE DEPONENT: I wasn't, except when he -- when I reviewed the text exchange where you misguided the investigator.

BY MS. GJOVIK:

Q. Sorry.

Again, Mr. Bertolus, you had indicated you had not reviewed the actual text exchange when you made the termination decision. But now I'm confused.

Had you read any of these texts when you

Page 163

made the termination decision?

MS. PERRY: Objection, to the extent it's argumentative. And misstates the witness's prior testimony.

MS. GJOVIK: I'm just trying to understand if he knew what the subject matter of the text was when he made the decision or not.

MS. PERRY: He's already answered that question for you. He said --

MS. GJOVIK: I thought he said no.

MS. PERRY: No, that's not what he said. You're misstating his testimony.

MS. GJOVIK: Help me understand, please.

MS. PERRY: You asked him if he was aware of the subject matter, and he said he did at the time. He told you he had reviewed the text at the time, and then he told you he didn't remember it now. That was his testimony just a few moments ago.

THE DEPONENT: That's correct.

BY MS. GJOVIK:

Q. Okay. So can you describe for me what you recollect now that you reviewed at that time?

A. Well, now you've just shown me a whole lot more than I had ever seen before.

I was focusing on the fact, at the time of

Page 164

your termination, that you took an exchange and misled the investigator by just taking a small section of the exchange, and that was misguiding.

Q. To the best of your recollection, do you remember seeing the actual text messages between me and Dan West when you made the termination decision?

A. To the best of my recollection, I do. But to the best of my recollection, not even as much, I think, as what you've just shown me today.

Q. Okay. And were you aware that the subject matter was Chez TJ and the sous chef, Andrew?

A. I remember that it was Chez TJ. I had absolutely no idea it was Andrew. Even when it was presented to me just now, I thought it was Jared himself, not Andrew.

Q. Oh, I'm sorry.

A. That tells you how much I didn't know the details of all that.

Q. Well, and I'm sorry. When I said Andrew, I meant more, like, just the subject matter of setting up with Andrew, versus who decided what.

But you did know this was Chez TJ-related when you had made the decision to terminate my employment; is that correct?

A. Yes.

Page 165

Q. Okay. So I sent that text -- again, this is Apple's exhibit. I sent the text to Dan.

Dan said:

"Is it a table for one?"

I said:

"Yep."

He tells me how long the meal will last.

I say:

"I'm prepared."

He says:

"I need to text the chef. I forgot earlier."

I said:

"Ha. You would have the chef's phone number."

We go back and forth a little bit.

Let's see. This is, like, 39 pages. I don't want to read all of it.

And then Dan texts:

"Amanda tells me you want us to set you up with someone."

I don't recall saying that.

But I said:

"Lol. I think I told her I need to find the male version of her, since

Page 166

you and I are so similar."

I felt I was very similar to Dan.

Then he says:

"So I may have mentioned to the chef that you are single and that his sous chef should introduce himself to you."

And I said:

"Oh, no. Dan," exclamation point.

And then I say:

"Is he cute?"

Dan responded:

"Expect at least one plate to be delivered by Andrew."

And then:

"I have no idea."

And I said:

"Oh, Lordy. Okay. Thank you for the good intentions."

Then Dan says:

"I'm the worst judge."

And I'm like:

"We'll see soon."

He says:

"He's a nice guy, though. I told

Page 167

them, 'Ashley is good people.'"

I said:

"Thank you, Dan. But we both know I'm trouble."

And he said:

"And Chef said they will treat you like family."

I said:

"Aww. That's awesome. You must really go there all the time."

Oh, and then they did -- they upgraded me to, like, fancy Wagyu and stuff and didn't even charge me.

And then I respond:

"Andrew's a cutie."

And he likes Andrew's a cutie, and he says:

"It will be great. I think Jared is definitely the best in the South Bay."

I said:

"He" -- Andrew -- "also looked super uncomfortable. Was he a willing participant in this?"

Dan says:

"Probably not. Head chef."

Page 168

And I said:

"We were both blushing the entire time. Poor guy. The food's incredible."

And then I say: Is this Andrew arrangement" --

Again, this is Apple's exhibit. This is Apple's full context.

I say:

"Is this Andrew arrangement you trying to combine empires? Like Game of Thrones for your dinners?"

Then I say: "Andrew came back. He said he's giving me complimentary Wagyu. Okay. Maybe you two are cupids after all. I'm a sucker for both blond guys and Wagyu."

And Dan says -- tongue sticking out. And then he says:

"I like the Game of Thrones reference."

And then I say:

"Jared reminds me of a mixture between you and Yannick."

And Dan says:

Page 169

"His intensity scares me a bit. But I love that guy."

Oh, and then I go:

"I picture Jared as a version of you that's had three glasses of wine and three cups of coffee in a short period of time."

He says:

"Maybe six of each."

I said:

"I could believe that. He was probably on good behavior when he introduced himself."

And again, Mr. Bertolus, I'm so sorry. I really hope you don't blame me for this. But this is Apple's exhibit.

So then I say:

"Yannick broke both of his arms?"

Dan says:

"That was a long time ago. He nearly died."

And I said:

"Holy shit. Poor Yannick."

I said:

"Jared seems sad he doesn't race

Page 170

anymore. Maybe Jared is a little cray-cray."

Dan says:

"He was racing, doing what he loves. Now he races cars."

I said:

"Yes, I heard about his Porsche and how Jared can't afford a Porsche."

Then Dan says:

"Should I tell Jared that Andrew is a cutie?"

I say:

"Most detailed introduction ever."

And he says:

"Or have I meddled enough?"

And I say:

"I told Jared he's being mean to Jared" -- I think I meant Andrew -- "He says there's fun being had on all sides."

And Dan says:

"Andrew?"

I said:

"Yeah. I'm two glasses in."

He says:

Page 171

"I can insult him."

I said:

"I'll leave my number for Andrew. Should take care of it."

He said:

"You had one job, and you freaking blew it."

I say:

"Lol. He already bought me a 100 dinner. At least deserves a number."

Because they bought my dinner. Apparently, Dan and Jared and Andrew all bought my dinner after that.

He says:

"Wagyu was more than 100? Oh, damn."

I said:

"Yeah, bro. Damn is right."

And Dan says, after the fact: "In all candor, no pressure from me. I only know Andrew a little bit. Jared is my buddy."

I said:

"I wouldn't do it if I wasn't

Page 172

actually interested. I'm very picky. I'm also a fan of Jared now. It was really nice of him to come out and say hi."

And Dan said:

"Jared came back and spent two whole minutes talking about how hot he thinks Yannick is."

Again, Mr. Bertolus, this is Apple's exhibit. I'm so sorry. I'm so sorry. I'm mortified.

And then:

"I think Jared is in love with YB" --

That's you, Mr. Bertolus.

And then Dan says:

"A-ooo-ga," with this emoji with the eyes.

And that's apparently to you, about how hot you are, Mr. Bertolus.

And then I do the thing with the emoji of me with the hearts. And then I say:

"Dan, your money is no good there."

Oh, they told me they would pay a little

Page 173

bit, and then they just covered my entire dinner.
I said:
"Your money is no good here.
'Says Dan West.'"
And then I say:
"What the fuck, dude?  That's way
too nice of you."
He said:
"Give a fat tip.  Jared covered
some too.  Just don't spread the word
that I'm a nice guy.  I've got a
reputation, you know."
And I said:
"Lol."
We're almost done.  I'm so sorry.
And then he said:
"I'm just glad you enjoyed the
meal."
And I said:
"Okay.  Mum's the word.  And
seriously, huge thank you.  Dinner was
amazing.  Merry Christmas, dude."
And he says:
"Make sure to thank Jared."
And I said:

Page 174

"He already left.  He said he had
a baby to take care of.  I guess I need
to come back.  Would you please tell
him I say a huge thank you for the
generosity, the delicious amazing food,
and the cute blonds?"
And then I said:
"Andrew even gave me a to-go
bottle of the super-secret Jedi Master
tea."
He says:
"Oh, yeah.  That tea is great."
And then I say:
"Thank you and thank you."
Mr. Bertolus, did you see this Apple exhibit
that I just showed you prior to me showing it to you?
A.  I don't remember the whole -- whole detail
you showed.  I remember seeing a snippet of that,
yes.
Q.  Okay.  Mr. Bertolus do you think this text
exchange is appropriate for interactions between a
senior director and one of his employees?
A.  I'm not sure that's for me to answer that.
Q.  Mr. Bertolus -- oh, sorry.
Go ahead.

Page 175

A.  No.  Go ahead.
Q.  Were you aware that Mr. West testified
during his deposition that the only feedback he
received from employee relations regarding corrective
actions coming out of my complaints was regarding
these -- my personal message with him and the
messages that night?
A.  I didn't -- I don't recall exactly, no.  I
don't know.  It's a -- it's a long time ago.
Q.  Okay.
MS. PERRY:  I think she was asking you about
Mr. West's testimony.
THE DEPONENT:  Yeah.  But that, no.  But I
thought in relation to, you know --
BY MS. GJOVIK:
Q.  No.  I was asking did you know that that was
the only feedback he got coming out of that
investigation.  And it sounds like you said no.  But
you wouldn't know what his testimony was if you
hadn't reviewed it.
So is that -- is that correct, you did not
know that he received feedback from employee
relations regarding his personal messages with me.
A.  So I don't know anybody's testimony.  I did
not remember the feedback until you brought it up.

Page 176

But even now, my recollection is very poor on that,
because it was many years ago.
Q.  So per my deposition of Mr. Okpo, he seemed
to think -- the employee relations investigator -- he
seemed to think the misrepresentation was that it
couldn't be inappropriate, anything that Dan was
doing that night or saying, because I said I thought
Andrew was cute.
Can you explain to me what your view was --
since you apparently did review some of these
messages -- of what my misrepresentation was that was
a subject fault that could cause my immediate
termination?
A.  My recollection of what I saw at the time
was that you presented to the investigator only a
small part of that text exchange.  And when reviewed
in full context, it doesn't convey the same message.
And therefore, you were misguiding and violating
your -- the business conduct as part of that.
Q.  Do you still stand by your assessment, after
you've read Apple's exhibit now?
A.  You're referring to the exchange that you
just discussed?  Well, I would need to see again
the -- exactly the snippets.
But yeah, I continue to believe that you

Yannick Bertolus

**Page 177**

misguided the investigators, the way I recollect the meeting at the time.

Q. And do you think if the broader context is given, then -- or -- misrepresentation indicates, like, I was making false complaints there, like I'm the problem.

So can you help me understand why that limited view of the conversation was seen as, like, misconduct by me? Was it something, like, them thinking that I was making, like, bad faith complaints?

A. Yes.

Q. Okay.

A. As it relates to that text exchange, yes.

Q. And so -- and I think you were saying something earlier about me being -- I think you said feminine, and didn't continue.

So is that a similar thing, that, like, because I was being --

A. Sorry to cut you off.

Can you say that again? What would I have said? I don't remember saying that.

Q. We don't have to go back. We'll see what was on the actual record. I don't know if you actually said it. I thought you said something. But

**Page 178**

we'll if you have to say it. Like, I think it was Okpo who kind of, like, opened the door.

Would you say that if I was being flirty or acting like I was going along in the minute that if I made a complaint later that I thought Mr. West was being appropriate in a sexual nature, that I can't complain later?

MS. PERRY: Objections. Vague. Ambiguous. Overbroad.

MS. GJOVIK: I'd like him to answer.

THE DEPONENT: That's not what I said.

BY MS. GJOVIK:

Q. Can you help me understand, then, what I did during that exchange that means that I can't complain about it later without it being misconduct?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: Okay.

MS. PERRY: He didn't conduct the investigation.

MS. GJOVIK: He said he reviewed the content, though, and made a determination.

MS. PERRY: No, that's not what he said. You're misstating his testimony.

///

**Page 179**

BY MS. GJOVIK:

Q. Mr. Bertolus, can you tell me everything you can without violating privilege of why you think that my representation conduct related to this exchange with Andrew and Chez TJ was misconduct by me?

A. I don't again remember. It was a long, long time ago.

What I do remember at the time was that you had taken a snippet out of the whole discussion, and that it was misguiding.

Q. Okay. I have a couple more I want to quickly show you.

I guess were you aware that Apple chose to use this as a formal reason for justifying my termination in the litigation?

MS. PERRY: Objection.

THE DEPONENT: I'm sorry.

To use what?

BY MS. GJOVIK:

Q. The Chez TJ and Andrew stuff.

MS. PERRY: Objection. Lacks foundation.

THE DEPONENT: You were terminated because you violated your confidentiality agreement when you posted those -- that picture on Twitter, failed to cooperate in the investigation right after that, and

**Page 180**

misguided the employee relation investigator by showing only a snippet of that text exchange.

BY MS. GJOVIK:

Q. Okay. Do you think it's fair for me to defend about this when I can't call Andrew, because he's apparently now deceased?

MS. PERRY: Objection. Vague. Ambiguous. Overbroad. Calls for speculation. Also to the extent it lacks foundation.

THE DEPONENT: As I mentioned earlier, I did not even know that -- that the whole exchange was about Andrew.

MS. GJOVIK: I quickly want to show you something. Thank you. And again, I'm sorry -- I'm sorry for all that and having to bring up your personal information too.

Okay. So I want to show you an email. This is Exhibit -- Plaintiff's production 12I.

(Exhibit I was marked for identification.)

BY MS. GJOVIK:

Q. This is an email between Dan and John and me and Kai from 2018 that I had given employee relations as evidence that I wanted them to investigate, that there were issues that should be addressed. And

Yannick Bertolus

Page 181

included in it included comments about yourself, unfortunately.

Q. Were you aware that Dan was making comments --

A. Can you scroll -- sorry.

Can you zoom in? I can't really see.

Q. Uh-huh.

-- that Dan was making comments to his organization about your eyesight, and that I had asked -- complained to Dan that he shouldn't be making fun of your eyesight to his team and asked employee relations to add that to the list of things to talk to Dan about?

A. No, I did not know.

Q. Did you know that also in that same exchange, and also I had asked them to investigate, Dan shared a story with women of PSQ -- was it Take a Seat at the Table? -- where he felt excluded by you. And you had asked one of his directs to go to a meeting, present at a meeting.

And he told us -- this was, like, an assume-good-intent story. He said later, he found out that you did it partially due to protecting Dan, as that meeting was involved with possibly of Apple being sued. This implicitly implied that it is okay

Page 182

to expense Dan's direct, even though Yannick, out of good intention, wanted to protect Dan.

Q. Are you aware of that complaint being made to Dan?

A. No. I don't know what this is referring to at all.

Q. Yeah.

Can you recall examples where you would -- you excluded Dan from a meeting and he got upset and asked you why, and you told him later that Apple might get sued and you didn't want him brought into it, so you were going to make his employee get brought into it?

A. No, I don't remember that at all.

Q. Okay. That was Exhibit I.

MS. GJOVIK: And then this is Exhibit J. This was an email I sent Mr. Okpo in 2021, again bringing that up.

(Exhibit J was marked for identification.)

BY MS. GJOVIK:

Q. And this says:

"Dan told a story when he was supposed to present on something. But Yannick switched him out and had Dan's

Page 183

direct present instead. And Dan said he was mad until Yannick told him that Apple will probably get sued about whatever it was, and that the direct can take the fall instead of Dan."

Q. Were you aware that employee relations was supposed to be investigating that complaint?

A. No.

Q. Okay. There's the eyesight thing again. Spanking, we don't have to talk about that.

And that -- I call that -- there's a section called matchmaking. And I said that Dan's daughter was a witness. Because she told me that the family talks about the matchmaking/pimping thing. And the dinner was on December, I think, 28th. And then I said where the texts so we could help narrow down where the texts were.

Q. Were you aware that I was communicating all that with employee relations during that investigation?

A. No.

Q. Okay.

MS. GJOVIK: And we're unfortunately out of time. I still have a lot more I want to ask.

But I thank you for your time. I know

Page 184

you're retired, Mr. Bertolus, and this is probably deeply unpleasant, and I'm really sorry. But I thank you for answering my questions and taking the time to do this.

THE DEPONENT: You're welcome.

MS. PERRY: So before we go off the record, we reserve the right to have the witness review the deposition.

And I'd like a rough, please.

MS. GJOVIK: Yeah. Within the rules of correcting, if there's typos or something, for sure.

(Whereupon the videoconference deposition of YANNICK BERTOLUS concluded at 5:00 p.m.)

***

**Yannick Bertolus**

**Page 185**

I, the undersigned, Carrie Gibson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness whereof, I have hereunto subscribed my name this 21st day of April, 2026.

_____
Carrie Gibson, CSR No. 13937

**Page 186**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
        vs. Apple Inc.
Date of Deposition: 04/17/2026
Job No.: 10188335

I, YANNICK BERTOLUS, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.
Executed this _____ day of _____, 2026, at _____.

_____
        YANNICK BERTOLUS

NOTARIZATION (If Required)
State of _____
County of _____
Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__,
by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.
Signature: _____ (Seal)

**Page 187**

DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
        vs. Apple Inc.
Name of Witness: Yannick Bertolus
Date of Deposition: 04/17/2026
Job No.: 10188335
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

**Page 188**

DEPOSITION ERRATA SHEET
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
_____ Subject to the above changes, I certify that the transcript is true and correct
_____ No changes have been made. I certify that the transcript  is true and correct.

_____
        YANNICK BERTOLUS

# EXHIBIT 33

Attached as Exhibit 33 is Okpo Deposition Exhibit B, the August 16, 2021 draft Issue Confirmation sent by Mr. Okpo to me.

APPLE CONFIDENTIAL



Hi Ashley,

As discussed, I'm providing a summary of my understanding of the concerns you shared with me via Box, Webex on July 20, 21, 27, 28, 29, August 2, 3, 2021, and by email. If there is anything I have missed, or if there are additional concerns you did not previously share with me, please let me know immediately by sending the details in writing to me via email. To confirm, on Thursday, July 29, 2021, you told me that you had confidence in my ability to conduct an impartial and objective investigation into the concerns you raised.

My investigation process includes speaking with the involved individuals, including you, and reviewing other relevant information and documentation. I may also consult with others whom I believe may assist in conducting a thorough investigation. As previously discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers whose names have been included here as part of the investigation document, and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.

Apple takes concerns such as yours seriously and has a No Retaliation policy that can be found here: https://businessconduct.apple.com/policies/speaking-up/no-retaliation/. If you have any concerns of retaliation, please do let me know.

In summary, you believe that Dan West, David Powers, and Helen Polkes are actively retaliating against you, and have created a hostile work environment for you. In addition, you raised new concerns, dating back to 2015 against various managers and colleagues across Software and Hardware Engineering.

### Retaliation:
You told me that the events listed below may have caused the alleged retaliatory actions:
- In December 2020, you raised concerns to Josh Cohen following Dan Riccio's all hands meeting on December 7, 2021. You shared with Cohen that your interpretation of what Riccio had to say during the meeting was that Apple had plans in place to "jump the line", and provide employees access to Covid-19 vaccines.
- In March 2021, you raised building and workplace safety concerns to Environmental Health and Safety (EHS).
- In April 2021, you raised concerns to Jenna Waibel that Powers treated you differently because of your gender and disability, which were thoroughly investigated, and appropriate corrective action was taken.
- In April 2021, you raised concerns to Waibel that Robert Yepez sexually harassed you. Waibel thoroughly investigated your concerns and was unable to substantiate your claim.

APPLE CONFIDENTIAL

- In June 2021, you assisted the Remote Work Advocacy (RWA) Slack channel with drafting a letter and creating a video addressed and sent to Tim Cook and Deirdre O'Brien in response to Apple's Hybrid Working Pilot.

As a result of your actions outlined above, you believe that Powers is retaliating against you by substantially increasing your workload which will force you to leave Apple or quit law school. You also believe that West reassigned your "How I Got Here" assignment to another employee, and has stopped inviting you to meetings and assigning you project work, namely the "Listening Session" project. Finally, you believe that your involvement with the RWA Slack channel may have influenced how Polkes is treating you because she has not been supportive or helpful with your request for remote work.

**<u>Software Engineering:</u>**
- In 2015, you told me that Brad Reigel, Rob Marini, and Aron Talburt shot at you with nerf guns and threw dodge balls at you. You stated that you asked them to stop, and that you had post-traumatic stress disorder. In their response to you, you told me that they said it was their goal to make you scream.
  - You stated that you reported this behavior to your skip level manager, Venkat Memula, and you said that his advice was for you to replace their alcohol with food color and water (you informed me that Reigel, Marini and Talburt kept alcohol in their workspaces).
  - You told me that you played along with the group, and had you pushed back, you believe that things may have gotten worse for you.
  - You mentioned that you informed Kristen Michallik of your general concerns about the "guys", but you believe that Michallik went out of her way to not ask questions.
- You mentioned that Reigel had live ammunition in his office, and you shared that Talburt looked at rifle specifications at work.
- You told me that within the first month of joining the team, Marini told you that you should have been aborted.
- You mentioned that after you joined Apple, you heard that during your on-site interview, Bodhi Gerfen saw you and said something about your ass, and things he wanted to do to your ass.
- You stated that in 2015, Gerfen texted you in the middle of the night and said "Tinder", and mentioned your hair and tattoos (pictures he saw on your Tinder profile).
  - You told me that you reported this text incident to Andy Andregna, your manager, Linda Keshishoglouglou, Reigel, Marini, and Memula.
  - You mentioned that you did not report this text incident to the People team because you believe that based on an unrelated matter that you shared with me, reporting concerns to the People team was frowned upon.
- You told me that Bill Stevenson was notorious for sexually harassing people, and it was well known that Stevenson was inappropriate with you.
  - You weren't able to provide specific examples when Stevenson sexually harassed you, but you asked that I speak with Debbie McDaniel who you said witnessed Stevenson's behavior towards you.

PL-PRD-8-0117

APPLE CONFIDENTIAL

- o You stated that Memula and Keshishoglou were aware of Bill's behavior.
- You mentioned that Keshishoglou did not include you in emails, group text, and strategy meetings, but she included your male colleagues (Marini, Talburt, Reigel).
    - o You stated that Keshishoglou provided no explanation as to why she excluded you from strategy meetings, group text, emails, etc.
    - o You mentioned that you made Michallik, Memula, Reigel, Talburt and Marini aware of your concerns that Keshishoglou excluded you from strategy meetings, group text, emails, etc.

- In September 2015, you received your first performance review at Apple (6 months in role) as an ICT3. You told me that Keshishoglou gave you $100K in Restricted Stock Unit (RSU) grants when the max guideline for your role was $60K. You also believe that you should have been rated as "too new to rate".
    - o You shared that during the same performance review conversation, Keshishoglou asked you to tell Memula that she was a good manager.
    - o You believe that Keshishoglou asked you to do this in exchange for the compensation you received.
    - o You shared that you reported this concern with Keshishoglou to Michallik on September 25, 2015 and to Memula on September 29, 2015.
- You stated that Memula, Reigel, Marini and Talburt came up with nicknames for you, and wrote them down on a white board at work. The names you shared are listed below:
    - o **Professor fun sucker**: You mentioned that because you asked the team to follow rules, they called you professor fun sucker and you were offended by it.
    - o **Fun sucker**: You weren't able to share any context as it relates to this name, and you mentioned that you were offended by it.
    - o **Master of the universe of suck**: You weren't able to share context as it relates to this name, and you mentioned that you were offended by it. **Mother of Neila**: You believe that the team called you this name because you were often the only adult in the room.
    - o **Mother of Feldon**: You believe that the team called you this name because you were often the only adult in the room.
    - o **Czarina**: Czarina means Russian dictator. You believe that the team called you this name because you are a project planner/manager.
    - o **Stupid millennial**: You told me that Reigel often called you stupid millennial.
    - o **Princess Beyonce**: You mentioned that the team called you this name because of your flare, assertiveness and confidence. You also shared that you were OK with being called "Princess Beyonce", and you embraced the name.

- In September 2015, you mentioned that Marini created a radar named "Make Ashley's life a living hell", and you believe it was assigned to Reigel to make your life a living hell.

PL-PRD-8-0118

APPLE CONFIDENTIAL

- o In October 2015, you shared that your role was reorganized under Reigel even though you made it clear to Memula that it was a bad idea.
  - o You stated that Marini told you that it was his mission to make you quit.
- You told me that Memula's organization had an intense culture of drinking at work, and Michallik was aware of it.
  - o You mentioned that Memula was often drunk at work, and you heard that his leader, Kim Vorrath, told him that he was not allowed to have alcohol in his office.
  - o You mentioned that Memula would snuggle up on you while drunk, whisper to you, and say things that made no sense.
  - o It is your belief that once you are in the "in group" at work, you are expected to drink a lot.
- In 2016 during a Giants game, you told me that you almost got alcohol poisoning because Marini and Memula kept feeding you alcohol.
  - o You mentioned that the team shamed you if you didn't drink.
  - o You stated that Vorrath and Michallik were in attendance during the game.
- You believe that Reigel, Talburt or Marini created a fake LinkedIn profile of you to harass you.
- You stated that Reigel called you fat, a moron, an idiot, and threatened to smack you.
  - o You mentioned that you escalated to Memula during a 1:1 meeting, but you do not believe that he did anything about it.
  - o You weren't able to provide the date when you met with Memula.
- In early 2016, you mentioned that you no longer wanted to work for Reigel, and Memula refused to move you.
- You told me that in February 2016, you met Haley Samale, and her team was interested in you as a potential internal hire.
  - o Stacey Lysik was your dotted line manager, and you shared with her that you were interested in an internal transfer.
  - o You stated that Lysik was initially supportive of the idea, but later gave you feedback that if you were going to transfer, you needed to transfer to her team.
  - o When you told Lysik you were interested in a different role, you believe that she became furious and she told you that you say no too much.
  - o You mentioned that when Reigel was asked to provide feedback for the role you were interviewing for on Samale's team, his feedback was that (1) you were not technical enough and (2) you had no experience presenting to executives.
  - o You mentioned that at the end of your interviews for the role, you were not offered the position.
- You stated that Vorrath offered you a different role as Engineering Program Manager (EPM) for Early Field Failure Analysis (EFFA), and you informed her that you didn't want the role.
  - o You shared that if you didn't accept the EFFA role, then you had no other option. As a result, you believe that this was constructive discharge.
- In 2016, Apple allegedly had products in the field (iPhones) with bad batteries.

PL-PRD-8-0119

APPLE CONFIDENTIAL

- o Based on your assessment of the situation, you thought it was a software issue, and you shared that Software Engineering was not doing anything to address the field issues.
- o You shared that you gave Jeff Williams an update on field issues and the meeting went well.
- o After your meeting with Williams, you felt that you were thrown under the bus by your skip level manager, Shandra Rica, and your manager, Evan Buyze, because they failed to update the leadership team on field issues.
  - You told me that after your meeting with Williams, Rica and Buyze shared with you the following performance feedback listed below, and it was your understanding after you met with them that your only job moving forward was to find another role outside of SW Engineering:
    - **Over-communicating internally**: You told me that Rica and Buyze shared that they received too many emails on EFFA topics and it was too much noise.
    - **Over-communicating externally**: You mentioned that Rica had concerns about your judgement on when to share information.
    - **Working too hard**: You stated that Rica said you were fixing issues quickly and you set unrealistic expectations for stakeholders.
    - **Prioritization**: You mentioned that Buyze said that everything was a priority for you and you were working too hard.
- o You told me that you didn't have work assignments for 3 months after this incident, and your responsibilities were taken away. As a result, you believe that this was constructive discharge and you raised your concerns to Michallik on December 7, 2016.

## Hardware Engineering:
### John Basanese
- You stated that in 2017/2018, Basanese told you that at your age, you needed to be married with children.
  - o You told me that at holiday functions, Basenese made comments like "where is your partner?, don't you have a boyfriend?, settle down and have kids."
  - o You mentioned that you told Bassanese to stop, but he wouldn't, so you escalated to West.
  - o You stated that Basanese once made this comment at the Caffe at work while West was present.
- You told me that at an all hands meeting in 2017, Basanese talked about diversity, and said that we didn't have a lot of women leaders in the organization because women don't want to be leaders and they are not ready to be leaders. You told me that Basanese went on to state that the business will bring in female interns, and have males mentor them to become leaders.

APPLE CONFIDENTIAL

- You mentioned that after a 2018 Fireside Chat event for Women of PSQ, Basanese received written feedback from Monu Mathur for comments he made at the event which were interpreted as the following:
  - You shared that Basenese received feedback for talking about someone's body size and posture in a way that sounded like it was a disadvantage. For example:
    - A guy who is really good when he's presenting, but doesn't seem like it before he starts presenting.
  - You told me that Basanese received feedback for suggesting that people should hug co-workers who are honest with them.

**Jason Ivan**
- You believe that Ivan is passive aggressive towards women.
- You shared that West told you that Ivan was the reason why Bhavana Koka voluntarily resigned in May 2014.
  - You believe that Ivan comes across as controlling and negative at times when he feels something you are working on is under his jurisdiction.
  - You mentioned that Ivan has attacked some of your ideas during meetings without concrete reasons as to why he disagrees with you. You also told me that Ivan refuses to provide proposals or solutions for his concerns.
  - You believe that Ivan does not talk to or treat men the same way he treated you and Koka.
  - You believe that Ivan does not see you as his peer.
- You told me that Ivan's recent hire, Nirupa Balamurugan, is the first female manager in the history of Mac Systems Quality organization.
  - You shared that during Balamurugan's hiring process, Ivan did not ask you or Mathur, the only female Manager 3 (M3) in West's organization, to interview Balamurugan.
- You told me that Ivan's team currently has an open manager position, and you believe that Ivan thinks that the male candidate is a great fit for the role, and the female candidate is a better fit for a lead position.
  - You mentioned that MSQ is 94% male, and for that reason, you would love to see the female candidate go through the interview process for the manager position.

**David Powers**
- You told me that Powers's succession planning is all males.
- You mentioned that Powers has the second worst team diversity of all of West's direct reports.
  - You believe that because of an I&D training on words that may deter women at work, Powers told you that you cannot use the word "rockstar".
  - You believe that Powers was inferring that there aren't women rockstars, and you were offended by that.
- You mentioned that you shared your concerns with Powers about how Ivan treats you, but you don't believe Powers has done anything about it. You believe that

APPLE CONFIDENTIAL

you are expected to smile, stay calm and keep a straight face when men treat you bad at work.
- o Example: You shared that you told Powers and West about Ivan's behavior, and they laughed and mentioned that he made another woman quit (Koka), and that you shouldn't tell anyone.
- In 2018, you mentioned that you led a project called "Hand Me Down" to identify the biggest gaps in testing on Mac computers at Apple. You believe that Powers cancelled your project and gave it to a man.
  - o You told me that Reed Johnson, who reports to Powers mentioned that he wanted the Macs and nicer systems for his team.
  - o As a result, you believe that Powers cancelled your project because the systems (needed for testing) started going directly to Johnson's team instead of partner teams.
- You told me that Powers uses the term "Open Kimono", and you are offended by it because of its sexual connotation.
- You further shared that Powers and West used the term in the context of being transparent.
- You stated that around August 2020, Powers told you that it was hard to write your review because you were "sick so much".
- In March 2021, you mentioned that Powers insisted that everyone's camera (WebEx) stays on at all times during meetings as an I&D initiative.
  - o You believe that this is bad for mental health and for women, especially because women have kids, and keeping their cameras on means that they will not be able to multitask during meetings.
- You believe that Powers is retaliating against you as a result of raising concerns that were investigated and closed out by Waibel in June 2021.
- You mentioned that after Waibel completed her investigation on June 10, 2021, Powers told you that there was no reason for him to receive coaching, and the focus was now on you to change yourself.
  - o You stated that when you inquired about working remotely, Powers told you that remote work is "not a thing", and that you must return on-site if EHS says that the building is safe.
- You also believe that Powers is retaliating against you by assigning you work that is a substantial increase from your previous responsibilities, and the assignments are unfavorable. You listed the work assignments below as concerning:
  - o Create a list of the top 20 field issues causing returns for Macintosh computers.
  - o Get all engineering teams across the company to prioritize root causing the field issues.

**Dan West**
- You told me that in 2017 while at Grace Hopper, West gave you dessert to eat with peanuts in it and you are allergic to peanuts.
  - o You stated that you are not certain if, prior to eating the dessert, you told West you were allergic to peanuts. However, you are fairly certain that you

APPLE CONFIDENTIAL

previously told him (prior to the Grace Hopper trip) about your peanut allergy.
- o You told me that after eating the dessert, you had an allergic reaction and West did not file an incident report for it.
- o You mentioned that Shikha Pandey, Heidi Zhang, and Marina Sadini were present when this incident happened.
- You mentioned that in 2017, you were at a restaurant (Michelin Star in Mt. View) that West really likes, so you texted him to let him know you were there.
  - o While you were at the restaurant, you told me that West and the Chef attempted to "set you up" with a Sous Chef.
  - o You shared that at the end of the night, West paid for your entire meal.
  - o You told me that in March 2021, West's daughter gave you a ride to Stanford, and during the car ride she told you that they still talk at home about how bizarre the restaurant incident was.
- You mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting.
  - o You told me that when you addressed West about his comment, he said he didn't want to sleep with Powers so it wasn't a problem.
- You stated that in October 2020, Nordine Kadri's "How I Got Here" article included a logo about gender equality, and the woman on the logo looked naked. You escalated to West, and he told you to "assume good intent".
- You shared that during a meeting in 2017, West made a "spanking" gesture with his hand to describe how you "keep him in line".
- You mentioned that you complained to West about naming team social events "beer bash".
  - o You shared that West's leadership team is all male and the term "beer bash" is masculine.
  - o You told me that male Indian coworkers and women mentioned that they felt excluded by the term "beer bash".
  - o When I asked you to share specific names of individuals who felt excluded by the term, you mentioned that Mathur was a single mother and she does not drink.
  - o You were not able to share names of male Indian coworkers who felt excluded.
- You told me that Kai Yun left West's organization because of how she was treated, and West did nothing about it.
  - o Yun's team was responsible for high quality Macs with high tech monitors. You believe that Yun's responsibilities were reassigned to a white male outside of West's organization.
  - o You believe that West, Basanese and Powers made the decision to reassign the work.
- You stated that in 2019, West shared a screenshot of his text messages with Steve Rozmus with you.
  - o You told me that the screenshot shows a picture Rozmus took of you in the "confidential" bin. Rozmus forwarded the picture to West, and West's

APPLE CONFIDENTIAL

> response to Rozmus was "she is not confidential, she should be in the blue bin."

- You told me that while you were out on leave due to exposure to chemicals at your apartment, a lawyer emailed you and warned you about potential physical violence from the Irvine company because they are known for retaliation. You forwarded the email to West, and he told you to send it to his personal email address because his work email account is routinely scanned for lawsuits.
    - You mentioned that your worker's compensation claim was denied on May 22, 2021, right before the announcement that the Irvine company and Apple signed a long term lease agreement on May 24, 2021.
    - You told me that West was aware of your mental state at that time, including your fear of physical violence from the Irvine company.
- You shared that on April 29, 2021, you told West that you could no longer work for Powers, and to reorganize your role so that you can report directly to him. You mentioned that West told you that from an organizational structure standpoint, it made no sense for you to report to him. You also told me that during the same conversation, West told you to quit Apple.
- You shared that West has since stopped meeting with you, and has reassigned your job responsibilities to others.
    - Example: You own the "How Did I Get Here" articles for West's org, and Daniel Carr is now involved with this assignment.
    - You told me that West is no longer involving you in projects such as the "Listening Session" project.
- You mentioned that you were never invited to West's extended staff meetings even though he assigns most of your work directly to you.

**Helen Polkes**
- You believe that Polkes may be retaliating against you because of the work you've done in support of the RWA Slack channel.
- You mentioned that on June 30, 2021, you asked Polkes about working remotely, and she said "oh, did you see Deirdre's video?". Polkes was referring to a video in which O'Brien clarified Apple's Hybrid Working Pilot.
- You told me that when you asked Polkes about accommodations for remote work, she said "it sounds like you believe you have a disability and we would need to review it."

During my investigation, I will take into consideration all of the documents you shared with me via Box, Webex (on the dates listed above), and by email.

On Wednesday, August 4, 2021, you told me that the above were all of your concerns. If I have missed something or if there is additional information or concerns that you did not share with me, please let me know immediately so that I may include them in my investigation. As a reminder, the scope of my investigation does not include the concerns you have raised with our Environmental Health and Safety (EHS) team. Those concerns will be handled by our team of EHS experts.

APPLE CONFIDENTIAL

Thank you again for bringing your concerns to my attention. I trust that you will respect the investigation process, and that you understand why it is important to not interfere with the investigation so that it can be objective and thorough. If you have any questions, please let me know. Otherwise, I will follow up with you if I need additional clarification and/or upon completion of my investigation.

Sincerely,
Ekelemchi

# EXHIBIT 34

Attached as Exhibit 34 is a true and correct copy of the cited pages of the certified deposition transcript of Ekelemchi Okpo, taken April 7, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 35–47, 48–51, 71, 102–105, 106, 116, 118, 121–123, and any additional pages cited in the Motion .

Deposition of

# Ekelemchi Okpo

April 07, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           ) CASE NUMBER:
                                    ) 23-cv-04597-EMC
APPLE INC.,                         )
                                    )
            Defendant.              )
_____)


REMOTE RECORDED DEPOSITION OF EKELEMCHI OKPO

Tuesday, April 7, 2026

VIA ZOOM VIDEOCONFERENCE


STENOGRAPHICALLY REPORTED BY:

Haleema Saleh

RPR, CA CSR 14506

JOB NUMBER: 10188180

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           ) CASE NUMBER:
                                    ) 23-cv-04597-EMC
APPLE INC.,                         )
                                    )
            Defendant.              )
_____)


DEPOSITION of EKELEMCHI OKPO, taken on behalf of the plaintiff, beginning at 1:01 p.m. on Tuesday, April 7, 2026, before Haleema Saleh, Certified Shorthand Reporter No. 14506.

**Page 3**

APPEARANCES:

(ALL COUNSEL APPEARING VIA ZOOM VIDEOCONFERENCE)

For the Plaintiff:

          A.M. GJOVIK CONSULTING, L.L.C.
          BY:  ASHLEY M. GJOVIK, ESQ.
          2108 North Street, Suite 4553
          Sacramento, California  95816
          (415) 964-6272
          Ashleymgjovik@protonmail.com

For the Defendant:

          ORRICK, HERRINGTON & SUTCLIFFE LLP
          BY:  MELINDA RIECHERT, ESQ.
          1000 Marsh Road
          Menlo Park, California  94025
          (650) 614-7400
          Mriechert@orrick.com

ALSO PRESENT:

          ISELA PEREZ, ESQ.

**Page 4**

I N D E X

Recorded Deposition of EKELEMCHI OKPO

| EXAMINATION BY: | PAGE |
|---|---|
| MS. GJOVIK | 6 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit A | Email from Ashley Gjovik to Ekelemchi Okpo, dated 7/28/2021, Bates-stamped PL-PRD-8-0026 to PL-PRD-8-0038 | 75 |
| Exhibit AA | Email chain, top email from Ekelemchi Okpo to Ashley Gjovik, dated 8/3/2021, Bates-stamped PL-PRD-8-0227 | 38 |
| Exhibit B | Issue Confirmation, Bates-stamped PL-PRD-8-0116 to PL-PRD-8-0125 | 42 |
| Exhibit C | Email from Ekelemchi Okpo to Ashley Gjovik, dated 8/24/2021, Bates-stamped PL-PRD-8-0147 to PL-PRD-8-0150 | 114 |
| Exhibit D | Issue Confirmation, 8/22/2021, Bates-stamped PL-PRD-8-0178 to PL-PRD-8-0211 | 42 |
| Exhibit DD | Email from Ashley Gjovik to Ekelemchi Okpo, dated 9/3/2021, Bates-stamped PL-PRD-8-0155 to PL-PRD-8-0156 | 101 |
| Exhibit EE | Email from Ashley Gjovik to Ekelemchi Okpo, dated 9/7/2021, Bates-stamped PL-PRD-8-0157 to PL-PRD-8-0160 | 102 |

Page 5

Exhibit FF    Email from Ashley Gjovik to    107
              Ekelemchi Okpo, dated 8/20/2021,
              Bates-stamped PL-PRD-8-0161 to
              PL-PRD-8-0163

Exhibit G     Box Folders, Bates-stamped    69
              PL-PRD-8-0105

Exhibit H     Box Folder, Bates-stamped    73
              PL-PRD-8-0039

Exhibit HH    Text messages, Bates-stamped    125
              PL-PRD-8-0103

Exhibit I     Box Folder, Bates-stamped    74
              PL-PRD-8-0024

Exhibit K     Email from Ashley Gjovik to    111
              Ekelemchi Okpo, dated 7/28/2021,
              Bates-stamped PL-PRD-8-0007 to
              PL-PRD-8-0008

Exhibit L     Email from Ashley Gjovik to    112
              Ekelemchi Okpo, dated 7/28/2021,
              Bates-stamped PL-PRD-8-0099 to
              PL-PRD-8-0102

Exhibit Y     Text messages, Bates-stamped    125
              PL-PRD-8-0104

Exhibit Z     Email from Ashley Gjovik to    100
              Ekelemchi Okpo, dated 7/29/2021,
              Bates-stamped PL-PRD-8-0222 to
              PL-PRD-8-0226

NO QUESTIONS MARKED

---oOo---

Page 6

TAKEN REMOTELY VIA ZOOM

April 7, 2026, 1:01 p.m.

PROCEEDINGS

---oOo---

THE REPORTER:  Good afternoon.  My name is Haleema Saleh.  I'm a California Certified Shorthand Reporter.  My license number is 14506.

---oOo---

EKELEMCHI OKPO, sworn as a witness by the Certified Shorthand Reporter, testified as follows:

EXAMINATION

BY MS. GJOVIK:

Q.  Okay.  Thank you.  And so, Mr. Okpo, you've been noticed for this deposition.  Thank you for attending.  It's being recorded, audio and visual, which will be shared with Apple and with counsel as to the meeting as we did the last one.  I also sent exhibits beforehand.  We may not cover all of them.

MS. GJOVIK:  Melinda, you'll be so proud.  I actually labeled them this time.

MS. RIECHERT:  Thank you.

MS. GJOVIK:  Thank you for your help last time.

BY MS. GJOVIK:

Q.  This is my second deposition conducting ever,

Page 7

so thank you for your patience as I work through this.

And then, Mr. Okpo, so -- good morning.  I am Ashley Gjovik.  I am the plaintiff.  I am pro se.  I have a law degree but I'm not an attorney, and I'm representing myself.

I am going to ask you some questions today, but before we get started, I want to go over some functional matters just to ensure we're on the same page.

You were just sworn in by the court reporter.

Do you understand that you're now under oath, the same as if you were testifying in a courtroom before a judge and jury?

A.  Yes.

Q.  Thank you.  And you understand that means you're required to give truthful answers to my questions today?

A.  Yes.

Q.  Thank you.  You understand that even though we're on Zoom, it sounds like we're both in hotel rooms, and this might feel informal, but giving false testimony under oath can subject you to penalties for perjury?

A.  Yes.

Q.  Thank you.  And you see a court reporter here.  She's taking down everything that's said today.  Every

Page 8

question I ask, every answer you give, and it's going to be made into a written transcript.  Because she can only take down words, I need you to give verbal answers.  So if your answer is "Yes," please say "Yes" rather than nodding your head.

Can you do that for me?

A.  Yes.

Q.  Thank you.  Along the same lines --

MS. GJOVIK:  Oh, we have Isela.  We just had Isela Perez join.  I believe she's in-house at Apple, but I'll let her introduce herself for the record for the court reporter.

MS. PEREZ:  Hi.  Yes.  Isela Perez, in-house counsel at Apple.

MS. GJOVIK:  Okay.  Thank you, ma'am.  We're just going over the preliminaries with Mr. Okpo.

BY MS. GJOVIK:

Q.  Along the same lines, Mr. Okpo, please try to let me finish my question before you start your answer.  I'll do my best to let you finish your answer before I ask my next question.  That way we don't talk over each other, and the court reporter can get a clean record.  Is that fair?

A.  Yes.

Q.  Thank you.  If at any point you don't

Ekelemchi Okpo

Page 9

understand a question I've asked, I want you to tell me and I'll rephrase it. Will you do that for me?

A. Yes.

Q. Thank you. Is it fair to say that if you answer a question, I'm entitled to assume you understood the question?

A. Yes.

Q. Thank you. If you need to take a break at any point, use the restroom, get some water, or stretch, that's fine. Just let me know. The only thing I ask that -- is if there's a question pending that you answer it before we go off the record. Is that agreeable?

A. Yes.

Q. Thank you. Is there any reason you might not be able to give your best testimony today? Are you feeling okay? Ill? Distracted?

A. I'm battling allergies, but I am good.

Q. Me too. Hang in there.

Let's see. Are you currently under the influence of any medication, drug, or alcohol that might affect your ability to understand my questions or give truthful answers?

A. No.

Q. Okay. Did you meet with anyone to prepare for today's deposition?

Page 10

A. Yes.

Q. Did you review any documents today before today's deposition in preparation?

A. Yes.

Q. Okay. Thank you.

Mr. Okpo, right now what is your job title?

A. Labor relations business partner.

Q. What organization is that in?

A. Within the Greater People Org at Apple.

Q. The human resources organization, they call it "People"?

A. Yes.

Q. What was your job title in the summer of 2021 between July and August 2021 -- sorry -- July and September 2021?

A. Employee relations business partner.

Q. And what organization was that?

A. At Apple within the People Org -- Greater People Org.

Q. In one -- okay. When did you change roles?

A. August of 2022.

Q. 2022. Your role in July through September 2021, can you describe that role, please?

A. As an employee relations business partner, I would conduct workplace investigations of varying

Page 11

complexities.

Q. Okay. Who was your supervisor?

A. Tony Lagares.

Q. When you get an assignment from -- actually, let me rephrase.

Who would provide you your assignments? Just Mr. Lagares, or would you get assignments from other people?

A. Mr. Lagares.

Q. When Mr. Lagares gives you an assignment, what did you do once you got an assignment?

A. Make sure that I fully understood the issues, and to the extent I needed to plan out an investigation plan, I would do that in partnership with Mr. Lagares and also in partnership with our in-house counsel team.

Q. Okay. Great. And you said "investigation plan." Is that usually like a written document, or it's in a tracking system, or how is that captured?

A. Written document.

Q. Okay. And then would you write a report at the end usually of your investigations?

A. Yes.

Q. Who does that report go to normally?

A. It would go to my supervisor and also employment counsel.

Page 12

Q. Okay. And then at the end of your investigation, what does the output normally look like?

Is it just kind of like an advisory, this is my general findings? Do you make recommendations? Do you suggest concrete next steps?

So, like, what does the -- what would be the substance of your reports, generally? Is it just kind of like an informational or might it suggest an action to take?

A. It would include my factual findings and -- and recommendations.

Q. Okay. What kind of recommendations do you give in these types of reports?

A. It depends. No two case is alike, right; so it truly depends.

Q. Okay. Would it sometimes be to escalate to a different organization at Apple, to take further action, or something like that?

A. It depends. It could be -- it just -- it just depends.

Q. Okay. Who decides if they're going to take action or not based on your report?

A. So not ER, but the -- the business leader. The business does.

Q. Oh, so you said you sent your report to

Ekelemchi Okpo

Page 13

Mr. Lagares and then employment counsel, or someone in in-house counsel. How does the business leader get a copy of it, or do they?

A. They can. But they -- there's a readout that I would do as well that would include, you know, my leader, employment counsel, and the business as well.

Q. Sorry. What's a readout?

A. Just a readout of my factual findings and recommendations.

Q. Is that like you're saying "read" like an audible presentation or an email or report or --

A. From my report.

Q. So it would be like forwarding the email to someone?

A. It would be an investigation report, and that would be a meeting.

Q. Okay.

A. And it would typically include my leader, it would include HR legal, and the business.

Q. Okay. So you would have a final report. You maybe, like, submit it more formally to Lagares and counsel, but then there would be sometimes also a meeting or generally there would be also a meeting?

A. Depending on the complexity of the case there would be a meeting.

Page 14

Q. Okay.

A. I would include all the appropriate parties.

Q. And so you said that might include, like, the business leaders? So that would be maybe, like, directors or higher of the organization for the employees?

A. It would, yes.

Q. Okay. When did you first get involved in any matter regarding the plaintiff, Ashley Gjovik, in this case? That's me. I'm going to talk in third person for some of these questions.

A. Sometime in July of '21.

Q. Okay. Who assigned you?

A. Tony Lagares.

Q. What were you told about the assignment?

A. There was a complaint -- that there was a complaint with, you know, a list of issues and so investigate those -- those concerns.

Q. Okay. At that time -- you're saying this was sometime in June -- or sorry -- July. I believe it might have been, like, maybe second week of July or so, kind of early/mid July.

At that point were you asked to investigate Ms. Gjovik's complaints and/or Ms. Gjovik herself?

A. Concerns that were raised by Ms. Gjovik.

Page 15

Q. Were you ever given an assignment to investigate Ms. Gjovik?

A. No.

Q. No. Did you ever investigate Ms. Gjovik?

A. I investigated the claims that she raised.

Q. Okay. So if there was an investigation into Ms. Gjovik for something, it would have been done by someone other than yourself?

A. That's correct.

Q. Okay. Do you know if there was an investigation into Ms. Gjovik at some point starting when you were assigned the case in July to the termination date, final September 10th, 2021?

A. Can you repeat the question?

Q. Are you aware if there was any investigation into Ms. Gjovik during that time, July to September?

Sorry. My dog. He's saying "Hello."

A. Other than what would have been shared to me by counsel.

Q. So -- I'm so sorry. I'm explaining to him this is very expensive time, and we don't need barking.

So you were not aware of any investigation into Ms. Gjovik other than anything you would have heard from counsel, which would be privileged?

A. Correct.

Page 16

Q. Okay. Thank you.

Did your investigation notes, reports, anything like that, ever reflect an investigation into Ms. Gjovik?

A. No.

Q. Okay. Thank you.

Did the scope of your investigation into Ms. Gjovik's complaints change over time?

A. No.

Q. Okay. Thank you.

For -- so when we first started talking about the procedure you normally use for your investigations, you mentioned that there's usually an investigation plan.

Did you create an investigation plan for your investigation into Ms. Gjovik's issues and complaints?

A. I did.

Q. You did. Okay. Where is that -- what does that look like? Was that, like, a Word document, an email, in some kind of tracking system?

A. It was at the direction of counsel.

Q. What was the format of the document, though? I think you can tell me if it was like a Word doc or a PDF, an email or --

A. I don't recall the actual format, whether it

Ekelemchi Okpo

Page 17

was a Numbers document or a Pages document. I --

Q. So assuming that one of the, like, Apple apps? It would have just been something in one of those -- a saved document?

A. Yes.

Q. Yeah. And then did you share that discovery plan with anyone else?

A. Yes.

Q. Who did you share it with?

A. My leader, employment counsel.

Q. Sorry. Who was the first person you said?

A. My leader, Tony Lagares.

Q. Okay. Can you tell me which employment counsel?

A. Isela Perez, Debbie Rice.

Q. Around when did you share that plan with them?

A. I don't recall the specific date, but it would have been shortly after I was assigned the case.

Q. Okay. Thank you.

And to be clear, if I ask you something you do think is privileged, tell me. But I am going to try my best to not ask you anything that's privileged. Because there's no point in just making you object for no reason. So thank you for answering that outside of privilege.

Page 18

And then you also mentioned that you create a report at the end of your findings.

Did you create one of those for your investigation into Ms. Gjovik's concerns?

A. Yes.

Q. And what kind of format of the document was that? Like a Pages document or an email or ticketing?

A. Keynote, I believe.

Q. Keynote. Who did you share it with?

A. I shared it with my leader at the time and also employment counsel.

Q. Can you identify their names, please, for the record?

A. Yeah. Isela Perez, Debbie Rice, Adele Mise, Joni Reicher, Megan Bowman, Yannick -- that's what I recall.

Q. Okay. And then you said your leader, was that Mr. Lagares again. You also shared it with Mr. Lagares.

Did you share it with Mr. Lagares?

A. There was a period where he was out of the business, but I believe I did.

Q. What does "out of the business" mean?

A. He was on -- on a leave.

Q. And -- sorry. I might have cut you off. Were you going to say something else?

Page 19

A. No.

Q. Okay. Thank you.

To your knowledge, has either that discovery -- or the -- the investigation plan or that end report been produced to the plaintiff in this case?

A. I don't know.

MS. GJOVIK: Okay. So, no, they haven't -- haven't shared that.

MS. RIECHERT: That's privileged.

BY MS. GJOVIK:

Q. And then you mentioned that there's often a meeting also that will occur where you'll discuss.

Was there a meeting like you described earlier for your investigation into Ashley Gjovik's complaints?

A. Yes.

Q. Around when did that occur?

A. Sometime in September. Early September.

Q. Was it prior to the termination of Ms. Gjovik or after?

A. I don't know. I don't...

Q. And that report you said you -- you created of your end results, the findings of the investigation, do you remember if that was finalized before or after the termination of Ms. Gjovik?

A. I don't know.

Page 20

Q. You don't know. You don't know if you completed the investigation of Ms. Gjovik's concerns prior to or after the termination of her employment?

A. I don't know when you were terminated.

Q. September 9th, 2021.

A. I -- I don't remember the specific date.

Q. Is it common for you to investigate employee concerns and to not complete your investigation prior to the employer terminating the employee?

A. Can you repeat the question?

Q. Is it common that you might be investigating employee concerns, assigned to you by Mr. Lagares or whoever your leader is, and that before you can complete your investigation into the employee's concerns, that the employer had terminated the employee's employment?

A. There were two separate issues.

Q. That wasn't the question. How many -- let me rephrase then.

How many other cases have you had where you are investigating the employee's concerns assigned to you by your leader, and the employer -- and the employee is terminated by the employer prior to you completing your investigation?

MS. RIECHERT: Objection. Assumes facts not in evidence that the report was completed -- was not

Page 17..20

Page 21

completed prior to the termination.

He doesn't recall when it was completed.

BY MS. GJOVIK:

Q. But I wasn't asking about me.

I was saying how many -- how many cases do you recall that you were assigned to and you were investigating that you had not completed a report, not finalized your investigation, but the employee was terminated by the employer, for whatever reason, prior to you completing?

A. I don't know.

Q. You can't recall one example?

A. I don't have an example.

Q. But if the case with Ashley Gjovik, if she was terminated prior to the completion of your report, that would be one example?

MS. RIECHERT: Objection. Assumes facts not in evidence.

BY MS. GJOVIK:

Q. Okay. So just to restate, you're saying you have no examples and you're unsure of any examples at this time of a case that you were investigating, and you had not completed your investigation yet, but then the employee was -- their employment was terminated prior to you completing?

Page 22

A. I don't understand the question.

Q. Okay. Can you please confirm if you can give any example or confirm knowledge of at least one case that you've investigated of employee concerns where the employee was terminated by the employer prior to you completing your investigation?

MS. RIECHERT: Objection. Asked and answered.

BY MS. GJOVIK:

Q. Did he? Okay. Okay. We can we can move on from that. And -- okay.

You don't remember when the report was finalized. You don't remember when the meeting occurred. There was a report; there was a meeting.

Did you create any other types of documents, presentations for those reports related to your investigation of Ashley Gjovik's concerns?

A. If you don't mind repeating that question again. I just want to make sure I understand.

Q. Can you please describe to me any types of documents, reports, communications that you created as part of your investigation into Ashley Gjovik's concerns?

A. Witness notes, interview notes, timelines, there are various different documents that one -- that an investigator would create on an investigation.

Page 23

Q. Were there any meetings or presentations given before the investigation was completed?

A. What do you mean by "meetings and presentations"?

Q. So you mentioned that you'd have a report at the end. That you would have a -- sometimes a meeting at the end also. You mentioned you think you probably created a Keynote document.

Is there anything that you created like a Keynote or a -- a Pages document or something like that or did you host any -- any meetings with the same types of people you mentioned prior to the completion of your investigation for the Ashley Gjovik case?

MS. RIECHERT: Objection. Vague.

BY MS. GJOVIK:

Q. I don't think it is.

Did you have any meetings with employment counsel prior to the completion of your investigation?

A. Throughout the --

Q. Sorry. Did you have any meetings with employment counsel about Ashley Gjovik prior to the completion of your investigation of Ashley Gjovik's concerns?

A. Throughout the investigation, yes.

Q. Can you tell me how many you think you

Page 24

probably had?

A. It's been five years. I don't -- I don't know.

Q. More than one?

A. Yes.

Q. More than five?

A. Yes.

Q. More than ten?

A. I --

Q. Can you say that more clearly, please?

A. Perhaps. Yes.

Q. What if I said eight? Would you feel more confident saying at least eight?

A. Eight to ten.

Q. Okay. Thank you.

Did you have any meetings with Yannick, or maybe Turnis or Riccio -- sorry -- John Turnis, Dan Riccio, Yannick Bertollis prior to the completion of your investigation to discuss your investigation into Ashley Gjovik?

A. Can you mention the names again?

Q. Yeah. Yannick Bertollis, the vice president of product integrity who was Ashley Gjovik's VP, and then his bosses, they -- they kind of changed around that time. The first was Dan Riccio, who was a senior

Ekelemchi Okpo

Page 25

vice president, and then John Turnis took over Dan Riccio's role, and they were both Ashley Gjovik's senior leaders under Tim Cook.

A. Yes.

Q. So "yes" to what?

A. Yes. I had -- I had a meeting with --

Q. Who did you meet with?

A. Yannick and John.

Q. And who?

A. Yannick and John.

Q. John Turnis?

A. Correct.

Q. How many meetings did you have with them?

A. One.

Q. One. Do you remember around the time you had that?

A. Sometime in September. I don't recall the specific date.

Q. Prior to or after the termination of Ashley Gjovik?

A. Again, I don't know when the day of the your termination. So I --

Q. September 9th, 2021.

A. Prior.

Q. Prior. And then you would have met with at

Page 26

least Yannick again after in your final meeting? You mentioned you had a final meeting, the presentation at the end, but you didn't remember if it was before or after the termination.

A. I had one meeting with Yannick concerning this case.

Q. So would that imply that you finished your investigation prior to the termination of the employee?

A. Without a timeline in front of me, I can't answer that confidently.

Q. Okay.

A. I was not involved in the termination decision.

Q. Okay. And then the -- you said you had a -- you're pretty sure you had one meeting with Mr. Bertollis?

A. Concerning this case, yes.

Q. Yeah. And then John Turnis, that would be one meeting as well?

A. Yes.

Q. And then did you meet with Mr. Lagares about the case?

A. Yes.

Q. How many times did you meet with Mr. Lagares about the case?

Page 27

A. He was my supervisor, so, I mean, we met multiple times. I don't have a specific number in mind.

Q. Did you send him email updates?

A. Initially, but not throughout the case. They were more live conversations.

Q. Why did you change the format of your communications about the case?

A. Because we were meeting regularly with employment counsel live.

Q. Okay. I was going to ask you what they told you, but I can't ask you that. I think that can probably be implied. Okay.

And then did you text Mr. Lagares about the case at all?

A. No.

Q. Was there any other method of communication used with Mr. Lagares about the case?

A. Live conversations.

Q. Live conversations and emails?

A. Yeah.

Q. Okay. And that would have all been sent from your Apple email account?

A. Correct.

Q. Okay. And then is there any kind of, like, investigation tracking system, database, anything that

Page 28

Apple uses like a centralized system to track open investigations?

A. Yes.

Q. Was that in place at that time?

A. Yes.

Q. Yeah. Was this case tracked in that system?

A. Yes.

Q. Your investigation into Ashley Gjovik's complaints was tracked in that system?

A. Yes.

Q. Yeah. What kind of information was tracked in the system?

A. Reporting party's statements and evidence provided, witness statements, everything that's involved in a workplace investigation.

Q. That's great. Do you remember maybe how many documents or files or entries there might be?

A. There were lots of documents.

Q. Lots. Because I know it's weird I'm talking in third person. I just feel like it's more professional than asking as a personal thing.

But she shared a bunch of documents with you on Box; right? Were those carried over to that system to keep copies?

A. No. It wasn't a system that -- Box would have

Page 29

been the main tool to store --

Q. Okay.

A. -- evidence.

Q. And the -- all those Box files, did you look through everything she had shared with you?

A. Yes.

Q. Okay. Cool. And then -- let's see.

Before you took over, there was another investigator who had done a separate investigation, Ms. Jenna Waibel.

What had Ms. Waibel done to investigate Ms. Gjovik's complaints?

MS. RIECHERT: We're getting very close to privilege here; so I am not going to let him testify to what she did.

BY MS. GJOVIK:

Q. I mean, facts aren't privilege, and she's not a lawyer, and, Mr. Okpo, I believe you're still not even an attorney; right? You just have a JD? So it's -- you're just --

MS. RIECHERT: Any investigation conducted under the advice of counsel is privileged, weather the investigator is a lawyer or not.

MS. GJOVIK: Okay. If you want to clarify -- I believe what you're trying to say, and I think we

Page 30

should clarify for the record if this is what you're saying, is that Ms. Waibel was assigned the investigation of Ms. Gjovik's concerns by counsel, not by Lagares and, therefore, you're claiming privilege to all the details of Waibel's investigation?

MS. RIECHERT: The investigations were conducted under the advice of counsel with counsel for the purpose of providing legal advice.

MS. GJOVIK: Thank you. Can you clarify --

MS. RIECHERT: For both investigations.

MS. GJOVIK: Yeah. So you didn't have that objection earlier with Mr. Okpo's response, but now you're claiming privilege to just the basic facts of Ms. Waibel's. So I'm curious what the differentiation is.

MS. RIECHERT: Yeah. Nothing that you asked him involved legal advice or the investigation itself. You asked him generally about investigations and you asked him about meetings, but you didn't ask about the investigation then.

So my objection is the same for the Jenna Waibel as it will be for his investigation.

BY MS. GJOVIK:

Q. Okay. Let me clarify: Without breaching privilege, Mr. Okpo, what kind of actions had Ms. Waibel

Page 31

taken on that prior investigation of Ashley Gjovik that were the same kind of things like I was asking about earlier that you felt okay answering? So did she create a plan? Did she have an end report? Did she talk to people? What did she do?

A. I don't know. I didn't investigate. It wasn't my investigation.

Q. Did you see any kind of report from her investigation?

A. Yes.

Q. Yeah. When did you see that report?

A. When? It would have been shortly after the case was assigned to me by Mr. Lagares.

Q. Okay. And so if that report had mentioned that she did create other documents or meet with people, Apple is claiming privilege to those facts; is that right?

MS. RIECHERT: The report would be privileged.

MS. GJOVIK: Yeah. The report, you're claiming privilege. But the underlying facts, so if he learned facts through that, you're claiming those facts themselves are also privileged?

MS. RIECHERT: Correct. Anything that the witness was told -- the investigator, would be privileged.

Page 32

BY MS. GJOVIK:

Q. Okay. And then at the point -- while you were investigating Ashley Gjovik's concerns, had Ms. Waibel completed her investigation?

A. Yes.

Q. Yes. To your knowledge, was there any kind of further next steps from Ms. Waibel's investigation?

MS. RIECHERT: Okay. I'll object to anything that was in her report or any recommendations that she made.

BY MS. GJOVIK:

Q. Okay. Other than that?

A. Not to my knowledge.

Q. Okay. And so you're saying that at the time that you started this investigation of Ashley Gjovik's concerns, which was probably in early/mid July 2021, that Ms. Waibel had already completed her investigation, and to your knowledge, there weren't -- or under privilege, you can't say -- any kind of next steps going on with Ms. Waibel's investigation?

A. Not to my knowledge.

Q. Okay. And then ongoing, after that, though, Ms. Waibel was still involved with the EHS matters regarding Ashley Gjovik's office -- and you had sent some emails. We'll look at them in a second later --

Ekelemchi Okpo

Page 33

mentioning that Ms. Waibel was managing the EHS concerns. But now you've said that her investigation was closed, and there weren't next steps you can at least share.

So can you help me understand what she was doing in that second phase starting July through September specific to the 825 Stewart Drive office in Sunnyvale and the environmental concerns?

MS. RIECHERT: Objection. Lacks foundation.

MS. GJOVIK: I don't think it does.

MS. RIECHERT: If he doesn't know, then it lacks foundation.

MS. GJOVIK: He's sent emails saying she was handling something regarding that, he was not because she was. So I would like him to share, where he can, what he meant by those statements.

THE WITNESS: I know EH&S was looking into those concerns.

BY MS. GJOVIK:

Q.  What does that mean?

A.  I don't know. I wasn't privy to the -- to that issue.

Q.  Who told you she was looking into the concerns?

MS. RIECHERT: I think he said EH&S was

Page 34

looking into it.

BY MS. GJOVIK:

Q.  Sorry. So why was Waibel involved?

A.  Because she was -- she was the ER investigator who previously worked with you.

Q.  So if she had already closed her case, and there was a new one working with me, why would she be involved in EHS concerns?

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q.  It doesn't. You still have to answer.

A.  The EH&S issue came up at the time when she was working with you.

Q.  And so the issues then were still open concurrently with your investigation if you said she was still working on it; is that correct?

A.  Not led by ER. It was being -- that -- that issue was -- was being handled by EH&S.

Q.  So what was her role with EH&S?

A.  It is normal and as part of our practice that the ER investigator would see issues through even if there are situations where the ER investigator isn't the lead.

Q.  Okay. That makes sense.

Would it be normal if the ER investigator

Page 35

though would close their investigation and write a final report prior to that issue actually being resolved and then continue on it?

A.  It was not --

MS. RIECHERT: Objection. Objection. Lacks foundation.

BY MS. GJOVIK:

Q.  He still has to answer.

A.  It's not an ER issue.

Q.  So if employees raise concerns about workplace safety at work or environmental concerns at work at Apple, ER wouldn't investigate?

A.  Subject matter expert there is EH&S.

Q.  What if the employee complains of retaliation for raising EHS concerns?

A.  Then that's an ER issue.

Q.  But that Ashley Gjovik case, did Ashley Gjovik ever complain about retaliation for raising EHS concerns?

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q.  He still has to answer.

A.  Yes.

Q.  As far as you remember, what was the earliest that she started reporting retaliation for raising EHS

Page 36

concerns?

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q.  He still has to answer.

A.  I don't know.

Q.  Could it have been March or April 2021?

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q.  He still has to answer.

A.  I don't know.

Q.  But it was before you started your investigation?

MS. RIECHERT: Objection. Lacks foundation.

THE WITNESS: I don't know.

BY MS. GJOVIK:

Q.  You don't know if Ashley Gjovik reported EH&S concerns prior to starting your investigation into her complaints?

A.  Yes.

Q.  Okay. And tell me about what you do remember about her complaints about EH&S issues.

MS. RIECHERT: Again, if this is from the report, then it would be privileged. If it's from a non-privileged source, you can talk about it.

THE WITNESS: It was from a report.

Ekelemchi Okpo

Page 37

BY MS. GJOVIK:

Q. What report?

A. The report that, as I mentioned earlier, Jenna previously worked with you.

Q. And then did Ms. Gjovik also report to you retaliation for raising EH&S concerns?

A. Yes.

Q. Do you remember the ways she reported those issues to you? Like, was it emails? Documents? Verbal?

MS. RIECHERT: Objection.

THE WITNESS: Other than what was included in the issue confirmation document, I don't recall.

BY MS. GJOVIK:

Q. Okay. And so you said that normally employee relations would investigate complaints about retaliation before raising EH&S concerns, and you mentioned that previously Jenna was involved with the EH&S complaints.

At the time that you were doing your investigation, what was your understanding of who, if anyone, at Apple was investigating Ms. Gjovik's complaints about retaliation for her making EH&S complaints?

A. My understanding is that Jenna Waibel looked

Page 38

into those concerns.

Q. The earlier investigation or one concurrent with your investigation?

A. The earlier investigation.

Q. Okay. And then you're saying that you did not investigate Ms. Gjovik's complaints about retaliation specific to EH&S complaints?

MS. RIECHERT: Okay. What he did in his investigation is privileged, and I am not going to let him answer about that.

MS. GJOVIK: He sent emails saying he wasn't investigating it. We can pull it up now, or he can just answer.

MS. RIECHERT: If you want to show him the email, that's fine. I thought it related to EH&S complaints, not retaliation for raising EH&S complaints. But you can show us the email.

BY MS. GJOVIK:

Q. Okay. So -- so this one is Exhibit AA. This is an email from August 3rd. And --

A. Can you make that a bit bigger?

Q. Yeah. Sorry about that.

MS. RIECHERT: I'll second that one.

(Exhibit AA was marked for identification.)

Page 39

BY MS. GJOVIK:

Q. Okay. This is an email you sent -- I had sent an email asking about the scope of the investigation, and you had said you were focused on the new concerns Ms. Gjovik raised since Jenna closed out her investigation on June 3rd. The items listed below and in Jenna's issue confirmation email were previously investigated, and Apple took corrective action in response to her investigative findings. As we discussed, if you have new information, please let us know.

And then you said, "Additionally, EHS is focused on reviewing your building and physical workplace safety issues. They will be in contact with you further to address those concerns."

So I think Melinda is actually correct there. That was saying that just EHS was looking into it, not Jenna. There was no mention that Jenna was looking into anything.

So that raised the question, again, then, of was there anyone at Apple investigating Ms. Gjovik's complaints about retaliation for raising EHS issues between July and September 2021?

MS. RIECHERT: I think he already answered that; so I'll object to asked and answered. He

Page 40

mentioned the --

MS. GJOVIK: What was the answer?

MS. RIECHERT: -- the issue confirmation document.

MS. GJOVIK: But that would imply that he was investigating, and he hasn't confirmed if he was investigating those complaints.

MS. RIECHERT: You can answer if that was one of the things in the issue confirmation document you were looking into.

BY MS. GJOVIK:

Q. If you don't -- sorry. Go ahead.

A. I -- I investigated what was in the issue confirmation. I don't -- it's been a long time.

Q. It's fine. Just tell me what you recall. You know, I don't want speculation.

Do you recall that anyone, yourself or someone else, was investigating Ms. Gjovik's complaints about retaliation specific to environmental health and safety issues between July 2021 and her termination in September 2021?

MS. RIECHERT: Are you talking about complaints of issues or complaints of retaliation for issues?

MS. GJOVIK: Retaliation for issues.

Ekelemchi Okpo

Page 41

MS. RIECHERT: Okay. I think he's answered that.

MS. GJOVIK: No, he didn't. He hasn't answered.

BY MS. GJOVIK:

Q. So if you don't recall if anyone was, I just need you to say you don't recall if anyone was.

MS. RIECHERT: He said that he was if it was in the issue confirmation. He just can't recall what was in the issue confirmation.

MS. GJOVIK: He never said that. You just said that. That's a speaking objection. And I object to your speaking objection. That's coaching the witness.

BY MS. GJOVIK:

Q. Mr. Okpo, please answer the question.

A. That's exactly what I said.

MS. RIECHERT: We can have the reporter read it back if you want.

THE WITNESS: Yeah.

BY MS. GJOVIK:

Q. So your answer is if -- anything that was in the issue confirmation was something that you investigated?

A. That's correct.

Page 42

Q. Okay. Great. Let's look at the issue confirmation. This is Exhibit D. This is the -- what I believe in the email we agreed was the final issue confirmation.

(Exhibit D was marked for identification.)

BY MS. GJOVIK:

Q. You had sent an earlier version. Let's see. This is Exhibit B.

Mr. Okpo, does this look like the version of the issue confirmation, to your best recollection, that you had sent Ms. Gjovik in August of 2021?

A. Yeah. I'm reading.

(Exhibit B was marked for identification.)

BY MS. GJOVIK:

Q. Yeah. I would like you to actually authorize it -- authenticate it, so we can go through each of the ten pages. If you can read it, and then let me know when you're ready to go to the next one.

A. Yeah. If you could -- don't mind making it just slightly bigger.

Q. Yeah. We can do half pages. Let me know when you want me to scroll down, and then let me know when you want me to go to the next one.

Page 43

A. Will do.

Q. Okay.

A. Please scroll down. Okay. Okay. Okay. Okay. Okay. Scroll. Okay. You can keep -- you can keep scrolling. You can keep scrolling. Okay. Keep scrolling. Keep scrolling. Okay. Keep scrolling. Okay. Okay. Okay.

Q. There's still more. One more.

A. I see. Okay. All right.

Q. Should stay for the closing. You don't want to skip that.

A. Okay.

Q. Does that look like an email that you sent?

A. Yes, it does. Thanks for that.

Q. Oh, thank you. Sorry. To clarify, that was -- I believe you said that was a PDF document attached to an email that you sent to Ashley Gjovik in August 2021?

A. Yes.

Q. Okay. Thank you. And you read through all the content just now? That's what we were doing; right?

A. Yeah. I -- yes.

Q. Yeah. Did you see any mention of complaints about retaliation for environmental health and safety concerns?

Page 44

A. No.

Q. I didn't either. And, in fact, you wrote, "On Wednesday August 4, 2021, you," Ashley Gjovik, "told me," you, Okpo, "that the above were all of your," Ashley Gjovik's, "concerns."

Is that true what it says?

A. Yes.

Q. Yeah. Did Ashley Gjovik ever tell you she had concerns about retaliation due to making EHS concerns?

If you said something, I couldn't hear it. Can you say it louder, please?

A. Yeah. I just -- I don't recall.

Q. Okay. You did add at the bottom here, "As a reminder, the scope of my investigation," Okpo's investigation, "does not include the concerns that you," Gjovik, "has raised with our Environmental Health and Safety team. Those concerns will be handled by our team of EHS experts."

A. Correct.

Q. Yeah. So you remember Ms. Gjovik making complaints about EHS issues?

A. Yes.

Q. Yeah. But you don't recall Ms. Gjovik ever making complaints about retaliation due to making EHS complaints?

Ekelemchi Okpo

Page 45

MS. RIECHERT:  Objection.  Asked and answered.

BY MS. GJOVIK:

Q.  Okay.  Do you remember Ms. Gjovik ever making complaints about retaliation?

A.  My recollection is -- my recollection is Jenna Waibel would have reviewed those concerns previously.

Q.  You said "Jenna Waibel"?

A.  That seems to be my recollection at this -- that's my recollection.

Q.  Okay.  And you had said that Ms. Waibel closed her investigation in June of 2021?

A.  Did I say that?  I don't recall.

Q.  I thought you did.  Well, I thought you said that at the time that you took this investigation in July 2021, Ms. Waibel had closed her investigation.  Is that true and accurate?

A.  Yeah.  Yes.  When I --

Q.  Yeah.

A.  When I met you, Ms. Waibel had closed her investigation.  Correct.

Q.  Okay.  And then so if Ms. Gjovik had complained about -- sorry.  I'm very sick.

If Ms. Gjovik had complained about retaliation in July, August, September 2021, who would be investigating her complaints about retaliation?

Page 46

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

BY MS. GJOVIK:

Q.  Was -- to your knowledge, was anyone investigating Ms. Gjovik's complaints about retaliation, or any complaints, in July, August, or September 2021?

MS. RIECHERT:  For any complaints?

MS. GJOVIK:  Of retaliation.

MS. RIECHERT:  Okay.

THE WITNESS:  Not specific to your EH&S concerns?  I just want to make sure I understand the question.  Any complaints --

BY MS. GJOVIK:

Q.  Go ahead.

A.  Yeah.  There -- there's mention of retaliation claims in this document.  So -- yes.

Q.  Yeah.

A.  I was investigating those specific concerns in this document.

Q.  This document seemed to focus on retaliation complaints with retaliation occurring around 2015, 2016, 2017.

What about complaints of retaliation occurring in 2021?  Were you investigating any of those?

A.  My investigation was focused on the issues

Page 47

laid out in the issue confirmation document.

Q.  So there's multiple.  So Exhibit B, this is your version of the issue confirmation document; right?

A.  Yes.

Q.  Yeah.  So when you say you're investigating the issues laid out in "the issue confirmation," I just want you to distinguish whether it's yours or mine, which we'll go back to in a second.  Mine was Exhibit D.  Yours was Exhibit B.

So are you saying that you were investigating just the issues laid out in your issue confirmation document?

A.  What I am saying is that I was investigating concerns laid out in the issue confirmation document.

Q.  Which one?

A.  You've called out that there are multiple versions.  So, I mean, I --

Q.  I can rephrase.  Did -- let's go to -- again, to Exhibit D, which was my final version of the issue confirmation document and in retrospect, I forgot to update the revision to revision three and the date and all that.  So it was the 23rd of August.  But I checked this was the right one because I had sent you an updated one when I filed a business conduct complaint on the 23rd about the Ronald Sugar and office issues.  So I --

Page 48

(Reporter clarification.)

MS. GJOVIK:  Ronald Sugar -- yeah.  And I think I said EHS office issues.  This document gives me anxiety.  Okay.

BY MS. GJOVIK:

Q.  So, Ms. Okpo, do you remember me sending you a document that looked like this?

A.  Yes.

Q.  Yeah.  And you -- do you remember replying in an email saying it was received and that you would investigate it -- the complaints made?

A.  I don't recall.

Q.  Okay.  Do you recall investigating the complaints made in this version of the issue confirmation?  All of them?

MS. RIECHERT:  What he did in his investigation is privileged; so I am not going to let him answer that.

MS. GJOVIK:  He just answered the same question for the last one.  I don't know why this is different.

MS. RIECHERT:  He cannot answer questions about what he did to investigate.

BY MS. GJOVIK:

Q.  Okay.  So the last document, we just

Page 49

confirmed, did not document any complaints about retaliation due to raising EHS concerns. And you had said you only investigated what was written in the issue confirmation. And I asked you to distinguish which issue confirmation, and I showed you this issue confirmation now, which has a header even about environmental health and safety concerns and talks about retaliation for raising health and safety concerns.

So, Mr. Okpo, did you investigate Ms. Gjovik's complaints about retaliation due to raising EHS concerns as she requested in this issue confirmation?

MS. RIECHERT: Objection. Attorney-client privilege. Instruct him not to answer.

MS. GJOVIK: I don't think that's privileged. I think that's actually the most fundamental question of this entire lawsuit.

MS. RIECHERT: Okay. Well, the investigation that he did was conducted under the advice of counsel, and what he did in connection with that investigation is privileged.

MS. GJOVIK: Okay. So as far as the facts go then, then we have no evidence that Apple ever investigated Ms. Gjovik's complaints about retaliation due to EHS concerns, July through September 2021. That's apparently where we're at.

Page 50

And it sounds like if I ask any further questions about whether you investigated anything in Ms. Gjovik's issue confirmation, you're going to claim privilege?

MS. RIECHERT: Correct. What he actually did to investigate.

MS. GJOVIK: What about the scope of the investigation?

MS. RIECHERT: Well, he's talked about these two documents.

MS. GJOVIK: Well, that's what you're not -- what I asked --

MS. RIECHERT: What he actually did is one thing, but if you ask him about the issue confirmation documents, he can talk about those documents. Just not what he did in response to them.

MS. GJOVIK: Yeah. But it was a binary question: Did he do anything at all, yes or no, regarding the complaints about retaliation due to making EHS complaints?

MS. RIECHERT: And that would ask him to answer -- require him to answer what he did in the investigation, and that's what I am not going to permit him to do.

MS. GJOVIK: But an answer could be "Nothing,

Page 51

I did absolutely nothing," or --

MS. RIECHERT: Right.

MS. GJOVIK: -- the answer could be, "I did something," and you're claiming privilege to those answers?

MS. RIECHERT: Correct. Because either would show what he did or didn't do.

MS. GJOVIK: Just a reminder, you can't claim privilege to misconduct.

MS. RIECHERT: I can claim privilege to an investigation that was conducted under the advice of counsel.

MS. GJOVIK: But you can't claim privilege to a lack of an investigation.

MS. RIECHERT: We can litigate that. We can argue that issue later. Let's not waste this witness's time on it.

MS. GJOVIK: Again, this is just the prima facie; so we'll keep coming back to this one. Okay.

BY MS. GJOVIK:

Q. Mr. Okpo, thank you.

Can you -- what can you tell me, if anything, about what you did investigate as part of your investigation?

MS. RIECHERT: I'll object to that on

Page 52

attorney-client privilege, and instruct him not to answer.

BY MS. GJOVIK:

Q. Zero details. Okay.

Mr. Okpo, did you talk to witnesses?

MS. RIECHERT: You can answer that generally.

THE WITNESS: Yes.

BY MS. GJOVIK:

Q. Thank you. Can you tell me who you talked to?

MS. RIECHERT: Objection. Attorney-client privilege. Instruct him not to answer.

BY MS. GJOVIK:

Q. Mr. Okpo, can you tell me if you talked to any of the witnesses recommended by Ms. Gjovik?

MS. RIECHERT: Objection. Attorney-client privilege. Instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. You did say that you did review the files provided. Actually, let's look at those for a second. Actually, it sounds like you're struggling a little too, Mr. Okpo.

Do you want to take five minutes? I can use five minutes.

MS. RIECHERT: Yeah. It's been just over an hour.

Page 53

MS. GJOVIK:  Does that sound good?

MS. RIECHERT:  Sounds good.

MS. GJOVIK:  Okay.  Thank you.

(Recess taken from 2:07 p.m. to 2:13 p.m.)

BY MS. GJOVIK:

Q.  Okay.  So, actually, Mr. Okpo, I thought we can actually just go back a few steps like we did at the very beginning where we were talking about kind of your general practice and your job in 2021, that role you held.

So you said that you would get assignments from Mr. Lagares to investigate employee concerns.

And did you have cases where you were assigned complaints about retaliation for EHS -- for making EHS complaints?

A.  Can you repeat that question?  I -- I don't understand.

Q.  Yeah.  Have you -- while you were in that role that you held, the one we talked about in 2021, did you ever get assigned cases to investigate where employees were complaining about retaliation due to them making EHS complaints?

A.  No.

Q.  Never?

Page 54

A.  No.

Q.  Not one case?  How long did you hold that role?

A.  A little over 18 months.

Q.  18 months, and not a single case for retaliation for making EHS complaints?

A.  Specific to EHS complaints, no.

Q.  Yeah.  Does that normally go to, like, another group?

A.  Does what go to another group?

Q.  Employee complaints about retaliation due to making EHS complaints.

A.  Not to my knowledge.

Q.  And I believe when we talked in 2021, you said that you were kind of assigned to a couple of functional groups.  Like, I think you said you were working with, like, legal on retail and some groups of corporate.

In July and August, what were the groups that you were assigned to?

A.  During that period, I was specifically focused on your case.  I had no client groups at that time.  I was specifically focused on your case.

Q.  Cool.  But that wasn't the question.

When you held that role, what groups were you generally assigned to?  I believe you had told me you

Page 55

were assigned to some groups.

A.  At what point?

Q.  Let's say, June, July, August, September of 2021?

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  That implies that he was investigating my complaints in June before it was assigned and/or he was doing absolutely nothing in June.

Do you want to sustain that objection?

MS. RIECHERT:  Okay.  So just if you focus it on -- you said June, July, August, September.  Maybe break it down by June or July or August or September, and then maybe we can get an answer.

BY MS. GJOVIK:

Q.  Okay.  Mr. Okpo, as of June 2021, were you generally assigned to employee complaints from certain organizations at Apple?

A.  Yeah.  I had a number of client groups.

Q.  Who were they?

A.  Finance, legal, the People Org, Café Macs.

Q.  When you say "legal," do you mean, like, all of the legal department under general counsel?

A.  Yes.

Q.  That's a huge job.  That's a lot of people.

And then when you say "People," you mean the

Page 56

human resources organization?

A.  Correct.

Q.  Does that include employee relations employees?

A.  We -- we typically wouldn't investigate our own.

Q.  Yeah.  That would be weird.  That would be weird.

And then you said Café Macs, that's Apple's, like, cafeteria workers?

A.  Yeah.

Q.  That's a lot of people.

And so, like, the cafeteria workers, would that be like maintenance and janitorial too?

A.  Front of house, back of house, maintenance -- janitorial is contracted out.

Q.  Okay.  And then you're saying that during the time that you held the role of employee relations investigator, you did not have a single case where you investigated employees making complaints about retaliation due to making EHS complaints?

MS. RIECHERT:  Objection.  Asked and answered several times.

BY MS. GJOVIK:

Q.  Okay.  I just want to make sure it's clear

Page 57

that you're applying that to all those groups. So I'm just noting that in my head.

And then, to your knowledge, if an employee in one of those groups wanted to make a complaint about retaliation due to filing EHS complaints, where would that complaint get routed in the employee relations group?

A. All retaliation claims would go through employer relations.

Q. So if you're assigned to those groups and someone from one of those groups makes this type of complaint, it would assumably go to you; right?

A. That's correct.

Q. Okay. Have there been any other cases other than the one we're talking about with Ms. Gjovik where Ms. Waibel was handling that complaint where you saw another investigator handling an investigation into complaints of retaliation due to making EHS complaints?

A. Specific to EHS complaints, no.

Q. Okay. And then do you know who Ms. Waibel -- what group she was assigned to as of June 2021?

A. It's been a long time. I -- you know, I can't speak definitively to that.

Q. Assumably the group that Ashley Gjovik worked

Page 58

in would have been one of the groups that she was assigned to?

A. I guess so.

Q. Yes?

MS. RIECHERT: Don't guess.

THE WITNESS: I don't know.

BY MS. GJOVIK:

Q. You don't know. Okay. Okay.

So is it possible that if you were investigating -- I am not going to ask you. She's already -- I can see from her eyes she's about to object.

MS. RIECHERT: Any time it starts "Is it possible," then that's an objection.

BY MS. GJOVIK:

Q. She just -- like this fierce look. Okay. Let me rephrase.

During your investigation into Ashley Gjovik's concerns/complaints, did you talk to anyone in EHS?

MS. RIECHERT: Objection. If it was part of his investigation, the answer is I instruct him not to answer.

MS. GJOVIK: Okay. Under what objection?

MS. RIECHERT: Attorney-client privilege.

Page 59

Sorry.

BY MS. GJOVIK:

Q. Yeah. There we go.

During your investigation into Ashley Gjovik's complaints, did you visit the office building where her desk is, 825 Stewart Drive?

MS. RIECHERT: Same objection. Anything he did as part of this investigation is privileged.

BY MS. GJOVIK:

Q. Have you ever been to 825 Stewart Drive in Sunnyvale, California?

MS. RIECHERT: That's sort of a backhand way of getting to the answer to the question.

MS. GJOVIK: Correct. It is.

MS. RIECHERT: So I think I'll have to instruct him not to answer.

It wouldn't matter whether he had been there or not except in connection with an investigation.

MS. GJOVIK: Yeah. But maybe he's been there a few times. I had lovely coworkers. Maybe he was hanging out with them. Talking to them. Who knows.

MS. RIECHERT: It wouldn't be relevant to this case in any event.

MS. GJOVIK: It would because of the condition of the site, actually.

Page 60

BY MS. GJOVIK:

Q. Have you ever been to 825 Stewart Drive?

MS. RIECHERT: Same objection. Instruct you not to answer.

BY MS. GJOVIK:

Q. If you have ever been to 825 Stewart Drive, would you have ever assumed it was a Superfund site?

MS. RIECHERT: Objection. Speculation. Hypothetical.

BY MS. GJOVIK:

Q. Are you -- are you aware -- are you aware that 825 Stewart Drive is a Superfund site?

MS. RIECHERT: Don't say anything you've learned as a result of consultations with counsel, but otherwise you can answer.

THE WITNESS: Only through counsel.

BY MS. GJOVIK:

Q. In your experience, have employees raised concerns to you about working on sites that are Superfund sites?

A. No.

Q. No. Other types of toxic waste, dump, cleanup sites like brownfield sites?

A. No.

Q. Toxic waste, hazardous waste, handling issues,

Ekelemchi Okpo

Page 61

or communication issues?

A. Repeat that last.

Q. In your role as employee relations investigator, have you had any cases where employees raised concerns to you about, like, a direct issue or retaliation for raising issues regarding hazardous materials and hazardous waste?

A. No.

Q. Never in 18 months? Okay.

And if -- like, if I was a backhouse worker at Café Macs, and there were hazardous materials and I wanted to make a complaint about it, and assume -- who would I make that complaint to?

A. What complaint?

Q. If I thought that there were safety issues at work regarding hazardous materials and/or hazardous waste.

A. Generally through your -- your manager who would take partners with the EH&S teams. They are the experts.

Q. Okay. And then what if I was concerned about retaliation for making concerns? Who would I report that to?

A. Employee relations. Or various avenues to report retaliation claims, but -- yeah.

Page 62

Q. And as of 2021, let's say, July 2021, what was the method for an employee to reach out to employee relations and request an investigation?

A. It's a direct reach out to the extent the employee knows who their employee relations business partner is, report a concern, people support, the -- the employee's manager. There're various channels in which our employees could raise workplace concerns.

Q. Okay. I would like to go back to Exhibit B for a moment. Okay. So this was your issue confirmation, Mr. Okpo. And there is a retaliation section; right?

And here it does say, "In March 2021," Ms. Gjovik, "raised building and workplace safety concerns to EHS." It was listed under that "Retaliation" section.

Then it says she raised concerns to Waibel and Powers treated me different -- treated differently because of sexism, sexual harassment stuff.

So can you explain to me what -- this statement right here, I'm going to highlight it just on this exhibit right now in the video -- where it says, "In March 2021, you raised building and workplace safety concerns to Environmental Health and Safety."

And it's listed under, "You," Ashley Gjovik,

Page 63

"told me," Okpo, "that the events listed below may have caused the above retaliatory actions."

Mr. Okpo, isn't that raising concerns about retaliation for EHS issues -- for making EHS complaints?

A. The document, what version?

Q. This is the only version you sent me.

A. Oh, I see.

Q. Exhibit B.

A. Okay.

Q. Okay. And -- and you said that you didn't investigate anything about Ms. Gjovik's complaint about retaliation making EHS complaints --

MS. RIECHERT: Objection. Misstates the testimony.

MS. GJOVIK: -- the document. I was mostly just talking to myself. That wasn't a question. But -- okay.

MS. RIECHERT: Okay.

BY MS. GJOVIK:

Q. And then, Mr. Okpo, you label this document "Apple Confidential."

Can you tell me why you believe the whole document is "Apple Confidential"?

A. It's internal work product process.

Q. How is that confidential?

Page 64

A. I mentioned it's our internal process and work product.

Q. Can you identify which portions are internal process?

A. Issue confirmations. You know, the drafting of an issue confirmation.

Q. Just the fact of creating an issue confirmation is Apple confidential?

A. It's our internal process.

Q. And then you said "work product." Are you claiming this document is work product?

A. At the direction of counsel.

Q. But then you gave it to the employee. You emailed this to the employee Ashley Gjovik?

MS. RIECHERT: Is your question did he email it to you?

MS. GJOVIK: Uh-huh.

MS. RIECHERT: Okay. You can answer that.

THE WITNESS: Yes. Yes, I did.

BY MS. GJOVIK:

Q. Okay. To your understanding, what does it mean to put "Apple Confidential" on a document like this?

A. As I mentioned, it's, you know, part of our internal process -- our internal investigatory process.

Ekelemchi Okpo

Page 65

Q. Yeah. But do you -- do you think it attaches any kind of expectation or obligation to the person receiving the document to have "Apple Confidential" written on it?

A. I don't know how to answer that question.

Q. Okay. And didn't Ms. Gjovik complain to you a couple times about putting "Apple Confidential" on communications as part of the investigation and ask you to stop?

A. I don't recall.

Q. Okay.

A. It's been five years.

Q. Yeah. Okay. If an employee was to protest -- that's speculative. I can already see Melinda perk up on that one.

Have -- have employees complained to you in prior investigations about Apple's use of the term "Apple Confidential" on communications regarding those investigations?

A. No.

Q. Okay. And then you -- you put a note here. It says, "Apple takes concerns such as yours seriously and has a No Retaliation policy that can be found here: If you have any concerns of retaliation, please do let me know."

Page 66

And, Mr. Okpo, you sent this document on August 16th, 2021.

Did Ms. Gjovik complain about any retaliation following that date to you?

A. What date? Sorry. August --

Q. August 16, 2021.

A. I don't remember.

Q. Okay. There's some emails showing she did. And so when you put a note like that "let you know if there's retaliation," what did you intend? If the employee was to tell you that there was retaliation, would you add that to your investigation?

A. Yes, I would.

Q. Okay. And then -- oh, I do want to go to those Box folders. So Box is an application Apple uses for file hosting internally. I think they use it with contractors too.

And can you tell me about the -- the folders that Ms. Gjovik created on Box for your investigation? And, first, here is -- here is one of the pictures of those Box folders.

Can you confirm if you remember these folders?

MS. RIECHERT: I can barely see them. Oh, better.

THE WITNESS: Yeah. I remember.

Page 67

BY MS. GJOVIK:

Q. Yeah. And then they were labeled by topics and years and then also tagged by Ms. Gjovik about whether they were discussed with yourself with the "EO" used for your name. Does that look right?

A. Yes.

Q. Yeah. Okay. Can you tell me what you remember about these folders and the files and the discussions with Ms. Gjovik about these folders and files?

MS. RIECHERT: That's a very compound question.

BY MS. GJOVIK:

Q. Can you just tell me what you remember about the Box folder titled "Ashley Gjovik ER Investigation Evidence."

A. I don't understand the question. What specifically -- like, it's -- it's a big -- what do I remember?

Q. Okay. Yeah. So can you tell me about your recollection of Ms. Gjovik's presentation of evidence to support her claims through this -- this folder presented to you? What was asked? What you reviewed? What was discussed?

A. What was asked? What was reviewed? What was

Page 68

discussed?

MS. RIECHERT: It's a really compound question.

BY MS. GJOVIK:

Q. Okay. So you confirmed Ms. Gjovik did share these folders and files with you?

A. Yes.

Q. And you confirmed you did review them all?

A. Yes.

Q. Yeah. And you've confirmed that she was going in and tagging stuff about the status of what was reviewed and what had not been reviewed? Yeah? Yeah?

A. What was the last question? Can you repeat that question?

Q. Yeah. Ms. Gjovik had gone in and tagged the folders with status of what had been reviewed or discussed with you or not?

A. Okay.

Q. Is that true?

MS. RIECHERT: Is it true that you tagged it?

MS. GJOVIK: Yeah. That he recollects that Ms. Gjovik was tagging things with the status of the discussion.

THE WITNESS: I don't know how to answer that question. I don't know what -- what you did.

Page 69

BY MS. GJOVIK:

Q. So this was -- these little -- where it has a little tag icon, and it says, like, "Reviewed with EO 8 3." That would be August 3rd.

A. Uh-huh.

Q. "Discussed with EO 8 3." "EO not investigating." "ER not investigating." "Ashley asked again if ER will investigate."

Do you see those little tags I am talking about?

A. Yes, I do.

Q. Yeah. Do you recollect now Ms. Gjovik using those tags to track the status of the review of these folders?

A. It's not something I paid attention to.

Q. Okay. So this -- this is Exhibit G that we're looking at.

(Exhibit G was marked for identification.)

BY MS. GJOVIK:

Q. And it shows on the Box folder who has access, and it shows Ashley Gjovik, Antonio Lagares, your manager, and yourself, Ekelemchi Okpo; is that correct?

A. Yes.

Q. Yes. And you said that you reviewed all these

Page 70

files and folders already.

So do you -- you're saying you do not recollect if you noticed the tags on the folders?

A. It's not something I paid attention to.

Q. Okay. And then the date on this screenshot -- or sorry. The screenshot shows that these folders were updated on August 3rd, 2021; is that correct?

A. That's what the screenshot says.

Q. Yeah. And the folder description says "Evidence for the ER Investigation, & Potential Future Legal Actions"; is that correct?

A. That's what it says.

Q. Yeah. And then do you recollect that you and Ms. Gjovik had several meetings to discuss her complaints and review evidence in July and early August 2021?

A. Yes.

Q. Yeah. Do you remember when the final meeting was?

A. Sometime in early August.

Q. August 4th?

A. Without a calendar or a timeline in front of me, I can't --

Q. Okay. Do you remember reviewing the evidence in the folder titled "New Evidence to Review 8-4"?

Page 71

A. Yes.

Q. Do you remember if you reviewed that prior to 8/4, on 8/4, or after 8/4?

A. I reviewed it. I don't remember specifically when.

Q. Do you recall Ms. Gjovik asking to review it with you on 8/4 and you refusing to review it with her on 8/4?

A. That's not my recollection. I would not have refused to review anything with you.

Q. I would have hoped so, Mr. Okpo. That's not how I remember it.

Do you remember on 8/4 informing Ms. Gjovik that Apple was placing her on paid administrative leave?

A. Yeah. Accommodating your request.

Q. That wasn't the question.

So, yes, you remember placing her on administrative leave.

Do you recall her making protests, complaints, objecting, or otherwise having concerns about that announcement?

MS. RIECHERT: It's a very compound question.

BY MS. GJOVIK:

Q. Do you recall Ms. Gjovik's response to being told she was being placed on leave?

Page 72

A. What exactly you said, no.

Q. General sentiment?

A. I recall you asking questions about what access you may or may not have to work tools.

Q. Do you remember what the answers were?

A. That the expectation is that you're uninvolved in any work-related activities.

Q. Can you define work-related activities?

A. Anything related to doing work at Apple. Apple sponsored things.

Q. Would that include using Apple Slack?

A. It's a work tool.

Q. So the expectation would be that when Ms. Gjovik was placed on paid administrative leave that she would not use Slack; is that correct?

A. I don't believe I ever explicitly said that to you.

Q. But that was the expectation?

A. Those are two different things; right? Like, I don't -- what the expectations are around forming any work duties or using any work tools is different from what I explicitly stated to you.

Q. Yeah. So let's -- let's just drill out on that on a high level then.

So you said that -- what was the first thing

Ekelemchi Okpo

Page 73

that you -- you said earlier that the instruction was to -- the expectation was to not be involved in workplace -- can you say it again?  What was the term you used?

A.  Whatever my email stated.

Q.  Okay.  And so you're saying that may not actually include the use of work communication tools still?  That the employee could still do that?

A.  I don't understand the question.

Q.  Okay.  So I need more cold medicine.

Let's go back to these folders for a second.  Okay.  So you've confirmed these look like the folders that you reviewed.  They cover your 2015 through 2021.  You said you looked through all the documents.  That was Exhibit G.  And I would like to look at just a couple more photos of these and just have you authenticate them to the best of your memory, please.

So here is another one.  It's basically the same thing with a slightly different view.  That's Exhibit H.

(Exhibit H was marked for identification.)

BY MS. GJOVIK:

Q.  Here is Exhibit I.  That one is actually not helpful.  It doesn't have the dates on it.  Sorry.

Page 74

(Exhibit I was marked for identification.)

BY MS. GJOVIK:

Q.  Notes.  Notes.  Notes.  Okay.

Now, Mr. Okpo, do you remember Ms. Gjovik ever expressing concerns to you about whether her complaints would actually be earnestly investigated or not rather than the investigation being -- I think she used the term like "farce" -- a farce investigation?

A.  Can you repeat the question?  I --

Q.  Do you recall Ms. Gjovik ever raising concerns to you about whether her complaints will actually be earnestly investigated by you?

A.  Yes.

Q.  Can you tell me about those?

A.  I recall it being a general statement of concern.

Q.  Did she cite any examples of why she might be concerned?

A.  I don't recall specifically, no.

Q.  Okay.  Do you recall Ms. Gjovik asking you about the outcome of your investigation?  Like, what the, like, the end product would be and who any recommendations would be made to?

A.  I don't remember.

Page 75

Q.  Do you remember Ms. Gjovik, around that time, that was around July 27, 28, 29, during the conversation with Ms. Gjovik, her getting so upset at the answers she was getting she spilled coffee all over her desk and herself, but continued talking to you covered in coffee?  I'll remember that forever, though.  Forever.

MS. RIECHERT:  I am not sure if there's a question in there.

MS. GJOVIK:  Just credibility of the witness's testimony of his actual recollections or not with things that can be substantiated based on other evidence.

I would like to show you an email sent to you, Mr. Okpo.  This will be Exhibit A.

(Exhibit A was marked for identification.)

BY MS. GJOVIK:

Q.  This is an email sent July 28, 2021.  The subject is "Slack ER Chain," sent by me cc'ing Mr. Antonio Lagares.

Do you remember this email, Mr. Okpo?

A.  Yes.

Q.  Yeah.  Can you tell me about this email?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q.  Can you tell me what was done with this --

Page 76

this complaint from Ms. Gjovik, if anything?

MS. RIECHERT:  So if you're asking what he did in connection with the investigation, then I will instruct him not to answer based on attorney-client privilege.

MS. GJOVIK:  Okay.  What can he answer outside of attorney-client privilege?

MS. RIECHERT:  I don't know if he did anything other than as part of his investigation he could.

MS. GJOVIK:  Or if he waived privilege such as if he told Ms. Gjovik to stop talking to her coworkers on Slack about this and instead send them to him directly.

MS. RIECHERT:  Okay.  Then you can ask him that question.

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

Q.  Mr. Okpo, what, if anything, did you do in response to this email that is not protected by privilege?

MS. RIECHERT:  Okay.  So I think your example was did he tell you anything in response to this email.

MS. GJOVIK:  I don't want to lead him.  I would just rather have him respond generally with what he can respond to.

Page 77

MS. RIECHERT: I know. But I'm -- yeah. I'm objecting on privilege, and that's the only example you've given that wouldn't be privileged.

MS. GJOVIK: We don't know what else would be because he hasn't answered. I can't read his mind.

MS. RIECHERT: So are you asking him if he talked to you about this?

MS. GJOVIK: I would like him to note any and everything he did in direct response to this email that he can share that is not blocked by privilege.

THE WITNESS: What I did during this investigation was directed by counsel.

BY MS. GJOVIK:

Q. Okay. So do you recall talking to me about the Slack exchanges that are captured in this email?

A. I recall this specific email.

Q. Okay. Do you recall any verbal conversations with Ms. Gjovik about this email or this -- the Slack conversations that were documented in this email? Would you like to see the full document? It's 13 pages. We can go through each page again.

A. Yeah. Let's do that.

Q. Okay. We'll keep it big for you guys and then do the thing where you tell me to scroll down. Okay?

A. Yup.

Page 78

Q. And we'll be reading this first part, actually, I would like to read onto the record just for the context in the deposition transcript. So I'll read the text, and then the rest is screenshots of exchanges on Slack.

The text says, "Hi, The Slack chain we talked about yesterday & today," with the link, a URL link. "Not even including DMs..." it meant "direct messages."

"I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation -- who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now -- but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

"There seems to be a growing group of us with very horrific stories to tell, who have tried to tell these stories, and have gotten nowhere at Apple.

"As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation -- but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there. Ashley."

Page 79

Okay. So here is the bottom half, and let me know when you would like to go to the next page.

A. I'm ready.

MS. RIECHERT: While he's doing that, Ashley, can you let Isela back in?

MS. GJOVIK: Oh, yeah. Let me check. I lost my header. I don't see her.

MS. RIECHERT: Okay. I'll -- I'll remind her. She just told me she got knocked off.

MS. GJOVIK: It usually dings for me when someone tries to get in. I didn't hear it either.

THE WITNESS: Okay. Okay. It's quite small. Thanks.

BY MS. GJOVIK:

Q. Okay. I am sorry. I'm actually going to change plans because this is going to take a long time, and I have a lot more questions for you.

So we got through the -- the two first pages and at least part of the third page. Yeah.

And you recall this email and the -- that Slack conversation now that you've refreshed your memory?

A. Yeah.

Q. Yeah. How would you characterize the Slack post, the ones that you reviewed?

Page 80

MS. RIECHERT: Objection. Vague.

BY MS. GJOVIK:

Q. The Slack posts -- there were multiple employees complaining about work conditions and failure to actually get a good investigation from ER?

A. Yeah.

Q. Yeah. Did you or anyone else at employee relations, in response to this email, look into those cases to see if they were handled properly?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege in anything he did in connection with the investigation.

BY MS. GJOVIK:

Q. Okay. Do you recall discussing with Ms. Gjovik and asking her to stop posting these things in Slack and instead send people directly to talk to you privately?

A. That's not my recollection.

Q. What is your recollection?

A. To the extent people had workplace concerns, they could come directly to the employer relations team or go through other channels that are available to them as Apple employees. It is not my recollection that I told you to stop posting to Slack.

Q. So could keep posting on Slack, but also

Page 81

wanted people to report concerns to you and your team?

A. Yeah. Or any other avenue in which they felt comfortable.

Q. Why was talking to coworkers on Slack not sufficient?

MS. RIECHERT: Objection. Vague.

BY MS. GJOVIK:

Q. You're saying that when these complaints were being made on Slack, you requested that they be raised to either HR or ER management? Why would that be needed in addition to talking with coworkers on Slack?

A. The mere act of talking to coworkers on Slack, which employees have the right to do, doesn't put Apple on notice that there may be potential concerns to investigate. And so at no point did I say you could not have conversations with coworkers on Slack.

Q. Yeah.

A. But what I would have said is that folks needed to -- to the extent they had concerns, report through their appropriate channels.

Q. Yeah. So many of the concerns expressed in this thread were about the employee relations team, your team. And when we were talking earlier and I asked who investigates your team or concerns from your team, you didn't really have an answer.

Page 82

So do you know who employees should complain -- who should the employees reach out to if they have concerns about the employee relations function or the employee relation investigators? Who do they report that to?

A. They could report that to their -- to their human business partner. They could call the hotline, report a concern. They could report it through their manager. There are multiple avenues in which Apple employees could raise those concerns.

Q. And then where would that concern get routed to?

MS. RIECHERT: Objection. Lacks foundation.

MS. GJOVIK: No, it doesn't. He has to answer.

MS. RIECHERT: No. He has to answer if he knows the answer.

THE WITNESS: I don't know. But -- I don't know.

BY MS. GJOVIK:

Q. To your awareness, is there any team at Apple who would be tasked with investigating employee relations misconduct?

A. To my knowledge, there is a team internally. I don't know which team it is.

Page 83

Q. Do you know what organization?

A. It would be within the People -- the HR department.

Q. And that would be, like, for individual employee misconduct or if there was a complaint about systemic misconduct by the employee relations function?

A. I don't understand your question.

Q. Yeah. So these complaints -- the thread in the conversation was that it seemed like there was a systemic issue. That just employee relations was systemically failing to investigate stuff, resolve issues, and even causing more harm, potentially intentionally. And so you're saying that -- your preference that you expressed to Ms. Gjovik was that those complaints at least be also made to someone in Apple management or administration. And I'm just trying to sort out who you were envisioning that complaint to be made to?

MS. RIECHERT: Objection. Asked and answered.

BY MS. GJOVIK:

Q. That's what I was clarifying.

Who -- an employee would raise a systemic -- a concern about a systemic issue with a function, and so your answer would just be HR? Like their HR business partner? They would just say that employee relations

Page 84

seems to be a broken function at the company?

MS. RIECHERT: Objection. Misstates his testimony as to the places people could complain.

MS. GJOVIK: Yeah. Can he answer then, because I still don't know?

MS. RIECHERT: He listed a number of places.

MS. GJOVIK: He listed places people can complain, but not who would investigate.

MS. RIECHERT: No. He said but it's within the HR department. He didn't know the name of the team.

BY MS. GJOVIK:

Q. Okay. Mr. Okpo, how do you know there's a team that investigates this stuff?

A. I don't understand what the -- do you mean how do I know?

Q. You said that you know that there's some team at HR who will investigate employee relations, and I would like to know how you know that information? Is it on a brochure somewhere or a website?

A. Not to my knowledge.

Q. Do you recall how you know that? How you know there is a team that will investigate this stuff?

A. Through my work. Through partnership across the organization.

Q. Do you have any knowledge of an Apple

Page 85

investigation into employee relations for mishandling employee relations investigations?

MS. RIECHERT: Okay. That sounds like it's going to be privileged; so instruct him not to answer.

BY MS. GJOVIK:

Q. Okay. Mr. Okpo, do you recall Ms. Gjovik complaining about facing retaliation from her managers David Powers and Dan West?

A. Yes.

Q. Can you tell me what you -- do you remember she complained?

A. About what specifically?

Q. Yeah.

A. Everything that was outlined in the issue confirmation document.

Q. Which one? Yours or Ms. Gjovik's or both?

A. The issue confirmation document.

Q. There's two. Which one? Exhibit B or Exhibit D? Exhibit B is yours; Exhibit D is Ms. Gjovik's.

A. The final version of the issue confirmation document.

Q. Exhibit D?

A. Yeah.

Q. Okay. And do you remember Ms. Gjovik

Page 86

complaining about having her workload changed and her work responsibilities changed?

A. Yes.

Q. Did you investigate those complaints?

MS. RIECHERT: Objection. Instruct the witness not to answer.

BY MS. GJOVIK:

Q. Okay. Do you remember Ms. Gjovik making those complaints prior to her being placed on administrative leave?

A. Yes.

Q. Yeah. Do you remember Ms. Gjovik making other complaints about other types of retaliation from her managers prior to being -- her being placed on administrative leave?

A. To the extent that they're outlined in the issue confirmation document.

Q. Okay. Do you recall Ms. Gjovik asking for intervention from Apple, either through your team or another team, to try to stop the retaliation prior to her being placed on administrative leave?

A. Yes.

Q. The alleged retaliation.

A. Yes.

Q. Thank you. Can you tell me what, if anything,

Page 87

was done to investigate and try to mitigate the alleged retaliation she was complaining about prior to placing her on administrative leave?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Okay. Mr. Okpo, do you remember Ms. Gjovik asking you -- let me rephrase.

Do you remember Ms. Gjovik telling you that she would prefer to stay at work, but that she needed intervention in the alleged retaliation she said she was facing, and she said at a very worse case we can talk about administrative leave again, but that she really wanted to stay at work?

Do you remember that conversation?

A. Not my recollection.

Q. Okay. And so if there's emails that Ms. Gjovik sent you saying that, you don't remember those?

A. I am sorry. I am sorry. Can you repeat that?

Q. Yeah. If Ms. Gjovik sent you emails saying that, you're saying you don't recall those emails?

A. The way you just phrased it is not my recollection of the conversation.

Q. Can you share with me how you do recollect it?

Page 88

A. Yes. You asked to be placed on administrative leave because you raised concerns about being subject to a hostile work environment by Helen, by David Powers, by Dan West, and that was your request, and we accommodated your request.

Q. Okay. But you also just said that -- well, first, objection that I don't agree with that, but that's your testimony.

You also just said, though, that you recollect Ms. Gjovik complaining about alleged retaliation and asking for some sort of intervention with it, and you're saying, though, that you don't recollect her ever asking you for an intervention other than an administrative leave?

A. I don't believe that was my testimony. I don't believe that was my --

Q. Okay. Can you restate please and clarify?

MS. RIECHERT: What's the question?

THE WITNESS: Restate what? What question?

BY MS. GJOVIK:

Q. Can you tell me what you remember Ms. Gjovik had asked you for prior to her being placed on administrative leave regarding any sort of intervention into the complaints of alleged retaliation?

A. My recollection is that you shared concerns

Page 89

about being subject to a hostile work environment by your People business partner and two levels of your management chain.

Q.   That didn't answer the question.

MS. RIECHERT:  I think it did.

BY MS. GJOVIK:

Q.   No.  Mr. Okpo, do you recall Ms. Gjovik asking you for any type of intervention into the allegations of retaliation other than administrative leave?

Isela is back.

MS. RIECHERT:  So the question is did you ask him for intervention other than administrative leave?

BY MS. GJOVIK:

Q.   The question is what I just stated prior.

A.   Nothing comes to mind.

Q.   Nothing comes to mind.

So you're saying the only thing Ms. Gjovik ever asked for regarding the alleged allegations of retaliation was to be placed on administrative leave; is that correct?

A.   You asked for a thorough investigation, right, and I also recall you --

Q.   Sorry.  Go ahead.  Can you speak up too?

A.   You asked for a thorough investigation, and I also recall you asking to the placed on admin leave

Page 90

because you believed you were subject to a hostile work environment.

Q.   So the question was other than saying "administrative leave."  So you're saying also a thorough investigation?

A.   Correct.

Q.   Correct.  And, Mr. Okpo, do you recall any statements from Ms. Gjovik about requesting intervention such as talking with her managers, meetings with her managers, talking to HR, to try to get them to stop the alleged retaliation?

A.   Can you restate -- can you state that again?

Q.   Yeah.  Do you recall any requests from Ms. Gjovik, prior to placing her on administrative leave, where she requested that yourself or someone else at Apple intervene with the parties who were doing the alleged retaliation and just to try to get them to stop that alleged retaliation?

A.   Yeah.  And conduct an investigation into those claims.  Yes.  But your specific request was to be placed on admin leave because you believed you were subject to a hostile work environment.

Q.   That's not the question, Mr. Okpo.

A.   I --

MS. RIECHERT:  Let him finish the answer.

Page 91

THE WITNESS:  I answered, yes, right.  Like, you did ask that someone, you know, talk to those individuals to stop their retaliation and to conduct a --

BY MS. GJOVIK:

Q.   Did anyone -- go ahead.

MS. RIECHERT:  Objection.  Instruct him not to answer as to whether he did anything.

MS. GJOVIK:  I didn't even ask the question yet, Melinda.

MS. RIECHERT:  Okay.

MS. GJOVIK:  Let him finish, too.  He was still finishing.  And then you can object because that's what I was going to ask.

BY MS. GJOVIK:

Q.   Go ahead, Mr. Okpo.

A.   I am done.

Q.   Okay.  And did you talk to anyone -- or did you or anyone else talk to those parties about the alleged retaliation and try to find ways to mitigate the actions that the employee Gjovik had alleged for retaliation?

MS. RIECHERT:  Objection.  Attorney-client privilege.  Instruct him not to answer.

MS. GJOVIK:  There we go.  It's like a tango,

Page 92

Melinda.  Okay.

BY MS. GJOVIK:

Q.   So did -- to your best recollection, did Ms. Gjovik ever ask to come back to work or -- let me -- let me reframe that.

To the best of your recollection, did Ms. Gjovik, after she was placed on administrative leave, ask for permission to participate in work activities to you?

A.   There was an Apple University training.

Q.   Tell me more.

A.   That you requested to attend.

Q.   And what was your response to the employee's request?

A.   Because you were on an administrative leave, a paid admin leave, the expectation was that you would not participate in any work-related activity.

Q.   How was the Apple University training considered a work-related activity?

A.   It's Apple sponsored.

Q.   Okay.  So then going back to Slack, would you say that Slack is Apple sponsored?

A.   It's a work tool.

Q.   Yeah.  So Ms. Gjovik asked you if she could go to this training, you said -- what was your response to

Ekelemchi Okpo

Page 93

her?

A.   The training could be rescheduled to a later date, but you were currently on a paid administrative leave and the expectation is that you would not participate in any work-related activity.

Q.   So, no, the answer was, no, she can't go; is that correct?

MS. RIECHERT:  Objection.  Asked and answered.

BY MS. GJOVIK:

Q.   Okay.  Mr. Okpo, at that same time, didn't -- around that same time, didn't you also tell Ms. Gjovik that she could ask to do work activities still?

A.   That's not my recollection.

Q.   If there's an email saying that she could ask to come back to work or do work activities, you don't recall that?

A.   Can you repeat that question?  I --

Q.   Yeah.  Do you recall around that time ever telling Ms. Gjovik that she could request to still do work activities?

A.   I recall an email where I mentioned we could arrange for your return back to work.

Q.   So is it your understanding that at least when Ms. Gjovik was placed on -- and I'm going to keep using third person.  I think it would be helpful for readers

Page 94

later if we don't just have, like, a personal interaction, but you're welcome to use whatever pronouns are more comfortable for you.

So do you recall -- let me rephrase this.

So is it your view that when Ms. Gjovik was placed on administrative leave, if she was to come back from administrative leave, like, how did it stop?  It was going to have to be, like, an all or nothing?  That either she requests to completely cancel the administrative leave or -- but she can't, like, do a training while she's on administrative leave?

A.   I don't know that I really -- I fully understand the question.  What are you --

Q.   Okay.  So when you said that the employee can request to come back to work, did you mean that that would be just a request to completely cancel the administrative leave rather than ask to be able to do something like take a training while on administrative leave?

A.   Yeah.  You're either on administrative leave or you're not, right.  So if you're not on administrative leave, then you're an active, you know, productive employee.

Q.   And so what was the concern about allowing Ms. Gjovik to attend the Apple University training?

Page 95

A.   You were -- you were currently on the administrative leave.

Q.   The concern was it was going to cause some kind of harm if she was able it attend the training?

A.   You were currently on administrative leave, and employees on administrative leave do not participate in any work-related activities.

Q.   And so that would also include Slack then; right?

MS. RIECHERT:  Objection.  Asked and answered many times.

BY MS. GJOVIK:

Q.   He still hasn't answered that one directly because it's part of the MLRB case.  He's avoiding that one pretty well.  I see you're hanging out with CWA a lot, Mr. Okpo.  Okay.

So next question:  How many investigations have you had where an employee has complained about alleged retaliation by their managers, ask for some kind of intervention to stop it, for whatever reason they end up on administrative leave, but as far as they know, nothing was done to stop the actions that they had complained was retaliation, and then they asked to come back to the environment that they had previously said had retaliation?

Page 96

MS. RIECHERT:  There are a lot of parts to that question.

THE WITNESS:  I am not following.

BY MS. GJOVIK:

Q.   Okay.  So we were just talking about a scenario where Ms. Gjovik had allegedly complained about alleged retaliation at work, and had asked for intervention to stop that retaliation, and then we're talking about her being placed on administrative leave, and a communication from you that she could ask to come back to work, but, like, completely.  She would have to stop the leave, completely come back.

And I am asking you how often in investigations, in that 18 months you did that job, do employees in her position ask to come back to leave after -- had just complained the same work conditions were retaliation and hostile work environment?

A.   I don't really know how to answer that question.  It truly depends on the circumstances of the case.

Q.   Like, 20?  2?  Zero?  100?

A.   I don't understand your question.

Q.   Can you recall any examples of any employees fitting that factual circumstance who asked you to come back to work completely before there was any kind of

Ekelemchi Okpo

Page 97

update or reassurance that there would not be the same actions they had just complained about?

A. Depends on the circumstances of the case. I --

Q. Can you think of one -- any examples?

A. When employees -- can you repeat the question?

Q. Yeah. If an employee who you're investigating had concerns, they had complained about a hostile work environment or retaliation, they end up on administrative leave one way or another, and there had been no communication or reassurance that the same stuff they had just complained about, the retaliation or hostile work environment, had been resolved or mitigated, but then asked to cancel the administrative leave and come back to work full in that same environment?

A. I can't think of a specific example that -- that 100 percent fits kind of that type of --

Q. Because it doesn't happen. No one does that.

Okay. So then let's talk about -- I want to talk about investigation. I want to talk about outcome.

MS. RIECHERT: Do we want to take a break now? It's been another hour.

MS. GJOVIK: Let me ask one more question --

MS. RIECHERT: Oh, yeah. You can.

Page 98

MS. GJOVIK: -- and then we can break because I need to keep it -- it just popped in my head. This is the third time after I lost it prior.

BY MS. GJOVIK:

Q. Okay. Mr. Okpo, documents produced by Apple indicate that Ms. Gjovik was under investigation by Apple employee relations no later than July 2021 at least specific to her talking to the New York Times about her concerns about workplace safety regarding COVID-19.

Are you aware of that investigation?

A. I am not.

MS. GJOVIK: Okay. That's all for now. Can we do ten minutes so I can walk my dog?

MS. RIECHERT: Sure.

MS. GJOVIK: Okay.

MS. RIECHERT: I can walk mine too.

(Recess taken from 3:13 p.m. to 3:24 p.m.)

BY MS. GJOVIK:

Q. Mr. Okpo, are you aware of how the administrative leave was coded in any system that --

A. No.

Q. Okay. When an employee is placed on paid administrative leave, is it usually tracked in some sort

Page 99

of system?

A. I don't know.

Q. Okay. Mr. Okpo, do you have any information you can share of your knowledge about the termination of Ashley Gjovik?

A. Only through what I know from -- only through kind of information I have from counsel.

Q. Did you see anything in the news?

A. No.

Q. Did you see anything in the news prior to the termination of Ashley Gjovik about Ashley Gjovik's complaints?

A. I remember you forwarded me an article from the New York Times.

Q. Did you see anything else?

A. No.

Q. No. Mr. Okpo, do you remember Ms. Gjovik complaining to you about Ms. Waibel's handling of the prior investigation?

A. Yes.

Q. What do you remember?

A. She had concerns about how she handled.

Q. Apparently sharing Exhibit Z. This is an email Ms. Gjovik sent to Mr. Okpo on July 29th, 2021.

Mr. Okpo, does this look familiar?

Page 100

(Exhibit Z was marked for identification.)

THE WITNESS: Yes.

BY MS. GJOVIK:

Q. Yeah. This is an email complaining that it seemed like -- let's see. What was the phrasing used?

"I talked to Ekelemchi about Jenna's investigation at length today" --

(Reporter admonition.)

MS. GJOVIK: Okay now?

MS. RIECHERT: Just read it slowly when you read. Everybody speeds up when they read.

MS. GJOVIK: Oh, yeah. Because reading is fun.

BY MS. GJOVIK:

Q. "I talked to Ekelemchi about Jenna's investigation at length today. As I've mentioned before, there are numerous areas I have reason to believe she didn't investigate at all."

Do you remember that, Mr. Okpo?

MS. RIECHERT: Remember that you said that?

MS. GJOVIK: Yeah.

MS. RIECHERT: Okay.

BY MS. GJOVIK:

Q. Is that a "Yes"?

Ekelemchi Okpo

Page 101

A. Oh, is that a question? Yes, I remember.

Q. Yeah. Yeah.

A. Yes.

Q. Okay. Mr. Okpo, is there anything that you are able to share that you might have done in response to Ms. Gjovik's complaints about concerns about that prior investigation?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Okay. So, Mr. Okpo, do you remember reaching out to Ms. Gjovik on September 3rd, 2021, asking to speak with her?

A. Yes.

Q. This is Exhibit DD.

(Exhibit DD was marked for identification.)

BY MS. GJOVIK:

Q. The bottom shows an email from September 3rd from Mr. Okpo asking to connect. He sent it September 3rd, 10:07 a.m., and said, "I wanted to follow up on the text message I sent this morning. Are you available to connect with me at 10:30 a.m.? If not, please suggest a time and I'll be happy to reschedule." Is that the email that you recollect?

Page 102

A. Yes.

Q. Yeah. And then the -- above that is a response sent my Ms. Gjovik. Do you remember Ms. Gjovik's response?

A. Yeah.

Q. Yeah. Do you remember Ms. Gjovik asking you to keep communications in writing?

A. Yes.

Q. Yes. Did you ever agree or disagree to that request? Let me rephrase. Did you ever respond directly to Ms. Gjovik's request to keep communications in writing?

A. No.

Q. Okay. And then, Mr. Okpo, you -- do you remember contacting Ms. Gjovik again on September 7th?

A. Yes.

Q. Yeah. So -- and is it your recollection that there was no communication in response to Ms. Gjovik's response on the third until your response on the 7th?

A. Yes.

Q. Yeah. This is Exhibit EE.

(Exhibit EE was marked for identification.)

BY MS. GJOVIK:

Q. And on September 7th, Mr. Okpo said, "Based on

Page 103

interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information." Mr. Okpo, what did you mean by that?

A. I was going through my investigation and I found some additional documents that were inconsistent with how you had laid out your complaints specific to the allegation that Dan West pressured you into engaging with a sous chef.

Q. That was the one thing you were reaching out about?

A. Yes.

Q. And that was the thing you were reaching out about on the 3rd and 7th?

A. It was -- yes.

Q. Okay. And then do you recall Ms. Gjovik's response on the 7th, which is shared on the screen right now from Exhibit EE, an email response at 6:45 p.m.?

A. Yes.

Q. And Ms. Gjovik asked you, again, if we could keep communication in writing. Says she is happy to discuss. Did you ever respond to her email?

A. This specific email, no.

Page 104

Q. Mr. Okpo, were you opposed to communicating in writing?

A. The work that we do, investigating claims, it would be very difficult to get to the heart of the issue and fact-find via email. What I mean by that is, as investigators, similar to what you're doing here, it's important to receive answers or -- from the -- the person you're interviewing in realtime so that you could ask follow-up questions where appropriate. And so it wouldn't have -- it's just not part of my process or our ER investigate process to conduct investigations via email.

Q. Do you -- do you feel like you understood why Ms. Gjovik was asking to keep things in writing?

A. No.

Q. No. Were you aware at this point, either the email you sent on the 3rd or the 7th, that Ms. Gjovik had already filed complaints with the EEOC, the California DFEH, the NLRB, and/or the California Department of Labor?

A. Only through counsel.

Q. Wouldn't it be reasonable to assume that someone who had filed complaints with the government about the same issues would want documentation to share with the government about the communications about those

Ekelemchi Okpo

issues?

MS. RIECHERT: Objection. Speculation.

BY MS. GJOVIK:

Q. Mr. Okpo, have you had other investigations where employees had asked to keep communications in writing?

A. Yes.

Q. Yeah. Have you ever said yes and agreed?

A. During the actual investigation process, I've been consistent around the need to have live conversations.

Q. What if -- and have counsel for employees, if they're already preparing to sue Apple, have they also asked sometimes to keep things in writing rather than have oral conversations?

MS. RIECHERT: Counsel for employees?

MS. GJOVIK: Yes.

MS. RIECHERT: Okay.

BY MS. GJOVIK:

Q. Because I specified earlier that employees asked, so I just want to be sure that I'm also including the other group.

A. So to make sure I understand your question, are you asking me if counsel for employees have direct -- have asked me directly to keep communication

with their clients in writing?

Q. Yes. That's the question.

A. No.

Q. No. Okay. And then -- let's see. So you've never agreed to keep things in writing.

Is there any policy that you're aware of, Apple, like, work policy that says investigations have to be oral and cannot -- communications are not allowed to be in writing?

A. Not that I am aware of.

Q. Yeah. Okay. And then this email that we're looking at right now, Ms. Gjovik had raised that she had just discovered that one of her coworkers had actually sued Apple over the alleged misconduct of Mr. West, and raised that to you with some concerns.

Did you ever respond to that?

A. Respond to what?

MS. RIECHERT: I'll misstate what the email says -- misstates what the email says, but you can ask if he responded to your "PS."

BY MS. GJOVIK:

Q. Okay.

A. No. I didn't respond to this -- this email.

Q. While you were conducting this investigation of Ms. Gjovik's concerns, were you aware that Crystal

Brown had sued Apple over alleged misconduct by Dan West?

A. No.

Q. Okay. And then -- let's see. I would like to look at Exhibit FF. It's another email.

(Exhibit FF was marked for identification.)

BY MS. GJOVIK:

Q. On this one, Ms. Gjovik emailed you on August 20th, 2021, while she was on administrative leave, and wrote, "I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.

"P.S. I should get you the updated issue Confirm," or confirmation, "before Monday. It's taken a lot of time to sort through and make sense."

Did you ever respond to this email to your recollection?

A. No.

Q. Do you -- is there anything you can share that you did in response to the employee complaining of retaliation by you?

MS. RIECHERT: Objection. Instruct the witness not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Is there any kind of process or protocol or policy in place at Apple when the employee complains to the employee relations investigator of the retaliation -- alleged retaliation by that investigator?

A. I don't understand the question. Can you repeat it?

Q. Yeah. Is there any kind of standard process or procedure that you're aware of when an employee complains to their investigator that the investigator themselves is also retaliating against them allegedly?

A. Standard process or procedure?

Q. How would you -- let me rephrase it.

If an employee was to complain to you that they felt that you were retaliating against them allegedly, how do you normally handle that sort of complaint?

A. I don't know that I could answer that question. I think it would just depend on the circumstances. But, generally speaking, right, whenever someone from the People team, employee relations, or a member of management is made aware of an employee raising workplace concerns, we take those concerns very seriously and look into them.

Q. Did you investigate yourself, Mr. Okpo, based

Page 109

on this email?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Uh-huh. Okay. And then this -- this -- this response that I read was after you had declined to allow the employee to attend the training that she wanted to attend, and she complained that her interpretation of the refusal to let her to attend the training was punishment, retaliation, and potentially a negative employment action.

Did you find that to be an actionable complaint of potential misconduct, Mr. Okpo?

MS. RIECHERT: Are you pointing to some particular thing?

MS. GJOVIK: Just exactly what I said.

MS. RIECHERT: No. I just was wondering where it is on this or not. Is it in this document? Oh, "I continue to struggling to understand how this current leave" -- that didn't seem to relate to the training.

MS. GJOVIK: Well, here it is. So she said, "I want to go to this training." Mr. Okpo said, "No." And then employee says, "This seems like punishment, retaliation, or negative employment action."

MS. RIECHERT: But "the current leave" is not

Page 110

the refusal to allow the training. Anyway...

MS. GJOVIK: But the refusal to allow the training was because of the current leave. It's circular. We're a snake eating itself, Melinda.

BY MS. GJOVIK:

Q. Mr. Okpo, could you please answer?

A. It's also clear in my response that I stated that we could -- you could reschedule and attend a session in the future.

Q. But the employee -- okay.

So the employee's response to you, you don't think was like an actionable complaint of potential misconduct?

A. No.

Q. No. Do you have a lot of employees when you're investigating their concerns send them emails accusing you of punishing them, retaliating against them, or doing negative employment actions against them?

A. Confidently, no.

Q. "Confidently"? What does that mean?

A. No, I don't have -- I don't have --

Q. Oh, like you're confident. So this was, like, the one time you heard that?

A. Yes.

Q. Yeah. And then what did you do with that

Page 111

complaint then if that was the very first time you had ever heard that?

MS. RIECHERT: Objection. Instruct him not to answer.

BY MS. GJOVIK:

Q. Okay. There we go. And then let's do -- Mr. Okpo, do you remember Ms. Gjovik complaining to you that it appeared Ms. Waibel had been using a prior administrative leave for improper purposes regarding the investigation she was also complaining about -- Ms. Gjovik was complaining about? Or let me -- let me rephrase. That was a huge run-on.

Ms. Okpo, do you recall Ms. Gjovik complaining to you about administrative leave that Ms. Waibel had arranged prior to you starting your investigation?

A. Complaining to me?

Q. Yes.

A. No.

Q. So we have two emails we're going to look at. Here's one -- this one was produced by Apple, actually. This is Exhibit K. This is from Ms. Gjovik to Okpo on July 28th, forwarded saying, "met with Jenna she offers admin leave on 5/21 and I started taking at 5/24."

(Exhibit K was marked for identification.)

Page 112

BY MS. GJOVIK:

Q. And then this is another email from Ms. Gjovik to yourself on July 28, 2021. It said, "Went on leave from 5/24 - 6/4.

"Jenna called 6/3 to tell me she finished and didn't find any issues. She never contacted me after 5/23 until she completed on 6/3. There were zero follow up questions from anything I sent her 5/20 - 5/22."

And then, "June 3-10 below -- clear to me Jenna didn't look into most of the stuff I sent her."

Do you recall this email?

A. Yes.

Q. Yeah. This is Exhibit L.

(Exhibit L was marked for identification.)

BY MS. GJOVIK:

Q. So, Mr. Okpo, wouldn't this basically be the -- Ms. Gjovik complaining to you about the leave that Ms. Waibel had arranged prior to you starting your investigation?

A. Complaining about the leave?

Q. Yeah.

A. My take away from this is you didn't think she conducted a thorough investigation, not specific to the leave that you requested.

Ekelemchi Okpo

---

**Page 113**

Q. Do you recall that Ms. Gjovik complained to you that she believed leave was used to basically, like, distract her while nothing was being investigated and then was brought back and had complained that things were actually even worse than prior?

A. That's not my recollection around the distraction allegation.

Q. So putting aside the term "distraction," do you recall Ms. Gjovik complaining to you that she didn't feel Waibel had actually investigated most or all things and complained that the alleged hostile work environment, retaliation were worse after she came back from the leave?

A. Yes. I recall you having general concerns about that investigation.

Q. Yeah. Mr. Okpo, do you recall Ms. Gjovik expressing concerns to you, prior to her being placed on administrative leave in August, that she was concerned the exact same thing might happen if she was placed on leave by Apple again?

A. I don't. I don't recall.

Q. Mr. Okpo, do you remember ever giving Ms. Gjovik an ETA of when she might be able to come back from work from that administrative leave?

A. I am sorry. Can you repeat the question?

---

**Page 114**

Q. Do you ever -- do you recall ever giving Ms. Gjovik an ETA, estimated time of arrival, of when she may be able it come back from that leave in August and September?

A. That would not be a normal practice. It would be dependent on the investigation.

Q. Okay. So we're looking at -- sorry. Go ahead. Did you have more?

A. No.

Q. Okay. Exhibit C is an email from August 24th with you saying you're -- "I am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you additional updates."

A. Right. That's consistent with my testimony.

(Exhibit C was marked for identification.)

BY MS. GJOVIK:

Q. Okay. And, Mr. Okpo, the next update you gave, was that that September 3rd email, to the best of your recollection?

A. Yes.

Q. Yeah. And then the next email after that was September 7th to the best of your recollection, that one we looked at?

A. It sounds right.

---

**Page 115**

Q. Okay. And then did you send Ms. Gjovik an email on September 9th as well?

MS. RIECHERT: Do you want to show it to him?

MS. GJOVIK: I couldn't find it in time. I was looking so hard for it, but it was the one you produced. I didn't have a copy.

MS. RIECHERT: Is that the one that says -- says something like "since you won't talk to me, I'm going to finish my investigation"?

MS. GJOVIK: Yeah. Yeah. But that's also -- objection. Leading objection.

You just told him what the letter said instead of letting him answer.

MS. RIECHERT: No, I was -- oh, well, he couldn't remember it sounds like --

MS. GJOVIK: He hasn't answered, though, Melinda.

BY MS. GJOVIK:

Q. So putting aside Melinda's speaking objection, Mr. Okpo, do you recall sending Ms. Gjovik an email on September 9th, 2021?

A. I don't remember the specific date.

Q. Do you remember sending her any additional emails after that one we looked at from September 7th?

A. Yes. I would have closed out stating that

---

**Page 116**

since you refused to engage with me orally, I had no other choice but to closeout the investigation based on the information I currently had.

Q. You closed out the entire investigation because Ms. Gjovik would not talk to you about the sous chef complaint? Is that what you just said?

A. I needed to talk to you about some inconsistencies, and without having the opportunity to connect with you verbally, I had to closeout the investigation.

Q. For that one specific issue you said that the request was about, or you closed out the entire investigation?

A. Closed out the investigation.

Q. You previously said you didn't remember what date you -- you did, if it was before or after the employee was terminated. Is that still true?

A. I am sorry?

Q. You previously said you did not recall if the -- if the investigation was closed prior to or after the termination of the employee. Is that still correct?

MS. RIECHERT: And you're giving the date as 9/10?

MS. GJOVIK: The notification of the termination was September 9th, effective September 10th,

---

Ekelemchi Okpo

Page 117

2021.

MS. RIECHERT: Okay. And the question is did he close it out before 9/9, or did he close it out before 9/10? Is that the question?

MS. GJOVIK: No. So he previously said he had no recollection whatsoever of whether he closed his investigation prior to or after the termination of the employee. And I am asking him if that testimony is still correct.

MS. RIECHERT: Yeah. But I'm asking you which date are you talking about. 9/9 or 9/10?

MS. GJOVIK: He said either way he did not know.

MS. RIECHERT: I am not sure I recollect that testimony.

MS. GJOVIK: Speaking objection again. Just let him answer.

BY MS. GJOVIK:

Q. Mr. Okpo, go ahead.

A. I don't recall the specific dates.

Q. Okay. So when you contacted Ms. Gjovik on the morning of September 9th that the communication you sent her about moving on without her, you're saying that that was you closing all of the investigations into all of her concerns and complaints that you had been

Page 118

investigating prior; is that correct?

A. Correct.

Q. Is that standard procedure for you, Mr. Okpo? That if an employee asks to keep things in writing on one specific issue, that you or other employee relations investigators will close an entire investigation?

MS. RIECHERT: Objection. Misstates the testimony. Assumes facts not in evidence.

BY MS. GJOVIK:

Q. Okay. Go ahead, though.

A. If the reporting party is refusing to engage orally, we will have no other option -- no other choice but to close out the investigation.

Q. Mr. Okpo, go ahead.

A. At that point, that employee is refusing to cooperate with the investigation.

Q. Mr. Okpo, what if the employee was raising, like, real issues with, like, regulatory noncompliance, criminal conduct by other employees, Apple would just close the investigation of those complaints even if, like, crimes were occurring if that employee would not get on the phone about one specific sub-issue? Is that what you're saying?

MS. RIECHERT: Objection. Misstates his testimony.

Page 119

BY MS. GJOVIK:

Q. He still has to answer.

A. As I stated, if a reporting party is refusing to engage orally, an investigator will have no choice but to close out the investigation based on information that they have.

Q. Okay. Mr. Okpo, are you aware that just, like, a couple hours after your email, the workplace violence team reached out to Ms. Gjovik?

A. No.

Q. No. Are you aware of any kind of investigation into Ms. Gjovik by the workplace violence team?

A. Workplace violence team?

Q. Workplace violence and threat assessment team.

A. The threat assessment team I'm familiar with. No.

Q. No. Okay. So it's just a coincidence that you and the workplace violence investigator used nearly the exact same language in your emails hours apart?

MS. RIECHERT: Assumes facts not in evidence. Haven't seen anything about that.

MS. GJOVIK: Uh-huh. Yup.

MS. RIECHERT: I think the witness doesn't know because he hasn't seen. He said he doesn't --

Page 120

MS. GJOVIK: He can say that, and then if it shows he's lying later, we can point that out.

MS. RIECHERT: Well, what's the question? Is it a coincidence that two people send emails with the same language at the same time?

MS. GJOVIK: That there's no coordination, there's no, you know, multiple people or same people drafting those emails, they were in complete isolation with very, very similar language and just hours timed apart.

MS. RIECHERT: Yeah. Assumes facts not in evidence. Lack of foundation.

BY MS. GJOVIK:

Q. Yup. Just a coincidence, Mr. Okpo?

A. I don't know how to answer that question. I was not aware of any investigation into your conduct.

Q. Okay. And then what was the concerns that you wanted to talk to Ms. Gjovik about so urgently? What was the -- the inconsistencies? Can you tell me please?

MS. RIECHERT: Objection. Asked and answered.

MS. GJOVIK: No. He never said what the inconsistencies were.

MS. RIECHERT: Yes, he did. He can answer again.

MS. GJOVIK: I think the general topic was

Page 121

sous chef, but he did not say anything more, and I think it is material what exactly he thought the inconsistency was.

MS. RIECHERT: Yes. He can answer that.

BY MS. GJOVIK:

Q. Yeah.

A. Okay. I found that there were misrepresentations of facts based on your framing of the concerns around Dan allegedly pressuring you into romantically engaging with a sous chef.

Q. What were the conflicting facts?

A. The claim that Dan pressured you into engaging with the sous chef. However, I found the full text thread where you use language like "the sous chef being cute," you know, at one point you mentioned that you had met another gentleman, and, sorry, it wouldn't work out with the sous chef. And Dan was very explicit "no pressure from me at all."

And so two very inconsistent scenarios there.

Q. Okay. Mr. Okpo, in your experience, do sometimes employees go along with a behavior by their superiors that sometimes they feel is inappropriate, but they might not feel comfortable objecting in realtime about that conduct, but then complain later?

MS. RIECHERT: Objection. Improper

Page 122

hypothetical.

BY MS. GJOVIK:

Q. Mr. Okpo, do you recall Ms. Gjovik telling you she wanted to go the office -- her office on August 4th specifically to look for that email -- that text exchange because she didn't have a copy and didn't recall what was said at that time?

A. No.

Q. Do you remember her protesting when she was being told she was being put on administrative leave that she had said she wanted to go to the office to get that exact exchange and also take pictures of the cracks in the floor?

A. No.

Q. No. Mr. Okpo, what knowledge do you have -- what do you recollect about the EPA inspection of Ms. Gjovik's office that occurred in August 2021?

A. None. That was not an issue that I was privy to.

Q. Okay. And then, Mr. Okpo, we're almost out of time.

You said you closed the investigation. Can you confirm you closed the investigation, then the same day you sent that email -- so September 9th, 2021, is when you -- you closed the investigation of Ms. Gjovik's

Page 123

concerns?

MS. RIECHERT: Objection. Misstates the testimony.

BY MS. GJOVIK:

Q. Mr. Okpo, what was the date that you closed the investigation of Ms. Gjovik's concerns?

A. Whenever I sent you that email stating that I would be closing out the investigation. I don't recall the specific date.

Q. Okay. And so if the employee had responded and said, "Oh, okay. I'll get on the phone with you," would you have reopened the investigation?

A. Absolutely.

Q. Okay. So completely contingent on oral communication?

A. Correct. That allows an investigator to conduct a thorough investigation.

Q. Okay. And has -- no, I'm not going to waste time about that.

Do you recall the emails about the employee complaining that she had heard Mr. West was going around and having all-hands -- or having staff meetings talking about the "Ashley issue" and telling staff that he would give an update on the "Ashley issue" at the October all-hands, and Ms. Gjovik complaining

Page 124

that it seemed like Dan West already knew that she was going to be fired while she was already on administrative leave?

A. That was a lot in that question.

MS. RIECHERT: I was going to say, there was about five things in that.

BY MS. GJOVIK:

Q. Do you remember or do you recall Ms. Gjovik complaining to you that she was hearing from her coworkers statements being made allegedly by Dan West that indicated that he did not plan she was ever coming back to work?

A. With that specific -- with that specific language, no.

Q. What about the "Ashley issue" complaint?

A. Yes.

Q. Yeah. And that she complained that Dan West said he was going to talk about the "Ashley issue" at an October all-hands, and he was saying this in August 2021?

A. That was your claim.

Q. Did you do anything to investigate those complaints?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

Ekelemchi Okpo

Page 125

BY MS. GJOVIK:

Q. Okay. And -- oh, and then, Mr. Okpo, do you recall some text messages with Ms. Gjovik as well as emails? Here is one of them. Here is a screenshot. This is Exhibit HH.

(Exhibit HH was marked for identification.)

MS. GJOVIK: And then the other is Exhibit Y.

(Exhibit Y was marked for identification.)

BY MS. GJOVIK:

Q. Do you recall these text messages?

A. Yes.

Q. Yeah. Did you watch that video that was sent to you?

A. I did.

Q. Yeah. And then in one of these also Ms. Gjovik is asking you are there any updates regarding her managers, and saying she's just going to email them and take down her one-on-ones and if they can just send stuff in writing with her and asking if you have updates. You said, "No update at this time, but I will circle back with you as soon as I learn more."

Do you remember that conversation?

A. Yes.

Page 126

Q. Yeah. Was that Ms. Gjovik asking to keep things in writing with her managers in July 2021?

A. Yes.

Q. Yeah. Did you ever respond to Ms. Gjovik either way about whether things could be kept in writing with her managers?

A. I don't recall if I specifically responded to that, but while active, it would be typically very difficult to only communicate with your manager via email only. That's just -- that's not how it works.

Q. Yeah. But during an investigation, it was a temporary thing, not permanent; right?

So would you view it's -- it's even like an act of employee misconduct to request things to be in writing in a temporary period?

A. I don't understand your question.

Q. Yeah. Do you think, like, an employee could be disciplined for asking to keep things in writing?

A. I don't know how to answer that question. It would depend on the circumstances and that's a hypo I just cannot -- I can't --

Q. Do you think Ms. Gjovik should be disciplined for asking to keep things in writing with the examples we discussed?

A. I don't see how an active employee can only

Page 127

communicate with their manager via email. Like, that's just --

Q. That wasn't the question. That was a temporary thing during the investigation, which is your purview; right?

So is it your view that an employee like Ms. Gjovik could be -- should be disciplined or could be disciplined for requesting to have -- temporarily have communications in writing?

A. I truly don't know how to answer that question. It truly will depend on the circumstances.

Q. But I -- the circumstance is Ms. Gjovik, the examples we discussed.

A. I maintain that I don't know how to answer that question.

Q. Okay. And we're out of time. I thank you so much for answering all my questions, Mr. Okpo. I do feel like you did answer most -- it was mostly just Melinda objecting with all the privilege stuff.

So thank you for cooperating. I really appreciate it.

(Reporter's request for orders.)

MS. RIECHERT: Yeah. Copy. Expedited. Rough. Rough tomorrow. Expedited whenever you can get it. Friday.

Page 128

(Reporter response.)

(Proceedings ended at 4:00 p.m.)

**Ekelemchi Okpo**

**Page 129**

CERTIFICATE OF REPORTER

I, Haleema Saleh, a Certified Shorthand Reporter, do hereby certify:  That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me At the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

In witness whereof, I have hereunto Subscribed my name.

Dated: April 10, 2026
_____

Haleema Saleh, RPR, CSR No. 14506

**Page 130**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
        vs. Apple Inc.

Date of Deposition: 04/07/2026

Job No.: 10188180

I, EKELEMCHI OKPO, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2026, at _____.

_____
EKELEMCHI OKPO

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 131**

DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik
        vs. Apple Inc.

Name of Witness: Ekelemchi Okpo

Date of Deposition: 04/07/2026

Job No.: 10188180

Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

**Page 132**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____
EKELEMCHI OKPO

# EXHIBIT 35

34.      Attached as Exhibit 35 is a true and correct copy of the cited pages of the certified deposition transcript of Aleks Kagramanov, taken April 16, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 29–30, 38–39, 57–59, 65, 69, 72–73, 91–97, 106, 115–116, 118–119, 120, 130–131, and any additional pages cited in the Motion.

Deposition of

# Aleks Kagramanov

April 16, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )  Case No.
                                     )  23-cv-04597-EMC
APPLE INC.,                          )
                                     )
                    Defendants.      )
_____  )

REMOTE DEPOSITION OF

ALEKS KAGRAMANOV

VIDEO-RECORDED VIA ZOOM

Thursday, April 16, 2026

Stenographically Reported By:

Vesna Walter, CSR, RPR, CCRR

CSR No. 11989

Job No. 10188334

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )  Case No.
                                     )  23-cv-04597-EMC
APPLE INC.,                          )
                                     )
                    Defendants.      )
_____  )

Deposition of ALEKS KAGRAMANOV, taken on behalf of Plaintiff, with all parties appearing remotely, beginning at 8:03 a.m. and ending at 10:53 a.m. Pacific time, on Thursday, April 16, 2026, before VESNA WALTER, Certified Shorthand Reporter No. 11989.

**Page 3**

APPEARANCES (All parties appearing remotely)

For the Plaintiff:

        AM GJOVIK CONSULTING, LLC
        By:  ASHLEY M. GJOVIK
        In Pro Per
        2108 N Street
        Suite 4553
        Sacramento, California  95816
        (415) 964-6272

For the Defendants:

        ORRICK, HERRINGTON & SUTCLIFFE LLP
        By:  MELINDA S. RIECHERT
        Attorney at Law
        1000 Marsh Road
        Menlo Park, California  94025
        (650) 614-7423
        Mriechert@orrick.com

ALSO PRESENT:

        PHILIP SCHECTER

(Video-recorded via Zoom by Ms. Gjovik)

**Page 4**

I N D E X

WITNESS

ALEKS KAGRAMANOV

Examination by:                                    Page

     MS. GJOVIK                                        5

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| Exhibit A | Emails | 22 |
| Exhibit C | Correspondence | 84 |
| Exhibit D | LinkedIn profile | 49 |
| Exhibit F | Email | 88 |
| Exhibit G | Email | 78 |
| Exhibit I | Complaint | 104 |
| Exhibit K | Privilege log | 116 |
| Exhibit L | Emails | 56 |
| Exhibit S | Settlement agreement | 109 |

Page 5

Thursday, April 16, 2026

8:03 a.m. - 10:53 a.m.

THE REPORTER:  Good morning.  My name is Vesna Walter.  I am a California Certified Shorthand Reporter and the deposition officer for today's deposition.  My CSR license number is 11989.

ALEKS KAGRAMANOV, having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. GJOVIK:

Q   And this -- hopefully you were given notice, Mr. Kagramanov -- already messed it up.  So sorry -- Kagramanov.  We're recording this on Zoom, as well as there's a video recording, and then we'll have the transcript as well.  And all of that will be provided to Orrick and Apple's and yourself, if you would like it too.

I'll just start.  So good morning.  My name is Ashley Gjovik.  I am the plaintiff in this matter.  I have a law degree, but I'm not an attorney.  I'm representing myself pro se.  I'm going to ask you some questions today.  And before we get started, I wanted to go over some foundational matters to ensure

Page 6

we're on the same page.

You were just sworn in by the court reporter.  Do you understand that you're now under oath the same as if you were testifying in a courtroom before a judge and jury?

A   I do.

Q   And you understand that means you're required to give truthful answers to my questions today?

A   I do.

Q   You understand that even though we're on Zoom and not in a formal office, I'm in a motel, this might feel informal, but giving false testimony under oath can still subject you to penalties of perjury?

A   I do.

Q   And then, now, you see the court reporter.  She's taking down everything you say today, every question I ask and every answer you give.  It's going to be made into a written transcript.  Because she can only take down words, I need you to give me verbal answers.  So if your answer is yes, please say yes rather than nodding your head.

Can you do that for me?

A   Yes.

Q   Thank you.

Page 7

Along the same lines -- sorry.  Is that an echo or is someone saying something?

Okay.  Along the same lines, please try to let me finish my question before you start your answer, and I'll do my best to let you finish your answer before I ask my next question.  That way we don't talk over each other and the court reporter can get a clean record.

Is that fair?

A   Yes.

Q   Thank you.

If at any point you don't understand a question I've asked, I want you to tell me and I'll rephrase it.

Will you do that, please.

A   Yes.

Q   Thank you.

Is it fair to say that if you answer one of my questions, I'm entitled to assume that you understood it?

A   Yes.

Q   If you need to take a break at any point to use the bathroom, get some water, stretch, that's fine.  Just let me know.  The only thing I ask is, if there's a question pending, that you please answer it

Page 8

before we go off the record.

Is that agreeable?

A   Yes.

Q   Thank you.

Is there any reason you might not be able to give your best testimony today?  Are you feeling okay?  Ill?  Distracted?

A   No.

Q   Thank you.

Are you currently under the influence of any medication, drug, or alcohol that might affect your ability to understand my questions or give truthful answers?

A   No.

Q   Did you meet with anyone to prepare for today's deposition?

A   I did.

Q   Did you review any documents in preparation for today's deposition?

A   No.  Emails.

Q   Can you describe what the emails are.

A   The two emails that we exchanged.

Q   Thank you.

Okay.  So I'd like to get started with your role and professional background at Apple.  It sounds

Aleks Kagramanov

Page 9

like you have since left Apple.  I'm going to be primarily focusing my questions on your role in 2021, around September 2021 when we had those email exchanges.

But just for the record, can you first state your full name and then any of the roles you held at Apple and roughly what year duration those roles were.

A  Yeah.  Full name, Aleks Kagramanov.  Held the same role essentially since I started with Apple since 2020.  Two -- dual role, threat assessment in the workplace and employee relations business partner.

Q  Were those overlapping or different roles?

A  Yeah.  It's -- I primarily was an employee relations business partner with also assisting with threat assessment in the workplace.

Q  Threat assessment.

What is threat assessment in the workplace?

A  Target -- like, targeted workplace violence.

Q  Okay.  And then employee relations, so who was your -- did you report to Tony Lagares?

A  Yes, for a time.

Q  Okay.  You said the whole time?

A  No.  For a short time.

Page 10

Q  For a short time.

Who were your supervisors and in what periods?

A  I believe one of them was Julie Potter, and then Tony.

Q  And then when did you leave Apple?

A  2023, I believe.

MS. GJOVIK:  Ms. Court Reporter, is that loud enough for you to hear?  It's a little muffled for me.

THE REPORTER:  Yeah.  I can hear.

BY MS. GJOVIK:

Q  Before joining Apple, what kind of role did you hold?

A  HR.

Q  And what is your current occupation?

A  Also with HR.

Q  Who's your current employer?

A  Microsoft.

Q  And where did you work before you joined Apple?

A  Google.

Q  All the big tech companies.

Why did you leave Apple?

A  So sorry.  Say that one more time.

Page 11

Q  Why did you leave your employment at Apple?

A  Had a different opportunity.

Q  Do you remember what -- roughly what month you left Apple in 2023?

A  I don't recall.

Q  What's your educational background?

A  Criminal justice, criminology.

Q  In your roles at Google and Microsoft, did you also hold roles -- you said HR, but similar to something with criminal justice or workplace violence, those type of topics?

A  I've held security roles.

Q  What kind of security roles are in HR?

A  Not specifically within HR, but prior to HR, I also held security roles.

Q  What kind of roles?

A  Like, global security.

Q  Do you hold any certifications or licenses related to investigations, threat assessment, security, or law enforcement?

A  I previously had a security card and interview training.

Q  Okay.  And then can you -- as of September 2021, what was your official job title at Apple?

Page 12

A  Employee relations business partner and threat assessment lead.

Q  And threat assessment team?

A  Lead.

Q  Lead.  Lead.

So that's the lead for all threat assessment for Apple?

A  Specifically to the employee relations side of things.

Q  Employee relations.

Can you please describe that function at Apple.

MS. RIECHERT:  Which function are we speaking about, ER or threat assessment?

MS. GJOVIK:  Threat assessment for employee relations at Apple.

THE WITNESS:  Yeah.  So threat assessment, we partner with many different teams, specifically kind of with employee relations.  We also take partnership with security, HR, benefits, depending on the nature of the situation.

BY MS. GJOVIK:

Q  Can you tell me more about the, like, workplace violence and threat assessment part of that.  That's something that's kind of new to me to

Page 13

hear as part of HR, and I would like to understand more of what that capacity looks like.

A   Yeah, any targeted workplace violence.  This could be just general threats to the workplace.  It could be workplace domestic violence issues, suicidal ideations, suicides.

Q   That's a rough job.  Okay.  Thank you.

And then did you have anyone else doing that kind of function with you at Apple or you were the primary person or only person?

A   I had partners just with, you know -- kind of, like, a team within security, benefits, HR.

Q   Okay.  And that was primarily, like, your exclusive role.  It wouldn't be just normal employee relations investigations.  It would be stuff that also touches upon the threat assessment and workplace violence issues?

A   Correct.

Q   Okay.  Makes sense.

And as of September 2021, your direct supervisor was Mr. Lagares; is that correct?

A   I don't recall if it was Tony -- yeah, I don't recall who it was at that specific time.

Q   So it would have either been Mr. Lagares or Ms. Potter?

Page 14

A   Or it could have been Cory.  I forget Cory's last name, but it could have been her.

Q   Okay.  Can you walk me up the chain of command from you, like, up to executive when the issue you're investigating is a workplace violence issue.  I assume you have -- like, you have your direct reporting structure, but you may also have stakeholders and different organizations like global security.

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

BY MS. GJOVIK:

Q   Okay.  You can answer.  Please go ahead.

A   Can you clarify, like, what you mean.  Like, reporting structure for my team?

Q   Let me rephrase.  Can you walk me through what a typical process is when you're assigned a case as an employee relations business partner specializing in workplace violence, threat assessment, kind of, like, start to finish.  What does that look like?

A   I mean, it's very case by case, depending on stakeholder engagement.  So it would be hard to -- it's not kind of, like, a one-size-fits-all approach.  I mean, I have my management team.  They're always

Page 15

involved and, you know, assigning the case work.  We do an assessment and determine who needs to be engaged.

Q   Okay.  So what are some of the factors or variables you might consider to decide how you would design -- or how about this:  Do you track your investigations in any kind of system or create any documents or plans related to your investigations?

A   Yeah.  We have an internal confidential case management system.

Q   And do you create, like, reports and documents of your findings and the outcomes from your investigations?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

MS. GJOVIK:  It's a question.

MS. RIECHERT:  I know.  We keep talking about him doing investigations, like, what he was doing in ER.

MS. GJOVIK:  That was his job, though; right?

MS. RIECHERT:  To do ER, yes, employee relations.

MS. GJOVIK:  So what facts are not in evidence?

Page 16

MS. RIECHERT:  That he did investigations.

BY MS. GJOVIK:

Q   Mr. Kagramanov, did you do investigations in your role?

MS. RIECHERT:  On violence issues.  Sorry.

BY MS. GJOVIK:

Q   Mr. Kagramanov, did you do investigations into workplace violence matters as part of your role?

A   As part of it.

Q   Yeah.  Thank you.

And so did you create documents, reports, or outcomes from those investigations?

A   Yes.

Q   Who did you generally share those with?

A   Again, depends on the stakeholders involved.  It varies case by case.

Q   What might be some of the variables that would help you decide what kind of stakeholders would be, like, the type of threat or violent -- like, you said suicide versus domestic violence.  Those two might have different stakeholders.

A   I mean, also engagement with the business, depending on the business and who's involved.

Q   Okay.  So instead of saying, like, the specific names, it would maybe, like, the -- a

Aleks Kagramanov

Page 17

business leader, an HR representative?  Could you maybe describe that process with more generalized terms versus having to identify a specific name.

A   Yeah.  I mean, the HR business partners aligned to that specific business would be informed, security is always a close partner in those matters, and of course, just our management team.

Q   Do you ever engage, like, police also?

A   Me directly, no.

Q   When you create your reports, is it -- do you anticipate those reports might be used in criminal enforcement or legal matters due to the nature of what you were investigating?

A   Potentially.

Q   Can you give me -- without disclosing anything confidential -- and it sounds like what you work on is probably very confidential -- can you give me some examples of kind of facts of what a case might look like that you might get assigned and investigate -- that you have investigated at Apple, without disclosing anyone's name or organization or anything that might identify them, just to help me understand what some of your typical cases might look like?

A   We do intakes with employees to understand

Page 18

the circumstances of whatever situation they're going through and then make an assessment of, from some of what they shared, how do we ensure safety in the workplace for them and everybody else involved.

Q   So do -- sometimes the employees are the ones that ask for the investigation?

A   Correct.  Depend -- like, let's say a domestic violence situation, an employee experiencing a situation that may have a nexus to the workplace and they need assessment and protection in the workplace to ensure they feel safe coming in.  So that's where we also engage with security.

Q   Interesting.

Okay.  And then how were cases generally assigned to you when you were in that role around 2021?

A   Sometimes I get notifications through email, sometimes through our -- whoever is managing a queue through my manager, and then we get huddled into the cases.

Q   First of all, for that work -- I know you've probably done a lot to help ensure safety, but complex issues, things can get pretty complicated.

A   Yes.

Q   Yeah.

Page 19

Was there any written policies or standard operating procedures for your team's investigations, and specifically the threat assessment and workplace violence function?

A   We had a process flow and kind of -- but again, every case is unique.  So, you know, there's outliers, but we have kind of a fundamental process.

Q   Is there anything you can explain about what that process looks like?

A   I don't recall specifically.

Q   Can you give me any examples or circumstances when you or your team might be asked to investigate an employee -- an active employee under the threat assessment and workplace violence function.

A   Can you clarify that.  Do you mean, like, how we get looped into that?

Q   Yeah.  So we talked about you sometimes will investigate employee concerns.  So they might have a concern in the workplace.  Maybe they're dating someone who's a coworker or something and there's domestic violence issues.  I'm speculating there.  But when you need to investigate an employee versus maybe investigate someone who's, like, maybe not an employee but stalking an employee or something is

Page 20

probably, I assume, different -- so if you need to investigate an employee in that job function, what does that generally look like, the step process?

A   Yeah.  I mean, similarly, just doing intakes with respective parties, getting perspectives from everybody involved, getting a comprehensive understanding of the matter, determining potential interim measures if there needs to be a level of separation, whatever it may be, and then making an assessment from there.

Q   Makes sense.

Let's see.  So I'm going to pivot a little bit from what you've been describing as your typical job function and ask more about the confidentiality investigations because that was kind of the nature, I think, of our interaction that I'm aware of.  I was never under investigation for anything related to workplace violence.

So when would you or your team typically be asked to investigate a matter related to confidential information?

A   Employee relations doesn't investigate confidentiality aspects.  We act as a support -- kind of a support mechanism through the process.

Q   Okay.  How does that fall under the umbrella

Page 21

of the workplace violence team?

A   So I'm also operating also from an employee relations business partner lens.  So I get looped into normal employee relations situations as well, in addition to the threat assessment piece.

Q   Oh, so you would do typical employee relations investigations, you would not just workplace violence or threat assessment?

A   Correct.  So both, on both sides.

Q   Both.

Okay.  Do you ever consider how an employee might perceive being contacted by someone, though, whose official title says workplace violence and threat assessment?

MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

Q   Okay.  Let's go to -- pause, and I'll come right back to that.

I'm going to share Exhibit A.

MS. GJOVIK:  Oh, Melinda, can you see the exhibits I shared, the Google Drive folder in the chat?

MS. RIECHERT:  I'll look in the chat right now.

MS. GJOVIK:  I'll re-share it in case it got

Page 22

out.

MS. RIECHERT:  I see the chat.

MS. GJOVIK:  See what I've shared in the chat?

MS. RIECHERT:  Let me click on that link.

MS. GJOVIK:  And I'm going to share -- just to Melinda's point, I'm going to share this Exhibit A.

And, Ms. Court Reporter, I shared these with you as well.

(Exhibit A was marked for identification.)

BY MS. GJOVIK:

Q   So this was -- this is an email that I received from you, Mr. Kagramanov, on September 9th, 2021.  Does this look like the email -- you said you were reviewing, it sounds like, these emails.  Does this look like the email you sent?  Does this look accurate?

A   Yes.

Q   Sorry.  Can you say it again.

A   Yes.

Q   Yes.  Thank you.

And so your signature is Alex Kagramanov.  As someone -- no one can say my last name.  So I apologize.  I struggle with yours.

Page 23

It says employee relations and then AMR.  Is that Americas?

A   Correct.

Q   Threat assessment and workplace violence, acronym TAT, T-A-T, and then Apple.  And that's your -- the signature you used around that time at Apple?

A   Correct.

Q   Thank you.

And then -- okay.  So I'm going to reask the question then since we now have evidence of what your signature was.  Melinda is actually kind of helping me.

MS. GJOVIK:  Thanks, Melinda.

BY MS. GJOVIK:

Q   Did you consider how an employee might perceive being contacted by your team -- yourself -- let me ask again.  Sorry.

Did you ever consider how an employee who was contacted by you, under your typical employee relations job function, might perceive your email signature when you contacted them if it included threat assessment and workplace violence in the signature?

A   I mean, I can't speculate how employees are

Page 24

going to react or feel.

Q   Have you ever received comments or questions about that function when you were engaging with employees in the typical employee relations business function?

A   No.

Q   To your knowledge, have you or your team been asked to investigate an employee for social media posts?

A   I can't recall a specific instance.

Q   So you said that confidentiality matters would be a different team, that you guys don't necessarily, like, leaking; that's right?  So that would probably be global security, or what team would you expect would do the investigation about leaking confidential information?

A   Global security investigations.

Q   And then if you were to investigate something like social media posts, would that be something like domestic violence threats or something like that might fall under the umbrella?

A   It could be part of an assessment.  Social media can be part of an assessment.

Q   Would you ever make an assessment yourself of whether information shared was confidential or

Page 25

not?

A   I don't make those investigations.

Q   Thank you for your patience.  This is I think my fourth deposition ever.  I've just been doing them the last two weeks, and I'm learning as I go.  Let's see.

Okay.  So it's kind of weird.  I'm going to ask you about me, but I'm going to do third person because it feels a little more professional than, like, us having a conversation as if we're just talking.

So when did you first become aware of Ashley Gjovik, the Apple employee?

A   September of 2021.

Q   Do you remember what date?

A   I believe it was September 7th.

Q   Do you remember how you became aware?

A   I think I got looped in by my leadership team or management team on the case.

Q   Do you remember the context or request or any other details about how you got looped in?

A   No.  I don't recall.

Q   It was a while ago.

Do you remember the name of the person who first asked you to look into the Ashley Gjovik

Page 26

matter?

A   I don't recall.

Q   Do you recall if there was any kind of written email, referral, ticket, or other documentation about initiating that investigation?

A   I don't recall exactly.

Q   When you were referred to investigate or contact Ashley Gjovik, was that under your typical employee relations function or was that under the workplace violence and threat assessment function?

A   Typical employee relations function.

Q   And were you told that this involved alleged disclosures of confidential information?

A   Correct, just employee confidential investigation.

Q   And so you had said you don't normally investigate leaks yourself.  So did someone tell you that there was already an investigation and some sort of determination that there was a leak, and then you were to do something in addition to what was already done prior?

A   I don't recall exactly the process leading up to it.

Q   Do you recall what you were asked to investigate?

Page 27

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

MS. GJOVIK:  It's just his memory.  I'm asking his memory, if he remembers what he was asked to investigate.

THE WITNESS:  I wasn't asked to investigate.

BY MS. GJOVIK:

Q   Oh, what were you asked to do?

A   To support global security in their investigation.

Q   Can you help me understand the distinction.

A   We don't lead -- employee relations does not lead confidential leaking of information.  That's led by global security.  We act as a support to them.  So we help coordinate meetings and act as a support.

Q   So if you contacted Ashley Gjovik and said there was an investigation into disclosures of confidential information, that investigation you'd be referring to would not be your own investigation.  That would be a global security investigation; is that correct?

A   Yeah.  I would be involved in that investigation, but I don't lead that investigation.

Q   And what would your involvement look like?

A   Coordinating the meeting, providing

Page 28

expectations, making sure the employee understands the process.

Q   Okay.  And do you remember what the plan was when you contacted me?

A   To coordinate time with you for the investigation with the investigator from global security.

Q   Do you remember who the investigator was in global security?

A   I believe it was Sophi -- Sophi Jacobs.

Q   What was her role?

A   She's a global security investigator.

Q   Okay.  Do you remember when she contacted you about Ashley Gjovik?

A   I do not recall.

Q   Do you remember anything she told you about the investigation into Ashley Gjovik?

A   I don't recall.

Q   Do you remember ever disclosing to Ashley Gjovik that the investigation was being conducted by Sophi Jacobs?

A   I don't recall that.

Q   When you were asked to -- what was the terminology you used about the service you provided global security in these type of exchanges?

Aleks Kagramanov

Page 29

A   Yeah.  We help provide support to employees, coordinate the meetings, talk through the process, expectations of the process.

Q   And when you say support employees, would you mean someone like Ashley Gjovik or an employee like Sophi Jacobs?

A   Ashley.

Q   Oh.

So -- so the stuff you just said prior, you would be supporting Ashley Gjovik by -- you said explaining the process was one of the things you said?

A   That's correct.

Q   What kind of explanation would you normally provide about how the process works?

A   I talk about confidentiality expectations, non-retaliation expectations, and what the process entails, and then typically turn it over to the investigator to discuss their process and proceed with, you know, their line of questioning.

Q   So if you had shared that information with Ashley Gjovik, could you describe, like, what you would have said to her about those topics you just listed.

A   Yeah.  In terms of confidentiality, we

Page 30

typically would say, you know, that we keep these conversations confidential, not to discuss this beyond, you know, the individuals involved in this process, protect the integrity of the investigation to ensure that others are not influenced in any way and have natural recollections of, you know, if other folks are being pulled into the investigation.

Also, non-retaliation expectations in that, you know, typically employees are entitled to raise good-faith concerns without any kind of adverse action being taken against them.  So we talk about non-retaliation piece.

And then expectations around, like, devices. If we need to collect devices for any reason, that investigator may need to review that and then turn it over to the investigator.

Q   Okay.  And then you said you'd cover non-retaliation policy.  You'd say that to an employee who's under investigation for some sort of alleged misconduct?

A   Correct, for any involved party.

Q   Okay.  And can you describe, to the best of your recollection, just a general summary of what you recollect the allegation was against Ashley Gjovik at the time that you were providing support.

Page 31

A   Yeah, posting -- my understanding was posting confidential information.  I believe it was on the Glimmer app.

Q   Posting where?

A   In the Glimmer app.

Q   Posting -- like, publishing where?  What was the platform?

A   I'm not sure.

Q   Okay.  And it was -- you said Glimmer app?

A   I believe that was my recollection.

Q   Like, just generally or --

A   Yeah.  I didn't -- I don't have insight into the actual -- the full concern.

Q   Okay.  So would you say that, to the best of your recollection so far, probably the person who would have the most information about the investigation would be this Ms. Jacobs?

A   I believe so.  I don't know the level of information she had at that time.

Q   Okay.  Did you have any background on how long that investigation had been going by the time you were brought in?

A   No.

Q   When you contacted Ms. Gjovik, were you aware if she was on administrative leave?

Page 32

A   No.

Q   When you contacted Ms. Gjovik, were you aware that employee relations was investigating her complaints about the workplace?

A   No.

Q   When you contacted Ms. Gjovik, were you aware she had filed charges with government agencies -- state and federal government agencies against Apple?

A   No.  I believe that's what you shared with me in the email.

Q   So you weren't aware she filed an EEOC complaint?

A   No.

Q   What about California DFEH?

A   No.

Q   California DAR, for Department of Labor violations?

A   No.

Q   U.S. Department of Labor Whistleblower Protection Program?

A   No.

Q   Complaints to the U.S. EPA?

A   No.

Q   To the California EPA?

Page 33

A   No.

Q   The U.S. Securities and Exchange Commission?

A   No.

Q   The FBI?

A   No.

Q   The NLRB?

A   No.

Q   Are you sure?

A   I believe you shared that with me in the email.

Q   Okay.  And is there any kind of process or protocol, either written or just how you would do it yourself, when you need to contact an employee under investigation by Apple for something but that had filed open charges or investigations with the government agency?

A   Sorry.  Can you clarify that.

Q   Yeah.

You kind of went over your typical approach of contacting employees and providing support.  Is there anything you would do differently if you did know that the employee had open charges and cases with a government agency against Apple at the time you were contacting them?

A   Not to my knowledge.

Page 34

Q   Do you have any background or training about the National Labor Relations Act?

A   No.

Q   Have you ever been involved in NLRB proceedings?

A   No.

Q   Are you sure?

A   I don't recall ever being involved.

Q   Do you recall ever being named in any NLRB complaints?

A   No.

Q   And let me be specific.  Not just Apple.  Maybe Google.

A   I'm not aware of being involved in a Google NLRB complaint.

Q   Okay.  If an employee disclosed to you that they did have open charges or complaints, is that something that might trigger you to learn more to ensure you can support that employee with their charges and complaints?

A   I'm not familiar with that process; so I can't speak on that.

Q   Okay.  Do you recall anything about having knowledge that Ms. Gjovik had spoken to the press and was being interviewed by the press and had articles

Page 35

published about her complaints about Apple at the time you reached out?

A   No.

Q   So there was a lot going on, it sounds like, you had no knowledge of when you reached out to Ms. Gjovik.  So would you maybe characterize your support function, if global security asked you to reach out to an employee, more as, like, just coordinating a meeting versus actually doing any investigation?

A   That's correct.

Q   Okay.  I'm just going to have to ask some of these just to get it on the record that you didn't know; so sorry to be repetitive.

Were you aware that Ms. Gjovik's complaints to the U.S. EPA in 2021 triggered the EPA to request an on-site inspection of her office in August 2021?

A   No.

Q   Were you aware her office was on a U.S. EPA Superfund site?

A   No.

Q   Do you know what that is?

A   No.

Q   It's a federally overseen toxic waste cleanup site.

Page 36

Did you have any background on that about Ashley's office?

A   No.

Q   When you contacted Ms. Gjovik, were you aware that the EPA had inspected and found some concerns that were documented and asked to have corrected prior to you contacting her?

A   No.

Q   Okay.  So no -- there was no investigation into Ashley Gjovik that you led or were privy to; is that correct?

A   That's correct.

MS. RIECHERT:  Objection.  Compound as to led and privy to.

MS. GJOVIK:  Okay.  He already answered he didn't lead it.  So I'll just say -- so just --

BY MS. GJOVIK:

Q   You were not privy to the details of any investigation into Ashley Gjovik; is that correct?

A   Correct.

Q   Okay.  I'm going skip over a bunch of these questions because you're just going to say you don't know for all of them.

Did you -- I guess I'll ask a couple of these.  You might still say no.

Page 37

Did you ever see the supposed social media posts or whatever the leak was that Ashley Gjovik did that Sophi Jacobs alleged?

A   No.

Q   Do you know what the Glimmer app is?

A   No.

Q   Did you ever find out what the alleged leaking was?

A   No.

Q   Were you aware of any review of Ms. Gjovik's online or digital activities prior to the investigation?

A   No.

Q   Did you speak with any other witnesses as part of your support for this investigation?

A   No.

Q   Did you prepare any written report of your participation in this investigation?

A   No.

Q   Was there any kind of tracking ticket or record of your participation in this investigation?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q   Other than the emails you sent to me and assumably sent with Ms. Jacobs as well, was there any

Page 38

other record, like, documented record of your participation in this investigation?

A   I don't -- I don't recall, outside of the two emails.

Q   Did you work with any Apple attorneys on this?

A   Yes.

Q   What are their names?

A   I don't recall their names.

Q   Do you recall what department?

A   Just our legal team, Apple legal team.

Q   That's a big team, though.

Like, was it products team or HR team or --

A   I don't recall.

Q   So -- okay.  Are you aware that Ms. Jacobs is a former criminal prosecutor?

A   No.

Q   Do you have any knowledge of what Ms. Jacobs planned to say to Ms. Gjovik during the call you were to arrange?

A   No.

Q   And was Ms. Gjovik told beforehand that Ms. Jacobs was going to be on this call you were arranging?

A   Say that one more time.

Page 39

Q   Did you ever tell Ms. Gjovik that Ms. Jacobs was going to be on this call you were trying to arrange with Ms. Gjovik?

A   I don't -- I don't think so.

Q   Is that typical for you to not disclose the global security or legal folks that would be on the call with the employee when asking the employee to join the call?

A   I don't recall the exact process there.

Q   Do you recall any involvement from outside counsel at that point regarding Ashley Gjovik?

A   No.

Q   Do you recall any interaction with the law firm Orrick at that time when you were supporting the Ashley Gjovik matter?

A   No.

Q   What about O'Melveny & Myers?

A   No.

Q   Are you aware that O'Melveny & Myers lawyers contacted Ms. Gjovik around September 15, 2021, after she was terminated?

A   No.

Q   And then do you recall any interaction with the law firm McDermott, Will & Emery regarding the Ashley Gjovik matter when you were supporting?

Page 40

A   No.

Q   These were apparently already three law firms retained at the time that you contacted Ms. Gjovik by Apple in response to her complaints.  That's why I'm asking.

Okay.  On September 9th, 2021, you sent Ms. Gjovik an email that we just looked at, Exhibit A; is that correct?

A   Correct.

Q   I'm going to share that again so we can just look at it.

This is the Exhibit A email.  It didn't have a subject line.  Is it typical for you to send emails for these type of things without a subject line?

A   I'm not sure.  I don't recall.  I mean, typically, there could be a subject line.

Q   Might this reflect that you were in a rush?  Do you remember if someone asked you to do this very quickly?

A   I mean, it's been in partnership with our legal counsel.

Q   So you're saying it's privileged?  You can't answer that question because it's privileged?

A   This email is not privileged, but I've taken partnership with legal counsel.

Page 41

Q  You testified a little bit earlier that you were first engaged, you think, around September 7th, 2021, and this would be two days later.  Does that sound correct?

A  Yes.  That sounds correct.

Q  Okay.  Do you recall any background that you are able to share about sending this email such as, did anyone help you draft it?  Why did you choose the language you chose?  Anything like that?

A  Again, it was in partnership with our legal counsel.

Q  I'm going to ask for the formal privilege objection if you're claiming privilege.  I think Melinda has to do that.

MS. GJOVIK:  Melinda, do you want to do that?

MS. RIECHERT:  Certainly.  To the extent that he had communications with counsel about this email, I instruct him not to answer if you ask about those communications on grounds of attorney-client privilege.

MS. GJOVIK:  Thank you, ma'am.  I'm going to oppose those later, but I need them on the record.

BY MS. GJOVIK:

Q  Okay.  So I'm going to -- I'm just going to

Page 42

read this because it's -- I want to kind of break it down.

So you said, no subject line:  Hi, Ashley.  This is Aleks Kagramanov from employee relations.  We're looking into a sensitive intellectual property matter that we would like to speak with you about.  We would like to connect with you as soon as possible today, within this hour, and you should see an iCal come through shortly.  We sincerely appreciate you prioritizing this call and being flexible.  If you absolutely cannot make this time, please propose a few other times for us to connect today.  I wanted to send this introductory email so you know who I am when I set it up.  I can share more details when we meet.  As part of Apple's policy, your cooperation and participation is imperative.  Thank you in advance, and talk soon.

Is that a correct reading of that email?

A  That sounds correct.

Q  Do you recall why the meeting that you were requesting had to occur that day?

A  I don't recall why exactly.

Q  And was the instructions from Apple legal that it had to occur that day?

MS. RIECHERT:  That sounds like a

Page 43

communication with counsel.  So I'll object and instruct him not to answer based on attorney --

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

Q  Sorry.  We have to go through this dance.

Okay.  And then the terminology "sensitive intellectual property matter," is that also something that Apple legal told you to use those -- that phrase?

MS. RIECHERT:  Same objection.  You're talking about based on attorney-client privilege if he was told to use that language by counsel.

BY MS. GJOVIK:

Q  Mr. Kagramanov, how often would you send employees emails like this that you request a same-day response?

A  I don't recall.  It would be case by case.

Q  Can you think of any other examples other than Ashley Gjovik?

A  Can't recall.

Q  What about asking for a response within this hour?  Can you recall any other examples of emailing, contacting employees requesting a response within the hour?

A  I can't recall a specific case.

Page 44

Q  But Ashley Gjovik was one?

A  Correct.

Q  And you had testified earlier that you support the employee under investigation.  So is it true that this email is sent to Ashley Gjovik to support Ashley Gjovik?

A  Correct, to coordinate a time to meet with the investigator.

Q  And you have testified that you will share kind of the details of the process of these investigations with the employee.  And in this email, you're saying you would do that on the call; is that correct?

A  I would do that on the call.

Q  Is there a reason you would not share that in email?

A  It's part of the process.

Q  What process?

A  The investigative process.

Q  Is there a formal policy where it says that?

A  I don't recall a specific policy.

Q  Okay.  Do you remember, as part of the process, not to share the details of that process with the employee until a call?

A  I don't recall that.

Aleks Kagramanov

Page 45

Q   Okay.  Is there a reason, when you send an email like this to -- to Ashley Gjovik where it's referencing intellectual property concern, that you'd still use the email signature that says threat assessment and workplace violence?

A   That's my standard signature line.

Q   But just to confirm, you weren't contacting Ashley Gjovik for a matter related to threat assessment and workplace violence?

A   Correct.

Q   And you said you worked for employee relations and at some point Mr. Lagares.  Did your coworkers include Mr. Ekelemchi Okpo?

A   Correct.

Q   So you guys had the same manager?

A   For a period of time.

Q   What about Jenna Waibel?

A   She was a manager.  I believe she may have been an employee relations partner.  I can't recall.

Q   And at least to my recollection as of, like, July and August 2021, Ms. Waibel also reported to Mr. Lagares, I believe.  So would that make her a coworker of yours at that time?

A   Correct.

Q   And were you privy to both of their

Page 46

investigations into Ms. Gjovik?

A   No.

Q   Did you know that they were investigating Ms. Gjovik's concerns at all?

A   No.

Q   Was Mr. Lagares aware of your assignment to contact Ms. Gjovik on September 9th?

A   I don't recall.

Q   Would it be typical for your supervisor to not know what you're working on?

A   It's case by case.  I mean, depends on the case.

Q   Can you think of any other examples where an employee had made complaints and requested an investigation, employee relations had opened an investigation and were investigating, but then some allegation was made against the employee, triggering a need for kind of, like, a cross-investigation?

A   Can you clarify that, the beginning part of that.

Q   Yeah.

Can you think of any other examples where you were involved in a case where the employee had already made complaints, requested an investigation of their own complaints, but then Apple's requesting

Page 47

an investigation into the employee now?

A   I can't recall a specific case.

Q   So assuming facts not in evidence that Ms. Gjovik had opened investigations with employee relations into her concerns, would that be, like, the one case that you can give an example of that you were involved in of investigating the employee with the concerns?

MS. RIECHERT:  Objection.  Assumes facts not in evidence that he knew about the investigation.

BY MS. GJOVIK:

Q   Still have to answer.

A   I was not aware of any other investigation.

Q   If you were, would you do anything differently?

MS. RIECHERT:  Objection.  Hypothetical, speculation.

BY MS. GJOVIK:

Q   I mean, part of the job description, I think, of, you know, managing these complexes issues, and if an employee has an open investigation, their concerns, government complaints filed and stuff, one would think that if the employer is going to then contact the employee and investigate the employee, it would be some kind of consideration for the employee

Page 48

relations team of how to handle that conflict.

So if you were aware that there was already investigation into the employee's concerns, including reports of retaliation, would you do anything differently if you were asked to then investigate the employee while that initial one was occurring?

MS. RIECHERT:  Same objections.

BY MS. GJOVIK:

Q   Okay.  Still answer.

A   I can't recall a specific process.

Q   Were you aware that while you were contacting Ms. Gjovik, she was actively signing her EEOC charge and submitting Department of Labor whistleblower protection documents?

A   No.

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  No.  It was a more specific question than the prior one.

BY MS. GJOVIK:

Q   Let's see.  Okay.  Let's look at -- I'll share another document.

Oh, I'd like you to also, please, if you will, authenticate this copy of your LinkedIn profile I gathered a little while back.  If you want to

Aleks Kagramanov

Page 49

please review it.  And we can go page by page.  Let me know when you've read each page, and if is that looks accurate to you, let me know.

THE WITNESS:  Okay.

MS. RIECHERT:  This is Exhibit D?

MS. GJOVIK:  Exhibit D.

(Exhibit D was marked for identification.)

THE WITNESS:  Okay.  Next page.  Okay.  Next page.  Next page.  Next page.  Okay.

BY MS. GJOVIK:

Q  Does that look accurate?

A  Yeah.

Q  And when I grabbed it, it said your title was senior ER BP.  That's employee relations business partner; correct?

A  Correct.

Q  And threat assessment workplace violence and supporting global security, Americas; is that right?

A  That's correct.

Q  So you had mentioned that you'll do typical employee relations investigations in addition to the threat assessment and workplace violence work.  And it's my understanding that the employee relations business partners will be assigned to certain organizational units.  At least that's what Mr. Okpo

Page 50

testified in his deposition.  Were you assigned a business unit to provide more typical employee relations support to?

A  Yes, global security.

Q  Security.

So I worked in hardware engineering at that time.  It's a team called product integrity.  But that's not global security.

So would it be more you're supporting employee -- or global security investigations versus, like, global security employees asking for investigations?

A  I support both.

Q  Oh, so if a global security employee said they had, like, a retaliation concern or something, they could file that and request an investigation.  You would be assigned probably by default?

A  Correct.

Q  I see.

So if -- and at that time, I had Ms. Waibel investigating.  She had said she was assigned to hardware engineering.  And then Mr. Okpo was assigned after I complained about Ms. Waibel.

Do you know why you were assigned to a hardware engineering employee if you were supposed to

Page 51

be supporting the employee but you say that you were assigned to global security employees?

A  I don't recall why.

MS. RIECHERT:  Objection.  Misstates his testimony.

MS. GJOVIK:  Sorry.  What?

MS. RIECHERT:  Misstates his testimony.

BY MS. GJOVIK:

Q  How often were you assigned to support employees in investigations of the employees in organizations outside global security?

A  I don't recall.

Q  Can you think of any other example other than Ashley Gjovik?

A  I can't recall.

Q  I mean, you can recall examples where you were assigned to global security employees for this sort of thing?

A  I don't recall a specific example.

Q  Okay.  If you had to kind of pick a percentage, how much of your job was supporting employees with more typical employee relations functions versus doing the threat assessment and workplace violence work?

A  I can't give you a percentage.  I don't

Page 52

recall the delineation of the work.

Q  Would you say the majority was one or the other?

A  I can't recall the data on that.

Q  Okay.  I'm going to share something else.

Okay.  I'm going to share Exhibit L.

MS. RIECHERT:  I forgot what letter you said.  B or D?

MS. GJOVIK:  I believe that was D.  Let me check.

MS. RIECHERT:  D?

MS. GJOVIK:  That was his LinkedIn?

MS. RIECHERT:  Yeah.

MS. GJOVIK:  Yeah.  That was D.

Okay.

MS. RIECHERT:  D for dog or B for boy.

MS. GJOVIK:  D as in dog.

MS. RIECHERT:  Thank you.

BY MS. GJOVIK:

Q  Okay.  Before I go to the next one, which will be Exhibit L, Mr. Kagramanov, do you recall how Ashley Gjovik responded to your initial email that we looked at?

MS. RIECHERT:  I don't see Exhibit L.  Do we have it up?

Page 53

MS. GJOVIK:  That would be 88, L.

MS. RIECHERT:  I still don't see an exhibit.

MS. GJOVIK:  Yeah.  Let me see.

MS. RIECHERT:  I can see your face.

MS. GJOVIK:  Oh, I'm not sharing it.

MS. RIECHERT:  Oh, okay.

MS. GJOVIK:  All right.  Are you saying it wasn't in the folder?  No.  It's in the folder.  I'm just not sharing it.

MS. RIECHERT:  No.  I'm just saying you weren't sharing an exhibit.

MS. GJOVIK:  I was going to say, before we go to that one, I actually just wanted to ask something.

BY MS. GJOVIK:

Q  Mr. Kagramanov, do you recall, after that initial email you sent Ms. Gjovik, which was Exhibit A that we looked at earlier, what Ms. Gjovik's response was to you?

A  I don't recall specifically unless I see it.

Q  Okay.  We'll look at it.

Do you recall anything about how that exchange ended up with Ms. Gjovik, what the outcome was?

A  I recall that we ended up not meeting.

Page 54

Q  If you had to -- if you had to come up with a number of how many investigations you think you've supported like this one, where you're contacting an employee for an employee -- for a global security investigation into the employee, how many times do you think you have contacted employees like you contacted Ms. Gjovik?

A  I can't recall a number.

Q  Like, 1 or 12 or 600?

A  I can't speculate on the number.

Q  Do you think it's more than one?

A  Likely.

Q  It's more than a dozen?

A  I can't say.

Q  How long did you hold that role?

A  I think for about three years.

Q  Three years.

And you're not sure if you sent an email to an employee about a global security investigation -- that employee more than a dozen times?

A  I can't recall the exact number or an approximate number.

Q  I'm not asking for exact.  That's why -- is it more than a dozen or is this kind of -- I'm trying to figure out if this is more of unusual.  Because

Page 55

over three years, one would think it would be more than a dozen.

A  It could be, but I can't -- I don't know an exact number.

Q  Okay.  I guess, till we figure it out, can you explain to me what your day to day might look like in your role.  Is it only doing these types of investigation support or is there other stuff that filled your day with other types of work?

A  I mean, every day is different with employee relations and threat assessment work.

Q  So would you say you had a workload other than being assigned cases to support investigations or conduct investigations?

A  Yeah.  I mean, every day is different.  Sometimes I work on, potentially, projects.  I can't recall what projects, but there could be projects on the side.

Q  What kind of projects?  Like, a process-type thing or --

A  Could be, yeah, improving processes, flows.

Q  Okay.  So I'm going to share Exhibit L, and this is the chronological -- so the one -- the original one we looked at, Exhibit A, is this bottom.  It's the bottom.  And in Pacific time, it's 2:08 p.m.

Page 56

That sounds correct.

And then the response to this email chain was from me via my iCloud account at 2:10 p.m.  That's two minutes later.  And I wrote: Hi, Aleks.  Happy to help.  Please send any questions/updates via email so we can keep everything written, please.  I will respond via email as quickly as I can.  Thanks, exclamation point.

Does that -- do you recall a response like that from me?

A  Yes.

(Exhibit L was marked for identification.)

BY MS. GJOVIK:

Q  And you said you reviewed emails before this deposition.  Does this look like the email you reviewed prior to the deposition?

A  Correct.

Q  How often would an employee respond within two minutes?

A  I can't recall any response times.

Q  Do you recall if employees generally respond immediately volunteering to participate?

A  I don't recall employees responses.

Q  When you saw this response from Ms. Gjovik, this 2:10 p.m. response, what was your reaction to

Aleks Kagramanov

Page 57

that response?

A   I don't recall what my reaction was at that moment.

Q   Okay.  In your professional capacity, doing this for years, looking at that email, would you characterize that email as refusal to cooperate?

A   I would determine that as refusal.

Q   Can you tell me why.

A   Because we don't facilitate investigations over email.

Q   Is that an official policy?

A   I don't recall what the specific policy is.

Q   Is there any written policy that Apple has that says that?

A   I don't recall a specific policy.

Q   And refusal to cooperate, is that an allegation of misconduct by the employee that it's being made against?

A   Refusal to cooperate, we typically go off of the information we have.

Q   So is it misconduct by the employee to refuse to cooperate or that's just something that changes the direction of the investigation process?

MS. RIECHERT:  Objection.  Lack of foundation.

Page 58

BY MS. GJOVIK:

Q   Can you think of -- I'm going to withdraw that one and try again.

Can you think of other examples where employees ask to keep communications in writing?

A   I can't recall an instance.

Q   Okay.  Can you recall any instructions to -- from anyone at Apple to you or your team to not have communications with employees in writing?

A   I don't recall a specific instance.

Q   You said the process is getting on the call and not have it -- not having the email.  So the refusal to cooperate is having the only written record.  Do you know who communicated that process, or is that a process that you created?

A   I can't recall who owns that process.

Q   So your understanding that a refusal to get on a call and a request to keep things in writing was a refusal to cooperate, what were you basing that on if there was no written policy or formal policy that things had to be only on a call?

MS. RIECHERT:  Objection.  Improper hypothetical.

MS. GJOVIK:  I don't think so.

///

Page 59

BY MS. GJOVIK:

Q   But go ahead.

A   I mean, I decided that, you know, you not engaging in a live process is refusal to participate.

Q   So that was just your unilateral view and assessment?

A   It was -- so it was my determination but also in partnership with our legal counsel.

Q   Also in partnership.

Did you make your own determination prior to the determination by legal counsel?

A   I don't recall what -- what that process was, actually.

Q   Okay.  So you say you determined that it's refusal to cooperate by asking to have things in writing.  Can you explain why asking to have things in writing is a problem.

A   Yes.  I mean, the intention for having a live conversation is to ensure that we have a natural recollection of, you know, whatever the discussion is at hand relating to the investigation.  It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.

Q   Mr. Kagramanov, are you aware that all of

Page 60

the content that Apple has subsequently alleged was leaked or improperly disclosed was all already published social media posts or commentary and participation in press articles; so -- and under the employee's own name; so there was not much for them to actually investigate?

MS. RIECHERT:  Objection.  Assumes -- he's already said he doesn't know anything about any of the allegations.  So...

MS. GJOVIK:  I just kind of want him to have to say no.

BY MS. GJOVIK:

Q   That's a no?

A   No.

Q   If you had known -- and you said Glimmer.  So let's say it was just the Glimmer thing, and again facts not in evidence.  But they keep pointing to photos I shared with "Verge" of just my face taken by an app.  And I was complaining of surveillance because it was taking pictures of me in my home and naked and stuff, and I thought that was wrong.  So it was just my face.

If you had known that what they were concerned was an article published -- it was August 30th; so almost, like, a week and a half

Page 61

prior -- and I had said I was the one sharing it and complaining about it, would you still say it was refusal to cooperate for Ashley Gjovik to ask for things in writing?

A   I mean, the process, like I said, is to -- cooperation means participating in a live discussion.

Q   Did you ever define that to Ashley Gjovik?

A   In the email, in what we requested in iCal, to coordinate a time in the iCal.

Q   Yeah.  But did you say it was mandatory it had to be without written record?

A   I believe I responded that we determined that you refused to participate.

Q   But did you ever say the only way to participate that Apple will accept will be getting on a call?

A   I don't recall making that specific comment.

Q   Do you think it's reasonable for an employee to assume that's a rule without that being stated?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  Still has to answer.

MS. RIECHERT:  Speculation.

THE WITNESS:  Sorry.  You still want me to answer that?

///

Page 62

BY MS. GJOVIK:

Q   She said lacks foundation, but you still have to answer.

A   Sorry.  Repeat the question again.

Q   Do you think it's reasonable for an employee to assume that rule exists without that rule being stated to the employee?

MS. RIECHERT:  Also assumes facts not in evidence.

MS. GJOVIK:  There's no evidence because that was never stated.

THE WITNESS:  I'm sorry.  Do you still want me to respond to that?

BY MS. GJOVIK:

Q   Yeah.  Sorry.  Go for it.

A   Yes.  That expectation is that employees participate live and that it's reasonable for them to know that we're scheduling an iCal and coordinating an iCal, that the participation is live.

Q   Do you think it's reasonable for the employee to assume that if they were to ask for a written record of the conversation, that it would be seen as refusal to cooperate?

MS. RIECHERT:  Same objections.

THE WITNESS:  The employee would be informed

Page 63

that if they refused to participate live or refused to participate, that we will go off of the information that we have.

BY MS. GJOVIK:

Q   So would it be reasonable to tell the employee that the only way to participate is live; so if then they refused live, then it's refusing to participate?

A   Correct.

MS. RIECHERT:  Same objections.

BY MS. GJOVIK:

Q   Okay.  So then looking at this same exhibit, Ms. Gjovik then also responded to you:  FYI -- this was at 2:27.  So she sent that -- actually, okay.  Sorry.  Withdraw that.

2:10 p.m., she sent that email we were just talking about, and you did not respond by 2:27.  Do you recall what was happening after she sent that email to you, that 2:10 email?

MS. RIECHERT:  I think you said he did not respond by 2:27.  I think you meant he did respond at 2:27.

MS. GJOVIK:  The 2:27 was my email.

MS. RIECHERT:  You're right.

MS. GJOVIK:  That's okay.

Page 64

MS. RIECHERT:  You're right.

MS. GJOVIK:  It was a lot of stuff happening really quick.

BY MS. GJOVIK:

Q   So Ms. Gjovik responded at 2:10, saying she wanted a written record.  And at least by 2:27, you had not responded.  Do you recall what you were doing during those 17 minutes?

A   I do not recall.

Q   Do you recall when you saw her response?

A   I don't recall.

Q   Okay.  Do you recall when you decided that she was refusing to participate?

A   I don't recall the time, specific time.

Q   Based on this 2:10 email, would this 2:10 email itself, where she says she's insisting everything stays written, be the basis of a determination of refusal to cooperate?

A   I can't recall when I actually saw that email.

Q   Sorry.  I mean just that email itself, though, without any of the other stuff we're going to look at that came after.

If that email says insisting on a written record, is that itself enough to determine refusal to

Aleks Kagramanov

Page 65

cooperate?

A   Correct.

Q   And then Mr. Gjovik responded at 2:27 and said, FYI, I forwarded your email and my reply to the investigator on my NLRB case.  So he's aware you just reached out to me the day before my affidavit is supposed to be taken.  This feels a little like witness intimidation, et cetera, dot, dot, dot.

Do you recall that response?

A   I recall.

Q   How did you respond -- sorry.  Go ahead.

A   No.  Just from what you shared, yeah, I recall.

Q   Do you recall how you responded?

A   Yes.

Q   How did you respond?

A   Do you want me to read my response there?

Q   Oh, sorry.  Not, like, an email yet.  But, like, when you saw that, did you change your determination on cooperation?  Did you want to find more information?  Like, what was your internal response to that email?

A   I can't recall what my internal response was.

Q   Okay.  And in your role, if an employee

Page 66

discloses to you directly that they have an open case with the government against Apple while you're contacting them to arrange an investigation, does that change your approach of supporting that employee for the investigation?

A   I don't recall what -- like, a process or change in approach.

Q   Okay.  And you had said that part of your process for supporting the employees was reassuring them that there would not be any retaliation; is that correct?

A   Correct.

Q   And so this email complains of something that feels a little like witness intimidation, which is a criminal statute that also includes retaliation.  So would you say this email was complaining to you that it felt like Apple might be retaliating against Ashley Gjovik, per Ashley Gjovik?

A   I can't speculate as to what your reception was to that email.

Q   So when you read Ashley Gjovik emailing you saying, this feels a little like witness intimidation, how did you interpret that?

A   I don't recall what my thought process was at that time.

Page 67

Q   Okay.  Do you recall any other cases where you saw something like that?

A   I can't recall a specific case.

Q   Okay.  And as a professional, if you see something like that, would it cause you to want to gather more information or talk to other Apple counsel or maybe change the way that you're strategizing your support?

A   I recall partnering with our legal counsel on this, but I don't recall what -- you know, what was specifically discussed in that scenario.

Q   Do you remember which legal counsel?

A   I do not recall.

Q   Do you remember if it was, like, HR or global security or product?

A   I don't recall who specifically was involved.

Q   Okay.  And are you aware of NLRB laws and cases about how to interact with employees when they have lodged NLRB complaints against the employer and are requesting certain conditions related to a requested interview with them?

A   No.

Q   Do you think that when you contacted -- based on whatever lawyers -- Apple lawyers you were

Page 68

discussing this matter with, was there at least an Apple HR lawyer involved?

MS. RIECHERT:  Objection.  Asked and answered.

BY MS. GJOVIK:

Q   Specific for these emails, I'm trying to gather whether Apple HR legal, who should be aware of the NLRB expectations, was aware of this response during this exchange.

MS. RIECHERT:  He already answered he didn't know what --

MS. GJOVIK:  He what?

MS. RIECHERT:  He already said he didn't know whether it was product, legal -- or I mean, employment or what.  He didn't know.

MS. GJOVIK:  He had no idea who the lawyers were?  Just lawyers?  That's -- it's kind of a leading objection.  I would like to ask him directly, please.

THE WITNESS:  I don't recall who the specific lawyer or lawyers were involved.

BY MS. GJOVIK:

Q   Okay.  And this exchange very quickly led to a termination of employment of an employee.  And in those type of cases where you're supporting these

Page 69

investigations, is it typical to have HR legal involved in that process?

A  I mean, I don't recall a specific instance. I think it's all case by case.

Q  Can you recall any other examples where you're emailing an employee and the employee was terminated within the day that you requested a meeting?

A  I also don't recall a specific example.

Q  Okay.  So Ashley Gjovik would then be the only example you recall?

A  I was not aware that you were terminated.

Q  You were never notified that I was terminated on September 9th?

A  I was not involved in that process.

Q  That's interesting.  Okay.  Thank you.

And then looking at the same exhibit, we have at 2:50 p.m. an email from you, and it wrote:  We are investigating allegations that you improperly disclosed Apple confidential information.  Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.  Best, Aleks Kagramanov.

Page 70

You sent that email?

A  Correct.

Q  Can you share any information or context of why you chose the language you chose in that email?

MS. RIECHERT:  Don't give any information provided by counsel.  Instruct you not to answer based on attorney-client privilege.

THE WITNESS:  Yeah, I do not recall how it was formulated.

BY MS. GJOVIK:

Q  Did you write this email?

A  It was sent by me.

Q  Did you draft the words used or did you send something someone else wrote?

MS. RIECHERT:  So again, objection to the extent you're asking to the role of legal in drafting this language, and in terms of attorney-client privilege, I'd instruct him not to answer.

BY MS. GJOVIK:

Q  How about this.  Mr. Kagramanov, the email that you sent here at 2:50 p.m., did someone else write the content of that email?

MS. RIECHERT:  Same objection.

MS. GJOVIK:  I'm not asking who.

MS. RIECHERT:  If other than legal, then

Page 71

you're welcome to ask him.  But if he worked on it with legal, then you're not entitled to ask him.

MS. GJOVIK:  I think he can say whether he wrote it or not.

MS. RIECHERT:  I'll instruct him not to answer if it was legal that was involved in helping him write this.

BY MS. GJOVIK:

Q  Okay.  And, Mr. Kagramanov, now, instead of sensitive intellectual property matter, it says disclosed Apple confidential information.  What was the Apple confidential information that was disclosed, to your knowledge?

A  Because I don't lead that investigation, I don't know.  I wasn't aware.

Q  And the suspension of access to Apple systems in your message, is that something that you coordinated to suspend access to Apple systems?

A  I don't recall who was -- who was responsible or involved in that.

Q  Do you recall when the access to Apple systems was suspended?

A  I don't recall.

Q  Okay.  And when it says Apple systems, which systems?

Page 72

A  I also am not aware.

Q  Okay.  Do you recall any other examples -- so you had sent the original email at 2:08 p.m. per Exhibit A.  And in this one, this response where you're suspending access to systems was sent at 2:50 p.m.  So this would be 42 minutes later.

Do you recall any other examples of contacting an employee for initial conversation and suspending all their account access in less than an hour?

A  I don't recall a specific example.

Q  So Ashley Gjovik would be the only one?

A  Correct, that I can recall.

Q  Thank you.

And then the next one, this is at 3:07 p.m. So this is still within one hour of the initial email you sent.  Ms. Gjovik responds:  Hi, Aleks.  As mentioned, I'm definitely willing to participate in your investigation.  I only asked that the discussion be kept to email.  I said nothing about not participating in the discussion at all.  I offered to help via email to ensure we have a documented record of our conversations considering everything that's currently going on with my investigation and my complaints to the government.  I have been speaking

Page 73

out about work conditions, about workplace safety, concerns about discrimination and retaliation, and about concerns about intimidation and corruption, as reported to the government in public record. I'm very concerned about what you're calling serious allegations. Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting -- but I meant suspending -- my access to Apple system or are you doing something more, and if so, what? Your email is very unexpected, and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good-faith attempt at that. In the meantime, without additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation, and I will consider it as such. Best, Ashley.

Do you recall that response?

A  Yes. Seeing it, I recall it.

Q  Do you recall how you -- how you responded, like, internally to reading that, if it would change your approach with the support for this investigation?

Page 74

A  I don't recall my interpretation.

Q  Did you share these emails with anyone at the time?

A  I don't recall.

Q  Is it typical for you, if you're helping global security do an investigation into an employee, to share those emails with global security as the employee is responding?

A  I don't recall the specific process or I -- it would be case by case.

Q  Okay. And if an employee was to disclose to you here that the government complaints were made, there's the LMB case, that there was concern retaliation was occurring, would you, like, escalate that and have that investigated to see if Apple might actually be retaliating against the employee?

A  I don't recall what the process there would be.

Q  Okay. So have you ever seen a situation where an employee was complaining that the investigation into them might be retaliation, other than the Ashley Gjovik case?

A  Yeah, I don't recall another example.

Q  And as a professional in your field, if the corporation was retaliating against the employee,

Page 75

because sometimes that happens, wouldn't it be a due diligence concern to ensure that that employee's complaint was investigated to ensure that whatever that investigation was wasn't retaliation?

MS. RIECHERT:  I think that's an improper hypothetical and lacks foundation.

MS. GJOVIK:  Okay. He still has to answer.

THE WITNESS:  I can't speculate or I can't recall a specific process in this scenario.

BY MS. GJOVIK:

Q  So I looked at your LinkedIn, and you've been doing this for a very long time and you've worked at these very large companies, and you're saying you have no professional opinion if an employee was to complain that the investigation into them appeared to be retaliation, of how you would handle that and whether you would actually investigate if it could be retaliation or ask someone to?

MS. RIECHERT:  Objection. Asked and answered. And same prior objections.

BY MS. GJOVIK:

Q  Okay. So no? No thoughts whatsoever.

And is it accurate that you never replied to this email?

Page 76

A  I can't recall if I responded or not.

Q  I never got a response.

Do you recall what happened after this response from Ms. Gjovik?

A  I do not recall.

Q  Okay. And you communicated, like, accounts are being suspended, but then you testified that you didn't know Ms. Gjovik was terminated. So do you recall if maybe you just ended your participation, your support for this investigation after that last exchange we reviewed?

A  I cannot recall my exact involvement after that.

Q  Okay. Just a few hours later --

MS. RIECHERT:  We've been going an hour and a half now.

MS. GJOVIK:  Do you want to take a break?

MS. RIECHERT:  I'm fine, but I'm sure -- the court reporter usually likes a break --

MS. GJOVIK:  Sorry. I can't hear you. What are you saying?

MS. RIECHERT:  Yeah. The court reporter usually likes a break after an hour and a half.

MS. GJOVIK:  Okay. Want to take five minutes?

Page 77

MS. RIECHERT:  Fine with me.

MS. GJOVIK:  Okay.  Let's come back in five.

(Recess taken.)

BY MS. GJOVIK:

Q  Okay.  So we just finished looking at those exchanges, and I'm just going to show you something here.

Mr. Kagramanov, do you remember the involvement of anyone named Megan Bowman while you were supporting this investigation?

A  I do not recall her involvement.

Q  I'll share -- and did you say -- do you recall -- any recollection of what information was supposedly shared or where it was shared?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q  The supposedly leaked information by Ashley Gjovik.

A  I do not recall specifically.

Q  So this is Exhibit G.  This is a document produced by Apple previously, and this is an email from Megan Bowman.

Do you know who Megan Bowman is?  Do you remember?

A  I do not recall her role.

Page 78

(Exhibit G was marked for identification.)

BY MS. GJOVIK:

Q  Okay.  Do you know who Yannick Bertolus is?

A  No.

Q  So Megan emailed Yannick here.  So this was September 9th at 6:20 p.m.  And we looked at that last email that Ashley Gjovik sent you was the 3:07 p.m. that it was in response to.  And so then we have 6:20.  It's a little over three hours later.

Megan Bowman wrote to Yannick:  Sophi Jacobs and Alex Kagramanov -- I'm finally getting this -- I had to say your name like 40 times to finally get this.  I'm so sorry.  Members of our global security and ER teams reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.  Ashley chose not to talk with the team and asked for all communications to be in writing.  She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations, her system access would be suspended.  Ashley disclosed confidential product-related information on Twitter, and this conduct on its own warrants termination.  In

Page 79

addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns.  More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents she presented to Apple's ER investigator.  Based on her conduct, which violates Apple policies, the people team recommends that her employment be terminated.

So it seems here that this -- Ms. Bowman is alleging that the refusal to cooperate with the insisting on a written record was misconduct by the employee.  Have you ever seen employees disciplined for asking for a written record?

A  I cannot recall a specific example.

Q  Other than Ashley Gjovik?

A  Correct.

Q  And are you aware that -- no.  You already said you weren't aware there was an investigation into her concerns.

And this allegation is apparently about sharing information on Twitter, and you said you weren't aware of any of the actual content shared.

So the main -- based on the conduct, which violates Apple policies -- based on your support of

Page 80

the investigation into Ashley Gjovik, are there any Apple policies that you yourself could identify that Ashley Gjovik potentially violated in her exchanges with you?

A  I cannot recall specific policy.

Q  And if the termination of Ashley Gjovik was partially based on Ashley Gjovik's request to have a written record of her communication with you, would you say that's a reasonable justification to terminate an employee's employment?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  Still has to answer.

THE WITNESS:  Refusal to participate would be considered misconduct.

BY MS. GJOVIK:

Q  That could justify termination?

A  Could be.

Q  Would it be reasonable to provide the employee notice that they could be disciplined if they refused to get on a call?

A  I cannot recall a process for that.

Q  And have you ever had employees request to, like, record the call so they can at least have a recording of the phone call?

A  I cannot recall a specific instance of that.

Page 81

Q  If Ashley Gjovik had said, if she can't have a written record, she'll get on the call if she can have a witness or record that call, would you have allowed that?

A  I cannot recall a specific policy or expectation for that.

Q  Would you have said no?

A  Me personally, when I facilitate interviews, I do not recall the meetings.

Q  What about if an employee asked to have a witness there with them?

A  We do not allow witnesses in confidential interviews.

Q  What if they want to bring their own lawyer?

A  In my experience, typically, we wouldn't include anyone as a witness, even including a lawyer, in a confidential investigation.

Q  So then in that case, if there's any dispute about what was said during the call, there would be no record to actually compare what was discussed to?

A  I tell employees they can take their own notes.

Q  But there's no recording or actual, like, admissible evidence, like, definitively saying what was actually said?

Page 82

MS. RIECHERT:  Objection.  Lacks foundation as to what evidence is admissible.

MS. GJOVIK:  Sorry.  The evidence was too concrete.  I'll withdraw that part.

BY MS. GJOVIK:

Q  Okay.  So Ms. Bowman sent that email at 6:20.

Mr. Bertolus responded at 6:26 p.m.: Understood.  I agree with the termination decision.

And then Ms. Bowman responded again:  Here are the attachments you can send Ashley in the email notifying her of the termination.  We will also send this via FedEx tonight.  Here is her email address. Below is a text and subject line you can use.  Please copy on the email you send to her.

And you don't recall if Ms. Bowman was involved in your participation in this investigation?

A  I do not know who Megan is.

Q  Okay.  And then here, she wrote at 6:20 -- no.  That was the same email.

It says:  Yes, I agree.  And then she sends that.

And so Mr. Bertolus then sent a letter terminating Ms. Gjovik's employment.

And just to confirm, you were not aware that

Page 83

Ms. Gjovik was then terminated that same day that you reached out?

A  That's correct.

Q  Did you ever discover that Ms. Gjovik had been -- had her employment terminated by Apple related to this investigation prior to being called for this deposition?

A  I do not recall.  Yeah, I don't recall.

Q  Do you recall ever seeing any news coverage or social media discussion about Ms. Gjovik's complaints and disclosures?

A  I don't recall that.

Q  And then I'm now going to share Exhibit H. This is the letter from Mr. Bertolus to Ms. Gjovik, September 9th, saying:  Termination of employment. Apple has determined that you have engaged in conduct that warrants termination of employment, including but not limited to violations of Apple policies.  You disclosed confidential product-related information in violation of Apple policies and your obligations under the intellectual property agreement.  We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.  Your access to Apple systems has been suspended as of today, and your employment

Page 84

will terminate September 10, 2021.

So now facts in evidence that there was a termination.

And there was one other -- another version of this without Apple's redactions.  They love to redact everything.  This is the same letter without the redactions.  This is the one that I got.  At the end of this one -- this is Exhibit C, the unredacted version, my version.

Exhibit C ends:  You are also obligated to return to Apple all Apple-owned equipment or devices. You will receive a prepaid FedEx box to ensure prompt return of Apple devices.  If you need assistance, please contact Aleks Kagramanov at, it looks like your Apple email.

Is that your Apple email?

A  That looks correct, yeah.

(Exhibit C was marked for identification.)

BY MS. GJOVIK:

Q  So that's to you -- to reach out to you.

So you're saying you didn't know the employee was terminated, yet you were to be the point of contact for the employee if they had questions about the termination process.  Is that --

A  Yeah.  I don't -- I don't recall what the

Page 85

involvement there was for me --

MS. RIECHERT: Object that that misstates the -- what the email says. It's about return of the equipment --

MS. GJOVIK: Oh, just returning equipment.

BY MS. GJOVIK:

Q Mr. Kagramanov, are you typically the point of contact for employees when they're terminated when there's an investigation of them for the return of equipment?

A It's case by case on that as well.

Q Can you think of any other examples where you were provided as the point of contact for returning equipment?

A I can't recall a specific case or example.

Q Other than Ashley Gjovik?

A Correct.

Q And so if you weren't aware that she was terminated, then if she reached out to you about returning equipment, that would be how you would be notified she had been terminated, by her saying, I was just terminated; is that fair?

A Yeah. Based on this notification, yeah.

Q And then that letter that we read to you said something about redacting information provided.

Page 86

Do you have any -- did you hear anything about investigating her for redacting information?

A Sorry. Can you say that one more time.

Q Yeah.

The list -- Bowman's list of Ms. Gjovik's misdeeds listed redacting information provided. Do you know anything about that?

A No.

Q And it also said she wasn't providing complete or accurate information. Do you know anything about that?

A I do not.

Q Do you know anything about what was going to be asked of Ms. Gjovik during the phone call you were supposed to arrange?

A No.

MS. RIECHERT: By him or by Sophi?

MS. GJOVIK: Either.

MS. RIECHERT: I think it was asked and answered as far as what he was going to ask her.

MS. GJOVIK: Okay.

MS. RIECHERT: He said he didn't know what Sophi was going to talk about. So it's asked and answered.

///

Page 87

BY MS. GJOVIK:

Q Mr. Kagramanov, when you've set up calls like this with global security when they're investigating employees, have you had cases where the employee is terminated on those phone calls?

A I can't -- I can't recall a specific case.

Q What kind of outcomes generally happen during these phone calls?

A I don't recall a specific outcome that was discussed in a specific case.

Q Okay. So as far as you know, these phone calls generally result in some kind of next step but not the termination of the employee during the call?

A Yeah, I don't -- I don't recall the specific outcome in a live call.

Q Are you generally present at the live call?

A Yes. I'm present, yeah.

Q Does Apple record their own version of the call so they have a record?

A I can't recall a specific call being recorded.

Q I don't have any of that stuff.

Mr. Kagramanov, do you have any -- you said you didn't know about Ms. Gjovik's office being a Superfund site or EPA or any of that stuff; so you're

Page 88

probably going to say you don't know about this, but I'm going to show it to you anyways.

This is Exhibit F. This is an email from Jenna Waibel on your team.

(Exhibit F was marked for identification.)

MS. RIECHERT: Did you say S, as in Sam?

MS. GJOVIK: F, as in fund.

MS. RIECHERT: Oh, F. Okay.

BY MS. GJOVIK:

Q September 9th. It's weird time zones. This looks like around maybe 12:24; so probably a couple hours before you reached out. And it was -- do you know who Elizabeth Schmidt is?

A I do not recall that person.

Q She works in EHS and real estate.

And she -- your coworker, Jenna Waibel, was providing -- she says: I'm providing notes to you from our last meeting with Ashley Gjovik as her EHS concerns, which occurred on 7/7/2021. Antone is copied since he was present at the meeting. He can answer additional questions you may have.

So this is your coworker, Jenna Waibel, emailing -- I believe Elizabeth is a director or senior manager -- these notes about Ms. Gjovik making EHS complaints and concerns, raising concerns just a

Page 89

couple hours before you were asked to contact Ms. Gjovik.

Do you have any awareness of Ms. Waibel communicating this or opening EHS complaints for Ms. Gjovik or Ms. Schmidt being involved or any concurrent investigation going on at the time you were asked to reach out to Ms. Gjovik?

MS. RIECHERT:  I think that misstates the testimony.  He said he reached -- he was told to reach out on September 7th (audio distortion).

MS. GJOVIK:  Sorry.  Can you say it again.

MS. RIECHERT:  Yeah.  I thought he testified he was told about -- to reach out on September 7th, not the 9th.

MS. GJOVIK:  Oh, September 7th.  That's right.

Let's go back to that, actually.  Thanks, Melinda.

BY MS. GJOVIK:

Q   Do you recall what you were told on September 7th about this matter?  Were you asked to contact Ms. Gjovik or something else that you were told at that point?

A   I recall being looped in to help support the global security investigation on September 7th.

Page 90

Q   On September 7th, were you asked to reach out to Ms. Gjovik?

A   I don't recall what the request was at that time.

Q   Do you recall what day you were asked to reach out to Ms. Gjovik?

A   I don't recall the exact date.

Q   So for the -- when you were working on this September 7th, September 8th, do you have any recollection of what you were doing with regards to this matter?

A   I do not recall what was happening.

Q   Okay.  And then you testified your role in this was basically just setting up a meeting for Ms. Gjovik?

A   That's correct.

MS. RIECHERT:  That misstates his testimony, but --

MS. GJOVIK:  I can ask him again, but then you'll say asked and answered.

MS. RIECHERT:  Right.  I mean, he told you what he was going to say during the meeting; so...

BY MS. GJOVIK:

Q   Yeah.  So I'm just trying to understand what your role was in the investigation two days prior to

Page 91

the 9th, if you didn't have any background what the investigation was about or the employee's complaints or cases or the other employee relations investigations or any of that.  So --

MS. RIECHERT:  That's a lot of premises in there that --

BY MS. GJOVIK:

Q   Well, this -- no recollection whatsoever what your role was on September 7th or 8th; is that correct?

MS. RIECHERT:  Misstates testimony too.

BY MS. GJOVIK:

Q   Can you please characterize any recollection you have whatsoever of your role, anything requested of you, any activity you had regarding Ashley Gjovik on September 7th or 8th.

A   I have no recall of the level of involvement.

Q   And do you communicate with Ms. Waibel or Mr. Okpo, your coworkers?

MS. RIECHERT:  Generally?

BY MS. GJOVIK:

Q   Yeah.

A   Can you clarify, like, what do you mean by that question.

Page 92

Q   Do you guys talk about your work, share updates on stuff if there are intersecting issues or investigations?

A   Yeah.  I mean, I don't recall the specific nature of our interactions or discussions at that time.

Q   Okay.  And if there is open investigations related to an employee with some of your other coworkers and then you would get one -- another one that's still with the same employee, is there any policy or practice or standard of trying to coordinate amongst your coworkers for the -- those multiple investigations?

A   I don't recall a specific process.

Q   Okay.  I'd like to talk a little bit about what you were planning to say to Ashley Gjovik during that phone call.  Could you share to me what you might say about -- you were saying things about keeping things confidential, not sharing what's discussed.  Can you, like, say to me what you might have said to me on that call if I called on that call.

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  I'd like the actual rules, the

Page 93

work rules he was planning on sharing.

MS. RIECHERT: Same. Asked and answered.

BY MS. GJOVIK:

Q Mr. Kagramanov, during that call, when you said -- you indicated that you were going to say that the investigation was confidential and not to share it with anyone. And the employee has a complaint with the government and says that they're giving an affidavit the next day, would your statement imply or expressly say that the employee is not allowed to share with the government investigator during the affidavit what occurred during that interview?

A I can't -- I can't, like, speculate what would have been said at that time.

Q So based on the rules -- you said your job is, like, to share these rules with employees to support them. So it's, like, you must do that a bit.

The employee in this case says, I have this case, and I'm about to give an affidavit tomorrow. You're insisting employee get on the phone call. You said you would tell them that it's confidential, they can't tell anyone.

So if the employee says -- if I say, well, I have an affidavit tomorrow and I want to testify about what happens here, am I allowed, what would

Page 94

your response be?

MS. RIECHERT: Objection. Hypothetical, speculation.

MS. GJOVIK: Still has to answer.

THE WITNESS: If you were -- if you could just clarify the question. If you were saying -- you're saying that if you disclose in a live discussion with me and the investigator that you have an affidavit, if that would change the confidentiality expectations?

BY MS. GJOVIK:

Q It was disclosed in the email; so you already knew that.

I'm asking, if I asked for clarification -- if you're saying -- when you say it's confidential and you can't share with anyone, and I said, does that apply for my affidavit to the government, what your answer would be?

MS. RIECHERT: Same objections. Hypothetical, speculation.

MS. GJOVIK: Okay. He still has to answer.

THE WITNESS: I would probably take partnership with my management team because I'm not familiar with that process.

///

Page 95

BY MS. GJOVIK:

Q Okay. So the employee said that in the emails that they had that affidavit coming up and was concerned, but I believe you testified that you did not recall ever escalating that or asking for feedback with the management team or anyone else; is that correct?

A My recollection is that the -- I had legal counsel in partnership in that scenario.

Q Oh, so you're saying that the email about the affidavit, that was shared with Apple legal?

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

MS. GJOVIK: This lawsuit is like a sodoku puzzle with your privilege claims, Melinda. I'm trying to put this together.

BY MS. GJOVIK:

Q So okay. If we're in that -- we're in that meeting and I ask that question point blank, you said you'd bring it to your management team. Would that imply that you'd then cancel or pause that meeting so you could talk to them and figure out what to do?

A I don't recall what the specific involvement was at that specific stage.

Q So you just said, if the employee said, I

Page 96

would like guidance if Apple is going to claim that the details of its investigation, this call, are confidential, if I can share that during any affidavit, and you testified you would need to talk to management about that and see what to do because you didn't have expertise on that. If that's occurring during a live phone call on September 9th, how would you handle that?

MS. RIECHERT: First of all, objection that that's not what your email to him said. You didn't ask if you could share it with the government in the affidavit.

MS. GJOVIK: That's what I'm saying. That's the problem, that if I have to raise that at the call and ask and the call is already occurring and he's saying he has to talk to management, who are already on the call, what he's going to do then with that call.

THE WITNESS: Yeah. I would probably --

MS. RIECHERT: You can answer, but the same objections that it's hypothetical. But you can answer the question.

THE WITNESS: Yeah. If you brought that up in realtime during the call, I wouldn't, you know, commit to a specific response. I would probably take

Page 97

some counsel.

BY MS. GJOVIK:

Q  Yeah.

What about if I said I would attend but I want to bring a witness, maybe a coworker with me just to have a witness with me?  What would you have said?

A  I would have declined that request.

Q  Okay.  And if I had requested to do an audio recording of what's discussed so I have a copy of what's discussed, what would you say?

A  I would have declined that request.

Q  Okay.  Same if I asked for, like, a video recording, like Apple tools, so we could both have a copy of what's discussed, what would your response be?

A  I would also have declined that request.

Q  And let's say we do have the call and there is discussion and then I go on Twitter about it and complain that Apple is retaliating against me and talk about what's discussed but you had said it was confidential, would you find that's probably a breach of your confidentiality rules if I'm complaining and sharing details of what's discussed?

MS. RIECHERT:  Objection.  Hypothetical,

Page 98

speculation.

BY MS. GJOVIK:

Q  Please answer.

A  You know, I can't control -- we can't control how -- you know, what you post on social media.  And I think you have discretion to talk about your workplace conditions and experience, but posting something that's confidential would be a violation of our policies.

Q  And you're saying that the entire interview that you were trying to schedule would be confidential by default?

A  Correct.  It's confidential.

Q  So if that discussion included complaints about workplace conditions, you're saying that would be confidential?

A  The workplace conditions is separate from the actual investigation that was going to be facilitated.

Q  Mr. Kagramanov, are you aware that the stated reason for firing me by Apple includes an article that includes the photos of my face from the Glimmer app and a "Verge" article called "Apple Cares About Privacy Unless You Work At Apple," and the Twitter post reference, we're also sharing that

Page 99

article.  And there was a number of Apple employees coming together to complain about their work conditions that they felt were invasions of their privacy by Apple using Apple's tools and processes.

And you can answer -- you don't know that, you already said.  You weren't aware of that; right?

A  No.

Q  Assuming facts not in evidence that that is true, then the conversation for that investigation would, by its very nature, be all about work conditions.  And so then the rule of not sharing what's discussed then would include work conditions.  And then if I was to complain about it later based on the rule you just shared and testified to, that would be violating the confidentiality rule that Apple created; is that correct?

MS. RIECHERT:  Objection.  Calls for a legal conclusion.

MS. GJOVIK:  He created a confidentiality --

MS. RIECHERT:  And also hypothetical -- improper hypothetical and speculation.

MS. GJOVIK:  Still has to answer.

THE WITNESS:  Again, discussing workplace conditions, you know, you have that discretion.  Discussing the confidential nature of the actual

Page 100

investigation would be in violation.

BY MS. GJOVIK:

Q  So are you standing by your prior testimony that anything that was discussed during that call then would be considered confidential and the employee is not to share it?

A  The nature of that investigation and the meeting would be confidential.

Q  Okay.  What if the employee was to go to Twitter and complain that Apple's called them to a meeting and said they thought it was intimidation and retaliation and was complaining about some prior posts they made in generalities?  Would you say that is a violation of the confidentiality rule you created for that meeting?

MS. RIECHERT:  Objection.  Improper hypothetical and speculation.

BY MS. GJOVIK:

Q  You can still answer.

MS. RIECHERT:  And vague.  I'm not sure exactly -- if you can perhaps repeat the question.

MS. GJOVIK:  You know that's what I do, Melinda.

BY MS. GJOVIK:

Q  Please answer.

Aleks Kagramanov

Page 101

A   Again, the actual nature of the investigation was discussed in the meeting.  The investigation would be confidential.

Q   And if an employee asks you for an agenda of one of these calls beforehand, is that something that you'll provide if requested?

A   I don't recall ever doing something like that.

Q   So, like, in this case, if the employee asked for the details of what allegations are being made against them so they know what's going to be discussed, is it typical for you to say no and deny that request?

A   I would say, yes.

Q   Mr. Kagramanov, are you aware that the NLRB and NLRA, National Labor Relations Act, has case law that gives employees something called Johnny's Poultry rights?

A   I do not.

Q   Are you aware that if an employee has a charge filed with the NLRB and there are proceedings underway, an investigation, and all of a sudden the employer wants to call them in and talk to them about stuff that is related to or intersected with the protected activity in charge, that they have rights

Page 102

to ask for agendas and ask for eyewitnesss and reassurances that that meeting would be used for retaliation or to interfere with their participation in board proceedings?

A   I'm not aware.

Q   And if that is -- assuming that's true -- and you have to take my word for it for this sake so Melinda can do her objections -- wouldn't it seem reasonable that if an employee raises that they have an open proceeding with you, that it would be reasonable to engage labor counsel or get more information to ensure Apple is not violating labor laws in its investigation into that employee?

MS. RIECHERT:  Objection on many bases. Calls for legal opinion, calls for a hypothetical, calls for speculation (audio distortion) and its employee might do.

BY MS. GJOVIK:

Q   Yep.  Yep.  Still answer.

A   Yeah.  I'm not familiar with that process. So I can't speak about it.

Q   Is it your understanding that the National Labor Relations Act applies to Apple and Apple employees?

A   I'm not aware.

Page 103

Q   Not aware.

Do you know what the National Labor Relations Act is?

A   I've heard of it.  I don't know exactly what.

Q   Are you familiar with any California labor laws?

MS. RIECHERT:  Vague.

THE WITNESS:  Not specifically.

BY MS. GJOVIK:

Q   Are you familiar that California labor laws protect employees' ability to talk about work conditions and protest work conditions?

A   Correct.  Yeah, from what I mentioned earlier.

Q   Are you aware that in California, that even private employees have a constitutional right to privacy under the California Constitution that includes a constitutional right to protest invasions of privacy by their employer?

A   I am not aware.

Q   Are you aware that California Labor Code also says that based on constitutional rights like that, an employee has a right to talk publicly and with coworkers about their work conditions arising

Page 104

from the constitutional rights?

A   I'm not aware of that.

Q   Yeah.

So I'm going to share Exhibit I, as in igloo.

Mr. Kagramanov, are you aware that the NLRB issued a complaint against Apple for unlawfully suspending me and terminating my employment?

A   I am not aware.

(Exhibit I was marked for identification.)

BY MS. GJOVIK:

Q   This is Exhibit I.  There's been some changes and back-and-forth on what's the scope of the charges, but this is the one that was issued on -- where's the date on this one? -- December 18, 2024. And this is based on Charges 282142 and 283161. These were filed -- the first one August 26, 2021. Mr. Kagramanov, is that prior to you contacting Ms. Gjovik?

A   Correct.  Yeah.

Q   And Ms. Gjovik told you she had charges -- an NLRB charge filed against Apple when you contacted her.  That's correct; right?

MS. RIECHERT:  Objection.  Document speaks for itself.

**Aleks Kagramanov**

Page 105

MS. GJOVIK: Uh-huh. He can still answer that one or does that one block me?

MS. RIECHERT: Go ahead.

BY MS. GJOVIK:

Q Okay. And then the next charge -- let's see. This charge -- I'm asking Melinda for legal advice just like a professor. She's done this for a really long time. She's very smart.

Okay. So then the second charge is 283161, and that one was filed by me on September 16, 2021, and included the termination of my employment. And your emails to me also were something I complained about, which I told you in email.

Are you aware that a charge was filed over that?

A I was not aware.

Q Yeah.

And so that was filed while you were still working at Apple; right? You said you didn't leave Apple till 2023; is that correct?

A From my recollection, yes, somewhere around 2023.

Q And so just to confirm, Apple never notified you that this case you worked on resulted in LOB proceedings?

Page 106

A I don't recall being notified of this.

Q Okay. And did Jenna Waibel and Ekelemchi Okpo -- you said these were your coworkers; right?

A Correct.

Q And they're named in this complaint.

There's a number of complaints I made that they -- the NLRB took action on. And it includes in -- let's see. What was this one? -- paragraph 8 on page 4, Section D: About September 9th, 2021, respondent discharged its employee, Gjovik. And then E, respondent engaged in the conduct described in paragraphs 8C and 8D including that termination because Gjovik engaged in the conduct described in paragraphs 8A and B, which is the NLRB -- the National Labor Relations Board, saying Apple suspended or terminated Gjovik. Because of employee Gjovik concertedly complained to respondent regarding the wages, hours, and working conditions of respondent's employees by inter alia, raising workplace health and safety concerns, and engaged in the concerted activities for the purpose of mutual aid and protection by inter alia circulating in the petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting

Page 107

about workplace complaints and concerns on social media, as well as respondent's Slack channel platform.

Are you aware of any of this?

A I was not aware.

Q And the NLRB says: By the conduct described, respondent has -- Apple has been interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act of Section 8(a)(1) of the act.

And then the NLRB's complaint also was going to ask Apple to reinstate my employment, Ashley Gjovik's employment. Are you aware of that?

A I was not aware.

Q And this complaint was -- the NLRB was going to sue Apple and ask Apple to, among other things, send a letter to Gjovik apologizing for suspending and terminating her.

Were you aware of that?

A I was not aware.

Q Do you think that if Apple's conduct in this case could result in such a complaint and legal action, that perhaps Apple should have been more careful about how it handled this investigation that you were asked to support into this employee while

Page 108

this employee was complaining about the NLRB proceeding while you were communicating with her?

MS. RIECHERT: Objection. Assumes facts not in evidence, lack of foundation, calls for a legal conclusion.

BY MS. GJOVIK:

Q Please answer.

A I cannot speak to Apple's position on this matter.

Q In retrospect, do you feel like perhaps you have -- should have asked more questions or escalated this matter or been more careful in how you handled it?

A In retrospect, I mean, I -- you know, I made the determination we determined in partnership with our legal counsel.

Q That's all you want to say on that?

A Yes.

Q Okay. And now I'd like to look at Exhibit S, as in salmon. This is Apple's very first national settlement agreement with the National Labor Relations Board. This is for Charge 284428 filed by me in October 2021 over Apple's national employment policies, work policies, and including its intellectual property agreements, at least the

Page 109

version it was using with me and other employees back to 2015. And Apple had a charge filed by the NLRB over this matter, alleging that their policies and work rules that were outlined, the specific ones, violated national labor laws, specifically the NLRA. And Apple decided to settle it and voluntarily withdraw problematic terms and agree to not enforce the terms that the NLRB had alleged were unlawful.

Were you aware of this, Mr. Kagramanov?

A  I was not aware.

(Exhibit S was marked for identification.)

BY MS. GJOVIK:

Q  And as part of this, Apple had to post a three- page notice posting for its employees with a long list of things it promises it will not do going forward as part of the settlement agreement. This is page 1, page 2.

MS. RIECHERT:  I will object to your characterizations of what this agreement said. The agreement speaks for itself. Just because you characterized it a certain way doesn't mean that that's accurate.

You're just asking the witness if he's aware of this?

MS. GJOVIK:  Your objection is just

Page 110

characterization; right?

MS. RIECHERT:  No.  It's -- I'm objecting that the document speaks for itself and you're not properly -- necessarily properly paraphrasing the document.

BY MS. GJOVIK:

Q  Okay.  And then this document is signed. The MLS is Apple's lawyers that they hired from Martin Lewis.  And the AMG, that's me.  So I signed it with Apple and NLRB.  It's called a trilateral national settlement agreement, and it applies to all of Apple's national employment policies.  And that was signed -- what's the date on this one?  This was in April 2025.  And there was a lot of press coverage about it, actually.  And did you see any press coverage about this?

A  I do not recall seeing any press coverage on this.

Q  And as part -- so as part of one these things Apple promises it will not do anymore, it says:  We will not promulgate, maintain, or enforce a misconduct or discipline policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act

Page 111

and/or contains overly broad restrictions on photography and recording.

Were you aware that Apple agreed that it would change its policies regarding recording in employee investigations?

A  I was not aware.

Q  Yeah.

MS. RIECHERT:  I think he was gone by Apple -- from Apple, if I'm not mistaken.

MS. GJOVIK:  I can't hear you.

MS. RIECHERT:  I think he was gone by that point from Apple, he said, by this -- 2025.

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

Q  But now, in retrospect, would you maybe reconsider your prior stated position on recording, considering this?

MS. RIECHERT:  Objection.  Improper hypothetical, speculation.

BY MS. GJOVIK:

Q  Still answer.

A  Our position at the time was our position at the time.

Q  Okay.  You have very little information to provide.  It sounds like you're being cooperative,

Page 112

and I appreciate you showing up and answering my questions.  And it sounds like you probably just were not provided much information at all of what was going on.  So I'm sorry you were put in that position.

And I'm going to try to think of more questions to ask because I want to use my time.  But while I'm looking at my list also, is there anything you would like to add to the record or share?

A  No.

Q  Regarding the confidentiality rules for investigations, have you -- do you recollect any other employees -- any employees complaining about the assertion that the investigation itself should be considered confidential?

A  I don't recall a specific instance.

Q  And you said you were generally present on these calls for these investigations?

A  That's correct.

Q  Do you recall any of these calls where an employee complained that they thought that the investigation was pretext or retaliation?

A  I can't recall a specific instance of that.

Q  Do you recall any of these types of phone calls with the investigation into the employee where

Page 113

Apple tries to get the employee to agree to voluntarily leave the company during the call?

A   I don't recall a specific instance of that as well.

Q   And were you ever, that you recall, provided any information -- because you -- sorry.  Back up.

You had said that you -- generally, your employee relations function was assigned to the global security organization.  So if a global security employee has an employee relations issue, concern, you'd be the default one to investigate it.  But then you may also be called in for the workplace violence and threat assessment stuff for any other organization at Apple in the Americas; is that correct?

A   That's correct.

Q   Okay.  And then were you provided any context, any information of why you were being brought in to support a hardware engineering employee who was being subject to an investigation that you testified was not related to workplace violence or threat assessment?

A   I don't recall being -- being told any kind of context.

Q   Do you recall any other cases where you were

Page 114

being asked to support an investigation into a non-global security employee who was being investigated by global security?

A   I can't recall a specific case for that.

Q   Other than Ashley Gjovik.

A   That's correct.

MS. GJOVIK:  Do you want to take, like, ten minutes?  I'm going to walk my dog and think if I can see any more questions because I'm going to pay this court reporter a lot of money anyways; so I'm going to think of more questions.  We can take a little break.

MS. RIECHERT:  Fine with me to take a break.

MS. GJOVIK:  What was that?

MS. RIECHERT:  Fine with me.  We can take a break.

MS. GJOVIK:  Okay.  So we can come back, let's say, 10:30?

MS. RIECHERT:  Okay.

MS. GJOVIK:  Thank you, guys.

(Recess taken.)

MS. GJOVIK:  Okay.  So we can go back on the record.

BY MS. GJOVIK:

Q   I did think of one other thing I'd like to

Page 115

do.  So I'd like to share Exhibit K with you.  This is Apple's privilege log.

So of course, I'm not asking you to disclose anything that's protected by privilege.  And Melinda will, of course, object to anything that touches that.  So I don't want to know the content of what's shared.

But this is a privilege log that Apple provided during the litigation, and -- for this case, and there are eight references to your name.  And I thought it might help you recollect perhaps the people you were talking to or messages sent about the case.  And maybe this helps -- this is information that Apple's counsel already shared in a privilege log.  So maybe not sharing more than this, if this is protected by privilege, but you could maybe remember which specific people you were talking to.

So with the first one, this is row -- it's really small.  I'm sorry.  They use, like, size 8 font.  This row 261 on September 9, there's a row for communications on messages app with attachments between Isela Perez, Adelmise Warner, Alex Kagramanov, and Joni Reicher.  And it says direct message with Warner, Kagramanov, and two others.

Do you recall texting with those three other

Page 116

people on September 9th about this matter?

A   I do not recall texting.

(Exhibit K was marked for identification.)

BY MS. GJOVIK:

Q   Okay.  Is it typical for you to text with HR or legal when you're assisting with investigations?

A   I think it's case by case on those situations.

Q   Okay.  And this text message does not include Sophi Jacobs from what I can tell.  So do you recall communicating with HR and legal but not including Sophi regarding this matter on the 9th?

A   I do not recall the nature of that exchange.

Q   Do you have any thought about what you would be talking to regarding this matter to HR legal without including Sophi?

A   Yeah, I do not recall what that exchange would have been.

Q   And let's go -- just so you recall who people are, this is Apple's little chart, actually.

So they have you as an employee relations business partner.  And Isela Perez is listed as corporate attorney manager for legal-HR.  Joni Reicher is listed as employee relations senior director for people support ops.

Aleks Kagramanov

Page 117

So in that thread, you'd have -- you'd be messaging with both legal executives and HR executives but without Sophi Jacobs. And you have no recollection of what that was about?

A   Yeah, I don't recall the nature of that exchange.

Q   Okay. And then on row 273 of Exhibit K, between September 7th and September 9th, there's 20 replies in an email with attachments sent by you, Adelmise Warner, Isela Perez, and Debbie Rice.

Do you remember Debbie Rice too, maybe the title?

A   I don't recall her exact title. I believe it was legal.

Q   Senior director, legal-HR?

A   Yeah.

Q   In your experience, when you were supporting these investigations, is it typical for you to work with directors and senior directors in HR and legal?

A   I would say it's case by case.

Q   Can you recall any other cases where you were messaging directly with senior directors about the case?

A   I cannot recall a specific case.

Q   Other than Ashley Gjovik?

Page 118

A   Correct.

Q   And let's see. So for this one, we can go back to that 9/7 one. Where did that go?

So on the 9/7 to 9/9, we have emails sent by yourself and Ms. Warner and Perez and Rice, all these executives, and the thread also had this Melissa Polinsky and Sophi Jacobs on it with 20 replies.

Does that help your recollection that's maybe the email where you got looped in on this investigation on the 7th?

A   I don't recall specifically. Could be when I got looped in.

Q   And the subject line is listed by Apple as AG forward internal application Glimmer/Gobbler, privileged and confidential, and then attachment is AG talkingpoints.pages.

Do you remember anything about that?

A   I don't recall that specific attachment.

Q   Okay. And then let's see. Where's the other one?

We have another email on the 9th. It's sent by you. So this column, sent by you. It's row 269, to Isela Perez, Debbie Rice, Adelmise Warner, Joni Reicher, and Deirdre O'Brien email with attachments and six pages. And it was titled AG emails, with a

Page 119

screenshot 2021/09/09. And this was just sent by you per Apple's record. So you would have screenshot something and sent a message called AG emails.

Does that help your recollection if you were sharing the emails you had with Ashley Gjovik with other people at Apple?

A   I don't recall the specific nature of the attachments or the email exchanges.

Q   Okay. Do you have any idea what else you would be sharing with them referencing AG emails at the same time you were emailing Ashley Gjovik?

MS. RIECHERT: Objection. Speculation.

THE WITNESS: Yeah, I do not.

BY MS. GJOVIK:

Q   Okay. Is it typical for you to send updates about the supporting employees through these investigations by global security to Deirdre O'Brien?

A   I don't recall a specific case.

Q   Other than Ashley Gjovik?

A   Correct.

Q   And do you recall who Deirdre O'Brien is?

A   I don't recall her specific title. I believe it was, like -- she was, like, the head of HR.

Q   And retail, yes.

Page 120

Let's go find her actual -- we'll put that -- O'Brien -- O'Brien, senior vice president of people and retail.

Do you recall why you would be sending updates about the investigation into Ashley Gjovik just setting up a phone call with Sophi Jacobs -- sending updates to the senior vice president of HR and retail at Apple?

A   I don't recall the nature of what led up to that.

Q   And you're saying you don't recall what you were screenshoting in those messages you sent them that you attached here?

A   That's correct.

Q   And then we have another one on September 9th sent by you, email with attachments, two pages, to Tony DeMario and Sophi Jacobs.

Who's Tony DeMario?

A   I believe he was Sophi's manager.

Q   It says global security manager, investigations and child safety. Sound right?

A   That sounds right.

Q   And so it says you sent them messages, AG intro email draft with attachment AG intro email pages.

Page 121

Does that sound right?

A Yeah, that sounds right. I just don't recall the nature of what that entailed.

Q Okay. And are Tony or Sophi attorneys?

A I do not know.

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q What?

A I do not know.

Q Okay. And then let's see. We have another one here. You're on this one. This is another September 9th sent by Adelmise Warner and Sophi Jacobs to the larger group including yourself, email attachments, three pages. And it says confidential and privileged and then a bunch of UTF8 AshleyGjovik.VCF. Do you know what that is?

A I do not know what that is.

Q Does that sound like maybe, like, a contact information attachment, like, how to call Ashley if you want to call Ashley?

A I cannot speculate. I don't know what that is.

Q Okay. And did looking at any of these help you direct, like, any further details about your role in supporting this investigation?

Page 122

A Other than some of the names involved, no.

Q Okay. And you had previously mentioned that you weren't aware of the details of what the alleged disclosed information was, but that one subject line we saw said Glimmer/Gobbler. Is that -- do you recall if that's how you knew the general assertion of what was the asserted leak?

A Yeah. That was probably my extent at that time of knowledge.

Q Okay. I'll stop sharing.

So when you would handle these type of investigations, when you're asked to look into something, does sometimes, maybe by the nature of who's asking to have it investigated, like, if it's top execs, it seems like that it might be a more sensitive matter than a typical matter? So if you were being asked to give updates to the senior VP and senior directors directly, that this might seen unusual compared to your typical coordination of setting up meetings for global security investigations?

MS. RIECHERT: Objection. Improper hypothetical, assumes facts not in evidence.

MS. GJOVIK: Okay. He has to answer.

THE WITNESS: Again, I think it's case by

Page 123

case. It depends on -- sometimes if an executive, you know, pushes down an investigation, we assess and determine complexity, urgency, and develop a plan.

BY MS. GJOVIK:

Q Yeah.

So you said the executive pushes down on the investigation. So looking at this, does this kind of resemble a case -- you don't recall directly for this because you say you don't recall -- where maybe an executive asked for an investigation of the employee?

A I don't recall how it was actually initially escalated.

Q Okay. Can you think of a reason why you'd be giving, like, realtime updates to senior leadership unless they were the ones that asked for those updates?

A Yeah, I don't recall the prompting of that or --

Q Do you typically -- do you typically send senior executives just updates as stuff happens?

A It would be depending on the nature of the case.

Q What kind of cases would prompt you to send senior executives at Apple realtime updates on the support of employee investigations?

Page 124

A I'm not sure. I don't recall, like, a specific case of -- or what would be, you know, discussed in those situations.

Q Other than the Ashley Gjovik case?

A Correct.

Q So considering everything we've looked at now and reviewed and talked about, I'm going to ask again, is there anything that you want to add or supplement or correct from -- based on your prior testimony?

A No, nothing said.

Q Okay. And I guess, just again, now considering also reviewing that privilege log and those documents too and refreshing of who you were interacting with, certain things like the NLB cases and developments, if in retrospect you might have handled the situation with Ashley Gjovik differently had you been provided more information?

A I think the situation was handled in the manner that it was for the time in partnership with out legal counsel.

Q Even if that was found by the federal government to be unlawful?

MS. RIECHERT: Objection. Assumes facts not in evidence.

Aleks Kagramanov

Page 125

MS. GJOVIK: Oh, no. We showed the complaint, though.

Sorry. Let me correct.

BY MS. GJOVIK:

Q The government found substantial evidence supports that the conduct violated federal labor laws specifically the NLRA.

MS. RIECHERT: Now -- (audio distortion).

(Reporter clarification.)

MS. RIECHERT: My recollection is that the government found that -- through the complaint, found that you were not fired for retaliation; that you were properly fired for the conduct you engaged in.

MS. GJOVIK: Speaking objection. You're not being deposed. That's not an actual objection. And that is after Apple got its own defense counsel appointed as the general counsel at the NLRB. So it's kind of tainted, Melinda. But I understand your position.

Okay. Let me just think if I have anything left.

BY MS. GJOVIK:

Q Can you think of any other cases where you were supporting a global security investigation and you say you don't have any insight into what the

Page 126

actual details of the investigation was or background but that you were providing updates to senior executives without the global security person who was leading the investigation?

A No. I can't recall a specific case of that.

Q Other than Ashley Gjovik?

A That's correct.

Q What was your relation with Sophi Jacobs?

MS. RIECHERT: Objection.

(Reporter clarification.)

MS. RIECHERT: Vague. Sorry.

BY MS. GJOVIK:

Q What was your working relationship with Sophi Jacobs? Like, did you interact regularly?

A If there was a case that came up, and depending on who was assigned to that case. It's not always Sophi that was assigned to a specific case.

Q You worked with her prior?

A Correct.

Q Do you recall if she had other investigations she asked for support with that requested a response within the hour from the employee?

A I don't have insight into her specific investigations.

Page 127

Q I mean the ones that you assisted with that you provided support for.

A Yeah, I don't recall a specific case.

Q Other than Ashley?

A Correct.

Q Than Ashley Gjovik.

Okay. And then is it typical that you are not made aware of the outcome of the investigations?

A I don't recall the process. I believe it would be typical in some cases to be made aware of an outcome.

Q Yeah.

Actually, so let's say global security is investigating the employee and does find that they violated some policy and thinks that some action should be taken against the employee. Assumably, they're going to go to HR, probably employee relations to try to facilitate that discipline process and -- because it wouldn't necessarily be the person's supervisor probably in, like, a functional unit that's, like, leaking.

So would it be more typical that if they do want to take action, they'd engage you or your team to help facilitate the discipline process?

MS. RIECHERT: There's a lot of assumptions

Page 128

in there that are improper.

MS. GJOVIK: That's fine.

You're still really muffled. Can you get closer to your computer.

MS. RIECHERT: Yes. I'm not sure why that is. Maybe it's the audio -- could you repeat your question or rephrase it.

MS. GJOVIK: It was long, and I already forgot.

BY MS. GJOVIK:

Q Oh, if global security is investigating an employee and does think that they leaked and violated some policy, so it's the -- global security wanted to discipline an employee rather than, like, the employee's supervisors, would the process be, like, global security would engage employee relations to help facilitate the discipline or termination process?

A Yeah, I don't recall the exact process there. But I mean, global security has their own policies that they investigate.

Q Can they just decide to fire employees themselves?

A Yeah, I don't recall that process.

Q And if someone at Apple wants to terminate

Page 129

an employee's employment, saying they violated some policy, are they supposed to go through employee relations?

A I don't recall the process.

Q Okay. Assumably, they would have to involve HR to, like, end the employment status; correct?

A Correct. There's a level of HR involvement.

Q And are there policies or protocols for someone reviewing the requested reason to terminate the employee within HR employee relations when someone wants to fire an employee?

MS. RIECHERT: Objection. Lacks foundation.

BY MS. GJOVIK:

Q Okay.

A Yeah, I don't recall the process.

Q So in this case, because there were, like, senior ER and HR executives involved getting updates on this, if someone in HR is facilitating that termination, safe to assume they skipped you because your superiors were already involved, the ones you were emailing?

MS. RIECHERT: Objection. Lacks foundation.

MS. GJOVIK: Still has to answer.

THE WITNESS: Yeah, I don't recall what or how it was prompted for my level of engagement.

Page 130

BY MS. GJOVIK:

Q And you say you worked in employee relations. So, like, Deirdre O'Brien was, like, your boss, right, top boss; is that correct?

A That would be correct.

Q Frozen. Sorry.

A It's frozen.

Q It's frozen.

But you said that Deirdre O'Brien -- so under Tim Cook, Deirdre O'Brien would be the highest-level person that you reported up under?

A Yeah. I believe that would be the case.

Q Okay. Did you regularly provide updates on any other cases or activities that you were working on to Deirdre O'Brien, that you recall?

A No. I don't recall a specific case.

Q Other than Ashley Gjovik?

A That's correct.

Q Did you have any, like, updates you'd provide her? Status updates? Any meetings you'd have with her regularly, ongoing? Any regular communication with Deirdre O'Brien?

A No.

Q Do you recall any other communication you had had with Deirdre O'Brien in those three years you

Page 131

worked in that role?

A No. I don't recall any since.

Q Other than the noted emails about Ashley Gjovik?

A That's correct.

MS. GJOVIK: Well, that's cool. So when you had to meet Deirdre O'Brien, it was about me.

Okay. We're at 10:52. I thank you for your time. I know you don't work there anymore. I appreciate you answering the subpoena and answering all my questions. Again, it sounds like you just weren't provided a lot of information about this stuff. So I appreciate you answering what you could answer, and thank you again for your time.

MS. RIECHERT: So I'd like to reserve the right of the witness to read and correct the transcript once he receives a copy of it.

MS. GJOVIK: Within the rules allowed under federal and California laws. He can't just completely change responses. You can correct errors and stuff, of course, within allowances, yeah.

MS. RIECHERT: And I'd like an expedited and a rough, please.

MS. GJOVIK: And, like, I'm filing my summary judgment motion in, like, a week. So you're

Page 132

definitely not going to -- would you plan to have any corrections you're going to have before the deadline for me filing my motion or are you going to claim that I can't use this as evidence until you file whatever corrections?

MS. RIECHERT: You do what you think you should do. I can't -- I can't answer that question.

MS. GJOVIK: Okay. This is the first time you've said that you're, like, planning on correcting anything. Can you share if you already noticed things that you want to have corrected?

MS. RIECHERT: Not at all.

MS. GJOVIK: Okay. She's a lot of fun. Melinda keeps me on my toes.

Okay. Thank you, everyone.

(Deposition concluded at 10:53 a.m.)

**Page 133**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/18/2026

_____
Vesna Walter
RPR, CCRR, CSR No. 11989

**Page 134**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
        vs. Apple Inc.

Date of Deposition: 04/16/2026

Job No.: 10188334

I, ALEKS KAGRAMANOV, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2026, at _____.

_____
ALEKS KAGRAMANOV

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__,

by_____,   proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 135**

DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik
        vs. Apple Inc.

Name of Witness: Aleks Kagramanov

Date of Deposition: 04/16/2026

Job No.: 10188334

Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

**Page 136**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript is true and correct.

_____
ALEKS KAGRAMANOV

# EXHIBIT 36

35.     Attached as Exhibit 36 is a true and correct copy of the cited pages of the certified deposition transcript of Dan West, taken April 13, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 15, 24–26, 42–43, 49–51, 52, 58, 81, 85–87, 93, 94, 95, 96, 101, 105, 106, 107–109, 113, and any additional pages cited in the Motion or in Section V above.

Deposition of

# Dan West

April 13, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
               Plaintiff,            )
                                     )
          vs.                        )  Case No.
                                     )  23-cv-04597-EMC
APPLE INC.,                          )
                                     )
               Defendants.           )
_____     )

REMOTE DEPOSITION OF

DAN WEST

VIDEO-RECORDED VIA ZOOM

Monday, April 13, 2026

Stenographically Reported By:
Vesna Walter, CSR, RPR, CCRR
CSR No. 11989
Job No. 10188332

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
               Plaintiff,            )
                                     )
          vs.                        )  Case No.
                                     )  23-cv-04597-EMC
APPLE INC.,                          )
                                     )
               Defendants.           )
_____     )

Deposition of DAN WEST, taken on behalf of Plaintiff, with all parties appearing remotely, beginning at 9:08 a.m. and ending at 11:56 a.m. Pacific time, on Monday, April 13, 2026, before VESNA WALTER, Certified Shorthand Reporter No. 11989.

**Page 3**

APPEARANCES (All parties appearing remotely)

For the Plaintiff:

AM GJOVIK CONSULTING, LLC
By:  ASHLEY M. GJOVIK
In Pro Per
2108 N Street
Suite 4553
Sacramento, California  95816
(415) 964-6272

For the Defendants:

ORRICK, HERRINGTON & SUTCLIFFE LLP
By:  MELINDA S. RIECHERT
Attorney at Law
1000 Marsh Road
Menlo Park, California  94025
(650) 614-7423
Mriechert@orrick.com

(Video-recorded via Zoom by Ms. Gjovik)

**Page 4**

I N D E X

WITNESS

DAN WEST

Examination by:                                    Page

    MS. GJOVIK                                        5

E X H I B I T S

(None)

Dan West

---

Page 5

Monday, April 13, 2026

9:08 a.m. - 11:56 a.m.

THE REPORTER: Good morning. My name is Vesna Walter. I am a California Certified Shorthand Reporter and the deposition officer for today's deposition. My CSR license number is 11989.

DAN WEST, having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. GJOVIK:

Q   Good morning. My name is Ashley Gjovik. I'm the plaintiff in this matter. I'm not an attorney. I don't have a law degree.

I'm going to be asking you some questions today, and before we get started, I wanted to go over some foundational matters so we're on the same page.

You were just sworn in by a court reporter. Do you understand now that you're now under oath the same as if you were testifying in a courtroom before a judge and jury?

A   Yes.

Q   Thank you.

And you understand that means you're

---

Page 6

required to give truthful answers to my questions today; yes or no?

A   Yes.

Q   You understand that even though you're sitting in a conference room, this feels informal, that giving false testimony under oath can subject you to penalties of perjury?

A   Yes.

Q   Now, you see the court reporter here. She's taking down everything you say today -- every question I ask and every answer you give -- and it's going to be made into a written transcript. Because she can only take down words, I need you to give verbal answers. So if your answer is yes, please say yes rather than nodding your head.

Can you do that for me.

A   Yes.

Q   Thank you.

Along the same lines, please try to let me finish my question before you start your answer, and I'll do my best to let you finish your answer before I start my next question. That way we don't talk over each other and the court reporter can get a clean record.

Is that fair?

---

Page 7

A   Okay.

Q   If at any point you don't understand a question I've asked, I want you to tell me, and I'll rephrase it.

Will you do that?

A   Yes.

Q   Thank you.

Is it fair to say that if you answer a question, I'm entitled to assume that you understood my question?

A   Yes.

Q   Thank you.

If you need to take a break at any point, use the restroom or get water or stretch, that's fine. Just let me know. The only thing I ask is that if there's a question pending, that you please answer it before we go off the record.

Is that agreeable?

A   Yes.

Q   Is there any reason you might not be able to give your best today? Are you feeling okay? Ill? Distracted?

A   I'm fine.

Q   Are you currently under the influence of any medication, drug, or alcohol that might affect your

---

Page 8

ability to understand my questions or give truthful answers?

A   No. No, I am not.

Q   Thank you.

Did you meet with anyone to prepare for today's deposition, without violating attorney-client privilege?

A   Just Apple legal.

Q   Did you review any documents in preparation for today's deposition?

A   Only with Apple legal.

Q   Around how many documents did you review?

A   I don't -- it's a couple. It wasn't a large number.

Q   Without telling me what you and your attorney discussed, before I -- I understand that's privileged. Did your attorney, Apple legal, any lawyer, anyone tell you what your answers should be for any of the answers to my questions today?

MS. RIECHERT: Objection. Attorney-client privilege. Instruct him not to answer what he was told by Apple legal in preparing for his deposition.

MS. GJOVIK: If they told him what to answer, it would be unlawful, and there's no privilege for unlawful conduct by attorneys.

---

Dan West

Page 9

MS. RIECHERT:  Same objection.  Instruct him not to answer.

MS. GJOVIK:  Okay.  We'll challenge that later.

BY MS. GJOVIK:

Q   You understand that your answers today need to be based on your own personal knowledge and recollection, and if you're guessing or speculating, I need you to tell me that?

A   Yep.

Q   And if at any point today you realize that an answer you gave earlier was incorrect or incomplete, will you please let me know so we can correct the record?

A   Yes.

Q   Thank you.

Okay.  Let's get started.

What is your job title?

A   Senior director, hardware engineering.

Q   How long have you had that role?

A   I've been a senior director for a while.  I don't know exactly.

Q   What is the name of your organization?

A   I have a new organization now.  So it's -- we're working on the name, TBD.

Page 10

Q   What is the scope of your organization?

A   We work on hardware tools internally within Apple and also human factors studies.

Q   What is that?

A   Things, like, if -- how your watch fits on your arm, how AirPods fit in your ear, and looking at that across Apple's user population.

MS. RIECHERT:  Do not provide any confidential information without telling us that it's confidential, in which case we'll handle it.

BY MS. GJOVIK:

Q   Actually, Mr. West, would you -- just do not share any confidential information if you can help it.  And if you think you need to share something that you think would be confidential, maybe we flag that.  But if you can avoid it, we're having some issues with the protective order, Melinda and I, which she's designating a lot of stuff confidential that I don't agree with.  So I prefer to not have to invoke it.  So if you think you can just avoid talking about confidential information, I would appreciate that.  If you think you need to talk about it to answer the question completely and accurately, then, of course, please do that.

A   Okay.

Page 11

Q   How long have you been in the current role, the new organization?

A   One week.

Q   That's not a long time.

And then what was your organization before that?

A   Before that, I was -- I led a team called hardware engineering operations.

Q   What was that again?

A   Hardware engineering operations.

Q   What did that team do?

A   This was responsible for the internal operations of hardware engineering, things like space planning, head count planning.  There was some tools development for -- to help with that -- those functions.  And then there's I&D initiatives as well as internal communications.

Q   Okay.  Do you know roughly when you took on that role?

A   Three to four years ago.

Q   That would have been 2022?

A   '22, '23, yeah, right around there.

Q   What was your role before that one?

A   I led a group called product systems quality.

Page 12

Q   When did you start working on that group?

A   20- -- 2017 would be my guess, maybe a little earlier.

Q   And what was the organization before that one?

A   Everything before that was different versions of that.  I guess MSQ was what I was leading before that.

Q   So at some point up to 2017?

A   Yeah.  Yeah, a couple years up until 2017.  Essentially, the organization expanded to become MSQ.

Q   As of -- sorry.  Go ahead.

A   PSQ; not MSQ.

Q   Okay.  Thank you.

As of 2021, is it correct that your role was that product systems quality team?

A   Yes.

Q   And what was your title then?

A   I believe senior director.

Q   Can you describe that organization to me, the scope generally, ideally not sharing any confidential information.

A   Yeah.  I want to be careful.  As you know, the way we validate our products -- I'll talk at a very high level here.  The way we validate our

**Dan West**

Page 13

products is confidential.

So this team was responsible for that intersection between hardware and software, and as hardware capabilities came online, we were responsible for working with our software teams, teams in other divisions as well to ensure that the user experience was as good as it could be at launch. And we did that across all product lines.

Q   Who were your direct reports?

A   Back then, David Powers, John Basanese, Yulong Tan, Megan Gates. I may have the timeline off a little bit there.

Q   And now, this is going be probably kind of awkward. I go back and forth about wanting to talk about myself in third person during these exchanges because it's strange for me to do it as my own attorney, but I'm just going to talk to you directly.

So how did we first meet at Apple, to the best of your recollection? What year and what was the context?

A   I don't know the year. The context was EFFA format program.

Q   What's that?

A   It might have been a phone program, actually.

Page 14

Early field failure analysis meeting. I don't remember what program.

Q   Some product for early field failure analysis. What is that?

A   When we launch a product at Apple, we look at all the field data that we can possibly get our hands on in the early days of the launch just to check to see if there are software issues, hardware issues, any kind of issues with the product.

Q   Do you remember what my role was?

A   You were a software EPM.

Q   Do you remember why I left software engineering?

MS. RIECHERT:  Objection. Lacks foundation.

THE WITNESS:  Yeah, I don't remember all the details is what I would say, but you were unhappy in the role.

BY MS. GJOVIK:

Q   Do you remember me interviewing for your organization?

A   Yes.

Q   Why did -- and your team offered me employment in your organization under David Powers; correct?

A   Correct.

Page 15

Q   Why did your organization want to hire me?

A   You performed well in the interview. We had seen your work through EFFA as well and had gotten good results. So it was those two things.

Q   Had there ever been a role like mine prior in your organization?

A   No.

Q   Why did you create this role?

A   It was something Dave and I had been discussing a lot that we needed help organizing all of the work that we were doing with software.

Q   Do you still have that role?

A   No.

Q   When did that role become canceled?

A   Well, when we hired you -- I don't know the year. I don't know what year.

Q   Did you ever hire a backfill for my role after I was terminated?

A   No, not into that role.

Q   So it would be safe to assume that the role was canceled after I was terminated?

A   Correct.

Q   Would you say that we got along?

A   Yes.

Q   Did we spend personal time together? Like,

Page 16

for instance, did you ever come to my house, outside?

A   Once, yes.

Q   Did I ever meet your family?

A   Yes, at Apple parties.

Q   Do you remember me spending time with your family one-on-one, outside Apple parties?

A   My daughter gave you a ride to the airport once.

Q   It was for a COVID test, but yes, she did --

A   Oh, COVID.

Q   Do you remember what happened in the -- with medical issues in the year 2020?

A   No. I know something happened. I just don't -- I don't remember the year. So...

Q   Do you remember me being -- go ahead. Sorry.

A   Something with your apartment.

Q   Do you remember me being on extended medical leave in 2020?

A   Yes.

Q   Do you remember what I complained about generally when I thought I figured out why I got sick?

A   Toxicity in your apartment is what I recall.

Q   Do you remember me seeing a lot of medical

Dan West

Ashley Gjovik vs.
Apple Inc.

Page 17

doctors and specialists while I was trying to figure out what was wrong with me?

A   Yes.

Q   Do you remember sending me emails and texts while I was out on medical leave, checking in on me?

A   Yes.

Q   Did you learn what I ended up figuring out was probably the source of my injuries in 2023?

MS. RIECHERT:  2023?

MS. GJOVIK:  Yeah.

MS. RIECHERT:  Oh.

THE WITNESS:  I don't -- so there's a lot of discussions there.  So I don't remember exactly.

MS. RIECHERT:  She said 2023.

THE WITNESS:  Yeah.  So this -- my recollection there is this is about toxicity in your apartment, and that's why you wanted to move out of the apartment.

Do I have the timeline -- I may have the timeline messed up.

BY MS. GJOVIK:

Q   Do you remember me ever figuring out what the source of that toxicity was?

A   Oh, yes.

Q   What?

Page 18

A   This was chemicals in the ground from previous companies.

Q   You do remember what I thought it was -- that might be what it was?

A   Can you repeat.  Sorry.  Just --

Q   What year are you talking about when I -- that understanding?

A   I don't know the year.  I don't recall.

Q   Have you followed my case and complaints against Apple after I was fired?

A   No.

Q   Are you aware that Apple is operating a semiconductor manufacturing and chip fabrication plant across the street from the apartments where I lived in 2020?

A   No.

Q   Are you aware of the Apple operations at the building at 3250 Scott Boulevard?

A   Do you know the Apple name of the building?  I don't know the address.

Q   Scott 1.

A   No.

Q   Are you aware that they faced formal EPA -- Apple has faced formal EPA enforcement action over unlawful hazardous waste management activities

Page 19

including unpermitted and potentially dangerous venting of toxic chemicals into the air from that facility?

A   I am not.

Q   Are you aware even the EPA has stated that it posed a risk to the health and safety of the community around that facility?

A   I am not.

Q   And that I have formally alleged and sued Apple that I believed Apple was responsible for making me so sick in 2020 due to their illegal venting of toxic substances into the environment around that facility?

A   Sorry.  Can you restate that, please.

Q   Are you aware I've made formal legal allegations against Apple, alleging that they are the party responsible for the injuries I suffered in 2020 due to their unlawful hazardous waste disposal activities at that facility, which was across the street from my apartment?

A   I knew you had concerns.  I didn't know it stemmed to that point, no.  So the answer is no.

Q   I sued them for toxic torts for nearly killing me, I alleged, and I found proof of arsine gas exposure in my bedroom one night when I had

Page 20

symptoms of heart failure.  And Apple's response was arguing the statute of limitation, that I should have figured out.  It was probably Apple prior, and I waited too long.  That's just a note.  That's not a question.

I'd like to talk about the employee relations investigations into my concerns in 2021.  Do you know an employee relations investigator named Jenna Waibel?

A   Yes.

Q   Do you remember Jenna Waibel investigating my concerns in 2021?

A   Yes.

Q   What do you recall about that investigation and any outcome?

MS. RIECHERT:  First of all, object.  Attorney-client privilege as to anything he knows about the investigation or the outcome of the investigation.

MS. GJOVIK:  That's very broad, Melinda.  Are you sure you want to do the full scope?

MS. RIECHERT:  Yes.  Any work that was done by Jenna Waibel, any interviews she conducted, the results that she concluded are all protected by the attorney-client privilege because the investigation

Dan West

Page 21

was privileged.

MS. GJOVIK:  Okay.  We'll confer about that later.

BY MS. GJOVIK:

Q   Do you know an employee relations investigator named Ekelemchi Okpo?

A   Yes.

Q   Do you recall anything about Mr. Okpo's investigation into my concerns in 2021?

MS. RIECHERT:  Again, anything that Mr. Okpo did to investigate your concerns was conducted under the direction of counsel and is therefore attorney-client privileged.

BY MS. GJOVIK:

Q   Are you aware that I made complaints against Apple and asked for Apple to investigate my complaints regarding health and safety and environmental issues in 2021?

A   Yes.

Q   Do you remember me raising those types of concerns to you directly in 2021?

A   Can you be more specific.  What type of --

Q   Yeah.

A   Yeah.

Q   Let's start with EHS concerns at the

Page 22

building where I worked.

A   Yes.

Q   What do you remember about that?

A   You were concerned about vapor intrusion.

Q   What was that?

A   As you described it to me at the time, this is gas coming in from under the building.

Q   How does that usually happen, to your understanding?

A   No idea.

Q   Do you remember texting me about this with your assertion of the specific safety protocols that were supposed to be in place?

A   No.  No, I don't.

Q   Do you remember anything about cracks in the floor?

A   Yes, I do.

Q   What do you remember about that?

A   That you were very concerned about the cracks.

Q   Why?

MS. RIECHERT:  Objection.  Lacks foundation as to why you were concerned about the cracks.

BY MS. GJOVIK:

Q   Do you remember me expressing any further

Page 23

detail about why I would be concerned about cracks in the floor?

A   Yes.  You were worried that the cracks were the entryway for the gases.

Q   Do you have any background information about why cracks might be a risk at a toxic waste site with solvent contamination under the floor?

A   Can you restate the question, please.

Q   I'm going to table that one.  We're going to go deeper into that building in a second.  So I'm actually going to skip that one.  Withdraw.

Okay.  Do you have any -- she's going to object to that one.  Melinda objects to everything.

Were there any changes in the organization policies, practices as an outcome of the investigations by employee relations into my complaints that you're aware of?

A   No.  But I don't fully understand your question.  So...

Q   Let me rephrase.

Did employee relations suggest any corrective actions or changes to you for the organization as an outcome of the investigations into my complaints?

MS. RIECHERT:  You said changes to the

Page 24

organization?

MS. GJOVIK:  To practices, policies, whatever employee relations suggests.

MS. RIECHERT:  I'll object that it's compound.  So changes to the organization, the policies, or the practice as a result of the investigation --

MS. GJOVIK:  Let me rephrase.

BY MS. GJOVIK:

Q   Did employee relations suggest any type of corrective action or changes were needed as an outcome of the investigation into my complaints?

A   Yes.

Q   Can you share any of those details of what they said.

A   The biggest one that I recall was around our relationship and me being very clear about separating friendship from work.

Q   Can you tell me more about that, please.

A   That's really the extent of it, is we got too friendly, and that's not appropriate.

Q   What does too friendly mean?

A   The text messages between each other, that sort of thing.

Q   Any specific examples you remember that they

**Dan West**

Page 25

noted were, you said, not appropriate?

A  Yeah.  For example, your meal at Chez TJ.

(Reporter clarification.)

BY MS. GJOVIK:

Q  Can you spell that for her, please.

A  C-h-e-z T-J.

Q  What is Chez TJ?

A  It's a restaurant.

Q  Do you go there often?

A  Not anymore.

Q  You used to go there often?

A  Yes.

Q  Are you friends with the owners or chefs?

A  I used to be, yes.

Q  Why did you stop going?

A  I thought the food quality went down.

Q  And why was that relevant to me?

A  Because you went there for a meal.

Q  Why is that inappropriate?

A  You -- you texted me while you were there, and that's why.

Q  It was inappropriate that I thought it was okay to text you when I was at a restaurant to tell you I was at a restaurant?

A  It was -- it was that I -- between the chef

Page 26

and I, we split the dinner for you.

Q  How much did you pay for my dinner?  Do you remember?

A  No recollection.

Q  Do you think it was over $100?

A  Somewhere between 100 and 150 would be my guess.

Q  And employee relations said it was inappropriate to have text messages or to pay for employees' dinners, or what was the issue?

A  To pay for the dinner.

Q  But it was okay to text?

A  Yeah.

Q  Why was it inappropriate to pay for a dinner?

A  It's just -- I was your skip-level leader at the time, and that's just not a very common occurrence.

Q  Why did you pay for my dinner?

A  It's a while ago.  I think part of it was I knew how expensive that meal was and I knew that you were stretching to pay for it, as you told me.  And I wanted you to have a great experience there because it was one of my family favorite restaurants.  So we thought we would splurge for it.

Page 27

Q  It was really good.  I remember that.  It was a very good dinner.  Thank you.

So yeah, I had shared some stuff with you about my background.  Do you remember about me telling you about my financial situation and kind of my work experience?  Anything that you can recollect?

MS. RIECHERT:  Objection.  Compound, vague.

BY MS. GJOVIK:

Q  You said I shared information with you about my financial background.  Do you remember any details of what I shared with you?

A  I don't remember the details.  I just remember that -- the one detail I remember is you talking about the cost of your apartment and how tough that was.

Q  To your recollection, did I have anyone else financially supporting me at that time?

A  Not that I know of.

Q  To your recollection, had I expressed concern that I couldn't afford a dinner at a place like that because I didn't have financial resources?

A  No.  And I didn't think that you would go there if you couldn't afford it, but I knew it was a stretch.

Q  Do you remember stating that once I got a

Page 28

promotion, when I was promoted in 2018, that then I could have now afforded to go there because of the promotion?

A  No.

Q  I'm sorry.  I can't remember if it was 2017 or 2018.

Okay.  Is there anything else employee relations told you that needed to change?

A  Not that I recall.

Q  Anything else employee relations told you that was inappropriate?

A  Not that I recall.

Q  Have you ever bought any other employees a dinner like that?

A  Not dinners but certainly bottles of wine that were very expensive, things like this, yeah.

Q  Why do you do that?

A  I think it's a nice gesture.  Like, people like to feel cared for, and I think people really appreciate it.

Q  Did you follow employee relations' advice?

A  Yes.

Q  I'm going to switch a little bit.

Do you have any insight from Apple about the reason my employment was terminated?

Page 29

MS. RIECHERT: Objection to the extent he's learned anything from counsel on the grounds of attorney-client privilege, and instruct him not to answer. But if he knows anything about it other than through counsel, he's free to answer.

BY MS. GJOVIK:

Q Please go ahead.

A No.

Q You have no idea why I was fired?

A I learned through counsel.

Q Since you can't share any information about why I was fired, did you read any articles online about why I was fired?

A It's possible. I couldn't quote which article, though.

Q Did you read any newspaper articles or magazine articles about why I was fired?

A No.

Q Did you watch any TV show coverage, news coverage about why I was fired?

A No.

Q Are you aware that my termination was covered in websites, newspapers, magazines, TV shows, news coverage?

MS. RIECHERT: Instruct him not to answer

Page 30

with respect to anything he learned from counsel, but otherwise, he's free to answer.

THE WITNESS: What I -- what I recall is there's a "Verge" article, but I don't remember if "The Verge" covered you being terminated or it was just talking about what your complaints were. That's what I don't remember.

BY MS. GJOVIK:

Q There were a couple of them prior to me being terminated too. Did you ever receive any emails or comments from employees in your organization -- not legal, your employees finding articles or coverage or social media posts about me being on administrative leave or being terminated?

A There were some, yeah. Some people would send stuff to me.

Q Can you describe some of the stuff that you recollect that they sent to you.

A Typically links, that sort of thing.

Q Do you remember the comments they made when they sent it to you?

A No. Nine times out of ten, there were no comments. It was just a link.

Q Just a link with no -- any additional information?

Page 31

A Correct.

Q Did anyone contact you with concerns about me being on administrative leave or my employment being terminated?

A No.

Q Did anyone contact you with questions or requests for clarification about me being on administrative leave or my employment being terminated?

A Not that I recall.

Q How do you feel about Apple terminating my employment?

A I think it was appropriate.

Q Can you tell me more.

A After learning the reasons through -- so I don't know how much I can say here, but after learning the reasons, I agreed with the reasons.

Q Can you share any other reasons.

MS. RIECHERT: Again, anything you learned from counsel, I instruct you not to answer on the grounds of attorney-client privilege.

BY MS. GJOVIK:

Q Can you share any details of why you feel whatever those secret reasons are are appropriate?

A I'll answer, a lot of this resolves

Page 32

around -- no, I cannot. I can't answer more.

Q You can't provide any further clarification on why you think the reason I was terminated was appropriate?

MS. RIECHERT: Well, obviously, he can't if -- if what he's learned is from counsel. That's why --

THE WITNESS: That's --

MS. RIECHERT: -- he's having trouble.

THE WITNESS: Exactly.

MS. GJOVIK: I think he can explain why something would be appropriate without sharing the privileged detail, which needs to be specific and concrete.

MS. RIECHERT: If you want to ask him -- tell him what the reasons were and ask him if that was appropriate, that would be fine. But to ask him if what counsel told him was justified or appropriate, I think he can't answer that because he has to rely on what counsel told him.

MS. GJOVIK: I would struggle to do that because Apple still has not provided a detailed explanation of why it terminated my employment to me. So I'm still looking for answers. And the judge actually said I was supposed to use discovery

Page 33

mechanisms just like this to actually find out the details of why I was fired.

MS. RIECHERT: Right, but you're not taking the deposition of the person who made the decision. So you should get it all from that.

MS. GJOVIK: Is he going to answer or are you going to claim privilege?

MS. RIECHERT: So I'm instructing him not to answer if he cannot answer that question other than based on information he received from counsel.

BY MS. GJOVIK:

Q  Mr. West, are you aware that Apple still has not provided me a detailed explanation of why my employment was terminated?

A  I just heard this conversation just now; so that's all -- that's all I know.

Q  Mr. West, are you aware I was given no warnings prior to the termination?

A  No.  I wasn't part of the termination; so I'm unaware.

Q  Were you aware that one of the bases for the termination was my insistence on a documented written record of communications because I filed LRB and EEOC complaints against Apple and wanted a record, and they said, because I wouldn't get on the phone, that

Page 34

was the reason I was fired?

MS. RIECHERT: Again, don't repeat anything that you know from counsel.

THE WITNESS: Yeah.  No, I do not know.

BY MS. GJOVIK:

Q  Mr. West, are you aware of any other employees who were fired specifically for asking for a documented written record for a conversation rather than a phone call?

A  No.  I'm not aware of that.

Q  Mr. West, how often are -- to your knowledge that you can share, how often are employees terminated by Apple without any warning?

A  I can't speak for the company.  I don't know.

Q  So I think we all know that Apple's general reason for firing me has something to do with leaking confidential information.  Can you explain to me any firsthand experiences you have that are not privileged with complaints about someone leaking and how that's generally handled, like, warnings or requested corrective actions versus immediate termination.

A  There's a lot there.

I can -- I can reflect on one employee from

Page 35

my organization who was terminated for leaking as well, and it was -- in their situation, there was no warning.  They leaked something, they violated our policy, and they were terminated.

Q  Mr. West, can you explain to me what your understanding is of the term "Apple confidential."

A  Apple confidential refers to -- it's a pretty large and encompassing term.  It refers to any products that are under development, any future products that are under consideration, how we do the validation, any data used in the creation of those products as well.  And there's probably even more that I'm not remembering off the top of my head.

Q  Mr. West, do you think that if Apple formally participates in a news article or interview discussing product-related information, that Apple has decided that is not leaking, that is not confidential information if it's sharing it publicly?

MS. RIECHERT: Objection.  Misstates facts not in evidence -- or states facts not in evidence.

BY MS. GJOVIK:

Q  Mr. West, are you aware -- let me withdraw that one and rephrase.

Mr. West, are you aware of examples where Apple will formally engage in press releases or

Page 36

interviews with the press regarding product information and share details of things like the validation process and make it public themselves?

MS. RIECHERT: Same.  Assumes facts not in evidence.

But if you're aware of it, you can answer.

THE WITNESS: Yeah.  Apple occasionally opens the doors to show, this is the rigor that goes into developing our products.

BY MS. GJOVIK:

Q  Do you have any examples you can think of?

A  At one point, we talk through the reliability tests that we do -- I think it was on a phone, just to demonstrate how durable the phones are.

Q  Mr. West, how do you distinguish between what would be Apple confidential and what would not be, with validation testing, if Apple has decided some of that information is fine to share with the press but maybe other is not?

A  My stance is everything is confidential until someone more senior than me decides to make a change.

Q  Can you explain what "everything" means.

A  Everything I'm working on.  So that is the

Dan West

Page 37

test process, the testing emails.

I'm referring to the time that we worked together. So the testing email -- sorry -- the testing process, the test procedures, the test results, who's involved in them, what teams are involved. All of it is confidential. And then if there's a decision made by another group to market that because they believe it will help Apple, then fine. We do that. But that's not my decision.

So it's confidential until people more senior than me make that decision.

Q  Mr. West, do you remember something that you had referred to as a family day at some of the PSQ offices at least in around 2021?

A  Yep.

Q  And what was that?

A  We invited employees to bring significant others and family members into the office just to see the new building, to see where people worked. It was -- it was very -- it was a very big event for the organization.

Q  Mr. West, do you remember asking me to help ensure that the building at 825 Stewart Drive was prepared for that day, walking around, making sure it's tidy and prepared for people to see it?

Page 38

A  Yes.

Q  Mr. West, do you remember us getting into a bit of a dispute about me having concerns that there were product code names visible throughout the laboratory that the families would see and your insistence that Apple code names were not secret?

A  I don't remember that.

Q  Do you remember me escalating to MPS over that and one other issue, asking for intervention because I thought that you might be violating confidentiality policies?

A  Code names are definitely confidential. So if I said that, I was mistaken.

Q  Let me clarify. Your position was, if it was a shipped product or otherwise not a new unreleased product, that it was fine to show family members and was not Apple confidential.

A  I stand by what I just said. Like, if I said that, it was mistaken.

Q  Okay. Could your mistaken position currently be the outcome of an MPS escalation?

A  I don't follow.

Q  Do you remember MPS ever reaching out to you about concerns about keeping confidential information confidential?

Page 39

A  I don't. MPS and I have a pretty good relationship.

Q  Mr. West, do you remember unilaterally deciding to disclose your management team on the entire iPad roadmap around 2019?

MS. RIECHERT:  Can you repeat that question. I didn't catch it.

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

Q  Mr. West, do you remember your decision unilaterally to disclose your entire management team on the full iPad development roadmap around 2018 or 2019?

A  I don't think I would have given -- so short answer is no. Yeah, you can ask more questions about that.

Q  Yeah.

You had said they didn't have to go through a disclosure process and get disclosures, and you showed the roadmap and extended staff meeting to everyone. And you and I also got in a dispute about that because I had concerns that you were not following mandatory disclosure processes, and that was one of the things I escalated to MPS, along with the code name matter.

Page 40

Does that help your recollection at all?

A  It does not. Now, the MPS policy is about need to know, and if people need to know, then they get disclosed. The piece that I think is important to keep in mind here is MPS also has a policy that if something is going to happen in passing, we don't need to disclose. And there's a lot of nuance there. So I think -- I think the assumption -- your question needs more context to be -- to be useful, I think.

Q  Mr. West, do you ever remember giving me any kind of feedback or warning about me sharing information you thought was confidential and I should not be sharing?

A  Not that I recall.

Q  Mr. West, do you remember complaints from members of max systems quality or other considerations under you that I was being too restrictive regarding confidential information and disclosures?

A  Not that I recall.

Q  Specific to software product tent poles and new features, perhaps?

A  Not that I recall.

Q  Okay. Mr. West, around August 2021, shortly after I was put on administrative leave -- that was

Page 41

August 4th -- I heard from members of your -- employees in your organization that there were staff meetings -- every staff meeting in that week right after I was put on administrative leave had an agenda topic about me. Do you recall anything about that?

A I do, and I still don't know where that came from.

Q What do you mean?

A I don't believe we ever had an agenda item about you.

Q I'm sorry. What do you mean you don't know where that came from?

A What you just said, that assertion.

Q I'm sorry. I said do you remember, and you said yes.

A Maybe let's restart it then.

Q Okay.

MS. RIECHERT: Just don't say what you've learned from counsel.

THE WITNESS: Yeah, start over. Like, what -- restate your question, please.

BY MS. GJOVIK:

Q Yeah. Mr. West, I was placed on administrative leave on August 4th, 2021. Members of your organization had contacted me, notifying me that

Page 42

it seemed like every staff meeting that week after I was put on leave had an agenda item specifically about me with kind of a script to talk to HR if anyone had any concerns.

Do you know anything about that?

A I had heard that this had come up. I don't know if -- I don't know if that was posted to your Twitter feed or something like that, but that's where I found out about it.

And what I said earlier, I don't understand where or how that information came out because I don't ever recall having a meeting agenda specifically about you.

Q Let me clarify. This was, like, first-level, second-level managers. It wasn't a complaint about a meeting you held. These were, like, employees and workers who were mentioning this.

A Then for sure I have no idea about it.

Q Did you ever hear any complaints from employees about that agenda item, that they were concerned that if I was complaining about Apple HR retaliating against workers and they were being told to raise complaints about that to HR, that that seemed like it wasn't going to be good for them?

A There's a lot in there. Can you break that

Page 43

up.

Q Do you recall any complaints from workers about the messaging about me being on administrative leave and the complaints I made, that it was directing them to Apple HR, when I had alleged Apple HR was part of the problem I was complaining about?

A I don't recall that.

Q So if any workers had raised those complaints to your directs, then your directs just didn't tell you?

A Or I legitimately don't remember them telling me.

Q Okay. Mr. West, at that time also, there was repeated contexts to me from your employees with concerns that that agenda item that seemed to have this script that was shared amongst all the managers and statements you made directly in August 2021 mentioned that you would be talking about the Ashley issue at an October all-hands in 2021. Do you recall anything about that?

A No. No. I don't ever remember saying anything about -- you used air quotes there, but, air quotes, Ashley issue.

Q Okay. Putting aside the Ashley issue, do you recall in around August 2021 planning an October

Page 44

all-hands and planning to discuss something related to me?

A No. No. I couldn't even tell you -- like, my memory isn't great. So I couldn't even tell you what we talked about in that October all-hands.

Q Mr. West, do you remember, one or two days after I was put on administrative leave, your administrative assistant scheduling ad hoc Women of PSQ meetings with everyone in those groups to talk with you, just chat with Dan?

A No. But those two things -- like, I was pretty active with Women of PSQ. Those two things could also be true in that we were planning to schedule meetings and then you were put on administrative leave. They don't necessarily relate to each other.

Q Mr. West, are you aware that some of the employees who attended those meetings notified me of those meetings and things that were said by you during at least one of those meetings about me?

A I'm not aware of that, but okay.

Q One of the things that I was told was you complained of being falsely accused. Do you have any recollection of what you would be talking about?

A No. And there's no way I would have talked

Dan West

Page 45

about an ER investigation at -- in a forum like that; even a forum that I tended to be a little bit more vulnerable in.

Q   Okay.  So these employees, if I have records of them saying this stuff, were lying?

A   I can only speak to what I recall.

Q   Mr. West, who was your manager in 2021?

A   I believe it was Yannick still.  Yeah, Yannick.

Q   Who was that?

A   He was my manager.

Q   Was his role --

A   Sorry.  Say that again.

Q   Sorry.  What was his role?

A   He ran all of product integrity.

Q   Sorry.  My dog is barking here at another dog.

What is product integrity?

A   Product integrity is a division of hardware engineering.

Q   What do you know about Mr. Bertolus's role in employee investigations?

A   I mean, I would assume it's the same as all the rest of senior leaders, but I don't know specifically.

Page 46

Q   Senior leaders, it sounds like there's kind of a typical role.  Can you describe what that role is you're referencing.

A   Yeah.  Usually the senior leader is left out of it entirely unless their feedback is needed for some reason.

Q   Can you tell me more, please.

A   I think -- no.  I think that -- that sort of covers it.  Like, it's -- all of these investigations are treated as employee confidential.  So we don't want to expose more people to the investigation than necessary.  That includes the senior leaders.

Q   So who -- when there's, like, the final results, the final report from an investigation, assuming there is one, who would that normally go to?  Do you know?

MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

Q   Mr. West -- sorry.  I'll withdraw.

Mr. West, have you ever seen or heard a final report from an employee relations investigation that was shared with you and/or other leaders?

A   No.  In my role, what I've seen is, if there are findings, there's a discussion around lessons learned.  That's typically what it is.  There's no

Page 47

formal report.

Q   About what?  What did you say?

A   Lessons learned, like, hey, how can we do better in the future.

Q   Okay.  And would it be unusual for any kind of formal report to go to someone at Mr. Bertolus's or higher level?

MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

Q   Mr. West, are you aware that employee relations testified in a deposition last week that they create formal reports for all their investigations and that a formal report was formally shared with Mr. Bertolus for my case?

MS. RIECHERT:  Objection.  Attorney-client privilege if he learned it from counsel.

MS. GJOVIK:  I just told him it happened.

THE WITNESS:  I just learned it from Ashley, but I've never seen that before.

BY MS. GJOVIK:

Q   Do you have any idea why he'd say that?

A   Sorry.  I'm not following the question.

Q   So in your experience at Apple, that would be unusual then, based on your prior testimony?

MS. RIECHERT:  Objection.  Vague.

Page 48

BY MS. GJOVIK:

Q   Mr. West, do you have any other examples that you're aware of with information you can share of a formal report being written from an investigation into employee concerns and it being shared with Mr. Bertolus or another VP?

A   No.  But that's highly confidential data.  So it's possible it's happened and I just never got --

Q   Mr. West, are you and Mr. Bertolus friends?

A   Yes.

Q   Do you spend time together outside of work?

A   Yes.

Q   How much time do you spend together outside work?

A   Well, he's retired.  He's long retired.  So now we -- we spend time together.  Like, we'll have dinners.  We'll -- our families will get together from time to time, that sort of thing.

Q   That's nice.

What about in 2021?

A   We were friends but far less active outside of work.

Q   Are you aware if Mr. Bertolus also enjoyed dinners at Chez TJ?

Page 49

A   Yep.

Q   Are you aware if Mr. Bertolus was friends with the chef at Chez TJ?

A   Yes.

Q   Did you also send personal texts to Mr. Bertolus like a friend?

A   Yes.

Q   What kind of things would you and Mr. Bertolus text about around 2021?

A   I mean, most of it was work.  Every once in a while, it was some personal things.

Q   What kind of personal things?

A   Stuff with the kids, that sort of thing.

Q   Did Mr. Bertolus ever share anything with you about the investigation into my concerns or the investigation into me?

A   No.

Q   Did you ever ask Mr. Bertolus about either of those things?

A   No.

Q   How long have you been friends with Mr. Bertolus?

A   A long time, more than a decade.

Q   Are you aware that in 2021, Mr. Powers never provided me a midyear performance review?

Page 50

A   No, I wasn't.

Q   Is it typical for your managers to sometimes skip and not send a midyear performance review if you had asked them to?

A   We strive for 100 percent, meaning every employee gets one.  Every year, there's reasons for certain employees not to get one:  Out on leave, too short of tenure on the job, those types of things.

Q   Can you think of any reason that might apply to my situation if I was not on leave and I had been there for years?

A   I'd need more context.  I don't know.

Q   I don't know either.

Do you have any insight into what my annual performance review was going to contain if I had not been fired by Apple?

A   No.  Dave and I hadn't discussed that at that point.

Q   And you previously testified that there was no backfill for my role.  Was there a job posting ever posted to backfill my role?

A   To clarify, the way we handle head count is you get one head count.  So your specific position was not filled.  We repurposed the head count to do another function.  I don't remember what that other

Page 51

function was.  An engineering task is my guess.

Q   It's my recollection that the head count planning was occurring in the late spring and summer of 2021.  Do you recall when that -- usually like a spreadsheet or document with each of the roles and whether they're open or they're going to be filled or not is my recollection.  Do you remember whether that would have been marked about whether or not my role was going to be open or transferred to a different type of role?

A   No.  I don't remember that.

Q   Do you recall around the time -- the first time you discovered that I was not going to be coming back to work at Apple?

A   I don't remember the date, if that's what you're talking about.

Q   Do you know how many employees in your organization back to, let's say, 2017, if you can remember, have filed LRB, EEOC, DFEH, or other discrimination or retaliation charges against yourselves or your managers in your organization?

A   No idea.

Q   You're not notified if an employee files one of those government charges against someone in your organization?

Page 52

A   No, not unless I'm needed in the investigation.

Q   Can you recall even one example?

MS. RIECHERT:  If it's an investigation, as such, then I instruct you not to answer it on attorney-client privilege.

BY MS. GJOVIK:

Q   You're not going to answer?

A   Yeah.  I've just been instructed not to answer.

Q   Mr. West, have you ever been named in a lawsuit against Apple alleging discrimination or retaliation?

A   Yes.  I was named in a lawsuit.

Q   Which lawsuit?

A   Crystal Brown.

Q   Can you tell me about that.

MS. RIECHERT:  Objection.  Vague.

And also instruct you not to answer anything that you might have learned that's privileged.

BY MS. GJOVIK:

Q   Mr. West, who is Crystal Brown?

A   She's a former admin in the organization. She reported directly to me.

Q   Did she make complaints to you about

Page 53

discrimination, harassment, or retaliation?

A   Through the lawsuit, yes.

Q   Did she ever make them to you directly?

A   Not in those words, but yes, she complained.

Q   What did she complain about that you recall?

A   The biggest thing was workload.

Q   Do you recall her complaining about a culture of retaliation?

A   I do not.

Q   What happened with the Crystal Brown lawsuit?

MS. RIECHERT:  If it's anything you learned through attorney-client -- through counsel, I instruct you not to answer on attorney-client privilege.

THE WITNESS:  Yeah.  All I know is it was settled.

BY MS. GJOVIK:

Q   Mr. West, do you recall asking me to come have dinner with you one night near my house in Mountain View and talking about this lawsuit to me? I believe it was around maybe 2018 or 2019.

A   I do not.  I do not.

Q   Do you recall ever making a statement, like, there was a lawsuit -- she filed a lawsuit and you

Page 54

told Apple to settle it because you would not do that to her?

A   I do not.

Q   Do you know if there was ever any corrective actions or lessons learned coming out of Crystal Brown's complaints?

A   No, not formal.

Q   Back to confidentiality for a second.  Had you seen the 2019 articles where Apple was talking about how they were scanning a lot of ears?

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  I don't recall.

BY MS. GJOVIK:

Q   So you mentioned you just took over a brand-new organization, and one of the things they do, the AirPod ear testing.

A   Uh-huh.

Q   Is it -- do you think it's safe to assume that if Apple had intentionally disclosed that they were doing ear scans for that testing, based on your prior testimony, that that would not be confidential because Apple already made that public?

MS. RIECHERT:  Objection.  Assumes facts not in evidence, improper hypothetical.

///

Page 55

BY MS. GJOVIK:

Q   Mr. West, are you aware that one of the potential reasons Apple is claiming it fired me was I complained that it kept emailing me, asking to scan my ear canals and ears, and I said no, and they wouldn't stop, and Apple said that was leaking?

A   No.  I didn't know that.

Q   Mr. West, if Apple had previously published articles or press disclosing that it was scanning people's ears, would you think that Apple asking to scan employee ears would be secret?

MS. RIECHERT:  Objection.  Improper hypothetical, assumes facts not in evidence.

MS. GJOVIK:  Mr. West leads a complex organization he himself put forth as handling extremely confidential information.  So this would be a discretion issue for Mr. West that he would handle day to day in his job.  So I think it's very appropriate for him to offer his opinion.

MS. RIECHERT:  I don't think that was a question.

THE WITNESS:  Can you restate the question.

MS. RIECHERT:  I think it was a statement, not a question.

MS. GJOVIK:  I can't hear you, Melinda.

Page 56

MS. RIECHERT:  I think it was a statement, not a question.  I don't think there's a question pending.

MS. GJOVIK:  No.  There's a question.

BY MS. GJOVIK:

Q   Mr. West, you're handling -- I said, you're handling the AirPods and testing.  So they're probably still doing the ear scanning.  And I said, if Apple had already made public that they were doing those ear scans in press articles, would it be your impression that Apple decided just the fact that they're scanning ears as part of that testing would not be Apple confidential because there's public news articles about it already?

MS. RIECHERT:  Again, assumes facts not in evidence.

MS. GJOVIK:  He still has to answer.

THE WITNESS:  The -- how do I -- I'm trying to think of a way to answer this.

No, I don't think that's a fair assumption. The reason I don't think it's a fair assumption is what we've done at one point in time -- like, if we're working on a new product and we're using similar techniques, that -- those similar techniques are still confidential.

Dan West

Page 57

BY MS. GJOVIK:

Q   What if it was just talking about scans with no further details?

MS. RIECHERT:  Again, assumes facts not in evidence.

BY MS. GJOVIK:

Q   This is also the reason Apple says they fired me.

Please state.

MS. RIECHERT:  Is this, like, another comment?  I lost the question.

MS. GJOVIK:  I can't hear you, Melinda.

MS. RIECHERT:  Yeah, sorry.  I lost the question.  What was the question?

MS. GJOVIK:  What was my question?  Ms. Reporter, can you read back my question.

MS. RIECHERT:  Probably good time for a break too after this question.

(Record read as follows:

"Q    What if it was just talking about scans with no further details?")

MS. GJOVIK:  Thank you.

THE WITNESS:  I don't think we would put out any kind of press that vaguely says we do scans.  So yeah, that's a weird hypothetical.

Page 58

BY MS. GJOVIK:

Q   Let's say the press had more technical details and then the complaint that was applicable was confidential, it just said scans.  Would it be safe to say that just saying scans is secret if Apple already intentionally shared far more technical detail?

MS. RIECHERT:  Objection.  Improper hypothetical, assumes facts not in evidence.

MS. GJOVIK:  Still has to answer.

THE WITNESS:  I think so much of that depends on the details and the facts.

BY MS. GJOVIK:

Q   Just one last and then we'll go to break.

Mr. West, you indicated that you thought that you knew the reasons that Apple terminated me, yet you seem surprised by this ear scan thing.  Were you not aware that Apple's lawyers are alleging I leaked related to ear scans?

MS. RIECHERT:  Objection.  Improper hypothetical, assumes facts not in evidence.

BY MS. GJOVIK:

Q   You still have to answer.

A   I'm not aware of ear scans as part of this.

MS. GJOVIK:  Would you like to take a break,

Page 59

Mr. West, five minutes?

THE WITNESS:  Yeah.

MS. GJOVIK:  Let's take five minutes please.

(Recess taken.)

MS. GJOVIK:  Let's go back on.

BY MS. GJOVIK:

Q   Mr. West, what do you know about hazardous waste clean-up activities at the building Stewart 1, address 825 Stewart Drive, in Sunnyvale?

A   Not a lot.

Q   What do you know?

A   I know there was an investigation there as to the air intrusion, and that's about it.

Q   What kind of investigation?

A   There were air sensors put in the building, and I don't know for what period of time -- one to two weeks -- to collect vapor information over that period of time.  And the data from there showed that there was no concern.

Q   Do you remember when that occurred?

A   I don't remember the dates, no.

Q   Like, 2017?  2021?  2025?

A   That came about after you were -- you had raised your concerns; so in that time frame.

Q   Were you aware there was an EPA inspection

Page 60

of that building related to the hazardous waste clean-up activities?

A   Yes.

Q   What do you know about that inspection?

A   That it happened.  That's about it.

Q   Do you know why it happened?

A   I do not.

Q   Do you recall me sharing that I had reported concerns to the EPA about my safety concerns at the building?

A   I do recall that.

Q   And do you recall anything about the EPA investigating because of my complaints?

A   I don't know that the two are correlated, but I do know that there was an EPA investigation as well.

Q   How often, in your experience, does the EPA investigate environmental compliance at Apple buildings where you have staff?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  No.

THE WITNESS:  I'm not an expert here.  That's a better question for EHS.  I don't know.

BY MS. GJOVIK:

Q   Do you have any examples from your own

Dan West

Page 61

recollection of an EPA inspection or environmental compliance at a building where you have staff?

A   No.

Q   And that building, the Stewart 1, that's a US EPA Superfund site; is that correct?

A   Yeah.  That's what you told me.

Q   You don't independently know that it's a Superfund site?

A   I didn't look it up myself.

Q   Did Apple -- anyone at Apple ever tell you it was a Superfund site?

A   No, not that I recall at least.

Q   Did anyone at Apple tell you that there was contaminated groundwater and soil under the building, at least prior to 2022?

A   You're the only one that raised this to me.

Q   So if I have text messages with you of you talking about people telling you that stuff when staff were moved in, you just forgot that?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

THE WITNESS:  Yeah, I don't ever recall that.

BY MS. GJOVIK:

Q   Do you recall saying something about they

Page 62

said that the cracks were sealed but I'm not sure?

A   I do -- I do recall saying that the cracks were sealed, yes.

Q   What cracks?

A   The floor in SD-1 is -- it's a cement floor. And so the cement flooring, there was some places where there were cracks in the floor.

Q   Is that a problem?

MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

Q   Is your understanding that it could be a workplace safety issue if there's cracks in the floor at one of these sites where there's contaminated groundwater or soil underneath?

A   I'll go back to I'm not an expert here, and the experts were telling us it's not a problem.

Q   Mr. West, do you recall any kind of outcome or corrective actions from the EPA following their inspection in August 2021?

A   No, I don't.

Q   Mr. West, do you recall the EPA discovering in July 2021, confirming in August 2021, and sending form emails to Apple with corrective actions once they discovered that Apple -- the sub -- let me go back and give a little background and we'll continue

Page 63

the question.

Remember the sub-slab depressurization system build in that building, so when the gases come up, they go through the tubes to the roof, to vent to the roof so they don't push up through any cracks in the floor?  Do you remember us talking about that generally?

A   Yes.  I remember you -- yes.  You --

Q   Are you aware there's a system for that in that building?

A   Yes.  That's all based off of what you told me, yes.

Q   So you have no -- you've never inquired or received any updates or anything about the sub-slab depressurization system or vapor intrusion mitigation systems in Stewart 1?

A   My understanding is that's what the air tests were trying to figure out, if there was a problem with that system, and the data came back as to no.  The answer was no.

Q   But you can't remember what the date was of that testing?

A   No.

Q   It was after I made complaints, though, you said?

Page 64

A   That's right.

Q   Yeah.

Okay.  Now back to that question I started asking that I stopped.  Are you aware that the EPA had a formal request for corrections at the facility after they discovered that when Apple moved into that building, they installed the HVAC intake on the roof in close proximity to the sub-slab depressurization vents on the roof, which creates something called a risk of re-entrainment, where the toxic gases would vent to the roof and then be sucked into the HVAC intake and vented inside the building and expose employees?

A   I did not.

Q   Doesn't that seem like, if that was true, something that should be rolled up to a leader like yourself to be aware of?

A   At Apple, we tend to rely on the experts, and we relied on EH&S to ensure that that -- that the building was safe.

Q   So if Apple had been forced to correct those issues by moving the HVAC and stuff on the roof, that would not be budgeted from your team even if it was your team's office?

A   Correct.

**Dan West**

Page 65

Q   How often does EHS make major renovations in buildings where you have staff and labs but you're not aware of what they're doing?

MS. RIECHERT:  Objection.  Lacks foundation.

THE WITNESS:  EHS will -- well, I'll be more general.  The facilities teams -- that includes EHS -- makes changes -- it's hard to say all the time but frequently enough where this wouldn't -- this wouldn't raise alarm bells to me.

BY MS. GJOVIK:

Q   Mr. West, are you also aware they also found that the performance team was venting thermal chamber exhaust without any kind of venting and just straight up into the ambient air, and EPA was also concerned about that?

A   No.  I didn't know that.

Q   Would -- generally, if there was an issue like that, EHS could just make changes to the thermal testing system without consulting the engineering team?

MS. RIECHERT:  Objection.  Lacks foundation.

THE WITNESS:  I would have to understand what the concerns were and what the mitigations were to be able to comment on that.

///

Page 66

BY MS. GJOVIK:

Q   Mr. West, are you aware of any facilities corrective actions that occurred because of that EPA inspection and subsequent communications from the EPA?

A   I'm not aware, no.

Q   Mr. West, are you aware that Apple never told me there was an inspection or any of the outcomes and I only found out through FOIA requests more than a year later?

A   I was not aware of that.

Q   Mr. West, are you aware that I had made it clear I planned to go to my office at Stewart 1 on August 4th, 2021, because I wanted to go take pictures of the cracks in the floor, I had said, and also gather some evidence for the investigations, including some text histories on one of my computers?

A   I'm not aware of that.  But were you on leave at that time?

Q   No.  They put me on leave that morning before I could go.

A   I see.

Q   Sorry.  Let me correct.  I was going on the 5th.  They put me on leave on the 4th, before I could go on the 5th.

Page 67

Same question, though, for the -- it sounds like you didn't know I was planning to go back to the office in August.  No.

Do you know if the cracks in the floor were repaired prior to the EPA inspection?

A   I know the cracks were filled, but I don't know when in the timeline they were filled.

Q   Did you make any personal observations of those cracks?

A   Not that I recall.  I walked that building from time to time; so maybe I saw them, but not that I recall.

Q   Do you recall me reporting an unexplained fainting spell in that office in 2019?

A   I don't remember fainting.  You definitely talked to me about being dizzy.

Q   Tell me about the -- what did I report to you?

A   You told me that you were sitting at your desk and that you got dizzy.

Q   Is that something you hear often from employees?

A   No.

Q   Did you do anything to follow up after I told you that?

Page 68

A   This was after the fact, and we didn't know what the cause was.  We thought it was related to your -- the medical issues that you had told me about from your apartment.

Q   This was 2019, before that.

A   We knew you had some -- there was something medically going on.  We didn't know what it was.

Q   Did you know that I complained to Apple repeatedly in 2021 that I -- after learning about my office being a Superfund site and a history of vapor intrusion through cracks in the floor, that I suspected that fainting spell was -- that dizzy spell -- that's how I characterized it -- was probably due to vapor intrusion?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

MS. GJOVIK:  I'm asking if he remembered that I told him that or knew that I told him that.

MS. RIECHERT:  You have a lot of things there that aren't true.

BY MS. GJOVIK:

Q   Mr. West, do you have any recollection of me complaining in 2021 that I thought the dizzy spell from 2019 was related to vapor intrusion?

A   I knew you were worried about that.

Dan West

Page 69

Q   Yeah.

Do you know if anyone looked into that, investigated that if there could be employee exposure that could cause dizzy symptoms from vapor intrusion?

A   That's what we talked about earlier.  There was the air testing in Stewart that came as a result of your complaints.

Q   Mr. West, that air testing, as far as has been reported, occurred after Apple reported they fixed the cracks in floor.  So that air testing wouldn't have gathered any of the data before the cracks were fixed.

Do you know --

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

MS. GJOVIK:  I didn't even ask the question yet.

BY MS. GJOVIK:

Q   Mr. West, do you know of any investigation into, like, my 2019 complaint or are there similar employee complaints prior to those cracks being fixed?

A   I'm not aware of any complaints prior.

Q   Mr. West, are you aware I specifically asked Apple to test the air before they fixed the cracks,

Page 70

informing them that once they fixed it, there would be no way to know if employees were exposed and that I was concerned about cancer, and that Apple said no, they would not test the air until after they fixed the cracks?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

MS. GJOVIK:  I believe I forwarded it to him.

THE WITNESS:  You believe -- sorry.  I didn't hear that.

BY MS. GJOVIK:

Q   Sorry.  Answer, please.

A   I know you had concerns there, and you were definitely asserting this.

Q   Mr. West, do you recall in 2021, between March and August 2021, me forwarding you emails I had with EHS, employee relations expressing concerns and forwarding them to you with additional commentary?

A   Yes.  I remember you forwarding me some emails.

Q   Can you describe some of those things that you remember.

A   Yeah.  My memory is vague because it's a long time ago.  The general -- my general

Page 71

recollection is you were dissatisfied with the way EH&S was responding, and you asked for some help.

Q   Mr. West, have other employees in your organization, say, in the last five years, made complaints to you directly or that you're aware of regarding environmental health and safety concerns?

A   No.

Q   None?

A   In the last five years, no.

Q   What about ten years?

A   Other than you, I can't recall any.  It's very rare to get those complaints.

Q   And in 2021, how large was product systems quality, generally?  How many people?

A   Back then, my guess is around 600 people.

Q   Just one EHS complaint.

Mr. West, same question but your employees complaining about retaliation.  Do you have any general number of complaints that you've received or become aware of?

A   It would have been a very small number.  It's a handful.  This is something we -- that I actively try and teach our managers not to do.  And it's also part of Apple policy.  It's all of this, yeah.

Page 72

Q   What do you teach them not to do?

A   Retaliate.

Q   Can you tell me more about that.  What do you teach them?

A   This is in line with all of our -- all of our employee rules and management rules.  Typically, if an employee raises a concern, it's a good thing.  It gives us a chance to either, one, set the record straight, or two, make a meaningful change.

Q   And you can't remember any -- sorry.  I'm wearing a wig because all my hair fell out because the hazardous waste burned it off and it still hasn't grown out.  That's why I'm doing this.

So you're saying you don't remember many -- a very small number of retaliation complaints.  Crystal Brown would have been one of those, though?

A   Yes.

Q   And for the complaints that you do recall that people made, what is the general practice you would engage in to respond to those complaints?

A   It depends on the severity.  Typically, there's some sort of questioning that happens either of the direct manager -- we want to understand -- we want to understand the veracity of the assertion that's been made.  That's typically what happens.

Dan West

Page 73

Q  Can you describe for me what kind of factual examples might indicate retaliation had occurred.

A  I -- that's a tough hypothetical.  Every case would be a little bit different.

Q  What about for adverse actions?  What kind of -- that's a legal term.  What kind of, like, negative things could be done against the employee that would trigger an investigation of was that rightfully done or could have that been retaliation?

A  Most of the time, it's around role assignment.  That's sort of what I would look at.

Q  Can you tell me more about that.

A  Yeah.  Sometimes -- sometimes there's an assertion that, hey, my job was changed unfairly.  So far, to the best of my knowledge, we've never been able to corroborate that, at least in my org.

Q  What kind of changes do you remember people complaining about?

MS. RIECHERT:  Objection.  Asked and answered.

THE WITNESS:  Yeah.

MS. GJOVIK:  He said job changes.  I'd like him to clarify, please.

THE WITNESS:  It's -- well, job assignments would be more specific, yeah.

Page 74

BY MS. GJOVIK:

Q  So is that, like, what type of stuff they're working on?  What teams they work on?

A  What type of stuff, typically.

Q  Like, products?

A  Products or the role within that product.

Q  Mr. West, do you remember me complaining about there being job changes in my role in 2021 and me alleging that could be retaliation?

A  Yeah.

Q  Can you tell me more about what you recall.

MS. RIECHERT:  Again, don't talk about anything about the investigations into any concerns.

THE WITNESS:  Yeah.  You were worried about the clarity of your role.  You thought it was too ambiguous.

BY MS. GJOVIK:

Q  Mr. West, do you remember me complaining in that I felt the workload in my role had just been quadrupled by Mr. Powers around July 2021?

A  Yes.  I remember that.

Q  Can you tell me what you remember.

A  I remember your assertion that the role was quadrupled.  That's really what I remember.

Q  Do you remember what new responsibilities

Page 75

had been proposed to be added to my role?

A  I don't remember those details, but I remember your concern was raised out of -- you had come to me and said, my role isn't clear enough.  I need more clarity.  And my assumption was that you had been talking to Dave about this as well.  I encouraged you to go back to Dave and say, hey, write it out, like, get it on paper, write it down, work through it.

Q  Mr. West, do you remember me making complaints to you directly about hostile work environment, harassment, unpleasant work conditions, and generally unpleasant interactions with some of the MSQ leaders and me seeking a different role?

MS. RIECHERT:  Objection.  Compound.

BY MS. GJOVIK:

Q  Mr. West, do you recall me complaining about a hostile work environment or hostility from MSQ leaders?

MS. RIECHERT:  Still compound.

THE WITNESS:  Do you want to rephrase?

BY MS. GJOVIK:

Q  Mr. West, do you remember me complaining about an unpleasant work experience working with my direct supervisor -- although I worked for both of

Page 76

you -- and someone at MSQ like Jason Ivan and complaining about that to you?

MS. RIECHERT:  Objection.  Still compound.

BY MS. GJOVIK:

Q  Mr. West, did I ever complain to you about my role with MSQ in relation to difficulty working with MSQ leaders?

A  Yes.  Your relationship with the leaders was deteriorating.

Q  Can you tell me more.

A  I think you were finding it harder and harder to get work done through them.

Q  Do you remember me complaining to you that I felt they were being hostile towards me?

A  I don't ever remember those -- that specific -- like, that phrase has a very specific meaning that would have spurred a different action.  I do remember you expressing frustration at working with them.  I don't remember the word "hostility."

Q  Mr. West, do you recall me giving you formal performance feedback for Mr. Powers, complaining that he would berate me and make me cry?

MS. RIECHERT:  Also compound.

BY MS. GJOVIK:

Q  Mr. West, do you recall me giving formal

Dan West

Page 77

performance feedback to you regarding your direct report, David Powers, claiming that his behavior made me cry?

A   I don't recall the crying piece.  I do recall you gave me a lot of feedback on him.

Q   Do you recall me using the term "discrimination" in my feedback about him?

A   I do not.

Q   Mr. West, do you read the feedback about your direct reports provided as feedback?

A   I do.  If I recall correctly, you did not use the tool and put it in the tool.  You sent me a PDF, or maybe you did both.

Q   So if I put feedback in the tool, you would have read it?

A   I read all the feedback.

Q   So if I sent a PDF to you as well, you would have read it?

A   Yeah.

Q   And if I had said discrimination or hostile work environment, you don't recall it, then you would have just forgot?

A   I think I would have remembered if you said that.  I don't remember you saying it that way.

Q   If I used those terms, do you think that

Page 78

would have triggered some kind of investigation on your part to learn more?

A   Probably I would have asked about it during our next one-on-one.

Q   Mr. West, do you remember me making complaints to you that I didn't think I could continue working for Mr. Powers and with Mr. Ivan due to the work environment with them and asked for your intervention?

MS. RIECHERT:  Objection.  Compound.

BY MS. GJOVIK:

Q   It's fine.  You can answer.

A   I remember the discussion about David, not Jason.

Q   What about -- what do you remember about David?

A   What you just said.  At one point, you said you didn't think you could keep working for him.

Q   And do you remember me asking to work for you?

A   I do.

Q   Do you remember what you said?

A   I don't remember the exact words, but the net was no.

Q   Mr. West, did we have a regular one-on-one?

Page 79

A   We did.

Q   Mr. West, did you give me direct assignments?

A   I gave you direct assignments within a very specific window, typically around the -- our internal website.

Q   And when you gave me direct assignments, that stuff would apply to all of your organizations, not just MSQ?

MS. RIECHERT:  Could you repeat that.  I'm sorry.  I missed it.

BY MS. GJOVIK:

Q   Mr. West, when you would give me direct assignments, those assignments would generally apply to all of your organizations, not just MSQ?

A   That's right.

Q   And, Mr. West, if you gave me direct assignments, could David Powers just overrule those himself or would he have to go to you?

A   Typically -- typically, that would result in a discussion if he had a concern.

Q   So, Mr. West, I kind of had -- it's co-supervisors or split supervisors.  Have you had a dynamic like that before with other employees?

A   I've been in that situation myself, yes.

Page 80

But actually, I wouldn't -- I wouldn't say they're co-supervisors.  I worked very hard to try and stay within the bounds, and Dave and I did as much as we could to coordinate.  So Dave was your manager, and I would direct along certain lines.  And that was it.

Q   Mr. West, did you ever give me direct performance feedback on my performance review signed by you?

A   I'm sure I added to Dave's feedback in his performance reviews of you.  He would query me.

Q   Mr. West, do you recall me complaining that it was very confusing to me, that it seemed like I had two managers and it wasn't clear exactly which one I worked for when, how?

A   I don't recall that one specifically.

Q   Mr. West, do you recall me asking for your intervention to help me find another job at Apple because I wanted to stay at Apple but I didn't think I could continue working for Mr. Powers due to the hostile work environment alleged starting around at least, like, 2019?

A   I don't recall you asking me for help, but I do remember that you had made this assertion but you couldn't work for Dave.

Q   Mr. West, do you remember a woman named

Dan West

Page 81

Charlene Wilsmore offering me just informally a role on her team and hoping to have me transfer to her team within product integrity?

A  Yes.

Q  Mr. West, do you remember how you responded?

A  Yes.  We needed -- at the time, we needed that count in our team.  There was still work that you were doing that needed to continue to be getting done.

Q  Mr. West --

A  Yeah.  Go ahead.

Q  No.  Continue.  You were just going to say something else.  Go ahead.

A  At the time, we needed the head count back so that we could continue to do the work.

Q  Okay.  So, Mr. West, at the time, if I had said I didn't think I could keep going in my role because I complained about issues and I was looking for another job at Apple and that was a job offer from somewhere at Apple, and you said no, wouldn't it be reasonably foreseeable that could cause me to have to quit Apple if I could find another job and that was blocked?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  I don't think so.  He does a

Page 82

lot of talks about employee retention.

MS. RIECHERT:  Yeah.  But what was reasonably foreseeable for you to do is something he doesn't know about.

BY MS. GJOVIK:

Q  Mr. West, would you generally be concerned if an employee in your organization had been complaining they were unhappy in their work environment and wanted another job at Apple so they could stay at Apple and they find an offer to transfer and then it was blocked by their supervisor?  Would you be concerned and maybe even written about it or spoken about it that then caused Apple to lose employees?

MS. RIECHERT:  Same objection.  Lacks foundation, assumes facts not in evidence.

MS. GJOVIK:  That's fine.  He can answer that one.

THE WITNESS:  I would be concerned, but I think the way you're -- the underlying assumptions there are invalid.

BY MS. GJOVIK:

Q  Okay.  And, Mr. West, you had said earlier in this deposition that after I had left, my role was canceled; is that right?

Page 83

A  Yes.  We -- at that point, we had made the decision to split the work amongst other people.

Q  Can you tell me who -- which people, which roles received the work that I had been doing.

A  I couldn't.  I didn't dig into all the details.  But the work was spread out amongst David's directs.  So it was spread out amongst his leadership team.

Q  What about the work that was being done for you?

A  A lot of that stopped.

Q  Stopped completely?

A  No.  A lot of it stopped, not all of it.  There were -- there are other people -- so that was an organizational website.  So there were other people adding to it here and there.

Q  So you just stopped all of that work because the person left?

A  Yes.

Q  Why?

A  From a prioritization perspective, our ultimate objective always is to ship our products.  The website was nice to have, and since we didn't have the resource to be able to maintain the website, we put it in maintenance mode, essentially.

Page 84

Q  Mr. West, are you aware that the NLRB issued a complaint against Apple at one point alleging that the administrative leave and my termination were unlawful and violated federal labor law?

MS. RIECHERT:  Don't repeat anything that you learned from counsel.  I'll instruct you not to answer based on attorney-client privilege.  If you learned it from another source, that's fine.

And assumes facts not in evidence.  Objection on that basis.

THE WITNESS:  Yeah.  The short answer is no.

BY MS. GJOVIK:

Q  Mr. West, I'm assuming the answer is still no, but are you aware that that complaint requested as remedies that Apple reinstate my employment and offer a public formal apology to me for the suspension and termination?

A  No.

Q  Mr. West, are you aware the NLRB withdrew those charges after the new general counsel was appointed to the NLRB as far as Apple's defense counsel in the same case?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

MS. GJOVIK:  There was a whole bunch of news

Dan West

Page 85

articles about this, actually, complaining of corruption. So he may know.

THE WITNESS: No.

BY MS. GJOVIK:

Q Mr. West, how would you respond if the court or government forced you to reinstate my employment?

MS. RIECHERT: Objection. Improper hypothetical, assumes facts not in evidence, speculation.

BY MS. GJOVIK:

Q Mr. West, the NLRB had issued a complaint saying, for relief, it wanted Apple to reinstate my employment, and I'm suing Apple in court for this lawsuit and the judge has approved me asking to be reinstated at least on payroll when I file a motion for summary judgment next month -- that seems very relevant. If I'm requesting reinstatement, what would be your response?

MS. RIECHERT: Objection. Hypothetical, speculation.

MS. GJOVIK: I'm requesting reinstatement. How does he respond to me requesting reinstatement?

MS. RIECHERT: I haven't seen any request for reinstatement. But again, it's hypothetical.

MS. GJOVIK: It's the complaint, Melinda.

Page 86

MS. RIECHERT: Assumes facts not in evidence. You haven't even found out that he's seen the complaint.

BY MS. GJOVIK:

Q Mr. West, how would you respond to some kind of legal authority ordering Apple to reinstate my employment?

MS. RIECHERT: Same objections.

You can answer.

BY MS. GJOVIK:

Q You can answer.

A If the authority -- if the law says do something, we'll do it.

Q And what job would I be given?

MS. RIECHERT: Same objections. Hypothetical, assumes facts not in evidence.

MS. GJOVIK: Extremely relevant if I'm requesting reinstatement and they canceled my job.

MS. RIECHERT: I didn't object on relevance. I objected on hypothetical, assumes facts not in evidence, speculation.

BY MS. GJOVIK:

Q Okay. Go ahead.

A My assumption would be it would be an equivalent job in the organization.

Page 87

Q Mr. West, are you aware I'm in Chapter 7 bankruptcy right now?

A No.

Q Mr. West, are you aware that I am without a permanent house and am living in a motel paid for solely by public donations from my social media followers because I'm completely insolvent?

A No.

Q Mr. West, have you had any other employees that were terminated by Apple that you're aware of that ended up in bankruptcy and insolvent?

A No, but I don't follow employees that closely.

Q Mr. West, I thought you said that we were friends and you got in trouble for inappropriate texts with me that were too friendly.

MS. RIECHERT: Objection. Compound.

THE WITNESS: I also said that there was guidance around separating friendships from work, and that's what I did.

BY MS. GJOVIK:

Q So, Mr. West, you never thought to check in and see how I was doing after Apple fired me?

A No.

Q Mr. West, in your experience, when Apple

Page 88

fires someone for leaking confidential information, what could happen to their careers? Do they generally get a job again working with confidential information?

MS. RIECHERT: Objection. Hypothetical, lacks foundation.

BY MS. GJOVIK:

Q There are formal Apple trainings everywhere that have the exact answer to this question.

A Yeah. Sometimes they get jobs. Sometimes they don't. That's up to them.

Q What do you mean, it's up to them?

A They're in the labor workforce at that point. They apply to a job just like anyone else would.

Q Mr. West, have you ever had any new product security trainings where they said that if people get fired for leaking, they may never work again?

A I don't recall that exact phrasing. But yes. There's -- there's language in there that says, depending on the severity of the leak, it could be harder, yeah.

Q Mr. West, in your experience, when employees need to be disciplined, what is the process that is followed for managers to initiate a discipline

Dan West

Page 89

process?

A  It depends on the disciplinary action.  Can you be more specific.

Q  Let's do suspension or termination.

A  Typically, PBP is involved.

Q  What is that?

A  Actually, always -- our HR.  HR is involved.

Q  So a manager would escalate to HR, and then HR handles it?

A  Manager would escalate to HR, and then there's an investigation.

Q  And in your experience, if an employee is violating some policy or not meeting expectations, is there usually a gradual discipline process with, like, warnings and a performance plan?

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  It depends on the type of issue.  So when it's -- when it's sort of a working style, working behavior issue, as an example, there is a gradual ramping up of what happens.  There's more and more formal discussions up until we get to the point where they are terminated.  There are also zero-tolerance examples as well where there is no warning.  It is, you're terminated.

///

Page 90

BY MS. GJOVIK:

Q  Can you give me some examples in your experience of what would have been zero-tolerance terminations.

A  Typically, egregious policy violations.  Leaking confidential information is another example.

Q  Mr. West, are you aware of -- that one of Apple's stated justifications for terminating me was my insistence on a paper trail or a written communication with them about some investigation I wanted to do and not getting on the phone with them?

A  I was not.

Q  Mr. West, have you ever heard of a disciplinary action being taken against an employee because they requested written communications out of a concern of stated retaliation or wanting a copy for the government and that they're disciplined for refusing to just have a phone call?

MS. RIECHERT:  There's a lot in that question.

THE WITNESS:  Yeah.  Yeah.  Can you --

BY MS. GJOVIK:

Q  Mr. West, were you ever -- do you have any -- can you think of any examples where an employee was disciplined or warned because they

Page 91

insisted on having some kind of written record of a communication?

A  No, not in that scenario.

Q  Mr. West, are you aware that employee relations reached out to me on September 3rd, 7th, and 9th -- I was fired on September 9th -- asking to get on the -- have a call with me or Webex, refusing to have written communication?

A  No.  I wasn't aware of those dates.

Q  Mr. West, are you aware that one of Apple's stated justifications for firing me was my repeated requests to have the written communication as my LRB charges and Apple saying that it is a fireable offense to not get on the phone?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

MS. GJOVIK:  That's your formal justification for firing me, Melinda.

MS. RIECHERT:  Has nothing to do with the NLRB.  So don't --

MS. GJOVIK:  Okay.  Remove the NRLB part.

MS. RIECHERT:  Okay.  Repeat your question.  I think he said he didn't know why you were fired, but you can keep asking if you want.

///

Page 92

BY MS. GJOVIK:

Q  Mr. West, are you aware that one of Apple's formal stated justifications for firing me was my request to keep written communication with employee relations for whatever reason and them stating it was some sort of misconduct for me to not get on the phone with them without any record?

A  No.  I'm not aware of those details.

Q  Mr. West, are you aware that Apple's stated justification for firing me also includes the workplace violence and threat assessment team making the same allegation that I refused to get on the phone with them on September 9th and instead had requested a written communication?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

THE WITNESS:  I'm not aware of the reasons for your termination.

BY MS. GJOVIK:

Q  Any of them?

A  All of them.

Q  Mr. West, I thought you had said you were but you couldn't share it because it was privileged.

A  Right.  Through counsel, I got that.  But I don't know -- I didn't know all of those details,

**Dan West**

Page 93

especially what you just described.

Q   Yeah.

Mr. West, are you aware of what employee relations says -- just admitted last week were reaching out to me in September at least 3rd and 7th that they insisted on talking to me about but said it couldn't be in written emails?  You said no.

MS. RIECHERT:  I don't think he's aware of any testimony last week.

THE WITNESS:  No.

BY MS. GJOVIK:

Q   Mr. West, are you aware that one of Apple's stated justifications for terminating me is I wouldn't to get on the phone with them to have them interrogate me about whether I thought the sous chef at Chez TJ was cute or not and whether I would consensually date him or not?

A   No.

Q   I wasn't either until last week.  That was a weird one.  So we're going to have to talk about Andrew, unfortunately, thanks to Apple.  Would you like to take a break before we do that?  It's going to be weird.

A   Sure.

MS. GJOVIK:  Yeah.  Five minutes, please.

Page 94

THE WITNESS:  Okay.

(Recess taken.)

BY MS. GJOVIK:

Q   Mr. West, do you remember ever recommending that I go have dinner at a restaurant that we talked about called Chez TJ?

A   Yeah.  You were a foodie, I was a foodie, and we sort of compared notes.

Q   Yeah.

Do you remember me going to Chez TJ around December 29th, 2017?

A   I don't remember the date, but sure.  I remember when you went.

Q   Yeah.

Do you remember me texting you or you texting me while I was at dinner that night?

A   I remember you texted me, telling me you were there.

Q   This was the dinner that you said you had paid for; right?

A   That's right.

Q   And that employee relations had mentioned that your behavior had been inappropriate?

A   I wouldn't have used -- I wouldn't use those terms.  That's not the phrasing that they used with

Page 95

me.  But they said, look, it would be better to draw a strong line between friendship and work.

Q   Sorry.  Mr. West, earlier you said that they said it was inappropriate.  You used that term I think twice.  Are you now changing your description of the feedback?

MS. RIECHERT:  Objection.  Misstates the testimony.

THE WITNESS:  Yeah, I don't remember saying it that way.  If I did, it was a mistake.

BY MS. GJOVIK:

Q   Okay.  Can you elaborate then what you do recall the feedback was from employee relations regarding the incident with the dinner at Chez TJ.

A   Yeah.  It was all around keeping a separation between work and friendships.

Q   Do you recall Apple employee relations or HR saying anything to you regarding a sous chef named Andrew that worked at that restaurant?

MS. RIECHERT:  Anything about an investigation, I instruct you not to answer on attorney-client privilege.

BY MS. GJOVIK:

Q   Mr. West, do you recall interacting with or knowing about a sous chef named Andrew at Chez TJ?

Page 96

A   I do.

Q   Yeah.

Can you tell me about Andrew.

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  What do you want to know about Andrew?

BY MS. GJOVIK:

Q   Well, let's start with the head chef.  You're friends with the head chef; right?

A   Jared?

Q   Yeah.

A   Yes.

Q   Can you tell me about your friendship.

MS. RIECHERT:  Objection.  Vague.

MS. GJOVIK:  I can't -- if Melinda is objecting, I can't hear.

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  I can answer.

Met him when he worked at a different restaurant, and when he became the head chef at Chez TJ, we went there to support him.

BY MS. GJOVIK:

Q   And he's also friends with Yannick Bertolus?

A   Yes.

Q   And at that restaurant, there was a sous

Page 97

chef working for Jared named Andrew?

A   (No audible response.)

Q   Do you remember how you met Andrew?

A   Through Chez TJ, yeah.

Q   Do you remember anything you talked about with Andrew?

A   Sure.  Andrew -- yeah.  Can you be more specific.

Q   Did you talk to him about whether he was, like, single or married?

A   No.  I never had those discussions with him.

Q   Do you recall around what age he was around 2017?

A   He's since passed away.  Back then --

Q   He did?  That's -- Melinda -- I'm going to yell at her later.  This is really messed up.  Go ahead, Mr. West.

A   He had to have been in his 20s.  I don't know where.  Maybe early 30s.

Q   I didn't know he passed away.  That's upsetting.  I'm sorry.  Apple opened a whole can of worms here, Mr. West.

Mr. West, do you remember that night at the restaurant, through texts, trying to set up some kind of romantic relationship between myself and the sous

Page 98

chef named Andrew?

A   That's not the way I would frame it.  Yeah, that's not the way I would frame it.

Q   Mr. West, what do you remember about that night -- and that's the only time I've ever ate at that restaurant.  So the time I ate dinner at that restaurant that you bought the dinner, what do you remember about your conversation with Jared and me and Andrew about some kind of relationship between me and Andrew?

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  Yeah, there's a lot there.  Can you break it down.

BY MS. GJOVIK:

Q   Mr. West, what do you remember about that night I had the dinner at the restaurant regarding your conversation with anyone who worked at the restaurant regarding a relationship between me and Andrew?

A   Well, I remember the conversation with you specifically.  You had -- I guess there was another party or something where you were talking with my wife, and you had said something to the effect of, I need to be set up with someone or I need to find someone, basically indicating that you were looking

Page 99

for a partner.

Q   Can you speak up.  I'm sorry.  I can't hear you.

A   You were looking for -- you had had a conversation with my wife indicating that you were looking for a partner.

Q   That wasn't the night of the dinner, though.  I was asking --

A   That's right.  That was our conversation --

Q   And I also object to the -- I don't recall ever saying that.  I don't think that's accurate.  But please go ahead.

A   Okay.  Why don't you ask your question then.

Q   Do you recall anything about talking to Jared or Andrew about some sort of relationship or setup between me and Andrew?

A   Yes.  So the context here -- so the context of that discussion with my wife, I asked you about, and you confirmed, yes, I'm interested.  So I'd say something to the effect of, well, Andrew is there and he's young.  I don't remember if I said he was single or not.  I don't even know if I knew that at the time.  And then I asked you if I should tell Jared.

Q   Do you remember telling me that you and Jared were having him bring out food for me directly

Page 100

as part of this?

A   Yeah.  After -- after we got the green light from you, I'd say something to the effect of Jared -- or not Jared -- Andrew will likely bring out a few plates.

Q   Do you recall you and I talking after that night about Andrew?

A   Yeah.  You said -- yes, I do.

Q   What do you recall that we talked about?

A   You said something to the effect of he's cute and you left your number.

Q   Do you recall me telling you that I met someone and I was going to date them; so I wasn't going to date Andrew, and I said hope that's okay?

(Reporter clarification.)

BY MS. GJOVIK:

Q   Yeah.  Mr. West, can you speak up.  Maybe your computer is moved away or your -- don't want to talk about this like I don't, but we have to talk about this.  I'm sorry.

A   No.  I just moved the monitor closer.

THE WITNESS:  Is that better, Court Reporter.

THE REPORTER:  I think so.

THE WITNESS:  All right.  So what was your

**Dan West**

Page 101

question?  Sorry, Ashley.

BY MS. GJOVIK:

**Q   Do you recall conversations you and I had after that dinner about Andrew, including me saying I met someone else and I'm going to see them, not Andrew, I hope that's okay?**

A   Yeah.  I do remember that.  And I remember responding, saying there was no pressure from me; so that's fine.

**Q   Mr. West, do you recall later text messages where you said that night what you did with Andrew was one of the worst things you've ever done?**

A   Yeah, I do.

**Q   Why would you say that?**

A   Well, I think this goes back to the guidance that I got from --

**Q   Sorry.  Can you speak up.**

A   This is really bad.  I don't even know where the mic is on this.

Yes.  Let's see.  I think this goes back to my discussion with ER around separating friendships from work.  And that's the main -- that was the major problem.  That's why I think it was an issue.

**Q   Mr. West, the feedback from employee relations regarding separation feedback and so forth**

Page 102

**would have been in 2021.  The comment I'm mentioning was prior to that.  So it wouldn't have been an outcome of that employee relations investigation.  It would have been something else.**

**Can you add more context.**

A   I think it's -- so thanks for the timeline, but I think it's the same -- it's the same thread.  It's separating personal from the job.

**Q   Mr. West, do you recall me telling you that your daughter had told me that your family was talking on a regular basis how inappropriate that was at least through 2020?**

A   I don't recall that, but -- yeah, I don't recall that.

**Q   Mr. West, do you recall your family, such as your daughter and wife, ever telling you they thought what you did with Andrew and myself was inappropriate?**

A   No, I do not.  The context, again, is the employee skip-level-manager relationship is concern.

**Q   Mr. West, in 2020, how old was your daughter?**

A   Let's see.  That's six years ago.  She must have been 16 or 17.

**Q   Mr. West, do you have any idea how your 16-**

Page 103

**or 17-year-old daughter would know about you trying to set one of your workers up with a sous chef at a Michelin-star restaurant?**

A   We have family discussions.

**Q   How would that come up in a family discussion?**

A   My daughter --

**Q   I'm sorry.  Mr. West, if you'd switch laptops.  That one is horrible.  We can't hear you.**

A   Let's switch.  Can you give me a minute?

**Q   Yeah.  Thank you.**

THE REPORTER:  Are we going off the record while he does that?

MS. GJOVIK:  Yeah.  We can.

(Recess taken.)

BY MS. GJOVIK:

**Q   Mr. West, how do you think the discussion came up at your home family dinner about you trying to set up one of your workers in your organization with a sous chef at your favorite restaurant?**

A   I have no idea how that came up.  My daughter at the time was working at Chez TJ.  She knew Andrew.  She knew the crew.  So maybe it came up at work and she asked about it at home.  Maybe it came up at home.  I don't know.

Page 104

**Q   So, Mr. West, you were pretty well connected with that restaurant -- the staff at that restaurant; right?**

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

**Q   Mr. West, you had a personal relationship with staff at that restaurant; is that correct?**

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  I knew Jared very well.

BY MS. GJOVIK:

**Q   And your daughter worked there?**

A   That's right.

**Q   Yeah.**

**Mr. West, when you were reflecting upon what happened with that dinner and myself and Andrew, and it sounds like you have a new opinion of what occurred.  Can you tell me if one of your direct reports had done the same thing, like, now, would you take some kind of corrective action on that report or warn them to not do that?**

MS. RIECHERT:  Objection.  There were assumptions in your question that were inaccurate, and therefore, you misstated his testimony.  And second objection --

MS. GJOVIK:  Melinda, we can't hear you.

Dan West

Page 105

MS. RIECHERT: Second objection -- my first one is that you misstated the testimony, and the second is that it's an improper hypothetical.

BY MS. GJOVIK:

Q  Let me rephrase.

Mr. West, the -- what we're talking about what you did in 2017 with that dinner, if one of your direct reports did that, like, now, how would you respond if you found out?

A  I think I'd warn them the same way, like, hey, you can do this for your friends, but be careful of the managerial -- like, if there's a power imbalance there, I think that's what makes it difficult.

Q  Mr. West, wouldn't you say that it's difficult for employees to say no to their supervisors about stuff because of that power imbalance?

MS. RIECHERT: Objection. Vague.

MS. GJOVIK: I don't think that's vague.

THE WITNESS: So -- okay.

MS. RIECHERT: Do you want an answer?

MS. GJOVIK: Yeah.

MS. RIECHERT: Okay. Could you repeat the question.

Page 106

BY MS. GJOVIK:

Q  Mr. West, wouldn't you say that the power imbalance makes it difficult for employees to say no to their supervisors about things?

MS. RIECHERT: Objection. Vague.

THE WITNESS: In certain scenarios, that's a true statement, I think.

BY MS. GJOVIK:

Q  Yeah.

Are there actually, like, regulations and strict rules about things that should not be asked of or done to employees because of the power dynamics and coercion?

MS. RIECHERT: Objection. Compound.

THE WITNESS: I'm not a lawyer; so I can't speak to the details of that. But there's certainly some things that we can't -- that we shy away from.

BY MS. GJOVIK:

Q  Yeah.

Mr. West, in your -- for any of the roles you went through, even back in 2021, you mentioned you did some stuff with, like, health or medical studies on employees, user studies. Isn't that something where coercion becomes an issue, especially if the studies can have a population in France or

Page 107

Germany?

MS. RIECHERT: Objection. Improper hypothetical, compound.

THE WITNESS: Can you be more specific.

BY MS. GJOVIK:

Q  Mr. West, in your experience managing teams that do different types of user studies or testing, have you heard there are special rules in countries like France or Germany that prohibit -- and UK, GDPR, that prohibit certain testing or requests of employees specifically because the risk of coercion and a power imbalance?

MS. RIECHERT: Is he aware of those rules? Is that the question?

MS. GJOVIK: Yeah.

THE WITNESS: No.

BY MS. GJOVIK:

Q  No.

So you --

A  Not those rules. I don't know the reason for those rules.

Q  But you said that there can be a power imbalance. It can be more difficult for employees sometimes to say no to stuff if it's their supervisor asking?

Page 108

A  Yes.

Q  Yeah.

Didn't you even text me that you aren't even sure if I really mean no sometimes because you don't know if I can be honest with you --

MS. RIECHERT: Objection.

BY MS. GJOVIK:

Q  -- or something like that?

A  I don't remember that text. I would need to see -- see the text and the context of the text.

Q  Mr. West, do you sometimes wonder, if you ask something of employees in your organization, if they'd actually honestly tell you no or if they might be afraid to tell you no?

A  Yeah, sometimes.

Q  And so, like, on that night when I was out to dinner, I said Andrew is cute. It sounds like I said something like, see where it goes or whatever. I haven't looked back at exactly what I said. But it sounds like you were make looking back and wondering if I was actually answering honestly because you're my supervisor; is that right?

A  That definitely was not the impression that I had going through that.

Q  Oh, can you explain then why you're thinking

Dan West

Page 109

now differently that that was inappropriate.

A   I think we've said this -- or I've said this a couple of times.  This is -- this goes back to the guidance that I got from Ekelemchi after those discussions.

Q   You said power imbalance, though.  What did you mean by that?

A   I'm -- I was -- at the time, I was your boss's boss.

Q   So what does the power imbalance have to do with matchmaking?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

MS. GJOVIK:  It's just his own testimony.

MS. RIECHERT:  He said nothing about matchmaking.

BY MS. GJOVIK:

Q   Mr. West, why did you think a power imbalance concern was relevant to the feedback you said you got from employee relations regarding the appropriateness of what you did with me and Andrew that night?

A   I don't know how to answer that differently.  Yeah, maybe we can come back to that.  I've got to think a little bit.

Page 110

Q   I would like to come back to that.

A   Yeah.

Q   So as I mentioned earlier, come to find out one of Apple's stated reasons for terminating my employment -- this is not a question.  I'm just giving background.  I see Melinda doing stuff.  One of their stated reasons for terminating my employment was requesting a written record of communications to employee relations after I had reported retaliation by them and NRLB charges filed against them and EEOC charges -- I just want it on the record -- to the government.  And they're saying, because I refused to get on the phone without a written record, that was some kind of misconduct.  That was one of the reasons that justified immediate termination without any warning.

And, Mr. West, I already asked you this.  So I'm just going to tell you again what they said because I think it's wild, and I think you're going to think it's wild.  They were planning exclusively Mr. Okpo to contact me to want to ask me about saying that Andrew was cute in those texts to you and not immediately objecting that night and calling that inconsistencies in reporting my concerns and told me that they closed the investigation to all of my

Page 111

concerns that I had filed because I wouldn't get on the phone with them when they wanted to talk to me whether I thought Andrew was cute and would consensually hook up with him because they thought that was inconsistent.

Considering that, Mr. West, does that seem like a --

MS. RIECHERT:  I'd object to all of that as assumes facts not in evidence.

BY MS. GJOVIK:

Q   Considering all that, Mr. West, does that seem like --

MS. GJOVIK:  Melinda, go ahead.  What are all your objections?

MS. RIECHERT:  Yeah, if you want to ask a question.  I'd just object to your summary of what happened.

MS. GJOVIK:  Okay.  Well, we'll go over that in summary judgment next month.

BY MS. GJOVIK:

Q   Mr. West, considering all of that, does that seem like a reasonable reason to terminate an employee who worked at Apple over six years?

MS. RIECHERT:  Assumes facts not in evidence and improper hypothetical.

Page 112

MS. GJOVIK:  He still has to answer.

THE WITNESS:  Yeah.  I wasn't part of the -- like, I was a part of the investigation in that they were asking me questions.  I was not part of this decision-making.  I was not part of those meetings that you're referring.  So I have no idea what they were going to talk to.  I don't know.

BY MS. GJOVIK:

Q   Mr. West, I'm curious, because you indicated you had some idea of why Apple stated they terminated my employment, but so far I think I've given at least three examples that you claim you were not actually aware of as being the reasons Apple is now stating they terminated my employment; is that correct?

MS. RIECHERT:  Objection.  Misstates his prior testimony.

THE WITNESS:  Can you give me the three examples.

BY MS. GJOVIK:

Q   The thing where I wouldn't get on the phone to tell them whether I would hook up with Andrew or not, because apparently if I thought he was cute, that nothing he did was wrong; the ear scans.  What was the other one?  Inconsistencies -- oh, and the double workplace violence also said they fired me

Dan West

**Page 113**

because I wouldn't get on the phone with them.

A   Okay.  So with those three things in mind, repeat the question, please.

Q   **Is it true that those three things, that you were not aware now stated reasons by Apple of why they say they fired me at the time they fired me until I just told you that?**

MS. RIECHERT:  Again, don't state anything that you were told by counsel.

THE WITNESS:  That's what I'm trying to dance around here.

Yeah.  Yes.  That's correct.

BY MS. GJOVIK:

Q   **It's correct that you weren't aware of the details of those three things I just told you?**

A   That's right.

Q   **Yeah.**

**Mr. West, there was also an article published in "The Verge" called "Apple Cares About Privacy Unless You Work At Apple."  Are you aware of this article?**

A   Can you tell me the content of the article.

Q   **Yeah.  It was published around August 30th, 2021, and it was a variety group of Apple employees, current and prior, generally complaining that Apple**

**Page 114**

was invading employee privacy and did not respect employee privacy and thought that Apple should do better in respecting employee privacy.

A   Were there examples in that article?

Q   **There were.  There were complaints about using personal iCloud accounts to set up systems.  There were tools that were gathering more data than employees thought were needed, including radar and that Glimmer app, Gobbler app.  Do you remember those?**

A   Yeah.  I think I know which article you're talking about.

Q   **Do you remember receiving any questions or comments from employees in your organization about that article?**

A   I don't specifically, no.

Q   **Do you recall ever reading that article?**

A   If it's the article I'm thinking, yes.

Q   **Can you tell me what article you're thinking of?**

A   There's an article that has images from an internal testing application, and I think it even has a video from -- I think it's Glimmer.  That's the article I'm thinking of.

Q   **So you don't know the title of the article**

**Page 115**

or the date or the content other than it has a photo or video from an app called Glimmer?

A   That's right.  This was an article from -- I don't know -- six, seven -- five, six years ago.  It was a while ago.

Q   **Mr. West, how did you learn about the content in the article that you don't know any details about the article itself?**

A   Sorry.  How do I know about it?

Q   **Yeah.**

MS. RIECHERT:  Well, objection.  Misstates the testimony that he doesn't know any details about it.  He just gave you details.

MS. GJOVIK:  He didn't know the title or what content was in it, but he somehow regurgitated a very similar-sounding script of a specific portion within that article without knowing exactly which article it's even in.

MS. RIECHERT:  Okay.  Objection to your commentary about that.

What's the question?

BY MS. GJOVIK:

Q   **Mr. West, you -- sorry.  Go ahead.**

A   We talked about this one earlier, that, like, employees -- someone must have texted me the

**Page 116**

link.  Like, I don't go on social media as often as I used to.  So yeah.  Someone must have texted it to me or it showed up in a news feed of mine.

Q   **And you really remember this photo or video.  What about it is in your memory?**

A   Well, that's test data that's in there, and that's -- it's pretty rare for something -- for a third-party company like that to get their hands on something like this.

Q   **What was the data?**

A   If it's Glimmer, Glimmer is all about Face ID.  So it's the internal -- it's sort of the uncleaned-up scan that we get from the Face ID elements in your phone.

Q   **Do you remember anything about the images in that photo or video?**

A   Not entirely, no.  No, I do not.

Q   **Mr. West, I have to comment that it seems very peculiar that you're aware of the fact that there was some image or video that you don't know the content of in an article you can't tell me what the title is of or what the article was about.  So I would just love to learn more about anything you can remember about why you seem to know so many details about the specific Glimmer video or photos.**

**Dan West**

Page 117

Did someone at Apple tell you to respond to questions about that article with that answer you just gave?

MS. RIECHERT: First of all, objection to all your commentary about that as being inappropriate. Ask him a question. Is the question did anybody at Apple tell him what?

MS. GJOVIK: To raise this specific video or photo that he just mentioned in response to questions I raise around that article.

THE WITNESS: No. No one has.

BY MS. GJOVIK:

Q Okay. So, Mr. West, you mentioned this photo or video. What was the issue with it or the comment that was made? Do you recall?

A This goes back to what I said earlier. That's an internal testing app.

Q Mr. West, I really don't know what article you're referring to because you can't tell me what the title was or any context of it, but I'm pretty sure you're referring to --

MS. RIECHERT: Well, misstates his testimony. He told you the context of it.

BY MS. GJOVIK:

Q Mr. West, you mentioned a photo or video.

Page 118

Do you remember the title of the article that photo or video was in?

A No.

Q Mr. West, do you remember the date that article was published?

A No.

Q Mr. West, do you remember any of the content in that article you're referencing?

MS. RIECHERT: Objection. Asked and answered.

MS. GJOVIK: We're clarifying. We wanted to clarify.

MS. RIECHERT: You already asked him what he recalled of the content, and he told you.

MS. GJOVIK: I asked about the "Apple Cares About Privacy Unless You Work At Apple" article. He's talking -- I don't want to define what he's talking about because he doesn't even know what article he's talking about.

So whatever article he's talking about, which I don't know what it is because he can't tell me the title, I'd like to know if he remembers any other content in that article he's thinking of, and I have not asked that question yet.

MS. RIECHERT: Yeah, you did. He said he

Page 119

recalled the test data that's referenced from a third-party company to get hands on something like this. It was about Glimmer, about --

MS. GJOVIK: That's not what I was asking.

MS. RIECHERT: -- Face ID and uncleaned-up scan.

MS. GJOVIK: We don't know what article he's talking about because he doesn't know the subject, title of it, or the date.

So I said one article. He responded with some kind of concrete image or video of some article he cannot identify. And I would like to know whatever article he is talking about because we don't know -- he can't confirm -- if he remembers anything else about that article to help us identify what he's talking about.

MS. RIECHERT: Other than what he's already testified about.

MS. GJOVIK: Other than that image or photo or whatever he's talking about.

MS. RIECHERT: He gave you a lot more than that.

But other than what he's already testified, do you recall anything else about the article?

THE WITNESS: Not really.

Page 120

BY MS. GJOVIK:

Q Do you remember the context of the person who emailed you or texted you or what you saw on social media about this image or video?

MS. RIECHERT: Objection. Vague.

THE WITNESS: Yeah, I don't remember how I found out about this article. That's -- so I can't answer this other part of the question, which is what was the context of how they sent me that article. Because I don't know if they sent it to me or if it came up in a news feed.

BY MS. GJOVIK:

Q Mr. West, can you explain to me how I asked you about a specific article with a title about it and your response was to then refer me to another -- it sounds like a separate article maybe that you don't know who the subject or title of that article and can't tell me anything what's in that article. Why was that a connection for you?

MS. RIECHERT: Objection. Vague.

MS. GJOVIK: He is being vague.

THE WITNESS: The article that I'm talking about came out of "The Verge." You talked about a different "Verge" article, I guess. And that was the connection, is "The Verge."

Dan West

Page 121

BY MS. GJOVIK:

Q   "The Verge."

So I'm just going to comment.  This isn't a question.  But I think you're referencing is the same article I was talking about.  And I just really wanted to highlight that you're referencing Apple's fourth and last, I believe -- we'll see.  They keep coming up with more stuff -- formal justification for firing me, pointing towards that image video.  But I found it very strange that you couldn't even identify what article it was in.  That was strange to me.

So -- but that article is called "Apple Cares About Privacy Unless You Work for Apple."  And I just want to confirm this video or photo you're referencing, were you aware there's photos and videos of my face?

MS. RIECHERT:  There was a lot of commentary in there, and I just --

BY MS. GJOVIK:

Q   Yeah.  That's just a question.  Were you aware that photo or video was just of my face?

A   I didn't know it was your face in there, but I did know that this was -- I thought this was the reason you were terminated.

Q   But you hadn't actually seen the photos or

Page 122

video?

A   I did.  That's what I'm -- I just said I did.

Q   You just said you didn't realize it was my face, but it was pretty clear it was my face.

A   Isn't it a green screen or something?  Like, it's been a while since I've seen that.

Q   It's just black-and-white pictures of me hanging out in my PJs in the living room.

A   Okay.

Q   So yeah.  It's very weird that that was just top of your mind but you can't -- haven't even seen the images and didn't know what article it was in, what it was titled.

MS. RIECHERT:  Please, don't have all this commentary.  Just let's get to the questions.

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

Q   Mr. West --

MS. RIECHERT:  We can comment on motions but --

MS. GJOVIK:  Yeah.  I'm going to -- finish your objections, please, Melinda.  I'll wait.

MS. RIECHERT:  Just let's stick to the questions instead of all the commentary, please.

Page 123

That's what a deposition is supposed to be about.

BY MS. GJOVIK:

Q   Mr. West, are you aware that the fourth stated justification for Apple terminating my employment was my participation in the article titled "Apple Cares About Privacy Unless You Work At Apple"?

MS. RIECHERT:  Objection.  Misstates -- assumes facts not in evidence.

MS. GJOVIK:  Not true.

THE WITNESS:  So I don't -- what I just said is the images from Glimmer are the reason why I thought you were fired.

BY MS. GJOVIK:

Q   But you did not know --

A   I don't know the article name.  That's true.

Q   Mr. West, how long did I work in your organization?

A   I'm not sure exactly.  Maybe three years, maybe four.

Q   And, Mr. West, I had regular one-on-ones with you and we spent personal time, you testified prior; right?

A   Yep.

Q   Yeah.  And I even hung out with your daughter, your teenage daughter; right?

Page 124

A   Yep.

Q   Yeah.

And Apple terminated my employment in 2020, and you never sought to find out any -- what -- oh, 2021.  Sorry.  You're right.  September 2021.  You never sought to find out any details of exactly why I was fired?

A   No.  The detail that I had was because you posted -- or because that Glimmer data was released, that's why you were fired, and I left it at that.

Q   But you never saw the photos that they referenced?

A   I saw that article.  I said I saw that article.

Q   So you would have seen it was just pictures of my face?

A   Okay.

Q   So if it was just pictures of my face, do you think that's Apple confidential?

A   If it's through the Glimmer application, which as I've stated, how we test our products, the tools that we use to test our product, all of that is confidential, then, yes.

Q   What if a government finds that one of the things -- tools Apple uses is unlawful?  Can Apple

Dan West

Page 125

just claim it's confidential that it uses something unlawful? Have you ever heard that?

A   I'm not a lawyer.

MS. RIECHERT:  May call for hypothetical.

THE WITNESS:  I can't answer that.

BY MS. GJOVIK:

Q   Yeah.

Do you think that if employees are protesting work conditions and invasions of privacy, that that should be considered outside of just Apple declaring everything is confidential?

MS. RIECHERT:  Objection.  Improper hypothetical.

BY MS. GJOVIK:

Q   Mr. West, do you think employees should be allowed to organize with each other and protest work conditions even if it is related to product development?

A   You're asking for my opinion?

Q   Yep.

A   Yeah.  I can't control what employees do outside of work.

Q   So if employees are organizing outside work, protesting work conditions they say they think violate their rights and they want better working

Page 126

conditions, do you think they should be allowed to talk about stuff that's related to product development as long as they're not leaking trade secrets or other proprietary information?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

THE WITNESS:  Yeah, can you break it down. Like --

BY MS. GJOVIK:

Q   Okay.  So earlier -- yeah.  Mr. West, earlier you said anything, like, product related is confidential generally; right?

A   Yes.

Q   But Apple workers -- a lot of them, especially, like, in your organizations, pretty much their whole job is working on products; right?

A   Yeah.  Back then, yes.  That's a true statement.

Q   Yeah, so product system quality.

If someone is going to want better working conditions, there's a reasonable chance that some of their working conditions are going to be about working on products; right?

MS. RIECHERT:  Objection.  Assumes facts not in evidence, improper hypothetical.

Page 127

THE WITNESS:  And I disagree.  No.

BY MS. GJOVIK:

Q   Oh, explain, please.

A   You don't need to reveal anything confidential to have those discussions.

Q   But that would imply that an employee could never take anything outside of Apple if they think Apple isn't going to help resolve the issue they have; right?

A   I don't --

Q   Do you think -- sorry.  Do you think employees -- if it's product-related complaints, do you think employees should not take that outside Apple ever?

A   Can you give me an example.

Q   Yeah.  Like, the other examples from the "Apple Cares About Privacy Unless You Work for Apple" where people were complaining about invasions of privacy through Apple product development processes and tools, I'm asking, do you think that because anything that they reference would be an internal tool or internal process or a user study, that that itself would make it confidential, and so they're leaking by making their complaints to the press?

MS. RIECHERT:  Objection.  Improper

Page 128

hypothetical, compound.

THE WITNESS:  I'd like to answer one part of this.  I think you're conflating something that's really important here.  Participation in some of these user studies, using the Glimmer application, all of that is voluntary.  That is not something that we push employees to do or at least that we didn't do in the organization.  So -- and, in fact, not participating is not something that they were penalized against, to the best of my knowledge.

BY MS. GJOVIK:

Q   Mr. West, are you aware that my performance reviews contained commentary about my participation in supposedly voluntary user studies as a sort of performance benchmark?

MS. RIECHERT:  Objection.  It assumes facts not in evidence, document speaks for itself.

THE WITNESS:  Yeah.  In -- so I can't speak to your specific example, but where something -- like, work in any kind of live-on program, as an example -- where that would come up in reviews is typically as a bonus, like, hey, this is exceptional. Thank you for doing this.

BY MS. GJOVIK:

Q   That's nice.

**Dan West**

Page 129

Because it helps the employer, right, when the employees help out with that sort of stuff. It gives them extra data they wouldn't have otherwise; right?

A  Gives who extra data?

Q  The employer, Apple.

A  For development, yes.

Q  Yeah.

Mr. West, are you aware that the only agreement I ever had regarding that Glimmer app was for a 20-minute user study in 2017?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

THE WITNESS:  No.

BY MS. GJOVIK:

Q  No.

Mr. West, are you aware that when I participated with the Glimmer app, I had also been asked to help one of your employees, Divienne (phonetic), to work on it pre-phone announce, and she put me on some sort of QA white list so I could help them tasks that they never took me off of?  That was around July or August 2017.

A  So your question is you were added to a white list and was I aware that you were never

Page 130

removed from that white list?

Q  Uh-huh.

A  No.

Q  Mr. West, are you aware that some kind of Gobbler -- I was in it when it was called Gobbler -- Gobbler application is still trying to access my personal iCloud account, and I've complained to Apple several times now but they've done nothing?

A  No, not aware of that.

Q  Mr. West, are you aware that in the state of California, employees have a constitutional right to privacy that is immediately executing and it's a termination and violation of public policy to terminate employees for protesting their employer invading their privacy?

MS. RIECHERT:  Objection.  Calls for a legal conclusion and --

MS. GJOVIK:  But he's a senior director.  He should know some basic stuff.

MS. RIECHERT:  He's not a lawyer.

MS. GJOVIK:  Yeah.  But does he know?  Is he aware of this?  Has he ever heard of this?

THE WITNESS:  No.

BY MS. GJOVIK:

Q  So, Mr. West, it sounds like -- even the one

Page 131

thing it sounds like you may have been aware of of Apple's stated justifications for firing me, but you weren't aware of the title of the article or the -- those employees organizing, asking for better working conditions regarding invasions of privacy; is that correct?

A  Yeah.  That's correct.

Q  Considering all this stuff I just told you, Mr. West, if you assumed it was true -- maybe I'll ask some more questions, but does that seem like a fair reason to fire an employee?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

MS. GJOVIK:  That's your own filings, though, Melinda.  You can check.

THE WITNESS:  For leaking internal information, that's an egregious violation.  Yes. We've talked about that.  We've --

BY MS. GJOVIK:

Q  Egregious -- finish.

A  Yeah.  Go ahead.

Q  Mr. West, you testified you didn't know that these photos or videos were of my face.  So how were you so certain that whatever this was was egregious if you didn't know the content being shared, the

Page 132

article it was being shared in, or the context of that article?

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  No.  He said egregious just now.  I'm asking why he thinks egregious if he has none of that information.

MS. RIECHERT:  He already told you why it was egregious.

THE WITNESS:  Yeah.

BY MS. GJOVIK:

Q  Why?

A  You're leaking internal testing process and tools.  That's egregious.

Q  I want to clarify again, though, Mr. West, because what you're saying is very incomplete and inconsistent, because you said you didn't know what was being shared, what the content was.  You didn't know it was my face.  It was just images of my face, and you didn't know it was of my face.

So I'm curious why you're so certain that whatever it was was egregious and justified immediate termination if your testifying you don't even know what the content was.

MS. RIECHERT:  Objection.  Assumes lots of

Dan West

Ashley Gjovik vs.
Apple Inc.

**Page 133**

facts not in evidence, misstates his testimony, asked and answered.

MS. GJOVIK: I want him to still answer this.

MS. RIECHERT: He's already told you.

MS. GJOVIK: He said egregious.

MS. RIECHERT: Leaking confidential is egregious. Leaking confidential information is egregious.

BY MS. GJOVIK:

Q Okay. Mr. West, what was the confidential information specifically?

MS. RIECHERT: Objection. Asked and answered.

MS. GJOVIK: He said very vague. If you want to keep that vague, we can keep it, but I would like to give him a chance to give more specifics if he would like to.

THE WITNESS: It's images from the Glimmer application.

BY MS. GJOVIK:

Q Mr. West, are you aware that the DRI for that Glimmer study had published at least a dozen detailed public articles discussing the methodology processes and product development process for Glimmer in developing Face ID on LinkedIn and Medium?

**Page 134**

MS. RIECHERT: Objection. Assumes lots of facts not in evidence.

MS. GJOVIK: He was deposed last week and testified to it. I want to know if Mr. West knows after he is so certain this is so egregious.

MS. RIECHERT: I was present at that deposition. That is not what he testified to. And he did publish articles but not about the subjects that you said.

BY MS. GJOVIK:

Q Face ID from, what, strategy to production, one of them was called.

Mr. West, are you aware that other employees have been actively publishing articles for years about the Face ID development process?

A I'm aware that there's a process to publish anything at Apple, and that would require review from several teams.

Q Can you tell me more about that.

A Yeah. Typically, there's marketing involved. There's senior leadership who are involved to approve articles like that.

Q When you said anything, what do you mean by anything?

**Page 135**

A Any sort of public publications require approval. That's what I mean by anything.

Q This DRI -- it wasn't confidential, and he just published them. Do you think he was leaking if that's the case?

A I'd have to read those articles to form an opinion. I don't know.

Q Mr. West, are you aware that the NLRB's issued a complaint against Apple specifically for that review process for publishing anything because it allegedly violated federal labor law, and Apple entered a consent agreement with me and NLRB rescinding, I think, over -- terms in over a dozen Apple national policies and IPA because Apple settled the allegation they violated the NLRA?

MS. RIECHERT: Assumes lots of facts not in evidence and compound. I don't know which -- which of those questions do you want him to answer? Does he know about NLRB doing something?

MS. GJOVIK: The settlement agreement and -- that resulted in the rescission of policies and public posting on the Apple website where they said they were fixing all that stuff because of the settlement for the charge I filed.

MS. RIECHERT: So you put a lot of extra

**Page 136**

things in there. Why don't you just ask him if he's aware of the NLRB consent decree.

BY MS. GJOVIK:

Q Mr. West, are you aware of the LNB consent agreement between me and Apple and NLRB regarding Apple's U.S. national employment policies, including intellectual property agreement?

MS. RIECHERT: Assumes lots of facts not in evidence.

But you can answer if you know about the consent decree.

THE WITNESS: No. I'm sorry. I'm not aware of it.

BY MS. GJOVIK:

Q Yeah.

Mr. West, we're almost out of time. Is there anything else you'd like to add or any prior statements you made that you would like to revise?

A No.

MS. GJOVIK: I thank you for your time in answering my questions.

I think we're done, Ms. Reporter.

MS. RIECHERT: I'd like a rough and an expedited, please.

MS. GJOVIK: I'll have a normal.

**Dan West**

**Page 137**

(Deposition concluded at 11:56 a.m.)

---

**Page 138**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [   ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/14/2026

_____

Vesna Walter
RPR, CCRR, CSR No. 11989

---

**Page 139**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
        vs. Apple Inc.

Date of Deposition: 04/13/2026

Job No.: 10188332

        I, DAN WEST, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

        Executed this _____ day of _____, 2026, at _____.

_____

        DAN WEST

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____,     proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

---

**Page 140**

DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
        vs. Apple Inc.
Name of Witness: Dan West
Date of Deposition: 04/13/2026
Job No.: 10188332
Reason Codes:  1. To clarify the record.
                       2. To conform to the facts.
                       3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

**Dan West**

**Page 141**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the
transcript is true and correct

_____ No changes have been made. I certify that the
transcript  is true and correct.


_____
                DAN WEST

**Page 141**

**EXHIBIT B**
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

good

They charge you much more for mail order blondes in Russia

well...Andrew now works in the city

What a deal

He got dumped after he kept texting me at 3am, and spent his weekends gambling in Chino

Way to make me feel 70 years old

thanks for not yelling at me

I did in real time

I don't remember you yelling at me

I'm so sorry

I guess that's all that matters 🤣

now I feel even worse

It's funny - at the time I thought it was going to be a good thing

Its' okay... again free dinner... lots of extra treats.... It all worked out

LOL

You and whats his face too

Jarrod

You were both plotting

yeah!

Jarrod.

he's a good friend

I drank too much to remember but he kept telling me secrets about Yannick

it was actually his idea

I just keep remember thinking "Yannick would be pisssssed if he heard this"

probably

So we can call your dinner intervention a plot to get me too drunk to remember Yannick's dirty laundry

ASHLEY MARIE GJOVIK
12/16/2025
JULIE L. ANDERSON, CSR 11422
**Exhibit 28**

**Chat Participants:**    Ashley Gjovik [Redacted], Da...

[Redacted], Dan West +[Redacted]

**Chat Start Date:**    12/29/17, 00:04:09 AM GMT

**Chat End Date:**    12/29/17, 05:33:55 AM GMT

**Service(s):**    iMessage

December 29, 2017

Ashley Gjovik

> Chez TJ tonight! How much wine do they give you if you add wine pairings? I'm a lightweight and am leaning towards just doing 1-2 glasses off the wine menu instead.

Sent: 12/29/17, 00:04:09 AM GMT

**EXHIBIT    28**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

APL-GAELG_00002678

Service: iMessage

Dan West

Emphasized "Chez TJ tonight! How much wine do they give you if you add wine pairings? I'm a lightweight and am leaning towards just doing 1-2 glasses off the wine menu instead."

Sent: 12/29/17, 00:07:26 AM GMT
Service: iMessage

Dan West

Is it table for 1?

Sent: 12/29/17, 00:08:12 AM GMT
Service: iMessage

APL-GAELG_00002679

Ashley Gjovik

> Yup

Sent: 12/29/17, 00:08:21 AM GMT
Service: iMessage

Dan West

> Meal will last 2-3 hours

Sent: 12/29/17, 00:08:33 AM GMT
Service: iMessage

Ashley Gjovik

> I'm prepared

Sent: 12/29/17, 00:08:43 AM GMT
Service: iMessage

Dan West

> I need to text the chef

Sent: 12/29/17, 00:08:51 AM GMT
Service: iMessage

Dan West

> (I forgot to earlier)

Sent: 12/29/17, 00:09:07 AM GMT
Service: iMessage

APL-GAELG_00002680

Ashley Gjovik

Hah!! You would have the chef's #....

Sent: 12/29/17, 00:09:17 AM GMT
Service: iMessage

Dan West

I'd go mega tasting (the global menu)

Sent: 12/29/17, 00:09:43 AM GMT
Service: iMessage

Ashley Gjovik

It looked like they only have the one menu, the $200 tasting menu

Sent: 12/29/17, 00:10:04 AM GMT
Service: iMessage

APL-GAELG_00002681

Ashley Gjovik

Are there other versions?

Sent: 12/29/17, 00:10:14 AM GMT
Service: iMessage

Dan West

Then tell them you only want 2 glasses

Sent: 12/29/17, 00:10:15 AM GMT
Service: iMessage

Dan West

Yeah. Usually - one is all sourced within 100 miles of here

Sent: 12/29/17, 00:10:40 AM GMT
Service: iMessage

APL-GAELG_00002682

Ashley Gjovik

> Oh interesting!! Ok I'll go global. And I'll let them suggest the 2 glasses based on the courses -- yeah?

Sent: 12/29/17, 00:11:11 AM GMT
Service: iMessage

Dan West

Liked "Oh interesting!! Ok I'll go global. And I'll let them suggest the 2 glasses based on the courses -- yeah?"

Sent: 12/29/17, 00:13:47 AM GMT
Service: iMessage

APL-GAELG_00002683

Ashley Gjovik

Thanks, Dan!! I'm stoked. It looks delicious.

Sent: 12/29/17, 00:14:36 AM GMT
Service: iMessage

Dan West

We almost went tonight

Sent: 12/29/17, 00:17:40 AM GMT
Service: iMessage

Ashley Gjovik

Hah! You still could!

Sent: 12/29/17, 00:18:07 AM GMT
Service: iMessage

Dan West

We go Saturday instead

Sent: 12/29/17, 00:18:35 AM GMT
Service: iMessage

APL-GAELG_00002684

Ashley Gjovik



Sent: 12/29/17, 00:19:36 AM GMT
Service: iMessage

Dan West

Amanda tells me you want us to set you up with someone

Sent: 12/29/17, 00:54:00 AM GMT
Service: iMessage

Ashley Gjovik

LOL! I think I told her I need to find the male version of her since you & I are so similar.

Sent: 12/29/17, 00:54:37 AM GMT

APL-GAELG_00002685

Dan West

So I may have mentioned to the chef that you are single and that his sous chef should introduce himself to you

Sent: 12/29/17, 00:55:00 AM GMT
Service: iMessage

Ashley Gjovik

Oh no. Dan!!

Sent: 12/29/17, 00:55:08 AM GMT
Service: iMessage

Ashley Gjovik

Is he cute?

Sent: 12/29/17, 00:55:19 AM GMT

APL-GAELG_00002686

Dan West

Expect at least one plate to be delivered by Andrew

Sent: 12/29/17, 00:55:36 AM GMT
Service: iMessage

Dan West

I have no idea

Sent: 12/29/17, 00:55:44 AM GMT
Service: iMessage

Ashley Gjovik

Oh Lordy. Ok. Thank you for the good intentions!

Sent: 12/29/17, 00:56:05 AM GMT

APL-GAELG_00002687

Dan West

I'm the worst judge

Sent: 12/29/17, 00:56:10 AM GMT
Service: iMessage

Ashley Gjovik

Well I'll see soon!

Sent: 12/29/17, 00:56:32 AM GMT
Service: iMessage

Dan West

He's a nice guy though

Sent: 12/29/17, 00:57:00 AM GMT
Service: iMessage

Dan West

I told them "Ashley is good people"

Sent: 12/29/17, 00:57:35 AM GMT
Service: iMessage

APL-GAELG_00002688

Ashley Gjovik

Thank you, Dan. 😇

Sent: 12/29/17, 00:58:03 AM GMT
Service: iMessage

Ashley Gjovik

But we both know I'm trouble.

Sent: 12/29/17, 00:58:22 AM GMT
Service: iMessage

Dan West

And chef said they will treat you like family

Sent: 12/29/17, 00:58:25 AM GMT
Service: iMessage

APL-GAELG_00002689

Ashley Gjovik

Aww! That's awesome. You must really go there all the time.

Sent: 12/29/17, 00:58:41 AM GMT
Service: iMessage

Dan West

Not as much as I'd like to

Sent: 12/29/17, 00:59:30 AM GMT
Service: iMessage

Ashley Gjovik

They've already tried to upgrade my menu $200 😬 I feel like a terrible person turning down truffles or wagyu

Sent: 12/29/17, 02:16:20 AM GMT

APL-GAELG_00002690

Service: iMessage

Ashley Gjovik

Andrew's a cutie

Sent: 12/29/17, 02:44:03 AM GMT
Service: iMessage

Dan West

Liked "Andrew's a cutie "

Sent: 12/29/17, 02:46:33 AM GMT
Service: iMessage

Dan West

It'll be great

Sent: 12/29/17, 02:50:44 AM GMT
Service: iMessage

Dan West

I think Jarad is definitely the best in the South Bay

Sent: 12/29/17, 02:51:08 AM GMT
Service: iMessage

APL-GAELG_00002691

Ashley Gjovik

> He also looked super uncomfortable. Was he a willing participant in this?

Sent: 12/29/17, 02:52:06 AM GMT
Service: iMessage

Ashley Gjovik

> Jarad?

Sent: 12/29/17, 02:52:16 AM GMT
Service: iMessage

Dan West

Probably not

Sent: 12/29/17, 02:52:20 AM GMT
Service: iMessage

Dan West

Head chef

Sent: 12/29/17, 02:52:25 AM GMT
Service: iMessage

APL-GAELG_00002692

Ashley Gjovik

Laughed at "Probably not"

Sent: 12/29/17, 02:52:27 AM GMT
Service: iMessage

Ashley Gjovik

We were both blushing the entire time. Poor guy.

Sent: 12/29/17, 02:52:43 AM GMT
Service: iMessage

Ashley Gjovik

The food has been incredible so far

Sent: 12/29/17, 02:53:05 AM GMT
Service: iMessage

Dan West

It's my favorite place

Sent: 12/29/17, 02:53:35 AM GMT
Service: iMessage

APL-GAELG_00002693

Ashley Gjovik

Liked "It's my favorite place"

Sent: 12/29/17, 02:53:50 AM GMT
Service: iMessage

Ashley Gjovik

Liked "I think Jarad is definitely the best in the South Bay"

Sent: 12/29/17, 02:53:54 AM GMT
Service: iMessage

Ashley Gjovik

I love how cozy it is.

Sent: 12/29/17, 02:54:00 AM GMT
Service: iMessage

APL-GAELG_00002694

Ashley Gjovik

Is this Andrew arrangement you trying combine empires? Like Game of Thrones for your dinners?

Sent: 12/29/17, 02:56:07 AM GMT
Service: iMessage

Ashley Gjovik

Andrew came back. He said he's giving me complementary wagyu. Ok, maybe you two are Cupids after all. Im a sucker for both blonde guys and wagyu.

Sent: 12/29/17, 03:11:00 AM GMT
Service: iMessage

Dan West



Sent: 12/29/17, 03:13:37 AM GMT
Service: iMessage

Dan West

I like the game of thrones reference

Sent: 12/29/17, 03:14:10 AM GMT
Service: iMessage

APL-GAELG_00002695

Ashley Gjovik

Liked "I like the game of thrones reference "

Sent: 12/29/17, 03:14:31 AM GMT
Service: iMessage

Ashley Gjovik

Um Jarad reminds me of a mixture between you & Yannick

Sent: 12/29/17, 03:56:06 AM GMT
Service: iMessage

Dan West

His intensity scares me a little. But I love that guy

Sent: 12/29/17, 03:58:53 AM GMT
Service: iMessage

APL-GAELG_00002696

Ashley Gjovik

I picture Jarad as a version of you that's had 3 glasses of wine & 3 cups of coffee in a short period of time

Sent: 12/29/17, 04:00:38 AM GMT
Service: iMessage

Dan West

Maybe 6 of each

Sent: 12/29/17, 04:03:27 AM GMT
Service: iMessage

Ashley Gjovik

I could believe that. He was probably on good behavior when he introduced himself.

Sent: 12/29/17, 04:04:23 AM GMT

APL-GAELG_00002697

Service: iMessage

Ashley Gjovik

Yannick broke both of his arms???

Sent: 12/29/17, 04:07:08 AM GMT
Service: iMessage

Dan West

That was a long time ago

Sent: 12/29/17, 04:14:09 AM GMT
Service: iMessage

Dan West

He nearly died

Sent: 12/29/17, 04:14:28 AM GMT
Service: iMessage

APL-GAELG_00002698

Ashley Gjovik

Holy shit

Sent: 12/29/17, 04:15:13 AM GMT
Service: iMessage

Ashley Gjovik

Poor Yannick 😢

Sent: 12/29/17, 04:15:28 AM GMT
Service: iMessage

Ashley Gjovik

Jarad seems sad he doesn't race anymore

Sent: 12/29/17, 04:15:41 AM GMT
Service: iMessage

APL-GAELG_00002699

Ashley Gjovik

Maybe Jarad is a little cray-cray

Sent: 12/29/17, 04:15:50 AM GMT
Service: iMessage

Dan West

He was racing - doing what he loves

Sent: 12/29/17, 04:16:47 AM GMT
Service: iMessage

Dan West

Now he races cars

Sent: 12/29/17, 04:17:06 AM GMT
Service: iMessage

APL-GAELG_00002700

Ashley Gjovik

> Yes I heard about his Porsche and how Jarad can't afford a Porsche

Sent: 12/29/17, 04:17:47 AM GMT
Service: iMessage

Dan West

So should I tell Jarad that Andrew is a cutie?

Sent: 12/29/17, 04:18:58 AM GMT
Service: iMessage

Ashley Gjovik

> *Most detailed introduction ever*

Sent: 12/29/17, 04:19:05 AM GMT
Service: iMessage

Dan West

Or have I meddled enough?

Sent: 12/29/17, 04:19:11 AM GMT
Service: iMessage

APL-GAELG_00002701

Ashley Gjovik

> I told Jarad he's being mean to Jarad

Sent: 12/29/17, 04:19:18 AM GMT
Service: iMessage

Dan West

Questioned "I told Jarad he's being mean to Jarad"

Sent: 12/29/17, 04:19:27 AM GMT
Service: iMessage

Ashley Gjovik

> He says there's fun "being had on all sides"

Sent: 12/29/17, 04:19:30 AM GMT
Service: iMessage

Dan West

Andrew

Sent: 12/29/17, 04:19:30 AM GMT
Service: iMessage

APL-GAELG_00002702

Ashley Gjovik

Yes, sorry, two glasses in

Sent: 12/29/17, 04:19:45 AM GMT
Service: iMessage

Dan West

I can insult him...

Sent: 12/29/17, 04:19:49 AM GMT
Service: iMessage

Ashley Gjovik

I'll leave my # for Andrew. Should take care of it

Sent: 12/29/17, 04:20:00 AM GMT
Service: iMessage

APL-GAELG_00002703

Ashley Gjovik

> Laughed at "I can insult him..."

Sent: 12/29/17, 04:20:06 AM GMT
Service: iMessage

Dan West

"You had 1 job and you freaking blew it"

Sent: 12/29/17, 04:20:08 AM GMT
Service: iMessage

Dan West

Loved "I'll leave my # for Andrew. Should take care of it "

Sent: 12/29/17, 04:20:12 AM GMT
Service: iMessage

APL-GAELG_00002704

Ashley Gjovik

> **LOL**

Sent: 12/29/17, 04:20:14 AM GMT
Service: iMessage

Ashley Gjovik

> **He already bought me a 100 dinner. At least deserves a #.**

Sent: 12/29/17, 04:20:52 AM GMT
Service: iMessage

Dan West

> **Wagyu was +100?**

Sent: 12/29/17, 04:21:19 AM GMT
Service: iMessage

Dan West

> **Oh damn**

Sent: 12/29/17, 04:21:40 AM GMT
Service: iMessage

APL-GAELG_00002705

Ashley Gjovik

> Yeah bro

Sent: 12/29/17, 04:21:49 AM GMT
Service: iMessage

Ashley Gjovik

> Dayum is right

Sent: 12/29/17, 04:21:59 AM GMT
Service: iMessage

Dan West

In all candor...no pressure from me

Sent: 12/29/17, 04:24:59 AM GMT
Service: iMessage

Dan West

I only know Andrew a little

Sent: 12/29/17, 04:25:12 AM GMT
Service: iMessage

Dan West

Jarad is my buddy

Sent: 12/29/17, 04:25:18 AM GMT
Service: iMessage

APL-GAELG_00002706

Ashley Gjovik

I wouldn't do it if I wasn't actually interested. I'm very picky.

Sent: 12/29/17, 04:25:48 AM GMT
Service: iMessage

Ashley Gjovik

I'm also a fan of Jarad now. It was really nice of him to come out and say hi.

Sent: 12/29/17, 04:26:26 AM GMT
Service: iMessage

Dan West

Liked "I wouldn't do it if I wasn't actually interested. I'm very picky. "

Sent: 12/29/17, 04:26:46 AM GMT
Service: iMessage

APL-GAELG_00002707

Ashley Gjovik

> Jarad came back and spent two whole minutes talking about how hot he thinks Yannick is. I think Jarad is in love with YB.

Sent: 12/29/17, 04:41:54 AM GMT
Service: iMessage

Dan West



<<Attachment file name: IMG_3805.png >>
Sent: 12/29/17, 04:44:38 AM GMT
Service: iMessage

APL-GAELG_00002708

Ashley Gjovik



<<Attachment file name: IMG_0467.JPG >>
Sent: 12/29/17, 04:46:10 AM GMT
Service: iMessage

APL-GAELG_00002709

Ashley Gjovik

DANNNNNN

Sent: 12/29/17, 05:10:00 AM GMT
Service: iMessage

Dan West

?

Sent: 12/29/17, 05:10:23 AM GMT
Service: iMessage

Ashley Gjovik

"Your money is no good here"

Sent: 12/29/17, 05:10:38 AM GMT
Service: iMessage

APL-GAELG_00002710

Ashley Gjovik

> "Says Dan West"
>
> Sent: 12/29/17, 05:10:51 AM GMT
> Service: iMessage

Ashley Gjovik

> Wtf dude that's way too nice of you.
>
> Sent: 12/29/17, 05:11:10 AM GMT
> Service: iMessage

Dan West

Give a fat tip

Sent: 12/29/17, 05:11:14 AM GMT
Service: iMessage

Dan West

Jarad covered some too

Sent: 12/29/17, 05:11:39 AM GMT
Service: iMessage

Dan West

Just don't spread the word that I'm a nice guy

Sent: 12/29/17, 05:12:37 AM GMT
Service: iMessage

Dan West

I've got a reputation you know...

Sent: 12/29/17, 05:12:48 AM GMT
Service: iMessage

APL-GAELG_00002711

Ashley Gjovik

LOL

Sent: 12/29/17, 05:13:08 AM GMT
Service: iMessage

Dan West

I'm just glad you enjoyed the meal

Sent: 12/29/17, 05:13:52 AM GMT
Service: iMessage

Ashley Gjovik

OK mums the word, and seriously huge thank you. Dinner was amazing.

Sent: 12/29/17, 05:14:20 AM GMT
Service: iMessage

APL-GAELG_00002712

Ashley Gjovik

Merry Christmas, dude!!

Sent: 12/29/17, 05:14:27 AM GMT
Service: iMessage

Ashley Gjovik

Laughed at "I've got a reputation you know..."

Sent: 12/29/17, 05:14:35 AM GMT
Service: iMessage

Ashley Gjovik

Liked "Give a fat tip"

Sent: 12/29/17, 05:14:39 AM GMT
Service: iMessage

Dan West

Liked "Merry Christmas, dude!!"

Sent: 12/29/17, 05:16:33 AM GMT
Service: iMessage

Dan West

Make sure to thank Jarad

Sent: 12/29/17, 05:16:51 AM GMT
Service: iMessage

APL-GAELG_00002713

Ashley Gjovik

He already left! He said he had a baby to take care of

Sent: 12/29/17, 05:17:25 AM GMT
Service: iMessage

Ashley Gjovik

I guess I need to come back!

Sent: 12/29/17, 05:17:32 AM GMT
Service: iMessage

Ashley Gjovik

Would you please tell him I say huge thank you for the generosity, the delicious, amazing food, and the cute blondes

Sent: 12/29/17, 05:26:07 AM GMT

APL-GAELG_00002714

Service: iMessage

Ashley Gjovik

Andrew even gave me a to go bottle of the super secret Jedi master tea

Sent: 12/29/17, 05:29:00 AM GMT
Service: iMessage

Dan West

Oh yeah. That tea is great

Sent: 12/29/17, 05:29:51 AM GMT
Service: iMessage

Dan West

Done

Sent: 12/29/17, 05:31:19 AM GMT
Service: iMessage

APL-GAELG_00002715

Ashley Gjovik

Thank you & thank you!! 🙏🏼⬜

Sent: 12/29/17, 05:33:55 AM GMT
Service: iMessage

APL-GAELG_00002716

# EXHIBIT 37

36.    Attached as Exhibit 37 is a true and correct copy of the cited pages of the certified deposition transcript of Robert McKeon, including pages 46, 59, 72, 81, 87, 88, 90, 93, 99, 101, and any additional pages cited in the Motion, together with the reporter's certification and cover sheet.

Deposition of

# Robert McKeon Aloe

April 03, 2026

Volume 1

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                      ) Case No. 23-cv-04597-EMC
                                       )
            Plaintiff,                 )
                                       )
v.                                     )
                                       )
APPLE INC.,                            )
                                       )
            Defendant.                 )
_____)

DEPOSITION OF ROBERT MCKEON ALOE

VOLUME 1, PAGES 1 THROUGH 107

FRIDAY, APRIL 3, 2026

Reported by:

Kathleen Madden Keenaghan

CSR No. 14577

Job No. 10187852

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                      ) Case No. 23-cv-04597-EMC
                                       )
            Plaintiff,                 )
                                       )
v.                                     )
                                       )
APPLE INC.,                            )
                                       )
            Defendant.                 )
_____)

DEPOSITION OF ROBERT MCKEON ALOE commencing at the hour of 1:04 p.m., on Friday, April 3, 2026, taking place over the Zoom application before Kathleen Madden Keenaghan, Certified Shorthand Reporter Number 14577, in and for the State of California.

**Page 3**

APPEARANCES

For the Plaintiff:

        BY:  ASHLEY GJOVIK (PRO SE)

        A.M. GJOVIK CONSULTING, L.L.C.

        2108 N Street, Suite 4553

        Sacramento, CA 95816

        Telephone: (415) 964-6272


For the Defendant:

        BY:  MELINDA SHENA RIECHERT (SBN 65504)

        BY:  KATHRYN MANTOAN (SBN 239649)

        ORRICK, HERRINGTON & SUTCLIFFE LLP

        1000 Marsh Road

        Menlo Park, California 94025-1015

        Telephone: 650-614-7423

        Email: mriechert@orrick.com

**Page 4**

I N D E X

Witness:  ROBERT MCKEON ALOE

| Examination by: | | Page |
|---|---|---|
| ASHLEY GJOVIC | | 7 |

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | PL_PROD_7-547 | 13 |
| Exhibit 2 | PL_PROD_7-917 – PL_PROD_7-924 | 14 |
| Exhibit 3 | PL_PROD_7-781 | 32 |
| Exhibit 4 | PL_PROD_7-040 – PL_PROD_7-042 | 42 |
| Exhibit 5 | PL_PROD_7-778 | 50 |
| Exhibit 6 | PL_PROD_7-886 | 50 |
| Exhibit 7 | PL_PROD_7-789 | 50 |
| Exhibit 8 | PL_PROD_7-990 – PL_PROD_7-991 | 50 |
| Exhibit 9 | APL-GAELG_00002770 | 51 |
| Exhibit 10 | APL-GAELG_00002762 – 00002763 (duplicative of Exhibit 18) | 51 |
| Exhibit 11 | APL-GAELG_00002765 – 00002769 | 52 |
| Exhibit 12 | APL-GAELG_00002757 – 00002758 (duplicative of Exhibit 17) | 52 |
| Exhibit 13 | APL-GAELG_00002761 (duplicative of Exhibit 16) | 52 |
| Exhibit 14 | APL-GAELG_00002771 – 00002772 | 53 |
| Exhibit 15 | APL-GAELG_00002773 | 53 |

Page 5

| Number | Description | Page |
|---|---|---|
| Exhibit 16 | APL-GAELG_00002761 (duplicative of Exhibit 13) | 53 |
| Exhibit 17 | APL-GAELG_00002757 - 00002758 (duplicative of Exhibit 12) | 54 |
| Exhibit 18 | APL-GAELG_00002762 - 00002763 (duplicative of Exhibit 10) | 54 |
| Exhibit 19 | PL_PROD_7-788 | 55 |
| Exhibit 20 | PL_PROD_7-783 | 56 |
| Exhibit 21 | PL_PROD_7-509 - PL_PROD_7-518 | 72 |
| Exhibit 22 | PL_PROD_7-723 - PL_PROD_7-728 | 75 |
| Exhibit 23 | PL_PROD_7-035 - PL_PROD_7-039 | 77 |
| Exhibit 24 | PL_PROD_7-992 - PL_PROD_7-996 | 79 |
| Exhibit 25 | PL_PROD_7-519 - PL_PROD_7-523 | 80 |
| Exhibit 26 | PL_PROD_7-529 - PL_PROD_7-533 | 82 |
| Exhibit 27 | PL_PROD_7-540 - PL_PROD_7-546 | 84 |
| Exhibit 28 | PL_PROD_7-461 - PL_PROD_7-469 | 84 |
| Exhibit 29 | PL_PROD_7-718 - PL_PROD_7-722 | 87 |
| Exhibit 30 | PL_PROD_7-795 - PL_PROD_7-798 | 88 |
| Exhibit 31 | PL_PROD_7-799 - PL_PROD_7-804 | 90 |
| Exhibit 32 | PL_PROD_7-792 - PL_PROD_7-794 | 95 |
| Exhibit 33 | PL_PROD_7-816 - PL_PROD_7-821 | 96 |
| Exhibit 34 | PL_PROD_7-805 - PL_PROD_7-815 | 97 |
| Exhibit 35 | PL_PROD_7-101 - PL_PROD_7-111 | 98 |

Page 6

Friday, April 3, 2026

1:04 p.m.

THE COURT REPORTER: Good afternoon. We are now on the record. Today's date is April 3rd, 2026, and the time is 1:04 p.m.

We are here for the remote deposition of Dr. Robert McKeon Aloe in the matter of Ashley Gjovik versus Apple Inc., matter number 23-CV-04597-EMC taking place over the Zoom application with all attendees appearing remotely.

My name is Kathleen Keenaghan. I am a California certified shorthand reporter and code compliant deposition officer for today's proceeding. My California license number is 14577. Will counsel please state your appearances for the record, beginning with noticing attorney.

PRO SE GJOVIK: I am not an attorney. I am a lawyer. I have a law degree. I am representing myself pro se, and my name is Ashley Gjovik.

ATTORNEY RIECHERT: My name is Melinda Reichert, and I am representing Apple and the witness.

ATTORNEY MANTOAN: Kathryn Mantoan from Orrick representing Apple and the witness.

THE COURT REPORTER: Thank you. We also have Ms. Perez with us, Apple in-house counsel.

Dr. McKeon, will you please raise your right hand so I may swear you in?

Page 7

DR. ROBERT MCKEON ALOE, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY PRO SE GJOVIK:

Q   Thank you so much. First of all, this is my very first deposition. So I going to try my best. Thank you for being with me today. Good morning. My name is Ashley. I am the plaintiff, and I am not an attorney, and I am appearing pro se. First, I want to say that you and I --

THE COURT REPORTER: I'm sorry, Ms. Gjovik.

ATTORNEY RIECHERT: Way too fast.

THE COURT REPORTER: Yes. Will you please slow down a little just for me to record everything. And speak clearly so that I can get every word down clearly. Thank you.

BY PRO SE GJOVIK:

Q   Good morning. My name is Ashley Gjovik, and I am the plaintiff in this matter. I have a law degree, but I am not an attorney. I am representing myself pro se.

Mr. McKeon, we were coworkers at Apple, and I am pursuing claims under labor laws with in solidarity and in support with my coworkers including yourself. So I want to make clear at the onset that nothing that I ask you today is to discourage them from exercising your own labor laws,

Page 8

including your rights under the NLRA and the California labor code.

Now, I'm going to ask you some questions today and before we get started, I'm going to ask you some foundational matters so we are on the same page.

Is that okay? Am I speaking too fast still?

THE COURT REPORTER: It's still a little fast, but you're okay.

ATTORNEY RIECHERT: Also, I want to object that you're misrepresenting the nature of your case, but you may proceed.

BY PRO SE GJOVIK:

Q   Okay. You were just sworn in by the court reporter. Do you understand now that you are testifying as if you are in a courtroom before a judge and jury?

A   Yes.

Q   Thank you. And do you understand that means you are required to give truthful answers to my questions today?

A   Yes.

Q   You understand that even though we are in a conference room or on Zoom and this feels informal, giving false testimony under oath can subject you to penalties for perjury?

A   Yes.

Q   Yeah. And I know you see the court reporter today.

**Page 9**

She is taking down everything that is said today, everything you ask and everything that I give. And it is going to be made into a written transcript, and before she can take down words, I need you to give verbal answers. So if your answer is yes, please say yes rather than nodding your head. Can you do that for me?

A  Yes.

Q  Along the same lines, please let me finish my question before you start your answer, and I will do my best to let you finish your answer before I ask my next question. If I interrupt you though, please let me know, and that way you and I do not talk over each other, and the court reporter can get a clean record. Is that fair?

A  Yes.

Q  If at any point you don't understand a question I have asked, I want you to tell me, and I will try my best to rephrase it in a way that you can understand. Will you do that?

A  Yes.

Q  Is it fair to say that if you answer a question, I am entitled to assume that you understood that question?

A  Yes.

Q  If you need to take a break at any point to use the restroom, get water, or stretch, that is fine, just let me know. The only thing I ask is if there is a question

**Page 10**

pending that you please answer it before we go off the record. Is that agreeable?

A  Yes.

Q  Is there any reason you might not be able to give your best testimony today? Are you feeling okay, ill, or distracted?

A  I am ready.

PRO SE GJOVIK:  Did you get that, Kat? I didn't hear.

(Reporter nods.)

BY PRO SE GJOVIK:

Q  Are you under the influence of medication or anything that would affect your ability to answer and give truthful answers to my questions?

A  No.

Q  Did you meet with anyone to prepare for today's deposition?

A  Yes.

Q  Without telling me what you and any attorneys discussed before -- I understand it is privileged -- did you or anyone else tell you what your answer should be to any of my questions today?

ATTORNEY RIECHERT:  Objection. Attorney-client privilege. Instruct you not to answer.

BY PRO SE GJOVIK:

**Page 11**

Q  I think he still has to answer.

ATTORNEY RIECHERT:  Don't answer.

THE WITNESS:  I don't have to answer.

BY PRO SE GJOVIK:

Q  Can you say?

A  I don't have to answer. I am not going to answer.

Q  Did you review any documents to prepare for today?

A  I am not going to answer that either.

ATTORNEY RIECHERT:  You can tell her what documents you reviewed.

THE WITNESS:  Okay. I reviewed some of the exhibits. I don't think I reviewed all of them.

BY PRO SE GJOVIK:

Q  Okay. Thank you. Do you understand that your answers today need to be based on your own personal knowledge and recollection, and if you are guessing or speculating, I need you to tell me that?

A  Yes.

Q  Thank you. And I am going to ask you to try not to speculate or guess, and if you don't know, say you don't know or you don't remember.

A  Okay.

Q  Is that okay?

A  Yes.

Q  And one last thing. If at any point during today,

**Page 12**

you realize an answer you gave earlier was incorrect or incomplete, will you let me know so that we can correct the record and make sure we have your complete and final answer?

A  Yes.

Q  Thank you. Okay. So let's get started. Please state your full name and current title at Apple.

A  My name is Robert Thomas Aloe. And my title that Apple is -- I actually don't remember what it is. It is, like, Generative AI Safety -- I guess you could say Safety Engineer. I am on a different team now.

Q  Do know what you are coded in Merlin for a rule code?

ATTORNEY RIECHERT:  Wait for the end of her question.

THE WITNESS:  Sorry. I do not.

BY PRO SE GJOVIK:

Q  Okay. How long have you worked at Apple?

A  Eleven years.

Q  From the time you started, what roles have you held?

A  I have been an algorithm engineer. I have been a manager, and I have worked on a few teams.

Q  I would like to show the first two exhibits, which is just to have you authenticate your public LinkedIn profile.

ATTORNEY RIECHERT:  Are you marking this as Exhibit

Page 13

Number 1?

PRO SE GJOVIK: If you would like me to put numbers like that, we can. I was just going to refer to the Bates numbers.

ATTORNEY RIECHERT: We should put numbers.

THE COURT REPORTER: Yes. We would need to mark them with exhibit numbers.

PRO SE GJOVIK: Okay. So should we start with 1 and then go through and mark them sequentially?

THE COURT REPORTER: Correct. Yes.

(Exhibit 1 was marked for identification.)

BY PRO SE GJOVIK:

Q   Okay. Sorry. I did not mark them beforehand.

So for Exhibit Number 1, we have the Bates number 7547. This is a printout of your LinkedIn profile that I captured on April 2nd, 2026. Does this look correct to you?

A   Yes.

ATTORNEY RIECHERT: I don't know if we are seeing the whole document. There we go. And I don't know if that is the whole document either.

THE WITNESS: Yes.

BY PRO SE GJOVIK:

Q   This is the first page of it just to show the URL. So the URL is Dr. Robert McKeon Aloe 01581595. And then the full one is Exhibit 2.

Page 14

ATTORNEY RIECHERT: Will this be Exhibit 2?

PRO SE GJOVIK: Thank you, Melinda.

(Exhibit 2 was marked for identification.)

BY PRO SE GJOVIK:

Q   Bates number 7-917, and I will show you each of the pages. There are eight pages on this. And I would just like you to confirm that this does represent your public LinkedIn profile.

ATTORNEY RIECHERT: Go slowly.

BY PRO SE GJOVIK:

Q   Yes. This is the first page. Let me know when you are done, and I will go to the next.

A   Okay. You can go to the next page. Okay. You can go to the next page. Okay. You can go to the next page. Okay. You can go to the next page. Okay. You can go to the next page. Okay. You can go to the next page. Okay. You can go to the next page. Yes. That's all mine.

Q   Thank you. And can you authenticate that is your LinkedIn profile with the full content?

A   Yes.

Q   Thank you. And that is public right now?

A   Yes.

Q   And has that information been public since you have worked at Apple as you accumulate related experience, you update and that information is on LinkedIn?

Page 15

A   I'm sorry. Can you repeat that?

Q   Have you always had a public LinkedIn profile while you worked at Apple?

A   Yes.

Q   And have you -- when was the first time that you made public on your LinkedIn profile that you were working on a face ID?

A   After face ID launched.

Q   What about biometrics generally?

A   After I had worked on biometric projects.

Q   What about when you were working at Apple and saying that you are working on biometrics at Apple?

A   I don't believe I published anything on biometrics at Apple until we reached face ID.

Q   And what year do you think it was that you updated your LinkedIn to say that you worked on biometrics and face ID at Apple?

A   I suspect 2017.

Q   Probably shortly after launch? That's tradition. Okay. So then probably no later than 2018?

A   Probably. Yes.

Q   Okay. Thank you. And did all the job titles that were on this profile look in the line that was either in line as what your job title was coded as or generally what your managers will designate your title as when you were in

Page 16

those roles?

A   Yes. Roughly.

Q   And then the information that you shared about the projects that you were working on, all of that looks accurate to you, the work you did?

A   Yes.

Q   Thank you. During 2017 you were working on face ID and biometrics work at Apple prior to the announcement of face ID; is that correct?

A   Yes.

Q   What was your group doing related to face ID development prior to the launch of face ID?

ATTORNEY RIECHERT: Don't reveal anything that is confidential.

THE WITNESS: We were collecting data to train the algorithm and understanding how we were failing and what data we needed to collect to fix the algorithm.

BY PRO SE GJOVIK:

Q   I'm sorry. Are you able to move the microphone closer to you?

A   Is this the one? That one. Sorry. I will move closer. We were collecting data to train the algorithm and then looking for data for what parts of the algorithm did not have the training parts or the training to add to that to the training.

Page 17

Q   What kind of things were you doing to gather that data?

A   User studies.

Q   Can you tell me about the user studies?

A   I believe they are confidential.

Q   Everything about these user studies?

ATTORNEY RIECHERT:  This is a good time, Ashley, for us to make clear.  He may testify to confidential information, but only if you commit not to disclose that information that he testifies to in any location at any time to any person until after the court has ruled whether it is confidential or not.  So I can designate testimony as confidential pursuant to the protective order.  And you have to commit to me that it will remain confidential unless and until a judge rules it is not confidential.  If you don't want to agree to that, then I will instruct him not to answer any questions that call for confidential information.

PRO SE GJOVIK:  It's my understanding that if we are going to be using the protective order for this, which I was expecting to ask questions that would have somewhat confidential information as part of the answers, that it would be up to Apple's counsel to designate that testimony when it is made during this deposition as confidential, and they would need to substantiate their designations through that process.  As of now, it sounds like that protective

Page 18

order is still in place, and if it is real designations, that is supposed to be the tool for it.  And it is my understanding that Apple would need to answer my questions during a deposition.  If there is a protective order in place that Apple had requested exactly for designating confidential information that is in place, then that is the tool they are supposed to use.  It cannot decline to answer requiring I stipulate to things beyond the protective order.  So if you want to refuse to answer questions under an objection that is confidential, even though you could designate under the protective order, that is your choice, and we can dispute that later, but it is up to you how you want to handle it.

ATTORNEY RIECHERT:  What I need your commitment to do is when I designate staff as confidentially pursuant to the protective order, I need your commitment that you will keep it confidential under the protective order unless and until a judge rules that it is not confidential.  This is the problem that we have.

PRO SE GJOVIK:  So that's not required.  It's not in any rule.  And I have said repeatedly if there is real confidential good faith designations, and if they could be colorably confidential, and I said I am expecting some answers today will be colorably confidential, if not actually confidential, and I would respect that.  And I have

Page 19

to do that under my intellectual property agreement and the valid terms anyway.  So I'm not stipulating with you over this.  It is up to you guys.  You either designate stuff as confidential under the protective order and its terms without further required deposition stipulations from me, or you refuse to answer, claiming whatever excuse you want, and I will just explain to the judge that you refuse to answer.

ATTORNEY RIECHERT:  But you will recall at your deposition, I designated stuff as confidential.

PRO SE GJOVIK:  I'm paying a lot of money for this deposition, Melinda.  We are not going to bicker about this.  I need a binary from you of which direction you want to go.  I am not going to argue, and I'm not going to do some weird stipulation with you about the deposition.

ATTORNEY RIECHERT:  Okay.  Unless you agree to keep what I designate as confidential as confidential, I will not let this witness give you any confidential information.

PRO SE GJOVIK:  That's a very vague statement, Melinda.  I am telling you right now if you designate under the protective order as confidential, and I am assuming this is not going to have -- assuming that you do it in good faith, the stuff that could be colorably confidential, then I have to respect that both with the protective order and the confidentiality agreement, and I have never indicated I would not do that.  But if you start designating his work

Page 20

conditions confidential, that might be a dispute.  But it is up to you.  We can handle it outside of this.  I am not going to argue with you on this.  So I need you to decide, are you going to refuse to answer stuff that is confidential because I would not agree to extra terms, and that is why or are you going to answer and designate --

ATTORNEY RIECHERT:  So at your deposition, I designated stuff as confidential --

PRO SE GJOVIK:  I am asking you -- Melinda, we are wasting a lot of time.  It is very expensive time.  I need an answer.

ATTORNEY RIECHERT:  Okay.  I want your commitment to keep --

PRO SE GJOVIK:  No.

ATTORNEY RIECHERT:  -- any confidential information confidential.  If not, I will instruct this witness not to give you any confidential information at this deposition.

PRO SE GJOVIK:  Confidential is an extremely broad term, Melinda, and you are -- and I am objecting for speaking objection actually.  This is a very broad and coercive speaking objection, and Melinda, I would also argue that it is probably an NLRA violation as well because the things you are saying are coercive to the worker.  He has a right to say stuff that he may think is not confidential.  And there's actually going to be a lot at this deposition.

Page 21

That why I said what I said at the beginning, that he does have rights, and I do not want to coerce him.

So I need you to make this decision right now.  I am not agreeing to anything beyond the protective order.  You can use the protective order you want to use, or you could just refuse to answer and you can explain to Judge Westmore why.

ATTORNEY RIECHERT:  I will instruct the witness not to answer any questions that are confidential unless you commit to me that you will keep his answers confidential pursuant to the protective order.

PRO SE GJOVIK:  That's not.  That's not -- okay.  So objecting to counsel's speaking objection.  Refusing to answer the question.  Whatever version of harassing the other party.

BY PRO SE GJOVIK:

Q   And I am going to ask Mr. McKeon again if there is anything he can tell me about his work on the face ID user studies in 2017 prior to the announcement of face ID other than there were user studies?

A   There were user studies, and I worked on them, and I designed some of them.

Q   What is a user study?

A   User study is where we ask for volunteers to use a device or series of devices to run a protocol and collect

Page 22

data which that data is then used for training and algorithm or testing and algorithm.  And all of that data is collected under informed consent.

Q   And you have run user studies in prior roles?

A   Yes.

Q   At Apple before?

A   Yes.

Q   Can you tell me anything about those user studies?

A   They involved people and devices and user experiences.  They were all voluntary, and they all required informed consent.  And the data was kept in accordance to the privacy that we set out in the informed consent.

Q   Okay.  Thank you.  And you are speaking about the user studies at Apple?

A   Yes.

Q   And did you conduct user studies at companies or institutions prior to Apple?

A   Yes.

Q   Are there any differences in process or procedure that you notice between Apple and other entities where you did similar stuff that was not Apple?

A   Apple felt more private, and I was more certain that the data was being kept encrypted and that the number of people that had access to the data was limited to the algorithm engineers.  Whereas prior employment, I did not

Page 23

feel the same.

Q   I'm sorry.  Can you get closer to the microphone again?

A   Yeah.

Q   Thank you.  And you said informed consent.  Did you manage informed consent processes either at the pre-Apple institution or companies and/or at Apple?

A   At the -- not before Apple.  While at Apple, I managed them for the user studies that I was the engineering DRI of.

Q   Can you tell me about your views about informed consent for user studies?

A   What do you mean by views on informed consent?

Q   What would you believe represents informed consent?  What are the principles of informed consent?  What would not be informed consent to you?

A   Sorry.  Can you split up the questions?

Q   Yes.  So I am just asking for your general view of what informed consent generally looks like as a practice?  So what does voluntary, kind of, look like to you?  Can you describe, maybe, what a process that looks like to you that -- because you said -- I believe you said that the Apple user studies were voluntary, and there was informed consent.  So what kind of things, what kind of criteria do you use for you to personally say this is voluntary to me?

Page 24

This makes me feel confident to say this was voluntary and otherwise informed consent?

A   Voluntary.

ATTORNEY RIECHERT:  Wait for the end of the question.

PRO SE GJOVIK:  I'm sorry.  What?

ATTORNEY RIECHERT:  He interrupted you.  So I told him to wait for the end of the question.

BY PRO SE GJOVIK:

Q   He can answer.  Go ahead.

A   Voluntary to me means that in the recruitment effort no specific individual is targeted but that a broad net is cast to people of a -- either whatever demographic you are looking for or just a broad graphic group in Apple, people that are exposed to a certain piece of hardware or software, asking if they are interested in participating in a user study.

I believe it also does not involve either large positive rewards or punishment.  So a large positive reward would be thousands of dollars to join a user study internally which potentially would make someone's ability to consent to lessen because of the coercive nature of money.  While at the same time, usually there is some kind of small monetary thing given like a meal voucher for most user studies at Apple.  And then as part of the ICF and privacy in terms of

Page 25

voluntary, the ability to withdraw from a study at any time either before the study starts, in the middle of the study or after the study, to request the data to be deleted at any time.

Additionally, having some kind of data retention policy, both in terms of security of data, as well as the length of time that the data is retained for any potential training.

Q   Thank you.  Do you think it is important for informed consent and voluntary for the folks to know the details in the nature of the study before they would start the recruitment process?  So they -- let me clarify then.  They may receive an e-mail trying to recruit for a study.  Do you think people can meaningfully engage in informed consent and voluntarily agree to the process without actually knowing the details of what is entailed in the study if it is not included in that recruitment e-mail?

A   That is not the process that we run by at Apple.  So typically when someone says that they want to volunteer for a user study, they meet with a user study engineer who goes over the ISTF as well as what the user study is about.

So I think the challenge of telling people that everyone that is interested in what the user study is could be revealing confidential information because sometimes a user study requires an extra level of disclosure.

Q   I understand.  Do you think that it might challenge

Page 26

a typical informed consent process where there generally is an upfront disclosure of the general nature of the study where Apple might not have that up front?  So people might start the recruitment process and sit down with someone to hear the details and then they hear the details, but they haven't actually started the recruitment process, and today may feel more coerced or less willing to withdraw compared to if they had known the details at the beginning and not started the process?

ATTORNEY RIECHERT:  Objection.  Vague.  Compound.  Lacks foundation.

BY PRO SE GJOVIK:

Q   Okay.  He still has to answer.

A   I don't believe that is a fair assessment of the process because when you sit down with someone to start to go over an ICF, not only is the discussion of what the study entails in the ICF itself for you to read, but we have instigated processes to point out those specific parts of the ICF and the voluntary nature and the date of retention to make sure that the subject is well-informed, and they have the ability to withdraw from the user study at any point.  And I don't think it makes a difference whether they start the recruitment process or not in terms of their ability to have it feel like it is a voluntary process.

Q   How many people have withdrawn from studies after

Page 27

they have started that recruitment process either sitting down to read the ICF or either midway?

A   I don't know the answer to that.

Q   Do you know if any have?

A   I know that two people have withdrawn from user studies that we had to delete their data.

Q   And that is for all the user studies you have worked on at Apple, you have two examples?

A   Yes.

Q   Do you have any information that they provided as to why they withdraw?

A   They do not need to provide a reason for why they withdraw.

Q   Did they provide a reason?

A   I don't recall, and we don't ask.

Q   And when folks ask to withdraw, what does that process look like?

A   An infrastructure team goes through and deletes all of their images and e-mails are sent out to the engineers to see if any engineer has local copies and all the engineers are instructed to delete their local copies.

Q   Thank you.  So for example, I was part of a Gobbler user study in 2017 prior to the announcement of face ID.  I had one where I was at a, kind of, thing in a parking lot, and we were doing stuff with sunlight.  If I had -- let's

Page 28

see.  And I will show you the e-mails and have you authenticate them and if you don't remember, we can look at them first.  Let me know.  And it did not show me exactly what was happening until I showed up, and there was something in the parking lot and it had NPS there.  If I wanted to decline at that point, what would have been my process to decline?  If I was already on the list and registered and NPS was checking me in?

ATTORNEY RIECHERT:  Objection.  Very compound, but if you want to ask what is the process to withdraw from that study, that is fine.

THE WITNESS:  I was not running that user study.

BY PRO SE GJOVIK:

Q   Okay.  The parking lot one or Gobbler generally?

A   I don't know which user study you are referring to.

Q   Okay.  We will go through the e-mails.  I will raise it again here.  Did you run any user studies related to an application called Gobbler or Glimmer?

A   Yes.

Q   Can you tell me about when you started those user studies?

A   In the spring or -- studies, I ran a few test fests.

Q   What year?

A   2017.

Q   And who developed the concept for the Gobbler and

Page 29

Glimmer user studies?

A   What do you mean by concept?

Q   Did you use a term directly or responsible individual for the Gobbler studies, was there a DRI for the Gobbler studies?

A   I was the DRI for Test Fest and the Test Fest used Glimmer as it's upload mechanism.

Q   Was there a DRI for Glimmer Gobbler?

A   I was also the DRI for Glimmer.

Q   And were you --

A   I --

Q   Go ahead.

A   I don't recall exactly when I became the DRI in the summer, but someone else was the DRI before.

Q   Do you remember who?

A   No.  I do not.

Q   Do you know why that person was not doing it anymore?

A   I do not recall.

Q   And when you started that -- when you took over that project, what was the current status of that project?  Did it already have plans for the user study?

A   It wasn't -- sorry.  Plans for which user study?

Q   Were there multiple user studies related to Gobbler and Glimmer?

Page 30

A   Yes.

Q   Okay.  Can you tell me about -- were there a lot of them or just a few?

A   I would like to clarify that Glimmer is not a user study itself.  It is an upload app.  It is an internal application, that it is not a user study in and of itself.

Q   Okay.  Thank you.  Is there a term or a proper term to use for the user studies that utilized Gobbler Glimmer?

A   Whatever user studies wanted to use that as the upload application, they could.

Q   Was -- so you are saying there might be other user studies doing a variety of stuff that use the tool as part of their user study?

A   Correct.

Q   And I think I'm trying to -- thank you.  I think I'm trying to narrow in on were there user studies specific to just getting the face ID development through Gobbler Glimmer, like, specifically targeting for the development of face ID?

A   All of our data collection efforts were to develop the algorithm.

Q   And were there general user studies for targeting that data versus a larger update for a software update?

A   No.  All the user studies we were doing were to develop the algorithm.  I don't understand what the

Page 31

difference would be.

Q   So I thought your earlier answer indicated that there was a user study that was a larger effort where it was using Gobbler Glimmer to gather face ID as part of developing maybe a larger application or project.  And I was trying to differentiate that versus just a user study only to gather the data just for the face ID development?

ATTORNEY RIECHERT:  Objection.  Misstates the prior testimony.

THE WITNESS:  I actually don't understand the question.

BY PRO SE GJOVIK:

Q   Okay.  I am trying to clarify because you said that Gobbler and Glimmer are not user studies.

A   Correct.

Q   Thank you.  And counsel for Apple for several years has referred to them as user studies.  So I'm trying to tease apart the distinction.  So I apologize if my questions are not clear because this was a new concept for me on this.  So can you elaborate for me on this -- maybe this is a better way to do this.  Can you elaborate on why the tool called Gobbler Glimmer, you don't consider that a user study?

A   Because the Glimmer tool is a tool to securely, like, encrypt data from the phone, and send it to a backend

Page 32

server.  And whether it is face ID data or other data that is written into the API, that does not matter.  Like, Glimmer, in and of itself is only there to display data and logs that are already on the phone.  It does not have a capture capability.

Q   Can you explain what you mean by a capture capability?

A   If you have a phone with Glimmer on it, and you delete Glimmer, it does not delete the face ID logs that are on the phone.  Because the face ID logging is to the internal system.  So Glimmer is only looking at files that already exist.  It does not maintain the directory of files that already exist.

Q   What tool or application does capture the data that has been displayed in Gobbler Glimmer?

A   I don't know.

(Exhibit 3 was marked for identification.)

BY PRO SE GJOVIK:

Q   You don't know.  Okay.  So I want to quickly show one of the exhibits.  This one is Bates number 7781.  This will be Exhibit 3.  This is a photo taken of me from my phone I viewed on the Gobbler Glimmer app in 2021.  I blurred any type of code or text on this.  So it is just of the photo.  Is this the type of image you would expect to see when someone opened Gobbler Glimmer and looking at data

Page 33

that is captured through it?

A  Yes.  This is an image I would expect to see in Glimmer.  It is just called Glimmer.

Q  Say again?

A  It is just called Glimmer.

Q  So I am using Burns because when I was enrolled, it was called Gobbler.  Do know the history -- is Gobbler the same thing as Glimmer, and it was just renamed, or are they separate?  Are they different?

A  Gobbler was renamed as Glimmer in 2017.

Q  Do you know why it was renamed?

A  I was not told directly.

Q  Do you have an opinion of why you think it was renamed?

A  Probably because the word Gobbler can be seen as offensive in the word in the United Kingdom.

Q  Yeah.  Why do you think it would be offensive?

ATTORNEY RIECHERT:  Do we really need to go into this?

PRO SE GJOVIK:  Yeah.  Absolutely.

ATTORNEY RIECHERT:  Well, you go look it up if you want to see why it is offensive.  He does not need to tell you.

PRO SE GJOVIK:  No.  I want him to tell me.

THE WITNESS:  I don't think it's offensive

Page 34

personally.

BY PRO SE GJOVIK:

Q  Why do -- you suggested that other people might.  Why do you think other people think it might be?

A  Because it could be used as a sexual term.

Q  Were there any complaints that you know about that people made about the term Gobbler?

A  I did not hear of any complaints.

Q  Do you know who decided to change it to Glimmer?

A  I do not know.

Q  Thank you.  The photo I am showing you -- we will just call it Glimmer since you are used to it being called Glimmer and now that we've established it is the same thing.

So this is a photo that someone might see in Glimmer.  Do you know what function on the phone is capturing these photos?

A  I do not know exactly what function.  I believe on face ID, the module is capturing the image, but I do not know the exact path that it takes to get onto the system.

Q  Okay.  And you said it is your understanding that Glimmer, kind of, displays data that is already on the phone.  It itself is not capturing any data; is that correct?

A  Correct.

Q  Okay.  So you said if someone was to delete the

Page 35

Gobbler app or Glimmer app off there and found that, if data were still being gathered through the underlying stuff, that just deleting the app would not stop that data from being gathered?

A  Yes.  In the same way that other system logging occurs for internal builds.

Q  Thank you.  And then if someone wanted to, let's say -- sorry.  Let me back up.

Do you know if the type of data that would be shown in Gobbler such as this photo, for example, is something that would be captured on an employee's phone without opting into any kind of Gobbler or Glimmer study?  Is this something that might be captured on any employee's phone?

A  It depends on if the employee has a development-fused device and if the employee has the logging.

ATTORNEY RIECHERT:  Karen Sullivan.

THE WITNESS:  -- if the employee has the logging toggle turned on and off.

BY PRO SE GJOVIK:

Q  What is the logging -- sorry.  Go ahead.

A  There is a toggle in internal settings to turn on or off any logging that is occurring on a device.

Q  And so anyone who is an employee could decide to just allow their phone to gather their images like what I

Page 36

showed you if they went into the settings and toggle that on?

A  Yes.  That's with the caveat that the images stay encrypted on the device because they are considered in the same category as held data in terms of data encryption.

Q  Okay.  So let's say when people were enrolling in at least 2017 and 2018, and they are joining what has been advertised as a Glimmer or Gobbler user study program, and they are installing that app on their phone, was part of the process of installing that and onboarding those employees to toggle that switch so stuff was captured?

A  I don't recall the exact process.  But if someone volunteered to join the study, then they were sent instructions and in those instructions, it involves setting up Glimmer and whatever was necessary for Glimmer to be able to function to upload logs for a file reader.

Q  Okay.  And then so you are saying whether assuming whether it is through the onboarding of the Gobbler Glimmer program, or whether someone went in and turned on that switch themselves, the device, the phone would start gathering that information, which at least like the photo I showed you, for example?

A  Yes.  That sounds correct.

Q  Okay.  And the Gobbler Glimmer application also shared things like the timestamps.  There were timestamps,

Page 37

right, for each of the images?

A  Yes.

Q  And there is GPS information too, right?

A  I don't recall.

Q  Okay.  And then it was -- when you would play those images, it was kind of, like, there was a stop motion animation where it is multiple photos and it looks like a video; is that right?

A  Yes.

Q  How would you describe that?  What it is gathering and, kind of, that video presentation?

A  That is an unlocked sequence.

Q  Do you refer to that file that is, kind of, an image and a video?  What do you describe that as?

A  I don't know aside from just calling it a video or a sequence.

Q  Video or sequence.  Okay.  And then it sounds like it might gather additional data too.  Do you know what kind of information was being -- or sorry.  Let me rephrase.

So the GPS information is being displayed in the Glimmer app, but whatever application or function is gathering those sequences would assumedly be gathering that GPS data, it would not be Gobbler and Glimmer itself?

ATTORNEY RIECHERT:  Objection.  Misstates his testimony about GPS.

Page 38

THE WITNESS:  I don't recall the GPS being in the file.  So I would be hard-pressed to answer about it.

BY PRO SE GJOVIK:

Q  Do you know if the application Gobbler Glimmer or the underlying functionality was gathering audio?

A  No, it was not.

Q  It was not gathering audio?

A  No.

Q  And would Gobbler Glimmer be able to -- if there was audio being gathered by underlying functionality, would Gobbler Glimmer be able to display that?

A  If they had it written in the application to feed into the API of Glimmer, and if we had modified Glimmer specifically, it would be able to playback audio.

Q  Did you ever do that intentionally?

A  I don't recall.

Q  Have you ever reviewed records that were gathered through your DRI role for Gobbler Glimmer with data being gathered as part of the Gobbler Glimmer effort that included audio in addition to the sequence and videos?

A  No.

Q  Do you know who would be reviewing that?

A  I don't know of the existence of any data of face ID with audio.

Q  And are there any risks with using the application?

Page 39

Could it potentially cause any injuries?

A  Not to my knowledge.

Q  What about the lasers, the face ID lasers?

A  I am not qualified to speak on that.

Q  Okay.  If you were recruiting employees for a user study related to the Glimmer application and it was using face ID on prototypes, would there be a risk of potential injuries from lasers?

A  If there was potential risk identified from DHS, it would have been included in the ICF document.

Q  And we were talking earlier about voluntariness and informed consent.  What would you expect if there was a risk of injuries from lasers, how that would be treated in disclosures in the process?

A  I would expect it to be taken very seriously.

Q  Do you think it would be ethical for Apple to state as part of an informed consent form that if someone was injured by lasers that they could not tell anyone other than Apple?

A  I am not sure.

Q  If you are presented in an informed consent from for a study like Glimmer using a tool with the phone like lasers and it warned that there could be injuries from lasers, but said it would be secret if anyone was hurt and they could not tell anyone other than Apple, would you sign that

Page 40

informed consent from?

ATTORNEY RIECHERT:  These are all hypotheticals.  This witness is not an expert witness.  He is not required to answer hypotheticals.  And they are very incomplete hypotheticals.  He has already said he knows nothing about lasers or risks from lasers.  So object on that basis.

PRO SE GJOVIK:  Understood.  He still has to answer.

THE WITNESS:  I have not seen that at Apple particularly because during the user studies with the prototype, we were required to take laser safety training to better understand, and some of the prototypes that had protections removed have unsafe lasers were required only to be in laser labs.  So the level of care that was taken to make sure that the lasers were safe and that we avoided laser injuries was very -- it seemed very responsible.

BY PRO SE GJOVIK:

Q  Thank you.  Let me ask more directly.  If you are DRI for a project from Glimmer, and there is a risk that people could be harmed from lasers from a user study and using it, would you object, put your foot down, if Apple wanted to state that injuries from those lasers had to be kept secret and confidential?

ATTORNEY RIECHERT:  Same objections.

PRO SE GJOVIK:  Understood.

Page 41

ATTORNEY RIECHERT: You use the word laser when there weren't. It assumes. It's an incomplete hypothetical, and it is calling for an opinion from a witness that is not here as an expert witness.

PRO SE GJOVIK: Just to clarify, I am asking him as an employee at Apple. I assume he gets recruitment e-mails too, and he is managing these user studies, and a directly responsible individual at Apple is, by the nature of the term, solely accountable for making decisions about how the projects run, and they are, kind of, looked at if something goes wrong or people complain. So these are expected decisions that they would be making, probably in partnership with the BPN if they are not. So it would be reasonable to ask this. So I am going to ask again.

ATTORNEY RIECHERT: You are asking hypothetical questions. If there are lasers, and he already said there were not lasers. So what difference does it make to ask that hypothetical and I object on the basis it is an incomplete hypothetical, and he is not here as an expert witness.

BY PRO SE GJOVIK:

Q  Understood. He still has to answer.

A  I would just like to comment that the face ID did use a dot laser projection. So there were lasers, but they were deemed safe.

Page 42

(Exhibit 5 was marked for identification.)

PRO SE GJOVIK: Okay. So I would like to show Exhibit 5 now.

ATTORNEY RIECHERT: Don't say anything confidential.

THE WITNESS: Okay.

PRO SE GJOVIK: What did you say?

ATTORNEY RIECHERT: I said don't say anything confidential.

PRO SE GJOVIK: Speaking objection. I object to that.

ATTORNEY RIECHERT: It was an instruction to the witness. That was not an objection.

PRO SE GJOVIK: I know it's a speaking objection coercing the witness to not make statements with a vague declaration of confidentiality, which I already objected, in addition to a being an improper objection and a coercive speaking objection, and it probably also violates his labor rights. So I am objecting to your objection.

(Exhibit 4 was marked for identification.)

BY PRO SE GJOVIK:

Q  This is Exhibit 4. This was a document produced by Apple. The Bates number is 7040. It is three pages. Can you see it, Mr. McKeon?

A  Yes.

Page 43

Q  Thank you. So I will show you all three pages, and you can -- I would like you to read it to. And tell me when you are done with each page, and I will go to the next one.

A  Sure.

Q  Okay.

A  Okay. You can go to the next page. You can go to the next page. Okay.

Q  Thank you. Have you seen this document before?

A  Yes.

Q  Can you tell me about where you saw it?

A  I have signed one before.

Q  You have signed one too?

A  Yes.

Q  It noted that this study, the Gobbler study was recording audio, but prior you said you did not think it was recording audio. Do you know why it says it was recording audio for this?

A  I'm sorry. Where does it say that?

Q  So it says what data will be collected, video and image recording of your face, and it says photo, audio, video, photo, video, audio?

A  If you go back up to page one.

Q  The purpose of the study says it will be to collect audio, video and photo images of the face.

A  So where it says what data will be collected, it

Page 44

says as part of the study of the information that may be collected, you may include the following information, including contact information, photo, video, audio sensitive, health and document study data.

Q  I'm sorry. Can you get closer to the microphone again?

A  So the use of the word may means that we may collect these things, and we may not collect these things.

Q  It says why is this study being done, and it says the purpose is to collect audio. So would it be safe to assume then this study would be collecting audio?

A  In the second line, it says the results of this study may be used to develop and improve technologies to -- images, video and/or audio data products.

So while it says that in the user study, I believe we were trying to be more broad in case we had any other video equipment to look out to how people were using the phones, but I cannot be certain of this for this specific user study.

Generally, we included that in ICS -- in these user studies because sometimes we had other video equipment that did collect audio, but inherent on the device, audio was not collected --

Q  Thank you.

A  -- for these.

Page 45

ATTORNEY RIECHERT: He's not finished.

THE WITNESS: Audio was not collected for these types of user studies.

BY PRO SE GJOVIK:

Q  Can you define this type of user study?

A  Using face recognition system.

Q  Okay. And you are saying you signed this. So you participated in the study with the thing in the parking lot and the sunlight? You did that too?

A  I don't recall whether it was in a parking lot or somewhere else.

Q  It says this study will take place in Mariani B, and it will take 20 minutes?

A  Oh, yes. Mariani 3B.

Q  So it was a while ago, but do you recall -- what I, kind of, remember it was this round compound with tall fences, and maybe two camp gates, and it was kind of a luau, where they had a task list for you to do to go through the data?

A  I don't recall exactly.

Q  Okay. So this says that the study will last approximately 20 minutes, and the date of it is 2017. Do you recall that when you signed this and participated in whatever version of this, 2017 was probably the year?

A  I believe so.

Page 46

Q  Would -- if you were signing this informed consent form to participate in this program, and it said this program will last approximately 20 minutes, would you expect that this study would last for years after that 20 minute period without the additional ICF?

A  No. I would not expect that.

Q  All right. So if they wanted to extend or do something different, there would be another ICF to sign that was ongoing because it was limited to 20 minutes, right?

A  I would expect so. Yes.

Q  Yeah. And especially since it says the only compensation would be food -- I think you saw that the compensation would be food and beverage after the study, that further kind of implies that it would be that one time thing?

A  Yes.

Q  Yeah. I think so too. And then where it says your confidentiality obligations, this says by agreeing to participate in the study, you acknowledge that any information in the study, including any study detail or the fact of your participation are considered Apple confidential information and are covered by the applications under your agreements with Apple.

Can you tell me what you think that would mean after the product is announced that the study was preparing for? So

Page 47

in this case specifically, I'm going to ask what you think this would mean after face ID was announced?

A  I presume it means that you follow the same confidentiality agreement we have with the company and don't reveal anything that was not already publicly revealed about the company.

Q  Do you think the fact that there was even a study would be confidential?

A  Yes.

Q  Do you think the fact that there would be any studies for this would be confidential?

A  I think the confidentiality would be more tied to the specific studies rather than there are studies because it was a public fact known that they did do studies for this product and other known products to collect data.

Q  Thank you. And I know you are not an expert witness, but you are a doctor, and it seems like you have some expertise in this field. How many years have you worked on biometrics development?

A  Fifteen.

Q  That's a long time. And so in your experience when something is generally announced if there was confidentiality about, you know, preparing for it, but once it is announced, does the fact that there are studies -- wouldn't it be kind of expected that in order to prepare

Page 48

something and develop it and that in order to ship it, there would be some kind of data collection or data collection process whether it required a user study or not, would you say that is expected to be a normal development practice?

ATTORNEY RIECHERT: Objection. Calls for expert testimony for my non-expert witness.

PRO SE GJOVIK: Understood. He can still answer.

THE WITNESS: Sorry. Can you repeat that?

ATTORNEY RIECHERT: I totally lost the question too.

BY PRO SE GJOVIK:

Q  Sorry. Now I lost it. Would you say the user -- whether you call it a user study or not, but like what we've been talking about with what Apple does for their user studies in gathering this type of data and data collection, would you say it is a typical product development process and standard? The fact that there was this user study to prepare this product to launch seems kind of intuitive for product design?

A  I think it is intuitive that there are user studies, but specific user studies and what the user studies are studying or even the code names used, I would consider that to be confidential.

Q  Why do you distinguish that?

A  Because they could give information in part or in

Page 49

full that could aid someone else, a competitor or a hacker, to harm Apple.

Q   So whatever information that you might consider confidential, it would have to be something that would actually cause some kind of competitive harm?

ATTORNEY RIECHERT:  Objection.  Calls for an expert opinion from a nonexpert witness.  You can ask him about what he did and what he knows, not about expert opinions on other subjects.

PRO SE GJOVIK:  Okay.  Let me rephrase.

ATTORNEY RIECHERT:  This would be a good time for a break.

PRO SE GJOVIK:  We can take a break.

THE COURT REPORTER:  Off the record at 2:09 p.m.

(Recess taken.)

THE COURT REPORTER:  On the record at 2:15 p.m.

PRO SE GJOVIK:  Thank you.  I want to be mindful of our court reporter who has a hard stop at 4:00 p.m. is my understanding.  So I do have a batch of documents I would like to authenticate.  So I think we can go through that now on the next phase before I go to the next question.  They should be fairly straightforward.

And I believe our last exhibit was 4; is that correct?

THE COURT REPORTER:  Yes.

Page 50

(Exhibit 5 was marked for identification.)

BY PRO SE GJOVIK:

Q   So for Bates 7778 would be Exhibit 5, Mr. McKeon.  Would you tell me if this document looks familiar to you and it is an e-mail you sent?

A   Yes.

Q   Thank you.  And then I believe this is just a different UI version of the same e-mail; is that correct?

(Exhibit 6 was marked for identification.)

BY PRO SE GJOVIK:

Q   This is 7886, and this will be Exhibit 6.  Is this the same e-mail?

A   I think so.

Q   This looks like an e-mail you sent?

A   Yes.

(Exhibit 7 was marked for identification.)

BY PRO SE GJOVIK:

Q   And then Exhibit -- 7789 will be Exhibit 7.  This is a confluence page using Glimmer.  It says it was last modified by you on October 15, 2018 that you edited.  Does this look like a screen you edited?

A   Hold on.  Yes.

Q   Thank you.

ATTORNEY RIECHERT:  Is it more than one page?

(Exhibit 8 marked for identification.)

Page 51

BY PRO SE GJOVIK:

Q   That was one page, but I have a second version with two pages.  I think it's a different UI Bates 7990, and this will be Exhibit 8.  Does this look like the same page that we talked about that you edited?

A   Can you go to the next page?  Yes.

Q   We already went over this one.  This is a document produced by Apple.  This is Apple's Bates number 2770.  This is an e-mail that you sent me in 2017.  Does this look accurate?  Like an e-mail you sent me in 2017?

A   Yes.  With the caveat that around this time, I sent a lot of e-mails to a lot of people.

(Exhibit 9 and Exhibit 10 were marked for identification.)

BY PRO SE GJOVIK:

Q   We emailed.  So this would be Exhibit 9.  Exhibit 10 we have a document produced by Apple, and this would be Bates number 2762.  I could show you the first page.  Let me know you want to see the second page.

A   Okay.  Go ahead to the second page.  That looks correct.

Q   And that looks like an e-mail that you sent?  That looks right?

A   Yes.

Q   Thank you.  Exhibit 11, this is five pages.

ATTORNEY RIECHERT:  Do you have the Bates number?

Page 52

(Exhibit 11 was marked for identification.)

BY PRO SE GJOVIK:

Q   Yes.  Just make sure it was not a duplicate.  Bates numbers 2765, Exhibit 11.  I will show you the first page.  Let me know when you want to go to the next.

A   Okay.  You can go to the next page.  Okay.  Go to the next page.  Go to the next page.  Go to the next page.  Okay.  This is it.  Okay.

Q   Does that look like an e-mail you sent?

A   Yes.

(Exhibit 12 was marked for identification.)

BY PRO SE GJOVIK:

Q   Thank you.  And Exhibit 12 is 2757.  This email is two pages.  Again, I will go to the first one and then let me know when you are ready for me to show you the second one.

A   Go to the second.  Okay.

Q   Is this an e-mail you sent?

A   Yes.

Q   Is it accurate?

A   Yes.

(Exhibit 13 was marked for identification.)

BY PRO SE GJOVIK:

Q   Then Exhibit 13 it is Bates number 2761.  This is just one page.  Is this an e-mail you sent?

Page 53

A  Yes.

(Exhibit 14 was marked for identification.)

BY PRO SE GJOVIK:

Q  Thank you.  Exhibit 14 is Bates 2771, it's two pages.  This is the first page.  Let me know when you want to see the second.

A  Okay.  You can go to the second.

Q  Is that an e-mail you sent?

A  Yes.

(Exhibit 15 was marked for identification.)

BY PRO SE GJOVIK:

Q  Thank you.  And then for Exhibit 15, this is Bates 2773, one page.  Is this an e-mail you sent?

A  This looks like an e-mail I received.

Q  It looks like there are two.  There is one from you and from me to you.

A  Yes.

Q  Okay.  So that's accurate to the best of your recollection?

A  Yes.

Q  Thanks.  And then for Exhibit 15 --

ATTORNEY RIECHERT:  16.

(Exhibit 16 was marked for identification.)

BY PRO SE GJOVIK:

Q  Thank you, Melinda.  For 2761, the Bates number.  It

Page 54

is one page that you sent -- is this an e-mail that you sent?

A  Yes.

(Exhibit 17 was marked for identification.)

BY PRO SE GJOVIK:

Q  Thank you.  And then for Exhibit 17, it is two pages and Bates number is 2757 from Apple.  This looks like a different version of the same one we looked at earlier.

A  I'm not sure.  If it is a different date, yeah, it is a different version.

Q  Does this look like an e-mail you sent?

A  Yes.

Q  Thank you.  And then for Exhibit 18 -- 18, Melinda?

ATTORNEY RIECHERT:  Yes.

(Exhibit 18 was marked for identification.)

BY ATTORNEY RIECHERT:

Q  Exhibit 18 is 2762.  It is an email, subject line announcement.  It is two pages.  Let me know when you want to see the second one.

ATTORNEY RIECHERT:  It's Exhibit 18 and Bates 2752?

BY PRO SE GJOVIK:

Q  Bates 2762.

A  Okay.  Go to the next page.  Okay.  Yeah.

Q  Is that an e-mail you sent?

A  Yes.

Page 55

(Exhibit 19 was marked for identification.)

BY PRO SE GJOVIK:

Q  Thank you.  And then for Exhibit 19, this is Plaintiff's Production 7788.  This was an informed consent form that we were looking at earlier today.  I believe it was Exhibit 3.

Do you know where the informed consent forms were being stored, or how they were supposed to access the documents that they supposedly signed prior?

A  Yes.

Q  Can you tell me?

A  They were using an application called Attache.

Q  So this was an error I saw when I tried to access a form in my e-mail, and I saw this error.  Have you seen this before, this kind of error?

A  I have not.

Q  Would it be expected -- go ahead.

A  Sorry.  I have not -- I have seen this error for other websites but not for this particular website.

Q  You have not seen this error ever for Attache?

A  Not that I recall.

Q  Okay.  Would you expect when you're running the programs for DRI that employees should be able to access the consent forms that they signed as part of that process?

A  Yes.  With the caveat that we stopped using Attache

Page 56

at some point.

Q  Okay.

A  And we started putting the consent forms on the Box.

Q  Okay.

A  And once we did that, the Attache links died, and I also think the Attache links were time-limited.  I don't know how long.

Q  Interesting.

A  I don't know if they last forever.

(Exhibit 20 was marked for identification.)

BY PRO SE GJOVIK:

Q  Okay.  Thank you.  And then this is -- so this would be Exhibit 20.

Melinda, correct me if I'm wrong.

Bates 7783.  This is a screenshot I took on my customer phone when I was no longer an employee on iCloud look up, and it said this com.apple.vtap.thegobbler was trying to look at my iCloud.  Are you familiar with this URI?

A  No.

Q  This warning message.  Have you ever seen this before?

A  No.

Q  Based on your understanding of the Gobbler app -- well, let me back up.  First question, when you see something like this with something using the term the

Page 57

Gobbler, would you expect that that was referencing some type of configuration prior to the name change to Glimmer?

A  Probably.

Q  Probably.  And if you are running an internal study using development phones, would you expect that the configuration would be trying to access a customer phone that is not used for work?

A  I don't.

Q  And what would the process be if, like, someone had left Apple, and they no longer work there, and they had their own personal device that they were seeing this kind of message that the Gobbler was trying to access their iCloud. How would they handle that?

A  I don't know that.  I have not looked at that.

Q  Okay.  Thank you.  That's fine.  And do you have any understanding of the backend or functionality of the Gobbler Glimmer application where they explain why it was trying to access a personal iCloud account?

A  I don't think so.

Q  Okay.  That's fine.  Thank you.  We are going to stop there on those.  I did want to ask you a couple of additional questions about these documents.  So going back to 7789 -- I really should have marked these with exhibits. I'm sorry.  I will do that next time.  On this document --

ATTORNEY RIECHERT:  It's Exhibit Number 7.

Page 58

PRO SE GJOVIK:  Thank you, Melinda.  It's nice to have a partner in a law firm who is helpful from the other side.

BY PRO SE GJOVIK:

Q  It says captured in public in the United States. Why is the United States called out specifically in these instructions?

A  Because in the United States when you are in public, you do not have a right to privacy.

Q  I'm sorry.  Can you get closer to the microphone and say that again?

A  In the United States, you do not have a right to privacy in public or in areas where you would not expect to have a right to privacy.  So any captures -- any captures there, would -- we would not need an informed consent or we would not have to worry about anyone getting mad that we were capturing either them or the background that we were capturing.  However, we also instructed the people to make sure no else was in the image.

Q  And when it says the United States, does that mean that folks should not -- at that point, when it was written that folks should not be uploading data in other countries?

A  It is only in countries where you had signed the appropriate ICF if there was one.  Because some countries do not allow you -- employees to collect data or employees to

Page 59

give consent.

Q  Tell me more about that please.

A  France and Germany don't believe that employees can give informed consent for data collection to their employer.

Q  Interesting.  So you are DRI of the applications and the studies.  Had you had any experiences with employees trying to upload data that was being captured in France or Germany?

A  No.

Q  Were employees told expressly not to use it in France and Germany?

A  They were told not to operate in those countries, and we were told to put in guardrails so that they were not able to.

Q  What were the guardrails?

A  A geo-fence.  So if the device was in the US, you would have had to sign the US ICF, and if the device was in another country that we did not have an ICF to cover it, you would not be allowed to upload the data in the Glimmer app.

Q  What does not allowed look like technically?

A  I don't recall.

Q  Okay.  So it could be an error message or maybe it doesn't upload in the background, but the idea or the concept was some type of geo-fence that would prevent it from being uploaded?

Page 60

A  Yes.

Q  And then it says captured in public, and so you mentioned your idea was you don't want folks that might accidentally get in the pictures that weren't the employees, that had not signed the ICF and would be upset that it was captured, but you are saying there no expectation of privacy in public.  So that is why the employees were being instructed that it is okay in public?

A  I'm sorry.  Could you repeat the question?

Q  Can you explain, again, why the employees were being told it was okay to upload information gathered in public even if it captured other people who had not signed ICF?

A  Because in the United States, you don't have a reasonable expectation of privacy when you are in public. So you only need a reasonable -- you need an ICF for capturing video or photos or audio when there is an expectation of privacy like in someone's home or business, but not when you are outside on the street.

Q  Were there ever concerns expressed about using the data, even if it was capturing people in public for commercial development if it's not being used for commercial development?

A  Not that I am aware of.

Q  Thank you.  This document we looked at earlier, this was Bates 2765, this one also talked about the same thing we

Page 61

just read, uploading in the United States in public, and on the second page, it says don't, under the don'ts, upload data in bathrooms, changing rooms, locker rooms or similar areas. And you sent this email. Why was this line here?

A We don't want any data from those places, and we don't want any accidental nudity.

Q Understandable. And when it says don't, is that left up to the employee to decide that they are supposed to review and they unilaterally would decide that there is not the information being uploaded?

A The employee has to review every image that they upload, and they have to decide to upload or not. So it is also up to their discretion. So they could also delete images where they feel like they look unflattering, where it is outside of the section of -- and we encourage people not to upload any photo that makes them feel uncomfortable.

So like the line at the top of the page, it says make sure any photo you upload would not be deemed inappropriate, including due to nudity or partial nudity.

Q And some of these instructions are with the intention that it is up to the employee then to use the app that has the front end showing the background data as you are explaining on Glimmer. And that they need to review the image and then they need to make the decision of whether it is appropriate or not, or has nudity or not, and they would

Page 62

offend people or not, and they would upload it to Apple, and then if there is an issue, it is kind of on the employee for uploading the data?

A Oh, sorry. Was there two questions there?

Q There were probably three. Let me rephrase. So the way this e-mail is framed, is the expectation that it is up to the employee who's phone captured the information to make the decision whether all these criteria are met on all the data they are uploading?

A Yes. It is up to the employee, but if engineers run across data that would be inappropriate or that we see as inappropriate, we would work towards deleting it.

Q And what happens if data is uploaded that have non-employees and is not appropriate?

ATTORNEY RIECHERT: Objection. Compound.

BY PRO SE GJOVIK:

Q Okay. Withdrawn.

What would happen if engineers find data that is uploaded that does contain nudity?

A What would happen is we would delete it, but I never saw or heard of a case where images were uploaded with nudity.

Q Okay. Were there any complaints from nonemployees that their data was being gathered?

A No.

Page 63

Q Thank you. And then we talked about France and Germany. We talked about this one. Okay.

So now I want to ask you about a term. And looking at -- I am showing you this document 2761, that we looked at earlier that you had authenticated, and this is an email sent to a group Gobbler whitelisted, and it says everyone that is whitelisted for Gobbler is whitelisted for Glimmer. Glimmer is just the new name of Gobbler. No need to fill out new authorization request. What does whitelisted mean?

ATTORNEY RIECHERT: So that's Exhibit 13.

PRO SE GJOVIK: Say that again.

ATTORNEY RIECHERT: That's Exhibit 13.

PRO SE GJOVIK: Thank you, Melinda.

THE WITNESS: Whitelisted was a group that could download the Glimmer application.

BY PRO SE GJOVIK:

Q I'm sorry. Could you go closer to the microphone?

A Whitelisted was an e-mail group of people that were authorized to download the Glimmer application.

Q And then the term listed for Glimmer, what does that mean?

A That means that they had gone through a process of signing the ICF, and that they had the correct disclosures and once they were verified, they were put on the white list.

Page 64

Q And so anyone using that Gobbler Glimmer application would be on a whitelist?

A Yes. They had to be whitelisted to use the application.

Q Okay. So there would be nothing specifically unique about being on the whitelist, other than you would be using the application so you could download it. Sorry. That was just me talking to myself. You can ignore that. I withdraw that.

Was there a point where they changed the process when employees could download it either on Attache or another tool that has special whitelisting and special approval links?

A It changed -- yes. It did change.

Q When did it change?

A I don't remember exactly when.

Q Okay. In 2017 -- this e-mail is from 2017. The term whitelisted, did it mean what you described earlier, or did it mean anything else about, like, what data could be uploaded?

A I don't understand the question.

Q This e-mail in 2017, August 2017, uses this term whitelisted, and we just established that Apple had changed the process at least once and how people are installing the application and having access to it. We talked about how

Page 65

whitelisted meant -- at least at one point meant that you could at least install it at all. I am asking as of August 2017, if that was all whitelist meant, or if whitelisted meant at that point, it was uploading data in a way that might be intended for QA team intended for a user study?

A   Whitelisted is intended for the data. So if someone was in a user study or in QA, they had to be waitlisted in some way. And I don't recall exactly how the user study was used to upload in Glimmer, but you had to be whitelisted. That is the only function it served, the term you had to be whitelisted.

Q   And was there a function or term in 2018 that they did not have to review the data? It was just automatically upload?

A   No, there was not.

Q   Would there be anywhere someone's data was being auto uploaded, and they did not have to review it?

A   There is not a function in Glimmer that allowed an auto upload of people's images.

Q   That is for QA teams too, not just user studies?

A   Correct.

Q   And if -- so I personally, in my version of it, saw data that appeared to be auto uploaded and did not see a workflow that looked like a review work flow.

Page 66

Do you have any idea after being on a different workflow because I was brought into the study earlier, back in August of 2017?

A   There were no images that were auto uploaded from Glimmer.

Q   And there is an e-mail too of -- I was helping Dan West's product assistant development team, and they asked me to do -- and they asked me to be whitelisted with what happened to be a QA whitelist. Could there be a separate whitelist term for the QA teams to allow auto upload of data associated with the employee IDs?

A   Not to my recollection.

Q   That would have been around July or August 2017. So that might have been before you joined and took over the project?

A   That was not before I joined.

Q   Okay.

A   But I don't recall when I exactly took over the project.

Q   Understood. And let me look. There was one other e-mail I wanted to ask you about. So this e-mail, this is Bates number -- Bates number 2762.

Do you have that, Melinda?

ATTORNEY RIECHERT:  18.

BY PRO SE GJOVIK:

Page 67

Q   Thank you. This is an e-mail you sent. I want to clarify data to upload. There are some legal restrictions which we didn't have to worry about because certain test scenarios were not likely as a result of the carry restrictions. Please review the following and verify all your data before upload. Do you remember what that was about?

A   No. Not exactly.

Q   Yeah. So there are some legal restrictions that we didn't have which we didn't have to worry about, certain scenarios were not likely as a result of the carry restrictions. What were the carry restrictions prior to September 2017?

A   I don't recall the carry restrictions, but to carry the device, you had a list of things you are restricted in where you could use the device.

Q   Yeah. And that iPhone, the first one with face ID, had a different one of a form factor and a UI, right? It was kind of noticeable that it was something new and different?

A   Yes.

Q   Yeah. And so either if you remember, or Apple typically, when they have carry programs like that with employees, generally, don't they put them in some sort of stealth case to hide the form factor or just say don't use

Page 68

it at all, just keep it on your campus or your home and that is it?

A   Each carry program has its own restrictions.

Q   Do you remember for this one?

A   It's not always ubiquitous. This, I don't recall exactly.

Q   Do you have any recollection of having the -- maybe, the whitelisting and the data set up, that there were far less restrictions because there was an expectation that the new form factor was not going to leave Apple's campus or if it was, it would be in someone's private office?

A   I suspect the restrictions were having other people that were -- that had not signed an ICF being involved in the capture, simply because you could not be around people that did not know about the device.

Q   Thank you. And then for people who were enrolled earlier in, like, 2017, was there data captured or stored in any different way? Here is my question. If I were to ask now, I want to delete all my Gobbler data. I withdraw from any of the studies. Can I actually get all of my data deleted?

A   Pretty reasonably, yes.

Q   What would be the process for me requesting that?

A   You would e-mail either the study DRI or someone at Apple who could get you to whoever took over the study and

Page 69

who is responsible for the data, and then they would go through a process to delete the data on the infrastructure servers, and then they would e-mail anyone who might have access to your data or downloaded your data or used your data locally and ask them to delete it and do their best efforts to do that.

Q   So does it track if anyone was accessing any of the data gathered, if there was an audit trail showing who did that?

A   I am not sure how the infrastructure set up for auditing who accesses the metadata.

Q   Okay.  Thank you.  And I am going to ask you a question.  Has there been -- what do you know about Apple's -- the type of VPN profiles required to install on employee phones that generally grant full disk access to Apple global security and allow them to monitor and access activity?  Can it access that Gobbler data and that Glimmer data?

A   Can what access Gobbler or Glimmer data?

Q   The profiles that employees are required to install on their phones that give new product security and global security full disk access to the devices so they can do their own backups of the data and monitor employee activity.

A   I am not sure.

Q   Are you familiar with those profiles?  Have you

Page 70

installed those on your devices?

A   Yes.  I have installed them on my devices.

Q   They generally say they give full disk access, right?

A   I don't recall.

Q   Does it -- when you install them, do you remember any terms when it tells you about how much access it is going to give Apple to your device?

A   I don't recall.

Q   Would you think that it did give full disk access -- what does disk access mean?

A   I am not sure.

Q   Appear --

A   I would assume that it means, like, access to anything.

Q   Yeah.  That's generally what I thought too.  And so if the Gobbler is also like the UI of that backend data being gathered by other backend processes that you mentioned you are not even sure exactly what they are.  Assuming that data is being stored in the disk on the phone, right?

A   The data, from my understanding, is stored encrypted on the disk, and can only -- is only decrypted when the device is unlocked.

Q   What kind of encryption is used?

ATTORNEY RIECHERT:  Don't say anything

Page 71

confidential.

THE WITNESS:  Whatever the iOS -- it's confidential, I'm sure, but I don't know what it is.  I just know that it is.

BY PRO SE GJOVIK:

Q   You don't know how it is encrypted?  Is it stored in the iOS in the cloud or just on device?

A   Just on device.

Q   Just on device.  But if there is a profile giving full disk access, it would give full disk access on that device too?

ATTORNEY RIECHERT:  Objection.  Hypothetical -- improper hypothetical.

THE WITNESS:  I do not have an answer for that.  I don't know.

BY PRO SE GJOVIK:

Q   Have you ever heard employee questions, concerns, complaints, about whether that data can be accessed by global security?

A   No, I have not.

Q   Have you ever heard any communications where it sounds like global security was trying to access that information?

A   No.  I have not.

PRO SE GJOVIK:  Okay.  Now I would like to go to --

Page 72

Now, what was our last -- Exhibit Number 20.  I have 20.  Yes.  No.  Exhibit 20 is the last one.  21 is next.

(Exhibit 21 was marked for identification.)

BY PRO SE GJOVIK:

Q   Mr. McKeon, I'm sorry to do this to you.  You are an excellent writer, and I'm glad you talk about the stuff you do, and I want to tell you again, I support you as a coworker and your right to speak out and talk about working conditions.  And I hope you do not face retaliation from Apple for what we are about to do.  But I would like to go through some of your public postings and the information you are sharing and why you thought it was okay to share this information and did not think it was confidential.

So we are going to go through some of your articles.  We are going to go through some of your articles, and I am going to have them added as exhibits.  These were produced to Apple as well.  And I am just going to, kind of, ask you for each of them when you talk about Apple to comment on why you found that it was a fine thing to make public, and I honestly don't see anything confidential.  So I think you are fine, but let's start with this one.  This will be Exhibit 21.

ATTORNEY RIECHERT:  Do you want him to read the article?

PRO SE GJOVIK:  Say that again.

Page 73

ATTORNEY RIECHERT:  Are you asking him to read the article?

PRO SE GJOVIK:  I would like him to authenticate to them.  If you would like him to look at each page of each of the articles, we can do that, or we can use the URL if he is -- are you very familiar with these articles?  I am assuming you are since you authored them.

ATTORNEY RIECHERT:  You should look at every page.

THE WITNESS:  I should look.  I have not seen these in many years.

BY PRO SE GJOVIK:

Q   So this would be Exhibit 21.  This would be Plaintiff's Exhibit 7509, it's called Balancing Creativity and Focus.  This is the first page.

A   Okay.  You can go to the next page.  Okay.  You can go to the next page.

ATTORNEY RIECHERT:  Is that middle section yours?

PRO SE GJOVIK:  I'm sorry.  What?

ATTORNEY RIECHERT:  I was wondering if that middle section is his?

PRO SE GJOVIK:  That looks like an advertisement.

BY PRO SE GJOVIK:

Q   Are you ready for the next page?

A   Not yet.  Go ahead.  Go to the next page.  Go on to the next page.  Go to the next page.  Go to the next page.

Page 74

Go to the next page.  Go ahead to the next page.  Okay.

Q   Is this an article that you published?

A   Yes.

Q   And to be clear, it looks like the recommended for Medium and trending AI, those are advertisements, but the rest of it was your content, right?

A   Yes.

Q   Thank you.  This is Exhibit 21, and we are talking about face ID, and we're going to talk about this article, methodology and process for managing projects.  And you are talking about managing face ID and showing some little tables here and user studies, and how you organize the study.  Can you tell me why you shared about that and why you thought it was important?

A   Because the thesis --

Q   I'm sorry.  Can you get closer to the microphone again?

A   The thesis of the article, I was talking about creating balance and creativity and focus, and I thought it was interesting to write about and interesting to share.

Q   I agree.  And with the tables, what were you trying to show people by giving them examples of those tables?

A   What I did for my organization.

Q   So maybe we could learn from you, like, if you have some tips to share, something they could apply to their own

Page 75

work?

A   Hopefully.

(Exhibit 22 was marked for identification.)

BY PRO SE GJOVIK:

Q   Yeah.  Thank you.  And then next one will be Exhibit 22.  And it is 7723.  This is from Medium.  The heading is a Fruit Company stories/page.  It is six pages.  So me know when you go through, and I will go to the next.

A   Okay.  Okay.  Go to the next.  You can go to the next.  Okay.  You can go to the next.  You can go to the next.  You can go to the next.

Q   Is this an article you published?

A   Yes.

Q   Thanks.  And then other than the recommended by Medium which looks like an advertisement, this is content you wrote, right?

A   Yes.

Q   And this looks like it is, kind of, an index where people are.  I saw you have several of these.  So you have a topical index of, kind of, the recommended articles that you have written on those topics, and you did one for Apple called Fruit Company.  Is that what this is?

A   Yes.

Q   And you have multiple different articles about Apple, and you mentioned -- you have a few stories that you

Page 76

can share.  And these are the stories that you can share.  Can you tell me more about that and your framing of deciding these are things you can share?

A   I felt like they were stories that --

Q   Sorry.  Can you get closer to the microphone again?

A   They were stories that I felt did not violate confidentiality.

Q   Why?

A   Because they didn't reveal confidential information.

Q   I agree, but can you tell me more?

A   I don't understand the question.

Q   Yes.  What is confidential information in that sense?  You said these don't include confidential information, and so you must've made a determination of what assumedly counts as confidential and assumedly doesn't.  And assumedly, you think this doesn't.  Based on your framing that, you can tell.  So are there any other details you can provide of thinking and discerning what is confidential and what is not?

A   Not that I recall.  I wrote these articles a while ago, but just that at the time, I did not think the information was confidential.

Q   Okay.  And then on this page, we have an article called Apple's best product.  We have face recognition, 3D face recognition from infancy to product.  Those are on the

Page 77

first page, and you have your patent at Apple. That's amazing. Congrats.

So you shared your patent for risk detection algorithm on this as well. So some of this product is related, but by the framing here, you felt like you can talk about this, right?

A   Yes.

Q   And I agree, and I support you. Again, I like your articles. So for Exhibit 22, we are going to have Plaintiff's Exhibit 7035 --

THE COURT REPORTER: And, Counsel, this is Exhibit 23.

(Exhibit 23 was marked for identification.)

BY PRO SE GJOVIK:

Q   Let me know when I can go to the next page.

A   Okay. You can go to the next page. Okay. You can go to the next page. You can go to the next page. Okay. You can go to the next page. Okay.

Q   Other than the recommended by Medium, a section which appears to be advertisements as this content that you wrote and published?

A   Yes.

Q   And when you said a collection of school and work stories, those work stories here include Apple, yes?

A   Yes. Oh, sorry. I don't recall.

Page 78

Q   One of the sections says fruit company stories. Who is the fruit company?

A   Apple.

Q   So then this collection of work stories would include Apple stories too?

A   Oh, yes. Sorry. I thought you were mentioning a different link in there.

Q   That's why I said definitely clarify it. We want to make sure we have the correct testimony. No worries. And this section also has images, and you have your patent again. Your patent is beautiful. And this image is at a desk. Is that your Apple desk?

A   No. It is not.

Q   Where is it? It is the upper right hand corner, so there are six images. There are three on the top and three below, and I'm asking the top right of the patent image?

A   I believe it is my desk at my previous company.

Q   Previous company. Okay. And we were on Exhibit 23.

THE COURT REPORTER: 24.

PRO SE GJOVIK: So sorry. Thank you.

ATTORNEY RIECHERT: Before we get to this exhibit, may we take our last break?

PRO SE GJOVIK: Yes. That works.

THE COURT REPORTER: Off the record at 3:04.

(Recess taken.)

Page 79

THE COURT REPORTER: On the record at 3:08 p.m.

(Exhibit 24 was marked for identification.)

BY PRO SE GJOVIK:

Q   Okay. We are back, and we are looking at Exhibit 7992, or Bates number 7992, which is Exhibit 24, and this one is Work Character/Page. So another one of those, it sounds like, indexes that you create. We are going to do the same thing where I have you look at each page please and then let me know.

A   Okay. You can go to the next. Go to the next page. Go to the next page. Go to the next page. Okay.

Q   Okay. So other than the advertisements, this is something, an article your wrote, other than the advertisements?

A   Yes.

Q   Okay. And work stories about different jobs that you have had?

A   That sounds accurate.

Q   What is the gist of this section that you were trying to put forward?

A   How I build character.

Q   Sorry. Can you get closer to the microphone again?

A   How I build character.

Q   How you build character at work?

A   I am not sure if it is explicitly at work. And

Page 80

these articles were written, like, five or six years ago. So I don't recall the content of the full articles.

(Exhibit 25 was marked for identification.)

BY PRO SE GJOVIK:

Q   That's fine. And then we have Exhibit 25 which will be Bates number 7519 and this is a link to an article I called Chaos Induced characterization that you wrote July 2, 2018, and I am going to have you look and tell me if it looks right.

A   Okay. Go to the next page. Go to the next page. Okay. You can go to the next page. Go to the next page. Okay.

Q   So other than the explore content carrier -- explore content categories on the center and the comment starts at times, is a post that you made on the LinkedIn?

A   Yes.

Q   Thank you. And in it, you are talking about how, it sounds like Apple's, kind of, strategy and very high level methodology for how it converges before it is getting ready to release something?

ATTORNEY RIECHERT: Objection. Compound.

BY PRO SE GJOVIK:

Q   Tell me what you were trying to explain by publishing this article?

A   Just how we go about getting quality and how chaotic

Page 81

it can be.

Q   Sorry.  Can you go closer to the mic again?

A   Just the process at Apple from a high level, and how we go from vision to product at a high quality level.

Q   Yeah.  And you are not the only one that writes stuff like this.  I've seen EPM's write stuff like this too.

And you are not the only one that uses the word chaos in the development process.  You used the word chaos, right?

A   Yes.

Q   So it is, kind of, just your honest take as someone who has watched these convergences of what your opinion is of the high level summary of what that process is?

A   Yes.

Q   And you did not think this was confidential, right?

A   No.

Q   Why didn't you think this was confidential?

A   I didn't think it was confidential.

Q   I mean, I agree, but is there anything that is, like, a flag for you that that can't be confidential.  It's kind of inherent, like, a gut feeling, like, it should be fine?

A   No.  To me, it is not just a doubt, the feeling.  It is whether it could actually harm Apple or harm Apple by revealing products or revealing confidential information that could cause harm to the company.

Page 82

Q   And you don't think this would harm Apple in any way, right?

A   I don't think so.

(Exhibit 26 was marked for identification.)

BY PRO SE GJOVIK:

Q   Yeah.  I don't either.  Okay.  Thank you.  We will go to Exhibit 26.  This is Plaintiff Exhibit 7529 -- or not exhibit, Bates number 7529.

This is another LinkedIn article I found with your account called Computer Vision Fundamental.  It's five pages.  We are going to do that thing where you tell me you are ready to tell me when you are ready for the next.

A   Sure.  Go to the next page.  Go to the next page.  Go to the next page.  Go to the next page.  Okay.

Q   And so other than the footer, explore more, is this another article that you wrote and published on LinkedIn?

A   Yes.

Q   And what were you trying to convey in this article?

A   I just wanted to talk about the fundamentals of computer vision.

Q   Yeah.  And your LinkedIn profile that we talked about earlier clearly says that you work at Apple, right?

A   Yes.

Q   And that you work on computer vision, right?

A   Yes.

Page 83

Q   And the stuff that you talked about in this article that you published, does that reference stuff that you do work on at Apple?

A   Does this article reference stuff that I worked on at Apple?

Q   Yes.

A   No, it does not.

Q   So do you do -- at Apple, have you Attunity computer vision techniques?

A   So I talked about the methods in the article.

Q   Yes.

A   But this article does not reference the work I do at Apple or did at Apple.

Q   Do you do pattern recognition methods at Apple?

A   Yes.  But I did not mention in the article specifically referencing Apple.

Q   Okay.

A   This was meant to be an overview of the fundamentals that I thought were important for a computer vision engineer, and I could have easily written this article before I joined Apple.

Q   Yes.  Because this does not really expose anything that is not industry-standard, right?

A   Correct.

Page 84

(Exhibit 27 was marked for identification.)

BY PRO SE GJOVIK:

Q   Yeah.  Okay.  Thank you.  And now we are on Exhibit 27 with Bates number plaintiff production 7540.  This is an article that I found.  Again, I love your articles.  I found this on Medium, Decisions by Consensus, and it is seven pages.  We will do that thing where you tell me to go to the next.

A   Go ahead to the next.  Okay.  Go ahead to the next.  Go to the next.  Go to the next.  Go ahead to the next.  Go ahead to the next.  All right.

Q   So other than the Explorer, footer and advertisements, is this an article that you wrote and published on Medium?

A   Yes.

Q   Yeah.  And you talk about 3D face recognition in the article, yeah?

A   Yes.

Q   And your Medium profile identifies you as an Apple employee, right?

A   Yes.

Q   Did you think any of that was confidential?

A   No.

(Exhibit 28 was marked for identification.)

BY PRO SE GJOVIK:

Page 85

Q  I don't think so either.  Okay.  Exhibit 28 will be Plaintiff production Bates 7461.  This one is called Apple's Best Product, and we are going to do that same thing again.  I'm sorry.  I keep doing the repetitious thing, but I appreciate you taking the time to do it.  Let me know when you are ready to go to the next page.

A  Okay.  Okay.  Go to the next.

Q  And on this one, it looks like the header is covering up that line.  So I am sorry about that.  So we can note that the format of the header appears to be covering up one line of the text.

A  Okay.  Go to the next.  Okay.  Go to the next. Okay.  Go to the next.  Okay.  Go to the next.  Go to the next.  Okay.  Go to the next.  Okay.  Go to the next.  Okay.

Q  And same caveat, other than the explore more and advertisements, is this a Medium post that you drafted and published?

A  Yes.

Q  Yeah.  And what were you trying to convey with this post?

A  Apple's best product.

Q  It seemed, kind of, like, a motivating post of trying to get people excited and encourage them and talking to them maybe about personal growth?

A  Sure.

Page 86

Q  And you talked about Apple products in this, yes?

A  Yes.

Q  You even included a picture from the campus itself, right?  This picture we are looking at right now from the campus on page two?

A  Yes.  It's in the day that there were rainbows and a similar picture was posted by Tim Cook on Twitter.

Q  It's a beautiful photo.  And you did not think any of this was confidential about this photo?

A  Yes.

Q  Okay.  Exhibit 28 will be plaintiff production 7718 and this is an article published on LinkedIn associated with your account called Farewell Computer Vision.  So we are going to do that thing where you let me know to go to the next.

A  Could you zoom in a little?

Q  Yes.

ATTORNEY RIECHERT:  Ms. Court Reporter, I have this as 29, not 28.

THE COURT REPORTER:  Okay.  I'm sorry, Counsel. Thank you.  I was just going back through the transcript to confirm.

PRO SE GJOVIK:  I'm so sorry to both of you.  I'll do the exhibit numbers on the next one.

Page 87

(Exhibit 29 was marked for identification.)

BY PRO SE GJOVIK:

Q  Go ahead, Mr. McKeon.

A  Okay.  Go to the next page.  Okay.  Go to the next page.  Okay.  Go to the next page.

Q  And I am going to ask you to validate the time comments just to validate your own content.

A  Okay.  You can go to the next page.  Okay.  Is that it?

Q  So other than the advertisements, comments, header and footer, is this an article that you drafted yourself?

A  Yes.

Q  Thank you.  And in it, you talk about face ID and Apple?

A  Yes.

Q  Yeah.  And for face ID, you said after years of traditional methods, face ID became a reality mostly because of data feeding the machine, not because of some super crafty algorithm; is that true?

A  Yes.  I wrote that.

Q  Yeah.  And so what did you mean by that?

A  I meant what I wrote.

Q  I'm sorry.  Can you speak up?

A  I said I meant what I wrote.  That data is more important than an algorithm.

Page 88

Q  So there is not really some secret algorithm to be leaked that would somehow expose these inner workings of face ID?

A  No.  There is still an algorithm that could be leaked.  There is still an algorithm that is confidential, and the data also could be leaked, and the data is also confidential.

Q  You are saying it still has to be protected because there is a lot of personal data.  So when you said that face ID became a reality mostly because of the data, what did you mean by that data compared to an algorithm?

A  I'm sorry.  Can you repeat the question?

Q  Yeah.  So you are saying face ID became a reality mostly because of data, so data gathered like data caption and user studies, rather than some super crafty algorithm. What did you mean by that?

ATTORNEY RIECHERT:  Objection.  Asked and answered.

BY PRO SE GJOVIK:

Q  Okay.  Did you think any of the things you published in this article were confidential?

A  I don't.

Q  I don't either.  Okay.  We are onto Exhibit 29 now.

ATTORNEY RIECHERT:  30.

(Exhibit 30 was marked for identification.)

BY PRO SE GJOVIK:

Page 89

Q   30.  Plaintiff production 7795.  This was a post here that I found on your LinkedIn.  Let me know when you want to move to the next page.

A   Okay.  You can go to the next page.  Okay.  You can go to the next page.  Okay.  You can go to the next page.  All right.

Q   So other than a footer, header and comments and all that stuff, is this an article that you drafted and published yourself on LinkedIn?

A   Yes.

Q   And you talk about working at Apple, working on face ID, working on a specific iOS release and converting the product and shipping it?

A   Yes.

Q   Yeah.  And you did not think any of this was confidential?

A   No.  I did not.

Q   Yeah.  You included a screenshot of what looks like release notes for iOS 15.4; is that true?

A   Yes.

Q   And you annotated it highlight the new stuff you are including with a new face ID feature, including masks?

A   Yes.

Q   And you did not think it was confidential?

A   It was released with everyone else with the release

Page 90

of the update.

Q   Yeah.  I agree.  And your comments even include people saying this one, Satchel Pachgar, this is what I love about Apple.

You talking about face ID and products and stuff and sharing some of this information actually caused people to say that is why they love Apple, right?

ATTORNEY RIECHERT:  Objection.  Lacks foundation as to what he meant by that.

BY PRO SE GJOVIK:

Q   In this post, you're talking about Apple products, product development, product releases, face ID, you and I agree that this is not confidential in our opinion, and the comments seem quite positive.  These two comments listed here, would you agree they seem positive towards Apple based on your post?

A   Sure.

(Exhibit 31 was marked for identification.)

BY PRO SE GJOVIK:

Q   Yeah.  And then we are going to go to Exhibit 31.  Exhibit 31 is plaintiff production 7799 this is still -- I like this post a lot.  This Medium post, Face Recognition 3D face recognition from infancy to product, a dream turned reality faster than I could have imagined.  It says you published it on November 17, 2020, and it is 6 pages and we

Page 91

will go through each page again.

THE WITNESS:  Can I have a quick break to use the restroom?

ATTORNEY RIECHERT:  Of course.

THE COURT REPORTER:  Off the record at 3:36 p.m.

(Recess taken.)

THE COURT REPORTER:  On the record at 3:38 p.m.

BY PRO SE GJOVIK:

Q   We are back.  This is Exhibit 31, and we were going to do that thing where you look at each page.  Let me know when you are ready.

A   Okay.  Go to the next page.

Q   And I apologize, again.  It look like there is a UI covering up one or two lines of codes at the bottom, so just confirming you will not be able to validate that.

A   Okay.  Go to the next one.  Okay.  Go to the next page.  Okay.  Go to the next page.  Okay.  Go to the next page.  All right.

Q   Other than headers, footers and other Medium advertisements and stuff, is this an article that you drafted and published yourself?

A   Yes.

Q   What was your objective in publishing this article?

A   Just to share my experience.

Q   Can you say more?

Page 92

A   I don't know many people who worked on research in grad school that then got to see it go into product or at least a product as big as the iPhone.

Q   I'm sorry.  Can you get closer to the microphone?

A   I said I do not know many people whose research went from grad school to product in this field and went into a product as big as the iPhone and as broadly used, so I thought it was an interesting experience to share.

Q   I agree.  You are probably rare to do and especially to do at that time, and you talk quite a bit about face ID in this and convergence and aggressors and how Apple went about preparing it for launch, right?

A   In broad terms, yes.

Q   Yeah.  And you are basically using industry-standard terminology here?

A   I am not sure which industry standard is.

Q   Do you feel like you shared anything in the here, but could not be copied and pasted into a different company if you are doing the same research for a different company?

A   I am not sure.

Q   Did you think anything in here was confidential?

A   No.

Q   Why didn't you think it was confidential?

A   I just did not think it was confidential.  Again, this article was written years ago, and I don't recall my

Page 93

thinking at the time when I wrote it.

Q   I don't think it is confidential either.  Have you gotten feedback on this article from anyone?

A   No.

Q   And I will ask you when we are done looking at a few more too, but in terms of we have seen so far, including this one, has Apple told you that your articles include confidential information?

A   They have not.

Q   And to be something published Eric we are looking at 2018, 2019, 2020 -- it is going back now eight years of articles, right?  And you have never had any feedback from Apple that you are publishing confidential information?

A   No.  I have never been told I was publishing confidential information.

Q   Yeah.  Have you ever been disciplined for publishing confidential information in these articles?

A   I have not been disciplined.

Q   Yeah.  You are a manager, correct?  Or you have worked as a manager at Apple?

A   I have worked as a manager.

Q   Yeah.  If you had team members publishing the articles that you are publishing, would you tell them that it included confidential information?

A   I would not.

Page 94

Q   Would you discipline them saying that it was leaking confidential information?

A   I am not sure what the process is for leaking confidential information, in the sense that I have not gone through it, and I have not had an employee that has gone through it.

Q   If it was up to you to decide if your employee was publishing articles that included confidential information and you needed to seek guidance from HR about whatever the process is about determining whether to discipline them or not, would the articles that we showed, if that were your employees, would that trigger you to go to HR about that discipline process?

A   No.  It would not.

Q   I agree.  Have you gotten any positive feedback about the articles from any folks that we have looked at so far?

A   I am not sure from who, but people have made comments on the articles.

Q   And you do -- it looks like interviews, podcast interview sometimes.  Mostly it looks like with the coffee work, but you will talk about Apple too sometimes with the projects?

A   I only mentioned that I work at Apple when talking about Apple.

Page 95

Q   You will say you work on the face ID and biometrics generally, it looks like, right?

A   I will say I worked at Apple while working on those projects.

Q   Yeah.  And that's not confidential, right?

A   I don't think so.

(Exhibit 32 was marked for identification.)

BY PRO SE GJOVIK:

Q   Okay.  I don't think so either.  So now we are going to have Exhibit 32.  This is Plaintiff Exhibit 7792.  And this is -- it looks like a LinkedIn post that you made.

A   Yeah.

Q   And can you let me know when you are ready to go to the next page?

A   Can you zoom in?

ATTORNEY RIECHERT:  Can you zoom in?  It is too small.

THE WITNESS:  Okay.  Okay.  You can go to the next page okay.  You can go to the next page.  You are good.

BY PRO SE GJOVIK:

Q   So this is an article that you wrote and published on LinkedIn?

A   Yes.

Q   And you are writing about interacting with Tim Cook on campus?

Page 96

A   Yes.

Q   Is that a photo of you with Tim on campus?

A   Yes.

Q   Did you think any of this was confidential?

A   No.

(Exhibit 33 was marked for identification.)

BY PRO SE GJOVIK:

Q   I don't either.  And I am going to be thoughtful, our court reporter has a hard stop at 4:00, and I am not going to be able to go through all of my exhibits.  So I want to see and make sure if there are others I want to include, and go through all that I need to include.  Yeah.  Let's do this one.  This will be Exhibit 33.  This is Plaintiff Production 7816.  This is an article on LinkedIn called Machine Learning Data -- sorry.  Examining the Test Set.  Let's do that thing.  Let me know when I can go to the next page.

A   Okay.  Go to the next page.  Okay.  You can go to the next page.  You can go to the next page here.  Okay.  You can go to the next page.  Okay.  You can go to the next page here.  All right.

Q   Okay.  Other than the caveats, header, footer, advertisements, is this an article that you drafted on LinkedIn?

A   Yes.

Page 97

Q  And did you think anything was confidential that you shared a message?

A  No.

(Exhibit 34 was marked for identification.)

BY PRO SE GJOVIK:

Q  I agree.  And then we are going to do one more of your articles because we are almost out of time.  This is going to be Plaintiff Exhibit 34, production 7805 called Privacy in Machine Learning, PII.  Let me know when I can go to the next page.

A  Okay.  Can you zoom in please?

Q  Yes.

A  Thanks.  Okay.  You can go to the next page.  Go to the next page.  Oh, scroll back up.

Q  Okay.  So based on the timing we are not going to have time to finish this so I'm going to ask you if those first two pages look accurate from the article that you published?

A  Yes.

Q  Thank you.  And this article talks about your work on face ID at Apple among other things?

A  It appears to.

Q  And you did not think anything you posted in this article was confidential?

A  No.

Page 98

(Exhibit 35 was marked for identification.)

BY PRO SE GJOVIK:

Q  I don't either.  I think it is a good article.  And Plaintiff Exhibit 35, production 7101, are you aware of this article?  It is called Apple Cares about Privacy Unless You Work At Apple.  It was published at the Verge on August 30th, 2021.

A  Yes.  I'm aware of this article.

Q  Yeah.  Did you think this included confidential information?

A  Could you just scroll down?

Q  I'm sorry.  I'm not going to be able to go through the whole thing.  She will have to wrap up, but based on your recollection of the article, do you remember ever thinking that it included confidential information specifically about face ID and Gobbler and Glimmer?

A  Were there images in this article?

Q  There was -- yes, of the sequences.  I don't think they show up on this though.

A  Okay.

Q  But did you, assuming since you work on --

A  When I saw this article and saw those images, I thought confidential information had been leaked.

Q  Why?

A  Because those images are confidential.

Page 99

Q  So the image I showed you earlier on our exhibit of my face, you thought that was confidential?

A  Yes.

Q  Why?

A  Because it shows what the customer doesn't see in terms of the camera quality and resolution, as well as the flash quality and resolution.  And those things are confidential in how our algorithm functions and how our algorithm could be broken by hackers.

Q  Okay.  So how does that harm Apple by that information being revealed?

A  It gives hackers a better idea of a piece of information they would need to break into face ID, and it gives more information to our competitors on how, if they wanted to implement face ID themselves, how they would be able to do it.

Q  How would they use that image to get that information?

A  That information would be -- that image would be helpful for how our camera system works, and our flash system works in terms of the resolution and the quality, and it would be helpful information for them.

ATTORNEY RIECHERT:  I'm going to instruct you not to answer any confidential information beyond that.

PRO SE GJOVIK:  I cannot hear you, Melinda.

Page 100

ATTORNEY RIECHERT:  I'm telling him not to answer any confidential information about it beyond that.  He is giving you the nonconfidential version.

PRO SE GJOVIK:  Okay.  Can you -- one last question.  Can you distinguish for me why that image would be confidential, but none of the other information that you shared that you shared prior was not confidential?

A  Sorry.  Could you repeat the question?

Q  Actually, I am going to asking a new question.  Are you aware that Apple's state of justification to my termination is that image that you are mentioning, and you are saying is confidential?

A  Is that -- I think so.

Q  Can you say that more clearly please?

A  I think so.

Q  Yeah.  So would you be concerned, if you were to say it's not confidential, would you feel like it might upset Apple because that is their stated justification supposedly for legitimately terminating me?

ATTORNEY RIECHERT:  Objection.  Assumes facts not in evidence.  Misstates his testimony.

BY PRO SE GJOVIK:

Q  He just admitted he thinks so, that that is Apple's -- that its public that Apple's stated justification for terminating me.  And it's my right to ask him if is

Page 101

concerned if he says it was not confidential, or if he would be afraid of Apple for retaliation for saying that?

ATTORNEY RIECHERT: You totally lost me. Can you ask the question again?

BY PRO SE GJOVIK:

Q I already asked the question. He can answer the question I asked.

A I -- I expect if I publish those images, I would be fired.

Q And so if Apple ever published those images in their own advertisements of inside that app and how it worked?

ATTORNEY RIECHERT: Objection. Improper hypothetical. Vague.

THE WITNESS: I don't know. I just know if I had published those images, I would expect to be fired. And if I had employees reporting to me that published those images, I would go through the similar process of taking it to the people team because it is a violation of confidentiality.

BY PRO SE GJOVIK:

Q Thank you for answering my questions, Mr. McKeon. I appreciate your time. We need to let our court reporter go. I am complete with this deposition.

THE COURT REPORTER: And Counsel Reichert, would you like a copy of the transcript? Sorry?

ATTORNEY RIECHERT: Yes. I would like an expedited

Page 102

and a rough please.

THE COURT REPORTER: Okay. And how soon do you need the final?

ATTORNEY RIECHERT: I need the rough and expedited final as soon as you can get it.

THE COURT REPORTER: Okay. So you need a rough right away, and then the final will be regular delivery? Okay.

ATTORNEY RIECHERT: No. I need the rough, and the final expedited.

THE COURT REPORTER: Okay. So can you let me know how soon you want the final. The rough I will have to you by tomorrow. I will work to get you tonight, I just don't know. And then how soon you need the final?

ATTORNEY RIECHERT: What is standard? Ten days?

THE COURT REPORTER: Ten business days is regular delivery.

ATTORNEY RIECHERT: I need it as soon as you can get it to me.

THE COURT REPORTER: Okay. If you just tell me what day you need it by, then I'll work have it to you by that day.

ATTORNEY RIECHERT: Does Tuesday work?

THE COURT REPORTER: Sure. Tuesday next week, the 7th. Okay. And then would you like a rough transcript as

Page 103

well, Ms. Gjovic?

PRO SE GJOVIK: No. I am trying to keep cost down. For the expedite, if I am not requesting it, who is responsible?

THE COURT REPORTER: No. That goes to the person ordering it.

PRO SE GJOVIK: Okay. Thank you.

THE COURT REPORTER: Sure. Going off the record at 4:01 p.m.

(The deposition concluded at 4:01 p.m.)

Page 104

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 7th day of April, 2026.

_____
Kathleen Madden Keenaghan
CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**Page 105**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik

vs. Apple Inc.

Date of Deposition: 04/03/2026

Job No.: 10187852

I, ROBERT MCKEON ALOE, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2026, at _____.

_____

ROBERT MCKEON ALOE

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____,     proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 106**

DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik

vs. Apple Inc.

Name of Witness: Robert McKeon Aloe

Date of Deposition: 04/03/2026

Job No.: 10187852

Reason Codes:  1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

**Page 107**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made. I certify that the transcript  is true and correct.

_____

ROBERT MCKEON ALOE

# EXHIBIT 38

37.     Attached as Exhibit 38 is Apple's Business Conduct Policy referenced in my termination letter.



# Business Conduct
## The way we do business

**October 2020**

# Contents

## 3 The Way We Do Business Worldwide

3  Your Responsibilities and Obligation to Take Action

4  Reporting a Concern

4  No Retaliation

4  Your Rights as an Employee

4  Human Rights

## 5 Workplace Behaviors

5  Drugs and Alcohol

5  Environment, Health, and Safety (EH&S)

5  Harassment and Discrimination

## 6 Protecting Apple

6  Protecting Apple's Assets and Information

6  Apple Confidential Information

6  Non-Disclosure/Confidentiality Agreements

6  Customer and Third-Party Information

6  Accuracy of Records and Reports

7  Accuracy of Business Expenses

7  Records and Information Management

7  Side Deals or Side Letters

7  The Apple Identity and Trademarks

7  Third-Party Intellectual Property

8  Copyright-Protected Content

8  Apple Inventions, Patents, and Copyrights

8  Activities Related to Technical Standards

8  Activities Related to Open Source Software

8  Public Speaking and Press Inquiries

9  Publishing Articles

9  Endorsements

## 10 Individual Accountability

10  Avoiding Conflicts of Interest

10  Significant Personal Relationships

10  Rotations (Operations Only)

10  Conflicts of Interest and Outside Activities

11  Outside Employment and Inventions

11  App Creation

11  Board Positions

12  Personal Investments

12  Insider Trading

12  Charitable Donations

13  Political Contributions

13  Personal Political Activities

13  Gifts

15  Gifts to Public Officials

## 16 Business Integrity

16  Governments as Customers

16  Hiring Government Employees

16  Bribery and Corruption

17  Money Laundering

17  Competition and Trade Practices

17  Obtaining and Using Business Intelligence

17  Trade Restrictions and Import/Export Controls

18  Private Employee Information

18  Human Trafficking

## 19 Resources

19  Policies and References

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 492 of 651

# The way we do business worldwide

Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations. This applies to every business decision in every area of the company worldwide.

The following principles guide Apple's business practices:

- **Honesty**—Demonstrate honesty and high ethical standards in all business dealings.
- **Respect**—Treat customers, partners, suppliers, employees, and others with respect and courtesy.
- **Confidentiality**—Protect Apple's confidential information and the information of our customers, partners, suppliers, and employees.
- **Compliance**—Ensure that business decisions comply with applicable laws and regulations.

Apple expects its suppliers, contractors, consultants, and other business partners to follow these principles when providing goods and services to Apple or acting on our behalf. Apple also requires its suppliers to comply with the Apple Supplier Code of Conduct.

The Business Conduct Policy applies to all full and part-time employees of Apple and its subsidiaries, and provides a standard guide for what is required of everyone at Apple. Relevant sections also apply to members of Apple's Board of Directors. The Business Conduct Policy also provides information on additional resources available to employees, including the Business Conduct Helpline and the Business Conduct website, which contains guidance and frequently asked questions to assist employees in understanding Apple's approach to Business Conduct.

All employees are required to complete annual, online Business Conduct training, and review and certify their understanding of the Business Conduct Policy. Employees are also required to complete online Respect at Apple and Privacy trainings, and depending on job responsibilities and location, may be required to participate in additional mandatory online trainings on specific topics, such as anti-corruption. Focused live training is also arranged periodically on Business Conduct and other relevant topics.

On rare occasions, local laws may impose requirements on Apple and its employees that differ from those set out in the Business Conduct Policy. Contact a local People Business Partner for more information on how these laws may apply to you.

Any waiver of this Policy for our directors, executive officers, or principal accounting officer may be made only by our Board of Directors, and will be disclosed as required by law or applicable listing rules.

## Your Responsibilities and Obligation to Take Action

Everything we do is a reflection of Apple. We expect you to:

- **Follow the Policy.** Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements.
- **Speak up.** If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.
- **Use good judgment and ask questions.** Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal,

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 493 of 651

or Business Conduct. Any failure to comply with Apple's Business Conduct Policy—or failure to report a violation—may result in disciplinary action, up to and including termination of employment.

You are also required to fully cooperate in any Apple investigation, and keep any information shared with you confidential to safeguard the integrity of the investigation.

## Reporting a Concern

To report a concern or ask a question about Apple's Business Conduct Policy, you can contact Business Conduct by phone, email, or web form. For contact details, visit the Business Conduct website or the Resources section at the end of this policy. Apple's external helpline (apple.ethicspoint.com) also allows employees and external parties to report concerns with the option of remaining anonymous, where permissible under applicable laws. The external helpline provides local, toll-free phone numbers that connect employees and external parties to a multilingual reporting service.

Your information will be shared only with those who have a need to know to help answer your questions or investigate concerns, ensure the prompt enforcement of this Policy, and, if appropriate, determine disciplinary action. If your information involves accounting, finance, or auditing, the law may require that necessary information be shared with the Audit and Finance Committee of the Board of Directors. Apple's Business Conduct Policy is administered by the Business Conduct organization, under the oversight of Apple's Chief Compliance Officer, who provides regular updates to the Audit and Finance Committee of the Board of Directors. The Business Conduct team is available to support all employees and answer questions on business conduct issues, policies, regulations, and compliance with legal requirements.

## No Retaliation

Apple will not retaliate—and will not tolerate retaliation—against any individual for reporting a good-faith concern or complaint to a manager, People, Legal, Business Assurance and Audit, Finance, or Business Conduct, or for participating in the investigation of a concern or complaint. We do not tolerate knowingly false reporting.

## Your Rights as an Employee

While we expect employees to follow the Business Conduct Policy, nothing in this Policy should be interpreted as being restrictive of your right to speak freely about your wages, hours, or working conditions.

## Human Rights

Apple is committed to respecting internationally recognized human rights. Apple's approach to respecting human rights is based on the United Nations Guiding Principles on Business and Human Rights, the global standard on business and human rights. For more information, see the Human Rights Policy.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 494 of 651

# Workplace Behaviors

## Drugs and Alcohol

Apple cares about the health and safety of our employees. You are expected to comply with Apple's guidelines regarding alcohol, drugs, and smoking, whether it is in the workplace, at Apple-sponsored events, or while conducting Apple business. You are not permitted to be under the influence of any legal or illegal drug that impairs your ability to perform your job, and employees are prohibited from manufacturing, soliciting, distributing, possessing, or using any illegal drugs or substances in the workplace, or while working. Use good judgment and keep in mind that you are expected to perform to your full ability at work. For more information, see the Alcohol, Drugs and Smoke-Free Environment Policy.

## Environment, Health, and Safety (EH&S)

Apple is committed to protecting the environment, health, and safety of our employees, customers, and the global communities where we operate.

Apple's EH&S team provides guidance on how to conduct your job while meeting or exceeding all applicable environmental, health, and safety requirements. Use good judgment and always put the environment, health, and safety first. Work proactively with the EH&S team to anticipate and manage EH&S risks in a timely manner.

For more information on the EH&S team, policies, training, and programs, visit the EH&S website.

## Harassment and Discrimination

Apple is committed to providing a workplace free of harassment (including sexual harassment) or discrimination based on a personal trait. Personal traits include race, color, ancestry, national origin, religion, creed, age, mental and physical disability, sex, gender, sexual orientation, gender identity or expression, medical condition, genetic information, marital status, military or protected veteran status, or any other characteristic protected by law.

We are dedicated to maintaining a creative, culturally diverse, and supportive work environment, and do not tolerate discrimination or harassment of employees or non-employees with whom we have a business, service, or professional relationship. This applies to all interactions where you represent Apple, including interactions with employees, customers, suppliers, and applicants for employment.

If you have been harassed or discriminated against, or have witnessed such behavior, report the incident to anyone on the People Team, a supervisor or manager at any level, or Business Conduct. For more information, see the Equal Employment Opportunity Policy and People policies for your region.

We also do not tolerate workplace violence of any kind. For more information, see the Workplace Violence Policy.

Case 3:23-cv-04597-EMC     Document 360     Filed 04/24/26     Page 495 of 651

# Protecting Apple

**Protecting Apple's Assets and Information**

You play a key role in helping us protect Apple. Assets include Apple's proprietary information (such as intellectual property, confidential business plans, unannounced product plans, sales and marketing strategies, and other trade secrets), as well as physical assets such as cash, equipment, supplies and product inventory.

- **Watch what you say.** Being aware of where you are, who is around you, and what they might see or overhear is an important way we all protect Apple's secrets.
- **Protect our assets.** Keep track of the assets and information Apple has entrusted to you, and prevent loss, misuse, waste, or theft.
- **Set an example.** Model behavior that protects our assets and information at all times.

## Apple Confidential Information

One of our greatest assets is information about our products and services, including future product offerings. Never disclose confidential, operational, financial, trade-secret, or other business information without verifying with your manager whether such disclosure is appropriate. We are very selective when disclosing this type of information to vendors, suppliers, or other third parties, and only do so once a non-disclosure agreement is in place. Even within Apple, confidential information should only be shared on a need-to-know basis. The Intellectual Property Agreement that you signed when you joined Apple outlines your duty to protect our information.

For more information, visit the Global Security website.

## Non-Disclosure/Confidentiality Agreements

Never share confidential information about Apple's products or services without your manager's approval. When there is a business need to share confidential information with a supplier, vendor, or other third party, never volunteer more than what is necessary to address the business at hand. Any confidential information shared outside Apple should be covered by a non-disclosure/confidentiality agreement (NDA). Contact Legal in your region to obtain an NDA. In the United States, you can find NDA information and support on the Legal website.

## Customer and Third-Party Information

Customers, partners, suppliers, and other third parties may disclose confidential information to Apple during the course of business. We are all responsible for protecting and maintaining the confidentiality of any information entrusted to us by our partners. Compromising that trust may damage relations with our partners and can also result in legal liability. For more information, see the Apple Customer Privacy Policy.

## Accuracy of Records and Reports

Accurate and honest records are critical to meeting our legal, financial, and management obligations. You should ensure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications are comprehensive, fair, accurate, timely, and understandable.

Do not misstate facts, omit critical information, or modify records or reports in any way to mislead others, and never assist others in doing so. Intentional manipulation of Apple records is a form of fraud.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 496 of 651

## Accuracy of Business Expenses

You are responsible for observing all policies and procedures regarding business expenses, including meal and travel expenses, and for submitting accurate expense reimbursement reports. Guidelines on daily meal expenses vary worldwide. For more information, see the Travel and Expense Policy.

## Records and Information Management

Apple owns all records and information in any form, such as electronic or paper, that is created or received in the course of doing Apple's business. Records are a type of information that must be kept because the information meets certain criteria, and are identified in the Global Records Retention Schedule. Examples include corporate tax documents, financial statements, design documents, and personnel records.

Employees are responsible for managing and protecting information and records in accordance with the Global Records and Information Management (RIM) Policy. Privacy laws may dictate how long these records can be retained. At times, Apple will need to retain records and information beyond the normal retention period for legal reasons or audits. If you have records and information that are categorized as under a "legal hold" you should not alter, destroy, or delete them in any way. Legal will notify you of any legal holds you may be subjected to and what is required.

For more information, see the Global Records & Information Management website or contact the Global Records & Information Management team.

## Side Deals or Side Letters

Apple formally documents all terms and conditions of the agreements into which it enters. Contractual terms and conditions define Apple's rights, obligations, liabilities, and accounting treatments. We do not accept business commitments outside of the formal contracting process managed by Legal. Side deals, side letters, or other informal documentation created by employees without Legal oversight are impermissible. You should not make any oral or written commitments that create a new agreement or modify an existing agreement without securing approval through the formal contracting process.

## The Apple Identity and Trademarks

The Apple name, names of products (such as iPhone), names of services (such as AppleCare), taglines (such as "Think Different"), and logos collectively create the Apple identity. Before publicly using any of these assets, review the Trademark List, Trademark and Copyright Guidelines, and Corporate Identity Guidelines for how to properly do so. You should also check with Legal before using the product names, service names, taglines, or logos of any third parties.

## Third-Party Intellectual Property

Apple respects third-party intellectual property. Never use the intellectual property of any third party without permission or legal right. If you are told or suspect that Apple may be infringing on third-party intellectual property, including patents, copyrights, trademarks, or trade secrets, contact Legal.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 497 of 651

## Copyright-Protected Content

Never use or copy software, music, videos, publications, or other copyright-protected content at work or for business purposes unless you or Apple are legally permitted to use or make copies of the protected content. You should never use Apple facilities or equipment to make or store unauthorized copies. For more information about personal content on Apple-owned devices, see the Employee Use of Electronic Systems and Communications Policy.

## Apple Inventions, Patents and Copyrights

Apple has a robust patent program that protects innovations related to our current or future products and services. You should submit your invention disclosure to the Apple Patent team via the Apple Patent System. It's best to submit your invention disclosure well before you share an invention outside of Apple, even if under an NDA, because doing so may compromise Apple's patent rights.

You may pursue, for your own personal ownership, inventions that (a) are not developed using Apple equipment, supplies, facilities, or proprietary information; (b) did not result from and were not suggested by work performed by you, Apple, or Apple proprietary information; and (c) are not related to Apple's current or anticipated business, products, research or development.

Be alert to possible infringement of Apple's patents and notify Legal of any possible infringements. If you create original material for Apple that requires copyright protection, such as software, place Apple's copyright notice on the work and submit a copyright disclosure form to Legal. For more information, see the Copyright Policy.

## Activities Related to Technical Standards

You must secure management and Legal approval before participating in any activities related to technical standards. This includes joining a standards organization or working group, contributing technology or code to a standard, or using a standard in the development of an Apple product. For more information, see the Standards Legal Policy or contact the Legal Standards team.

## Activities Related to Open Source Software

Open source software is usually collectively developed software with its source code made available under an open source license. Before using, modifying, or distributing any open source software for Apple infrastructure, or as part of an Apple product or service development effort, you must receive management and Legal approval. For additional information on how to submit requests, visit Open Source at Apple. This website also includes information about personal contributions to Open Source and required approvals.

## Public Speaking and Press Inquiries

All public or outside speaking engagements that relate to Apple's business or products must be pre-approved by your manager and Corporate Communications. If your request is approved, you may not request or accept any form of personal compensation from the organization that requested your participation, but you may accept reimbursement for incurred expenses. All inquiries from the media, industry, or financial analyst community must be referred to Corporate Communications or Investor Relations.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 498 of 651

## Publishing Articles

If you want to contribute an article or other type of submission to a publication or blog on a topic that relates to Apple's business or products or could be seen as a conflict of interest, you must first request approval from Corporate Communications. If your contribution is technical or academic and relates to Apple, complete the Academic and Industry-Related Activities Questionnaire to obtain review from Legal and Business Conduct. If your contribution is determined to be a conflict of interest, you will need to get senior vice president approval. For additional information, see the Social Media and Online Communications guidelines.

Employees in the Machine Learning organization should follow the Guidelines for Academic Activities of Apple Employees in Machine Learning.

## Endorsements

You should never endorse a product or service of another business or individual in your role as Apple employee, unless the endorsement has been approved by your manager and Corporate Communications. This does not apply to statements made in the normal course of business about third-party products sold by Apple. If you want to provide a personal reference, review the Employment Reference Guidelines.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 499 of 651

# Individual Accountability

## Avoiding Conflicts of Interest

A conflict of interest is any activity that may damage Apple's reputation or financial interests, or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.

Members of Apple's Board of Directors should follow the requirements and procedures described in the Guidelines Regarding Director Conflicts of Interest.

The following are common situations employees may encounter that could present a conflict of interest.

### Significant Personal Relationships

Personal relationships in the workplace can present a real or perceived conflict of interest when one individual in the relationship makes or influences employment decisions regarding the other, including performance or compensation.

Significant personal relationships include, but are not limited to, spouses, domestic partners, family members, dating or physical relationships, close friends, and business relationships outside of Apple. Apple business relationships include, but are not limited to, vendors, customers, suppliers, contractors, temporary agency workers, or similar relationships.

Do not conduct Apple business with family members or others with whom you have a significant personal relationship. Do not use your position at Apple to obtain favored treatment for yourself, family members, or others with whom you have a personal relationship. This applies to product purchases or sales, investment opportunities, hiring, promoting, selecting contractors or suppliers, and any other business matter.

If you believe that you have a potential conflict involving a family member or other individual, disclose it to your manager and your People Business Partner to review and work through any potential conflicts.

You should not allow any relationship to disrupt the workplace or interfere with your work or judgment.

In rare cases where exceptions may be appropriate, written approval from the senior vice president of your organization is required.

### Rotations (Operations Only)

Operations managers are responsible for ensuring that their employees who make or significantly influence sourcing, contractual, financial or capacity decisions with suppliers change position every three years so as to work with different suppliers. Exceptions are subject to VP review and approval each year. "Suppliers" include anyone who had, has, or might have any business connection (directly or indirectly) with Apple or Apple's supply chain.

### Conflicts of Interest and Outside Activities

You may participate in outside activities, including secondary employment, businesses, inventions, and serving on boards, only if they do not present a conflict of interest and you adhere to the rules set out below.

Apple generally considers an outside activity to be a conflict of interest if it:

- Is for a company or organization that makes or sells competing products or services to Apple, or that Apple is reasonably anticipated to create. This includes but is not limited to: Apple hardware products (e.g., computers, mobile devices, headphones), financial services, original content, health services, cloud services, any distribution of video, music or eBooks, and any software or app.
- Generates or exposes you to intellectual property that competes with or relates to Apple's present or reasonably anticipated business, products, or services.
- Would require you to disclose or use confidential Apple information.
- Is the same work you do for Apple.
- Arises from your role in Apple's business relationship with the organization.

Work with your manager and Business Conduct to evaluate a potential conflict of interest. If an outside activity presents a conflict of interest, you must partner with a People Business Partner, and obtain written approval from your manager, Legal (if applicable), and the senior most person reporting to the CEO of both your and any relevant organizations. Contact Business Conduct to assist with Legal review.

Any employee, full or part-time, who is participating in an outside activity, must comply with the following rules. **Do not:**

- Use any time at work or any Apple assets for your outside activity. This includes Apple's workspace, phones, computers, Internet access, photocopiers, and any other Apple assets or services.
- Use your position at Apple to solicit resources or any other benefit for your outside activity, obtain favored treatment, or pressure others to assist you.
- Participate in an activity that could have an adverse effect on your ability to perform your duties at Apple.
- Use confidential Apple information.

## Outside Employment and Inventions

Before participating in creating inventions or businesses that are in the same area as your work for Apple, or that compete with or relate to Apple's present or reasonably anticipated business, products or services, you must have written permission from your manager and the senior vice president of your organization. Before taking any paid employment outside of Apple, you should notify your manager.

## App Creation

You can only create apps for personal or educational purposes. You cannot join the Developer Program or share, sell, or distribute apps, stickers, or other media (for iOS, Android, or any other operating system), unless required for Apple business purposes. Some exceptions apply for employees who created apps before joining Apple or who are joining Apple for a short period of time. If this applies to you, contact Business Conduct to understand what is permitted.

## Board Positions

You may not serve as a director, trustee, officer, or advisory board member without prior approval from Apple. Apple has pre-approved positions in certain organizations like residential boards (i.e., HOAs) and local sports and arts organizations, provided their activities do not conflict with Apple's interests. Contact Business Conduct if you have any questions or if you would like to seek approval from Apple for a position that is not in a pre-approved category. A board position that presents a potential or actual conflict of interest is unlikely to be approved.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 501 of 651

The rule above relates to serving on a board in your individual capacity. If you have been asked to serve on a board as a representative of Apple, you should work with your manager, Legal, and any impacted business teams to determine if Apple should participate, and whether you are the best person to represent Apple on that board. If the position is on a public sector advisory board, work with Business Conduct to assess whether your participation would impact Apple's ability to interact with that government agency. You should also consult with Corporate Communications, if applicable.

### Personal Investments

You should avoid investing in companies that are Apple competitors or business partners when the investment presents a conflict of interest. When determining whether a personal investment creates a conflict of interest, consider if you are in a position to influence transactions between Apple and a business in which you have invested. If a real or apparent conflict arises, disclose the conflict to your manager. Your manager will help determine whether a conflict exists and, if appropriate, the best approach to eliminate the conflict. If you still need help, contact Business Conduct.

## Insider Trading

Never buy or sell Apple securities, including Apple stock, if you are aware of information that has not been publicly announced and that could have a material effect on the value of the securities. It is illegal and against Apple policy to give anyone, including friends and family, tips on when to buy or sell securities when aware of material nonpublic information concerning that security. This applies to decisions to buy or sell Apple stock or the stock of an Apple supplier, manufacturer, vendor, or customer, such as cellular network carriers or other channel partners.

Information is material if it would likely be considered important by an investor who is deciding whether to buy or sell a security, or if the information is likely to have a significant effect on the market price of the security. Both positive and negative information may be considered material. Examples of potential material information include financial results, information about new products or significant features, timing of significant product announcements or new product introductions, news of a pending or proposed acquisition or other corporate transaction, significant changes in sources or availability of supplies, changes in dividend policy, significant product defects or modifications, and significant cybersecurity, or other data protection or privacy incidents.

Short sales, transactions that hedge or offset, or are designed to hedge or offset any decrease in the value of Apple securities and transactions in derivatives of Apple stock, are prohibited at all times, including transactions involving prepaid variable forward contracts, equity swaps, collars, options, warrants, puts, calls, or similar instruments related to shares of Apple stock.

For more information about restrictions on trading in securities as well as answers to FAQs, see the Insider Trading Policy or email Insider Trading.

## Charitable Donations

You are encouraged to support charitable causes of your choosing as long as you do not use or furnish Apple assets (including your work time or use of Apple premises, equipment, or funds). Any charitable donations involving Apple assets are managed by the Corporate Donations team and must be approved by the VP of Environment, Policy, & Social Initiatives. Any donation of 100K USD or more also requires the approval of the Chief Executive Officer or Chief Financial Officer. For additional information, see the Finance Policy on charitable donations. This policy does not prevent you from

taking advantage of the Apple Matching Gifts Program to contribute to a nonprofit organization of your choice, or from participating in our Global Volunteer Program.

## Political Contributions

Apple does not make political contributions to individual candidates or political parties. All corporate political contributions, whether monetary or in-kind (including lending or donating equipment or technical services), must be approved in advance by Apple's CEO, and processed by Government Affairs and Political Compliance to ensure compliance with legal requirements and Apple policy. You may not use Apple resources, including employee work time, Apple premises, equipment, or funds, to personally support candidates and campaigns. It is also illegal for Apple to reimburse an employee for a political contribution. For more information, see the Corporate Political Compliance Policy and the Apple Public Policy Advocacy website.

## Personal Political Activities

You are free to personally participate in political activities, including running for and serving in public positions, and supporting candidates and causes, as long as you comply with the points below:

- Do not represent or give the impression that you are representing Apple during any political activities or in campaign materials.
- Do not make public comments that could be misconstrued as being made on behalf of Apple, or give the impression that Apple is endorsing any particular legislation, position, or issue.
- Do not use Apple work time, equipment, or resources for political or campaign activities.
- If holding a public office, you may need to recuse yourself from any matters involving Apple.

## Gifts

Giving or accepting business gifts can create a real or perceived conflict of interest and can lead to a perception of favoritism and an expectation of reciprocity that could compromise an employee's objectivity, even inadvertently. **Apple employees are under either a zero gift rule or a $150 gift rule**, depending on their organization. Refer to the Gifts page on the Business Conduct website to determine your rule. Employees under a zero gift rule may not give or accept gifts to or from current or potential vendors, suppliers, customers, or other business associates, regardless of the value, unless one of the key exceptions below applies. Employees under the $150 gift rule may only give or accept gifts if the value is under $150, unless one of the key exceptions below applies. Gifts must not reflect poorly on Apple if publicly disclosed, and must be legal in the location and under the circumstances where given. Gifts given with the purpose of influencing a decision are always prohibited.

A gift is considered anything of value, including a meal, travel, entertainment (including tickets), Apple logo items, equipment or loans, and employee discounts. Gifts that are cash or cash equivalents, such as gift cards, are never allowed. In addition, paying for a gift without getting reimbursement from Apple does not remove the requirement to comply with the gift policy. Gifts between employees are not considered business gifts.

### Key Exceptions

Gifts that fall under one of the following exceptions are permissible for most employees, regardless of gift rule (additional approval requirements may be noted):

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 503 of 651

- **Business meals.** With the exception of Apple Store employees, employees may provide and accept reasonable and appropriate business-related meals, provided they are limited in frequency and expense. Any meals paid for by Apple must comply with Apple's Travel and Expense Reimbursement Finance Policy. Employees in Operations must obtain approval from their manager to accept business meals. Approval should occur beforehand when possible.
- **Commemorative items.** With the exception of Operations and Apple Store employees, employees may accept commemorative items of nominal value, such as inexpensive and infrequent vendor promotional items like pens, calendars, and t-shirts.
- **Business-related event attendance.** With the exception of Operations and Apple Store employees, free tickets for sporting events and other forms of entertainment where participation is directly related to an employee's job function and part of legitimate Apple business are not considered a gift under Apple's policy. If you are unsure if attendance at an event is directly related to your role, check with your manager. For high-value or high-profile events, you should review your attendance with your manager and your vice president. Employees should never use relationships built through Apple business for their personal advantage, such as obtaining tickets that are difficult to access, since that is preferential treatment and could be considered a conflict of interest.
- **Conferences.** With the exception of Operations and Apple Store employees, free tickets to conferences that are offered by a vendor, supplier or other third party are permissible if the tickets are free to all attendees, offered as part of a contract with Apple, or offered to all customers of a particular vendor. Tickets outside of those parameters do not fall under an exception, and require approval if the value is over your gift limit. Conference tickets purchased by Apple are not a gift.
- **Vendor-supplied local ground transportation.** Operations employees may accept reasonable local ground transportation provided by vendors to and from work locations.

Any other exceptions must be approved by your vice president. For vice president–level employees, exceptions must be approved by your manager.

## Refusing and Returning Gifts

Gifts outside the limits of your gift rule should be declined or returned whenever possible. If it is impossible or inappropriate to refuse or return a gift, you should notify your manager immediately after accepting the gift, then send it to your local People Business Partner or contact Business Conduct for further guidance. Perishable, non-alcohol gifts may be placed in a common area for employees to share. For more information, see the Business Conduct website.

## Samples

Current and potential vendors and suppliers may provide product samples to Apple for business evaluation purposes. These samples are not gifts and may not be used for personal purposes. Receipt of samples should be documented according to any internal division policies, and where appropriate, returned to the vendor and supplier when the evaluation is complete.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 504 of 651

# Gifts to Public Officials

Apple permits providing gifts to public officials only when permissible under applicable laws and policies. A public official is any person who is paid with government funds or performs a public function. This includes individuals who are elected or appointed to public office, as well as individuals who work for local, state/provincial or national government, public international organizations, public (government-owned or operated) schools, and state-owned or state-run enterprises. Employees at such organizations are considered public officials regardless of title or position.

## U.S. Public Officials

For U.S. public officials, anything other than refreshments of nominal value ($10 or less) must be pre-approved by Political Compliance or comply with internal guidelines if available, including disclosure requirements

## Non-U.S. Public Officials

In many countries, it is considered customary to provide token ceremonial gifts to government officials on certain occasions. All gifts exceeding USD $10 in value require pre-approval from Political Compliance or your regional Apple legal counsel. Meals that comply with posted guidance or a country are permissible and do not need pre-approval. Meals that are frequent and/or lavish could appear to influence a business decision and are inappropriate.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 505 of 651

# Business Integrity

## Governments as Customers

Governments are unique customers for Apple. They often have unique bidding, pricing, disclosure, and certification requirements. When dealing with government customers, make sure to partner with Legal when bidding for business, and contact Business Conduct with questions relating to compliance requirements.

## Hiring Government Employees

Laws often limit the duties and types of services that former government, military, or other public sector employees may perform as employees or consultants of Apple, especially in regard to matters they were involved in while with the government. Employment negotiations with government employees may be subject to legal restrictions and disclosure requirements, particularly if the government employee is involved in a matter involving Apple's interests. Contact Political Compliance before entering such negations. You may never hire any individual in exchange for securing or retaining business, or securing an improper advantage. We also prohibit hiring preference being given to anyone in return for special treatment of any kind. For more information, see the Anti-Corruption Recruiting Policy.

## Bribery and Corruption

At Apple, we do not tolerate corruption in connection with any of our business dealings. Corruption can take many forms, but most often it occurs through bribery. A bribe is offering or giving anything of value, including cash, cash equivalents such as gift cards, gifts, meals, travel and entertainment, to any person for the purpose of obtaining or retaining business, or securing an improper advantage. You cannot offer or receive bribes from any individual, regardless of whether that individual is a public official or a private party. Kickbacks are a type of bribery, and occur when a person is offered money or something of value in exchange for providing something, such as information, a discount or a favor, to a third party. Kickbacks are not permissible and are strictly prohibited by Apple.

Facilitating payments are a type of bribe generally used to facilitate or expedite the performance of routine, non-discretionary government action. These payments are not permissible and are strictly prohibited by Apple. Exceptions may be made in circumstances that involve an imminent threat to health or safety, and such situations must be immediately reported to Business Conduct.

Apple can be found responsible for bribes, kickbacks, and/or facilitating payments made by third parties in connection with Apple's business. Before engaging a third party that will be interacting with the government or public officials on Apple's behalf, contact Business Conduct to evaluate whether we need to conduct additional due diligence.

For more information, see the Anti-Corruption Policy and other resources available on the Business Conduct and Global Compliance website.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 506 of 651

## Money Laundering

Money laundering occurs when individuals or organizations try to conceal illicit funds or make those funds look legitimate. Money laundering is illegal and strictly prohibited by Apple. In certain countries, we are required to report suspicious activity. If you deal directly with customers or vendors, the following examples may signal potential money laundering:

- Attempts to make large payments in cash
- Payments by someone who is not a party to the contract
- Requests to pay more than provided for in the contract
- Payments made in currencies other than those specified in the contract
- Payments from an unusual, nonbusiness account
- Transactions forming an unusual pattern such as bulk purchases of products or gift cards or repetitive cash payments

## Competition and Trade Practices

Competition and innovation are at the core of Apple's DNA. We vigorously compete to develop and create the very best products for our customers. Apple will never seek to eliminate or reduce competition through illegal agreements with competitors. Agreements with competitors are subject to rigorous scrutiny in all countries. Agreements with our resellers, distributors, and suppliers can also give rise to scrutiny, particularly if Apple has a leading position in the market.

You should never:

- Agree with or exchange information with competitors regarding price, policies, contract terms, costs, inventories, marketing plans, capacity plans, or other competitively significant data.
- Agree with competitors to divide or assign sales territories, products, or dedicate customers.
- Agree with resellers on the resale pricing of Apple products without legal approval. Resellers are free to determine their own resale pricing.
- Violate fair bidding practices, including bidding quiet periods, or provide information to benefit one vendor over other vendors.
- Remember: Always consult the Competition Law Team whenever you have a question. For more information, see the Antitrust and Competition Law Policy.

## Obtaining and Using Business Intelligence

Gathering information about customers, competitors, and markets in which we operate is a common business practice, but you must always do so with integrity. You may generally obtain information from public sources, surveys, and competitive research. Personal information shall not be obtained from third parties without confirming with Privacy. We do not seek business intelligence by illegal or unethical means. It is never appropriate to engage in theft, espionage, or breach of a non-disclosure agreement. If you obtain confidential nonpublic information, accidentally or provided by unknown sources, that relates to a competitor, it may be unethical to use the information. If this happens to you, immediately contact your manager, Legal, or Business Conduct.

## Trade Restrictions and Import/Export Controls

Many countries periodically impose restrictions on imports, exports, and other dealings with certain countries, persons, or groups. These can include the trading of commodities or technologies, travel to or from a sanctioned country, and investments. Certain laws also prohibit support of boycott activities. If your work involves the sale or shipment of products, technologies, or services across international borders, always consult Global Export and Sanctions Compliance before moving goods. For more information, see the Export Control and Sanctions Policy.

Case 3:23-cv-04597-EMC     Document 360     Filed 04/24/26     Page 507 of 651

## Private Employee Information

You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history, personal contact information, compensation, health information, or performance and disciplinary matters. Any Legal or business need-to-know exceptions should be approved by your manager and Legal.

As an Apple employee, you should understand that subject to local laws and regulations and in accordance with Apple's review process, we may do one of the following when you access Apple's network or systems, or use any device, regardless of ownership, to conduct Apple business:

- Access, search, monitor, and archive all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts).
- Conduct physical, video, or electronic surveillance, search your workspace (e.g. file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g. backpacks, handbags) while on company premises.
- Disclose to law enforcement, without prior notice, any information discovered during a search that may indicate unlawful behavior

While limited personal use of Apple equipment and systems is allowed, Apple may monitor equipment and systems. You should not have any expectation about the privacy of content or personal information on Apple systems or networks, including VPN. To learn more, read our Information Security Policies and guidance on Personal Information Privacy on the People site, which explain Apple's rights and your rights when conducting Apple business or using Apple-provided equipment. For more information, contact the Privacy team.

## Human Trafficking

Apple is committed to treating everyone in our business and supply chain with dignity and respect, to upholding human rights across our global network of suppliers, and to protecting the planet we all share. Human trafficking and the use of involuntary labor are strictly prohibited in Apple's supply chain and our own business operations. If you become aware of human trafficking or behavior supporting human trafficking, you must report this activity to Business Conduct as soon as possible. Some Apple employees who interact with the U.S. government must abide by additional requirements set for government contractors. For more information, see the Anti-Human Trafficking Policy.

Case 3:23-cv-04597-EMC    Document 360    Filed 04/24/26    Page 508 of 651

# Resources

Anti-Corruption Policy

Apple Antitrust and Competition Law Policy Statement

Apple Customer Privacy Policy

Apple Public Policy Advocacy Website

Human Rights Policy

Intellectual Property

Investor Relations

Legal Department Contacts

Trademark and Copyright Information

Trademark List

Trademarks and Copyrights Guidelines

Business Conduct Helpline
(web form and telephone options)

External Helpline for China:
400-602-9612

# EXHIBIT 39

38.    Attached as Exhibit 39 is Apple's Confidentiality and Intellectual Property Agreement.

# Confidentiality and Intellectual Property Agreement

This Confidentiality and Intellectual Property Agreement ("Agreement" or "IPA Agreement") is entered into between you (also referred to as "Employee") and Apple Inc., a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, California 95014 USA (collectively and severally with its affiliates and subsidiaries, "Apple") (Employee and Apple collectively, the "parties"). Apple has agreed to employ you (or continue to employ you if this Agreement is signed after you have already been employed by Apple) on the condition that you agree to and abide by all of the following terms and conditions for the duration of your employment by Apple, including but not limited to during any leave of absence or other time off, and thereafter.

Apple's business includes the research & development, design, engineering, programming, assembly, manufacture, distribution, retail, and sale of electronic goods, software, content, and services. As a full-time or part-time employee, intern, or temporary or contingent worker employed by Apple, you will have, access to various types of confidential information that is owned by Apple or to which Apple has separately committed to one or more third parties to maintain as confidential. Therefore, to protect Apple's intellectual property rights and business and technical secrets and safeguard both parties' interests, the parties hereby agree as follows in consideration of the above premises, the mutual promises contained herein, and the compensation paid to you in connection with your at-will employment by Apple.

## I. CONFIDENTIAL AND PROPRIETARY INFORMATION

You understand that your employment by Apple creates a relationship of confidence and trust with respect to any confidential, proprietary, or non-public information that may be disclosed to you or otherwise learned by you in the course of employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. As referred to herein, "Proprietary Information" means all information not generally known outside Apple and/or kept confidential by Apple, including for example but not limited to (a) trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, market research, or any other information relating to the business operations or affairs of Apple or persons or companies dealing with Apple; and (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information.[1]

A. **Treatment of Proprietary Information.** You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information.

---

[1] Nothing in this Agreement should be interpreted as restricting your rights to speak freely about your wages, hours, or working conditions as legally permitted.

B. **Information of Others.** You agree that you have not brought, and during your employment with Apple will not bring, any confidential, proprietary, or secret information or intellectual property of your former employer(s) or any other person(s) or entity(ies) onto Apple property. You further agree you have not improperly used or disclosed (or induced the same), and during your employment with Apple will not improperly use or disclose (or induce the same), any confidential, proprietary, or secret information or intellectual property of your former employer(s) or any other person(s) or entity(ties).

## II. INVENTIONS

A. **Definition of Invention.** As used in this Agreement, "Inventions" means any and all inventions, ideas, and discoveries, including improvements, original works of authorship, designs, formulas, processes, specifications, technology, computer programs or portions thereof, databases, mask works, results, know-how, trade secrets and proprietary information, documentation, and materials made, created, conceived, or reduced to practice by you, alone or jointly with others.

B. **Prior Inventions.** In the space provided below, or on a separate sheet attached to this Agreement, you may list all Inventions that you made prior to your employment with Apple and that you claim an ownership or any other legal right or title in ("Prior Inventions"). If you do not claim an ownership or other legal right or title in a Prior Invention because you assigned all rights to a previous employer, then you should not list the Prior Invention. You should not include any information that is subject to a confidentiality obligation to a third party.

You agree that you will not incorporate, or permit to be incorporated, any Prior Inventions in any Apple product, service, process, or method (collectively "Apple Product") without Apple's prior written consent. You further agree to grant and do hereby grant to Apple a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license without any additional compensation to make, have made, use, offer to sell, sell, import, export, reproduce, modify, display, perform, transmit, and otherwise distribute and exploit any listed Prior Invention(s) that is incorporated or used in or for an Apple Product, (i) with your knowledge, involvement, acquiescence, or permission, (ii) if you were involved in the development or implementation of the relevant part of the Apple Product, or (iii) if you do not promptly object to the public use or commercialization of the relevant part of the Apple Product in a written notice to an Apple Vice President.

If you do not list a Prior Invention, you acknowledge and agree that no such Prior Inventions exist, and, to the extent such Prior Inventions do exist, you waive any and all past, present, and future claims against Apple relating to such Prior Inventions. You understand that your listing of any Prior Inventions here does not constitute an acknowledgment by Apple of the existence or extent of such Prior Inventions, nor of any ownership of such Prior Inventions. Please do not use this space to disclose an ongoing business or project, or a product that you are developing and/or distributing; such ongoing activity must be disclosed and presented to your manager in writing, and approved in advance by your Apple Vice President.

Prior Inventions (description and identifying number of patent or patent application, if applicable):

_____    _____
Title                                              Date

_____
Brief description of invention

_____

_____

☐  A separate sheet listing Prior Inventions is attached.

US IPA v14.2                                                                      2

C. **Apple Ownership of Inventions.** You confirm and agree that all Inventions that (a) are developed using any equipment, supplies, facilities or Proprietary Information provided by Apple; (b) result from or are suggested by work performed by you for Apple or Proprietary Information provided by Apple; or (c) are conceived of or reduced to practice during the time you are employed by Apple and relate to any aspect of Apple's business or products, or Apple's actual or anticipated research and development (collectively "Apple Inventions") are the sole and exclusive property of Apple. You agree to make a full written disclosure promptly to Apple of any and all Apple Inventions. You agree that no additional compensation or remuneration is or will become due to you in consideration for Apple's ownership of the Apple Inventions, and that any award or bonus provided to you (for example pursuant to a patent award program) will be at Apple's sole discretion and is not a condition for Apple's ownership of any Inventions. You acknowledge and agree that you have no right to, and will not directly or indirectly use Apple Inventions except as authorized by Apple for your work at Apple. For example, you agree not to: (a) reproduce, manufacture, market, publish, distribute, sell, license, or sublicense, transfer, rent, lease, transmit, broadcast, display, or use the Apple Inventions, or any portion or copy thereof, in any form; (b) apply for, or apply to register, any patent, copyright, trademark, mask work, or other industrial property right or intellectual property right in or related to the Apple Inventions, anywhere in the world; or (c) cause other persons, companies, or organizations to do any of the above.

**Assignment, License, and/or Waiver of Rights to Apple Inventions.** If any applicable laws and regulations provide that certain rights in any Apple Inventions vest in Employee, you hereby agree to assign and do hereby assign such rights to Apple to the fullest extent legally permitted, including any "moral" rights that you may have in any Apple Invention(s) under the copyright or other law, whether U.S. or foreign, and Apple hereby accepts such assignment (the "Assigned Inventions"). You acknowledge that all original works of authorship that are made by you (solely or jointly with others) within the scope of your employment by Apple, and that are protectable by copyright, are works made for hire, as that term is defined in the United States Copyright Act (17 U.S.C. §101). In the event that any rights to an Apple Invention are not effectively assigned to Apple, then you hereby grant Apple a license to make, have made, use, offer to sell, sell, import, export, reproduce, modify, display, perform, transmit and otherwise distribute and exploit, in its sole discretion, the Apple Inventions (and modified and derivative works thereof). The license rights under this clause shall be free of charge, perpetual, irrevocable, exclusive (you shall not use or otherwise exploit the Apple Inventions nor appoint other licensees), worldwide, and transferable, and Apple shall have the right to sublicense. In the event that there are any rights to an Apple Invention that are not effectively assigned or licensed to Apple pursuant to the foregoing provisions, then you irrevocably waive and agree not to exercise or assert any rights to any such Apple Inventions worldwide, including but not limited to all moral rights, rights of attribution, identification of authorship, limitation on subsequent modification or other "personal rights" in the Apple Inventions, during or after the termination of your employment by Apple. You agree that Apple and its licensees are not required to designate you as the author of any Apple Inventions when distributed.

**Protection of Apple Inventions.** You agree, during and after termination of employment, whether voluntary or involuntary, to assist Apple or any party designated by Apple (at Apple's expense) in every proper way to obtain, perfect, confirm, realize rights in, and/or enforce all of Apple's ownership and other rights to Apple Inventions in any and all countries. This includes promptly executing any documents that Apple may reasonably request for use in obtaining or enforcing such patents, copyrights, and other legal protections.

D. **Excluded Employee Inventions.** Apple acknowledges and agrees, in accordance with any applicable law,[2] that any Inventions (a) that you develop entirely on your own time; and (b) that you develop without using Apple's equipment, supplies, facilities, or trade secret information; and (c) that do not result from any work performed by you for Apple; and (d)[3] that do not relate, at the time of conception or reduction to practice, to Apple's business or products, or to Apple's actual or demonstrably anticipated research or development, will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple.

## III. NO CONFLICTING OBLIGATIONS

A. **No Conflicting Outside Interests.** You agree that during your employment by Apple, you will not plan or engage in any other employment, occupations, consulting, or other business activities or commitments competitive with or directly related to Apple's business or products, or to its actual or demonstrably anticipated research or development, nor will you engage in any other activities that conflict with any employment obligations to Apple. Activities and commitments as used herein do not include passive investments in stocks or other financial instruments.

B. **No Conflicting Agreements.** You represent to Apple that you have no other commitments that would hinder or prevent the full performance of your duties as an Apple employee or your obligations under this Agreement, and you agree not to enter into any such conflicting agreement during the tenure of employment by Apple.

C. **Disclosure of Agreement.** You hereby authorize Apple to notify others, including customers of Apple, and any future employers you may have, of the terms of this Agreement and your responsibilities under this Agreement.

D. **No Solicitation.** To the fullest extent permitted by applicable law, during your employment and for a period of one (1) year following your termination (whether voluntary or involuntary), you will not, directly or indirectly, on your own behalf or on behalf of any person or entity, solicit, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple.

## IV. NON-COMPLIANCE

You acknowledge and agree that the limitations set forth herein are reasonable with respect to scope and duration, and are properly required for the protection of the legitimate interest of Apple. If you breach any part of this Agreement, Apple is entitled to take any action to the extent permissible under applicable laws and this Agreement, including but not limited to terminating employment, initiating a legal proceeding, filing a

---

[2] For employees in California: Labor Code §2870 provides: "(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either: (l) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) Result from any work performed by the employee for the employer. (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a) the provision is against the public policy of this state and is unenforceable."

[3] For employees in the states of Kansas, Minnesota, or Washington, in accordance with Section 44-130 of the Kansas Statute, Section 181.78(3) of the Minnesota Statute, and Section 49.44.140(3) of the Washington State Code, respectively: Section II.D(d) reads as follows: "(d) that do not directly relate, at the time of conception or reduction to practice, to Apple's business or products, or actual or demonstrably anticipated research or development of Apple, will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple."

4

US IPA v14.2

complaint to relevant administrative departments, and assisting the relevant judicial authorities to pursue you liabilities in case that your breach of this Agreement has violated any criminal laws.

You acknowledge and agree that any breach of this Agreement could give rise to irreparable harm to Apple for which money damages may not be an adequate remedy. Because such harm and injury may not be compensable by damages, you agree that Apple will have the right to enforce this Agreement by injunction, specific performance, or other equitable relief without posting of a bond or security and without prejudice of any other rights and remedies available. Accordingly, Apple may apply to any court of competent jurisdiction for any interim or conservatory measures, including temporary or permanent injunctive relief or to compel arbitration.

## V.  NO IMPLIED EMPLOYMENT RIGHTS

You understand and agree that no term or provision of this Agreement confers upon you any rights to continued employment by Apple and that no term or provision of this Agreement obligates Apple to employ you for any specific period of time or interferes with or restricts your right or, to the fullest extent permitted by applicable law, Apple's right to terminate your employment at will, at any time for any reason with or without cause or prior notice.

## VI.  GENERAL PROVISIONS

A.  **Severability.**  If one or more of the provisions of this Agreement are deemed void or unenforceable by law, then the remaining provisions will continue in full force and effect and the Parties or a tribunal of competent jurisdiction shall substitute suitable provisions having like effect.

B.  **Governing Law.**  This agreement will be governed in accordance with the laws of the state where you are currently or were most recently employed by Apple.  If this Agreement is executed in the U.S., any judicial action between the parties relating to this Agreement will take place in Santa Clara County, California, and you consent to the personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California.

C.  **Successors and Assigns.**  This Agreement will be binding upon your heirs, executors, administrators, and other legal representatives, and will be for the benefit of Apple, its successors, and assigns.  You may not assign or transfer this Agreement, in whole or in part, to any other person or entity.

D.  **Entire Agreement.**  This Agreement sets forth the entire agreement between you and Apple relating to the subject matter of this Agreement.  No modification to or amendment of this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both you and an Apple Vice President.  Any subsequent changes in your duties, salary, or compensation will not affect the validity or scope of this Agreement.

E.  **Compliance with Laws.**  You agree that you will comply, and do all things necessary for Apple to comply, with the laws and regulations of all governments where Apple do business, and with provisions of contracts between any such government or its contractors and Apple.

## VII.  VOLUNTARY AGREEMENT

You acknowledge that you have read this Agreement carefully, that you understand all of its terms, that all agreements between you and Apple relating to the subjects covered in this Agreement are contained in it, and that you have entered into this Agreement voluntarily and not in reliance upon any promises or representations other than those contained in this Agreement itself.

US IPA v14.2

You further acknowledge that you have had the opportunity to discuss this Agreement with private legal counsel.

This Agreement is and will be effective on and after the first day of your employment.

Understood and agreed by:

2015

Please make and retain a copy of this agreement for your records.

US IPA v14.2

6

# EXHIBIT 40

39.    Attached as Exhibit 40 is Apple's Social Media and Online Communications Policy.

# Social Media and Online Communications

Most of us rely on online resources such as email, social media, blogs, and wikis to stay connected.

It's your decision whether or not to engage in these or other online communications. But keep in mind that Apple's policies and guidelines apply to any activities that affect your performance, the performance of other Apple employees, or Apple's business interests.

This is true even if you blog, tweet, write, post, comment, share visual or other media, or otherwise communicate online outside of work — even if you do not identify yourself as an Apple employee. So before you click or tap "send," keep these guidelines in mind:

- **Protect Apple's confidential information.** As we conduct business around the world, our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential. This includes non-public information such as the timing, pricing, and design of Apple products; Apple's overall business performance; and the layout of our stores (including back-of-house areas, which contain competitive business operations information, customer data, sales targets, and other proprietary information).

  All Apple employees have an obligation to protect this information. Doing so respects the significant amount of time and energy Apple puts into introducing our customers to new products and new retail stores. For more information on confidentiality, see the

Intellectual Property Agreement you signed when you were hired. You can also learn more about protecting Apple's assets and confidential information in Apple's [Business Conduct Policy](#).

- **Respect our customers.** Our customers give us their private information with the expectation that we will treat it with the utmost sensitivity. Do not use this information for personal gain, or as a way to contact them for social reasons. Customers deserve the same respect online as they do when they visit our stores. Do not discuss or make comments online about customers under any circumstances.
- **Be polite.** We want you to be yourself, but you should also be respectful in posts, tweets, and other online communications. Do not use vulgar, intimidating, discriminating, or harassing language. Apple is a global organization whose employees and customers come from different backgrounds and may have different values and points of view. Keep Apple's Harassment policies in mind when considering what you post online. For more information, refer to Apple's Business Conduct Policy.

We think Apple is a great place to work and we want to keep it that way, so if you have any questions or concerns, please talk with your manager or the People team, or call People Support or Business Conduct Helpline.

Nothing in these guidelines should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions.

Popular next steps:

[Business Conduct Policy](#)

# EXHIBIT 41

40.    Attached as Exhibit 41 is the email with Kragmanov

# Re:

**From: Ashley Gjovik <ashleygjovik@icloud.com>**                    Thu, Sep 9, 2021 at 6:07 PM EDT (GMT-04:00)
To: Aleks Kagramanov <akagramanov@apple.com>
Cc: Ashley G (Work) <ashleygjovik@apple.com>

Hi Aleks,

As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.

I offered to help via email to ensure we have a documented recored of our conversations considering everything that's currently going on with my investigation and my complaints to the government.

I have been speaking out about work conditions, about workplace safety, concerns about discrimination & retaliation, and about concerns about intimidation and corruption (as reported to the government in public record).

I'm very concerned about what you are calling "serious allegations." Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting my access to Apple system? Or are you doing something more — and if so what?

Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.

In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.

Best,
-Ashley

—
**Ashley M. Gjøvik**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
✆ (415) 964-6272


On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com


On Sep 9, 2021, at 2:27 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

**EXHIBIT    92**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.

This feels a little like witness intimidation, etc...

—

**Ashley M. Gjøvik**
☐ Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
☎ (415) 964-6272

On Sep 9, 2021, at 2:10 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Aleks! Happy to help! Please send any questions / updates via email so we keep everything written please.

I will respond via email as quickly as I can. Thanks!

—

**Ashley M. Gjøvik**
☐ Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
☎ (415) 964-6272

On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:

Hi Ashley,

This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.

As part of Apple's policy, your cooperation and participation is imperative.

Thank you in advance, and talk soon.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone +1-408-202-4963
akagramanov@apple.com

PL_PROD10_EX093

# EXHIBIT 42

41.    Attached as Exhibit 42 is the NLRB complaint issued against Apple concerning Apple's confidentiality and related employment policies (NLRB Case No. 32-CA-284428 and related), introduced as an exhibit at the Bertolus deposition.

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE, INC.**                                             Case   **32-CA-284428**

     **and**

**ASHLEY GJOVIC, an Individual**

<u>**COMPLAINT AND NOTICE OF HEARING**</u>

This Complaint and Notice of Hearing is based on a charge filed by Ashley Gjovik ("Charging Party" or "Gjovik").  It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Apple, Inc. ("Respondent"), has violated the Act as described below.

1.     The charge was filed by Gjovik on October 12, 2021, and a copy was served on Respondent by U.S. mail on October 13, 2021.

2.     (a)     At all times reasonably encompassed by this complaint and any answer Respondent may file, i.e., all material times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, CA and retail facilities throughout the U.S.,  has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

     (b)     Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

(c)    At all times reasonably encompassed by this complaint and any answer Respondent may file, i.e., all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3.    Since at least April 13, 2021, in a **Frequently Asked Questions** page on its intranet, a copy of which is attached to this Complaint as Attachment A and is incorporated herein in its entirety, Respondent has defined confidential information as follows:

> Apple Confidential information is anything not explicitly, publicly, or purposefully disclosed by Apple. Examples of Apple Confidential information include unannounced products (including their release dates, pricing, and specifications), unannounced sales promotions, certain AppleWeb announcements, organizational charts, financial forecasts, and customer information.

4.    Since at least April 13, 2021, Respondent has maintained a "**Confidentiality and Intellectual Property Agreement**" (IPA), a copy of which is attached to this Complaint as Attachment B and is incorporated herein in its entirety.

(a)    Under the section heading "**I. Confidential and Proprietary Information**," the IPA states, inter alia:

> You understand that your employment by Apple creates a relationship of confidence and trust with respect to any confidential, proprietary, or non-public information that may be disclosed to you or otherwise learned by you in the course of employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. As referred to herein, "Proprietary information" means all information not generally known outside Apple and/or kept confidential by Apple, including for example but not limited to (a) trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, market research, or any other information relating to the business operations or affairs of Apple or persons or companies dealing with Apple; and (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resources information.

2

(b)    There is a footnote at the end of the paragraph quoted above that states:

Nothing in this Agreement should be interpreted as restricting your rights to speak freely about your wages, hours, or working conditions as legally permitted.

(c)    Under the section heading "**I. Confidential and Proprietary Information**," the IPA further states:

**A. Treatment of Proprietary Information**. You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information.

5.    Since at least April 13, 2021, Respondent has maintained a **Business Conduct Policy** (BCP), and since at least April 13, 2021, Respondent has maintained as part of the BCP the rules and provisions set forth below. A copy of the 2020 version of the BCP is attached to this Complaint as Attachment C and is incorporated herein in its entirety.

(a)    Under the section heading "**The Way We Do Business Worldwide**," the BCP states, inter alia:

**Your Responsibilities and Obligation to Take Action**

Everything we do is a reflection of Apple. We expect you to:

- **Follow the Policy**. Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements.

- **Speak up**. If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.

3

- **Use good judgment and ask questions**. Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal, or Business Conduct. Any failure to comply with Apple's Business Conduct Policy—or failure to report a violation—may result in disciplinary action, up to and including termination of employment.

You are also required to fully cooperate in any Apple investigation, and keep any information shared with you confidential to safeguard the integrity of the investigation.

(b)    Under the section heading "**The Way We Do Business Worldwide**," the

2020 BCP further states:

**Your Rights as an Employee**

While we expect employees to follow the Business Conduct Policy, nothing in this Policy should be interpreted as being restrictive of your right to speak freely about your wages, hours, or working conditions.

In the August 2022 BCP, this subsection was modified to read as follows:

**Your Rights as an Employee**

You are permitted to speak freely about your wages, hours, and working conditions, including information about harassment, discrimination, or any other conduct you have reason to believe is unlawful, and nothing in this Policy, or any Apple policy, should be interpreted as being restrictive of your right to do so.

(c)    Under the section heading "**Protecting Apple**," the BCP states:

**Protecting Apple's Assets and Information**

You play a key role in helping us protect Apple. Assets include Apple's proprietary information (such as intellectual property, confidential business plans, unannounced product plans, sales and marketing strategies, and other trade secrets), as well as physical assets such as cash, equipment, supplies and product inventory.

- **Watch what you say**. Being aware of where you are, who is around you, and what they might see or overhear is an important way we all protect Apple's secrets.

- **Protect our assets**. Keep track of the assets and information Apple has entrusted you, and prevent loss, misuse, waste, or theft.

4

- **Set an example**. Model behavior that protects our assets and information at all times.

(d)     Under the section heading "**Protecting Apple**," the BCP further states:

**Apple Confidential Information**

One of our greatest assets is information about our products and services, including future product offerings. Never disclose confidential, operational, financial, trade-secret, or other business information without verifying with your manager whether such disclosure is appropriate. We are very selective when disclosing this type of information to vendors, suppliers, or other third parties, and only do so once a non-disclosure agreement is in place. Even with Apple, confidential information should only be shared on a need-to-know basis. The Intellectual Property Agreement that you signed when you joined Apple outlines your duty to protect our information.

For more information, visit the Global Security website.

(e)     Under the section heading "**Protecting Apple**," the BCP further states:

**Non-Disclosure/Confidentiality Agreements**

Never share confidential information about Apple's products or services without your manager's approval. When there is a business need to share confidential information with a supplier, vendor, or other third party, never volunteer more than what is necessary to address the business at hand. Any confidential information shared outside Apple should be covered by a non-disclosure/confidentiality agreement (NDA). Contact Legal in your region to obtain an NDA. In the United States, you can find NDA information and support on the Legal website.

(f)     Under the section heading "**Protecting Apple**," the BCP further states:

**Accuracy of Records and Reports**

Accurate and honest records are critical to meeting our legal, financial, and management obligations. You should ensure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications are comprehensive, fair, accurate, timely, and understandable.

Do not misstate facts, omit critical information, or modify records or reports in any way to mislead others, and never assist others in doing so. Intentional manipulation of Apple records is a form of fraud.

(g)     Under the section heading "**Protecting Apple**," the BCP further states:

5

**Public Speaking and Press Inquiries**

All public or outside speaking engagements that relate to Apple's business or products must be pre-approved by your manager and Corporate Communications. If your request is approved, you may not request or accept any form of personal compensation from the organization that requested your participation, but you may accept reimbursement for incurred expenses. All inquiries from the media, industry, or financial analyst community must be referred to Corporate Communications or Investor Relations.

(h)    Under the section heading "**Protecting Apple**," the BCP further states:

**Publishing Articles**

If you want to contribute an article or other type of submission to a publication or blog on a topic that relates to Apple's business or products or could be seen as a conflict of interest, you must first request approval from Corporate Communications. If your contribution is technical or academic and relates to Apple, complete the Academic and Industry-Related Activities Questionnaire to obtain review from Legal and Business Conduct. If your contribution is determined to be a conflict of interest, you will need to get senior vice president approval. For additional information, see the Social Media and Online Communications guidelines.

(i)    Under the section heading "**Individual Accountability**," the BCP states:

**Avoiding Conflicts of Interest**

A conflict of interest is any activity that may damage Apple's reputation or financial interests, or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.

(j)    Under the section heading "**Individual Accountability**," the BCP further states:

**Conflicts of Interest and Outside Activities**

You may participate in outside activities, including secondary employment, businesses, inventions, and serving on boards, only if they do not present a conflict of interest and you adhere to the rules set out below.

Apple generally considers an outside activity to be a conflict of interest if it:

[…]

6

- Would require you to disclose or use confidential Apple information.

[…]

- Arises from your role in Apple's business relationship with the organization.

(k)    Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

Work with your manager and Business Conduct to evaluate a potential conflict of interest. If an outside activity presents a conflict of interest, you must partner with a People Business Partner, and obtain written approval from your manager, Legal (if applicable), and the senior most person reporting to the CEO of both your and any relevant organizations. Contact Business Conduct to assist with Legal review.

(l)    Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

Any employee, full or part-time, who is participating in an outside activity, must comply with the following rules. **Do not:**

- Use any time at work or any Apple assets for your outside activity. This includes Apple's workspace, phones, computers, internet access, photocopiers, and any other Apple assets or services.

[…]

- Use confidential Apple information.

(m)    Under the section heading "**Individual Accountability**," the BCP further states:

**Outside Employment and Inventions**

Before participating in creating inventions or businesses that are in the same area as your work for Apple, or that compete with or relate to Apple's present or reasonably anticipated business, products or services, you must have written permission from your manager and the senior vice president of your organization. Before taking any paid employment outside of Apple, you should notify your manager. Visit the Conflicts of Interest page for more information on what would be considered a conflict.

(n)    Under the section heading "**Business Integrity**," the BCP states:

7

**Private Employee Information**

You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history, personal contact information, compensation, health information, or performance and disciplinary matters. Any Legal or business need-to-know exceptions should be approved by your manager and Legal.

(o)    Under the section heading "**Business Integrity**," the BCP further states:

As an Apple employee, you should understand that subject to local laws and regulations and in accordance with Apple's review process, we may do one of the following when you access Apple's network or systems, or use any device, regardless of ownership, to conduct Apple business:

- Access, search, monitor, and archive all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts).

- Conduct physical, video, or electronic surveillance, search your workspace (e.g. file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g. backpacks, handbags) while on company premises.

- Disclose to law enforcement, without prior notice, any information discovered during a search that may indicate unlawful behavior.

(p)    Under the section heading "**Business Integrity**," the BCP further states:

While limited personal use of Apple equipment and systems is allowed, Apple may monitor equipment and systems. You should not have any expectation about the privacy of content or personal information on Apple systems or networks, including VPN. To learn more, read our Information Security Policies and guidance on Personal Information Privacy on the People site, which explain Apple's rights and your rights when conducting Apple business or using Apple-provided equipment. For more information, contact the Privacy team.

6.    Since at least April 13, 2021, Respondent has maintained an "**About Workplace Policies**" (AWP) page on its intranet, a copy of which is attached to this Complaint as Attachment D and is incorporated herein in its entirety.

(a)    Under the section heading "**Important points to know**," the AWP states, inter alia:

- If you have knowledge of a possible violation of Apple's Business Conduct Policy (PDF), any other Apple policy, or legal or regulatory requirements, you must notify your manager, your People Business Partner, People Support, or the Business Conduct Helpline.

7. Since at least April 13, 2021, Respondent has maintained a **Workplace Searches and Privacy Policy** (WSPP), a copy of which is attached to this Complaint as Attachment E and is incorporated herein in its entirety.

(a) The first paragraph of the WSPP states:

In order to protect Apple confidential and sensitive information and maintain the security and integrity of our networks and equipment, any use of Apple property, as well as use of your personal devices for Apple business or for accessing Apple networks, is subject to this policy.

(b) Under the section heading "**Use of Apple systems and data**," the WSPP states:

All Apple facilities, furnishings, supplies, equipment, networks, and electronic systems (such as internet and intranet access, voicemail, email, instant messaging, and collaboration tools) are company property and are provided to conduct Apple business. Personal use is permitted as long as such use is reasonable and doesn't interfere with normal business activities. It must also not affect your performance, violate Apple policies and practices, or applicable local laws.

Generally, you should use Apple equipment to conduct Apple business. If you use your personal property to conduct Apple business (such as computers, data storage devices, mobile devices, and so on), or to access Apple networks, you must act in accordance with Apple policies. In addition, your property may be subject to search and the Apple-related content may be removed.

(c) Under the section heading "**Workplace searches**," the WSPP states:

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

9

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

The search or removal of Apple-related content on a device will be determined on a case-by-case basis when there is a business need and subject to local approval processes. Refusing to permit a search or removal of Apple-related content may result in disciplinary action up to and including termination of employment.

8.    Since at least April 13, 2021, Respondent has maintained a "**Misconduct and Discipline Policy**" (MDP), a copy of which is attached to this Complaint as Attachment F and is incorporated herein in its entirety.

(a)    Under the section heading "**Conduct warranting immediate termination**," the MDP states, inter alia:

Conduct that may warrant immediate termination of employment includes, but isn't limited to:

**Policy violations**

- Violating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement).

- Using Apple time, materials, facilities, equipment, or electronic resources for purposes unrelated to Apple business without your manager's express permission

(b)    Under the section heading "**Conduct warranting immediate termination**," the MDP further states:

**Other violations**

- Video or audio recording others without their prior consent. Apple may use recording or surveillance equipment for safety or security reasons.

10

- Photography at any Apple facility or home office or during meetings at any location where Apple confidential information could be compromised.

9.    Since at least April 13, 2021, Respondent has maintained a "**Social Media and Online Communications Policy**" (SMOCP), a copy of which is attached to this Complaint as Attachment G and is incorporated herein in its entirety.

(a)    The SMOCP states, inter alia:

Most of us rely on online resources such as email, social media, blogs, and wikis to stay connected.

It's your decision whether or not to engage in these or other online communications. But keep in mind that Apple's policies and guidelines apply to any activities that affect your performance, the performance of other Apple employees, or Apple's business interests.

This is true even if you blog, tweet, write, post, comment, share visual or other media, or otherwise communicate online outside of work — even if you do not identify yourself as an Apple employee. So before you click or tap "send," keep these guidelines in mind:

- **Protect Apple's confidential information**. As we conduct business around the world, our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential. This includes non-public information such as the timing, pricing, and design of Apple products; Apple's overall business performance; and the layout of our stores (including back-of-house areas, which contain competitive business operations information, customer data, sales targets, and other proprietary information).

All Apple employees have an obligation to protect this information. Doing so respects the significant amount of time and energy Apple puts into introducing our customers to new products and new retail stores. For more information on confidentiality, see the Intellectual Property Agreement you signed when you were hired. You can also learn more about protecting Apple's assets and confidential information in Apple's Business Conduct Policy.

[…]

Nothing in these guidelines should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions.

11

10.     Since at least April 13, 2021, Respondent has maintained a "**Confidentiality Obligations Upon Termination of Employment Policy**" (COTEP), a copy of which is attached to this Complaint as Attachment H and is incorporated herein in its entirety.

(a)     The COTEP states, inter alia:

During your employment, you had access to proprietary information of Apple Inc. and its subsidiaries (Apple). Examples of such proprietary information means all information not generally known outside Apple and/or kept confidential by Apple including for example and without limitation (a) trade secrets, R&D records, reports, samples, manuals plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, budgets, market research, marketing or advertising plans, or any other information relating to business operations or affairs of Apple or persons or companies dealing with Apple; (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information. You may have created such information in the course of your everyday work. You may have additionally had access to proprietary information in the course of your work at Apple obtained by third parties including subsidiaries, affiliates, vendors, suppliers, customers, consultants, licensees, and dealers. You are obligated not to disclose any above described proprietary information to any other person or company (other than with Apple's prior consent) or use it for your own benefit. Furthermore you are obligated to have returned to Apple all documents and materials of any kind pertaining to your work at Apple and containing any proprietary information.

Certainly Apple has no desire to prevent you from the lawful exercise of your professional skills. However, any unauthorized disclosure or use of Apple proprietary information in conjunction with your new employment—or otherwise—would be a breach of your agreement with Apply, as well as a violation of the laws relating to the protection of such information. Your obligations continue until such time as the proprietary information is generally available to the public.

[…]

If you have any questions regarding the Confidentiality and Intellectual Property Agreement, if you are concerned about the use or disclosure of proprietary information, or if you should find yourself in a position where you are uncertain about whether an idea or invention should have been

12

disclosed to Apple, please promptly contact the *Apple IP Transactions Department* at [redacted] and we will be pleased to review the matter with you.

11.    Since at least April 13, 2021, Respondent has maintained a "**Checklist for Employees Leaving Apple**" (Checklist), a copy of which is attached to this Complaint as Attachment I and is incorporated herein in its entirety.

(a)    The Checklist states, inter alia:

Confidentiality: As a reminder, you are expected to continue to abide by the provisions of the Intellectual Property Agreement after your employment with Apple ends. Examples include but are not limited to unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, and vendor contacts.

12.    By the conduct described above in paragraphs 3, 4(a), 4(c), 5(a), 5(c) – 5(p), and 6 – 11, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above, the General Counsel seeks an Order requiring:

- Respondent to physically and electronically post, and electronically distribute to all current and former employees employed by Respondent at any time since April 13, 2021 at all its facilities in the United States and its Territories, any Notice that may issue in these proceedings if Respondent customarily uses electronic means such as an electronic bulletin board, e-mail, website, text messaging, internal apps, or intranet to communicate with those employees.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

**ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be **electronically filed with this office on or before Friday, October 11, 2024.**  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.  To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21.  If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if

14

an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **January 22, 2025, at 9:00 a.m.** at the National Labor Relations Board, Region 21, 312 N. Spring Street, 10th Floor, Los Angeles, CA, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  September 27, 2024

William B. Cowen
Regional Director, Region 21
National Labor Relations Board
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

15

FORM NLRB 4338
  (6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 32-CA-284428

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1)  The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)  Grounds must be set forth in *detail*;

(3)  Alternative dates for any rescheduled hearing must be given;

(4)  The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5)  Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Tim Cook, Chief Executive Officer
Apple, Inc.
One Apple Park Way
Cupertino, CA 95014
tcook@apple.com

Christopher Foster, Attorney at Law
McDermott Will & Emory LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
cfoster@mwe.com

Syed Mannan, Attorney at Law
McDermott Will & Emery LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
smannan@mwe.com

Crystal S. Carey, Attorney at Law
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178
crystal.carey@morganlewis.com

Brian Mahoney, Attorney at Law
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.mahoney@morganlewis.com

Kelcey J. Phillips, Attorney at Law
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave
Washington, DC 20004
kelcey.phillips@morganlewis.com

(continue's next page)

Mark L. Stolzenburg, Attorney at Law
Morgan Lewis & Bockius LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
mark.stolzenburg@morganlewis.com

Harry I. Johnson III, Attorney at Law
Morgan, Lewis & Bockius LLP
2049 Century Park E Ste 700
Los Angeles, CA 90067-3109
harry.johnson@morganlewis.com

Ashley Marie Gjovik

ashleymgjovik@protonmail.com

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.    BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:**  If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:**  One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.    DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**:  At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:  Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

Form NLRB-4668
(6-2014)

**in evidence.**  If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing.  Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:**  In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

# EXHIBIT 43

42.     Attached as Exhibit 43 is the national settlement agreement between Apple, the NLRB, and me regarding the foregoing policies.

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**SETTLEMENT AGREEMENT**

**IN THE MATTER OF**

   **APPLE INC.**                                                   **Case 32-CA-284428**

Subject to the approval of the Regional Director for the National Labor Relations Board, the Charged Party Apple Inc. and the Charging Party Ashley Marie Gjovik

**HEREBY AGREE TO SETTLE THE ABOVE MATTER AS FOLLOWS**:

**POSTING OF NOTICE TO EMPLOYEES** — The Charged Party will post a link to a copy of the Notice in English and in additional languages if the Regional Director decides that it is appropriate to do so, on the Policies and Notices page of its People intranet and keep such link continuously posted there for 60 consecutive days from the date it was originally posted. Such link will read, "This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428." Charged Party will also post, on a public-facing website maintained indefinitely by Charged Party containing legal notices, an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement. To document its compliance with this requirement, the Charged Party will submit screen shots of the posting to include screen shots of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov.  Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

**COMPLIANCE WITH NOTICE** — The Charged Party will comply with all the terms and provisions of said Notice.

**NON-ADMISSION**—By entering into this Agreement the Charged Party does not admit to any violation of the National Labor Relations Act ("Act").

**ADDITIONAL TERMS** – The Charged Party agrees that it will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the Confidentiality and Intellectual Property Agreement ("IPA") effective as of the date that this Agreement is executed to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act.

A further material term of this Agreement is that the Charged Party is directed to prospectively clarify the definition of Proprietary Information (or similar terms) in the IPA and make other clarifications to the IPA relating to the Section 7 rights of employees or at its option issue a new IPA for certain employees with prospective effect, with such clarified definition of Proprietary

Charged Party Initials: _MLS_____          Charging Party Initials: _AMG_____

**EXHIBIT   101**
Witness:  Y. Bertolus
Date:  April 17, 2026
Stenographer:  Carrie Gibson, CSR No. 13937

PL_PROD10_EX101

Information (or similar terms) or such new agreement as reflected in the attached Appendix A, and has agreed to revise certain other policies, as reflected in the attached Appendix B.[1]

**SCOPE OF THE AGREEMENT** — This Agreement settles only the allegations in the above-captioned case(s), including all allegations covered by the attached Notice to Employees made part of this agreement, and does not settle any other case(s) or matters, including, but not limited to, 32-CA-282142, 32-CA-283161, and 32-CA-284441.  It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out.  The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned case(s) for any relevant purpose in the litigation of this or any other case(s), and a judge, the Board and the courts may make findings of fact and/or conclusions of law with respect to said evidence.

**PARTIES TO THE AGREEMENT** — If the Charging Party fails or refuses to become a party to this Agreement and the Regional Director determines that it will promote the policies of the National Labor Relations Act, the Regional Director may approve the settlement agreement and decline to issue or reissue a Complaint in this matter.  If that occurs, this Agreement shall be between the Charged Party and the undersigned Regional Director.  In that case, a Charging Party may request review of the decision to approve the Agreement.  If the General Counsel does not sustain the Regional Director's approval, this Agreement shall be null and void.

**AUTHORIZATION TO PROVIDE COMPLIANCE INFORMATION AND NOTICES DIRECTLY TO CHARGED PARTY** — Counsel for the Charged Party authorizes the Regional Office to forward the cover letter describing the general expectations and instructions to achieve compliance, a conformed settlement, original notices and a certification of posting directly to the Charged Party. If such authorization is granted, Counsel will be simultaneously served with a courtesy copy of these documents.

Yes _____     No _MLS_____
    Initials              Initials

**PERFORMANCE** — Performance by the Charged Party with the terms and provisions of this Agreement shall commence immediately after the Agreement is approved by the Regional Director, or if the Charging Party does not enter into this Agreement, performance shall commence immediately upon receipt by the Charged Party of notice that no review has been requested or that the General Counsel has sustained the Regional Director. The Charged Party agrees that in case of non-compliance with any of the terms of this Settlement Agreement by the Charged Party, and after 14 days notice from the Regional Director of the National Labor Relations Board of such non-compliance without remedy by the Charged Party, the Regional Director will reissue the complaint previously issued on October 3, 2024, in the instant case. Thereafter, the General Counsel may file a motion for default judgment with the Board on the

---

[1] Charged Party, through counsel, will provide Charging Party with notice of these revisions.

Charged Party Initials: _MLS_____        Charging Party Initials: _AMG_____

allegations of the complaint. The Charged Party understands and agrees that the allegations of the aforementioned complaint will be deemed admitted and its Answer to such complaint will be considered withdrawn. The only issue that may be raised before the Board is whether the Charged Party defaulted on the terms of this Settlement Agreement. The Board may then, without necessity of trial or any other proceeding, find all allegations of the complaint to be true and make findings of fact and conclusions of law consistent with those allegations adverse to the Charged Party on all issues raised by the pleadings. The Board may then issue an order providing a full remedy for the violations found as is appropriate to remedy such violations. The parties further agree that a U.S. Court of Appeals Judgment may be entered enforcing the Board order ex parte, after service or attempted service upon Charged Party/Respondent at the last address provided to the General Counsel.

**NOTIFICATION OF COMPLIANCE —** Each party to this Agreement will notify the Regional Director in writing what steps the Charged Party has taken to comply with the Agreement.  This notification shall be given within 5 days, and again after 60 days, from the date of the approval of this Agreement.  If the Charging Party does not enter into this Agreement, initial notice shall be given within 5 days after notification from the Regional Director that the Charging Party did not request review or that the General Counsel sustained the Regional Director's approval of this agreement.  No further action shall be taken in the above captioned case(s) provided that the Charged Party complies with the terms and conditions of this Settlement Agreement and Notice.

| **Charged Party Apple Inc.** | **Charging Party Ashley Marie Gjovik** |
|---|---|
| By:          Name and Title    Date | By:          Name and Title          Date |
| /s/ Mark L. Stolzenburg        March 25, 2025 | *Ashley M. Gjovik*          April 3 2025 |
| Print Name and Title below | Print Name and Title below |
| Attorney for Apple Inc. | **Ashley M. Gjovik, Charging Party** |
| Recommended By:                        Date | Approved By:                        Date |
| ELVIRA PEREDA<br>Counsel for the Acting General Counsel | NATHAN M. SEIDMAN<br>Acting Regional Director, Region 21 |

Charged Party Initials: MLS          Charging Party Initials: AMG

**(To be printed and posted on official Board notice form)**

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**YOU HAVE THE RIGHT** to discuss wages, hours and working conditions and **WE WILL NOT** do anything to interfere with your exercise of that right.

**WE WILL NOT** promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple."

**WE WILL NOT** promulgate, maintain, or enforce a Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, Confidentiality Obligations Upon Termination of Employment statement, or a Business Conduct and Global Compliance FAQ regarding confidential information that broadly defines "confidential" or "proprietary" information, or relies upon any other overly broad definitions of those terms, without contemporaneously notifying employees of their rights to discuss wages, hours, or working conditions and their rights to engage in union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts public speaking, responses to press inquiries and publishing articles without contemporaneously notifying employees of their rights to speak publicly, respond to press inquiries and publish articles regarding their wages, hours, or working conditions, or their union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts "conflicts of interest" or "outside activities," without contemporaneously notifying employees that such policies do not restrict their right to form, join or assist a union, or engage in other protected, concerted activity and that these activities are not considered to be conflicts of interest or outside activities under such policy.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly prohibits sharing of employee personal identifying information if such policy could be interpreted as prohibiting the sharing of personal contact information, employment history, compensation or other terms and conditions of employment.

**WE WILL NOT** promulgate, maintain, or enforce a Workplace Searches and Privacy Policy that advises you that we have the right to access Apple's network or systems, or any non-Apple

Charged Party Initials: _MLS_____        Charging Party Initials: _AMG_____

device used to conduct Apple business, without contemporaneously advising you that we will not exercise our right of access to monitor your union or other protected, concerted activity.

**WE WILL NOT** promulgate, maintain, or enforce a Misconduct and Discipline Policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act, and/or contains overly broad restrictions on photography and recording.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information or for failing to report alleged violations of overly broad rules relating to confidential or proprietary information.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding photographing, video or audio recording that prohibit the recording of protected, concerted activity.

**WE HAVE** clarified the aspects of the Confidentiality and Intellectual Property Agreement described above and revised it to make clear that the definition of "Proprietary Information," which was changed to "Apple Confidential Information," does not include wages, hours, and working conditions, to reiterate employee rights about discussing terms and conditions of employment and reporting to governmental agencies, and to make clear that prohibitions against "conflicting outside interests" do not cover forming or joining (or refraining from joining) labor organizations of an employee's choice and **WE HAVE** informed employees of these clarifications.

**WE HAVE** rescinded the aspects of Business Conduct and Global Compliance FAQ regarding Confidential Information described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Business Conduct Policy described above and revised it to make clear that Apple Confidential Information does not include wages, hours, and working conditions, that employees may communicate about labor disputes, to clarify that employees may not respond to public inquiries or participate in speaking engagements where employees could be construed as speaking on behalf of Apple, to clarify that employees may publish articles but must receive approval about articles about Apple products or services or could be seen as a conflict of interest, make clear that a conflict of interest does not include forming, joining, or assisting a union, or engaging in protected, concerted activity, to make clear that employees do not need to notify a manager of outside employment that complies with our policy, and to inform employees that searches will not be used to monitor employees' protected, concerted activity, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Workplace Searches and Privacy Policy described above and revised it to conform with the definition of Apple Confidential Information described above and to inform employees that searches will not be used to monitor employees' protected, concerted activity and **WE HAVE** informed employees of these revisions.

Charged Party Initials: MLS _____        Charging Party Initials: AMG _____

**WE HAVE** rescinded the aspects of the Misconduct and Discipline Policy described above and revised it to conform with the definition of Apple Confidential Information described above, to reiterate employee rights under the National Labor Relations Act relating to certain workplace investigations relating to alleged unfair labor practices under the National Labor Relations Act, to clarify when recording and photography is permitted and prohibited, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Social Media and Online Communications Policy described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the prior version of the Confidentiality Obligations Upon Termination of Employment statement, which contained an overbroad definition of proprietary information, and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**APPLE INC.**
_____
(Charged Party)

**Dated:** _____  **By:** _____
                                        (Representative)        (Title)

_The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Callers who are deaf or hard of hearing who wish to speak to an NLRB representative should send an email to relay.service@nlrb.gov. An NLRB representative will email the requestor with instructions on how to schedule a relay service call._

US Court House, Spring Street        **Telephone:** (213)894-5200
312 N Spring Street, 10th Floor       **Hours of Operation:** 8:30 a.m. to 5 p.m.
Los Angeles, CA 90012

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the above Regional Office's Compliance Officer.

Charged Party Initials: MLS _____        Charging Party Initials: AMG _____

# EXHIBIT 44

43.     Attached as Exhibit 44 is my most recent Apple W-2 and pay records reflecting my compensation in effect on September 9, 2021.

```
            EMP #                              E A R N I N G S      S T A T E M E N T
  Cost Center: 5741
```

```
                                    Period Beginning:    08-14-2021
                                    Period Ending:       08-27-2021
                                    Check Date:          09-03-2021
                                    Pers. No
                                    Apple ID:

                                    Ashley M Gjovik


                                    San Francisco CA  94121
```

| Earnings | Rate | Hours/Units | Amount | Year-To-Date |
|---|---|---|---|---|
| Vacation Pay | | | | 11,700.00 |
| Sick Pay | | | | 5,850.00 |
| Paid Not Worked-Ex | | | | 1,300.00 |
| Salary | | | 6,500.00 | 98,150.00 |
| Tuition Reimbursem | | | | 5,250.00 |
| RSU Net Due Employ | | | | 120.34 |
| Product Discount T | | | | 205.35 |
| | | | | |
| Gross Pay | | | 6,500.00 | 122,575.69 |
| | | | | |
| Tax Deductions: Federal | | | | |
| Withholding Tax | | | 1,078.97- | 68,828.11- |
| EE Social Security Tax | | | | 8,853.60- |
| EE Medicare Tax | | | 148.96- | 4,492.71- |
| Tax Deductions: California | | | | |
| Withholding Tax | | | 463.71- | 28,235.66- |
| EE Voluntary Disabilit | | | | 1,539.58- |
| | | | | |
| Additional Deductions | | | | |
| _____ | | | | |
| *Health Insurance | | | 47.64- | 857.52- |
| *Dental Insurance | | | 10.61- | 190.98- |
| *Vision | | | 1.22- | 21.96- |
| *LTDI Buy Up | | | 8.19- | 147.42- |
| *Health Care FSA | | | 105.76- | 1,903.68- |
| *Pre-Tax Transit | | | | 160.00- |
| *Trad 401(k) Contribution 6.00 | | | 390.00- | 7,800.00- |
| ESPP Refund Plan 1 | | | | 2,815.49 |
| RSU Tax Offset | | | | 78,756.28 |
| Stock Purchase (ESPP) | | | | 2,990.00- |
| | | | | |
| Total Net Pay | | | 4,244.94 | 78,126.24 |

| Other Benefits and Information | This Period | Year-to-Date |
|---|---|---|
| RSU Vesting | | 151,312.50 |
| RSU Dividend Equ | | 1,942.62 |
| Post-Tax Transit | | 130.00 |
| EE GTLI Taxable | 12.00 | 216.00 |
| Product Discount | | 379.84 |
| ESPP Disqualifyi | | 2,911.58 |
| 401(k) Apple Mat | 390.00 | 7,020.00 |

| Quota Summary | Used | Earned | Balance |
|---|---|---|---|
| Vacation | 0.00 | 53.83 | 53.83 |
| Sick | 0.00 | 90.14 | 90.14 |
| CA COVID Sick | 0.00 | 80.00 | 80.00 |

| Payment Method | Amount |
|---|---|
| Direct Deposit | 4,244.94 |

```
  Fed taxable wages-Current        5,948.58
  Fed taxable wages-YTD          262,886.33

  *Excluded from Federal Taxable Wages
```

```
        Apple Inc.
        One Apple Park Way
        Cupertino          CA  95014           Check Date:09-03-2021
        Phone 800-473-7411
```

T H I S   I S   N O T   A   C H E C K

| Deposited to the account of: | Payment Type | Account No. | Bank/Check No. | | Amount |
|---|---|---|---|---|---|
| Ashley M Gjovik | Bank transfer | XXXXX | | USD | 4,244.94 |

N O N - N E G O T I A B L E

```
      EMP #                              E A R N I N G S    S T A T E M E N T
Cost Center: 5741
```

```
                              Period Beginning:   07-31-2021
                              Period Ending:      08-13-2021
                              Check Date:         08-20-2021
                              Pers. No

                              Ashley M Gjovik

                                              CA  94121
```

| Earnings | Rate | Hours/Units | Amount | Year-To-Date |
|---|---|---|---|---|
| Vacation Pay | | | | 11,700.00 |
| Sick Pay | | | | 5,850.00 |
| Paid Not Worked-Ex | | | | 1,300.00 |
| Salary | | | 6,500.00 | 91,650.00 |
| Tuition Reimbursem | | | | 5,250.00 |
| RSU Net Due Employ | | | | 120.34 |
| Product Discount T | | | | 205.35 |
| | | | | |
| Gross Pay | | | 6,500.00 | 116,075.69 |
| Tax Deductions: Federal | | | | |
| Withholding Tax | | | 1,078.97- | 67,749.14- |
| EE Social Security Tax | | | | 8,853.60- |
| EE Medicare Tax | | | 148.96- | 4,343.75- |
| Tax Deductions: California | | | | |
| Withholding Tax | | | 463.71- | 27,771.95- |
| EE Voluntary Disabilit | | | | 1,539.58- |
| | | | | |
| Additional Deductions | | | | |
| *Health Insurance | | | 47.64- | 809.88- |
| *Dental Insurance | | | 10.61- | 180.37- |
| *Vision | | | 1.22- | 20.74- |
| *LTDI Buy Up | | | 8.19- | 139.23- |
| *Health Care FSA | | | 105.76- | 1,797.92- |
| *Pre-Tax Transit | | | | 160.00- |
| *Trad 401(k) Contribution 6.00 | | | 390.00- | 7,410.00- |
| ESPP Refund Plan 1 | | | | 2,815.49 |
| RSU Tax Offset | | | | 78,756.28 |
| Stock Purchase (ESPP) | | | | 2,990.00- |
| | | | | |
| Total Net Pay | | | 4,244.94 | 73,881.30 |

| Other Benefits and Information | This Period | Year-to-Date |
|---|---|---|
| RSU Vesting | | 151,312.50 |
| RSU Dividend Equ | | 1,942.62 |
| Post-Tax Transit | | 130.00 |
| EE GTLI Taxable | 12.00 | 204.00 |
| Product Discount | | 379.84 |
| ESPP Disqualifyi | | 2,911.58 |
| 401(k) Apple Mat | 390.00 | 6,630.00 |

| Quota Summary | Used | Earned | Balance |
|---|---|---|---|
| Vacation | 0.00 | 48.29 | 48.29 |
| Sick | 0.00 | 86.44 | 86.44 |
| CA COVID Sick | 0.00 | 80.00 | 80.00 |

| Payment Method | Amount |
|---|---|
| Direct Deposit | 4,244.94 |

```
Fed taxable wages-Current          5,948.58
Fed taxable wages-YTD            256,937.75

*Excluded from Federal Taxable Wages
```

```
Apple Inc.
One Apple Park Way
Cupertino          CA  95014              Check Date:08-20-2021
Phone 800-473-7411
```

```
    T H I S   I S   N O T   A   C H E C K
```

| Deposited to the account of: | Payment Type | Account No. | Bank/Check No. | | Amount |
|---|---|---|---|---|---|
| Ashley M Gjovik | Bank transfer | XXXXX | | USD | 4,244.94 |

```
                              N O N - N E G O T I A B L E
```

# EXHIBIT 45

44.     Attached as Exhibit 45 is documentation regarding my Apple-provided medical, dental, and vision insurance plans in effect on September 9, 2021.

# 2021 Benefit Summary

Learn about other benefits and link to important information related to family status change events.

**Currently, you do not have any dependents on file.**

| Name | Relationship | Birth Date |
|------|-------------|-----------|
| ASHLEY GJOVIK | Self | 8/26/1986 |

**This is what you selected for 2021 as of 11:30 AM PST, October 26, 2020**

| Benefits | Before-Tax Cost | After-Tax Cost | Total Biweekly Cost |
|----------|----------------|---------------|---------------------|
| **Medical:** YOU<br>Apple Plus PPO - UHC (Employee) | $47.64 | $0.00 | **$47.64** |
| **Medical Tobacco-User Premium:**<br>No Tobacco Users | $0.00 | $0.00 | **$0.00** |
| **Vision:** YOU<br>Apple Vision (Employee) | $1.22 | $0.00 | **$1.22** |
| **Dental:** YOU<br>Apple Dental (Employee) | $10.61 | $0.00 | **$10.61** |
| **Employee Life Insurance:**<br>2 x Salary - Basic Employee Life Insurance - $339,000 (Tobacco Free) | $0.00 | $0.00 | **$0.00** |
| **Spouse/DP Life Insurance:**<br>No Spouse Life | $0.00 | $0.00 | **$0.00** |
| **Child Life Insurance:**<br>No Child Life | $0.00 | $0.00 | **$0.00** |
| **AD&D Insurance:** YOU<br>2 x Salary - $339,000 | $0.00 | $0.00 | **$0.00** |
| **Long-Term Disability:**<br>70% Buy-Up | $8.19 | $0.00 | **$8.19** |
| **Health Care Flexible Spending Account:**<br>Your annual contribution - $2,750.00 | $105.76 | $0.00 | **$105.76** |
| **Dependent Day Care Flexible Spending Account:**<br>Not Enrolled | $0.00 | $0.00 | **$0.00** |
| **Total Biweekly Cost:** | **$173.42** | **$0.00** | **$173.42** |

Case 3:23-cv-04597-EMC     Document 360     Filed 04/24/26     Page 554 of 651

# EXHIBIT 46

45.     Attached as Exhibit 46 is the annual performance review feedback Apple produced during discovery.

Performance and Accomplishments Section:

Key Accomplishments:
   Good job creating content and presentation for MSQ All Hands, and collecting feedback afterwards.
   Created 5 Simple Things training and drove course with my managers. Training went very well, and Ashley presented it to Dan staff. After we collected feedback, there was one piece of feedback Ashley didn't like, and asked me to pursue who gave the feedback. As the survey was anonymous, I told her I wouldn't do that, but it difficult for her to let go. There have been multiple instances over the past couple of years where feedback comes in that we can use to be constructive and get better. I encourage Ashley to look at it in that light.
   Helped to create a new bottom 5 process along with documentation for the review period. She worked with each of my managers, and came up with a proposal similar to HLP. Feedback from managers was positive; they thought this was the best version that we've done.
   Continued to add content to PSQ Portal, including "From the Desk of Dan" and "How I Got Here". In addition, she worked with Red on the Innovation Portal.
   Created MSQ Important Dates calendar, and we agreed she would do her best to keep it up. There is room for improvement here. Some dates were off and various milestones were missing from time to time.  Please work with cross-functional teams to maintain this.
   Ashley has taken on some mentorship opportunities within the organization. Said one, "She was a wonderful mentor to me." Said another, "She took it upon herself to reach out to my intern and meet with her regularly and make it feel at home"
   Ashley does a great job holding people accountable for deliverables. This is something I've seen, and has been noted by others.  With regards to that, it's important to see the bigger picture, and to know when to push versus give space.  Said one, "She has escalated to me that the team has not completed their tasks and when I investigate, it turns out it's because we were in a major product push.  I think she can lose effectiveness and influence within the team when obvious priorities over PSQ Portal work arise and she is rigid."  Said another, "I'd like to see Ashley work on understanding that her top priority is not always the top priority of the leader she is working with. I've had several instances of her relentlessly pushing/badgering/shaming me to complete a task she assigned to me."  Focus on when to push and how to place deadlines that don't align with product milestones.

Goals & Development Section

   •      Align on your goals for the upcoming year. We had a conversation in July to discuss your role, and we need to get back to that.  Focus on what you can do, and have that conversation with me.  **Joint conversation versus me imposing**
   •      Status reports should consist of work-related activities only.  It's ok to share what's going on in your personal life, but please keep the weekly status report focused on your work at Apple.  **Weekly status reports are to provide team members relevant business tasks.  Please keep weekly status report focused on Apple work.**
   •      When working cross-functionally, agree with leaders on deliverables and schedule.  Align deliverables so it doesnt intersect too deeply with key product milestones.
   •      Tighten up MSQ Important Dates calendar.  There is no perfect here, as dates are changing constantly, but it's something I need you to continue to monitor closely.
   •      Continue driving PSQ Portal initiatives, including How I Got Here articles for MSQ.
   •      Consider how you provide feedback on others.  Said one, "I find her feedback to be harsh when commenting on others. I don't appreciate when anyone in the org bashes others when speaking to me, especially when I haven't even asked for feedback on the person." Focus on giving constructive feedback that is actionable.
   •      There are times when you can jump to conclusions without having all the data.  Said one, "An example would be her saying 'this person declined the meeting' and implying or outright saying that they are dodging giving  an update.  When in fact, upon me asking, they have a serious exec review that was put on top of the meeting."  Think about times where you made an assumption too quickly about a situation that wasn't correct.  Also, consider what possible positive outcomes could occur in the same situation.

APL-GAELG_00001565

**On 7/2/21, West, Dan (HWE) wrote:**
The ratings above represent my work with Ashley primarily on to PSQ confluence page. A few comments on her work:

Positives:
- I like that she attempts to hold me accountable for deliverables. She raises action items and missed dates respectfully and directly. More has been done on the portal as a result of this.

- She is willing to engage in debate around content and priorities for the portal. There have been times when she was pushing for something and I had to make a call to back off. While she didn't agree, and even pushed back hard, she respected the call.

Negatives:
- Sometimes she loses track of the big picture. She has escalated to me that the team has not completed their tasks and when I investigate it turns out it's because we were in a major product push. I think she can lose effectiveness and influence with the team when obvious priorities over PSQ Portal work arise and she is rigid. Where I think she needs to focus, is when to push and how to place deadlines that don't intersect with product milestones. For example, Fall and Spring are always very busy with product convergence, so let's avoid deadlines in those areas.

- Assuming good intent - Sometime during the year a switch flipped where Ashley seemed to stop assuming good intent with most leadership. I see the leadership team as largely aligned on I&D topics, yet she is letting perfection be the enemy of the progress. One example of this is the 5 simple things exercise in MSQ. This is driving the right conversations in the organization and driving positive action. Yet some of her feedback instilled concern in the org and made it less likely for leaders to roll out similar exercises for their teams.


**On 6/4/21, [ Redacted ] wrote:**
I worked with Ashley pretty closely this year on the PSQ Tools Managers pages. This was hard going with all the project commitments, pandemic etc and took far longer to complete than originally planned. Ashley kept driving it though and holding us to deliverables. I think the end product worked out well and certainly wouldn't have happened but for her efforts. Ashley has a lot of passion for the I&D space, she has regularly reached out to me to see what's going on in Cork in this space and shown an

APL-GAELG_00001559

review that was put on top of the meeting. This is unnecessary and adds to the lack of teamwork.

- The reason I mark below expectations on results is that she seems to push back hard on tasks that she could be very impactful. She typically will say "DP doesn't want me to do that." And that might be true (and fair), but sometimes it seems like she just doesn't want to do that type of task. Just an assumption, but something to look at.
- Lastly, I find her feedback to be very harsh when commenting on others. I'm a senior person and I don't appreciate when people (anyone) in the org bashes others when speaking to me, especially when I haven't even asked for feedback on the person.

Overall, it's gotten to the point with me where I don't enjoy working with Ashley and, when possible, I avoid interactions. This is unfortunate because this has not always been the case, we've had a good relationship before the things I've listed became more prevalent.

APL-GAELG_00001561

# EXHIBIT 47

46.     Attached as Exhibit 47 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Two, verified on April 6, 2026.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
| Plaintiff, | **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET TWO** |
| v. | |
| APPLE INC., | |
| Defendant. | |

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:**    Defendant Apple Inc.

**SET NUMBER:**    Two

Defendant Apple Inc. ("Apple") amends its response to Plaintiff Ashley Gjovik's Interrogatories, Set Two, served on July 17, 2025, as follows:

**INTERROGATORY NO. 2:**

For each affirmative defense Apple Inc asserts in Apple's Amended Answer (or otherwise plans to use in this litigation) that bars, limits, or reduces the employee's recovery on any claim in this action:

(a) State the complete factual basis for each defense;

(b) State the complete legal basis for each defense;

(c) Identify all Documents that support each defense; and,

(d) Identify all Persons with knowledge of facts supporting each defense.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Apple objects to this Interrogatory because it contains fourteen "discrete subparts." *See* Dkt. No. 327 at 2-3.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent that Plaintiff seeks to define "Apple Inc" as "Employer Apple Inc and its counsel," and therefore seeks to invade the attorney-client privilege.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, overly broad, and unduly burdensome, particularly in its request that Apple state the "complete" bases or identify "all" documents or persons related to each affirmative defense. *See Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) (citations omitted) ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.").

Apple objects to subpart (b) of this Interrogatory on the grounds that the Court sustained Apple's prior objection to that subpart. *See* Dkt. No. 327 at 3:2-3.

Subject to and without waiving the foregoing objections and pursuant to the Court's March 30, 2026 Order directing a further response to portions of this Interrogatory (Dkt. No. 327 § I.A.iii.), Apple responds as follows:

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

**Affirmative Defense No. 1:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that no conduct by or attributable to it was the cause in fact or legal cause of the damages, if any, suffered by Plaintiff. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory, and non-retaliatory reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

Docusign Envelope ID: 529E1538-1651-4B2B-BC2C-7739EAE84808

regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality.

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

Docusign Envelope ID: 529E1538-4651-4B2B-BC2C-7729EAE84808

Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 2:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that, should it be determined that Plaintiff was damaged, then said damages were proximately caused by Plaintiff's own conduct. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she

had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Docusign Envelope ID: 529E1538-4651-4B2B-BC2C-7738EAE84808

and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of

- 9 -

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and

- 10 -

accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 3:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that Plaintiff was an at-will employee with no entitlement to continued employment pursuant to Labor Code section 2922. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

On January 31, 2015, Plaintiff accepted a position at Apple. The January 30, 2015 offer letter stated, "Your employment relationship with Apple will be at will. This means that either you or Apple may terminate the employment relationship at any time and for any or no reason with or without notice." On January 13, 2017, Plaintiff accepted a different position at Apple. The offer letter stated, "Your employment relationship with Apple will continue to be at will. This means that either you or Apple may terminate the employment relationship at any time and for any or no reason with or without notice."

In late July 2021, Plaintiff raised hostile work environment concerns regarding managers in her department. Plaintiff provided information to Ekelemchi Okpo in Employee Relations during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's

intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000001; APL-GAELG_00000006; APL-GAELG_00000017; APL-GAELG_00000020; APL-GAELG_00001140; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 4:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that Plaintiff consented to certain of the conduct that she now claims was wrongful."

**(a) State the complete factual basis for each defense;**

Plaintiff has alleged that certain conduct of Apple unlawfully violated her rights or that she was subjected to certain conduct against her will when she in fact consented to the conduct at issue.

Plaintiff requested administrative leave on two occasions. In May 2021, Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to

APPLE'S AMENDED RESP. TO PLT.'S INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late June and July 2021, Ekelemchi Okpo in Employee Relations met with Plaintiff about additional concerns she had raised. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave. After learning that Plaintiff publicized on Twitter that she was placed on involuntary leave, Okpo twice offered to reinstate Plaintiff from paid leave. Plaintiff did not respond to either offer.

Plaintiff consented to participate in FaceID studies during her employment. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the study and signed the studies' Informed Consent Forms expressly acknowledging that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." By signing the Informed Consent Forms to participate in the study, Plaintiff consented to participate in the study, as well as to keep information about the study confidential.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001506; APL-GAELG_00002096; APL-GAELG_00002751; APL-GAELG_00002778; APL-GAELG_00002780; APL-GAELG_00002781; APL-GAELG_00002788; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAELG_00002824; APL-GAELG_00002860; APL-GAELG_00002861.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Robert McKeon Aloe; Ekelemchi Okpo; Jenna Waibel.

**Affirmative Defense No. 5:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that recovery in this action by Plaintiff is barred in whole or in part to the extent Plaintiff failed to exercise reasonable care and diligence to mitigate any damages allegedly accruing to her. Plaintiff had a duty to mitigate any damages by seeking alternative employment, and if she did not exercise reasonable care and diligence to seek alternative employment, her failure to do so precludes her from recovering damages for lost wages. Apple is currently unaware of the efforts, if any, which Plaintiff took to seek alternative employment, and asserts this defense to preserve its right to limit or reduce any potential damages awarded to Plaintiff pending further discovery."

**(a) State the complete factual basis for each defense;**

Plaintiff produced tax returns for 2021, 2022, 2023, and 2024, which appear to reflect some post-termination income. In response to Apple's Interrogatory No. 3, Plaintiff has produced some information regarding her post-termination employment, including identification of a year-long contract with Northeastern University, and she has produced some documents reflecting efforts to apply to jobs following her employment at Apple. However, Plaintiff's response to Apple's Interrogatory No. 11 ("Describe how you have attempted to minimize the amount of your lost income that you attribute to Defendant under Counts One, Two, Three, and Four in the 5AC.") does

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

not demonstrate that Plaintiff exercised reasonable care and diligence to mitigate any damages, and Plaintiff has not provided documents that fully evidence reasonable mitigation efforts.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

Plaintiff's responses to Apple's Interrogatory Nos. 3 and 11 and the absence of sufficient evidence from Plaintiff regarding her mitigation efforts.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Plaintiff.

**Affirmative Defense No. 6:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple is entitled to an offset for any monies Plaintiff received from any source after Plaintiff ceased to be employed by Apple under the doctrine prohibiting double recovery set forth by *Witt v. Jackson*, 57 Cal. 2d 57 (1961), and its progeny. Plaintiff had a duty to mitigate any damages by seeking alternative employment, and if she did obtain alternative employment, that income should offset any damages, if awarded. Apple is currently unaware of the extent, if any, to which Plaintiff received income through alternative employment, and asserts this defense to preserve its right to an offset pending further discovery."

**(a) State the complete factual basis for each defense;**

Plaintiff produced purported tax returns for 2021, 2022, 2023, and 2024, which appear to reflect some post-termination income.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

Plaintiff's tax returns for 2021, 2022, 2023, and 2024, and the notice of her Chapter 7 bankruptcy (Dkt. No. 238), as well as documents by Plaintiff in that bankruptcy proceeding.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Plaintiff.

**Affirmative Defense No. 7:** "As a separate defense to the Fifth Amended Complaint and to claim therein, Apple alleges that Plaintiff's recovery is barred in whole or in part by her own unclean hands and by the doctrines of unclean hands, *in pari delicto* and/or after-acquired evidence, or in the alternative, these doctrines cut off or reduce her alleged damages. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process. Moreover, Apple learned—shortly after Plaintiff's employment was terminated—that Plaintiff admitted that she disclosed confidential product-related information to a journalist at the Verge in violation of Apple policies and her obligations under her Intellectual Property Agreement. Moreover, in the years since Plaintiff's employment was terminated, Plaintiff has continued to provide inaccurate and/or incomplete information to government entities and the public."

**(a) State the complete factual basis for each defense;**

In late July 2021, Plaintiff raised hostile work environment concerns regarding managers in her department. Plaintiff provided information to Ekelemchi Okpo in Employee Relations during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared

internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information

relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

Moreover, after Plaintiff's employment was terminated, an Apple employee made a report to the Business Conduct Helpline that Plaintiff had publicly disclosed information about the FaceID study. The employee attached screenshots of text messages they had exchanged with Plaintiff dated August 2021. In the text messages, Plaintiff described how she disclosed confidential information about the FaceID study to a reporter from The Verge.

Further, in the years since Plaintiff's employment was terminated, Plaintiff has continued to provide inaccurate and/or incomplete information to government entities and the public. *See, e.g.*, Dkt. No. 142 at 17, ¶ 97; *id.* at 21, ¶ 132; *id.* at 27-28, ¶ 183.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000775; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002259;

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277;

APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281;

APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727;

APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801;

APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 8:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that assuming *arguendo* that discriminatory or retaliatory reasons had been a motivating factor in any employment decision toward Plaintiff (which they were not), Apple would have made the same decisions toward Plaintiff in any case for legitimate, non-discriminatory and/or non-retaliatory business reasons. *Harris v. City of Santa Monica*, 56 Cal.4th 203 (2013). Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May

24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856;

APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135;

APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513;

APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760;

APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271;

APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279;

APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678;

APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798;

APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802;

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820;

APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 9:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that any alleged action that it took with respect to Plaintiff was privileged and justified and protected by the doctrine of business necessity. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role

under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

- 30 -

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 10:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that it at all times acted without malice, in good faith, and with reasonable grounds for believing its actions did not violate the law. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm

our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

[its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also

- 36 -

concluded that she had failed to cooperate and to provide accurate and complete information during Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 11:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation, including Cal. Civ. Proc. Code §§ 335.1, 338(a), and 340(a)."

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

**(a) State the complete factual basis for each defense;**

To the extent Plaintiff alleges her retaliation claim is premised on any alleged adverse action occurring prior to September 7, 2020, it is barred by Cal. Civ. Proc. Code § 338(a) and § 340(a). *See* Dkt. No. 142 ¶ 110 ("This led Lagares to assign a new investigator, Ekelemchi Okpo, and open an additional investigation into Plaintiff's concerns starting in 2015.")

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

Dkt. No. 1; Dkt. No. 142.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Plaintiff; Ekelemchi Okpo.

**Affirmative Defense No. 12:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that any award of punitive damages in this case would violate the due process, equal protection and excessive fines provisions of the California and United States Constitutions."

**(a) State the complete factual basis for each defense;**

This is a purely legal defense. *See Scheffler v. Molin*, No. CIV. 11-3279 JNE/JJK, 2012 WL 3292894, at *6 (D. Minn. Aug. 10, 2012) ("some of the affirmative defenses Defendants raised in their Answer, such as failure to state a claim for which relief can be granted, involve 'issue of 'pure law'' not requiring any identification of facts").

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

Not applicable. *See Scheffler*, 2012 WL 3292894, at *6.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Not applicable. *See Scheffler*, 2012 WL 3292894, at *6.

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

**Affirmative Defense No. 13:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that it was fully justified, and exercised reasonable care, prudence, skill and business judgment with respect to Plaintiff, and any decisions with respect to Plaintiff were made without regard to Plaintiff's alleged disability, national origin, age or other protected basis. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

required all participants—as a condition of participating—to maintain strict confidentiality. Plaintiff voluntarily chose to participate in the studies and signed the studies' Informed Consent Forms. The Informed Consent Forms expressly acknowledge that any information about the studies, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." As a study participant, Plaintiff had to download and register the Glimmer app to use in the studies (which could only be done if she had signed the Informed Consent Forms), received emails about the studies, and on at least two occasions emailed the study leads to inquire about issues she was having with data collection related to these studies.

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

(a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

On August 28, 2021, Plaintiff tweeted details about a separate proprietary Apple study related to ear scans, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the study.

On August 30, 2021, Plaintiff tweeted photographs of herself that were captured as part of her voluntary participation in the FaceID study, thus disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the study and permitted confidential information from the FaceID study to be published. Specifically, the story included a video comprised of photographs displaying confidential images her device had collected for the FaceID study.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential product-related information in violation of Apple policies and her obligations under the confidentiality agreements. Apple also concluded that she had failed to cooperate and to provide accurate and complete information during

- 42 -

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

Apple's investigation process.

Apple treated Plaintiff the same as other employees who similarly failed to protect Apple's intellectual property and improperly disclosed confidential product information without authorization.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

APL-GAELG_00000006; APL-GAELG_00000020; APL-GAELG_00000856; APL-GAELG_00001053; APL-GAELG_00001126; APL-GAELG_00001135; APL-GAELG_00001140; APL-GAELG_00001506; APL-GAELG_00001513; APL-GAELG_00001582; APL-GAELG_00001749; APL-GAELG_00001760; APL-GAELG_00002096; APL-GAELG_00002248; APL-GAELG_00002271; APL-GAELG_00002274; APL-GAELG_00002277; APL-GAELG_00002279; APL-GAELG_00002280; APL-GAELG_00002281; APL-GAELG_00002678; APL-GAELG_00002717; APL-GAELG_00002727; APL-GAELG_00002798; APL-GAELG_00002800; APL-GAELG_00002801; APL-GAELG_00002802; APL-GAELG_00002803; APL-GAELG_00002804; APL-GAELG_00002820; APL-GAELG_00002822; APL-GAEGL_00002824.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Apple objects to providing the names of everyone with knowledge of facts supporting this defense on the ground that it is overbroad and burdensome. Subject to, and without waiving this objection, Apple responds that the most knowledgeable persons are: Plaintiff; Yannick Bertolus; Aleks Kagramanov; Ekelemchi Okpo; Megan Bowman.

**Affirmative Defense No. 14:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that it may be entitled to a setoff for any amounts paid to Plaintiff through workers' compensation. Apple is currently unaware of the extent, if any, to which Plaintiff has received such payments, and asserts this defense to preserve its right to a setoff pending

further discovery."

**(a) State the complete factual basis for each defense;**

Apple remains unaware of the extent, if any, to which Plaintiff has received workers' compensation payments and Plaintiff has failed to provide any such evidence.

**(b) State the complete legal basis for each defense;**

The Court's March 30, 2026 Order sustained Apple's objection to this subpart and accordingly, Apple will not provide a response. *See* Dkt. No. 327 at 3:2-3.

**(c) Identify all Documents that support each defense; and,**

Any documents supporting this defense are in Plaintiff's position.

**(d) Identify all Persons with knowledge of facts supporting each defense.**

Plaintiff.

Dated: April 6, 2026                                    ORRICK, HERRINGTON & SUTCLIFFE LLP

*Melinda Riechert*

MELINDA S. RIECHERT
Attorneys for Defendant
APPLE INC.

APPLE'S AMENDED RESP. TO PLT.'S
INTERROGATORIES, SET TWO
CASE NO. 23-CV-4597-EMC

### **VERIFICATION**

I, Megan Bowman, declare that I am the Director of Human Resources, Hardware Engineering, for Apple Inc. and I am authorized to make this verification on its behalf. I have read the following:

- **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET TWO**

Based on information and belief and/or personal knowledge, I believe the matters stated therein to be true and accurate. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed in San Carlos, California on April 6, 2026.


*Megan Bowman*
_____
Megan Bowman

APPLE'S RESPONSES TO PLAINTIFF'S
INTERROGATORIES, SET TWO
CASE NO. 23-cv-4597-EMC

## CERTIFICATE OF SERVICE

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. On April 6, 2026, I served the following document(s):

- **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET TWO**

By Electronic Service: On all of the interested parties in this action by transmitting true and correct copies of the documents identified above in portable document format from the email address mriechert@orrick.com to the email addresses below:

Ashley Gjovik (in pro per)
ashleymgjovik@protonmail.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 6, 2026.

*Melinda Riechert*

_____
Melinda S. Riechert

CERTIFICATE OF SERVICE
CASE NO. 23-CV-4597-EMC

# EXHIBIT 48

47.     Attached as Exhibit 48 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Three, verified on April 6, 2026.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

                 Plaintiff,

        v.

APPLE INC.,

                 Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S
AMENDED RESPONSES TO
PLAINTIFF'S INTERROGATORIES,
SET THREE**

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:**    Defendant Apple Inc.

**SET NUMBER:**          Three

Defendant Apple Inc. ("Apple") amends responses to Plaintiff Ashley Gjovik's Interrogatories, Set Three, served on July 17, 2025, as follows, pursuant to the Court's March 30, 206 Order (Dkt. No. 327):

**INTERROGATORY NO. 3:**

Do You contend that Plaintiff engaged in any "protected activity" as defined under federal or state whistleblower, retaliation, or labor laws during her employment with Apple?

(a) If yes, identify each such activity with date ranges for the acknowledged activity.

(b) If no, state that You contend Plaintiff engaged in no protected activities.

**AMENDED RESPONSE TO INTERROGATORY NO. 3:**

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, overly broad, and unduly burdensome, particularly in its request that Apple identify "any protected activity" Plaintiff ever engaged in at any point during her employment with Apple. *See Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) (citations omitted) ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."); *Moses v. Halstead*, 236 F.R.D. 667, 672 (D. Kan. 2006) ("On numerous occasions this Court has held that a request or interrogatory is overly broad or unduly burdensome on its face if it (1) uses an omnibus term such as 'relating to' or 'concerning,' and (2) applies to a general category or group of documents or a broad range of information. Here, the term 'concerning' modifies an enormous amount of information, i.e., all issues raised in the pleadings. The Court therefore finds Allstate's overbreadth objection to be valid."). Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks a complete statement of Apple's positions as to particular issues.

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-cv-4597-EMC

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it seeks a legal conclusion about whether any of Plaintiff's concerns qualify as a "protected activity" under any "federal or state whistleblower, retaliation, or labor laws."

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information regarding issues on which Plaintiff has the burden of proof and must herself identify as part of substantiating her claims in this case as a precursor to Apple being in a position to frame its responses and defenses.

Subject to and without waiving any of the foregoing objections and pursuant to the Court's March 30, 2026 Order (Dkt. No. 327 § I.A.iii.), and construing this vague and overbroad Interrogatory to ask whether Plaintiff ever raised any concerns that may be construed as protected under federal or state whistleblower, retaliation, or labor laws, Apple responds as follows:

Apple does not dispute that Plaintiff raised concerns during her employment with Apple, at least some of which may be construed as protected activity as defined under federal or state whistleblower, retaliation, or labor laws.

(a) On August 23, 2021, Plaintiff provided Apple Employee Relations a 34-page "Issue Confirmation" document summarizing all concerns she had during her employment with Apple ranging from 2015 through 2021, including dates of communications with others about her concerns spanning a six-year period. In that document, Plaintiff also identified specific communications within that six-year span she alleges constitute protected activity under various laws. Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Issue Confirmation document, produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

**INTERROGATORY NO. 4:**

Regarding Plaintiff's Recent Disclosures concerning Workplace Safety:

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026 Order . *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10 ("Although Plaintiff seeks supplemental responses to Interrogatory Nos. 3-16, she only attached Interrogatory No. 3 to her letter. Thus, the Court cannot possibly address Interrogatory Nos. 4-16.").

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Workplace Safety" – what are in effect multiple separate interrogatories. *See Synopsys, Inc. v. ATopTech, Inc*, 319 F.R.D. 293, 295 (N.D. Cal. 2016) ("It is important to acknowledge at the outset that the issue of 'discreteness' cannot reliably be captured by a verbal formula, and that ultimately the issue turns on a case-by-case assessment of the degree to which the subpart is logically related to the primary question in the interrogatory, as opposed to being separate and distinct.") (quoting *Erfindergemeinschaft Uropep GbR v. Eli Lilly & Co.*, 315 F.R.D. 191, 197 (E.D. Tex. 2016)). Plaintiff's vague, compound, and overbroad definition of "Workplace Safety" includes at least eight separate lines of inquiry related to unidentified "hazardous working conditions, safety violations, workplace injuries or illnesses, exposure to toxic or hazardous substances, exposure to biological agents (for example, COVID-19), unsafe equipment or facilities, safety training and planning deficiencies, and compliance with OSHA or other workplace safety regulations."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Workplace Safety"—to include "occupational health and safety matters including but not limited to hazardous working conditions, safety violations, workplace injuries or illnesses, exposure to toxic or hazardous substances, exposure to biological agents (for example, COVID-19), unsafe equipment or facilities, safety training and planning deficiencies, and compliance with OSHA or other workplace safety regulations"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses v. Halstead*, 236 F.R.D. 667, 672 (D. Kan. 2006) ("On numerous occasions this Court has held that a request or interrogatory is overly broad or unduly burdensome on its face if it (1) uses an omnibus term such as 'relating to' or 'concerning,' and (2) applies to a general category or group of documents or a broad range of information. Here, the term 'concerning' modifies an enormous amount of information, i.e., all issues raised in the pleadings. The Court therefore finds Allstate's overbreadth objection to be valid.").

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the requested information regarding concerns that Plaintiff may contend fall within her definition of "Workplace Safety."

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

(c) The most knowledgeable persons regarding Plaintiff's concerns that Plaintiff may contend fall within her definition of "Workplace Safety" are: Plaintiff, Antoine Jain, Michael Stieger, Dori Farrah, Helen Polkes, Ekelemchi Okpo, Jenna Waibel, Dave Powers, Jane Markham, Paul Shinhira, Bhava Avula, and Austin DeBaene.

(d) Apple EH&S employees, including Michael Steiger and Antoine Jain, met with Plaintiff multiple times to understand and address some of her concerns that Plaintiff may contend fall within her definition of "Workplace Safety", and continued to work with her to address her concerns until the termination of her employment. Apple Human Resources, Benefits, and Accommodations personnel, including Jenna Waibel, discussed Plaintiff's request for accommodations based on her concerns. Apple Human Resources employee Dori Farrah reached out to Plaintiff to understand and address other concerns that Plaintiff may contend fall within her definition of "Workplace Safety." Dave Powers, Jane Markham, Paul Shinhira, Bhava Avula, and Austin DeBaene had communications with Plaintiff about other concerns that Plaintiff may contend fall within her definition of "Workplace Safety."

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to concerns that Plaintiff may contend within her definition of "Workplace Safety." Apple also refers Plaintiff to the August 23, 2021 Issue Confirmation , produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793, and Apple's privilege logs.

**INTERROGATORY NO. 5:**

Regarding Plaintiff's Recent Disclosures concerning Environmental Regulations and Compliance,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-cv-4597-EMC

policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026 Order . *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Environmental Regulations and Compliance" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad definition of "Environmental Regulations and Compliance" includes at least twelve separate lines of inquiry related to "to environmental contamination, pollution, hazardous waste generation and disposal, air quality, water quality, soil contamination, land use covenants, EPA records of decision, environmental impact assessments, environmental remediation, and compliance with other EPA or environmental regulations."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Environmental Regulations and Compliance"—to include "environmental contamination, pollution, hazardous waste generation and disposal, air quality, water quality, soil contamination, land use covenants, EPA records of decision, environmental impact assessments, environmental remediation, and compliance with

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

other EPA or environmental regulations"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information that Plaintiff may contend fall within her definition of "Environmental Regulations and Compliance."

(c) The most knowledgeable persons regarding Plaintiff's concerns that Plaintiff may contend fall within her definition of "Environmental Regulations and Compliance" are: Plaintiff, Antoine Jain, Michael Stieger, Helen Polkes, Ekelemchi Okpo, Jenna Waibel, Dave Powers, Jane Markham, Paul Shinhira, Bhava Avula, and Austin DeBaene.

(d) Apple EH&S employees, including Michael Steiger and Antoine Jain, met with Plaintiff multiple times to understand and address some of her concerns that Plaintiff may contend fall within her definition of "Environmental Regulations and Compliance", and continued to work with her to address these concerns until the termination of her employment. Apple Human Resources, Benefits, and Accommodations personnel, including Jenna Waibel, discussed Plaintiff's request for accommodations based on her concerns. Dave Powers, Jane Markham, Paul Shinhira, Bhava Avula, and Austin DeBaene had communications with Plaintiff about other concerns that Plaintiff may contend fall within her definition of "Environmental Regulations and Compliance."

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to concerns that Plaintiff may contend fall within her definition of "Environmental Regulations and Compliance.". Apple also refers Plaintiff to the August 23, 2021 Issue Confirmation letter,

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793, and Apple's privilege logs.

**INTERROGATORY NO. 6:**

Regarding Plaintiff's Actions and Disclosures concerning Labor Activities,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is argumentative and seeks a legal conclusion about which, if any, of Plaintiff's communications qualify as protected concerted activity under unidentified labor laws because her definitional phrase "and other concerted activities for mutual aid or protection" suggests that each of the terms in the definition preceding that phrase are also "concerted activities for mutual aid or protection," which calls for a legal conclusion about the scope and coverage of the National Labor Relations Act or other labor laws.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Labor Activities" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague,

compound, and overbroad definition of "Labor Activities" includes at least seven separate lines of inquiry related to "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Labor Activities"—to include "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm people who may have seen or heard of any statement she made during her employment. Plaintiff does not define "Actions." Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

The only activity Apple is aware that may constitute "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection" (as opposed to actions related to Plaintiff's individual employment claims) relate to Apple's response to COVID-19, regarding which Plaintiff signed an employee petition and sent an email to Tim Cook and Deirdre O'Brien.

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of her concerns about Apple's response to COVID-19.

(c) The most knowledgeable persons regarding Plaintiff's concerns about Apple's response to COVID-19 are: Plaintiff and Dori Farrah.

(d) Apple Human Resources employee Dori Farrah reached out to Plaintiff to understand and address her concerns about Apple's response to COVID-19.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate to the investigation of her concerns about Apple's response to COVID-19.

**INTERROGATORY NO. 7:**

Regarding Plaintiff's Disclosures concerning Compliance with Federal White Collar Laws,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 7:**

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order . *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory as vague on the grounds that Plaintiff does not define "Compliance with Federal White Collar Laws." Plaintiff did define "Federal White Collar Regulations," and Apple will respond assuming that is the term Plaintiff meant to include in the text of this Interrogatory.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Federal White Collar Regulations" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad definition of "Federal White Collar Regulations" includes at least nine separate lines of inquiry related to "all federal white-collar laws including but not limited to sanctions, smuggling, wire fraud, obstruction of justice, witness intimidation, racketeering, antitrust, securities, and/or criminal laws."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" and is therefore overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Federal White Collar Regulations"— to include "all federal white-collar laws including but not limited to sanctions, smuggling, wire fraud, obstruction of justice, witness intimidation, racketeering, antitrust, securities, and/or criminal laws"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

Apple is not aware of any "Disclosures" concerning "Federal White Collar Regulations." However, Plaintiff's August 23, 2021 Issue Confirmation characterizes some of her concerns as pertaining to alleged fraud, racketeering, organized witness tampering, organized intimidation, corporate corruption, cronyism, and nepotism, even though none of her allegations in that Issue Confirmation support any such inference. Apple assumes Plaintiff is referring to the issues presented in her August 23, 2021 Issue Confirmation and responds on that basis.

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Issue Confirmation document, produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

(c) The most knowledgeable persons regarding Plaintiff's concerns raised in her August 23, 2021 Issue Confirmation are: Plaintiff and Ekelemchi Okpo.

(d) Apple investigated the issues Plaintiff identified in the August 23, 2021 Issue Confirmation.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of the issues raised in her August 23, 2021 Issue Confirmation, the Issue Confirmation, and Apple's privilege logs.

**INTERROGATORY NO. 8:**

Regarding Plaintiff's Disclosures concerning Privacy,

(a) Identify all such communications You are aware of;

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-cv-4597-EMC

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order . *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id*. at 3:9-10.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Privacy" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad definition of "Privacy" includes at least seven separate lines of inquiry related to "to employee privacy rights, employer searches and surveillance of employees, employer monitoring of employee activities at work and outside of work, employee personal data collection and protection, and California constitutional privacy rights."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

proportional to the needs of the case. Plaintiff's definition of "Privacy"—to include "employee privacy rights, employer searches and surveillance of employees, employer monitoring of employee activities at work and outside of work, employee personal data collection and protection, and California constitutional privacy rights"—is vague, overbroad and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

The only communications Apple is aware of pertaining to Plaintiff raising concerns about "Privacy" involve her public dissemination of confidential Apple product information.

(a)-(b) On August 20, 2021, Plaintiff told another Apple employee, Cher Scarlett, via text that she sent Zoe Schiffer of The Verge information and images pertaining to an internal Apple application and internal Apple user study. This communication was not reported to Apple until September 15, 2021. Additionally, between August 29, 2021, and September 15, 2021, Apple received four separate reports from other Apple employees that Plaintiff had publicly disclosed confidential information pertaining to an internal Apple application and internal Apple user studies. Plaintiff also publicly shared confidential Apple product information on her social media and in an article published online by The Verge.

(c) The most knowledgeable persons regarding Plaintiff's disclosure of Apple's confidential product information, the investigation thereof, and Plaintiff's termination are: Plaintiff, Robert Aloe, Yannick Bertolus, Aleks Kagaramanov, Ekelemchi Okpo, Megan Bowman.

(d) Apple investigated Plaintiff's breach of her confidentiality agreement and violation of Apple policies and terminated her employment.

- 14 -

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the documents produced in this case related to Plaintiff's improper disclosure of confidential product information to Zoe Schiffer and The Verge, her Twitter posts regarding the same, and Apple's privilege logs.

**INTERROGATORY NO. 9:**

Regarding Plaintiff's Disclosures concerning discrimination, harassment, or retaliation,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 9:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory as vague on the grounds that Plaintiff does not define "discrimination, harassment, or retaliation."

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad reference to "discrimination, harassment, or retaliation"– what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad reference to "discrimination, harassment, or retaliation" arguably references many separate lines of inquiry because in her August 23, 2021 Issue Confirmation she alleged many different instances of alleged discrimination, harassment, and

- 15 -

retaliation spanning a six-year period by different actors on different teams and arising from different situations that are not all "logically related" to each other.

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. For example, Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections and construing this Interrogatory as seeking information about concerns Plaintiff raised during her employment to Apple Human Resources or Employee Relations about discrimination, harassment, or retaliation she alleges was directed at her, Apple responds as follows:

(a)-(b) Between April and August 2021 Plaintiff informed Apple Employee Relations personnel of a variety of concerns that she characterized as relating to alleged discrimination, harassment, and retaliation. On August 23, 2021, Plaintiff provided Apple Employee Relations a 34-page "Issue Confirmation" document summarizing all concerns she had during her employment with Apple ranging from 2015 through 2021, including dates of communications with others about her concerns spanning a six-year period. Pursuant to Federal Rule of Civil Procedure 33(d), Apple

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

refers Plaintiff to the Issue Confirmation document, produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

(c) The most knowledgeable persons regarding the discrimination, harassment, or retaliation concerns Plaintiff identified for investigation are: Plaintiff, Ekelemchi Okpo, Jenna Waibel, and Helen Polkes.

(d) Apple conducted a privileged investigation of the discrimination, harassment, or retaliation concerns Plaintiff identified.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she Plaintiff created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of the issues raised in her August 23, 2021 Issue Confirmation, the Issue Confirmation, and Apple's privilege logs.

**INTERROGATORY NO. 10:**

Regarding Plaintiff's Disclosures concerning environmental, safety, and/or regulatory compliance concerns about or created by 3250 Scott Blvd (if not already answered above),

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id*. at 3:9-10.

- 17 -

Apple objects to this Interrogatory as vague, on the grounds that Plaintiff does not define "environmental, safety, and/or regulatory compliance concerns about or created by 3250 Scott Blvd."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections and construing this Interrogatory as seeking information about environmental safety concerns at 3250 Scott Boulevard that Plaintiff raised to Apple employees during her employment, Apple responds as follows:

Plaintiff did not raise any concerns to Apple about 3250 Scott Boulevard during her employment.

**INTERROGATORY NO. 11:**

Regarding Plaintiff's Disclosures concerning environmental, safety, and/or regulatory compliance concerns at 825 Stewart Drive (if not already answered above),

(a) Identify all such communications You are aware of;

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 11:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory as vague, on the grounds that it does not define "environmental, safety, and/or regulatory compliance concerns at 825 Stewart Drive."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections and construing this Interrogatory as seeking information about environmental safety concerns at 825 Stewart Drive that Plaintiff raised to Apple employees during her employment, Apple responds as follows:

As Apple understands this Interrogatory, no response is required because its response to Interrogatory Nos. 4 and 5 would encompass any information responsive to this Interrogatory.

**INTERROGATORY NO. 12:**

Regarding Plaintiff's Disclosures concerning Batterygate and her EFFA/QIF role and activities in relation to Batterygate,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 12:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.:

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Batterygate" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague and overbroad

- 20 -

definition of "Batterygate" includes at least seven separate lines of inquiry related "to iOS battery performance management, device performance changes, consumer notifications, regulatory compliance, securities disclosure obligations, consumer protection matters, and Apple's communications regarding iPhone performance and battery management."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Batterygate"—to include "issues related to iOS battery performance management, device performance changes, consumer notifications, regulatory compliance, securities disclosure obligations, consumer protection matters, and Apple's communications regarding iPhone performance and battery management"— is overbroad, vague, and burdensome. Plaintiff's definition of "EFFA/QIF"—to include "Employee's role as a Software Failure Analysis Engineering Program Manager in 2016 where her job duties included managing reports of major software failures in new released products and also in existing product lines, including the iPhones suffering battery failures as described in 'Batterygate'" as well as "Employee's disclosures regarding Apple Legal's communication with the Employee about government investigations and litigation into the matter, including the scope and retention of document collection on her devices and personal communications"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple understands this Interrogatory to be seeking information about an issue Plaintiff calls "Batterygate" that she raised in her August 23, 2021 Issue Confirmation and it responds on that basis.

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Issue Confirmation, produced by Plaintiff at bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

(c) The most knowledgeable persons regarding Plaintiff's concerns raised in her August 23, 2021 Issue Confirmation are: Plaintiff and Ekelemchi Okpo.

(d) Apple investigated the issues Plaintiff identified in the August 23, 2021 Issue Confirmation.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of the issues raised in her August 23, 2021 Issue Confirmation, the Issue Confirmation, and Apple's privilege logs.

Dated: April 6, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

*Melinda Riechert*

MELINDA S. RIECHERT
Attorneys for Defendant
APPLE INC.

APPLE'S AMENDED RESP. TO PL.'S
INTERROGATORIES, SET THREE
CASE NO. 23-CV-4597-EMC

**VERIFICATION**

I, Megan Bowman, am the Director of Human Resources, Hardware Engineering, for Apple Inc. and I am authorized to make this verification on its behalf. I have read the following:

- **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET THREE**

Based on information and belief and/or personal knowledge, I believe the matters stated therein to be true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Carlos, California on April 6, 2026.

*Megan Bowman*
_____
Megan Bowman

VERIFICATION
CASE NO. 23-CV-4597-EMC

## **CERTIFICATE OF SERVICE**

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. On April 6, 2026, I served the following document(s):

- **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET THREE**

By Electronic Service: On all of the interested parties in this action by transmitting true and correct copies of the documents identified above in portable document format from the email address mriechert@orrick.com to the email addresses below:

Ashley Gjovik (in pro per)
ashleymgjovik@protonmail.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 6, 2026.

*Melinda Riechert*

_____
Melinda S. Riechert

CERTIFICATE OF SERVICE
CASE NO. 23-CV-4597-EMC

# EXHIBIT 49

48.    Attached as Exhibit 49 is Defendant Apple Inc.'s Responses to Plaintiff's Requests for Admission, including without limitation the responses cited in the Motion.

49.    Exhibit 50 is the Court's Order dated January 13, 2026 (Dkt. No. 273).

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>    Plaintiff,<br><br>  v.<br><br>APPLE INC.,<br><br>    Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, SET ONE** |

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:**  Defendant Apple Inc.

**SET NUMBER:**        One

Defendant Apple Inc. ("Apple") responds to Plaintiff Ashley Gjovik's Request for Admission, Set One, served on July 3, 2025, as follows.

Apple responds to Plaintiff's Requests based on the information and documents currently available to it, given that discovery in this action is ongoing. Nothing contained in these responses shall in any way limit Apple's ability to make all uses at trial or otherwise of the information or documents referenced herein or of any information, documents or other evidence that may be discovered in the future. Apple has made its best effort to respond accurately to Plaintiff's Requests, but reserves the right to amend its objections and responses upon completion of its search for responsive documents.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Apple objects to Plaintiff's definition of "Defendant" as overly broad and neither relevant to any claim or defense in this Action, nor reasonably calculated to lead to the discovery of admissible evidence, to the extent that it purports to include Apple Inc. as well as all of "its employees, agents, or representatives." Apple will respond to the Requests using a definition of "Defendant" as "Apple Inc."

2.      Apple objects to the instruction to "clearly state all reasons for [any] denial" and to "include a good faith explanation for [any] denial" because such instructions impose requirements beyond those set forth in Rule 36 of the Federal Rules of Civil Procedure. Moreover, N.D. Cal. L.R. 36-2 provides, "A demand that a party set forth the basis for a denial of a requested admission will be treated as a separate discovery request (an interrogatory) and is allowable only to the extent that a party is entitled to propound additional interrogatories."

3.      Apple objects to the instruction to provide "a detailed explanation of the efforts undertaken to determine the truth of the matter" and "a description of the reasonable inquiry undertaken to determine whether the matter could be admitted" for any Request it is unable to admit or deny because those instructions purport to impose obligations beyond those required by Rule 36 of the Federal Rules of Civil Procedure.

/ / /

/ / /

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-CV-4597-EMC

**RESPONSES TO REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

Admit that Defendant began designating communications regarding Plaintiff's Environmental Health & Safety inquiries about her office at 825 Stewart Drive as attorney-client privileged no later than March 17, 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege. Apple objects to this Request to the extent it seeks information that Apple has already provided in its privilege log and is therefore harassing. *See Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007) ("Admissions are sought, first, to facilitate proof with respect to issues that cannot be eliminated from the case and, second, to narrow the issues by eliminating those that can be. … The rule is not to be used in an effort to 'harass the other side[.]'"). Apple further objects to this Request as vague and ambiguous. Apple further object to this Request as compound. *See* Fed. R. Civ. P. 36(a)(2) ("Each matter must be separately stated."); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at *5 (E.D. Cal. Nov. 19, 2024) (citing cases) ("[R]equests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements").

Based on its understanding of the Request, Apple responds:

Apple admits that Apple employees had attorney-client privileged communications on March 17, 2021 related to Plaintiff. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 2:**

Admit that Defendant designated communications regarding Plaintiff's Environmental Health & Safety inquiries about her office at 825 Stewart Drive as privileged and created "in anticipation of litigation" starting no later than March 19, 2021.

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-cv-4597-EMC

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege. Apple objects to this Request to the extent it seeks information that Apple has already provided in its privilege log and is therefore harassing. *See Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007). Apple further objects to this Request as vague and ambiguous. Apple further object to this Request as compound. *See* Fed. R. Civ. P. 36(a)(2); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at *5 (E.D. Cal. Nov. 19, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that Apple employees had attorney-client privileged and attorney work product communications on March 19, 2021 related to Plaintiff. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the phrase "in anticipation of litigation" appears in over sixty entries within Defendant's privilege log prior to August 4, 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admitted.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Plaintiff verbally and/or electronically communicated with Apple employees David Powers and Dan West between February and July 2021, raising concerns that included the words "safety," "chemical exposure," "vapor intrusion," "cancer," and "Superfund site."

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024) ("[P]laintiffs requested [Defendant] to admit the contents of [a] document … Plaintiffs' motion is denied as to these requests … [A]dmitting the fact of what the note says is not an issue for trial that needs to be

eliminated through requests to admit."). Apple further objects to this Request on the grounds that it is compound. *See* Fed. R. Civ. P. 36(a)(2); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at *5 (E.D. Cal. Nov. 19, 2024). As a result, it is vague and ambiguous and impermissible under the Rules. As just one example, it is unclear whether Plaintiff is requesting an admission that Plaintiff sent any electronic communication containing any one of the five specified terms, or whether Plaintiff is requesting an admission that she sent a single electronic communication containing all five of the specified terms. Apple further objects to this Request on the grounds that it is vague and ambiguous as to "electronically communicated" and "raising concerns," such that it is not clear what Plaintiff is asking Apple to "admit." Apple further objects to this Request on the grounds that it is unduly burdensome and not proportional to the needs of the case to the extent it requires Apple to search extensive electronically stored information (ESI) already produced to Plaintiff to determine whether Plaintiff made any responsive communications. Apple further objects to this Request to the extent it requires Apple to search ESI that is not in Apple's possession, custody, or control.

Based on its understanding of the Request, Apple responds:

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included the word "safety."

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included the term "chemical exposure."

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included the term "vapor intrusion."

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included that included the word "cancer."

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included the term "Superfund site."

Apple admits that Plaintiff communicated with Apple employee David Powers one or more times between February and July 2021 that included the word "safety."

Apple admits that Plaintiff communicated with Apple employee Dan West one or more

times between February and July 2021 that included the term "chemical exposure."

Apple admits that Plaintiff communicated with Apple employee Dan West one or more times between February and July 2021 that included the term "vapor intrusion."

Apple admits that Plaintiff communicated with Apple employee Dan West one or more times between February and July 2021 that included the term "Superfund site."

Apple otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 5**

Admit that Apple informed Plaintiff in April-May 2021, and between July 20, 2021 and August 4, 2021 that it would conduct investigations into her complaints.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the term "conduct investigations" and "concerns."

Based on its understanding of the Request, Apple responds:

Apple admits that on April 12, 2021, Jenna Waibel told Plaintiff, "I'm going to set up some time to talk with Dave and get his perspective," to which Plaintiff responded, "Sounds good." Apple further admits that on August 3, 2021, Ekelemchi Okpo told Plaintiff, "I'm focused on the new concerns you've raised since Jenna closed out her investigation with you on June 3, 2021." Apple denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Apple told Plaintiff on or about August 4, 2021, that she was being placed on administrative leave in connection with an ongoing internal investigation into her complaints.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Apple requested WebEx meetings with Plaintiff on or about September 3 and September 7, 2021, for the stated purpose of discussing the status or findings of the internal investigations that Plaintiff requested.

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-CV-4597-EMC

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "status" and "findings."

Based on its understanding of the Request, Apple responds:

Apple admits that on September 3, 2021, Ekelemchi Okpo requested a WebEx meeting with Plaintiff for the stated purpose of "an update." Apple further admits that on September 7, 2021, Okpo asked for Plaintiff's availability to discuss "inconsistencies" that had come up in the investigation. Apple denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Apple currently claims no internal investigation was opened, tracked, or formally documented in any tracking system regarding Plaintiff's complaints made between July and September 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "tracked," "formally documented," and "tracking system." Apple further objects to the extent this Request seeks to invade the attorney-client privilege, attorney work product, or any other applicable privilege; Apple will not waive any of those privileges for purposes of responding to this Request.

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Apple's internal systems contain no investigation file, tracking number, Business Conduct record, or Employee Relations record labeled or notated as associated with Plaintiff's 2021 complaints or administrative leave.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "internal systems," "investigation file," "tracking number," "labeled," "notated," "associated with."

- 6 -

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 10:**

Admit that prior to terminating Plaintiff, Apple never informed Plaintiff of any findings, determinations, conclusions, or outcomes related to any investigation into her July-August 2021 workplace complaints.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "findings," "determinations," "conclusions," "outcomes," and "workplace complaints."

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Apple has not identified any findings or outcomes resulting from the alleged investigation referenced in Apple's August 16, 2021 Issue Confirmation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "findings" and "outcomes." Apple further objects to the extent this Request seeks to invade the attorney-client privilege, attorney work product, or any other applicable privilege; Apple will not waive any of those privileges for purposes of responding to this Request.

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Apple took no documented action to investigate, escalate, resolve, or remediate the allegations Plaintiff submitted via the August 23, 2021 revised Issue Confirmation and Business Conduct complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-cv-4597-EMC

not limited to the terms "escalate," "resolve," and "remediate." Apple further objects to this Request on the grounds that it assumes facts not in evidence, in that it presupposes—incorrectly—that Plaintiff's complaint contained allegations that were substantiated and, therefore, required "escalat[ion]," "resol[ution]," and/or "remediat[ion]." Apple further objects to the extent this Request seeks to invade the attorney-client privilege, attorney work product, or any other applicable privilege; Apple will not waive any of those privileges for purposes of responding to this Request.

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Apple has not preserved or produced any internal case file, investigation record, audit trail, decision memo, or other documentation associated with the Business Conduct complaint submitted by Plaintiff on August 23, 2021 under tracking number HRC000017207.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "case file," "audit trail," and "decision memo." Apple further objects to the extent this Request seeks to invade the attorney-client privilege, attorney work product, or any other applicable privilege; Apple will not waive any of those privileges for purposes of responding to this Request.

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Apple has never initiated or threatened Plaintiff with formal legal proceedings related to any alleged breach of contract or intellectual property violations by Plaintiff.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "threatened," "formal legal proceedings," "intellectual property violations."

Based on its understanding of the Request, Apple responds:

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-CV-4597-EMC

Apple admits that in September 2021, an attorney representing Apple sent a letter to Plaintiff asking her to "remove certain images and video that [she] ha[d] displayed publicly in violation of [her] Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015." Plaintiff has referred to this letter as "threatening" (*see* Second Amended Complaint (Dkt. No. 32-1) ¶ 550), though Apple denies that characterization is accurate and thus denies the Request on that basis and to that extent.

**REQUEST FOR ADMISSION NO. 15:**

Admit that Apple did not notify Plaintiff at any time prior to September 9, 2021, that she was under investigation, subject to discipline, or at risk of termination for any conduct, including any social media activity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 16:**

Admit that on September 9, 2021, prior to Apple terminating the Plaintiff, Plaintiff wrote to Apple and stated that she was willing to cooperate with any investigation Apple was conducting.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "cooperate."

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 17:**

Admit that on or about August 30, 2021, the publication The Verge published an article titled "Apple cares about privacy, unless you work at Apple" that included an embedded video of Plaintiff [sic] face and upper body, recorded on Plaintiff's phone through the Gobbler application.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Apple objects to the Request to the extent it seeks information to which Apple does not have personal knowledge or information sufficient to admit or deny the request as phrased.

Based on its understanding of the Request, Apple responds:

On information and belief, Apple admits that The Verge published an article titled, "Apple cares about privacy, unless you work at Apple" on or about August 30, 202, as indicated by the following URL: https://www.theverge.com/22648265/apple-employee-privacy-icloud-id. On information and belief, Apple further admits that the article features an embedded video composed of, among other things, images showing Plaintiff's face (or parts of her face) and parts of her upper body. On information and belief, Apple further admits that the images were captured on Plaintiff's phone by an application that has been called Gobbler. Apple denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 18:**

Admit that Apple was contacted by The Verge for comment prior to publication of the article, and did not provide a comment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the term "the article." Apple further objects to this Request on the grounds that it is compound. *See* Fed. R. Civ. P. 36(a)(2); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at *5 (E.D. Cal. Nov. 19, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that a reporter from the Verge reached out to an employee at Apple "for comment" prior to the publication of the article titled, "Apple cares about privacy, unless you work at Apple" and that Apple did not provide a comment prior to the publication of the article. Apple denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 19:**

Admit that Apple did not inform Plaintiff at any time prior to September 9, 2021, that her social media posts or communications regarding Apple's surveillance practices violated any confidentiality or employment policies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the terms "surveillance policies" and "confidentiality or employment policies." Apple

further objects to this Request on the grounds that it assumes facts not in evidence; specifically, this Request presupposes—incorrectly—that Apple engaged in "surveillance practices." Apple further objects to this Request on the grounds that it is compound. *See* Fed. R. Civ. P. 36(a)(2); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at \*5 (E.D. Cal. Nov. 19, 2024).

Based on its understanding of the Request, Apple responds:

Apple denies that it engaged in "surveillance practices" and denies the Request.

**REQUEST FOR ADMISSION NO. 20:**

Admit that prior to the publication of the Verge article titled "Apple cares about privacy, unless you work at Apple", Apple was contacted by the Verge for comment and did not respond or send a cease-and-desist letter or other legal notice to the publisher, despite having the opportunity to do so.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Apple objects to this Request to the extent it seeks information that is duplicative of Request for Admission No.18, and is therefore harassing. Apple further objects to this Request on the grounds that it is compound. *See* Fed. R. Civ. P. 36(a)(2); *Weil v. Raisin City Elementary Sch. Dist.*, No. 1:21-cv-00500-JLT-EPG, 2024 WL 4826233, at \*5 (E.D. Cal. Nov. 19, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that a reporter from the Verge reached out to an employee at Apple "for comment" prior to the publication of the article titled, "Apple cares about privacy, unless you work at Apple" and that Apple did not provide a comment prior to the publication of the article. Apple denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 21:**

Admit that at 2:08 PM on September 9, 2021, Apple emailed Plaintiff requesting a conversation regarding a "sensitive Intellectual Property matter" and Plaintiff responded at 2:10 PM, stating that she was willing to participate and would communicate with the investigator.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that on September 9, 2021, at 2:08 PM PDT, Alexs Kagramanov (from Apple Employee Relations) emailed Plaintiff requesting a conversation regarding a "sensitive Intellectual Property matter." Apple denies Plaintiff's characterization of the 2:10 PM PDT email and on that basis denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 22:**

Admit that Plaintiff emailed Apple at 3:07 PM, stating her willingness to participate in their investigation and requesting that Apple disclose any allegations against her.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that on September 9, 2021, at 3:07 PM PDT, Plaintiff emailed Alexs Kagramanov. Apple further admits that Plaintiff stated in that email, among other things, that she was "willing to participate in [the] investigation." Apple further admits that Plaintiff asked, "Can you please provide me additional detail on what these allegations are?" Apple denies Plaintiff's characterization of the 3:07 PM PDT email and on that basis denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 23:**

Admit that on August 5, 2021, Apple Employee Relations representative Ekelemchi Okpo sent Plaintiff an email stating that she must request permission from Apple before returning to work.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that on or about August 21, 2021, Plaintiff emailed Employee Relations to request permission to return to work in order to attend the Apple University course titled Race and Justice in the United States: A Third Reconstruction.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Apple further objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the term "return to work."

Based on its understanding of the Request, Apple responds:

Admit that Plaintiff emailed Employee Relations on August 21, 2021 to request permission to attend an Apple University course titled "Race and Justice in the United States: A Third Reconstruction," but deny she requested to "return to work."

**REQUEST FOR ADMISSION NO. 25:**

Admit that on or about August 21, 2021, Apple Employee Relations representative Ekelemchi Okpo informed Plaintiff that she was not permitted to return to work.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-CV-4597-EMC

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the term "return to work."

Based on its understanding of the Request, Apple responds:

Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that the National Labor Relations Board issued a Complaint against Apple Inc. in Case No. 32-CA-282142, citing Apple's suspension of Plaintiff on August 4, 2021 as an alleged unfair labor practice.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Apple objects to this Request on the grounds that it assumes facts not in evidence. Specifically, this Request further presupposes—incorrectly—that Plaintiff was "suspen[ded]." Apple further objects to this Request on the grounds that it mischaracterizes the Complaint at issue. Apple further objects to this Request on the grounds that it seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case.

Based on its understanding of the Request, Apple responds:

Apple admits that the National Labor Relations Board issued a Complaint against Apple Inc. in Case No. 32-CA-282142 and states that the Complaint speaks for itself.

**REQUEST FOR ADMISSION NO. 27:**

Admit that the same NLRB Complaint cited Ekelemchi Okpo's August 5, 2021 email to Plaintiff as an alleged unfair labor practice.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Apple objects to this Request on the grounds that it mischaracterizes the Complaint at issue. Apple further objects to this Request on the ground that it seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case.

Based on its understanding of the Request, Apple responds:

Apple admits that the National Labor Relations Board issued a Complaint against Apple Inc. in Case No. 32-CA-282142 and states that the Complaint speaks for itself.

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-cv-4597-EMC

**REQUEST FOR ADMISSION NO. 28:**

Admit that Jessica Perry, esq. was retained by Apple and began communicating with Apple management and HR/ER related to Plaintiff's complaints no later than Aug. 17 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege

Based on its understanding of the Request, Apple responds:

Apple admits that there were attorney-client privileged communications involving Jessica Perry related to Plaintiff no later than August 17, 2021. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Apple created a Keynote deck about Plaintiff on or before August 26 2021 that was titled "exit outcomes" and the content included discussion of the termination of Plaintiff's employment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege.

Based on its understanding of the Request, Apple responds:

Apple admits that a Keynote file entitled Draft Exit Outcomes ACP.key was emailed on August 26, 2021. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 30:**

Admit that between 2015-2020, Plaintiff received primary medical care from Apple Inc directly or through Apple subsidiaries generally known as "AC Wellness" or "Apple Wellness."

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the term "Apple subsidiaries generally known as 'AC Wellness' or 'Apple Wellness.'" Apple will interpret this term to mean "AC Wellness Center LLC." Apple objects to this Request as vague and ambiguous with respect the phrase "primary medical care."

Based on its understanding of the Request, Apple responds:

Apple has made a reasonable inquiry, and the information it can readily obtain is insufficient to enable Apple to admit or deny whether "between 2015-2020, Plaintiff received primary medical care … through" AC Wellness Center LLC. AC Wellness Center LLC is prohibited by HIPAA from disclosing to Apple whether Plaintiff received medical care through AC Wellness Center LLC. Apple denies the remainder of this Request.

Dated: August 4, 2025                    ORRICK, HERRINGTON & SUTCLIFFE LLP

                                         _/s/ Melinda S. Riechert_
                                         MELINDA S. RIECHERT
                                         Attorneys for Defendant
                                         APPLE INC.

APPLE'S RESPONSES TO PLAINTIFF'S
REQ. FOR ADMISSION, SET ONE
CASE NO. 23-CV-4597-EMC

**<u>CERTIFICATE OF SERVICE</u>**

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. On August 4, 2025, I served the following document(s):

- **DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, SET ONE**

By Electronic Service: On all of the interested parties in this action by transmitting true and correct copies of the documents identified above in portable document format from the email address mriechert@orrick.com to the email addresses below:

> Ashley Gjovik (in pro per)
> ashleymgjovik@protonmail.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2025.

_____
Melinda S. Riechert
.

CERTIFICATE OF SERVICE
CASE NO. 23-CV-4597-EMC
