JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:     +1 650 614 7400
Facsimile:     +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:     +1 202 339 8400
Facsimile:     +1 202 339 8500

Attorneys for Defendant
APPLE INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>              Plaintiff,<br><br>      v.<br><br>APPLE INC.,<br><br>              Defendant. | Case No. 23-cv-4597-EMC<br><br>**DECLARATION OF MELINDA S. RIECHERT IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**<br><br>Date:        June 11, 2026<br>Time:        1:30 p.m.<br>Dept:        Courtroom 5, 17th Floor<br>Judge:       Honorable Edward M. Chen |

I, Melinda S. Riechert, declare as follows:

1.     I am an attorney admitted to practice law in the state of California and am a partner at the firm Orrick, Herrington & Sutcliffe LLP. I am counsel for defendant Apple Inc. in this action. I submit this declaration in support of Apple's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment and Preliminary Injunction. I took the deposition of Plaintiff in this case and defended all the depositions taken by Plaintiff except the deposition of Yannick Bertolus which my partner Jessica Perry defended.  I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto.

2.     A true and correct copy of excerpts from the transcript of the December 16, 2025 deposition of Ashley Gjovik (Volume I) together with Exhibits 23 and 25 to that deposition are attached as **Exhibit A**.

3.     A true and correct copy of excerpts from the transcript of the April 28, 2026 deposition of Ashley Gjovik (Volume III) and Exhibit 32 are attached as **Exhibit B**.

4.     A true and correct copy of excerpts from the transcript of the April 17, 2026 deposition of Yannick Bertolus, including Mr. Bertolus's errata which was timely submitted to correct transcription errors, is attached as **Exhibit C**.

5.     A true and correct copy of excerpts from the transcript of the April 16, 2026 deposition of Aleks Kagramanov and Exhibit L is attached as **Exhibit D**.

6.     A true and correct copy of excerpts from the transcript of the April 7, 2026 deposition of Ekelemchi Okpo and Exhibits AA and EE are attached as **Exhibit E**.

7.     A true and correct copy of excerpts from the transcript of the April 3, 2026 deposition of Robert Aloe, Ph.D., is attached as **Exhibit F**.

///
///
///
///
///
///

RIECHERT  DECL. ISO OF APPLE'S MSJ &
OPP. TO PL.'S MSJ & & PI
[ 23-CV-4597-EMC]

8. Dr. Aloe, Mr. Bertolus, Ms. Bowman, and Mr. Okpo each signed their declarations in support of this motion via DocuSign and each concurred that their declaration may be filed in support of Apple's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment and Preliminary Injunction.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed May 7, 2026 in Menlo Park, California.


_/s/ Melinda S. Riechert_
Melinda S. Riechert

RIECHERT DECL. ISO OF APPLE'S MSJ &
OPP. TO PL.'S MSJ & & PI
[ 23-CV-4597-EMC]

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**CERTIFIED TRANSCRIPT**

ASHLEY GJOVIK,

       Plaintiff,

vs.                                    CASE NO. 23-cv-4597-EMC

APPLE INC.,

       Defendant.

_____/



VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

ASHLEY MARIE GJOVIK


Pages 66 to 305 MARKED CONFIDENTIAL




DATE:          Tuesday, December 16, 2025

TIME:          9:07 a.m. - 5:53 p.m.

LOCATION:      (All attendees appearing remotely.)

REPORTED BY:   JULIE L. ANDERSON, CSR
               Stenographic California CSR No. 11422


               Talty Court Reporters
               2131 The Alameda, Suite D
               San Jose, California 95126

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)               December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

:::  APPEARANCES  :::

FOR THE PLAINTIFF:

    ASHLEY MARIE GJOVIK, IN PRO PER
    ashleymgjovik@protonmail.com
    (415) 964-6272

FOR THE DEFENDANT:

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  MELINDA S. RIECHERT, ATTORNEY AT LAW
        (APPEARING VIA VIDEOCONFERENCE)
    1000 MARSH ROAD
    MENLO PARK, CALIFORNIA 94025
    (650) 614-7423
    mriechert@orrick.com

- AND -

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  RYAN D. BOOMS, ATTORNEY AT LAW
        (APPEARING VIA VIDEOCONFERENCE)
    2100 PENNSYLVANIA AVENUE NW
    WASHINGTON, D.C. 20037
    (202) 339-8400
    rbooms@orrick.com

- AND -

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  NICHOLAS J. HORTON, ATTORNEY AT LAW
        (APPEARING VIA VIDEOCONFERENCE)
    400 CAPITAL MALL, SUITE 3000
    SACRAMENTO, CALIFORNIA 95814
    (916) 329-4906
    nhorton@orrick.com

- AND -

    APPLE INC.
    BY:  ISELA PEREZ, ATTORNEY AT LAW
        (APPEARING VIA VIDEOCONFERENCE)
    1 APPLE PARK WAY, M/S 37-2BE
    CUPERTINO, CALIFORNIA 95014

ALSO APPEARING REMOTELY:

    MICHAEL MACK, VIDEOGRAPHER



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

::: INDEX OF EXAMINATIONS :::

EXAMINATION BY:                                                PAGE


        MS. RIECHERT                                            9



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

MS. RIECHERT:  Could you please, Mr. Videographer, put tab 1-05 into the chat?

I'd like to mark as Exhibit Number 5 the January 28 and April 24, 2020, complaints that you made about others breaching confidentiality.

THE VIDEOGRAPHER:  Exhibit 5.

(DEPOSITION EXHIBIT 5 WAS MARKED.)

THE WITNESS:  Okay.

BY MS. RIECHERT:

Q.  Taking a look at Exhibit Number 5, is this a email that you sent?

A.  Yes.  This looks like it.  Although it looks like the formatting has been altered and some of the characters were moved and there's redactions.

Q.  The redactions are of the email address and the email -- yeah, to the email addresses.

But other than that, is this an email that you sent?

A.  Yeah.  But there's also those little squares where characters are replaced too.  And, like, my signature is not normally centered, so someone centered the text.

But I generally do remember sending this email, yes.

Q.  Okay.  And why did you send it?



A.   So I had seen an article online where prior -- a prior senior director -- I believe she's a senior director -- or director, Bethany, was doing press interviews, and it -- the article did not look like it was affiliated with Apple, that Apple had participated.  And she and -- I believe actually her husband also worked at Apple.  I can't remember how to pronounce his name.  They have a startup that they were working on and --

Q.   Could you just focus on the answer.  I don't need the background.

A.   Well -- well, so they were talking about their work at Apple where they were developing new products that they were framing as being really important and material and the designs being really important, and they were sharing the details of the design and engineering process for those products in depth.  And all the training that I had received and stuff that I'd been hearing from Apple's new product security and the business conduct training and the -- all the trainings said that all of that stuff, all that kind of information was -- was very sensitive and very confidential, and I was especially concerned seeing that someone who is a previous leader of the program managers was sharing



all that information with the press, and it didn't seem like Apple was involved and didn't comment. And to me, it seems like that was inappropriate.  So Apple also told us that we were required to report leaks or things we thought were leaks, so I felt like I had an obligation to report that and I did report that.

Q.   You reported it because you felt that these people were violating their confidentiality obligations to Apple; correct?

A.   That they might be, but that's for Apple to decide.  I was just obligated to report the issue and let Apple investigate.

Q.   And they might be reporting it because you believed that they were disclosing confidential information; correct?

A.   I was not sure, and the email specifically says, "Not sure how much this matters leak-wise." So I even framed the email as saying, I don't know if this -- you know, I don't know if this counts as a leak.  I don't know if this is still confidential. But I felt like because Apple told us we had an obligation to report when we thought there could be a leak, which they defined, like, a breach of confidentiality or something Apple considered a



of my job escalating engineering issues, so I tried not to escalate personal concerns.  So I don't think I pressed on it, but I remember no one really having an explanation for why mine was different.

Q.  So you knew from 2017 that your version of the app -- the Gobbler app was auto uploading?

A.  I don't know if it was 2017.  I would feel -- at least 2018.  I think, like, late 2018 at the very least -- that I didn't see the review workflow.  And so I guess my -- my initial concerns were, like, was the documentation wrong.  Is everyone else seeing this?  And it sounded like, no.  It sounded like there was something different with mine that all these photos and biometrics that we gathered were just being auto uploaded and that -- it bothered me because that seemed like a big invasion of privacy.

Q.  And what made you think yours were being auto uploaded?

A.  Yeah.

Q.  What made you think that?

A.  The way that the Gobbler app supposedly worked was it was gathering these, like, photos/videos.  It was like a stop -- like a bunch of photos so you could play it like a video, and the

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

biometrics and all the geo location and all this information and the documentation said it would queue that information for folks to review and then push -- like push something affirmatively to say, like, send that to Apple and then it would be sent. But I didn't see the workflow to review and send. And the documentation had also suggested that unless you send all of those photos and video stuff it was gathering, the 24/7 in the front of the phone, you would be, like, queued up on the phone.  And mine didn't queue, so I didn't see the review and I didn't see the queue.  And I had seen that -- I think it was around 2018 or 2019 that it started auto uploading at least, like, some logging information.  So it was able to auto upload stuff, and that indicated to me that one of two things were happening with my phone, that either it was maybe auto deleting the content it was gathering or it was auto uploading all of the content it was gathering. And the later one was very concerning to me.

Q.   But you don't know if it was, in fact, auto uploading the content; correct?

A.   Correct.  And that's what I said when I made the complaints in the Verge article.

Q.   Could we continue on please to page 2771?

bar there.

MS. RIECHERT:  So if we could go and mark as Exhibit Number 14, tab 7.0.

(DEPOSITION EXHIBIT 14 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 14.

THE WITNESS:  It's my complaint.

BY MS. RIECHERT:

Q.  Do you agree that these are tweets that you put on to Twitter now known as X?

A.  Sorry.  You sent -- it's the fifth amended complaint is what I just opened.

Q.  Okay.  So looking at the tweets on Paragraph 185, pages 37 or 38 of the exhibit.

A.  Yeah.  So we're looking at my fifth amended complaint that's documented in the civil case we're doing this deposition for, and on this page there are four screenshots of Twitter posts I made.  And, yes, these are Twitter posts I made.

MS. RIECHERT:  If we could look at tab 3.02 and mark that as Exhibit 15.

(DEPOSITION EXHIBIT 15 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 15.

THE WITNESS:  That's just one page that's a zoom of the ear one.

/ / /



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

BY MS. RIECHERT:

Q.   So is this a copy of one of the tweets that you placed on Twitter?

A.   It looks like it, yes.

Q.   And was that on August 28, 2021?

A.   That's my recollection.

Q.   Okay.  And this tweet includes emails; correct?

A.   Yes.

Q.   And you received these emails while you were on paid leave; correct?

A.   Yes.

Q.   And so you still had system access while you were on paid leave in August of 2021; correct?

A.   As of August 28, 2021, I still had access to my Apple email, yeah.

Q.   And you still had access to Apple's Slack system; correct?

A.   I don't know if I checked on August 28, no.

Q.   But while you were on paid leave, you had access to Apple's Slack system; correct?

A.   I know I checked in -- earlier in August, and I did when I posted on Slack.  But I don't know if I checked if I still had access later, so I can't confirm, no.

A.  No.

Q.  Do you know if it related to undisclosed product development of existing products?

A.  No.

MS. RIECHERT:  Okay.  I'd like to mark as exhibit next in order.  What are we up to?  16, tab 3-02A.

(DEPOSITION EXHIBIT 16 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 16.

THE WITNESS:  Okay.

BY MS. RIECHERT:

Q.  Looking at Exhibit 16, are these the emails that you posted on Twitter?

A.  I don't know.  These look different.  The ones that I had had, like, a colored banner and had a -- kind of different appearance than what I'm looking at here.

Q.  But are they substance of the emails -- the substance of the emails you posted on Twitter?

A.  They look about the same.  I don't know if they're exactly the same, but they look similar.

MS. RIECHERT:  I'd like to mark as Exhibit 17, tab 3-03.

(DEPOSITION EXHIBIT 17 WAS MARKED.)

/ / /



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

BY MS. RIECHERT:

Q.    Now the print is very small on this, but you can zoom in on it to what it says.

THE VIDEOGRAPHER:    Exhibit 17.

BY MS. RIECHERT:

Q.    These are tweets that you put on to Twitter about what -- is this a tweet that you put on Twitter?

A.    This has three tweets on it.  Two of them are mine.  I don't know what the third one is. That's not mine.

Q.    And the first one that's yours is about the global security team of ex-US intelligence employees?

A.    No.  The first one is "Apple has an internal culture of surveillance, intimidation, and alienation.  Employees are closely monitored and our data hoarded" --

Q.    Okay.

A.    -- "in the name of secrecy and quality. We're told" --

Q.    Okay.  I don't need you to read it.

You placed that one on Twitter; correct?

A.    That's the first one.  And then the second one was about the ex-FBI, ex-military, MPS team,

yeah.  So there's two.

Q.  And then there's a picture of you -- one or more pictures of you; correct?

A.  Yeah.

Q.  Two pictures of you.

And you put that on Twitter too?

A.  Correct.

Q.  Did you also link to a Verge article titled, "Apple cares about privacy, unless you work at Apple" --

A.  I did.

Q.  -- on your Twitter page?

And this was all on August 30, 2021; correct?

A.  I believe so, yes.

Q.  And did you provide Zoe Schiffer, who wrote the Verge article, information to help her write that article?

A.  I did.

Q.  And with respect to the tweets that we're looking in front of you, the one with the pictures, did you post those images from Glimmer?

A.  Those were images that were in the Glimmer image repository on my device, yes.

Q.  So if you look at the next two documents --

in the chat or you're referring to something else I produced?

Q.   I'm referring to Exhibit Number 19.

A.   So 19304A?

Q.   Yeah.

A.   And what was your question again?

Q.   Are those the videos that you sent to Zoe?

A.   Asked and answered.  I don't know.

Q.   But those are videos that you took.  You just don't know if you sent them all to Zoe.  Is that what you're telling me?

A.   I don't know if that file is exactly what I sent to her.  It looks similar to what is posted on the web page, but I had different versions.  I had edited different versions, so I would have to go back and check before I'd confirm that's exactly what I sent her.  I don't know.

Q.   And how would you confirm that?  By sending me the emails that you sent to Zoe?

A.   I think it was sent -- it might have been sent in Signal, so I'd have to go back to my screenshots in Signal and see if there's a file name and then cross-reference it to my files in my storage and -- and see that way.  Or I might have designated it in my file storage of which ones I



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

specifically sent her, so I'd just have to go back and check.

Q.   Okay.   But the one that's in the Verge article is one that you sent her.   Only in the Verge article, there's some blurring in it; correct?

A.   Yes.   I sent it and requested the blurring.

Q.   Yeah.   And you asked them to blur out the app UI; correct?

A.   Anything with text.

Q.   Did it include the app UI?

A.   No.

Q.   So anything that was in the video that you sent that had app -- that had text in it, you asked to be blurred out; correct?

A.   Right, yeah.   And any kind of, like, icon. So for the UA, like the icons, there's the little, like, red and purple and some of them have letters and stuff.

(Reporter clarification.)

THE WITNESS:   There's little icons.   Like there's a red and purple dot and some of them have letters, and I asked them to blur all of that kind of stuff out too.   The focus to me was the fact it was taking photos and videos of my body, and that's what I wanted the video to focus on.

Q.   Did you give Zoe a screenshot of internal Apple web page about Glimmer?

A.   I believe so, yes.

Q.   And you gave her the video of the Glimmer app that shows the images of the Glimmer app; correct?

A.   Yeah.

Q.   And the user interface; correct?

A.   Yeah.

Q.   And details about the Pearl study; correct?

A.   About the what?

Q.   Pearl study?

A.   Oh, yeah, that weird user study.

Q.   You gave Zoe details about the Pearl study; correct?

A.   Yeah.

Q.   Okay.  And you gave her images captured on your phone by Glimmer; correct?

A.   Yeah.

Q.   And you gave her screenshots of the app interface and functionality; correct?

A.   Functionality?  I don't know what that means.

Q.   Okay.  Did you give her screenshots of the app's interface?

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.  Okay.  Let me just go back to another question.  I'd asked you earlier about Pearl data metrics, and you said you didn't know what that meant.  I'm talking about whether the FaceID was successful and whether other metrics revealed beneath the photo.

So the question is do you share screenshots of the app's collection of Pearl data metrics, and Pearl data metrics includes whether the FaceID was successful and other metrics revealed beneath the photo?

A.  So you're saying a term "metrics" which infers a collection of data.  These photos show a binary yes or no which is not a metric.  But these photos show, for each photo, something that says, like, result, failure, success if that's what you mean by "metric."

Q.  Yes.  Did you share that with Zoe?

A.  Yeah.  That's on the image screenshot.

MS. RIECHERT:  Okay.  I'd like to mark as Exhibit 20, tab 3-01.

(DEPOSITION EXHIBIT 20 WAS MARKED.)

THE WITNESS:  Sorry.  Did you want me to answer that other question that you asked and then I never answered and then you went to a different



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

BY MS. RIECHERT:

Q.   Anybody else other than --

A.   Yeah, a lot.

Q.   Okay.

A.   Congress too.  And I was included and cited in that government accountability report about employee privacy concerns published --

Q.   Regarding who you shared it with.  You've got Telerama, Der Spiegel, and Congress.  Anybody else?

A.   The agencies.

Q.   Government agencies?

A.   There were other reporters.  A lot of other reporters and I've shared stuff, social media, and in the court case.

Q.   What other reporters?

A.   Probably dozens.  I'd have to go back and, like, itemize the whole list.

Q.   Okay.  What about during your employment?  Did you share this information with anybody other than Zoe Schiffer?  Apple's product-related information or internal tools?

A.   Talking about Gobbler.

Q.   Apple's product-related information or internal tools?

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.   I don't know what those terms mean.

Q.   Okay.  We're back to that again.  Okay.  If you find out what you think they mean, let me know and we can get the question answered.

A.   I need a definition from you that's more specific than those general terms.

Q.   Understand.  Okay.  So let's look at Exhibit Number 20, which is tab 3-01.

A.   Okay.

Q.   Okay.  Is this a text message that you sent to Cher Scarlett?

A.   Looks like it, yeah.

Q.   Okay.  And who is Cher Scarlett?

A.   She's an ex-Apple global security employee who sued me and accused me of criminal extortion and harassment and blackmail and then was stalking me for multiple years, and I had to file multiple police reports against her.

Q.   Why did you share this information with Cher Scarlett?

A.   We were organizing together for a brief period of time in July and, like, very early August.  We seemed to have some intersecting interests in organizing about making Apple better.  And at this time we were still communicating, and she had been



encouraging me -- my advocacy and my disclosures and this was something -- a topic, the privacy stuff, that she was specifically very interested in and she'd even been sharing some of my stuff herself from her own Twitter account.  Like my protest that Apple was requesting us to share all of our medical records directly with Apple if we were to request disability or ADA accommodations.

Q.  And in that message you confirm that you gave all of this information to Zoe; correct?

A.  I said, [As read]:  "I gave all of this to Zoe as background.  Some engineering told her about it a while ago.  I'm letting her use those pics of me for the article to show how invasive it is.  I chose the pretty ones because most are not."

Q.  And Zoe is referring to the Verge reporter who published the article with your Glimmer pictures and video; correct?

A.  Yeah.  Cher helped connect me to Zoe.  Cher had been working with Zoe --

Q.  Okay.  I didn't ask that.  I'm just asking if that's who Zoe is when you refer to Zoe.  "I gave all of this to Zoe," you were referring to Zoe who wrote the Verge article -- that published the article with your Glimmer pictures and video;

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

correct?

A.   Yeah.   Zoe Schiffer of the Verge.

Q.   Okay.   And when you say "all of this," you're referring to the screenshots that you were sharing in the text thread with Cher; is that correct?

A.   I don't have the full text anymore.  I got locked out of --

(Reporter clarification.)

THE WITNESS:  -- my old iMac.  So I can't go back and confirm exactly what it is.  We're just working off of Cher's documents I think at this point.

BY MS. RIECHERT:

Q.   But you did share this information with -- that's in this exhibit with Cher; correct?

A.   Cher's falsified and fabricated a number of documents --

Q.   Okay.  Did you or did you not share this information with Cher?  Yes, no, I don't know.

A.   The first page -- that screenshot included just in that first page does look like something I did share with Zoe on background, the article for her to do fact checking.

Q.   And the other pictures that are in here and

the other information that's in here, did you share that with Zoe -- excuse me -- with Cher?

A.   Again, I lost my copies of this so --

Q.   Yes, no, I don't know?

A.   So the timing, the ordering, it looks like I -- some of that stuff with Zoe, but it looks like some of this I was just sharing with Cher to show to her because she wasn't familiar with the app, so there's two different things happening it looks like in this chain.

Q.   So when you say, "I gave all of this to Zoe as background," what are you referring to?

A.   That's where I'd have to go back and look in the chain.  I think some of this -- it looks like some of this stuff I'd shared with Cher, like, later in this PDF and the later pages was stuff I was just showing Cher because she said she wasn't aware -- she indicated she was not aware of the app, so I wanted to show Cher more of what the app looked like, and Cher was an active Apple employee.

(Reporter admonition.)

BY MS. RIECHERT:

Q.   Do you agree that sharing this information with Cher was a breach of your confidentiality obligations with Apple?

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

received?

A.   This is a copy of a letter I received on September 9 terminating my employment.

Q.   You requested a leave -- I'm switching subjects now.  You requested a leave of absence from April 15 to April 20, 2021, through Dave Powers; correct?

A.   I'm not sure of the exact dates.  I know I had to take some time off for health reasons and also for final exams.

Q.   And also for?

A.   Final exams.

Q.   Final exams.

Okay.  Do you recall requesting a leave of absence and receiving that leave of absence?

A.   Yeah.

Q.   Okay.  And Dave Powers granted you the leave of absence; correct?

A.   I believe so.

MS. RIECHERT:  Okay.  I'd like to mark as Exhibit Number 23, tab 4-08.

(DEPOSITION EXHIBIT 23 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 23.

MS. RIECHERT:  Thank you.

THE WITNESS:  I'm sorry.  Is this still

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

confidential or are we ending the confidential part?

BY MS. RIECHERT:

Q.  If you're okay with us revealing this information, then we can take it off confidential.

A.  Yeah.  You firing me is not confidential -- your client firing me is not confidential.

Q.  Okay.  If there's anything you think is confidential continuing, just let us know. Otherwise we can end it at the end of Exhibit Number 21.

A.  Sounds good.

Q.  21?  22.  Sorry.

A.  The termination email is 21, so I would say 21 is when it's not confidential anymore when workplace violence reaches out.

Q.  Okay.  So we're ending confidential after Exhibit 22.

A.  I'm sorry.  I did not say that the stuff before is confidential, but I'm just saying your bookmark, I think we can all agree that the email from Aleks would not be confidential.

Q.  Okay.

A.  Okay.  May 21 email, yeah.

Q.  Is this a copy of email correspondence between you and Jenna Waibel?

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.    Appears to be, yes.

Q.    Okay.   You were placed on a paid administrative leave on August 4th, 2021; correct?

A.    Yeah.

Q.    And you remained on paid administrative leave through your termination; correct?

A.    Yeah.   Yes, I did.

MS. RIECHERT:   Okay.   I'd like to mark as Exhibit Number 24, tab 4-21.   This is a document you produced, 2302.

(DEPOSITION EXHIBIT 24 WAS MARKED.)

BY MS. RIECHERT:

Q.    Is this an email that --

A.    Sorry.   It's still loading.

Q.    Sorry.

A.    Okay.   Go ahead.

Q.    Yeah.   Is this an email between you and Mr. Okpo in August of 2021?

A.    Yes.

Q.    Did you respond to that email?

A.    I did not.

Q.    Did you request to be reinstated from your paid leave after this email?

A.    I did.

Q.    And how did you do that?

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.    I emailed him saying I had a scheduled training I still would like to participate in, and he told me I was not allowed to and that I had to wait to hear back from Apple about any next steps.

Q.    So you didn't request to be reinstated from your paid leave; you asked to attend a training; right?

A.    Which was -- I was testing the water to see what the response would be because it seemed like I should -- I had asked Apple University --

Q.    The question is did you ask to be reinstated from your leave -- administrative leave or did you ask to attend a training?

A.    I did not send any communications using the words "reinstatement from administrative leave."

Q.    Okay.

MS. RIECHERT:   I'd like to mark as Exhibit Number 25, 7-19.

(DEPOSITION EXHIBIT 25 WAS MARKED.)

THE VIDEOGRAPHER:   Exhibit 25.

MS. RIECHERT:   Thank you.

THE WITNESS:   I'm sorry.  I want to clarify your prior question about Exhibit 24_4-21 when you asked if I responded to the Okpo email.  I did not respond directly to Okpo, but I was tweeting about

those emails and complaining about them, and those are also emails NLRB found violated federal labor law.  But I did not respond directly to Okpo on that chain.

Okay.  Exhibit 25.

BY MS. RIECHERT:

Q.  Yes.  Is this a Slack exchange from you dated August 4, 2021?

A.  Yes, it looks like it.

Q.  And page 1 contains Slack messages you sent; correct?

A.  Sorry.  You said -- say your question again.

Q.  Yes.  Page 1 contains Slack messages that you sent; correct?

A.  I don't know if "messages" is the right term because it was posted to a group, but it was things I posted on Apple Slack, yes.

Q.  Okay.  And what was the help escalation concerns Slack channel?

A.  It was created arising out of a chat that happened on July 28, I believe, was the day I started a post on the Women of Suite Software Engineering, SWE, channel explaining that I had raised concerns and I felt like I was met with not just retaliation but kind of a systematic and

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

::: CERTIFICATE OF REPORTER :::

I, JULIE L. ANDERSON, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 11422, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing remote deposition was administered an oath remotely to testify to the whole truth in the within-entitled cause.

That said deposition was taken down remotely by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

(X) Reading and signing was requested/offered.

Should the signature of the witness not be affixed to the original deposition transcript, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.
The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

DATED:   January 5, 2026

JULIE L. ANDERSON, CSR
California Certified Shorthand Reporter 11422

**TALTY COURT REPORTERS, INC.**                **346**
**408.244.1900 - www.taltys.com**

ASHLEY MARIE GJOVIK
12/16/2025
JULIE L. ANDERSON, CSR 11422
**Exhibit 23**

| | |
|---|---|
| **Subject:** | Re: Ashley taking leave |
| **From:** | "Ashley Gjovik" ☐ Redacted |
| **Received(Date):** | Fri, 21 May 2021 22:58:48 +0000 |
| **To:** | "Jenna Waibel" ☐ Redacted |
| **Cc:** | "David Powers" |
| **Date:** | Fri, 21 May 2021 22:58:48 +0000 |

==Thank you, Jenna! Confirmed.==

—

**Ashley M. Gjøvik**

  Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

☐ Redacted

On May 21, 2021, at 2:30 PM, Jenna Waibel < ☐ Redacted > wrote:

+ Dave

Hi Ashley,

Thanks for our call this morning. I'm glad to hear you are feeling well supported in this offer of time off.

==We agreed that you would take administrative leave, with full pay and benefits, starting Monday for two weeks, beginning Monday May 24, 2021 while I look into the concerns you have raised. You will return to work on Monday, June 7, 2021.== We agreed this time will not be formally submitted in a time off system, and will not decrease your sick time or paid time off balance.

For the next two weeks, we agreed you will not do any work. You will post an away message that lets folks know you will be out, but I left it to your judgement on what else you say about your time out.

During this time off, I committed to you that I would continue my review and hope to have findings to share by the end of the two week period. We agreed that the best way to reach you is to send you a text message on your work number. Other than that, we agreed you would not do any work or respond to work emails during this time.

You can continue to contact me with additional information or questions about my investigation at any time.

Best,

**Jenna Waibel**

**Corporate Employee Relations**

Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.**

APL-GAELG_00002821

ASHLEY MARIE GJOVIK
12/16/2025
JULIE L. ANDERSON, CSR 11422
**Exhibit 25**

🔒 **help-escalation-concerns** ⓪ ⌄    Escalation concerns     8

Wednesday, August 4th ⌄

 **Ashley Gjøvik** 💬 8:18 AM

I've been meaning to check in with this group but i've spent most of my week with employee relations. Eight hours this week in meetings with them, six hours last week, six hours the week before -- and the rest of the time me having to dig and gather and present evidence from the last 7 years of hell here.

I've also been Tweeting openly about a lot of things. I'm at ashleygjovik on Twitter.

I want to follow up more on this, but wanted to say I've had Apple alumni's reach out to me after I started Tweeting -- women who tried to complain or even sue after they leave and said Apple tried to ruin their lives after they quit. Women saying Apple also tried to get them to go on medical leave when they complain. And one of my therapists confirmed that Apple has court ordered EAP therapy notes when patients sue. It's all worse than i thought, and I assumed it was pretty bad.

I"m going to share some of their Tweets & comments later today or this week -- but for me personally, i'm realizing that i'm in the best position still being an employee (refusing to quit or go on medical leave) and locking horns with ER and demanding they address the issues i'm raising. But i've had to go into it assuming they wouldn't have any souls about it and sadly i think that is the key to my success so far. (edited)

 **1 reply** 8 days ago

🔖 Added to your saved items



 **Ashley Gjøvik** 💬 11:48 AM

Ok well maybe no update... I asked ER that during the investigation into hostile work environment that they request that any communications between me and my two managers and my HR BP be in writing, and that no new work is assigned to me (my boss tried to quadruple my workload with a ton of awful projects). They said: what if they can't do that? I said: then put me on paid leave with benefits until they're done. They just offered me the paid leave instead and inferred that means they don't want me on Slack or talking to coworkers during the investigation. I yelled a lot and told him i know why they're doing this and they can't keep me off Twitter etc.

Anyhow, i think y'all should have access to add more people to this group now if others want to join and if you want to talk still my personal info is below. I told ER i would give it out to the "other women" and he looked sad. 😇

⬚ Redacted
⬚ Redacted (personal phone & have Signal)
Twitter is at ashleygjovik

Also if anyone is interested in talking to the press, anonymously or named, about their experiences, i have a bunch of journalists interested in hearing more. Feel free to ping me and I can connect you or others.

Thank you all and hang in there. Just know, if i don't come back and you're not hearing from me anymore on any of this, my "price" is enough money to launch my human rights law firm next to a beach house in Kona. If that happens, you're all welcome to visit and sunbathe with me on the beach while we conspire to take down the white supremacist patriarchy. 💪🏼🤞🏼 Otherwise i won't shut up about this, ever. 🎤

 2    😊⁺

To: +1    Redacted



Wtf?

Ur on indefinite paid admin leave? What even is that

Are they trying to force you to not speak to other employees?

It's what ER does when they don't want you around causing trouble, or your bosses giving them more to investigate

Or force you to take leave?

Its basically no change in my employment status but I agree to do not work

*do no work

Will u be coming back ? Hoping they resolve this

No idea

They know im not going away unless they actually fix this or give me a bunch of money

Well I deserve a break from this bs

I hope they fix it for you though

And not just try to silence you and justify the bs

02441

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--o0o--

ASHLEY GJOVIK,                    )
                                  )       **CERTIFIED TRANSCRIPT**
          Plaintiff,              )
                                  )
     vs.                          )  Case No.: 23-cv-4597-EMC
                                  )
APPLE, INC.,                      )
                                  )
          Defendant.              )
_____)


VIDEOTAPED DEPOSITION OF ASHLEY GJOVIK

VOLUME III

Pages 365 to 624


DATE:  Tuesday, April 28, 2026

TIME: 11:09 a.m. - 4:23 p.m.

LOCATION: REMOTE VIA ZOOM


REPORTED BY:     Karen Ferguson, CSR
                 Certified Shorthand Reporter #5970
                 TALTY COURT REPORTERS
                 2131 The Alameda, Suite D
                 San Jose, California 95126
                 (408) 244-1900

DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

APPEARANCES

FOR THE PLAINTIFF:  ASHLEY GJOVIK

    By:  ASHLEY MARIE GJOVIK, IN PRO PER
    (415) 964-6272
    Ashleymgjovik@protonmail.com

FOR THE DEFENDANT:  APPLE, INC.

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    By:  MELINDA S. RIECHERT, Attorney at Law
    1000 Marsh Road
    Menlo Park, California  94025
    (650) 614-7423
    Mriechert@orrick.com

-AND-

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    By:  RYAN D. BOOMS, Attorney at Law
    2100 Pennsylvania Avenue NW
    Washington, D.C. 20037
    (202) 339-8400
    Rbooms@orrick.com

-AND-

    APPLE, INC.
    By:  ISELA PEREZ, Attorney at Law
    1 Apple Park Way, M/S 37-2BE
    Cupertino, California  95014

THE VIDEOGRAPHER:  THERESA MAJORS



DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

one?

Q.   Yes.

Is that a video that you created using your phone and the Glimmer app?

A.   That is a combination.  That was -- I had taken a, like, screen recording on my phone of the photos on Glimmer and Gobbler app and I had shared it with so I /SHEUFR and she shared it with part of her team and in preparation of sharing it in the article about privacy invasion I had them scrub and, like, blur all the text and that looks like a version they had sent me back of their draft after they were blurring the text because the point was just showing the photos to show how invasive it was so we didn't need the text.

Q.   So what you did is you sent Zoe Schiff (sic) this video, but the text was not blurred when you sent it to her; is that correct?

A.   That's my recollection, yeah.

Q.   Okay.

And then she sent you back the video that we marked as Exhibit No. 30, but she blurs the text; is that correct?

A.   I believe so, yes.

Q.   And when did you create this video?

A.   That's a good question.  I believe it was shortly before -- probably within, like, a week before that article -- but I'm not entirely certain.

Q.   And why did you create the video?

A.   Because I wanted to show that it was capturing these images of employees and people around them to show so people could understand how invasive it was and that it was violating people's privacy and I felt like you couldn't actually understand that fully unless you saw the videos and saw the content it was recording and when I shared it with other people to a similar type of reaction. Once they saw the video they understood how invasive it was.

Q.   And then who else did you send the video to besides so I /SHEUFR at The Verge?

A.   When?

Q.   Did you hear my question?

A.   Yeah.  I said "when."

Q.   At any point.

A.   Like once the /SRERPBL published it?

Q.   No.

At any point in time before or after The Verge published it, who have you shared this video with?

A.   Sorry -- this video was The Verge's in



between video.  This isn't what they published and this wasn't what I sent them originally.  So this is, like, an editing in between version.

Q.  Okay.

A.  Do you want to know who I shared this with?

Q.  No.

The video that you created and sent to The Verge, who did you share that with?

A.  A bunch of reporters, government agencies, NLRD for sure, friends and co-workers.  I think I more shared the version on the /SRERPBL article once that was published on social media.  I don't -- I don't recall sharing the original version on social media.

Q.  Okay.

So the only thing that you shared was The Verge article?

A.  No, that's not what I said.

Q.  Okay.

So you shared the -- this video -- the one that we're looking at now Exhibit 30 -- that's the one you shared?

A.  No.  I said that's the -- that's the one that The Verge was doing the editing where they're blurring stuff and it was -- this doesn't look like

sure.

Q.   And have we -- have you agreed -- do you agree that the one or other of these two videos was the one that is in the article with The Verge?

A.   I would have to look at the video in The Verge article and compare.

ATTORNEY RIECHERT:   All right.

Let's move on.

There's another document in the chat.   It ends in 11507.   I'm marking that as Exhibit No. 32.

(Whereupon, Defendant's Exhibit No. 32 was marked for identification.)

THE WITNESS:   Also, same objections for all your prior questions as outside the scope of what the Court approved.   Apple has no jurisdiction to be asking any of this stuff.   They're just supposed to be asking about harm.

ATTORNEY RIECHERT:   And I'll take that as a standing objection.   You don't need to spend time giving that information in response to every question.

THE WITNESS:   Okay.   Thank you.

I don't see anything in chat.

ATTORNEY RIECHERT:   Okay.

Q.   You don't see -- I'll put it back down



again.  It's --

A.  I see it now.

Q.  Okay.  Thank you.

A.  Oh, this is the one from earlier.

Go ahead.

Q.  Is this a copy of a text message between you and Zoe at The Verge?

A.  Yes, I remember this one.

Q.  And August 20th, 2021, was when you sent it?

A.  Yes, that sounds right.

Q.  Okay.

And the messages in blue are the ones you sent; is that correct?

A.  That's correct.

Q.  And you tell her to remove the code numbers e-t-c; correct?

A.  Yeah.

Q.  Why did you do that?

A.  I already answered that question.  It wasn't -- the whole point was sharing the invasions of privacy.  It wasn't about sharing any other stuff.

Q.  So did you ask her to remove those numbers?

A.  I answered this question the last

the photo?

A.  No.

Q.  Okay.

You just found it on the phone when you were looking through the photos on the phone?

A.  Correct.  And that's what I was complaining.  It was taking all these photos and storing them and I had no control over it.

ATTORNEY RIECHERT:  All right.

Let's look at the next exhibit which I think is going to be No. 44.

And it's a text message.

(Whereupon, Defendant's Exhibit No. 44 was marked for identification.)

THE WITNESS:  And I also just want to note we're now nearly two-and-a-half hours in and you still have not even started asking me about harm which was the premise of your request for this deposition.

ATTORNEY RIECHERT:  I know because you're wasting so much time.  We could have got through these ten exhibits --

THE WITNESS:  No, that's not why.  None of these were approved for your -- and you've been asking bad questions.  They're framed in ways that

had to be rephrased.  And you spent 30 minutes trying to say you can't even have the deposition at all, despite the Court ordering you to have it just like we're having it, other than you asking stuff that is non-scope.

So you haven't even started your deposition you asked for, Melinda, and that's on you.

Go ahead.  What's your question?

Q.  Okay.

Is this a text message conversation you were a part of?

A.  I'm reading it.

Q.  Okay.

A.  Yeah, this was -- I sent this.

Q.  Okay.

And who was it with?

A.  I don't remember who that phone number is.  I think that might have been Adria.  Do you know who that is?  Did you look it up?

Q.  I do not.

When did you send it?

A.  So I mention the investigation with --

Q.  Okay.

When did you send it?

A.  There's no date on it, but I'm trying to

tell you if I'm mentioning to Okpo doing the investigation.  He started the investigation in July so it would have been at some point in July or August 2021.

Q.  Thank you.

The messages is in blue are the ones you wrote; correct?

A.  Correct.

Q.  And you wrote -- the last message in blue "No, as I told ER, I'm sticking around until they fire me so I can sue for the most money"; correct?

A.  I did say that which was great oversimplification of feedback I had been giving Okpo themselves about my concerns about the investigation and Apple's handling employee complaints.

ATTORNEY RIECHERT:  Next document, please, Ryan.  It's production four, No. 135.  Should be Exhibit 45.

(Whereupon, Defendant's Exhibit No. 45 was marked for identification.)

THE WITNESS:  Okay.

It's a Slack -- iMessage with Slack quotes.

ATTORNEY RIECHERT:  Okay.

Q.  Is this a Slack message that you were a

part of?

A.   Sorry -- do you want to know who this is with -- I know who the person is.

Q.   Okay.

Who is it with?

A.   Anthony Yvanovich.  He's a senior manager and software engineer.

Q.   Okay.

Is this a Slack message that you were a part of?

A.   This is a text message thread with an embedded Slack message and I was part of the Slack message, yes.

Q.   Okay.

And it was sent June 8th of 2021; correct?

A.   That looks correct.

Q.   Okay.

And messages in blue are the ones you wrote; correct?

A.   Yes.

Q.   And you wrote "Give me my money b's.  I earned it"; correct?

A.   Yes.  I sent that, which again, was an oversimplification of the dispute I was having with employee relations.

DEPONENT: ASHLEY GJOVIK, VOLUME III                         April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

Q.   And then you wrote "I want my exit package"; correct?

A.   Correct, again, as an oversimplification of a dispute I was having with employee relations.

ATTORNEY RIECHERT:  Ryan, could you put the next document which will be Exhibit No. 46 in the chat.

(Whereupon, Defendant's Exhibit No. 46 was marked for identification.)

ATTORNEY RIECHERT:

Q.   This was Exhibit 17 from the last session of your deposition.

A.   Okay.

What's the question?

Q.   Okay.

These are images from your Twitter account from August 30th, 2021; correct?

A.   There's two posts.  One of them has images. One of them has a link -- or a re-Tweet of a shared article.

Q.   And you said "Not fired yet"; correct?

A.   Where?  I didn't say that anywhere in these posts.

Q.   Okay.

A.   It appears you're referencing my profile --

my Twitter profile at that time on August 30th.  My profile looks like said "Apple senior engineering manager," in quotations, "'not fired yet,'" exclamation point.

Is that what you're referring to?

Q.  That is correct.

A.  That was apparently my profile at the time, yes, August 30th.

Q.  Okay.

And when did you add "not fired yet" to your Twitter bio?

A.  I don't recall exact.

Q.  You don't recall when you added it is what you're saying?

Did you answer the question?

THE REPORTER:  Looks like she froze.

ATTORNEY RIECHERT:  Yeah.

Do you need a break, by the way?

THE REPORTER:  No, I'm fine.

ATTORNEY RIECHERT:  Okay.  Great.

Ryan, can you put 2721 -- is that the next one I'm going to ask about -- or do we need -- can we skip all of that.

ATTORNEY BOOMS:  I can put that in.

THE WITNESS:  Can you hear me, Karen?

I, KAREN L. FERGUSON, CSR No. 5970, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision;

That the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

(  ) Reading and signing was requested.

(  ) Reading and signing was waived.

(XX) Reading and signing was not requested.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 1st day of May, 2026.

KAREN L. FERGUSON, CSR No. 5970

 **Zoe Schiffer** ⊘

im also changing my mood about maybe letting you use one of the pics it took of me

Aug 20 12:59pm



one of the least awful ones maybe

Aug 20 12:59pm

but remove any code / #s etc

Aug 20 12:59pm

a photo of me is not Apple IP

Aug 20 12:59pm

especially a photo fo me drunk making pirate faces

Aug 20 1:00pm

Hahahha

Aug 20 1:00pm

Your call but it def like illuminates how invasive this is

Aug 20 1:00pm

So you just lmk

Aug 20 1:00pm

And say which one you're ok with and I'll get the team to redact

Aug 20 1:00pm

righhhhht like did you watch the video is ent

Aug 20 1:08pm

omfg

Aug 20 1:08pm

Witness ASHLEY GJOVIK
**DEFT EXHIBIT**
**32**
Karen Ferguson, CSR  Apr 28, 2026

PL_PROD_11_11507

# EXHIBIT C

Deposition of

# Yannick Bertolus

April 17, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M. GJOVIK,               )
                               )
            Plaintiff,          )
                               )
   vs.                          )    Case No. 23-cv-04597-EMC
                               )
APPLE, INC.,                    )
                               )
            Defendant.          )
_____)




VIDEOCONFERENCE DEPOSITION OF

YANNICK BERTOLUS

VIDEO-RECORDED VIA ZOOM

Friday, April 17, 2026










Stenographically reported by:
CARRIE GIBSON, CSR No. 13937
JOB No. 10188335

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                )
                                 )
            Plaintiff,           )
                                 )
   vs.                           )    Case No. 23-cv-04597-EMC
                                 )
APPLE, INC.,                     )
                                 )
            Defendant.           )
_____)

        Deposition of YANNICK BERTOLUS, taken on

        behalf of Plaintiff via videoconference,

        commencing at 1:07 p.m. and ending at

        5:00 p.m. on April 17, 2026, reported

        stenographically by Carrie Gibson,

        California Certified Shorthand Reporter

        No. 13937.

                       APPEARANCES:


  For the Plaintiff:

    A.M. GJOVIK CONSULTING, LLC
    BY:  ASHLEY M. GJOVIK, Pro Se
    (Appearing Via Videoconference)
    2108 North Street
    Suite 4553
    Sacramento, California 95816
    (415) 964-6272
    legal@ashleygjovik.com


  For the Defendant:

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  JESSICA R. PERRY, ESQ.
    (Appearing Via Videoconference)
    1000 Marsh Road
    Menlo Park, California 94025
    (650) 614-7400
    jperry@orrick.com


            (Video-recorded via Zoom by Ms. Gjovik)

concerns about David Powers and Dan West, and that those were being looked into.

BY MS. GJOVIK:

Q.   Thank you.  Sorry.

I was trying to clarify that I wasn't asking about that part.  I was asking about the investigation into me, like, leaking or whatever the -- my misconduct with the investigations.

I'm asking when you became aware that Apple was investigating me.

A.   Oh, that was not months before.  That was days before --

Q.   Yeah, that's --

A.   Yeah.

MS. PERRY:  Hold on.  Please let him finish his answers before you interrupt him.

BY MS. GJOVIK:

Q.   Sorry.

Go ahead.

A.   Yeah.  So that's was days, not months.

Q.   Do you remember roughly how many days?

A.   We're talking a week, two weeks.  I don't know.

Q.   Okay.  It was a long time ago.

Is there anything you can share about that

**Yannick Bertolus**

Q.   We don't have to dispute what you said prior.  It will be on the record.

But if you are confirming now that that is one of the reasons, is the Verge article, can you please provide me more information about what about the Verge article -- or sorry.  Yes, we can discuss that next.

For this, though, I believe you previously said that you saw me, you saw a room behind that was black and white, and a screenshot of the UI of an application.

So does the photo embedded in this Twitter post look like the image you were referring to?

A.   It looks like -- I'm not saying it's exactly that one.  But it looks like it, yes.

Q.   Okay.  And you had said you didn't -- had not seen the text of the Twitter post prior; correct?

MS. PERRY:  Objection.  Misstates testimony.

BY MS. GJOVIK:

Q.   Okay.  Mr. Bertolus, had you seen the Twitter post in full at the time you made the termination decision?

A.   I don't recall if I saw it or not.

Q.   Okay.  I'd just like to read this text for the record.  This is a post made from the account at

misguided the investigators, the way I recollect the meeting at the time.

Q.   And do you think if the broader context is given, then -- or -- misrepresentation indicates, like, I was making false complaints there, like I'm the problem.

So can you help me understand why that limited view of the conversation was seen as, like, misconduct by me?  Was it something, like, them thinking that I was making, like, bad faith complaints?

A.   Yes.

Q.   Okay.

A.   As it relates to that text exchange, yes.

Q.   And so -- and I think you were saying something earlier about me being -- I think you said feminine, and didn't continue.

So is that a similar thing, that, like, because I was being --

A.   Sorry to cut you off.

Can you say that again?  What would I have said?  I don't remember saying that.

Q.   We don't have to go back.  We'll see what was on the actual record.  I don't know if you actually said it.  I thought you said something.  But

**Yannick Bertolus**

we'll if you have to say it.  Like, I think it was Okpo who kind of, like, opened the door.

        Would you say that if I was being flirty or acting like I was going along in the minute that if I made a complaint later that I thought Mr. West was being appropriate in a sexual nature, that I can't complain later?

        MS. PERRY:  Objections.  Vague.  Ambiguous.  Overbroad.

        MS. GJOVIK:  I'd like him to answer.

        THE DEPONENT:  That's not what I said.

BY MS. GJOVIK:

    Q.  Can you help me understand, then, what I did during that exchange that means that I can't complain about it later without it being misconduct?

        MS. PERRY:  Objection.  Vague.  Ambiguous.  Overbroad.

        MS. GJOVIK:  Okay.

        MS. PERRY:  He didn't conduct the investigation.

        MS. GJOVIK:  He said he reviewed the content, though, and made a determination.

        MS. PERRY:  No, that's not what he said.  You're misstating his testimony.

///

I, the undersigned, Carrie Gibson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness whereof, I have hereunto subscribed my name this 21st day of April, 2026.

_____
Carrie Gibson, CSR No. 13937

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
          vs. Apple Inc.
Date of Deposition: 04/17/2026

Job No.: 10188335

            I, YANNICK BERTOLUS, hereby certify

under penalty of perjury under the laws of the State of

_California_____ that the foregoing is true and correct.

            Executed this _27____ day of

_April_____, 2026, at _Carmel, California_____.




                          _W/_____

                          YANNICK BERTOLUS


NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on

this _____ day of _____, 20__,

by_____,    proved to me on the

basis of satisfactory evidence to be the person

who appeared before me.

Signature: _____ (Seal)

Docusign Envelope ID: B85E71C2-9B10-8F04-810B-2FFFB3A33382

**Yannick Bertolus**

```
DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
       vs. Apple Inc.
Name of Witness: Yannick Bertolus
Date of Deposition: 04/17/2026
Job No.: 10188335
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.
```

Page ___20___ Line __7___ Reason __3___

From ___Loretta Grow_____ to __Laura Legros_____

Page ___21___ Line __19, 20, 21__ Reason __3_____

From __Turnis_____ to __Ternus_____

Page __22_____ Line __2_____ Reason __3_____

From __Turnis's_____ to __Ternus's_____

Page __22____ Line __7___ Reason __3___

From __Turnis_____ to __Ternus_____

Page __89____ Line __18___ Reason __3___

From __image_____ to __imagine_____

Page __158____ Line __13___ Reason __3___

From __feminine_____ to __familiar_____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

___ X ___  Subject to the above changes, I certify that the
transcript is true and correct

_____  No changes have been made. I certify that the
transcript  is true and correct.

_____
YANNICK BERTOLUS

# EXHIBIT D

Deposition of

# Aleks Kagramanov

April 16, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M. GJOVIC,                      )
                                       )
                    Plaintiff,         )
                                       )
            vs.                        )  Case No.
                                       )  23-cv-04597-EMC
APPLE INC.,                            )
                                       )
                    Defendants.        )
_____)


REMOTE DEPOSITION OF

ALEKS KAGRAMANOV

VIDEO-RECORDED VIA ZOOM

Thursday, April 16, 2026


Stenographically Reported By:
Vesna Walter, CSR, RPR, CCRR
CSR No. 11989
Job No. 10188334

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
ASHLEY M. GJOVIC,                     )
                                      )
                    Plaintiff,        )
                                      )
          vs.                         )  Case No.
                                      )  23-cv-04597-EMC
APPLE INC.,                           )
                                      )
                    Defendants.       )
_____       )
```

Deposition of ALEKS KAGRAMANOV, taken on behalf of Plaintiff, with all parties appearing remotely, beginning at 8:03 a.m. and ending at 10:53 a.m. Pacific time, on Thursday, April 16, 2026, before VESNA WALTER, Certified Shorthand Reporter No. 11989.

APPEARANCES (All parties appearing remotely)


For the Plaintiff:

     AM GJOVIC CONSULTING, LLC
     By:  ASHLEY M. GJOVIC
     In Pro Per
     2108 N Street
     Suite 4553
     Sacramento, California  95816
     (415) 964-6272

For the Defendants:

     ORRICK, HERRINGTON & SUTCLIFFE LLP
     By:  MELINDA S. RIECHERT
     Attorney at Law
     1000 Marsh Road
     Menlo Park, California  94025
     (650) 614-7423
     Mriechert@orrick.com

ALSO PRESENT:

     PHILIP SCHECTER

(Video-recorded via Zoom by Ms. Gjovik)

Aleks Kagramanov

That sounds correct.

And then the response to this email chain was from me via my iCloud account at 2:10 p.m. That's two minutes later.  And I wrote:  Hi, Aleks.  Happy to help.  Please send any questions/updates via email so we can keep everything written, please.  I will respond via email as quickly as I can.  Thanks, exclamation point.

Does that -- do you recall a response like that from me?

A    Yes.

(Exhibit L was marked for identification.)

BY MS. GJOVIK:

Q    And you said you reviewed emails before this deposition.  Does this look like the email you reviewed prior to the deposition?

A    Correct.

Q    How often would an employee respond within two minutes?

A    I can't recall any response times.

Q    Do you recall if employees generally respond immediately volunteering to participate?

A    I don't recall employees responses.

Q    When you saw this response from Ms. Gjovik, this 2:10 p.m. response, what was your reaction to

Aleks Kagramanov

that response?

A    I don't recall what my reaction was at that moment.

Q    Okay.  In your professional capacity, doing this for years, looking at that email, would you characterize that email as refusal to cooperate?

A    I would determine that as refusal.

Q    Can you tell me why.

A    Because we don't facilitate investigations over email.

Q    Is that an official policy?

A    I don't recall what the specific policy is.

Q    Is there any written policy that Apple has that says that?

A    I don't recall a specific policy.

Q    And refusal to cooperate, is that an allegation of misconduct by the employee that it's being made against?

A    Refusal to cooperate, we typically go off of the information we have.

Q    So is it misconduct by the employee to refuse to cooperate or that's just something that changes the direction of the investigation process?

MS. RIECHERT:  Objection.  Lack of foundation.

BY MS. GJOVIK:

Q    But go ahead.

A    I mean, I decided that, you know, you not engaging in a live process is refusal to participate.

Q    So that was just your unilateral view and assessment?

A    It was -- so it was my determination but also in partnership with our legal counsel.

Q    Also in partnership.

Did you make your own determination prior to the determination by legal counsel?

A    I don't recall what -- what that process was, actually.

Q    Okay.  So you say you determined that it's refusal to cooperate by asking to have things in writing.  Can you explain why asking to have things in writing is a problem.

A    Yes.  I mean, the intention for having a live conversation is to ensure that we have a natural recollection of, you know, whatever the discussion is at hand relating to the investigation.  It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.

Q    Mr. Kagramanov, are you aware that all of

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/18/2026

_____
Vesna Walter
RPR, CCRR, CSR No. 11989




**Exhibit L**
**Kagramanov, A.**
04/16/26
@aptus.

**From:** Ashley Gjovik    Redacted
**Subject:** Re:
**Date:** September 9, 2021 at 3:07 PM
**To:** Aleks Kagramanov    Redacted
**Cc:** Ashley G (Work)    Redacted

Hi Aleks,

As mentioned, I'm definitely willing to participate in your investigation. ==I only asked that the discussion be kept to email== — I said nothing about not participating in the discussion at all.

I offered to help via email to ensure we have a documented recored of our conversations considering everything that's currently going on with my investigation and my complaints to the government.

I have been speaking out about work conditions, about workplace safety, concerns about discrimination & retaliation, and about concerns about intimidation and corruption (as reported to the government in public record).

I'm very concerned about what you are calling "serious allegations." Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting my access to Apple system? Or are you doing something more — and if so what?

Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.

In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.

Best,
-Ashley

—
Ashley M. Gjøvik
Santa Clara University School of Law
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
☎ Redacted

On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov <    Redacted    > wrote:

==We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.==

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino, CA 95014, USA
iPhone    Redacted
        Redacted

On Sep 9, 2021, at 2:27 PM, Ashley Gjovik <    Redacted    > wrote:

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.

This feels a little like witness intimidation, etc...

—
Ashley M. Gjøvik
 Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
☎ Redacted

PL_PROD10_EX088

On Sep 9, 2021, at 2:10 PM, Ashley Gjovik <   Redacted   > wrote:

Hi Aleks! Happy to help! <mark>Please send any questions / updates via email so we keep everything written please.</mark>

I will respond via email as quickly as I can. Thanks!

—

Ashley M. Gjøvik
 Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
📞   Redacted

On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <   Redacted   > wrote:

Hi Ashley,

<mark>This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible.</mark> If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.

<mark>As part of Apple's policy, your cooperation and participation is imperative.</mark>

Thank you in advance, and talk soon.

Best,

Aleks Kagramanov
Employee Relations
AMR Threat Assessment & Workplace Violence (TAT)
Apple
One Apple Park Way, mail stop
Cupertino. CA 95014. USA
iPhone   Redacted
   Redacted

PL_PROD10_EX089

# EXHIBIT E

Deposition of

# Ekelemchi Okpo

April 07, 2026

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M GJOVIK,                          )
                                          )
                 Plaintiff,               )
                                          )
              vs.                         )   CASE NUMBER:
                                          )   23-cv-04597-EMC
APPLE INC.,                               )
                                          )
                 Defendant.               )
_____)










REMOTE RECORDED DEPOSITION OF EKELEMCHI OKPO

Tuesday, April 7, 2026

VIA ZOOM VIDEOCONFERENCE








STENOGRAPHICALLY REPORTED BY:

Haleema Saleh

RPR, CA CSR 14506

JOB NUMBER: 10188180

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M GJOVIK,                    )
                                   )
               Plaintiff,          )
                                   )
          vs.                      )  CASE NUMBER:
                                   )  23-cv-04597-EMC
APPLE INC.,                        )
                                   )
               Defendant.          )
_____)




          DEPOSITION of EKELEMCHI OKPO, taken on behalf

of the plaintiff, beginning at 1:01 p.m. on Tuesday,

April 7, 2026, before Haleema Saleh, Certified

Shorthand Reporter No. 14506.

APPEARANCES:

(ALL COUNSEL APPEARING VIA ZOOM VIDEOCONFERENCE)


For the Plaintiff:
            A.M. GJOVIK CONSULTING, L.L.C.
            BY:  ASHLEY M. GJOVIK, ESQ.
            2108 North Street, Suite 4553
            Sacramento, California  95816
            (415) 964-6272
            Ashleymgjovik@protonmail.com


For the Defendant:
            ORRICK, HERRINGTON & SUTCLIFFE LLP
            BY:  MELINDA RIECHERT, ESQ.
            1000 Marsh Road
            Menlo Park, California  94025
            (650) 614-7400
            Mriechert@orrick.com


ALSO PRESENT:

            ISELA PEREZ, ESQ.

**Ekelemchi Okpo**

into those concerns.

Q.    The earlier investigation or one concurrent with your investigation?

A.    The earlier investigation.

Q.    Okay.  And then you're saying that you did not investigate Ms. Gjovik's complaints about retaliation specific to EH&S complaints?

MS. RIECHERT:  Okay.  What he did in his investigation is privileged, and I am not going to let him answer about that.

MS. GJOVIK:  He sent emails saying he wasn't investigating it.  We can pull it up now, or he can just answer.

MS. RIECHERT:  If you want to show him the email, that's fine.  I thought it related to EH&S complaints, not retaliation for raising EH&S complaints.  But you can show us the email.

BY MS. GJOVIK:

Q.    Okay.  So -- so this one is Exhibit AA.  This is an email from August 3rd.  And --

A.    Can you make that a bit bigger?

Q.    Yeah.  Sorry about that.

MS. RIECHERT:  I'll second that one.

(Exhibit AA was marked for identification.)

BY MS. GJOVIK:

Q.    Okay.    This is an email you sent -- I had sent an email asking about the scope of the investigation, and you had said you were focused on the new concerns Ms. Gjovik raised since Jenna closed out her investigation on June 3rd.    The items listed below and in Jenna's issue confirmation email were previously investigated, and Apple took corrective action in response to her investigative findings.    As we discussed, if you have new information, please let us know.

And then you said, "Additionally, EHS is focused on reviewing your building and physical workplace safety issues.    They will be in contact with you further to address those concerns."

So I think Melinda is actually correct there. That was saying that just EHS was looking into it, not Jenna.    There was no mention that Jenna was looking into anything.

So that raised the question, again, then, of was there anyone at Apple investigating Ms. Gjovik's complaints about retaliation for raising EHS issues between July and September 2021?

MS. RIECHERT:    I think he already answered that; so I'll object to asked and answered.    He

A.   Yes.

Q.   Yeah.  And then the -- above that is a response sent my Ms. Gjovik.

Do you remember Ms. Gjovik's response?

A.   Yeah.

Q.   Yeah.  Do you remember Ms. Gjovik asking you to keep communications in writing?

A.   Yes.

Q.   Yes.  Did you ever agree or disagree to that request?  Let me rephrase.

Did you ever respond directly to Ms. Gjovik's request to keep communications in writing?

A.   No.

Q.   Okay.  And then, Mr. Okpo, you -- do you remember contacting Ms. Gjovik again on September 7th?

A.   Yes.

Q.   Yeah.  So -- and is it your recollection that there was no communication in response to Ms. Gjovik's response on the third until your response on the 7th?

A.   Yes.

Q.   Yeah.  This is Exhibit EE.

(Exhibit EE was marked for identification.)

BY MS. GJOVIK:

Q.   And on September 7th, Mr. Okpo said, "Based on

interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information."

Mr. Okpo, what did you mean by that?

A.   I was going through my investigation and I found some additional documents that were inconsistent with how you had laid out your complaints specific to the allegation that Dan West pressured you into engaging with a sous chef.

Q.   That was the one thing you were reaching out about?

A.   Yes.

Q.   And that was the thing you were reaching out about on the 3rd and 7th?

A.   It was -- yes.

Q.   Okay.  And then do you recall Ms. Gjovik's response on the 7th, which is shared on the screen right now from Exhibit EE, an email response at 6:45 p.m.?

A.   Yes.

Q.   And Ms. Gjovik asked you, again, if we could keep communication in writing.  Says she is happy to discuss.

Did you ever respond to her email?

A.   This specific email, no.

**Ekelemchi Okpo**

Q.    Mr. Okpo, were you opposed to communicating in writing?

A.    The work that we do, investigating claims, it would be very difficult to get to the heart of the issue and fact-find via email.  What I mean by that is, as investigators, similar to what you're doing here, it's important to receive answers or -- from the -- the person you're interviewing in realtime so that you could ask follow-up questions where appropriate.  And so it wouldn't have -- it's just not part of my process or our ER investigate process to conduct investigations via email.

Q.    Do you -- do you feel like you understood why Ms. Gjovik was asking to keep things in writing?

A.    No.

Q.    No.  Were you aware at this point, either the email you sent on the 3rd or the 7th, that Ms. Gjovik had already filed complaints with the EEOC, the California DFEH, the NLRB, and/or the California Department of Labor?

A.    Only through counsel.

Q.    Wouldn't it be reasonable to assume that someone who had filed complaints with the government about the same issues would want documentation to share with the government about the communications about those

**Ekelemchi Okpo**

issues?

MS. RIECHERT:  Objection.  Speculation.

BY MS. GJOVIK:

Q.   Mr. Okpo, have you had other investigations where employees had asked to keep communications in writing?

A.   Yes.

Q.   Yeah.  Have you ever said yes and agreed?

A.   During the actual investigation process, I've been consistent around the need to have live conversations.

Q.   What if -- and have counsel for employees, if they're already preparing to sue Apple, have they also asked sometimes to keep things in writing rather than have oral conversations?

MS. RIECHERT:  Counsel for employees?

MS. GJOVIK:  Yes.

MS. RIECHERT:  Okay.

BY MS. GJOVIK:

Q.   Because I specified earlier that employees asked, so I just want to be sure that I'm also including the other group.

A.   So to make sure I understand your question, are you asking me if counsel for employees have direct -- have asked me directly to keep communication

**Ekelemchi Okpo**

MS. GJOVIK:  He can say that, and then if it shows he's lying later, we can point that out.

MS. RIECHERT:  Well, what's the question?  Is it a coincidence that two people send emails with the same language at the same time?

MS. GJOVIK:  That there's no coordination, there's no, you know, multiple people or same people drafting those emails, they were in complete isolation with very, very similar language and just hours timed apart.

MS. RIECHERT:  Yeah.  Assumes facts not in evidence.  Lack of foundation.

BY MS. GJOVIK:

Q.   Yup.  Just a coincidence, Mr. Okpo?

A.   I don't know how to answer that question.  I was not aware of any investigation into your conduct.

Q.   Okay.  And then what was the concerns that you wanted to talk to Ms. Gjovik about so urgently?  What was the -- the inconsistencies?  Can you tell me please?

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  No.  He never said what the inconsistencies were.

MS. RIECHERT:  Yes, he did.  He can answer again.

MS. GJOVIK:  I think the general topic was

**Ekelemchi Okpo**

sous chef, but he did not say anything more, and I think it is material what exactly he thought the inconsistency was.

MS. RIECHERT:  Yes.  He can answer that.

BY MS. GJOVIK:

Q.    Yeah.

A.    Okay.  I found that there were misrepresentations of facts based on your framing of the concerns around Dan allegedly pressuring you into romantically engaging with a sous chef.

Q.    What were the conflicting facts?

A.    The claim that Dan pressured you into engaging with the sous chef.  However, I found the full text thread where you use language like "the sous chef being cute," you know, at one point you mentioned that you had met another gentleman, and, sorry, it wouldn't work out with the sous chef.  And Dan was very explicit "no pressure from me at all."

And so two very inconsistent scenarios there.

Q.    Okay.  Mr. Okpo, in your experience, do sometimes employees go along with a behavior by their superiors that sometimes they feel is inappropriate, but they might not feel comfortable objecting in realtime about that conduct, but then complain later?

MS. RIECHERT:  Objection.  Improper

CERTIFICATE OF REPORTER

I, Haleema Saleh, a Certified Shorthand Reporter, do hereby certify:  That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me At the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

In witness whereof, I have hereunto Subscribed my name.

Dated: April 10, 2026

_____

Haleema Saleh, RPR, CSR No. 14506

# Re: Notes from our Friday call

---

**From: Ekelemchi Okpo <**     Redacted     **>**         Tue, Aug 3, 2021 at 12:35 PM EDT (GMT-04:00)

To: Ashley Gjovik <     Redacted     >

Cc: Antonio Lagares <     Redacted     >

**Exhibit AA**

**Okpo, E.**

04/07/26

@ aptus.

Hi Ashley,

Correct, I'm focused on the new concerns you've raised since Jenna closed out her investigation with you on June 3, 2021. The items listed in your email below and in Jenna's April 27, 2021 issue confirmation email (attached below) were previously investigated, and Apple took corrective action in response to her investigation findings. As we discussed, if you have new information related to Jenna's 4/27 issue confirmation email, please let me know.

Additionally, EHS is focused on reviewing your building and physical workplace safety issues. They will be in contact with you to further address those concerns.

☐
Best,

Ekelemchi Okpo
Corporate Employee Relations
     Redacted

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

> On Aug 3, 2021, at 11:34 AM, Ekelemchi Okpo <    Redacted    > wrote:
>
> Hi Ashley,
>
> Correct, I'm focused on the new concerns you've raised since Jenna closed out her investigation with you on June 3, 2021. The items listed in your email below and in Jenna's April 27, 2021 issue confirmation email (attached below) were previously investigated, and Apple took corrective action in response to her investigation findings. As we discussed, if you have new information related to Jenna's 4/27 issue confirmation email, please let me know.
>
> Additionally, EHS is focused on reviewing your building and physical workplace safety issues. They will be in contact with you to further address those concerns.

---

## Attachments

- Re: Notes from our Friday call 2.eml

**From:** Ashley Gjovik     Redacted
**Subject:** Re: Meeting Request
**Date:** September 7, 2021 at 6:45 PM
**To:** Ekelemchi Okpo (ER)    Redacted



Exhibit EE
**Okpo, E.**
04/07/26
aptus.



AG

Hi Ekelemchi!

Happy belated Labor Day! I hope you're well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I'd like to request that we please keep our exchanges in writing.") Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you're implicitly denying my request otherwise — and because you're an attorney and you're in an adversarial position to me, if you are denying my request, I'd also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?

**II. I'm also awaiting your reply about my review**

> I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4 and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

**III. I'm also waiting your reply about the safety of my workplace**

> Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will not answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

Thanks!
-Ashley

P.S. Not sure if you've heard yet, maybe they didn't tell you - but I found Superior Court for the State of California for the County of Santa Clara Case 18CV330796 (2018) & 18CV330922 (2019) with for the NOTICE OF SETTLEMENT OF ENTIRE CASE for Retaliation, Failure to take Reasonable Steps to Investigate, Failure to take Reasonable Steps to Prevent Retaliation, Constructive Termination in Violation of Public Policy, & Intentional Infliction of Emotional Distress against Apple Inc, Dan West, and Employee Relations. Please feel free to respond now….otherwise we'll def address this later.

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎     Redacted

> On Sep 7, 2021, at 5:42 PM, Ekelemchi Okpo <   Redacted   > wrote:
>
> Ashley-
>
> Thank you for your email.
>
> Based on interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information.
>
> Please let me know when you have availability to connect tomorrow or later this week.
>
> 
> Best,
>
> Ekelemchi Okpo

PL-PRD-8-0157

Ekelemchi Okpo
Corporate Employee Relations

Redacted

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 3, 2021, at 4:10 PM, Ashley Gjøvik <     Redacted     > wrote:

Hi Ekelemchi. I hope you're well.

As mentioned, I'm not actively checking messages on work devices on this indefinite leave situation, so the 2hr notice of your text wasn't enough. (At 8:36am you texted me "Hi Ashley, Good morning. I will like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time with for you? Thank you.") As mentioned, please send email to my personal address if you need a quick response.

<PastedGraphic-1.png>

I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.

As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.

I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) —  I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.

On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you that on 8/3 that I was concerting with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.

Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.

Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

-Ashley

Ashley

—
Ashley M. Gjøvik
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎  Redacted

On Sep 3, 2021, at 10:07 AM, Ekelemchi Okpo <    Redacted    > wrote:

Hi Ashley,

I wanted to follow up on the text message I sent this morning. Are you available to connect with me today at 10:30am PT? If not, please suggest a time and I will be happy to reschedule.

Thank you.

 
Best,

Ekelemchi Okpo
Corporate Employee Relations
    Redacted

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

# EXHIBIT F

Deposition of

# Robert McKeon Aloe

April 03, 2026

Volume 1

Ashley Gjovik

vs.

Apple Inc.



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                  ) Case No. 23-cv-04597-EMC
                                   )
                Plaintiff,         )
                                   )
v.                                 )
                                   )
APPLE INC.,                        )
                                   )
                Defendant.         )
_____)


DEPOSITION OF ROBERT MCKEON ALOE

VOLUME 1, PAGES 1 THROUGH 107

FRIDAY, APRIL 3, 2026


Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10187852

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M. GJOVIK,                    ) Case No. 23-cv-04597-EMC
                                     )
                Plaintiff,           )
                                     )
v.                                   )
                                     )
APPLE INC.,                          )
                                     )
                Defendant.           )
_____)



        DEPOSITION OF ROBERT MCKEON ALOE commencing at the

hour of 1:04 p.m., on Friday, April 3, 2026, taking place

over the Zoom application before Kathleen Madden Keenaghan,

Certified Shorthand Reporter Number 14577, in and for the

State of California.

APPEARANCES

For the Plaintiff:

BY:  ASHLEY GJOVIK (PRO SE)
A.M. GJOVIK CONSULTING, L.L.C.
2108 N Street, Suite 4553
Sacramento, CA 95816
Telephone: (415) 964-6272

For the Defendant:

BY:  MELINDA SHENA RIECHERT (SBN 65504)
BY:  KATHRYN MANTOAN (SBN 239649)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025-1015
Telephone: 650-614-7423
Email: mriechert@orrick.com

(Exhibit 35 was marked for identification.)

BY PRO SE GJOVIK:

Q    I don't either.  I think it is a good article.  And Plaintiff Exhibit 35, production 7101, are you aware of this article?  It is called Apple Cares about Privacy Unless You Work At Apple.  It was published at the Verge on August 30th, 2021.

A    Yes.  I'm aware of this article.

Q    Yeah.  Did you think this included confidential information?

A    Could you just scroll down?

Q    I'm sorry.  I'm not going to be able to go through the whole thing.  She will have to wrap up, but based on your recollection of the article, do you remember ever thinking that it included confidential information specifically about face ID and Gobbler and Glimmer?

A    Were there images in this article?

Q    There was -- yes, of the sequences.  I don't think they show up on this though.

A    Okay.

Q    But did you, assuming since you work on --

A    When I saw this article and saw those images, I thought confidential information had been leaked.

Q    Why?

A    Because those images are confidential.

Q    So the image I showed you earlier on our exhibit of my face, you thought that was confidential?

A    Yes.

Q    Why?

A    Because it shows what the customer doesn't see in terms of the camera quality and resolution, as well as the flash quality and resolution.  And those things are confidential in how our algorithm functions and how our algorithm could be broken by hackers.

Q    Okay.  So how does that harm Apple by that information being revealed?

A    It gives hackers a better idea of a piece of information they would need to break into face ID, and it gives more information to our competitors on how, if they wanted to implement face ID themselves, how they would be able to do it.

Q    How would they use that image to get that information?

A    That information would be -- that image would be helpful for how our camera system works, and our flash system works in terms of the resolution and the quality, and it would be helpful information for them.

ATTORNEY RIECHERT:  I'm going to instruct you not to answer any confidential information beyond that.

PRO SE GJOVIK:  I cannot hear you, Melinda.

ATTORNEY RIECHERT:  I'm telling him not to answer any confidential information about it beyond that.  He is giving you the nonconfidential version.

PRO SE GJOVIK:  Okay.  Can you -- one last question.  Can you distinguish for me why that image would be confidential, but none of the other information that you shared that you shared prior was not confidential?

A    Sorry.  Could you repeat the question?

Q    Actually, I am going to asking a new question.  Are you aware that Apple's state of justification to my termination is that image that you are mentioning, and you are saying is confidential?

A    Is that -- I think so.

Q    Can you say that more clearly please?

A    I think so.

Q    Yeah.  So would you be concerned, if you were to say it's not confidential, would you feel like it might upset Apple because that is their stated justification supposedly for legitimately terminating me?

ATTORNEY RIECHERT:  Objection.  Assumes facts not in evidence.  Misstates his testimony.

BY PRO SE GJOVIK:

Q    He just admitted he thinks so, that that is Apple's -- that its public that Apple's stated justification for terminating me.  And it's my right to ask him if is

concerned if he says it was not confidential, or if he would be afraid of Apple for retaliation for saying that?

ATTORNEY RIECHERT:  You totally lost me.  Can you ask the question again?

BY PRO SE GJOVIK:

Q    I already asked the question.  He can answer the question I asked.

A    I -- I expect if I publish those images, I would be fired.

Q    And so if Apple ever published those images in their own advertisements of inside that app and how it worked?

ATTORNEY RIECHERT:  Objection.  Improper hypothetical.  Vague.

THE WITNESS:  I don't know.  I just know if I had published those images, I would expect to be fired.  And if I had employees reporting to me that published those images, I would go through the similar process of taking it to the people team because it is a violation of confidentiality.

BY PRO SE GJOVIK:

Q    Thank you for answering my questions, Mr. McKeon.  I appreciate your time.  We need to let our court reporter go. I am complete with this deposition.

THE COURT REPORTER:  And Counsel Reichert, would you like a copy of the transcript?  Sorry?

ATTORNEY RIECHERT:  Yes.  I would like an expedited

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 7th day of April, 2026.

_____

Kathleen Madden Keenaghan

CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)