Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

> **Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

> **Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S REQUEST FOR JUDICIAL NOTICE (DKT. 373); AND PLAINTIFF'S CONTINGENT REQUEST FOR JUDICIAL NOTICE OF COMPANION PUBLIC DOCUMENTS UNDER FED. R. EVID. 106 AND 201**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

## TABLE OF AUTHORITIES

***Cases***

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988)

*Doe v. Google, Inc.*, 54 Cal. App. 5th 948 (2020)

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)

*Heckler v. Chaney*, 470 U.S. 821 (1985)

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)

*M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483 (9th Cir. 1983)

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)

*NLRB v. United Food & Commercial Workers, Local 23*, 484 U.S. 112 (1987)

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)

*Sheet Metal Workers Local 28 (American Elgen)*, 306 NLRB 981 (1992)

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)

*Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980)

*United States v. Liera-Morales*, 759 F.3d 1105 (9th Cir. 2014)

*United States v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)

*Univ. of Tenn. v. Elliott*, 478 U.S. 788 (1986)

*Vaca v. Sipes*, 386 U.S. 171 (1967)

***Statutes, Rules, and Constitutional Provisions***

5 U.S.C. §§ 554, 556, 557

1

29 U.S.C. § 153(d)

29 U.S.C. § 160(a), (e), (f)

Cal. Const. art. I, § 1

Cal. Code Civ. Proc. § 1001

Cal. Gov't Code § 12964.5

Cal. Lab. Code §§ 96(k), 98.6, 232, 232.5, 1102.5, 1102.6, 6310

Fed. R. Civ. P. 56(a)

Fed. R. Evid. 106, 201, 401, 402

### *Other Authorities*

Restatement (Second) of Judgments § 27 (1982)

NLRB General Counsel Memorandum 23-02, *Electronic Monitoring and Algorithmic Management of Employees Interfering with the Exercise of Section 7 Rights* (Oct. 31, 2022)

NLRB General Counsel Memorandum 25-05, *Rescission of Certain General Counsel Memoranda* (Feb. 14, 2025)

Harry I. Johnson, III & David R. Broderdorf, *Electronic Monitoring and Algorithmic Management: Permissible Labor Practice or Unlawful Oversight?*, Morgan Lewis LawFlash (Nov. 8, 2022)

Harry I. Johnson, III, Mark L. Stolzenburg & Laura V. Spector, *New NLRB Acting General Counsel's Actions and Increased White House Oversight Signal Shift in Enforcement*, Morgan Lewis LawFlash (Feb. 24, 2025)

## I.    INTRODUCTION

1.    Plaintiff Ashley Gjovik disagrees with Defendant Apple Inc.'s intended use of the NLRB documents in its summary judgment briefing, but **does not oppose** judicial notice of the Settlement Agreement attached as Exhibit A to Defendant's Request. (Dkt. 373.) The Settlement, in NLRB Case 32-CA-284428, was Defendant's first national settlement with the NLRB. (Dkt. 246 at 7.) It required Defendant to revise more than a dozen workplace policies governing confidentiality, surveillance, and employee rights to discuss working conditions. (*Id.*; Settlement Agreement, Dkt. 373-1 at PDF pp. 5-9.) Plaintiff orally referenced the Settlement at the August 5, 2025 Status Conference (Dkt. 246 at 7), attached it to her February 17, 2026 Notice of Pendency (Dkt. 278), and substantively cited it in her motion for summary judgment and supporting declaration (Dkts. 359-360). Plaintiff supports the Court's consideration of the Settlement.

2.    Plaintiff **opposes**, however, Defendant's attempt to use judicial notice to extract binding or persuasive effect from the September 25, 2025 partial Withdrawal of allegations in NLRB Cases 32-CA-282142 and 32-CA-283161 — a separate proceeding from the case in which the Settlement was reached. The Withdrawal is a discretionary, unreviewable, pre-hearing prosecutorial decision, characterized as such by the agency itself, and Defendant's proposed use of it would call on this Court to make NLRA determinations it has no jurisdiction to make. For the reasons set out below:

3.    **(1)**    The Withdrawal is a discretionary, informal, and unreviewable agency dismissal. The NLRB itself characterized it in writing as "a purely 'prosecutorial' decision to withdraw a complaint, i.e., effectively a dismissal," issued pursuant to the Acting General Counsel's "broad prosecutorial discretion." (May 8, 2026 Appeal Denial at 1.)

4.    **(2)**  No formal APA adjudication occurred. No ALJ hearing was held; no findings of fact or conclusions of law were issued; and the Withdrawal does not meet even the threshold of reasoned decisionmaking required of informal agency action.

5.    **(3)**  The Withdrawal coincided with — and does not acknowledge — the February 14, 2025 rescission of the General Counsel memorandum that had defined the agency's position on the conduct underlying the original complaint. The Withdrawal contains no findings of fact, no reference to evidence, no legal citations, and no explanation of the agency's midstream reversal.

6.    **(4)**  The NLRB has exclusive original jurisdiction over unfair labor practice claims, 29 U.S.C. § 160(a), and review of NLRB orders lies in the courts of appeals, 29 U.S.C. §§ 160(e), 160(f). This Court has no jurisdiction to make NLRA determinations or to review NLRB withdrawals. A non-finding by the agency on its own claims therefore does not map onto Plaintiff's claims under California Labor Code §§ 1102.5, 98.6, 232.5, 96(k), and 6310, and under *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980), which arise under independent state law with different elements.

7.    **(5)**  Defendant asks the Court to take notice of the Withdrawal letter alone, while omitting the active reissued complaint pending in the same NLRB case, the original consolidated complaint, Plaintiff's administrative appeal, and the agency's denial of that appeal. Federal Rule of Evidence 106 requires that all of these be considered together if the Withdrawal is to be considered at all.

8.    Plaintiff therefore submits this Opposition together with a **contingent and conditional** request that, if (and only if) the Court is inclined to take notice of any portion of the Withdrawal record presented by Defendant, the Court also take judicial notice under Federal

4

Rules of Evidence 106 and 201 of the companion public documents identified in Section V below (Exhibits A through J). If the Court denies Defendant's request as to the Withdrawal, Plaintiff's contingent request becomes moot and need not be reached.

## II.    LEGAL STANDARDS
### A.    JUDICIAL NOTICE UNDER FEDERAL RULE OF EVIDENCE 201.

9.      Federal Rule of Evidence 201(b) authorizes judicial notice only of facts "not subject to reasonable dispute" because they are generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Subsection (e) guarantees the opposing party an opportunity to be heard. Judicial notice is a *substitute for proof* of indisputable facts — not a procedural device for resolving contested ones.

### B.    JUDICIAL NOTICE OF AGENCY FINDINGS AND DOCUMENTS.

10.     Within the Ninth Circuit, the existence of a public record may be noticed, but the **truth** of disputed factual assertions inside that record may not:

11.     Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth.

12.     *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (a court "may not . . . take judicial notice of facts favorable to [d]efendants that could reasonably be disputed"); *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) (administrative determinations not judicially noticeable for their truth).

### C.    JUDICIAL NOTICE AT SUMMARY JUDGMENT.

13.     On a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact," with all reasonable inferences drawn in favor of the non-moving party. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). A request for judicial notice filed in support of summary judgment cannot be used to convert disputed facts into undisputed ones; doing so would "resolv[e] competing theories" against the non-moving party without the procedural safeguards Rule 56 requires. *Khoja*, 899 F.3d at 998.

14.     Defendant's RJN identifies its stated relevance as "contradict[ing] Plaintiff's prior assertion in this case," citing two of Plaintiff's prior filings: Plaintiff's Motion for Discovery Sanctions Under Rule 26(g) (Dkt. 302) and Plaintiff's Opposition to Defendant's Motion to Enforce Protective Order (Dkt. 306). (Dkt. 373 at 2-3.) Both are discovery filings, separate from the summary judgment briefing the RJN is filed to support. The RJN therefore identifies a use that is not anchored to the proceedings the RJN supports, and that, in any event, would require notice of disputed factual propositions for purposes of contradicting Plaintiff's substantive arguments — the exact use *Khoja* and *Lee* prohibit.

### D.     LIMITED AUTHORITY OF DISTRICT COURTS OVER NLRA MATTERS.

15.     The NLRA vests the Board with exclusive original jurisdiction over unfair labor practice cases. 29 U.S.C. § 160(a); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–45 (1959). Review of final Board orders lies in the courts of appeals, and there only. 29 U.S.C. §§ 160(e), 160(f). District courts therefore have neither original jurisdiction to make NLRA Section 7 determinations nor appellate jurisdiction to review Board orders or General Counsel actions. To the extent any NLRA-related significance the RJN's documents may carry depends on the Court treating them as Section 7 adjudications, the Court is not the forum in which that significance can be established.

### III.     THE SETTLEMENT AGREEMENT IN CASE 32-CA-284428: NOTICE IS APPROPRIATE; DEFENDANT'S INFERENTIAL USE IS NOT

16. The Settlement, in NLRB Case 32-CA-284428, is a separate proceeding from the cases in which Defendant seeks notice of the Withdrawal (Cases 32-CA-282142 and 32-CA-283161). It was Defendant's first national settlement with the NLRB. (Dkt. 246 at 7.) Under it, Defendant agreed to revise more than a dozen workplace policies — including the Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Workplace Searches and Privacy Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, and the Confidentiality Obligations Upon Termination of Employment statement — and to post notice of employee rights at Defendant's facilities. (Settlement Agreement, Dkt. 373-1 at PDF pp. 5-9.) The Settlement is presently in effect.

17. Plaintiff has previously placed the Settlement before the Court: she referenced it at the August 5, 2025 Status Conference (Dkt. 246 at 7), attached it to her February 17, 2026 Notice of Pendency (Dkt. 278), and substantively cited it in her motion for summary judgment and supporting declaration (Dkts. 359-360). The Settlement is properly the subject of judicial notice as to its existence and terms, and Plaintiff supports the Court's consideration of it.

18. What Defendant cannot do, on the four corners of its own RJN, is read into the Settlement a per-employee carve-out that the text does not contain. Three observations from the document itself control this point.

19. **First,** the Settlement's policy commitments are unconditional in pertinent part. Defendant agreed: WE WILL NOT promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple." (Settlement, Dkt. 373-1 at PDF p. 8.) That commitment is not qualified by Section 7, not qualified by employee, not qualified by time-of-conduct. The Settlement contains a parallel list of policies Defendant has rescinded and revised — the "WE HAVE" provisions — which are

agency-supervised admissions that the pre-revision versions of Defendant's CIPA, Business Conduct Policy, Workplace Searches Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, and Confidentiality Obligations Upon Termination statement each contained overbroad definitions that the agency required Defendant to clarify or to limit. (*Id.* at PDF pp. 8-9.) The Settlement is what it says it is: a national, agency-supervised admission that Defendant's pre-revision policies were not lawful as written, and a binding commitment that Defendant will not enforce them as written going forward.

20.    **Second,** the Settlement's scope clause is about which charges are settled, not which employees are covered. The clause provides that the Settlement "settles only the allegations in the above-captioned case(s) . . . and does not settle any other case(s) or matters, including, but not limited to, 32-CA-282142, 32-CA-283161…." (Settlement, Dkt. 373-1 at PDF p. 6.) That clause prevents the Settlement from being read to resolve the retaliation cases against Defendant; it does not write any individual employee out of Defendant's unconditional national policy commitments. Defendant's RJN treats the clause as if it did the latter.

21.    **Third,** Defendant's own stated purpose for the RJN exposes impermissible use. Defendant states the documents are submitted "because they contradict Plaintiff's prior assertion in this case that Apple agreed before the NLRB not to enforce agreements like the one Plaintiff signed that require Apple employees to protect confidential product-related information, and her assertion that public disclosure of confidential product-related information is protected concerted activity under the NLRA." (Dkt. 373 at 2.) That is a written representation that Defendant seeks judicial notice for purposes of substantively contradicting Plaintiff's contested arguments — the precise use Rule 201 prohibits. *Khoja*, 899 F.3d at 999; *Lee*, 250 F.3d at 689–90.

22. The inferential chain Defendant must walk to reach the result it apparently wants from this RJN can be stated openly: take notice of the Settlement; read its commitments as applying only to Section 7-protected activity; take notice of the Withdrawal; treat it as a determination that Plaintiff's conduct was not Section 7-protected; conclude on that basis that the Settlement's policy commitments do not reach Defendant's enforcement of its (pre-revision) confidentiality definitions against Plaintiff. Each step except the first requires judicial notice to do work it cannot do.

23. The Withdrawal letter, by its own terms, does not adjudicate Section 7 status — it says only that "even if a prima facie case could be established," Defendant "can likely meet its burden." (Sept. 25, 2025 Order at 2.) That is an express refusal to make the determination Defendant's chain requires. And the result that chain would, if drawn, produce — a non-adjudicative agency document treated by this Court as displacing California whistleblower protections — is foreclosed by *Doe v. Google, Inc.*, 54 Cal. App. 5th 948, 965–69 (2020), which held that an informal NLRB settlement of overbroad confidentiality policies did not preempt California Labor Code claims arising from the same policies.

24. California has, in any event, regulated employee speech, disclosure, and confidentiality independently of and above the federal floor. *See* Cal. Const. art. I, § 1; Cal. Lab. Code §§ 232, 232.5, 96(k); Cal. Gov't Code § 12964.5; Cal. Code Civ. Proc. § 1001. Plaintiff therefore supports judicial notice of the Settlement for what its text actually says. Plaintiff opposes the inferences Defendant would draw from it in its summary judgment briefing.

## IV. THE WITHDRAWAL OF CHARGES IN CASES 32-CA-282142 AND 32-CA-283161 CANNOT SUPPORT PRECLUSION OR ANY BINDING EFFECT

9

A.       **THE WITHDRAWAL IS DISCRETIONARY, INFORMAL, AND UNREVIEWABLE, AND THE AGENCY HAS SO STATED.**

25.      The NLRA vests the General Counsel with "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints." 29 U.S.C. § 153(d). The Supreme Court has long read that provision to commit pre-hearing dismissal decisions to unreviewable prosecutorial discretion. *Vaca v. Sipes*, 386 U.S. 171, 182 (1967); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975); *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985). The Court has further held that "[u]ntil the hearing begins, settlement or dismissal determinations are prosecutorial" in nature and not subject to judicial review. *NLRB v. United Food & Commercial Workers, Local 23*, 484 U.S. 112, 125–26, 130–33 (1987).

26.      Those doctrines control here because the agency itself has classified the Withdrawal that way. The May 8, 2026 letter from the Office of Appeals denying Plaintiff's administrative appeal states: Under Section 3(d) of the National Labor Relations Act, the General Counsel has unreviewable final authority, which is "not only authority to decide whether to issue unfair labor practice complaints, but also, in some circumstances, authority extending beyond the point at which a complaint is issued," including "a purely 'prosecutorial' decision to withdraw a complaint, i.e., effectively a dismissal." (May 8, 2026 Appeal Denial at 1 (citing *Sheet Metal Workers Local 28 (American Elgen)*, 306 NLRB 981, 982; *NLRB v. Food & Commercial Workers*, 484 U.S. 112, 122-23, 125-26 (1987)).)

27.      The agency expressly invoked the Acting General Counsel's "broad prosecutorial discretion" and declined further review. (*Id.*) Defendant cannot now ask this Court to treat as adjudicative what the agency itself — in writing, with citations — has characterized as a purely prosecutorial decision.

28.     The procedural posture of this Withdrawal is documented in the record of these proceedings. At the August 5, 2025 Status Conference, the Court asked the status of the NLRB matter. (Dkt. 246 at 7.) Plaintiff explained that the then-General Counsel-designate of the NLRB had been listed as counsel for Defendant in the original December 18, 2024 Consolidated Complaint in these NLRB cases; that this designate had withdrawn from representing Defendant upon her nomination; and that the NLRB hearing in this matter had been postponed contemporaneously with that change in agency leadership. (*Id.* at 7-8.)

29.     Defendant's counsel in this action represented that they could not speak further to the agency proceedings, confirming only the postponement. (*Id.* at 8.) The General Counsel-designate was subsequently confirmed by the Senate on December 18, 2025 and sworn in as General Counsel on January 7, 2026. *See* NLRB, *General Counsel Biography*, https://www.nlrb.gov/bio/general-counsel. The May 8, 2026 appeal-denial letter at issue here issued under her tenure. The partial Withdrawal itself issued on September 25, 2025 under the Acting General Counsel. (Order Withdrawing Certain Allegations, Sept. 25, 2025; Ex. C to Dkt. 278.) Plaintiff has further documented the procedural history in her Notice of Pendency, including the agency's subsequent communication that Defendant "has expressed a strong interest in settling" the remaining cases. (Dkt. 278 at 4-5 & Ex. B.) These circumstances do not transform the Withdrawal's prosecutorial character into an adjudicative one. They confirm it — and they preclude Defendant from presenting the Withdrawal in this Court as a routine merits determination divorced from the documented circumstances of its issuance.

30.     Preclusion and estoppel doctrine require **adjudicatory** agency action: an agency "acting in a judicial capacity" that "resolve[s] disputed issues of fact . . . which the parties have had an adequate opportunity to litigate." *United States v. Utah Constr. & Mining Co.*, 384 U.S.

394, 422 (1966); *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986). A discretionary, unreviewable pre-hearing dismissal does not satisfy any element of that standard.

### B.    THE WITHDRAWAL LACKS THE REASONED BASIS REQUIRED FOR ANY PERSUASIVE EFFECT, AND COINCIDED WITH AN UNACKNOWLEDGED RESCISSION OF THE GOVERNING GENERAL COUNSEL MEMORANDUM.

31.    Whatever the form of agency action, the action must reflect reasoned decisionmaking to receive any binding or persuasive weight. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

32.    No formal APA adjudication occurred. The APA's formal-hearing requirements, 5 U.S.C. §§ 554, 556, 557, apply only when adjudication is "required by statute to be determined on the record after opportunity for an agency hearing," and the scheduled hearing was cancelled before any such proceeding could begin. No ALJ presided; no findings of fact or conclusions of law issued.

33.    The Withdrawal also issued against a documented policy-shift context that the letter does not acknowledge. On October 31, 2022, the General Counsel issued GC Memorandum 23-02, *Electronic Monitoring and Algorithmic Management of Employees Interfering with the Exercise of Section 7 Rights* — the agency's authoritative statement of position on the conduct at the center of the original consolidated complaint. (NLRB, GC 23-02, Oct. 31, 2022, https://www.nlrb.gov/news-outreach/news-story/nlrb-general-counsel-issues-memo-on-unlawful-electronic-surveillance-and.) The original Consolidated Complaint in Cases 32-CA-282142 and 32-CA-283161 issued December 18, 2024, while GC 23-02 was in force. On February 14, 2025, Acting General Counsel William B. Cowen issued GC Memorandum 25-05,

PL.'S OPP. TO DEF. RJN & CROSS-RJN | 3:23-CV-04597-EMC                    MAY 21 2026

expressly rescinding GC 23-02. (NLRB, GC 25-05, Feb. 14, 2025, https://www.nlrb.gov/news-outreach/news-story/gc-25-05-rescission-of-certain-general-counsel-memoranda.) The hearing in these cases was then postponed indefinitely on April 16, 2025; the partial Withdrawal issued September 25, 2025.

34.    The Withdrawal letter does not acknowledge the rescission of GC 23-02, does not address the agency's prior position on the underlying conduct, and offers no reason for abandoning the merit determination on which the original complaint rested. The Supreme Court has held that an agency reversing course must "display awareness that it is changing position" and offer reasons "consistent with the requirement that an agency provide reasoned explanation for its action." *Fox*, 556 U.S. at 515; *see also Encino Motorcars*, 579 U.S. at 221. The Withdrawal does neither.

35.    Members of Defendant's NLRB counsel team publicly tracked both the issuance of GC 23-02 (*see* Harry I. Johnson, III & David R. Broderdorf, *Electronic Monitoring and Algorithmic Management: Permissible Labor Practice or Unlawful Oversight?*, Morgan Lewis LawFlash (Nov. 8, 2022)) and its rescission (*see* Harry I. Johnson, III, Mark L. Stolzenburg & Laura V. Spector, *New NLRB Acting General Counsel's Actions and Increased White House Oversight Signal Shift in Enforcement*, Morgan Lewis LawFlash (Feb. 24, 2025)) — public-record evidence that the policy reversal preceding the Withdrawal was a salient circumstance to the parties in these proceedings.

36.    The Withdrawal's substantive analysis of the termination question is also internally deficient. As to that question, the letter provides only: [T]he evidence fails to establish that the Charging Party engaged in protected concerted activity when she revealed to the media confidential product development information about a Respondent study. Moreover, even if a

13

prima facie case could be established, Respondent can likely meet its burden to show that the Charging Party would have been terminated for disclosing confidential product development information, even absent her protected concerted activities. (Sept. 25, 2025 Order at 2.) This is the agency's **entire** substantive analysis of the termination question. It is deficient in three independent respects.

37.     **First,** the agency does not identify what "study" it refers to, what "product development information" was at issue, what was "confidential," or by what standard the agency assessed the confidentiality claim. Defendant has advanced a shifting array of justifications for the termination in this litigation; the agency does not say which one it accepted, what evidence it considered, or how it resolved any of the contested factual questions surrounding the alleged disclosure. The vagueness is not incidental — it is the substance.

38.     **Second,** Defendant's own characterization of the underlying conduct has shifted under oath. The agency's reference to a "study" tracks Defendant's earlier framing; deposition testimony from Defendant's witnesses has since established that the project at issue was not a study, and Defendant has more recently recast its termination rationale around an alleged disclosure of employee photographs that Defendant now contends were confidential. [Specific deposition citations to be inserted.] A factual proposition that Defendant itself has reformulated repeatedly cannot be "not reasonably subject to dispute" under Rule 201(b).

39.     **Third,** the very next sentence of the letter resolves any doubt about the prosecutorial character of the analysis. The agency assumes, rather than decides, that a "prima facie case could be established" — and concludes only that Defendant "can likely meet its burden" on its same-decision defense. By the letter's own terms, the agency did not determine whether Plaintiff engaged in protected concerted activity. The agency made a litigation-risk

assessment about Defendant's likely burden of proof — a paradigmatic exercise of prosecutorial judgment, and the antithesis of adjudicative factfinding.

40.    The Withdrawal contains no findings of fact, no reference to specific evidence, no citation to legal authority, and no explanation of the agency's reversal in the policy context outlined above. It cannot support binding effect, and it cannot bear the persuasive weight Defendant assigns to it. Nor does any post-*Loper Bright* deference attach. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Even the lesser persuasive-weight standard of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), requires thoroughness, valid reasoning, and consistency — none of which the Withdrawal possesses.

## C.    THE NLRB'S EXCLUSIVE JURISDICTION OVER THE NLRA, AND THE LIMITED AUTHORITY OF THIS COURT, MEAN THE WITHDRAWAL DOES NOT MAP ONTO PLAINTIFF'S STATE-LAW CLAIMS.

41.    The NLRB possesses exclusive original jurisdiction over the prosecution of unfair labor practices under the NLRA. 29 U.S.C. § 160(a); *Garmon*, 359 U.S. at 244–45. Review of final Board orders lies in the courts of appeals. 29 U.S.C. §§ 160(e), 160(f). This Court therefore has neither original jurisdiction to make Section 7 determinations nor appellate jurisdiction to review or give substantive effect to the General Counsel's discretionary withdrawal decisions. To the extent the inferences Defendant invites this Court to draw from the Withdrawal would require Section 7 determinations, those determinations are reserved to the agency and, on review of final orders, to the courts of appeals.

42.    Plaintiff's claims here arise under independent California statutes and common-law doctrine: California Labor Code §§ 1102.5, 98.6, 232.5, 96(k), and 6310, and the public-policy tort recognized in *Tameny*, 27 Cal. 3d 167. These claims have different elements, different burdens (including the clear-and-convincing same-decision defense under Cal. Lab. Code §

1102.6), different remedies, and different governing law than those that would have been at issue in a fully prosecuted NLRA proceeding. *See Doe v. Google*, 54 Cal. App. 5th at 965–69 (California workplace protections operate independently of the NLRA, including under *Garmon*'s local-interest exception). A prosecutorial decision not to pursue NLRA claims therefore lacks any **relevance** to the elements at issue here. Fed. R. Evid. 401, 402. And even if preclusion were doctrinally available (and it is not), identity of issues would fail. *See* Restatement (Second) of Judgments § 27 cmt. c (1982).

43.     The point is reinforced by what the agency itself declined to do. Plaintiff specifically raised the absence of any preemption analysis in her administrative appeal, identifying the "Garmon gap" created by the agency's assertion of jurisdiction in the original consolidated complaint, the agency-supervised settlement of Defendant's confidentiality and surveillance policies as overbroad in Case 32-CA-284428, and the withdrawal of the enforcement-related allegations without any analysis of state-law protections. (Pl.'s Nov. 21, 2025 Appeal.) The Office of Appeals declined to address that argument, denying the appeal solely on prosecutorial-discretion grounds. (May 8, 2026 Appeal Denial at 1.) Defendant cannot now ask this Court to draw preemption inferences from a withdrawal that the agency itself refused to ground in any preemption analysis.

44.     Nor is the NLRB matter closed. On the same day the partial Withdrawal issued, the Regional Director served an Order Severing Cases, Amended Complaint, and Notice of Hearing in Case 32-CA-282142, with hearing scheduled for December 16, 2025. (Ex. C to Dkt. 278; Ex. B hereto.) That hearing was subsequently postponed because, in the Region's words, "The Employer has expressed a strong interest in settling the cases." (Ex. B to Dkt. 278; Ex. E hereto.) The remaining allegations — still pending and not yet resolved — concern restrictions

Defendant imposed on employee discussion of workplace environmental health and safety concerns. The Withdrawal Defendant now seeks to leverage in this Court is one chapter of an ongoing agency prosecution of Defendant, not its conclusion.

45.     Finally, and relatedly, the Settlement in Case 32-CA-284428 cannot be read to retroactively validate Defendant's 2021 conduct toward Plaintiff. The Settlement's policy commitments are forward-looking in form — "WE WILL NOT enforce" — and were approved on April 4, 2025. Conduct from 2021 cannot violate a 2025 settlement, and the question whether such conduct was lawful at the time it occurred is not resolved by an agreement Defendant entered into four years later. That question remains for adjudication in this proceeding under California law.

## V.     PLAINTIFF'S CONTINGENT REQUEST FOR JUDICIAL NOTICE OF COMPANION PUBLIC DOCUMENTS UNDER FED. R. EVID. 106 AND 201 (IF THE COURT CONSIDERS THE WITHDRAWAL)

46.     This Section is **contingent and conditional**. Plaintiff requests judicial notice of the documents identified below **only if** the Court is inclined to take judicial notice of any portion of Defendant's Exhibit B (the Withdrawal letter). If the Court denies Defendant's request as to the Withdrawal, the request in this Section is moot and need not be reached.

47.     If the Court is inclined to consider any part of the Withdrawal, Federal Rule of Evidence 106 requires consideration of the remainder of the agency record and the public materials in fairness ought to be considered together with it: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time." *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988); *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014). Defendant's submission of the three-page Withdrawal letter alone, with no

accompanying agency record and no acknowledgment of the contemporaneous public materials bearing on the policy reversal under which the Withdrawal issued, places exactly the selectivity Rule 106 was enacted to prevent.

48.     Each of the documents identified below satisfies Federal Rule of Evidence 201(b)(2): each is publicly available from an official source whose accuracy cannot reasonably be questioned. Each is offered **only** for its existence, dates, authorship, and content as written, and **not** for the truth of any disputed factual assertion contained within. *Khoja*, 899 F.3d at 999. The substantive relevance of each is established above. Core NLRB documents in NLRB Cases 32-CA-282142 and 32-CA-283161:

49.     **Ex. A.**  Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Dec. 18, 2024). Public NLRB case files: https://www.nlrb.gov/case/32-CA-282142 and https://www.nlrb.gov/case/32-CA-283161.

50.     **Ex. B.**  Order Severing Cases, Amended Complaint, and Notice of Hearing in Case 32-CA-282142 (Sept. 25, 2025) (the active reissued complaint, with surviving allegations against Defendant). Also previously filed in this case as Ex. C to Dkt. 278. Public NLRB case file: https://www.nlrb.gov/case/32-CA-282142.

51.     **Ex. C.**  Plaintiff's Notice of Appeal & Appellate Memorandum (Nov. 21, 2025), filed in NLRB Cases 32-CA-282142 and 32-CA-283161, raising APA-procedural objections, evidentiary basis, the Garmon-gap question, and the inconsistency of the partial dismissal with the agency's continuing prosecution of related allegations. Public NLRB case files: https://www.nlrb.gov/case/32-CA-282142 and https://www.nlrb.gov/case/32-CA-283161.

52.     **Ex. D.**  Appeal Denial from the Office of Appeals (May 8, 2026) (Acting Deputy General Counsel Lynisa B. Michalski, by Pedro M. Arguello, Managing Attorney), denying

Plaintiff's appeal solely on the ground that the General Counsel's decision was "a purely 'prosecutorial' decision to withdraw a complaint." Public NLRB case files: https://www.nlrb.gov/case/32-CA-282142 and https://www.nlrb.gov/case/32-CA-283161.

53.     **Ex. E.**  Communication from NLRB Region 21 Field Attorney Elvira Pereda to Plaintiff (Nov. 21, 2025) stating that the Region was postponing the scheduled hearing because Defendant had expressed a strong interest in settling the cases. Also previously filed in this case as Ex. B to Dkt. 278.

54.     Additional public documents establishing the policy-shift context:

55.     **Ex. F.**  NLRB General Counsel Memorandum 23-02, Electronic Monitoring and Algorithmic Management of Employees Interfering with the Exercise of Section 7 Rights (Oct. 31, 2022), together with NLRB press release of the same date, NLRB General Counsel Issues Memo on Unlawful Electronic Surveillance and Automated Management Practices, https://www.nlrb.gov/news-outreach/news-story/nlrb-general-counsel-issues-memo-on-unlawful-electronic-surveillance-and.

56.     **Ex. G.**  NLRB General Counsel Memorandum 25-05, *Rescission of Certain General Counsel Memoranda* (Feb. 14, 2025), expressly rescinding GC 23-02. https://www.nlrb.gov/news-outreach/news-story/gc-25-05-rescission-of-certain-general-counsel-memoranda.

57.     **Ex. H.**  Harry I. Johnson, III & David R. Broderdorf, *Electronic Monitoring and Algorithmic Management: Permissible Labor Practice or Unlawful Oversight?*, Morgan Lewis LawFlash (Nov. 8, 2022). https://www.morganlewis.com/pubs/2022/11/electronic-monitoring-and-algorithmic-management-permissible-labor-practice-or-unlawful-oversight.

58.     **Ex. I.** Harry I. Johnson, III, Mark L. Stolzenburg & Laura V. Spector, *New NLRB Acting General Counsel's Actions and Increased White House Oversight Signal Shift in Enforcement*, Morgan Lewis LawFlash (Feb. 24, 2025). https://www.morganlewis.com/pubs/2025/02/new-nlrb-acting-general-counsels-actions-and-increased-white-house-oversight-signal-shift-in-enforcement.

59.     **Ex. J.** *General Counsel Biography*, National Labor Relations Board, https://www.nlrb.gov/bio/general-counsel, confirming the General Counsel's swearing-in on January 7, 2026 and her prior position at Morgan Lewis & Bockius LLP.

60.     Each of these documents satisfies Rule 201(b)(2). The NLRB documents are official records and publications of an administrative agency of the United States. The Morgan Lewis publications are professional commentary published on the firm's official website and reflect the public-record position-tracking of Defendant's NLRB counsel team. None is offered for the truth of any disputed factual assertion; each is offered solely for existence, date, authorship, and content as written.

61.     Without these documents, Defendant's selective excerpt would mislead the Court in three specific respects. It would imply an agency-wide exoneration where the agency in fact continues to prosecute related allegations in an active reissued complaint. It would imply a merits adjudication where the agency self-classified its action as prosecutorial discretion. And it would imply an independent factual determination where the only record of agency reasoning is the conclusory Withdrawal letter and the bare appeal-denial citing prosecutorial discretion, issued against an unacknowledged policy reversal. Rule 106 requires completion.

## VI.     CONCLUSION AND RELIEF REQUESTED

62.     For the reasons stated, Plaintiff respectfully requests that the Court rule as follows:

63.    **As to the Settlement Agreement (Case 32-CA-284428, Dkt. 373-1):** Judicial notice **granted** as to existence and terms. The Settlement is what its text says it is. The inferences Defendant would draw from it — including any per-employee carve-out tied to a non-adjudicative Withdrawal — are not available through Rule 201 and would, if drawn, produce an outcome foreclosed by *Doe v. Google, Inc.*, 54 Cal. App. 5th 948 (2020), and by the limited NLRA jurisdiction of this Court.

64.    **As to the September 25, 2025 partial Withdrawal (Cases 32-CA-282142 and 32-CA-283161, Dkt. 373-2):** Judicial notice **denied** as a basis for preclusion, estoppel, or any binding or persuasive effect on the merits. The Withdrawal is a discretionary, unreviewable, pre-hearing prosecutorial decision, so characterized by the agency itself, undertaken without findings of fact, evidence, legal citation, or acknowledgment of the contemporaneous rescission of the governing General Counsel memorandum, and concerns an agency proceeding whose subject matter does not map onto Plaintiff's state-law claims.

65.    **Plaintiff's contingent request for judicial notice: Granted only if** the Court takes judicial notice of any portion of the Withdrawal letter. In that event, the Court should also take judicial notice under Federal Rules of Evidence 106 and 201 of Exhibits A through J identified in Section V above. Each is offered solely for its existence, dates, authorship, and content as written, and not for the truth of any disputed factual assertion contained within. If Defendant's request as to the Withdrawal is denied, the request in this paragraph is moot and need not be reached.

Respectfully submitted,

_____

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 22 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

22

## VII.    EXHIBIT A

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE INC.**

     **and**                                   **Cases  32-CA-282142**
                                                     **32-CA-283161**

**ASHLEY MARIE GJØVIK, an Individual**

**ORDER CONSOLIDATING CASES, CONSOLIDATED**
**COMPLAINT AND NOTICE OF HEARING**

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations

Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED THAT Cases 32-

CA-282142 and 32-CA-283161, filed by Ashley Marie Gjøvik , an Individual (Gjøvik or Charging

Party) against Apple, Inc. (Respondent) are consolidated.

This Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, which

is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act

(the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Board's Rules and Regulations, and

alleges Respondent has violated the Act as described below.

1.      (a)      The original charge in Case 32-CA-282142 was filed by the Charging

Party on August 26, 2021, and a copy was served on Respondent by U.S. mail on August 30,

2021.

      (b)      The amended charge in Case 32-CA-282142 was filed by the Charging

Party on April 1, 2022, and a copy was served on Respondent by U.S. mail on April 4, 2022.

      (c)      The charge in Case 32-CA-283161 was filed by the Charging Party on

September 16, 2021, and a copy was served on Respondent by U.S. mail on September 20, 2021.

1

2.    (a)    At all times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, California has retail facilities throughout the United States, has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

(b)    Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

3.    At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

4.    At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

Jenna Waibel        Corporate Employee Relations Representative

David Powers        Software Development Engineering Director

Ekelemchi Okpo        Corporate Employee Relations Representative

5.    About March 22, 2021, Respondent, by David Powers, by telephone:

(a)    Directed employees to refrain from talking about workplace environmental health and safety concerns with other employees.

(b)    Impliedly threatened employees with discipline by telling employees that the instruction to refrain from talking about workplace environmental health and safety concerns with other employees, was a warning.

2

6.     About April 27, 2021, Respondent, by Jenna Waibel:

(a)     By telephone, told employees to use the following five-point balancing test in advance of communicating workplace health and safety concerns to other employees:

o   make sure the information is complete

o   make sure the information is accurate

o   that it does not cause panic

o   that it does not make an assessment about safety; and

o   that people talk to the Employer's Environmental Health and Safety (EHS) department directly.

(b)     By email, told employees that when discussing terms and conditions of employment, they should ensure that the information shared was as accurate and complete as possible.

(c)     By email, told employees to refrain from discussing their terms and conditions of employment by telling employees to first communicate their workplace health and safety concerns directly with Respondent.

7.     Respondent, by Ekelemchi Okpo:

(a)     About August 4, 2021, during a video meeting, directed employees not to talk to other employees about Respondent's investigation of employees' workplace health and safety concerns.

(b)     About August 4, 2021, by email, told employees to refrain from sharing communications about Respondent's investigation into employees' workplace health and safety concerns.

(c)    About August 5, 2021, by email, told employees that he was "disappointed" that they "misrepresented" their discussion on August 4, 2021.

8.    (a)    From about March 22, 2021, to about September 2021, Respondent's employee Gjøvik concertedly complained to Respondent regarding the wages, hours, and working conditions of Respondent's employees, by inter alia, raising workplace environmental health and safety concerns.

(b)    From about June 2021, to about September 2021, Respondent's employee Gjøvik engaged in concerted activities for the purposes of mutual aid and protection, by, inter alia, circulating a petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting about workplace complaints and concerns on social media as well as on Respondent's Slack channel platform.

(c)    About August 4, 2021, Respondent suspended its employee Gjøvik.

(d)    About September 9, 2021, Respondent discharged its employee Gjøvik.

(e)    Respondent engaged in the conduct described above in paragraphs 8(c) and 8(d), because Gjøvik engaged in the conduct described above in paragraphs 8(a) and 8(b), and to discourage employees from engaging in these or other concerted activities.

9.    By the conduct described above in paragraphs 5 through 8 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

10.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraphs 5 through 8, the General Counsel seeks an Order requiring Respondent to: (1) physically and electronically post the Notice to Employees at all its facilities including, but not limited to, posting on Respondent-sponsored Slack communication channels, intranet portals, and by email; (2) email a copy of the Notice to Employees to all its supervisors and managers; (3) physically and electronically post the Employee Rights Notice poster in the same manner as the posting of the Notice to Employees; (4) have a Board Agent conduct a training session for its managers and supervisors on their obligations under the Act, on work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director); and (5) have a Board Agent conduct a training session for its employees on their rights under the Act, on work time, scheduled so as to ensure the widest possible attendance (by videoconference or in person, at the discretion of the Regional Director).

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraph 8 the General Counsel seeks an Order requiring Respondent to: (1) offer employee Gjøvik reinstatement to her former job position or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed; (2) send a letter to Gjøvik apologizing for suspending and terminating her, expunge all Respondent's records of such suspension and termination, and inform her, in writing, that her suspension and termination have been expunged from Respondent's records and will not be used against her in any way; (3) make employee Gjøvik whole for all losses incurred as a result of the unfair labor practices described above, including for all direct and foreseeable pecuniary harm incurred as a result of her unlawful

5

suspension an termination; and (4) should Gjøvik waive reinstatement, provide a neutral job reference to all prospective employers with the correct job titles and positions of employee Gjøvik.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint. The answer must be **electronically filed with this office on or before January 2, 2025**. Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. Responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a consolidated

6

complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint are true.

### NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **August 4, 2025, at 9:00 am at 312 N Spring Street, 10th Floor, Los Angeles, CA 90012**, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this consolidated complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  December 18, 2024

William B. Cowen, Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

7

FORM NLRB 4338
  (6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 32-CA-282142 and 32-CA-283161

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements **will not be granted** unless good and sufficient grounds are shown **and** the following requirements are met:

(1)  The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)  Grounds must be set forth in **detail**;

(3)  Alternative dates for any rescheduled hearing must be given;

(4)  The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5)  Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Crystal S. Carey, Attorney
Morgan, Lewis & Bockius, LLP
101 Park Avenue, 37th Floor
New York, NY 10178-0060
crystal.carey@morganlewis.com

Kelcey J. Phillips, Attorney
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
kelcey.phillips@morganlewis.com

Harry I. Johnson III, Attorney
Morgan, Lewis & Bockius, LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
harry.johnson@morganlewis.com

Mark Stolzenburg, Attorney
Morgan, Lewis & Bockius, LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
mark.stolzenburg@morganlewis.com

Brian J. Mahoney, Attorney
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.mahoney@morganlewis.com

Apple, Inc.
One Apple Park Way
Cupertino, CA 95014

Ashley Marie Gjovik
2108 N Street, Suite 4553
Sacramento, CA 95816
ashleymgjovik@protonmail.com

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law.  **You may be represented at this hearing by an attorney or other representative**.  If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible.  A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations.  The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently.  To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts.  You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**.  The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.    BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations.  In addition, you should be aware of the following:

- **Special Needs:**  If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance.  Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:**  One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference.  You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.    DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations.  Please note in particular the following:

- **Witnesses and Evidence**:  At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:  Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

Form NLRB-4668
(6-2014)

**in evidence.**  If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing.  Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:**  In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

VIII.  **EXHIBIT B**

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE INC.**

**and**                                                                    **Cases  32-CA-282142**
                                                                                          **32-CA-283161**
**ASHLEY MARIE GJØVIK, an Individual**

**ORDER SEVERING CASES, AMENDED COMPLAINT**
**AND NOTICE OF HEARING**

On December 18, 2024, an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Consolidated Complaint) issued in these matters.  Thereafter, on September 25, 2025, an Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 issued.

Accordingly, IT IS HEREBY ORDERED that Case 32-CA-283161 is SEVERED from Case 32-CA-282142.

Pursuant to Section 102.17 of the Rules and Regulations of the National Labor Relations Board (the Board), the Consolidated Complaint and Notice of Hearing issued on December 18, 2024, is amended as follows:

This Amended Complaint is based on a charge in Case 32-CA-282142 filed by Ashley Marie Gjøvik (Charging Party).  It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 and 102.17 of the Board's Rules and Regulations and alleges that Apple Inc. (Respondent) has violated the Act as described below:

1

1.    (a)    The original charge in Case 32-CA-282142 was filed by the Charging Party on August 26, 2021, and a copy was served on Respondent by U.S. mail on August 30, 2021.

(b)    The amended charge in Case 32-CA-282142 was filed by the Charging Party on April 1, 2022, and a copy was served on Respondent by U.S. mail on April 4, 2022.

2.    (a)    At all times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, California has retail facilities throughout the United States, has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

(b)    Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

3.    At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

4.    At all material times, the following individuals held the position set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| Jenna Waibel | Corporate Employee Relations Representative |
| David Powers | Software Development Engineering Director |
| Ekelemchi Okpo | Corporate Employee Relations Representative |

5.    About March 22, 2021, Respondent, by David Powers, by telephone:

(a)    Directed employees to refrain from talking about workplace environmental health and safety concerns with other employees.

2

(b)    Impliedly threatened employees with discipline by telling employees that the instruction to refrain from talking about workplace environmental health and safety concerns with other employees, was a warning.

6.    About April 27, 2021, Respondent, by Jenna Waibel:

(a)    By telephone, told employees to use the following five-point balancing test in advance of communicating workplace health and safety concerns to other employees:

- o   make sure the information is complete

- o   make sure the information is accurate

- o   that it does not cause panic

- o   that it does not make an assessment about safety; and

- o   that people talk to the Employer's Environmental Health and Safety (EHS) department directly.

(b)    By email, told employees that when discussing terms and conditions of employment, they should ensure that the information shared was as accurate and complete as possible.

(c)    By email, told employees to refrain from discussing their terms and conditions of employment by telling employees to first communicate their workplace health and safety concerns directly with Respondent.

7.    Respondent, by Ekelemchi Okpo:

(a)    About August 4, 2021, during a video meeting, directed employees not to use Slack while on administrative leave in connection with Respondent's investigation into employees' concerns about working conditions.

3

(b)    About August 5, 2021, by email, told employees that he was "disappointed" that they "misrepresented" their discussion on August 4, 2021.

8.    By the conduct described above in paragraphs 5 through 7 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

9.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be **electronically filed with this office on or before Thursday, October 9, 2025**.  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website pursuant to Section 102.5(c) of the Board's Rules and Regulations.  To file electronically, go to the E-Filing tab on nlrb.gov, click on **E-File Case Documents**, and follow the detailed instructions.  The responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed or electronically signed by counsel or non-attorney representative for represented parties or by the party if not

4

represented. See Sections 102.7 and 102.21.  Service of the answer on each of the other parties must be by email, if possible, or in accordance with Section 102.5(g) of the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **December 16, 2025,** at 9:00 am. at the National Labor Relations Board, Region 21, 312 N. Spring Street, 10th Floor, Los Angeles, CA 90012, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this amended complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: September 25, 2025

David Selder, Acting Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

5

FORM NLRB 4338
(6-90)

# UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD
### NOTICE

**Case   32-CA-282142 and 32-CA-283161**

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1)  The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)  Grounds must be set forth in *detail*;

(3)  Alternative dates for any rescheduled hearing must be given;

(4)  The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5)  Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

| | |
|---|---|
| Brenda Rosales-Carrillo, Corporate Counsel<br>Apple, Inc.<br>1 Apple Park Way<br>Cupertino, CA 95014<br>b_rosalescarrillo@apple.com | Harry I. Johnson III, Attorney<br>Morgan, Lewis & Bockius LLP<br>2049 Century Park East, Suite 700<br>Los Angeles, CA 90067-3109<br>harry.johnson@morganlewis.com |
| Diego Acevedo, Corporate Counsel<br>Apple, Inc.<br>1 Apple Park Way<br>Cupertino, CA 95014<br>dacevedo@apple.com | Kelcey J. Phillips, Attorney<br>Morgan, Lewis & Bockius LLP<br>1111 Pennsylvania Avenue NW<br>Washington, DC 20004<br>kelcey.phillips@morganlewis.com |
| Ashley Marie Gjovik<br>2108 N Street, Suite 4553<br>Sacramento, CA 95816<br>ashleymgjovik@protonmail.com | Brian Mahoney, Esquire<br>Morgan, Lewis, & Bockius, LLP<br>2222 Market Street<br>Philadelphia, PA 19103<br>brian.mahoney@morganlewis.com |
| Mark L. Stolzenburg, Attorney<br>Morgan Lewis & Bockius LLP<br>110 North Wacker Drive, Suite 2800<br>Chicago, IL 60606<br>mark.stolzenburg@morganlewis.com | |

Form NLRB-4668
  (6-2014)

## Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

I.    **BEFORE THE HEARING**

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

Form NLRB-4668
(6-2014)


## II.    DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations.  Please note in particular the following:

(OVER)

- **Witnesses and Evidence**:  At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:  Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in evidence.**  If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing.  If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service

Form NLRB-4668
(6-2014)

with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **<u>ALJ's Decision:</u>**  In due course, the ALJ will prepare and file with the Board a decision in this matter.  Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **<u>Exceptions to the ALJ's Decision</u>**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

## IX.     EXHIBIT C

# E-Service of RD Order to Reschedule Hearing in Case 32-CA-282142

From    e-Service@service.nlrb.gov <NLRB@public.govdelivery.com>

To      Ashley Gjovik<ashleymgjovik@protonmail.com>

Date    Friday, November 21st, 2025 at 7:33 PM

---

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**DELIVERY OF RD ORDER TO RESCHEDULE HEARING**

**Case Name**: Apple Inc.
**Case Number**: 32-CA-282142

In accordance with the National Labor Relations Board Rules and Regulations, as amended, you are hereby served with RD Order to Reschedule Hearing in this matter. You can view the letter by clicking the attached pdf file. You may wish to print or save the letter and this email for your records. You will not receive a copy of this document by U.S. mail.

**Please do not reply to this email. If you have questions regarding this correspondence, please refer to the contact information contained in the attached pdf file.**

RD Order to Reschedule Hearing

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DO NOT REPLY TO THIS MESSAGE. THIS IS A POST-ONLY NOTIFICATION.
MESSAGES SENT DIRECTLY TO THE EMAIL ADDRESS LISTED ABOVE WILL NOT BE READ.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Ashley M. Gjovik, JD**
*In Propria Persona*
Boston, MA
legal@ashleygjovik.com

# United States

# National Labor relations Board

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | **Case No.** |
| | **32-CA-282142** |
| Charging Party, | **32-CA-283161** |
| | |
| & | **Charging Party's** |
| | **Notice of Appeal &** |
| **Apple Inc.**, a corporation, | **Appellate Memorandum** |
| | |
| Charged Party. | |

# TABLE OF CONTENTS

I.    PROCEDURAL VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT ...................................................................... 2

II.    FAILURE TO ADDRESS EVIDENTIARY BASIS FOR COMPLAINT OR EXPLAIN CHANGED LEGAL STANDARDS ............................... 2

III.    THE SUSPENSION ALLEGATIONS (PARAGRAPHS 8(a), 8(b), 8(c), 8(e)) SHOULD BE REINSTATED ........................................... 3

IV.    THE TERMINATION ALLEGATIONS (PARAGRAPHS 8(a), 8(b), 8(d), 8(e)) SHOULD BE REINSTATED ........................................ 4

V.    THE WORKPLACE INVESTIGATION SECRECY ALLEGATIONS (PARAGRAPH 7(b)) SHOULD BE REINSTATED ........................... 7

VI.    THE REGION IMPROPERLY MODIFIED THE SLACK ALLEGATION WITHOUT DISCLOSURE & IN FRUSTRATION OF ITS OWN CLAIM ...................................................................10

VII.    FEDERAL RECOGNITION OF GJOVIK'S CASE AS EXEMPLIFYING SYSTEMIC SURVEILLANCE RETALIATION ......... 11

VIII.    Failure to Address California Law Creates a Garmon Gap and Contradicts NLRB's Jurisdictional Claims ....................................... 13

IX.    THE DISMISSAL UNDERMINES THE AGENCY'S PROSECUTION OF REMAINING ALLEGATIONS .............................................. 18

X.    EPA ENFORCEMENT ACTION VALIDATES THE CHARGING PARTY'S WORKPLACE SAFETY COMPLAINTS ...........................20

XI.    REQUEST FOR STAY OF HEARING PENDING APPEAL DECISION ................................................................................23

XII.    THE HEARING LOCATION CREATES AN ADDITIONAL PROCEDURAL BARRIER ........................................................ 24

XIII.    CONCLUSION & REQUESTED RELIEF ............................. 25

# APPEAL OF WITHDRAWAL AND DISMISSAL OF ALLEGATIONS (CASES 32-CA-282142 AND 32-CA-283161)

1.    Charging Party Ashley Marie Gjøvik appeals the Agency's decision to withdraw and dismiss critical claims and allegations from the Consolidated Complaint in the above-referenced matters. The Charing Party filed Charge No. 32-CA-282142 on Aug. 26 2021 and Charge No. 32-CA-283161 on Sept. 16 2021. On Jan. 30 2023, the Agency issued a Decision of Merit for both Charges. On Dec. 18 2024, the Agency filed a Complaint and Notice of Hearing for numerous claims in both of these charges.

2.    On April 4 2025, the Charging Party, Charged Party, and NLRB entered a settlement agreement regarding another one of Charging Party's cases, Case No. 32-CA-284428, regarding Apple's NDAs, employee handbook, work policies, and employee surveillance policies and practices. Every work policy that Apple cited as a basis for firing the Charging Party was included in that settlement: where Apple agreed to withdraw the terms and not enforce those terms.

3.    Then, abruptly on Sept. 25 2025, the Agency withdrew and dismissed a number of the Charging Party's claims it previously found substantial evidence supported violations of the NLRA. The withdrawal/dismissal included vague and brief statements but no legal analysis, no reference to specific evidence or filings, or an explanation about why the Agency changed its mind.

4.    This withdrawal, issued after a hearing had been scheduled and subsequently cancelled, violates the Administrative Procedure Act, contradicts the Agency's prior prosecutorial determinations, ignores substantial new evidence, and appears to undermine a complementary settlement agreement the Agency itself negotiated.

5.    The withdrawal/dismissal occurred on Sept. 25 2025 and then the U.S. government was furloughed for some time. Per the NLRB's 2025 shutdown tolling notice, the new deadline for the appeal is Nov. 21 2025, today.

# I. PROCEDURAL VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

6.    The Agency's summary withdrawal of these allegations violates basic requirements of administrative adjudication under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* After a lengthy investigation into the charges, the Region, upon guidance from Division of Advice, issued a Consolidated Complaint finding reasonable cause to believe violations had occurred. The Region then scheduled a formal hearing pursuant to Section 102.34 of the Board's Rules and Regulations.

7.    Once a hearing is scheduled, the matter becomes subject to formal adjudication under the APA. 5 U.S.C. § 554. The APA requires that parties be given *"opportunity for the submission and consideration of facts [and] arguments"* and that agencies provide a *"statement of... findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented."* 5 U.S.C. §§ 554(b)(3), 557(c).

8.    The Agency's abrupt cancellation of the hearing and summary dismissal of the allegations with only a few conclusory sentences of explanation, deprived the Charging Party of the formal adjudication process guaranteed by the APA. While the General Counsel retains prosecutorial discretion, that discretion is not unlimited and must be exercised consistent with the APA's procedural requirements. See *NLRB v. United Food & Commercial Workers Union,* Local 23, 484 U.S. 112, 130 (1987) ("the Board's discretion to issue complaints... is not boundless").

9.    Moreover, once the Agency determined there was reasonable cause to issue a complaint and scheduled a hearing, it assumed an obligation to either proceed with that adjudication or provide a reasoned explanation for its change in position. The cursory analysis provided here falls far short of that standard.

# II. FAILURE TO ADDRESS EVIDENTIARY BASIS FOR COMPLAINT OR EXPLAIN CHANGED LEGAL STANDARDS

10.    The Region previously found sufficient evidence to support each of the now-withdrawn allegations. When an agency reverses its position or abandons a prior determination, it must "*display awareness that it is changing position*" and "*show that there are good reasons for the new policy*." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). The withdrawal letter fails to meet this standard.

11.    The letter provides no explanation for why evidence previously deemed sufficient to support a complaint is now considered insufficient. It does not identify what evidence was reconsidered, what new evidence emerged, or what change in legal analysis occurred. Instead, it simply asserts conclusory findings that directly contradict the Agency's prior prosecutorial judgment.

12.    If the Region is applying different legal standards or interpreting the evidence under a new framework, it must explain what those changes are and why they are being implemented. The current withdrawal order provides none of this analysis, making it arbitrary and capricious under the APA.

## III. THE SUSPENSION ALLEGATIONS (PARAGRAPHS 8(A), 8(B), 8(C), 8(E)) SHOULD BE REINSTATED

13.    The withdrawal letter dismisses the suspension allegations by characterizing the administrative leave as having been "*at the Charging Party's request*." This characterization is contradicted by substantial evidence, as the NLRB knows, because it stated the same until just last month.

14.    Further, Civil discovery has revealed that in late July 2021—before any administrative leave began in August 2021—the Charging Party was formally placed under investigation by Respondent for allegedly "leaking" workplace safety concerns to the New York Times. (Exhibit A). This evidence fundamentally undermines the Region's characterization of the leave as consensual.

15.    An employee cannot meaningfully, unilaterally, and casually "request" leave when she is facing extensive retaliation, not receiving assistance from the employer's HR/ER team in addressing or stopping that retaliation, and is

simultaneously under secret investigation by her employer for engaging in protected concerted activity.  The temporal proximity between the employer′s investigation into the Charging Party′s protected communications about workplace safety and her placement on leave strongly suggests retaliatory motive.

16.    Even if the initial placement on leave could be characterized as borderline consensual (despite the Ninth Circuit standards being in strong favor of the employee here), the evidence establishes that the Charging Party subsequently asked to return to work and Charged Party (per Mr. Okpo) refused. Once an employee seeks to end a leave arrangement and the employer denies that request, any veneer of consent evaporates.

17.    The employer′s continued exclusion of the Charging Party from the workplace while simultaneously investigating her for protected activity and not disclosing that investigation to her, cannot be characterized as consensual. The Region′s analysis completely fails to address this critical fact: the Charging Party asked to come back to work and was told ″no.″ This alone should be sufficient to establish that the continued leave was not voluntary and raises a strong inference of retaliation, particularly given the undisclosed investigation.

18.    Considering the full context (including but not limited to, a formal investigation into protected activity, the temporal proximity of the leave, the Charging Party′s denied request to return, and the employer′s failure to disclose its investigation) the evidence more than sufficiently supports the suspension allegations. The Region′s conclusory dismissal of these facts is not supported by substantial evidence.

## IV.  THE TERMINATION ALLEGATIONS (PARAGRAPHS 8(A), 8(B), 8(D), 8(E)) SHOULD BE REINSTATED

19.    The Region′s withdrawal of the termination allegations is even more problematic, as it ignores the very nature of the protected activity at issue and contradicts the Agency′s own prior findings against this same Respondent.

20. The Region's analysis fundamentally mischaracterizes what the Charging Party allegedly disclosed. The Charging Party did not leak "confidential product development information." Rather, she was communicating with other employees and the media about workplace conditions: specifically, concerns about workplace surveillance, invasions of privacy, unlawful secrecy policies, systemic retaliation, and monitoring of employees.

21. This is not merely the Charging Party's post-hoc characterization. The same conduct is the subject of an active civil retaliation claim under California law (T*ameny v. Atlantic Richfield Co.,* 27 Cal. 3d 167 (1980)), specifically alleging that the supposed "confidential information" claim is itself protected activity, and thus the employer's "legitimate defense" is admitted retaliation for Charging Party raising workplace concerns. The Charging Party is already successfully litigating this exact theory in civil court.

22. Further, a California Unemployment Insurance ALJ also already found substantial evidence supports that Apple fired the Charging Party for reasons other than misconduct due to, among other things, Apple's: refusal to provide warnings, refusal to explain why the Charging Party was in trouble until well after the Charging Party was fired, and alleging that the Plaintiff refused to cooperate when the Charging Part yin fact, in writing, was cooperating and would cooperate.

23. The disclosure of workplace surveillance practices to fellow employees and the media falls squarely within the NLRA's protection of concerted activity for mutual aid or protection. See *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565-66 (1978); *Timekeeping Sys., Inc.*, 323 NLRB 244 (1997). The Region's failure to grapple with this fundamental issue and clear pretextual employer conduct, renders its analysis deficient.

24. The Region's analysis also completely ignores a devastating fact: the Charging Party was terminated pursuant to the same policies that this very Agency previously found to be unlawful. In April 2025, Respondent entered into a

settlement agreement with the Agency regarding workplace rules and policies. As part of that settlement, Respondent agreed to withdraw and not enforce certain policies that the Agency had found to unlawfully restrict employees' Section 7 rights. The Charging Party (the very employee who filed the charge that led to this settlement) was terminated under those same unlawful policies.

25.    The Board is now, inexplicably, declining to enforce the terms of its own settlement agreement. By withdrawing the termination allegations, the Agency is effectively permitting Apple to continue enforcing against the Charging Party the very policies it agreed to withdraw and not enforce. This undermines the integrity of the Board's settlement process and rewards an employer for violating the terms of its settlement with the Agency.

26.    Civil discovery has also revealed critical new evidence regarding the supposed contractual basis for Respondent's confidentiality claims. Apple has asserted that the Charging Party was bound by confidentiality obligations regarding the iPhone application she complained about by some "ICF". However, when faced with sanctions and a motion to compel, Apple's counsel finally, years later, produced this document in August 2025. (Exhibit B).

27.    This discovery production revealed that the purported confidentiality agreement was executed in 2017, four years before the 2021 complaints; the agreement covered a period of only 20 minutes; and, the Charging Party never actually signed the agreement. This evidence fundamentally undermines Respondent's defense that it terminated the Charging Party for violating confidentiality obligations.

28.    If there was no valid confidentiality agreement (or if any such agreement cannot reasonably be construed to cover complaints about workplace surveillance made four years later) then Apple's proffered justification collapses. The Region's analysis fails to account for this evidence entirely and rewards the Charged Party for making false statements and misleading the U.S. government.

29.    Even accepting arguendo the Region's statement that "Respondent can likely meet its burden" under *Wright Line,* 251 NLRB 1083 (1980), this is precisely the type of disputed factual and credibility issue that should be resolved through formal adjudication, not summary dismissal.

30.    The Region's role at the complaint stage is to determine whether there is reasonable cause to believe a violation occurred, not to weigh evidence and make ultimate credibility determinations. That is the function of a hearing before an Administrative Law Judge. By substituting its own *Wright Line* analysis for the formal hearing process, the Region has usurped the adjudicative function and denied the Charging Party her right to a hearing.

## V.   THE WORKPLACE INVESTIGATION SECRECY ALLEGATIONS (PARAGRAPH 7(B)) SHOULD BE REINSTATED

31.    The Region withdrew the allegations regarding Apple's instructions to employees not to disclose information about workplace investigations, finding that "Respondent's interest in protecting the integrity of the investigation outweighs employees' interest in sharing the communications with the investigator."

32.    This analysis is fundamentally flawed when the "investigation" in question was not an investigation into Charging Party's concerns, but instead was an investigation into Charging Party about her protected concerted activity, specifically including her complaints about work conditions, and the employer then forbid her from speaking to her coworkers about her work conditions and their handling of her complaints about work conditions.

33.    As noted above, newly discovered evidence establishes that in July 2021, Respondent was investigating the Charging Party for "leaking" her concerns about workplace safety. (Exhibit A). This was not a neutral investigation into workplace misconduct; it was an investigation into the Charging Party's exercise of her Section 7 rights. When an employer investigates an employee for engaging in

protected activity and then imposes confidentiality restrictions on that investigation, the employer's asserted interest in "investigation integrity" cannot outweigh employees' Section 7 rights. To hold otherwise would allow employers to insulate their retaliatory investigations from scrutiny by simply invoking confidentiality.

34.    Email evidence demonstrates that during the Charging Party's administrative leave, Apple specifically instructed her to stop asking questions about workplace safety and to focus on "being on leave." This goes far beyond a narrow confidentiality instruction about an investigation—it was a direct prohibition on the Charging Party continuing to raise protected workplace concerns. The Board's analysis fails to address this evidence and instead accepts Apple's characterization of a "narrow confidentiality instruction." The evidence shows the instruction was neither narrow nor limited to investigation communications.

35.    Under *Banner Health System,* 362 NLRB 137 (2015), confidentiality rules in workplace investigations are unlawful unless the employer can show a legitimate business justification that outweighs employees' Section 7 rights. The employer bears the burden of demonstrating this justification on a case-by-case basis. Here, Apple cannot meet that burden because the investigation was into protected activity; the confidentiality instruction was broader than just investigation communications; and Respondent used the confidentiality directive to suppress ongoing protected complaints about workplace safety. The Region's blanket acceptance of Respondent's "investigation integrity" rationale fails to apply the *Banner Health* standard and inappropriately shifts the burden to the Charging Party.

36.    The urgency and federal significance of these claims is confirmed by two federal statutes enacted while this appeal was pending. On May 15, 2025, Senator Grassley introduced the AI Whistleblower Protection Act, recognizing that artificial intelligence companies' use of *"illegally restrictive NDAs"* to silence

employees from making protected disclosures requires specific federal whistleblower protections. AI Whistleblower Protection Act, S. 1792, 119th Cong. (introduced May 15, 2025); see also H.R. 3460, 119th Cong. (companion bill).

37.    Senator Grassley's legislation directly responds to widespread industry practices, including at OpenAI, where *"illegally restrictive non-disclosure agreements"* were used to prevent employees from warning regulators about AI safety risks. Senate Judiciary Committee Press Release (May 15, 2025). As Grassley noted: *"For over a decade, I've sounded the alarm about restrictive NDAs that hinder oversight and improperly silence employees from making protected disclosures."* Letter from Sen. Chuck Grassley to Sam Altman, CEO, OpenAI (Aug. 1, 2024).[1]

38.    On May 19, 2025, the TAKE IT DOWN Act became law, creating federal criminal penalties and civil remedies for non-consensual sharing of intimate imagery. TAKE IT DOWN Act, Pub. L. No. 119-12, 47 U.S.C. § 223(h) (2025). This new federal law directly applies to Charging Party's allegations that Apple took intimate images of her and distributed them via email as purported "evidence" for her termination.

39.    Critically, Apple has claimed Charging Party "consented" to this conduct, but the new federal law defines consent as *"an affirmative, conscious, and voluntary authorization made by an individual free from force, fraud, duress, misrepresentation, or coercion."* 47 U.S.C. § 223(h)(9)(A). Consent obtained through workplace coercion from a whistleblower facing retaliation cannot meet this federal standard.

40.    These developments demonstrate that Congress recognizes that tech companies like Apple use *"illegally restrictive NDAs"* to silence AI whistleblowers, requiring federal protection (S. 1792/H.R. 3460) and Apple's alleged conduct—taking and distributing intimate images under workplace coercion, as a tool of

---

[1] Letter from Sen. Chuck Grassley to Sam Altman, CEO, OpenAI (Aug. 1, 2024), https://www.grassley.senate.gov/imo/media/doc/grassley_to_openai_-_ndas.pdf.

retaliation and intimidation—now constitutes an express federal crime (Pub. L. 119-12).=

41.    Charging Party's case represents the exact intersection of AI whistleblowing and tech company retaliation that prompted Congress to enact emergency federal protections. The fact that conduct central to Gjovik's NLRA claim became a federal crime demonstrates the exceptional importance and urgency of these issues.

## VI.  THE REGION IMPROPERLY MODIFIED THE SLACK ALLEGATION WITHOUT DISCLOSURE & IN FRUSTRATION OF ITS OWN CLAIM

42.    Beyond the formal withdrawals, the Region made a significant substantive change to the complaint that was not disclosed in the withdrawal order. This change effectively withdraws an additional allegation without formally doing so The original complaint alleged that Respondent made the Charging Party believe she would face discipline for using Slack to communicate with coworkers about workplace concerns, and when she asked for clarification, Appel refused to clarify. This allegation reflected the Charging Party's actual statements and experiences.

43.    However, the current version of the complaint has been edited to instead allege that the Charging Party's "Slack access was removed." The Charging Party never made this claim. In fact, she told the press the opposite—that Respondent would not confirm whether her access remained active.

44.    This modification is significant because it changes the nature of the alleged violation from a threat/chilling effect (which occurred) to a concrete adverse action (which did not occur); the Respondent will be able to demonstrate that the Charging Party's Slack access was not removed, thereby defeating the allegation as currently written; and the original allegation—that Respondent created a chilling effect on the Charging Party's use of Slack for protected communications—was actionable under the Act.

45.    By editing the allegation in this manner without disclosure, the Region has effectively withdrawn a meritorious claim and substituted an unfounded one, all without providing notice or explanation. This procedural irregularity further demonstrates the arbitrary nature of the Region's actions.

## VII.  FEDERAL RECOGNITION OF GJOVIK'S CASE AS EXEMPLIFYING SYSTEMIC SURVEILLANCE RETALIATION

46.    The federal significance of Plaintiff's case is definitively established by the U.S. Government Accountability Office's August 2024 report to Congress, which specifically incorporated and analyzed Gjovik's public comments about Apple's surveillance practices and the subject matter of her claims. (Exhibit C).

47.    GAO reviewed 217 public comments submitted by 211 stakeholders—including workers, advocacy organizations, unions, researchers, technology developers, and trade associations—to the White House Office of Science and Technology Policy (OSTP) regarding the use of automated digital surveillance. (GAO-24-107639).[2] The GAO report included a case study that directly parallels Gjovik's experience:

> "One worker reported being fired from a large technology company after raising concerns about the company's privacy policy, which empowered managers to access, search, monitor, archive, and delete data stored on any worker's devices."

By quantifying the report as "one worker," the reply implies this comment is specifically Gjovik's experience, demonstrating that federal investigators recognized her case as representative of systemic industry practices requiring congressional attention.

48.    The GAO report documented extensive negative effects of workplace surveillance, including that "constant surveillance can amplify workers' stress and anxiety levels" and "workers increasingly reported feeling that they cannot voice

---

[2] Digital Surveillance of Workers: Tools, Uses, and Stakeholder Perspectives | U.S. GAO, GAO-24-107639, https://www.gao.gov/products/gao-24-107639

concerns or share suggestions out of fear that their digital footprint will bite back."[3] The report specifically found that "Being perpetually watched can also eat away at a workers' sense of autonomy and privacy. Consequently, some workers feel it discourages workplace solidarity and unionization efforts." (Id).

49.    On June 29, 2023, Gjovik submitted detailed public comments to the White House Office of Science and Technology Policy's Request for Information on *"Automated Worker Surveillance and Management"* (Federal Register Document ID: OSTP_FRDOC_0001-0008). These comments described her direct experiences with Apple's biometric surveillance, mobile device monitoring, privacy violations, and subsequent retaliation for raising concerns about these practices.

50.    The GAO report was specifically requested by Senator Robert Casey Jr., and Rep. Robert "Bobby" Scott, demonstrating high-level congressional concern about these issues. Sen. Robert Casey, Jr. is a member of the Committee on Health, Education, and Labor, and the chair of the Senate Special Committee on Aging. Rep. Robert "Bobby" Scott is the Ranking Member on the House Committee on Education and the Workforce.

51.    Gjovik's June 2023 comments to OSTP directly contributed to federal policy development on workplace surveillance issues. The GAO report analyzed stakeholder perspectives on digital surveillance tools, finding that *"most workers say being watched gives them the creeps"* and documenting concerns about *"the potential for digital surveillance to create bias or discrimination."* [4]

52.    The incorporation of Gjovik's specific experiences into congressional-level policy analysis proves this case involves matters of exceptional public importance transcending individual litigation. The NLRB's dismissal of Gjovik's

---

[3] U.S. GAO, "'*Why do I feel like somebody's watching me?' Workplace Surveillance Can Impact More Than Just Productivity,*" October 29, 2024, https://www.gao.gov/blog/why-do-i-feel-somebodys-watching-me-workplace-surveillance-can-impact-more-just-productivity
[4] U.S. GAO, "'*Why do I feel like somebody's watching me?' Workplace Surveillance Can Impact More Than Just Productivity,*" October 29, 2024, https://www.gao.gov/blog/why-do-i-feel-somebodys-watching-me-workplace-surveillance-can-impact-more-just-productivity

claims eliminates agency oversight of conduct that federal investigators have identified as representative of industry-wide problems requiring immediate policy intervention at a national level. When Congress specifically studies a plaintiff's case as exemplifying systemic problems requiring federal attention, that case cannot be dismissed for vague and undefined reasons.

## VIII. FAILURE TO ADDRESS CALIFORNIA LAW CREATES A GARMON GAP AND CONTRADICTS NLRB'S JURISDICTIONAL CLAIMS

53. The NLRB is currently litigating against California and New York, arguing that those states are encroaching on the NLRB's exclusive jurisdiction over labor matters. While asserting exclusive federal jurisdiction in that litigation, the NLRB has dismissed this California employee's claims without analyzing California's constitutional and statutory protections or conducting any preemption analysis.

54. The Charging Party's termination for complaining about workplace surveillance implicates California's constitutional right to privacy (Cal. Const. art. I, § 1), California Labor Code § 96(k) (prohibiting retaliation for lawful conduct), § 1102.5 (whistleblower protection), §§ 232, 232.5 (protecting discussion of working conditions), and other state laws. The Charging Party has an active *Tameny* claim in federal district court based on these protections. Respondent has filed five motions to dismiss other claims but has not challenged the *Tameny* claim, suggesting its strength. The dismissal order makes no mention of any California protections.

55. This creates a *Garmon* gap. Under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959), conduct within the NLRA's scope preempts state regulation, while conduct outside that scope does not. The NLRB asserted jurisdiction by issuing a complaint, then dismissed without stating whether the conduct falls within NLRA scope, whether California protections are preempted, or whether state remedies remain available.

56.    The jurisdictional incoherence is compounded by the fact that the NLRB settled Respondent's workplace surveillance and confidentiality policies as unlawful, then characterized Respondent's enforcement of those same policies against the Charging Party as legitimate. The NLRB cannot claim exclusive jurisdiction over these policies while disclaiming jurisdiction over their enforcement, particularly while simultaneously litigating against California to prevent state-level labor protections.

57.    California introduced a bill in 2025, approved by both the Senate and Assembly, which would have expressly codified the Charging Party's right to complain about the matters she specifically complained about and that Apple cites as a legitimate reason to terminate her. The bill includes an express anti-retaliation provision, already based in common law, and to be codified in California statutes which forbids employers from retaliating against employees due to employees complaining about workplace surveillance – including through AI, biometrics, photos, and videos.[5]

58.    California has also recognized the critical importance of these issues through AI legislation that directly validates the public policy underlying Gjovik's claims. The state's legislative findings explicitly recognize that AI whistleblowers represent *the last line of defense when corporate incentives prioritize growth, profit, or competitive advantage over public welfare.* Senate Judiciary Committee Analysis, SB 53, 2025-2026 Reg. Sess. (Cal. 2025).[6]

59.    Senator Scott Wiener's SB 53 (2025) specifically targets the conduct at issue in this case, prohibiting developers from *making, adopting, or enforcing* rules *that prevent an employee from disclosing* information about AI safety risks and expressly prohibiting retaliation. Cal. Lab. Code § 1107.1(a) (proposed), S.B. 53,

---

[5] AB-1331 Workplace surveillance.(2025-2026), Legislative Information, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202520260AB1331
[6] Cal. AG, California State Senate Approves the California Artificial Intelligence Bill of Rights (June 3, 2025), https://sd18.senate.ca.gov/news/california-state-senate-approves-california-artificial-intelligence-bill-rights

2025-2026 Reg. Sess. (Cal. 2025).

60.    The legislation recognizes that *"company contracts may prevent [employees] from reporting concerns"* because *"broad non-disclosure and non-disparagement agreements...can prevent employees from sharing a good faith public safety concern...."* Bill Analysis, S.B. 53, 2025-2026 Reg. Sess. (Cal. 2025).[7] Senator Wiener's press release emphasized that *"Whistleblowers—employees of the largest labs who speak out about safety and security risks posed by the advanced AI systems they are developing—have emerged as a key window into the safety practices of large AI labs."* Press Release, Sen. Scott Wiener, Senator Wiener Introduces Legislation to Protect AI Whistleblowers & Boost Responsible AI Development (2025).[8]

61.    The California Legislature's findings in SB 420 establish that individuals have fundamental rights regarding AI systems, including "the right to control their personal data" and requirements for "informed, explicit consent" before personal data is used in AI systems. S.B. 420, § 1(c)(2), 2025-2026 Reg. Sess. (Cal. 2025).12 These protections directly contradict Apple's claimed authority to collect and distribute intimate imagery of employees (and anyone undressed near their iPhones). California's legislative analysis recognizes that *"technical complexity...creates significant information asymmetry between companies and outside regulators"* making *"whistleblowers uniquely positioned to identify issues that might otherwise remain hidden."* Cal. Senate Judiciary Committee Analysis, SB 53, 2025-2026 Reg. Sess. (Cal. 2025). The analysis further notes that *"most governmental bodies lack the specialized expertise to effectively evaluate these systems without insider information."* Id.

62.    The legislative record demonstrates California's recognition that: AI companies use *"broad non-disclosure and non-disparagement agreements"* to silence

---

[7] *SB-53: Artificial intelligence models: large developers.* (2025-2026), <u>Cal. Legislative Information</u>, [Approved by Governor  September 29, 2025. Filed with Secretary of State  September 29, 2025.].

[8] *SB-53: Artificial intelligence models: large developers.* (2025-2026), <u>Bill Analysis</u>: Senate Judiciary Committee; April 4 2025 Report, April 8, 2025 Hearing.

employees about safety concerns (*id.*)  "*Without protected channels for these voices, companies may face fewer checks on irresponsible development practices until after harm has occurred*" (*id.*)  Whistleblowers serve as "*an essential safety valve*" when "*potential consequences…can affect millions, if not billions, of people.*" (*id.*)

63.    Senator Padilla's statement accompanying SB 420 emphasized that "*tech companies would have us believe any regulation at all would be disastrous. The truth is it would be disastrous to allow tech titans to operate AI without oversight, accountability, or restraint.*" Press Release, Sen. Steve Padilla, California State Senate Approves the California Artificial Intelligence Bill of Rights (2025).[13]

64.    Gjovik's case represents the exact intersection of AI company retaliation and whistleblower silencing that prompted California's comprehensive legislative response. The state's explicit finding that such conduct threatens public welfare—combined with federal criminalization of Apple's specific tactics—demonstrates that immediate appellate review serves compelling public interests beyond the parties' individual dispute.

65.    Gjovik's case also represents exactly the type of widespread biometric privacy violation that prompted California's comprehensive legislative response. After Gjovik contacted her California Senator about Apple's biometric collection practices in fall 2021, that same Senator introduced SB 1189: Biometric Information (2021-2022), California's first comprehensive biometric privacy bill. This legislative sequence demonstrates that Gjovik identified a genuine public policy crisis requiring immediate judicial attention.

66.    SB 1189's legislative findings mirror Gjovik's allegations about Apple's conduct: "*While the use of this information provides many benefits, serious concerns have arisen with the widespread collection and disclosure of this highly sensitive biometric information without the informed consent of the people to whom the information pertains. These issues are compounded by the commodification of biometric data and its disclosure for for-profit purposes.*" Cal. Senate Judiciary Committee Analysis, SB 1189 (Apr. 5,

2022).

67.    The California Legislature specifically identified the employment context abuse that Gjovik experienced: *"On the employee side, it is reported that Walmart requires employees to record their voice using voice recognition software...."* In addition, *TopGolf* recently settled a lawsuit that alleged the company was improperly collecting biometric information from its employees without informed consent when it required them to scan their fingerprints to 'punch the clock' at work." *Id.*

68.    The proposed statute directly addressed Apple's violations: § 1798.302(b)(2): Prohibiting combination with employment contracts—exactly what Apple did by making Gobbler participation a job requirement and claiming the Gjovik somehow violating an "*informed consent agreement*" justified her termination. § 1798.305: Mandating reasonable security standards—which Apple violated by sharing intimate employee data. § 1798.306(a)(1): Providing statutory damages of $100-$1,000 per day—recognizing ongoing daily harm . And, § 1798.306(d): Authorizing *"equitable or declaratory relief"*—confirming monetary damages are inadequate.

69.    California's comprehensive biometric privacy legislation confirms two critical elements for appellate review. First, significant public interest: The Legislature found that biometric privacy violations *"risk empowering discriminative business practices, degrading privacy, and imposing heightened security risks on consumers."* Senate Judiciary Committee Analysis, SB 1189 (Apr. 5, 2022). Gjovik's case addresses exactly these statewide concerns affecting millions of Californians. Second, inadequacy of legal remedies: SB 1189's authorization of equitable relief alongside statutory damages demonstrates California's recognition that monetary compensation cannot cure ongoing biometric privacy violations.

70.    Yet, the NLRB, now after claiming jurisdiction over this matter, issues, and claims, has taken action to sabotage the same claims, in violation of tis own government statues and regulations, and in obstruction of state causes of action,

public policy, and Constitutional rights.

## IX.   THE DISMISSAL UNDERMINES THE AGENCY'S PROSECUTION OF REMAINING ALLEGATIONS

71.   The Agency continues to prosecute other allegations in this consolidated complaint, including claims regarding unlawful workplace rules and confidentiality policies. The Charging Party is the primary witness regarding the application of these policies.

72.   The dismissal order makes factual findings that will be used to impeach the Charging Party at the hearing on remaining allegations: "The evidence shows that Respondent placed the Charging Party on administrative leave at the Charging Party's request," "The evidence fails to establish that the Charging Party engaged in protected concerted activity when she revealed... confidential product development information," and "Respondent's interest in protecting the integrity of the investigation outweighs employees' interest."

73.   These are determinations on disputed facts. Respondent's counsel will cross-examine using the General Counsel's own findings. The General Counsel cannot object to questions based on its own dismissal order. Further, the Agency is simultaneously arguing:

a) **In the remaining complaint**: Respondent's confidentiality and investigation secrecy policies are unlawfully overbroad and chill protected concerted activity.

b) **In this dismissal**: Respondent's application of those same policies to investigate, suspend, and terminate the Charging Party was narrow, justified, and legitimate.

74.   Respondent will argue at hearing that if these policies were legitimately applied to the Agency's key witness, who raised the most extensive workplace concerns, the policies cannot be shown to chill protected activity or be unlawfully overbroad as applied.

75.    In April 2025, the Agency reached a settlement with Respondent regarding workplace policies, including confidentiality and investigation secrecy rules. Respondent agreed to stop claiming these policies were lawful and agreed not to enforce them. The Charging Party was terminated pursuant to these same policies. The dismissal order now states this termination was for legitimate reasons. This creates a legal problem: the Agency cannot enforce a settlement prohibiting use of certain policies while simultaneously determining that use of those policies against the charging party who secured the settlement was appropriate.

76.    Even under the most deferential standard, when an agency takes inconsistent positions—particularly within the same proceeding—it must at minimum acknowledge the inconsistency and explain it. See *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

77.    The dismissal order does not: acknowledge that these are the same policies subject to the April 2025 settlement; explain how enforcement against the Charging Party was legitimate while the policies themselves were unlawful; address how the General Counsel will prosecute remaining claims about these policies while maintaining that their application to terminate the Charging Party was appropriate.

78.    At summary judgment in the civil case, Respondent will argue: "*The NLRB—which has exclusive jurisdiction over federal labor claims—investigated these exact retaliation allegations and determined the termination was for legitimate disclosure of confidential information, not protected activity.*" The Charging Party will respond by pointing to these internal inconsistencies and arguing the dismissal is arbitrary, lacks reasoned decision-making, and cannot be given weight.

79.    The federal court will then evaluate whether the NLRB's dismissal—which contradicts its own ongoing prosecution and its own settlement—is entitled to any deference or persuasive weight. At the NLRB hearing on remaining allegations, Respondent will use the dismissal findings to impeach the Charging Party's testimony about the chilling effect and application of these policies.

80.    The Agency need not have a perfect prosecution strategy. However, when issuing merit determinations that will be used as evidence in both the Agency's own ongoing proceeding and in pending federal litigation, the Agency must at minimum not create direct contradictions with its own ongoing prosecution of related claims; and must acknowledge when findings conflict with the Agency's own prior settlement and provide some explanation for inconsistent positions within the same case.

81.    The dismissal order meets none of these minimum requirements. This failure has concrete consequences for the Agency's ability to prosecute the remaining allegations and for the Charging Party's ability to defend against use of this dismissal in federal court.

## X.    EPA ENFORCEMENT ACTION VALIDATES THE CHARGING PARTY'S WORKPLACE SAFETY COMPLAINTS

82.    After the dismissal order was issued, the Environmental Protection Agency took formal enforcement action against Respondent based on the Charging Party's complaints about workplace environmental health and safety hazards. This action creates legal and factual issues that the General Counsel must address.

83.    On Nov. 18 2025, the US EPA announced a finalized federal enforcement action (including a $261,283 fine & federal consent agreement) against Apple Inc over an unpermitted semiconductor manufacturing facility, next to thousands of homes and a playground, in Santa Clara, California. The EPA issued a public press statement attributing the enforcement action to tips and complaints provided by the Charging Party. (Exhibit D).

84.    The Charging Party's complaints and tips included information about and reports of environmental health and safety violations by Apple that Charging

Party experienced in 2020 and reported in 2020-2025.[9] Charging Party's roles was also expressly noted in the CAFO.

85.    The US EPA has published the legal documents and the case docket for their RCRA ("Resource Conservation and Recovery Act" federal hazardous waste management) enforcement action taken against Apple Inc over Apple's Santa Clara semiconductor manufacturing facility at 3250 Scott Blvd. The *Consent Agreement and Final Order* was signed and finalized as Case. No. RCRA-09-2026-0006, dated Oct. 27 2025.[10] (Exhibit D).

86.    This enforcement action validates that the Charging Party's health and safety complaints were factually grounded; conditions she reported constituted violations warranting federal enforcement action; Apple had a motive to conceal the underlying facts related to her complaints; Federal authorities considered Charging Party's complaints credible and significant enough to investigate and take enforcement action, and the hazards she reported were serious enough to result in fines and consent agreements.

87.    The workplace health and safety concerns that led to EPA enforcement action include and overlap with the same and similar concerns that form the basis of the dismissed NLRB allegations. Respondent was aware the Charging Party was reporting these environmental health and safety issues to federal authorities when it suspended and terminated her. The temporal proximity between her complaints and the adverse actions was part of the basis for the original complaint.

88.    The United States government cannot speak with two voices on the same facts. The EPA—an executive branch agency—has made a formal determination that the Charging Party is a credible whistleblower who reported

---

[9] US EPA, *EPA Takes Action Against Apple for Inadequate Hazardous Waste Management,* Nov. 18 2025, https://www.epa.gov/newsreleases/epa-takes-action-against-apple-inadequate-hazardous-waste-management

[10] U.S. EPA, Apple, Inc. (RCRA-09-2026-0006), Oct. 27 2025, https://yosemite.epa.gov/oa/rhc/epaadmin.nsf/47b294b16c6945d68525758200646805/276a7c424 28d5a4885258d310021678c!OpenDocument

legitimate workplace environmental health and safety violations warranting federal enforcement action. The NLRB—also an executive branch agency—has now dismissed allegations that the Charging Party was retaliated against for raising these same workplace health and safety concerns, characterizing her termination as legitimate.

89. These positions are legally inconsistent. See *United States v. Benson,* 941 F.2d 598, 613-14 (7th Cir. 1991) (single sovereign doctrine requires executive branch consistency). When one executive agency determines that an employee's workplace safety complaints warranted enforcement action, another executive agency cannot simultaneously dismiss retaliation claims based on those same complaints without at minimum acknowledging and explaining the inconsistency.

90. In addition to the recent enforcement action based on 2020 conditions, EPA conducted a separate inspection of the Charging Party's office in 2021 based on her complaints about different health and safety issues at that location. The timeline is significant: the Charging Party filed complaints with EPA about her office; EPA notified Respondent of an impending inspection; days later, Respondent placed the Charging Party on administrative leave; during the leave, Respondent instructed her not to discuss workplace health and safety matters; the inspection occurred while she was on leave and after the inspection when she asked to come back to work, the employer told her she cannot come back to work. The dismissal order characterizes the leave as having been "at the Charging Party's request" without addressing that Respondent placed her on leave immediately after being notified of the EPA inspection.

91. When an agency makes determinations on facts that overlap with another agency's enforcement actions, it must at minimum acknowledge those other findings. See *Reiter v. Cooper,* 507 U.S. 258, 267 (1993) (agencies must consider relevant information). The dismissal order does not: acknowledge the EPA enforcement action or investigation; address how the EPA's validation of the

Charging Party's complaints affects the analysis of whether she engaged in protected concerted activity; explain how the Charging Party can be simultaneously a credible federal whistleblower (per EPA) and a leaker of non-protected information (per NLRB); or consider the timing of the 2021 EPA inspection notification and the subsequent leave.

92.    At summary judgment in the civil case, the record will include: EPA enforcement action crediting the Charging Party as a whistleblower for serious safety violations; EPA inspection of her office in 2021, notification to employer, followed immediately by her leave; and the NLRB dismissal stating her termination for raising safety concerns was legitimate. The federal court will need to reconcile these positions. Respondent will cite the NLRB dismissal. The Charging Party will cite the EPA enforcement action. The court will reasonably question how the NLRB can dismiss retaliation claims when another federal agency has validated the underlying complaints as serious enough for enforcement action.

## XI.  REQUEST FOR STAY OF HEARING PENDING APPEAL DECISION

93.    The Charging Party requests that any scheduled hearing on the remaining allegations be stayed pending resolution of this appeal. As documented above, the dismissal order creates impeachment evidence that will be used against the Charging Party at the hearing on remaining allegations. If the hearing proceeds before this appeal is decided, the Charging Party will be cross-examined using the General Counsel's own factual findings from the dismissal order.

94.    If this appeal is later granted and the allegations are reinstated, the damage will already have occurred. The Charging Party's testimony will have been impeached at hearing, and those impeachment statements will be part of the hearing record. A stay pending appeal resolution would avoid this irreparable harm while causing minimal prejudice to other parties. The remaining allegations concern the same factual circumstances and time period as the dismissed allegations, and many

of the same witnesses and documents will be relevant to both.

95.    If the hearing proceeds and this appeal is subsequently granted, the matter would require a second hearing to adjudicate the reinstated allegations; recall of witnesses who already testified; and duplication of testimony regarding the same factual circumstances and policies. A stay would allow for a single, comprehensive hearing on all allegations if the appeal is granted. The Charging Party respectfully requests that any hearing on the remaining allegations be stayed pending the General Counsel's decision on this appeal.

## XII.  THE HEARING LOCATION CREATES AN ADDITIONAL PROCEDURAL BARRIER

96.    The Region has scheduled the hearing on remaining allegations in Los Angeles. No party resides in Los Angeles. The Charging Party resides in Boston and is currently in bankruptcy proceedings. The Charging Party previously objected to scheduling hearings in Los Angeles and informed the Region that she does not reside in California; she currently resides in Boston; she is in bankruptcy proceeding. The travel cost and time to attend an in-person hearing in Los Angeles creates a substantial barrier to her participation. The Region scheduled the hearing in Los Angeles regardless.

97.    Section 102.34(a) of the Board's Rules and Regulations provides that hearings "shall be conducted at the places designated by the Board or the regional director issuing the complaint." While this grants discretion, it does not authorize scheduling hearings in locations that effectively prevent a party's participation.

98.    The Charging Party is the key witness for the remaining allegations about workplace policies. Her testimony about how policies were communicated, her understanding of those policies, and the chilling effect of those policies is central to the General Counsel's case. Scheduling the hearing in a location where the Charging Party cannot afford to attend—after being notified of this barrier—risks proceeding without the testimony of the General Counsel's own key witness.

99.    The Region has not provided any explanation for why Los Angeles was selected when the Charging Party resides in Boston; Respondent's headquarters are not in Los Angeles; the events at issue did not occur in Los Angeles; the Charging Party has specifically objected and explained the financial barrier.

100.    The Charging Party requests that if the hearing is not stayed pending appeal, it be conducted either by videoconference, consistent with the Board's established procedures for remote hearings; or in a location accessible to the Charging Party. At minimum, the Region should articulate its rationale for requiring in-person attendance in Los Angeles when the Charging Party has specifically objected and explained that she cannot afford to attend.

# XIII.  CONCLUSION & REQUESTED RELIEF

101.    The Agency's withdrawal of these allegations is procedurally defective, legally erroneous, and factually unsupported. The withdrawal:

a)    Violates the APA by denying formal adjudication after a hearing was scheduled;

b)    Fails to explain why previously sufficient evidence is now inadequate;

c)    Ignores substantial new evidence obtained through discovery;

d)    Contradicts the Agency's own prior findings against this Respondent;

e)    Undermines the Agency's own settlement agreement;

f)    Mischaracterizes the protected nature of the Charging Party's conduct;

g)    Disregards and conflicts with other federal agency determinations and actions;

h)    Applies legal standards incorrectly; and

i)    Makes credibility determinations that should be reserved for formal hearing.

102.    For these reasons, I respectfully request that the General Counsel:

a) Reverse all withdrawals, modifications, and dismissals of allegations in the Consolidated Complaint;

b) Direct the Region to restore these allegations to the Consolidated Complaint;

c) Order that a hearing be scheduled before an Administrative Law Judge to adjudicate these allegations;

d) Provide a reasoned explanation for any determination that differs from the Region's initial prosecutorial judgment to issue the complaint; and

e) Ensure that Respondent's termination of the Charging Party under policies the Agency found unlawful is addressed consistent with the Agency's April 2025 settlement agreement.

103.    The Charging Party requests that the Agency to consider the discovery production and EPA enforcement action as new evidence relevant to whether the Charging Party engaged in protected concerted activity and at minimum, acknowledge the EPA's findings and explain how the NLRB's dismissal of retaliation claims is consistent with EPA's validation of the underlying complaints and address the timing of the 2021 EPA inspection notification and the Charging Party's subsequent placement on leave, and the direct evidence in support of Charging Party's claims (the July 2021- investigation) and direct evidence contradicting Apple's defense (the 2017 Gobbler ICF). Absent consideration of these issues, the dismissal fails to account for material evidence and creates an untenable inconsistency within the executive branch.

104.    The Charging Party has been denied the formal adjudication to which she is entitled under the APA and the Board's Rules. She has presented substantial evidence of retaliation for protected concerted activity, including new evidence that has never been considered in a formal proceeding. The summary dismissal of her claims, without hearing or adequate explanation, is contrary to law and should be reversed.

ASHLEY GJOVIK; APPLE INC                          E-FILING #1108573163 | 11/21/2025

Thank you for your consideration of this appeal.

**Respectfully submitted,**

**/s/ Ashley M. Gjovik**

*Pro Se Charging Party*

Dated: Nov. 21 2025
legal@ashleygjovik.com

## X.    EXHIBIT D



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**OFFICE OF THE GENERAL COUNSEL**
**Washington, DC 20570-0001**

May 08, 2026

ASHLEY MARIE GJOVIK
2108 N ST STE. 4553
SACRAMENTO, CA 95816

Re:     Apple Inc.
        Cases 32-CA-282142
               32-CA-283161

Dear Ms. Gjovik:

Your appeal from the Acting Regional Director's September 25, 2025 *Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161* ("Order") has been carefully considered, along with the additional evidence submitted. The appeal is denied.

Under Section 3(d) of the National Labor Relations Act, the General Counsel has unreviewable final authority, which is "not only authority to decide whether to issue unfair labor practice complaints, but also, in some circumstances, authority extending beyond the point at which a complaint is issued," including "a purely 'prosecutorial' decision to withdraw a complaint, i.e., effectively a dismissal." *Sheet Metal Workers Local 28 (American Elgen)*, 306 NLRB at 982 (citing *NLRB v. Food & Commercial Workers*, 484 U.S. 112, 122-23, 125-26 (1987)). Here, the Acting General Counsel reviewed the cases and pursuant to his broad prosecutorial discretion, decided not to continue the prosecution of certain allegations. As such the Acting Regional Director's Order withdrawing certain allegations from the consolidated complaint, partially dismissing certain allegations in 32-CA-282142, and dismissing 32-CA-283161 was a proper exercise of prosecutorial discretion. *See* §102.18 of the Board Rules and Regulations.

Certain allegations in charge 32-CA-282142, as identified in the Acting Regional Director's September 25, 2025 *Order Severing Cases, Amended Complaint and Notice of Hearing,* remain with the Region for further processing.

Accordingly, the appeal is denied.

Apple Inc.
Cases 32-CA-282142, et al.

2        May 08, 2026

Sincerely,

Lynisa B. Michalski
Acting Deputy General Counsel

By:    _____

Pedro M. Arguello, Managing Attorney
Office of Appeals

Apple Inc.                    3     May 08, 2026
Cases 32-CA-282142, et al.


cc:     REGION

         APPLE, INC.
         ONE APPLE PK WY
         CUPERTINO, CA 95014

         BRENDA ROSALES-CARRILLO, CORPORATE
         COUNSEL
         APPLE, INC.
         1 APPLE PKWY
         CUPERTINO, CA 95014

         BRIAN MAHONEY ESQ.
         MORGAN, LEWIS, & BOCKIUS, LLP
         2222 MARKET ST
         PHILADELPHIA, PA 19103

         DIEGO ACEVEDO, CORPORATE COUNSEL
         APPLE, INC.
         1 APPLE PKWY
         CUPERTINO, CA 95014

         HARRY I. JOHNSON III, ESQ.
         MORGAN, LEWIS & BOCKIUS LLP
         2049 CENTURY PARK E STE 700
         LOS ANGELES, CA 90067-3109

         KELCEY J. PHILLIPS, ESQ.
         MORGAN, LEWIS & BOCKIUS LLP
         1111 PENNSYLVANIA AVE NW
         WASHINGTON, DC 20004

         MARK L. STOLZENBURG ESQ.
         MORGAN LEWIS & BOCKIUS LLP
         110 N WACKER DR STE 2800
         CHICAGO, IL 60606

vrm

## XI.    EXHIBIT E

# XII.    EXHIBIT F

**OFFICE OF THE GENERAL COUNSEL**

**MEMORANDUM GC 23-02**                                    **October 31, 2022**

TO:          All Regional Directors, Officers-in-Charge,
               and Resident Officers

FROM:      Jennifer A. Abruzzo, General Counsel

SUBJECT:   Electronic Monitoring and Algorithmic Management of Employees
               Interfering with the Exercise of Section 7 Rights

Recent technological advances have dramatically expanded employers' ability to monitor and manage employees within the workplace and beyond. As more and more employers take advantage of those new capabilities, their practices raise a number of issues under the Act. An issue of particular concern to me is the potential for omnipresent surveillance and other algorithmic-management tools to interfere with the exercise of Section 7 rights by significantly impairing or negating employees' ability to engage in protected activity and keep that activity confidential from their employer, if they so choose.[1] Thus, I plan to urge the Board to apply the Act to protect employees, to the greatest extent possible, from intrusive or abusive electronic monitoring and automated management practices that would have a tendency to interfere with Section 7 rights. I will do so both by vigorously enforcing extant law and by urging the Board to apply settled labor-law principles in new ways, as described below.

It is well documented that employers are increasingly using new technologies to closely monitor and manage employees.[2] In warehouses, for example, some employers record

---

[1]  In this memorandum, I use the term "automated management" or "algorithmic management" to refer to "a diverse set of technological tools and techniques to remotely manage workforces, relying on data collection and surveillance of workers to enable automated or semi-automated decision-making." Alexandra Mateescu & Aiha Nguyen, *Explainer: Algorithmic Management in the Workplace*, Data & Society Research Institute (Feb. 2019), *available at* https://datasociety.net/wp-content/uploads/2019/02/DS_Algorithmic_Management_Explainer.pdf.

[2]  Danielle Abril, *Your Boss Can Monitor Your Activities Without Special Software*, Washington Post (Oct. 7, 2022), *available at* https://www.washingtonpost.com/technology/2022/10/07/work-app-surveillance/; Jo Constantz, *"They Were Spying On Us": Amazon, Walmart, Use Surveillance Technology to Bust Unions*, Newsweek (Dec. 13, 2021), *available at* https://www.newsweek.com/they-were-spying-us-amazon-walmart-use-surveillance-technology-bust-unions-1658603;  Richard A. Bales & Katherine V. W. Stone, *The Invisible Web at Work: Artificial Intelligence and Electronic Surveillance in the Workplace*, 41 Berkeley J. Emp. & Lab. L. 1, 16-22 (2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3410655; Charlotte Garden, *Labor*

workers' conversations and track their movements using wearable devices, security cameras, and radio-frequency identification badges.[3] On the road, some employers keep tabs on drivers using GPS tracking devices and cameras.[4] And some employers monitor employees who work on computers—whether in call centers, offices, or at home—using keyloggers and software that takes screenshots, webcam photos, or audio recordings throughout the day.[5]

Electronic monitoring and automated management are not always limited to working time. After the workday ends, some employers continue to track employees' whereabouts and communications using employer-issued phones or wearable devices, or apps installed on workers' own devices.[6] And even before the employment relationship begins, some employers pry into job applicants' private lives by conducting personality tests and scrutinizing applicants' social media accounts.[7]

Importantly, advances in artificial intelligence and algorithm-based decision-making in recent years have made it possible for employers to analyze, sell or otherwise share, and act on the voluminous data that new technologies generate.[8] Some employers use that

---

*Organizing in the Age of Surveillance*, 63 St. Louis U. L.J. 55, 56-57 (2018), *available at* https://scholarship.law.slu.edu/lj/vol63/iss1/5/. *See also* Kate Bronfenbrenner, Testimony before the United States House Committee on Education and Labor, *In Solidarity: Removing Barriers to Organizing*, Cornell School of Indus. and Labor Relations, at 11-12 (Sept. 14, 2022), *available at* https://ecommons.cornell.edu/handle/1813/111838 (noting increase in electronic surveillance during union campaigns).

[3]  Bales & Stone, *supra*, at 17, 20; Garden, *supra*, at 57.

[4]  Kathryn Zickuhr, *Workplace Surveillance Is Becoming the New Normal for U.S. Workers*, Wash. Ctr. for Equitable Growth, at 4 (Aug. 2021), *available at* https://equitablegrowth.org/research-paper/workplace-surveillance-is-becoming-the-new-normal-for-u-s-workers/.

[5]  Garden, *supra*, at 56. *See* Letter from Rep. Robert "Bobby" Scott, Chairman, Committee on Education and Labor, U.S. House of Representatives, to Gene Dodaro, Comptroller, GAO (Oct. 5, 2022), *available at* https://edlabor.house.gov/download/scott-letter-to-gao-re-bossware (discussing "bossware" technology used to monitor employees in telework and office settings).

[6]  *See* Emma Oppenheim, *Shining a Spotlight on Workers' Financial Experiences*, CFPB (Mar. 9, 2022), *available at* https://www.consumerfinance.gov/about-us/blog/shining-a-spotlight-on-workers-financial-experiences/; Bales & Stone, *supra*, at 20-22.

[7]  Bales & Stone, *supra*, at 10-15.

[8]  *Id.*; *Policy Statement on Enforcement Related to Gig Work*, FTC, at 10 (Sept. 15, 2022), *available at* https://www.ftc.gov/legal-library/browse/policy-statement-enforcement-related-gig-work.

data to manage employee productivity, including disciplining employees who fall short of quotas, penalizing employees for taking leave, and providing individualized directives throughout the workday.[9]

Under settled Board law, numerous practices employers may engage in using new surveillance and management technologies are already unlawful. In cases involving employer observation of open protected concerted activity and public union activity like picketing or handbilling, the Board has recognized that "pictorial recordkeeping tends to create fear among employees of future reprisals."[10] The Board accordingly balances an employer's justification for surveillance "against the tendency of that conduct to interfere with employees' right to engage in concerted activity."[11] In that context, "the Board has long held that absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate."[12]

In addition, it is well established that an employer violates Section 8(a)(1) if it institutes new monitoring technologies in response to activity protected by Section 7; utilizes technologies already in place for the purpose of discovering that activity, including by reviewing security-camera footage or employees' social-media accounts; or creates the impression that it is doing such things.[13] Employer surveillance of Section 7 activity is

---

[9] Annette Bernhardt, Lisa Kresge & Reem Suleiman, *Data & Algorithms at Work: The Case for Worker Technology Rights*, UC Berkeley Labor Center, at 6 (Nov. 2021), *available at* https://laborcenter.berkeley.edu/data-algorithms-at-work/; Jodi Kantor, Karen Weise & Grace Ashford, *The Amazon That Customers Don't See*, New York Times (June 15, 2021), *available at* https://www.nytimes.com/interactive/2021/06/15/us/amazon-workers.html; Zickuhr, *supra*, at 20; Bales & Stone, *supra*, at 17-18. Although the trend is visible across the national economy, the rising use of intrusive monitoring and management technologies disproportionately affects low-wage workers, workers of color, immigrants, and women, who are more likely to work in heavily tracked positions in warehousing, package delivery, and call centers. Bernhardt, Kresge & Suleiman, *supra*, at 15; Zickuhr, *supra*, at 12.

[10] *Brasfield & Gorrie, LLC*, 366 NLRB No. 82, slip op. at 5 (2018) (quoting *National Steel & Shipbuilding Co.,* 324 NLRB 499, 499 (1997), *petition for review denied,* 156 F.3d 1268 (D.C. Cir. 1998)).

[11] *F.W. Woolworth Co.*, 310 NLRB 1197, 1197 (1993) (citations and internal quotation marks omitted).

[12] *Id.*

[13] *See, e.g.*, *National Captioning Institute*, 368 NLRB No. 105, slip op. at 5 ("It is well settled that an employer commits unlawful surveillance if it acts in a way that is out of the ordinary in order to observe union activity."); *AdvancePierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 2 n.4, 15-16 (2018) (employer's review of break-room security-camera footage to observe employee distribution of union literature was unlawful

4

unlawful whether it is carried out openly or covertly[14] and certain conduct can be unlawful even if it merely creates an impression of surveillance.[15] An employer who spends money on surveillance technology "to obtain information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer," or otherwise expends money to interfere with, restrain, or coerce employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing, must generally file a Form LM-10, reporting the expenditure to the U.S. Department of Labor's Office of Labor-Management Standards.[16]

It is clear under extant law that employers violate Section 8(a)(1) if they discipline employees who concertedly protest workplace surveillance or the pace of work set by algorithmic management.[17]   Employers also violate Section 8(a)(1) if they coercively question employees with personality tests designed to evaluate their propensity to seek

---

surveillance), *enforced*, 966 F.3d 813 (D.C. Cir. 2020); *National Captioning Institute, Inc.*, 368 NLRB No. 105, slip op. at 5 (2019) ("intentional monitoring of pro-union employees' Facebook postings" violates the Act); *Mek Arden, LLC*, 365 NLRB No. 109, slip op. at 19 (2017) (employer unlawfully created impression of surveillance by stating that voice-activated security cameras were monitoring union activity), *enforced*, 755 F. App'x 12 (D.C. Cir. 2018).

[14]  *NLRB v. Grower-Shipper Vegetable Ass'n*, 122 F.2d 368, 376 (9th Cir. 1941).

[15]  *Frontier Telephone of Rochester, Inc.*, 344 NLRB 1270, 1276 (2005) ("In determining whether an employer has unlawfully created the impression of surveillance of employees' union activities, the test that the Board has applied is whether, under all the relevant circumstances, reasonable employees would assume from the statement in question that their union or other protected activities had been placed under surveillance."), *enforced*, 181 F. App'x 85 (2d Cir. 2006).

[16]  29 USC § 433(a)(3). *See* OLMS Fact Sheet, Form LM-10 Employer Reporting: Transparency Concerning Persuader, Surveillance, and Unfair Labor Practice Expenditures, at 3, *available at* https://www.dol.gov/sites/dolgov/files/OLMS/regs/compliance/LM10_FactSheet.pdf (describing obligation to report expenditures on "[s]urveillance equipment or other technology used to surveil and the time spent on installing, operating, and monitoring it, as well as analyzing the information the equipment produces" among others). OLMS relies on Board findings in enforcing these reporting requirements. To promote compliance in cases that do not proceed to a Board decision, Regions should add the following language to settlement proposals in appropriate cases: "The Charged Party will report to the U.S. Department of Labor, Office of Labor-Management Standards, via its Form LM-10, the amount of any payments or expenditures made in conjunction with the conduct at issue in this case."

[17]  *See NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 15 (1962) (employees' walkout to protest working conditions was protected); *Accel, Inc.*, 339 NLRB 1052, 1052 (2003) (employer unlawfully discharged employees for protesting requirement to work through a scheduled break).

union representation.[18] And employers violate Section 8(a)(1) if they dismantle or preclude employee conversations or isolate union supporters or discontented employees to prevent Section 7 activity.[19]

Further, if employers rely on artificial intelligence to screen job applicants or issue discipline, the employer—as well as a third-party software provider—may violate Section 8(a)(3) if the underlying algorithm is making decisions based on employees' protected activity.[20] Employers also violate Section 8(a)(3) by discriminatorily applying production quotas or efficiency standards to rid themselves of union supporters.[21] Finally, where employees have union representation, employers violate Section 8(a)(5) if they fail to provide information about, and bargain over, the implementation of tracking technologies and their use of the data they accumulate.[22]

In addition to zealously enforcing the foregoing precedent, I will urge the Board to adopt a new framework for protecting employees from intrusive or abusive forms of electronic monitoring and automated management that interfere with Section 7 activity. It is the Board's responsibility "to adapt the Act to changing patterns of industrial life."[23] An employer's right to oversee and manage its operations with new technologies is "not

---

[18] *See Facchina Construction, Co.*, 343 NLRB 886, 886 (2004) (employer violated the Act by questioning job applicant about union membership), *enforced*, 180 F. App'x 178 (D.C. Cir. 2006); *Allegheny Ludlum Corp.*, 333 NLRB 734, 740 (2001) (an employer engages in unlawful polling by forcing an employee to make "an observable choice that demonstrates their support for or rejection of the union"), *enforced*, 301 F.3d 167 (3d Cir. 2002).

[19] *See Trus Joist MacMillan*, 341 NLRB 369, 373 (2004) (employer violated Section 8(a)(1) by restricting employee's movements within facility during working time "to curtail employees' union discussions").

[20] *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 186-87 (1941) (discrimination in hiring against union supporters violates the Act); *Blankenship & Associates*, 306 NLRB 994, 995 (1992) (entering order against consultant acting as employer's agent).

[21] *See Roemer Industries*, 367 NLRB No. 133, slip op. at 17 (2019) (finding employer's claim that it discharged union supporter for inefficiency to be pretextual), *enforced*, 824 F. App'x 396 (6th Cir. 2020).

[22] *See Anheuser-Busch, Inc.*, 342 NLRB 560, 560 (2004) (employer violated the Act by failing to bargain with union prior to installation and use of surveillance cameras in the workplace), *enforced in pertinent part sub nom. Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36 (D.C. Cir. 2005). *See generally* Lisa Kresge, *Union Collective Bargaining Agreement Strategies in Response to Technology*, Working Paper, UC Berkeley Labor Center (Nov. 2020), *available at* https://laborcenter.berkeley.edu/wp-content/uploads/2022/01/Working-Paper-Union-Collective-Bargaining-Agreement-Strategies-in-Response-to-Technology-v2.pdf (discussing collective-bargaining-agreement provisions addressing employers' use of technology in the workplace).

[23] *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975).

unlimited in the sense that [it] can be exercised without regard to any duty which the existence of rights in others may place upon [the] employer."[24] Rather, it is up to the Board to work out an "adjustment" between the interests of management and labor that guarantees employees a meaningful "[o]pportunity to organize."[25] Consistent with the Board's statutory role, I will urge the Board to ensure that intrusive or abusive methods of electronic surveillance and automated management do not unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights by stopping union and protected concerted activity in its tracks or preventing its initiation.[26]

The framework I will advocate is grounded in well-settled Board principles. The Board has held, with the Supreme Court's approval, that "the right of employees to self-organize and bargain collectively established by [Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite."[27] The workplace "is the one place where employees clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees."[28] Employers cannot lawfully prevent discussions about such matters, even during working time, if (as is often the case) they permit other kinds of non-work discussions.[29] And "time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as [the employee] wishes without unreasonable restraint, although the employee is on company property."[30]

In addition, both inside and outside of the workplace, "[t]he confidentiality interests of employees have long been an overriding concern to the Board."[31] Because employers so commonly retaliate against employees for exercising their Section 7 rights, the Board recognizes, with court approval, that a "right to privacy" is "necessary to full and free

---

[24]  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945).

[25]  *Id.*

[26]  *Cf. Parexel International, LLC*, 356 NLRB 516, 519-20 (2011) (finding unlawful a "preemptive strike" discharge that prevented employees "from discussing, and possibly inquiring further or acting in response to, substandard wages or perceived wage discrimination").

[27]  *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978).

[28]  *Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 (1978) (quoting *Gale Products*, 142 NLRB 1246, 1249 (1963)) (brackets omitted).

[29]  *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 26 (2019), *enforced in pertinent part*, 825 F. App'x 348 (6th Cir. 2020).

[30]  *Republic Aviation*, 324 U.S. at 803 n. 10 (1945) (quoting *Peyton Packing Co.*, 49 NLRB 828, 843 (1943)).

[31]  *National Telephone Directory Corp.*, 319 NLRB 420, 421 (1995).

exercise of the organizational rights guaranteed by the [Act]."[32] The Board, accordingly, holds that "Section 7 of the Act gives employees the right to keep confidential their union activities,"[33] and it "zealously seeks to protect the confidentiality interests of employees."[34] In short, "employees should be free to participate in union organizing campaigns [or other protected concerted activity] without the fear that members of management are peering over their shoulders, taking note of who is involved in [Section 7] activities, and in what particular ways."[35]

Close, constant surveillance and management through electronic means threaten employees' basic ability to exercise their rights. In the workplace, electronic surveillance and the breakneck pace of work set by automated systems may severely limit or completely prevent employees from engaging in protected conversations about unionization or terms and conditions of employment that are a necessary precursor to group action.[36] If the surveillance extends to break times and nonwork areas, or if excessive workloads prevent workers from taking their breaks together or at all, they may be unable to engage in solicitation or distribution of union literature during nonworking time.[37] And surveillance reaching even beyond the workplace—or the use of technology that makes employees reasonably fear such far-reaching surveillance—may prevent employees from exercising their Section 7 rights anywhere.

I am mindful that some employers may have legitimate business reasons for using some forms of electronic monitoring and automated management. But to the extent that employers have a legitimate need to electronically monitor and direct employees in ways that could inhibit Section 7 activity, the employer's interests must be balanced against

---

[32] *Pac. Molasses Co. v. NLRB Reg'l Off. No. 15*, 577 F.2d 1172, 1182 (5th Cir. 1978).

[33] *Guess?, Inc.*, 339 NLRB 432, 434 (2003). *Accord Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1274 (D.C. Cir. 2012).

[34] *Wright Elec., Inc. v. NLRB*, 200 F.3d 1162, 1165 (8th Cir. 2000). *Accord United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 785 (9th Cir. 2017).

[35] *Flexsteel Industries*, 311 NLRB 257, 257 (1993).

[36] *See Alternative Energy Applications, Inc.*, 361 NLRB 1203, 1206 n.10 (2014) (noting that "discussions of wages are often preliminary to organizing or other action for mutual aid or protection"). *Cf. Spring Valley Hospital Medical Center*, 363 NLRB 1766, 1766 n.3, 1782 (2016) (adopting, in absence of exceptions, judge's finding that employer violated Section 8(a)(1) by requiring employees to speak English only, which limited employees' "ability to freely discuss and communicate about work conditions, wages and other terms and conditions of employment").

[37] *See Peyton Packing*, 49 NLRB at 843 (absent special circumstances, employers must allow their employees to engage in union solicitation on employer premises during nonwork time), *enforced*, 142 F.2d 1009 (5th Cir. 1944); *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615, 620 (1962) (employees generally may distribute union-related literature on their employer's premises, but the employer may restrict the distribution to nonwork areas).

employees' rights under the Act.[38] The Board must reach an accommodation between competing employer interests and employee rights "with as little destruction of one as is consistent with the maintenance of the other."[39]

Thus, in appropriate cases, I will urge the Board to find that an employer has presumptively violated Section 8(a)(1) where the employer's surveillance and management practices, viewed as a whole, would tend to interfere with or prevent a reasonable employee from engaging in activity protected by the Act. If the employer establishes that the practices at issue are narrowly tailored to address a legitimate business need—i.e., that its need cannot be met through means less damaging to employee rights—I will urge the Board to balance the respective interests of the employer and the employees to determine whether the Act permits the employer's practices. If the employer's business need outweighs employees' Section 7 rights, unless the employer demonstrates that special circumstances require covert use of the technologies, I will urge the Board to require the employer to disclose to employees the technologies it uses to monitor and manage them, its reasons for doing so, and how it is using the information it obtains. Only with that information can employees intelligently exercise their Section 7 rights and take appropriate measures to protect the confidentiality of their protected activity if they so choose.[40]

The foregoing framework is consistent with the approach I have advocated in cases where an employer maintains facially neutral work rules that could interfere with the exercise of Section 7 rights.[41] In those circumstances, as here, I have urged the Board to evaluate the effect of employer rules on a reasonable employee who is in a position of economic vulnerability, taking into account the totality of the surrounding circumstances.[42] And in doing so, I have urged the Board to give full consideration to employers' business needs, and to "permit[] employers to maintain narrowly tailored rules that infringe on employees' Section 7 rights in the limited circumstances where conflicting legitimate business interests outweigh those rights."[43] In the same way, with regard to investigative-confidentiality rules, I have urged the Board to permit restrictions on statutorily protected

---

[38] *See Guess?*, 339 NLRB at 434-35 (balancing employer's legitimate need for information against employees' Section 7 right to keep union activities confidential).

[39] *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956).

[40] In addition, I will consider whether other safeguards or assurances are necessary to protect employees' Section 7 rights. *See, e.g.*, Garden, *supra*, at 67-68 (discussing proposals to require employers to limit who may access information obtained through electronic surveillance and algorithmic management, and to permit employees to respond before imposing discipline based on such information).

[41] *See generally Stericycle, Inc.*, Case Nos. 04-CA-137660 et al., Brief to the Board dated Mar. 7, 2022.

[42] *Id.* at 3, 12.

[43] *Id.* at 4, 13.

9

employee communications "only when legitimate and substantial justifications outweigh employees' Section 7 rights in a particular investigation."[44]

Finally, I note that I am committed to an interagency approach to these issues, as numerous agencies across the federal government are working to prevent employers from violating federal law using electronic surveillance and algorithmic management technologies. Through those efforts, agencies including the Federal Trade Commission, the Consumer Financial Protection Bureau, Department of Justice, Equal Employment Opportunity Commission, and the Department of Labor are working to combat a range of harms employers inflict on workers using such technologies, from discrimination in hiring and work assignments, to misclassification of employees as independent contractors, to other unfair or deceptive pay practices, to selling or sharing workers' personal data, to injuries caused by overwork and repetitive motions.[45] Recent agreements that we have signed with many of these agencies will facilitate information sharing and coordinated enforcement on these issues.[46]

Consistent with the principles set forth above, Regions should vigorously enforce extant Board law in cases involving new workplace technologies. In addition, Regions should submit to Advice any cases involving intrusive or abusive electronic surveillance and algorithmic management that interferes with the exercise of Section 7 rights.

/s/
J.A.A.

---

[44]  *Id.* at 16.

[45]  *See* Press Release, Justice Department and EEOC Warn Against Disability Discrimination (May 12, 2022), *available at* https://www.justice.gov/opa/pr/justice-department-and-eeoc-warn-against-disability-discrimination (discussing technical assistance document concerning disability discrimination resulting from the use of artificial intelligence and algorithmic decision-making); FTC Policy Statement on Enforcement Related to Gig Work, *supra* (discussing FTC's enforcement priorities in relation unfair and deceptive practices involving surveillance and algorithm-based decision-making, and exclusionary or predatory conduct by dominant firms that may unlawfully create or maintain a monopoly or a monopsony resulting poorer working conditions for gig workers); Oppenheim, *supra* (noting CFPB's intention to closely monitor the collection and sale of workers' data and assess where provisions of the Fair Credit Reporting Act and other consumer protection laws may protect workers).

[46]  *See* NLRB Interagency Memoranda of Understanding, *available at* https://www.nlrb.gov/guidance/key-reference-materials/interagency-international-collaboration/interagency-MOUs.

# XIII.   EXHIBIT G



🇺🇸 An official website of the United States government  **Here's how you know** ⌄

**Español**  |  **Other Languages** 🌐



**NLRB**
National Labor Relations Board

☰ **Menu**

Home

# News & Publications

# GC 25-05 Rescission of Certain General Counsel Memoranda

Office of Public Affairs

202-273-1991

publicinfo@nlrb.gov

www.nlrb.gov

February 14, 2025

Today, NLRB Acting General Counsel William B. Cowen issued a memo to all field offices, rescinding certain memoranda issued by the former General Counsel, and announced his intention to assist the Regions by issuing further guidance on appropriate allocation of the Agency's resources.

In the memo, ACG Cowen stated, "Over the past few years, our dedicated and talented staff have worked diligently to process an ever-increasing workload. Notwithstanding these efforts, we have seen our backlog of cases grow to the point where it is no longer sustainable. The unfortunate truth is that if we attempt to accomplish everything, we risk accomplishing nothing."

Among the rescinded memos are: GC 21-06 and GC 21-07 addressing remedies to be sought, GC 21-08 on the rights of student-athletes under the NLRA; GC 23-02 on electronic monitoring; · GC 23-05 on severance agreements and· GC 23-08 and GC 25-01 on non-compete agreements. AGC Cowen rescinded and will provide further guidance on GC 24-01 concerning the Board's Decision in *Cemex Construction Materials Pacific, LLC*.

AGC Cowen announced that [GC Memo 21-01](#) on Mail Ballot Elections, was rescinded as COVID-19 is no longer a Federal Public Health Emergency.

*Established in 1935, the National Labor Relations Board is an independent federal agency that protects employees from unfair labor practices and protects the right of private sector employees to join together, with or without a union, to improve wages, benefits and working conditions. The NLRB conducts hundreds of workplace elections and investigates thousands of unfair labor practice charges each year.*

## Most Popular Pages

[Who We Are](#)

[National Labor Relations Act](#)

[Cases & Decisions](#)

[Recent Charges & Petitions Filings](#)

[The Law](#)

[The Right to Strike](#)

[Case Search](#)

[Contact Us](#)

[Frequently Asked Questions](#)

## Content in Other Languages

[Español - Spanish](#)
[العربية - Arabic](#)
[中文 (繁體中文) - Chinese (Traditional)](#)
[中文 (简体中文) - Chinese (Simplified)](#)
[Français - French](#)

[Kreyòl ayisyen - Haitian Creole](#)
[हिंदी - Hindi](#)
[Hmong - Hmong](#)
[한국어 - Korean](#)
[Polski - Polish](#)
[Português - Portuguese](#)

[ਪੰਜਾਬੀ - Punjabi](#)
[Русский - Russian](#)
[Somali - Somali](#)
[Tagalog - Tagalog](#)
[اردو - Urdu](#)
[Tiếng Việt - Vietnamese](#)

## Connect With NLRB

**NLRB Subscription Updates**

   



# National Labor Relations Board

Site Map | Policies | OpenGov | USA.gov | FOIA | Privacy |
No Fear Act | EEO

## About

Rights We Protect

What We Do

Who We Are

## Resources

Inspector General

Fact Sheets

Fillable Forms

Related Agencies

E-file via SecureRelease

Section 508

Employee Rights Poster

## Other

Site Feedback

FAQ

Contact Us

# XIV.   EXHIBIT H

**OFFICE OF THE GENERAL COUNSEL**

**MEMORANDUM GC 23-02**                                    **October 31, 2022**

TO:          All Regional Directors, Officers-in-Charge,
               and Resident Officers

FROM:        Jennifer A. Abruzzo, General Counsel

SUBJECT:     Electronic Monitoring and Algorithmic Management of Employees
             Interfering with the Exercise of Section 7 Rights

Recent technological advances have dramatically expanded employers' ability to monitor and manage employees within the workplace and beyond. As more and more employers take advantage of those new capabilities, their practices raise a number of issues under the Act. An issue of particular concern to me is the potential for omnipresent surveillance and other algorithmic-management tools to interfere with the exercise of Section 7 rights by significantly impairing or negating employees' ability to engage in protected activity and keep that activity confidential from their employer, if they so choose.[1] Thus, I plan to urge the Board to apply the Act to protect employees, to the greatest extent possible, from intrusive or abusive electronic monitoring and automated management practices that would have a tendency to interfere with Section 7 rights. I will do so both by vigorously enforcing extant law and by urging the Board to apply settled labor-law principles in new ways, as described below.

It is well documented that employers are increasingly using new technologies to closely monitor and manage employees.[2] In warehouses, for example, some employers record

---

[1]  In this memorandum, I use the term "automated management" or "algorithmic management" to refer to "a diverse set of technological tools and techniques to remotely manage workforces, relying on data collection and surveillance of workers to enable automated or semi-automated decision-making." Alexandra Mateescu & Aiha Nguyen, *Explainer: Algorithmic Management in the Workplace*, Data & Society Research Institute (Feb. 2019), *available at* https://datasociety.net/wp-content/uploads/2019/02/DS_Algorithmic_Management_Explainer.pdf.

[2]  Danielle Abril, *Your Boss Can Monitor Your Activities Without Special Software*, Washington Post (Oct. 7, 2022), *available at* https://www.washingtonpost.com/technology/2022/10/07/work-app-surveillance/; Jo Constantz, *"They Were Spying On Us": Amazon, Walmart, Use Surveillance Technology to Bust Unions*, Newsweek (Dec. 13, 2021), *available at* https://www.newsweek.com/they-were-spying-us-amazon-walmart-use-surveillance-technology-bust-unions-1658603; Richard A. Bales & Katherine V. W. Stone, *The Invisible Web at Work: Artificial Intelligence and Electronic Surveillance in the Workplace*, 41 Berkeley J. Emp. & Lab. L. 1, 16-22 (2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3410655; Charlotte Garden, *Labor*

2

workers' conversations and track their movements using wearable devices, security cameras, and radio-frequency identification badges.[3] On the road, some employers keep tabs on drivers using GPS tracking devices and cameras.[4] And some employers monitor employees who work on computers—whether in call centers, offices, or at home—using keyloggers and software that takes screenshots, webcam photos, or audio recordings throughout the day.[5]

Electronic monitoring and automated management are not always limited to working time. After the workday ends, some employers continue to track employees' whereabouts and communications using employer-issued phones or wearable devices, or apps installed on workers' own devices.[6] And even before the employment relationship begins, some employers pry into job applicants' private lives by conducting personality tests and scrutinizing applicants' social media accounts.[7]

Importantly, advances in artificial intelligence and algorithm-based decision-making in recent years have made it possible for employers to analyze, sell or otherwise share, and act on the voluminous data that new technologies generate.[8] Some employers use that

---

*Organizing in the Age of Surveillance*, 63 St. Louis U. L.J. 55, 56-57 (2018), *available at* https://scholarship.law.slu.edu/lj/vol63/iss1/5/. *See also* Kate Bronfenbrenner, Testimony before the United States House Committee on Education and Labor, *In Solidarity: Removing Barriers to Organizing*, Cornell School of Indus. and Labor Relations, at 11-12 (Sept. 14, 2022), *available at* https://ecommons.cornell.edu/handle/1813/111838 (noting increase in electronic surveillance during union campaigns).

[3]  Bales & Stone, *supra*, at 17, 20; Garden, *supra*, at 57.

[4]  Kathryn Zickuhr, *Workplace Surveillance Is Becoming the New Normal for U.S. Workers*, Wash. Ctr. for Equitable Growth, at 4 (Aug. 2021), *available at* https://equitablegrowth.org/research-paper/workplace-surveillance-is-becoming-the-new-normal-for-u-s-workers/.

[5]  Garden, *supra*, at 56. *See* Letter from Rep. Robert "Bobby" Scott, Chairman, Committee on Education and Labor, U.S. House of Representatives, to Gene Dodaro, Comptroller, GAO (Oct. 5, 2022), *available at* https://edlabor.house.gov/download/scott-letter-to-gao-re-bossware (discussing "bossware" technology used to monitor employees in telework and office settings).

[6]  *See* Emma Oppenheim, *Shining a Spotlight on Workers' Financial Experiences*, CFPB (Mar. 9, 2022), *available at* https://www.consumerfinance.gov/about-us/blog/shining-a-spotlight-on-workers-financial-experiences/; Bales & Stone, *supra*, at 20-22.

[7]  Bales & Stone, *supra*, at 10-15.

[8]  *Id.*; *Policy Statement on Enforcement Related to Gig Work*, FTC, at 10 (Sept. 15, 2022), *available at* https://www.ftc.gov/legal-library/browse/policy-statement-enforcement-related-gig-work.

3

data to manage employee productivity, including disciplining employees who fall short of quotas, penalizing employees for taking leave, and providing individualized directives throughout the workday.[9]

Under settled Board law, numerous practices employers may engage in using new surveillance and management technologies are already unlawful. In cases involving employer observation of open protected concerted activity and public union activity like picketing or handbilling, the Board has recognized that "pictorial recordkeeping tends to create fear among employees of future reprisals."[10] The Board accordingly balances an employer's justification for surveillance "against the tendency of that conduct to interfere with employees' right to engage in concerted activity."[11] In that context, "the Board has long held that absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate."[12]

In addition, it is well established that an employer violates Section 8(a)(1) if it institutes new monitoring technologies in response to activity protected by Section 7; utilizes technologies already in place for the purpose of discovering that activity, including by reviewing security-camera footage or employees' social-media accounts; or creates the impression that it is doing such things.[13] Employer surveillance of Section 7 activity is

---

[9] Annette Bernhardt, Lisa Kresge & Reem Suleiman, *Data & Algorithms at Work: The Case for Worker Technology Rights*, UC Berkeley Labor Center, at 6 (Nov. 2021), *available at* https://laborcenter.berkeley.edu/data-algorithms-at-work/; Jodi Kantor, Karen Weise & Grace Ashford, *The Amazon That Customers Don't See*, New York Times (June 15, 2021), *available at* https://www.nytimes.com/interactive/2021/06/15/us/amazon-workers.html; Zickuhr, *supra*, at 20; Bales & Stone, *supra*, at 17-18. Although the trend is visible across the national economy, the rising use of intrusive monitoring and management technologies disproportionately affects low-wage workers, workers of color, immigrants, and women, who are more likely to work in heavily tracked positions in warehousing, package delivery, and call centers. Bernhardt, Kresge & Suleiman, *supra*, at 15; Zickuhr, *supra*, at 12.

[10] *Brasfield & Gorrie, LLC*, 366 NLRB No. 82, slip op. at 5 (2018) (quoting *National Steel & Shipbuilding Co.,* 324 NLRB 499, 499 (1997), *petition for review denied,* 156 F.3d 1268 (D.C. Cir. 1998)).

[11] *F.W. Woolworth Co.*, 310 NLRB 1197, 1197 (1993) (citations and internal quotation marks omitted).

[12] *Id.*

[13] *See, e.g.*, *National Captioning Institute*, 368 NLRB No. 105, slip op. at 5 ("It is well settled that an employer commits unlawful surveillance if it acts in a way that is out of the ordinary in order to observe union activity."); *AdvancePierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 2 n.4, 15-16 (2018) (employer's review of break-room security-camera footage to observe employee distribution of union literature was unlawful

4

unlawful whether it is carried out openly or covertly[14] and certain conduct can be unlawful even if it merely creates an impression of surveillance.[15] An employer who spends money on surveillance technology "to obtain information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer," or otherwise expends money to interfere with, restrain, or coerce employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing, must generally file a Form LM-10, reporting the expenditure to the U.S. Department of Labor's Office of Labor-Management Standards.[16]

It is clear under extant law that employers violate Section 8(a)(1) if they discipline employees who concertedly protest workplace surveillance or the pace of work set by algorithmic management.[17] Employers also violate Section 8(a)(1) if they coercively question employees with personality tests designed to evaluate their propensity to seek

---

surveillance), *enforced*, 966 F.3d 813 (D.C. Cir. 2020); *National Captioning Institute, Inc.*, 368 NLRB No. 105, slip op. at 5 (2019) ("intentional monitoring of pro-union employees' Facebook postings" violates the Act); *Mek Arden, LLC*, 365 NLRB No. 109, slip op. at 19 (2017) (employer unlawfully created impression of surveillance by stating that voice-activated security cameras were monitoring union activity), *enforced*, 755 F. App'x 12 (D.C. Cir. 2018).

[14] *NLRB v. Grower-Shipper Vegetable Ass'n*, 122 F.2d 368, 376 (9th Cir. 1941).

[15] *Frontier Telephone of Rochester, Inc.*, 344 NLRB 1270, 1276 (2005) ("In determining whether an employer has unlawfully created the impression of surveillance of employees' union activities, the test that the Board has applied is whether, under all the relevant circumstances, reasonable employees would assume from the statement in question that their union or other protected activities had been placed under surveillance."), *enforced*, 181 F. App'x 85 (2d Cir. 2006).

[16] 29 USC § 433(a)(3). *See* OLMS Fact Sheet, Form LM-10 Employer Reporting: Transparency Concerning Persuader, Surveillance, and Unfair Labor Practice Expenditures, at 3, *available at* https://www.dol.gov/sites/dolgov/files/OLMS/regs/compliance/LM10_FactSheet.pdf (describing obligation to report expenditures on "[s]urveillance equipment or other technology used to surveil and the time spent on installing, operating, and monitoring it, as well as analyzing the information the equipment produces" among others). OLMS relies on Board findings in enforcing these reporting requirements. To promote compliance in cases that do not proceed to a Board decision, Regions should add the following language to settlement proposals in appropriate cases: "The Charged Party will report to the U.S. Department of Labor, Office of Labor-Management Standards, via its Form LM-10, the amount of any payments or expenditures made in conjunction with the conduct at issue in this case."

[17] *See NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 15 (1962) (employees' walkout to protest working conditions was protected); *Accel, Inc.*, 339 NLRB 1052, 1052 (2003) (employer unlawfully discharged employees for protesting requirement to work through a scheduled break).

5

union representation.[18] And employers violate Section 8(a)(1) if they dismantle or preclude employee conversations or isolate union supporters or discontented employees to prevent Section 7 activity.[19]

Further, if employers rely on artificial intelligence to screen job applicants or issue discipline, the employer—as well as a third-party software provider—may violate Section 8(a)(3) if the underlying algorithm is making decisions based on employees' protected activity.[20] Employers also violate Section 8(a)(3) by discriminatorily applying production quotas or efficiency standards to rid themselves of union supporters.[21] Finally, where employees have union representation, employers violate Section 8(a)(5) if they fail to provide information about, and bargain over, the implementation of tracking technologies and their use of the data they accumulate.[22]

In addition to zealously enforcing the foregoing precedent, I will urge the Board to adopt a new framework for protecting employees from intrusive or abusive forms of electronic monitoring and automated management that interfere with Section 7 activity. It is the Board's responsibility "to adapt the Act to changing patterns of industrial life."[23] An employer's right to oversee and manage its operations with new technologies is "not

---

[18]  *See Facchina Construction, Co.*, 343 NLRB 886, 886 (2004) (employer violated the Act by questioning job applicant about union membership), *enforced*, 180 F. App'x 178 (D.C. Cir. 2006); *Allegheny Ludlum Corp.*, 333 NLRB 734, 740 (2001) (an employer engages in unlawful polling by forcing an employee to make "an observable choice that demonstrates their support for or rejection of the union"), *enforced*, 301 F.3d 167 (3d Cir. 2002).

[19]  *See Trus Joist MacMillan*, 341 NLRB 369, 373 (2004) (employer violated Section 8(a)(1) by restricting employee's movements within facility during working time "to curtail employees' union discussions").

[20]  *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 186-87 (1941) (discrimination in hiring against union supporters violates the Act); *Blankenship & Associates*, 306 NLRB 994, 995 (1992) (entering order against consultant acting as employer's agent).

[21]  *See Roemer Industries*, 367 NLRB No. 133, slip op. at 17 (2019) (finding employer's claim that it discharged union supporter for inefficiency to be pretextual), *enforced*, 824 F. App'x 396 (6th Cir. 2020).

[22]  *See Anheuser-Busch, Inc.*, 342 NLRB 560, 560 (2004) (employer violated the Act by failing to bargain with union prior to installation and use of surveillance cameras in the workplace), *enforced in pertinent part sub nom. Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36 (D.C. Cir. 2005). *See generally* Lisa Kresge, *Union Collective Bargaining Agreement Strategies in Response to Technology*, Working Paper, UC Berkeley Labor Center (Nov. 2020), *available at* https://laborcenter.berkeley.edu/wp-content/uploads/2022/01/Working-Paper-Union-Collective-Bargaining-Agreement-Strategies-in-Response-to-Technology-v2.pdf (discussing collective-bargaining-agreement provisions addressing employers' use of technology in the workplace).

[23]  *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975).

unlimited in the sense that [it] can be exercised without regard to any duty which the existence of rights in others may place upon [the] employer."[24] Rather, it is up to the Board to work out an "adjustment" between the interests of management and labor that guarantees employees a meaningful "[o]pportunity to organize."[25] Consistent with the Board's statutory role, I will urge the Board to ensure that intrusive or abusive methods of electronic surveillance and automated management do not unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights by stopping union and protected concerted activity in its tracks or preventing its initiation.[26]

The framework I will advocate is grounded in well-settled Board principles. The Board has held, with the Supreme Court's approval, that "the right of employees to self-organize and bargain collectively established by [Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite."[27] The workplace "is the one place where employees clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees."[28] Employers cannot lawfully prevent discussions about such matters, even during working time, if (as is often the case) they permit other kinds of non-work discussions.[29] And "time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as [the employee] wishes without unreasonable restraint, although the employee is on company property."[30]

In addition, both inside and outside of the workplace, "[t]he confidentiality interests of employees have long been an overriding concern to the Board."[31] Because employers so commonly retaliate against employees for exercising their Section 7 rights, the Board recognizes, with court approval, that a "right to privacy" is "necessary to full and free

---

[24] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945).

[25] *Id.*

[26] *Cf. Parexel International, LLC*, 356 NLRB 516, 519-20 (2011) (finding unlawful a "preemptive strike" discharge that prevented employees "from discussing, and possibly inquiring further or acting in response to, substandard wages or perceived wage discrimination").

[27] *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978).

[28] *Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 (1978) (quoting *Gale Products*, 142 NLRB 1246, 1249 (1963)) (brackets omitted).

[29] *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 26 (2019), *enforced in pertinent part*, 825 F. App'x 348 (6th Cir. 2020).

[30] *Republic Aviation*, 324 U.S. at 803 n. 10 (1945) (quoting *Peyton Packing Co.*, 49 NLRB 828, 843 (1943)).

[31] *National Telephone Directory Corp.*, 319 NLRB 420, 421 (1995).

7

exercise of the organizational rights guaranteed by the [Act]."[32] The Board, accordingly, holds that "Section 7 of the Act gives employees the right to keep confidential their union activities,"[33] and it "zealously seeks to protect the confidentiality interests of employees."[34] In short, "employees should be free to participate in union organizing campaigns [or other protected concerted activity] without the fear that members of management are peering over their shoulders, taking note of who is involved in [Section 7] activities, and in what particular ways."[35]

Close, constant surveillance and management through electronic means threaten employees' basic ability to exercise their rights. In the workplace, electronic surveillance and the breakneck pace of work set by automated systems may severely limit or completely prevent employees from engaging in protected conversations about unionization or terms and conditions of employment that are a necessary precursor to group action.[36] If the surveillance extends to break times and nonwork areas, or if excessive workloads prevent workers from taking their breaks together or at all, they may be unable to engage in solicitation or distribution of union literature during nonworking time.[37] And surveillance reaching even beyond the workplace—or the use of technology that makes employees reasonably fear such far-reaching surveillance—may prevent employees from exercising their Section 7 rights anywhere.

I am mindful that some employers may have legitimate business reasons for using some forms of electronic monitoring and automated management. But to the extent that employers have a legitimate need to electronically monitor and direct employees in ways that could inhibit Section 7 activity, the employer's interests must be balanced against

---

[32] *Pac. Molasses Co. v. NLRB Reg'l Off. No. 15*, 577 F.2d 1172, 1182 (5th Cir. 1978).

[33] *Guess?, Inc.*, 339 NLRB 432, 434 (2003). *Accord Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1274 (D.C. Cir. 2012).

[34] *Wright Elec., Inc. v. NLRB*, 200 F.3d 1162, 1165 (8th Cir. 2000). *Accord United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 785 (9th Cir. 2017).

[35] *Flexsteel Industries*, 311 NLRB 257, 257 (1993).

[36] *See Alternative Energy Applications, Inc.*, 361 NLRB 1203, 1206 n.10 (2014) (noting that "discussions of wages are often preliminary to organizing or other action for mutual aid or protection"). *Cf. Spring Valley Hospital Medical Center*, 363 NLRB 1766, 1766 n.3, 1782 (2016) (adopting, in absence of exceptions, judge's finding that employer violated Section 8(a)(1) by requiring employees to speak English only, which limited employees' "ability to freely discuss and communicate about work conditions, wages and other terms and conditions of employment").

[37] *See Peyton Packing*, 49 NLRB at 843 (absent special circumstances, employers must allow their employees to engage in union solicitation on employer premises during nonwork time), *enforced*, 142 F.2d 1009 (5th Cir. 1944); *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615, 620 (1962) (employees generally may distribute union-related literature on their employer's premises, but the employer may restrict the distribution to nonwork areas).

employees' rights under the Act.[38] The Board must reach an accommodation between competing employer interests and employee rights "with as little destruction of one as is consistent with the maintenance of the other."[39]

Thus, in appropriate cases, I will urge the Board to find that an employer has presumptively violated Section 8(a)(1) where the employer's surveillance and management practices, viewed as a whole, would tend to interfere with or prevent a reasonable employee from engaging in activity protected by the Act. If the employer establishes that the practices at issue are narrowly tailored to address a legitimate business need—i.e., that its need cannot be met through means less damaging to employee rights—I will urge the Board to balance the respective interests of the employer and the employees to determine whether the Act permits the employer's practices. If the employer's business need outweighs employees' Section 7 rights, unless the employer demonstrates that special circumstances require covert use of the technologies, I will urge the Board to require the employer to disclose to employees the technologies it uses to monitor and manage them, its reasons for doing so, and how it is using the information it obtains. Only with that information can employees intelligently exercise their Section 7 rights and take appropriate measures to protect the confidentiality of their protected activity if they so choose.[40]

The foregoing framework is consistent with the approach I have advocated in cases where an employer maintains facially neutral work rules that could interfere with the exercise of Section 7 rights.[41] In those circumstances, as here, I have urged the Board to evaluate the effect of employer rules on a reasonable employee who is in a position of economic vulnerability, taking into account the totality of the surrounding circumstances.[42] And in doing so, I have urged the Board to give full consideration to employers' business needs, and to "permit[] employers to maintain narrowly tailored rules that infringe on employees' Section 7 rights in the limited circumstances where conflicting legitimate business interests outweigh those rights."[43] In the same way, with regard to investigative-confidentiality rules, I have urged the Board to permit restrictions on statutorily protected

---

[38] *See Guess?*, 339 NLRB at 434-35 (balancing employer's legitimate need for information against employees' Section 7 right to keep union activities confidential).

[39] *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956).

[40] In addition, I will consider whether other safeguards or assurances are necessary to protect employees' Section 7 rights. *See, e.g.*, Garden, *supra*, at 67-68 (discussing proposals to require employers to limit who may access information obtained through electronic surveillance and algorithmic management, and to permit employees to respond before imposing discipline based on such information).

[41] *See generally Stericycle, Inc.*, Case Nos. 04-CA-137660 et al., Brief to the Board dated Mar. 7, 2022.

[42] *Id.* at 3, 12.

[43] *Id.* at 4, 13.

9

employee communications "only when legitimate and substantial justifications outweigh employees' Section 7 rights in a particular investigation."[44]

Finally, I note that I am committed to an interagency approach to these issues, as numerous agencies across the federal government are working to prevent employers from violating federal law using electronic surveillance and algorithmic management technologies. Through those efforts, agencies including the Federal Trade Commission, the Consumer Financial Protection Bureau, Department of Justice, Equal Employment Opportunity Commission, and the Department of Labor are working to combat a range of harms employers inflict on workers using such technologies, from discrimination in hiring and work assignments, to misclassification of employees as independent contractors, to other unfair or deceptive pay practices, to selling or sharing workers' personal data, to injuries caused by overwork and repetitive motions.[45] Recent agreements that we have signed with many of these agencies will facilitate information sharing and coordinated enforcement on these issues.[46]

Consistent with the principles set forth above, Regions should vigorously enforce extant Board law in cases involving new workplace technologies. In addition, Regions should submit to Advice any cases involving intrusive or abusive electronic surveillance and algorithmic management that interferes with the exercise of Section 7 rights.


/s/
J.A.A.

---

[44]  *Id.* at 16.

[45]  *See* Press Release, Justice Department and EEOC Warn Against Disability Discrimination (May 12, 2022), *available at* https://www.justice.gov/opa/pr/justice-department-and-eeoc-warn-against-disability-discrimination (discussing technical assistance document concerning disability discrimination resulting from the use of artificial intelligence and algorithmic decision-making); FTC Policy Statement on Enforcement Related to Gig Work, *supra* (discussing FTC's enforcement priorities in relation unfair and deceptive practices involving surveillance and algorithm-based decision-making, and exclusionary or predatory conduct by dominant firms that may unlawfully create or maintain a monopoly or a monopsony resulting poorer working conditions for gig workers); Oppenheim, *supra* (noting CFPB's intention to closely monitor the collection and sale of workers' data and assess where provisions of the Fair Credit Reporting Act and other consumer protection laws may protect workers).

[46]  *See* NLRB Interagency Memoranda of Understanding, *available at* https://www.nlrb.gov/guidance/key-reference-materials/interagency-international-collaboration/interagency-MOUs.

## XV.    EXHIBIT I

Case 3:23-cv-04597-EMC    Document 376    Filed 05/22/26    Page 106 of 114

# Morgan Lewis

**SUBSCRIBE**

**LAWFLASH**

# NEW NLRB ACTING GENERAL COUNSEL'S ACTIONS AND INCREASED WHITE HOUSE OVERSIGHT SIGNAL SHIFT IN ENFORCEMENT

February 24, 2025

National Labor Relations Board Acting General Counsel William B. Cowen on February 14, 2025 changed the course of the agency's strategic goals by rescinding more than a dozen memos penned by former General Counsel Jennifer Abruzzo. Cowen's repeal of several specific memos signals a shift from the more union-friendly litigation strategy pursued by the prior general counsel. Regardless of Cowen's agenda, the White House may play a more significant role in setting the general counsel's enforcement priorities moving forward.

The National Labor Relations Board (NLRB) general counsel (GC) serves as the presidentially appointed chief prosecutor for the agency. Each GC, upon assuming office, introduces a distinct set of policy objectives articulated in GC memoranda (memos). The memos provide a comprehensive overview of the GC's positions on various labor law issues and inform the agency's direction in line with the GC's prosecutorial priorities. Each GC memo is subject to recission upon the appointment of a successor GC.

## ACTING GENERAL COUNSEL COWEN'S POLICY RESET

Cowen, the regional director of NLRB Region 21 in Los Angeles, was appointed by President Donald Trump to lead the agency's prosecutorial arm as acting general counsel (AGC) on February 3, 2025.[1] After eleven days in office, Cowen issued Memorandum 25-05 (Rescission Memo), which rescinded many of his predecessors' initiatives. In the Rescission Memo, Cowen explained his reasoning for scaling back the prior GC priorities, pointing to the backlog of NLRB cases which had swelled under the previous administration. Cowen noted, the "unfortunate truth is that if we attempt to accomplish everything, we risk accomplishing nothing." Based on the

## AUTHORS



**HARRY I. JOHNSON, III**
Partner
Washington, DC



**MARK L. STOLZENBURG**
Partner
Chicago



**LAURA V. SPECTOR**
Associate
Washington, DC

## RELATED RESOURCES

### PRACTICES

- 〉 **Labor, Employment & Benefits**
- 〉 **US Labor/Management Relations**

### GLOBAL CAPABILITIES

- 〉 **United States**

5/21/26, 7:38 PM    New NLRB Acting General Counsel's Actions and Increased White House Oversight Signal Shift in Enforcement

Case 3:23-cv-04597-EMC    Document 376    Filed 05/22/26    Page 107 of 114

memo, the AGC signals a return to an institutionalist enforcement philosophy

Importantly, the AGC's Rescission Memo reverses many of the former GC's policies, which, since 2021, were the cause of protracted litigation and expensive outcomes for employers. For example, the rescission of GC Memos 21-06 and 22-06 indicates the return to more flexibility on reasonable settlements in unfair labor practice cases, now that NLRB regions will no longer be expected to seek "the full panoply of remedies available."[2] More than a dozen other memos were also reversed, including the memos which asserted student-athletes qualify as employees under the National Labor Relations Act (NLRA), deemed employer surveillance and automated management practices legally questionable, argued that most noncompete agreements generally violate the NLRA, and concluded that "stay-or-pay" provisions infringe on employees' rights under the NLRA.

Several of the prior memos were "rescinded pending further guidance." This strongly indicates that the AGC has a new memo in mind to replace the prior Abruzzo-era memos. This includes GC 25-04, "Harmonization of the NLRA and EEO Laws," which had attempted to minimize the competing requirements of the NLRA and anti-discrimination laws. This is a controversial area following the NLRB's decision in *Lion Elastomers LLC*, 372 NLRB No. 83 (2023), which effectively declares NLRA supremacy.

The Rescission Memo also revokes GC Memo 21-02, issued by then-AGC Peter Sung Ohr on February 1, 2021, which rescinded a series of memos issued under the Trump-Pence administration. The revocation of GC Memo 21-02 signals a return of previously issued memos, some of which increase enforcement of unfair labor practices against unions. The re-adopted memos will include the following guidances:

- **GC 18-06** – Instructing NLRB regions not to oppose intervention in unfair labor practice hearings by employees who filed decertification petitions or circulated a document upon which the employer had withdrawn recognition from the collective bargaining representative.

- **CG 19-01** – Clarifying that where unions raise "mere negligence" defenses in duty of fair representation cases based on having lost track, misplaced, or otherwise forgotten about a grievance, unions must establish the existence of established, reasonable procedures or systems to track grievances.

- **GC 20-09** – Instructing NLRB regions to urge the Board to adopt an "arguable merit" standard in Section 8(b)(1)(A) duty of fair representation cases, which would shift the burden of proof onto the union to prove the grievance was not meritorious. The GC Memo also argues that the union should carry full liability for mishandling employee grievances.

- **GC 20-13** – Requiring NLRB regions to urge the Board in charges involving union neutrality agreements to adopt the "more than ministerial aid" standard used in union decertification cases.

The reinstatement of these and other memos signals a broader shift toward the philosophy we can expect to shape the NLRB's prosecutorial policy over the next four years. However, as explained below, the NLRB GC's policy prerogatives may require executive vetting by the president.

## PRESIDENTIAL CONTROL OVER NLRB

On January 27, 2025, President Trump dismissed GC Jennifer Abruzzo, as expected, but also dismissed sitting NLRB Chair Gwynne Wilcox, under both a theory that they were removable at-will, with some intimation of malfeasance in carrying out executive policies. Wilcox swiftly sued, and the case over the president's ability to terminate NLRB members will likely end up at the US Supreme Court.

Various employers in 2024 had argued that board bembers were unconstitutionally shielded from executive removal, and with the dismissal of Wilcox, the White House has agreed with this argument. In a February 12, 2025 letter to Senator Richard Durbin of Illinois, the acting solicitor general indicated the administration's intent to urge the Supreme Court to overrule *Humphrey's Executor v. United States,* [3] a decision that upheld some removal protections for administrative agency officials who perform quasi-judicial or quasi-legislative functions.

Following this move to remove Chair Wilcox and the acting solicitor general's letter, on February 18, 2025, the White House published an Executive Order titled Ensuring Accountability for All Agencies (EO) that seeks to increase presidential "supervision and control" over "so-called 'independent regulatory agencies.'" Specifically, the EO criticizes previous administrations for allowing independent regulatory agencies to operate with "minimal Presidential supervision" and provides, "these regulatory agencies have been permitted to promulgate significant regulations without review by the President."

The promulgation of regulations, the EO states, undermine "the agencies' accountability to the American people and prevent a unified and coherent execution of Federal law." Going forward, the Office of Management and Budget (OMB) is to "establish performance standards and management objectives" for agencies and will provide reports on agency performance to the president. OMB will also review agency actions for "consistency" with presidential policies and "adjust such agencies' apportionments by activity, function, project, or object, as necessary and appropriate, to advance the President's policies and priorities."

Although former President Biden's firing of the Trump-appointed NLRB GC meant greater control by the White House over the GC's actions, the EO expands the president's control over not only the GC but also NLRB policymaking. This apparently covers even Board adjudication as well, because the EO states that interpretations of law the come from the White House are controlling:

> The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. *No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law*, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General. (Emphasis added).

In the EO, the president's emphasis on "supervision and control" over agencies that have traditionally operated with a high degree of independence could place substantial pressure on the NLRB, as it has historically functioned with a high degree of autonomy in setting labor policy and adjudicating related disputes. The EO effectively provides that the White House will directly control the policymaking

5/21/26, 7:38 PM
New NLRB Acting General Counsel's Actions and Increased White House Oversight Signal Shift in Enforcement

Case 3:23-cv-04597-EMC    Document 376    Filed 05/22/26    Page 109 of 114

functions of administrative agencies such as the NLRB. Moreover, an OMB determination that the NLRB's adjudicative, enforcement or rulemaking efforts conflict with broader White House priorities could result in NLRB member and GC dismissals, budgetary constraints or other administrative roadblocks that limit both the GC's and the whole of the agency's abilities to implement any self-created agendas. Accompanying this has been an effort to enhance the White House's ability to replace NLRB administrative law judges and LRB members, as noted above.[4]

## PRACTICAL TAKEAWAYS

With the rescission of various memos, employers should reassess how these changes affect both the charges they face and those they may pursue. Key considerations include:

- **Investigation Phase:** Determine which types of charges may be directly impacted by the rescinded memos and adjust strategies accordingly.

- **Settlement Considerations:** The rollback of aggressive enforcement may allow for more reasonable settlement terms, offering greater flexibility in resolving disputes.

- **Post-Complaint:** Refine litigation strategies in light of changing interpretations and reconsider what legal standards may apply.

- **Noncompete and Employee Agreements:** Consider opportunities to challenge existing Board precedent based on the rescission of GC memos on these topics.

Employers should work proactively with counsel to navigate these changes and optimize their approach in response to the evolving legal landscape.

## CONTACTS

If you have any questions or would like more information on the issues discussed in this LawFlash, please contact any of the following:

**Authors**
Harry I. Johnson, III
Mark L. Stolzenburg
Laura V. Spector

**Century City**
Harry I. Johnson, III

**Chicago**
Mark L. Stolzenburg

**Dallas**
Michael T. Mortensen

**Los Angeles**
Nicole A. Buffalano
Douglas R. Hart

**Philadelphia**
Joseph C. Ragaglia

**Washington, DC**
Jonathan C. Fritts
Philip A. Miscimarra

John F. Ring

---

[1] A permanent GC must be confirmed by the US Senate. President Trump has not yet made his intentions public with respect to naming a permanent GC.

[2] Office of the General Counsel Memorandum, GC 22-06 (June 23, 2022), Update on Efforts to Secure Full Remedies in Settlement.

[3] 295 US 602 (1935).

[4] *See, e.g.,* Statement from Justice Department Chief of Staff Chad Mizelle, US Department of Justice, "Today the Department of Justice determined that multiple layers of removal restrictions shielding administrative law judges (ALJs) are unconstitutional. Unelected and constitutionally unaccountable ALJs have exercised immense power for far too long. In accordance with Supreme Court precedent, the Department is restoring constitutional accountability so that Executive Branch officials answer to the President and to the people" (Feb. 20, 2025, last checked Feb. 22, 2025).

© 2026 Morgan, Lewis & Bockius LLP. Morgan Lewis is a registered trademark of Morgan, Lewis & Bockius LLP. All rights reserved.

## XVI.    EXHIBIT J

 An official website of the United States government  **Here's how you know** ⌄

Español  |  Other Languages



**NLRB**
National Labor
Relations Board

☰ **Menu**

[Home](#)

# About NLRB

## General Counsel

[Traducir página al español](#)

The current General Counsel: **Crystal Stowe Carey**



Crystal Carey was sworn in on January 7, 2026, as the General Counsel of the National Labor Relations Board (NLRB).

The General Counsel, appointed by the President to a 4-year term, is independent from the Board and is responsible for the investigation and prosecution of unfair labor practice cases and for the general supervision of the NLRB field offices in the processing of cases.

GC Carey began her labor law career as an intern at the Agency's Baltimore Regional office (Region 5) while attending Penn State Dickinson School of Law. After graduation, she served as a Field Attorney in Region 5 for three years. She then spent six years working at the NLRB's Headquarters both in the Division of Enforcement Litigation in the Office of Appeals and as senior staff counsel to Chairman Philip A. Miscimarra. In 2018, Ms. Carey transitioned to private practice at Morgan Lewis, where she became a partner.

Born in Athens, Georgia, Ms. Carey received her J.D. degree from Penn State Dickinson School of Law, her M.A. from Old Dominion University, her B.A. from the University of Georgia, and her A.A. from Emmanuel College. She and her husband Paul (a U.S. Navy Veteran and Reservist) are the proud parents of three daughters and love attending wrestling tournaments, soccer matches and track meets in their free time.

[Click here for a list of General Counsels since 1935.](#)

For information on the operating status of Agency's offices and visitor requirements, click [here](#).

# Most Popular Pages

[Who We Are](#)

[National Labor Relations Act](#)

[Cases & Decisions](#)

[Recent Charges & Petitions Filings](#)

[The Law](#)

[The Right to Strike](#)

[Case Search](#)

[Contact Us](#)

[Frequently Asked Questions](#)

# Content in Other Languages

[Español - Spanish](#)

[العربية - Arabic](#)

[中文 (繁體中文) - Chinese (Traditional)](#)

[中文 (简体中文) - Chinese (Simplified)](#)

[Français - French](#)

[Kreyòl ayisyen - Haitian Creole](#)

[हिंदी - Hindi](#)

[Hmong - Hmong](#)

[한국어 - Korean](#)

[Polski - Polish](#)

[Português - Portuguese](#)

[ਪੰਜਾਬੀ - Punjabi](#)

[Русский - Russian](#)

[Somali - Somali](#)

[Tagalog - Tagalog](#)

[اردو - Urdu](#)

[Tiếng Việt - Vietnamese](#)

# Connect With NLRB

**NLRB Subscription Updates**

   



**National Labor Relations Board**

Case 3:23-cv-04597-EMC     Document 376     Filed 05/22/26     Page 114 of 114

Site Map | Policies | OpenGov | USA.gov | FOIA | Privacy |
No Fear Act | EEO

## About

Rights We Protect

What We Do

Who We Are

## Resources

Inspector General

Fact Sheets

Fillable Forms

Related Agencies

E-file via SecureRelease

Section 508

Employee Rights Poster

## Other

Site Feedback

FAQ

Contact Us

Site Map | Policies | OpenGov | USA.gov | FOIA | Privacy |
No Fear Act | EEO