Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION OF PLAINTIFF RE: DEPOSITION & INTERVIEW AUTHENTICATION**

**IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION (375); & OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT (Dkt. 367, 375)**

**Under Cal. Labor Code § § 98.6, 1102.5 6310, & the *Tamney* Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# TABLE OF CONTENTS

**I.   INTRODUCTION**                                                                 **1**

**II.  PINCITE CROSSWALK OF PRIOR CITED DEPOSITIONS**                                 **1**

**III.   ADDITIONAL CITATIONS TO THE FIRST FIVE DEPOSITIONS
WITH EXCERPTS**                                                                       **4**

**IV.   RULE 30(B)(6) DEPOSITION OF APPLE INC – DAY 1**                               **5**

**V.  DEPOSITION OF ASHLEY GJOVIK BY APPLE INC (12/2025-4/2026)7**

**VI.   INTERVIEW OF ASHLEY GJOVIK BY U.S. DEPT. OF LABOR
(NOV. 2021)**                                                                         **7**

**VII.  CONCLUSION**                                                                  **8**

PLAINTIFF'S DECLR. RE: DEPOSITIONS  | 3:23-CV-04597-EMC                    MAY 25 2026

**PLAINTIFF'S DECLARATION (REGARDING DEPOSITIONS
IN SUPPORT OF PL.'S REPLY IN SUPPORT OF HER MOTION FOR
SUMMARY JUDGMENT & PRELIM. INJ.; AND OPP. TO DEF.'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

1.    I, Ashley Gjovik, swear under penalty of perjury that the statements made in this Declaration are true and correct. I am the Plaintiff in the above captioned matter. I write this Declaration in support of my Reply in support of my Motion for Summary Judgement & Preliminary Injunction at Dkt. 375 and 359; and my Opposition to Defendant's Cross-Motion for Summary Judgment  at Dkt. 375 and 367.

## II.    PINCITE CROSSWALK OF PRIOR CITED DEPOSITIONS

2.    As addressed in the Reply/Opposition at Dkt. 375, Section II, in my Motion for Summary Judgment (Dkt. 359) and supporting Declaration (Dkt. 360), I used non-standard pincites for some deposition excerpts. This was due to me rushing to complete the work on time (and I was still not able to complete it on time and was late). I'm providing a cross-walk below of the standard pincites for those prior references, including where they were referenced in the prior Motion (Dkt. 359) and Declaration (Dkt. 360).

3.    I'm also attaching as Exhibits the certified full-page transcript excerpts for all sections as a supplement to the mini-versions previously filed at Dkt. 360. The full excerpts for Mr. Bertolus are at Exhibit A, Mr. West at Exhibit B, Mr. Okpo at Exhibit C, Mr. Kagramanov at Exhibit D, and Mr. Aloe McKeon at Exhibit E.

4.    Deposition excerpts with court reporter's certification, cited by page:line, and authenticated via declaration with declarant laying the foundation is self-authenticating including under FRE 902. Exhibits are authenticated by Plaintiff, and/or by Defendant's witnesses, and/or

1

by Defendant producing said document which self-authenticates. *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996).

| P's MSJ | Deposition Transcript | Dkt. 359 Pincites | Corrected Pincite(s) | New Exhibit (Infra) |
|---|---|---|---|---|
| p. 3, ¶ 7 | Bertolus Dep. (Ex. 32) | 22:13-15, 24:10-14, 27:3-4. | n/a | Ex. A |
| p. 4, ¶ 11 | Okpo Dep. (Ex. 34). | 71:9-15 | n/a | Ex. C |
| p. 5, ¶ 12 | Okpo Dep. (Ex. 34). | 121:7-18 | n/a | Ex. C |
| p. 5, ¶ 13 | Okpo Dep. (Ex. 34). | 41:20-25; 44:2-10; 45:5-47:1 | n/a | Ex. C |
| p. 6, ¶ 15 | Bertolus Dep. (Ex. 32) | ~~2005-2012~~ | 71:23-73:23; 114:13-123:6 | Ex. A |
| p. 6, ¶ 16 | Okpo Dep. (Ex. 34). | 102:13-20; 103:6-10, 106:6-10, 116:4-14, 118:11-16 | n/a | Ex. C |
| p. 7, ¶ 18 | Kagramanov Dep. (Ex. 53) | 69:18-25, 72:3-6; 72:7- 13, 115:20-116:1, 118:21-119:3, 130:13-131:5 | n/a | Ex. D |
| p. 11, ¶ 31 | Bertolus Dep. (Ex. 32) | 99:11-15, 179:22-180:2 | n/a | Ex. A |
| p. 12, ¶ 33 | Okpo Dep. (Ex. 34). | 35-47 | 35:10-47:17 | Ex. C |
| p. 12-13, ¶ 34 | Kagramanov Dep. (Ex. 53) | 115:20-116:1, 118:21- 119:3 | n/a | Ex. D |
| p. 13, ¶ 36 | Bertolus Dep. (Ex. 32) | 102:2-12, 131:4-7 | n/a | Ex. A |
| p. 13, ¶ 36 | Bertolus Dep. (Ex. 32) | ~~394-397~~ | 13:19-22 | Ex. A |
| p. 13, ¶ 36 | Bertolus Dep. (Ex. 32) | ~~2112- 2128; 2134-2148~~ | 81:25-83:3 83:9-84:5 | Ex. A |
| p. 13, ¶ 36 | Bertolus Dep. (Ex. 32) | ~~2129-2132~~ | 83:4-83:8 | Ex. A |
| p. 13, ¶ 37 | Bertolus Dep. (Ex. 32) | ~~2005-2012~~ | 71:23-73:23; 114:13-123:6 | Ex. A |
| p. 15, ¶ 42 | West Dep. (Ex. 36) | 24:20-21, 25:1 | n/a | Ex. |
| p. 16, ¶ | Okpo Dep. (Ex. 34). | 102:13-20, | n/a | Ex. C |

PL'S DECLARATION RE: DEPOSITIONS | 3:23-CV-04597-EMC          MAY 25 2026

| P's MSJ | Deposition Transcript | Dkt. 359 Pincites | Corrected Pincite(s) | New Exhibit (Infra) |
|---|---|---|---|---|
| 44 | | 116:4-14 | | |
| p. 16, ¶ 44 | Okpo Dep. (Ex. 34). | ~~3048-3060~~ | 102:25-103:16; 120:17-121:19 | Ex. C |
| p. 17, ¶ 46 | Kagramanov Dep. (Ex. 53) | 115:20-116:1, 130:13-131:5 | n/a | Ex. D |
| p. 17, ¶ 47 | Okpo Dep. (Ex. 34). | 103:6-10, 106:6-10, 116:4-14, 118:11-16. | n/a | Ex. C |
| p. 17, ¶ 47 | Kagramanov Dep. (Ex. 53) | 57:7-15, 65:1-2, 106:6-10 | n/a | Ex. D |
| p. 18, ¶ 49 | Bertolus Dep. (Ex. 32) | ~~2005-2012~~ | 71:23-73:23; 114:13-123:6 | Ex. A |
| p. 18, ¶ 50 | Okpo Dep. (Ex. 34). | 102:13-20; 106:6-10, 116:4-14 | n/a | Ex. C |
| p. 18, ¶ 50 | Kagramanov Dep. (Ex. 53) | 57:7-15, 65:1-2, 106:6-1 | n/a | Ex. D |
| p. 21, ¶ 56 | Okpo Dep. (Ex. 34). | 71:9-15; 121:7-18 | n/a | Ex. C |
| p. 21-22, ¶ 57 | Kagramanov Dep. (Ex. 53) | 115:20-116:1, 118:21-119:3, 130:13- 131:5 | n/a | Ex. D |
| p. 22, ¶ 57 | Bertolus Dep. (Ex. 32) | 102:2-12, 131:4-7 | n/a | Ex. A |
| p. 22, ¶ 57 | Bertolus Dep. (Ex. 32) | ~~1842-1847; 1849-1864~~ | 98:16-102:21; 117:1-125:11 | Ex. A |
| p. 22, ¶ 57 | Bertolus Dep. (Ex. 32) | ~~2526-2527; 2562-2568~~ | 98:22-99:2; 100:11-100:18 | Ex. A |
| p. 22, ¶ 58 | Kagramanov Dep. (Ex. 35) | 38:22-39:4; 72:3-13; 72:7-13; 130:13- 131:5 | n/a | Ex. D |
| p. 22-23, ¶ 59 | Bertolus Dep. (Ex. 32) | ~~2005-2012~~ | 71:23-73:23; 114:13-123:6 | Ex. A |
| p. 24, ¶ 61 | Okpo Dep. (Ex. 34). | 116:4-14 | n/a | Ex. C |
| p. 24, ¶ 61 | Kagramanov Dep. (Ex. 53) | 57:7-15, 72:3-6 | n/a | Ex. D |
| p. 24, ¶ 61 | Bertolus Dep. (Ex. 32) | 131:4-7 | n/a | Ex. A |

3

| P's MSJ | Deposition Transcript | Dkt. 359 Pincites | Corrected Pincite(s) | New Exhibit (Infra) |
|---|---|---|---|---|
| p. 24, ¶ 61 | Bertolus Dep. (Ex. 32) | ~~1012-1019; 1307-1341~~ | 38:7-42:4; 79:11-109:4 | Ex. A |
| p. 24, ¶ 61 | Bertolus Dep. (Ex. 32) | ~~2005-2012, 2008-2009~~ | 71:23-73:23; 114:13-123:6 | Ex. A |
| p. 24, ¶ 62 | Okpo Dep. (Ex. 34). | ~~974-976~~ | 29:7-30:22 | Ex. C |
| p. 24, ¶ 62 | Okpo Dep. (Ex. 34). | ~~1254-1272~~ | 51:21-52:16 | Ex. C |
| p. 24, ¶ 62 | Okpo Dep. (Ex. 34). | ~~2027-2028~~ | 75:25-80:12 | Ex. C |
| p. 24, ¶ 62 | Okpo Dep. (Ex. 34). | ~~2715-2716~~ | 124:8-25 | Ex. C |
| p. 24, ¶ 62 | Kagramanov Dep. (Ex. 53) | ~~2383-2388~~ | 57:4-83:12 | Ex. D |
| p. 24, ¶ 62 | McKeon Dep. (Ex. 27) | 81:14-17, 90:20-24, 93:9-18; 99:5-9, 81:22-25 | n/a | Ex. E |
| p. 24, ¶ 62 | McKeon Dep. (Ex. 27) | ~~2342-2362~~ | 94:7-14 | Ex. E |
| p. 25, ¶ 64 | West Dep. (Ex. 36) | 86:12-25 | n/a | Ex. B |

## III.    ADDITIONAL CITATIONS TO THE FIRST FIVE DEPOSITIONS WITH EXCERPTS

5.      My Reply/Opposition at Dkt. 375 includes additional citations to the first five depositions and I'm including excerpts of the full certified transcripts, with court reporter's certification, for each of those depositions as part of Exhibits A-E. I also failed to include full page:line pincites in some deposition cites in the Reply/Opposition at Dkt. 375, there were also a couple typos, and so where errors or omissions occurred, I correct it below.

6.      Deposition excerpts with court reporter's certification, cited by page:line, and authenticated via declaration with declarant laying the foundation is self-authenticating including under FRE 902. Exhibits are authenticated by Plaintiff, and/or by Defendant's witnesses, and/or

4

by Defendant producing said document which self-authenticates. *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996).

| Dkt. 375 Cite | Deposition Transcript | Dkt. 375 Pincite | Corrected Pincite(s) | New Exhibit (Infra) |
|---|---|---|---|---|
| p. 3, ¶ 6 | Okpo Dep. | 41:20-25 | n/a | Ex. C |
| p. 6, ¶ 12 | West Dep. | 24:20-21, 25:1 | n/a | Ex. B |
| p. 8, ¶ 18 | Bertolus Dep. | 87 | 87:1-24 | Ex. A |
| p. 9, ¶ 21 | McKeon Aloe Dep. | 56-57, 69-70, 71 | 56:12-57:19, 69:12-70:15, 71:6-15 | Ex. E |
| p. 10, ¶ 23 | McKeon Aloe Dep. | 30, 45-46 | 30:4-6, 45:21-46:16 | Ex. E |
| p. 15, ¶ 35 | Kagramanov Dep. | 57:7-15, 72:3-13; 95:8-13 | n/a | Ex. D |
| p. 15, ¶ 35 | Okpo Dep. | 106:6-10, 116:4-14 | n/a | Ex. C |
| p. 16, ¶ 37 | Bertolus Dep. | 164:11-17 | n/a | Ex. A |
| p. 18, ¶ 43 | McKeon Aloe Dep. | 93:7-18, 93:22- 94:14 | n/a | Ex. E |
| p. 18, ¶ 44 | McKeon Aloe Dep. | 93:7-18, 93:22-94:14; 99:5-9 | n/a | Ex. E |
| p. 19, ¶ 46 | Bertolus Dep. | 15:21-22 | n/a | Ex. A |
| p. 19, ¶ 47 | Bertolus Dep. | 15:21-22; 164:11-17 | n/a | Ex. A |
| p. 20, ¶ 51 | Bertolus Dep. | 29 | 28:16-30:19 | Ex. A |
| p. 20, ¶ 52 | Bertolus Dep. | 158:13; 177:14-178:11 | n/a | Ex. A |
| p. 21, ¶ 52 | Bertolus Dep. | 158, 177 | 158:10-23; 177:3-22 | Ex. A |
| p. 21, ¶ 52 | West Dep. | 24 | 24:10-26:25 | Ex. B |
| p. 25, ¶ 62 | West Dep. | 86:12-25 | n/a | Ex. B |

## IV.    RULE 30(B)(6) DEPOSITION OF APPLE INC – DAY 1

7.    The first day of the Rule 30(B)(6) deposition occurred May 12 2026 and Apple had designed Ms. Warner as its witness. The second day of the deposition occurred May 14 2026 and Apple designated Ms. Schmidt as its witness. As of today, May 25 2026 only the

transcript for the first day (May 12 2026) has been released. It is attached as Exhibits F (excerpts) and Exhibit G (full/mini).

8.    I also started meet/confer with Apple over concerns about the May 12 2026 deposition, wanting to raise the matter to the Court, and Apple's response was that discovery is closed and no further discovery issues can be brought to the Court. (Exhibit M).

9.    The pincites in Plaintiff's Reply/Opposition (Dkt. 375) are below with excerpts from the full transcript. The Plaintiff was also late in filing this paper and accordingly rushed as much as possible – and apologizes for any errors that occurred because of that rush.

| Dkt. 375 Cite | Deposition Transcript | Dkt. 375 Pincite | Corrected Pincite(s) | Exhibit |
|---|---|---|---|---|
| p. 6-7, ¶ 10 | Apple 5/12/26 Dep. | 186, 189, 190 | 186:1-17; 189:5-190:23 | Ex. F |
| p. 6, ¶ 12 | Apple 5/12/26 Dep. | 148:1-11; 150:7-15 | n/a | Ex. F |
| p. 6, ¶ 14 | Apple 5/12/26 Dep. | 209:1-224:25 | n/a | Ex. F |
| p. 6-7, ¶ 15 | Apple 5/12/26 Dep. | 232-237, 234-235, 236 | 232:11-237:12 234:2-235:16, 236:3-236:23 | Ex. F |
| p. 7, ¶ 16 | Apple 5/12/26 Dep. | 236, 240-241 | 232:11-237:12 240:6-11 | Ex. F |
| p. 7, ¶ 17 | Apple 5/12/26 Dep. | 48, 232-237 | 48:3-14, 232:11-237:12 | Ex. F |
| p. 8, ¶ 17 | Apple 5/12/26 Dep. | 54-55 | 54:18-55:20 | Ex. F |
| p. 8, ¶ 18 | Apple 5/12/26 Dep. | 52:5-23; 52:17-53:13 | n/a | Ex. F |
| p. 11, ¶ 26 | Apple 5/12/26 Dep. | 79:14-22, 81:18-22, 83:3-4. | n/a | Ex. F |
| p. 13, ¶ 31 | Apple 5/12/26 Dep. | 153:24-25; 154:25-155:5; 155:17-156:7; 156:8-10 | n/a | Ex. F |
| p. 15, ¶ 35 | Apple 5/12/26 Dep. | 52:17-22, 52:24-53:13, 55:6-10 | n/a | Ex. F |
| p. 15, ¶ 35 | Apple 5/12/26 Dep. | 153:24-155:5, 155:17-156:7, 187:25-188:5 | n/a | Ex. F |
| p. 16, ¶ 37 | Apple 5/12/26 Dep. | 241 | 196:21-197:5 | Ex. F |

6

| p. 16, ¶ 37 | Apple 5/12/26 Dep. | ~~243~~ | 199:2-199:22 | |
| p. 19, ¶ 47 | Apple 5/12/26 Dep. | 193:19-22 | n/a | Ex. F |
| p. 19, ¶ 48 | Apple 5/12/26 Dep. | 33-34 | 33:6-34:25 | Ex. F |
| p. 19-20, ¶ 48 | Apple 5/12/26 Dep. | 60:1-2 | n/a | Ex. F |
| p. 19-20, ¶ 48-49 | Apple 5/12/26 Dep. | 340 | 339:19-340:24 | Ex. F |
| p. 20, ¶ 50 | Apple 5/12/26 Dep. | ~~243~~ | 199:2-199:22 | Ex. F |
| p. 21, ¶ 52 | Apple 5/12/26 Dep. | 145 | 145:2-24 | Ex. F |

## V.    DEPOSITION OF ASHLEY GJOVIK BY APPLE INC (12/2025-4/2026)

10.    Defendant Apple Inc conducted three depositions of me, the Plaintiff, Ashley Gjovik, including on Dec. 16 2025, April 08 2026, and April 28 2026. The following excerpts were referenced in my concurrently filed substantive Declaration and are authenticated and attached here. True and correct copies, with certification from a court reporter, are attached as Exhibit H (12/16/25), Exhibit I (4/8/26), and Exhibit J (4/28/26).

## VI.    INTERVIEW OF ASHLEY GJOVIK BY U.S. DEPT. OF LABOR (NOV. 2021)

11.    Additionally, a certified transcript of my official interview with the U.S. Dept. of Labor on Nov. 8 2021 is attached as Exhibit K. The U.S. Dept. of Labor case is docketed as Apple Inc./Gjovik/9-3290-22-051 under CERCLA, OSH Act Section 11(c), and Sarbanes-Oxley Act and is currently pending appeal with the U.S. Dept. of labor Admin. Review Board.

12.    The recording of this interview was obtained via a FOIA request (#2024-F-03430) to the U.S. Dept. of Labor and released on Dec. 18 2024 as file name "Exhibit 2-A (CP Intake 11.08.21).mp3" The audio recording was then transcribed by certified court reporter through Epiq in 2026. Epiq was provided a true and correct copy of the U.S. Dept. of Labor case notification (Exhibit L-1, "Exhibit A-2 (RP Notification Ltr)_Redacted.pdf"), FOIA request response (Exhibit L-2), U.S. Dept. of Labor Interview Summary (Exhibit L-3, FOIA, "Exhibit 2-

7

B (CP Intake Interview Summary)_Redacted.pdf"), and audio file named "Exhibit 2-A (CP Intake 11.08.21).mp3".

## VII.    CONCLUSION

13.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 25 2026 in San Jose, California.

Respectfully filed,

_____

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 25 2026 in San José, California
(408) 883-4428 | ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# VIII. EXHIBITS

## A.    EXHIBIT A: BERTOLUS DEP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                )
                                 )
            Plaintiff,           )
                                 )
   vs.                           )    Case No. 23-cv-04597-EMC
                                 )
APPLE, INC.,                     )
                                 )
            Defendant.           )
_____)

VIDEOCONFERENCE DEPOSITION OF

YANNICK BERTOLUS

VIDEO-RECORDED VIA ZOOM

Friday, April 17, 2026

Stenographically reported by:
CARRIE GIBSON, CSR No. 13937
JOB No. 10188335

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,               )
                               )
            Plaintiff,         )
                               )
   vs.                         )   Case No. 23-cv-04597-EMC
                               )
APPLE, INC.,                   )
                               )
            Defendant.         )
_____)

Deposition of YANNICK BERTOLUS, taken on
behalf of Plaintiff via videoconference,
commencing at 1:07 p.m. and ending at
5:00 p.m. on April 17, 2026, reported
stenographically by Carrie Gibson,
California Certified Shorthand Reporter
No. 13937.

I, the undersigned, Carrie Gibson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness whereof, I have hereunto subscribed my name this 21st day of April, 2026.

_____

Carrie Gibson, CSR No. 13937

Yannick Bertolus

Ms. Perry or Perez.

MS. PERRY:  It's Ms. Perry.  I'm the one who's going to be speaking today.

MS. GJOVIK:  Okay.

MS. PERRY:  Ms. Court Reporter, can you hear me?

(Discussion off the record.)

MS. PERRY:  I made an objection that the witness can testify as to anything he did to prepare that did not involve communicating with his counsel. Anything he did to prepare for this deposition that involved communicating with counsel would be covered by the privilege.

MS. GJOVIK:  Okay.

BY MS. GJOVIK:

Q.  **You can answer.**

A.  Sorry.

Can you repeat the question again?

Q.  **Did you do anything to prepare for today's deposition?**

A.  Based on what my lawyer just said, no. Only -- I only worked with the lawyers.

Q.  **Okay.  Did you review -- without disclosing anything that's privileged, did you review any documents in preparation for today's deposition?  Yes**

**Yannick Bertolus**

MS. PERRY:  Objection.  Overbroad.
Compound.

BY MS. GJOVIK:

Q.  Okay.  You can answer.

A.  Do you mind splitting that?  I think there were three questions in there.  Do you mind splitting them to three separate questions?

Q.  Sure.

When did you start working at Apple?

A.  I started working at Apple in 2006.

Q.  What was your first role at Apple?

A.  My first role at Apple was director of iPod software quality assurance.

Q.  Okay.  And then when did you leave Apple?

A.  I left Apple in -- at the end of 2023.

Q.  '23.

Did you take a new job or retire?

A.  I retired.

Q.  Congrats.  Sorry again I had to drag you here.  Thank you for being here.

During that time you worked at Apple, what roles did you hold?

A.  The last role I had was supervising the project managers in hardware engineering, in addition to the communications team, the tools team, the

Yannick Bertolus

BY MS. GJOVIK:

Q. What is John Turnis's job title at Apple as of January 2021 through September 2021?

A. John, during that time, was senior vice president of hardware engineering.

Q. Thank you.

And at that time, who did John Turnis report to?

A. During that time, John reported to Tim Cook.

Q. And what is Tim Cook's title?

A. The CEO of Apple.

Q. Thank you.

And did a person named Dan West report to you during that time?

A. Yes.

Q. What was Dan's title at that time?

A. Dan was a senior director of software quality assurance.

Q. Product system quality.

A. Okay.

Q. Whatever the -- that's fine. There's a bunch of different names, so that's fine.

What was -- how about what was your understanding of Dan West's scope of his organization during that time?

**Yannick Bertolus**

of.  But typically, hardware products, yes.

Q.  Sorry.  This was a long time ago, and there's a lot of change.

Just -- it was my understanding that we're responsible for all products, the whole product line, with the product system quality.  But I know that there was a lot of expansion of merchant and renaming of everything basically every year.

And do you recall a director named David Powers in your organization?

A.  I do.

Q.  Okay.  Do you recall what David Powers' job role was during that time period I mentioned?

A.  He was running one of the teams under Dan.

Q.  During that time period, do you recall having any engineering project managers or program managers within your organization?

A.  Yes.

Q.  About how many?

A.  I don't remember.

Q.  Do you recall how many Dan West had in his organization during that time period?

A.  I don't.

Q.  Do you recall me working in your organization?

**Yannick Bertolus**

Do you recall my reporting structure during the time period I mentioned?

A.   The one thing I remember is that in 2021, you were reporting to David Powers.

Q.   Could you speak up, sir.

A.   Sorry.

In 2021, you were reporting to David Powers.

Q.   What time period would you say that you recall holding your -- the role of senior vice president or vice president of a role like product integrity?  Like, what would be the duration of years that -- I want to hone in on your role at that time period I mentioned, but at that full duration of when you were in a role most resembling that, even though I know there was an of renames of organizations.

MS. PERRY:  Objection.  Vague.  Ambiguous. Overbroad.

BY MS. GJOVIK:

Q.   Can you please share what the time period was that you held the role of VP or senior VP of product integrity or a similar role with a different organizational title?

A.   Product integrity, I think the role was created -- and I don't like saying "I think" -- 2013

Yannick Bertolus

is what comes to mind.  But I don't remember precisely.

Q.  So that would be 2013 to 2021?

A.  Yes.

Q.  Did the organization grow in size over time?

A.  Yes, it did.

Q.  How -- what was the -- do you recall what the size was when it started?  How many people?

A.  I don't.

Q.  And as of that time period that I mentioned in 2021, do you have an estimate of how many people were in that organization?

A.  I don't for 2021.  I mentioned earlier roughly the number I think when I left it.

I think under 2,000.

Q.  Under 2,000.  Okay.

During the time period that you were holding that role that you mentioned, how often were employees involuntary terminated in your organization?

MS. PERRY:  Objection. Vague.  Ambiguous. Overbroad.

MS. GJOVIK:  Let me rephrase.

BY MS. GJOVIK:

Q.  During that time period, how many employees

Yannick Bertolus

Q.  I guess I'm looking for a yes-or-no on that.

MS. PERRY:  I think he just told you he doesn't understand your question and it's vague.

MS. GJOVIK:  Okay.

MS. PERRY:  Do you want to try again?

BY MS. GJOVIK:

Q.  Maybe we lean into what you were talking about for mine as a concrete example.  You mentioned I violated Apple policies.

Can you -- do you recall which policies that you determined that I violated, specifically by name?

A.  Yes.  You violated the confidentiality and intellectual property agreement.  You also violated the business conduct.  There is some others.  I don't remember the exact name.  But posting on social media.  I can't remember the name.  A couple around communications.  So, you know, there were many.  But the two obviously that you violated were the confidentiality agreement and the business conduct.

Q.  Okay.  And I think this might be a more productive way to do it.  We're actually digging in on some actual policies now.

Do you recall which terms in the intellectual property agreement you determined were violated?

A.   I would need to look at it exactly.  But you basically posted on Twitter product-related information.  It was also an internal tool, so it's a trade secret.  So there were -- that was very egregious.

In addition to that, you failed to cooperate with the investigators, which is a violation of the business conduct.  You also misled the ER investigation when they were looking into some workplace concerns that you brought up.  So all of that made it very egregious and grounds for termination.

Q.   Okay.  So the business conduct policy -- I'm sorry.  Can you say which specific portions of the business -- it's very long.

Which portions were violated?

A.   I wouldn't -- I'd like to reread it again, if you really want me to spell out an excerpt.

Q.   I'm sorry.  Go ahead.

A.   No, that's it.

Q.   Okay.  If -- I was planning on offering a break at, like, 2:00.  We can take a 10:00 p.m., and I can go -- or a 10-minute, and I can go dig up those policies you mentioned and we can look at them together, if that's okay, so you're not just

**Yannick Bertolus**

speculating.

A.   Yeah, that's okay.

Q.   Okay.  Sounds good.  And then -- so business conduct.

And you said social media too; is that right?

A.   Yeah.  I would need to -- again, I don't remember the exact title of the policy.

Q.   Okay.  What do you recall about the policy terms that were violated for the policies you don't remember the name of the policies?

A.   A lot of those were kind of covering what was in the confidentiality agreement.  Basically, you posted confidential information online.

Q.   So that would be, like, the Apple confidentiality policy too, maybe?  Like, they kind of had a freestanding what is confidential?

A.   Yeah.  That's the first one I listed, yeah.

Q.   Okay.  And you said didn't cooperate with an investigation.

What policy is that?

A.   You just said you're going to show them to me.  Again, I could be speculating.  I mean, maybe it's in the code of conduct.

Q.   Oh, I'm sorry.  I'm trying to figure out

**Yannick Bertolus**

which ones to find for you to look at.

A.   Code of conduct.

Q.   Okay.

A.   Business conduct and the confidentiality agreement.

Q.   And there was a stand-alone social media policy.  Were you thinking of that, or the subsection in the business conduct policy?

A.   I was thinking of, yeah, additional -- those two or three additional policies, yeah.

Q.   Yeah.  So I have those in a folder I can grab too.  There's a social media one and there's a talking to press one.  I think you mentioned talking to press.  I can get that one, and you can look at it and see if that helps your recollection.

A.   Okay.

Q.   Okay.  Social media, press.  And you said something about misleading investigations.

Do you remember what -- is that business conduct or a different policy?

A.   Business conduct.

Q.   Business conduct.  And you said something about trade secrets.

So is that intellectual property agreement?

A.   It's in there for sure.  I believe it shows

**Yannick Bertolus**

up in others as well.

Q.   Okay.  I'll try to -- I'll look for the main confidentiality one from 2021 as well.  Thank you. So we can come back to those.

Okay.  Mr. Bertolus, do you recall during the period of let's say January 2019 to September 2021 -- just give a shorter time period of your role in product integrity -- do you recall any employees that worked in your organization suing Apple, alleging retaliation or discrimination?

A.   I don't recall.

Q.   Do you recall any employees filing charges or complaints with government agencies about labor or employment complaints during the time that they worked at your organization?

A.   I don't remember.

Q.   During that time period, do you recall employees making complaints that triggered employee relations investigations into the employees' complaints when they worked in your organization?

A.   Yes.

Q.   Thank you.

Do you remember roughly how many?

A.   I don't remember how many.

Q.   How many specific examples can you recall by

Yannick Bertolus

A.   No.

Q.   Okay.  Do you recall how it was described to you?

MS. PERRY:  Okay.  I'm going to -- if the question is do you recall, you can answer that question.  So let's take this question by question.  Because I'm going to instruct you, to the extent these questions ask for privileged information.

MS. GJOVIK:  Okay.

THE DEPONENT:  So can you repeat the last question, then?

BY MS. GJOVIK:

Q.   Do you recall how that allegation -- the facts underlying the allegation of refusal to cooperate were presented to you?

A.   No.

Q.   We just reviewed that email you had with Ms. Bowman, and she said something about refusal to cooperate.

Do you remember getting any additional details beyond what she said in her own email?

A.   No.

Q.   Okay.  And then the -- the leaking -- it sounds like you reviewed the post at issue.

Can you confirm:  Did you review any of the

posts that Apple was stating was leaking?

A.   I remember quite vividly seeing a picture in black and white, which I believe was a screenshot of an internal tool as part of a user study.  That was a violation of your confidentiality agreement, as well as the user study agreement that you had participated in.

Q.   Did you see the Twitter post or just the image?  Do you recall?

A.   I recall seeing the image.

Q.   Okay.  So you wouldn't have seen them on Twitter yourself, then; someone at Apple showed them to you; is that correct?

A.   Yes.

Q.   Okay.  Do you recall what the content of the image -- or how many images were you shown that you reviewed?

MS. PERRY:  So again, I'm going to instruct you not to answer, to the extent that this is getting into what specifically an attorney investigation showed you.

To the extent that you want to ask him questions about what he was aware of, you can do that.  But you need to separate that from what investigators showed him or what specifically

happened in the investigation.

MS. GJOVIK:  We'll bring that to the magistrate.  This is Apple's supposed justification for terminating me.  You cannot claim a sword and shield on this.  But understood.  I'll withdraw that last question.

BY MS. GJOVIK:

Q.  And I'm going to ask you:  Do you recall the content of the photos that you reviewed?

A.  I think I answered that just a minute ago. I remember vividly seeing one photo, black and white, which was a screenshot, I believe, of an internal tool.  And by posting that, you violated your confidentiality agreement.

Q.  Thank you.

I meant, like, what was in the image itself?

A.  A room, you.

Q.  A photo of me; is that right?

A.  Not just you.  I mean, you were there, I believe, and then the -- black and white and the room in the background.

Q.  Do you know what room?

A.  No.

Q.  Are you familiar with the Gobbler/Glimmer application that Apple uses?

A.  It was part of the reasons for your termination.

Q.  Okay.  Do you recall any of the factual details underlying why I was sharing that text message about Dan with Apple?

MS. PERRY:  I'm going to instruct you here that this calls for attorney-client privileged information, with respect to the investigation.

MS. GJOVIK:  Okay.

BY MS. GJOVIK:

Q.  Mr. Bertolus, would you like to review those policies I gathered for us?  We can do that now.

A.  Yeah.

Q.  Yeah.  Cool.

Okay.  Would you like to maybe start with the intellectual property agreement I signed?

A.  Okay.

Q.  Okay.  Can you see that okay?

A.  Yes.

Q.  Are you familiar with these enough to know what's contained, or would you like to review it and confirm the content of the one I signed?

A.  I'd like to review it, please.

Can you zoom in a tiny bit?

Q.  Yeah.  Okay.  And then just let me know when

Yannick Bertolus

you want me to scroll down, please.

A.   Okay.   Thank you.

Okay.

Q.   Are you ready now?

A.   Oh, yeah.   Can you scroll to the first one?

Q.   Yeah.

A.   Okay.   So this, for instance, is clearly something you violated.   When it says "proprietary information," it means all information not generally known outside of Apple or kept confidential to Apple, including trade secrets, specification, prototype, software.   So that was something that that you clearly violated.

Q.   Okay.   I'm sorry.   I was just going to have you read it all.   But if you want to go through and then find the terms that you think are relevant, we can do it that way.

Would you prefer to do it how you were doing it naturally?

A.   Yeah.   It might being easier, I think, to do it this way, unless you'd rather not.

Q.   No, I'd prefer you just to answer what's more naturally for you.   So we can do that.

So you were just -- can you explain what you were just identifying for me?

Yannick Bertolus

A.   Yes.   Where it says "proprietary information" means all information not generally known outside of Apple and are kept confidential by Apple, including, for example, but not limited to trade secrets -- which is what an internal tool would be specifications, software, or any other materials or information relating to past, existing, and future products that's something you violated with posting that picture.

Q.   And can you clarify, are you saying all the things you just said were violated, or if that was more of a broad term, can you narrow in on which specific things you think were violations?

A.   I can.   I mean, proprietary information, I think, includes it.

Q.   And can you explain -- sorry.   This is -- you know, law is much more ritualistic than engineering.   So I'm just going to ask you to have to do some stuff for the sake of the analysis.

Can you explain to me why you think the leaking -- my leaking was proprietary, how it falls under proprietary?

A.   It was an internal tool, and that tool was disclosing features of a product, potentially.

Q.   And if -- so if we do it this way, I might

Yannick Bertolus

have a couple follow-up questions.  But we can just keep going back to this, if that's okay.

Do you know what product it could potentially disclose information about?

A.  You brought up earlier, I think, that you spoke to Robert.

Q.  Mr. McKeon?

A.  Yeah.  He made it clear that what you disclosed was product-related information.

Q.  I'm sorry, Mr. Bertolus.

How do you know that?

A.  I know that because I spoke to Robert.

Q.  When did you speak to Mr. McKeon?

A.  I spoke to him today.

Q.  Interesting.

Can you share what else you talked to him about?

A.  That's it.

Q.  And how long did you talk to Mr. McKeon today?

A.  For a few minutes.

Q.  Did you talk to Mr. McKeon prior to this deposition, or while we were at break?

A.  Prior to this deposition.

Q.  Okay.  And what was the purpose of talking

Yannick Bertolus

to Mr. McKeon this morning?

A. Confirming that what you leaked was proprietary.

Q. Whose idea was it for you to talk to Mr. McKeon?

MS. PERRY: I'm going to instruct you not to answer any questions about this further.

BY MS. GJOVIK:

Q. Mr. Bertolus, did you speak with any other nonlawyers today about me, prior to this deposition?

A. Yes.

Q. Who did you speak to, Mr. Bertolus?

A. Somebody in global security.

Q. Do you remember their name?

A. Sophi.

Q. Sophi Jacobs?

A. Yes.

Q. Can you share what you talked to her about?

A. We spoke about the fact that when you leaked the information, you leaked it intentionally, that you had not had the authorization to -- to leak it, and that -- I believe that was it. That it was confidential.

Q. Okay. And can you clarify, when you say "information," specifically what information were you

**Yannick Bertolus**

talking about?

A.    What you leaked on Twitter.

Q.    You're talking about the photos again?  Just the photo that you mentioned earlier?

A.    Yes.

Q.    And before, you said one.

Can you clarify how many photos you discussed?

A.    We discussed the photo I was telling you about that I remembered seeing.

Q.    So one photo; is that correct?

A.    Yes.

Q.    And when we take our next break, I might go find these Twitter posts, and we can look at them. There were several photos that were just, like, the pictures of me.  And I believe there was one screenshot from inside the application that showed multiple photos.

Is that your recollection, it looked like there -- actually, I'll go find them and we can look at them later.  Because I don't want you to speculate.  Sorry.  I'll withdraw that for now.

Thank you for sharing that.  We can go back to this now, if you'd like to keep reading this and see if you can find more violations that I did.

Yannick Bertolus

A.  Well, the treatment of proprietary information, you violated.

Q.  Oh, and we -- sorry.  I was going to have you define "proprietary information."  And I think that's where -- we'll have to go back.  I think that's where we went on that tangent.

In your -- in your view, your personal view -- because you said you had reviewed this and made the determination yourself; is that correct?

A.  Yeah.

Q.  Yeah.

Why was the information that you reviewed I shared, that -- that photo you said you saw, that screenshot proprietary?

MS. PERRY:  Objection.  Asked and answered.

MS. GJOVIK:  He said because McKeon said this morning.

Is that the answer we're sticking with?

MS. PERRY:  No, that's not what he said. You're misstating his testimony.

BY MS. GJOVIK:

Q.  Okay.  If we don't -- if you don't want to clarify further what "proprietary" means, we can skip that.

If you can go to the next, please.

A. Well, I think "proprietary" is very clearly stated here. It means all information not ordinarily known outside of Apple and/or kept confidential by Apple, like that tool.

Q. So would you say the tool, just because it wasn't known outside Apple, and/or because Apple would claim it's confidential?

A. No. Because the tool was an internal tool, which is considered a trade secret. In addition to the fact that, based on that photo, one could -- could speculate on what the features could be of a future product.

Q. Okay. And then you say "trade secret."

Can you clarify -- and we don't have lawyers objecting. And I'm assuming you may be using more of a colloquial use of "trade secret" than the actual, like, legal analysis and statutes of how you'd substantiate trade secret claims.

Can you clarify what you mean by an internal tool being a trade secret?

MS. PERRY: Objection, to the extent it calls for a legal conclusion.

MS. GJOVIK: Yeah, I don't -- I don't want a legal conclusion from him. I want him to explain what he's trying to assert with this statement.

**Yannick Bertolus**

THE DEPONENT:  Yeah.  So -- yeah, you're right.  I am not a lawyer.

What I mean by "trade secret" in this case is something that we would not necessarily patent but that is part of our secret recipe of how we do work at Apple -- or I should say how I used to do work at Apple.

BY MS. GJOVIK:

Q.  I know.  I still say -- even I still sometimes say, like, "I'm with Apple."  It's hard to let go when you've been there a while.

Thank you.  Okay.  So -- so secret sauce.

Is there anything else that you might -- instead of maybe using the word -- you can use "trade secret" if you want to use it.  But is there any other terminology you might use to just clarify why you think this would be distinguished from sharing other internal things?

MS. PERRY:  Objection. Vague.  Ambiguous.  Overbroad.

MS. GJOVIK:  I can't hear you.

Can you speak up?

MS. PERRY:  Objection. Vague.  Ambiguous.  Overbroad.

///

BY MS. GJOVIK:

Q. Okay. Mr. Bertolus, there's a -- there's a lot of stuff that happens internal Apple that isn't necessarily considered proprietary.

Can you explain why you feel the information that I supposedly leaked counts as proprietary and your use of trade secret?

A. Yeah. I feel I'm going to be repeating myself. You leaked an internal tool, and in addition, that people could speculate on what features are going to be based on that.

Q. Okay. And did you make any determinations that people could speculate for future products based on what information was shared?

A. Can you repeat the question? I feel I've answered it already.

Q. Sir, I know. I'm asking it a couple different ways to get to some very, like, specific things. I'm sorry.

You said that you reviewed the information and made the determination and that the information was proprietary, and proprietary meaning someone could speculate about potential future product. That's just my commentary.

My question for you is: As part of your

analysis and determination in firing me for this leaking, did you determine that someone could make a determination about a future Apple product based on the information I shared?

MS. PERRY:  I'm going to instruct you, to the extent that this is asking for privileged information.  If you have nonprivileged information that you can share on this, you can go ahead and testify, if you understand the question.

MS. GJOVIK:  And I'm specifically asking him for his own decision-making, since he said he made the decision.  I don't want privileged.

THE DEPONENT:  My decision-making was based on the fact that you posted a picture of an internal tool that is confidential and non-public information, which I see listed clearly as a violation of this document.  And -- and I don't think it's far-fetched to think that the fact that people saw or could image what the tool would do that they could conclude what could be a new product that is yet to be released.

BY MS. GJOVIK:

Q.  Okay.  I'll be satisfied with that for now. Thank you, Mr. Bertolus.

Would you like to keep reading and look for more violations now?

Yannick Bertolus

A.   Yes, please.

Q.   **Okay.**

A.   So we discussed that you violated the treatment of proprietary information.

Can you keep scrolling, please?  You can keep scrolling.  You can keep scrolling.  You can keep scrolling, please.  You can keep scrolling, please.  You can keep scrolling.

And then obviously, it states very clearly that:

"If you breach any part of this agreement, employer is entitled to take any action to the extent permissible under applicable laws under this agreement, including, but not limited to, terminating employees."

Q.   **Do you want to keep going?**

A.   Yeah.

Okay.  You can keep scrolling.

Q.   **And, Mr. Bertolus, it says "no implied employment rights."**

**Is that maybe part of the authorization for that at-fault immediate termination, or --**

MS. PERRY:  Objection.  Vague and ambiguous.

MS. GJOVIK:  Okay.

Yannick Bertolus

BY MS. GJOVIK:

Q.  Mr. Bertolus, do you agree with the "no implied employment rights" section of this agreement?

A.  Well, if I read it correctly, I understand that there is employment at will.  But I'm not sure that it's employment at will in this case.  I mean, there was -- again, it was more in relation to your violation, by posting that picture and the other things we've discussed earlier that were egregious violations.

Q.  Okay.  So generally, like, "at will" means that Apple can just fire me whenever they want?

So that term says:

"Apple's right to terminate your
    employment at will at any time for any
    reason, with or without cause or prior
    notice."

So I think that supports what you're saying, rather than conflicts with it.

So I'll just ask again:  Do you agree with that term, in relation to the termination of my employment?

MS. PERRY:  Objection.  Vague and ambiguous.  Also to the extent it calls for a legal conclusion.

MS. GJOVIK:  I'll withdraw and rephrase.

Yannick Bertolus

BY MS. GJOVIK:

Q.  Mr. Bertolus, during your time as an executive at Apple, including the 2021 time period we've discussed, do you agree Apple has the right to terminate employment of its employees at will at any time, for any reason, with or without cause or prior notice?

A.  That's my understanding, yes.

Q.  Okay.  Thank you.

And then general provisions.

A.  Okay.  Okay.  And then clearly, you acknowledged that you read and agreed with all this.

Q.  Yeah, I signed that.  My signature is only redacted because this was shared for another purpose that was public, and I don't want my signature public.  But I signed it.

A.  Okay.

Q.  So anything else you want to add?

A.  No.

Q.  Okay.  So the things that you pointed out as we were walking through this, those were the terms in this agreement you believe were violated that justified my termination; is that correct?

A.  Yes, that's correct.

Q.  Okay.  And then we can look at -- well,

Yannick Bertolus

let's look at -- you mentioned a social media and online communications policy.  I have a copy of that we can look at.

Does this look familiar, like Apple's policy on this topic?

A.  Can you --

Q.  You want it bigger?

A.  Yes, please.  Sorry.

Q.  I'm so sorry.  I keep forgetting.

Okay.  Go ahead.

A.  Can you please scroll?

Okay.  So here, again, it explains you shouldn't be posting on social media any intellectual property or proprietary information.  So you violated that.

Q.  Okay.  Can you be more specific of what was posted that violated it?

A.  That picture that we've discussed multiple time today already.

Q.  I know.  I'm sorry.  I just need for the record the full --

A.  Okay.

Q.  Being a lawyer is really tedious.  I'm sorry.

Okay.  Go ahead.

Yannick Bertolus

A.  You want to keep scrolling?

Yeah.  So it also refers to the IPA and the business conduct.  I guess we'll get there next.

Q.  Yeah.

A.  Keep scrolling, please.

Okay.

Q.  So the terms you pointed out when we were speaking, those were the terms you believe were -- I violated that justified my termination; is that correct?

A.  Sorry.  Repeat the question.

Q.  The terms that you pointed out as we scrolled through this, those were the terms in this specific policy you believe I violated that justified my termination; is that correct?

A.  That's correct.

Q.  Thank you.

And now you'd like to look at the business conduct policy?

A.  Okay.

Q.  Okay.  So I have -- this is the October 2020 version.  It's my understanding this was the current version when these events occurred in 2021.

And I have a lot of stuff I still want to ask you on limited time.  So I'd prefer if we don't

have to go through the whole section.  If possible, if you can identify which subsections you'd like to review, I would appreciate that.

A.  Yeah, I don't know exactly where it would be.

Q.  Oh, do you want -- I'm sorry.  I should make it bigger.

A.  Yeah.

How many pages is the whole thing?  I don't mind scrolling through it quickly to --

Q.  Yeah.

A.  But --

Q.  Yeah, we can go through it.  And if you maybe see a header and you're like, that's not applicable, we can just skip it.  I don't need you to authenticate the document.  If we're just looking for stuff, we can for sure do it that way.

So that sounds good?

A.  Okay.

Q.  Okay.

A.  Okay.  Well, confidentiality is there.

You can scroll.  You can keep going.

I'm sorry.  Is this frozen?  Are you scrolling?

Q.  Oh, I'm at the bottom of the first page.

Yannick Bertolus

A.   Yeah, I'm done with that page.

Q.   **Okay.**

A.   Okay.  So this is one:

"You're also required to fully cooperate in any Apple investigation and keep any information shared with you confidential to safeguard the integrity of the investigation."

So that's something you --

Q.   **Okay.  And I'm sorry.  If this was an engineering project, I know this would probably annoy you, so I'm so sorry.  I remember working for you.  But I'm going to have to drill in on this again and ask you to specify which investigation.**

**So we had the misleading them investigation and then that failure to cooperate.**

A.   Yeah.

Q.   **Can you provide additional detail of which one it applies to or both and why?**

MS. PERRY:  Objection.  Compound.

MS. GJOVIK:  Sorry.  Withdrawn.

BY MS. GJOVIK:

Q.   **Can you please elaborate your response to specify the specific allegations of misconduct against me and how this policy applies?**

**Yannick Bertolus**

MS. PERRY:  Objection.  Vague and ambiguous.  Overbroad.

BY MS. GJOVIK:

**Q.  Mr. Bertolus, you just said that the line you just read is a policy violation that justified my termination related to investigations.  You also said that there were two separate violations related to investigation, one about misleading or misrepresenting and one about failure to cooperate.**

**Can you please elaborate which violation you're talking about with that term you just read?**

A.  Well, the sentence here would cover both.

**Q.  And why?**

A.  Because you did not fully cooperate in the investigation, one, by refusing to answer on the leaks; two, by misleading and not providing full context in that text exchange.

**Q.  Okay.  And I know -- I'm sorry -- this is really annoying.**

**Okay.  So for the first one, for failure to cooperate, can you be more specific?  You said refusal to answer.  But no one called me that I'm aware of I didn't answer.**

**So can you specify what the more specific violation is you're referring to?**

Yannick Bertolus

A.   Well, you're making statements I can't verify.  So it's -- I'm a little confused.

Q.   Okay.  Well, let me rephrase.  Sorry.  I'm dealing with very ambiguous information from Apple.  So I'm trying to -- trying to frame it right.

The failure to cooperate violation, because that was part of my termination reason, can you provide more details of what your understanding is of how I failed to cooperate?

A.   So you posted that -- you leaked on Twitter.  And when global security tried to reach out to you, you did not participate in that.  That's one.  And you also did not fully cooperate in the investigation on your workplace concerns by misguiding the investigator by not showing fully a text exchange.

Q.   Thank you.

For the first one, can you provide more details on what exactly my misconduct was that was seen as refusal to cooperate?

MS. PERRY:   Objection.  Asked and answered.

BY MS. GJOVIK:

Q.   Mr. Bertolus, are there any factual details you can provide that underline the allegation that I refused to participate in an investigation with global security on September 9th?

A.   I think that would be better answered by global security.

Q.   Agreed.

But if you made the determination to fire me and said you made that independently yourself and reviewed the information yourself, I would assume that you would have more details than just a blanket assertion.

So I would like to know if you have more details.

A.   The leak on Twitter of that internal tool was so egregious that that in itself warranted termination.  The fact that you did not cooperate was an addition to that, but not the main reason.  The main was your leak.

Q.   Thank you.

I'm still trying to hone in on the failure to cooperate, what that actually means, though.  So I'm not asking you these questions -- these retaliation lawsuits, Apple says one thing, and then I have to say, like, that's not what they mean, or this is what really happened.

So if they just say something vague, it's hard for me to come up with facts to show what really happened.  So I'm just trying to figure out what the

Yannick Bertolus

actual facts are and the different stories from different people, which is why I'm probably annoying you a lot right now asking this a million times.  And I'm so sorry.

But if you -- I'm going to ask again:  Do you know any information about what that allegation of refusal to cooperate was with global security on September 9th, other than what you've told me so far?

A.   Sorry.

Can you repeat the question again?

Q.   Yeah.

Do you have any other information that you recall about the factual details about why I was refusing to cooperate -- why Apple said I was refusing to cooperate when global security contacted me on September 9th, other than what you've shared already?

A.   No.

Q.   Okay.  So then we don't have to keep asking that a million times.  I'm sorry.

Okay.  So then when you said you determined that it was justified that I should be terminated based on this policy violation we're just reading a million times -- I'm sorry -- and you stated this example of refusal to cooperate, can you explain your

determination of why that refusal to cooperate would violate this policy without any factual details of what occurred?

MS. PERRY:  Objection.  Vague and ambiguous. Misstates testimony.  Lacks foundation.

MS. GJOVIK:  Let me ask again a different way.

BY MS. GJOVIK:

Q.  Mr. Bertolus, is it correct that you just said that you believe I violated this policy term that we just read and we've been discussing when I refused to cooperate when global security contacted me on September 9th, 2021?

A.  I mean, you could ask the court reporter. But I think I said that this was an example that covers both things.

Q.  I think you -- I'm just trying to avoid objections.

So because you said that, can you provide any factual details of why you believe this policy term and the violation applies to the facts underlying what occurred on September 9th?

MS. PERRY:  Objection. Vague.  Ambiguous. Overbroad.

MS. GJOVIK:  I'm going to keep that one.

Yannick Bertolus

I'd like him to answer.

THE DEPONENT:  So I think you showed me the email that the HR sent to me; right?

BY MS. GJOVIK:

Q.  Yes, Megan Bowman's email.

A.  I think it stated on there, which is the information I'm getting, that you did not cooperate with global security.  And when I read this again today, it says clearly:

"You are also required to fully cooperate in any Apple investigation."

So that looks pretty clear to me.

Q.  I'm sorry.

What I'm trying to get you to confirm is that you made the decision to terminate my employment based on that allegation, just based on what was told to you, but not knowing what the factual basis was underlying the allegation.

MS. PERRY:  So I'm going to instruct you not to answer, to the extent that this starts to get into what was communicated to you by counsel.

MS. GJOVIK:  I think -- I think I have enough now for that.  I don't want to keep annoying him.

///

**Yannick Bertolus**

BY MS. GJOVIK:

Q.   I'm sorry, Mr. Bertolus.

Would you like to continue reading this policy?

A.   Yes, please.

Q.   Okay.   Please let me know more stuff I did wrong.

A.   Okay.   You can keep going.   You can keep going.

Q.   And we've already used up, like, 20 minutes on this.   So if possible, if we can skip over stuff you don't think is going to be applicable, I'd appreciate it.

A.   I mean, you asked me to review this.   So --

Q.   I know.

A.   Keep scrolling, please.   You can keep scrolling.   Thank you.   Okay.   You can keep scrolling.

Okay.   So this is yet another example when you leaked the information:

"Assets include Apple's proprietary information, such as intellectual property," et cetera.

So:

"Watch what you say.   Never

Yannick Bertolus

disclose confidential trade secrets or other business information without verifying with your manager whether such disclosure is appropriate."

And then you had no authorization to disclose what you did on Twitter.  It should be shared on a need-to-know basis.  Obviously Twitter, no need to know.

You can keep scrolling to the nondisclosure.

So there again:

"Never share confidential information about Apple's products or services without your manager's approval," which you did.

You can keep scrolling, please.  You can keep scrolling.  You can --

Q.  And I'm actually -- unless you insist, I'm going to be the one to say I think I have enough from this now that you've identified some stuff, because I've struggled to get Apple to identify anything.

So unless you want to go -- insist on going though the whole thing, I would ask if we could do -- maybe do a follow-up response from you, if you'd like to add additional.

I'd like to go to that misconduct and

discipline policy that Ms. Perry asked us to review next, if that's okay?

A.  Is there anything -- can you at least scroll, so that we can see if there is --

Q.  I'd be super happy to, like, send these policies and have you guys review.  And if you can send me, like, a written --

MS. PERRY:  No, we're not doing that. Discovery is --

MS. GJOVIK:  Okay.

THE DEPONENT:  No, we're not doing that.

MS. GJOVIK:  Okay.

MS. PERRY:  If you want him to answer questions about this, you're going to need to show it to him and allow him to go through it.

MS. GJOVIK:  Okay.  Well, we're not going to have time.  I have too many questions, so we're not going to have time to go through the whole thing.

BY MS. GJOVIK:

Q.  But you gave me answers.

So we can, for the record, say that your answer might be incomplete; that there might be more that you would see if we reviewed the whole document.

Is that fair?

A.  Yeah, that's okay.

**Yannick Bertolus**

Q.  Okay.  Thank you.

And then Ms. Perry asked us to also look at the misconduct and discipline policy.  So I have a copy of that --

MS. PERRY:  No.  No.  No.  No.  No.  Hold on.  I did not ask you to look at the policy.  You're making statements on the record that are inappropriate and inaccurate, and I object to that.

MS. GJOVIK:  Okay.  Well, he didn't mention this one.  So we don't have a lot of time.  So we can just skip this one, then, if we don't need to look at it, Ms. Perry.

MS. PERRY:  I'm not here to testify.  That's not my role.  Your role is to ask questions.  He told you that there were multiple policies that he reviewed.  And that was what his testimony was.  If you want to ask him about the multiple policies that he reviewed, it's your deposition, and you can do that.

MS. GJOVIK:  I did.  So Mr. Bertolus named the IPA, which we reviewed, and the business conduct policy, which we've now viewed at least part of, and the social media policy.

BY MS. GJOVIK:

Q.  Did we look at the social media policy?

Yannick Bertolus

A.   No.   But I mentioned -- I mean, there were five in total.

Do you want to go back to the previous one and zoom in?

Q.   I would like to look at the social media policy with you, if we have not finished reviewing that one, please.

A.   Can you zoom in a little bit, please?

Q.   Yes.   I'm so sorry.

A.   And then scroll up to the --

Q.   Are we good?

A.   Okay.   So once again:

"Protect Apple's confidential information.   Our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential," which you violated.

You want to keep scrolling, please?

This refers to the other policy and the business conduct, which we hardly looked at.

You want to keep scrolling?

Okay.   I think -- yeah, that looks like something we reviewed already.

Okay.

Q.   Okay.  So can you highlight which terms you think that I violated that justified my termination?

A.   Yeah, I just did.

Scroll back up.

Q.   Yeah.

A.   You violated -- you failed to keep Apple's intellectual property and proprietary information confidential.

Q.   By sharing it on Twitter?

A.   Yes.

Q.   Okay.  And you're talking about that one image that we're talking about that shows the screenshot of the UI of the Glimmer app; is that correct?

A.   That's correct.

Q.   Okay.  Thank you.

And just to confirm, are there any other policies that you think I violated that you remember by name that were not the three we just looked at?

A.   I remember five total.  We've reviewed -- what -- three?  There is one you glanced over just now -- before.

Q.   That was the one that Ms. Perry and I were fighting about.

I was asking you if you remember the

policies by name that you believe I violated.

A.   As I said, I remember that there were five of them.  I didn't remember exactly the names of all of them.

Q.   That's fine.

So I'd just like to look at the ones that you remembered.  And I thank you for doing that.

MS. GJOVIK:  What was that?

THE DEPONENT:  I was asking --

MS. PERRY:  He wants to take a break.

THE DEPONENT:  Yeah.

MS. GJOVIK:  Okay.  Five minutes okay?

MS. PERRY:  Let's take ten.

MS. GJOVIK:  We're really running out of time.

But okay.  Thank you.  Ten minutes.

(Off the record from 3:36 p.m. to 3:49 p.m.)

MS. GJOVIK:  So for the sake of making sure I'm marking these exhibits, I'm going to go -- this won't be questions for you, Mr. Bertolus.  I'm just going through and show her the documents I was showing that she has copies of so she can label them as exhibits for the deposition record.

Okay.  So -- okay.  So for the record, when

Yannick Bertolus

(Exhibit GG was marked for identification.)

MS. GJOVIK:  And then let's see.

BY MS. GJOVIK:

Q.  So, Mr. Bertolus, while we --

MS. GJOVIK:  Is that good, Ms. Court Reporter?

THE STENOGRAPHER:  Yeah, that's good.

MS. GJOVIK:  Okay.  Thank you.  Sorry I missed that.  I should have confirmed.  Again, I'm still learning.

BY MS. GJOVIK:

Q.  While we were at break, Mr. Bertolus, I went looking for the photos that seem to be at issue.

So first I'd ask:  Are you aware that on September 15th, after I was terminated, that lawyers from external counsel for Apple at O'Melveny & Myers, contacted me concerning some of my Twitter posts and other public statements, and asserting it was related to the reason I was terminated?

A.  No, I did not know that.

Q.  Okay.  So they linked some url's of Twitter posts and some other content.  But you didn't bring that up, so I'm not going to talk about the other stuff right now.  And I'm going to show you the

Yannick Bertolus

Twitter post that they linked to that they said they wanted me to delete.  And I said I disagree with all this, but I deleted it.

But I'm going to show you the one I think you're talking about.  And if you can let me know if that is the one you're talking about.  And then I can show you the other three and see if you have anything to say for those too.

So this is the one I think you might be talking about.

MS. GJOVIK:  This is Exhibit 1 -- sorry. Now I go into numbered exhibits -- Photo Exhibit 1.

(Exhibit 1 was marked for
    identification.)

BY MS. GJOVIK:

Q.  Does this look like the photo that you reviewed?

A.  It was a very long time.  It could be. Again, what I said that I vividly remembered was a picture in black and white with you or part of you, what I see in this picture.

There was also a Verge article that we discussed.

Do you have that that I can look at?

Q.  We can go to that.

But, Mr. Bertolus, you didn't mention that prior.

Why are you just bringing that up now?

MS. PERRY:  Objection.  Misstates testimony.

MS. GJOVIK:  Sorry.  Let me clarify.

BY MS. GJOVIK:

Q.  Mr. Bertolus, when you listed the reasons I was terminated -- and you did that several times.  We went over that.  You didn't mention the Verge article.

So why are you raising it now?

A.  Maybe the court reporter could go back.  But very early in the deposition, I brought it up.

Q.  Sorry.

Can you say it again?  I can't hear you.

A.  Very early in the deposition, I brought it up.

Q.  So would you like to correct your testimony of the reasons that I was terminated to include that, or would you just like to review that separately?

A.  No.  I have said clearly that you violated your confidentiality agreement, and that -- and that Verge article is part of that.  If you want to go back to the record, we can go back to the record.  I mentioned that early on.

Yannick Bertolus

Q.   We don't have to dispute what you said prior.  It will be on the record.

But if you are confirming now that that is one of the reasons, is the Verge article, can you please provide me more information about what about the Verge article -- or sorry.  Yes, we can discuss that next.

For this, though, I believe you previously said that you saw me, you saw a room behind that was black and white, and a screenshot of the UI of an application.

So does the photo embedded in this Twitter post look like the image you were referring to?

A.   It looks like -- I'm not saying it's exactly that one.  But it looks like it, yes.

Q.   Okay.  And you had said you didn't -- had not seen the text of the Twitter post prior; correct?

MS. PERRY:  Objection.  Misstates testimony.

BY MS. GJOVIK:

Q.   Okay.  Mr. Bertolus, had you seen the Twitter post in full at the time you made the termination decision?

A.   I don't recall if I saw it or not.

Q.   Okay.  I'd just like to read this text for the record.  This is a post made from the account at

**Yannick Bertolus**

@ashleygjovik on August 30th, 2021.

And it says:

"We're learning about Apple's long history of systemic oppression and retaliation against employees when employees express concerns about discrimination, harassment, and other abuse.  Why wouldn't Apple try to use our data and their internal surveillance infrastructure against us."

Mr. Bertolus, do you recall that statement I just read when you were reviewing this content and making the decision to terminate my employment?

A.  No.

Q.  Okay.  Okay.  So we can go to the Verge -- would you like to see the other three photos that that law firm e-mailed me?  Also, I would like for you to look at them and tell me if you had reviewed those too.

A.  Okay.

Q.  Okay.

MS. GJOVIK:  So this is Photo Exhibit 2. This was a post I made on my Twitter account August 30, 2021.  It has two photos of me taken in

Yannick Bertolus

the Gobbler/Glimmer app.

(Exhibit 2 was marked for identification.)

BY MS. GJOVIK:

Q.  And the text says:

"Apple's global security team of ex-US intelligence employees includes ex-NSA, ex-FBI, ex-military, and ex-secret service workers.  'Very little is known about the way it operates'" -- with quotes for the two articles -- "Why wouldn't they use this internal data."

Do you recall reviewing this post when you decided to terminate my employment?

A.  No.

Q.  Okay.  Thank you.

MS. GJOVIK:  And then Photo Exhibit 3.  This was a post I made on August 30th, 2021, from my Twitter account.

And this was -- I believe this was the embedded video.  It's either a screenshot of the video or the embedded video taken from a screen capture on the Gobbler/Glimmer app on my phone.

///

Yannick Bertolus

(Exhibit 3 was marked for identification.)

BY MS. GJOVIK:

Q.  And I posted:

"Totally normal.  Nothing weird about any of this.  Just the video/photos my internal Apple iPhone captures of me while I'm not paying attention and stores on device, and also maybe uploads too?" and then a link to where the Vox had posted that video I shared with them.

Had you reviewed this when you made the determination to -- or the determination to terminate my employment?

A.  I don't remember.

Q.  Okay.

MS. GJOVIK:  And then the fourth one was a post I made on my Twitter account on August 28th, 2021.  And it includes screenshots of two emails I got in my Apple e-mail account, with some redactions.

(Exhibit 4 was marked for identification.)

BY MS. GJOVIK:

Q.  And I said:

Yannick Bertolus

"I'm still over here in Apple's timeout chair, and they keep telling me to respect my abuser's privacy and be silent.  Meanwhile, I got 3x of these in the last month since being on leave.  No, Apple.  Stop it" -- monkey face with covered ears and crying emoji -- "I can't tell if they're harassing me or just being super intrusive or both."

Mr. Bertolus, do you remember reviewing this content when you decided to terminate my employment?

A.  I don't remember.

Q.  Okay.  Thank you.

MS. GJOVIK:  And then the Verge article.

So this is from the McKeon article.  So it's Exhibit 35 McKeon Aloe.  So it will be a double exhibit, I guess.

And this was an article that was published August 30th, 2021 in The Verge, called Apple cares about privacy unless you work at Apple.

(Exhibit 35 was marked for identification.)

BY MS. GJOVIK:

Q.  And it says:

"The company has taken a strong

Yannick Bertolus

stance on safeguarding its customers'
data, but some employees don't believe
it protects theirs."

Is this the article you're referring to,
Mr. Bertolus?

A.   Can you zoom in, please, and scroll?

Q.   It's 11 pages.  So I'd prefer we don't
review the whole thing, because I still have a lot of
other questions I'd like to ask.

MS. PERRY:  Well, he can't answer your
questions about it unless you allow him to look at
the actual --

MS. GJOVIK:  But I didn't have questions,
because he didn't bring it up until just now.  He
just brought it up midway.  So he asked to see it.

BY MS. GJOVIK:

Q.   What exactly would you like to see,
Mr. Bertolus?

A.   The pictures embedded in there that you
disclosed.

Q.   So this PDF that I have, for some reason, it
didn't save that video in it.  So it doesn't show it
in the content of the article.  But --

A.   Can you scroll quickly?

Q.   Yeah.

A.   And you're not -- you agree that there were pictures there; right?  So that's --

Q.   Yeah.  Oh, yeah.  I shared that.  And that was also what I screenshot on those Twitter posts.

A.   Okay.  So that was basically, yeah, the violation of your confidentiality agreement.  Yeah.

Q.   Can you tell me what that content was that you're saying was a violation?

A.   The pictures where -- I don't know which other picture you showed me.  But -- but clearly, it was a screenshot of an internal tool, which was a violation of your confidentiality agreement, and that was grounds for termination.

Q.   Mr. Bertolus, did you review this article when you made the decision to terminate my employment?

A.   I don't remember reviewing the whole article.  I just remember a mention of a Verge article.

Q.   Do you recall the -- did you know the title of the article when you made the termination decision?

A.   I don't remember.

Q.   Mr. Bertolus, do you know that in California, workers have a constitutional right to

Yannick Bertolus

privacy in the Constitution of California that gives them a protected right to protest invasions of privacy by their employer?

A.  No.

Q.  No.

Were you aware that there's even --

MS. PERRY:  Objection, to the extent it misstates the law.

MS. GJOVIK:  Okay.

BY MS. GJOVIK:

Q.  How about this:  Mr. Bertolus, do you think it would be a justified reason to terminate an employee if they were protesting what they thought was egregious violations of their privacy by their employer?

MS. PERRY:  Objection.  Calls for a legal conclusion.

MS. GJOVIK:  He made the determination to --

BY MS. GJOVIK:

Q.  How about this:  Mr. Bertolus, if you have the context of the Twitter posts I just read of what complaints were being made and at least knew that the article -- that the content you just mentioned, that the premise was Apple employees organizing to protest invasions of privacy, would you still have -- are you

Yannick Bertolus

still certain you would have made the decision you did to terminate my employment?

MS. PERRY:  Objection.  Calls for speculation.  Lacks foundation.  Incomplete hypothetical.

MS. GJOVIK:  He can answer.

THE DEPONENT:  You were terminated because you violated your confidential agreement by posting a screenshot of an internal tool, among other things that we discussed earlier.  I can repeat them if you want.

BY MS. GJOVIK:

Q.  No thank you.

So just to confirm, no additional facts or data would make you change your mind about the decision you made?

MS. PERRY:  Objection.  Vague and ambiguous.

BY MS. GJOVIK:

Q.  Mr. Bertolus, do you think that additional information could be provided to the context of what happened that might make you reconsider your decision to terminate my employment on September 9th?

A.  I'm sorry.  The way the question is phrased is complicated.

Based on the data that I had at the time,

Yannick Bertolus

really does feel like intimidation and
additional retaliation, and I will
consider it as such."

Mr. Bertolus, have you ever seen any part of this email exchange before I just showed it to you now?

A.  No, I have not.

Q.  Okay.  And now that you've seen this exchange -- and this was authenticated by Mr. Kagramanov -- would you say that it looked like I was refusing to cooperate?

A.  You refused to talk to the investigator, so what we said is factual.

Q.  So to clarify, you know, I was saying I'd talk to him in email.  I just said I didn't want to get on the phone.

So can you clarify, are you saying that the only way to cooperate would be getting on the phone with him?

A.  After leaking proprietary information and violating your confidentiality agreement, I think an appropriate next step would have been to speak to the investigator and cooperate that way.

Q.  Okay.  And do you think that my explanation of why I wanted to keep a written record then was

Yannick Bertolus

That goes back to Exhibit A.

Mr. Bertolus, were you aware that Mr. West, who reported to you, and I were talking about you in this way?

A.  No.

Q.  Were you aware that Mr. West and I were having conversations about Jared and Andrew about this context?

A.  Nope.

Q.  Do you think this is an appropriate way for a senior director to talk to their EPM?

A.  I would need to have more context to make a -- you seem pretty feminine -- I don't even want to even go there and speculate.  But you seem pretty -- I don't know.  I still don't see the relevance of all this.  But --

Q.  I don't either.  But Apple kind of made it relevant, so that's what we're stuck doing.

So --

A.  So I think --

MS. PERRY:  Hold on.  Hold on.  Just wait for a question.

THE DEPONENT:  Okay.

MS. GJOVIK:  What was that?

MS. PERRY:  No, I was telling him to wait

your termination, that you took an exchange and misled the investigator by just taking a small section of the exchange, and that was misguiding.

Q. To the best of your recollection, do you remember seeing the actual text messages between me and Dan West when you made the termination decision?

A. To the best of my recollection, I do. But to the best of my recollection, not even as much, I think, as what you've just shown me today.

Q. Okay. And were you aware that the subject matter was Chez TJ and the sous chef, Andrew?

A. I remember that it was Chez TJ. I had absolutely no idea it was Andrew. Even when it was presented to me just now, I thought it was Jared himself, not Andrew.

Q. Oh, I'm sorry.

A. That tells you how much I didn't know the details of all that.

Q. Well, and I'm sorry. When I said Andrew, I meant more, like, just the subject matter of setting up with Andrew, versus who decided what.

But you did know this was Chez TJ-related when you had made the decision to terminate my employment; is that correct?

A. Yes.

Yannick Bertolus

misguided the investigators, the way I recollect the meeting at the time.

Q.   And do you think if the broader context is given, then -- or -- misrepresentation indicates, like, I was making false complaints there, like I'm the problem.

So can you help me understand why that limited view of the conversation was seen as, like, misconduct by me?  Was it something, like, them thinking that I was making, like, bad faith complaints?

A.   Yes.

Q.   Okay.

A.   As it relates to that text exchange, yes.

Q.   And so -- and I think you were saying something earlier about me being -- I think you said feminine, and didn't continue.

So is that a similar thing, that, like, because I was being --

A.   Sorry to cut you off.

Can you say that again?  What would I have said?  I don't remember saying that.

Q.   We don't have to go back.  We'll see what was on the actual record.  I don't know if you actually said it.  I thought you said something.  But

we'll if you have to say it.  Like, I think it was Okpo who kind of, like, opened the door.

Would you say that if I was being flirty or acting like I was going along in the minute that if I made a complaint later that I thought Mr. West was being appropriate in a sexual nature, that I can't complain later?

MS. PERRY:  Objections.  Vague.  Ambiguous.  Overbroad.

MS. GJOVIK:  I'd like him to answer.

THE DEPONENT:  That's not what I said.

BY MS. GJOVIK:

Q.  Can you help me understand, then, what I did during that exchange that means that I can't complain about it later without it being misconduct?

MS. PERRY:  Objection.  Vague.  Ambiguous.  Overbroad.

MS. GJOVIK:  Okay.

MS. PERRY:  He didn't conduct the investigation.

MS. GJOVIK:  He said he reviewed the content, though, and made a determination.

MS. PERRY:  No, that's not what he said.  You're misstating his testimony.

///

**Yannick Bertolus**

BY MS. GJOVIK:

Q.  Mr. Bertolus, can you tell me everything you can without violating privilege of why you think that my representation conduct related to this exchange with Andrew and Chez TJ was misconduct by me?

A.  I don't again remember.  It was a long, long time ago.

What I do remember at the time was that you had taken a snippet out of the whole discussion, and that it was misguiding.

Q.  Okay.  I have a couple more I want to quickly show you.

I guess were you aware that Apple chose to use this as a formal reason for justifying my termination in the litigation?

MS. PERRY:  Objection.

THE DEPONENT:  I'm sorry.

To use what?

BY MS. GJOVIK:

Q.  The Chez TJ and Andrew stuff.

MS. PERRY:  Objection.  Lacks foundation.

THE DEPONENT:  You were terminated because you violated your confidentiality agreement when you posted those -- that picture on Twitter, failed to cooperate in the investigation right after that, and

misguided the employee relation investigator by showing only a snippet of that text exchange.

BY MS. GJOVIK:

**Q.   Okay.  Do you think it's fair for me to defend about this when I can't call Andrew, because he's apparently now deceased?**

MS. PERRY:  Objection.  Vague.  Ambiguous. Overbroad.  Calls for speculation.  Also to the extent it lacks foundation.

THE DEPONENT:  As I mentioned earlier, I did not even know that -- that the whole exchange was about Andrew.

MS. GJOVIK:  I quickly want to show you something.  Thank you.  And again, I'm sorry -- I'm sorry for all that and having to bring up your personal information too.

Okay.  So I want to show you an email.  This is Exhibit -- Plaintiff's production 12I.

(Exhibit I was marked for
   identification.)

BY MS. GJOVIK:

**Q.   This is an email between Dan and John and me and Kai from 2018 that I had given employee relations as evidence that I wanted them to investigate, that there were issues that should be addressed.  And**

**B.**   <u>**EXHIBIT B: WEST DEP.**</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
                Plaintiff,           )
                                     )
            vs.                      )   Case No.
                                     )   23-cv-04597-EMC
APPLE INC.,                          )
                                     )
                Defendants.          )
_____     )

REMOTE DEPOSITION OF

DAN WEST

VIDEO-RECORDED VIA ZOOM

Monday, April 13, 2026

Stenographically Reported By:
Vesna Walter, CSR, RPR, CCRR
CSR No. 11989
Job No. 10188332

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    )
                                     )
              Plaintiff,             )
                                     )
         vs.                         )   Case No.
                                     )   23-cv-04597-EMC
APPLE INC.,                          )
                                     )
              Defendants.            )
_____ )

          Deposition of DAN WEST, taken on behalf of
Plaintiff, with all parties appearing remotely, beginning
at 9:08 a.m. and ending at 11:56 a.m. Pacific time, on
Monday, April 13, 2026, before VESNA WALTER, Certified
Shorthand Reporter No. 11989.

**Dan West**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/14/2026

_____

Vesna Walter
RPR, CCRR, CSR No. 11989

**Dan West**

organization?

MS. GJOVIK:  To practices, policies, whatever employee relations suggests.

MS. RIECHERT:  I'll object that it's compound.  So changes to the organization, the policies, or the practice as a result of the investigation --

MS. GJOVIK:  Let me rephrase.

BY MS. GJOVIK:

Q   Did employee relations suggest any type of corrective action or changes were needed as an outcome of the investigation into my complaints?

A   Yes.

Q   Can you share any of those details of what they said.

A   The biggest one that I recall was around our relationship and me being very clear about separating friendship from work.

Q   Can you tell me more about that, please.

A   That's really the extent of it, is we got too friendly, and that's not appropriate.

Q   What does too friendly mean?

A   The text messages between each other, that sort of thing.

Q   Any specific examples you remember that they

**Dan West**

noted were, you said, not appropriate?

A    Yeah.  For example, your meal at Chez TJ.

(Reporter clarification.)

BY MS. GJOVIK:

Q    **Can you spell that for her, please.**

A    C-h-e-z T-J.

Q    **What is Chez TJ?**

A    It's a restaurant.

Q    **Do you go there often?**

A    Not anymore.

Q    **You used to go there often?**

A    Yes.

Q    **Are you friends with the owners or chefs?**

A    I used to be, yes.

Q    **Why did you stop going?**

A    I thought the food quality went down.

Q    **And why was that relevant to me?**

A    Because you went there for a meal.

Q    **Why is that inappropriate?**

A    You -- you texted me while you were there, and that's why.

Q    **It was inappropriate that I thought it was okay to text you when I was at a restaurant to tell you I was at a restaurant?**

A    It was -- it was that I -- between the chef

Dan West

MS. RIECHERT:  Assumes facts not in evidence.  You haven't even found out that he's seen the complaint.

BY MS. GJOVIK:

Q   **Mr. West, how would you respond to some kind of legal authority ordering Apple to reinstate my employment?**

MS. RIECHERT:  Same objections.

You can answer.

BY MS. GJOVIK:

Q   **You can answer.**

A   If the authority -- if the law says do something, we'll do it.

Q   **And what job would I be given?**

MS. RIECHERT:  Same objections. Hypothetical, assumes facts not in evidence.

MS. GJOVIK:  Extremely relevant if I'm requesting reinstatement and they canceled my job.

MS. RIECHERT:  I didn't object on relevance. I objected on hypothetical, assumes facts not in evidence, speculation.

BY MS. GJOVIK:

Q   **Okay.  Go ahead.**

A   My assumption would be it would be an equivalent job in the organization.

Charlene Wilsmore offering me just informally a role on her team and hoping to have me transfer to her team within product integrity?

A    Yes.

Q    Mr. West, do you remember how you responded?

A    Yes.  We needed -- at the time, we needed that count in our team.  There was still work that you were doing that needed to continue to be getting done.

Q    Mr. West --

A    Yeah.  Go ahead.

Q    No.  Continue.  You were just going to say something else.  Go ahead.

A    At the time, we needed the head count back so that we could continue to do the work.

Q    Okay.  So, Mr. West, at the time, if I had said I didn't think I could keep going in my role because I complained about issues and I was looking for another job at Apple and that was a job offer from somewhere at Apple, and you said no, wouldn't it be reasonably foreseeable that could cause me to have to quit Apple if I could find another job and that was blocked?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  I don't think so.  He does a

**Dan West**

lot of talks about employee retention.

MS. RIECHERT:  Yeah.  But what was reasonably foreseeable for you to do is something he doesn't know about.

BY MS. GJOVIK:

**Q   Mr. West, would you generally be concerned if an employee in your organization had been complaining they were unhappy in their work environment and wanted another job at Apple so they could stay at Apple and they find an offer to transfer and then it was blocked by their supervisor? Would you be concerned and maybe even written about it or spoken about it that then caused Apple to lose employees?**

MS. RIECHERT:  Same objection.  Lacks foundation, assumes facts not in evidence.

MS. GJOVIK:  That's fine.  He can answer that one.

THE WITNESS:  I would be concerned, but I think the way you're -- the underlying assumptions there are invalid.

BY MS. GJOVIK:

**Q   Okay.  And, Mr. West, you had said earlier in this deposition that after I had left, my role was canceled; is that right?**

A   Yes.  We -- at that point, we had made the decision to split the work amongst other people.

Q   Can you tell me who -- which people, which roles received the work that I had been doing.

A   I couldn't.  I didn't dig into all the details.  But the work was spread out amongst David's directs.  So it was spread out amongst his leadership team.

Q   What about the work that was being done for you?

A   A lot of that stopped.

Q   Stopped completely?

A   No.  A lot of it stopped, not all of it. There were -- there are other people -- so that was an organizational website.  So there were other people adding to it here and there.

Q   So you just stopped all of that work because the person left?

A   Yes.

Q   Why?

A   From a prioritization perspective, our ultimate objective always is to ship our products. The website was nice to have, and since we didn't have the resource to be able to maintain the website, we put it in maintenance mode, essentially.

Dan West

Q   Mr. West, are you aware that the NLRB issued a complaint against Apple at one point alleging that the administrative leave and my termination were unlawful and violated federal labor law?

MS. RIECHERT:  Don't repeat anything that you learned from counsel.  I'll instruct you not to answer based on attorney-client privilege.  If you learned it from another source, that's fine.

And assumes facts not in evidence. Objection on that basis.

THE WITNESS:  Yeah.  The short answer is no.

BY MS. GJOVIK:

Q   Mr. West, I'm assuming the answer is still no, but are you aware that that complaint requested as remedies that Apple reinstate my employment and offer a public formal apology to me for the suspension and termination?

A   No.

Q   Mr. West, are you aware the NLRB withdrew those charges after the new general counsel was appointed to the NLRB as far as Apple's defense counsel in the same case?

MS. RIECHERT:  Objection.  Assumes lots of facts not in evidence.

MS. GJOVIK:  There was a whole bunch of news

**Dan West**

articles about this, actually, complaining of

corruption.  So he may know.

THE WITNESS:  No.

BY MS. GJOVIK:

**Q   Mr. West, how would you respond if the court**

**or government forced you to reinstate my employment?**

MS. RIECHERT:  Objection.  Improper

hypothetical, assumes facts not in evidence,

speculation.

BY MS. GJOVIK:

**Q   Mr. West, the NLRB had issued a complaint**

**saying, for relief, it wanted Apple to reinstate my**

**employment, and I'm suing Apple in court for this**

**lawsuit and the judge has approved me asking to be**

**reinstated at least on payroll when I file a motion**

**for summary judgment next month -- that seems very**

**relevant.  If I'm requesting reinstatement, what**

**would be your response?**

MS. RIECHERT:  Objection.  Hypothetical,

speculation.

MS. GJOVIK:  I'm requesting reinstatement.

How does he respond to me requesting reinstatement?

MS. RIECHERT:  I haven't seen any request

for reinstatement.  But again, it's hypothetical.

MS. GJOVIK:  It's the complaint, Melinda.

Dan West

MS. RIECHERT:  Assumes facts not in evidence.  You haven't even found out that he's seen the complaint.

BY MS. GJOVIK:

Q    Mr. West, how would you respond to some kind of legal authority ordering Apple to reinstate my employment?

MS. RIECHERT:  Same objections.

You can answer.

BY MS. GJOVIK:

Q    You can answer.

A    If the authority -- if the law says do something, we'll do it.

Q    And what job would I be given?

MS. RIECHERT:  Same objections. Hypothetical, assumes facts not in evidence.

MS. GJOVIK:  Extremely relevant if I'm requesting reinstatement and they canceled my job.

MS. RIECHERT:  I didn't object on relevance. I objected on hypothetical, assumes facts not in evidence, speculation.

BY MS. GJOVIK:

Q    Okay.  Go ahead.

A    My assumption would be it would be an equivalent job in the organization.

Dan West

Q    Mr. West, are you aware I'm in Chapter 7 bankruptcy right now?

A    No.

Q    Mr. West, are you aware that I am without a permanent house and am living in a motel paid for solely by public donations from my social media followers because I'm completely insolvent?

A    No.

Q    Mr. West, have you had any other employees that were terminated by Apple that you're aware of that ended up in bankruptcy and insolvent?

A    No, but I don't follow employees that closely.

Q    Mr. West, I thought you said that we were friends and you got in trouble for inappropriate texts with me that were too friendly.

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  I also said that there was guidance around separating friendships from work, and that's what I did.

BY MS. GJOVIK:

Q    So, Mr. West, you never thought to check in and see how I was doing after Apple fired me?

A    No.

Q    Mr. West, in your experience, when Apple

Dan West

fires someone for leaking confidential information, what could happen to their careers?  Do they generally get a job again working with confidential information?

MS. RIECHERT:  Objection.  Hypothetical, lacks foundation.

BY MS. GJOVIK:

Q   There are formal Apple trainings everywhere that have the exact answer to this question.

A   Yeah.  Sometimes they get jobs.  Sometimes they don't.  That's up to them.

Q   What do you mean, it's up to them?

A   They're in the labor workforce at that point.  They apply to a job just like anyone else would.

Q   Mr. West, have you ever had any new product security trainings where they said that if people get fired for leaking, they may never work again?

A   I don't recall that exact phrasing.  But yes.  There's -- there's language in there that says, depending on the severity of the leak, it could be harder, yeah.

Q   Mr. West, in your experience, when employees need to be disciplined, what is the process that is followed for managers to initiate a discipline

Dan West

process?

A    It depends on the disciplinary action.  Can you be more specific.

Q    **Let's do suspension or termination.**

A    Typically, PBP is involved.

Q    **What is that?**

A    Actually, always -- our HR.  HR is involved.

Q    **So a manager would escalate to HR, and then HR handles it?**

A    Manager would escalate to HR, and then there's an investigation.

Q    **And in your experience, if an employee is violating some policy or not meeting expectations, is there usually a gradual discipline process with, like, warnings and a performance plan?**

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  It depends on the type of issue.  So when it's -- when it's sort of a working style, working behavior issue, as an example, there is a gradual ramping up of what happens.  There's more and more formal discussions up until we get to the point where they are terminated.  There are also zero-tolerance examples as well where there is no warning.  It is, you're terminated.

///

Dan West

especially what you just described.

Q    Yeah.

Mr. West, are you aware of what employee relations says -- just admitted last week were reaching out to me in September at least 3rd and 7th that they insisted on talking to me about but said it couldn't be in written emails?  You said no.

MS. RIECHERT:  I don't think he's aware of any testimony last week.

THE WITNESS:  No.

BY MS. GJOVIK:

Q    Mr. West, are you aware that one of Apple's stated justifications for terminating me is I wouldn't to get on the phone with them to have them interrogate me about whether I thought the sous chef at Chez TJ was cute or not and whether I would consensually date him or not?

A    No.

Q    I wasn't either until last week.  That was a weird one.  So we're going to have to talk about Andrew, unfortunately, thanks to Apple.  Would you like to take a break before we do that?  It's going to be weird.

A    Sure.

MS. GJOVIK:  Yeah.  Five minutes, please.

**Dan West**

THE WITNESS:  Okay.

(Recess taken.)

BY MS. GJOVIK:

Q   Mr. West, do you remember ever recommending that I go have dinner at a restaurant that we talked about called Chez TJ?

A   Yeah.  You were a foodie, I was a foodie, and we sort of compared notes.

Q   Yeah.

Do you remember me going to Chez TJ around December 29th, 2017?

A   I don't remember the date, but sure.  I remember when you went.

Q   Yeah.

Do you remember me texting you or you texting me while I was at dinner that night?

A   I remember you texted me, telling me you were there.

Q   This was the dinner that you said you had paid for; right?

A   That's right.

Q   And that employee relations had mentioned that your behavior had been inappropriate?

A   I wouldn't have used -- I wouldn't use those terms.  That's not the phrasing that they used with

Dan West

me.  But they said, look, it would be better to draw a strong line between friendship and work.

Q   Sorry.  Mr. West, earlier you said that they said it was inappropriate.  You used that term I think twice.  Are you now changing your description of the feedback?

MS. RIECHERT:  Objection.  Misstates the testimony.

THE WITNESS:  Yeah, I don't remember saying it that way.  If I did, it was a mistake.

BY MS. GJOVIK:

Q   Okay.  Can you elaborate then what you do recall the feedback was from employee relations regarding the incident with the dinner at Chez TJ.

A   Yeah.  It was all around keeping a separation between work and friendships.

Q   Do you recall Apple employee relations or HR saying anything to you regarding a sous chef named Andrew that worked at that restaurant?

MS. RIECHERT:  Anything about an investigation, I instruct you not to answer on attorney-client privilege.

BY MS. GJOVIK:

Q   Mr. West, do you recall interacting with or knowing about a sous chef named Andrew at Chez TJ?

**Dan West**

A    I do.

Q    **Yeah.**

**Can you tell me about Andrew.**

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  What do you want to know about Andrew?

BY MS. GJOVIK:

Q    **Well, let's start with the head chef. You're friends with the head chef; right?**

A    Jared?

Q    **Yeah.**

A    Yes.

Q    **Can you tell me about your friendship.**

MS. RIECHERT:  Objection.  Vague.

MS. GJOVIK:  I can't -- if Melinda is objecting, I can't hear.

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  I can answer.

Met him when he worked at a different restaurant, and when he became the head chef at Chez TJ, we went there to support him.

BY MS. GJOVIK:

Q    **And he's also friends with Yannick Bertolus?**

A    Yes.

Q    **And at that restaurant, there was a sous**

**Dan West**

chef working for Jared named Andrew?

A    (No audible response.)

Q    Do you remember how you met Andrew?

A    Through Chez TJ, yeah.

Q    Do you remember anything you talked about with Andrew?

A    Sure.  Andrew -- yeah.  Can you be more specific.

Q    Did you talk to him about whether he was, like, single or married?

A    No.  I never had those discussions with him.

Q    Do you recall around what age he was around 2017?

A    He's since passed away.  Back then --

Q    He did?  That's -- Melinda -- I'm going to yell at her later.  This is really messed up.  Go ahead, Mr. West.

A    He had to have been in his 20s.  I don't know where.  Maybe early 30s.

Q    I didn't know he passed away.  That's upsetting.  I'm sorry.  Apple opened a whole can of worms here, Mr. West.

Mr. West, do you remember that night at the restaurant, through texts, trying to set up some kind of romantic relationship between myself and the sous

Dan West

chef named Andrew?

A    That's not the way I would frame it.  Yeah, that's not the way I would frame it.

Q    Mr. West, what do you remember about that night -- and that's the only time I've ever ate at that restaurant.  So the time I ate dinner at that restaurant that you bought the dinner, what do you remember about your conversation with Jared and me and Andrew about some kind of relationship between me and Andrew?

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  Yeah, there's a lot there. Can you break it down.

BY MS. GJOVIK:

Q    Mr. West, what do you remember about that night I had the dinner at the restaurant regarding your conversation with anyone who worked at the restaurant regarding a relationship between me and Andrew?

A    Well, I remember the conversation with you specifically.  You had -- I guess there was another party or something where you were talking with my wife, and you had said something to the effect of, I need to be set up with someone or I need to find someone, basically indicating that you were looking

Dan West

for a partner.

Q   Can you speak up.  I'm sorry.  I can't hear you.

A   You were looking for -- you had had a conversation with my wife indicating that you were looking for a partner.

Q   That wasn't the night of the dinner, though. I was asking --

A   That's right.  That was our conversation --

Q   And I also object to the -- I don't recall ever saying that.  I don't think that's accurate. But please go ahead.

A   Okay.  Why don't you ask your question then.

Q   Do you recall anything about talking to Jared or Andrew about some sort of relationship or setup between me and Andrew?

A   Yes.  So the context here -- so the context of that discussion with my wife, I asked you about, and you confirmed, yes, I'm interested.  So I'd say something to the effect of, well, Andrew is there and he's young.  I don't remember if I said he was single or not.  I don't even know if I knew that at the time.  And then I asked you if I should tell Jared.

Q   Do you remember telling me that you and Jared were having him bring out food for me directly

**Dan West**

as part of this?

A    Yeah.  After -- after we got the green light from you, I'd say something to the effect of Jared -- or not Jared -- Andrew will likely bring out a few plates.

Q    Do you recall you and I talking after that night about Andrew?

A    Yeah.  You said -- yes, I do.

Q    What do you recall that we talked about?

A    You said something to the effect of he's cute and you left your number.

Q    Do you recall me telling you that I met someone and I was going to date them; so I wasn't going to date Andrew, and I said hope that's okay?

(Reporter clarification.)

BY MS. GJOVIK:

Q    Yeah.  Mr. West, can you speak up.  Maybe your computer is moved away or your -- don't want to talk about this like I don't, but we have to talk about this.  I'm sorry.

A    No.  I just moved the monitor closer.

THE WITNESS:  Is that better, Court Reporter.

THE REPORTER:  I think so.

THE WITNESS:  All right.  So what was your

Dan West

question?  Sorry, Ashley.

BY MS. GJOVIK:

Q   Do you recall conversations you and I had after that dinner about Andrew, including me saying I met someone else and I'm going to see them, not Andrew, I hope that's okay?

A   Yeah.  I do remember that.  And I remember responding, saying there was no pressure from me; so that's fine.

Q   Mr. West, do you recall later text messages where you said that night what you did with Andrew was one of the worst things you've ever done?

A   Yeah, I do.

Q   Why would you say that?

A   Well, I think this goes back to the guidance that I got from --

Q   Sorry.  Can you speak up.

A   This is really bad.  I don't even know where the mic is on this.

Yes.  Let's see.  I think this goes back to my discussion with ER around separating friendships from work.  And that's the main -- that was the major problem.  That's why I think it was an issue.

Q   Mr. West, the feedback from employee relations regarding separation feedback and so forth

Dan West

would have been in 2021.  The comment I'm mentioning was prior to that.  So it wouldn't have been an outcome of that employee relations investigation.  It would have been something else.

Can you add more context.

A    I think it's -- so thanks for the timeline, but I think it's the same -- it's the same thread. It's separating personal from the job.

Q    Mr. West, do you recall me telling you that your daughter had told me that your family was talking on a regular basis how inappropriate that was at least through 2020?

A    I don't recall that, but -- yeah, I don't recall that.

Q    Mr. West, do you recall your family, such as your daughter and wife, ever telling you they thought what you did with Andrew and myself was inappropriate?

A    No, I do not.  The context, again, is the employee skip-level-manager relationship is concern.

Q    Mr. West, in 2020, how old was your daughter?

A    Let's see.  That's six years ago.  She must have been 16 or 17.

Q    Mr. West, do you have any idea how your 16-

**Dan West**

or 17-year-old daughter would know about you trying to set one of your workers up with a sous chef at a Michelin-star restaurant?

    A   We have family discussions.

    Q   How would that come up in a family discussion?

    A   My daughter --

    Q   I'm sorry.  Mr. West, if you'd switch laptops.  That one is horrible.  We can't hear you.

    A   Let's switch.  Can you give me a minute?

    Q   Yeah.  Thank you.

    THE REPORTER:  Are we going off the record while he does that?

    MS. GJOVIK:  Yeah.  We can.

    (Recess taken.)

BY MS. GJOVIK:

    Q   Mr. West, how do you think the discussion came up at your home family dinner about you trying to set up one of your workers in your organization with a sous chef at your favorite restaurant?

    A   I have no idea how that came up.  My daughter at the time was working at Chez TJ.  She knew Andrew.  She knew the crew.  So maybe it came up at work and she asked about it at home.  Maybe it came up at home.  I don't know.

**Dan West**

Q   So, Mr. West, you were pretty well connected with that restaurant -- the staff at that restaurant; right?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q   Mr. West, you had a personal relationship with staff at that restaurant; is that correct?

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  I knew Jared very well.

BY MS. GJOVIK:

Q   And your daughter worked there?

A   That's right.

Q   Yeah.

Mr. West, when you were reflecting upon what happened with that dinner and myself and Andrew, and it sounds like you have a new opinion of what occurred.  Can you tell me if one of your direct reports had done the same thing, like, now, would you take some kind of corrective action on that report or warn them to not do that?

MS. RIECHERT:  Objection.  There were assumptions in your question that were inaccurate, and therefore, you misstated his testimony.  And second objection --

MS. GJOVIK:  Melinda, we can't hear you.

**Dan West**

MS. RIECHERT:  Second objection -- my first one is that you misstated the testimony, and the second is that it's an improper hypothetical.

BY MS. GJOVIK:

Q   **Let me rephrase.**

**Mr. West, the -- what we're talking about what you did in 2017 with that dinner, if one of your direct reports did that, like, now, how would you respond if you found out?**

A   I think I'd warn them the same way, like, hey, you can do this for your friends, but be careful of the managerial -- like, if there's a power imbalance there, I think that's what makes it difficult.

Q   **Mr. West, wouldn't you say that it's difficult for employees to say no to their supervisors about stuff because of that power imbalance?**

MS. RIECHERT:  Objection.  Vague.

MS. GJOVIK:  I don't think that's vague.

THE WITNESS:  So -- okay.

MS. RIECHERT:  Do you want an answer?

MS. GJOVIK:  Yeah.

MS. RIECHERT:  Okay.  Could you repeat the question.

Dan West

BY MS. GJOVIK:

Q   Mr. West, wouldn't you say that the power imbalance makes it difficult for employees to say no to their supervisors about things?

MS. RIECHERT:  Objection.  Vague.

THE WITNESS:  In certain scenarios, that's a true statement, I think.

BY MS. GJOVIK:

Q   Yeah.

Are there actually, like, regulations and strict rules about things that should not be asked of or done to employees because of the power dynamics and coercion?

MS. RIECHERT:  Objection.  Compound.

THE WITNESS:  I'm not a lawyer; so I can't speak to the details of that.  But there's certainly some things that we can't -- that we shy away from.

BY MS. GJOVIK:

Q   Yeah.

Mr. West, in your -- for any of the roles you went through, even back in 2021, you mentioned you did some stuff with, like, health or medical studies on employees, user studies.  Isn't that something where coercion becomes an issue, especially if the studies can have a population in France or

**C.    <u>EXHIBIT C: OKPO DEP.</u>**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,                    )
                                    )
            Plaintiff,              )
                                    )
        vs.                         )   CASE NUMBER:
                                    )   23-cv-04597-EMC
APPLE INC.,                         )
                                    )
            Defendant.              )
_____)

REMOTE RECORDED DEPOSITION OF EKELEMCHI OKPO

Tuesday, April 7, 2026

VIA ZOOM VIDEOCONFERENCE

STENOGRAPHICALLY REPORTED BY:

Haleema Saleh

RPR, CA CSR 14506

JOB NUMBER: 10188180

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,                    )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   CASE NUMBER:
                                    )   23-cv-04597-EMC
APPLE INC.,                         )
                                    )
                Defendant.          )
_____)

        DEPOSITION of EKELEMCHI OKPO, taken on behalf

of the plaintiff, beginning at 1:01 p.m. on Tuesday,

April 7, 2026, before Haleema Saleh, Certified

Shorthand Reporter No. 14506.

APPEARANCES:

(ALL COUNSEL APPEARING VIA ZOOM VIDEOCONFERENCE)


For the Plaintiff:
          A.M. GJOVIK CONSULTING, L.L.C.
          BY:  ASHLEY M. GJOVIK, ESQ.
          2108 North Street, Suite 4553
          Sacramento, California  95816
          (415) 964-6272
          Ashleymgjovik@protonmail.com


For the Defendant:
          ORRICK, HERRINGTON & SUTCLIFFE LLP
          BY:  MELINDA RIECHERT, ESQ.
          1000 Marsh Road
          Menlo Park, California  94025
          (650) 614-7400
          Mriechert@orrick.com


ALSO PRESENT:

          ISELA PEREZ, ESQ.

CERTIFICATE OF REPORTER

I, Haleema Saleh, a Certified Shorthand Reporter, do hereby certify:  That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me At the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

In witness whereof, I have hereunto Subscribed my name.

Dated: April 10, 2026

_____

Haleema Saleh, RPR, CSR No. 14506

been the main tool to store --

Q.   Okay.

A.   -- evidence.

Q.   And the -- all those Box files, did you look through everything she had shared with you?

A.   Yes.

Q.   Okay.  Cool.  And then -- let's see.

Before you took over, there was another investigator who had done a separate investigation, Ms. Jenna Waibel.

What had Ms. Waibel done to investigate Ms. Gjovik's complaints?

MS. RIECHERT:  We're getting very close to privilege here; so I am not going to let him testify to what she did.

BY MS. GJOVIK:

Q.   I mean, facts aren't privilege, and she's not a lawyer, and, Mr. Okpo, I believe you're still not even an attorney; right?  You just have a JD?  So it's -- you're just --

MS. RIECHERT:  Any investigation conducted under the advice of counsel is privileged, weather the investigator is a lawyer or not.

MS. GJOVIK:  Okay.  If you want to clarify -- I believe what you're trying to say, and I think we

should clarify for the record if this is what you're saying, is that Ms. Waibel was assigned the investigation of Ms. Gjovik's concerns by counsel, not by Lagares and, therefore, you're claiming privilege to all the details of Waibel's investigation?

MS. RIECHERT:  The investigations were conducted under the advice of counsel with counsel for the purpose of providing legal advice.

MS. GJOVIK:  Thank you.  Can you clarify --

MS. RIECHERT:  For both investigations.

MS. GJOVIK:  Yeah.  So you didn't have that objection earlier with Mr. Okpo's response, but now you're claiming privilege to just the basic facts of Ms. Waibel's.  So I'm curious what the differentiation is.

MS. RIECHERT:  Yeah.  Nothing that you asked him involved legal advice or the investigation itself. You asked him generally about investigations and you asked him about meetings, but you didn't ask about the investigation then.

So my objection is the same for the Jenna Waibel as it will be for his investigation.

BY MS. GJOVIK:

    **Q.   Okay.  Let me clarify:  Without breaching privilege, Mr. Okpo, what kind of actions had Ms. Waibel**

Ekelemchi Okpo

though would close their investigation and write a final report prior to that issue actually being resolved and then continue on it?

A.   It was not --

MS. RIECHERT:   Objection.   Objection.   Lacks foundation.

BY MS. GJOVIK:

Q.   He still has to answer.

A.   It's not an ER issue.

Q.   So if employees raise concerns about workplace safety at work or environmental concerns at work at Apple, ER wouldn't investigate?

A.   Subject matter expert there is EH&S.

Q.   What if the employee complains of retaliation for raising EHS concerns?

A.   Then that's an ER issue.

Q.   But that Ashley Gjovik case, did Ashley Gjovik ever complain about retaliation for raising EHS concerns?

MS. RIECHERT:   Objection.   Lacks foundation.

BY MS. GJOVIK:

Q.   He still has to answer.

A.   Yes.

Q.   As far as you remember, what was the earliest that she started reporting retaliation for raising EHS

**Ekelemchi Okpo**

concerns?

   MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

  Q. He still has to answer.

  A. I don't know.

  Q. Could it have been March or April 2021?

   MS. RIECHERT:  Objection.  Lacks foundation.

BY MS. GJOVIK:

  Q. He still has to answer.

  A. I don't know.

  Q. But it was before you started your investigation?

   MS. RIECHERT:  Objection.  Lacks foundation.

   THE WITNESS:  I don't know.

BY MS. GJOVIK:

  Q. You don't know if Ashley Gjovik reported EH&S concerns prior to starting your investigation into her complaints?

  A. Yes.

  Q. Okay.  And tell me about what you do remember about her complaints about EH&S issues.

   MS. RIECHERT:  Again, if this is from the report, then it would be privileged.  If it's from a non-privileged source, you can talk about it.

   THE WITNESS:  It was from a report.

BY MS. GJOVIK:

Q.    What report?

A.    The report that, as I mentioned earlier, Jenna previously worked with you.

Q.    And then did Ms. Gjovik also report to you retaliation for raising EH&S concerns?

A.    Yes.

Q.    Do you remember the ways she reported those issues to you?  Like, was it emails?  Documents? Verbal?

MS. RIECHERT:  Objection.

THE WITNESS:  Other than what was included in the issue confirmation document, I don't recall.

BY MS. GJOVIK:

Q.    Okay.  And so you said that normally employee relations would investigate complaints about retaliation before raising EH&S concerns, and you mentioned that previously Jenna was involved with the EH&S complaints.

At the time that you were doing your investigation, what was your understanding of who, if anyone, at Apple was investigating Ms. Gjovik's complaints about retaliation for her making EH&S complaints?

A.    My understanding is that Jenna Waibel looked

into those concerns.

Q.    The earlier investigation or one concurrent with your investigation?

A.    The earlier investigation.

Q.    Okay.  And then you're saying that you did not investigate Ms. Gjovik's complaints about retaliation specific to EH&S complaints?

MS. RIECHERT:  Okay.  What he did in his investigation is privileged, and I am not going to let him answer about that.

MS. GJOVIK:  He sent emails saying he wasn't investigating it.  We can pull it up now, or he can just answer.

MS. RIECHERT:  If you want to show him the email, that's fine.  I thought it related to EH&S complaints, not retaliation for raising EH&S complaints. But you can show us the email.

BY MS. GJOVIK:

Q.    Okay.  So -- so this one is Exhibit AA.  This is an email from August 3rd.  And --

A.    Can you make that a bit bigger?

Q.    Yeah.  Sorry about that.

MS. RIECHERT:  I'll second that one.

(Exhibit AA was marked for identification.)

**Ekelemchi Okpo**

BY MS. GJOVIK:

Q.   Okay.  This is an email you sent -- I had sent an email asking about the scope of the investigation, and you had said you were focused on the new concerns Ms. Gjovik raised since Jenna closed out her investigation on June 3rd.  The items listed below and in Jenna's issue confirmation email were previously investigated, and Apple took corrective action in response to her investigative findings.  As we discussed, if you have new information, please let us know.

And then you said, "Additionally, EHS is focused on reviewing your building and physical workplace safety issues.  They will be in contact with you further to address those concerns."

So I think Melinda is actually correct there.  That was saying that just EHS was looking into it, not Jenna.  There was no mention that Jenna was looking into anything.

So that raised the question, again, then, of was there anyone at Apple investigating Ms. Gjovik's complaints about retaliation for raising EHS issues between July and September 2021?

MS. RIECHERT:  I think he already answered that; so I'll object to asked and answered.  He

mentioned the --

MS. GJOVIK:  What was the answer?

MS. RIECHERT:  -- the issue confirmation document.

MS. GJOVIK:  But that would imply that he was investigating, and he hasn't confirmed if he was investigating those complaints.

MS. RIECHERT:  You can answer if that was one of the things in the issue confirmation document you were looking into.

BY MS. GJOVIK:

Q.   If you don't -- sorry.  Go ahead.

A.   I -- I investigated what was in the issue confirmation.  I don't -- it's been a long time.

Q.   It's fine.  Just tell me what you recall.  You know, I don't want speculation.

Do you recall that anyone, yourself or someone else, was investigating Ms. Gjovik's complaints about retaliation specific to environmental health and safety issues between July 2021 and her termination in September 2021?

MS. RIECHERT:  Are you talking about complaints of issues or complaints of retaliation for issues?

MS. GJOVIK:  Retaliation for issues.

MS. RIECHERT:  Okay.  I think he's answered that.

MS. GJOVIK:  No, he didn't.  He hasn't answered.

BY MS. GJOVIK:

Q.  So if you don't recall if anyone was, I just need you to say you don't recall if anyone was.

MS. RIECHERT:  He said that he was if it was in the issue confirmation.  He just can't recall what was in the issue confirmation.

MS. GJOVIK:  He never said that.  You just said that.  That's a speaking objection.  And I object to your speaking objection.  That's coaching the witness.

BY MS. GJOVIK:

Q.  Mr. Okpo, please answer the question.

A.  That's exactly what I said.

MS. RIECHERT:  We can have the reporter read it back if you want.

THE WITNESS:  Yeah.

BY MS. GJOVIK:

Q.  So your answer is if -- anything that was in the issue confirmation was something that you investigated?

A.  That's correct.

**Ekelemchi Okpo**

Q.   Okay.  Great.  Let's look at the issue confirmation.  This is Exhibit D.  This is the -- what I believe in the email we agreed was the final issue confirmation.

(Exhibit D was marked for identification.)

BY MS. GJOVIK:

Q.   You had sent an earlier version.  Let's see.  This is Exhibit B.

Mr. Okpo, does this look like the version of the issue confirmation, to your best recollection, that you had sent Ms. Gjovik in August of 2021?

A.   Yeah.  I'm reading.

(Exhibit B was marked for identification.)

BY MS. GJOVIK:

Q.   Yeah.  I would like you to actually authorize it -- authenticate it, so we can go through each of the ten pages.  If you can read it, and then let me know when you're ready to go to the next one.

A.   Yeah.  If you could -- don't mind making it just slightly bigger.

Q.   Yeah.  We can do half pages.  Let me know when you want me to scroll down, and then let me know when you want me to go to the next one.

Ekelemchi Okpo

A.    Will do.

Q.    **Okay.**

A.    Please scroll down.  Okay.  Okay.  Okay. Okay.  Okay.  Scroll.  Okay.  You can keep -- you can keep scrolling.  You can keep scrolling.  Okay.  Keep scrolling.  Keep scrolling.  Okay.  Keep scrolling. Okay.  Okay.  Okay.

Q.    **There's still more.  One more.**

A.    I see.  Okay.  All right.

Q.    **Should stay for the closing.  You don't want to skip that.**

A.    Okay.

Q.    **Does that look like an email that you sent?**

A.    Yes, it does.  Thanks for that.

Q.    **Oh, thank you.  Sorry.  To clarify, that was -- I believe you said that was a PDF document attached to an email that you sent to Ashley Gjovik in August 2021?**

A.    Yes.

Q.    **Okay.  Thank you.  And you read through all the content just now?  That's what we were doing; right?**

A.    Yeah.  I -- yes.

Q.    **Yeah.  Did you see any mention of complaints about retaliation for environmental health and safety concerns?**

Ekelemchi Okpo

A.   No.

Q.   I didn't either.  And, in fact, you wrote, "On Wednesday August 4, 2021, you," Ashley Gjovik, "told me," you, Okpo, "that the above were all of your," Ashley Gjovik's, "concerns."

Is that true what it says?

A.   Yes.

Q.   Yeah.  Did Ashley Gjovik ever tell you she had concerns about retaliation due to making EHS concerns?

If you said something, I couldn't hear it.  Can you say it louder, please?

A.   Yeah.  I just -- I don't recall.

Q.   Okay.  You did add at the bottom here, "As a reminder, the scope of my investigation," Okpo's investigation, "does not include the concerns that you," Gjovik, "has raised with our Environmental Health and Safety team.  Those concerns will be handled by our team of EHS experts."

A.   Correct.

Q.   Yeah.  So you remember Ms. Gjovik making complaints about EHS issues?

A.   Yes.

Q.   Yeah.  But you don't recall Ms. Gjovik ever making complaints about retaliation due to making EHS complaints?

MS. RIECHERT:  Objection.  Asked and answered.

BY MS. GJOVIK:

Q.    Okay.  Do you remember Ms. Gjovik ever making complaints about retaliation?

A.    My recollection is -- my recollection is Jenna Waibel would have reviewed those concerns previously.

Q.    You said "Jenna Waibel"?

A.    That seems to be my recollection at this -- that's my recollection.

Q.    Okay.  And you had said that Ms. Waibel closed her investigation in June of 2021?

A.    Did I say that?  I don't recall.

Q.    I thought you did.  Well, I thought you said that at the time that you took this investigation in July 2021, Ms. Waibel had closed her investigation.  Is that true and accurate?

A.    Yeah.  Yes.  When I --

Q.    Yeah.

A.    When I met you, Ms. Waibel had closed her investigation.  Correct.

Q.    Okay.  And then so if Ms. Gjovik had complained about -- sorry.  I'm very sick.

If Ms. Gjovik had complained about retaliation in July, August, September 2021, who would be investigating her complaints about retaliation?

MS. RIECHERT:  Objection.  Assumes facts not in evidence.

BY MS. GJOVIK:

Q.   Was -- to your knowledge, was anyone investigating Ms. Gjovik's complaints about retaliation, or any complaints, in July, August, or September 2021?

MS. RIECHERT:  For any complaints?

MS. GJOVIK:  Of retaliation.

MS. RIECHERT:  Okay.

THE WITNESS:  Not specific to your EH&S concerns?  I just want to make sure I understand the question.  Any complaints --

BY MS. GJOVIK:

Q.   Go ahead.

A.   Yeah.  There -- there's mention of retaliation claims in this document.  So -- yes.

Q.   Yeah.

A.   I was investigating those specific concerns in this document.

Q.   This document seemed to focus on retaliation complaints with retaliation occurring around 2015, 2016, 2017.

What about complaints of retaliation occurring in 2021?  Were you investigating any of those?

A.   My investigation was focused on the issues

laid out in the issue confirmation document.

Q.   So there's multiple.  So Exhibit B, this is your version of the issue confirmation document; right?

A.   Yes.

Q.   Yeah.  So when you say you're investigating the issues laid out in "the issue confirmation," I just want you to distinguish whether it's yours or mine, which we'll go back to in a second.  Mine was Exhibit D. Yours was Exhibit B.

So are you saying that you were investigating just the issues laid out in your issue confirmation document?

A.   What I am saying is that I was investigating concerns laid out in the issue confirmation document.

Q.   Which one?

A.   You've called out that there are multiple versions.  So, I mean, I --

Q.   I can rephrase.  Did -- let's go to -- again, to Exhibit D, which was my final version of the issue confirmation document and in retrospect, I forgot to update the revision to revision three and the date and all that.  So it was the 23rd of August.  But I checked this was the right one because I had sent you an updated one when I filed a business conduct complaint on the 23rd about the Ronald Sugar and office issues.  So I --

I did absolutely nothing," or --

MS. RIECHERT:  Right.

MS. GJOVIK:  -- the answer could be, "I did something," and you're claiming privilege to those answers?

MS. RIECHERT:  Correct.  Because either would show what he did or didn't do.

MS. GJOVIK:  Just a reminder, you can't claim privilege to misconduct.

MS. RIECHERT:  I can claim privilege to an investigation that was conducted under the advice of counsel.

MS. GJOVIK:  But you can't claim privilege to a lack of an investigation.

MS. RIECHERT:  We can litigate that.  We can argue that issue later.  Let's not waste this witness's time on it.

MS. GJOVIK:  Again, this is just the prima facie; so we'll keep coming back to this one.  Okay.

BY MS. GJOVIK:

    Q.   Mr. Okpo, thank you.

         Can you -- what can you tell me, if anything, about what you did investigate as part of your investigation?

         MS. RIECHERT:  I'll object to that on

attorney-client privilege, and instruct him not to answer.

BY MS. GJOVIK:

Q.   Zero details.  Okay.

Mr. Okpo, did you talk to witnesses?

MS. RIECHERT:  You can answer that generally.

THE WITNESS:  Yes.

BY MS. GJOVIK:

Q.   Thank you.  Can you tell me who you talked to?

MS. RIECHERT:  Objection.  Attorney-client privilege.  Instruct him not to answer.

BY MS. GJOVIK:

Q.   Mr. Okpo, can you tell me if you talked to any of the witnesses recommended by Ms. Gjovik?

MS. RIECHERT:  Objection.  Attorney-client privilege.  Instruct you not to answer.

BY MS. GJOVIK:

Q.   Okay.  You did say that you did review the files provided.  Actually, let's look at those for a second.  Actually, it sounds like you're struggling a little too, Mr. Okpo.

Do you want to take five minutes?  I can use five minutes.

MS. RIECHERT:  Yeah.  It's been just over an hour.

A.   Yes.

Q.   Do you remember if you reviewed that prior to 8/4, on 8/4, or after 8/4?

A.   I reviewed it.  I don't remember specifically when.

Q.   Do you recall Ms. Gjovik asking to review it with you on 8/4 and you refusing to review it with her on 8/4?

A.   That's not my recollection.  I would not have refused to review anything with you.

Q.   I would have hoped so, Mr. Okpo.  That's not how I remember it.

Do you remember on 8/4 informing Ms. Gjovik that Apple was placing her on paid administrative leave?

A.   Yeah.  Accommodating your request.

Q.   That wasn't the question.

So, yes, you remember placing her on administrative leave.

Do you recall her making protests, complaints, objecting, or otherwise having concerns about that announcement?

MS. RIECHERT:  It's a very compound question.

BY MS. GJOVIK:

Q.   Do you recall Ms. Gjovik's response to being told she was being placed on leave?

Ekelemchi Okpo

Q.   Do you remember Ms. Gjovik, around that time, that was around July 27, 28, 29, during the conversation with Ms. Gjovik, her getting so upset at the answers she was getting she spilled coffee all over her desk and herself, but continued talking to you covered in coffee? I'll remember that forever, though.  Forever.

MS. RIECHERT:  I am not sure if there's a question in there.

MS. GJOVIK:  Just credibility of the witness's testimony of his actual recollections or not with things that can be substantiated based on other evidence.

I would like to show you an email sent to you, Mr. Okpo.  This will be Exhibit A.

(Exhibit A was marked for identification.)

BY MS. GJOVIK:

Q.   This is an email sent July 28, 2021.  The subject is "Slack ER Chain," sent by me cc'ing Mr. Antonio Lagares.

Do you remember this email, Mr. Okpo?

A.   Yes.

Q.   Yeah.  Can you tell me about this email?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q.   Can you tell me what was done with this --

this complaint from Ms. Gjovik, if anything?

MS. RIECHERT:  So if you're asking what he did in connection with the investigation, then I will instruct him not to answer based on attorney-client privilege.

MS. GJOVIK:  Okay.  What can he answer outside of attorney-client privilege?

MS. RIECHERT:  I don't know if he did anything other than as part of his investigation he could.

MS. GJOVIK:  Or if he waived privilege such as if he told Ms. Gjovik to stop talking to her coworkers on Slack about this and instead send them to him directly.

MS. RIECHERT:  Okay.  Then you can ask him that question.

MS. GJOVIK:  Yeah.

BY MS. GJOVIK:

   Q.    Mr. Okpo, what, if anything, did you do in response to this email that is not protected by privilege?

MS. RIECHERT:  Okay.  So I think your example was did he tell you anything in response to this email.

MS. GJOVIK:  I don't want to lead him.  I would just rather have him respond generally with what he can respond to.

MS. RIECHERT:  I know.  But I'm -- yeah.  I'm objecting on privilege, and that's the only example you've given that wouldn't be privileged.

MS. GJOVIK:  We don't know what else would be because he hasn't answered.  I can't read his mind.

MS. RIECHERT:  So are you asking him if he talked to you about this?

MS. GJOVIK:  I would like him to note any and everything he did in direct response to this email that he can share that is not blocked by privilege.

THE WITNESS:  What I did during this investigation was directed by counsel.

BY MS. GJOVIK:

Q.   Okay.  So do you recall talking to me about the Slack exchanges that are captured in this email?

A.   I recall this specific email.

Q.   Okay.  Do you recall any verbal conversations with Ms. Gjovik about this email or this -- the Slack conversations that were documented in this email?  Would you like to see the full document?  It's 13 pages.  We can go through each page again.

A.   Yeah.  Let's do that.

Q.   Okay.  We'll keep it big for you guys and then do the thing where you tell me to scroll down.  Okay?

A.   Yup.

**Ekelemchi Okpo**

Q.   And we'll be reading this first part, actually, I would like to read onto the record just for the context in the deposition transcript.  So I'll read the text, and then the rest is screenshots of exchanges on Slack.

The text says, "Hi, The Slack chain we talked about yesterday & today," with the link, a URL link. "Not even including DMs..." it meant "direct messages."

"I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation -- who has received no real help from HR or ER in resolving the issue.  (Yes I know you're looking into things now -- but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

"There seems to be a growing group of us with very horrific stories to tell, who have tried to tell these stories, and have gotten nowhere at Apple.

"As mentioned before, this is incredibly disappointing and unacceptable to me.  Not just for my own situation -- but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect.  Pretends seems to be the important word there.  Ashley."

Ekelemchi Okpo

Okay.  So here is the bottom half, and let me know when you would like to go to the next page.

A.    I'm ready.

MS. RIECHERT:  While he's doing that, Ashley, can you let Isela back in?

MS. GJOVIK:  Oh, yeah.  Let me check.  I lost my header.  I don't see her.

MS. RIECHERT:  Okay.  I'll -- I'll remind her.  She just told me she got knocked off.

MS. GJOVIK:  It usually dings for me when someone tries to get in.  I didn't hear it either.

THE WITNESS:  Okay.  Okay.  It's quite small.  Thanks.

BY MS. GJOVIK:

Q.    Okay.  I am sorry.  I'm actually going to change plans because this is going to take a long time, and I have a lot more questions for you.

So we got through the -- the two first pages and at least part of the third page.  Yeah.

And you recall this email and the -- that Slack conversation now that you've refreshed your memory?

A.    Yeah.

Q.    Yeah.  How would you characterize the Slack post, the ones that you reviewed?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q.    The Slack posts -- there were multiple employees complaining about work conditions and failure to actually get a good investigation from ER?

A.    Yeah.

Q.    Yeah.  Did you or anyone else at employee relations, in response to this email, look into those cases to see if they were handled properly?

MS. RIECHERT:  Objection.  Instruct him not to answer.  Attorney-client privilege in anything he did in connection with the investigation.

BY MS. GJOVIK:

Q.    Okay.  Do you recall discussing with Ms. Gjovik and asking her to stop posting these things in Slack and instead send people directly to talk to you privately?

A.    That's not my recollection.

Q.    What is your recollection?

A.    To the extent people had workplace concerns, they could come directly to the employer relations team or go through other channels that are available to them as Apple employees.  It is not my recollection that I told you to stop posting to Slack.

Q.    So could keep posting on Slack, but also

Ekelemchi Okpo

A.    Yes.

Q.    Yeah.  And then the -- above that is a response sent my Ms. Gjovik.

Do you remember Ms. Gjovik's response?

A.    Yeah.

Q.    Yeah.  Do you remember Ms. Gjovik asking you to keep communications in writing?

A.    Yes.

Q.    Yes.  Did you ever agree or disagree to that request?  Let me rephrase.

Did you ever respond directly to Ms. Gjovik's request to keep communications in writing?

A.    No.

Q.    Okay.  And then, Mr. Okpo, you -- do you remember contacting Ms. Gjovik again on September 7th?

A.    Yes.

Q.    Yeah.  So -- and is it your recollection that there was no communication in response to Ms. Gjovik's response on the third until your response on the 7th?

A.    Yes.

Q.    Yeah.  This is Exhibit EE.

(Exhibit EE was marked for
identification.)

BY MS. GJOVIK:

Q.    And on September 7th, Mr. Okpo said, "Based on

**Ekelemchi Okpo**

interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information."

Mr. Okpo, what did you mean by that?

A.   I was going through my investigation and I found some additional documents that were inconsistent with how you had laid out your complaints specific to the allegation that Dan West pressured you into engaging with a sous chef.

Q.   That was the one thing you were reaching out about?

A.   Yes.

Q.   And that was the thing you were reaching out about on the 3rd and 7th?

A.   It was -- yes.

Q.   Okay.  And then do you recall Ms. Gjovik's response on the 7th, which is shared on the screen right now from Exhibit EE, an email response at 6:45 p.m.?

A.   Yes.

Q.   And Ms. Gjovik asked you, again, if we could keep communication in writing.  Says she is happy to discuss.

Did you ever respond to her email?

A.   This specific email, no.

**Ekelemchi Okpo**

with their clients in writing?

Q.   Yes.   That's the question.

A.   No.

Q.   No.   Okay.   And then -- let's see.   So you've never agreed to keep things in writing.

Is there any policy that you're aware of, Apple, like, work policy that says investigations have to be oral and cannot -- communications are not allowed to be in writing?

A.   Not that I am aware of.

Q.   Yeah.   Okay.   And then this email that we're looking at right now, Ms. Gjovik had raised that she had just discovered that one of her coworkers had actually sued Apple over the alleged misconduct of Mr. West, and raised that to you with some concerns.

Did you ever respond to that?

A.   Respond to what?

MS. RIECHERT:   I'll misstate what the email says -- misstates what the email says, but you can ask if he responded to your "PS."

BY MS. GJOVIK:

Q.   Okay.

A.   No.   I didn't respond to this -- this email.

Q.   While you were conducting this investigation of Ms. Gjovik's concerns, were you aware that Crystal

since you refused to engage with me orally, I had no other choice but to closeout the investigation based on the information I currently had.

Q. **You closed out the entire investigation because Ms. Gjovik would not talk to you about the sous chef complaint?  Is that what you just said?**

A. I needed to talk to you about some inconsistencies, and without having the opportunity to connect with you verbally, I had to closeout the investigation.

Q. **For that one specific issue you said that the request was about, or you closed out the entire investigation?**

A. Closed out the investigation.

Q. **You previously said you didn't remember what date you -- you did, if it was before or after the employee was terminated.  Is that still true?**

A. I am sorry?

Q. **You previously said you did not recall if the -- if the investigation was closed prior to or after the termination of the employee.  Is that still correct?**

MS. RIECHERT:  And you're giving the date as 9/10?

MS. GJOVIK:  The notification of the termination was September 9th, effective September 10th,

investigating prior; is that correct?

A.    Correct.

Q.    Is that standard procedure for you, Mr. Okpo? That if an employee asks to keep things in writing on one specific issue, that you or other employee relations investigators will close an entire investigation?

MS. RIECHERT:  Objection.  Misstates the testimony.  Assumes facts not in evidence.

BY MS. GJOVIK:

Q.    Okay.  Go ahead, though.

A.    If the reporting party is refusing to engage orally, we will have no other option -- no other choice but to close out the investigation.

Q.    Mr. Okpo, go ahead.

A.    At that point, that employee is refusing to cooperate with the investigation.

Q.    Mr. Okpo, what if the employee was raising, like, real issues with, like, regulatory noncompliance, criminal conduct by other employees, Apple would just close the investigation of those complaints even if, like, crimes were occurring if that employee would not get on the phone about one specific sub-issue?  Is that what you're saying?

MS. RIECHERT:  Objection.  Misstates his testimony.

MS. GJOVIK:  He can say that, and then if it shows he's lying later, we can point that out.

MS. RIECHERT:  Well, what's the question?  Is it a coincidence that two people send emails with the same language at the same time?

MS. GJOVIK:  That there's no coordination, there's no, you know, multiple people or same people drafting those emails, they were in complete isolation with very, very similar language and just hours timed apart.

MS. RIECHERT:  Yeah.  Assumes facts not in evidence.  Lack of foundation.

BY MS. GJOVIK:

 Q.  **Yup.  Just a coincidence, Mr. Okpo?**

 A.  I don't know how to answer that question.  I was not aware of any investigation into your conduct.

 Q.  **Okay.  And then what was the concerns that you wanted to talk to Ms. Gjovik about so urgently?  What was the -- the inconsistencies?  Can you tell me please?**

MS. RIECHERT:  Objection.  Asked and answered.

MS. GJOVIK:  No.  He never said what the inconsistencies were.

MS. RIECHERT:  Yes, he did.  He can answer again.

MS. GJOVIK:  I think the general topic was

sous chef, but he did not say anything more, and I think it is material what exactly he thought the inconsistency was.

MS. RIECHERT:  Yes.  He can answer that.

BY MS. GJOVIK:

Q.    Yeah.

A.    Okay.  I found that there were misrepresentations of facts based on your framing of the concerns around Dan allegedly pressuring you into romantically engaging with a sous chef.

Q.    What were the conflicting facts?

A.    The claim that Dan pressured you into engaging with the sous chef.  However, I found the full text thread where you use language like "the sous chef being cute," you know, at one point you mentioned that you had met another gentleman, and, sorry, it wouldn't work out with the sous chef.  And Dan was very explicit "no pressure from me at all."

And so two very inconsistent scenarios there.

Q.    Okay.  Mr. Okpo, in your experience, do sometimes employees go along with a behavior by their superiors that sometimes they feel is inappropriate, but they might not feel comfortable objecting in realtime about that conduct, but then complain later?

MS. RIECHERT:  Objection.  Improper

that it seemed like Dan West already knew that she was going to be fired while she was already on administrative leave?

A.    That was a lot in that question.

MS. RIECHERT:  I was going to say, there was about five things in that.

BY MS. GJOVIK:

Q.    Do you remember or do you recall Ms. Gjovik complaining to you that she was hearing from her coworkers statements being made allegedly by Dan West that indicated that he did not plan she was ever coming back to work?

A.    With that specific -- with that specific language, no.

Q.    What about the "Ashley issue" complaint?

A.    Yes.

Q.    Yeah.  And that she complained that Dan West said he was going to talk about the "Ashley issue" at an October all-hands, and he was saying this in August 2021?

A.    That was your claim.

Q.    Did you do anything to investigate those complaints?

MS. RIECHERT:  Objection.  Instruct him not to answer.  Attorney-client privilege.

**D.**   **EXHIBIT D: ALEKS DEP.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                      )
                                       )
                Plaintiff,             )
                                       )
        vs.                            )   Case No.
                                       )   23-cv-04597-EMC
APPLE INC.,                            )
                                       )
                Defendants.            )
_____ )

REMOTE DEPOSITION OF

ALEKS KAGRAMANOV

VIDEO-RECORDED VIA ZOOM

Thursday, April 16, 2026

Stenographically Reported By:
Vesna Walter, CSR, RPR, CCRR
CSR No. 11989
Job No. 10188334

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                          )
                                           )
                    Plaintiff,             )
                                           )
          vs.                              )  Case No.
                                           )  23-cv-04597-EMC
APPLE INC.,                                )
                                           )
                    Defendants.            )
_____  )

          Deposition of ALEKS KAGRAMANOV, taken on behalf

of Plaintiff, with all parties appearing remotely,

beginning at 8:03 a.m. and ending at 10:53 a.m. Pacific

time, on Thursday, April 16, 2026, before VESNA WALTER,

Certified Shorthand Reporter No. 11989.

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/18/2026

_____
Vesna Walter
RPR, CCRR, CSR No. 11989

Aleks Kagramanov

other record, like, documented record of your

participation in this investigation?

A    I don't -- I don't recall, outside of the

two emails.

Q    Did you work with any Apple attorneys on

this?

A    Yes.

Q    What are their names?

A    I don't recall their names.

Q    Do you recall what department?

A    Just our legal team, Apple legal team.

Q    That's a big team, though.

Like, was it products team or HR team or --

A    I don't recall.

Q    So -- okay.  Are you aware that Ms. Jacobs

is a former criminal prosecutor?

A    No.

Q    Do you have any knowledge of what Ms. Jacobs

planned to say to Ms. Gjovik during the call you were

to arrange?

A    No.

Q    And was Ms. Gjovik told beforehand that

Ms. Jacobs was going to be on this call you were

arranging?

A    Say that one more time.

Aleks Kagramanov

Q   Did you ever tell Ms. Gjovik that Ms. Jacobs was going to be on this call you were trying to arrange with Ms. Gjovik?

A   I don't -- I don't think so.

Q   Is that typical for you to not disclose the global security or legal folks that would be on the call with the employee when asking the employee to join the call?

A   I don't recall the exact process there.

Q   Do you recall any involvement from outside counsel at that point regarding Ashley Gjovik?

A   No.

Q   Do you recall any interaction with the law firm Orrick at that time when you were supporting the Ashley Gjovik matter?

A   No.

Q   What about O'Melveny & Myers?

A   No.

Q   Are you aware that O'Melveny & Myers lawyers contacted Ms. Gjovik around September 15, 2021, after she was terminated?

A   No.

Q   And then do you recall any interaction with the law firm McDermott, Will & Emery regarding the Ashley Gjovik matter when you were supporting?

that response?

A    I don't recall what my reaction was at that moment.

Q    Okay.  In your professional capacity, doing this for years, looking at that email, would you characterize that email as refusal to cooperate?

A    I would determine that as refusal.

Q    Can you tell me why.

A    Because we don't facilitate investigations over email.

Q    Is that an official policy?

A    I don't recall what the specific policy is.

Q    Is there any written policy that Apple has that says that?

A    I don't recall a specific policy.

Q    And refusal to cooperate, is that an allegation of misconduct by the employee that it's being made against?

A    Refusal to cooperate, we typically go off of the information we have.

Q    So is it misconduct by the employee to refuse to cooperate or that's just something that changes the direction of the investigation process?

MS. RIECHERT:  Objection.  Lack of foundation.

Aleks Kagramanov

BY MS. GJOVIK:

Q    Can you think of -- I'm going to withdraw that one and try again.

Can you think of other examples where employees ask to keep communications in writing?

A    I can't recall an instance.

Q    Okay.  Can you recall any instructions to -- from anyone at Apple to you or your team to not have communications with employees in writing?

A    I don't recall a specific instance.

Q    You said the process is getting on the call and not have it -- not having the email.  So the refusal to cooperate is having the only written record.  Do you know who communicated that process, or is that a process that you created?

A    I can't recall who owns that process.

Q    So your understanding that a refusal to get on a call and a request to keep things in writing was a refusal to cooperate, what were you basing that on if there was no written policy or formal policy that things had to be only on a call?

MS. RIECHERT:  Objection.  Improper hypothetical.

MS. GJOVIK:  I don't think so.

///

BY MS. GJOVIK:

Q    But go ahead.

A    I mean, I decided that, you know, you not engaging in a live process is refusal to participate.

Q    So that was just your unilateral view and assessment?

A    It was -- so it was my determination but also in partnership with our legal counsel.

Q    Also in partnership.

Did you make your own determination prior to the determination by legal counsel?

A    I don't recall what -- what that process was, actually.

Q    Okay.  So you say you determined that it's refusal to cooperate by asking to have things in writing.  Can you explain why asking to have things in writing is a problem.

A    Yes.  I mean, the intention for having a live conversation is to ensure that we have a natural recollection of, you know, whatever the discussion is at hand relating to the investigation.  It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.

Q    Mr. Kagramanov, are you aware that all of

Aleks Kagramanov

the content that Apple has subsequently alleged was leaked or improperly disclosed was all already published social media posts or commentary and participation in press articles; so -- and under the employee's own name; so there was not much for them to actually investigate?

MS. RIECHERT:  Objection.  Assumes -- he's already said he doesn't know anything about any of the allegations.  So...

MS. GJOVIK:  I just kind of want him to have to say no.

BY MS. GJOVIK:

Q    That's a no?

A    No.

Q    If you had known -- and you said Glimmer. So let's say it was just the Glimmer thing, and again facts not in evidence.  But they keep pointing to photos I shared with "Verge" of just my face taken by an app.  And I was complaining of surveillance because it was taking pictures of me in my home and naked and stuff, and I thought that was wrong.  So it was just my face.

If you had known that what they were concerned was an article published -- it was August 30th; so almost, like, a week and a half

prior -- and I had said I was the one sharing it and complaining about it, would you still say it was refusal to cooperate for Ashley Gjovik to ask for things in writing?

A    I mean, the process, like I said, is to -- cooperation means participating in a live discussion.

Q    Did you ever define that to Ashley Gjovik?

A    In the email, in what we requested in iCal, to coordinate a time in the iCal.

Q    Yeah.  But did you say it was mandatory it had to be without written record?

A    I believe I responded that we determined that you refused to participate.

Q    But did you ever say the only way to participate that Apple will accept will be getting on a call?

A    I don't recall making that specific comment.

Q    Do you think it's reasonable for an employee to assume that's a rule without that being stated?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  Still has to answer.

MS. RIECHERT:  Speculation.

THE WITNESS:  Sorry.  You still want me to answer that?

///

Aleks Kagramanov

BY MS. GJOVIK:

Q   She said lacks foundation, but you still have to answer.

A   Sorry.  Repeat the question again.

Q   Do you think it's reasonable for an employee to assume that rule exists without that rule being stated to the employee?

MS. RIECHERT:  Also assumes facts not in evidence.

MS. GJOVIK:  There's no evidence because that was never stated.

THE WITNESS:  I'm sorry.  Do you still want me to respond to that?

BY MS. GJOVIK:

Q   Yeah.  Sorry.  Go for it.

A   Yes.  That expectation is that employees participate live and that it's reasonable for them to know that we're scheduling an iCal and coordinating an iCal, that the participation is live.

Q   Do you think it's reasonable for the employee to assume that if they were to ask for a written record of the conversation, that it would be seen as refusal to cooperate?

MS. RIECHERT:  Same objections.

THE WITNESS:  The employee would be informed

Aleks Kagramanov

that if they refused to participate live or refused to participate, that we will go off of the information that we have.

BY MS. GJOVIK:

Q   So would it be reasonable to tell the employee that the only way to participate is live; so if then they refused live, then it's refusing to participate?

A   Correct.

MS. RIECHERT:   Same objections.

BY MS. GJOVIK:

Q   Okay.  So then looking at this same exhibit, Ms. Gjovik then also responded to you:  FYI -- this was at 2:27.  So she sent that -- actually, okay. Sorry.  Withdraw that.

2:10 p.m., she sent that email we were just talking about, and you did not respond by 2:27.  Do you recall what was happening after she sent that email to you, that 2:10 email?

MS. RIECHERT:   I think you said he did not respond by 2:27.  I think you meant he did respond at 2:27.

MS. GJOVIK:   The 2:27 was my email.

MS. RIECHERT:   You're right.

MS. GJOVIK:   That's okay.

MS. RIECHERT:  You're right.

MS. GJOVIK:  It was a lot of stuff happening really quick.

BY MS. GJOVIK:

Q   So Ms. Gjovik responded at 2:10, saying she wanted a written record.  And at least by 2:27, you had not responded.  Do you recall what you were doing during those 17 minutes?

A   I do not recall.

Q   Do you recall when you saw her response?

A   I don't recall.

Q   Okay.  Do you recall when you decided that she was refusing to participate?

A   I don't recall the time, specific time.

Q   Based on this 2:10 email, would this 2:10 email itself, where she says she's insisting everything stays written, be the basis of a determination of refusal to cooperate?

A   I can't recall when I actually saw that email.

Q   Sorry.  I mean just that email itself, though, without any of the other stuff we're going to look at that came after.

If that email says insisting on a written record, is that itself enough to determine refusal to

Aleks Kagramanov

cooperate?

A    Correct.

Q    And then Mr. Gjovik responded at 2:27 and said, FYI, I forwarded your email and my reply to the investigator on my NLRB case.  So he's aware you just reached out to me the day before my affidavit is supposed to be taken.  This feels a little like witness intimidation, et cetera, dot, dot, dot.

Do you recall that response?

A    I recall.

Q    How did you respond -- sorry.  Go ahead.

A    No.  Just from what you shared, yeah, I recall.

Q    Do you recall how you responded?

A    Yes.

Q    How did you respond?

A    Do you want me to read my response there?

Q    Oh, sorry.  Not, like, an email yet.  But, like, when you saw that, did you change your determination on cooperation?  Did you want to find more information?  Like, what was your internal response to that email?

A    I can't recall what my internal response was.

Q    Okay.  And in your role, if an employee

discloses to you directly that they have an open case with the government against Apple while you're contacting them to arrange an investigation, does that change your approach of supporting that employee for the investigation?

    A    I don't recall what -- like, a process or change in approach.

    Q    Okay.  And you had said that part of your process for supporting the employees was reassuring them that there would not be any retaliation; is that correct?

    A    Correct.

    Q    And so this email complains of something that feels a little like witness intimidation, which is a criminal statute that also includes retaliation. So would you say this email was complaining to you that it felt like Apple might be retaliating against Ashley Gjovik, per Ashley Gjovik?

    A    I can't speculate as to what your reception was to that email.

    Q    So when you read Ashley Gjovik emailing you saying, this feels a little like witness intimidation, how did you interpret that?

    A    I don't recall what my thought process was at that time.

Aleks Kagramanov

Q    Okay.  Do you recall any other cases where you saw something like that?

A    I can't recall a specific case.

Q    Okay.  And as a professional, if you see something like that, would it cause you to want to gather more information or talk to other Apple counsel or maybe change the way that you're strategizing your support?

A    I recall partnering with our legal counsel on this, but I don't recall what -- you know, what was specifically discussed in that scenario.

Q    Do you remember which legal counsel?

A    I do not recall.

Q    Do you remember if it was, like, HR or global security or product?

A    I don't recall who specifically was involved.

Q    Okay.  And are you aware of NLRB laws and cases about how to interact with employees when they have lodged NLRB complaints against the employer and are requesting certain conditions related to a requested interview with them?

A    No.

Q    Do you think that when you contacted -- based on whatever lawyers -- Apple lawyers you were

Aleks Kagramanov

discussing this matter with, was there at least an Apple HR lawyer involved?

MS. RIECHERT:  Objection.  Asked and answered.

BY MS. GJOVIK:

Q    Specific for these emails, I'm trying to gather whether Apple HR legal, who should be aware of the NLRB expectations, was aware of this response during this exchange.

MS. RIECHERT:  He already answered he didn't know what --

MS. GJOVIK:  He what?

MS. RIECHERT:  He already said he didn't know whether it was product, legal -- or I mean, employment or what.  He didn't know.

MS. GJOVIK:  He had no idea who the lawyers were?  Just lawyers?  That's -- it's kind of a leading objection.  I would like to ask him directly, please.

THE WITNESS:  I don't recall who the specific lawyer or lawyers were involved.

BY MS. GJOVIK:

Q    Okay.  And this exchange very quickly led to a termination of employment of an employee.  And in those type of cases where you're supporting these

**Aleks Kagramanov**

investigations, is it typical to have HR legal involved in that process?

A    I mean, I don't recall a specific instance. I think it's all case by case.

Q    Can you recall any other examples where you're emailing an employee and the employee was terminated within the day that you requested a meeting?

A    I also don't recall a specific example.

Q    Okay.  So Ashley Gjovik would then be the only example you recall?

A    I was not aware that you were terminated.

Q    You were never notified that I was terminated on September 9th?

A    I was not involved in that process.

Q    That's interesting.  Okay.  Thank you.

And then looking at the same exhibit, we have at 2:50 p.m. an email from you, and it wrote: We are investigating allegations that you improperly disclosed Apple confidential information.  Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.  Best, Aleks Kagramanov.

You sent that email?

A   Correct.

Q   Can you share any information or context of why you chose the language you chose in that email?

MS. RIECHERT:  Don't give any information provided by counsel.  Instruct you not to answer based on attorney-client privilege.

THE WITNESS:  Yeah, I do not recall how it was formulated.

BY MS. GJOVIK:

Q   Did you write this email?

A   It was sent by me.

Q   Did you draft the words used or did you send something someone else wrote?

MS. RIECHERT:  So again, objection to the extent you're asking to the role of legal in drafting this language, and in terms of attorney-client privilege, I'd instruct him not to answer.

BY MS. GJOVIK:

Q   How about this.  Mr. Kagramanov, the email that you sent here at 2:50 p.m., did someone else write the content of that email?

MS. RIECHERT:  Same objection.

MS. GJOVIK:  I'm not asking who.

MS. RIECHERT:  If other than legal, then

Aleks Kagramanov

you're welcome to ask him.  But if he worked on it with legal, then you're not entitled to ask him.

MS. GJOVIK:  I think he can say whether he wrote it or not.

MS. RIECHERT:  I'll instruct him not to answer if it was legal that was involved in helping him write this.

BY MS. GJOVIK:

Q   Okay.  And, Mr. Kagramanov, now, instead of sensitive intellectual property matter, it says disclosed Apple confidential information.  What was the Apple confidential information that was disclosed, to your knowledge?

A   Because I don't lead that investigation, I don't know.  I wasn't aware.

Q   And the suspension of access to Apple systems in your message, is that something that you coordinated to suspend access to Apple systems?

A   I don't recall who was -- who was responsible or involved in that.

Q   Do you recall when the access to Apple systems was suspended?

A   I don't recall.

Q   Okay.  And when it says Apple systems, which systems?

A   I also am not aware.

Q   Okay.  Do you recall any other examples --
so you had sent the original email at 2:08 p.m. per
Exhibit A.  And in this one, this response where
you're suspending access to systems was sent at
2:50 p.m.  So this would be 42 minutes later.

Do you recall any other examples of
contacting an employee for initial conversation and
suspending all their account access in less than an
hour?

A   I don't recall a specific example.

Q   So Ashley Gjovik would be the only one?

A   Correct, that I can recall.

Q   Thank you.

And then the next one, this is at 3:07 p.m.
So this is still within one hour of the initial email
you sent.  Ms. Gjovik responds:  Hi, Aleks.  As
mentioned, I'm definitely willing to participate in
your investigation.  I only asked that the discussion
be kept to email.  I said nothing about not
participating in the discussion at all.  I offered to
help via email to ensure we have a documented record
of our conversations considering everything that's
currently going on with my investigation and my
complaints to the government.  I have been speaking

out about work conditions, about workplace safety, concerns about discrimination and retaliation, and about concerns about intimidation and corruption, as reported to the government in public record.  I'm very concerned about what you're calling serious allegations.  Can you please provide me additional detail on what these allegations are?  And when you say move forward, are you simply suspecting -- but I meant suspending -- my access to Apple system or are you doing something more, and if so, what?  Your email is very unexpected, and I'm caught quite off guard if this is a real issue.  I'd like the opportunity to remedy any actual issues.  Please let me know what the issues are so I can make a good-faith attempt at that.  In the meantime, without additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation, and I will consider it as such.  Best, Ashley.

        Do you recall that response?

     A   Yes.  Seeing it, I recall it.

     Q   Do you recall how you -- how you responded, like, internally to reading that, if it would change your approach with the support for this investigation?

A    I don't recall my interpretation.

Q    Did you share these emails with anyone at the time?

A    I don't recall.

Q    Is it typical for you, if you're helping global security do an investigation into an employee, to share those emails with global security as the employee is responding?

A    I don't recall the specific process or I -- it would be case by case.

Q    Okay.  And if an employee was to disclose to you here that the government complaints were made, there's the LMB case, that there was concern retaliation was occurring, would you, like, escalate that and have that investigated to see if Apple might actually be retaliating against the employee?

A    I don't recall what the process there would be.

Q    Okay.  So have you ever seen a situation where an employee was complaining that the investigation into them might be retaliation, other than the Ashley Gjovik case?

A    Yeah, I don't recall another example.

Q    And as a professional in your field, if the corporation was retaliating against the employee,

Aleks Kagramanov

because sometimes that happens, wouldn't it be a due diligence concern to ensure that that employee's complaint was investigated to ensure that whatever that investigation was wasn't retaliation?

MS. RIECHERT:  I think that's an improper hypothetical and lacks foundation.

MS. GJOVIK:  Okay.  He still has to answer.

THE WITNESS:  I can't speculate or I can't recall a specific process in this scenario.

BY MS. GJOVIK:

Q   So I looked at your LinkedIn, and you've been doing this for a very long time and you've worked at these very large companies, and you're saying you have no professional opinion if an employee was to complain that the investigation into them appeared to be retaliation, of how you would handle that and whether you would actually investigate if it could be retaliation or ask someone to?

MS. RIECHERT:  Objection.  Asked and answered.  And same prior objections.

BY MS. GJOVIK:

Q   Okay.  So no?  No thoughts whatsoever.

And is it accurate that you never replied to this email?

A   I can't recall if I responded or not.

Q   **I never got a response.**

**Do you recall what happened after this response from Ms. Gjovik?**

A   I do not recall.

Q   **Okay.  And you communicated, like, accounts are being suspended, but then you testified that you didn't know Ms. Gjovik was terminated.  So do you recall if maybe you just ended your participation, your support for this investigation after that last exchange we reviewed?**

A   I cannot recall my exact involvement after that.

Q   **Okay.  Just a few hours later --**

MS. RIECHERT:  We've been going an hour and a half now.

MS. GJOVIK:  Do you want to take a break?

MS. RIECHERT:  I'm fine, but I'm sure -- the court reporter usually likes a break --

MS. GJOVIK:  Sorry.  I can't hear you.  What are you saying?

MS. RIECHERT:  Yeah.  The court reporter usually likes a break after an hour and a half.

MS. GJOVIK:  Okay.  Want to take five minutes?

Aleks Kagramanov

MS. RIECHERT:  Fine with me.

MS. GJOVIK:  Okay.  Let's come back in five.

(Recess taken.)

BY MS. GJOVIK:

Q    Okay.  So we just finished looking at those exchanges, and I'm just going to show you something here.

Mr. Kagramanov, do you remember the involvement of anyone named Megan Bowman while you were supporting this investigation?

A    I do not recall her involvement.

Q    I'll share -- and did you say -- do you recall -- any recollection of what information was supposedly shared or where it was shared?

MS. RIECHERT:  Objection.  Vague.

BY MS. GJOVIK:

Q    The supposedly leaked information by Ashley Gjovik.

A    I do not recall specifically.

Q    So this is Exhibit G.  This is a document produced by Apple previously, and this is an email from Megan Bowman.

Do you know who Megan Bowman is?  Do you remember?

A    I do not recall her role.

Aleks Kagramanov

(Exhibit G was marked for identification.)

BY MS. GJOVIK:

Q    Okay.  Do you know who Yannick Bertolus is?

A    No.

Q    So Megan emailed Yannick here.  So this was September 9th at 6:20 p.m.  And we looked at that last email that Ashley Gjovik sent you was the 3:07 p.m. that it was in response to.  And so then we have 6:20.  It's a little over three hours later.  Megan Bowman wrote to Yannick:  Sophi Jacobs and Alex Kagramanov -- I'm finally getting this -- I had to say your name like 40 times to finally get this.  I'm so sorry.  Members of our global security and ER teams reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.  Ashley chose not to talk with the team and asked for all communications to be in writing.  She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations, her system access would be suspended.  Ashley disclosed confidential product-related information on Twitter, and this conduct on its own warrants termination.  In

addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns.  More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents she presented to Apple's ER investigator.  Based on her conduct, which violates Apple policies, the people team recommends that her employment be terminated.

So it seems here that this -- Ms. Bowman is alleging that the refusal to cooperate with the insisting on a written record was misconduct by the employee.  Have you ever seen employees disciplined for asking for a written record?

A    I cannot recall a specific example.

Q    Other than Ashley Gjovik?

A    Correct.

Q    And are you aware that -- no.  You already said you weren't aware there was an investigation into her concerns.

And this allegation is apparently about sharing information on Twitter, and you said you weren't aware of any of the actual content shared.

So the main -- based on the conduct, which violates Apple policies -- based on your support of

Aleks Kagramanov

the investigation into Ashley Gjovik, are there any Apple policies that you yourself could identify that Ashley Gjovik potentially violated in her exchanges with you?

A    I cannot recall specific policy.

Q    And if the termination of Ashley Gjovik was partially based on Ashley Gjovik's request to have a written record of her communication with you, would you say that's a reasonable justification to terminate an employee's employment?

MS. RIECHERT:  Objection.  Lacks foundation.

MS. GJOVIK:  Still has to answer.

THE WITNESS:  Refusal to participate would be considered misconduct.

BY MS. GJOVIK:

Q    That could justify termination?

A    Could be.

Q    Would it be reasonable to provide the employee notice that they could be disciplined if they refused to get on a call?

A    I cannot recall a process for that.

Q    And have you ever had employees request to, like, record the call so they can at least have a recording of the phone call?

A    I cannot recall a specific instance of that.

Aleks Kagramanov

Q    If Ashley Gjovik had said, if she can't have a written record, she'll get on the call if she can have a witness or record that call, would you have allowed that?

A    I cannot recall a specific policy or expectation for that.

Q    Would you have said no?

A    Me personally, when I facilitate interviews, I do not recall the meetings.

Q    What about if an employee asked to have a witness there with them?

A    We do not allow witnesses in confidential interviews.

Q    What if they want to bring their own lawyer?

A    In my experience, typically, we wouldn't include anyone as a witness, even including a lawyer, in a confidential investigation.

Q    So then in that case, if there's any dispute about what was said during the call, there would be no record to actually compare what was discussed to?

A    I tell employees they can take their own notes.

Q    But there's no recording or actual, like, admissible evidence, like, definitively saying what was actually said?

MS. RIECHERT:  Objection.  Lacks foundation as to what evidence is admissible.

MS. GJOVIK:  Sorry.  The evidence was too concrete.  I'll withdraw that part.

BY MS. GJOVIK:

Q   Okay.  So Ms. Bowman sent that email at 6:20.

Mr. Bertolus responded at 6:26 p.m.: Understood.  I agree with the termination decision.

And then Ms. Bowman responded again:  Here are the attachments you can send Ashley in the email notifying her of the termination.  We will also send this via FedEx tonight.  Here is her email address. Below is a text and subject line you can use.  Please copy on the email you send to her.

And you don't recall if Ms. Bowman was involved in your participation in this investigation?

A   I do not know who Megan is.

Q   Okay.  And then here, she wrote at 6:20 -- no.  That was the same email.

It says:  Yes, I agree.  And then she sends that.

And so Mr. Bertolus then sent a letter terminating Ms. Gjovik's employment.

And just to confirm, you were not aware that

Aleks Kagramanov

Ms. Gjovik was then terminated that same day that you reached out?

A    That's correct.

Q    Did you ever discover that Ms. Gjovik had been -- had her employment terminated by Apple related to this investigation prior to being called for this deposition?

A    I do not recall.  Yeah, I don't recall.

Q    Do you recall ever seeing any news coverage or social media discussion about Ms. Gjovik's complaints and disclosures?

A    I don't recall that.

Q    And then I'm now going to share Exhibit H. This is the letter from Mr. Bertolus to Ms. Gjovik, September 9th, saying:  Termination of employment. Apple has determined that you have engaged in conduct that warrants termination of employment, including but not limited to violations of Apple policies.  You disclosed confidential product-related information in violation of Apple policies and your obligations under the intellectual property agreement.  We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.  Your access to Apple systems has been suspended as of today, and your employment

Aleks Kagramanov

BY MS. GJOVIK:

Q   Okay.  So the employee said that in the emails that they had that affidavit coming up and was concerned, but I believe you testified that you did not recall ever escalating that or asking for feedback with the management team or anyone else; is that correct?

A   My recollection is that the -- I had legal counsel in partnership in that scenario.

Q   Oh, so you're saying that the email about the affidavit, that was shared with Apple legal?

MS. RIECHERT:  Objection.  Instruct him not to answer.  Attorney-client privilege.

MS. GJOVIK:  This lawsuit is like a sodoku puzzle with your privilege claims, Melinda.  I'm trying to put this together.

BY MS. GJOVIK:

Q   So okay.  If we're in that -- we're in that meeting and I ask that question point blank, you said you'd bring it to your management team.  Would that imply that you'd then cancel or pause that meeting so you could talk to them and figure out what to do?

A   I don't recall what the specific involvement was at that specific stage.

Q   So you just said, if the employee said, I

Aleks Kagramanov

A    I don't recall being notified of this.

Q    Okay.  And did Jenna Waibel and Ekelemchi Okpo -- you said these were your coworkers; right?

A    Correct.

Q    And they're named in this complaint.

There's a number of complaints I made that they -- the NLRB took action on.  And it includes in -- let's see.  What was this one? -- paragraph 8 on page 4, Section D:  About September 9th, 2021, respondent discharged its employee, Gjovik.  And then E, respondent engaged in the conduct described in paragraphs 8C and 8D including that termination because Gjovik engaged in the conduct described in paragraphs 8A and B, which is the NLRB -- the National Labor Relations Board, saying Apple suspended or terminated Gjovik.  Because of employee Gjovik concertedly complained to respondent regarding the wages, hours, and working conditions of respondent's employees by inter alia, raising workplace health and safety concerns, and engaged in the concerted activities for the purpose of mutual aid and protection by inter alia circulating in the petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting

do.  So I'd like to share Exhibit K with you.  This is Apple's privilege log.

So of course, I'm not asking you to disclose anything that's protected by privilege.  And Melinda will, of course, object to anything that touches that.  So I don't want to know the content of what's shared.

But this is a privilege log that Apple provided during the litigation, and -- for this case, and there are eight references to your name.  And I thought it might help you recollect perhaps the people you were talking to or messages sent about the case.  And maybe this helps -- this is information that Apple's counsel already shared in a privilege log.  So maybe not sharing more than this, if this is protected by privilege, but you could maybe remember which specific people you were talking to.

So with the first one, this is row -- it's really small.  I'm sorry.  They use, like, size 8 font.  This row 261 on September 9, there's a row for communications on messages app with attachments between Isela Perez, Adelmise Warner, Alex Kagramanov, and Joni Reicher.  And it says direct message with Warner, Kagramanov, and two others.

Do you recall texting with those three other

Aleks Kagramanov

people on September 9th about this matter?

A    I do not recall texting.

(Exhibit K was marked for identification.)

BY MS. GJOVIK:

Q    Okay.  Is it typical for you to text with HR or legal when you're assisting with investigations?

A    I think it's case by case on those situations.

Q    Okay.  And this text message does not include Sophi Jacobs from what I can tell.  So do you recall communicating with HR and legal but not including Sophi regarding this matter on the 9th?

A    I do not recall the nature of that exchange.

Q    Do you have any thought about what you would be talking to regarding this matter to HR legal without including Sophi?

A    Yeah, I do not recall what that exchange would have been.

Q    And let's go -- just so you recall who people are, this is Apple's little chart, actually.

So they have you as an employee relations business partner.  And Isela Perez is listed as corporate attorney manager for legal-HR.  Joni Reicher is listed as employee relations senior director for people support ops.

A   Correct.

Q   And let's see.  So for this one, we can go back to that 9/7 one.  Where did that go?

So on the 9/7 to 9/9, we have emails sent by yourself and Ms. Warner and Perez and Rice, all these executives, and the thread also had this Melissa Polinsky and Sophi Jacobs on it with 20 replies.

Does that help your recollection that's maybe the email where you got looped in on this investigation on the 7th?

A   I don't recall specifically.  Could be when I got looped in.

Q   And the subject line is listed by Apple as AG forward internal application Glimmer/Gobbler, privileged and confidential, and then attachment is AG talkingpoints.pages.

Do you remember anything about that?

A   I don't recall that specific attachment.

Q   Okay.  And then let's see.  Where's the other one?

We have another email on the 9th.  It's sent by you.  So this column, sent by you.  It's row 269, to Isela Perez, Debbie Rice, Adelmise Warner, Joni Reicher, and Deirdre O'Brien email with attachments and six pages.  And it was titled AG emails, with a

Aleks Kagramanov

screenshot 2021/09/09.  And this was just sent by you per Apple's record.  So you would have screenshot something and sent a message called AG emails.

Does that help your recollection if you were sharing the emails you had with Ashley Gjovik with other people at Apple?

A    I don't recall the specific nature of the attachments or the email exchanges.

Q    Okay.  Do you have any idea what else you would be sharing with them referencing AG emails at the same time you were emailing Ashley Gjovik?

MS. RIECHERT:  Objection.  Speculation.

THE WITNESS:  Yeah, I do not.

BY MS. GJOVIK:

Q    Okay.  Is it typical for you to send updates about the supporting employees through these investigations by global security to Deirdre O'Brien?

A    I don't recall a specific case.

Q    Other than Ashley Gjovik?

A    Correct.

Q    And do you recall who Deirdre O'Brien is?

A    I don't recall her specific title.  I believe it was, like -- she was, like, the head of HR.

Q    And retail, yes.

Aleks Kagramanov

BY MS. GJOVIK:

Q    And you say you worked in employee relations.  So, like, Deirdre O'Brien was, like, your boss, right, top boss; is that correct?

A    That would be correct.

Q    Frozen.  Sorry.

A    It's frozen.

Q    It's frozen.

But you said that Deirdre O'Brien -- so under Tim Cook, Deirdre O'Brien would be the highest-level person that you reported up under?

A    Yeah.  I believe that would be the case.

Q    Okay.  Did you regularly provide updates on any other cases or activities that you were working on to Deirdre O'Brien, that you recall?

A    No.  I don't recall a specific case.

Q    Other than Ashley Gjovik?

A    That's correct.

Q    Did you have any, like, updates you'd provide her?  Status updates?  Any meetings you'd have with her regularly, ongoing?  Any regular communication with Deirdre O'Brien?

A    No.

Q    Do you recall any other communication you had had with Deirdre O'Brien in those three years you

worked in that role?

    A    No.  I don't recall any since.

    Q    Other than the noted emails about Ashley Gjovik?

    A    That's correct.

        MS. GJOVIK:  Well, that's cool.  So when you had to meet Deirdre O'Brien, it was about me.

        Okay.  We're at 10:52.  I thank you for your time.  I know you don't work there anymore.  I appreciate you answering the subpoena and answering all my questions.  Again, it sounds like you just weren't provided a lot of information about this stuff.  So I appreciate you answering what you could answer, and thank you again for your time.

        MS. RIECHERT:  So I'd like to reserve the right of the witness to read and correct the transcript once he receives a copy of it.

        MS. GJOVIK:  Within the rules allowed under federal and California laws.  He can't just completely change responses.  You can correct errors and stuff, of course, within allowances, yeah.

        MS. RIECHERT:  And I'd like an expedited and a rough, please.

        MS. GJOVIK:  And, like, I'm filing my summary judgment motion in, like, a week.  So you're

E.    **<u>EXHIBIT E: MCKEON ALOE DEP.</u>**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M. GJOVIK,                      ) Case No. 23-cv-04597-EMC
                                       )
               Plaintiff,              )
                                       )
v.                                     )
                                       )
APPLE INC.,                            )
                                       )
               Defendant.              )
_____)



DEPOSITION OF ROBERT MCKEON ALOE

VOLUME 1, PAGES 1 THROUGH 107

FRIDAY, APRIL 3, 2026












Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10187852

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,                    ) Case No. 23-cv-04597-EMC
                                     )
              Plaintiff,             )
                                     )
v.                                   )
                                     )
APPLE INC.,                          )
                                     )
              Defendant.             )
_____)

         DEPOSITION OF ROBERT MCKEON ALOE commencing at the
hour of 1:04 p.m., on Friday, April 3, 2026, taking place
over the Zoom application before Kathleen Madden Keenaghan,
Certified Shorthand Reporter Number 14577, in and for the
State of California.

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 7th day of April, 2026.

_____

Kathleen Madden Keenaghan

CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

A    Yes.

Q    Okay.  Can you tell me about -- were there a lot of them or just a few?

A    I would like to clarify that Glimmer is not a user study itself.  It is an upload app.  It is an internal application, that it is not a user study in and of itself.

Q    Okay.  Thank you.  Is there a term or a proper term to use for the user studies that utilized Gobbler Glimmer?

A    Whatever user studies wanted to use that as the upload application, they could.

Q    Was -- so you are saying there might be other user studies doing a variety of stuff that use the tool as part of their user study?

A    Correct.

Q    And I think I'm trying to -- thank you.  I think I'm trying to narrow in on were there user studies specific to just getting the face ID development through Gobbler Glimmer, like, specifically targeting for the development of face ID?

A    All of our data collection efforts were to develop the algorithm.

Q    And were there general user studies for targeting that data versus a larger update for a software update?

A    No.  All the user studies we were doing were to develop the algorithm.  I don't understand what the

ATTORNEY RIECHERT:  He's not finished.

THE WITNESS:  Audio was not collected for these types of user studies.

BY PRO SE GJOVIK:

Q   Can you define this type of user study?

A   Using face recognition system.

Q   Okay.  And you are saying you signed this.  So you participated in the study with the thing in the parking lot and the sunlight?  You did that too?

A   I don't recall whether it was in a parking lot or somewhere else.

Q   It says this study will take place in Mariani B, and it will take 20 minutes?

A   Oh, yes.  Mariani 3B.

Q   So it was a while ago, but do you recall -- what I, kind of, remember it was this round compound with tall fences, and maybe two camp gates, and it was kind of a luau, where they had a task list for you to do to go through the data?

A   I don't recall exactly.

Q   Okay.  So this says that the study will last approximately 20 minutes, and the date of it is 2017.  Do you recall that when you signed this and participated in whatever version of this, 2017 was probably the year?

A   I believe so.

Q   Would -- if you were signing this informed consent form to participate in this program, and it said this program will last approximately 20 minutes, would you expect that this study would last for years after that 20 minute period without the additional ICF?

A   No.  I would not expect that.

Q   All right.  So if they wanted to extend or do something different, there would be another ICF to sign that was ongoing because it was limited to 20 minutes, right?

A   I would expect so.  Yes.

Q   Yeah.  And especially since it says the only compensation would be food -- I think you saw that the compensation would be food and beverage after the study, that further kind of implies that it would be that one time thing?

A   Yes.

Q   Yeah.  I think so too.  And then where it says your confidentiality obligations, this says by agreeing to participate in the study, you acknowledge that any information in the study, including any study detail or the fact of your participation are considered Apple confidential information and are covered by the applications under your agreements with Apple.

Can you tell me what you think that would mean after the product is announced that the study was preparing for?  So

at some point.

Q   Okay.

A   And we started putting the consent forms on the Box.

Q   Okay.

A   And once we did that, the Attache links died, and I also think the Attache links were time-limited.  I don't know how long.

Q   Interesting.

A   I don't know if they last forever.

(Exhibit 20 was marked for identification.)

BY PRO SE GJOVIK:

Q   Okay.  Thank you.  And then this is -- so this would be Exhibit 20.

Melinda, correct me if I'm wrong.

Bates 7783.  This is a screenshot I took on my customer phone when I was no longer an employee on iCloud look up, and it said this com.apple.vtap.thegobbler was trying to look at my iCloud.  Are you familiar with this URI?

A   No.

Q   This warning message.  Have you ever seen this before?

A   No.

Q   Based on your understanding of the Gobbler app -- well, let me back up.  First question, when you see something like this with something using the term the

Gobbler, would you expect that that was referencing some type of configuration prior to the name change to Glimmer?

A    Probably.

Q    Probably.  And if you are running an internal study using development phones, would you expect that the configuration would be trying to access a customer phone that is not used for work?

A    I don't.

Q    And what would the process be if, like, someone had left Apple, and they no longer work there, and they had their own personal device that they were seeing this kind of message that the Gobbler was trying to access their iCloud. How would they handle that?

A    I don't know that.  I have not looked at that.

Q    Okay.  Thank you.  That's fine.  And do you have any understanding of the backend or functionality of the Gobbler Glimmer application where they explain why it was trying to access a personal iCloud account?

A    I don't think so.

Q    Okay.  That's fine.  Thank you.  We are going to stop there on those.  I did want to ask you a couple of additional questions about these documents.  So going back to 7789 -- I really should have marked these with exhibits. I'm sorry.  I will do that next time.  On this document --

ATTORNEY RIECHERT:  It's Exhibit Number 7.

who is responsible for the data, and then they would go through a process to delete the data on the infrastructure servers, and then they would e-mail anyone who might have access to your data or downloaded your data or used your data locally and ask them to delete it and do their best efforts to do that.

Q   So does it track if anyone was accessing any of the data gathered, if there was an audit trail showing who did that?

A   I am not sure how the infrastructure set up for auditing who accesses the metadata.

Q   Okay.  Thank you.  And I am going to ask you a question.  Has there been -- what do you know about Apple's -- the type of VPN profiles required to install on employee phones that generally grant full disk access to Apple global security and allow them to monitor and access activity?  Can it access that Gobbler data and that Glimmer data?

A   Can what access Gobbler or Glimmer data?

Q   The profiles that employees are required to install on their phones that give new product security and global security full disk access to the devices so they can do their own backups of the data and monitor employee activity.

A   I am not sure.

Q   Are you familiar with those profiles?  Have you

installed those on your devices?

A   Yes.  I have installed them on my devices.

Q   They generally say they give full disk access, right?

A   I don't recall.

Q   Does it -- when you install them, do you remember any terms when it tells you about how much access it is going to give Apple to your device?

A   I don't recall.

Q   Would you think that it did give full disk access -- what does disk access mean?

A   I am not sure.

Q   Appear --

A   I would assume that it means, like, access to anything.

Q   Yeah.  That's generally what I thought too.  And so if the Gobbler is also like the UI of that backend data being gathered by other backend processes that you mentioned you are not even sure exactly what they are.  Assuming that data is being stored in the disk on the phone, right?

A   The data, from my understanding, is stored encrypted on the disk, and can only -- is only decrypted when the device is unlocked.

Q   What kind of encryption is used?

ATTORNEY RIECHERT:  Don't say anything

confidential.

THE WITNESS:  Whatever the iOS -- it's confidential, I'm sure, but I don't know what it is.  I just know that it is.

BY PRO SE GJOVIK:

Q   You don't know how it is encrypted?  Is it stored in the iOS in the cloud or just on device?

A   Just on device.

Q   Just on device.  But if there is a profile giving full disk access, it would give full disk access on that device too?

ATTORNEY RIECHERT:  Objection.  Hypothetical -- improper hypothetical.

THE WITNESS:  I do not have an answer for that.  I don't know.

BY PRO SE GJOVIK:

Q   Have you ever heard employee questions, concerns, complaints, about whether that data can be accessed by global security?

A   No, I have not.

Q   Have you ever heard any communications where it sounds like global security was trying to access that information?

A   No.  I have not.

PRO SE GJOVIK:  Okay.  Now I would like to go to --

thinking at the time when I wrote it.

Q   I don't think it is confidential either.  Have you gotten feedback on this article from anyone?

A   No.

Q   And I will ask you when we are done looking at a few more too, but in terms of we have seen so far, including this one, has Apple told you that your articles include confidential information?

A   They have not.

Q   And to be something published Eric we are looking at 2018, 2019, 2020 -- it is going back now eight years of articles, right?  And you have never had any feedback from Apple that you are publishing confidential information?

A   No.  I have never been told I was publishing confidential information.

Q   Yeah.  Have you ever been disciplined for publishing confidential information in these articles?

A   I have not been disciplined.

Q   Yeah.  You are a manager, correct?  Or you have worked as a manager at Apple?

A   I have worked as a manager.

Q   Yeah.  If you had team members publishing the articles that you are publishing, would you tell them that it included confidential information?

A   I would not.

Q    Would you discipline them saying that it was leaking confidential information?

A    I am not sure what the process is for leaking confidential information, in the sense that I have not gone through it, and I have not had an employee that has gone through it.

Q    If it was up to you to decide if your employee was publishing articles that included confidential information and you needed to seek guidance from HR about whatever the process is about determining whether to discipline them or not, would the articles that we showed, if that were your employees, would that trigger you to go to HR about that discipline process?

A    No.  It would not.

Q    I agree.  Have you gotten any positive feedback about the articles from any folks that we have looked at so far?

A    I am not sure from who, but people have made comments on the articles.

Q    And you do -- it looks like interviews, podcast interview sometimes.  Mostly it looks like with the coffee work, but you will talk about Apple too sometimes with the projects?

A    I only mentioned that I work at Apple when talking about Apple.

Q   So the image I showed you earlier on our exhibit of my face, you thought that was confidential?

A   Yes.

Q   Why?

A   Because it shows what the customer doesn't see in terms of the camera quality and resolution, as well as the flash quality and resolution.  And those things are confidential in how our algorithm functions and how our algorithm could be broken by hackers.

Q   Okay.  So how does that harm Apple by that information being revealed?

A   It gives hackers a better idea of a piece of information they would need to break into face ID, and it gives more information to our competitors on how, if they wanted to implement face ID themselves, how they would be able to do it.

Q   How would they use that image to get that information?

A   That information would be -- that image would be helpful for how our camera system works, and our flash system works in terms of the resolution and the quality, and it would be helpful information for them.

ATTORNEY RIECHERT:  I'm going to instruct you not to answer any confidential information beyond that.

PRO SE GJOVIK:  I cannot hear you, Melinda.

F.    **<u>EXHIBIT F: WARNER DEP. (EXCERPTS)</u>**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,

        Plaintiff,

    vs.              3:23-CV-04597-EMC

APPLE INC., a corporation,

        Defendant.

_____

REMOTE DEPOSITION OF APPLE INC.'S 30(b)(6)

ADELMISE R. WARNER

VIDEO-RECORDED VIA ZOOM

Tuesday, May 12, 2026

Reported by:
Layli Phillips
RPR, CRR, CSR No. 14402

Job No. 10190735

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ASHLEY M. GJOVIK, an individual,

        Plaintiff,

                     3:23-CV-04597-EMC

   vs.

APPLE INC., a corporation,

        Defendant.

_____


     Remote Deposition of ADELMISE R. WARNER, taken on behalf of Plaintiff, beginning at 9:09 a.m. and ending at 5:00 p.m., on Tuesday, May 12, 2026, appearing remotely via Zoom before Layli Phillips, RPR, CRR, Certified Shorthand Reporter No. 14402.

**Adelmise R. Warner**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed by me; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  May 12, 2026

_____
Layli Phillips
RPR, CRR, CSR No. 14402

experience and decisions and facts.

And that would be separate than what we're doing today, which is a deposition of a corporation where you're representing the corporation instead of yourself.

So because you have -- you're also a fact witness in this case, I would ask that when you're answering questions, if there's things where you would also have stuff you could answer that's based on your own personal experience that you try to distinguish that.

MS. RIECHERT: I'll object. I don't think that's possible, nor is it required. She's here as a 30(b)(6) witness. She can testify about things she's learned in preparation for the testimony, and she can testify about her own experiences on the subjects of the 30(b)(6). I don't think she can be expected to distinguish between what she knew as a percipient witness and what she learned in preparation for the deposition. I don't think that's legally required, and I don't think it's possible.

MS. GJOVIK: I would object to that and sustain this because I think it's very important that now basically if I was to depose her after this, it would be extremely complex to figure out what she actually did

and said and knew back then versus what she learned in preparation for this deposition and essentially sullied her as a fact witness because now she knows a lot more than she might have otherwise and we going to trial likely be called.

So we will have to separate things of what was specific to her own experience versus her preparation for this.

But I understand that that's kind of a -- usually they get someone that's, like, not involved to be the witness.

So I understand this will be kind of complex of flagging stuff.  So I might just ask follow-up questions if it sounds like it's something intersecting both to try to separate it, and that's why because I want to make sure that we're not combining two things in case we have to pull it apart later.

MS. RIECHERT:  I'll object to much of what you just said, including discovery is closed, so you can't take that deposition as a fact witness.

But if she can remember things that she knew individually, she's welcome to say it.  But she's under no obligation to do so.

MS. GJOVIK:  I said she could be called at trial.

Adelmise R. Warner

posted on Twitter, now X.  And those were deemed to be confidential and in violation of policies.

Q. Okay.  Was it one or more Twitter posts?  How many Twitter posts?

A. I don't know how many Twitter posts you had, but there were at least one Twitter post that had the confidential information that led to your termination.

Q. Can you explain what the confidential information was?

A. The actual image of the Face ID, the product, the recording you had.  And you probably recall on -- it was a study you were participating in that was on the Glimmer app at that time.  And that was an image that you had posted on Twitter, and you had also shared it.

Q. Sorry.  Can you distinguish the difference between posting and sharing?

A. You posted online.  You're sharing it online. I don't think there's a difference.

Q. You said posting and then also shared.  So I'm trying to get the specific details nailed, you know, really get them, the -- the final formal answer from Apple of exactly what they are pointing towards.

So can you confirm you're saying the confidential information that was shared leading to the termination as of the date of the termination that was

Adelmise R. Warner

decision was based on the images that you had specifically on Twitter that, as I said, Mr. Bertolus reviewed.

Q. Thank you.

And can you confirm the termination -- as of the date of the termination, it was just one Twitter post, is that correct, that was the -- giving rise to the termination?

A. There was at least one Twitter post.

Q. When you say at least, is Apple uncertain how many Twitter posts were considered?

A. I don't have the exact number.  You had posts and you had images that they looked at.  So the images were on Twitter.  And there were various of them.  But I cannot confirm for you how many you had posted that we were not aware of.

Q. Ms. Warner, that was not my question.

My question is when Apple was deciding to terminate my employment on September 9th, 2021, how many Twitter posts did they consider as the basis for the termination of that employment?

A. I don't have the exact number, but there was at least one.

Q. Okay.  And then can you confirm that as of the date of my termination, Apple is currently unsure how

Adelmise R. Warner

many posts were reviewed and were the basis of the termination?

A. No.  That was not my answer.  I think I've answered it a few different times for you.

Q. So you're saying at least one, which implies there's more than one.  But when I ask you if there's more than one, it seems like you're refusing to answer.

A. I think I have answered the question a few different times.  So I have not refused to answer your question.

Q. Okay.  So --

A. You don't like the answer that I'm giving, but I have not refused to answer the question, to be clear.

Q. I actually like your answer because it's inconsistent and helps prove my case.

I'm trying to get you to commit to something specific here, and Apple's refusal to commit to literally the bare minimum of the legitimate justification defense is actually extraordinarily helpful for my case.

MS. RIECHERT:  (Inaudible.)

(Reporter interrupts for clarification of the record.)

MS. RIECHERT:  Objection to your characterization.  Okay.  You're here to ask questions.

Adelmise R. Warner

You're not here to characterize the evidence or how it helps or doesn't help your case.

MS. GJOVIK:  All right.  That was prompted by the witness, but I'll move on.

BY MS. GJOVIK:

**Q. I would still like to ask a couple more questions at a high level about this first category --**

MS. RIECHERT:  One, by the way, I don't know that it's the first category.  Are you on the termination one?

MS. GJOVIK:  I'm still talking about the termination and the three categories of misconduct that Ms. Warner listed as the basis for the termination.

MS. RIECHERT:  Okay.  Topic 8.

MS. GJOVIK:  And then we're talking about the confidential information.

BY MS. GJOVIK:

**Q. Ms. Warner, you said there's at least one Twitter post.  And you said something about the image. Can you please provide more detail about what it was about this image that made it confidential?**

A. I think I've said before there were and the image had shown you were participating in a study and, again, that -- the Face ID specifically looking at that. You had provided screenshots, or at least you posted the

Adelmise R. Warner

screenshot of those images that were taken in the course of the study that you were involved in, and that information had shown potentially certain features of the tool or the actual Face ID product that was not yet released.

And the way it was set up was structured how you provided that image could reflect some of the confidential nature unreleased or the -- the how algorithm behind the scenes, if you will, information about that feature.

So that by itself was confidential, and it is my understanding that it was confirmed at the time of your termination that the image that you had posted included confidential information that had not yet been released to the public.

Q. Thank you, Ms. Warner.

Who confirmed that at the time of the termination?

A. Mr. Bertolus for one did confirm before he made the decision that, in fact, it was confidential.

Q. What was the basis for Mr. Bertolus's determination that it was confidential?

A. What do you mean by what's the basis?

Q. You said he determined it was confidential. I'm asking you what facts was -- what facts were

Adelmise R. Warner

members of global security, the members of the HR team or the people team, and legal counsel.

And those conversations led to the conclusion that the information you had shared, the images, specifically, were confidential.

Q. Thank you.

But can you identify the names of any of these people in these organizations that you're mentioning?

A. Megan Bowman is one of them. Again, conversations that may have happened were with counsel. To the extent of that, I'm not going to speak to that.

Megan Bowman who is in HR. And we had the global security team. Sophi Jacobs is one individual. And I've already mentioned Robert Aloe who was one of the individuals consulted.

Q. Thank you.

I just want to confirm again because we're talking about as of the date I was terminated. So did Mr. Bertolus consult with Mr. Aloe prior to my termination?

A. I've already answered that. He consulted with various folks who included conversations with Mr. Aloe.

Q. So you're saying Mr. Bertolus did talk to Mr. Aloe prior to terminating my employment about this matter?

Adelmise R. Warner

things that are wrong.  Apple changed its reasons, that's just not true.

So just ask the question, did Apple consider "The Verge" article, yes or no.  And then she'll answer that question.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple consider that "Verge" article called "Apple Cares About Privacy Unless You Work For Apple" when it decided to terminate my employment?

A. Apple considered the images and videos that you had posted or included, shared on Twitter and "The Verge" article.

Q. At the time it terminated me on September 9th, 2021, correct?

A. I've already answered that.  That was part of the reasons for your termination because there was -- it came to our attention that you had posted, again, the images, which, again, we can look at them, on Twitter, and you also had "The Verge" article.

Q. This is where I just want to clarify because you said also "The Verge" article.

So when Apple terminated my employment on September 9th, 2021, was one of the reasons for that termination content I shared with "The Verge" and where

Adelmise R. Warner

it was in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?

MS. RIECHERT:  Objection.  Asked and answered many, many times.

And objection also as to the word "content." She's told you it's the images.  I don't know why we keep going through this over and over.

MS. GJOVIK:  I would like her to answer this question.

MS. RIECHERT:  Okay.  So I'll object to the use of the word "content" with respect to "The Verge" article.

MS. GJOVIK:  Okay.

A. I've already answered the question in terms of the images that you had shared.  I don't have any other answer for you.

Q. I am uncertain of what your answer is based on the answers you've given thus far.  I would like a more -- so let me rephrase with pivoting from Melinda's objection.

Ms. Warner, at the time I was terminated on September 9th, 2021, was one of the reasons for that termination photos I shared with "The Verge" included in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?

Adelmise R. Warner

A. I've already answered; the images that you had shared on Twitter, which I understand you also had videos and images, similar images shared on -- with "The Verge," that was the basis for your termination.

Q. You're not answering my question.  I'm not asking about Twitter.  I'm asking about "The Verge" article, and you continue to answer this with, like, a caveat on "The Verge" that's not clear.

I'm asking -- I would like a direct answer about this "Verge" article if the reason I was terminated on September 9th, 2021, included images I shared and that were included in that "Verge" article.

A. I've already answered the question, Ms. Gjovik.

Q. Is the answer yes?  Because I don't know what the answer is based on your prior answers.

A. I've given --

MS. RIECHERT:  You can answer it one more time. Did Apple consider the images in "The Verge" article at the time it terminated her employment?

THE WITNESS:  The -- Apple did consider the images and videos that you had posted included in "The Verge."

BY MS. GJOVIK:

Q. Sorry.  I'm not talking about posted.  I didn't post anything to "The Verge."  "The Verge" is press.

Adelmise R. Warner

They write their own articles.  They have reporters.  So I'm not -- I don't want -- I'm not asking for your answer to have anything about Twitter or me posting or me sharing.

I'm asking specifically at the time Apple fired me on September 9th, 2021, was one of the reasons the images and/or videos or sequences in "The Verge" article called "Apple Cares About Privacy Unless You Work For Apple"?

A. I've already answered the question.

Q. Please answer it again, then, because I don't know what your answer is.

A. You can have the record read back.  I feel like I've answered this so many different times.

Q. This is a very fundamental question for this entire lawsuit, and the five-year dispute between me and Apple has an affirmative defense claiming it did not know about that article at the time it fired me.

So your answer to this question is extremely material for both Apple's supposed legitimate defense and my arguments about pretext.

And I need a very clear answer from Apple on this topic today, and I don't feel like I have it.  So I would like you to answer my question, please.

MS. RIECHERT:  Objection to all your

characterizations there as just being wrong.

MS. GJOVIK:  Mm-hmm.

MS. RIECHERT:  So I have not seen anything that says that Apple did not know about "The Verge" article.

But the witness has answered over and over it was the images in "The Verge" article and the Twitter post that were considered.  I don't know how many --

MS. GJOVIK:  Speaking objection.  You're the one that is going to get in trouble about this, too, Melinda.  You were biased on this.  So I'm going to ask you to stop with the speaking objections and testifying on behalf of Apple.

BY MS. GJOVIK:

**Q. And I'm going to ask Ms. Warner again, please, at the time I was terminated on September 9th, 2021, was one of the reasons I was terminated images or videos included in "The Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?**

A. I've already answered the question, Ms. Gjovik.

**Q. What was the answer?**

MS. RIECHERT:  One more time and be done with it, please.

THE WITNESS:  I feel like I keep saying the same thing over and over again.

Adelmise R. Warner

which complaints?

Q. Well, let's say any of the complaints that were in the issue confirmation I sent Mr. Okpo in August 2021.

A. Yes.

Q. What feedback did they receive?

A. One was with respect to the use, from what I had understood, of the use of the term "open kimono." That was -- and which it was in your issue confirmation; the feedback of the use of that term was one.

Q. Any more?

A. I would have to -- it -- well, for Okpo investigation, there was no others with respect to Mr. West or Mr. Powers.

Q. Mr. West testified he received feedback from Mr. Okpo regarding something you have not mentioned.

A. Yes.  There was for -- with respect to the restaurant, sorry, the restaurant sous chef for Mr. West, not Mr. Powers, there was feedback about the familiarity, his having a clearer line between professional and not.

That was another feedback that was provided both by Mr. Okpo and Helen Polkes, and that was one of the things that I had spoken with Mr. West about.

Q. Okay.  Are there any other topics of feedback

Adelmise R. Warner

that you have not mentioned?

A. I've talked about the open kimono.  With respect to that investigation, I don't believe so.

Q. What about the Waibel investigation?

A. There was feedback provided to Mr. Powers with respect to communications with you, better communications, and also role clarity, my understanding from that investigation.

Q. Okay.  Can you tell me more about the open kimono?  What was the nature of the feedback provided and any instructions given of how to correct the issue?

A. Just the use of that term or the phrase that I think you had raised concerns about just being mindful of using that reference.

Q. So generally don't -- try not to use that reference?  Is that --

A. What I've just stated in terms of what I understood.

Q. Regarding communications between me and Mr. Powers, what was the feedback provided about improving communications?

A. Finding more ways and Helen to work with you two to have better communications, interactions, clarity of role which were somewhat commingled because I think there was some concerns around your role and feedback

Adelmise R. Warner

being provided.

Q. Thanks.

For communication, though, was there anything more specific about what communication was at issue or how to improve communication other than the whole definition?

A. Nothing specific that I was aware of other than around just how you were interacting with each other because a lot of the concerns were around your interactions professionally and lack of clarity, et cetera.

Q. Yeah.

Can you give me any additional details about communication between me and Mr. Powers and any feedback he received on communication?

A. What was described in your issue confirmation with Jenna, some of those things, that would be the gist of it.  I don't have any specific without looking at the issue confirmation.

Q. Okay.  And then you said Mr. Powers and the restaurant and --

A. Mr. West.

Q. Or, sorry, yeah.

Mr. West and the restaurant, can you tell me more about the feedback you received?

Adelmise R. Warner

A. The feedback generally was around just having clearer boundaries, again, professional from the familial, it was some -- one of the concerns you had raised, just it's better to have that boundary from a skip-level senior leader and you, the familiarity.

Q. And how does that intersect with the dinner?

A. The concern was the interactions with you and what you shared with going to the dinner, the sous chef and all of that, that text messages, that goes back to the last point I had shared earlier on the exchanges.

Q. Yeah.

But what was the feedback Mr. West received?

A. I think I've already answered that.

Q. So are you -- when you -- just to not do -- not do that or?

A. I've explained the having clearer boundaries, professional, personal, separating the two.

Q. So that -- how does that play out with the text message thread and dinner?

A. Well, do you want to go through the text message threads in the dinner --

Q. No.  We've already done that on prior ones.

It's more about, like, was he being told to, like, stop texting Ashley like she's a friend?  Like, what was the actual feedback given to him?

A. The gist of it is to be able -- he's a leader, you're two levels down, to be able to have clearer boundaries; again, that's his recollection of the feedback I was provided.

**Q. But what's Apple's -- you're not testifying on behalf of Dan.**

**What's Apple's position on the feedback provided to Dan?**

MS. RIECHERT:  Objection.  I'll object to that as inaccurate.  She's entitled to obtain information in order to give testimony on behalf of Apple.  She did that.  She talked to Mr. West.  And she's testifying about what Mr. West told her.

MS. GJOVIK:  Yeah.  But I'm not asking what Mr. West said, and Apple would be responsible if Mr. West continued to do misconduct to other employees and would look back at this case of was he put on notice it was wrong, so this stuff is very material, and I'm asking Apple what feedback was --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK:  I'm sorry.

I'm asking Apple what feedback was provided to Mr. West specifically on this topic.

MS. RIECHERT:  Okay.  So first of all, you have

a lot of characterizations in there at the beginning that I disagree with and object to as assumes facts not in evidence.

Secondly, you asked and answered as to the feedback that Mr. West was provided.

MS. GJOVIK:  Okay.  So I'm asking this in more detail because Apple concurrently argues the same factual basis was misconduct by me justifying termination.

So if Apple also gave Dan West feedback that his conduct was inappropriate and I was complaining about his misconduct, that then runs contrary to my complaint being misconduct by me and justifying my termination.

So if Apple won't provide any additional information about what feedback was provided with Dan West, that refusal then becomes evidence itself.

So if there's anything else Apple would like to add in response to my inquiry on this topic, I invite Apple to do so.

Otherwise, we can move on, and we will count Apple's prior answer as Apple's complete answer to that line of questioning.

MS. RIECHERT:  Are you asking what is the difference between what Dan did and what you did?

Adelmise R. Warner

between the two of them, so --

MS. GJOVIK:  If she would like to answer, please go ahead.

THE WITNESS:  Yes.  You cut me off before I finished.

Your termination, you are comparing why you were terminated and the feedback to Mr. West.  I have explained the primary reason for your termination, in addition to the fact that you didn't cooperate.

And then the final thing, which you seem to be zeroing in on, is you actually gave a part of a text thread misleading the investigators on that, when ultimately the full text thread showed something very different.

In fact, you just characterized the -- what Mr. West did, and the text messages did not show that.

So your attempt to give false and/or misleading information, very different than what Mr. West was, again, being a bit familial.

So that was my complete answer.

BY MS. GJOVIK:

Q. Can you please clarify, though, what you think the difference is because there was very little facts shared in what you just said.

So what was the premise that my screenshots

showed that you say that the whole text thread then showed was somehow false?  What is -- please explain to me the narrative of that difference.

A. We can look at the text messages you provided Mr. Okpo with a single text which --

Q. Because I didn't have the full thread.

But we've reviewed the thread in detail now with multiple witnesses, so I don't think we have to spend an hour doing that today.

But you're Apple, so you must know why you fired me.  So please, Ms. Warner, as Apple, explain to me what exactly I misled about.

A. You just described, Ms. Gjovik, that he tried to have you sleep with -- and I don't know the exact word you used -- with the sous chef.  The text thread, the -- when you look at the whole thread shows a different picture.  It says something different, and so --

Q. Tell me about that picture.

MS. RIECHERT:  Wait.  She hasn't finished.

MS. GJOVIK:  Yeah.

A. We do need to look at it so we can compare it again.  I'm not -- I haven't, you know, gotten it all in memory in terms of everything.

But there was a multitude of texts exchanged

between you and Mr. West during the course of the dinner, and that tells a very different picture, which Mr. Okpo attempted to speak to you about, and even now looking at it is very different.

So that is the reason.  Those are different.  And we can look at it.  I know you don't want to, but it is important --

Q. No, we can.  We just don't have time because we have a hard stop, and Melinda already said that I can't have more time with you.  We don't have time to go over it again.

And I would expect that Apple would already know and have an answer on this and not want to spend just an hour reading those texts.

They are pretty weird, though.

Apple also has not provided what supposed texts I provided or why they're misleading.  And I was hoping to get that answer today.

So if you need to go read your stuff at lunch, I would really appreciate it because I would like an answer from Apple today based on stuff they should have prepared on.  If this was a formal reason they fired me, there should be an in-hand answer about exactly what text I provide, why they were misleading, and then why that full thread shows something different.

Adelmise R. Warner

And the only thing Mr. Okpo has testified to was that I texted the sous chef was cute, and that's all I know.

So I was really hoping to learn more from you today.  Would you be able to maybe read more during the lunch and read up on those -- that stuff or talk to your Apple witnesses so we can get an answer from you today, please?

MS. RIECHERT:  There's so much wrong with that question, I just don't even know where to start.

We have provided the text that you provided, the one text you provided.

Everything else you said was just absolutely false, and this witness has explained why it was that you were -- one of the reasons that you were terminated was providing misleading information about what the texts said when compared to the full texts.  So she's --

BY MS. GJOVIK:

Q. So what was different?  That's the open question.

And Apple has not identified which texts I've provided it thought was misleading.  If it does have that and can provide that, that would be helpful.  I don't currently have that information.

MS. RIECHERT:  Okay.  You don't have the texts

A. Again, without reading your issue confirmation, what I recall from reviewing it, you had used the word of being -- pimping and pandering, I believe, were the words.

You had mentioned that you were -- you didn't express any interest in Andrew.  I recall you also mentioned that you were pressured to give the phone number.

And then just earlier when you were asking me the question, you basically were indicating you were forced -- you were being forced to have, you know, relations or with Andrew.

The text messages, what I was explaining, showed something different where you were, in essence, voluntarily saying you would give Andrew your phone number.

That's one example I recall.

**Q. Okay.  And you said that you -- you recall -- and, I'm sorry, we don't have time to go back through all that.  I have, and I would have expected that you would probably read this beforehand to get prepared for it because we don't have time to go through every document with these type of documents.**

A. There's not a question there.

But I want to clarify, I have read them before.

Adelmise R. Warner

What you want me to do is recite for you what the actual text said.  There are multiple.

Q. No.  I'm asking for Apple -- because they haven't given me an explanation on this, so I'm hoping to get from Apple today an explanation, like a narrative or summary, more information than just what I already have from those documents.

MS. RIECHERT:  Objection.  Mischaracterizes what Apple has and hasn't provided you.  Mr. Okpo provided you a lot of information, as have discovery responses.

MS. GJOVIK:  Disagree with that, but that's fine.

BY MS. GJOVIK:

Q. So, okay, and you're saying that you -- Apple believes that in those documents, I indicated I had no interest in Andrew, like it was being forced on me, but then the texts show that was not true?  That's another example?  Is that right?

A. To restate what I've shared, and I'll try to do it as succinctly as possible, in your -- in the issue confirmation, the characterization of that incident or that event, that interaction painted one story.  The single text you provided showed one story.

The full thread indicated something different

Adelmise R. Warner

in terms of the story, the unwillingness to participate or engage or talk to Andrew or share the phone number. And I've given you some examples.

Again, without reading through each word of the issue confirmation, each word of the text, the point of the third reason was there was an understanding by Mr. Okpo that you were giving inconsistent, if not misleading, information, and he wanted to talk to you about that.  And you refused.

**Q. Oh, but it was just he wanted to talk without a written record.  And we talked about that earlier because I said I would talk to him.  I just wanted a written record.**

**And then you mentioned the pimping and pandering, the --**

MS. RIECHERT:  Hold on.  Object to that as misstates the testimony and the documents.

BY MS. GJOVIK:

**Q. The pimping you mentioned, it's a cause of action:  Pimping and pandering with indirect benefits. So, like, actually, that's, like, California Labor Code whistleblower disclosures or complaints making -- a allegation of a violation of a statute is an actual whistleblower disclosure.**

**And are you --**

Adelmise R. Warner

MS. RIECHERT:  Okay.  First of all, please don't recite the law because I'm just going to object. Ask a question.

BY MS. GJOVIK:

Q. Are you aware of the legal -- because -- so okay.

You were mentioning that the use of the term "pimping and pandering" as a sort of misconduct or basis of misconduct or the comparisons.

So I would like to ask if Apple is aware of the legal definition of a statute I was citing for pimping and pandering with indirect benefits and what the legal criteria is for that.

MS. RIECHERT:  Okay.  Objection.  Outside the scope of any of the topics --

MS. GJOVIK:  Protected activity.  Retaliation. Reason for termination.

MS. RIECHERT:  Calls for a legal opinion.  I think that's -- I'll stop at those two.

MS. GJOVIK:  Okay.  So if we leave it at that, though, it's basically like saying she said that we violated the NLRA and we think that's misconduct because we don't think we did, so her saying we violated the NLRA is misconduct.

If you want to leave it like that, we can, but

I was hoping to get more information about why Apple would think me citing the violation of a statute is misconduct.

MS. RIECHERT:  Okay.  First of all, that is exactly not what the witness said and so misstates the witness's testimony.

MS. GJOVIK:  That's why I'm trying to get more information.

THE WITNESS:  If you would allow me to, again, make sure I clarify, I did not state that you simply citing pimping or pandering is misconduct.

Very clearly, my testimony and what I understand is that you had characterized the interaction, and how you described what happened and what you provided to Mr. Okpo seemed to be different than what he was able to see from the text thread.  And he wanted to speak to you about it.  And you refused.

So the reason for that part of the termination was the misleading information and your refusal to speak to him.

I did not say your citing the statute or any legal argument you made was the basis for the termination.

BY MS. GJOVIK:

Q. Thank you.

Adelmise R. Warner

I was trying to do you a solid on that one because it sounded kind of bad, and I assumed it was not that wild.

But are you aware that Mr. West testified that he believed that there was a power imbalance that would prevent me from actually being able to consent to something like that?

A. That Mr. Powers testified?

Q. Or, sorry, Mr. West.  Not Mr. Powers.  Thank you.

A. Yeah.  Can you say that again?  Just, like, there's a lot there.

Q. Are you aware that Mr. West testified that he believed there was a power imbalance that would prevent me from actually being able to consent to something like that?

MS. RIECHERT:  Objection.  That misstates the testimony.

But you can answer if you're aware of his testimony.

THE WITNESS:  I am not.

BY MS. GJOVIK:

Q. Okay.  Are you aware that Mr. West and I had texted, and he had said it was one of the worst things he's ever done and confirmed that in his deposition?

A. I am not.

Q. Are your aware that Mr. Okpo testified that me requesting to have communications in writing on this specific issue was a reason he closed the entire investigation and stopped investigating all of my other complaints?

MS. RIECHERT:  Objection.  Misstates the testimony.

A. I do not believe that's what he said, so that is not an accurate characterization of what Mr. Okpo shared.

Q. If that's not true, did Apple continue investigating my complaints after I was fired?

A. Mr. Okpo -- the -- again, without disclosing any privileged investigation that had occurred, the investigation did not necessarily conclude with you simply refusing.  There were lots of other things Mr. Okpo had done.

And so how you're characterizing his testimony, again, I read his testimony; I don't believe that is accurate.

Q. Okay.  When did the investigation into my concerns complete, then?

A. Into which concerns?

Q. The issue confirmation.

Adelmise R. Warner

A. That Mr. Okpo was -- was investigating?

Q. Yeah.

A. Sometime around the first week of September, the first half of September, the 9th, I believe, or the -- right after that.

Q. So I was fired on the 9th, so that would stick with him saying he closed it on the 9th because I wouldn't get on the phone with him.

A. Well, the 7th, he did tell you based on the information he has he would close out his investigation. So that assumes --

Q. He never said that.

MS. RIECHERT: The record will speak for itself.

BY MS. GJOVIK:

Q. Okay. So I should have just let you continue because that's not what's in there.

But, okay, let's continue with this.

So Ms. Bowman sends Yannick this email. Within six minutes, Mr. Bertolus responds:

"Understood. I agree with the termination decision."

Did Mr. Bertolus and Ms. Bowman talk about this prior to Ms. Bowman's email?

MS. RIECHERT: Objection to the extent that it

Adelmise R. Warner

calls for attorney-client privilege that he was present at a meeting at which counsel was present at which privileged information was revealed.

A. Outside of any privileged conversations that may have happened including Ms. Bowman and Mr. Bertolus that I've talked to -- earlier about, I don't have any independent information to say he had spoken to her separate from that and what she said in her email here.

**Q. And in preparing for this deposition today, is there a reason you did not speak with Ms. Bowman to learn more from her experience in this?**

A. I had information that I needed specific to the topics that you had described that I needed to testify about.

**Q. Okay.  Well, like, for example, using the term "redacting" and us not being sure what that means seems it would have been helpful to talk to her to learn more.**

**Did someone tell you not to talk to her?**

MS. RIECHERT:  First of all, that's your characterization.  The witness said she had anything she needed.  And if anybody told her not to talk to her, it would be privileged.

BY MS. GJOVIK:

**Q. Okay.  In retrospect, do you think maybe you should have talked to Ms. Bowman prior to this**

Adelmise R. Warner

deposition?

A. No.  I had the information I needed to be able to testify this morning.  Asking me what she meant by a single word in an email being redacted, which I've explained what that would mean, I don't see the importance of the need to have spoken to her about it. I had what I needed.

Q. Okay.  Let's talk about this more.  So she says:

"Actively redacting relevant information from documents that she presented."

So how does that phrasing translate to providing screenshots without redactions?  Help me understand, please.

MS. RIECHERT:  Objection.  Asked and answered.

A. I've already answered that a couple different times, Ms. Gjovik.

Q. So this indicates, like, withheld information.

Does Apple believe that I had more information I could have provided but I chose to withheld?

A. Again, you are assuming what Ms. Bowman meant, but as I've testified earlier, you provided summaries of what you believed happened.  You provided a text message.  You did not provide the full exchange.

And Mr. Okpo was attempting to speak to you.

So whether you withheld it intentionally or not, that's what he was trying to talk to you about, and you refused.

Q. Okay.  So the issue confirmation indicates I didn't have it and I was trying to get it.  It was at my office.

So I'm trying to understand if Apple thinks I was intentionally withholding more information than I had.

A. Based on the information we had and what Mr. Okpo had, Apple believed you did have information or at least there was more to the thread than what you provided.

But more significantly, the story, the thread, the messaging, what happened, shows a different picture, a different story than what you had described to Mr. Okpo in the issue confirmation.

That's the crux of him trying to reconcile the inconsistencies in what you shared happened and what he seems to see was happening reading the full thread.

Q. So are you aware that Mr. Bertolus testified that he wasn't even aware that this was about the sous chef?  He thought this was about his personal friend who is the head chef.

A. Yes, I'm aware of that.  I read his testimony

that he did not know, and he mentions Andrew specifically.

But the point of this is the information that Mr. Okpo had he believed were inconsistent from what you had shared, not who the chef or sous chef was.

Q. And it sounds like Mr. Bertolus was provided this information by at least partially legal because he claimed privilege.

Do you think that maybe him being presented with information that led him to believe that this was a complaint about his friend, his personal friend, could have biased his decision making?

MS. RIECHERT:  Objection.  Lacks foundation.  Speculation.

MS. GJOVIK:  Yeah.  She can answer.

A. No, I cannot because I think you've said a few things that assumes he knew a whole lot of different things.  You said the information he had could have led to him being biased about his friend.  You just said he didn't know it was Andrew.

So I'm not sure which part of the question you want me to answer --

Q. He's not -- Andrew is not his friend.  His friend is Jared, the head chef.  He testified that he thought my complaint was about Jared, his close friend,

and he didn't realize it was about Andrew, the sous chef.

A. Okay.  What's the question?

**Q. Do you think -- do you think Mr. Bertolus mistakenly thinking my complaint was about his friend Jared could have biased Mr. Bertolus's decision making in deciding that I filed a frivolous sexual harassment complaint because he was led to believe that it was about his close personal friend?**

MS. RIECHERT:  Same objections.

A. Your question is asking me to assume what was in Mr. Bertolus's head, whether he had bias and whether it was considered his friend.

I have testified what Mr. Okpo was aware of and what was shared with the HR team, including Megan Bowman and what Megan shared with Mr. Bertolus, so I can't testify to do I believe a whole lot of different things that you said.

**Q. Sure.**

A. So I believe what he was provided, what was in front of him, and he considered that what Megan shared and what I've already testified about, that you, in essence, led the investigator to be misled into believing one thing when the evidence was showing something else.  That was the nature of what he

Adelmise R. Warner

considered.

Q. Does Apple have any concerns about that decision, now looking back and realizing the decision-maker didn't even know who the complaint was about and mistakenly thought it was his friend, and if the complaint is about me supposedly misleading people, but that decision-maker not even knowing what the complaint was about, that maybe there should have been a further investigation before a decision was made?

MS. RIECHERT:  Objection.  Compound.  Argumentative.  Vague as to what the question is.

A. Yeah.  I don't know.  Like, the -- your question has a lot of different things in there.

Again, repeating what I've said earlier, what was important, Mr. Bertolus was told that there was an investigation, and there was inconsistencies in the information you provided and what the investigator had.  And you refused to speak to the investigator about it.

Whether it was his friend or what he knew or what he now says he knows would not have changed the decision that was provided to him -- the information that was provided to him and the decision that was made.

Q. Does Apple stand by the integrity of their investigation into this matter?

A. Yes.

Adelmise R. Warner

Q. Okay.  Does Apple stand by the integrity of the decision to terminate me arising from this matter?

A. Apple stands behind the decision to terminate you for the reasons I've already stated multiple times and as Mr. Bertolus stated.

Q. Okay.  Thank you.

Okay.  So then he responds in six minutes and says:

"I agree."

And, I'm sorry, whatever tool they used for these documents cuts off date and time stamps, and it gets really messy.

But she sends:

"Please see attached.  Here's the attachments you can send to Ashley."

Do you know -- so Mr. Bertolus testified he did not draft that termination letter.

Do you know who did draft the termination letter?

A. Again, assuming your characterization of how Mr. Bertolus described the drafting, and then I don't have the specific words in front of me, but it is not uncommon to have the partners who were working with him, including Megan, HR, ER, and to be able to help draft the notification letter to the employee who is being

Adelmise R. Warner

MS. GJOVIK:  And you said privileged earlier.

MS. RIECHERT:  And privileged.

BY MS. GJOVIK:

Q. Is there anything you can still answer?

A. I have already answered the question a few different times, outside of any privileged investigation plan; I cannot answer that question.

Q. So that was Exhibit B, that email.

And then now I want to show you three photos. These were photos of Twitter posts that I deleted after that email from OMM in 2021.

And I would like you to let me know if any of these were the posts -- where is my screen share -- that Apple fired me over.

This is Exhibit C1.

(Deposition Exhibit C1 was marked for identification.)

BY MS. GJOVIK:

Q. Is this -- are these images that Apple terminated my employment over?

MS. RIECHERT:  Again, just looking at the image and not the words.  That's your question, right?

MS. GJOVIK:  Well, she said that Apple terminated me over images.

MS. RIECHERT:  Right.

Are you aware that Apple has used the ear scans as a justification for terminate me -- terminating me in different proceedings?

A. I believe you've -- I've already testified in terms of the extent of my knowledge on the ear scan.

But what legal proceedings that have been made a defense by counsel I am not aware specifically.

Q. So Apple code named the ear scans and the Glimmer and Gobbler stuff Alpha and Omega in their responses.

Are you aware of their use of the terms of "Alpha" and "Omega" as code names for these matters?

A. When you say these matters, I think it's a little confusing for me.  There's this matter where there have been summary judgments filed, interrogatory responses.  And then you have this letter and an administrative proceeding.

I have not seen this letter.  I am not privy to the administrative proceedings that this letter is referencing to.

I have seen at least the code names Alpha and Omega in, I believe, the interrogatories perhaps and the summary judgment -- I can't recall specifically which -- but not in the context of what you are asking me about for this administrative proceeding.

**Adelmise R. Warner**

MS. GJOVIK:  Okay.  So I'm going to show the interrogatory response.  Let's call this 6.

MS. RIECHERT:  Is this exhibit -- another exhibit?

MS. GJOVIK:  I was going to make it, yeah, an exhibit.  But it's already filed.

Sorry.  I'm so bad at multitasking all this. One moment.

So we'll call this E6.

(Reporter interrupts for clarification of the
       record.)

MS. GJOVIK:  Yeah, sorry.

Close current tab.  I'm trying to save it.  And that's why it's not saving.

Okay.  Try again.

(Deposition Exhibit E6 was marked for
       identification.)

BY MS. GJOVIK:

Q. Okay.  Here we go.  So this is Apple -- sorry. My computer is not cooperating.

This is Apple's interrogatory response, Set One.  This will be Exhibit E6.

This also has Omega.  So this is in Apple's interrogatory response as to why it says it fired me at the time it fired me on September 9th.  And it cites

Adelmise R. Warner

this Omega study, which is the ear scans.

Or I guess that's a question:  What is the Omega study, Ms. Warner?

A. I would -- it's -- and I would have to look at this entire interrogatory responses that described it. One was -- the ear scan was the Face ID.

So is that described in here without disclosing confidential information?

Q. It says on August 28th for Omega -- that was the date of the ear scan Tweets -- and then August 30th for Alpha, which would have met with the Gobbler stuff.

But Apple would be the best entity to know what it meant by using these terms.  I have been guessing, as is everyone else.

A. The terms would have been described in somewhere in there.  And, again, I'm not looking at the entire document.

Q. Okay.  So on behalf of Apple, can you tell me what Omega refers to?

A. Other than what's described here in the interrogatory that it is a study in connection that you had participated in.

Q. Mm-hmm.

A. Okay.  Can you scroll up, please?

Okay.  Scroll down.

Adelmise R. Warner

Well, in here, it says, again, the footnote:

"To safeguard Apple's confidential information, studies were referenced as Omega for purposes of this response."

So that was my point of do you want me to talk about a study that was deemed confidential?

Q. Well, does Omega refer to that Tweet about the ear scans?

A. One of the two does.  I believe it's -- I don't want to speculate which one is which without looking at the document that describes it.

Q. Is there a document that describes it?

A. I don't know.

Q. I would love to see if there is because I -- I have not seen a decoder ring for the code names.  Okay. So there's that.

And then we have -- okay.  I'm attaching Exhibit E4.

E4 was returned through a FOIA request to U.S. Department of Labor for Apple's filings to Department of Labor in their response.

(Deposition Exhibit E4 was marked for identification.)

BY MS. GJOVIK:

Q. In their response, Apple, via Orrick, included

on Exhibit 2 for 12, under Omega study includes what appears to be the ear scan Tweets.

So based on this, do we think that Omega means ear scans?

MS. RIECHERT:  You're asking this witness who has no knowledge about which is which to deduce something based on some exhibit that she's never seen before.  And I just object on that basis.  This is not --

MS. GJOVIK:  Otherwise, the witness representing Apple Inc. cannot actually decipher Apple's interrogatory response as to why Apple fired me.

And one of the reasons Apple appears to be indicating as to why it fired me is something Apple's own witness indicated is a reason they did not fire me.

So I'm just trying to get to the bottom of this.

MS. RIECHERT:  Okay.

MS. GJOVIK:  I would like to continue on this line of questioning if that's all right.

MS. RIECHERT:  So the witness is not here to talk about interrogatory answers.  Not here to talk about FOIA requests or DOL or anything like that.  So --

MS. GJOVIK:  We're talking about pretext, though, and so Apple's other administrative filings that

Adelmise R. Warner

show that Apple's responses in the retaliation civil litigation may be pretext is directly relevant to my showing.

MS. RIECHERT:  Right.  But you can make those arguments to the judge that the reasons are pretextual, but that's not what this witness is here -- she's here to tell you why the -- why you were terminated, and she's told you that.

MS. GJOVIK:  Yeah.  That's what we're doing. You can object where you think it's fine, but --

MS. RIECHERT:  I am.

MS. GJOVIK:  -- get that on the record.

BY MS. GJOVIK:

Q. I would also like to ask you, Exhibit 10 was submitted by Orrick and Apple regarding the -- that "Verge" article.  So this is a copy they submitted of "The Verge" article here.

And if you scroll down, you got all this text. Text.  Text.  Add text.  Image of the radar thing. Text.  And then the end.  That's the end.

So the evidence that Apple submitted of that "Verge" article doesn't actually include the photo or video in that "Verge" article that you mentioned was the basis for termination.

Why did Apple use evidence of an article that

referring to?

A. We already walked through the videos and the images.  This one may have been one where, again, if you scroll up, if that has the images in there, like, there are multiple pages, that would be included in there.

**Q. We just scrolled down, and this version of it didn't have the images or video in it.  It is in the article, but the example that Apple submitted is their evidence didn't include the photos or the video.**

A. Okay.  I can't speak to what was submitted in the evidence in the DOL proceeding.

**Q. Okay.  I'm sorry I have to do this.  It's the pretext.  I don't know if you've done retaliation cases, but it looked like you worked for Morgan Lewis, actually, so maybe you have done some of these.**

**This is the pretext back and forth.  I'm sorry.  It's probably exhausting.**

**Okay.  So I would like to now look at -- this one will be Exhibit -- okay.  So this is Exhibit L.**

(Deposition Exhibit L was marked for
identification.)

BY MS. GJOVIK:

**Q. This is the complaint I filed to the California Department of Industrial Relations against Apple on August 29, 2021.**

concerns about my physical safety?

MS. RIECHERT:  Objection.  Instruct you not to answer to the extent that came up in either Jenna Waibel's or Mr. Okpo's investigation.

BY MS. GJOVIK:

Q. Okay.  This email continues:

"Updated.  Spanking.  Found the full Dan/John panel with the Ashley, slash, spanking bit, but it included a bit more.  I uploaded the full video."

Ms. Warner, did Apple watch the video when Dan made spanking gestures when talking about how I -- I said keep him in line?

MS. RIECHERT:  Objection.

Instruct you not to answer with respect to anything that was done in connection with the investigations.

BY MS. GJOVIK:

Q. I also included complaints that Mr. West was making fun of Yannick's eyesight.  John was disrespecting someone's size and posture.

"Dan told a story where he was supposed to present on something but Yannick switched him out and had Dan's direct present instead, and Dan said he was mad until Yannick told him that

Adelmise R. Warner

Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan."

Ms. Warner, did Apple watch that video I provided?

MS. RIECHERT:  Objection.

Instruct you not to answer to the extent it related to anything that was done in connection with a privileged investigation.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple consider using Yannick as the final decision-maker in terminating my employment related to my sexual harassment complaint against Dan knowing that one of my open complaints was that Yannick was trying to obstruct future litigation in order to protect Dan?

MS. RIECHERT:  There's so much wrong with that question, I don't know where to start.

Assumes facts not in evidence.  Privileged as to who Apple decided to use as the decision-maker, assuming there was a decision to be made there.

MS. GJOVIK:  It's in the issue confirmation.  It's in the email.  So it is in evidence.  It's just a strange choice of decision-maker.

BY MS. GJOVIK:

**G.**    <u>**EXHIBIT G: WARNER DEP. (FULL/MINI)**</u>

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,

              Plaintiff,

                        3:23-CV-04597-EMC

     vs.

APPLE INC., a corporation,

              Defendant.

_____

REMOTE DEPOSITION OF APPLE INC.'S 30(b)(6)

ADELMISE R. WARNER

VIDEO-RECORDED VIA ZOOM

Tuesday, May 12, 2026

Reported by:

Layli Phillips

RPR, CRR, CSR No. 14402

Job No. 10190735

**Page 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,

              Plaintiff,

                        3:23-CV-04597-EMC

     vs.

APPLE INC., a corporation,

              Defendant.

_____

Remote Deposition of ADELMISE R. WARNER, taken on behalf of Plaintiff, beginning at 9:09 a.m. and ending at 5:00 p.m., on Tuesday, May 12, 2026, appearing remotely via Zoom before Layli Phillips, RPR, CRR, Certified Shorthand Reporter No. 14402.

**Page 3**

REMOTE APPEARANCES:

For the Plaintiff:

     A.M. GJOVIK CONSULTING, LLC
     By: ASHLEY M. GJOVIK
     In Pro Per
     2108 N Street
     Suite 4553
     Sacramento, California 95816
     (415) 964-6272
     ashleymgjovik@protonmail.com

For the Defendants:

     ORRICK, HERRINGTON & SUTCLIFFE LLP
     By: MELINDA S. RIECHERT
     Attorney at Law
     1000 Marsh Road
     Menlo Park, California 94025
     (650) 614-7423
     mriechert@orrick.com

ALSO PRESENT: Isela Perez, Apple in-house counsel

(Video-recorded via Zoom by Ms. Gjovik.)

**Page 4**

                I N D E X

WITNESS                              EXAMINATION

ADELMISE R. WARNER

     Examination By Ms. Gjovik                15

                E X H I B I T S

Plaintiff's                               PAGE

  Exhibit A      LinkedIn Profile              181

  Exhibit B      Termination Communication Apple    181

                 Produced Between Ms. Bowman and

                 Mr. Bertolus

  Exhibit C1     Photo of Twitter Post          209

  Exhibit C2     Photo of Twitter Post          211

  Exhibit C3     Photo of Twitter Post          212

  Exhibit D1     Business Conduct Complaint Filed   216

                 on August 29th

  Exhibit D2     Twitter Post About the Ear Scans   216

  Exhibit C4     Letter From O'Melveny & Myers      219

                 Law Firm, Mr. David Eberhart, on

                 September 15th, 2021

Adelmise R. Warner

**Page 5**

| | Exhibit | Description | |
|---|---|---|---|
| | Exhibit C5 | Letter From David L. Hecht to Apple on October 6, 2021, in Response to Letter From OMM | 219 |
| | Exhibit E1 | Letter Drafted By Orrick and Sent on Behalf of Apple on March 4, 2022, to the U.S. Department of Labor | 230 |
| | Exhibit E6 | Apple's Interrogatory Response, Set One | 233 |
| | Exhibit E4 | Apple's Filings to Department of Labor | 235 |
| | Exhibit L | Complaint Filed to the California Department of Industrial Relations Against Apple on August 29, 2021 | 240 |
| | Exhibit E2 | Letter From the U.S. Department of Labor Whistleblower Protection Program Regarding the Complaint Docketing the Case Under OSHA, CERCLA, and SOX | 242 |
| | Exhibit E3 | OSHA Online Whistleblower Complaint Form Filled Out on August 29th, '21 | 244 |

**Page 6**

| | Exhibit | Description | |
|---|---|---|---|
| | Exhibit M1 | EEOC Complaint Against Apple, Dual Filed With DFEH and Signed on September 9th, 2021 | 245 |
| | Exhibit M2 | EEOC form submitted on August 12th, 2021 | 249 |
| | Exhibit O | Finding From the California Unemployment Insurance Appeals Board From Unemployment Claim | 253 |
| | Exhibit F | Business Conduct Complaint HRC000045789, Filed on September 7th, 2021 | 255 |
| | Exhibit H | Apple Production 2258, Posted September 6, 2021 | 260 |
| | Exhibit F2 | Bates Number 2255 Posted By Plaintiff From Twitter Account | 261 |
| | Exhibit J | September 8th From Business Conduct to Ms. Rice and Ms. Warner, Subject: Ashley Gjovik, Bates Number 2256 | 263 |
| | Exhibit N1 | Production By Apple, Bates Number 1452, Email From Mr. Okpo to Mr. Lagares on July 21st, 2021 | 279 |

**Page 7**

| | Exhibit | Description | |
|---|---|---|---|
| | Exhibit R | Issue Confirmation, Plaintiff's Production 8-0178 | 289 |
| | Exhibit N | Apple Production 1277, Email Forwarded to Ms. Waibel From Ms. Polkes, HR Business Partner, April 21st | 298 |
| | Exhibit N2 | Email Exchange Between Mr. West and Ms. Waibel and Polkes Dated May 18, 2021, Apple's Production 1356, Five Pages Long | 306 |
| | Exhibit P | Apple's Production 861, One Page, Plaintiff Emailing Mr. Powers on May 10, 2021 | 310 |
| | Exhibit S | Plaintiff's Production 8-0026, Email From Plaintiff to Mr. Okpo on July 28, 2021, Referencing a Slack Conversation in the Women of SWE Channel on July 26, 2021 | 316 |
| | Exhibit T | Plaintiff's Production 8, Number 99, Email Plaintiff Sent Mr. Okpo on July 28th | 326 |
| | Exhibit U | Plaintiff's Production 8-222, | 329 |

**Page 8**

| | Exhibit | Description | |
|---|---|---|---|
| | | Email From Plaintiff to Mr. Okpo on July 29, 2021, and Mr. Lagares | |
| | Exhibit V | Email Plaintiff Sent Mr. Okpo on July 27th, 2021, Plaintiff's Production 8, Number 64 | 333 |
| | Exhibit W | Plaintiff's Production 8, Number 58, Another Email to Mr. Okpo on the 29th | 338 |
| | Exhibit X | Plaintiff's Production 8, Number 76, Forwarding an Old Email From Waibel; August 2nd, 2021, Forward to Mr. Lagares and Mr. Okpo | 341 |
| | Exhibit Y | Production From Apple, 1595, Forwarded Email Chain on August 17th, 2021; Plaintiff Emailed Mr. Okpo | 344 |
| | Exhibit Z | Plaintiff's Production 8-155, Email Sent to Mr. Okpo on September 3rd | 345 |
| | Exhibit Z1 | Plaintiff's Production 8-157, | 348 |

www.aptusCR.com

Page 9

Mr. Opko's Response on September 7th

Exhibit Z2    Plaintiff's Production 231,    352
August 20th, 2021, Email to Mr. Okpo

Exhibit Z3    Email From August 5th and    354
August 4th, Plaintiff's Production 8-49

(Quoted material appears as it was read.)

Page 10

PROCEEDINGS

9:09 a.m.

--oOo--

THE REPORTER: Good morning. My name is Layli Phillips. I am a California Certified Shorthand Reporter, CSR number 14402.

Please note it is imperative that everyone speak clearly and one at a time. Overlapping speakers are not discernible over the phone and cannot be reported.

Beginning with the noticing party, will counsel please introduce themselves and state whom they represent.

MS. GJOVIK: Yeah. My name is Ashley Gjovik, I am the plaintiff, and I am pro se, I'm not an attorney, so there's not counsel for the plaintiff side.

MS. RIECHERT: And my name is Melinda Riechert, and I am counsel for Apple and the witness.

(Witness sworn.)

THE REPORTER: Please proceed.

MS. GJOVIK: Thank you.

First, just a clarification question. Ms. Riechert, you said you are an attorney for Apple and the witness?

MS. RIECHERT: Yes.

Page 11

MS. GJOVIK: Can you please clarify if you have a separate attorney-client relationship with Ms. Warner outside of her role at Apple?

MS. RIECHERT: No. I represent her as the Apple-designated witness here.

MS. GJOVIK: Okay. Thank you for clarifying.

Okay. So good morning. We are on the record. This is May 12th, at 9:10 a.m. This is the videoconference deposition of Apple Inc. taken pursuant to Rule 30(b)(6) notice and the court's order at Docket 357 on April 22nd compelling Apple to appear at this deposition in the matter of Gjovik v. Apple, pending in the U.S. District Court of Northern California, Case 3:23-CV-04597.

My name is Ashley Gjovik, and I am the plaintiff.

Can the folks in the conference room please confirm if there's anyone else in the room with them or if it is just them?

MS. RIECHERT: Yeah. Isela Perez is also in the room representing Apple, in-house counsel.

MS. GJOVIK: And what is her title?

MS. RIECHERT: Counsel. We're not big on titles here. She's in-house counsel --

MS. GJOVIK: She's a senior director, I

Page 12

believe?

MS. RIECHERT: This doesn't matter. She's here.

MS. GJOVIK: Okay. All right.

Okay. And then just a reminder this is being recorded, video and audio is being recorded. It was in the notice. We have the stenography through the court reporter as well, and a copy of the audio video will be provided by me to Apple through the Zoom platform after the close of the deposition.

MS. RIECHERT: Yeah. We'll object to the use of the recording in connection with this lawsuit, either the video or the audio. The only official transcript is the one prepared by the court reporter.

MS. GJOVIK: That is the first objection you've ever made to the video and audio recordings that have been in every single one of my depositions thus far, Melinda. Can you please elaborate your position?

MS. RIECHERT: Yeah. We've explained it to you in email correspondence several times, which is the only official recording is the recording that the one the court reporter prepares, and you're not allowed to prepare your own transcripts. You're not allowed to make -- you're not allowed to use -- excuse me -- your own transcripts or your own recording in connection with

Page 13

the lawsuit.

MS. GJOVIK: Okay. We can discuss that later. But to clarify, you have never objected to the use of audio or video recording, and, in fact, you yourself sent notices that you also plan to also use audio-video recording as part of trial exhibits in evidence.

So just to clarify, this is a new conversation that I'm going to have to have with counsel after, but your objections are noted.

Can you also please clarify when you say that you're objecting to the use of audio video, of course it's not the official transcript. That's from the court reporter.

Are you objecting to the use of the audio-video recording at all as evidence in the proceeding?

MS. RIECHERT: Yeah. It's not used as evidence. The video that we did was official, used by an official videographer, and so that can be used. But the ones you're using through Zoom are not official, and so they cannot be used in connection with the case.

So I'm not objecting to your making the videos. And I'm not objecting to your trans -- using the -- making the Zoom recording, but I am objecting to your using them in connection with the case.

MS. GJOVIK: Okay. So you didn't object --

Page 14

make that objection for any of the prior depositions, so I believe that's waived, and you will need to follow up with me separately if you want to retroactively make that objection.

But we'll, you know, document your objection for the record in this proceeding, and we can dispute that later. Thank you for clarifying.

MS. RIECHERT: There's been correspondence over time where we explained to you that you needed to have an official court reporter and that if you didn't have an official court reporter, you --

MS. GJOVIK: Melinda, we don't need to --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: Melinda, as I said, we can discuss this later. I object to your framing of these prior discussion, and I don't agree with your framing of it, and I would like to discuss it after.

But as I said, we can note your objection for this deposition, which I believe is already on the record now, so we can move on.

Page 15

ADELMISE R. WARNER

the deponent herein, called as a witness, after having been first remotely duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. GJOVIK:

Q. Okay. Ms. Warner, I would like to have some preliminary questions for you, please. You were just sworn in by the court reporter. Do you understand that you're now under oath the same as if you were testifying in a courtroom before a judge and jury?

A. I do.

Q. Thank you.

And you understand that means you're required to give truthful answers to my questions today?

A. I do.

Q. Thank you.

You understand that even though we're on Zoom and in conference rooms, in a motel, this might feel informal, but giving false testimony under oath can subject you to penalties for perjury?

A. I do.

Q. Thank you.

And you see the court reporter. She's taking down everything that's said today; every question I ask

Page 16

and every answer you give, every objection Melinda lodges is going to be made into a written transcript.

Because she can only take down words, I really need you to give me verbal answers. So if your answer is yes, can you please say yes rather than only nodding your head?

A. Yes.

Q. Thank you.

I say instead of only because I also will nod and say yes and, like, I don't want to say you can't just nod.

A. I understand.

Q. Thank you.

Along the same lines, please try to let me finish my question before you start your answer, and I will do my best to let you finish your answer before I ask my next question. That way we don't talk over each other and the court reporter can hopefully get a clean record. Is that okay?

A. Yes.

Q. Thank you.

MS. GJOVIK: And then I'm going to ask Ms. Riechert, if you make objections, please just keep them to the -- a simple objection itself instead of long things or arguing or dispute. As the court reporter

Adelmise R. Warner

**Page 17**

already noted, that causes a lot of -- we end up talking over each other and wasting time, and it's hard for the court reporter to track what's being said.

So I want you to for sure be able to lodge your objections when you want to make objections, but just try to keep things on track, please.

BY MS. GJOVIK:

Q. And then, Ms. Warner, if at any point you don't understand a question I've asked, I really would like you to tell me, and I'll do my best to rephrase it. Will you please do that?

A. Yes.

Q. Thank you.

Is it fair to say that if you do answer a question I ask that I'm entitled to assume that you understood that question?

A. Yes.

Q. Thank you.

If you need a break at any point to use the bathroom or get water or stretch, that's fine. Just let me know.

The only thing that I ask is that if there's a question pending if you can please answer it before we go off the record. Is that agreeable?

A. That is. I do need to let you know due to

**Page 18**

medical conditions I have, I do need to be able to stand up and stretch at least once an hour.

Q. I also have medical conditions that cause me -- so that sounds great. We can take like hourly five minute or so and take a little break. Does that sound fine?

A. Sounds good. Thank you.

Q. Yeah, no problem.

Is there any reason you might not be able to give your best testimony today other than what you just noted?

A. There's no other reason.

Q. Okay. Did you meet with anyone to prepare for today's deposition?

A. Yes.

Q. Who did you meet with?

A. My counsel.

Q. And that's Ms. Riechert?

A. Ms. Riechert, yes.

Q. And without telling me what you and Ms. Riechert discussed, because I understand that's privileged, did anyone tell you what your answers should be to any of the questions that might be asked today?

A. No.

MS. RIECHERT: And I'll object on privilege

**Page 19**

grounds as to what was discussed.

MS. GJOVIK: Okay. But countering your objection, if you told her what to answer, that's unlawful, so there's no privilege for unlawful conduct.

BY MS. GJOVIK:

Q. Ms. Warner, did you review any documents in preparation for today's deposition?

A. I do want to go back to your question. I mentioned Ms. Riechert. I've also met with Ms. Perez who is in here, so but that's also our counsel.

Q. Okay. Thank you for clarifying.

Did you review any documents before in preparation for the deposition?

A. I did review some, yes.

Q. Roughly how many documents?

A. Quite a few. I've reviewed various ones that have been part of the case. I don't know the exact number.

Q. So part of the case as in like production, documents that have been produced --

A. Part of that --

MS. RIECHERT: Wait.

A. Yes.

Q. Do you recall which specific documents you reviewed?

**Page 20**

A. Some, yes.

Q. Which ones? Can you identify them?

A. Some of the policies I've reviewed. I've reviewed the issue confirmations that you had with the investigators. I've also reviewed the summary judgment motion and some of the declarations, a few others.

Q. The -- both summary judgment motions? There's two, the one I filed -- sorry, go ahead.

A. Go ahead.

Q. I was going to say, there's the one I filed and there's the one Apple filed.

A. The one Apple filed.

Q. So you have not reviewed the one I filed?

A. Correct.

Q. And is there anything you can share with me that you discussed that is not privileged?

A. Discussed where?

Q. In preparation for the deposition.

A. Other than with the attorneys, no. That's privileged.

I also met with Dan and Dave Powers, but that was also in preparation for this since I'm a 30(b)(6) witness.

Q. Okay. Thanks.

Ms. Warner, let's go back, then, to my question

Page 21

if you met with anyone in preparation for the deposition because your first answer was Ms. Riechert, but then you went back and added Mrs. Perez, and now you've gone back and added Mr. West and Mr. Powers.

So is there anyone else that you met with in preparation for today's deposition you have not mentioned so far?

MS. RIECHERT: Objection to your characterizations.

You can answer the question.

A. There is no one else. I will clarify that you moved to the next question before I finished listing who I met with.

Q. Okay. So your complete answer, then, would be Ms. Riechert, Ms. Perez, Mr. Powers, and Mr. West?

A. Yes.

Q. Okay. So to confirm, you did not meet with Mr. Okpo or Mr. McKeon or Mr. Bertolus?

A. I did not.

Q. Can you share what you discussed with Mr. West?

A. I've discussed with them some of the concerns that they had received in this case.

Q. For Mr. West?

A. For both, from you.

Q. Sorry. Can you -- I'm confused. Can you

Page 22

clarify which for each person what was discussed?

A. I discussed with them questions because one of the things I'm testifying about is about complaints raised to them, so I discussed that with them.

Q. Oh, so the complaints I would have raised directly to them?

A. Yes.

Q. Before I was terminated assumably.

A. That would be yes.

Q. Yeah. Okay.

Did you discuss Mr. West's deposition with Mr. West?

A. No.

Q. Have you read the transcript from Mr. West's deposition?

A. No.

Q. Okay. Sorry. I'm never done -- these are my first depositions, and I'm learning this all as I go. It's really complex.

Okay. Ms. Warner, have you ever been deposed before?

A. No.

Q. This is your first time? Oh, that makes me feel better about me doing my first depositions the other way.

Page 23

Let's see, when were you notified or agreed to be the witness for Apple in this deposition, or, I guess, when did you confirm that you would be the witness for Apple in this deposition?

A. Okay. There are three questions there. Which one do you want me to answer?

Q. Sorry. Yeah. I just withdrew the prior ones and say when did you confirm that you would be the witness for Apple in this deposition?

A. Between the time you had -- I received the notice through my counsel and now, I don't know the exact date.

Q. Roughly how many days ago?

A. The last week and a half or week.

Q. The last week. Okay.

And then who contacted you about it? Was that Ms. Riechert?

MS. RIECHERT: That would be privileged.

MS. GJOVIK: Not the identities of the lawyers is not privileged.

MS. RIECHERT: What they discussed would be privileged, so if they are -- if they told her she was going to be the deponent, then that would be a privileged communication.

MS. GJOVIK: Well, I'll have to do some

Page 24

research.

She's a very good lawyer. Melinda is very good with her objections.

BY MS. GJOVIK:

Q. Okay. Do you have any documents in front of you in the conference room right now?

MS. RIECHERT: We have documents in the conference room, but they are in binders, and they are not -- she doesn't have them open.

MS. GJOVIK: I'm sorry. Objection. That question was for Ms. Warner, not Ms. Riechert, so that was a speaking objection.

BY MS. GJOVIK:

Q. Ms. Warner, do you have any documents in the conference room with you?

A. There are lots of documents in the conference room in binders, yes.

MS. GJOVIK: Okay. I would ask that if you guys are going to reference any of those documents that you please let me know, like ask that you would want to pull it up and review it or read it, or if you read it on breaks you let me know just to ensure that the -- we understand where the substance of the answers are coming from.

A. I understand.

Page 25

Q. Thank you.

Similarly, if you guys need to take breaks to discuss, like consult counsel or something, that you disclose that's what's happening and if there's anything you can share from what is discussed to the -- to share that afterwards, please.

A. You're saying you want me to discuss what I discuss with counsel during a break?

Q. I would like either -- I would at least like a disclosure that if you guys need to have a consult that that's what is occurring, that you want to have that conversation between counsel versus just saying it's like a bathroom break if it's actually just to talk to lawyers.

MS. RIECHERT:  That's actually not legally required.

MS. GJOVIK:  So you're going to say no?

MS. RIECHERT:  Right.  What -- the reasons for breaks, what was discussed during breaks is not legally required, and it would be privileged.

BY MS. GJOVIK:

Q. Okay.  Okay.  So can you please, again, state your full name for the record, Ms. Warner.

A. Adelmise Rosemé Warner.

Q. Thank you.

Page 26

And what is your current job title at Apple?

A. I am a senior director of global employee relations.

Q. How long have you held that position?

A. For almost six and a half years.

Q. And how long have you been at Apple?

A. Same time.

Q. What was your prior position at a different company before Apple?  What -- sorry.  Let me rephrase.

Where did you work before Apple?

A. I worked at Pandora and SiriusXM.

Q. What was your position there at the time you left?

A. When I left, I was leading diversity and inclusion and learning and development.  I had various other roles at Pandora.

Q. And around what time did you join Apple?

A. January of 2020.

Q. And who do you -- who did you report to at Apple when you joined?

A. Joni Reicher.

Q. And who do you report to now?

A. I report to Deirdre O'Brien.

Q. And around August and September 2021, who did you report to?

Page 27

A. Joni.

Q. Do you have people who report to you?

A. Yes.

Q. Roughly how many people report to you?

A. Currently direct reports or total?

Q. Total.

A. Total is roughly about a hundred, a little less.

Q. Did the employee relations investigators report to you?

A. Yes.

Q. So Ekelemchi Okpo would report to you?

A. Not directly.

Q. But he'd be in your organization?

A. Not -- not at this time, no.

Q. Around August -- around July through September 2021 was Mr. Okpo in your organization?

A. Yes.

Q. At the same time was Ms. Jenna Waibel in your organization?

A. Yes.

Q. Around the same time was Mr. Aleks Kagramanov in your organization?

A. Yes.

Q. So those are the three employee relations

Page 28

investigators in my case.  I just wanted to confirm.

And then as of now, are any of those in your organization, any of those people I named?

A. As of when?

Q. Now.

A. As of now, no.

Q. Did your role change since then?

A. No.

Q. Did they transfer to a different organization?

A. No.  One did, yes.

Q. Oh, Mr. Okpo moved to like a labor relations role I believe.  Is that right?

A. Currently Mr. Okpo is in labor relations.

Q. Why do Mr. -- oh, sorry.

So Mr. Kagramanov no longer works at Apple is probably why he's not in your organization.

And then Ms. Waibel, why is she no longer in your organization?

A. She is not at Apple.

Q. She also left Apple.  Okay.  Thank you.

What are your day-to-day responsibilities as of today?

A. That's quite a broad question.

Q. I know.

A. Is there something specific you want to know

Page 29

that I do or?

Q. Yeah. So based on what content is in your answers and how it's used in the case, I just want to make sure that there's a baseline of what your role and knowledge and understanding of things at Apple is. And so this is me trying to suss out some of those details just for context if that helps makes sense.

A. Maybe rephrasing the question would be helpful so I can answer it for you.

Q. Yeah.

How would you briefly describe your current role at Apple?

A. I lead the global employee relations function. That means I'm responsible for anything that is referred in terms of concerns by employees to the employee relations team. My team handles them. They do investigations. They conduct investigations to partner with the business.

And I also have a team that oversees accommodations and operations for the ER function, so I lead that function.

Q. Thank you.

Is that Americas or global?

A. I think I said global employee relations, yeah.

Q. Global. Okay. Thank you.

Page 30

Did you have any direct involvement in this case yourself outside of your role as the witness for Apple today in this deposition?

MS. RIECHERT: Objection to the word "this case" as vague.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

Q. Ms. Warner, are you also a fact witness in the Ashley Gjovik v. Apple Inc. civil litigation that we're having this deposition about today in addition to being a witness for Apple corporate during this deposition?

MS. RIECHERT: Same objection. Vague.

MS. GJOVIK: I think that's pretty specific.

BY MS. GJOVIK:

Q. Go ahead.

A. I'm not sure what you mean if I'm a fact witness in addition to my current role here at this deposition.

Q. Yeah. Let me rephrase.

A. Thank you.

Q. Yeah.

So, Ms. Warner, if you were asked to testify about your own personal experiences with this case in 2021, would you have personal experiences that you could testify to in addition to you currently representing the

Page 31

corporation generally right now?

MS. RIECHERT: Same objection as to the use of "this case." Are you talking about the lawsuit?

MS. GJOVIK: This lawsuit.

MS. RIECHERT: So did she have any personal involvement in the lawsuit is what you're asking besides this.

MS. GJOVIK: In the subject matter underlying this lawsuit.

BY MS. GJOVIK:

Q. So how about this? Ms. Warner, you were noted as someone who was involved in the termination of my employment back in 2021, which indicates that you were personally involved in the termination of my employment. But you are here today representing Apple Inc. as a corporation.

So I am asking you to summarize your personal involvement, if any, in the termination of my employment and related matters -- leave, investigations -- that separate from you today just representing Apple.

MS. RIECHERT: And don't reveal any privileged communications or work that you did.

THE WITNESS: Thank you.

I think this question has multiple parts. So if you are asking whether I was involved in the decision

Page 32

to or the conversations that led to the decision to terminate you, the answer is yes.

BY MS. GJOVIK:

Q. Okay. So I would ask, then, when you're answering questions on behalf of Apple to distinguish if there's anything that you may be answering from your own personal experience, so when I say -- sorry.

Ms. Warner, are you an attorney?

A. I have a license. I am not practicing as an attorney.

Q. Okay. How long have you had an attorney to -- licensed to practice law?

A. I graduated from law school in 2001.

Q. Did you practice law?

A. Yes.

Q. How long did you practice law?

A. Roughly 17 and a half years.

Q. That's a long time.

So, Ms. Warner, you assumably understand what I mean when I say fact witness that you would be someone that I could call that I could depose you -- so I could depose you potentially directly instead of this Rule 30(b)(6), that I could say, Ms. Warner, tell me about the investigations into me, the decision to terminate me, and you would be testifying on your own personal

Page 33

experience and decisions and facts.

And that would be separate than what we're doing today, which is a deposition of a corporation where you're representing the corporation instead of yourself.

So because you have -- you're also a fact witness in this case, I would ask that when you're answering questions, if there's things where you would also have stuff you could answer that's based on your own personal experience that you try to distinguish that.

MS. RIECHERT: I'll object. I don't think that's possible, nor is it required. She's here as a 30(b)(6) witness. She can testify about things she's learned in preparation for the testimony, and she can testify about her own experiences on the subjects of the 30(b)(6). I don't think she can be expected to distinguish between what she knew as a percipient witness and what she learned in preparation for the deposition. I don't think that's legally required, and I don't think it's possible.

MS. GJOVIK: I would object to that and sustain this because I think it's very important that now basically if I was to depose her after this, it would be extremely complex to figure out what she actually did

Page 34

and said and knew back then versus what she learned in preparation for this deposition and essentially sullied her as a fact witness because now she knows a lot more than she might have otherwise and we going to trial likely be called.

So we will have to separate things of what was specific to her own experience versus her preparation for this.

But I understand that that's kind of a --usually they get someone that's, like, not involved to be the witness.

So I understand this will be kind of complex of flagging stuff. So I might just ask follow-up questions if it sounds like it's something intersecting both to try to separate it, and that's why because I want to make sure that we're not combining two things in case we have to pull it apart later.

MS. RIECHERT: I'll object to much of what you just said, including discovery is closed, so you can't take that deposition as a fact witness.

But if she can remember things that she knew individually, she's welcome to say it. But she's under no obligation to do so.

MS. GJOVIK: I said she could be called at trial.

Page 35

BY MS. GJOVIK:

Q. Anyways, okay. So, Ms. Warner, do you understand that you have been designated by Apple to testify on its behalf today pursuant to Rule 30(b)(6)?

A. I do.

Q. Do you understand that your testimony today will be the testimony of Apple Inc. and that Apple Inc. will be bound by your answers?

MS. RIECHERT: She's testifying on behalf of Apple Inc. The legal ramifications of that we can discuss. I'll object to asking for a legal opinion.

MS. GJOVIK: That's kind of a speaking objection. And I think it's important that she understands her role. If she does not understand that the things she says today are binding on Apple Inc., then we probably have to cancel and circle back because that would put all of her testimony at issue, so I'm going to ask that she answer that question.

MS. RIECHERT: She understands she's appearing as a 30(b)(b) witness on behalf of Apple Inc. The legal consequences of that can be determined by the court.

MS. GJOVIK: Okay. Speaking objection. You're testifying on her behalf, which is not proper. That's very improper, Melinda. You know better than that.

So let me rephrase, though.

Page 36

BY MS. GJOVIK:

Q. Ms. Warner, do you understand that your testimony today is going to be considered on the record as testimony made by Apple Inc. instead of yourself?

A. I understand that I am responding to a 30(b)(6) and that I am here testifying on behalf of Apple, yes.

Q. Okay. And do you understand that today you're required to testify not only based on your personal knowledge but based on all information known or reasonably available to Apple Inc.?

A. All information relating to the topics that I was notified to testify about, yes.

Q. Yes. Thank you.

Has it been explained to you that the company Apple Inc. had a duty to prepare you to testify about the information that is reasonably available to it related to the topics of this deposition, including documents, current and former employees, and other sources?

MS. RIECHERT: Objection. Calls for attorney-client privilege.

Instruct you not to answer.

MS. GJOVIK: Unless you guys didn't do it. If the answer is no, I don't think it's privileged.

MS. RIECHERT: I'm not going to discuss what we

Adelmise R. Warner

Page 37

did or did not discuss with the witness in preparing for the deposition.

BY MS. GJOVIK:

Q. Okay. So, Ms. Warner, you said that in preparation for today's deposition, you met with Ms. Riechert, Ms. Perez, Mr. West, and Mr. Powers. And you said that was the complete list of people.

So can you confirm that in preparation for today's deposition of you presenting on behalf of Apple Inc. that you did not meet with any other witnesses?

A. I think I've already answered that, but yes, again --

Q. Thank you.

A. -- in preparation for this deposition since I received the notice.

Q. Yeah.

Okay. And then I just want to go over the topics today just to confirm, these are the topics ordered by the court and which Orrick had emailed that they -- I believe that were going to be slotted for today with you testifying as the witness.

We have Topic 4, which is:

"Any complaints, reports, or concerns raised by Gjovik regarding environmental, health, and safety conditions, regulatory compliance,

Page 38

privacy invasion concerns, discrimination, retaliation, or harassment from 2020 to 2021; and defendants response thereto."

MS. RIECHERT: She's only testifying to some of that topic, not all of that topic.

MS. GJOVIK: I was -- I was about to say that before you interrupted me.

BY MS. GJOVIK:

Q. They said that was a split one, so can you please clarify which topics in that group you are testifying to today?

A. I'd like to pull my -- the notice that I received just to --

Q. Yeah.

A. -- make sure I'm speaking accurately.

Topic 4, I will speak to the privacy invasion concerns, discrimination, retaliation, or harassment.

Q. Thank you.

But not regulatory compliance?

A. Correct.

MS. GJOVIK: Ms. Riechert, is regulatory compliance targeted for 5/14?

MS. RIECHERT: Yes.

MS. GJOVIK: Okay. Thank you.

Page 39

BY MS. GJOVIK:

Q. And then for Topic 6, we have:

"Any investigations conducted by or on behalf of defendant into Gjovik's conduct or performance in 2020 through 2021, including the basis, scope, and outcome of each."

Is that on -- you're planning to testify to that today, Ms. Warner?

A. Yes.

Q. Thank you.

Same question for Topic 7:

"The decision to place Gjovik on administrative leave, including the reasons, the decision-makers involved, and the information they considered."

Is that something you're testifying to today?

A. Yes.

Q. Thank you.

Topic 8:

"The decision to terminate Gjovik's employment, including the reasons, timeline, investigation, the decision-makers involved, communication to Gjovik, the information they considered, and any alternatives considered."

Is that something you're planning to testify to

Page 40

today?

A. Yes.

Q. Thank you.

And then Topic 9:

"Defendant's knowledge of and response to Gjovik's charges or complaints filed with the EPA, NLRB, Department of Labor, EEOC, DFEH/CRD, and DIR prior to termination, or other agencies."

Is that something you're planning to testify to today?

A. Only to the extent of what I am aware we had knowledge, Apple had knowledge of, yes.

Q. Okay. And then finally, Topic 14:

"Any investigations into Gjovik's 2020 through 2021 complaints, including findings, outcomes, and timelines and decision-makers."

Is that something that you're planning to testify to today?

A. Broadly speaking, yes.

Q. Thank you.

Am I missing anything?

A. I don't know. I'm not aware of any other topics --

Q. Okay.

Page 41

A. -- that's been notified for me.

Q. Okay. Thank you for confirming all that.

Approximately how much time, Ms. Warner, did you spend preparing for this deposition?

A. Approximately maybe equivalent of two days.

Q. Ms. Warner, did you review any deposition transcripts -- sorry. That's my dog, Captain. He's a good guard dog with squirrels.

Did you review any of the transcripts of the depositions conducted this far in this litigation in preparation for this deposition?

A. Yes.

Q. Which ones?

A. I reviewed Yannick Bertolus's deposition transcript.

Q. Okay.

A. I also reviewed Ekelemchi Okpo's deposition transcript.

Q. Thank you.

Did you review the company's responses to written discovery in this case, including interrogatories and requests for admissions?

A. Yes.

MS. RIECHERT: Objection. Compound.

Page 42

BY MS. GJOVIK:

Q. Okay. Did you review privilege logs?

A. No.

Q. And interrogatories.

Okay. Were there any documents you wanted to review in preparation but were unable to access in time?

A. I'm not sure how to answer that question. No.

Q. If there was -- okay. You said no?

A. Correct. I don't know what you mean by wanting to review. But --

Q. Oh, like if there was a complaint filed or some -- like the issue confirmation, I want to read that, and you couldn't get it in time before then, you'd be like, well, I wanted to see the issue confirmation, but I didn't have time to read it.

A. Is that an example of a question you're asking me?

Q. Yeah. That's what I mean, like if there's something specific you wanted to review and didn't have time.

A. No.

Q. Okay. Thank you.

Did anyone at the company or counsel for the company tell you you should not review certain documents and -- or should not speak with certain people?

Page 43

MS. RIECHERT: Objection to the extent it calls for attorney-client privilege as to what she was or was not told by counsel.

MS. GJOVIK: But if they told her to do that, it's unlawful and not privileged.

MS. RIECHERT: Objection to that statement as well.

A. Can you rephrase that, please.

Q. Yeah.

And let me ask it as two questions so it's not compound.

Melinda's objections do help me ask better questions. It gives me time to iterate.

Did anyone at the company or counsel for the company tell you you should not review any documents in preparation for today's deposition?

MS. RIECHERT: Again, objection. Attorney-client privilege as to what she was or was not told by counsel. But if she was told that by other than counsel, she's welcome to answer.

A. I was not told that by anyone other than counsel.

Q. Okay. And then did anyone at the company or counsel for the company tell you to not speak with certain people in preparation for today's deposition?

Page 44

MS. RIECHERT: Same objection as to attorney-client privilege.

Instruct you not to answer as to any discussions with counsel.

A. The answer is no, same as before.

Q. Is there anyone with the company who knows more about these topics than you do?

A. I have no idea how you want me to answer that. I don't know.

Q. Okay.

A. I'm here to testify as a person who has most knowledge about the information. So I think that probably tells you the answer.

Q. It's not exactly what I was looking for.

I'm sorry. Some of these questions are weird. Part of this is me figuring out how this works. Part of this is Apple being kind of dodgy about stuff.

Let me try and dig in and figure out what's going on --

MS. RIECHERT: Objection to your statements --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: I'm sorry, ma'am.

MS. RIECHERT: Objection to your statements that Apple is dodgy about this or anything else.

Page 45

Absolutely not true.

BY MS. GJOVIK:

Q. Okay. Anyway, so sorry if some of my questions seem odd. They are all being asked for some reason, and I will try to ask them more clearly when you explain if they're not clear.

Okay. But after your preparation so far, Ms. Warner, do you feel confident you are able to fully testify on behalf of Apple Inc. about each of the topics that you've been designated for and we just discussed and confirmed?

A. Each of the topics as discussed and I had answered, yes.

Q. Okay. Thank you.

Okay. And it's 9:45. We can plan to take a break at like 10:00, take like a five-minute break if that sounds good at 10:00.

A. That's fine. Thank you.

Q. Yeah.

So just to start, I thought it might be helpful to start with some like high-level questions before I get into the more details of the categories.

So the first one would just be, Ms. Warner, can you please describe your -- Apple Inc.'s position of why Ms. Gjovik was terminated -- her employment was

Page 46

terminated on September 9th, as of September 9th, 2021?

A. There are two questions there, and it's a bit convoluted.

But my understanding and Apple's position is that you were terminated primarily because you had disclosed confidential information publicly and, in addition to that, you also had refused to cooperate with investigators in the course of an investigation that was being conducted and, in addition, you had provided information that was misleading. And all of those acts were in violation of Apple policies.

Q. Okay. Thank you.

You mentioned it was convoluted, which indicates maybe you didn't understand.

So can you help me understand what was confusing about my question?

A. You had a few things in there: You were terminated on that date and as of that date and what Apple's understanding.

Q. Yeah. So this is like the question of the lawsuit. So I just want to make sure we have a really clean answer.

What I was going at is Apple's legitimate justification for terminating me at the time it terminated me. That's Apple's defense.

Page 47

So it might come up with stuff later, and those are other types of defenses. But the main defense that the plaintiff has been tasked with attacking is whatever the defendant said at that -- at time of the termination the reason was. So that's what I'm trying to get towards.

So is there anything in your answer you would modify with that clarification I just gave, or is the answer you gave just before still what -- the answer you would provide?

A. The answer I gave is the answer responding to your question as to the reasons for your termination on September 9th, 2021.

Q. Okay. Thank you.

So now I would like to -- I'm sorry. Did I interrupt you?

A. No.

Q. Okay. Thank you.

Now I would like to pull apart each of those categories. The first one, you said something about confidential information. Can you please provide more details about that?

A. Yes. There were images of unreleased product or things that you were involved in the studies involving the Face ID that you had, for example, you had

Page 48

posted on Twitter, now X. And those were deemed to be confidential and in violation of policies.

Q. Okay. Was it one or more Twitter posts? How many Twitter posts?

A. I don't know how many Twitter posts you had, but there were at least one Twitter post that had the confidential information that led to your termination.

Q. Can you explain what the confidential information was?

A. The actual image of the Face ID, the product, the recording you had. And you probably recall on -- it was a study you were participating in that was on the Glimmer app at that time. And that was an image that you had posted on Twitter, and you had also shared it.

Q. Sorry. Can you distinguish the difference between posting and sharing?

A. You posted online. You're sharing it online. I don't think there's a difference.

Q. You said posting and then also shared. So I'm trying to get the specific details nailed, you know, really get them, the -- the final formal answer from Apple of exactly what they are pointing towards.

So can you confirm you're saying the confidential information that was shared leading to the termination as of the date of the termination that was

Page 49

just related to Face ID and Glimmer?

A. That was one of the images that you had posted on Twitter that I mentioned earlier I -- Yannick, who was the decision-maker in the case, had reviewed.

Q. Thank you.

You said one of the images. Was there -- there's others that were leading to the termination?

A. They were related to that. You had also posted things like with the ear scan, so there were other things you had posted. But specific to that day, the Face ID, the images that you had on Twitter, which I think, I believe, has been produced in this case and you do have, was what Mr. Bertolus had reviewed.

Q. Okay. So and I want to be clear. I'm asking on behalf of Apple, not Mr. Bertolus.

So Mr. Bertolus received emails from Ms. Bowman and had conversations with Ms. Jacobs per his own testimony, so there was a lot more going on behind the scenes than just Mr. Bertolus.

So I would just ask that you please reanswer the question on behalf of Apple Inc. instead of restating Mr. Bertolus's testimony.

MS. RIECHERT: Well, I'll object to that. She's -- as part of the statement as to what the reasons for the termination as known by Apple Inc., she

Page 50

obviously has to rely on Mr. Bertolus's testimony since he was the main decision-maker, so she cannot distinguish between what Mr. Bertolus said and Apple's knowledge since Apple's knowledge is what Mr. Bertolus said.

MS. GJOVIK: Objection to that. There are multiple decision-makers in the termination disclosed by Apple, including Ms. Warner. So she may actually even know more than Mr. Bertolus.

So I would like an answer on behalf of Apple Inc., and if they want to narrow it to just what Mr. Bertolus said, okay, but I need that in Apple's own words instead of just citing Mr. Bertolus's prior testimony.

MS. RIECHERT: Objection. Objection that what you just stated is inaccurate and not in accordance with the record in this case.

There was one decision-maker. It was Mr. Bertolus. He made the decision. He relied on information received from other people. But there was only one decision-maker.

MS. GJOVIK: Speaking objection. You're not testifying, Ms. Riechert.

MS. RIECHERT: No, but I'm objecting to your characterization which is incorrect.

Page 51

MS. GJOVIK: Well, you can just say that instead of the speaking objection is the point, please. You're not supposed to go on a monologue.

BY MS. GJOVIK:

Q. Okay. So I'm going to ask this -- sorry, Ms. Warner.

Did you -- you looked like you were about to say something?

A. No.

Q. Okay. So I might ask these questions a couple times from different angles just to try to get more information. I'm sorry if it sounds repetitive.

So regarding this first category you're saying I was terminated for about confidential information, can you confirm that as of the date I was terminated that the sharing of confidential information that led to the termination was just on Twitter, now known as X, and not other platforms or in the press?

A. As of the date, you may have had those images in other settings, but one of the places that you had it was on Twitter, now X.

And I do understand and you also had posted, share that with "The Verge." There was an article on that.

But my answer before with respect to the

Page 52

decision was based on the images that you had specifically on Twitter that, as I said, Mr. Bertolus reviewed.

Q. Thank you.

And can you confirm the termination -- as of the date of the termination, it was just one Twitter post, is that correct, that was the -- giving rise to the termination?

A. There was at least one Twitter post.

Q. When you say at least, is Apple uncertain how many Twitter posts were considered?

A. I don't have the exact number. You had posts and you had images that they looked at. So the images were on Twitter. And there were various of them. But I cannot confirm for you how many you had posted that we were not aware of.

Q. Ms. Warner, that was not my question.

My question is when Apple was deciding to terminate my employment on September 9th, 2021, how many Twitter posts did they consider as the basis for the termination of that employment?

A. I don't have the exact number, but there was at least one.

Q. Okay. And then can you confirm that as of the date of my termination, Apple is currently unsure how

Page 53

many posts were reviewed and were the basis of the termination?

A. No. That was not my answer. I think I've answered it a few different times for you.

Q. So you're saying at least one, which implies there's more than one. But when I ask you if there's more than one, it seems like you're refusing to answer.

A. I think I have answered the question a few different times. So I have not refused to answer your question.

Q. Okay. So --

A. You don't like the answer that I'm giving, but I have not refused to answer the question, to be clear.

Q. I actually like your answer because it's inconsistent and helps prove my case.

I'm trying to get you to commit to something specific here, and Apple's refusal to commit to literally the bare minimum of the legitimate justification defense is actually extraordinarily helpful for my case.

MS. RIECHERT: (Inaudible.)

(Reporter interrupts for clarification of the record.)

MS. RIECHERT: Objection to your characterization. Okay. You're here to ask questions.

Page 54

You're not here to characterize the evidence or how it helps or doesn't help your case.

MS. GJOVIK: All right. That was prompted by the witness, but I'll move on.

BY MS. GJOVIK:

Q. I would still like to ask a couple more questions at a high level about this first category --

MS. RIECHERT: One, by the way, I don't know that it's the first category. Are you on the termination one?

MS. GJOVIK: I'm still talking about the termination and the three categories of misconduct that Ms. Warner listed as the basis for the termination.

MS. RIECHERT: Okay. Topic 8.

MS. GJOVIK: And then we're talking about the confidential information.

BY MS. GJOVIK:

Q. Ms. Warner, you said there's at least one Twitter post. And you said something about the image. Can you please provide more detail about what it was about this image that made it confidential?

A. I think I've said before there were and the image had shown you were participating in a study and, again, that -- the Face ID specifically looking at that. You had provided screenshots, or at least you posted the

Page 55

screenshot of those images that were taken in the course of the study that you were involved in, and that information had shown potentially certain features of the tool or the actual Face ID product that was not yet released.

And the way it was set up was structured how you provided that image could reflect some of the confidential nature unreleased or the -- the how algorithm behind the scenes, if you will, information about that feature.

So that by itself was confidential, and it is my understanding that it was confirmed at the time of your termination that the image that you had posted included confidential information that had not yet been released to the public.

Q. Thank you, Ms. Warner.

Who confirmed that at the time of the termination?

A. Mr. Bertolus for one did confirm before he made the decision that, in fact, it was confidential.

Q. What was the basis for Mr. Bertolus's determination that it was confidential?

A. What do you mean by what's the basis?

Q. You said he determined it was confidential. I'm asking you what facts was -- what facts were

Page 56

considered or what kind of risk was confirmed for Mr. Bertolus to if -- let me withdraw.

Are you saying that Mr. Bertolus was the one who made the decision that the content in the image was confidential?

A. I am saying he confirmed that it was, in fact, confidential. And as the leader who was making the decision, he determined that it was confidential.

Q. How did Mr. Bertolus determine it was confidential?

A. He spoke to probably -- others who would have been involved in the tool -- the product, the feature, to determine that.

Q. Who did he speak with?

A. He consulted with various folks, including in global security. He consulted with others who had been -- in HR who had looked into whether it was confidential. And I believe you have here Mr. or Dr. Aloe who also has indicated that it was a confidential feature.

Q. So I want to be clear we're talking about the date of my termination. So are you saying Mr. Bertolus talked to Mr. Aloe before I was fired about this?

A. No, I'm not saying that.

Q. Okay. And so who -- who by name did

Page 57

Mr. Bertolus speak to to determine what I shared was confidential prior to my termination?

A. I do not have the exact names. He spoke to various folks, as I mentioned, in global security, HR, and the business.

MS. RIECHERT: And a lot of that is confidential and privileged, and we've objected on that basis.

BY MS. GJOVIK:

Q. Okay. So if you speak to someone who is not a lawyer, that can't be privileged, so --

MS. RIECHERT: It can. It was in the presence of counsel and in connection with the obtaining of legal advice.

BY MS. GJOVIK:

Q. Okay. So on behalf of Apple, as of the date of my termination, who by name at Apple were the ones to make the determination that what I shared in the Twitter post or posts was confidential?

A. Mr. Bertolus determined it was confidential and it was in violation of policy, and he did that by having conversations; some of them were with counsel.

Q. Is Apple planning to argue as a defense the adequacy of their investigation?

MS. RIECHERT: Objection. This witness is not

Page 58

here to talk about Apple's defense in this case. It's not one of the topics.

BY MS. GJOVIK:

Q. Okay. So, Ms. Warner, is Apple going to claim that any further detail on this matter is privileged and they won't provide any other information?

MS. RIECHERT: Okay. Ask your questions. I will object if the question calls for privileged information.

BY MS. GJOVIK:

Q. Okay. Ms. Warner, is there anything else that you can share with me about Mr. Bertolus's investigation and determination on -- up to and when I was fired about the content I shared being confidential?

MS. RIECHERT: Objection. Vague. Overbroad. Ask a question, and then she'll answer it.

MS. GJOVIK: That is the question because she's claimed privilege.

BY MS. GJOVIK:

Q. You've claimed privilege, so is there anything else that you can share about Mr. Bertolus's investigation and determination that I shared confidential information on Twitter beyond what you've already testified just now?

MS. RIECHERT: Okay. You already know what

Page 59

she's allowed to testify about because Yannick already testified about his --

MS. GJOVIK: Objection. Speaking objection.

MS. RIECHERT: I know. But you asked anything else you can testify about. That's not a proper question.

Who did she consult with, what did they tell her, you can ask all of that.

MS. GJOVIK: I'm sorry. You're saying "her," but she said it was Mr. Bertolus who --

MS. RIECHERT: Right. Who did he consult with, you can ask that. And she can answer as to the stuff that's not privileged, which you know well about.

MS. GJOVIK: Okay. So I did ask, and she could not give me any names.

MS. RIECHERT: Incorrect, incorrect. That's not what --

BY MS. GJOVIK:

Q. Okay. Ms. Warner, can you please provide me any names of the people that Mr. Bertolus consulted in making the determination that what I shared was confidential?

A. I have already answer -- I've already answered that. In the course of him making the determination about the images, I've said there were discussions with

Page 60

members of global security, the members of the HR team or the people team, and legal counsel.

And those conversations led to the conclusion that the information you had shared, the images, specifically, were confidential.

Q. Thank you.

But can you identify the names of any of these people in these organizations that you're mentioning?

A. Megan Bowman is one of them. Again, conversations that may have happened were with counsel. To the extent of that, I'm not going to speak to that.

Megan Bowman who is in HR. And we had the global security team. Sophi Jacobs is one individual. And I've already mentioned Robert Aloe who was one of the individuals consulted.

Q. Thank you.

I just want to confirm again because we're talking about as of the date I was terminated. So did Mr. Bertolus consult with Mr. Aloe prior to my termination?

A. I've already answered that. He consulted with various folks who included conversations with Mr. Aloe.

Q. So you're saying Mr. Bertolus did talk to Mr. Aloe prior to terminating my employment about this matter?

Page 61

MS. RIECHERT: Misstates the testimony. She said he consulted with people who had consulted with Aloe, not that he consulted with Aloe.

BY MS. GJOVIK:

Q. Ms. Warner, was --

A. Different times.

Q. Ms. Warner, prior to and up to the termination of my employment, was Mr. Aloe consulted about the confidentiality of content I shared on Twitter?

A. The confidentiality of broad content or the images?

Q. The images.

A. Yes.

Q. What was the date that Mr. Aloe was consulted?

A. I don't have the exact date. It would have been between when you posted it around the August 30th and the September 9th of your termination.

Q. And what was Mr. Aloe's position on the content shared?

A. That it was confidential.

Q. Why was it confidential?

A. I think I've already explained that earlier. The nature of the image is not public, what's behind the scene, the algorithm, what people would be able to decipher from that, as I answered it earlier.

Page 62

Q. What could people decipher from the images posted?

A. Well, if somebody could -- they could take the images that you have. Again, it's the Face ID, the features behind them. They could reverse engineer. That's my understanding of what led to that.

And also, it was a study that you were involved in that was not public, and it was made very clear to you that it was confidential.

Q. Can you tell me more about the study?

A. The study that -- about the Face ID that you were involved in?

Q. Mm-hmm.

MS. RIECHERT: Well, first of all, I know you don't like the witness to answer anything that's confidential that I'm going to put under the protective order, so assuming that you continue to take that position, then I'll instruct her not to provide any confidential information that I would have to put under the protective order.

MS. GJOVIK: I agree if she can avoid providing anything that you might designate confidential. However, you've not designated anything confidential related to Gobbler or Glimmer or that user study in this litigation thus far, so I find it highly unlikely that

Page 63

would occur here.

MS. RIECHERT: Right. When you took Mr. Aloe's deposition, we had an agreement that he would not answer anything that would be confidential that I would put under the protective order, so he gave you general information but not super-confidential information about what it was about the images that were confidential.

MS. GJOVIK: He -- he testified why he thought the images were confidential.

MS. RIECHERT: Right. But he didn't give any confidential information about it because you didn't want me to put anything on the --

MS. GJOVIK: I'm going to object to this objection. It's a speaking and monologue and conversation and confusing.

BY MS. GJOVIK:

Q. And I'd like to go back to my question, please. Ms. Warner, can you please tell me about what this study is that you're referencing in your past -- your last answer?

MS. RIECHERT: Okay. Do we want to get into confidential information or not?

MS. GJOVIK: I would like her to provide more information. She said study, and I would like to know what this study is.

Page 64

THE WITNESS: I think I said more than just study. I said the Face ID that was in Glimmer that you were participating in. I've already answered that a few different times.

MS. GJOVIK: Okay.

THE WITNESS: And at this point I think I would like to be able to take a break if you don't mind.

MS. GJOVIK: Oh, yeah. Sorry. We went past 10:00.

THE WITNESS: That's all right.

MS. GJOVIK: We can take five minutes.

THE WITNESS: Sounds good. Thank you.

(A short break was taken.)

MS. GJOVIK: Thank you.

BY MS. GJOVIK:

Q. So, Ms. Warner, let me continue the questioning we had prior. But let me just hone in on some specific details on these photos that were posted to Twitter, now X.

Is it Apple's position that it was just the photos themselves that was the leak of confidential information?

A. The images that were posted were the -- in terms of the post on Twitter contained the confidential information. Again, that's how the photos were

Page 65

captured, where they were captured, what could be shown on the photos, the actual images themselves, that's the confidential information.

Q. Okay. Thank you.

A. You're welcome.

Q. And assumably someone at Apple had somehow seen those images and shared them with Mr. Bertolus because Mr. Bertolus testified he did not see the Twitter posts themselves. He only saw the images.

So who at Apple was the ones that removed the images from the post to show to Mr. Bertolus?

A. I'm sorry. You said something earlier. There was a word I didn't catch in what you said in your question. Can the court reporter please read that because I want to make sure I captured it correctly.

(Record was read as requested.)

A. I think your question's assuming somebody at Apple removed the images, but Mr. Bertolus was made aware of the images that were posted because they were concerns that were raised about you posting the confidential images on Twitter. I'm not aware of somebody going into Twitter and removing them from Twitter to show Mr. Bertolus.

Q. Let me clarify and reask because that didn't answer my question.

Page 66

Mr. Bertolus testified he believes he saw images, but he believed he did not see the Twitter post that images were shared on.

Who at Apple showed Mr. Bertolus the images?

MS. RIECHERT: So I think it's vague and confusing. You're saying the post. Is the post the image or the post is the words below the image? I think that's what's causing the confusion here.

BY MS. GJOVIK:

Q. So Mr. Bertolus said he did not see what was actually shared on Twitter, so he would not have seen the account and the comment made in the post or exactly what images were necessarily shared or comments. Mr. Bertolus testified he only saw images and said they were shared to social media.

So I'm asking who at Apple showed Mr. Bertolus the images from the post at issue?

A. I -- I think you may be mischaracterizing some of Mr. Bertolus's testimony. But if you have the transcript, you want to read it, that would be fine.

As I've said before, Mr. Bertolus received information that there were the images posted by you on Twitter, and he had also received information, as I've mentioned before, of you also shared some of that through "The Verge," and there were similar images.

Page 67

And he reviewed those, and some of this came to Apple through various concerns that -- that were raised to the company and were shared with Mr. Bertolus.

And as I've also mentioned, he had conversations with people in global security, with HR, ER, and legal to talk about those concerns in the specific images.

Q. Thanks. That didn't answer my question. It created a few more.

So let's do it -- let me ask this way.

A. I think you don't like the answer. But go ahead. I'll try to answer it for you.

Q. Yeah. So let me just rephrase from a more foundational level.

Did Mr. Bertolus review the actual Twitter post at issue in making his determination to terminate my employment?

MS. RIECHERT: Okay. The same objection as to the word "post." Are you talking the post is the image or the post is the comments and the words below the image?

BY MS. GJOVIK:

Q. Post as in the -- whatever I shared. If there's images attached, the text I put in line, I -- I'm not asking about comments from other parties.

Page 68

I'm saying whatever Apple said they fired me for posting on social media, however I posted it, did Mr. Bertolus review that content as could be seen on Twitter, now known as X?

A. Mr. Bertolus reviewed the images that you included in your posts on Twitter.

Q. Thank you.

So Mr. Bertolus did not review the words, the content I posted in -- when I shared these images?

A. I believe he testified that he didn't review the comments. And, again, you can share what he said specifically or we can look at his testimony.

But as he's testified, he did review the actual images that were included in your post on Twitter.

Q. Thanks.

So if he's reviewing the images but not the actual words in my post, that would imply that someone took the images, downloaded them from the post, and shared just the images with Mr. Bertolus rather than the Twitter post itself.

And I'm asking again who at Apple shared those images with Mr. Bertolus?

MS. RIECHERT: The images without the lang -- without the words?

MS. GJOVIK: Whatever images Mr. Bertolus

Adelmise R. Warner

Page 69

reviewed in determining to terminate my employment.

A. I think I've already answered that through conversations with global security, with HR, and ER and legal, he was shown, and I've identified Megan Bowman as one, I identified others, shown the images, and he's reviewed them.

Again, comments or words, you can go back to his testimony and what he said he did. But I've testified he's reviewed the actual images that you had posted.

Q. Okay. Do you have name -- other names, or is your only answer Megan Bowman? Was Megan Bowman the only person that shared the images with Mr. Bertolus?

A. I don't know how else you want me to keep answering the same question.

Q. I want names. So if I was to follow up to whoever shared them with him with more questions, I would need their name. So I need the names of the individual or individuals who shared the photos with Mr. Bertolus.

MS. RIECHERT: Just a reminder that discovery is closed.

A. I've listed the individuals and teams that consulted with Mr. Bertolus and looked at the video of the images with him.

Page 70

Q. You only listed one name: Megan Bowman. Are there additional names?

A. I have said members of global security were involved in the consultation. Members of the legal team, again, privileged conversations.

Q. The names of the individuals are not privileged, and if Apple refuses to provide additional names, that is something I would have to raise to the discovery judge. That's --

MS. RIECHERT: You want the names of the people -- you want the names of the people in global security and the names of the people in legal? Is that what you're asking for?

MS. GJOVIK: That's what I've asked repeatedly.

A. I've already mentioned global security, Sophi Jacobs. And Megan Bowman obviously is in HR. And from a legal perspective, we have Ms. Perez here, Debbie Rice were the legal counsel internally. And HR would be myself who would have seen the images as well.

Q. Okay. So we have Warner, Jacobs, Bowman, Perez, Rice.

Did all these people then see the actual Twitter post themselves with the content, the words I shared in addition to the attached photos?

A. This is a -- so the words that you posted on

Page 71

Twitter, they probably did.

Q. So all --

A. The images that were at least -- the screenshots and what you had posted on "The Verge" or shared on "The Verge," again, focus on the images that you had shared that was related to Apple.

Q. Yeah. And I'm asking about the words in the social media post where the images were attached to.

So is Apple's answer that Ms. Warner, Ms. Jacobs, Ms. Bowman, Ms. Perez, and Ms. Rice all saw the actual Twitter post with the words I used in addition to the photos --

A. Do you have the --

Q. -- prior to the termination?

A. Do you have the actual post because I think we're getting down a path of it's a little confusing: Posts, comments, images.

You had them on Twitter. Again, there were images. There were reports that came in to Apple, and you had the videos and some of the screenshots on "The Verge." Again, various members of the teams that I've mentioned were aware of those.

Now you're asking whether -- who went on Twitter and looked at them. I'm not saying that they are -- all these individuals went on your Twitter if

Page 72

that's what you're asking.

So I think you need to clarify; to the extent that I haven't answered that question, I feel like I've answered it a few different times.

Q. I'm --

MS. RIECHERT: And anything that the legal department did would be privileged.

BY MS. GJOVIK:

Q. I'm asking again who saw the words of the Twitter post since Mr. Bertolus testified he didn't remember seeing the words, and he --

MS. RIECHERT: No. He said he did not see the words before --

MS. GJOVIK: Mm-hmm. So I'm asking who saw the words, not who went on my Twitter and who was reading my Twitter. I'm just asking who saw the words.

And I also just want to, like, counter object here that it's not on me to prove why I think Apple fired me. This deposition and all these questions are about Apple trying to explain why it fired me.

So if Apple cannot point to the Twitter post and cannot point to the investigation details, that's on Apple. It's not on me to help Apple build the story.

So I'm going to ask one more time --

MS. RIECHERT: Object to that whole

Adelmise R. Warner

Page 73

characterization as, again, you're liking to tell a story here, but we're here to answer questions.

MS. GJOVIK: Mm-hmm.

MS. RIECHERT: Secondly, what legal department did and advised is privileged, and we're not going to answer about that.

If the witness knows if any -- if Megan Bowman went on Twitter, she can answer that question.

MS. GJOVIK: That's not the question. It's not who went on Twitter.

BY MS. RIECHERT:

Q. I'm asking who at Apple prior to the termination in this group of people involved in the termination reviewed the actual words in the posts at issue here.

A. Again, Ms. Gjovik, I think I've testified already what was at issue was the image that was posted. There was a report to Apple about you posting confidential information. The group of teams or people I've identified were involved in reviewing -- and, again, we'll get to the second part of the reason for your termination -- and consulted with Mr. Bertolus.

And counsel has already objected to the -- any attorney-client privileged conversation.

But the image itself was seen, and "The Verge"

Page 74

article, what you posted, the screenshots, were also seen.

What you're asking me is who went on Twitter and -- or would have gone on Twitter. I don't know that anybody went on Twitter to look at your comments.

Q. So the post, the post that Apple says it fired me over?

A. The images were provided, and so we reviewed them.

MS. RIECHERT: She's talking about the post as being the image and writing.

BY MS. GJOVIK:

Q. Not under, not comments under. When you post something on Twitter, you can post images, and then you post, like, your little, like, here's a thing I'm saying.

And in mine, I was complaining about retaliation and surveillance.

And I'm asking who saw the full context of the post, at least that one post, and --

A. Do you want to pull that post so we can be clear on what it is that you are asking about?

Q. I would actually, like I asked prior, for Apple to identify which post, and I didn't get a clear answer on that. Mr. Bertolus also could not clearly identify

Page 75

which post or posts.

So and actually that goes to my next question, which is what is --

MS. RIECHERT: Okay. Let me object to all that characterization. He said it was an image, not a post. You keep talking about a post, and the witness keeps talking about an image. We need to get our terminology right here.

MS. GJOVIK: No. These are -- this is -- you want to focus on the defense, and I want to focus on the protected concerted activity and protected activity and whistleblower disclosures and labor organizing and all of that. So your objection is --

(Reporter interrupts for clarification of the record.)

MS. RIECHERT: Mr. Bertolus testified he only focused on the image, not writing that was in connection with the image.

So that's the answer to your question.

MS. GJOVIK: Well, this is --

THE WITNESS: That's what I --

BY MS. GJOVIK:

Q. Go ahead.

A. That's what I have shared a few different ways talking about the images, that was the source and nature

Page 76

and reason for your termination.

Q. Mm-hmm.

A. All the other things that you've said, I'm not going to repeat them. They were not the reasons for your termination.

So I've already explained what was seen, and if you have something you want me to look at, again, I'm happy to do that. But I'm not sure what other ways you want me to answer the same question.

Q. Let me ask a few more ways.

Okay. How many -- what is the total number of images that were the basis for the finding of leaking prior to the termination?

A. I've already answered that there was at least one image that Mr. Bertolus saw, and he's testified to that effect as well.

Q. But there were more?

MS. RIECHERT: We're repeating over and over here.

MS. GJOVIK: This is a very material issue, Melinda.

MS. RIECHERT: But you want to show her "The Verge" article? She can count the number of pictures --

MS. GJOVIK: No. And speaking objection. We're not talking about "The Verge" article.

Page 77

MS. RIECHERT: Well, I don't know what you're talking about. I think that's the problem here.

MS. GJOVIK: This is Apple's defense for terminating me, and I'm asking for Apple's final answer of how many images supposedly contained Apple confidential information that it used as the basis to terminate my employment and --

MS. RIECHERT: Okay. Can she look at "The Verge" article and count the --

MS. GJOVIK: No speaking objection. We're not even talking about "Verge." You keep inserting "The Verge" article. I'm talking about the Twitter post.

MS. RIECHERT: You said "The Verge" article and the Twitter post were the basis for the termination, and so you're saying how many photos are there. And I'm saying if you want her to count the photos in "The Verge" article, she can do that.

MS. GJOVIK: Ms. Riechert, I'm going to ask to have you replaced by a different attorney if you do not stop with these speaking objections. You are testifying on behalf of Apple Inc. repeatedly. It's inappropriate. I'm going to ask you to please stop and reduce your objections to formal objections and not testimony.

BY MS. GJOVIK:

Q. And I'm actually now going to pivot and ask for

Page 78

clarification here, if one of the -- if Apple considered "The Verge" article called "Apple Cares About Privacy Unless You Work At Apple" as part of the basis for terminating my employment prior to terminating my employment.

A. Ms. Gjovik, I've said that a few times, for your termination, the images that you had, again, copies or screenshots of the images that you had on Twitter, and you also had similar images and videos that were included in "The Verge" or shared with "The Verge."

Again, those were considered. The -- again, if you want to go through, look at the images, we can count them. But I have said that, I think, at least 45 minutes ago since we've been starting down this line of questioning.

Q. I'm asking for clarification because Apple has given inconsistent answers about whether "Verge" was considered at the time of termination or whether it's an affirmative defense after the fact.

And so I'm looking for Apple Inc.'s deposition testimony today whether the reason I was fired on September 9th, 2021, included that "Verge" article or if that was considered after the termination.

MS. RIECHERT: Again, objection to your characterization. You've got to stop characterizing

Page 79

things that are wrong. Apple changed its reasons, that's just not true.

So just ask the question, did Apple consider "The Verge" article, yes or no. And then she'll answer that question.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple consider that "Verge" article called "Apple Cares About Privacy Unless You Work For Apple" when it decided to terminate my employment?

A. Apple considered the images and videos that you had posted or included, shared on Twitter and "The Verge" article.

Q. At the time it terminated me on September 9th, 2021, correct?

A. I've already answered that. That was part of the reasons for your termination because there was -- it came to our attention that you had posted, again, the images, which, again, we can look at them, on Twitter, and you also had "The Verge" article.

Q. This is where I just want to clarify because you said also "The Verge" article.

So when Apple terminated my employment on September 9th, 2021, was one of the reasons for that termination content I shared with "The Verge" and where

Page 80

it was in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?

MS. RIECHERT: Objection. Asked and answered many, many times.

And objection also as to the word "content." She's told you it's the images. I don't know why we keep going through this over and over.

MS. GJOVIK: I would like her to answer this question.

MS. RIECHERT: Okay. So I'll object to the use of the word "content" with respect to "The Verge" article.

MS. GJOVIK: Okay.

A. I've already answered the question in terms of the images that you had shared. I don't have any other answer for you.

Q. I am uncertain of what your answer is based on the answers you've given thus far. I would like a more -- so let me rephrase with pivoting from Melinda's objection.

Ms. Warner, at the time I was terminated on September 9th, 2021, was one of the reasons for that termination photos I shared with "The Verge" included in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?

Page 81

A. I've already answered; the images that you had shared on Twitter, which I understand you also had videos and images, similar images shared on -- with "The Verge," that was the basis for your termination.

Q. You're not answering my question. I'm not asking about Twitter. I'm asking about "The Verge" article, and you continue to answer this with, like, a caveat on "The Verge" that's not clear.

I'm asking -- I would like a direct answer about this "Verge" article if the reason I was terminated on September 9th, 2021, included images I shared and that were included in that "Verge" article.

A. I've already answered the question, Ms. Gjovik.

Q. Is the answer yes? Because I don't know what the answer is based on your prior answers.

A. I've given --

MS. RIECHERT: You can answer it one more time. Did Apple consider the images in "The Verge" article at the time it terminated her employment?

THE WITNESS: The -- Apple did consider the images and videos that you had posted included in "The Verge."

BY MS. GJOVIK:

Q. Sorry. I'm not talking about posted. I didn't post anything to "The Verge." "The Verge" is press.

Page 82

They write their own articles. They have reporters. So I'm not -- I don't want -- I'm not asking for your answer to have anything about Twitter or me posting or me sharing.

I'm asking specifically at the time Apple fired me on September 9th, 2021, was one of the reasons the images and/or videos or sequences in "The Verge" article called "Apple Cares About Privacy Unless You Work For Apple"?

A. I've already answered the question.

Q. Please answer it again, then, because I don't know what your answer is.

A. You can have the record read back. I feel like I've answered this so many different times.

Q. This is a very fundamental question for this entire lawsuit, and the five-year dispute between me and Apple has an affirmative defense claiming it did not know about that article at the time it fired me.

So your answer to this question is extremely material for both Apple's supposed legitimate defense and my arguments about pretext.

And I need a very clear answer from Apple on this topic today, and I don't feel like I have it. So I would like you to answer my question, please.

MS. RIECHERT: Objection to all your

Page 83

characterizations there as just being wrong.

MS. GJOVIK: Mm-hmm.

MS. RIECHERT: So I have not seen anything that says that Apple did not know about "The Verge" article.

But the witness has answered over and over it was the images in "The Verge" article and the Twitter post that were considered. I don't know how many --

MS. GJOVIK: Speaking objection. You're the one that is going to get in trouble about this, too, Melinda. You were biased on this. So I'm going to ask you to stop with the speaking objections and testifying on behalf of Apple.

BY MS. GJOVIK:

Q. And I'm going to ask Ms. Warner again, please, at the time I was terminated on September 9th, 2021, was one of the reasons I was terminated images or videos included in "The Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?

A. I've already answered the question, Ms. Gjovik.

Q. What was the answer?

MS. RIECHERT: One more time and be done with it, please.

THE WITNESS: I feel like I keep saying the same thing over and over again.

Page 84

BY MS. GJOVIK:

Q. Yes or no?

A. At the time you were terminated, there were images that you had both on Twitter and you had shared with "The Verge." And those were the images reviewed and considered as being confidential.

Q. I am going to ask you again to answer without mentioning the Twitter because you're now -- your answer implies that these are the same images shared on Twitter and "The Verge" article, and it wasn't -- maybe you didn't consider "The Verge."

How about this: Ms. Warner, around what date did the decision-makers who terminated me become aware -- what?

MS. RIECHERT: One decision-maker. You keep saying decision-makers. So objection. Misstates the testimony. Assumes facts not in evidence.

BY MS. GJOVIK:

Q. Okay. How about this --

MS. RIECHERT: I don't want to wait until the end of the question because then we have to repeat the question all over again.

BY MS. GJOVIK:

Q. Apple's disclosures indicated there were a number of people involved in the decision to terminate

Page 85

my employment. And Apple is putting forward Mr. Bertolus was the final decision-maker. Other people were noted, including Ms. Bowman, yourself, Ms. Warner, other folks.

And so of the people Apple disclosed that were involved in the decision to terminate me, when -- actually, let me rephrase.

Apple, when did Apple Inc. become aware of the article called "Apple Cares About Privacy Unless You Work At Apple"?

A. Sometime in September. I don't have the exact date. I don't have the article in front of me.

Q. It was published in August.

A. Okay. August --

Q. August 30th.

A. Okay.

Q. Did Apple become aware of this article prior to my termination?

A. Before the 9th, before -- yes, it would have been before the 9th.

Q. Did Apple investigate this article?

A. What do you mean?

MS. RIECHERT: Objection. Vague.

A. What do you mean, investigate this article?

Q. Did Apple receive any complaints of people who

Page 86

thought that this article could be leaking?

A. I think I've already answered that, again, probably 30, 40 minutes ago that there were concerns raised or complaints made about you sharing confidential information.

Q. Who made these complaints?

A. They came from various folks in -- within the company, and I think you have some of those, like employees raised concern about you sharing confidential information.

Q. So it was employees who reported this article, this "Verge" article?

A. Employees raised escalations or concerns about you potentially sharing confidential information, which I've talked to you about already.

Q. So who reported that the content in this "Verge" article could be leaking?

A. Some of them came anonymously. Some of them came from employees here, and, again, they were shared with the various teams that I've already explained that there was content that you had -- I know you don't like me to combine posting and to what you shared, but that's the crux of what came to us.

Q. Thanks. But this question, I'm specifically asking about "The Verge" article.

Page 87

So you were -- you're saying that there are complaints made that the content in "The Verge" article was leaking. Is that correct?

A. No, I did not say there was leaking.

Q. Well, or --

A. I'm saying that there were concerns that were brought up that you were sharing confidential information, and that included the images that were shared with us.

Q. In "The Verge" article?

A. That was one of the places where you had the images, yes, and you had it on Twitter.

Q. So I'm asking -- I'm really just asking about "The Verge" article right now.

Were there complaints filed to Apple prior to my termination with links to or copies of that "Verge" article?

A. That was included in some of the concerns that were raised, and the timing of it I would have to look at the concerns, complaints.

Q. Were they filed prior to my termination?

A. Some, yes.

Q. And so did Apple then investigate those complaints?

A. That was part of the investigation that was

Page 88

ongoing, and that was the second reason or the secondary reason for your termination, and that was a privileged investigation that was underway.

Q. Sorry. What is this underway investigation? When did that start?

A. When did what start?

Q. You said there was an already-in-progress investigation and this became part of it.

So when did that existing investigation start?

A. I did not say existing.

Q. Okay.

A. I did say one of the reasons why you were terminated as well is for failing to cooperate, and as you know, there was an attempt to speak with you, which I believe was on the 9th -- and we can look at the some of the emails -- to speak to you about the confidential information, and you refused.

So sometime between when you posted it and your termination date on the 9th.

Q. Thanks. That wasn't my question.

So you said people filed complaints about that "Verge" article and linked to "The Verge" article or attached copies. And I asked did Apple investigate.

And can you answer that question again of what Apple's investigation was when it started about "The

Page 89

Verge" article?

MS. RIECHERT: Okay. Objection. Again, objecting to your commentary on it assumes facts not in evidence.

Why don't you just ask the question.

MS. GJOVIK: I just asked it. I would like her to answer.

MS. RIECHERT: I know, but you had a whole bunch of commentary about that there were links to "The Verge" article in the business conduct, and she hasn't testified to that.

So when you ask a question that has things in it that are wrong, I have to object on assumes facts not in evidence.

MS. GJOVIK: I thought she just said that.

BY MS. GJOVIK:

Q. So, okay, so please clarify: Were there any complaints made about me regarding that "Verge" article prior to my termination?

A. I did not -- you mischaracterized how I -- what I testified.

I did say there were concerns that were raised about your sharing confidential information that included what you -- we've already talked about images that you had shared on "The Verge," you had posted, and

Page 90

that became part of an investigation that they reached out to you to try to speak to you about it, and you refused --

Q. Okay.

A. -- to speak to the investigators --

Q. That wasn't my question --

A. -- the time --

Q. -- Ms. Warner.

I'm going to ask you to please respond directly to the questions I'm asking instead of testifying to -- we'll talk about all of this eventually. We'll have a lot of time together today.

So I'm hearing that, yes, there were complaints made that reference this "Verge" article and me prior to my termination and Apple did investigate.

What did Apple do as part of its investigation into this prior to contacting me on the 9th?

MS. RIECHERT: Okay. That investigation is privileged. And so we are not going to talk about that, and I'll instruct the witness not to answer.

MS. GJOVIK: Okay. But you can't claim privilege to facts, dates, or people.

BY MS. GJOVIK:

Q. So what can you share with me, Ms. Warner, about that investigation that's not privileged?

Page 91

A. I think that's a very broad question. It's hard for me to answer what that's not privileged. Is there something specific you want to know?

Q. Who led the investigation?

A. You had one -- an investigator who had reached out to you on the 9th, Aleks Kagramanov. He had reached out -- and we can spell it for the court reporter, I can get the -- I'm sure you already have that -- reached out to you to speak to you, and you refused to speak to Aleks.

Q. So are you saying Mr. Kagramanov led the investigation to me based on the complaints about "The Verge" article?

A. You asked -- no. Your question is assuming a whole lot of different things that I did not say.

Q. So I'm asking who led the investigation into me regarding "The Verge" article prior to my termination.

A. The concerns about your posting and sharing the images in the form that I have already discussed were being reviewed by -- and I've mentioned global security, with Sophi Jacobs, and with Aleks who had contacted you directly. Aleks was on my team. And you had refused to speak with Aleks.

So those two individuals in those teams were involved in reviewing the content and the images that

Page 92

were posted in both or shared in both form. That was part of the same investigation that that was under privilege.

Q. Okay. Well, and first of all, I said I was happy to talk to him and repeatedly said I was happy to participate. I just asked for a written record because I had an affidavit the next day and wanted to share with the government what was discussed. So I don't appreciate Apple's insistence on mischaracterizing that record. And I will --

MS. RIECHERT: These -- your commentary is not moving this along and not helping because every time I have to object that that assumes facts not in evidence and is not accurate.

BY MS. GJOVIK:

Q. Okay. Mr. Kagramanov testified he had no background on this investigation and had not seen the post. So are you saying he actually did? He was part of this investigation?

MS. RIECHERT: Objection. That also assumes lots of facts not in evidence.

BY MS. GJOVIK:

Q. Okay. Can you please give me more detail about Ms. Jacobs and Mr. Kagramanov's roles in this investigation, specifically regarding "The Verge"

Adelmise R. Warner

Page 93

article?

A. As I've said before, Ms. Jacobs and Mr. Kagramanov were going to be the investigators or were the investigators to look into the concerns about you posting and sharing the confidential images. Aleks reached out to you to speak to you, and you refused.

Again, I know you don't like that, but that's my answer, and that's my understanding of what transpired.

Q. So the -- so are you saying that the only part of this -- the only investigation that occurred was Mr. Kagramanov contacting me and if -- nothing else was done as part of this investigation?

MS. RIECHERT: Objection. Assumes facts not in evidence. And the investigation is privileged. So I'm not going to let her answer questions about the investigation.

BY MS. GJOVIK:

Q. Did Apple read the article, "The Verge" article, prior to my termination?

MS. RIECHERT: Objection. Assumes -- to the extent it is part of the privileged investigation and I'm not going to let her to answer questions and instruct her not to answer questions about the investigation that was done prior to the decision.

Page 94

BY MS. GJOVIK:

Q. Did Apple watch the video in "The Verge" article prior to terminating me?

MS. RIECHERT: Same objection. And same instruction.

BY MS. GJOVIK:

Q. Okay. Did Apple see me linking to that "Verge" article in the social media posts I made prior to my termination?

MS. RIECHERT: Same objection. Same instruction.

BY MS. GJOVIK:

Q. Okay. You also mentioned something about ear scans. Was one of the reasons that Apple terminated me on September 9th, 2021, my complaints about ear scans?

MS. RIECHERT: Objection. Misstates the testimony.

A. That was not my testimony.

Q. Did Apple believe that me posting about those ear scans was me sharing Apple confidential information?

A. What I've described before, I mentioned in the studies that you had done, the ear scans one, the concerns that were raised, then the Face ID.

Again, images that you had posted were confidential. You speaking about the ear scan or being

Page 95

in the study was not the basis for your termination, and that by itself is not confidential.

Q. Okay. Thank you.

And then the ear scans, are you saying that the images I shared related to ear scans were confidential? You said images. Can you clarify?

A. I'm talking about the images for Face ID which was the nature of your termination.

Q. Okay. Was one of the reasons I was terminated as of September 9th, 2021, related to ear scans?

MS. RIECHERT: Objection. Just asked and answered.

BY MS. GJOVIK:

Q. Apple previously filed things to the court saying it was one of the reasons, and it appears to be backtracking. So it's very material, and I would like a clear answer on this.

MS. RIECHERT: You got a clear answer.

BY MS. GJOVIK:

Q. What is the answer?

A. It's on the record.

Q. Is it no? Is that the answer?

A. I've already answered that.

Q. Okay. So, okay, let's go to the second bucket, something about me refusing to cooperate.

Page 96

Can you please summarize for me the -- that second bucket of the reason I was terminated related to refusal to cooperate?

A. In addition to what I have already shared where Aleks did reach out to you to speak with you and you refused, that was one of the reasons, and that was shared with Mr. Bertolus in addition to what I've already described about the images.

You also had a reach out from Ekelemchi Okpo who was investigating your concerns, and he had attempted to reach out to you, and you also refused to speak with him, and he had shared with you that because you had refused to speak with him, he would conclude his investigation based on what he had.

Q. Okay. Can you clarify, then, the Okpo complaint about refusal to cooperate? That was a reason for termination as of September 9th, 2021?

A. Clarification, it's not an Okpo complaint. Okpo was investigating the concerns. He had reached out to you to speak with you about, as you probably know from the emails, inconsistencies he had identified in the course of the investigation, and you had refused to actually speak with him, and you --

Q. On the phone. I wanted things in writing, yeah.

Page 97

So I just want to -- this is another one that I just want to make sure we have the record fully straight from Apple that that second bucket, then, of refusal to cooperate would actually, then, be two factual scenarios giving rise to the reason for termination?  Please confirm.  It would be the exchange with Mr. Kagramanov and the exchange with Mr. Okpo.  Is that correct?

A. Those were both additional facts that Mr. Bertolus considered ultimately.  The primary reason, which I've already testified about, was your disclosure of confidential information; and your failure to cooperate in the investigation, meaning speaking with investigators, were additional factors he considered, yes.

Q. Okay.  And so just speaking with investigators, we have Mr. Kagramanov and Mr. Okpo.  And both of these -- it is Apple's position that both of these, the misconduct is that I requested a written record and resisted getting on a phone or Webex for an oral-only conversation.  Is that correct?

A. Both of those indicated that you -- because you refused to speak with both of these individuals who reached out to you led to the conclusion that you did not fully cooperate in the investigation.

Q. Okay.  But when you say speak, you mean orally,

Page 98

not written.  Is that correct?

A. Correct.

Q. Okay.  And then what -- can you please explain Apple's position of why a request to have a written record of a conversation is improper or misconduct?

A. Your refusal to actually speak with the investigators to hear the concerns they have, allow you to explain and answer, again, part of a -- if you take the Aleks piece is a confidential potential leak investigation, then you take Okpo, which is in the course of he's trying to assess what the inconsistencies are, your refusal to speak to them was the misconduct.

Q. Thank you.

But what is -- can you please distinguish for Apple why the -- when you say speak, you mean oral, why written was unacceptable?

A. Because it's just when you're having a conversation with an investigator, being -- having to do it in writing, send you an email, you write back, and it's really hard to decipher or talk through and understand what the nature of the concerns are.

And they had simply attempted to speak with you, and you said no.

So the preference is to be able to have a conversation with the individual to ask the questions,

Page 99

being able to follow up on them.  And you didn't want to do that.

Q. Thank you.

I repeatedly, though, had written that I would speak in written.  And I had asked Mr. Okpo to have written conversations and even asked him to raise it to business conduct prior to this.

So I'm trying to understand Apple's position policy-wise why it would find a request for a written record of a conversation to be misconduct.  And the things you're saying sound more like preferred efficiency.

So I'm trying to understand why it's misconduct to request a written record.

MS. RIECHERT:  Again, Ashley, object on all your characterizations before that.  Why don't we just get to the question, which I believe the witness has already answered --

THE WITNESS:  I have.

MS. RIECHERT:  -- as to why Apple needs people to talk to them as part of an investigation.

BY MS. GJOVIK:

Q. Okay.  And I had specifically told Mr. Kagramanov that I had an NLRB charge --

MS. RIECHERT:  Okay.

Page 100

BY MS. GJOVIK:

Q. -- and I had an NLRB --

MS. GJOVIK:  Please don't interrupt unless you're going to object --

MS. RIECHERT:  Your question -- I'm going to object --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK:  Yeah.  I'm sorry.  Thank you.

MS. RIECHERT:  Aleks -- Ashley, I am going to object to this question, so there's no point in asking it when you have all this testimony that you're giving.  That's the quest -- the purpose of this deposition is for you to ask this witness questions, not for you to recite your version of the events.

MS. GJOVIK:  Ms. Riechert, you cannot object to a question before I even ask it.  Please let me ask my question.

MS. RIECHERT:  Okay.  I'll wait until you finish it, and then I'll object, but then that's a waste of time.

BY MS. GJOVIK:

Q. Ms. Warner, I had explained to Mr. Kagramanov that I had an open NLRB case, and I wanted to share with the NLRB what was discussed, and that was the basis for

Page 101

request -- the primary basis for requesting a written record.

What is Apple's position on employees requesting a written record when there's an open federal investigation into their complaints against Apple?

MS. RIECHERT:  Objection.  You're stating testimony.  Mischaracterizes the testimony.  And the question is asked and answered as to why the witness -- why Aleks required and the company required you to speak as opposed to have written information.

MS. GJOVIK:  I'm asking about with federal investigations.

BY MS. GJOVIK:

Q. Can you please answer, Ms. Warner?

A. No, I cannot because there was not a federal investigation underway, so I can't -- I don't know how you want me to answer this about your -- your comment on federal investigation.

What I've described is there were two ongoing investigations that were being conducted.  And in order for the investigators to be able to assess, again, be able to ask you question, have you answer, have some follow-ups, be able to determine in an efficient way what happened, to hear your side of the story and share information, they had attempted to speak with you.

Page 102

And as an employee of Apple, we would expect that you would say yes, you would talk to them, and you can share your side of the story.  You can always follow up with a writing.  But you simply did not want to do that.  And, therefore, there was a determination you did not fully cooperate.

Whether you had been talking to investigators externally, government agency, was not the basis for the determination.  It was simply you did not want to speak to them.  And I've already answered that.

Q. Ms. Warner, I'm going to ask again -- you said there's no federal investigation, but there was an open NLRB charge.  Apple had already retained counsel to defend them on that NLRB charge I filed.  And my emails to Mr. Kagramanov specifically mentioned an NLRB case and me wanting to share the information with the NLRB.

So can you please explain your position that that is not a federal investigation?

A. Mr. Kagramanov's response -- or reach out to you or Ekelemchi's reach out to you had nothing to do with the NLRB charge or response by Apple.

We've got to be clear when you talk about investigation, my testimony is about the internal Apple investigation that we have an obligation to follow up on.

Page 103

Q. Yeah, understood.

But I told Mr. Kagramanov that I wanted the record because of the NLRB case, and I complained of -- I used the words "witness intimidation" the day before an NLRB affidavit.

So I'm trying to understand Apple's position why me asking for that is somehow misconduct.  And I would like an answer why Apple believes that asking for a written record while there was a pending NLRB investigation into Apple and the employee is stating they would like evidence for the NLRB regarding Apple's request to talk to the employee is misconduct by the employee.

A. I've already answered.

MS. RIECHERT:  Objection.  Asked and answered many, many times.  So you're connecting two things together, and the witness is saying they are not connected.

MS. GJOVIK:  Speaking objections, Melinda.  Please stop the speaking objections.

This is absolutely material to this litigation.  I need a straight answer from Apple.  Apple is refusing to answer my questions, and at this point I have a list of maybe at least five things I'm probably going to have to move Judge Westmore to compel Apple to answer if it

Page 104

continues to refuse to answer my extremely basic questions, so --

MS. RIECHERT:  Okay.  It's been asked and answered several times, and you keep combining these two things together, and the witness keeps separating them, and then you combine them, and then she separates them.

MS. GJOVIK:  Because they are together.  The employee's stated --

MS. RIECHERT:  You think --

MS. GJOVIK:  -- reason for wanting a written record stated to the employer is absolutely material to the employer denying the employee's request.

So we can look at that email --

MS. RIECHERT:  The witness is saying the fact that you had an NLRB investigation had nothing to do with the decision to require you to talk to them.

So you're putting the two together, and the witness keeps saying no, the fact that you had an NLRB charge had nothing to do with the fact that we expected, Apple expected, witnesses to talk to the investigators.

MS. GJOVIK:  Speaking objections, Melinda.  You are not the witness for Apple.  I'm going to ask you to please stop testifying on behalf of Apple.

MS. RIECHERT:  I'm not testifying.  I'm giving the explanation for why the witness has already asked

Page 105

and answered this same question over and over.

MS. GJOVIK: No, because the employee said that the basis for the request for a written record was the NLRB proceeding, and there are claims in this litigation specifically about retaliation due to the employee participating in labor proceedings.

This is an extremely material question, and I have not received an answer yet why Apple would find it misconduct for an employee to request a written record of communications with the stated reasoning being in order to provide evidence to labor agencies as part of a pending proceeding into the employer.

And I would like an answer to that question. So I can ask it again.

MS. RIECHERT: Answer --

MS. GJOVIK: And I want an answer again. Yeah.

A. Ms. Gjovik, as I've stated multiple times, the reason that it was determined you failed to fully cooperate in the investigation was because both investigators attempted to speak to you to be able to ask you questions, follow up, and hear your side of the story orally.

You refused to do that. That was deemed to be failure to cooperate, and that was the part that was considered.

Page 106

Your having an investigation, a charge, needing to speak with a government agency or various agencies you've mentioned had nothing to do with both Aleks and Ekelemchi wanting to speak to you and that determination.

That's the answer I provided. I know you don't like that, but that is the answer.

**Q. So, no, your answer is insightful in what it's not addressing.**

**But I would ask that are you aware that Mr. Kagramanov testified that he was uncertain if the content of the oral interview could even be shared by the employee after the fact at all with a federal agency and said he would cancel that oral-only interview he said he was about to schedule to consult with counsel of what to do when the employee asked if they could share the content of what Apple said with federal investigators because he was not certain.**

MS. RIECHERT: Okay. Objection. Misstates the testimony of Mr. --

MS. GJOVIK: We can look at it after lunch. We'll -- let's look at that after lunch.

MS. RIECHERT: Yeah, let's do it.

BY MS. GJOVIK:

**Q. And, Ms. Warner, the Okpo reach out, is it**

Page 107

**correct to summarize that as Mr. Okpo wanting to contact me without a written record to ask me if I thought the sous chef was cute, as he testified?**

MS. RIECHERT: Objection. Misstates the testimony.

MS. GJOVIK: Okay. So we're at 11:00. I would like to talk about that third category, the sous chef sexual harassment stuff. But I think we should probably do a five-minute break. Does that sound all right?

And then should we talk about lunch?

Is there a preferred time to take a lunch break, Ms. Court Reporter?

THE REPORTER: Off the record?

MS. GJOVIK: Yeah.

(A short break was taken.)

MS. GJOVIK: Thank you.

BY MS. GJOVIK:

**Q. Okay. I'm actually going to skip ahead to a different topic.**

**Ms. Warner, did Apple retain external counsel regarding my complaints and concerns prior to terminating me?**

MS. RIECHERT: This is beyond the scope of the topics.

MS. GJOVIK: No. It's -- my complaints and

Page 108

concerns are in the scope of topics.

MS. RIECHERT: Yes, but whether Apple retained counsel is not within the scope of the topics.

MS. GJOVIK: Is that your only objection to that question?

MS. RIECHERT: Yes.

MS. GJOVIK: Okay. She still has to answer. You can dispute it after.

A. This is --

MS. RIECHERT: If you know the answer, you're welcome to answer it.

A. I do not know specifically when Apple retained outside counsel on because there were various things, so I'm not sure how you want me to answer that.

**Q. Do you know --**

A. Specifically what?

**Q. My complaints and concerns against Apple.**

A. The complaints that's this lawsuit? The complaints? Which complaints?

**Q. How about this: Regarding my charges to EEOC, DFEH, California Department of Labor, Federal Department of Labor, NLRB, social media complaints, my issue confirmation that said that's Ashley's complaints in 2021, when did Apple retain Orrick to represent it regarding Ashley's complaints?**

Page 109

A. I don't -- I don't know specifically when Apple retained Orrick for purposes of this lawsuit. We'll take that.

And you have a whole lot of other things that, again, I don't know. It's assuming that Apple retained counsel for each and every one of them.

Q. Prior to my termination.

A. Correct. Your question has a lot of things in there in terms of all the complaints, and it also assumes that prior to your termination, Apple was aware of all the complaints that you have listed and retained counsel.

Again, I think there's a lot there, so unpacking that and asking specific and if I know, I'm happy to answer, but when we retained -- Apple retained counsel for this lawsuit, I don't know the specific date --

Q. I didn't ask for this lawsuit.

And Apple has actually given a date range of when they retained Orrick. It was in August of 2021.

A. Okay.

Q. Okay. And then what about when Apple retained MWE in response to my NLRB charges?

A. I don't have that date specifically to tell you.

Page 110

Q. Okay. We'll look at the notice of appearance prior to my termination.

A. Okay.

Q. Prior to my termination, were there any other law firms that you're aware of that Apple retained regarding Ashley's complaints?

A. Not independently. I did not look for that in preparation for this testimony today because that wasn't the nature of what I thought I would be testifying about.

Q. Okay. And then roughly around what month of 2021 did Apple start claiming attorney-client privilege regarding Ashley's complaints?

MS. RIECHERT: Again, outside the topics.

MS. GJOVIK: No, it's not. No, it's not.

MS. RIECHERT: There's no topic about when Apple started claiming attorney-client privilege with respect to the work that it was -- its counsel was doing.

MS. GJOVIK: Regarding Ashley's complaints is absolutely material because it indicates Apple knew it was at risk of being sued regarding Ashley's complaints.

MS. RIECHERT: My objection is that it's outside the topic.

MS. GJOVIK: Okay. She still has to answer.

Page 111

MS. RIECHERT: If she knows.

THE WITNESS: I do not, and it was not one of the things that I had prepared for for this 30(b)(6) deposition in terms of when and which counsel Apple retained with respect to you and your complaints.

BY MS. GJOVIK:

Q. Sorry. This question was about claiming attorney-client privilege regarding investigations into my complaints.

A. That's a different question that you asked than what you did before, so there are two separate questions.

Q. So that's what I thought my last one was. Let me rephrase, then.

Roughly around when did Apple start claiming attorney-client privilege regarding Ashley's complaints, investigating Ashley's complaints, prior to terminating Ashley?

MS. RIECHERT: Objection. Outside the scope of the topics.

MS. GJOVIK: It's not. She has to answer.

A. I believe it is outside the scope.

But if we take complaints internally that were being investigated, some -- those were conducted under privilege. So that would be -- again, I don't have the

Page 112

exact dates of when we started noting that they were under privilege, again, being specific about concerns and complaints and investigations; there's a whole lot there.

Q. Would it be all of them?

A. All of what?

Q. All of the investigations into my complaints.

A. Investigations that are the subject of what I'm testifying about and that is the subject of what I'm aware of that you had raised concerns specifically, there were two investigations conducted by Jenna Waibel and then Ekelemchi Okpo with respect to your concerns that you had raised.

Q. Mm-hmm.

A. So for those, that would be the privilege would have been asserted because there's investigations under privilege. I don't have the exact date.

Q. Okay. So that's what I was asking, privilege asserted for my investigations of my complaints. And the two investigators were Waibel and Okpo.

And it sounds like your answer is all of those investigations had privilege asserted. Is that correct?

A. No, that's not my -- that's not my answer, and that's not what you had asked about.

So maybe asking the question in a clear way

Adelmise R. Warner

Page 113

because I think I've answered them, and I'm not sure what it is -- I'm not clear what it is that you're asking.

Q. Let me rephrase, then.

A. Okay.

Q. Are there any investigations that Apple employee relations conducted into my complaints in 2021 where they did not claim attorney-client privilege regarding the investigation?

A. Not that I'm aware of.

Q. Okay. And so if the first investigation was Jenna Waibel investigating my concerns in March 2021, that would then assumably be attorney-client privilege claims made by Apple starting at least March 2021. Is that fair?

A. I would say during the course of the investigation, that would be conducted under attorney-client privilege. The time frame of when specifically Apple would be claiming it, that's a legal determination.

Q. Okay.

A. But the investigation by Ms. Waibel and Mr. Okpo are being conducted under privilege.

Q. Is it typical for Apple to conduct employee relation investigations under privilege?

Page 114

A. I don't know what you mean by typical. Some investigations are done at the direction of counsel. That's not abnormal. That happens.

Q. So in this case like the Waibel, if attorney-client privilege was claimed on Waibel's investigation into my concerns, does that mean that counsel was administering that investigation?

MS. RIECHERT: Objection to the use of the word "administering."

BY MS. GJOVIK:

Q. What was the -- you used a different word. At direction, was giving direction on the investigation.

MS. RIECHERT: Under the direction of counsel was what she said.

THE WITNESS: Investigation under direction of counsel, correct.

BY MS. GJOVIK:

Q. Okay. Which counsel was directing the investigations that Waibel was conducting?

A. Under the -- in the legal department, we would put -- and I don't have the exact list in front of me. It would be at that time Isela Perez and/or Debbie Rice would be our internal counsel.

Q. They are executives. Is it normal for legal executives to direct investigations into employee

Page 115

concerns?

MS. RIECHERT: Objection. Misstates the testimony. Assumes facts not in evidence.

A. They are internal legal counsel, and some investigations are done at the direction of the internal Apple legal counsel.

Q. Okay. When did the discussions about terminating my employment begin?

A. That's a very broad question. When did the discussion with whom?

Q. The people involved in the decision to terminate me as Apple disclosed, that list of people, culminating in the Bertolus decision but with the larger discussion.

A. Those discussions would have been probably between the 30th and -- the 30th of August and the 9th were the discussions to determine what the basis for your termination specifically would have been around the 9th of September. The discussions that I mentioned, again, to be clear, the list of people I had mentioned before.

Q. Okay. And on the 30th when those discussions started, what was the basis for those discussions?

A. Again, the 30th would have been when you had started posts and concerns were coming in. This

Page 116

specific discussion that I mentioned, that would have been with global security, legal, including HR, Megan Bowman would be around the 9th of September.

And, of course, the conversations that Aleks had attempted to speak with you and Ekelemchi around the 7th, so somewhere around that time.

Q. So as of August 30th, who was involved in those conversations?

A. There was no conversations happening August 30th with the group of people that I've shared.

Q. So when did the conversations start about terminating my employment?

MS. RIECHERT: So object and instruct you not to answer with respect to any conversations that were -- involved the legal department or were made in connection with the legal department for providing legal advice.

MS. GJOVIK: You can't claim privilege to facts on dates.

MS. RIECHERT: You can -- if you ask what was discussed on a certain date, then I can because by answering that question, she's revealing what was discussed.

MS. GJOVIK: Under which case Apple would be claiming --

MS. RIECHERT: You can ask when legal counsel

**Page 117**

got involved, but you can't ask what date a certain discussion by legal counsel took place because that would reveal attorney-client privileged information.

BY MS. GJOVIK:

Q. Let me -- Ms. Warner, who were the people or persons to start the conversation about terminating my employment, and what departments do they work in?

MS. RIECHERT: Again, to the extent that it involves legal counsel, I instruct you not to answer.

MS. GJOVIK: If legal were the ones to start the conversation about firing me, they are then decision-makers, and their identities and dates have to be disclosed. Otherwise, we have to raise that to the magistrate judge and have her compel Apple to provide that information.

So please clarify your objections.

MS. RIECHERT: Yeah. I object on the ground that you wanted to know when discussions by the legal department took place regarding her termination, and I'm instructing not to answer regarding any discussions in the legal department about the termination.

And I also object to your characterization that you just made, which is incorrect.

BY MS. GJOVIK:

Q. Okay. So my question was who and what

**Page 118**

departments. If the answer is legal, that's where Melinda's objection comes in.

But then I need you to still give me an indicator of the people, like you can't just say, I can't tell you who.

So please answer, Ms. Warner.

MS. RIECHERT: Yeah. She's given you an indication of the people involved that provided information to Mr. Bertolus that resulted in him making the decision --

MS. GJOVIK: Speaking objection.

BY MS. GJOVIK:

Q. I am asking for who started the conversation.

MS. RIECHERT: And I'm objecting to the extent that that calls for information about legal counsel and what they were doing.

MS. GJOVIK: Okay. She can answer.

MS. RIECHERT: So if -- other than legal counsel, who was -- and other than under the direction --

MS. GJOVIK: No --

MS. RIECHERT: -- of counsel --

MS. GJOVIK: -- Melinda, I need to know who started the conversation about firing me for this wrongful termination lawsuit. And if Apple's lawyers

**Page 119**

were the ones who started that conversation, that is a fact they have to admit.

You can potentially claim privilege to content of some of those conversations. However, as you know, they are sword and shield issues that Apple can't claim privilege to absolutely critical defense facts. Otherwise, they waive their ability to make a defense in this lawsuit altogether.

MS. RIECHERT: So --

BY MS. GJOVIK:

Q. So I need to know who started the conversation to fire me. Please answer that, Ms. Warner.

MS. RIECHERT: By asking that question, you are asking what was discussed by Apple's legal department --

MS. GJOVIK: Speaking objection. You're testifying on behalf of Apple again.

MS. RIECHERT: I'm objecting on the grounds of privilege.

And I'm instructing you not to answer that question with respect to anything done by the legal department or under the direction of the legal department on grounds of privilege.

BY MS. GJOVIK:

Q. Ms. Warner, was it Apple's legal department that started the conversation about firing me?

**Page 120**

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Ms. Warner, which lawyers in Apple's legal department started the conversation about terminating my employment?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer.

BY MS. GJOVIK:

Q. Ms. Warner, around what date did Apple's legal department start the conversation about terminating my employment?

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client privilege.

BY MS. GJOVIK:

Q. Ms. Warner, what do you know about the Keynote slide deck called "Exit Outcomes" about terminating my employment created prior to the 30th?

A. I don't know anything about that, that Keynote.

Q. Okay. We'll get back to that later.

When was Mr. Kagramanov assigned to do the investigation into me?

Page 121

A. It would have been sometime the early part of September, before the 9th, so I believe after probably around the -- I would have to look at, but before the 9th of September. I think there was a Labor Day holiday that week as well.

Q. Why was Mr. Kagramanov getting updates on my case directly to senior vice president Deirdre O'Brien?

A. I'm sorry. Your question is why was he getting updates?

Q. Giving updates.

A. Giving updates to Deirdre about your case, what case is that you're referencing?

Q. Apparently the investigation into me.

A. Okay. His involvement, Deirdre was the head of the people team. So if there's an update to her, to me, within the legal -- the people team, she would get an update.

But I'm not sure what it is that you're referencing to.

Q. Is it typical to give those high-level executives updates on employee relations disputes?

A. It depends on the circumstances. It depends on the case. You don't want your executive to be surprised by a case, so if there is a case that we're handling we think or I think it's appropriate for her to have an

Page 122

update, I'd do that.

There's no set rules about what case or types of cases to give. She's the head of people, the head of HR.

Q. Were you the one who decided she should get updates on my case?

A. I think you're assuming -- I don't know what updates specifically you're talking about. She would get updated, but I would be involved in the discussion to make sure she's aware there are particular cases we're working on that she may know.

Your -- your investigation wouldn't have been any unique. I give her update regularly one-on-one certain cases. The team might give her update with me copied. So it's not unusual.

Q. Do you know why Mr. Kagramanov testified this was the only case in his entire tenure in employee relations where he was contacting Deirdre O'Brien?

MS. RIECHERT: Objection. Misstates his testimony. He said it was the only one he could recall. So don't misstate the testimony of the witnesses. That's not fair.

BY MS. GJOVIK:

Q. Okay. Do you know why he would say that?

MS. RIECHERT: Objection. Misstates the

Page 123

testimony. He didn't say it.

A. I don't know that he said that --

Q. Okay. We can look at his testimony later. We'll look at it after lunch.

When Ms. Bowman sent Mr. Bertolus an email about the reasons for the termination, she mentioned something about redactions.

What do you recall about redactions being a factual basis for the termination?

MS. RIECHERT: Objection. Vague.

A. I would need to look at the email to see where the term "redactions." I don't recall without looking at it redactions in the context of that.

But as I mentioned earlier, there was a third basis or to consider for your termination, which was the misleading information that you had provided in the text messages, and I know we haven't talked about that.

Q. Were there redactions in the text messages?

A. You provided one set, and then there was more. So that -- I don't know if that's what that's referencing, so we would need to look at the letter or the email.

Q. There's -- we will look at it.

But is there anything you know as Apple's witness about why the term "redactions" would be used as

Page 124

a factual basis for firing me?

A. I don't believe the -- the term "reduction" -- "redaction" is the basis for firing you. I don't believe that's what the -- the record so far has shown or that my understanding.

Q. Are you aware of any allegations of misconduct about me related to redactions?

A. Not that I'm aware of, again, other than you're providing part of the story on the text messages, that's what I would assume. But I don't want to assume because your question is not really -- I don't know what the -- what it's regarding.

Q. Okay. And then let's talk about the administrative leave. So on August 4th, 2021, Mr. Okpo put me on administrative leave.

What was that administrative leave coded as in Apple's systems?

MS. RIECHERT: Objection. Misstates the testimony. Assumes facts not in evidence.

A. To clarify, my understanding is you had requested to be placed on an administrative leave, and Mr. Okpo agreed to that. As of August 4th, you were on leave. Mr. Okpo did not put you on leave. He agreed to a request that you had made.

And to answer your question, that was not

Adelmise R. Warner

Page 125

coded, and you actually were just on leave and getting full pay and full benefits.

Q. So if someone is on administrative leave, there's no update in any system designating them on leave?

A. The investigator or the person who is working with you could -- at that time could send a request to have it be coded or changed.

But, again, in this instance, given that you had requested to be out while the investigation was ongoing, there was not a request to actually change you in the system. And you were simply granted that request to be out.

Q. So I disagree with the framing -- Apple's framing of this, and it's answering questions I'm not asking.

But it sounds like you're confirming it's no update in the system.

Was there ever an ETA for when I would be able to come back to work from that leave?

MS. RIECHERT: You're talking about the Okpo leave?

MS. GJOVIK: The Okpo leave.

A. You were granted the request to be out on leave while Mr. Okpo was conducting the investigation, so the

Page 126

assumption would be during the course of that investigation, when it was completed, unless you had decided to be returned, which I believe Mr. Okpo did offer you that if you wanted to come back, you had -- they would make the arrangements for you to return.

Q. So I had asked to go to a training I had registered for, and Mr. Okpo declined.

What was the basis for Apple declining to allow me to go to the training I registered for?

A. My understanding is Mr. Okpo did not decline you attending the training. He had told you because you were on a leave of absence, you should not be attending a training which is an Apple-sponsored event.

Again, when an employee is on leave, they don't participate in a work event. If you wanted to attend the training, you had a couple of options: One, you could schedule it for a different time when you returned, or you could tell them you wanted to return and he would make the arrangements for you to return.

He did not decline you attending the training, which I think is misstating what he had done.

Q. Yeah.

So I had permission from Mr. Cohen and Ms. Stout at Apple University to attend it while I was on leave, and I wanted to attend it because it was

Page 127

related to something I was working on in law school, which I explained to Mr. Okpo.

And he said I wasn't allowed to go while I was on leave.

What is Apple's policy basis for telling an employee they can't go to a training they want to go to with the basis being they are on leave?

A. As I've already stated, when you are on a leave of absence, the expectation's that you're on leave. You're not participating, engaging in work-related meetings, events, activities, et cetera.

Apple University, the individuals you described, they don't make the decision on whether an employee should be returned from leave or not.

And, again, as I've stated, Mr. Okpo did give you the options if you wanted to attend that training.

Q. Yeah.

So as you read in my issue confirmation, I complained about a hostile work environment and had been asking for intervention about that hostile work environment.

So is Apple's position the only way that I could go to the training I wanted to is if I voluntarily requested to return to an environment I claimed was a hostile work environment? And constructive termination

Page 128

were the terms I used in that issue confirmation.

MS. RIECHERT: Objection. Argumentative. Assumes facts not in evidence.

A. You're also conflating a whole lot of different things in the question you are asking.

As I've stated, when an employee is on a leave of absence, the expectation is that they are not to be working or engaging in work-related activities.

And I've described what Mr. Okpo gave you as the options to attend the training in my prior testimony.

Q. When was it decided to -- I say put me on leave. You have your own interpretation of what that's called.

When was it decided, though, that Ashley Gjovik can or should go on leave? What was the date?

A. I believe August 4th, you requested the leave, and Mr. Okpo granted you that request, and, therefore, you were on leave.

Q. So there was no discussion about leave prior to August 4th?

A. In this instance with Mr. Okpo, I also understand you took a administrative leave back in -- earlier in May, I believe, when Jenna was investigating your --

Adelmise R. Warner

**Page 129**

Q. I'm talking about Okpo. My question is about Okpo.

A. Yes.

Q. So are you saying there was no discussion or decisions made about administrative leave in the Okpo investigation with me prior to August 4th?

A. Yes, correct, no decision made because you had not specifically requested to be placed on leave.

Q. And Apple is saying I requested to be placed on leave on August 4th?

A. That -- I believe that was around the time you had the conversation with Mr. Okpo, yes --

Q. Okay.

A. -- in the Okpo investigation, to be clear.

Q. Mm-hmm.

A. Yes.

Q. And my prior request that actions be taken to mitigate the hostile work environment and I wanted interactions with my managers in writing I had asked for several times to Okpo, were any of those requests considered prior to deciding to put me on leave instead?

MS. RIECHERT: Objection as to whether it was considered by you, but with respect to Apple, you can answer the question.

A. I'll take the -- because I think you add a lot

**Page 130**

of different things in the way you ask the question.

But if you are talking about specifically the request to only interact with your manager in writing, yes, I believe you did discuss that with Mr. Okpo.

And, again, you -- it's very difficult for an employee to be managed and only interact with their manager via writing. The nature of the work is sometimes you do need to talk to the person. They need to talk to you.

And, again, that was one of the things you had asked for, and since the leave, you wanted to not be engaging with your manager, Okpo -- Mr. Okpo agreed to grant you that request to be out on leave.

Q. And to be clear, the writing was just during Okpo's investigation. That wasn't ongoing.

So is that another case of Apple finding that written communication -- requests for written communication are things they won't approve?

A. I think --

MS. RIECHERT: Objection. Vague.

A. And you're misstating what I've said.

Q. Okay. Apple was aware that I planned to go to my office on August 5th to go get my laptop with evidence including text messages and to go look at the cracks on the floor.

**Page 131**

And Mr. Okpo put me on leave on the 4th and removed me from the workplace and all workplace interactions.

What was Apple's justification for preventing me from going to my office as I had planned to go?

MS. RIECHERT: Objection. Misstates the testimony. Assumes facts not in evidence.

A. As I've stated, Mr. Okpo heard your request to be -- go out on the leave, so not -- you're not in the workplace. He agreed to that.

Your wanting to and what you've said, wanting to go to the office and doing all those things, were not the basis for his decision. He simply granted a request that you had made.

Q. Why would I request to be put on leave concurrently with wanting to go to the office? Those would be contradictory.

MS. RIECHERT: Objection. Lacks foundation.

MS. GJOVIK: It's in the issue confirmation. I complained about this specifically in the issue confirmation filed to Apple.

A. Ms. Gjovik, you're asking me why would you ask something. I was not in your head, so I wouldn't be able to explain why you asked for that. So that's -- I'm not sure how you would want me to answer that.

**Page 132**

Q. So Apple's position is it understands that I planned to go to the office on the 5th but that I concurrently asked to be put on leave the day before I wanted to go to the office?

MS. RIECHERT: Objection. Misstates the testimony. Assumes facts not in evidence that that's what Apple knew.

A. Again, going back to my earlier testimony, your interaction was with Mr. Okpo. You requested the leave. He granted it.

Your question is assuming he knew all the things you wanted to do, future, after you were on leave, and I don't think that's the right assumption.

Q. Okay. Did Apple review my communications with Okpo prior to that leave where I repeatedly said I didn't want to be put on leave and thought Apple was using leave in ways that were retaliatory?

A. Can I --

MS. RIECHERT: Objection. Assumes facts not in evidence.

BY MS. GJOVIK:

Q. We can look at those emails after lunch. Actually, that's a better way. We'll look at those emails after lunch. We can read them together.

A. That would be helpful.

Page 133

Q. And then was it Apple's position that regardless of whether I asked to be put on leave or Apple --

(Reporter interrupts for clarification of the record.)

BY MS. GJOVIK:

Q. Let me start fresh on that one, too.

Apple's position regarding the leave I was on starting August 4th, did that include an expectation that I would not use Apple's Slack tool to talk to my coworkers?

A. No.

Q. So I could have used Slack to talk to my coworkers while on leave. Is that correct?

A. Correct. You were not prohibited from using Slack. In fact, your systems access were not cut off. You had full access to Slack and emails and other things while you were on the leave.

Q. When Okpo said I was removed from all workplace interactions, did that then mean -- or help me understand what that means if I could still use Slack.

A. Actually, I think it would be helpful to look at the specific words Mr. Okpo stated in the email.

But my understanding is he never told you you could not use Slack and you were prohibited from using

Page 134

Slack. In fact, you did, and you had access to Slack.

Q. How did you know I used Slack?

A. If you are saying that you -- I don't know if you used Slack. You had access to them.

Q. Okay.

A. You had the systems, access to Slack, emails. None of it was shut off, my understanding.

Q. When was the first time my system access was shut off?

A. Your systems access were shut off after your termination. My understanding is that your systems access were not shut off while you were on the leave.

Q. So when Mr. Kagramanov told me that my access to systems was removed prior to me being notified of being terminated, would that indicate that a decision was already made to terminate me?

MS. RIECHERT: Objection. Misstates the testimony.

A. I don't know that's what Mr. Kagramanov testified to, that he told you your systems access were shut off.

So, again, I think to -- for me to answer that, I would need to see what he said exactly. I did not review his deposition testimony.

Q. But it's your understanding that until a

Page 135

decision was made to terminate me, my system access wasn't removed?

A. Your systems access were not removed while you were on a leave. But when -- around the timing, I don't have the exact date, but around your termination, of course your systems access were removed.

Q. Okay.

A. But Mr. Okpo did not prohibit you or cancel your systems access during the leave.

Q. So if I could still use Slack while I was on leave, why couldn't I go to the Apple University training? What was the difference?

A. Again, the training is an event, activity, a program that you would have to go attend.

And as an employee, if you -- just like you can use email, just like you can use Slack, if you still -- or Box, if you have systems access, you can do that. You're not expected to do work. You're not expected to attend events like -- like the Apple U training. So they were very different.

Not every time an employee is on a leave that we would suspend access. And in your case, that was not suspended.

Q. Okay. Ms. Warner, maybe you're not familiar with what this training was. It was about racial

Page 136

justice, specifically black voter suppression. And I was writing a paper about black voter suppression in law school, so it was directly relevant.

And it was remote. I didn't have to go in person.

So I'm trying to understand why an Apple University training about racial justice and black voter suppression was something I could not attend, but you're saying I could use Slack to talk to my coworkers still. Can you please explain why one thing is being prohibited but the other is not?

MS. RIECHERT: Objection. Misstates -- asked and answered repeatedly.

A. Two things. And I will say this, and I've -- I seem to be repeating myself quite a bit.

It doesn't matter what the topic of the training was, whether it's about racial justice, black voters, none of that. That was not the factor.

The point is you were on a leave of absence. Mr. Okpo told you while you're on leave, it would not be expected and appropriate for you to attend a training by Apple University that is considered somewhat work related.

Again, if you're writing a paper about it, that -- it doesn't matter what the topic was.

Ashley Gjovik vs. Apple Inc.

Adelmise R. Warner

**Page 137**

The Slack, email, those other things, you were not prohibited if you were on leave. You could still have access. Again, if you need it, for example, communicate with Okpo via email, you would have access to that. They are very different things.

Q. Okay. So why do you feel that a training about black voter suppression was related to my role at Apple?

MS. RIECHERT: Objection. Asked and answered.

MS. GJOVIK: No. That hasn't been asked, and she indicated that the training was related to my role in work.

BY MS. GJOVIK:

Q. And so I would like to understand why learning about the history of black voter suppression in the United States was related to my role as a senior engineering program manager at Apple.

A. Ms. Gjovik, that's not what I said. I think you hear different things when I speak, so I think it would be helpful for us to hear what I said.

I did not say this was related to your work at Apple. I said the training, regardless of the topic, the expectation when you're on leave, you would not be engaging in any work-related activity, whether training, through Apple U, or none of that.

Again, it was sponsored by Apple U. I did not

**Page 138**

say that was part of your job.

Q. But you said I could talk to my coworkers on Slack, so I'm just confused about the distinction here.

MS. RIECHERT: Objection. Asked and answered if there's a question in there.

BY MS. GJOVIK:

Q. Okay. So on August 4th, with the conversation with Okpo about administrative leave, if I had said no, I don't want to be on administrative leave, would I have been allowed to continue working in my role and not be on leave?

A. If you had not requested to be placed on a leave, Mr. Okpo would not have granted you to be placed on leave. At that time you would have been working while he was going through the investigation.

Q. So that's not what I requested.

Like regardless of whether or not I said I would talk about leave or consider leave -- because there was a nuanced conversation about leave if there's other stuff I'd prefer he did, but I was getting --

Anyways, if I said during that meeting, I don't want to be on leave or I don't want to be on leave today or some kind of caveats, did I have any agency to determine the timing of the leave or whether I was on leave, or was there already a decision that I was going

**Page 139**

to be put on leave on August 4th?

A. You had complete agency.

Q. Okay. I told him I did --

A. The leave --

Q. Sorry. Go ahead.

A. The leave you went on, the timing, the request, the agreement to be placed on leave was completely up to you.

Q. Okay. So I objected that if I was going to be put on leave, I didn't want to be on leave that day. I wanted at least a couple days. And I was told no.

MS. RIECHERT: Hold a second. Is there a question there?

And I'll object. Assumes facts not in evidence.

BY MS. GJOVIK:

Q. Okay. Are you aware that I attended a project meeting that afternoon after the meeting with Okpo still and told several managers in my organization that I had been put on leave and didn't know if I was allowed to even be at that meeting, but I still wanted to see them and get the project work done and still -- I still attended my work task that day?

MS. RIECHERT: Objection. Assumes facts not in evidence.

**Page 140**

But you can ask if you're aware of that.

A. Yeah. There's a whole lot there that I don't know what part of it that I'm aware of specifically on what you told your coworkers. I did not look at anything of what you shared with them specifically.

Q. Okay. Ms. Warner, how many employees who complain about hostile work environment -- and I used that word in emails and the issue confirmation.

So how many -- how many employees that complain about a hostile work environment and end up on leave one way or another ask to come back to the same environment that they said was a hostile work environment?

A. I think you're asking a question that is an impossibility. I don't know the number of individuals at Apple who's raised concerns and who have requested to be placed on a leave.

If the employee requests to be placed on a leave while the investigation is ongoing, typically the answer would be we would grant them that because -- especially if they said, I don't want to be here.

But that's on a case-by-case basis. I don't have an exact number for you.

In your case, you requested it, and it was granted.

MS. RIECHERT: It's also not one of the --

www.aptusCR.com

Page 141

MS. GJOVIK:  It's not my -- objection.

BY MS. GJOVIK:

Q. And Melinda has been using my deposition transcripts with stuff taken out of context as if it's somehow testifying against me.

So I'm going to ask you to please answer my question directly and stop inserting stuff that I'm not asking because she uses that somehow as evidence against me.  It drives me crazy.

So employees --

MS. RIECHERT:  That characterization --

BY MS. GJOVIK:

Q. -- who complain --

MS. RIECHERT:  -- so ask the question without that characterization in it.

(Speaking simultaneously.)

BY MS. GJOVIK:

Q. My question was of complaints -- of employees who complained about hostile work environment and then end up on leave one way or another, how many asked to come back to the same environment they had described as a hostile work environment?

MS. RIECHERT:  Asked and answered.

A. I have answered that.  And there's also -- you've added multiple parts to this question, but I've

Page 142

already answered the question.

I don't know how many employees who have raised concerns who ask to be put on a leave of --

Q. That's not the question, Ms. Warner.

MS. RIECHERT:  Okay.  What is the question, then?

BY MS. GJOVIK:

Q. Who end up on leave one way or another ask to come back to the same environment they described as a hostile work environment?

MS. RIECHERT:  I'll object as improper hypotheticals.  Way outside of the topic of what this witness is testifying to.  And I think the witness is saying it depends on why they ended up on leave.  You said one way or the other.  So objection on that basis, too.

MS. GJOVIK:  We'll look at the investigators' testimony after lunch where they said they could recall no one ever asking.  Okay.

A. I think, Ms. Gjovik, you're -- I just want to add to that, I think, again, you're assuming, I'm sure -- I know Melinda said that, but you're assuming the person, there's a determination there's a hostile work environment.

So, again, you're asking specific -- specific

Page 143

numbers that --

Q. That's not what I'm asking.

I'm asking if someone who complained using the term "hostile work environment" who ends up on leave one way or another asking to come back to the same environment they described as a hostile work environment.

A. I've already answered.

Q. Okay.  Yeah.

What can you tell me about why my position was eliminated after I was terminated?

MS. RIECHERT:  Objection.  Outside of the topics.

MS. GJOVIK:  No, it's not.

MS. RIECHERT:  You can tell me which topic that is, but I don't see it there.

But if you can answer --

MS. GJOVIK:  The termination.  If in firing me they canceled my position completely, that is relevant to the termination.

MS. RIECHERT:  Disagree with that characterization.  The question is why were you terminated, and it was not a position elimination.

MS. GJOVIK:  That is not the question I asked.  And you can have objections, but she still has to

Page 144

answer.

MS. RIECHERT:  Yeah.  I'm just objecting it's outside of the topic.  If she knows the answer, then she can answer it.

A. It is outside of the topic.  It is not one that I prepared to respond to as to why that role was ultimately eliminated.

But it would have nothing to do with your termination because that was a termination for misconduct.

Q. It would be evidence of pretext is why we're asking.

MS. RIECHERT:  Objection to your characterization.

BY MS. GJOVIK:

Q. Were Mr. Powers or Mr. West involved in the decision to terminate my employment at all?

A. No.

Q. Were Mr. Powers or Mr. West involved in the decision about me being on administrative leave in August 2021 at all?

A. No.

Q. Did Mr. Powers or Mr. West receive any feedback about their own conduct as an outcome of my complaints?

A. That's a very broad question.  Outcomes of

Page 145

which complaints?

Q. Well, let's say any of the complaints that were in the issue confirmation I sent Mr. Okpo in August 2021.

A. Yes.

Q. What feedback did they receive?

A. One was with respect to the use, from what I had understood, of the use of the term "open kimono." That was -- and which it was in your issue confirmation; the feedback of the use of that term was one.

Q. Any more?

A. I would have to -- it -- well, for Okpo investigation, there was no others with respect to Mr. West or Mr. Powers.

Q. Mr. West testified he received feedback from Mr. Okpo regarding something you have not mentioned.

A. Yes. There was for -- with respect to the restaurant, sorry, the restaurant sous chef for Mr. West, not Mr. Powers, there was feedback about the familiarity, his having a clearer line between professional and not.

That was another feedback that was provided both by Mr. Okpo and Helen Polkes, and that was one of the things that I had spoken with Mr. West about.

Q. Okay. Are there any other topics of feedback

Page 146

that you have not mentioned?

A. I've talked about the open kimono. With respect to that investigation, I don't believe so.

Q. What about the Waibel investigation?

A. There was feedback provided to Mr. Powers with respect to communications with you, better communications, and also role clarity, my understanding from that investigation.

Q. Okay. Can you tell me more about the open kimono? What was the nature of the feedback provided and any instructions given of how to correct the issue?

A. Just the use of that term or the phrase that I think you had raised concerns about just being mindful of using that reference.

Q. So generally don't -- try not to use that reference? Is that --

A. What I've just stated in terms of what I understood.

Q. Regarding communications between me and Mr. Powers, what was the feedback provided about improving communications?

A. Finding more ways and Helen to work with you two to have better communications, interactions, clarity of role which were somewhat commingled because I think there was some concerns around your role and feedback

Page 147

being provided.

Q. Thanks.

For communication, though, was there anything more specific about what communication was at issue or how to improve communication other than the whole definition?

A. Nothing specific that I was aware of other than around just how you were interacting with each other because a lot of the concerns were around your interactions professionally and lack of clarity, et cetera.

Q. Yeah.

Can you give me any additional details about communication between me and Mr. Powers and any feedback he received on communication?

A. What was described in your issue confirmation with Jenna, some of those things, that would be the gist of it. I don't have any specific without looking at the issue confirmation.

Q. Okay. And then you said Mr. Powers and the restaurant and --

A. Mr. West.

Q. Or, sorry, yeah.

Mr. West and the restaurant, can you tell me more about the feedback you received?

Page 148

A. The feedback generally was around just having clearer boundaries, again, professional from the familial, it was some -- one of the concerns you had raised, just it's better to have that boundary from a skip-level senior leader and you, the familiarity.

Q. And how does that intersect with the dinner?

A. The concern was the interactions with you and what you shared with going to the dinner, the sous chef and all of that, that text messages, that goes back to the last point I had shared earlier on the exchanges.

Q. Yeah.

But what was the feedback Mr. West received?

A. I think I've already answered that.

Q. So are you -- when you -- just to not do -- not do that or?

A. I've explained the having clearer boundaries, professional, personal, separating the two.

Q. So that -- how does that play out with the text message thread and dinner?

A. Well, do you want to go through the text message threads in the dinner --

Q. No. We've already done that on prior ones.

It's more about, like, was he being told to, like, stop texting Ashley like she's a friend? Like, what was the actual feedback given to him?

Page 149

A. The gist of it is to be able -- he's a leader, you're two levels down, to be able to have clearer boundaries; again, that's his recollection of the feedback I was provided.

Q. But what's Apple's -- you're not testifying on behalf of Dan.

What's Apple's position on the feedback provided to Dan?

MS. RIECHERT: Objection. I'll object to that as inaccurate. She's entitled to obtain information in order to give testimony on behalf of Apple. She did that. She talked to Mr. West. And she's testifying about what Mr. West told her.

MS. GJOVIK: Yeah. But I'm not asking what Mr. West said, and Apple would be responsible if Mr. West continued to do misconduct to other employees and would look back at this case of was he put on notice it was wrong, so this stuff is very material, and I'm asking Apple what feedback was --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: I'm sorry.

I'm asking Apple what feedback was provided to Mr. West specifically on this topic.

MS. RIECHERT: Okay. So first of all, you have

Page 150

a lot of characterizations in there at the beginning that I disagree with and object to as assumes facts not in evidence.

Secondly, you asked and answered as to the feedback that Mr. West was provided.

MS. GJOVIK: Okay. So I'm asking this in more detail because Apple concurrently argues the same factual basis was misconduct by me justifying termination.

So if Apple also gave Dan West feedback that his conduct was inappropriate and I was complaining about his misconduct, that then runs contrary to my complaint being misconduct by me and justifying my termination.

So if Apple won't provide any additional information about what feedback was provided with Dan West, that refusal then becomes evidence itself.

So if there's anything else Apple would like to add in response to my inquiry on this topic, I invite Apple to do so.

Otherwise, we can move on, and we will count Apple's prior answer as Apple's complete answer to that line of questioning.

MS. RIECHERT: Are you asking what is the difference between what Dan did and what you did?

Page 151

Because she can certainly answer that question.

MS. GJOVIK: That's not what I was asking, but since you greenlit that one, let's do that.

BY MS. GJOVIK:

Q. Please answer, Ms. Warner.

MS. RIECHERT: It's a great question.

A. They are very different, Ms. Gjovik. Dan, the concern you had was -- again, we can go through the text messages. I don't want to read them without seeing them in front of me.

But the gist of it, you thought it was inappropriate for him to invite you to the dinner or engage with you in the various text messages.

The feedback for him was as a senior leader, you're skip level, just having clearer boundaries.

Again, I am entitled to be able to say I spoke with him to confirm -- this was five years ago or almost five years ago -- what the feedback was to him, what the learnings were. So I've already described that.

Your conduct is very different in that you intentionally disclosed confidential product information when you should not have, and that was in violation of multiple policies, and I've also explained a couple other things, so very different --

Q. I'm sorry, Ms. Warner. We were going to be

Page 152

comparing and contrasting the allegation that me making a complaint about sexual harassment when Mr. West tried to get me to sleep with the sous chef at the restaurant that night was misconduct by me when apparently Dan got feedback that his activity was misconduct.

And that's what I'm trying to suss out is the difference between me complaining about the same conduct that apparently Mr. Okpo gave Mr. West feedback about that being inappropriate, and the basis being me not providing a complete text message exchange that I specifically said I wanted to go get on August 5th at my office, and then was told by Mr. Okpo I was not allowed to get to my office to get, and then said because I didn't have the text message, that was a reason for firing me.

So I think we should actually probably take our lunch, and we can continue the rest of this after.

I'm going to gather some documents and emails we can read, and maybe it'll be helpful for us to look at some stuff as we continue the rest of these questions, unless there's anything else you'd like to add before we end.

MS. RIECHERT: She had not finished her answer on what the difference between Mr. West's conduct and what your conduct was with respect to the text messages

between the two of them, so --

MS. GJOVIK: If she would like to answer, please go ahead.

THE WITNESS: Yes. You cut me off before I finished.

Your termination, you are comparing why you were terminated and the feedback to Mr. West. I have explained the primary reason for your termination, in addition to the fact that you didn't cooperate.

And then the final thing, which you seem to be zeroing in on, is you actually gave a part of a text thread misleading the investigators on that, when ultimately the full text thread showed something very different.

In fact, you just characterized the -- what Mr. West did, and the text messages did not show that.

So your attempt to give false and/or misleading information, very different than what Mr. West was, again, being a bit familial.

So that was my complete answer.

BY MS. GJOVIK:

Q. Can you please clarify, though, what you think the difference is because there was very little facts shared in what you just said.

So what was the premise that my screenshots

showed that you say that the whole text thread then showed was somehow false? What is -- please explain to me the narrative of that difference.

A. We can look at the text messages you provided Mr. Okpo with a single text which --

Q. Because I didn't have the full thread.

But we've reviewed the thread in detail now with multiple witnesses, so I don't think we have to spend an hour doing that today.

But you're Apple, so you must know why you fired me. So please, Ms. Warner, as Apple, explain to me what exactly I misled about.

A. You just described, Ms. Gjovik, that he tried to have you sleep with -- and I don't know the exact word you used -- with the sous chef. The text thread, the -- when you look at the whole thread shows a different picture. It says something different, and so --

Q. Tell me about that picture.

MS. RIECHERT: Wait. She hasn't finished.

MS. GJOVIK: Yeah.

A. We do need to look at it so we can compare it again. I'm not -- I haven't, you know, gotten it all in memory in terms of everything.

But there was a multitude of texts exchanged

between you and Mr. West during the course of the dinner, and that tells a very different picture, which Mr. Okpo attempted to speak to you about, and even now looking at it is very different.

So that is the reason. Those are different. And we can look at it. I know you don't want to, but it is important --

Q. No, we can. We just don't have time because we have a hard stop, and Melinda already said that I can't have more time with you. We don't have time to go over it again.

And I would expect that Apple would already know and have an answer on this and not want to spend just an hour reading those texts.

They are pretty weird, though.

Apple also has not provided what supposed texts I provided or why they're misleading. And I was hoping to get that answer today.

So if you need to go read your stuff at lunch, I would really appreciate it because I would like an answer from Apple today based on stuff they should have prepared on. If this was a formal reason they fired me, there should be an in-hand answer about exactly what text I provide, why they were misleading, and then why that full thread shows something different.

And the only thing Mr. Okpo has testified to was that I texted the sous chef was cute, and that's all I know.

So I was really hoping to learn more from you today. Would you be able to maybe read more during the lunch and read up on those -- that stuff or talk to your Apple witnesses so we can get an answer from you today, please?

MS. RIECHERT: There's so much wrong with that question, I just don't even know where to start.

We have provided the text that you provided, the one text you provided.

Everything else you said was just absolutely false, and this witness has explained why it was that you were -- one of the reasons that you were terminated was providing misleading information about what the texts said when compared to the full texts. So she's --

BY MS. GJOVIK:

Q. So what was different? That's the open question.

And Apple has not identified which texts I've provided it thought was misleading. If it does have that and can provide that, that would be helpful. I don't currently have that information.

MS. RIECHERT: Okay. You don't have the texts

Case 3:23-cv-04597-EMC    Document 377    Filed 05/25/26    Page 294 of 610    Ashley Gjovik vs.
Apple Inc.

Adelmise R. Warner

Page 157

that you put in the box that you gave to Mr. Okpo?

MS. GJOVIK: Apple has never made a statement -- and you're not Apple, Melinda, unless you want to do a written filing in the court for a discovery response.

But there's no formal statement from Apple at this time of what I provided, why it was misleading, other than Mr. Okpo's cutie comment, what the full thread shows, why it was misconduct for me to not provide an email thread I didn't even have access to and was trying to obtain, and a bunch of other stuff.

So I was really hoping Apple would be prepared to answer this in detail from their side. But instead you're asking me a bunch of questions. And it's not a deposition of me today.

So is this something that Apple can, like, regroup on over lunch and then hopefully have a better response after?

MS. RIECHERT: So we don't need to regroup on it. We have provided you with the text that you provided. We've explained to you why it's misleading --

MS. GJOVIK: Why? Why is it misleading?

(Reporter requests a break.)

MS. GJOVIK: Let's have -- let's do 45 minutes. We'll come back at 12:50.

Page 158

(A lunch break was taken.)

BY MS. GJOVIK:

Q. Okay. Ms. Warner, was Apple aware of the plaintiff filing any complaints or charges with any government agency prior to her termination?

A. Prior to her termination, yes, Apple was aware of charges that plaintiff had filed with the NLRB.

Q. With any other agencies?

A. No. NLRB is what we were -- Apple was aware of that I'm aware of.

Q. When did Apple become aware of the NLRB charge?

A. It would have been the last part of August, before the beginning of September. I don't have the exact dates of when it was filed.

Q. Okay. And then Apple's produced a number of business conduct tickets tracking complaints about the plaintiff or questions about the plaintiff.

Did Apple -- someone at Apple investigate every one of those business conduct tickets?

A. Sorry. Can you rephrase that? I think there's a lot in your question. Can you restate that?

Q. Yeah.

Apple produced a number of business conduct tickets that included complaints or concerns about the plaintiff, myself, from July '21 to September 2021. Did

Page 159

Apple investigate all of those complaints made about the plaintiff?

A. I would need to understand from July to September, you said multiple complaints about you.

Q. Mm-hmm.

A. I have already testified earlier some of the concerns that were raised about your disclosing confidential information, so that's one.

And if there are other complaints that came in through business conduct, they would have been part of the investigations that occurred in August and September.

Q. Okay. So if there is a business conduct ticket and it complained about me and it said it was sent to HR and/or legal in the ticket and Apple produced it as part of this litigation, it's safe to assume that was part of the investigation into me?

A. It's safe to assume that they would be part of the ongo -- the investigations, correct.

Q. Okay.

A. Yeah --

(Speaking simultaneously.)

BY MS. GJOVIK:

Q. And then any --

Page 160

(Reporter interrupts for clarification of the record.)

THE WITNESS: I said, investigations --

MS. RIECHERT: Plural.

THE WITNESS: -- plural.

BY MS. GJOVIK:

Q. And then anything that people had attached to those business conduct complaints as, like, evidence that the alleged misconduct assumably was reviewed by someone at Apple as part of that investigation?

A. Your question is assuming a few different things. So if there is a misconduct complaint that included an attachment that came to HR, ER, that would be included in the investigations.

Q. Okay. Thank you.

A. You're welcome.

Q. And then when did Apple become aware I filed a complaint with the EEOC?

A. Subsequent to your termination, and I don't have the exact date.

Q. When did --

MS. RIECHERT: The topic related to knowledge of complaints prior to the termination.

MS. GJOVIK: What?

MS. RIECHERT: The topic deals with knowledge

Page 161

of complaints prior to the termination.

BY MS. GJOVIK:

Q. Okay.

A. It's topic --

Q. When did Apple become -- that doesn't -- that -- I can still ask the question.

When did Apple become aware that I filed a complaint with the California Department of Labor?

A. That would be after your termination.  I don't have the exact date.  Again, the notice of termination (sic) talks about those agencies before your termination.

Q. Okay.

MS. RIECHERT:  You mean notice of the deposition.

A. The notice of deposition that we --

Q. You guys are providing far more information than what's being asked.  So you can -- if it's after termination, you can just say after termination.

So let me rephrase that question or the remainder of my questions on the same topic.

I filed a complaint with the U.S. Department of Labor Whistleblower Protection Program.  Was Apple aware of that prior to or after it terminated me?

A. After.

Page 162

Q. Okay.  Same question with the SEC tip.

A. Except for the NLRB complaint that it was listed in the -- the notice for deposition, Apple was not aware of any other complaints with any government agency prior to your termination.

Q. Okay.  So all of the other agencies I was about to list, we're just putting them into that bucket of unless it's NLRB, they're saying they didn't know?

A. I don't know the list you're going to list.  I know the notice of deposition has a list of them, and I had already mentioned the NLRB from that list.

Q. Okay.  Regarding the NLRB charge, was anything done on Apple's side to investigate whether they may have violated the NLRA prior to terminating me?

MS. RIECHERT:  Objection.  Attorney-client privilege.

Instruct you not to answer if anything was done by counsel.

BY MS. GJOVIK:

Q. Was -- were the lawyers involved in responding to the NLRB charge also involved in the decision to terminate my employment?

A. That's assuming which -- I don't know which lawyers, internal in-house counsel would have been involved in responding to whatever charges that were

Page 163

filed that we were noticed of.

Q. And Apple had retained MWE as defense counsel for the NLRB charge prior to the termination.

Were they involved in the decision to terminate my employment?

A. No.

Q. Did Apple provide the plaintiff any warnings about their supposed misconduct prior to the termination?

A. No.  There were no warnings about your termination other than letting you know that we needed to speak with you, but the conduct that led to your termination was so egregious that it led to immediate termination.

Q. Is there, like, a standard practice or procedure when terminating employees that was followed for my termination?

A. That's a very broad question.  What do you mean procedures practice that were followed?

You had posted the information.  Again, I've walked through all the reasons for the termination.  There was a decision to terminate you, and you were notified of that.

Q. Okay.  Ma'am, you're not answering my question.

Most companies will have a standard process,

Page 164

usually HR manages it, when they are going to terminate an employee, and they'll follow, and it's like written policies and procedures.

I'm asking -- I guess the first question would be does Apple have that?

MS. RIECHERT:  So first of all, I'll object to your characterization that most companies have a process based on lack of foundation.

BY MS. GJOVIK:

Q. Okay.  Does Apple have written policies that HR and/or managers are supposed to follow if they are going to terminate an employee's employment?

A. That's a really broad question.  There are policies about what could lead to a termination, and some of those policies, I believe, were provided to you that are -- we can go over the list.

So if there is a review of the conduct and there's a determination that that conduct could lead to termination, that decision was made.

In this case it was.

Q. And you indicated that due to the, you said, egregiousness of the conduct at issue in my case that it was immediate termination.

Is there any kind of written policy or procedure at Apple for when someone thinks they need to

Adelmise R. Warner

Page 165

make an immediate termination?

A. Some of the policies call for when termination can happen. There's not a specific policy that says these categories will lead to an immediate termination. Again, it depends on the circumstances.

Something like egregious nature of actually leaking or sharing confidential information intentionally was a basis for termination.

Q. Okay. Did Apple have any communications with government agencies about charges or complaints I made, so NLRB, prior to my termination?

A. To the extent that there would have been a notice of appearance to the charge done through counsel, I'm not aware of any other contact with government agencies about you in advance of your termination.

Q. Okay. And Apple has indicated that my social media activity was relevant to the termination decision. Is that correct?

A. If you are referring to your posting of the images on Twitter, X now, and/or sharing them with "The Verge," then, yes.

But if you're referring to something else, I don't know what that is.

Q. Sorry. "The Verge" isn't social media.

So, yes, by social media, I mean Twitter, now

Page 166

called -- I don't like calling it X, either. I --

A. Okay.

Q. -- we can just call it Twitter.

So I'm talking about Twitter specifically, and it sounds like Apple has indicated that my Twitter activity was relevant to my termination decision. Is that correct?

MS. RIECHERT: Objection. Misstates the testimony.

A. My testimony is the images you posted on Twitter was relevant to your termination.

Q. Thank you.

So when Apple was investigating these images I shared on Twitter, did it review other posts I made on my Twitter account?

MS. RIECHERT: Objection to the extent it calls for information that would be privileged under the attorney-client privilege.

BY MS. GJOVIK:

Q. Okay.

A. Speaking to anything that is not privileged, what I've shared before, Mr. Bertolus reviewed the images that you had posted on Twitter, and that was the basis for the decision to terminate you.

Q. Thank you.

Page 167

My question is -- that didn't answer my question.

My question is did anyone, like, pull open my Twitter account and look at my other posts? Like assumably if they thought I was leaking, they would see if I was leaking more stuff than the thing they thought was leaking.

So did anyone at Apple go and, like, read my Twitter post as part of the investigation into me supposedly leaking supposedly confidential information on Twitter?

MS. RIECHERT: Objection.

Instruct you not to answer as to anything that may or may not have been done by the legal department.

A. Outside of anything that may have been done under privilege, no.

Q. If someone did go look at my social media platforms and posts, did they also look at my LinkedIn?

MS. RIECHERT: Same objection.

To the extent that anything was done by legal counsel or under the direction of legal counsel, it's privileged, and I instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. What about my website at ashleygjovik.com? Did they investigate the things I was

Page 168

posting on my website?

MS. RIECHERT: Same objections. Same instruction.

If it was done by in-house counsel or in the direction of in-house counsel, then I instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. So assuming it was done but by in-house counsel, what was the time frame? When did they start reading my social media or blog posts?

MS. RIECHERT: Are you talking about assuming that Apple's in-house counsel did it?

MS. GJOVIK: Mm-hmm.

MS. RIECHERT: Then I instruct you not to answer on grounds of attorney-client privilege.

MS. GJOVIK: I believe you have to provide at least the basic underlying facts. So, like, if it was legal, I need to know which lawyer and at what point they went snooping, like at least a rough timeline. I don't think you can just claim privilege to the entire factual basis.

MS. RIECHERT: I can. Anything that was done by Apple's legal department is privileged, and I will instruct the witness not to answer.

MS. GJOVIK: Okay. So all of these objections

Page 169

we're going to have to bring to Judge Westmore, but we'll do that separately.

BY MS. GJOVIK:

Q. Okay. When did Apple first become aware that I was posting on social media about Apple?

MS. RIECHERT: Again, to the extent anything was learned by legal counsel, I instruct you not to answer on grounds of attorney-client privilege. But if it came through another source, you're welcome to answer.

A. Other than -- I can't answer that other than some of the business conduct concerns that you've already -- we've already talked about. Outside of any privileged investigation that may have happened, I cannot answer that.

Q. There were business conduct tickets back to July 2021.

So is it safe to say that Apple had begun investigating my social media activity about Apple no later than July 2021?

MS. RIECHERT: You're making that representation. I don't know that the witness can --

BY MS. GJOVIK:

Q. How about this --

A. I cannot, assuming I'm aware of complaints from

Page 170

July 2021.

Q. Is it safe to assume that if there's business conduct complaints filed against -- about me, complaining about me supposedly leaking or misconduct, and you said that they would have been investigated as part of the investigation into me, that if there's business conduct complaints like -- actually, let me withdraw that. Let me find a better way to answer this.

What is generally the timeline for Apple to investigate a business conduct complaint being filed alleging that someone is making public statements that were misconduct? Is it usually days? Weeks? It could be months?

A. It depends on the nature of the allegations and how much and where the person is, what's being shared. So it depends.

Something about an allegation of leaks of confidential information is pretty immediate because that has potential for significant impact on Apple.

Q. So is it safe to assume if there were business conduct tickets alleging me of sharing confidential information, and there was, like, activity on the ticket saying it was being sent to legal and HR teams, that that meant that Apple was investigating those complaints at the time those entries were made?

Page 171

MS. RIECHERT: Objection. You said -- were they investigating at the time that the business conduct complaint was made at that -- on that day or --

MS. GJOVIK: No, when the entries were made, like, sending to HR and legal team to look into this.

MS. RIECHERT: Right.

And the question is was it investigated on that day or on subsequent days? So I just wanted to clarify your question.

BY MS. GJOVIK:

Q. My question is opaque because I'm not getting a straight answer the way I wanted to ask it, so I don't know. I might abandon this question. I have the evidence.

Let me find a different question.

Did Apple ever go back and investigate my other social media posts as part of an investigation into me?

MS. RIECHERT: Objection to the extent you're asking for information done by Apple's in-house counsel or at the direction of in-house counsel.

And instruct you not to answer based on attorney-client privilege.

BY MS. GJOVIK:

Q. Okay. Around when did Apple retain the law firm OMM to respond to me?

Page 172

MS. RIECHERT: Objection. Outside of the topics that this witness is knowledgeable for.

But if you know the answer, you can answer.

THE WITNESS: I do not.

I think you asked me that question earlier.

MS. RIECHERT: No. It was MWE earlier.

THE WITNESS: Oh, okay.

BY MS. GJOVIK:

Q. No. This is -- yeah, this one is OMM. They got three. They had another one.

A. No, I do not.

Q. Okay. There was a business conduct complaint filed on September 15th by someone named Cheryl Stewart Scarlett that was cited in some of the Apple's defense filings.

Was that used as a factual basis for determining to fire me or as part of Apple's defense in this matter?

MS. RIECHERT: Okay. Objection. Compound. Break that down. One, was it related to the termination? And, two, is it related to Apple's defense? She can answer those two separate questions.

BY MS. GJOVIK:

Q. Okay. First one, was it related to the termination?

Adelmise R. Warner

Page 173

A. I think you said that it was filed -- did you say September 15th?

Q. Yeah.

A. If it was filed after September 15th, it couldn't have been the reason for your termination. You were terminated on September 9th.

Q. And then was it used as part of Apple's defense?

A. That was part of Apple's defense in the legal lawsuit, but that's not the -- that wouldn't be part of what was decided for your termination.

Q. What was the relevance of using that complaint in the litigation as a defense?

MS. RIECHERT: So first of all, I think this is outside of the topics, which is not related to the defenses in the lawsuit.

Second, it calls for attorney-client privilege.

And thirdly, it calls for a legal conclusion.

MS. GJOVIK: It's definitely related if Apple is still continuing to use it as a defense, which it indicated by asking to have me sanctioned related to this communication with Stewart, so I would like an answer.

MS. RIECHERT: It's not related to this witness's topic is what I'm saying.

Page 174

MS. GJOVIK: But she's Apple, and you're representing Apple, so I would like an answer.

MS. RIECHERT: Yes. But it's not one of the topics. So she is --

MS. GJOVIK: It's only not a topic if you're abandoning it as a defense.

MS. RIECHERT: No. You told me which topic asks about our defenses to this lawsuit, and we can respond. But none of these topics that --

MS. GJOVIK: Investigations into the plaintiff and termination of the plaintiff.

MS. RIECHERT: Right. And she -- the witness has said that the Cher Scarlett complaint does not relate to the termination of the plaintiff.

MS. GJOVIK: That's probably good enough.

MS. RIECHERT: Good, because it came after the termination.

MS. GJOVIK: Okay. But if Apple is saying it's not related to the termination at all, then it's completely irrelevant to its defense.

MS. RIECHERT: No, not true. We've got the after-acquired evidence rule. So that's one of our --

MS. GJOVIK: So there goes why my question is relevant. Unless you're saying that this deposition -- the scope of this deposition doesn't cover your

Page 175

after-acquired evidence rule defenses. Is that what you're arguing?

MS. RIECHERT: Correct.

MS. GJOVIK: Okay. That's not how that works. Your after-required evidence as related to would have fired her anyway, it's definitely included here, especially since a complaint was about overlapping materials from what you're saying is your legitimate justification.

So I would like to ask more questions about this.

BY MS. GJOVIK:

Q. Did Apple have conversations with Ms. Stewart Scarlett about this matter prior to her filing that complaint on the 15th?

MS. RIECHERT: So first of all, outside of the topic.

But if you know the answer, you're more than welcome.

THE WITNESS: I do not.

Prior to your termination, again, the basis for your termination we've already talked about, which were the images that Mr. Bertolus reviewed, and the other subsequent actions.

I'm not aware of any conversation with Cher

Page 176

that led or that was considered by Mr. Bertolus for your termination.

BY MS. GJOVIK:

Q. I meant before she filed it on the 15th.

A. I don't -- I'm not aware -- I don't know of --

Q. She indicated that someone contacted her --

(Reporter interrupts for clarification of the record.)

BY MS. GJOVIK:

Q. Ms. Stewart Scarlett indicated that someone from Apple legal contacted her around the 3rd to discuss this matter, the 3rd of September 2021.

Do you know anything about this?

A. That would be legal counsel presumably under the investigation that's under privilege, so I'm not aware of anyone in legal, in the Apple legal, contacting her.

Q. Apple has indicated that this complaint that Ms. Stewart Scarlett -- Stewart Scarlett because at the time this happened, her last name was Stewart, but then she changed it to Scarlett, so it's Stewart Scarlett.

Apple indicated that the complaint filed by Ms. Stewart Scarlett revealed some information that they previously did not know at the time of the termination.

What was revealed in what she filed that was

Page 177

not known prior?

MS. RIECHERT: Okay. So first of all, this relates to the after-acquired evidence defense, which is not one of this witness's topics.

But if you know the answer other than what you've been advised by counsel, you're welcome to answer it.

THE WITNESS: I do not.

BY MS. GJOVIK:

Q. Do you know if there was an investigation into me further following her complaint?

A. Other than what I'm aware of from legal counsel and the privileged investigations, I am not aware of any.

Q. Has Ms. Stewart Scarlett ever been interviewed as a defense witness by Apple?

MS. RIECHERT: Objection. Work product privilege. Attorney-client privilege. Not one of this witness's topics.

BY MS. GJOVIK:

Q. Did Apple ever have communications about this matter prior to the termination with Ricky Mondello?

A. Outside of -- I am not aware of outside of any perhaps investigation that's privileged has done. I don't know Ricky Mondello. I'm not aware of any

Page 178

specific conversation. Is there something you want to --

Q. He was a -- sorry.

A. No.

Q. Okay. He was a manager, and he was posting stuff with holding out, like, an insider knowledge about "The Verge" article and Gobbler stuff. And he made some inflammatory posts right after I was fired saying, sometimes you fuck around, sometimes you find out, about me. And it seemed like he might have been involved somehow.

A. After you were terminated?

Q. Before -- the Gobbler/"Verge," that stuff was before, and then the fuck around, find out was like a couple hours after I was fired.

A. Again, talking to what led to your termination and what conversations happened is different than what happened after you were terminated.

Nonetheless, I'm not aware independently of posting by, you said, Ricky --

Q. Mm-hmm.

A. -- and conversations he may have had with anyone in legal at Apple.

Q. Legal, global security, HR. Okay.

Similar question for Shantini Vyas who also

Page 179

made a bunch of posts around September 1 and September 2 alleging I was making false claims and misleading people about my complaints about Apple and that I was filing frivolous complaints to the government and, again, held herself out as appearing to have inside information, did she have any communications with Apple legal, HR, or global security about this matter?

A. Since prior to your termination or since --

Q. Yeah.

A. -- termination?

Q. Prior.

A. Not aware of that individual. Again, if it's something that occurred in the course of the privileged investigation, that would be something I wouldn't be able to speak to.

MS. GJOVIK: Okay. Okay. Now we're going to do something a little bit different, in all my documents during lunch, the first one is going to be kind of boring.

Ms. Court Reporter, do you want me to get these loaded in the -- a drive folder now, or is it okay if I do it at the end and send you a link?

THE REPORTER: Yeah, either one is fine.

MS. GJOVIK: Okay. Thank you.

So I'm going to go like this, share.

Page 180

MS. RIECHERT: Are you going to put it in the chat, Ashley, or are you going to show it up on the screen?

MS. GJOVIK: I'm just trying to get my computer to work. It wasn't cooperating.

Okay. This one's just --

MS. RIECHERT: We're just seeing a black --

(Speaking simultaneously.)

BY MS. GJOVIK:

Q. This is just your LinkedIn I just pulled since you're the witness, just to have the profile of your experience. This is just a download from your LinkedIn as of today.

Is this accurate for your role at Apple?

MS. RIECHERT: It's eight pages long.

THE WITNESS: Yeah.

MS. GJOVIK: It's five pages.

THE WITNESS: Can you scroll -- five, yeah.

MS. RIECHERT: Five pages, right?

THE WITNESS: Yeah.

BY MS. GJOVIK:

Q. Does that look right?

A. It generally looks right. I have a copy of it. But it seems to be reflective.

I don't see the date of when you printed it.

Page 181

Usually when you print something out or download it, it has a date.

Q. It doesn't download when you do the PDF. I'm sorry.

But if that looks generally correct to you? This is Exhibit A.

(Deposition Exhibit A was marked for identification.)

A. It generally looks accurate.

Q. Thank you.

And then we were talking about this earlier. Exhibit B is that termination communication that Apple produced between Ms. Bowman and Mr. Bertolus.

(Deposition Exhibit B was marked for identification.)

BY MS. GJOVIK:

Q. Do you need it bigger?

A. Yeah. It's just --

Q. Yeah, yeah. I'm sorry about that. I forget how small it can be on the laptop screen.

So, okay, it starts here on September 9th.

MS. RIECHERT: (Inaudible.)

THE WITNESS: Oh, yeah. That's better.

BY MS. GJOVIK:

Q. Oh, she's got it projected?

Page 182

A. Yeah. It's good.

Q. Okay. Great.

So it starts September 9th with Ms. Bowman saying:

"Yannick, this afternoon Sophi Jacobs and Aleks Kagramanov, members of our global security and ER teams, reached out to Ashley to talk with her about allegations she had disclosed confidential product-related information on Twitter. Ashley chose not to talk with the team and asked for all communication to be in writing. She was informed that because she chose not to participate in this discussion, Apple would move forward with the information that we had and that due to the seriousness of the allegations, her systems access would be suspended. Ashley disclosed confidential product-related information on Twitter, and this conduct on its own warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including

Page 183

actively redacting relevant information from documents that she presented to Apple's ER investigator. Based on her conduct which violates Apple's policies, the people team recommends that her employment be terminated. Thanks, Megan."

Had you seen this email from Ms. Bowman prior?

A. Yes.

Q. Do you know did Ms. Bowman write this email herself, or was this a group effort with others?

A. The author says Ms. Bowman, so she wrote it.

Q. Okay. There were other emails that have been part of this where the folks were -- testified that it was drafted by someone else and they sent it.

So I just want to confirm, do you know that Ms. Bowman actually drafted it herself?

A. I haven't asked her if she drafted it, but because it came from her that she would -- she's the author of it, and I'm not aware of other emails you're mentioning that other people wrote.

Q. Okay.

A. So if you ask who wrote it, it's from Ms. Bowman. She wrote it.

Q. Okay. And this is the one where it says -- it uses that term "redacting."

Page 184

Do you know what she means by redacting?

A. Again, not having spoken with Ms. Bowman directly about this, what I was sharing earlier including actively redacting relevant information from the documents that you presented would relate to the text messages we talked about. You give one part of it, and then there was a fuller text thread.

Q. Yeah. I had provided what I had. I didn't have the other stuff.

But was there an allegation I redacted what I provided, like put black boxes on top of text or?

A. No. There's no allegation you put black box around the text. She may be using a term "redacted" in a different way than how you are referring to it. Again, I can't speak to what she meant by putting it there.

But the point of that third reason for the termination was you provided the text that was limited, and then there was a fuller text thread, which I've already testified about.

Q. Yeah.

And back to that, so is there anything else you want to add for Apple's rationale for that third bucket of things being misconduct, or was that your complete answer prior? We kind of cut off a little early on

Adelmise R. Warner

Page 185

that. I want to give you a chance if there's any other information you want to provide.

A. We did, and we talked a lot about that, and what I was trying to explain -- and I thought you were going to come back to the text -- but regardless, in your issue confirmation, you did characterize the interaction with Dan and Andrew and the chef at the restaurant, I believe your word in the issue confirmation, you used some term that he was pimping you and pressured to give Andrew your phone number, you had no interest in Andrew, and you had provided Okpo that single thread of text, which I've shared.

But the fuller text when you read it and the back and forth indicated a different story, which is why Mr. Okpo was trying to reach out to you to ask you to explain the inconsistency because that -- the text messages didn't show that the pressure and/or being forced to give the phone number. In fact, I remembered one of the texts, you had indicated you would give Andrew your phone number.

So, again, that's what I meant by that.

Q. That's helpful.

Is there anything else you want to add related to that? So it sounds like phone number? What was the other example you just gave?

Page 186

A. Again, without reading your issue confirmation, what I recall from reviewing it, you had used the word of being -- pimping and pandering, I believe, were the words.

You had mentioned that you were -- you didn't express any interest in Andrew. I recall you also mentioned that you were pressured to give the phone number.

And then just earlier when you were asking me the question, you basically were indicating you were forced -- you were being forced to have, you know, relations or with Andrew.

The text messages, what I was explaining, showed something different where you were, in essence, voluntarily saying you would give Andrew your phone number.

That's one example I recall.

Q. Okay. And you said that you -- you recall -- and, I'm sorry, we don't have time to go back through all that. I have, and I would have expected that you would probably read this beforehand to get prepared for it because we don't have time to go through every document with these type of documents.

A. There's not a question there.

But I want to clarify, I have read them before.

Page 187

What you want me to do is recite for you what the actual text said. There are multiple.

Q. No. I'm asking for Apple -- because they haven't given me an explanation on this, so I'm hoping to get from Apple today an explanation, like a narrative or summary, more information than just what I already have from those documents.

MS. RIECHERT: Objection. Mischaracterizes what Apple has and hasn't provided you. Mr. Okpo provided you a lot of information, as have discovery responses.

MS. GJOVIK: Disagree with that, but that's fine.

BY MS. GJOVIK:

Q. So, okay, and you're saying that you -- Apple believes that in those documents, I indicated I had no interest in Andrew, like it was being forced on me, but then the texts show that was not true? That's another example? Is that right?

A. To restate what I've shared, and I'll try to do it as succinctly as possible, in your -- in the issue confirmation, the characterization of that incident or that event, that interaction painted one story. The single text you provided showed one story.

The full thread indicated something different

Page 188

in terms of the story, the unwillingness to participate or engage or talk to Andrew or share the phone number. And I've given you some examples.

Again, without reading through each word of the issue confirmation, each word of the text, the point of the third reason was there was an understanding by Mr. Okpo that you were giving inconsistent, if not misleading, information, and he wanted to talk to you about that. And you refused.

Q. Oh, but it was just he wanted to talk without a written record. And we talked about that earlier because I said I would talk to him. I just wanted a written record.

And then you mentioned the pimping and pandering, the --

MS. RIECHERT: Hold on. Object to that as misstates the testimony and the documents.

BY MS. GJOVIK:

Q. The pimping you mentioned, it's a cause of action: Pimping and pandering with indirect benefits. So, like, actually, that's, like, California Labor Code whistleblower disclosures or complaints making -- a allegation of a violation of a statute is an actual whistleblower disclosure.

And are you --

Page 189

MS. RIECHERT: Okay. First of all, please don't recite the law because I'm just going to object. Ask a question.

BY MS. GJOVIK:

Q. Are you aware of the legal -- because -- so okay.

You were mentioning that the use of the term "pimping and pandering" as a sort of misconduct or basis of misconduct or the comparisons.

So I would like to ask if Apple is aware of the legal definition of a statute I was citing for pimping and pandering with indirect benefits and what the legal criteria is for that.

MS. RIECHERT: Okay. Objection. Outside the scope of any of the topics --

MS. GJOVIK: Protected activity. Retaliation. Reason for termination.

MS. RIECHERT: Calls for a legal opinion. I think that's -- I'll stop at those two.

MS. GJOVIK: Okay. So if we leave it at that, though, it's basically like saying she said that we violated the NLRA and we think that's misconduct because we don't think we did, so her saying we violated the NLRA is misconduct.

If you want to leave it like that, we can, but

Page 190

I was hoping to get more information about why Apple would think me citing the violation of a statute is misconduct.

MS. RIECHERT: Okay. First of all, that is exactly not what the witness said and so misstates the witness's testimony.

MS. GJOVIK: That's why I'm trying to get more information.

THE WITNESS: If you would allow me to, again, make sure I clarify, I did not state that you simply citing pimping or pandering is misconduct.

Very clearly, my testimony and what I understand is that you had characterized the interaction, and how you described what happened and what you provided to Mr. Okpo seemed to be different than what he was able to see from the text thread. And he wanted to speak to you about it. And you refused.

So the reason for that part of the termination was the misleading information and your refusal to speak to him.

I did not say your citing the statute or any legal argument you made was the basis for the termination.

BY MS. GJOVIK:

Q. Thank you.

Page 191

I was trying to do you a solid on that one because it sounded kind of bad, and I assumed it was not that wild.

But are you aware that Mr. West testified that he believed that there was a power imbalance that would prevent me from actually being able to consent to something like that?

A. That Mr. Powers testified?

Q. Or, sorry, Mr. West. Not Mr. Powers. Thank you.

A. Yeah. Can you say that again? Just, like, there's a lot there.

Q. Are you aware that Mr. West testified that he believed there was a power imbalance that would prevent me from actually being able to consent to something like that?

MS. RIECHERT: Objection. That misstates the testimony.

But you can answer if you're aware of his testimony.

THE WITNESS: I am not.

BY MS. GJOVIK:

Q. Okay. Are you aware that Mr. West and I had texted, and he had said it was one of the worst things he's ever done and confirmed that in his deposition?

Page 192

A. I am not.

Q. Are your aware that Mr. Okpo testified that me requesting to have communications in writing on this specific issue was a reason he closed the entire investigation and stopped investigating all of my other complaints?

MS. RIECHERT: Objection. Misstates the testimony.

A. I do not believe that's what he said, so that is not an accurate characterization of what Mr. Okpo shared.

Q. If that's not true, did Apple continue investigating my complaints after I was fired?

A. Mr. Okpo -- the -- again, without disclosing any privileged investigation that had occurred, the investigation did not necessarily conclude with you simply refusing. There were lots of other things Mr. Okpo had done.

And so how you're characterizing his testimony, again, I read his testimony; I don't believe that is accurate.

Q. Okay. When did the investigation into my concerns complete, then?

A. Into which concerns?

Q. The issue confirmation.

Page 193

A. That Mr. Okpo was -- was investigating?

Q. Yeah.

A. Sometime around the first week of September, the first half of September, the 9th, I believe, or the -- right after that.

Q. So I was fired on the 9th, so that would stick with him saying he closed it on the 9th because I wouldn't get on the phone with him.

A. Well, the 7th, he did tell you based on the information he has he would close out his investigation. So that assumes --

Q. He never said that.

MS. RIECHERT: The record will speak for itself.

BY MS. GJOVIK:

Q. Okay. So I should have just let you continue because that's not what's in there.

But, okay, let's continue with this.

So Ms. Bowman sends Yannick this email. Within six minutes, Mr. Bertolus responds:

"Understood. I agree with the termination decision."

Did Mr. Bertolus and Ms. Bowman talk about this prior to Ms. Bowman's email?

MS. RIECHERT: Objection to the extent that it

Page 194

calls for attorney-client privilege that he was present at a meeting at which counsel was present at which privileged information was revealed.

A. Outside of any privileged conversations that may have happened including Ms. Bowman and Mr. Bertolus that I've talked to -- earlier about, I don't have any independent information to say he had spoken to her separate from that and what she said in her email here.

Q. And in preparing for this deposition today, is there a reason you did not speak with Ms. Bowman to learn more from her experience in this?

A. I had information that I needed specific to the topics that you had described that I needed to testify about.

Q. Okay. Well, like, for example, using the term "redacting" and us not being sure what that means seems it would have been helpful to talk to her to learn more.

Did someone tell you not to talk to her?

MS. RIECHERT: First of all, that's your characterization. The witness said she had anything she needed. And if anybody told her not to talk to her, it would be privileged.

BY MS. GJOVIK:

Q. Okay. In retrospect, do you think maybe you should have talked to Ms. Bowman prior to this

Page 195

deposition?

A. No. I had the information I needed to be able to testify this morning. Asking me what she meant by a single word in an email being redacted, which I've explained what that would mean, I don't see the importance of the need to have spoken to her about it. I had what I needed.

Q. Okay. Let's talk about this more. So she says:

"Actively redacting relevant information from documents that she presented."

So how does that phrasing translate to providing screenshots without redactions? Help me understand, please.

MS. RIECHERT: Objection. Asked and answered.

A. I've already answered that a couple different times, Ms. Gjovik.

Q. So this indicates, like, withheld information. Does Apple believe that I had more information I could have provided but I chose to withheld?

A. Again, you are assuming what Ms. Bowman meant, but as I've testified earlier, you provided summaries of what you believed happened. You provided a text message. You did not provide the full exchange.

And Mr. Okpo was attempting to speak to you.

Page 196

So whether you withheld it intentionally or not, that's what he was trying to talk to you about, and you refused.

Q. Okay. So the issue confirmation indicates I didn't have it and I was trying to get it. It was at my office.

So I'm trying to understand if Apple thinks I was intentionally withholding more information than I had.

A. Based on the information we had and what Mr. Okpo had, Apple believed you did have information or at least there was more to the thread than what you provided.

But more significantly, the story, the thread, the messaging, what happened, shows a different picture, a different story than what you had described to Mr. Okpo in the issue confirmation.

That's the crux of him trying to reconcile the inconsistencies in what you shared happened and what he seems to see was happening reading the full thread.

Q. So are you aware that Mr. Bertolus testified that he wasn't even aware that this was about the sous chef? He thought this was about his personal friend who is the head chef.

A. Yes, I'm aware of that. I read his testimony

Page 197

that he did not know, and he mentions Andrew specifically.

But the point of this is the information that Mr. Okpo had he believed were inconsistent from what you had shared, not who the chef or sous chef was.

Q. And it sounds like Mr. Bertolus was provided this information by at least partially legal because he claimed privilege.

Do you think that maybe him being presented with information that led him to believe that this was a complaint about his friend, his personal friend, could have biased his decision making?

MS. RIECHERT: Objection. Lacks foundation. Speculation.

MS. GJOVIK: Yeah. She can answer.

A. No, I cannot because I think you've said a few things that assumes he knew a whole lot of different things. You said the information he had could have led to him being biased about his friend. You just said he didn't know it was Andrew.

So I'm not sure which part of the question you want me to answer --

Q. He's not -- Andrew is not his friend. His friend is Jared, the head chef. He testified that he thought my complaint was about Jared, his close friend,

Page 198

and he didn't realize it was about Andrew, the sous chef.

A. Okay. What's the question?

Q. Do you think -- do you think Mr. Bertolus mistakenly thinking my complaint was about his friend Jared could have biased Mr. Bertolus's decision making in deciding that I filed a frivolous sexual harassment complaint because he was led to believe that it was about his close personal friend?

MS. RIECHERT: Same objections.

A. Your question is asking me to assume what was in Mr. Bertolus's head, whether he had bias and whether it was considered his friend.

I have testified what Mr. Okpo was aware of and what was shared with the HR team, including Megan Bowman and what Megan shared with Mr. Bertolus, so I can't testify to do I believe a whole lot of different things that you said.

Q. Sure.

A. So I believe what he was provided, what was in front of him, and he considered that what Megan shared and what I've already testified about, that you, in essence, led the investigator to be misled into believing one thing when the evidence was showing something else. That was the nature of what he

Page 199

considered.

Q. Does Apple have any concerns about that decision, now looking back and realizing the decision-maker didn't even know who the complaint was about and mistakenly thought it was his friend, and if the complaint is about me supposedly misleading people, but that decision-maker not even knowing what the complaint was about, that maybe there should have been a further investigation before a decision was made?

MS. RIECHERT: Objection. Compound. Argumentative. Vague as to what the question is.

A. Yeah. I don't know. Like, the -- your question has a lot of different things in there.

Again, repeating what I've said earlier, what was important, Mr. Bertolus was told that there was an investigation, and there was inconsistencies in the information you provided and what the investigator had. And you refused to speak to the investigator about it.

Whether it was his friend or what he knew or what he now says he knows would not have changed the decision that was provided to him -- the information that was provided to him and the decision that was made.

Q. Does Apple stand by the integrity of their investigation into this matter?

A. Yes.

Page 200

Q. Okay. Does Apple stand by the integrity of the decision to terminate me arising from this matter?

A. Apple stands behind the decision to terminate you for the reasons I've already stated multiple times and as Mr. Bertolus stated.

Q. Okay. Thank you.

Okay. So then he responds in six minutes and says:

"I agree."

And, I'm sorry, whatever tool they used for these documents cuts off date and time stamps, and it gets really messy.

But she sends:

"Please see attached. Here's the attachments you can send to Ashley."

Do you know -- so Mr. Bertolus testified he did not draft that termination letter.

Do you know who did draft the termination letter?

A. Again, assuming your characterization of how Mr. Bertolus described the drafting, and then I don't have the specific words in front of me, but it is not uncommon to have the partners who were working with him, including Megan, HR, ER, and to be able to help draft the notification letter to the employee who is being

---

**Page 201**

terminated and for the leadership to be able to review and put in their own words.

Q. And then when she says:

"The people team recommends that employment be terminated."

Does the people team include employee relations as well as the HR business partners?

A. Employee relations is part of the people team, so, yes.

Q. And when she says:

"The people team recommends."

Who was she referring to as members of the people team that are making the recommendation?

A. In addition to Megan, that would be myself from the ER team. And I believe you were aware I was reporting -- I already mentioned reporting to Joni Reicher who was my former manager. So the people team would be inclusive of that.

Q. And that's the exclusive list? There's no one else?

A. On the people team?

Q. Mm-hmm.

A. Those who have been -- again, I've already listed anybody who was involved in consulting Mr. Bertolus; that would be Megan, myself, obviously

---

**Page 202**

Aleks who was involved in the conversations as well, and Ekelemchi who provided the information.

Q. Mr. Okpo said he didn't know I was fired or the reason I was fired. And Mr. Kagramanov said he had no background on the investigation and never heard anything more about it after notifying them that I wouldn't get on the phone.

MS. RIECHERT: Okay --

A. I've stated those who provided information.

Q. Okay. So I'm asking about recommends -- who recommends the employment be terminated, what the names are.

MS. RIECHERT: (Inaudible.)

(Reporter interrupts for clarification of the record.)

MS. RIECHERT: I said, asked and answered. It's -- the question was who on the people -- people team recommended it, and she gave three names.

MS. GJOVIK: But then she said Okpo and Kagramanov but then said they just provided information, so I'm trying to clarify who is on her list.

MS. RIECHERT: And they are not on the people team -- or maybe Aleks was --

MS. GJOVIK: They were. Both are.

MS. RIECHERT: You're right. You're right.

---

**Page 203**

You're right.

THE WITNESS: They were.

Ms. Gjovik, I think you are parsing it out. I said the people who would have been making the recommendation, to be clear again, Megan, myself who is on the ER team, part of the people team, and Joni at that time.

And what I stated was based on information obviously provided by Ekelemchi and Aleks, Mr. Okpo and Mr. Kagramanov.

BY MS. GJOVIK:

Q. So the information used to determine to fire me was based on information from Kagramanov and Okpo, but assumably other people from other organizations or just them?

MS. RIECHERT: Okay. A whole bunch of questions in there. Could you repeat it so we get one question?

MS. GJOVIK: She was listing people who provided information for the decision to terminate, and I was asking her to clarify if those two names she mentioned were the entire list of people or only the list of people who were in the people organization and provided information used to decide to terminate.

MS. RIECHERT: Okay. I don't think that was

---

**Page 204**

her testimony --

THE WITNESS: No, those are two different --

MS. RIECHERT: -- about this -- the letter, but --

THE WITNESS: There are two different things you're conflating.

Who provided information, I've given a list, I think, from the beginning of this morning of who were consulted, who were involved in the discussions, and also the two individual investigators who I've talked about following on the wanting to talk to you providing information.

In terms of the recommendation to terminate, the people team would include Megan Bowman who was the PBP, or people business partner, myself, head of ER, and Joni who was my boss at that time for the people team. That was your question.

BY MS. GJOVIK:

Q. Okay. Thank you.

And two times it was mentioned that someone wanted to reach out to me and talk to me and me not wanting to get on the phone was the reason for me being fired.

Was there anything that I could have said during those phone calls that were requested that could

---

Page 205

have prevented me from being terminated?

MS. RIECHERT: Objection. Incomplete hypothetical. Speculation.

You can answer if you know.

A. I don't know. It's hard to -- you could have said a whole lot of different things in those conversations.

But to be clear, going back to the underlying fundamental reason for your termination was that it was concluded what you had shared -- posted and/or shared through the press were confidential information. That was a basis Mr. Bertolus determined was grounds for termination.

In addition to that, your refusal to speak with those two investigators, which presumably you could have said, yes, I'll talk to you, I'll share my side of the story, whatever the justification could be, but you didn't do that.

And I've added the third additional factor that Mr. Bertolus considered.

So I don't know how to answer that without you having decided to talk to them. I've stated the reasons.

Q. So let's hone in on the Gobbler pictures and Mr. Kagramanov reaching out to talk to me because I

Page 206

think it's important to distinguish if Apple wanted to get me on the phone to talk about something that could have saved my employment or if Apple already knew that they were about to fire me.

So I'm trying to understand what exactly Apple planned to ask me on that call to try to figure out if there's any answers I could have gotten to save my employment at Apple.

So maybe a better question, my question would be what did Mr. Kagramanov and Ms. Jacobs plan to ask me on that call I was requesting?

MS. RIECHERT: So that's part of the investigation, and I will object on the basis of attorney-client privilege. Obviously, if they had spoken to you, then it would no longer be privileged. But you wouldn't speak to them, so it's privileged.

MS. GJOVIK: Okay. We'll bring that to Judge Westmore, too, and I'll ask again --

MS. RIECHERT: You've had your one chance at discovery.

But anyway, let's move on.

MS. GJOVIK: That's not true.

BY MS. GJOVIK:

Q. Anyways, the -- is there anything that I could have said during that call with Mr. Kagramanov and

Page 207

Ms. Jacobs that could have saved my employment, like, for instance, if I said, I'm sorry you're so mad at the -- about this, here's why I did it, though, I'm really sorry, do you want me to delete it right now, I'll delete it right now, could I have prevented getting fired?

MS. RIECHERT: Objection. Hypothetical. Speculation.

A. Could have, would have, should have. There was a whole lot of things you could have said and done.

But going back to my point earlier, the fact that, as I know it and as happened, is you did disclose the confidential information, you did refuse to speak, and you did provide misleading information. So those facts led Mr. Bertolus to terminate you.

What you could have done, should have done, would have done, again, is speculation, and I can't speculate to what that would have been and how it would have transpired because you chose not to speak with the investigators about it.

Q. Yeah.

So what I'm trying to figure out is if Apple has any substance at all to this defense I'm not trying to get on the phone, like if they were looking for a concrete piece of information or they just wanted me to

Page 208

apologize or agree not to talk about stuff, it gives Apple a little more credibility on this.

But if Apple has no -- nothing to say about what they are going to ask and can't give me any examples of how I could save my employment, then it sounds like that call was just probably to fire me, not actually ask any questions.

So then the whole wouldn't get on the phone for an investigation doesn't really make any sense.

So if there's anything Apple would like to --

MS. RIECHERT: All of that is your commentary, and I object to it all on that basis. So --

MS. GJOVIK: Okay.

MS. RIECHERT: -- when you make a whole bunch of commentary and then you ask a question, I have to keep objecting to your commentary. Just ask the question.

BY MS. GJOVIK:

Q. Is there anything else Apple would like to provide about what they plan to ask or anything I could have said during the call Mr. Kagramanov and Jacobs requested regarding the Gobbler stuff that could have prevented my termination?

MS. RIECHERT: Objection. Speculation. Hypothetical. Asked and answered many times.

Adelmise R. Warner

**Page 209**

MS. GJOVIK: And you said privileged earlier.

MS. RIECHERT: And privileged.

BY MS. GJOVIK:

**Q. Is there anything you can still answer?**

A. I have already answered the question a few different times, outside of any privileged investigation plan; I cannot answer that question.

**Q. So that was Exhibit B, that email.**

**And then now I want to show you three photos. These were photos of Twitter posts that I deleted after that email from OMM in 2021.**

**And I would like you to let me know if any of these were the posts -- where is my screen share -- that Apple fired me over.**

**This is Exhibit C1.**

(Deposition Exhibit C1 was marked for identification.)

BY MS. GJOVIK:

**Q. Is this -- are these images that Apple terminated my employment over?**

MS. RIECHERT: Again, just looking at the image and not the words. That's your question, right?

MS. GJOVIK: Well, she said that Apple terminated me over images.

MS. RIECHERT: Right.

**Page 210**

BY MS. GJOVIK:

**Q. So if that's true, going off of what Apple said, then, based on Apple's stated reason for terminating me, would these be the images Apple says it fired me over?**

MS. RIECHERT: And my point is there are words in addition to images here, so I don't want it understood that it was because of the words as opposed to the images.

MS. GJOVIK: I do think it's because of the words, too. But to your point, we're clarifying.

BY MS. GJOVIK:

**Q. Per Apple's stated defense, which is just the images, not the words, do these look like the images that Apple says it fired me over?**

A. If you look at just the images, and there were a few that were shared that I've had, it's -- I don't know if this is a replica of some of the other ones or a screenshot of them, but that -- it's hard for me to tell what this one is.

**Q. You can say you don't know. I would rather if you don't know, just say you don't know.**

A. It's assuming -- I need to be able to look at -- I didn't see these in the context of the -- of the post themselves.

**Page 211**

**Q. Okay. So I have two more, so I'm looking for a yes, a no, or an I don't know.**

A. Okay.

MS. RIECHERT: Are you going to show the two more?

THE WITNESS: Let's look at the two more.

MS. GJOVIK: No. I would like her to answer for each of them.

BY MS. GJOVIK:

**Q. Is this yes, no, or I don't know?**

A. I can't recall at the moment if this was one of them. I would need to look at what I had reviewed. And this looks like one of the ones that I might have seen, but I don't recall specifically.

**Q. Okay. Here's the next one.**

**This is Exhibit C2.**

(Deposition Exhibit C2 was marked for identification.)

A. Nothing is changing.

**Q. Can you see this one now?**

A. I can.

This one, again, it's in isolation, so it could be one of the ones, but I don't recall specifically.

**Q. Okay. And then the third one, this -- let's see, C3.**

**Page 212**

(Deposition Exhibit C3 was marked for identification.)

BY MS. GJOVIK:

**Q. Here. What about this one?**

A. This one, again, to the right with just your face because this looks like two pictures, but to the right one might have been one of the images with your face that I've seen here.

**Q. Okay. So of the three things I just showed, can Apple answer conclusively if any of those represent the photos -- photo or photos that were the basis for my termination?**

A. Or images that -- this one particularly with the right and the second one may have included, again, parts of the images to focus in what was the specific image that they thought was confidential, not the full text the way you have it as the full post.

**Q. Okay. But the images, can you conclusively say any of those, or you thought that there were maybe two examples?**

A. Two examples I could say, yes.

**Q. Okay. So the two examples you can say yes, let's pin that down.**

**Let's see. Sorry. Sharing the photos is a little more tricky than on Adobe.**

Page 213

Okay.  Okay.  So this one, I believe this is Exhibit C3.  And it has two images at the -- embedded in the Twitter post.

And I believe you said the one on the right, that's the one you indicated.  Is that correct?

A. The one on the right, just that image itself appears to be one that may have been included in the images.  But you're showing just specifically the post versus, like I said, the images that were produced, and I don't know if this is one of the ones that was produced by you or Apple.

Q. So this is my Twitter post.  And these, like I said, were the ones that that law firm OMM indicated and had me delete.  I had to delete these --

A. Yeah.

Q. -- well, I didn't have to, and I protested, but I did anyways.

So, okay, we're indicating, though, you think --

MS. RIECHERT:  More commentary in there, so let's just --

BY MS. GJOVIK:

Q. This right one, this right image on Exhibit C3?  Is that right?

A. Yes.

Page 214

Q. Okay.  Thank you.

A. I believe it is --

Q. And then I think you said on that second one -- on this one and that is -- that Vox Media, this is the video that was embedded in that "Verge" article, and so this is a screenshot of that "Verge" article video.  Is this that -- the second one you indicated?

A. That was part of the video.  Again, that's -- this is just a screenshot of it.

Q. Yeah.

A. So correct.

Q. Okay.  So that's the other one.  Thank you.

A. I think the other one --

THE REPORTER:  Could we take a break soon?

MS. RIECHERT:  Yeah, hold --

MS. GJOVIK:  I do.  I have to go, too, yeah.

(Speaking simultaneously.)

MS. RIECHERT:  She hasn't finished her answer.

A. The first one you had had, again, screenshots on the right.  That's why I was saying because it indicated multiple pictures, so --

Q. Oh, sorry.  Do you want to go to that C1, you had one, too?  The first one?

A. I think I was -- I was showing like the first one you had, C1, had a line of various pictures and

Page 215

screenshots.  One of them might have been similar to what you shared on the third one.

But we can look at it after a break.

Q. Oh, sorry.  So do -- that was 3, then, the screenshot on that first one of the multiple pictures and then the still of the video and then the one on the right --

A. Why don't we look at that when we come back.

MS. GJOVIK:  Okay.  Okay.  Five minutes.

(A short break was taken.)

BY MS. GJOVIK:

Q. Ms. Warner, I think you were saying something about Exhibit C1, so I'm sharing that again.

A. Yeah.  So I'm saying you have on the side different images.  Some of them are duplicative of the other ones you shared, so they look similar to the ones -- the images that were reviewed and considered.

And the middle one, the big block with the side-view, appears to be similar to the screenshot of the video that was on "The Verge."  So that looks like one of the ones that was considered as well.

Q. Sorry.  This one I just circled in orange, is that the one you're talking about?  I think that was the third one, the --

A. Yes.  The third one looks like -- this one you

Page 216

circled seems like a copy of the third one, so that's obviously the same --

Q. Okay.

A. -- and the big block looks like a screen --

Q. That one.

A. -- shot similar to what you had on "The Verge."

Again, these are all the images that were shown but in different settings, and some of -- a couple of them are duplicative.

Q. Okay.  Thank you.

A. Yeah.  You're welcome.

Q. Okay.  So we shared that one.

And then I would like to share Exhibit D1.

(Deposition Exhibit D1 was marked for identification.)

MS. GJOVIK:  And D2.

(Deposition Exhibit D2 was marked for identification.)

BY MS. GJOVIK:

Q. So we have -- lawyering is a bunch of paperwork and Zoom and screen sharing.  I'm trying my best.  Sorry.  Thank you for your patience.

So this is a Twitter post I had about the ear scans.  We talked about this a little at the beginning.

And I just wanted to ask for confirmation if

Page 217

this post was one of the factual basis for the termination of my employment on September 9th.

MS. RIECHERT:  Objection.  Asked and answered.

A. I've already --

Q. The answer is no, right?

A. I've already answered that question earlier.

Q. Okay.  And then so that was exhibit -- which one is this?

MS. RIECHERT:  D1.

MS. GJOVIK:  D1 is -- sorry.  This is D2.

D2 was the image of that Twitter post.  And then D1 was a business conduct complaint filed on August 29th:

"User is concerned that Ashley is posting internal emails about 3D ear scans on their Twitter account."

MS. RIECHERT:  Can you show us, scroll?

MS. GJOVIK:  Mm-hmm.

BY MS. GJOVIK:

Q. So it looks like it was sent to Debbie Rice.

A. Can you scroll up, please?

Q. Yeah.

It was either sent to Debbie Rice or filed by Debbie Rice.  Do we know who filed it?

A. What you're looking at, this page here is the

Page 218

email -- an email from business conduct, and you have Debbie's -- again, some of it is redacted.  Debbie would have been either copied or sending -- forwarding it.  But it's redacted --

Q. Oh, okay.

A. She did not --

(Speaking simultaneously.)

(Reporter interrupts for clarification of the record.)

MS. GJOVIK:  I don't know.

THE WITNESS:  She did not file the complaint.  Ms. Gjovik said did she file it.  I just want to make sure the record is clear, this is not Debbie filing it by simply seeing her name on the bottom.

BY MS. GJOVIK:

Q. And when it says received by "dri," is that "dri" is Debbie Rice?

A. It's hard for me to see what the -- something is missing from there.

Q. Yeah.  It's redacted by Orrick, so I don't know sometimes what this is.

A. I can't read what it is when it's cut off, so --

Q. I can't, either.

What about this one?  So here below on 8/31, it

Page 219

says sent by "ade."  Is that you?

A. Oh, I see what that is.  I think it's the email address that's being cut off.

So going back to the Debbie Rice, so I see now it's the email, and then "ade" would have been my email address being redacted.

Q. Okay.  So the "ade" is you, and then "dri" would be Debbie Rice?

A. Yes.

Q. Okay.  Thank you.

A. You're welcome.

Q. So this was not a basis for the termination.

MS. RIECHERT:  Can you go through the whole document?

A. Yes.  You have some on the bottom.

Q. Sure.

A. Okay.

Is that the end?

Okay.

Q. Okay.  That was D1 and D2.

And then I'd like to share C4 and C5.

(Deposition Exhibit C4 was marked for identification.)

(Deposition Exhibit C5 was marked for identification.)

Page 220

BY MS. GJOVIK:

Q. So C4 is an email -- a letter emailed to me by that O'Melveny & Myers law firm, when we said OMM, on September 15th, 2021.  Mr. David Eberhart sent me a message and said:

"Dear Ms. Gjovik, on behalf of Apple Inc., we write to request that you remove certain images and video that you have displayed publicly in violation of your confidentiality and intellectual property agreement with Apple dated January 31st, 2015.  The first are the images contained in the following Tweet.  As you know, the images are comprised of internal Apple emails regarding a confidential Apple internal user study project.  Please remove those images from any public location and refrain from further public disclosures about that project.  The second is an image contained in the following Tweet.  The related video is located here.  As you know, that image and video were generated by a confidential internal Apple application during confidential Apple internal user studies.  Please remove that image and video from any public location and refrain from further public disclosures about

Page 221

that application or related user studies. A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If you're represented by counsel, please identify your counsel."

Are you aware of this letter?

MS. RIECHERT: I'll object that it's outside the topic.

But you can answer if you're aware of it.

THE WITNESS: No, I am not.

BY MS. GJOVIK:

Q. Okay. That first link went to the ear scan Tweet and said:

"Those images are comprised of Apple emails."

So it was a screenshot of the emails about the ear scan.

Do you know why Apple would be emailing me about or sending me a letter asking me to delete my Twitter posts about the ear scans if that wasn't a reason I was fired?

MS. RIECHERT: Again, outside the topic.

A. First you are wanting me to assume this link is to the ear scan. Assuming that, I -- this was dated after your termination. And if you had -- they

Page 222

discovered or had the post Apple -- they thought was still confidential, asking you to remove it would be appropriate.

But I don't have any independent knowledge or reasons outside of what the lawyers would indicate as to why O'Melveny sent you that letter.

Q. Okay. And do you know if Apple's planning on using the ear scans as part of an affirmative defense or fired her anyways?

MS. RIECHERT: Objection. Attorney-client privilege. Work product privilege.

Instruct you not to answer.

Outside the topics of this deposition.

MS. GJOVIK: I mean, this is the reason for the termination.

MS. RIECHERT: No. The witness has said that the ear scans was not the reason for the termination.

MS. GJOVIK: Apple said it was in their interrogatory response.

MS. RIECHERT: Okay. You can argue that later.

MS. GJOVIK: Yeah. We will. We will at length.

So just to confirm, we're not -- she's not allowed to answer that question I just asked?

MS. RIECHERT: Right, if it's -- if she had any

Page 223

knowledge other than what she obtained from legal counsel as to what our defenses are in this case and what we intend to introduce as evidence in this case.

BY MS. GJOVIK:

Q. Okay. Is it Apple's position that that post about the ear scans is confidential?

MS. RIECHERT: Okay. Don't ask me questions.

MS. GJOVIK: No, not you, Melinda. I'm not.

BY MS. GJOVIK:

Q. Ms. Warner, is it Apple's position that the -- that Twitter post about the ear scans contains confidential information?

MS. RIECHERT: Again, outside the topics of this deposition.

But if you know the answer, you're welcome to give it.

A. Other than what you have clearly see -- showing on the screen now where the letter indicated that it is, again, presuming that that link included in there, without seeing it itself, is of the ear scan, then, yes, that's what Apple was stating. And I don't have any reason to testify differently at the moment.

Q. Okay. And then if Apple does think that the ear scans is confidential, is there a reason they are not using it in their defense in the litigation?

Page 224

MS. RIECHERT: Same objection. Attorney-client privilege. Work product.

Instruct you not to answer outside the topics of this deposition.

BY MS. GJOVIK:

Q. Is there any reason that Apple began to use that as a defense and then appears to have abandoned that defense mid-litigation?

MS. RIECHERT: Same objections. Assumes facts not in evidence. Attorney-client privilege. Work product.

Instruct you not to answer outside the topics of this deposition.

BY MS. GJOVIK:

Q. This is Exhibit C5. This is a letter that a lawyer that I retained sent Apple on October 6, 2021, in response to that letter from OMM. It is three pages.

It says:

"Dear Mr. Eberhart, I represent Ms. Gjovik. I'm in receipt of your" --

Can you read this okay, or do you need it to be bigger?

A. No, I'm -- I can read it.

Q.

"I'm in receipt of your letter dated

Page 225

September 15th, 2021, and subsequent email communication with my client. Going forward, please direct all such correspondence to me. As you are aware, Ms. Gjovik has already complied with your September 15, 2021, demand to remove certain images from some of her Twitter posts. However, I write regarding the inappropriateness of your requests, which may compromise copyright misuse. While I understand that Apple is not opposed to taking aggressive litigation postures and indeed has a history of doing so, I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law. Your September 15, 2021, letter alleges that Ms. Gjovik violated the confidentiality and intellectual property agreement with Apple dated January 31st, 2025. You are incorrect. The IPA does not cover the images/video that Ms. Gjovik posted. For example, you take issue with Ms. Gjovik's posted screenshots of an automated email sent to Ms. Gjovik from Ask, an" --

(Reporter interrupts for clarification of the record.)

Page 226

BY MS. GJOVIK:

Q. Sorry.

-- "an internal survey solution. The email itself was not marked confidential. Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential. The content of the automated email also contained nothing that could be considered secret or otherwise proprietary. There was no disclosure of the content, methodology, identity of any participants in the survey, other than Ms. Gjovik, or any of the survey's findings. The post" -- "posted image of the email merely noted what was already known to the public. Apple was conducting 3D scans of human ears to collect representative ear geometry data across age, gender, and ethnic groups and to benefit the audio research efforts and better our understanding of ear geometry variance. It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPod products. In fact, Apple's vice president of product marketing, Greg Joswiak,

Page 227

spoke publicly about 3D ear scans over a year ago.

We had done work with Stanford to 3D scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population, Joswiak says. With AirPods Pro, we took the research further, studied more ears, more ear types, and that enabled us to develop a design, along with three different tip sizes, works across an overwhelming percentage of the worldwide population.

See Jeremy White, The secret behind the runway success of Apple's AirPods, Wired, September 5, 2020, available at wired.co.uk/article/apple-airpods-success.

Accordingly, Ms. Gjovik cannot face restriction in disclosing a nonconfidential email about the mere existence of a survey concerning 3D ear scanning, scanning that Apple has already publicly disclosed much earlier, sent to her during a period in which Apple put her on administrative leave. Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual. Your

Page 228

September 15, 2021, letter and subsequent email communication also takes issue with image video you contend were generated by a confidential internal Apple application during confidential Apple internal user studies. Apple holds no copyright to these images, which were not authored by a human. As you're aware, United States copyright law only protects the fruits of intellectual labor that are founded in the creative powers of the mind. Trade-Mark Cases, 100 U.S. 82, 94, 1879. Because copyright law is limited to the original intellectual conceptions of the author, Apple would be unable to register any of the such images or video generated by the Glimmer app since a human being did not create the work. Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58, 1884. Apple therefore cannot allege infringement of any copyright by Ms. Gjovik. To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such. You have also not alleged how the mere images of Ms. Gjovik, in her home, taken by the Glimmer app, on Ms. Gjovik's own phone, could qualify

Page 229

quality as confidential and/or proprietary information under the IPA. For example, your letter fails to acknowledge that the images were, a, taken by an automated process running on Ms. Gjovik's own iPhone and, b, captured her own likeness and portions of her living space. There can be no doubt that Ms. Gjovik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the nonproprietary images Ms. Gjovik posted, she intentionally rendered unreadable any conceivably nonpublic information while posting these otherwise nonproprietary images. Your claims of any violation on the IPA based on the posting of these images appear, therefore, to have no basis in fact or law. Given Ms. Gjovik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021, letter, we consider this issue closed, and we expect that Apple will immediately cease sending further inappropriate demands.

Page 230

Sincerely, David L. Hecht, Hecht Partners."

Did Apple receive this letter?

MS. RIECHERT: Objection. Outside the scope of this deposition.

But you can answer if you know.

A. I do not know.

Q. Okay. I guess, well, that was short, then.

Now upon reviewing this letter on behalf of Apple, does it make Apple reconsider any of their positions regarding ear scans or the Glimmer application?

A. That letter contains a whole lot of different things, including arguments, legal arguments back and forth. This letter does not change what I've testified previously with respect to the reasons for your termination.

MS. GJOVIK: Now we have Exhibit E1.

(Deposition Exhibit E1 was marked for identification.)

MS. RIECHERT: Which letter is this?

MS. GJOVIK: This is written by Orrick.

MS. RIECHERT: Oh, what's the exhibit number?

MS. GJOVIK: Oh, this was -- I just put it in the chat. It's Exhibit E1.

MS. RIECHERT: E1. Thank you.

Page 231

MS. GJOVIK: Yeah.

BY MS. GJOVIK:

Q. This is a letter drafted by Orrick and sent on behalf of Apple on March 4, 2022, to the U.S. Department of Labor.

Are you familiar with this letter, Ms. Warner?

A. I need to look at the whole letter. I am assuming it's not half a page.

Q. It's 13 pages. It's Apple's position statement to the U.S. Department of Labor Whistleblower Protection Program.

Have you reviewed that in preparation for this deposition?

A. Again, looking solely on the first page because I am not seeing the 13 pages to understand if there are any parts of it I may have seen, but I have not seen this first page that is on the screen at the moment.

Q. Okay. We can look at this. So there's Page 1, Page 2. Just read the headers. The factual background. Page 3, Page 4, Page 5, 6, 7, 8, 9. Then argument. 10, 11.

This is in response to my claims under CERCLA, SOX, and OSHA violations. This letter argues that my disclosures of confidential information included the ear scans as the reason for me being terminated.

Page 232

Are you aware that Apple has used the ear scans as a justification for terminate me -- terminating me in different proceedings?

A. I believe you've -- I've already testified in terms of the extent of my knowledge on the ear scan.

But what legal proceedings that have been made a defense by counsel I am not aware specifically.

Q. So Apple code named the ear scans and the Glimmer and Gobbler stuff Alpha and Omega in their responses.

Are you aware of their use of the terms of "Alpha" and "Omega" as code names for these matters?

A. When you say these matters, I think it's a little confusing for me. There's this matter where there have been summary judgments filed, interrogatory responses. And then you have this letter and an administrative proceeding.

I have not seen this letter. I am not privy to the administrative proceedings that this letter is referencing to.

I have seen at least the code names Alpha and Omega in, I believe, the interrogatories perhaps and the summary judgment -- I can't recall specifically which -- but not in the context of what you are asking me about for this administrative proceeding.

**Page 233**

MS. GJOVIK: Okay. So I'm going to show the interrogatory response. Let's call this 6.

MS. RIECHERT: Is this exhibit -- another exhibit?

MS. GJOVIK: I was going to make it, yeah, an exhibit. But it's already filed.

Sorry. I'm so bad at multitasking all this. One moment.

So we'll call this E6.

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: Yeah, sorry.

Close current tab. I'm trying to save it. And that's why it's not saving.

Okay. Try again.

(Deposition Exhibit E6 was marked for identification.)

BY MS. GJOVIK:

Q. Okay. Here we go. So this is Apple -- sorry. My computer is not cooperating.

This is Apple's interrogatory response, Set One. This will be Exhibit E6.

This also has Omega. So this is in Apple's interrogatory response as to why it says it fired me at the time it fired me on September 9th. And it cites

**Page 234**

this Omega study, which is the ear scans.

Or I guess that's a question: What is the Omega study, Ms. Warner?

A. I would -- it's -- and I would have to look at this entire interrogatory responses that described it. One was -- the ear scan was the Face ID.

So is that described in here without disclosing confidential information?

Q. It says on August 28th for Omega -- that was the date of the ear scan Tweets -- and then August 30th for Alpha, which would have met with the Gobbler stuff.

But Apple would be the best entity to know what it meant by using these terms. I have been guessing, as is everyone else.

A. The terms would have been described in somewhere in there. And, again, I'm not looking at the entire document.

Q. Okay. So on behalf of Apple, can you tell me what Omega refers to?

A. Other than what's described here in the interrogatory that it is a study in connection that you had participated in.

Q. Mm-hmm.

A. Okay. Can you scroll up, please?

Okay. Scroll down.

**Page 235**

Well, in here, it says, again, the footnote:

"To safeguard Apple's confidential information, studies were referenced as Omega for purposes of this response."

So that was my point of do you want me to talk about a study that was deemed confidential?

Q. Well, does Omega refer to that Tweet about the ear scans?

A. One of the two does. I believe it's -- I don't want to speculate which one is which without looking at the document that describes it.

Q. Is there a document that describes it?

A. I don't know.

Q. I would love to see if there is because I -- I have not seen a decoder ring for the code names. Okay. So there's that.

And then we have -- okay. I'm attaching Exhibit E4.

E4 was returned through a FOIA request to U.S. Department of Labor for Apple's filings to Department of Labor in their response.

(Deposition Exhibit E4 was marked for identification.)

BY MS. GJOVIK:

Q. In their response, Apple, via Orrick, included

**Page 236**

on Exhibit 2 for 12, under Omega study includes what appears to be the ear scan Tweets.

So based on this, do we think that Omega means ear scans?

MS. RIECHERT: You're asking this witness who has no knowledge about which is which to deduce something based on some exhibit that she's never seen before. And I just object on that basis. This is not --

MS. GJOVIK: Otherwise, the witness representing Apple Inc. cannot actually decipher Apple's interrogatory response as to why Apple fired me.

And one of the reasons Apple appears to be indicating as to why it fired me is something Apple's own witness indicated is a reason they did not fire me.

So I'm just trying to get to the bottom of this.

MS. RIECHERT: Okay.

MS. GJOVIK: I would like to continue on this line of questioning if that's all right.

MS. RIECHERT: So the witness is not here to talk about interrogatory answers. Not here to talk about FOIA requests or DOL or anything like that. So --

MS. GJOVIK: We're talking about pretext, though, and so Apple's other administrative filings that

Page 237

show that Apple's responses in the retaliation civil litigation may be pretext is directly relevant to my showing.

MS. RIECHERT: Right. But you can make those arguments to the judge that the reasons are pretextual, but that's not what this witness is here -- she's here to tell you why the -- why you were terminated, and she's told you that.

MS. GJOVIK: Yeah. That's what we're doing. You can object where you think it's fine, but --

MS. RIECHERT: I am.

MS. GJOVIK: -- get that on the record.

BY MS. GJOVIK:

Q. I would also like to ask you, Exhibit 10 was submitted by Orrick and Apple regarding the -- that "Verge" article. So this is a copy they submitted of "The Verge" article here.

And if you scroll down, you got all this text. Text. Text. Add text. Image of the radar thing. Text. And then the end. That's the end.

So the evidence that Apple submitted of that "Verge" article doesn't actually include the photo or video in that "Verge" article that you mentioned was the basis for termination.

Why did Apple use evidence of an article that

Page 238

didn't include the one thing they said was the basis for termination as their supposed evidence for the termination?

MS. RIECHERT: Okay. This witness is not here to talk about DOL responses, interrogatory answers, anything like that. She's here to talk about why the termination decision was made. Why a certain article was included in a DOL response is not part of the subject of this witness's testimony.

MS. GJOVIK: Well, this was the article she said that I was fired over.

MS. RIECHERT: No. She said you were fired over posting images in a "Verge" article.

MS. GJOVIK: But this is the "Apple Cares About Privacy Unless You Work At Apple" article, so that's the article she was referencing.

And I didn't post it because I'm not a journalist. I don't write for "The Verge."

MS. RIECHERT: I don't know if this is the one that she saw that has images and video in it.

MS. GJOVIK: So this one is called Apple -- sorry.

BY MS. GJOVIK:

Q. Were you going to say something, Ms. Warner?

Page 239

A. Yes. I think we're just repeating ourselves here. The -- what I had shared before that were images that were posted on "The Verge," the images that were considered.

Again, you are showing me an exhibit to some administrative that has a long article. I did not speak to the article itself. I said the images you posted on Twitter and on "The Verge."

Q. Okay. What article or articles in "The Verge" were you referring to?

A. The -- this one was one I have seen this before. But like I say, we have talked about images in here. There was one from -- we had just talked about the Glimmer that was included in "The Verge."

Again, which one, again, there were probably multiple ones that you had posted. But I don't know about this entire article and what was provided in the administrative proceeding.

Q. I'm sorry. For the retaliation case, for Apple's defense -- well, for Apple's defense, right now, we're doing this as part of the retaliation case, but the reason Apple says it fired me, it's -- you mentioned that it included photo or videos shared in a "Verge" article.

What was the title of the article you were

Page 240

referring to?

A. We already walked through the videos and the images. This one may have been one where, again, if you scroll up, if that has the images in there, like, there are multiple pages, that would be included in there.

Q. We just scrolled down, and this version of it didn't have the images or video in it. It is in the article, but the example that Apple submitted is their evidence didn't include the photos or the video.

A. Okay. I can't speak to what was submitted in the evidence in the DOL proceeding.

Q. Okay. I'm sorry I have to do this. It's the pretext. I don't know if you've done retaliation cases, but it looked like you worked for Morgan Lewis, actually, so maybe you have done some of these.

This is the pretext back and forth. I'm sorry. It's probably exhausting.

Okay. So I would like to now look at -- this one will be Exhibit -- okay. So this is Exhibit L.

(Deposition Exhibit L was marked for identification.)

BY MS. GJOVIK:

Q. This is the complaint I filed to the California Department of Industrial Relations against Apple on August 29, 2021.

Page 241

Did Apple -- was Apple aware of this complaint prior to terminating me?

A. I've already testified earlier prior to terminating you the NLRB complaint that Apple was aware of.

Q. Okay. And so in this one, I complained:

"I raised concerns about workplace safety and was told to stop speaking about my concerns. Then I was threatened, harassed, intimidated, suspended, and constructively terminated."

So, "what right?"

I said, "Workplace safety and whistleblower protections."

They said, "How did your employer know about the right you exercised?"

And I said, "I kept saying, stop it you guys, there's labor laws about this."

And I wanted, "Accountability and redress."

Okay. And then the next one is --

A. Was there a question?

Q. Sorry. I'll try not to talk to myself while I'm trying to multitask. I'm distracting. Sorry.

MS. RIECHERT: Can we take a break?

THE WITNESS: Can we take a quick break if we

Page 242

don't --

MS. GJOVIK: Yeah, five minutes.

THE WITNESS: Yeah, please. Thank you.

(A short break was taken.)

BY MS. GJOVIK:

Q. So this first thing, this is a letter from the U.S. Department of Labor Whistleblower Protection Program regarding the complaint I made docketing the case under OSHA, CERCLA, and SOX.

MS. RIECHERT: Which exhibit is this?

MS. GJOVIK: E2. Thank you.

MS. RIECHERT: B?

MS. GJOVIK: E, E, as in elephant.

MS. RIECHERT: Elephant 2.

MS. GJOVIK: 2 elephants.

And then on this Page 5 is documenting it was filed on August 29th, 2021, case number 9-3290-22-051.

(Deposition Exhibit E2 was marked for identification.)

MS. RIECHERT: Is this DOL?

MS. GJOVIK: The allegations written by Department of Labor were:

"Beginning in March 2021, complainant reported multiple safety and health concerns to respondent including but not limited to: vapor

Page 243

intrusion exposure in the building, inquiring about vapor intrusion testing, and the building being located on a Superfund site, TRW Microwave. Additionally, complainant reported concerns that one of the respondent's board of directors, Ronald Sugar, has a conflict of interest because he was previously CEO/president of Northrop Grumman" --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: Oops, I'm sorry. Yes, I'll try.

-- "Northrop Grumman was the responsible for party for the TRW Microwave site. Complainant alleges that on or August 4, 2021, respondent suspended her employment and subsequently terminated her employment on September 9, 2021, in retaliation for participating in the aforementioned protected activities and for filing or being suspected of filing a complaint with the SEC and EPA. Complainant contends respondent violated her rights under the Occupational Safety and Health Act, Comprehensive Environmental Response Compensation, and Liability Act, and Sarbanes-Oxley Act."

Page 244

BY MS. GJOVIK:

Q. Ms. Warner, are you familiar with this complaint?

A. No.

(Deposition Exhibit E3 was marked for identification.)

BY MS. GJOVIK:

Q. And on Exhibit E3 is the OSHA Online Whistleblower Complaint Form I filled out on August 29th, '21, where I checked: Suspension, threat, harassment/intimidation, constructive termination, and threat to take adverse actions.

Said the most recent adverse action was August 4th.

And I said I believe I suffered the adverse employment actions because I made complaints with OSHA, with the federal EPA, I complained to management about unlawful conditions, because I engaged in protected concerted activities, because I reported an injury, illness, or accident, because -- that cut it off; there was something else there; I don't know what that is -- and because of my race, color, religion, sex, national origin, age, disability, or genetic information.

Said there was no rational or legitimate reason provided for adverse actions and that I filed complaints

Page 245

with the NLRB, EEOC, and California DEFH (sic).  Filed it --

MS. RIECHERT:  DFEH.

BY MS. GJOVIK:

Q. -- against Apple.

Ms. Warner, are you familiar with me filing this complaint on August 29, 2021?

A. No.

Q. And, Ms. Warner, was Apple aware that I filed this complaint prior to my termination on September 9th, 2021?

A. I've already answered the question in terms of what administrative complaint Apple was aware of prior to your termination.

MS. GJOVIK:  Okay.  And then I'd like to look at Exhibit -- let's start with M1.

(Deposition Exhibit M1 was marked for identification.)

BY MS. GJOVIK:

Q. M1 is my EEOC complaint against Apple, and it was dual filed with DFEH and signed on September 9th, 2021.

And it says:

"I have been employed by Apple as a senior engineering program manager since

Page 246

February 23rd, 2015, reporting to David Powers, director of MSQ.  I am also assigned work by his manager, Dan West, senior director of PSQ.  Since January 2017, Powers subjected me to a sex-based discrimination and retaliation by referring to me as emotional/aggressive, giving men credit for my work, criticizing me, excluding me from meetings and refusing to address harassment/sexism from colleague Jason Ivan.  West subjected me to sex-based discrimination and retaliation by excluding me from meetings, making sexual comments and gestures, and personally humiliating me.  West failed to address my discrimination concerns about Powers raised since 2017.  I find all of this offensive.  In March 2021, I began to raise concerns about safety at my office due to it being an EPA Superfund site, which I believe caused injury and I filed a workers' compensation claim.  Powers personally attacked me due to my disability by stating that due to expressing safety concerns I would receive an employee warning, and not more, because I was having mental health issues which I found to be offensive.  Around April 9th, 2021, Jenna

Page 247

Waibel in Apple employee relations launched an investigation into sexual harassment and hostile work environment due to sex, despite me telling her I did not want the investigation due to fear of retaliation, but she persisted only to conclude around June 3rd, 2021, saying she found no policy violations.  After, I complained to Antonio Lagares, senior manager of employee relations, because Waibel failed to investigate all of my allegations, because the hostile work environment continued, and I was subject to retaliation.  Soon thereafter, Lagares appointed Ekelemchi Okpo, employee relations investigator, to conduct a new investigation into the hostile work environment based on sex and disability I have been subject to since 2015, and sexual harassment since 2015.  Apple alleges they are conducting an investigation.  After engaging in protected activity, around May 6, 2021, West reassigned my work to others without explanation and ostracized me.  Around July 15, 2021, Powers dramatically increased my workload with unfavorable projects.  Around July 2, 2021, employee relations forced me to submit a

Page 248

reasonable accommodation request to not be exposed to the hazardous chemicals, instead of addressing my concerns for the health/safety of all employees.  Waibel asked I not share concerns with other employees, refused to take or answer my safety questions, or allow the EHS team to take/answer my safety questions.  In retaliation on August 4th, 2021, Apple placed me on indefinite paid administrative leave even though I objected.  However, to date Apple argues I requested to be placed on leave, which is misleading.  I believe I was discriminated against due to my disability and retaliated against after engaging in protected activity in violation of the Americans with Disabilities Act of 1990, as amended.  I believe I was discriminated against due to my sex, female, and retaliation against after engaging in protected activity, in violation of Title 7 of the Civil Rights Act of 1964, as amended."

Ms. Warner, are you familiar with this complaint I filed?

A. No.

(Deposition Exhibit M2 was marked for identification.)

Page 249

BY MS. GJOVIK:

Q. And then here is a copy as Exhibit M2 of the EEOC form I submitted on August 12th, 2021. That was the original date of this submission.

And I complained about discrimination due to sex, disability, and retaliation and said retaliation was because I contacted a government agency to complain about job discrimination, and I complained to my employer about job discrimination, and retaliation because I helped as a witness in someone else's complaint about job discrimination.

And my intake appointment was September 2nd, 2021, a week before I was fired.

Ms. Warner, are you familiar that I filed my EEOC charge on August 12th, 2021?

MS. RIECHERT: Objection. Misstates what the form is.

But you can answer the question.

A. No, responding to what I'm familiar with on the date, no.

And you're still scrolling through this document, by the way, to --

Q. We can go all the way. Sorry. This is the end.

A. I just want to make sure answering the specific

Page 250

question, the answer was no while you were scrolling through the document.

Q. Okay. And then for adverse actions on -- this is what I submitted on August 12th, 2021. I said:

"Subject to hostile work environment on basis of sex, harassment, failure to resolve hostile work environment. Reported all the above and then was retaliated upon for that. Also whistleblower about corruption and workplace safety and retaliated upon for that. Then retaliated upon for reporting retaliation. Adverse employment actions include constructive termination, failure to resolve hostile work environment, assignment of unfavorable work, dramatic increase in workload, reduction of supervisory capacity, and pressured into taking administrative leave."

Ms. Warner, did Apple do anything to investigate these complaints I made?

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client privilege.

Not within one of the topics covered by this witness.

MS. GJOVIK: Okay. These reflect the same

Page 251

things that were reported in the issue confirmation.

BY MS. GJOVIK:

Q. When Apple was eventually put on notice at some point that I filed these complaints, did Apple take action to investigate the underlying subject matter and correct any issues they identified?

MS. RIECHERT: So first of all, it's a compound question.

Secondly, it assumes that these charges had anything to do with the issue confirmation.

So if you want to ask her if Apple investigated it, the issue's raised in the issue confirmation, that's a perfectly good question.

MS. GJOVIK: She can answer this one. Then I'll ask your question, too.

MS. RIECHERT: I don't understand your question. It's definitely compound, and it calls for privileged information.

A. Your question combines a multitude of things. I don't know how you want me to answer that because you are showing me a document that is a charge you filed that -- with an agency, and you're asking me what investigations happened. You're asking about issue confirmation.

There are too many things in there, so if you

Page 252

could break it down, I'm happy to answer your questions.

Q. Okay. Thank you.

Did Apple investigate my complaints about gender discrimination?

A. Apple did investigate complaints you had raised in March-April 2021. And that included reference to gender discrimination.

Also investigated complaints in August 2021.

And I've talked earlier about Jenna Waibel and Ekelemchi Okpo who investigated.

And there were two issue confirmations that laid out your concerns. And those were investigated and under privilege.

Q. Did Apple find any evidence that there was discrimination based on sex or gender?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer. The investigations are privileged. Findings are privileged.

BY MS. GJOVIK:

Q. Did Apple investigate my complaints about sexual harassment, including the Jenna Waibel and Ekelemchi Okpo investigations?

A. As I've testified, the concerns raised in the issue confirmations with respect to the investigation by

Page 253

Jenna Waibel and Ekelemchi Okpo were investigated under privilege.

Q. When you refer to an issue confirmation with Jenna Waibel, what are you referring to?

A. There was an email that Jenna had sent you, and you -- I think you have that. That was sometime in April. I don't have the exact date in front of me, but there was an email summarizing the concerns you had raised, an email with her that confirmed the concerns.

Q. And did -- Apple views that email as an issue confirmation. Is that right?

A. The email summarizes the concerns or confirms the concerns that Jenna understood you had raised.

Q. Okay. During the next break, I'll go find that and make sure that we have that and can look at it. Thank you.

Okay. And then Exhibit O is a finding from the California Unemployment Insurance Appeals Board from my unemployment claim.

(Deposition Exhibit O was marked for identification.)

BY MS. GJOVIK:

Q. And this decision was published or mailed on July 27, 2022. And it found in my favor.

And the findings of fact based on the evidence

Page 254

provided are read as followed on Page 2:

"Prior to the filing the claim for benefits the claimant last worked in September of 2021 as a senior engineering program manager at a salary of 169,000 per year. She worked approximately six and a half years for the employer. The claimant received notice from vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability."

Ms. Warner, are you aware that I had this finding in my favor from the Unemployment Appeals Board?

A. For the record, you are reviewing a portion of this letter or document on the screen. I have not

Page 255

reviewed the whole document. I did not review it in advance of this deposition.

And in answering your question, the answer is no.

Q. Okay. So the ultimate finding was:
"The claimant is not disqualified from benefits under Section 1256 of the code. Benefits are payable provided the claimant is otherwise eligible."

And then I was paid benefits.

Ms. Warner, did Apple try to contest this appeal or submit its own evidence?

MS. RIECHERT: Objection. Outside of the scope of the topics that this witness is here to testify about. But if she knows the answer, she's more than welcome to tell it.

THE WITNESS: I do not.

MS. GJOVIK: Okay. And then I just received production of a document yesterday. This is the production from Apple. It is of a business conduct complaint HRC000045789.

I am sharing right now Exhibit F.

(Deposition Exhibit F was marked for identification.)

Page 256

BY MS. GJOVIK:

Q. And it was filed on September 7th, 2021.
It says:
"Possible internal information being posted to Twitter. Series of other Tweets from this user that seems to be releasing internal information. Referred to Debbie and Adelmise."
That's yourself, right?

A. It's Adelmise.

Q. Adelmise. I'm so sorry.

A. That's okay.

Q. Adelmise.
And that's yourself, right?

A. Yes.

MS. RIECHERT: And can you go through the whole thing? It's 2250?

MS. GJOVIK: 2250 what? Oh, production, yes okay.

BY MS. GJOVIK:

Q. So we have an update from Kathleen Emery closing on September 9th.

We have some comment from Debbie Rice on the 8th that says something redacted and then "thanks."

Yourself posting on September 7th. Something that was redacted. It was attorney-client privilege.

Page 257

There's the comment from Debbie Rice, it looks like, on September 7th and September 8th.

Do you recall this business conduct ticket, Ms. Warner?

MS. RIECHERT: Can you go through the whole --

THE WITNESS: Yes, the whole, please.

MS. GJOVIK: Sure.

THE WITNESS: There's a few pages in there.

BY MS. GJOVIK:

Q. The person who filed it on the 7th wrote:

"Hello, on Twitter today I came across this in a series of other" -- sorry.

A. You switched.

Q. I know. I was going to try to make it bigger because it got really small.

"On Twitter today, I came across this and a series of other Tweets from this user that seems to be releasing internal information. It has been up for a day already so it may have been reported already, but I thought that I should also report it in case it has not been previously. They also had posted many screenshots to conversations with people they identify as Apple employees to Twitter as well, which seems to be a violation of our business

Page 258

conduct policy. I don't follow this user or know them personally, but please let me know if you have questions or need additional information. Thanks, Apple care team manager."

A. There's more on the bottom. Thank you.

Q. Yeah.

That's it.

A. Okay.

Q. Do you recall this specific business conduct complaint?

A. Yes. I'm familiar with it.

Q. And by the nature of it being closed on the 8th, does that mean it was referred to people to review?

A. If you scroll back to, again, go back to the top, I believe there's a part where it said it's reference -- referred to Debbie and Adelmise, as you read at the top.

Q. So that -- so it'd be safe to assume it was referred on the 8th to Ms. Rice and yourself?

A. I need to look at the date.

Q. Ms. Emery, who I believe is a business conduct employee, says:

"State, closed complete," on the 8th.

A. No, it would not be. If you scroll down, there are correspondence on the 7th with me and Debbie, so

Page 259

that would not be a fair assumption that it was --

Q. I'm sorry. The 7th is before the 8th.

A. Yes. You said is it fair to say it was referred to me and Debbie on the 8th, so that would not be a fair assumption.

Q. Oh, I'm sorry. Okay.

So it could have been referred on the 7th or the 8th, but by -- my question was by the 8th when it was closed, is it fair to assume at the point it was closed, it had been referred to Ms. Rice and yourself?

A. The document shows that it was sent to Debbie and myself, so yes.

Q. Do you recall reviewing this --

A. The date -- I'm sorry?

Q. Sorry. Oh, finish your thought. Sorry I interrupted you.

A. I was going to say, since it was sent to us on the 7th, that would be correct to assume it was sent to us before the 8th.

Q. Okay. Do you recall reviewing this before my termination?

A. I recall when it was sent. I would have reviewed it if it was sent that time.

Q. Okay. So and there was one attachment we saw at the very bottom. Right here, "uploaded on" the 7th.

Page 260

So is it safe to assume that prior to my termination, you had at least reviewed the information in this ticket and that attachment?

A. That would be a fair assumption, but I don't have independent recollection of the exact timing I would have reviewed it.

Q. That's okay. It was a long time ago. Okay.

A. And for the record -- okay. Maybe that's where you're going because you did make a statement about an attachment which was not shown to me.

MS. GJOVIK: Mm-hmm. So this is Apple production 2258. This was also just produced to me yesterday. This is Exhibit H.

(Deposition Exhibit H was marked for identification.)

MS. RIECHERT: Yeah, that's not the attachment. The attachment would have been 2255 -- 56 or 55, 225 --

MS. GJOVIK: Okay. So there's also this one. There's 257.

MS. RIECHERT: It's 2255 because the last document was 2220 to 2254. So the attachment would be 2255 in the next document number.

THE WITNESS: And what you're showing here is 2257, for the record.

MS. GJOVIK: Yeah, right.

Adelmise R. Warner

MS. RIECHERT: 57, yeah.

MS. GJOVIK: So there's this one. This is 56. Okay. Let me go -- let me get it.

Okay. You're saying it's 256 or 255?

MS. RIECHERT: 2255.

MS. GJOVIK: Okay.

MS. RIECHERT: By the way, as you well know, we sent this production to you a long time ago. You asked us to reproduce it yesterday, which we did.

MS. GJOVIK: Because it was never opened because you stayed my case for three months due to my bankruptcy and then failed to mention that I never opened the production until after discovery closed. But, yes.

Okay. So let me label this. Exhibit -- let's call this exhibit --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: We're going to call it Exhibit F2. And I'm adding that now.

(Deposition Exhibit F2 was marked for identification.)

MS. GJOVIK: Okay. So here's the Bates number that Melinda is indicating. And we would have to actually confirm this is what was attached to that

ticket, which she's indicating she thinks it's this one.

MS. RIECHERT: It's the next consecutive number.

MS. GJOVIK: Yeah. We'd have to actually attach -- like, look at the file name. There's no file name here.

THE WITNESS: I cannot see the Bates number on the bottom of what you're showing.

MS. GJOVIK: 2255.

THE WITNESS: Okay. Thank you.

BY MS. GJOVIK:

Q. Yeah.

So this is -- and there was various versions of this attached.

This was posted by me from my Twitter account on -- there's no date on this, on this version.

But it says:

"August 4 to 5, 2021, nonsense emails from Apple employee retaliations. 10:00 a.m. meeting with ER to review remaining evidence turns into putting me on leave despite my protest, with no ETA for any updates or end, saying will narrow scope of inquiry, and implies they don't want me organizing."

And then I included screenshots of the emails

with Mr. Okpo.

So it appears Ms. Riechert is indicating this was the example of the misconduct alleged --

A. Go back, please. Sorry to interrupt you. I need to see the --

Q. You're fine.

A. -- the email, just --

Q. Yeah. Let me make it bigger.

A. Yeah.

Q. This is -- sorry. It's low quality, but this is what was produced.

A. Thank you.

MS. GJOVIK: Mm-hmm. And then this is Exhibit J.

(Deposition Exhibit J was marked for identification.)

MS. GJOVIK: And I don't know if I have all these, actually. Let me -- G, F.

And, Ms. Court Reporter, I'm putting them in the chat for you. I don't think I put these in yet.

THE REPORTER: Thank you.

BY MS. GJOVIK:

Q. And then so this one is Exhibit J on September 8th. It says:

"From: Business Conduct, To: dri."

Which you indicated would be Ms. Rice, and then from (sic) "ade," which indicated it was yourself, Ms. Warner.

"Subject: Ashley Gjovik Case."

With an attachment.

Do you recall this email, Ms. Warner?

A. Not independently. Again, what's the Bates number on the bottom? If it --

Q. 2256.

A. 2256, that would have been -- again, I don't want to speak for Melinda that what was produced, if it came to me, I would recall -- there's no text in it. So I don't have an independent recollection. And I would need to look at the business conduct case number as well to match it, but there's nothing in it other than what you're showing here.

Q. Okay. So this is 45789 --

A. Yes.

Q. -- and that business conduct complaint was 45789.

A. Okay. Then yes.

Q. So then assumably it would be an email.

And if it's attorney-client privilege, does that indicate that this was, like, a notification of entry added in the business conduct ticket that you're

Page 265

like -- or let me ask this a different way.

If you get emails like this with this kind of formatting on the subject and attachments, is that some kind of automated notification from the business conduct tool to you?

A. Not necessarily. That would not be the right assumption.

Q. What --

A. This email shows redaction, so there's content in there that is shared with me and our internal legal counsel who is Debbie -- actually went to Debbie Rice with me on copy.

Q. So when it's an email from business conduct, that could just be from the business conduct team itself instead of the tool?

A. I don't know what tool you're referencing. It's coming from business conduct to Debbie Rice as legal counsel.

Q. Okay. Oh, I meant like whatever this ethics help central tool, like sometimes they might have an automated notification, if someone adds a comment, they get a notice, versus someone, like, emailing something separately.

I'm trying to figure out if this email is, like, automated or that was some kind of communication.

Page 266

A. The email is indicating it's coming from business conduct, the actual team, with an email address to Debbie Rice. So it's not coming from the ethics point, which is the other document you had shared.

Q. Okay. Thank you.

And then let's see. This was -- there's so many of these.

So this was another one. This is 57. So this was later. This looks like a -- maybe the same thing. So maybe this was an attachment on that email sent. I'm not entirely sure, and then --

A. I'm having to look at the -- what's the screenshot, but the text of the top looks to be the same as what you had just shown me.

Q. Yeah. Me too.

And then so that's 57.

And then this Bates number 58 that comes right after. This is the last one in the sequence.

And to me, this looks like the same thing we were just looking at. Does that look right to you?

MS. RIECHERT: It looks -- part of it looks like the same but not --

BY MS. GJOVIK:

Q. Yeah. This -- the August 4th to 5th, the post

Page 267

I made. And this one is dated September 6, 2021, at 7:10 a.m.

So is it safe to assume that's probably the date and time that was posted, then, since the other version didn't have that?

A. That would not be. I don't know what this -- the stamp -- the date stamp is referring because there's a cut and paste, there's a screenshot, so I don't know what you're referencing --

Q. This is like the Twitter post stamp.

A. Oh, okay. No, that would not be a fair assumption, then. I would assume the Twitter post is the same date as whatever this email was that was sent.

Q. Sorry. What are you -- so the email -- screenshot email was from August 4th to August 5th and was included with me complaining about those emails.

And then this stamp is indicating when I posted that to Twitter.

And then the complaint was filed apparently on September 7th, 2021, which should be the next day.

MS. RIECHERT: I'm totally lost on your questions now.

THE WITNESS: Me too.

MS. RIECHERT: What was your question?

MS. GJOVIK: So the attachment that Apple had,

Page 268

it looks like, to that business conduct complaint didn't have any time stamp on it when I posted that to Twitter.

MS. RIECHERT: The attachment is 2257, correct?

MS. GJOVIK: 2255 and 57.

MS. RIECHERT: Yeah.

(Speaking simultaneously.)

(Reporter interrupts for clarification of the record.)

MS. RIECHERT: 2255 was attached to 2250 to 2254. And 2257 was attached to 2256. 2258 isn't attached to any of them.

MS. GJOVIK: Wait. Sorry. What was attached to 2256?

MS. RIECHERT: 2257.

MS. GJOVIK: And then what was 2258 attached to?

MS. RIECHERT: Nothing.

MS. GJOVIK: Where did 2258 come from?

MS. RIECHERT: Good question. But the witness doesn't seem to know --

THE WITNESS: I don't know.

BY MS. GJOVIK:

Q. So this W, Ms. Warner, could that W be -- indicate your last name?

MS. RIECHERT: What W?

Page 269

A. What?

Q. Yeah, this -- when the screenshot was taken, it shows the Twitter account but that it was taken from that W. So that's where the Twitter, like, icon is of the user.

MS. RIECHERT: (Inaudible.)

(Reporter interrupts for clarification of the record.)

A. I have no clue.

MS. RIECHERT: I pointed to the W on the document which I otherwise hadn't seen.

And the question is is that your W.

THE WITNESS: No. I don't know how you would assume that just because it's a W. This is -- I have no idea where this post -- if it's on Twitter, it wouldn't have my W because you're assuming this is reflecting Twitter.

So I don't know what you're asking me. The W doesn't necessarily mean it's my name.

BY MS. GJOVIK:

Q. Yeah. So the things we were looking at prior, it looks like this was referred to yourself and Ms. Rice and that there was an email from business conduct to yourself and Ms. Rice.

And that is assumably you and Ms. Rice were

Page 270

investigating it.

And this screenshot we're looking at was produced by Apple in that series of documents we were just discussing.

And the screenshot's indicating that someone with a Twitter account with a W in it was the one to take the screenshot because that's what the user icon is, and your last name starts with a W.

Is that correct, Ms. Warner?

A. Ms. Gjovik, my last name does start with a W. But there's a whole lot of assumptions that you believe that this W on Twitter on a screenshot that I have not seen before necessarily is the same W as my last name.

So the answer is no, I cannot assume that.

Q. Okay. So then it's an open question of where Apple got this and why they produced it. Because it was taken from someone's account with a W. So assumably that would be an Apple person whose account is just a W.

But either way, Apple produced this with the production of relevant to the -- the litigation. And this is --

MS. RIECHERT: I'll object to that statement. Just because the document is produced doesn't mean it's relevant. It just means it's responsive.

MS. GJOVIK: Responsive. Okay.

Page 271

And this is Exhibit H we're looking at right now.

BY MS. GJOVIK:

Q. And so Exhibit H shows that on that same date, September 6, 2021 -- and I remember posting this, so I definitely posted this -- September 6, 2021, I commented on that book post @-ing, like "at" sign, a bunch of government agencies. And I said:

"@NLRB, Case Number 32-CA-282142."

That was the NLRB charge I filed which you said Apple was aware of.

I said:

"@OSHA DOL Whistleblower Claim: 1218-023."

I said, "@USEEOC Case: 556-2021-00608. @SEC Enforcement Whistleblower Claim: 16304-612-987-465."

I said, "@DOJ CivilRights Complaint: 98145-RJH. @California DIR Whistleblower Claim: RCI-CM-842830. @CalDFEH Case: 202108-14540123."

Ms. Warner, did Apple see that Twitter post before it fired me?

A. I have no recollection or no independent understanding that Apple had seen this post, again, your screenshot of just this top part here prior to your

Page 272

termination.

And I've already explained the -- what Apple was aware of on -- in terms of the NLRB charge.

Q. Mm-hmm. Okay. And so if this business conduct complaint was filed about me and attached the screenshot of at least the upper part of that Twitter post we were just looking at, and it was sent to at least you and Ms. Rice to investigate, would it make sense that you guys would go on to Twitter and confirm that post was made and see it on my account to confirm that that was a real complaint made about me?

MS. RIECHERT: So are you asking her if she went online on Twitter to confirm that you made the post?

MS. GJOVIK: If anyone who is investigating that matter did.

MS. RIECHERT: Okay. So first of all, if it was investigated by the legal department or under the direction of the legal department, then it is privileged.

But you can ask this witness if she went on Twitter to look at your post.

MS. GJOVIK: She's the witness for Apple.

MS. RIECHERT: Yep, and the -- the privilege as to what the legal department might have done.

Page 273

MS. GJOVIK: But if she knows that maybe Ms. Rice did or someone else did, she can testify to that, too. That's the whole point of this deposition today.

MS. RIECHERT: Yep, as long as it wasn't privileged.

A. That would be a privileged conversation, what Ms. Rice did, so I cannot answer that.

I also wanted to note in your question, you said this post being attached to this business conduct complaint. I think I've already testified and established what was attached in sequence and not this last one that you were referencing with the W.

Q. So it would be great to clarify because none of those exhibits we looked through were actually titled of what is IMGB0F9A260A769-1.jpeg, which appears to be the attachment.

So it would be great to figure out -- I'm assuming that's not going to let me download it; I'm hovering over it with a link -- what that was.

But I'm trying to understand, also, even if it didn't have the attachment with all those case numbers, if someone probably went to my Twitter account to go see it for themselves.

A. I cannot answer that without -- to the extent

Page 274

that anybody at the direction of counsel may have done that as part of the investigation.

Q. Okay. And do you have any idea who made that screenshot that we showed that has all those case numbers with the W on their account?

A. No.

Q. Okay. And is that something that could be looked into to get back to me for, like, custodianship of, like, where that document came from that Apple produced? Because assumably Apple would know where it got its documents from.

MS. RIECHERT: Okay. This is not a question for this witness. You can raise it in the meet and confer if you want.

MS. GJOVIK: I will. Thank you.

Okay. Also, it's 3:10. We could probably do -- can we do, like, a ten-minute break so I can go walk my dog? He's getting antsy.

MS. RIECHERT: Your deposition, as long as we're done by 5:00.

(A short break was taken.)

BY MS. GJOVIK:

Q. Okay. Ms. Warner, was Apple aware that I was making complaints about a "long-running hostile work environment" was the term I used, working for

Page 275

Mr. Powers?

MS. RIECHERT: The word is "long term"?

MS. GJOVIK: Yeah.

MS. RIECHERT: Yeah, long-term hostile work environment.

A. I have testified earlier, I'm aware that you had raised concerns about hostile work environment and the -- that were investigated, including Jenna and Ekelemchi.

Q. And what was Apple's findings regarding my allegations about a hostile work environment?

MS. RIECHERT: Objection. Privileged. Instruct you not to answer.

BY MS. GJOVIK:

Q. Ms. Warner, is Apple aware that I had requested assistance in transferring to a new role or reporting to someone else or other ways that I argued would help alleviate what I alleged to be a hostile work environment?

A. Yes. I am aware you had made a request to report to somebody else and to be transferred.

Q. And Apple is -- is Apple aware that I was actively applying for other roles in Apple doing informationals, and talking to other teams trying to find another role at Apple starting around, I think,

Page 276

2019?

MS. RIECHERT: Objection. Not one of the topics that is covered by this witness's deposition. But if she knows the answer, she's welcome to give it.

A. I don't know the answer from 2019 when you had attempted to try to find roles, but I'm aware that, I believe, in at least one of the issue confirmation emails, you had talked about interviewing for a role.

MS. GJOVIK: If we can talk about that on the 14th, whoever is doing Environmental, Health, and Safety, because I had several at least in -- in -- this is not for you, Ms. Warner. Sorry.

Ms. Riechert.

THE WITNESS: Oh, okay. Talking to Ms. --

MS. GJOVIK: Yeah.

I had at least several informationals and even informal interviews with Lisa Jackson's team in 2020 and early 2021. So if there's anything that they can respond to on that matter, I would appreciate it.

MS. RIECHERT: Yeah. I don't think that's within the topics. I think they are doing E, H and S, not interviews you might have had.

BY MS. GJOVIK:

Q. Okay. And then, Ms. Warner, is Apple aware that I had complained that after the start of the

Page 277

Ms. Waibel's interactions that I was reporting retaliation, including increased workload and unfavorable projects?

A. As I've testified earlier, in the issue confirmation that was between you and Ekelemchi, that included your allegation of retaliation.

Q. Did Apple investigate my complaints about increased workload?

A. To the extent that was included in the issue confirmation, there was an investigation under privilege at the direction of counsel that was conducted.

Q. And what was the outcome of that investigation?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. Ms. Warner, and did Apple investigate my complaints about assignment of unfavorable projects?

A. To the extent that was included in the issue confirmation, that was included in Ekelemchi's investigation. That was done at the direction of counsel.

Q. And what was the outcome of that investigation?

MS. RIECHERT: Objection. Attorney-client privilege.

Page 278

Instruct you not to answer.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple investigate my complaints that my work was being assigned to men in my organization, specifically the project on the PSQ portal?

A. To the extent the concern related to what was described in the issue confirmation around assignment of your work, that was investigated by Mr. Okpo under direction of counsel.

Q. And what was the outcome of that investigation?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. Did Apple investigate my complaints that I was being asked to work with a director who I had complained of sexual harassment, Mr. Yepez?

A. Again, to the extent that was an allegation included in the issue confirmation with Mr. Okpo, that was included in the investigation that he conducted at the direction of counsel.

Q. What was the outcome of that investigation?

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client

Page 279

privilege.

BY MS. GJOVIK:

Q. And, Ms. Warner, did Apple investigate my complaints that my direct supervisor, Mr. Powers, was making statements that I believed violated labor laws regarding my ability to discuss work conditions and workplace safety with my coworkers?

A. To the extent that concern was included in the issue confirmation that Mr. Okpo investigated at the direction of counsel, that was conducted under the direction of counsel.

Q. And what was the outcome of that investigation?

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client privilege.

MS. GJOVIK: That was just a whole song and dance we had to do. Thank you for your patience.

Okay. And then we're going to look at some more emails.

I'm going to put these in the chat.

Okay. So this is Exhibit N1.

(Deposition Exhibit N1 was marked for identification.)

BY MS. GJOVIK:

Q. This is a production by Apple. This is Bates

Page 280

number 1452. This is an email from Mr. Okpo to Mr. Lagares --

MS. RIECHERT: 1152?

THE WITNESS: 1452.

BY MS. GJOVIK:

Q. -- on July 21st, 2021.

Mr. Lagares just said:

"Hi Ekelemchi, TL."

What does "TL" mean?

A. That stands for Tony Lagares. He went by Tony.

Q. So:

"Hi Ekelemchi."

Just signature. Doesn't say anything.

And then Mr. Okpo responds:

"Received, thanks."

And this was an email that I sent Mr. Lagares on July 8, 2021:

"Subject matter: Re: Introduction; Hle."

Are you familiar with this email, Ms. Warner?

A. This is a long email that you're only showing the part of it, so I would need to look at the entirety of it.

Q. It's 37 pages. We're probably not going to have time.

A. I understand that. And I can't testify I'm

Page 281

familiar with all of it without looking at it.

Q. Okay. So as part of this email on that July 8th, I responded and say:

"Unfortunately there's a new event, I just found out today. In May, apparently Dan and Dave decided to reduce my ownership and supervision of one of my main projects and appear to have handed it off to a male colleague in another organization, Dan -- Daniel, and didn't even tell me directly. Dan reduced my supervision and gave Daniel the project after I started raising formal concerns to him about Dave creating a hostile work environment" -- and it says "be" but I meant "being sexist, raising workplace safety concerns, and filing a worker's comp claim. One of Dan's directs, Yuan, sent me an email this morning adding me to an existing thread he had with Daniel."

Then I included some of that information.

Ms. Warner, is this something that Apple did investigate?

A. Are you referring to -- referring to what you just read or the entire email?

Q. Just the part that I read.

Page 282

A. To the extent that was shared with Ekelemchi and included in the issue confirmation, that he was investigating, that would have been an investigation under the direction of counsel.

Q. And did they confirm that my work was reassigned to someone else?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer as to the results of the investigation.

BY MS. GJOVIK:

Q. If I was to come back from that leave back to my role, was there any plan to have my work reassigned back to me?

MS. RIECHERT: Objection. Hypothetical. Improper hypothetical. Speculation.

BY MS. GJOVIK:

Q. Okay. And then this part of this email, again, it drops the date and time stamps. But part of this email had a timeline I sent Mr. Lagares of the timeline of raising formal concerns within PSQ. And I had this really long timeline of stuff I was complaining about.

And then I added this 7/8 one, I found out that Dan wanted to reassign my projects.

When I sent emails like this to Mr. Lagares,

Page 283

were these included in the investigation of my concerns?

A. I'm not sure how to answer that, Ms. Gjovik. If you sent emails, that would be included in the -- what Mr. Okpo confirmed he was investigating, and that would be included into his investigation at the direction of counsel.

Again, you're showing me an email and scrolling that has a whole lot of different things, so I can't confirm every email you sent Mr. Lagares would have been included in the investigation.

Q. This detailed timeline I made of things that I claimed were protected activity and retaliation, was that investigated by Mr. Okpo as part of his investigation?

MS. RIECHERT: Objection. Asked and answered.

MS. GJOVIK: I -- she said it was too vague, and I said this specific thing, this detailed timeline I sent.

THE WITNESS: That's not all I said. I testified to the extent you raised concerns to Mr. Lagares that were included in the issue confirmation by Mr. Okpo to conduct his investigation, that would have been investigated under the direction of counsel.

BY MS. GJOVIK:

Q. Okay. Thank you.

Page 284

And then I noted here that on June 14th, another -- a coworkers and I, we sent a remote work advocacy letter to Tim Cook and Deirdre O'Brien. We were advocating for employees or coworkers regarding return to work during the COVID-19 pandemic.

Can you confirm Tim Cook and Deirdre O'Brien were aware that I was the one that sent that letter to them in June?

MS. RIECHERT: Objection. Way beyond the scope of any of the topics that this witness is giving testimony on.

MS. GJOVIK: That's listed protected activity that's in the complaint. That's part of my motion for summary judgment. It's definitely relevant.

MS. RIECHERT: May or may not be relevant, but it's not one of the topics this witness is asked -- answering questions about.

MS. GJOVIK: Can we put that on the 14th?

MS. RIECHERT: No. It's not about EHS complaints.

MS. GJOVIK: Yeah, but it's about protected activity.

MS. RIECHERT: Maybe, but it's not one of the topics.

MS. GJOVIK: I'm going to email her later about

Page 285

that.

BY MS. GJOVIK:

Q. Okay. And then this email to Mr. Lagares also mentions that restaurant incident. This is Page 18 and 19.

And I had sent this June 22, 2021. And I was trying to advocate for him to open a new investigation because I was unhappy with Ms. Waibel's investigation. We'll look at those emails and my complaints next.

But and I said:

"Thank you for talking last week and asking someone to do a secondary review. I really appreciate it and look forward to our next conversation about findings next steps."

This is Page 17.

"The more I've thought about our last conversation the more I felt the need to clarify something you asked about. You asked if there's any new information or events worth including, and I mentioned there is a lot as far as past events that I didn't feel were included in the investigation but should have been, missed due to lack of follow-up and contextual questions from Jenna. I could see how me replying the way I did to you might be

Page 286

too vague. And I wanted to share with you three concrete examples to show the magnitude of what I'm talking about. I understand per Jenna the primary investigation is done. So I assume these might not actually be looked into at all. But I'd like you to see and decide how you'd like to proceed on your end."

And actually, this is Page 18. I think it might be helpful to look at -- I'm going to read the first one and the third one. The third one is that sous chef incident. The first one I complained --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: Thank you -- or sorry.

BY MS. GJOVIK:

Q. It's redacted, but I said:

"John Basanese is another director reporting to Dan West, peers with David powers. A few years ago he was frequently making comments to me and giving me a hard time about not being married or having kids. He expressed direct displeasure that I was single and dating at my age and continued to comment it's time for me to settle down. He brought this up during work settings and especially at work parties and

Page 287

gatherings when others would bring their spouses. I told John to knock it off. And he wouldn't. So I asked Dan to step in. Dan said he told him to stop it and John did finally stop bringing it up directly."

And then another example I gave, the third:

"I was eating out at a Michelin star restaurant in Mountain View in winter of 2017. It was a restaurant Dan insisted I try several times. So when I sat down and texted him that I looked forward to the meal, I didn't realize before that Dan West and Yannick Bertolus, Dan's boss, our VP, are very, very good friends with the head chef of the restaurant. As soon as I texted Dan, he replied right away, and within maybe ten minutes, the chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me midway and was telling me very personal stuff about Yannick. About halfway through the dinner, the chef and Dan both told me they were trying to set me up with the sous chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, 10 years my junior. I expressed

Page 288

no interest in Andrew or dating him, but they persisted. Dan also told the head chef he would pay my entire bill, and he did. I protested strongly to both the chef and Dan and told the chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the sous chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It was humiliating. I've met Dan's wife and daughter a couple times and they were/are both aware of this night and say it's a running topic in the household of how weird and inappropriate it was of Dan to do that, et cetera. Hopefully this helps paint a better picture of what I meant but lots of historical events not actually investigated."

Ms. Warner, that recollection I gave of that night, is that what you were referring to when Apple believes that I have misled the employee relations team?

MS. RIECHERT: Objection. Misstates her testimony.

A. This does not capture what I testified to earlier. What I've shared was in the issue confirmation that was between you and Ekelemchi, there was some -- a

summary of the incident that night at the Michelin star restaurant. And you -- I'm sure you have the issue confirmation as well. And that was part of the Ekelemchi's investigation and that he did realize there were inconsistencies in what you had shared, in the summary, and in the text and what he had read in terms of the full text.

I will also note that, again, you're reading two pages or half a page of a 35-page document. But if you're referencing just to this Number 3 about the restaurant, I have already testified as to the concerns around the inconsistencies.

MS. GJOVIK: One second.

Okay. So I'm pulling open Exhibit R, which is the issue confirmation.

(Deposition Exhibit R was marked for identification.)

BY MS. GJOVIK:

Q. So there was it -- under Dan West, there was Concern Number 4 on Page 21. This is my version of the issue confirmation, the one I sent Mr. Okpo.

He had wrote on his version:

"You shared that during" --

Oh, this was -- this was a combined category of sexual harassment. And then I added the pimping and

pandering with receipt of indirect benefits.

And Okpo's version had included one where I also had shared during a meeting West was making a spanking gesture with his hand to describe how I keep him in line and then asked me to delete the video.

And I had shared that video with Mr. Okpo.

And then I added:

"I was eating out at a Michelin star restaurant in Mountain View in winter of 2017. It was a restaurant Dan" --

This is actually -- it looks like exactly verbatim what was in that email I just read.

I can read it again and we can check. But does that look like to you actually what I just read in that email to Lagares? Like I probably just copy and pasted what I emailed him and put it in here?

MS. RIECHERT: I'm lost on the question. Are you saying is what you wrote in here exactly the same as what you read in the last exhibit?

MS. GJOVIK: Yeah. As I started reading it, I realized that actually just matched that email, so I can read it all again, but --

MS. RIECHERT: Please don't. The documents speak for themselves. If they are exactly the same, then they are. If they are not, they are not.

But it's not fair to ask this witness to go word by word on two different documents and see if they are exactly the same.

MS. GJOVIK: Okay. Well, if she says that the issue confirmation was different and I was in trouble because of what I put in the issue confirmation, let me read this version of the issue confirmation.

MS. RIECHERT: Okay. You don't really need to read it. She says that what was written in the issue confirmation, including the pandering and pimping stuff at the top, was inconsistent with what the text showed.

MS. GJOVIK: Okay. So I'm looking at this now, and I'm going to say this looks like what was in the email, so we're not going to just listen to me read books to you guys because it's not a great use of time.

MS. RIECHERT: Thank you.

MS. GJOVIK: You're welcome.

But I will read what else is in this section since the context was probably relevant.

So I also added:

"Ashley texted Dan in December after the dinner and told him she's dating a professor now and need" -- that's a typo, sto -- "to turn down the sous chef, and Dan said, I'm not even a little concerned. Regarding Andrew, too bad

it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on."

And then I said:

"Ashley was supposed to go to her office on August 5th to retrieve the laptop with the text" -- it says to "send" but meant "sent" -- "during the night at that restaurant, but ER put me on leave and removed me from the workplace on 8/4 before I could, and they knew I was planning on it."

BY MS. GJOVIK:

Q. So, Ms. Warner, that was in the issue confirmation that Mr. Okpo had right directly under the section about the sous chef in that restaurant.

And, again, it says this is Page 21, and this is plaintiff's production 8-0198. And in this deposition, this is Exhibit R.

And it says "Ash" -- and I'm writing this in the third person:

"Ashley was supposed to go to her office on August 5th to retrieve the laptop with the text sent during that night at the restaurant. But ER put me on leave and removed me from the workplace on 8/4 before I could, and they knew

Page 293

I was planning on it."

So, Ms. Warner, can you explain to me how Apple could justify terminating me by me supposedly withholding a text exchange that I said I was planning to go get at my office and complained that the employee relations team was preventing me from obtaining, but then blaming me for not getting that exact exchange that I wanted to show them?

MS. RIECHERT: Objection. Misstates the testimony. That was -- she's testified over and over what the misinformation was, and it had nothing to do with that.

MS. GJOVIK: Speaking objection. You're not testifying on behalf of Apple. I would like her to answer.

MS. RIECHERT: Again.

MS. GJOVIK: Well, now we have content to impeach her prior statement. So I would like to see if she's standing by her prior statement or she's going to pivot now that we're looking at the issue confirmation and see this statement, which appears contradictory to the statement made prior by Apple.

MS. RIECHERT: Objection. Misstates her earlier testimony. Misstates your characterization of it.

Page 294

A. First I would say you -- again, looking at this very limited paragraph that you have read, the question you're asking is absolutely convoluted.

But I will attempt to, again, answer it as I've answered before: I still stand by the answer I provided with respect to the reasons why you were terminated, specifically with respect to the text messages and your statement here and the issue confirmation.

Again, I'm not seeing the whole page, but what I was aware of, you described the incident one way, the text messages showed something different, and that was an attempt to mislead or misleading information.

You were called to speak with the investigator Mr. Okpo, and you refused to do that.

So this has not changed my testimony, your reading this paragraph here.

Q. Okay. Can you help me understand, then, how Apple's position is that I misled or attempted to mislead by not providing a full text exchange when it was documented in this issue confirmation, which you confirmed Apple investigated and reviewed, that I was trying to get that very text exchange to provide to the investigator?

MS. RIECHERT: Objection. Misstates her testimony again.

Page 295

A. I will answer it one last time. It is not the simple act of not providing the text message. It's your characterization of the events, what occurred, Mr. West's interactions with you, what he did, his intent, what you did not want to do; again, compared to what the texts showed, they were two different stories.

In addition to that, you refused to speak with Mr. Okpo.

Q. Okay. Do you think it's -- if this happened in 2017, winter of 2017, and this was written in 2021, even if there are things that were not perfectly accurate, wouldn't it be understood that within four years, a memory might not be perfect and would actually support why the employee was trying to get the full text message exchange to have concrete evidence to review?

MS. RIECHERT: Is there a question there?

BY MS. GJOVIK:

Q. Isn't it reasonable for the employee to want to get the text messages for themselves and the investigator after four years had passed since the event in question?

MS. RIECHERT: Again, this misstates the witness's testimony again.

A. You're asking me to assume what is reasonable for you, what was not. Again, I have shared it is it

Page 296

not the simple act of not having the text message.

You've described the incident, as you stated, that happened four years prior pretty vividly in a very descriptive way that is very inconsistent with what the messages showed.

And that's what Ekelemchi was trying to reach out to you to speak with you about, which you refused.

Q. Okay. And you did answer. You gave some examples of what you thought was misrepresentations.

And then just to conclude this section, the other bullets here was -- this was Ekelemchi from his:

"You told me that in March 2021, West's daughter gave you a ride to Stanford and during the car ride, she told you that they still talk at home about how bizarre the restaurant incident was."

As part of Mr. Okpo's investigation, did he contact Mr. West's wife or daughter to ask about this?

MS. RIECHERT: Objection. Instruct you not to answer. Attorney-client privilege. Investigation is privileged. What he did is privileged.

BY MS. GJOVIK:

Q. And then as part of Mr. Okpo or anyone's investigation into this matter prior to my termination,

Adelmise R. Warner

Page 297

did anyone speak with that head chef Jared, the sous chef Andrew to get their insight on this matter?

MS. RIECHERT: Objection. Attorney-client privilege.

Instruct you not to answer. Investigation is privileged.

BY MS. GJOVIK:

Q. And as part of this investigation, did anyone speak with Dan West prior to my termination about this night at the restaurant?

MS. RIECHERT: Same objection. Attorney-client privilege.

Instruct you not to answer.

BY MS. GJOVIK:

Q. Okay. And then the final bullet is -- this was Ekelemchi:

"You mentioned that in 2020 West made a comment in Slack that Powers will unbutton the top three buttons of his shirt during the next all-hands meeting. You told me that when you addressed West about his comment, he said he didn't want to sleep with Powers so it wasn't a problem. He then inferred you were only offended because he thought you wanted to sleep with Powers."

Page 298

And then evidence is Box folder including emails and photos.

Did Apple review the evidence files I provided in those Box folders?

MS. RIECHERT: Objection.

Instruct you not to answer. Attorney-client privilege.

(Deposition Exhibit N was marked for identification.)

BY MS. GJOVIK:

Q. Okay. Okay. And then we're going to look at -- not really long -- N, as in Nancy. This is Apple production 1277. This is an email forwarded from Ms. Waibel to Ms. Polkes, HR business partner, April 21st.

And then it had been forwarded from Mr. West to Ms. Polkes same day.

And Mr. West wrote:

"Another one for us to discuss during one-on-one on Friday."

And the message forwarded was from myself to Mr. West on April 14th, 2021.

And part of this, I say, "I would" -- to Mr. West:

"I would like to report to you or" --

Page 299

I redacted this. I can't remember what name this is. It might be John.

"My biggest concern with either of you would be workload, so I think at least for the next six months or so, if possible, I would love to go four days a week. I think having a time box for project assignments should help drive clear boundaries with either of y'all, and it would give me more space to breathe while I'm processing everything that happened/is happening. Four days a week is not a showstopper but is strongly desired. Moving under one of you is a showstopper. Otherwise, I think I will recommit myself to looking for a new opportunity at Apple. I remember I said something in my last peer review feedback for Dave in 2020 about how working for him is" -- all caps -- "TERRIBLE for my mental health. I think I might have said that the year before too. I need to change the situation. It's partially on me for waiting so long to leave, regardless of the distracting patient zero/Erin Brockovich stuff. Sorry for the extra chaos while you're already dealing with so much. P.S. My previous neighbors at the toxic

Page 300

apartment complex just told me they saw some guy in a black sedan parked up the road staring into their apartments with binoculars. Fun. I told them to call the cops."

And then the prior email was me emailing Mr. West on April 9th, 2021, and said:

"My ADT enabled SOS necklace arrived today. It's horrifically awesome and pretty. I might actually get single girlfriends these for Christmas. Just set up Eve camera and door sensor too. Super nice. Thank you for the recommendations."

Ms. Warner, was Apple at the time they fired me aware that I had been having these conversations with Mr. West about the toxic exposure I experienced at the apartment I was living in in 2021 in fear of retaliation, including physical violence, which Mr. West had responded with recommendations for personal security measures, including the security cameras and an ADT personal security necklace to wear so I could call ADT in case someone was attacking me due to my complaints I was making about those toxic exposures?

MS. RIECHERT: Okay. That's a very, very compound question there. Do you want to break it down?

But, I mean, if your question is is Apple aware

Adelmise R. Warner

Page 301

of it, aren't you reading from an email you sent to Apple?

MS. GJOVIK: Mm-hmm.

MS. RIECHERT: Yeah. So then Apple would be aware of it.

MS. GJOVIK: Mm-hmm. Well, that was easy. Thank you.

MS. RIECHERT: You're welcome.

BY MS. GJOVIK:

Q. Ms. Warner, so Apple is aware of this?

MS. RIECHERT: You have to answer.

A. First of all, the in -- in reading the email, I just want to clarify, you mentioned the beginning that it was an email from Ms. Waibel to Ms. Polkes. That's the reverse, so that was not accurate. It is the reverse. It's from Ms. Polkes to Ms. Waibel forwarding the email that Mr. West had sent to her. So that's the first clarification.

Q. Oh, you're right. Thank you. Okay.

A. You're welcome.

And you've read a lot in this email. Very convoluted.

But to the extent you're asking whether Apple was aware of you raising concerns around safety/health issues, the answer is yes. And since this email went to

Page 302

Ms. Polkes and Ms. Waibel, so Apple was aware of this email.

Q. Yeah. Thank you.

And specifically also is my concern, was Apple aware about my concerns about my physical safety and concerns about physical violence as a possible form of retaliation for me making complaints about the toxic exposure issues at my old apartment?

MS. RIECHERT: Objection. The document speaks for itself. I don't know if you're reading from it or characterizing it, but the document speaks for itself.

MS. GJOVIK: That's not really an objection. She can answer.

MS. RIECHERT: Yeah. It is an objection. Document speaks for itself is an evidentiary objection.

MS. GJOVIK: Okay. But I'm not asking about that email.

BY MS. GJOVIK:

Q. I'm saying is Apple aware at the time it fired me that the months prior, I had been having concerns about physical safety and discussing those matters with Mr. West, concerns about physical violence because of my complaints about the toxic exposure next to my old apartment?

MS. RIECHERT: Okay. Again, same objection.

Page 303

Document speaks for itself.

MS. GJOVIK: Okay.

MS. RIECHERT: Whatever is in the document Apple was aware of.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple -- go ahead.

A. You have in front of me on the screen an email that is -- that you've read, and you're describing what you've complained about.

As I've already testified, since it's gone to HR, Apple was aware of it. And --

Q. And then did -- sorry. Go ahead.

A. Apple was aware of your concerns around safety and health -- E, H, and S -- which I believe there will be separate testimony to that effect.

Q. When Apple became aware of this email exchange I had with Mr. West, did Apple inquire to Mr. West why he was making recommendations to me about personal security technology?

MS. RIECHERT: To the extent that you're asking for what was done in connection with Mr. Okpo's investigation, I'll instruct her not to answer on attorney-client privilege.

If it's other than that, you may answer.

A. I don't know -- this email doesn't speak to

Page 304

Mr. West making recommendations to security, and this is an email from you to Mr. West. And you stopped reading at that part.

So I don't know how you want me to answer that without making -- or speculating as to what Mr. West had agreed to.

Q. Yeah.

So the part I read on April 9, 2021, it ends with:

"Thank you for the recommendations."

And talks about an ADT-enabled SOS necklace that I called "horrifically awesome."

And then it talks about Eve camera and door sensors and indicates:

"Thank you for the recommendations."

So that's why I'm indicating did Apple follow up with Mr. West why he's recommending to his employees the need for personal security necklaces or home surveillance technology?

MS. RIECHERT: Again, if it was covered as part of a privileged investigation, then I'll object and instruct you not to answer based on privilege.

A. To the extent that this was part of Ms. Waibel's privileged investigation, I cannot answer that.

Page 305

I will clarify, again, look -- since you have a document in front of me that you're scrolling, this states you are telling Mr. West:

"Thank you for your recommendations."

I didn't read anything where he recommended these things to you.

Again, if there's something you want to show me, if it's in this email, then Apple was aware of it, and it would have been included in Jenna's investigation of the concerns you had raised.

Q. Okay. And this email also reflected that I was telling Mr. West that I have to leave my current job. I said working for it is terrible for my mental health, and that if he does not give me a better option in his organization, I was going to look for a new job at Apple.

So Apple was aware that as of April 2021, I believed I could no longer stay in my current role due to the working conditions with my manager?

MS. RIECHERT: Objection. Calls for speculation and lacks foundation as to what you believed.

BY MS. GJOVIK:

Q. Let me rephrase. Same question, but Apple believes that I alleged all the other stuff I just said.

Page 306

A. All the other stuff means it's a very vague, convoluted question.

But to the extent you are talking about what you stated in this email to Dan that was ultimately forwarded to Jenna and Helen, yes, Apple is aware of that.

And to the extent that was included in Jenna's summary of what concerns she was reviewing and investigating, that would have done under attorney-client privilege.

Q. So if I was to ask if there was any outcome from those investigations about helping me find a role that I did not believe was a hostile work environment, your answer would be attorney-client privilege?

MS. RIECHERT: Yes, to the extent of whether that was a recommendation or -- excuse me, a finding of the investigation.

MS. GJOVIK: This one, this is Exhibit N2.

(Deposition Exhibit N2 was marked for identification.)

BY MS. GJOVIK:

Q. This is an email exchange between Mr. West and Ms. Waibel and Polkes. This is dated May 18, 2021. It is Apple's production 1356. This is an email that there's an exchange between me and Mr. West. It's five

Page 307

pages long.

And I was taking notes from a conversation I was having with him during a one-on-one. This is dated April 29, 2021, the original email that was forwarded.

And I wrote in the notes:

"Ashley can't report to Dan. Dan does not want any reorgs. EPM role will stay under Dave until Ashley leaves. Then role will likely be dissolved and transformed into standard engineer or manager role. Ashley will need to find a new role outside PSQ or new job outside of Apple because she could not work for Dave without further detriment to her mental health and there are no options in PSQ."

So is it safe to assume, Ms. Warner, if this was an email that Ms. Waibel and Ms. Polkes had that Apple was aware that as of April 29th, I had stated to Mr. West what I just read?

A. You have read a section of an email that is five pages long that looks like it has multiple forwards. What you've shown me is only reflected from what you sent to Dan West.

So I would need to see who it was forwarded to to confirm.

Q. Yeah.

Page 308

So at the very top here, we have from Dan West to Ms. Waibel and Ms. Polkes on May 18th. And they are working on an email draft. But that email thread is based on the thing that I just read per Apple's production.

So that email exchange with Ms. Waibel and Ms. Polkes would have that part I just read as part of the document Apple produced.

MS. RIECHERT: So what's the question?

BY MS. GJOVIK:

Q. Is it safe to assume that as of May 18, 2021, that Apple was aware no later than May 18, 2021, that I had said that thing that I just read, that I'll need to find a new role outside PSQ or new job outside Apple because I can't work for Dave without further detriment to my mental health and there's no options in PSQ?

A. Yes. It would be safe to assume that because now that you show the entire email which was forwarded to HR and ER, it would be safe to assume that Apple was aware of that, at least Jenna and Helen were aware of it, what you read.

Q. Thank you.

Is it safe to assume that any email that went to someone who works in -- not just anyone.

Is it safe to assume that any emails that were

Page 309

forwarded to or seen by an HRBP or an employee relations investigator is then attributable to the -- the knowledge they see is attributable to knowledge by Apple?

MS. RIECHERT: That may call for a legal conclusion.

MS. GJOVIK: Yeah. She's said this a few times now that if -- or how about instead of teams --

BY MS. GJOVIK:

Q. Is it safe to assume that if I have emails, especially produced by Apple, where Ms. Waibel, Mr. Okpo, Ms. Polkes are on those emails, that whatever content was in those emails, that's the knowledge attributable to Apple if one of those three people had that content in the email that they were on?

MS. RIECHERT: I think that's calling for a legal conclusion. I'll object on that basis.

BY MS. GJOVIK:

Q. Still going to answer or not going to answer?

A. I'm not going to answer legal conclusions. I'm not testifying as a lawyer.

But as I've stated before, and if you are looking at a specific email with respect to the emails you've shown me, if it was sent to HR and, in this instance Helen, or ER, in this instance Jenna Waibel,

Page 310

that it would be correct that Apple is aware of it because it's gone to the people team.

Q. Okay. Thank you.

A. I can't assume for all emails.

MS. GJOVIK: And then this one is Exhibit P.

(Deposition Exhibit P was marked for identification.)

BY MS. GJOVIK:

Q. And this is Apple's production 861. This is just one page. This is me emailing Mr. Powers on May 10, 2021.

I said:

"Sorry for the short notice, but I'm going to need to be out the rest of the week. I have another echocardiogram Thursday to see if the chemical exposure caused physical damage to my heart. On Friday I have to do a bunch of imaging to look for cancer, and I started a medication this weekend related to the chemical exposure that's causing side effects, and I need to rest outside the apartments. I still have PTO today and tomorrow. I submitted sick time for Wednesday and Friday."

And then the email shows that Mr. Powers forwarded it to someone and said:

Page 311

"I assume you're aware of this but just in case."

That was the next day, May 11th.

And then the next response is from Ms. Polkes, so he assumably forwarded it to her same day:

"Thanks for letting me know. Did you respond back to her yet?"

Mr. Powers responded:

"I did."

And then Ms. Polkes responded same day:

"Thanks."

So, Ms. Warner, is it -- we can say that Apple, as of May 11, 2021, was aware that I was still suffering or I alleged I was suffering physical injuries due to chemical exposure?

MS. RIECHERT: Did she say chemical exposure?

THE WITNESS: Chemical exposure.

MS. RIECHERT: Yeah.

A. Based on this email that you show and I'm reading now, it would be correct that because it went to Helen Polkes who responded and communicated with David Powers that Apple was aware of what you've alleged in this email dated May 10th.

Q. Thank you.

And, Ms. Warner, when you have employees at

Page 312

Apple who are making complaints or raising concerns and they are suffering things in their life like health issues, does Apple consider that in the way that they handle investigations or engaged with those employees that those employees may be more complicated than an employee that's in great health or not experiencing stressors outside their lives?

MS. RIECHERT: Objection to the use of the word "complicated." That's vague.

A. Yeah. This question is very broad and vague, and I don't know how to answer that because you -- I would have to assume a whole lot of different things, right.

We handle concerns by employees, and obviously caring and supporting employees at Apple is very important to us. And on the ER team, we do that.

And so if we're investigating, it depends on the circumstances how much care, how much support, what is needed to make sure the person is okay while we conduct the investigation is part of what we do.

MS. GJOVIK: So we'll put aside Apple's chip fab and my accusations that Apple was the one that made me sick in 2020 and all that. That's going to be for Thursday, I assume.

That's right, Melinda? Thursday will be 3250?

Page 313

MS. RIECHERT: Thursday will be the other topics that were not covered by this witness.

MS. GJOVIK: And this -- is this witness going to answer any of my questions about 3250 Scott?

MS. RIECHERT: I don't think that's one of her topics.

MS. GJOVIK: You don't think or it's not?

MS. RIECHERT: Do not think it is. I don't believe you have 3250 Scott in any of her topics. You have it Topic 3. 3250 Scott is not this witness. So it's --

MS. GJOVIK: Okay.

MS. RIECHERT: -- Thursday's witness.

By MS. GJOVIK:

Q. Okay. So putting aside the cause of my alleged injuries, did Apple consider my health issues and what I said I had suffered the year prior when the employee relations team investigators were interacting with me?

A. Again, that -- it's also a very vague question when you say "did Apple consider."

We just talked through emails where you've expressed some of those concerns, and the email confirming the issues between you and Jenna included some of that, the confirmation, issue confirmation included some of that, so -- and, again, you going on a

Page 314

leave at your request, and there are a whole host of other things that was included in those two confirmations.

So when you say "consider," that was part of what they looked at in responding to your question -- your concerns.

Q. So, I guess, more like, you know, if I'm saying that I'm sick, I potentially could have cancer, I might have physical heart issues, I think I suffered all this chemical exposure, and I'm asking for accommodations like communications in writing, or maybe -- and I think what I tweeted was protected activity, and I had the right to, but let's say I make a mistake and I tweet something that maybe is a little inappropriate, but you're like, she's sick, maybe we should talk to her and warn her and work with her because she's gone through a lot.

Was there any consideration like that, or did Apple just treat me like anyone else and disregard all of the stuff I said I had just gone through the last year and a half?

MS. RIECHERT: Okay. So there's so many assumptions in that that are -- assumes facts not in evidence that I don't know there's any way the witness can answer that question. And it is super compound,

Page 315

so --

MS. GJOVIK: So let's break it down. Let's break it down.

MS. RIECHERT: You're talking about May, and you're talking about tweeting stuff in September. And you're asking if we should have excused the tweeting in September because you were sick in May. Is that the question?

MS. GJOVIK: Oh, no. More like almost died in 2020, could have permanent physical injuries to my heart, could have cancer. I also complained to Waibel about cancer at the office.

BY MS. GJOVIK:

Q. So I'm just asking if there's any -- any consideration for -- like if Apple is actually -- the way they treated me through all this was them being nicer than they would have been otherwise, or if they were just treating me the same they would regardless of all the other health issues that I had complained were -- occurred and still occurring.

MS. RIECHERT: Same objection. Compound. Assumes lots of facts not in evidence. Assumes you asked for accommodations.

MS. GJOVIK: Well, I'm calling accommodations, like, communication in writing.

Page 316

MS. RIECHERT: I -- that also assumes facts not in evidence.

THE WITNESS: Yeah. I think, Ms. Gjovik, I would break down the question you want me to ask.

But I will say this because you're asking in terms of the consideration, again, as I've stated, you did get the leave, and depending on the time, you did request for remote work, and you did work with an accommodations team. So those are the things I know that happened.

But with respect to when you were terminated, to the extent you're asking that, again, you didn't speak to anybody. So, no, there was not a let's think about do you have cancer, do you have this.

So you would want me to assume all these things to be the -- to be true to answer that question.

MS. GJOVIK: Okay. Now I'd like to look at Exhibit S.

(Deposition Exhibit S was marked for identification.)

BY MS. GJOVIK:

Q. This is plaintiff's production 8-0026 and deposition Exhibit S. Just put it in the chat.

This is an email from me to Mr. Okpo on July 28, 2021, referencing a Slack conversation in the

Page 317

women of SWE, S-W-E, channel on July 26, 2021.

Ms. Warner, are you familiar with this email and/or that Slack conversation?

MS. RIECHERT: Objection. Compound.

BY MS. GJOVIK:

Q. Ms. Warner, are you familiar with this email?

A. If you're looking at the page that's on the screen because this email is part -- looks to be part of a very long, lengthy document, this top email that you're referencing, I have seen that before in preparation for this deposition.

Q. And are you familiar with the Slack conversation that it references and includes as the attachment?

A. To the extent that, again, this is part of a very long document, this page here that you're showing, that would be included in the email to Ekelemchi, I have seen that.

Q. Okay. And it is 13 pages. But it's all just, you know, screenshots of -- actually, we can look through it. We can look through it. Okay. Okay.

So the email itself to Mr. Okpo is sent by me by July 28th. It's called "Slack ER chain." ER is in employee relations.

And I said:

Page 318

"Hi, the Slack chain we talked about yesterday and today," and then I have a URL. And then I say:

"Not even including DMs, dot, dot, dot. I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation who has received no real help from HR or ER in resolving the issue. Yes, I know you're looking into things now, but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing. There seems to be a growing group of us with very horrific stories to tell who have tried to tell these stories and have gotten nowhere at Apple. As mentioned before, this is incredibly disappointing and unacceptable to me, not just for my own situation, but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretend seems to be the important word there. Ashley."

And then the rest is all screenshots from that conversation.

Page 319

Ms. Warner, did Apple investigate my complaints that it seems like there's systemic concealment of employee complaints at Apple?

A. Again, going back to this email of the 13- or 14-page document, which has a screenshot, so I'm not testifying to what I'm not seeing on the screen, but to the extent your concerns shared with Mr. Okpo were included in the issue confirmation about your workplace concerns, those were investigated as part of the privilege investigation that was done at the direction of counsel.

Q. And did Apple investigate the complaints made by the other employees in those screenshots as well?

MS. RIECHERT: Okay. We're only talking about investigation of your complaints. Anything else would be privileged.

MS. GJOVIK: You also said my complaints were privileged.

MS. RIECHERT: Right. But we've already said that we investigated the issue confirmation issues.

BY MS. GJOVIK:

Q. Okay. So on this Slack thread, I started it. It was posted at 12:41 p.m. And I was sharing an article I read on "Washington Post" about gender discrimination at Amazon.

Page 320

And I asked people:

"Do we think Apple does a sufficient job at handling employees' complaints about discrimination? Do we feel comfortable even reporting issues, question mark?"

And then I make additional comments, too.

And there was a lot of people who responded. There was multiple comments like this Barbara Pitts. She commented:

"I think there are a lot of problems with the current escalation process. I tried to escalate something that was being swept under the rug, employee comments that were racist and racially insensitive. It wasn't happening directly to me, but basically the options for resolving the issue we were given seemed ridiculous and not entirely helpful. It also" -- "I've also found it highly dependent on the attitude of the manager" -- it's cut off, something -- "approach, and many managers are not properly trained how to handle it."

She also added:

"And also, I've heard a few stories of bullying and downright harassment in other orgs outside SWE, not so much to the extent with

Page 321

anyone" -- something -- "work with, but the victims are afraid to say anything to anyone with authority for fear of retaliation. There have been multiple HR complaints about specific people and said person still acting in their role as a hostile manager. It's extremely unfortunate and" -- it's cut off -- "driven crazy. I don't know what I, slash, we can do other than continue to be vocal when we see something that's wrong."

Bri Chapman chimed in of her own experience. She said also she's had more difficulty escalating things on behalf of others, which is unfortunate but might be fair.

I commented:

"I am in hardware engineering and I'm now raising concerns about retaliation, based on raising concerns about retaliation, based on raising concerns about sexism. The culture of impunity has crushed me enough to kick off the conversation now. I hate it."

Then there was another -- this Allie Cassidy responds. She said:

"I have a friend who is totally not me, that did experience harassment and bullying at Apple

Page 322

some years back. She's sharing her story."

This is Rebecca Taylor chimes in, and she says she's:

"Witnessed and experienced a range of bullying, harassment, and retaliation and even illegal behavior. And never once has there been any outcome where I felt heard and all of the perpetrators are still at Apple."

This is Srivani Pinneli responds:

"I feel like we really need a forum or committee where we can go and talk about issues while maintaining the confidentiality. This really helps people who are hesitant to speak up."

Bryan Henry responds.

Gowri Somanath responds.

I responded to the thread again:

"Yes. Employee relations seems horrified by how well I documented everything over the last six and a half years. I created Box folders by year and by cause of action, because that's apparently all they care about, and added photos, emails, texts, chats, and copies of my personal agendas and meeting notes. The first round of investigation I thought they would

Page 323

hear me out and we would just discuss like normal people, but that's apparently not a thing here. So now we're going Box folder by Box folder chronologically by cause of action, noting each piece of evidence that would substantiate the claim in court. I also keep calling it prediscovery and saying, when I sue you, and telling them not just that I'm going to" -- "going to the press but that I'm actively talking to the press. This has been the only way I've gotten them to give me the time of day. Document, document, document. If you think there's a power dynamic and politics at work, I'd say assume you need to go the route out of assuming they won't help you. So assert yourself and your rights as clearly as possible."

So, Ms. Warner, when Apple was reviewing all this when I sent it to them, did they consider trying to settle this matter with me?

MS. RIECHERT: All right. Let me think of the number of objections to that. One, it's outside the scope.

Two, it's covered by attorney-client privilege and work product privilege and probably many others.

Page 324

MS. GJOVIK: So you're not going to let her answer?

MS. RIECHERT: Absolutely not.

Instruct you not to answer.

BY MS. GJOVIK:

Q. Ms. Warner, Mr. Okpo and I had a conversation about settlement, and we even were discussing numbers around this time at end of July.

And the one thing that Apple was requesting was a full waiver of claims, which I expressed I was uncomfortable with because I was concerned I could have disease from the chemical exposure at my office. Mr. Okpo indicated that was the requirement was full waiver of claims.

Did Apple know at that time that I had been exposed to the chemicals at my office from the Superfund site exposure? Was that the reason that they made -- they insisted on that term?

MS. RIECHERT: So first of all, this witness is not talking about chemical exposure in offices, so she's the wrong person.

Secondly, this topic of release of claims and settlement of suits is outside of the topic.

And thirdly, what Apple knew would be covered by the attorney-client privilege.

Page 325

BY MS. GJOVIK:

Q. Okay. When I was talking to Mr. Okpo, the number on the table was the amount that I would make in total compensation through when I graduated law school, which was over $500,000, the requirement of full waiver of claims.

But after I declined that based on the cancer dispute, Apple's never had a settlement offer ever again.

Why is Apple refused to discuss settling this matter completely following that initial discussion with Okpo?

MS. RIECHERT: First of all, that's an incorrect statement. We went to a settlement conference. I was there. You were there.

Secondly, it's nothing within the topic of this witness.

Third, settlement discussions are excluded from evidence under the FR -- the Evidence Code 402, I think.

And, fourthly, a lot of that would be covered by the attorney-client privilege.

MS. GJOVIK: Okay. So regarding the exclusion from evidence --

THE WITNESS: Is it possible to take a break at a point, like, when's a good time?

Page 326

MS. GJOVIK: So we're going to get close to 5:00 soon, but we can take a five minute right now if you want.

THE WITNESS: That would be helpful.

MS. GJOVIK: Okay.

(A short break was taken.)

MS. GJOVIK: Thank you, ma'am.

Okay. One second. I'll get the rest of the attachments.

Okay. This is -- this doesn't have the exhibit number. Sorry. One second.

This is Exhibit T.

(Deposition Exhibit T was marked for identification.)

BY MS. GJOVIK:

Q. Plaintiff's production 8, Number 99. This is an email I sent Mr. Okpo on July 28th. And I said:

"I went on leave from May 24 to June 4. Jenna called June 3rd to tell me she finished and didn't find any issues. She never contacted me after May 23rd until she completed on June 3rd. There was zero follow-up questions from anything I sent her from May 20 to 22nd."

And then I said:

Page 327

"June 3rd to 10 below. It's clear to me Jenna didn't look into most of the stuff I sent her."

And I was forwarding an email I sent Waibel on June 10th saying -- with more information including:

"I implore you to read the 2020 feedback I gave Dan about Dave."

Dan said -- "I literally mentioned gender discrimination and sexism in the feedback, multiple times."

And then also forward complaints to her again about her investigation.

Ms. Warner, did Apple ever investigate my complaints about Jenna Waibel's investigation into my concerns?

A. First, you reading an email about Ms. Waibel's review of your concerns, I don't consider this, what you've read -- again, there's an email you're scrolling through about a complaint of Jenna Waibel.

Q. Okay.

A. This email is indicating -- go ahead.

Q. Let me be more specific.

How about the complaint that I did not believe that Jenna looked into most of the stuff I sent her?

A. To the extent you're characterizing this email

Page 328

as your complaint of what Jenna Waibel did or did not investigate, as I've shared before, there were the two investigations, obviously with -- this is speaking to Ekelemchi Okpo's investigation that was forwarded to her through Tony Lagares, the manager, and he conducted an investigation into any concerns that you believe were new and not investigated.

What Ms. Waibel investigated were not included in Mr. Okpo's investigation.

Q. So was there any investigation by Apple into my complaints about the integrity and diligence of Ms. Waibel's investigation?

MS. RIECHERT: Objection. Just asked and answered --

MS. GJOVIK: Okay.

MS. RIECHERT: -- and mischaracterizing what you said in the email.

THE WITNESS: And what I've just testified to. You're characterizing it something very different.

BY MS. GJOVIK:

Q. So I was trying to -- my question was did Apple investigate my complaints into Ms. Waibel's investigation into my concerns?

I showed you an example with that email, but I

Page 329

don't believe you answered my question.

MS. RIECHERT: She did.

A. I have. You don't like the answer, but I have answered it.

Q. Is the answer just privileged?

A. I have answered the question two questions ago.

MS. GJOVIK: Okay. This one. This is Exhibit U.

(Deposition Exhibit U was marked for identification.)

BY MS. GJOVIK:

Q. This is -- this is plaintiff's production, plaintiff's production 8-222. This is an email from me to Mr. Okpo on July 29, 2021, and I -- and Mr. Lagares. And I say:

"Hi guys, I talked to Ekelemchi about Jenna's investigation at length today. As I mentioned before, there are numerous areas I have reason to believe she didn't investigate at all. I forwarded several emails to Ekelemchi along with a timeline I find very suspicious for a quick resolution and no follow-up questions from Jenna."

And then I asked them if they can at least distinguish what Jenna investigated in finding no policy

Page 330

violations.

So actually, I say -- I'll read this:

"What I'd like to ask from you all after you two chat is for ER to provide me a list of items which Jenna investigated and closed out finding there were no Apple policy violations and no action would be taken. I think we should get this from Jenna before Ekelemchi and I complete this prediscovery phase since if there's things she didn't close out, I want to ensure Ekelemchi looks at those, and it's very unclear what she did or did not actually investigate. There was so much terrible stuff that happened to me at Apple and continues to happen to me, I think it will help everyone during litigation if we can draw a clear line of what events Apple has already closed investigation into, Jenna's round, and which things Ekelemchi will be investigating, which I know is still in progress, and in the closure of each of Ekelemchi's items as well with outcomes. Ideally, if we can sort this by area of law, it will help route to the different lawyers: Labor, ADA, FMLA, employment discrimination, whistleblower, toxic tort, et

Page 331

cetera. When you send over the list of Jenna's items that she closed, I would also appreciate you noting whether or not she looked into my concerns about workplace safety at my Superfund office and, if so, if she closed that as an ER investigation as well since she's so heavily involved in the communication of those conversations and facilitated all dialogue between me and EHS and I sent her numerous emails expressing my deep concern and asking for help. Thanks."

So I'm going to ask again, Ms. Warner, did Apple investigate my complaints into Jenna Waibel's handling of the investigation into my concerns in March through June of 2021?

A. I will answer it again, Ms. Gjovik. Any concerns that were raised following Jenna's investigation that was summarized in Mr. Okpo's issue confirmation were investigated by Mr. Okpo and that those investiga -- that investigation was done under privilege. This email you're reading is from -- I can't see it -- is July 10th or July 28th?

Q. July 29th.

A. 29th. And the issue confirmation, I believe, was subsequent to that.

Page 332

Q. Okay. So the -- you're saying that Mr. Okpo only investigated the things that were in the issue confirmation that I sent in August. Is that correct?

A. What I've said that any -- the concerns that were summarized in the issue confirmation constituted the scope of Mr. Okpo or what was investigated in August, and to the extent those concerns you raised between Jenna's investigation and Mr. Okpo's investigation were raised they were not investigated, that would have been included in that.

Q. So Mr. Okpo investigated his coworker, Ms. Waibel?

A. No. That's a different question you are asking.

Q. Yeah. So that's what I'm trying to get to is I complained about essentially misconduct by Ms. Waibel, and I'm asking if Apple ever investigated my complaints of misconduct by Ms. Waibel.

MS. RIECHERT: Objection to your mischaracterization of the nature of your complaint about Ms. Waibel's investigation.

A. Yes. You are characterizing what you shared was she did not fully investigate your concerns as misconduct.

As I've said, again, I will say it for the last

Page 333

time, concerns you raised about workplace concerns and to Mr. Okpo and the issue confirmation were investigated at the direction of counsel.

MS. GJOVIK: Okay. So that was Exhibit U. This is Exhibit V.

(Deposition Exhibit V was marked for identification.)

BY MS. GJOVIK:

Q. This is an email I sent Mr. Okpo on the 28th. This is plaintiff's production 8, Number 64. And I sent it to Mr. Okpo and Mr. Lagares. I'm sorry, I did not -- I forwarded it to myself on July 28th. I sent it on July 27th, 2021.

And I said I was capturing outstanding action items, and I said:

"I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. I've asked several times now including today that all one-on-ones with them be in writing only, during the duration of this investigation. I also ask that there not be any new projects added to my workload during the duration of this investigation, and this is especially important now that my manager

Page 334

decided to substantially increase the amount of work I need to do beyond what a single role is capable of and all unfavorable work. I would like for him to not add any new work beyond what I had a month ago. I do see his current actions with this workload as retaliation and a negative employment action. Also as I mentioned, I'm actively suffering emotional harm as I'm continuing to be exposed to their behavior, and I look forward to hearing about next steps on this."

Then I added:

"Further, as I mentioned previously and ongoing, I'm requesting a long-term solution to the hostile work environment and unsafe work conditions. At this point it's clear my team will not stop the sexism, harassment, discrimination, and retaliation, so I need to be removed from the situation. As mentioned, I refuse to quit or take medical leave as a response to the hostility. This is on Apple ER to resolve, not for me to hide from. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not an unsafe work conditions. And I

Page 335

mentioned that because I will not be at Apple after December 31st, 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement. The second option is an exit package that will compensate me and provide benefits through that time. As mentioned, this would be" -- "would only be a payment and exit to mitigate the current hostile work environment and unsafe work conditions and would not include any litigation or arbitration waiver agreements, nor any nondisclosure agreements beyond what I've already signed as an employee. Any further contractual agreements beyond what I've already signed would need to be reviewed by my team of lawyers, and the compensation for each would need to be negotiated by each new specific requirement. Here's the outstanding list of our to-dos. See you tomorrow."

And then I list stuff we're working on, stuff I'm sharing with them. And that includes a number of complaints of sexism and hostile work environment.

Ms. Warner, Apple has characterized that I just asked to be on an administrative leave on August 4th and I was just waiting to hear what they do with the

Page 336

investigation, but doesn't address the fact that we're emailing about expected litigation and settlement agreements.

So I ask what was Apple's position while all this was going on? Because it seems like they were fully aware that they had to do something to change the current situation I had at work.

So what was Apple's plan at the end of the investigation when it was time for me to either come back to the current hostile work environment or something else? What was Apple's -- and Apple had the deck of exit outcomes. Was Apple's only plan that I was going to leave Apple?

MS. RIECHERT: Okay. That was a very, very long statement and question. If we just jump to the end of what was Apple's plan when the investigation was over, I will object that it's a hypothetical, speculation, and probably attorney-client privilege.

MS. GJOVIK: Okay. And then continuing the conversation about the settlement stuff, the settlement is not protected under settlement privilege under the evidentiary rules when Apple was concealing the chemical exposure. That's part of the complaint.

MS. RIECHERT: Okay. I have no --

MS. GJOVIK: And the settlement conference,

**Page 337**

Apple's offer was zero dollars. It's always been zero dollars. Following that, it's been --

MS. RIECHERT: Okay. You are not allowed to discuss anything that was discussed at the settlement conference. That is absolutely prohibited, and the magistrate judge made that absolutely clear to you. He will be --

MS. GJOVIK: Zero dollars is not a settlement offer.

MS. RIECHERT: You are not allowed to --

MS. GJOVIK: Drop the lawsuit, I told you I -- anyways, we don't have time for this.

And that was not the settlement conference. You made no offer to me in the settlement conference. You made that in email for the Department of Labor.

(Speaking simultaneously.)

MS. RIECHERT: You are not permitted to discuss anything that was discussed at the settlement conference, and the magistrate judge made that absolutely clear.

MS. GJOVIK: You made no offer during it, so I'm not discussing it.

MS. RIECHERT: You are discussing what was discussed.

MS. GJOVIK: I filed -- anyways, I've

**Page 338**

complained about this to Judge Chen in formal public filings, so it's not news.

I would like to finish the documents I would like to review, please. I also have Exhibit W.

(Deposition Exhibit W was marked for identification.)

BY MS. GJOVIK:

Q. Exhibit W is plaintiff's production 8, Number 58. This is another email to Mr. Okpo on the 29th. And I said:

"Additional files per today's discussion."

And I said:

"Also I found a bunch of super weird texts between me and Dan I forgot about from March and April and added them to the folder. He was fully aware I was traumatized and also in physical danger. He was giving me recommendations about guns and knives versus home surveillance. In context, it's slightly less weird, but this spring he did also text me at one point, you're nasty as fuck. Talk to you Monday."

So I ask again, Ms. Warner, did Apple inquire to Mr. West why he and I were talking about concerns about physical violence, home surveillance, and my

**Page 339**

concerns about my physical safety?

MS. RIECHERT: Objection. Instruct you not to answer to the extent that came up in either Jenna Waibel's or Mr. Okpo's investigation.

BY MS. GJOVIK:

Q. Okay. This email continues:

"Updated. Spanking. Found the full Dan/John panel with the Ashley, slash, spanking bit, but it included a bit more. I uploaded the full video."

Ms. Warner, did Apple watch the video when Dan made spanking gestures when talking about how I -- I said keep him in line?

MS. RIECHERT: Objection.

Instruct you not to answer with respect to anything that was done in connection with the investigations.

BY MS. GJOVIK:

Q. I also included complaints that Mr. West was making fun of Yannick's eyesight. John was disrespecting someone's size and posture.

"Dan told a story where he was supposed to present on something but Yannick switched him out and had Dan's direct present instead, and Dan said he was mad until Yannick told him that

**Page 340**

Apple will probably get sued about whatever it was and that the direct can take the fall instead of Dan."

Ms. Warner, did Apple watch that video I provided?

MS. RIECHERT: Objection.

Instruct you not to answer to the extent it related to anything that was done in connection with a privileged investigation.

BY MS. GJOVIK:

Q. Ms. Warner, did Apple consider using Yannick as the final decision-maker in terminating my employment related to my sexual harassment complaint against Dan knowing that one of my open complaints was that Yannick was trying to obstruct future litigation in order to protect Dan?

MS. RIECHERT: There's so much wrong with that question, I don't know where to start.

Assumes facts not in evidence. Privileged as to who Apple decided to use as the decision-maker, assuming there was a decision to be made there.

MS. GJOVIK: It's in the issue confirmation. It's in the email. So it is in evidence. It's just a strange choice of decision-maker.

BY MS. GJOVIK:

Page 341

Q. This also has the section called matchmaking, and I mentioned:

"Dan's daughter Alison took me to Stanford. Told me the family talk" --

(Reporter interrupts for clarification of the record.)

BY MS. GJOVIK:

Q. I'm so sorry.  Yes.

"Told me the family talks about the matchmaking, slash, pimping thing."

I said, "Dinner was on December 28, 2017. Texts with Dan were December 30th, 2017."

Ms. Warner, if I was already texting with Mr. Okpo about the matchmaking thing in the text, why didn't Mr. Okpo ask me for those text messages before the leave?

MS. RIECHERT:  Objection.

Instruct not to answer with respect to what he was doing at that time in connection with his investigation.

(Deposition Exhibit X was marked for identification.)

BY MS. GJOVIK:

Q. Okay.  Exhibit X is plaintiff's production 8, Number 76.  Specific to -- this is forwarding an old

Page 342

email from Waibel, but specifically this August 2nd, 2021, forward to Mr. Lagares and Mr. Okpo where I say:

"Per conversation with Ekelemchi today, he will not be investigating."

And I list stuff he says he's not going to investigate, that includes:

"Uptalk and vocal tone.  An FMLA violation. Yepez sexual harassment.  Comment to focus on equal opportunity only, not equal outcome."

A comment that "Ashley is too hard on the white man.  Dave calling Ashley emotional. Dave gives men credit for Ashley's work."

And "Dan will not reorg me under him this spring following years of complaints about hostile work environment under Dave.  And Dan gave no explanation and said I can quit Apple. Ekelemchi says it's an understanding that Jenna looked into all that, but if there is new information, it can be revisited."

He says, "He will" -- "we will not talk about workplace safety issues but we'll be investigating everything else."

So, Ms. Warner, can you confirm that the things in that list that I said on August 2nd reflected a conversation with Okpo, were those things never

Page 343

investigated again by Apple after Waibel's investigation?

A. Your question, Ms. Gjovik, is actually misreading and mischaracterizing what Mr. Okpo says in this email specifically.  You listed those things, and he said his understanding, Jenna looked into them, and if there's new information, they would be revisited.

And as I've testified earlier, his issue confirmation with you later in August that you reviewed and agreed to in terms of the scope formed the basis and the scope of what was investigated, and that investigation was done at the direction of counsel.

Q. Ms. Warner, I directly objected to his issue confirmation.  That's why I wrote my own.  And I complained he was misleading with his, so I just want to correct that.  We can have that as a dispute, but I did not say that I agreed with his version.

I would ask you were any of the things in this list investigated by Mr. Okpo or Apple after July 2021?

A. I've already answered that question in terms of the scope of Mr. Okpo's investigation.

Q. That it's privileged?

A. I said a whole lot more than just it's privileged.

MS. GJOVIK:  Okay.  Running out of time.

Page 344

This one is plaintiff's production Y.

(Deposition Exhibit Y was marked for identification.)

MS. GJOVIK:  Make sure it's in there, chat.  X, Y.  Nope.  Let me add it.

BY MS. GJOVIK:

Q. Okay.  This is Y.  This is a production from Apple, 1595.  And on this it's a forwarded email chain on August 17th, 2021; I emailed Mr. Okpo:

"I'm glad our communications will be in writing going forward so that there will not be any more he said, she said.  As I mentioned many times and in writing, this exact type of scenario is why I wanted my one-on-ones with Dave, Dan, and Helen to be in writing during the investigation because verbal conversations were frequently being misrepresented and statements denied after the fact.  I stand by my memory of the events on 8/4 and as you've seen/read, Apple senior leaders have trusted my recollection and interpretation of event statements, even with major risk and consequences leading from that interpretation."

Ms. Warner, this was August 17, 2021, well before the exchanges I had with Mr. Kagramanov and

Page 345

Mr. Okpo about conversations in writing versus oral.

I ask, again, what Apple's explanation is for demanding that the conversations I had with them be oral only with no written record when there's evidence produced by Apple of me complaining weeks prior that Apple had been misrepresenting what I said, and I thought that a written record would ensure that we can actually document what's actually discussed?

MS. RIECHERT: Objection. Asked and answered.

A. Ms. Gjovik, we spent quite a bit of time earlier explaining why it was important for you to speak with Mr. Okpo and Mr. Kagramanov about the things they wanted to talk to you about to speak with them versus having it be in writing.

(Deposition Exhibit Z was marked for identification.)

BY MS. GJOVIK:

Q. Okay. This is Exhibit Z. This is plaintiff's production 8-155. This is an email I sent Mr. Okpo on September 3rd after he had reached out wanting to talk to me.

And I said again:

"I'd like to request that we please keep our exchanges in writing. If you're going to require a call or video meeting, I'm requesting

Page 346

you grant me permission to record it."

Ms. Warner, he never responded to this email. Is there a reason that Apple would not allow me to record a video or audio conversation?

A. You're asking me to assume that he never responded. You're showing me an email of August 3rd.

Q. He testified -- September. And he testified he never responded.

MS. RIECHERT: So the question.

A. What's the question?

Q. Would Apple allow me to record the audio or video conversation they wanted to have with me?

A. This is with -- sorry. This is about your conversation with him on the 4th?

Q. On September 3rd, I said:

"If you're going to require a call or video meeting, I am requesting you grant me permission to record it."

A. Okay. And what is your question?

Q. He never responded.

But I'm asking you would Apple allow me to record that? Is that in line with the policy position that you stated earlier?

A. To record your conversation with the investigator?

Page 347

Q. Yeah.

A. Well, you never agreed to speak with him, so that's the part that you're assuming, you know, a lot of different things in there.

But he wanted to speak with you, and he's not going to -- he was not going to record it. And I don't believe that was a part of the conversation with him.

Q. So Mr. Okpo also requested a call, though, and you also said one of the reasons I was terminated was asking to have a written conversation with Mr. Okpo.

And here I had requested could I record it.

And I'm asking what would -- what is Apple's position because he never responded if I could record that conversation with Mr. Okpo?

A. I believe you spoke with him, or at least you exchanged messages with him after this date. Again, I don't know what the -- I'm -- you're saying he never responded since that email.

Q. Okay. So then I say:

"As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with human resources, and with employee relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've

Page 348

heard from other employees in similar situations, this appears to be a pattern by Apple's HR and ER teams to misrepresent and mischaracterize, likely to intimidate and retaliate, and I won't allow you to continue doing this to me."

So, Ms. Warner, if this is the written explanations I'm giving of why I'm requesting to have things in writing, does Apple maintain that my position is misconduct?

A. As I've already stated, your refusing to speak with him, I've already explained the reasons why. And I've already explained the few other things that led to the misconduct determination.

So that position still stands, yes.

MS. GJOVIK: Okay. And then this is Exhibit Z1. This is plaintiff's production 8-157.

(Deposition Exhibit Z1 was marked for identification.)

BY MS. GJOVIK:

Q. You asked if he -- he emailed back. So he -- he responded on September 7th only saying:

"Thank you for your email. Based on the interviews I've conducted so far and the evidence I reviewed, there are some

Page 349

inconsistencies I'd like to discuss with you in detail and give you the opportunity to provide additional information. Please let me know when you have availability to connect tomorrow or later this week."

So he never responded to the points I raised --

MS. RIECHERT: Objection. Just ask the question.

BY MS. GJOVIK:

Q. Okay. So then --

A. I do want to clarify, though, the -- you -- you said I asked if he responded. I said you assume -- you want me to assume he never responded to that email. And you just read an email he responded to.

So, again, I just want to make sure the record's clear.

Q. Sorry. No. That's -- so he responded to the email. He never responded to the points. That's an important clarification.

A. Okay.

Q. Thank you.

So September 7, then I respond:

"Hi Ekelemchi, happy belated Labor Day."

And I say, again:

"Updates in writing. My previous email

Page 350

requested that we please keep future conversations in writing. Will you please send me your updates in writing? Or are you refusing my request? If refusing, can you please document your justification for doing so?"

And then I said:

"I feel like you're implicitly denying my request otherwise, and because you're an attorney and you're in an adversarial position to me" --

(Reporter interrupts for clarification of the record.)

MS. GJOVIK: Sorry. We're running out of time, so I was extra rushing. I'm so sorry.

BY MS. GJOVIK:

Q.

"If you're denying my request, I'd also like to request if there's an appeal process, business conduct maybe, to review my request to keep communications in writing?"

Ms. Warner, was that ever escalated or considered beyond Mr. Okpo himself, my request to keep things in writing with him?

MS. RIECHERT: To the extent it was discussed

Page 351

with counsel, then I object on the attorney-client privilege and instruct you not to answer.

A. I can't answer that without disclosing attorney-client privilege information.

Q. Okay. And in that same email also, I said:

"I'm not sure if you've heard, maybe they didn't tell you, but I found" --

And I cited a case where Crystal Brown sued Apple. She was an administrative assistant for Dan West, and she sued Apple and alleged a variety of things by Mr. West and Apple.

Did Mr. Okpo include Ms. Brown's allegations as part of his investigation?

MS. RIECHERT: Objection.

I guess you can answer that one. Sorry.

What he investigated she can answer. What he did to investigate she can't answer.

MS. GJOVIK: Yeah.

A. I can't answer this because you're asking whether he included your statement here about Ms. Brown's complaint in his investigation. Again, Ms. Brown is different than what -- you're not claiming concerns on her behalf.

I can't speak to what specifically investigated without disclosing attorney-client privilege, other than

Page 352

whatever you had in the issue confirmation that I've shared the concerns he was going to look at, he looked at them at the direction of counsel.

(Deposition Exhibit Z2 was marked for identification.)

BY MS. GJOVIK:

Q. Okay. And then Exhibit Z2, which is plaintiff's production 231.

Z2. Yeah. That last one was Z1. This is Z2.

This is August 20th, 2021. And I emailed Mr. Okpo:

"I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action. I should get you the updated issue confirmation before Monday. It's taken a lot of time to sort through and make sense of."

Ms. Warner, if an employee is complaining that administrative leave feels like retaliation or punishment, does Apple normally, then, maybe rethink that leave and/or -- and/or investigate their complaints, try to understand why they feel like it's retaliation?

A. I think with respect to you, again, you're showing me part of an email. There's subsequent

Adelmise R. Warner

Page 353

conversations, I believe, or emails from Mr. Okpo to you offering you the choice to return if you wish to return from leave.

And so if you -- again, as I've testified earlier, you requested the leave. He granted it. And if you later decided you did not want to be on leave, you were welcome to return.

Q. Did Apple ever investigate my complaints that employee relations was using leave as retaliation?

A. This is assuming your characterization of this email is your complaint that employee relations was putting you on leave and in retaliation.

Again, as I've testified, you requested the leave. Ekelemchi granted it appropriately, and he gave you the option to return if you decided you wanted to return.

Q. Thank you. But that was not answering my question.

But my question was did Apple ever investigate my complaints that the administrative leave was retaliatory?

A. You're -- again, without disclosing any attorney-client privilege investigations that may have taken place, my answer in terms of your assumption that this was a complaint and what was and what was not done

Page 354

still stands.

Q. Okay. And this is probably our final because we're almost out of time, and I'm going to respect your appointment. This is Exhibit Z3.

(Deposition Exhibit Z3 was marked for identification.)

BY MS. GJOVIK:

Q. This is email from August 5th and August 4th. Plaintiff's production 8-49.

We were talking earlier about Mr. Okpo emailing about whether or not I was removed from the workplace and workplace interactions. This email from Mr. Okpo on August 4th says:

"This administrative leave ensures that you're removed from the workplace, workplace interactions, and contributions and your day-to-day roles and responsibilities."

So we were talking earlier in this deposition about the difference between you said I was still allowed to use Slack to talk to my coworkers but I wasn't allowed to go to a racial justice training.

And I wasn't allowed to go back to my office to get the text messages.

So when it says removed from the workplace and workplace interactions, did Apple not consider that to

Page 355

include Slack? Apple Slack tool?

A. You've already asked me the question earlier. I've answered it multiple times.

You were not prohibited from using Slack. You were not told not to use Slack. Your access to Slack was not removed.

MS. GJOVIK: Okay. We have one minute left, so I'm going thank you for your time for spending all this time answering my questions. I know this has probably been an extremely long day, so thank you.

And, Ms. Court Reporter, I'm so sorry for all the fast talking, and that's probably hard for you, too. Is there anything you need from us before we end?

MS. RIECHERT: Yeah. I would like the -- to make sure that you have the opportunity to review and sign the transcript. So the court reporter needs to find a way for you to get access to the transcript so you can review and sign it.

MS. GJOVIK: Who is "you"?

MS. RIECHERT: Beg your pardon?

MS. GJOVIK: By "you," do you mean Ms. Warner?

MS. RIECHERT: No, I mean you -- yes. I mean, yes. She gets the opportunity to review and sign the transcript.

MS. GJOVIK: Okay. So if the court reporter

Page 356

sends it to you, you can send to Ms. Warner?

MS. RIECHERT: I will indeed.

MS. GJOVIK: Okay.

MS. RIECHERT: And also I hate to tell you, the court reporter, but I would love a rough or an expedited as soon as possible.

(The deposition adjourned at 5:00 p.m.)

**Page 357**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed by me; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  May 12, 2026

_____

Layli Phillips

RPR, CRR, CSR No. 14402

**Page 358**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik

vs. Apple Inc.

Date of Deposition: 05/12/2026

Job No.: 10190735

I, ADELMISE R. WARNER, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2026, at _____.

_____

ADELMISE R. WARNER

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__,

by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 359**

DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik

vs. Apple Inc.

Name of Witness: Adelmise R. Warner

Date of Deposition: 05/12/2026

Job No.: 10190735

Reason Codes:  1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

**Page 360**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____

ADELMISE R. WARNER

**H.**    **EXHIBIT H: GJOVIK DEP. (12/16/25)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**CERTIFIED TRANSCRIPT**

ASHLEY GJOVIK,

       Plaintiff,

vs.                           CASE NO. 23-cv-4597-EMC

APPLE INC.,

       Defendant.
_____/

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

ASHLEY MARIE GJOVIK

Pages 66 to 305 MARKED CONFIDENTIAL

DATE:          Tuesday, December 16, 2025

TIME:          9:07 a.m. - 5:53 p.m.

LOCATION:     (All attendees appearing remotely.)

REPORTED BY:  JULIE L. ANDERSON, CSR
              Stenographic California CSR No. 11422

              Talty Court Reporters
              2131 The Alameda, Suite D
              San Jose, California 95126

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

:::  APPEARANCES  :::

FOR THE PLAINTIFF:

    ASHLEY MARIE GJOVIK, IN PRO PER
    ashleymgjovik@protonmail.com
    (415) 964-6272

FOR THE DEFENDANT:

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  MELINDA S. RIECHERT, ATTORNEY AT LAW
       (APPEARING VIA VIDEOCONFERENCE)
    1000 MARSH ROAD
    MENLO PARK, CALIFORNIA 94025
    (650) 614-7423
    mriechert@orrick.com

- AND -

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  RYAN D. BOOMS, ATTORNEY AT LAW
       (APPEARING VIA VIDEOCONFERENCE)
    2100 PENNSYLVANIA AVENUE NW
    WASHINGTON, D.C. 20037
    (202) 339-8400
    rbooms@orrick.com

- AND -

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  NICHOLAS J. HORTON, ATTORNEY AT LAW
       (APPEARING VIA VIDEOCONFERENCE)
    400 CAPITAL MALL, SUITE 3000
    SACRAMENTO, CALIFORNIA 95814
    (916) 329-4906
    nhorton@orrick.com

- AND -

    APPLE INC.
    BY:  ISELA PEREZ, ATTORNEY AT LAW
       (APPEARING VIA VIDEOCONFERENCE)
    1 APPLE PARK WAY, M/S 37-2BE
    CUPERTINO, CALIFORNIA 95014

ALSO APPEARING REMOTELY:

    MICHAEL MACK, VIDEOGRAPHER



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

:::  CERTIFICATE OF REPORTER  :::

I, JULIE L. ANDERSON, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 11422, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing remote deposition was administered an oath remotely to testify to the whole truth in the within-entitled cause.

That said deposition was taken down remotely by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

(X) Reading and signing was requested/offered.

Should the signature of the witness not be affixed to the original deposition transcript, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

DATED:   January 5, 2026

_Julie L. Anderson_

_____
JULIE L. ANDERSON, CSR
California Certified Shorthand Reporter 11422

**TALTY COURT REPORTERS, INC.**                **346**
**408.244.1900 - www.taltys.com**

pretty good chance I was going to put it in some folder versus keeping it in my inbox.

Q.  I just wanted to clarify that I understand something.  You got a production-fused phone initially for the D-22 project; is that correct?

A.  That's my recollection, yeah.

Q.  That is or is not?

A.  Is.

Q.  Yes.  And then did you later get a development-fused phone?

A.  Yeah.  I believe it was very short after.

Q.  Okay.  And did you have the Glimmer app on the development-fused phone?

A.  I assume I -- if it was built into the operating system at the time, then, yes, it definitely would have been.

Q.  Okay.

A.  I think it was.

Q.  And did you understand that the development-fused phone gave you full access to Glimmer?

A.  The full access is kind of a vague term because there's going to be different tiers depending on whose version of configuration is what and what kind of software they're running and all of



that.  But it was my understanding that the way that Glimmer works, it would not work on a customer device, period.  And so in order for it to function at all, it would have to be on a development device.

Q.  And you said earlier that you looked at the photos that were being stored on the phone; correct?

A.  I said I did during that study, and I assume I did at multiple points, but I did not have a concrete recollection of that process and that I felt like I was missing a workflow for the review of the photos.

Q.  But did you continue to look to see if your phone -- once you got the development-fused phone, did you continue to look to see that photos were being stored on that phone?

A.  I have no recollection.  That was a long time ago.

Q.  Yeah.  But you said it was shortly after -- you got the development-fused phone shortly after the production-fused phone, and you said you continued to look at email -- at photos.  I just wanted to know during what period of time were you looking at photos on your phone?

A.  I never said I continued to look at photos.

Q.  Okay.



A.   I did confirm that I quickly got a development phone, and as I explained that LiveOn was on the development.  That was kind of the purpose to get the additional logging.  And so I think -- I think that email also reflected I was on the development one by, like, October.

Q.   And did you look at photos on your phone after October 2017?

A.   Yeah, from time to time.  Like, I don't remember specifics of it.  I think there were studies that asked us to go in from time to time, and I definitely did in 2021 and -- when I had found those -- the photos that I had shared in August where there was -- there was photos and videos on there going back to, I think, at least, like, April.

Q.   But had you continued to look -- between 2017 and 2021, did you continue to look on your phone to see that it was capturing photos of you?

A.   I don't have a recollection of, like, specific dates and confirmation and inquiries, but I was generally keeping an eye on the stuff on my phone.

Q.   And I forget if I asked you how often?  Like, weekly, monthly?  How often would you check the phone during this 2017 to 2021 period to see the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

photos on the phone?

A.  I -- I mean, I was very busy.  I had a busy schedule.  I assume I was going in -- like I remember going in and seeing stuff.  I just don't remember the why, when, how.  But I assume it was related to LiveOn programs when they asked us to go check something or do something.  So like I said --

(Reporter admonition.)

THE WITNESS:  It had a little app that would give you a task or tell you to go do something as part of that program, and so I assume that would probably be when I'm spending time digging through stuff and looking in the apps -- the LiveOn-type apps.

BY MS. RIECHERT:

Q.  Was it your best recollection that you knew during the period 2017 to '21 that there were photos being stored on your phone?

A.  Yeah.

Q.  And that was photos that were being captured by the Glimmer app; correct?

A.  Yeah, yeah.

Q.  Did you ever ask to be removed from the Glimmer/Gobbler whitelist?

A.  I talked with other coworkers who -- we



didn't like it, but no one -- none of us would ever ask to be removed from stuff like that.

Q.   Okay.  This is just a yes-or-no question.  Did you ask or did you not ask?  Did you ask --

A.   Who did I ask?  What did I ask?

Q.   I'm asking, did you ask anyone, "Please remove me from the Gobbler whitelist" or words to that effect?

A.   I didn't know I was on a whitelist.

Q.   Okay.  So we have a lot of emails that we've sent you that show that you were on a whitelist.  Are you saying now, "I didn't realize I was on a whitelist for Glimmer or Gobbler"?

A.   You showed me emails from about a month period in 2017.

Q.   Okay.

A.   Right?  And I said I didn't get most of those.

Q.   Okay.  So are you saying, "I did not know I was on a whitelist for Gobbler and Glimmer"?

A.   As of 2021, I did not know I was on a whitelist.  And when you produced those documents, I was shocked to see I was on a whitelist.

Q.   So let's take 2018, 2019, 2020.  Did you know you were on a whitelist for Glimmer/Gobbler?



A.   I don't think so, and I think it would have explained to me why my workflow was different and so I wouldn't have been asking why my workflow was different.

Q.   Did you ever ask anyone to be removed from the Gobbler/Glimmer studies?

A.   I said to coworkers and managers and people in authority I didn't like it and didn't want to be part of it, but I never emailed, like, legal to say, "Please remove me from this."

Q.   Not just legal.  But did you email anybody and say, "Please remove me from the Gobbler/Glimmer study" or words to that effect?

A.   No, no one does that.

Q.   And why not?  Why didn't you do it?  I don't know --

A.   Why didn't I do it?  Like my performance review frequently would cite my participation in these programs as directly tied to my success in my role and my bonuses and my pay.  And you were generally rewarded and included in the ingroup the more you participated in these programs, especially for the folks that would run these launches.  And when you would not want to participate in this stuff or express that, you were frequently excluded then



from stuff ongoing, and that was my experience watching with other people.  And I was also told directly from multiple people who have been at Apple for some time in positions of influence and power that you participate and you succeed on this -- any kind of stuff like this and if you don't, you will be excluded and you will not be given opportunities to advance your career at Apple.

Q.  So, first of all, who -- which managers did you tell that you did not like participating in the Glimmer/Gobbler app program?

A.  Aidria Astravas and I talked about it a bit. Aidria and I actually talked before I talked to Verge, and I was, like, I want to complain about this publicly because I don't like it at all.  I don't think the way I want to complain about it is confidential, and I think Apple is not going to stop until it's public.  And she actually agreed with me. She's a senior manager of the video engineering organization, which includes stuff like the camera app stuff.  It also bothered her, and we'd talk a lot.  Aidria and I talk to Deepa --

Q.  That's way beyond my question.

A.  Yeah.

Q.  Did you ever talk to either of your



managers, who you mentioned earlier, telling them you did not want to participate in the Glimmer/Gobbler app?

A.  I believe I brought it up to Dan a couple times casually.

Q.  Okay.  And what did you say to him?

A.  I don't like it.  I don't like this stuff. I don't like that we do that.

Q.  I don't like participating --

A.  I don't like this stuff.  I don't like -- but there was a lot of stuff that we don't like doing at Apple that we'd still do.

Q.  No.  My question is what did you say to Dan that you didn't like about the Glimmer/Gobbler app other than "I don't like it"?

A.  It was creepy and spying on me.

Q.  And when did you tell Dan that?

A.  Probably -- I remember complaining about it to him sometime, like, end of 2018 or sometime in 2019 during our one-on-ones.

Q.  And what was his response?

A.  Just kind of brushed it off.  Shrugged it off.  And it was complained about with some other stuff that bothered me too, but just kind of the way it is at Apple.



iPhone studies already.

Q.  Right.

A.  And I had been for years and they were directly cited in my reviews that the example I gave you of things I didn't want to participate in --

(Reporter clarification.)

THE WITNESS:  Okay.  The -- the things I -- I declined to participate in were things like the exercise studies or ears.  Those were completely different studies.  I had been a accomplished LiveOn participant in iPhone and -- especially iPhone, but also, like, Mac and some other LiveOns for years. It was already directly said in my reviews.  I was already on the LiveOn lists.  I was automatically invited.  So this was not the same.  This was not comparable to a one-off invitation for a menstrual study that I had not previously participated in.  I was a long-term participant in the iPhone -- a variety of iPhone LiveOn programs.

BY MS. RIECHERT:

Q.  And you said that you didn't sign the ICF because you didn't -- you pretended it wasn't happening.  You therefore knew the type of information that was in the ICF; right?

A.  Most of the Apple -- I don't think that's an



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

ICF.  I think that's an NDA.

Q.  We're talking about ICFs, User Study Informed Consent.  You knew the type of information that was in this user study informed consent which is why you didn't want to read it; correct?

A.  No.  And object.  You're trying to put words in my mouth.  You're mischaracterizing things, and I don't agree to the legal analysis these IC -- that this is an ICF where it has legal obligations like it's a contract.  These are a whole different thing.  My -- I knew what kind of things that Apple tried to make us sign because like I said, we sign hundreds of these and they made, like, attendance to meetings or access to conference rooms or participation in program team conditional on agreeing to lots of stuff just like this.  And the terms were generally stuff that were extremely overbroad and aggressive.  And, you know, we kind of knew Apple was going to do whatever it wanted anyways, so you just -- you have to sign it.  And there was no real point in reading it because Apple was never going to negotiate with you on the terms.  And you knew that the terms were going to be extreme and always on the side of Apple and it was going to be extreme confidentiality because Apple said all the time that everything is

secret, even your lunch is secret and you can't even tell your, like, wife or husband stuff.  Like they said that in all their trainings, so it's not like there's a surprise in there.  You know what it is, and you know that you're going to have to sign this one or another one just like it anyways.

Q.  So how many of these user study informed consent documents were you asked to sign?

A.  Again, I don't -- the ICF thing I think is a confusing designation because they called them multiple things and I don't think an ICF has, like, contractual obligations for secrecy, like --

Q.  I'm not asking about contractual obligations.  I asked a simple question, how many user study informed consent forms were you asked to sign?

A.  The -- I don't know what you're defining as ICF.  I mean, there's, like, agreements related to user studies or Carry programs or whatever.  Probably like dozens of them at least.

Q.  Okay.  So with respect to user studies, did you review any of them?

A.  I feel like I skimmed a couple of them.  And also without any legal education, I didn't even really know what I was looking at.  And Apple had



also --

Q.  Okay.  I didn't ask you that.

A.  Yeah.

Q.  I asked you, these document -- these agreements -- you're calling it an agreement.  I just called it an informed consent.  But these documents about user studies, you said you skimmed a couple of them?

A.  Yeah.  I didn't -- I was saying I don't know what a lot of it meant.  It was intimidating to me.  I didn't understand the terms, and they seemed very one-sided.

Q.  But you knew enough after skimming them to know that they contained information that you didn't like; correct?

A.  Yes.  And it was consent with all of Apple's other trainings and communications.

Q.  I'm not asking about anything else.  I'm just asking about these informed consent forms.  You knew that there was information -- from skimming them, you knew there was information in these informed consent forms that you didn't like; correct?

A.  Yeah.

Q.  Okay.  And then when they -- this one came



in, you signed it because you knew it had information in it that you didn't like; correct?

A.   No.  I signed it because there's information I don't like?

Q.   Right.  You pretended it wasn't happening because there was information in it that you didn't like?

A.   You said I signed it because there's information in it I didn't like.

Q.   Right.  You signed it without reviewing it because it contained information that you knew you didn't like; correct?

A.   No.  So if you want the question fully answered, it would be, I already knew what content would be included.  The content skimmed is consistent with all of Apple's other communications, that they generally asked us to sign this while we're in the room.

Q.   I'm not asking about any other documents other than informed consent forms.

A.   No.  I'm talking about these.

(Simultaneous speakers.  Reporter admonition.)

BY MS. RIECHERT:

Q.   Okay.  Don't talk about any other documents.



Just focus on these informed consent studies.  Now you can answer the question.

A.   That's kind of what I was talking about.

Q.   Okay.

A.   So I was saying, like, they generally wouldn't have us sign these until we're in the training.  They'd have you come to some -- they called "black site building," and you'd have MPS scare the crap out of you for an hour with a presentation and tell you how you're going to get fired if you do anything wrong and tell stories of firing other employees.  And then they say, "Oh, now we're going to give you the product we're going to have you live on, but first before you leave, you need to sign the agreement," and so you are already in the physical room with MPS after they already identified as ex-military or ex-FBI or ex-CIA or whatever it is.  And you're in a line.  You're already badged in.

(Reporter admonition.)

THE WITNESS:  You're already registered. You're already on the list, and they say they're not going to distribute the product to you until you sign the thing, the agreement.  And they'd have iPads and that you'd stand in a line to sign the



agreement.  And then they would hand you whatever -- generally whatever product it is after you signed it.  So there's kind of like a checkpoint line in that black site building.  And so if you were to change your mind that you didn't want to do it, you would need to step out of line and go speak with the self-identified ex-FBI or ex-Marine or whoever was leading that meeting and say actually you don't want to participate, take off the list.  Or leave but they already said you're on their list and you had already checked in.  They make you check in at the very beginning.  So you log in that you're there. You swipe your badge and then, oh, there's a discrepancy.  That person fled.

(Reporter clarification.)

THE WITNESS:  So that you already checked in with your badge at the beginning that you were at the training because the training is a requirement for the program.  So you swipe your badge and then you get on the attendance list that they see that you're physically there for the training.  And so if you were to try to, like, leave without signing, they would see a discrepancy that they had someone there who didn't complete the process.  And so if you -- so the -- worry about follow-up.  And then

you're in that line already where everyone is signing, so, like, that -- when I knew that was my iPad sign.  Because you're in the line.  You just quickly -- and if you wanted to sit and read that agreement, you can't even see it until you're at the iPad.  And then you're in a line with everyone behind you and then the ex-Marine or ex-FBI or ex-CIA person is trying to get everyone through so they can distribute those products in that one-hour period.

So, no, no, I did not generally sit down and read the whole thing.  I just quickly signed it and tried to move on the way specifically for these LiveOn programs because of that setup Apple designed and the other reasons I stated.

BY MS. RIECHERT:

Q.  So how many of these trainings did you go to?

A.  Probably between maybe 8 and 12.

Q.  And they were one-hour long; is that correct?

A.  Generally at least 45 minutes.  I think the longest one might have been for D-22 for that new phone because they were very paranoid about that one was probably 90.



Q.   And give me a summary of what they told you during these trainings?

A.   Yeah.  They generally start off with reminding everyone that Apple thinks everything is secret and frame it on surprise and delight, that Apple wants to surprise and delight customers so that's why we don't tell anyone anything.  That's like when they remind you don't even tell your wife or husband what you do at work.  And then they tell a couple case studies of employees losing a prototype, and the only way to not get fired is to immediately confess to Apple what happened and work with Apple to find whatever it is.  And then they might tell some cases studies of -- of, like, leakers.  They might not tell you who it was, but they'll show someone sharing some product, like, roadmap information or future information.  And then talk about how much time and effort they spend trying to keep that stuff secret and figure out who did it -- who done it.  And then it's kind of, like, they go through, like, the best practices of just don't tell anyone anything and don't move -- remove stuff from work and if you do at home, make sure you have a safe and don't even give your wife the combo and put it in a separate room that you lock and you



don't let your family and duh-duh-duh-duh-duh.  And then they're like, "So that's best case.  Worst case, if you mess up, be like the person that fesses up but don't be like the people -- other people because you'll get fired.  We'll fire everyone."  And then that's usually, like, 10 to 15 minutes they'll spend on that part, the framing.  And then they'll say, "Oh, we have this new thing that we're working on and you get to be part of it," and then they'll give kind of an overview, high, high level of whatever this thing is.  And if it has new features, usually it's a longer session.  If it's more of a not that exciting changes, might be, like, the 45 minute.  And they'll generally have a description of like -- not necessarily what the new exciting thing is but more of how to hide it.  So they might say something vague, like, "This is going to have a new hardware design," or "This is going to have something new with the software, so we're going to have you use" -- they'll call it a "stealth case" where you might use a special case that's going to hide the difference or a screen protector or -- sometimes they'll tell you if the UI is too different to still use your normal phone on a shipping software most of the time and only bring



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

out the other one when no one is looking.  So they'll kind of give you their -- their play -- play-by-play of their strategy for not letting anyone realize that you have something new and fancy out in the real life.  And then go over their expectations for how you're going to protect it at home as well.  And then generally going over their expectations for the work you're going to do for testing.  For the simpler ones it's more like the -- you know, file bugs if you find issues.  Here are specific topics.  We want more detailed information from you and what kind of information to provide. But then sometimes they want you to specifically use a new feature, and they might give you suggestions of what to do or how to do it.  And then -- then they're generally on their way of the now -- now you're all logged in.  We went over that.  Everyone get in line and sign your agreements on the iPad and we'll hand you, you know, the -- the case and the new device or whatever and then check in and so the email's after.

MS. RIECHERT:  Okay.  I misread the tab here on my next exhibit, so I believe I am up to Exhibit 11.

THE VIDEOGRAPHER:  Correct.



MS. RIECHERT:  And the tab is 2-03.

(DEPOSITION EXHIBIT 11 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 11.

THE WITNESS:  Okay.

BY MS. RIECHERT:

Q.  Okay.  Taking a look at Exhibit Number 11.
Is this a document that you -- hold a second --
received?

A.  I just see, like, a terminal output.

Q.  What does that mean?

A.  Someone's, like, command line data.  Like
the first page is that gray dark background and then
white text from someone's command prompt.

Q.  Okay.  So is it your understanding from -- I
know you're into software engineering -- that this
indicates when you signed a document called "Pearl
Hand Carry (USA)"?

A.  No.  I have no idea what this is.

Q.  Okay.  And you can't tell from reading it
that it shows that you signed up to participate in
the Pearl Hand Carry program in 2019?

A.  No.  I don't know what this is or what
system they're using or where this data is coming
from.

Q.  Okay.  So do you recall acknowledging an



additional ICF on May 14, 2019, related to the Pearl study?

A.   It's possible.

Q.   And then looking at the next page of the exhibit, which is the user -- user study informed consent form.  Do you recall seeing that document before?

A.   I think you might have produced this and I might have seen it.  But, otherwise, I don't recall this.

Q.   And if you received it during your employment at Apple, is this a document that you would have maybe acknowledged but not read because you didn't like what they were asking you to agree to?

A.   I'd say for some of this stuff I might read it because it might help me understand whatever the study is if they were being vague.  So I wouldn't necessarily say this is something I ignore by default.  The iPhone stuff was pretty typical of the "you just don't tell anyone anything or else they destroy you" is basically the five pages.  So I'm not going to say that I wouldn't have read this one because this looks a bit different in format.

Q.   So your best recollection is that you did



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  There are ones that I agreed to do even sometimes I didn't know what they were until midway. They were ones that there would be invitations.  I just wouldn't respond.  And then there were ones where there were, like, invitations, like, midway or where I half-responded and I had to affirmatively say no.

Q.  And your understanding was that the studies were voluntary; correct?  I know you felt that you got kudos in your review for participating.  But you understood that it was voluntary whether you decided initially whether to participate or not; correct?

A.  No.  I don't think they were voluntary.

Q.  Okay.  So why don't you think they were voluntary?

A.  Because I felt like they -- no matter what they said in these documents, if there -- your performance reviews, your inclusion in otherwise restricted privileged access, and your standing and view from the execs of you of your role with the company are a factor in that is your participation in these types of programs, then your performance equals your employment at the company.  And then this is -- I guess my view is if you want to be successful at Apple, participation in programs like

this is not voluntary.  If you don't care about being successful or need access to executive circles, then you could decline and see what happens.  My role -- my success was dependent on my ability to work with, influence, and coordinate with executives.  Executives made it clear that they knew I participated in these programs.

Like the example I gave where the iPhone operation team had shared with Dan that I was one of the best participants in the iPhone LiveOn program, and Dan shared that with me.  Like the examples where Dave put in my performance review about my participation in these programs.  They know it's used to gauge my performance that ended up in my performance reviews, and so I did not see it as voluntary.

Q.  So why didn't you sign up for the other studies that you decided not to participate in if you thought it was important for your success and your access to executives?

A.  Because it crossed a line.

Q.  So studies you were okay with participating in, you agreed to participate in, but if you felt the study crossed the line then you did not agree to participate; correct?



A.   No.   I might have concerns about other studies and still participate.   But there were certain things that were too far for me to participate even if it was quietly under duress.

Q.   So there was a level of concern that caused you to participate in some and not in others?   The higher the level of concern you had, the less likely you were to participate?

A.   One of the factors, but there were other factors.

Q.   Like?

A.   The type of right I felt it might be violating or the severity of the privacy invasion or if I had already signed up for something partway and I had to affirmatively withdraw or if I had already been praised for my participation in whatever that thing was, if that study touched upon something I knew that my leadership were already prioritizing and thought was important, these are all factors that I would consider and I'd have to balance my visceral reaction to certain things that I would otherwise not want to do at all versus what I -- how I thought it would impact my performance reviews, standing with executives, and my career at Apple.

Q.   You said it would get you access to



executive circles.  What do you mean by "executive circles"?

A.  Apple is very cliquey, like middle school cliques with executives.  They're open about that, and they generally will only allow access to their meetings and conversations or openness about their operations when they feel someone is loyal and part of -- part of, like, the exec team mentality of just helping them do whatever is it they want to do.  And my role frequently required an ability to get access to the executives to talk to them about stuff, to escalate, to know what they were worried about, to get them to agree to projects with other executives.  So it was paramount as a senior engineering program manager, who was leading programs and projects that required at least participation, if not agreement, from these executives to keep them happy, wanting to work with me, and thinking I was a good, loyal Apple employee.

Q.  Who were the executives that you felt you needed to participate in these programs to get access to?

A.  So I'm saying just participation generally in this -- in these types of programs shows that you're helping them with their product development,



get the products ready, and that you're loyal to the cause.  Like I said, like, my participation in the iPhone LiveOn program pre-release was apparently very well known that I was one of the best LiveOners and was shared directly with my leadership from leadership of the iPhone operations team.

Q.  Okay.  If you can focus on the question. Who were the executives that you felt you can get access to by participating in these programs?

A.  Sorry.  I didn't hear the "who" part first.

Q.  Yeah.  Sorry.  Who?

A.  So like Number 1, the operations -- the iPhone operations team, that was Sabih.  Like I talked directly to Sabih.  Sabih was the senior vice president.  And then Priya -- Priya -- I can't remember how to say her full last name, but the VP of iPhone operations.  She also knew I was actively helping -- she viewed it as me helping her with her development by doing this.  And they were very challenging people to get as, like, an ally at Apple.  And one of the things people would praise me about was my ability to, like, network with these folks that generally don't network with other organizations, especially engineering.

Apple -- AppleCare was another one.  I



actually ended up having Tara Bunch as a personal mentor.  We would go out drinking and having dinner a lot.  She was the vice president of all of AppleCare, and she would frequently cite my work on early field failure analysis with the product launches and these type of LiveOn programs.  It's something that -- that she -- pleased her because it also directly benefited her in getting this kind of information and getting products converged.

Q.  I think you're going a little far afield.  I was asking about participation in these studies.

A.  Yeah.

Q.  Okay.  So you started with Sabih.  Did you get access to Sabih because you participated in these studies you participated in?

A.  It was one of the factors.

Q.  What do you mean by that?

A.  Like it wouldn't be the only factor.  Sabih and Priya, like they -- the organization told me that they were extremely pleased with my work when I ran early field failure analysis for software engineering.

Q.  Hold on a second.  Early field failure analysis.  Is there a study on that or is that part of your job?



A.  It was my job.

Q.  Okay.  So I'm not talking about your job. I'm talking about your participation in these studies you felt gave you access to these executives, and you listed these executives.  So I'm trying to find out how did your participation in these studies get you access to Sabih?

A.  You -- you -- I said it was one factor.  You said what other factors.  I was answering.  You interrupted me.  If you want to change the question, please change the question, otherwise let me finish.

Q.  So Sabih and Priya were pleased with your work on failure analysis; correct?

A.  Yeah.  That was another factor.

Q.  Okay.  So what made you think that you got additional access to them because you participated in these studies?

A.  Because Priya and her -- the directors reported to her told me they knew and that I was one of the best people in the studies and were thanking me for that.

Q.  And did they say that because you were one of the best people in the studies, you got better access to Priya?

A.  No one really talks like that.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.  Okay.  And how about Tara?  Did she say that you got -- did you get better access to Tara because you participated in these studies?  Did anybody tell you that?

A.  No one really talks like that.

Q.  Okay.  You just assumed that because you were participating in the studies, you would get better access to these executives; is that correct?

A.  Because I participated, it was known I participated, and my participation was celebrated and they knew that I was participating and I had positive feedback from their organizations for my participation.  It seems logical to me to infer that that was a factor.

Q.  Did you know of any employees who had not participated in studies and felt that they had negative consequences as a result?

A.  I didn't have a lot of work friends.  Well, I'm -- I don't have a lot of friends generally.  I have a close group of friends -- like my personality-wise.  And my close group of work friends were all people in, kind of, similar roles where we felt compelled to participate in all this for access.  It was something we actually talked about a lot.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.   And who were the friends that felt compelled to participate in studies?

A.   Like I was saying earlier, Aidria Astravas and I had talked about --

(Reporter clarification.)

THE WITNESS:  A-I-D-R-I-A A-S-T-R-A-V-A-S.

Aidria Astravas.  Do you want me to spell it again?

(Reporter response.)

THE WITNESS:  Thank you.

Aidria Astravas was a very good friend of mine until I was fired and then she got very quiet. But we would frequently talk about our concerns about privacy invasions -- invasions of our privacy by the way these -- our work devices were set up and Apple's practices and some of these studies.  But also just -- we would participate a lot because we knew that the execs knew and it showed that we were loyal and helped, you know, our performance reviews and kind of standing with those executives, required that kind of sacrifice and participation and investment.

BY MS. RIECHERT:

Q.   And did Aidria participate in the Gobbler/Glimmer study?

A.  Say again.

Q.  Did Aidria participate in the Gobbler/Glimmer studies?

A.  I know she said that it was on her device. At some point it was installed on everyone's devices by default.  And I know that she had talked about it being on her device.  I don't know if she was part of any studies.  She worked in an organization, though -- the video engineering organization --

(Reporter clarification.)

THE WITNESS:  Video engineering organization that worked directly on some of this stuff, so I would assume that she was either directly participated or planned or oversaw some of it.

BY MS. RIECHERT:

Q.  Anybody else who you were friends with who you say felt compelled to participate in studies?

A.  Yeah.  Deepa Balasupranarian [sic].  She's in -- I think she moved to Apple University now. She was manager of EPMs.  She was a very good friend.  She also went very quiet after I was fired. But she and I were very similar of making sacrifices of stuff we wouldn't normally do based on our personality types or values but wanting to be successful at Apple and fit in and show we're loyal.

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q. Did she participate in the Gobbler/Glimmer studies?

A. I don't know if she participated in studies. But, again, it was installed on everyone's phones by default at some point, and she was a core OS EPM manager. They work on the system level stuff, so she was assumably directly involved also.

Q. Any other friends that you discussed feeling compelled to participate in studies?

A. My friend Marina. I miss Marina so much. I think about Marina. Marina Sadini, she worked in Core OS.

Q. What was the name?

A. Marina, M-A-R-I-N-I [sic] S-A-D --

MS. RIECHERT: Why don't we take a break. It's time for a break. We've been going an hour and three quarters, and we'll come back in 10 minutes.

THE VIDEOGRAPHER: This marks the end of media Number 3. We are now going off the record. The time is 2:44 p.m.

(Off the record: 2:44 p.m. to 2:56 p.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 2:56 p.m. This marks the beginning of Media Number 4 in the deposition of Ashley Gjovik on December 16, 2025.

Please continue.

BY MS. RIECHERT:

Q. Do you know if Marina Sadini participated in any studies?

A. I believe she did.

Q. Do you know if she declined to participate in any studies?

A. I believe she did.

Q. Do you know if anything negative happened to Marina Sadini as a result of her declining to participate in studies?

A. I know she was on a green card application, and now she lives in Italy and doesn't appear to work at Apple anymore.

Q. That wasn't my question.

(Reporter clarification.)

THE WITNESS: I know she was on a green card application, but now she lives in Italy and doesn't appear to work at Apple anymore.

BY MS. RIECHERT:

Q. Do you know if Bippa Balsuranian (phonetic) -- anything negative happened to her because she did or did not participate in studies?

A. My understanding, she frequently participated.



Q.  But you don't know if she did in Glimmer or Gobbler; right?

A.  No.  I said it was installed on phones by default.

Q.  Right.  But the question was whether you participated in the study?

A.  Well, I said there's not always a study.  It was installed by default.

Q.  And then Adrianna [sic], do you know if anything negative happened to her as a result of her participation or not participation in the studies?

A.  Aidria.

Q.  Yes.

A.  She also abruptly left the country, and I haven't heard from her since.

Q.  Do you know if your managers were ever informed about which studies you were invited to participate in?

A.  Yes.

Q.  And how do you know that?

A.  Like I said, they told me that they heard I was a great participant in certain studies and that I had also complained to them directly about other studies.

Q.  And the one -- was there any particular one



or was that just what was referenced in the review?

A.  Be more specific, please.

Q.  Yeah.  So you mentioned that in your review it said that you were a great participant in studies.

A.  My review did mention my participation in studies -- my reviews and celebrated it, but I'd also heard outside the reviews about my participation -- participation that was my -- specifically that comment about the iPhone LiveOn program, I heard outside reviews as well.

Q.  From your manager?

A.  I know I heard it from Dan.

Q.  From your managers?

A.  I know I heard it from Dan.  I can't remember if I heard it directly from Dave.

Q.  Okay.  Do you know if they heard about it because people complimented you on your participation?

A.  The example I gave with Dan was, yes, he heard from the iPhone operations leadership directly.

Q.  But other than what Dan may have heard, do you know if he was ever informed about which studies you were invited to participate in?



A.  Absolutely, because it was moved under his team.  He managed them.

Q.  So he knew which studies you were invited to participate in?

A.  They were his studies.

Q.  Okay.  And did he know which studies you agreed to participate in?

A.  They were his studies.

Q.  The question is do you know if Dan knew whether -- which studies you agreed to participate in?

A.  I can't speculate what he knew or not, but he would have access to all that information and an incentive to know those -- that information, and I've also seen him frequently look into information exactly like that during review season.

Q.  And were all of these studies under Dan's team?

A.  No.

Q.  Which ones were under Dan's team?

A.  Dan took over one of the LiveOn groups that was previously, I believe, in operations.  It was the Jay Gordon, Eric Brown.  I can't remember the guy's name that led it.  And they managed that Beddit, the sleeping one where they wanted to know



who I was sleeping with and have them sign NDAs.  It was under my manager Dan West.  He would have managed the NDAs of people I was sleeping with. They also had the cervical mucus menstruation one. They had some of those FaceID ones, like the Divya makeup one, but that was more of a temporary -- more like event-based one.  They also managed the iPad and Apple TV LiveOn programs.  Most of those went through Dan's team.  There are more.

Q.  And do you know if your manager knew which studies you declined to participate in?

A.  Dan or Dave?

Q.  Either.

A.  Dan would know.  He would have access to that kind of information.  Dave could find out.  I mean, people would say stuff to them all the time, and I'd hear, like, secondhand comments about stuff I said or didn't say.

Q.  Did either Dan or Dave ever tell you that you had to participate in a study?

A.  I was strongly encouraged on some of them, and I remember being asked --

Q.  Listen to the question.  Did Dan or Dave ever tell you that -- I forgot my question now.  Let me look it up.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

(Record read as follows:

"Question:  -- that you had to

participate in a study?")

MS. RIECHERT:  Yeah.  Thank you.

THE WITNESS:  That I was required to, like, use those words?

BY MS. RIECHERT:

Q.  Words to that effect.

A.  The word "required" I don't think was ever used specifically.

Q.  Did they say anything that suggested you had to participate?

A.  That's what I was saying, and you interrupted me and told me to stop.

(Reporter clarification.)

THE WITNESS:  And then she interrupted me and told me to stop.

So, yes, they frequently said stuff indirectly that implied to me it was required.

BY MS. RIECHERT:

Q.  And that was because they complimented you for the participation; correct?

A.  No.  More than that.

Q.  Okay.  What else?

A.  Our job was product integrity, which is the

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

quality of these products.  Their success and their roles was ensuring --

Q.  Okay.  I just want to know what they told you that implied that you had to participate in the studies?  I'm not asking what your job was.  I'm asking what they said.

A.  I was going to answer your question though.

Q.  Okay.  I just want you to focus on the question.

A.  I am.

Q.  Okay.

A.  My participation in these studies that would directly improve the quality, especially hotspots -- we call them hotspots.  Issues of quality issues, like a -- known areas where we're getting a lot of bugs or customer feedback.  If my participation can help resolve those, it directly helps their own job and their own reviews and their own position with the managers.  Because these studies are directly related to product quality and their jobs and titles were literally product quality for these exact products, they have a direct personal benefit from my participation in improving those products.

Q.  Okay.  So what did they say or do to imply that you had to participate in a study?



A.  Strongly encouraging, suggesting, signing me up for studies, frequently talking about studies, watching them look at data about these studies. Their employees' participation in these studies.  I know that they asked me a couple of times to help with a couple of them.  Like that Divya one.

Q.  So what would -- let's take Dan.  What did he say to strongly encourage you to sign up for the study?

A.  I can't quote them.  That was over, like, eight years ago.

Q.  What's your best recollection of what he said that strongly encouraged you to sign up for a study?

A.  I would have to speculate of putting words in his mouth.  It was too long ago for me to try to come up with a phrase he used.

Q.  So you can't recall what if anything he said to strongly encourage you to sign up for a study; is that correct?

A.  No.  The stuff I said, but you're asking for a quote and I don't have one.

Q.  And what study was it that Dan was strongly encouraging you to sign up for?

A.  I have a recollection of some kind of need



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

for more coverage on the iPad studies.  I feel like there's something -- Dave pushed me -- Dave pushed me hard to get on the Mac studies.  He would -- actually Dave specifically told me he wanted me living on the Macs because he did Mac system quality, and he would say, like, you know, I'm so good at this.  He needs me on it.  He needs me --

(Reporter clarification.)

THE WITNESS:  He needs -- I just said he needs me on it a few times.  He needs me on it.  He said I was so good at it and I could help improve the quality, and his job was Mac systems quality.

BY MS. RIECHERT:

Q.  And Macs, is that one of the studies you mentioned before?

A.  Again, the term study is very -- very vague and they do this type of thing in different formats and with different terminology.  He wanted me the Living On or Carrying or a formal LiveOn -- some version of that where I am frequently using a Mac that they are concerned about the quality of, want to converge on and filing the bugs and helping as those teams need, whether it's more formal or not, to help ensure we improve the quality of those

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

products.

Q.   And what is Macs?

A.   Macintosh computer.

Q.   So did you sign up for a study to help improve the Macintosh computer?

A.    There were a variety.  There was like the -- like when we were looking at those emails that were coming out about getting on a new software update.  Like there was the version of signing up to put my Mac on a new unreleased software was a version of this.  And that one might have occasional surveys rather than maybe ongoing tasks.  There was the version of getting the new hardware -- I had some of those too -- where you have the unreleased hardware.  I did that with Macs more often because you couldn't really tell from just looking at it that it was a new one.  And then you're on the new hardware and the new software.  Those ones frequently had surveys as well.  And then there occasionally might be something where it's more feature focused and more of the formal quote/unquote study.  I don't know if I did any of those for Macs though.

Q.   When did you create your Twitter account?

A.   I think, like, March 2021.

Q.   By the way, have you ever passed the bar



exam in any state in the United States?

A.  I haven't taken it.

Q.  And you're not licensed in any state in the United States to practice law; correct?

A.  That would be impossible without the bar, so no.

Q.  And have you gone through any moral character assessment in connection with the ability to practice law?

A.  Yeah, I passed in California.

Q.  And when was that?

A.  I had started the process in early 2021, I believe, around March or April.  And I passed in, I think, July or August 2021, and then I kept them up to date on anything that occurred that would have been relevant to the moral character questions until it expired, and I was in contact with them with things like getting fired or being accused of criminal harassment by ex-Apple employees.

Q.  And when did it expire?

A.  I believe it was good for four years, so that would have been -- no, it wouldn't have been four because -- I think it expired, like, last year.  But it's not -- it's not current anymore.  I couldn't get back to California in time to take the



BY MS. RIECHERT:

Q.   Now the print is very small on this, but you can zoom in on it to what it says.

THE VIDEOGRAPHER:   Exhibit 17.

BY MS. RIECHERT:

Q.   These are tweets that you put on to Twitter about what -- is this a tweet that you put on Twitter?

A.   This has three tweets on it.  Two of them are mine.  I don't know what the third one is.  That's not mine.

Q.   And the first one that's yours is about the global security team of ex-US intelligence employees?

A.   No.  The first one is "Apple has an internal culture of surveillance, intimidation, and alienation.  Employees are closely monitored and our data hoarded" --

Q.   Okay.

A.   -- "in the name of secrecy and quality.  We're told" --

Q.   Okay.  I don't need you to read it.

You placed that one on Twitter; correct?

A.   That's the first one.  And then the second one was about the ex-FBI, ex-military, MPS team,

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

yeah.  So there's two.

Q.  And then there's a picture of you -- one or more pictures of you; correct?

A.  Yeah.

Q.  Two pictures of you.

And you put that on Twitter too?

A.  Correct.

Q.  Did you also link to a Verge article titled, "Apple cares about privacy, unless you work at Apple" --

A.  I did.

Q.  -- on your Twitter page?

And this was all on August 30, 2021; correct?

A.  I believe so, yes.

Q.  And did you provide Zoe Schiffer, who wrote the Verge article, information to help her write that article?

A.  I did.

Q.  And with respect to the tweets that we're looking in front of you, the one with the pictures, did you post those images from Glimmer?

A.  Those were images that were in the Glimmer image repository on my device, yes.

Q.  So if you look at the next two documents --

next two pages of the exhibits, that is a picture that you posted on Twitter; correct?

A.   I can confirm that is of me and that looks like from Glimmer -- Gobbler and that looks like one of the photos I posted on Twitter.  There's nothing here designating it was on Twitter.

Q.   Well, if you look above, do you see the pictures above on the first page?  There's a picture of you -- two pictures of you.  The next two pages, just blow those up.

A.   The ones on that first page are more cropped, so I can't confirm they're exactly the same.  But this looks similar, yes.

Q.   Okay.  So when did you take the picture that was on 2275 -- Bates Number 2275?

A.   I never took that picture.  AI took that picture.

Q.   When was that picture taken?

A.   I don't recall, but the -- the -- it's timestamped.  Like, I could go find that file for you to go see when that was taken.

Q.   Okay.

A.   It would have been 2021.

Q.   Do you still have that on -- accessible to you?



A.   Yeah.

Q.   Okay.  So sometime in 2021 the Glimmer app took that picture; correct?

A.   Yeah.

Q.   And when did you discover that the Glimmer app had taken that picture of you?

A.   That specific picture, when I was going in to go look at the photos it was taking when I was reflecting upon the Gobbler app in August 2021.

Q.   And then the next one is a picture.  It's Bates Number 2276.  When was that picture taken?

A.   I believe that was also 2021.

Q.   Okay.  Do you remember which month?

A.   No.  If it's important, I can go find the originals.

Q.   If you can provide it -- send it to us later, I'd appreciate it.

A.   Yeah.

Q.   And was it in August in 2021 that you saw that picture on your Glimmer app?

A.   Yeah.  I might have seen them earlier, but I know that, like, I went specifically in August and I specifically saw these and that's when I pulled copies of them.  And to be clear, I think it was August.  It could have been July.  I'm going to have



to check the timestamps on the files.  I can produce all that if the timing matters.

Q.  And then again I know these are hard to read, but if you can zoom in on them.

A.  Okay.

Q.  Did you post a tweet on August 30, 2021, that included these pictures from Glimmer and then say, "Apple's global security team"?

A.  The -- this is the page 4 of your PDFs?

Q.  I think so.

A.  This one starts with the "totally normal" post.

Q.  So I still have Apple products and brand.  I devoted nearly seven years.  You see that one?

A.  No.  The next one that I have in mine starts "totally normal.  Nothing weird about any of this."

The tweet you're reading is the end of the page on that same page.  There's multiple tweets from me on that page.

Q.  Correct.  Do you see the one that says "Apple's global security team"?

A.  I don't see that one.  I see the "totally normal."  I see me sharing the link.  I see me saying this is the Glimmer app, which the article talks about.  It says "Glimmer."  I see me saying --

I have a longer quote and used the word "panopticon" and then I insert another post in that response.

Q.   And did you also post a video?

A.   Yeah.  The top of that page, that's -- does that have a Bates Number?  I've expanded it so much. The one ending 777.  That first post is a video of -- because they are not just photos.  They are videos taken of me by my phone.  I stitched together multiple of the videos, and that was posted on the Verge article and shared publicly so people could see the amount of information it was capturing and that there were videos.

Q.   And how did you create that video?

A.   I did a screen recording on my phone while playing the videos from the Gobbler app and then redacted -- even though I thought it was probably not completely required, but redacted off any text strings or words on the app.  So it was just the videos of me.

Q.   Look at page 2274.

A.   Okay.

Q.   You see where it begins "Apple's Global Security Team"?

A.   Yeah.

Q.   And you posted that too; correct?



A.  Yeah.

(Reporter clarification.)

THE WITNESS:  I already confirmed that.

BY MS. RIECHERT:

Q.  Did you also respond to an inquiry about what app you used to find the images you posted by stating, "It's an internal app called Glimmer."  And then relinking to the Verge article?

A.  I think you're referring to one specific comment.  Multiple people asked for this stuff -- where these videos came from and photos.  And I responded to I think all -- most of those replies.  There was a specific one you're quoting, and, yeah, I sent the Verge article because it sounded like they hadn't read it since that question was answered in the article.

Q.  In response to a question about what app you used to find the images you posted, you said it was Glimmer; correct?

A.  Pages -- that was on your --

Q.  2274.

A.  I don't think it's on that page.

Q.  Sorry.  2277.

A.  Yes.  Someone had commented named Don, "What app did you use to find these?"  And I didn't want

to have to spend all the time explaining that it was, like, on purpose by Apple, so I just sent the link so he could read the article.

Q. Right. But you said that it was Glimmer; right?

A. Yeah.

Q. And you -- you describe yourself as senior engineering program manager, not fired yet; correct?

A. What are you talking about?

Q. Find the page number where I see that. So top right on the first page. You see that, where it says "relevant people"?

A. Oh, that was my -- I changed my Twitter profile description quite a few times during that time period, and I had my job title on it and at one point I added, kind of, tongue in cheek, "not fired yet" when I was pretty sure I was about to be fired.

Q. And why did you think you were going to be fired?

A. All the reasons I documented in an email complaining to Apple before they put me on leave that my work had been quadrupled, projects were assigned to me that it was going to make everyone upset at me and there was no way I could possibly do all that work, but Dan was refusing to intervene



while there was ongoing harassment, that I felt that Jenna had engaged in an employee relations investigation with the sole intent to cause my managers to become upset with me and then refused to intervene when they were upset and I was reporting retaliation, that I was being frozen out of meetings and projects, that I was requesting Apple employee relations and HR intervene in what I felt was harassment and stop what I viewed as a setup that would cause me to have a negative performance review in a matter of months.  And I said as a very worst case at least do the administrative leave they did prior to try to avoid that negative review I expected would occur and then I was abruptly put on leave and then given no updates and told I couldn't even return to work.  And this was after I had started raising concerns in Apple Slack about what I felt was intentional retaliation and concealment of employee concerns with a number of other employees -- senior employees like myself reporting similar issues and concerns.  And then Mr. Okpo told me to stop talking to my coworkers.  Send them to him instead.  And also admitted that despite him doing a second investigation, it would only result in a proposal from him to the same people I was



complaining about with no binding intervention or outcome. And so to me, that and more all spelled that I was about to be fired one way or another.

Q. Wouldn't you also agree that the posting of this information on the tweets that's on this page was also a concern of yours that you were going to be fired for that?

A. There was -- there's a list of about 300 things I thought I was about to be fired for.

Q. Okay. But my specific question is -- was one of the things you thought you were going to be fired for the fact that you were posting these tweets that are on this page?

A. That's kind of vague and --

Q. It's not vague. It's a very specific question.

A. Well -- well, you're saying at the time I posted this when I thought I would be fired would I be fired for the things I was posting when I already thought I was going to be fired, so that's confusing.

Q. You said there were many reasons why you thought you were going to be fired.

A. Yeah.

Q. And my question to you is very specific.



Did you think one of the reasons you were going to be fired was because you posted this information?

A.   Can you do a temporal proximity of when I thought I was going to be fired and when I considered this because I thought -- I was certain I was going to be fired before I posted any of this.

Q.   Listen to the very specific question.  Did you think that one of the reasons you were going to be fired was because you were posting this information that's on this page?

A.   Yeah.  That's why I'm saying this is kind of compound and confusing and vague, and I need a temporal proximity here because I was certain back in, like, May as documented in emails.

Q.   That's not my question.  The question is did you think that one of the reasons that you were going to be fired was because you posted this information that's on this exhibit?  Yes or no.

A.   I mean do you want to try a different form of this question?

Q.   No.  That's my exact question.

A.   Did I think at the time I made these disclosures I was going to be fired for making these disclosures?

Q.   Correct.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  No.  I thought I was going to be fired for all my environmental disclosures and escalating to the EPA and organizing with coworkers and filing NLRB complaints and all that kind of stuff.

Q.  And not because you were posting this information?

A.  No.  I thought Apple was way more mad at me about the other stuff.

Q.  Do you agree that these tweets breached your confidentiality obligations to Apple?

A.  I do not.

Q.  Why not?

A.  I was organizing with my coworkers in this article, which includes other coworkers, to raise concerns about our constitutional right in the great state of California to protest invasions of privacy and to organize with each other under the wonderful National Labor Relations Act to try to improve our working conditions regarding things that we agreed were detrimental to our working conditions and harmful to us, and we wanted to collaborate with each other and utilize public support to try to influence Apple to reform its practices.  And at that time and after, there's extensive case law and legislation that expressly says our actions were

protected and the fact that Apple was doing this at all is unlawful.

Q.  So you felt that by posting this information you were organizing your coworkers?

A.  The article itself includes multiple coworkers.

Q.  I'm not asking about the article.  I'm asking about the information you posted on this page.

A.  One of the objectives I had in sharing the stuff on my social media page --

(Reporter admonition.)

THE WITNESS:  One of the goals of me sharing this on my social media page where you knew I had coworkers following my updates because I was no longer able to use Slack and communicate with them on work channels was for them to see this and for us to engage and discuss and hopefully have them help amplify it and share it and organize around this topic to improve privacy for Apple employees.

BY MS. RIECHERT:

Q.  Did you -- while you were -- at any time while you were participating in these studies from 2017 onwards, did you ever do anything to try to organize your coworkers to protest the fact that



these studies were going on?

A. There's no real such thing at Apple like that.

Q. I just asked, yes or no. Did you or did you not do anything to organize your coworkers to protest your constitutional right of privacy with respect to these studies at any time from 2017 until you posted this on Twitter in August of 2021?

A. Yes.

Q. Okay. What did you do?

A. Talking to my close friends, sharing concerns, trying to figure out if there's anything that we could do without facing a backlash or negative repercussions. I also made numerous complaints internally through more formal and neutralist channels about things I thought were privacy violations.

Q. Okay. We're just talking about the things that you're posting here; right?

A. You just asked me if I did anything before I posted.

Q. Right. To talk -- about the things you're posting about this constitutional right of privacy from the study that you're participating in, Glimmer.



So did you do anything to try to organize your coworkers to stop the Glimmer studies at any time from 2017 to 2021 before you posted this?

A.  I just answered and said yes.

Q.  What did you do to try to organize your coworkers to stop the Glimmer study?

A.  I was -- I already said earlier in here.  I talked to other coworkers about their concerns.

Q.  Close friends, uh-huh.

A.  See if there's anything we thought we could do, and I already said too that I already talked to Aidria before I made the disclosures.  Aidria is a senior manager.  She's -- Aidria Astravas.

Q.  I understand.  You talked to your three close workers.  You told me that.  Your coworkers.

A.  No.  I'm saying I talked to Aidria before I posted this about my intention to share this information because I wanted a sanity check.  I said I don't think this is confidential.  I think this is not confidential, and I think it's important to share that I don't think Apple is going to do anything internally to ever make this better.  And I knew she also had concerns, and I knew she was in a leadership position in an Apple organization where she would know if Apple had the willingness or

capability to ever do better about this specific thing that I knew she -- it also bothered her and she agreed --

Q.  Did she tell you -- did she tell you it was okay for you to post this on Twitter?

A.  She did.

Q.  Okay.

A.  She encouraged me.  She thought it was the best chance we possibly had for Apple to do better and stop invading our privacy like this with Gobbler.  And from what I've heard, it worked and Apple made pretty quick changes to that application in the way it's used with employees that was credited to this article.

Q.  Okay.  So we'll go back to that.  But first of all, you -- I asked you if you made any efforts to organize your coworkers to stop the Glimmer application, and you said you talked to your friends.  You talked to Aidria.  Anything else you did to organize your coworkers to stop the Glimmer application prior to the August 30 tweets?

A.  I believe I brought it up on some Slack group chats at some point.  There's AI ethics group chats.  To kind of gauge the feeling about it.  But these kind of things were generally things we



whispered because we knew that Apple would get really upset.

Q.   Because it was confidential?

A.   No.  Because they don't like us talking back and disrupting stuff that works well for them especially if it's exploitive of us.

Q.   Anything else that you did to organize your coworkers to prevent the Glimmer application other than what you've testified to?

A.   I mean, I would say my work trying to develop Apple's AI ethics policy while I worked in Apple legal and with government affairs was me organizing with some of my coworkers, even if it was Josh Cohen, senior director.  Josh C-O-H-E N.

Q.   When you were developing the AI policy, did you say that you hoped that that policy would prevent the Glimmer app?  Did you talk about the Glimmer app while you were developing the AI policy?

A.   I believe I brought it up softly and casually as I was meeting with AI executives around the company among a few other topics.

Q.   And you talked about Aidria.  When you communicated with Aidria, was that by email, by Slack, or by phone, or by text?

A.   It was by phone.  And when we knew I was



about to be fired, probably starting in, like, July, she was using her house phone instead of her work phone.  She'd leave her work phone in, like, the garage knowing that Apple was probably eavesdropping and wiretapping her to see her talking to me.  So she'd call me on her house phone.

Q.  Okay.  And you said to Aidria what?  What did you say to her?

A.  She knew I was making multiple --

Q.  No.  What did you say to her?

A.  I told her I wanted to make a disclosure about Gobbler specifically, that Zoe had reached out to me.  She was planning on writing an article about privacy for Apple.

Q.  That is what you're telling Aidria; right?

A.  Yeah.

Q.  Okay.

A.  And Zoe reached out to me.  It was her idea to write an article about privacy --

(Reporter clarification.)

THE WITNESS:  -- saying she was planning on writing an article about privacy for Apple employees.

BY MS. RIECHERT:

Q.  This is what you're telling Aidria; right?



A.   Uh-huh.

Q.   Okay.

A.   And I said one of the things I wanted to raise -- this was just one of several.  But I wanted to raise Gobbler because Gobbler really bothered me, and I know we had talked about it, that she'd also -- seemed like it bothered her, and I didn't think Apple was ever going to change its processes around Gobbler unless it was forced to.  And I told her that I was a little bit worried about sharing it even though I thought the photos should not be confidential and are not confidential, but I knew that Apple tended to overreact about confidentiality.  That was an ongoing topic.  And just wanted a sanity check.  I said I think that is fine to share and important to share, and I don't think they're ever going to change unless I share. And I said I wanted a sanity check.  Do you think that if I share photos taken of me from this app that that's actually confidential?  Because I don't think it is, and she agreed.  She didn't think it is.  And she led a video engineering team that worked on this stuff with tons of actual confidential stuff.  So we agreed together, both, we didn't not think these photos are actually



confidential; and, two, and it would be critical to share this publicly if we had any hope of getting Apple to stop doing this stuff.

Q.   And so you told her, "I wanted to share these photos from the Glimmer app with the -- on the Verge article and on Twitter," and Aidria said, "I agree.  The photos are not confidential.  You should share them"?

A.   Yeah.

Q.   Okay.  And you said you did have concerns about whether you could share the information you were going to share.  Why did you have those concerns?

A.   Because Apple says everything is confidential.  And at that point, I was trying to find distinction in what is actually confidential and what is not.  Because for many years I just went along with Apple's general statement and did not try to fight it at all.  And I was part of the problem. I ran around sending a ton of emails telling everyone stuff was confidential that's clearly not. I probably helped Dan and Dave violate the NLRA multiple times.  So I was in a process of trying to sort out and in de-, like, Apple-cultify and figure out, you know, I want to share stuff.  What is

actually confidential.  And for those, I was on the fence just for the sense that I was terrified of Apple, and Apple is constantly, like, saying everything is secret.  And so I just wanted -- I wanted a sanity check with her, and I thought she'd be a perfect person to sanity check because she works on this stuff.

Q.  Did you think about talking to someone in the legal department and asking them if they thought this was confidential?

A.  That's not really a thing.  You'd go to -- they'd tell us to, like, talk to new privacy security.

Q.  The question is did you or did you not go to anyone in the legal department and ask them if they thought that posting this would be confidential?

A.  There's no --

Q.  Yes or no?  Did you go to anyone in the legal department?

A.  While I was suspended in August?  No.

Q.  Did you go to anyone in the legal department at any time and ask if you could post this information?

A.  I said I was raising the concerns with the AI ethics policy development, but I wasn't planning



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)              December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

on posting until August and I was suspended in August, so I don't know why I would have brought it up before August.

Q.   Right.   But you did talk to Aidria in August about posting it; right?

A.   Yeah.   She was one of my best friends until you guys fired me.

Q.   You said Apple changed its policies as a result of your posting this information or the Verge article; is that correct?

A.   That's what I heard.

Q.   Okay.   What did you hear and from whom?

A.   I believe I saw some screenshots of emails coming -- I think one came from Tom Duffy, which was really exciting.   He's a director in Core OS, and I heard about discussions from staff meetings.   Some of the updates I believe came from Aidria.   I think some came from Deepa.   Some came from others.   I think even on Twitter I heard some stuff that they were changing the way that -- like it wouldn't just be -- Gobbler would not be installed by default anymore.   It wouldn't gather stuff by default. There would be clear ways to opt out without having to send an email to legal and request to be opted out of an engineering workflow where there's no real

way to actually opt out.  There would be more autonomy with the settings and configuration, and it was Gobbler but there was a few other things too where they were going to try to -- oh, the iCloud stuff.  They were also making changes where they had previously forced you to merge your personal iCloud account with your work account, and then everything is just, like, permanently merged.  And that was another thing raised in that article that multiple employees with concerns.  And it sounds like they took steps with an engineering project to fully separate it so you didn't have to do that anymore.

Q.  And what did Tom Duffy tell you?

A.  I know he texted me while I was suspended a couple times, I believe.  I don't know if he told me directly or not.  He -- it's possible he could have. He and I were kind of friends.

Q.  Do you recall anything that Tom Duffy told you about policies being changed as a result of your article -- your sharing information on the Verge article or the posts?

A.  I don't know if he told me anything directly on that, but I remember seeing screenshot of an email from him talking about that they needed to change it and it was good they were changing things



and they are changing things.  He didn't send that to me directly though.

Q.  And who sent that to you?

A.  Might have been Aidria or Deepa.  Someone in -- it was one of my friends, and they were encouraging me, showing that what I did was good and was actually making change.

Q.  And what were you told about what happened at staff meetings?

A.  For the Core OS -- this must have come from Deepa.  The Core OS meetings were having conversations about the need for reform.  They were -- they apparently talked about me directly multiple times in the disclosure.  I worked very closely with those folks and --

Q.  Which staff meetings are these?

A.  Core OS executives.  So core operating system.  These are the teams that work on the low-level software for the Apple products and the kernel.

Q.  And did Aidria share that information with you by phone, by email, by text?  How?

A.  I think that would have been Deepa because Deepa is Core OS, but it could have been -- I don't remember.  And would have been probably, like,



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Signal image sharing.  Also maybe just sending, like, a text summary of updates.

Q.  And that was all from Aidria and Deepa?

A.  And some other -- I have a bunch of these old messages.  If this is important to you, I can go back and produce some of this.  I haven't gone through -- back to this for years.

Q.  Do you know if Glimmer had -- or Gobbler had ever been publicly disclosed prior to these tweets?

A.  Yeah.  The name was out.  There was some vague references.  And Zoe has said that other employees had told her about it prior.  At least two other employees.

Q.  Did she say who?

A.  No.  And I wasn't the only one talking about it in that article.  There's at least one other employee cited.

Q.  The question is publicly disclosed.  Prior to the article -- the Verge article, do you know if Glimmer or Gobbler had been publicly disclosed?

A.  I mean, Craig Federighi disclosed it to Congress when they asked him where he --

        (Reporter clarification.)

        THE WITNESS:  Craig Federighi.  I don't know how to spell his last name.

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

(Reporter clarification.)

(Record read as follows:

"Answer:  Disclosed it to

Congress...")

THE WITNESS:  Uh-huh.  When Congress was asking Apple directly where they were getting all those images they were using to train FaceID directly in a letter, and he responded, not saying the word Glimmer or Gobbler, but they have a program and basically it's very consensual, he said.  Very consensual.

BY MS. RIECHERT:

Q.  And when was that?

A.  2018, I believe.

Q.  Any other information that led you to believe that the information had been publicly disclosed?  The information about Glimmer had been publicly disclosed other than Craig Federighi's disclosing something to Congress in 2018?

A.  Yeah.  I mean, Apple launched this FaceID feature, and so they have to gather this information somewhere.  That's how you train this stuff so --

Q.  Talking about public disclosure.

A.  Yeah.  They have papers they publish.  Their marketing materials.  They're talking about how they

have all these images they use to train the FaceID model to be able to recognize the biometrics.  They published stuff about their finding, the process.  And then Mr. Robert Aloe McKeon published several in-depth articles on LinkedIn and Medium.  He actually managed the Gobbler/Glimmer team, talking about the program, the timeline of them establishing the Gobbler program, gathering all the data from the employees, refining the process.

(Reporter clarification.)

THE WITNESS:  Refining the process.  I can't remember what I said after that.  But I think there was three separate articles that he pushed publicly on Medium and LinkedIn talking in depth about his own work on his own team that managed Gobbler, and that was 2018 through 2020.

BY MS. RIECHERT:

Q.  So I have Craig Federighi disclosing to Congress about the Gobbler/Glimmer app or the information in the Gobbler/Glimmer app; correct?

A.  Craig Federighi, the senior vice president of software engineering.

Q.  Okay.  And he disclosed the Gobbler/Glimmer information to Congress in 2018; correct?

A.  Congress asked him where he got all those



images generally.  And that was them directly asking.  The answer would be Gobbler.  He responded without saying "Gobbler" or "Glimmer" but referenced the program and generally just said it was very consensual.  Wouldn't respond further.

Q.  Okay.  And then you said there were papers that were published.  Who published the papers?

A.  Robert Aloe McKeon, the manager of the Gobbler team.

Q.  And when did he publish these articles?

A.  Looks like between 2018 and 2019 or 2020.

Q.  Where did he publish them?

A.  LinkedIn and Medium.  And I believe one other platform.  I can't recall what it was though. I believe I produced these.

Q.  And he said in these articles that they had -- Apple had images to train models; is that correct?

A.  Yeah.  He talked about the timeline of them doing it specifically for FaceID and all the challenges they had leading up to launching FaceID. The challenges of gathering all that information, privacy concerns, and then developing the team ongoing even after launch.

Q.  Okay.  Do you know the names of these

articles?

A.   I believe I produced them to you guys already, but if you want them sent specifically, I can resend them.

Q.   Okay.  And then you said something about index articles talking about the timeline.  That's the same thing; is that correct?

A.   In-depth articles --

Q.   Oh, in-depth?

A.   -- including the timeline.  So he referenced the timeline of their projects including the things like that user study that I was invited to in the parking lot with the military compound.  Makeup studies.  All of that sort of stuff.

Q.   Okay.  Any other reasons that you believe that the information that you disclosed in your tweets and to the Verge -- to Zoe and the Verge was already publicly available at the time you disclosed it?

A.   Yeah, lots of reasons.

Q.   Okay.  Any others?

A.   For one, it's just basic engineering that they would be gathering this kind of information somehow.

Q.   No.  This is publicly disclosing.  Tell me



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

about public disclosures that you know about where the information that you disclosed to Zoe and that she put into the Verge article and that you disclosed on Twitter was already publicly available.

A.  So the fact that they were gathering images, training data for the FaceID is just a given.  They said that in their own marketing materials.  The fact it was using an application called Gobbler, is not in their marketing materials.

Q.  What marketing materials are you talking about?

A.  FaceID.

Q.  Okay.

A.  And the new phone and all that.  They talked really in detail of marketing and product specification details about how the camera works, how FaceID works, and then they published academic papers and white papers also talking in-depth about the engineering and architecture work to design all of it and ensure it worked.  Basically the only two things that I shared that were not directly public information was the term Gobbler and Glimmer and the photos of my own face taken by my own phone.

Q.  And where were these articles of the marketing materials published about FaceID and how

the cameras worked?

A.   Apple.com.

Q.   Okay.  And that's publicly available; right?

A.   At least in way back archive if it's not currently on their pages.

Q.   So the only confidential information you shared either on Twitter or with Zoe was the name Gobbler or Glimmer and the photos of yourself?

A.   No.  Those are not confidential.

Q.   Right.  But the only information you disclosed?

A.   The only information I disclosed that I did not -- was not certain was already in the public realm was the face Gobbler term, now called Glimmer, and the photos of myself on the phone.  And -- sorry -- third, that Apple was almost -- apparently their entire data source for this development came from employees through that Gobbler app rather than purchasing the data or formally paying and contracting people for the data, which is more typical process.

Q.   And do you know if the images captured by Glimmer were ever publicly available prior to your tweets?

A.   Probably.  I would assume so.



Q.  Okay.  But do you know if the images captured by Glimmer were ever publically available prior to your tweets?

A.  If they were not identified as Gobbler, I can't know.  But they published a bunch of white papers and technical papers talking about this process, and one would assume it -- the photos included -- include stuff from Gobbler.

Q.  Do you know if any images were captured by Glimmer -- images captured by Glimmer were ever publicly available prior to your tweets?

A.  I don't know.

Q.  Do you know if iPhone users can access these TrueDepth censor images without Glimmer?

A.  Today it sounds like Apple got a patent and was making a change so something like this would be actually running on customer phones, but I don't know if they can actually view the images because it sounds like there's a lot more security in place because the people were very concerned about that.

Q.  When you posted these images, did you know if iPhone users could access these TrueDepth censor images without Glimmer?

A.  It was my understanding at the time that that was never intended for customers.  And in the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

article I'm quoting as saying, "If Apple did this to customers," quote/unquote, "they'd lose their goddamn minds."  The quote was emphasized in the article with a special font and coloring.

Q.  So I'm going to ask it a third time.  Do you know -- did you know if the iPhone users could access these TrueDepth censor images without Glimmer?  Yes or no?

A.  It was my understanding that there's no Gobbler for customer phones and that customers would not see stuff like this on their phones.

Q.  So the answer is they could not access it?

A.  My understanding.

MS. RIECHERT:  Okay.  I'd like to mark as Exhibit Number 18, the August 30, 2021, article from the Verge.

THE VIDEOGRAPHER:  Do you have the tab number for that?

MS. RIECHERT:  Oh, sorry.  3-04.

(DEPOSITION EXHIBIT 18 WAS MARKED.)

(Reporter request.)

MS. RIECHERT:  Let's do that.

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:04 p.m.

(Off the record:  4:04 p.m. to 4:17 p.m.)

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

THE VIDEOGRAPHER:  We are now back on the record.  The time is 4:17 p.m.

BY MS. RIECHERT:

Q.  Is this document that we marked as Exhibit 18 a copy of the article from the Verge?

A.  "Apple Cares About Privacy, Unless You Work at Apple," yes.

Q.  And did you communicate with anybody at the Verge other than Zoe Schiffer, who is the person who wrote this article?  S-C-H-I-F-F-E-R.

A.  Kind of, like, through Zoe when we were going through the editorial process there was some feedback and back and forth.

Q.  Okay.  And who did you communicate with other than Zoe?

A.  I can't remember if she identified them.  It would be in my text with her.  Like, I can go check if that's important, but I believe it is editors.

Q.  So you had texts with an editor at the Verge?

A.  Not directly, but she was giving feedback from -- between us.  She was, like, the middle one.

Q.  Okay.  So did you -- do you say you had texts with someone at the Verge or you didn't have texts with someone besides Zoe Schiffer?

A.  I did not have direct communication, I don't believe, with anyone other than Zoe.

Q.  Okay.  So what were you talking about an editor?

A.  It's -- as we were preparing the article, and I was just insisting that they redacted the -- any code or strings or text in the videos as to eliminate areas that Apple could complain about with any kind of foothold whatsoever.

(Reporter clarification.)

THE WITNESS:  Foothold whatsoever.  And I felt very confident the photos themselves of me taken by AI were not something that Apple could actually meaningfully complain about.  So they were showing me -- I said show me a copy of anything before you publish it.  I want to make sure that I can send off on it.  And we went back and forth a couple times where I was having them redact and bore more stuff.  And then the final product had, I think, like everything that was text and not just photo completely blurred.

BY MS. RIECHERT:

Q.  And was that with somebody other than Zoe Schiffer?

A.  It's my understanding the people doing the



blurring and preparing the copy were not Zoe.  Those were the editors, and she was the middlewoman sharing my feedback with them, and I believe she also shared some comments with them about being excited about the article.

Q.  So is the answer to my question, no, you did not communicate with anybody at the Verge other than Zoe Schiffer?

A.  Directly, no.

Q.  Okay.  So much easier if you just answer the question, and it makes it much quicker than if you give a long answer that doesn't answer the question.  So --

A.  Well, it's misleading to say I didn't if I'm making a request to them.

Q.  No.  It's -- I just asked you who you communicated with, Zoe or anybody else?  The answer is I only communicated with Zoe.

Have you produced all your communications with Zoe or anyone else at the Verge in connection with this article?

A.  They were never requested directly.  I can if you guys want all of them.

Q.  Okay.  So the answer, no, I have not produced all my communications with the Verge, but I



am willing to do so?

A.   Yeah.

Q.   Okay.

MS. RIECHERT:   Okay.   Now we're going to go to Exhibit 19 which is the video.

(DEPOSITION EXHIBIT 19 WAS MARKED.)

BY MS. RIECHERT:

Q.   And you can play the video, and I just want to confirm that this is the video that you sent to Zoe.   And then the next question is -- is that the video that was posted by the Verge in their article -- with their article?

A.   I don't know.   There were a couple of different videos.   I don't know which one I sent.   I have to go back and look.

Q.   All right.   So watch the video that's Exhibit Number 19.

A.   I did.   I am.

Q.   And is that the video that you sent to Zoe?

A.   That's what I just said.   I don't know.   I'd have to go back and check and see exactly which one I sent her.

Q.   Okay.   So you have more than one video?

A.   There's a couple different videos I took and then different versions of the editing of those

videos, so I don't know exactly which one I sent.

Q.  Do you know that the Verge posted a video?

A.  Yes.  They posted a video that I had sent them.

Q.  Okay.  And I believe we produced that at 229 -- 2281 is our Bates Number.

So the video that the Verge posted is a video that you sent to the Verge; correct?

A.  Correct.

Q.  But the Verge -- the one before -- the one that's Exhibit 19 is a document that you produced; correct?

A.  19?  Yes.

Q.  Okay.  And did you produce -- the one that you produced that's Bates Number 9, is that the version of the video that you sent to Zoe?

A.  There's no video in it.  Unfortunately when you print a PDF on that article page, it does not capture the video.

Q.  No.  I'm going back to Exhibit 19 is your document Number 00009 is the video that you produced.

A.  Sorry.  Is that the article I have open?

Q.  It's the video.

A.  That you didn't -- can you -- that you sent



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

in the chat or you're referring to something else I produced?

Q.   I'm referring to Exhibit Number 19.

A.   So 19304A?

Q.   Yeah.

A.   And what was your question again?

Q.   Are those the videos that you sent to Zoe?

A.   Asked and answered.  I don't know.

Q.   But those are videos that you took.  You just don't know if you sent them all to Zoe.  Is that what you're telling me?

A.   I don't know if that file is exactly what I sent to her.  It looks similar to what is posted on the web page, but I had different versions.  I had edited different versions, so I would have to go back and check before I'd confirm that's exactly what I sent her.  I don't know.

Q.   And how would you confirm that?  By sending me the emails that you sent to Zoe?

A.   I think it was sent -- it might have been sent in Signal, so I'd have to go back to my screenshots in Signal and see if there's a file name and then cross-reference it to my files in my storage and -- and see that way.  Or I might have designated it in my file storage of which ones I



specifically sent her, so I'd just have to go back and check.

Q.   Okay.  But the one that's in the Verge article is one that you sent her.  Only in the Verge article, there's some blurring in it; correct?

A.   Yes.  I sent it and requested the blurring.

Q.   Yeah.  And you asked them to blur out the app UI; correct?

A.   Anything with text.

Q.   Did it include the app UI?

A.   No.

Q.   So anything that was in the video that you sent that had app -- that had text in it, you asked to be blurred out; correct?

A.   Right, yeah.  And any kind of, like, icon.  So for the UA, like the icons, there's the little, like, red and purple and some of them have letters and stuff.

(Reporter clarification.)

THE WITNESS:  There's little icons.  Like there's a red and purple dot and some of them have letters, and I asked them to blur all of that kind of stuff out too.  The focus to me was the fact it was taking photos and videos of my body, and that's what I wanted the video to focus on.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

(Reporter admonition.)

BY MS. RIECHERT:

Q.   So with respect to what you asked her to blur out, did that include the app UI?

A.   I might have used that term, but it was more about anything that was, like, a little icon.  But we didn't, like, remove all of the UI.  You can still see the UI.  It's just blurred.

Q.   Did you ask her to blur the app -- the app UI?

A.   I don't remember if I used that term or not.

Q.   Did you ask her to blur the code strings?

A.   I believe I said that specifically, yes.

Q.   And did you ask her to blur anything with numbers?

A.   I believe I asked for that too, yes.

Q.   And do you agree that the video that you sent Zoe was not blurred in any way?

A.   I don't think I had blurred it, no.

Q.   And why did you ask Zoe to blur out these portions of the video?

A.   Because I expected that Apple would complain about this, and I thought that anything text-wise would give them, like, foothold for possibly complaining and that it would be very difficult for

them to complain if it was just a photo or video of me, and so I wanted to eliminate that foothold for Apple for the complaining.

Q. And you thought that Apple might complain because the information that you asked to be blurred out was confidential; correct?

A. No.

Q. So why was it that you asked that they blur out that specific information from the article?

A. Because if Apple wanted to complain, they could make up more reasons based on text versus simply a photo taken by AI.

Q. And why did you think they would make up more reasons based on text as opposed to photos?

A. There's -- there's more potential legal arguments that, while I did not think they applied here, that I thought Apple could stretch to try to make apply if there was text, and I thought the text was entirely unnecessary for the point being made in the article.

Q. And what were the potential legal arguments that you thought that Apple could make with respect to text?

A. I didn't know, but Apple has really good lawyers and they are very creative and I -- again,



that's why I used foothold.  I wanted to reduce the surface area for Apple complaining about the article, and if they wanted to complain, I wanted them not to complain about my face specifically, which they are, and that's why we're here.

Q.  But why is it that you thought that Apple would be okay with your putting the face but not the text?

A.  I didn't think they'd be okay with my face either.

Q.  Why do you think they would be more upset about the text than the face?

A.  I didn't think they would be upset more about the text.  I thought it would give them more surface area for making far-fetched legal arguments based on text versus simply a photo of my face taken by AI.

Q.  And do you know if there was anything that was in that photo that you posted that would reveal confidential information about -- of Apple -- belonging to Apple?

A.  Confidential is a vague term.

Q.  Yes, I understand.

But do you know if there was anything in the photo that would reveal confidential information



Apple -- information Apple considered confidential?

A. Apple considers everything confidential.

Q. Okay. Do you know if there was anything specific in the photos that Apple would argue revealed confidential information?

A. I didn't think so because it doesn't show any of the back end. That was something I thought about. I believe we texted about. Because I was more concerned if it showed back end of how it worked, which it doesn't show at all. And actually Apple disclosed that information themselves.

Q. In these articles that you talked about earlier?

A. Yeah. And also their patent application. It was, like, two years ago. They filed detailed patent applications with, like, the ins and outs of this -- what appears to be this stuff.

Q. But two years ago is after you'd been let go; right?

A. Yeah. You're saying before I said this, then, yes, the prior answer I made.

Q. That you think that there's something in the photo -- you don't think there's anything in the photos that Apple would consider revealing confidential information?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.   Sorry.  That's a new question.

Q.   Okay.  Answer that one then.

A.   Do I think there's anything in the photos that Apple would consider confidential?  Apple considers everything confidential.

Q.   And nothing specific to the photos; correct?

A.   Like every -- everything.

Q.   Right.  But nothing specific to the photos that you think reveal confidential information?

A.   I think everything I shared in July through September is stuff Apple considered confidential. For this -- the photo itself of me taken by AI, I don't think that is confidential or anything I shared.

Q.   But you didn't check with anyone at Apple to find out if they thought there was something specific to the photos that would reveal confidential information; correct?

A.   No, I checked with Aidria.

Q.   Besides Aidria?

A.   Aidria is -- I might have talked to other folks.  I don't remember specifically.  I very clearly remember that conversation with Aidria though.  It was a very meaningful conversation to me.



Q.  Did you give Zoe a screenshot of internal Apple web page about Glimmer?

A.  I believe so, yes.

Q.  And you gave her the video of the Glimmer app that shows the images of the Glimmer app; correct?

A.  Yeah.

Q.  And the user interface; correct?

A.  Yeah.

Q.  And details about the Pearl study; correct?

A.  About the what?

Q.  Pearl study?

A.  Oh, yeah, that weird user study.

Q.  You gave Zoe details about the Pearl study; correct?

A.  Yeah.

Q.  Okay.  And you gave her images captured on your phone by Glimmer; correct?

A.  Yeah.

Q.  And you gave her screenshots of the app interface and functionality; correct?

A.  Functionality?  I don't know what that means.

Q.  Okay.  Did you give her screenshots of the app's interface?



A.   Yeah.  Well, specific to the photos.

Q.   Did you give her screenshots of the app's collection of Pearl data metrics?

A.   I don't know what that means.

Q.   Anything else you gave her?

A.   I remember -- so I gave her some photos, the videos.  I'd talked to her about it work.  She quoted me in that article, and we talked about it. And I had provided some of those confluence pages just so she could verify the stuff I was saying and the stuff the other employee was saying.  And I gave her, like, a slide deck about it again so she can -- I mean, they have to verify this information if they publish it.  They can't publish stuff that ends up being wrong.  And some of that stuff I shared, I told her that was off the record.  So like it's just for them internally to verify as correct, but they wouldn't share it, and she agreed with that before I shared it.  Yeah.

Q.   And have you turned over in this case copies of all the information, including the slide deck that you gave to Zoe?

A.   Ask your question again, please.

Q.   Yes.  Have you produced in this litigation all of the documents you shared with Zoe including



the slide deck?

A.  So specific to Gobbler and preparing the article, I believe so.  I can go back and check and, if not, produce more.  But I also shared other things with her too for this article and for other articles as well.

(Reporter admonition.)

THE WITNESS:  I believe I produced everything I shared with her in preparation for this article related to Gobbler.  I can go back and check, and if I haven't, I'm fine producing that.  But I also shared other things with her for the other disclosures I made for this article, and if -- I don't know if I shared all -- produced all of those, and we haven't talked about those.  And then I also shared additional things with her for the other articles she wrote about my advocacy and the employee organizing at that time.

BY MS. RIECHERT:

Q.  I'm focusing on information you shared during your employment.  Okay.

A.  That's what I'm saying.  That's all.

Q.  Okay.  So you say that you will check to see if you shared with us all the information -- if you produced in this litigation all the information you



shared with Zoe; correct?

A.  Specific to Gobbler or about the other disclosures?

Q.  All the information you disclosed that belonged -- that was Apple information that you disclosed to Zoe?

A.  So until I was fired?  Leading up until I was fired?

Q.  We're going to get to the one article after you were fired too, but let's talk about --

A.  No, I'm confirming.  You want all things produced that I provided to Zoe prior to Apple terminating my employment?

Q.  Or after.

A.  Or -- or after?

Q.  Yep.

A.  I don't think I produced all of it.  I can. This article also included my disclosures about the --

(Reporter clarification.)

THE WITNESS:  -- batterygate and Apple taking the naked photos of me and saying they were going to put them in the permanent evidence locker while I had been fired in retaliation for raising concerns about product quality related to

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

batterygate --

BY MS. RIECHERT:

Q.  Okay.  That was not my question.

A.  -- that was also included in that article.

Q.  I'm just asking you, have you turned over everything that you gave to Zoe at any time that was Apple information, and you're not sure if you have, but you will look and check and make sure we have it; correct?

A.  You can send a request for production.  You haven't for this yet.  Happy to provide it.  Most recently you guys complained I was sending too much stuff.  So if you can send a request for production, I'm happy to respond.

Q.  We'll meet and confer on whether that's covered by our document requests, and we can always send another one.

A.  Okay.

Q.  Other than government agencies, the Verge, and Orrick, have you had any communications with anyone else related to Apple product information or internal tools?

A.  Do you want to elaborate further on the terminology of product information or internal tools?

Q.  Okay.  Let me just go back to another question.  I'd asked you earlier about Pearl data metrics, and you said you didn't know what that meant.  I'm talking about whether the FaceID was successful and whether other metrics revealed beneath the photo.

So the question is do you share screenshots of the app's collection of Pearl data metrics, and Pearl data metrics includes whether the FaceID was successful and other metrics revealed beneath the photo?

A.  So you're saying a term "metrics" which infers a collection of data.  These photos show a binary yes or no which is not a metric.  But these photos show, for each photo, something that says, like, result, failure, success if that's what you mean by "metric."

Q.  Yes.  Did you share that with Zoe?

A.  Yeah.  That's on the image screenshot.

MS. RIECHERT:  Okay.  I'd like to mark as Exhibit 20, tab 3-01.

(DEPOSITION EXHIBIT 20 WAS MARKED.)

THE WITNESS:  Sorry.  Did you want me to answer that other question that you asked and then I never answered and then you went to a different



question?

BY MS. RIECHERT:

Q.   No.   Because you didn't understand my question.   You didn't understand what product-related information meant.   You didn't understand what tools -- internal tools meant.   So if you don't understand the question and you don't understand what those words mean, then we can move on to another question.   If you understand what product-related information is and if you understand what internal tools are then you can answer the question.

A.   I mean, if you're asking, like, about me sharing Gobbler, a lot.   Telerama wrote an in-depth thing.   So did --

(Reporter clarification.)

THE WITNESS:   If you're talking about that I shared Gobbler, for example, I shared with Telerama. It's a French paper.   Telerama.   And they wrote a very in-depth article about it as did Der Spiegel. It's a German magazine, and they also wrote a very in-depth magazine article.   I shared a lot with those reporters and other reporters too.   Some of that was -- most of that was after I was terminated.

/ / /

BY MS. RIECHERT:

Q.   Anybody else other than --

A.   Yeah, a lot.

Q.   Okay.

A.   Congress too.  And I was included and cited in that government accountability report about employee privacy concerns published --

Q.   Regarding who you shared it with.  You've got Telerama, Der Spiegel, and Congress.  Anybody else?

A.   The agencies.

Q.   Government agencies?

A.   There were other reporters.  A lot of other reporters and I've shared stuff, social media, and in the court case.

Q.   What other reporters?

A.   Probably dozens.  I'd have to go back and, like, itemize the whole list.

Q.   Okay.  What about during your employment?  Did you share this information with anybody other than Zoe Schiffer?  Apple's product-related information or internal tools?

A.   Talking about Gobbler.

Q.   Apple's product-related information or internal tools?



A.   I don't know what those terms mean.

Q.   Okay.  We're back to that again.  Okay.  If you find out what you think they mean, let me know and we can get the question answered.

A.   I need a definition from you that's more specific than those general terms.

Q.   Understand.  Okay.  So let's look at Exhibit Number 20, which is tab 3-01.

A.   Okay.

Q.   Okay.  Is this a text message that you sent to Cher Scarlett?

A.   Looks like it, yeah.

Q.   Okay.  And who is Cher Scarlett?

A.   She's an ex-Apple global security employee who sued me and accused me of criminal extortion and harassment and blackmail and then was stalking me for multiple years, and I had to file multiple police reports against her.

Q.   Why did you share this information with Cher Scarlett?

A.   We were organizing together for a brief period of time in July and, like, very early August. We seemed to have some intersecting interests in organizing about making Apple better.  And at this time we were still communicating, and she had been



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

encouraging me -- my advocacy and my disclosures and this was something -- a topic, the privacy stuff, that she was specifically very interested in and she'd even been sharing some of my stuff herself from her own Twitter account.  Like my protest that Apple was requesting us to share all of our medical records directly with Apple if we were to request disability or ADA accommodations.

Q.  And in that message you confirm that you gave all of this information to Zoe; correct?

A.  I said, [As read]:  "I gave all of this to Zoe as background.  Some engineering told her about it a while ago.  I'm letting her use those pics of me for the article to show how invasive it is.  I chose the pretty ones because most are not."

Q.  And Zoe is referring to the Verge reporter who published the article with your Glimmer pictures and video; correct?

A.  Yeah.  Cher helped connect me to Zoe.  Cher had been working with Zoe --

Q.  Okay.  I didn't ask that.  I'm just asking if that's who Zoe is when you refer to Zoe.  "I gave all of this to Zoe," you were referring to Zoe who wrote the Verge article -- that published the article with your Glimmer pictures and video;



correct?

A.   Yeah.  Zoe Schiffer of the Verge.

Q.   Okay.  And when you say "all of this," you're referring to the screenshots that you were sharing in the text thread with Cher; is that correct?

A.   I don't have the full text anymore.  I got locked out of --

(Reporter clarification.)

THE WITNESS:  -- my old iMac.  So I can't go back and confirm exactly what it is.  We're just working off of Cher's documents I think at this point.

BY MS. RIECHERT:

Q.   But you did share this information with -- that's in this exhibit with Cher; correct?

A.   Cher's falsified and fabricated a number of documents --

Q.   Okay.  Did you or did you not share this information with Cher?  Yes, no, I don't know.

A.   The first page -- that screenshot included just in that first page does look like something I did share with Zoe on background, the article for her to do fact checking.

Q.    And the other pictures that are in here and



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)              December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

the other information that's in here, did you share that with Zoe -- excuse me -- with Cher?

A.   Again, I lost my copies of this so --

Q.   Yes, no, I don't know?

A.   So the timing, the ordering, it looks like I -- some of that stuff with Zoe, but it looks like some of this I was just sharing with Cher to show to her because she wasn't familiar with the app, so there's two different things happening it looks like in this chain.

Q.   So when you say, "I gave all of this to Zoe as background," what are you referring to?

A.   That's where I'd have to go back and look in the chain.  I think some of this -- it looks like some of this stuff I'd shared with Cher, like, later in this PDF and the later pages was stuff I was just showing Cher because she said she wasn't aware -- she indicated she was not aware of the app, so I wanted to show Cher more of what the app looked like, and Cher was an active Apple employee.

(Reporter admonition.)

BY MS. RIECHERT:

Q.   Do you agree that sharing this information with Cher was a breach of your confidentiality obligations with Apple?

A.   Absolutely not.

Q.   Why not?

A.   One, Cher was an active Apple employee.

Q.   And were you permitted to share confidential information with all Apple employees?

A.   Ask your question again.

Q.   Yes.  Do you believe you were able to share confidential information about Apple with all Apple employees?

A.   Confidential is a broad term I don't understand.  But second, some of this stuff was highly protected.  This includes naked photos of me. I shared --

Q.   I'm just asking you a question.  Do you agree that sharing this information with Cher was a breach of your confidentiality obligations, and you said no.  And I said why not?  And you said she's an Apple employee.  And then I said, "Do you believe that you were entitled to share all confidential information you got from Apple with all Apple employees?"

A.   I was answering your other question of why I thought it was okay, which I was not done answering, and I don't want it to appear that that was my only answer to your question of why I thought it was fine



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

sharing it with her.

Q.   Okay.   The answer number one was she was an Apple employee.   Okay.   Keep -- keep going on why you thought it was okay to share this confidential information -- this information with Cher?

A.   One, Apple employee -- engineering employee. Two, this includes stuff very protected, such as naked photos of me.

Q.   Where is the naked photo?

A.   There's one on here of my -- I don't know if you included it in this document, but it was of my, like, full chest to show that this app is fully capable of -- because it's taking -- the AI is just taking photos whenever it thinks it sees a face.   It doesn't care if you're topless.

Q.   Are you talking about the document that's on page 9 of 10?

A.   There was 68, which if you open that one it shows far deeper than what you're seeing as well. And then there was the --

Q.   When you say "68," what are you -- are you talking about 2268?

A.   Yes, ma'am.

Q.   Okay.   And you said -- you talked about naked photos.   Is the photo on 2268 what you



referred to when you said it was sharing naked photos of you?

A.   It was one of them.

Q.   Okay.  And that was a picture that you sent to Cher Scarlett; right?

A.   Yeah.  I chose one that didn't actually show my nipples because I didn't want to send my nipples to Cher Scarlett.  But I wanted her to fully understand that this app was taking a lot of photos that are problematic and it's fully capable of capturing.  And I had photos it was taking that include my nipples and other parts of my naked body.

Q.   Did you share those with anybody?

A.   I don't think so.

Q.   Okay.

A.   And then -- what was I saying?  Why it was -- oh, because we were organizing about work conditions.  I was protesting this and said I don't like this.  I want Apple to stop.  And if she was organizing with me at that time -- sorry.  I'm going to slow -- trying to help improve our work conditions, then sharing this with her for her understand -- and she seemed very upset about this as well -- was absolutely NLRA, the National Labor Relations Act, and California Labor Law, protected

concerted activity of coworkers trying to make a better workplace for themselves and their other coworkers.  And whistleblower disclosures that something is going on that seems unethical or unlawful, and there's nothing in here that's trade secret and other reasons.

Q.   And the other reasons are what?

A.   Organizing, disclosures.  Kind of an escalation.  She worked for new product security. She worked for the team that tells us everything is secret, so if she can see something like this and get upset and say that's not right, she's actually in a great position to escalate that issue to people who could, like, actually try to change stuff.  That would be great.

Nothing on it was marked, like, actual confidential or needed disclosure, not trade secret. And the photos again were taken of me by AI, so there's no legal protection for Apple there.  And if anyone owns it, it's me, and I'm complaining.  And me complaining about work conditions is protected also under other California labor protections.

Q.   Do you know if Cher was whitelisted for Glimmer?

A.   What was that?



Q.  Do you know if Cher was whitelisted for Glimmer?

A.  She indicated she had no familiarity with the app before I told her about it.

Q.  So would that answer to my question be, no, I do not believe that Cher was whitelisted for Glimmer?

A.  I have no idea.  You'd have to check in the engineering background.

Q.  But you had no reason to believe that she was whitelisted for Glimmer; correct?

A.  It's a very, like, weird question.  I don't know how to answer your question.

Q.  Do you have any reason to believe that she was -- that Cher Scarlett was whitelisted for Glimmer?

A.  I don't know how to answer your question.

Q.  Okay.  Well, you said she knew nothing about the app.  So is there any reason that you would think that Cher Scarlett is whitelisted for Glimmer?

A.  I'd have to speculate, but I could think up a lot of stuff, but that's speculation.  Are you asking me to speculate?  I can.

Q.  No.  Any reason to believe -- not speculation -- that she was allowed to review

information from Glimmer?

A.   Review information?

Q.   Yes.

A.   That's different than whitelisting.

Q.   Okay.  Well, you couldn't answer my whitelisted question.  You were totally incapable of asking it, so I'm trying another one to see if I can get to the end of it.

A.   So you're asking if she has Gobbler on her phone, so it was taking --

Q.   No.  I started off by asking if you had any reason to believe that she was whitelisted for Glimmer.  Is the answer to that, yes, no, or I don't know?

A.   That's a thing that happens in the engineering teams in the background, so I had no way to know.

Q.   So, yes, no, or I don't know?

A.   I don't know.

Q.   Okay.  Making progress.

Do you have any reason to believe that you were permitted to share Glimmer information with Cher Scarlett?  Yes, no, or I don't know?

A.   What was the term you used, "permitted"?

Q.   Yes.

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  So I don't know how to answer that question with the "permitted" term.

Q.  Okay.  You don't know what "permitted" means?

A.  I don't know what "permitted" means.

Q.  How about allowed?  Is that any better? A-L-L-O-W-E-D?

A.  No.

Q.  Okay.  Don't know what "permitted" and "allowed" mean.

Okay.  Are Apple employees allowed to share confidential information with Apple -- Apple employees who are not --

A.  I don't know.

Q.  -- who are not whitelisted to receive the confidential information?

A.  I don't know what "allowed" or "whitelisted" means in your question.

(THE PRECEDING PAGES, 66 TO 305, WERE DESIGNATED CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.)

-oOo-



**I.**     <u>**EXHIBIT I: GJOVIK DEP. (4/8/26)**</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**CERTIFIED TRANSCRIPT**

ASHLEY GJOVIK,

      Plaintiff,

vs.                    CASE NO. 23-cv-4597-EMC

APPLE INC.,

      Defendant.
_____/


VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
ASHLEY GJOVIK
VOLUME II
Pages 347 to 364


DATE:          Wednesday, April 8, 2026

TIME:          12:03 p.m. - 12:17 p.m.

LOCATION:     (All attendees appearing remotely.)

REPORTED BY:  JULIE L. ANDERSON, CSR
             Stenographic California CSR No. 11422


             Talty Court Reporters
             2131 The Alameda, Suite D
             San Jose, California 95126
             (408) 244-1900

DEPONENT: ASHLEY GJOVIK, VOLUME II                    April 08, 2026
ASHLEY GJOVIK vs APPLE INC.

::: APPEARANCES :::

FOR THE PLAINTIFF:

    ASHLEY GJOVIK, IN PRO PER
    ashleymgjovik@protonmail.com
    (415) 964-6272

FOR THE DEFENDANT:

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    BY:  MELINDA S. RIECHERT, ATTORNEY AT LAW
         (Appearing Via Videoconference)
    1000 Marsh Road
    Menlo Park, California 94025
    (650) 614-7400
    mriechert@orrick.com


- AND -

    APPLE INC.
    BY:  PHILIP J. SHECTER, ATTORNEY AT LAW
         (Appearing Via Videoconference)
    1 Apple Park Way, M/S 37-2Be
    Cupertino, California 95014



ALSO APPEARING REMOTELY:

    Theresa Majers, Videographer



DEPONENT: ASHLEY GJOVIK, VOLUME II                                          April 08, 2026
ASHLEY GJOVIK vs APPLE INC.

::: CERTIFICATE OF REPORTER :::

I, JULIE L. ANDERSON, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 11422, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing remote deposition was administered an oath remotely to testify to the whole truth in the within-entitled cause.

That said deposition was taken down remotely by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

(X) Reading and signing was not requested/offered.

Should the signature of the witness not be affixed to the original deposition transcript, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

DATED:  April 10, 2026

_Julie L. Anderson_

_____
JULIE L. ANDERSON, CSR
California Certified Shorthand Reporter 11422

would have probably tried to do it while sick had you not been doing all of the other stuff, and that was my objections and that's the motions I've filed. If Apple will agree they will not use the protective order at all during this deposition, that would relieve -- or after -- a lot of my anxiety and PTSD, which is exacerbating the illness, you blaming me. I'm maintaining my case, which otherwise I would lose it and I'd continue to be homeless forever, insolvent forever if this case is dismissed, Melinda, is not a valid argument.

Q. Okay. So I cannot commit not to use the protective order in this case because I have a number of questions to ask you about your employment, and if any of those questions I believe yield confidential information, then I will not be able to agree not to issue the protective order.

A. And I asked you in email to tell me beforehand some kind of definition of what you think confidential is so I can avoid any possible terms that you had said, and you refused to respond to that. You provide no clarification. You provide no guardrails on that. So how am I supposed to proceed with that, Melinda?

Q. So under the protective order, as you well



know, we have the right to designate things as confidential.  You have the right to object.  And then the magistrate judge will decide if those were confidential or not.

A.  You designated whistleblower disclosures, NLRB charges, me protesting criminal conduct by Apple that Apple confirmed again by National Institute of Health this morning is formally under investigation for violating human research laws by everything you're doing right now, all the motions you filed, Melinda.  You are under investigation by the federal government for violating human research laws for the thing you're defending right now, and you want to talk to me about stuff that you're saying right now you may tag as confidential and want months of gag orders against me about -- based on Apple's unilateral unsigned designations claiming stuff that is public protected crime victim testimony is somehow secret and I should be sanctioned, held in contempt, have my lawsuits dismissed, and worse, for even protesting it.  And now you want to talk for at least four more hours to do even more of it and you're blaming me.

Q.  You brought this lawsuit.  We have not sought to sanction you --



A.   Your client fired me --

(Simultaneous speakers.  Reporter admonition.)

BY MS. RIECHERT:

Q.   You brought this lawsuit.  We have not sought to sanction you.  We have not sought to hold you in contempt.  We have simply sought to enforce a protective order that you agreed to and signed and then violated.

A.   You requested to have the entire lawsuit dismissed based on that.

Q.   I have not seen a motion for Rule 11 sanctions --

A.   It was in a footnote --

(Simultaneous speakers.  Reporter admonition.)

BY MS. RIECHERT:

Q.   Okay.

A.   Melinda, what do you want to do today?

Q.   I do not want to go forward if you are not well enough to go forward because then the testimony will not be -- you'll later claim that the testimony was not valid.  So if you're not ready to go forward, which it sounds like you're not, we will suspend the deposition at this time.  I disagree



**J.** **EXHIBIT J: GJOVIK DEP (4/28/26)**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--o0o--

ASHLEY GJOVIK,                    )
                                  )        **CERTIFIED TRANSCRIPT**
        Plaintiff,                )
                                  )
    vs.                           ) Case No.: 23-cv-4597-EMC
                                  )
APPLE, INC.,                      )
                                  )
        Defendant.                )
_____)


VIDEOTAPED DEPOSITION OF ASHLEY GJOVIK

VOLUME III

Pages 365 to 624


DATE:  Tuesday, April 28, 2026

TIME: 11:09 a.m. - 4:23 p.m.

LOCATION: REMOTE VIA ZOOM


REPORTED BY:     Karen Ferguson, CSR
                 Certified Shorthand Reporter #5970
                 TALTY COURT REPORTERS
                 2131 The Alameda, Suite D
                 San Jose, California 95126
                 (408) 244-1900

APPEARANCES

FOR THE PLAINTIFF:  ASHLEY GJOVIK

    By:  ASHLEY MARIE GJOVIK, IN PRO PER
    (415) 964-6272
    Ashleymgjovik@protonmail.com

FOR THE DEFENDANT:  APPLE, INC.

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    By:  MELINDA S. RIECHERT, Attorney at Law
    1000 Marsh Road
    Menlo Park, California  94025
    (650) 614-7423
    Mriechert@orrick.com

-AND-

    ORRICK, HERRINGTON & SUTCLIFFE LLP
    By:  RYAN D. BOOMS, Attorney at Law
    2100 Pennsylvania Avenue NW
    Washington, D.C. 20037
    (202) 339-8400
    Rbooms@orrick.com

-AND-

    APPLE, INC.
    By:  ISELA PEREZ, Attorney at Law
    1 Apple Park Way, M/S 37-2BE
    Cupertino, California  95014

THE VIDEOGRAPHER:  THERESA MAJORS



DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

I, KAREN L. FERGUSON, CSR No. 5970, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision;

That the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

(  ) Reading and signing was requested.

(  ) Reading and signing was waived.

(XX) Reading and signing was not requested.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 1st day of May, 2026.

KAREN L. FERGUSON, CSR No. 5970

DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

(Whereupon, Defendant's Exhibit No. 37 was

marked for identification.)

THE WITNESS:  All the objections I made prior about your --

ATTORNEY RIECHERT:  I know.  We have a standing objection.

THE WITNESS:  But also these are things that I have my own exhibits of the same content so I don't understand why you're doing duplicate authentications of these documents.

ATTORNEY RIECHERT:

Q.  Is this a post that you made on Twitter -- the document I have marked as Exhibit 37 is called Twitter Post 4?

A.  Twitter Post 4.  And these are all exhibits in Yannick Bertolus' deposition.  There's no point for you to do a duplicate authentication of these. I don't understand why you are.

"Apple's Global Security team" post -- sorry -- go ahead.

Q.  Okay.

So Mr. Bertolus cannot authenticate the exhibit.  Only you can.

So is this a post you made on Twitter?

A.  Yeah, I did during that deposition -- yes,

this is a post I made on Twitter.

Q.  And is this the partially nude photo that you were referring to that was taken by the Glimmer app?

A.  No.

ATTORNEY RIECHERT:  Okay.

I'm now going to show you Twitter Post 5.

(Whereupon, Defendant's Exhibit No. 38 was marked for identification.)

ATTORNEY RIECHERT:

Q.  Is Twitter Post -- oh, I'm probably not sharing it yet.

Do you see the document we marked as Twitter Post 5, which is Exhibit 38 to this deposition?

A.  I'm sorry -- this document says -- what's this up at the top?  I don't know what the stuff at the top is.  It looks like some kind of app printing stuff out.

And then the thing you're sharing has multiple Twitter posts on it.

Q.  Okay.

My question is, are these Twitter posts that you made?

A.  Yes, I made those.

Q.  Okay.

A.   Oh sorry.  Sorry.  You asked that before you scrolled down.

There's a third one from someone I don't know who that is.  I didn't make that one.

Q.   Okay.

You made --

A.   You wanted to differentiate which ones I made versus what someone else made?

Q.   No, I can see your name and I can see the pictures.

All right.

So none of these is the partially nude photo that you were referring to earlier; correct?

A.   Correct.

Q.   All right.

A.   Objection to harassment.  Irrelevant.  Foundation.

What are you doing right now, Melinda?

Q.   I'm -- have you produced in this litigation a copy of the partially nude photograph that you took with your Glimmer app?

A.   I did not take the photo.  The Glimmer app -- Apple's application -- took many photos -- many photos.  I did produce at least one, yes.

Q.   Okay.

DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

And it wasn't any of the ones we've seen today?

A.   No.

Q.   Okay.

And were you using your phone when you took that partially naked picture of yourself?

A.   I did not take pictures of myself.  The Gobbler Glimmer app designed by Apple takes pictures without my consent or knowledge and stores them on my device and I'm only able to see them later.

Do you want to rephrase your question?

Q.   Yes.

Were you using your phone when the Glimmer app took the partially naked picture of you?

A.   I don't know because it takes them in the back with no notification.  I don't know what I was doing when it takes photos.  It takes them when I'm not using it as well so there's no way to differentiate.

Q.   So did you not have to unlock the phone in order for it to take the pictures?

A.   Correct.  It took pictures while it was locked and the screen was black with no notification.

Q.   So you would have the phone in your purse or somewhere and it would be taking pictures?



A.  If it thought it saw a face -- probably not in the purchases -- but any time it thought it saw a face was the way that Apple phrased it.  It would take -- Mr. McKeon called them sequences -- it wasn't just photos because it was videos or sequences -- and gather additional data whenever it thought it saw any face in front of it, even if it was off and locked.  Sorry -- not off like powered off, but screen off.

Q.  And was one of these photos that you sent to Zoe Shiff (sic) the one of you drunk making pirate faces?

A.  I don't know if I was drunk.  That was a description I made of a silly face it captured of me because it's taking pictures when you don't even know it -- these sequences -- it caught a lot of silly faces and so I described it as drunk making pirate faces was the facial expression in that photo.

Q.  But you don't know if you were drunk at that time?

A.  No, I don't know.

ATTORNEY RIECHERT:  Could you mark -- put in the chat, Ryan, the document that's 07056.

THE WITNESS:  Go ahead.



ATTORNEY RIECHERT:  I'm marking that as Exhibit 39.

(Whereupon, Defendant's Exhibit No. 39 was marked for identification.)

ATTORNEY RIECHERT:

Q.  Is this a photo that was taken using the Glimmer app on your phone?

A.  Well, technically McKeon testified that it's not the Glimmer app that takes the photos actually so we should clarify that.

I wasn't aware how it worked.  He indicated there's processes in the background that capture these sequences in videos -- he doesn't call them photos.

And the Glimmer and Gobbler app is so you can view the stuff that is being taken was how he explained it so the -- it would be more technically appropriate to say whatever -- and he didn't know what processes were capturing these sequences.

So this was a sequence captured on my phone then viewed through the Glimmer/Gobbler app of my arm from my phone.

Q.  Okay.

So given your re-definition of it, is this a photo that was taken on your phone using the

sequence captioned app?

A.   This would be a screen shot of the viewing feature in the Glimmer/Gobbler app of the sequence captured from whatever background process automatically captures these sequences on my device, but I did not take this phone -- or take this -- it's not a video and I didn't take the sequence. It's the Apple's technology that captures the sequences.

Q.   Did you send this image to anyone?

A.   Yeah.

Q.   Who did you send it to?

A.   I'm pretty sure I sent that to Zoe and probably other reporters, too.

Q.   Anybody else?

A.   Government -- I believe that -- that specific image was included in several government filings, including to the White House.

Q.   Anybody else?

A.   That's also on blog posts -- that's a blog post I did with the Apple Siri Whistleblower Thomas Le Bonniec.  We did a joint blog post where he was complaining about Apple's secret Siri recordings and I was talking about the secret Gobbler sequences and I believe that image is included in that blog post,



too.

Q.   Anywhere else?

A.   Probably in more.  I don't recall.

ATTORNEY RIECHERT:  Ryan, could you put 07060 in the chat, please, and I'm going to mark that as Exhibit No. 40.

(Whereupon, Defendant's Exhibit No. 40 was
marked for identification.)

THE WITNESS:  I just want to object again.  I remembered how you're supposed to do this.  It's request for authentication, Melinda.  You just send a document asking for request for authentication. There's no point in using a deposition for this.

ATTORNEY RIECHERT:  Okay.

Q.   The question is, is this looking at Exhibit No. 40, marked as 070- -- 07060 -- is this a photo that was taken on your phone using the sequence captured app Glimmer?

A.   This is a photo simply taken by my phone by Apple software on my phone and I don't know the technology that captures it and it was a screen shot, though, of the viewing in the Glimmer/Gobbler app of those sequences and I did the screen shot of it.

Q.   And when was that photo taken?



A.   I'm going to guess that was the images I was grabbing for Zoe so that would be August 2021.

Q.   So you took the photo -- the photo was taken in August of 2021?

A.   Oh, I don't know when it was taken.  When the phone captured it, I'm not sure what the date was.  It would be potentially on the other screen shots, though.

Are you asking when the phone captured the sequence or when I captured the screen shot?

Q.   I was asking when the phone captured the sequence.

A.   I'm not sure, but it might be on the screen shots that show the more pictures with the more data.  Some of them had dates on it.  I think you could cross-reference potentially.

Q.   When did you first realize that the phone was taking these sequences?

A.   Years prior.

Q.   And right after you got the phone with the app on it?

A.   What do you mean?

Q.   So you testified last time that you did that social study and then you got an Apple iPhone and it of the gap -- Gobbler app on it -- and my



question to you is, when did you first realize that photos were being taken using on -- using that phone?

A.   Well, that phone specifically is hard because we switched out a ton of phones and I think it was more the Gobbler app was associated with my account so it was showing up on any phone I was using because I think I testified to when I joined then --

Q.   The question is a when date.  When calls for a date.

When did you first --

A.   I don't remember.  I don't remember.

Q.   Can you give me a year?

A.   I'd have to speculate.

Q.   Okay.

You don't know if it was in -- what year it was in?

A.   I am pretty sure it was at least two years prior to 2021 because I remember complaining about it with friends -- which I testified to prior -- but I don't recall the exact -- actually, I would guess it would be maybe that around that users -- no, I don't know.  I don't want to speculate.

Q.   Okay.



And how many photos were taken on your phone using this sequence capture app?

A.  I don't know and I'd love the answer to that question.

Q.  Okay.

Did you ever look on the phone to see how many pictures were on it?

A.  You asked that last time.

Q.  What's the answer?

A.  Yes, and stuff seemed to be getting auto uploaded and so it wasn't, like, a backlog of stuff. Apparently as stuff gets uploaded then it clears out the que so you're only seeing the most recent so you don't know the, like, history of what's uploaded so I have no idea.

Q.  Okay.

How many photos did you see on the phone?

A.  I had to speculate for prior times when I went in.  When I went in to look for The Verge article and part of the video recording was me scrolling through all the photos that were taken to show how many I could see in just scrolling.  It was a lot.

Q.  Okay.

Give me your best estimate of how many photos



were on the phone?

A.   When?

Q.   Whenever you saw photos on the phone.

A.   I'm just saying it was always different.

Q.   Okay.

Give me a total number.

A.   It would be complete speculation.

Q.   You can't give me an estimate -- more than a thousand, more than a hundred, more than five, more than ten?

A.   Of, like, every time I went in and looked at from what I can recall totalling all those photos up was definitely more than 100 -- probably more than a thousand.

Q.   And what period of time did you see that photos were being taken on the phone?

A.   You already asked that.  I don't know.

Q.   Okay.

Can you give me an estimate -- was it over a six-month period, a one-month period, four-year period?

A.   Years -- ongoing.

Q.   Okay.

A.   Because I couldn't get it off.  I couldn't turn it off.  That was part of my complaint.

Q.  So over a number of years the phone was taking -- took over 100 pictures or photos; correct?

A.  More like over a thousand -- well, you're asking me of how many I saw that I specifically recall seeing which is different based on how it works how much it probably captured.  They said billions.  They said they captured billions from employees.

Q.  Okay.

The question is how many did you see and you said it was more than 100?

A.  I told you I don't recall.  It's been too long.

Q.  Okay.

So it was more than 100 and it was over years that you saw photos being captured on the phone; correct?

A.  In the hundred I'm just basing on when I was looking for Zoe so that was just one time, like, it definitely was a lot more, but if I'm not speculating then I don't know.

Q.  Well, you provided instructions on how to upload the photos?

A.  I believe so, but I believe it changed sometimes and as I repeatedly complained it seemed



mine were being auto uploaded without me doing anything.

Q. But you were provided instructions on how to upload the photos; correct?

A. I believe so.

Q. Okay.

And did you follow those instructions and upload any yourself?

A. I believe I did when I was doing user studies that required it so like I testified last time when I did the user studies for, like, a new phone or something they'd have homework in the apps. They'd give a popup of a task you have to do and I remember at least one of them had stuff with this app that having to do some uploads. I remember doing it for that some.

Q. But when it was in your house taking photos of any time it saw a face, did you follow the instructions and upload any of those photos?

A. I don't recall -- I might have, but I don't recall ever doing it unless it was required of me for some study.

Q. And the photos that I've shown you in this deposition already, do you recall following the instructions and uploading any of those photos



yourself?

A.   No, I don't recall uploading any of those.

Q.   And how long did you use the Glimmer app for?

A.   What do you mean "use it"?

Q.   Have it taking pictures?

A.   It doesn't -- remember McKeon said it doesn't take pictures.

Q.   All right.

A.   It just displays pictures taken in the background.

Q.   How long was it displaying pictures taken?

A.   It was always on my phone after that user study.  I couldn't get it off.  I couldn't stop it.

Q.   So you're saying -- still saying years?

A.   Yeah.

Q.   Okay.

And you continued to use that phone after you learned it was taking photos of you; correct?

A.   That was my only phone.  That was my work phone.

Q.   And that was the reason you continued to use it -- because it was your only phone?

A.   My work -- well, that's a bigger question.  If you want to ask about Apple's position on using

these devices.  I believe I answered this in the last deposition.

Q.  Yeah, I'm only asking if that was your -- the reason you continued to use it is because it was your only phone.

Is that what you're saying?

A.  No, I'm not saying it's my only phone.

Q.  Okay.

A.  I'm saying Apple had us living on their internal devices and I even documented business conduct tickets that I understood I was expected to be using Apple devices for everything and because it was associated with my account it was on any phone. It even tried to access my personal phone still iCloud so there's no escaping it.  It was everywhere.

Q.  Okay.

A.  And I did in 2021 based on business conduct concerns about me doing legal work at a clinic while I was working at Apple --

Q.  I don't think this has anything to do with my question.  I was just asking --

A.  Yeah, I got a separate phone.  I got a personal phone.  You -- I thought that's what you were asking about -- my two phones starting in 2021.



DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

Q.  No.

A.  No.  Okay.

Q.  Why did you sign up to use the Glimmer app on the iPad in 2019 when you knew that Glimmer was using these sequence captures to take pictures of you?

A.  I testified to that last time.  I was asked by my team who runs user studies to do the iPad user study and apparently it included Glimmer.

Q.  Did you open your Twitter account in March of 2021?

A.  Yes.

Q.  And was it a public account so anybody could look at it?

A.  I don't recall.  I was hesitant because I deleted all my social media --

Q.  Okay.

Just -- just was it public or not?

A.  I don't remember.

Q.  You don't remember.

Do you remember it becomes public at any time?

A.  Yeah, it did.  I had started posting articles so I was publishing about international law.

Q.  That's not the question.



Q.   No.

A.   No.  Okay.

Q.   Why did you sign up to use the Glimmer app on the iPad in 2019 when you knew that Glimmer was using these sequence captures to take pictures of you?

A.   I testified to that last time.  I was asked by my team who runs user studies to do the iPad user study and apparently it included Glimmer.

Q.   Did you open your Twitter account in March of 2021?

A.   Yes.

Q.   And was it a public account so anybody could look at it?

A.   I don't recall.  I was hesitant because I deleted all my social media --

Q.   Okay.

Just -- just was it public or not?

A.   I don't remember.

Q.   You don't remember.

Do you remember it becomes public at any time?

A.   Yeah, it did.  I had started posting articles so I was publishing about international law.

Q.   That's not the question.



The question is, did it become public at any time?

A.  It would have been when I posted the articles about international law.

Q.  Okay.

So when did it become public?

A.  Whenever I published those articles about international law.

Q.  Okay.

You don't know when that was?

A.  It's on the -- they're still posted on that Twitter account so whenever they were posted.

Q.  Okay.

Was it public at the time that you posted the pictures that were -- I showed I earlier that were from the sequence captured from the app?

A.  Yes.  I just don't recall if it was public when I first created it.

Q.  Okay.

And did you open the account in order to share information about Apple?

A.  No.

I would like to explain why I opened the account.

Q.  No.  I'm not -- that's fine.

Okay.

Let's see.

The next document --

A.   I actually -- I would like to say that I would like the opportunity to explain why I opened the account because Apple's made allegations related to me opening that account and has not asked me why I did so I feel like that's relevant.  I would like the opportunity to make a statement about that.

ATTORNEY RIECHERT:  No, that's not a pending question.  We're just going through my questions right now.

And so I believe the next document is 7060 -- have I got that -- done that one already.  Yep.

The next document is 07076, which I believe is Exhibit No. 41, if you could put that in the chat, Ryan.

ATTORNEY BOOMS:  It's actually 11766.

ATTORNEY RIECHERT:  Okay.  Sorry.  Thank you.

(Whereupon, Defendant's Exhibit No. 41 was marked for identification.)

THE WITNESS:  Okay.  And I just -- I want to object again.  We're almost, like, two hours in and you still haven't done any of the stuff you requested this deposition for.  We haven't talked



about harm at all.  This has all been about Gobbler which was not approved by the Court for this purpose and I continue to complain that it's out of scope and harassment and you could have just done a request for authentication for all of this stuff.

But go ahead.

ATTORNEY RIECHERT:  Okay.

So if we keep going at this rate I'm going to have to go back -- I'm probably going to have to go back to the Court anyway because you keep wasting my time.

THE WITNESS:  Objection, Melinda.  If you're going back to the Court anyways we should just stop. If you're saying right now you're already planning to go back to the Court about this we should just stop and go back to the Court because I'm going to argue that you didn't have the right to ask any of these questions anyways and get them right so if you want the Court approval to do it we should just go back now -- end this and go back and bring it to the Court for the proper scope of what you want to do.

ATTORNEY RIECHERT:  Okay.

Q.  I'm showing you a document that we've marked --

A.  Melinda, I'd like an answer from you on



this.

Q.  One, one -- keep going -- one, one.

A.  Melinda, if you're already saying you're going to bring this to the Court as an issue to ask for more time I think we should stop so we'll just do that.  We can bring the dispute to Judge Westmore.

There's no point in continuing to go on when I'm arguing you did not have approval for any of these questions and the questions you're continuing to ask are things you didn't have approval for so we should just bring it to her if you're already planning on escalating this to her.

Q.  Okay.

You're just wasting time.

Please look at the exhibit that I have marked as Exhibit 41, which is 011766.

A.  Fine.  What?

What's your question, Melinda?

Q.  Is this a image that was taken using your phone using the sequenced captured app?

A.  The words you're saying don't make any sense.

Q.  I know because I'm using words that you used.



this.

Q.  One, one -- keep going -- one, one.

A.  Melinda, if you're already saying you're going to bring this to the Court as an issue to ask for more time I think we should stop so we'll just do that.  We can bring the dispute to Judge Westmore.

There's no point in continuing to go on when I'm arguing you did not have approval for any of these questions and the questions you're continuing to ask are things you didn't have approval for so we should just bring it to her if you're already planning on escalating this to her.

Q.  Okay.

You're just wasting time.

Please look at the exhibit that I have marked as Exhibit 41, which is 011766.

A.  Fine.  What?

What's your question, Melinda?

Q.  Is this a image that was taken using your phone using the sequenced captured app?

A.  The words you're saying don't make any sense.

Q.  I know because I'm using words that you used.



All we --

A.  No, you're not.

Q.  All we talked about this is Glimmer.

Is This a photo that you -- that was taken on your phone?

A.  It was taken by my phone.

Q.  Okay.

Is this a photo that was taken by your phone?

A.  Yes.

Q.  Okay.  Thank you.

When was it taken?

A.  I don't know.

Q.  Okay.

Did you send it to anyone?

A.  Definitely sent this one to Zoe and shared this one with folks.  This one I shared a lot.

Q.  Okay.

And with whom did you share it?

A.  The same list as the prior ones.

Q.  Okay.

The reporters?

A.  Reporters, yes.

Q.  Government agencies?

A.  I believe so, yes.

Q.  Anyone else?



A.   Well, of like this version or the version Verge posted or other versions of it?  This one was --

Q.   I'm showing you this exhibit and I'm asking you if you sent this exhibit we have marked as Exhibit No. 41 to anybody other than reporters and government agencies?

A.   Oh, like, the entire thing?

Q.   No, this exhibit.

A.   Yeah, I know, but this is where you need to clarify because of these I just took the picture out and redacted the other stuff and if you're talking about all this other stuff on the bottom two, that changes the answer who I shared stuff with.

Q.   Okay.

So first you said you sent this exhibit to reporters -- to Zoe, reporters, and government agencies; correct?

A.   But if you're talking about a version where it has all the, like, words and stuff on the bottom --

Q.   That's what's on this exhibit.

A.   Then those I shared less, like -- when I did a blog -- well, this is why I'm continually asking you to clarify exactly what you're talking



about when you're sharing this stuff and you kept

objecting and not letting me ask that clarification.

So if you're -- if you're talking about this

whole thing, then no, I wasn't, like, blogging the

stuff with the text.  I was just extracting

the photos and sharing the photos.

Q.  Okay.

So am I correct that you did not share this

exhibit as it looks with anybody?

A.  No, I shared with Zoe and probably

reporters.  Like I said, the reporters want to

authenticate and make sure the stuff's exactly what

you say it is.

Q.  So with respect to Exhibit No. 41 you

shared this entire exhibit -- including the writing

at the bottom -- with Zoe and other reporters;

correct?

A.  Zoe and probably at least a couple other

reporters, yes.

Q.  Okay.

And other than that did you share it with

anybody else?

A.  I might have shared it with government

agencies.  I'm not sure.  But wouldn't have --

probably wouldn't have published -- again, because

it was all about the photos, not the text, I wasn't

really publishing stuff with the text on, like,

blogs or public complaints.

ATTORNEY RIECHERT:  Okay.

And, then, Ryan, can you put the next document

in the chat.  It's going to be Exhibit 42.

And this is 12-4921 plaintiff's production.

(Whereupon, Defendant's Exhibit No. 42 was

marked for identification.)

THE WITNESS:  Okay.

ATTORNEY RIECHERT:  Okay.

Q.  Is this a photo taken by your phone?

A.  There's multiple photos and a video.

Q.  Okay.

Are these photos taken by your phone and the

video?

A.  Do you mean are these photos and video

taken by my phone?

Q.  Okay.

A.  Yes.

Q.  Photos and video taken by your phone?

A.  Yeah.

Q.  Okay.

Did you share these photos and video with

anyone --

A.  Yeah.

Q.  -- as it appears here in this exhibit?

A.  I believe this is -- is this the text message with Cher?  I don't recognize the number.

Q.  So do you believe that you shared this document with anyone?

A.  I just said yes and I said --

Q.  Okay.

A.  -- I don't recognize the phone number. This might be the text message I had with Cher Scarlett.

Q.  Okay.

Anybody else besides Cher Scarlett that you shared this information with?

A.  These information -- you mean these photos and the video?

Q.  Yeah.

A.  Possibly.  I don't remember, though. Co-workers probably.

Q.  Okay.

Like who?

A.  I don't recall.  It's been five years.

Q.  So other than Cher Scarlett you don't remember anyone that you shared these photos and video with; is that correct?



it was all about the photos, not the text, I wasn't

really publishing stuff with the text on, like,

blogs or public complaints.

ATTORNEY RIECHERT:  Okay.

And, then, Ryan, can you put the next document

in the chat.  It's going to be Exhibit 42.

And this is 12-4921 plaintiff's production.

(Whereupon, Defendant's Exhibit No. 42 was

marked for identification.)

THE WITNESS:  Okay.

ATTORNEY RIECHERT:  Okay.

Q.  Is this a photo taken by your phone?

A.  There's multiple photos and a video.

Q.  Okay.

Are these photos taken by your phone and the

video?

A.  Do you mean are these photos and video

taken by my phone?

Q.  Okay.

A.  Yes.

Q.  Photos and video taken by your phone?

A.  Yeah.

Q.  Okay.

Did you share these photos and video with

anyone --



A.   Yeah.

Q.   -- as it appears here in this exhibit?

A.   I believe this is -- is this the text message with Cher?  I don't recognize the number.

Q.   So do you believe that you shared this document with anyone?

A.   I just said yes and I said --

Q.   Okay.

A.   -- I don't recognize the phone number. This might be the text message I had with Cher Scarlett.

Q.   Okay.

Anybody else besides Cher Scarlett that you shared this information with?

A.   These information -- you mean these photos and the video?

Q.   Yeah.

A.   Possibly.  I don't remember, though. Co-workers probably.

Q.   Okay.

Like who?

A.   I don't recall.  It's been five years.

Q.   So other than Cher Scarlett you don't remember anyone that you shared these photos and video with; is that correct?

A.   I only recall Cher Scarlett because you guys have made that a defense argument and brought it up yourselves.

Q.   Okay.

It's not responsive to the question.

Is there anybody -- any other co-workers --

A.   Well, I just want to be fair that the only reason I remember --

Q.   Okay.

I didn't ask you that question.

The question is do you remember sharing with any other co-workers other than Cher Scarlett?

A.   I remember sharing the information.  I just don't remember exactly with who.

ATTORNEY RIECHERT:  Ryan, could you put the next document in the chat, please.

This is going to be Exhibit No. 43.

ATTORNEY BOOMS:  Melinda, could I just have a moment?

ATTORNEY RIECHERT:  Yeah.

Why don't we take a break.

ATTORNEY BOOMS:  Thank you.

THE VIDEOGRAPHER:  Off the record at 1:01 p.m.

(Off the record at 1:01 p.m.)

(Resumed at 1:07 p.m.)



DEPONENT: ASHLEY GJOVIK, VOLUME III April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

THE VIDEOGRAPHER: This is the beginning of Media File No. 4.

We are back on the record at 1:07 p.m.

ATTORNEY RIECHERT: Okay.

I've put in the chat and marking as Exhibit 43?

THE REPORTER: 44, I believe.

ATTORNEY RIECHERT: Okay. 44.

A text with Cher Scarlett.

THE VIDEOGRAPHER: I had 43.

ATTORNEY RIECHERT: Okay.

Let's do 43 because I think I was going to mark another one and then I'm switching topics.

(Whereupon, Defendant's Exhibit No. 43 was marked for identification.)

ATTORNEY RIECHERT:

Q. So looking at Exhibit 43, is this a copy of texts you had with Cher Scarlett?

A. There's strange yellow overlays on it that I don't know what they are that don't look familiar at all.

Q. Okay.

Other than the yellow overlays is there -- are these texts that you had with Cher Scarlett?

A. I mean, I don't want to authenticate something that I don't -- I don't know who went in

and was highlighting stuff and changing the colors, so no.  Whatever this is has been modified.

Q.  Okay.

Other than the yellow overlays, so other than the fact that there is yellow on this document, is this something you sent to Cher Scarlett?

A.  I mean, someone went in and put boxes over text and changed colors over colored things, so do you have a copy of this that has not been artificially modified?

Q.  I do not.

A.  I don't think this is even the copy that you produced because --

Q.  If you look on the bottom right-hand corner --

A.  Yeah, I know.  I think someone went in after and was messing with it and adding a bunch of stuff.

Do you have the original version?

Q.  This is the one I have.

Let me know -- other than the fact that there's yellow on it -- is this a copy of the text that you had with Cher Scarlett?

A.  I would prefer if you could remove all the stuff people added -- the annotations and stuff.



Q.  I'm --

A.  I can't authenticate this in the form it's at.  Like, if you were to introduce this as is I can't authenticate that because I didn't do all this yellow overlay stuff and the modifications and notations.

You need to find the original version.

Q.  I've asked you -- this is the version I have.  I've asked you to ignore the fact there's yellow on some of the words.

Is this the text that you sent to Cher Scarlett?

A.  I mean, if it's admissible evidence you should send me the actual copy of it without a bunch of annotations and overlays.  I'm not going to authenticate something -- I don't even know who went in and did that.

There's initials on it that are -- what does this say -- something like NXM or something.  I don't know who that person is.

Q.  Can you answer the question, please?

A.  I can't authenticate this in the form it's at.  If you're asking me for -- if you're just asking me of, like, generally does this look like it I can answer it, but if you're doing this for



document authentication this isn't a proper document. You need to have one without someone's modifications on it.

Q. Okay.

I've asked you to ignore the yellow highlights.

Is this a text you sent to Cher Scarlett?

A. I can't do a document authentication of a document where someone's modified it so if you -- I need you to clarify -- are you asking me for formal document authentication?

And if so, I'm going to say I can't authenticate that. I don't know who's modified this.

If you're just asking me generally I can answer.

Q. Okay.

I'll ask you generally then.

A. Generally, this looks like texts that I had with someone named Cher -- Cheryl Stewart at the time I had the text messages. She later changed her name to Cher Scarlett.

Q. Looking at page -- let's see -- page -- the Bates number is 2268.

Are you there?

A. Yeah.

Q.  Okay.

Is this the document -- is this picture you were referring to when you said there was a partially nude photo of you?

A.  When did I say that?

Q.  I don't know.  You've said it lots of times in this litigation that the phone -- there was a picture on the phone taken by the phone that had a partially nude -- had a nude picture of you and now we've clarified it's a partially nude picture of you and so the question is, is this the partially nude picture of you that was taken by the phone?

A.  So just to clarify I've complained multiple times that it was taking naked photos of me generally and then what I wanted you to clarify was what specific one you were talking about.

So if you're talking about the specific one we were talking about earlier that I shared with Zoe, correct, I did not share a completely nude photo with a reporter -- a partially nude photo.

This looks like a cropped version.  When you share photos on the messages app it will show, like, a cropped version in the app, but if you click it it shows a larger version.  This looks like the same photo I shared with Zoe to my recollection.

Q.  And it looked like this when you shared it when her; correct?

A.  That's the iPhone screen shot version.  I believe it had slightly more content.  I can't remember.  I thought I had redacted the version I sent Scarlett, but I don't remember.  I don't have access to this.

Q.  So when you referred in this litigation to the fact that the phone took a nude or partially nude photo of you, you were referring to this photo; is that correct?

A.  No, there was lots of photos.  This was the one where specifically we were referencing my conversation with Zoe about me sharing one with her and then with the one with Cher Scarlett this is, to my recollection, that specific photo we were talking about.

Q.  Okay.

Do you still have the other photos that were nude or partially nude?

A.  That's all on that work device I had to give back to Apple and whatever they uploaded and I requested production of the photos Apple has of me and they have refused to produce those.  I believe there's a lot of them that they have, but they



refuse to produce them to me.

Q.   Could you listen to the question, please.

A.   Sure.

Q.   Do you still have the nude or partially nude photos that you claim were taken by the phone?

A.   Your question says "still" which indicates, like, I had them and got rid of them or something.

Q.   Well, you said they were on the phone.

A.   Then they're automatically uploading and then they erase from the phone after they automatically upload.

Q.   Okay.

So that's why I was saying do you still have the pictures that were on the phone of you that were nude or partially nude?

A.   This was the one I could find from the batch that hadn't been automatically uploaded and wiped.

Q.   And do you know when that picture was taken?

A.   I believe it's on the screen shots that had the dates, but I don't recall off the top of my head.  I think it might have been, like, April.

Q.   Of which year?

A.   2021.



ATTORNEY RIECHERT:  Okay.  Okay.

I think we skipped over -- maybe not.

All right.

Ryan, could you put up the 07066 in the chat.

ATTORNEY BOOMS:  I don't think we're doing that one, Melinda.

ATTORNEY RIECHERT:  Okay.

ATTORNEY BOOMS:  I think we're on -- I'll put the next one in the chat.

ATTORNEY RIECHERT:  Thank you.

THE WITNESS:  Oh, I'm sorry.  I want to clarify my last answer.

ATTORNEY RIECHERT:

Q.  Yes.

A.  So looking at the one you shared -- that one we're looking at -- when I say it's not showing the full part because it's cropped in that preview it does show the top of the nipple and I had said "more boobs nip removed" so I had redacted the top of the nipple.  I do recall the one I sent her I put a black box over the top of the nipple because you could see the areola on it, but you can't see that on the cropped preview of what was in the text message because they do a square smaller version and I said "more boobs."  I don't remember what I sent

her prior to that because I don't have a copy of all of these.

Q.   And did you -- did you have the phone in front of you when you were taking that photo of -- the partially nude photo?

A.   I didn't take any of these photos.  Apple's software took these photos.

Q.   Okay.

Did you have the phone in front of you when Apple's software took that partially nude photo?

A.   What does in front of me mean?

Q.   I don't know.  It's the opposite of back and side.

A.   Well, it takes a photo whenever it thinks it sees a face -- Apple's documentation says -- so if it took a picture of my face it thought it saw my face.  I would have been in front of the phone.  But that doesn't mean -- I don't know if I was using it. I don't know if it was unlocked.  Most of these photos seem to be taken when it was locked and without notification.

Q.   Okay.

So did you intentionally take that photo?

A.   No.

Q.   Did you intentionally have the phone take



the photo?

A.  No.

Q.  Okay.

You just found it on the phone when you were looking through the photos on the phone?

A.  Correct.  And that's what I was complaining.  It was taking all these photos and storing them and I had no control over it.

ATTORNEY RIECHERT:  All right.

Let's look at the next exhibit which I think is going to be No. 44.

And it's a text message.

(Whereupon, Defendant's Exhibit No. 44 was marked for identification.)

THE WITNESS:  And I also just want to note we're now nearly two-and-a-half hours in and you still have not even started asking me about harm which was the premise of your request for this deposition.

ATTORNEY RIECHERT:  I know because you're wasting so much time.  We could have got through these ten exhibits --

THE WITNESS:  No, that's not why.  None of these were approved for your -- and you've been asking bad questions.  They're framed in ways that

the photo?

A.  No.

Q.  Okay.

You just found it on the phone when you were looking through the photos on the phone?

A.  Correct.  And that's what I was complaining.  It was taking all these photos and storing them and I had no control over it.

ATTORNEY RIECHERT:  All right.

Let's look at the next exhibit which I think is going to be No. 44.

And it's a text message.

(Whereupon, Defendant's Exhibit No. 44 was marked for identification.)

THE WITNESS:  And I also just want to note we're now nearly two-and-a-half hours in and you still have not even started asking me about harm which was the premise of your request for this deposition.

ATTORNEY RIECHERT:  I know because you're wasting so much time.  We could have got through these ten exhibits --

THE WITNESS:  No, that's not why.  None of these were approved for your -- and you've been asking bad questions.  They're framed in ways that

DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

had to be rephrased.  And you spent 30 minutes trying to say you can't even have the deposition at all, despite the Court ordering you to have it just like we're having it, other than you asking stuff that is non-scope.

So you haven't even started your deposition you asked for, Melinda, and that's on you.

Go ahead.  What's your question?

Q.  Okay.

Is this a text message conversation you were a part of?

A.  I'm reading it.

Q.  Okay.

A.  Yeah, this was -- I sent this.

Q.  Okay.

And who was it with?

A.  I don't remember who that phone number is. I think that might have been Adria.  Do you know who that is?  Did you look it up?

Q.  I do not.

When did you send it?

A.  So I mention the investigation with --

Q.  Okay.

When did you send it?

A.  There's no date on it, but I'm trying to

tell you if I'm mentioning to Okpo doing the investigation.  He started the investigation in July so it would have been at some point in July or August 2021.

Q.  Thank you.

The messages is in blue are the ones you wrote; correct?

A.  Correct.

Q.  And you wrote -- the last message in blue "No, as I told ER, I'm sticking around until they fire me so I can sue for the most money"; correct?

A.  I did say that which was great oversimplification of feedback I had been giving Okpo themselves about my concerns about the investigation and Apple's handling employee complaints.

ATTORNEY RIECHERT:  Next document, please, Ryan.  It's production four, No. 135.  Should be Exhibit 45.

(Whereupon, Defendant's Exhibit No. 45 was marked for identification.)

THE WITNESS:  Okay.

It's a Slack -- iMessage with Slack quotes.

ATTORNEY RIECHERT:  Okay.

Q.  Is this a Slack message that you were a

part of?

A.  Sorry -- do you want to know who this is with -- I know who the person is.

Q.  Okay.

Who is it with?

A.  Anthony Yvanovich.  He's a senior manager and software engineer.

Q.  Okay.

Is this a Slack message that you were a part of?

A.  This is a text message thread with an embedded Slack message and I was part of the Slack message, yes.

Q.  Okay.

And it was sent June 8th of 2021; correct?

A.  That looks correct.

Q.  Okay.

And messages in blue are the ones you wrote; correct?

A.  Yes.

Q.  And you wrote "Give me my money b's.  I earned it"; correct?

A.  Yes.  I sent that, which again, was an oversimplification of the dispute I was having with employee relations.

Q.   And then you wrote "I want my exit package"; correct?

A.   Correct, again, as an oversimplification of a dispute I was having with employee relations.

ATTORNEY RIECHERT:   Ryan, could you put the next document which will be Exhibit No. 46 in the chat.

(Whereupon, Defendant's Exhibit No. 46 was marked for identification.)

ATTORNEY RIECHERT:

Q.   This was Exhibit 17 from the last session of your deposition.

A.   Okay.

What's the question?

Q.   Okay.

These are images from your Twitter account from August 30th, 2021; correct?

A.   There's two posts.  One of them has images. One of them has a link -- or a re-Tweet of a shared article.

Q.   And you said "Not fired yet"; correct?

A.   Where?  I didn't say that anywhere in these posts.

Q.   Okay.

A.   It appears you're referencing my profile --

my Twitter profile at that time on August 30th.  My profile looks like said "Apple senior engineering manager," in quotations, "'not fired yet,'" exclamation point.

Is that what you're referring to?

Q.  That is correct.

A.  That was apparently my profile at the time, yes, August 30th.

Q.  Okay.

And when did you add "not fired yet" to your Twitter bio?

A.  I don't recall exact.

Q.  You don't recall when you added it is what you're saying?

Did you answer the question?

THE REPORTER:  Looks like she froze.

ATTORNEY RIECHERT:  Yeah.

Do you need a break, by the way?

THE REPORTER:  No, I'm fine.

ATTORNEY RIECHERT:  Okay.  Great.

Ryan, can you put 2721 -- is that the next one I'm going to ask about -- or do we need -- can we skip all of that.

ATTORNEY BOOMS:  I can put that in.

THE WITNESS:  Can you hear me, Karen?

ATTORNEY RIECHERT:  Yeah, we can now.  You were frozen.

ATTORNEY BOOMS:  Actually, let's -- we can move to the next one.

ATTORNEY RIECHERT:  Okay.

Could you put in the chat, please --

THE WITNESS:  Sorry -- did you get the last part I said that I had been telling reporters -- can you hear me?

ATTORNEY RIECHERT:  Yes.

Q.  I did not get the last part.

A.  I --

Q.  Can't hear you.

(Zoom technical difficulties with audio.)

THE WITNESS:  Internet issues and it looks like my phone had just died.

Can we take a minute for me to get my charging cable to charge my phone so I can use the hotspot?

ATTORNEY RIECHERT:  Sure.

THE VIDEOGRAPHER:  Off the record at 1:24 p.m.

(Off the record at 1:24 p.m.)

(Resumed at 1:29 p.m.)

THE VIDEOGRAPHER:  This is the beginning of Media File No. 5.

We are back on the record at 1:29 p.m.

DEPONENT: ASHLEY GJOVIK, VOLUME III                    April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

ATTORNEY RIECHERT:

Q.  Switching topics now.

Did you file a claim with the Department of Labor?

A.  California or Federal?

Q.  Federal.

A.  Yeah.

Q.  August 29th; correct -- 2021?

A.  That sounds right.

Q.  Okay.

Why did you file it on that date?

A.  Kind of a strange question.  I don't know exactly why.  Did you want to rephrase that question?

Q.  No.

A.  Do you want to phrase, like, why did I file it generally?  I don't think I have an answer for why that date.

Q.  Okay.

What prompted you to file that in -- on August 29th, 2021?

A.  So as I'd been speaking out about what was going on with my dispute with Apple I had a lot of people reaching out to me and sharing their own experiences and giving me warnings of pitfalls they

ATTORNEY RIECHERT:

Q.  Switching topics now.

Did you file a claim with the Department of Labor?

A.  California or Federal?

Q.  Federal.

A.  Yeah.

Q.  August 29th; correct -- 2021?

A.  That sounds right.

Q.  Okay.

Why did you file it on that date?

A.  Kind of a strange question.  I don't know exactly why.  Did you want to rephrase that question?

Q.  No.

A.  Do you want to phrase, like, why did I file it generally?  I don't think I have an answer for why that date.

Q.  Okay.

What prompted you to file that in -- on August 29th, 2021?

A.  So as I'd been speaking out about what was going on with my dispute with Apple I had a lot of people reaching out to me and sharing their own experiences and giving me warnings of pitfalls they

had in litigation with Apple and one of them was not filing stuff within statute of limitations and they missed out on a lot of the legal remedies.

So I wanted to make sure I was -- and I Tweeted about this actually -- I posted on Twitter as I was doing it and said that was the reason -- I was making sure I filed everything, that I didn't leave any legal options and so I -- that's when I filed -- the two-day period I filed with US Department of Labor, there was SEC, filed a formal complaint with EPA and California EPA of and some other agencies, too.

Q. And was it because somebody told you shortly before that that you had to be careful about the statute of limitations -- that's what prompted you to file it -- file them?

A. Asked and answered.

Q. Okay.

You may answer the question.

A. I already answered.

Q. Okay.

When did somebody tell you that you had to be worried about the statute of limitations?

A. I had a lot of people reaching out through August.



Q.  When is the question.  So when is a date question.

So when did somebody tell you you had to be worried about the statute of limitations that caused you to file all these charges on August 29th?

A.  Multiple people told me.  I'm trying to answer your question.

Q.  Okay.

When?

A.  So I'm saying -- I'm saying multiple people and I remember saying some things in August --

Q.  Okay.

A.  -- and I don't know what pushed the needle on it for filing that stuff at the end.  I think it was also the exchange with Okpo -- those emails I was having with Okpo -- where he wouldn't let me come back to training and wouldn't give me an update on stuff and me getting concerned that things were going to go very, very poorly very soon.

Q.  And you filed with the Federal Department of Labor; correct?

A.  And California Department of Labor.

Q.  And the Federal EPA?

A.  Uh-huh.

Q.  And the California EPA?



A.  Yes.

Q.  Also all of these August 29th or thereabouts of 2021?

A.  Or thereabouts and then I had filed NLRB on the 26th.

Q.  DLSE August 29th?

A.  That sounds right.

Q.  SEC August 29th?

A.  No, I think that was August 31st.

Q.  Okay.

EEOC August of --

A.  That was August 12th.

Q.  Okay.

And DFEH?

A.  August 12th.

Q.  Okay.

Any other agencies that you filed claims with -- besides the NLRB and OSHA -- which I'm going to get to separately?

A.  I'm thinking.  FBI.

Q.  Also August of 2021?

A.  I think that was September -- I think that was September 1st.

Q.  Okay.

A.  And I've been reporting to the EPA since



March of 2021.  It wasn't -- I just filed a formal -- formal complaint later and I called OSHA -- I think it was May or June 2021 and California EPA I believe I also -- oh, so I'm just talking about my office as well.

If we're talking about also 3250 Scott so then back in, like, 2021 and through 2021 similar agencies, but also the politicians, elected officials, mayor -- and that was end of 2020 through early 2021 and through later, too.  Other agencies -- there might be more.  I can't recall right now.  There was a lot.

Q.  Do you know if Apple knew about any of these claims that you filed with these agencies prior to your termination?

A.  Yeah.

Q.  And who at Apple knew?

A.  Well, definitely Craig Mannov confirmed that I told him I had the NLRB case.  He knew that on the 9th.

Apple's lawyers had a -- filed a notice of appearance for the NLRB cases the day after it was filed I believe, so that would be August 27th, so that would be Apple legal.

I had Tweeted about filing all the complaints



Case 3:23-cv-04597-EMC    Document 377    Filed 05/25/26    Page 521 of 610

DEPONENT: ASHLEY GJOVIK, VOLUME III                April 28, 2026
ASHLEY GJOVIK vs APPLE INC.

as I filed them and Apple's indicated they were investigating my Twitter so whoever was investigating my Twitter I assume saw my post about filing the charges.

Apple's EHS team and legal team were aware of the EPA complaints.  The production's shown that.  EPA notified them I was making complaints and talking to EPA.  And that was back in, like, April 2021.

And Mr. Bertolus testified at his deposition he was aware for months about the EPA complaints.

Let's see -- Mr. West was aware of the EPA complaints and talking to politicians and elected officials when we were Tweeting about the mayor specifically.

And I had included all those prior complaints, too, in the issue confirmation that went to Okpo, but it was also filed in business conduct ticket, and was sent to the executives in HR and legal, so they would have seen all of that.

The later complaints were more about concerns about retaliation for protection activity, but the protection activity was well documented well before the leave.

Q.  Since you left Apple what lawsuits have you



Is that what you're referring to, or is there a document that says how much hours you spent on the externship?

A.  I believe the paperwork for the externship had actual hours spent, but I'd have to go back and look for it.

Q.  Okay.

So what else were you doing while you were in law school and doing this externship between the time your employment ended and May or June of 2022?

A.  I -- between May or -- that's a very specific time and I already said I don't recall the specifics so can we have a more generalized timeframe or are you specific to --

Q.  Yeah.

You said you graduated from law school in May or June of 2022.

So I'm looking at the time between you stopped working at Apple and May or June of 2022 when you graduated from law school what else were you doing during that time?

A.  I mean, if you're asking me what I was doing, like, in 2022 generally I might have a better answer.  This is -- it's been, like, five years ago and that's given me specific boundaries, but I know

in 2022 I was applying for jobs and trying to interview for jobs and I was -- that's when I was dealing with all that Cher Scarlett lawsuit stuff, too, and gag orders, which was really traumatic.

And there were articles published accusing me of stuff which I find as false and defamatory.

Oh, I also sent a notice to New York Post threatening them with litigation, but I didn't file it over those articles.

Q.  Who are the articles by?

A.  New York Post wrote the worst one and then there was another one by Apple Insider following up accusing me of horrible stuff and publicizing the restraining order Cher Scarlett got before it was overturned on appeal and once it was overturned on appeal they refused to retract or correct or update and those articles were coming up at the top of the search results for my name, which made it very difficult for finding work, in addition to all the other articles accusing me of being a leaker and other things that people generally don't like hiring when those associated with someone's name.

So I had been trying to network and get work and in 2022 I did get that the job at GreatFire and was working with them.  I believe that overlapped

when I was finishing law school.

And I was trying to do advocacy about my complaints about my concerns about Apple and just doing some interviews and articles and stuff.

I was suffering greatly, though.  I was extremely depressed.  I gained a ton of weight.  I think I gained about 60 or 70 pounds in 2022 and felt very debilitated.  I was not able to function like I normally do.

Q.  You said you were applying for jobs.

Have you provided us with all the documents that you have with respect to your applications for jobs?

A.  I've sent you guys a lot of them.  I don't know if that's all of them.  If you want every single one I'd have to go back and check and make sure I'm not missing anything.

Q.  So what did you do to apply for jobs during this period while you were in law school?

A.  So that's where I -- it's more difficult for me to answer your questions with that time constraint because it's fuzzy -- it was a really long time ago -- and I'm not entirely sure what exactly was before or after without referencing documents.  So I can't answer you directly on that



with a time frame you're providing.

Q.  Okay.

So what did you do to look for work without a timeframe?

A.  Yeah, I had a bunch of applications on LinkedIn and I know I produced for you guys the list of, like, stuff submitted and that should have dates on it, too.

So I was submitting applications.  I was using the open for work profile on LinkedIn for years.

When anyone reached out I was trying to talk to them, see if there might be opportunities.

I applied directly on websites as well.

And if there was ever any opportunity to have an interview I tried to do that.  I had several that I went through the interview process with.  It always came back to Apple, though.

And the ones that got close it was kind of a comment of, like, after the stuff with Apple ends try again.

Everyone seems pretty afraid of Apple's lawyers -- kind of honest about that -- which was really demoralizing and frustrating, but I kept trying.

And I was trying to, like, network and I was



also trying to get some, like, better articles about me because for all that time you search my name and everything at the top was just really horrible, horrible stuff and I was fairly certain that, like, when I got close and stuff HR just Googled my name and saw those articles then stopped it.

It was also really hard having to do an application -- why did you leave your last, like, full-time work and having to say I was fired and if they ask why, you know, Apple's reasoning because that makes you unemployable, but I kept trying.  I was trying and trying and trying.

Q.  Okay.

So you said you submitted applications on LinkedIn; is that correct?

A.  Yeah, and directly on company websites, too.

Q.  Let's start with LinkedIn.

Who did you apply for jobs at LinkedIn?

A.  I produced records of the applications.  I don't recall off the top of my head.

Q.  So if I wanted to see who you applied to on LinkedIn I could look at the documents you produced?

A.  Yeah.

Q.  Okay.

And no other information on jobs -- applications you applied to on LinkedIn other than what's in the documents; is that correct?

A.   That should be correct.  They keep a list of what you apply through -- oh, sometimes they'll route you to another, like, website to submit so if I did that I might have a separate thing, but of the ones that I applied directly through LinkedIn that list should be complete.

Q.   And what companies websites did you apply to?

A.   I produced those records, too.  The -- the ones that I got furthest on interviews -- Access Now was one I applied and I did get several interviews with them, but they ended up passing.  I'm pretty sure because the Apple stuff -- we had talked about that -- it was going to be complicated.

And then AFL-CIO had a position for AI ethics related to labor and I had several interviews with them on that, but, again, there was a concern about the Apple litigation.

Q.   Any company websites that you applied to other than what's in the documents you produced?

A.   There might be.  There might be more.

I tried saving copies whenever I applied, but I



don't think I saved all of them and I don't know if I have produced all of them yet.  If you guys want all of them I can go back and search.

Q.  We want what was requested in the document requests.

So with respect to Access Now, when did you have those interviews?

A.  I think that was 20- -- early 2023, but I'm not certain.

Q.  And what type of job was that?

A.  It was around technology ethics and responsibility so holding tech companies responsible for common good public policy concerns.

Q.  Where was that job located?

A.  I can't remember.  It might have been remote.  I think most of them were remote because they had people all over the world.

Q.  And how much would you have been paid if you got that job?

A.  I can't recall.  It might have been in those documents or they might not have disclosed it yet.

Q.  Did they ask you why you left Apple?

A.  Yeah -- yeah, we talked about it.

Q.  And what did you say?



A.  Explained that I had done a bunch of whistleblowing and that Apple had retaliated and they were saying they fired me for leaking stuff that I felt was protected disclosures and even discussed the stuff -- the Gobbler stuff -- and how I was deeply concerned about tech companies not only doing that stuff, but declaring it was secret and they could fire employees over it and that was one of the reasons I was so interested in working in this field.

And there was general agreement with everyone I talked to that Apple's position was untenable and unlawful and it was right for me to speak out that I did and it was an unlawful termination.

But they're still the public stuff about that and the ongoing litigation and they knew before I understood that Apple would be subpoenaing -- requesting records of any future employer -- which is apparently very invasive and they don't like that.

Q.  And how do you know that?

A.  Because Apple's now subpoenaed the Northeastern records and upon researching if I could object to that at all -- often you can't -- and that now explains to me why many of them were -- I was



getting responsive yeah, we'd hire you, but after the litigation ends and I had not fully put together what that entails and now I am fairly confident that was them trying not to get subpoenaed by Apple and harassed by Apple's lawyers, which is understandable.

Q.  They didn't tell you that?

A.  No, but there was an "after the litigation ends" was stated a couple of times from different parties.

Q.  So Access Now told you that they would hire you after the litigation ends?

A.  Access Now did not say that because they -- they were trying to do some interviews.  We vent through several interviews.

Q.  Okay.

A.  They did not tell me the exact reason why.

Q.  I'm focusing on Access Now right now.

A.  Okay.

Q.  Okay.

So you told them that you'd been unlawfully terminated and all the things you've said.

Did they say why they didn't offer you the job?

A.  They never told me exactly why, but we had discussed concerns that I also had that Access Now



needs to be able to work in partnership with these big tech companies when they're trying to get them to reform and if I was in adversarial positions with one of the large ones it could complicate things, especially based on Apple's history of kind of going scorched on some stuff and freezing out parties and that I didn't want to bring risk to Access Now if Apple was to retaliate against them for my -- the dispute I was having with Apple.

Q.   Is that what you told them or is that what they told you?

A.   That was my position.

Q.   Okay.

So you told them, hey, you probably don't want to hire me because you need to work with technology companies and I have a dispute with Apple?

A.   No, I said that I would want to have to be able to -- they talked about working with the companies, you know, being able to hold them accountable, partnering with them, and I explained that -- disclosed that Apple had been very adversarial with me and had retaliated against other parties related in my -- like Gizmodo got retaliated against for that article they wrote -- the absurd excuse article -- and that I didn't -- I wanted to

manage that and mitigate and I didn't want to introduce risk to them and was hoping we could find a role where we could do the stuff we were talking about, but it wouldn't cause problems for them with the Apple stuff and I -- they -- I don't know what -- why they passed.  I think they said they found someone with a longer history working in that type of role.  I don't know if it was related to Apple or not for Access Now.

Q.  And you had had no history working in that role; correct?

A.  That role.  I had done relevant work, but they had very have very unique roles and most people don't have, like, a copy and paste history of whatever role it is.

Q.  But you hadn't worked in the AI ethics area; correct?

A.  I did at Apple.  I had direct experience when I worked in Apple legal and helped Apple develop their first AI ethics and social responsibility policy in 2019.  It was very on point experience.

Q.  Did you tell them that?

A.  Yeah.

Q.  Okay.



But they found someone with more experience than you -- is that what they're telling you?

A.  I'd have to go back and see if I have records, but I think it was something like that.

Q.  And how many interviews did you have with them?

A.  I think, like, five or six.

Q.  All right.

The second company that you mentioned you had interviews with was the AFL-CIO.

When was that?

A.  I think that was 2023 also -- maybe early 2023 or -- yeah, maybe early 2023 or late 2022.

Q.  And that was also an AI ethics role; is that correct?

A.  Yeah, it was.

Q.  And was that also remote?

A.  I believe so.  I don't recall.

Q.  And how many interviews did you have?

A.  I think it was three.

Q.  Did they tell you why they didn't offer you the job?

A.  Yeah, they had found someone who had worked in a role just like that before that they had worked with prior that they were going to go with, but

encouraged me to apply for other roles.

Q.  And did you?

A.  I think I applied for one other, but they -- they had a limited amount of roles opening up in that specific team.

Q.  Which was the AI team?

A.  It was, like, technology ethics intersecting with labor and focusing on, like, policy and legislative reform.  It was a new group they were developing.

Q.  When you were applying for the roles on -- through LinkedIn -- what kind of roles were you applying for?

A.  Everything I could think of.  I was doing stuff that was more typical -- engineering project manager or program manager.  I was doing stuff -- roles in, like, ethics and policy stuff.  I was legal, project manager, program manager.

I was trying to just -- and then lots of different groups, so not just, like, private companies, but NGOs and government agencies, like, I'd also done some interviews with the New York State Police doing more typical project management for their technology projects, deploying further -- their systems.

A.  Yeah.

Q.  Did --

A.  You have to.  All these applications ask you why you left whatever job and have you ever been fired and you have to answer on the application.

Q.  And did you say why you were fired?

A.  Yeah, if it asked I did.

Q.  Do you know if the Department of Labor -- New York Department of Labor asked why you were fired?

A.  I would have to go back and check.  I do remember disclosing it to them, though, because I was talking about my experience with whistleblower protection agencies as complainant.

Q.  And how many interviews did you have with them?

A.  At least -- I believe it was two and they told me the third one was going to be with HR and I had raised -- no, so I had raised the Apple stuff and wanted to make sure that I could explain it in case anyone was concerned and they said that it would be the third interview with HR and I could talk to HR and explain it and before I could have the -- and they said the next one, like, they were going to schedule it with HR, but then it was just



cancelled and they wouldn't tell me why.

Q.  Okay.

We have now gone through all the interviews you've had since your employment at Apple ended?

A.  No, there's probably more.

Q.  What other ones?

A.  Interviews -- so there's like -- there's, like, recruiting companies, too -- I haven't named all of them.  I'd have to go and look at all the records of having those, like, intake calls and them wanting to dismiss stuff on my behalf.

And I believe I talked to -- at least on the phone once -- with an AI ethics group -- I can't remember -- AI Partnership Now or AI something now. They were the one that specifically said in an email "wait until the Apple stuff is done."

And let's see -- I think there's more.  There's probably more than that.  I wouldn't say that was all, but I would need more time to think.

Q.  To the best of your recollection as you sit here today, those are all the interviews you had?

A.  No, I'm pretty sure there's more.  I just can't off the top of my head name them all.

Q.  Anything else that you've done to look for jobs other than what you described in this



A.  Yeah, and because you don't have all of them it might be easier for me just to, like, give you a group of them and say here's the ones that I think are evidence supporting it, which we cannot do on this call right now.

Q.  That would be helpful.

A.  Okay.

Q.  And, then, the other questions I have is why do you think that it was because of your complaints -- your protected activity -- that you were fired?

So why do you think the Glimmer -- the posting of the Glimmer pictures was not the reason for your termination?

A.  Yeah, is that your last question?

Q.  No, I have a -- that's the -- that's the topic.

A.  Oh, how many questions do you have under that?

Q.  I don't know.  Depends on what your answers are.

Not many -- less than a page.

A.  And then you're done?

Q.  Yeah?

A.  Okay.



Let's do it.

Q.  All right.

So -- so why do you think that it was the posting of the Glimmer pictures was not the reason for your termination?

A.  I've argued both because I'm arguing Apple's admitting officially to discriminatory reasons for firing based on that stuff, but I think the other reasons Apple did -- there's all the pretext analysis I've done they're just making up stuff after the fact.

So, like, with the Gobbler they were notified there was an article happening and asked to comment with the content of what's included.  They didn't even comment.  They clearly knew about it when it came out.  They had PR teams watching everything. They didn't say anything for a long time.  If they investigated it they were refusing to produce any records to show that investigation.  They didn't give any warnings.  They -- at the time I was fired they didn't link to any URLs or information indicating what they thought was leaking, which is extremely basic if they actually thought it was a leak -- they'd want a takedown.  They never asked for one.  It look, like, a week for them to send

something.

When they had the external law firm contact me with the here's some stuff that you violated it was very vague.  It didn't even, like, conclusively say this was the stuff.  And he also, like, responded midway being, like, oh, and I found some more later, like, just showed it was just making it up after the fact.

And then the -- that Cher Scarlett thing -- it sounds like she even wrote stuff saying she was pressured to file some complaint right before those lawyers reached out and even she said it didn't make any sense when she was filing that stuff.

And, then, Apple's position on The Verge article seems to be that I was hiding my involvement with it, even though it was my face and I was quoted by name and I was Tweeting about my involvement with it so that makes so sense whatsoever.  I wouldn't be concealing it while saying I did this so that was just, like, you know, doesn't make any sense.

And, then, the article itself was about employees organizing about privacy rights, which is super protected, which is why I'm, like, if Apple wants to say that's what fired me, sure, because that's just admitting to an unlawful motive or

termination.

And, like, I said I had checked with, like, Adria was one of the people I talked to, like, this can't be confidential, right -- it's a picture of my face -- and complaining about misconduct can't be confidential.

And Apple was clearly really upset about all the stuff I was doing even months prior to that so it doesn't make any sense why I -- there would be, like, an exit outcomes slide deck about me before I even posted any of that stuff, or why there's all these business conduct tickets saying I'm being investigated for things like talking to the New York Times about workplace safety and COVID well before any of this and then that being what I'm fired for.

And, then, the timing with the EPA inspection and concealment that there was an inspection and then covering up all the cracks in the floor that I had been recording all before this -- like the timing of that is super damming so just if it's all the pretext boxes of making stuff up later for some kind of justification and similarly, like, claiming that I was fired for asking to have stuff in writing because of an NLRB complaint, when apparently they say they were wanting to talk to me about those

posts.  That's just -- it's wild.  That's a wild thing to say.

And he admitted that he was going to try to claim anything I said was, like, confidential and secret and I couldn't even tell NLRB, which is, like, unlawful, too.

So it's just, like, layers of pretext and unlawfulness and admissions of the unlawful intent and anyone that, like, saw that article and the content being shared, your action was generally just ridiculing Apple.

Like that was the Gizmodo article of Apple wanted her fired.  It settled on an absurd excuse. It was Gizmodo's title based on Apple's justifications, so it's just, like, openly ridiculed by the public, which is another pretext bucket there.

And the other ear thing was added later -- the ear scans -- that that was already public information.  Apple itself had disclosed that. Apple ended up dropping that.

And then the sexual harassment thing that just came out that Bertolus said he fired me because I reported sexual harassment and that he thought it was misleading because he thinks I wanted to sleep

with his friend and then was lying later I didn't want to have sex with his friend so he was, like, personally upset about it.

Like, one, that's not an unbiased decision-maker if he's, like, upset about me rejecting his friend, but then admitted he didn't even know it was about his friend -- it was about the sous chef -- because Apple legal was showing him the conversation without the actual context, but claiming my version was without context.

And just the recurrent theme of, like, Apple legal and global security curating whatever is shown and, like, removing context and information and apparently, like, choreographing this whole thing looks incredibly suspicious I think is my answer.

Q.  Okay.

Do you think you had the right to post that image from the user study?

A.  There's no -- that wasn't a user study.

Q.  From the Glimmer application?

A.  Yes.

Q.  Okay.

And it was more than a picture of you in it; right?

A.  There were multiple pictures posted.  It

was generally me, the house -- my house -- my living

room behind me.  I think my dog was in a couple.

Q.  But it also shows how information about how

the Apple camera works; correct?

A.  No.

ATTORNEY RIECHERT:  All right.

Why don't we end at this time.

I don't think I have anymore questions.

I don't expect to have to take this to the

Judge.

So you can go to your meeting and I'll --

A.  Melinda, look, team work.  We did it.

Q.  We'll see.

A.  Okay.

Q.  All right.

A.  Okay.

I'm still going to raise the thing about the

errata sheet, but I'm glad we're done with this.

Q.  Okay.

A.  And glad me made it through it.

ATTORNEY RIECHERT:  That's good.

All right.

Let me talk to Karen about when I can get my

rough.

THE WITNESS:  Okay.

**K.**    **<u>EXHIBIT K: U.S. DEPT. OF LABOR INTERVIEW (11/8/21)</u>**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

----------------------------------x

ASHLEY GJOVIK, an individual,       :

                   Plaintiff,       : U.S. D.C. Case No.:

  v.                                : 23-cv-4597-EMC(KAW)

APPLE INC, a corporation,           :

                Defendant.       :

----------------------------------x

Telephonic Conference Call

U.S. DEPARTMENT OF LABOR

Occupational Safety and Health Administration

Seattle Regional Office

Whistleblower Protection Program

INTERVIEW OF ASHLEY GJOVIK

Case Number: Apple Inc./Gjovik/9-3290-22-051

Date: Monday, November 8, 2021

Taken via Zoom videoconference

**CERTIFIED**

Court Reporter:

KATHERINE SCHILLING, RPR

CA CSR No, 14163

A Court Reporting Transcript by Epiq

(10:05 a.m.)

ASSIGNED INVESTIGATOR:  Okay.  Ashley.  Do you understand that you're being recorded?

MS. GJOVIK:  I do.

ASSIGNED INVESTIGATOR:  Thank you.  And I need to make you aware that this is a federal investigation, and it is illegal to intentionally provide false information to a federal investigator.

Can you please confirm with a "yes" that your answers will be truthful to the best of your knowledge?

MS. GJOVIK:  Yes.

ASSIGNED INVESTIGATOR:  Thank you.  Today is November 8th, 2021.  It is approximately 10:05 a.m. Pacific time.  [Audio redacted].  I am speaking to Ashley Gjovik, and she has filed a complaint against Apple.  And she is on speakerphone.

Ashley, I just want to make sure I have the most accurate contact information for you on file.  So for mailing address, I have 1050 Benton Street.  And is this a unit number, 2310?

MS. GJOVIK:  Yes, apartment number.

ASSIGNED INVESTIGATOR:  Got it.  Santa Clara, California 95050?

MS. GJOVIK:  Correct.

ASSIGNED INVESTIGATOR:  Okay.  And when was your hire date with Apple?

A Court Reporting Transcript by Epiq

MS. GJOVIK:  February 23rd, 2015.

ASSIGNED INVESTIGATOR:  And what was your position title?

MS. GJOVIK:  Engineering Project Manager.

ASSIGNED INVESTIGATOR:  Can you briefly describe for me what your job duties and responsibilities entailed as an engineer project manager?

MS. GJOVIK:  Yeah.  So this is a different role than the one I was terminated in.  Do you still want to know the details of the original one?

ASSIGNED INVESTIGATOR:  Oh, let's go with: What was your title when you were let go?

MS. GJOVIK:  Yeah.  I was a Senior Engineering Program Manager.

ASSIGNED INVESTIGATOR:  Okay.  And what were your duties for that role?

MS. GJOVIK:  So this was something, because I had none.  This was an ongoing discussion with my -- I had a co-manager situation, and they thought it was a feature that I didn't have a job description because they kind of treated me as a chief of staff.  I reported to a director and then also his boss, a senior director.  It was a very big org, like 700 people.

And I was kind of a consultant for the executive team.  I managed projects and programs, whatever they decided.  It was a mix of things.  Sometimes it was engineering, sometimes it was employee engagement, or inclusion and diversity or communications.

ASSIGNED INVESTIGATOR:  Uh-huh.

A Court Reporting Transcript by Epiq

MS. GJOVIK:  Sometimes I was just a fixer going on in other people's stuff and sorting it out and improving processes.  That's the closest I've come for a comparison, I guess, is a chief of staff.  But my title was Senior Engineering Program Manager.

ASSIGNED INVESTIGATOR:  Okay.  And where -- where were you working?  Where the location of the building?

MS. GJOVIK:  My desk was at 825 Stewart Drive, Sunnyvale, California.  Also known as the TRW Microwave Superfund site.

ASSIGNED INVESTIGATOR:  Okay.  And I know you briefly mentioned this, but sounds like you had a few managers you were reporting to.

So who was your -- did you have, like, one immediate manager?

MS. GJOVIK:  My immediate manager was David Powers.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  He was the Director of Mac Systems Quality.  And then I also had work assigned -- at least half my workload by his boss, Dan West who was Senior Director of Product Systems Quality.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  And if it matters, I was terminated by his boss, who I barely had a conversation with ever, Yannick Bertolus.

ASSIGNED INVESTIGATOR:  Can you spell that, if you know the spelling?

MS. GJOVIK:  Y-A-N-N-I-C-K. B-E-R-T-O-L-U-S, I think.

A Court Reporting Transcript by Epiq

ASSIGNED INVESTIGATOR:  And do you happen to know his title?

MS. GJOVIK:  Vice President of Product Integrity.

ASSIGNED INVESTIGATOR:  Okay.  Thank you.

MS. GJOVIK:  Yeah.

ASSIGNED INVESTIGATOR:  And when you were employed, were you a union employee?

MS. GJOVIK:  No.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Someday I hope tech companies will have unions, but we are nowhere near that today.

ASSIGNED INVESTIGATOR:  Got it.  And do you -- I know you mentioned you're currently going through law school, but do you happen to have an attorney that's representing you in this matter?

MS. GJOVIK:  I have an attorney for the employment matter, but not for the government stuff.  I've been doing the government stuff myself.

ASSIGNED INVESTIGATOR:  Okay.  Okay.  So what I wanted to focus on first, and it seems like to me based on the information that I read, is that the crux of the safety and health concern that you were reporting was regarding this vapor intrusion.  So I want to focus on that first.

MS. GJOVIK:  Okay.

ASSIGNED INVESTIGATOR:  So can you please explain where specifically did you notice the cracks in the floor?

MS. GJOVIK:  So I never saw them, but I've gone through photos.  I had other people looking.  I was notified

A Court Reporting Transcript by Epiq

by Apple that there were cracks in the floor, but -- so did you read the timeline, the play-by-play about how this all kind of came about?  Or should I give you a little briefing about this?  Are you familiar with the Superfund program and, like, the practice of it?  Or should I give you a little background?

ASSIGNED INVESTIGATOR:  So yeah, I'm familiar with the Superfund program.

MS. GJOVIK:  Okay.

ASSIGNED INVESTIGATOR:  I did read your timeline, but I think it would be good to -- if you can give me a brief overview of how --

MS. GJOVIK:  It's so complicated.  Yeah.  So with the Superfund program, in practice, and where -- you're Oakland?

ASSIGNED INVESTIGATOR:  I'm in Seattle.

MS. GJOVIK:  Oh, okay.  So no, no.  We can do a bit of background.

So Silicon Valley, there was a ton of dumping by these defense contractors and the silicon companies in the '70s and '80s.  Like, it was literally just sometimes they'd pour these toxic chemicals out their backdoor.  And they didn't catch until, like the mid-/late-80s that, you know, it was so much pollution.

And there's this stuff called groundwater, so it's the water in the ground.  And if you pour past

the soil, these chemicals will get into that groundwater. And it's kind of like a like -- it's not really a lake, but a lake under the ground. And when it gets those chemicals in it, it can spread as far as that water goes. And so they realized in the late '80s that Silicon Valley was just this, like, toxic mess, and that's when they petitioned to get 26 Superfund sites declared. And there's 580 chemical clean-up sites too.

I mean, it's not that big of an area either, so it's a lot. They're everywhere. To that point, just because something is a chemical clean-up site doesn't mean it's bad. I mean, I'd prefer it wouldn't be, right? But it depends on the oversight, the clean-up, the mitigations they've done.

So I knew that my office was a Superfund. Apple never told me, but when I moved into it in 2017 to join my current team, one of my good friends, she grew up in the area next to my building. And she was like, "You should know…"

Because mine is bad enough that there are articles about it. Like, NPR articles and The Atlantic and stuff with, like, pictures of my building because that area is so bad. And I was, like, "Oh, that's not good."

But it wasn't until last year when I got really sick in the apartment complex, it was just built on a bunch of this, but I really learned the intricacies of

what is proper mitigation, what is not, what questions to ask. So I had just been kind of -- you know, I assumed people were doing the right thing with my office. But in March of this year, we get an email saying our environmental health and safety team wants to test our office for vapor intrusion. And vapor intrusion is when those chemicals that are under the ground start evaporating and they can push up into, like, the basements and the pipes and stuff of these buildings and get into the indoor air.

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: So generally the government consensus, which I find not ideal, but whatever, realpolitik, is as long as the toxic wasteland under the building is sealed enough that the air probably won't get into the building even though it's evaporating into, like, the outdoor community air, then it's probably fine.

So them sending that email, "We want to vapor intrusion" is like, "We want to test to see if toxic chemicals are in the air of your current office." And I'm, like, "Follow-up questions." Because I had been there since 2017, January 2017. I'm like, "Were you not doing this before?" Because they have to go in with, like, very special approvals every time they want to get into our office because we do really secret testing R&D stuff. "Secret" I mean as in the sense of, like, you know, new computers and stuff. So we have to be IP-secret.

A Court Reporting Transcript by Epiq

So this was the first time I had ever seen a request like that come in.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  So I was like, "Was there an incident that caused you to want to do this?  What is going on?"  And that's when -- you know, and I replied to the email chain, which was me and then the management team.  And my boss, within a week was, like, telling me, "You freaked people out.  Don't tell them it's a Superfund site."  He said, work with EHS and him, but, like, don't tell anyone else about my safety concerns.

And I'm, like, "Wait, wait.  Labor laws."  So when I say "labor laws" and stuff in some of those emails, I'm like deliberately just, "You guys, labor laws.  This is the basement of labor laws.  You can't say this."  But I do end up asking to meet with the Environmental Health and Safety team to ask them questions.  Because through my experience last year, I learned how to read all the government documentation and figure out what seems reasonable, what doesn't, at least as like an armchair expert.

And so they agreed to meet with me.  And I asked them for a couple weeks, because I downloaded a ton of the government documentation; that site has been around for a while.  I was reading through it and found that there had been, like, over a decade of vapor intrusion with toxic chemicals in the indoor air

of that office; it was vacant. And then Apple decided to lease it, did a little bit of clean-up. They did a little more remediation. Did very limited testing.

So on these Superfund sites, they are supposed to -- well, supposed to; no one really dictates it. But, like, the ideal is you're going to do this -- they call it a Summa canister. And it should do 24 or 48 hours, or maybe a week, of testing. Because these chemicals, when they come up from the ground into the air, they can rise and fall at different times during the day.

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: So you want a longer period that you can test and monitor to see just how bad it is.

So Apple only tested it 10 hours, which doesn't even get a full day, so completely could've missed the rising and falling. One of them, they didn't even turn off the HVAC which moves the stuff around so it dilutes it. And then they move employees in and never test again, for six years.

And so I go in, try to be nice. But, like, asking them, "This is what I saw. Can you confirm if that's accurate?" And they're, like, "Yeah, that was plan of record." And I'm bringing up, "Why don't you inform us that we're on these Superfund sites? It seems like, you know, maybe legally, like, Right to Know." And they're like, "Well, Right to Know isn't implicated because we have no proof that you're being

A Court Reporting Transcript by Epiq

exposed to the chemicals."  And I'm like, "Well, you're not testing, so you don't even know if we're even being exposed to the chemicals."  And they're like, "Well, that's a good question."  And then, you know, the practicality of "What if all of a sudden we start feeling really sick?"  And he's like, "If anything smells bad, call us immediately."  I'm like, "How would we even know this?"

So it just goes downhill from there.  They meet with me a couple more times, but eventually just say they're going to stop answering any of my questions.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Usually it was when I was asking really good questions.  And there was a whole other separate thing with retaliation going on already about that, but ...

Then it was -- I believe it was -- what is that?  May or June?  It said it in the timeline when the Employee Relations lady who I don't even know why Employee Relations was in that meeting, but she was the one that would shut it down, be like, "We're not answering more of your questions.  This meeting is over," when I've asked some really good technical questions.

She sends an email.  I don't even think she even knows what she's sending, but says, "Hey, so the guy that used to run this program for seven years is quitting Apple," just suddenly, no questions.  "And also want to know that we -- to let you know that we

A Court Reporting Transcript by Epiq

found cracks in the floor and we're going to be fixing them."  By this time, they had previously said, to the extent they were going to test the air, and then when I started asking questions, they had said now they may not actually test the air.  And I was throwing a fit, because I'm like, "The only reason you wouldn't test the air now is if you think there's evidence that there was vapor intrusion, and you don't want the evidence."  And they're like, "This meeting is over, we're not answering more of your questions."

And so the notice comes out saying that they have the cracks in the floor, and the three steps -- they are going to have a vendor come in who will fix the cracks, and then they are going to test this air.  And I have this email to them where I'm like, "Yo, would it be possible you could test before you fix the cracks?"  Because, you know, cancer monitoring --

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  -- needs to know what chemicals and at what levels.  And they said "No."

And so, like, at this point not only are they shutting me down, they seem to be obfuscating what they're actually doing.  I had been trying to talk to some of my colleagues who are also concerned because our, like, specific lockdown was like the hotspot.  And this was a big area.  So my office was TRW Microwave which is one of the Superfunds, but it's right next to two others.  And it sounds like towards

the late '80s there are groundwater plumes.  Those toxic chemicals under the ground, like, intermingled and became like a mega plume.  That's why they call it like the triple site.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And it stretches like a mile.  It's enormous.  And they've had vapor intrusion issues around the community, not just my office.  So, like, this Site, this Triple Site, it affects schools, residentials, businesses, offices, all sorts of stuff.  There was a lawsuit.  The government -- I believe it was the government that sued at least two of these companies in 2019 and there was a big settlement that they needed to do vapor intrusion testing for, like, the entire community over this one-mile area.  And they ended up having to install a bunch of vapor intrusion mitigations, like in schools.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  So, like, I'm very suspicious. Right?  You know, I understand there's a scale of risk on these sites.  Some of them might be more contained or whatever, but this one, I'm like, "You guys, you have to take this seriously.  This is a really bad one."

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And so they say they won't test the air until after they fix the cracks.  And I'm again pleading, like, "You guys, how are we going to know if where was vapor intrusion?  You're literally, like, trying to

fix it and then test so you don't have evidence that there was an issue.  And we could've been exposed to this for years."

They're, like, retaliating more and more and more, if you want the details of that separately.  But like, at this point by, like, April I kind of knew I was going to be fired.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Because I had emailed being like, "I need to talk to a lawyer," kind of feeling like, "I think Apple is going to fire me because of the way this is going."

I laugh so I don't cry, by the way, for the tone on the recording.

So I am really concerned, though, because it seems like, you know, they are misrepresenting what they're doing, if not straight-up lying.  They're intimidating witnesses, at least me.  They are -- appear to be, like, trying to either not gather evidence or, like, mess with evidence of wrongdoing.

I had started emailing the federal EPA to tattle on them pretty early on.  At least telling her about the, like -- you know, they are telling me I can't talk to people about my safety concerns.  And, you know, I appreciate the federal EPA, but the Superfund program is not the best program as far as, like, non-businesses go.  And I understand they are set up to, like, have to negotiate with the businesses to

A Court Reporting Transcript by Epiq

actually get them to do the clean-up.

So I didn't have huge expectations going into it that the federal EPA would do anything to help.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Especially after my last year experience.  But she really did not do anything.  And I expected when I said "They're telling me I can't talk about my safety concerns or say it's a Superfund."  She'd be like, "Oh, we should follow up."  No.  She was just brushing it off.  And so, okay.

And then I was telling her, you know, when these crack things came up, she had said at one point it's important for her to know if there's a change in circumstances.  And that's part of the -- what the Superfund, the CERCLA, CERCLA law I know is like -- you know, because the arguing about the stuff that happened last year and they're, like, "Whatever we approved is fine, unless there's a change in circumstances, and then government needs to come in and reassess," right?  And so cracks in the floors is exactly how vapor intrusion happens.  Like, exactly, right?

And so I'm telling her, I'm, like, "Yo, did you know there's cracks in the floor?"  And she's, like, "No."  And, like, this was when I was having the meetings with Apple, I was like, "Are you telling the federal EPA that there's cracks in the floor?  And they're not, like, "We don't have to."  And I'm like,

"Yes, you do.  It's a change in circumstances."  And they're like the whole program is voluntary.  And I'm like, "You keep saying that, but it was only like that voluntary when the building was vacant before you had humans in it."  And they're, like, "This meeting is over."

Like, it was just such a mess.  And I was so suspicious of everything they were doing, since it seemed so ... just, you know, bad intent, bad faith, covering their asses.  And through all this, I started, you know, the emails and stuff even before I knew the laws and what words to use.  I would say "fraud" and "misrepresentation," because it seemed like that's what they were doing.  They're going around, intimidating witnesses.  The fact that they won't gather this evidence seems like they're, you know, fucking with evidence, making sure that they can't be held accountable later, not telling the government the stuff they should.  It just seemed so shady.

Like, not only was it, you know, concerns about -- I'm not even at the office at this point.  Like, I'm working at home, because we're still home for the pandemic.  I'm concerned about my coworkers, but with this kind of oversight I'm concerned about just about anyone.  Right?  Like, because this site is so big.  I'm like, who is actually overseeing this?

So telling the federal EPA what's going on, it

sounded like -- so she was avoiding me, avoiding me, until I raised the concerns about the board of directors.  It helped her realize that Apple's incentives are to do exactly what they were doing, at least Ronald Sugar.  And I mentioned that I've been talking to the press.  And then that's when she's like, "Oh, we're going to go send a team to go talk to Apple."  But no one would tell me what actually came of that.

ASSIGNED INVESTIGATOR:  So I just want to back up a bit.  So is it your understanding that the cracks started happening in March of this year?  Or is that just when you were personally notified?

MS. GJOVIK:  I have no idea when they started.  I think I remember seeing them when I was back in the office.  But, you know, we left the office, like -- well, I did February 2020.  So it was a long time ago.  I couldn't remember -- I kind of remember seeing some cracks in the floor, but I couldn't, like, swear by it because it was so long ago.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  They didn't notify me of the cracks.  So they were in March, April, I think even -- I think even May, "The office is perfect.  The office is fine.  There's no reason to be concerned at all.  We don't even have to test the air now.  Stop asking your questions."  And then it was, like, that June email, I think that was early June whenever she emailed me and

A Court Reporting Transcript by Epiq

was like "By the way, there's a bunch of cracks in the floor and we're going to repair them, but don't ask any questions about it."

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  And then I'm like, "Ugh, you guys!"

ASSIGNED INVESTIGATOR:  And this is the Employee Relations that --

MS. GJOVIK:  Yeah.  Which was also really weird, again where I'm, like, you know, saying, like, "corruption" and "what the fuck are you guys doing," is apparently Employee Relations, as they told me later has nothing to do with Environmental Health and Safety.  Nothing.

So there was no real explanation of why she was even at that original meeting, let alone being the one that's like cutting me off and not letting me talk to them directly.  Because you know, I ended up escalating to her boss about all the -- like, they were -- Employee Relations was retaliating upon me.  So, like, I'm escalating to her boss, the senior manager in charge of all corporate employee relations, just, like, "What is it you people do here?  Are you just like the witness intimidation machine?  This is what it seems like."

And I was like, "Why is Jenna involved in this?  Why is she at these meetings, let alone being your goon?"  And he's like, "You know, it's not really what we normally do, but there was a lot --" he kept saying, "There's a lot of stakeholders with the

A Court Reporting Transcript by Epiq

concerns you're raising, and we needed someone to help field your complaints in the communication."

And I'm, like, "What does that even mean?" And so, like, when I -- later, when I was asking -- you know, they're doing a separate Employee Relations investigation I actually asked for of, like, "If you're going to fire me and ruin my career, at least investigate all the abuse I suffered at Apple over the last seven years." But I mean, it's tech, so tech is a hostile work environment and discrimination and all that."

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: And when we were doing that, I'm like, "What is going on with my office? Can someone tell me? Like, I'm very concerned about the safety of the people there." And they would say "Oh, we're Employee Relations. We have nothing to do with Environmental Health and Safety." And I'm like, "What was Jenna doing as the project manager for the witness intimidation?" And they're, like, "Oh, that was like a special assignment for that her." And I'm like, "What does even mean?" They never told me.

ASSIGNED INVESTIGATOR: So you mentioned that because of the pandemic you left the office in February 2020 and hadn't been back since.

MS. GJOVIK: Yeah.

ASSIGNED INVESTIGATOR: So when the issue of, you know, being notified of the cracks in the floor and the

A Court Reporting Transcript by Epiq

vapor intrusion, do you know if -- were there any employees working there?

MS. GJOVIK: Yeah. We had staff there. We actually never left, some of our team.

ASSIGNED INVESTIGATOR: Okay.

MS. GJOVIK: Which I also disagreed with for other reasons. Just general health and safety. I like, "Why, you guys? Are we really -- is our lives worth just computers?"

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: But they had a lot of staffing there. I think the bare minimum is probably like 10 people.

ASSIGNED INVESTIGATOR: Okay.

MS. GJOVIK: Back in like early, early pandemic. But they were up to, I think, like, half-staffing. And I was concerned. You know I want to know for me what I was exposed to. I was concerned for my colleagues. They also have like vendors and guests coming.

And again, though, you know, that site is really bad. TRW is kind of like one of the hotspots for that whole Triple Site.

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: So I was also concerned of, like, what is going on at the office? Because if those chemicals are into the ground, they move. It's really weird when you learn about it. These groundwaters, they like -- they can, like -- I think it's like they can move an inch a week or something. Like, it moves like a body of

A Court Reporting Transcript by Epiq

water.  So I'm like, "There's a whole community here.
There's like schools and stuff, you guys?  Like, what
is going on with this site?  You need to be on top of
this.  You could be hurting a whole community."

ASSIGNED INVESTIGATOR:  Okay.  So you said you saw pictures
of the cracks; is that correct?

MS. GJOVIK:  Yeah.  I had asked -- so I was working with
a couple colleagues.  So a manager, like, who sits
near me when we were in the office.  Mike Ertell from
the beginning.  You know, he had followed along what
happened to me at my apartment last year with this
kind of stuff.  And I had let him know when I started
figuring this out about the office.  And he was
really interested.  And, you know, I had to go, like,
"Oh, I can't talk to you now.  They put a gag order
on me."  Or "Now I can talk," and I'd try to get him
updates.

And I was trying to see -- he was also working
from home -- if he could go in -- I was up in San
Francisco at that time.  So it's like a big commute.
I had been planning on going to the office on the
5th.  I had said that a bunch of times, August 5th.
And I was going to go try and gather some evidence.
But I was going to see if he could go in too.  He
wasn't able to make time.

And then as Apple was, like, being even more
mafia to me in, like, end of July, they also -- they
sent some notice like very end of July, that they

A Court Reporting Transcript by Epiq

were going to be at the office all of a sudden on August 4th. That was the day before they knew my plan to go to the office to get evidence, not just for the sexism investigation, but for this. I told them, I'm like, "I'm going to take pictures, I'm going to -- clearly you're trying to cover all this up, but I'm going to get evidence because you can't do this. It's really messed up."

And so I see this notice that they're going to be on site on the 4th doing something. And I'm like, "Ugh, these guys!" Like, it's just coincidence they go the day before I'm supposed to be. And they suspend me on the 4th. That was the morning where they're like, "You are removed from the workplace." And I'm like, "You guys!" Well, then paid administrative leave. So I couldn't go.

So they've been on site a bunch, you know. Well, I was still getting emails. All of a sudden, from like never being on site, they were on there like every day, doing who knows what.

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: And so when I thought I might go out on the -- I think it was even, like, the day before, because it was the 3rd, and I get really worried and I text two other managers on my team who I'm close with, Simon and Eddie. And I'm, like -- well, Slack is our communication tool. But I just message them, and I'm like, "Hey, you guys. Like, I'm really

A Court Reporting Transcript by Epiq

concerned with what's going on at the office.  It seems like Apple is trying to cover up what they're doing.  Are you there right now, by chance?"  Their teams had been on site.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  "Could you take pictures of these cracks?  I'll send you the email" -- like, I sent them the emails for context of what I was asking.  And they were like, "On it!"  Like, they're going around, tracking down all the cracks.  And they're, like, "They are everywhere.  They are everywhere."  And I'm saying, "We really need to know depth, because that's one of the bigger issues is the deeper they are, the worse this could be."  And so, like, trying to be like, "Can you -- like, is there clay or something?  Can you try to get a picture of depth?  Can you do location to figure out where these are?"

And they were helping me gather -- and even on the 3rd, I showed Apple I had been having these meetings with mployee Relations.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And I screen-shared.  Because I had been telling them, I'm like, "Stop saying this isn't your problem.  What's going on is, like, super-illegal and unethical.  You guys need to intervene.  I don't know what Environmental Health and Safety is doing.  It's super messed up."  And they're, like, "That's not our job, that's not our

job."  And so I showed them, I'm like, "Listen, you keep saying it's not your job, but like I have people gathering evidence right now.  We're not going to let you get away with this."

And I showed him.  And he's like "Uh."  And then all of a sudden I'm suspended the next day.  Ugh!  But they are gathering and I have pictures and screenshots of these messages, and they had been -- like, on the 4th even in the morning, they were getting more pictures of cracks.  Because I had had a fainting spell in the office in 2019 too.  And then come to find out, you know, I had the fainting spell in Mike's office, which is near my desk, and apparently that is like the hotspot for the whole building.  That is like the vat of TCE over the building was just like, where we were sitting.

And so I'm, like, "Can you go check by Mike's office where I had been standing when I got dizzy."  And they were, they were taking pictures.  And they're like, "By the way, EHS is here with a bunch of tools."  And I'm like, "Take pictures of them too."  He said, "They're hiding in an office."  And then I was removed from the workplace.

ASSIGNED INVESTIGATOR:  So when your colleagues were taking pictures of the cracks, did -- were you able to get some sort of information in terms of what the -- how deep these cracks were?

MS. GJOVIK:  They said they didn't look like that deep.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  But I mean, that's kind of hard to tell without any kind of tools to do that.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  And the floor isn't that deep from what I had seen.  I had gone back and looked at pictures of like, you know, when it was cut open when they were whatever stuff they were doing.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And if they all over.  And my biggest concern with Apple too, because I was like, "You guys, that fainting spell was at my desk too, and they have carpet on a bunch of the building."  And I was, like, "Are you looking under the carpet for cracks?"  And they were, like, "No."  And I'm, like, "But isn't that the same, like, concrete floor under the carpet?"  And they are like, "Yeah."  And then I was like, "And it sounds like there's a bunch of cracks in the floor that you can't see."  And they're like, "Yeah."  So I'm like, "Why won't you check under the carpet?"  And they're, like, "This meeting's over."

This is why, you know, I think my gut was, like, this whistleblower -- this feels like some Enron shit.  What are you doing?  This is so fucked up. Especially when it's, like -- it's people's safety, the community's safety.  Like, it just is so

A Court Reporting Transcript by Epiq

depraved.

ASSIGNED INVESTIGATOR:  So before, you know, you were told you can't return to campus, you were suspended and later let go, do you know if they ever fixed the cracks and do the testing?

MS. GJOVIK:  I kept asking.  I would send emails asking.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And they wouldn't tell me anything.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  And I tried asking a couple of my colleagues but, you know, I was supposed to be removed from all workplace interactions too.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Which, you know, Apple tried to play it like this was like a voluntary thing.  This -- the indefinite paid administrative leave, even though I was, like, "I don't want it," and they're like "Well, you're on it."  But like, "You want it!"  And I'm like, "I don't want!"

So it felt like I was already in trouble, so I was trying to walk this line of, I didn't want to give them reason to terminate me, I guess.  But at the same time, I'm still really worried about what's going on there.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And so I checked in with a couple of the colleagues, and it sounds like they were not being informed either.  It's like Apple is going there

A Court Reporting Transcript by Epiq

on the weekends and stuff and doing stuff secretly.

ASSIGNED INVESTIGATOR:  Do you know if any other employees were reporting concerns about vapor intrusion and the cracks in the floor?

MS. GJOVIK:  So I know that Mike Ertell ended up talking to Environmental Health and Safety too.  He was concerned -- my boss even said he was concerned earlier on.  But the way that Environmental Health and Safety was doing this is they were saying, like, "Oh, don't talk to colleagues about your concerns.  Just send them to us directly so we can have a private conversation."

And I'm, like, "You A-holes!"  Like, this is what they do, we found out, with like sexism and racism concerns too and just general Employee Relations is they didn't want you talking to anyone else.  They just wanted to bring it to them, and then they tell you -- it's like Apple Confidential.  You're own trauma.  I'm like, "That's not a thing, you guys!"  Like I have a separate NLRB complaint about stuff like that.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  But -- so, you know, all the people who went to them, it's possible they just went privately and then were intimidated not to talk to anyone else.  It's been on my to-do to try to do like a FOIA or something, or maybe it's a FOIA and a PRA, just to

A Court Reporting Transcript by Epiq

see if there were other complaints.

But the other big concern I had, which I raised endlessly, was Apple did not even tell you, you were on a chemical release site, let alone a Superfund. And I'm, like, "You guys!  Like, you should at least inform people."  And they're, like, "Well, you know, there's no reason for them to be worried."  And I'm like, "Well, then tell them that.  Like, you can take 15 minutes of staff meetings and explain what the Superfund program is and explain these chemical release sites.  You know, I do it on the phone with, like, journalists, it takes five minutes, and they get it."

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Like, just explain it.  And these are engineers, so if it really is something they shouldn't worry about, just explain it and they should get it.  If it is something they should worry about, then maybe you should be doing a better job of your oversight."  That's what it is.  Like -- and they're like, "No, we're not going to tell anyone."

Like, at one point they even tried to tell me I can't even tell people it was a Superfund.  And I'm, like, "It's public information.  It's public information."

So, you know, this has been one of my concerns, that if other people had health issues or concerns about Apple's oversight or whatever, they don't

even -- most of them didn't even know it was a Superfund.  Only, like, part of my management team does now, because I did that email -- sent that email saying it was, for those that don't know.

ASSIGNED INVESTIGATOR:  Mm-hmm.  And do you happen to know, does Apple own that particular building?

MS. GJOVIK:  No.  So they are leasing it.  Northrop Grumman doesn't own it either.  The SEC filings I did, it mentioned the owners who had since acquired it.  I think it's, right now, like, GI Partners or something.  It's in the SEC filing.  I filed it for just everyone that's owned this site.

ASSIGNED INVESTIGATOR:  Okay.  And so you had mentioned [audio redacted], that also ended up talking to the Environmental and Health team?

MS. GJOVIK:  Yeah.

ASSIGNED INVESTIGATOR:  So -- and do you know what specifically  he talked to them about?

MS. GJOVIK:  Not in-depth.  It sounded like, you know, he expressed too, he wants to not only have them test the air, but to know the results when they test the air.  And he's waiting to hear back on that.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Actually, when I had talked to them -- he didn't reach out to them.  When I was talking to them and I mentioned the fainting spell, I mentioned it was in Mike's office, they then followed up with

A Court Reporting Transcript by Epiq

him just under the premise of "Just checking in, in case you might have any questions."  And he, like, reached out to me, I have his email of him being, like, "Any idea why they're reaching out to me?"

And again, this feels like the witness intimidation so -- because they didn't even say, like, the premise.  It was just, "Thought you might have some questions."  And it freaked him out.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  My boss did reach out.  He said to talk to them, but I don't know if he actually did or what was said.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Because it's confidential, they say.  How is that confidential?

ASSIGNED INVESTIGATOR:  All right.  So now I wanted to move into the part about your SOX complaint.

MS. GJOVIK:  Yeah.

ASSIGNED INVESTIGATOR:  So typically, the SOX complaints that they receive are reports of securities fraud, wire fraud, or bank fraud.  So from the information that you've provided and what you've told me so far, it seems like, you know, your complaint is it keeps relating back to the safety and health concern.

So can you briefly explain to me why you believe your complaint is covered under SOX?

MS. GJOVIK:  Yeah.  So -- and, yeah, this one seems like it's more of, you know, when I run "Why SOX was

A Court Reporting Transcript by Epiq

created," I'm, like, that's why.  But when I read the details, I was, like, well, I guess it's not, like, fraud-fraud.

So through all of this, I'm, like, Apple is doing super shady shit, this seems super corrupt, early on using terms "fraud" and "corruption," "misrepresentation."  The stuff they're doing is just, like, mafia shit.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And then I realize -- I can't remember, I think it was July, and it was -- you know, I still have the documentation, but it was, I think, the EPA telling me "Oh, your responsible party for the building is Northrop Grumman."  And through separate conversation, realizing Apple's board of directors, one of the members of the board of directors used to run Northrop Grumman.  And then it kind of just like, you know, fires up in my brain.  And I'm like, "Ugh!"

Because I had been, like, wondering, why is Apple going to such great effort to cover this up, intimidate us, do such a shitty job of overseeing this Superfund site?  You know, it's not that hard to do decent work on these sites.  Why are they doing such a terrible job to just cover up all their terrible stuff they've done?

And then I say, okay, so Northrop Grumman.  So oh, Ronald Sugar.  Okay.  So Ronald Sugar, I look him

up, this guy. And he used to run TRW Microwave. And I was, like, "Oh, that's the name of my building, the Superfund name." So he used to be, like, CEO/president of TRW. My building was the California headquarters of TRW Microwave. They must have been very familiar. And, you know, the Superfund designation was in the '80s, and they were doing the clean-up in the '90s, so he must've also been very aware it was a Superfund, gnarly, had to do a lot of clean-up.

Then he becomes, like, the CEO and then president of Northrop Grumman, who is currently the Responsible Party for the contamination under my building and, you know, partially for that Triple Site mega-plume. So he did that for a long time. So he would have again been very familiar with having to clean this stuff up since it's pretty expensive. And then in 2010, he decides to join the board of directors at Apple. And he, for the last 10 years, was the chair of the Finance and Audit Committee.

And so I see that and immediately my stomach just drops and I'm, like, "Oh, my God, they are so mafia. This is Enron shit." Like, even before I realized the SOX part of this, I was just like, "This feels like Enron shit. What are they doing?" So you know, I'm digging and I'm looking through the board of directors, like, what they're supposed to do and

the Chair of the Finance and Audit Committee's outfit.

So his role, he is supposed to be the, like, ultimate oversight of risk management, due diligence. So not only would he have been involved somehow, or at least reviewed/approved, the expensive leasing of my building in 2015, because we had been there for five years. And the money that Apple had to spend in additional clean-up, because they did a lot of work to clean it up. They had to -- the building was gutted, so they had to do a full remodel. So he of course would have seen that money, that budget, been involved in it, knowing that was his little headquarters.

And again, like, from face value, when I immediately looked, what they did to, as far as, like, clean it up and the testing was, like, face value, even people who are, like, very relaxed about this stuff they're, like, "That's not enough. What? Who would approve that?" It was almost as if it was, like, "Let's do whatever we can to make sure that the results pass so we can actually lease out this gutted, empty building."

So then I'm, like, concerned of, well, that seems like a very big conflict of interest on his part. Like, okay, he's not at Northrop Grumman anymore, but he was. He's probably personally liable, and still maybe, for some of the stuff, the

A Court Reporting Transcript by Epiq

decisions they made about that site.  So I see that, I'm, like, "That's not good."  And then I'm looking up their, like, conflict of interest policy, which it sounds like they're supposed to have this charter, per the SEC, of what does this group do, and what do they do with conflicts of interest.

And it says that he's supposed to notify general counsel if there's any even potential conflict of interest.  And so I see that, and I'm bringing that up to even the federal EPA in July.  I sent the email to her with all this, being, like, "Dude, I keep telling you, Apple seems to be doing really shady shit.  They're covering this up.  They're telling people not to talk about it.  I am really concerned.  If you are just assuming they're doing the right thing" -- because this is the EPA -- I'm like, "If you're just hoping business is doing the right thing, like, please process for a minute this conflict of interest.  Like, this is so messed up!"

And that's when she was, like, "You know, what, we'll send a team to go talk to Apple about those cracks in the floor."  And I'm, like, "That would be great, thanks."

So I'm concerned about what -- like, him approving that from the beginning, maybe him wanting cover it up, you know, them -- looking at their 10-K, they say stuff about the safety of their buildings, they say stuff about environmental health and safety,

government investigations and stuff.

I'm, like, he's -- so -- and if raise concerns about, like, the oversight of this stuff, it apparently goes to not just the board of directors, it goes to the Finance and Audit Committee.  It goes to the Chair of the fund.  So me raising concern, which I did.  I filed the ticket in like, August 23rd, being like, "Yo, major conflict of interest here."  And in it, it says "Fraud, conflicts of interest."  It would have gone to him to review his own conflict of interest.  So I'm just, like, hands in the air.  And then I'm also raising concerns, because it seems like the federal EPA is being even less helpful than they normally are.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  And to be fair, federal EPA, if you're listening to this call later, that's not the whole EPA, but at least the Superfund program.  And you know what these guys do.

So I'm like, they're being extra unhelpful.  And then I remember that Apple is employing the previous head of the federal EPA.  Lisa Jackson ran the federal EPA for quite some time.  She now reports to Tim Cook.  And I was thinking -- this is July too.  And I'm, like, well okay, would she really throw her weight around?  She's doing like racial justice stuff and climate change.  Would she really throw her weight around to get the EPA to look the other way?

A Court Reporting Transcript by Epiq

And then I'm looking, and I find this article from 2016 that the California Department of Toxic Substances Control sued Apple for half a million dollars for mishandling hazardous waste.

And Apple, for their press release, pulled out this woman who's currently leading the racial justice initiative at Apple, Alisha Johnson.  And Alisha Johnson came out and said to the government, to the press "Total misunderstanding.  Apple always goes above and beyond the law.  You know, everything is fine."  So Alisha Johnson used to be the press secretary for, what, the federal EPA under Lisa Jackson.  And she now works for Apple.

Meanwhile, when I told Apple, "Why don't you tell us all it's a Superfund site?"  They told me, "We decided we're not legally required to."  And I said, "What about, like, moral, ethical, practical?"  And they're, like, "That'd be a much bigger conversation."

So they literally told me, and I have it in email I sent to them, saying they only do what is absolutely legally required.  Meanwhile, previous press secretary of the EPA now working under Tim Cook says, "Apple always goes above and beyond the law."

So again this just, like -- this feels like Enron shit.  So I don't know exactly how it goes in.  It does seem like they're making, like, the 10-K representations they're making about the buildings

being safe and them caring about this stuff seems wrong. They also mentioned stuff about, like, government investigations related to environmental health and safety, could be a material risk for finances. And then looking at their -- the charter they created for the Finance and Audit Committee, and those conflicts of interest sounds like they were not managing that at all. And they had a policy as part of that, which it sounds like is SEC required, this whole stuff they had to create. Or at least I don't know the reason why they didn't says, if you raise any concerns about auditing concerns -- I don't know if that's finance or not, it didn't say only finance --

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: -- zero retaliation policy. Absolutely no retaliation. And so I filed that complaint with Apple, Business Conduct, on August 23rd, and then I'm terminated for no reason on September 9th.

ASSIGNED INVESTIGATOR: So can you -- I'm sorry if you mentioned it, but did you reported internally this conflict of interest that you had concerns about with Ronald Sugar, when was that reported internally to the company?

MS. GJOVIK: July. I was reporting it verbally to employee relations.

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: I had brought it up in a Slack. So randomly,

not -- I didn't say "conflict of interest" yet.  But I was, like, "Did you know Ronald Sugar is on our board of directors?"

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  So, like, when I discovered it, I have in their own records, and I have screenshots of it being, like, "You guys, what the hell is going on? A quarter of Apple's board is defense contractors. What are we doing here?"  Because they have Boeing too, James Bell.

And then verbally was raising it, and I put that in the SEC filing stuff too, of I raised it to Employee Relations saying, "I want to report this. Who can I even report this to?"  And they kept telling me.  "Oh, I have no idea."  And he's a lawyer, that investigator.  But he had ideas.  He could have at least said Business Conduct.

ASSIGNED INVESTIGATOR:  Okay.  So in the interest of time, there -- I did want to talk about your termination.

So what was the reason Apple provided as to why you were let go?

MS. GJOVIK:  Yeah.  So this went down really weird too.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  So I was on this indefinite paid administrative leave.  I had been insisting that everything be in writing for quite some time now because they were, like, saying stuff verbally and then denying it later. Whatever.

A Court Reporting Transcript by Epiq

So I'm just like, "We'll only talk in writing." And he had tried to reach out, the investigator, a couple times. And I was, like, "Happy to talk, but only in writing." And he never responded. So I'm sitting there in purgatory, and it was the 9th, and I get this really weird email.

So I had tweeted something about -- I'd done an article where back in 2011, 2010, an Apple employee went to some guy's apartment in San Francisco and pretended to be a police officer and got in and was searching his stuff and threatening deportation and shit, because they were looking for a prototype. And I was tweeting like, "Oh, my God, you guys, what is going on? This is crazy!" There was a bunch of press about it back in the day. Sounds like they got in trouble. It was, like, impersonating a police officer.

And not, like, 10 minutes after I tweet this, I get this really weird email from somebody I had never met, at Apple. And the Apple Employee Relations person had only been sending to my Apple email. He refused to send to my personal, even though I kept asking. This one went to my personal.

There's no subject line. Personal email, from a guy that works in the Apple Employee Relations Workplace Violence team. And it says, like, "Urgent. Need to talk to you. Confidentiality concern. Need to get you on the phone within the hour."

And I had been warned all through this that Apple was going to try to find some IP nonsense to fire me on, and we know they have the secret police. They hire all these, like, ex-FBI, CIA people, Blackwater.  And so I see this and I'm kind of like "Oh, God, here we go."  A very vague reason, just want to get me on the phone in an hour.

I respond within like two minutes.  And I'm, like, "Hello, happy to help.  But as request, because of all the government investigations going on, would love to keep this in an email.  Just let me know when you need, and I'll respond as soon as I can."  And mind you, this is the day before my NLRB affidavit, and they know that.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Right?  They have all this stuff.  So he doesn't respond for, like, 20 minutes.  And so then I respond again, "FYI, this is the day before my NLRB affidavit.  This feels like a bit like witness intimidation.  I'm forwarding this to the NLRB investigator."  And I did send it to him.  And he's, like, "What's this about?"  And I'm, like, "Not sure. Stay tuned."  And then the guy doesn't respond, and then it's like maybe 40 minutes since the first email, and he responds.  He's, like, "Because the allegations against you are so concerning, and you refuse to cooperate in this investigation, we're suspending all of your accounts immediately."  I'm, like, "What the

hell is he even talking about?"

So -- and I respond -- again this is, like, the total time of this email exchanges is maybe an hour total. So I respond pretty quickly of just, like, "Hey, want to be explicitly clear, want to participate in this investigation. Only want it in writing because of all the government investigations and stuff." You know, "Severe -- big allegations is a -- you know, I want a good faith opportunity to be able to work through whatever concerns you have. Please let me know. Very happy to help."

Don't hear anything, anything. This is, like, 2:00 to 3:00 p.m. And then, like, 7:00 p.m. I get an email from my vice president who I've had, like, maybe two conversations with in my life, maybe. And the subject line is "Employment Status." And I'm, like, "Oh, Jesus."

So I open the email. It just says "See attached." He CC'ed HR. The letter then says, "Apple is terminating you because you violated" -- I can't remember what the exact wording is. It's in the Gizmodo article I went to. But, like, it's like "Product-related confidentiality," something about "product-related confidentiality," and "violation of Apple policies and refusal to participate in an investigation. Your last day is tomorrow. You're terminated." And I'm, like, "What the ...?"

So it sounds like they are saying that me saying I want it to be in writing because they are being investigated by the government was me refusing to participate in the investigation.  Which is, again, just like Enron shit.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  What are they doing here?  And then the confidentiality stuff, I had no idea what they were talking about.  They've never given me any idea, and I didn't get an email -- it was, like, maybe a week later I got an email from one of their attorneys, from one of the third-party attorneys, claiming that two of my tweets included stuff that violated my confidentiality agreement.

But this stuff they pointed to was like weeks old.  And we had every reason to think that they've been following every one of my tweets, because I've been tweeting their dirty laundry, so they suspended me.  Like, when I realized they weren't going to actually investigate anything, I was redacted internal -- or, posting redacted internal documents about, you know, me raising concerns about abuse and retaliation and the safety concerns and stuff.

And lots of journalists are following because it's Apple.  And everyone is, like, none of this is IP, none of this is confidential.  This is just work condition concerns or retaliation concerns.  So when I saw that, I'm like "Ugh!"

So they reached out, and they -- apparently the thought is just scroll through my entire Twitter timeline and found the two things that were closest to, like, product. And one of them, they complained about me complaining that Apple kept emailing, wanting to take detailed scans of my ears. And I was complaining, like, "Apple, no. This is -- this is really creepy. Can you stop doing this?" The emails did not say "confidential," they didn't say anything about what they were doing with them. They had previously spoken publicly that they were doing this.

So, like, that one was just, like, "What are you even talking about?" And then the second one, I had worked with a journalist to do an article a week and a half previous --

ASSIGNED INVESTIGATOR: Mm-hmm.

MS. GJOVIK: -- talking about Apple's surveillance of its employees. Like, lots of creepy surveillance stuff. And that they say that, you know, we have no expectation of privacy whatsoever. Doesn't matter if we're at home, on personal devices. Pretty much, like, "If we can and want to, we will get into all of your digital privacy stuff," which is always really bothered me. And, in fact, that's one of my newer NLRB charges, of like, "You can't do that. That's not okay."

And one of the things I raised was this internal app that tested known features, Face ID, right, and

A Court Reporting Transcript by Epiq

what it does for employees, though, is it takes pictures/videos of us anytime it thinks it sees our face and stores it and uploads it.  Doesn't matter if we're naked or in the bathroom or in bed or whatever.

And I'm, like, "I don't like this.  I can't even turn it off.  It's constantly doing this."  And so I shared pictures it had taken of me, like, in my living room in pajamas without me knowing.  And apparently sent to Apple, as it does with this.  And I, you know, redacted anything that was possibly like text or code or whatever, but they were claiming that the pictures of me taken by my phone with their spyware were somehow confidential.

And so I had told them -- I was, like, "I don't think any of this is confidential."  I did remove the tweets.  But then I hired a lawyer, an IP lawyer --

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  -- who actually won against Apple a couple times.  And I'm like, "Can you just go shut this down now?"

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Because I'm assuming with the employment lawsuit, that's what they're going to, at least after acquired evidence, and enough pretext, and it's just so nonsense.

And so he went in and wrote a letter and sent it to them that was pretty much like, "None of this is actually based in law, your allegations…"  He shot

A Court Reporting Transcript by Epiq

down everything they were saying.  That's that Gizmodo article.  I made sure one of the press changes, so Apple -- I'm like, stuck.

They sent these emails to me at like 9:00 p.m. at night too.  To get in from San Francisco.  I'm, like, there's no reason to send me harassing emails about "Don't tell people we want to look in your ear canals" at 9:00 p.m.

So they finally did stop.  But that's all I know.  And the NLRB sent notice to Apple.  So it's, like, five weeks to come up with the answer why they fired me.  I guess they finally sent it over last week.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  But, like, they clearly don't know.

ASSIGNED INVESTIGATOR:  Okay.  And so to clarify, the termination letter that you received was from that VP of Product Integrity?

MS. GJOVIK:  Yeah, yeah.

ASSIGNED INVESTIGATOR:  Okay.  And as -- do you know if he was aware of all of these concerns you were raising?

MS. GJOVIK:  I did assume so.  I'd be surprised if he wasn't.  I mean, the concerns I was raising, I had been talking to the press.  This was covered in, like, Financial Times, Bloomberg, New York Times.  And Apple is, like, obsessed with their public image.  I realized quickly they do not care about the law.  And I even told them that when I was talking to that Employee Relations manager.  I'm, like, "Clearly,

like, you don't care if I sue you."  He's like, "Nah."
And I'm, like, "You don't even care if I report you to
the government."  And they're, like, "Meh."  And I'm
like, "What if I talk to the press?"  He's, like,
"Don't do that."

So I have been.  That's what I've been doing.
That's the only thing they seem to care about.

ASSIGNED INVESTIGATOR:  Mm.

MS. GJOVIK:  And ultimately again it's, like, "Stop, you
know, abusing your employees.  Stop intimidating your
employees.  Stop covering up safety issues.  Stop
whatever this shit is going on with your board of
directors."

So I have every -- you know, it's an ongoing joke
that there's probably a team at Apple that has to read
every single tweet I make, let alone every article
that comes out.  Because I'm still talking about their
crimes and shit.  Like, I'm still exposing this stuff,
and still plan to.  So it's, you know.

ASSIGNED INVESTIGATOR:  Do you know if anyone else was
involved in the decision to terminate your employment?

MS. GJOVIK:  You know, the VP said, like, "If you need any
help returning your devices, reach out to the
Workplace Violence guy."

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  Who, by the way, I looked up on LinkedIn.
Certified in interrogation.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Insists I get on the phone with him only.

ASSIGNED INVESTIGATOR:  Okay.  All right.  And then so --

MS. GJOVIK:  I bet you hear some -- there's so much crazy shit every day with this job.  By the time people come to you, they must have the worst stories.

ASSIGNED INVESTIGATOR:  So if OSHA were to open an investigation into your complaint, what is the desired outcome or remedy that you're seeking?  And I can briefly describe what whistleblower complaints you can get as a remedy.  So it's --

MS. GJOVIK:  Yeah, please do.

ASSIGNED INVESTIGATOR:  It's very specific to you as an individual.  We call it a make-whole remedy, bringing you back to the status as if the retaliation didn't happen.  So, for example, in your case, it can include reinstatement into your position, lost wages, compensatory damages, damages for pain and suffering.  Things like that.  And if you don't know right now, that's okay.  But if you do --

MS. GJOVIK:  I mean, I definitely want the damages -- the compensatory, make-whole, any of that.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Like, you know they fired me the week before I was supposed to get my annual bonus, and three weeks before I was supposed to get an RSU vesting.  It was like $180,000 I was supposed to get, that they fired me right before I was supposed to get that.  That was another theory of why they fired me, so

I don't have money for litigation.  And then I watched, like, $580,000 of RSUs disappear.

ASSIGNED INVESTIGATOR:  Okay.

MS. GJOVIK:  Let alone, the salary -- like, I'm unemployed now.  And it's just -- yeah, and it's been so high-profile, even if I hadn't gone to the press, like, my colleagues were all watching, people knew.  It's been so embarrassing.  And because -- and I'm in a law school.  I want to become a lawyer.  Because their accusation is "I shared confidential information," they can try to take my entire, you know, career as a lawyer.

I'm about to graduate, and I had to go to the California Bar the next day after I was fired being like, "So Apple fired me for sharing confidential information, and here is why I think you should not fail my moral character exam."  Right?  Like, that's the one thing, like being a lawyer, you have to be trusted with confidential information.

ASSIGNED INVESTIGATOR:  Mm-hmm.

MS. GJOVIK:  So all of that stuff is just so bad.  The reinstatement, I'd have to think about.  Like, my gut says, I absolutely never want to go back to that place.  But also, like, I need a job.

ASSIGNED INVESTIGATOR:  Mm-hmm.  Understood.  Okay.  So that --

MS. GJOVIK:  Do you do punitive?  Do you have, like, stock -- like, at least for that CERCLA, it seemed

A Court Reporting Transcript by Epiq

like that was just a given of, like, "Don't do that, you guys."  It's literally -- and like, just egregious violation of the stuff.

ASSIGNED INVESTIGATOR:  Yeah.  So punitive damages is also a remedy that we can seek through whistleblower investigation.

MS. GJOVIK:  Yeah.

ASSIGNED INVESTIGATOR:  Okay.  Well, that's all the questions that I had for you, Ashley.  So what I was going to do was turn off the recorder and then tell you what the next steps will look like from here.

MS. GJOVIK:  Okay.

ASSIGNED INVESTIGATOR:  So I'm turning off the recorder at 11:02 a.m.

(11:02 a.m.)

                              (End of interview)

**L.**     <u>**EXHIBIT L: U.S. DEPT. OF LABOR CASE/FOIA RECORDS**</u>

**U.S. Department of Labor**   **Occupational Safety and Health Administration**
**San Francisco Federal Building**
**90 7th Street, Suite 2650**
**San Francisco, CA  94103**



**Via UPS**
December 10, 2021

Human Resources/Legal Department
Apple Inc.
One Apple Park Way
Cupertino, CA 95014

Complainant(s):  Ashley Gjovik
Respondent(s):   Apple Inc.
Case Number:    Apple Inc./Gjovik/9-3290-22-051
Law/Statute 1:   Section 11(c) of the Occupational Safety and Health Act (OSHA),  29 U.S.C. §660
Law/Statute 2:   Comprehensive Environmental Response, Compensation and Liability Act
                (CERCLA), 42 U.S.C. §9610
Law/Statute 3:   Sarbanes-Oxley Act (SOX),  18 U.S.C.A. §1514A
Regulation 1:    OSHA 11(c) Complaint Procedures:  29 CFR Part 1977
Regulation 2:    EPA Complaint Procedures:  29 CFR Part 24
Regulation 3:    SOX Complaint Procedures:  29 CFR Part 1980

Dear Sir/Madam:

This office has received a complaint filed by the above-named Complainant(s) against the above-named Respondent(s). The complaint alleges retaliatory employment practices in violation of the Law(s)/Statute(s) cited above. A copy of the complaint allegation is enclosed.

The Occupational Safety and Health Administration's Whistleblower Protection Program (WPP) is responsible for enforcing the anti-retaliation provisions of the law(s) cited above and will conduct its investigation following the procedures outlined in the regulation(s) cited above. You may obtain a copy of the law(s) and regulation(s) at: ***www.whistleblowers.gov***. Upon request, a printed copy of these materials will be mailed to you.

You have the right to be represented in this matter. If you choose to have a lawyer or someone else represent you, please have that person complete and email to the investigator the enclosed Designation of Representative form.

WPP will send most, if not all, future correspondence by email - this includes final disposition letters that include time sensitive appeal rights.

**WPP policy encourages the voluntary resolution of complaints. If you are interested in settlement discussions and/or Alternative Dispute Resolution (ADR), please contact the assigned investigator.**

This letter will confirm that Respondent(s) are responsible for retaining and maintaining all records, documents, computer files, e-mail, correspondence, memoranda, reports, notes, tools, equipment, objects, photographs, videotapes, digital video, tape recordings, digital recordings, voicemails and

recordings of radio and telephone conversations, and telephone and cellular telephone records, and all other evidence relating to the above-captioned case. The failure of Respondent(s) to maintain and retain such materials may result in court-imposed sanctions. As a party responsible for preserving relevant evidence, you may wish to instruct all individuals with potentially relevant documentation to affirmatively preserve and retain such documentation. You also may wish to suspend any routine document retention/destruction policy that you may have, including email retention policies. Please provide **within 20 days** a written account of the facts and a statement of your position with respect to the allegation that you have retaliated against Complainant in violation of the law. Please note that a full and complete initial response, supported by appropriate documentation, may help to achieve early resolution of this matter. Your cooperation is critical so that all facts of the case may be considered.

*Please send documents to WPP electronically, if possible, using the investigator's email address below and also send a copy to all named parties listed below:*

ASSIGNED INVESTIGATOR:                     COMPLAINANT(S):
(b) (7)(C)                                 Ashley Gjovik
Whistleblower Protection Program          1050 Benton Street, Apt. 2310
U.S. Department of Labor, OSHA            Santa Clara, CA 95050
300 Fifth Avenue, Room 1280              ashleymgjovik@protonmail.com
Seattle, Washington 98104
(b) (7)(C)

If the information provided contains personal, identifiable information about individuals other than Complainant, or business sensitive information, please remove this information before sending it to Complainant.

**Please be advised that any request of confidential or proprietary privilege in your submissions to WPP must specifically identify each such privilege for which protection from disclosure under the Freedom of Information Act (FOIA) is made.**

**All communications and submissions should be made to the investigator, identified above.**

Sincerely,

 
Digitally signed by (b) (7)(C)
(b) (7)(C)
Date: 2021.12.10 09:46:55
-08'00'

For Ryan Himes
Assistant Regional Administrator

Enclosures:    (1) Designation of Representative Form
               (2) Alternative Dispute Resolution FAQ
               (3) Copy of Complaint Allegation

**U.S. Department of Labor**    Occupational Safety and Health Administration
San Francisco Federal Building
90 7th Street, Suite 2650
San Francisco, CA  94103



## DESIGNATION of REPRESENTATIVE FORM

**Please Complete The Information In The Boxes Below.  Use Blue Or Black Ink.**

**Email or Fax This Form To The Assigned Investigator As Soon As Possible**

Re:    Apple Inc./Gjovik/9-3290-22-051

**The undersigned is the authorized representative of the named party below in the above-captioned matter.**

| Party's Name (Type or print in the box below) | Representative's Name (Type or print in the box below) |
|---|---|
| | |
| **Representative's Signature (Sign below)** | **Street Address or P.O. Box (Type or print in the box below)** |
| | |
| **Date (Type or print in the box below)** | **City, State, ZIP (Type or print in the box below)** |
| | |
| **Telephone (Type or print in the box below)** | **FAX (Type or print in the box below)** |
| | |

**E-mail Address (Type or print in the box below)**



**OSHA will email all correspondence including the Secretary's Findings at the conclusion of this investigation.**

**OSHA WPP REGION 9-10**
**Alternative Dispute Resolution (ADR)**
**Frequently Asked Questions**

### What is WPP's ADR program?

ADR is a voluntary program that allows the parties to resolve a whistleblower retaliation complaint outside of the investigative process. The parties attempt to negotiate a settlement with the help of a neutral WPP facilitator who is not involved in the investigation of the complaint.

### What are the benefits of ADR?

ADR allows the parties to reach a win-win resolution of the complaint on their own terms rather than let WPP pick a winner and a loser. ADR is a faster method than an investigation, which can be lengthy and involve multiple appeals. ADR may also allow the parties to preserve/repair the employment relationship.

### Is ADR Confidential?

Yes. Communications during ADR are kept confidential, to the extent permitted by law, and are not disclosed to anyone without the consent of the parties. If the complaint is not resolved during ADR, neither party may share with the assigned investigator any discussions that were made during ADR.

### What happens to the investigation during ADR?

While the ADR process is ongoing, the investigation will be put on-hold.

### Does attempting ADR delay the WPP investigation?

No. In most cases an investigation cannot begin immediately whether or not the parties are pursuing ADR.

### How do I sign up for ADR?

If you would like to pursue ADR, please contact the assigned investigator and/or check the appropriate box on the Designation of Representative Form and return it to the assigned investigator.

### How much does ADR cost?

There is no charge to participate in WPP's ADR Program.

### What happens if I want to pursue ADR but the other party does not agree?

ADR is voluntary. All parties must agree to participate. If either party does not wish to participate, WPP will proceed with an investigation.

### What happens if both parties ask for ADR?

If both parties request ADR, an WPP official will contact each party separately to coordinate a mutually-agreed upon date, time, location and format for the ADR session. If the parties agree upon a framework, a neutral WPP official will then facilitate the ADR session. If the parties reach a settlement during the ADR session, the WPP official will draft or review a proposed settlement agreement following the procedures outlined in Chapter 6 of the Whistleblower Investigations Manual. (Available at *www.whistleblowers.gov.*)

### What happens if ADR fails?

If the parties decline to pursue ADR or if the parties fail to reach a settlement during ADR, the complaint will be referred for investigation.

### Is settlement possible outside ADR?

Yes. The parties may enter into a settlement agreement at any time during the course of the investigation, but all settlements must be approved by WPP before the case can be closed.

### How can I learn more about WPP's ADR program?

Please contact the assigned investigator identified in your opening letter.

## Case Activity Worksheet

Occupational Safety and Health Administration

Run Date: 12/10/21

| Filed Date: | 08/29/21 | Local Case Number: | 9-3290-22-051 | | Activity Number: | 3057667 | Reporting ID: | 0900000 |
|---|---|---|---|---|---|---|---|---|
| Case Type: | OSHA | Statutory Implication: | CERCLA  SOX | | | | | |
| Allegation: | M - Complaint with management | | | Investigator: | (b) (7)(C) | | Assigned Date: | 11/03/21 |

| Allegation Summary: | Beginning in March 2021, Complainant reported multiple safety/health concerns to Respondent including but not limited to: vapor intrusion exposure in the building, inquiring about vapor intrusion testing, and the building being located on a Superfund site (TRW Microwave). Additionally, Complainant reported concerns that one of Respondent's board of directors, Ronald Sugar, has a conflict of interest because he was previously the CEO/President of Northrup Grumman. Northrup Grumman was the responsible party for the TRW Microwave site.

Complainant alleges that on or around August 4, 2021, Respondent suspended her employment and subsequently terminated her employment on September 9, 2021 in retaliation for participating in the aforementioned protected activities and for filing or being suspected of filing a complaint with the SEC and the EPA. Complainant contends Respondent violated her rights under Section 11(c) of the Occupational Safety and Health Act, 29 U.S.C. §660, Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9610, and Sarbanes-Oxley Act, 18 U.S.C.A. §1514A. |
|---|---|

| Respondent Information | Name: | Apple Inc. | Phones: | Emails: |
|---|---|---|---|---|
| Primary Address: | | 825 Stewart Drive | | |
| | | Sunnyvale CA 94086 UNITED STATES | | |
| Alternate Address: | | | | |

| Complainant Information | Name: | Ashley Gjovik | Phones: | Emails: |
|---|---|---|---|---|
| Primary Address: | | 1050 Benton Street 2310 | H | (415)964-6272 | ashleymgjovik@protonmail. |
| | | Santa Clara CA 95050 | | |

| Determination Date | Determination | Total Compensation | $0 | Reinstatement | |
|---|---|---|---|---|---|

I certify that the complaint was filed with me on(date):  08/29/21

| Signature | Title | Date |
|---|---|---|
| (b) (7)(C)  Digitally signed by (b) (7)(C)  Date: 2021.12.10 09:46:15 -08'00' | (b) (7)(C) | 12/10/21 |

Note:This report contains sensitive information that may not be appropriate for distribution outside OSHA. Local offices should review the information BEFORE it is provided to outside requestor.

**U.S. Department of Labor**     **Occupational Safety and Health Administration**
**San Francisco Regional Office**
**San Francisco Federal Building**
**90 7th Street, Suite 2650**
**San Francisco, CA  94103**



Sent via Kiteworks Only.

December 18, 2024

Ashley M. Gjovik
18 Worcester Sq, 1
Boston, MA 02118

Email:  ashleymgjovik@protonmail.com

Ms. Gjovik:

This decision is in response to your Freedom of Information Act (FOIA) request assigned FOIA #2024-F-03430, requesting records concerning OSHA WPP case #9-3290-22-051.  We located the records you seek (446 pages and one audio) and conducted a review of the material you requested.  We have considered the reasonable harm standard of 5 U.S.C. § 552(a)(8)(A) and have made the following release determination.

Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt . . . ." 5 U.S.C. § 552(b).  Where we have withheld pages entirely, it is because those pages contain no reasonably segregable information that may be released without creating the harm the indicated exemptions were designed to prevent.

Information is being released to you as complainant that if requested by a member of the general public, may be withheld under one or more FOIA exemptions.

We determined 212 pages may be released in full.

We determined 150 pages, and one audio may be released with personal identifying information redacted pursuant to Exemption 7(C).

We determined three pages may be released with redactions pursuant to Exemptions 5 and 7(C).

We determined one page must be withheld in full pursuant to Exemptions 4 and 7(C).

We determined five pages must be withheld in full pursuant to Exemption 5.

We determined 12 pages must be withheld in full pursuant to Exemptions 5 and 7(C).

We referred one 68-page document to EPA FOIA at hq.foia@epa.gov.

The FOIA requires that agencies generally disclose records.  Agencies may withhold requested records only if one or more of nine exemptions apply.

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  This exemption is intended to protect two categories of information in agency records: (1) trade secrets; and (2) certain confidential or privileged commercial information.  We are withholding certain privileged or confidential information pursuant to Exemption 4.  When applying this part of exemption 4, the terms "commercial or financial" should not be narrowly construed to include proprietary information only.  Rather, they should be given their ordinary meaning.

Under Exemption 4, information that is submitted to the government is categorically protected from disclosure provided it is not customarily and actually disclosed to the public by the submitter and was submitted to the government under an assurance or expectation of confidentiality.  See Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 915 (2019).  For this reason, this information is protected by Exemption 4.

Exemption 5 of the FOIA allows an agency to withhold "inter-agency or intra-agency" information that would not be available to a party in litigation with the agency.  5 U.S.C. § 552(b)(5).  As an initial matter, exemption 5 requires the agency to determine whether the documents requested are "normally privileged in the civil discovery context."  Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  One privilege available to government agencies is the deliberative process privilege.  This privilege protects confidential intra-agency opinions of governmental personnel whose disclosure "would be injurious to the consultative functions of government."  This privilege, unique to the government, ensures that personnel within an agency feel free to provide decision makers with their opinions and recommendations without fear of later being subject to public criticism.  Also, the privilege protects against misleading the public by disseminating material suggesting reasons for a course of action that may not have been the ultimate reasons for the agency's action.

Exemption 7(C) permits an agency to withhold information contained in files compiled for law enforcement purposes if production "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Thus, the purpose of Exemption 7(C) is to protect the privacy of any person mentioned in law enforcement records.  In determining whether a protected privacy interest exists, we must evaluate not only the nature of the personal information found in the records, but also whether release of that information to the general public could affect that individual adversely.  Thus, we must consider whether release of even seemingly innocuous personal information could lead to the harassment or annoyance of an individual through unsolicited inquiries.  We find that release of personal identifying information withheld here reasonably could be expected to have a negative impact on an individual's privacy.

We have determined you are a "other" requester for fee purposes under the FOIA.  The fees for this FOIA request totaled less than $25.00; consequently, all fees have been waived.

If you have any questions about this FOIA determination, please contact our office at (415) 625-2547.

You have the right to appeal this decision with the Solicitor of Labor within 90 days from the date of this letter.  The appeal must state, in writing, the grounds for the appeal, including any supporting statements or arguments.  The appeal should also include a copy of your initial request and a copy of this letter.

If you appeal, you may mail your appeal to: Solicitor of Labor, U.S. Department of Labor, Room N-2420, 200 Constitution Avenue, N.W., Washington, D.C. 20210 or fax your appeal to (202) 693-5538.  Alternatively, you may email your appeal to foiaappeal@dol.gov; appeals submitted to any other email address will not be accepted.  The envelope (if mailed), subject line (if emailed), or fax cover sheet (if faxed), and the letter indicating the grounds for appeal, should be clearly marked: "Freedom of Information Act Appeal."

In addition to filing an appeal, you may contact the Department's FOIA Public Liaison, Thomas G. Hicks, Sr. at (202) 693-5427 or hicks.thomas@dol.gov for assistance in resolving disputes.

You also may contact the Office of Government Information Services (OGIS) for assistance.  OGIS offers mediation services to resolve disputes between FOIA requesters and federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect your right to pursue litigation.  You may mail OGIS at the Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road – OGIS, College Park, MD 20740-6001.  Alternatively, you may email or contact OGIS through its website at: ogis@nara.gov; Web: https://ogis.archives.gov.  Finally, you can call OGIS at (202) 741-5770; toll-free: 1-877-684-6448.

It is also important to note that the services offered by OGIS, is not an alternative to filing an administrative FOIA appeal.

Sincerely,

GARY
JACOBS

Digitally signed by
GARY JACOBS
Date: 2024.12.18
09:04:38 -08'00'

GARY M. JACOBS
Assistant Regional Administrator
Administrative Programs

Attachments: As stated

**U.S. DEPARTMENT OF LABOR**
**Occupational Safety and Health Administration**
**Seattle Regional Office**

TO:          THE FILE
FROM:        <span style="background:black">(b) (7)(C)</span>
CASE:        Apple/Gjovik
SUBJECT:     Interview of Ashley Gjovik

INTERVIEW DATE:   11/8/21              INTERVIEW RECORDING:   Yes
INTERVIEW TYPE:   Telephone            CONFIDENTIALITY:        No
OTHERS PRESENT:  None

**INTERVIEW SUMMARY:**

Mailing Address: 1050 Benton Street Apt, 2310, Santa Clara, CA 95050
Email: ashleymgjovik@protonmail.com
Phone Number: 415-964-6272

Hire Date: 2/23/15
Job Title: Sr. Engineer Program Manager
Job Duties: Treated as a chief of staff for a big org of 700 people; consultant for executive team.
Work Location: TRW Microwave Superfund site
Address: 825 Stewart Dr., Sunnvale, CA
Supervisor: David Powers, Dir. Mac Systems Quality
Dan West, Sr. Dir. Product Systems Quality
Yannick Bertolus, VP Product Integrity

Union: No
Attorney: CP has an attorney for employment matter.

**Vapors:**

**Where specifically were the cracks located?**

CP never saw the cracks in the floor. CP was notified by Apple that there were cracks in the floor.

*Superfund background:*
Silicon Valley was dumping ground by defense contractors. Didn't catch it until mid to late 80s. Toxic chemicals went into the groundwater. Silicon Valley was a toxic mess. There was a petition to declare it superfund sites. It became a chemical clean-up site. CP knew her site was superfund site.

In March 2021, CP received an email from the environmental health safety (EHS) team that they were going to test the office for vapor intrusion. The vapors from the ground can push up into basement and pipes – get into indoor air. CP was concerned that the toxic wasteland underneath was not sealed enough. CP was concerned there was toxic chemicals in the air of the office.

CP asked follow up questions to the EHS team – was this not being done before? Was there an incident that initiated the testing? CP requested to meet with the EHS team and they agreed to meet with her. During the meeting, CP asked – why weren't employees informed the building was on superfund site? How do employees know if they're currently being exposed if no testing is being done?

CP found there was an over a decade of vapor intrusions in the building. Apple only tested it for 10 hours, not even a full day. They moved in employees and never tested again for 6 years.

In May/June 2021, RP notified CP that cracks in the floor were found and RP will be fixing them. RP said they were going to test the air after they fixed the cracks. RP told CP not to ask questions about the cracks in the floor.
CP said by April she knew she was going to be terminated.

CP starting emailing the federal EPA early on. CP believed EPA didn't really do anything.

CP left the office February 2020. CP was working from home – CP was concerned about her coworkers. She was concerned for the safety of the people there. Some of the team never left the building. There was staff in the building during the early pandemic, about 10 staff. Currently, there's about half staff.

CP was suspended on 8/4/21 and placed on paid administrative leave.

CP asked her team members to take pictures of the cracks on the floor. CP said the cracks were everywhere. It was difficult to tell the depth of the cracks without any tools.

CP had a fainting spell in 2019. The hotspot was by (b) (7)(C) office. CP's fainting spell was at her desk which is near (b) (7)(C) office.
CP asked if RP looked underneath the carpet for cracks.

CP kept sending emails if cracks were fixed, but received no response.

**Who owns the building?**
Apple doesn't own, it's being leased. Owned by GI partners.

**Do you know if any other employees reported a concern regarding the vapors?**
(b) (7)(C) ended up talking to the EHS team – wants them to test air and know the results. EHS team specifically reached out to (b) (7)(C) to see if (b) (7) had any questions. CP's boss had concerns too – wasn't sure if he actually reached out though. CP believes other people were intimidated not to talk about it. CP had a concern that Apple didn't tell people they were working on a superfund site.

**SOX:**

CP believes her complaint is covered under SOX because she reported fraud, corruption, and misrepresentation. Ronald Sugar used to be on the board of directors for Northrup Grumman and as of 2010 is on the board of directors for Apple. CP did research and Northrup Grumman was the company responsible for contamination of the building in question. Sugar is the chair for the finance committee and responsible for oversight/due diligence. CP believes there is a conflict of interest and she reported the concern internally.

**What reason did the company provide as to why you were terminated?**

When CP was on paid admin leave she insisted everything be in writing when she interacted with company personnel conducting an internal investigation.
CP tweeted an article about an Apple employee impersonating an officer.
CP received a personal email from Apple Employee Relations team to schedule a time to talk. CP responded within 2 minutes. She requested communication via email. This occurred the day before CP's NLRB affidavit – it felt like witness intimidation. The investigator told CP RP was suspending all of her accounts immediately.
On 9/9/21, around 7pm CP received an email from Bertolus – subject line was employment status. It says see attachment. Attachment said Apple is terminating CP for product related confidentiality and refusal to participate in apple investigation.

CP's tweets were allegedly in violation of confidentiality.
CP had posted redacted internal documents – regarding work retaliation concerns. She tweeted about an email which discussed scans of CP's ears. It alluded to Apple's surveillance of its employees – no sense of privacy. Also tweeted about an internal app which scans a person face and takes a video it. The video is then uploaded. CP had tweeted it. CP believed it was spyware. CP didn't believe it was confidentiality.

**Desired Outcome?**

Compensatory damages
Make whole damages
Fired week before annual bonus and before she vested.

M.    **<u>EXHIBIT M: MEET/CONFER RE: WARNER RULE 30(B)(6) DEP.</u>**

# RE: Gjovik v. Apple Inc., No. 3:23-cv-04597-EMC (N.D. Cal.) Meet-and-Confer Pursuant to Civil L.R. 37-1(a)

| | |
|---|---|
| From | Perry, Jessica R. <jperry@orrick.com> |
| To | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| CC | Booms, Ryan <rbooms@orrick.com>, Mantoan, Kathryn G. <kmantoan@orrick.com>, Riechert, Melinda <mriechert@orrick.com>, Horton, Nicholas J. <nhorton@orrick.com>, Weaver, Nicholas <nweaver@orrick.com>, Davidson, Sarah <sdavidson@orrick.com>, Perry, Jessica R. <jperry@orrick.com> |
| Date | Wednesday, May 20th, 2026 at 11:32 AM |

Ashley:

Fact discovery is closed (save for specific issues related to your alleged damages), per Dkt. 345. *See also* N.D. Cal. Civ. L.R. 37-3.

The point of a fact discovery cut-off is to move the case forward to resolution and avoid endless attempts to litigate and relitigate discovery issues. No further discovery dispute submissions or letter briefs to Judge Westmore are permitted at this stage – including "supplement[s]" of prior briefing (which would not only be untimely but inappropriately flout the Court-ordered page limits). *See* Dkt. 327.

In any event, Apple properly prepared both of its FRCP 30(b)(6) witnesses regarding the noticed topics and consistent with Judge Westmore's order.  *See* Dkt. 357 (ordering testimony on specific topics to the extent they encompassed "pre-termination issues or the termination itself"). Your accounts below of the testimony that Ms. Warner gave on May 12, 2026 are not accurate.  We reject your suggestion that her testimony "establishes pretext on the current record"; it does not. We do not agree to your characterization of the testimony or other evidence in this case, and we decline your demands below (including demands that Apple pay part of your deposition costs, or that Apple produce yet another witness).

Thank you.

**[EXTERNAL]**

Dear Counsel:

This letter initiates the meet-and-confer process required by Rule 37-1(a) regarding discovery disputes arising from the May 12, 2026 Rule 30(b)(6) deposition of Apple Inc., taken through its designee Adelmise R. Warner pursuant to the Court's Order at Dkt. 357. A second email will be sent regarding the May 14, 2026 deposition of Apple via Elizabeth Schmidt, which shared many of the issues and failures described below.

Two discovery issues are identified below. A third — the at-issue waiver of attorney-client privilege arising from Apple's reliance on internal investigations as the basis for the termination decision — is currently before the Magistrate Judge in the parties' pending final dispute resolution process. Plaintiff intends to supplement that pending submission with the events of the May 12 deposition; this letter raises that intention so the parties may also confer regarding it.

**The current record establishes pretext, and Plaintiff's position absent a further deposition**

Apple was on notice of Plaintiff's Rule 30(b)(6) deposition for nearly a year, received formal notices and subpoenas in early April 2026, and was compelled by the Court in mid-April 2026, with the federal court compelling Apple to appear and extending the discovery date for these depositions due to Apple's refusal to comply with the notice — which the Court referred to as "unreasonable" and stated Apple "knows better." The Court ordered Apple's appearance on April 22, 2026 and Apple had at least 20 days to prepare. Despite this, Apple's witness stated she was notified of her role only a week prior at most, and prepared for only two days.

The designee further testified to a series of preparation choices that left Apple unable to provide corporate testimony on its own termination decision. By her own account, the designee did not interview Megan Bowman — the author of both the Sept. 9, 2021 termination-recommendation email and the termination letter (Tr. 194–195); did not review the depositions of Mr. Kagramanov, Mr. Powers, Mr. West, Ms. Waibel, or other percipient witnesses on the topics for which she was designated (Tr. 41); did not review Apple's privilege logs (Tr. 42); did not review Apple's prior written statements to agencies about the same termination underlying this matter, including the California Unemployment Insurance Appeals Board decision finding Apple's termination notice "vague and incomplete" (Tr. 254–255); did not review Apple's own interrogatory responses in this case sufficient to identify what the term "Omega" refers to and/or has no idea what "Omega" refers to due to obstructive misconduct by Apple's counsel in codenaming the facts underlying their defense (Tr. 232–236); etc.

The result is that Apple, as a corporation, was unable on May 12 to provide substantive answers to basic factual questions about the termination Plaintiff is challenging. The designee testified that she did not know:

- how many of Plaintiff's Twitter posts formed the basis of the termination decision or which ones (Tr. 52, 76, "at least one");
- what the term "actively redacting relevant information from documents," used in Apple's internal Sept. 9, 2021 termination-recommendation email, was intended to mean (Tr. 184);
- what the term "Omega" refers to in Apple's own verified interrogatory responses (Tr. 232–236);
- the date on which Apple's legal department began reviewing Plaintiff's social media (Tr. 167–169);
- the date on which discussions of terminating Plaintiff's employment commenced, or which person or department initiated them (Tr. 115–119);
- the names of the individuals within Apple's Global Security team who reviewed or transmitted the social-media images underlying the termination decision (Tr. 69–70).

These are examples and not an exclusive list -- though we also need to start drafting and exchanging a document tracking our designated testimony in preparation for trial as well.

A corporation's designee speaks as the corporation. Her answers — including "I do not know" — bind Apple as Apple's own answers. *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co.*, 251 F.R.D. 534, 539–40 (D. Nev. 2008); *Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989); *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 622–23 (N.D. Cal. 2006); *In re Vitamins Antitrust Litig.*, 216 F.R.D. 168, 172 (D.D.C. 2003).

A corporation that cannot answer basic factual questions about its own termination decision — including how many posts formed the basis, who reviewed them, what its own internal communications meant, when its legal department got involved, and who initiated the termination — has, as a matter of law, admitted that it cannot articulate a coherent legitimate basis for the firing. That admission is itself substantial evidence of pretext under *McDonnell Douglas* and its progeny.

Plaintiff's position, absent a further Rule 30(b)(6) deposition, is that Apple's testimony on May 12 — combined with what Apple did not and could not say — establishes pretext on the current record. Plaintiff intends to rely on the May 12 transcript for that purpose.

**Plaintiff seeks:**

*First*, Plaintiff intends to seek from the Court a proportionate share of the court-reporter costs of the May 12 session attributable to defending counsel's speaking objections and resulting colloquy. Plaintiff proposes 15%, corresponding to the approximately 60 minutes of the seven-hour deposition consumed by speaking objections of more than 20 words and the colloquy they generated, in addition to the witness's inability to answer numerous questions, and obstructive conduct when asked straightforward questions (i.e., telling the Plaintiff the Plaintiff "doesn't like" the answers as a basis for refusing to answer). Plaintiff will raise this request to the Court alongside the at-issue privilege dispute and other pending issues. If Apple agrees to bear this cost voluntarily, court intervention will not be necessary.

*Second*, separately, if Apple believes its corporate position on the termination is something other than what the May 12 record reflects, Apple may cure the deficiency by producing a properly prepared designee for a continuation of the court-compelled May 12 session — to be conducted within two weeks, with a witness prepared on the matters listed above and on the topics for which Ms. Warner was designated. Because the further session would be necessary only as a result of Apple's unprepared May 12 designee, the full court-reporter costs of the continuation would be borne by Apple. If Apple declines to provide a further deposition, Plaintiff will proceed on the record as it stands. Until that is complete, the record stands as is, and further testimony may only supplement prior omissions but may not modify the substance of prior admissions.

Inadequate Rule 30(b)(6) preparation is treated as a failure to appear under Rule 37(d) and warrants both further deposition and cost-shifting. *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000); *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012); *Calzaturificio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 40 (D. Mass. 2001).

**Defending counsel's and the designee's conduct at the deposition**

Federal Rule of Civil Procedure 30(c)(2) limits objections at depositions to non-suggestive, concise form, and limits instructions not to answer to three grounds: privilege, court-ordered limitation, or presentation of a motion under Rule 30(d)(3). The advisory committee notes to the 1993 amendments make clear that argumentative or suggestive objections are prohibited, and that "[d]epositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond." This Court enforces those limits. *See Cabasug v. Crane Co.*, 2014 WL 27319, at *2–3 (D. Haw. Jan. 2, 2014); *Hall v. Clifton Precision*, 150 F.R.D. 525, 530–31 (E.D. Pa. 1993); *Plaisted v. Geisinger Med. Ctr.*, 210 F.R.D. 527, 534–35 (M.D. Pa. 2002); *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 621 (D. Nev. 1998).

Over the course of the May 12 deposition, defending counsel made 169 objections. None was a "form" objection, the only routinely recognized non-substantive objection in federal practice. *See* Fed. R. Civ. P. 30 advisory committee's note (1993). Counsel instead recurrently asserted compound, non-form grounds.

On 128 occasions, the objection extended beyond 20 words and contained substantive argument, witness suggestion, or attorney testimony. On 41 occasions, defending counsel instructed the witness not to answer, including on grounds outside FRCP 30(c)(2) such as "outside the scope" and "calls for a legal conclusion" (Tr. 173). On 17 occasions, defending counsel told the witness she "can answer if [she] know[s] the answer" or used a similar formulation that signaled to the witness whether and how to respond. Counsel also told the witness repeatedly to answer on behalf of herself, instead of Apple, and argued to Plaintiff that it was proper to convert a Rule 30(b)(6) deposition to an individual deposition and improper for Plaintiff to object.

Representative examples include:

- **Testifying through objection.** "[A]s part of the statement as to what the reasons for the termination as known by Apple Inc., she obviously has to rely on Mr. Bertolus's testimony since he was the main decision-maker, so she cannot distinguish between what Mr. Bertolus said and Apple's knowledge since Apple's knowledge is what Mr. Bertolus said." (Tr. 49–50.) "There was one decision-maker. It was Mr. Bertolus. He made the decision. He relied on information received from other people. But there was only one decision-maker." (Tr. 50.)
- **Restating the witness's position.** "The witness is saying the fact that you had an NLRB investigation had nothing to do with the decision to require you to talk to them. . . . So you're putting the two together, and the witness keeps saying no, the fact that you had an NLRB charge had nothing to do with the fact that we expected, Apple expected, witnesses to talk to the investigators." (Tr. 104.)
- **Personal factual assertions by counsel.** "I have not seen anything that says that Apple did not know about 'The Verge' article." (Tr. 83.) "[T]he fact that, as I know it and as happened, is you did disclose the confidential information, you did refuse to speak, and you did provide misleading information." (Tr. 207.) "We have provided you with the text that you provided. We've explained to you why it's misleading." (Tr. 157.)
- **Argumentative remarks toward Plaintiff.** "Everything else you said was just absolutely false." (Tr. 156.) "There's so much wrong with that question, I just don't even know where to start." (Tr. 156; similar at Tr. 340.) "Don't misstate the testimony of the witnesses. That's not fair." (Tr. 122.) "[T]his is not — . . . You're asking this witness who has no knowledge about which is which to deduce something based on some exhibit that she's never seen before." (Tr. 236.)
- **Instructions not to answer on improper grounds.** Tr. 173 (instructing on the basis that the question "calls for a legal conclusion"); Tr. 250 (instructing on the basis that the topic was not within the witness's designation, combined with privilege); Tr.

222 (instructing on the basis of "outside the topics of this deposition" combined with privilege); Tr. 324 (instructing on grounds of "outside the scope" combined with privilege).

The designee herself adopted a similar pattern, including remarking that Plaintiff "[doesn't] like the answer" when Plaintiff pressed an unanswered question (Tr. 329), characterizing Plaintiff's questions as "absolutely convoluted" (Tr. 294), and repeatedly accusing Plaintiff of "conflating" or "assuming" matters (Tr. 198, 295, 296, 301, 312) in lieu of providing responsive testimony.

The cumulative effect was that approximately, at least, an hour of a seven-hour deposition were consumed by speaking objections of more than 20 words and by colloquy provoked by them, and the designee left numerous questions unanswered. *Hall v. Clifton Precision*, 150 F.R.D. at 528–32, condemns each of these practices specifically. Sanctions under Rule 30(d)(2) are available for any person who impedes, delays, or frustrates the fair examination of a deponent.

**Plaintiff seeks:** Apple's agreement that, in the event a further Rule 30(b)(6) session goes forward and at any further depositions in this case, (a) defending counsel will limit objections to concise, non-suggestive form; (b) defending counsel will instruct the witness not to answer only on the grounds enumerated in Rule 30(c)(2); (c) defending counsel will refrain from testifying, restating the witness's position, making personal factual assertions, characterizing Plaintiff's questions or motives, or signaling to the witness whether or how to respond; and (d) the witness will respond to questions rather than characterize them.

### Supplementation of pending privilege dispute

The parties' pending final dispute resolution submission to Magistrate Judge Westmore concerning Apple's invocation of attorney-client privilege over the investigations of Plaintiff's complaints is directly affected by the May 12 deposition record. Plaintiff intends to supplement that submission to include the deposition transcript and the specific privilege invocations made therein. This letter provides notice of that intention so the parties may also confer regarding the timing and form of supplementation.

Plaintiff reserves all rights, including the right to seek relief from the Court if the parties cannot resolve these matters informally, and will plan to seek assistance from the Court within five days of the start of this meet-and-confer as needed, per the Judge's Standing Order and discovery orders in this matter.

Sincerely,

- Ashley M. Gjovik

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

> **From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
> **Sent:** Sunday, May 17, 2026 8:53 AM
> **To:** Booms, Ryan <rbooms@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Perry, Jessica R. <jperry@orrick.com>
> **Subject:** Gjovik v. Apple Inc., No. 3:23-cv-04597-EMC (N.D. Cal.) Meet-and-Confer Pursuant to Civil L.R. 37-1(a)

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.